# 25-0643-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## JOINT APPENDIX
### Volume 36 of 43 (Pages A-8751 to A-9000)

---

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
*Attorneys for Plaintiffs-Counter-*
*Defendants-Appellees*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant-*
*Appellant NHF TRS, LLC and*
*Defendant-Counter-Claimant-*
*Appellant Nexpoint Diversified*
*Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

*(For Continuation of Appearances See Inside Cover)*

 (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Counter-Defendant-
Appellee*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Amended Complaint, dated and filed
February 23, 2022 ................................. A-56

Exhibit A to Amended Complaint -
Bench Ruling and Memorandum of Law In
Support of (A) Final Approval of Disclosure
Statement; and (B) Confirmation of Chapter 11
Trustee's Third Amended Joint Plan, in re: *Acis
Capital Management, L.P., Debtor,* Case No. 18-
30264-SGJ-11, and in re: *Acis Capital
Management GP, L.L.C., Debtor*, Case No. 18-
30265-SGJ-11, dated January 31, 2019 ................. A-80

Exhibit B to Amended Complaint -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021 ................................. A-128

Exhibit C to Amended Complaint -
Letter of Bonds Ellis Eppich Schafer Jones LLP
to Court, dated September 23, 2020 ..................... A-160

Exhibit D to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019 ............................ A-163

Exhibit E to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Shana Sethi,
dated August 6, 2019 ............................................ A-170

ii

**Page**

Exhibit F to Amended Complaint - Plaintiff's Second Amended Complaint and Jury Demand in *The Charitable Donor Advised Fund, L.P., v. U.S. Bank National Association, et al.*, Case No. 1:19-CV-09857-NRB ............................ A-179

Exhibit G to Amended Complaint - Plaintiffs' Original Complaint in *The Charitable Donor Advised Fund, L.P., and CLO HOLDCO, Ltd. v. U.S. Bank National Association, et al.*, Case No. 1:20-cv-1036 ........................................... A-212

Exhibit H to Amended Complaint - Letter of Myers Bigel to Mark Kotwick, dated May 8, 2020 ............................................................ A-246

Exhibit I to Amended Complaint - Plaintiff's Second Amended Complaint, *NexPoint Strategic Opportunities Fund v. Acis Capital Management, L.P., et al.*, Case No. 1:21-cv-04384-GHW .......................................... A-254

Exhibit J to Amended Complaint - Letter of Quinn Emanuel to The Charitable Donor Advised Fund, L.P. and Others, dated December 28, 2021 ..................................... A-296

Exhibit K to Amended Complaint - Letter of Parsons McEntire McCleary PLLC to Jonathan E. Pickardt and Mark D. Kotwick, dated January 10, 2022 .................................... A-299

Exhibit L to Amended Complaint - Settlement Agreement, dated April 28, 2021 ......... A-302

iii

**Page**

Exhibit M to Amended Complaint -
Order Approving Debtor's Settlement with (A)
Acis Capital Management, L.P. and Acis Capital
Management GP LLC (Claim No. 23), (B)
Joshua N. Terry and Jennifer G. Terry (Claim No.
156), and (C) Acis Capital Management, L.P.
(Claim No. 159) and Authorizing Action
Consistent Therewith, dated October 7, 2020........   A-329

Exhibit N to Amended Complaint -
Memorandum Opinion and Order Granting in
Part Plaintiff's Motion to Hold James Dondero in
Civil Contempt of Court for Alleged Violation of
TRO in re: *Highland Capital Management, L.P.,
Debtor,* Case No. 19-34054-sgj-11, and *Highland
Capital Management, L.P. v. Dondero*, Case No.
20-03190-sgj11, dated June 7, 2021 .....................   A-354

Exhibit O to Amended Complaint -
Transcript of Proceedings in re: *Highland Capital
Management, L.P., Debtor*, Case No. 19-34054-
sgj-11, dated June 25, 2021 ..................................   A-410

Exhibit P to Amended Complaint -
Acis Capital Management, L.P.'s Memorandum
of Law in Support of its Motion to Dismiss
Plaintiff's Second Amended Complaint and for
Attorneys' Fees and Costs, dated January 27,
2022, *NexPoint Strategic Opportunities Fund v.
Acis Capital Management, L.P., et al.*, Case No.
1:21-cv-04384-GHW ...........................................   A-533

iv

**Page**

Order on Plaintiffs' Unopposed Motion to Amend
Caption, dated March 26, 2022.............................. A-562

Defendants the Charitable Donor Advised Fund,
L.P., and CLO HoldCo, Ltd.'s Amended Answer
and Counterclaim, dated and filed
March 30, 2023 ...................................................... A-563

Amended Answer of Defendant/Counter-Plaintiff
NexPoint Diversified Real Estate Trust to
Amended Complaint, dated March 30, 2023......... A-597

Exhibit 1 to Amended Answer -
Indenture, dated April 16, 2015 ............................ A-656

Exhibit 2 to Amended Answer -
Portfolio Management Agreement, dated
April 16, 2015, labeled Exhibit 2.......................... A-985

Exhibit 3 to Amended Answer -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019, labeled
Exhibit E .............................................................. A-1037

Notice of Defendant/Counter-Plaintiff NexPoint
Diversified Real Estate Trust for Leave to Add
Party, dated and filed April 10, 2023 .................... A-1043

Order of Honorable Gregory H. Woods, dated
May 1, 2023 and filed May 2, 2023...................... A-1043.1

Notice of Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023............... A-1044

Declaration of Blair A. Adams, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023............... A-1047

v

**Page**

Exhibit 1 to Adams' Declaration -
Transcript of Hearing, dated February 23, 2023.... A-1051

Exhibit 2 to Adams' Declaration -
Second Amended Complaint (Including Claim
Objections and Objections to Administrative
Expense Claim), *Acis Cap. Mgmt. L.P. and Acis
Cap. Mgmt. GP, LLC v. Highland Cap. Mgmt.,
L.P., et al.*, Adv. Pro. No. 18-03078, dated
June 20, 2019 ........................................................ A-1084

Exhibit 3 to Adams' Declaration -
Agreement, dated February 28, 2023 ................... A-1193

Exhibit 4, Part 1, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015........................................................ A-1257

Exhibit 4, Part 2, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 *continued* ....................................... A-1367

Exhibit 5 to Adams' Declaration -
Transcript of Proceedings, dated May 1, 2023 ...... A-1379

Exhibit 6, Part 1, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017.................................................... A-1425

Exhibit 6, Part 2, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1432

vi

**Page**

Exhibit 6, Part 3, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1439

Exhibit 6, Part 4, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1446

Exhibit 7 to Adams' Declaration -
Order Granting Senior Certificate Holders'
Motion for Summary Judgment and Denying
Junior Certificate Holders' Motion for Summary
Judgment, *In the Matter of the Trust Established
Under the Pooling and Service Agreement
relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage Pass-
Through Certificates, Series 2007-C30*, Case No.
62-TR-CV-19-33, dated October 26, 2022 .......... A-1454

Exhibit 8 to Adams' Declaration -
Ruling in *In re Acis Cap. Mgmt., L.P.*, 18-30264-
SGJ-11, dated August 30, 2018 ............................ A-1473

Exhibit 9 to Adams' Declaration -
Portfolio Management Agreement, dated
June 5, 2014 ........................................................... A-1481

Exhibit 10 to Adams' Declaration -
Indenture, dated June 5, 2014, paginated bottom
center as Exhibit 3, Page 1 of 421 ........................ A-1534

Exhibit 11 to Adams' Declaration -
Portfolio Management Agreement, dated
November 18, 2014 ............................................... A-1956

vii

**Page**

Exhibit 12 to Adams' Declaration -
Indenture, dated November 18, 2014, paginated
bottom center as Exhibit 4, Page 1 of 335 ............. A-2008

Exhibit 13 to Adams' Declaration -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021
(Reproduced herein at pp. XXX – EX B)

Exhibit 14 to Adams' Declaration -
Original Complaint, *NexPoint Diversified Real
Estate Trust v. Acis Capital Management, L.P., et
al.*, dated October 3, 2022..................................... A-2344

Exhibit 15 to Adams' Declaration -
Notice of Appeal, *In re Acis Capital
Management, LP.*, Appeal No. 19-10847, dated
July 26, 2019 .......................................... A-2392

Exhibit 16 to Adams' Declaration -
Opening Brief of Appellant Highland CLO
Funding, LTD, in above appeal, dated
September 20, 2019 ................................ A-2396

Exhibit 17 to Adams' Declaration -
Memorandum of Law in Support of Defendant
U.S. Bank, National Association's Motion to
Dismiss the Second Amended Complaint,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2473

viii

**Page**

Exhibit 18 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding LTD.'s Motion to Intervene,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated November 24, 2021 .......... A-2499

Exhibit 19 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding Ltd.'s Motion to Dismiss,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022 ............... A-2521

Declaration of Jonathon Milne, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 16, 2023 ............... A-2543

Exhibit 1 to Milne's Declaration -
Sections 12, 25(3), 28(1), 38, 46 and 48 of the
Cayman Islands Companies Act ........................... A-2569

Exhibit 2 to Milne's Declaration -
*In the Matter of Lancelot Investors Fund Limited
(In Official Liquidation)* [2015] (1) CILR 328 ...... A-2576

Exhibit 3 to Milne's Declaration -
*Marex Financial Ltd. v Sevilleja* [2020]
UKSC 31 .................................................................. A-2599

Exhibit 4 to Milne's Declaration -
*Primeo Fund v Bank of Bermuda (Cayman) Ltd*
[2021] UKPC 22 ..................................................... A-2682

Exhibit 5 to Milne's Declaration -
*Renova Resources Private Equity Limited v
Gilbertson* [2009] CILR 268 ................................. A-2713

ix

Page

Exhibit 6 to Milne's Declaration -
Order 15, rule 12A of the Grand Court Rules........ A-2745

Exhibit 7 to Milne's Declaration -
*Birch v Sullivan* [1957] 1 WLR 1247 ................... A-2749

Exhibit 8, Part 1, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ)........................... A-2754

Exhibit 8, Part 2, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2774

Exhibit 8, Part 3, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2794

Exhibit 8, Part 4, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2813

Exhibit 8, Part 5, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2829

Exhibit 9 to Milne's Declaration -
*Foss v Harbottle* (1843) 2 Hare 461 ..................... A-2847

Exhibit 10 to Milne's Declaration -
*Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204 .................... A-2868

Exhibit 11 to Milne's Declaration -
*Johnson v Gore Wood & Co* [2000] UKHL 65 ...... A-2902

Exhibit 12 to Milne's Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-2948

x

**Page**

Exhibit 13 to Milne's Declaration -
Sections 994 to 996 of the UK Companies Act
2006 ........................................................................ A-3131

Exhibit 14 to Milne's Declaration -
*Kuwait Ports Authority et al. v Port Link GP Ltd
et al.* (Court of Appeal 20 January 2023 decision)   A-3135

Exhibit 15 to Milne's Declaration -
*Rolled Steel Products (Holdings) Ltd v British
Steel Corp* [1986] Ch. 246 ...................................... A-3204

Exhibit 16 to Milne's Declaration -
*Nurcombe v. Nurcombe* [1985] 1 370 .................... A-3270

Exhibit 17 to Milne's Declaration -
*Portfolios of Distinction v Laird* [2004]
2 BCLC 741 ............................................................. A-3284

Exhibit 18 to Milne's Declaration -
*Schultz v Reynolds* [1992-93] CILR 59 ................. A-3308

Exhibit 19 to Milne's Declaration -
*Berland v Earle* [1902] AC 83 ............................... A-3333

Exhibit 20 to Milne's Declaration -
*Harris v Microfusion* [2017] 1 B.C.L.C. 305 ........ A-3355

Exhibit 21 to Milne's Declaration -
*Top Jet Enterprises Limited v Sino Jet* [2018] (1)
CILR 18 ................................................................... A-3370

Exhibit 22 to Milne's Declaration -
*Estmanco (Kilner House) Ltd v G.L. C.* [1982] 1
W.L.R. 2 .................................................................. A-3405

Exhibit 23 to Milne's Declaration -
*Cook v Deeks* [1916] 1 AC 554 ............................. A-3420

xi

**Page**

Exhibit 24 to Milne's Declaration -
*Pavlides v. Jensen* [1956] 2 All ER 518................. A-3433

Exhibit 25 to Milne's Declaration -
*Menier v Hooper's Telegraph Works* LR 9 Ch
App 350 .................................................. A-3440

Exhibit 26 to Milne's Declaration -
*Heyting v Dupont* [1964] 1 W.L.R. 843................. A-3446

Exhibit 27 to Milne's Declaration -
*Burnford et al. v Automobile Association
Developments Limited* [2022] EWCA Civ 1943 ... A-3460

Exhibit 28 to Milne's Declaration -
*De Sena & Anor v Notaro & Ors* [2020] EWHC
1031 (Ch)................................................. A-3482

Exhibit 29 to Milne's Declaration -
*Williams v Natural Life Health Foods Ltd* [1998]
1 WLR 830................................................ A-3558

Declaration of Todd William McGuffin, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed May 16, 2023 ......... A-3569

Exhibit 1 to McGuffin Declaration -
*Morton v Paint* [1996] 21 GLJ 61 ........................ A-3582

Exhibit 2 to McGuffin Declaration -
*Flightlease Holdings (Guernsey) Ltd v
Flightlease (Ireland) Ltd* [2009–10] GLR 38 ........ A-3608

Exhibit 3 to McGuffin Declaration -
*Perpetual Media Capital Limited v Enevoldsen,*
[2014] GLR 57............................................. A-3646

xii

**Page**

Exhibit 4 to McGuffin Declaration -
*Prodefin Trading Limited v Midland Resources*
Royal Court, 14 February 2017, Judgement
7/2017, unreported ................................................. A-3675

Exhibit 5 to McGuffin Declaration -
*Fonds v GRCF* [2022] GRC 039 ........................... A-3701

Exhibit 6 to McGuffin Declaration -
*Carlyle Capital Corporation Limited v Conway*
*& Ors* Royal Court, 4 September 2027, Judgment
38/2017, unreported ................................................. A-3726

Exhibit 7 to McGuffin Declaration -
*Jackson v Dear* (2013) GLR 167 ........................... A-4197

Exhibit 8 to McGuffin Declaration -
*Pilatus (PTC) Limited v RBC Trustees*
*(Guernsey) Limited* [2021] GRC 063 .................... A-4222

Exhibit 9 to McGuffin Declaration -
*Apex Global Management Limited v Fi Call*
*Limited* [2015] EWHC 3269 (Ch) ......................... A-4233

Exhibit 10 to McGuffin Declaration -
*Re Coroin Limited* (No 2) [2012] EWHC 2343
(Ch) .......................................................................... A-4288

Exhibit 11 to McGuffin Declaration -
*Grace v Biagioli* [2005] EWCA Civ 1222 ............. A-4447

Exhibit 12 to McGuffin Declaration -
*Rock (Nominees) Limited v RCO (Holdings) plc*
[2004] EWCA Civ 118 ............................................ A-4478

Exhibit 13 to McGuffin Declaration -
*Re Saul D Harrison & Sons plc* [1994] BCC 475 . A-4496

xiii

**Page**

Exhibit 14 to McGuffin Declaration -
*Apex v Fi Call Ltd* [2014] BCC 286 ..................... A-4524

Exhibit 15 to McGuffin Declaration -
*Zedra Trust Company (Jersey) Limited v The Hut
Group Limited* [2020] EWHC 5 ........................... A-4565

Exhibit 16 to McGuffin Declaration -
*Peskin v Anderson* [2001] BCC 874 ..................... A-4591

Exhibit 17 to McGuffin Declaration -
*Sharp v Blank* [2015] EWHC 3220 ..................... A-4607

Exhibit 18, Part 1, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22 ..... A-4624

Exhibit 18, Part 2, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22,
*continued*................................................................. A-4643

Exhibit 19 to McGuffin Declaration -
*Foss v Harbottle* [1843] 2 Hare 461 ..................... A-4663

Exhibit 20 to McGuffin Declaration -
*Marex Financial Ltd v Sevilleja* [2020] UKSC 31 A-4684

Exhibit 21 to McGuffin Declaration -
*Prudential Assurance Co. Ltd. v Newman
Industries Ltd. and Others* (No. 2) [1982] Ch 204 A-4767

Exhibit 22 to McGuffin Declaration -
*Renova Resources v Gilbertson* [2009] CIFsd 10.. A-4806

Notice of Motion of Counter-Defendant Brigade
  Capital Management, LP's ("Brigade") to
  Dismiss the Counterclaims of Defendant
  NexPoint Diversified Real Estate Trust against
  Brigade, dated and filed May 31, 2023.................. A-4869

xiv

**Page**

Declaration of Jason C. Hegt, Esq., in Support of
    Brigade's Motion to Dismiss, dated and filed
    May 31, 2023 ........................................................  A-4871

Exhibit 1 to Hegt Declaration -
Indenture, dated April 16, 2015, paginated
bottom center as "Exhibit 5, Page 1 of 329" .........  A-4873

Exhibit 2 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
February 9, 2023  .................................................  A-5203

Exhibit 3 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
January 4, 2022 ....................................................  A-5211

Declaration of Mazin A. Sbaiti, Esq., in Opposition
    to Plaintiffs' Motion to Dismiss Defendants'
    Counterclaims and for Judgment on the
    Pleadings, dated and filed June 14, 2023 ...............  A-5217

Exhibit 1 to Sbaiti Declaration -
Indenture, dated April 16, 2015, labeled as
Exhibit 1 ................................................................  A-5219

Exhibit 2 to Sbaiti Declaration -
Offering Circular relating to the offering of the
Co-Issued Notes of ACIS CLO 2015-6 Ltd. and
ACIS CLO 2015-6 LLC and the Issuer Notes of
ACIS CLO 2015-6 Ltd. dated April 14, 2015 .......  A-5548

Exhibit 3 to Sbaiti Declaration -
Portfolio Management Agreement, dated
April 16, 2025, labeled Exhibit 3 ..........................  A-5768

xv

**Page**

Exhibit 4 to Sbaiti Declaration -
Red-lined version of Amended Complaint, *U.S. Bank National Association, et al. v The Charitable Donor Advised Fund, L.P., et al.*, Case No. 1:21-cv-11059-GHW, dated and filed February 23, 2022 ................................................. A-5820

Exhibit 5 to Sbaiti Declaration -
Excerpt from *Tianrui (Int'l) Holding Co. Ltd. v. China Shanshui Cement Grp. Ltd.*, Grand Court of the Cayman Is., April 6, 2020 ........................... A-5844

*Declaration of Bhavesh Narendra Patel, Esq., in Opposition to Plaintiffs' Motion to Dismiss Defendants' Counterclaims and for Judgment on the Pleadings, dated and filed June 14, 2023 ......... A-5917

Exhibit 1 to Patel Declaration -
*Islena Airlines v Jefferson* [1998 CILR 148] ......... A-5942

Exhibit 2 to Patel Declaration -
Section 14(1) of the Exempted Limited Partnerships Act, (2022 Revision) ......................... A-5955

Exhibit 3 to Patel Declaration -
Sections of Cayman Islands Companies Act (2023 Revision) ...................................... A-5959

Exhibit 9 to Patel Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-5970

Exhibit 22 to Patel Declaration -
*Scott v Metropolitan Police Commissioner* [1974] UKHL 4 ................................................ A-6096

Exhibit 25 to Patel Declaration -
*Watson v Kea Investments* [2019] EWCA Civ 1759 ......................................................... A-6106

xvi

**Page**

Exhibit 28 to Patel Declaration -
Cayman Grand Court Rules, Order 15, Rule 12A . A-6130

Reply Declaration of Jonathon Milne, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 28, 2023 ........ A-6133

Exhibit 1 to Milne's Reply Declaration -
*Snell's Equity* ............................................................ A-6161

Exhibit 2 to Milne's Reply Declaration -
Lewis on Trusts ...................................................... A-6166

Exhibit 3 to Milne's Reply Declaration -
*Knight v Knight* ...................................................... A-6172

Exhibit 4 to Milne's Reply Declaration -
*Hunter v Moss* ........................................................ A-6188

Exhibit 5 to Milne's Reply Declaration -
*Grand View Private Trust Co. Ltd. et al. v
Wen-Young Wong, et al.* .......................................... A-6200

Exhibit 6 to Milne's Reply Declaration -
*In the Matter of the Ta-Ming Wang Trust* .............. A-6243

Exhibit 7 to Milne's Reply Declaration -
*Helen Gorbunova v The Estate of Boris
Berezovsky, et al.* .................................................... A-6256

Exhibit 8 to Milne's Reply Declaration -
*In re Empress Engineering Company* .................... A-6283

Exhibit 9 to Milne's Reply Declaration -
*Neste Oy v Lloyds Bank PLC* ................................ A-6290

Exhibit 10 to Milne's Reply Declaration -
*Steven Anthony Pearson, et al. v Lehman
Brothers Finance SA, et al.* .................................... A-6301

xvii

**Page**

Exhibit 11 to Milne's Reply Declaration -
*Chanan Singh Thandi v. Mark Sands and Andrew
Appleyard* ............................................................. A-6399

Exhibit 12 to Milne's Reply Declaration -
*Grupo Torras S.A. and Torras Hostench London
Limited v. Bank of Butterfield International
(Cayman) Limited and Five Others* ....................... A-6421

Exhibit 13 to Milne's Reply Declaration -
*Bailey and another v. Angove's PTY Limited* ......... A-6443

Exhibit 14, Part 1, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al.* .......................................................... A-6463

Exhibit 14, Part 2, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al. continued* .......................................... A-7363

Exhibit 15, Part 1, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL)* ................................................ A-8366

Exhibit 15, Part 2, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL) continued* ............................... A-8397

Exhibit 16, Part 1, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another* ....................... A-8429

Exhibit 16, Part 2, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another continued* ...... A-8460

Exhibit 17 to Milne's Reply Declaration -
*Pearson v. Primeo Fund* ........................................ A-8487

xviii

**Page**

Exhibit 18 to Milne's Reply Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ..................................................... A-8513

Exhibit 19 to Milne's Reply Declaration -
*Secretary of State for Trade and Industry and
another* .................................................................. A-8517

Exhibit 20 to Milne's Reply Declaration -
*China Shanshui Cement Group Limited v. Tianrui
(International) Holding Company Limited* ............ A-8542

Exhibit 21 to Milne's Reply Declaration -
*GAO v. China Biologic Products Holdings
Incorporated* ......................................................... A-8561

Exhibit 22 to Milne's Reply Declaration -
*West Mercia Safetywear Ltd (in liq) v Dodd and
another* .................................................................. A-8604

Exhibit 23 to Milne's Reply Declaration -
*Svanstrom and Nine Others v. Jonasson* ............... A-8611

Exhibit 24 to Milne's Reply Declaration -
Directors' Duties, Creditors' Rights and
Shareholder Intervention ....................................... A-8629

Exhibit 25, Part 1, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al.* ....................................................... A-8663

Exhibit 25, Part 2, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ...................................... A-8711

Exhibit 25, Part 3, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ...................................... A-8759

xix

Page

Exhibit 25, Part 4, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments*
*Limited, et al. continued* ........................................ A-8806

Exhibit 26 to Milne's Reply Declaration -
*Monsolor 1Q Ltd. v Woden Park Ltd.* .................... A-8825

Exhibit 27 to Milne's Reply Declaration -
*Chartbook Limited v. Persimmon Homes Limited*
*and Others and Another* ........................................ A-8842

Exhibit 28, Part 1, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.* ...... A-8885

Exhibit 28, Part 2, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.*
*continued* ............................................................... A-8932

Exhibit 28, Part 3, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.*
*continued* ............................................................... A-8974

Exhibit 28, Part 4, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.*
*continued* ............................................................... A-9014

Exhibit 29 to Milne's Reply Declaration -
*Yeoman's Row Management Limited and Another*
*v Cobbe* ................................................................. A-9027

Exhibit 30 to Milne's Reply Declaration -
*Mutter v. Eastern and Midlands Railway*
*Company* ................................................................ A-9080

Exhibit 31 to Milne's Reply Declaration -
*Peak Hotels and Resorts Limited v. Tarek*
*Investments Limited, et al.* ..................................... A-9097

**xx**

**Page**

Second Declaration of Bhavesh Narendra Patel in
Opposition to the Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings on Plaintiffs' Claims, dated and
filed July 19, 2023 ................................................ A-9126

Exhibit 1 to Second Declaration -
*Arnold* v. *Britton* [2015] UKSC 36 ........................ A-9140

Exhibit 2 to Second Declaration -
*Al Sadik v Investcorp Bank BSC & Ors*
*[2017 (1) CILR 1])* ................................................ A-9189

Exhibit 3 to Second Declaration -
*Williams v Central Bank of Nigeria* [2014]
UKSC 10 ................................................................ A-9342

Exhibit 4 to Second Declaration -
*Broadcasting Investment Group Ltd v Smith*
[2021] EWCA Civ 912, [2022] 1 WLR 1 .............. A-9406

Stipulation and Proposed Order Regarding Addition
of NHF TRS, LLC as Party, filed
October 31, 2023 .................................................. A-9427

Exhibit A to Stipulation-
Counter-Plaintiffs NexPoint Diversified Real
Estate Trust and NHF TRS LLC's First Amended
Counterclaim, dated October 24, 2023 .................. A-9434

Exhibit B to Stipulation-
Second Amended Complaint, dated
October 31, 2022 .................................................. A-9487

Stipulation and Order Regarding Addition of NHF
TRS, LLC as Party, dated October 31, 2022 and
filed November 1, 2023 ........................................ A-9512

xxi

Page

Stipulation of Voluntary Dismissal, dated and filed
  March 10, 2025........................................................ A-9518

Notice of Appeal of NexPoint Diversified Real
  Estate Trust, dated and filed March 18, 2025 ........ A-9522

Amended Notice of Appeal of NexPoint Diversified
  Real Estate Trust and NHF TRS LLC, dated and
  filed March 26, 2025............................................. A-9524


**<u>*Additional Exhibits to Declaration of
Bhavesh Narendra Patel, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023</u>**

Exhibit 4 to Patel Declaration -
  Re Hydrodam (Corby) Ltd.................................... A-9526

Exhibit 5 to Patel Declaration -
  Omni Securities Limited....................................... A-9531

Exhibit 6 to Patel Declaration -
  Hutchinson Limited v Cititrust & Ors .................. A-9553

Exhibit 7 to Patel Declaration -
  Whar-Hansen v Bridge Trust Company................. A-9575

Exhibit 8 to Patel Declaration -
  Ritter v Butterfield Bank ..................................... A-9592

Exhibit 10 to Patel Declaration -
  AHAB v SAAD Investment Company.................. A-9634

Exhibit 11 to Patel Declaration -
  Westdeutsche Landesbank v Islington London ..... A-9910

xxii

**Page**

Exhibit 12 to Patel Declaration -
Ernst & Young v FOI Officer................................. A-9983

Exhibit 13 to Patel Declaration -
Kuwait Ports Authority v Port Link GP Ltd .......... A-10016

Exhibit 14 to Patel Declaration -
Prudential Assur Co v Newman Indus................... A-10084

Exhibit 15 to Patel Declaration -
Marex Financial v Sevilleja .................................. A-10160

Exhibit 16 to Patel Declaration -
Russell v Wakefield Water Works.......................... A-10232

Exhibit 17 to Patel Declaration -
MacDougall v Gardiner ......................................... A-10242

Exhibit 18 to Patel Declaration -
Tempo Group v Fortuna Development .................. A-10246

Exhibit 19 to Patel Declaration -
FamilyMart China v Yin-Hen Wei........................ A-10385

Exhibit 20 to Patel Declaration -
Burland v Earle ..................................................... A-10418

Exhibit 21 to Patel Declaration -
Schultz v Reynolds & Newport ............................. A-10439

Exhibit 23 to Patel Declaration -
Merkanti v Raiffeisen Bank .................................. A-10463

Exhibit 24 to Patel Declaration -
H1 of Tolleys on Administration of Trusts ........... A-10487

Exhibit 26 to Patel Declaration -
Cayman Trusts Act................................................. A-10537

Exhibit 27 to Patel Declaration -
Re China Milk........................................................ A-10539

Quinlan's shares. Mr Murphy forwarded to Mr Lukas the statement issued on Mr Quinlan's behalf, correcting the article which had appeared in the Irish Times and making clear that Mr Quinlan had not yet agreed to sell his shares in the company. In the accompanying email Mr Murphy said "*Yes, Peter that is exactly the position. We will not be selling Derek Quinlan's shares unless there is a full sale. However, we are joined at the hip and will be supporting Misland (Barclays) and so one could say that there is now a very solid block of 60% plus*". It seems to me clear that Mr Murphy is saying that Mr Quinlan has not sold his shares to the Barclay interests or anyone else, but is closely allied with and supporting the Barclay interests.

351.   The final major area of evidence relied on in support of the alleged agreement made on 15 January 2011 is the conduct of Mr Quinlan after that date which, it is said, is reasonably explicable only if the agreement had been made.

352.   First, it is said that Mr Quinlan and Mr Murphy discharged their functions as a director or alternate director in a manner which mirrored or followed the actions of Mr Faber. It is to be inferred, Mr McKillen alleges, that Mr Quinlan and Mr Murphy were acting on instructions from the Barclay interests. It is said that there were no occasions on which Mr Quinlan acted otherwise than in accordance with the interests and wishes of the Barclay interests. In fact, there were only two board meetings of which complaint is made in the period between 15 January 2011 and 16 May 2011 when Mr Quinlan ceased to be a director. They were on 25 January and 8 February 2011. There does not appear to have been any divisive issue or any question on which Mr Quinlan could demonstrate partisan support for the Barclay interests, save possibly for a division of opinion at the meeting of 8 February 2011 as to whether the data room should remain closed. With the exception of the data room issue and the release of Deutsche Bank, it was not argued, and never put to Mr Quinlan, that he took any decision in his capacity as a director other than in what he considered to be the best interests of the company.

353.   Secondly, reliance is placed on some email exchanges between Mr Faber and Mr Murphy on 23 January 2011 preparatory to the board meeting fixed for 25 January 2011. Mr Faber spoke of needing to talk about how "*we handle the board meeting given PMcK stand point re: Q*" (referring to the Qataris) and of wanting to use the board meeting "*to get some resolutions passed*". He met Mr Faber on 24 January 2011 "*to run through the board matters for tomorrow*". In fact, as I have mentioned, there was no contentious business at the board meeting and it is not clear which issues Mr Faber wished to discuss. To my mind, the tenor of these exchanges is not that of instructions being given by a person with a contractual entitlement to do so but of one shareholder/director seeking the co-operation of another shareholder/director at a forthcoming board meeting. There is no dispute that Mr Quinlan was co-operating with the Barclay interests but these emails and text messages appear to me to go no further than that.

354.   Thirdly, reliance is placed on Mr Murphy's co-operation in obtaining a release for Deutsche Bank from the company. The background is that Deutsche Bank had during 2010 been discussing with the company terms for a refinancing of the NAMA debt. In January 2011, the Barclay interests wished to negotiate with Deutsche Bank for the grant of facilities to finance the purchase of shares and to refinance the NAMA debt. Deutsche Bank required a formal release from the company. It is not suggested that there was any good reason why Deutsche Bank

should not be released for this purpose and in fact the shareholders agreed to its release, although it is said on behalf of Mr McKillen that he did not appreciate that Deutsche Bank would be working with the Barclay interests. The points principally relied on in this connection are: first, an email from Mr Faber to Deutsche Bank on 1 February 2011, saying "*we will ask Derek's advisor under power of attorney for him, to release the Bank*"; secondly, the speed with which Mr Kelly on behalf of Mr Quinlan agreed to the release once he received an email from Mr Hennebry raising the point; and thirdly, a further email from Mr Faber saying that it was he who had asked Deutsche Bank to be released from the company and adding "*please write supporting to release them*". None of this suggests that Mr Quinlan was under an obligation to support the release. It is consistent with the release being an unobjectionable step and with Mr Quinlan co-operating to achieve it.

355.    Fourthly, Mr McKillen relies on the grant by Mr Quinlan of a charge on a small number of shares which he had acquired in 2009 from Mr McLaughlin under the operation of the pre-emption provisions. This further charge was granted by a deed dated 1 February 2011, two days after the transfer by BOSI of its secured debt to Ellerman. It was Mr Quinlan who suggested to the Barclay interests that this further charge be granted. Mr Quinlan's evidence was that he believed that BOSI had been entitled to a charge on these shares, although they had overlooked that entitlement. Mr McKillen has not sought to disprove this evidence by reference to the relevant documentation. Mr Quinlan could of course have let sleeping dogs lie but I think it likely that he preferred those shares to be charged in favour of the Barclay interests rather than in favour of NAMA, which would have required a charge if it had become aware that the shares were unencumbered. Indeed, a week later, on 8 February 2011, NAMA did seek a charge on the shares but Ellerman was able to inform it that they were charged to it, with a covenant by Mr Quinlan not to grant any further security. I have difficulty in understanding how this episode can support the existence of the agreement allegedly made on 15 January 2011.

356.    Fifthly, reliance is placed on the acquisition by the Barclay interests of Mr Quinlan's debt to BOSI secured over part of his shareholding. I have earlier summarised the evidence relating to this transfer. It was Mr Quinlan who sought to persuade the Barclay interests that they should take an assignment of this debt and the Barclay interests decided to do so in order to forestall its acquisition by any other party interested in acquiring control of the company. The Barclay interests had to pay a premium for this debt over the value attributable to the charged shares on the basis of an enterprise value of £900 million. It is suggested on behalf of Mr McKillen that the Barclay interests were prepared to do this only because they had the benefit of the agreement allegedly made on 15 January 2011. In my view, this does not follow. Whether or not there was the alleged agreement, the Barclay interests had good commercial reasons for acquiring this secured debt. In particular, once the security holder was registered as the holder of the charged shares, it could exercise the right to appoint a director. On any basis, the Barclay interests would not wish this power to be exercisable by a potential competitor for control of the company.

357.    Sixthly, Mr McKillen relies on Mr Quinlan's failure to encourage and pursue alternative offers, either when he entered into the exclusivity agreement, or when he supported the closure of the data room at the end of January 2011  or when the

exclusivity period expired on 16 February 2011. This presupposes that anyone considered that there were any credible bidders available other than the Barclay interests and the Qataris. He decided to deal with the Barclay interests rather than the Qataris for the reasons already given. He and Mr Murphy did not consider a deal with Sheikh Mansour was possible for reasons already given, and it is to be noted that Mr McKillen did not pursue any negotiations with Sheikh Mansour. PCP Capital Partners was not taken seriously by any of the shareholders.

358.    The only possible candidate as another bidder was the Malaysian group, Wynton. Although the Green family showed interest when Wynton made an approach in early January 2011, neither Mr Quinlan nor, significantly, Mr McKillen considered that it had any credibility. Their proposal to fund the purchase by £900 million of debt and only £100 million of equity was regarded as unrealistic. Mr McKillen said in evidence *"The Malaysians offered an unrealistic finance package with £900 million debt and no one appreciated that it was realistic – nobody. I met the Malaysians and I did not believe they had the credibility to deliver £1 billion"*. It was put to Mr Quinlan in cross-examination that if he was truly free to sell his shares and wished to protect the interests of his creditors, then at any rate after the expiry of the exclusivity agreement he would, like Mr McLaughlin, have served a transfer notice expressing the desire to sell his shares at the same price as that being offered by Wynton. But to do that, and thereby to antagonise the Barclay interests, he would have had to be confident that Wynton would make and be able to complete a firm offer. In fact, the scepticism as to Wynton's ability to raise the requisite funds persisted. As to protecting the interests of his creditors, NAMA approved the 17 February agreement and the conditional sale of Mr Quinlan's shares to the Barclay interests, notwithstanding that it had details of Wynton's offer.

359.    There are further dealings as regards Wynton on which Mr McKillen relies. On 23 February 2011, Wynton's advisers sent a renewed offer for Mr Quinlan's shares to Mr Murphy. By then Mr Quinlan was bound by the 17 February agreement. On Mr Faber's advice, Mr Murphy replied that *"DQ has undertaken to sign a contract to sell his shares to a third party which is legally binding and so there is no possibility DQ can consider your offer either now or in the future"*. The submission that this was not a reference to the 17 February agreement because Mr Quinlan had already signed that agreement, rather than having simply undertaken to sign it, is fanciful.

360.    There were text exchanges between Sir David Barclay and Mr Murphy on 23 February 2011 when Sir David again thought Mr Quinlan might be dealing with Wynton. Mr McKillen relies in particular on two. Sir David Barclay sent the following text to Mr Murphy:

> *"If i have misjudged you i am sorry but it is not helpfull to have discussion with others about Maybourne we are not making progress with Paddy because of Qatar backing and RT [Robert Tchenguiz] is relying on higher value to hold us to ransom the price of the deal has increased substantially and will reflect on our proposed arrangement".*

Mr Murphy replied:

*"Sir David. The price we agreed for DQ shares has never changed. We have signed off on it and so have Nama with you. You can't blame us for what others do? Gerry".*

361.   It was submitted that Sir David's reference to the increased price reflecting on "*our proposed arrangement*" was a reference to the side payments to Mr Quinlan and that Mr Murphy's reply referred to agreement on the price reached in January 2011. It is not in dispute that the price was agreed in January 2011. The dispute is whether it was agreed in principle or as a binding commitment. Mr Murphy's text seems to me consistent with the former. The price was agreed in January 2011, but when he says "[w]e *have signed off on it and so have Nama with you*" he is clearly referring to the binding 17 February agreement. Why refer to that agreement if a binding agreement had already been made in January 2011? It is not clear what Sir David meant by "*our proposed arrangement*" but a "*proposed*" arrangement is not consistent with an existing contract under which, on Mr McKillen's case, payments have already been made. Neither of these texts was put to Mr Murphy.

362.   Seventh, JQ2 approached Mr Murphy in May 2011 to suggest discussions for a purchase of Mr Quinlan's shares. Mr Murphy forwarded the email to Mr Faber, asking "*What do you want us to do*", and to Sir David Barclay, saying "*We will be guided by you and RF* [Mr Faber]". Mr Murphy agreed to send a reply along the lines suggested by Mr Faber. Mr Murphy also told Mr Faber that "*[w]e are happy to take your instructions*" on whether to convert loan notes into ordinary non-voting shares. He also looked to Mr Faber for guidance on whether to challenge the sale of Mr Quinlan's loans by Anglo Irish Bank and NAMA to JQ2. Mr McKillen submits that all this is "*consistent with the reality being that all Mr Quinlan's rights and interests in "his" shares in the company were continuing to be held for the benefit of, and exercised in accordance with the wishes of, the Barclay Brothers*". In my judgment, it is simply consistent with being bound by the terms of the 17 February agreement.

363.   In about early May 2011 the holder of the second charge over Mr Quinlan's 21.34% shareholding gave notice to redeem the first charge held by the Barclay interests as assignee. Mr Murphy sought to persuade Sir David Barclay to cooperate with this, in a text message sent on 6 May 2011 in which Mr Murphy also said "*Sir David. We are 100% committed to you and so who owns our debt will NEVER be an issue between us. You do NOT need our debt to tell us what to do. We will ALWAYS do that anyway.*" Mr McKillen submits that this commitment to comply with instructions was "*in accordance with*" the alleged oral agreement. In my view, it is more obviously consistent with being bound by the 17 February agreement and with a non-binding agreement to cooperate with the Barclay interests.

364.   Finally, Mr Murphy said in an email dated 17 April 2011 to Mr Faber "*Derek would do nothing unilaterally without referring to yourselves in advance*". This, however, was not said in the context of exercising rights attached to Mr Quinlan's shares in the company or exercising his votes as a director. It was said in the context of the possible bankruptcy of Mr Quinlan and, in particular, whether he might apply for his own bankruptcy. This would be a concern to the Barclay interests, at least partly because it would trigger the pre-emption provisions.

365.    For the reasons given above, I reject Mr McKillen's case that a binding oral agreement was made by Mr Quinlan and Sir David Barclay on 15 January 2011, or at any other time.

*Enforceability of charges over Mr Quinlan's shares*

366.    The case that the security over Mr Quinlan's shares became enforceable so as to trigger clause 6.6 centres on two charges granted by Mr Quinlan in favour of Bank of Ireland (Scotland) Limited (BOSI). I should mention that reliance was also placed on a charge which, it appeared, had been given by Mr Quinlan in favour of Anglo Irish Bank on 2 September 2010. Such a charge was indeed pleaded by Mr Quinlan but it appears that Mr Quinlan, reluctant to grant this further charge, did not return the executed charge document to Anglo Irish Bank. It is common ground that other security in favour of Anglo Irish Bank over Mr Quinlan's shares did not become enforceable.

367.    The first charge to be granted by Mr Quinlan in favour of BOSI was dated 14 May 2004 (the 2004 charge). It secured all sums due under a facility letter dated 6 April 2004, as amended by a supplemental letter dated 21 April 2004. The charge extended to Mr Quinlan's shares and convertible loan stock in the company.

368.    Whether the security created by the 2004 charge had become enforceable depends on a combination of provisions contained in the 2004 charge, the facility letter and BOSI's general conditions. I return to these in detail later.

369.    The other charge in favour of BOSI was created by a charge document dated 20 October 2005 (the 2005 charge). The 2005 charge secured sums due under the facility letters dated 6 and 21 April 2004 and under a further facility letter dated 17 October 2004. The security is expressed to be enforceable upon the happening of an Event of Default which is defined as "*any failure by the Chargor to pay upon written demand by the Bank any sums which are due and payable to the Bank by the Chargor whether as principal, surety or in any other manner whatsoever*". It is common ground that there has been only one written demand for payment of any sum secured by the 2005 charge. While it is also common ground that payment was made in response to that demand, there is nonetheless an issue as to whether a default occurred and the charge became enforceable. This is the only occasion on which it is alleged that the 2005 charge became enforceable.

370.    Mr Quinlan submits that neither charge has become enforceable. First, the 2004 charge has not become enforceable on a proper analysis of the relevant provisions of the charge, the facility letter and the general conditions. The 2005 charge did not become enforceable because the only sum which was the subject of a written demand for payment was paid. Secondly, he submits that the terms of the 2004 charge were superseded by the 2005 charge so that the question of whether the former charge became enforceable does not arise. It is not suggested that it had become enforceable prior to the execution of the 2005 charge. While Mr Quinlan places the greater emphasis on the first of these submissions, the second logically comes first and I will address it now.

*Did the 2005 charge supersede the 2004 charge?*

371.    The sequence of events as regards the two charges is as follows. As mentioned above, the 2004 charge was created by a deed executed and dated 14 May 2004, securing sums due under the facility letters dated 6 and 21 April 2004. Under a facility letter dated 4 November 2004, Mr Quinlan borrowed further sums from BOSI to purchase additional securities in the company. By the terms of that letter, he agreed to give BOSI security over his entire interests in the company and on 21 December 2004 executed a deed, expressed to be supplemental to the 2004 charge, which expressly included within the property charged by the 2004 charge the additional securities purchased by Mr Quinlan. Further sums were borrowed by Mr Quinlan under a facility letter dated 18 March 2005 which were also expressed to be secured by the 2004 charge. Mr Quinlan executed a deed dated 14 April 2005, stated to be supplemental to the 2004 charge and containing a clause which expressly amended the 2004 charge to define facility letter as including the letters dated 6 and 21 April 2004, 4 November 2004 and 18 March 2005.

372.    Mr Quinlan borrowed further sums under a facility letter dated 17 October 2005, which provided that the loan would be secured by, amongst other things, *"an extension of the security held by the Bank over the shares and loan stock held by or on behalf of the Borrower in Coroin...."*. Instead of executing a supplemental deed, as had previously occurred, Mr Quinlan executed a new deed of charge, the 2005 deed. By the 2005 deed Mr Quinlan granted a first equitable charge and mortgage over his shares and loan stock in the company as detailed in the first schedule. It was therefore a charge over precisely the same property as charged by the 2004 charge, as supplemented by the deed of charge dated 21 December 2004.

373.    Mr Quinlan submits that the 2004 charge was superseded by the 2005 charge. He relies on a number of points for this submission. First, the 2005 charge expressly created a *"first equitable mortgage and charge in favour of"* BOSI. Secondly, the property charged is the same as that charged by the 2004 charge together with the supplemental deed executed in December 2004. Thirdly, it would be odd to have different charges with different provisions, for example as to enforceability, applying to the same security for liabilities covered by both charges. Fourthly, by clause 7(f) of the 2005 charge, Mr Quinlan represented and warranted that "the Charged Property is free from any Security Interest of any kind other than the security created pursuant to this Charge".

374.    As an alternative to the submission that the 2005 charge superseded or replaced the 2004 charge, it was submitted for Mr Quinlan that the effect of the 2005 charge was to amend the terms of the security previously granted by the 2004 charge, such that the terms of security were set out in the 2005 charge.

375.    In further support of these submissions, Mr Quinlan relies on seven deeds executed by him in favour of BOSI following the 2005 charge. Each is expressed to be a supplemental deed and deed of confirmation and each provides that *"this Deed should be construed as one single Deed with each of the Security Documents"* and that *"provisions contained in the Security Documents which are inconsistent with the terms of this Deed shall cease to apply"*. "*Security Documents*" is defined to include *"the Equitable Charge"* which itself was defined in the first, second, third and fourth supplemental deeds (made between 19 May 2006 and 10 December

2007) as the 2005 charge, as supplemented. They did not refer to the 2004 charge. The fifth, sixth and seventh supplemental deeds referred to the 2004 charge but in somewhat inconsistent ways. The fifth supplemental deed dated 22 January 2008 defined "Equitable Charge" to mean the 2004 charge "as amended and supplemented" by the subsequent deeds including the 2005 charge. However, the sixth and seventh supplemental deeds dated 2 May 2008 and 9 September 2008 respectively referred separately to the 2004 charge and the 2005 charge and did not state that the former was amended by the latter.

376.   As against this, Mr McKillen relies on express provisions of the 2005 charge. Clause 14.1(a) provides that the 2005 charge *"shall be in addition to and not in substitution for or limitation of and shall neither be prejudiced nor affected by, nor shall it prejudice or affect, any other security held by"* BOSI. Clause 17.1 provides that the 2005 charge *"shall be in addition to and shall be independent of every other security which [BOSI] may at any time hold for any of the Secured Obligations. No prior security held by [BOSI] over the whole or any part of the Charge Property shall merge in the security hereby constituted".*

377.   While it may at first sight appear odd that BOSI should have taken separate and inconsistent charges over the same property, such that there might in the absence of express provision be good argument for reading the two consistently, it seems to me that the express provisions of the 2005 charge just cited make clear the parties' intention that the 2004 charge was to continue unaffected. The powers of the court under insolvency law to set aside prior transactions made within specified periods before the start of bankruptcy provide a good reason why banks commonly seek to preserve pre-existing security, even where a new charge covering the same security is executed.   The provisions of the supplemental deeds do not in my view assist Mr Quinlan's argument.   The first four do not refer to the 2004 charge and the last two expressly distinguish between the two changes and do not treat the earlier charge as amended by the latter.   Only the fifth refers to the 2005 charge as amending the 2004 charge but in context it is a misdescription, and in any event the reference cannot be relied on as an operative provision to amend the 2004 charge.

378.   I turn to the second issue whether either of the charges has become enforceable for the purposes of clause 6.6 of the shareholders agreement.

*Has the 2005 charge become enforceable?*

379.   As detailed above, it is common ground that the 2005 charge became enforceable only upon *"any failure by the Chargor to pay, on written demand by the Bank any sums which are due and payable to the Bank by the Chargor".* On 10 September 2009 BOSI wrote to Mr Quinlan, stating that he had failed to make interest payment due under a loan agreement dated 28 August 2006 on three occasions in 2009. The letter recorded that failure to pay constituted an event of default under the loan agreement *"unless remedied within 60 days to the satisfaction of the majority lenders in the manner set out in the proviso (the "Proviso") to clause 19.1 of the Loan Agreement".* The proviso to clause 19.1 of the loan agreement provided that non-payment of amounts due or any of the other events specified in clause 19.1 would not constitute an event of default, if it arose in relation to one or more but not all of the borrowers and within 60 days of the occurrence of the event the defaulting

borrowers were replaced by other persons acceptable to the majority Lenders. It is not suggested that this occurred in this case.

380.    The letter dated 10 September 2009 continued:

> *"We hereby make formal demand for payment forthwith of all outstanding interest payment.*
>
> *In the event that the outstanding interest payments are not immediately paid or the above Event of Default is not remedied to the satisfaction of the Majority Lenders within 60 days of the date of this letter in the manner specified in the Proviso, the Lenders will be entitled to exercise all rights conferred upon them by Clause 19.2 of the Loan Agreement including the right to demand immediate repayment of the Loan together with all interest and other sums (including any applicable broken funding costs). In the event that such sums are not paid we reserve the right to exercise the power to appoint a receiver over the Secured Assets, the power of sale and all other powers conferred on us by law or by the Security Documents."*

The rights conferred by clause 19.2 are not to enforce security but to accelerate repayment of borrowings and to terminate any existing commitment to lend.

381.    It is common ground that Mr Quinlan paid the amount demanded in the letter dated 10 September 2009 on or about 4 November 2009. BOSI had not by then taken any steps to exercise the rights under clause 19.2 or to exercise any rights arising under the 2005 charge.

382.    It is submitted for Mr McKillen that the failure to pay the sums demanded *"forthwith"* or *"immediately"* meant that there was a failure by Mr Quinlan to pay on written demand the sums due. The words *"forthwith"* and *"immediately"* appear in the letter dated 10 September 2009. They do not appear in the definition of event in default in the 2005 charge.

383.    The issue is whether BOSI was entitled to enforce the 2005 charge following Mr Quinlan's failure to pay "forthwith" the sums demanded in the letter dated 19 September 2009. In my judgment it was not entitled to do so. Its rights of enforcement could not be determined by reference only to the terms of the 2005 charge but required account to be taken also of the loan agreement under which the unpaid sums had fallen due and the letter dated 10 September 2009. The letter demanded payment of the outstanding interest immediately or the substitution of new borrowers within 60 days of the date of the letter. Necessarily BOSI had to wait until the expiry of the 60 days before it could take the next step of exercising those rights. It could not rely on the failure to meet the first alternative of immediate payment without waiting the 60 days allowed for the second alternative. Even then those rights were not to enforce security but to demand immediate repayment of the principal amount of the loan together with all other sums due and only in the event that such sums were not paid did BOSI reserve the right to exercise powers of enforcement. In my judgment, the provisions of the 2005 charge did not allow BOSI to leapfrog over the requirements contained in the loan agreement dated 28 August 2006 and BOSI's letter of demand. Reading these

A-8759

# EXHIBIT 25
# PART 3

documents together, and bearing in mind that the relevant provision in the 2005 charge does not use the words *"immediate"* or *"forthwith"*, BOSI would not be entitled to enforce the 2005 charge at least until 60 days had passed from the letter dated 10 September 2009. That is the basis on which Mr Quinlan and, it appears, BOSI proceeded at the time and in my judgment they were right to do so.

384.   It follows that the 2005 charge did not at any time become enforceable. If it had become enforceable, it would have fallen to the directors to determine under clause 6.6 of the shareholders agreement whether to deem a transfer notice to have been given by Mr Quinlan. Given the circumstances of the demand just referred to and the draconian consequences of a deemed transfer notice, I am far from satisfied that the directors would have considered it appropriate to deem a transfer notice to be given. It appears to me much more likely that they would have waited at least until the expiry of the 60 days to see whether payment was made and whether BOSI was likely to take any enforcement action as against the shares. In any event Mr McKillen has not established, or even addressed, whether the directors would have taken action under clause 6.6 and unless he can show that they would have done, he cannot show that he has suffered any prejudice in relation to this matter.

*Has the 2004 charge become enforceable?*

385.   The relevant provisions in relation to the enforceability of the 2004 charge are as follows. The 2004 charge in clause 1.1 defines *"Events of Default"* to mean *"the events of default set out in the Facility Letter and any one an 'Event of Default'"*. The facility letter is the letter dated 6 April 2004 as amended by the supplemental letter dated 21 April 2004. Clause 10.1 provides that upon *"the happening of an Event of Default"* BOSI is entitled to exercise a power of sale and clause 11.1 provides that it may, at any time after the power of sale has become exercisable, appoint a receiver. Clause 2.3 provides that the liabilities secured by the charge shall become due and payable upon written notice by BOSI and that Mr Quinlan shall pay all actual and contingent liabilities on the occurrence of any Event of Default. Clause 2.4 provides that Mr Quinlan will *"notify the Bank in writing on the occurrence of any Event of Default or of the occurrence of any event which with the lapse of time or giving of notice or both would or may constitute an Event of Default"*.

386.   Notwithstanding the definition of *"Events of Default"* in the 2004 charge, the facility letter does not set out the Events of Default but incorporates BOSI's standard loan conditions. Paragraph 9 of the facility letter provides:

> *"In addition to the terms contained in this facility letter, the Loan is subject to the conditions set out in the Bank's General Loan Conditions (Ref:01.01.04) attached. Unless expressly excluded or varied by the terms of this facility letter, the General Conditions shall apply to the loan".*

387.   Condition 9 of the General Conditions is headed *"Events of Default"*. It sets out in twenty numbered sub-paragraphs various events, such as a failure by the borrower to pay sums due to BOSI on the due date. It continues *"then, and in such case and*

*at any time thereafter, the Bank may in its absolute discretion*" and there then follow four numbered paragraphs of which the fourth is:

> "*Declare that the Security Documents have become enforceable immediately in accordance with their terms whereupon the same shall be immediately enforceable*".

388.   It is submitted for Mr McKillen that the Events of Default for the purposes of the 2004 charge are each of the events listed in the twenty numbered sub-paragraphs in paragraph 9 of the General Conditions. Accordingly, where clause 10 of the 2004 charge provides that "*upon the happening of an Event of Default the Bank shall have and be entitled to exercise the power to sell or otherwise dispose of*" the charged property, that power arises when any of the listed events occurs without the need for a declaration that the security has become enforceable in accordance with the fourth numbered paragraph above.

389.   In my judgment, these documents must be read consistently with each other, unless there is provision in the 2004 charge or the facility letter which is inconsistent with the terms of the general conditions: see paragraph 9 of the facility letter. The effect of condition 9 of the General Conditions is to make the security enforceable only upon the occurrence of one of the twenty listed events together with a declaration issued by the Bank, in its absolute discretion, that the security has become enforceable. There is nothing in the terms of the 2004 charge which conflicts with condition 9 read in its totality. The definition of Events of Default in the 2004 charge does not require that the need under condition 9 for a declaration of enforceability should be ignored. Clause 2.4 expressly contemplates that an event of default may require the giving of notice following the occurrence of any event. It would require rather more than is contained in the definition of Events of Default in the 2004 charge to create a conflict with the terms of the General Conditions in circumstances where, unless expressly excluded or varied, the General Conditions are to apply to the loan.

390.   It is not in dispute that a number of events occurred in 2010 and 2011 which fell within one or more of the twenty numbered sub-paragraphs in condition 20 of the General Conditions. It is also common ground that there has been no declaration pursuant to condition 9 that the security had become enforceable. It follows, in my judgment, that the 2004 charge has never become enforceable.

*Issues under clause 6.6 of the shareholders agreement*

391.   These conclusions, that the charges over Mr Quinlan's shares have not become enforceable, mean that it is unnecessary to decide some further issues on the construction and application of clause 6.6 of the shareholders agreement but I will briefly address them. Those issues arise from the terms of clause 6.6 providing that, if the security had become enforceable, a transfer notice would be deemed to be served only if the directors made a determination to that effect within one month after the security became enforceable.

392.   Mr Quinlan and the Barclay interests rely on the fact that there was no determination by the directors that a transfer notice should be deemed to be given

within one month after the occasions on which the charges are said to have become enforceable.

393.    It is submitted for Mr McKillen that in order to make clause 6.6 workable it is necessary to imply an obligation on a shareholder to notify the company of the occurrence of any of the events which acts as a trigger under clause 6.6. It is pointed out rightly, in my view, that many of these events could occur without the company or its directors knowing about it. Bankruptcy in any part of the world is a trigger. It could well occur without coming to the attention of the company or the directors. Even more likely, he might enter into an arrangement with his creditors, or security over his shares could become enforceable, without coming to the knowledge of the company or its directors. It would then be a matter of chance whether the directors had an opportunity of making a determination under clause 6.6.

394.    Viewed objectively, it cannot sensibly have been the intention of the parties to the shareholders agreement that clause 6.6 should work as haphazardly as the respondents suggest. There is no difficulty, in order to give commercial sense to the provision, in implying an obligation to give notice to the company of the occurrence of any of the triggering events within the knowledge of the shareholder: see *Tett v Phoenix Property and Investment Co. Ltd.* [1986] BCLC 149 (CA).

395.    The next issue is whether, for the purposes of clause 6.6.2, a shareholder security can become enforceable more than once, in the absence of a waiver by a chargee of an earlier breach. If, for example, the shareholder misses a series of interest payments and, in respect of each, a declaration is made by the chargee that the security is enforceable, does the security become enforceable only on the first of such occasions or does it become enforceable each time the relevant declaration is made?   It is submitted for Mr Quinlan and the Barclay interests that, as a matter of ordinary language, security can become enforceable only once, unless there is a waiver of a prior breach. If a security is already enforceable, it is submitted that it makes no sense to say that it "becomes enforceable" when a further event of default occurs.

396.    As a matter of general language, I would agree with this approach but it fails in my judgment to give full effect to the purpose and effect of clause 6.6. As Mr Quinlan and the Barclay interests have been at pains to emphasise, the occurrence of an event listed in clause 6.6 does not automatically trigger the deemed service of a transfer notice but gives the directors the discretion whether to determine that a transfer notice should be given. They have also, rightly in my view, been at pains to point out that there could be circumstances, such as a trivial event giving rise to a right of enforcement without any real prospect that enforcement would follow, where the board could quite properly determine that no transfer notice should be deemed to be given. This is all the more the case when it is remembered that the deemed transfer notice, if determined to be given, applies to all the shares held by the shareholder, not just those shares which are subject to the charge. If those submissions are accepted, which I believe they should be, their reading of *"becomes enforceable"* could deprive clause 6.6 of much of its purpose.   A decision by the directors not to determine that a transfer notice be deemed to be given on a trivial event of default would deprive the directors of the ability to do so, in the event of a subsequent, but more substantial, event of default making the security enforceable. It seems to me very unlikely that the parties to the agreement can have intended this

result. The words *"becomes enforceable"* are not incapable of applying to a succession of events of default giving rise to rights of enforcement and I would hold that they do so apply in those circumstances.

397.   There is a further issue which I should mention. Mr Quinlan pleads in his defence that if, contrary to his primary case, security over his shares became enforceable, the same is true of security over Mr McKillen's shares, so that Mr McKillen cannot complain of unfair prejudice in this respect. It follows from my decision on Mr Quinlan's security that this point does not arise. Mr Quinlan applied towards the end of the trial to amend his defence to add a reference to a further security over Mr McKillen's shares which had only lately been disclosed. In the light of my decision on the issue of enforceability, I refuse the application.

**Mr McKillen's ability to finance the purchase of shares**

398.   If I had concluded that the pre-emption provisions would have been triggered as regards Mr Quinlan's shares, and if those shares had been offered round to the shareholders, the issue arises as to whether Mr McKillen could have purchased the shares or a sufficient proportion to give him control. Mr McKillen's pleaded case in his petition is that he could and would have done so, and this is denied by the respondents. Mr McKillen's evidence is that he would have purchased shares equal to a 20% stake, bringing his holding up to 56%. This would cost about £48 million at an enterprise value of £900 million or £58 million at an enterprise value of £950 million.

399.   Issues of law arise, such as whether a failure to comply with or operate the pre-emption provisions caused unfair prejudice to Mr McKillen only if he would have taken up the shares. There is also the prior issue whether a failure by a shareholder to give notice of a relevant event when required involves conduct of the affairs of the company or an act or omission of the company, so as to fall within section 994. In view of my conclusion that the pre-emption provisions were not triggered, these issues do not arise for decision. However, I should make the relevant findings of fact on the evidence which I heard on Mr McKillen's ability to finance a purchase of shares.

400.   Mr McKillen's case, as originally pleaded in his petition, was:

> " *Mr McKillen intended to retain funds to purchase all or a proportionate share of Mr Quinlan's shares in the Company once they became available pursuant to the pre-emption rights.*"

401.   Subsequently, Mr McKillen made clear that he was not saying that he could have financed a purchase of shares out of his own funds. The petition was amended to read:

> *"Mr McKillen would have raised funds to avail himself of any opportunity to purchase all or a proportionate share of Mr Quinlan's shares in the Company once they became available pursuant to the pre-emption rights.*"

402.  I will not here recite the tortuous process by which evidence and disclosure was provided on this issue. The upshot was a substantial amount of disclosure by Mr McKillen and two witness statements by Mr Cunningham. Both Mr McKillen and Mr Cunningham were cross-examined on this issue.

403.  Certain matters are not in dispute. First, Mr McKillen did not himself have the funds required for any purchase. Secondly, Mr McKillen did not have any committed facilities available to him for this purpose, until the agreement dated 16 March 2012 with Al Mirqab Capital (SPC), an entity under the same control as Al Mirqab Holdings LLC. Thirdly, Mr McKillen does not suggest that he could have obtained a loan facility for this purpose from a bank or similar commercial lender.

404.  In support of his case, Mr McKillen relies on three principal matters. First, there were a number of parties who were interested in the company in 2011, in particular the Qataris, Wynton, and Sheikh Mansour. Secondly, he relies on the agreement dated 16 March 2012 with Al Mirqab. Thirdly, he had discussions or negotiations with a number of potential funding parties in 2011, six of which reached the stage of draft term sheets.

405.  The parties, such as the Qataris and Wynton, who demonstrated a substantial level of interest in the company in 2011, were concerned to achieve an equity position in the company. Wynton made offers, first for all the shares and then for each member's shares. It subsequently acquired, through JQ2 Limited, debts secured on part of Mr Quinlan's shareholding and later took part in negotiations with the Barclay interests and Sheikh Mansour for a joint venture. Sheikh Mansour and related Abu Dhabi interests had also bought debts secured on Mr Quinlan's shares and were involved in the joint venture negotiations. The transactions these parties were considering were very different from a personal loan to Mr McKillen to enable him to purchase shares and there is no evidence to suggest that they would have had any interest in making any such loan.

406.  The negotiations and agreements with the Qataris in January-February 2011 were all concerned with the Qataris either obtaining at least 75% ownership of the company or, after the Barclay brothers became involved with the purchase of Misland, entering into a joint venture with the Barclay brothers and Mr McKillen.

407.  It is true that on 21 January 2011, immediately after the acquisition of Misland became known, Mr Bakhos emailed Mr McKillen with a suggestion that if the shares held by Misland were as a consequence offered round under the pre-emption provisions, Al Mirqab *"would be prepared to provide you with funding to acquire some or all these shares"* subject to the price reflecting an enterprise value of no more than £875-900 million and:

> *"our reaching a satisfactory arrangement under which it may be possible for my Principal in due course to obtain ownership of the shares concerned, together with sufficient additional shares to provide control of the company."*

This condition would have to be satisfied in a way which did not itself trigger the pre-emption provisions.

408. It is said for Mr McKillen that this has been achieved in the agreement dated 16 March 2012, and could also have been achieved in January 2011. However, Mr Bakhos' letter was concerned with Misland's shares, not Mr Quinlan's. The whole thrust of the discussions and negotiations was to achieve a joint venture with the Barclay interests. At that time, unless Misland's shares were offered round and sold with the result that the Barclay brothers' involvement ceased, there is no basis for concluding that the Qataris would have been prepared to finance a purchase of Mr Quinlan's shares without reaching an agreement with the Barclay brothers.

409. I do not consider that the agreement dated 16 March 2012 with Al Mirqab provides a basis for inferring that a similar agreement could have been reached in 2011 with Al Mirqab to purchase Mr Quinlan's shares. First, the agreement is the product of the proceedings. It is driven by the prospect that Mr McKillen might obtain orders for the sale to him of the shares held and owned by Misland and/or Mr Quinlan.

410. Secondly, relations between Mr McKillen and the Qataris broke down after Mr McKillen pulled out of the tri-partite agreement dated 12 February 2011. There was mutual distrust. Mr McKillen felt badly treated by them and, as evidenced by Arthur Cox's letter dated 17 February 2011, had no confidence in them as a party to a joint venture. In evidence, he said that they had "*burned their bridges*" with him. He needed to be persuaded by close friends and family before dealing again with them in February 2012. For their part, the Qataris felt that Mr McKillen had reneged on the agreement and took advice on proceedings against him. I am satisfied that each would have been very reluctant to deal with the other and it is significant that Mr McKillen did not approach the Qataris in 2011 when he was holding funding discussions with a large number of parties. It would appear that it was only Tony Blair's personal approach to Sheikh Hamad during a meeting in Qatar in February 2012 that brought the two together. There is no evidence of Mr Blair's involvement, or any likelihood of his involvement, at any relevant time in 2011.

411. Negotiations with potential funders is the third basis for Mr McKillen's case. Mr McKillen relies in particular on the discussions with six possible funders who issued draft indicative term sheets. I will consider each of these in turn.

412. Mr McKillen was introduced to Och-Ziff Capital Investments LLC (Och-Ziff), a hedge fund, in May 2011. At the end of June 2011, it provided a proposal for a loan of £48 million, at rates of interest with a minimum of 15% pa, which represented high risk equity-type returns. Och-Ziff required security over both the shares to be acquired and Mr McKillen's existing holding, although Mr McKillen said in evidence that the latter security requirement was dropped. Mr McKillen was advised at the time that refinancing this facility would be difficult, and probably only achievable with the injection of new funds or other assets by him on an asset sale. Mr McKillen agreed that the terms were unattractive and that he would not have agreed to them. Further term sheets were prepared in July 2011 but on terms which did not significantly change from the June term sheet.

413. No terms were produced by Och-Ziff which Mr McKillen would have agreed. Mr McKillen did not call any witnesses from Och-Ziff and I am unable to find that it is likely that they would have reached agreement on terms acceptable to each side.

414. In August 2011, Mr McKillen approached Ong Beng Seng, a Singapore businessman and hotelier, for financial support to purchase Mr Quinlan's shares if offered under the pre-emption provisions. Mr McKillen had known Mr Ong for about 10 years and had been in contact with him about the company since January 2011 but had not previously sought support.

415. Mr Ong's interest was not in making loans but in acquiring an equity stake in the company. A proposal was put forward by Leisure Ventures Pty Limited, a joint venture company owned equally by Mr Ong and a company called Hotel Properties Limited. The proposal for a loan of £54 million was set out in draft heads of terms sent on 9 September 2011 by Leisure Venture's solicitors, who wrote in a covering email:

> "*As discussed between Mr B.S. Ong and Mr Patrick McKillen and subsequently between you and me, our willingness to provide the share financing is by way of a first step to acquire a shareholding within the Coroin Limited (the holding company) and therefore we have provided in the HOT that when the Loan Amount is advanced, we would have documentation executed with PMcK in place which will give us rights to become a 50:50 shareholder with you in due course.*"

416. This requirement conflicted with the pre-emption provisions because it would involve the conferral of rights to acquire shares from Mr McKillen, and hence an interest in those shares, simultaneously with his acquisition of them.

417. Mr McKillen's solicitors provided amended heads of terms on 5 October 2011, removing the requirement for rights in favour of Leisure Ventures to acquire shares and substituting a financial penalty against Mr McKillen if Leisure Ventures did not acquire the shares within a specified period.

418. This was quickly picked up by Alex Lee of Hotel Properties Limited , on behalf of Leisure Ventures, who said in an email on 7 October 2011:

> "*I am afraid that will not meet our requirement.*
>
> *We thought we have made it very clear through Evershed to Arthur Cox and from myself to you.*
>
> *If our most fundamental requirement is not met, I believe it would not be very meaningful for us to discuss other terms.*"

In cross examination, Mr McKillen dismissed this as just "*toing and froing negotiations*". It was not, he said, a deal-breaker. However, it looks as if it was regarded as fundamental and it was not followed by agreement to remove the requirement. Whether it was a deal-breaker is a matter for evidence from Leisure Ventures but Mr McKillen called none.

419. The only development was that an offer on significantly worse terms was made in February 2012. Instead of providing 100% of the funding required to purchase

some or all of Mr Quinlan's shares, it proposed 75% of the funding up to £37.5 million required to purchase a 19.86% holding, based on an enterprise value of £908 million rather than £930 million as before. This would have left a funding gap of some £18.5 million. The interest rate was 10%, not 6%. Moreover, Leisure Ventures required a period of not less than three weeks for due diligence, despite having been provided with information.

420.    In the earlier draft heads, Leisure Ventures had required six weeks and Mr McKillen's solicitors suggested four weeks in response. But the offer period under clause 6.2 of the shareholders agreement was only four weeks.

421.    In light of these difficulties, it was not in my judgment likely that Mr McKillen could have reached agreement in 2011 with Leisure Ventures or Mr Ong for the provision of funding to purchase shares offered under the pre-emption provisions.

422.    In January 2012, Mr McKillen was contacted by Talos Capital Limited, a hedge fund or hedge fund manager. Its CEO worked for Blackstone when it owned the Savoy Group, so he was familiar with the company's hotels, and he obtained Mr McKillen's contact details from NAMA. Mr McKillen's evidence is that there were about ten meetings in January/February 2012, leading to a two-page heads of terms. This proposed a loan facility of a figure in square brackets of £48 million to purchase a 20% shareholding from Mr Quinlan under the pre-emption procedure. It envisaged a 50/50 joint venture with Mr McKillen to own the company, once Mr McKillen had an unconditional right to buy the Barclay brothers' interest in the company. The proposal was therefore clearly made in the context of these proceedings and the possibility of a successful outcome for Mr McKillen.

423.    There is no evidence from Talos Capital Limited. There is no explanation why the approach to Mr McKillen was not made until January 2012. The reasonable inference is that it was the prospect of a joint venture made possible by Mr McKillen's proceedings.

424.    There are no good grounds for concluding that Talos Capital Limited had any interest in 2011 for lending funds to Mr McKillen to purchase Mr Quinlan's shares or some of them. Mr McKillen made no approach to Talos Capital Limited at any time, despite seeking funds to purchase Mr Quinlan's shares.

425.    On 16 September 2011, Mr McKillen had a meeting with Morgan Stanley as managers of the Morgan Stanley Real Estate Fund No. 7 (MSREF), a property investment fund. On 4 October 2011, MSREF provided an indicative term sheet. Rather than a loan to Mr McKillen, funding of £45 million would be provided through an issued of preferred redeemable shares by a special purpose vehicle to be owned by Mr McKillen. At a meeting on 6 October 2011, Morgan Stanley said that they would prefer the funding to be provided in that way because a loan to Mr McKillen would require "*tiresome and intrusive*" know-your-client procedures "*which will be slow*". They were however prepared to be flexible on this point.

426.    Capped at £45 million, representing on a 20% holding an enterprise value of £850 million, the facility was insufficient. Mr McKillen said in evidence that he would supplement it with his own funds. Mr McKillen did not demur at the suggestion that the interest rate of 20% pa was "*eye-wateringly large*". He said "*That is the*

*name of the game. If you want money quick, 15 to 20%*". Mr McKillen did not
pursue this proposal because of its cost.

427. On 31 October 2011, Mike Walsh, who was introducing a number of possible
funders to Mr McKillen, met the CEO of Round Hill Capital, an investment
management group, which led to a letter of intent dated 2 December 2011 from
Global Asset Capital Europe LLP (GAC), part of a private equity firm with,
according to its brochure, $1 billion under management.

428. The letter of intent proposed financing the purchase of shares held by Misland
and/or Mr Quinlan if Mr McKillen succeeded in the present proceedings. The
"*ultimate goal*" was to acquire 50:50 control of the company, but, pending removal
or waiver of the pre-emption provisions, the funding would be provided as a loan.
The interest on the loan was to be the dividends and other profit derived from the
shares acquired with it. Since the company did not pay dividends and, with its
borrowings, was not obviously in a position to do so, it is not clear how this would
work. Mr McKillen admitted that he did not understand it.

429. Most striking is that neither the letter of intent nor any subsequent communication
indicated the amount of funding which GAC was prepared to provide. It also
required a four-month exclusivity period which Mr McKillen said in evidence he
would definitely not agree. Negotiations with GAC extended over a period of some
three months up to early March 2012. I am not satisfied that any agreement could
have been reached with GAC or that the negotiations with GAC provide a reliable
basis for concluding that Mr McKillen could have raised funds to purchase shares
under a pre-emption offer.

430. A company called Avington Financial Limited (Avington) was introduced to Mr
McKillen at the end of November 2011. Mr McKillen's evidence is that it manages
investments for some wealthy Canadian families. It provided a draft term sheet in
January 2012, where the objective was stated as:

> "*To become a 50% / 50% equity partner with Patrick
> McKillen or entities controlled by Patrick McKillen ("PM")
> in Coroin Limited ("Coroin" or the "Company") in the event
> that PM is presented with the opportunity to acquire 100% of
> the voting and total issued shares in the Company (the
> "Shares") in a single transaction or in a series of
> transactions leading to the ultimate acquisition of 100% of
> the Shares.*"

431. Avington offered to make a bridge loan of £35-48 million to Mr McKillen to
finance the acquisition by him of up to 14% of the shares to bring his holding up to
50%. The term would be five years at an interest rate of 8%. It was conditional on
the completion of due diligence and an exclusivity period of 120 days.

432. Avington's interest was clearly prompted by the prospect of success by Mr
McKillen in these proceedings opening the way to a 50:50 joint venture. Mr
Browne of Le Bruin Private Limited who introduced Avington emailed Mr
Cunningham on 14 December 2011 to say that Avington had "*advised that they
have the funding in place to back Paddy in the battle with the BB*". There were

problems with their draft offer which were never resolved. First, the funding offered was too small. Mr McKillen said in evidence that he would only accept funding to bring his holding up to 56%. Secondly, he would never agree to exclusivity. Thirdly, confirmation of the availability of funding was not received. On 15 February 2012, Avington emailed to say that they were waiting to hear back from one family office and then would be in touch. I was not shown any further evidence on this. Nor was there any evidence that they would have agreed Mr McKillen's points on the amount of funding or the exclusivity period.

433.    Mr McKillen had discussions with a variety of other parties but none reached the point of an indicative term sheet. These included the following. There were discussions in May 2011 and again between November 2011 and February 2012 with Blackstone Advisory Partners, which is associated with the Blackstone private equity fund. Discussions were held between October 2011 and February 2012 with Walter Kwok, from Hong Kong, and with an intermediary acting for him. Mr McKillen met Mr Kwok once. Mr McKillen lost interest after a short time. Mr Cunningham continued the discussions but they never came close to an agreement. There were discussions also with John Caudwell, the Kumar family from Singapore, the Abu Dhabi Investment Authority and others but none of them got to the point of serious engagement. None of these proposals and discussions, including those which resulted in a draft term sheet, provides any solid basis for concluding that Mr McKillen could have raised funds in 2011 to buy a 20% stake from Mr Quinlan if the pre-emption provisions had been triggered and followed.

434.    There were significant outstanding issues on even the most advanced of these proposals. Mr McKillen called no evidence from any of them to say that a deal could have been achieved and, if so, how. Most of the interest arose only after Mr McKillen started these proceedings. No doubt they were perceived as opening up the possibility that Mr McKillen could gain 100% control of the company. This is striking given that Mr McKillen was seriously trying to arrange the necessary finance from May 2011.

435.    It is said on Mr McKillen's behalf that a bridging loan on expensive terms could be arranged, on the basis that it would be soon refinanced. But there is no adequate answer in the evidence to the obvious question of how this would be done. The evidence as to Mr McKillen's overall financial position is such, I find, that he could not raise a conventional term facility for this. Even if his net cash flow was sufficient to service a facility, he could not offer adequate security as his existing 36% holding was not available, being already charged to secure existing (and as yet un-refinanced) borrowing.

436.    It might be thought that achieving a 56% controlling interest would provide a basis for refinancing a bridge loan. In the absence of a conventional facility, the only realistic source for finance would be an investor interested in a joint venture, but this would almost certainly require a much larger stake than 56%, probably 100%. Otherwise, the joint venture investor would have to face the prospect of the Barclay interests as a substantial minority shareholder and would not itself be able to have a controlling holding while allowing Mr McKillen a continuing equity stake. There is no evidence that an investor would have been willing to proceed on that basis.

437. Without reassurance that bridging finance would be repaid, it is unrealistic to think that Mr McKillen could have obtained such finance. Mr McKillen relies on his unencumbered ownership of a number of properties in Vietnam, Argentina, California, France, Ireland, Dubai and Kazakhstan and his equity in a number of encumbered properties in France, England and Germany.

438. The evidence about Mr McKillen's property interests came in a very unsatisfactory form, and I disallowed a substantial part at the trial.

439. Insofar as Mr McKillen says that he could have used any of these interests as security, I have no evidence from any potential lenders that they would have been acceptable. So far as prospective sales are concerned, if this were seriously relied on, I would expect proper expert evidence, but there is none. I do not regard the evidence as a satisfactory basis for concluding that Mr McKillen could probably have used property sales to raise funds for a purchase of a 20% shareholding. It is telling that he did not seek to sell properties for this purpose in 2011, or even contemplate doing so, even though he was trying to raise finance from May 2011 and even though he thought from September 2011, if not before, that the pre-emption provisions might be triggered imminently.

440. On the evidence before me, I conclude that Mr McKillen would not have been able in 2011 to raise the funds necessary to buy a 20% stake in an offer under the pre-emption provisions.

**National Asset Management Agency (NAMA)**

441. The National Asset Management Agency is an Irish public body established by the National Asset Management Agency Act 2009, enacted by the Irish Parliament in December 2009. It was established as part of Ireland's response to the international economic and financial crisis and in particular to the severe problems in the Irish banking sector. Its statutory purpose, which it is permitted to fulfil through subsidiaries, is to acquire loans and related assets from banks and other credit institutions facing financial difficulties. In the transactions relevant to the case, NAMA acted through a wholly-owned subsidiary, National Asset Loan Management Limited, but I will refer to both as NAMA without distinction.

442. NAMA aims to deal expeditiously with the loans acquired by it and to protect or otherwise enhance the value of those loans for the purpose of contributing to the achievement of its objectives. As at 1 January 2012, it had acquired loans with a nominal value of over €74 billion from five participating financial institutions, including Bank of Ireland and Anglo Irish Bank. A witness statement filed on behalf of NAMA states:

> *"The Agency's objective is to obtain the best achievable financial return for the Irish State on this portfolio, and in the case of each individual loan to achieve such a return as soon as practicable in order to reduce the value of the portfolio to zero as soon as commercially practicable."*

443.  For this purpose NAMA's statutory powers include all steps necessary or expedient
to realise the value of assets acquired by it, including disposing of loans for the best
achievable price: see section 11(a) of the National Asset Management Agency Act
2009. Section 12 confers on NAMA all powers necessary or expedient for or
incidental to the achievement of its purposes and performance of its functions,
including the power to transfer debt securities and to sell assets for such
consideration and on such terms as the Board of NAMA thinks fit. John Mulcahy,
the Head of Portfolio Management at NAMA, said in evidence that "*our focus is to
get our money back*". The options for doing so are threefold. First, it can encourage
the debtor to repay or refinance the loans. Secondly, it can seek to sell the loan to
third party. Thirdly, it can enforce the security for the loan, where such power has
arisen. Clearly, as Mr Mulcahy confirmed, the best outcome for NAMA is to
recover the full par value of a loan together with accrued interest and costs.

444.  The establishment of NAMA caused considerable concern to the shareholders of the
company at that time, both as regards the company as a substantial borrower from
Bank of Ireland and Anglo Irish Bank and, in the case of Mr McKillen and Mr
Quinlan, as very substantial borrowers from those banks.  Their personal facilities
had expired but had not been repaid nor, as had previously been the case, rolled out
into new term facilities. Instead the facilities went into default but steps to enforce
the security for them were not taken.

445.  The view of the shareholders, as regards both the company and themselves, was that
a transfer of their loans to NAMA would be catastrophic.  So far as the individuals
were concerned the loans to Mr Quinlan were transferred to NAMA in March 2010.
His financial position was so dire that there was little he could do about it. Mr
McKillen successfully resisted the transfer of his loan facilities to NAMA. He
brought proceedings in the Republic of Ireland against NAMA and, on appeal to the
Supreme Court of Ireland, he succeeded in his claim that NAMA had not validly
resolved to acquire his debts: *Dellway Investments Ltd v NAMA* [2011] IESC 4 (3
February 2011). In a later judgment the Supreme Court also held that NAMA was
required to give notice of any intention to consider making a decision to acquire his
debts so as to give him an opportunity of making representations: [2011] IESC 14
(12 April 2011). This left it open to NAMA to resolve afresh to take a transfer of his
debts but on 6 July 2011 it resolved not to do so.

446.  The concern as regards the company was twofold. First, the shareholders were
concerned that if the loan facilities were transferred to NAMA it might try to sell
them to a more aggressive lender. Secondly, there was a concern that a transfer to
NAMA would cause reputational damage to the hotels owned by the company.
They considered that NAMA had an international reputation as Ireland's "bad bank"
set up to deal with distressed properties loans which had failed, which was certainly
not the case with the loans to the company.

447.  Accordingly, after the Irish Government announced in the course of 2009 that it
intended to establish NAMA, but even before the statute establishing NAMA had
been enacted, the company was active in seeking to discourage the transfer of the
company's loans to NAMA. These efforts continued through the autumn of 2009
and into 2010 and included approaches to the European Commission. However, on
25 June 2010 the loan facilities were transferred to NAMA.

448.   At this stage there were three separate loan facilities, comprising a Facilities Agreement originally dated 21 September 2005 (the Senior Facilities Agreement), a Subordinated Facility Agreement also dated 21 September 2005 and a Facilities Agreement dated 12 March 2008 to finance the purchase of a property in Brook Street, adjacent to Claridge's. At the time of the transfer of the facilities to NAMA, some £625 million had been drawn down and, other than one tranche of the Senior Facilities Agreement, they were all due to expire on 31 December 2010. A fourth facility had been made available by Anglo Irish Bank to a number of the shareholders for the purchase of a property in Knightsbridge adjacent to The Berkeley. All four facilities were effectively consolidated into a single Facility Agreement dated 1 April 2011. At that time a total of approximately £648.4 million was outstanding.

449.   Following the transfer to NAMA, the manager at NAMA with day-to-day responsibility for the company's facilities was Paul Hennigan. Mr Hennigan's unchallenged evidence is that throughout his dealings with the company he made it clear that NAMA was keen to exit its position with the company as soon as practicable. All the shareholders and directors of the company understood that NAMA was not a normal commercial lender but aimed to achieve repayment as soon as possible and might sell the loans.

450.   NAMA's approach to dealing with the company's facilities was complicated by the fact that in March 2010 it acquired Mr Quinlan's personal loans from Anglo Irish Bank. These loans were secured over part of Mr Quinlan's shareholding in the company representing some 13.52% of the total equity of the company. Accordingly, NAMA's interests were best served not only by a repayment in full of the company's loans but also by maximising the value of the company's equity. This made NAMA reluctant to enforce the loan facilities if they were not repaid by the expiry date of 31 December 2010. Although enforcement would almost certainly result in repayment of the loans, enforcement would impair the value of Mr Quinlan's equity.

451.   As detailed in the chronological section, all attempts during 2010 to raise the finance necessary to repay the NAMA debt, by a combination of loan facilities and equity investment, had failed by early November 2010. The company and its shareholders decided to seek a two-year extension to the loan facilities from NAMA. This was raised with Mr Hennigan by Mr Buchanan at a meeting on 5 November 2010 and was followed on 19 November 2010 by a formal application from the company. Mr Hennigan viewed this request as a last resort, the company having exhausted all other forms of refinancing. At their meeting on 5 November 2010 Mr Buchanan had told Mr Hennigan that Ernst & Young had been appointed by the company to advise the directors on their legal duties and obligations given that there was a very strong likelihood that the company would be insolvent within three months if the facilities were not extended. Mr Buchanan had explained to Mr Hennigan that the advantage of an extension for a period as long as two years was that it would allow the company to seek a sale of the group without any association of a distressed asset sale. NAMA initially suggested an extension of 18 months but by the end of December 2010 an extension of two years had been agreed in principle. Certain key terms, such as the interest rate and an arrangement fee of 1% of the total size of the facilities, were agreed in principle but further terms remained

to be agreed and the proposed new facility agreement still had to be drafted. Accordingly, on 24 December 2010 NAMA agreed to extend the facilities to 31 January 2011 and, by the terms of the extension letter, confirmed that, if requested, it would give reasonable consideration to a further extension to 1 March 2011.

452.    NAMA's approach to the company at this stage may be summarised as follows. First, the company's overall indebtedness to NAMA was well secured. Secondly, the level of indebtedness was nonetheless too high because the anticipated cash flow would be only just sufficient to allow the company to service the debt. Thirdly, the company was over-leveraged by about £200 million and any new lender would require a reduction in the debt. Fourthly, the existing shareholders were unable to provide the necessary new equity or other funding, so that new equity or similar finance would have to come from external sources. Fifthly, the shareholders were in disarray and it was necessary for shareholder issues to be resolved. Sixthly, a two-year extension would provide the time and stability needed for a sale and refinancing of the company. Progress towards a resolution of the problems would be closely monitored, with a view to a sale at an earlier opportunity.

453.    The approach of NAMA was significantly affected by the events of January-February 2011: the purchase by the Barclay interests of Misland and the tripartite agreement between the Barclay interests, Mr McKillen and Al Mirqab. Although the agreement with Al Mirqab failed, these events demonstrated to NAMA that it was possible for its loan facilities to be repaid within a relatively short time scale and for Mr Quinlan's shares to be purchased, provided that the shareholders could reach agreement amongst themselves. The arrival of a wealthy investor such as the Barclay interests with ambitions to control the company, either alone or with others, indicated to NAMA that this was achievable.

454.    NAMA first heard of the purchase of Misland by the Barclay interests on 21 January 2011. It learnt also about the exclusivity agreement signed by Mr Quinlan on 15 January 2011. Mr Barclay and Mr Peters attended a meeting in Dublin on 24 January 2011 with Mr Mulcahy, Mr Hennigan and other representatives of NAMA. The note of the meeting prepared on the same day by Mr Hennigan records that Mr Barclay expressed his intention to purchase 100% of the shares of the company within the following four to eight weeks and requested NAMA to finalise the proposed two year extension to its facility but stated that he intended to refinance 100% of the debt within 12 months. NAMA regarded this as a positive development, indicating an exit for NAMA both by repayment of its loan facilities and a sale of the equity over which it held security. Mr Hennigan's memorandum sets out the return that NAMA could expect on the assumption that the debt was refinanced by the end of 2011.

455.    On 1 February 2011, NAMA agreed to extend the deadline on its facilities to 14 February 2011. Discussions on the final terms of the 2-year extension to the NAMA facilities continued. Mr Hennebry reported to a board meeting of the company on 8 February 2011 that although the loan agreement was substantially complete there were still some outstanding issues. Nonetheless, the extension was seen as imminent. The minutes record Mr Faber as saying that the company should remain focussed on the NAMA refinancing proposition "*so as to allow the Board to act from a position of strength and allow the company to stabilise before looking to a 3rd party debt provider for a longer term solution*". He reported on the same day to

Aidan Barclay that the Board remained confident that the outstanding points would be dealt with and that the extended facility would be entered into on Friday 11 February or Monday 14 February 2011.

456. On 4 February 2011, the Barclay interests informed NAMA that it had acquired Mr Quinlan's secured debts from BOSI, and offered to purchase his debts to NAMA which were secured on part of his shareholding, representing 13.52% of the equity of the company. The price offered was £35 million, representing an enterprise value of £900 million. Mr Mulcahy regarded this as a reasonable offer but on 7 February 2011 NAMA received a competing offer from Wynton at a price equivalent to an enterprise value of £1.028 billion.

457. On Saturday 12 February 2011, the Barclay interests, Al Mirqab and Mr McKillen made their agreement in relation to the company. Mr Hennigan was informed that this would involve the purchase of Mr Quinlan's shares and the repayment in full of the NAMA facilities through credit facilities negotiated by the Barclay interests with Barclays Bank. A further two week extension of the NAMA facilities was requested in order to finalise these arrangements. At its meeting on 15 February 2011 the credit committee of NAMA agreed the extension and agreed to the proposed repayment of its facilities and to a sale of Mr Quinlan's debt, but on terms that the company would pay an "exit fee" of £13.5 million. The fee's purpose was to compensate NAMA for not selling the loans to Wynton at a higher price.

458. The terms agreed with NAMA were contained in two letters, one from the company to NAMA and the other from EHGL to NAMA, each dated 16 February 2011. The agreement with the company provided that NAMA would extend the present facilities until the close of business on 28 February 2011 *"so that the Group may complete a refinance of the entire current NAMA senior debt facilities, totalling £660 million, plus all accrued interest, on or before such date"*. It provided also for the payment of the balance of the arrangement fee, amounting to £2.3 million, on completion of the third party refinancing. The agreement with the Barclay interests provided, first, for a period of exclusivity until the close of business on 28 February 2011 during which time NAMA would not enter into discussions with or accept any offer from any third party relating to the refinancing of its facilities or the sale or purchase or refinancing of debt owed by Mr Quinlan. Secondly, NAMA agreed to release its charge over shares in the company held by Mr Quinlan upon receipt of £35 million. Thirdly, EHGL agreed to procure that the company would pay NAMA the exit fee of £13.5 million upon the refinancing of the group. Fourthly, NAMA undertook to seek to agree with Anglo Irish Bank that the latter would consent to the sale of shares held by Mr McKillen in the company. Fifthly, EHGL agreed that it would procure that on the refinancing the company would pay NAMA's costs and legal fees incurred to date relating to the two-year extension subject to a cap of £500,000.

459. Mr Hennigan's unchallenged evidence was that these were very positive developments for NAMA and reaffirmed their view that refinancing by an external party would only be available where there was both shareholder agreement and a financially solid shareholder with majority control.

460. NAMA gave internal approval to a sale of Mr Quinlan's personal loan facilities on 22 February 2011. On the same day it received further evidence that the proposed

deal was proceeding when a request was sent to it by Anglo Irish Bank for approval to the sale of its security over part of Mr McKillen's shareholding representing 18.23% of the equity of the company. This request was regarded as important by NAMA, in particular because, while they had concerns as to whether Mr McKillen would in fact support the deal, the request had come via Mr Cunningham so it was believed to be fully supported by Mr McKillen.

461.    The first indication to NAMA that the deal might not proceed was on 25 February 2011 when Mr Hennigan received a call from Mr Hennebry to say that refinancing might be about to fall through. On 1 March 2011 Mr Hennigan called Mr Faber to ascertain the position. Mr Faber confirmed that the agreement would not proceed on account of Mr McKillen's rejection of it. Mr Hennigan says that NAMA viewed this action as "*bizarre*" because a credible proposal for refinancing the company's debts had been rejected by the shareholders "*for no apparently good reason*".

462.    The importance of the events of January-February 2011 for NAMA is summarised by Mr Mulcahy and Mr Hennigan in their witness statements.

463.    Mr Mulcahy states:

> "........*the BarCap Refinance did demonstrate that, contrary to Coroin's assertions in late 2010, the company did not need a two-year term to be able to raise the necessary funds for a full refinance. In fact, it had been able to raise sufficient funds in the course of less than two months. The only reason that the deal had not gone through was due to shareholder disagreement. As such, and also to focus the shareholders on the aim for finally completing the successful refinance or sale, we decided that NAMA would only offer Coroin a three-month, rather than a two-year, extension in order to keep them focused on the refinancing or other exit for NAMA.*"

464.    In his witness statement, Mr Hennigan says:

> "*67. NAMA saw the position differently as a result of the failed BarCap Refinance. In December 2010 NAMA had agreed in principle to a two year extension because, according to Coroin, the shareholders and directors could not arrange a full refinance without a two year window in which to do so.*
>
> *68. It was now clear, after the BarCap Refinance, that Coroin did in fact have the ability to raise the full amount for a refinance, and could do so with a maturity date of just two months. The BarCap Refinance had only failed because the shareholders could not agree personal terms, not because of the short extension.*
>
> *69. Consequently NAMA adopted a new strategy moving forwards. It would not grant a two year refinance. Instead, it would only grant short extensions, keeping Coroin aware that it needed to push hard to find a way*

> *of agreeing a refinance out of NAMA. Because of the*
> *actions of the shareholders NAMA had formed the view*
> *that it was imperative to exit Coroin at the earliest*
> *opportunity."*

465.   In early March 2011, NAMA held discussions with the Barclay interests and with
representatives of Wynton with a view to agreeing a sale of Mr Quinlan's debt
secured on part of his shareholding. The Barclay interests were no longer prepared,
by payment of the £13.5 million fee, to match the Wynton offer but Wynton was
prepared to proceed with a purchase of the debt at a price of £49.1 million which
was agreed by NAMA in early April 2011. This too appeared to NAMA to be a
positive sign. As Mr Mulcahy comments, *"there were clearly now two interested*
*and well-backed parties in competition for control of Coroin."*

466.   NAMA's position became very clear in the course of March 2011. Although Mr
Hennebry seems to have understood from a conversation with Mr Hennigan on 28
February 2011 that NAMA was moving towards approving a two-year extension
and permitting drawdown the following week, I am satisfied that he misunderstood
the position. A telephone conversation with Mr Hennigan later that evening showed
that NAMA was far from agreeing any such new facility. On 3 March 2011 Mr
Hennigan told Mr Hennebry that if the company wished to renew its requests for a
two-year extension then it would have to make the request in writing. Mr Hennebry
on behalf of the company wrote in those terms to NAMA on the same day.

467.   There was at this time continuing discussion, or the prospect of continuing
discussion, between the Barclay interests and Mr McKillen with a view to reviving
in some form the deal which had been agreed in February 2011. Aidan Barclay and
Mr Faber met Mr Hennigan and Mr Mulcahy at NAMA's offices on 2 March 2011.
The main purpose of the meeting was to discuss the Barclay interests' offer for Mr
Quinlan's debt but in the course of the meeting Mr Barclay and Mr Faber explained
that they expected or hoped that the collapsed deal could still be revived and for that
reason, at that stage, wished to there be a delay in the two-year extension.

468.   On 8 March 2011, NAMA informed the company that the facility would be
extended only till 21 March 2011. Mr Hennigan's evidence is that the purpose of
this short extension was to enable the shareholders to revive the deal agreed in
February and in particular the Barclays Bank refinance. In a letter dated 9 March
2011 to the company, NAMA made clear that any agreement at the end of 2010 for
an extension to the facilities had been an agreement in principle only. In the letter
NAMA made clear its position:

> *"Please note that we were assured by Coroin that the Anglo*
> *facilities would be repaid in full by no later than 28 February*
> *2011. This did not happen. NAMA is under a statutory duty to*
> *protect the interests of the Irish State and Ireland's taxpayers*
> *in respect of loans that it has acquired under the NAMA Act*
> *2009. If NAMA considers it necessary to make facilities to*
> *Coroin in any way conditional upon, or subject to, reaching*
> *satisfactory agreements or compromises with Coroin's*
> *shareholders then this is a matter for NAMA in the discharge*
> *of its statutory objectives. Coroin's option is to obtain third*

*party financing and repay Anglo in accordance with the contractual terms of the various facilities agreements."*

The letter ended *"NAMA will continue to discharge its statutory obligations in such manner as it considers appropriate to protect the interests of the Irish State".*

469.   On 10 March 2011, Mr Hennebry and Mr Cunningham met Mr Hennigan and Mr Mulcahy to discuss an extension to the NAMA debt. The latter made clear that NAMA would not grant a two-year extension without shareholder consensus. They would at most consider a three-month extension to permit time for the shareholders to reach agreement. As Mr Hennebry reported to the board of the company the following day, NAMA was prepared to sell the loan as it was becoming increasingly frustrated with the situation, although it would not sell it at a discount and it appreciated the potential damage to the value of the shares over which it held security.

470.   The prospect of an agreement among the shareholders led NAMA to state that it would extend the NAMA debt until 31 March 2011, as Mr Hennebry reported to the board of the company on 14 March 2011. Mr Hennebry further reported that NAMA's position *"remains unchanged in that they still seek reassurance from the shareholders on the long term solution"*.

471.   Agreement was not reached with Mr McKillen in the course of discussions in mid-March 2011. On 22 March 2011 the NAMA credit committee agreed to offer the company a three-month extension of the facilities. The minutes record that the reduced refinance period followed a change in the shareholders and was intended to encourage the shareholders to agree external refinance with a third-party. Mr Hennigan conveyed this decision to Mr Hennebry in a call on the same day during which he made clear that NAMA retained the ability to sell the NAMA debt. Mr Hennigan also made clear that a two-year refinance was firmly off the cards and that NAMA now expected the company to press hard for a sale or refinance within the following three months. Mr Hennigan followed this up with an email on 29 March 2011 in which he stated that *"if appropriate, any extension to the 3 month facility will be considered on the basis of Coroin's or the shareholders' progress in achieving a 3rd party refinance out of NAMA"*.

472.   It is in my judgment clear that by the end of March 2011 the approach of NAMA to the company's indebtedness had irrevocably changed. NAMA's primary function was to realise to the best advantage of the Irish State and taxpayer the loans which had been transferred to it. The events of February 2011 had made clear that it could realistically expect full repayment of the NAMA debt. It was clear that, if the shareholders could reach agreement, the debt could be refinanced. NAMA's assessment was that the debt could not be refinanced by a conventional senior loan facility alone. It would need a significant amount of equity injection or perhaps mezzanine finance. It considered that in order successfully to refinance the debt the company needed a financially strong equity holder and it recognised such a party in the Barclay interests. However, it was not concerned with the identity of the purchaser of the NAMA debt. It was prepared to sell to any party which could raise the funds required to purchase debt at par with accrued interest. A short extension of the debt was needed to bring pressure on what NAMA regarded as a dysfunctional

group of shareholders. It would keep the shareholders focussed on resolving matters.

473.   In his cross-examination of Mr Mulcahy and Mr Hennigan, Mr Marshall sought to make the case that NAMA's decisions with regard to an extension of the debt were influenced by what was said to them by Mr Faber and Mr Barclay in the course of meetings and communications. I am satisfied that this was not the case. NAMA had every reason to refuse a lengthy extension to the NAMA debt, acting with a view to the pursuit of its statutory purposes, and in my judgment their decisions would have been the same whatever was said to them by representatives of the Barclay interests.

474.   The new consolidated facilities agreement was executed on 1 April 2011, with a maturity date of 30 June 2011. The accompanying letter from NAMA to the company highlighted that "*nothing in this letter shall oblige or commit NAMA or the Finance Parties in any way to grant any extension to any Repayment Date or agree any roll-over of any Loans or to renew or refinance any Loans and any such decisions shall be for NAMA to make in its absolute and sole discretion*".

475.   As it appeared to NAMA, and indeed was the case, nothing was achieved during the three-month extension to 30 June 2011 which would bring closer a refinancing of the NAMA debt. Negotiations between the Barclay interests and Mr McKillen came to an end in June 2011 without acceptable terms being agreed. Although in its letter dated 16 June 2011 to NAMA, requesting a further three-month extension, the company wrote that every effort continued to be made to achieve the primary objective of refinancing the NAMA debt and that the company was confident that a refinancing could take place in the near term, there was in truth little basis for this.

476.   On 8 July 2011 NAMA agreed to grant a three-month extension, expiring on 30 September 2011. By then, there had been a further significant development in NAMA's approach to dealing with this debt. As an alternative to a repayment of the debt, NAMA now started to give serious consideration to a sale of the debt. It had previously been inhibited in this respect by its continuing interest in the equity of the company, which might be damaged by a sale of the debt. As well as its security over part of Mr Quinlan's shareholding, it had a potential interest if it sought a transfer of bank loans to Mr McKillen secured on his shareholding. However, in April 2011, NAMA had sold the Quinlan debt to Wynton and on 6 July 2011 the board of NAMA resolved not to acquire Mr McKillen's debts. Its sole interest was therefore in the speedy realisation of the debt due from the company. Mr McKillen accepted in cross-examination that he appreciated that this was the case. The NAMA board paper supporting the recommendation for board approval to the extension of the company's facility to 30 September 2011 stated as follows:

> "*Coroin is the holding company for the Maybourne Hotel Group. NAMA previously provided a 3 month facility extension to encourage the shareholders to refinance the debt. The shareholders of Coroin have requested another 3 month extension to 30th September to allow sufficient time to identify an alternative lender, noting that trading performance is satisfactory.*

> *NAMA PM is uncertain as to the ability of the shareholders to
> secure alternate financing in light of the current shareholding
> structure therefore NAMA PM will consider alternative exit
> strategy during the extension period."*

477.    In July 2011 NAMA took active steps to pursue a sale of the company's debt. It
        contacted Wynton's lawyers who responded that it was still interested in a purchase
        of the debt. On 28 July 2011, the board of NAMA approved a sale of the NAMA
        debt at par, without specifying any purchaser. At a meeting on 4 August 2011, Mr
        Hennigan told Mr Hennebry that NAMA had opened discussions with a view to a
        sale of debt and that NAMA might well sell the debt in the near future. In addition
        to discussions with Wynton, NAMA engaged in discussions with a view to a
        possible sale of the NAMA debt to the Barclay interests. These started with a call
        from Mr Peters on 9 August 2011.

478.    There was no room for the company or its directors and shareholders to
        misunderstand NAMA's position, nor in fact did they do so. In a letter dated  10
        August 2011, rejecting a proposal which had been put by the company to NAMA,
        Mr Hennigan made clear that the only proposal NAMA would consider was full
        repayment of the debt plus accrued interest. He added:

> *"I also wish to take this opportunity to state that I can give no
> guarantee or expectation that NAMA will agree to extend the
> facilities beyond the 30 September 2011 maturity date".*

        This letter was discussed in a conference call of the directors of the company on 15
        August 2011 and they well understood that NAMA might seek to sell the debt, so
        much so that there was a proposal for a letter to be written to NAMA asking
        whether NAMA was in discussion with any parties with a view to a sale of the debt.

479.    Mr McKillen's evidence was that he was aware of rumours that NAMA might be in
        discussions with possible purchasers of the debt. He emailed NAMA on 26 August
        2011 to say that he was alarmed by the statement in Mr Hennigan's letter of 10
        August 2011 quoted above and he sought confirmation that NAMA was not in
        negotiations with any third party with a view to a sale of the debt. Mr Mulcahy
        made NAMA's position abundantly clear in his reply to Mr McKillen sent on 29
        August 2011:

> *"NAMA's objective is to achieve full repayment of par debt
> as soon as is practicable. The company and shareholders are
> well aware of our objective and we note that the company has
> been in refinancing talks for close to 2 years now without
> success. As you recall no doubt we facilitated a restructuring
> of the Knightsbridge loan into the company this year to assist
> and enhance the ability to achieve refinancing by the
> company.*

> *In our view the 3 month extensions is not the real issue, as we
> understood that refinancing by the company was very close
> earlier this year only to be thwarted at the last minute by a
> disagreement amongst the shareholders over certain issues.*

*NAMA reserves its rights to achieve its objective of achieving full par debt repayment by any means available to it. We would welcome any near term firm proposals by the company to achieve full par debt repayment as soon as possible."*

480.    The company was no more able in the period from July to September 2011 to put forward proposals which NAMA would regard as remotely satisfactory than it had been in the preceding three months. All that NAMA received in July was a letter dated 18 July 2011 stating:

> *"We remain committed to exploring all available options to enable us to refinance the existing facilities. Indeed, Coroin and its shareholders are actively engaged in discussions with several banks which it is hoped would lead to a refinance before the end of September."*

NAMA was hardly likely to be impressed by generalised statements of this sort, nor was it.

481.    On 5 August 2011 Mr Hennebry wrote to Mr Hennigan with the proposal that there should be a refinancing on the basis that 75% of the NAMA debt would be repaid out of a new senior facility and that NAMA would accept a junior position with respect to the balance of 25%. Leaving aside the fact that the company was nowhere near arranging the finance for this proposal, it was from NAMA's point of view a wholly unrealistic suggestion. NAMA's interest, as it had made clear on many occasions, was the repayment in full of the existing indebtedness as soon as possible. Not only was the suggestion of taking a deferred position in respect of 25% of its debt intrinsically unattractive, when all parties are agreed that an enforcement of the security would be likely to result in full repayment of the debt, but the interest offered on the junior debt was at a rate (3.75% over LIBOR) lower than the rate under the existing senior debt and significantly lower than market rates for comparable mezzanine finance.

482.    The company's next move was to write to NAMA on 9 September 2011, requesting an extension of the maturity date to 31 January 2012 at the earliest. The letter stated:

> *"Refinancing the company's loans away from NAMA remains the priority and every effort continues to be made to achieve this objective. With stronger trading results which underpin the property values and which provide improved interest cover, the company is confident that a refinancing can take place in the near term. We are engaging with an investment bank to assist in this process and their view is that a refinancing transaction would be viewed positively by the real estate debt market.*
>
> *It has also become clearly evident over the last couple of months that the quarterly debt maturity deadline is counterproductive in our efforts to refinance the debt. A longer maturity date of one year would remove this avoidable*

*uncertainty and allow the company to focus on refinancing. I would welcome your thoughts on this matter.*"

This letter showed that the company was in truth no further forward than it had been when it wrote, in strikingly similar terms, to NAMA on 8 July 2011. In fact, it appeared the position was worse. The letter indicated that it might take at least a year to achieve a refinancing and its reference to "*engaging with an investment bank*" indicated that company was not yet in discussions with any potential sources of finance.

483.    NAMA's reply dated 13 September 2011 made clear its scepticism at the contents of the company's letter. Mr Hennigan wrote:

> "*I am not clear what evidence you have that quarterly debt maturity deadlines are counterproductive to your efforts in achieving a refinance of existing facilities. Perhaps you would like to elaborate in concrete terms how a change in the maturity date would have the desired effect of achieving a refinance?*"

The letter ended with the now familiar statement that it was NAMA's wish that "*this loan be repaid in full at the earliest opportunity*". The inability of the company to provide the concrete evidence requested by NAMA was exposed by its reply dated 16 September 2011. Referring again to the company's discussions with a leading international investment bank, it stated "*initial indications have been very positive and we have another meeting with them scheduled for early next week*". It goes on to state that they planned to provide examples from their own experience to date together with the additional insight of the investment bank on how a longer maturity date would facilitate the refinancing process. The company was unable to provide anything of more substance in its letter dated 26 September 2011, requesting a further extension.

484.    On 23 September 2011 Mr Hennigan, supported by NAMA's credit and risk department, recommended to the credit committee that any loan extension should be rejected "*to encourage the company or the shareholders to refinance the debt out of NAMA*". This was stated to be in line with its approved strategy. On the same day the Barclay interests had made a new offer to NAMA to purchase the NAMA debt at par plus accrued interest, thus fulfilling NAMA's requirements. Mr Hennigan's evidence, which I accept, is that even if this offer had not been received his recommendation would have been the same given the lack of any progress on the company's part with a refinancing of the debt.

485.    As detailed in the chronological section, discussions had continued in August and September between NAMA and Wynton and the Barclay interests as possible purchasers of the NAMA debt. In mid-September 2011 the Barclay interests reached agreement with Wynton and the interested Abu Dhabi parties, so that thereafter the Barclay interests appear to have been the only prospective purchasers of the debt.

486.    In my judgment, it is very clear that by August and September 2011, there was no prospect whatsoever of NAMA agreeing to an extension to the facilities by one

year, let alone two years. There was simply no way in which any party could persuade NAMA to agree to an extension to the debt without concrete evidence that a full refinancing would be forthcoming in the very near future. Mr McKillen's belief that NAMA could be persuaded to agree a further extension does not bear examination. His evidence, if accepted, on the company's dealings with NAMA in this period suggests that he did not have a grasp on the realities of the situation. His views that the proposal made in early August 2011 involving NAMA taking a junior position in respect of 25% of its debt was *"a brilliant idea"* and that NAMA's letter dated 13 September 2011 should be *"seen as positive"* were fanciful.

**Alleged breaches of duty by directors**

487.    Leaving aside the pre-emption issues, the principal basis for Mr McKillen's case of unfairly prejudicial conduct of the affairs of the company rests on allegations that the directors appointed by the Barclay interests acted in a number of respects in breach of their duties as directors.

488.    The duties of directors are now largely codified in sections 170 to 177 of the Companies Act 2006 but they reflect the fiduciary and other duties of directors long established at law and in equity. The duties are owed to the company: section 170(1). The duties most relevant to the present proceedings are as follows. Under section 172(1), a director *"must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole"* and in doing so he must have regard, amongst other matters, to the factors set out in sub paragraphs (a) to (f). Section 173(1) requires a director to exercise independent judgment. Section 174(1) requires a director to exercise reasonable care, skill and diligence. Under section 175(1) a director *"must avoid a situation in which he has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company."* A conflict of interest includes a conflict of duties: Section 175(7). By section 177(1), if a director is in any way, directly or indirectly, interested in a proposed transaction or arrangement with the company, he must declare the nature and extent of that interest to the other directors.

489.    The directors in question are Mr Faber, Mr Seal and Mr Mowatt. They were appointed as directors on the following dates: Mr Faber on 21 January 2011, Mr Seal on 23 March 2011 and Mr Mowatt on 16 May 2011. Mr Faber ceased to be a director on 11 October 2011, but the other two remain directors. They were all appointed by the exercise of powers attached to shares registered in the names of companies comprising the Barclay interests.

490.    Most of the alleged breaches occurred in the period July to September 2011 although there is a breach alleged against Mr Faber at the end of January 2011. An allegation that they had been in breach of duty by blocking redevelopment plans for Claridge's and The Berkeley was abandoned in Mr McKillen's closing submissions. I shall deal with each of the alleged breaches in their chronological order.

*Closure of the data room*

491.    This is an allegation against Mr Faber. Mr Seal and Mr Mowatt had no involvement in it. The events complained of occurred in late January and early February 2011.

They should be seen in the context of the other events at this time which I have set out in the chronological section of this judgment. I shall first set out the sequence of events directly relevant to this issue.

492.   In the course of 2010 the company established an electronic data room to contain confidential information relating to the company, its operations and its financial position.   The purpose was to provide information to Northwood as a proposed investor and Deutsche Bank as the lead for a new banking syndicate. When the Northwood deal fell through in November 2010, the data room was closed. With new approaches and discussions with third party purchasers and investors in early January 2011, there was renewed interest in the data room. It appears that at some point in January 2011 Credit Suisse acting on behalf of the Qataris was told that it would have access to the data room. In addition Mr Buchanan on behalf of the Green family was concerned that Wynton should also have access to it.   On 10 January 2011 Wynton executed a non-disclosure agreement as a pre-condition to access.   There is however no evidence that either Credit Suisse or the Qataris or Wynton in fact accessed the data room in January 2011.

493.   Mr Faber attended his first board meeting on 25 January 2011, when there was no reference either to any proposed sale of shares in the company or to the existence of or access to a data room. On 27 January 2011, Mr Hennebry sent an email to the directors in which he referred to the negotiations then taking place with NAMA with a view to an extension to its facilities. He continued in the email as follows:

> "Separately and in parallel to the Nama process, DLA are in the process of putting the finishing touches to a "draft" sale & purchase agreement which will be sent to the lawyers acting for the potential acquirors who continue to show an active interest in acquiring the company which it is hoped will, amongst other things, give the board opportunities to explore the terms on which potential bidders may be willing to conclude a transaction and finance any such acquisition and the impact on the group of such financing arrangements going forward (which is obviously very important from the company's standpoint). In connection with these processes DLA are continuing to populate the data room, update their draft vendor legal dd report and respond to material due diligence enquiries to the extent they are able to do so".

494.   Mr Faber promptly called Mr Hennebry and then emailed a letter to him, stating:

> "As I mentioned, I was extremely surprised by the last paragraph of the email in which you detailed the action DLA is taking purportedly on behalf of Coroin in connection with the sale of the company and the provision of information (potentially of a confidential nature) to third parties.
>
> This is a key matter for Coroin and, given the importance of such potential steps, these actions must be viewed and discussed by the board. Further action must not be taken without the board's authority".

He confirmed their earlier conversation in which Mr Hennebry had agreed that work on any sale documentation would cease and he would not send documentation to any third parties.   He would inform all members of the board in detail of the steps taken to date in relation to any purported sale, including details of any information

which had been made available to third parties. Mr Hennebry did not in fact provide details of any information which had been made available to third parties, so it is a reasonable inference that no such information had been provided. Mr Faber continued in his letter to say that he was instructing the secretary to convene a board meeting by no later than noon on 31 January 2011 to enable the board to consider and review the position. The instruction was subject to the receipt of agreement by directors holding between them at least 100 votes, as required by the shareholders agreement for a meeting to be held on short notice.

495.   I do not doubt that Mr Faber was extremely surprised to read the last paragraph of Mr Hennebry's email. The preparation and distribution to lawyers acting for potential purchasers of a draft sale and purchase agreement relating to the shares in the company is necessarily an act on behalf of the shareholders of the company. It requires the support of the shareholders. Whatever the position of the Green family, once the Barclay interests had acquired Misland, there could be no assumption that Misland remained interested in a sale of its shares. On the contrary, there was every reason to suppose that the Barclay interests were not  interested in selling shares but in buying them.

496.   Mr Faber gave evidence that he had not been aware before Mr Hennebry's email that there was a data room. In an email sent to him on 16 January 2011 Mr Murphy had referred to getting access for the Barclay brothers to the company data room and the need for a non-disclosure agreement. Mr Faber had given Mr Murphy the following day an address for a non-disclosure agreement. Whether or not Mr Faber had that exchange in mind when he spoke to Mr Hennebry following receipt of Mr Hennebry's email on 27 January 2011, I find it entirely plausible that he may not have done, he had no reason to believe that a draft sale and purchase agreement was being prepared or that other potential purchasers were being given access to the data room.

497.   Mr Faber's request for a board meeting to be held on short notice was followed 17 minutes later by an email of support from Mr Murphy. The combination of the votes capable of being cast by Mr Faber and Mr Quinlan or by Mr Murphy as his alternate exceeded the 100 votes required for the meeting to be called on short notice. Accordingly, on 28 January 2011, Ms Walker gave notice of the meeting to be held at 11.00am on 31 January 2011.

498.   Mr McKillen emailed the other directors objecting to the meeting convened for 31 January 2011 and saying that in any case that he would not be in London on that date due to commitments which he could not change at short notice. He said that "*as a gesture of goodwill I am prepared to attend a meeting on 8 February to facilitate an early discussion of the matters raised*". He also said that the provision of information had been discussed with and approved by all of the shareholders and directors including Misland and its nominee and its appointee on the board and as such he failed to see how a further discussion could reasonably and in good faith be considered as sufficiently urgent to justify a meeting at such short notice. Mr McKillen's evidence demonstrated that he was at least in part motivated in his reply by a desire to show that he would not be pushed around by the new owners of Misland.

499.    Mr Faber responded that he would accept a delay in the meeting until 8 February 2011 as requested by Mr McKillen, conditional upon no further steps being taken by the company or its advisers in connection with any offer for the company or its assets and of no further data room access being provided to third parties pending a proper discussion at the meeting on 8 February 2011. The following day Mr McKillen agreed to the conditions specified in Mr Faber's letter.

500.    In an email dated 31 January 2011 DLA raised concerns as regards to the closure of the data room: *"that was made operational last week to which advisors to a prospective bidder currently had access"*. The advisers in question were Credit Suisse. Their concern was that closing the data room, as opposed to not posting additional information to it, could be seen as closing off a process with a party at a time when the company should, technically, be considering all options open to it in light of its refinancing position.

501.    The board meeting was held on 8 February 2011. The minutes of the meeting record:

> *"With the NAMA refinance now imminent, the meeting agreed that the company would not engage with any third parties until such time as the refinancing was complete. This would provide a solid balance sheet and remove the perception of distress that surrounds the Company...... It was agreed that the data room would remain closed".*

There was some difference in the evidence as to whether a vote was taken on this issue, with Mr McKillen voting against the continued closure of the data room. I find that no vote was taken but that Mr McKillen did register his objections to the closure of the room. Mr Faber's evidence was that Mr McKillen's concern appeared to be that he had been embarrassed in his dealings with the Qataris by this decision. I am satisfied that Mr McKillen went somewhat further than that.

502.    On the basis of these largely undisputed facts, the petition alleges that the decision to close the data room and Mr Faber's insistence on its closure before the meeting on 8 February 2011 was a breach of fiduciary duty on the part of Mr Faber and Mr Quinlan. Somewhat surprisingly, notwithstanding that Mr McKillen had known all the material facts since the time at which they occurred, this allegation did not feature in the petition as presented or as amended in early February 2012 but was brought in as one of a number of amendments made shortly before the start of the trial.

503.    It is alleged in the petition that the decision to close the data room and Mr Faber's insistence on its closure prior to the meeting:

> *"i.     was not in the interests of the Company, as it would reduce the prospects of the Company being able to obtain financing from third parties (as part of an acquisition of or investment in shares in the Company or at all) at a time when the Company's facilities with NAMA were due to expire on 31 January 2011 and an extension had not yet been agreed, and further*

> ii.    *was calculated to advance the sectional interests of the Barclay Brothers, and accordingly motivated by a collateral purpose rather than being actions considered most likely to promote the success of the company for the benefit of its members as a whole."*

504.   The short answer to this allegation, as an instance of conduct which was unfairly prejudicial to Mr McKillen as a member of the company or indeed to any claim for relief for breach of fiduciary duty, is that the closure of the data room caused no loss or prejudice at all. No potential purchaser or finance provider was put off by its closure. The Qataris were content to enter into agreements with the Barclay brothers on 2 February 2011 and with Mr McKillen on 3 February 2011, without any access to the data room. Equally they were prepared to enter into the tri-partite agreement on 12 February 2011 without any such access. The closure of the data room did not prevent Wynton from making an offer to the shareholders on 7 February 2011.

505.   Nor was there any damage to the company in its dealings with NAMA. It is true that NAMA was initially concerned when it learnt that the data room had been closed: *"They've gone nuts that we closed the data room"* as Mr Faber described it in an internal email but it did not in fact prevent NAMA from agreeing a short extension of the facilities and from thereafter dealing with the company first in the light of the tri-partite agreement reached with the Qataris and then subsequently. It is quite impossible to conclude that events in relation to NAMA would have been any different at all if the data room had remained opened. Their concerns stemmed from the fact that Credit Suisse as advisers to the Qataris did not have access to the data room with the result, as they initially saw it, that it would affect the prospects of a deal of the Qataris. But, as is clear, that was not the case and NAMA had no further grounds for concern once agreement was reached with the Qataris.

506.   As regards Mr Faber's motivation for seeking the closure of the data room, it was not in my judgment improper or a breach of duty on his part to seek its closure. This must be seen in the context of, first, the circumstances in which the data room was initially established and, secondly, the change in those circumstances brought about by the purchase of Misland by the Barclay interests. The data room was originally established in circumstances where all the shareholders accepted the need for new capital in order to refinance the company but none of them was prepared to provide it. All the shareholders, with the exception of Mr McKillen, wished to sell their shares. In drafting a share purchase agreement and in making information available in a data room, the company was facilitating the injection of new capital by a third party and the sale of shares of existing shareholders. The circumstances were substantially altered by the purchase of Misland by the Barclay interests. Misland did not wish to sell its shares, and was clearly interested in buying the shares of other shareholders. Moreover, it was prepared and in a position to provide the further capital required by the company. A third party offer for the shares of the company was no longer feasible if it did not have the support of the Barclays interests, because they would refuse it. The data room was no longer relevant, as events showed. In those circumstances, Mr Faber was not, in my judgment, acting wrongfully in seeking the closure of the data room. Nor can Mr McKillen complain about the closure of the data room pending the meeting held, for his convenience, on 8 February 2011 because he agreed to its closure during that period.

*JLL Valuation*

507. It is alleged that Mr Faber acted in breach of his duties as a director by taking steps to obtain a valuation of the company's hotels from Jones Lang LaSalle (JLL) in July 2011.

508. The relevant facts are as follows. As appears from the chronological section, from mid-June 2011 Mr Peters on behalf of the Barclay interests was negotiating with HSBC and with Barclays Bank with a view to agreeing a facility to enable the Barclay interests to purchase or refinance the NAMA debt. By 8 July 2011 the discussions with HSBC had got to the point where a draft term sheet from HSBC was imminent. It would appear that HSBC wanted to see an up-to-date valuation of the group's hotels and properties, because on that day Mr Peters emailed HSBC to ask:

> *"Assuming that HSBC want to undertake the transaction with us, and receive the necessary internal approvals, would you please confirm that if we got JLL to update their valuations from May 2010 that would suffice for your purposes?"*

509. JLL had produced a valuation of the company's hotels in May 2010 for the purposes of discussions then taking place between the company and Deutsche Bank for a new facility. On 8 July 2011, Mr Faber emailed JLL, saying: *"We are currently keen to engage JLL to refresh the valuation of Maybourne Hotel group from last June"*. The coincidence of timing, combined with Mr Peters' evidence that obtaining the valuation is something that Mr Faber would have dealt with, makes it highly probable that Mr Faber's approach to JLL was prompted by the need to obtain a valuation for the purposes of negotiations with HSBC, and I so find. Mr Faber's email to JLL would give the impression that the valuation was being sought by the Barclay interests. In the course of their subsequent exchanges, however, it became clear that Mr Faber envisaged that the company would be the client and would pay for the valuation. JLL made clear that they would wish to re-inspect the hotels and Mr Faber arranged this with Mr Alden, with visits to The Connaught and The Berkeley taking place on 21 July 2011. Mr Hennebry was kept informed of these visits.

510. On or about 20 July 2011 Mr McKillen discovered that Mr Faber had taken steps to instruct JLL and that they were inspecting the hotels. He called Mr Faber in the evening of 20 July 2011 and, in an email sent two days later, Mr Cunningham confirmed that Mr McKillen was *"absolutely outraged"* that these steps had been taken without consultation. The email made clear that Mr McKillen wanted to be fully involved in the valuation process. JLL met Mr McKillen on 27 July 2011 to discuss in particular any proposed changes to the development proposals for the hotels. At a board meeting on 11 October 2011 attended by Mr Cunningham as Mr McKillen's alternative, as well as by Mr Seal, Mr Mowatt and Mr Alden, it was unanimously resolved to obtain an up-to-date valuation from JLL. JLL was willing to provide the draft valuation provided their fee was paid. Their agreed fee of £112,500 was paid, with the specific approval of Mr Cunningham.

511. It is alleged in the petition that Mr Faber liaised with and directed the appointment of JLL purportedly on behalf of the company without authority and, *"principally or at least in part for the benefit and use of the Barclay brothers and their interests"*. The petition invites the inferences that, first, *"a purpose for instructing to JLL to*

*value the company was in order that the valuation could be provided to Barclays Bank to satisfy the condition imposed on planned provisions of funding to MFL"* and secondly *"a purpose of instructing JLL to value the Company was in order that the valuation could be used by MFL in the planned appropriation of assets".* The planned appropriation of assets alleged in the petition would occur following a purchase of the NAMA debt and a foreclosure.

512.    In my judgment, the evidence supports neither of these inferences. The evidence does suggest, and I find, that Mr Faber's initial instructions to JLL were for the purpose of providing a valuation which could be used by the Barclay interests in negotiations with HSBC. In fact, however, this is not how matters proceeded. No valuation by JLL was used by the Barclay interests in their discussions with HSBC nor is there any evidence that any such valuation was used in their discussions with Barclays Bank. Instead the company was quickly identified as the client and JLL's work for the production of the valuation was undertaken with the full co-operation of Mr Hennebry, Mr Alden and Mr McKillen. Mr McKillen was clearly angry that JLL had been instructed without consultation with him but he nonetheless co-operated with them. No fee for the valuation was paid by the company until the board unanimously resolved to do so on 11 October 2011. The valuation was then provided to the company, for its own purposes.

513.    In my judgment, these events disclose no breach of duty on the part of Mr Faber, nor, importantly, any loss to the company or any prejudice to Mr McKillen or any other shareholder in the company.

514.    It was Mr Faber's evidence, and this would seem to be plainly correct that the Barclay interests would not be in a position to use a valuation obtained by and addressed to the company. If the Barclay interests wished to rely on a valuation, they would have to obtain their own. It is true that in his memorandum dated 1 August to Sir David Barclay, Mr Faber referred to the headline figures as appearing in the draft JLL valuation. Whether those figures had been provided orally or in writing by JLL does not appear from the evidence. This, however, is the only evidence of any use being made of the JLL valuation for any purposes other than those directly of the company. As for the allegation that a purpose of the valuation was for use by the Barclay interests in the event of a foreclosure, Mr Faber makes clear in his memorandum that following a foreclosure the lender would have to select its own valuer. It is significant that Mr Peters never saw the valuation.

515.    It cannot be denied that, objectively speaking, it was in the interests of the company to obtain an up-to-date valuation of its properties, even though it was highly unlikely that the company would be able to procure refinancing without agreement amongst its shareholders. If such agreement could be reached, then the company would need to move quickly to co-operate in obtaining funding for the purpose of refinancing the NAMA debt. It made obvious sense that any valuation should be prepared by JLL, given their previous experience.

*Draft Letter to NAMA*

516.    Mr McKillen alleges that Mr Seal was in breach of his duties as a director in interfering with the contents of a letter to be sent on behalf of the company to NAMA.

517.  On 10 August 2011 NAMA had written to the company, rejecting its proposal for refinancing the NAMA debt contained in the company's letter dated 5 August 2011. A board meeting was held by telephone on 15 August 2011 to discuss the company's response to NAMA's rejection. Mr Hennebry, Mr Cunningham, Mr Seal, Mr Mowatt and Mr Faber, who was then in Abu Dhabi, participated in the call. No note or minute was taken of the discussion but in an email sent just after the call by Mr Alden to Ms Walker, Mr Alden reported *"discussed blunt response from NAMA re our proposal to refinance with their help. Also concerning that they refer to no obligation to roll over debt. Toby will be drafting a note to NAMA asking about whether they are attempting to sell the debt as there is a provision in the facilities agreement for them to consult with the company if they are"*. It was agreed that Mr Hennebry would circulate the proposed draft letter among the directors for their comment. Mr Hennebry circulated the draft on the following day.   After expressing in the first paragraph the company's disappointment that the previously proposed refinancing route had been rejected, the draft letter continued:

> *"In reference to the possibility that NAMA may be considering selling the company's loan to another bank, financial institution etc the company expects that notification and consultation as required under the facilities agreement would commence at least four weeks prior to any such transfer or assignment in order for the company to have adequate time to consider it. In addition, please can you confirm if NAMA is currently in discussion with any party at this time regarding its loan to the company".*

518.  There were email exchanges between Mr Seal, Mr Mowatt and Mr Faber regarding the wording of this draft letter to which I shall refer in a little more detail. The upshot was that Mr Seal responded to Mr Hennebry suggesting that in effect the second paragraph should be excluded. Mr Hennebry took the view that there was little or no point in sending a letter which did no more than express the company's disappointment, although Mr Seal's view was that it was important to have a response on record. In any event Mr Hennebry did not send a response. When Mr Cunningham discovered this, he raised his concerns that a letter along the lines agreed, as he saw it, during the conference call on the 15 August 2011 had not been sent. In the end Mr McKillen wrote a letter to NAMA making the points included in Mr Hennebry's draft letter and received an abrupt response.

519.  It is alleged in the petition that it is to be inferred that Mr Seal sought to delay the company from contacting NAMA or setting out the company's entitlement as regards consultation on the sale of the NAMA debt *"as he was aware that NAMA was in discussions with"* the Barclay interests. It is further alleged that *"in this regard Mr Seal was in a position of conflict and preferred his duty to or interest in Ellerman Investments and the Barclay interests to his duty to the company, in breach of his duties to the company"*. Consistent with this allegation, it is alleged in the closing submissions for Mr McKillen that Mr Seal was seeking to ensure that NAMA did not inform the company that the Barclay interests were in discussions with NAMA for the purchase of the NAMA debt.

520.  This allegation requires a careful consideration of the emails sent in the days following the circulation of Mr Hennebry's draft. Throughout much of this period Mr Faber was in Abu Dhabi and, although he was able to participate in the

conference call on 15 August 2011, he was for the most part heavily engaged in the negotiations there. Mr Seal responded within about half an hour of receiving Mr Hennebry's draft letter to say that he had given his comments to Mr Mowatt who would call Mr Hennebry as regards to the draft letter *"which I think needs some tweaking"*. Mr Hennebry and Mr Mowatt spoke by telephone, following which in the afternoon of 17 August 2011 Mr Hennebry emailed Mr Seal, referring to the conversation with Mr Mowatt and saying *"The question that I'd like to discuss with you is whether we have a specific time frame for NAMA to notify us or leave it open ended. My preference is for the former but perhaps we could speak as it may be more efficient than emails?"* Mr Seal responded half an hour later to say *"Difficult to chat right now but not actually sure why we are asking NAMA anything about the possibility of their selling their loan. If they have obligations under the facility Agreement then I am sure they will be only too well aware of them. I would therefore be inclined to exclude any reference to this."* Mr Hennebry responded to say that the reference to the notification period was to put NAMA on notice of what the company expected. The following morning Mr Hennebry and Mr Mowatt spoke and Mr Mowatt expressed the view, as Mr Hennebry recorded in an email to Mr Faber, *"that there is little point in telling NAMA their duties under the facility agreement"*. It appears from an email which Mr Seal sent to Mr Faber in the afternoon of 19 August 2011 that he had told Mr Hennebry *"that it was futile to raise the issue of debt sale and their obligations"*.

521.    In the light of this Mr Hennebry saw little point in sending a letter to NAMA at all and this prompted Mr Cunningham to ask why no letter had been sent. In that context, Mr Seal emailed Mr Hennebry on 21 August 2011, saying *"it was indeed only after seeing the draft letter prepared by DLA that I thought it inadvisable to include reference to the NAMA debt. Agreeing to review a draft is not of itself agreement to send the letter. Being cognisant of the fact that a letter was to be sent I thought it best just to include the reference to the our [sic] disappointment in their decision not to consider an extension beyond the end of September and to reject the mezzanine proposal. If you recall it was you who told me that if that was all that was to be said that it was best not to send the letter at all. That was your decision and not mine. I would ask you to make that perfectly clear to Liam"*.

522.    In his witness statement, Mr Mowatt says in relation to the draft letter circulated by Mr Hennebry that he thought demanding four weeks' notice from NAMA of any assignment of the loan was unrealistic and *"had the potential negatively to affect negotiations between Coroin and NAMA"*. He further says that he believed that it was futile to ask who NAMA were negotiating with. In his witness statement Mr Seal says that he regarded the inclusion of the request for information with regard to negotiations and for a four week consultation period as inappropriate. He states that NAMA was under no obligation to comply with these requests and would simply reject them. He continues *"I was concerned that the inclusion of these matters in a letter would present Coroin in an uncommercial light and might have a detrimental impact in the context of the important and delicate negotiations between Coroin and NAMA regarding the possibility of extending Coroin's loan facility"*.

523.    Looked at objectively, it would in my judgment be reasonable for Mr Seal and Mr Mowatt to form these views. The company had already put to NAMA a refinancing proposal which the directors appointed by the Barclay interests regarded as so

unattractive commercially to NAMA as to be bound to be rejected. NAMA was clearly not required to answer the questions which Mr Hennebry proposed should be asked and it could be thought unlikely that they would answer them. Making such a request was unlikely to advance negotiations between the company and NAMA. The concerns expressed by Mr Seal and Mr Mowatt in their witness statements were borne out by the very short response of NAMA when Mr McKillen himself raised these questions with them.

524.   At the same time, it must be acknowledged that MFL had made an approach to NAMA on 9 August 2011 with a view to a possible purchase of the NAMA debt and had chosen not to disclose the approach to the company. They would therefore have an interest in preventing the company from asking the question which might elicit that very information.

525.   In deciding whether Mr Seal was motivated by a desire to conceal the Barclay interests' negotiations with NAMA or, alternatively, by a view that this was an unwise letter for the company to send to NAMA at this time, there are two striking points. First, there is internal email communication between Mr Seal, Mr Mowatt and Mr Faber and in none of those emails is there any indication that the letter should be amended with a view to preventing disclosure of the Barclay interests' discussions with NAMA. On the contrary, Mr Seal emailed on receipt of the first draft of the letter on 16 August 2011: "*It seems a nonsense to write to NAMA in terms as suggested*". Secondly, Mr Mowatt was involved in the discussions about the terms of the letter and indeed talked directly to Mr Hennebry about the draft letter. Mr Mowatt's evidence that he believed it to be futile to ask NAMA who they were negotiating with was not challenged. Thirdly, the oral offer made by Mr Peters to NAMA on 9 August 2011 was rejected by NAMA the following day. No further offer or approach was made until the written offer on 7 September 2011. Mr Hennebry's draft letter was not prepared at a time of continuing communication between MFL and NAMA.

526.   I accept the evidence of Mr Seal and find that in proposing amendments to the draft letter, he was not motivated by a desire to conceal the discussions taking place between the Barclay interests and NAMA.

527.   If a letter had been sent to NAMA, asking whether it was in negotiation for a sale of the debt and, if so, with whom, it is clear from its response to Mr McKillen's letter that NAMA would not have answered it. Even if it had said that it was in discussions with MFL, the company would not, for reasons later given, have been able to change the course of events. The company and its members suffered no loss or prejudice.

*Dismissal of Mr Hennebry*

528.   On 9 September 2011 Mr Hennebry's consultancy contract with the company was terminated. The decision was taken by Mr Faber, Mr Seal, Mr Mowatt and Mr Alden. The petition alleges that the decision was taken without good reason and without any reference to the board or attempt to convene a board meeting and during a crucial period of negotiation between the company and NAMA. It is alleged that the decision was not taken in the best interests of the company. As Mr Hennebry acted as a liaison officer between the company and its shareholders, it is

alleged that the shareholders had a legitimate expectation that they would all first be consulted before he was dismissed. The petition alleges that the decision to dismiss Mr Hennebry was intended to exclude Mr McKillen and obstruct his involvement in the company.

529.   In his witness statement Mr Hennebry described his role between May 2004 and September 2011 as "*the asset manager and shareholder representative*" for the company. From 2004 until early 2010 he was employed by Mr Quinlan's asset management companies. The role of asset manager was, he describes in his witness statement, to be responsible to the shareholders for management of the hotels, dealing with many aspects of the business including ownership and real estate aspects, annual budgets and capital expenditure plans. As shareholder representative, he attended company board meetings and his role was to liaise between the company and its shareholders. In 2008, the vice-president of finance of the company left and was not replaced. Some of his responsibilities were taken up by Ms Walker and a financial controller, but, Mr Hennebry explains in his witness statement, in view of his background in finance and accounting, he took on more aspects of a chief financial officer's role.

530.   In early 2010 Mr Hennebry established his own advisory firm, Cadence Advisory Limited, which contracted with the company for the provision of his services. Under the terms of the consultancy contract, Mr Hennebry's company was paid a fee of over £20,000 per month and a bonus of £200,000 was paid in March 2011. The services provided under the consultancy agreement were set out in the schedule to the agreement and they are stated to be "*to act as the representative for the Company's shareholders and in this respect provide, as requested, financial and asset management consultancy services to the Company and any other Group companies*". A number of specific matters are then set out including budget review, leases, banking and legal matters, general corporate matters and business development. Paragraph 2 of the schedule stated that the consultant will report to the shareholders as required.

531.   The idea of terminating Mr Hennebry's contract appears first to have surfaced on 17 August 2011 in an email from Mr Faber to Mr Seal and Mr Mowatt. The email chain concerned a proposal to pay some intra-group dividends. There was some frustration at this time amongst those directors as regards this and one or two other issues. In the email sent by Mr Faber he says "*We should think about changing DLA and Mark* [Hennebry] *in the coming days. Will make our lives considerably easier*". It next surfaced in a text sent by Sir David Barclay to Mr Faber. The time and date of the text is unknown but it was during the period when consideration was being given to engage Goldman Sachs to advise the company. The text reads "*Agreed. Its better we run the Goldman process and fire Hennebry. That way u can brief them. Also we don't have to appoint Goldman. We can appoint anyone*".

532.   The decision to terminate Mr Hennebry's contract was taken at a meeting on 8 September 2011 attended by Mr Faber, Mr Seal, Mr Mowatt and Mr Alden. Mr Alden was asked whether the company needed Mr Hennebry's services and whether it would cause the company any difficulties if his contract was terminated. Mr Faber, Mr Seal and Mr Mowatt are unanimous in their evidence that Mr Alden was clear that Mr Hennebry was not needed by the company. Mr Faber's evidence is that Mr Alden said "*It was beyond him what Mr Hennebry was supposed to be doing*

*and he and the office had little or no involvement with him".* According to Mr Mowatt, Mr Alden's opinion was that Mr Hennebry was surplus to requirements and had no real role in the business.

533.    So far as Mr Hennebry's role as shareholder representative was concerned, the view of Mr Faber, Mr Seal and Mr Mowatt was that it had become redundant. The role may well have had some real content at a time when the shareholders were a disparate group, some of whom played little or no part in the management of the business. With the sale of Misland to the Barclay interests and the sale by Mr McLaughlin of his shares, the situation had changed. Neither Mr McKillen nor the Barclay interests, nor Mr Quinlan for that matter, needed Mr Hennebry to act as their representative in dealings with the company. They were all well capable of direct involvement with the company's affairs.

534.    As regards the services provided directly to the company, Mr McKillen stresses in particular his role in representing the company in its dealings with NAMA. For reasons which were for the most part outside the control of Mr Hennebry, it was the view of Mr Faber and the others that Mr Hennebry was unable to make any impact in this role.    Mr Hennebry was unable to make any headway in raising outside finance while the disagreement between the shareholders continued. In the absence of firm proposals to refinance the debt, he was not in a position to achieve anything of substance for the company in its dealings with NAMA, which by now was not interested in any long term extension to the debt.

535.    Looked at objectively, it was in my judgment a view which a director could reasonably come to that the expense of continuing to engage Mr Hennebry was no longer justified.    Mr Mowatt gave direct and impressive evidence as to his thinking on this topic.    He made clear that he was principally swayed by the views of Mr Alden. I am satisfied that he voted in favour of the termination of Mr Hennebry's contract only because he was persuaded by what Mr Alden said that there was no point in its continuation.

536.    It is not clear to me how the sectional interests of the Barclay interests were particularly advanced by the removal of Mr Hennebry. They were able to pursue their negotiation with NAMA and a variety of other third parties for a long period before 9 September 2011 without Mr Hennebry's position causing any difficulties. If one then examines the course of events following 9 September it is difficult to see that Mr Hennebry's removal made any difference.

537.    While Mr Faber accepts that he perceived Mr Hennebry to be in some degree in Mr McKillen's camp, and felt no doubt that it would be convenient if Mr Hennebry was no longer involved, I am satisfied that there were grounds on which the directors could and did reasonably conclude that it was in the company's interests to terminate his contract and that therefore the decision to terminate the contract was not a breach of duty.

538.    The manner in which the decision was taken, at a meeting at which no notice was given to Mr McKillen or Mr Cunningham, is unquestionably a matter which is open to criticism. However, the subject was raised at a duly convened board meeting held on 21 September 2011. The issue was discussed and Mr Cunningham proposed the reinstatement of Mr Hennebry, a resolution which was defeated. As Mr McKillen

accepted in evidence, it would have made no difference to the course of events if he had been given notice of and attended the meeting on 9 September 2011. I should add that it does not seem to me that there is anything in the allegation that the decision to dismiss Mr Hennebry was intended to exclude Mr McKillen or obstruct his involvement in the company. It made no difference to Mr McKillen's ability to participate, either himself or through Mr Cunningham in the affairs of the company.

*Security held by Ellerman over Mr Quinlan's shares*

539.    This relates to the debt due to BOSI secured on part of Mr Quinlan's shareholding which was purchased by Ellerman at the end of January 2011. The allegation pleaded in the petition is that Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company or the other directors that the security over these shares had become enforceable. In his closing submissions, Mr McKillen abandons the claim as against Mr Seal and Mr Mowatt. The claim is maintained against Mr Faber, the allegation being that he knew that the security had become enforceable by July 2011 but failed to disclose it. The result was that the directors did not have the opportunity of determining whether to deem a transfer notice to have been given in respect of Mr Quinlan's shares.

540.    In the light of my decision that the security in favour of BOSI over Mr Quinlan's shares had not become enforceable, it follows that this claim must fail.

*Non-Disclosure of the Barclay interests' negotiations with NAMA*

541.    I have in the chronological section set out the sequence of events as it applies to the attempts by the Barclay interests to purchase the NAMA debt. Serious consideration of this possibility began towards the end of May 2011 when Mr Peters on behalf of the Barclay interests started negotiations with Barclays Bank with a view to an appropriate facility and MFL was identified as the company which might borrow the necessary funds and purchase the NAMA debt. Negotiations to this end with Barclays Bank and HSBC continued through June and July 2011. Discussions were started with NAMA on 9 August 2011 and after something of a lull over the holiday period resumed in earnest with MFL's offer letter sent on 7 September 2011. That offer was rejected as was an attempt to repeat it. Finally, agreement was reached between the parties on or about 26 September 2011. MFL's negotiations with NAMA were conducted by Mr Peters. Although Mr Faber texted Mr Hennigan on 5 August 2011 to suggest a meeting, this was not followed up and Mr Faber did not participate in the negotiations with NAMA which were initiated by Mr Peters on 9 August 2011.

542.    It is alleged that each of Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company that MFL was in negotiations with NAMA to acquire the NAMA debt and were accordingly in breach of their duties as directors to the company.

543.    The case is summarised in paragraph 58(g) and set out more fully in paragraphs 68A – 68F of the petition. Paragraph 58(g) alleges that Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company that MFL was in negotiation with NAMA to acquire the company's debts, and were throughout 2011 involved as directors of the company in relation to the company's own negotiations with NAMA in

circumstances where they had a conflict of interest. Though linked, this involves two separate alleged breaches of duty, as later appears.

544.   Paragraph 68A alleges that representatives of the Barclay interests including MFL and Mr Faber had been in negotiations with NAMA in relation to the acquisition of the company's debt from January 2011 onwards. As appears from the chronological section and the section dealing with NAMA, I do not accept that negotiations with NAMA for a purchase of the debt started before early August 2011.

545.   Paragraph 68A.1 pleads: *"The true motivation of the Barclay Brothers in seeking to acquire the NAMA debt was to further the Scheme to acquire ownership and control of the Company, by enforcing the debt or using the threat of enforcement to force a dilutive rights issue."* In support of this allegation, reliance is placed on the negotiations with Barclays Bank in June and July 2011 for a facility to enable the debt to be acquired or repaid, Mr Faber's memorandum dated 1 August 2011 to Sir David Barclay and a further memorandum dated 8 August 2011 from Mr Faber to Sir David Barclay.

546.   Paragraphs 68B and 68C plead that Mr Faber, Mr Seal and Mr Mowatt were aware of the negotiations to acquire the company's debt and the alleged true motivation in doing so. As regards Mr Seal and Mr Mowatt, reliance is placed on the fact that they were sent a copy of Mr Faber's memorandum of 1 August 2011. As regards Mr Faber, reliance is placed on the memoranda written by him and on the more general proposition that:

> *"Mr Faber was one of the principal investment managers working for the Barclay Brothers and Barclay Interests in relation to the potential acquisition of ownership and control of the Company from April 2010 onwards."*

547.   Paragraph 68D alleges the following breaches of duty. First, sub paragraph (a) alleges that Mr Faber, Mr Seal and Mr Mowatt failed to disclose to the company or to the other directors that NAMA was prepared to sell the debt to whoever was prepared to pay the asking price. Pausing there, it will be apparent from the chronological section and the section dealing with NAMA that this is an unsustainable allegation. It was clearly known to all concerned, including in particular Mr McKillen, that NAMA was very ready to sell the debt as a means of realising its value. Sub paragraph (a) continues that they were in breach of duty in failing to disclose that MFL (and Mr Faber) was engaged in negotiations to acquire the NAMA debt *"for the purpose of furthering the Barclay Brothers desire to obtain ownership and control of the Company"*. Secondly, sub paragraph (b) alleges that Mr Faber, Mr Seal and Mr Mowatt were as directors of the company involved in discussions relating to the company's own negotiations with NAMA in circumstances where they had a plain conflict of interest which was not disclosed to the board and where the only appropriate course for them would have been to disclose the conflict of interest and absent themselves from board discussions or to resign their positions as directors of the company.

548.   Further breaches are alleged against Mr Faber. First, in paragraph 68D(a) it is alleged that he participated in MFL's negotiations with NAMA and in the scheme for the acquisition of the company of the NAMA debt and sought to further that

scheme to the detriment of the company. Secondly, paragraph 68D(c) pleads that Mr Faber's text message to Mr Hennigan on 5 August 2011 in effect encouraging Mr Hennigan to ignore the letter shortly to be sent by Mr Hennebry on behalf of the company was a breach of duty by Mr Faber as a director of the company.

549.    The loss or prejudice flowing from these alleged breaches of duty is pleaded as follows in paragraph 68F:

> "*Had the company or its board of directors been made aware of the above matters prior to 27 September 2011, it could and would have explored alternative means of re-financing the debt owed to NAMA. It would have concluded that it was not in the interests of the Company or its members as a whole (or its members including Mr McKillen) that its debt should be acquired by a vehicle of the Barclay Brothers rather than an independent and responsible lending institution.*"

550.    It is submitted that, if well founded, these allegations involve the breaches of two separate duties on the part of the directors. The first, in reliance on *Scottish Co-operative Wholesale Society v Meyer* [1959] AC 324 and *Whillock v Henderson* [2009] BCC 314, is put in Mr McKillen's closing submissions as follows: "*failure of this kind by directors to inform their co-directors or take steps to protect the company where they are aware that it has suffered or is about to suffer damage will amount to a breach of duty that comprises relevant conduct of the company's affairs*". This is an aspect of the duty of directors under section 172 of the Companies Act 2006 to act in the way they consider in good faith would be most likely to promote the success of the company. I understand the directors to accept that this duty may give rise to an obligation on directors to disclose to the company matters of which they are aware. Reference can also be made to *British Midland Tool Ltd v. Midland International Tooling Ltd* [2003] 2 BCLC 523 and *Shepherds Investments Ltd v. Walters* [2007] 2 BCLC 202. The second duty is the duty set out in section 175 to avoid conflicts of interest. Even without the alleged detrimental purpose of the intended acquisition of the NAMA debt, the fact that MFL was negotiating to acquire the debt conflicts with the company's own negotiations with NAMA. Assuming that Mr Faber, Mr Seal and Mr Mowatt had competing interests or duties in their capacities as directors or executives of companies within the Barclay interests, they were under a duty to disclose the relevant facts. The breaches alleged against Mr Faber alone engage both of these duties.

551.    It is necessary to take each of the elements in this part of the case in turn.

552.    First, it is beyond dispute that in June and July 2011 the Barclay interests were considering seriously the possibility of buying the NAMA debt, as an alternative to re-financing it, and had engaged in serious negotiations with Barclays Bank and HSBC for a facility to enable it to do so. It is further beyond dispute that from about 9 August 2011 the Barclay Interests actively pursued with NAMA a purchase of the debt.

553.    The acquisition of the NAMA debt by the Barclay Interests was not intrinsically detrimental to the company or its interests. NAMA was a creditor with a statutory objective and single-minded purpose to achieve full recovery of the indebtedness as

soon as possible. By August 2011, it was not inhibited in how it did so by having any equity interest in the company, as had been the case earlier in 2011. It did not mind who it sold the debt to, nor were there any commercial reasons why it should not, if necessary, enforce the debt. As against NAMA, it could well be beneficial to the company if the debt were held instead by a substantial shareholder. The benefit to the company would not come from the possibility that a shareholder would be a more indulgent creditor than NAMA or any other holder of the debt. It could not be expected that a new holder of the debt including a shareholder would tolerate a lengthy extension of the debt in circumstances where all were agreed that the company was seriously over-indebted. What might be expected is that the shareholder holding the debt would present the company with the opportunity of re-financing the debt in the obvious way, that is to say by a rights issue.

554.   As I have elsewhere observed, the position facing the company at this stage was that it had no prospect of raising the funds necessary to reduce its borrowings except by the injection of new capital. As Mr Cunningham made clear in his correspondence with Mr Faber, Mr McKillen did not object to an injection of capital from a new investor but he did object to the capital being provided by the existing shareholders. This is a surprising position. Unless there are good reasons justifying a different approach, the opportunity of providing new capital should, both commercially and legally, be first offered to the existing equity holders. Shareholders have statutory pre-emption rights over the issue of new shares for cash, which may be removed or modified only by the articles of association or a special resolution: sections 560-577 of the Companies Act 2006. Further, it is a requirement of the shareholders agreement that all new shares be offered first to the existing shareholders: clause 5.

555.   Mr McKillen alleges that the Barclay interests would use the NAMA debt to force a dilutive rights issue. The reference to *"a dilutive rights issue"* is not entirely clear. Dilution will always occur where a shareholder does not take up his rights in a rights issue. If the word "dilutive" is to have any real meaning in this context, it must be a rights issue at an unjustifiably low price, thereby increasing the number of shares to be issued, in circumstances where it was known or anticipated that one or more of the shareholders (in this case Mr McKillen) would not take up his rights. The same would be true of a rights issue at a proper price in circumstances where it was not reasonably believed that a rights issue was necessary or desirable but was instead motivated by a desire to dilute those shareholders who it was known or anticipated would not take up their rights. In those circumstances rights issues may constitute breaches of duty and unfairly prejudicial conduct: see *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] AC 821, *In re A Company* (1986) 2 BCC 99453, [1986] BCLC 430 (CA), *In re A Company* [1986] BCLC 362 at 366-367. The evidence and in particular the memorandum produced by Mr Faber in August 2011 on which Mr McKillen relies, does not in my judgment establish that the Barclay interests had in mind a dilutive rights issue in either of these senses. They certainly had in mind a rights issue and had in mind that Mr McKillen might well not wish or be able to take up his rights but it does not follow that a rights issue would be improper. Indeed, as I say elsewhere, a rights issue was an obvious and legitimate means of providing a solution to the financial problem faced by the company at that time.

556.   The next issue is the knowledge of the individual directors. Clearly they can only disclose what they know.

557.   As Mr McKillen's closing submissions acknowledge, the position is rather different as regards each of the directors. Of the directors Mr Faber was the most involved. He had a strategic role in advising on, and implementing, the Barclay interests' plans to obtain control of the company. It was in that capacity that he prepared the memorandum dated 1 August 2011 for Sir David Barclay which specifically addressed the acquisition of the NAMA debt. Mr Faber acknowledges that he was aware that Mr Peters was conducting negotiations with Barclays Bank and HSBC in June and July 2011 and that from early August negotiations were under way between Mr Peters on behalf of MFL and NAMA. For the most part he was not closely concerned with those negotiations but he certainly knew of their existence and that their purpose was to acquire the NAMA debt before its maturity on 30 September 2011.

558.   Mr Seal's involvement was more remote than that of Mr Faber, but he acknowledges that he knew that Mr Peters was negotiating both with banks from June 2011 and subsequently with NAMA. He knew that the negotiations with the banks in June-July 2011 were for the grant of a facility to MFL with the purpose of either purchasing the NAMA debt or a loan by MFL to the company to enable it to repay NAMA. Neither of these alternatives in June-July 2011 was regarded as being the primary purpose. They were genuine alternatives of equal weight. Mr Seal resigned as a director of MFL on 14 June 2011, to avoid a conflict of interest as director of the company, because either alternative, if pursued, would involve a conflict. Mr Seal knew that in late July and early August 2011, with the bank facility agreed in principle, Mr Faber, Sir David Barclay and Mr Peters were considering the next steps to be taken by the Barclays interests. He accepted in evidence that he was kept in the loop. Mr Faber sent his memorandum dated 1 August 2011 to Mr Seal. I find that Mr Seal read it carefully, as appears from his email of 2 August 2011 with its reference to "*a cold towel job*" and a detailed query arising from page 5 of the memorandum. I reject Mr Seal's evidence that he gave it just "*a cursory glance*". The memorandum informed Mr Seal of the possibilities being considered, but not the course that would be followed. Mr Seal's evidence, which I accept, is that he was unaware of the offer made on 7 September 2011 by MFL to purchase the debt and that when the purchase of the NAMA debt was made on 27 September 2011 it came as something of a surprise to him. I also accept his evidence that:

> "*I knew they were talking. I had no knowledge of how close or otherwise they were or that a deal could have been done with both the funders for MFL or the Barclay company, as well as NAMA's agreement to sell. As I said earlier, I doubted whether NAMA would actually agree to assign the debt.*"

This does however show, as does other evidence, that Mr Seal knew that negotiations were taking place with NAMA and that a purchase of the NAMA debt was one of the main alternatives, albeit that he doubted whether NAMA would sell the debt. This, as it seems to me, is a sufficient degree of knowledge to have put Mr Seal in a position of conflict, given his duties to the Ellerman group companies.

559.   Mr Mowatt's knowledge and involvement was a good deal less than that of Mr Seal. In this context, it is important to note that Mr Mowatt's involvement in the management of the Telegraph Media Group meant that he spent a lot of time at its offices and rather less at the St James's Street offices.

560.   Mr Mowatt knew that MFL had been formed as a possible vehicle to help refinance the company and he resigned as a director on 14 June 2011 on the advice of Mr Seal. I accept Mr Mowatt's evidence that Mr Seal told him no more than at some point there could be financing arrangements involving MFL and the company. Given that Mr Mowatt was only peripherally involved in this part of the business, there was no particular reason why he should be told or request more details.

561.   There is no evidence that Mr Mowatt was aware of the negotiations with Barclays Bank or other banks in June-July 2011, and I accept Mr Mowatt's denial in evidence of any knowledge of them.

562.   Mr Faber sent his memorandum dated 1 August 2011 to Mr Mowatt. Mr Mowatt's evidence was that he read it. He regarded it as a document prepared before the August holidays for Sir David Barclay to read, in which Mr Faber hypothesised on the various options open in relation to the company. This is consistent with Mr Faber's covering email, that he was *"trying to highlight some of the possibilities and obstacles we face"*. He thought that it was sent to him so as to brief him on what was going on. He was not otherwise aware of what was happening or being considered. He did not receive any further documents and he did not discuss it with Mr Faber or Mr Peters. I accept his evidence. I also accept his evidence that he did not know of the negotiations with NAMA or the offer to it, and that he first learnt of them on 27 September 2011. There is no evidence to the contrary, and Mr Mowatt's evidence on this, as on other matters, was given in a direct and convincing manner.

563.   In my judgment, Mr Mowatt knew nothing which could give rise to a duty of disclosure to the company. He did not know that a decision to make an offer to NAMA or even to start negotiations had been taken, he did not know that there were any negotiations or offers, nor did he know of negotiations with banks for a facility.

564.   The position is different with Mr Faber and Mr Seal. Each knew that MFL was negotiating with NAMA. Mr Faber knew that the negotiations were for the purchase of the debt and Mr Seal knew that a purchase of the debt was a real possibility. If a duty of disclosure arose as regards these matters, their knowledge was sufficient for the duty to apply to them. They were each asked why they had not disclosed these matters. Mr Seal did not see why the company would need to know about discussions with NAMA. Mr Faber was clear in his view as to why he chose not to disclose the negotiations to the board. It was *"because this was patently something I felt would be in the company's best interests, but not necessarily something Mr McKillen would like"*.

565.   Mr McKillen's case is that the purpose of the Barclay interests in seeking to acquire the NAMA debt was to enforce the debt or use the threat of enforcement to force a dilutive rights issue, to the detriment of the company. In seeking to establish this case, heavy reliance is placed on documents produced in June 2011 in the context of the negotiations with Barclays Bank for a facility and on the memoranda prepared

by Mr Faber in early August 2011. Rather less attention is paid to the offer in fact made by MFL on 28 September 2011 immediately after it acquired the debt. It seems to me that what was in fact done is a better guide to whether damage to the company was planned than wide-ranging discussion documents prepared nearly two months earlier.

566. It cannot be doubted that the documents on which Mr McKillen relies contain ideas which, if developed and implemented, would properly be seen as damaging to the company. One of the alternative plans put forward to Barclays Bank in June 2011 was that if the Barclay interests had "*not obtained control of a satisfactory amount of the shareholding of Coroin within [3] days Business Days of utilisation of the Facility then [MFL] shall appropriate the shares of the subsidiary companies of Coroin through the share charge contained in the existing debenture granted in favour of NAMA*". Likewise, Mr Faber's memorandum set out a number of alternative ways forward, including some which envisaged the appropriation of assets through foreclosure. At the same time Mr Faber warns of the legal and other difficulties which this course would involve.

567. The closing submissions for the directors rightly emphasise that the duty under section 172 is subjective, to the extent that a director must act in the way he considers, in good faith, would be most likely to promote the interests of the company. The closing submissions cite the following passage from the judgment of Jonathan Parker J. in *Regentcrest plc (in liquidation) v. Cohen* [2001] 2 BCLC 80 at para. 120. Although referring to the corresponding equitable duty, I agree that it is equally applicable to the duty under section 172:

> "*The question is not whether, viewed objectively by the court, the particular act or omission which is challenged was in fact in the interests of the company; still less is the question whether the court, had it been in the position of the director at the relevant time, might have acted differently. Rather, the question is whether the director honestly believed that his act or omission was in the interests of the company. The issue is as to the director's state of mind. No doubt, where it is clear that the act or omission under challenge resulted in substantial detriment to the company, the director will have a harder task persuading the court that he honestly believed it to be in the company's interests; but that does not detract from the subjective nature of the test.*"

568. I have no difficulty in accepting Mr Faber's evidence that he genuinely believed that a rights issue would be in the best interests of the company. He denied in evidence that the plan was to acquire the debt and foreclose on it and the events after 27 September 2011 corroborate this denial.

569. If, however, the intention had been to foreclose and appropriate the company's assets in that way, as some of the ideas mooted in Mr Faber's memorandum envisaged, it could not reasonably be seen as likely to promote the success *of the company* nor would I accept that Mr Faber, an intelligent and astute man, would think so. The last sentence of the passage from Jonathan Parker J's judgment is in point.

570. It is clear that Mr Faber's memorandum is not a blueprint for action, but, as he said in his covering email to Mr Seal and Mr Mowatt, he was "*trying to highlight some of the possibilities and obstacles we face*".

571. MFL's proposal on 28 September 2011 was for a 3 month extension to the existing facility on terms that it was "*to be reduced by way of the proceeds of an equity issue for the minimum sum of £200,000,000 (net) by no later than 12th December 2011*". Failure so to reduce the debt would be an event of default.

572. Objections were taken to some of the other terms, such as some very substantial fees, and it may well be that they were well-grounded objections. Alvarez & Marsal certainly thought so, when they were appointed in early October 2011, with the concurrence of Mr Faber, Mr Seal and Mr Mowatt, as the company's financial advisers.

573. In my judgment, however, the fundamental elements of the proposal, a 3-month extension and a requirement to reduce the debt by £200 million through an equity issue, could not be described as damaging or detrimental to the company. On the contrary, a reduction in indebtedness and an increase in capital was what the company had needed for well over a year, and what Mr McKillen himself had been negotiating for with the US equity funds in 2010 and with Al Mirqab in January-February 2011.

574. My conclusion on this aspect of the claim is that the duty of a director to disclose actual or intended damage to the company and, in conjunction with the other directors, to take steps if practicable to prevent or mitigate the damage did not arise on the facts of this case.

575. I move on to consider the claim of a breach of the duty stated in section 175(1) of the Companies Act 2006 to avoid a situation in which a director has, or can have, a direct or indirect interest that conflicts, or possibly may conflict, with the interests of the company. A conflict of interest includes a conflict of duties.

576. It is not suggested that Mr Faber, Mr Seal or Mr Mowatt had a relevant personal interest. What is said is that their respective positions in and duties to the companies comprised in the Barclay interests conflicted with their duties to the company.

577. It seems clear to me that there was the potential for conflict because MFL was negotiating to purchase the NAMA debt while the company was negotiating to extend or modify it. There was a direct competition.

578. The issue is whether any of the directors owed conflicting duties. It is not sufficient, in my view, for the directors to look solely to the position of MFL, relying on the facts that it was not part of the Ellerman group, but was separately owned by the Barclay brothers, and that they had either, in the case of Mr Faber, never been a director of MFL or, in the case of Mr Seal and Mr Mowatt, had ceased to be directors on 14 June 2011, nearly two months before any negotiations with NAMA.

579.   MFL was not acting independently of the relevant Ellerman group companies but was acting in tandem with them, with a view to those companies obtaining control of the company. The duty of the directors and executives of the relevant Ellerman companies, acting in the best interests of those companies, was to promote and advance the policy of obtaining control. Steps taken by the company, or which should in its best interests be taken, to deal with and improve its position with NAMA would be likely to conflict with the interests of the Ellerman companies. For the directors common to both the company and the relevant Ellerman companies, there is a conflict of their duties.

580.   In my judgment, Mr Faber was in a clear position of conflict. He was not a director of any of the companies which had bought Misland or the secured debts of Mr Quinlan. He was however the executive with primary responsibility for implementing on behalf of all those companies the policy of obtaining control of the company, and he was well aware of the negotiations with NAMA. Mr Seal, like Mr Faber, is a director of Ellerman Investments Limited, which is the management company for the companies comprising the Ellerman group. His duty as such is therefore to promote and advance the interests of the companies managed by Ellerman Investments Limited. Moreover, he had some involvement in, or was at least kept generally aware of, plans and transactions of the Ellerman group of companies as regards the company. He too knew that there were negotiations with NAMA which could well involve a proposal to purchase the NAMA debt. It follows that he too had a conflict of duties.

581.   Mr Mowatt is also a director of Ellerman Investments Limited but he had no involvement in, and knew little about, developments as regards the company. Specifically, he had no knowledge of the negotiations with NAMA. There was no actual or potential conflict of which he was aware as regards dealing with NAMA, and there was accordingly no breach by him of the duty under section 175.

582.   It was submitted for the directors that section 175(1) did not apply by virtue of section 175(3) because the proposed transfer of the NAMA debt was "*a transaction or arrangement with the company*". I reject this. It was a transaction between NAMA and MFL, not with the company. A sale of a debt due from the company is no more a transaction or arrangement with the company than a sale of shares in the company. This would equally be true if NAMA had a duty under the facility agreement to give notice to and consult with the company before the assignment, but, following the decision of the Court of Appeal on the NAMA preliminary issue, not even that point arises.

583.   For the same reason, I do not consider that section 177 is in point, as it is solely concerned with interests of a director in a proposed transaction with the company. By reason of section 175(3), sections 175 and 177 are mutually exclusive. It is not therefore relevant that the directors had made general declarations, as permitted by sections 177(2)(b) and 185, at various meetings of the company. They did not in any event notify the company that Mr Faber and Mr Seal had a conflict of interest arising not from a proposed transaction with the company but from a proposed transaction between MFL and NAMA. The specific declaration relating to MFL made at the board meeting on 27 September 2011 was too late and in any event could not satisfy section 175.

584.    Likewise, the exemption from the obligation to give notice under section 177 created by section 177(b), where the other directors are already aware of the relevant director's interest, does not apply. Knowledge on the part of Mr McKillen might nonetheless be relevant to his case of unfair prejudice and I refer to this below.

585.    In my judgment, Mr Faber and Mr Seal were in breach of duty under section 175 as a result of the conflict created by MFL's negotiations with NAMA. I do not consider that a breach occurred at the earlier stage when Mr Peters for MFL was negotiating with banks for a facility. Plans were then too uncertain. They were at an exploratory stage. No decision had been taken, even in principle, to seek to purchase the NAMA debt and, until a facility could be agreed at least in principle, it was premature to do so. It is noticeable that the decision-making process was not undertaken until early August 2011, after agreement in principle with Barclays Bank in late July 2011. In any event, Mr McKillen's case rests on MFL's negotiations with NAMA: see paragraph 58(g) of the petition.

586.    The issue then is whether this breach caused any prejudice to Mr McKillen, which I address in the section of this judgment dealing with unfair prejudice.

587.    There are two allegations of breach of duty made solely against Mr Faber.

588.    First, it is alleged that Mr Faber participated in MFL's negotiations with NAMA and that he sought to further the scheme for the acquisition of the NAMA debt to the detriment of the company. I reject this allegation. First, Mr Faber did not participate in the negotiations with NAMA. The nearest he got to it was his text to Mr Hennigan on 5 August 2011 suggesting a meeting which did not take place. Secondly, for the reasons already given, MFL's acquisition of the debt was not detrimental to the company.

589.    Secondly, it is alleged that Mr Faber acted in breach of duty when he sent a text to Mr Hennigan on 5 August 2011, advising him to ignore the letter to be sent by Mr Hennebry on behalf of the company with the proposal for NAMA to take a junior position with part of their debt and for repayment of the balance. Mr Faber did this because he thought the proposal was "*ridiculous*" and I am inclined to agree with him. But it cannot be right for a director secretly to interfere in this way with what the company is doing. The right course was to explain to Mr Hennebry and the other directors why it was a ridiculous step for the company to take. Mr Faber's text went further and encouraged NAMA not to grant an extension to the debt beyond 30 September 2011. I am satisfied that Mr Faber genuinely believed that an extension would not help the company because it would simply lead to a further delay in dealing with the need for new capital, but this text is a clear illustration of his conflict of duties.

590.    Having said that, I am satisfied that it caused no loss. It is clear that NAMA would have rejected the proposal without any prompting from Mr Faber. It was also not, as I have found, going to grant a further extension.

591.    Finally, there is an allegation against all three directors that they breached the duty under section 173 to exercise independent judgment. This is based on the allegation

that they acted on the instructions of Sir David Barclay, and that he was accordingly a shadow director, an allegation to which I now turn.

**Was Sir David Barclay a shadow director?**

592.    Among the many amendments which Mr McKillen applied to make to his petition shortly before trial was an allegation that Sir David Barclay was a *de facto* or shadow director of the company. I refused permission to include the allegation that he was a *de facto* director on the grounds that the matters relied on to support it could not make out a sustainable case, but I did permit an amendment to allege that Sir David Barclay was a shadow director: see [2012] EWHC 521 (Ch) at para 14-78.

593.    A shadow director is a "*person in accordance with whose directions or instructions the directors of the company are accustomed to act*": section 251(1) of the Companies Act 2006. By section 251(2) a person is not to be regarded as shadow director "*by reason only that the directors act on advice given by him in a professional capacity*". The general duties of directors specified in section 171 to 177 of the Companies Act 2006 apply to shadow directors "*where, and to the extent, the corresponding common law rules or equitable principles so apply*": section 170(5). The extent to which those rules and principles apply has been the subject of differing decisions at first instance: see *Yukong Line of Korea Ltd v Rendsburg Corp Investment of Liberia Inc* [1998] 1 WLR 294 and *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 (Ch).

594.    In order to make out the case that Sir David Barclay was a shadow director of the company, it is necessary for Mr McKillen to establish that the directors of the company were accustomed to act in accordance with his directions. It is not necessary that all the directors should so act. It is sufficient if it is a majority that does. The instructions must of course be given to them so as to affect their decisions as directors.

595.    Much of the closing submissions of counsel for Mr McKillen on this topic is devoted to establishing not that Mr Faber and other directors acted in their capacity as such on the instructions of Sir David Barclay but that decisions of the Barclay interests as shareholders of the company were directed or influenced by Sir David Barclay. Save in the general sense there were circumstances in which Mr Faber and others would consult Sir David Barclay and act in accordance with his wishes and directions, this is irrelevant to a case of shadow directorship. Mr McKillen must show that Mr Faber and others acted in their capacity as directors of the company in accordance with the instructions of Sir David Barclay.

596.    The allegation that he was a shadow director is shortly stated in paragraph 60A of the petition and supported by the matters set out in schedule B to the petition. Paragraph 1 of schedule B lists seven matters from which it is to be inferred that Mr Faber, Mr Seal and or Mr Mowatt acted in accordance with the instructions of Sir David Barclay. They are: the closure of the data room, the failure to disclose that Mr Quinlan's shareholder security had become enforceable, the appointment of JLL, the blocking of the redevelopment of two hotels, Mr Seal's position in relation to the letter to NAMA prepared by Mr Hennebry on 16 August 2011, the dismissal of Mr Hennebry and the failure of the directors in question to disclose MFL's

negotiations with NAMA in the course of August and September 2011. The allegation of blocking the redevelopment of two hotels can be disregarded because that allegation has been abandoned. Paragraphs 2 to 5 of schedule B rely on the communications between Sir David Barclay and Mr Faber and the other directors in August and September 2011 in relation to the proposal to appoint Goldman Sachs as financial advisers to the company. Paragraph 6 of schedule B refers to various matters, principally relating to Mr Quinlan and his alternate Mr Murphy.

597.   There is, in my judgment, no evidence to support the allegations that the following matters were directed by Sir David Barclay or indeed that he had any knowledge of them: the closure of the data room, the appointment of JLL, the position taken by Mr Seal in relation to the draft letter to NAMA in mid-August 2011 and the alleged failure to disclose that the shareholder security granted by Mr Quinlan had become enforceable. As to the last of those matters, I have held that the security had not become enforceable. Sir David Barclay of course knew of the negotiations with NAMA to acquire the NAMA debt but there is no evidence of any instruction or involvement on his part as to whether those negotiations should or should not be disclosed by Mr Faber or Mr Seal to the other directors of the company.

598.   This leaves only the dismissal of Mr Hennebry and the appointment of Goldman Sachs. There was communication between Mr Faber and Sir David Barclay on the appointment of Goldman Sachs. Sir David took the view, as in fact did Mr Faber, that the appointment of Goldman Sachs was pointless in that the company would in any event be unable to raise the funds required to refinance the NAMA debt. Nonetheless, Mr Faber, Mr Seal and Mr Mowatt thought there was merit in the particular circumstances in agreeing the appointment of Goldman Sachs. The emails between them undoubtedly disclose a concern that they should not proceed with the appointment of Goldman Sachs against the opposition of Sir David Barclay. They argued their corner with him and ultimately he appears reluctantly to have withdrawn his opposition. These events show some independence on the part of the directors. If they had simply been accustomed to act in accordance with the instructions of Sir David Barclay they would presumably have simply refused to consent to the appointment of Goldman Sachs. What is certainly clear is that the appointment of Goldman Sachs was not the result of instructions to those directors by Sir David Barclay. What is said is that the withdrawal of Sir David's opposition was on terms that Mr Hennebry would be dismissed. It is then said that Mr Hennebry was dismissed on Sir David's instructions. I do not accept this. I am satisfied that Mr Faber, Mr Seal and Mr Mowatt reached their own decision that the contract with Mr Hennebry's company should be terminated. They did so only after discussing the position with Mr Alden and, particular in the case of Mr Mowatt, I am satisfied that Mr Alden's views were decisive.

599.   It follows that none of the matters relied on at paragraph 1 or paragraphs 2-5 of schedule B can establish the case that Sir David Barclay was a shadow director of the company.

600.   As regards paragraphs 6 of schedule B, I shall refer first to those matters which do not principally concern Mr Quinlan and/or Mr Murphy. The allegation that Mr Faber was the principal representative of the Barclay interests in their negotiations to acquire Misland and in negotiations with Mr Quinlan, and the extent to which he acted in those respects on instructions from Sir David Barclay, are irrelevant to

A-8806

# EXHIBIT 25
# PART 4

whether Sir David Barclay was a shadow director of the company. They do not relate to any activity on the part of Mr Faber in his capacity as a director of the company. Likewise, whether he was appointed by Misland as a director of the company on the instructions of Sir David Barclay is irrelevant because it does not concern Mr Faber's actions in his capacity as a director of a company. Statements that the company or its board were under the control of the Barclay interests do not constitute instances of instructions being given by Sir David Barclay to Mr Faber and other directors and, in a case where there has been so much evidence, they cannot form the basis for some general inference.

601.    The other matters relied on in paragraph 6 of schedule B relate principally to relations between the Barclay interests on the one hand and Mr Faber and Mr Murphy on the other. General statements of support for the Barclay interests or the Barclay brothers made by Mr Murphy in text messages do not establish that instructions were given by Sir David Barclay to Mr Quinlan or Mr Murphy as to how they were to act as directors of the company, nor are any pleaded. The matters relied on other than general statements of support are as follows. First, reference is made to Mr Faber asking Mr Murphy to support the registration of Ellerman as the holder of shares held by Mr Quinlan to secure his debt to BOSI which was assigned to the Barclay interests. There is no evidence of any involvement by Sir David Barclay in this. Secondly, in May 2011 when Mr Faber asked Mr Murphy whether Mr Quinlan would be willing to convert his loan stock to non-voting shares, Mr Murphy replied *"We are happy to take your instructions on this."* This concerned Mr Quinlan's position as an investor in the company, not his actions as a director, and in any case there is no evidence of instructions coming from Sir David Barclay. Thirdly, when on 5 May 2011 Mr Murphy received an email from the solicitors for Wynton asking whether Mr Quinlan would be interested in starting discussions to sell his shares, Mr Murphy asked Mr Faber in an email what they should do and told Sir David in a further email "We will be guided by you and RM". This also concerned Mr Quinlan's position as a shareholder in the company and the response from the Barclay side was, not surprisingly, that Mr Quinlan was bound by the 17 February agreement. Fourthly and finally, it is alleged that Mr Quinlan's decision to resign as a director was in fact taken as a result of instructions from Sir David and Sir Frederick Barclay. Even if true, this would be irrelevant. The instructions needed to constitute Sir David Barclay a shadow director were instructions to Mr Quinlan on the exercise of his powers and duties as a director, not how he was to take his own personal decision whether to resign as a director.

602.    My overall conclusion is that there is no evidence of any substance to support Mr McKillen's case that Sir David Barclay was a shadow director of the company. In those circumstances it is unnecessary to consider legal issues as to what duties he would have owed, if my conclusion had been different.

**Contractual obligations of good faith**

603.    Clause 8.5 of the shareholders agreement provides as follows:

> "*8.5  Each of the Shareholders agree that:*
> *8.5.1  during the continuance of this Agreement all transactions entered into between any of them or any company controlled by them on the one hand and the Group on the other shall be conducted in*

*good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement as may be agreed by the parties and in the absence of such agreement on an arm's length basis;*

*8.5.2 each of them shall at all times act in good faith towards the others and shall use all reasonable endeavours to ensure the observance of the terms of this Agreement;*

*8.5.3 no party will seek to increase its profit or reduce its loss at the expense of another; and*

*8.5.4 each of them will do all things or [sic] desirable to give effect to the spirit and intention of this Agreement."*

604. Express obligations of good faith in contracts governed by English law remain relatively unusual. There has been some, but only limited, analysis in the cases as to the effect of such clauses. I was referred to a number of English and Australian authorities either directly concerned with contractual obligations of good faith or relating more generally to obligations of good faith. Rather than try to elucidate the general principles applicable to such obligations or to analyse clause 8.5 in general terms. I propose to go straight to the specific allegations of breach of clause 8.5 made by Mr McKillen. For the reasons which appear when considering those alleged breaches, this is not a case in which it is necessary to subject the clause to a general analysis.

605. It is of course elementary that the clause binds only parties to the shareholders agreement. The allegations made by Mr McKillen are therefore confined to allegations against Misland and Mr Quinlan. None of these allegations was contained in the petition as originally presented. An allegation that Misland was required to offer its shares round to the other shareholders after it had been purchased by the Barclay interests was added only after Mr McKillen failed on the preliminary issue to establish that the sale of Misland triggered the pre-emption provisions. The remaining allegations against Misland and all the allegations against Mr Quinlan were added by amendment shortly before the trial.

606. The allegations against Mr Quinlan are contained in paragraphs 42E-42G. In paragraph 42E it is alleged that *"in giving assistance and support to the Barclay brothers in furthering their Scheme to obtain control of the Company to the detriment of Mr McKillen, Mr Quinlan was in breach of the obligations owed by Mr Quinlan"* under clause 8.5, in the following respects.

607. First, Mr Quinlan or his alternate used Mr Quinlan's powers as a director *"for the collateral purpose of advancing the interests of the Barclay brothers and/or adversely to affect the interests of Mr McKillen as pleaded at paragraph 37a above."* Paragraph 37a is concerned with the closure of the data room. I have already dealt with that issue and held that it did not involve any breach of duty nor did it adversely affect the interests of Mr McKillen.

608. Secondly, it is alleged that Mr Quinlan or his alternate discharged his functions as a director *"on the instructions of a third party with whom he had entered into his own*

*commercial arrangement, rather than in accordance with the purposes for which they were conferred, as pleaded at paragraph 37 above.*" Only two instances of Mr Quinlan acting as a director on the instructions of the Barclay interests are pleaded in paragraph 37. The first is the closure of the data room to which I have just referred. The second is agreeing to the release of Deutsche Bank from any obligations owed to the company. I have earlier dealt with that matter and found that it involves no breach of duty. I do not accept on the evidence that it is correct to say that Mr Quinlan acted on the *"instructions"* of the Barclay interests but even if it were, there can be no damage to Mr McKillen if the only instances of acting on such instructions involved no breach of Mr Quinlan's duties as a director.

609.    The only other matters pleaded in paragraph 37 are not instances of Mr Quinlan acting on the instructions of the Barclay interests but are of statements made by Mr Faber to the effect that the Barclay interests had an *"alliance"* with Mr Quinlan such that they could control the board votes. However, I have earlier drawn attention to another internal communication from Mr Faber where he makes clear that the Barclay interests are dependent upon the agreement of Mr Quinlan to vote in the same way as the Barclay interests. Assuming for a moment that the Barclay interests were in practice able to control Mr Quinlan's votes as a director, a breach could arise only when that control is exercised to dictate Mr Quinlan's vote on an issue or other action as a director.

610.    Thirdly, paragraph 42E alleges that Mr Quinlan assisted the Barclay brothers in promoting a scheme calculated to reduce the prospects of other shareholders, and in particular Mr McKillen, receiving the best price for their shares and/or obtaining investment in the company on terms that they consider advantageous and/or were prepared to agree by reason of the matters pleaded at paragraph 33D(e),(g),(l-n) and 37a and b above. I have already dealt with the matters pleaded in paragraph 37a and b and they do not establish the point here sought to be made. Paragraph 33D(e) pleads the conference call on 15 January 2011 when Mr Murphy, on Mr Quinlan's behalf, Mr McKillen and Mr McLaughlin orally agreed that they would enter into an exclusivity agreement with Al Mirqab and later that day Mr Quinlan signed instead the exclusivity agreement with the Barclay interests. It then pleads that it is to be inferred Mr Quinlan entered into the exclusivity agreement in performance of the agreement reached with Sir David Barclay in October 2010. I have already held that the exclusivity agreement was not in performance of any arrangement reached with Sir David Barclay in 2010. Mr Quinlan was not bound to enter into the proposed exclusivity agreement with Al Mirqab and I do not understand how he can have been inhibited in agreeing to an exclusivity agreement with a different party, in this case the Barclay interests. He plainly was not prohibited from doing so by the other terms of the shareholders agreement and a prohibition to that effect cannot in my judgment be spelt out of clause 8.5. Mr Quinlan was as free to enter into an exclusivity agreement with the Barclay interests as Mr McKillen was with Al Mirqab.

611.    Paragraph 33D(g) alleges that the Barclay brothers gave personal assistance to Mr Quinlan and his family *"to induce Mr Quinlan to sell his shares to the Barclay brothers for his personal advantage rather than to Al Mirqab or any other investor irrespective of whether this was part of an arrangement that would have been acceptable to and for the benefit of all shareholders in the Company and in the*

*interests of the Company itself.*" I have earlier found that there was no agreement that the Barclay brothers would provide assistance to Mr Quinlan and his family in consideration for any agreement by Mr Quinlan as regards his shares. I accept that Mr Quinlan must have realised that if he acted in relation to his shares in a way which was contrary to the wishes of the Barclay brothers, then he would be running a risk that they would cease or reduce the assistance they provided. If he had entered into an agreement for the disposal of his shares then the pre-emption provisions would have been triggered. If he has not entered into any agreement as regards his shares which triggers the pre-emption articles, he remains bound by the pre-emption provisions as and when he does so. I do not understand how he can be in breach of an obligation of good faith in these circumstances if he has an understanding with the Barclay brothers as to the use and retention of his shares which is neither prohibited by the other terms of the shareholders agreement nor triggers the pre-emption provisions.

612.   Paragraph 33D(l)-(n) concern the making by Mr Quinlan of the 17 February agreement. This is contrasted with the offer made by Wynton which was accepted by Mr McLaughlin in respect of his small holding of shares. I have already dealt with these events.   I have found, contrary to the allegation in paragraph 33D(n), that the 17 February agreement was not in accordance either with any agreement reached with Barclay brothers in October 2010 or in accordance with any subsequent agreement for the transfer of Mr Quinlan's shares.  The 17 February agreement was expressly conditional on compliance with the shareholder's agreement, i.e. with the pre-emption provisions, and it is in my view not sustainable to argue that it involved a breach of clause 8.5.

613.   It follows that there is no factual basis for the allegations made in support of the general averment contained in paragraph 42E. Paragraph 42E(b) alleges that Mr Quinlan concealed or failed to disclose the true and full arrangements between him and the Barclay brothers or Barclay interests. Those arrangements are said to include the agreement with Sir David Barclay reached in October 2010, the 17 February agreement and the power of attorney granted in May 2011. It is alleged that he was under an obligation to disclose them by reason of clause 8.5.2 because such arrangements *"would be material to Mr McKillen's decisions in relation to his own dealings with his shares in the company"*. Mr McKillen has not attempted to make good how such disclosure would have affected his decisions in relation to his own dealings with his shares in the company. As regards the 17 February agreement, Mr Quinlan knew following the making of the tri-partite agreement in Doha on 12 February 2011 that the Barclay interests would be acquiring Mr Quinlan's shares. The 17 February agreement, conditional as it was on compliance with the pre-emption provisions, was clearly a step in achieving that agreed object.

614.   Paragraph 42E(c) alleges that in accepting the payments and benefits from the Barclay brothers in return for support and assistance in transferring effective ownership and control of his shares in the company to the Barclay brothers in a manner designed to avoid triggering the pre-emption provisions and thereby preventing him from exercising his pre-emption rights. Mr Quinlan *"sought to profit at the expense of Mr McKillen"* in breach of clause 8.5.3. The short answer to this point is that such arrangements as were made did not avoid the pre-emption provisions.  As I have just mentioned the pre-emption provisions continued to apply

such that as and when Mr Quinlan disposed or agreed to dispose of his shares, the pre-emption provisions would be triggered. The same is true of the allegation contained in paragraph 42E(d) that in entering into arrangements designed to transfer effective ownership and control of his shares without triggering the pre-emption provisions Mr Quinlan was in breach of his obligations in clauses 8.5.2 and 8.5.4.

615.   Paragraph 42F asserts that rather than entering into *"arrangements designed to transfer effective ownership and control of his shares without triggering the pre-emption provisions"* Mr Quinlan was bound by clauses 8.5.2 and 8.5.4 to offer his shares in the company for sale to the other shareholders. In my judgment, an obligation to act in good faith towards the other parties and an obligation to do all things necessary or desirable to give effect to the spirit and intention of an agreement cannot be relied on to extend the scope of the express pre-emption clause, properly construed. In construing the terms of the pre-emption provisions, the court is seeking to give effect to the intention of the parties. To impose a wider set of pre-emption requirements would be to go beyond the intentions of the parties as expressed in their agreement. In my judgment, this would be a clear misuse of the obligations contained in clause 8.5.

616.   Paragraph 42G asserts that in order to comply with clause 8.5.2, Mr Quinlan was obliged to inform the company and its shareholders of circumstances indicating that security over his shares had become enforceable. I have already held that the security over Mr Quinlan's shares did not become enforceable.

617.   The case against Misland alleges five breaches of clause 8.5, although little is said about them in Mr McKillen's closing submissions.

618.   First, Misland is said to be in breach by failing to offer its shares to the other shareholders after it was bought by the Barclay interests. For the same reasons in relation to the similar claim against Mr Quinlan, I do not think this is sustainable. It does not assist to say that Misland disposed of its other assets just prior to the sale, as it was clearly free to do so.

619.   Secondly, it is alleged that Misland exercised its rights as a shareholder not for the shareholders' common purpose but in accordance with the wishes and for the benefit of the Barclay interests. No details are given of the occasions when Misland exercised its rights as a shareholder and I am not aware of any, except the appointment of Mr Faber and the acceptance of the pre-emption offer of Mr McLaughlin's shares, which Mr McKillen declined. There is nothing in this allegation.

620.   Thirdly, Misland permitted Mr Faber as its appointed director to conduct the affairs of the company in the interests of the Barclay brothers, not in the interests of the company. Leaving aside whether Misland *"permitted"* Mr Faber to act in any particular way as a director, I have rejected the allegations of breach of duty against Mr Faber, save as regards his non-disclosure of a conflicting duty from which no loss to the company or Mr McKillen flowed.

621.   Fourthly, Misland failed to disclose the true nature of the relationship between Mr Quinlan and the Barclay interests of which it must have been aware. Leaving aside

how it is said that Misland had such knowledge, and given that the arrangements did not trigger the pre-emption provision, I fail to see how clause 8.5 could have required their disclosure. All that is said is that it was material to Mr McKillen's decisions in relation to his dealings with his shares, but it is not explained how or what difference disclosure would have made.

622.    The fifth allegation, that Misland failed to disclose that Mr Quinlan's security had become enforceable, must in any event fail in the light of my decision on that issue.

623.    Sixthly, the failure to inform the company or its directors or Mr McKillen of the intention to acquire the NAMA debt or the true motivation for it. In the section on unfair prejudice, I hold that the company and Mr McKillen suffered no loss or prejudice from the non-disclosure of the intention to acquire the NAMA debt and the negotiations with NAMA, and I have earlier held that the true motivation was not as alleged by Mr McKillen. His case is not improved by alleging the non-disclosure to be a breach of clause 8.5.

**Unfair prejudice: the Law**

624.    The jurisdiction of the court to grant relief in respect of unfairly prejudicial conduct in relation to a company is entirely statutory. It was first introduced by section 75 of the Companies Act 1980 and was re-enacted as sections 459-461 of the Companies Act 1985. It is now contained in sections 994-999 of the Companies Act 2006. Its essential elements have remained unchanged. The grounds on which the jurisdiction may be invoked are set out in section 994(1) which permit a member of a company to apply to the Court for relief on the ground:

> *"(a)    that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or*

> *(b)    that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial."*

625.    The petitioner must therefore establish that, first, the matters of which he complains are either actual or proposed acts or omissions of the company or consists of the conduct of the company's affairs; secondly, that those matters have caused prejudice to his interests as a member of a company; and thirdly, that the prejudice is unfair. I will take each of these elements in turn.

*The company's affairs*

626.    The purpose of the jurisdiction is to provide remedies in respect of the way in which the affairs of the company are conducted. It was perceived prior to the enactment of section 75 of the Companies Act 1980 that there was insufficient protection to shareholders in that respect. The section is not directed to the activities of shareholders amongst themselves, unless those activities translate into acts or omissions of the company or the conduct of its affairs. Relations between

shareholders inter se are adequately governed by the law of contract and tort, including where appropriate the ability to enforce personal rights conferred by a company's articles of association. This important distinction has been emphasised in many of the authorities. In *re Legal Negotiators Limited* [1999] BCC 547 the Court of Appeal upheld the decision of Peter Goldsmith QC, sitting as a deputy Judge of the Chancery Division, to strike out a petition under section 459 of the Companies Act 1985 as unsustainable. Peter Gibson LJ at page 550 summarised the judgment below, with which he said he completely agreed. He said that the Judge

> *"reviewed the authorities from which he drew two points of significance for the case before him. The first was that the starting point was to consider what the parties had agreed between themselves as their commercial relationships, though he recognised this not need always be contained in the articles of association. The second was that the essence of the powers under s.459 is to give a remedy where there is complaint about the way the company's affairs are being conducted through the use (or failure to use) powers in relation to the conduct of the company's affairs provided by its constitution. He regarded the section as concerned with the company's affairs rather than the affairs of individuals and to be concerned with acts done by the company or those authorised to act as its organs".*

At page 551, Peter Gibson LJ said:

> *"Thus, like the Judge I too would lay emphasis on the need to show that it is the affairs of the company which are being or have been conducted in an unfairly prejudicial manner or that it is an act or omission of the company that is or would be so prejudicial. The conduct of a member of his own affairs, for example by requesting a general meeting of the company or seeking answers to an excessive number of questions, is irrelevant".*

I would only add that the refusal by a company to convene a general meeting would be an act of the company, although whether it was either unfair or prejudicial would of course depend on the circumstances. Other authorities in which the same distinction had been drawn include *In re Unisoft Group Limited (No. 2)* [1994] BCC 766, *In re Estate Acquisition and Development Limited* [1995] BCC 338 and *In re Leeds United Holdings Limited* [1997] BCC 131.

627.    Counsel for Mr McKillen submitted that *Blackmore v Richardson* [2006] BCC 276 demonstrated that dealings by shareholders concerning their shares may be part of the affairs of the company and found a claim of unfair prejudice. In my judgment, his submission is not borne out by that authority. The case concerned a company with three shareholders which took over a business previously run by them in partnership. An outsider made an offer to purchase all the shares of the company, which was accepted by two of the shareholders. A board meeting was held at which the offeror and his associate were appointed directors and the share transfers by the two selling shareholders were approved. At a board meeting two days later, the third shareholder who was the petitioner was suspended and requested not to attend the company's premises. The Judge held that the acts complained of were unfairly prejudicial conduct, by reference to the basis upon which the parties had gone into

business and converted their business into a company. It was not the dealings between the shareholders alone which brought the case within the jurisdiction conferred by section 459. The Judge at first instance, HHJ Wyn Williams QC (as he then was). referred to the requirement that the petition must be founded upon the conduct of the affairs of the company and said at paragraph 88 of his judgment (October 2004 unreported):

> *"In my judgment, it is impossible in the factual context of this case to separate the sale of their shares which in itself and standing alone could be construed as the purely private business of the first two Respondents, from the steps associated with it which amounted to the conduct of the affairs of the Company. I refer, here, principally to the meetings which were called and conducted on the 23 and 24 June 2002".*

Moreover there had been a serious attempt to exclude the petitioner from the management of the company, contrary to the understanding on which the shareholders had formed the company. This part of the decision below is summarised in paragraph 21 of the judgment of Lloyd LJ in the Court of Appeal, but, as he records, permission to appeal against that part had been refused.

628.    The Court will not adopt a technical or legalistic approach to what constitutes the affairs of the company but will look at the business realities. It was held by the Court of Appeal in *Rackind v Gross* [2005] 1 WLR 305 that the affairs of a company could include the affairs of a wholly-owned subsidiary which had common directors. If the affairs of the subsidiary are being conducted in a manner which damages the subsidiary and hence the value of the holding company's interest in the subsidiary, then the omission of the directors of the holding company to take steps to rectify the situation seems to me plainly capable of falling within section 994(1). Likewise, where the directors of a partly owned subsidiary nominated by the holding company permitted the holding company to build up a business at the expense of the subsidiary's business, which was allowed to wither, without taking any steps to protect the subsidiary's position, they were engaged in the conduct of the affairs of the subsidiary: *Scottish Co-operative Wholesale Society Limited v Mayor* [1959] AC 324. See also the decision of Court of Session (Outer House) in *Whillock v Henderson* [2009] BCC 314.

629.    By way of conclusion on this aspect, guidance was given by the Court of Appeal in *In re Neath Rugby Ltd (No.2)* [2009] 2 BCLC 427 where at para. 50 of a judgment with which the other members of the Court agreed, Stanley Burnton LJ said:

> *"The judge cited the observations of Powell J in Re Dernacourt Investments Pty Ltd (1990) 2 ACSR 553:*
>
> > *The words "affairs of a company" are extremely wide and should be construed liberally: (a) in determining the ambit of the "affairs" of a parent company for the purposes of s 320, the court looks at the business realities of a situation and does not confine them to a narrow legalistic view; (b) "affairs" of a*

> *company encompass all matters which may come before its board for consideration; (c) conduct of the "affairs" of a parent company includes refraining from procuring a subsidiary to do something or condoning by inaction an act of a subsidiary, particularly when the directors of the parent and the subsidiary are the same ...*
>
> *I would accept these propositions, but with some qualification. (b) may extend to matters which are capable of coming before the board for its consideration, and may not be limited to those that actually come before the board: I do not accept that matters that are not considered by the board are not capable of being part of its affairs. Nonetheless, like the judge, I am unable to see how it can be said that the affairs of Neath and of Osprey were so intermingled that all of the affairs of the latter were the affairs of the former. It would, for example, be quite irrational to suggest that Mr Blyth, when acting as a director of Osprey, was conducting the affairs of Neath."*

It no doubt goes without saying that the affairs of the company will also encompass matters which must go to the company in general meeting, rather than the board, for consideration.

*Prejudice*

630.    Prejudice will certainly encompass damage to the financial position of a member. The prejudice may be damage to the value of his shares but may also extend to other financial damage which in the circumstances of the case is bound up with his position as a member. So, for example, removal from participation in the management of a company and the resulting loss of income or profits from the company in the form of remuneration will constitute prejudice in those cases where the members have rights recognised in equity if not at law, to participate in that way. Similarly, damage to the financial position of a member in relation to a debt due to him from the company can in the appropriate circumstances amount to prejudice. The prejudice must be to the petitioner in his capacity as a member but this is not to be strictly confined to damage to the value of his shareholding. Moreover, prejudice need not be financial in character. A disregard of the rights of a member as such, without any financial consequences, may amount to prejudice falling within the section.

631.    Where the acts complained of have no adverse financial consequence, it may be more difficult to establish relevant prejudice. This may particularly be the case where the acts or omissions are breaches of duty owed to the company rather than to shareholders individually. If it is said that the directors or some of them had been in breach of duty to the company but no loss to the company has resulted, the company would not have a claim against those directors. It may therefore be difficult for a shareholder to show that nonetheless as a member he has suffered prejudice. In *Rock (Nominees) Limited v RCO Holdings Plc* [2004] BCC 466 the respondent directors of the company procured the sale of an asset to a company of which they were also directors. It was alleged to be a sale at an undervalue and procured in

breach of the respondent directors' fiduciary duties to the company. The evidence established that the price paid was not an undervalue but was the best price reasonably obtainable, and the Court of Appeal upheld the decision at first instance that no prejudice had been caused to the petitioner. At paragraph 79 of this judgment, with which the other members of the Court agreed, Jonathan Parker LJ said:

> " As to the judge's finding of breach of fiduciary duty on the part of the respondent directors, it is plain that, as the judge found, the respondent directors were "in a position of hopeless conflict". Further, they would undoubtedly have been well advised to obtain an independent valuation. However, no harm was in fact done and no damage or prejudice was caused. Nor is there any question of the respondent directors being personally accountable in any way. That being so, it seems to me to be inappropriate to reach a conclusion that they breached their fiduciary duties, as it were, in the abstract".

*Unfairness*

632.    On the difficult concept of fairness, the Court has the authoritative guidance given by the House of Lords in *O'Neill v Phillips* [1999] 1 WLR 1092 and the Court of Appeal in *In re Saul D Harrison & Sons Plc* [1995] 1 BCLC 14. The passage from the speech of Lord Hoffmann in *O'Neill v Phillips* is so central to a consideration of these issues that I consider it right to set it out in full:

> "5. "Unfairly prejudicial"
>
> In section 459 Parliament has chosen fairness as the criterion by which the court must decide whether it has jurisdiction to grant relief. It is clear from the legislative history (which I discussed in In re Saul D. Harrison & Sons Plc. [1995] 1 B.C.L.C. 14, 17-20) that it chose this concept to free the court from technical considerations of legal right and to confer a wide power to do what appeared just and equitable. But this does not mean that the court can do whatever the individual judge happens to think fair. The concept of fairness must be applied judicially and the content which it is given by the courts must be based upon rational principles. As Warner J. said in In re J. E. Cade & Son Ltd. [1992] B.C.L.C. 213, 227: "The court . . . has a very wide discretion, but it does not sit under a palm tree."
>
> Although fairness is a notion which can be applied to all kinds of activities, its content will depend upon the context in which it is being used. Conduct which is perfectly fair between competing businessmen may not be fair between members of a family. In some sports it may require, at best, observance of the rules, in others ("it's not cricket") it may be unfair in some circumstances to take advantage of them. All is said to be fair in love and war. So the context and background are very important.
>
> In the case of section 459, the background has the following two features. First, a company is an association of persons for an economic

*purpose, usually entered into with legal advice and some degree of formality. The terms of the association are contained in the articles of association and sometimes in collateral agreements between the shareholders. Thus the manner in which the affairs of the company may be conducted is closely regulated by rules to which the shareholders have agreed. Secondly, company law has developed seamlessly from the law of partnership, which was treated by equity, like the Roman societas, as a contract of good faith. One of the traditional roles of equity, as a separate jurisdiction, was to restrain the exercise of strict legal rights in certain relationships in which it considered that this would be contrary to good faith. These principles have, with appropriate modification, been carried over into company law.*

*The first of these two features leads to the conclusion that a member of a company will not ordinarily be entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted. But the second leads to the conclusion that there will be cases in which equitable considerations make it unfair for those conducting the affairs of the company to rely upon their strict legal powers. Thus unfairness may consist in a breach of the rules or in using the rules in a manner which equity would regard as contrary to good faith.*

*This approach to the concept of unfairness in section 459 runs parallel to that which your Lordships' House, in In re Westbourne Galleries Ltd. [1973] A.C. 360, adopted in giving content to the concept of "just and equitable" as a ground for winding up. After referring to cases on the equitable jurisdiction to require partners to exercise their powers in good faith, Lord Wilberforce said, at p. 379:*

> *"The words ['just and equitable'] are a recognition of the fact that a limited company is more than a mere legal entity, with a personality in law of its own: that there is room in company law for recognition of the fact that behind it, or amongst it, there are individuals, with rights, expectations and obligations inter se which are not necessarily submerged in the company structure. That structure is defined by the Companies Act [1948] and by the articles of association by which shareholders agree to be bound. In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small. The 'just and equitable' provision does not, as the respondents [the company] suggest, entitle one party to disregard the obligation he assumes by entering a company, nor the court to dispense him from it. It does, as equity always does, enable the court to subject the exercise of legal rights to equitable considerations; considerations, that is, of a personal character arising between one individual and another, which may make it unjust, or inequitable, to insist on legal rights, or to exercise them in a particular way."*

*I would apply the same reasoning to the concept of unfairness in section 459. The Law Commission, in its report on Shareholder Remedies (Law Com. No. 246) (1997) (Cm. 3769), para. 4.11, p. 43 expresses some concern that defining the content of the unfairness concept in the way I have suggested might unduly limit its scope and that "conduct which would appear to be deserving of a remedy may be left unremedied. . ." In my view, a balance has to be struck between the breadth of the discretion given to the court and the principle of legal certainty. Petitions under section 459 are often lengthy and expensive. It is highly desirable that lawyers should be able to advise their clients whether or not a petition is likely to succeed. Lord Wilberforce, after the passage which I have quoted, said that it would be impossible "and wholly undesirable" to define the circumstances in which the application of equitable principles might make it unjust, or inequitable (or unfair) for a party to insist on legal rights or to exercise them in particular way. This of course is right. But that does not mean that there are no principles by which those circumstances may be identified. The way in which such equitable principles operate is tolerably well settled and in my view it would be wrong to abandon them in favour of some wholly indefinite notion of fairness."*

633.    To similar effect is the judgment of Hoffmann LJ in *In re Saul D Harrison & Sons Plc* where he makes clear that the starting point in any case under section 994 is to ask whether the conduct complained of was in accordance with the basis upon which the petitioner agreed that the affairs of the company would be conducted and that, in most cases, this basis is adequately and exhaustively laid down in the articles of association, the material statutory provisions and sometimes in collateral agreements between the shareholders. It is equally well established that it is not every breach of the articles or shareholders agreement which will constitute unfair prejudice.

**Conclusions on Mr McKillen's case on unfair prejudice**

634.    It follows that Mr McKillen must establish conduct of the affairs of the company, or acts or omissions of the company, which have caused prejudice to his interests as a member in a manner which the law recognises as unfair. To the extent that his case is founded on breaches of the articles of association, breaches of the shareholders agreement or breaches of duty by the directors, the element of unfairness may be established.

635.    For part of his case, however, Mr McKillen relies also on legitimate expectations of participation in the management of the company. In my judgement, this is not sustainable. The importance of the passage from the speech of Lord Wilberforce in *In re Westbourne Galleries Ltd* cited by Lord Hoffmann in *O'Neill v Phillips* is that it indicates the circumstances in which reliance may be placed on equitable considerations (Lord Hoffmann deprecates the use of the expression 'legitimate expectations', regretting that he introduced it into this area of the law: see p.1102) as giving rise to a possible case of unfair prejudice. It is very important to note that in that passage, having identified that the structure of a company is defined by company law and the articles of association, Lord Wilberforce observed that;

> *"In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small."*

Equitable considerations, affecting the manner in which legal rights can be exercised, will arise only in those cases where there exist considerations of a personal character between the shareholders which makes it unjust or inequitable to insist on legal rights or to exercise them in particular way. Typically that will be in the case of a company formed by a small number of individuals on the basis of participation by all or some of them in the management of the company.

636.  In my judgment, there is no room for equitable considerations of this kind in the present case. The company was formed by a group of highly sophisticated and experienced business people and investors with a view to the purchase of a well-known group of hotels for a price running into many hundreds of millions of pounds and to retaining and managing some of those hotels. There was little prior relationship between many of the investors and some were unknown to each other until a few days before the company was formed. More importantly, articles of association and a shareholders agreement were negotiated and drafted, containing lengthy and complex provisions governing their relations with each other and with the company. I find it hard to imagine a case where it would be more inappropriate to overlay on those arrangements equitable considerations of the sort discussed by Lord Wilberforce and Lord Hoffmann.

637.  This part of Mr McKillen's case arises in relation to his allegation that he has been unfairly prejudiced by exclusion from participation in management. His right to participate in the management of the company is defined by his right as the holder of a particular class of shares to appoint a director to the board of the company. He exercised that right by appointing himself and by appointing Mr Cunningham as his alternate. There has been no interference with that right and no interference with the rights of either Mr McKillen, or in his absence, Mr Cunningham to attend board meetings. On the contrary, they, but mainly Mr Cunningham, have attended all or most of the board meetings held since the purchase of Misland by the Barclay interests. It is clear from the evidence that Mr McKillen and Mr Cunningham have been in no respect inhibited from exercising their rights as directors and from arguing their position. Mr McKillen submits that he has been put in a position of being a permanent minority because directors appointed by the Barclay interests and by Mr Quinlan formed a majority. But there is clearly nothing in the articles or the shareholders agreement which entitles directors to more than the votes at board meetings conferred on them by the shareholders agreement. Nor do the articles or the shareholders agreement prohibit particular groups of shareholders from co-operating with each other unless they have done so in a way which triggers the pre-emption provisions or which constitutes in some way a breach of the obligations of good faith to which I shall later return. The fact that the directors appointed by the Barclay interests and Mr Quinlan may take a position different to that of Mr McKillen does not involve any exclusion of Mr Quinlan or any unfairness unless the position which they take is taken in breach of their duties as directors.

638.  Mr McKillen relies on unguarded comments made by Mr Faber in some internal emails to the effect that Mr McKillen's life would be made hell at board level and

that they should do all that they could to make him uncomfortable. That is not, however, the way in which board meetings have in fact taken place. There appears to have been every opportunity for proper discussion at those meetings and it is clear that Mr Cunningham, who for the most part has attended them, has quite properly taken advantage of those opportunities.

639.   The matters relied on by Mr McKillen as constituting unfairly prejudicial conduct of the affairs of the company or acts or omissions of the company are summarised in paragraphs 933-959 of his closing submissions. A substantial part of Mr McKillen's case is based on the allegation that a transfer notice should have been given or deemed to have been given in respect of Mr Quinlan's shares. As I read paragraphs 933-946 they are all based on that proposition, except paragraph 941 which concerns the alleged analogous duty arising under the express contractual duty of good faith. I have found that there were no events which triggered the pre-emption provisions, whether under clause 6.6 or 6.17 of the shareholders agreement. If I had found that a transfer notice should have been given or a directors' meeting called to determine whether a transfer notice should be deemed to be given under clause 6.6, some potentially difficult issues would arise as to the nature of the case made by Mr McKillen under section 994. The obligation of a shareholder to give a transfer notice is a personal obligation of the shareholder which is enforceable against him by the other shareholders. The failure of a shareholder to give a transfer notice is not of itself conduct of the affairs of the company or an act or omission of the company. Something more is needed to bring the case within section 994. I would accept that where the directors or a majority of the directors knew that events had occurred which triggered the power of the board to make a determination whether to deem a transfer notice to have been given under clause 6.6 of the shareholders agreement, the failure to do so could properly be described as an omission of the company. If such a meeting had been held and there was a realistic prospect that the board would have determined the transfer should be deemed to be given, then I would accept also that members who may thereby have been deprived of the opportunity of a pre-emption offer may have suffered relevant prejudice. However, in the light of my findings, it is unnecessary for me to analyse whether such a case is pleaded or made out on the evidence.

640.   Paragraph 941 and 949-952 of Mr McKillen's closing submission address his case under section 994 based on breaches of the duty of good faith and other provisions of clause 8.5. I have earlier held that there were no breaches of those obligations.

641.   Mr McKillen relies on the alleged breaches of duty by the directors as causing or resulting in unfair prejudice to his interests as a member. Plainly the decisions of directors as such involve the conduct of the affairs of the company and if those decisions are reached by the directors or a majority of them in breach of duty and result in prejudice to the member or to the interests of a member then the fact of the decisions being in breach of duty will supply the necessary element of unfairness. I have elsewhere examined the alleged breaches and concluded that, save in one respect, the allegations are not made out. Moreover, on the facts, none of those breaches resulted in any prejudice to Mr McKillen's interests as a member. The closure of the data room had no effect either on the making of offers to the company and its members, principally by the Qataris and Wynton, or on the way in which those offers were considered by the shareholders. The appointment of JLL to

produce a revised valuation of the hotels was approved by the board of the company which approved also the payment of JLL's fee. The company received JLL's valuation report. Mr Seal's encouragement to Mr Hennebry not to write to NAMA on or about the 16 August 2011 in terms which referred to consultation prior to a transfer of the debt and asking whether NAMA was in discussions in relation to a transfer of the debt had no impact on the course of events in August and September 2011 as between the company and NAMA. Likewise, the termination of the company's contract for the provision of Mr Hennebry's services, apart from saving the company the fees payable under that contract, had no impact on the company or its business and in particular had no impact on the course of events as regards the company and NAMA.

642. I have concluded that Mr Faber and Mr Seal were in a position in August and September 2011 where their duty to the company as directors conflicted with their duties as executives of the Ellerman Group and that disclosure should have been made of this conflict. I am satisfied that the failure to disclose this conflict of duties had no adverse impact on the company, and caused no prejudice to Mr McKillen. The same would be true of the other breaches of duty if I had found them to be established.

643. The only prejudice pleaded in the section resulting from the allegations of breach of fiduciary duty is in paragraph 68F that *"Had the Company or its board of directors been made aware of the matters prior to 27 September 2011, it could and would have explored alternative means of refinancing the debt owed to NAMA. It would have concluded that it was not in the interests of the Company or its members as a whole or its members including Mr McKillen that its debt should be acquired by a vehicle of the Barclay Brothers rather than an independent and responsible lending institution"*. The company was already exploring the alternative means of refinancing the NAMA debt. The problem was not that it did not know that it had to refinance the debt in short order, but that it was unable to do so. There certainly was not *"an independent and responsible lending institution"* available to provide the necessary finance.

644. The course of events would have been the same. It was impossible for the company to re-finance the NAMA debt without the active support of the Barclay interests. While the company could raise £450-500 million by way of senior debt in a conventional manner, the problem related to the balance. The balance could be raised either by new capital or by borrowing backed by guarantees or security on which the lenders would be prepared to rely. There is no evidence to suggest that any third party would be prepared to provide new capital without very substantial changes to the existing shareholdings. The Barclay interests were not sellers of Misland or the shares which it held in the company and there was no obligation on them to consider the sale of those shares. Unless Mr McKillen was prepared to contemplate a reduction in his share holdings and in effect a return to a deal such as that reached with the Qataris on 12 February 2011 there was no prospect of further capital, except by means of a rights issue but, as earlier mentioned, Mr McKillen would not agree to a rights issue.

645. As regards a loan to bridge the gap, the only source of the requisite security were the Barclay interests. In fact, the financing raised by MFL required the personal guarantees of Sir David and Sir Frederick Barclay. It goes without saying that they

would not be willing to provide a personal guarantee to secure loans to the company if they did not have control of the company. There was the theoretical possibility of some form of mezzanine financing but the proposals which were put forward in that respect, for example by Goldman Sachs, would have been very expensive. Morgan Stanley advised Mr Cunningham that the group's net earnings could not support mezzanine financing in full on an ongoing basis and that it would be necessary to capitalise some of the interest as part of the principal, which would further increase the cost. No case is pleaded nor has any attempt been made to establish that it would have been reasonable or sensible for the company or its shareholders to agree to the type of mezzanine financing that might have been available, still less that it would have been unreasonable to decline it.

646.    A sale of assets would not provide the answer. First, Mr McKillen was opposed to a sale of any of the hotels, as Mr Cunningham made clear in his exchanges with Mr Faber in late August 2011. Secondly, the evidence shows that only a sale of Claridge's would release sufficient funds and that was not on the cards as far as anyone was concerned.

647.    Mr McKillen's case repeatedly put in cross-examination was that Mr Faber and the other directors should have been pressing hard on behalf of the company for an extension of NAMA's debt by 2 years or at any rate by a substantial period. For the reasons which I give in the section on NAMA, it is in my judgment clear that NAMA was not prepared to grant any such extension but would almost certainly have allowed the facility to go into default on 30 September 2011 without granting any extension. Their often repeated concern was to see the debt repaid or sold at par as soon as possible. If MFL had not purchased it, NAMA is likely to have sought a sale to Wynton and Aabar or another third party. Wynton and Aabar ceased to be competitors only as a result of the deal with the Barclay interests in mid-September 2011.

648.    The disclosure of the facts giving rise to the conflict therefore had in fact no impact either on what the company was able to do in relation to the NAMA debt or on what NAMA and MFL in fact did in relation to the NAMA debt. The position is the same as that which existed in *Rock Nominees Ltd v RCO (Holdings) Plc* and no prejudice to Mr McKillen's interests as a member arose as a result of this non-disclosure.

649.    There is this further consideration. MFL's deal with NAMA was not a surprise to Mr McKillen. His evidence is that by 26 August 2011 rumours were rife that the Barclay brothers were negotiating with Barclays Bank to raise finance to purchase the NAMA debt. For that reason he wrote on 26 August 2011 to Bob Diamond, then the chief executive of Barclays Bank, requesting a meeting. The brief reply that there could be no meeting because Barclays Bank was conflicted can only have confirmed Mr McKillen's belief.

650.    Notwithstanding this knowledge, as in effect it was, Mr McKillen did nothing to raise funds to meet the company's liability. Coming after months when no solution was found, it tends to confirm that even with formal disclosure by Mr Faber and Mr Seal, neither the company nor Mr McKillen could have found an alternative to MFL's purchase of the debt, followed by a rights issue.

651.    A final but important point is that, even if Mr McKillen's case as to the true purpose
        of acquiring the NAMA debt were correct, the prejudice would lie not in MFL's
        acquisition of the debt but in what MFL and the company then sought to do. MFL
        was free of any contractual or other constraint on acquiring the debt and the
        acquisition would not involve conduct of the affairs of the company. If an ensuing
        foreclosure or a rights issue were in some way improper, a failure by the company
        to challenge the former or its agreement to the latter would constitute an omission or
        act respectively of the company potentially open to challenge under section 994. In
        that way, the real prejudice, if such it were, would be identified and addressed.

652.    The section of the petition headed "*MFL Refinancing Demands*" refers in
        paragraphs 72 to 75 to the proposals made by MFL to the company on 27 and 28
        September 2011 for refinancing the NAMA debt which it had by then acquired.
        Paragraph 76 sets out objections to those terms. Paragraph 78 alleges that "*Any
        agreement by the Company to the terms proposed by MFL or similar terms*" would
        in the circumstances be unfairly prejudicial to Mr McKillen's interest as a member
        of the company. It goes on to allege that the company should instead either
        challenge the assignment from NAMA or seek to establish whether improved terms
        were available from MFL or pursue alternative proposals for refinancing the debt.

653.    In fact, matters have moved on considerably since the end of September. The board
        has engaged financial advisers and there have been extensive discussions between
        the directors and with third parties. So far as I am aware, there is no current
        proposal to proceed with a rights issue on the terms set out towards the end of
        September 2011 and these proceedings have not been concerned with and have not
        investigated whether the course of events since then has involved any unfairly
        prejudicial conduct of the affairs of the company.

**Tort claim**

654.    In light of my findings and decisions on the breaches of contract and breaches of
        duty alleged in the petition, I can deal with the tort claim very shortly. It fails. First
        there have been no breaches of contract and only one breach of duty established.
        Secondly, Mr McKillen has suffered no loss from that one established breach of
        duty, nor would he if the other breaches had been established. Without loss, there is
        no tort. Thirdly, there is no evidence of a combination or agreement of the
        defendants that Mr Faber and Mr Seal should not disclose the existence of the
        negotiations with NAMA.

655.    Many interesting issues on the limits to the tort of conspiracy to injure by unlawful
        means were discussed in submissions, such as whether a breach of contract can
        constitute unlawful means and the degree of knowledge on the defendants' part as to
        the unlawfulness of the means. A decision on these matters must await a case
        whose facts merit it. One finding I can and should make is that none of the
        defendants can have understood that any of their acts would breach clause 8.5 of the
        shareholders agreement, even assuming any of them had read it which I find highly
        unlikely with the possible exception of Mr Faber.

**Conclusion**

656.   I wish to repeat the tribute previously paid to the solicitors and counsel engaged for all the parties.  I gave directions at an early stage for a speedy trial and a very tight timetable for disclosure and the preparation of witness statements, both of which were very large tasks.  The organisation of all the materials for trial was very impressive.  The oral and written submissions were of the highest standard and all counsel were unfailingly helpful to me.

657.   The overall conclusion is that Mr McKillen's petition and claim fail and will be dismissed.  They fail because the alleged breaches of the pre-emption and other provisions in the shareholders agreement and the alleged breaches of duty by the directors are not established (save in one instance) and because Mr McKillen cannot establish any conduct of the affairs of the company which has been unfairly prejudicial to him.

A-8825

# EXHIBIT 26



Neutral Citation Number: [2021] EWCA Civ 961

Case No: A3/2020/1072

IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
PROPERTY TRUSTS AND PROBATE LIST (ChD)
Mr Justice Fancourt
[2020] EWHC 1407 (Ch) and [2020] EWHC 1521 (Ch)

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 29 June 2021

Before :

**LORD JUSTICE BAKER**
**LORD JUSTICE MALES**
and
**LORD JUSTICE NUGEE**
- - - - - - - - - - - - - - - - - - - - -
Between :

MONSOLAR IQ LTD | Claimant and Respondent

- and -

WODEN PARK LTD | Defendant and Appellant

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Timothy C Dutton QC** (instructed by **Geldards LLP**) for the **Appellant**
**Mr Toby Watkin** and **Mr Luke Wilcox** (instructed by **Osborne Clarke LLP**)
for the **Respondent**

Hearing date: 10 June 2021
- - - - - - - - - - - - - - - - - - - - -
## Approved Judgment

Covid-19 Protocol: This judgment was handed down remotely by circulation to the parties'
representatives by e-mail, release to BAILII and publication on the Courts and Tribunals
Judiciary website. The date and time for hand-down is deemed to be at 10:30am on
29 June 2021

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

**Lord Justice Nugee:**

*Introduction*

1.  The Appellant, Woden Park Ltd ("**Woden Park**"), is the owner of a 15-acre site at Woden Park near Cardiff ("**the Land**"). By a lease dated 8 July 2013 ("**the Lease**") Woden Park demised the Land to the Respondent, MonSolar IQ Ltd ("**MonSolar**"), for a term of 25 years and 6 months from that date for use as a solar farm. These proceedings concern the proper construction of a provision in the Lease for rent review.

2.  I will set out the provision in question straightaway. It is found in sch 6 of the Lease. This provides for a starting Rent of £1,000 per acre or £15,000, and for annual Review Dates on the anniversary of the date of the Lease. Paragraph 3 of sch 6 then provides:

    "**Review of Rent**

    The Rent payable under this Lease will be reviewed in accordance with this paragraph 3 on each of the Review Dates and such Rent payable from and including each such Review Date shall be the Revised Rent which shall be calculated as follows:

    Revised Rent = Rent payable prior to the Review Date (disregarding any
    suspension of Rent)   x   $\frac{\text{Revised Index Figure}}{\text{Base Index Figure}}$

    I will refer to this as "**the Formula**".

3.  It is common ground that there is no ambiguity in how the Formula, read literally, operates. It is also common ground that the effect is that although the index referred to is the General Index of Retail Prices or RPI, the rent will not increase over the term in line with RPI but (assuming RPI generally increases) at a very much higher rate. I refer below to some example calculations.

4.  In these proceedings MonSolar claimed that the Formula should be construed so that the rent was indexed in line with RPI, contending that this could and should be done under the principle by which clear mistakes in the drafting of a document can be corrected as a matter of construction, as exemplified by *Chartbrook Ltd v Persimmon Homes Ltd* [2009] 1 AC 1011 ("*Chartbrook*"). I will call this "**the Chartbrook principle**" although the principle itself long pre-dates that case.

5.  Fancourt J accepted MonSolar's contentions. He delivered two judgments, one ("**the Main Judgment**" or "**Jmt**") at [2020] EWHC 1407 (Ch) on 5 June 2020, and a second one ("**the Supplementary Judgment**" or "**SJmt**") at [2020] EWHC 1521 (Ch) on 12 June 2020. The combined effect of both judgments was encapsulated in his Order dated 12 June 2020 granting an appropriate declaration in favour of MonSolar.

6.  Woden Park appeal, with permission granted by Newey LJ, on two grounds, namely that it is neither clear that the Formula contained a drafting error, nor clear, if there were an error, what the error was.

Judgment Approved by the Court for handing down.                              MonSolar IQ Ltd v Woden Park Ltd

7.  Despite the able submissions of Mr Timothy C Dutton QC, who appeared for Woden
    Park, I agree with the submissions (also very able) of Mr Toby Watkin, who appeared
    with Mr Luke Wilcox for MonSolar.  I consider that Fancourt J reached the right
    conclusion for the right reasons and would dismiss the appeal accordingly.

*Background*

8.  Both parties adduced evidence by way of witness statement, but there was a dispute
    about the admissibility of the evidence on both sides.  Fancourt J resolved these
    issues, and there is no appeal against them, so it is unnecessary to go into the detail.
    There was no cross-examination, nor indeed any trial at all as counsel for one of the
    parties fell ill the day before trial, and rather than reschedule the trial, it was agreed
    that Fancourt J should determine the construction of the Formula on the basis of the
    documents, such parts of the written evidence as he determined to be admissible, and
    written submissions.

9.  The background facts which were either agreed, or which Fancourt J found to be
    admissible, were as follows.  Woden Park was incorporated in September 2012.  Its
    sole director was a Mr Feakins.  It bought 38 acres of agricultural land at Woden Park
    (including the 15 acres that make up the Land) in January 2013.  Planning permission
    for a solar photovoltaic park (or solar farm) on the Land was obtained in March 2013.
    MonSolar was incorporated, again with Mr Feakins as its sole director, in April 2013.
    Mr Feakins then caused Woden Park to grant the Lease to MonSolar on 8 July 2013.

10. MonSolar, which was owned by companies ultimately owned by or on behalf of Mr
    Feakins, was incorporated as a single purpose vehicle or SPV to hold the Lease, and
    as part of a structure to enable a sale of the project development rights as a package,
    these rights consisting of the Lease, the planning permission and an electricity grid
    connection offer which Woden Park had obtained.  The Lease was therefore not an
    arms' length transaction.  Although there has been no assignment of the Lease, which
    remains vested in MonSolar, control of MonSolar has now passed to others.

11. That is all one needs to know by way of background.

*The Lease*

12. The Lease was granted by Woden Park to MonSolar.  It was executed by Mr Feakins
    on behalf of both parties.  It demised the Land for a term of 25 years and 6 months
    from the date of grant of 8 July 2013, subject to a tenant's break clause as noted
    below.  It is described on the coversheet as a lease of land "for the installation of solar
    photovoltaic equipment", and the tenant's user covenant required the tenant to use it
    only for the purpose of installing and operating a solar photovoltaic system.  The
    tenant was also required to remove the system and reinstate the site – the relevant
    clause does not in fact expressly say when, but Fancourt J read it, in my view
    obviously correctly, as applying on the termination of the Lease.  Sch 5 contained
    provisions whereby the tenant could break the Lease at any time on not less than 6
    months' written notice, slightly oddly split into paragraph 2.1 which applied before
    the tenant's works had been commenced and paragraph 2.2 which applied afterwards,
    although there is no relevant difference between the two rights.

13. Sch 6 is headed "Rent".  The first paragraph (not expressly numbered, but the next

Judgment Approved by the Court for handing down.                    MmeSolar IQ Ltd v Wedco Park Ltd

one is paragraph 2) contains definitions for the purpose of the schedule.  The relevant ones are as follows:

| | |
|---|---|
| "Base Index Figure" | the Index Figure published in respect of the month two months before the commencement of the Term |
| "General Index" | the General Index of Retail Prices (RPI – all items) … |
| "Index Figure" | the figure published at the relevant time as the General Index |
| "Rent" | A x B |
| | where 'A' equals the area of the Site measured in acres which is **15 acres** |
| | and |
| | 'B' equals £1,000 (**£1,000 per acre**) |
| "Review Date" | each anniversary of the date of this Lease during the Term and 'Review Dates' shall be construed accordingly |
| "Revised Index Figure" | the Index Figure published in respect of the month two months before the relevant Review Date |
| "Revised Rent" | the increased Rent payable with effect from the relevant Review Date. |

14.   Paragraph 3 provides for the rent to be reviewed in accordance with the Formula in the terms set out at paragraph 2 above, which I repeat here for convenience:

"**Review of Rent**

The Rent payable under this Lease will be reviewed in accordance with this paragraph 3 on each of the Review Dates and such Rent payable from and including each such Review Date shall be the Revised Rent which shall be calculated as follows:

Revised Rent = Rent payable prior to the Review Date (disregarding any suspension of Rent)   x   $\dfrac{\text{Revised Index Figure}}{\text{Base Index Figure}}$

15.   By reading in the relevant defined terms, the Formula can be more simply expressed as follows:

"Revised Rent = Previous year's Rent   x   $\dfrac{\text{May RPI for current year}}{\text{May 2013 RPI}}$"

Judgment Approved by the Court for handing down.                                    MacSelar IQ Ltd v Wedco Park Ltd

16.    There are certain other provisions of sch 6 which it is convenient to note here:

(1)    Paragraph 2 provides for the rent to be payable half-yearly in arrears.

(2)    Paragraph 4 provides as follows:

"**Index**

4.1    In the event of any change after the date hereof in the reference base used to compile the General Index, the figure to be shown in the General Index after such change shall be the figure which would have been shown in the General Index if the reference base current at the date hereof had been retained

4.2    If the General Index shall cease to be published there shall be substituted as the relevant calculation in paragraph 3 a new arrangement (the "Revised Indexation") whereby the figure to be calculated under paragraph 3 shall reflect increases in the cost of living on a similar basis to that set out in paragraph 3

..."

(3)    Paragraph 5 provides as follows:

"**Interim payment pending the determination of the Revised Rent**

5.1    If the Revised Rent shall not have been ascertained by the relevant Review Date, until such time as the Revised Rent is ascertained, the Tenant shall continue to pay the Rent previously payable

5.2    Within thirty days of the Revised Rent being ascertained, the Tenant shall pay to the Landlord a sum equal to the difference between the Revised Rent and the Rent actually paid during the interval between the relevant Review Date and the date upon which the Revised Rent is ascertained."

17.    There is no dispute between the parties as to how the Formula, applied literally, operates. It was described by Fancourt J in the Main Judgment at [8]-[11] as follows:

"8.    It is accepted by the Tenant that, read literally, the indexation clause operates as follows. On the first anniversary date, the rent is increased by the RPI increase over the first year of the term. On the second anniversary date, that Revised Rent is further increased by the aggregate RPI increase over the first and second years of the term. On the third anniversary date, that further Revised Rent is further increased by the aggregate RPI increase over the first, second and third years of the term. And so on during the 25 years and six months of the term, so that at the end of year 24 the Revised Rent currently payable would be further increased by the aggregate RPI increase over the first twenty-four years of the term and a year later it would be further increased by the aggregate RPI increase over the first twenty-five years of the term.

Judgment Approved by the Court for handing down.                                     MonSolar IQ Ltd v Woden Park Ltd

9. Assuming RPI increases of 5% in each of the first three years of the term, the rent of £15,000 would thereby increase to £15,750 at the end of year one; to £17,325 (i.e. £15,750 + 10%) at the end of year two; and to £19,923.76 (i.e. £17,325 + 15%) at the end of year three. Thus, increases in rent upon the sequential annual rent reviews are not merely compounded, in the sense that it is the current, previously increased rent that is further increased on each Review Date; the current rent is also increased once more by the same factor by which the rent was previously increased, not just by a new factor reflecting the subsequent increase in the RPI index.

10. Departing from the arithmetically simple example based on successive 5% annual RPI increases, the Tenant's evidence is that if an annual rate of increase equal to the average RPI increase over the 20 years before the date of grant of the Lease (2.855% p.a.) is applied according to the formula in the Lease on each Review Date during the term of the Lease, the rent payable by year 25 of the term will be just over £76,000,000, as compared with less than £30,000 if non-cumulative RPI increases at that same average rate are applied to the reserved rent of £15,000 p.a.

11. It is of course the case that the RPI index is capable of decreasing as well as increasing – this in fact happened, for a single year only, in 2009 – and that the rate of increase (or decrease) over time cannot accurately be predicted. The Landlord's evidence is that if annual RPI increases of 1% p.a. were assumed over the length of the term of years, the annual rent would increase to only £380,660 in year 25. Neither side disputes the other's arithmetic but the appropriate assumptions to make to examine the effect of the indexation clause are very much disputed."

18. As well as looking at the potential effect of the Formula on the basis of various assumptions, it is possible to look at the actual effect of the Formula since the grant of the Lease, which has the advantage of avoiding any argument as to which assumptions might be more appropriate. This exercise does not appear to have been done below, but the relevant figures for RPI were included in written submissions for MonSolar filed between the Main and Supplementary Judgments (other than the figure for May 2020, which was not then available) and the calculations are otherwise a matter or arithmetic. The results are shown in the table in the Appendix.[1] This demonstrates the exponential effect of the Formula. Thus for example the increase in RPI for the 12 months to May 2020 was a modest 1%, but the Formula produced an increase in rent from July 2020 of 16.9% (based on the total increase in RPI between May 2013 and May 2020); and this total increase in RPI over 7 years of 16.9% can be contrasted with the total increase in rent over the same period of 83.1%.

*The Judgments*

19. In the Main Judgment, Fancourt J, having set out the facts, the evidence, his ruling on admissibility and the law, began his discussion at [52]. He summarised the question he had to decide as being whether it was clear that the indexation provisions were a

---

[1] I am indebted to Males LJ's Judicial Assistant, Mr Andrew Brown, for these figures.

Judgment Approved by the Court for handing down.                                                    MonSolar IQ Ltd v Woden Park Ltd

mistake, and if so whether it was clear what paragraph 3 of sch 6 meant: if both conditions were satisfied, the Lease would be interpreted contrary to its literal meaning, but if one were unsatisfied, paragraph 3 could only be corrected by way of rectification, and no such claim had yet been made.

20.    At [53]-[56] he accepted the submissions for MonSolar that the increases in rent produced by the Formula on a literal reading were irrational and arbitrary, or illogical and arbitrary, giving some illustrations of why that was so.  At [57] he accepted the submission for MonSolar that paragraph 4.2 of sch 6 recognised that the purpose of the Formula was for the reviewed rent to reflect increases in the cost of living, but that on its literal interpretation it did not do so (except in the first year).  At [58]-[62] he considered whether the Formula had an absurd effect in that (unless inflation were nominal, or there were a sustained period of deflation) the rent would grow to an unaffordable amount: he described the arguments in this respect as more subtle, pointing out that the most serious consequences would not be felt until the latter half of the term, and that the tenant could use the break clause to escape the more extreme consequences, although at the expense of dismantling the solar farm and possibly having to reinstate the Land if the landlord required it.  At [62] he concluded that although the break option might have been considered adequate protection by some lessees, it did nothing to mitigate the arbitrary and irrational way in which the Formula operated.  At [63]-[64] he considered the position from the point of view of the landlord, pointing out that the Lease was created as part of a package of development rights, and that it was difficult to accept that Woden Park intended the Formula to operate as drafted as it would either suppress the sale value of the package of rights, or prevent a sale to any well-advised purchaser.  At [65] he held that a reasonable and informed objective observer seeking to understand the meaning of the Lease would conclude that the Formula must be a drafting mistake because it made no sense.

21.    At [67]-[72] he proceeded to consider whether it was clear what sch 6 was objectively intended to mean.  MonSolar's case was that the drafting mistake should be corrected by reading the Formula as if it read:

"Revised Rent = Original Rent (£15,000)   x   $\dfrac{\text{May RPI for current year}}{\text{May 2013 RPI}}$"

Fancourt J however considered that the appropriate correction was as follows:

"Revised Rent = Previous year's Rent   x   $\dfrac{\text{May RPI for current year}}{\text{May RPI for previous year}}$"

I will call these **"Correction A"** and **"Correction B"** respectively.

22.    No doubt due to the fact that he was having to resolve the issues on written submissions alone, Fancourt J evidently thought that Correction A and Correction B produced different results, and he proceeded to explain why he preferred Correction B.  This part of his judgment, with respect, is not entirely easy to understand, but in summary it appears he thought that Correction A would only produce simple increases whereas Correction B would produce compound increases.  It is however common ground that the premise is false and that Correction A and Correction B will always produce exactly the same results.  This is because RPI itself is in effect

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

compounded, as a simple illustration demonstrates: if an item costing £100 is subject to RPI increases of 2% a year, it will cost £102 after one year and £104.04 (not £104) after two years, and the total RPI increase over the two years will be 4.04% not 4%. So it does not matter whether one calculates the price at the end of year 2 as £100 x 104.04/100 (Correction A). or £102 x 104.04/102 (Correction B).   Both produce the same figure of £104.04.

23.    This was pointed out to Fancourt J in written submissions on behalf of MonSolar after delivery of the Main Judgment.  In his Supplementary Judgment he noted this, and proceeded to deal with a new argument raised by Mr Dutton (not previously instructed) on behalf of Woden Park. namely that if there were a mistake it was not clear how it should be corrected, because the parties might have intended an upwards only rent review clause.  Fancourt J rejected this (SJmt at [11]-[12]) on the grounds that the necessary correction must reflect the nature of the mistake, and a failure to provide for upwards only rent reviews would be a different mistake of a different kind, and there was no reason to think that the parties made that mistake too.  He therefore saw no reason to alter his decision in the Main Judgment.

24.    By his Order dated 12 June 2020. he therefore declared:

"On the true construction of the Lease, paragraph 3 of Schedule 6 to the Lease means that the rent passing at the end of each complete year of the term is to be increased or decreased on the Review Date in accordance with any proportionate change in the RPI during that year, as measured by the values of the RPI two months before the Review Date and two months before the previous Review Date (or. in the case of the first Review Date, two months before the Term Commencement Date)."

As I have already indicated, I consider that Fancourt J came to the right conclusion. and save for the passage where he considers the supposed choice between Correction A and Correction B. I entirely agree with his reasoning and analysis.

*The law*

25.    There was very little dispute about the law.  The principles applicable to the construction of written instruments in general. and contracts in particular, have been considered by the Supreme Court in a series of well-known cases, which it is not necessary to go over again.  Those authorities are largely concerned with the position where a contractual provision is open to two possible interpretations.  In the present case we are not concerned with such an exercise as it is common ground that the Formula. read with the relevant definitions, is clear and unambiguous and not open to two different interpretations.  Rather we are concerned with the *Chartbrook* principle. under which the literal meaning of a provision can be corrected if it is clear both that a mistake has been made. and what the provision was intended to say.  This is in principle a different exercise from that of choosing between rival interpretations: see for example the recent decision of this Court in *Britvic plc v Britvic Pensions Ltd* [2021] EWCA Civ 867.

26.    In his written submissions, Mr Dutton contended that Fancourt J had erred in taking into account the matters he referred to at Jmt [53]-[56] and [58]-[63] (whether the Formula produced results that were illogical and arbitrary, and whether it had an

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

absurd effect), as these matters should, he said, have been identified as relevant only in the event that the Formula was open to more than one interpretation. This submission was premised on the basis that what Lord Hoffmann said in *Chartbrook* now had to be read in the light of the judgments of Lords Neuberger and Hodge in *Arnold v Britton* [2015] UKSC 36.

27.    I do not accept this submission. I do not read anything said by Lords Neuberger and Hodge in *Arnold v Britton* as qualifying or departing from the approach adopted by Lord Hoffmann in *Chartbrook*, and indeed in oral argument Mr Dutton said in terms that *Arnold v Britton* had in a sense not changed anything. He suggested however that it had underlined the need for judicial restraint in two ways. The first was in the observation by Lord Neuberger at [17] that commercial common sense and surrounding circumstances should not be invoked to undervalue the importance of the language of the provision to be construed. This was not I think directed at the *Chartbrook* principle at all. Lord Neuberger's point was that the parties cannot control commercial common sense or the surrounding circumstances but they can control the language of their contract, and that is primarily where the reasonable reader would expect to find what the parties intended. None of that really applies where the suggestion is that the parties have made a drafting mistake, where the very question is whether the language does really reflect what the parties intended.

28.    Mr Dutton's second point was based on the judgment of Lord Hodge, who did examine the *Chartbrook* principle by reference to some of the decided cases (see at [68]-[71]). Mr Dutton said that in each case the existence of the mistake was not found in the absurdity of the result but was either based on there being factual evidence of how a mistake had come about, or on some conflict with the other terms of the contract.

29.    But again I do not think Lord Hodge was intending to qualify the *Chartbrook* principle or delimit its precise boundaries. He was considering the submission of Mr Morshead QC for the tenants to the effect that no reasonable person would have thought that the parties intended the tenants to assume the risk of inflation falling below 10% (see at [67]). He rejected that submission on the basis that the question for the Court was not whether a reasonable and properly informed tenant would enter into such a bargain. That would involve illegitimately re-writing the parties' bargain in the name of commercial good sense (see at [77]). He then separately rejected the application of the *Chartbrook* principle on the basis that it was neither clear that there was a drafting mistake, nor clear, even if there were, what correction ought to be made (at [78]).

30.    *Arnold v Britton* undoubtedly supports the proposition that the mere fact that a bargain is not one that a reasonable and properly informed tenant would enter into is not enough to enable the Court to re-write it. The Court cannot alter an unambiguous provision of a contract simply because it provides for one of the parties to pay a price for something which appears to be a high one. There may be any number of reasons why a party accepts such a term: it may be in return for concessions elsewhere, or because that party has made a poor bargain, or for other reasons. The reasonable objective reader, who is not privy to the parties' subjective intentions, or their negotiations, cannot know why the relevant party agreed to it, and unless it is clear that there is a drafting mistake, cannot do any other than read the contract as providing what it unambiguously says. But there is nothing new in this. Lord

Judgment Approved by the Court for handing down.                                    Manchester IQ Ltd v Wedco Park Ltd

Hoffmann said the same in *Chartbrook* itself: see at [20] where he said that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. What enabled the Court in *Chartbrook* to conclude that a mistake had been made was that the result was not just imprudent but arbitrary and irrational.

31.    There is therefore a distinction between a case which concerns a provision which seems merely imprudent and one which appears irrational. The position was neatly summarised by Briggs LJ in *Sugarman v CJS Investments Ltd* [2014] EWCA Civ 1239 (*"Sugarman"*) at [43]-[44] where he referred to the fine dividing line between a case where the result appears "commercially unattractive and even unreasonable" and a case which appears "nonsensical or absurd".

32.    As Mr Watkin submitted in his brief but cogent oral submissions, there is a consistent line of authority illustrating the sort of case that falls on the far side of the line. The language used by judges to describe such cases naturally varies but the concept is consistent. In *City Alliance Ltd v Oxford Forecasting Services Ltd* [2000] EWCA Civ 510 Chadwick LJ at [13] referred to the Court being satisfied that the words actually used "produce a result which is so commercially nonsensical that the parties could not have intended it". In *Chartbrook* itself Lord Hoffmann referred variously to "an interpretation ... sufficiently irrational to justify a conclusion that there has been a linguistic mistake" (at [15]); to a "commercially absurd" interpretation (ibid); to one that "makes no commercial sense" (at [16]); to his not being able to believe that "any rational parties" who wished to provide for a catastrophic fall in the market would have adopted the precise sum which the literal interpretation produced (at [19]); and to the interpretation adopted by the trial judge and majority of the Court of Appeal as not just producing provisions that were favourable to Chartbrook but as making the structure and language of the relevant provisions appear "arbitrary and irrational" when the concepts could be combined in a rational way (at [20]). In *Sugarman* Briggs LJ at [43] referred to a case where the apparently unambiguous meaning of the words used "produces such a nonsensical result" that it cannot be treated as expressing the meaning of the document.

33.    There is nothing in *Arnold v Britton* which suggests that this dividing line between on the one hand a provision which is unduly favourable to one side, imprudent or unreasonable, and on the other hand one that produces irrational, arbitrary, nonsensical or absurd results has been redrawn. In the event therefore, I do not think there is any new point of law raised by this appeal: the question is whether Fancourt J was right to hold that the present case was one which fell on the far side of the line such as to make it clear that the literal reading of the Formula cannot have been intended by the parties and that there must have been a mistake.

*Ground 1: is it clear that there was a mistake?*

34.    Ground 1 of the appeal is that it is not clear that the provisions of the Lease contain a drafting error.

35.    I have already said that I agree with Fancourt J's conclusion on this point. Indeed it seems to me abundantly clear that the Formula contains a drafting error, and that it is about as plain a case of such a mistake as one could find. I will briefly indicate my own reasons for coming to this view before considering the specific points relied on

Judgment Approved by the Court for handing down.                    MansSolar IQ Ltd v Wedco Park Ltd

by Mr Dutton.

36. First, it has long been established what the general purpose of a rent review clause is. In *British Gas Corporation v Universities Superannuation Scheme Ltd* [1986] 1 WLR 398 at 401 Sir Nicolas Browne-Wilkinson V-C said (in the context of a clause requiring a review by reference to an open market rental) that the purpose was to "reflect the changes in the value of money and real increases in the value of the property during a long term". In *Equity & Law Life Assurance Society Plc v Bodfield Ltd* [1987] 1 EGLR 124 at 125 Dillon LJ (in the context of an upwards only review clause) said that the general object of a rent review clause was to provide the landlord with some measure of relief "where, by increases in property values or falls in the real value of money in an inflationary period, a fixed rent has become out of date and unduly favourable to the tenant." Where a rent review clause makes no reference to open market rentals, but is based on changes in an index such as RPI, it can be more simply be said that the general purpose of the rent review clause is ordinarily to reflect changes in the value of money, usually (since we live in inflationary times) by increasing the rent in line with increases in the relevant index.

37. Now of course the mere fact that this is the ordinary purpose of a rent review clause does not prevent the parties agreeing to review the rent in accordance with a different mechanism and for a different purpose, but it is at least a reasonable working hypothesis when one finds a rent review clause based on changes in an index such as RPI that the general purpose was to enable the rent to be increased in line with changes in the index. If that was not what the parties intended it seems slightly odd that they should have based their rent review provision on the index at all.

38. Second, that general purpose is echoed here by paragraph 4.2 of sch 6 under which where a revised index is substituted the figure to be calculated under paragraph 3 "shall reflect increases in the cost of living on a similar basis to that set out in paragraph 3"; see paragraph 16(2) above. Mr Dutton said that this provision was of no help as under its literal interpretation the Formula did reflect increases in the cost of living. I do not think this is right. One could say that the Formula in its literal interpretation requires a calculation by reference to changes in RPI, or perhaps that it is based on changes in RPI, but I do not think one would normally say that it "reflected" increases in the cost of living. A provision that reflects increases in the cost of living would normally be understood to be one that adjusted a figure in line with such increases, so that one mirrored the other. The Formula, because of its exponential effect, does not do this except in a very distorted way.

39. Third, I agree with Fancourt J that the results of applying the Formula literally can aptly be described as both arbitrary and irrational; indeed I think they can equally be described as commercially nonsensical or absurd, such that it cannot be supposed that rational parties really intended them. The effect of the Formula, literally construed, is that the rent is increased each year by an amount that reflects not the change in RPI for the previous year, but the cumulative change in RPI since the start of the term, all of which, apart from that attributable to the latest 12 months, has already been taken into account, in most cases repeatedly. It is impossible to think that any rational parties could have intended that. Among the arbitrary results that it produces is that if inflation is high at the beginning of the term and low at the end, this will produce a much higher rent overall than if inflation is low at the beginning and high at the end, even if the total inflation over the term is the same (see Jmt at [56]). Another is that if

Judgment Approved by the Court for handing down.                    MonSolar IQ Ltd v Woden Park Ltd

there has been a period of inflation, followed by a fall in RPI, the rent will still continue to rise each year unless and until the fall in RPI is so sustained that the RPI drops to what it had been at the start of the term. Neither of these results makes any sense, and it is impossible to think of any reason why rational parties would have intended them. They can quite properly be called nonsensical and absurd.

40.    Fourth, it is not difficult to see how the mistake came about. It is not necessary before the Court can correct a mistake under the *Chartbrook* principle that the Court should be satisfied how the mistake happened, and, since, unlike in an action for rectification, evidence as to the drafting process will almost always be inadmissible (as Fancourt J correctly held it was here), it will often be impossible to know. But the fact that there is a plausible explanation as to how the error occurred can support the conclusion that there has indeed been such an error: see for example *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin)* [2003] UKHL 12 at [22]-[23] where counsel suggested that the explanation for an omission was the phenomenon, technically known as homeoteleuton, whereby the drafter's eye had skipped from one occurrence of a word to the next, an explanation accepted by Lord Bingham.

41.    Here the cause of the error is simple enough. In order to review a rent each year in line with RPI, one can either draft the clause by taking the starting rent and reviewing it in line with the total cumulative increase in RPI since the start of the term (ie method A), or by taking the previous year's rent and increasing it in line with the increase in RPI for the last 12 months (ie method B). Whichever method is used therefore, one has a multiplicand consisting of a figure for a previous rent and a multiplier consisting of a figure for the increase in RPI. It does not matter which method is used as they produce the same result; but what the drafter has done here is take the multiplicand from method B (the previous year's rent) and apply to it the multiplier from method A (total increases in RPI since the beginning of the term), thereby duplicating the effect and leading to the exponential rise. The error is obvious enough once it has been pointed out, but it is easy to believe that the drafter may not have noticed it at the time. There are several other indications that the drafting of the Lease was less than perfect, which suggests that it was not carefully reviewed. And we were shown extracts from two publications warning those drafting rent review provisions against falling into precisely this error: see *Lewison's Drafting Business Leases* (8th edn, 2013) at §6-14, referring to "one unfortunate error which is made from time to time", namely that the indexation relates back to the beginning of the lease so that inflation is double counted; and *Index linking rent reviews: deceptively simple* (Chandler, Estates Gazette 4.1.2018), which referred to it being easy to get the formula wrong, for example if the increase in the index is based on the index figure at the start of the lease, but applied to the passing rent. There is also a reported case from New South Wales, *Westpac Banking Corporation v Tanzone Pty Ltd* [2000] NSWCA 25, where a similar error had been made (and was duly corrected).

42.    I think it is plain that that is what happened here. This is not just a case of a rent review clause that is unduly favourable to one party, or imprudent for the other party to enter into; this seems to me a paradigm example of a clause which, literally interpreted, leads to arbitrary and irrational results when it is possible for the concepts employed (the starting or passing rent, changes in the index) to be combined in a wholly orthodox and rational way. I have not the slightest doubt that Fancourt J was right to find that there was a drafting error in the way the Formula was written.

Judgment Approved by the Court for handing down.                                    MonSolar IQ Ltd v Woden Park Ltd

43.    As to Mr Dutton's arguments, I have already in effect addressed most of them.  Mr Dutton said that Fancourt J was wrong to look at the effects of the Formula: this was just part of the price paid by the tenant under the Lease and one could not say that the price, although high, was in itself not intended.  One needed to find some context either in the factual background or in the Lease itself before one could conclude that there had been a mistake.

44.    I do not accept that the enquiry is as limited as Mr Dutton suggested.  For reasons already given, it is in my judgment legitimate to look at the results produced by the Formula, provided that one bears firmly in mind that what one is looking for are not just results that are unduly favourable to one side, but arbitrary and irrational ones that are nonsensical and lead to the conclusion that they cannot have been intended.  In any event as explained above, the provisions of the Lease, and in particular paragraph 4.2 of sch 6, do lend support to the proposition that the drafting contained a mistake.

45.    Mr Dutton said that the drafting of the Formula might have been intentional.  It might have been counterbalanced by other factors, or have been a *quid pro quo* for some other concession.  Or if the starting rent had been below market value, the Formula might have been designed to remedy this.  Neither suggestion seems to me a realistic possibility.  Matters such as these might explain some adaptation of the usual form of rent review provision in the landlord's favour; but they do not explain the quite arbitrary and extreme effects of the Formula as drafted.

46.    Mr Dutton also sought to criticise Fancourt J for suggesting (at Jmt [63]) that it was difficult to accept that the landlord could have intended the Formula to operate as drafted.  He said that since the Formula was very "landlord-friendly" it was verging on the absurd to suggest that the landlord would not want to have it.  That I think does not do justice to the reality of the position.  The Lease was part of a structure to exploit the potential of the land as a solar farm by selling a package including the Lease to a person wishing to operate a solar farm.  The Lease was granted to MonSolar, a newly incorporated SPV.  Fancourt J held those facts to be admissible (and that has not been challenged).  In those circumstances, whatever MonSolar's theoretical liability for rent under the Lease, Woden Park would not actually receive any rent from MonSolar unless MonSolar installed and operated a solar farm; and that would not happen unless the package, including the Lease, could be sold.  It is against that background that Fancourt J concluded that the landlord could not have really meant the Formula to operate as drafted, among other things because it would prevent a sale to any well-advised purchaser.  Unless there were such a sale, Woden Park would be unlikely to receive a penny of rent from MonSolar.  I agree therefore that it was not in Woden Park's interests to draft the Formula in such a way as to reduce the likelihood of the package of rights being sold.

47.    I do not therefore accept Mr Dutton's criticisms of Fancourt J's conclusion that the Formula clearly contained a drafting error.  I would dismiss Ground 1 of the appeal.

*Ground 2: is it clear how the mistake should be corrected?*

48.    Ground 2 of the Appeal is that is if it is clear that the Formula contained a drafting error, it is not clear how it should be corrected.

Judgment Approved by the Court for handing down.                                     Manthorke 2Q Ltd v Wrefon Park Ltd

49.   Mr Dutton accepted that it did not matter for these purposes if there were two different ways of correcting the error but they had the same mathematical effect. If therefore the only choice were between Correction A and Correction B, that would not prevent the Formula being corrected under the *Chartbrook* principle.

50.   But he said that there was another possibility which could not be ruled out, which was that the parties actually intended an upwards only rent review. It is common ground that if the rent review were upwards only, it would potentially make a difference whether Correction A or Correction B was used as in periods when RPI went down, the results would diverge. But quite apart from this, Mr Dutton's submission was that if it was not clear whether the parties did intend upwards only rent reviews or not, it could not be concluded that it was clear how the mistake should be corrected.

51.   Fancourt J dealt with this in his Supplementary Judgment: see paragraph 23 above. I entirely agree with him and there is little more that needs to be said. Paragraph 3 of sch 6 is not drafted as an upwards only rent review clause. Including provision for upwards only rent reviews would have nothing to do with correcting the mistake that was made (mixing the two methods of indexation); it would be including a new provision. There is no reason to suppose that the failure to specify upwards only rent reviews was a mistake at all, and no basis for supposing that the parties intended to include a provision to that effect.

52.   Mr Dutton pointed to various parts of sch 6 which contemplated that the rent would increase on each review. These were (i) the definition of Revised Rent, which refers to "the increased Rent payable…"; (ii) paragraph 4.2, which refers to the revised indexation reflecting "increases in the cost of living"; and (iii) paragraph 5 which makes provision for the case where the Revised Rent has not been ascertained at the Review Date, and provides for the tenant to pay the extra rent once ascertained, but not for the case where the tenant has overpaid. All of these suggested, he said, that the parties envisaged that the rent would increase and not decrease when reviewed.

53.   I accept that these provisions show that the drafter envisaged that rents would increase at each review date. I do not find that surprising. Price inflation has been a constant of the UK economy since at least the 1940s, and although there were some months in 2009 when the index showed a decrease in RPI over the previous 12 months, this was a consequence of the financial crash in 2008 which at the time of the grant of the Lease in 2013 might reasonably have been thought unlikely to recur.

54.   But the fact that the drafter envisaged that rents would increase on each review does not mean that he made any provision to that effect. It is easy enough to draft a clause providing that the rent payable after a review date shall never be less than that payable before, or that it should be the higher of the passing rent and that produced by the relevant formula. The drafter did not do that, and like Fancourt J, I do not see that we, or the reasonable objective reader, have any material on which to conclude that the Lease contains, or might contain, a second and separate mistake in failing to so provide.

55.   In my judgment it is clear that the drafting mistake in the Formula should be corrected by substituting either Correction A or Correction B, and not by incorporating any provision for upwards only rent reviews. Since it does not matter which correction is

Judgment Approved in the Court for handing down.                    MoonStar IQ Ltd v Wedco Park Ltd

adopted. I see no reason for disturbing Fancourt J's Order (which in fact adopts Correction B).

56.   I would therefore dismiss Ground 2, and the appeal.

**Lord Justice Males:**

57.   I agree.

**Lord Justice Baker:**

58.   I also agree.

A-8841

Judgment Approved by the Court for handing down.                    MeadSolar IQ Ltd v Weston Park Ltd

Appendix

| Review Date | RPI for May of that year | Formula | Rent / Revised Rent | 12 month increase in RPI | Increase in RPI since May 2013 | Increase in rent since May 2013 |
|---|---|---|---|---|---|---|
| Grant (8.7.13) | 250.0 | | £15,000.00 | - | - | - |
| 8.7.14 | 255.9 | £15,000.00 × $\frac{255.9}{250}$ | £15,354.00 | 2.4% | 2.4% | 2.4% |
| 8.7.15 | 258.5 | £15,354.00 × $\frac{258.5}{250}$ | £15,876.04 | 1.0% | 3.4% | 5.8% |
| 8.7.16 | 262.1 | £15,876.04 × $\frac{262.1}{250}$ | £16,644.44 | 1.4% | 4.8% | 11.0% |
| 8.7.17 | 271.7 | £16,644.44 × $\frac{271.7}{250}$ | £18,089.18 | 3.7% | 8.7% | 20.6% |
| 8.7.18 | 280.7 | £18,089.18 × $\frac{280.7}{250}$ | £20,310.53 | 3.3% | 12.3% | 35.4% |
| 8.7.19 | 289.2 | £20,310.53 × $\frac{289.2}{250}$ | £23,495.22 | 3.0% | 15.7% | 56.6% |
| 8.7.20 | 292.2 | £23,495.22 × $\frac{292.2}{250}$ | £27,461.21 | 1.0% | 16.9% | 83.1% |

A-8842

# EXHIBIT 27

A-8843

HOUSE OF LORDS

SESSION 2008–09
**[2009] UKHL 38**
*on appeal from:[2008] EWCA Civ 183*

# OPINIONS
## OF THE LORDS OF APPEAL
## FOR JUDGMENT IN THE CAUSE

### Chartbrook Limited (Respondents) *v* Persimmon Homes Limited and others (Appellants) and another (Respondent)

**Appellate Committee**

**Lord Hope of Craighead**
**Lord Hoffmann**
**Lord Rodger of Earlsferry**
**Lord Walker of Gestingthorpe**
**Baroness Hale of Richmond**

**Counsel**

*Appellant:*
Christopher Nugee QC
Julian Greenhill
(Instructed by Mayer Brown International)

*Respondent:*
Robert Miles QC
Timothy Morshead
(Instructed by Carter-Ruck )

*Hearing dates:*

31 MARCH, 1 and 2 APRIL 2009

ON
WEDNESDAY 1 JULY 2009

A-8844

## HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT
## IN THE CAUSE

**Chartbrook Limited (Respondents) _v_ Persimmon Homes Limited
and others (Appellants) and another (Respondent)**

[2009] UKHL 38

## LORD HOPE OF CRAIGHEAD

My Lords,

1.     I have had the privilege of reading in draft the opinion of my noble and learned friend, Lord Hoffmann. Like my noble and learned friend, Lord Walker of Gestingthorpe, whose opinion I have also had the privilege of reading, I agree with all his reasoning and I share Lord Walker's admiration for the way it has been expressed. For the reasons they give I would allow the appeal.

2.     I agree that Persimmon's argument that the House should take account of the pre-contractual negotiations raises an important issue. Every so often the rule that prior negotiations are inadmissible comes under scrutiny. That is as it should be. One of the strengths of the common law is that it can take a fresh look at itself so that it can keep pace with changing circumstances. But for the reasons that have been set out by Lord Hoffmann I think that the arguments for retaining the rule have lost none of their force since _Prenn v Simmonds_ [1971] 1 WLR 1381 demonstrated, as Lord Wilberforce put it at p 1384, the disadvantages and danger of departing from established doctrine.

3.     In the Court of Appeal Lawrence Collins LJ said that the policy reasons for the rule have not been fully articulated: [2008] EWCA Civ 183, para 106. I am not sure, with respect, that everyone would agree with him. Lord Gifford did his best to explain what they are in his dissenting opinion in _Inglis v Buttery_ (1877) 5 R 58, 69-70. When that

case came before this House Lord Blackburn said that they set out exactly what he himself thought: (1878) 3 App Cas 552, 577. As Lord Gifford explained, the very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon what the parties said or wrote to each other during the period of their negotiations. It is the formal contract that records their bargain, however different it may be from what they may have stipulated for previously

4.    Lord Blackburn clearly saw no conflict between the exclusionary rule and Lord Justice Clerk Moncreiff's proposition that the Court was entitled to be put in the position that the parties stood before they signed: (1877) 5 R 58, 64. In *River Wear Commissioners v Adamson* (1877) 2 App Cas 743, 763 he had already acknowledged that the court should look beyond the language of the contract and see what the circumstances were with reference to which the words were used. As he put it, the meaning of words varies according to the circumstances with respect to which they are used. It was the reasons that Lord Gifford articulated in *Inglis v Buttery* (1877) 5 R 58, 69-70, that persuaded him that to admit evidence of prior negotiations would be a step too far. I think that what appealed to Lord Blackburn still holds true today. If more is needed, Lord Hoffmann's analysis provides it. As he has indicated, it would only be if your Lordships were confident that the rule was impeding the proper development of the law or contrary to public policy that it would be right for it to be departed from. That this is so has not, as I see it, been demonstrated.

**LORD HOFFMANN**

My Lords,

5.    On 16 October 2001 Chartbrook Ltd ("Chartbrook") entered into an agreement with Persimmon Homes Ltd ("Persimmon"), a well-known house-builder, for the development of a site in Wandsworth which Chartbrook had recently acquired. The structure of the agreement was that Persimmon would obtain planning permission and then, pursuant to a licence from Chartbrook, enter into possession, construct a mixed residential and commercial development (commercial premises below, flats above, parking in the basement) and sell the properties on long leases. Chartbrook would grant the leases at the direction of Persimmon, which would receive the proceeds for its own account and

pay Chartbrook an agreed price for the land. Planning permission was duly granted and the development was built, but there is a dispute over the price which became payable.

6.　　Schedule 6 contained the relevant provisions.　The price was defined as the aggregate of the Total Land Value and the Balancing Payment. The Total Land Value was made up of three parts: Total Residential Land Value, Total Commercial Land Value and Total Residential Cark Parking Land Value. Total Residential Land Value was to be £76.34 per square foot multiplied by the area for which planning permission for flats was granted. Total Commercial Land Value was £38.80 per square foot multiplied by the area for which planning permission for shops and other commercial uses was granted. And Total Residential Cark Parking Land Value was £3,024 multiplied by the number of spaces for which planning permission was granted.　The Schedule set out the dates upon which the Total Land Value was to be paid. In principle, payment would fall due as each flat, shop or parking space was sold. But there was also a backstop provision for payment of specified percentages of the Total Land Value (so far as not already paid) by dates commencing about two and a half years after the grant of planning permission and ending about two years later, by which time the whole sum was due, whether the properties had been sold or not.

7.　　The provisions about Total Land Value are all quite straightforward and only require the insertion of the appropriate figures from the planning permission (which are not in dispute) into the formulae provided.　The other element in the price is the Balancing Payment. For reasons concerned with its drafting history which need not be explored, the Schedule defines the Balancing Payment as the Additional Residential Payment ("ARP") and then goes on to define the latter expression. So when I refer to the ARP, that means the Balancing Payment.

8.　　The definition of the ARP, over which the whole dispute turns, is outwardly uncomplicated:

> "23.4% of the price achieved for each Residential Unit in excess of the Minimum Guaranteed Residential Unit Value less the Costs and Incentives."

3

9.    This contains three more defined concepts.  Residential Unit means a flat.  The Minimum Guaranteed Residential Unit Value ("MGRUV") means the Total Residential Land Value divided by the number of flats.  And Costs and Incentives ("C & I") mean the additional expense which Persimmon might have to incur to induce someone to buy a flat; for example, by providing fittings better than specification or paying legal expenses. Such payments are economically equivalent to a reduction in the price achieved.

10.    Chartbrook says that the meaning of the definition is perfectly simple. You take the price achieved, deduct the MGRUV and the C & I and calculate 23.4% of the result.  That gives you a figure for an individual flat which, together the figures for similar calculations on all the other flats, makes up the ARP or Balancing Payment. That and the Total Land Value is the price.  On the agreed figures, that produces a Total Land Value of £4,683,565 and an ARP of £4,484,862, making £9,168,427 in all. The judge (Briggs J) [2007] EWHC 409 (Ch) and a majority of the Court of Appeal (Tuckey and Rimer LJJ) [2008] EWCA Civ 183 agreed.

11.    This construction is certainly in accordance with conventional syntax, at any rate, up to the point at which one decides when C & I should be deducted. As Briggs J said (at para 53) —

    "ARP means 23.4% of something. To the question '23.4% of what?' the clear answer is the excess of the price achieved for each Residential Unit over the MGRUV, less the Costs and Incentives."

12.    I do not think that the syntax helps one to decide whether C & I should be deducted before or after calculating the 23.4%, that is to say, whether there is a notional pause for breath after "MGRUV", represented in the passage I have quoted from the judgment by a comma which does not appear in the contract.  That is a grammatical ambiguity which must be resolved by considering the business purpose of providing for a deduction of C & I.  But the judge was clearly right about the effect of the syntax employed in the first part of the definition.

13.    Persimmon, on the other hand, says that the purpose of dividing the price into Total Land Value and ARP was to give Chartbrook a minimum price for its land, calculated on current market assumptions,

and to allow for the possibility of an increase if the market rose and the flats sold for more than expected.  It is agreed that, at the time of the agreement, the parties expected that a 700 square foot flat would sell for about £200,000 or so, maybe slightly more.  The MGRUV at £76.34 a square foot for such a flat was £53,438 or 26.7% of a price of £200,000. If the realised price was £228,000, it would represent 23.4%.  The purpose of the ARP was to provide that if the flats sold for more than £228,000, Chartbrook would be entitled to the amount by which 23.4% of the higher price exceeded the £53,438 MGRUV. What the definition therefore means is that you deduct C & I from the realised price to arrive at the net price received by Persimmon, then calculate 23.4% of that price,  and the ARP is the excess of that figure over MGRUV.  On this calculation, ARP is £897,051, compared with Chartbrook's claim for £4,484,862.  In the Court of Appeal Lawrence Collins LJ, dissenting, held that Persimmon's construction was correct.

14.    There is no dispute that the principles on which a contract (or any other instrument or utterance) should be interpreted are those summarised by the House of Lords in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998]  1 WLR 896, 912-913. They are well known and need not be repeated. It is agreed that the question is what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean. The House emphasised that "we do not easily accept that people have made linguistic mistakes, particularly in formal documents" (similar statements will be found in *Bank of Credit and Commerce International SA v Ali* [2002]  1 AC 251, 269, *Kirin-Amgen Inc v Hoechst Marion Roussel Ltd* [2005]  RPC 169, 186  and *Jumbo King Ltd  v Faithful Properties Ltd* (1999)   2 HKCFAR 279, 296) but said that in some cases the context and background drove a court to the conclusion that "something must have gone wrong with the language".  In such a case, the law did not require a court to attribute to the parties an intention which a reasonable person would not have understood them to have had.

15.    It clearly requires a strong case to persuade the court that something must have gone wrong with the language and the judge and the majority of the Court of Appeal did not think that such a case had been made out.  On the other hand, Lawrence Collins LJ thought it had. It is. I am afraid, not unusual that an interpretation which does not strike one person as sufficiently irrational to justify a conclusion that there has been a linguistic mistake will seem commercially absurd to another: compare the *Kirin-Amgen* case [2005] RPC 169 at pp. 189-190.  Such a division of opinion occurred in the *Investors Compensation Scheme* case

itself. The subtleties of language are such that no judicial guidelines or statements of principle can prevent it from sometimes happening. It is fortunately rare because most draftsmen of formal documents think about what they are saying and use language with care. But this appears to be an exceptional case in which the drafting was careless and no one noticed.

16.    I agree with the dissenting opinion of Lawrence Collins LJ because I think that to interpret the definition of ARP in accordance with ordinary rules of syntax makes no commercial sense.   The term "Minimum Guaranteed Residential Unit Value", defined by reference to Total Residential Land Value, strongly suggests that this was to be a guaranteed minimum payment for the land value in respect of an individual flat.   A guaranteed minimum payment connotes the possibility of a larger payment which, depending upon some contingency, may or may not fall due. Hence the term "Additional Residential Payment". The element of contingency is reinforced by paragraph 3.3 of the Sixth Schedule, which speaks of the "date of payment *if any* of the Balancing Payment." (My emphasis).

17.    The judge declined to regard the terms Total Land Value and Minimum Guaranteed Residential Unit Value as indicative of an intention that MGRUV was to be the minimum Chartbrook would receive as the land value of a flat because both terms were defined expressions.   They might just as well have been algebraic symbols. Indeed they might, and I strongly suspect that if they had been, they would have made it clear that the parties were intending to give effect to Persimmon's construction. But the contract does not use algebraic symbols. It uses labels. The words used as labels are seldom arbitrary. They are usually chosen as a distillation of the meaning or purpose of a concept intended to be more precisely stated in the definition. In such cases the language of the defined expression may help to elucidate ambiguities in the definition or other parts of the agreement: compare *Birmingham City Council v Walker* [2007]  2 AC 262, 268. I therefore consider that Lawrence Collins LJ was right to take into account the connotations of contingency to be derived from the defined terms.

18.    On Chartbrook's construction, there is virtually no element of contingency at all. ARP is payable in every case in which the flat sells for more than £53,438. Chartbrook submits that is still a contingency. Who could tell whether or not the market for flats in Wandsworth might not collapse?   In the Court of Appeal, Rimer LJ accepted that submission. He said that the "relevant language", i.e. the language of

contingency, was "strictly consistent also with Chartbrook's construction."

19.    My Lords, I cannot believe that any rational parties who wished to make provision for such a catastrophic fall in the housing market (itself an unlikely assumption) would have adopted so precise a sum to represent their estimate of what might happen. Why £53,438? That was the agreed minimum figure for that part of the value of a flat attributable to the *land* which Chartbrook was selling. It was clearly based upon a careful and precise estimate of current market prices and building costs. But how could this figure have been appropriate as a minimum expected *sale* price of the entire flat at some future date? If the parties were wanting to guess at some extraordinary fall in the market against which Chartbrook was to be protected, why £53,438? Why not £50,000 or £60,000, or £100,000? A figure chosen to represent someone's fears about a possible collapse in the market could only have been based upon wild speculation, not the kind of calculation which produces a figure like £53,438. That figure cannot have been meant to play the part in the calculation which Chartbrook's construction assigns to it. It must have been intended to function as a minimum land value, not a minimum sale price. To compare it with the realised sale price would not be comparing like with like.

20.    It is of course true that the fact that a contract may appear to be unduly favourable to one of the parties is not a sufficient reason for supposing that it does not mean what it says. The reasonable addressee of the instrument has not been privy to the negotiations and cannot tell whether a provision favourable to one side was not in exchange for some concession elsewhere or simply a bad bargain. But the striking feature of this case is not merely that the provisions as interpreted by the judge and the Court of Appeal are favourable to Chartbrook. It is that they make the structure and language of the various provisions of Schedule 6 appear arbitrary and irrational, when it is possible for the concepts employed by the parties (MGRUV, C & I etc) to be combined in a rational way.

21.    I therefore think that Lawrence Collins LJ was right in saying that ARP must mean the amount by which 23.4% of the achieved price exceeds the MGRUV. I do not think that it is necessary to undertake the exercise of comparing this language with that of the definition in order to see how much use of red ink is involved. When the language used in an instrument gives rise to difficulties of construction, the process of interpretation does not require one to formulate some alternative form of

7

words which approximates as closely as possible to that of the parties. It is to decide what a reasonable person would have understood the parties to have meant by using the language which they did. The fact that the court might have to express that meaning in language quite different from that used by the parties ("12ᵗʰ January" instead of "13ᵗʰ January" in *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749; "any claim sounding in rescission (whether for undue influence or otherwise)" instead of "any claim (whether sounding in rescission for undue influence or otherwise)" in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896) is no reason for not giving effect to what they appear to have meant.

22.    In *East v Pantiles (Plant Hire) Ltd* (1981) 263 EG 61 Brightman J stated the conditions for what he called "correction of mistakes by construction":

> "Two conditions must be satisfied: first, there must be a clear mistake on the face of the instrument; secondly, it must be clear what correction ought to be made in order to cure the mistake. If those conditions are satisfied, then the correction is made as a matter of construction."

23.    Subject to two qualifications, both of which are explained by Carnwath LJ in his admirable judgment in *KPMG LLP v Network Rail Infrastructure Ltd* [2007] Bus LR 1336, I would accept this statement, which is in my opinion no more than an expression of the common sense view that we do not readily accept that people have made mistakes in formal documents. The first qualification is that "correction of mistakes by construction" is not a separate branch of the law, a summary version of an action for rectification. As Carnwath LJ said (at p. 1351, para 50):

> "Both in the judgment, and in the arguments before us, there was a tendency to deal separately with correction of mistakes and construing the paragraph 'as it stands', as though they were distinct exercises. In my view, they are simply aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended."

8

24.    The second qualification concerns the words "on the face of the instrument".  I agree with Carnwath LJ (at pp 1350-1351) that in deciding whether there is a clear mistake, the court is not confined to reading the document without regard to its background or context.  As the exercise is part of the single task of interpretation, the background and context must always be taken into consideration.

25.    What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed.  All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant.  In my opinion, both of these requirements are satisfied.

26.    That leaves the question of the deduction of C & I, which the judge and the majority of the Court of Appeal regarded as an insuperable obstacle to Persimmon's construction. I cannot see why this should be so.  Everyone agrees that the only sum from which C & I can rationally be deducted is the headline price achieved on the sale, so as to arrive at the net amount received by Persimmon. That is accordingly what the parties must have meant. You deduct the C & I from the nominal price achieved and the ARP is the excess, if any, of 23.4% of that net sum over the MGRUV.  Giving this meaning to the provision about C & I does not in any way weaken or affect the argument for interpreting the rest of the definition in a way which gives ARP a rational meaning. To say, as Rimer LJ said, that it requires "rewriting", or that it "distorts the meaning and arithmetic of the definition" is only to say that it requires one to conclude that something has gone wrong with the language – not, in this case, with the meanings of words, but with the syntactical arrangement of those words. If however the context drives one to the conclusion that this must have happened, it is no answer that the interpretation does not reflect what the words would conventionally have been understood to mean.

27.    If your Lordships agree with this conclusion about the construction of the contract, the appeal must be allowed.  There is no need to say anything more.  But Persimmon advanced two alternative arguments of very considerable general importance and I think it is appropriate that your Lordships should deal with them.  The first was that (contrary to the unanimous opinion of the judge and the Court of Appeal) the House should take into account the pre-contractual negotiations, which in the opinion of Lawrence Collins LJ (at paragraph 132), were determinative confirmation of Persimmon's argument on

construction. The second was that the judge and the Court of Appeal had misunderstood the principles upon which rectification may be decreed and that if Persimmon had failed on construction, the agreement should have been rectified.

28. The rule that pre-contractual negotiations are inadmissible was clearly reaffirmed by this House in *Prenn v Simmonds* [1971] 1 WLR 1381, where Lord Wilberforce said (at p. 1384) that earlier authorities "contain little to encourage, and much to discourage, evidence of negotiation or of the parties' subjective intentions." It is clear that the rule of inadmissibility has been established for a very long time. In *Inglis v John Buttery & Co* (1878) 3 App Cas 552, 577 Lord Blackburn said that Lord Justice Clerk Moncreiff (at (1877) 4 R 58, 64) had laid down a principle which was nearly accurate but not quite when he said that in all mercantile contracts "whether they be clear and distinct or the reverse, the Court is entitled to be placed in the position in which the parties stood before they signed". The only qualification Lord Blackburn made was to reject Lord Moncreiff's view that the Court was entitled to look at the pre-contractual negotiations because unless one did so, one could not be fully in the position in which the parties had been.

29. Instead, Lord Blackburn preferred (at p. 577) the opinion of Lord Gifford ((1877) 4 R 58, 69-70):

> "Now, I think it is quite fixed - and no more wholesome or salutary rule relative to written contracts can be devised - that where parties agree to embody, and do actually embody, their contract in a formal written deed, then in determining what the contract really was and really meant, a Court must look to the formal deed and to that deed alone. This is only carrying out the will of the parties. The only meaning of adjusting a formal contract is, that the formal contract shall supersede all loose and preliminary negotiations - that there shall be no room for misunderstandings which may often arise, and which do constantly arise, in the course of long, and it may be desultory conversations, or in the course of correspondence or negotiations during which the parties are often widely at issue as to what they will insist on and what they will concede. The very purpose of a formal contract is to put an end to the disputes which would inevitably arise if the matter were left upon verbal negotiations or upon mixed communings partly consisting

of letters and partly of conversations. The written contract is that which is to be appealed to by both parties, however different it may be from their previous demands or stipulations, whether contained in letters or in verbal conversation. There can be no doubt that this is the general rule, and I think the general rule, strictly and with peculiar appropriateness applies to the present case."

30.     To allow evidence of pre-contractual negotiations to be used in aid of construction would therefore require the House to depart from a long and consistent line of authority, the binding force of which has frequently been acknowledged: see *Bank of Scotland v Dunedin Property Investment Co Ltd* 1998 SC 657, 665 ("well-established and salutary", per Lord President Rodger; *Alexiou v Campbell* [2007] UKPC 11 ("vouched by…compelling authorities", per Lord Bingham of Cornhill.) The House is nevertheless invited to do so, on the ground that the rule is illogical and prevents a court from, as the Lord Justice Clerk in *Inglis v John Buttery & Co* (1878) 3 App Cas 552 said, putting itself in the position of the parties and ascertaining their true intent.

31.     In *Prenn v Simmonds* [1971] 1 WLR 1381, 1384 Lord Wilberforce said by way of justification of the rule:

"The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back: indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to. It may be said that previous documents may be looked at to explain the aims of the parties. In a limited sense this is true: the commercial, or business object, of the transaction, objectively ascertained, may be a surrounding fact.

11

Cardozo J. thought so in the *Utica Bank* case. And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get 'agreement' and in the hope that disputes will not arise. The only course then can be to try to ascertain the 'natural' meaning. Far more, and indeed totally, dangerous is it to admit evidence of one party's objective - even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want. So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised."

32.    Critics of the rule, such as Thomas J in New Zealand (*Yoshimoto v Canterbury Golf International Ltd* [2001] 1 NZLR 523, 538-549) Professor David McLauchlan ("Contract Interpretation: What is it About?" (2009) 31:5 Sydney Law Review 5-51) and Lord Nicholls of Birkenhead ("My Kingdom for a Horse: The Meaning of Words" (2005) 121 LQR 577-591) point out that although all this may usually be true, in some cases it will not. Among the dirt of aspirations, proposals and counter-proposals there may gleam the gold of a genuine consensus on some aspect of the transaction expressed in terms which would influence an objective observer in construing the language used by the parties in their final agreement.   Why should court deny itself the assistance of this material in deciding what the parties must be taken to have meant? Mr Christopher Nugee QC, who appeared for Persimmon, went so far as to say that in saying that such evidence was unhelpful, Lord Wilberforce was not only providing a justification for the rule but delimiting its extent. It should apply only in cases in which the pre-contractual negotiations are actually irrelevant.  If they do assist a court in deciding what an objective observer would have construed the contract to mean, they should be admitted. I cannot accept this submission. It is clear from what Lord Wilberforce said and the authorities upon which he relied that

the exclusionary rule is not qualified in this way. There is no need for a
special rule to exclude irrelevant evidence.

33.    I do however accept that it would not be inconsistent with the
English objective theory of contractual interpretation to admit evidence
of previous communications between the parties as part of the
background which may throw light upon what they meant by the
language they used. The general rule, as I said in *Bank of Credit and
Commerce International SA v Ali* [2002] 1 AC 251, 269, is that there
are no conceptual limits to what can properly be regarded as
background. Prima facie, therefore, the negotiations are potentially
relevant background. They may be inadmissible simply because they are
irrelevant to the question which the court has to decide, namely, what
the parties would reasonably be taken to have meant by the language
which they finally adopted to express their agreement. For the reasons
given by Lord Wilberforce, that will usually be the case. But not always.
In exceptional cases, as Lord Nicholls has forcibly argued, a rule that
prior negotiations are always inadmissible will prevent the court from
giving effect to what a reasonable man in the position of the parties
would have taken them to have meant. Of course judges may disagree
over whether in a particular case such evidence is helpful or not. In
*Yoshimoto v Canterbury Golf International Ltd* [2001] 1 NZLR 523.
Thomas J thought he had found gold in the negotiations but the Privy
Council said it was only dirt. As I have said, there is nothing unusual or
surprising about such differences of opinion. In principle, however, I
would accept that previous negotiations may be relevant.

34.    It therefore follows that while it is true that, as Lord Wilberforce
said, inadmissibility is normally based in irrelevance, there will be cases
in which it can be justified only on pragmatic grounds. I must consider
these grounds, which have been explored in detail in the literature and
on the whole rejected by academic writers but supported by some
practitioners.

35.    The first is that the admission of pre-contractual negotiations
would create greater uncertainty of outcome in disputes over
interpretation and add to the cost of advice, litigation or arbitration.
Everyone engaged in the exercise would have to read the
correspondence and statements would have to be taken from those who
took part in oral negotiations. Not only would this be time-consuming
and expensive but the scope for disagreement over whether the material
affected the construction of the agreement (as in the *Yoshimoto* case)
would be considerably increased. As against this, it is said that when a

dispute over construction is litigated, evidence of the pre-contractual negotiations is almost invariably tendered in support of an alternative claim for rectification (as in *Prenn v Simmonds* and in this case) or an argument based on estoppel by convention or some alleged exception to the exclusionary rule. Even if such an alternative claim does not succeed, the judge will have read and possibly been influenced by the evidence. The rule therefore achieves little in saving costs and its abolition would restore some intellectual honesty to the judicial approach to interpretation.

36.     There is certainly a view in the profession that the less one has to resort to any form of background in aid of interpretation, the better. The document should so far as possible speak for itself. As Popham CJ said in the *Countess of Rutland's Case* (1604) 5 Co Rep 25b, 26a:

> "it would be inconvenient, that matters in writing made by advice and on consideration, and which finally import the certain truth of the agreement of the parties should be controlled by averment of the parties to be proved by the uncertain testimony of slippery memory."

37.     I do not think that these opinions can be dismissed as merely based upon the fallacy that words have inherent or "available" meanings, rather than being used by people to express meanings, although some of the arguments advanced in support might suggest this. It reflects what may be a sound practical intuition that the law of contract is an institution designed to enforce promises with a high degree of predictability and that the more one allows conventional meanings or syntax to be displaced by inferences drawn from background, the less predictable the outcome is likely to be. In this respect, it is interesting to consider the reaction to the statement of principle in *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896,912-913, which was viewed with alarm by some distinguished commercial lawyers as having greatly increased the quantity of background material which courts or arbitrators would be invited to consider: see Lord Bingham's recent paper ("A New Thing Under the Sun: The Interpretation of Contract and the ICS Decision" (2008) 12 Edinburgh LR 374-390) and Spigelmann CJ, "From Text to Contract: Contemporary Contractual Interpretation" (2007) 81 ALJ 322. As Lord Bingham pointed out, there was little in that statement of principle which could not be found in earlier authorities. The only points it decided that might have been thought in the least controversial were, first, that it was not necessary to find an

"ambiguity" before one could have any regard to background and, secondly, that the meaning which the parties would reasonably be taken to have intended could be given effect despite the fact that it was not, according to conventional usage, an "available" meaning of the words or syntax which they had actually used.

38.     Like Lord Bingham, I rather doubt whether the *ICS* case produced a dramatic increase in the amount of material produced by way of background for the purposes of contractual interpretation. But pre-contractual negotiations seem to me capable of raising practical questions different from those created by other forms of background. Whereas the surrounding circumstances are, by definition, objective facts, which will usually be uncontroversial, statements in the course of pre-contractual negotiations will be drenched in subjectivity and may, if oral, be very much in dispute. It is often not easy to distinguish between those statements which (if they were made at all) merely reflect the aspirations of one or other of the parties and those which embody at least a provisional consensus which may throw light on the meaning of the contract which was eventually concluded. But the imprecision of the line between negotiation and provisional agreement is the very reason why in every case of dispute over interpretation, one or other of the parties is likely to require a court or arbitrator to take the course of negotiations into account. Your Lordships' experience in the analogous case of resort to statements in Hansard under the rule in *Pepper v Hart* [1993] AC 593 suggests that such evidence will be produced in any case in which there is the remotest chance that it may be accepted and that even these cases will be only the tip of a mountain of discarded but expensive investigation. *Pepper v Hart* has also encouraged ministers and others to make statements in the hope of influencing the construction which the courts will give to a statute and it is possible that negotiating parties will be encouraged to improve the bundle of correspondence with similar statements.

39.     Supporters of the admissibility of pre-contractual negotiations draw attention to the fact that Continental legal systems seem to have little difficulty in taking them into account. Both the *Unidroit Principles of International Commercial Contracts* (1994 and 2004 revision) and the *Principles of European Contract Law* (1999) provide that in ascertaining the "common intention of the parties", regard shall be had to prior negotiations: articles 4.3 and 5.102 respectively.  The same is true of the United Nations Convention on Contracts for the International Sale of Goods (1980). But these instruments reflect the French philosophy of contractual interpretation, which is altogether different from that of English law. As Professor Catherine Valcke explains in an

illuminating article ("On Comparing French and English Contract Law: Insights from Social Contract Theory") (16 January 2009), French law regards the intentions of the parties as a pure question of subjective fact, their *volonté psychologique*, uninfluenced by any rules of law. It follows that any evidence of what they said or did, whether to each other or to third parties, may be relevant to establishing what their intentions actually were. There is in French law a sharp distinction between the ascertainment of their intentions and the application of legal rules which may, in the interests of fairness to other parties or otherwise, limit the extent to which those intentions are given effect.    English law, on the other hand, mixes up the ascertainment of intention with the rules of law by depersonalising the contracting parties and asking, not what their intentions actually were, but what a reasonable outside observer would have taken them to be. One cannot in my opinion simply transpose rules based on one philosophy of contractual interpretation to another, or assume that the practical effect of admitting such evidence under the English system of civil procedure will be the same as that under a Continental system.

40.    In his judgment in the present case, Briggs J thought that the most powerful argument  against admitting evidence of pre-contractual negotiations was that it would be unfair to a third party who took an assignment of the contract or advanced money on its security. Such a person would not have been privy to the negotiations and may have taken the terms of the contract at face value. There is clearly strength in this argument, but it is fair to say that the same point can be made (and has been made, notably by Saville LJ in *National Bank of Sharjah v Dellborg* [1997] EWCA Civ 2070, which is unreported, but the relevant passage is cited in Lord Bingham's paper in the Edinburgh Law Review) in respect of the admissibility of any form of background.  The law sometimes deals with the problem by restricting the admissible background to that which would be available not merely to the contracting parties but also to others to whom the document is treated as having been addressed. Thus in *Bratton Seymour Service Co Ltd v Oxborough* [1992] BCLC 693 the Court of Appeal decided that in construing the articles of association of the management company of a building divided into flats, background facts which would have been known to all the signatories were inadmissible because the articles should be regarded as addressed to anyone who read the register of companies, including persons who would have known nothing of the facts in question.  In *The Starsin* (*Homburg Houtimport BV v Agrosin Private Ltd* [2004] 1 AC 715) the House of Lords construed words which identified the carrier on the front of a bill of lading without reference to what it said on the back, on the ground that the bankers to whom the bill would be tendered could not be expected to read the small

print. Ordinarily, however, a contract is treated as addressed to the parties alone and an assignee must either inquire as to any relevant background or take his chance on how that might affect the meaning a court will give to the document. The law has sometimes to compromise between protecting the interests of the contracting parties and those of third parties. But an extension of the admissible background will, at any rate in theory, increase the risk that a third party will find that the contract does not mean what he thought. How often this is likely to be a practical problem is hard to say. In the present case, the construction of the agreement does not involve reliance upon any background which would not have been equally available to any prospective assignee or lender.

41.    The conclusion I would reach is that there is no clearly established case for departing from the exclusionary rule. The rule may well mean, as Lord Nicholls has argued, that parties are sometimes held bound by a contract in terms which, upon a full investigation of the course of negotiations, a reasonable observer would not have taken them to have intended. But a system which sometimes allows this to happen may be justified in the more general interest of economy and predictability in obtaining advice and adjudicating disputes. It is, after all, usually possible to avoid surprises by carefully reading the documents before signing them and there are the safety nets of rectification and estoppel by convention. Your Lordships do not have the material on which to form a view. It is possible that empirical study (for example, by the Law Commission) may show that the alleged disadvantages of admissibility are not in practice very significant or that they are outweighed by the advantages of doing more precise justice in exceptional cases or falling into line with international conventions. But the determination of where the balance of advantage lies is not in my opinion suitable for judicial decision. Your Lordships are being asked to depart from a rule which has been in existence for many years and several times affirmed by the House. There is power to do so under the *Practice Statement (Judicial Precedent)* [1966] 1 WLR 1234. But that power was intended, as Lord Reid said in *R v National Insurance Comrs, Ex p Hudson* [1972] AC 944, 966, to be applied only in a small number of cases in which previous decisions of the House were "thought to be impeding the proper development of the law or to have led to results which were unjust or contrary to public policy". I do not think that anyone can be confident that this is true of the exclusionary rule.

42.    The rule excludes evidence of what was said or done during the course of negotiating the agreement for the purpose of drawing inferences about what the contract meant. It does not exclude the use of

such evidence for other purposes: for example, to establish that a fact which may be relevant as background was known to the parties, or to support a claim for rectification or estoppel. These are not exceptions to the rule. They operate outside it.

43.     There is however a group of cases in which judges have found an exception to the exclusionary rule and your Lordships will have to decide whether such an exception can be justified. The leading case is the decision of Kerr J the *Karen Oltmann* (*Partenreederei MS Karen Oltmann v Scarsdale Shipping Co Ltd* [1976] 2 Lloyd's Rep 708. This concerned a time charter for 2 years (14 days more or less in charterers' option) which contained a break clause:

> "Charterers to have the option to redeliver the vessel after 12 months' trading subject to giving three months' notice".

44.     The issue was whether "after 12 months' trading" meant that the break clause could be operated only at the end of the first year or at any time during the second year. The judge said that he was entitled to look at telexes by which the fixture was negotiated in which the parties discussed various lengths of break clauses and were clearly using the word "after" to mean "on the expiry of" rather than "at any time after the expiry of". He justified the admissibility of this evidence on the following principle (p 712):

> "If a contract contains words which, in their context, are fairly capable of bearing more than one meaning, and if it is alleged that the parties have in effect negotiated on an agreed basis that the words bore only one of the two possible meanings, then it is permissible for the court to examine the extrinsic evidence relied upon to see whether the parties have in fact used the words in question in one sense only, so that they have in effect given their own dictionary meaning to the words as the result of their common intention. Such cases would not support a claim for rectification of the contract, because the choice of words in the contract did not result from any mistake. The words used in the contract would ex hypothesi reflect the meaning which both parties intended."

45.    In his judgment in this case, Lawrence Collins LJ said of this principle (in paragraph 121) that he doubted whether it differed in any material respect from admitting evidence of prior negotiations in construing a contract. Indeed, the case is frequently cited as an example of an exception which undermines the rule: see for example Professor McLauchlan, "Contract Interpretation: What is It About?" (2009) 31:5 Sydney Law Review 5-51. It is true that evidence may always be adduced that the parties habitually used words in an unconventional sense in order to support an argument that words in a contract should bear a similar unconventional meaning. This is the "private dictionary" principle, which is akin to the principle by which a linguistic usage in a trade or among a religious sect may be proved: compare *Shore v Wilson* (1842) 9 Cl & F 355. For this purpose it does not matter whether the evidence of usage by the parties was in the course of negotiations or on any other occasion. It is simply evidence of the linguistic usage which they had in common. But the telexes in the *Karen Oltmann* did not evidence any unconventional usage. There was no private dictionary. The case involved a choice between two perfectly conventional meanings of the word "after" in a particular context. In my opinion Lawrence Collins LJ was right in saying that the admission of the evidence infringed the exclusionary rule. It is perhaps significant that the evidence merely confirmed the meaning which Kerr J, as an experienced commercial judge, would in any case have given to the clause.

46.    What would have been the position if Kerr J had thought that, without the evidence of the telexes, he would have construed the clause in the opposite sense? He said that rectification would not be available because "The words used in the contract would ex hypothesi reflect the meaning which both parties intended." I do not understand this, because, on this hypothesis, the telexes would show that the words (as construed by the judge) did *not* reflect the meaning which both parties intended. And it is generally accepted that Brightman J was right in *Re Butlin's Settlement Trusts* [1976] Ch 251 in holding that rectification is available not only when the parties intended to use different words but also when they mistakenly thought their words bore a different meaning.

47.    On its facts, the *Karen Oltmann* was in my opinion an illegitimate extension of the "private dictionary" principle which, taken to its logical conclusion, would destroy the exclusionary rule and any practical advantages which it may have. There are two legitimate safety devices which will in most cases prevent the exclusionary rule from causing injustice. But they have to be specifically pleaded and clearly established. One is rectification. The other is estoppel by convention,

19

which has been developed since the decision in the *Karen Oltmann*: see *Amalgamated Investment & Property Co. Ltd. v. Texas Commerce International Bank Ltd.* [1982] QB 84. If the parties have negotiated an agreement upon some common assumption, which may include an assumption that certain words will bear a certain meaning, they may be estopped from contending that the words should be given a different meaning. Both of these remedies lie outside the exclusionary rule, since they start from the premise that, as a matter of construction, the agreement does not have the meaning for which the party seeking rectification or raising an estoppel contends.

48.    The last point is whether, if Chartbrook's interpretation of the agreement had been correct, it should have been rectified to accord with Persimmon's interpretation.  The requirements for rectification were succinctly summarized by Peter Gibson LJ in *Swainland Builders Ltd v Freehold Properties Ltd* [2002] 2 EGLR 71, 74, para 33:

> "The party seeking rectification must show that:
>
> (1)    the parties had a common continuing intention, whether or not amounting to an agreement, in respect of a particular matter in the instrument to be rectified;
> (2)    there was an outward expression of accord;
> (3)    the intention continued at the time of the execution of the instrument sought to be rectified;
> (4)    by mistake, the instrument did not reflect that common intention."

49.    To explain how the claim for rectification arose, I must summarise the relevant pre-contractual exchanges between the parties. They began by discussing a proposal for an outright sale of the land by Chartbrook to Persimmon at a price calculated by reference to such planning permission as Chartbrook might obtain. In early 2001 this structure was abandoned and Persimmon in a letter dated 1 February 2001 proposed the building licence arrangement eventually agreed.  The letter included the following passages:

> "we would be prepared to pay you 29.8% of the net sales proceeds generated from the private sale residential

element of the scheme and a further 45% of the net sales revenue generated from the disposal of the commercial element of the site. We would pay you this proportion of the income regardless of the development costs incurred by my Company and the quantum of accommodation that we ultimately obtain planning permission for…By tying your land value to a percentage of the income, you will also automatically share in any sales uplift that we experience."

50.     This offer of a straightforward sharing of the proceeds was modified in a letter dated 6 February 2001 by the addition of what were described as "guaranteed backstop dates and minimum payments":

"Upon receipt of the purchase monies, the revenue will be apportioned to Chartbrook on the basis of 29.8% of the net revenue achieved from the disposal of the private sale residential units and 45% of the net revenue from the disposal of the commercial units. In addition, we are prepared to provide you with guaranteed backstop dates and minimum payments that will be made regardless of the actual performance of the project both in terms of timescales and costs. I set out on the attached schedule our proposals concerning this element of the deal.

Based on the current scheme for 80 units, and 9020 sq ft of commercial floor space, the minimum land value we are prepared to pay to Chartbrook on the disposal of each residential unit is £67,000, together with a further minimum payment of £400,000 on the disposal of the commercial unit. If as a result of improvements in the market, Chartbrook are entitled to more than the minimum payments I suggest an equalisation calculation takes place following the disposal of the last unit…

Within the contract, I…suggest that a formula is included whereby the land value is calculated using the following inputs:

Private Sale Residential Accommodation…..94.96/sq ft…

21

> Once the total land value has been calculated, a simple
> formula can then be applied to divide the land values by
> the number of units, in order for us to calculate the
> guaranteed payments that you will receive on the sale of
> each plot…"

51.     On 12 February there was a further modification to make separate
provision for the sales of car parking spaces, but the overall offer for
land value remained the same.  The judge found (paragraph 110) that
Chartbrook accepted this offer in principle and Persimmon's solicitors
were instructed to draft an agreement. Their draft was attached to an e-
mail dated 1 March 2001 and contained essentially the same formulae
for calculating the price as those in the final agreement. The definition
of "Additional Residential Payment" was (save for the percentage
figure) in precisely the same words as those of the final agreement.

52.     Between March and May Chartbrook acquired some additional
adjoining land and Persimmon revised its cost estimates.  The result was
a change in the figures but not in the formulae.  In a letter dated 24 May
2001 Persimmon offered a new total land value of £7,191,947.  The
letter contained a table setting out —

> "the minimum guaranteed  land values that you will
> receive for the respective elements of the scheme, together
> with the percentage of sales revenue that you will also be
> entitled to if the project performs better than is currently
> anticipated"

53.     The figures in the table were 23.4% for "percentage of sales
revenue" and £53,333 for "minimum value per plot."   The judge found
that this offer was also accepted in principle and the new figures were
inserted into the final contract. The words of the definition of ARP in
the final draft remained (subject to the change in the percentage figure)
exactly the same as in the first draft.

54.     It is I think clear that a reasonable person who read the February
and May letters in the light of the background known to the parties
would have taken them to have been intending that Chartbrook should
receive an ARP if, but only if, "the project performs better than is
currently anticipated".

55.    Persimmon's case on rectification at the trial was that the letter of 24 May 2001 was an outward expression of the common and continuing intention of the parties and (if Chartbrook was right about its true construction) the definition had been drafted in the mistaken belief that it gave effect to that common intention. On the other hand, the evidence of the two principals of Chartbrook, Mr Vantreen and Mr Reeve, was that they had made no mistake. The definition accorded exactly with what they had thought they were being offered in the letters of February and May 2001. Indeed, they said they would not have done the deal for any less. It was put to them in cross-examination that no rational person could have understood the letters in the sense which they claimed and Mr Vantreen was caused some little difficulty by the fact that, on his copy of the May 2001 letter, he had calculated the amount which (on Persimmon's construction of the definition) the sale price of a 700 sq ft flat would have to exceed before any ARP became payable (£228,000). This calculation would have been irrelevant on his own construction of the definition and he was unable to explain why he had made it. Nevertheless the judge accepted the evidence of Mr Reeve and Mr Vantreen that they had honestly believed that the definition (as they claimed to have understood it) was what had been agreed and they were not been mistaken. The judge therefore held that the mistake was not common to both parties and dismissed the claim for rectification.

56.    The case was argued at trial on the assumption that rectification required both parties to be mistaken about whether the written agreement reflected what they believed their prior consensus to have been. In the Court of Appeal, Persimmon challenged the finding of fact about what Mr Reeve and Mr Vantreen had believed, but not the underlying proposition of law. The Court of Appeal unanimously dismissed this part of the appeal on the ground that it could not disturb the findings of fact. There are accordingly concurrent findings of fact about the states of mind of Mr Reeve and Mr Vantreen. Your Lordships indicated at the hearing that in accordance with the usual practice, you would not re-examine them: see *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd* [1997] AC 254, 274-275.

57.    In the printed case, however, Persimmon (encouraged by articles in the Law Quarterly Review by Marcus Smith ("Rectification of Contracts for Common Mistake, Joscelyne v Nissen and Subjective States of Mind" (2007) 123 LQR 116-132 and Professor McLauchlan ("The 'Drastic' Remedy of Rectification for Unilateral Mistake" (2008) 124 LQR 608-640)) asked for leave to challenge, for first time, the proposition of law. Mr Nugee submitted that the judge and the Court of Appeal had been wrong in their assumption about what a party had to be

mistaken about. Rectification required a mistake about whether the
written instrument correctly reflected the prior consensus, not whether it
accorded with what the party in question believed that consensus to have
been. In accordance with the general approach of English law, the terms
of the prior consensus were what a reasonable observer would have
understood them to be and not what one or even both of the parties
believed them to be. In the present case, submitted Mr Nugee, the prior
consensus was contained in the May letter, which made it clear that the
terms were to be as contended for by Persimmon. If the definition in the
final agreement did not have that meaning, it was not in accordance with
the prior consensus and if Mr Reeve and Mr Vantreen believed that it
was, then they, like the representatives of Persimmon, were mistaken.

58.     Mr Robert Miles QC, for Chartbrook, objected to Persimmon
being given leave to advance this argument. He said that if the point had
been taken at the trial, the evidence might have taken a different shape. I
rather doubt this, but as I understand that the Committee shares my view
that Persimmon is entitled to succeed without rectification, the question
is academic. Nevertheless, as it has been very well and fully argued, I
propose to express an opinion about it.

59.     Until the decision of the Court of Appeal in *Joscelyne v Nissen*
[1970] 2 QB 86 there was a view, based upon dicta in nineteenth and
early twentieth century cases, that rectification was available only if
there had been a concluded antecedent contract with which the
instrument did not conform. In *Lovell and Christmas Ltd v Wall* (1911)
104 LT 85, 88 Sir Herbert Cozens-Hardy MR said that rectification
"may be regarded as a branch of the doctrine of specific performance".
It presupposed a prior contract and required proof that, by a common
mistake, the final completed agreement as executed failed to give proper
effect to the prior contract. In *Joscelyne*'s case the Court of Appeal
declared itself puzzled by the reference to specific performance, but I
think it is clear enough that the Master of the Rolls had in mind a
contractual obligation to execute a lease, conveyance, settlement or
similar instrument, giving rise to a specifically enforceable obligation to
do so. A failure to execute a document giving effect to the terms of the
agreement would be a breach of that obligation and the court, in
rectifying the instrument, would be specifically performing the
agreement. Since the decision in *Joscelyne's* case extended the
availability of rectification to cases in which there had been no
enforceable prior agreement, specific performance is plainly an
inadequate explanation of the doctrine. But for present purposes the
significance of cases like *Lovell and Christmas Ltd v Wall* (1911) 104
LT 85 is that the terms of the contract to which the subsequent

24

instrument must conform must be objectively determined in the same way as any other contract. Thus the common mistake must necessarily be as to whether the instrument conformed to those terms and not to what one or other of the parties believed those terms to have been.

60.    Now that it has been established that rectification is also available when there was no binding antecedent agreement but the parties had a common continuing intention in respect of a particular matter in the instrument to be rectified, it would be anomalous if the "common continuing intention" were to be an objective fact if it amounted to an enforceable contract but a subjective belief  if it did not. On the contrary, the authorities suggest that in both cases the question is what an objective observer would have thought the intentions of the parties to be. Perhaps the clearest statement is by Denning LJ in *Frederick E Rose (London) Ltd v William H Pim Jnr & Co Ld* [1953] 2 QB 450, 461:

> "Rectification is concerned with contracts and documents, not with intentions. In order to get rectification it is necessary to show that the parties were in complete agreement on the terms of their contract, but by an error wrote them down wrongly; and in this regard, in order to ascertain the terms of their contract, you do not look into the inner minds of the parties - into their intentions - any more than you do in the formation of any other contract. You look at their outward acts, that is, at what they said or wrote to one another in coming to their agreement, and then compare it with the document which they have signed. If you can predicate with certainty what their contract was, and that it is, by a common mistake, wrongly expressed in the document, then you rectify the document; but nothing less will suffice."

61.    Likewise in the *Olympic Pride (Etablissements Georges et Paul Levy v Adderley Navigation Co Panama SA* [1980] 2 Lloyd's Rep 67, 72, Mustill J said:

> "The prior transaction may consist either of a concluded agreement or of a continuing common intention. In the latter event, the intention must have been objectively manifested. It is the words and acts of the parties

demonstrating their intention, not the inward thoughts of
the parties, which matter."

62.    An example of the application of this objective ascertainment of
the terms of the prior transaction is *George Cohen Sons & Co Ltd v
Docks and Inland Waterways Executive* (1950)  84 Lloyd's Rep 97 in
which a landlord negotiating a new lease proposed to the tenant that "the
terms and conditions contained in the present lease to be embodied in
the new lease where applicable."  The tenant accepted this offer, but the
new lease as executed made the tenant liable for repairs which under the
old lease had been the responsibility of the landlord. In answer to a
claim for rectification, the landlord said that the new lease was in
accordance with what he had understood to be the effect of his offer.
The Court of Appeal said that this was irrelevant. What mattered was
the objective meaning of what the landlord had written.  Sir Raymond
Evershed MR said, at p 107:

> "If the defendants…did misconstrue [the letter] that is
> unfortunate for them, but at least they cannot be heard to
> say that their letter was intended to mean anything other
> than that which the words convey to the reader as a piece
> of ordinary English."

63.    As against these authorities, there are two cases upon which Mr
Miles relied. The first is *Britoil plc v Hunt Overseas Oil Inc* [1994]
CLC 561, in which the Court of Appeal by a majority (Glidewell and
Hobhouse LJJ, Hoffmann LJ dissenting) refused to rectify an agreement
which was alleged not to be in accordance with what had previously
been agreed in summary heads of agreement. Hobhouse LJ, who gave
the majority judgment, affirmed the decision of Saville J, who said that
the defendants had failed to establish that there was a prior common
agreement or intention in terms that the court could ascertain or (which
is probably another way of saying the same thing) that the definitive
agreement failed to reflect that prior agreement. In other words, the
language of the heads of agreement was too uncertain to satisfy the
requirement stated by Denning LJ in *Rose's* case that one should be able
to "predicate with certainty what their contract was". Hobhouse LJ
noted that Saville J "did not base himself upon any consideration of the
evidence as to the actual state of mind of the parties" and in my opinion
the case lends no support to the view that a party must be mistaken as to
whether the document reflects what he subjectively believes the
agreement to have been.

64.     The other case is the decision of Laddie J in *Cambridge Antibody Technology Ltd v Abbott Biotechnology Ltd* [2005] FSR 590, in which he rejected a submission that evidence of the subjective state of mind of one of the parties contained in statements which had not been communicated to the other party ("crossed the line") was inadmissible. In my opinion, Laddie J was quite right not to exclude such evidence, but that is not inconsistent with an objective approach to what the terms of the prior consensus were. Unless itself a binding contract, the prior consensus is, by definition, not contained in a document which the parties have agreed is to be the sole memorial of their agreement. It may be oral or in writing and, even if the latter, subject to later variation. In such a case, if I may quote what I said in *Carmichael v National Power plc* [1999] 1 WLR 2042, 2050 - 2051:

> "The evidence of a party as to what terms he understood to have been agreed is some evidence tending to show that those terms, in an objective sense, were agreed. Of course the tribunal may reject such evidence and conclude that the party misunderstood the effect of what was being said and done."

65.     In a case in which the prior consensus was based wholly or in part on oral exchanges or conduct, such evidence may be significant. A party may have had a clear understanding of what was agreed without necessarily being able to remember the precise conversation or action which gave rise to that belief. Evidence of subsequent conduct may also have some evidential value. On the other hand, where the prior consensus is expressed entirely in writing, (as in *George Cohen Sons & Co Ltd v Docks and Inland Waterways Executive* (1950) 84 Lloyd's Rep 97) such evidence is likely to carry very little weight. But I do not think that it is inadmissible.

66.     In this case there was no suggestion that the prior consensus was based on anything other than the May letter. It is agreed that the terms of that letter were accepted by Chartbrook and no one gave evidence of any subsequent discussions which might have suggested an intention to depart from them. It follows that (on the assumption that the judge was right in his construction of the ARP definition) both parties were mistaken in thinking that it reflected their prior consensus and Persimmon was entitled to rectification.

27

67.    Since, however, I think that the judge and the majority of the Court of Appeal were wrong on the question of construction, I would allow the appeal on that ground.


**LORD RODGER OF EARLSFERRY**


My Lords,


68.    I have had the privilege of considering the speeches of my noble and learned friends, Lord Hoffmann and Lord Walker of Gestingthorpe, in draft.    For the reasons which they give, I consider that the construction favoured by Persimmon is appropriate.    In particular, it seems to me that once you grasp the general structure of schedule 6 of the agreement, as described by Lord Walker in para 79 of his speech, the appropriate interpretation becomes clear.


69.    Like Lord Hoffmann, I would decline counsel's elegant but, in the event, unnecessary invitation to revisit the rule in *Prenn v Simmonds* [1971] 1 WLR 1381.  No-one could possibly say that the rule is based on some error of law or misconception.  On the contrary, the main pros and cons of having regard to prior negotiations when interpreting a formal contract have been known and discussed for centuries.  The present law represents a choice which was already second nature to the Earl of Eldon LC as long ago as *Millers v Miller* (1822) 1 Sh App 309.  When interpreting a clause in a marriage contract which had been preceded by "a vast deal of correspondence", the Lord Chancellor assured the House that he did not recollect a case to which he had given more earnest attention, but still gave the correspondence short shrift, at p 317:


> "My Lords, all the previous correspondence I lay entirely out of the case, because I cannot conceive that any thing can be more dangerous than the construing deeds by the effect of letters and correspondence previous to the execution of them."


Subsequently, at p 319, he described the possibility of looking at the effect of the correspondence as "a very singular thing".  Some sixty years later, with rather more deliberation, the House affirmed that approach in *Inglis v John Buttery* (1873) 3 App Cas 552 and, a century

after that, reaffirmed it in *Prenn v Simmonds* [1971] 1 WLR 1381.  The rule could scarcely be more firmly embedded in our law.

70.    Of course, in *Miliangos v George Frank (Textiles) Ltd* [1976] AC 443 the House departed from a rule, of which Lord Denning had said some fifteen years previously, "if there is one thing clear in our law, it is that the claim must be made in sterling and the judgment given in sterling": *In re United Railways of Havana and Regla Warehouses Ltd* [1961] AC 1007, 1068-1069.  But not only was that rule essentially procedural:  in addition, the House could point to a change of circumstances which seemed to cry out for intervention.  Here, by contrast, the rule about prior negotiations forms part of the law of evidence and there are no particular pressing circumstances which call for a change.  The House is simply being asked to make a fresh policy decision and, in effect, to legislate to provide for a different rule.  The wisdom of the proposed change is, however, debatable.  So, if there is to be a change, it should be on the basis of a fully informed debate in a forum where the competing policies can be properly investigated and evaluated.  Although counsel presented the rival arguments with conspicuous skill, your Lordships' House in its judicial capacity is not that forum.

71.    Like Lord Walker, I see no reason to differ from what Lord Hoffmann has said on rectification.


**LORD WALKER OF GESTINGTHORPE**


My Lords,


72.    I shall first address, on a traditional approach, the issue of construction raised in this appeal.  That approach requires the court to consider the disputed definition of "Additional Residential Payment" in the context of the agreement as a whole, and the parties' shared understanding of the general situation and the aim of the transaction they were entering into.


73.    The owner (Chartbrook) had assembled a site off Wandsworth High Street, London SW18 (Numbers 1,3,5,7 and 9 Hardwicks Way), with valuable potential for development.  Under the agreement dated 16

October 2001 the developer (Persimmon Homes, a subsidiary of a well-known quoted company which guaranteed the developer's obligations) had the responsibility of applying for planning permission for a mixed commercial and residential development in a form approved by the owner.    The agreement was conditional on the developer obtaining planning permission in a satisfactory form within 15 months (subject to extension in certain circumstances).    If planning permission in a satisfactory form was obtained the owner would continue as registered owner of the site, but would execute a charge of the property as security for its obligations to the developer.    The developer would occupy the site as a licensee and carry out the development at its own expense, including responsibility for insurance.    The developer's obligations in carrying out the residential development (by the construction of flats) were not prescribed in detail.    Its obligations in carrying out the commercial development were limited to what were described as "core and shell works".

74.    As the flats were developed they were to be marketed by the developer, at its own expense, and sold (together with parking spaces) on 125-year leases at escalating ground rents. The commercial development, when the core and shell works were completed, was to be sold to a nominee of the owner on a 125-year lease at a peppercorn rent. There was to be a premium calculated at the rate of £110 per square foot of the net internal area of the commercial premises (plus VAT).    The developer was also to negotiate the eventual sale of the freehold subject to all these leases.    The owner was under an obligation to grant all the necessary leases and to make the eventual transfer of the freehold.

75.    As I have mentioned, the agreement did not provide in detail for the specification or cost of the construction by the developer of the residential part of the development – that is, the flats.    The owner had to approve the planning application, and the developer had to meet NHBC standards, but that was all.    In particular, the developer did not commit itself to any particular level of expenditure, with two minor exceptions: the developer undertook to spend a sum of at least £250,000 on planning gain through an agreement under section 106 of the Town and Country Planning Act 1990, and to pay at least £25,000 in compensation to adjoining owners for the loss of rights to light.    There was also an unquantified contingency sum for dealing with possible pollution in the sub-structure.    These three items were to be deducted in computing the Total Residential Land Value ("TRLV") for the purposes of schedule 6 (the Price) but there was nothing at all in the agreement providing for the developers' overall profit as such to be computed and brought into the bargain.

76.     All this is background, but to my mind relevant background, to the problem at the heart of this appeal, that is the correct construction of the definition of the Additional Residential Payment ("ARP") set out in para.1 of schedule 6. The ARP (also pointlessly relabelled as the Balancing Payment) is one of two components which had to be aggregated to make up the Price—that is, the total consideration payable by the developer to the owner. The other component was the Total Land Value ("TLV"), that is the aggregate of (i) the TRLV already mentioned; (ii) the Total Commercial Land Value ("TCLV") and (iii) the Total Residential Car Parking Land Value ("TRCPLV"). Under para 3 of schedule 6 the TLV was payable by instalments over 52 months, starting nine months after the grant of planning permission, and the ARP was payable on completion of the last residential sale or six months after the completion of the development, whichever was the earlier.

77.     Each of the three components of the TLV was defined by a formula. The TRLV was to be computed by reference to the net internal area of the residential units for which planning permission was obtained at the rate of £76.34 per square foot ("less the section 106 money and less the rights of light money and less the sub-structure assumptions additional cost").   The TCLV was to be computed by reference to the net internal area of the commercial premises for which planning permission was obtained, at the rate of £38.80 per square foot.   The TRCPLV was to be £3,024 multiplied by the number of residential parking places for which planning permission was obtained.

78.     Both parties were experienced in the property world—the owner as a land dealer, the developer as a developer—and they shared the knowledge that the site (including units 1 and 3 Hardwicks Way which the owner acquired during the negotiations), with the benefit of planning permission on favourable terms, would have a market value in the general region of £5m.   They hoped that planning permission for residential development would be granted for up to 100 flats with an aggregate internal area of 50,000 to 60,000 square feet.   The background facts known to the parties included the recent takeover by the developer's group of Beazer Homes Ltd, as a result of which the developer decided that it could not afford an outright purchase of the Wandsworth site. Instead the purchase was to be funded out of the proceeds of the disposal of the development, and the owner would expect to be compensated for the deferment of its consideration.

79.     The definitions that I have already mentioned, and others, such as Costs and Incentives ("C&I"), that I have yet to come to, can be quite confusing. It is important, I think, to discern and keep in mind the general structure of schedule 6 of the agreement. The components of the price referable to the commercial development (TCLV) and the residential parking (TRCPLV) were to be calculated under the simple formulae already mentioned (together they eventually amounted to about £1.727m).   By contrast, the price for the residential development was to consist of two elements, the TRLV and the ARP.   The TRLV is agreed to be approximately £4.684m, reflecting the approved residential internal area of rather over 61,000 square feet at £76.34 per square foot. The question is how much this sum has to be increased by the ARP to make up the owner's total consideration for the residential development.

80.     The ARP is defined as follows:

"23.4% of the price achieved for each Residential Unit in excess of the Minimum Guaranteed Residential Unit Value ['MGRUV'] less the [C&I]"

The amount of the C&I is agreed to have been relatively trivial – a little less than £250,000 for all 100 flats – and I put it aside for the moment, while recognising that it plays an important part in the technicalities of the argument on construction. If this item is disregarded for the moment the disputed text can be set out in a simplified form, using "RP" (for residential price) where the judge and the Court of Appeal referred to Unit Price:

"23.4% of the RP in excess of the MGRUV".

81.     The MGRUV was defined as meaning:

"for each Residential Unit [ie each flat] the [TRLV] divided by the number of Residential Units for which Planning Permission is granted".

Under the planning permission eventually granted on 23 August 2002 there were to be exactly 100 flats, which simplifies the arithmetic. Nevertheless it may be unfortunate that the draftsman chose to define the ARP by a formula referring to the MGRUV rather than by referring directly to the TRLV (to which the MGRUV is directly linked, being, as

events turned out, one per cent of it).    The use of the two linked formulae rather than one, and the fact that the formulae are not set out in mathematical notation, make it harder to keep clearly in mind the structure of the arrangements contained in schedule 6.

82.    Briggs J expressed the issue in paras 20 and 21 of his judgment:

"Leaving aside for the moment the point at which the C&I are deducted, the broad commercial effect of each of the parties' rival submissions may be summarised as follows. Chartbrook's case was that it was entitled to a 23.4% share of the net proceeds of sale of each Residential Unit in excess of a minimum guaranteed amount (being the unitised Total Residential Land Value of £76.34 per square foot of Residential Net Internal Area).  Put another way, its stake in the residential part of the development was to be the whole of the first £76.34 per square foot of net sales value, and 23.4% of the surplus.

By contrast, Persimmon's case was that Chartbrook was to receive an additional payment only if 23.4% of the net sales price amounted to more than the Minimum Guaranteed Residential Unit Value.  Put more broadly, Chartbrook's stake in the residential part of the development was whichever was the greater of :

(i)    23.4% of the net residential sales price; and,

(ii)    the guaranteed minimum of £76.34 per square foot of Residential Net Internal Area."

83.    That is, with great respect to the judge, a confusing way of putting it, because it fails to distinguish between the two elements of the price for the residential development and to make clear whether it is addressing both elements, or only the ARP.  The owner was to get the TRLV in any event, as the most important component of the TLV (a point that may be reflected in the expression "in excess of" in the definition of the ARP).  Indeed paras 20 and 21 of the judgment are to my mind two ways of describing the same result, unless the judge intended para 20 to state the owner's view of the ARP alone, and para 21 to state the developer's view of the TRLV and the ARP operating in conjunction.

84.    In his brief judgment Rimer LJ quoted the definition of the ARP and observed in para 183:

> "There is nothing unclear, uncertain or ambiguous about that.    It is clear, certain and unambiguous and its arithmetic is straightforward".

Tuckey LJ agreed. With profound respect to both of them, I totally disagree.   The definition is obviously defective as a piece of drafting. To start with defects that can be spotted and remedied fairly easily, the draftsman could not decide whether he was dealing with the flats ("each Residential Unit") collectively or individually.   The MGRUV was one-hundredth of the TRLV, but the C&I was plainly defined as a single aggregate figure.

85.    Much more significantly and problematically, the draftsman has failed to notice the ambiguity of the formula "$x$ per cent of the RP in excess of the MGRUV less the C&I".   The ambiguity could be resolved by the use of mathematical notation, as the judge observed in paras 18 and 19 of his judgment (though he did not mention that there was also a choice to be made as to putting another set of brackets round MGRUV – C&I, so producing four possibilities rather than two).

86.    Treated acontextually, the formula "$x$ per cent of A in excess of B" is undoubtedly ambiguous.   It can mean $(x/100 \times A)$-B or $x/100(A-B)$.   If required to guess I would opt for the latter meaning, because the expression "in excess of" has been used rather than "less", and to my mind "in excess of" suggests a focus on B as an integer and distances it from the percentage.   But I readily accept that this would be little more than guesswork.

87.    In a contract negotiated between businessmen there always is a commercial context.  If a contracting party agrees to pay the whole of some budgeted cost (B, say £100,000) and also agrees to pay 25% of the eventual actual cost (A, say £140,000) in excess of the budgeted costs, he would expect to pay a total of £110,000. Both elements of the obligation are, as it were, in the same currency, that is, cost, and the wording of the second element naturally translates into the formula ¼ (A-B), as (¼A)-B would be commercial nonsense.   The owner can therefore give plausible examples in which ¼(A-B) would obviously be the right answer.   But the present appeal is not such a case.

88.    In this case the very significant difference between the results produced by the competing formulae is demonstrated in the figures set out in para 14 of the judgment of Lawrence Collins LJ in the Court of Appeal.  The difference between the two bottom lines (£5,580,616 and £9,168,427) is £3,587,811.  That difference figure is 76.6% of the TRLV (£4,683,565).  On the owner's case it gets one hundred times the MGRUV as the TRLV, but in effect has to give credit for only 23.4% of it in the calculation of the ARP.  That seems to be a fairly surprising bargain for commercial men to make.  It becomes not merely surprising but totally incredible if one takes account of the fact that although schedule 6 does not in terms state that the ARP is to have no value unless the actual receipts from sales of flats exceed the TRLV, that is implicit in its structure. On the owner's construction any such limitation is contradicted, and the ARP has a substantial value even if the sales do not reach the "trigger point" of £20.015m (23.4% of which is £4.684m).

89.    This can be illustrated by considering the effect of the competing formulae (set out in paras 18 and 19 of the judge's judgment, but continuing to exclude C&I for the present) for assumed residential sale price totals (RP) of £18m, £20m, £20.015m (the trigger point),  £22m and £23.849m (the actual result):

| RP | Owner's Construction | | Developer's Construction | |
|---|---|---|---|---|
| | 23.4%(RP-MG) = | ARP | (23.4%RP)-MG = | ARP |
| 18.000 | 23.4%(18.000-4.684) = | 3.116 | (23.4% x 18.000)-4.684 = | Negative |
| 20.000 | 23.4% (20.000-4.684) = | 3.584 | (23.4% x 20.000)-4.684 = | Negative |
| 20.015 *Trigger Point* | 23.4%(20.015-4.684) = | 3.587 | (23.4%x 20.015)-4.684 = | Zero |
| 22.000 | 23.4%(22.000-4.684) = | 4.052 | (23.4% x 22.000)-4.684 = | 0.464 |
| 23.849 *Actual Result* | 23.4%(23.849-4.684) = | 4.485 | (23.4% x 23.849)- 4.684 = | 0.897 |

RP = Total actual receipts from residential sales
MG = Total Residential Land Value (100 x MGRUV)
All amounts in £m

The figures are, on the owner's construction, commercial nonsense. They would bring the owner a total of £7.8m for the residential development (£4.684m + £3.116m) even if sales of flats were disastrously low at £18m. The idea of the TRLV (linked as it is to the MGRUV) as a guaranteed minimum would be totally subverted.

90.    The judge accepted that there was some force in the developer's reliance on the words "if any" which occur in para 3.3 of schedule 6 with reference to the Balancing Payment (alias the ARP).   He saw less force in the submission that he should give weight to the natural meaning of the expressions "minimum", "guaranteed" and "additional" in the definitions of the MGRUV and the ARP, on the ground that by the use of a special definition "[t]he word or phrase is stripped of its natural meaning"(para 61). In preferring the owner's submissions the judge attached particular weight to the difficulty (for the developer) of explaining the words "less the C&I".   The judge observed (paras 55-57):

> "An equally serious problem with Persimmon's construction is what to do with the subtraction of the C&I. It is common ground that the Costs and Incentives have a linear relationship with the amount of the price achieved for each Residential Unit.  For example, Persimmon may agree the sale of a flat for £250,000 after incurring Costs and Incentives of say £50,000 or, with the same commercial consequence, sell the same flat for £200,000 but incur no Costs and Incentives.   Typical Incentives would include payment of the purchaser's legal fees or stamp duty, or the installation of special features such as wooden floors, over and above the standard fit-out specification.

> One would expect Chartbrook's profit share to be unaffected, one way or the other, by the decision of Persimmon to sell a particular flat by one or other of those methods (high price plus Incentives or low price without Incentives).   Chartbrook's construction, under which the Costs and Incentives are deducted from the price achieved for each Residential Unit before the application of the 23.4% share, fulfils precisely that expectation.

> By contrast, Persimmon's construction deducts the C&I from the 23.4% of the price achieved for the Residential

Unit before the net amount is compared with the MGRUV, to ascertain whether there is any excess. By comparison with Chartbrook's construction, that calculation magnifies the negative effect of C&I by a factor of more than 3 in comparison with the positive effect of the increase in the Residential Unit Price attributable to the C&I."

91.    Lawrence Collins LJ took a different view, and I unhesitatingly prefer his view. His reasons are set out clearly in paras 90 to 94 of his judgment, and I cannot usefully add much to them. But I would make a few further comments.

92.    The first is as to the perceived problem about C&I. It is true that from the developer's point of view it made little or no difference (except perhaps for timing and tax) whether or not, in relation to a particular flat, it spent an extra £2,000 on parquet flooring or granite worktops and managed to sell the flat for £2,000 more as a result. But it did make a marginal difference to the owner, as its ARP was calculated (in some way or other, on any view) by reference to the total achieved by residential sales: that is, by reference to the developer's turnover and not by reference to the developer's profit (the judge's reference to "Chartbrook's profit share" was not therefore entirely apposite). So (to adopt the expression used in the courts below) C&I had a linear relationship for the developer, but not for the owner. It would therefore have made sense for the parties to have agreed that C&I expenditure and allowances should be deducted from the total obtained for residential sales for the purposes of these computations (rather as the section 106 money and the rights of light money were to be disregarded in computing the TRLV). But it would not make sense to deduct the whole of the C&I from 23.4 per cent of the total obtained for residential sales.

93.    Rimer LJ gave an example (para 185) to reinforce his view about the C&I. His example produces very odd results but that is partly because the figures taken are unrealistic. If one takes more realistic figures (such as a normal average sale price of £200,000 with C&I of £2,500 and an MGRUV of £47,500) the result is much less surprising. But it is still anomalous and makes no commercial sense, as Lawrence Collins LJ observed. An ARP of (23.4% of [RP less C&I]) less MGRUV does make commercial sense, and in my opinion it is well within the principles in *Antaios Cia Naviera v Salen Rederiana AB* [1985] AC 191, 201 and *Investors Compensation Scheme Ltd v West Bromwich Building Society* [1998] 1 WLR 896, 912-913, to read the agreement in that way.

94.    I am sure that Lawrence Collins LJ was right to give a lot of weight to the terms "minimum", "guaranteed" and "additional" in the relevant definitions.    There is a good deal of authority, if authority is needed, to give weight to the natural meaning of words in a definition. In relation to statutory definitions there are the observations of my noble and learned friend, Lord Hoffmann, in *Macdonald v Dextra Accessories Ltd* [2005] 4 All ER 107, para 18 and *Birmingham City Council v Walker* [2007] 2AC 262, para 11 and Lord Scott of Foscote in *Oxfordshire County Council v Oxford City Council* [2006] 2 AC 674, paras 82-83.    I would apply the same principle to a definition in a commercial contract.

95.    That brings me back to what I said earlier about the need, in the midst of a thicket of rather confusing definitions, to keep in mind the general structure of the bargain.  As part of the TLV the owner was to receive the TRLV,  the total residential land value, representing the estimated value attributable to land which would (on the agreement becoming unconditional) have the benefit of a favourable planning permission for residential development (but on which development had not yet taken place). The developer was to bear all the costs of the development.  The owner was also to have the prospect of an additional payment, the ARP.  As regards the residential development the bargain could have been expressed between businessmen as "a guaranteed minimum of the first £76.34 per square foot of residential internal area from the total proceeds of the flats, and 23.4% of the excess" (indeed the judge, in para 20 of his judgment, summarised the owner's case in very similar terms, except that he used "surplus" rather than "excess").  If one approaches it in that way, the developer's case as to the meaning of the definition is not merely linguistically possible, but is linguistically (as well as commercially) compelling.  The owner's case becomes plausible only if one concentrates on the ARP, forgetting the TRLV (to which the MGRUV is directly linked).  Lawrence Collins LJ dealt with this point quite briefly, in paras 81 and 93 of his judgment.  He must have thought it unnecessary to spell it out more fully.    But as he ended in the minority I have dealt with the point more fully.

96.    Since preparing this opinion I have had the privilege of reading in draft the opinion of my noble and learned friend, Lord Hoffmann.  In paras 1 to 22 of his opinion Lord Hoffmann reaches precisely the same conclusion as I have reached in regard to the correct construction, by traditional methods, of the agreement.  I agree with all his reasoning, which is essentially the same as my own, but more trenchantly expressed.  I have however thought it worthwhile setting out my own more pedestrian route to the conclusion that this House should, without

having to depart from established principles of construction, allow the appeal and dismiss Chartbrook's claim.

97.    I have also read with interest and admiration Lord Hoffmann's observations, in the remaining part of his opinion, on the important questions that we do not have to decide. I would not differ from any of these views. In particular, I agree that *Karen Oltmann* is a questionable application of the "private dictionary" principle, since the meaning of the English word "after" can hardly be equated to the use of a technical or trade term.

**BARONESS HALE OF RICHMOND**

My Lords,

98.    I too have had the privilege of reading in draft the opinions of my noble and learned friends, Lord Hoffmann and Lord Walker of Gestingthorpe. For the reasons they give, together with those of Lawrence Collins LJ in the Court of Appeal, I agree that Persimmon's construction of this contract is correct and that this appeal should be allowed.

99.    But I have to confess that I would not have found it quite so easy to reach this conclusion had we not been made aware of the agreement which the parties had reached on this aspect of their bargain during the negotiations which led up to the formal contract. On any objective view, that made the matter crystal clear. This, to me, increased the attractions of accepting counsel's eloquent invitation to reconsider the rule in *Prenn v Simmonds* [1971] 1 WLR 1381, the pot so gently but effectively stirred by Lord Nicholls of Birkenhead in his Chancery Bar Association lecture of 2005 ([2005] 121 LQR 577). My experience at the Law Commission has shown me how difficult it is to achieve flexible and nuanced reform to a rule of the common law by way of legislation. In the end abolition may be the only workable legislative solution, as eventually happened with the hearsay rule (Law Com No 216 (1993), *The Hearsay Rule in Civil Proceedings*). Even that can prove difficult if, on analysis, the view is taken that the rule has no real content, as with the parol evidence rule (Law Com No 154 (1986), *The Parol Evidence Rule*). The courts, on the other hand, are able to achieve step-by-step

changes which can distinguish cases in which such evidence is "helpful" from cases in which it is not.

100.   However, the approach to rectification adopted by Lord Hoffmann would go a long way towards providing a solution. If the test of the parties' continuing common intentions is an objective one, then the court is looking to see whether there was such a prior consensus and if so what it was. Negotiations where there was no such consensus are indeed "unhelpful". But negotiations where consensus was reached are very helpful indeed. If the language in the eventual contract does not reflect that consensus, then unless there has been a later variation of it, the formal contract should be rectified to reflect it. It makes little sense if the test for construing their prior consensus is different from the objective test for construing their eventual contract. This situation is, and should be, quite different from the situation where one party is mistaken as to its meaning and the other party knows this – the latter should not be permitted to take advantage of the former.

101.   For those reasons, I would respectfully associate myself, as does Lord Walker, with the views of Lord Hoffmann on the issues which we do not have to decide. In particular, I would like to express my admiration for the skill and charm with which both issues were argued by counsel on each side. It is perhaps surprising that questions of such practical and theoretical importance in the law of contract should still be open to debate and development. But that is also the great strength of the common law.

# EXHIBIT 28 PART 1



Neutral Citation Number: [2019] EWHC 2322 (Ch)

Case No: BL-2018-000281; CR-2018-003995

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES (ChD)**
**BUSINESS LIST AND INSOLVENCY AND COMPANIES LIST**

Royal Courts of Justice
Strand, London
WC2A 2LL
Date: 16 September 2019

Before :

**MR JUSTICE FANCOURT**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

UTB LLC                                                    Claimant
- and -
SHEFFIELD UNITED LIMITED                                   Defendant
And
HRH PRINCE ABDULLAH BIN MOSAAD BIN
ABDULAZIZ AL SAUD
And
YUSUF GIANSIRACUSA

**AND IN THE MATTER OF BLADES LEISURE**
**LIMITED**
**AND IN THE MATTER OF S.994 OF THE**
**COMPANIES ACT 2006**

SHEFFFIELD UNITED LIMITED            Petitioner
And
    (1) UTB LLC
    (2) UTB 2018 LLC
    (3) HRH PRINCE ABDULLAH BIN MOSAAD
        BIN ABDULLAH BIN ABDULAZIZ AL
        SAUD
    (4) YUSUF GIANSIRACUSA
    (5) HRH PRINCE MUSA'AD BIN KHALID M
        BIN ABDULRAHMAN AL SAUD
    (6) BLADES LEISURE LIMITED            Respondents

- - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - -

**Mr Andreas Gledhill QC and Mr Tom Mountford** (instructed by **Jones Day**) for the
**Claimant, Third Party, Fourth Party and the First to Fourth Respondents**
**Mr Paul Downes QC and Miss Emily Saunderson and Mr Luka Krsljanin** (instructed by
**Shepherd and Wedderburn LLP**) for the **Defendant/Petitioner**

Hearing dates: 13-17 May, 20-24 May, 4, 5, 7, 10-13, 18, 19 June 2019
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE HONOURABLE MR JUSTICE FANCOURT

A-8888

THE HONOURABLE MR JUSTICE FANCOURT                          UTB LLC v. Sheffield United
Approved Judgment

**Mr Justice Fancourt:**

This judgment comprises the following parts:

A. Introduction (paras 1-10);

B. Undisputed factual narrative (paras 11-133)

C. The ISA: quasi-partnership and implied terms (paras 134-229)

D. The contractual obligations arising from service of the Call Option Notice and Counternotice (paras 230-270).

E. Mistake (paras 271-286)

F. The disputed events in 2017 (paras 287–372).

G. The disputed events in 2018 (paras 373-377).

H. Breaches of contract (paras 378-398).

I. Conspiracy to cause harm to SUL (paras 399-413).

J. Unfairly prejudicial conduct: the section 994 petition (paras 414-487).

K. Specific performance (paras 488-514)

L. Postscript: valuation evidence (paras 515-528)

M. Summary of conclusions (paras 529-538).

A.    Introduction

1.      The origin of this dispute is an investment and shareholders' agreement made on 30 August 2013 ("the ISA"). The ISA was made between Blades Leisure Ltd ("Blades"), Blades' wholly-owned subsidiary, The Sheffield United Football Club Ltd ("SUFC"), which operates the football club of that name, and the two shareholders of Blades and their guarantors. The shareholders are UTB LLC ("UTB"). a company incorporated in Nevis, and a company known at the time as Sheffield United plc and now known as Sheffield United Ltd ("SUL"). The principal individual behind SUL is Kevin McCabe, a Yorkshire businessman, and the beneficial owner of UTB is HRH Prince Abdullah bin Mosaad bin Abdulaziz al Saud ("Prince Abdullah"). a grandson of the late King Abdulaziz of Saudi Arabia.

2.      Under the terms of the ISA, UTB agreed to inject £10 million of capital over a period of about two years in return for a 50% shareholding in Blades. SUL was issued with the other 50% of the shares. Blades was expected to be a loss-making company for several years, until promotion to the Premier League of English football was secured. Despite the detailed and precise terms of the new articles of association and the ISA,

3

the shareholders had different understandings about who would fund Blades after the initial two-year period of UTB's funding. SUL believed that UTB would continue to fund any deficit in future years. UTB believed that, until it achieved super-majority control of Blades, UTB and SUL would fund Blades equally.

3.   Disagreement between UTB and SUL about the funding of Blades arose in 2014, 2015, 2016, 2017 and 2018. Disagreement about funding spawned disagreement about several other matters, all of which came to a head in November 2017. At that time, Prince Abdullah believed that he was being deceived and manipulated by Kevin McCabe, who (he thought) was seeking to control SUFC at the expense of proper corporate governance. Kevin McCabe believed that those acting on behalf of Prince Abdullah were unfairly seeking to marginalise SUL's involvement in Blades and SUFC and force SUL's exit. The disagreement became very personal and acrimonious between Kevin McCabe and Prince Abdullah's attorney, Yusuf Giansiracusa, in November and December 2017.

4.   At that stage, both SUL and UTB were considering how they might be able to exercise contractual rights under the ISA to bring the joint ownership of Blades to an end. SUL acted first. In December 2017, without prior warning, it served a call option notice on UTB, offering to buy UTB's shareholding for £5 million. That offer entitled UTB instead to elect to buy SUL's shareholding at the same price. It did so on 26 January 2018, by serving a counternotice on SUL.

5.   In these proceedings, UTB seeks to enforce the contract of sale and purchase of SUL's shares at the price of £5 million that arose from service of the counternotice. SUL seeks to have that contract declared void or set aside and seeks an order that UTB sell its shares to SUL at the current value of UTB's non-majority shareholding. SUL also seeks damages for breach of contract and for a conspiracy by UTB, Prince Abdullah and Mr Giansiracusa to harm SUL by unlawful means.

6.   Following service of the counternotice, completion of the contract of sale and purchase of SUL's shares (if valid) was due at 2pm on 6 February 2018. Completion did not take place. By letter of the same day, SUL purported to terminate the ISA and the contract of sale and purchase on account of alleged repudiatory breaches of contract by UTB. UTB issued a claim form on 9 February 2018 seeking specific performance of the contract of sale and purchase and declaratory relief in relation to the status of contingent obligations of SUFC under the ISA to buy property assets used by or in association with the football club ("the Club"). By counterclaim dated 27 March 2018, SUL sought different declaratory relief in relation to those contingent obligations and served an additional claim for damages for breach of contract and unlawful conspiracy.

7.   On 15 May 2018, SUL issued and served a petition under section 994 of the Companies Act 2006 ("the Petition"), claiming relief against UTB, Prince Abdullah, Mr Giansiracusa and others in respect of conduct unfairly prejudicing the interests of SUL as a shareholder of Blades.

8.   After a substantial number of interim applications, all these claims were heard together at a trial in May and June 2019. Although the evidence and arguments at trial covered a very wide range of facts and issues, it is unnecessary to decide all the facts and issues in order to resolve the claims that have been brought. There is nevertheless

a substantial number of issues of fact and law that need to be determined. The principal issues that will determine the outcome of the litigation are the following:

i)     Is the contract of sale and purchase of SUL's shares for £5 million valid and enforceable?

ii)    Did UTB act in breach of contract? The main breaches of contract alleged are breach of an implied term of good faith in the ISA and preventing SUFC from exercising the property call options in the ISA.

iii)   Was any breach of contract repudiatory, and if so were the ISA or the contract of sale and purchase, or both, terminated by SUL on 6 February 2018?

iv)    Did UTB, Prince Abdullah and Mr Giansiracusa conduct the affairs of Blades between August and December 2017 in a manner unfairly prejudicial to SUL, such that relief should be granted to SUL, either by setting aside the contract of sale and purchase or by ordering the buy-out of UTB's shares at market value, or both?

9.     For the convenience of those who need only to know the outcome of the trial, reference can be made to Part M of this judgment (paras 529-538 below), where I set out a summary of my conclusions. Parts C to L below explain my conclusions and reasons on the many issues and sub-issues that the parties have raised.

10.    Before addressing all such issues individually, it is convenient to set out in Part B the main aspects of the factual history, in so far as it is now uncontentious. In doing so, I will indicate where the factual disputes arise that are relevant to the issues in dispute and will return to those disputed matters later in the judgment.

B.     Undisputed Factual Narrative

11.    Kevin McCabe was born in Sheffield and has been a Sheffield United fan all his life. After school, he qualified as a quantity surveyor and was later appointed an associate member of the Royal Institution of Chartered Surveyors. He began working in the construction industry and, by his own skill and hard work during his lifetime, established a very substantial group of companies, operating worldwide and principally in relation to real estate and property development and management. The main holding company is Scarborough Group International Limited and I will refer to the group of companies as the "Scarborough Group". SUL is a company in the Scarborough Group.

12.    By the 1990s, Kevin McCabe was an influential local businessman and became an owner and director of the Club. By about 2003, he had become the majority shareholder of SUL, which was then the holding company of SUFC. By 2013, he owned all but about 12% of the shares in SUL. These 12% are held by about 9,000 individual supporters of the Club. Effectively, therefore, Kevin McCabe owned and controlled the Club through his or his companies' shareholding in SUL. Over many years, he has injected tens of millions of pounds into the club out of love and loyalty, not for financial return.

5

A-8891

THE HONOURABLE MR JUSTICE FANCOURT                                                    UTB LLC v. Sheffield United
Approved Judgment

13.     Before the early part of 2013, SUL (and certain other Scarborough Group companies)
        owned five properties associated with the football club: the stadium at Bramall Lane
        ("the Stadium"), the Sheffield United hotel at Bramall Lane, land at Shirecliffe Road,
        Sheffield where the Club's youth academy is established ("the Academy"), a junior
        development centre at Crookes Road, Sheffield and a serviced offices centre at
        Bramall Lane.

14.     In 2012, when Kevin McCabe was approaching 65 years of age, he began to look for
        someone to whom he could, as he put it, "hand on the baton". The Club, which had
        been in the Premiership in 2006-7, was languishing in the English League Division
        One (despite its name, the third tier in English professional league football, below
        what are now called the Premier League and the Championship). The Club was in
        need of a benefactor, Kevin McCabe thought, who would invest very substantial sums
        to make the Club competitive at higher levels.

15.     He decided to make the Club more attractive (i.e. cheaper) to would-be investors by
        splitting ownership of the property assets from the Club itself.  Kevin McCabe's
        ambition was for the property assets then to be re-sold to the Club, when it was back
        in the Premier League and after he had handed over the baton.  The mechanism was
        for Blades, as a new subsidiary of SUL, to purchase the shares in SUFC from SUL
        and for SUL (and other Scarborough Group companies) to retain the property assets.
        The investor would then take shares in Blades. The separation of the property assets
        was not in fact effected until 2013, when Prince Abdullah was negotiating to acquire
        an interest in the Club.

16.     At the end of 2012, Kevin McCabe and Prince Abdullah were introduced by an
        intermediary, Mr Puian Mollaian. Mr Mollaian led Kevin McCabe to believe that
        Prince Abdullah was extremely wealthy. He misrepresented the Prince's income as
        being £20 million to £25 million annually by way of dividends from Saudi Paper
        Manufacturing Company ("Saudi Paper"), a tissue paper production company in
        Saudi Arabia founded and part-owned by the Prince.  Prince Abdullah said that the
        most that he received in annual dividends from Saudi Paper was about US$8 million
        when Saudi Paper was at its peak prior to 2013. Kevin McCabe and Prince Abdullah
        first met on 16 January 2013 at the Corinthia Hotel in London. Kevin McCabe was
        accompanied on that occasion by his son, Simon McCabe. A further meeting took
        place in Riyadh on 13 March 2013 at Prince Abdullah's home. At the time, Prince
        Abdullah was looking at more than one English football club as a possible investment.

17.     In fact, as was established in cross-examination and had become apparent in 2015,
        Prince Abdullah, though rich by any standards, was not as wealthy in income terms as
        Mr Mollaian had led Kevin McCabe to believe, nor as rich as Kevin McCabe assumed
        that a Saudi prince must be.  Most of his assets were illiquid.  Prince Abdullah's own
        wealth was self-made. His principal asset in 2013 was his shareholding in Saudi
        Paper.  Prince Abdullah had himself founded and developed that business.  It was
        worth at that time about US$160 million but declined alarmingly in value in the
        following years. Prince Abdullah in 2013 had other Saudi and American shares and
        private equity investments worth about US$30 million net, and owned houses in
        London and Los Angeles worth in the region of US$40-60 million.  In 2013, Saudi
        Paper declared dividends equivalent to US$5 million, but its business declined in the
        following years and by 2015 it was not paying dividends at all. This deprived Prince
        Abdullah of his principal source of income.

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

18.    In March 2013, Kevin McCabe prepared a memorandum stating that he intended to
       sell:

>      "a controlling stake (50.1%) in SUFC [in return for] the new
>      partner investor committing to provide appropriate sums to
>      efficiently run the business with an emphasis on permitting a
>      higher than budgeted player wage bill in order to aid
>      promotion(s) back to the Premier League within a 3-5 year
>      term".

       The memorandum referred to a sum of £300 million that could expect to be earned
       during two seasons in the Premier League, at the new levels of payment for
       broadcasting rights that were about to come into force.

19.    On 12 April 2013, leases of the property assets were granted to SUFC. The leases
       provided for different rents to be payable depending on the division in which the Club
       was playing. Schedule 2 to the lease of the Stadium specified annual rents of
       £150,000 in League Two, £250,000 in League One, £500,000 in the Championship
       and £3 million in the Premier League. From April 2013, Prince Abdullah began to
       undertake due diligence into SUFC, using accountants from Deloitte, lawyers from
       Onside Law, sports advisers and property advisers.

20.    The Club ended the season in fifth place in League One but did not secure promotion.
       On 13 May 2013, Kevin McCabe's other son, Scott, was appointed a director of
       Blades and SUFC.

21.    Following a meeting at the Scarborough Group's London offices between Kevin
       McCabe and Prince Abdullah's legal adviser, Jim Phipps, on 18 June 2013 Kevin
       McCabe emailed Mr Phipps draft heads of terms. On the same day, Mr Phipps
       confirmed that Prince Abdullah had decided to abandon the other football club
       acquisition opportunity "in preference to pursuing becoming part of the Blades
       family".

22.    The heads of terms were subsequently negotiated and signed off by the Scarborough
       Group and Amas Holdings Limited ("Amas") at the start of July 2013. They provided
       for a formal agreement to be made subsequently for the acquisition by Prince
       Abdullah of a 50% interest in Blades for an investment into Blades of £10 million and
       included the following terms:

       i)     the intention of the parties to work together over a three to five-year term to
              achieve (a) promotion of the football club back to the Premier League and (b)
              re-uniting all parts of the football club by buying back the property assets;

       ii)    option agreements to be put in place between SUFC and SUL and the
              Scarborough Group to buy back the property assets;

       iii)   Amas was to provide the £10 million cash investment principally to fund first-
              team football in order to improve the Club's chances of achieving promotions
              back to the Premier League. The investment would be made in four tranches
              between July 2013 and January 2015;

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

iv)    representatives of the Scarborough Group and Amas would have an equal number of directors on the boards of Blades and SUFC and, with the approval of Amas, Kevin McCabe would initially be the chairman of both;

v)     loans made to SUFC would be reorganised so that SUFC could stand alone, to Amas's satisfaction, but on the understanding that all the property assets will be reunited with the club once Premier League football was achieved;

vi)    "once SUFC have utilised the £10 million of funds from Amas, then thereafter each party will equally provide any agreed further monies as required for the efficient running of the club".

23.    On 2 August 2013, SUL and Prince Abdullah agreed a non-binding "deal sheet", which developed the agreed heads of terms. The common intention to seek to achieve promotion to the Premier League and reuniting the property assets within a 3 to 5-year term was restated. There was provision for new leases and options to be entered into. Materially, the new lease of the Stadium was to be at an annual rent of £250,000 while the club was in League One, but on promotion to the Championship or the Premier League the parties were to agree a suitable and appropriate revised annual rent. Similar provisions were to be contained in the new lease of the Academy.

24.    The deal sheet stipulated that, prior to completion, the parties were to agree a business plan and operating budget for 2013/2014 which "must demonstrate how the club will be operating on a breakeven or profitable basis during Season 2013/2014 and thereafter". It also provided that either party could inject further cash for equity, with the other party having a right to match it, until one party held 75% of the fully diluted share capital of Blades or until promotion to the Premier League.

25.    The deal sheet also provided for Prince Abdullah to have call options on the shares of SUL between years 3 to 7, if promotion to the Premier League was not achieved within three years, or at any time if the Club was relegated. In the event that Prince Abdullah acquired 75% or more of the share capital of Blades, he was to acquire the freehold and leasehold property assets at a price and on terms to be agreed.

26.    Subsequently, Prince Abdullah's solicitors, Onside Law, negotiated with Kevin McCabe's solicitors, Shepherd & Wedderburn, the terms of the leases and property options. On 12 August 2013, Onside Law wrote to Shepherd & Wedderburn: "we need a formula to ascertain how the rent will be reviewed upon promotion to Championship and Premiership (and relegation)". Shepherd & Wedderburn replied that they had "stripped back the rent review provisions… to provide for the rent to be the higher of £250k/£60k [i.e. for the Stadium/Academy] and such other figure as the parties agreed. This is in line with… our instructions". This proposal was accepted by Onside Law on behalf of Prince Abdullah and was reflected in the final versions of the new leases.

27.    On 16 August 2013, Onside Law wrote to Shepherd & Wedderburn to tell them that Prince Abdullah would be acquiring his shareholding in Blades through a newly incorporated company, UTB.

28.    On 30 August 2013, the parties executed the ISA, newly-drafted articles of Association for Blades, new leases of the property assets and a call option agreement

for each of those assets. The ISA is extremely detailed. Reference to its specific terms will be made later in this judgment when I address the particular issues of interpretation of the ISA that arise for determination. At this stage, it is material to note, in the light of the heads of terms and the deal sheet just referred to, how the finally agreed terms reflected or differed from what had previously been agreed on a non-binding basis.

29.     At the start of the ISA the following section, headed "Background" states:

> "(A) The Investor wishes to subscribe for 50% of the fully diluted share capital of the Company [Blades] in return for the payment of £10 million… to the Company in a number of tranches on the terms of this Agreement.
>
> (B) The intention of the Company, SUFC, [SUL] and [UTB] is to work together to seek to achieve the following within the period covering Seasons 2015/2016 to 2017/2018:
>
> > (i) promotion of Sheffield United football club to the English Premier league; and
> >
> > (ii) the re-unification of the freehold and leasehold interests in the property leased to SUFC.
>
> (C) This Agreement sets out the terms and conditions upon which the investment shall be made by [UTB] and regulates the basis on which the Company and SUFC shall be operated."

30.     The annual business plan was not required to be prepared on a break even or profit-making basis. That provision in the term sheet was omitted from the ISA. Clause 6.1 of the ISA contained an acknowledgement that Blades might require further finance to fund its and SUFC's projected cash requirements under the business plan. There is no requirement for each of the shareholders to fund on an equal basis, but each was given the right to subscribe for further shares in Blades for cash at any time, subject to pre-emption rights (effectively giving the other shareholder the right to match the subscription), but not after promotion to the Premier League or when either shareholder held 75% or more of the share capital. The subscription price was fixed at the rate of £5 million for new shares that would amount to a 24.9% holding on a fully diluted basis. The issue of further shares to either shareholder on that basis would require the prior written approval of the other shareholder if the subscriber's holding would as a result amount to 75% or more of the share capital. So UTB could not dilute SUL so as to achieve super-majority control without the agreement of SUL.

31.     If and when any shareholder acquired 75% or more of the share capital, SUFC was to exercise each of the property call options unless the shareholders agreed otherwise. In the event of deadlock on any important issue, each shareholder should have the right to offer to buy all the shares of the other shareholder. The offeree could either accept that offer or buy out the offeror at the same price per share. Both shareholders (not just UTB) were given the option to acquire the shares of the other shareholder during

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

the close season of years four to eight, or after the end of year three at any time if the Club had not by then been promoted to the Premier League or if it had been relegated.

32.    The new leases of the Stadium and the Academy reserved initial annual rents of £250,000/£60,000 and then subject to revision in accordance with provisions in schedules to the leases. These provided for Review Dates on 1 May 2014 and on each anniversary of that date and for the reviewed rent on each occasion to be the greater of the originally reserved annual rent and "such other sum as the Landlord and Tenant may agree". There was therefore no express obligation to increase the rents on promotion.

33.    The property call options each conferred on SUFC the right during a period of 10 years to purchase the freehold or leasehold asset at the market value at the time of exercise or, in the case of the Stadium, the average of (i) the market value at the time of exercise and (ii) a value based on the aggregate of the land value and book value of the property less capital expenditure made during the option period. The contract of sale and purchase arising from exercise of the option was to be completed 12 months after the date of service of the option notice.

34.    The completion documents therefore did not provide that the property call options must be exercised if the Club was promoted to the Premier League, nor was UTB required to have more than 75% of the share capital by that time. The ISA did not provide for further injections of capital that might be needed after the first two years to be provided equally by the shareholders; it merely conferred on each a right to subscribe for further shares for cash.

35.    As a result of completion of the investment of Prince Abdullah in these terms, it was therefore less clear that UTB would be acquiring SUL's shares by any particular time, and unclear who would be funding the annual losses (if any) incurred after the 2014/15 season had ended.  The aspiration was for the Club to reach the Premier League within 3-5 years, but of course that could not be guaranteed (and in the event did not happen). The result was that the shareholders had somehow to fund four further seasons of loss-making business of SUFC before the Club did achieve promotion to the Premier League shortly before the start of the trial.

36.    Kevin McCabe believed that a super-rich Prince Abdullah would be exercising his right to subscribe for further shares and would dilute SUL to the point that he obtained super-control of Blades and the property call options would be exercised. SUL would not be troubled to inject further capital and the baton would be passed on. Prince Abdullah believed, consistently with what had been stated in the heads of terms but was not stated in the ISA, that UTB and SUL would be providing the needed capital in equal shares after the 2014/15 season until he was in a position to acquire control.

37.    It did not take very long for the disagreement about funding to arise. By the time that further capital was needed in order to pay SUFC's bills, the Club had failed to obtain promotion even to the Championship and Prince Abdullah was facing a significant decline in his income.  The Scarborough Group too, as principally a real estate business, was still suffering from the after-effects of the global financial crisis and recession.  Neither side was well-placed to inject further cash.

THE HONOURABLE MR JUSTICE FANCOURT                                         UTB LLC v. Sheffield United
Approved Judgment

38.   But that crisis was still two years away at the time when the transaction was completed in August 2013. In the meantime, Prince Abdullah became the co-chairman of SUFC with Kevin McCabe. Kevin, Scott and Simon McCabe together with Jeremy Tutton, a Scarborough Group employee, certified accountant and the secretary of Blades and SUFC, became the SUL-nominated directors of Blades and Prince Abdullah, Jim Phipps (Prince Abdullah's then legal advisor) and Selahattin Baki were nominated as directors by UTB. Even though there was (at that time) one fewer UTB-appointed director than the full complement of SUL-appointed directors, the votes on the board were nevertheless treated as equal pursuant to clause 5.10 of the ISA. Prince Abdullah and Mr Phipps also became directors of SUFC at that time.

39.   Sheffield United had a disastrous start to the new football season, which resulted in the sacking of the manager, David Weir, on 11 October 2013. Nigel Clough became the full-time manager on 23 October 2013. In January 2014, the chief executive officer ("CEO") of SUFC, Julian Winter, was replaced by Malachy Brannigan, who had previously worked with Mr Clough at another club. The two of them had a close bond, and Mr Phipps (who was effectively Prince Abdullah's eyes and ears in Sheffield) became quite close to them too. Kevin McCabe was less than happy with this axis, in particular with the level of spending for which they were primarily responsible. It appears that the board of SUFC was not exercising effective control of management at that time.

40.   Nevertheless, after a poor start to the season, the Club finished strongly (though it failed to achieve promotion from League One) and there was harmony between the UTB and SUL-appointed directors and, to the extent that they had contact, between Kevin McCabe and Prince Abdullah. Prince Abdullah only attended very few matches and only went to Sheffield twice during that first season. Kevin McCabe was, as he had always been, a constant presence at the Club on match days and occasionally during the week. Prince Abdullah was happy to defer to Kevin McCabe to some extent, given the latter's presence in Yorkshire (although he lived in Scarborough and the Scarborough Group had offices in Leeds and London, not Sheffield) and his substantial experience of English football and knowledge of the Club and its affairs. Mr Phipps was present to safeguard Prince Abdullah's interests.

41.   Prince Abdullah's ability to be involved with the Club to any significant degree was however curtailed in June 2014 by his appointment by the King of Saudi Arabia to be President of the General Presidency of Youth Welfare in the Saudi government. This was a ministerial position with particular responsibility for sport and youth welfare in the Kingdom. Having considered his position and taken soundings from advisors, Prince Abdullah decided that it was better if he resigned as co-chairman and as a director of Blades and SUFC. Although the King had told him that it was accepted that Prince Abdullah should continue his own business interests, other advisors said that it might be better if he was not seen to be connected to the Club.

42.   In a letter written to Kevin McCabe dated 29 June 2014, Prince Abdullah referred to "our beloved Sheffield United" and said that he resigned with great sadness and that:

        "It has been the highlight of my career to serve with you, Kevin, in the chairmanship of the Blades. My departure to serve my country is but for a season. When my duty has been fulfilled, it is my intention to return. Meanwhile, it is my desire

11

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

> to see the Club achieve the goals you and I have set for it. I
> know you share this intention. I thank you and your sons, Scott
> and Simon,… for introducing and welcoming me and my
> family to the Blades family. In the year we have spent together
> as partners, I have caught the Sheffield United bug and have
> become a Blade and, as you well know, once a Blade, always a
> Blade!"

43.    The letter went on to charge Mr Brannigan and Mr Clough with taking the Club up to
       the Premier League, assured them of his commitment to the cause and reassured them
       that the next tranche of finance was on its way. Prince Abdullah considered that he
       might have to place UTB's shares into a trust, "to provide the required separation
       between myself and the Club to satisfy applicable Saudi law", but in the event that
       was not done.

44.    Mr Phipps took over from Prince Abdullah as co-chairman and some consequential
       changes were made in the composition of the two boards.

45.    By the autumn of 2014, which was the second year of UTB's initial funding, Kevin
       McCabe had indicated that there was no further funding for SUFC available from the
       SUL side, though he did suggest that part of the property assets might be sold to
       Prince Abdullah to raise funds. By January 2015, the question of funding had revived.
       On 22 January, Kevin McCabe sent an email to Mr Phipps:

> "on so many occasions over the course of the last six months or
> more, either Scott or myself have made it clear that
> Scarborough/the Family simply do not have further financial
> resources available to invest in SUFC. This statement has also
> been made to Mal to ensure that there is no confusion between
> the Joint Owners and Management."

46.    On 13 April 2015, Kevin McCabe met Prince Abdullah in Riyadh. By that time, Mr
       Phipps and Kevin McCabe were disagreeing about what Kevin McCabe saw as Mr
       Phipps siding with Mr Clough and Mr Brannigan in unnecessary or ill-judged
       expenditure of UTB's £10 million. Once again, the Club failed to gain promotion to
       the Championship. Mr Phipps wrote to Kevin McCabe a letter headed "The Future of
       Sheffield United Football Club" asserting that Kevin McCabe was abandoning a
       commitment to fund the Club 50/50 after the first two years and criticising him for
       accepting two years' significant funding from Prince Abdullah then walking away
       from his responsibilities with three years out of the five-year project remaining. Mr
       Phipps threatened that if SUL did not fund the Club going forwards, UTB would not
       do so either and the project would come to an end. Mr Phipps proposed that each side
       should put in £3 million, with UTB leading the way in June/July and SUL to follow
       by December 2015. He suggested that thereafter the two sides should work together to
       identify a replacement investor for SUL before the end of the following (2015/16)
       season.

47.    Kevin McCabe wrote a conciliatory reply to Mr Phipps, referring to the annoyance
       and frustration of missing out on promotion again, but not making any funding
       proposal. Three days later he wrote to Prince Abdullah complaining about Mr Phipps

but nevertheless making reassuring noises about his commitment to the Club. The principals then met again in Riyadh on 10 June 2015 to discuss the affairs of the Club.

48.   By that time Mr Clough had been removed as the manager of the Club. Discussions in Riyadh appeared to cover the sustainability of SUFC going forwards, as Kevin McCabe sent an email two weeks later saying that he was going to spend more time at the Club, seek to make more from the property resources that the Club enjoyed and cut costs, in an effort to move away from the "benefactor model" that had applied over the previous two years. Prince Abdullah replied to the effect that his businesses were in trouble and none were paying dividends, and that he had to "cut into flesh" in order to raise £4 million for Blades. At about the same time Mr Phipps had warned Kevin McCabe that if a funding agreement could not be reached by 15 July 2015 the Prince would cease to fund the Club.

49.   These discussions led to a funding agreement ("the July 2015 Funding Agreement") which was signed by Kevin McCabe and Mr Phipps on 2 July 2015, the day after a further meeting between them.

> "We are grateful to have reached a meeting of the minds between [SUL] and [UTB], the 50:50 owners of [Blades]… relative to owner funding of SUFC's 2015 – 2016 campaign for promotion from League One to the Championship… Our joint expectations are to ensure that the executive of SUFC do not expose SUL and UTB to further owner funding over and above the maximum combined amounts now budgeted of £8,000,000. UTB and SUL will henceforth impose sensible controls and disciplines upon the executive along with providing as deemed appropriate experience and guidance to better exploit raising revenues and saving costs for SUFC from both the 'on and off the field' activities.
>
> Additionally SUL and UTB will actively work together to secure new and suitable investors for SUFC in order to aid achievement of our joint aims using if appropriate the benefit of SUL and [Scarborough Group's] real estate investment situated at Bramall Lane, Shirecliffe and Crookes, Sheffield
>
> This letter memorializes the meeting of the minds reached as follows:
>
> 1. Further to the August 2013 [ISA] as it relates to continuing financial support of SUFC by its owners, SUL and UTB have agreed that they will each provide the following financial support to SUFC for use in connection the Campaign [sic] per the following schedule:

| Party | Amount | To be paid in full by no later |
|-------|--------|-------------------------------|
|       |        |                               |

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

|  |  | than … |
|---|---|---|
| UTB | £3,000,000 (Three Million Pounds Sterling) | 15 July 2015 |
| SUL | £3,000,000 (Three Million Pounds Sterling) | 15 October 2015 |
| SUL | £1,000,000 (One Million Pounds Sterling) | 1 February 2016 |
| UTB | £1,000,000 (One Million Pounds Sterling) | 1 May 2016 |
| Combined | £8,000,000 (Eight Million Pounds Sterling) | 1 May 2016 |

> 2. The issuers of the parent guaranties given in respect of the obligations of SUL and UTB under the [ISA] ('the Guaranties") have each acknowledged that the funding commitments set forth in the funding schedules above are: (a) binding each of SUL and UTB; and (B) covered by the Guaranties… "

50. Pursuant to the July 2015 Funding Agreement, UTB paid its initial £3,000,000 on 14 and 16 July 2015.

51. On 15 October, SUL did not pay its £3,000,000. Kevin McCabe had formed the view that it was better to drip feed the money into SUFC when it was really needed, rather than pay a large sum in one go. He did not tell Prince Abdullah that this was what he intended to do. Mr Phipps discovered that SUL had not paid in accordance with the July 2015 Funding Agreement and informed Prince Abdullah.

52. Prince Abdullah regarded it as a serious breach of trust. He sent Kevin McCabe an email dated 17 October 2015 headed "Crossroads", stating "This violates both the letter and the spirit of our [July 2015 Funding Agreement] and constitutes not merely a breach of contract, but a breach of fundamental trust between us as partners". The letter also complained that "…it has become clear to me that you want to be free of the control approach set forth in the investment agreement, under which we conceded a great deal of decision making power to management" and called on Kevin McCabe to "correct course and pay in the full 3 million pounds before we meet in early November".

53. Kevin McCabe replied, explaining his reasons for withholding the money, and asserting his faithfulness to the aims of the ISA. He said that at the meeting in November the key topic to discuss would be his inability to work any longer with Mr

14

Phipps. Prince Abdullah denied that in his response, stating that the key issue was one of trust between them. He stated that SUL had to pay in full. The email also said that Mr Phipps was not going to remain in position after December and Prince Abdullah said that he might need a lawyer to help him to deal with Mr McCabe.

54.    In a reply dated 29 October 2015, Kevin McCabe blamed the drafting of the July 2015 Funding Agreement and offered to pay the full £3million to Prince Abdullah personally, though not to Blades, but it was in the event paid neither to Prince Abdullah nor to Blades. A sum of £1.3 million was paid to Blades on 23 November 2015.

55.    On 1 December 2015, a further funding agreement was made ("the December 2015 Funding Agreement"), under which 4,000,000 new shares were to be allotted to each of UTB and SUL in order to keep debt off Blades' balance sheet. SUL's outstanding contribution for the year was re-scheduled, to be paid in instalments on 25 January, 15 February and 31 May 2016. UTB was to pay its final instalment in July 2016. The Scarborough Group guaranteed SUL's obligations to pay. Following the December 2015 Funding Agreement both parties paid on time (or early) for the remainder of the 2015-16 season.

56.    At a meeting of Prince Abdullah and Kevin McCabe in Riyadh on 2 or 3 December 2015, agreement must have been reached on the removal of Mr Brannigan as CEO. On 3 December 2015, Simon McCabe emailed his friend Stephen Bettis, offering him informally the chance to take a short-term role as CEO and restructure the football club. Mr Bettis started work in mid-January 2016.

57.    By March 2016, it is evident that Prince Abdullah – though still preoccupied by ministerial duty – was considering how the running of SUFC might change. The football season was not going as well as would have been hoped. Promotion – even to the Championship – was not imminent. The Prince met Scott McCabe on 12 March 2016 at Westfield in London to discuss how the Club might be run in future. It is accepted by all that, even when relations between the Prince and Kevin McCabe were strained, he and Scott McCabe were close and got on well.

58.    But Prince Abdullah had decided to obtain professional assistance. It is evident that for some time he had been concerned by the way in which SUFC was being run and why such substantial losses were being made. He sent two new representatives, Chris Howard, an ex-partner from a top City law firm, and Tareq Hawasli, to Sheffield to make an independent assessment of what they found there. The visit lasted for 3 days and included two meetings with Kevin McCabe. Messrs Howard and Hawasli prepared a detailed report ("the Howard Report"), which – though praising certain good qualities of Kevin McCabe – was damning in other respects: principally that he acted according to his own will and opinions and circumvented good governance. The management of the Club was described as "a fiasco and chaos … where no controls and processes were imposed". The conclusion reached was that Kevin McCabe had unfinished business at the club and was going nowhere:

         "Now that KM has to inject money into the club it is absolutely
         clear that he will be actively involved at every level of the club
         and that he will seek to direct the club in every area in order to

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

                  protect his investment and to reduce the amount of cash
                  contribution going forward."

59.     The report was not shared with SUL at the time. It must inevitably have coloured
        Prince Abdullah's attitude to the way in which UTB's interests in Blades should be
        protected, the appropriate governance structure and the desirability of finding a
        replacement investor for SUL. The following month, Tareq Hawasli was appointed a
        director of SUFC.

60.     May 2016 brought no promotion and a poor eleventh place in League One. That
        meant that there would be at least another year of funding a League One club. It
        would be the fourth season since Prince Abdullah's investment. The 3-5 year plan to
        regain Premier League status was not going well. The manager was sacked and Chris
        Wilder was appointed in his place. Mr Phipps resigned and was removed as a director
        of Blades and SUFC.

61.     On 24 May 2016, there was a Blades and SUFC board meeting at the George V hotel,
        Paris. Mr Bettis's financial presentation indicated a budget for the next year that
        produced a cash flow shortfall of £8m, subject to possible cost savings.  There is no
        evidence that specific dates for payments of capital contributions were agreed
        between principals at that time, though Mr Bettis's cash flow probably included them.
        It was recognised that further external investment was needed. No sooner had Kevin
        McCabe returned to Manchester airport the following day than he was summoned by
        Messrs Howard and Hawasli to London to discuss a possible investment from the
        Qatari Investment Authority. This was named "Project Beta" and included an outline
        proposal to sell the Scarborough Group property assets (other than Crookes Road) and
        half the football club for £47.5 million.  That would leave the new investor owning
        most of the property assets and sharing the Club ownership with UTB. The stated aim
        was for completion on 31 July 2016.  Kevin McCabe was enthusiastic about Project
        Beta.

62.     On 20 June 2016, Mr Bettis asked each owner for an injection of £1m to meet
        SUFC's tax bill. The request had an amended cash flow forecast attached and was
        said to contain suggested dates for injection of capital by UTB and SUL, but the
        spreadsheet was not in evidence. SUL paid its £1m on 22 July 2016 but UTB did not
        pay.  Prince Abdullah explained, when chased for his contribution at that time, that he
        would need a month in which to raise further cash for investment in the Club.  But he
        paid only £200,000 on 23 August 2016, £400,000 on 21 September 2016 and a further
        £400,000 on 2 November 2016.  At this time, Prince Abdullah had no spare cash
        because Saudi Paper had stopped paying dividends the previous year.  SUL was
        reluctant to pay more money into Blades at a time when Project Beta was progressing.
        SUFC was in real danger of being unable to pay its employees' wages on a monthly
        basis. Mr Bettis called for another £1m from each owner in November 2016 but SUL
        paid only £450,000 on 29 November, £50,000 on 1 December and a further £500,000
        on 12 December. When Prince Abdullah was called upon to equalise contributions by
        paying £1m in January 2017 he did not do so, and SUL had to pay a further £600,000
        urgently on 27 January 2017 in order to save SUFC from insolvency.

63.     Although Project Beta ultimately came to nothing, to Kevin McCabe's annoyance, by
        January 2017 a new potential investor had been found by Prince Abdullah in Saudi
        Arabia.  This was presented as being Sela Sport, a Saudi sports media company

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

owned by Dr Rakan Al Harthy, though in fact the true investor turned out to be a different person. This new investment possibility had openly been discussed between SUL and UTB first in November 2016, though it is evident that Prince Abdullah or those acting for him had been seeking to interest Sela Sport for at least a month before that. This was named "Project Delta". A new and more complicated phase of the story was about to begin.

64.     Mr Howard, who was assisting Prince Abdullah with Project Delta, sent Sela Sport and their apparent representative in London, Mr Hossam Alsaady of Nuovo Capital Wealth Management Ltd (described as an affiliate of Sela Sport), a confidentiality agreement, which was signed by Mr Alsaady on behalf of Nuovo on 5 December 2016. Whether Mr Alsaady was at any time acting for Sela Sport is a matter of dispute. The following day, Mr Howard explained to Mr Tutton that exactly the same deal as in Project Beta was to be offered to Sela Sport and that Nuovo were an affiliate and representative of Sela Sport.

65.     On 9 January 2017, the three McCabes and Mr Bettis flew to Dubai to meet Prince Abdullah and Dr Rakan. At the meeting with Dr Rakan, it became clear that, although Sela Sport was a possible investor in Blades, there would likely be other investors. The name of Saleh bin Laden was mentioned. At the meeting, an early advance or loan of £3 million was discussed and apparently agreed in principle by Dr Rakan. There is an important dispute about what exactly was said by Dr Rakan and Prince Abdullah at the meeting as regards repayment of the £3 million loan, if that is what it turned out to be, and who the investor(s) might be.

66.     As a result of the meetings in Dubai, the McCabes and Mr Bettis returned to England the following day confident that a deal with Sela Sport would be done. This was significant for the McCabes not just because their stake in Blades and SUFC would be acquired, ending their need to fund SUFC's losses, but because they would soon be paid very substantial sums for four of the five property assets. The next day, Mr Tutton emailed a rudimentary draft loan agreement to Dr Rakan.

67.     On 28 January 2017, Mr Alsaady informed the parties to the proposed transaction that lawyers were being instructed to prepare a loan agreement between an investment company and Blades. In the event, the investment company turned out to be Charwell Investments Ltd ("Charwell"). The loan agreement dated 9 February 2017 provided for three instalments of £1 million each to be paid on 15 February, 15 March and 14 April 2017, repayable on demand, without interest, on 30 April 2018. It gave the lender but not the borrower the option to capitalise the £3 million as equity in Blades.

68.     Blades did no due diligence on Charwell in connection with the money laundering regulations. In fact, the ultimate beneficial owner of Charwell was not Sela Sport but the bin Laden family. What exactly SUL knew and believed at the time and subsequently about the source of the loan is in dispute. The money from Charwell was nevertheless extremely welcome to both SUL and UTB. It saved them from having to make further capital contributions during the 2016/17 season. However, at the date of the Charwell loan agreement, SUL had contributed £1.6 million more than UTB. Although in principle, under the ISA, that entitled SUL to subscribe for more shares and dilute the interest of UTB, it did not seek to do so, no doubt because SUL wanted to sell its stake, not increase it.

17

A-8903

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

69.   The next event of significance was that, in March 2017, over a dinner at The Ivy, Mr
      Bettis told Kevin McCabe that his other business interests required him to move to
      Los Angeles later that month. Mr Bettis said that he would not leave SUFC "in the
      lurch", but at that stage no decision was taken about whether Mr Bettis could or
      would continue as CEO. At about the same time, Mr Giansiracusa, a lawyer and
      partner in Jones Day practising from Riyadh, first became involved with Blades and
      SUFC, initially in connection with the heads of terms and due diligence process for
      Project Delta.

70.   On 1 April 2017, Prince Abdullah and Kevin McCabe met in the Peninsula Hotel,
      Paris, to discuss Project Delta and the future of the Club, against the happy backdrop
      of virtually guaranteed promotion to the Championship at the end of the season. A
      restructuring of the board of SUFC was discussed, assuming that Project Delta
      proceeded. Kevin McCabe told Prince Abdullah that Mr Bettis would resign at the
      end of that season and that a replacement was being sought. Prince Abdullah wanted
      to be involved in the process of selecting the replacement. After the meeting, Kevin
      McCabe contacted Mr Giansiracusa to try to arrange a meeting to discuss changes to
      the boards and arrangements for a successor to Mr Bettis.

71.   During April 2017, things were looking brighter for Blades in certain respects. The
      immediate funding crisis had passed, though that proved to be only a temporary state
      of affairs. The Club achieved promotion to the Championship. It was still believed
      that Project Delta would come to fruition, though possibly not for a full 50% stake in
      the Club. In Kevin McCabe's mind, payment of the Charwell loan had made Project
      Delta a virtual certainty. Prince Abdullah's ministerial post came to an end on 23
      April 2017, releasing him to devote more time to the affairs of the Club.

72.   It was initially assumed by both Kevin McCabe and Prince Abdullah that, at some
      time in the near future (though no fixed date was ever agreed between them), Mr
      Bettis would cease to be CEO. Kevin McCabe did not believe that Mr Bettis could do
      that important job part-time, based in Los Angeles. Both sides concerned themselves
      with arrangements to recruit a successor. On 22 April 2017, ahead of their first
      meeting, Mr Giansiracusa emailed Kevin McCabe and suggested that they discuss the
      future of Mr Bettis and instruct an executive search firm to focus on proposals for
      three positions: a CEO, a chief financial officer ("CFO") and a player recruitment
      position. He also sounded warning notes about the importance of instilling good
      corporate governance.

73.   The meeting of the McCabes and Mr Giansiracusa (and Mr Bettis) in Sheffield took
      place on 29 April 2017. Mr Bettis had produced budgets for the following season,
      which required substantial input from the Project Delta investor. By that time, Prince
      Abdullah was considering instructing Deloitte to carry out an analysis of the Club's
      business and a benchmarking exercise. Nothing was decided about the timing of Mr
      Bettis's resignation.

74.   However, on 12 May 2017, Prince Abdullah had lunch with Mr Bettis in Los Angeles.
      He found Mr Bettis (whom he had not previously met) to be an impressive man with
      an independence of mind and sound judgment. He wanted him to remain as CEO. As
      a consequence, Mr Giansiracusa on Prince Abdullah's behalf prepared a
      memorandum and draft board resolution, which recorded agreement by the directors
      that Mr Bettis should remain in post part-time and resolved that the Club should seek

18

THE HONOURABLE MR JUSTICE FANCOURT                                          UTB LLC v. Sheffield United
Approved Judgment

to appoint a full-time Chief Operating Officer ("COO"). There is disagreement
between the parties as to whether that resolution, which was eventually signed by all
directors, amounted to agreement that Mr Bettis should continue to be employed part-
time. On 26 June 2017, Andy Birks, a friend of Simon McCabe, started work as COO
of SUFC.

75.     By that time, the parties had received some bad news. On 6 June 2017, Mr Alsaady
        informed Mr Giansiracusa and Mr Hawasli that his principal had decided not to
        proceed with Project Delta. That was not unexpected: both sides had realised in about
        mid-May that the deal was not progressing as it should have been. Mr Giansiracusa
        confirmed the bad news to Kevin McCabe on 11 June and suggested that, when
        dealing with any future would-be investors (that Prince Abdullah was already
        seeking), changes needed to be made to the due diligence and legal processes. The
        collapse of Project Delta meant that annual debt finance was once again an overriding
        issue for SUL and UTB.

76.     Apart from the need for more money going forward, Blades had to deal with the
        implications of the £3 million Charwell debt. To comply with the Salary Costs
        Management Protocol of the English Football League, part of the debt had to be taken
        off Blades' balance sheet by the end of the season. Mr Tutton ingeniously suggested
        that that problem and the imbalance in the equity contributions of UTB and SUL in
        2016/17 could be addressed together, by UTB taking on liability for £2.3 million of
        the debt and SUL for £0.7 million (i.e. UTB contributing £1.6 million more than
        SUL). It was later decided that, instead, £1.6 million of the Charwell loan should be
        novated to UTB, leaving Blades liable to repay £1.4 million. That suggestion was
        rather indelicately put to Mr Alsaady, on behalf of Charwell, who initially was
        uncooperative, with the result that no resolution was achieved in time to avoid a
        temporary embargo on the Club's transfer activity. Had the issue not been resolved
        (as it later was, on 25 July 2017) it could have had a damaging impact on the Club's
        ability to position itself for the new season in the Championship.

77.     After the end of Project Delta there was a period of some weeks leading up to an
        important meeting between Prince Abdullah, Mr Giansiracusa and Kevin McCabe at
        the Grand Resort, Bad Ragaz, Switzerland on 24 July 2017. Detailed communications
        took place in that period between Mr Giansiracusa and Kevin McCabe in relation to
        the restructuring of the boards of Blades and SUFC. Kevin McCabe was very keen to
        see Selahattin Baki and Tareq Hawasli removed as directors. Those communications
        gave rise to a number of misunderstandings and disagreements, in particular about
        Prince Abdullah's prerogative to appoint whomever he wished to be a director of
        Blades or SUFC. In addition, it was clear that Kevin McCabe envisaged Mr Bettis's
        involvement being phased out quickly, as Mr Birks settled in to the COO role, and
        that he should be guided by the McCabes or Prince Abdullah (not Mr Bettis) until he
        was ready to take over as CEO.

78.     In an email of 28 June 2017, Mr Giansiracusa criticised the suggestion that matters
        should carry on in that way and rebuked Kevin McCabe for seeking to interfere in the
        management of the Club. He stated that it had been understood that Mr Bettis would
        remain as a part-time CEO for the forthcoming season and that he and Prince
        Abdullah would be extremely concerned if there was any deviation from that
        understanding. The seeds of the November 2017 breakdown in relations had now
        been sown. They were then watered by constant conflict between Mr Giansiracusa's

THE HONOURABLE MR JUSTICE FANCOURT                                                        UTB LLC v. Sheffield United
Approved Judgment

determination on behalf of Prince Abdullah to impose orthodox corporate governance, allowing the board of SUFC to determine strategy and hold the managers to account, and Kevin McCabe's resistance to that, though the motives of each side in this respect are in dispute.

79.     At Bad Ragaz, the parties discussed: board composition; the senior executive positions at SUFC; rent increases for the Stadium and Academy; the technical committee of the Club, and the Deloitte proposed benchmarking exercise.

80.     The composition of the boards was agreed. Each board would now comprise three appointees of each shareholder and the two boards would be identical.  Prince Abdullah and Mr Giansiracusa would come onto the boards with Mr Hawasli, and Mr Baki being removed; the SUL appointees were to be Scott McCabe, Simon McCabe and Mr Tutton.

81.     No agreement was reached as to whether Mr Bettis would stay as CEO until the end of January 2018 (a weakening of Prince Abdullah's position from the terms of the board resolution of June 2017), the end of August 2017 or mid-September 2017 at the latest (Kevin McCabe's position). But it was agreed that in the meantime Mr Bettis would take steps to prepare Mr Birks to assume the CEO role at the end of the 2017/18 season.  It was also agreed that, if Prince Abdullah required it, the Club must appoint a CFO chosen by the Prince (in accordance with clause 5.11 of the ISA), and that the Club would retain The Savannah Group (executive consultants) to conduct a search for suitable candidates.  However, Kevin McCabe is minuted as requesting Prince Abdullah to reconsider the exercise of his right, as it could be disruptive to Mr Birks. What exactly was said about Mr Bettis at Bad Ragaz is disputed.

82.     The question of rent increases had been raised by SUL once it was suspected that Project Delta would fail, leaving SUL (and UTB) with the need to find cash to fund the following season's business.  The issue was raised by SUL by means of a cashflow forecast for the season, which included a rent of £1.65 million (instead of £310,000) for the Stadium and the Academy.  UTB refused to consider a rent increase, both before the meeting at Bad Ragaz and at it, but Prince Abdullah expressed willingness to address the issue again the following year and stated that if the Club achieved promotion to the Premier League he would be likely to exercise the property call options. (Since the call options only allowed SUFC to exercise the options, not UTB, this must have been on the assumption either that by then UTB would have taken control of SUFC, by one means or another, or that SUL would concur in their exercise.)

83.     There was agreement at Bad Ragaz to re-activate the technical football committee according to the terms of the ISA, but its membership was changed to include a shareholder representative for each side as well as the club manager, the head of football administration (Mr Shieber) and Mr Birks (or the CEO for the time being).

84.     Prince Abdullah was keen to have Deloitte's professional opinion on how well and efficiently Club was being run.  He did not have the right under the ISA to have accountants carry out a review of SUFC's activities, and so was dependent on the agreement of the board (or of Kevin McCabe as the appointor of SUL's board representatives) for such a review to take place. The minutes for Bad Ragaz record that Kevin McCabe did not "agree" that Deloitte should be mandated to carry out the

review (since he had no faith in consultants) but "accepted" that Deloitte should be mandated, and that this acceptance was qualified: "provided that it was postponed until 1st November 2017". After being sent the amended minutes for signing, Kevin McCabe wrote back to Mr Giansiracusa saying "think better wording is '…Accordingly he did not agree to the mandate but was happy to accept it being discussed further in November'". He was immediately challenged on this by Mr Giansiracusa, who said that Kevin McCabe was changing his position. The parties still differ as to what exactly was said about Deloitte at that meeting.

85.    Two days after that, Kevin McCabe asked to see the brief given to Deloitte and asked Prince Abdullah to obtain a competitive quotation for the work from Grant Thornton. Prince Abdullah agreed to send the brief and asked: "if we don't agree on the end, will you stick to your promise in Bad Ragaz about accepting to this even if you Don't agree? [sic]" Kevin McCabe replied: "between now and November I will adhere to our debate in Zurich but at the same time do my utmost to convince you that there's no benefit in spending needless sums in employing so called 'Experts' to tell us how to run an English Football Club". He agreed to instruct Grant Thornton to give a quotation for the work.

86.    Shortly before this, with the agreement of Charwell, £1.6 million of the Charwell loan was novated to UTB. Under the Subscription and Novation Agreement, Blades was released from liability for that amount, UTB assumed liability for that amount and Blades (acting by Mr Tutton) confirmed and agreed that the Charwell loan remained in full force and effect to the extent of a debt of £1.4 million. It was SUL's original pleaded case that this transaction was a disguised gift and therefore a bribe to Prince Abdullah, but that case was all but abandoned at the end of the trial.

87.    On 24 August 2017, Mr Bettis emailed Mr Giansiracusa and told him that Kevin McCabe had expressed a desire not to proceed with the recruitment of a CFO. Mr Giansiracusa told Mr Bettis that SUL had no say on the CFO, since the ISA gave the right to appoint a CFO to UTB, and he instructed Mr Bettis to proceed with The Savannah Group's work in that regard.

88.    On 20 September 2017, Kevin McCabe sent his sons an email expressing the wish that SUL's board representatives would continue to address the disputed issue of the recruitment of a CFO and stating that he had "agreed also with Steve [Bettis] he should step down as CEO as at 31st October". By this stage, Mr Tutton was suggesting to Kevin McCabe (email of 11 September 2017) that, in view of the Project Beta/Delta debacle, SUL could not trust UTB and that Kevin McCabe should refuse to cooperate further until the ISA was amended to provide for, among other things, a rent review. The email ends: "How much time are you prepared to lose with these awful partners?"

89.    Ahead of a board meeting of SUFC due to take place on 26 October 2017, Kevin McCabe sent the SUL appointees (including Mr Bettis, who had by that time been re-appointed a director in place of Scott McCabe) a memorandum expressing his wishes about the stance that should be taken on various issues at the board meeting. As regards the technical football committee, the memorandum records that Kevin McCabe wished to see Jan van Winckel (a Belgian football coach known to Prince Abdullah) replace Mr Baki, though recognising the need to work harmoniously with the team manager in that regard. It states that Kevin McCabe did not wish to see a

21

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

high-ranking new executive appointment made, but rather that Mr Birks and Mr Tutton could bring a new finance person on board at a modest salary. While recognising SUL's right to appoint a CFO, he suggested that it was totally inappropriate to do so at such a high salary, which was unaffordable.

90.    As regards Mr Bettis, the memorandum reads:

> "I suggest Stephen writes to Prince Abdullah and myself confirming that he wishes to step down as CEO as from 31st October but of course retain his position as a Director on the Boards of BLL/SUFC representing SUL."

Since this memorandum was sent to Mr Bettis, it was in effect an instruction to Mr Bettis to tender his resignation.

91.    As regards Deloitte, the memorandum stated that all were as one in reaffirming to Prince Abdullah that there was no point in undertaking a benchmarking exercise of SUFC, and that any costs incurred or to be incurred should not be the responsibility of Blades/SUFC. The memorandum urged the appointees to continue to press on the property rents issue, and it reminded them that the Charwell loan was intended to be phase 1 of Project Delta and was as such a responsibility of Prince Abdullah, so that the residual £1.4 million debt "also remains as his responsibility to the Club in order to extinguish this unforeseen debt". This was an issue that had not previously been raised with Prince Abdullah or anyone else, after Kevin McCabe declined Mr Tutton's suggestion in February 2017 that SUL ought to ask Prince Abdullah to guarantee the Charwell loan, but the memorandum making this assertion (and the other points summarised above and below) was sent to all SUFC directors, including UTB appointees, prior to the board meeting.

92.    Finally, Kevin McCabe stated in the memorandum that there was a clear implication in the stated aim underlying the ISA that Prince Abdullah would secure sufficient finance to get back into the Premier League. There were to be no further funds for SUFC provided by SUL "given current circumstances".

93.    By this time, Kevin McCabe had opened negotiations with Alan Pace of ALK Capital Inc ("ALK") to sell SUL's interest in Blades. UTB had been notified of this interest and a draft non-disclosure agreement was provided to give ALK access to the data room that had been set up.

94.    Against this background, the board meeting of SUFC took place on 26 October. Contrary to Kevin McCabe's instruction, Mr Bettis had not resigned. It is evident from the transcribed recording of the meeting that: UTB did not want Mr Bettis to resign but to continue part-time until the end of the season; Mr Bettis did not want to resign but agreed to do so if that was what either of the owners required, rather than be the cause of disharmony; and that neither Mr Tutton nor Mr Green (the SUL-appointed directors) stated at the meeting that SUL did require Mr Bettis to resign, though Mr Tutton challenged Mr Bettis's ability to do the job properly even on a part-time basis. The proper interpretation of what happened at this meeting, against the background leading up to it, is a matter of dispute between the parties, though it is common ground that no matter was voted upon. Kevin McCabe's understanding (though he was not at the board meeting) was that Mr Bettis was to stop working for

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

SUFC on 31 October 2017. UTB's understanding (both Prince Abdullah and Mr Giansiracusa were at the meeting) was that the question was unresolved.

95.    As regards the Deloitte benchmarking, Mr Giansiracusa again explained why the work was required and Mr Tutton agreed to raise the matter again with Kevin McCabe, but no further decision was made. There was however unanimous agreement that Mr van Winckel would be a suitable replacement for Mr Baki on the technical committee, and Mr Bettis agreed to discuss Mr van Winckel's financial terms with Kevin McCabe. Mr Tutton raised once more the question of rent review, to which Mr Giansiracusa responded that "the rent would be reviewed in good faith if and when the club attained [Premier League] status, but whilst deficits existed UTB would stand behind the legal agreement". The suggestion that the balance of the Charwell loan was the liability of Prince Abdullah was rejected by both the Prince and Mr Giansiracusa.

96.    Following the board meeting, Scott McCabe and Mr Tutton exchanged emails about Mr Bettis. Scott McCabe said that his father had asked him to establish whether Mr Bettis was "off the SU payroll", to which Mr Tutton replied: "no far from it". Scott McCabe then asked: "does Stephen want to remain in title/position?", to which the reply was: "of course he does". "And salaried?" "He thinks he is on half salary at his current rate". It would therefore have been clear to Kevin McCabe then that Mr Bettis had not resigned and wished to remain in position.

97.    Prince Abdullah and Kevin McCabe met at the Corinthia Hotel on 1 November 2017 for a "clear the air" meeting. Emails exchanged after the meeting show that Kevin McCabe confirmed UTB's decision to proceed with Deloitte and accepted it, and that it was agreed that Mr van Winckel would work for three months on a probationary consultancy arrangement, with the precise role and terms to be confirmed.

98.    Oddly, the resignation or continuation in office of Mr Bettis appears not to have been discussed at the Corinthia Hotel. Neither did Kevin McCabe tell Prince Abdullah what he had instigated as regards Mr Bettis the day before their meeting. This was to remove Mr Bettis from the SUFC payroll without notifying anyone (including Mr Bettis) other than Mr Birks and Mr Tutton, who were instrumental in stopping Mr Bettis's pay. The sequence was as follows:

    i)    On 31 October 2017, Kevin McCabe emailed Mr Birks on a private and confidential basis, copied to no one, saying:

          "as I believe you're aware Steve B steps down as an assumed CEO of SUFC as from close of play today. This accords with sensible discussions that Steve and myself have held over a good few weeks/months... Now you've settled in very well to your COO duties and responsibilities then as in past months where you need guidance and direction then I'm always to hand and am available in an 'untitled CEO type role' to help. So please request Neal Barber to remove him from the payroll as from the end of October."

    ii)   The following day, Mr Birks replied:

                                                                                              23

THE HONOURABLE MR JUSTICE FANCOURT                                          UTB LLC v. Sheffield United
Approved Judgment

> "... In order to stop his pay, technically HR need a letter or an
> email confirming his resignation or otherwise we can be
> accused of constructive (not that he would) dismissal. Is this
> possible?"

iii)   Kevin McCabe responded:

> "not needed. Speak tomorrow"

iv)   On 6 November 2017, Mr Tutton emailed Mr Birks, on Kevin McCabe's
instruction, copying in no one else:

> "further to your telephone request please accept this email, in
> my capacity as Director of SUFC, and remove Stephen Bettis
> from the SUFC payroll as from 31 October 2017."

99.   The result was that Mr Bettis's pay was stopped, but neither he nor the UTB directors
were told about it. Mr Bettis continued to work (the amount of work he did is
disputed) during November without realising that he was not going to be paid.
SUFC's head of HR was only obliquely informed that Mr Bettis's status had been
changed by SUL when she emailed him (copied to four other directors) about a
proposed contract of employment for the new CFO, Simon Ratcliffe. Mr Tutton
replied (copied to no one):

> "I am perplexed by this, why are you dealing with Stephen
> Bettis since he has stepped down from his CEO role which he
> has clearly been unable to fulfil since he moved abroad?"

Prince Abdullah and Mr Giansiracusa first learned of what Kevin McCabe had done
when Mr Bettis complained to them, in an email of 30 November 2017, that he had
only just discovered that he had been working for a month and would not be paid.

100.   On 8 November 2017, Kevin McCabe emailed Mr Giansiracusa stating that the
mandate to Deloitte:

> "... should not be triggered at this particularly busy period of
> the year and critical time for first-team football. Logic says that
> once the mandate is understood and approved then February
> would seem to be more appropriate giving Andy and his key
> people time to prepare."

In his reply on 11 November Prince Abdullah said:

> "I have to be frank with you, if after what we agreed on our last
> meeting in London regarding Jan and Deloitte doesn't start this
> week, I see it very difficult that we can work on any thing
> together, I hope both of these things move forward this week."

There was subsequently no movement on either from SUL.

101.   On 10 November 2017, Mr van Winckel had emailed Prince Abdullah, after meeting
Kevin McCabe, to say that he considered that Kevin McCabe was seeking to postpone

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

Mr van Winckel's appointment on the grounds that it would disrupt the momentum that had been developed at the Club. Kevin McCabe wrote to Prince Abdullah two days later and said:

> "I like Jan… However at SUFC we have a very 'British cultured' + 'Sheffield centric' football management team… Let matters rest until the end of this season and then we can sensibly readdress."

The following week, Kevin McCabe emailed Mr van Winckel telling him that his attendance at the Club was contradicting Kevin McCabe's decision, and telling him not to interfere with the smooth running of the Club and to let colleagues concentrate on their jobs without distraction. Later, he told Prince Abdullah in an email that Mr van Winckel could not now be appointed to the technical committee or be employed in any shape or form by the Club.

102.   By mid-November 2017, Mr Ratcliffe had been identified as the preferred candidate for appointment as CFO. On 14 November, Mr Birks emailed Mr Giansiracusa requesting clarification:

> "in order for Catherine [Frost] to send out the offer letter to Simon Ratcliffe, we need confirmation of the reporting line please. I have attached the new starter authorisation form but need this information to complete the form…"

103.   Mr Giansiracusa replied on 15 November, copying in Mr Bettis:

> "regarding the reporting lines, Simon will have a solid line to UTB (Prince Abdullah) and a dotted line to the CEO. The Investment Agreement mandates only the solid line but I think a dotted line to the CEO is good corporate governance and UTB agrees."

A similar email, with an explanation, was sent to Ms Frost and Mr Bettis, copied to Mr Tutton. Ms Frost had prepared a draft offer letter, stating that Mr Ratcliffe would be directly responsible to the CEO and the board of SUFC, and copied in Mr Tutton, among others. Mr Tutton forwarded it to Kevin McCabe (saying "this is moving fast") and shortly afterwards received from Mr Birks Mr Giansiracusa's email about reporting lines, which was similarly forwarded by him to Kevin McCabe. As a result, Kevin McCabe attended Bramall Lane that afternoon (he had been in London but was planning to travel to Sheffield that day in any event) and a meeting took place with Ms Frost and Mr Tutton.

104.   As a result of that meeting, Ms Frost amended the offer letter and draft contract so that Mr Ratcliffe was to report to the COO, i.e. Mr Birks, not the CEO, as instructed by Mr Giansiracusa, who no longer existed at the Club so far as Kevin McCabe and Mr Tutton were concerned. No further change was made by Ms Frost to the reporting lines. However, Ms Frost copied the amended letter and contract to all the SUFC directors and indicated that Kevin McCabe had required changes to be made. As a result, Mr Giansiracusa discovered that Kevin McCabe had intervened in the preparation of the contract. He drew Kevin McCabe's attention to clause 5.11 of the

25

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

ISA, which entitled UTB to appoint a CFO, and stated that he was wrong to interfere and that any further interference on this issue would represent a breach of the ISA. The email was copied to Ms Frost.

105.    Kevin McCabe responded:

> "you're a gentleman who certainly lacks grace and has of yet learnt so little as to understanding the business of Sheffield United FC. This in part is emphasised by sending your email to Catherine an employee of the club creating confusion and at the same time besmirching myself… My direction and leadership is always to benefit SUFC and my partner and does not waver as Prince Abdullah recognises."

He added that Mr Giansiracusa should have the bravery to pick up the phone and not dictate email traffic that indicated a desire to create disputes. This email was copied to Prince Abdullah and the directors of Blades.

106.    Prince Abdullah responded to this the same day:

> "i have had the pleasure of knowing Yusuf for over 20 years, I can honestly from experience say that he has more grace than most of the people I met all my life, he is also a man of his word, classy, intelligent and educated, above all he is a good Muslim, as for our partnership, it is obviously deteriorating to the point I'm afraid it is very difficult to fix, he is only communicating with you via email because meetings as I tried many times is not working, i got your ok in Bad ragaz for Deloitte a few months ago. i met you with you again in London three weeks ago and you gave your word and agreed to Deloitte and Jan and that didn't happen yet, please be sure that things will not continue as they were before and time will prove that, i will not be writing to you anymore."

107.    Following those exchanges (and before Prince Abdullah and Mr Giansiracusa became aware that Mr Bettis's pay had been stopped), Mr Giansiracusa sent a detailed response to Kevin McCabe's email on 19 November 2017. The response had been considered by those on the UTB side. It characterised Kevin McCabe's interference in Mr Ratcliffe's appointment as "duplicitous" and a blatant attempt to deceive UTB. The email referred to Kevin McCabe's "seemingly uncontrollable insistence on meddling in matters which neither concern you nor benefit from your involvement". It accused Kevin McCabe of being a bully and refusing to compromise, yet lacking the intellectual integrity to make out an argument. The email criticised Kevin McCabe for going back on his promises in relation to Deloitte and Mr van Winckel:

> "when a person has integrity, when his word is his bond, a handshake is enough. This is how Prince Abdullah usually operates and it usually serves him quite well. Regrettably, it is no longer how we can do business with you. When a person manipulates facts to serve his purpose, promises one thing and then does another and in general, openly and notoriously flouts

the truth, then those around him would be foolish not to put things in writing. We are not foolish people and you have only your own weak grasp on honesty to blame for the fact that we want everything in writing...

In short, if you cannot act as a constructive and co-operative partner, we shall likewise stop indulging you in what has proven to be a misguided effort at achieving informal consensus and require that all directions to management be given through formal board processes. If, on reconsideration, you wish to preserve a more harmonious and co-operative working relationship, you will withdraw any objections to the Deloitte mandate and will allow Prince Abdullah to manage Jan [van Winckel]'s retention as a consultant. We do not need you to 'promote' anything or be otherwise involved ...

While I am under no illusion that this will be seen as a welcome or friendly communication, let me close by emphasising that despite your disruptive and frequently malignant behaviour, we, as your partners, have no such instincts. We respect the people you have around you, including Jeremy, Stephen and Martin, while accepting their duty of loyalty to SUL. We bear no animus and seek nothing but the best interests of the Club and the benefit of our bargain for rights under the [ISA]. While we are neither petty nor vindictive, please do not underestimate our resolve. We will take counsel given in good faith from all quarters but we shall no longer tolerate your version of business as usual. "

This email was tough and uncompromising in its language: probably more personally offensive than it needed to be to convey the message that it conveyed. It does reflect UTB's anger at the way that (as it perceived it) Kevin McCabe had reneged on commitments that he had made to Prince Abdullah and was seeking to interfere in UTB's exercise of its rights under the ISA. What UTB and SUL were each seeking to achieve at this time are matters that are hotly disputed.

108.   In response to Prince Abdullah, Kevin McCabe characterised Mr Giansiracusa's email as "long winded" and "disrespectful and threatening". He expressed himself to be at a loss as to why there was so much infighting when business on and off the field was performing well. He said:

"by the way I'm not 'interfering or meddling' - my remarks are always meant to help as SUFC's business is in Sheffield, England not Riyadh, Saudi Arabia where managing people is not best achieved via 'edicts and resolutions' produced as if the recipients are subservient. It's accomplished by adapting to our culture and being present, talking and explaining. To my knowledge Yusuf has only been to Sheffield twice so he cannot possibly have an affiliation with SUFC personnel."

109.   Kevin McCabe told Mr Giansiracusa in reply that he had no desire to have further dialogue with him and wished to know whether his "edict demanding missive" was written as a legal adviser on behalf of Prince Abdullah, directors of UTB or directors of Blades/SUFC, or written in his capacity as a director of Blades/SUFC. He added:

> "the partnership between Prince Abdullah and myself relates to a Football Club that has for 162 years been situated in Sheffield, England. The culture of individuals from the North of England is naturally far different from those based and living in Riyadh, Saudi Arabia. We are not subservient people who respond to 'edicts demands and resolutions' in a fearful way. The 'need for change' rests with you as should always have been apparent to an experienced professional businessman."

110.   On 24 November 2017, Kevin McCabe sent Prince Abdullah a further email referring to various points discussed at the Corinthia Hotel on 1 November 2017. He suggested that the Deloitte exercise was underway, even though he didn't agree with it, but that the proposals for Mr van Winckel's involvement on the technical committee could not now be agreed by him as it would be detrimental to the club. In fact, the Deloitte exercise was not underway. Kevin McCabe said in evidence that he had spoken to Deloitte in Manchester about the possibility of starting work in February 2018. As for Mr van Winckel, Kevin McCabe wrote to the SUL directors the next day, stating:

> "... There's only one issue that for the moment needs to be firmly addressed and thus confirmed by you as Directors of SUFC namely to confirm that Jan van Winckel does not have our approval to sit as a member of the clubs Technical Committee or in any shape or form be employed - directly or as a consultant - by the club. Can I assume you're all in agreement?"

111.   Later that day, Kevin McCabe emailed Mr Bettis stating that he had received confirmation from Mr Green and Mr Tutton regarding Mr van Winckel and would be grateful for Mr Bettis's reply that Mr van Winckel was not needed. He added: "sense that this will bring the dispute with HRH to a head".

112.   Shortly after this, Kevin McCabe received a proposal from Mr Pace at ALK in America relating to the acquisition of up to 90% of SUFC. This proposal was a response to a previous proposal made by Kevin McCabe to Mr Pace. Between 1 and 3 December 2017, Kevin McCabe and Mr Tutton discussed proposed heads of terms that included an initial advance of £10 million by ALK to allow SUL to serve a call option notice on UTB under clause 11 of the ISA. Kevin McCabe proposed buying out UTB's interest so that ALK and SUL could together seek to promote the Club's interests and reunite the property assets with the Club, with a view to ALK taking in due course an 85% stake of both. He explained the terms of clause 9.1.12 and clause 11 of the ISA to Mr Pace, pointing out that the clause 9.1.12 mechanism requiring SUFC to exercise the property call options was drafted for SUL's benefit and that it was potentially onerous for UTB because they would have the "headache" of procuring the substantial monies required to pay for the property assets. He expressed the view that, in view of UTB's past reluctance to "go for it", a "modest but sensible and respectful offer" would suffice to obtain full control of the Club. Draft heads of

28

terms followed the next day for an initial sale and purchase of 60% of the shares in Blades with an option to acquire up to 85%, the price for the shares to be agreed and the price for the property assets to be market value.

113. On the same day that the draft heads of terms were sent to Mr Pace, Kevin McCabe sent Prince Abdullah a further email, asking whether it was UTB's intention to litigate against SUL and expressing the view that the relationship with UTB was not working ("your colleagues – including new appointment Jan – are nowhere near either understanding or managing SUFC's day to day business operations on and off the field of play"), that there were decisions to be made and that he and Prince Abdullah should meet before Christmas.

114. On 12 December 2017, Kevin McCabe emailed Prince Abdullah seeking to convene a Blades board meeting on 11/12 January 2018 in Sheffield and informing him that the McCabes would again become directors of Blades and SUFC. On the same day Mr Bettis sent Prince Abdullah and Mr Giansiracusa formal notice of his resignation as CEO, following his discovery that his pay had been stopped at the direction of Kevin McCabe. Also on the same day, Mr Giansiracusa sought to give notice to the directors of SUFC, Mr Birks and Mr Ratcliffe of an emergency board meeting of SUFC to take place on 18 December 2017 to consider the recent conduct of Kevin McCabe, to reaffirm Mr Bettis's status, to discuss steps to enhance and assure compliance with the ISA, establish proper reporting lines and discuss the Club's plan for the January 2018 transfer window. The proposed resolutions included apologising to Mr Bettis, Mr Birks and Ms Frost for what had happened.

115. Mr Tutton on behalf of SUL objected to the notice calling for an emergency meeting (and its contents). On the same day, he sent revised heads of terms to Mr Pace suggesting that a conference call should take place early the following week to finalise them "as we are keen to trigger the Call Option with UTB LLC as soon as possible". The revised heads of terms still included a £10 million cash facility, to fund the acquisition of UTB's shares, and ALK would pay a further £7 million for its 85% holding, fund the club in future, and pay higher rents for the principal property assets with a five-year option to acquire the property assets at an aggregate price of about £66 million, or such other amount as might be agreed.

116. On 17 December 2017, Mr Giansiracusa sent Kevin McCabe a more conciliatory email, suggesting that they ought to be able to work together constructively, but without Kevin McCabe expecting to get his way by using brute force. He expressed a wish to move forward and to discuss and address issues in a mutually respectful way. The email pointed out that the alternative, a trajectory of confrontation, was one in which SUL could expect to see its commercial interests adversely affected in various ways. By way of brief response, Kevin McCabe agreed to speak to Mr Giansiracusa the following day.

117. In the event it appears that they spoke on 20 December 2017. Before then, Kevin McCabe and Mr Tutton had exchanged emails about the tactics for exercising the call option on UTB's shares. Mr Tutton proposed offering to subscribe under the ISA for £5 million of new capital, to see whether UTB was in a position to offer to match it, to maintain equality. He said: "if they say they can match we know we should just go for the Texas shoot out at our higher end of £10m – If they cannot match we go in at a much lower price". Kevin McCabe replied stating that it potentially was a wise move

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment                                                    UTB LLC v. Sheffield United

and that he would discuss quietly with the club manager the January transfer window requirements as a proper reason for "upping the ante by investing above the agreed £1m".

118.   On 20 December 2017, Mr Giansiracusa emailed Prince Abdullah in the following terms:

> "I'll fill in the colour when we talk. KM and I spoke for over an hour. It was much more productive than I had expected. Not so much on Jan or Deloitte but on longer-term issues.
>
> KM says he wants to sell but wants the real estate to be part of the deal. The concept he offered is this:
>
> 1. Purchase price for 100% of SUL's shares of BLL = £10 million
>
> 2. Fair market rent for Bramall Lane and the Academy
>
> 3. Purchase of Bramall Lane with payment over 3-5 years
>
> 4. Purchase of other real estate within 5-6 years
>
> obviously an opening offer but he seemed to be in a mood to exit and he clearly and thought about it [sic]
>
> We agreed that he would keep up the discussion with me. I told him you were upset about his behaviour and didn't want to speak with him but that I'd convey to you whatever KM and I discussed. We agreed to keep this among the three of us for now "

119.   Notwithstanding that offer to sell the SUL shares, Kevin McCabe was preparing to serve a call option notice. On 22 December 2017, Mr Tutton sent a draft notice with a price of 30.12p per share, resulting in an aggregate price of £5 million.

120.   On 23 December 2017, Kevin McCabe emailed Mr Pace with festive greetings stating:

> "working on the Sharp proposals over the holiday period as instinct tells me Prince Abdullah realises it's best for him to depart. Thus with the importance of the January transfer window - which brings with it decision-making re-new players etc. - dealing now seems sensible. I'll keep you posted as matters progress and reaffirm we are up for Sharp to knock the transaction in place during the coming weeks."

"Sharp" was the agreed name given by the negotiating parties to the proposed acquisition by ALK of control of SUFC.

121.   On 29 December 2017, a call option notice pursuant to clause 11 of the ISA was served on UTB, under which (in accordance with its terms) SUL offered to buy

30

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

UTB's shares at 30.12p each and also offered to sell their shares to UTB at the same price ("the Call Option Notice"). A completion date of 2pm on 6 February 2018 was specified. No prior notice to UTB of SUL's intention to serve the Call Option Notice had been given.

122. So far as SUL was concerned, the die was now cast and matters were out of its control. UTB had the power either to sell for £5 million or to accept the alternative offer and buy SUL's shares for the same price. As UTB was by this time aware, an acceptance of the alternative offer would trigger the obligation in clause 9.1.12 of the ISA and require SUFC to exercise the property call options. That in turn would require SUFC (controlled by UTB) to pay for the property assets within 12 months.

123. On 10 January 2018, Prince Abdullah decided to accept the alternative offer. But UTB did not serve a counternotice at that time. It waited until the last working day before the contractual deadline for service of a counternotice, namely 26 January 2018. Before that date arrived, UTB took a number of steps with a view to defeating the operation of clause 9.1.12 of the ISA upon completion of the share sale.

   i)   On 22 January 2018, UTB and Mr Giansiracusa entered into a written agreement, under which Mr Giansiracusa agreed to buy for £3,000,000 60 percent of the shares to be acquired by UTB from SUL and UTB agreed to ensure that these shares were transferred by SUL to Mr Giansiracusa on completion. The agreement gave Mr Giansiracusa a put option to sell all or a proportion of the shares to UTB and UTB a call option to acquire the shares from Mr Giansiracusa.

   ii)  On the same day, Prince Abdullah's lawyers caused to be incorporated a company in Nevis called UTB 2018 LLC ("UTB 2018").

   iii) On 24 January 2018, a stock transfer form was executed by UTB for the transfer of 13,280,000 shares in Blades, amounting to 80% of its existing holding in Blades (40% of the Blades share capital) to UTB 2018 for the expressed consideration of £1. The stock transfer form was signed on behalf of UTB by Mr Giansiracusa. On the same day, UTB and UTB 2018 executed a deed of adherence in accordance with the form annexed to the ISA, by which UTB 2018 covenanted with the parties to the ISA to comply with its terms.

   iv)  On 25 January 2018, Jones Day on behalf of UTB sent Mr Tutton as secretary of Blades the stock transfer form and the deed of adherence. The email stated that UTB 2018 was under the control of Prince Abdullah and that the transfer was therefore permitted under the articles of association of Blades. The email asked Mr Tutton to write up the transfer in the register of members as soon as possible. Mr Tutton in response raised some questions about UTB 2018 and pointed out that the deed of adherence needed to be revised, given that UTB was going to remain a shareholder of Blades. He asked what the reason was for the transfer and whether a counternotice was to be served by UTB to the Call Option Notice.

124. Before UTB's counternotice was served on 26 January 2018 ("the Counternotice") the solicitors acting for SUL emailed Mr Giansiracusa, asking whether he could confirm that (as they had been advised) it was UTB's intention to serve a counternotice. Mr

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

Giansiracusa replied the following day (25 January) stating: "I don't have instructions from my client. You'll be notified if and when I do." When it was served the following day, the Counternotice confirmed a completion time of 2pm on 6 February 2018.

125.    After service of the Counternotice, Mr Tutton and Jones Day agreed that the deed of adherence should be amended to remove the reference to the release of UTB from the terms of the ISA.

126.    On 29 January 2018, an undated written agreement was prepared, under which Prince Musa'ad agreed to buy for £1,000,000 20% of the shares to be acquired by UTB from SUL (on terms similar to those of the agreement made with Mr Giansiracusa on 22 January) and it was sent to Prince Musa'ad. It was apparently signed on a different version of the document by Prince Abdullah's son, Prince Abdulrahman, on behalf of UTB.

127.    On 30 January 2018, SUL's solicitors wrote to the directors of SUFC contending that UTB had acquired all of the share capital of Blades, on the basis that it remained the legal registered owner of its own 50% of the shares and had acquired a beneficial interest in SUL's 50%. The letter stated that the directors were required to execute and serve option notices under clause 9.1.12 of the ISA in relation to all the property assets on or before 4pm on 1 February 2018, and pointed out that a failure to do so would be construed as a refusal and a breach of clause 9.1.12.

128.    On the same day, Prince Abdullah emailed his fellow directors:

> "please be advised that Jones Day will be writing to the directors tomorrow on behalf of UTB LLC responding to Shepherd and Wedderburn's letter. The position as set out in the Shepherd and Wedderburn letter is not accepted. In the meantime, I am advised that no action should be taken by the board or any individual director on behalf of the board to execute and serve the option notices to which Shepherd and Wedderburn refer in their letter nor should any other precipitous action be taken in this regard. If any such action were to be taken, particularly without the agreement of a majority of the board, I am advised that this would constitute a breach of the duties we have as directors."

The following day, 31 January 2018, Jones Day wrote to the SUFC directors to the same effect, disagreeing that the obligation under clause 9.1.12 had been triggered and stating that a dispute existed between SUL and UTB. They stated that until such time as Jones Day confirmed that the obligation had been triggered, or a majority of the board of SUFC resolved to execute option notices, the directors must not take any action in that regard. The letter then reminded the directors of their fiduciary and statutory duties, warning that UTB would treat very seriously any action taken by an individual director to execute and serve option notices.

129.    The transfer of UTB's shares to UTB 2018 was not registered by Blades. Completion of the sale and purchase of SUL's shares did not take place and no property option notices were executed. On 6 February 2018, Shepherd & Wedderburn purported to

UTB LLC v. Sheffield United

terminate the ISA and the contract of sale and purchase. UTB issued proceedings on 9 February 2018.

130.    After the proceedings had been issued and legal battle was joined, SUFC continued to suffer severe financial difficulties. £1.4 million had to be repaid to Charwell by 30 April 2018. The parties could not agree how that money would be raised. In the event, each of SUL and UTB provided a loan of £1,000,000 to Blades, but only after an application to the court had been issued by SUL to be heard urgently on 30 April 2018. Blades repaid its £1.4 million on time. UTB was unable to repay £1.6 million to Charwell, though it did prepay £100,000 on 12 April 2018. The remainder of UTB's debt was not repaid until 25 June 2018.

131.    By that time, SUFC had a further funding crisis necessitating another application to the court. The parties were unable to agree whether each should give or lend a further £1 million Blades, despite their having agreed at a board meeting in May 2018 that they would contribute equally to the deficit in the 2018/19 season. SUL sought an order compelling UTB to lend £1 million. I declined to make that order in June 2018 on the basis that further funding was not as it turned out absolutely necessary, given the recent sale of a valuable player.

132.    There was no evidence about how the Club's deficit was in fact funded during the 2018/19 season. It may be that player sales covered the deficit, or that the shareholders contributed equally whatever funds were needed, in accordance with the board resolution. There is no evidence or suggestion that SUL injected further capital or made loans that were not matched by UTB, or vice versa. On any view, SUFC was clearly surviving on a tight budget, with both shareholders unwilling to invest or lend more than was necessary to keep the Club afloat. In those circumstances, it is remarkable -- and likely to be to the credit of the Club manager and the independent executive team headed by Mr Bettis (who returned to the position of CEO in the summer of 2018) – that the Club secured automatic promotion to the Premier League in April 2019, shortly before the start of the trial.

133.    On 25 April 2019, two weeks before the start of the trial, Jones Day on behalf of UTB and UTB 2018 wrote to Shepherd & Wedderburn giving their consent to the exercise of the property call options by SUFC, subject to formal confirmation that the Club was promoted. Promotion to the Premier League meant that SUFC would have hugely increased revenue during and before the 2019/20 season and could therefore afford to buy the property assets. UTB sought SUL's confirmation that a board meeting of SUFC should take place to resolve to exercise the options. This was done during the course of the trial and the options were then exercised.

C.    The ISA: Quasi-partnership and Implied Terms

134.    SUL's case (in brief outline) is that UTB (and Prince Abdullah and Mr Giansiracusa personally) acted unlawfully in the period from November 2017 to January 2018, contrary to the terms of the ISA and its duty to act in good faith and fairly and to seek to work in co-operation with SUL to achieve the objectives of the ISA, and instead acted in a manner unfairly prejudicial to the interests of SUL as a shareholder of Blades.

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

135.   A substantial part of SUL's case depends on there being an obligation on UTB to act
       in good faith, fairly and openly towards SUL.  There is no such express obligation,
       either in the articles of association or in the terms of the ISA.  There is no assertion by
       SUL of a collateral contract to that effect.  SUL contends that nevertheless the
       obligation exists and that UTB breached it by seeking to drive SUL out of the joint
       ownership of Blades and by seeking to deprive SUL of its rights under clause 9.1.12
       of the ISA.

136.   The alleged obligation of good faith is said to arise in two distinct ways.

137.   First, SUL contends that Blades is a quasi-partnership, not just a company limited by
       shares where the rights of its shareholders are as stated in the articles of association
       and the ISA.  If Blades is a quasi-partnership then the shareholders (UTB and SUL)
       owe each other equitable obligations of trust and confidence, openness and fair
       dealing, and of good faith, in the same way as partners of a partnership owe each
       other such duties.

138.   Second, SUL contends that the ISA is a 'relational' contract between UTB and SUL,
       such that as a matter of law there is implied into the contract an obligation on each
       party to deal fairly and act in good faith towards the other.

139.   If either of those arguments succeeds, SUL argues that UTB was in dereliction of
       those duties: first, in its sustained attack on Kevin McCabe in November and
       December 2017 that was calculated to end their cooperation, and, second, in the way
       in which UTB devised and sought to hide until the last minute its scheme to avoid the
       obligations in clause 9.1.12 being triggered upon purchase of the shares of SUL.

140.   In addition to arguing for an implied obligation of good faith, SUL says that further
       terms are to be implied into the ISA if they are not express terms, namely:

       i)     A shareholder may not transfer part only of its shareholding in Blades;

       ii)    A shareholder must not wilfully obstruct or hinder the re-unification of the
              property assets pursuant to clause 9.1.12 of the ISA;

       iii)   A recipient of a call option notice under clause 11 of the ISA must not allow
              its shares to be encumbered or otherwise act to prevent it from being able to
              transfer its shares free from any incumbrances on completion;

       iv)    Following receipt of a call option notice, the recipient must not take any step
              that would materially diminish the value of the other party's (the offeror's)
              shares, and

       v)     No party to the ISA must deliberately prevent or hinder any other party from
              fulfilling its obligations under the ISA.

(i) The express terms of the ISA

141.   In order to address these arguments, it is necessary to examine in detail the
       contractual basis of the parties' venture.  Although heads of terms and a term sheet

34

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

were agreed and exchanged during the summer of 2013, the contractual terms that the parties agreed are contained in the bespoke articles of association of Blades and the ISA. The rights of the parties as shareholders in Blades are also impacted by the subordinate documents made between companies in the Scarborough Group and SUFC: the new leases of the property assets and the property call options that SUFC was granted.

142.    The articles of association govern, materially, the basis on which shares in Blades could be assigned and the rules for convening and holding board meetings of Blades. Article 49.1 provides that the company is not concerned with any beneficial interests in its shares and article 62.4 that a transferor of a share remains the holder of the share until the transferee's name is registered. The articles entitle a shareholder to sell its shares, subject to pre-emption provisions in favour of existing shareholders; but, under article 9.1, these restrictions on a transfer of shares do not apply to a transfer to certain categories of transferee, including a "privileged relation", a family trust, a nominee or bare trustee and a company controlled by the shareholder. In the last case, a company controlled by Prince Abdullah or by Kevin McCabe is deemed to be a company controlled by UTB and SUL respectively. Article 62.5 provides that the directors of the company may only refuse to register a transfer in limited circumstances (none of which is relevant in this case) and by article 62.6 any refusal to register must be notified with reasons within 30 days of the transfer being lodged.

143.    By article 13, subject to the power to delegate, the management of Blades is a matter for its directors, and by article 17 decisions of the directors, unless taken unanimously, are to be by majority decision at a meeting (unless the company at any time has only one director). A quorum of two directors (at least one appointed by each of SUL and UTB) is required. The chairman is chosen by the directors at the meeting and has no casting vote.

144.    The ISA is expressed to prevail in the case of any conflict or inconsistency between its terms and the articles (cl. 25), and the defined terms in the articles apply also in the ISA.

145.    As previously noted (para 29 above), the parties' overriding objectives (promotion to the Premier League and reunification of Club and property assets) are set out in recital (B). Recital (C) states that the ISA sets out the terms on which UTB is investing in Blades and regulates the basis on which Blades and SUFC shall be operated. That is reinforced by clause 26, which provides:

> "This Agreement, the documents in the Agreed Form and all agreements entered, or to be entered into, pursuant to the terms of this Agreement or entered into between the parties in writing and expressly referring to this Agreement:
>
> 26.1.1 together constitute the entire agreement and understanding between the parties with respect to the subject matter of this Agreement; and
>
> 26.1.2 (in relation to such subject matter) supersede all prior discussions, understandings and agreements between the parties and their agents (or any of them) and all prior representations

35

and expressions of opinion by any party (or its agent) to any
other party (or its agent). "

146.  Clause 28.1 provides that a waiver of any term, provision or condition of the ISA
shall be effective only if given in writing and signed by the waiving or consenting
party. Clause 28.4 provides that any variation of the ISA is valid only if it is in writing
and signed by all the parties.

147.  Clause 24 provides that nothing in the ISA is to be deemed to constitute a partnership
between the parties or any of them.

148.  By clause 2.3, UTB's subscription monies were to be made available by Blades to
SUFC solely for the Improved Performance Purpose, which was improving the on-
pitch performance of the SUFC first team. That was therefore consonant with the
overriding objective of achieving promotion to the Premier League.

149.  Clause 5 specifies how the board and the shareholders are to conduct the business of
Blades and SUFC. The board was not to have responsibility for the management of
Blades and its business to the extent of matters specified in schedule 3 as requiring
Investor Consent. Thus, a number of important matters were to be subject to a veto by
UTB. These include: the adoption of any operating budget that includes any line item
more than 10% ahead of the previous year's actual results, or that reflected negative
free cash flow; the admission of any new shareholder into Blades or any member of
the Blades group of companies; any material activity outside the Business Plan; any
expenditure outside the annual Player Transfer/Management Protocol; and the
initiation of any litigation or claim. Similarly, various matters were specified in
schedule 4 as requiring either the approval of a majority of shareholders' or a
supermajority of shareholders' votes. The board could not, in the conduct of the
ordinary business of Blades, override these matters. Each of UTB and SUL was
therefore in practical terms given a veto in relation to these matters, which include:
the making of any loan by or to the company, other than by its bankers in the course
of ordinary business; any transaction other than by way of bargain at arm's length
upon normal commercial terms; transactions involving expenditure of more than
£50,000; any distribution; the appointment of any employee earning in excess of
£40,000 a year; and the delegation of any matter to a committee.

150.  While there was no majority shareholder the board was deadlocked, with each
shareholder having the right to appoint four directors, with no more than eight
directors in total permitted. A resolution could not be passed at a board meeting
without at least one director appointed by each shareholder being present. If either
shareholder had appointed fewer than the permitted maximum number of directors, or
a director so appointed was absent, the directors present at the meeting would
nevertheless have the full number of votes that the maximum permitted number of
directors would have had if they had been in attendance (clause 5.10).

151.  By clause 5.11, UTB alone was given the power to appoint its choice to the office of
Finance Director of Blades and SUFC and to agree the terms of appointment of such
person on behalf of the companies. The Finance Director was an ex officio member of
the Technical Football Board, alongside the CEO of SUFC, the Head of Football
Operations and the Team Manager.

THE HONOURABLE MR JUSTICE FANCOURT                                          UTB LLC v. Sheffield United
Approved Judgment

152.   Unlike in the pre-contract documents exchanged, the ISA imposed no obligation on
       UTB or SUL to inject further capital or make loans to the companies.  Clause 6.1
       provides:

              "The Shareholders acknowledge that, in addition to the
              subscription monies referred to in clause 2.2, the Company may
              require further finance to fund its and SUFC's projected cash
              requirements under the Business Plan. The parties agree that
              each of [SUL] and [UTB] has the right to subscribe for further
              shares in the Company for cash at any time, subject to pre-
              emption rights on the issue of new shares in the share capital of
              the Company, provided that the right to do so shall cease for so
              long as: (i) either Shareholder holds, or will following the issue
              of such shares hold, 75% or more of the fully diluted share
              capital; or (ii) Sheffield United football club is in the English
              Premier League (or any successor thereof)."

       Clause 6.2 fixed the price at which any such further subscription be made. By clause
       6.5, any subscription that would result in a shareholder holding 75% or more of the
       issued share capital required the written approval of both shareholders.

153.   By clause 8, Blades undertook to the shareholders that it would (and the shareholders
       were to exercise their voting rights and powers of control to that end): prepare and
       deliver a draft Business Plan and a draft Player Transfer/Management Protocol by a
       specified time each year; prepare and provide management accounts and audited
       accounts; deliver to the shareholders monthly Technical Football Board reports.

154.   By clause 9, Blades gave further undertakings to SUL and UTB and the shareholders
       were to exercise their voting rights accordingly in various respects. These included
       procuring that none of the matters set out in schedule 3 occurred in relation to any
       Blades company without the consent of UTB; that none of the matters set out in
       schedule 4 occurred in relation to any Blades company without either supermajority
       shareholder consent or majority shareholder consent, as the case may be, and most
       importantly:

              "**on any Shareholder acquiring 75% or more of the entire
              issued share capital of the Company, SUFC shall be
              compelled to exercise and each party hereby authorises and
              instructs SUFC to forthwith execute and serve Option
              Notices in respect of each and every Property Call Option
              on the date that the shareholder acquires 75% or more of
              the entire issued share capital of the Company, unless each
              of [SUL] and [UTB] agree otherwise**" (clause 9.1.12).

155.   Clause 10 of the ISA contains the deadlock provisions. Deadlock exists where the
       shareholders are unable to arrive at a decision on any matter that a shareholder
       reasonably considers to be fundamental to the business of the Blades group because of
       disagreement between them, having first exhausted the dispute resolution procedure
       in clause 33. That clause requires any dispute to be referred first to the directors of
       each shareholder for resolution, failing which the dispute is referred to Mr Phipps and
       Kevin McCabe to resolve. If Mr Phipps and Kevin McCabe cannot reach agreement,

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

the dispute is to be mediated. Thereafter, if the dispute remains, either party is entitled to serve a notice under clause 10. Thereupon, within 21 days, the matter is again referred to Kevin McCabe and Mr Phipps (or their successors) for each to "use all reasonable endeavours in good faith to resolve the dispute". If the deadlock has not been broken, both parties are entitled to serve a purchase notice within 10 business days offering to buy all the other party's shares in Blades at a specified price ("a Roulette Notice"). The offer is deemed to comprise an offer to buy all the offeree's shares at that price and an alternative offer to sell to the offeree all the offeror's shares at that price. The offeree has 30 days in which to serve a counternotice accepting the alternative offer, failing which it is deemed to have accepted the offer to buy its shares.

156.    Clause 11 of the ISA contains similar provisions conferring on each shareholder the right to exercise a call option to purchase all of the other shareholder's shares. There are specified option periods during which the option can be exercised. A call option notice served within the defined option periods operates in exactly the same way as a Roulette notice served under the clause 10 deadlock provisions.

157.    The following provisions are directly material in this case:

> "11.1    Each Shareholder grants to the other Shareholder a right to exercise a call option to purchase all of its Shares (Option Shares) in accordance with this clause 11 (Call Option).
>
> 11.2    The Call Option may only be exercised:
>
> 11.2.1    within the period 1 June to 31 July in each year from 1 June 2017 to 31 July 2021 (inclusive) (Option Periods) or
>
> 11.2.2    at any time (i) after the end of Season 2015/2016 if Sheffield United Football Club does not achieve promotion to the English Premier League by the end of Season; or (ii) if Sheffield United Football Club is relegated from any League at any time after Completion
>
> 11.3    .....
>
> 11.4    The Call Option shall be exercised by one Shareholder (Shareholder Exercising Option) giving the other Shareholder (Other Shareholder) written notice (Option Notice) in accordance with clause 22 which shall include:
>
> 11.4.1    the date on which the Option Notice is given;
>
> 11.4.2    a statement to the effect that it is exercising the Call Option;

38

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

11.4.3       the number of Option Shares in respect of which the Call Option is being exercised, such number being all of the Shares of the other Shareholder;

11.4.4       an:

(a) offer by the Shareholder Exercising Option to purchase all (but not some only) of the Other Shareholder's shares at the price per share specified (Option Price);

(b) an alternative offer by the Shareholder Exercising Option to sell to the Other Shareholder all (but not some only) of the Shareholder Exercising Option's shares at the Option Price;

11.4.5       a date on which option completion is to take place, which shall be no less than 20 Business Days and no more than 30 Business Days following the date of the Option Notice;

11.4.6       a signature by the Shareholder exercising the Call Option.

11.5       Once given, an Option Notice may not be revoked without the prior written consent of the Other Shareholder.

11.6       Within 30 days of service of the Call Option Notice, the Other Shareholder may by counter-notice (the 'Call Option Counter Notice') to the Shareholder Exercising Option require the Shareholder Exercising Option to sell all (but not some only) of its shares to the Other Shareholder at the Option Price.

11.7       Service of the Counter Notice shall constitute an acceptance of the offer referred to in clause 11.4.4(b) and a rejection of the offer referred to in clause 11.4.4(a) and the Shareholder Exercising Option shall be bound to sell, and the Other Shareholder shall be bound to purchase, the Shareholder Exercising Option's Shares subject only to the receipt of the Option Price by the Shareholder Exercising Option.

11.8       If no counter-notice is served by the Other Shareholder under clause 11.6 then the Shareholder Exercising Option shall be bound to purchase, and the Other Shareholder shall be bound to sell, the Other Shareholder's shares subject only to receipt of the Option Price by the Other Shareholder.

11.9       Completion of the sale and purchase contemplated by this clause 11 shall be at the date, time and place specified in the Call Option Notice, or, if a Call Option Counter Notice is

served, at the date, time and place specified in the Call Option Counter Notice…

11.10    No Call Option Notice or Call Option Counter Notice may be withdrawn except with the written consent of the Shareholder to which it was given and save as aforesaid shall constitute a binding obligation on the Shareholders to sell and purchase the relevant Shares in the manner contemplated by this clause 11.

11.11    Any shares sold pursuant to this clause 11 shall be transferred free from any claims, equities, liens and encumbrances whatsoever and with all rights attached to the relevant shares as at the date of service of the Call Option Notice, but without the benefit of any other warranties or representations whatsoever. "

158.   Clause 12.2 of the ISA provides:

"each of [SUL] and [UTB] undertakes to the other that they or it will (so far as it is lawfully able) exercise the powers vested in it from time to time as shareholder (as the case may be) of the Company to ensure that the Company complies (insofar as they are able by the exercise of such powers) with the Articles, this Agreement and all other agreements referred to in this Agreement."

159.   The ISA contains numerous other detailed provisions and extends to 94 typed pages in all (excluding the execution pages). The ISA balances the rights of the two shareholders and confers particular rights on UTB alone. It establishes a 50/50 deadlock on the board with no casting vote, so that the SUL and UTB appointed directors (or some of them) will have to reach agreement in order to pass resolutions of Blades. In the event that agreement cannot be reached, there is informal and then formal mediation, and if that is unsuccessful a final requirement for a resolution to be sought in good faith. If no resolution is achieved, either party can make an offer to acquire the other's interest and the offeree has the choice whether to sell or buy at the specified price.

160.   At that stage, all attempts to resolve an important disagreement having failed, each shareholder must necessarily be entitled to have regard to its own interests in deciding whether to serve a Roulette Notice and if so what price to specify. That is particularly so since the Roulette Notice can be accepted by the offeree (in its own interest) either as an offer to buy or as an offer to sell.

161.   Clause 11 confers a similar right on both parties, but is not dependent on inability to agree how the affairs of Blades are to be conducted. Thus, unless the Club has achieved the desired promotion to the top level within 3 seasons, and even if it is progressing well and the relationship between the shareholders is good, each has the right to force separation by making an offer to buy out the other, but at risk that it may itself be bought out. In making the decision whether to serve a call option notice, a

A-8926

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

shareholder must therefore necessarily be acting in its own interests and not in furtherance of any cooperative endeavour.

(ii) Quasi-partnership

162.    A quasi-partnership is a company where the basis on which the shareholders are associating gives rise to equitable obligations as between them, which are capable of overriding or qualifying the strict terms of the company's constitution, so as to prevent one of them from taking unfair advantage of his strict rights.  The paradigm (but not the only) case of quasi-partnership is where it is understood that each of the shareholders will be personally involved in managing the company's affairs with the other(s) and remunerated as such, rather than by dividends.  Because of the nature of the association based on mutual cooperation and trust, the minority shareholder will not have the ability to sell his shares in the market and achieve a fair price for his interest. In those circumstances, if one of the shareholders has a majority holding and could vote to remove the other as a director and employee of the company, equity intervenes to prevent the majority shareholder from doing what the articles of the company allow him to do, where that would in all the circumstances be unconscionable.

163.    The origin of the use of the expression "quasi-partnership" in relation to a particular type of limited company is Ebrahimi v Westbourne Galleries Ltd [1973] A.C. 360. The only shareholders of the company in that case were two former partners of the business and the son of one of them. After a disagreement, one partner was removed as a director, using the majority voting rights of the other two shareholders in accordance with the company's articles of association.  The profits of the company had only ever been distributed by way of directors' remuneration. The judge held that the respondents had done the appellant a wrong in equity, notwithstanding the rights conferred by the articles. It was a breach of good faith to exclude the appellant from participation in a business upon which they had embarked on the basis that all the shareholders should participate in its management and be remunerated as such. It was therefore just and equitable to wind up the company.

164.    The Court of Appeal allowed an appeal, holding that it had not been shown that the shareholders' voting rights had been exercised in bad faith. On appeal, Lord Wilberforce held that the statutory jurisdiction to wind up a company where it was just and equitable to do so acknowledged that there was room in company law for recognition of the fact that, behind the corporate status and personality of the company, there were "individuals with rights, obligations and expectations among themselves, which were not necessarily submerged in the corporate structure". While in most cases the corporate constitution adequately defined the rights of the members, the just and equitable criterion allowed courts to subject the exercise of legal rights to considerations of a personal character, arising between one individual and another, which might make it unjust or inequitable to insist on legal rights or to exercise them in a particular way.

165.    His Lordship then identified the extra considerations, above purely commercial ones, that could indicate that equitable rights or considerations could be superimposed:

            "… typically [they] may include one, or probably more, of the
            following elements: (i) an association formed or continued on

41

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

the basis of a personal relationship, involving mutual
confidence – this element will often be found where a pre-
existing partnership has been converted into a limited company;
(ii) an agreement, or understanding, that all, or some (for there
may be 'sleeping' members), of the shareholders shall
participate in the conduct of the business; (iii) restriction upon
the transfer of the members' interest in the company – so that if
confidence is lost, or one member is removed from
management, he cannot take out his stake and go elsewhere.

It is these, and analogous, factors which may bring into play the
just and equitable clause… "

166.   Lord Wilberforce then observed that, in very many cases, exercise of statutory rights
       or rights conferred by a company's articles would be unexceptional and part of the
       risk that a director or shareholder of a company accepts, and continued:

       "the just and equitable provision nevertheless comes to his
       assistance if he can point to, and prove, *some special
       underlying obligation of his fellow member(s) in good faith, or
       confidence, that so long as the business continues he shall be
       entitled to management participation, an obligation so basic
       that, if broken, the conclusion must be that the association must
       be dissolved*" (emphasis added)

167.   In O'Neill v Phillips [1999] 1 WLR 1092, a case brought under the predecessor of
       section 994 of the Companies Act 2006, Lord Hoffmann said that he agreed with
       Jonathan Parker J. when he said, in In Re Astec (B.S.R.) plc [1998] 2 BCLC 556, 588:

       " … in order to give rise to an equitable constraint based on
       'legitimate expectation' what is required is a personal
       relationship or personal dealings of some kind between the
       parties seeking to exercise the legal right and the party seeking
       to restrain such exercise, such as will affect the conscience of
       the former."

       Lord Hoffmann added:

       "… I think that one useful cross-check in a case like this is to
       ask whether the exercise of the power in question would be
       contrary to what the parties, by words or conduct, have actually
       agreed. Would it conflict with the promises which they appear
       to have exchanged? In *Blisset v Daniel* the limits were found in
       the 'general meaning' of the partnership articles themselves. In
       a quasi-partnership company, they will usually be found in the
       understandings between the members at the time they entered
       into association. But there may be later promises, by words or
       conduct, which it would be unfair to allow a member to ignore.
       Nor is it necessary that such promises should be independently
       enforceable as a matter of contract. A promise may be binding
       as a matter of justice and equity although for one reason or

                                                                                          42

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

another (for example, because in favour of a third party) it would not be enforceable in law."

168. In the instant case, SUL does not rely on the existence of a quasi-partnership to seek to restrain UTB from exercising rights given to it by the articles or by the ISA. Rather, SUL seeks to establish an additional obligation binding UTB by reason of the existence of a quasi-partnership, namely an obligation to act towards SUL in good faith. However, SUL may in substance be seeking to use equitable rights as a shield rather than as a sword, because it contends that UTB is not entitled to rely on or enforce the contract of sale and purchase arising from the Call Option Notice and Counternotice, or to rely on the intended transfer of shares to UTB 2018 (in accordance with the articles and the ISA) as a means of defeating SUL's contractual rights under the ISA. In both cases, it contends that UTB has only been able to assert contractual rights under the ISA by reason of breaches of obligations of good faith and that therefore it is unconscionable for it to do so. If the obligation, the breach and a causative link were established, equity would be acting in a conventional way in refusing to grant specific performance, either at all or unless UTB performed its obligations.

169. SUL contends that Blades was or became a quasi-partnership for the following reasons:

    i)    The parties accepted in evidence that their objectives were in the nature of a joint venture;

    ii)   They accepted that the contractual relationship could only work if they got on, cooperated and had a common vision for Blades and SUFC;

    iii)  The parties treated and referred to each other as partners;

    iv)   There was a recognition that the parties' rights and responsibilities were not exhaustively defined by the ISA (e.g. in relation to Prince Abdullah's wish to appoint Deloitte to appraise SUFC, he said "I didn't think about the [terms of the ISA] I thought that it's a matter between two partners").

170. It is not clear to me what rights and obligations equity should recognise on account of this, beyond a mutual obligation of fair dealing and good faith, but that obligation is sufficient for SUL's purposes. Indeed, the whole quasi-partnership argument advanced by SUL seems to be advanced solely for that purpose. However, to the extent that SUL contends that from 30 August 2013 the relationship of UTB and SUL was governed or affected by such equitable rights and obligations, the contention runs directly into the entire agreement clause of the ISA.

171. By that clause, Blades, SUFC, SUL and UTB and their guarantors agreed that there was no understanding between them beyond the completion documents in relation to the subject-matter of the ISA and that the ISA superseded all previous discussions and understandings in that regard. Mr Downes QC sought to characterise clause 26 as "boilerplate" in nature, but that epithet does not mean that, in a carefully drafted, detailed contract between sophisticated and professionally-advised parties, a term of this type can simply be ignored or given little weight. While such terms do not preclude the implication into the contract of unexpressed terms, or deprive any

43

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

binding collateral contracts of legal effect (or indeed prevent rectification of mistaken omissions or words), such terms do (and are intended to) prevent parties from seeking to rely on a different or additional understanding that may have been identified - or even provisionally agreed - in pre-contract negotiations but which has not been included as a term of the contract.

172. Entire agreement clauses have (subject to the above-mentioned limitations) been assumed to be effective. Their effectiveness has recently been affirmed by Lord Sumption, giving the leading judgment in the Supreme Court in the case of Rock Advertising Ltd v MWB Business Exchange Centres Ltd [2018] UKSC 24; [2019] A.C. 119, a judgment with which Lady Hale, Lord Wilson and Lord Lloyd-Jones agreed. The case was concerned with the validity and effectiveness of a "no oral modification" clause in a contract, but in reviewing that issue Lord Sumption considered the effect of comparable provisions such as "no reliance" and "entire agreement" clauses. At para [14] he said:

> "Entire agreement clauses generally provide that they 'set out the entire agreement between the parties and supersede all proposals and prior agreements, arrangements and understandings between the parties.' An abbreviated form of the clause is contained in the first two sentences of clause 7.6 of the agreement in issue in this case. Such clauses are commonly coupled (as they are here) with No Oral Modification clauses addressing the position after the contract is made. Both are intended to achieve contractual certainty about the terms agreed, in the case of entire agreement clauses by nullifying prior collateral agreements relating to the same subject-matter. As Lightman J put it in *Inntrepreneur Pub Co (GL) v East Crown Ltd* [2000] 2 Lloyd's Rep 611, para 7:
>
> > 'The purpose of an entire agreement clause is to preclude a party to a written agreement from threshing through the undergrowth and finding in the course of negotiations some (chance) remark or statement (often long forgotten or difficult to recall or explain) on which to found a claim such as the present to the existence of a collateral warranty. The entire agreement clause obviates the occasion for any such search and the peril to the contracting parties posed by the need which may arise in its absence to conduct such a search. For such a clause constitutes a binding agreement between the parties that the full contractual terms are to be found in the document containing the clause and not elsewhere, and that accordingly any promises or assurances made in the course of the negotiations (which in the absence of such a clause might have effect as a collateral warranty) shall have no contractual force, save insofar as they are reflected and given effect in that document. The operation of the clause is not to render evidence of the collateral warranty inadmissible in evidence as is suggested in *Chitty on Contract* 28th ed Vol 1 para 12-102: it is to denude what

44

would otherwise constitute a collateral warranty of legal effect.'

But what if the parties make a collateral agreement anyway, and it would otherwise have bound them? In *Brikom Investments Ltd v Carr* [1979] QB 467, 480, Lord Denning MR brushed aside an entire agreement clause, observing that 'the cases are legion in which such a clause is of no effect in the face of an express promise or representation on which the other side has relied.' In fact there were at that time no cases in which the courts had declined to give effect to such clauses, and the one case which Lord Denning cited (*J Evans & Son (Portsmouth) Ltd v Andrea Merzario Ltd* [1976] 1 WLR 1078) was really a case of estoppel and concerned a different sort of clause altogether. In *Ryanair Ltd v SR Technics Ireland Ltd* [2007] EWHC 3089 (QB), at paras 137-143, Gray J treated Lord Denning's dictum as a general statement of the law. But in my view it cannot be supported save possibly in relation to estoppel. The true position is that if the collateral agreement is capable of operating as an independent agreement, and is supported by its own consideration, then most standard forms of entire agreement clause will not prevent its enforcement: see *Business Environment Bow Lane Ltd v Deanwater Estates Ltd* [2007] L&TR 26 (CA), at para 43, and *North Eastern Properties Ltd v Coleman* [2010] 1 WLR 2715 at paras 57 (Briggs J), 82 to 83 (Longmore LJ). But if the clause is relied upon as modifying what would otherwise be the effect of the agreement which contains it, the courts will apply it according to its terms and decline to give effect to the collateral agreement. As Longmore LJ observed in the *North Eastern Properties Ltd* case, at para 82:

'if the parties agree that the written contract is to be the entire contract, it is no business of the courts to tell them that they do not mean what they have said.'

Thus in *McGrath v Shah* (1989) 57 P&CR 452, 459, John Chadwick QC (sitting as a Deputy Judge of the Chancery Division) applied an entire agreement clause in a contract for the sale of land, where the clause served the important function of ensuring that the contract was not avoided under section 2 of the Law of Property (Miscellaneous Provisions) Act 1989 on the ground that the terms were not all contained in one document. Outside the domain, in some ways rather special, of contracts for the sale of land, in *Deepak Fertilisers and Petrochemical Corpn v ICI Chemicals & Polymers Ltd* [1998] 2 Lloyd's Rep 139, 168 (Rix J) and (1999) 1 Lloyd's Rep 387, para 34 (CA), both Rix J and the Court of Appeal treated the question as one of construction and gave effect to the clause according to its terms. Lightman J did the same in the *Inntrepreneur* case. Since then, entire agreement clauses have been routinely applied... "

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

Lord Briggs, agreeing with the disposal of the appeal proposed by Lord Sumption but for different reasons, did not accept that entire agreement clauses were a useful analogy to "no oral modification" clauses because they did not attempt to bind the future conduct of the contracting parties in the same way.

173.    In my judgment, it is therefore no answer to contend that clause 26 is a "boilerplate" clause. It negatives any other understanding between the parties relating to the affairs of Blades and the rights and obligations of its shareholders between themselves. There is no suggestion that a binding collateral agreement was made incorporating the obligation for which SUL contends, or that by mistake the ISA omitted it.  Mr Downes QC contended that the equitable jurisdiction of the court could never be excluded and so such clauses could not have effect to prevent the assertion of equitable rights outside the terms of the contract.  However, equity in such a case – though not excluded – will "follow the law" by recognising and not contradicting the legal effect of the express term that the parties have agreed.  In any event, it does not seem to me that equitable rights are being asserted, but rather SUL is seeking to establish the existence of a contractual obligation of fair dealing and good faith.

174.    It cannot therefore be contended that, from its inception, Blades was a quasi-partnership and that on that account SUL and UTB owed each other obligations to act fairly and in good faith.

175.    Even in the absence of the entire agreement clause, I would not have held that Blades was a quasi-partnership as at 30 August 2013.  Although the indicia of a quasi-partnership are not rigidly defined or exhaustively identified by Lord Wilberforce in the Ebrahimi case, the essence of a quasi-partnership is, as the name suggests, that the corporators or shareholders of a company intend to conduct their business affairs not as directors and shareholders whose rights are defined by the corporate constitution but *on the basis of* mutual confidence and mutual duties of fidelity, trust and openness and their joint management of the company's affairs.  A limited company is not to be treated as a quasi-partnership merely because the shareholders and directors do in fact have or need to have confidence in each other and work together openly and in cooperation to manage the company affairs. The question is rather *on what basis* the parties understand the company's affairs to be run.

176.    In this case, the affairs of Blades are governed by its articles of association and the very detailed terms of the ISA, which regulate to what extent each of the shareholders has rights and obligations and what controls exist on the way in which the business of Blades and its subsidiaries is run.  This is certainly not the case of a convenient corporate wrapper being placed over a relationship that is in substance a partnership or an undefined joint venture.  The particular rights and obligations of each of the shareholders are identified with care and in detail in the ISA.  Each of the shareholders is a corporation, which will appoint directors of Blades and SUFC to act on its behalf.  Blades itself is only a holding company, but its principal subsidiary, SUFC, was at the time carrying on a sophisticated business with the benefit of professional management and executives in place.  Although loss-making, SUFC was a substantial and complex business enterprise.  The business was to be managed by the managers subject to the control of the directors of the company (which might or might not include Prince Abdullah and Kevin McCabe as the principal owners of UTB and SUL respectively) and a Technical Football Committee that would report to

A-8932

# EXHIBIT 28
# PART 2

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

the board.  The business was not to be managed by Prince Abdullah and Kevin McCabe.

177.  There was a joint venture in the sense that both shareholders agreed and shared the objective of achieving promotion to the Premier League and reuniting the Club with the property assets over a 3-5 year period.  It is true that the principals of the shareholders must have understood and recognised that those objectives were likely more readily to be achieved if there was harmony between the principals and their appointed directors and agreement on the strategy for the Club, and were correspondingly likely to be undermined if there was no cooperation between them.  But those factors do not mean that the business of Blades was to be carried on on the basis of trust, confidence and cooperation between the two shareholders rather than on the basis of the terms agreed in the ISA and the supervision of the management of the Club by the board of directors.  As at 30 August 2013, Prince Abdullah and Kevin McCabe – the principals of the two shareholders – hardly knew each other and had no established business dealings.  For that reason, their professional advisors drafted detailed agreements about the basis on which the affairs of Blades and its subsidiary SUFC would be run.

178.  It is also pertinent to observe that the ISA was not simply an agreement about how jointly to achieve the overriding objectives.  The ISA catered for a number of different eventualities: the relegation of the Club; its promotion; and the failure to achieve Premier League status within 3 seasons.  It conferred rights for one or other of the parties (though it was expected to be UTB) to take over Blades at any time before promotion to the Premier League by investing more capital, and rights to offer to buy out the other shareholder, at risk of being bought out on equivalent terms.  This was not simply an elaborate mechanism for terminating the joint venture: clause 10 is such a mechanism, where deadlock exists, but clause 11 confers freestanding rights for one or other of the shareholders to exclude the other and continue alone if the overriding objective has not been achieved, and in any event at specified times between years 4 and 8 regardless of the success or otherwise of the venture.

179.  The ISA is therefore not merely a joint venture agreement under which the parties are to work together on the basis of trust and cooperation to achieve the specified objectives.  The fact that the board and equity is set up as a 50/50 deadlock and that the parties therefore called and regarded each other as "partners" does not mean that they were partners.  Smooth running of SUFC at board level (but not at management level) would require agreement of the principals or at least some of the directors, but the ISA catered for what would happen in case of dispute and deadlock.  It imposed, at a late stage of the dispute resolution process, an obligation of good faith, and it provided machinery for terminating the joint venture if deadlock remained.  I therefore reject the argument that the 50/50 deadlock arrangement drives a conclusion that Blades was a quasi-partnership or that the shareholders owed each other obligations of good faith.

180.  In Re Coroin Ltd (No.2) [2013] 2 BCLC 583, David Richards J rejected an argument of legitimate expectation of participation in management derived from understandings outside the articles and shareholders agreement in that case and held that equitable considerations had no part to play. He said at [635]-[636]:

"Equitable considerations, affecting the manner in which legal rights can be exercised, will arise only in those cases where there exist considerations of a personal character between the shareholders which makes it unjust or inequitable to insist on legal rights or to exercise them in a particular way. Typically that will be in the case of a company formed by a small number of individuals on the basis of participation by all or some of them in the management of the company.

In my judgment, there is no room for equitable considerations of this kind in the present case. The company was formed by a group of highly sophisticated and experienced business people and investors with a view to the purchase of a well-known group of hotels for a price running into many hundreds of millions of pounds, and to retaining and managing some of those hotels. There was little prior relationship between many of the investors and some were unknown to each other until a few days before the company was formed. More importantly, Articles of Association and a shareholders' agreement were negotiated and drafted, containing lengthy and complex provisions governing their relations with each other with the company. I find it hard to imagine a case where it would be more inappropriate to overlay on those arrangements equitable considerations of the sort discussed by Lord Wilberforce and Lord Hoffmann."

181. The same reasoning applies in the instant case. Blades and SUFC were not to be managed on the basis of a personal relationship of cooperation and trust between Prince Abdullah and Kevin McCabe. SUFC was to be managed by professional executives and management staff subject to strategic control by directors appointed by SUL and UTB in accordance with the matters agreed in the ISA. If the directors were unable to agree on a matter of importance, the dispute resolution provisions of the ISA required Kevin McCabe and Mr Phipps (not Prince Abdullah) to attempt to resolve the disagreement. Although it would have been anticipated at the date of the ISA that Prince Abdullah would be one of the UTB appointed directors and that Kevin McCabe or one or more of his sons would be SUL appointed directors, it cannot have been envisaged that Prince Abdullah would personally be present or deeply involved in managing Blades or SUFC. There was in my judgment no relationship of a personal character between Prince Abdullah and Kevin McCabe on the basis on which the affairs of Blades and SUFC were to be managed.

182. SUL's alternative case on quasi-partnership is that Blades became a quasi-partnership on the basis of an understanding that arose between Prince Abdullah on behalf of UTB and Kevin McCabe on behalf of SUL after the date of the ISA. In light of Lord Wilberforce's reference to "an association formed *or continued* on the basis of a personal relationship" and Lord Hoffmann's dicta quoted above, it is now accepted that equitable rights and obligations can arise subsequently to the incorporation that may change the character of the company to that of a quasi-partnership. The matters relied on by SUL are the following:

THE HONOURABLE MR JUSTICE FANCOURT                                                    UTB LLC v. Sheffield United
Approved Judgment

    i)      A shared emotional enthusiasm and bond that Kevin McCabe and Prince Abdullah developed for the Club;

    ii)     A subsequent agreement to fund the Club equally after the initial two seasons of UTB's £10 million funding had ended;

    iii)    A shared understanding that Kevin McCabe would be the "strong partner" having a regular "hands on" presence at the Club, looking after its best interests, while Prince Abdullah was absent on government duty in Saudi Arabia;

    iv)    The fact that the two principals referred to and regarded each other as "partners" in such a way as to convey an assurance of an obligation to act in good faith.

    v)    This was reflected in Mr Giansiracusa's acceptance at the 26 October 2017 board meeting that, on promotion to the Premier League, the rent for the Stadium and Academy would be reviewed in good faith.

183.   SUL is not precise about when the change from a company to be run on the basis of its articles and the ISA to a company to be run on the basis of a personal relationship between the principals of the corporate shareholders arose. SUL faces a similar difficulty to the one that it faced in establishing an agreement or understanding at the time that the ISA was made. Clause 28.4 of the ISA provides that: "Any variation of this Agreement is valid only if it is in writing and signed by all the parties hereto". As confirmed by the decision in the Rock Advertising case, that means that any oral agreement or understanding to different effect from the terms of the ISA and articles would be ineffective to vary them. Without prejudice to that answer to SUL's case, I will also address its factual basis.

184.   SUL places reliance on the terms of Prince Abdullah's letter to Kevin McCabe dated 29 June 2014, after he had been appointed minister of state in Saudi Arabia, in which he refers to "our beloved Sheffield United Football Club". The language used is, certainly, redolent of a family relationship, and Prince Abdullah emphasises his commitment to and affection for the Club and the values that they "hold dear as Blades" and his desire to achieve the goals that he and Kevin McCabe had set. There was a shared emotional enthusiasm for the Club and to that extent a bond between them, in June 2014. However, in the same letter, Prince Abdullah explains how he will fill the spaces on the boards of Blades and SUFC, so there is no suggestion that the affairs of Blades are to be conducted on the basis of a personal relationship between him or Mr Phipps and Kevin McCabe.

185.   Since 30 August 2013, Prince Abdullah had attended only one match at Bramall Lane, and there had been only one board meeting, on 18 December 2013, which Prince Abdullah attended by Skype. He had had few meetings with Kevin McCabe and otherwise the two of them communicated by email. They had agreed on the sacking of Mr Weir as manager and the appointment of Mr Clough and Mr Brannigan, though all of these were instigated by Kevin McCabe. Prince Abdullah said in evidence that, in the first year, he was conscious that he knew little about running an English football club in League One and was happy to be guided by Kevin McCabe's greater knowledge and rely on his presence in Sheffield. It is obvious that Prince Abdullah

had nevertheless been warmly treated by the McCabe family in the initial year, on the few occasions when they did meet, and had developed a real enthusiasm and affection for the Club. By 25 June 2014 there were no financial problems. However, Kevin McCabe was about to tell Mr Phipps that he was not intending to put a penny more into the Club. Mr Tutton told Mr Brannigan (the CEO) so on 15 August 2014 ("there is no more available from Scarborough or Kevin … enough is enough. The club must stand on its own two feet"), and Scott McCabe told Mr Phipps the same by email dated 17 August 2014.

186. Following that, there was no agreement about further funding from SUL until the July 2015 Funding Agreement. In the meantime, relations between Kevin McCabe and Prince Abdullah had deteriorated, with Prince Abdullah in effect threatening (in a letter written by Mr Phipps dated 28 May 2015) that if SUL did not honour its obligation to invest 50/50, Prince Abdullah would pull out, leading to the collapse of SUFC. Although this caused Kevin McCabe to soften his approach, Mr Phipps accused Kevin McCabe on 25 June 2015 of violating the spirit of the original deal, and Kevin McCabe finally climbed down on 1 July 2015 and agreed, formally, to inject £3 million by no later than 15 October 2015 and a further £1 million by no later than 1 May 2016. But this was an ad hoc resolution and neither established any agreement beyond the 2015/16 season nor acknowledged a 50/50 obligation as having existed in the spirit of the original agreement. I reject the argument that, by making this agreement (which Kevin McCabe then flouted) the parties reached an understanding that they would fund the deficit in equal shares going forwards.

187. It matters not for present purposes who was right about the spirit of the original deal, but what is significant is that there were substantial differences between Prince Abdullah and Kevin McCabe about fundamental matters relating to their venture. On Kevin McCabe's part the July 2015 Funding Agreement was reluctantly made: he believed that it had been understood that Prince Abdullah was going to take over responsibility for funding the Club, but he knew that it was impossible for him to stand by and allow the Club to collapse through lack of money. Both before and after the July 2015 Funding Agreement, the parties were looking for a new investor to buy out SUL's interest, or at least buy a substantial stake in Blades. When this did not materialise, the differences between Prince Abdullah and Kevin McCabe grew. These events are inconsistent with a new understanding and agreement that Kevin McCabe and Prince Abdullah were effectively partners going forwards.

188. It is clear (and I find) that the realisation that SUL was going to have to share the funding of the deficit for 2015/16 changed Kevin McCabe's attitude to the management of the Club. He persuaded Prince Abdullah to believe that the lack of success was attributable to Mr Clough, Mr Brannigan and Mr Phipps having too much involvement or influence in the management of SUFC's affairs, and that what was needed was more control by him. Although Kevin McCabe was of that opinion earlier, he was not so bothered while it was someone else's money that was being wasted, as long as the Club itself was not under threat. He was determined in any event that if he was going to be funding the Club's losses, when he had hoped no longer to need to do so, he was going to supervise the management and in particular expenditure and income from off the field activities. This is reflected in his email to Prince Abdullah dated 7 July 2015, in which he says "…as part of the new arrangements between us, as promised I am involving myself much more than in the

past two years in the various activities that ensure from Bramall Lane, Shirecliffe and Crookes". It is clear from the rest of that email that Kevin McCabe had a particular problem with the fact that the property assets leased by SUFC were not being made to "sweat", i.e. to produce income, and Kevin McCabe had it in mind to change that, but his mind was also on the amount of football expenditure.

189.    The reality was, of course, that Prince Abdullah was a continent away, engaged on heavy governmental business and with little time to consider SUFC's affairs, whereas Kevin McCabe was present in Yorkshire for much of the time. It was therefore inevitable that he would have a much greater presence at the Club and would be more able to watch over what management were doing and more influential in conveying the wishes of the owners. Prince Abdullah recognised that, though he still used Mr Phipps to maintain some presence and involvement. In the autumn, Kevin McCabe set about persuading Prince Abdullah to remove Mr Phipps, with whom by then he felt unable to work, and whom he blamed for some of the financial misfortunes that had occurred during the initial two-year period.

190.    However, none of this amounted to a new basis on which the affairs of Blades and SUFC were to be managed, turning Blades into a quasi-partnership. On the contrary, trust and confidence were being slowly eroded by this point, and were about to suffer a further substantial blow when, on 15 October 2015, SUL did not pay the agreed £3 million because Kevin McCabe decided that it would be better discipline for the Club's management to have the funds drip fed (by him) as and when they were needed, to avoid imprudent expenditure. Prince Abdullah was greatly offended by that conduct, being a deliberate and clear breach of what had been agreed, at a time when he was personally "cutting into flesh" to make his agreed contribution. Despite the rebuke of Prince Abdullah and his insistence that the money be paid, SUL did not make payment of its agreed £3 million in full until 15 February 2016 (the first tranche was paid on 23 November 2015).

191.    By 29 October 2015, Prince Abdullah had decided that he would not renew Mr Phipps' contract when it expired in December that year. The intimation that he felt that he needed a lawyer to help him in his relations with Kevin McCabe and the Club reflected distrust and uncertainty rather than a new relationship based on trust and confidence. By early 2016, faced with Kevin McCabe exerting greater control over the affairs of SUFC, Prince Abdullah decided that he needed help and instructed Messrs Howard and Hawasli to go to Sheffield and appraise what they saw. The Howard Report was damning about the degree to which Kevin McCabe had effectively taken control and side-stepped proper corporate governance.

192.    I do not accept that there was a shared understanding that Kevin McCabe would be the strong partner and that Prince Abdullah, by implication, would be a weak one. Prince Abdullah and Kevin McCabe shared an unhappiness with the way that the £10 million invested by UTB had been spent and the lack of success on the pitch. That had happened under the watch of Mr Phipps, so Prince Abdullah's position was weakened in terms of real influence over day-to-day affairs at the Club. It is also evident that his other appointed directors were not effective in securing proper corporate governance. Kevin McCabe seized the initiative at the time when he was again required to pay towards the deficit of the Club. He told Prince Abdullah that he would become more involved. Up to a point Prince Abdullah was pleased that someone with an eye for financial rigour would be exerting some control. That

limited understanding and coincidence of financial interests does not make Blades a quasi-partnership at that time, and in any event the limited understanding did not last once Prince Abdullah had received the Howard Report.

193.   The fact that the parties regarded each other as "partners" reflects the fact that there was a corporate joint venture on which they were both engaged, working to achieve the overriding objectives, but that does not mean that a quasi-partnership existed. Both Kevin McCabe and Prince Abdullah recognised that they had a duty to act in the best interests of both of them, and in good faith in that respect, but that was inherent in the responsibilities of all the directors of Blades and SUFC, each of whom owed the companies a duty in good faith to act in the best interests of their company.  It is telling that, in seeking to find an example of an acknowledged obligation of good faith, SUL relies on what was said by Mr Giansiracusa in October 2017, in relation to rent reviews, at a time when the relationship between the shareholders was in rapid decline.  By that time, each of them was, to a significant degree, seeking to influence the Club's affairs in their own interests.  Within 3 weeks of that occasion, the relationship had irretrievably broken down.  Moreover, although an agreement to review the rent in good faith on promotion to the Premier League is relied upon, at that time the rent review would be inconsequential as the property call options would then be likely to be exercised, leading to an end to the rental liabilities.  Further, from 2014 until 2017 UTB had consistently declined to agree a rent review, which was in the best interests of SUFC but was adverse to the interests of SUL and Scarborough Group as landlords.

194.   In short, SUL's case on the creation of a quasi-partnership amounts to extracting from the totality of dealings between SUL and UTB after the date of the ISA those particular instances that might lend support to its case that SUL and UTB agreed to run Blades and SUFC on the basis of mutual trust and confidence rather than in accordance with the articles and the ISA.  In my judgment, those particular instances do not amount to a change in the agreed basis on which Blades and SUFC were run. The total picture is different.   As a result of Prince Abdullah's ministerial appointment, and through inadequate representation on the boards of the companies, UTB allowed the proper corporate governance of the companies to slide to an extent that Kevin McCabe, by himself and through his chosen appointees to executive positions, was able to take virtual control of what was happening.  This was not governance on the basis of cooperation and mutual trust and confidence, nor was it by agreement with Prince Abdullah, but rather as a result of his lack of sufficient care and attention.  The position was slowly remedied between 2016 and 2017.  In fact, throughout the period from August 2014 to October 2017, the relationship between SUL and UTB was gradually declining and trust and confidence were evaporating, such that by 2017 a battle for control of Blades and SUFC had developed.  I reject SUL's claim that, at some time after the ISA was made, the affairs of those companies were conducted on the basis of a quasi-partnership.

(iii) Implied term of good faith

195.   The alternative way in which SUL seeks to establish obligations of fair dealing and good faith that bound UTB in late 2017 is to contend that the ISA was a "relational" contract, into which -- as a matter of law -- there are implied such obligations.

THE HONOURABLE MR JUSTICE FANCOURT                                UTB LLC v. Sheffield United
Approved Judgment

196.    The law on this subject has evolved rapidly since the (as it now appears) landmark decision of Leggatt J in Yam Seng Pte Ltd v International Trade Corp Ltd [2013] EWHC 111 (QB). However, the law has not yet reached a stage of settled clarity, nor is there binding authority, though there is a body of first instance decisions and dicta in the Court of Appeal that establish various principles.

197.    The general law of implied terms in contracts has been comprehensively restated by the Supreme Court in Marks and Spencer plc v BNP Paribas Securities Trust Company (Jersey) Ltd [2015] UKSC 72; [2016] Q.C. 742. That decision reaffirms the traditional approach that, however reasonable it may be, a term will not be implied into a contract unless, at the time the contract was made, a reasonable reader of it would consider the term to be so obvious as to go without saying or the term is necessary for business efficacy. As Lord Neuberger of Abbotsbury PSC observed at para [21], although these limbs are theoretically alternatives, in most cases both will be satisfied: a term will be obvious to the reasonable reader because it is necessary to give the contract commercial and practical coherence in accordance with its intended effect. Excluded from that general approach are contracts of a particular type where, as a matter of law, a term is treated as being implied if not expressed, such as an obligation of fidelity in an employment contract or, as in Liverpool City Council v Irwin [1977] A.C. 239, a right to safe access to and egress from a flat let under a contract of tenancy.

198.    In Yam Seng, Leggatt J implied an obligation of good faith into the distributorship contract as a matter of fact and not because the contract was a distributorship contract or, more generally, a "relational" contract:

            "Under English law a duty of good faith is implied by law as an incident of certain categories of contract, for example contracts of employment and contracts between partners or others whose relationship is characterised as a fiduciary one. I doubt that English law has reached the stage, however, where it is ready to recognise a requirement of good faith as a duty implied by law, even as a default rule, into all commercial contracts. Nevertheless, there seems to me to be no difficulty, following the established methodology of English law for the implication of terms in fact, in implying such a duty in any ordinary commercial contract based on the presumed intention of the parties [131]

            ….

            In some commercial contexts the relevant background expectations may extend further to an expectation that the parties will share information relevant to the performance of the contract such that a deliberate omission to disclose such information may amount to bad faith English law has traditionally drawn a sharp distinction between certain relationships – such as partnership, trusteeship and other fiduciary relationships – on the one hand, in which the parties owe owner's obligations of disclosure to each other, and other contractual relationships in which no duty of disclosure is

> supposed to operate. Arguably at least, that dichotomy is too simplistic. While it seems unlikely that any duty to disclose information in performance of the contract would be implied where the contract involves a simple exchange, many contracts do not fit this model and involve a longer term relationship between the parties in which they make a substantial commitment. Such 'relational' contracts, as they are sometimes called, may require a high degree of communication, cooperation and predictable performance based on mutual trust and confidence and involve expectations of loyalty which are not legislated for in the express terms of the contract but are implicit in the parties' understanding and necessary to give business efficacy to the arrangements. Examples of such relational contracts might include some joint venture agreements, franchise agreements and long-term distributorship agreements. [142]"

It is clear therefore that, while certain types of joint venture agreements may require the implication of such a term, in order to give them business efficacy, other types of joint venture agreements may not do so.

199.   The dichotomy is illustrated by a later judgment of Leggatt LJ (sitting at first instance), <u>Sheikh Tahnoon bin Saeed bin Shakhboot Al Nehayan v Kent</u> [2018] EWHC 333 (Comm). In that case, an oral joint venture had been agreed relating to the acquisition and operation of hotels, and part of the business was later demerged under a rudimentary framework agreement. The express terms were very limited, and yet the joint venture had been intended as a long-term collaboration requiring the cooperation and commitment of both parties. It was based on a strong personal friendship between them.

200.   Leggatt LJ held that implication of an obligation to act in good faith was essential to give effect to the reasonable expectations of the parties, i.e. the term was implied in fact on the conventional approach. The contract was of course a "relational" contract, and Leggatt LJ held that the term would also have been implied as a matter of law, given the nature of the contract. Two paragraphs of the Judge's judgment are particularly apposite:

> "[167] It does not follow from the conclusion that he did not owe any fiduciary duties to Mr Kent that the Sheikh's entitlement to pursue his own self-interest was untrammelled. I have previously suggested in [*Yam Seng*], at para 142, that it is a mistake to draw a simple dichotomy between relationships which give rise to fiduciary duties and other contractual relationships and to treat the latter as all alike. In particular, I drew attention to a category of contract in which the parties are committed to collaborating with each other, typically on a long-term basis, in ways which respect the spirit and objectives of their venture which they have not tried to specify, and which it may be impossible to specify, exhaustively, in a written contract. Such 'relational' contracts involve trust and confidence but of a different kind from that involved in

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

fiduciary relationships. The trust is not in the loyal subordination by one party of its own interests to those of another. It is trust that the other party will act with integrity and in a spirit of cooperation. The legitimate expectations which the law should protect in relationships of this kind are embodied in the normative standard of good faith.

[174] In the circumstances the contract made between these parties seems to me to be a classic instance of a relational contract. In my view, the implication of a duty of good faith in the contract is essential to give effect to the parties' reasonable expectations and satisfies the business necessity test which Lord Neuberger in [*Marks and Spencer*] at paras 16 to 31 reiterated as the relevant standard for the implication of a term into a contract. I would also reach the same conclusion by applying the test adumbrated by Lord Wilberforce in *Liverpool City Council v Irwin* [1976] A.C. 239 at 254 for the implication of a term in law, on the basis that the nature of the contract as a relational contract implicitly requires (in the absence of a contrary indication) treating it as involving an obligation of good faith."

In my judgment, it is clear that Leggatt LJ is there explaining that a particular type of contract, which may be called a "relational" contract, is one that will as a matter of law include an obligation of good faith. But the type of contract in issue is not any contract that involves a long-term relationship between the parties; it is a contract that requires the parties to collaborate in future in ways that respect the spirit and objectives of their joint venture *but which they have not specified or have been unable to specify in detail*, and which involves trust and confidence that each party will act with integrity and cooperatively. The contract in that case was exactly as described above and, as explained by Leggatt LJ, in fact necessarily required such a term to be implied if it was to work in accordance with the parties' reasonable expectations.

201.    The *ratio* of the decisions in Yam Seng and Sheikh Tahnoon are ones that any first instance judge must follow unless he or she were satisfied that they were wrong. I shall follow them. In other recent cases, there has been a tendency to substitute for the question whether a reasonable reader of the contract would consider a term to be necessary or obvious the question of whether the contract is a "relational" contract: see, e.g., the decision of Fraser J in Bates v Post Office [2019] EWHC 606 (QB). At para 725, Fraser J asked what the characteristics are that are expected to be present that will determine whether a commercial contract ought to be considered a "relational contract". The Judge set out nine relevant factors, of which only the first was determinative, namely that there must be no express term of the contract that prevents a duty of good faith being implied.

202.    If by "relational contract" it is clear that one means a relational contract of the kind described by Leggatt LJ in Sheikh Tahnoon and not all relational contracts in a broader sense, then there is no difficulty and the characteristics identified by Fraser J may assist to identify such a contract. But there is a danger in using the term "relational contract" that one is not clear about what exactly is meant by it. There is a great range of different types of contract that involve the parties in long-term

55

THE HONOURABLE MR JUSTICE FANCOURT                                          UTB LLC v. Sheffield United
Approved Judgment

relationships of varying types, with different terms and varying degrees of detail and use of language, and to characterise them all as "relational contracts" may be in one sense accurate and yet in other ways liable to mislead. It is self-evidently not all long-term contracts that involve an enduring but undefined, cooperative relationship between the parties that will, as a matter of law, involve an obligation of good faith. As Beatson LJ said (*obiter*) in Globe Motors, Inc v TRW Lucas Varity Electric Steering Ltd [2016] EWCA Civ 396 at para [68]:

> "… as seen from the *Carewatch Care Services* case, an implication of a duty of good faith will only be possible where the language of the contract, viewed against its context, permits it. It is thus not a reflection of a special rule of interpretation for this category of contract."

203.    Rather than seek to identify and weigh likely indicia of a "relational contract" in the narrower sense used by Leggatt LJ, it is, I consider, preferable to ask oneself first – as Leggatt LJ did in the Sheikh Tahnoon case – whether a reasonable reader of the contract would consider that an obligation of good faith was obviously meant or whether the obligation is necessary to the proper working of the contract. The overall character of the contract in issue will of course be highly material in answering that question but so will its particular terms, as recognised by the principle that (as restated in the Marks and Spencer case) no term may be implied into a contract if it would be inconsistent with an express term.

204.    That approach is, in my respectful opinion, preferable also because the exact content of any implied obligation of fair dealing, or to act with integrity, or to act in good faith, will be highly sensitive to the particular context of the contract, as observed by Dove J in D&G Cars Ltd v Essex Police Authority [2015] EWHC 226 (QB) at [175]. The greater part of that context is the express terms of the contract. Thus, to imply a general obligation to act at all times in good faith towards the counterparty because the contract is a relational contract may fail to have regard to rights and obligations created by the express terms, to which any implied obligation must be tailored if it is not to be excluded as being inconsistent with them. In the instant case there is a real example of just such a question, to which I return in para 214 below.

205.    The question, therefore, is whether a reasonable person reading the ISA at the time that it was made, with knowledge of the circumstances in which it is entered into (though not the negotiations of the parties or their drafts and preparatory documents) and the other agreements made as part of the same transaction, would consider that it was obvious that UTB had to act in good faith in all its dealings with SUL, and vice versa, or whether such an obligation is necessary to give coherent business effect to the ISA.

206.    The starting point is that the ISA and the associated contractual documents are extremely detailed and professionally (and skilfully) drafted. This case is therefore at the opposite end of the spectrum from the Sheikh Tahnoon case in that regard. Where detailed, professionally-drawn contracts exist, it is more difficult to imply terms because there is a strong inference that the parties have given careful consideration to all the terms by which they agree to be bound (though the test for implying terms remains the same). That inference is less strong if the subject-matter of the contract is such that, by its nature, it is difficult to set out and agree in advance all the terms that

56

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

will govern the relationship. The ISA is, however, not that kind of contract, as demonstrated by the quantity and detail of the express terms.

207.    Further, as regards implying a term of good faith, the ISA does in two places specify that the parties owe each other obligations of good faith. The first is in clause 29.2, which provides for severance of any void, illegal or invalid term of the ISA and for the parties then in good faith to negotiate the terms of a lawful substitute term. More significantly, clause 10.3 – in the deadlock provisions – requires the principals of each shareholder to use reasonable endeavours in good faith to resolve the dispute that has not been resolved by them in the first instance and has not been resolved by mediation. There is therefore an argument that where the parties meant to impose an obligation of good faith they did so, that elsewhere they did not intend any such obligation to exist, and that implying a more general good faith obligation would be inconsistent with the structure of clause 10 in particular.

208.    A further substantial point is that the ISA does not only operate by pointing in a single collaborative direction. Although the overriding aim is to obtain promotion and reunite the property assets within 3-5 years, and that is expressed as a shared objective, the ISA will not necessarily operate in that way. Both parties (but in practice UTB, since SUL wanted to "hand on the baton") have the right to dilute the other and obtain super-majority control. It does not make sense for the exercise of such rights to be subject to an obligation to act in good faith, not least because super-majority control can only be obtained in that way with the consent of the other shareholder: clause 6.5 of the ISA. After a specified time or in the event of deadlock, either shareholder can (if it so chooses) offer to buy out the other, thereby becoming the owner of all the equity in Blades. But whether that shareholder succeeds in its objective depends entirely on the will of the other shareholder, who – acting in its own interests -- can serve a counternotice reversing the proposed sale and purchase. The parties, when they are at the stage of preparing to serve, selecting the time at which to serve and serving a call option notice, Roulette Notice or counternotice, will very likely have adverse interests. An obligation in those circumstances to lay cards on the table, in performance of an obligation of good faith, would be inapt. Indeed, if there is a right in case of deadlock and in any event after a certain time to exit the ISA at will – in performance of the ISA and not upon a material breach of it – it is hard to see why it is necessary for each party to act on the basis of mutual trust and fair dealing; certainly not after a time (whenever it is) that the right to exit becomes available.

209.    Another point is that, in entering the ISA, SUL and UTB had different interests, although they both aspired to promotion to the Premier League for financial and other reasons. SUL was expecting to be diluted and left with a minority interest, and upon UTB obtaining 75% of the share capital SUL's principal interest was in SUFC – by then under the control of UTB – buying the property assets from SUL and other Scarborough Group companies. In the meantime, SUL expected UTB to finance the club and wanted there to be rent reviews under the leases of the property assets. UTB's interests were in Blades being financed on a 50/50 basis until it was ready to exercise its right or agree with SUL to take control, and in the meantime for the rent to remain unreviewed. Once the Club had been promoted to the Premier League, UTB could not dilute SUL and could only acquire control under clause 11, by making an offer for SUL's shares. If the offer were too low, SUL could acquire its shares at

the same price. This demonstrates that clause 11 was a substantive part of the operation of the ISA, not simply an exit mechanism.

210. Against that background, can it be said that it would have been obvious on 30 August 2013 to an informed observer that each of UTB and SUL owed the other obligations of fair dealing, open cooperation and good faith for the duration of the ISA? Or that the ISA is devoid of commercial and practical coherence, to use the expression in the judgment of Lord Neuberger in para [21] of the Marks and Spencer case, unless such obligations are implied?

211. SUL contends that the ISA is in such terms that it needs the parties to cooperate in good faith for it to succeed in achieving its primary objective. That is because Blades was deliberately set up as a 50/50 deadlock company. It can be said that, in order for strategic business to be done, the shareholders would need to agree, and in order to agree they need to deal with each other fairly and openly and in good faith. Some (but not all) of the characteristics identified by Fraser J as typical of the sort of contracts where an obligation of good faith is implied are present here: in particular, the contract is (reasonably) long-term, though of variable duration; Blades will function more smoothly if the parties collaborate with each other, which will need a high degree of communication; and there is a significant financial contribution by UTB to the venture.

212. Looking at the principal way in which the ISA may operate to achieve its overriding aim, open collaboration between the representatives of UTB and SUL would be likely more effectively to achieve promotion to the Premier League and reunification of the property assets with the Club. But the directors appointed by UTB and SUL each owe a duty to Blades and SUFC to act in good faith in the best interests of those companies. Moreover, the ISA does not operate only on the basis that UTB and SUL will remain equal owners of Blades until that happens. Had UTB had unlimited funds (as perceived by Kevin McCabe when signing the deal in 2013), it would have sought to dilute SUL at an early stage and then funded the acquisition of the property assets. SUL, which wanted to hand on the baton, would have agreed. That outcome does not depend in any way on performance of obligations of good faith; nor would the exercise by either party of its rights under clause 11, possibly as soon as the end of the first season. If there had been genuine deadlock before then, the same buy-out would have been achieved under clause 10.

213. In these circumstances, I cannot accept that a mutual obligation of good faith is obviously what the parties meant to prescribe, or that such an obligation is necessary to give business efficacy to the ISA. The ISA is a sophisticated and complex mix of unequal rights and obligations for two parties who have, in some respects, conflicting interests, which can work well enough even if the parties are entitled to look after their own interests to a degree that the implied term would prevent. The shareholders are not individuals and Blades and SUFC as companies operate through boards of directors. Each director owes statutory and fiduciary duties to Blades and SUFC. A majority of directors' votes is perfectly possible (it would have been achieved in October 2017 if Mr Bettis's continuation as CEO had been put to a vote, despite Kevin McCabe's opposition), but if there is deadlock the provisions of clause 10 come into play. These include an obligation in good faith to seek to resolve the dispute. If there is genuine deadlock, both parties have the right to seek to acquire the shares of the other. It is impossible in those circumstances to say that the ISA does

58

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

not function effectively, in the way that the parties envisaged, unless there is an obligation on both parties to act at all times in good faith.

214.    Even if that were wrong, and each shareholder owed the other an obligation of good faith while pursuing collaboratively the primary objective of the ISA, it cannot be right that such an obligation continues when either side has the right under clause 10 of the ISA to serve a Roulette Notice, or is considering how and when to exercise the right under clause 11 of the ISA. Mr Downes QC submitted that it was particularly at that time and in those circumstances that each side had to act openly and fairly towards the other, but in my judgment that is not right, as the parties at that time have conflicting interests.

215.    The difficulty is illustrated by asking whether a party who is considering serving a Roulette Notice must tell the other that it is proposing to do so. There is only a limited period of time in which such a notice may be served after a failed attempt to resolve the dispute. Both parties agree that the machinery benefits the party that receives rather than serves the notice, so the effect may be that the offeree, who was about to serve its own Roulette Notice, desists from doing so. As a result the offeror is disadvantaged. Further, it cannot be the case that the offeree is obliged to give advance notice of its decision whether to serve a counternotice. The same considerations apply in the same way under clause 11. Moreover, the time at which a Call Option Notice is served and the price specified are likely to be calculated to benefit the offeror, and it cannot be right that the offeror has to be open about his intentions in advance. Mr Downes's contention that such protection is needed to prevent the offeree shareholder from "encumbering" its shares is in my judgment wrong, for reasons that I will come to under Part D below.

(iv) Other implied terms

216.    As stated in para 140 above, SUL also contends that other terms are to be implied into the ISA. For the reason given in para 206 above, it is more difficult to imply terms into a detailed, professionally-drawn contract, but the test is nevertheless whether such terms are obviously what the parties meant or are necessary to give business efficacy to their contract.

217.    The first term sought to be implied – if not an express term – is that a shareholder may not transfer part only of its holding in Blades. This raises in the first instance a difficult question of interpretation of the ISA, namely whether a part of SUL's or UTB's holding can be transferred, or whether their holdings can only be transferred as a whole. For the reasons given in paras 229-235 below, I consider that the terms of the ISA compel the conclusion that a part of SUL's or UTB's holding can be transferred, although it does produce rather odd results in terms of the operation of the other terms of the ISA. Since I consider that the terms of the ISA provide for and permit transfer of part only of a shareholder's holding, it is impossible to imply a term to contrary effect.

218.    The second term sought to be implied is that a shareholder must not wilfully obstruct or hinder the re-unification of the property assets pursuant to clause 9.1.12 of the ISA. Re-unification was one of the overriding objectives of the ISA. Clause 9.1.12 is a term intended to benefit SUL when UTB acquires control of Blades. It confers no equivalent benefit on UTB if SUL purchases UTB's shares because SUL or the

59

THE HONOURABLE MR JUSTICE FANCOURT                                UTB LLC v. Sheffield United
Approved Judgment

Scarborough Group already have control of the property assets and, if they control SUFC, can do as they please in terms of selling the assets to SUFC. Under the ISA, UTB would acquire the requisite control in one of two ways: by agreement with SUL, following dilution of SUL's interest by UTB, or following service of a Roulette Notice or call option notice under clauses 10 and 11. In the latter cases, UTB would be acquiring all of the holding of SUL; in the first case, SUL would retain up to 25% of the shares in Blades. In both cases, clause 9.1.12 is clearly intended to come into play so that the Scarborough Group's SUFC-related property assets are bought from it within a year of UTB acquiring super-majority control.

219.   It was obviously not intended that UTB should be entitled to acquire SUL's shares or take effective total control of Blades without SUFC being obliged to buy the property assets. If SUFC were not, in those circumstances, obliged to buy the property assets, SUFC would be able to continue to enjoy the benefit of very substantially reduced rents for the property assets for the remainder of the 25-year term of the new leases or until it chooses to exercise the property call options. SUL would have no control of Blades or SUFC, no ability to activate a rent review and no means of compelling SUFC to buy the property assets from it and the other Scarborough Group companies. Although UTB has in fact, upon securing promotion to the Premier League in April 2019, chosen to exercise the property call options, it was not obliged to do so if clause 9.1.12 was not triggered by its purchase of SUL's shares. UTB would then be able to buy out SUL's interest but prevent it from obtaining a fair return on the property assets. In effect, SUL and Scarborough Group companies would be subsidising companies in which they had no interest for up to 25 more years.

220.   In my judgment, it would have been obvious to the reasonable person reading the ISA that the parties intended that if UTB acquired SUL's shares under clauses 10 or 11 of the ISA, or if it acquired super-majority control by dilution, it was at that point obliged to cause SUFC to exercise the property call options. Buy-out or dilution of SUL cannot happen without UTB choosing to bring it about, so UTB cannot be forced into having to fund the purchase of the property assets at an inopportune time.

221.   UTB contended that it could not be necessary or reasonable to imply a term requiring it to ensure that the property call options were exercised at a time when SUFC could not afford to pay for the property assets, which would have the effect of making Blades and SUFC insolvent. It says that it could only have been intended that the property call options would be exercised if and when Blades could pay the price, which would be likely to be upon promotion to the Premier League. Recital (B) in the ISA contemplates that the two overriding objectives of promotion and re-unification would take place together. Accordingly, submits UTB, it is not implicit that it must not obstruct or hinder exercise of the property call options at a time when SUFC could not afford to buy the property assets.

222.   I disagree with UTB's argument. If the question is posed as being whether UTB must trigger the property call options when SUFC cannot afford to perform, the answer to the question appears obvious and in UTB's favour. But what is implicit is that *if* UTB chooses to bring about the circumstances in which clause 9.1.12 will be triggered, it must not wilfully obstruct or hinder its taking effect. UTB has the choice whether to subscribe for sufficient new shares to give it super-majority control and whether to serve a Roulette Notice or call option notice seeking to buy SUL's shares or serve a counternotice to SUL's Roulette or call option notice. If it takes those steps, and will

60

obtain control as a result, it is obliged to trigger the property call options (unless it and SUL agree otherwise) and then cause SUFC to pay for the property assets within 12 months. If it was not willing or able to do that, it should not have taken the steps that it did to bring clause 9.1.12 into play. There is no third alternative. Moreover, it is not the case that the notices will only be given under clauses 10 or 11 when the Club is a rich Premier League club, and achieving super-majority control by dilution cannot happen at such a time.

223.   What happened in this case was that UTB was unwilling to sell its shares to SUL for £5 million and so resolved to serve a counternotice; but it was unwilling to fund the purchase of the property assets within a year and so took steps calculated to prevent that obligation from arising. Whether those steps were in fact effective will be considered in Part D below. But it is in my judgment implicit in the ISA that if UTB (or SUL) chooses to take control of Blades it must comply with clause 9.1.12. It was not entitled to buy out SUL but defer acquisition of the property assets. Evasion of clause 9.1.12 produces uncommercial and unreasonable results and was obviously not what the parties intended. It is clear that SUL was never to be placed in that position. Clause 9.1.12 is of course of benefit to SUL and not UTB, but that is the bargain that the parties struck.

224.   I therefore agree with SUL that neither SUL nor UTB must wilfully obstruct or hinder the re-unification of the property assets pursuant to clause 9.1.12 where this would otherwise take effect in connection with the operation of clauses 10 or 11.

225.   Turning to the third implied term for which SUL contends, I do not consider that it is necessary to imply a term that a recipient of a call option notice must not allow its shares to be encumbered or act to prevent itself from being able to transfer its shares free from incumbrances on completion. In the first place, a recipient of a call option notice has it within its power to serve a counternotice, the result of which will be that its shares will not be sold. It is difficult to see why any restriction (other than what is expressed in the articles and the ISA, including the express prohibition in clause 16.1) should be placed on what a shareholder may do with its shares in those circumstances. The implied term contended for appears to be a counterpart of the positive obligation in clause 11.11 to transfer any shares sold free from claims, equities, liens and encumbrances, but if so there is no need for any negative prohibition. Unless the recipient of the call option notice serves a counternotice, it is obliged to sell to the offeror, subject only to receiving the price. In those circumstances, the offeree will have equitable duties to preserve and not encumber the shares, so that they can be transferred on completion, and the express terms of clause 11.11 go further than that in imposing an obligation on the seller to remove any equities, liens and encumbrances that already exist. If the seller does not comply with those obligations it will be in breach of contract. If it does something that will prevent it from complying, it is in anticipatory breach of contract. It is superfluous to create another term that the seller will breach before performance of the obligation to transfer is due.

226.   The fourth implied term contended for is a term that the recipient of a call option notice must not take any step that would materially diminish the value of the offeror's shares. Mr Downes QC described this, in an appropriate metaphor, as a prohibition on the goalposts being moved once the free kick has been taken. Once again, presented in that metaphorical way, the answer that SUL wants seems to be implied: of course the goal posts should not be moved. But I am unclear why it is that the

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

recipient of a call option notice is forbidden to diminish the value of the offeror's shares. One can follow the logic of an argument that the value of the shares to be purchased by the offeror must not be diminished, since the offeror has specified in the call option notice the price that it is willing to pay. Instead, the term sought to be implied is one that relates to the value of the offeror's shares. It appears, however, that the purpose of this implied term is to prohibit UTB from reorganising its shareholding to avoid triggering clause 9.1.12 and thereby reduce the value of SUFC, or alternatively of SUL itself.

227.    The value of SUL's shares in Blades depends on the assets and liabilities of Blades and its subsidiaries. If SUFC were obliged to exercise property call options when it was unlikely to be able to afford them, one would expect the value of Blades's shares to be reduced on account of the very substantial future liability to SUL that it was unable to meet. A reduction in the value of Blades shares would be avoided, not caused, by avoidance of the clause 9.1.12 obligation. What may be diminished is the value of SUL's own shares, not the shares in Blades that SUL owns, and SUL's real complaint is that it will not be receiving the price for the property assets payable under the property call options.

228.    In view of the conclusion that I have reached on the second implied term, above, it is unnecessary to ponder further the appropriateness of this fourth alleged implied term. I am not persuaded that it is obvious, or adds anything to the other alleged implied terms, or that any such term is necessarily implicit in the ISA.

229.    The fifth and final implied term that is asserted is that no party to the ISA must deliberately prevent or hinder any other party from fulfilling its obligations under the ISA. It is generally implicit that where performance of a contract between A and B depends on matters to be done by B, A must not seek to prevent B from performing and may be obliged to take any steps that he can take to enable B to perform: see Mackay v Dick (1881) 6 App Cas 251, 263. That is uncontroversial, but I cannot see to what issue in this case such an obligation is relevant. It may be that it was at one time considered relevant to the question whether UTB was in breach of contract in seeking on 31 January 2018 to prevent the directors of SUFC from executing property call option notices. However, if UTB was obliged on that date to cause SUFC to execute notices under clause 9.1.12 then it is in breach of contract for refusing to do so and the extra implied term adds nothing to the analysis.

D.    The Contractual Obligations Arising from Service of the Call Option Notice and the Counternotice.

(i) Introduction to the remaining issues

230.    The Counternotice served on behalf of UTB on 26 January 2018 put an end to the proposed purchase by SUL of UTB's shares in Blades and gave rise to a contract for the sale of SUL's shares in Blades to UTB for £5 million. That is the stated effect of clause 11.7 of the ISA.

231.    Under clause 9.1.12 of the ISA, SUFC is obliged to exercise the property call options if UTB acquires 75% of more of the issued share capital of Blades. Prior to January

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

2018, UTB held 50% of Blades' shares and under the contract of sale and purchase it was entitled to purchase the remaining 50% of the shares. Clause 9.1.12 would therefore apparently be triggered.

232.   UTB's case is that the contract of sale and purchase of SUL's shares in Blades for £5 million is valid but that, as a result of the transfer of most of its shares in Blades to UTB 2018 and a direction that SUL's shares should be transferred mostly to Mr Giansiracusa and Prince Musa'ad, UTB did not acquire and at no time would acquire 75% or more of the share capital of Blades. Accordingly, its case is that the Court should order SUL to transfer its shares in Blades as UTB has directed, upon payment of £5 million, and decide that UTB was right to contend by Jones Day's letter dated 31 January 2018 that SUFC should not execute property call option notices.

233.   SUL's case is that UTB's attempts to avoid acquiring 75% of the shares of Blades were unsuccessful, and that it did acquire 100% of the shares upon service of the Counternotice, such that clause 9.1.12 was enforceable from that time. If that is wrong, SUL says that it made a mistake as to the terms that it offered by the Call Option Notice, because the price of £5 million offered depended on the fact that (as Kevin McCabe assumed) SUL (or Scarborough Group companies) would also be paid the purchase price for the property assets under the property call options. It contends that that mistake was known to UTB and that accordingly the contract of sale and purchase of SUL's shares in Blades that prima facie arose from service of the Counternotice should be avoided by the Court.

234.   Since April 2019 UTB has accepted and agreed that the property call options should be exercised (and they were in fact exercised by the board of SUFC and deemed to have been exercised on 1 July 2019). In consequence, if the contract of sale and purchase is enforced SUL will indeed receive in due course the £5 million for its shares and the price payable for the property assets, as it envisaged would be the case when it served the Call Option Notice in December 2017. However, it is still necessary to resolve the question of whether clause 9.1.12 was triggered in January 2018. That is because SUL is no longer content to receive the sum of £5 million for its shares in Blades. Even if the contract of sale and purchase is not avoided for mistake, SUL claims that UTB was in repudiatory breach of the ISA and the contract of sale and purchase, such that SUL was entitled to and did terminate both contracts by notice on 6 February 2018 and is therefore not obliged to sell its shares in Blades to UTB.

235.   SUL further claims that the conduct of UTB, Mr Giansiracusa and Prince Abdullah was unfairly prejudicial to SUL's interests as shareholder and that, by way of remedy for the harm caused, UTB should be ordered to sell its shares in Blades to SUL at their current value. So, instead of receiving £5 million and (in due course) the price for the property assets, SUL seeks the right to buy out UTB at valuation. SUL argues that such an outcome is eminently fair, given that one shareholder or the other has to step aside in the interests of the wellbeing of the Club. On the other hand, it contends that for SUL to have to sell its shareholding to UTB for £5 million (which it is common ground is only a small percentage of its current market value) would be an unfair result.

236.   The remainder of this judgment will address all these remaining issues and the further question of whether UTB, Mr Giansiracusa and Prince Abdullah conspired to use unlawful means to harm SUL.

(ii) Did the Scheme succeed in evading clause 9.1.12 of the ISA?

237.   The first set of issues relates to UTB's attempt to avoid triggering clause 9.1.12: was it successful?  For convenience, I refer to UTB's attempts to do so as "the Scheme". The Scheme comprised two parts: a transfer of 40% of the shares in Blades to UTB 2018 on 24 January 2018 and the direction (either given or to be given) by UTB to SUL to transfer 30% of its shares in Blades to Mr Giansiracusa and a further 10% to Prince Musa'ad.

238.   Mr Giasiracusa gave evidence that he first became aware of the detail of clauses 11 and 9.1.12 of the ISA on about 22 November 2017 and that about that time he realised that, by directing that the shares purchased be transferred to persons other than UTB, UTB might be able to avoid clause 9.1.12.  He and Prince Abdullah both gave evidence that, following legal advice and commercial consideration, the decision to serve a counternotice was taken on (and not before) 10 January 2018.  They also said that they did not identify and decide to implement a second means of avoidance of clause 9.1.12, namely transferring most of UTB's shares in Blades to a new controlled company, until 22 January 2018.  None of these factual matters were seriously challenged by SUL and I find that they are true.  (UTB has not waived privilege in the legal advice that it obtained at those times.)

239.   In the event, although it was thought of second in time, the transfer of shares to UTB 2018 became the principal means of avoiding clause 9.1.12.  Had there been a genuine sale of shares by UTB to UTB 2018 and registration of UTB 2018 before the Counternotice was served (or at least before completion of the resulting contract of sale and purchase was due), UTB would have had a strong argument that it at no time "acquired" 75% of the share capital in Blades.  I find that Mr Giansiracusa and UTB's lawyers hoped that such registration would take place before completion of the contract of sale and purchase, but in fact that did not happen and UTB 2018 has still not been registered.

240.   The first point of challenge raised by SUL to the validity of the share transfer is that, on the true interpretation of the articles and the ISA, part only of the holding of UTB could not be transferred, only the entire holding.

241.   The articles of association are drafted so as to permit the transfer of any share or number of shares.  Any restriction on transfer of part of a holding must therefore derive (if it exists) from the ISA.  There is no express term of the ISA that prohibits the transfer of part of a Shareholder's holding.  Clause 16, which deals with dealings in shares, provides as follows:

> "16.1   No Shareholder shall do, or agree to do, any of the following during the continuance of this Agreement except with the prior written consent of the other Shareholder or otherwise in accordance with this Agreement:

> 16.1.1 pledge, mortgage, charge or otherwise encumber any Share or any interest in any Share;
>
> 16.1.2 grant an option over any Share or any interest in any Share; or
>
> 16.1.3 enter into any agreement in respect of the votes attached to any Share.
>
> 16.2    No Shareholder shall transfer or dispose of any Share or any interest in any Share other than in accordance with this Agreement and the Articles or with the prior written consent of the other Shareholder.
>
> 16.3    Subject always to the Articles, [UTB] and [SUL] shall be entitled to transfer their Shares with all rights attaching to those Shares (including, without limitation, any rights set out in this Agreement) and the parties to this Agreement agree to allow the transferee to enter into a Deed of Adherence. "

242.    The prohibition in clause 16.1 is on creating subordinate interests in or over any share. It is not a prohibition on transfer. Clause 16.2 is a general prohibition on transfer or disposal, but is subject to the articles of association and clause 16.3. Clause 16.3 refers to a transfer of Shares, which might be a contrast with the use of the singular form in clauses 16.1 and 16.2; but clause 1.9 of the ISA states that references to the singular include references to the plural, and vice versa.

243.    The express reference in clause 16.3 to the Deed of Adherence lends some support to the inference that what is contemplated is a transfer of all the shares of UTB or SUL. That is because the Deed of Adherence must be in the form attached at schedule 7. This includes a term that the parties to the ISA have agreed that the transferor is released and discharged from all the provisions of the ISA, save for certain specified provisions. However, recital (C) states that the proposed transferee "has made an offer to purchase [certain] shares in the capital of the Company currently held by the Transferor", rather than "… an offer to purchase the Transferor's shares".

244.    A further argument why a transfer of part of a holding of SUL or UTB might not have been envisaged is that certain clauses of the ISA work better if there are only two shareholders, as there were at the date of the ISA. The effect of clause 5 is that directors of Blades can only be directors appointed by SUL or UTB and on transfer of all the shares of a Shareholder it must procure the resignation of each director appointed by it (clause 5.6). There is no requirement to remove any director on transfer of some of a shareholder's shares, so UTB or SUL could sell all but one of their shares and retain all their directors, with the purchaser having no board representation. That looks quite odd, though it is not an impossible outcome. The deadlock provisions of clause 10 are drafted on the assumption that only SUL and UTB are involved in attempts to resolve the deadlock. The provisions are capable of having sensible effect for so long as UTB and SUL have a majority of the votes of the shareholders, but not if they become a minority. The call option provisions of clause

65

11 can work on the basis that any shareholder can serve a call option notice on any other shareholder.

245.   What appears to me to be conclusive of the answer to this question is clause 18 of the ISA, which restricts the ability of UTB and SUL to assign the benefit of rights under the ISA with their shares. They can only be assigned in accordance with clause 18.2, which provides:

> "If any Shares held by [UTB] or [SUL] shall at any time be transferred in accordance with the Articles their rights and benefits under this Agreement may be assigned in whole or in part to the transferee of such Shares (without prejudice to the continuing rights and benefits of the transferor under this Agreement, *for as long as it continues to hold any Shares*, provided always that the transferee shall have executed a deed of adherence *in a form agreed between the Shareholders* (acting reasonably) and provided further that no party to this Agreement shall have any greater liability to such transferee than it would have had to the transferor as a party to this Agreement." (*emphasis added*)

This clause establishes that a part of the holding of UTB or SUL may be assigned, together with rights under the ISA, on the basis that the transferor retains its rights under the ISA for as long as it continues to hold any shares. Rights may be assigned with some shares provided that a deed of adherence is signed, and in this case it must be a deed in such form as the shareholders reasonably agree. That is because the form of the deed in schedule 7 is recognised as being appropriate only in the case where all the shares of the transferor are transferred.

246.   For these reasons, on balance I consider that the ISA does permit UTB to transfer a part of its holding. Rights under the ISA can only be assigned with the shares, however, if a deed of adherence has been executed in a form agreed between the shareholders, acting reasonably. There is therefore no objection to the execution of the stock transfer form in favour of UTB 2018 as such.

247.   The next question is: what is the effect of the executed transfer dated 24 January 2018? The transfer has not yet been registered, so UTB remains the shareholder. Given that UTB 2018 is under the sole control of Prince Abdullah, Blades has no right under the articles to object to the transfer or refuse to register it. It is not disputed by UTB that, until registered, UTB still has legal title to the shares and its principal case is that it is the legal title that matters, not the beneficial interest. On that basis, on 24 January 2018, UTB retained 50% of the Blades shares for the time being. But when UTB 2018 is registered in Blades' share register as the holder of 40% of its shares, will UTB then cease to have an interest in them?

248.   That depends on whether the shares will be held by UTB 2018 on resulting trust or other bare trust for UTB. The ISA permits UTB to take shares in the name of a nominee (clause 2.5) and, in the light of that, it is not disputed that if shares are owned by a nominee or bare trustee they are to be treated as owned by UTB for the purposes of clause 9.1.12 of the ISA. However, UTB contends that the shares are beneficially

66

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

owned by UTB 2018 and will therefore not be held on any trust once UTB 2018 is registered as the holder of them.

249.   On its face, the stock transfer form suggests that consideration of £1 was paid for the shares. That is an undervalue of £3,999,999 on the basis of the price offered in the Call Option Notice.   The evidence about the transaction underlying the executed transfer of shares to UTB 2018 was extremely odd.  The cross-examination of Prince Abdullah included the following:

> "Q. Did you know anything about that transaction?
>
> A. I know that Yusuf [Giansiracusa] will – or, like, my lawyers will find another company or, like, another company, something like this.
>
> …
>
> Q. Did you apply your mind at all to that transaction?
>
> A. No, I know, I trust Yusuf that he will do a good job and he will not fool me or steal money from me anything.
>
> Q. No, not the sale to Yusuf; the sale to UTB 2018.
>
> A. No, I know he would not, like, whatever number you call the company, he will not make me do something that is not in my interest.
>
> Q. No, he said he didn't know anything about that transaction. I asked him about this. He said he didn't know anything about that one.
>
> A. So how would I know then?
>
> Q. Well, who is running this show, Prince Abdullah? Who is making the decision to transfer 40% of Blades from UTB to UTB 2018? Whose decision was that?
>
> A. Did you ask Yusuf?
>
> Q. Yes.
>
> A. Okay, so I'm sure you gave a better answer –
>
> Q. No, he didn't know about that transaction.
>
> A. Okay.
>
> Q. Whose decision was that?
>
> A. If Yusuf does not know, how would I know? … So I'm sure it was, that if I have to guess, it will be Jones Day.

THE HONOURABLE MR JUSTICE FANCOURT                                        UTB LLC v. Sheffield United
Approved Judgment

> Q. Jones day made the decision?
>
> A. No, I mean, if you... I leave all things to yourself, so I don't remember at the time I have another lawyer, I'm sure I did not have any other lawyer to consult.
>
> Q. So all that you can say is that you don't know anything about this transaction?
>
> A. No, I left everything to Yusuf and I did not have any lawyer that I was – like, to lawyers representing me; it was only Yusuf."

250.    Mr Giansiracusa had previously been asked in cross-examination about his understanding of the underlying transaction:

> "Q. ... Finally, the transfer from UTB to UTB 2018, the shares that were being transferred had an implied value of £4 million did they not? £3 million for 30%, £4 million for 40%?
>
> A. Okay.
>
> Q. On that basis. Was there any contract drawn up to govern that transfer?
>
> A. I didn't handle that part of the transaction.
>
> Q. The consideration on the face of the stock transfer form is £1. Do you know whether that £1 was ever paid?
>
> A. No, I wasn't involved.
>
> Q. So you don't have any evidence about that transaction at all?
>
> A. I wasn't involved, I have nothing – "

251.    The inference is irresistible that the transfer from UTB to UTB 2018 was just "papered" by Jones Day, probably on the instruction of Mr Giansiracusa on behalf of UTB, following the realisation on 22 January 2018 that if a transferee were registered as holder of Blades shares, UTB would or might not be the owner of them for the purposes of clause 9.1.12. I find that there was no transaction that was agreed by anyone, and no consideration was paid.

252.    Mr Gledhill QC submitted, on the strength of Pennington v Waine [2002] EWCA Civ 227; [2002] 1 WLR 2075, that although UTB 2018 was a volunteer nevertheless the gift of the shares in Blades was perfected by UTB's executing the stock transfer form and delivering it to the secretary of Blades for registration. In that case, however, it was common ground that the 400 shares were a gift of the deceased; the question was whether the gift had been perfected, since the stock transfer form had only been sent to the deceased's accountant. The question in this case is whether there was intended to be a gift of the shares by UTB to UTB 2018.

68

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

253.   Mr Gledhill argued that UTB, a company controlled by Prince Abdullah, had power
       with the consent of its shareholder, Prince Abdullah, to make a gift of property it
       owned to another company.   That is doubtless so, subject to any questions of
       insolvency and the interests of creditors (which do not arise here) and assuming that
       the law of Nevis is the same in this respect as the law of England and Wales. But
       there is no evidence of any such intended gift or Prince Abdullah's consent: Prince
       Abdullah said that he knew nothing about it.   The stock transfer form was no more
       than a piece of paper and did not reflect any underlying transaction.

254.   In those circumstances, there was no transfer of the beneficial interest in the shares of
       Blades.   Even if registered, UTB 2018 will (as things stand) hold the shares on
       resulting trust for UTB.  The presumption of advancement does not apply, as between
       two limited companies, and so unless there is evidence that a gift was intended the
       law presumes that UTB 2018 was to hold the shares on behalf of UTB.   In
       Westdeutsche Landesbank Girozentrale v Islington LBC [1996] A.C. 669 at 708, Lord
       Browne-Wilkinson explained the circumstances in which a resulting trust arises as
       follows:

              "Under existing law a resulting trust arises in two sets of
              circumstances: (A) where A makes a voluntary payment to B or
              pays (wholly or in part) for the purchase of property which is
              vested either in B alone or in the joint names of A and B, there
              is a presumption that A did not intend to make a gift to B: the
              money or property is held on trust for A (if he is the sole
              provider of the money) or in the case of a joint purchase by A
              and B in shares proportionate to their contributions. It is
              important to stress that this is only a *presumption*, which
              presumption is easily rebutted either by the counter-
              presumption of advancement or by direct evidence of A's
              intention to make an outright transfer… "

255.   In relation to personal property, Snell's Equity (33rd ed.) states, at para 25-019:

              "For property other than land, the general law about the
              presumption of resulting trust applies unmodified. On a
              voluntary transfer of personal property the transferee is
              presumed to hold on a resulting trust for the transferor unless
              the presumption of advancement applies or the transferor is
              proved to have had an actual intention to make the transferee
              the beneficial owner of the property. Where the voluntary
              transfer is made by a husband, father or other person in loco
              parentis the presumption of advancement will apply."

256.   Absent any evidence of an intention to make a gift of the shares to UTB 2018, the
       beneficial interest in the shares did not pass on the execution of the stock transfer
       form and, when UTB 2018 is registered, it will hold the shares on resulting trust for
       UTB.  At that stage, therefore, UTB will be the beneficial but not the legal owner of
       the shares.

257.   The next question is whether, as UTB contends, that means that UTB will no longer
be the shareholder, or be treated as having those shares, for the purpose of clause
9.1.12 of the ISA. The word "acquired", in the context of SUL and UTB having 50%
of the shares already, connotes obtaining more than the 50% already held, viz.
additional shares that would take the holder above 75%. On obtaining another 25% of
the shares, UTB would be "acquiring 75% or more" of the shares. If, on the other
hand, UTB sold its shares, and then later acquired 25% at a time when it held no other
shares, it would not have acquired 75%. But what if the original 50% are held by a
nominee or trustee for UTB? In those circumstances, in my judgment, UTB would
have acquired 75% even though 50% was at the time registered in the name of (and
for the purposes of the articles held by) another person. Given that UTB was entitled
under clause 2.5 of the ISA to take its shares in the name of a nominee, those shares
would be treated for the purpose of the ISA as held by UTB. It would be perverse, in
those circumstances, for UTB to be able to escape clause 9.1.12 merely by
transferring shares to a nominee.

258.   Accordingly, I conclude that UTB did own all its original 50% holding of Blades
shares at the time of the Counternotice and will continue to own those shares even if,
at a future time, UTB 2018 is registered as holder of 40% of the shares.

259.   The next question is whether, upon service of the Counternotice, UTB "acquired"
SUL's 50% of Blades shares. If it did then at that time the trigger in clause 9.1.12
was satisfied and SUL was right in contending that UTB was obliged to procure that
SUFC execute the property call option notices. UTB's case in this regard is that legal
ownership is what matters, so that although upon service of the Counternotice UTB
became the equitable owner of those shares, it did not thereby "acquire" them. SUL
contends, on the contrary, that beneficial ownership suffices for these purposes.

260.   In the context of the ISA, I consider that UTB cannot be said to have "acquired"
SUL's shares upon service of the Counternotice. Subject to SUL's claim for
avoidance on the basis of mistake, which I address in Part E of this judgment, upon
service of the Counternotice a contract of sale and purchase came into existence. As
with a contract to sell and buy land, that contract means that, for certain purposes, the
buyer is treated as the owner in equity, subject to payment of the price on completion.
That is because the buyer has it within his power to compel transfer of the property on
the completion date: a court of equity will specifically enforce the contract if the
buyer pays the price. However, the question here is not whether UTB was an
equitable owner of the shares on 26 January 2018 but whether it "acquired" them
within the meaning of clause 9.1.12.

261.   In my judgment, the parties cannot have meant that the property call options should
be irrevocably triggered at a time when the price for the shares had not yet been paid.
Until the price was paid, the shares did not fully belong to the buyer. There might
well be circumstances in which the buyer was unable to pay the price, for a time or at
all. A recipient of a low bid for its shares might be unwilling to sell and therefore
forced to buy, but not immediately have the means to do so. That is not far from the
actual circumstances that pertained in December 2017. If the price were not paid,
completion would be delayed and the contract of sale and purchase might be
rescinded, in which case the parties would continue to own Blades jointly and the
company might well be deadlocked. It was obviously not intended that in those
circumstances the property call options should be triggered. Once the price is paid,

however, the seller becomes a bare trustee for the buyer and then the buyer has "acquired" the shares, even though it is not yet registered as the holder of them. Accordingly, UTB would only "acquire" SUL's holding on completion of the contract of sale and purchase.

262. The next question is whether a different conclusion on the acquisition of the shares must be reached if, instead of paying the £5 million and receiving a stock transfer form in relation to all SUL's shares in Blades, UTB paid the £5 million and received a transfer of only one-fifth of SUL's shares, with stock transfer forms in respect of the other four-fifths of SUL's shares being delivered to Mr Giansiracusa and Prince Musa'ad, at UTB's direction.

263. Clause 11.9 of the ISA states that at completion the transferring shareholder [SUL] must deliver or cause to be delivered to the purchasing shareholder [UTB] *or as it may direct* a duly executed transfer or transfers in favour of UTB *or as it may direct.* There is therefore no doubt that UTB is entitled to nominate other persons to take transfers of SUL's holding. But it is the purchasing shareholder (UTB) that is required by clause 11.9 to deliver to SUL a banker's draft or telegraphic transfer for value in an amount equal to the option price multiplied by the number of shares being sold. It is therefore not the nominees who stand in the shoes of UTB to complete the contract: UTB completes the contract and directs SUL to execute transfers in favour of other persons nominated by it.

264. Although UTB, as of right, could have simply directed a transfer of shares to Mr Gianisracusa and Prince Musa'ad, agreements were made between them to give some colour to the direction that UTB was intending to give SUL. The agreements are in substance sale agreements under which a deposit of 10% is paid by the buyer on completion and the remainder of the purchase price is deferred to be paid on or before 30 June 2018, subject to various options. There is a put option for the buyer to sell some or all of the shares to UTB and the price for the shares sold to UTB is the deposit paid by the buyer on completion (paid pro rata if the option is exercised in respect of fewer than all the shares). There is also a call option for UTB to buy some or all of the shares from the buyer at a price 30% above the deposit paid by the buyer.

265. Thus, in substance, the contracts made with Mr Giansiracusa and Prince Musa'ad are sub-sales of the shares to be purchased by UTB from SUL, with the same time and date for completion as the completion date for the contract of sale and purchase between SUL and UTB. But the sub-sales contain put and call options that, if exercised, will result in the ultimate transferee of the shares (or some of them) being UTB.

266. The relevant question is therefore whether UTB "acquires" the shares of SUL, within the meaning of clause 9.1.12, if it completes the contract of sale and purchase by paying the price of £5 million to SUL (and otherwise complying with the requirements of clause 11.9 as regards completion) but directs that some of the shares be transferred to others, against the background that those others have made agreements with UTB to buy shares from UTB.

267. In my judgment, UTB "acquires" all the Blades shares sold by SUL in those circumstances. It does so because it completes the contract of sale and purchase, under which it has agreed to buy those shares, by paying to SUL the full price for all

A-8958

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

the shares. The fact that it directs that certain shares be transferred to others, as it is entitled to do under the ISA, cannot mean that it has not at that time acquired the shares within the meaning of clause 9.1.12. It has acquired them from SUL. A buyer who purchases shares and enters into a back-to-back contract to sub-sell them to another acquires the shares when he completes the principal contract and he does not cease to acquire them because he exercises a right to have the shares transferred to someone else. The sub-sale agreements with Mr Giansiracusa and Prince Musa'ad are *res inter alios acta*, so far as the rights of SUL are concerned. It cannot have been intended that clause 9.1.12 would not be triggered simply because UTB exercised its right (expressly given by the ISA) to have transfers executed in favour of third parties. The fact that UTB does so because it is sub-selling the shares, with an option to reacquire them, rather than because the transferee is a pure nominee, makes no difference to the analysis. The purchase of the shares pursuant to clause 11 of the ISA is one of the principal means of "acquisition" of more than 75% of the shares by UTB, and completion of a contract arising under clause 11, entitling UTB to take the shares from SUL, must have been intended by the parties to be acquisition for the purposes of clause 9.1.12.

268.    For these reasons, I consider that UTB is wrong in contending that, upon registration of the transfer in favour of UTB 2018 and completion of the contract of sale and purchase, it will not acquire more than 75% of the shares in Blades. However, SUL is wrong in contending that UTB acquired 75% or more of the shares in Blades on 26 January 2018. It would have done so only on completion of the contract of sale and purchase on 6 February 2018. Had completion taken place, UTB would have been obliged at that time to cause the directors of SUFC to exercise the property options. UTB was therefore technically right to require the directors of SUFC not to sign the property call options when called upon to do so by SUL's solicitors on 30 January 2018, but it was not entitled to seek to prevent signature after completion of the contract of sale and purchase. Although UTB tried to prevent the triggering of clause 9.1.12, it failed to achieve that. Its refusal to cause SUFC to execute property call option notices on completion was therefore wrongful.

269.    It follows that Kevin McCabe was not wholly mistaken as to the liabilities that would arise when he caused SUL to serve the Call Option Notice specifying £5 million as the purchase price. He said (and I accept) that he did so only in the belief that, if UTB elected to buy SUL's shares, UTB would also be obliged to cause the property call options to be exercised, with the result that within 12 months SUL or other Scarborough Group companies would receive the purchase prices specified in the five property call option agreements. On the basis of my conclusions, he was in fact correct in that assumption, although if UTB had genuinely sold or gifted most of its existing shares to another person and that other person had become registered as holder of those shares before completion of the contract of sale and purchase, the outcome would have been different.

270.    Kevin McCabe was mistaken in his assumption that UTB would not attempt to avoid the obligation in clause 9.1.12 and claim that it had done so, but it is clear from Mr Tutton's email to Kevin McCabe headed "Texas shoot out" dated 22 November 2017 that they did consider the risk that UTB would serve a counternotice but then be unable or unwilling to find the money to pay for the property assets 12 months later. So SUL were aware of the risk that the property assets might not be paid for on time,

but they did not foresee that this might be because UTB disputed its obligation to do so. That kind of mistake – as to the motives and likely conduct of the counterparty – is clearly not the kind of mistake that entitles a party to avoid a contract, as I shall explain. In case I am subsequently held to be wrong in my conclusion that UTB would acquire 75% of more of Blades shares, I will go on to consider whether Kevin McCabe's (assumed) mistake about clause 9.1.12 being triggered was such as to entitle SUL to have the contract of sale and purchase arising from the Call Option Notice and the Counternotice avoided.

E.    Mistake

271.    On 29 December 2017 SUL gave UTB written notice that it was exercising the call option in clause 11 of the ISA. The notice contained two offers in compliance with clause 11.4.4: an offer by SUL to purchase all UTB's shares in Blades at an aggregate price of £5m, and an alternative offer by SUL to sell all its shares in Blades to UTB at the same price. The notice specified 6 February 2018 as the date on which completion was to take place.

272.    The effect of the offer notice was (and was understood to be) that if UTB did nothing in response by 28 January 2018 it would be bound to sell its shares to SUL for £5m on 6 February 2018, and that if by 28 January 2018 UTB served a valid counternotice SUL would be bound to sell its shares to UTB for the same price on that date. Kevin McCabe on behalf of SUL believed that, if a valid counternotice was served by UTB, UTB would have to cooperate with SUL to cause SUFC to exercise the property share options. He had no specific belief or assumption about how or when that would have to happen, but he assumed that it would happen as part of the sale of SUL's shares to UTB. As I have explained, he was aware that there was a risk that SUFC, by then controlled by UTB, would not comply with its obligations under the property call options, but he did not identify as such a risk that UTB would seek to avoid (or would dispute) the obligation to exercise the property call options.

273.    If UTB served a valid counternotice then, under clauses 11.7 and 11.10 of the ISA, a contract of sale and purchase of SUL's shares would come into existence on the date of service of the counternotice, to be completed on the date specified in the counternotice. In view of the language of clauses 11.4.4(b) and 11.7, I agree with Mr Downes QC that the contract of sale and purchase of SUL's shares would be formed by express offer and acceptance of the terms of the alternative offer contained in the Call Option Notice. Although clause 11.7 says that the obligations in those circumstances are "subject only to the receipt of the Option Price", it is clear from clause 11.9 that payment of the Option Price is a matter of completion and that a binding contract of sale and purchase would come into existence upon service of the counternotice, with an obligation to pay the price on completion.

274.    The contract of sale and purchase arising from the service of the Counternotice is, of course, a separate contract from the contracts in the articles of association and the ISA. The terms of the contract of sale and purchase are principally those stated in the Call Option Notice and the Counternotice, in part by reference to clause 11 of the ISA. The fact that the ISA specifies terms of the contract of sale and purchase does

not mean that there is no separate contract. The contract of sale and purchase and the ISA exist in parallel.

275.    SUL argues that the contract of sale and purchase is void, or voidable, by reason of unilateral mistake made by SUL. The nature of the mistake that Mr Kevin McCabe asserts is explained in paras 269, 270 above. Although I have held that he was not mistaken about the obligations that bound UTB but only about the motives of UTB, for the purposes of this part of the judgment I assume that UTB had successfully avoided the obligation in clause 9.1.12 and that Kevin McCabe accordingly was mistaken as to the obligations that would flow from service of a counternotice by UTB. I will consider in the alternative the significance of SUL's actual mistake (as I have found it to be) about the motives of UTB.

276.    It was frankly accepted by Mr Giansiracusa and Prince Abdullah that they knew that Kevin McCabe must have assumed that the Counternotice would trigger the property call options under clause 9.1.12 of the ISA, otherwise he would not have risked being bought out for £5 million. They therefore knew that he was mistaken in believing that the property call options would be exercised because they had it in mind to prevent those options being triggered. The mistake as to the consequences of service of a counternotice was one made by SUL only: it was a unilateral mistake, not a common mistake.

277.    There is only a limited jurisdiction to avoid a contract on the grounds of unilateral mistake. The law in this regard is now reasonably clear, although for half a century or more it was bedevilled by confusion. The relevant distinctions are twofold: between common mistake and unilateral mistake, and between mistake as to the terms of the contract (or the identity of the contracting parties) and mistake about relevant facts or the law: see Chitty on Contracts (33rd ed), paras 6-001, 6-002. In the case of unilateral mistake, only mistakes as to the terms of the contract or identity (a "type 1 mistake") will suffice to prevent a valid contract from coming into existence, not some other mistake as to facts or motive (a "type 2 mistake"). The fact that one party knows that the other party has entered into the contract under some kind of mistake is not sufficient to avoid a contract.

278.    The law was summarised by Aikens J in Statoil ASA v Louis Dreyfus Energy Services LP [2008] 2 Lloyd's Rep 685 as follows:

> "[87]…The general rule at common law is that if one party has made a mistake *as to the terms of the contract* and that mistake is known to the other party, then the contract is not binding. The reasoning is that although the parties appear, objectively, to have agreed terms, it is clear that they are not in agreement. Therefore the normal rule of looking only at the objective agreement of the parties is displaced and the court admits evidence to show what each side subjectively intended to agree by way of terms. If it is clear from such evidence that there was not consensus, then there can be no contract, because the parties have not truly agreed on the terms. Some of the cases talk of such a contract being "void", but I think it is clearer to say that there was never a contract at all.

74

A-8961

THE HONOURABLE MR JUSTICE FANCOURT                                UTB LLC v. Sheffield United
Approved Judgment

[88] However, if one party has made a mistake about a fact on which he bases his decision to enter into the contract, but that fact does not form a term of the contract itself then, even if the other party knows that the first is mistaken as to this fact, the contract will be binding. That was the effect of the decision of the Court of Queen's Bench on appeal from the County Court in *Smith v Hughes* (1871) LR 6 QB 597, see particularly at page 603 per Cockburn CJ, and page 607 per Blackburn J. The correctness of that decision and the analysis in it has never been doubted. "

279.   In that case, the buyers and sellers of a cargo of gas negotiated a compromise of the sellers' demurrage claim. In calculating their claim, the sellers made a mistake about the date on which the vessel's lay time ended. The buyers knew that the sellers had made a mistake but decided not to draw it to their attention. The claim was compromised for a figure significantly less than the amount of the claim. When the buyers realised their mistake, they claimed that the contract of compromise was not binding, or that it should be set aside in equity. The judge held that it was not a term of the compromise that the discharge of the cargo was completed on a particular date. There was therefore no mistake about a term of the contract. The reasoning of Aikens J was cited with apparent approval by Hamblen J in Merrill Lynch International v Amorim Partners Ltd [2014] EWHC 74 (QB) at [55].

280.   Aikens J also rejected the argument that there was a wider jurisdiction in equity to rescind a contract formed on the basis of a unilateral mistake about a fundamental assumption that a party has made where the mistake was known to the other party. He referred to the decision of the Court of Appeal in Great Peace Shipping Ltd v Tsavliris Salvage International Ltd [2003] QB 679, and said:

"[103] ... The Court of Appeal reiterated the rule that a contract would only be held void at common law by reason of common mistake if the mistake of both sides concerned a fundamental assumption of a state of affairs (positive or negative) and the mistake rendered performance of the essence of the obligation impossible.

[104] The Court of Appeal also considered whether there was any equitable principle which widened the circumstances in which a court could rescind a contract for common mistake when the common law would hold it was binding. The court declared that there was no jurisdiction to grant rescission of a contract on the ground of common mistake where that contract is valid and enforceable according to ordinary principles of contract law: para 157.

[105] With respect to Andrew Smith J, I must disagree with his conclusion that there is an equitable jurisdiction to grant rescission of a contract where one party has made a unilateral mistake as to a fact or state of affairs which is the basis upon which the terms of the contract are agreed, but that assumption does not become a term of the contract. None of the cases he

75

> cites… is authority for the existence of that jurisdiction. The *Great Peace* decision strongly suggests that there is no such jurisdiction in the case of a unilateral mistake. If there is no such jurisdiction in the case of a common mistake, I fear I am unable to see how, in logic, one can devise a rationale for an equitable jurisdiction in the case of a unilateral mistake, at least where there has been no misrepresentation by the other party."

In my judgment, that correctly states the law, though Aikens J was not addressing the different question of whether a unilateral mistake other than as to the terms of the contract or identity might lead a court of equity to decline specifically to enforce a valid contract.

281.    Mr Downes QC submits that Kevin McCabe's mistake was one as to the offer price, in that the price offered mistakenly assumed that a counternotice would trigger clause 9.1.12 of the ISA. He submits that the offer to sell was based (as a matter of obvious inference) on the operation of clause 9.1.12 and therefore could only be accepted on those terms. I reject this attempt to categorise Kevin McCabe's mistake as a mistake as to the price payable. The price payable was £5 million, as specified by SUL in the Call Option Notice, which made an alternative offer to UTB to sell SUL's shares in Blades at that price and which was accepted in terms by UTB. The offer was not £5 million plus the price payable under the property call options. The fact that Kevin McCabe believed (but UTB did not believe) that if a contract of sale and purchase of SUL's shares was made clause 9.1.12 would operate was not a mistake about the price but a mistake as to the circumstances in which a contract of sale and purchase of SUL's shares would trigger the obligations in clause 9.1.12 of the ISA. It was also a mistake of motive because it was a mistake about the risk or possibility of UTB acting so as to avoid triggering clause 9.1.12, if it could. The mistake involved an understanding about the meaning and effect of the ISA (which was a different contract) and about the conduct of UTB, but those matters were not terms of the contract of sale and purchase.

282.    There is in any event no persuasive evidence that, but for its mistake, SUL would have specified a different price in the Call Option Notice. In his witness statement, at para 416, Kevin McCabe asserts that "if I had thought that UTB were going to attempt to renege on obligations under [clause 9.1.12] then the Option Notice would have provided a considerably higher figure". However, Mr Tutton's third witness statement, at para 192 states: "We would not have called for their shares at all if we had any knowledge whatsoever that they would seek to perform a purported manoeuvre so as to seek to evade the Property Call Option". On this point, I consider that Mr Tutton must be right and I reject Kevin McCabe's evidence. The price payable for the property assets was of much greater significance to Kevin McCabe than whether he received £5 million or £10 million for SUL's shares in Blades. He would not have taken the risk of losing all control over Blades if there was a real prospect of UTB not having to procure payment for the property assets, nor would he have risked a higher offer for UTB's shares being accepted by UTB.

283.    Accordingly, the ratio of the Statoil case applies and the result must be the same: there was no unilateral mistake as to a term of the contract of sale and purchase of SUL's shares in Blades.

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

284.   Mr Downes also argued that there was an equitable jurisdiction to set aside the
       contract on the basis that SUL's mistake was known to UTB and that it was
       unconscionable for UTB not to draw the mistake to SUL's attention. He referred to
       the equitable jurisdiction to rectify a contract where one party takes unconscionable
       advantage of another's mistake. He went as far as to say that the failure to draw
       attention to the mistake amounted to dishonesty on the part of Prince Abdullah and
       Mr Giansiracusa. I reject those arguments. There is no equitable jurisdiction to
       avoid a contract on the ground of a unilateral mistake of a "type 2" character, as
       explained by Aikens J. Rectification cases are, by definition, cases of mistake as to
       the terms of the contract, and so the equitable jurisdiction to rectify in cases of
       unilateral mistake follows the approach of the common law to cases of "type 1"
       unilateral mistakes, though providing the additional remedy of correction of the
       written document to reflect what equity regards as the true bargain, rather than
       concluding that no valid contract was made. The question of whether equity will
       decline specifically to enforce a contract where there is unconscionable conduct (or
       "sharp practice" as it is characterised in some of the rectification cases) is a different
       question. But in my judgment the contract of sale and purchase cannot be set aside on
       account of UTB's knowledge of Kevin McCabe's mistake of motive.

285.   Whether the contract should be specifically enforced, as UTB claims, is a question to
       which I will return after considering all the circumstances in which the contract came
       into existence in January 2018. There are wide-ranging disputes of fact about the
       conduct of the parties during 2017, in particular who was to blame for the total
       breakdown in relations in November 2017; whether UTB, Prince Abdullah and Mr
       Giansiracusa conspired together to injure SUL by unlawful means; and whether they
       conducted the affairs of Blades in a manner unfairly prejudicial to SUL's interests as
       shareholder.

286.   Another important part of SUL's case is the alleged breaches of contract by UTB.
       SUL argues that UTB was in breach of implied terms of fair dealing and good faith
       (between November 2017 and January 2018) and in breach of other implied terms (in
       January 2018) in pursuing the Scheme to avoid clause 9.1.12 of the ISA. SUL
       contends that the breaches of contract were repudiatory breaches of contract, such that
       it was entitled to and did terminate the ISA and the contract of sale and purchase of
       Blades shares by notice on 6 February 2018. Although I have held that there is no
       implied term of fair dealing and good faith and that the Scheme was unsuccessful, I
       will make findings about the facts alleged in case it is later held that I was wrong in
       relation to the alleged implied terms. I will then address the question of what
       breaches of contract are proved and whether the breaches were repudiatory breaches,
       so that SUL was entitled to put an end to the ISA or the contract of sale and purchase,
       or both.


F.     The Disputed Events in 2017

287.   I heard evidence from several witnesses from each side about the events of 2017 that
       led to a complete breakdown in the relationship between Kevin McCabe and Prince
       Abdullah, and between those acting on their behalf as directors of Blades and SUFC.
       The evidence that I heard covered the full history of the contractual relationship and
       up to date. Understandably, the witness statements and the cross-examination dwelt

on matters of dispute in the years 2014, 2015 and 2016 as well as the more recent and directly relevant events in 2017 and 2018.  What happened prior to January 2017 is important background and each side sought to identify aspects of the other side's conduct that was unsatisfactory in itself, or that in some way laid the ground for future disagreement or proved character traits of the principals.  With some exceptions, however, it is not necessary for me to attempt to resolve all disputed matters in those earlier years, for example whether spending money on particular players was or was not approved specifically by the board to the knowledge of Kevin McCabe.  These disputes are peripheral to the important issues that lead directly to the breakdown in November 2017 and the steps that both parties took thereafter.

288.    From the lead up to 2017, I reach the following general conclusions:

i)      The parties had not been clear at the outset about how SUFC would be funded after the initial two years of UTB's funding (i.e. from about the end of the 2014/15 season).  Each side had different assumptions and the ISA was non-specific about it.

ii)     Kevin McCabe was in principle keen to pass on the baton of responsibility for the Club's affairs, but in his mind that depended on UTB proving themselves to be capable and suitable as custodians of the Club's future and willing to inject much more money.  He wished to be rid of the constant cash drain on Scarborough Group's resources, but he did not want to hand on the baton to someone who would be unable to lead the Club to a better place.

iii)    Kevin McCabe was devoted to the Club and wished above all to see it succeed. I find that he felt very personally the failure of the Club since 2007, when it was relegated after only one season in the Premiership (as it then was) at the time of the Carlos Tevez controversy and then relegated again, and he was determined to see it regain top-tier status.

iv)     Prince Abdullah, though mostly absent, also became fired with enthusiasm for (and, in due course, love of) the Club and genuinely wishes to see it succeed, though from June 2014 he was preoccupied with ministerial duty in Saudi Arabia and had less influence on the Club as a result.  The directors that he appointed to look after his interests did not perform well, and the Club suffered in 2014/15 from having its affairs principally controlled by the manager, Mr Clough, the then CEO, Mr Brannigan, and Prince Abdullah's attorney, Mr Phipps, who became close to them both.

v)      Kevin McCabe was disappointed with the way that things had developed while Prince Abdullah's £10 million was funding the Club's losses.  He determined to remove all three of the above-mentioned individuals.  This coincided to a large extent with the realisation that Prince Abdullah would only invest further in the Club if that investment was matched by SUL.  Although Kevin McCabe did not wish to invest further, he ultimately had to agree to do so, in order to keep the Club solvent.

vi)     As a consequence of being required to fund the Club, Kevin McCabe determined to exert greater control over the way that the Club was being run, in an attempt to reduce the losses that it was incurring (while still stuck in

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

League One, contrary to the overriding objectives of the ISA). He put in place (with Prince Abdullah's acquiescence) a new manager and new executives, all of whom were known to the McCabe family personally or worked for Scarborough Group companies. Messrs Clough, Brannigan and Phipps were removed.

vii)   However, Prince Abdullah encountered very serious cash flow difficulties in 2015, which only began to improve in 2017 when he made difficult decisions to sell investments at a substantial loss. Those financial difficulties and SUL's reluctance to invest further made it inevitable that another investor would have to be found. Both sides realised that and set about trying to find one, but the search proved unsuccessful. Early in the 2016/17 season, Prince Abdullah was unable to meet his share of the funding needed to keep the Club afloat and he left SUL to inject (very reluctantly) further money that was urgently needed.

viii)  Disagreements about funding, then SUL's deliberate failure to honour the July 2015 Funding Agreement and Prince Abdullah's failure to inject money during the 2016/17 season led to a deterioration of the personal relationship between Kevin McCabe and Prince Abdullah. UTB appointed Messrs Howard and Hawasli to conduct a review of the Club's operations and the Howard Report showed Prince Abdullah that steps urgently needed to be taken to impose good corporate governance on Blades and SUFC and to change the way in which Kevin McCabe was running the Club. The new manager was not a success and was replaced a year later, with the Club still in League One.

ix)    A hoped-for investment from the Qatari Investment Authority had not materialised and at the end of 2016 Prince Abdullah was working on contacts in Saudi Arabia to try to find a new purchaser for SUL's interest in Blades. By the end of 2016, he had had meetings with Dr Rakan Al Harthy of Sela Sport, who was expressing interest in the Club.

x)     The Club was, at that time, in serious financial difficulty. Mr Bettis had come on board as CEO and was bringing some financial rigour to the budgets and cash flows, but the Club was still loss-making and needed cash investment of about £8 million a year. Neither side was willing to invest further, pending the arrival of a new investor, but SUL had to pay further money to SUFC in order to protect it from insolvency.

xi)    There was, in short, an extremely difficult and rather stressful position by January 2017. There was no progress in terms of promotion from League One, the owners were unable or unwilling to invest further in the Club and, despite serious endeavours, no white knight had agreed to buy a stake in the Club's future, though Sela Sport was perceived to be the next possibility.

289.   Before embarking on resolving the disputed events of 2017, it is appropriate to say something about the witnesses that I heard and the quality and reliability of their evidence.

290.   Kevin McCabe gave a remarkable performance in the witness box. He is now in his 70s and, on his own admission, has been slowing down and is ready to hand over the affairs of the Club. He was cross-examined for the best part of three days and

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

appeared to relish the experience, as presenting an opportunity to set the record straight and explain why he was right. He is clearly a man of considerable physical reserves, appearing to be as fresh and alert at the end of the three days as at the beginning, and willing and able to engage in detailed debate and often lengthy answers and explanation throughout. He is a self-made man and entitled to feel proud of his achievements, but on the other hand he gave every impression of there being little in the way of truth or objective fact that differed from his own understanding or opinion. He plainly believes that his way is the only proper way of doing things.

291.   The other principal characteristic that was evident was his ability to talk forcefully and persuasively on any subject. He has the gift of eloquence and was never at a loss for a reasoned and detailed explanation of a matter that he was questioned about, and indeed many points that he was not being asked about. It was easy to imagine his being a considerable personal force at the Club and a dominating presence. There is a recurring theme in the emails in 2017 of Kevin McCabe wishing to have face-to-face meetings with Prince Abdullah and Prince Abdullah and Mr Giansiracusa preferring to communicate by email. It is easy to understand Kevin McCabe's preference. He knows that he is able, by force of personality and a command of words, to dominate a conversation and thereby seek to impose his own will on those to whom he speaks.

292.   He demonstrated to me an ability to turn any question that he was asked or any particular issue into an argument or exposition of his choice, often replete with self-justification. It would be an exaggeration to say that he did not answer questions that he was asked, but he rarely answered questions directly, often answered a different question rather than the one that he had been asked, or used the question as a springboard from which to assert his own perception and opinion, and he sometimes avoided answering questions that he did not wish to answer. His answers to questions too often involved assertions that were patently at odds with the documents to which he was taken, or implausible explanations for the difference. These included (on a repeated basis) that emails were "only banter between colleagues"; minutes were unreliable because they were drawn up weeks or months late; social media was inaccurate and unreliable, and he was too busy with other business to reply to emails correcting a false statement.

293.   I consider that Kevin McCabe is only able to recall events or even look at documents through the prism of his own subjective beliefs and understanding of how things were, or how in his opinion they must have been, and his belief about who was in the right and who was wrong. There are numerous instances in which the account that he vigorously asserted and defended in the witness box was obviously wrong, or the opinion that he espoused was without any proper factual basis. I shall address some of these in the sections of this judgment that follow.

294.   In one case he accepted that he had been in the wrong, namely the failure to tell Mr Bettis that his pay had been stopped, and he apologised for that; yet the real question is not whether he was in the wrong, which he plainly was, but why he acted in the underhand way that he did. I have come with regret to the conclusion that Kevin McCabe was being manipulative and devious in relation to the Deloitte, Van Winckel, Bettis and Ratcliffe incidents, and some of his evidence about those matters was disingenuous. Kevin McCabe was not out-and-out dishonest in the evidence that he gave, though at times disingenuous and less than fully frank. But his perception of

THE HONOURABLE MR JUSTICE FANCOURT                                                UTB LLC v. Sheffield United
Approved Judgment

events that happened in the past is distorted in important respects by his own beliefs and prejudices about what was right and wrong at the Club and I feel unable to rely solely on his evidence about those events. It is also clear that to a degree he has re-cast events in order to suit the case that is being advanced on his behalf.

295.  It would be wrong, however, to leave the subject of Kevin McCabe's evidence without acknowledging his devotion to the Club and the considerable generosity of his funding of it over many years. He deserves respect for that. Another admirable characteristic was his unwillingness to make unsubstantiated allegations of serious wrongdoing against others, even though he has felt himself to have been badly wronged by Prince Abdullah and Mr Giansiracusa.

296.  Mr Tutton also gave an extraordinary performance in the witness box. He was extremely nervous and uncertain in much of the evidence that he gave, and eager to blame others for things that had gone wrong and absolve himself from responsibility. I regret to say that I consider that some of the evidence that he gave in his witness statements, particularly in relation to the Charwell loan, was a fabrication. He readily abandoned his account of how he was told by Charwell's solicitors that Sela Sport was behind the Charwell loan, when pressed to explain the conversations that he said that he had had. His evidence from the witness box about how the Charwell loan "stank" and SUL were the victims in the matter and Prince Abdullah personally responsible was a bravura performance but not at all convincing. He readily accepted that SUL's solicitors had written parts of his witness statements for him, as if that absolved him from responsibility for what was in them.

297.  I formed the very clear view from Mr Tutton's evidence, his body language, the content of contemporaneous emails and documents and his constant presence in court, sitting next to SUL's solicitors throughout, that he has acted in this case as Kevin McCabe's trusted lieutenant and has been largely responsible for shaping the way in which its case was presented, by the account and instructions that he has given. It was only he who was willing to say in his oral evidence that Prince Abdullah had taken a bribe from Sela Sport, notwithstanding the documents produced on disclosure from third parties that showed conclusively that the ultimate beneficial owner of Charwell was the bin Laden family, not Sela Sport, and that the Charwell loan had been repaid in full. I feel unable to place reliance on Mr Tutton's evidence, save where it amounts to an admission against SUL's interests or is supported by other reliable witnesses or documentary evidence.

298.  Scott McCabe was implacable in his defence of his father on certain issues, even where the line of defence was obviously wrong, for example the specification and sponsorship of the new dugouts, and he was less than completely frank on others, such as the number of non-football events able to be held on the new Desso pitch at Bramall Lane. There was, inexplicably, nothing in his witness statement about his personal involvement in signing the minutes of the June 2017 resolution about keeping Mr Bettis and appointing a COO. I treat his evidence with some caution, though there was little on which his evidence was of particular importance for the resolution of the issues in the case.

299.  Simon McCabe appeared to me to be an honest and straightforward witness. He made concessions against SUL's interest where it was proper to do so. I feel that I can rely

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

on his evidence in general, though again there was little that he was able to add of particular importance for the resolution of the key issues in the case.

300. Mr Birks was a cautious and somewhat diffident witness, who was doing his best to assist the court. However, on one particular point on which his evidence was important I am quite satisfied that he was wrong in his claim that Mr Giansiracusa told him in October 2017 that UTB had repaid its novated part of the Charwell loan. What Mr Giansiracusa said was that part of the loan was novated to UTB so that Blades did not have to repay it. Mr Birks' only interest at the time was in knowing Blades' liability. What he and Mr Tutton say that he recalled in April 2018, upon discovering that UTB's novated debt remained outstanding, was incorrect. I see no reason to conclude that Mr Birks made anything other than an honest mistake: the language of para 74 of his witness statement, which sets out his mistaken recollection, demonstrates how easily he could have misunderstood Mr Giansiracusa's explanation that UTB had the responsibility to pay part of the Charwell loan debt. It was Mr Tutton who made the most of the mistake because it served his (and SUL's) theory at the time that the novation of part of the debt was a disguised bribe of Prince Abdullah by Dr Rakan.

301. Mr Giansiracusa was an intelligent, eloquent, careful and in my judgment truthful witness. He was accused by Mr Downes QC of having acted in a deliberately slippery way. There were undoubtedly occasions on which Mr Giansiracusa was pushing the limits of what was fair and straightforward in his dealings with SUL. In particular, he drafted the May 2017 board resolution in a way that made it more likely that SUL-appointed directors would overlook the main point, which was the agreement to retain Mr Bettis, and he misstated the extent to which that matter had been discussed with both owners. On occasions he drafted and amended minutes of meetings in a way that was calculated to provide a record favourable to UTB rather than an entirely accurate summary of what took place: the minutes of the Bad Ragaz meeting in July 2017 and the minutes of the October 2017 board meeting, in particular. In such cases, his view (and justification) was that he was not dealing with unsophisticated people and that accordingly they could be expected to read what was provided and object where appropriate to do so. Mr Giansiracusa knew that Prince Abdullah was being less than straightforward with Kevin McCabe about the Project Delta "commission" and played his part in the cover up of the use to which that commission (if paid) would have been put. These were not attractive features of Mr Giansiracusa's conduct, but they were not abusive or improper. He was not evasive or untruthful about these matters in evidence and, despite what I have said about aspects of his conduct, I found him to be a truthful witness.

302. Prince Abdullah was at a slight disadvantage in giving evidence, in that his English, though good by any standards, was not entirely fluent where sophisticated language or concepts were concerned, and there were moments where genuine misunderstandings occurred during his cross-examination and he had to ask for words to be explained. His spoken English is quite strongly accented, which led in some cases to difficulty with the transcription of his evidence. I take these matters into account in assessing the way in which he gave evidence, what he said and the reliability of his evidence. He is, however, a very intelligent man who readily understood the nature of the dispute and the criticisms made of him. Other witnesses stated that the Prince was a shy man and that is consistent with the impression that he gave in the witness box.

THE HONOURABLE MR JUSTICE FANCOURT      UTB LLC v. Sheffield United
Approved Judgment

303.   The most striking thing about Prince Abdullah's evidence was his apparently poor memory of events, in particular (as he explained) routine meetings that took place in his home. It was evident to me that Prince Abdullah is not a man for small detail: he relies on others to implement his wishes and deal with the fine print and does not immerse himself in the detail of transactions. Nevertheless, there were occasions when it was quite striking that Prince Abdullah appeared to have no memory whatsoever of meetings having taken place, or of what was said or who was present at such meetings, even when those meetings took place in hotels in London or Paris rather than at his home. A particular concern was his professed inability to remember his meetings and discussions with Dr Rakan over the period September 2016 to April 2017, other than the meeting with him in Dubai. I consider that, for whatever reason – whether to shelter his friend or protect himself or UTB's interests – Prince Abdullah was not giving as full a picture as he could have done about his dealings with Dr Rakan.

304.   I am also concerned that disclosure was delayed and remained incomplete. The Prince's mobile phone, which contained business emails and Whatsapp messages, was initially not part of UTB's or the Prince's disclosure and was only disclosed under sustained pressure from SUL's solicitors. There were other areas where there must have been more documents – such as the Prince's business diary – but nothing was produced. There is also no doubt in my mind that Prince Abdullah knew and understood that he was concealing from SUL the fact that half of a very substantial commission payable by SUL on the intended sale of its shares in Blades (or some of them) was to be paid back to him. Prince Abdullah thought that this was justified, in view of the part that he had played in Project Delta and the work that his employees had done to further it, but nevertheless this was not conduct that measured up to his own description of himself as being recognised to be beyond criticism in his financial dealings.

305.   Despite these matters, and subject to the qualifications that must go with them, I found Prince Abdullah to be a generally reliable witness, and where I am satisfied that he had any detailed recollection of certain meetings – for example the Bad Ragaz meeting of July 2017 and the Corinthia Hotel meeting of 1 November 2017 – I prefer his account of those meetings to Kevin McCabe's account.

306.   Mr Alsaady was an impressive, honest and helpful witness. I accept his evidence, in particular that – despite the appearance given by some of the documents – he was only acting for Saleh bin Laden and not for Sela Sport.

307.   Mr Bettis was called as a witness by UTB but was in a difficult position. He had the respect of both sides in the litigation (despite the unfortunate treatment of him by SUL in November 2017) but was conscious that he did not want to upset either of them by the evidence that he gave, since his future employment – in a job that he evidently loves – might depend on it. He should have been a wholly impartial witness, on whose evidence I could entirely rely, but I am left with concern about some of the evidence that he gave. He was watchful and careful, and started out in a frank and straightforward way. However, by shortly before lunch on the day on which he gave evidence he had been rattled by being criticised by Mr Downes for allowing himself to become an ally of the UTB side during 2017, after the May 2017 lunch with Prince Abdullah in Los Angeles.

83

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

308. The result – it appeared to me – was that after lunch Mr Bettis decided to say as little as possible, and broadly agreed with any leading question that was put to him. Seeing an open goal, Mr Downes took full opportunity to ask him to agree with a large number of factual propositions, or in many cases comments, that were calculated to serve SUL's interests in the trial. For the most part, Mr Bettis obliged and agreed with or acquiesced in Mr Downes' propositions with a single word or (quite often) a single noise of assent. I feel unable to give great weight to this evidence, in the circumstances. In any event, what Mr Bettis thought of Kevin McCabe as a person and employer is hardly material to the issues. The one matter on which Mr Bettis remained resolute was the suggestion that it was understood by him at any time that he was definitely to leave the position of CEO in 2017. He considered that it remained uncertain at the end of the October 2017 board meeting and was never resolved.

309. In the light of those observations about the main witnesses, I can return to the events of 2017 that are in dispute.

310. At the meeting on 9 January 2017 in Dubai, there was discussion between Dr Rakan, Prince Abdullah and Kevin McCabe about a proposed investment in Blades. Prince Abdullah had previously travelled to Jeddah to meet Saleh bin Laden on 30 December 2016, to discuss a possible investment by him. I accept Prince Abdullah's evidence that a loan or early advance of £3 million was not discussed there, though it is clear that a payment of £3 million towards 2016/17 losses was to be paid as part of the transaction. I find that this was raised and discussed in Jeddah: it was referred to as such in a Whatsapp message of 30 December 2016. Mr bin Laden had obviously expressed sufficient interest in a substantial investment that his name was – as all agree – specifically mentioned by Dr Rakan at the meeting on 9 January as a possible investor.

311. Given that Prince Abdullah had met Mr bin Laden shortly before that meeting, it is inconceivable that there was no discussion of him as a potential investor, but I find that there was also shared hope and expectation that Sela Sport itself would take a small stake. Everyone involved seemed to desire that outcome, for various reasons. Kevin McCabe was aware that Sela Sport had previously organised investment or a fund for investment in a New York football club and the expectation at that time was that Sela Sport would similarly "organise" the investment. I find that, apart from the genuine possibility that Sela would invest, it was also regarded by all involved as convenient for Sela Sport to front the proposed deal and therefore the investor was referred to throughout as Sela Sport, rather than Charwell or bin Laden.

312. Although a £3 million early loan had not previously been raised with Dr Rakan and had not been discussed with Mr bin Laden on 30 December 2016, it clearly was discussed in Dubai. It was very important from SUFC's perspective, as the owners were unwilling to fund the Club at that time. It mattered not greatly whether it was to be an advance on a larger capital investment or a loan: SUFC desperately needed the money. Although Dr Rakan evidently gave some comfort about the £3m loan, it could not have been with the authority of Mr bin Laden at that stage. However, Dr Rakan must have appreciated that if the investment was to proceed the "loan" could be treated as a part payment of the capital investment. That is what all the parties understood could be arranged. There is no evidence that Dr Rakan was offering himself or through Sela Sport to lend £3 million.

84

THE HONOURABLE MR JUSTICE FANCOURT                                          UTB LLC v. Sheffield United
Approved Judgment

313.   Dr Rakan evidently gave sufficient comfort about the investment on that occasion for
       Kevin McCabe to believe that everything was very promising and likely to bear fruit.
       I find that the McCabes believed after the Dubai meetings that a loan would be made
       by the investor(s), that it would be capitalised if the investment proceeded, and that it
       could still be capitalised if the investment did not proceed.  What was not spelt out in
       Dubai was whether the lender or the borrower should have the option to capitalise if
       the investment did not proceed, but it is clear that the McCabes assumed that it should
       be at the borrower's option.  That is what Scott McCabe told Mr Tutton in an email
       later on the same day.

314.   Kevin McCabe said that, at the end of the meetings in Dubai, Prince Abdullah told
       him that whatever happened at least Blades would have a £3 million loan that did not
       have to be repaid.  He and Mr Tutton (who was not in Dubai) later claimed to have
       relied on that assurance, and on its being a justification for Prince Abdullah having to
       repay the part of the Charwell loan that remained on Blades' books.  At an even later
       stage, the supposed assurance of Prince Abdullah was relied upon (despite the fact
       that the Charwell loan had by then been repaid in full) as evidence that the financial
       accommodation that was being arranged was in the nature of a bribe from Sela Sport
       to Prince Abdullah.

315.   Prince Abdullah's account was that he said at the end of the meeting that the loan
       might not have to be repaid if an investment was made in the Club, and that even if
       there was no investment the loan was interest-free and would hopefully be paid back
       using income from new sponsorship deals once the Club was promoted.  He says that
       he gave Kevin McCabe no assurance that the loan would not need to be repaid in any
       circumstances.

316.   I consider it most unlikely that Prince Abdullah gave Kevin McCabe any absolute
       assurance.  Whether or not the loan would be made was still uncertain, even if Dr
       Rakan had agreed in principle that one could be arranged.  Undoubtedly, all parties
       had fastened on the fact that any such loan would be made by the potential investor(s)
       and so could be converted to equity in the event that the investment proceeded.  There
       was considerable optimism (rather too much optimism) that the investment would
       proceed.  Kevin McCabe in particular assumed that it would.  In a rather strange way
       (for an experienced businessman), Kevin McCabe was reassured that the investment
       would proceed by the fact that Dr Rakan agreed that in principle a loan could be
       made, and then -- when the loan was made by Charwell -- took that as proof that the
       investment was indeed going to happen.

317.   I consider that both Prince Abdullah and Kevin McCabe were in optimistic mood at
       the end of the meetings in Dubai, not just because an investment was now a serious
       prospect but because there was agreement in principle that a much needed loan would
       be made available.  I do not however accept that Prince Abdullah said anything more
       than that the loan would be capitalised and that (since both parties believed the
       investment would proceed) it therefore would not have to be repaid.  I reject the
       evidence of Kevin McCabe that an out-and-out assurance was given that in no
       circumstances would the loan have to be repaid, and I also reject the embellishments
       that appear in Prince Abdullah's witness statement.  I do not accept that Prince
       Abdullah had such a detailed recollection of exactly what was said to Kevin McCabe,
       though I do accept his evidence that he would not have given and did not give any
       categoric assurance.

THE HONOURABLE MR JUSTICE FANCOURT                                                    UTB LLC v. Sheffield United
Approved Judgment

318.  Kevin McCabe was strongly of the view that the loan would not be repayable because
      he believed and assumed that the deal would proceed, whereupon it was accepted that
      it would be converted into equity. Prince Abdullah – who knew Dr Rakan well and
      had just met Mr bin Laden – was also optimistic that the deal would proceed. Mr
      Bettis was quite clear in his evidence that his understanding on the plane back to
      London that night was that if the deal did not proceed the loan would be repaid. That
      is also consistent with the note of the meeting between Prince Abdullah and Kevin
      McCabe that was made in Scott McCabe's notebook.

319.  The draft loan agreement that Mr Tutton sent Dr Rakan on 10 January 2017 was non-
      specific about whose option it would be to convert the loan to equity if the investment
      did not proceed.  Mr Tutton characterised that as inept drafting on his part.  In due
      course, however, a different draft loan agreement came from Mr Alsaady, ostensibly
      acting for Sela Sport but in fact acting on behalf of Mr bin Laden and Charwell. Mr
      Tutton picked up the fact that this draft gave an option to capitalise to the lender, but
      not to Blades, and he correctly pointed out the importance of this change to Kevin
      McCabe.

320.  By that stage, however, Kevin McCabe was not interested in such details.  He
      (through SUL) had just had to provide another £600,000 to SUFC so that it could pay
      its wages bill on time. There was a desperate need for funds. As Mr Tutton put it in
      his third witness statement, "I was upset at the perilous state of affairs at the Club"
      (para 98).  By April 2017, Kevin McCabe had quite forgotten that the option had been
      given to the lender and he had to be reminded of that fact by Mr Tutton at that time.
      The conclusion that I draw is that Kevin McCabe was only interested in getting in the
      £3 million loan, not in whether it was repayable or on what terms. For him, the loan,
      once made, would be further strong evidence that the investment was going to
      proceed, so it was important for all those reasons to ensure that the loan was provided
      as soon as possible. Although Mr Tutton suggested that there should be a guarantee
      from Prince Abdullah, Kevin McCabe was not interested in that either.  He replied to
      the effect that the loan agreement should proceed.

321.  Another matter that illustrates the urgent need for the loan was the fact that, contrary
      to what Mr Tutton stated in his witness statements, he did not attempt before the loan
      agreement was made to comply with money laundering regulations and identify the
      ultimate beneficial owner of Charwell, when he became aware that it would be
      lending the £3 million. Mr Tutton's evidence that he spoke to Marianne Kafena at
      Farrer & Co LLP and that she volunteered that the owner of Charwell was Dr Rakan
      was a fabrication.  On 2 February 2017, Mr Tutton emailed Kevin McCabe:

              "I think I should sign for Blades and Scott or you sign for
              SUFC. At this stage I'm not going to bother with asking any
              questions about who the lender is unless you are particular, but
              a little KYC is called for I'd hate for Sheffield Star headlines
              BLades launder money for extremists. Please no."

      Although Kevin McCabe did not reply to that particular email, another email about
      the loan was sent by Mr Tutton shortly after it, to which Kevin McCabe's response
      was:

              "J Get it done! Let's have them in our cage."

86

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

322.   Kevin McCabe was in my judgment not in the least concerned whether the money
       was coming from a bin Laden controlled company, as he must have known it might
       be. Nothing had been said to him after the Dubai meeting to suggest that the loan was
       coming from Sela Sport rather than from Mr bin Laden. All that was known was that
       Charwell was lending the money. Mr Tutton's attempt to explain away his concerns
       about the borrowing of extremists' money as being a general warning was not
       convincing. I find that it is likely that Kevin McCabe had told his loyal lieutenant
       after the Dubai meeting that a member of the bin Laden family might be an investor
       and that is why Mr Tutton wrote in the terms that he did. Nevertheless, because
       Kevin McCabe was not bothered, Mr Tutton did no KYC or AML diligence until a
       week after the loan agreement had been made. On 16 February 2017 he emailed
       Farrer & Co asking for the AML/KYC information they held on Charwell. Farrer &
       Co replied that they would usually send copies of the memorandum and articles of
       association and the certificate of incorporation and asked whether Mr Tutton required
       anything else. He replied that it was best practice to have something on file and that
       the documents indicated would suffice. So no attempt was made to identify the
       beneficial owner or owners of Charwell at that stage.

323.   The £3 million loan was duly made, in three instalments, and it appears that SUL just
       as much as UTB were delighted to have received the money, which they knew had
       been procured through Prince Abdullah's good contacts in Saudi Arabia and hoped
       would lead to a substantial equity investment in the Club.

324.   The next problem that Blades faced arose in early March 2017, when Mr Bettis
       informed Kevin McCabe that his business interests in Los Angeles required more of
       his time and that he was going to move there, but that he would not leave SUFC "in
       the lurch". By the date of the meeting between Prince Abdullah and Kevin McCabe
       in the Peninsula Hotel, Paris on April Fool's Day, Kevin McCabe had clearly formed
       the view that Mr Bettis would be leaving at the end of the season. He told Prince
       Abdullah so and that he had started the process to find a replacement. The Prince's
       comment to Mr Giansiracusa the following day was that "I think you should make it
       clear to him that we should be involved and active in this process, I am afraid that if
       we leave it to him we will end up with another person who is loyal only to him". 
       There was no evidence that Kevin McCabe told Mr Bettis after the dinner in March
       that he was to leave at the end of the season. Kevin McCabe's witness statement says
       that on about 26 April 2017, he agreed with Mr Bettis that a search should start for Mr
       Bettis's successor. Mr Bettis said that there was no agreement made with him that he
       should leave at the end of the season. I prefer Mr Bettis's evidence on this point.
       Kevin McCabe had told Prince Abdullah on 1 April that he was already seeking a
       successor: Kevin McCabe decided to go down that route without reaching any
       agreement with Mr Bettis about when he would resign. He simply assumed that Mr
       Bettis would go when Kevin McCabe wanted him to go. Mr Bettis was hoping that
       he would not have to go at all and could continue part-time from Los Angeles.

325.   At the Dorchester Hotel on 3 May 2017, Prince Abdullah and Kevin McCabe were
       both "assuming", as Kevin McCabe put it in re-examination, that Mr Bettis would
       leave in due course, when a successor had been identified and appointed. Prince
       Abdullah had not at this stage spoken to Mr Bettis about it. Nor had Kevin McCabe.
       What changed matters was the lunch between Prince Abdullah and Mr Bettis in Los

87

A-8974

# EXHIBIT 28
# PART 3

Angeles later that month. Prince Abdullah wanted to keep Mr Bettis as CEO. He told Mr Giansiracusa and the latter made it his business to try to get Mr Bettis on UTB's side as regards changes to the governance of Blades and SUFC. It was in those circumstances that Mr Giansiracusa drafted and circulated his memorandum dated 23 May 2017, ostensibly relating to the search for a COO but also recording agreement that Mr Bettis should stay as CEO on a part time basis for the 2017/18 season. Mr Giansiracusa was criticised in cross-examination for concealing in recitals to the draft board resolution to search for a COO what should have been a board resolution to keep Mr Bettis on part-time basis. There was an element of craftiness in the way that Mr Giansiracusa proceeded; it would have been more straightforward to have included a resolution about Mr Bettis too. But as Mr Giansiracusa himself said, he was dealing with experienced professional directors, including Scott and Simon McCabe, who both supported Mr Bettis's retention in the short term, not individuals who did not know their way around board resolutions. The draft resolution was only one page long, and it was signed by all the directors of SUFC individually.

326.    Kevin McCabe accepted in cross-examination that, in view of those documents, the position by June 2017 was that Mr Bettis was to stay part-time for the following season. In my judgment, that acceptance was realistic and correct. Although there was no formal resolution as such that Mr Bettis should remain, he was in fact employed as CEO at the time, and the recitals in the board resolution reflect agreement by the directors that he should remain part-time for at least the following season. Scott McCabe and Simon McCabe both stated in their evidence that that correctly reflected their views at the time. I reject the argument that Mr Giansiracusa's draft minutes had been so deviously presented that the board did not know what it was doing, even though Mr Bettis was led by Mr Downes to agree that he had not realised when signing the minutes what exactly he was agreeing to. Mr Bettis said on 21 May that he was happy to continue in the role of CEO if that is what the owners and board would like. The agreed position in mid-June was therefore that Mr Bettis was staying as CEO part-time for the following season.

327.    Nevertheless, Kevin McCabe continued with his plan to remove Mr Bettis. His reason was that, although he recognised that Mr Bettis was an able and valuable executive for the Club, the job of running a football club in Sheffield could simply not be done by a man living in Los Angeles and only occasionally in the UK. That may well have been a valid viewpoint and was genuinely held, but the decision was for SUFC to take, not for Kevin McCabe. His plan at this time centred on recruiting Andy Birks, a friend of the family, as the new COO. Despite the fact that (as I find) Kevin McCabe knew Mr Birks and knew him as a close friend of his son, Simon, he told Mr Giansiracusa that "I have a meeting tomorrow with Andrew Birks (not met him before) who's been recommended to us by a business colleague." The business colleague was in fact Simon McCabe. Mr Birks was interviewed by Kevin McCabe, then by the committee established by the board resolution for that purpose, and Mr Birks was installed as COO on 26 June 2017.

328.    Once appointed, Kevin McCabe saw Mr Birks as likely to take over as CEO and in the meantime able to take guidance not from Mr Bettis as CEO but from the three McCabes:

"it's abundantly clear that CEO duties are impossible to administer for an organisation – SUFC – that operates only

88

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

from one location namely Sheffield… Within two months
Andy will be fully in the "pound seat" where in the interim he
of course receives direct guidance (not interference) from Scott,
Simon and myself…"

Mr Giansiracusa by reply criticised that approach and pointed out that UTB would be
"extremely concerned" if there was any deviation from the understanding reached by
the board about Mr Bettis's role. Whether Kevin McCabe's opinion was right or
justified is not the issue: the question is whether it was right for him to seek to go
behind the board's agreement that Mr Bettis should remain as CEO.

329. I find that Kevin McCabe at this time had determined that if Project Delta did not
happen, he would de facto take control and run the Club's affairs in a different way,
with a view to stopping the accrual of annual losses until a buyer could be found. On
10 May he had said to Mr Bettis in an email that "in some shape or form we have to
know that Delta will definitely happen and quickly or SUFC has to change course to
suit us where Scarborough will then dictate on a like it or not basis. My patience is
running thin!". Asked about that in cross-examination, Kevin McCabe said that what
this meant was that he would begin to look again at investors, including investors
from China. I reject that explanation, which was disingenuous. Although in the
autumn potential investors from the United States did come forward, looking for
investors was no change of course. That would go on regardless. What Kevin
McCabe meant was that, in the meantime, he would shake up the way that SUFC was
run to suit SUL's agenda, which meant no further investment from SUL and close
control by Kevin McCabe. Mr Birks was the means by which Kevin McCabe was
going to achieve this aim, and, as Mr Birks explained, on his first day at the Club he
was introduced to everyone as the CEO and the COO and the man who was going to
take over the running of the Club.

330. By this time, Prince Abdullah had ceased his ministerial duties and was about to be
reappointed a director of Blades and SUFC. That was one of the issues discussed at
Bad Ragaz on 24 July 2017, by which time Project Delta had fizzled out entirely. Mr
Bettis's position was also discussed: Prince Abdullah was willing to compromise on
keeping Mr Bettis as CEO until the end of January 2018, but no agreement to that
effect could be reached. Kevin McCabe had to accept that clause 5.11 of the ISA
entitled UTB to appoint a finance director, but he asked Prince Abdullah to reconsider
his decision to do so.

331. A further matter of dispute was the appointment of Deloitte. Kevin McCabe was
implacably opposed to their involvement at the Club. Prince Abdullah wanted them
to conduct a review. It is right to say that UTB had no entitlement to have such a
review conducted. It was a matter on which the board would have had to decide if the
two principals could not themselves reach informal agreement. When the Project
Delta transaction fell through in June 2017, Prince Abdullah met Deloitte – who were
intended to have been involved in the due diligence exercise for Project Delta – to
request them to review, principally, payroll costs, transfer policy and the Academy's
performance. At Bad Ragaz a compromise was apparently reached. The amended
minutes recorded that Kevin McCabe did not agree that Deloitte should be mandated
but accepted the mandate "provided it was postponed until 1 November 2017". The
only natural reading of that wording is that Deloitte should be mandated to proceed
but not before 1 November 2017. That is presumably how Kevin McCabe read them

89

too, because almost immediately on receiving the amended minutes in final draft, he sent an email asserting that all that he had agreed was that a further discussion would be held in or after November. Mr Giansiracusa refused to accept that change and suggested that if he wanted to change what had been agreed Kevin McCabe had to speak to Prince Abdullah about it.

332.   After a rent review was refused at Bad Ragaz, Kevin McCabe accepts that he was "frustratedly angry". He regarded the absence of an increase in rent as unfair. Mr Tutton also agreed that he was angry about it. The matter was left until a telephone conversation between Kevin McCabe and Mr Giansiracusa on 24 August 2017. A number of issues had been raised on which Kevin McCabe said that he wanted compromise. It is not a surprise that rent review was top of the list, followed by the removal of Mr Bettis; removal of Selahattin Baki from the technical committee and Tareq Hawasli from the board; the use of loan players; and two issues that Kevin McCabe is recorded in Mr Giansiracusa's note of the conversation as objecting to as an insult to him: the proposed appointment of Deloitte and the proposed appointment of a CFO. Kevin McCabe threatened to withdraw from management completely unless Prince Abdullah compromised on these issues.

333.   Mr Giansiracusa interpreted this as an invitation to concede on the issues, since no compromise position was identified, and concluded: "Basically, the guy is a bully and a blowhard. I think standing up to him continues to be the best strategy". Prince Abdullah's response to that email contained an uncharacteristic expletive and made it clear that there would be no compromise on Deloitte or the appointment of Mr Van Winckel to the technical committee. He added: "The only question is should we take more calls like this from him? I say we save our time and money and run everything through the board, do you agree?". In reply, Mr Giansiracusa said that he would just keep standing up to Kevin McCabe and see who blinked first.

334.   It is clear that, by this stage, passions were already inflamed on both sides and that their positions were entrenched. Prince Abdullah was, as he confirmed in his evidence in court, particularly annoyed by the way in which Kevin McCabe would agree or concede something and then seek to go back or behind it, particularly in the case of Deloitte. He and Mr Giansiracusa had agreed that the right approach was to stand up to Kevin McCabe's attempt to do things his way and deny Prince Abdullah any say – as they saw his behaviour – and to insist on good corporate governance.

335.   In the case of Deloitte, I find that Prince Abdullah's recollection of the discussion at Bad Ragaz, as minuted by Mr Giansiracusa, is likely to be correct, and that Kevin McCabe did accept that Deloitte could be instructed to start work as from 1 November 2017 but that he then sought to deny that. Although Kevin McCabe did not want Deloitte to come at all, he recognised that it was a point of central importance to Prince Abdullah at this time, but he did not want it to happen at the busiest times of the season: the two transfer windows and Christmas/New Year. Hence November. The reason why Kevin McCabe later became very anxious to keep Deloitte away from the Club in November was that, unknown to UTB, he was making substantial progress in negotiating a valuable deal for the sale of a controlling interest in SUFC to ALK, and did not want ALK to draw the wrong inference from the presence of accountants at the Club at that time. That is why he then tried to put off the Deloitte work until February and took the initiative to book them in for that month. By then he hoped that the deal with ALK would have been agreed.

90

336.    On 20 September 2017, Kevin McCabe sent his sons an email after a discussion of
        certain disputed issues with Mr Bettis the previous evening. The email suggests that
        Kevin McCabe had agreed with Mr Bettis that he should step down as CEO on 31
        October. I do not accept that there was any such final agreement, even though Mr
        Bettis was led in cross-examination to accept that the email suggested that an
        agreement had been reached. Mr Bettis is clearly principled and a man of his word.
        Had such an agreement been made, Mr Bettis would have told Mr Giansiracusa and
        would have tendered his resignation. He did not do so.

337.    On 11 October 2017, Kevin McCabe sent a note to his side ahead of the board
        meeting that month, which indirectly called on Mr Bettis to resign. Again, he did not
        do so. Asked in re-examination by Mr Downes whether he remembered any detail of
        the conversation, Kevin McCabe suggested that he would have said something like
        "Come on Steve, why don't you step down at the end of this coming month", and that
        he "didn't have any reaction of Steve as saying 'No, no, no'; he had a reaction from
        Steve saying 'Whatever suits, Kevin'. I find that Mr Bettis was probably non-
        committal, and probably said something apparently accommodating to Kevin
        McCabe's wishes, such that no dispute arose and Kevin McCabe thought that he had
        what he wanted. I find that it is understandable that Kevin McCabe thought that Mr
        Bettis was willing to resign, but that Mr Bettis had not agreed to do so. It is clear that
        Mr Bettis wanted to stay on part-time and would not have agreed anything without
        referring to UTB's side.

338.    The note that Kevin McCabe prepared was sent on 11 October 2017 to the SUL-
        appointed directors and Mr Bettis. The note promoted the appointment of Mr van
        Winckel to the technical committee, subject to the need to work harmoniously with
        the Club manager. It counselled opposition to the appointment of a CFO and
        suggested instead that Mr Birks might recruit a lower-level employee to assist, while
        recognising UTB's right to appoint a CFO "but it seems totally inappropriate to do so
        at such a high level paying unnecessary costs that the Club simply cannot afford". It
        suggested that Mr Bettis write to Prince Abdullah and Kevin McCabe confirming that
        he wished to resign as CEO on 31 October. It asserted wholesale opposition to
        Deloitte and promotion of a rent review on an equitable basis. It suggested that Prince
        Abdullah be told that the part of the Charwell loan on Blades' books was Prince
        Abdullah's responsibility. It reaffirmed that SUL was not going to provide any
        further funds to SUFC "given current circumstances".

339.    With the exception (at that stage) of Mr van Winckel's appointment, this was a sign
        that Kevin McCabe was determined to continue to oppose Prince Abdullah on all
        fronts. He was determined to oppose the corporate governance changes that Mr
        Giansiracusa for UTB was trying to implement and he wanted to retain practical and
        effective control of the Club. Although the venture had started out with Kevin
        McCabe willing to hand on the baton, that was on the basis that the recipient of the
        baton was so rich that SUL no longer had to fund the Club and the Club would be in
        excellent hands for the future. When Kevin McCabe's expectations about funding
        were confounded, he decided that Prince Abdullah was not a suitable person to whom
        to hand over. He wanted to take back control of the Club until such a suitable person
        could be found and a buy-out (of shares and property assets) be achieved.

340.    Oddly, Kevin McCabe was not a director of Blades or SUFC at this time, and so he
        was not present at the 26 October 2017 board meeting. Mr Tutton, Mr Green and Mr

Bettis were the SUL-appointed directors present. Mr Bettis's own future was raised at the meeting. A transcript of the meeting shows exactly what was said. Mr Bettis said that he left it in the hands of the owners to decide: he didn't want to be the cause of a fight or problems and would go if that was what they wanted. Mr Tutton stated that he was not going to tell Mr Bettis that he had better go, but asked him whether he was devoting the right amount of time to the Club, given where he was living. Mr Bettis said that he was not, but pointed out that he was being paid less than half a full-time salary. Mr Giansiracusa stated that Mr Birks was doing a reasonable job as COO but was not ready for the CEO role and that Mr Bettis, who had a good working relationship with the Club manager, was needed to provide a steady hand for the following season. Mr Bettis then said that if Kevin McCabe wanted him to leave he would leave, it was as simple as that. Mr Giansiracusa said that if Kevin McCabe made that demand it would be over UTB's objections and that the Club was best served by Mr Bettis staying in his role. Mr Green clearly agreed at that point and later spoke strongly in favour of keeping Mr Bettis. Mr Tutton did not, as he could have done, either confirm that Kevin McCabe did insist that Mr Bettis leave, or call for a vote on the question. He said that he did not see any issue. As a result, Mr Bettis's position was left up in the air: although the majority of the board was in favour of retaining the status quo, Kevin McCabe was not present. Mr Bettis's evidence was that he believed that there would be other discussions subsequently with the owners to resolve matters.

341.   After the meeting, Mr Tutton sent Kevin McCabe an email reporting on matters, telling him that he had raised all his matters and received all the answers he didn't want to hear. He told Kevin McCabe that he had put it to Mr Giansiracusa that SUL would not put in more funds and that Mr Giansiracusa had replied that Prince Abdullah would not put in funds either in that case. "Therefore heading for the impasse you want". This, in my judgment, was an indication that Kevin McCabe expected that, on a number of matters, neither side was going to back down and therefore the company would become deadlocked and one side or other would have to back out. Mr Tutton commented on Mr Bettis's performance at the meeting, but did not say that he had resigned, or that it had been agreed that he should do so. I find that there was no agreement or expectation that Mr Bettis would resign.

342.   The email exchange later that evening between Scott McCabe and Mr Tutton shows that the McCabes knew that Mr Bettis had not resigned. Nevertheless, Kevin McCabe proceeded to instruct Mr Birks to remove Mr Bettis from the payroll. I find that that was done in a way calculated to ensure that UTB did not find out about it for some time. Kevin McCabe knew full well that UTB had not agreed to remove Mr Bettis and that he had not resigned. He would have known from Mr Tutton's oral report the day after the board meeting that the sentiment on the board was in favour of keeping Mr Bettis (he also received Mr Green's email to that effect dated 31 October 2017). Since Kevin McCabe was determined not to back down on this issue but knew that UTB would not agree with him, Kevin McCabe did not raise Mr Bettis's position at the meeting with Prince Abdullah at the Corinthia Hotel on 1 November 2017, even though he knew that UTB and the board supported Mr Bettis's retention and that the position therefore was that Mr Bettis had not been removed or resigned.

343.   Kevin McCabe wrongly decided to act unilaterally to try to force matters and tried to conceal this from everyone, including Mr Bettis himself, even though Kevin McCabe

saw him at the football match at Loftus Road on the same day as the Corinthia meeting. In my judgment, Kevin McCabe, with Mr Tutton's support, had determined to present UTB with a fait accompli. Suborning Mr Birks into doing the dirty work with the payroll and keeping Mr Bettis in the dark, while he did a month's unpaid work before he discovered what had been done, were for them an acceptable way of achieving their objective, though in the cold light of the courtroom Kevin McCabe accepted that he had acted wrongly. Kevin McCabe acted immediately to reassure Mr Birks that he had settled in well and that when he needed guidance Kevin McCabe was "always to hand and available in an 'untitled CEO type role' to help". Kevin McCabe was, I find, using the removal of Mr Bettis to tighten his grip on the Club's business affairs.

344.   Mr Giansiracusa and Prince Abdullah were incensed when they found out about that underhand behaviour, at the end of November, but that discovery was significantly after the breakdown in relations had occurred. The breakdown was caused by what happened about Deloitte and Mr van Winckel first, which led Mr Giansiracusa to start drafting his email of rebuke, and then the discovery about Kevin McCabe's interference in UTB's appointment of the finance director, Mr Ratcliffe, which provided further material to include in the email. The sequence of events was as follows.

345.   Deloitte was discussed at the Corinthia Hotel on 1 November 2017. Both principals said afterwards that it was a "good meeting". Following the meeting, Prince Abdullah emailed to confirm that Kevin McCabe had agreed that the Club should carry on with the Deloitte review and that they had agreed that Mr van Winckel join the Club as a consultant for 3 months.   Kevin McCabe replied that evening confirming that as regards Deloitte "your decision to proceed with them is accepted by me" and that in the case of Mr van Winckel a "punch point note" of how he saw his role was being awaited. When it was received Prince Abdullah should leave matters to Kevin McCabe to progress a three-month probationary consultancy arrangement with a view to a permanent position. That, one might have thought, would be the end of both those previously contentious matters, but within a week or so Kevin McCabe was seeking to go back on both matters.

346.   In my judgment, what was agreed at The Corinthia was unambiguous. UTB was entitled following the meeting to assume that both matters would proceed without further delay. I reject Kevin McCabe's attempted explanation that all that was agreed at The Corinthia about Deloitte was that they should proceed at some time, but that the question of when was a good time had still to be decided. The start of Deloitte's work had been deferred from July until 1 November 2017. Provided that Prince Abdullah still wished to proceed with it at that time, after having thought about it again, as he promised at Bad Ragaz that he would, the work was to proceed in November. On 8 November 2017, Kevin McCabe first acknowledged to Mr Tutton that he had so agreed at the Corinthia: but then he wrote to Mr Giansiracusa saying that he would wish to see the mandate to Deloitte, that the mandate should not be triggered at this particularly busy time, and that February would be a better time.

347.   Kevin McCabe met Mr van Winckel on 10 November. He had changed his mind about that appointment too. Mr van Winckel reported that Kevin McCabe was now seeking to postpone his appointment, on the basis that it was a sensitive time and momentum at the Club should not be disrupted. It is clear from Mr van Winckel's

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

email that Kevin McCabe had leaned on him, in an attempt to persuade him to sell the idea of a postponement to Prince Abdullah, in order to avoid a storm.

348.   Prince Abdullah intervened by email on 11 November:

> "I have to be frank with you, if after what we agreed on our last meeting in London regarding Jan [van Winckel] and Deloitte doesn't start this week, I see it very difficult that we can work on any thing together, I hope both of these things move forward this week."

They did not move forward. Kevin McCabe replied asking Prince Abdullah to let matters rest until the end of the season in the case of Mr van Winckel, and later that month he said only that Deloitte could start "at an appropriate time".

349.   The issue here is not whose judgment about the value of Deloitte and the timing of Mr van Winckel's introduction was right, or whether Kevin McCabe's views were reasonable ones. The issue was that after a lengthy debate Kevin McCabe had given an assurance to Prince Abdullah and then gone back on it. Prince Abdullah considered that Kevin McCabe had broken his word and that he could not trust him. Prince Abdullah accepted that he was angry about the Deloitte and van Winckel incidents, and then very angry about the way that Kevin McCabe had dealt with Mr Ratcliffe's contract and Mr Bettis's pay.

350.   In my judgment, Prince Abdullah was entirely justified in being offended by Kevin McCabe's behaviour, which was underhand and deliberately obstructive, despite the agreement that he accepted had been reached at the "good meeting" at The Corinthia. Kevin McCabe's subjective belief that the requirements of the Club at the time justified his decision misses the point. It is his case in this trial that Prince Abdullah was effectively his partner and the two of them (through their corporate vehicles) owed each other duties of fair dealing, candour and good faith. Yet here Kevin McCabe was quite deliberately operating behind Prince Abdullah's back to try to subvert agreements that they had only just confirmed. He probably did not see it that way, and certainly does not see it that way now, but that was what it amounted to.

351.   It was at this time that Mr Giansiracusa started to draft his email of rebuke (based on the Deloitte and van Winckel matters, and previous disagreements). Prince Abdullah, Mr van Winckel and Mr Hawasli all saw the draft of the email and commented on it. But, before it was sent, the incident with Mr Ratcliffe's contract occurred. Mr Giansiracusa said that, even in comparison with the anger about the Deloitte and van Winckel matters, this was on another level in terms of the offence that was caused. At that point, his and Prince Abdullah's attitude to Kevin McCabe changed dramatically. The criticism is that Kevin McCabe went behind people's backs and used Catherine Frost, an HR employee of the Club, to change the terms of Mr Ratcliffe's contract.

352.   The indisputable facts about this incident are set out in paras 102-104 above. The dispute is about what exactly Kevin McCabe did and whether he was either acting appropriately, in the best interests of SUFC, in meeting Ms Frost to answer her questions about the terms of the contract, as SUL says, or (as UTB says) was trying without alerting UTB to get Ms Frost to change the terms of the contract and ensure

that the new finance director reported to Mr Birks rather than Mr Bettis and that there was no reporting line to UTB.

353.   My findings about that incident are the following:

i)      The appointment of a finance director was a sensitive issue for Kevin McCabe because UTB had the right to make the appointment and remove the appointee at will; Kevin McCabe thought that one was unnecessary and that a junior to Mr Birks would be more appropriate. In that way, Kevin McCabe would maintain his control of the Club's finances.

ii)     Mr Tutton was loyally looking out for Kevin McCabe's interests in this as in other matters and tipped him off that the contract needed his urgent attention.

iii)    Ms Frost had not drafted the letter or contract on the basis that Mr Ratcliffe had to report to UTB, but on the basis that he was to report to the CEO of SUFC and its board.   The first point of concern for Mr Tutton and Kevin McCabe was the reporting to Mr Bettis, whom they had previously removed from the payroll and who was (so far as they were concerned) no longer an employee.  The second point was the risk that Catherine Frost would amend the contract in accordance with Mr Giansiracusa's request to insert a reporting line to UTB instead of the board of SUFC.

iv)    What Mr Tutton and Kevin McCabe wanted to bring about was that Mr Ratcliffe should report to the COO, Mr Birks, who was Kevin McCabe's man (or so they believed), and that there was no substitution of UTB for the board of SUFC.   This is the only way to make complete sense of Mr Tutton's observation that "Catherine Frost is now in an awkward position."  She did not know that Mr Bettis's pay had been stopped, as there had been no formal process of resignation or dismissal.

v)     Kevin McCabe and Mr Tutton then met Catherine Frost and instructed her to change the reporting structure so that Mr Ratcliffe reported to the COO, but not otherwise to change it.   They did not instruct Ms Frost to circulate the amended drafts to Mr Giansiracusa and did not intend that she should do so, but rather intended that the contract should be sent to Mr Ratcliffe in its amended form.

vi)    Ms Frost did circulate the amended drafts before posting the letter, pointing out that Kevin McCabe had made changes to the contract and letter.   Mr Giansiracusa reacted swiftly and before the letter was posted identified the changes made and not made.  He wrote to Kevin McCabe, copied to Catherine Frost, pointing out that he had no authority to make changes and should confirm to Ms Frost that she should take instructions only from Prince Abdullah in relation to Mr Ratcliffe.

354.   In my judgment, Kevin McCabe was once more acting wrongly and in an underhand way over the Ratcliffe contract, aided and abetted by Mr Tutton. He did so in order to try to achieve control of Club employees, at the expense of UTB's interests. Again, as with Mr Birks in relation to Mr Bettis's pay, Kevin McCabe was willing to make

use of SUFC employees (Ms Frost on this occasion) to achieve his ends, thereby putting them in an invidious position.

355.   Kevin McCabe's response to Mr Giansiracusa's email that was copied to Catherine Frost is revealing: "You're a gentleman who certainly lacks grace". It is evident that Kevin McCabe felt humiliated that he had been called out by Mr Giansiracusa in a relatively public way. He challenged Mr Giansiracusa to pick up the telephone rather than look to create disputes by emails and to show his legal skills and pursue an action if he thought that SUL had breached the terms of the ISA. He said in evidence that Mr Giansiracusa's email was offensive because it was written as a lawyer, not as a colleague, and because it was "blown out of all proportion". He claimed that the changes he had made to the contract were insignificant, and that they were "common sense amendments to benefit SUFC". This was in my judgment disingenuous: Kevin McCabe knew exactly what he was doing, even though he denied it from the witness box. It was his email that provoked Mr Giansiracusa's long email of rebuke on 19 November 2017, but it is clear that the relationship between the sides had already broken down at this stage, as a result of the Deloitte and van Winckel issues.

356.   Both sides realised by this time that a separation was close. SUL was at exactly this time entering into a non-disclosure agreement with ALK, so that ALK could start due diligence on purchasing SUL's interest. On 20 November 2017, Mr Tutton commented to Kevin McCabe "Looks like we have the dispute you want." This was a comment on an email from Mr Giansiracusa about SUFC's annual report, which required the statement "...our thanks to Stephen Bettis, who serves so ably as Chief Executive Officer" to be inserted. Kevin McCabe explained Mr Tutton's comment as his wanting a reason for him and Prince Abdullah to get together to sort things out, but I do not accept that explanation. There had been plenty of disputes since the last meeting between them at The Corinthia but they were the very reason why Prince Abdullah was no longer willing to talk. Kevin McCabe was looking for the right pretext to justify steps to force a separation of SUL and UTB, once ALK was ready to proceed.

357.   In my judgment, UTB was also starting to consider how the parties could separate, but its thinking was less well-advanced than SUL's. UTB was considering how and when it could serve a call option notice to acquire SUL's shares. Prince Abdullah and Mr Giansiracusa knew that they did not have the ready money at that time to buy out SUL and pay for the property assets within a year. So they preferred to wait and had no immediate plans to serve a call option notice. That is why Mr Giansiracusa said on 6 December 2017: "I'm really looking forward to the day we can pull the trigger on the call option" and why he started to look at the property call option machinery for the first time in mid-November.

358.   When it came, on 19 November 2017, Mr Giansiracusa's rebuke was uncompromising and, in certain respects, unnecessarily personally unpleasant. However, it reflected the state that relations between the parties had reached by then; it did not damage a good working relationship. Although Kevin McCabe may have been taken aback by the personal attack in the email, I am quite sure, having seen the man that he is, that he would not in any way have been cowed or intimidated by it and that he would not have been deflected from the course on which he was set. This was to exert his control as much as possible, sell his stake in SUFC to ALK and get out of

the continuing drain on his resources that the Club still represented, but without causing damage to the standing of the Club itself.

359.   The proof that Kevin McCabe was not in any way deflected from his course is what he wrote in the following days. First, on 20 November 2017 to Prince Abdullah, he insisted that he wished to communicate with the Prince and not with Mr Giansiracusa and explained that SUFC's business lay in Sheffield, England, not Riyadh, Saudi Arabia "where managing people is not best achieved via 'edicts and resolutions' produced as if the recipients are subservient", and that accordingly he and not the Prince's representatives had an affiliation with the Club's personnel. On the same day, he responded to Mr Giansiracusa, making the same observation about the "Sheffield-centric" nature of the business and stating that the need for change was on UTB's side, not on SUL's. On 21 November, Mr Tutton sent Kevin McCabe an email saying "If Alan Pace and chums are up for it we could take HRH out no problem at all. Remember beautiful clause 11 – Call Option…You just need to get agreement with Alan that he stands behind you irrevocably". (Alan Pace and his colleagues had been in Sheffield for meetings with Kevin McCabe at the same time as the Catherine Frost incident.) The following day, 22 November 2017, Mr Tutton wrote again, advising Kevin McCabe that he should look to structure a deal with the full intention of taking out UTB via the call option route. He warned that UTB may not be able to finance the property call options and so SUL should only propose a price that (if UTB served a counternotice) would be large enough to compensate for SUFC remaining a tenant rather than paying for the property assets. He proposed £10 million and that part of the deal with ALK should therefore be a £10 million initial loan to fund the desired buy out of UTB's interest. Mr Tutton expressed the view that Prince Abdullah might be tempted to cash in his losses, take the £10 million and avoid the need to pay that sum to SUL, fund ongoing losses of a Championship club and then pay £40 million or more for the property assets. Mr Tutton may well have been right in his analysis, but Kevin McCabe thought that he could do better than that.

360.   Further proof of Kevin McCabe's determination not to be deflected is in his emails to the SUL-appointed directors and separately to Prince Abdullah, both on 24 November 2017. He first told the directors that they must as directors confirm that Mr van Winckel did not have SUL's approval to sit on the technical committee or be employed "in any shape or form – directly or as a consultant – by the Club". As to the other issues raised in Mr Giansiracusa's "wallpaper email" he commented: "As they say 'water off a duck's back'". He awaited their confirmation "as the smooth running of SUFC is of paramount importance" – presumably to give ALK the impression that they were about to buy into a well-run football club.

361.   The email to Prince Abdullah repeated that Kevin McCabe did not approve of Deloitte's involvement and that the work "will be at a sensible date to suit SUFC's business and football operations". He repeated that proposals for Mr van Winckel's involvement could not be agreed as the time was not right and there was little or nothing for him to contribute to a well-run committee. He blamed a misunderstanding of cultures for the lack of harmony between the owners and Mr Giansiracusa for damaging the ethos and spirit of the Club. The letter ends: "It rests with yourself and not myself to sort out these issues which like it or not are disrupting a Sheffield Institution who's roots began in 1855". Characteristically, Kevin McCabe was blaming anyone but himself for what had gone wrong. He was being wholly

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

uncompromising on his determination to control the Club at that time. Interestingly, his email makes no reference at all to dealings with ALK and no further reference was made by SUL to those discussions before the Call Option Notice was served. The email of 24 November 2017 was forwarded to the SUL-appointed directors with the comment "Let's see if Prince Abdullah can man up and see the light!" Without waiting for a response from Prince Abdullah, Kevin McCabe emailed Mr van Winckel on the same day telling him that his involvement was not desired.

362.   Kevin McCabe followed up on this with Mr Bettis (in his capacity as a director of SUFC) on 25 November, asking for confirmation that he agreed with the van Winckel proposal. He said that he sensed that "this will bring the dispute with HRH to a head", and that he intended to circulate a note to all those involved in the Club's football management and the technical committee to the effect that Mr van Winckel would not be joining. He added: "Of course HRH will be copied in". Here, as with the removal of Mr Bettis and the amendment to Mr Ratcliffe's contract, Kevin McCabe was intent on providing UTB with a fait accompli.

363.   The suggestion – advanced by SUL in this case – that Mr Giansiracusa's email of rebuke (or other steps taken by him before or after that email to call out Kevin McCabe's conduct) did real damage to the relationship of trust and confidence between UTB and SUL, or cowed or intimidated Kevin McCabe and forced him to submit, is quite unrealistic and is wrong. There was at that time no trust and confidence left in the relationship, and SUL was determined to continue as it had previously, acting in its own interests and not collaboratively with UTB, with a view to selling out to ALK at a large profit. How exactly it was going to achieve that was still unclear, though SUL knew that it could rely on clause 11 and did not need to rely on deadlock. However, clause 11 (and clause 10) carried with it uncertainty. Kevin McCabe's email to Prince Abdullah dated 5 December 2017 strongly implied that the two of them needed to meet in order to decide how to separate their interests.

364.   To that end, it appears to have been Kevin McCabe's thinking that a serious dispute, or perhaps deadlock on a material issue, was not inconvenient for his purpose of persuading Prince Abdullah to give up his interest in the Club. I find that by seeking to reassert control in an uncompromising manner, by obstructing Prince Abdullah's attempted reforms and being implacable in his approach, Kevin McCabe was hoping to cause Prince Abdullah to think that his continued involvement in the Club was not worth all the heartache that it was bringing him. Informing Prince Abdullah in December 2017 that he and his two sons would again become directors of Blades and SUFC was part of the same approach: to let UTB know that SUL would seek to exert maximum control, both on the board and through the appointed senior executives.

365.   Negotiations with ALK were proceeding apace and a new proposal from ALK was received on 29 November 2017, ahead of a meeting with Kevin McCabe the following week. It was for an initial loan of £5 million by 31 January 2018 and options to buy up to 90% of the equity in Blades in tranches, with the first 20% to be by 30 June 2018. SUL reverted to ALK with a proposal that they provide a loan of £10 million with a view to using it to buy out UTB's interest.

366.   At about the same time, Mr Giansiracusa received Mr Bettis's email informing him and Prince Abdullah that his salary had been stopped. I accept Mr Giansiracusa's evidence that he and Prince Abdullah were outraged by what had been done. This

THE HONOURABLE MR JUSTICE FANCOURT                                          UTB LLC v. Sheffield United
Approved Judgment

was not just because it went contrary to UTB's aims for Mr Bettis's continued employment but because it was done in an irregular way: without informing Mr Bettis or the directors of SUFC of the fact, and again using an innocent employee to do a wrongful act.

367.   The argument advanced by SUL that Kevin McCabe had made it clear in his email of 8 November 2017 about the Deloitte mandate that Mr Bettis was no longer the CEO ("I also don't see the need for Steve's involvement other than in his position to approve as a Director of SUFC") is not persuasive. It was calculated to exclude Mr Bettis from implementing the Deloitte arrangements without making explicit to him or to the UTB side that Mr Bettis was no longer an executive of the Club. The fact that this was being concealed for as long as possible is clear from Mr Tutton's email to Mr Giansiracusa dated 21 November 2017. Mr Giansiracusa had suggested wording to insert into the statutory accounts and report about Mr Bettis "who serves so ably as Chief Executive Officer". Instead of replying to the effect that he no longer did serve in that capacity, Mr Tutton replied pointing out that Mr Bettis had accepted in the 26 October 2017 board meeting that he could not properly fulfil the CEO role from Los Angeles and stating that Mr Bettis had requested that he should not be mentioned in the document "other than where there is a statutory duty to do so". Were Kevin McCabe and Mr Tutton being open about the matter, the response would have been quite different. Mr Giansiracusa replied pointing out that he had not seen any formal resignation from Mr Bettis and that he understood he was serving until the end of the year. Mr Tutton did not take the opportunity then or at any other time during November 2017 to disabuse Mr Giansiracusa of his belief; nor did Kevin McCabe.

368.   When Mr Giansiracusa and Prince Abdullah found out what had happened to Mr Bettis, UTB realised that the relationship was beyond repair and that a suitable exit would need to be found. Both sides were then, independently, of the mind that there was no future in their carrying on together as "partners". When later in the month Mr Giansiracusa served short notice of a board meeting to be held on 18 December 2017, he realised that SUL would not attend it, but nevertheless circulated the agenda and proposed resolutions for the purpose of putting everything that he considered that Kevin McCabe had done wrong "on the record".

369.   I do not accept that UTB or Prince Abdullah or Mr Giansiracusa acted in November 2017 with a view to causing hurt, embarrassment and distress to Kevin McCabe so that the relationship was destroyed and so that he would take steps under clause 11 of the ISA (or otherwise) to get out of Blades and SUFC. SUL submitted that that was the case and that Mr Giansiracusa was the chosen instrument of oppression, but that argument seemed to me to "protest too much", given what SUL was seeking to achieve at the same time.

370.   It is undoubtedly true that Prince Abdullah and Mr Giansiracusa were determined to force Kevin McCabe to respect the constitutions of Blades and SUFC and act correctly through their boards and their appointed CEO, to the extent that matters could not be agreed by the owners. If Kevin McCabe consistently opposed that line, which he did, they regarded it as necessary to force him to act in accordance with decisions of the board and its authorised executives, and not according to Kevin McCabe's preference. That did necessitate opposing him and his wishes, directly and in strong terms, but it was not done for the purpose of embarrassing or intimidating

A-8987

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

him. It was done to assert UTB's rights under the articles and ISA and by that means to protect UTB's best interests, as Prince Abdullah and Mr Giansiracusa saw them. Although pugilistic language is present in some internal emails on the UTB side during this period (e.g. Prince Abdullah's email of 17 November 2017: "our war against Kevin McCabe should start from here"), the aim was not to bully or intimidate Kevin McCabe but to make him understand that his behaviour was unacceptable and bring him to heel, so far as corporate governance was concerned. As matters deteriorated, which they did with the revelation about Mr Bettis on 30 November 2017, UTB realised that they needed to make plans to end the relationship too. Later, SUL took them by surprise, by making an oral offer on 20 December 2017 and then serving the Call Option Notice on 29 December 2017.

371.    The discussion between Kevin McCabe and Mr Giansiracusa on 20 December 2017 followed a more conciliatory email from Mr Giansiracusa on 17 December 2017. The offer made on 20 December 2017 was probably a tactical offer from SUL, though the tactics were different from those suggested by Mr Tutton in an email earlier that day. Kevin McCabe offered to sell SUL's shares for £10 million on the basis that purchase of the property assets would be deferred for 3-6 years. I find that that offer was made in an attempt to test the water and find out the ability of UTB to fund a payment of that size, and also to flag up the problem with having to pay for the property assets. A range of £5 million to £10 million was clearly in consideration by SUL as an offer for UTB's shares. Acquiring UTB's shares was, in my judgment Kevin McCabe's clear preference, since it enabled him to sell to ALK and retain some interest in the Club. Everything depended on a perception of whether UTB would serve a counternotice, and if so up to what price it would be able to do so.

372.    In the event, Kevin McCabe chose to make the offer at £5 million. Despite his evidence in court that he expected UTB to be able to organise funds to pay £5 million and pay for the property assets within 12 months, I find that Kevin McCabe hoped and expected that UTB would find itself unable to serve a counternotice, owing to Prince Abdullah's previous financial difficulties and the problem of having to fund the continuing losses of the Club and pay for the property assets within a year. He said in answer to my question that he hoped that UTB would not serve a counternotice. That, I find, was the truth. He therefore must have considered that he could get away with a price as low as £5 million. As it turned out, £5 million was too low a price. Prince Abdullah's reaction was that it "was not a fair offer". UTB determined on 10 January 2018 to serve a counternotice, believing that it had it within its power to defer the property asset purchase by other means.

G.    The Disputed Events in 2018.

373.    There was, in the end, no dispute about UTB's evidence that it did not decide to serve a counternotice until 10 January 2018 and did not hit upon the device of transferring some of its shares to UTB 2018 until 22 January 2018. That evidence is supported by the evident hurry in which the transfers were effected and the sub-sales of shares to be purchased from SUL put in place. Had UTB decided earlier to transfer its shares, it clearly would have done so earlier, so that there was a greater chance of the transfer being registered before service of a counternotice.

374.    After the Counternotice was received, SUL promptly sought to cause SUFC's directors to execute the property call options and Prince Abdullah personally and then

100

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

Jones Day on his behalf intervened to seek to prevent that from happening. UTB considered that its assignment and sub-sale schemes were effective to avoid clause 9.1.12, although I have held that they were not. Prince Abdullah's email dated 30 January 2018 said that no action should be taken in response to Shepherd & Wedderburn's letter calling for execution of the property call option notices until Jones Day had written the following day.

375.   Jones Day stated that they disagreed that the obligation under clause 9.1.12 of the ISA had been triggered and that there was therefore a dispute between SUL and UTB and that, in light of that, the status quo should be preserved and no action taken until UTB confirmed that the obligation had been triggered or the board of SUFC agreed by a majority to execute in any event. While emphasising that there was a dispute as to the meaning of clause 9.1.12, the letter did not in terms say that the matter would be referred to the court for determination. It was, in substance, a denial of SUL's right upon completion of the share sale to have the SUFC directors execute the property call option notices. SUL claimed that it was a repudiatory breach of contract, among others, and by letter dated 6 February 2018 purported to terminate the ISA and the contract of sale and purchase on account of repudiatory breaches by UTB.

376.   Proceedings were in fact started by UTB shortly after the failure by SUL to complete the sale on 6 February 2018. UTB had contended that SUL should complete but without prejudice to any rights that had arisen prior to the date of completion, however SUL declined to do so, for fear that completion might waive such rights as SUL had to set aside or terminate the contract of sale and purchase. It offered different terms of completion but UTB would not agree these.

377.   Further disputes between SUL and UTB during 2018 related to the basis on which each of them should contribute to the repayment of the Charwell loan on 30 April 2018 and the funding of the Club's deficit thereafter. It took two applications made to the Court by SUL to achieve loans of £1 million from each owner for the purpose primarily of repaying Charwell.

H.   Breaches of Contract

378.   SUL argues that UTB was in breach of the ISA and the contract of sale and purchase in various respects. All but one of the alleged breaches depend on the implication of various terms. I have held, in Part D of this judgment, that there is no implied term of good faith, no implied term restricting a partial transfer of shares or encumbering of a party's own shares or diminishing the value of the other party's shares once a call option notice has been served. I have held that it is implicit that UTB and SUL must not wilfully obstruct or hinder the reunification of the property assets pursuant to clause 9.1.12 of the ISA in connection with the operation of clauses 10 or 11.

379.   The allegations of breach of contract no longer matter in this case for the claim for damages. Had UTB successfully evaded the obligation under clause 9.1.12, in breach of contract, and not voluntarily agreed in April 2019 to cause SUFC to execute the property call options, there would have been a claim for damages, which prima facie would have been the difference between the price for the property assets payable under the property call options and the value of those assets subject to the leases to SUFC. However, SUL now accepts that, if SUFC does in due course pay the price under the property call options that have been triggered, there is no financial loss

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

caused by the breaches of contract alleged. But the alleged breaches of contract are nonetheless important because SUL claims to have terminated the ISA and the contract of sale and purchase on 6 February 2018 for repudiatory breach, with the consequence (if correct) that UTB cannot now enforce the contract of sale and purchase of SUL's shares.

380.   The main breach of contract relied on in this regard was the breach of an implied term of good faith, but I have held that there is no such implied term. I have similarly rejected SUL's claim that other terms are to be implied, apart from the obligation not wilfully to obstruct or hinder the operation of clause 9.1.12 of the ISA. By transferring 40% of the shares in Blades to UTB 2018 and seeking to have the transfer registered, UTB intended to defeat the operation of clause 9.1.12 but it did not do so. It did not do so because there is a resulting trust of the shares transferred to UTB 2018 and because the nomination of third parties as transferees of the shares bought from SUL did not mean that UTB did not acquire them and was perfectly lawful. The steps taken by UTB prior to Jones Day's letter dated 31 January 2018 were therefore not a breach of the implied term because, in themselves, they did not obstruct or hinder the operation of clause 9.1.12.

381.   The other breach of contract on which SUL relies is a repudiatory breach of UTB's obligation under clause 9.1.12 to cause SUFC to execute and serve property call option notices. I have held that performance of that obligation would have been due immediately after completion of the contract of sale and purchase on 6 February 2018, when UTB paid SUL the price under that contract, thereby "acquiring" its shares in Blades. Completion never in fact took place, but before it was due Jones Day wrote to the directors of SUFC telling them that they must not execute property call option notices before UTB agreed or the board of SUFC resolved to do so. In the circumstances, that was an anticipatory breach of contract -- since UTB and SUL would have been obliged upon completion on 6 February 2018 to cause their appointed directors to execute the property call option notices. It was also itself a breach of the implied term because it hindered the operation of clause 9.1.12.

382.   Non-exercise of the property call options except at the will of UTB (or with the agreement of the majority of an evenly divided board of SUFC) would have deprived SUL of substantially the whole of the benefit then remaining to it under the terms of the ISA, since the joint venture came to an end with the purchase of SUL's shares in Blades and the principal remaining obligation of benefit to SUL was to trigger the property call options. In my judgment, UTB was plainly refusing to perform clause 9.1.12 on completion on 6 February 2018 or at any time other than a time of its choice, thereby hindering the operation of clause 9.1.12, and it was a repudiatory breach of contract entitling SUL to terminate the ISA. Jones Day's letter dated 31 January 2018 alluded to a dispute about the operation of clause 9.1.12 but it did not say that the options should not be exercised until the court had determined the issue; it said that they should not be exercised until UTB (or SUFC's board) decided that they should be exercised. SUL elected to terminate the ISA (and the contract of sale and purchase) by its solicitors' letter dated 6 February 2018, as to which there is no dispute. The effect of that was that SUL lost the benefit of clause 9.1.12 of the ISA and any other obligation of the ISA that remained to be performed and has instead a claim for damages against UTB for any losses caused by the breach.

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

383.  However, it is not the ISA that SUL needs to terminate if it is to avoid having to sell its shares in Blades to UTB for £5 million: it is the contract of sale and purchase that had to be terminated.  This contract came into existence only on 26 January 2018, upon service of the Counternotice, which in terms accepted the alternative offer made in the Call Option Notice.  Upon service of the Counternotice, subject only to payment of the price of £5 million, UTB was entitled to SUL's shares on 6 February 2018.

384.  Since the contract of sale and purchase of SUL's shares in Blades came into existence as a result of an offer made by SUL on 29 December 2017 and an acceptance of that offer by UTB on 26 January 2018, the contract in question is plainly a separate contract from the ISA itself.  The same would be true even if UTB had exercised an option to buy the shares: see Sherwood v Tucker [1924] 2 Ch 440 at 444-5, per Pollock MR.  Once an option is exercised, a new contract arises. The new contract is a contract of sale and purchase of shares: Francis v Vista del Mar Development Ltd [2019] UKPC 14 at [1], per Lady Arden. The new contract analysis in these option cases applies more strongly where there is a bilateral contract formed by offer and acceptance.

385.  That being so, the termination of the ISA on 6 February 2018 will leave the contract of sale and purchase in place.  It will discharge the unperformed obligations of the ISA, leaving SUL with a remedy in damages: Photo Production Ltd v Securicor Transport Ltd [1980] A.C. 827, 849, per Lord Diplock. This is restated in clause 20.2 of the ISA, which provides that any termination of the ISA is without prejudice to rights, obligations or liabilities of any party accrued or arisen prior to termination. It does not therefore terminate the contract of sale and purchase.

386.  SUL seeks to avoid this outcome in two ways.

387.  First, it contends that the obligation under the contract of sale and purchase was conditional on various matters, including payment of the price and execution of documents that are reasonably required by the buyer, as well as identification of the required transferees of the shares.  It argues that the right to have the shares transferred had not accrued at the time of termination and so no such obligation could arise. In my judgment that is an incorrect analysis. The contract of sale and purchase is not a conditional contract: payment of the price and execution of documents are matters of completion.  UTB was entitled from 26 January 2018 to have the shares transferred to it at completion, on payment of the price. In any event, the rights of UTB were not rights under the terminated ISA: they were rights under the contract of sale and purchase itself.

388.  Second, SUL contends that the contract of sale and purchase arising under clause 11 of the ISA "does not operate in a vacuum"; the rights under clause 9.1.12 are an essential part of the clause 11 contract and "are written into the contract of sale and purchase, as a matter of construction", such that the contract cannot stand without the rights under clause 9.1.12 and therefore termination of the ISA necessarily terminates the contract of sale and purchase.  This argument of SUL is not one that was fully developed by Mr Downes QC until closing submissions.  SUL's pleaded case is that the ISA and/or the contract of sale and purchase were terminated on account of various repudiatory breaches of contract by UTB. Nothing specific was pleaded about the terms of the contract of sale and purchase.  I remain unclear whether SUL is

103

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

arguing that the implied terms of the ISA are also implied terms of the contract of sale and purchase, or whether it is contending for an implied term of the contract of sale and purchase that SUL and UTB must cause SUFC to exercise the property call options in compliance with clause 9.1.12 of the ISA.

389.    Whichever way SUL is putting its case, I consider that the true analysis is that the contract of sale and purchase contains no such implied term. It is unnecessary to imply any such term into the contract that arises under clause 11 of the ISA for the following reasons. First, the obligations already exist under the terms of the ISA, which as I have held include an implied obligation not wilfully to do anything that defeats the operation of clause 9.1.12 when clause 11 rights are being exercised. Second, the obligation under clause 9.1.12 is triggered by completion of the contract of sale and purchase; it is not a term of that contract. The contract of sale and purchase of SUL's shares in Blades is solely concerned with transferring the shares and paying the price that has been set by the clause 11 machinery. Third, there is no lacuna in the operation of the ISA and the contract that requires to be filled. If SUL as seller of its shares wishes to enforce clause 9.1.12 its remedy is plain: it can affirm the ISA and sue to enforce clause 9.1.12 after completion of the sale of its shares, or claim damages for the loss of that right. If on the other hand UTB had succeeded in preventing clause 9.1.12 from being triggered, SUL would have a strong defence in equity to a claim for specific performance of the contract of sale and purchase of its shares. There is therefore no necessary or obvious implied term of the contract of sale and purchase relating to the operation of the ISA.

390.    In case I am later held to be wrong in holding that there are no other material terms to be implied into the ISA, I need to make brief findings about what breaches of any such terms are established – and whether they are repudiatory breaches.

391.    The principal breach of contract on which SUL relied was breach of an implied obligation of good faith, in relation to the conduct of Mr Giansiracusa, Prince Abdullah and UTB in November and December 2017 and in relation to the attempt to avoid triggering clause 9.1.12. I have held that there was no such implied term, or at least that no such obligation could exist at a time when one party was exercising or was about to exercise its rights to serve a call option notice under clause 11 or a Roulette Notice under clause 10. If there is any such implied obligation, then in my judgment UTB was in breach of that obligation by Mr Giansiracusa's emails in November 2017 and his agenda and draft resolutions of December 2017. These went further than was appropriate and necessary if the relevant context was one of a cooperative venture in which a good personal relationship between Prince Abdullah and Kevin McCabe was of paramount importance and the parties were required to deal fairly with each other. Although UTB may then have been in breach of an implied obligation to act in good faith towards SUL, there was very significant mitigation for its conduct. SUL had itself been in serious breach of the same obligation during the months September to November 2017 and, for the reasons I have already given, UTB was entitled to be offended and angry by Kevin McCabe's conduct. Nevertheless, the ISA was not terminated by UTB and in my judgment Mr Giansiracusa did in some of his language overstep the mark that would be regarded as appropriate, if there were a good faith joint venture between the parties.

392.    I do not, however, consider that UTB's actions with regard to Mr Ratcliffe's appointment and Mr Bettis's employment were breaches of the obligation of good

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

faith. UTB may have exceeded its rights under clause 5.11 in seeking to set the reporting lines that it did, but there was no absence of good faith in the way that UTB conducted itself. Mr Giansiracusa considered that UTB was properly exercising a right conferred on it by the ISA and it is notable that, at the October 2017 board meeting, Mr Tutton acquiesced in what UTB was doing, and subsequently acquiesced in the terms of the appointment of Mr Ratcliffe. A vigorous disagreement about what was best for the Club and what the ISA permitted is not an absence of good faith. Equally, UTB did not act contrary to the requirements of good faith in seeking to retain Mr Bettis as CEO, even though they were aware that Kevin McCabe (but not all the SUL-appointed directors) wished that he would leave. The board did not vote to invite Mr Bettis to resign. In those circumstances his salary was payable and Mr Giansiracusa was right to cause it to be paid. Even if Mr Giansiracusa was strictly in breach of fiduciary duty in advising Mr Bettis that he had a claim against SUFC, his doing so was an attempt to mollify Mr Bettis at a time when he was angry about the way that he had been treated. In the last year, the Club has derived the benefit of that attempt by UTB to maintain good relations with Mr Bettis. I reject the contention that Mr Giansiracusa acted with the intention of causing Mr Bettis to make a claim against SUFC.

393.   Turning to January 2018, if I am wrong in concluding that there was no obligation of good faith binding UTB after SUL had served the Option Call Notice, then UTB was in breach of it by seeking to take advantage of SUL's misjudgment of its motives, without first informing UTB that it considered that – by taking various steps prior to serving a counternotice – it could avoid the obligation to trigger the property call options until a time of its choosing. Since UTB was obliged not to obstruct clause 9.1.12 by taking any such steps, it must therefore have been a breach of the obligation of good faith to attempt to do so without at least disclosing to SUL what it intended to do and the basis of its entitlement. However, the obligation of good faith did not require UTB to offer to rescind the Call Option Notice that SUL had served. UTB was in any event obliged not to do anything that would circumvent clause 9.1.12 by reason of the implied term that I have held to exist.

394.   The next question is whether any such breach of the implied obligation of good faith was a repudiatory breach of contract. I consider that any breach constituted by Mr Giansiracusa's communications in November/December 2017 was clearly not a repudiatory breach of contract. The reason is that, by that time, any relationship of confidence and trust between the principals of SUL and UTB had been irrevocably damaged by Kevin McCabe's conduct in the previous weeks or months. UTB's breaches of the obligation of good faith were minor in comparison with SUL's breaches. The ISA-governed relationship had already reached its end stage, with both sides starting to look for the right opportunity and circumstances in which to exercise contractual rights to terminate the relationship. Those contractual rights were unaffected by any breach of the obligation of good faith. There was little else of benefit remaining for SUL in the ISA. SUFC remained a substantially loss-making company and neither UTB nor SUL was prepared to continue to fund it without finding a new investor. The remaining benefit of the ISA for SUL was therefore not taken from SUL by UTB's conduct. (SUL may well have affirmed the ISA by exercising its rights under clause 11 on 29 December 2017, with full knowledge of UTB's conduct and its consequences; however, UTB did not plead affirmation and in

105

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment
UTB LLC v. Sheffield United

closing disclaimed its ability to argue that SUL did in fact know at that time of its legal right to elect to terminate the ISA.)

395. As regards a breach of the obligation of good faith by seeking to avoid triggering clause 9.1.12 without first drawing its intended actions to SUL's attention, this was of no effect on the substantive rights of SUL under the ISA (other than to give rise to a legal dispute that needed to be adjudicated) if the Scheme was ineffective.

396. If the Scheme to avoid triggering clause 9.1.12 succeeded because (contrary to my conclusion) either the transfer of UTB's shares when lodged or registered will be effective to transfer those shares beneficially to UTB 2018, or because UTB will not "acquire" the SUL shares that are transferred to Prince Musa'ad and Mr Giansiracusa, then UTB would have breached the implied term not to obstruct or hinder the operation of clause 9.1.12. That breach would be a repudiatory breach of the implied term in itself because it would deprive SUL of its very important rights under clause 9.1.12 of the ISA. On the basis that UTB was intending to serve or had served a counternotice, these were by far the most substantial rights remaining to SUL under the terms of the ISA.

397. However, a repudiatory breach of any implied obligation of the ISA gets SUL no further for the reasons already explained in paras 383ff above: the contract of sale and purchase was a separate contract. There is no pleaded case that the contract of sale and purchase was a "relational" contract or otherwise subject to an implied term of good faith. Nor could any such implied term be obvious or necessary. Further, SUL does not allege that anything that UTB did after the contract of sale and purchase was formed was a breach of an implied obligation of good faith.

398. For the reasons that I have given, no breach of contract for which SUL has contended amounts to a breach of the contract of sale and purchase that came into existence on 26 January 2018. That contract therefore is not terminated. In that regard, SUL has one remaining argument, which I shall address under Part J of this judgment dealing with alleged unfairly prejudicial conduct (see paras 415, 416 below. That is that unfairly prejudicial conduct of UTB, Prince Abdullah and Mr Giansiracusa was a substantial cause of Kevin McCabe's serving the Call Option Notice on 29 December 2017, which led to the contract of sale and purchase, and that relief granted for such conduct should include setting aside the Call Option Notice or the contract of sale and purchase.

I.   Conspiracy to Cause Harm to SUL

399. SUL advances an additional claim that it suffered loss caused by UTB, Mr Giansiracusa and Prince Abdullah conspiring together to use unlawful means to harm its interests. At one stage, SUL also relied on a lawful means conspiracy whose predominant motive was to harm SUL's interests, but that alternative claim was abandoned by SUL during the trial.

400. SUL contends that UTB, Mr Giansiracusa and Prince Abdullah acted in combination and unlawfully in two separate respects. First, in waging a war of attrition against Kevin McCabe in November and December 2017, calculated to cause him to give up SUL's interest in Blades by using the exit mechanisms of the ISA or otherwise offering to sell out to UTB. The alleged loss crystallised when SUL served the Call

106

**A-8994**

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

Option Notice on 29 December 2017, which gave UTB the option to buy out SUL for £5 million. Second, in seeking to conceal until the last minute the Scheme that UTB had conceived to deprive SUL of the benefit of clause 9.1.12 upon completion of the contract of sale and purchase.

401.   As far as the first of these is concerned, I have already found that there was no conspiracy in November and December 2017 to cause harm to SUL by making its position as an owner of Blades untenable. Prince Abdullah and Mr Giansiracusa, with the input of others such as Mr van Winckel and Mr Hawasli, worked together to seek to protect UTB's best interests, as they saw it, which necessarily involved curtailing the liberties and influence of Kevin McCabe. They considered that the events relating to the engagement of Deloitte, Mr van Winckel's appointment, Mr Ratcliffe's appointment and Mr Bettis's employment required them to confront Kevin McCabe in a strong way. They agreed how to do that to best effect. But the purpose was to cause Kevin McCabe to realise that his behaviour would not be tolerated and must cease. Their objective, as demonstrated by the Whatsapp messages exchanged before the meeting on 19 November 2017, was to restore proper balance between the two sides in the management of the Club's affairs. I find that there was no intention to cause SUL to give up its involvement in Blades.

402.   Although some strong, excessively hurtful, language was used by Mr Giansiracusa in his communications with Kevin and Scott McCabe, there was nothing unlawful in what was done. There was no motive to injure SUL and no intention to cause Kevin McCabe to walk away from the Club. Prince Abdullah and Mr Giansiracusa were angry about Kevin McCabe's conduct, and this anger only increased when they discovered the way that Mr Bettis had been treated. Nevertheless, I find that before the service of the Call Option Notice on 29 December 2017 UTB had made no decision to acquire SUL's interest in Blades or to cause SUL to serve a call option notice. UTB was starting to consider exit routes because it had become apparent that it could no longer work with SUL, unless Kevin McCabe fundamentally changed his *modus operandi*. But UTB had not reached a decision that it should operate clause 10 or 11 of the ISA, or that it should attempt to force SUL to do so. Both parties were looking at various ways of restructuring the ownership of Blades, by selling an interest to another investor, and had been for some considerable time. Unknown to Prince Abdullah and Mr Giansiracusa, SUL was at that time well advanced in discussions with ALK that would involve UTB's shares being acquired by ALK. When Kevin McCabe made an offer on the telephone to Mr Giansiracusa on 20 December 2017, UTB was interested to consider it further and possibly negotiate the offer down, but still had made no decision about what to do.

403.   In any event, I find that the various rebukes and criticisms that were directed at Kevin McCabe in November and December 2017 were not a cause of SUL's serving the Call Option Notice. That act was entirely a calculated decision by Kevin McCabe, after careful discussion with Mr Tutton and no doubt his sons over Christmas that year, to take advantage of apparent financial weakness of Prince Abdullah, so that SUL could acquire UTB's shares cheaply and sell on at a substantial profit to ALK. The argument that Kevin McCabe was left with no alternative and that the hurtful treatment he had received caused him to trigger the exit machinery does not stand up to analysis.

107

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

404.    In the first place, Kevin McCabe, though no doubt stung by the criticism he received, is not the kind of man to be intimidated by cross words. He is a seasoned businessman with the experience, toughness and "good humour" (as he often states in his emails to others) to rise above such matters. Second, his intention was not to sell SUL's shares and get out but to acquire UTB's shares as cheaply as possible. Despite the oral offer to sell SUL's shares for £10 million – which was a means only of testing UTB's means and resolve – and the discussion with Mr Tutton about offering up to that sum to buy out UTB, the offer that SUL made for UTB's shares was at the unrealistically low figure of £5 million: about one-third of Prince Abdullah's investment to that time. Despite Kevin McCabe's claim that he assumed that a wealthy Prince Abdullah would be able to fund the property call options or find another investor, I consider that he calculated that Prince Abdullah would feel unable to take the risk of such a substantial future liability, even if he could raise the £5 million. Kevin McCabe believed that SUL could if necessary afford to pay that sum from Scarborough Group's resources, in the event that no counternotice was served by UTB. Although the hoped-for loan of £10 million from ALK had not yet materialised – Mr Pace had indicated that he required some due diligence to be done before he would take that step – there was still every prospect in late December 2017 that the deal with ALK would proceed.

405.    Third, Kevin McCabe does not say in his witness statement that he was so hurt by the attack on him that SUL was left with no choice but to seek to get out of Blades. What he says is that he recognised that it was in the best interests of the Club for the dispute to be resolved on the basis that one or other party should take complete control and "get on with it", and that owing to the breakdown of the relationship with Prince Abdullah it seemed appropriate to operate the machinery in the ISA to resolve matters one way or the other. However, Kevin McCabe had every intention of it being SUL that would buy out UTB, not least because he regarded those acting for UTB as inadequate and unsuitable to run the Club. Although no deal had at that time been struck with ALK, Kevin McCabe was optimistic – as he had been in January 2017 with Sela Sport – and was willing to take the chance that the deal with ALK would shortly be agreed. The relationship with Prince Abdullah had certainly deteriorated in November 2017 but it had been apparent for some time that the ISA would be terminated once a suitable and willing investor was found.

406.    For all these reasons, I reject the argument that an unlawful means conspiracy caused SUL loss as a result of the service by SUL of the Call Option Notice.

407.    Turning to the second aspect of the unlawful means conspiracy claim, SUL claims that Mr Giansiracusa, Prince Abdullah and UTB conspired together to try to deprive SUL of the benefit of clause 9.1.12 of the ISA, in particular by concealing their intentions until the last minute. The unlawful means invoked for this purpose are the underlying breaches of contract by UTB (breaches of an implied term and the obligation under clause 9.1.12 itself) and fraudulent misrepresentation by Mr Giansiracusa on 25 January 2018, when he implied to Shepherd & Wedderburn that he had no instructions from UTB about service of a counternotice ("I don't have instructions from my client. You'll be notified if and when I do.").

408.    As for that email, I find that it was Mr Giansiracusa's intention to keep SUL and its solicitors guessing for as long as possible about UTB's decision to serve a counternotice, although in fact Mr Ratcliffe had already heard from Mr Hawasli that UTB was intending to serve one. The fact that Mr Hawasli had spoken openly about

108

THE HONOURABLE MR JUSTICE FANCOURT                                    UTB LLC v. Sheffield United
Approved Judgment

UTB's intention demonstrates that there was no concerted attempt at secrecy. At about the same time that Mr Giansiracusa's email was sent, Jones Day sent SUL the stock transfer form in favour of UTB 2018. Mr Giansiracusa explained his email as just "brushing off" an inappropriate enquiry from Shepherd & Wedderburn; but there was nothing inappropriate about the enquiry, though Jones Day were entitled to decline to answer it. Mr Giansiracusa went further than that and accepted frankly in the witness box that his wording was unfortunate. Although he did not accept that it was a misrepresentation, I find that it was, since it was clear that UTB had decided to serve the Counternotice and was preparing to do so on the last possible day.

409.    However, Mr Giansiracusa's email was not part of a concerted plan to deceive SUL. The Scheme had only been conceived at the last moment and the incorporation of UTB 2018 and the stock transfer were hurriedly done. Mr Giansiracusa himself took the view that he would not tell SUL anything that they were not entitled to know; however, that was attributable to his own mindset as a tough business lawyer, not a shared strategy to deceive SUL. Moreover, the email had no causative effect at all. SUL lost nothing as a result of being uncertain for one further day what UTB would do and the Scheme was ineffective.

410.    Further, the loss in respect of which SUL claims damages is the difference between the freehold value of the Stadium and the Academy subject to the property call options and their value without those options. In the events that have happened, the property call options have been exercised, in July 2019, and SUL will not suffer the losses claimed because it will in due course be entitled to be paid the prices specified in those options. SUL did not seek to amend its claim for damages to allege loss caused by a delay in the exercise of the property call options.

411.    Although SUL recognises that the substantial losses that are the subject of its damages claim will not be incurred, provided that SUFC does indeed complete the purchase of the property assets, it contends that if that purchase is not completed on time it will have suffered loss. It therefore seeks to have the quantum of any damages payable (whether for breach of contract of conspiracy) adjourned to await the outcome of the exercise of the property call options.

412.    In my judgment, that is not an appropriate course to take. It wrongly assumes that SUFC would have performed if the property call options had been exercised in February 2018. The claim for damages was for the difference in value between the property assets with and without the benefit of exercised property call options. That difference will not arise. Moreover, in valuing the properties with the benefit of the property call options, the valuers would necessarily have to take into account the risk of non-completion of the purchase by SUFC, as at the date on which the tortious conduct caused loss, in about late January 2018. Unless the risk of non-completion by SUFC of the purchase of the property assets is greater today or the price lower, there is no loss resulting from delay. In January 2018, SUFC controlled by UTB would have been in substantial difficulty in paying for about £40 million of property assets within a year. Its ability to do so would have depended on UTB finding a new investor. Such an investor would have been buying into a loss-making Championship football club with no certainty of promotion to the Premier League and a liability to pay for the property assets. At the current time, SUFC has the benefit of very substantial revenue that Premier League clubs enjoy and, inevitably, a much higher prospect of attracting further capital investment. It is impossible therefore to

109

conclude that there is a greater risk of non-completion of the purchase of the property assets. There is no argument that the price will be lower. There is therefore no reason to adjourn assessment of loss to a later date.

413.    For the reasons given above, I dismiss the claim for conspiracy to cause loss to SUL by unlawful means. Although UTB, Prince Abdullah and Mr Giansiracusa did combine to try to avoid the exercise of the property call options, they were not conspiring to act unlawfully and their attempt to avoid the contractual obligation in clause 9.1.12 of the ISA was unsuccessful. Further, no loss was caused by any such combination; alternatively, in view of the voluntary exercise by SUFC of the property call options in July 2019, no loss that has been claimed exists.

J.    Unfairly Prejudicial Conduct: the Section 994 Petition

414.    In its Petition, SUL seeks an order that it be entitled to buy all UTB's shares in Blades, or an order setting aside the Call Option Notice or the contract of sale and purchase, or both. It does so on the basis that UTB, Prince Abdullah and Mr Giansiracusa have conducted the affairs of Blades in a manner that is unfairly prejudicial to SUL's interests as a member of the company, such that the relief claimed is appropriate. During the course of the trial, SUL abandoned its case that the price for its purchase of UTB's shares should be £5 million. It now accepts that the price should be the market value of UTB's holding.

415.    The alleged prejudicial conduct in part mirrors the allegations that are the subject of the conspiracy claim, but there are further allegations that are relied upon. SUL accepts that the Call Option Notice or the contract of sale and purchase can only be set aside, by way of relief granted under section 996 of the Companies Act 2006, if unfairly prejudicial conduct caused SUL to serve the Call Option Notice. However, for the same reasons that I have given in Part I above, it was not the case that any unfair or wrongful treatment of Kevin McCabe by or on behalf of UTB caused him to serve the Call Option Notice. The causative link required is wholly absent, so there is no basis on which the Call Option Notice can be set aside.

416.    The allegations of unfairly prejudicial conduct and the relief that SUL seeks are therefore of significance only if I decline to grant specific performance of the contract of sale and purchase, leaving SUL as owner of 50% of the shares of Blades. Otherwise, SUL will be selling its shares at a price that it chose, not a price that reflects the market value of those shares diminished by any conduct of the Respondents. I will in any event make factual findings about the allegations of unfairly prejudicial conduct.

417.    It is unnecessary for me to consider again the allegations of quasi-partnership and breaches of an implied obligation of good faith, which I have addressed and rejected in earlier parts of this judgment. I have also rejected the argument that UTB and those acting on its behalf were seeking to cause SUL to give up its interest in Blades and SUFC. The remaining allegations on which SUL relies are the following:

THE HONOURABLE MR JUSTICE FANCOURT                                        UTB LLC v. Sheffield United
Approved Judgment

    i)       Attempting to defeat an objective of the ISA, namely the reunification of the property assets with SUFC, so as to create a dispute that made SUL's shares in Blades unmarketable;

    ii)     Acting in such a tricky way in relation to the attempted avoidance of clause 9.1.12 that SUFC was likely to be brought into disrepute;

    iii)   Taking advantage of SUL's misunderstanding about the effect of service of the Call Option Notice;

    iv)   Misappropriation of SUFC funds in seeking to continue the employment of Mr Bettis;

    v)     Breach of fiduciary duty by Mr Giansiracusa's email to Mr Bettis dated 1 December 2017 informing him that he had a claim against SUFC;

    vi)   Abuse of power in relation to the appointment of Mr Ratcliffe as CFO in November 2017;

    vii)  Prince Abdullah's conduct in relation to the Charwell loan, viz. his accepting a bribe.

418.    The starting point is to address to what extent these matters amount to management of the company's affairs. A shareholder is not entitled to complain about the way in which another shareholder exercises rights appurtenant to their shares unless it amounts to management of the company's affairs, as distinct from a shareholder's affairs. SUL submits that "management … must obviously include a shareholder exercising its powers qua shareholder" but this is far too broad a proposition. As the example then given by SUL establishes, it is only if the votes or rights of a shareholder are used to determine how the company's affairs are conducted, for example by passing a resolution in general meeting or by removing or appointing a director to the board, that it amounts to management of the company's affairs.

419.    Even if a shareholder's actions do amount to managing the company's affairs, another shareholder will not be "entitled to complain of unfairness unless there has been some breach of the terms on which he agreed that the affairs of the company should be conducted" (per Lord Hoffmann in O'Neill v Phillips [1999] 1 WLR 1092 at 1098H). There must not only be material prejudice to the interests of SUL as a shareholder but the prejudice must be unfair, that is to say not justified by the terms that have been agreed or by the conduct of SUL.

(i) Creating a dispute by attempting to avoid clause 9.1.12

420.    In relation to the first allegation, the steps taken by UTB in an attempt to avoid triggering clause 9.1.12 of the ISA do arguably relate to management of the affairs of Blades because SUFC had existing rights (under the property call options) and contingent obligations (under clause 9.1.12 of the ISA) in relation to the property assets, of which it was also the lessee. What UTB was seeking to do would directly affect those interests and obligations. Further, it was part of the scheme of the ISA (to which Blades and SUFC were parties) that the property assets would be reunited with SUFC when a shareholder gained super-majority control.

111

THE HONOURABLE MR JUSTICE FANCOURT                                       UTB LLC v. Sheffield United
Approved Judgment

421.    However, it is impossible to discern prejudice caused to SUL as a shareholder of
        Blades by not exercising the property call options in February 2018. In the first place,
        the effect was that SUL remained a shareholder, when it would otherwise have had to
        sell its shares in February 2018. If any prejudice was caused to SUL by delaying the
        exercise of those options, it was caused to SUL as the owner of some of the property
        assets, which ownership predated the ISA. The interests of SUFC (and therefore of
        Blades and its shareholders) were for clause 9.1.12 not to be triggered and for it to be
        able to exercise the property call options at a time that suited it – a right that it had
        under the property call options themselves. That is so for two principal reasons.
        First, SUFC had the benefit of leases of the main property assets at concessionary
        rents (in July 2017 Kevin McCabe was seeking a market rent of £1.65 million p.a. for
        the Stadium and Academy, for which SUFC was obliged to pay £310,000 p.a.). It
        was SUFC (and therefore Blades) that benefited from that arrangement and SUL only
        in its capacity as landlord that was disadvantaged by it. While SUFC remained a loss-
        making Championship club, it was clearly in SUFC's and Blades' interests for the
        subsidised rental arrangement to continue, since the rental liabilities were a much
        lower sum than likely finance costs of paying for the property assets.

422.    Second, if the property call options were triggered at a time when SUFC could not
        afford to pay the purchase prices, it would become insolvent. At the time of the
        attempts by UTB to avoid triggering clause 9.1.12 (including the letter of Jones Day
        dated 31 January 2018 that was a repudiatory breach of the ISA), Blades had no
        immediate prospect of paying around £40 million for the property assets, and the
        chances of Blades controlled by UTB being able to do so within 12 months were
        speculative. Even if (which is not the case) there was unfair prejudice to SUL as a
        shareholder, that prejudice has now been removed by the voluntary exercise of the
        property call options by SUFC and no further relief is needed or appropriate.

423.    SUL attempts to get round this difficulty by characterising the prejudice as the
        creation of a dispute that made its shares in Blades unmarketable. Since UTB was
        unaware of SUL's detailed negotiations with ALK until disclosure in these
        proceedings, it is not credible that UTB created a dispute to stymie those negotiations.
        UTB's conduct did create a dispute from about 31 January 2018 but by then SUL had
        offered to sell its shares to UTB for £5 million. If there had been no dispute SUL
        would have had to complete the sale of its shares to UTB on 6 February 2018 for £5
        million. It could not then have sought to market its shares anywhere else. Its ability
        to sell its shares to ALK or to any other purchaser depended on its being able to set
        aside (or resist enforcement of) the contract of sale and purchase with UTB.
        Moreover, SUL was able to agree terms with ALK even though a dispute had arisen.
        SUL has identified no prejudice that it has suffered as a result of the delay in
        completion of the contract of sale and purchase and, if that contract is valid and
        enforceable, it cannot sell its shares elsewhere. If the contract is not enforced, SUL is
        free to sell its shares to ALK or another person and there is no evidence that the value
        of the shares has been affected by the dispute with UTB or that ALK has lost interest.
        There is therefore no prejudice and no relief is justified.

        (ii) Alleged tricky conduct of UTB in relation to service of counternotice

424.    The second allegation is that SUFC has been or was likely to be brought into
        disrepute by the tricky conduct of UTB. This allegation therefore also relies on
        SUL's shares in Blades being worth less or being less marketable as a result of the

                                                                                              112

THE HONOURABLE MR JUSTICE FANCOURT
Approved Judgment

UTB LLC v. Sheffield United

conduct in question. The tricky conduct is understood to refer to the attempts by UTB to avoid informing SUL before 26 January 2018 that it was intending to serve a counternotice and to conceal the Scheme. However, nothing that UTB did in terms of concealing its intentions from SUL or misleading SUL amounts to management of the affairs of Blades.

425. The short answer to the remainder of this allegation is that there is no evidence that anything that UTB did that gave rise to the legal dispute has brought SUFC into disrepute so as to affect the value or marketability of SUL's shares. If SUL has to sell its shares to UTB, the price was fixed on 29 December 2017 by SUL's own act. If it is free to sell its shares (or some of them) to ALK then there is nothing to show that SUL's shares are worth less or that ALK reduced its price as a consequence of anything that UTB did. Neither of the share valuers suggested that the current market price is affected by the circumstances in which the dispute arose. Nor is there any evidence that if SUL is able and elects to keep its shares in Blades, those shares are worth less on account of the way in which UTB, Prince Abdullah or Mr Giansiracusa have conducted the affairs of Blades or SUFC. SUL submits that news about the way in which the McCabes have been treated by UTB will be liable to bring SUFC and Blades into disrepute because of adverse fan reaction, adverse media comment and the perception of strife at the Club. This however was mere supposition and assertion: there was no evidence capable of supporting it.

(iii) Attempts to avoid clause 9.1.12 ISA

426. The third allegation is that UTB took advantage of a mistake by SUL about the effect of service of the Call Option Notice. In so far as this differs from the first allegation, it is because it focuses on the element of taking advantage by UTB of SUL's mistake and so alleges a different kind of impropriety. The mistake was a mistake by SUL, as shareholder, as to the motives of the other shareholder, or as to the scope within the ISA to avoid triggering clause 9.1.12. UTB took certain steps as shareholder: it transferred shares to UTB 2018 and agreed to sub-sell shares acquired from SUL, to try to take advantage of that mistake. But this alleged impropriety – as distinct from the alleged breach of contract – has nothing to do with UTB, Prince Abdullah or Mr Giansiracusa's managing Blades' affairs. In so far as this allegation is based on steps that UTB took to avoid clause 9.1.12, the allegation has already been dealt with in the paragraphs above dealing with the first and second allegations.

(iv) Improper use of SUFC monies to pay Mr Bettis

427. The fourth allegation is that UTB, Prince Abdullah and Mr Giansiracusa misappropriated the funds of SUFC by their attempts to keep Mr Bettis employed. There are two components to this allegation. The first is that it was obvious from March 2017 that Mr Bettis could not properly perform the work of CEO of SUFC from Los Angeles and that the attempt by UTB to retain his services wasted money and delayed the appointment of a successor. The second is that Mr Giansiracusa and UTB caused Mr Bettis to be paid for November 2017 at a time when he was no longer working as CEO and had agreed to leave his position.

428. In the light of my findings about these matters, it is impossible for SUL to argue that money was misappropriated on payment of Mr Bettis's wages. At no time did Mr Bettis resign, nor was he sacked or made redundant. He therefore remained employed

113