# 25-0643-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 38 of 43 (Pages A-9251 to A-9525)

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
 & SULLIVAN, LLP
*Attorneys for Plaintiffs-Counter-
 Defendants-Appellees*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant-
 Appellant NHF TRS, LLC and
 Defendant-Counter-Claimant-
 Appellant Nexpoint Diversified
 Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS    (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Counter-Defendant-
   Appellee*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Amended Complaint, dated and filed
February 23, 2022 ................................ A-56

Exhibit A to Amended Complaint -
Bench Ruling and Memorandum of Law In
Support of (A) Final Approval of Disclosure
Statement; and (B) Confirmation of Chapter 11
Trustee's Third Amended Joint Plan, in re: *Acis
Capital Management, L.P., Debtor,* Case No. 18-
30264-SGJ-11, and in re: *Acis Capital
Management GP, L.L.C., Debtor*, Case No. 18-
30265-SGJ-11, dated January 31, 2019 ................ A-80

Exhibit B to Amended Complaint -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021 ................................ A-128

Exhibit C to Amended Complaint -
Letter of Bonds Ellis Eppich Schafer Jones LLP
to Court, dated September 23, 2020 ..................... A-160

Exhibit D to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019 ............................ A-163

Exhibit E to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Shana Sethi,
dated August 6, 2019 ............................................ A-170

ii

**Page**

Exhibit F to Amended Complaint -
Plaintiff's Second Amended Complaint and Jury
Demand in *The Charitable Donor Advised Fund,
L.P., v. U.S. Bank National Association, et al.*,
Case No. 1:19-CV-09857-NRB ............................ A-179

Exhibit G to Amended Complaint -
Plaintiffs' Original Complaint in *The Charitable
Donor Advised Fund, L.P., and CLO HOLDCO,
Ltd. v. U.S. Bank National Association, et al.*,
Case No. 1:20-cv-1036 ........................................... A-212

Exhibit H to Amended Complaint -
Letter of Myers Bigel to Mark Kotwick, dated
May 8, 2020 ............................................................. A-246

Exhibit I to Amended Complaint -
Plaintiff's Second Amended Complaint, *NexPoint
Strategic Opportunities Fund v. Acis Capital
Management, L.P., et al.*, Case No. 1:21-cv-
04384-GHW ............................................................ A-254

Exhibit J to Amended Complaint -
Letter of Quinn Emanuel to The Charitable
Donor Advised Fund, L.P. and Others, dated
December 28, 2021 .................................................. A-296

Exhibit K to Amended Complaint -
Letter of Parsons McEntire McCleary PLLC to
Jonathan E. Pickardt and Mark D. Kotwick, dated
January 10, 2022 ..................................................... A-299

Exhibit L to Amended Complaint -
Settlement Agreement, dated April 28, 2021 ......... A-302

iii

**Page**

Exhibit M to Amended Complaint -
Order Approving Debtor's Settlement with (A)
Acis Capital Management, L.P. and Acis Capital
Management GP LLC (Claim No. 23), (B)
Joshua N. Terry and Jennifer G. Terry (Claim No.
156), and (C) Acis Capital Management, L.P.
(Claim No. 159) and Authorizing Action
Consistent Therewith, dated October 7, 2020........    A-329

Exhibit N to Amended Complaint -
Memorandum Opinion and Order Granting in
Part Plaintiff's Motion to Hold James Dondero in
Civil Contempt of Court for Alleged Violation of
TRO in re: *Highland Capital Management, L.P.,
Debtor,* Case No. 19-34054-sgj-11, and *Highland
Capital Management, L.P. v. Dondero*, Case No.
20-03190-sgj11, dated June 7, 2021 .....................    A-354

Exhibit O to Amended Complaint -
Transcript of Proceedings in re: *Highland Capital
Management, L.P., Debtor*, Case No. 19-34054-
sgj-11, dated June 25, 2021 ..................................    A-410

Exhibit P to Amended Complaint -
Acis Capital Management, L.P.'s Memorandum
of Law in Support of its Motion to Dismiss
Plaintiff's Second Amended Complaint and for
Attorneys' Fees and Costs, dated January 27,
2022, *NexPoint Strategic Opportunities Fund v.
Acis Capital Management, L.P., et al.*, Case No.
1:21-cv-04384-GHW ...........................................    A-533

iv

**Page**

Order on Plaintiffs' Unopposed Motion to Amend
Caption, dated March 26, 2022.............................. A-562

Defendants the Charitable Donor Advised Fund,
L.P., and CLO HoldCo, Ltd.'s Amended Answer
and Counterclaim, dated and filed
March 30, 2023 ....................................................... A-563

Amended Answer of Defendant/Counter-Plaintiff
NexPoint Diversified Real Estate Trust to
Amended Complaint, dated March 30, 2023 ......... A-597

Exhibit 1 to Amended Answer -
Indenture, dated April 16, 2015 ............................ A-656

Exhibit 2 to Amended Answer -
Portfolio Management Agreement, dated
April 16, 2015, labeled Exhibit 2.......................... A-985

Exhibit 3 to Amended Answer -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019, labeled
Exhibit E ................................................................ A-1037

Notice of Defendant/Counter-Plaintiff NexPoint
Diversified Real Estate Trust for Leave to Add
Party, dated and filed April 10, 2023 .................... A-1043

Order of Honorable Gregory H. Woods, dated
May 1, 2023 and filed May 2, 2023....................... A-1043.1

Notice of Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023............... A-1044

Declaration of Blair A. Adams, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023............... A-1047

v

**Page**

Exhibit 1 to Adams' Declaration -
Transcript of Hearing, dated February 23, 2023.... A-1051

Exhibit 2 to Adams' Declaration -
Second Amended Complaint (Including Claim
Objections and Objections to Administrative
Expense Claim), *Acis Cap. Mgmt. L.P. and Acis
Cap. Mgmt. GP, LLC v. Highland Cap. Mgmt.,
L.P., et al.*, Adv. Pro. No. 18-03078, dated
June 20, 2019 ........................................................ A-1084

Exhibit 3 to Adams' Declaration -
Agreement, dated February 28, 2023 ................... A-1193

Exhibit 4, Part 1, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015........................................................ A-1257

Exhibit 4, Part 2, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 *continued* ....................................... A-1367

Exhibit 5 to Adams' Declaration -
Transcript of Proceedings, dated May 1, 2023 ...... A-1379

Exhibit 6, Part 1, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017................................................... A-1425

Exhibit 6, Part 2, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1432

vi

**Page**

Exhibit 6, Part 3, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1439

Exhibit 6, Part 4, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1446

Exhibit 7 to Adams' Declaration -
Order Granting Senior Certificate Holders'
Motion for Summary Judgment and Denying
Junior Certificate Holders' Motion for Summary
Judgment, *In the Matter of the Trust Established
Under the Pooling and Service Agreement
relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage Pass-
Through Certificates, Series 2007-C30*, Case No.
62-TR-CV-19-33, dated October 26, 2022 .......... A-1454

Exhibit 8 to Adams' Declaration -
Ruling in *In re Acis Cap. Mgmt., L.P.*, 18-30264-
SGJ-11, dated August 30, 2018 ............................ A-1473

Exhibit 9 to Adams' Declaration -
Portfolio Management Agreement, dated
June 5, 2014 ............................................................ A-1481

Exhibit 10 to Adams' Declaration -
Indenture, dated June 5, 2014, paginated bottom
center as Exhibit 3, Page 1 of 421 ........................ A-1534

Exhibit 11 to Adams' Declaration -
Portfolio Management Agreement, dated
November 18, 2014 ................................................ A-1956

vii

**Page**

Exhibit 12 to Adams' Declaration -
Indenture, dated November 18, 2014, paginated
bottom center as Exhibit 4, Page 1 of 335 ............. A-2008

Exhibit 13 to Adams' Declaration -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021
(Reproduced herein at pp. XXX – EX B)

Exhibit 14 to Adams' Declaration -
Original Complaint, *NexPoint Diversified Real
Estate Trust v. Acis Capital Management, L.P., et
al.*, dated October 3, 2022...................................... A-2344

Exhibit 15 to Adams' Declaration -
Notice of Appeal, *In re Acis Capital
Management, LP.*, Appeal No. 19-10847, dated
July 26, 2019 ......................................................... A-2392

Exhibit 16 to Adams' Declaration -
Opening Brief of Appellant Highland CLO
Funding, LTD, in above appeal, dated
September 20, 2019 ................................................ A-2396

Exhibit 17 to Adams' Declaration -
Memorandum of Law in Support of Defendant
U.S. Bank, National Association's Motion to
Dismiss the Second Amended Complaint,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2473

viii

**Page**

Exhibit 18 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding LTD.'s Motion to Intervene,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated November 24, 2021 .......... A-2499

Exhibit 19 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding Ltd.'s Motion to Dismiss,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2521

Declaration of Jonathon Milne, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 16, 2023............... A-2543

Exhibit 1 to Milne's Declaration -
Sections 12, 25(3), 28(1), 38, 46 and 48 of the
Cayman Islands Companies Act ........................... A-2569

Exhibit 2 to Milne's Declaration -
*In the Matter of Lancelot Investors Fund Limited
(In Official Liquidation)* [2015] (1) CILR 328 ...... A-2576

Exhibit 3 to Milne's Declaration -
*Marex Financial Ltd. v Sevilleja* [2020]
UKSC 31................................................................. A-2599

Exhibit 4 to Milne's Declaration -
*Primeo Fund v Bank of Bermuda (Cayman) Ltd*
[2021] UKPC 22 .................................................... A-2682

Exhibit 5 to Milne's Declaration -
*Renova Resources Private Equity Limited v
Gilbertson* [2009] CILR 268 ................................. A-2713

ix

**Page**

Exhibit 6 to Milne's Declaration -
Order 15, rule 12A of the Grand Court Rules........ A-2745

Exhibit 7 to Milne's Declaration -
*Birch v Sullivan* [1957] 1 WLR 1247 .................... A-2749

Exhibit 8, Part 1, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ)............................ A-2754

Exhibit 8, Part 2, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2774

Exhibit 8, Part 3, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2794

Exhibit 8, Part 4, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2813

Exhibit 8, Part 5, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2829

Exhibit 9 to Milne's Declaration -
*Foss v Harbottle* (1843) 2 Hare 461 ...................... A-2847

Exhibit 10 to Milne's Declaration -
*Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204 .................... A-2868

Exhibit 11 to Milne's Declaration -
*Johnson v Gore Wood & Co* [2000] UKHL 65...... A-2902

Exhibit 12 to Milne's Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-2948

x

**Page**

Exhibit 13 to Milne's Declaration -
Sections 994 to 996 of the UK Companies Act
2006 ....................................................................... A-3131

Exhibit 14 to Milne's Declaration -
*Kuwait Ports Authority et al. v Port Link GP Ltd
et al.* (Court of Appeal 20 January 2023 decision)  A-3135

Exhibit 15 to Milne's Declaration -
*Rolled Steel Products (Holdings) Ltd v British
Steel Corp* [1986] Ch. 246 ..................................... A-3204

Exhibit 16 to Milne's Declaration -
*Nurcombe v. Nurcombe* [1985] 1 370 .................... A-3270

Exhibit 17 to Milne's Declaration -
*Portfolios of Distinction v Laird* [2004]
2 BCLC 741 ............................................................ A-3284

Exhibit 18 to Milne's Declaration -
*Schultz v Reynolds* [1992-93] CILR 59 ................. A-3308

Exhibit 19 to Milne's Declaration -
*Berland v Earle* [1902] AC 83 ............................... A-3333

Exhibit 20 to Milne's Declaration -
*Harris v Microfusion* [2017] 1 B.C.L.C. 305 ........ A-3355

Exhibit 21 to Milne's Declaration -
*Top Jet Enterprises Limited v Sino Jet* [2018] (1)
CILR 18 .................................................................. A-3370

Exhibit 22 to Milne's Declaration -
*Estmanco (Kilner House) Ltd v G.L. C.* [1982] 1
W.L.R. 2 ................................................................. A-3405

Exhibit 23 to Milne's Declaration -
*Cook v Deeks* [1916] 1 AC 554 ............................. A-3420

xi

**Page**

Exhibit 24 to Milne's Declaration -
*Pavlides v. Jensen* [1956] 2 All ER 518................. A-3433

Exhibit 25 to Milne's Declaration -
*Menier v Hooper's Telegraph Works* LR 9 Ch
App 350 .................................................... A-3440

Exhibit 26 to Milne's Declaration -
*Heyting v Dupont* [1964] 1 W.L.R. 843................. A-3446

Exhibit 27 to Milne's Declaration -
*Burnford et al. v Automobile Association
Developments Limited* [2022] EWCA Civ 1943 ... A-3460

Exhibit 28 to Milne's Declaration -
*De Sena & Anor v Notaro & Ors* [2020] EWHC
1031 (Ch)................................................... A-3482

Exhibit 29 to Milne's Declaration -
*Williams v Natural Life Health Foods Ltd* [1998]
1 WLR 830.................................................. A-3558

Declaration of Todd William McGuffin, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed May 16, 2023......... A-3569

Exhibit 1 to McGuffin Declaration -
*Morton v Paint* [1996] 21 GLJ 61 ........................ A-3582

Exhibit 2 to McGuffin Declaration -
*Flightlease Holdings (Guernsey) Ltd v
Flightlease (Ireland) Ltd* [2009–10] GLR 38 ........ A-3608

Exhibit 3 to McGuffin Declaration -
*Perpetual Media Capital Limited v Enevoldsen*,
[2014] GLR 57.............................................. A-3646

xii

**Page**

Exhibit 4 to McGuffin Declaration -
*Prodefin Trading Limited v Midland Resources*
Royal Court, 14 February 2017, Judgement
7/2017, unreported................................................. A-3675

Exhibit 5 to McGuffin Declaration -
*Fonds v GRCF* [2022] GRC 039 .......................... A-3701

Exhibit 6 to McGuffin Declaration -
*Carlyle Capital Corporation Limited v Conway
& Ors* Royal Court, 4 September 2027, Judgment
38/2017, unreported................................................. A-3726

Exhibit 7 to McGuffin Declaration -
*Jackson v Dear* (2013) GLR 167.......................... A-4197

Exhibit 8 to McGuffin Declaration -
*Pilatus (PTC) Limited v RBC Trustees
(Guernsey) Limited* [2021] GRC 063 ................... A-4222

Exhibit 9 to McGuffin Declaration -
*Apex Global Management Limited v Fi Call
Limited* [2015] EWHC 3269 (Ch) ........................ A-4233

Exhibit 10 to McGuffin Declaration -
*Re Coroin Limited* (No 2) [2012] EWHC 2343
(Ch) ......................................................................... A-4288

Exhibit 11 to McGuffin Declaration -
*Grace v Biagioli* [2005] EWCA Civ 1222............. A-4447

Exhibit 12 to McGuffin Declaration -
*Rock (Nominees) Limited v RCO (Holdings) plc*
[2004] EWCA Civ 118............................................. A-4478

Exhibit 13 to McGuffin Declaration -
*Re Saul D Harrison & Sons plc* [1994] BCC 475 . A-4496

xiii

**Page**

Exhibit 14 to McGuffin Declaration -
*Apex v Fi Call Ltd* [2014] BCC 286 ...................... A-4524

Exhibit 15 to McGuffin Declaration -
*Zedra Trust Company (Jersey) Limited v The Hut
Group Limited* [2020] EWHC 5 ........................... A-4565

Exhibit 16 to McGuffin Declaration -
*Peskin v Anderson* [2001] BCC 874 ..................... A-4591

Exhibit 17 to McGuffin Declaration -
*Sharp v Blank* [2015] EWHC 3220 ...................... A-4607

Exhibit 18, Part 1, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22 ..... A-4624

Exhibit 18, Part 2, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22,
*continued*............................................................... A-4643

Exhibit 19 to McGuffin Declaration -
*Foss v Harbottle* [1843] 2 Hare 461 ..................... A-4663

Exhibit 20 to McGuffin Declaration -
*Marex Financial Ltd v Sevilleja* [2020] UKSC 31 A-4684

Exhibit 21 to McGuffin Declaration -
*Prudential Assurance Co. Ltd. v Newman
Industries Ltd. and Others* (No. 2) [1982] Ch 204 A-4767

Exhibit 22 to McGuffin Declaration -
*Renova Resources v Gilbertson* [2009] CIFsd 10.. A-4806

Notice of Motion of Counter-Defendant Brigade
Capital Management, LP's ("Brigade") to
Dismiss the Counterclaims of Defendant
NexPoint Diversified Real Estate Trust against
Brigade, dated and filed May 31, 2023.................. A-4869

xiv

**Page**

Declaration of Jason C. Hegt, Esq., in Support of
Brigade's Motion to Dismiss, dated and filed
May 31, 2023 ......................................................... A-4871

Exhibit 1 to Hegt Declaration -
Indenture, dated April 16, 2015, paginated
bottom center as "Exhibit 5, Page 1 of 329" ......... A-4873

Exhibit 2 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
February 9, 2023 .................................................. A-5203

Exhibit 3 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
January 4, 2022 ..................................................... A-5211

Declaration of Mazin A. Sbaiti, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023 ............... A-5217

Exhibit 1 to Sbaiti Declaration -
Indenture, dated April 16, 2015, labeled as
Exhibit 1 .............................................................. A-5219

Exhibit 2 to Sbaiti Declaration -
Offering Circular relating to the offering of the
Co-Issued Notes of ACIS CLO 2015-6 Ltd. and
ACIS CLO 2015-6 LLC and the Issuer Notes of
ACIS CLO 2015-6 Ltd. dated April 14, 2015 ....... A-5548

Exhibit 3 to Sbaiti Declaration -
Portfolio Management Agreement, dated
April 16, 2025, labeled Exhibit 3 .......................... A-5768

xv

**Page**

Exhibit 4 to Sbaiti Declaration -
Red-lined version of Amended Complaint, *U.S.
Bank National Association, et al. v The
Charitable Donor Advised Fund, L.P., et al.*, Case
No. 1:21-cv-11059-GHW, dated and filed
February 23, 2022 ................................................... A-5820

Exhibit 5 to Sbaiti Declaration -
Excerpt from *Tianrui (Int'l) Holding Co. Ltd. v.
China Shanshui Cement Grp. Ltd.*, Grand Court
of the Cayman Is., April 6, 2020 ........................... A-5844

*Declaration of Bhavesh Narendra Patel, Esq., in
Opposition to Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 14, 2023 ......... A-5917

Exhibit 1 to Patel Declaration -
*Islena Airlines v Jefferson* [1998 CILR 148] ......... A-5942

Exhibit 2 to Patel Declaration -
Section 14(1) of the Exempted Limited
Partnerships Act, (2022 Revision) ......................... A-5955

Exhibit 3 to Patel Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ..................................................... A-5959

Exhibit 9 to Patel Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-5970

Exhibit 22 to Patel Declaration -
*Scott v Metropolitan Police Commissioner* [1974]
UKHL 4 ................................................................. A-6096

Exhibit 25 to Patel Declaration -
*Watson v Kea Investments* [2019] EWCA Civ
1759 ...................................................................... A-6106

xvi

**Page**

Exhibit 28 to Patel Declaration -
Cayman Grand Court Rules, Order 15, Rule 12A . A-6130

Reply Declaration of Jonathon Milne, Esq., in
  Support of Plaintiffs' Motion to Dismiss
  Defendants' Counterclaims and for Judgment on
  the Pleadings, dated and filed June 28, 2023 ........ A-6133

Exhibit 1 to Milne's Reply Declaration -
*Snell's Equity* ........................................................... A-6161

Exhibit 2 to Milne's Reply Declaration -
Lewis on Trusts ...................................................... A-6166

Exhibit 3 to Milne's Reply Declaration -
*Knight v Knight* ...................................................... A-6172

Exhibit 4 to Milne's Reply Declaration -
*Hunter v Moss* ........................................................ A-6188

Exhibit 5 to Milne's Reply Declaration -
*Grand View Private Trust Co. Ltd. et al. v
Wen-Young Wong, et al.* ......................................... A-6200

Exhibit 6 to Milne's Reply Declaration -
*In the Matter of the Ta-Ming Wang Trust* .............. A-6243

Exhibit 7 to Milne's Reply Declaration -
*Helen Gorbunova v The Estate of Boris
Berezovsky, et al.* .................................................... A-6256

Exhibit 8 to Milne's Reply Declaration -
*In re Empress Engineering Company* .................... A-6283

Exhibit 9 to Milne's Reply Declaration -
*Neste Oy v Lloyds Bank PLC* ................................. A-6290

Exhibit 10 to Milne's Reply Declaration -
*Steven Anthony Pearson, et al. v Lehman
Brothers Finance SA, et al.* ..................................... A-6301

xvii

**Page**

Exhibit 11 to Milne's Reply Declaration -
*Chanan Singh Thandi v. Mark Sands and Andrew
Appleyard*............................................................. A-6399

Exhibit 12 to Milne's Reply Declaration -
*Grupo Torras S.A. and Torras Hostench London
Limited v. Bank of Butterfield International
(Cayman) Limited and Five Others* ...................... A-6421

Exhibit 13 to Milne's Reply Declaration -
*Bailey and another v. Angove's PTY Limited*......... A-6443

Exhibit 14, Part 1, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al.*.......................................................... A-6463

Exhibit 14, Part 2, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al. continued* .......................................... A-7363

Exhibit 15, Part 1, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL)* ................................................ A-8366

Exhibit 15, Part 2, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL) continued* ............................... A-8397

Exhibit 16, Part 1, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another* ....................... A-8429

Exhibit 16, Part 2, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another continued* ...... A-8460

Exhibit 17 to Milne's Reply Declaration -
*Pearson v. Primeo Fund* ....................................... A-8487

xviii

**Page**

Exhibit 18 to Milne's Reply Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ...................................................... A-8513

Exhibit 19 to Milne's Reply Declaration -
*Secretary of State for Trade and Industry and
another* ................................................................... A-8517

Exhibit 20 to Milne's Reply Declaration -
*China Shanshui Cement Group Limited v. Tianrui
(International) Holding Company Limited* ............ A-8542

Exhibit 21 to Milne's Reply Declaration -
*GAO v. China Biologic Products Holdings
Incorporated* ......................................................... A-8561

Exhibit 22 to Milne's Reply Declaration -
*West Mercia Safetywear Ltd (in liq) v Dodd and
another* ................................................................... A-8604

Exhibit 23 to Milne's Reply Declaration -
*Svanstrom and Nine Others v. Jonasson* ................ A-8611

Exhibit 24 to Milne's Reply Declaration -
Directors' Duties, Creditors' Rights and
Shareholder Intervention ....................................... A-8629

Exhibit 25, Part 1, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al.* ......................................................... A-8663

Exhibit 25, Part 2, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ......................................... A-8711

Exhibit 25, Part 3, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ......................................... A-8759

xix

                                                              **Page**

Exhibit 25, Part 4, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ........................................  A-8806

Exhibit 26 to Milne's Reply Declaration -
*Monsolor 1Q Ltd. v Woden Park Ltd.* ....................  A-8825

Exhibit 27 to Milne's Reply Declaration -
*Chartbook Limited v. Persimmon Homes Limited
and Others and Another* ........................................  A-8842

Exhibit 28, Part 1, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.* ......  A-8885

Exhibit 28, Part 2, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................  A-8932

Exhibit 28, Part 3, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................  A-8974

Exhibit 28, Part 4, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................  A-9014

Exhibit 29 to Milne's Reply Declaration -
*Yeoman's Row Management Limited and Another
v Cobbe* ..................................................................  A-9027

Exhibit 30 to Milne's Reply Declaration -
*Mutter v. Eastern and Midlands Railway
Company* ..................................................................  A-9080

Exhibit 31 to Milne's Reply Declaration -
*Peak Hotels and Resorts Limited v. Tarek
Investments Limited, et al.* .....................................  A-9097

xx

**Page**

Second Declaration of Bhavesh Narendra Patel in
  Opposition to the Plaintiffs' Motion to Dismiss
  Defendants' Counterclaims and for Judgment on
  the Pleadings on Plaintiffs' Claims, dated and
  filed July 19, 2023 ................................................ A-9126

  Exhibit 1 to Second Declaration -
  *Arnold* v. *Britton* [2015] UKSC 36 ........................ A-9140

  Exhibit 2 to Second Declaration -
  *Al Sadik v Investcorp Bank BSC & Ors
  [2017 (1) CILR 1])* ................................................. A-9189

  Exhibit 3 to Second Declaration -
  *Williams v Central Bank of Nigeria* [2014]
  UKSC 10 .................................................................. A-9342

  Exhibit 4 to Second Declaration -
  *Broadcasting Investment Group Ltd v Smith*
  [2021] EWCA Civ 912, [2022] 1 WLR 1 .............. A-9406

Stipulation and Proposed Order Regarding Addition
  of NHF TRS, LLC as Party, filed
  October 31, 2023 ..................................................... A-9427

  Exhibit A to Stipulation-
  Counter-Plaintiffs NexPoint Diversified Real
  Estate Trust and NHF TRS LLC's First Amended
  Counterclaim, dated October 24, 2023 .................. A-9434

  Exhibit B to Stipulation-
  Second Amended Complaint, dated
  October 31, 2022 ..................................................... A-9487

Stipulation and Order Regarding Addition of NHF
  TRS, LLC as Party, dated October 31, 2022 and
  filed November 1, 2023 .......................................... A-9512

xxi

**Page**

Stipulation of Voluntary Dismissal, dated and filed
    March 10, 2025 ....................................................... A-9518

Notice of Appeal of NexPoint Diversified Real
    Estate Trust, dated and filed March 18, 2025 ........ A-9522

Amended Notice of Appeal of NexPoint Diversified
    Real Estate Trust and NHF TRS LLC, dated and
    filed March 26, 2025 .............................................. A-9524

**<u>*Additional Exhibits to Declaration of
Bhavesh Narendra Patel, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023</u>**

Exhibit 4 to Patel Declaration -
    Re Hydrodam (Corby) Ltd. ..................................... A-9526

Exhibit 5 to Patel Declaration -
    Omni Securities Limited ........................................ A-9531

Exhibit 6 to Patel Declaration -
    Hutchinson Limited v Cititrust & Ors ................... A-9553

Exhibit 7 to Patel Declaration -
    Whar-Hansen v Bridge Trust Company ................. A-9575

Exhibit 8 to Patel Declaration -
    Ritter v Butterfield Bank ....................................... A-9592

Exhibit 10 to Patel Declaration -
    AHAB v SAAD Investment Company .................. A-9634

Exhibit 11 to Patel Declaration -
    Westdeutsche Landesbank v Islington London ..... A-9910

xxii

**Page**

Exhibit 12 to Patel Declaration -
    Ernst & Young v FOI Officer.................................  A-9983

Exhibit 13 to Patel Declaration -
    Kuwait Ports Authority v Port Link GP Ltd ..........  A-10016

Exhibit 14 to Patel Declaration -
    Prudential Assur Co v Newman Indus...................  A-10084

Exhibit 15 to Patel Declaration -
    Marex Financial v Sevilleja ...................................  A-10160

Exhibit 16 to Patel Declaration -
    Russell v Wakefield Water Works..........................  A-10232

Exhibit 17 to Patel Declaration -
    MacDougall v Gardiner .........................................  A-10242

Exhibit 18 to Patel Declaration -
    Tempo Group v Fortuna Development ..................  A-10246

Exhibit 19 to Patel Declaration -
    FamilyMart China v Yin-Hen Wei.........................  A-10385

Exhibit 20 to Patel Declaration -
    Burland v Earle .....................................................  A-10418

Exhibit 21 to Patel Declaration -
    Schultz v Reynolds & Newport .............................  A-10439

Exhibit 23 to Patel Declaration -
    Merkanti v Raiffeisen Bank ...................................  A-10463

Exhibit 24 to Patel Declaration -
    H1 of Tolleys on Administration of Trusts ............  A-10487

Exhibit 26 to Patel Declaration -
    Cayman Trusts Act.................................................  A-10537

Exhibit 27 to Patel Declaration -
    Re China Milk........................................................  A-10539

C.A.                                                    AL SADIK v. INVESTCORP BANK

106   It is said on behalf of Investcorp that it would have made no sense for there to be a limitation in cl. A of the SPA (or elsewhere in that agreement) in circumstances where (i) there was no meaningful difference between first-layer leverage and second-layer leverage; (ii) both parties accepted that Investcorp was to have a discretion as to the investment of Mr. Al Sadik's money, including investing it in funds which used leverage; (iii) cl. D.2 of the SPA gave Shallot the authority to take "any actions that the board believes are necessary or desirable in order to effectuate the purposes of the investment or otherwise manage the affairs of [Shallot]"; (iv) Professor Stowell's unchallenged expert evidence was that, under a discretionary mandate such as this, the money manager would ordinarily be permitted to decide on the particular structure to be used to make the investment; and (v) that Professor Stowell's unchallenged expert evidence was that there was nothing surprising about the use of a structure such as Blossom to effect Mr. Al Sadik's investment.

107   Investcorp submits that cl. I of the SPA did not prohibit the use of first-layer leverage. It is pointed out that the judge found, at para. 4.4 of his judgment, that—

   "... Clause I (under the heading Borrowing Relationships) authorizes Investcorp to cause Shallot to borrow money to meet possible temporary cash shortfalls and for other corporate purposes, described as 'Liquidity Borrowings,' the amount of which will be limited to 25% of the company's equity. It is agreed that borrowing for liquidity purposes is materially different from borrowing for investment purposes, and that Clause I relates only to the former."

It is said Mr. Al Sadik did not dispute in his written closing submissions at trial that the parties were agreed that borrowing for liquidity purposes is not the same thing as borrowing for investment purposes: his counsel had made oral closing submissions on this basis:

   "... [T]he issue in relation to borrowing power ... is whether Shallot had the power under SPA to borrow for investment purposes. It is not disputed and I think never has been that it had the power to borrow for liquidity purposes under I."

In those circumstances it is said to be difficult to understand the basis on which Mr. Al Sadik now seeks to reopen the point by contending that cl. I.I has the effect that Shallot was permitted to borrow only for liquidity purposes and not for any other purposes, in particular, not for investment purposes. It is said that the significance of the fact that the parties agreed (and the judge held) that borrowing for liquidity is not the same thing as borrowing for investment is not that this shows that first-layer leverage was not authorized under the SPA, rather, as the judge recognized, it shows that cl. I has nothing to do with the authority issue. It is said that Mr. Al Sadik has misunderstood the purposes of provisions such as cl. I.

63

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

Clause I did not limit or restrict any other clause of the SPA; in particular, it did not limit or restrict the scope of cl. A and it did not limit or restrict Investcorp's authority to leverage the sums invested at the portfolio level. Investcorp seeks to rely on Mr. Boynton's oral evidence that cl. I was intended to deal with the limits of Shallot's direct borrowing, primarily in order to cover short-term liquidity issues, which was unchallenged. It is said that Blossom's auditors, Ernst & Young, signed off on the accounts to June 30th, 2009, on the basis of this interpretation of cl. I, as confirmed by Habib Al Mulla & Co., one of Dubai's leading law firms. Mr. Al Sadik's assertion, first made in these proceedings in his second witness statement, that the question of borrowing by Shallot was specifically discussed during the SPA negotiations and the results of those discussions were recorded in cl. I of the SPA, contradicted his previous assertion, made in his first witness statement, that leverage of his investment was never discussed during the SPA negotiations. And it is said his oral evidence at trial made it clear that his understanding was that cl. I had nothing to do with borrowing for leverage. In those circumstances, it is said on behalf of Investcorp that cl. I of the SPA was not intended to, and did not, prohibit borrowing for investment and that that is what a reasonable person with knowledge of the background would have understood.

108   In approaching Mr. Al Sadik's challenge, under the second limb of Ground 12 in the memorandum of grounds of appeal, to the judge's conclusion that on its true construction the SPA did authorize first-layer leverage—a challenge based upon the assertion that the judge was led to misconstrue the SPA "because no reasonable person would have construed the SPA in the way the learned Judge did"—it is important, in my view, to have in mind that, in reaching that conclusion, the judge held (i) that the transfer of the investment amount (less a small retention) from Shallot to Blossom was an administrative step (and was not itself an "investment" in Blossom for the purposes of the SPA); (ii) that it was "plainly obvious" that the investment proposal was proposing a leveraged investment; (iii) that the purpose of the SPA was to authorize Investcorp to implement the investment proposal (save to the extent that its implementation was actually inconsistent with what had been expressly agreed by the parties); and (iv) that he could regard first-layer (or portfolio-level) leverage through a special purpose vehicle (such as Blossom) as "economically equivalent" to second-layer leverage through, say, LDSF. In my view he was correct to make each of those findings.

109   It is also important to have in mind that it was common ground that, notwithstanding that no investment manager had been appointed to carry out the task of selection, the investments permitted under cl. A of the SPA included any Investcorp hedge fund or a hedge fund or segregated account with any hedge funds managers (provided that any such other hedge fund manager is at the time of investment a manager with which an Investcorp

C.A.                                    AL SADIK v. INVESTCORP BANK

hedge fund is invested) and that that class included (*inter alia*) DSF and LDSF. As the judge explained, investment in a high risk (leveraged) portfolio of LDSF was economically equivalent to investment in DSF leveraged at the portfolio level. Given that investment in DSF was authorized under cl. A, there was no reason—in the absence of clear words either in cl. A of the SPA or elsewhere in that agreement—to construe the SPA in a way which permitted leveraged investment in DSF by one means (second-layer leverage through a high risk portfolio of LDSF) but did not permit leveraged investment in DSF by the other means (first-layer leverage at the portfolio level through a special purpose vehicle controlled by Investcorp).

110   I agree with the judge's view that there is nothing in cl. A of the SPA which suggests that leveraged investment in DSF at the portfolio level is not permitted: cl. A does not address that question. I also agree with the judge's view that there is nothing in cl. I of the SPA which leads to the conclusion that leveraged investment in DSF at the portfolio level is not permitted. Clause I authorizes borrowing by Shallot to meet possible temporary cash shortfalls and for other corporate purposes: it does not address the question whether borrowing by an SPV controlled by Investcorp in order to leverage investments at the portfolio level is, or is not, authorized.

111   In those circumstances, there was no reason for the judge to construe the SPA in a way which permitted leveraged investment in DSF by means of second-layer leverage but did not permit leveraged investment in DSF by first-layer leverage, provided that he was satisfied that borrowing by an SPV upon the security of investments for the purpose of leveraging at the portfolio level was permitted by that agreement. In that context, it is important to have in mind that the question whether Blossom itself had power to borrow on the security of the investments which it held (or would acquire) did not depend on the terms of the SPA. Blossom was not a party to the SPA and its power to borrow on the security of the investments which it held was derived from its own constitution. The relevant question, as it seems to me, was whether Investcorp (or Shallot) would be in breach of the SPA if it caused or permitted Blossom, which it controlled, to borrow. The judge found the answer to that question in the terms of cl. D.2 of the SPA: Shallot's board of directors was authorized to cause Shallot "to take any actions that the board believes are necessary or desirable in order to effectuate the purposes of this investment . . ." The judge was satisfied that leveraging was necessary in order to effectuate the purposes of the investment. If Shallot's board of directors believed that leveraging at the portfolio level (rather than second-layer leveraging through LDSF) was desirable, then there was no reason to think that Investcorp or Shallot would be in breach of the SPA if Blossom was

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

caused or permitted to borrow for that purpose, upon the security of the investments which it held (or would acquire).

112   I reject the submission, advanced on behalf of Mr. Al Sadik, that the judge was led to misconstrue the SPA "because no reasonable person would have construed the SPA in the way the learned Judge did." In my view the judge was correct to conclude that, on its true construction, the SPA did authorize first-layer leverage.

### The causation issue

113   The judge observed (at para. 4.11 of his judgment) that—

"if, contrary to my findings, Investcorp was not authorized to leverage the investment amount at the portfolio level and/or Blossom is characterized as an unauthorized investment, Investcorp's case is that the breach of contract caused no loss and damage."

It is clear from that observation that the judge identified two distinct cases in which a claim for damages might arise: (i) if he ought to have held that the transfer of funds by Shallot to Blossom on or about March 4th, 2008 was not merely an administrative step but was an investment in Blossom (so that, properly analysed, the breach of contract lay in making an unauthorized investment); and (ii) if he were correct in his conclusion that the transfer of funds to Blossom was merely an administrative step, but wrong to hold that leverage at the portfolio level was authorized by the SPA (so that, properly analysed, the breach of contract lay, not in making an unauthorized investment in Blossom but in causing or permitting Blossom to make further, leveraged, investments in DSF and the SMFs in the period May to September 2008 with borrowed funds). For convenience, I shall refer to those cases, respectively, as "the unauthorized investment claim" and "the leveraged investments claim."

114   Given that I would hold (i) that the judge was correct to take the view that the transfer of funds by Shallot to Blossom was merely an administrative step, and so not properly to be regarded as an investment in Blossom for the purposes of the SPA, and (ii) that the judge was also correct to take the view that leverage at the portfolio level was authorized by the SPA, it is, perhaps, unnecessary for me to address the causation issue in this judgment. But it may be of assistance if I do so to the extent that that issue arises in the context of the 4th claim.

115   Although the judge identified, correctly, that there were (at least) those two distinct cases in which—if he were wrong in his conclusions as to the meaning and effect of the SPA—a claim for damages might arise, it appears that, in addressing the causation issue, he made no distinction between them. At para. 4.11 of his judgment, he said this:

A-9255

C.A.                                    AL SADIK v. INVESTCORP BANK

"The burden of proof rests on the plaintiff, but [counsel for Mr. Al Sadik] did not cross-examine Messrs. Franklin or Gurnani about how they would have constructed the portfolio, if the use of First Layer Leverage had not been open to them. Nor did he attempt to ascertain how they could have applied leverage incrementally, if the use of First Layer Leverage was not open to them. In my judgment the most reasonable inference to draw from the evidence is that they would have allocated 50% to LDSF (×3) and 50% to SMFCo in March 2008. Had they done so, Mr. Opp's evidence leads to the conclusion that Mr. Al Sadik's loss would have been greater than that which he actually suffered. In conclusion, if Mr. Al Sadik had established that Investcorp was in breach of contract, as alleged in the Fourth and Ninth Claims, he would have failed to prove that the breaches caused any loss and damage." [Footnote omitted.]

116   In support of his challenge to the judge's conclusion on the causation issue, Mr. Al Sadik did not rely—either in the appellant's skeleton argument or in oral submissions made at the hearing of the appeal—on Ground 17 in the memorandum of grounds of appeal: that when the judge found that cl. F.4 of the SPA had been breached he ought to have proceeded to consider and decide whether or not the breach had caused Mr. Al Sadik loss and damage. He relied on that ground in support of his challenge to the judge's conclusion on what I have described as the third issue. In relation to the 4th claim, Mr. Al Sadik relies on Grounds 18 and 19 in the memorandum of grounds of appeal:

"*Ground 18*: The learned Judge erred in law when in connection with the Appellant's Fourth Claim he held that even if the First Respondent had exercised the Investment Power correctly the Appellant would not have suffered loss or damage.

*Ground 19*: Further and in the alternative to Ground 18 the learned Judge erred in equity when in connection with the Appellant's Fourth Claim he held that even if the First Respondent had exercised the Investment Power correctly the Appellant would not have suffered loss or damage."

117   It is, perhaps, less than clear whether the phrase "even if the First Respondent had exercised the investment power correctly" is intended to cover both (i) the hypothesis that Shallot had not made a transfer of funds to Blossom in March 2008 ("the unauthorized investment claim"), and (ii) the hypothesis that that transfer had been properly made (as merely an administrative step) but that Blossom had not made further, leveraged, investments in DSF and the SMFs in the period May to September 2008 with borrowed funds ("the leveraged investments claim"). The probability, I think, is that the judge saw no reason to distinguish between the outcome if Mr. Al Sadik succeeded on the unauthorized investment claim and the

67

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

outcome if Mr. Al Sadik succeeded only on the leveraged investments claim. The reasonable inference to draw, in either case, was that the investment amount would have been allocated, in March 2008, equally between LDSF and SMFCo and that, if that had occurred, Mr. Al Sadik's loss would have been greater than that which he actually suffered.

118    Grounds 18 and 19 in the memorandum of grounds of appeal, taken together, raise the question whether the applicable principles of causation differ if the claim is brought in equity (for breach of trust or breach of fiduciary duty) rather than in law (for breach of contract). In its submissions in response to the causation issue under the 4th claim, Investcorp's submissions did not distinguish between those two grounds. That is understandable, given that the 4th claim was pleaded in the re-re-amended statement of claim, at paras. C21 and C22 under the head "Breach of Contract (Unauthorised Leveraging)," as a claim for breach of contract and the judge treated it as such. In those circumstances, it seems to me inappropriate—as well as being unnecessary for the reasons already mentioned—that I should address the question raised by Ground 19: that is to say, the question whether the applicable principles of causation differ if the claim is brought in equity (for breach of trust or breach of fiduciary duty) rather than in law (for breach of contract) and, if so, whether the judge was wrong to conclude (if and in so far as he did so), that, if Mr. Al Sadik had established (i) the unauthorized investment claim, and/or (ii) the leveraged investments claim, he would have failed to recover damages in equity for breach of trust or breach of fiduciary duty on the ground that Mr. Al Sadik had not suffered loss by reason of that breach.

119    The question which arises under Ground 18 in the memorandum of grounds of appeal is whether the judge was wrong to conclude that, if Mr. Al Sadik had established (i) the unauthorized investment claim, and/or (ii) the leveraged investments claim, he would have failed to recover damages at law for breach of contract on the ground that Mr. Al Sadik had not suffered loss by reason of that breach.

120    Before addressing that question I should add that it is pointed out on behalf of Mr. Al Sadik that the judge recorded (at para. 7.6 of his judgment):

"... I came to the conclusion that it would not be appropriate for me to say anything about the causation and quantum issues which would have arisen in the event that I had found in favour of the Plaintiff. Counsels' written Closing Submission disclose areas of disagreement which were not ventilated in the oral argument on the basis that further and more detailed written submissions would be made if I were to find in favour of the Plaintiff on all or any of his claims. For this reason it would not be appropriate for me to comment on any of these points."

C.A.                                                    AL SADIK v. INVESTCORP BANK

It is said to be the case, therefore, that the judge's findings were made without the benefit of full argument of the parties.

*Was the judge wrong to conclude that, if Mr. Al Sadik had established (i) the unauthorized investment claim and/or (ii) the leveraged investments claim, he would have failed to recover damages at law for breach of contract on the ground that Mr. Al Sadik had not suffered loss by reason of that breach?*

121   It is submitted on behalf of Mr. Al Sadik that the judge was wrong to hold, at para. 4.11 of his judgment, that, even if Investcorp had exercised the investment power correctly, Mr. Al Sadik would have been in no better position than that in which (in the events which happened) he was. It is clear from the submissions advanced that Mr. Al Sadik relies, primarily at least, on the unauthorized investment claim rather than on the leveraged investment claim. It is said on his behalf that the judge's decision to draw the inference that Investcorp would have allocated "50% to LDSF (×3) and 50% to SMFCo in March 2008" was wrong in law because the investment in Blossom made by Investcorp was not a legitimate performance of the SPA but an unauthorized investment—and so a breach of contract—which caused loss to Mr. Al Sadik and there is no rule or principle of law that enables a contract-breaker to claim there was no causation where he has chosen an illegitimate method of performance (rather than chosen between legitimate methods of performance).

122   In developing that submission it is said that—

   (1) Shallot undertook to appoint—and Investcorp Bank undertook to procure the appointment of—Investcorp Advisers to be the investment manager. It was for the investment manager to exercise the power of selection of investments (the investment power) under cl. A of the SPA. The appointment of investment manager was not made and it is not in dispute that Investcorp Bank took responsibility for the investment power and exercised it. Mr. Al Sadik claims that Investcorp breached the investment power when it selected and transferred to Blossom US$135m. His claim is for losses caused by that selection and transfer. He contends that Investcorp failed to perform the SPA in the manner to which he was contractually entitled, in that (although because the investment power was a fiduciary power of investment it did not need to be exercised at all) he was entitled to expect that, if any investments were selected, these would be investments permitted by the investment power. His claim for loss and damages is advanced under the general principle that damages for breach of contract are to compensate a plaintiff for damages he has suffered through the breach. Mr. Al Sadik did not bargain for an investment in Blossom and the loss he claims is loss sustained through and caused by that breach.

69

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

(2) The breach of contract of which Mr. Al Sadik complains deprived him of a real profit, equal to the losses incurred by the blended leverage element of an investment in Blossom. When Mr. Al Sadik redeemed his shares in Shallot he received AED292,398,778. He suffered a gross loss on his investment in Shallot of the difference between that amount and AED500m.—that is to say, a gross loss of AED207,601,222. Nevertheless, he has quantified his claim at AED202,937,666, by calculating what the value of Shallot's shares would have been but for the element of blended leverage applied to the investment in Blossom and excluding losses resulting from investments which Blossom made to the extent these were not leveraged. The reduction which he has made is on the basis that the unleveraged portion of the investments were (as good as) disclosed to him and would have been permitted if Shallot had made them (which, it is said, he believed it had done until March 2009, when Investcorp sent him the false IMA in a deceitful attempt to justify the investment in Blossom).

123   It is said on behalf of Mr. Al Sadik that the relevant question is whether or not there is a basis in law for the proposition that because Investcorp had a choice of investments it can avoid liability in damages by proving that, if it had not breached its contract, it could and would have chosen a single investment which would have led to an even greater loss than that actually suffered. There are, it is said, three ways in which that question may be resolved: first, by reference to the so-called "minimum performance rule," secondly, by reference to the principles of causation and, thirdly, by reliance on breach of trust. In developing that submission (in the context of the claim for damages at law for breach of contract) it is said that—

(1) Damages for expectation losses may be limited by the minimum performance rule, which requires that, where the promisor has a discretion between the mode or level of performance, his liability in damages is presumptively limited to the mode or level least burdensome to him and not (if different) the one least beneficial to the promisee. But the minimum performance rule has no application in the circumstances of the present case. The investment power in cl. A of the SPA is discretionary: it provides for the investment manager to make a selection. But it was not more burdensome for the investment manager to select one investment rather than to select another. And the same was true for Investcorp which, in the events which happened, chose to exercise the power. Exercise of the investment power imposed the same burden on each occasion: the burden of making (or of deciding not to make) a selection. Further, the relevant measure for the reduction of damages under the minimum performance rule is not what is least beneficial to the promisee but what is least burdensome to the promisor. There was no difference in the burden on Investcorp (as contract breaker) between different modes of performance

A-9259

C.A.                                                    AL SADIK v. INVESTCORP BANK

because in every case the burden was the same. Therefore the minimum performance rule has no application in the present case.

(2) There is no rule or principle of law that permits a contract breaker to argue that there is no causation by advancing a hypothesis about what he (the contract breaker) would have done if he had not broken his contract. Such a hypothesis may be advanced in respect of what the plaintiff or a third party would have done (*i.e.* to prove that the loss would have occurred despite the breach complained of) but that does not arise in this case. Accordingly, the fact that Mr. Al Sadik's counsel did not cross-examine the Investcorp witnesses about what they would have done, if (instead of acting in breach of the investment power) Investcorp had acted under that power, is not to the point.

(3) Accordingly, the principles of causation do not excuse Investcorp from liability in damages for breach of contract.

124   Investcorp's response to Ground 18 in the memorandum of grounds of appeal is that the judge was correct to hold that, even if Investcorp had acted in breach of its contractual obligations under the SPA, that breach was not the cause of Mr. Al Sadik's loss, in that it was open to him on the evidence (which Mr. Al Sadik had not challenged in cross-examination at the trial) to conclude that that loss would have occurred—and, indeed, would have been greater—if Investcorp had fulfilled those obligations. Mr. Opp's unchallenged expert evidence, it was said, was (i) that, had investments been made in LDSF (×2 leverage portfolio) and SMFCo (×3 leverage portfolio, extrapolating the performance of SMFCo with ×1 leverage), Mr. Al Sadik would have suffered losses which exceeded those which he did suffer as a result of the investments made by Blossom to the extent of some AED97.57m., and (ii) that had investments been made in LDSF (×2 leverage portfolio) and SMFCo (×1 leverage portfolio), Mr. Al Sadik would have suffered losses which exceeded those which he did suffer as a result of the investments made by Blossom to the extent of some AED8.44m. Accordingly, it is said, even if Mr. Al Sadik were to succeed in his breach of contract claims he is unable to recover anything in excess of nominal damages: reliance is placed on observations in *McGregor on Damages*, 18th ed., at paras. 10–004 – 10–005 (2009).

125   In developing that response, it is said on behalf of Investcorp that the principles by reference to which issues of causation, foreseeability and remoteness are determined in the context of a breach of contract claim are well established and may be summarized as follows:

(1) Where a party sustains a loss by reason of breach of contract he is, so far as can be done by a monetary award, to be placed in the same position as he would have been if the contract had been performed: *Robinson* v. *Harman* (16) (1 Exch. at 855); *Livingstone* v. *Rawyards Coal Co.* (15) (5 L.R. App. Cas. at 39); *British Westinghouse Elec. & Mfg. Co.*

71

v. *London Underground Elec. Ry. Co. (No. 2)* (5) ([1912] A.C. at 688–689).

(2) There must be a causal connection between a defendant's breach of contract and a plaintiff's loss: *Chitty on Contracts*, 30th ed., at para. 26–032 (2008). In other words, a successful plaintiff cannot recover damages in respect of loss not caused by the defendant's conduct: *McGregor on Damages*, 18th ed., at para. 1–024 (2009).

(3) A defendant's wrongful conduct is a cause of a plaintiff's harm if such harm would not have occurred without it, *i.e.* "but for" it. Even then, satisfying the "but for" test is a necessary condition for the imposition of liability but is by no means sufficient: *McGregor on Damages*, 18th ed., at paras. 6–005 – 6–007 (2009).

It is said that the judge found, at para. 4.11 of his judgment, that even if Mr. Al Sadik had established that Investcorp was in breach of contract, as alleged in his 4th and 9th claims, he would have failed to prove that the breaches caused any loss and damage. The judge accepted Investcorp's case—pleaded at paras. 19 and 199 of the amended defence—that, even if the use of Blossom had amounted to a technical breach of the SPA, this had caused Mr. Al Sadik no loss in excess of that which he would have suffered had he been invested in the funds specifically referred to in the investment proposal. He was entitled to find—on the basis of Investcorp's expert evidence on this point which was not challenged at trial—that, even if Investcorp did breach the SPA (which it did not), had it performed its contractual obligations then Mr. Al Sadik would have suffered greater losses than he did as a result of Investcorp's use of the Blossom structure. It is submitted on behalf of Investcorp that the judge's application of basic principles of causation was correct.

126   I agree that the judge reached the correct conclusion in relation to the unauthorized investment claim. As I have said, the obligation of Investcorp under the SPA was to establish an SPV (Shallot) as a separately managed account for the purpose of investing in hedge funds or in segregated accounts with hedge fund managers to be selected by Investcorp Advisers. On the evidence at trial the judge was entitled to conclude that, if that obligation had been performed without the interposition of Blossom, the probability was that the investment amount would have been allocated equally between LDSF (×3 leveraged portfolio) and SMFCo in March 2008. The measure of damages (if any) for breach of contract in law is the difference between the position in which Mr. Al Sadik would have been if that had been done and the position in which he was as a result of the interposition of Blossom. Mr. Al Sadik would have been in no better position if Blossom had not been used.

127   It seems to me, however, that the position is different in relation to the leveraged investments claim. That claim arises if the judge was correct

C.A.                                                    AL SADIK V. INVESTCORP BANK

to hold that there was no breach of contract on March 4th, 2008—when the investment amount (less a small retention) was transferred by Shallot to Blossom—but wrong to hold that first-layer leverage was authorized by the SPA. On that basis there were breaches of contract when Blossom borrowed for investment on May 1st, June 1st, August 1st and September 1st, 2008. The measure of damages (if any) for these breaches of contract, as it seems to me, is the difference between the position that Mr. Al Sadik would have been in if those borrowings had not taken place and the position in which he was in consequence of those borrowings. *Prima facie,* that would equate to the figure of AED202,937,666 which Mr. Al Sadik claims to be his loss after calculating what the value of Shallot's shares would have been but for the element of blended leverage applied to the investment in Blossom and excluding losses resulting from investments which Blossom made to the extent these were not leveraged. But the court heard no argument on that question and I make no finding that that figure is correct.

**The third issue: whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed**

128   The judge's reasons for dismissing the 3rd claim are set out in section 5 of his judgment. The issue which he addressed was whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed. He held that Investcorp's failure to inform Mr. Al Sadik about its intention to leverage his assets by means of first-layer leverage using the White Ibis III credit facility did not constitute a breach of its reporting obligations under the SPA in that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation. He accepted that Investcorp was in breach of its obligations under cl. F.4 of the SPA, in that Investcorp failed to provide Mr. Al Sadik with any statements of the underlying investments held through Blossom and he found that, had Investcorp complied with cl. F.4, the fact that it had employed first-layer leverage and the amount of the borrowing would have been disclosed to Mr. Al Sadik in the report for May 2008 (which would have been delivered in mid-June) and that, in the events which happened, Investcorp's breach of contract led to Mr. Al Sadik not being informed about the level of leverage and the manner in which it had been carried out until March 2nd, 2009. But he held that, nevertheless, Investcorp's reporting was done *bona fide* in a manner which Mr. Kironde honestly believed would best serve Mr. Al Sadik's interests and that there was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had

73

A-9262

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

been carried out. He concluded that, in those circumstances, the non-disclosure was not deceitful.

### The judge's findings in section 5 of his judgment

129   The judge explained (at para. 5.1 of his judgment) that Mr. Al Sadik's case was that Investcorp had no authority to borrow money on the security of his assets and that by doing so, Investcorp not only acted in breach of contract but did so deliberately for its own improper purposes and that it then dishonestly concealed what had been done. It followed, he said, that there were two elements to the factual case on deceitful non-disclosure:

   (1) Whether (as alleged) Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the single-manager funds, rather than invest in LDSF and SMFCo which is what he probably expected. In that context, it was Mr. Al Sadik's case that the use of Blossom as the vehicle through which to leverage the assets was a device by which to conceal the existence of the borrowing.

   (2) Whether, having entered into the White Ibis III credit facility with RBS, there was a further ongoing breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under cl. F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from May 1st, 2008 onwards.

The judge acknowledged that Mr. Al Sadik's case had not been put on the basis that there were two distinct breaches of fiduciary duty but took the view that it was convenient to analyse the two elements separately.

130   At paras. 5.2–5.6 of his judgment, the judge reminded himself of the relevant principles of law. He noted that it was not in dispute that Investcorp owed a fiduciary duty to Mr. Al Sadik and that the core obligation of a fiduciary was that of loyalty, as explained by Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (4). The dispute on the law, he said, was whether or not the existence of the fiduciary relationship gave rise to a reporting obligation which was additional to and independent of the contractual duty. He held that it did not. He reached that conclusion on the basis of observations in the opinion of the Judicial Committee of the Privy Council in *Kelly* v. *Cooper* (13) ([1993] A.C. at 213–214) and in the judgment of the High Court of Australia in *Hospital Prods. Ltd.* v. *United States Surgical Corp.* (10) (156 CLR at 97). After setting out the passages in those authorities on which he relied, he said this (at para. 5.3 of his judgment):

C.A.                                                    AL SADIK v. INVESTCORP BANK

"In my judgment, it follows that the scope of the fiduciary duties owed by Investcorp to Mr. Al Sadik (and in particular the duty to disclose information about the investments made on his behalf) are to be defined by reference to the terms of the SPA."

In reaching that conclusion he rejected the submission advanced on behalf of Mr. Al Sadik that under the law in the Cayman Islands an investment manager owes a fiduciary duty to disclose to its client everything that is or may be material to the exercise of the client's judgment, whatever the terms of the reporting obligations contained in the investment management agreement (in this case, cll. F.2 and F.4 of the SPA), with the consequence, it was said, that Investcorp was under a continuing obligation to disclose from time to time all the facts and information which would be material to any decision which Mr. Al Sadik might reasonably be expected to make (including a decision to terminate the mandate or give instructions to redeem investments or to de-leverage the investments or to change the investment criteria). He held that that proposition was wrong in principle and was not supported by the Canadian decisions—*Davidson* v. *Noram Capital Mgmt. Inc.* (6), *Laflamme* v. *Prudential-Bache Commodities Canada Ltd.* (14), *Ryder* v. *Osler, Wills, Bickle Ltd.* (17) and *Williamson* v. *Williams* (19)—on which counsel for Mr. Al Sadik relied. In his view "these authorities are entirely consistent with *Kelly* v. *Cooper* and lead to the conclusion that the existence of a fiduciary relationship does not impose upon Investcorp a reporting obligation over and above that for which Mr. Al Sadik contracted."

131    At paras. 5.7–5.11 of his judgment, the judge addressed the first of the two elements of the factual case on deceitful non-disclosure which he had identified: whether Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the SMFs, rather than invest in LDSF and SMFCo. He concluded, at para. 5.11, that the evidence established that Investcorp believed that it had authority to make leveraged investments, through the mechanism of first- and/or second-layer leverage and that, given the discretionary mandate, there was no need to explain the actual arrangements to Mr. Al Sadik. He held that the evidence did not establish that Investcorp deceitfully concealed the borrowing arrangements from Mr. Al Sadik or that Blossom was incorporated as a mechanism for achieving that purpose.

132    The judge set out the passages in the evidence on which he relied in reaching those conclusions. It is not, I think, necessary to do so in this judgment (at least at this stage): it is sufficient to identify the steps in the judge's reasoning:

(1) At para. 5.7 the judge explained that the construction of the portfolio was the work of Mr. Franklin, in conjunction with Mr. Gurnani and Mr.

Gharghour (who, he said, was responsible for making the final decision). He explained that Mr. Al Sadik's liquidity requirements had the effect that the original plan to invest in COF could not be implemented and that, in those circumstances, it was decided to invest 50% of his portfolio in SMFs with ×3 leverage. And he explained that, because SMFCo did not offer that level of leverage, an alternative arrangement had to be adopted. That, he said, was the context in which the decision to apply first-layer leverage was made.

(2) He found that the evidence established that it never occurred to Mr. Franklin, Mr. Gharghour, Mr. Boynton or anyone else involved in the process that Investcorp might not have authority to construct a portfolio using first-layer leverage rather than second-layer leverage. He went on to say this (at para. 5.7):

"Having decided to apply First Layer Leverage, I think that it is equally clear that they simply took it for granted, without really applying their minds to the point, that the credit facility would be established through an SPV incorporated as a subsidiary of Shallot."

In support of that view he referred to paras. 6.9–6.17 and 9.18–9.19 in the first witness statement of Mr. Franklin, dated June 9th, 2011, and to para. 5.5 in the witness statement of Mr. Boynton, of the same date.

(3) At para. 5.8 of his judgment, the judge said this:

"Messrs. Franklin, Boynton, Gurnani and Kironde were all cross-examined at length on this subject. They are all experienced industry professionals. They impressed me as honest witnesses whose evidence can be relied upon. They all deny that Blossom was created for the purpose of concealing from Mr. Al Sadik the fact that his investment would be leveraged. In my judgment the contemporaneous e-mail traffic passing amongst these (and other) Investcorp executives in March 2008 reflects the kind of discussion one would expect to see in the ordinary course of business. It is consistent with their oral evidence and I found no documentary evidence tending to suggest that they were behaving dishonestly or had any motive to do so."

The judge set out the passages from the transcript of the oral evidence given at trial by Mr. Franklin, Mr. Boynton and Mr. Gurnani. He summarized Mr. Franklin's evidence. It was, he said, that Mr. Franklin had never considered the question of using Shallot as the borrowing vehicle and that the incorporation of Blossom was a normal and natural thing for the funds administration team to do; that the first time he came across any suggestion that Blossom had been created to hide leverage was when he saw the allegation in the statement of claim; and that, whilst it would obviously have been possible to put the borrowing transaction through

C.A.                                    AL SADIK v. INVESTCORP BANK

Shallot, his understanding was that Mr. Gharghour and Mr. Gurnani had decided upon the use of a "clean structure," meaning an SPV. Mr. Gurnani, he said, had "focused on the economics and was 'agnostic' about the mechanics for achieving the desired result"; by which he meant (as the judge said) that, so long as the desired level of leverage was achieved, it did not matter whether it was done through first- or second-layer leverage. Mr. Gurnani did not accept that Blossom was inserted into the structure so that borrowing could be hidden from Mr. Al Sadik and he said that, when he and Mr. Gharghour had first met Mr. Al Sadik, leverage would have been raised.

(4) The judge found that the credit facility was arranged by Mr. Ravi Nevile ("Mr. Nevile"), a member of Investcorp's banking department based in London. He said this (at para. 5.9 of his judgment):

"[Mr. Nevile] conducted the negotiations with RBS as a result of which Blossom was added into an existing credit facility known as White Ibis III . . . During the course of his negotiations, on 31st March, 2008, he sent an e-mail addressed to Messrs Kironde, Mirza and Khatib, with a copy to Mr. Gharghour, asking them to confirm to him what language is contained in the SPA on the subject of giving security to the lender. He commented that 'in order for me to close the leverage for the client we will need to pledge some of the shares in the portfolio,' meaning some of the underlying assets. The only reply came from Mr. Gharghour, who said 'It may be a problem having client sign a new SPA with a pledge of his shares.' Neither Mr. Gharghour nor Mr. Nevile was called to give evidence and there are no follow-up e-mail exchanges. In fact Blossom, as the borrower, gave security over its assets, which is what I would expect to happen in a limited recourse transaction of this sort. Mr. Gharghour's response suggests that he misunderstood the question and thought that Mr. Nevile was suggesting that Mr. Al Sadik or Shallot might have to join in the transaction for the purpose of pledging Mr. Al Sadik's shares in Shallot or Shallot's shares in Blossom. The fact that Mr. Gharghour did not want to go back to his client for this purpose does not lead me to draw the inference he was acting for some improper purpose or believed that he was acting without authority." [Footnote omitted.]

(5) At para. 5.10 of his judgment, the judge explained that Mr. Al Sadik's pleaded case was that the reason for Investcorp's deceitful non-disclosure was that it was suffering a liquidity crisis and needed to borrow large sums of money to inject into its hedge fund platform and indirectly obtain liquidity for itself. He went on to say that, in the light of overwhelming evidence that no such liquidity crisis existed, this allegation was rightly abandoned and that no other motive was suggested. He observed that it had been put to Mr. Gurnani, Mr. Franklin and Mr.

77

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

Boynton that Blossom was incorporated because they all knew that the SPA did not contain an adequate borrowing power. But, he said, the evidence was that they did not know the terms of the SPA or did not apply their minds to the scope of the borrowing powers: they all took it for granted that there was no contractual limitation upon the ability of Shallot to employ first-layer leverage, whether directly or indirectly through a subsidiary incorporated specially for this purpose. He found that there was no evidence that RBS asked for the SPA and/or IMA (which did not exist) and that there was no reason to suppose that RBS would have looked behind the borrower's memorandum and articles of association and the usual resolutions of its board of directors. He said this:

> "It seems to me that Mr. Gharghour's desire to present the bank with a 'clean structure' is exactly what is to be expected of any asset manager in these circumstances. Blossom could be presented to the bank as a special purpose vehicle whose sole function is to enter into the credit facility and own the assets purchased with the proceeds of the loan. The bank would have security over all its assets and its audited financial statements (reported in US dollars) would tell the bank what it needs to know about its customer's financial position in the simplest possible way. In contrast, Shallot could not be presented as a special purpose vehicle because it will enter into a series of forward foreign currency transactions. Its financial statements will be presented in Dirhams and it will have other assets over which the bank has no security."

133   At paras. 5.12–5.22 of his judgment, the judge addressed the second of the two elements of the factual case on deceitful non-disclosure which he had identified: whether, having entered into the credit facility with RBS, there was a further ongoing breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under cl. F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from May 1st, 2008 onwards. He accepted that there had been a breach of the contractual reporting obligation but held (at para. 5.22) that the evidence did not point to the conclusion that anybody on the Investcorp side had deliberately intended to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from May 1st, 2008 onwards. In their minds (he said) there was nothing to conceal: the evidence showed that they took it for granted that they had authority to leverage the investment and that they did not draw any distinction between what has been described as first-layer leverage and second-layer leverage.

134   The reasoning which led the judge to that conclusion may be summarized as follows:

A-9267

C.A.                                    AL SADIK v. INVESTCORP BANK

(1) He noted (at para. 5.12 of his judgment) that there was no material dispute about what reports were actually sent to Mr. Al Sadik during the relevant period up to March 2009: he was sent NAV statements every month. He described those as single page documents, each specifying the number of redeemable preference shares issued by Shallot, the net asset value per share and the net asset value of the company expressed in UAE dirhams. He recorded that it was accepted that the production of this information and its presentation in this simple format was all that Investcorp was required to provide in order to comply with its obligation under cl. F.4.

(2) He found that, in addition, Mr. Al Sadik was provided with reports generated from Investcorp's funds processing system, referred to as "FPS2 Reports," which contained an estimate of the portfolio value, information about the portfolio's performance (presented in a graphical and statistical format), the annualized rate of return and the asset allocation (presented as a pie chart). Those reports, he said, were prepared monthly for the months ending April 30th, 2008 through to October 31st, 2008 and most, if not all of them, were received by Mr. Al Sadik. He explained that the asset allocation pie charts in the FPS2 Reports for May and each subsequent month are headed "Asset Allocation (Blossom IAM Ltd.) as at [date]."

(3) He accepted Mr. Zaidi's evidence that, on receipt of the first of these reports (on June 5th, 2008), he called Mr. Kironde to enquire about the reference to Blossom and that he was told that it referred to an internal arrangement to distinguish between the UAE dirham and US dollar accounts. He observed that, on any view, that was an incomplete explanation of the reasons for having incorporated Blossom but that it was an explanation which apparently made sense to Mr. Zaidi at the time and it was consistent with the fact that Blossom's functional currency was US dollars and Shallot's reporting currency was UAE dirhams. He was satisfied that the failure to provide a full and complete explanation for the use of Blossom did not lead to the conclusion that Mr. Kironde was intending to mislead his client.

(4) He found that, on June 26th, 2008, in response to a request from Mr. Zaidi for information about the underlying investments, Mr. Kironde sent him the first of two documents referred to as "allocation tables." He explained that those tables comprised two parts. The first part identified each of the underlying hedge fund investments and stated what appeared to be the market value as at the beginning and end of each month from inception until May 31st, 2008; the second part set out the percentage allocation (that is to say, the value of each investment as a percentage of Shallot's total NAV). The judge described the second part as accurate but he took the view that the first part was misleading (at least, in the absence of an explanatory footnote), in that, although the first drawdown of US$67.5m. was made from the RBS credit facility on May 1st, 2008, the

79

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

additional amount invested into each of the underlying funds was not reflected in either the opening values for May 1st, 2008, or the market values for May 31st, 2008. Instead, he said, the numbers for the month of May 2008 were the notional net value of the investments after setting off against each one a pro-rated share of principal and accrued interest owing to RBS. A second allocation table was sent to Mr. Zaidi containing up-dated information for the months of June, July and August 2008. Again, as the judge said, this table accurately reflected Shallot's NAV and the percentage of the total portfolio allocated to each of the underlying hedge funds as at the beginning and end of each month from inception until August 31st, 2008. In the final sentence of para. 5.13 of his judgment the judge said this:

"However, in the absence of any footnote to explain the accounting treatment which has been adopted, I consider the first parts of both Allocation Tables to be misleading because they appear to reflect the market value of the underlying investments, rather than an analysis of Shallot's NAV."

(5) He explained (at para. 5.14 of his judgment) that an FPS2 Report (including Blossom's name) and an allocation table (including the information that he had described as misleading) was contained in the portfolio update—August 2008 discussed at the meeting between Mr. Kironde and Mr. Al Sadik and Mr. Zaidi on September 17th, 2008. He held that Mr. Kironde was responsible for determining how the information would be presented in the allocation table. He explained that the original draft, prepared by Mr. Mirza, included a column entitled "Cash and Other Assets" which was said to reflect a number of components including loan interest but that that column had been removed on Mr. Kironde's instructions. He held that, given that that table was intended to reflect the notional net value of the investments comprised in the portfolio (that is to say, the net value of each investment after setting off a pro-rated share of the liabilities, the accrued interest expense and other minor items on Shallot's balance sheet), it should have been treated in the same way as the principal amount owing to RBS. But, he said, Mr. Kironde categorically denied that the removal of this column was motivated by a desire to hide the existence of the leverage. The judge accepted that evidence, for reasons which he gave—in particular, he held that Mr. Kironde would not have invited Mr. Zaidi to go to Bahrain to meet the funds administration department (as the judge found that he did) if he were trying to conceal the fact that the portfolio had been leveraged.

(6) He summarized (at para. 5.15 of his judgment) the evidence of Mr. Boynton, on which he had confidence in relying. He found that the funds administration department (of which Mr. Boynton was head at the material time) had not appreciated that the SPA required other than standard monthly and quarterly reporting, which they understood to be restricted to

C.A.                                              AL SADIK v. INVESTCORP BANK

the issue of monthly estimated and quarterly final NAV statements in respect of
Shallot. He summarized the basis upon which those statements would be prepared
and concluded, on the basis of his analysis of the underlying accounting records,
that that was done in exactly the way one would expect of a professional fund
administrator.

(7) He explained (at para. 5.16 of his judgment) that cl. F.4 of the SPA required
Investcorp to provide a statement of the "underlying investments," a term which
was defined by cl. A of the SPA to mean each hedge fund or segregated account in
which the assets of Shallot were invested. He held that a statement of the
investments contained in a portfolio required particulars of the identity, quantity,
cost price and market value of each security: it did not require Investcorp to perform
a complex accounting exercise of the kind performed, on Mr. Kironde's
instructions, to produce the allocation tables. It was enough, he said, that Mr. Al
Sadik be provided with the information contained in the schedule entitled
"Client/Entity Holdings"; with that information, he would have the opportunity to
review the performance of the hedge funds in which he was invested, using the fact
sheets and all the other information available to him on Investcorp's client website
and cl. F.4 of the SPA cannot have been intended to serve any other purpose. He
said this (at para. 5.16):

> "It seems to me that the Funds Administration department was in fact collating
> the information called for by Clause F.4 in the ordinary course of preparing
> the monthly NAV statements and it would have been perfectly simple to put it
> into the form of a client report. However, as a result of an administrative
> oversight, the Funds Administration department failed to produce the reports
> necessary to discharge the contractual reporting obligations in respect of six
> clients, including Mr. Al Sadik. Mr. Boynton said that there was a 'generic
> problem' in relation to these managed accounts caused by a lack of
> communication between PRM and Funds Administration, with the result that
> his department failed to produce reports tailored to the reporting requirements
> specified in individual share purchase agreements."

(8) He found that, on February 26th, 2009, a table headed "Blossom IAM Limited
(Since Inception on 01 March 2008 to 31 January 2009)" was sent to Mr. Zaidi. He
said that the table was in three parts: the first part was entitled "Underlying
Manager Performance" and set out the monthly performance figures for each of the
hedge funds; the second part was entitled "Allocation (Based on Total Equity +
Debt)" and set out the percentage of the gross amount of the investment allocated
to each fund; the third part was entitled "Approx. Performance Attribution" and
reflected the performance of Blossom, so enabling Mr. Al Sadik to see the effect of
the leverage upon the performance of his portfolio. The judge found that Mr. Al
Sadik responded angrily to this information and claimed

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

not to know that leverage had been applied to his investment; that he asked for more detail about the leverage and that, in response, on March 2nd, 2009, he was sent a document described as a "decomposition statement." The judge described that as "simply another three part table setting out the market value of the investments, the percentage allocation, the amount of leverage, the debt-to-equity ratio, total equity and percentage return for each month from inception to 31st January 2009."

(9) He held (at para. 5.17 of his judgment) that, on any view, Investcorp's reporting was unsatisfactory and there was a failure to comply with the requirements of cl. F.4 of the SPA. But he went on to remind himself that the issue which he had to decide was whether the failings in reporting which he had identified reflected a deliberate and deceitful attempt to mislead Mr. Al Sadik and to conceal from him the fact that his assets had been leveraged.

(10) In addressing that issue, he observed that it was related to the question whether Investcorp had authority to leverage the investment: if Investcorp's executives believed they had authority to leverage the assets (as in his view, they did), an obvious motive for deceit disappeared and it became difficult to infer that the reporting (or absence of reporting) was done in bad faith.

(11) He noted (at para. 5.18 of his judgment) that it was not in dispute that Investcorp had failed to provide Mr. Al Sadik with any proper explanation for having incorporated Blossom until March 2nd, 2009 but, he said, the evidence did not point to the conclusion that Investcorp had deliberately and deceitfully concealed Blossom's existence. He summarized the evidence which led him to that view:

  (i) Blossom's existence, he said, was disclosed in the FPS2 Reports sent to Mr. Zaidi in respect of the months from May to October 2008. Mr. Kironde explained that he had some control over the format and could exclude (but not add) certain fields. The judge observed that if Mr. Kironde was attempting to conceal the existence of Blossom he would have taken its name (or the pie chart containing its name) out of these documents.

  (ii) Mr. Kironde was in a position to influence the extent of the information sent to Mr. Zaidi in response to his request made in February 2009. There was no evidence to suggest that Mr. Kironde attempted to exclude information about the borrowings from the documents sent on February 26th and March 2nd, 2009.

  (iii) By an email dated March 1st, 2009, Mr. Mirza sent a draft of the "decomposition statement" to those involved, including

82

C.A.                                    AL SADIK v. INVESTCORP BANK

Mr. Al Khatib and Mr. Tanner. He pointed out to them that "[Mr. Al Sadik] will see the total leverage amount and will not be happy. The IMA is being signed today/early tomorrow." No one suggested that there should be anything other than full disclosure of the leverage although (as the judge noted) Mr. Tanner did respond by asking the recipients of that email to delete it from their systems on the ground that he did not like the statement to which we have just referred.

(iv) On receipt of the document sent to him on February 26th, 2009, Mr. Zaidi had asked for a copy of the "investment management agreement"; which, pursuant to cl. D.1 of the SPA, was to be entered into between Investcorp Advisers Ltd. and Shallot. Mr. Zaidi's request exposed the fact that no investment management agreement had ever been executed. The judge found that Investcorp's response to the request was deceitful. He said this (at para. 5.19 of his judgment):

"A standard form investment management agreement was prepared, including an express term authorizing First Layer Leverage, and executed on 1st March 2009. The parties are Shallot, Investcorp Bank B.S.C. and Investcorp Investment Advisers Limited. It purports to have retrospective effect and is dated 'effective as of March 4, 2008' which is the date on which the first investments were made. This document was sent to Mr. Al Sadik on 8th March 2009 without explaining to him that it had been executed only a few days beforehand. When he complained about the use of leverage, Investcorp wrote to him on 10th March 2009 and said 'In our discussions with and presentations to you prior to setting up this portfolio we made it clear that to achieve the returns you wished for, it was anticipated that we would introduce leverage to the portfolio.' This is true, but the letter goes on to say 'This is provided for in Section 1(b) of the Investcorp Hedge Funds Management Agreement,' without disclosing that the document had only been executed the previous week and could not have had retrospective effect. Investcorp rightly places no reliance upon this document which is not binding and enforceable in accordance with its terms, but it is relevant to my assessment of the credibility of the evidence of those involved in its production."

135   The judge set out his conclusions on the third issue—whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed—at paras. 5.20–5.22 of his judgment. It is, I think, appropriate in this judgment to include those paragraphs in full:

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

"5.20 Mr. Al Sadik knew that Investcorp believed the target return of 45% could only be achieved by making a leveraged investment. The Investment Proposal clearly spells out a proposal to make a leveraged investment and Mr. Al Sadik could not have been under any misapprehension about Investcorp's intention. The Investment Proposal also proposes specific levels of leverage and indicates how this can be achieved through investments in LDSF (×3), SMFCo. (×1) and LEDF (×1). It is reasonable to infer that Mr. Al Sadik would have expected his portfolio to be structured in this way, but he also understood that he was giving Investcorp a discretionary mandate which meant that he would not necessarily be consulted or informed about the actual asset allocation or the way in which the desired level of leverage would be achieved. The evidence establishes that Investcorp believed that it had authority to make a leveraged investment and had no reason to doubt that Mr. Al Sadik agreed with this approach. Investcorp's executives did not focus on the language of the SPA, even when asked to do so by Mr. Nevile, and it never occurred to them that they might be authorized to make a leveraged investment directly through LSDF and SMFCo, but not authorized to enter into a limited recourse credit facility for the purpose of making a leveraged investment directly into DSF and the single manager funds. The failure to inform Mr. Al Sadik about the way in which the leveraged investment was in fact being made is not indicative of any intention to conceal anything. Furthermore, if he had been fully informed in March or April 2008 about the way in which Investcorp intended to leverage the investment, I find it difficult to envisage why he would have objected in principle to the use of a limited recourse credit facility offered by a bank but accepted an investment in LDSF and SMFCo, when the two approaches were intended to achieve an equivalent economic result for him. In principle, the returns would be the same and the management fee would also be the same, because he had already agreed that no fee would be charged on leverage.

5.21 The failure to inform Mr. Al Sadik in advance about the intention to apply First Layer Leverage was not a breach of duty, but the failure to inform him after the fact came about as a result of a breach of the reporting requirements of Clause F.4. The Funds Administration department collated the information necessary to produce an F.4 Report. This was done routinely each month as a necessary step in the calculation of Shallot's NAV and the information could easily have been put into the form of a report for distribution to clients. The Funds Administration department failed to produce these reports because it was not part of the 'standard reporting' and, as a result of an innocent oversight, they failed to appreciate that there was a requirement to produce various reports for six clients, including Mr. Al Sadik. When Mr. Zaidi asked for this

84

C.A.                                        AL SADIK V. INVESTCORP BANK

information on or about 5th June 2008, the relevant information was provided to Mr. Kironde, but he does not appear to have applied his mind to the contractual requirements of the SPA.

5.22 Instead, he focused on how to respond to the request for information in a way which would best meet what he perceived to be his client's needs. He concluded, rightly in my judgment, that the provision of an F.4 Report by itself would be unhelpful and that something more was required to reconcile the statement of underlying investments with the NAV statement (the F.2 Report). This could have been done by adding in a brief summary of the other components on Shallot's balance sheet which were the principal and interest owing to RBS, the market value of the hedging transactions (which could be an asset or a liability) and the accrual for fees and start-up costs. This would be the conventional approach. Instead, Mr. Kironde decided that it would be more helpful to provide his client with the Allocation Table, which constitutes a 'netted down' version of what would otherwise be the F.4 Report. The end result is that he failed to comply with the contractual requirement, but I am satisfied that his decision was made bona fide for a proper purpose. He approached the exercise in exactly the same way three months later when preparing the Allocation Table for the period ended 31st August. The evidence does not point to the conclusion that Mr. Kironde (or anybody else) was deliberately attempting to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from 1st May onwards. In their minds there was nothing to conceal. The evidence shows that they took it for granted (rightly in my judgment) that they had authority to leverage the investment and that they did not draw any distinction between what has been described as First and Second Layer Leverage. Mr. Kironde must bear principal responsibility for Investcorp's failure to comply with the requirements of Clause F.4, but I am satisfied that this breach of contract occurred innocently and does not equate to a breach of fiduciary duty. He was not deceitfully attempting to conceal the fact that Mr. Al Sadik's portfolio was being leveraged. In Mr. Kironde's mind, there was nothing to hide."

### *The questions for determination by this court in relation to the third issue*

136   As I have said, in reaching his conclusion that the third of the four issues which (at para. 1.15 of his judgment) he had identified as those which he needed to resolve—whether Investcorp deceitfully concealed its intention to leverage the assets, the manner in which the assets were leveraged and the extent of the leverage actually employed—should be determined in favour of Investcorp, the judge held that—

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

(1) Investcorp's failure to inform Mr. Al Sadik in advance about its intention to leverage his assets by means of first-layer leverage using the White Ibis III credit facility did not constitute a breach of its reporting obligations under the SPA, in that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation.

(2) Although Investcorp was in breach of its obligations under cl. F.4 of the SPA and, in the events which happened, Investcorp's breach of those contractual obligations led to Mr. Al Sadik not being informed about the level of leverage and the manner in which it had been carried out until March 2nd, 2009, nevertheless, Investcorp's reporting was done *bona fide* in a manner which it (through Mr. Kironde) honestly believed would best serve Mr. Al Sadik's interests and that there was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had been carried out.

137   The judge's conclusion that, in the circumstances of the present case, the fiduciary relationship arising out of the SPA did not give rise to a reporting obligation which was additional to and independent of the contractual duty, was challenged by Mr. Al Sadik in the memorandum of grounds of appeal. Ground 21 is in these terms:

"The learned Judge erred when he held that that the existence of a fiduciary duty did not give rise to a reporting obligation which is additional to and independent of the contractual duty to report under Clause F.4 of the SPA."

That ground was abandoned by Mr. Al Sadik in his appellant's skeleton argument and there was no attempt to pursue it at the oral hearing of the appeal. In those circumstances it might be thought that the issue whether the fiduciary relationship arising out of the SPA gave rise to a reporting obligation which was additional to and independent of the contractual duty is no longer for determination by this court.

138   Nevertheless, Mr. Al Sadik does challenge the judge's failure to hold that Investcorp was in breach of duty in failing to disclose to him, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the SMFs; rather than to invest those assets in LDSF and SMFCo (which, as the judge observed at para. 5.1 of his judgment, is what Mr. Al Sadik probably expected to occur). Grounds 20 and 23 in the memorandum of grounds of appeal are in these terms:

"*Ground 20*: The learned Judge erred when he omitted to decide the issues in connection with the Appellant's case that the Respondents were in breach of a duty to disclose arising from their fiduciary duty of loyalty to the Appellant."

A-9275

C.A.                                                                AL SADIK v. INVESTCORP BANK

"*Ground 23*: The learned Judge erred in law when he omitted to consider and make findings on the issue whether or not the Respondents' alleged breach of the duty to disclose (consequent upon its fiduciary duty of loyalty), arising before the SPA was entered into or in any event before 4th March 2008, was deceitful."

It is convenient to refer to the issues raised by those grounds as "the pre-investment non-disclosure issues."

139   Investcorp's response in relation to the pre-investment non-disclosure issues is (i) that the non-disclosure claim which Mr. Al Sadik is now seeking to advance is a new claim which was not part of his pleaded case and was not advanced at trial; (ii) that, properly understood, the new claim is (in part) an impermissible attempt to resurrect his abandoned fraudulent misrepresentation claims; and (iii) that, in any event, the new claim cannot be sustained given the judge's finding that Investcorp acted honestly when it did not disclose its intention to apply first-layer leverage (a finding which, it is said, an appellate court should not overturn without compelling reasons). In those circumstances, it is said, this court should hold that it is not open to Mr. Al Sadik to advance the new non-disclosure claim on this appeal.

140   The judge explained (at para. 5.1 of his judgment) that Mr. Al Sadik's case was that Investcorp had no authority to borrow money on the security of his assets; that by doing so Investcorp not only acted in breach of contract but did so deliberately for its own improper purposes and that it then dishonestly concealed what had been done. In those circumstances the judge took the view that there were two elements to the factual case on deceitful non-disclosure: (i) whether (as alleged) Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets; and (ii) whether, having entered into the White Ibis III credit facility with RBS on March 10th, 2008, there was a further ongoing breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under cl. F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from May 1st, 2008 onwards.

141   As I have said, in relation to the second of those elements, the judge held that Investcorp had failed to comply with its reporting obligations under cl. F.4 of the SPA. Nevertheless, he held that Investcorp had sought, *bona fide*, to comply with those obligations in a manner which it honestly believed would best serve Mr. Al Sadik's interests and that there was no intention to conceal from Mr. Al Sadik the fact that his portfolio had been leveraged or the level of leverage or the manner in which it had been carried out. He made no award of damages in respect of what he regarded as an "innocent" breach of cl. F.4 of the SPA. Mr. Al Sadik challenges

87

A-9276

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

both the judge's conclusion that, in failing to comply with its reporting obligations, Investcorp had acted honestly and the judge's failure to award damages for what he had held to be an innocent breach of cl. F.4. Ground 22 (read with the clarification in the appellant's skeleton argument) and Ground 24 in the memorandum of grounds of appeal are in these terms:

"*Ground 22*: The learned judge was wrong in law to hold that insofar as he held the Respondents' breach of Clause F.4 occurred innocently he should not award damages for that breach."

"*Ground 24*: The learned Judge misdirected himself when he found that the breach of Clause F.4 was not deceitful."

Ground 22 in the memorandum of grounds of appeal supplements ground 17:

"*Ground 17*: When the learned Judge found that Clause F.4 of the SPA had been breached he ought to have proceeded to consider and decide whether or not the breach had caused the Appellant loss and damage."

It is convenient to refer to the issues raised by those grounds as "the post-investment non-disclosure issues."

142   Investcorp's response in relation to the post-investment non-disclosure issues is (i) that Mr. Al Sadik's challenge to the judge's finding that Investcorp's breach of cl. F.4 of the SPA was not deceitful is founded on assertions of inference with no evidential basis and should be rejected on the ground that an appellate court should not overturn a finding that a witness was honest without compelling reasons; and (ii) that the judge was correct not to have considered loss and damage on the basis of an innocent breach of cl. F.4: no such claim was either pleaded or advanced at trial.

143    It follows that the questions for determination by this court in relation to the third issue fall under four main heads:

(1) Whether it is open to Mr. Al Sadik to pursue, on appeal, a claim in respect of pre-investment non-disclosure.

(2) If so, whether the judge ought to have held that Investcorp's failure to disclose, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level, was deceitful.

(3) Whether the judge was wrong to hold that Investcorp's post-investment breaches of cl. F.4 of the SPA were not deceitful.

(4) Whether, given the judge's finding that Investcorp's post-investment breaches of cl. F.4 were innocent and not deceitful, he should, nevertheless, have made findings on the loss and damage caused to Mr. Al Sadik by reason of that breach.

C.A.                                    AL SADIK v. INVESTCORP BANK

*Is it open to Mr. Al Sadik to pursue a claim in respect of pre-investment non-disclosure on this appeal?*

144   It is said, in the appellant's skeleton argument, that Mr. Al Sadik's claim in deceit rested on two foundations: (i) active representation, in that Investcorp made a representation in the form of a statement to Mr. Al Sadik, reckless as to its truth or falsity, on which he relied when he authorized Investcorp Bank to transfer US$135m. to Shallot on March 4th, 2008 for investment on the terms of the SPA; and (ii) implied representation, in that the law recognizes that non-disclosure where there is a duty to disclose is tantamount to an implied representation that there is nothing relevant to disclose.

145   In advancing his challenge under Ground 20 in the memorandum of grounds of appeal it is said on behalf of Mr. Al Sadik that, having noted (at para. 5.1 of his judgment) that he alleged that "Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell [him] that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the single-manager funds, rather than invest in LDSF and SMFCo which is probably what he expected," the judge was wrong to decide that issue summarily, on the basis that "the use of Blossom as a vehicle through which to leverage the assets is alleged to have been a device by which to conceal the existence of borrowing" and that "the evidence does not establish that Investcorp deceitfully concealed the borrowing arrangements from Mr. Al Sadik or that Blossom was incorporated as a mechanism for achieving that purpose." It is said that the judge ought to have addressed the issues to which Mr. Al Sadik's allegation of breach of fiduciary duty gave rise.

146   In developing that submission it is said that, properly understood, Mr. Al Sadik's claim in respect of pre-investment non-disclosure was that Investcorp had represented to him that it was intending to make investments authorized by the terms of the SPA when it knew full well that that was not what it was intending to do; that is to say, it knew that it was going to invest in Blossom. The effect of the judge's approach was that he did not address or decide the main issues arising from the claim of pre-investment non-disclosure and he was wrong not to do so. It is said that the material before this court—in particular, the judgment and Investcorp's amended defence—is sufficient to identify the issues which the judge ought to have decided. The elements of Mr. Al Sadik's claim in respect of pre-investment non-disclosure are said to be these:

(1) Mr. Al Sadik claimed, and Investcorp admitted, that he sent the investment amount (AED500m.) to Investcorp Bank on February 27th, 2008 and that it was received and accepted on trust for him "for the purpose of investing it on the terms of an agreement in writing to be negotiated."

89

(2) Mr. Al Sadik pleaded that Investcorp Bank "undertook" that the AED500m. which he had transferred to it would be invested in Shallot on the terms of the SPA, and that Investcorp (i) deliberately did not disclose (and deceived him as to) its intention to invest in Blossom before the signature of the SPA; (ii) intended (secretly) to invest in Blossom "contrary to the representations they had made and to make an investment [in Blossom] which was not an authorised investment," which it then did; and (iii) never "intended to do what it represented to Mr. Al Sadik would be done" and "deceived Mr. Al Sadik to obtain his money to do something different."

(3) The core of the claim for "Deceitful Non-Disclosure" is at paras. C16–C20 of the re-re-amended statement of claim. Those paragraphs contain the following claims:

  (i) that Investcorp was under a duty to disclose to Mr. Al Sadik and not to conceal from him its intention to divert US$135m. to Blossom (which was not an authorized investment on the terms of the SPA);

  (ii) that the disclosure of Investcorp's intention should have been made before the SPA was signed and that Investcorp breached its duty to disclose "knowingly or recklessly (and deceitfully)";

  (iii) that the failure to disclose the intention to invest in Blossom was a breach of duty because Investcorp did not make the disclosure before entry into the SPA.

(4) Mr. Al Sadik's claim contained a specific allegation that Investcorp was under a pre-investment fiduciary duty to disclose, which (it is said) is an aspect of a separate allegation that Investcorp represented that it would abide by the SPA (but deceitfully did not do so).

(5) Accordingly Mr. Al Sadik claimed that, by reason of Investcorp's deceitful non-disclosure, he authorized Investcorp Bank to transfer his AED500m. to Shallot as an investment on the terms of the SPA and thereby suffered loss in the value of the investment amount.

147   In further development of his submission that the judge ought to have addressed the issues to which Mr. Al Sadik's allegation of breach of fiduciary duty gave rise, it is said that the findings of fact which the judge made (at paras. 5.19 and 6.2 of the judgment)—that the date on which "the first investments were made" and "implemented" was March 4th, 2008—are relevant to that pleaded case in relation to the breach of the pre-investment fiduciary duties to disclose because (i) it was on that date (March 4th, 2008) that Investcorp transferred the investment amount to Shallot and caused it to invest in Blossom; (ii) it was on that date that the SPA was carried into effect (that is to say, it was on that date that the

C.A.                                    Al Sadik v. Investcorp Bank

investment in Shallot was made); and (iii) until that date, Investcorp held the investment amount on trust for Mr. Al Sadik to invest according to the terms of the SPA. In those circumstances it is submitted that the judge ought to have addressed the issues (i) whether or not Investcorp was under a duty, on or before March 4th, 2008, to disclose to Mr. Al Sadik its intention not to make an investment authorized by cl. A of the SPA and/or to divert the value representing the investment amount to Blossom; and (ii) if so, whether or not Investcorp was in breach of that duty.

148   It is submitted on behalf of Investcorp that the pre-investment non-disclosure claim which Mr. Al Sadik seeks to advance is not open to him on this appeal. It is said that, in seeking to advance that claim on appeal, Mr. Al Sadik has ignored the basis on which the 3rd claim was pleaded and advanced at trial. In essence, it is said, the 3rd claim (as pleaded and advanced at trial) was that Investcorp dishonestly acted in breach of various "duties to disclose" which arose on Investcorp's receipt of Mr. Al Sadik's moneys and the entry into the SPA on March 1st, 2008. The premise on which Mr. Al Sadik appeals (namely that this aspect of his appeal is in respect of his 3rd claim) is wrong. Properly analysed, these "pre-investment non-disclosure" elements of Mr. Al Sadik's appeal are an impermissible attempt, first, to resurrect the 8th claim (for fraudulent misrepresentation) abandoned at trial at the conclusion of the evidence—and possibly also the 2nd claim, which was in related terms—and, secondly, to advance a new, unpleaded, claim based on new allegations of fraudulent misrepresentation. The first of those allegations—described by Mr. Al Sadik as the "active representation" basis of his appeal—is that Investcorp represented that Mr. Al Sadik's investment would be authorized under the SPA. The second—described as the "implied representation" basis of the appeal—is that there was an implied representation by Investcorp (in circumstances where, it is said, Investcorp was under a fiduciary duty to disclose its intention to use the Blossom structure) that there was nothing relevant to disclose.

149   In developing those submissions, it is said that—

(1) the pleaded allegations in support of the 3rd claim were (in summary):

(i) that Investcorp was under a duty to disclose: (a) the intention to use first-layer leverage through an SPV incorporated for that purpose; (b) the full extent of first-layer leverage from time to time; and (c) the intention to divert—and the diversion of—his investment amount into Blossom: para. C16 of the re-re-amended statement of claim;

(ii) that the duty to disclose arose: (i) from cl. F.4 of the SPA and Investcorp's duties to disclose as a trustee and (ii) upon receipt of Mr. Al Sadik's investment amount on February

91

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

27th, 2008 (and/or on March 1st, 2008) "when the SPA was entered into": paras. C17 and C19 of the re-re-amended statement of claim);

(iii) that Investcorp breached each of the duties "knowingly or recklessly (and deceitfully)": para. C18 of the re-re-amended statement of claim and that the particulars of breach alleged are all particulars of an alleged intention to deceive Mr. Al Sadik: para. C20 of the re-re-amended statement of claim;

(iv) that the investment in Blossom was made in secret to facilitate unauthorized leverage: para. C20.2 of the re-re-amended statement of claim;

(v) that Investcorp was suffering a liquidity crisis and that its motive for acting as it did was that Investcorp wanted to raise funds as quickly as possible in order to invest in its hedge funds: paras. A22.4(b)(iv) and (v), A23 and A26A of the re-re-amended statement of claim;

(vi) that the loss and damage alleged to flow from the deceitful non-disclosure is the investment amount and the lost opportunity to invest it elsewhere (that is to say, the tortious measure of damage): para. C29 of the re-re-amended statement of claim.

(2) The new and unpleaded version of the 3rd claim was not advanced at trial and rests on two bases, "active representation" and "implied representation":

*Active representation*

(i) Investcorp made "active representations" to Mr. Al Sadik that: (a) the only leveraged investments made would be in "Investcorp Hedge Funds" which were authorized by cl. A of the SPA; and (b) and that Investcorp would abide by the terms of the SPA ("the representations");

(ii) Mr. Al Sadik acted on the representations on March 4th, 2008, when Investcorp invested in Blossom—by that date Investcorp had decided to invest in Blossom which was an unauthorized investment—accordingly, by that date, Investcorp knew that the representations were untrue;

(iii) in those circumstances, the failure to correct the representations on or before March 4th, 2008 was deceitful.

*Implied representation*

(iv) Investcorp made an implied representation that there was nothing relevant to disclose in circumstances where it had a

92

C.A.                                              AL SADIK V. INVESTCORP BANK

fiduciary duty to disclose its intention to invest in Blossom, but did not do so.

(3)  In seeking to advance the 3rd claim on the basis of pre-investment representations (whether "active" or "implied"), Mr. Al Sadik is attempting to revive (in another form) a case in fraudulent misrepresentation (or deceit) which was abandoned at trial. Indeed, the active representation formulation of Mr. Al Sadik's new claim is advanced in terms which are virtually identical to those in which the abandoned 8th claim (described on its face as being a claim for "Fraudulent Misrepresentation") at para. C26B (and summarized at para. A16B of the re-re-amended statement of claim) had been advanced.

(4) The essence of the 8th claim was that Investcorp deliberately led Mr. Al Sadik to believe that the investment amount would be invested in Investcorp hedge funds or other authorized investments, when at all times prior to the SPA being signed Investcorp knew this was untrue. Further, the 2nd claim ("the risk representation claim")—which was the "inverse" of the 8th claim (in that Mr. Al Sadik alleged, at paras. C11–C15 of the re-re-amended statement of claim, that Investcorp deliberately led him to believe that the only investment technique that would be used was a direct (that is to say, unleveraged) investment in hedge funds and that no other technique would be employed)—was abandoned at the same stage of the trial. Mr. Al Sadik expressly abandoned these two claims prior to closing submissions; neither party made submissions on them and the judge was told by Mr. Al Sadik that they were not being pursued. It is now too late for him to reintroduce those claims in another guise.

(5) Even if he had not already abandoned the "active representation" element of his new claim—which, of itself, is sufficient to preclude him from reintroducing it—Mr. Al Sadik should not be allowed to advance his new pre-investment non-disclosure claim because neither formulation of that new claim had been pleaded or advanced at trial. In particular:

    (i) the 3rd claim is not a fraudulent misrepresentation claim; it is neither pleaded nor framed in those terms;

    (ii) none of Investcorp's PRM or hedge funds witnesses was cross-examined on the basis that they had deliberately misled Mr. Al Sadik as to their intention to apply first-layer leverage before he agreed to invest his funds; indeed, an inconsistent case—(a) that the investment proposal did not make any representation as to the structure of the investment; and (b) that they had not told Mr. Al Sadik about the possibility of using first-layer leverage before he signed the SPA because they were unaware that this was the hedge funds team's

93

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

intention—was put to the PRM witnesses involved in presenting the investment proposal to Mr. Al Sadik and negotiating the SPA;

(iii) the pre-investment non-disclosure case which Mr. Al Sadik seeks to advance on this appeal was not developed at trial in his written or oral closing submissions in relation to the 3rd claim; in particular, neither (a) the active and implied representation analysis, nor (b) the suggestion that March 4th, 2008 was the critical date on which Mr. Al Sadik relied upon the Bank's representations; nor (c) the claim that Mr. Gurnani and Mr. Gharghour were "reckless" as to whether there was authority to invest through Blossom—a core allegation on which Mr. Al Sadik seeks to advance his "new" fraudulent misrepresentation claim—were relied upon in those written or oral submissions.

In those circumstances, it is said, the judge cannot be criticized for failing to identify—and so failing to address—any pre-investment non-disclosure claim in the terms set out (at paras. 152 and following) in the appellant's skeleton argument: Mr. Al Sadik's criticism of the judge's failure to consider not only a claim that was expressly abandoned but also an unpleaded claim first formulated only in the memorandum of grounds of appeal is ill-founded.

150   In my view there is force in the submission that it is not open to Mr. Al Sadik to advance on this appeal a claim based on the allegation that Investcorp made a deceitful pre-investment "active representation" that his investment would be authorized under the SPA.

151   As Mr. Al Sadik asserts in the appellant's skeleton argument, the "core" of the 3rd claim—the claim for "Deceitful Non-Disclosure"—is at paras. C16–C20 of the re-re-amended statement of claim. Those paragraphs are in these terms (so far as material in the present context):

"16. Investcorp Bank was under a duty to disclose to Mr. Al Sadik and not to conceal from him—(i) the intention of Investcorp Bank, Shallot, Blossom and Investcorp Nominee 1 or each of them to arrange First Layer Leverage and/or (ii) the fact of the arrangement of the First Layer Leverage and/or (iii) the full extent of First Layer Leverage from time-to-time, and/or (iv) the intention to divert and the diversion of the value representing the Investment Amount to Blossom (which was not an authorised investment on the terms of the SPA and which served as a screen to conceal the true state of affairs from Mr. Al Sadik ('the Duties to Disclose'). An honest person would have discharged the Duties to Disclose.

94

A-9283

C.A.                                    Al Sadik v. Investcorp Bank

17. The Duties to Disclose were each continuing duties which arose immediately upon the receipt by Investcorp Bank of the investment amount on 27th February, 2008 and in any event on 1st March, 2008 when the SPA was entered into. Investcorp Bank was in breach of each of the Duties to Disclose from the moment when the duties arose until on or about 2nd March, 2009 when Mr. Al Sadik received the Decomposition Statement in which the disclosure was for the first time made.

18. Investcorp Bank breached each of the Duties knowingly or recklessly (and deceitfully) and so breached its contractual and/or fiduciary duty owned to Mr. Al Sadik to disclose those facts to Mr. Al Sadik and/or not to conceal them from him. Each of the breaches of duty caused loss and harm to Mr. Al Sadik.

19. The duties to disclose arose from 2 independent sources—

19.1 Duty in contract . . .

19.2 Duty as a trustee: Upon the receipt by Investcorp Bank of the Investment Amount on 28th February, 2008 to hold and invest the same on the terms of the SPA, and from and upon the parties' entry into the SPA on or about 1st March, 2008 Investcorp Bank was constituted Mr. Al Sadik's trustee on the terms more particularly described in Part A at paragraphs 14 to 16 and Part B at paragraphs 51 to 57. As Mr. Al Sadik's trustee Investcorp Bank was under each of the Duties to Disclose.

Particulars of Breach

20. The intention to deceive is shown by Investcorp Bank's conduct (done by its servants or agents) who actively sought to conceal the true facts from Mr. Al Sadik:

20.1 the intention to use First Layer Leverage was not disclosed to Mr. Al Sadik on or before his entry into the SPA;

20.2 as pleaded in Part A in paragraph 21 the investment in Blossom was done in secret in order to facilitate unauthorised leveraging so as to exclude the effect of leveraging from the net asset value of the shares of Shallot . . ."

152   Investcorp is correct to point out that, as pleaded, Mr. Al Sadik's 3rd claim was not advanced on the basis of active (or explicit) misrepresentation: there is no allegation of explicit misrepresentation—in particular, no allegation of explicit pre-investment representation—in the paragraphs that I have just set out. The 3rd claim is for "Deceitful Non-Disclosure" not for "Fraudulent Misrepresentation." And that is how the judge understood the position when he said at para. 5.1 of his judgment that there

95

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

were two aspects to Mr. Al Sadik's factual case on deceitful non-disclosure (at para. 5.1):

"Firstly, it is alleged that Investcorp acted in breach of its fiduciary duty in March 2008 by failing to tell Mr. Al Sadik that it had decided to leverage his assets at the portfolio level and invest the proceeds directly in DSF and the single manager funds, rather than invest in LDSF and SMFCo which is what he probably expected . . ."

153   Investcorp is also correct to point out that Mr. Al Sadik's claim in respect of fraudulent misrepresentation was advanced as the 8th claim—the claim for "Fraudulent Misrepresentation (Investment Representation)"—which is pleaded at para. 26B of the re-re-amended statement of claim:

"(1) Investcorp Bank made the investment representation [that the entire value of the Investment Amount would be invested in Investcorp Hedge Funds or in other Authorized Investments] between about November 2007 and about 1st March, 2008 when the SPA was signed . . .

(2) The Investment Representation was made for and on behalf of Investcorp Bank by Mr. Al Khatib and Mr. Kironde. The Investment Representation became a misrepresentation when the bank decided that it was not going to invest the investment amount in Investcorp Hedge Funds or other authorised investments, but instead in Blossom. Investcorp Bank and/or Mr. Al Khatib and Mr. Kironde knowingly or recklessly allowed Mr. Al Sadik to rely on the truth of the Investment Representation whereas they had no honest belief that it was true.

(3) Mr. Al Sadik was induced to enter into the SPA by the Investment Representation and when Mr. Al Khatib signed the SPA for and on behalf of Investcorp Bank he knew (i) that Mr. Al Sadik believed the Investment Representation was true and (ii) knowingly concealed the falsity of the Investment Representation in order to induce Mr. Al Sadik to enter into the SPA.

(4) For the reasons given in Part A at paragraph 16B Mr. Al Sadik was materially deceived by the [Investment] Representation.

Particulars

(5) Investcorp Bank's knowledge that the Investment Representation was false (or that it was reckless as to its truth or falsity) is shown by the fact that it did not make the investments it had proposed to Mr. Al Sadik and instead made the investment in Blossom which was not an Authorised Investment as particularised in Part A at paragraph 36.

C.A.                                        AL SADIK v. INVESTCORP BANK

(6) The speed with which the investment was made in Blossom (that is to say, on the same day the SPA was signed) shows that before and on signature of the SPA Investcorp Bank intended the entire value representing the Investment Amount to be invested in Blossom only. The circumstances in which the investment was made are particularised in Part B at paragraph 105.3A. Investcorp Bank's motives for making the misrepresentation are pleaded in Part A at paragraph 13C."

As I have said—and as the judge recorded at para. 1.14 of his judgment—the 8th claim was expressly abandoned on the 26th day of the trial (after the conclusion of the evidence). In my view Investcorp's submission that, in seeking to advance on appeal the 3rd claim on the basis of pre-investment active (or explicit) representations, Mr. Al Sadik is attempting to revive (in another form) a case in fraudulent misrepresentation (or deceit) which was abandoned at trial is correct. It is not open to him to do so and that attempt should be rejected.

154   I take the view, also, that it is not open to Mr. Al Sadik to advance on this appeal a claim based on the proposition that there was an implied representation by Investcorp that there was nothing relevant to disclose in circumstances where, it is said, Investcorp was under a fiduciary duty to disclose its intention to use the Blossom structure.

155   At para. C17 of the re-re-amended statement of claim it is pleaded that the duties to disclose upon which Mr. Al Sadik relied ". . . were each continuing duties which arose immediately upon the receipt by Investcorp Bank of the Investment Amount on 27th February, 2008 and in any event on 1st March, 2008 when the SPA was entered into." It is not in dispute that, in the period between the receipt of the investment amount and the execution of the SPA, Investcorp Bank held the investment amount upon trust "for Mr. Al Sadik for the purpose of investing it on the terms of an agreement in writing to be negotiated." For convenience, I shall refer to that trust as "the pre-SPA trust." Given the terms of the pre-SPA trust, it necessarily came to an end when Investcorp Bank and Mr. Al Sadik (with other parties) entered into the SPA on March 1st, 2008. From that date until March 4th, 2008 (when Investcorp Bank converted the investment amount into US dollars and credited the proceeds to the account of Shallot), the investment amount was held by Investcorp Bank upon the trusts of the SPA ("the post-SPA trust"). In the circumstances that there is no appeal before this court from the judge's finding that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation imposed by cl. F.4 of the SPA, it is necessary to consider the position under the pre-SPA trust and the position under the post-SPA trust as separate questions.

97

A-9286

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

156   In advancing the submission that the fiduciary relationship between Investcorp Bank and Mr. Al Sadik under the pre-SPA trust gave rise to a fiduciary duty to disclose, Mr. Al Sadik relies on the judgment of Arden, L.J. (with which, on the relevant issue, the other members of the Court of Appeal, Mummery, L.J. and Holman, J. agreed) in *Item Software (UK) Ltd.* v. *Fassihi* (12).

157   The issue before the Court of Appeal in *Item Software* (so far as material in the present context) was whether the trial judge had been right to hold that the appellant, Mr. Fassihi, was in breach of his duties as a director of the respondent company, Item Software Ltd. ("Item"), in failing to disclose to Item his own misconduct at the time that misconduct occurred ("the disclosure issue"). The facts which gave rise to the disclosure issue may be summarized as follows. At the relevant time a major part of Item's business was the distribution of software products for Isograph Ltd. ("Isograph"). In November 1998, Item decided to attempt to negotiate more favourable terms with Isograph. At the same time, Mr. Fassihi secretly approached Isograph with his own proposals, which involved establishing his own company, RAMS International Ltd. ("RAMS"), to take over the contract between Item and Isograph. In the events which happened, the negotiations between Item and Isograph failed because Mr. Dehghani, the managing director of Item, insisted—with the encouragement of Mr. Fassihi—on terms that Isograph was not prepared to accept. Isograph terminated its contract with Item by giving 12 months' notice expiring on May 11th, 2000. Item then discovered what Mr. Fassihi had done, and he was summarily dismissed for misconduct on June 26th, 2000. Item brought proceedings against Mr. Fassihi alleging (so far as material) that he was in breach of duty as a director and employee in seeking to divert the contract with Isograph to RAMS ("the diversion issue") and for having pressed Mr. Dehghani to take a hard line in the negotiations with Isograph so as to improve the prospects of obtaining the business for himself ("the sabotage issue"). Those claims failed before the trial judge, who was not satisfied that Mr. Fassihi's conduct in seeking to divert the contract to RAMS or in pressing Mr. Dehghani to take a hard line in negotiations with Isograph was the cause of Item losing its contract but Item succeeded on the disclosure issue. In holding that Mr. Fassihi was in breach of duty in failing to disclose to Item his own wrongdoing, the trial judge was satisfied that loss had resulted from that non-disclosure. He held that it was highly probable that, had Mr. Fassihi disclosed what he had done, this would indeed have changed Mr. Dehghani's attitude to the negotiations with Isograph radically and would have led him to accept Isograph's proposal "instead of indulging in the further brinkmanship which caused Isograph to lose patience and serve notice of termination."

158   In dismissing the appeal against the decision of the trial judge on the disclosure issue, Arden, L.J. said this ([2004] BCC 994, at para. 41):

A-9287

C.A.                                              AL SADIK v. INVESTCORP BANK

> "For my part, I do not consider that it is correct to infer from the cases to which I have referred that a fiduciary owes a separate and independent duty to disclose his own misconduct to his principal or more generally information of relevance and concern to it. So to hold would lead to a proliferation of duties and arguments about their breadth. I prefer to base my conclusion in this case on the fundamental duty to which a director is subject, that is the duty to act in what he in good faith considers to be the best interests of his company. This duty of loyalty is the 'time-honoured' rule: per Goulding J in *Mutual Life Insurance Co of New York v The Rank Organisation Ltd* [1985] BCLC 11 at p.21 . . ."

And she went on to say this (*ibid.*, at para. 44):

> ". . . [O]n the facts of this case, there is no basis on which Mr. Fassihi could reasonably have come to the conclusion that it was not in the interests of Item to know of his breach of duty. In my judgment, he could not fulfil his duty of loyalty in this case except by telling Item about his setting up of RAMS, and his plan to acquire the Isograph contract for himself."

159   It is accepted on behalf of Mr. Al Sadik that the Court of Appeal in the *Item Software* case (12) held that a fiduciary does not owe a separate and independent duty to disclose to his principal his own misconduct or, more generally, to disclose information of relevance to the principal. The *ratio* of the decision on the disclosure issue, it is said, is that a duty to disclose is a facet of the duty of loyalty and arises if there is an expectation of disclosure: a fiduciary is under a duty to disclose to his principal information which it is in the economic interests of the principal to know unless he can prove he had a reasonable belief that the principal's economic interests would not be affected if he did not disclose: the fiduciary may escape liability if he can show that in the circumstances there was no expectation of disclosure.

160   Investcorp's response is that, properly understood, the *Item Software* case does not support the proposition for which Mr. Al Sadik contends. Arden, L.J. explained that a fiduciary does not owe a separate and independent duty to disclose his misconduct. *Item Software* is authority for the proposition that a company director may be obliged to report his own wrongdoing. A director is, of course, a fiduciary but the case was decided on the basis of the duty owed by a director as director. Reliance is placed, also, on the observations of Etherton, J. in *Shepherd Invs. Ltd.* v. *Walters* (18) ([2006] EWHC 836 (Ch), at paras. 85–86). When referring to the judgment of Arden, L.J. in the *Item Software* case, Etherton, J. said this (*ibid.*, at para. 86):

> "The Court of Appeal held, on the facts of the case, that there was no basis on which the defendant could reasonably have come to the

99

A-9288

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

conclusion that it was not in the interests of the claimant company to know of his breach of duty: he could not fulfil his duty of loyalty on the facts of that case except by telling the claimant of his setting up of his own company, and his plan to acquire the contract for himself."

He explained (*ibid.*, at para. 132) that—

"In the case of the acts of his fellow directors in promoting a rival business, the breach of fiduciary duty of the director is failing to disclose matters which are of relevance and concern to the company and which, if acting in good faith in the best interests of the company, the director would disclose. Those are straightforward applications of ordinary principles of equity concerning fiduciary duties."

161    In my view, the true position, in the light of the observations of the Court of Appeal in *Item Software* (12) and those of Etherton, J. in *Shepherd Invs.*, is that there is no separate and independent duty upon a fiduciary to disclose his own misconduct or, more generally, to disclose information of relevance to the principal. But a fiduciary duty to disclose may arise—as an element or facet of the fiduciary's duty of loyalty in the particular circumstances—in respect of matters (including his own misconduct) which a person in his position, acting in good faith, would appreciate should be disclosed (in that, without such disclosure, he would be unable to fulfil his duty of loyalty).

162    In order, therefore, to answer the question whether the judge ought to have held that Investcorp Bank owed to Mr. Al Sadik a fiduciary duty, before they each entered into the SPA on March 1st, 2008, to disclose its intention to leverage his investment at the portfolio level, it is necessary to ask, first, whether Investcorp had indeed formed such an intention at the relevant time and (if so), secondly, whether the judge should have found on the facts that were before him at trial that Investcorp Bank, acting in good faith, should have appreciated that it could not fulfil its duties of loyalty under the pre-SPA trust without disclosing that intention to Mr. Al Sadik.

163    Adopting that approach, the answer to the question whether the judge ought to have held that Investcorp Bank owed to Mr. Al Sadik a fiduciary duty, before they each entered into the SPA on March 1st, 2008, to disclose its intention to leverage his investment at the portfolio level must be "No." That is because, by the conclusion of the trial, it was common ground between the parties (and the subject of a finding of fact by the judge) that Investcorp had not formed that intention before March 1st, 2008. The position is stated at para. 92.8 of the written closing submissions on behalf of Mr. Al Sadik, dated February 28th, 2008:

100

C.A.                                                  AL SADIK v. INVESTCORP BANK

"92. Based on the evidence at trial, the following facts are understood to be agreed between the parties in relation to the reporting/non-disclosure issues:

. . .

92.8 It was not until March 1st, 2008 at the earliest that Investcorp formed the intention to arrange leverage through an SPV instead of a direct investment in leveraged Products."

That that was the position is said to be supported by the evidence of Mr. Franklin and it is consistent with the judge's analysis of the evidence at paras. 5.7–5.8 of his judgment. It is, also, the judge's finding of fact at para. 6.2 of his judgment. In my view, it is not open to Mr. Al Sadik to advance on this appeal a case of implied non-disclosure based on the premise that in order to fulfil its duties of loyalty under the pre-SPA trust Investcorp Bank was under a fiduciary duty to disclose an intention to arrange leverage at the portfolio level.

164    Nor is it open to Mr. Al Sadik to advance on this appeal a case of implied non-disclosure based on the premise that, in order to fulfil its duties of loyalty under the post-SPA trust, Investcorp Bank was under a fiduciary duty to disclose the intention (which, on the evidence, it did form shortly after March 1st, 2008) to arrange leverage at the portfolio level. The reason which leads to that conclusion is that, as I have said, the judge held that the fiduciary relationship arising out of the SPA did not impose upon Investcorp any disclosure obligation which was additional to or independent of the contractual obligation imposed by cl. F.4. In reaching that conclusion he pointed out that it was not disputed that Investcorp owed a fiduciary duty to Mr. Al Sadik and that the core obligation of a fiduciary was that of loyalty. He referred to the observations of Millett, L.J. in *Bristol & West Bldg. Socy.* v. *Mothew* (4) ([1998] Ch. at 18):

"A fiduciary is someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence. The distinguishing obligation of a fiduciary is the obligation of loyalty. The principal is entitled to the single-minded loyalty of his fiduciary. This core liability has several facets. A fiduciary must act in good faith; he must not make a profit out of his trust; he must not place himself in a position where his duty and his interest may conflict; he may not act for his own benefit or the benefit of a third person without the informed consent of his principal. This is not intended to be an exhaustive list, but it is sufficient to indicate the nature of fiduciary obligations."

But, after reviewing the authorities (at paras. 5.2–5.6 of his judgment), he held that the fiduciary relationship which arose under the post-SPA trust

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

imposed no obligations to disclose other than those for which the parties had contracted in the SPA itself. Although, as I have said, that conclusion was challenged (at Ground 21 in the memorandum of grounds of appeal), that challenge was withdrawn in the appellant's skeleton argument and it was not pursued at the oral hearing of the appeal. Absent an appeal from the judge's conclusion on this issue, Mr. Al Sadik cannot re-open the point.

*Ought the judge to have held that Investcorp's failure to disclose, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level, was deceitful?*

165   Ground 23 in the memorandum of grounds of appeal is in these terms:

"The learned Judge erred in law when he omitted to consider and make findings on the issue whether or not the Respondents' alleged breach of the duty to disclose (consequent upon its fiduciary duty of loyalty), arising before the SPA was entered into or in any event before 4th March 2008, was deceitful."

In advancing that ground on behalf of Mr. Al Sadik it is said that the judge did not address the issue whether or not Investcorp's failure to make pre-contractual (or pre-investment) disclosure of its intention to leverage Mr. Al Sadik's investment at the portfolio level through Blossom was deceitful, because, having held that no additional duty to disclose (that is to say, no duty to disclose in addition to the contractual duty under cl. F.4 of the SPA) arose by reason of the fiduciary relationship between Investcorp and Mr. Al Sadik, he did not go on to decide whether or not Investcorp's breach of its fiduciary duty to disclose before the SPA was entered into (or in any event on or before March 4th, 2008) was deceitful.

166   Given that I would hold—for the reasons set out in the previous section of this judgment—that it is not open to Mr. Al Sadik to pursue, on this appeal, a claim in respect of pre-investment non-disclosure, I find it unnecessary to address the question whether the judge ought to have held that Investcorp's failure to disclose, before March 4th, 2008, that it was intending to leverage his assets at the portfolio level, was deceitful. If it is not open to Mr. Al Sadik to pursue a claim in respect of pre-investment non-disclosure, that question does not arise on this appeal.

*Was the judge wrong to hold that Investcorp's post-investment breaches of cl. F.4 of the SPA were not deceitful?*

167   Ground 24 of the memorandum of grounds of appeal is in these terms:

102

C.A.                                                     AL SADIK v. INVESTCORP BANK

"*Ground 24*: The learned Judge misdirected himself when he found that the breach of Clause F.4 was not deceitful."

In advancing that ground it is said on behalf of Mr. Al Sadik that the judge was correct to identify the second factual element of the 3rd claim ("Deceitful Non-Disclosure") as he did (at para. 5.1 of his judgment):

"Secondly, having entered into the credit facility with RBS, it is alleged that there was a further on-going breach of duty in that Investcorp deliberately failed to comply with its reporting obligation under Clause F.4 of the SPA in order to conceal both the existence of the credit facility and the subsequent application of leverage from time to time during the period from 1st May 2008 onwards."

And correct, also, to accept that there had been a breach of the contractual reporting obligation under cl. F.4 of the SPA but that the judge was wrong to conclude (at para. 5.22 of his judgment) that the evidence did not point to the conclusion that anybody on the Investcorp side had deliberately intended to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from May 1st, 2008 onwards:

"The evidence does not point to the conclusion that Mr. Kironde (or anybody else) was deliberately attempting to mislead Mr. Al Sadik by concealing the fact that his investment had been leveraged from 1st May onwards. In their minds there was nothing to conceal. The evidence shows that they took it for granted (rightly in my judgment) that they had authority to leverage the investment and that they did not draw any distinction between what has been described as First and Second Layer Leverage."

It is submitted that the judge's conclusion was wrong in that (i) he failed to have regard to the findings he had made—that the IMA was deceitful and that Investcorp was reckless about its powers—which tended to show that Investcorp had a motive to deceive Mr. Al Sadik about the investments that had been made in and by means of Blossom; and (ii) his findings on the issue of deceit (set out in Schedule 2 of the memorandum of grounds of appeal) were wrong.

168   In developing those submissions it is said that, in addressing the facts (and the judge's findings) in relation to Investcorp's failure to comply with its reporting obligations, it is important to have in mind that:

(1) At the time the relevant reports were sent to Mr. Al Sadik, he did not know that Shallot had invested in Blossom, what Blossom was, or that it existed as a fund to do with his investment.

It is said that those matters should have been brought to Mr. Al Sadik's attention at the time the relevant reports were sent to him because the

103

A-9292

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

investments had been made by Blossom, which had incurred liabilities when it borrowed from RBS. The periodical reports sent to Mr. Al Sadik should have stated, but did not state, all the assets or any of the liabilities incurred; they showed only a quantity of investments made in DSF and the SMFs in a value that reflected the equity of Mr. Al Sadik's investment and were represented as investments made by Shallot. The investments shown had in fact been made by Blossom and not by Shallot.

(2) The reports were under the control of Mr. Kironde.

It is said that, on February 26th, 2009, a table headed "Blossom IAM Limited (Since Inception on March 1st, 2008 to 31 January 2009)," prepared by Mr. Kironde, was sent to Mr. Zaidi in response to an information request from him. The judge held that on this occasion (and for the first time) Mr. Al Sadik could see the use of leverage. If Blossom were an investment in a fund then Blossom should have been named in Investcorp's report of "underlying investments"; because that is what Blossom was. The problem for Investcorp was that Blossom was not an authorized investment. Investcorp sought to overcome that problem by not reporting the existence of Blossom (or all of its assets and liabilities). Further, it is said, Investcorp's case that Blossom was not actually an investment and, secondly, that Investcorp's reporting systems were disorganized does not stand up to analysis and the judge was wrong to hold that it did.

(3) The picture presented by the reports was misleading.

It is said that the picture presented by the reports was also seriously deficient in that it had the effect that Mr. Al Sadik did not have information he had a right to know pursuant to cl. F.4 and which he needed to know. He needed to know because that information would inform him whether or not to exercise his right to redeem (a right conferred by cl. H of the SPA).

(4) Mr. Kironde was a well-educated and intelligent man who went to Harvard and he was an experienced banker.

It is said to be beyond doubt that Mr. Kironde knew precisely what the SPA obliged Investcorp to report to Mr. Al Sadik and why Mr. Al Sadik needed to know it, in that Mr. Kironde was very well informed about the background to and contents of the SPA. He had been at the meeting on January 28th, 2008 when the investment proposal was given to Mr. Al Sadik; he negotiated the terms of the SPA in person with Mr. Al Sadik; he was Mr. Zaidi's point of contact and source of information about the investment and he knew about Blossom and that it was a leveraged vehicle with a variety of reference assets in which it was making leveraged investments. Even if others at Investcorp were incompetent, Mr. Kironde was not. It is not credible that Mr. Kironde did not know that Mr. Al Sadik

104

C.A.                                              AL SADIK V. INVESTCORP BANK

had a right to know about Blossom's assets and liabilities or why he needed to know that information.

(5) Mr. Kironde could have provided Mr. Al Sadik with the missing information.

It is said also to be beyond doubt that, if Mr. Kironde did not have that information to hand he could have obtained it. He chose not to provide it. He made that choice despite knowing that Mr. Al Sadik had a right and need to know what it would have disclosed. Indeed it is not in dispute that Mr. Kironde deliberately removed information that would have shown leverage so that Mr. Al Sadik would not see it.

(6) The judge held that Investcorp's letter of March 10th, 2009 was a deceitful response to Mr. Al Sadik's request for the IMA.

It is said that Mr. Kironde wrote and signed that letter and that it is established he knew when the IMA was drafted and signed because he had received the "Please delete this email" instruction sent by Mr. Tanner on March 1st, 2009 to disguise the date the IMA had been entered into. Therefore Mr. Kironde was fully informed about the import and intended effect of the IMA. An honest person knowing what Mr. Kironde knew would have refused to send the letter of March 10th, 2009. In sending that letter, Mr. Kironde was dishonest. This follows "axiomatically" from the judge's findings on the IMA.

(7) Mr. Kironde's conduct in relation to the IMA needs to be put in context.

It is said that Mr. Kironde's conduct in relation to the IMA entailed a fraud whereby a false and dishonest statement was made to Mr. Al Sadik. The fiduciary (Investcorp) deceived its beneficiary. Mr. Kironde was a central participant in that. The judge should have condemned such conduct in the strongest terms. The IMA and missing information both relate to the fact that an investment had been made in Blossom. The IMA was produced to justify the hitherto unexplained or reported investments of Blossom. The circumstances of non-disclosure (the missing information) and false disclosure are so closely connected as to be inseparable and the judge was wrong not to assess Mr. Kironde's conduct in relation to reporting with his dishonesty in relation to the IMA.

169   Amongst the findings of fact made by the judge which are challenged on behalf of Mr. Al Sadik are those set out in Schedule 2 to the memorandum of grounds of appeal:

(1) *The first finding*: It is said that his finding (at para. 5.12 of his judgment) that Mr. Kironde "had no reason to mislead his client about the use of leverage" was wrong because Mr. Kironde was subject to the same motives as Investcorp to mislead Mr. Al Sadik about the use of leverage.

105

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

Behind the motive to mislead Mr. Al Sadik lay Investcorp's desire to earn fees and propagate its hedge funds line of business. Withholding information about what had actually been done lowered the risk that Mr. Al Sadik would redeem and deprive Investcorp of fees and funds for its business was a motive. In addition, because Investcorp had not made immediate disclosure it had put itself in an embarrassing position, because if eventually it did disclose it would have to explain why it had not disclosed before: thus the initial failure to disclose generated a motive not to disclose later. Investcorp's eventual response to its embarrassment was to deceive Mr. Al Sadik with the false IMA.

(2) *The second finding*: It is said that his finding (at para. 5.12 of his judgment) that Mr. Kironde was not intending to mislead his client (Mr. Al Sadik) about Blossom was wrong because, in answer to a direct question put by Mr. Zaidi to Mr. Kironde about the significance of the name "Blossom" which had appeared without explanation in a pie chart sent by Investcorp, he replied with an answer that was neither full nor complete (as the judge found) when he claimed that it was an internal matter and nothing more than to differentiate between the USD and AED. Mr. Kironde knew what Blossom was and could have given an explanation about it but he chose not do to so (then or subsequently); therefore he knew that the answer he gave was misleading and in the premises he was being deceitful, that is to say an honest person would have given a full and complete answer to the question put.

(3) *The third finding*: It is said that his finding (at para. 5.14 of his judgment) that Mr. Kironde's decision to remove information from the reports sent to Mr. Zaidi which would have shown the amount of leverage was not "motivated by a desire to hide the existence of leverage" was wrong because Mr. Kironde did in fact alter the information that was sent to Mr. Al Sadik about his investments in a way that made it misleading which is not something an honest person with nothing to conceal would have done.

(4) *The fourth finding*: It is said that his finding (at para. 5.18 of his judgment) that because Mr. Kironde left a reference to Blossom in a pie chart he was not attempting to conceal its existence was wrong because (i) there is a material probability that Mr. Kironde left the reference to Blossom in the pie chart only because he was careless in his perpetration of the deceit of Mr. Al Sadik; (ii) a small amount of accurate information which is not full information may be deployed by a deceitful person who wishes afterwards to claim that he was not being deceitful; and (iii) Mr. Kironde misled Mr. Zaidi as to the true function of Blossom and admitted that he never informed him that the purpose of Blossom was to enable the borrowing from RBS.

C.A.                                      AL SADIK v. INVESTCORP BANK

(5) *The fifth finding*: It is said that the finding (at para. 5.14 of his judgment) that Mr. Kironde's invitation to Mr. Zaidi to visit Bahrain to meet with Investcorp's funds administration department to discuss reporting shows that he was not trying to conceal the portfolio had been leveraged is wrong because (i) all of the facts about leverage were known to Mr. Kironde but he chose not to explain them to Mr. Zaidi; and (ii) the invitation to visit Investcorp's funds administration department could not reasonably be construed as meaning that leverage was not being deliberately concealed from Mr. Zaidi and Mr. Al Sadik.

170    In those circumstances, it is said, the judge ought to have concluded that Mr. Kironde made a conscious and deliberate choice to withhold information in breach of cl. F.4 of the SPA. An honest person in possession of the information, knowing that Mr. Al Sadik had a right to it and needed to know it, would not have withheld it. The judge ought to have concluded that Mr. Kironde intended Mr. Al Sadik to rely on the incomplete information he was sent in order to induce him not to redeem his investment. Investcorp was as deceitful about its disclosure of the assets and liabilities of Blossom as it was deceitful about the IMA: that is what the judge should have found.

171    In response to those submissions it is said on behalf of Investcorp that, applying well-established principles of appellate review, there is no basis on which to overturn the judge's assessment that Mr. Kironde had not dishonestly or deceitfully sought to conceal the leverage of Mr. Al Sadik's investment at portfolio level, in that (i) Mr. Al Sadik's arguments give no meaningful explanation why the judge erred in reaching any of his conclusions on the honesty of Investcorp's witnesses (and in particular Mr. Kironde); (ii) in any event, Mr. Al Sadik's newly identified motives for what he says was Mr. Kironde's dishonest behaviour were never put to that witness; and (iii) Mr. Al Sadik's suggestion that the judge did not take into account his own findings in connection with the preparation of the IMA in assessing Mr. Kironde's credibility is wrong, given that (at para. 5.19 of the judgment) the judge stated in terms that he was taking those findings into account.

172    In developing that response, it is said that Mr. Al Sadik's appeal from the judge's finding of fact that Mr. Kironde had not deceitfully attempted to conceal the fact that Mr. Al Sadik's portfolio was being leveraged is without merit, in that—

(1) an appellate court should be extremely reluctant to overturn a finding of fact made—as this finding was made—on the basis of the judge's assessment of the evidence he heard at trial and which was the subject of lengthy cross-examination.

(2) The judge found (at para. 5.12 of his judgment) that Mr. Kironde was an honest witness. Mr. Al Sadik has advanced no clear challenge to

107

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

the judge's assessment of Mr. Kironde's evidence. Again, an assessment of honesty in a witness whom the judge has had the advantage of hearing and seeing under cross-examination is not susceptible to review by an appellate court in the absence of compelling reasons.

(3) Mr. Al Sadik does not, either in his grounds of appeal or skeleton argument, explain how or why the judge erred in reaching any of his conclusions. Rather, Mr. Al Sadik seeks to re-argue the factual case in relation to reporting and deceit. In doing so, he makes a series of bare assertions that certain inferences are "beyond doubt." None of those assertions is supported by the evidence—most are founded on Mr. Al Sadik's contention that the use of Blossom and the application of first-layer leverage were unauthorized—a view which the judge rejected and most (if not all) are founded on contentions that were not put to Mr. Kironde in cross-examination.

(4) Mr. Al Sadik cannot mount any sensible challenge to the judge's finding (at para. 5.17 of his judgment) that Mr. Kironde had no motive to conceal leverage from Mr. Al Sadik. If there is no basis on which to challenge that finding, then there is no basis on which the finding that Mr. Kironde did not deliberately conceal the application of leverage from Mr. Al Sadik can be challenged. As the judge put it, correctly, without a motive to conceal leverage from Mr. Al Sadik "it becomes difficult to infer that the reporting (or absence of reporting) was done in bad faith."

173   Investcorp points out that the judge's finding that Mr. Kironde had no motive to conceal leverage from Mr. Al Sadik was based on his findings (at paras. 5.20 and 5.22 of his judgment) that Mr. Kironde, along with other Investcorp employees, "believed that [Investcorp] had authority to make a leveraged investment and had no reason to doubt that Mr. Al Sadik agreed with this approach" and, in relation to that authority, did not draw any distinction between first- and second-layer leverage. Mr. Al Sadik does not challenge those findings: it would be difficult for him to do so, given that they are founded on Mr. Kironde's evidence on those matters which was not challenged at the trial. Rather, it is said on behalf of Investcorp, that the case which Mr. Al Sadik advances on appeal is that the judge was wrong to conclude that Mr. Kironde had no reason to mislead him about the use of leverage, because Mr. Kironde was "subject to the same motives as the Bank." The motives on which Mr. Al Sadik now relies, it is said, are (i) to "lower the risk that Mr. Al Sadik would redeem and deprive the Bank of fees and funds," and (ii) to escape from the embarrassing position in which Investcorp Bank found itself as a result of its initial failure to disclose the use of leverage at the portfolio level. But, it is said, Mr. Al Sadik's attempt to rely on those supposed motives is hopeless, in that—

C.A.                                                        AL SADIK v. INVESTCORP BANK

(1) Mr. Al Sadik fails to explain why Mr. Kironde might have feared either that Mr. Al Sadik would redeem if he found out about Blossom or considered that the fact of having not disclosed this at the outset was "embarrassing." The basis advanced in the appellant's skeleton argument (at para. 213)—that Investcorp knew that Blossom was not an authorized investment—cannot stand with the judge's finding that Mr. Kironde believed that Blossom was authorized—a finding which is not challenged on appeal.

(2) Neither of the two motives on which Mr. Al Sadik now seeks to rely was put to Mr. Kironde in cross-examination. Indeed, it is said, the trial record shows that no alleged motive at all was ever put to Mr. Kironde.

In summary, it is said that Mr. Al Sadik advances no sensible basis upon which the judge's finding of fact that Mr. Kironde had no motive to conceal leverage can be overturned by this court: his inability, or failure, to do so is fatal to his appeal.

174   It is said on behalf of Investcorp that, absent any motive for Mr. Kironde (and Investcorp) to act in breach of cl. F.4, Mr. Al Sadik's case in support of his appeal from the judge's finding of fact that Mr. Kironde did not deliberately (and deceitfully) withhold information in breach of the reporting obligation which that clause contains rests on two arguments:

(1) That Mr. Kironde knew what the SPA obliged Investcorp to report—a matter which Mr. Al Sadik contends is beyond doubt—and could have easily provided Mr. Al Sadik with that information to which he had a right and which he needed and that it is to be inferred from Mr. Kironde's decision not to provide that information that the breach of cl. F.4 was deliberate. That argument is said to be devoid of merit, in that—

(i) the judge made a finding (at para. 5.21 of his judgment)—to which Mr. Al Sadik makes no reference—that Mr. Kironde did not apply his mind to the reporting obligations set out in the SPA and it is implicit in the judge's overall finding (at para. 5.22 of his judgment) that Mr. Kironde's breach of cl. F.4 was innocent that he did not know what cl. F.4 required.

(ii) The judge's finding that Mr. Kironde did not apply his mind to the reporting obligations set out in cl. F.4 is consistent with Mr. Kironde's unchallenged evidence that (a) funds administration was generally responsible for discharging SPA reporting requirements; (b) cl. F.4 was not a standard reporting provision and Mr. Kironde had not focused on the provision before February 2009; and (c) that he did not think (when he was asked to consider cl. F.4 in the witness box) that the provision required him to report the assets and liabilities of Blossom, or that it was necessary to do so. Further, it was not

109

put to Mr. Kironde in cross-examination that he knew what cl. F.4 required or indeed, even that this was something he should have known.

(iii) Mr. Al Sadik's challenge to the judge's finding that Mr. Kironde did not apply his mind to the reporting obligations set out in cl. F.4 is unsustainable: it amounts to no more than the bare assertion that it is "beyond doubt" that Mr. Kironde knew what was required under the SPA because (i) Mr. Kironde is "an intelligent man who went to Harvard and he is an experienced banker"; (ii) Mr. Kironde was involved in presenting the investment proposal to Mr. Al Sadik, in negotiating the SPA and was the point of contact for Mr. Zaidi in relation to reporting; and (iii) he knew what Blossom was. That assertion provides no basis on which this court can overturn the judge's finding of fact that a witness whom he has seen and heard did not act dishonestly in relation to a breach of contract.

(2) That "it is not in dispute that Mr. Kironde deliberately removed information that would have shown leverage so that Mr. Al Sadik would not see it." In advancing that argument it is said that Mr. Al Sadik is referring to Mr. Kironde's preparation of an "allocation table" that was sent to Mr. Zaidi on September 11th, 2008 after a "cash" column, the negative figure in which would have revealed (amongst other things) the existence of leverage, had been removed from a draft on Mr. Kironde's instruction. Mr. Al Sadik's statement as to what is "not in dispute" is misleading: it suggests that the parties agreed (and/or that the judge found) that Mr. Kironde removed the "cash" column in order to conceal leverage. But that is an incomplete statement of the facts: the judge accepted (at para. 5.14 of his judgment) Mr. Kironde's denial that this was the reason for removing the column. Mr. Al Sadik offers no basis on which the judge's finding may be overturned beyond the bare assertion that this was "not something an honest person with nothing to conceal would have done." Again, that assertion provides no basis on which this court can overturn the judge's finding of fact that a witness whom he has seen and heard did not act dishonestly in relation to a breach of contract.

175   Further, it is said that Mr. Al Sadik's contention that the judge was "wrong not to take account of his finding that Mr. Kironde's conduct in relation to the IMA was dishonest" is without foundation, in that—

(1) the judge did not expressly make any criticism of Mr. Kironde in relation to the IMA and there was no evidence upon which he should have done.

(2) Even if the judge did intend to criticize Mr. Kironde (amongst others) in relation to the IMA, it is incorrect to assert that he did not take

C.A.                                    AL SADIK v. INVESTCORP BANK

account of the circumstances in which the IMA was prepared by Investcorp and sent to Mr. Al Sadik in the letter dated March 10th, 2009. The judge expressly acknowledged (at para. 5.19 of his judgment) that Investcorp's conduct with respect to the IMA was "relevant to [his] assessment of the credibility of the evidence of those involved in its production."

(3) The basis on which the contention that the judge ought to have taken the conduct of Investec and its employees in relation to the IMA into account in reaching his conclusion that Mr. Kironde did not deliberately (and deceitfully) withhold information in breach of the reporting obligation is advanced is that—

"if the Bank was prepared as it did to deceive Mr. Al Sadik about his investment in March 2009 in connection with the false IMA in order to disguise a breach of contract which occurred when it invested in Blossom, then it is very likely that it was reckless in 2008 too when Mr. Gurnani and Mr. Gharghour took the decision to invest in Blossom."

Leaving aside what is said to be the wholly illogical nature of that proposition, it is submitted on behalf of Investcorp that it has no evidential basis, it was not put to Mr. Gurnani and, in particular, it was not put to either Mr. Kironde or Mr. Boynton, the individuals involved in dealing with the preparation of IMA. If Mr. Al Sadik's case was that the IMA was drafted to cover up the alleged recklessness of Investcorp's hedge funds team in making the investment in circumstances where they were uncertain about their authority to do so, then Mr. Al Sadik was under an obligation to advance that case at trial and put it to the relevant witnesses. He did not do so and it is not open to an appellate court to make such a finding *a fortiori*, having regard to the judge's other findings of fact.

176   Further, it is said that Mr. Al Sadik's challenges to the findings in Schedule 2 to the memorandum of grounds of appeal cannot be maintained. The criticisms of the "first finding" (in relation to motive) and the "third finding" (in relation to the allocation table) have been addressed on behalf of Investcorp in submissions to which reference has already been made. The other three findings that Mr. Al Sadik seeks to challenge are the "second finding" (that Mr. Kironde was not intending to mislead Mr. Al Sadik about Blossom when he gave him an incomplete explanation of the reason for it), the "fourth finding" (that, because Mr. Kironde left a reference to Blossom in the FPS2 reports sent to Mr. Al Sadik, he was not attempting to conceal its existence) and the "fifth finding" (that Mr. Kironde's invitation to Mr. Zaidi to visit Bahrain to meet with the bank's funds administration department to discuss reporting showed that he was not trying to conceal that the portfolio had been leveraged). These challenges have no prospects of success, in that—

111

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

(1) none of them can be supported without establishing a motive for Mr. Kironde to conceal Blossom and/or leverage from Mr. Al Sadik.

(2) None of the allegations which Mr. Al Sadik now seeks to advance as to Mr. Kironde's intentions was put to him in cross-examination. They are no more than mere assertions of inferences which Mr. Al Sadik submits the judge should have drawn without any evidential foundation.

177   As I have said, the 3rd claim ("deceitful non-disclosure") is pleaded at paras. C16–C20 of the re-re-amended statement of claim. The particulars of the deceitful post-investment non-disclosure relied upon are set out at para. 20(3)–(6) of that pleading. They are in these terms:

"20.3 None of the Monthly Summaries, the Tabular Summaries or the Allocation Tables . . . disclosed the fact of, or the full extent from time-to-time of, the First Layer Leverage . . . and it was impossible for Mr. Al Sadik to detect the same from any of those documents;

20.4 No other communication was made during the material time to Mr. Al Sadik by Investcorp Bank (or any other person) informing him of the fact and full extent from time-to-time of the First Layer Leverage . . .

20.5 When . . . Mr. Zaidi asked Mr. Kironde about the reference to Blossom in the Monthly Summaries Mr. Kironde replied falsely that it was part of an internal arrangement to show the value of the asset in a foreign currency;

20.6 When Mr. Al Sadik became alarmed about the precipitous drop in the value of his investment in about October 2008 he began to seek explanations from Investcorp Bank about why this had occurred. The explanations sought by Mr. Al Sadik and the answers given to him by Investcorp Bank are described in Part B at paragraphs 66 to 88;

20.7 One of the main causes for the reduction in the value Mr. Al Sadik's investment was the very large extent (from time-to-time) of the First Layer Leverage but Investcorp Bank did not explain this to Mr. Al Sadik despite many opportunities to do so . . ."

The issue for the judge was whether that course of non-disclosure was deceitful. He held that it was not. I am not persuaded that he was wrong to take that view.

178   The principal reasons which lead me to take that view are these:

(1) I accept that an appellate court should not overturn a finding of fact made—as this finding was made—on the basis of the judge's assessment of the evidence he heard at trial and which was the subject of lengthy cross-examination without very cogent reasons.

112

C.A.                                            AL SADIK v. INVESTCORP BANK

(2) I accept that the arguments advanced on behalf of Mr. Al Sadik provide no basis on which this court should hold that the judge erred in reaching any of his conclusions on the honesty of those of Investcorp's witnesses who gave evidence in relation to the matters pleaded. In particular, I accept:

> (i) that the judge was entitled to reject the submission that Mr. Kironde (or, so far as material, Mr. Gurnani, Mr. Franklin or any other Investcorp employee) had a motive to conceal from Mr. Al Sadik the fact that his assets were being leveraged through Blossom at the portfolio level; in particular, I accept that he was entitled to reject that submission in the circumstances that the motives on which Mr. Al Sadik now seeks to rely were not put to those witnesses in the course of cross-examination on their evidence; and

> (ii) that the submission that the judge assessed the credibility of Mr. Kironde (and other witnesses) without having regard to his findings in relation to the IMA—in so far as those findings were of relevance to events which had occurred some months earlier—is ill-founded, given the judge's statement (at para. 5.19 of his judgment) that that document was relevant to his assessment of the credibility of those involved in its production.

In those circumstances, it would be wrong, as it seems to me, for this court to reverse the findings of the judge as to the honesty of Mr. Kironde (and others) whom he had the advantage of seeing and hearing when they gave evidence at the trial.

*Given the judge's finding that Investcorp's post-investment breaches of cl. F.4 were innocent and not deceitful, should he, nevertheless, have made findings on the loss and damage caused to Mr. Al Sadik by reason of that breach?*

179   Grounds 17 and 22 in the memorandum of grounds of appeal are in these terms:

> "*Ground 17*: When the learned Judge found that Clause F.4 of the SPA had been breached he ought to have proceeded to consider and decide whether or not the breach had caused the Appellant loss and damage."

> "*Ground 22*: The learned judge was wrong in law to hold that insofar as he held the Respondents' breach of Clause F.4 occurred innocently he should not award damages for that breach."

It is submitted on behalf of Mr. Al Sadik that, having found (at para. 5.16 of his judgment) that Investcorp was in breach of the duty to report under

113

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

cl. F.4 of the SPA, the judge should have gone on to consider whether or not that breach had caused Mr. Al Sadik loss and damage. Had the judge considered that question, it is said that he should have found that Mr. Al Sadik had suffered loss and damage because he would have exercised his power to redeem to the maximum extent available on the first date that a monthly statement pursuant to cl. F.4 had been issued in which the RBS loan was shown (that is to say the statement for May 2008) and that the loss and damage which he suffered was to be measured by all of the losses incurred in consequence of leverage through Blossom from the date that he would have redeemed in exercise of that power until the date he did redeem.

180   In developing those grounds it was submitted that—

(1) the judge was wrong to have any regard as to whether or not the breach was innocent. It is said that the judge ought to have held that the breach of cl. F.4 was also a breach of fiduciary duty because the fiduciary duty to disclose (consequent upon Investcorp's fiduciary duty of loyalty) was a continuing duty and that the unsatisfactory reporting by Investcorp, which he had found at para. 5.17 of the judgment, was both a breach of cl. F.4 of the SPA and a breach of fiduciary duty, irrespective of Investcorp's innocence or otherwise and that Mr. Al Sadik was therefore entitled to the appropriate relief.

(2) Mr. Al Sadik rescinded the SPA on November 24th, 2009 for misrepresentation and for deceitful non-disclosure. In these proceedings he seeks (i) an order confirming his rescission and for restitution by Investcorp of the full amount of his investment (AED500m.); and (ii) damages for consequential loss to be assessed by reference to what he would have earned.

181   Given that (i) I would hold that no fiduciary duty to disclose an intention to leverage at the portfolio level arose under the pre-SPA trusts (because, if for no other reason, Investcorp had not formed such an intention before the SPA was executed); (ii) the judge held that no fiduciary duty to disclose (independently of or in addition to the contractual duty to report under cl. F.4) arose under the SPA and there is no appeal on that issue; and (iii) the judge held (and I agree) that the non-disclosure in breach of cl. F.4 was not deceitful, I find it unnecessary to address the claims to damages in so far as they are advanced on the basis of breach of fiduciary duty or on the basis of deceitful non-disclosure. Nor do I find it necessary to address a claim for damages based on pre-contractual misrepresentation. In my view, no such claim was pleaded or established. On a true analysis, as it seems to me, Mr. Al Sadik's claims lay in contract, for innocent breach of the reporting obligations imposed by cl. F.4.

114

C.A.                                                      AL SADIK V. INVESTCORP BANK

182   In response to the submission that the judge ought to have addressed the
question whether Mr. Al Sadik was entitled to an award of damages in respect of
what he had held to be an innocent breach of cl. F.4 of the SPA, it is said on behalf
of Investcorp that the judge was correct not to make findings on the loss and
damage caused to Mr. Al Sadik by reason of the breach of cl. F.4 in that no such
loss and damage was pleaded: Mr. Al Sadik's claim for loss and damage was put
on the tortious and not the contractual basis. More particularly, it is said that—

   (1) no such loss and damage was pleaded. Mr. Al Sadik's claim for loss and
damage for deceitful non-disclosure (pleaded at para. C29 of the re-re-amended
statement of claim) is on the tortious basis: that is to say, it is for the full investment
amount and the loss of the opportunity to invest that amount elsewhere. This
reflects and is only consistent with Mr. Al Sadik's claim that there was a deceit that
was planned and executed from the inception of Blossom. There is no alternative
pleading for loss and damage on the basis that had cl. F.4 been complied with (*i.e.*
the contractual basis for a damages claim), Mr. Al Sadik would have redeemed
particular amounts at various points in time when he received Investcorp's reports.

   (2) Mr. Al Sadik did not advance any such case at trial. Although Mr. Al Sadik
made claims (for the first time) in his oral evidence that he would have redeemed
at various points, a claim for loss and damage based on cl. F.4 was not pursued in
his written closing submissions. The point was specifically raised on behalf of
Investcorp in counsel's oral closing submissions:

   "*Counsel*: In relation to F4—and I will come to this in more detail—the
      nature of the case that has been put and pleaded is one of deceitful non-
      disclosure.

   *The judge*: Which is not the same thing as breach of contract?

   *Counsel*: Exactly, my Lord, and indeed that has a significance in relation to
      pleading, because the way the loss and damage is pleaded is right from
      the start there was a deceit being planned and executed to deceive as to
      what was going on, damages claimed, the whole of the sum invested,
      and the opportunity to invest it in something else. There is no plea of,
      'At some stage during the course of the process, maybe June after
      leverage had been applied, I would have been told this, I would have
      done something different.' So if Mr. Al Sadik fails on his deceitful non-
      disclosure case, he can't then try to revive it by saying it is an F4 case
      without the deceitful element, because he has not pleaded such a case.
      If one looks at the way the case is pleaded, the F4 is pleaded as part of
      'the intention to

A-9304

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

    deceive.' So I respectfully say that's the end of the deceitful non-disclosure case."

Counsel for Mr. Al Sadik did not dissent from that analysis when the loss and damage pleading point was raised with him directly in his oral closing submissions.

183   In seeking to advance a claim in contract for innocent breach of the reporting obligations imposed by cl. F.4, it is said on behalf of Mr. Al Sadik (correctly) that, given that leverage at the portfolio level was first effected by Investcorp on May 1st, 2008, Investcorp was under a contractual duty to provide a report in the course of June 2008 which disclosed that that had occurred. It is said that, if Investcorp had provided such a report to Mr. Al Sadik in the course of June 2008 (as it should have done) then, pursuant to cl. H.1, he would have been able to redeem AED166m. at the end of the next calendar quarter on 60 days' written notice. That is to say, he would have redeemed AED166m. as at September 30th, 2008 and the balance as at March 29th, 2009. It is said that, in the course of his cross-examination, Mr. Al Sadik repeatedly stated that he would have redeemed if he had learned about the use of leverage by reference to an investment in LDSF: if he had discovered that his investment had been leveraged in a fund like Blossom (and all that implied) he would have redeemed. The judge was wrong not to proceed to assess Mr. Al Sadik's claim for loss and damage for breach of cl. F.4 for which he claimed.

184   In response to that submission, it is said on behalf of Investcorp that Mr. Al Sadik's assertion that he would have redeemed if he had learned about the use of leverage is not to be believed. In determining whether the judge should have considered loss and damage in consequence of breach of cl. F.4, no weight should be given to Mr. Al Sadik's assertion that he "repeatedly stated" in evidence that he would have redeemed had he seen from the reports that leverage (in any form) had been applied. Investcorp relies on the judge's observation (at para. 5.20 of his judgment) that—

    ". . . [it is] difficult to envisage why [Mr. Al Sadik] would have objected in principle to the use of a limited recourse credit facility offered by a bank but accepted an investment in LDSF and SMFCo, when the two approaches were intended to achieve an equivalent economic result for him. In principle, the returns would be the same and the management fee would also be the same, because he had already agreed that no fee would be charged on leverage."

Further, it is said that the references in the appellant's skeleton argument to Mr. Al Sadik's oral evidence at trial are all examples of Mr. Al Sadik saying (in effect) that he would have objected to the leverage and redeemed because of the volatility in the markets in 2008. This evidence, it is said, is not credible having regard to: (i) the judge's findings in relation to the credibility of Mr. Al Sadik (in particular, the judge's finding, at para. 3.11 of

116

C.A.                                                    AL SADIK v. INVESTCORP BANK

his judgment, that Mr. Al Sadik had given "disingenuously contrived" evidence in relation to his appetite for risk); (ii) the abandonment of Ground 7 in the memorandum of grounds of appeal (in which Mr. Al Sadik had sought to challenge the judge's finding that Mr. Al Sadik's evidence on every major issue was simply not credible); (iii) the fact that Mr. Al Sadik made these assertions for the first time in his oral evidence (they do not appear anywhere in his 69 pages of written evidence); (iv) Mr. Al Sadik's written evidence that he believed he had been offered a guaranteed return of 45% over three years (if that were his belief, why would he redeem his funds in those circumstances?); (v) Mr. Al Sadik's evidence that he was personally indifferent as to whether he received any reports; (vi) the judge's finding (at para. 5.20 of his judgment) that, during the investment proposal stage and the negotiation of the SPA, Mr. Al Sadik was content for his investment to be leveraged through leveraged funds, and that he knew that the 45% target return could only be achieved by making a leveraged investment; and (vii) the judge's finding (at para. 3.21 of his judgment) that there was discussion between Mr. Al Khatib and Mr. Al Sadik about leverage having been applied to his investment on October 20th, 2008 and the absence of any evidence that Mr. Al Sadik raised any objection to the application of leverage at that time.

185   In my judgment, if the judge had been minded to make an award of damages in respect of a claim in contract for innocent breach of the reporting obligations imposed by cl. F.4, he would have needed to decide whether, and if so when, on or after September 30th, 2008, Mr. Al Sadik would have redeemed his investment pursuant to cl. H of the SPA. It is clear, given the points advanced on behalf of Investcorp to which I have referred, that those issues would have been contested. The judge made no findings on those issues. He was entitled to take the view— having regard to (i) the absence of any pleading raising those issues; (ii) the decision, on behalf of Mr. Al Sadik, not to re-raise those issues in his closing written submissions; and (iii) the exchanges during oral closing submissions to which I have referred—that he did not need to: those issues were not before him for determination.

186   In those circumstances—for the reasons which I have set out—I would reject the submission that, having held that Investcorp was in breach of the duty to report under cl. F.4 of the SPA but that that breach was innocent, the judge should have gone on to consider whether or not that breach had caused Mr. Al Sadik loss and damage.

**The fourth issue: whether the asset allocation decisions, including decisions about the application of leverage, were made in breach of fiduciary duty**

187   The judge's reasons for dismissing the 5th claim are set out in section 6 of his judgment. The issue which he addressed was whether the

117

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

asset allocation decisions, including decisions about the application of leverage, were made in breach of fiduciary duty. He held that Investcorp's initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made *bona fide* for a proper purpose in accordance with the SPA, in that the allocation of half the investment amount to SMFs (with ×3 leverage), on the basis that the investment would be diversified across an additional four SMFs (including Alt Beta funds) as and when new funds were launched, was made in what Investcorp believed to be Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee-sharing arrangement with the SMFs.

***The judge's findings in section 6 of his judgment***

188   At para. 6.1 of his judgment the judge explained that, although the 5th claim, as pleaded, alleged breach of trust by Investcorp Bank and/or Investcorp Nominee 1 in the capacity as trustee of the shares issued by Shallot, on a true analysis the obligation to manage the assets of Shallot (as opposed to its shares), whether held directly or through its subsidiary, was a contractual one arising under the SPA— that, in the absence of any investment management agreement between Shallot and Investcorp Advisers, that obligation was performed at the material times by Investcorp Bank and that the facts and matters pleaded constituted a claim against Investcorp Bank that it exercised its discretionary powers under the SPA in breach of its fiduciary duties. It was on that basis, he said, that he intended to address the 5th claim.

189   At paras. 6.2 and 6.3 of his judgment, the judge described how the 5th claim had evolved in the pleadings and at the trial. He explained that it was common ground that the SPA conferred a discretionary mandate upon Investcorp; that investing in DSF and/or the SMFs fell within the scope of Investcorp's authority under the SPA and that Investcorp owed Mr. Al Sadik a fiduciary duty to exercise its power for a proper purpose in accordance with the terms of the SPA. Investcorp's obligation, he said, was to manage the portfolio in what it *bona fide* believed to be the interests of its client, Mr. Al Sadik, and not for some ulterior purpose in its own interest. He explained that the 5th claim, "as finally articulated in counsel's written Closing Submission," was that Investcorp's asset allocators (Mr. Gharghour and Mr. Gurnani) formulated a plan to put one half of Mr. Al Sadik's money in DSF (with ×2 leverage) and the other half in SMFs (with ×3 leverage), with the intent that the SMF portion would be notionally divided into 10 equal parts: six of those parts to be invested in the six existing SMFs (one part in each SMF) and the remaining four parts to be invested in new SMFs and/or Alt Beta products as and when these became available. He said that the fact that such a plan was formulated on about March 2nd, 2008, and was implemented from March 4th, 2008

118

C.A.                                          AL SADIK v. INVESTCORP BANK

onwards, was not in dispute. Mr. Al Sadik's case, the judge said, was that it was an illegitimate and dishonest plan designed to serve Investcorp's interests: first, by generating capital for the development of Investcorp's hedge funds line of business and, secondly, by generating two layers of fees from Mr. Al Sadik's investment in the SMFs. The allegation pleaded on behalf of Mr. Al Sadik was that Investcorp pursued that plan without regard to Mr. Al Sadik's interests from March 4th, 2008 (when the first investments were made) until September 1st, 2008 (when leverage was added for the last time) and that it was abandoned around September 16th, 2008, only because the asset allocators had reason to believe Mr. Al Sadik might redeem his investment. It was alleged that the decision to employ first-layer leverage through Blossom, using the White Ibis III credit facility, lay at the heart of the breach of fiduciary duty because Blossom was the vehicle through which the fraud was committed and the means by which it was concealed from Mr. Al Sadik.

190   The judge observed that, although the re-re-amended statement of claim contained an express plea of fraud and dishonesty, that case (and the case advanced by counsel for Mr. Al Sadik in his written opening submissions) differed in material respects from the case put in Mr. Al Sadik's written closing submissions. The judge pointed out that motive for allegedly dishonest conduct was an important element of the case to be put to witnesses in cross-examination. The motive that had been advanced, when the case was opened, was that Investcorp needed to resolve a liquidity crisis which it was then facing. But, as the judge held, there was overwhelming evidence that Investcorp was never facing any liquidity crisis. When, as the judge put it at para. 6.3 of his judgment, it became apparent to Mr. Al Sadik's counsel that the case, as opened, was unsustainable, it was abandoned and, thereafter, the case was put on the basis of what counsel described as "the plan." That case, the judge observed, was based on a distinctly different motive for the dishonest behaviour alleged against Investcorp. But he was not persuaded that, in asserting a different motive of the dishonest behaviour alleged, the factual case, as ultimately presented to the court, was so fundamentally different from the pleaded case that he should dismiss it for that reason alone. At its core, he said, the case against Investcorp was—and always had been—that it ignored Mr. Al Sadik's best interests and acted for some selfish interest of its own.

191   Nevertheless, as the judge explained at para. 6.3 of his judgment, the fact that the case had altered at a late stage of the trial in the way that he had described did have an effect on his approach to the evidence. After referring to observations of Lewison, J. in *Abbey Forwarding Ltd.* v. *Hone* (1) ([2010] EWHC 2029 (Ch), at para. 47)—citing with approval observations of Briggs, J. in *Dempster* v. *H.M. Rev. & Customs* (7) ([2008] STC 2079, at para. 26)—the judge held (at para. 6.3) that—

A-9308

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

"where the actions or statements of Investcorp's witnesses are open to an innocent interpretation, I should not draw the contrary inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to them in cross-examination."

192    The judge then turned to address, at paras. 6.4–6.9 of his judgment, "how and why Investcorp's investment plan for Mr. Al Sadik's portfolio was formulated." His findings of fact may be summarized as follows:

(1) The portfolio construction work was done by Mr. Franklin, with input from Mr. Gharghour and Mr. Gurnani (to whom he reported) and from Mr. Mirza. Mr. Franklin's work began on January 24th, 2008, when Mr. Gharghour forwarded to him an email from Mr. Mirza notifying him about the potential new client, the client's requirements and a suggested portfolio. Mr. Mirza's summary of the client's requirements included a three-year lock-up period. That turned out to be inconsistent with Mr. Al Sadik's liquidity requirements. His asset allocation proposal comprised 50% in Investcorp Balanced Fund ("IBF"), 30% in Investcorp Event Driven Hedge Fund ("EDF") and 20% in SMFCo with overall portfolio leveraged ×1 or ×1.5 "depending on what is possible from banks and impact of hedging cost on client returns." In other words, the judge said, Mr. Mirza was contemplating first-layer leverage and his email reflected that he had already contacted Mr. Nevile, who was a banker employed in Investcorp's banking department in London.

(2) Mr. Al Sadik's requirement for a hedge fund portfolio denominated in UAE dirhams was highly unusual. It was driven by his belief that the dirham might be revalued against the US dollar. There was discussion amongst members of the hedge fund and PRM groups about the cost of hedging the currency risk. In his email dated January 24th, 2008, Mr. Kironde suggested that the hedging cost might be as much as 4%–5% p.a.

(3) Mr. Franklin's initial work was sent to Mr. Gurnani on January 25th, 2008. Mr. Franklin made some assumptions which had an important impact on the gross returns needed to generate a net return of 45% over three years (equivalent to 13.2% p.a. compounded). He assumed that the management and administration fees would be 1.2% of NAV p.a.; whereas, as the judge pointed out, the management fee ultimately negotiated by Mr. Al Sadik was only 0.5% of the initial equity for the first year and thereafter 0.5% of NAV calculated annually. Mr. Franklin assumed that the hedging cost would be 3% whereas the overall actual net cost turned out to be lower. He initially proposed to allocate 40% of the assets to LDSF with ×3 leverage, 20% to SMFs with ×1 leverage and 40% to "Credit Opportunities Fund/Opportunistic Funds" unleveraged (which included reference to the planned COF which had not then been launched). He estimated the volatility at 12% to 13% which he considered

120

C.A.                                        AL SADIK v. INVESTCORP BANK

reasonable given that he was looking at a gross return target of 20%. The expected returns were derived from information reflected in Investcorp's then current "Hedge Fund Asset Allocation Policy Manual." Some, but not all, of his spreadsheets and draft workings were put in evidence.

(4) While Mr. Franklin was working on the portfolio construction, Mr. Nevile was thinking about ways in which the leverage and currency hedging might be done. He summarized his initial ideas in an email sent on January 25th, 2008 to all those members of the hedge fund and PRM groups involved in the matter. He proposed that Investcorp set up an SPV for the client and that the SPV would invest into a leveraged note which would be either a US dollar denominated note with Dresdner Bank (on the basis that Investcorp would do the hedging) or a UAE dirham denominated note with UBS (on the basis that UBS would also deal with the hedging). The judge found that Mr. Nevile obviously intended that those proposals would be discussed with Mr. Al Sadik at the meeting to be held on January 28th, 2008 but Mr. Gharghour responded that he should "forget all this for the time being." Mr. Gharghour's view was that the mechanics of the hedging (and leverage) and the corporate structure should be left until the next stage of discussion with Mr. Al Sadik.

(5) Mr. Franklin sent his final draft of what was to become the investment proposal to the PRM team on January 26th, 2008, expecting that they would make amendments. His proposed asset allocation was 50% in LDSF with ×3 leverage, 25% in SMFs with ×2 leverage and 25% in "Opportunistic Funds" with ×1 leverage (including the planned COF). He expected the PRM team to make presentational alterations but not to make any fundamental changes to the portfolio composition.

(6) Mr. Mirza and Mr. Fierens worked on the proposal. The final asset allocation, as it appeared in the investment proposal handed to Mr. Al Sadik at the meeting on January 28th, 2008, was described by the judge in para. 4.5 of his judgment, to which I have already referred. The general description of the proposed portfolio, contained in the "Overview of Proposal" (on p.2 of the investment proposal) remained the same but the "Indicative Terms" (on p.5) referred to SMFCo (rather than to the underlying SMFs) and to LEDF (rather than to COF, which did not then exist). The judge found that two fundamental elements of the investment proposal were clear: first, it did not propose a guaranteed return; secondly, it did propose a leveraged investment.

(7) The meeting on January 28th, 2008 was attended by Mr. Al Khatib, Mr. Kironde and Mr. Fierens. The investment proposal was in the form of a slide presentation. Mr. Kironde took Mr. Al Sadik through it but Mr. Al Sadik moved the discussion along quickly and would not allow him to linger on the individual slides. There was no discussion at the meeting about the way in which the investment would be leveraged. The judge

121

A-9310

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

concluded that, following that meeting, Mr. Al Sadik must have been left with the impression that it would be done by investing in the identified hedge fund products which offer a specific level of leverage. He said this (at para. 6.7):

"My analysis of the evidence relating to the preparation of the Investment Proposal and its presentation to Mr. Al Sadik does not lead me to conclude that any of the Investcorp personnel were acting unprofessionally. In particular, the evidence does not support the allegation that Mr. Franklin deliberately overestimated the gross returns needed to meet Mr. Al Sadik's target in order to justify increased leverage and therefore increased AUM."

(8) Mr. Franklin did no further work on the portfolio construction until February 24th, 2008, when he received an account of the meeting which had taken place with Mr. Al Sadik on that day. The judge found that, from the perspective of Mr. Franklin (as the person responsible for the portfolio construction), the key point to emerge from that meeting was the change in Mr. Al Sadik's liquidity requirements. For this reason his original proposal to include COF in the portfolio would have to be dropped because that proposal envisaged an initial two-year hard lock-up period. Mr. Franklin ran the figures for two alternative portfolios which sought to offset the anticipated reduction in the expected return resulting from the exclusion of COF by increasing the leverage and increasing the exposure to SMFs. He conducted various back testing exercises and sent the result of his calculations to Mr. Gurnani on February 27th, 2008. He put forward two alternative scenarios: the first based on one half of the assets being allocated to SMFs (×3 leverage) and one half to LDSF (×2 leverage); the second based on two thirds allocated to SMFs (×3 leverage) and one third to LDSF (×2 leverage). The expected returns (gross of hedging costs) were estimated at 21% and 22.3% respectively. Mr. Franklin initially made a mistake in his volatility calculations, which was corrected in an email later in the day. His revised volatility estimate was 13–14% for the first scenario and 16–17% for the second scenario. Mr. Gurnani responded by email indicating that the first scenario should be adopted. That was both lower risk and involved a lower allocation to SMFs than the second scenario. The judge observed that that response was inconsistent with the case advanced on behalf of Mr. Al Sadik. As he said (at para. 6.8):

"If Mr. Gurnani had been motivated by a desire to use Mr. Al Sadik's money for the purpose of generating two layers of fees, one might expect him to have decided upon Mr. Franklin's second scenario."

193   At para. 6.9 of his judgment, the judge recorded that both Mr. Franklin and Mr. Gurnani were cross-examined at length about the details of the work done and decisions made in relation to the construction of the initial portfolio and that it was put to each of them that the asset allocation

C.A.                                          AL SADIK V. INVESTCORP BANK

exercise was "driven by the fees" and "the economics of the deal." He pointed out that the allegation was that the increased allocation of 50% to SMFs (×3 leverage)—rather than the 25% allocation to SMFCo (×1 leverage) reflected in the investment proposal—was driven by the existence of fee-sharing arrangements between Investcorp and the SMFs. It was also put to Mr. Gurnani that Mr. Al Sadik's portfolio was intended to be used as a source of "complementary capital" for the purposes of capitalizing the new SMFs and the Alt Beta fund, thus reducing the amount of seed capital needed from Investcorp itself. In order to put these allegations in their proper context, the judge took the view that it was necessary to say something about the concept of SMFs and the way in which they were promoted.

194   He did so, at paras. 6.10–6.12 of his judgment, in a section headed "The single-manager concept—fee sharing arrangements." After setting out passages from the evidence of Mr. Gurnani and of Professor Stowell (an expert witness called by Investcorp) and explaining that, in the present context, SMFs were funds managed by independent investment managers selected by Investcorp, he said this (at para. 6.11):

> "They [the independent investment managers] are experienced individuals whose investment strategies and track record (working with established investment management firms) have impressed Investcorp and met its selection criteria. Investcorp provides the seed capital (which is usually locked up for two years), risk management oversight (which is highly important in the context of a start-up operation), and back office services. The single manager funds will usually charge investors a standard '2 and 20' fee structure, meaning a management fee of 2% of NAV per annum plus a performance fee of 20% of realized profits, over a hurdle rate. In consideration for providing the seed capital and on-going services, Investcorp is remunerated by receiving a percentage of the fees on a sliding scale depending upon the amount of Investcorp's capital contribution and the size of the NAV. It is not disputed that this arrangement is consistent with established industry practice and that it is fully disclosed in the offering documents published by each of the Single Managers, copies of which were readily available to Mr. Al Sadik . . ."

But the judge went on to point out that it was accepted that these fee-sharing arrangements were not brought to Mr. Al Sadik's attention, either at the time of executing the SPA or at any time thereafter. And he accepted that investing Mr. Al Sadik's money in the SMFs indirectly generated a higher fee income for Investcorp than an investment in DSF (for instance) would have done and that investing in SMFCo, which in turn invested in the SMFs, had the same indirect result. Nevertheless he noted that both Mr. Franklin and Mr. Gurnani "emphatically denied" that

123

THE CAYMAN ISLANDS LAW REPORTS                          2017 (1) CILR

the portfolio construction was "driven by fees" or by "the economics of the deal." The judge set out passages from the evidence of Mr. Gurnani which were to that effect. At para. 6.12 of his judgment he said this:

> "The terms of the fee sharing arrangements vary. In each case there is a sliding scale starting at nil and rising to a maximum which varies considerably. In each case the fixed management fee is 2% of NAV and I assume that the performance fee is 20% of realized gains over some specified hurdle rate. It follows that Investcorp's maximum share of the management fee varies from 0.2% up to 1% of the Single Manager's NAV and its maximum share of any performance fee would vary from 2% to 10% of the profit over the hurdle rate. I do not have any evidence about the actual amount received by Investcorp from the Single Managers as a result of the investments made on behalf of Mr. Al Sadik, but it would always be negligible relative to Investcorp's total income of US$383 million for the year ended 30th June 2008, of which US$85.7 million was earned from the hedge funds line of business. In these circumstances, it must be inherently unlikely that the existence of this type of fee sharing arrangement (which is actually compensation and not a commission or profit share) would motivate Messrs. Franklin, Gurnani and Gharghour to behave unprofessionally. Mr. Gurnani explained quite convincingly that what matters from a commercial point of view is generating good returns for clients. In my judgment the evidence leads to the conclusion that the decision to allocate half of the Investment Amount to Single Managers (leveraged 3×) was made bona fide in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% return target over three years. If Messrs. Gurnani and Gharghour's decision had been 'driven by the fees' one might expect them to have opted for Mr. Franklin's Scenario #2 which involved allocating two-thirds to Single Managers rather than Scenario #1 which proposed allocating only half to them."

195   At paras. 6.13–6.15 of his judgment, the judge addressed the case, advanced on behalf of Mr. Al Sadik, that the allocation of one half of his investment to SMFs was driven by a need to replace or complement proprietary capital. He referred to an email chain sent by Mr. Kapoor on February 19th, 2008, on which counsel for Mr. Al Sadik relied. He explained that Mr. Kapoor had informed the hedge funds group about his budget plan for the amount of Investcorp's proprietary capital to be allocated to its hedge fund business for 2008 and that had led Mr. Franklin to set out his proposed plan for the following 6 to 12 months on the assumption that the budget figure was US$1.9 bn. and to project a US$400m. investment in four new SMFs and three new Alt Beta products. But the judge held that that documentation did not lead him to infer that

C.A.                                              AL SADIK v. INVESTCORP BANK

Mr. Franklin's portfolio construction was in any way driven by an intention that
part of Mr. Al Sadik's capital could be used to substitute or "complement"
Investcorp's proprietary capital. He set out passages from the written evidence of
Mr. Gurnani and referred to answers which he (Mr. Gurnani) and Mr. Franklin had
given and he went to say this (at para. 6.14 of his judgment):

> "Investcorp did decide to reduce the amount of proprietary capital allocated
> to its hedge fund line of business but this decision was not communicated to
> the Hedge Fund group until after they had made the decision to deploy Mr. Al
> Sadik's funds in the Single Managers. Nor did this decision prevent the launch
> of new Single Managers."

Those conclusions, he said, were apparent from the examination of a series of
emails, beginning in May 2008, when Mr. Kapoor explained to Mr. Gurnani and
others that he did not wish to allocate US$50–100m. of proprietary capital to COF.
He explained that Mr. Kapoor had written in his email sent on May 4th, 2008, that
his primary concern was that Investcorp already had significant exposure to the
credit opportunities strategy, both through the Washington Corner and investments
in DSF and IBF. This email exchange prompted discussions between Mr. Kapoor
and Mr. Chehime about the scale of Investcorp's hedge funds co-investments and
they agreed that the amount should be reduced. The conclusions reached were set
out by Mr. Chehime in a presentation entitled "Optimizing HF Investment Risk
Profile" which he sent to Mr. Kapoor on May 1st, 2008. The judge said that the
presentation proposed a staged reduction of hedge fund proprietary capital, starting
with a reduction to US$1.75 bn. by July 1st, 2008 and culminating in a target
proprietary capital of US$1.25 bn. by July 1st, 2009. The reduction was to be
achieved by reducing the investment in the funds of hedge funds, thus enabling
Investcorp to continue providing seed capital for the single-manager programme.
The judge found that the overall reason for this strategy was the re-allocation of
capital to new ventures. In consequence, he said, a redemption request was made
on May 26th, 2008 but Mr. Gurnani and Mr. Gharghour sought to defer redemption
on the basis that, although it could be met, it would prevent the continuing reduction
of DSF's overdraft which had been mandated by a recent review of the hedge fund
line of business. The result, he said, was that they agreed to postpone the proposed
redemption and settled on a target phased reduction of the proprietary capital
invested in the hedge fund line of business down to US$1.25 bn. by July 1st, 2009.
He concluded (at para. 6.15 of his judgment) that Mr. Kapoor's email of June 4th,
2008 reflected a decision to provide proprietary capital of US$25m. (rather than the
previously agreed amount of US$50m.) for each of three Alt Beta strategies and he
noted that Mr. Kapoor also agreed, later in June 2009, to provide just under
US$100m. of proprietary capital to seed two further SMFs, namely White Eagle
and Hawkstone. The judge

125

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

held that those decisions did not support Mr. Al Sadik's case that the allocation of half of his money to SMFs was motivated by a need to replace or complement proprietary capital. He said (at para. 6.15) that—

"the injection of just under US$100 million of capital to two new seeded managers in June and July 2008, and the fact that the planned reduction in proprietary capital co-investments was to be from a fund of hedge funds, not Single Managers suggests that Investcorp continued to be fully committed to its single manager programme."

196   At paras. 6.16–6.20 of his judgment, the judge addressed Mr. Al Sadik's complaint that the use of first-layer leverage caused him substantial disadvantages over and above those which would have resulted from an investment in leveraged hedge fund products such as LDSF and SMFCo and that (in particular) the terms of the White Ibis III credit facility exposed him to a materially higher degree of risk of loss. The judge explained (at para. 6.21) that the decision to invest in SMFs with ×3 leverage necessarily required the use of first-layer leverage because SMFCo offered only ×1 leverage.

197   The judge explained that "White Ibis III" was the name used by Investcorp to describe the master note purchase agreement dated as of January 2nd, 2008 and originally made between LEDF and SMFCo (in each case acting solely for only one of their respective segregated portfolios), as issuers of loan notes, and RBS, as the initial noteholder. The purpose of this agreement, he said, was to enable LEDF and SMFCo to obtain credit with which to make leveraged investments in EDF and the SMFs respectively. It was amended and restated on April 10th, 2008 for the specific purpose of adding Blossom as an additional issuer for the purpose of financing leveraged investments in DSF and the SMFs (including the proposed Alt Beta fund).

198   The judge pointed out (at para. 6.17 of his judgment) that the three issuers (LEDF, SMFCo and Blossom) were unrelated entities and that, accordingly, the White Ibis III credit facility necessarily constituted a limited recourse facility under which RBS had recourse to Blossom's assets only for the purpose of discharging Blossom's liabilities. There was never, he said, any question of the issuers' assets being used to cross-collateralize each other's liabilities. He referred to what he described as the theoretical possibility that a default on the part of one issuer could have an adverse impact on the other two issuers: a possibility which, he said, could arise because a default by one issuer could constitute a "global early termination event"; giving RBS the option to terminate the facility as a whole and so putting the other issuers in the position of having to re-finance their borrowings, either with RBS itself or another bank. He described that as a risk inherent in any multi-party credit facility and said that it had no more significance for Blossom than for LEDF and SMFCo.

126

C.A.                                      AL SADIK v. INVESTCORP BANK

199   At para. 6.18 the judge explained that, under the White Ibis III credit facility, the issuers (LEDF, SMFCo and Blossom) were subject to restrictions of a kind ordinarily included in this type of credit facility. Blossom, he said, was subject to a loan to value ratio of 70%, which had the effect that its equity of US$135m. would support borrowings up to US$315m., so limiting the overall leverage ratio to ×2.3 or thereabouts. He explained that, during the first year of the White Ibis III credit facility the concentration of Blossom's investments was subject to the following limitations: (i) at least 40% of the portfolio was to be invested in DSF (reducing to 33% in the second year); (ii) no more than 60% of the portfolio was to be invested in SMFs; and (iii) no more than 20% of the portfolio was to be invested in Alt Beta. He said that Mr. Franklin's involvement in the negotiations with RBS ensured that the investment restrictions were consistent with asset allocation decisions made in respect of Blossom. But he accepted that it was right to say that the existence of such specific borrowing restrictions would present a need to renegotiate in the event that Investcorp decided to re-allocate the assets—for example, by investing in IBF rather than DSF—and also right to say that the existence of investment restrictions might force a borrower to re-balance his portfolio as a result of changes in the relative market values of its components. He expressed the view that that consequence would not necessarily be against the interests of the borrower. He held that it was normal for this type of credit facility to include borrowing restrictions; that the restrictions agreed with RBS were intended to facilitate Mr. Al Sadik's portfolio construction and that there was no reason to suppose that those restrictions could not have been renegotiated to accommodate a different portfolio, so long as the change did not adversely impact upon RBS's assessment of its counterparty risk.

200   The judge went on to explain (at para. 6.19 of his judgment) that the use of first-layer leverage resulted in a concentration of risk, compared with leveraging the investment through separate vehicles such as LDSF and SMFCo. Leveraging investments in DSF and the SMFs separately, through LDSF and SMFCo, would lead, he said, to what counsel had called "product isolation": that is to say, that a catastrophic loss or insolvency of DSF, for example, would have no impact upon the value of Mr. Al Sadik's investment in the SMFs. To have replicated that position using first-layer leverage it would have been necessary to enter into two or more limited recourse credit facilities with different banks for the purpose of leveraging each investment separately. By causing Blossom to enter into a single credit facility, Investcorp had deprived Mr. Al Sadik of the benefit of "product isolation." But this was equally true in relation SMFCo. The fullest "product isolation" for Mr. Al Sadik could have been achieved not by investing in SMFCo but by leveraging his investments in the SMFs separately through six limited recourse credit facilities with six different banks.

127

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

201   The judge explained (at para. 6.20 of his judgment) that the purpose of entering into the White Ibis III credit facility was twofold: first, it was necessary because a ×3 leveraged exposure to the SMFs could not be achieved through SMFCo; and secondly, it was desirable to use first-layer leverage because it provided Investcorp with the flexibility to apply leverage incrementally and control the level of leverage more easily. He went on to say this (at para. 6.20):

"With the benefit of hindsight, it can be said that this advantage was real because Mr. Al Sadik's losses would have been greater if he had been fully invested in LDSF and SMFCo from day one. However, the use of a multi-party credit facility in the terms of White Ibis III also carried with it certain disadvantages and risks, but it cannot be said that they were in any way unusual or peculiar to Blossom. Both Prof. Stowell and Mr. Opp said that, in their experience, the investment restrictions and other terms of White Ibis III intended to protect the lender's interest, were consistent with what they would normally expect to see in credit facilities of this sort. There is nothing about these terms which leads me to the conclusion that Investcorp was disregarding Mr. Al Sadik's best interests by entering into this credit facility."

202   At paras. 6.21–6.27 of his judgment, the judge addressed Mr. Al Sadik's complaint that, in applying leverage to his portfolio incrementally, Investcorp was serving its own interests, and acting to his disadvantage. At para. 6.21 he set out (in a table) the amounts drawn down, for the purpose of leverage, in the months of May, June, August and September 2008. That table showed that the first drawdown was on May 1st, 2008. The judge explained that it was said, on behalf of Mr. Al Sadik, that drawdown commenced on May 1st, 2008, only because that was the earliest opportunity after the funds became available and that the reason for not applying the maximum amount which could be drawn down under the credit facility "on day one" was that Investcorp was "saving the bullets" for use when the new SMFs and Alt Beta fund were launched. But, he said, Mr. Gurnani emphatically denied this allegation: he insisted that leverage was applied incrementally because Investcorp was cautious about the economic environment and market outlook. The judge observed that the phrase "saving the bullets," adopted by counsel on behalf of Mr. Al Sadik, was taken from an email sent by Mr. Gharghour on June 18th, 2008 to Mr. Kironde and Mr. Franklin in response to a request from Mr. Kironde for an explanation why the Interlachen Fixed Income Relative Value Fund had been excluded from Blossom's asset allocation. The email was in these terms:

"Very simple: we are not yet sure if we will roll out this fund as a stand alone fund and want to save our bullets for single-managers and alt beta (we have 4 new fundings soon, 2 alt beta and 2 new

128

C.A.                                                    AL SADIK v. INVESTCORP BANK

single-managers, white eagle, which is European event, and Hawkstone which is long/short European fund).”

After setting out passages from the oral evidence of Mr. Franklin and Mr. Gurnani, the judge concluded that he should not draw any adverse inference from what he described as “Mr. Gharghour's colourful use of language.” He said this (at para. 6.23 of his judgment):

“It seems to me that it describes a perfectly legitimate investment strategy which has been fully explained by the evidence of Mr. Franklin and Mr. Gurnani. The decision to diversify the portfolio of Single Managers by adding four additional funds/strategies (but not duplicating strategies) does not raise a red flag in my mind and suggest that Investcorp was putting its own interest ahead of Mr. Al Sadik's interest. Mr. Franklin and Mr. Gurnani struck me as honest, experienced industry professionals. There was nothing about their explanation for the original asset allocation decision or the subsequent applications of leverage which tended to suggest that they were acting dishonestly for some improper purpose.”

203    The judge went on to explain (at para. 6.24 of his judgment) that Mr. Al Sadik also relied on email exchanges on May 23rd to 25th, 2008, in which Mr. Gurnani, Mr. Gharghour and Mr. Franklin discussed the decision to apply leverage on June 1st, 2008, and on an email sent on May 28th, 2008, in which the outcome of those discussions was reported to Mr. Boynton. After setting out the terms of those emails and observing, first, that the outcome was consistent with the policy that Investcorp should use its own proprietary capital to launch a new SMF and that client capital should follow some months later and, secondly, that, in the light of the decision, Mr. Franklin proposed to make a corresponding increase in the allocation to the existing six SMFs, with the result that US$67.5m. was drawn down, thereby increasing the overall leverage ratio from 0.5% to 1.0%, the judge said this (at para. 6.24):

“I do not infer from this e-mail exchange any improper motive on the part of Investcorp. To the contrary, it seems to me that it is evidence that the decision makers were complying with Investcorp's established policy and acting in their client's interest. If Messrs. Gurnani and Gharghour were intent upon using Mr. Al Sadik's portfolio simply as means of launching White Eagle for Investcorp's own commercial benefit, one might expect them to have followed Mr. Franklin's suggestion. They did not.”

204    At para. 6.25 of his judgment, the judge explained that, at around this time (May 2008), Investcorp was conducting the annual review of its various lines of business. He said that Mr. Al Sadik relied on a memorandum dated May 14th, 2008 sent by the chief operating officer (Mr. Long) to the chairman (Mr. Kirdar), with a copy to the chief financial officer (Mr.

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

Kapoor). That memorandum comprised a summary of key action points and key points for discussion. Under the heading "Hedge Fund (HF) Review," it was said that—

"1. HF Group to agree a set of actions with Rishi to get HF Group (all business activities within HFs) to the 40% net fee margin benchmark within a defined period of time.

2. No LDSF (i.e. the levered product) campaign to be launched by PRM until the market stabilizes (and when a campaign is launched, HF/PRM to consider a minimum 1 year lock up period).

3. HF to de-risk LDSF at the Fund level (as opposed to going to clients suggesting a shift from the levered product)."

The judge said that Mr. Fierens (the chief of staff of PRM), in explaining this memorandum, had explained that para. 2 did not mean that Investcorp intended to cease marketing its leveraged hedge funds—it simply meant that there would be no "campaign-based approach, where we would do a marketing blitz around a certain product"; that para. 3 meant "protecting the downside" by making sure that no leverage was being run accidentally at the underlying fund level (meaning DSF) and that Investcorp never made the decision to "get people out of LDSF into unlevered products." The judge said that Mr. Gurnani explained this part of the review in the same way. The judge held (at para. 6.25) that "this evidence does not point to the conclusion that the decision to add leverage on 1st June was inconsistent with Investcorp's market outlook or any high level policy."

205   The judge explained (at para. 6.26 of his judgment) that, on June 25th, 2008, Mr. Franklin sent an email to Mr. Gharghour and Mr. Gurnani with his asset allocation recommendations for July 1st. Those included a recommendation for a further drawdown from the credit facility for the purpose of investing an additional US$33.9m. in DSF (which would take the leverage ratio up to ×1.5) and a recommendation that nothing more be added to the SMFs, with a view to investing in the two new ones (White Eagle and Hawkstone) on September 1st or October 1st and then three Alt Beta products for a total of 11, rather than 10, SMFs. The judge said that that proposal was discussed in a conference call on the following day, in which Mr. Gharghour, Mr. Gurnani, Mr. Kironde and Mr. Mirza took part. The judge held that that evidence did not suggest "blind adherence to an investment strategy without regard to Mr. Al Sadik's interest." To the contrary, he said, it evidenced that a review was conducted. In the event, as the judge found, Mr. Franklin's recommendation was not followed—no leverage was added on July 1st and, as at June 30th, 2008, the portfolio's performance was slightly down.

206   As the table at para. 6.21 of the judgment shows, leverage was added as at August 1st, 2008, when an additional US$33.9m. was invested

C.A.                                            AL SADIK v. INVESTCORP BANK

into DSF, taking the leverage ratio up to ×1.5 for DSF and ×1.3 for the portfolio as a whole. The judge explained that that proposal was reflected in an email from Mr. Nirav Shah but that there was no documentary evidence recording that the proposal was reviewed in a conference call, as in the prior month. The judge said that, although Mr. Gurnani had no specific recollection of what took place, he had explained in the course of his cross-examination that there was a process which was followed every time; that Mr. Franklin did not have authority to make asset allocation decisions; that he was absolutely sure that he (Mr. Gurnani) would have participated in the review and made the final decision and that the decision was recorded in the follow-up email which constituted the instructions to Mr. Boynton who was responsible for its implementation. The judge held that, in the light of Mr. Gurnani's evidence that there was a review process which was always followed, it would not be reasonable to infer that no review took place simply because there is no documentary evidence of it having done so.

207   At para. 6.28 of his judgment, the judge referred to a similar email, which was circulated on August 25th, 2008, in respect of the proposed asset allocations for September 1st, 2008. That email, he said, related to SMFCo, Blossom and another client company. In it, Mr. Franklin recommended adding US$22.8m. to Blossom's investment in DSF which would take the leverage ratio to ×1.85; he commented that this would be "slightly short of intended 2.0x since the debt that RBS allowed slightly fell short of plan" and recommended investing:

"Blossom in white eagle: 7th single-manager—22.4m, reserving place for 1 more SM after white eagle and 3 alt beta products. The current leverage level on single-managers after white eagle investment is 1.3× (planned leveraged is 3.0×)."

The judge went on to explain that Mr. Franklin also recommended, in that email, that SMFCo invest an additional US$7.5m. and that the other client invest US$2.5m. (representing 4% of its equity of US$62.5m.) in White Eagle. All those proposals, he said, were approved by both Mr. Gharghour and Mr. Gurnani and, at the time that decision was made, they must have known that the NAV of DSF and the SMFs had fallen in the month, although they would not have known the precise numbers until later. He explained that, as at August 31st, 2008, the NAV of Mr. Al Sadik's portfolio was US$128.2m., compared with US$132.6m. at July 31st, and US$135m. at inception. That decision, he said, was consistent with the original asset allocation decision made at the beginning of March 2008 but he did not regard it as evidence of a blind adherence to the plan without regard to Mr. Al Sadik's interests. After setting out passages in the evidence of Mr. Gurnani in answer to questions as to the reasons for increasing the leverage incrementally—which were to the effect (as the judge summarized) that the asset allocation decision made in March 2008,

with a three-year time horizon, was still being pursued six months later, notwithstanding that the NAV of the portfolio had fallen from US$135m. to US$128.2m. during the period—the judge said this (at para. 6.28):

> "In my judgment, the evidence does not allow me to infer that this decision was made without regard to Mr. Al Sadik's interest, in blind adherence to a plan which was improper from its inception. With the benefit of hindsight, it can be said that wrong decisions were made and that Mr. Al Sadik would have been better off if his investment had not been leveraged but those decisions were honestly made in accordance with an established review and decision making process."

### The questions for determination by this court in relation to the fourth issue

208   Mr. Al Sadik's case in respect of his 5th claim ("Breach of Trust") was pleaded in these terms (at paras. C23 and 24 of the re-re-amended statement of claim):

> "23. On the terms of the Trust arising between Investcorp Bank and Mr. Al Sadik . . . Investcorp Bank was under a duty ('the Trust Duties')—(i) to do everything within its power to ensure that the terms of the SPA were carried into effect in a fair and honest manner and (ii) and under a duty of loyalty and fidelity to Mr. Al Sadik.

> 24. By organising and permitting the investment of the trust fund (in the value of the investment amount) in circumstances in which first-layer leverage would be used each of Investcorp Bank and/or Investcorp Nominee 1 committed a breach of the first and/or the second of the Trust Duties."

But, as the judge explained (at paras. 6.2 and 6.3 of his judgment) the claim evolved during the course of the trial and, "as finally articulated in counsel's written Closing Submission," was advanced on the basis that, on or about March 2nd, 2008, Investcorp's asset allocators (Mr. Gharghour and Mr. Gurnani) formulated a plan ("the plan") for the investment of the investment amount which was implemented from March 4th, 2008 and pursued, without regard to Mr. Al Sadik's interests, until September 2008 and which was "an illegitimate and dishonest plan designed to serve Investcorp's interests: first, by generating capital for the development of Investcorp's Hedge Funds line of business and, second, by generating two layers of fees from Mr. Al Sadik's investment in the SMFs." The judge observed that the motive for allegedly dishonest conduct was an important element of the case and needed to be put to witnesses in cross-examination. That observation was of particular relevance in a case where, as in the present case, the motive (or motives) alleged and relied upon by Mr. Al Sadik had changed in the course of the trial. He accepted that, at its core, the case against Investcorp was—and always had been—that it

132

C.A.                                                AL SADIK V. INVESTCORP BANK

ignored Mr. Al Sadik's best interests and acted for some selfish interest of its own. But he directed himself that, where the actions or statements of Investcorp's witnesses were open to an innocent interpretation, he should not draw the contrary inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to them in cross-examination.

209   In summary, it is submitted on behalf of Mr. Al Sadik, first, that the judge misconstrued his case on the issue whether or not Investcorp exercised the investment power in its own interests in breach of fiduciary duty and that, as a result approached the evidence on the basis that allegations of fraud were being made against Investcorp and its witnesses and secondly, that the judge was led by his flawed approach to the evidence to hold, wrongly, that Investcorp exercised the power of investment in cl. A in Mr. Al Sadik's interests and not in its own interests. It is said on behalf of Investcorp that the judge's approach to the evidence and his application of the burden of proof was plainly correct and that, regardless of questions about the "approach" to the evidence he heard at trial, the only conclusion available to the judge, as he found, was that Investcorp at all times acted in Mr. Al Sadik's interests.

210   The questions for determination by this court in relation to the fourth issue are:

(1) Whether the judge misconstrued the nature of Mr. Al Sadik's case that Investcorp exercised the investment power in breach of fiduciary duty and so approached the evidence on the wrong basis.

(2) Whether the judge's approach to the evidence led him to conclude, wrongly, that Investcorp had exercised the investment power in Mr. Al Sadik's interests rather than in its own interests.

***Did the judge misconstrue the nature of Mr. Al Sadik's case that Investcorp exercised the investment power in breach of fiduciary duty and so approach the evidence on the wrong basis?***

211   Grounds 25 and 26 in the memorandum of grounds of appeal were in these terms:

"*Ground 25*: The learned Judge misconstrued the Appellant's case on the issue whether or not the First Respondent exercised the Investment Power in its own interests in breach of fiduciary duty.

*Ground 26*: The learned Judge erred in law when he incorrectly approached the evidence about breach of fiduciary duty on the basis that allegations of fraud were being made."

212   It is submitted on behalf of Mr. Al Sadik that, in stating (at para. 6.2 of his judgment) that "the Plaintiff's case is that [the plan] was an

133

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

illegitimate and dishonest plan designed to serve Investcorp's interests," the judge misconstrued Mr. Al Sadik's case and that he was wrong to state that Mr. Al Sadik had alleged "fraud" because Mr. Al Sadik did not make any such allegation. Correctly understood, it is said, Mr. Al Sadik's case was: (i) that the investment power under the SPA was a fiduciary power; (ii) that because the IMA had not been executed the investment power was held on trust by Investcorp; (iii) that Investcorp was under a duty of loyalty in respect of the exercise of the investment power; (iv) that Investcorp was under a duty to exercise the investment power only in the best interests of Mr. Al Sadik; (v) that Investcorp exercised the investment power for its own benefit and/or without any or any proper regard for the interests of Mr. Al Sadik; (vi) that Investcorp exercised the investment power primarily for its own benefit to propagate its hedge funds line of business and/or to earn additional fees from the SMFs; (vii) that Mr. Al Sadik did not give his informed consent to the exercise by Investcorp of the investment power primarily for its own benefit; and (viii) that Investcorp was in breach of its duty to exercise the investment power only in the best interests of Mr. Al Sadik in that it acted in circumstances where it had a personal interest which was in conflict with the duty it owed to Mr. Al Sadik.

213   In developing the submission that the judge erred in treating Mr. Al Sadik's case as founded on an allegation of dishonesty—and that the judge's observation, at para. 6.3 of his judgment that—

"where the actions or statements of Investcorp's witnesses are open to innocent interpretation, I should not draw the contrary inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to then in cross-examination,"

was wrong as a matter of law, it is said:

(1) Mr. Al Sadik's case was that Investcorp was in breach of its fiduciary duty of loyalty, not that Investcorp had been dishonest—the issue whether or not Investcorp's witnesses had an honest or dishonest state of mind was not relevant to the issues the judge had to decide in relation to the 5th claim.

(2) The judge was wrong to approach the 5th claim on the basis that Mr. Al Sadik "explicitly pleads a case of fraud and dishonesty." He seems to have arrived at this wrong conclusion because a pleaded motive for fraudulent misrepresentation claims (which Mr. Al Sadik did not eventually pursue) was that Investcorp had suffered from a liquidity crisis. However, the 5th claim was not put on the basis of fraud and the judge was wrong to approach the 5th claim as he did.

134

C.A.                                                    AL SADIK V. INVESTCORP BANK

(3) The judge's approach led him to make the observation at para. 6.3 of his judgment (set out above); that approach coloured the judge's assessment of the evidence of Investcorp's witnesses in relation to the 5th claim and renders the entire judgment in respect of the 5th claim unsafe.

(4) The approach was wrong and unsafe for the additional reason that the judge should have recognized that, because the investment power was a fiduciary power, the burden lay on Investcorp to show that it had been exercised in the best interests of Mr. Al Sadik.

In summary, it is said that, having concluded, wrongly, that Investcorp's admitted fiduciary duties added nothing to its contractual duties—and notwithstanding the recognition of Investcorp's own witnesses that Investcorp was bound to act in Mr. Al Sadik's best interests—the judge not only reversed the burden of proof (by assuming that it lay on Mr. Al Sadik) but imposed an inappropriate standard of proof (namely that applicable to fraud). His analysis of the evidence was entirely vitiated by these fundamental errors of law.

214   In response, it is submitted on behalf of Investcorp that the judge correctly described and assessed the 5th claim and that Mr. Al Sadik's partial quotation of para. 6.3 of the judgment provides no support for the submission that the judge considered the wrong case. In short, it is said, Mr. Al Sadik appears to have misunderstood not only what the judge said but also his own case as advanced at trial. More particularly, it is said that—

(1) The judge's observation, at para. 6.3 of his judgment, that where the actions or statements of Investcorp's witnesses were open to an innocent interpretation he should not draw the inference that they were acting dishonestly for some improper purpose if the allegation was not fairly and squarely put to them in cross-examination, must be understood in the context in which it was made. Counsel for Mr. Al Sadik had been challenged, on a number of occasions during the trial, for failing properly to put his case to Mr. Gurnani and Mr. Franklin, among others. The judge's conclusion was self-evidently correct.

(2) The judge approached the issue of what findings he could properly make in relation to the honesty of Investcorp's witnesses against the background of his description of the evolution of the 5th claim. The 5th claim had alleged breach of trust based on Investcorp's arrangement and application of first-layer leverage (at paras. C23 and C24 of the re-re-amended statement of claim). The judge's approach to the issue to which he referred at para. 6.3 of his judgment was consistent with the pleaded case that Investcorp had breached the duty to carry out the SPA honestly.

(3) In the latter stages of trial, the case advanced by Mr. Al Sadik in respect of the 5th claim changed radically, and was finally formulated only

135

THE CAYMAN ISLANDS LAW REPORTS                              2017 (1) CILR

in paras. 224–275 of his written closing submissions, served after 26 days of trial.
But that change was in respect of the alleged motive for Investcorp's behaviour. At
para. 1.14 of his judgment the judge described that reformulated case in these terms:

> "Finally, there is the 5th claim in the Re-Re-Amended Statement of Claim,
> described as a breach of trust claim which is essentially based upon the
> allegation that Investcorp was under a duty to do everything in its power to
> ensure that the terms of the SPA were carried into effect in an honest manner
> in the interests of Mr. Al Sadik. The pleaded breach of trust was based upon
> the allegation, now abandoned, that Investcorp's investment decisions were
> motivated by a desire to alleviate a pressing liquidity crisis. The case put in
> Counsel's written Closing Submissions is that the investment decisions were
> made for the improper purpose of providing complementary capital for its
> single manager programme (including the proposed Alt Beta fund) and
> generating two layers of fees. Whether it is open to the Plaintiff to pursue this
> un-pleaded claim is an issue I have to decide."

The judge correctly identified (at para. 6.3 of his judgment) that "the plan" first
alleged by Mr. Al Sadik at trial was a "distinctly different motive for the dishonest
behaviour originally alleged against Investcorp." The central allegation that Mr.
Gurnani and Mr. Franklin knowingly pursued an improper purpose, deliberately
acting in Investcorp's own interests and acting against the interests of Mr. Al Sadik,
plainly involved the implicit allegation of dishonest conduct. Mr. Al Sadik
overlooks the fact that his allegations concerning "the plan" were inextricably
linked to his case on the use of Blossom and its inclusion in the investment
structure, which was also put on the basis that Investcorp had acted dishonestly.
This was acknowledged by counsel for Mr. Al Sadik in his oral closing
submissions. The judge observed (at para. 6.2 of his judgment) that the decision to
use first-layer leverage through Blossom, using the White Ibis III credit facility,
went to the heart of Mr. Al Sadik's allegations of fiduciary duty.

  (4) It is not open to Mr. Al Sadik to suggest, on this appeal, that his case at trial
was not that Investcorp acted dishonestly having regard to the exchange between
judge and counsel in the course of his unsuccessful application to amend his case
on the eve of trial:

> "*The judge*: I think there would be more force in that point if this really was
>     a negligence action. It's not—it's a breach of fiduciary duty to which
>     you're making serious allegations of dishonesty.
>
> *Counsel*: Yes, we are, My Lord."

C.A.                                              AL SADIK V. INVESTCORP BANK

Further, in response to the submissions that, in making his findings of fact, the judge shifted the burden of proof and applied the wrong standard of proof, it is said on behalf of Investcorp that—

(5) Mr. Al Sadik's contention that the burden of proof lay on Investcorp to establish that it did not act in breach of trust is ill-founded. It is readily apparent from the judgment that the judge applied well-established principles. Mr. Al Sadik has identified no basis on which it can be said that the judge was wrong to do so and cites no authority in support of his unreasoned assertion. It is accepted as trite law that a fiduciary is bound to account for any profit that he has received in breach of fiduciary duty. The taking of an account is the means by which the beneficiary requires the trustee to justify his stewardship of trust property—the trustee must show what he has done with that property—on the taking of an account, the court lays the burden on the defaulting fiduciary to show that the profit is not one for which he must account. But, it is said, that is not this case: (i) Investcorp had not been found to have acted in breach of fiduciary duty; (ii) there is no dispute as to what Investcorp did with the moneys invested by Mr. Al Sadik; and (iii) no account has been ordered in respect of any profit. Mr. Al Sadik ignores the wider point of principle that the burden of proof lies on the party who asserts the truth of the issue in dispute: in the present context that issue was whether Investcorp acted in breach of fiduciary duty. If that party adduces sufficient evidence to raise a presumption that what is claimed is true, the burden (the so-called evidential burden) shifts to the other party, who will fail on the issue in question unless he adduces evidence sufficient to rebut the presumption.

(6) It is then for the court to make its decision on the "balance of probabilities," and this is the standard of proof required in civil cases. Mr. Al Sadik has failed to identify any basis for his submission that the judge applied the wrong standard of proof. Nowhere in his judgment did the judge suggest that he was applying anything other than the ordinary civil standard of proof.

Accordingly, it is said, the judge was correct to conclude that he should only make a finding of dishonesty if that allegation had been fairly put to a witness: that was a relevant and necessary conclusion in the context of the case that Mr. Al Sadik advanced at trial. The attempt to overturn the judge's first-hand impressions of the relevant witnesses is hopeless.

215   The 5th claim ("Breach of Trust") was pleaded at paras. C23 and C24 of the re-re-amended statement of claim:

"23. On the terms of the Trust arising between Investcorp Bank and Mr. Al Sadik . . . Investcorp Bank was under a duty ('the Trust Duties')—(i) to do everything within its power to ensure that the terms of the SPA were carried into effect in a fair and honest manner and (ii) and under a duty of loyalty and fidelity to Mr. Al Sadik.

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

24. By organising and permitting the investment of the trust fund (in the value of the Investment Amount) in circumstances in which First Layer Leverage would be used each of Investcorp Bank and/or Investcorp Nominee 1 committed a breach of the first and/or the second of the Trust Duties."

In my view the judge was right to treat that as a claim founded on allegations of dishonesty. Paragraph 24 of the re-re-amended statement of claim alleged that, by investing the trust fund in circumstances in which first-layer leverage would be used, Investcorp committed a breach of the first of the trust duties identified in para. 23, namely, a duty to do everything in its power to ensure that the terms of the SPA were carried into effect "in a fair and honest manner." Taken together, the substance of the allegation is that, in using first-layer leverage, Investcorp failed to act in an honest manner: that is to say, that Investcorp acted dishonestly.

216   The claim evolved during the course of the trial—as the judge explained (at paras. 6.2 and 6.3 of his judgment)—because Mr. Al Sadik (through his counsel) recognized that the motive originally relied upon as the foundation for the allegation of dishonesty could not be established, the case against Investcorp remained "that it ignored Mr. Al Sadik's best interests and acted for some selfish interest of its own." As the judge put it—correctly, in my view—the factual case ultimately presented to the court, although "asserting a different motive of the dishonest behaviour alleged," was not fundamentally different from the pleaded case. In those circumstances, I reject the submission that the judge misconstrued the nature of Mr. Al Sadik's case in relation to the 5th claim. The claim was at the outset, and remained, a claim based on allegations of dishonest conduct on the part of Investcorp and its relevant employees. The judge was right to treat it as such.

217   I reject, also, the submission that the judge approached the evidence on the wrong basis. I agree with Investcorp that the burden of establishing the case that it was in breach of trust—or in breach of fiduciary duty—lay on Mr. Al Sadik and that the evidential burden did not shift in the course of the trial. In my view, that submission is correct, for the reasons which Investcorp has advanced. The 5th claim was not a claim for an account of profits: the primary rule that the burden of proof lies on the party who asserts the truth of the issue in dispute was not displaced. And I agree with Investcorp that there is nothing in the judge's judgment to suggest that the judge applied a standard of proof other than the civil standard of proof. But the allegations of dishonesty that were at the core of Mr. Al Sadik's case were serious allegations against professional bankers and the judge was right to approach them on that basis. In particular, he was right not to make findings against Mr. Kironde (and others) on issues that had not been fairly and squarely put to them in cross-examination.

C.A.                                              AL SADIK v. INVESTCORP BANK

***Did the judge's approach to the evidence lead him to conclude, wrongly, that Investcorp had exercised the investment power in Mr. Al Sadik's interests rather than in its own interests?***

218    Grounds 27 and 28 in the memorandum of grounds of appeal were in these terms:

> "*Ground 27*: The learned Judge's errors of law caused him wrongly to hold that the Appellant had failed to prove his case that there was an 'ulterior purpose' for the Respondents' asset allocation when in fact the burden of proof was on the Respondents to demonstrate that they had obtained the Appellant's informed consent to the asset allocation.

> *Ground 28*: The learned Judge's failure to adopt the correct approach to determining the question of whether the Respondents had acted in the Appellant's best interests caused him to fail to take into account the arguments by the Appellant that the allocation decisions taken by the First Respondent were taken for its own benefit without regard to the interests of the Appellant."

219    It is said on behalf of Mr. Al Sadik that had the judge adopted the correct approach he would have held that Investcorp had failed to establish that it had acted in Mr. Al Sadik's best interests in exercising the discretionary investment power. In particular, Investcorp failed to answer, adequately or at all, why it was in Mr. Al Sadik's best interests that Investcorp chose the investments that it did; why it exposed Mr. Al Sadik to the risks that it did and why it applied leverage to Mr. Al Sadik's portfolio when and in the sums it did. Investcorp failed to establish that there was any process to consider, or any actual consideration of, the performance of Mr. Al Sadik's portfolio against the risks to which he was exposed and failed to establish that it acted otherwise than in its own interests in the undisclosed maximization of its fee income and the propagation of its hedge funds line of business.

220    In developing that ground it is submitted that—

(1) the judge's findings of fact—that Mr. Gurnani's decision to adopt Scenario 1 instead of Scenario 2 "was not motivated by a desire to use Mr. Al Sadik's money for the purpose of generating two layers of fees" (at para. 6.8 of his judgment) and that the decision to allocate half of the investment amount to the SMFs (×3 leverage) "was made bona fide in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% target return over three years" (at para. 6.12 of his judgment)—were wrong, in that the judge failed to take into account the following material circumstances:

(i) that Scenario 1 and Scenario 2 were each in respect of an unauthorized investment;

139

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

    (ii) that he had made findings of fact, at paras. 6.11 and 6.12 of the judgment (a) that Investcorp earned two layers of fees (that is to say management and performance fees on the terms of the SPA and fees from each of the SMFs from investments made on behalf of Mr. Al Sadik); (b) that the fee-sharing arrangements between Investcorp and the SMFs "were not brought to Mr. Al Sadik's attention, either at the time of executing the SPA or at any time thereafter"; and (c) that "It is correct to say that investing Mr. Al Sadik's money in the Single Managers indirectly generates a higher fee income for Investcorp";

    (iii) that, under the terms of the SPA, Investcorp had delegated the selection of investments to the holder of the investment power and that, therefore, the onus of reading the offering documents of the SMFs did not fall on Mr. Al Sadik but on the holder of the investment power, and that it was for the holder of the investment power to obtain Mr. Al Sadik's informed consent to permit Investcorp to earn additional fees from the SMFs which were identified in the offering documents;

    (iv) that Investcorp's motivation was not relevant to the question whether or not it had breached its fiduciary obligation not to put itself in a position where there was a conflict between its own interest and the interest of Mr. Al Sadik; and

    (v) that the burden of proving that Investcorp had obtained the informed consent of Mr. Al Sadik to permit it to make investments where there was a conflict between Investcorp's duty and interest lay on Investcorp and Investcorp did not discharge that burden.

  (2) Investcorp's intended course of action ("the plan") was to invest Mr. Al Sadik's money 50% in DSF ×2 and 50% divided equally between SMF ×3 and/or Alt Beta ×3. The way in which the plan was implemented reveals the reasons for it and this can be seen in the pattern of investments made. The judge failed to consider Mr. Al Sadik's submissions (set out at para. 235 of his written closing submissions) in which he demonstrated that leverage was not applied carefully and incrementally, but systematically and in accordance with a single asset allocation decision that had been taken on March 2nd, 2008. That asset allocation decision was not reconsidered and there was no deviation from it. The decision was taken for the benefit of the development of Investcorp's hedge funds line of business and not for the benefit of Mr. Al Sadik. In those circumstances, it is said, the asset allocation decision was taken in breach of the overriding

140

C.A.                              AL SADIK v. INVESTCORP BANK

duty of loyalty and was selfish conduct and contrary to Investcorp's duty to act only in Mr. Al Sadik's best interests. More particularly:

  (i) Under the White Ibis III credit facility an equity investment of US$135m. could produce a maximum buying power of US$450m. The effect was that, to invest in DSF ×2 (under the plan), the allocation of buying power intended for that category had to be US$193m. and, to invest in SMF ×3 (under the plan), the allocation of buying power intended for that category had to be US$257m.

  (ii) The "investments table" (Appendix 1 to the appellant's skeleton argument on this appeal) shows that already, by July 1st, 2008 (see row D), each of the six SMFs then in existence had received nearly the entire allocation that the plan envisaged would (and on the terms of the RBS loan could) be allocated to it: that is to say, US$22.4m. When Blossom invested in a seventh SMF (White Eagle, launched only two months earlier), Investcorp allocated an identical amount (US$22.4m.) to that SMF also (see row F). The table shows that, by September 1st, 2008, Blossom had reached its leverage target in respect of DSF at ×2: that is to say, US$192.3m. had been invested).

  (iii) It can be seen from the investments table (a) that, by September 1st, 2008, Investcorp had leveraged Mr. Al Sadik's investment very nearly to the maximum amount possible in accordance with the plan; and (b) that it was only waiting for new SMFs and/or Alt Beta products before leveraging to maximum. The only thing that constrained Investcorp was the lack of SMFs and/or Alt Beta products.

  (iv) In mid-September 2008, Investcorp was determined to invest all funds Blossom could raise out of the RBS facility in a new SMF (Hawkstone) to be launched on October 1st, 2008 and in Alt Beta products which Investcorp was planning to launch on the same day. The only reason the final investments were not made is that Investcorp believed that Mr. Al Sadik had threatened to redeem by the year end. The internal emails show that Investcorp was desperate for funding for its new projects and saw Blossom as a ready source (in fact the only available external source) to propagate its hedge funds line of business.

(3) The plan was devised in order to use Mr. Al Sadik's investment as a source of capital to propagate Investcorp's hedge funds line of business. The investment pattern demonstrates that the decisions to apply leverage when (and in the amounts) that it was applied were driven by the

THE CAYMAN ISLANDS LAW REPORTS                                    2017 (1) CILR

availability of new products. Investcorp was acting in its own interests and not in the interests of Mr. Al Sadik. This is further evidenced by the fact that, although (under the SPA) it had a choice of over 80 funds in which to invest, it chose to invest only in Blossom. Investcorp made that choice so that it could implement the plan.

(4) The findings of the judge, at para. 7.5 of his judgment, that—

"the Defendants' initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made bona fide for a proper purpose in accordance with the SPA. The allocation of half the Investment Amount to Single Managers (with $3\times$ leverage), on the basis that the investment would be diversified across an additional four Single Managers (including Alt Beta funds) as and when new funds were launched, was made in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee sharing arrangement with the Single Managers,"

indicates that he ignored, or did not take into account, the arguments which had been advanced at trial. In particular, the judge failed to take into account that each of the following decisions taken by Investcorp was taken to enable it to make investments in new single-manager funds and in new Alt Beta products as and when these became available:

　(i)the decision to generate funds by making the investment in Blossom and to negotiate the White Ibis III facility;

　(ii)the decision not to obtain Mr. Al Sadik's consent to borrowing by means of the White Ibis III credit facility;

　(iii)the decision not to make investments in named Investcorp leveraged funds but instead to make the investment in Blossom;

　(iv)the decision to negotiate the maximum allocation with RBS to invest into the SMFs and new, untried and untested Alt Beta products (which were not hedge funds but accounts traded to simulate returns that could be expected from hedge funds);

　(v)the decision to divide the capital available from the White Ibis III credit facility for SMFs and Alt Beta into 10 equal parts without discrimination contrary to weighting adopted by SMFCo and Mr. Franklin's recommendation;

　(vi)the decision to reserve the maximum allocation of capital to Alt Beta products under RBS's liquidity guidelines for Alt Beta products;

142

C.A.                                        AL SADIK v. INVESTCORP BANK

    (vii)      the decision to leverage Mr. Al Sadik's investment in due course to the level of the maximum LTV under the White Ibis III credit facility;

    (viii)      the decision to abandon its policy not to use client capital to seed Alt Beta products and use Mr. Al Sadik's capital to seed Alt Beta products;

    (ix) the decision to increase leverage in DSF in step with investments in new SMFs and Alt Beta products;

    (x) decision to make an investment of 10% of the capital allocation for the SMFs and Alt Beta as soon as each such fund or product was or would be available;

    (xi) the decision to plan to borrow and draw down the maximum available under the White Ibis III credit facility in the immediate aftermath of the collapse of Lehman Brothers in the single-minded pursuit of their own interest in the launch of the Alt Beta products and without any or any proper regard to the interests of Mr. Al Sadik.

And, further, the judge failed to take into account that because Investcorp had less and less capital available to propagate its hedge funds line of business it needed Mr. Al Sadik's funds to do so.

   (5) Notwithstanding that the burden of proving that Investcorp exercised the investment power in the best interest of Mr. Al Sadik lay on Investcorp and not on Mr. Al Sadik, Investcorp did not produce any documentary evidence that it ever considered the best interests of Mr. Al Sadik in the way his investments were structured. In support of Mr. Al Sadik's grounds of appeal, reliance is placed on the matters identified in Schedules 1 and 2 to the memorandum of grounds of appeal.

221   In response to the submission that the judge failed to consider Mr. Al Sadik's case (advanced at para. 235 of his written closing submissions) that Investcorp had taken its investment decisions in breach of the duty of loyalty and contrary to the duty to act in Mr. Al Sadik's interests, it is said on behalf of Investcorp that the judge's decision not to address in his judgment a number of the matters raised in para. 235 of Mr. Al Sadik's written closing submissions is not a proper ground for challenge: reliance is placed on the observations in *Eagil Trust Co. Ltd.* v. *Piggot-Brown* (8) that there is no duty on a judge, in giving his reasons, to deal with every argument presented by counsel in support of his case. It is said that the evidence set out in section 6 of his judgment supports the judge's finding that Investcorp was acting in Mr. Al Sadik's best interests when applying leverage to his portfolio; that Mr. Al Sadik has failed to point to any convincing reason why the judge should have addressed the arguments in

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

para. 235 of his written closing submissions and that his complaint that the judge did not do so has no weight.

222   In response to Mr. Al Sadik's submission that, on the facts, Investcorp failed to establish that it had acted in Mr. Al Sadik's best interests in exercising the discretionary investment power, it is submitted on behalf of Investcorp that it had adduced extensive evidence in relation to the portfolio construction and asset allocation process—as can be seen from the judge's consideration of that evidence throughout section 6 of his judgment—a significant portion of which formed the basis of the judge's findings. That evidence included:

(1) The reasons for Mr. Gurnani's decision to adopt Scenario 2, following the tightening of Mr. Al Sadik's portfolio liquidity requirements, which had the effect that he selected (of the two alternatives) the portfolio with a lower risk profile and lesser allocation to SMFs. That decision, and its effect, contradicted Mr. Al Sadik's case: as the judge observed, at para. 6.8 of his judgment, if the motive had been fees, Mr. Gurnani could have been expected to select the alternative scenario.

(2) The process by which Investcorp selected and promoted SMFs, which was described in detail by Mr. Gurnani—as the judge found at para. 6.11 of his judgment—and was not criticized in any way.

(3) The reasons for revenue sharing arrangements with the SMFs, which were recognized by the judge as a form of compensation and not as a commission or profit share. The judge found (at para. 6.12 of his judgment) that it must be inherently unlikely that the existence of a revenue sharing arrangement with the SMFs would motivate Mr. Franklin, Mr. Gurnani or Mr. Gharghour to behave unprofessionally.

(4) The email chain from February 19th, 2008—discussing the budget plan for proprietary capital—did not lead the judge to infer (as he said at para. 6.13 of his judgment) that Mr. Franklin's portfolio construction was in any way driven by the motive that part of Mr. Al Sadik's capital could be used to substitute or "complement" Investcorp's proprietary capital. The judge found (at para. 6.14 of his judgment) that Investcorp's decision to reduce the amount of proprietary capital allocated to its hedge fund line of business was not communicated to the hedge fund group until after they had made the decision to deploy Mr. Al Sadik's funds in the SMFs.

(5) The reasons for Mr. Kapoor's decision to seed two further SMFs (White Eagle and Hawkstone), which, as the judge held (at para. 6.15 of his judgment) did not support Mr. Al Sadik's case that the allocation of half of Mr. Al Sadik's money to the SMFs was motivated by a need to replace or "complement" proprietary capital.

(6) The reasons for the decision to defer investment of Mr. Al Sadik's capital into White Eagle until after the initial investment of proprietary

C.A.                                                 AL SADIK V. INVESTCORP BANK

capital into that fund, which, as the judge held (at para. 6.24 of his judgment) supported the view that the decision makers were complying with Investcorp's established policy and acting in its client's interest.

223   In developing the submission that, in any event, it is plain from his judgment that the judge did consider Mr. Al Sadik's case in reaching his decision (at para. 7.5 of his judgment) that Investcorp's investment and leverage decisions were made *bona fide* and for a proper purpose in accordance with the SPA, it is said that the judge made the following findings:

(1) At para. 6.23 of his judgment, that there was nothing about Mr. Gurnani and Mr. Franklin's explanation of the original asset allocation decision or the subsequent applications of leverage which tended to suggest that they were acting dishonestly for some improper purpose.

(2) At para. 6.12 of his judgment, that the decision to allocate half of the investment amount to SMFs (×3 leverage) was made *bona fide* in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% return target over three years.

(3) At para. 6.23 of his judgment that the strategy of investing in SMFs and Alt Beta, and saving funds for investment in new products, was perfectly legitimate and was fully explained by the evidence of Mr. Franklin and Mr. Gurnani.

(4) At paras. 6.26 and 6.28 of his judgment, that the evidence did not support an allegation of blind adherence to an investment strategy without regard to Mr. Al Sadik's interests but, on the contrary, investment decisions were made honestly in accordance with an established review and decision-making process.

(5) At para. 7.5 of his judgment, that the allocation to SMFs was made in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee-sharing arrangement with SMFs.

224   It is pointed out on behalf of Investcorp that the judge's conclusions were reached with the benefit of extensive written evidence (over 100 pages of witness statements from the hedge funds team alone) and lengthy cross-examination and that they were largely informed by his judgment of the credibility of Mr. Gurnani and Mr. Franklin, whom he found (at para. 6.23 of his judgment) to be honest and experienced industry professionals. It is said that, in challenging those conclusions, Mr. Al Sadik seeks to rely on the pattern of investments by Investcorp from March to September 2008. The nature and timing of these investments is not in dispute and in any event the judge properly considered and addressed these matters when he found (at para. 6.28 of his judgment) that the investment decisions were

145

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

made honestly in accordance with an established review and decision-making process. At para. 7.5 of his judgment the judge rejected Mr. Al Sadik's case (which he now seeks to revive on appeal) that Investcorp used "the plan" as a source of capital to propagate its hedge funds business. The judge rejected that case on the basis of the evidence and Mr. Al Sadik has identified no basis on which the judge's decision to do so may be overturned on appeal.

225   It is asserted in Ground 27 in the memorandum of grounds of appeal that the judge reached his conclusion that Mr. Al Sadik had failed to prove his case that there was an "ulterior purpose" for Investcorp's asset allocation as a result of "errors of law" and, at Ground 28, that it was the judge's "failure to adopt the correct approach to determining the question of whether the Respondents had acted in the Appellant's best interests" which led him to leave out of account Mr. Al Sadik's arguments that the allocation decisions were taken for the benefit of Investcorp without regard to his interests. Given that I have held that the judge did not err in his approach to the evidence in relation to the 5th claim—whether in laying the burden of proving his case on Mr. Al Sadik or in applying the wrong standard of proof—I reject those assertions. If the judge was wrong to hold that, in exercising its power to allocate assets to Mr. Al Sadik's investment, that was not because he adopted the wrong approach to the evidence: if he was wrong, it was because he misunderstood the evidence or failed in his task of evaluating the evidence in the light of the arguments which had been put to him.

226   I reject, also, the submissions—advanced on behalf of Mr. Al Sadik—that (i) the judge's finding of fact (at para. 6.8 of his judgment) that Mr. Gurnani's decision to adopt Scenario 1 instead of Scenario 2 was not motivated by a desire to use Mr. Al Sadik's money for the purpose of generating two layers of fees, and (ii) that the judge's finding (at para. 6.12 of his judgment) that the decision to allocate half of the investment amount to the SMFs (×3 leverage) "was made bona fide in the belief that it was an appropriate component for Mr. Al Sadik's portfolio having regard to the 45% target return over three years" were flawed, in that the judge failed to take into account material circumstances. In particular:

  (1) Given that the judge had reached the conclusion (with which I agree) earlier in his judgment that leveraging at the portfolio level was authorized by the SPA, it cannot be said that either Scenario 1 or Scenario 2 was "in respect of an unauthorized investment."

  (2) The judge accepted (in making the findings that he did at paras. 6.11 and 6.12 of his judgment) that investing in the SMFs "indirectly generates a higher fee income for Investcorp" but explained (at para. 6.12) why he took the view that "it must be inherently unlikely that the existence of this type of fee sharing arrangement (which is actually compensation and not a

C.A.                                              AL SADIK v. INVESTCORP BANK

commission or profit share) would motivate Messrs. Franklin, Gurnani and Gharghour to behave unprofessionally."

(3) The judge appreciated that Investcorp had not obtained Mr. Al Sadik's informed consent to the fee-sharing arrangements. It is not in dispute that Mr. Al Sadik could have informed himself of those arrangements if he had chosen to read the SMFs offering documents but, whether or not there was any onus upon him to do so is irrelevant in the present context.

(4) It is irrelevant, also, to the findings of fact which the judge made at paras. 6.8 and 6.12 of his judgment that Investcorp had not obtained Mr. Al Sadik's informed consent to the fee-sharing arrangements. The 5th claim was not a claim for the recovery of undisclosed profits.

(5) The claim which was before the judge was not based on an allegation that Investcorp had put itself in a position of conflict: the allegation was that Investcorp's conduct was dishonest in that it had deliberately chosen to prefer its own interest to the interest of Mr. Al Sadik. In that context the question of motivation was of obvious relevance.

227    It is said on behalf of Mr. Al Sadik that the judge's conclusion (at para. 7.5 of his judgment) that Investcorp's initial asset allocation decision and the subsequent decisions in relation to the application of leverage were made *bona fide* for a proper purpose in accordance with the SPA—in what Investcorp believed to be in Mr. Al Sadik's interest and not for the ulterior purpose of capitalizing the new funds and/or increasing its fee income through the fee-sharing arrangement with the SMFs—indicated that the judge ignored, or did not take into account, the arguments which had been advanced at trial. In particular, it is said that the judge did not take account of the arguments at para. 235 of Mr. Al Sadik's written closing submissions, in that the judge did not refer expressly to each of those arguments. In addressing that criticism, it seems to me appropriate (notwithstanding the length of para. 235 in the written closing submissions) to set it out in this judgment:

"It is important to keep in mind some basic mathematics—

235.1 The amount invested in Blossom by Shallot on March 4th, 2008 was just less than USD135 million. For the purpose of illustrating the mathematics 135 million is taken as the starting point and all amounts of money are in millions (A) 50% of 135 at 2× leverage produces 202.5; (B) 50% of 135 at 3× leverage produces 270. This means that according to the Plan when it was originally formulated the asset allocators would have been looking at buying power of USD 472.5 million and finance for leverage of USD337.5 million.

147

235.2 The terms of the RBS facility were as follows: (A) there was a loan to value ratio (LTV) fixed at 70%; (B) in the first year of the facility the concentration of investments was limited: to 60% of the portfolio in SMs; to 20% of the portfolio in Alt Beta and to 10% of the portfolio in any given Alt Beta. In addition at least 40% of the portfolio had to be invested in DSF at any given time.

235.3 The 70% LTV ratio means that with 135 million of equity it would be possible to borrow no more than USD315 million and the maximum buying power would be USD450 million (i.e. equity+debt). If the RBS facility concentration limits are applied to these numbers it means that: no more than USD270 million could be allocated to SM (because the SM component was capped at 60%) of which no more than 90 million could be allocated to Alt Beta of which no more than 45 million could be allocated to any given Alt Beta product.

235.4 The concentration limits referred to the 'portfolio,' therefore, in order for an investment of USD270 million to be made in SMs (on these figures) it would have been necessary to invest USD180 million in DSF.

235.5 For the avoidance of doubt (by reference to what is said in the foregoing para.) it is to be noted that if, e.g., only USD100 million was invested in DSF then the maximum funding available for SMs would be USD150 million. Of course, if from such a position the value of DSF were to decline then the LTV limits could easily be breached and it would be necessary to redeem SMs or vice versa. Such a situation could give rise to distress depending on the ability to redeem from SMs in order to rebalance the concentration. By October 2008 precisely that problem had arisen on Blossom's account and there was a forced redemption of USD80 million in November. This is because the 80% of Investcorp's suspension/redemption trigger was at a real risk of being breached.

235.6 There is a pattern to the way the AA was done. Again working from a figure of USD135 million of equity. 50% of available debt was allocated to the SMs/Alt Betas side, i.e., USD450 million divided by 2 which produces USD225 million. If this is divided by 10 SMs (the target) USD22.5 million is available to each. By the 1 June the existing 6 single-managers had each received USD22.4 million (i.e. just below the equal allocation figure). This meant that on the SMs/Alt Beta side on 1 June 2008 there remained USD90.6 million, i.e., USD22.6 million was left over for each in future. These calculations are consistent with the contemporaneous documents which are referred to below.

C.A.                                                    AL SADIK V. INVESTCORP BANK

235.7 In order to fund more SM/Alt Beta managers it would have been necessary to leverage DSF up so that the initial (self-imposed) fifty fifty concentration limit would be maintained. For each SM added it was necessary to add equal funding to the DSF side. It is to be noted that redemptions from DSF were available only quarterly on 60 days' notice therefore if Investcorp believed that a new Single Manager would be ready for follow on funding or an Alt Beta product was ready for seeding imminently actually storing funds in DSF would have been impractical because the funds would not have been instantly available.

235.8 The position on 1 September (having regard to debt) was as follows. At that stage DSF stood at 2× leverage (see the table in Mr. Franklin's first witness statement). This means that DSF had reached its target maximum leverage according to the AA Plan. Therefore, in so far as this could support the application of leverage to the SMs/Alt Beta side that is where all the remaining AAs would be. In the course of September AA decisions were being taken that would use up all of the remaining credit on the SMs/Al Beta side: investment in one more SM (Hawkstone) and capital used to seed 2 Alt Beta products—which was all to happen on 1 October 2008. It did not happen only because Investcorp formed the belief on or about 16 September that the Plaintiff was threatening to redeem.

235.9 The Plaintiff's case is that leverage was not applied carefully and incrementally but systematically and according to one AA decision that was taken on 2 March 2008, which was not reconsidered and not deviated from, and which was taken for the benefit of the development of Investcorp's Hedge Fund LOB and not for the benefit of the Plaintiff (whose interests were merely incidental). That was a breach of the overriding duty of loyalty and was selfish conduct and contrary to the duty to act fairly. Investcorp has admitted it was a fiduciary in all respects, it was exercising a fiduciary power and therefore it owed a duty to the Plaintiff of the highest order, which he says it did not discharge. The burden is on Investcorp to prove the reverse.

235.10 Investcorp's main witness on AA was Mr. Gurnani. His colleague Mr. Gharghour was not called. Those two were the asset allocation decision takers. Mr. Gurnani's evidence showed that at all material times he had a pure and unswerving faith in the benefits of the Single Manager Program and Alt Beta products. He believes that the newer a fund is the more likely it is to make money, which is bizarre and should not be given credit because ex hypothesi, if he is right then Investcorp would set up and abandon funds on a regular basis. Above all, he showed that there was never a shadow of a doubt in his mind that his original AA decision (to organize the Plaintiff's

149

investment to fund new SMs and Alt Beta products) might not have been the right one. This is inexplicable because the stark fact is that Mr. Gurnani's decisions (on which he relied for Mr. Franklin's help) lost almost USD75 million of the Plaintiff's money in a matter of months pursing a disastrous investment policy: he applied leverage in a very bad market (to which his trite response is that even in bad markets hedge funds are expected to do well which might be the case for some specific hedge fund based on particular information, but as a general statement is meaningless.

235.11 It is undeniable that when Investcorp decided to invest the Plaintiff in SMs they obtained 2 lots of fees. The first fee was charged at the level of the SPA (*sic*). The second fee was Investcorp's share of the fees of the SMs. The higher the leverage the higher the fee. An ordinary investor, going into SMFCo would have paid only one set of fees. Mr. Gurnani testified that Investcorp's flagship funds did not invest in the SM platform, because, as Mr. Gurnani explained at great length, it would not be an arm's length arrangement (by which he clearly meant there would be a conflict of interest) and it would be necessary to go back to the investors on every occasion. The obvious and only legal reason why DSF would have to go back to the investors to approve such a decision is because it would have to be disclosed that the investment manager (Investcorp) was not impartial because it was taking a fee on both sides of the deal and that therefore it had a conflict of interest. It is not possible to draw a meaningful distinction between the position of investors in DSF and the Plaintiff for these purposes. There was a conflict of interest and the fees should have been but were not disclosed to the Plaintiff. It is in the very nature of a fiduciary discretionary power of investment that the fiduciary looks out for the principal's interests; the principal has conferred the power, so that someone else will have the responsibility of looking after his interest unselfishly, with absolute loyalty: therefore it does not behove a fiduciary to turn around and say, 'you should have known' or 'you could have read the fund memoranda yourself': that was the fiduciary's job, it lay within the ambit of his fiduciary responsibility and the fiduciary cannot turn around and say that to his principal that he should have been looking after his own interest by doing a task which the principal had conferred on the fiduciary. The Defendants' position on this is tautologous: they have no way out. Equity does not tolerate a fiduciary to obtain a collateral benefit by reason of his fiduciary relationship unless he has been permitted to do so by his principal after giving the most full and frank disclosure.

235.12 Mr. Gurnani's evidence that Investcorp's flagship funds did not invest in SMs is simply wrong. It is wrong because on 1 January

C.A.                                                    AL SADIK V. INVESTCORP BANK

2008 IBSF invested in the SM's when it became the only invention (*sic*) in SMFCo.

235.13 Yet another aspect of the Investcorp's breach of fiduciary duty lies in the nature of the high risk investments it pursued. The law says that a person who has a discretionary power of investment is not obliged to exercise it. He can choose not to do so. If he does so he must do so in good faith. The Plaintiff demonstrated massive faith in Investcorp when he conferred the discretionary power on it: he did not for one minute believe that it would play fast and loose with his money. He was an experienced investor but he was not an expert and it is too much to expect him to have understood or second guessed each and every aspect of his investment. It was a complicated investment (as this case has demonstrated) in funds of hedge funds: e.g., it involved the use of leverage through investment in leveraged vehicles (such as LDSF 3×), or so the Plaintiff thought—in fact the position was much more complicated than that: Blossom borrowed money from RBS in order to pursue a combined 2× and 3× strategy in which concentration limits applied, this meant that if one side of the equation did badly the LTV ratio could be breached and forced redemptions would occur giving rise to a situation in which the Investment Manager has lost control: and that is precisely what did occur in October 2008. This was an unwise, high stakes and very risky way to structure the Plaintiff's investment: and it was done without the Plaintiff's knowledge or consent. There is a very real and material difference in control between an isolated investment that is leveraged, and one that is interdependent with another investment that is leveraged: the latter type of arrangement is apt to veer out of control.

235.14 Mr. Gurnani says that he was a numbers man, all he was interested in was the asset allocation: he left the detail on which he based his decisions to Mr. Franklin, and if it was a complicated decision, e.g., to do with structuring and leverage, he left it to Mr. Gharghour. Mr. Gurnani says it was Mr. Gharghour who took the decisions about leverage. So far as Mr. Gurnani was concerned, as long as the asset allocations he wanted were made, he did not mind how it was done. Mr. Gurnani admitted that he did not know the terms of the SPA; or the terms of the RBS facility: and, he thought that if he needed to know these terms someone else would tell him about them. He did not even see the investment proposal that had been put to the client before he took his AA decisions. Mr. Gurnani's attitude towards the responsibilities that his own job [imposed] displays breath taking insouciance: it is astonishing that the person exercising a fiduciary power of investment did not understand the scope of his investment mandate or the constraints upon it, or even

151

A-9340

THE CAYMAN ISLANDS LAW REPORTS                    2017 (1) CILR

receive a properly detailed memorandum about what the client wanted. What the client wanted should have been checked and verified. Mr. Gurnani was relying, in relation to what he intended to be an investment worth almost half a billion dollars (*sic*), on information provided by employees (Mr. Al Khatib and Mr. Kironde) who he knew would be amply rewarded for the investments that had been made by reference to the AUM that had been brought in. Mr. Franklin said in evidence that the PRM team's compensation was linked to the amount of leverage applied. He should have checked, he did not check. The way Investcorp was organised meant that the asset allocators did not know things they should have made it their business to find out."

228   I reject the submission that this court can be asked to infer that the judge ignored, or did not take into account, the arguments which had been advanced at trial. In my view that inference cannot be drawn either (i) from a judge's decision not to refer to each and every argument put to him; or (ii) from the judge's decision to make findings of fact which differ from those which the arguments were advanced to support. The inference that the judge took no account of the arguments cannot be drawn because it ignores the obvious possibilities (i) that in a lengthy, detailed and obviously careful judgment, the judge chose not to refer to arguments which he found irrelevant or of little assistance, and (ii) that the judge made the findings that he did because he preferred to rely on the evidence of the witnesses that he had seen and heard rather than on counsel's submissions.

229   The question for the judge in relation to the 5th claim was whether, in making the initial asset allocations and applying leverage, Investcorp (through its relevant employees) improperly and in breach of fiduciary duty, preferred its own interests to those of Mr. Al Sadik. The question was not whether the investment decisions that were made were sensible or wise, or whether other investment managers would or might have made other investment decisions. The question for this court is not whether it would have reached the conclusions of fact on those issues which the judge reached but whether, on the evidence which was before him at trial, those were conclusions of fact which were open to the judge. And, in addressing that question, this court must have proper regard to the fact that the judge had the advantage (which this court does not have) of seeing and hearing the witnesses give their evidence.

230   In my view there is no basis on which this court could hold that it was not open to the judge to reach the conclusions that he did in relation to the 5th claim.

A-9341

C.A.                                            AL SADIK V. INVESTCORP BANK

**Conclusion and disposal of appeal**

231    For the reasons that I have set out in this judgment, I would dismiss this appeal.

232    In the circumstances that I would reject all (or substantially all) of the submissions advanced on behalf of Mr. Al Sadik, I take the view that there is no reason why the costs of the appeal should not follow the event. Costs should be assessed on the standard basis. But the parties should have the opportunity to make representations to the Court of Appeal, if they so wish, that some other order as to costs would be more appropriate. Such representations (if any) should be made in writing within 28 days of the delivery of this judgment.

233    **MOTTLEY, J.A.:** I have read the judgment of Chadwick, J.A. in draft and have nothing to add.

234    **CAMPBELL, J.A.:** I have had the advantage of reading in draft the judgment of Chadwick, J.A. and for the reasons that he has given I agree that the appeal should be dismissed.

*Appeal dismissed.*

Attorneys: *Harney Westwood & Reigels* for the appellant; *Walkers* for the respondents.

---

A-9342



**Hilary Term**
**[2014] UKSC 10**
*On appeal from: [2013] QB 499*

# JUDGMENT

# Williams (Respondent) *v* Central Bank of Nigeria (Appellant)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Clarke**
**Lord Sumption**
**Lord Hughes**

**JUDGMENT GIVEN ON**

**19 February 2014**

**Heard on 4 and 5 November 2013**

A-9343

| *Appellant* | *Respondent* |
|---|---|
| Guy Philipps QC | Jonathan Adkin QC |
| Edward Levey | (Instructed by Alfred |
| (Instructed by Berwin | James & Co Solicitors |
| Leighton Paisner LLP) | LLP) |

**LORD SUMPTION, (with whom Lord Hughes agrees)**

*Introduction*

1.      The facts of this case can fairly be described as exotic, but very few of them are relevant to the present appeal. Dr Williams claims to be the victim of a fraud instigated by the Nigerian State Security Services which occurred in 1986. His case is that he was induced to serve as guarantor of a bogus transaction for the importation of foodstuffs into Nigeria. In connection with that transaction, he paid $6,520,190 to an English solicitor, Mr Reuben Gale, to be held on trust for him on terms that it should not be released until certain funds had been made available to him in Nigeria. Dr Williams says that in fraudulent breach of that trust, Mr Gale, knowing that those funds were not available to him in Nigeria, paid out $6,020,190 of the money to an account of the Central Bank of Nigeria with Midland Bank in London, and that he pocketed the remaining $500,000.  The Central Bank is said to have been party to Mr Gale's fraud. The Bank applied for an order setting aside the permission given to Dr Williams to serve the claim form and particulars of claim on the Central Bank in Nigeria and declaring that the English court lacked, or at any rate should not exercise, jurisdiction in respect of it. That in turn depended on whether there was a serious issue to be tried.

2.      Supperstone J, who heard the matter in the High Court, held that of the various claims then advanced by Dr Williams, the only ones which raised a serious issue to be tried on the pleaded facts were the so-called "1986 trust claims": [2011] EWHC 876 (QB). Dr Williams no longer challenges that. The 1986 trust claims comprised (i) a claim to require the Central Bank to account for the $6,520,000 on the footing that it dishonestly assisted Mr Gale's breach of trust; (ii) a claim to require it to account for $6,020,190 on the footing that it received that sum knowing that it was being paid by Mr Gale in breach of trust; and (iii) a claim to trace the $6,020,190 in the Central Bank's hands. As far as these claims were concerned, the issue turns wholly on whether they were subject to statutory limitation by virtue of section 21 of the Limitation Act 1980, which deals with time limits for actions in respect of trust property. It is common ground that so far as any of the 1986 trust claims is subject to statutory limitation, the limitation period has expired and that on that footing those claims would give rise to no serious issue to be tried. Since Supperstone J gave judgment, Dr Williams has received permission to amend his Particulars of Claim to add three further causes of action, collectively known as the "Nigerian law claim".  This court has not been concerned with that claim, and I say nothing more about it. The result is that regardless of the outcome of this appeal, permission to serve out of the jurisdiction will stand, so that the Nigerian law claim may be tried.

3.      Section 21 of the Limitation Act 1980 provides (so far as relevant) as follows:

"21. (1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action

(a) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy ; or

(b) to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to his use.

. . .

(3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued."

Section 23 provides:

"An action for an account shall not be brought after the expiration of any time limit under this Act which is applicable to the claim which is the basis of the duty to account."

Section 38(1) of the Limitation Act 1980, defines the terms "trust" and "trustee" as having "the same meanings, respectively, as in the Trustee Act 1925". This is a reference to section 68(17) of the Trustee Act 1925, which provides that subject to immaterial exceptions,

"the expressions 'trust' and 'trustee' extend to implied and constructive trusts... and to the duties incident to the office of a personal representative, and 'trustee' where the context admits includes a personal representative."

4.      As applied to the 1986 trust claims, these provisions give rise to two questions. The first is whether a stranger to a trust who is liable to account (as the

Page 3

Central Bank is alleged to be) on the footing of dishonest assistance in a breach of trust or knowing receipt of trust assets is a trustee for the purposes of section 21(1)(a). If the answer to that question is No, then the second question is whether an action "in respect of" any fraud or fraudulent breach of trust to which the trustee was a party or privy includes an action against a party such as the Central Bank which is not itself a trustee.

5.      Both questions were argued before Supperstone J. He held that the Central Bank could not be described as a trustee, but that it was at least arguable that section 21(1)(a) was not confined to actions against the trustee and extended to an action against the Bank arising out of its participation in the trustee's fraud. He therefore refused to set aside the order for service. Before the Court of Appeal (Sir Andrew Morritt C, Black and Tomlinson LJJ), Dr Williams conceded the first question, as a result of which only the second was argued: [2013] QB 499. They decided that question in favour of Dr Williams, and affirmed the judge's decision. Before this court, Mr Adkin QC, who appeared for Dr Williams, has partially withdrawn his concession on the first issue. He still accepts that a person liable to account on the footing of dishonest assistance in another's breach of trust is not a trustee. But he says that a person liable to account on the footing of knowing receipt is a trustee. Mr Philipps QC, appearing for the Central Bank did not object to his being allowed to take this point, and was clearly right not to do so. Not only is it a pure question of law, but a proper understanding of section 21 requires an examination of both questions.

6.      We are not concerned (as the Judge thought he was) with the question whether Dr Williams' case on limitation is merely arguable. Dr Williams' case is certainly arguable, and has been exceptionally well argued. Both parties now accept that we can and should decide whether it is right. In my opinion it is not. The 1986 trust claims are time barred, essentially because section 21(1)(a) of the Limitation Act 1980 is concerned only with actions against trustees and the Central Bank is not a trustee. This is because a constructive trust of the kind alleged against the Bank is not a true trust. To explain why this is so, it is necessary to examine the rather complicated interaction between the successive statutes of limitation and the equitable rules regarding the limitation of actions against trustees.

*Two categories of constructive trust*

7.      The combined effect of the definition sections of the Limitation Act 1980 and the Trustee Act 1925 is that in section 21 of the Limitation Act a trustee includes a "constructive trustee". Unfortunately, this is not as informative as it might be, for there are few areas in which the law has been so completely obscured by confused categorisation and terminology as the law relating to constructive trustees.

8.     The starting point for any consideration of this subject remains the well-known statement of principle of Lord Selborne in *Barnes v Addy* (1874) LR 9 Ch App 244, 251:

> "Now in this case we have to deal with certain persons who are trustees, and with certain other persons who are not trustees. That is a distinction to be borne in mind throughout the case. Those who create a trust clothe the trustee with a legal power and control over the trust property, imposing on him a corresponding responsibility. That responsibility may no doubt be extended in equity to others who are not properly trustees, if they are found either making themselves trustees *de son tort*, or actually participating in any fraudulent conduct of the trustee to the injury of the *cestui que trust*. But, on the other hand, strangers are not to be made constructive trustees merely because they act as the agents of trustees in transactions within their legal powers, transactions, perhaps of which a Court of Equity may disapprove, unless those agents receive and become chargeable with some part of the trust property, or unless they assist with knowledge in a dishonest and fraudulent design on the part of the trustees."

9.     It is clear that Lord Selborne regarded as a constructive trustee any person who was not an express trustee but might be made liable in equity to account for the trust assets as if he was. The problem is that in this all-embracing sense the phrase "constructive trust" refers to two different things to which very different legal considerations apply. The first comprises persons who have lawfully assumed fiduciary obligations in relation to trust property, but without a formal appointment. They may be trustees *de son tort*, who without having been properly appointed, assume to act in the administration of the trusts as if they had been; or trustees under trusts implied from the common intention to be inferred from the conduct of the parties, but never formally created as such. These people can conveniently be called de facto trustees. They intended to act as trustees, if only as a matter of objective construction of their acts. They are true trustees, and if the assets are not applied in accordance with the trust, equity will enforce the obligations that they have assumed by virtue of their status exactly as if they had been appointed by deed. Others, such as company directors, are by virtue of their status fiduciaries with very similar obligations. In its second meaning, the phrase "constructive trustee" refers to something else. It comprises persons who never assumed and never intended to assume the status of a trustee, whether formally or informally, but have exposed themselves to equitable remedies by virtue of their participation in the unlawful misapplication of trust assets. Either they have dishonestly assisted in a misapplication of the funds by the trustee, or they have received trust assets knowing that the transfer to them was a breach of trust. In either case, they may be required by equity to account as if they were trustees or fiduciaries, although they are not. These can conveniently be called cases of ancillary liability. The intervention of

equity in such cases does not reflect any pre-existing obligation but comes about solely because of the misapplication of the assets. It is purely remedial. The distinction between these two categories is not just a matter of the chronology of events leading to liability. It is fundamental. In the words of Millett LJ in *Paragon Finance Plc v DB Thakerar & Co (a firm)* [1999] 1 All ER 400, at 413, it is "the distinction between an institutional trust and a remedial formula – between a trust and a catch-phrase."

10.     *Selangor United Rubber Estates Ltd v Craddock (No. 3)* [1968] 1 WLR 1555, is a decision of Ungoed-Thomas J about the elements of ancillary liability. It has been much criticised for drawing the net of liability too wide, and for making excessively fine distinctions between different mental states. But it contains a clear and entirely orthodox statement of the different categories of constructive trustee. The judge observed, at p 1579:

> "It is essential at the outset to distinguish two very different kinds of so-called constructive trustees: (1) Those who, though not appointed trustees, take upon themselves to act as such and to possess and administer trust property for the beneficiaries, such as trustees de son tort. Distinguishing features for present purposes are (a) they do not claim to act in their own right but for the beneficiaries, and (b) their assumption to act is not of itself a ground of liability (save in the sense of course of liability to account and for any failure in the duty so assumed), and so their status as trustees precedes the occurrence which may be the subject of claim against them. (2) Those whom a court of equity will treat as trustees by reason of their action, of which complaint is made. Distinguishing features are (a) that such trustees claim to act in their own right and not for beneficiaries, and (b) no trusteeship arises before, but only by reason of, the action complained of."

Later in his judgment, at p 1582, the judge expanded upon the characteristics of his category (2):

> "It seems to me imperative to grasp and keep constantly in mind that the second category of constructive trusteeship (which is the only category with which we are concerned) is nothing more than a formula for equitable relief. The court of equity says that the defendant shall be liable in equity, as though he were a trustee. He is made liable in equity as trustee by the imposition or construction of the court of equity. This is done because in accordance with equitable principles applied by the court of equity it is equitable that he should be held liable as though he were a trustee."

11.     The same point was made in very similar language by Millett LJ in *Paragon*, at pp 408-409:

> "Regrettably, however, the expressions 'constructive trust' and 'constructive trustee' have been used by equity lawyers to describe two entirely different situations. The first covers those cases already mentioned, where the defendant, though not expressly appointed as trustee, has assumed the duties of a trustee by a lawful transaction which was independent of and preceded the breach of trust and is not impeached by the plaintiff. The second covers those cases where the trust obligation arises as a direct consequence of the unlawful transaction which is impeached by the plaintiff.
>
> A constructive trust arises by operation of law whenever the circumstances are such that it would be unconscionable for the owner of property (usually but not necessarily the legal estate) to assert his own beneficial interest in the property and deny the beneficial interest of another. In the first class of case, however, the constructive trustee really is a trustee. He does not receive the trust property in his own right but by a transaction by which both parties intend to create a trust from the outset and which is not impugned by the plaintiff. His possession of the property is coloured from the first by the trust and confidence by means of which he obtained it, and his subsequent appropriation of the property to his own use is a breach of that trust... In these cases the plaintiff does not impugn the transaction by which the defendant obtained control of the property. He alleges that the circumstances in which the defendant obtained control make it unconscionable for him thereafter to assert a beneficial interest in the property.
>
> The second class of case is different. It arises when the defendant is implicated in a fraud. Equity has always given relief against fraud by making any person sufficiently implicated in the fraud accountable in equity. In such a case he is traditionally though I think unfortunately described as a constructive trustee and said to be 'liable to account as constructive trustee'. Such a person is not in fact a trustee at all, even though he may be liable to account as if he were. He never assumes the position of a trustee, and if he receives the trust property at all it is adversely to the plaintiff by an unlawful transaction which is impugned by the plaintiff. In such a case the expressions 'constructive trust' and 'constructive trustee' are misleading, for there is no trust and usually no possibility of a proprietary remedy; they are nothing more than a formula for equitable relief."

*Relevance of the distinction to limitation*

12.     Before the Trustee Act 1888, no statutory time-bar applied to a claim by a beneficiary against a trustee. The practice of equity was to apply statutory limitation periods by analogy to equitable claims, in addition to its own doctrines of laches and acquiescence. But by way of exception statutory limitation periods were not applied, even by analogy, to claims by a beneficiary against a trustee for breach of trust. Trustees were accountable to their beneficiaries without limitation of time.

13.     It is important to understand why equity adopted this rule, for its rationale will not necessarily apply to every kind of constructive trust. The reason was that the trust assets were lawfully vested in the trustee. Because of his fiduciary position, his possession of them was the beneficiary's possession and was entirely consistent with the beneficiary's interest. If the trustee misapplied the assets, equity would ignore the misapplication and simply hold him to account for the assets as if he had acted in accordance with his trust. There was nothing to make time start running against the beneficiary. It will be apparent that this reasoning can apply only to those who, at the time of the misapplication of the assets have assumed the responsibilities of a trustee, whether expressly or de facto. Persons who are under a purely ancillary liability are in a different position. They are liable only by virtue of their participation in the misapplication of the trust assets itself. Their dealings with the assets were at all times adverse to the beneficiaries, and indeed to the true trustees holding the legal interest.

14.     This point was first articulated by Lord Redesdale, Lord Chancellor of Ireland, in *Hovenden v Lord Annesley* (1806) 2 Sch & Lef 607, a classic judgment delivered (according to the reporter) after several days of argument around his sickbed at home. Referring to a judgment of Lord Maccelsfield on the application of statutory limitation by analogy to claims against trustees for breach of trust, he continued at pp 632-633:

> "Now I take it that the position which has been laid down, 'that trust and fraud are not within the statute,' is qualified just as he qualifies it here: that is, if a trustee is in possession and does not execute his trust, the possession of the trustees is the possession of the *cestui que trust*; and if the only circumstance is, that he does not perform his trust, his possession operates nothing as a bar, because his possession is according to his title... But the question of fraud is of a very different description: that is a case where a person who is in possession by virtue of that fraud, is not, in the ordinary sense of the word, a trustee, but is to be constituted a trustee by a decree of a court of equity, founded on the fraud; and his possession in the meantime is adverse

to the title of the person who impeaches the transaction on the ground of fraud."

15.     The position of a person who is not an express or a de facto trustee but is "constituted a trustee by a decree of a court of equity" may be illustrated by another early case, *Beckford v Wade* (1805) 17 Ves Jun 87, a decision of the Privy Council on appeal from Jamaica. The claim was to recover trust assets from a stranger to the trust into whose hands they had come. The issue concerned the application of the English statutes of limitation, which were held to apply in Jamaica subject to a Jamaican statute excepting (among other people) trustees. Delivering the advice of the Board, Sir William Grant MR said, at pp 95, 97:

> "The question then is, what the true construction of the Act is in this particular: whether it meant only actual and express trusts, as between *cestui que trusts* and trustees properly so called, upon which length of time ought to have no effect: or whether it intended to leave open to perpetual litigation every equitable question relative to real property... It is certainly true, that no time bars a direct trust, as between *cestui que trust* and trustee. But if it is meant to be asserted that a court of equity allows a man to make out a case of constructive trust at any distance of time, after the facts and circumstances happened, out of which it arises, I am not aware that there is any ground for a doctrine, so fatal to the security of property as that would be."

*Inconsistent case-law*

16.     These cases gave a coherent and rational explanation of the reason why, exceptionally, limitation could not be taken by an express or de facto trustee against his beneficiary, but was available to strangers who had incurred an ancillary liability. Courts of equity, however, later lost sight of the underlying principle and for much of the 19th century continued to deal with the issue on a confusing and inconsistent basis, generally without analysis or reference to earlier authority.  For many years, *Bonney v Ridgard* (1784) 17 Ves 87 and *Beckford v Wade* (1805) 17 Ves Jun 87 were the principal authorities for the proposition that limitation was available to strangers who were under an ancillary liability arising from a breach of trust. *Wilson v Moore* (1834) 1 My&K 337 and *Bridgman v Gill* (1857) 24 Beav 302 were authority for the opposite proposition. I do not propose to analyse the facts of these cases, some of which are very summarily reported. The story can conveniently be taken up in 1893, when *Soar v Ashwell* [1893] 2 QB 390 came before the Court of Appeal.

17.     *Soar v Ashwell* was decided under the general principles of equity relating to limitation as they stood before the Trustee Act 1888. The facts were similar to those of many other cases about Victorian family trusts. The fund had been entrusted by the trustees to Ashwell, the solicitor to the trust, who exercised all of their administrative and investment powers for them and misapplied the assets. The actual question at issue was whether the reasoning which deprived trustees of the right to raise limitation against their beneficiaries applied to him, given that he was not an express trustee. The Court of Appeal held that it did. According to Lord Esher MR and Bowen LJ, this was because he stood in a fiduciary position to the trustees as his clients. According to Kay LJ it was because he was a trustee de son tort. For present purposes, the difference does not matter. In either case, as Lord Esher put it at pp 393, 394, he had assumed to act as if he were a trustee. "The Court of Equity treats the defendant as a trustee become so by construction, and the trust is called a constructive trust."

18.     Lord Esher recognised the distinction explained by Lord Redesdale between a person liable by reason of his pre-existing status as a trustee and a person liable only by reason of his involvement in a misapplication of the assets. At p 394 he observed:

> "Assume that he misappropriated that money to his own use, and that was all; the misappropriation would at once of itself make him the holder of the money in trust for the rightful owner, but if that were all only a trustee by construction of a constructive trust. But the questions in this case are whether Ashwell was not, in view of a Court of Equity, a trustee of the money before the alleged breach by misappropriation and, if he was, under which class of trust he was with regard to limitations. The moment the money was in his hands, he was in a fiduciary relation to the nominated trustees; he was a fiduciary agent of theirs; he held the money in trust to deal with it for them as directed by them; he was a trustee for them. He was therefore a trustee of the money before he committed, if he did commit, the alleged breach of trust, and was in possession of and had control over the money before he committed, if at all, the alleged breach of trust."

19.     Notwithstanding this impeccable statement of the reasons why Ashwell could not rely on limitation, all three members of the court went on to deal, in terms which had no regard to it, with the position of other kinds of constructive trustee. Lord Esher expressed the view, at pp 394-395, that a stranger to the trust who knowingly assisted in a dishonest misapplication of trust assets would be treated for limitation purposes in the same way as an express trustee. Bowen LJ, at pp 396-397, while recognising that the authorities were irreconcilable, identified three cases where a constructive trustee would be treated for limitation purposes like an express trustee, namely the case of de facto trustees, which was the case before the court; the case

of a stranger to the trust knowingly assisting the fraud of a trustee; and the case of a stranger knowingly receiving trust property in breach of trust. Kay LJ, whose own examination of the authorities at pp 400-405 disclosed the same inconsistency, seems to have been of the same view as Bowen LJ. None of them suggested that a stranger liable to account as a constructive trustee on the footing of knowing assistance or knowing receipt was actually a trustee, only that for the purpose of the general equitable principles governing limitation such persons were to be treated in the same way as trustees. None of them sought to explain why the rather special rationale of the rule of equity applicable to express or de facto trustees should apply to a person who was not a trustee but had a purely ancillary liability to account as a constructive trustee. Nonetheless in the years immediately following the decision in *Soar v Ashwell*, most judges were content to follow the dicta in that case: see *In re Gallard* [1897] 2 QB 8; *Heynes v Dixon* [1900] 2 Ch 561; *In re Eyre-Williams* [1923] 2 Ch 533 (although only the first of these cases was a true case of ancillary liability).

*Statutory modification*

20.    From this unsatisfactory state of affairs, the law was rescued by the intervention of statute, which provoked some fresh judicial analysis.

21.    Section 25(2) of the Judicature Act 1873 gave statutory effect to the rule which deprived trustees of the right to raise limitation, at any rate so far as express trustees were concerned. It provided:

> "No claim of a cestui que trust against his trustee for any property held on an express trust, or in respect of any breach of such trust, shall be held to be barred by any statute of limitations."

22.    The first significant change in the law came with the Trustee Act 1888, which sought to relieve honest trustees who had parted with the assets and had not converted them to their own use from the harshness of the rule which held them accountable without limitation of time. Section 8(1) of the Act applied

> "in any action or other proceeding against a trustee or any person claiming through him, except where the claim is founded upon any fraud or fraudulent breach of trust to which the trustee was party or privy, or is to recover trust property, or the proceeds thereof still retained by the trustee, or previously received by the trustee and converted to his use…"

If these conditions were satisfied, the trustee was entitled to the same statutory period of limitation as would have been available if he had not been a trustee or, in the case of an action to recover trust money or property, to the limitation period applicable to a common law action for money had and received. This meant, in effect, six years. For the purpose of section 8(1), "trustee" was defined in section 1(3) as including "an executor or administrator and a trustee whose trust arises by construction or implication of law as well as an express trustee."

23.    The leading case on the effect of sections 1(3) and 8(1) of the Trustee Act 1888 was *Taylor v Davies* [1920] AC 636, a decision of the Privy Council on a Canadian statute in the same terms. Davies was a secured creditor of an insolvent firm whose property had been the subject of an assignment for the benefit of creditors. He was also a member of the committee of inspection appointed to supervise the assignee. He took a conveyance of the mortgaged property from the assignee in satisfaction of the debt at what was alleged to be an undervalue. Twelve years later, the other creditors sought to set aside the conveyance, on the ground that as a member of the committee of inspection Davies had been a fiduciary and as such precluded by the self-dealing rule from acquiring the property himself, at any rate without fuller disclosure. There was no allegation of dishonesty. The Board held that Mr Davies was not an express trustee because the assets of the insolvent were vested in the assignee and the committee of creditors had no power to dispose of them. The same point would have been fatal to any suggestion that he was a de facto trustee. They considered that he was a constructive trustee, apparently on the footing of knowing receipt of assets held in trust by the assignee. In those circumstances, the question arose whether the Act applied. It was argued for Davies that the Act had no application to constructive trustees whose liability was purely ancillary, because such persons had always been entitled in equity to raise limitation. The creditors' argument was that the definition of "trustee" extended to constructive trustees, and that Davies was deprived of the right to raise limitation by the statutory exception for cases where the property or its proceeds was still in the hands of the alleged trustee. The Board decided this question in favour of Davies. Their reason was that the Act did not extend to constructive trustees whose liability to account arose from the wrongful misapplication itself. Two passages from the advice of the Board, given by Viscount Cave, are relevant. At pp 650-651, Viscount Cave said:

> "The possession of an express trustee was treated by the Courts as the possession of his cestuis que trust, and accordingly time did not run in his favour against them. This disability applied, not only to a trustee named as such in the instrument of trust, but to a person who, though not so named, had assumed the position of a trustee for others or had taken possession or control of property on their behalf, such (for instance) as the persons enumerated in the judgment of Bowen L.J. in *Soar v Ashwell* or those whose position was in question in *Burdick v Garrick*, *In re Sharpe*, *Rochefoucauld v Boustead*, and *Reid-*

Page 12

*Newfoundland Co v Anglo-American Telegraph Co.* These persons, though not originally trustees, had taken upon themselves the custody and administration of property on behalf of others; and though sometimes referred to as constructive trustees, they were, in fact, actual trustees, though not so named. It followed that their possession also was treated as the possession of the persons for whom they acted, and they, like express trustees, were disabled from taking advantage of the time bar. But the position in this respect of a constructive trustee in the usual sense of the words - that is to say, of a person who, though he had taken possession in his own right, was liable to be declared a trustee in a Court of equity - was widely different, and it had long been settled that time ran in his favour from the moment of his so taking possession. This rule is illustrated by the well-known judgment of Sir William Grant MR in *Beckford v Wade*."

Turning to the extended definition of "trustee" to include constructive trustees, Viscount Cave said at p 653:

"The expressions 'trust property' and 'retained by the trustee' properly apply, not to a case where a person having taken possession of property on his own behalf, is liable to be declared a trustee by the Court; but rather to a case where he originally took possession upon trust for or on behalf of others. In other words, they refer to cases where a trust arose before the occurrence of the transaction impeached and not to cases where it arises only by reason of that transaction. The exception no doubt applies, not only to an express trustee named in the instrument of trust, but also to those persons who under the rules explained in *Soar v Ashwell* and other cases are to be treated as being in a like position; but in their Lordships' opinion it does not apply to a mere constructive trustee of the character described in the judgment of Sir William Grant."

There is some confusion in these passages, arising from the references to *Soar v Ashwell*. Some of Viscount Cave's turns of phrase, taken in isolation, might be thought to suggest that he was approving Bowen LJ's extension of the equitable rule to cases of ancillary liability. But I think that he must have been referring to the ratio of that case, ie to the extension of the equitable rule to de facto trustees. Otherwise, he could not have decided the case in the way he did. Nor could he have distinguished cases in which the liability to account was imposed by equity by reason of the wrongful act itself, such as the decision of Sir William Grant in *Beckford v Wade*, the relevant part of which he had quoted at 651-652. Three years later, in *Clarkson v Davies* [1923] AC 100, the Privy Council applied the same reasoning to the same statute, in another case involving the knowing receipt of a company's funds by its directors. *Taylor v Davies*, they said at 110-111, was

authority for "a distinction between a trust which arises before the occurrence of the transaction impeached and cases which arose only by reason of that transaction."

24.     In 1936, the Law Revision Committee under the chairmanship of the then Master of the Rolls Lord Wright presented its fifth interim report, on statutes of limitation. Paragraph 11 of the report dealt with section 8 of the Trustee Act 1888, so far as relevant to the present issues. The Committee regarded the section as generally satisfactory. But it identified a problem about actions against persons, in particular executors, who owed fiduciary obligations in relation to property but were not express trustees. In two cases decided after the Act of 1888 but under the previous law, it had been held that executors were entitled to rely on a statutory time bar even if they were still in possession of the assets. This was because section 25(1) of the Judicature Act, in giving statutory effect to the rule of equity preventing trustees from raising limitation against their beneficiaries, had referred only to express trustees and executors were not express trustees: see *In re Jane Davies* [1891] 3 Ch 119; *In re Lacy* [1899] 2 Ch 149. This result was not consistent with section 8(1) of the Act of 1888, which had excluded from its ambit cases in which the trustee was still in possession when sued. But the anomaly would nevertheless persist because section 8(3) preserved any pre-existing right to rely on limitation. The Committee's conclusion, at para 11, was as follows:

> "It is difficult to find any real justification for the rule that an executor or other person holding property as a trustee, but not on an 'express' trust, can plead the statute, though he still retains the trust property or has converted it to his own use. The rule has been extensively modified by decisions giving such a wide meaning to 'express trust' as to bring most cases of fiduciary relationship within the exception to the Trustee Act, and to raise serious doubt as to where the line is to be drawn for this purpose between express and constructive trusts. See the judgment of the Bowen LJ in *Soar v Ashwell* [1893], 2, QB at p 395, and the authorities there cited, and the cases referred to by Romer J in *In re Eyre Williams* [1923] 2 Ch 533. It is perhaps too late now to suggest that the Trustee Act, 1888 was intended to do away with the distinction between express and constructive trusts for the purpose of the limitation of actions, though the definition of 'trustee' in section 1 (8) seems to point to that conclusion. At any rate we consider that the distinction should now be abolished, and we recommend that the exception in section 8 of the Trustee Act, 1888 should be expressly made to extend to trustees whether holding on express or constructive trusts, including personal representatives."

Recommendation (7) of the Committee was

"that the Statutes of Limitation should only apply to constructive trustees to the extent to which they do to express trustees."

It will be apparent from these observations that the only distinction which needed to be abolished for limitation purposes in order to dispose of the anomaly identified by the Committee was the distinction between express trustees and executors. It is clear that in referring to the position of persons who still held the property in their possession the Committee had in mind de facto trustees and other persons such as executors owing fiduciary duties in relation to property by virtue of their office. Notwithstanding the ambiguous reference to Bowen LJ's judgment in *Soar v Ashwell*, there is nothing in the Committee's reasoning to suggest that they had in mind ancillary liabilities.

25.     The Limitation Act 1939 was both a consolidating and an amending Act.  So far as it amended the law, it was intended to give effect to the principal recommendations of the Wright Committee. It is, however, necessary to be cautious about transposing the views of the Wright Committee into the statutory language. The Committee did not produce a draft bill and the language of section 19 does not follow that of the report as some other sections do. It may therefore have been influenced by other considerations. As far as trustees were concerned the Act repealed the Trustee Act 1888 and replaced section 8 of that Act by section 19 of the new Act. Section 19(1) and (2) were in substantially the same terms as section 21(1) and (3) of the Limitation Act 1980, which I have set out above. They employed a different drafting technique from the old section 8(1). Instead of creating a right on the part of trustees to raise limitation by analogy with statute, subject to the two exceptions for cases of fraud by the trustee or actions to recover trust property in the possession of the trustee or previously converted to his use, it reversed the order of ideas. It provided that no limitation period prescribed by the Act should apply in those two cases, and then that the limitation period in other cases should be six years. The effect was to address the Wright Committee's specific concerns about the survival of pre-existing rights to raise limitation in cases falling within the exceptions, by excluding such rights in terms.

26.     If, which I doubt, the Wright Committee intended to propose the abolition of the distinction for limitation purposes between express trustees and *every* kind of constructive trustee, including those whose liability was ancillary, then it is clear that this proposal was not adopted by Parliament. Section 31(1) of the 1939 Act adopted the meaning given to "trust" and "trustee" in section 68(17) of the Trustee Act 1925. This had the effect of broadening the definition to include personal representatives, whose unsatisfactory position had been the main source of concern to the Committee. Otherwise the scope of the new definition was no broader than that of the Trustee Act 1888. But it goes further than that. By adopting the meaning and not just the language of the definition in the Trustee Act 1925, Parliament made it even clearer that the intention was simply to cover de facto trustees. The Trustee

Act 1925 is concerned with the administration of true trusts. It is not concerned with constructive trusts imposed by equity on strangers to the trust in the exercise of its remedial jurisdiction. As Millett LJ observed when making this point in *Paragon*, at p 412, constructive trustees required to account in the exercise of equity's remedial jurisdiction,

> "have no trust powers or duties; they cannot invest, sell or deal with the trust property; they cannot retire or appoint new trustees; they have no trust property in their possession or under their control, since they became accountable as constructive trustees only by parting with the trust property. They are in reality neither trustees nor fiduciaries, but merely wrongdoers."

All of these considerations apply equally to section 21 of the Limitation Act 1980, which is in the same terms.

27.      It was suggested to us that in enacting section 19 of the Limitation Act 1939, Parliament must have intended to abolish for limitation purposes the distinction between true trustees and others upon whom equity imposed a liability to account as if they were trustees. This was because it intended to adopt the recommendations of the Wright Committee, and that (it was said) is what the Wright Committee intended. It is I think important to remember that we are construing the Act, not the report of the Committee. But the submission cannot in any event be correct for a number of reasons. In the first place, there is nothing in the report of the Wright Committee which suggests that they intended to abolish that distinction. What they were concerned with was the distinction between different kinds of true trustees. In particular, they were concerned with the anomalous distinction which had crept into recent case-law between the application of the law of limitation to express trustees and "an executor or other person holding property as a trustee, but not on an express trust." Second, if the Committee had intended to abolish for limitation purposes any distinction between true trustees and persons incurring an ancillary liability, it is hardly conceivable that they would have done so without discussing or even mentioning the two recent decisions of the highest persuasive authority, *Taylor v Davies* and *Clarkson v Davies*, which were based on precisely that distinction. The reason why they ignored the two Privy Council decisions was not that they were ignorant of them, or that they regarded them as outliers or wrong, but because they were not at all concerned with the question of ancillary liabilities which arose in those cases. Third, if Parliament had understood the Wright Committee as having recommended the abolition for limitation purposes of the distinction between true trustees and persons incurring an ancillary liability, they would not have done so by adopting the definition of "trustee" in the Trustee Act 1925. That definition extends the category of "trustees" to a personal representative, but says nothing about ancillary liabilities, with which the Trustee Act was not concerned. The latter point raises an altogether more fundamental objection to using the Committee's report to

elucidate not the rules of limitation as such but the categories of "trustee" to which they were intended to apply. By adopting not just the language but the meaning of the ready-made definition in the Trustee Act 1925, Parliament directed the courts to discover its meaning in the latter Act. On that question, the intentions of a Committee reporting 11 years later cannot be of the slightest assistance.

28.    The above analysis of section 21 of the Limitation Act 1980 has now been accepted by the English courts at every level below this court. The turning point was the decision of the Court of Appeal in *Paragon Finance Plc v DB Thakerar & Co (a firm)* [1999] 1 All ER 400, which is notable mainly for an extended obiter dictum of Millett LJ on the distinction, for limitation purposes, between a liability for breach of a true trust and an ancillary liability. I have already quoted freely from this valuable and characteristically trenchant judgment, which among other things draws attention to the importance of the decisions in *Beckford v Wade* and *Taylor v Davies*. There is a briefer dictum to the same effect by Lord Millett, as he had by then become, in *Dubai Aluminium Co Ltd v Salaam* [2003] 2 AC 366, 404.  In *Cattley v Pollard* [2007] Ch 353, Richard Sheldon QC sitting as a deputy judge of the High Court, after an impressive review of a substantial body of case-law and academic literature, held that section 21(1)(a) of the Limitation Act 1980 applied only to express and de facto trustees and not to persons liable only by virtue of their dishonest assistance in a breach of trust. In *JJ Harrison (Properties) v Harrison* [2002] 1 BCLC 162, and again in *Gwembe Valley Development Co Ltd v Koshy (No. 3)* [2004] 1 BCLC 131, the Court of Appeal adopted the analysis of Millett LJ and applied it to a case of knowing receipt of the assets of a company.  It was held in both cases that no period of limitation applied, but only because the defendant was a director and as such to be treated as a true trustee. It is clear from the court's reasoning that the limitation position would have been different if he had not been. In *Halton International (Holdings) Inc Sarl v Guernroy Ltd* [2006] WTLR 1241, the Court of Appeal adopted the same reasoning and held that section 21(1) applied only to claims against express or de facto trustees, and not to claims against constructive trustees whose liability came into being as a result of the transaction impeached.  In *Peconic Industrial Development Ltd v Lau Kwok Fai* [2009] 5 HKC 135, the Court of Final Appeal of Hong Kong held that the relevant provision of the Hong Kong Ordinance, which was in the same terms as section 19(1) of the English Limitation Act 1939, did not apply to a person liable to account as a constructive trustee on the footing of dishonest assistance. Lord Hoffmann, delivering the leading judgment, declined to follow the dicta of the Court of Appeal in *Soar v Ashwell*, which he regarded as wrong in principle and unsupported by authority. He was also unimpressed by the submission that this put a dishonest assister in a better position than an innocent or merely negligent trustee:

> "The principle is not that the limitation defence is denied to people
> who were dishonest. It plainly applies to claims based on ordinary

common law fraud. The principle is that the limitation period is denied to fiduciaries. But dishonest assisters are not fiduciaries." Para 24

29.    These decisions represent a formidable corpus of modern and carefully reasoned authority in favour of a principle which is in my view correct.

*Is knowing receipt different?*

30.    Mr Adkin realistically acknowledged that so far as his client's claim was based on dishonest assistance in a breach of trust, the Central Bank could not be regarded as a trustee for the purposes of the Limitation Act. But he submitted that so far as his claim was based on knowing receipt or on a right to follow the money into the hands on the Central Bank, the position was different. I do not think that it is.  It is true that many of the authorities which I have reviewed involved the participation of the defendant in a fraud, and some of the statements of principle are expressed by reference to that situation.  But others, notably *Taylor v Davies*, did not involve fraud and can only be analysed as cases of knowing receipt.  The difficulty about Mr Adkin's submission is that the principle does not depend on the difference between assistance and receipt, dishonesty or innocence. It depends on the difference between the liability of a true trustee, and the liability which a stranger incurs solely by reason of his participation in the very misapplication of trust assets which the claimant seeks to impeach.

31.    The essence of a liability to account on the footing of knowing receipt is that the defendant has accepted trust assets knowing that they were transferred to him in breach of trust and that he had no right to receive them. His possession is therefore at all times wrongful and adverse to the rights of both the true trustees and the beneficiaries.  No trust has been reposed in him.  He does not have the powers or duties of a trustee, for example with regard to investment or management. His sole obligation of any practical significance is to restore the assets immediately. It is true that he may be accountable for any profit that would have been made or any loss that would have been avoided if the assets had remained in the hands of the true trustees and been dealt with according to the trust. There may also, in some circumstances, be a proprietary claim. But all this is simply the measure of the remedy.  It does not make him a trustee or bring him within the provisions of the Limitation Act relating to trustees.

*Application of section 21(1)(a) to an action against a non-trustee*

32.    If, as I conclude, the Central Bank was not a trustee, the question arises whether it is nevertheless a party sued "in respect of any fraud or fraudulent breach

of trust to which the trustee was a party or privy." Section 8 of the Trustee Act 1888 applied to "any action or other proceeding against a trustee or any person claiming through him." Accordingly, it was expressly confined to actions against a trustee. However, the words which I have quoted were lost when the provision was reformulated in 1939. Did this change, which carried through into section 21 of the Act of 1980, extend the scope of that provision to actions against a stranger who was not a trustee? Mr Adkin submits that it did. But no authority has ever supported that contention apart from a tentative dictum of Danckwerts J in *GL Baker Ltd v Medway Building and Supplies Ltd* [1958] 1 WLR 1216, at 1222 and an alternative ratio of Evans-Lombe J in *Statek Corporation v Alford* [2008] EWHC 32 (Ch). For my part, I would accept that this is a linguistically possible construction. But I think that it is mistaken because it overlooks the principles of equity which provide the background and subject-matter of this section. In my opinion, it clear that section 21(1)(a) of the Act of 1980 is concerned only with actions against trustees on account of their own fraud or fraudulent breach of trust.

33.     In the first place the whole of the legislative history, as I have summarised it above, demonstrates that what is now section 21(3) was intended to relieve trustees, save in the two cases specified in section 21(1), from the harsh consequences of the equitable rule which held them liable to account without limitation of time. The exceptions must apply to the same persons as the rule. On a correct analysis of the law, restated in *Taylor v Davies* and *Clarkson v Davies*, the rule had never applied to strangers who were subject only to an ancillary liability, and they had therefore never needed to be relieved. This was essentially the ground on which Lord Hoffmann in *Peconic Industrial Development Ltd v Lau Kwok Fai* [2009] 5 HKC 135, paras 24 and 25 considered that the corresponding provision in the Hong Kong ordinance had no application to claims against such persons.

34.     Second, unlike section 21(3), which introduces the general limitation period for trust claims, section 21(1)(a) is limited to cases of fraud or fraudulent breach of trust "to which the trustee was a party or privy". These words are there to relieve trustees who acted in good faith, including the honest co-trustees of a dishonest trustee. They would be unnecessary if the provision applied to actions against strangers to the trust, because any fraudulent breach of trust must necessarily be one to which the trustee is a party or privy. The inclusion of the phrase makes sense only on the footing that the section applies to actions against trustees and that it was intended to limit the circumstances in which it applied to them. The point is reinforced by the use of the definite article ("the trustee"), which can only mean that the draftsman was referring to fraud or fraudulent breach of trust on the part of the particular trustee sued.

35.     Third, the ancillary liability of a stranger to the trust arises independently of any fraud on the part of the trustee. This has always been recognised in the case of ancillary liabilities on the footing of knowing receipt. A liability on that basis does

not require proof of any dishonesty on anyone's part. Knowing assistance is different. It is based on fraud. But it is now clear that that knowing assisters are liable on account of their own dishonesty, irrespective of the dishonesty of the trustees: *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 There is no rational reason why the draftsman of section 21(1)(a) should have intended that the availability of limitation to a non-trustee should depend on a consideration which had no bearing on his liability, namely the honesty or dishonesty of the trustee. Mr Adkin submitted that the Act was drafted on the mistaken assumption that liability for knowing assistance depended on the dishonesty of the trustee, because that was how Lord Selborne had expressed it in *Barnes v Addy* and everyone assumed it to be the law when the legislation assumed its current form in 1939. I do not accept this. The liability of a knowing assister has always depended on the unconscionability of *his* conduct. Cases involving an honest trustee and a dishonest assister have rarely arisen, whether before or after 1939. In practice the trustee usually is dishonest and the alleged constructive trustee's conscience is affected because he has participated in the scheme with knowledge of that fact. That was why Lord Selborne spoke as he did. But the authorities cited by Lord Nicholls of Birkenhead in *Royal Brunei Airlines*, at 385, show that in those, older, cases where the question of the honest trustee and the dishonest assister had been considered, the critical question was the state of mind of the assister. The problem, as he pointed out at 386, was the tendency since *Selangor United Rubber Estates Ltd v Craddock (No. 3)* [1968] 1 WLR 1555 to read Lord Selborne's statement like a statute.

36.    Finally, section 21(1)(b), which deals with actions to recover trust property in the possession of the trustee, is unquestionably limited to actions against the trustee. It does not apply to actions against third parties such as knowing recipients of trust property. I can discern no rational reason why Parliament, if it wished to exclude persons under an ancillary liability, should have done so in cases where such persons were liable to account on the footing of knowing assistance but not in cases of knowing receipt. The truth is that both paragraphs (a) and (b) are concerned with actions against the trustee.

37.    The Report of the Wright Committee seems to me to have no bearing on this issue. The relevant part of it is concerned only with the question how a trustee should be defined for the purposes of statutory limitation. The present issue arises only once it is concluded that the Bank was not a trustee for the purposes of statutory limitation. I agree with Lord Neuberger that if anything the Committee's analysis tends to militate against giving a wider meaning to section 21(1)(a) of the Act.

*Conclusion*

38.    For these reasons, and for the very similar reasons given by Lord Neuberger, I would allow the appeal and declare that the English court has no jurisdiction which

it ought to exercise in respect of the 1986 trust claims. It follows that those claims should be struck out.


**LORD NEUBERGER, (with whom Lord Hughes agrees)**


*Introductory*

39.     This appeal, whose substantive and procedural history is summarised in paras 1 and 2 above, raises two questions, both of which concern the scope of section 21(1)(a) of the Limitation Act 1980 ("the 1980 Act"), which, together with the other relevant statutory provisions, is set out in para 3 above.


40.     The questions which arise are:

> a)   Is a stranger to a trust who is liable to account on the grounds of knowing receipt of trust assets and/or on the grounds of dishonest assistance in a breach of trust, a "trustee" for the purposes of section 21(1)(a) of the 1980 Act ("section 21(1)(a)")?

> b)   Does an action "in respect of" any fraud or fraudulent breach of trust under section 21(1)(a) to which the trustee was a party or privy, include an action against a party which is not itself a trustee?


Given the rather tangled way in which the law has developed in this area, through both cases and statutes, it is important to bear in mind that these are separate questions, although they are concerned with resolving the same issue.


41.     In the courts below, the respondent, Dr Williams conceded that the answer to the first question was "no", but he now contends that it is "yes"; he also contends, as he contended below, that the answer to the second question is "yes", and the Court of Appeal (Sir Andrew Morritt C, and Black and Tomlinson LJJ) agreed – see [2013] QB 499. The appellant, Central Bank of Nigeria, contends that the answer to both questions is "no".


42.     There is a divergence of opinion in this Court as to the outcome of Central Bank of Nigeria's appeal to this Court. I agree with Lord Sumption that this appeal

should be allowed. However, because the resolution of the two issues is not easy, the first issue has been raised for the first time in this Court, we are not all agreed, and I differ from the Court of Appeal, I propose to give my reasons for allowing the appeal. In doing so, I shall consider the two questions in turn.

### The meaning of "trustee" in section 21(1)(a)

#### Limitation bars on claims against trustees

43.     It is important to bear in mind the history of the law relating to limitation and trustees, now contained in section 21 of the 1980 Act, particularly when considering earlier judicial decisions.

44.     Until 1888, there was no express statutory limitation period applicable to claims in equity. However, as Lord Redesdale LC (Ireland) explained in *Hovenden v Lord Annesley* (1806) 2 Sch & Lef 607, 632, the Courts of Equity took the view that "wherever the legislature has limited a period for law proceedings, equity will, in analogous cases, consider the equitable rights, as bound by the same limitation". He added that the Courts of Equity also proceeded on the basis that "trust and fraud are not within the statute" – ie that there was no "virtual enact[ment]", to use his language at 631, which applied to claims for breach of trust or claims based on fraud.

45.     The sweeping procedural reforms of the 1870s maintained this position, in that section 25(2) of the Judicature Act 1873 ("the 1873 Act") specifically excluded from the ambit of "any Statute of Limitations", any "claim of a *cestui que trust* against his trustee … in respect of any breach of trust".

46.     Thirteen years later, section 8 of the Trustee Act 1888 ("the 1888 Act") entitled a trustee to raise a limitation defence against a claim brought by a beneficiary. The relevant parts of section 8 of the 1888 Act (section 8"), which did not involve a repeal of section 23(2) of the 1873 Act, are set out in para 22 above.

47.     The law on limitation of actions generally was considered by the Law Revision Committee in its *Fifth Interim Report (Statutes of Limitation)* Cmd 5334 ("the 1936 Report"), which was presented to Parliament in December 1936. The recommendations in the 1936 Report resulted in the Limitation Act 1939 ("the 1939 Act"). In para 24, Lord Sumption sets out the centrally relevant passages in the 1936 Report, and Lord Mance, in paras [146-147] quotes passages from the speeches of the Lord Chancellor, Lord Wright and Lord Romer in the House of Lords, and of the Solicitor General in the House of Commons, when introducing the Bill which became the 1939 Act.

48.     The 1939 Act repealed all previous legislation relating to limitation (including section 25(2) of the 1873 Act and section 8) and contained provisions which were, for present purposes, to the same effect as the sections of the 1980 Act summarised in para 3 above. The 1980 Act repealed the 1939 Act, and re-enacted almost all its provisions, albeit with many significant amendments, none of which is relevant to the first (or indeed the second) issue on this appeal.

*The proper approach*

49.     The word "trustee" in section 21(1)(a) is defined in section 38(1) of the 1980 Act, which provides that "'trust' and 'trustee' have the same meaning respectively as in the Trustee Act 1925".

50.     Where a term in a later statute is defined by reference to a definition in an earlier statute, it seems to me self-evident that the meaning of the definition in the later statute must be the same as the meaning of the definition in the earlier statute. Hence, the meaning of the term in the later statute is determined by the definition in the earlier statute. Further, the adoption of the definition in the later statute cannot somehow alter the meaning of the definition in the earlier statute. It accordingly follows that one has to determine the meaning of the term in the later statute simply by construing the definition in the earlier statute. Thus, the meaning of "trustee" in section 21(1)(a) must be determined by construing the definition of "trustee" in section 68(1)(17) of the 1925 Act ("section 68(1)(17)"). In the light of Lord Mance's judgment, it is, I think, important to emphasise that the way in which the definition of "trustee" in section 68(1)(17) is incorporated into the 1980 Act appears to leave no scope for contending that the meaning of the expression in the 1980 Act can somehow be different from that which it bears in the 1925 Act.

51.     It follows from this that a correct reformulation of the first question raised on this appeal is whether the definition of "trustee" in section 68(1)(17) includes a stranger to a trust who is a knowing recipient or a dishonest assister – ie a person, not otherwise a trustee, who is liable to account on the grounds of knowing receipt of trust assets and/or on the grounds of dishonest assistance in a breach of trust.

52.     The 1925 Act was, of course, a consolidating statute, with amendments, which formed part of the sweeping property law reforms of that year. It was concerned with the powers and duties of trustees, not with limitation, and the definition in section 68(1)(17) largely follows the wording of the definition of "trustee" in earlier legislation concerned with the powers and duties of trustees, the Trustee Acts 1850 and 1893. In my view, therefore, judicial decisions as to the meaning of "trustee", or related expressions, in a non-statutory context or in

Page 23

connection with different legislation, have to be approached with a degree of caution.

53.     I also consider that it is self-evident that statements made in the 1936 Report, and by the Solicitor General in Parliament in connection with the Bill which became the 1939 Act must be irrelevant to the resolution of the first issue on this appeal. What a committee recommended in 1936, or what was said in Parliament in 1939, cannot, as I see it, possibly affect the meaning of a definition in a statute enacted in 1925.

*The problem thrown up by the first issue*

54.     The definition of "trustee" in section 68(1)(17) ("the Definition") obviously extends to a person who accepts property expressly (or impliedly) on the basis that he is to hold it for the benefit of another, a classic definition of a trustee. It is also apparent that the term includes a trustee de son tort, a somewhat archaic expression, explained thus in *Lewin on Trusts* 18th ed, (2008) para 42-74:

> "If a person by mistake or otherwise assumes the character of trustee when it does not really belong to him, he becomes a trustee de son tort and he may be called to account by the beneficiaries for the money he has received under the colour of the trust. A trustee de son tort closely resembles an express trustee. The principle is that a person who assumes an office ought not to be in any better position than if he were what he pretends: he is accountable as if he had the authority which has been assumed."

55.     However, as Millett LJ explained in *Paragon Finance Plc v DB Thackerar & Co (a firm)* [1999] 1 All ER 400, 409, the Courts of Equity treated as a trustee not only an express or implied trustee and a trustee de son tort, but also a person, who "though not expressly appointed as trustee, has assumed the duties of a trustee by a lawful transaction which was independent of and preceded the breach of trust and is not impeached by the [claimant]". As he then said, such a person is known as a constructive trustee, and "really is a trustee", as "his possession of the property is coloured from the first by the trust and confidence by means of which he obtained it, and his subsequent appropriation of the property to his own use is a breach of that trust".

56.     It is, rightly, common ground that the persons described in paras 16 and 17 above are properly called trustees and are within the scope of the Definition. The question which arises is whether a person who is treated as accountable to the

claimant in equity solely as a result of (i) knowingly wrongly receiving property, or (ii) dishonestly assisting a trustee in committing a breach of trust, is a constructive trustee for the purposes of the Definition.

*Knowing recipients: the authorities*

57.     A number of clear and considered judicial observations over the past two centuries seem to me to make it clear that a knowing recipient is not a trustee. I have in mind what was said by Lord Redesdale in *Hovenden*'s case at pp 632-633, Lord Selborne LC in *Barnes v Addy* (1874) 9 Ch App 244, 251 Viscount Cave LC in *Taylor v Davies* [1920] AC 636, 650-1 and 653, Ungoed-Thomas J in *Selangor United Rubber Estates Ltd v Cradock (No. 3)* [1968] 1 WLR 1555, 1579 and 1582, Millett LJ in the *Paragon* case at pp 409-410, and Lord Hoffmann NPJ in the Hong Kong Court of Final Appeal in *Peconic Industrial Development Ltd v Lau Kwok Fai* [2009] 5 HK 135, para 24, quoted, respectively, by Lord Sumption in paras 14, 8, 23, 10, 11 and 28 above.

58.     The point at issue in *Hovenden*'s case involved a question of alleged knowing receipt. Lord Redesdale referred, at pp 632-633, to a "trustee [who] does not execute his trust", and described such a person at p 633 as having "possession … according to the right of the party against whom he seeks to set it up". He then went on to explain that "the question of fraud is of a very different description" because "a person who is in possession by virtue of that fraud is not, in the ordinary sense of the word, a trustee, but is to be constituted a trustee by a decree of a court of equity founded on the fraud". He contrasted such a person's "possession in the meantime" with that of a trustee on the ground that it was "adverse to the title of the person who impeaches the transaction on the ground of fraud."

59.     In *Barnes v Addy,* Lord Selborne similarly distinguished between those who were "clothe[d] … with a legal power and control over the trust property, imposing on [them] a corresponding responsibility", and those to whom a similar "responsibility [was] extended in equity to others who are not properly trustees", such as those "actually participating in any fraudulent conduct of the trustee."

60.     In *Taylor v Davies*, the Privy Council adopted the same approach in connection with a Canadian limitation statute, which was in very similar terms to its contemporary English equivalent, section 8. At p 651, Viscount Cave, giving the judgment of the Board, said that, although time did not run in favour of a trustee properly so-called, "the position in this respect of a constructive trustee in the usual sense of the words - that is to say, of a person who, though he had taken possession in his own right, was liable to be declared a trustee in a Court of Equity - was widely different, and it had long been settled that time ran in his favour from the moment

of his … taking possession". Like section 8 and, now, section 21, the definition of "trustee" in the Canadian statute extended to a constructive trustee, but Viscount Cave said two pages later, that the references to constructive trustee apply "to a case where he originally took possession upon trust for or on behalf of others", so that "they refer to cases where a trust arose before the occurrence of the transaction impeached and not to cases where it arises only by reason of that transaction". (It is true that the defendant in that case was not alleged to be a knowing recipient in the normal sense, but the principle expressed by Viscount Cave is clear, and, in one sense, the facts were stronger against the defendant than in this case, as he already had fiduciary obligations to the plaintiff).

61.     That approach was followed by the Privy Council in another appeal concerning the same Canadian statutory provision, *Clarkson v Davies* [1923] AC 100. In that case, at pp 110-111, the Board (which included Viscount Cave), in a judgment written by Lord Scott Dickson, the Lord Justice-Clerk (who died before it was given) said *Taylor* was authority for "a distinction between a trust which arises before the occurrence of the transaction impeached and cases which arose only by reason of that transaction."

62.     In the *Selangor* case [1968] 1 WLR 1555, 1582, Ungoed-Thomas J explained that a person who was held liable to account as a knowing recipient was "made liable in equity as trustee by the imposition or construction of the court of equity", and explained that this was because the Court of Chancery considered it "equitable that he should be held liable as though he were a trustee" – ie he was liable to account in the same way as a trustee, not that he was a trustee and was therefore liable to account.

63.     Millett LJ (with whom Pill and May LJJ agreed) reached the same conclusion in his closely reasoned, bravura judgment, from which I have briefly quoted at para 54 above, in the *Paragon* case. It was also the conclusion reached by Lord Hoffmann (with whom the other four Justices of the Court of Final Appeal agreed) in the *Peconic* case at paras 19-24.

64.     To my mind, those observations are convincing and in accordance with principle. It is unreal to refer to a person who receives property dishonestly as a "trustee", ie a person in whom trust is reposed, given that the trust is said to arise simply as a result of dishonest receipt. Nobody involved, whether the dishonest receiver, the person who passed the property to him, or the claimant, has ever placed any relevant trust and confidence in the recipient. As Millett LJ expressed the point in the *Paragon* case at p 409, a knowing recipient "never assumes the position of a trustee and if he receives the trust property at all it is adversely to the [claimant]"; and, while he is "not a trustee at all", "he may be liable to account as if he were".

*Knowing assistance: the authorities*

65.    While the cases I have just been discussing suggest a clear and consistent approach to knowing recipients, they do not, as Lord Mance says, deal with dishonest assisters. Indeed, dishonest assisters were expressly discussed by Millett LJ in the *Paragon* case in the passage Lord Mance quotes at para 124 below. However, I have some trouble with that observation of Millett LJ. First, it misses the essential point that the meaning of "trustee" in section 21(1)(a) is not to be determined by reference to earlier cases or statutes on limitation, but by reference to the definition in section 68(1)(17). Secondly, there is no reason why an accessory to a fraud should not be subject to a shorter limitation period than the principal fraudster. In any event, Millett LJ was merely saying that there was "a case" for treating dishonest assisters in the same way as fraudulent trustees, when it came to limitation.

66.    In my judgment, given that knowing recipients are not constructive trustees, it must follow that dishonest assisters are not either. As Professor Mitchell observed in *Dishonest Assistance, Knowing Receipt and the Law of Limitation* [2008] 72 Conv 226, 233, "it is harder to characterise dishonest assistants as 'trustees' than it is knowing recipients", not least because dishonest assisters do not take possession of any of the funds at issue (as if they did, they would be knowing recipients). If a dishonest trustee was assisted by X in stealing trust funds, and then passed on some of those funds to Y, and X and Y both were aware of the dishonesty, it would be remarkable if X, who merely helped the trustee and did not receive any of the trust funds, was deemed a trustee when Y, who actually received (and maybe still holds) some of the funds was not.

67.    Furthermore, many of the points made by Millett LJ in the *Paragon* case as to why a knowing recipient is not a trustee (reflecting what was said in the earlier cases mentioned in para 19 above) apply equally to a dishonest assister. Two examples should suffice, but there are many others. At p 409, he said that a knowing recipient "never assumes the position of a trustee, and if he receives the trust property at all it is adversely to the plaintiff by an unlawful transaction which is impugned by the plaintiff" and that "there is no trust and usually no possibility of a proprietary remedy". That is at least as true of a dishonest assister. And Millett LJ's description at p 413 of *Taylor v Davies* as "mark[ing] a real difference between trustees (whether or not expressly appointed as such) who commit a breach of trust (however created) and persons who are not trustees at all but are described as trustees for the purpose of enabling equitable relief to be granted against them" applies to dishonest assisters just as it applies to knowing recipients.

68.    Accordingly, I agree with the conclusion reached by Mr Sheldon QC in his impressive judgment in *Cattley v Pollard* [2007] Ch 353, para 82, where he said that

Millett LJ's class of claims which do not give rise to a constructive trust, but simply amount to an obligation to account "is apt to cover the position of claims for dishonest assistance in a fraudulent breach of trust". As he went on to explain, this was on the basis that in the *Paragon* case Millett LJ was "drawing the distinction first expressed in the Privy Council cases [viz *Taylor v Davies* and *Clarkson v Davies*] between those whose trusteeship preceded the transaction impugned … and those who only became trustees on the occurrence of the transaction …".

*The statutory context*

69.     When one looks at the Definition, at least on its own, there is no reason to think that the drafter of section 68(1)(17) intended "constructive trust" or "trustee" to have a wider meaning than that which they had been accorded by the Courts of Equity over the years. Indeed, it would be surprising if a statute concerned with consolidating the law governing the powers and duties of trustees did not adopt an orthodox definition of "trust" and "trustee".

70.     If one casts one's eyes more widely, the provisions of the 1925 Act appear to me to reinforce the notion that knowing recipients or dishonest assisters were not intended to be covered by the Definition. The Act is concerned with classic trusts, or, as Millett LJ put it in the *Paragon* case at p 412, with "the powers and duties of trustees properly so called", rather than "persons whose trusteeship is merely a formula for giving restitutionary relief". It appears to me that a dishonest assister cannot be within the statutory definition as he does not have trust property without also being a knowing recipient, and, as for a knowing recipient, he "never assumes the position of a trustee" because his receipt of trust property "is adversely to the [claimant]", to quote Millett LJ again. I should add that that is a vital distinction between a trustee de son tort and a knowing recipient, which is why, assuming (which is almost certainly right) that a trustee de son tort is included within the section 68(1)(17) definition, that does not assist Dr Williams's case.

71.     The first four Parts of the 1925 Act deal with permitted investments, general powers of trustees, appointment and discharge, and the powers of the court; and the remaining, fifth, Part contains "general provisions". It is a little difficult to see how most of the sections of the 1925 Act could apply to a dishonest assister (at least unless he was also a knowing recipient), because he has no assets in respect of which he can he said to be a trustee. Further, many of the provisions appear inappropriate in relation to property for which a knowing recipient is obliged to account. I have in mind provisions such as sections 8, 30 (exculpatory where trust money lost on loans, or due to agent's defaults), section 25 (delegation of trustee's functions), 31 and 32 (powers of maintenance and advancement), 36-39 (power to retire and appoint fresh trustees) and 57 (power of court to authorise dealings). As Lord Sumption says in

para 31 above, a knowing recipient has one overriding duty, and that is to account for and return the property.

72.    Given the unambiguous way in which the 1939 and 1980 Acts incorporate the definition in the 1925 Act, the definition of "trustee" in the 1925 Act simply cannot have a different meaning in the later Acts from that which it has in the 1925 Act itself, simply because any wording is "subject to the context", or because of "the mischief being addressed" in the later Acts, or because of "Parliament's evident intention when enacting" the later Acts. When interpreting a statute, the court's function is to determine the meaning of the words used in the statute. The fact that context and mischief are factors which must be taken into account does not mean that, when performing its interpretive role, the court can take a free-wheeling view of the intention of Parliament looking at all admissible material, and treating the wording of the statute as merely one item. Context and mischief do not represent a licence to judges to ignore the plain meaning of the words that Parliament has used. As Lord Reid said in *Black-Clawson International Ltd v Papierwerke Waldhof-Aschaffenburg AG* [1975] AC 591, 613, "We often say that we are looking for the intention of Parliament, but that is not quite accurate. We are seeking the meaning of the words which Parliament used".

73.    In the present instance, the definition sections of the 1939 and 1980 Acts unambiguously state that the meaning of "trustee" is to be determined by reference to the definition in the 1925 Act. For a court to suggest that, in the 1939 or 1980 Acts, the definition or the expression can have a different meaning from that which it has in the 1925 Act is both inconsistent with the plainly expressed will of Parliament as set out in the definition sections of the 1939 and 1980 Acts and a recipe for uncertainty in future cases of statutory interpretation.

*The obiter dicta in Soar v Ashwell*

74.    I have not so far referred to observations in *Soar v Ashwell* [1893] 2 QB 390, which are strongly relied on to support the wider interpretation of "trustee", so that it incorporates a dishonest assister and/or a knowing recipient.

75.    The actual decision in *Soar v Ashwell* that limitation could not be relied on was unexceptionable, because, as the court held, the deceased solicitor whose estate was being sued was liable, on any view, as a trustee - either because he received the property concerned as a trustee for the trustees of a pre-existing and fully constituted trust (per Lord Esher MR at p 394 and Bowen LJ at pp 397 and 398), or because he became a trustee de son tort of that trust (per Kay LJ at pp 405-406). However, each member of the Court of Appeal in *Soar v Ashwell* expressed obiter views which are said to support the notion that a dishonest assister or a knowing recipient is a trustee.

76.     After explaining that a trustee de son tort could not rely on limitation, Lord Esher added this at pp 394-395:

> "There is another recognised state of circumstances in which a person not nominated a trustee may be bound to liability as if he were a nominated trustee, namely, where he has knowingly assisted a nominated trustee in a fraudulent and dishonest disposition of the trust property. Such a person will be treated by a Court of Equity as if he were an express trustee of an express trust."

77.     Bowen LJ, again after referring to the fact a trustee de son tort could not rely on limitation, said this at pp 396-397:

> "Secondly, the rule as to limitations of time which has been laid down in reference to express trusts has also been thought appropriate to cases where a stranger participates in the fraud of a trustee … . Thirdly, a similar extension of the doctrine has been acted on in a case where a person received trust property and dealt with it in a manner inconsistent with trusts of which he was cognizant … ".

78.     And Kay LJ observed at p 405, after reviewing the authorities:

> "[T]here are certain cases of what are, strictly speaking, constructive trusts, in which the Statute of Limitations cannot be set up as a defence. Amongst these are the case where a stranger to the trust has assumed to act and has acted as a trustee, and the case where a stranger has concurred with the trustee in committing a breach of trust, and has taken possession of the trust property, knowing that it was trust property, and has not duly discharged himself of it by handing it over to the proper trustees or to the persons absolutely entitled to it."

79.     Properly analysed, I am of the view that these observations ("the obiter dicta in *Soar v Ashwell*") do not support a positive answer to the issue posed in para 40(a) above.

80.     In the passage quoted in para 76 above, Lord Esher did not say that a dishonest assister is a trustee; he said that a dishonest assister is liable "as if he were a nominated trustee", and that he is treated in equity "as if he were an express trustee". In other words, he was saying that, at least in some circumstances for the purpose of limitation, Courts of Equity treated such a person not *as* a trustee, but *as if he were* a trustee. For present purposes it does not matter whether Lord Esher

intended that passage to apply to limitation cases, which is not as clear as it may seem, because to read it in this way would be inconsistent with what he said at p 394 (quoted by Lord Sumption at para 18 above), as well as with the reasoning of Lord Redesdale in *Hovenden*'s case and Sir William Grant MR in *Beckford v Wade* (1805) 17 Ves Jr 87 (discussed above by Lord Sumption at para 15). The essential point, it seems to me, is that Lord Esher was saying that a dishonest assister is not actually a trustee. Accordingly, as the meaning of "trustee" in the limitation legislation has been taken from the 1925 Act, where it has an orthodox meaning, I am of the view that Lord Esher's observations, if anything, actually assist the interpretation I favour.

81.     The same is true of Bowen LJ's observations. The statement that "the rule as to limitations of time which has been laid down in reference to express trusts has also been thought appropriate to cases" of dishonest assistance, highlights two points. The first part of that statement shows that Bowen LJ was concerned with limitation law, not with the meaning of "trustee"; the subsequent words appear to distinguish between a "stranger" as opposed to a "trustee". The latter point is reinforced by the closing words of the passage I have quoted, namely that a "similar extension of the doctrine" is made in relation to knowing recipients. In other words, Bowen LJ expressed himself in a way which indicated that he did not consider dishonest assisters or knowing recipients to be trustees, but that the Court of Equity's disapplication of limitation periods to claims against trustees was extended to such people, even though they are not trustees. Again, when one bears in mind the issue which we have to determine, namely the meaning of the word "trustee", Bowen LJ appears to have regarded a dishonest assister or a knowing recipient as not being a trustee.

82.     Kay LJ does not seem to me to have expressly dealt with dishonest assisters or knowing recipients, although he may well have agreed with his colleagues' obiter dicta, particularly in the light of his suggestion that in some earlier cases where limitation had been raised, courts had treated the "trustee" exemption as going wider than was laid down in *Hovenden*'s and *Beckford*'s cases. The two strongest cases for this purpose are *Wilson v Moore* (1834) 1 My&K 337 and *Bridgman v Gill* (1857) 24 Beav 302. In each case, the defendants, "merchants" in one case and "bankers" in the other, held money which they knew to be trust money, which they then took for themselves to pay a debt owed to them by the trustee personally, which they knew was a breach of trust. However, neither in *Wilson v Moore* nor in *Bridgman v Gill* did the plaintiff beneficiary need to assert a trust arising as a result of, or even at the moment of, the misappropriation. He simply relied on fact that, at the time of the misappropriation, the defendants held the money subject to a pre-existing trust whose terms they knew precluded their taking the money for themselves. The decisions therefore can be said to fall within the principle stated by Lord Redesdale in *Hovenden*'s case, and by Millett LJ in the *Paragon* case.

83.     Whether or not they were so intended (and, as indicated, I accept that they may very well have been), the obiter dicta in *Soar v Aswell* were regarded as representing the law on limitation in a number of subsequent cases. In *In re Gallard* [1897] 2 QB 8, 14, they were cited, relied on and applied by Vaughan Williams J. In *In re Dixon* [1900] 2 Ch 561, 574, Sir Richard Webster MR considered the *obiter dicta*, and regarded them as binding authority, but neither Rigby LJ nor Collins LJ addressed the point (although Rigby LJ's slightly cryptic comment at the bottom of p 580 suggests that he may have agreed with the Master of the Rolls on the point). *In re Eyre-Williams* [1923] 2 Ch 533 deserves special consideration because, at pp 537-541, Romer J considered the obiter dicta in some detail and regarded them as binding; he also referred to them briefly as representing the law in *In re Mason* [1928] 1 Ch 385, 394. And Maugham J referred to the obiter dicta very briefly, on the apparent assumption that they were correct in *In re Blake* [1932] Ch 54, 63.

84.     *Soar v Ashwell* was decided on the basis of the law of limitation as developed by the Courts of Equity. Thus Lord Esher said at p 393 that the two questions to be answered were was "the plaintiff within a meaning of the word 'trustee' attributed to it in equity, and was he such a trustee as a Court of Equity will not allow to rely on the Statutes of Limitation", and Bowen LJ at p 395 described the question at issue as being "whether the claim of the plaintiff can be barred through lapse of time, by analogy to the Statute of Limitations". The only reference to any statutory provision was made by Kay LJ who at p 403 referred to section 25 of the 1873 Act. However, he mentioned that provision simply to say that it effected no change in the law.

85.     The absence of any reference in *Soar v Ashwell* to section 8(1) may seem a little mystifying, as the action was commenced in 1891, and section 8(3) provided that section 8(1) applied to an action started in or after 1890. However, as I see it, section 8(1) could not have been relied on by the defendant in that case, as, even if the solicitor had been a trustee, his estate "still retained" the "trust property, or the proceeds thereof". Given that section 25(2) of the 1873 Act was still in force, the limitation argument had to be decided on the basis of the law as developed by the Courts of Equity.

86.     In *In re Eyre-Williams* at p 537, Romer J specifically explained why section 8(1) did not apply (namely because the money at issue had been "received by the testator [viz the deceased trustee] and applied to his own use"), and, in those circumstances, he similarly dealt with the limitation defence by reference to the law as developed by the judges in relation to equitable claims. Having considered that case law, he concluded at p 541 that he was bound by the obiter dicta in *Soar v Ashwell*. The judges in the other cases referred to in para 81 appear to have adopted the same approach, but their reasoning was much more attenuated.

87.     Thus, in all the cases in which the obiter dicta in *Soar v Ashwell* have been followed, the courts approached the issue before them (i) on the basis that the question at issue concerned limitation rather than a statutory definition of "trustee", (ii) on the assumption that the relevant law on limitation was as it had been developed by the Courts of Equity rather than as laid down in statute, (iii) on the assumption that the obiter dicta in *Soar v Ashwell* were intended to apply to limitation, (iv) on the basis that the obiter dicta were effectively binding, and (v) without considering the principles enunciated in *Hovenden*'s or *Beckford*'s cases.

88.     Given that, since 1939, the definition of "trustee" for limitation purposes has been that in section 68(1)(17), and it is with that statutory definition with which the first issue on this appeal is concerned, I do not consider that it would be very helpful to say much more about the obiter dicta in *Soar v Ashwell* and the cases in which they were applied. The approach in those cases, all of which of course preceded the 1939 Act, is, at least in some respects, as likely to mislead as to assist when it comes to interpreting section 68(1)(17).

89.     Having said that, I consider that the obiter dicta in *Soar v Ashwell* were probably incorrect (if they were intended to suggest that a knowing recipient or dishonest assister could not rely on common law limitation periods), because they were inconsistent with the earlier decisions discussed, and for the reasons given, in paras 57-68 above, as well as for the fuller reasons given by Lord Sumption.

*Conclusion on the first issue*

90.     Accordingly, I conclude that a "trustee" in section 21(1)(a) does not include a party who is liable to account in equity simply because he was a dishonest assister and/or a knowing recipient. This is because such a party, while liable to account in the same way as a trustee, is not, according to the law laid down by the courts, a trustee, not even a constructive trustee; and "trust" and "trustee" in the 1925 Act were meant to have orthodox meanings. Further, even if the obiter dicta in *Soar v Ashwell* (assuming that they were intended to apply to limitation, as Dr Williams contends, as they may well have been, and as they were understood to have been in subsequent cases) were correct (which I do not think they were), they do not call this into question.

**An action "in respect of any fraud or fraudulent breach of trust"**

*The nature of the issue*

91.     In the light of my conclusion on the first issue, namely that neither a dishonest assister nor a knowing recipient is a "trustee" for the purpose of section 21(1)(a), it is necessary to address the second issue, namely whether such a person, while not a "trustee", is nonetheless properly a party who is sued "in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy" within section 21(1)(a).

92.     The second issue requires us to decide (i) whether section 21(1)(a) only applies to claims brought against the trustee who was "a party or privy" to the "fraud or fraudulent breach of trust" ("the narrower meaning"), or (ii) whether it applies to anyone, including such a trustee, who was involved in the "fraud or fraudulent breach of trust" ("the wider meaning").

93.     Unlike the first issue, which involves interpreting a word in section 21(1)(a) by reference to a definition in another statute, this second issue involves construing section 21(1)(a) directly. Further, although the 1936 Report is of potential relevance to the second issue, this issue does not require much consideration of earlier judicial decisions.

*The arguments based on the wording of section 21(1)(a)*

94.     It is convenient to start the examination by saying that, in agreement with Lord Mance, I consider that, if section 21(1)(a) has the wider meaning, it could be relied on against dishonest assisters or advisers, without applying to innocently (as opposed to fraudulently) negligent co-trustees and professional advisers, of a fraudulent trustee. Where a trustee defrauds a trust, a claim against a dishonest assister or adviser can fairly be described as "an action … in respect of [that] fraud or fraudulent breach of trust", and that would also normally be true in the case of a dishonest recipient. However, as discussed more fully below, the words "in respect of" are flexible, in that they can have a broad or a restricted effect. Accordingly, while the contrary view is tenable as a matter of language, the context of section 21(1)(a) suggests that a claim against an innocently negligent co-trustee or professional adviser of the fraudulent trustee is not "an action … in respect of …fraud or fraudulent breach of trust". Rather it should be characterised as an action "in respect of [their] negligence". In the case of a co-trustee, this is borne out by what is stated in Article 96.1 of Underhill and Hayton's *The Law of Trusts and Trustees*, 18th ed (2010), namely that a trustee "is not vicariously answerable for the … defaults of his co-trustee, but only for his own acts or defaults".

95.     With that introductory point, I turn to the wording of section 21(1)(a). On a quick reading, one can well see how the provision may strike a reader as having either the wider or the narrower meaning. In particular, it may appear to bear the

wider meaning, because, while para (a) limits the type of action to which it applies, there appears to be no express qualification as to the identity of the person against whom that action may be brought. However, closer examination calls that impression into question, and suggests that there are five reasons for thinking that section 21(1)(a) has the narrower meaning.

96.    First, if section 21(1)(a) has the wider meaning and is not limited to claims against "the trustee" referred to at the end of para (a), it is hard to see what effect can be given to the words "to which the trustee was a party or privy". Given that the wider meaning involves giving a restricted effect to the words "in respect of", so that only those involved in the fraud would be within section 21(1)(a) on the wider meaning, they must include "the trustee", not least because there can be no breach of trust save one to which the trustee was "a party or privy". On the other hand, if the narrower meaning is correct, the expression "in respect of" can be given a broad effect, so that the words "to which the trustee was party or privy" serve an important function, in that they limit the circumstances in which section 21(1)(a) can apply to a trustee. I note that this point caused Black LJ concern in the Court of Appeal, although she ultimately agreed that the wider meaning was correct – see at [2013] QB 499, para 56.

97.    Approached in this way, I consider that the fact that it is common ground that the words "an action … in respect of any breach of trust" in section 21(3) are broad enough to cover a claim against a dishonest assister or knowing recipient, actually support, rather than undermine this first reason. At first sight, there is force in Lord Clarke's argument that, if that expression in section 21(3) covers dishonest assistance or knowing receipt, the similar expression "an action … in respect of any … fraudulent breach of trust" in section 21(1)(a) should do so as well. But the vital words "to which the trustee was a party or privy" are not to be found in section 21(3). The essential point in this connection is that the fact that the expression "in respect of" in section 21(3) has a broad, rather than a restrictive, effect suggests that the expression should also have a broad effect in section 21(1)(a), in which case the words "to which the trustee was a party or privy" are otiose unless section 21(1)(a) as a whole is given the narrower meaning for which Central Bank of Nigeria contends, rather than the wider meaning supported by Dr Williams.

98.    Secondly, the expression "the trustee" at the end of section 21(1)(a) presents a difficulty unless the "action" in the opening part of the subsection is understood as meaning an action against a trustee, and in particular the trustee referred to in the closing words of the paragraph. If one does not read the opening part in this way, it is hard to justify the use of the definite article in the expression "the trustee" in para (a): it would have to mean "a trustee". If it is said that "the trustee" means the trustee against whom the action is brought, then that would bring one back to the reading of the opening words of section 21(1) suggested at the start of this paragraph.

Page 35

99.     Thirdly, the wider meaning would have the consequence that section 21(1)(a) could be relied on against a dishonest knowing recipient or a dishonest assister if one of the trustees was guilty of fraud, but it could not be relied on against such a person if the trustee was merely negligent, and not guilty of fraud. It seems inappropriate that the ability of a dishonest assister or dishonest knowing recipient to invoke the normal six-year limitation period should depend on whether or not the trustee, whom he assisted or from whom he received trust assets, was fraudulent. This is not a fanciful possibility. As Mr Sheldon QC rightly pointed out in the *Cattley* case, para 41, Lord Nicholls in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 said in terms that "an accessory will be liable if there is dishonest assistance on his part in the breach of trust by the trustee irrespective of whether or not the breach of trust by the trustee was itself dishonest".

100.    Fourthly, there is section 21(1)(b), which is concerned with claims to recover trust property or its proceeds from the trustee. Like section 21(1)(a), it disapplies the normal six year time limit, but it quite clearly only applies to claims against a trustee, and does not apply to claims against dishonest assisters or knowing recipients, even if the recipient is not only knowing, but dishonest. It may be hard to think of a case where such a claim could be brought against a dishonest assister who was not also a knowing recipient, but that does not weaken the point that it would be very odd if section 21(1)(a) applied to dishonest knowing recipients as well as to trustees, given that section 21(1)(b) only applies to trustees.

101.    Fifthly, and perhaps less tellingly, it is clear that section 21(1)(a) and (b) originate from section 8(1) of the 1888 Act (set out in para 22 above), and there is no doubt that  the benefit of that provision was limited to a claim against the fraudulent trustee, and not any dishonest assister or knowing recipient.

102.    These points persuade me that section 21(1)(a) can only be invoked by a beneficiary against a trustee, and not against a knowing recipient or a dishonest assister. The narrower meaning is not called into question by the obiter dicta in *Soar v Ashwell* or judicial views expressed in any other case prior to the 1980 Act, save for some very tentative remarks of Danckwerts J in *GL Baker Ltd v Medway Building and Supplies Ltd* [1958] 1 WLR 1216, 1222 (reversed on other grounds at p 1225). It is only fair to add that, at least as far as I can see, there is no decision prior to the 1980 Act which calls the wider meaning into question, as neither in *Taylor v Davies* nor in *Clarkson v Davies* did this point arise; at any rate, it was not apparently considered.

*The 1936 Report*

103.    In support of the wider meaning of section 21(1)(a), reference was made to the 1936 Report and what was said in Parliament when the Bill which became the 1939 Act was introduced by the Solicitor General. In that connection, provided certain requirements are satisfied, the contents of the 1936 Report and what was said in Parliament can be raised as an aid to interpretation.

104.    However, one must not lose sight of four important factors in that connection. First, the court's constitutional role in any exercise of statutory interpretation is to give effect to Parliament's intention by deciding what the words of the relevant provision mean in their context. Secondly, it follows that, in so far as any extraneous material can be brought into account, it is only as part of that context. Thirdly, before such material can be considered for the purpose of statutory interpretation, certain requirements have to be satisfied – see eg per Lord Mance in *The Presidential Assurance Co Ltd v Resha St Hill* [2012] UKPC 33, para 23 and per Lord Browne-Wilkinson in *Pepper v Hart* [1993] AC 593, 640. Fourthly, even where those requirements are satisfied, any court must be wary of being too ready to give effect to what appears to be the Parliamentary intention from what was said by the authors of a report or by the sponsors of the relevant Bill: one cannot always be sure that what they say has been read or heard, or accepted, by the Parliamentarians who voted in favour of the provision in question.

105.    Having said that, I accept that, as was said in the *Presidential Assurance* case, at para 23, in principle, "assistance" in interpreting legislation "can … be obtained as to the general background and as to the mischief which the legislation was addressing by looking at the reports of the proceedings in Parliament".

106.    Turning now to the 1936 Report, para 11 identified "the only difficulty" with section 8 of the 1888 Act as being that it "does not apparently apply to a constructive trustee, eg an executor or an administrator". The Report went on to say that it was "difficult" to justify a rule whereby "an executor or other person holding property as a trustee, but not on an '*express*' trust, can plead [a limitation defence] though he still retains the trust property or has converted it to his own use". The Report then explained that the courts had given the concept of an "express trust" a very wide meaning, citing Bowen LJ's judgment in *Soar v Ashwell* and the cases cited by Romer J in *In re Eyre-Williams*. The Report then recommended that "the exception to [section 8] should be expressly made to extend to trustees whether holding on express or constructive trusts, including personal representatives". The specific recommendation at the end of the 1936 Report was that limitation "should only apply to constructive trustees to the extent that [it does] to express trustees". When the Bill which became the 1939 Act was introduced into Parliament, it was described as "based" on the 1936 Report.

107.   In my judgment, the 1936 Report is of no assistance when it comes to resolving the second issue. The only relevant recommendation of the Report related to the definition of "trustee", which does not apply to the second issue in this appeal at all. In any event, even in relation to the first issue, it takes matters no further, because the recommendation was simply that the definition of "trustee" should extend to personal representatives – which was achieved by adopting the section 68(1)(17) definition. It also may be worth adding that the reference to "constructive trustee" in the 1936 Report could be a little misleading as I do not think that it is intended thereby to refer to a constructive trustee in the sense that it has been used in the present appeal. As mentioned, the Report itself refers to the fact that section 8(1) "does not apparently apply to a constructive trustee, eg an executor or an administrator", who are not constructive trustees in the sense that the term is currently normally used, and, in any event, section 8 already included a "trust by construction" within the meaning of "trust".

108.   Nonetheless, it is said that the 1936 Report accepts the correctness of the obiter dicta, or at least the obiter dictum of Bowen LJ, in *Soar v Ashwell*. In addition, or perhaps in amplification, of what is said in para 103 above, there are a number of reasons why I consider that the references to the judgments of Bowen LJ and Romer J in the 1936 Report do not help the argument in support of the wider meaning of section 21(1)(a).

109.   First, it is not entirely clear that the 1936 Report does accept the correctness of the obiter dicta which are relied on by the respondent in this appeal and are set out in paras 74-76 above. The reference to Bowen LJ's judgment is very general in that it simply identifies the first page of the judgment, and the only one of the "cases referred to by Romer J in *In re Eyre-Williams*" which can actually be said to support the respondent's case in any way on this appeal is *Soar v Ashwell* itself.

110.   Secondly, even assuming that the obiter dicta in *Soar v Ashwell* were being approved in para 11 of the 1936 Report, the authors of the Report were in that paragraph considering the ambit of the words "trustee" and "trust", and were (on this assumption) saying that the words extended to a dishonest assister and a knowing recipient, and the trust funds they held. While that could have a bearing on the first issue on this appeal (were it not ruled out for the reasons given in paras 49-53 above), it cannot assist on the second issue on this appeal which is concerned with a different issue. Indeed, if anything, it could be said that, if the 1936 Report approved the obiter dicta, any such approval would support the narrower meaning of section 21(1)(a), because, on the view taken by the authors of the 1936 Report, "trustee" would have embraced dishonest assisters and, possibly, knowing recipients, so there would have been no need for section 21(1)(a) to have the wider meaning.

111.   Thirdly, one is here concerned with the intention of Parliament and I cannot accept the contention that Parliament somehow approved the observations in the 1936 Report relating to the obiter dicta in *Soar v Ashwell*. The purpose of the Bill which became the 1939 Act was to consolidate the law on limitation and to give effect to the recommendations of the 1936 Report. To contend that, in enacting those proposals, Parliament was adopting those recommendations, which therefore may be looked at for the purpose of interpreting the 1939 Act, is one thing. To contend that, in enacting those proposals, Parliament was approving the legal analysis or reasoning behind those recommendations, which therefore may be looked at for the same purpose, is quite another. Save possibly in a very clear case indeed, I consider that such an approach would be inappropriate. That is particularly true in this case, where the analysis and reasoning were somewhat opaque, unspecific, and unnecessary to the ultimate recommendation. Opaque as I have explained in para 102 above; unspecific because there was no explanation in the 1936 Report or by the Solicitor General as to what Bowen LJ or Romer J actually decided, and to assume that Parliamentarians would have appreciated the analysis and reasoning appears to me unrealistic; unnecessary, because the ultimate recommendation related to personal representatives, and therefore did not involve the question whether dishonest assisters or knowing recipients should be within the scope of section 21(1)(a).

112.   Fourthly, it would not in any event be safe to assume that Parliament followed every recommendation in the 1936 Report, let alone the thinking behind those recommendations, to the letter. This is not a case where the Report had a draft Bill attached or proposed draft clauses. Further, as Lord Sumption says in para 27, rather than incorporating and amending the definition of "trustee" in section 8, as the Report effectively suggested, Parliament decided to incorporate a definition from an existing statute.

*Conclusion on the second issue*

113.   I therefore disagree with the conclusion reached by the Court of Appeal on this second issue, and would hold that the narrower meaning of section 21(1)(a) is to be preferred.

**Conclusion**

114.   For these reasons, which are much the same as those of Lord Sumption, with whose judgment I agree, I am of the view that, as against Dr Williams, Central Bank of Nigeria was not a "trustee" within the meaning of section 68(1)(17), and that he cannot rely on section 21(1)(a), as it only applies to claims against fraudulent

trustees. It follows from this that the 1986 trust claims are barred by limitation, and I would therefore allow the appeal.

115.   I should add that this conclusion does not appear to me to give rise to difficulties. It is consistent with the case-law before *Soar v Ashwell*; and, in any event, the obiter dicta in that case, and their application in the subsequent cases which followed them, cannot sensibly be invoked as a reliable aid to the interpretation of the definition of "trustee" in section 68(1)(17) or to the scope of section 21(1)(a).

116.   With the exception of the tentative remarks in *GL Baker*, in no reported case until *Paragon* was any consideration given to the meaning of "trustee" in the 1939 or 1980 Acts, or to the proper scope of section 21(1)(a). The powerful reasoning in the *Paragon* case is consistent with principle and the authorities, and it justifies the conclusion that neither a knowing recipient nor a dishonest assister is a "trustee", and that section 21(1)(a) is limited to claims against trustees.

117.   That reasoning has been applied by the Court of Appeal in a number of recent cases, such as *JJ Harrison (Properties) Ltd v Harrison* [2002] 1 BCLC 162, *Gwembe Valley Development Company Ltd v Koshy (No. 3)* [2004] 1 BCLC 131, and *Halton International (Holdings) Inc Sarl v Guernroy Ltd* [2006] WTLR 1241.

118.   So far as raising a limitation defence is concerned, this conclusion places dishonest assisters and knowing recipients (i) in the same position as those who are liable in common law for improper or dishonest conduct, and (ii) in a better position than defaulting trustees. The first result seems appropriate: as Millett LJ said in the *Paragon* case at p 414, "[t]here is no case for distinguishing between an action for fraud at common law and its counterpart in equity". As for the second result, it is plainly justifiable, as defaulting trustees have pre-existing fiduciary duties to claimants which dishonest assisters and knowing recipients do not.

119.   Finally, it is right to mention that in some cases of dishonest assistance or knowing receipt, even though the normal six year period may have expired, a claimant may be able to invoke section 32 of the 1980 Act, which postpones the commencement of the six years, in cases "based upon the fraud of the defendant", or where the defendant has "deliberately concealed" relevant facts from the claimant.

**LORD MANCE, dissenting**

120.   I have read with interest the judgment prepared by Lord Sumption and supported by Lord Neuberger in his judgment.  The rationalisation which Lord Sumption imputes to Parliament is coherent: the exception to the right to limit would be confined to trustees or those owing fiduciary duties. But it is not the only coherent rationalisation, and whether it is historically accurate or catches Parliament's real intention is another matter.

121.   The present appeal raises two potential issues: (i) how far are, first, dishonest assisters and, second, knowing recipients to be treated as trustees within the meaning of section 21(1) of the Limitation Act 1980, and (ii) does section 21(1)(a) of the 1980 Act cover only actions against the trustee, or does it also cover actions against a dishonest assister in respect of a trustee's fraud?

122.   The rationalisation which Lord Sumption advances and Lord Neuberger adopts relies upon a general distinction drawn in *Beckford v Wade* (1805) 17 Ves Jun 87 between: (a) possession of trust assets obtained consistently with the trust by someone who later acts contrary to the trust and (b) possession which is taken from the outset adversely to the trust. It treats (b) as covering knowing recipients, and overlooks the fact that the distinction does not address at all: (c), the status of a person who, whether or not he also takes or has taken possession, dishonestly assists a trustee to dispose of trust assets contrary to the trust.

123.   Lord Neuberger in his paras 58 and 59 refers to passages in two other early cases as supporting a distinction between categories (a) and (c) for limitation purposes: *Hovenden v Lord Annesley* (1806) 2 Sch & Lef 607, 633-634 and *Barnes v Addy* (1874) 9 Ch App 244, 251. But in fact in *Hovenden v Lord Annesley* (1806) 2 SCh & lef 607, 633-634, the two categories (a) and (c) were identified not to distinguish them, but to explain that they were to be assimilated for limitation purposes. As to *Barnes v Addy* (1874) 9 Ch App 244, 251, Lord Neuberger suggests that it distinguished between (i) those "clothe[d] with a legal power and control over the trust property, imposing on [them] a similar responsibility" and (ii) those to whom a similar "responsibility [was] extended in equity who are not properly trustees" such as, he says, those "actually participating in any fraudulent conduct of the trustee". But Lord Selborne LC actually identified his category (ii) as follows:

> "others who are not properly trustees, if they are found either making themselves trustees de son tort, or actually participating in any fraudulent conduct of the trustee to the injury of the cestui qui trust."

He was, in other words, assimilating categories (a) and (c) for limitation purposes. An executor de son tort is a person within category (a) - as Lord Neuberger accepts in his paragraphs 73 and 74.

124.    Moreover - and this is an important feature of the issue under discussion - the assimilation of the dishonest assister with the dishonest trustee for limitation purposes has a coherent and principled basis, as Millett LJ observed in *Paragon Finance plc v D B Thakerar & Co* [1999] 1 All ER 400, 414a-d, when he said:

> "A principled system of limitation would also treat a claim against an accessory as barred when the claim against the principal was barred and not before. There is, therefore, a case for treating a claim against a person who has assisted a trustee in committing a breach of trust as subject to the same limitation regime as the claim against the trustee: see J W Brunyate, *Limitation of Actions in Equity* (1932)."

125.    This assimilation is supported by *Soar v Ashwell* [1893] 2 QB 390 and a wealth of case law to which I refer in the following paragraphs. I shall also return below (paras 140 and 141) to the law as analysed by J W Brunyate and a unanimous body of other distinguished textbook writers in the 1930s, all to the same effect. Their work constitutes important background to a proper understanding of section 19 of the Limitation Act 1939, reproduced in substance  in section 21(1), (3) and (4) of the Limitation Act 1980 with which the present appeal is concerned.

126.    *Soar v Ashwell* was itself concerned with a solicitor who fell within (a), either because he had received funds in a fiduciary capacity for clients (trustees under a will) or because he had assumed to act as such. The Court of Appeal held that he was to be considered as having been in the same position as an express trustee. So he was unable to plead limitation. But all three members of the Court of Appeal also identified another situation in which "the rule as to limitations of time which had been laid down in reference to express trusts has also been thought appropriate" (per Bowen LJ, p 396) : that is (c) dishonest assistance - arising, as Lord Esher MR put it, "where [a person not nominated a trustee] has knowingly assisted a nominated trustee in a fraudulent and dishonest disposition of the trust property" (pp 394-395); or, as Bowen LJ put it, "where a stranger participates in the fraud of a trustee: *Barnes v Addy* LR 9 Ch 244" (p 396) ; or, as Kay LJ put it, "where a stranger has concurred with the trustee in committing a breach of trust, and has taken possession of the trust property, knowing that it was trust property, and has not duly discharged himself of it by handing it over to the proper trustees or to the person absolutely entitled to it" (p 405).

127.   Consistently with *Barnes v Addy*, these formulations describe dishonest assistance by a stranger in terms indicating a form of liability accessory to that of the dishonest trustee.   As *Lewin on Trusts* 18th ed (2008), paras 44-56 and 44-57 states, prior to *Royal Brunei Airlines Sdn. Bhd. v Tan* [1995] 2 AC 378, "it was thought that liability was based on knowing assistance in a dishonest and fraudulent breach of trust on the part of the trustee", though since that case fraud of the express trustee "is now irrelevant to the actual liability" of a dishonest assister.

128.   In asserting its limitation defence to Dr Williams' claim, the Central Bank of Nigeria submits that the six year limitation period provided by section 21(3) of the Limitation Act 1980 for "an action by a beneficiary to recover trust property or in respect of any breach of trust" is in terms wide enough to apply to an action by a beneficiary against a holder of trust property or against a trustee or someone assisting a trustee in respect of a breach of trust. The Central Bank has to assert this, since otherwise it has no basis for asserting any statutory limitation defence at all. But, when it comes to section 21(1)(a), the Bank alleges that the exception in respect of "an action by a beneficiary under a trust, being an action (a) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy" does not cover an action by a beneficiary against someone dishonestly assisting in a fraud or fraudulent breach of trust to which the trustee was a party or privy.

129.   As Lord Clarke demonstrates in his judgment, it is unconvincing to suggest that the words "an action … in respect of any breach of trust" do, yet the words "an action …. in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy" do not, cover an action by a beneficiary against someone who is not the trustee but who dishonestly assists a fraudulent trustee. Yet that is - and has to be - the Central Bank's case.  The line between those who owe fiduciary duties and those who do not certainly does not offer any reason for implying such a distinction – and Lord Neuberger does not suggest that it does. It is coherent and understandable if the law distinguishes, in the context of fraud or fraudulent breaches of trust, between, on the one hand, actions against trustees and others party or privy thereto, and, on the other hand, actions against trustees and others innocent of involvement therein. It is true that, since the *Royal Brunei* case, it has been recognised as conceptually possible that a dishonest stranger to a trust may assist in bringing about a fraud on a trust to which no trustee is party or privy. But that is a possibility barely, if at all, envisaged at the dates when the statutory language of section 21 and its predecessor crystallised. Even now that it is clearly recognised, it is possible to see logic in a distinction between situations in which a dishonest trustee does and does not exist. In the latter situation, beneficiaries are particularly prejudiced, and it is understandable that the law should lift the limitation period against them and their dishonest assisters.

130.   I will give an example of how that distinction would as I see it work. Take an action against an innocent trustee or against the innocent solicitors or accountants

acting for trustees for failure to discover and prevent a fraud by a guilty trustee assisted in conjunction with a dishonest stockbroker. The action against the fraudulent trustee and dishonest assister would fall within section 21(1)(a). The action against the innocent trustee would not be "in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy".  Nor would be the action against the allegedly negligent solicitor or accountant. Indeed, I do not consider that it would even be "in respect of any breach of trust" within section 21(3). It would be an action for negligence for which there would be a six year time limit in tort under section 2 and/or contract under section 5.  This analysis is consistent with that adopted by J W Brunyate, cited by Millett LJ: see para 124 above and para 140 below; and Lord Neuberger accepts it in his paragraph 94.

131.   Nevertheless, Lord Neuberger suggests, as it appears must Lord Sumption, that the phrase "in respect of" means different things in section 21(1)(a) and section 21(3). The reasons he gives are addressed and rebutted in Lord Clarke's judgment. As to the first, it is true that section 21(1)(a) applies to a case where the defendant is the dishonest trustee as well as a case where the defendant is a dishonest assister of a trustee. But the words "in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy" both preclude any suggestion that section 21(1)(a) extends the limitation period for a claim against a non-fraudulent trustee who was party to a breach of trust in circumstances where a fraudulent trustee was also party, and put beyond doubt, in the case of a claim against a dishonest assister, that the only relevant dishonest assistance is assistance of a fraudulent trustee. As to the second reason, the words "the trustee" postulate that there is a fraudulent trustee whom the assister has dishonestly assisted. In a situation in which there was both a fraudulent and an innocent trustee, the language makes only the fraudulent trustee relevant. As to the third, in the state of the law as it was understood and developed at the relevant times, section 21(1)(a) and its predecessor were probably addressing the only type of dishonest assistance then clearly established, namely dishonest assistance of a fraudulent trustee. On that basis, section 21(1)(a) represented a coherent picture: see paras 124 and 127 of this judgment. For good measure, even now that dishonest assistance has clearly been recognised as a basis of liability when there is no fraudulent trustee, a coherent rationale still exists: see paras 124 and 157 of this judgment.  As to the fourth, I see nothing strange about an analysis according to which a dishonest assister who is also a knowing recipient of trust property falls within section 21(1)(a), even if (contrary to the view which I express in paras 160-161 below) a knowing recipient is not, as such, a trustee for the purposes of section 21(1)(b). Dishonest assistance is a separate (and on its face, it may be thought, more opprobrious) category of liability, identified as such in the authorities and legal writings from *Soar v Ashwell* onwards, as well as by Millett LJ in *Paragon*.

132.   Finally, Lord Neuberger refers in his paragraph 100 to the 1888 Act. That evidences an error, which in my opinion underlies the majority's analysis, namely treating the legislator by the deliberately chosen different wording of the 1939 Act

as reproducing or restricting the previously understood exemption from the operation of limitation, rather than, as was clearly the case, expanding it: see the rest of this judgment. It is surprising to find such emphasis being now placed on the words "to which the trustee was party or privy" which were present in section 8(1) of the 1888 Act and remain in section 19(1)(a) of the 1939 Act and now section 21(1)(a) of the 1980 Act, but no weight at all given to Parliament's omission from section 19(1)(a) and section 21(1)(a) of the qualification "against a trustee or any person claiming through him" which had governed both limbs of the predecessor section 8(1). This is particularly surprising when the drafters took care to reinsert into section 19(1)(b), now section 21(1)(b), equivalent words in the form of the phrase "from the trustee". It is the changes in the legislation in 1939 on which attention should focus – but which the majority reasoning sets at naught contrary to the Law Revision Committee's and Parliament's clear intention to maintain and expand upon existing previously understood exceptions from limitation: see paras 137-149 below.

133.    Let me therefore return to the historical position. In *Soar v Ashwell* the action brought in 1891 by a surviving trustee against a solicitor's personal representatives concerned the solicitor's failure to account to trustees in January 1879 (the solicitor himself having died later in 1879).   The claim was equitable, and counsels' submissions as reported turned upon whether or not the Statute of Limitations applied by analogy. The judgments refer more straightforwardly to the question as being whether the Statute of Limitations applied. The reason may lie in Kay LJ's reference on p 403 to section 25 of the Judicature Act 1875, and of a statement by Baggallay LJ that section 25 "is but a statutory declaration of a law which had always been recognised and administered in Courts of Equity". Section 25(2) of the Judicature Act 1873 read:

> "No claim of a cestui que trust against his trustee for any property held on an express trust, or in respect of any breach of such trust, shall be held to be barred by any Statute of Limitations."

Section 25(2) was confined to claims against a trustee. But the Court of Appeal in *Soar v Ashwell* was clearly indicating that both categories (a) and (c), identified in paras 121 and 122 above, should be treated in the same way as claims against a trustee for breach of an express trust within section 25(2). However, in *In re Jane Davies* [1891] 3 Ch 119 (CA), dealing with a claim arising between 1858 and 1888 and *In re Lacy* [1899] 2 Ch 149 (Stirling J), dealing with a claim arising in 1873, it was held that executors were not express trustees within section 25(2) and so were entitled to limit.

134.    The Trustee Act 1888 (51 & 52 Vict c59) enacted on 24 December 1888 adopted a much wider definition of trustee, deeming the expression

> "to include an executor or administrator and a trustee whose trust
> arises by construction or implication of law as well as an express
> trustee". Section 1(3)

At the same time section 8(1)(b) enabled "the trustee or person claiming through
him" to limit, where "no existing statute of limitation applies", as if the claim had
for money had and received. But it excepted from this any action or other proceeding

> "where the claim is founded upon any fraud or fraudulent breach of
> trust to which the trustee was party or privy, or is to recover trust
> property, or the proceeds thereof still retained by the trustee, or
> previously received by the trustee and converted to his use".

135.   Following the passing of the 1888 Act (though in most of the cases in relation
to pre-Act events), there was a series of cases in which the principles stated in *Soar
v Ashwell* were cited with approval or applied. *In re Gallard* [1897] QBD 8
concerned post-1888 Act events consisting of a sale in 1889 by a trustee to a
purchaser who knew that the sale was at a gross undervalue. Vaughan Williams J
noted that the submission was that the Statute of Limitations applied by analogy,
rather than directly; he then cited passages in Lord Esher's judgment in *Soar v
Ashwell* identifying the two categories, (a) and (c), mentioned in paras 122 and 123
above, in which a person not nominated as a trustee would be treated as if he were
an express trustee. On the basis that category (c) applied, i.e. that the defendant had
dishonestly assisted in a fraudulent and dishonest disposition of the trust property,
he held that the lapse of time could not be relied upon.

136.   In *In re Dixon* [1900] 2 Ch 561, 574, the facts of which concerned events
between 1876 and 1896, Webster MR referred to the classes enumerated by Bowen
LJ in *Soar v Ashwell* "of persons who are subject to the rule that time is no bar in
the case of express trusts", and applied the third ("where a person received trust
property and dealt with it in a manner inconsistent with trusts of which he was
cognizant"). In *In re Eyre Williams* [1923] 2 Ch 533, mortgage monies which had
been agreed to be assigned to marriage settlement trustees had in 1887 been received
by a testator who failed to pay them over to the trustees before his death. Romer J
said (p 537) that there was "of course, no express Statute of Limitations which would
apply to the claim of the trustees to recover these moneys from the estate of the
testator, unless it be the Trustee Act 1888". He noted the equitable rule that an
express trustee could not avail himself by analogy of the Statute of Limitations, a
rule which had been "ultimately given statutory recognition and force by section
25(2)" of the 1873 Act, and further noted that the exception "has, however, in certain
cases been extended by the Courts of Equity to constructive trustees". He then said
that "In the present case it cannot be contended that the testator was ever constituted
an express trustee, but without any question he did become a constructive trustee of

the mortgage moneys which he received". He then cited with approval, first, passages from *Soar v Ashwell* dealing with each of the exceptional classes of constructive trustee treated as being in the position of express trustees for limitation purposes, and, second, Webster MR's judgment in *In re Dixon*.  On that basis, he held that the testator, although he had only been a constructive trustee, could not rely on limitation. In *In re Mason* [1928] 1 Ch 385, 394, Romer J referred to *In re Eyre-Williams* as an instance of a case "where the trust funds or the proceeds of the trust funds have been received by a person with knowledge that they have been wrongly paid to him".

137.    Under this case-law, the principles in *Soar v Ashwell* were regarded as applicable, and dishonest assisters were clearly recognised as within the exception to limitation, whether the claim was or was not strictly to be regarded as falling within the 1888 Act. Against this background came the Law Revision Committee's Fifth Interim Report (Cmd 5334), dated December 1936, which led in due course to s.19 of the Limitation Act 1939, and its consolidating successor, section 21 of the Limitation Act 1980.  The Report described section 8 of the Trustee Act 1888, noted that it had been considered satisfactory and so left unaffected when the Trustee Act 1925 was passed, but identified, at para 11, as the only difficulty the fact that section 8 "does not apparently apply to a constructive trustee, eg an executor or administrator; and doubts arise as to whether or not any statute of limitations applies to property still retained by an executor or administrator". Cited as authority for these concerns and doubts were *In re Jane Davies* and *In re Lacy* (see para 132 above). They concerned pre-1888 Act events, but there was apparently no more recent authority.

138.    The Report continued with the passages cited by Lord Sumption in his para 24, which I repeat for ease of reference:

> "11. …. It is difficult to find any real justification for the rule that an executor or other person holding property as a trustee, but not on an 'express' trust, can plead the statute, though he still retains trust property or has converted it to his own use. The rule has been extensively modified by decisions giving such a wide meaning to 'express trust' as to bring most cases of fiduciary relationship within the exception to the Trustee Act, and to raise serious doubt as to where the line is to be drawn for this purpose between express and constructive trusts. See the judgment of the Bowen LJ in *Soar v Ashwell* [1893], 2, QB at p 395, and the authorities there cited, and the cases referred to by Romer J in *In re Eyre Williams* [1923] 2 Ch 533. It is perhaps too late now to suggest that the Trustee Act, 1888 was intended to do away with the distinction between express and constructive trusts for the purpose of the limitation of actions, though the definition of 'trustee' in Section 1(3) seems to point to that

conclusion. At any rate we consider that the distinction should now be abolished, and we recommend that the exception in Section 8 of the Trustee Act, 1888 should be expressly made to extend to trustees whether holding on express or constructive trusts, including personal representatives."

Recommendation (7) of the Committee was

"that the Statutes of Limitation should only apply to constructive trustees to the extent to which they do to express trustees."

Several matters are clear from this passage. First, there is not a hint of disagreement with the principles stated in *Soar v Ashwell*, in *In re Eyre-Williams* and in *In re Dixon* (the other case cited by Romer J in *In re Eyre-Williams*). Second, the Report was, on the contrary, to the effect that these principles should be affirmed. Third, after an expression of regret about the possible missed opportunity to do this provided by the Trustee Act 1888, an unequivocally general intention was stated to do away with the distinction between express and constructive trusts for the purposes of limitation. There is nothing to support the suggestion by Lord Neuberger and Lord Sumption that the Law Revision Committee Report can and should be read as dealing only with some constructive trustees, effectively only category (a) trustees, that is anyone holding property subject to a trust or fiduciary obligations before the occurrence of the transaction impeached ("a trustee de son tort"). The language of the Report or its recommendations gives no support to it, it postulates a retreat from the English law position as established and understood at the time (when the Committee was clearly advocating a decisive move in the opposite direction), and it postulates the preservation of a distinction which the Committee was at pains to abolish. Fourth, and in contrast, the approach taken by the Committee is in no way surprising, particularly when Romer J, who had decided both *In re Eyre-Williams* and *In re Mason* was a member of the Committee, as indeed was A F Topham KC who had successfully argued that there was no limitation in *In re Mason*.

139.    A fifth point is just as significant. There is no mention in the Report of either of the Privy Council decisions, *Taylor v Davies* [1920] AC 636 and *Clarkson v Davies* [1923] AC 100, cases under a Canadian statutory provision paralleling section 8 of the English 1888 Act. Lord Sumption suggests that *Taylor v Davies* was the leading case on the effect of sections 1(3) and 8(1) of the 1888 Act. He also suggests (para 27) that "The reason why they [the authors of the Law Revision Committee] ignored the two Privy Council decisions was not that they were ignorant of them, or that they regarded them as outliers or wrong, but because they were not at all concerned with the question of ancillary liabilities which arose in those cases". Clairvoyance aside, I note that not only does the Committee's Report focus

exclusively on the relevant English case law, showing no awareness of either Privy Council case, but Lord Sumption cites no English authority in which either was mentioned and contemporary text-books are also notable for their absence of any reference to them. The text-books state the law exclusively in accordance with the principles in the English cases including *Soar v Ashwell*, *In re Eyre-Williams* and *In re Dixon* to which I have referred: see eg Brunyate's Limitation of Action in Equity (1932), Halsbury's Laws of England 2nd ed (1936), Limitation of Actions, para 1036, Lewin's Practical Treatise on The Law of Trusts 14th ed (1939), Chap VIII, Limitation of Actions, pp 839-840 and Underhill's The Law relating to Trusts and Trustees 9th ed (1939), article 101.

140.   Thus, Brunyate (Fellow of Trinity, Cambridge, and barrister) said, at p 108:

> "A person who assists a true trustee in committing a fraudulent breach of trust is very properly held liable as though he had himself been a trustee, and he cannot plead the Statute of Limitations (*In re Gallard* ….; and see *Soar v Ashwell*….). A person who assists in a breach of trust which is not fraudulent is not generally liable in equity to the *cestui que trusts,* even apart from the Statute of Limitations, unless he has become chargeable with trust property (*Barnes v Addy* ….; ….). Thus a solicitor who has assisted in a wrongful investment of trust money by drawing up deeds will only be liable, if at all, to an action for negligence to which the statute will apply."

Brunyate went on to identify as another class of persons said to be unable to plead the Statute of Limitations "persons who have obtained possession of property which is subject to trusts of which they are cognizant", noting that "the scope of this class is very doubtful".

141.   Halsbury (1936), para 1036, stated (citing *In re Dixon, Soar v Ashwell* and *In re Eyre-Williams*) that if

> "a person enters into possession or receives the rent of property with full notice of the trust, he is a trustee, and …. cannot, when he is called upon to account for the property, avail himself of the lapse of time as a defence".

Lewin (1939), p 841, recorded that *Soar v Ashwell* had separately enumerated "at least three instances of a constructive trust in which it was not open to a constructive trustee to plead the Statute", footnoting in this connection *In re Eyre-Williams*. In similar vein is Underhill (1939), article 101, stating that:

"All persons who knowingly meddle with trust funds, or mix themselves up with a breach of trust, are equally liable with the trustees; and equally subject to the restrictions on the right of pleading the Statutes of Limitation."

142.   The absence in all these passages of references to *Taylor v Davies* and *Clarkson v Davies* (which dealt only briefly with the present issue, citing *Taylor v Davies*) becomes perhaps less surprising in view of passages in *Taylor v Davies*, particularly at pp 651 and 653, which expressly refer with apparent approval to "the persons enumerated in the judgment of Bowen LJ in *Soar v Ashwell*" and "those persons who under the rules explained in *Soar v Ashwell* and other cases are to be treated as in a like position" to an express trustee. The Privy Council cases may well therefore have passed in their day as cases leaving undisturbed the rules established in *Soar v Ashwell* and its successor cases. The facts in *Taylor v Davies* are in this connection also instructive. The defendant, Davies, was not a trustee, but an inspector appointed by the assignee under an assignment made by a debtor for the benefit of creditors, and, as such, he was held to owe a fiduciary duty which precluded him from buying for his own benefit unless he made full disclosure, which he failed to do. Any liability he had as constructive trustee arose simply from that act. He was not someone who had assumed possession of any trust assets *before* or indeed by the breach of duty and so he was also not a dishonest assister in a breach of trust or even a knowing recipient of previously existing trust assets (see *Lewin On Trusts*, 18th ed, para 42-22 for the requirements for knowing receipt). So he was not within any of the categories identified in paragraph 122 above or considered in *Soar v Ashwell*. A constructive trust was imposed as a simple result of and in order to remedy his breach of fiduciary duty (see eg *Lewin on Trusts*, paragraph 4.24 et seq). The facts in *Clarkson v Davies* were similar. The directors were not trustees, and had not assumed possession of any assets. Nor were they dishonest assisters of any breach of trust or knowing recipients of any previously existing trust monies. Their liability arose upon a sale of the assets of the selling company, of which they were directors, to another company, in connection with which they had personally received a payment from the buying company. A constructive trust was imposed simply to remedy this breach of fiduciary duty.

143.   Whatever the reason, however, the two Privy Council cases do not feature as part of the English legal background leading to the 1939 Act. The Law Revision Committee Report is in contrast a powerful indication of the genesis and aims of section 19 of that Act. These were to reflect and build on the established principles set out in *Soar v Ashwell* and the other English case law discussed above. A comparison of section 8 of the 1888 Act and section 19 of the 1939 Act shows careful redrafting to achieve this. Under the 1888 Act, the right to limit was confined to actions by "the trustee or persons claiming through him", and the exception for claims founded on fraud and claims to recover trust property was correspondingly limited to such actions. Under section 19(2) of the 1939 Act (now section 21(2) of

the 1980 Act), the right to limit applies simply to "an action by a beneficiary to recover trust property or in respect of any breach of trust", ie without any limit as to the persons against whom the action was brought. The exception is also, on its face, unrestricted as regards the persons against whom the action is brought, being defined by reference to the nature of the action. The question is simply: is the action "in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy"?  The change (as I have said in para 132 above) must have been deliberate, particularly bearing in mind the preservation in section 19(1)(b) (now section 21(1)(b) of the 1980 Act) of a limitation that the action to recover trust property must be against the trustee.

144.    As to the definition of "trustee", section 31(1) of the 1939 Act provides that:

"In this Act, unless the context otherwise requires, ….

….

'Trust' and 'trustee' have the same meanings respectively as in the Trustee Act, 1925".

The 1939 Act is therefore to be read as if these phrases were defined expressly to give this the same meaning as in the Trustee Act 1925. Section 68 of that Act provides that:

"In this Act, unless the context otherwise requires ….

(17) …. the expressions "'trust' and 'trustee' extend to implied and constructive trusts, and to cases where the trustee has a beneficial interest in the trust property, and to duties incident to the office of a personal representative, and 'trustee' where the context admits, includes a personal representative, and 'new trustee' includes an additional trustee."

It is not difficult to see why the draftsman should have thought that this was wide enough to overcome any possible difficulties that could arise from the 1888 Act and all such concerns and proposals as the Law Revision Committee had expressed.  I return later in this judgment to the significance for this appeal of this redefinition, which I see as being primarily to assimilate knowing recipients of trust property with

those obtaining possession within category (a). In other words, it was no longer to be significant whether possession of trust property was gained innocently, with its later wrongful handling converting the possessor into a trustee de son tort, or was knowingly taken from the outset contrary to the interests of the beneficiary.

145.    The 1939 Act was intended to give effect to the recommendations of the Law Revision Committee. The mischiefs at which it was aimed were those identified in that Committee's Report. "[A]ssistance can …. be obtained as to the general background and as to the mischief which the legislation was addressing by looking at the reports of the proceedings in Parliament": see The *Presidential Insurance Co Ltd v Resha St Hill* [2012] UKPC 33, para 23-24, citing *Gopaul v Iman Bakash* [2012] UKPC 1, para 3 per Lord Walker, and *R (Jackson) v Attorney General* [2005] UKHL 56, [2006] 1 AC 262, para 97 per Lord Steyn. This is so without satisfying the requirements which *Pepper v Hart* [1993] AC 593 imposes when the aim is to rely on ministerial statements in Parliament to clarify ambiguity in a legislative text (although those requirements would, if necessary, also be capable of being satisfied in this case).

146.    The Bill was a House of Lords Bill. It was introduced for second reading by the Lord Chancellor on 27 June 1938 in the presence of Lord Wright, who had chaired the Law Revision Committee, and Lord Romer, as he now was. All three spoke. Clauses 19 and 20 of the Bill were in precisely the same form as became sections 19 and 20 of the 1939 Act. The Lord Chancellor said:

> "The matter was put before the Law Revision Committee, who reported on the matter in December 1936, and I am glad to see here my noble and learned friends Lord Wright and Lord Romer, who were concerned with the hard work which was necessary before this Bill could attain its present simple, or comparatively simple, form. I do not propose to go through the provisions of this difficult and complex Bill, because I am quite satisfied that those who have done the work and are here present can tell your Lordships with much more accuracy and ability the reasons why any particular provision in the Bill is to be found there and can explain any conundrum that your Lordships may wish to put to them." (Hansard (HL Debates) 27 June 1938, vol 110, col 310).

Lord Wright added:

> "The Report on which this Bill is based has been before the country for a considerable number of months, and surely if it is to be criticised, if it has blemishes, it is for those who are concerned to point them out.

> We have done our best, and it is for Parliament to decide whether effect should be given to our recommendations, and what form that effect should take." (Hansard (HL Debates) 27 June 1938, vol 110, col 314).

147.   The Bill went to the House of Commons, where it was introduced by another member of the Law Revision Committee, the Solicitor-General, Sir Terence O'Connor QC. He opened the debate at 11.56 pm on 19 July 1938 by saying

> "It is not a simple Bill and I feel to some extent a parental responsibility because I served on the Law Revision Committee on whose report it is based. …. their Report was laid before Parliament in December 1936, and this Bill introduced in another place last month in order to do something to clear up the confusion which was found to exist in the law. …...

> Clauses 19 and 20 extend the general exclusion from all limitations to actions to recover money from trustees and executors, and in the case of personal estates, make a similar exemption". (Hansard (HC Debates) 2 February 1939, vol 343, cols 487-515)

Not surprisingly, due to the very late hour of its introduction, the Bill was then withdrawn, but was reintroduced by the Solicitor-General at the more civilised hour of 9.00 pm on 2 February 1939 with similar explanations both generally and relating to clauses 19 and 20. It then received its second reading, no member of the House having raised any point on these clauses. Closing the debate on this occasion, the Solicitor-General also made clear that:

> "The whole of the material upon which this Bill is founded has been embodied in the report of the Law Revision Committee, and it has been available ever since 1936, so that there has been ample opportunity for everybody to know what the proposals of the Committee were." (Hansard (HC Debates) 2 Feb 1939, vol 343, cols 487-516)

148.   Reviewing the effect of the 1939 Act in the Modern Law Review vol 4 in July 1940, pp 45, 47, J Unger wrote:

> "This Act, which came into operation on the 1st July, 1940, is founded upon the Fifth Interim Report of the Law Revision Committee.

…..

Section 19 simplifies the law of limitation of actions in respect of trust property. All constructive trustees are now subject to the same restrictions when claiming the protection of the Statute as express trustees. Thus the obstacle presented by *Soar v Ashwell* to a proper classification of trusts has been removed."

The same view was expressed by Professor Donovan Waters in a book on Canadian law, *The Constructive Trust* (published 1964) cited by Millett LJ in *Paragon Finance* at p 411G. Professor Waters stated (with hindsight over-optimistically) that "with the Limitation Act 1939 it ['the limitation controversy'] passed, probably, for ever", the generally accepted view being that "the false and limited trilogy of trusts in *Soar v Ashwell* had been "swept away" (p 411) and that "the Limitation Act was intended to bury this issue" (p 1020, as cited by Millett LJ).

149.   In this light, it is unsurprising that section 19(1)(a) of the 1939 Act gave rise to little litigation. The one decision worth noting was by Dankwerts J at first instance in *G L Baker Ltd v Medway Building and Supplies Ltd* [1958] 1 WLR 1216. The judgment suggests that there was only limited examination of the relevant history and case law. But Dankwerts J, in a part of his judgment not appealed, held that section 19(1)(a) was wide enough to cover a claim against a third party company based on a fraudulent payment of trust monies by a trustee to the company (of which the trustee was a director). Since the company was treated as innocent of the fraud, that conclusion went wider than category (c), and is in my opinion open to questions to that extent.

150.   It is only recently in litigation under section 21 of the 1980 Act that the theses have been developed, first that a knowing recipient cannot benefit by a limitation defence and, later, that a dishonest assister can benefit by a limitation defence although the dishonest trustee whom he assists cannot (in short, that category (c) cases are also outside section 21(1)(a)). These theses were initially, and in my view correctly, rejected by the Isle of Man Staff of Government Division in *Barlow Clowes International Ltd v Eurotrust International Ltd* (31 March 1998). The first thesis was however accepted by Millett LJ in *Paragon Finance*, but he was, as I have already noted, careful to make clear that he was not accepting, but was leaving undecided, the second thesis. It is however a thesis which it is suggested that Lord Millett (as he had by now become) accepted in *Dubai Aluminium Co Ltd v Salaam* [2002] UKHL 48, [2003] 2 AC 366, para 141. It was not, however, a thesis advanced or discussed in submissions by counsel (who included Mr Jonathan Sumption QC), because limitation was not advanced and was irrelevant. The issue in that case was simply one of contribution between joint tortfeasors.

151.   The remarks by Lord Millett at paras 140-143 in *Dubai Aluminium* were addressed to the question which was relevant, which was "whether …. a firm and its innocent partners may be vicariously liable for a partner's dishonest assistance in a breach of trust" (para 81). What Lord Millett was concerned to do was underline his previous remarks in *Paragon Finance* about the distinction between the "two entirely different situations" in which the expressions "constructive" trust and trustee were used. Lord Millett's statements in *Dubai Aluminium* that a person in the dishonest partner's position in that case could not plead the Limitation Acts as a defence to the claim were passing comments relating to the informal remedial sense in which it is (he suggested "unfortunately") used. They cannot be read as deciding *sub silentio* an issue which he had carefully left open in *Paragon Finance*. It is equally inappropriate to treat it as sharing the authority of the two other members of the House (Lord Hutton and Lord Hobhouse) whose judgments record their general agreement with the reasons given by both Lord Nicholls (who said nothing on the present subject) and Lord Millett.

152.   None of the Court of Appeal decisions in *J J Harrison (Properties) Ltd v Harrison* [2002] 1 BCLC 162, *Gwembe Valley Development Co Ltd v Koshy (No 3)* [2004] 1 BCLC 131 and *Halton International (Holdings) Inc Sarl v Guernroy Ltd* [2006] EWCA Civ 801 concerned a dishonest assister. In *Harrison* a director who without disclosing material information bought specific property from his company, which was under his control and in respect of which he owed pre-existing fiduciary duties, was unable to plead limitation because of section 21(1)(b). In *Gwembe Valley* a director making an undisclosed profit from a currency transaction entered into by the company was liable only under a constructive remedial trust, so that section 21(1)(b) was not applicable: paras 120 and 161(10). However, since he was held to have been fraudulent, the claim did fall, directly or by analogy, within section 21(1)(a) – see paras 120 and 161(9) and (12). *Halton* was another case, like *Gwembe Valley*, in which the benefit obtained by alleged fiduciaries did not consist of pre-existing property belonging to the company, but consisted in shares which came into existence only because of the transaction impeached.

153.   The next cases are conflicting first instance authorities on the limitation position of dishonest assisters: *Cattley v Pollard* [2006] EWHC 3130 (Ch), [2007] Ch 353 (Richard Sheldon QC, sitting as a deputy) and *Statek Corp v Alford* [2008] EWHC 32 (Ch) (Evans-Lombe J). In an impressive analysis of prior authority, Richard Sheldon QC concluded (para 81) that the dicta in *Soar v Ashwell* could no longer stand as good law in the light of Millett LJ's analysis in *Paragon Finance* and Lord Millett's speech in *Dubai Aluminium*. He also held that section 21(1)(a) did not cover claims against a dishonest assister. A year later Evans-Lombe J expressed his opposite view, albeit obiter.

154.   A yet further year later, the same point came before the Hong Kong Final Court of Appeal in *Peconic Industrial Development Ltd v Lau Kwok Fai* [2009] 5

HKC 135. Lord Hoffmann gave the main judgment. Speaking quite briefly, he acknowledged the "high authority" of the dicta in *Soar v Ashwell*, but thought them "wrong in principle and unsupported by authority" (para 24). He therefore saw no basis to treat a dishonest assister as a trustee within the meaning of section 21(1)(a) (paras 23-24). He also rejected the view that a claim against a dishonest assister would be within section 21(1)(a) "because it is 'in respect of', in the sense of being accessory to, the actual trustee's fraudulent breach of trust" (para 25). He though that, had that been intended, then "the language would have been a good deal clearer". He did not refer to the Law Revision Committee Report, the relevant Parliamentary material or the actual contemporary understanding of the law, evidenced by the case law and jurisprudence to which I have referred. Instead, he relied on *Taylor v Davies* as an "authoritative" statement of the previous position. Above all, however, he did not mention section 21(3) or therefore address the obvious objection presented by it to his analysis of the words "in respect of". I cannot in these circumstances attach weight to the analysis or decision in *Peconic*.

155.   All the modern cases from *Paragon Finance* onwards in fact make reference to the Privy Council decisions in *Taylor v Davies* and *Clarkson v Davies*. As I have pointed out, these form no part of the actual background to section 19 of the 1939 Act or therefore section 21 of the 1980 Act, and were also not cases of dishonest assistance or knowing receipt in respect of any trust assets. Further, none of the modern cases analyses the position as it was (clearly) understood to be in the 1930s and in the report of the Law Reform Committee which led to the 1939 Act. All that Millett LJ said in the *Paragon Finance* case at p 412, was that

> "The actual recommendation of the Law Reform Committee went wider than the mischief to which it drew attention [viz the interpretation of 'trustee' to exclude an executor], and it is an open question whether Parliament intended to adopt the wider recommendation or merely to put an end to the mischief"

156.   He thought that, if Parliament had intended the latter, it would have said so more clearly. In fact, it is clear from the Parliamentary material (paras 146 and 147 above) that Parliament intended to deal with all the mischiefs identified by the Law Revision Committee, so that it was wrong to describe the adoption of the Committee's wider recommendation as an open question. In addition, Millett LJ was not concerned at all with the question, which he expressly left open later in his judgment, whether Parliament had intended to abolish the previously well-understood rule that dishonest assisters were in the same position as regards limitation as the dishonest trustees who they assisted and his attack on the use of the term constructive trust was based on cases which involved neither dishonest assistance nor knowing receipt, but pure remedial trusts. To make dishonest assistance, and in my view also knowing receipt cases subject to limitation, Parliament would have had to have been imputed with the intention to do the

opposite of what the Law Reform Committee had advised, that is to reverse rather than reflect the common understanding of the legal position stated in *Soar v Ashwell*, *In re Dixon* and other authorities. There is no basis or likelihood for that at all. Neither Millett LJ nor any of the other authorities suggests any. The Parliamentary material quoted in paras 146 and 147 above puts it beyond doubt (if any otherwise existed) that this was not the intention.

157.   The Court's role is to give to section 21 in the 1980 Act the effect which Parliament must be taken to have intended it to have. That in turn depends upon the effect to be given to section 19 of the 1939 Act. In my view, it is clear that this was to treat dishonest assisters as in the same position as regards limitation as the dishonest trustees they assist. That is the approach adopted by the Court of Appeal in its dicta in *Soar v Ashwell*. There is no difficulty about treating dishonest assisters as persons sued in respect of the fraud of the principal trustee within section 21(1)(a). It was the clear intention of the Law Revision Committee and Parliament under the 1939 and now 1980 Acts that dishonest assisters should not be able to plead limitation. It is only recently, since *Royal Brunei* in 1995, that it is clear that liability as a dishonest assister does not necessarily depend upon the existence of a dishonest trustee. Even if one looks at the position since *Royal Brunei*, the resulting position is still not incoherent. A beneficiary whose trustee is involved in fraud is particularly exposed.  A third person who dishonestly procures the removal of trust assets without a trustee being complicit in the fraud can be compared with any other stranger committing a fraud on a property owner. But to equate a third person, who dishonestly joins with a dishonest trustee to defraud the trust, with the dishonest trustee for limitation purposes is entirely natural.  See also Millett LJ's statement in *Paragon (*para 124 above). Certainly, that was the understanding prior to and when the 1939 Act was passed, and it was, as I have shown, one which the Act was clearly intended to reflect.

158.   In these circumstances, I am of the opinion that Dr Williams' claim against the Central Bank of Nigeria as alleged dishonest assisters falls within section 21(1)(a) of the 1980 Act and is not time-barred.

159.   As to Dr Williams' claim for knowing receipt by the Central Bank of Nigeria, to avoid limitation, he has to show that this claim falls within section 21(1)(b). It may be open to doubt how far the rules in *Soar v Ashwell* were themselves designed to cover this type of claim (category (b) identified in para 122 above) and take it outside the limitation defence. The class of case identified by Kay LJ at p 405 (see para 126 above) identified a situation involving a combination of knowing assistance and knowing receipt and J W Brunyate observed that the scope of the class of persons referred to in *Soar v Ashwell* "who have obtained possession of property which is subject to trusts of which they are cognizant" and could not on that basis plead limitation was "very doubtful" (para 140 above).

160.   However, by the time of the Law Revision Committee Report Romer J had decided both *In re Eyre Williams* and *In re Mason*, and, in the latter case he had (see para 136 above) specifically explained the former as a case "where the trust funds or the proceeds of the trust funds have been received by a person with knowledge that they have been wrongly paid to him" (ie as a category (b) case: see para 122 above). Further, Halsbury (1936) and Underhill (1939), cited in para 141 above, endorsed this approach. In its Report, the Law Revision Committee, on which Romer LJ (as he now was) sat, made clear that it was intending to endorse the approach taken not just in *Soar v Ashwell*, but also in the cases cited in *In re Eyre Williams*, which (apart from *Soar v Ashwell* and *Lee v Sankey* (1872) LR 15 Eq 204) consisted only of *In re Mason*.   Finally, the Committee made clear that it intended to do away with the distinction between express and constructive trusts in the area of limitation, and the 1939 Act adopted a definition in terms wide enough to achieve that result. On that basis, Parliament's clear intention in 1939 appears as being that, for the purposes of limitation, those guilty of knowing receipt should be unable to plead limitation, falling to be treated as trustees within the scope of section 21(1)(b), in the same way as possessors falling within category (a) (see para 122 above). To that extent the distinction drawn in *Beckford v Wade* was to be abrogated.

161.   Lord Neuberger seeks to derive from an examination of the effect of the definition of "trust" and "trustee" in the context of the 1925 Act a conclusion that these phrases cannot embrace all express, implied and constructive trusts and trustees in the context of the 1939 Act. I do not agree that the phrases are limited in the context of the 1925 Act in such a way as to exclude a knowing recipient. I understand Lord Neuberger and Lord Sumption to accept that section 21(1)(a) covers a category (a) possessor - that is an executor de son tort (a person, such as a solicitor, who is not strictly a trustee but receives trust property honestly, and only later decides to deal with it contrary to the trust). That being so, I fail to see why the 1925 Act definition is incapable of covering a category (b) knowing recipient (someone who knowingly receives trust property intending from the outset to deal with it contrary to the trust). On the contrary, it seems to me understandable that the Law Revision Committee in 1936 and Parliament in 1939 should decide to assimilate these two cases for the purposes of section 21(1)(b).  Possession is the hallmark of a trustee's role and shapes a trustee's duties. A knowing recipient has possession just as does an executor de son tort. An executor de son tort is treated as a trustee under section 21(1)(b) because of the wrong he commits. Precisely the same reason justifies treating a knowing recipient as a trustee under section 21(1)(b). As regards taking possession, a knowing recipient and an executor de son tort differ from a simple dishonest assister. A dishonest assister conspiring with a fraudulent trustee can however also be seen as even less meriting of protection by limitation than a mere knowing recipient. That is quite apart from the evident oddity (on Lord Neuberger's and Lord Sumption's case) of one conspirator (a dishonest assister) benefitting by limitation, while the other (the fraudulent trustee) does not. Hence, in my opinion, the formulation of section 21(1)(a) to cover a dishonest assister.

162.    I would only add, though not necessary for my decision, that the definitions in both the 1925 and the 1939 Acts are made subject to context. I do not see why the 1925 definition when read into the 1939 Act should not be capable of being shaped in effect by any factors generally admissible to shape the interpretation of the 1939 Act. Those factors include the case law background, the mischief being addressed and Parliament's evident intention when enacting section 21.

163.    I therefore consider that Dr Williams succeeds on both dishonest assistance and knowing receipt, and that the appeal by the Central Bank of Nigeria should be dismissed.

**LORD CLARKE, dissenting in part**

164.    I appreciate that this is a minority judgment.  I will therefore keep it short.

165.    In the course of the argument, I was attracted by the submission that the Central Bank of Nigeria was a trustee within the meaning of section 21(1)(a) of the Limitation Act 1980 for the reasons powerfully set out by Lord Mance in his judgment. However, somewhat reluctantly, I am persuaded by the reasoning of Lord Neuberger and Lord Sumption that he was not.  In particular, I agree with them that it is not apt to describe a person who receives property dishonestly as a trustee where the trust is alleged to arise, as Lord Neuberger puts it at para 64, simply as a result of dishonest receipt.  As he says, nobody has ever placed any relevant trust and confidence in the recipient.

166.    What then of the knowing assister?  There is force in the point that, if a dishonest recipient is not a trustee, it is difficult to see why a dishonest assister should be one.  However, as I see it, the critical points derive from the terms of the statute.  Section 38(1) of the 1980 Act defines the terms "trust" and "trustee" as having the same meanings, respectively, as in the Trustee Act 1925.  As Lord Neuberger puts it at para 69, there is no reason to think that the drafter of section 68(1)(17) of the 1980 Act intended "constructive trust" or "trustee" to have a wider meaning than that which they had been accorded by Courts of Equity over the years. As he says, it would be surprising if a statute consolidating the law governing the powers and duties of trustees did not adopt an orthodox definition of "trust" and "trustee".  The effect of the argument for Dr Williams is to give those expressions a wider meaning than they would have had in the Trustee Act standing alone.  I agree with Lord Neuberger that, for the reasons he gives at paras 72 and 73, it is not permissible to achieve that result by reference to context.

167.    The point upon which I have reached a different conclusion from the majority is whether this action is an action by Dr Williams as the "beneficiary of a trust, being an action in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy" within the meaning of section 21(1)(a) of the 1980 Act.  As Lord Sumption explains in para 2, the alleged trustee was a Mr Gale and Dr Williams asserts that the Central Bank of Nigeria dishonestly assisted Mr Gale's breach of trust and/or received money knowing that it was being paid by Mr Gale in breach of trust.

168.    All three members of the Court of Appeal (the Chancellor and Black and Tomlinson LJJ) held that the action is such an action within section 21(1)(a).  It is submitted that they were wrong so to hold on the ground that the section is limited to actions against the trustee.  I would reject that submission.  There is nothing in the language of the section to lead to that conclusion.

169.    I appreciate that section 21 has been set out by Lord Sumption.  I set it out again because its wording is critical on this point.  It provides, so far as relevant:

"21. (1) No period of limitation prescribed by this Act shall apply to an action by a beneficiary under a trust, being an action

(a) in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy ; or

(b) to recover from the trustee trust property or the proceeds of trust property in the possession of the trustee, or previously received by the trustee and converted to his use.

. . .

(3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued."

Section 23 provides:

> "An action for an account shall not be brought after the expiration of any time limit under this Act which is applicable to the claim which is the basis of the duty to account."

170.   Section 21(1)(a) contains two requirements: (a) the action must be brought by a beneficiary under a trust; and (b) it must be an action in respect of a fraud or fraudulent breach of trust to which the trustee was a party or privy.  Here the action was brought by Dr Williams as a beneficiary of a trust in which Mr Gale was the trustee and the action was against the Central Bank of Nigeria in respect of a fraudulent breach of trust to which it is alleged that Mr Gale was a party.

171.   On this basis, the action in my opinion falls within the ordinary meaning of the language used in the section.  There is nothing to suggest that the action must be against the trustee.  It would have been very simple for the drafters so to provide if that was intended.

172.   In para 91 Lord Neuberger identifies the question as whether the person in the position of the Central Bank of Nigeria is "sued in respect of any fraud or fraudulent breach of trust to which the trustee was a party or privy".  In para 94 he treats the question as being whether the words "in respect of " should be given a wider meaning, in which case he accepts that they can properly be construed to extend to dishonest assisters or advisers without applying to innocently (as opposed to fraudulently) negligent co-trustees and professional advisers of a fraudulent trustee.  He says that the words "in respect of" are flexible in that they can have a broad or restricted effect.  He concludes that, construed in their context, they should be given a narrow effect.

173.   The difficulty with an approach which depends upon the construction of the expression "in respect of any fraud or fraudulent breach of trust" as meaning that the action must be against the trustee is, as I see it, that it is common ground that in section 21(3) the expression "an action by a beneficiary … in respect of any breach of trust" includes an action against a dishonest assister.  It is only by construing subsection (3) in that way that, on the Central Bank's case, the relevant time period under the 1980 Act is six years.

174.   The purpose of section 21(3) is to reflect the position in section 21(1)(a) and (b), albeit treating them in the reverse order.  It refers first to an action by a beneficiary to recover trust property, which is a reference back to section 21(1)(b), which is expressly concerned only with an action to recover trust property.  It then refers to an action by a beneficiary in respect of any breach of trust, which is surely a reference back to section 21(1)(a), which refers to an action by a beneficiary in respect of any fraud or fraudulent breach of trust.  It seems to me to be clear that

Page 61

section 21(1)(a) and section 21(3) must be read together.  The purpose of them was to provide the circumstances in which there would be no limitation period and the circumstances in which the period would be six years.  Since section 21(3) is expressly subject to the preceding provisions of the section, which of course include section 21(1)(a), section 21(3) has the effect that a claim by a beneficiary against a dishonest assister is six years unless section 21(1)(a) applies.  Section 21(1)(a) applies where the dishonest assister assists a fraud or fraudulent breach of trust to which the trustee was a party or privy.  If, as is correctly common ground, an action against a dishonest assister is an action *in respect of* a breach of trust within section 21(3), it seems to me that such an action must also be an action *in respect of* a fraud or fraudulent breach of trust to which the trustee is a party or privy where that is the position on the facts. (My emphasis)

175.   Both the history of section 21 and the section itself show that the drafters could readily have limited section 21(1)(a) to actions against the trustee if they had wished.  As to the history of the provision, section 21(1) of the 1980 Act was a re-enactment of section 19 of the Limitation Act 1939.  Prior to that, the relevant provision was section 8(1) of the Trustee Act 1888, which was confined to "any action or other proceeding against a trustee or any person claiming through him".  There is no such express provision in section 21(1)(a).  As to section 21 itself, by contrast with section 21(1)(a), section 21(1)(b) is expressly limited to actions against the trustee to recover property and the like.

176.   It is suggested that this approach gives no sensible effect to the words "to which the trustee was a party or privy".  I respectfully disagree.  It seems to me that that they emphasise that whoever is the defendant will only be deprived of the benefit of the six year limitation provision in section 21(3) if the trustee is privy to the fraud or fraudulent breach of trust.  The purpose of the drafters was to ensure that the both the trustee and any other person liable in respect of the fraud would be treated in the same way for limitation purposes.  To my mind that is an understandable purpose.

177.   It is further suggested that the use of the expression "the trustee" is inconsistent with this approach.  Again, I respectfully disagree.  The reference to "the trustee" is no more than a reference back to the trust in the opening words of the section.  Thus, the action must be by a beneficiary of "a trust" and the reference to "the trust" in (a) does no more than make it clear that the trustee of that trust must be a party or privy to the fraud or fraudulent breach of trust concerned.

178.   Next, it is suggested that it seems inappropriate that the ability of a dishonest assistant or dishonest knowing recipient to invoke the normal six year period should depend upon whether or not the trustee was fraudulent.  Reference is made to the speech of Lord Nicholls in *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378,

where he said that a dishonest assistant may be liable whether or not the breach of trust on the part of the trustee was dishonest.  I accept that that is the position but I am not persuaded that that was appreciated at the time of the Limitation Acts 1939 and 1980.  Whether it was or not, I have already expressed the view that it is understandable that the drafters should have thought it appropriate to treat the trustee and the dishonest assister in the same way for limitation purposes.

179.   Finally, I am not persuaded that there is anything in section 21(1)(b) which leads to any different conclusion.

180.   I recognise that this conclusion is inconsistent with that expressed by Lord Hoffmann in *Peconic Industrial Development Ltd v Lau Kwok Fai* [2009] 5 HKC 135, where the Court of Final Appeal in Hong Kong was considering a Hong Kong Ordinance in the same terms as section 21.  In para 25, after recognising that the words "in respect of" may have a very wide meaning and referring to the possibility of such a meaning being given to them being tentatively considered by Dankwerts J in *GL Baker Ltd v Meday Builders and Supplies Ltd* [1958] 1 WLR 1216, 1222, he said this:

> "But I think that in the context of section 20 of the Ordinance it simply means that the beneficiary must be claiming against the trustee on the ground that he has committed a fraudulent breach of trust.  If it had been intended to include claims against dishonest assisters or other non-fiduciaries on the ground that they were accessories to the breach of trust, the language would have been a good deal clearer."

181.   Lord Hoffmann makes no reference to the use of the expression "in respect of" in section 21(3) as discussed above and, while I recognise the experience of Lord Hoffmann in this area, the question for decision is one of construction of the section and, as I see it, the section does not have the limited effect to which he refers.

182.   For the reasons I have given I would dismiss the appeal on this point.

A

# The Weekly Law Reports

## Volume 1

*Containing those cases of value which are not intended to be included
in The Law Reports, together with practice notes and directions*

B

———————

C

Court of Appeal

## *Broadcasting Investment Group Ltd and others *v* Smith and another

### [2021] EWCA Civ 912

D

2021   May 25;                                           Asplin, Coulson, Arnold LJJ
        June 18

*Company — Shareholder — Rule against reflective loss — Claimant and defendant
entering into agreement for formation of company of which claimant to be
shareholder and defendant director — Claimant alleging breach of agreement by
defendant and claiming for diminution in value of shareholding in company —
Company having statutory right to enforce agreement as third party — Rule
preventing shareholder from claiming for loss suffered by company where
company itself having cause of action — Whether rule overriden by statute where
company's cause of action arising from statutory right to enforce agreement as
third party — Contract (Rights of Third Parties) Act 1999 (c 31), ss 1, 4*

E

F

The claimant alleged that it had entered into an oral agreement with the
defendant, under which the defendant was to procure the transfer of shares in two
broadcasting technology companies to a holding company in which the claimant was
to be a 39% shareholder and the defendant a director.  In the event, the shares were
never transferred to the holding company, which subsequently went into liquidation.
The claimant brought a claim seeking to enforce the agreement, claiming to have
suffered loss by reason of the consequent diminution in the value of its shareholding in
the holding company and loss of dividend income from the holding company.  The
defendant applied to strike out certain of the claims in reliance upon the rule that a
shareholder in a company could not bring an action to make good a diminution in the
value of his shareholding, or in the dividends he received, which flowed from loss
suffered by the company for the recovery of which the company had a cause of action
("the rule in *Prudential*").  In particular the defendant argued that the holding
company had a cause of action because it could enforce the agreement in its own right
by virtue of section 1(1)(b) of the Contract (Rights of Third Parties) Act 1999[1].
The deputy judge accepted that submission and struck out the claim.  The claimant
appealed, contending that since it was section 1(1)(b) of the 1999 Act which conferred
upon the holding company a right to enforce the agreement, the effect of section 4 of

G

H

---

[1] Contract (Rights of Third Parties) Act 1999, ss 1(1)(b), 4: see post, para 31.

© 2022 The Incorporated Council of Law Reporting for England and Wales

2
**Broadcasting Investment Group Ltd v Smith (CA)**                    **[2022] 1 WLR**

A
the 1999 Act, which provided that section 1 did not "affect" any right of a contractual promisee to enforce any term of a contract, would be to override the rule in *Prudential* so far as it related to the claimant's claim.  By a respondent's notice, the defendant contended that the judge's decision should be upheld on the further or alternative ground that the holding company's contractual claims engaged the rule in *Prudential* since, on the facts assumed by the judge, it would have a claim against him for breaching his fiduciary duties as a director.

On the appeal—

B
*Held*, allowing the appeal, that on a true construction of section 4 of the Contract (Rights of Third Parties) Act 1999, any right to enforce a contract which a third party acquired by virtue of section 1 of the Act was additional to and could not "affect", whether by destroying, extinguishing or otherwise, any pre-existing right of a contractual promisee to enforce any term of the contract; that, accordingly, if section 1 were to be the proximate cause of a contractual promisee's rights being extinguished, section 4 would operate to prevent such an outcome; that, therefore,

C
the critical question in the present case was whether it was the rule in *Prudential* or section 1 of the Act that was the proximate cause of the claimant's right to enforce the agreement being extinguished, since it was only in the latter case that section 4 would afford any protection to the claimant as contractual promisee; that, on analysis, it was the rights of the holding company created under section 1 of the 1999 Act which enabled the defendant to seek to invoke the rule in *Prudential* which in turn would have the effect of destroying the claimant's right to enforce the agreement

D
and it would be entirely artificial to treat the rule in *Prudential* as if it were independent of the right in the holding company arising under section 1; that, therefore, if the application of the rule in *Prudential* were separated from the right created by section 1, which enabled it to be applied, section 1 "affected" the claimant's right to enforce the agreement by negating it entirely, which was impermissible under the terms of section 4; that, similarly, on the facts, any cause of action arising for breach of fiduciary duty was entirely parasitic on the agreement and the right of the holding company to enforce it arising under section 1 of the Act; that,

E
therefore, in either case section 4 of the 1999 Act operated so as to prevent the defendant from relying on the rule in *Prudential* so as to extinguish the claimant's rights under the contract; and that, accordingly, the deputy judge had been wrong to strike out the claim (post, paras 47–51, 54, 59, 64, 65, 66).

*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204, CA and *Marex Financial Ltd v Sevilleja* [2021] AC 39, SC(E) considered.

F
*Quaere*. Whether claims for specific performance (whether with or without seeking additional or alternative relief in the form of equitable damages) fall within the rule in *Prudential* (post, para 62).

Decision of Andrew Simmonds QC sitting as a deputy judge of the Chancery Division [2020] EWHC 2501 (Ch) reversed.

The following cases are referred to in the judgment of Asplin LJ:

G
*Fischer (George) (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, CA
*Foss v Harbottle* (1843) 2 Hare 461
*Johnson v Gore Wood & Co* [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481; [2001] 1 BCLC 313, HL(E)
*Latin American Investments Ltd v Maroil Trading Inc* [2017] EWHC 1254 (Comm); [2017] 2 CLC 45

H
*Marex Financial Ltd v Sevilleja* [2017] EWHC 918 (Comm); [2017] 4 WLR 105; [2018] 1 All ER (Comm) 761; [2018] EWCA Civ 1468; [2019] QB 173; [2018] 3 WLR 1412; [2019] 1 All ER (Comm) 522; [2018] 2 BCLC 601, CA; [2020] UKSC 31; [2021] AC 39; [2020] 3 WLR 255; [2021] 1 All ER 585; [2021] 1 All ER (Comm) 97; [2020] 2 BCLC 319, SC(E)
*Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch)

© 2022 The Incorporated Council of Law Reporting for England and Wales

3

[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)

A   *Pepper v Hart* [1993] AC 593; [1992] 3 WLR 1032; [1993] ICR 291; [1993] 1 All ER
        42, HL(E)
    *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204;
        [1982] 2 WLR 31; [1982] 1 All ER 354, CA
    *Xie Zhikun v Xio GP Ltd* (unreported) 14 November 2018, Cayman Islands Ct of
        Appeal

B   The following additional cases were cited in argument:

    *Beswick v Beswick* [1968] AC 58; [1967] 3 WLR 932; [1967] 2 All ER 1197, HL(E)
    *Hasham v Zenab* [1960] AC 316, PC
    *Naibu Global International Co plc v Daniel Stewart & Co plc* [2020] EWHC 2719
        (Ch)
    *Prest v Petrodel Resources Ltd* [2013] UKSC 34; [2013] 2 AC 415; [2013] 3 WLR 1;
        [2013] 4 All ER 673, SC(E)
C   *Sidaway v Board of Governors of the Bethlem Royal Hospital and the Maudsley
        Hospital* [1985] AC 871; [1985] 2 WLR 480; [1985] 1 All ER 643, HL(E)
    *Sprintroom Ltd, In re* [2019] EWCA Civ 932; [2019] 2 BCLC 617, CA

    No additional cases were referred to in the skeleton arguments.

    **APPEAL** from Andrew Simmonds QC sitting as a deputy judge of the
D   Chancery Division
        By a claim form the claimants, Broadcasting Investment Group Ltd, Visual
    Investment International Ltd and Kenneth Burgess, brought claims against
    the defendants, Adam Smith, Dan Finch, Parkhead Properties Ltd and
    Skoosh Investments Ltd (two Cayman Island companies), seeking to enforce
    an alleged oral agreement made on 30 October 2012 between the first and
E   second defendants on the one hand and the first and third claimants on the
    other.  By an application notice dated 21 June 2019, the first defendant
    sought to strike out the claims pursuant to CPR r 3.4 or alternatively,
    sought reverse summary judgment under CPR r 24.2 on the basis that the claims
    were barred by the rule that shareholders in a company could not bring an
    action to make good a diminution in the value of their shareholding, or in the
    dividends they received, which flowed from loss suffered by the company for
F   the recovery of which it had a cause of action ("the rule in *Prudential*"), on the
    basis that Streaming Investments plc, a company incorporated pursuant to
    the agreement and in which the first claimant was a shareholder, had itself
    acquired a right to enforce the agreement by virtue of section 1(1)(b) of the
    Contract (Rights of Third Parties) Act 1999.  By order dated 13 November
    2019, Andrew Simmonds QC sitting as a deputy judge of the Chancery
G   Division granted the claimants' application to add Streaming Investments plc
    as fifth defendant and to amend their particulars of claim so as to discontinue
    their claims in respect of the third and fourth defendant companies.  By a
    decision dated 21 September 2020, Andrew Simmonds QC [2020] EWHC
    2501 (Ch) held that the first claimant company's claims to enforce the
    agreement, including both its claims for damages and specific performance,
    should be struck out.
H       By an appellant's notice filed on 12 October 2020 and with permission
    of the deputy judge the claimant appealed on the ground that the judge's
    conclusions were contrary to the terms of section 4 of the 1999 Act and as a
    result of the terms of that section, the fifth defendant company's acquisition
    of rights under section 1 could not affect the first claimant's right as a

© 2022 The Incorporated Council of Law Reporting for England and Wales

4
**Broadcasting Investment Group Ltd v Smith (CA)**          **[2022] 1 WLR**
Asplin LJ

A

contractual promisee under the agreement, to enforce it. On 14 December 2020 the Court of Appeal (Newey LJ) granted the first claimant further permission to appeal on the ground that the rule in *Prudential* did not bar a claim for specific performance. By a respondent's notice the first defendant sought to uphold paragraph 1 of the deputy judge's order (pursuant to which the first claimant's claims were struck out) on the different or additional ground that the first claimant's contractual claims engaged the rule against reflective loss because, on the facts as assumed by the deputy judge, the fifth defendant company would have had a hypothetical claim against him for breaching his fiduciary duties as its director.

B

The facts are stated in the judgment of Asplin LJ, post, paras 8–29.

*Dan McCourt Fritz* (instructed by *Withers LLP*) for the claimants.
*Joseph Sullivan* and *Maya Chilaeva* (instructed by *Gowling WLG (UK) LLP*) for the defendants.

C

The court took time for consideration.

18 June 2021. The following judgments were handed down.

**ASPLIN LJ**

D

1   This appeal and the cross-appeal are concerned with the scope and effect of the rule in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 ("*Prudential*") as recently explained by the Supreme Court in *Marex Financial Ltd v Sevilleja* [2021] AC 39. In particular, they are concerned with the effect of the rule in *Prudential* when taken together with the Contract (Rights of Third Parties) Act 1999 (the "1999 Act"), in respect of a contract that benefits a company, but to which the company is not a party. These appeals also concern: the extent to which the rule in *Prudential* applies where a shareholder seeks specific performance (and/or damages in lieu of specific performance) in respect of a breach of contract to which it is a party, where the company in which the shareholding is held also has a cause of action; and the application of the rule in *Prudential*, if any, to shareholders in corporate shareholders of the company which has a cause of action.

E

F

2   These issues arise in the context of an application by the respondent, Mr Adam Smith, to strike out certain claims made against him by the appellant, Broadcasting Investment Group Ltd ("BIG"), Visual Investment International Ltd ("VIIL") and Mr Kenneth Burgess (together referred to as the "Claimants") pursuant to CPR r 3.4, or alternatively, for reverse summary judgment under CPR r 24.2. Mr Burgess is the majority shareholder of VIIL which in turn owns 51% of the issued share capital of BIG.

G

3   In summary, the Claimants seek to enforce an alleged oral agreement made in October 2012 between BIG, Mr Burgess, Mr Smith and the second defendant, Mr Dan Finch, amongst others, for the transfer of shares in two broadcasting technology companies to a joint venture vehicle, the fifth defendant, Streaming Investments plc ("SS plc") in which Mr Smith, Mr Finch, BIG and one other investor became shareholders (the "Agreement"). SS plc is in creditors' voluntary liquidation and took no part either in the hearing before the judge or in the appeals before us.

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A     **4**   The strike-out/summary judgment applications were heard by Andrew Simmonds QC, sitting as a deputy High Court judge.  In summary, he held (insofar as relevant to these appeals) that BIG's claims to enforce the Agreement, including both its claims for damages and specific performance, should be struck out.  He held that the claims were barred by the rule in *Prudential*, on the basis that SS plc, in which BIG owned shares, itself had a right to enforce the Agreement under the 1999 Act.  However, the judge

B     declined to strike out Mr Burgess' equivalent claim.  The citation of his judgment is [2020] EWHC 2501 (Ch).

     **5**   The deputy judge gave permission to appeal in relation to the appellants' first ground of appeal, concerning the relationship between section 4 of the 1999 Act and the rule in *Prudential*.  Permission was granted subsequently by Newey LJ in relation to their second ground, concerning

C     whether the rule in *Prudential* barred a claim for specific performance.

     **6**   In his respondent's notice, Mr Smith seeks to uphold paragraph 1 of the deputy judge's order (pursuant to which BIG's claims were struck out) on the different or additional ground that BIG's contractual claims engage the rule in *Prudential* because, on the facts as assumed by the deputy judge, SS plc would have had a claim against him for breaching his fiduciary duties as its director.

D     **7**   Mr Smith also cross-appeals the deputy judge's refusal to strike out the claims by Mr Burgess in respect of the Agreement and was given permission to do so by Newey LJ.  In his cross-appeal, Mr Smith contends that because Mr Burgess owns shares in BIG, which in turn holds shares in SS plc, the rule in *Prudential* bars Mr Burgess' claims in contract.  He submits that the rule applies not only to claims brought by the direct shareholders in a company, but also to claims brought by those further up

E     the shareholding chain.  This has been referred to as the "Russian doll" argument or effect.

     *Background in more detail*

     **8**   I take the relevant background to this matter from the judgment. Reference should be made to the judgment itself for a full explanation of the

F     facts.  The account contained in the judgment was taken, in turn, from the amended particulars of claim, the contents of which were treated as factually correct for the purposes of the applications before the deputy judge.  It was made clear in the judgment that were the claims to proceed, many of the allegations in the pleading would be contested.  The position remains the same before us.

G     **9**   The background is complicated but is necessary to understand the issues before us.  Mr Burgess says that he was introduced to Mr Smith in February 2012.  Mr Smith was associated with a company named Simplestream Ltd ("SS Ltd").  Its directors were Mr Smith and Mr Finch.  It is said that Mr Smith told Mr Burgess that SS Ltd could develop software which Mr Burgess required but that the company required investment.  As a result, Mr Burgess and/or VIIL were invited to invest in SS Ltd.  Mr Burgess

H     told Mr Smith that he/VIIL would not themselves invest in SS Ltd but that outside investors, being a Mr Goddard and a Mr Macpherson and companies associated with them, would be introduced.

     **10**   SS Ltd was owned as to 80% by a Ms Cynthia Franklin and as to 20% by Mr Smith.  Another company, TV Player Ltd ("TVP"), was said to be

© 2022 The Incorporated Council of Law Reporting for England and Wales

6
**Broadcasting Investment Group Ltd v Smith (CA)**                    [2022] 1 WLR
Asplin LJ

owned as to 75% by Ms Franklin, as to 20% by Mr Smith and as to 5% by        A
Mr Finch.  Mr Burgess says that in August 2012, Mr Smith told him about a
dispute between himself and Ms Franklin which had been resolved by an
agreement providing for the transfer of all Ms Franklin's shares in SS Ltd
and TVP to Mr Smith, giving Mr Smith total, or nearly total, control of the
two companies.

11   It is pleaded that in about October 2012 Mr Burgess and Mr Smith        B
agreed that BIG, as the vehicle of VIIL and ViiomniTV Ltd (an investment
vehicle of Mr Goddard and Mr McPherson, "Vii"), should be entitled to
39% of the equity in a company to be called Simplestream Group on the
basis that it would become the holding company for SS Ltd and TVP.  BIG
was incorporated on 15 October 2012 and its shares were held as to 51% by
VIIL (which in turn was controlled by Mr Burgess) and as to 49% by Skoosh      C
Investments Ltd ("Skoosh") (at one time, the fourth defendant), another
Goddard/Macpherson investment vehicle.

12   Later that month, at a meeting on 30 October 2012, it is alleged that
the Agreement was entered into by BIG (acting by Mr Burgess), Mr Burgess,
Mr Smith, Mr Finch and two companies acting by Mr Macpherson, Skoosh
and Vii.  Insofar as relevant to this appeal, the features of the Agreement
were as follows.  First, Mr Smith would procure the incorporation of the       D
Simplestream Group holding company, and its shares would be held by the
participants as follows: 39% by BIG, 48% by Mr Smith, 5% by Mr Finch and
8% by a company to be nominated by Mr Macpherson.  Second, once a loan
of £150,000 made by BIG to SS Ltd had been repaid, BIG would transfer the
loan to the holding company in order to capitalise it (the "Capitalisation
Condition").  Third, Mr Smith would, within a reasonable time of the            E
fulfilment of the Capitalisation Condition, procure the transfer of SS Ltd and
TVP, the operating subsidiaries, to the Simplestream Group holding
company.

13   The Claimants allege that both BIG and Mr Burgess personally
were parties to, and therefore, entitled to enforce the Agreement.  The
Simplestream Group holding company, however, was not in existence at
the date of the Agreement and therefore could not be a party to it.            F

14   It is pleaded that the following steps were taken to give effect to the
Agreement.  On 20 November 2012, the holding company was incorporated,
with its shares allocated as set out above.  This company is the fifth
defendant, SS plc which was originally named Simplestream Group plc.  On
12 February 2013, BIG fulfilled the Capitalisation Condition.  The Claimants
allege, however, that in breach of the Agreement, the shares in SS Ltd and      G
TVP were never transferred.

15   On 4 August 2015, SS plc went into creditors' voluntary liquidation.
The liquidator has, thus far, declined to pursue any claims which SS plc may
have in relation to the Agreement.

16   In their amended particulars of claim, the Claimants plead that by
reason of the breach of the Agreement:                                          H

"32. . . . BIG has suffered loss by reason of the consequent diminution
in the value of its shareholding in SS plc and loss of dividend income from
SS plc.  Further, it was a foreseeable consequence of the aforesaid breaches
that (by reason of lacking the revenues they would have supplied) SS plc

© 2022 The Incorporated Council of Law Reporting for England and Wales

A   subsequently entered insolvent liquidation, such that BIG's shares in SS plc
    lost the entirety of their value."

Insofar as relevant to these appeals, the relief claimed by the Claimants is as
follows:

> "42. BIG and/or Mr Burgess claim specific performance of the
> [Agreement] as regards the transfer to SS plc of the shares in SS Ltd and
B > TVP, alternatively damages in lieu of specific performance.
> "43. Further or alternatively, BIG claims damages for breach of the
> [Agreement] in respect of the consequent diminution of the value of its
> shares in SS plc (equating to the market value of the shares which BIG
> should have obtained) and loss of past and future dividend income."

C   There were other claims which are not relevant for these purposes.

*The strike-out application*

17   As I have already mentioned, Mr Smith applied for strike out or
reverse summary judgment of the claim. In respect of BIG's claim, Mr Smith
contended that this fell within the scope of the rule in *Prudential*, as
explained by Lord Reed PSC in *Marex Financial Ltd v Sevilleja* [2021] AC
D   39. It is said that the claim concerns a loss suffered by SS plc; BIG is a
shareholder in SS plc and the pleaded loss is merely reflective of that suffered
by SS plc. By virtue of section 1(1)(b) of the 1999 Act, SS plc has its own
claim against Mr Smith under the Agreement; it follows that SS plc and BIG
have concurrent claims against Mr Smith, and therefore, BIG's claim is
barred by the rule in *Prudential*. As demonstrated by *Marex*, that bar
E   extends both to the claim for damages and to the claims for specific
performance and other relief made by the shareholder.
18   In the alternative, Mr Smith contended that BIG's claim was also
barred under the rule in *Prudential* because, on the facts alleged in the
Claimant's amended particulars of claim, Mr Smith's failure to procure the
share transfer was inevitably a breach of his fiduciary duties as a director of
F   SS plc, a breach which is actionable at the suit of SS plc.
19   In respect of Mr Burgess' claim, Mr Smith submitted that this was
also barred by the rule in *Prudential*. Mr Burgess is a shareholder in VIIL
which is a shareholder in BIG which, in turn, is a shareholder in SS plc. On
the Claimants' pleaded case, Mr Burgess' only loss is a reduction in the value
of his shareholding in VIIL consequent upon a reduction in the value of
VIIL's shareholding in BIG which in turn is consequent upon a reduction in
G   the value of BIG's shareholding in SS plc.

*The judge's reasoning*

20   As I have already mentioned, the deputy judge struck out BIG's
claims on the basis of the rule in *Prudential* but declined to strike out
Mr Burgess' claims.
H   21   As the application of the rule in *Prudential* is dependent upon a cause
of action being vested in the company as well as the shareholder and as SS
plc had not been incorporated at the date of the Agreement, the judge
considered first whether SS plc had a cause of action arising out of the
Agreement, by virtue of the 1999 Act. He held that: section 1(1)(b) of the
1999 Act applied because on the Claimants' case, the Agreement purported

© 2022 The Incorporated Council of Law Reporting for England and Wales

8
**Broadcasting Investment Group Ltd v Smith (CA)**                    **[2022] 1 WLR**
Asplin LJ

to confer a benefit upon SS plc in that it required Mr Smith to procure the         A
transfer of SS Ltd and TVP to SS plc, and SS plc was to hold the shares in
those companies beneficially; and section 1(1)(b) was not dis-applied by
section 1(2). That subsection dis-applies section 1(1)(b) if "on a proper
construction of the contract it appears that the parties did not intend the
terms to be enforceable by the third party". Accordingly, SS plc was entitled
to enforce the Agreement pursuant to section 1 of the 1999 Act. See               B
paras 48–52. This part of the judge's reasoning is not in dispute.

22   His reasoning in relation to the interaction of sections 1 and 4 of the
1999 Act and the rule in *Prudential*, however, is the basis for the first ground
of appeal. The judge rejected Mr McCourt Fritz's argument which was
based upon three steps. They were as follows: (i) it is section 1 of the 1999
Act which confers a right of action upon SS plc to enforce the Agreement
which is concurrent with the rights of the promisees (BIG and/or             C
Mr Burgess); (ii) it is the existence of that right in SS plc conferred by
section 1 which enables the rule in *Prudential* to be invoked which would
bar BIG's claim under the Agreement; (iii) accordingly, the effect of section 4
must be to override the rule in *Prudential* so far as it relates to BIG's claim.

23   The judge held that the "obvious purpose, and effect, of section 4 is
to make it clear that the right to enforce conferred on the third party by            D
section 1 is additional to any right of enforcement which the promisee may
have" (para 53). The judge went on to reason as follows:

"53. . . . That [the purpose] is confirmed by paras 11.1–11.4 of the
Law Commission Report and is reflected in the Explanatory Notes
published with the 1999 Act. There is no reason to think that, in passing
section 4, Parliament had in mind the rule in *Prudential* which would only       E
be relevant in the specific case where the third party was a company and
the promisee was a shareholder in that company and no reason at all to
conclude that Parliament intended, by section 4, to override the rule
where it would otherwise be applicable. Therefore, the 'right' of the
promisee to enforce a contract which is preserved by section 4 can only be
a right which is subject to generally applicable legal principles, including
(where applicable) the rule in *Prudential*."                            F

24   Despite having decided that SS plc already had a concurrent claim
to enforce the Agreement, the judge, nonetheless, went on to consider
Mr Smith's alternative submission that SS plc also had a concurrent claim
against Mr Smith for breach of a fiduciary duty. He held that, in the context
of a strike-out application, he would not have acceded to that argument,
because it raised questions of fact that had not formed part of the Claimants'      G
case. The Claimants had not pleaded that Mr Smith was a director of SS plc;
there was no defence from Mr Smith pleading to his own breach of fiduciary
duty owed to SS plc; and even if there had been such pleading, it might raise
disputed questions of fact requiring resolution at trial: para 54. This is the
basis for Mr Smith's respondent's notice point.

25   At para 56, the deputy judge turned to consider two arguments made
by the Claimants to the effect that *Prudential* [1982] Ch 204 could not bar          H
BIG/Mr Burgess' claims, even if SS plc did have a concurrent claim. First, the
Claimants relied on Lord Reed PSC's dicta at para 9 of *Marex* [2021] AC 39,
where he held that *Prudential* applied where the diminution in the value of
the shareholding (or distributions) was "merely the result of a loss suffered

© 2022 The Incorporated Council of Law Reporting for England and Wales

9
[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
                                                                   Asplin LJ

A  by the company in consequence of a wrong done to it by the defendant".
   The Claimants submitted their claims were based on Mr Burgess/BIG's
   contract with Mr Smith, and not any loss to SS plc, which was not party to
   the contract.  The deputy judge rejected this argument too.  He concluded
   that Lord Reed PSC cannot have been suggesting that the loss must have
   resulted "merely" from loss actionable at the suit of the company: that
   would mean there were no concurrent claims at all, and the rule in
B  *Prudential* was not engaged.  There is no appeal in this regard.
      26   Second, the Claimants argued that even if *Prudential* barred their
   damages claim, it was not applicable to their claim for specific performance,
   as the latter was not a claim about diminution in the value of the
   shareholding or distributions.  The judge's reasoning in this regard forms the
   basis for the second ground of appeal.  He rejected the argument on the basis
C  that it was contrary to the Court of Appeal's judgment in *Prudential* itself, as
   endorsed by Lord Reed PSC in *Marex* at para 35.  There, Lord Reed PSC
   articulated the principle as barring a shareholder from bringing an action
   against a wrongdoer "to recover damages *or secure other relief*" for an injury
   done to the company (emphasis added): "other relief" would include an
   order for specific performance: para 57.
D     27   The judge also rejected Mr McCourt Fritz's submission that
   Lord Reed PSC's disapproval of *Latin American Investments Ltd v Maroil
   Trading Inc* [2017] 2 CLC 45 at paras 52–53 of *Marex*, was limited to the
   claim for the payment of contractual damages and did not extend to the
   claim for specific performance.  He held that:

      "58. . . . It is clear from the judgment of Teare J in *Latin American* that
E     the claim for 'specific performance' referred to in his paras 4 and 6 *was*
      the claim for an order that the defendants pay the relevant sums to the
      company: see also para 10.  There was no distinct claim for specific
      performance of which Lord Reed PSC did not disapprove.  Indeed, as
      appears from para 13, the successful argument in *Latin American* (which
      Lord Reed PSC considered should have been rejected) substantially
      replicates the argument advanced by Mr McCourt Fritz to the effect
F     that BIG's claim for specific performance of Mr Smith's obligation to
      procure a transfer of the shares in SS Ltd and TVP to SS plc is not barred
      by the rule in *Prudential*: 'Rather, Mr Shah submitted that there is a
      good arguable case that the "reflective loss" principle does not bar a
      shareholder with a cause of action seeking a remedy which requires
      *property or* payments to be restored to the company.  The Claimant, as a
      party to the Shareholder Agreements, should be entitled to maintain a
G     claim under those agreements to compel the first defendant to restore to
      the Joint Venture Companies payments which should have been made to
      them.   The remedy which Mr Shah seeks is the remedy of specific
      performance.' (My emphasis.)"

      28   On that basis, the judge held that BIG's claim was a "paradigm
   example" of a claim that is barred by the rule in *Prudential*.  As the Supreme
H  Court made clear in *Marex*, the *Prudential* rule is a rule of law and does not
   confer any discretion in applying that rule on the judge hearing the claim
   (paras 59–60).
      29   In relation to Mr Burgess' claim, however, the judge held that the
   rule in *Prudential* did not apply.  He gave four reasons: (1) *Marex* was clear

© 2022 The Incorporated Council of Law Reporting for England and Wales

10
**Broadcasting Investment Group Ltd v Smith (CA)**        **[2022] 1 WLR**
Asplin LJ

A

that the *Prudential* rule only bars claims by shareholders in the loss-suffering company; (2) the Supreme Court had stressed the rule was a highly specific exception, reflective of the unique position of a shareholder in relation to the company, and was antipathetic to any incremental extension to non-shareholders; (3) a second- or third-degree shareholder is not a shareholder in the relevant company, and blurring that distinction would ignore the separate legal personality of the companies forming the intervening links in the chain; and (4) a shareholder contracts into the *Prudential* rule when he acquires shares in a company, and accepts it will affect the recovery of losses incurred by that company; the same cannot be said of an indirect shareholder (para 64). This reasoning gives rise to Mr Smith's cross-appeal.

B

### The 1999 Act and Marex

C

30    The issues which arise in this case require the careful consideration of the relevant provisions of the 1999 Act and rule in *Prudential*, as explained in the *Marex* case. The arguments can only be understood against that background. Accordingly, I turn to them now.

31    First, section 1 of the 1999 Act provides as follows:

D

"1 *Right of a third party to enforce a contractual term*
"(1) Subject to the provisions of this Act, a person who is not a party to a contract (a 'third party') may in his own right enforce a term of the contract if— (a) the contract expressly provides that he may, or (b) subject to subsection (2), the terms purport to confer a benefit on him.
"(2) Subsection (1)(b) does not apply if on a proper construction of the contract it appears that the parties did not intend the term to be enforceable by the third party.

E

"(3) The third party must be expressly identified in the contract by name, as a member of a class, or as answering a particular description but need not be in existence when the contract is entered in to . . ."

These provisions must be read in light of sections 4 and 7(1) which state:

F

"4 *Enforcement of a contract by promisee*
"Section 1 does not affect any right of the promisee to enforce any term of the contract."
"7 *Supplementary provisions relating to third party*
"(1) Section 1 does not affect any right or remedy of a third party that exists or is available apart from this Act."

G

32    Secondly, as I have already mentioned, it is important to consider the *Marex* decision [2021] AC 39 in some detail. In that case, the claimant was a creditor of two companies which, it alleged, had been unlawfully stripped of their assets by the defendant, from whom the claimant sought damages. The defendant applied to set aside service of the claim form on the basis that the claimant's claim was barred by the rule in *Prudential*, as the liquidator of the two companies could pursue a claim against the defendant for the same loss. At first instance, the judge rejected the application [2017] 4 WLR 105, but he was overturned by the Court of Appeal [2019] QB 173, which held that the rule against reflective loss was not limited to shareholders, and extended to unsecured creditors. The matter was appealed to the Supreme

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

11
[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
Asplin LJ

A    Court, which took the opportunity to conduct a "root and branch" reconsideration of the doctrine.

33    The majority in the Supreme Court allowed the appeal, Lord Reed PSC giving the leading judgment and Lord Hodge DPSC providing a short concurring judgment. In essence, they decided that the rule in *Prudential* is restricted to a principle of company law, whereby a shareholder cannot bring a claim in respect of the diminution in the value of his shareholding, or

B    a reduction in the dividends he receives, which is merely the result of loss suffered by the company as a result of the defendant's wrongdoing. In so holding, the majority reined in the expansion of the *Prudential* rule that had followed the House of Lords' decision in *Johnson v Gore Wood & Co* [2002] 2 AC 1.

34    Lord Reed PSC set out his view of the narrow ambit of the rule in

C    *Prudential* at paras 9–10 in the following terms:

> "9. The fact that a claim lies at the instance of a company rather than a natural person, or some other kind of legal entity, does not in itself affect the claimant's entitlement to be compensated for wrongs done to it. Nor does it usually affect the rights of other persons, legal or natural, with concurrent claims. There is, however, one highly specific exception to

D    > that general rule. It was decided in the case of *Prudential Assurance Co Ltd v Newman Industries (No 2)* [1982] Ch 204 that a shareholder cannot bring a claim in respect of a diminution in the value of his shareholding, or a reduction in the distributions which he receives by virtue of his shareholding, which is merely the result of a loss suffered by the company in consequence of a wrong done to it by the defendant, even

E    > if the defendant's conduct also involved the commission of a wrong against the shareholder, and even if no proceedings have been brought by the company. As appears from that summary, the decision in *Prudential* established a rule of company law, applying specifically to companies and their shareholders in the particular circumstances described, and having no wider ambit.

F    > "10. The rule in *Prudential*, as I shall refer to it, is distinct from the general principle of the law of damages that double recovery should be avoided. In particular, one consequence of the rule is that, where it applies, the shareholder's claim against the wrongdoer is excluded even if the company does not pursue its own right of action, and there is accordingly no risk of double recovery. That aspect of the rule is understandable on the basis of the reasoning in *Prudential*, since its

G    > rationale is that, where it applies, the shareholder does not suffer a loss which is recognised in law as having an existence distinct from the company's loss. On that basis, a claim by the shareholder is barred by the principle of company law known as the rule in *Foss v Harbottle* (1843) 2 Hare 461: a rule which (put shortly) states that the only person who can seek relief for an injury done to a company, where the company has a

H    > cause of action, is the company itself."

35    He turned to consider the Court of Appeal's judgment in *Prudential* in detail at para 23. Prudential, a minority shareholder, brought a personal and derivative action against the company's directors, claiming that they had committed the tort of conspiracy against the company and its members.

© 2022 The Incorporated Council of Law Reporting for England and Wales

12
**Broadcasting Investment Group Ltd v Smith (CA)**          **[2022] 1 WLR**
Asplin LJ

The Court of Appeal held the claim was barred, but, as Lord Reed PSC       A
explained at para 26, the ambit of its decision was limited:

"26. The court disallowed Prudential's claim on the ground that it had
not suffered any personal loss. It stated at pp 222–223: 'But what he
[the shareholder] cannot do is to recover damages merely because the
company in which he is interested has suffered damage. He cannot
recover a sum equal to the diminution in the market value of his shares, or       B
equal to the likely diminution in dividend, because such a "loss" is merely
a reflection of the loss suffered by the company.' As that passage makes
clear, the decision was concerned only with a diminution in the value of
shares or in distributions, suffered by a shareholder merely because the
company had itself suffered actionable damage. It was not concerned
with other losses suffered by a shareholder, or with situations where the       C
company had not suffered any actionable loss."

36   Lord Reed PSC then went on to consider the basis for the rule in
*Prudential*, and concluded that the avoidance of double recovery was not a
sufficient explanation for it. First, that explanation could not account for
circumstances where there may not be a close correlation between the
company's loss and any fall in share value, and second, it failed to have       D
regard to the role of company autonomy. Explaining his second point, Lord
Reed PSC said:

"34. . . . What if the company fails to pursue a right of action which,
in the opinion of a shareholder, ought to be pursued, or compromises its
claim for an amount which, in the opinion of a shareholder, is less than its
full value? If that opinion is shared by a majority of the shareholders,       E
then the company's articles will normally enable them to direct the
company's course of action by passing a suitable resolution at a general
meeting. Even if the shareholder finds himself in a minority, he has a
variety of remedies available to him, including the bringing of a derivative
action on the company's behalf, equitable relief from unfairly prejudicial
conduct, or a winding up on the 'just and equitable' ground, if (put       F
shortly) those in control of the company are abusing their powers. But
what if the company's powers of management are not being abused, and a
majority of shareholders approve of the company's decision not to pursue
the claim, or its decision to enter into a settlement? Should the minority
shareholder not then be able to pursue a personal action?

"35. In *Prudential*, the court answered that question in the negative,
stating at p 224 that the rule in *Foss v Harbottle* would be subverted if the       G
shareholder could pursue a personal action. The rule, as stated in
*Edwards v Halliwell* [1950] 2 All ER 1064 and restated in *Prudential* at
pp 210–211, has two aspects. The first is that 'the proper plaintiff in an
action in respect of a wrong alleged to be done to a corporation is, prima
facie, the corporation'. As was explained in *Prudential* at p 210, one of
the consequences of that aspect of the rule is that a shareholder cannot, as
a general rule, bring an action against a wrongdoer to recover damages or       H
secure other relief for an injury done to the company. The second aspect
of the rule is that: 'Where the alleged wrong is a transaction which might
be made binding on the corporation and on all its members by a simple
majority of the members, no individual member of the corporation is

© 2022 The Incorporated Council of Law Reporting for England and Wales

13
[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
                                                                  Asplin LJ

A   allowed to maintain an action in respect of that matter because, if the
    majority confirms the transaction, cadit quaestio [the question falls]; or, if
    the majority challenges the transaction, there is no valid reason why the
    company should not sue.' This second aspect of the rule reflects the fact
    that the management of a company's affairs is entrusted to the decision-
    making organs established by its articles of association, subject to the
    exceptional remedies mentioned in para 34 above.  When a shareholder
B   invests in a company, he therefore entrusts the company—ultimately, a
    majority of the members voting in a general meeting—with the right to
    decide how his investment is to be protected.  As the court stated in
    *Prudential* at p 224: 'When the shareholder acquires a share he accepts
    the fact that the value of his investment follows the fortunes of the
    company and that he can only exercise his influence over the fortunes of
C   the company by the exercise of his voting rights in general meeting.' "

        37   Lord Reed PSC then returned to the true ambit of the rule in
    *Prudential* which he summarised as follows:

        "39. In summary, therefore, *Prudential* decided that a diminution in
    the value of a shareholding or in distributions to shareholders, which is
    merely the result of a loss suffered by the company in consequence of a
D   wrong done to it by the defendant, is not in the eyes of the law damage
    which is separate and distinct from the damage suffered by the company,
    and is therefore not recoverable.  Where there is no recoverable loss, it
    follows that the shareholder cannot bring a claim, whether or not the
    company's cause of action is pursued.  The decision had no application to
    losses suffered by a shareholder which were distinct from the company's
E   loss or to situations where the company had no cause of action."

        38   Lord Reed PSC went on at paras 40–51 to examine the House of
    Lords' decision in *Johnson*, deprecating Lord Millet's reliance on the
    avoidance of double recovery as the explanation for the rule in *Prudential*.
    He suggested this approach had led to a loophole which had been
    "exploited" by claimants and went on as follows:

F       "52. One problem with reasoning based on the avoidance of double
    recovery is that the principle is one of the law of damages.  It does not
    deny the existence of the shareholder's loss, as the rule in *Prudential* does,
    where the loss falls within its ambit, but on the contrary is premised
    on the recognition of that loss.  Applying an approach based on the
    avoidance of double recovery, it is therefore possible for a shareholder to
G   bring a personal action based on a loss which would fall within the ambit
    of the decision in *Prudential*, and to obtain a remedy which that decision
    would have barred to him, provided the relief that he seeks is not an
    award of damages in his own favour.  This device has been exploited in a
    number of cases subsequent to *Johnson*, in ways which circumvent the
    rule in *Foss v Harbottle*: a rule which is not confined to actions for
    damages but also applies to other remedies, as explained at para 35
H   above.
        "53. For example, in *Peak Hotels and Resorts Ltd v Tarek Investments
    Ltd* [2015] EWHC 3048 (Ch), the judge considered it arguable that the
    'reflective loss' principle, as explained by Lord Millett in *Johnson*, did not
    bar proceedings by a shareholder, who complained of a fall in the value of

© 2022 The Incorporated Council of Law Reporting for England and Wales

14
**Broadcasting Investment Group Ltd v Smith (CA)**          [2022] 1 WLR
Asplin LJ

his shares resulting from loss suffered by the company in respect of which
the company had its own cause of action, where the relief that he sought
was not damages but a mandatory injunction requiring the defendant to
restore property to the company.  A similar view was taken in *Latin
American Investments Ltd v Maroil Trading Inc* [2017] EWHC 1254
(Comm), where the shareholder complained of a fall in the value of its
shares resulting from a breach of obligations owed to the company, which
also involved a breach of contractual obligations owed to itself.  It
responded to the argument that its claim was for 'reflective loss' by
seeking an order for the payment of the contractual damages not to itself
but to the company.  A further example is *Xie Zhikun v Xio GP Ltd*
(unreported) 14 November 2018, Cayman Islands Court of Appeal.
Summarising complex facts, in that case the shareholder applied for a
quia timet injunction to prevent the breach of fiduciary duties owed both
to the company and to himself, which would cause the company to suffer
loss, and would consequently affect the value of his interest in it.  Sir
Bernard Rix JA observed at para 66 that he did not see 'how, other than
perhaps in terms of pure formalism . . . the present case differs from . . . a
derivative action'.

    "54.  Those cases demonstrate how right the Court of Appeal was in
*Prudential* in considering that the rule established in that case, based on
the absence of separate and distinct loss, was necessary in order to avoid
the circumvention of the rule in *Foss v Harbottle*.  The exception to that
rule is the derivative action.  Whether a shareholder can bring such an
action depends on whether the relevant conditions are satisfied."

39    Another aspect of Lord Reed PSC's treatment of *Johnson* which is
worthy of note for present purposes is his conclusion at para 66 that the case
was not authority for the *Prudential* rule barring "claims brought otherwise
than in the capacity of a shareholder".  Further, he said at para 67 that the
speech of Lord Bingham of Cornhill in *Johnson*, who took a different line to
Lord Millett:

    "gave authoritative support to the decision in *Prudential* that a
shareholder is normally unable to sue for the recovery of a diminution in
the value of his shareholding or in the distributions he receives as a
shareholder, which flows from loss suffered by the company, for the
recovery of which it has a cause of action, even if it has declined or failed
to make good that loss."

40    Lord Reed PSC drew together the strands of his reasoning in the
following way:

    "79.  Summarising the discussion to this point, it is necessary to
distinguish between (1) cases where claims are brought by a shareholder
in respect of loss which he has suffered in that capacity, in the form of a
diminution in share value or in distributions, which is the consequence of
loss sustained by the company, in respect of which the company has a
cause of action against the same wrongdoer, and (2) cases where claims
are brought, whether by a shareholder or by anyone else, in respect of loss
which does not fall within that description, but where the company has a
right of action in respect of substantially the same loss.

© 2022 The Incorporated Council of Law Reporting for England and Wales

15
[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
                                                                    Asplin LJ

A       "80. In cases of the first kind, the shareholder cannot bring proceedings
        in respect of the company's loss, since he has no legal or equitable interest
        in the company's assets: *Macaura* and *Short v Treasury Comrs*. It is only
        the company which has a cause of action in respect of its loss: *Foss v
        Harbottle*. However, depending on the circumstances, it is possible that
        the company's loss may result (or, at least, may be claimed to result) in a
        fall in the value of its shares. Its shareholders may therefore claim to have
B       suffered a loss as a consequence of the company's loss. Depending on the
        circumstances, the company's recovery of its loss may have the effect of
        restoring the value of the shares. In such circumstances, the only remedy
        which the law requires to provide, in order to achieve its remedial
        objectives of compensating both the company and its shareholders, is an
        award of damages to the company.

C       "81. There may, however, be circumstances where the company's right
        of action is not sufficient to ensure that the value of the shares is fully
        replenished. One example is where the market's valuation of the shares is
        not a simple reflection of the company's net assets, as discussed at para 32
        above. Another is where the company fails to pursue a right of action
        which, in the opinion of a shareholder, ought to have been pursued, or
        compromises its claim for an amount which, in the opinion of a
D       shareholder, is less than its full value. But the effect of the rule in *Foss v
        Harbottle* is that the shareholder has entrusted the management of the
        company's right of action to its decision-making organs, including,
        ultimately, the majority of members voting in general meeting. If such a
        decision is taken otherwise than in the proper exercise of the relevant
E       powers, then the law provides the shareholder with a number of remedies,
        including a derivative action, and equitable relief from unfairly prejudicial
        conduct."

        41   He went on to conclude:

        "89. I would therefore reaffirm the approach adopted in *Prudential* and
        by Lord Bingham in *Johnson*, and depart from the reasoning in the other
F       speeches in that case, and in later authorities, so far as it is inconsistent
        with the foregoing . . . The rule in *Prudential* is limited to claims by
        shareholders that, as a result of actionable loss suffered by their company,
        the value of their shares, or of the distributions they receive as
        shareholders, has been diminished. Other claims, whether by shareholders
        or anyone else, should be dealt with in the ordinary way."

G       42   As I have said, Lord Hodge DPSC gave a concurring judgment,
        focusing on the "central role of company law in the Court of Appeal's
        judgment in the *Prudential* case" (para 95). In this regard, he said:

        "99. . . . I agree with Lord Reed PSC (para 28 above) that what the
        court was saying is that where a company suffers a loss as a result of
        wrongdoing and that loss is reflected to some extent in a fall in the value
H       of its shares or in its distributions, the fall in the share value or in the
        distributions is not a loss which the law recognises as being separate and
        distinct from the loss sustained by the company.

        "100. That is the full extent of the 'principle' of reflective loss which
        the *Prudential* case established. It was not articulated as a general

© 2022 The Incorporated Council of Law Reporting for England and Wales

16
**Broadcasting Investment Group Ltd v Smith (CA)**                    **[2022] 1 WLR**
Asplin LJ

A

principle to be applied in other contexts; it is a rule of company law arising from the nature of the shareholder's investment and participation in a limited company and excludes a shareholder's claim made in its capacity as shareholder."

*Ground 1—Interrelationship between the 1999 Act and the rule in Prudential*

B

43    With that background in mind, I turn to the first ground of appeal. As I have already mentioned, Mr McCourt Fritz, on behalf of BIG, does not challenge the judge's conclusion that although SS plc had not been incorporated at the date on which the Agreement was entered into, it nevertheless acquired a right to enforce the Agreement by virtue of section 1(1)(b) of the 1999 Act. He says, however, that the judge's conclusions are contrary to the terms of section 4 of the 1999 Act and as a result of the terms of that section, SS plc's acquisition of rights under section 1 cannot affect BIG's right as a contractual promisee under the Agreement, to enforce it. He says that by holding that SS plc's cause of action as a result of section 1 engages the rule in *Prudential*, so as to bar BIG's claim to enforce the Agreement, the judge caused section 1 to do what Parliament expressly proscribed by section 4. The effect of that reasoning, therefore, is to cause section 1 to negate BIG's contractual rights entirely in a manner which is impermissible by statute.

C

D

44    Mr McCourt Fritz described the reasoning, that the right acquired by SS plc after the Agreement was made, by virtue of section 1 of the 1999 Act, prevents BIG as a shareholder of SS plc from pursuing its cause of action for breach of the Agreement because of the rule in *Prudential*, as a parasite which kills its host. He says that it would be surprising if the 1999 Act barred a claim of the type which was recognised in *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260, where it was held that a corporate shareholder was entitled to damages for breach of a contract it had entered into with the defendant for the installation of equipment at its subsidiary's premises, as the subsidiary did not have its own cause of action on the contract (as the case pre-dated the 1999 Act). He pointed out that it was no part of BIG's bargain that its primary rights under the Agreement would be subsumed by the rights of a company which was not yet in existence. He also pointed out the irony that if Mr Smith had failed to comply with his obligation to incorporate SS plc, BIG could have enforced the Agreement, but because he complied with that part of the bargain, it is said that BIG is deprived of its rights under the Agreement.

E

F

G

45    In essence, Mr Sullivan, on behalf of Mr Smith, submits that: section 4 of the 1999 Act cannot be construed to mean that it abrogates the rule in *Prudential* and as a result, subverts the principle of the autonomy of the company in *Foss v Harbottle* (1843) 2 Hare 461 as explained and relied upon by Lord Reed PSC in *Marex*; and that it is clear from *Marex*, in particular, at paras 10 and 39, that where the shareholder and the company have concurrent claims, the law does not recognise the shareholder's loss. The loss is that of the company. The promisee's cause of action preserved by section 4 is still subject to the rules of law, including the rule in *Prudential*.

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

17

[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
                                                                    Asplin LJ

A   *Discussion and conclusion on ground 1*

**46**   There is no dispute that SS plc acquired a right to enforce the Agreement by virtue of section 1(1)(b) of the 1999 Act. Furthermore, it is not in dispute that BIG, which became a shareholder in SS plc after the latter was incorporated pursuant to the Agreement, was a contractual promisee under the Agreement. Does section 4 preserve BIG's right to enforce the Agreement or has the creation of a right in SS plc as a result of section 1(1)(b) destroyed those rights?

B   **47**   Section 4 states expressly that "Section 1 does not affect any right of the promisee . . ." What is the proper construction of that section? First, it seems to me that it is clear from the natural meaning of the words used that the right conferred upon a third party under section 1 is additional to any right the contractual promisee has to enforce the contract. Such a construction is consistent with the Explanatory Notes to the 1999 Act. It is also consistent with the clear terms of the 1999 Act as a whole which reflect the fact that it was intended to create only a limited and tightly constrained incursion into the rule of privity of contract. This is implicit not only in section 4, but also, for example, from the fact that parties are able to contract out of the 1999 Act. Section 4 makes clear that the rights created in section 1 are not intended to affect what already existed. They take nothing away.

C

D   **48**   The real question, therefore, is whether the rule in *Prudential* "affects" BIG's right to enforce the Agreement rather than section 1. If section 1 is the proximate cause of BIG's rights being extinguished, section 4 prevents such an outcome. If the rule in *Prudential* is the proximate cause and it stands alone from the rights granted to SS plc under section 1 of the 1999 Act, the rights are extinguished and section 4 provides no protection to BIG as promisee.

E   **49**   It seems to me that it is quite clear that it is the rights created under section 1 which enable Mr Smith to seek to invoke the rule in *Prudential* which in turn would have the effect of destroying BIG's right to enforce the Agreement. The possibility would not arise without the operation of section 1. It is section 1, therefore, which affects the right of the promisee and is prevented from doing so by the clear terms of section 4 of the 1999 Act. It would be entirely artificial to treat the rule in *Prudential* as if it were independent of the right in SS plc which exists as a result of section 1 and causes the rule to apply. The acquisition by SS plc of a right under section 1 cannot affect BIG's right as contractual promisee. As Mr McCourt Fritz put it in his written argument, if one separates the application of the rule in *Prudential* from the right created by section 1, which enables it to be applied, section 1 not only affects BIG's rights to enforce the Agreement but negates them entirely. That is impermissible as a matter of statute.

F

G   **50**   I also agree with Mr McCourt Fritz that the judge's reasoning at para 53 to the effect that the right of the promisee to enforce a contract which is preserved by section 4 "can only be a right which is subject to generally applicable legal principles, including (where applicable) the rule in *Prudential*" takes the matter no further. It seems to me that such an approach is contrary to section 4 and defeats the purpose of that section. The rule in *Prudential* can only come into play, if at all, as a result of the statutory right which is vested in SS plc under section 1 of the 1999 Act. That right is conferred purely by statute and is subject to the terms and

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

18
**Broadcasting Investment Group Ltd v Smith (CA)**                    [2022] 1 WLR
Asplin LJ

limitations imposed by statute.  Section 4 expressly provides that section 1   A
(and therefore, the right created by section 1) does not affect the right of the
promisee.  In circumstances such as these, if the rule in *Prudential* were
treated as if it were entirely separate from the statutory right under section 1,
section 4 would be sidestepped.  That cannot be correct.

51   In my judgment, therefore, it would be a nonsense if section 4 were
construed in any other way.  As a matter of proper construction, it seems to
me that "affect" must include something which would destroy the right   B
which section 4 seeks to protect.  This construction is reinforced when
section 4 is read in conjunction with section 7(1) of the 1999 Act.  That
section makes clear that section 1 is not intended to affect any right or
remedy of a third party which exists apart from the 1999 Act.  It is clear,
therefore, that the inroad into the principle of privity of contract created by
section 1 was not intended to derogate from any right vested in the promisee   C
or a third party.  It seems to me that the words of the statute are clear.  They
are supported by the Explanatory Notes.  There is no need to go any further.
There is no uncertainty as to the mischief which the 1999 Act, and section 4
in particular, was intended to cure.  Accordingly, it was not permissible to
turn to the Law Commission Report which led to the enactment of the 1999
Act as the judge did at para 53.  It is not a tool which can be used in order   D
to determine the proper construction of the provisions of the 1999 Act
themselves: *Pepper v Hart* [1993] AC 593, 630G.  It is therefore unnecessary
to consider Mr McCourt Fritz's argument that, on a proper reading, the
Report does not support the judge's conclusions.

52   It is unnecessary, therefore, to consider Mr McCourt Fritz's further
argument based upon a detailed analysis of Lord Reed PSC's judgment in
*Marex*.  I will outline it nevertheless.  He argued that following the   E
conclusions of the majority in *Marex*, the rule in *Prudential* has been revealed
to be a very specific and narrow exception to the norm.  It is a rule of company
law.  Where it applies, the shareholder does not suffer a loss which is
recognised in law as having an existence distinct from the loss suffered by the
company itself.  He cannot bring a claim in respect of a diminution in the
value of his shareholding, or a reduction in the distributions which he   F
receives by virtue of his shareholding which is merely the result of a loss
suffered by the company.  A claim by the shareholder, therefore, is barred by
the principle in *Foss v Harbottle* which, put shortly, states that the only
person who can seek relief for an injury done to a company, where the
company has a cause of action, is the company itself.  See *Marex* at paras 9,
10, 28, 35 and 37.  However, Mr McCourt Fritz argued that the primary
obligations owed to a contractual promisee are different from the secondary   G
entitlement granted to SS plc by section 1 of the 1999 Act and in this case, BIG
was not binding its fortunes to that of a company in which it held shares.  Its
rights under the Agreement preceded the incorporation of SS plc and were
different in nature.  In this regard, he relied upon the *George Fischer* case.

53   As I have already mentioned, it is not necessary to consider this
argument in any detail.  Suffice it to say that I consider it to be a difficult one
upon which to succeed given that the shareholder's loss would be of the very   H
nature described by Lord Reed PSC as falling within the rule in *Prudential*
even though the shares were not to be allotted until after the Agreement was
entered into.  I should also add that as Lord Reed PSC explained in *Marex* at
para 45, *George Fischer* was a case in which the wrong was committed

© 2022 The Incorporated Council of Law Reporting for England and Wales

19

[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
                                                                  Asplin LJ

A  against the shareholder and not the company in circumstances in which the
company had no cause of action. In those circumstances, there was no
reason why the shareholder could not recover its loss by means of an award
of damages, in accordance with ordinary principles. It follows that it is of no
assistance here.

   54   In any event, in my judgment, BIG's claims under the Agreement are
B  not barred by the rule in *Prudential*. To the contrary, they are expressly
protected by section 4 of the 1999 Act. It follows that I consider that the
judge was wrong to strike those claims out.

   *Respondent's notice—fiduciary duties?*

   55   What of Mr Sullivan's argument on behalf of Mr Smith, that the
judge's order should be upheld on the additional ground that on the facts
C  pleaded by the Claimants, SS plc would have a cause of action against
Mr Smith for breach of his fiduciary duties as a director of SS plc to promote
the success of the company for the benefit of its members, to exercise
reasonable care, skill and diligence and to avoid conflicts of interest and
accordingly, the rule in *Prudential* applies to that claim?

   56   It is common ground that at the material time, Mr Smith was one of
D  the directors of SS plc. Further, it is the Claimants' case that pursuant to the
Agreement, Mr Smith promised to transfer assets he owned in the form of
the shares in SS Ltd and TVP to SS plc. The judge found that SS plc had a
right under the 1999 Act to enforce the Agreement and there is no appeal in
that regard. Mr Sullivan submits, therefore, that if the Claimants' case is
correct, Mr Smith owed a personal contractual duty, enforceable by SS plc,
E  to transfer assets, but he did not do so and did not cause SS plc to take steps
to enforce the contractual right against him.

   57   It is said that in relation to both the decision whether to comply with
the Agreement and transfer his personal assets to SS plc and the decision
whether to cause SS plc to take steps to enforce the Agreement, Mr Smith's
personal interests and those of SS plc were in conflict. If the facts pleaded by
F  BIG are true, Mr Smith would have preferred his own interests over those of
the company and would be have been in breach of fiduciary duty. The judge
found that SS plc would, if the Claimants' case is true, have a right to enforce
the Agreement under the 1999 Act. In such circumstances, it is said that SS
plc would have a separate cause of action against Mr Smith in addition to
its claim under the 1999 Act and, therefore, BIG's appeal in relation to
section 4 of the 1999 Act becomes otiose.

G  58   First, in this regard, I should say that I consider that the judge was
wrong to decide that the hypothetical claim for breach of fiduciary duty
might require disputed questions of fact which would require resolution at
trial as he did at para 54 of his judgment. It seems to me that the claim
should have been considered on the basis of what had been pleaded at the
time that the matter came before the judge, assuming for the purposes of the
H  strike-out application that all of the facts and matters pleaded were true. In
that context, it was not a matter for further factual enquiry.

   59   Secondly, and in any event, it seems to me that the hypothetical claim
is fatally flawed in two ways. First, such a fiduciary duty arises after the
personal obligation upon Mr Smith. SS plc obtained a cause of action in
relation to breaches of the Agreement, and therefore, any breach of the

© 2022 The Incorporated Council of Law Reporting for England and Wales

20
**Broadcasting Investment Group Ltd v Smith (CA)**                    **[2022] 1 WLR**
Asplin LJ

personal obligation, as soon as it was incorporated, by virtue of section 1 of   A
the 1999 Act. It is not clear what the fiduciary duty would add. In any
event, the fiduciary duty would necessarily depend upon the existence of SS
plc's right to enforce the Agreement pursuant to the 1999 Act and would
have no existence independent of the Agreement and the rights under
section 1. It seems to me, therefore, that section 4 of the 1999 Act would
operate in respect of the hypothetical fiduciary duty claim in just the same   B
way as it does in relation to SS plc's direct claim to enforce the Agreement.
The position is just the same. Although fiduciary duties are owed by a
director of a company to that company, in this case, the alleged content and
breach of those duties are entirely parasitic upon the Agreement and the
right of SS plc to enforce it pursuant to the 1999 Act. I agree with
Mr McCourt Fritz, therefore, that even if the claim were made out, it would
not engage the rule in *Prudential* because it too is reliant upon section 1 and   C
subject to section 4 of the 1999 Act.

60    Lastly, it seems to me that in any event, the hypothetical breach of
fiduciary duty fails at the first hurdle. Mr Smith's personal duty under the
Agreement and his fiduciary duty to SS plc to take steps to get in the assets to
which it is entitled are entirely in parallel. There is no conflict between them.
It is to be assumed that Mr Smith intends to and will fulfil his contractual   D
obligations. As a result, there is no breach of fiduciary duty upon which
Mr Smith can rely for the purposes of this ingenious argument.

61    To conclude, therefore, in my judgment, the rule in *Prudential* is not
engaged either in relation to the direct claim to enforce the Agreement or the
hypothetical fiduciary duty claim and that claim is not another basis for
upholding the judge's decision.
                                                                                 E
*Ground 2—Specific performance*

62    In the light of my conclusion in relation to ground 1, it is
unnecessary to consider Mr McCourt Fritz's second ground of appeal.
It poses difficult questions. Although Lord Reed PSC's reference to a
shareholder being unable to bring an action against a wrongdoer to recover
damages "or secure other relief for an injury done to the company" at   F
para 35 in *Marex* and his treatment at paras 53 and 54 of *Peak Hotels and
Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch), *Latin
American Investments Ltd v Maroil Trading Inc* [2017] 2 CLC 45 and *Xie
Zhikun v Xio GP Ltd* (unreported) 14 November 2018, Cayman Islands
Court of Appeal, together with the application of the principle in *Foss v
Harbottle*, might on superficial consideration lead one to the conclusion that   G
claims for specific performance (whether with or without seeking additional
or alternative relief in the form of equitable damages) also fall within the
rule in *Prudential*, the matter is complex. It is best left to a case in which it is
essential to determine the issue.

*The cross-appeal—the "Russian doll" argument*
                                                                                 H
63    In the light of my conclusion under ground 1 and in relation to the
alternative hypothetical fiduciary duty claim that the rule in *Prudential* is not
engaged, it is also not necessary to consider Mr Sullivan's "Russian doll"
argument on the cross-appeal (regarding the application of the *Prudential*
rule to indirect shareholders) and I say no more about it.

© 2022 The Incorporated Council of Law Reporting for England and Wales

A-9426

21

[2022] 1 WLR                    Broadcasting Investment Group Ltd v Smith (CA)
                                                                    Asplin LJ

A  *Conclusion*

64   For all the reasons set out above, I would allow the appeal.

**COULSON LJ**

65   I agree with both judgments.

B  **ARNOLD LJ**

66   I agree that this appeal should be allowed for the reasons given by
Asplin LJ. I would only add that I consider it well arguable that the rule in
*Prudential* can apply to indirect shareholders in appropriate circumstances.
Suppose A owns 100% of the shares in B Ltd which owns 100% of the shares
in C Ltd. Suppose that a wrong is done to C Ltd by D which results in a
diminution of the value of B Ltd's shares in C Ltd which in turn results in

C  a diminution of the value of A's shares in B Ltd. Suppose that A has a
concurrent right of action and sues D to recover his loss as result of that
diminution. I find it difficult to see why, on those hypotheses, the rule should
not apply.

*Appeal allowed.*

D                                    Isabella Marshall, *Barrister*

E

F

G

H

© 2022 The Incorporated Council of Law Reporting for England and Wales

A-9427

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT DIVERSIFIED REAL ESTATE TRUST, <br><br> *Defendants*. | No. 1:21-cv-11059 (GHW) |

## STIPULATION AND PROPOSED ORDER
## REGARDING ADDITION OF NHF TRS, LLC AS A PARTY

WHEREAS, on the February 23, 2022, filing date of the Amended Complaint (Dkt. 15), on the March 30, 2023 filing date of the counterclaims (Dkt. 78) filed by Defendant NexPoint Diversified Real Estate Trust ("NexPoint") and as of today, NexPoint's subsidiary NHF TRS, LLC ("NHF TRS") has been the registered holder of the Subordinated Note issued by Acis CLO 6 that is the subject of this litigation;

WHEREAS, the parties, Plaintiffs U.S. Bank, National Association, in its capacity as Trustee, Acis Capital Management, L.P., and Joshua N. Terry (collectively, "Plaintiffs"), Counter-Defendant Brigade Capital Management, LP ("Brigade"), and Defendants The Charitable Donor Advised Fund, L.P. and CLO HoldCo Ltd. (the "DAF Parties") and NexPoint (altogether, the "Parties") have agreed to add NHF TRS as an additional defendant and an additional counter-plaintiff subject to the conditions of this Stipulation;

NOW THEREFORE, the Parties stipulate and agree as follows:

1.      Plaintiffs and Brigade provide written consent pursuant to FRCP 15(a)(2) to NexPoint filing its proposed Second Amended Answer and Counterclaim attached hereto as Exhibit A.  The Second Amended Answer and Counterclaim add NHF TRS as an additional counter-plaintiff and adjusting certain of its counterclaims to reflect the same.

2.      NexPoint and the DAF Parties provide written consent pursuant to FRCP 15(a)(2) to Plaintiffs filing the Second Amended Complaint attached hereto as Exhibit B.  The Second Amended Complaint adds NHF TRS as an additional defendant on substantially all allegations and all claims against NexPoint.

3.      NexPoint and NHF TRS's Second Amended Answer and Counterclaim referenced in paragraph 1 of this Stipulation and the DAF Parties' Second Amended Answer and First Amended Counterclaim (Dkt. 155) shall each constitute an answer to the Second Amended Complaint referenced in paragraph 2 of this Stipulation, and neither NexPoint and NHF TRS, nor the DAF Parties, shall be required to serve any further answer to the Second Amended Complaint under FRCP 12(a)(1)(A).  NexPoint, NHF TRS, and the DAF Parties further stipulate and agree that they will not assert that the Stipulation and Proposed Order renders the relief sought in Plaintiffs' already-briefed motion for judgment on the pleadings (the "Original MJOP," Dkts. Dkts. 106-107, 139, 151, 162) premature or impact whether the pleadings addressed in the Original MJOP are "closed" for purposes of Federal Rule of Civil Procedure 12(c).  NexPoint, NHF TRS, and the DAF Parties further stipulate and agree that they will not seek to reopen briefing on the Original MJOP based on this Stipulation and Proposed Order and the amended pleadings submitted pursuant thereto.

4.      Plaintiffs' and Brigade's already-briefed motions to dismiss NexPoint's counterclaims (the "Original Motions to Dismiss," Dkts. 106-107, 119-120, 139, 147, 151, 157,

162) and the Original MJOP, and the arguments for dismissal and judgment on the pleadings raised therein, will apply equally to NHF TRS once it is added as a defendant and any ruling on the Original Motions to Dismiss and/or the Original MJOP will bind NHF TRS.  Thus, for example, if the Court enters an order ruling that NexPoint lacks direct and derivative standing to assert its claims based on the arguments in the Original Motions to Dismiss and/or the Original MJOP, that ruling will apply equally to NHF TRS and the Court shall, either *sua sponte* or upon the request of a party, enter an identical order against NHF TRS without further briefing.

5.     All references to the "Amended Complaint" or "AC" in the briefing on the Original Motions to Dismiss and the Original MJOP will refer to the paragraph numbering in Plaintiffs' Amended Complaint (Dkt. 15), except for the supplemental briefing described below.  Further, all references to the answer or counterclaims in the briefing on the Original Motions to Dismiss and the Original MJOP will refer to the paragraph numbering in NexPoint's Amended Answer & Counterclaims (Dkt. 78) filed in response to Plaintiffs' Amended Complaint, except for the supplemental briefing described below.

6.     All references to the "Amended Complaint" or "AC" in the briefing on Plaintiffs' Motion to Dismiss the DAF Parties' Amended Counterclaims and for Judgment on the Pleadings on Plaintiffs' Claims (Dkts. 183, 199) will refer to the paragraph numbering in Plaintiffs' Amended Complaint (Dkt. 15), and all references to the DAF Parties' answer to the Amended Complaint in that same briefing will refer to the DAF Parties' answer (Dkt. 155).

7.     Plaintiffs and Brigade shall file a single supplemental brief of no more than five (5) pages (the "Supplemental Opening Brief") solely to present the argument that under the contemporaneous ownership rule NexPoint lacks derivative standing to assert the claims in the amended counterclaims because it does not currently hold the Subordinated Note and NHF TRS

A-9430

lacks derivative standing to assert the claims in the amended counterclaims because it did not own the Subordinated Notes at the time of the alleged wrongdoing.  The Opening Supplemental Brief shall be filed by no later than November 3, 2023.

8.      NexPoint shall file a supplemental brief of no more than five (5) pages (the "Supplemental Response Brief") solely to respond to the Supplemental Opening Brief by no later than November 13, 2023.

9.      Plaintiffs and Brigade shall file a single supplemental reply brief (together with the Supplemental Opening Brief and the Supplemental Response Brief, the "Supplemental Briefs"), if any, of no more than two (2) pages solely to respond to the Supplemental Response Brief by no later than November 20, 2023.

10.     All references to NexPoint and NHF TRS's counterclaims in the Supplemental Briefs will refer to the paragraph numbering in NexPoint and NHF TRS's Second Amended Answer and Counterclaim referenced in paragraph 1 of this Stipulation.

A-9431

Dated:  New York, NY
          October 31, 2022

/s/ Blair A. Adams
Jonathan E. Pickhardt
Blair A. Adams
Brendan Carroll
Misha Boutilier
Jeffrey Arnier
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
**Counsel for Plaintiffs ACIS Capital
Management, L.P., and Joshua N. Terry**

/s/   Mark D. Kotwick
Mark D. Kotwick
Thomas Ross Hooper
Julie J. Hong
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
(202) 574-1200
**Counsel for Plaintiff U.S. Bank National
Association, as Trustee**

/s/   Mazin A. Sbaiti
Mazin A. Sbaiti
SBAITI & COMPANY PLLC
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
(214) 432-2899
**Counsel for Defendant NexPoint Diversified
Real Estate Trust**

By:   /s/ Jason C. Hegt
Jason C. Hegt
Alexis Kellert Godfrey
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
**Counsel for Counter-Defendant Brigade
Capital Management, L.P.**

/s/ Sawnie A. McEntire
Sawnie A. McEntire
*Admitted Pro Hac Vice*
Texas Bar No.: 13590100
Fed ID #3476
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Fax: (214) 237-4340
E-mail: smcentire@pmmlaw.com

Roger L. McCleary
*Admitted Pro Hac Vice*
Texas Bar No.: 133937000
Fed. ID #205
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Fax: (713) 960-7347
E-mail: rmccleary@pmmlaw.com

5

A-9432

Lindsey R. Skibell
E-mail: rskibell@glennagre.com
Jewel K. Tewiah
E-mail: jtewiah@glennagre.com
GLENN AGRE BERGMAN & FUENTES LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: 212.358.5600
***Counsel for CLO Holdco, Ltd. and The
Charitable Donor Advised Fund, L.P.***

A-9433

SO ORDERED.

Dated: November __, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

A-9434

# EXHIBIT A

A-9435

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P., <br><br>                      Plaintiffs, <br><br>  -against- <br><br> THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT DIVERSIFIED REAL ESTATE TRUST, <br><br>                   Defendants. <br><br> NEXPOINT DIVERSIFIED REAL ESTATE TRUST and NHF TRS LLC, <br><br>                Counter-Plaintiffs, <br><br>  -against- <br><br> JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT, L.P., and BRIGADE CAPITAL MANAGEMENT L.P., <br><br>               Counter-Defendants. | **Case No. 1:21-cv-11059 (GHW)** |

<u>**COUNTER-PLAINTIFFS NEXPOINT DIVERSIFIED REAL ESTATE TRUST AND NHF TRS LLC'S FIRST AMENDED COUNTERCLAIM**</u>

Defendant/Counter-Plaintiff NexPoint Diversified Real Estate Trust ("NexPoint") submits this Amended Counterclaim to plead NHF TRS LLC as the real party in interest for certain claims previously alleged and brought against Plaintiff/Counter-Defendants Joshua N. Terry ("Terry") and Acis Capital Management, L.P. ("Acis"), and against Counter-Defendant Brigade Capital Management, L.P. ("Brigade") alleging that Counter-Defendants are liable to NexPoint and NHF TRS LLC (together, "Counter-Plaintiffs") for (i) breaches of fiduciary and other duties with respect to the management of an investment trust in which NexPoint invested; (ii) tortious

interference with NexPoint's rights under its Notes; and (iii) conversion of funds that NexPoint would have otherwise received. The acts and omissions which have come to light reveal a pattern of conduct transgressing fiduciary duties which have caused NexPoint damages.[1]

## SUMMARY OF THE ACTION

1.      Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC (together, the "Issuers") acquired a series of assets, namely interests in collateralized loan obligations. Via a trust indenture agreement, the Issuers granted all rights, title, and interest in the assets to a trustee, U.S. Bank, N.A., and vested all management power over the securities in Acis, thus creating a trust for the purpose of paying off the secured noteholders and paying all residual cash flows to the equity holders (hereinafter, this arrangement is referred to as "ACIS-6").

2.      ACIS-6 is managed by Acis as the portfolio manager and Terry as the primary advisor. Brigade is a sub-advisor. All three are registered investment advisors and agreed to abide by the Portfolio Management Agreement (the "PMA").

3.      In a classic "rob Peter to pay Paul" scheme, Counter-Defendants:

- Knowingly charged ACIS-6 exorbitant amounts of "expenses" without accountability or justification;

- Knowingly caused ACIS-6 to purchase loans that failed to meet credit-quality tests and average-life tests, causing the entire portfolio to fail the applicable collateral-quality tests;

- Knowingly caused ACIS-6 to sell valuable assets cheaply; and

- Knowingly breached industry standards (*e.g.*, best execution) when buying and selling assets of managed funds.

---

[1] This action is solely predicated on claims that accrued after February 15, 2019, which is the effective date of the Bankruptcy Court order exculpating Counter-Defendants from liability as of that date and enjoining any lawsuit or action seeking to recover for liability accruing on or prior to that date. Nothing in this action is intended to violate said injunction or order.

4.      To put it simply, since February 16, 2019, Counter-Defendants have wiped out millions in value from ACIS-6 through the combined effect of their malfeasance and deprived NexPoint of the full benefit of its investment bargain.

5.      The impact on NexPoint is substantial. It is entitled to millions of dollars from ACIS-6. Counter-Defendants have caused the net asset value of ACIS-6 to nosedive. Counter-Defendants have thus caused NexPoint to suffer millions in losses.

6.      These are not just ephemeral numbers. NexPoint represents the interests of thousands of investors who rely on the promised security of these types of investments to provide cash flow and to fund things like retirements and college tuitions.

7.      NexPoint invested in ACIS-6 because the portfolio was supposed to contain relatively safe, diversified investments and, if managed properly, secure returns.

8.      The economic purpose of investing in portfolio trusts, like the one at issue, is obliterated where the portfolio manager and assorted advisors manage the portfolio for their own ends, extend the life of the existing portfolio to maximize fees earned, and prohibit the investors from realizing gains to which they are entitled. Unfortunately, that is *exactly* what Counter-Defendants did here. Counter-Defendants are legally obligated fiduciaries who must look out for the best interests of the advised funds, *i.e.*, ACIS-6 and its beneficiaries.

## THE PARTIES

9.      Defendant/Counter-Plaintiff NexPoint Diversified Real Estate Trust ("NexPoint") is a publicly traded (NYSE: NXDT) Delaware statutory trust operating as a qualified real estate investment trust ("REIT"). At the time of the events herein, it was operating as "NexPoint Strategic Opportunities Fund," a publicly traded (NYSE: NHF) Delaware closed-end trust. Its principal place of business is Dallas, Texas. NexPoint is owned by individuals nationwide and

traded on the New York Stock Exchange.

9.1    Additional Counter-Plaintiff NHF TRS LLC is a Delaware limited liability company. NHF TRS LLC is a qualified "taxable real estate subsidiary," and is a wholly owned subsidiary of NexPoint (and has been at all relevant times). NHF TRS LLC's principal place of business is in Dallas, Texas.

10.    Plaintiff/Counter-Defendant Acis Capital Management, L.P. is a Delaware limited partnership.  Acis is a registered investment advisor. It may be served via its counsel of record appearing in this action.

11.    Plaintiff/Counter-Defendant Joshua N. Terry is an individual citizen of Texas. Terry is the owner and President of Acis. Terry is a registered investment advisor. Terry may be served via his counsel of record appearing in this action.

12.    Additional Counterclaim-Defendant Brigade Capital Management, LP is a Delaware limited partnership registered to do business in and with its principal place of business in the state of New York. Brigade was added under Rule 13(h) of the Federal Rules of Civil Procedure. Brigade is a registered investment advisor. It may be served via his counsel of record appearing in this action.

## JURISDICTION AND VENUE

13.    This Court has personal jurisdiction over each Counter-Defendant pursuant to N.Y. C.P.L.R. 301 and/or 302.

14.     Personal jurisdiction and venue are proper as to Acis because the governing documents—the Indenture and the PMA, to which Acis is bound—require Acis to submit to the jurisdiction of New York and to waive any objection to New York as a forum or venue. Acis is authorized to and regularly conducts business in the state of New York and, here, is accused of

torts directed within and at the state of New York. Furthermore, the acts and/or omissions giving rise to the causes of action herein occurred in whole or in part in this county and affected property situated in this county.

15.     Personal jurisdiction and venue are proper as to Terry because he is bound by the governing documents mentioned *supra*, and he committed torts that are the subject of NexPoint's claims against him that occurred within or were directed to New York, including certain trading activity with brokers or dealers within New York or to New York.

16.     Personal jurisdiction and venue are proper as to Brigade because it is registered to do business in New York, and the transactions and occurrences that are the subject of NexPoint's claims against Brigade, including certain advice, communications, and trading activity with brokers or dealers, took place in whole or in part in this county.

17.     Further, by filing their Complaint in this action, Acis and Terry have consented to the Court's jurisdiction and have waived all challenges and objections to personal jurisdiction and venue. *See Adam v. Saenger*, 303 U.S. 59, 67–68 (1938).

## FACTUAL BACKGROUND

### A.   A BRIEF (AND CONTEXTUAL) PRIMER ON THE TRANSACTION

18.     Unlike a standard bond indenture trust—where unsecured bonds are issued and the indenture trustee has no "trust res" to manage or look after—the type of indenture trust at issue here creates a trust that contains a res to hold and manage, which may consist of many different forms of assets. The res of ACIS-6 contained various loan obligations and is, as such, is commonly referred to as a "Collateralized Loan Obligation" or a "CLO".[2]

19.     CLOs are a form of structured financial transaction. CLOs are usually comprised

---

[2] A CLO does not have to be a trust, it can be organized as a corporation, a partnership, an limited liability company, or any other form of unincorporated associations.

of a mixture of publicly available, floating rate, senior-secured debt instruments issued by corporations.

20.     To raise the money necessary to acquire the assets constituting a CLO, an issuer may pool CLOs together and funnel them into a special purpose vehicle. From there, the special purpose vehicle brings in the necessary funds by (1) raising equity funds from equity investors, and (2) obtaining additional financing in the form of debt, normally from the public markets, by issuing notes to third-party investors.

21.     This debt is typically arranged in tranches based on their makeup—the most senior debt being paid back first but bearing the lowest expected yield (*i.e.*, the lowest interest rate), whereas the most junior debt is paid back next-to-last but bears the highest expected yield (*i.e.*, largest interest rate). In other words, the more senior the debt, the less relative risk the investor carries.

22.     After all debt, regardless of seniority, is paid out and all defaults are taken on, the equity holders are paid. The character of incoming funds cascading down these tranches to pay the debt in descending seniority order, and then the equity holders last, is frequently referred to as a "payment waterfall."

23.     This general structure is depicted this way:



24.     The assets within a CLO are the source of cash flow that pay a CLO's expenses, followed by the principal and interest payments due on those assets—which go to the CLO's noteholders.

25.     Any cash remaining at the end of each quarter (after debt service and paying the fees and expenses of the trustee and portfolio manager) is typically paid to the junior-most noteholders Thus, they are tantamount to the equity holders, who take on the most risk of any investor in a CLO.

26.     The value of an investor's equity increases as incoming cash flows from a CLO's assets pay the operating expenses and interest on the issued notes, and then pay down the principal on the debt tranches.

27.     As the principal of the debt tranches is paid down, the equity will realize more and more of the benefits—so long as cash flows from the assets continue in an amount that is greater than the cost of servicing the debt and the expenses.

28.     Other than the investors themselves, the key parties to the success or failure of a CLO in this arrangement are (1) the portfolio manager, (2) the advisor, and (3) the indenture

trustee.

29.     Each of these parties is bound by contracts known as indentures and portfolio management agreements.

30.     A trustee's role is often limited to holding legal title to the assets, while the portfolio manager is responsible for managing the assets of the CLO.

31.     A portfolio manager's role is two-fold: (1) identify and purchase the assets within a CLO, doing so in a manner that creates the cash flow necessary to satisfy a CLO's debt-service requirements (*e.g.*, the payout, diversification, credit-quality, and average-life requirements) while not exposing the CLO to non-market risks; and (2) to monitor the assets within a CLO to ensure that, over time, those assets individually continue to meet various collateral-quality tests, which are designed to ensure a CLO can meet its debt-service requirements—all the while producing income for equity holders. This latter task usually requires the portfolio manager to monitor each and every asset in the CLO to ensure that the CLO has a mix of assets in different industries or markets, with differing maturity dates within acceptable risk profiles, and within a variety of credit ratings. This aspect of the portfolio manager's job normally includes selling assets that are deteriorating and buying assets that are superior to those already in a CLO's portfolio; otherwise, investing too much of the portfolio in any one of these categories overexposes a CLO to risk and may well lead to losses.

32.     The portfolio manager also often serves as the primary investment advisor and may also outsource or delegate certain functions to one or more sub-advisors.

33.     Advisors of these sorts of asset pools must register as investment advisors under federal law, which imposes robust un-waivable fiduciary duties (discussed in greater detail *infra*). One such duty is to maintain the best interest of the investors and to make investment decision

that are suitable to the investors' assumption of risk.

34.     Advisors are also subject to fiduciary duties imposed by state law. Registered investment advisors act for the benefit of the equity holders.

35.     As compensation, portfolio managers receive a percentage of the assets under management (the "AUM"), which is determined by the face value, or par value, of the assets in a CLO.

36.     If this compensation structure is left unchecked, portfolio managers can maximize their own pay by purchasing debt instruments with the highest par value, irrespective of the quality of these assets.

37.     Because lower-quality debt instruments are cheaper than those of higher quality, portfolio managers can acquire a greater number of these lower-quality loans and pool them in the special purpose vehicle to manipulate a CLO's fee structure for their own benefit.

38.     Doing so allows portfolio managers to achieve the largest possible par value in the aggregate—thereby "earning" the largest fees for themselves.

39.     Pursuing this strategy allows portfolio managers to earn significantly more in fees over a longer period, even though doing so exposes a CLO (and, thereby, the noteholders and equity holders) to significantly more risk due to the longer maturities and lower credit ratings of these inferior debt instruments.

40.     This is where indenture trustees come in—the governing documents charge them to safeguard the beneficiaries, doing so by monitoring changes in the assets within a CLO, as well as in the portfolio's credit quality and maturity.

41.     Indentures provide much needed structure to support oversight efforts, typically including standards, generally called collateral-quality tests, by which portfolio managers and

indenture trustees are to govern the asset pools. Of immediate note, two such tests are the weighted average rating factor ("WARF") and the weighted average life ("WAL").

42.     The WARF demonstrates the credit quality of a CLO's entire portfolio. WARF is calculated by taking the credit rating of each debt instrument in a CLO, determining the percentage of the CLO portfolio that each instrument constitutes, and aggregating those to a factor of the portfolio's notional balance. The better the WARF, the lower the risk to a CLO's investors.

43.     The WAL demonstrates average maturity of the debt instruments in a CLO, *i.e.*, the riskiness of the entire portfolio with respect to the time until the principal is repaid. Calculating the WAL yields the average number of years for which each dollar of unpaid principal on an investment remains outstanding. This metric is important because, in general, investors want to be paid back sooner rather than later. Longer payouts typically mean greater exposure to risk due to unforeseen circumstances, *e.g.*, inflation, default risk, etc. Therefore, the shorter the maturity dates, the better the WAL—and, accordingly, the lower the risk to a CLO's investors.

44.     Together, the WARF and the WAL are effective gauges to evaluate whether assets within a CLO are becoming too risky. Thus, those managing an indenture trust have several benchmarks designed to protect a CLO's noteholders and equity holders.

**B. NEXPOINT INVESTS IN THE ACIS CLOS, AND ACIS-6 IS CREATED**

45.     In or around 2014, the Issuers issued certain debt instruments to secured noteholders and equity securities (unsecured notes with residuary interests) to raise capital, and, with that cash, purchased a variety of CLOs (collectively, the "Assets").

46.     In 2016, through a secondary market transaction, NexPoint became a holder of

certain subordinated notes of Acis-6 CLO, *i.e.*, the equity securities. At that time, the face value of the equity was approximately $7.5 million. NexPoint invested as part of its mission and as a secure and safe investment on behalf of its investors.

46.1    On March 31, 2021, NexPoint transferred the subordinated Note in Acis-6 CLO to NHF TRS LLC. The transfer was for no consideration.

46.2    U.S. Bank N.A. as the Trustee and registrar under the Indenture § 2.6(a), recorded NHF TRS LLC as the holder of the subordinated note contemporaneously therewith.

46.3    Hereinafter, unless otherwise specified, where NexPoint's interests or injuries are expressed, it shall refer to NexPoint Diversified Real Estate Trust's direct rights and interests held between February 15, 2019 and March 31, 2021, and to NHF TRS LLC thereafter.

47.    Via a trust indenture dated April 16, 2015 (the "Indenture", attached as Exhibit 1), the Issuers granted all ownership, title, and interest not only in the Assets, but also in the Indenture itself, the PMA (attached as Exhibit 2), and other instruments, to the Trustee, U.S. Bank N.A. The Assets were granted to secure the rights of the noteholders.

48.    Specifically, the Indenture states that:

> The Issuer hereby Grants to the Trustee . . . **all of its right, title and interest** in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, (a) the Collateral Obligations which the Issuer causes to be delivered to the Trustee (directly or through an intermediary or bailee) herewith and all payments thereon or with respect thereto, and all Collateral Obligations which are purchased, or otherwise acquired, by the Issuer in the future pursuant to the terms hereof and all payments thereon or with respect thereto, (b) the Issuer's interest in each of the Accounts, …any Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein, (c) the Issuer's rights under the Portfolio Management Agreement as set forth in Article 15 hereof, the Hedge Agreements . . . the Collateral Administration Agreement, the Purchase Agreement **and any subscription agreements related to the purchase of the Notes**, (d) all Cash or Money delivered to the Trustee (or its bailee), (e) all accounts, chattel paper, deposit

accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations relating to the foregoing, (f) any other property otherwise delivered to the Trustee by or on behalf of the Issuer (whether or not constituting Collateral Obligations or Eligible Investments (including, without limitation, Equity Securities)), (g) the Issuer's rights in all assets owned by any ETB Subsidiary and the Issuer's rights under any agreement with any ETB Subsidiary and (h) all proceeds with respect to the foregoing; *provided* that such Grants shall not include the $250 transaction fee paid to the Issuer in consideration of the issuance of the Secured Notes and Subordinated Notes, the funds attributable to the issue and allotment of the Issuer's ordinary shares and the Co-Issuer's membership interests or the bank account in the Cayman Islands in which such funds are deposited (or any interest thereon) (or any funds deposited or credited thereto) (the assets referred to in (a) through (h) are collectively referred to as the "Assets"). Such Grants are made to secure, in accordance with the priorities set forth in the Priority of Payments, the Secured Notes equally and ratably without prejudice, priority or distinction between any Secured Note and any other Secured Note by reason of difference in time of issuance, documentation governing the incurrence or otherwise, except as expressly provided in this Indenture, and to secure, in accordance with the priorities set forth in the Priority of Payments of this Indenture, (i) the payment of all amounts due on the Secured Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and other related transaction documents and (iii) compliance with the provisions of this Indenture, all as provided in this Indenture. The foregoing Grant shall, for the purpose of determining the property subject to the lien of this Indenture, be deemed to include any securities and any investments granted to the Trustee by or on behalf of the Issuer, whether or not such securities or investments satisfy the criteria set forth in the definitions of "Collateral Obligation" or "Eligible Investments," as the case may be.

**THE TRUSTEE ACKNOWLEDGES SUCH GRANTS, ACCEPTS THE TRUSTS HEREUNDER IN ACCORDANCE WITH THE PROVISIONS HEREOF**.

Ex. 1, Indenture, pp. 1–2 (emphases added).

49.     Since closing on the Indenture, the Issuers have had no title or interest in the

assets, have no independent obligation to pay NexPoint or any other Subordinated Noteholder—

that obligation now rests with the Trustee who only has to pay NexPoint out of the income from

the Assets and, when liquidated, NexPoint is entitled to a pro-rata share of the liquidation amount, after deducting the prescribed fees and expenses.

50.     U.S. Bank, N.A. agreed to serve as the trustee (the "Trustee"). Acis originally came on board as the portfolio manager, and Highland Capital Management L.P. ("Highland") served as the sub-advisor.

51.     NexPoint was not a signatory to the Indenture. However, by virtue of the Indenture granting all rights, title, and interest in the underlying assets and governing agreements to the Trustee and the powers therein to Acis, ACIS-6 was born. And due to its ownership of the equity securities, NexPoint became a beneficiary of ACIS-6.

52.     NexPoint's rights are solely related to the assets assigned to ACIS-6. According to the Notes, NexPoint may not seek recourse from the Issuers, the officers or directors of the Issuers, or the Trustee. Once all senior debt is paid off, the subordinated notes become entitled to all net residual proceeds (after expenses and fees). Today, all senior debt has been paid off. There is no interest to which the subordinated notes are senior or junior at this stage.

53.     The subordinated notes expressly incorporate by reference certain duties that are explained in the Indenture and provide that there is no recourse against the Issuers. It provides in relevant part that:

> The obligations of the Issuer under this Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets in accordance with the Indenture[.].

Ex. 1, Indenture, Subordinated Note, A2-7.

> Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.

*Id.* at A2-8.

54.     The subordinated notes are essentially equity:

> EACH HOLDER OF THIS NOTE (AND ANY INTEREST THEREIN)
> WILL BE DEEMED TO HAVE REPRESENTED AND AGREED TO
> TREAT THE SUBORDINATED NOTES AS EQUITY FOR U.S.
> FEDERAL, STATE AND LOCAL INCOME AND FRANCHISE TAX
> PURPOSES.

*Id.* at A2-3.

55.     The Indenture also assigned away the Issuers' rights and obligations as to the original securities. Now, instead of the PMA being a contract between Counter-Defendants and the Issuers, it is between Counter-Defendants and the Trustee (as counterparty).

56.     The PMA imposed several obligations on Acis as the portfolio manager, requiring Acis to "supervise and direct the investment and reinvestment of the Assets" and to "monitor the Assets."

57.     When Terry took over Acis in August 2018, Acis continued to serve as portfolio manager to ACIS-6, but Terry became the advisor.

58.     As a result of having neither the labor force nor the wherewithal to manage the Assets on its own, Acis retained Brigade to assist the company and Terry to provide the portfolio-management services as a sub-advisor.

59.     As registered investment advisors, Acis, Terry, and Brigade are subject to the Investment Advisers Act of 1940 (the "IAA").

60.     As part of the Acis bankruptcy proceeding (the "Acis Bankruptcy")[3] in which Terry became 100% owner of Acis (as well as its president and owner of its general partner), the United States Bankruptcy Court for the Northern District of Texas formally approved Acis's appointment of Brigade as sub-advisor and shared-services provider to Acis in connection with Acis's management of the Assets.

61.     At all pertinent times through the present, Brigade has provided these services.

62.     As a sub-advisor, Brigade is the agent of Acis and, therefore, of ACIS-6. Upon information and belief, Terry needed help managing the Assets, so he retained Brigade to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with Acis's obligations under the PMA.

63.     Upon information and belief, Terry employed Brigade to assist in the negotiation and execution of all documents necessary to acquire or dispose of assets under the PMA. He further delegated to Brigade certain tasks related to the Assets, including, but not limited to, identifying potential assets (and their buyers and sellers) and modeling ratings, default, and price scenarios as needed.

64.     In providing these critical portfolio-management services for ACIS-6, Brigade worked directly with and for Terry. Terry testified in the Acis bankruptcy proceedings that he intended for this arrangement to manifest.

65.     Critically, although Terry effectively approves all trading activity as to ACIS-6's portfolio, Terry and Acis have no executive-level employees aside from Terry, and, upon

---

[3] The two case numbers in the consolidated bankruptcy proceeding are: Case Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11.

information and belief, they do not possess the ability to manage the Assets effectively. As president and sole owner of Acis, Terry exercises complete dominion over the company and its activities. Absent a chain of command or support system, Terry answers to nothing and no one other than his self-interest and greed.

66.     Given the far-reaching extent of Brigade's involvement in managing the portfolio of ACIS-6, Brigade's conduct—and, by extension, Acis's conduct through Terry's direction and control—severely and adversely impacted ACIS-6, in which NexPoint is a noteholder and equity holder.

67.     Acis paid Brigade for its portfolio-management services as though Brigade were another portfolio manager or advisor. As of February 20, 2019, Brigade had charged Acis fifteen basis points on the Assets, a fee which Brigade represented to have been negotiated in good faith with Acis.

68.     Prior to the Acis Bankruptcy, Highland managed various Acis indenture trusts, serving as a sub-advisor to Acis. One of the original investment vehicles, ACIS-7, continued to be managed by Highland after Counter-Defendants took over control of the other Acis indenture trusts.

69.     Since August 2, 2018, Counter-Defendants have managed ACIS-6 subject to the Indenture and the PMA, which require them to "comply with all [applicable] terms and conditions of the [Indenture]" and "perform [their] obligations . . . in good faith and with reasonable care." The Indenture's applicable "terms and conditions" obligate Counter-Defendants to ensure compliance with the collateral-quality tests described above. [4]

---

[4] *See, e.g.*, Ex. 1, Indenture at p. 14 (*see* definition of "Collateral Quality Test"), p. 35 (*see* definition of "Market Value"), and §§ 1.2, 7.18, and 12.

70.     Moreover, § 8 of the PMA prohibits the portfolio manager—here, Acis, Terry, and Brigade—from "taking any action that would intentionally, or with reckless disregard . . . adversely affect the interest of the Holders in the Assets in any material respect,"[5] unless approved in writing by, among others, a majority of both the controlling class and the subordinate noteholders.

71.     The PMA holds Acis liable for its acts or omissions, including, but not limited to, acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the Acis Indenture.

72.     Notably, § 11(a)(i) of the PMA holds Acis liable for any decrease in the value of ACIS-6's portfolio as a result of bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations.

73.     As portfolio manager, advisor, and sub-advisor, respectively, Acis, Terry, and Brigade were aware that they performed services for ACIS-6 for a particular purpose.

74.     Counter-Defendants also understood, and were fully aware, that investors in the Assets, like NexPoint, directly relied on them to perform services in furtherance of their collective duty to manage the portfolio of ACIS-6 diligently.

75.     Despite the extra-contractual duties Counter-Defendants owed to NexPoint and NHF TRS LLC (and in furtherance of clear and impermissible conflicts of interest), from February 15, 2019,[6] to the present, Counter-Defendants caused ACIS-6 to incur astronomic, unprecedented expenses, which were well outside the historical expense patterns—and, as

---

[5] See Ex. 2, PMA, p. 15.

[6] Effective February 15, 2019, the Bankruptcy Court issued an order (the "BK Order") that (1) released any claims against Acis or Terry that accrued prior to the effective date, and (2) enjoined any lawsuit from being filed against Acis or Terry to recover on any claims that accrued prior to the effective date.

discussed *infra*, clearly outside market and industry norms.

76.     As well, Acis failed to uphold its duty to ensure that every purchase and sale made thereunder maintained or improved any failing collateral-quality test. Acis further failed in its fiduciary capacity when it permitted transactions that did not maintain or improve ACIS-6's failing WAL metric.

77.     Moreover, Counter-Defendants attempted to offset transactions that the Indenture prohibited by making same-day, bulk purchases of loans with non-failing WALs, but that were overpriced or bad investments based on, among other factors, the loans' coupon return rates being lower than the expense to acquire them.

## C.   How Did Counter-Defendants Decimate the Value and Integrity of ACIS-6's Portfolio?

78.     Before Terry took the reins of Acis, the Acis CLOs, under Highland's management, had produced consistent distributions to equity holders over time.

79.     Since Counter-Defendants assumed control of ACIS-6, this is no longer the case. Payouts to the equity holders have been far and few between.

80.     Under Counter-Defendants' management, Acis replaced shorter-term debt with longer-term loans, extending the WAL of ACIS-6's portfolio assets.

81.     This course of conduct extended the average life of the Assets and allowed prepayments to be avoided, which resulted in, among other things: (1) increased risk, (2) decreased residual principal value, and (3) longer, artificially induced periods for interest accrual.

82.     Predictably, and as explained *infra*, Counter-Defendants' tactics have decimated the value of the Assets. Meanwhile, the revenue and profit to Acis, Terry, and Brigade have increased significantly due to artificially inflated fees, the exorbitant yet unexplained expenses foisted on the Assets, and the extended life of the Assets.

83.     The value of the assets in ACIS-6's portfolio is best understood through an assessment of the net asset value (the "NAV") of its equity. Because equity is junior to all debt, healthy equity signifies healthy debt. Unhealthy equity (or, worse yet, equity that has been wiped out) signifies potential default at least as to the less senior debt tranches. The NAV of the Acis CLOs over time (counting the distributions made to equity) can be seen via the following graphic illustration:



84.     The NAV of ACIS-6's equity has been reduced to approximately thirty cents on the dollar.

85.     This data makes it no small wonder that national CLO rankings place each Terry-managed indenture trust at the bottom of every list in terms of performance.

86.     Yet, despite beginning with similar profiles and investment goals as the other Acis CLOs, ACIS-7, which remains under Highland's management, has done remarkably well, returning almost one hundred cents on the dollar.

87.    Thus far, NexPoint and NHF TRS LLC have discerned the primary ways that Counter-Defendants have eradicated the value of ACIS-6's portfolio.

**1.   Mis-Accruing and Mis-Allocating Expenses**

88.    Prior to Terry and Brigade advising the ACIS-6 portfolio, the Acis CLOs generally paid out millions of distributions to the equity holders, and expenses were remarkably low (as a percentage of those distributions).

89.    The expenses incurred since February 15, 2019, have been nothing short of impressive. Counter-Defendants literally inverted the distributions-to-expenses ratio that had been in place for years prior.

90.    Upon information and belief, the following graphic depicts that inexplicable inversion:

**Expenses Paid before Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|------|------|------|------|------|-------|
| 11/1/2017 | 53,366 | 74,533 | 75,099 | 97,077 | 300,075 |
| 2/1/2018 | 45,996 | 79,541 | 97,729 | 149,641 | 372,907 |
| 5/1/2018 | 32,194 | 15,635 | 11,723 | | 59,552 |
| 8/1/2018 | - | 27,648 | 39,900 | 33,217 | 100,771 |
| **Total** | **131,557** | **197,363** | **224,450** | **279,935** | **833,305** |

**Equity Distirbutions Paid before Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|------|------|------|------|------|-------|
| 11/1/2017 | 1,068,208 | 1,434,935 | 1,220,175 | 1,499,862 | 5,223,179 |
| 2/1/2018 | 471,645 | 898,027 | 640,095 | 870,666 | 2,880,433 |
| 5/1/2018 | 229,888 | 1,231,081 | 1,096,471 | 1,313,207 | 3,870,646 |
| 8/1/2018 | - | - | 166,472 | 651,402 | 817,874 |
| **Total** | **1,769,741** | **3,564,043** | **3,123,213** | **4,335,136** | **12,792,132** |

91.    The ratio was approximately $13 million in equity distributions to shareholders versus less than $900,000 in expenses, or roughly 14-to-1 distributions to expenses.

92.    Since Counter-Defendants began managing ACIS-6, the distributions to expenses has plummeted to what it is now: an anemic 0.25-to-1 ratio.

93.    Because of the way the Acis CLOs have been managed, the expenses were distributed proportionately among themselves, thereby impacting ACIS-6 *pro rata*.

94.    Assuming that remains true, and given the amount of revenue that Acis has purportedly earned, roughly $12 million, Acis has taken well over $24 million in revenue through its manipulation of the Assets and accompanying expenses as of NexPoint's latest estimate.

95.    ACIS-6 has never incurred such profoundly high expenses and fees. This includes roughly $2.3 million in extra profits to Acis, as well as substantial legal fees incurred by Acis itself (not by the Assets, and not for the benefit of ACIS-6's beneficiaries).

96.    Acis periodically reported its expenses, yet wholly lacked candor, as evidenced by the use of misleading descriptions and failure to come clean about what all the expenses actually were for.

97.    For it to all come at the expense of the investors in ACIS-6, *i.e.*, the beneficiaries, is gob smacking.

98.    That the expenses were incurred by Counter-Defendants—who are registered investment advisors—only *after* securing bankruptcy protections for themselves against redemptions gives rise to a strong inference that they are not properly allocated as expenses.

99.    That Acis has represented these expenses as having been charged on behalf of or for the benefit of ACIS-6, and then unilaterally collecting those expenses under the same pretense, gives rise to a strong inference that Counter-Defendants knowingly misrepresented the nature and proper allocation of these expenses.

100.    That Counter-Defendants have complete control over this information and have not disclosed it, all the while misrepresenting the nature of the fees and expenses, is a bad-faith manipulation of their duties and rights under the Indenture and the PMA.

### 2. __Failure to Buy Loans that Satisfy the Collateral Quality Requirements.__

101.    Considering the life cycle of a CLO, the Assets are currently outside the reinvestment period. As such, ACIS-6 is stuck with the assets it has at this moment.

102.    Normally this may be fine, but not so here. The issue is that, prior to the close of the reinvestment period, Counter-Defendants caused ACIS-6 to buy and hold collateral that failed the risk parameters delineated in the Indenture and the PMA.

103.    Relatedly, the Notes (via incorporation from the Indenture) also provide that, for future purchases and sales of collateral obligations, Counter-Defendants shall only consummate transactions that satisfy certain investment criteria.

104.    One such criterion for all purchases is that either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such  requirement or test will be maintained or improved after giving effect to the reinvestment. *See, e.g.*, Indenture § 12.2(a)(iv).

105.    The defines "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro  forma* calculations in relation to a proposed purchase of a Collateral  Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted  Average Life Test.

106.    These tests are defined, in turn, as follows:

> "__Maximum Moody's Rating Factor Test__": The test that will be  satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[7] of the Collateral Obligations is  less than or equal to the

---

[7] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to  the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition,  the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the  definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be  disregarded, and instead each applicable rating on credit

lesser of (i) the sum of (A) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Excess Recovery Adjustment Amount.

"Weighted Average Life Test": A test that is satisfied if the Aggregate Weighted Average Life[8] on such date of determination is not later than November 18, 2022.

*See, e.g.*, Ex. 1, Indenture at pp. 37–38.

107.    These provisions of the Indenture seek to maintain the integrity and continued performance of the Assets by requiring certain parties, including the portfolio manager and the Trustee, to ensure that the collateral complies with the detailed, industry-recognized, bargained-for tests—the exact safeguards on which investors relied when investing in the Assets.

108.    Similar to those terms concerning collateral quality, these provisions aim to ensure the rights of any investor under the Indenture, such as NexPoint, are not diluted.

109.    Moreover, some loans have maturity dates further out than what is appropriate; others simply lacked the creditworthiness on their own to qualify under the governing parameters.

---

watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture, pp. 64–65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id.*

[8] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (A) the actual number of years (…) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. Indenture, p. 6.

Counter-Defendants' purchase of these loans violated the PMA, the course of performance, and good industry practices.

110.   Equally important, Counter-Defendants' purchase of these loans did not maintain or improve the credit quality of the ACIS-6 portfolio, which violates the terms of the Indenture and the PMA.

111.   The purchase of these loans caused ACIS-6 to suffer substantial losses.

112.   An analysis of these individual trades and purchases further underscores Acis's failure to adhere to the Indenture's collateral-quality requirements.

113.   For example, ACIS-6 is required to provide monthly reports which disclose, among other things, whether the Assets remain in compliance with the requisite WAL thresholds.[9]

114.   The WAL threshold for the portfolio of ACIS-6 is 4.66.

115.   On August 21, 2018, the Assets registered a failing WAL of 4.78. According to the Indenture, failing the WAL threshold means that Counter-Defendants could not make any further transactions unless a given purchase improved the WAL of ACIS-6's portfolio.

116.   Further, the portfolio manager must use commercially reasonable efforts to effect the sale of any collateral obligation that no longer meets the applicable criteria, including assets causing the portfolio to fail the WAL threshold.

117.   From a practical perspective, this means that (1) the portfolio manager needed to sell all collateral obligations that caused the Assets to violate the WAL threshold, and (2) the portfolio manager could only execute transactions that would effectuate a more favorable WAL.

118.   Despite these requirements, Counter-Defendants made multiple purchases that did not improve the WAL, thereby violating the terms of the Indenture.

---

[9] *See* Ex. 1, Indenture, § 10.7.

119.     Counter-Defendants may well argue that even though these acquisitions did not meet the WAL threshold, they bundled these purchases with loans that did satisfy the WAL threshold.

120.     According to such a contention, Counter-Defendants purport to have met the requisite WAL threshold by packaging these loans together to average out to a satisfactory WAL under the Indenture's terms. But their argument is illusory. Counter-Defendants bought loans with maturity dates that are more than two years apart, which the Indenture does not allow. Once the less risky notes are paid off more quickly due to their shorter durations, ACIS-6's portfolio becomes disproportionately weighted with longer-term notes, no longer offset by the healthier notes.

121.     The result of Counter-Defendants' course of conduct initially projects an impression (albeit, a false one) that a portfolio's WAL threshold is under control, while, in reality, it is a mirage, soon to be vanquished by a predictably rapid ascension in WAL due to the less risky debt being paid off.

122.     Pairing these loans of diverging quality circumvents the maintain/improve language engrained in the Indenture's WAL threshold.

123.     Counter-Defendants' actions saddle investors with long-dated collateral, escalating duration risk, and increasing ACIS-6's debt levels, which is particularly problematic because the Assets should be decreasing in maturity time and deleveraging through the amortization of shorter-term loans.

### 3.  Buying Bad Investments

124.     Upon information and belief, Counter-Defendants intentionally and purposefully purchased substandard assets.

125.     For instance, Counter-Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the requisite WAL threshold.

126. These loans remain in ACIS-6's portfolio and, due to a continuing and (apparently) uncurable default, are currently valued at approximately twenty cents on the dollar.

127. Counter-Defendants should have foreseen, and indeed foresaw, this risk given the low credit ratings.

128. Had Counter-Defendants abided by the requirements of the Indenture and the PMA (not to mention prudent investing standards), these losses incurred by ACIS-6 could have been avoided.

129. There was no pro-investor justification for how Counter-Defendants managed this investment.

### 4. **Failure to Provide Best Execution**

130. Counter-Defendants' loan purchases were often executed on the same day at a time when the market was flying high. Single-day purchases tend to make assets more expensive to buy.

131. These same-day purchases violated Counter-Defendants' duties of best execution.

132. Counter-Defendants' purchases also appear to have been consolidated together to create the false appearance that a portfolio's WAL threshold had been maintained or improved upon. Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL thresholds on individual bases.

133. Additionally, many of the purchased assets were some of the cheapest on the market—and yet were still overpriced.

134. At the time Counter-Defendants executed these purchases, loans were scarce, making the market conditions much more suitable for sellers than buyers.

135. The prudent course would have been to remain in cash or identify investment opportunities that were more secure and of shorter duration. Counter-Defendants did not do so.

136.    Moreover, Counter-Defendants caused ACIS-6 to sell certain collateral prematurely and at a severe discount.

137.    As a result of Counter-Defendants' tactics and actions, the mix of assets in the ACIS-6 portfolio is well short of the required WARF, and the maturity of the assets in the portfolio has pushed well past the required WAL.

138.    Both the Indenture and the PMA require Acis and Brigade to seek best execution.[10]

## CAUSES OF ACTION

### COUNT ONE
**Breach of Fiduciary Duty**
**Against All Counter-Defendants**

139.    Counter-Plaintiffs incorporate all factual averments in this pleading as if fully set forth herein.

139.1   Counter-Plaintiffs plead that Counter-Defendants (or any of them) owed fiduciary duties directly to NexPoint during the period prior to March 31, 2021, and to NHF TRS LLC from that day on. Counter-Defendants further plead that to the extent that the fiduciary duties were owed to Acis-6 CLO fund, and that any claims would have to be brought derivatively, NHF TRS LLC has standing to bring such claim as the holder of the subordinated note.

140.    Fiduciary duties are unique in nature and of the utmost importance. These duties involve "something stricter than the morals of the market place"—the "standard of behavior" is "[n]ot honesty alone, but the punctilio of an honor the most sensitive." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.).

141.    Counter-Defendants did not come close to upholding this standard.

---

[10] *See* Ex. 1, Indenture, § 12.2; PMA, § 4(a).

142.    Counter-Plaintiffs first explains the three sources of fiduciary duties applicable to some or all of Counter-Defendants, subsequently turning to general allegations of breach, causation, and damages.

## A. THERE ARE THREE INDEPENDENT BASES FOR FIDUCIARY DUTY

### 1. Counter-Defendants Owe Fiduciary Duties Under the IAA that Are Actionable Under New York Law

143.    As registered investment advisors, each Counter-Defendant is subject to the IAA.

144.    The IAA establishes an unwaivable fiduciary duty for investment advisors.[11]

145.    Counter-Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to always act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party. *See SEC v. Gruss*, 245 F. Supp. 3d 527, 591 (S.D.N.Y. 2017).

146.    The essence of these fiduciary duties is manifested in the duties of loyalty, transparency, and utmost care.

147.    These duties also signify that Counter-Defendants must follow the terms of any agreements and regulations that apply to the investment vehicles.

148.    The fiduciary duties Counter-Defendants owed to NexPoint are predicated on trust and confidence. Section 204A of the IAA requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to

---

[11] *SEC v. Cap. Gains Rsch. Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) ("[Section] 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers." (citation omitted)); *SEC v. DiBella*, 587 F.3d 553, 568 (2d Cir. 2009) ("The 'legislative history of the [IAA] leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment advisors." (citation and brackets omitted)). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (citing *Proxy Voting by Investment Advisers*, Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003)).

prevent registered investment advisors from violating disclosure rules. 15 U.S.C. § 80b-4a; *see also* 17 C.F.R. § 275.206(4)-7(a).

149.    Therefore, registered investment advisors must disclose all aspects relevant to potential conflicts of interest and report their own malfeasance to investors.

150.    Specifically, for all conflicts of interest, registered investment advisors must (1) disclose those conflicts to the clients verbally, in writing, on Form ADV,[12] and (2) obtain the client's written consent before proceeding with any transaction that could be deemed double dealing.[13]

151.    Where registered investment advisors trade on their own behalf or place their interests above those of the advisee or investors, the IAA holds such registered investment advisors liable to the advisee and its investors for breaching their fiduciary duty.

152.    Section 206 of the IAA prohibits registered investment advisors from employing "any device, scheme, or artifice to defraud any client or prospective client," "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(1)–(2), (4).

---

[12] General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them").

[13] Investment Advisers Act Release 3060, *supra*; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

153.    Section 206 of the IAA focuses on the use of the unlawful means—its provisions do not require that the activity be in the offer or sale of any security, or in connection with a purchase or sale with the advisee. They do not require evidence of reliance or materiality.

**2.  Acis Owes Fiduciary Duties as Co-Trustee of ACIS-6**

154.    ACIS-6 is a valid trust under New York law. *See Brown v. Spohr*, 73 N.E. 14, 16–17 (N.Y. 1904).

155.    The Indenture designates the equity holders as the beneficiaries of ACIS-6. In doing so, the Issuers granted all *equitable* title in the Assets to the noteholders, among them, NexPoint and NHF TRS LLC.

156.    The Issuers granted legal title in the Assets to two entities: first, to Acis to manage the Assets, and second, to the Trustee as custodian and certain ministerial obligations.

157.    The Indenture designates U.S. Bank, N.A. as the "Trustee" of ACIS-6. The Indenture states that the Trustee is granted "all title and interest" in specific assets of the Issuer and Co-Issuer, and that the Trustee "accepts these trusts , leaving the Issuers essentially as empty shells and nominal players only. The Issuers identified the specific Assets as the property constituting ACIS-6's res and that would pass to the Trustee. And upon execution of the Indenture, not only did all legal title and interest to the trust res actually passed to the Trustee of ACIS-6 from the Issuers, custody passed as well .

158.    Acis, the portfolio manager, was designated as the manager of all aspects of the investment—typically, a trustee role.

159.    Therefore, in executing the Indenture, the Issuers, as trust settlors, formed ACIS-6, a trust created under New York law.

160.    Under New York law, a person acting as an investment manager for property for the benefit of another, and who is vested with the discretion and power to decide what investment to make, owes fiduciary duties directly to the beneficiaries of the propert . *See Matter of Wallens*, 877 N.E.2d 960, 962 (N.Y. 2007); *Mercury Bay Boating Club, Inc. v. San Diego Yacht Club*, 557 N.E.2d 87, 95 (N.Y. 1990); *see also* 106 N.Y. Jur. 2d Trusts § 348 ("Since the relationship between a trustee and advisor is that of a cotrustee, with the advisor having the controlling power, the trustee is justified in complying with the directives of the advisor and will not, generally, be held liable for any losses[.]") (citing *In re Est. of Rubin*, 540 N.Y.S.2d 944 (N.Y. Sur. Ct. 1989)); J. R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee of Executor*, 56 A.L.R.3d 1249, § 10 ("Consonant with the status of a nonbeneficiary advisor as a quasi-trustee, or assistant to a trustee, it has generally been held or recognized that such an advisor stands in a fiduciary relationship to the beneficiaries of a[] . . . trust.").

161.    The division of authority between Acis and the Trustee as to ACIS-6 is nothing unordinary. "[T]he terms of [a] trust may provide that certain powers shall be exercised by one trustee and other powers by another." *Crocker-Citizens Nat'l Bank v. Younger*, 481 P.2d 222, 228 (Cal. 1971) (citing 2 A.W. Scott, The Law of Trusts § 185 (3d ed. 1967)). Here, the Trustee functions as a standard trustee per the trust-formation documents, and Acis functions as a trustee as to its assigned roles in the Indenture and PMA, which makes Acis a  trustee with fiduciary duties to the beneficiaries of ACIS-6. *See Rubin*, 540 N.Y.S.2d at 947.

162.    As such, Acis "must act with the same diligence, loyalty, and prudence" that a trustee otherwise would. *See* Kemper, *supra*, 56 A.L.R.3d 1249, § 10; *see also Rubin*, 540 N.Y.S.2d at 947 ("Insofar as the status of an advisor is concerned, the courts have generally considered him a fiduciary, somewhat in the nature of a . . . special trustee.").

163.    As Acis's control person, Terry also bore the fiduciary duties that inured to Acis as co-trustee of ACIS-6 or is liable for aiding and abetting a breach of fiduciary duty.

164.    Brigade knew of such duties and directly participated in identifying the trades, had a direct pecuniary interest in inflating its own fees, and is thus liable directly or for aiding and abetting a breach of fiduciary duty.

### 3.    Under New York Law, Acis Owes Fiduciary Duties to ACIS-6 Even If Not a Trust

165.    Under New York law, investment advisors owe fiduciary duties to their clients and "may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties," since in "these instances, it is policy, not the parties' contract, that gives rise to a duty of care." *Sommer v Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992); *see also Bullmore v Ernst & Young Cayman Islands*, 846 N.Y.S.2d 145, 148 (N.Y. App. Div., 1st Dep't., 2007) (professional investment adviser had fiduciary duty in connection with investment advice tendered, notwithstanding whether a direct contractual duty exists).

166.    New York further recognizes that an investor has a direct action for an injury resulting from a wrongful inflation of the value of assets as a means to inflating the manager's fees or to avoid negative reactions from investors. *See Bullmore v. Banc of Am. Sec. LLC*, 485 F. Supp. 2d 464, 471 (S.D.N.Y. 2007); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 409 (S.D.N.Y. 2005) ("the principal wrong here appears to have been a valuation fraud that injured plaintiffs, not the Funds") (citing *Coronado Dev. Corp. v. Millikin*, 175 Misc. 1, 5, 22 N.Y.S.2d 670, 674 (Sup. Ct. 1940) (injury "resulting from the dissemination of false information as to corporate assets or business or management, as distinguished from a wrongful withholding or taking or dissipation of corporate property or interference with its business, necessarily constitutes a direct injury to individual stockholders and is a wrong to them rather

than to the corporation and may be redressed by suit by individual stockholders suing in their own right")).

167.    Here, Acis owed fiduciary duties under New York law directly to the investors and to the ACIS-6 CLO. Acis is thus liable for breach of these duties, and Terry as control person is likewise liable directly or as an aider and abettor, as is Brigade.

**B.  BREACH, CAUSATION, AND DAMAGES**

168.    Counter-Defendants violated their fiduciary duties by breaching the terms of the Indenture, by self-dealing, and by converting property of the investors for themselves.

169.    Because of the life cycle of a CLO, the Assets are currently outside the period of reinvestment. Therefore, ACIS-6 is stuck with the assets it has.

170.    The problem is that, prior to the close of the reinvestment period, Counter-Defendants caused ACIS-6 to buy and hold collateral that would not have qualified for the risk parameters delineated in the PMA and the Indenture.

171.    Certain loans have maturity dates further out than what is necessary or appropriate. Certain loans simply lacked the creditworthiness on their own to qualify. The purchase of these loans violated the PMA, as well as the course of performance and good industry practices.

172.    Equally important, the purchase of these loans violated the requirements in the Indenture and the PMA that any trading should maintain or improve the credit quality of the portfolio.

173.    This has caused the ACIS-6 portfolio to suffer substantial losses. Several examples are shown here.

a.  Chief Power. Throughout the relevant time period, Counter-Defendants held the Chief Power loan, which bore a very dismal Caa1/B- rating when Counter-Defendants

initially purchased it. Critically, the loan had a December 2020 maturity date. The loan's lack of creditworthiness is evidenced not only by its low credit rating, but also by the fact that it was not refinanced when it could have been in 2018–2019. The loan was then downgraded to Caa2/CCC in the fall of 2019. It was only then that Counter-Defendants went on to sell this loan at 51 cents on the dollar within a year, locking in $4.7 million of realized losses to the Acis CLOs. The manager had purchased this loan with a December 2020 (1+ year) maturity date on the same day Counter-Defendants bought multiple loans with 2025 (6+ year) and 2024 (5+ year) maturities. This is important because the 2025 and 2024 loans do not maintain or improve failing WAL tests in existence at the time of purchase. However, the addition of Chief Power was plainly to generate the appearance of a _blended_ WAL that did maintain or improve the failing WAL test. This type of chicanery is not allowed by, nor is it in the spirit of, the Indenture, and ended up directly causing almost $5 million in losses to the Acis CLOs. There was no pro-investor justification for how Counter-Defendants managed this investment.

b. <u>Glass Mountain Pipeline.</u> Counter-Defendants purchased $2 million of this loan on a single day (April 30, 2019). It had B3/B ratings at the time of purchase, indicating heightened credit risk, and also had a December 2024 maturity date, which was 5.5+ years from the purchase date. The WAL test for ACIS-6 that bought this loan was failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL, which stood at four years or shorter. This was a purchase that, in addition to heightening credit risk and increasing the average maturity date of ACIS-6's portfolio, also violated the Indenture's credit-quality requirements. Similar to other situations,

Counter-Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the WAL test restrictions. Counter-Defendants should have known and foreseen this risk because of the low credit ratings. Had Counter-Defendants abided by the Indenture and the PMA, as well as prudent investing standards, these losses to ACIS-6 would have been avoided. There was no pro-investor justification for how Counter-Defendants managed this investment.

c.  <u>KCA Deutag.</u> Counter-Defendants purchased this loan with a Caa1/CCC+ rating at the time of its purchase in April through May 2019. There was no justification to purchase loans with a Caa/CCC rating, as the implied credit quality is far too risky for a levered CLO structure. The purchase price averaged 85 cents on the dollar (*i.e.*, of the face value of the loan), which also implies significant credit risk. Counter-Defendants ended up selling this loan six months later on November 18, 2019, at 65 cents on the dollar, locking in $1.8 million in losses. The low credit rating and the fact that the loan had a long maturity date would have warned Counter-Defendants that the loan lacked the requisite credit quality and would not maintain or improve the credit quality of the portfolio; in fact, it would have certainly dragged the credit quality down. There was no pro-investor justification for how Counter-Defendants managed this investment.

d.  <u>Libbey Glass.</u> This loan was being held by Acis for no apparent reason. Its B2/B credit was weak, which is why it had not already been refinanced or extended during a very strong 2018–2019 market. Inexplicably, Counter-Defendants held on to the loan, which was downgraded to B3 in November 2019 and again to Caa2/CCC in March 2020. The issuer corporation filed for bankruptcy, and the loan was restructured into reorganized equity, wiping out essentially all the value from the lenders. Counter-Defendants'

decision to hold the loan throughout the entire downward process locked in $12.7 million of tangible losses to the Acis CLOs. There was no pro-investor justification for how Counter-Defendants managed this investment.

e.   <u>Carestream Health.</u> This loan had B3/B- ratings. The credit was very weak, which was reflected in the ratings, and is why it had not already been refinanced or extended during a very strong 2018–2019 market. Following an S&P downgrade from B- to CCC+ in February 2020 (and also remaining Creditwatch Negative), Counter-Defendants sold this loan across all portfolios on the same day (March 3, 2020) at 75 cents on the dollar, locking in $4.8 million of realized losses to the Acis CLOs.

f.   <u>Envision Healthcare.</u> This loan had B2/B+ ratings at the time of purchase in April 2019 because the loan had been issued with a maturity date of October 2025.  The WAL of this loan was 6.5 years. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at less than 4.0 years or shorter. This was a purchase that clearly violated the CLOs' indentures. The loan would go on to be downgraded to its current Caa2/CCC ratings. The loan is currently still held in the Acis CLO portfolios at a $1.5 million loss thus far.

g.   <u>Doncasters.</u> This loan bore a B3/B- rating which means it was unlikely to be paid off or refinanced. While Counter-Defendants continued to hold the loan (which they should never have bought), Caa1/CCC- and the manager sold the loan around July 1, 2020, at an average price of 80.51, locking in $1.2 million of realized losses to the Acis CLOs in less than a year.

h.  <u>Lumileds (Bright Bidco)</u>. This loan is being held in violation of the CLOs' indentures. As of February 16, 2019, the loan had just recently been issued, carried B1/B ratings, and has a June 2024 maturity date, which was nearly six years from when it was bought in September 2018. The WAL Tests for the CLOs that bought this were failing at this time, meaning it failed to maintain or improve the failing WAL Tests, which were all standing at four years or shorter. In September 2019, the loan was downgraded to B3/CCC+, and in November 2019, the loan's ratings were downgraded again to Caa1/CCC+. The manager has not sold any of this loan to date. Today, the loan trades at 76-77, which is currently $2.2 million in losses to the Acis CLOs.

i.  <u>McGraw-Hill.</u> This loan had B2/B rating and was downgraded by Moody's to B3 in May 2019 and then again to Caa2 in August 2020. S&P downgraded the rating to B- in May 2020 and to CCC+ in September 2020. This was a loan with a very weak credit profile, but seemingly one that the manager believed in, as this was one of the largest positions put on by the manager. However, after purchasing over $36 million across four CLOs between August 2018 and December 2019, the manager decided to sell all of it on a single day--September 30, 2020—at a price of $82.75, foregoing any chance of a par recovery. This loan was then fully paid off at 100 cents on the dollar <u>roughly three months</u> later in January 2021. The sell at $82.75 cost the four CLOs a total of $5.9 million compared to the full paydown the CLOs would have received in January 2021 had the loans not been sold;

j.  <u>GIP III Stetson.</u> The GIP Stetson loan bore low credit ratings of Ba3/B+ and, more critically, was a loan that carried a 6+ year maturity (July 2025) that made purchasing it a violation of the indentures. The WAL Test of this loan did not maintain or improve

the failing WAL Tests. By purchasing this loan—in addition to all the others herein—the manager was engaging in a scheme or artifice to deceive by manipulating the metrics of the indenture in bad faith. The manager was buying risky loans that never should have been included in the collateral pool. The loan was subsequently downgraded to B1/B-, and the manager sold this loan at 66 cents on the dollar between May 2020 and August 2020, locking in $1.5 million in damages. It is also curious as to why the manager would then sell this loan down 34 points; not long after the loan was sold, the trading levels moved up materially and is now trading at 96 cents on the dollar.

k.  <u>Boardriders.</u>  Purchased in March 2019, the loan had B3/B- ratings at the time of purchase, indicating heightened credit risk, and it also had an April 2024 maturity date, which was 5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that, in addition to heightened credit risk, also violated the CLOs' indentures. The loan is currently still held in the portfolios, has been downgraded to B3/CCC, and trades in the low-mid 90s--several points lower than where it was purchased--and reflects a loss of $442,193;

l.  <u>Premiere Brands (Nine West)</u>. This loan had B3/B- ratings at the time of purchase, including a Caa1 tranche rating on the loan, indicating heightened credit risk, and also had a March 2024 maturity date, which almost five years from when it was bought in April 2019. The WAL Tests for ACIS-6, the CLO that bought this, was failing at this time, meaning a loan purchased needed to maintain or improve the failing WAL Tests, stood at 4.15 years. This was a purchase that, in addition to heightened credit risk, also

violated the CLOs' indentures. Similar to other situations, the manager bought sixteen items on a single day, which is a violation of the indenture and of best execution conventions. The loan has subsequently been downgraded to Caa2/CCC, is currently still held in the portfolios and is quoted in the mid-high 60s, which is more than a $600,000 unrealized loss.

This chart summarizes an estimate of the losses:

| Issuer | Commitment Bought | Loss on Investment |
|---|---|---|
| Libbey Glass | 12,750,000 | (12,660,000) |
| Chief Power | 10,894,048 | (4,724,826) |
| Lumileds Holding | 9,732,632 | (2,181,083) |
| KCA Deutag UK Finance PL | 8,992,443 | (1,781,329) |
| Glass Mountain Pipeline | 1,994,949 | (1,548,280) |
| Envision Healthcare | 13,994,987 | (1,470,094) |
| Doncasters | 9,730,000 | (1,190,979) |
| Premiere Brands | 2,000,000 | (635,000) |
| Boardriders | 6,569,202 | (448,763) |
| **Total** | **$76,658,262** | **($26,640,333)** |

174.    These purchases were also problematic because they were often executed on the same day (purchasing in a single day tends to make an asset more expensive to buy) and were executed at a time when the market was flying high.  This violated the Counter-Defendants' best-execution duties.[14]

175.    Additionally, many of the purchased "bad" assets were some of the cheapest assets on the market—and yet were still overpriced. The market at the time was a seller's market—loans

---

[14] *See* PMA, § 4(a); Indenture, § 12.2.

were scarce.

176.    The most prudent course would have been to remain in cash or find far more secure short-term investments.

177.    Counter-Defendants have furthermore caused ACIS-6 to sell certain collateral cheaply and prematurely. In other words, Counter-Defendants took over advising and managing ACIS-6 with several credit-worthy assets, or they themselves (luckily) bought several creditworthy assets.

178.    The problem is that Counter-Defendants then sold those assets, inexplicably, at a time when the assets could not be replaced by any of equal or improved quality—and Counter-Defendants knew as much.

179.    Given that Counter-Defendants had no intention of redeeming the Assets (that is, allowing investors to take their money out) or resetting them (raising new debt and opening a new investment period), the investors in the Assets would have been best served had these "good" assets simply been allowed to mature.

180.    These losses are illustrated here:

| Issuer | Commitment Sold | Lost Value |
|---|---|---|
| McGraw-Hill Global Education | $34,288,241 | ($5,914,722) |
| Carestream Health | $20,644,508 | ($4,799,848) |
| Advantage Sales & Marketing 1L | $27,038,364 | ($3,622,316) |
| Advantage Sales & Marketing 2L | $10,688,828 | ( 2,820,378) |
| Mohegan Tribal Gaming | $12,153,419 | ( 1,830,609) |
| GIP III STETSON I | $5,169,653 | ( 1,518,878) |
| Advantage Sales & Marketing 1L | $6,510,157 | ( 890,963) |
| Party City | $8,826,376 | ( 822,638) |
| **Total** | **$125,319,547** | **($22,220,350)** |

181.    There is no plausible pro-investor basis for such actions.

182.    One is left to wonder who the purchasers of these assets were, and whether they were entities or persons related to Terry, or in which he had a hidden or surreptitious or beneficial interest.

183.    These assets were sold well after the start of COVID—in late 2020. And so they were sold *after* they had hit their "COVID lows"—but the market had already shown it was roaring back in the last quarter of 2020.

184.    The above assets were also sold on or about the same day—again, a breach of best-execution practices.

185.    Because of these knowingly errant purchases and sales, the Assets fall well below the acceptable, reasonable WARF, and pushed maturity of the portfolio out past any acceptable, reasonable WAL.

186.    As shown, Counter-Defendants sold qualified assets early without justification and without being able to replace them with the same or better-quality assets. Instead, they bought cheaper assets—and more of them—doing so using bundling, same-day purchasing, and other deceptive means to mask the low quality and true life of the loans, all in violation of their best-execution duties and the collateral-quality tests in the Indenture.

187.    The purpose of these transactions is obvious: purchasing more bad assets on the cheap to inflate the notional value of the AUM, thus inflating the fees Counter-Defendants could charge, and extending their tenure for this mountain of money. This scheme operated as an artifice to deceive and defraud the investors like NexPoint.

188.    As if that were not enough, Counter-Defendants engaged in a practice or course of business consisting of passing off expenses, without disclosure or accountability, that were

incurred by Acis—as though they were the expenses of ACIS-6—to the *advisees*. By doing so, Counter-Defendants affirmatively misrepresented the character and nature of those expenses and subsequently assessed the managed entities their pro rata share.

189.    The fiduciary duty that Counter-Defendants owed to investors like NexPoint and later NHF TRS LLC, is predicated on trust and confidence, and not committing corporate waste.[15]

190.    Counter-Defendants have breached their fiduciary duties by committing corporate waste in two primary forms: (1) by incurring unnecessary expenses or improperly imposing expenses on ACIS-6 without justification, and (2) by collecting fees based upon a knowingly inflated notional asset value.

191.    Counter-Defendants have breached their fiduciary duties of transparency by failing to fulsomely justify and document their investor-related activities. Failing to do so is a breach of the duty of loyalty because it is plainly a means to conceal the true extent of the malfeasance and damage done.

192.    All contracts made in violation of the IAA are void, and the IAA also voids all contracts, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of the IAA, or any rule, regulation, or order issued thereunder.

193.    Therefore, there are no contractual defenses or justifications for the violations of the IAA's duties.

194.    The agreements between Acis and any third party in any transaction in violation of the IAA are also void, and Counter-Defendants' rights under the Indenture and the PMA are void due to their violations of the IAA.

---

[15] *See Cap. Gains Rsch. Bureau*, 375 U.S. at 191–92 (stating that the IAA was meant to "eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser — consciously or unconsciously — to render advise which was not disinterested").

195.    Counter-Defendants have further aided and abetted the breaches by their co-Counter-Defendants and/or conspired with their co-Counter-Defendants, making them liable as principals for breaches of fiduciary duty.

196.    Counter-Defendants are thus liable for damages, punitive damages, and all other relief to which NexPoint and NHF TRS LLC are justly entitled. NexPoint and NHF TRS LLC seek all legal and equitable relief to which they are entitled, including, but not limited to, restitution and disgorgement of all funds and moneys paid in violation of the IAA after the effective date of the Bankruptcy Order.

197.    In particular, Terry and Brigade are also liable, or liable in the alternative, for aiding and abetting a breach of fiduciary duty owed by Acis, based on the facts above.

## COUNT TWO
### Negligence/Gross Negligence
### Against All Counter-Defendants

198.    Counter-Plaintiffs incorporate all factual averments in this pleading as if fully set forth herein.

199.    To the extent Counter-Defendants would be liable for any of the foregoing causes of action prior to their lack of sufficient intent or willful actions, NexPoint pleads in the alternative that such acts or omissions were negligent.

200.    Counter-Defendants owed NexPoint a duty of care in managing ACIS-6 and in discharging their duties under the IAA, the Indenture, and the PMA.

201.    Counter-Defendants' acts and omissions in violation of the duties outlined herein have resulted in substantial losses to NexPoint, totaling at least $8 million.

202.    Counter-Defendants' conduct was knowing and willful and done in disregard of known and established safeguards implemented and created in the industry to avoid well-known,

foreseeable risks.

203.    Counter-Defendants' acts and omissions were taken in reckless disregard of these known risks.

204.    Counter-Defendants are fiduciaries and are thus liable for negligence and gross negligence.

205.    NexPoint and NHF TRS LLC are thus entitled to damages, punitive damages, attorneys' fees, disgorgement, and costs as the law provides and to which each is justly entitled.


## COUNT THREE
### Conversion
### Against All Counter-Defendants

206.    Counter-Plaintiffs incorporate all factual averments in this pleading as if fully set forth herein.

207.    NexPoint held a subordinated note it purchased in 2016 through March 31, 2021, and NHF TRS LLC held that interest thereafter.

208.    The subordinated note is a contract, but it is not directly with Acis, Terry, or Brigade.

209.    Under the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met, and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted. The payment of these expenses is pulled from a reserve of specific and identifiable equity, which includes funds belonging to NexPoint and/or NHF TRS LLC (as the case may be to the extent either was an equity holder in ACIS-6).

210.    NexPoint and NHF TRS LLC had an identifiable property interest in specific moneys and/or assets held by the Trustee on behalf of ACIS-6.

211.    In allowing the payment of inexplicably high expenses (nearly twenty times their historical amount), Terry, upon information and belief, wrongfully and improperly reimbursed Acis, and potentially himself and Brigade, using NexPoint's and NHF TRS LLC's property designated for the payment of ACIS-6's administrative expenses and costs.

212.    Upon information and belief, Terry wrongfully and improperly reimbursed Acis and potentially himself by using NexPoint's and NHF TRS LLC's property designated for the payment of the Acis CLOs' administrative expenses and costs, and by allowing the payment of uncharacteristically high expenses upwards near 20 times their historical amount.

213.    Upon information and belief, Terry, Acis and Brigade each exercised a wrongful and unauthorized dominion over NexPoint's and NHF TRS LLC's property designated for the payment of fees and ACIS-6's administrative expenses and costs to the alteration of its condition or to the exclusion of NexPoint's and NHF TRS LLC's rights.

214.    The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

215.    Additionally, Defendants caused distributable funds to be withheld pending litigation, which is not privileged or authorized.

216.    One or more Counter-Defendants are liable for conversion and/or for aiding and abetting conversion.

### COUNT FOUR
**Unjust Enrichment/Assumpsit/Money Had and Received**
**Against All Counter-Defendants**

217.    Counter-Plaintiffs incorporate all factual averments as if fully set forth herein.

218.    Counter-Plaintiffs plead in the alternative that the foregoing actions and omissions are wrongful, and that Counter-Plaintiffs are entitled to disgorge the ill-gotten gains from Counter-

Defendants under the theory of unjust enrichment, assumpsit or money had and received.

## COUNT FIVE
### Tortious Interference with Contract
### Against All Counter-Defendants

219.   Counter-Plaintiffs incorporate all factual averments in this pleading as if fully set forth herein.

220.   Counter-Plaintiffs plead this claim in addition to or in the alternative to the foregoing actions.

221.   NexPoint was a holder of a subordinated note of Acis-6 CLO with face value of $7.5 million, and NHF TRS LLC has held such interest since March 31, 2021.

222.   The subordinated note incorporates certain duties and obligations of the Indenture and is a contract with ACIS-6. The rights of the noteholders to payment(s) (here, NexPoint until March 21, 2021, and then NHF TRS LLC thereafter) are incorporated by reference from the Indenture.

223.   Thus, the note is a contract, but it is not directly with Acis, Terry, or Brigade.

224.   Acis, Terry, and Brigade were well aware of the note's terms since they were appended to the Indenture, which is incorporated into the PMA and by which each Defendant agreed to live.

225.   Under the note, NexPoint is entitled to an amount from the Assets that is residual after compliance with the investment criteria has been met, and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted. The payment of these expenses is pulled from a reserve of specific and identifiable equity, which includes funds belonging to NexPoint and to NHF TRS LLC, respectively (to the extent each was an equity holder in ACIS-6).

226.     Counter-Plaintiffs thus had a property interest in identifying amounts in the ACIS-6 (even if it is not held to be a trust) to its share of the moneys used to pay the fees and administrative expenses and costs.

227.     Counter-Defendants' actions were tortious, unlawful, wrongful, and/or illegal.

228.     Counter-Defendants' actions were purposeful and intentional.

229.     Counter-Defendants' actions caused ACIS-6 to breach the terms of the subordinated note by causing the portfolio to pay substantially less than what subordinated noteholders were entitled to under the subordinated note. Acis, Terry, and/or Brigade's direct involvement in identifying the securities to be bought and sold in violation of the note's requirements, their direct involvement in executing the trades, and their direct involvement in inflating the amount of expenses and fees directly caused ACIS-6 CLO fund to pay less to Counter-Plaintiffs than what it is obligated to pay under the note.

230.     Counter-Defendants' actions also tortiously interfered with NexPoint's and NHF TRS LLC's right(s) as a minority holder to have the Controlling Class declare a default and/or bring suit.

231.     NexPoint thus seeks damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which it is justly entitled for tortious interference.

**COUNT SIX**
**Aiding and Abetting**
**Against Terry and Brigade**

232.     Counter-Plaintiffs incorporate the foregoing factual averments as if fully set forth herein.

233.     To the extent that Terry and Brigade are found to not owe a duty to NexPoint and/or NHF TRS LLC under Counts 1, 2, 3, 4 and 5, Counter-Plaintiffs alternatively plead that Terry and

Brigade actively aided and abetted Acis's breaches of the duties Acis owed to NexPoint.

234.    Counter-Plaintiffs have sufficiently pleaded the underlying causes of action necessary to an aiding-and-abetting claim *supra*.

235.    Counter-Plaintiffs thus seek damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which each is justly entitled.

## COUNT SEVEN
### Declaratory Judgment Action Under 28 U.S.C. § 2201 *et seq.*
### Against All Counter-Defendants

236.    Counter-Plaintiffs incorporate the foregoing factual averments as if fully set forth herein.

237.    Counter-Plaintiffs seek a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of Counter-Plaintiffs viz-a-viz Counter-Defendants under the Indenture, the PMA, and New York law.

238.    The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties and will provide certainty to the parties with respect to their rights, obligations, and duties under the Indenture, the PMA, and New York law.

239.    Counter-Plaintiffs therefore request declaratory relief under 28 U.S.C. §§ 2201–02 that:

- Counter-Defendants manipulated the assets in derogation of the rights of subordinated noteholders under the Notes in one or more ways as described herein;

- The Acis-6 fund and/or Counter-Plaintiffs were damaged by Counter-Defendants' actions;

- Counter-Defendants were or are owed fiduciary duties under New York or Federal law as an investor in Acis-6;

As a Noteholder suing for its rights under the Notes, Counter-Plaintiffs are not bound by the Indenture's No-Action clause for each of its claims.

**CONDITIONS PRECEDENT**

240.    Counter-Plaintiffs hereby plead that all conditions precedent to bringing suit or to finding liability have occurred, or been performed, or have been waived.

241.    To the extent Counter-Defendants must be sued via a derivative action as to any count, NHF TRS LLC respectfully pleads these claims in the alternative as a derivative action on the Notes.

242.    All conditions precedent to derivative standing have been met. The subordinated note, of which NHF TRS LLC is a holder, selects New York law as the governing choice of law.[16]

243.    Under New York law, subordinated notes are tantamount to equity. They are the residuary interest for all payments after all debt and expenses have been paid.

244.    On August 6, 2019, when it was still a holder, NexPoint sent a demand letter to U.S. Bank as Trustee via its then-identified counsel, Frost Brown Todd LLP, and to other persons, regarding the alleged malfeasance of the portfolio manager and advisors. *See* Exhibit 3 attached hereto. The Trustee failed to act given the ample amount of evidence demonstrating such malfeasance.

245.    While no further demand on the Trustee was necessary, NexPoint and NHF TRS LLC allege that any further demand to the Trustee or to anyone else would have been futile due to, among other things, a conflict of interest with Counter-Defendants, who functioned as the trustees in managing the Assets. Acis would not have sued itself. Acis's control person, Terry, would not have sued himself, Brigade, or any other person with whom he is aligned, *e.g.*,

---

[16] *See* Ex. 1, Indenture, at Exhibit A2-9 ("THE NOTES SHALL BE CONSRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK").

Highland CLO Funding, Ltd. (with whom Acis settled in exchange for mutual releases).

246.    Moreover, the Trustee has been held in federal court to have breached no duty because neither the Portfolio Manager, Acis, nor the majority in interest, Highland CLO Funding, Ltd. ("HCLOF"), declared a default. The Trustee contends it had no duty to act because, under the Indenture, it only had a duty to act after there had been a declared "Event of Default" as set forth in  § 5.1(d) and § 5.3. Section 5.1(e) specifically states that no event of default shall be deemed an "Event of Default unless notice is given to the trustee of such default by the Portfolio Manager or by the "Controlling Class." Section 5.3 specifically states that the Controlling Class Notably, Highland is the majority in interest, controlling holder of HCLOF, and investment advisor of HCLOF. Highland therefore controlled the "Controlling Class." Upon information and belief, Highland entered into one or more settlement agreements to settle claims against it by Acis and Terry, to obtain releases for itself from them  in exchange for, in part, releases of Acis and Terry given by itself and by HCLOF. This collusive settlement is an additional reason why HCLOF has not joined in any suit and why any demand would be futile.

247.    Furthermore, to the extent that Counter-Defendants' actions caused the Controlling Class not to declare a default or to bring suit as a condition precedent to NHF TRS LLC's rights to recover, the prevention doctrine holds that Counter-Defendants have waived such a condition precedent.

248.    Accordingly, any demand on the Trustee, Acis, or the Controlling Class would have been futile.

**DEMAND FOR ATTORNEYS' FEES**

249.    Counter-Plaintiffs hereby make a demand for the attorneys' fees and court costs each has sustained in bringing this action as may be available under contract, statute, or other law

or equity.

## JURY DEMAND

Pursuant to the Seventh Amendment of the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Counter-Plaintiffs hereby demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

250.     All requested relief is hereby expressly intended to be predicated solely on the alleged acts and omission accruing after the effective date of the Bankruptcy Order.

251.     Counter-Plaintiffs respectfully requests that judgment be entered in their favor and against Counter-Defendants Acis, Terry, and Brigade as follows:

A.     Damages in an amount to be determined at trial;

B.     Punitive damages in an amount to be determined at trial;

C.     Disgorgement of wrongfully paid fees and expenses and restitution thereof in an amount to be determined at trial;

D.     Disgorgement of any and all ill-gotten gains in an amount to be determined at trial;

E.     Attorneys' fees and costs;

F.     Constructive trust, injunctive relief, and any other equitable relief necessary to prevent further injury;

G.     All other legal and equitable relief to which NexPoint and/or NHF TRS LLC are justly entitled.

Dated:  October 24, 2023    Respectfully submitted,

**SBAITI & COMPANY PLLC**

/s/ *Mazin A. Sbaiti*
Mazin A. Sbaiti
New York Bar No. 4339057
mas@sbaitilaw.com
Griffin S. Rubin
Texas Bar No. 24121809 (admitted *pro hac vice*)
gsr@sbaitilaw.com
J.P. Morgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: 214.432.2899
F: 214.853.4367

***COUNSEL FOR DEFENDANT/COUNTER-PLAINTIFF NEXPOINT DIVERSIFIED REAL ESTATE TRUST***

# EXHIBIT B

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P.,

*Plaintiffs*,

v.

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., NEXPOINT DIVERSIFIED REAL ESTATE TRUST, AND NHF TRS, LLC,

*Defendants*.

No. 1:21-cv-11059-GHW

## SECOND AMENDED COMPLAINT

Plaintiffs U.S. Bank, National Association, in its capacity as trustee ("U.S. Bank" or the "Trustee"), Joshua N. Terry ("Mr. Terry"), and Acis Capital Management, L.P. ("ACM," and, collectively with the Trustee and Mr. Terry, "Plaintiffs") file this Amended Complaint against Defendants The Charitable Donor Advised Fund, L.P. ("DAF"), CLO HoldCo, Ltd. ("CLO HoldCo"), NexPoint Diversified Real Estate Trust ("NexPoint"), and NHF TRS, LLC ("NHF TRS," and, collectively with DAF, CLO HoldCo, and NHF TRS, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this action to stop James Dondero, the former majority owner of Plaintiff ACM, from holding investors in subordinated notes issued by ACIS CLO 2014-4 Ltd. ("ACIS 4"), ACIS CLO 2014-5 Ltd. ("ACIS 5"), and ACIS CLO 2015-6 Ltd. ("ACIS 6" and, collectively with ACIS 4 and ACIS 5, the "ACIS CLOs") hostage by threatening to bring meritless litigation against Plaintiffs.  Acting through Defendants, which he functionally controls, Dondero

1

has previously commenced vexatious and meritless lawsuits against ACM for purported mismanagement of the ACIS CLOs' investments and against U.S. Bank, the Trustee of the ACIS CLOs, for purported failures to prevent ACM's alleged mismanagement. Dondero's lawsuits and the continued threat of additional claims have delayed distributions to the ACIS CLOs' subordinated noteholders by forcing the holdback of funds from the ACIS CLOs' final distributions to cover potential indemnity obligations to U.S. Bank, ACM, Mr. Terry (ACM's owner), and Brigade Capital Management, L.P. ("Brigade") (ACM's sub-advisor). In order to free up funds for payment to the subordinated noteholders, Plaintiffs hereby seek a declaratory judgment that (a) Defendants DAF and CLO HoldCo lack standing to bring their threatened claims under the Investment Advisers Act of 1940 ("Advisers Act"), the Trust Indenture Act of 1939 ("TIA"), and other causes of action, and Defendants NexPoint and NHF TRS lacks standing to bring their claims under the Advisers Act and other causes of action against Mr. Terry, ACM, and Brigade and (b) Defendants DAF and CLO HoldCo's claims are barred by a settlement agreement between ACM and Highland CLO Funding, Ltd. ("HCLOF"), the actual owner of the subordinated notes on which DAF and CLO HoldCo's threatened claims are based.

2.      Dondero has harassed Plaintiffs through threatening letters and legal actions ever since a bankruptcy judge terminated his ownership of ACM in January 2019. Acting through Defendants DAF and CLO HoldCo, in 2019 and 2020, he twice commenced lawsuits in this District that baselessly alleged mismanagement of the ACIS CLOs by ACM and Mr. Terry and breach of duties by U.S. Bank (the "2019 and 2020 Lawsuits"), only to voluntarily dismiss those lawsuits before service was effected as to all parties or any responsive pleading was filed.

3.      Since the second voluntary dismissal, Dondero, acting through Defendants, has continued to threaten litigation against Plaintiffs. And earlier this year, Dondero, acting through

Defendant NexPoint, initiated a lawsuit related to one of the ACIS CLOs (ACIS 6) in a case captioned *NexPoint Strategic Opportunities Fund v. Acis Capital Management, L.P.*, *et al.*, Case No. 1:21-cv-04384-GHW (S.D.N.Y.) (the "NexPoint Lawsuit").   In the NexPoint Lawsuit, NexPoint has asserted, among other things, claims under the Advisers Act against Mr. Terry and ACM and claims under the TIA against U.S. Bank.  The *NexPoint* complaint blatantly copies and pastes allegations from the 2019 and 2020 Lawsuits, reinforcing the continuing threat that DAF and CLO HoldCo will also pick up their swords and pursue similar claims against Plaintiffs.

4.   DAF and CLO HoldCo's tactical dismissals have, to date, evaded judicial consideration of both those same fatal flaws and other additional fatal flaws in their claims.  For example, neither DAF nor CLO HoldCo has direct standing to assert claims against Plaintiffs or Brigade related to the ACIS CLOs because neither owns any subordinated notes in the ACIS CLOs—which are the only notes issued by the ACIS CLOs that remain outstanding.   Instead, DAF, through CLO HoldCo, is a minority investor in *another* entity, HCLOF, that directly holds the subordinated notes.  HCLOF, meanwhile, entered into a settlement agreement with ACM on April 28, 2021 (the "HCLOF Settlement Agreement"), releasing any and all claims related to the management of the ACIS CLOs, including the claims asserted by DAF and CLO HoldCo against Plaintiffs in the 2019 and 2020 Lawsuits.   Further, like NexPoint, DAF and CLO HoldCo cannot assert derivative standing on behalf of the ACIS CLOs under Cayman Islands law.  Thus, DAF and CLO HoldCo's claims fail at the outset because DAF and CLO HoldCo cannot establish either level of the double-derivative standing (both at the HCLOF level and at the ACIS CLO level) necessary to proceed. But even if they could, DAF and CLO HoldCo cannot assert claims derivatively on behalf of HCLOF that HCLOF has released under the HCLOF Settlement Agreement.

5.　　Undeterred by this dispositive standing deficiency, DAF and CLO HoldCo have refused to withdraw their threat of litigation against Plaintiffs related to ACM's purported mismanagement of the ACIS CLOs.  Indeed, as recently as January 10, 2022, DAF and CLO HoldCo again unequivocally rejected Plaintiffs' request to avoid unnecessary litigation by refusing to confirm they would release their threatened claims.

6.　　Meanwhile, NexPoint and the subsidiary to whom it transferred its Subordinated Note in Acis CLO 6 (the "Acis 6 Note") in March 2021, NHF TRS, continue to prosecute meritless claims against Plaintiffs that suffer from many of the same fatal flaws as the claims threatened by DAF and CLO HoldCo.  NexPoint and NHF TRS, like DAF and CLO HoldCo, lack direct standing to bring its claims against Mr. Terry and ACM, and they cannot assert derivative standing on behalf of the ACIS CLOs under Cayman Islands law.  NexPoint and NHF TRS additionally lack standing under the continuous ownership rule, which bars NexPoint's claims because it no longer owns the Acis 6 Note, and also bars NHF TRS from claiming because it did not own that Acis 6 Note at the time of the mismanagement alleged by NexPoint.

7.　　By bringing the NexPoint Lawsuit and hanging the perpetual threat of further litigation brought by DAF and CLO HoldCo over Plaintiffs' heads, Dondero and Defendants have disrupted the normal operation of the ACIS CLOs and delayed distributions to third-party investors in the ACIS CLOs (who, as explained further below, also happen to be in litigation with Dondero). This inequitable scenario is exactly what the Declaratory Judgment Act is designed to address.

8.　　Accordingly, Plaintiffs assert claims for declaratory judgment that Defendants' threatened claims against Plaintiffs and Brigade are barred because (a) Defendants DAF and CLO HoldCo lack direct or derivative standing to bring the threatened causes of action against Plaintiffs and Brigade and Defendants NexPoint and NHF TRS lack direct or derivative standing to bring

the causes of action against Mr. Terry, ACM, and Brigade in the NexPoint Lawsuit and (b) the claims threatened by DAF and CLO HoldCo were released by HCLOF, the holder of those claims, in the HCLOF Settlement Agreement.

## THE PARTIES

### A.    Plaintiffs

9.      Plaintiff U.S. Bank is a national banking association and serves as Trustee for the ACIS CLOs under (i) that certain Indenture (the "ACIS 4 Indenture"), dated as of June 4, 2014, among ACIS 4, ACIS CLO 2014-4 LLC, and U.S. Bank, as Trustee; (ii) that certain Indenture (the "ACIS 5 Indenture"), dated as of November 18, 2014, among ACIS 5, ACIS CLO 2014-5 LLC, and U.S. Bank, as Trustee; and (iii) that certain Indenture (the "ACIS 6 Indenture" and, together with the ACIS 4 Indenture and the ACIS 5 Indenture, the "ACIS Indentures"), dated as of April 16, 2015, among ACIS 6, ACIS CLO 2015-6 LLC, and U.S. Bank, as Trustee.

10.     Plaintiff Mr. Terry is an individual and citizen and resident of Texas.  Mr. Terry is the President of Shorewood GP, LLC ("Shorewood"), the general partner of ACM.

11.     Plaintiff ACM is a Delaware limited partnership.  ACM is located at 4514 Cole Avenue, Suite 600, Dallas, Texas 75205.  ACM's general partner is Shorewood, a limited liability company organized under the laws of Delaware.  Mr. Terry is the indirect 100% owner of Shorewood and holds, through an affiliate, 100% of the limited partnership interests in ACM. Pursuant to portfolio management agreements that ACM executed with ACIS 4, ACIS 5, and ACIS 6 (collectively, the "ACIS Portfolio Management Agreements"), ACM was authorized to serve as Portfolio Manager to the ACIS CLOs and make decisions about how to manage the ACIS CLOs' assets.

**B.      Defendants**

12.      Defendant DAF is a limited partnership organized in the Cayman Islands and administered by Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.  DAF is the 100% owner of CLO HoldCo.

13.      Defendant CLO HoldCo, a Cayman Islands exempted company, is wholly owned by DAF.  CLO HoldCo's registered office is 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.  CLO HoldCo owns 49% of HCLOF.

14.      Defendant NexPoint Strategic Opportunities Fund is a Delaware statutory trust managed by NexPoint Advisors, L.P.  Its business address is 2515 McKinney Avenue, Suite 1100, Dallas, TX 75201.  Defendant NHF TRS, LLC is a Delaware limited liability company that is a subsidiary of NexPoint.  NHF TRS's registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.  NexPoint owned the Acis 6 Note until March 2021, when it transferred ownership of that note to NHF TRS to obtain real estate investment trust tax status.

**C.      Relevant Non-Parties**

15.      ACIS 4, ACIS 5, and ACIS 6 are exempted limited liability companies incorporated in the Cayman Islands.  Each of the ACIS CLOs maintains a registered office located at P.O. Box 1093, Queensgate House, Grand Cayman, KY1-1102, Cayman Islands, and conducts its business through directors located in the Cayman Islands.  The ACIS CLOs are investment funds managed by ACM, and they issued, among other things, certain subordinated notes to investors pursuant to the ACIS Indentures in private offerings.

16.      Brigade is the sub-advisor to ACM for the ACIS CLOs.

17.     HCLOF is a collective investment scheme registered in the island nation of Guernsey.  HCLOF owns 100% of the subordinated notes issued by ACIS 4 and ACIS 5 and 87% of the subordinated notes issued by ACIS 6.

18.     Highland Capital Management, L.P. ("Highland"), is the 51% owner of HCLOF. Highland's current CEO and Chief Restructuring Officer is James P. Seery ("Mr. Seery").

19.     Dondero is an individual resident of Texas.  Dondero functionally controls NexPoint and NHF TRS.  Upon information and belief, Dondero also functionally controls DAF and, through it, CLO HoldCo.  Dondero formerly owned ACM.  He also formerly served as CEO of Highland.

## JURISDICTION AND VENUE

20.     There are actual, justiciable controversies between the parties.  NexPoint's decision to advance meritless claims in the NexPoint Lawsuit, and DAF and CLO HoldCo's refusal to release meritless claims, for which they have twice pursued litigation, have created a justiciable controversy regarding the administration of monies currently held in reserve in the ACIS CLOs. This Court has subject matter jurisdiction over this action pursuant to the Edge Act, 12 U.S.C. § 632, because Plaintiff U.S. Bank is a national banking association and this action arises out of transactions involving U.S. Bank's international banking and/or financial operations.  The ACIS CLOs are Cayman Islands exempted limited liability companies and U.S. Bank, as the ACIS CLOs' Trustee, has provided international financial services to the ACIS CLOs.  Those same international financial services form the subject of NexPoint's claims, and DAF and CLO HoldCo's threatened claims, against Plaintiffs.

21.     Separately and additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  This Court has federal question jurisdiction over Plaintiffs' declaratory judgment claims that Defendants lack standing to bring

Advisers Act and TIA claims under 28 U.S.C. § 1331 because "a coercive action brought by the declaratory judgment defendant[s]" under the Advisers Act and/or the TIA "would necessarily present a federal question." *Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014) (internal quotation marks omitted); *see also Paysafe Holdings UK Ltd. v. Accruit, LLC*, No. 18 Civ. 75 (ER), 2019 WL 1115054, at *2 (S.D.N.Y. Mar. 11, 2019) (finding federal question jurisdiction because plaintiffs seeking declaratory judgment "ask the Court to resolve several potential claims [by defendants] that could arise under federal laws"). This Court has supplemental jurisdiction over Plaintiffs' declaratory judgment claims that Defendants lack standing to bring non-Advisers Act and non-TIA claims because those claims and the Advisers Act and TIA claims "derive from a common nucleus of operative fact." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004).

22.    This Court has specific personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and N.Y. C.P.L.R. § 302.

23.    The ACIS Portfolio Management Agreements and the ACIS Indentures are governed by New York law.

24.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this district, and Defendants are subject to personal jurisdiction in this district.

### STATEMENT OF FACTS

**A.    ACM Manages The ACIS CLOs**

25.    The ACIS CLOs are offshore investment funds managed by ACM pursuant to the ACIS Portfolio Management Agreements. The ACIS CLOs raised money through the private sale of secured and subordinated notes and used the proceeds to purchase senior-secured debt instruments issued by corporations. Income generated by the ACIS CLOs' investments are used

to pay the ACIS CLOs' expenses, as well as principal and interest owed to the secured and subordinated noteholders of the ACIS CLOs.

26.    ACM is the Portfolio Manager of the ACIS CLOs.  As Portfolio Manager, it is responsible for identifying and purchasing the assets that are held in the ACIS CLOs, monitoring those assets, and monetizing those assets in specified circumstances.

27.    U.S. Bank is the Trustee under each of the ACIS Indentures.  As Trustee under the ACIS Indentures, its duties at all relevant times were limited to those set forth in the ACIS Indentures, which were ministerial and administrative and did not include any duties to monitor or supervise ACM or approve its investment decisions or particular trades.

**B.     Dondero Commences A Vexatious Litigation Campaign Against Mr. Terry, ACM, And U.S. Bank**

28.    This action is necessary because of the vexatious conduct of Dondero, ACM's former owner, through the Defendant entities he functionally controls.  Dondero lost control of ACM during an involuntary bankruptcy instigated by a series of wrongful acts he committed.  In 2016, Dondero wrongfully terminated Mr. Terry, ACM's Portfolio Manager.  In arbitration that ensued, the arbitrator held ACM and its general partner, Acis Capital Management GP, LLC ("ACM GP"), liable to Mr. Terry for $8 million in damages.

29.    Rather than direct ACM and ACM GP to pay the judgment, Dondero attempted to frustrate Mr. Terry's ability to enforce it by stripping ACM and ACM GP of their assets.  Mr. Terry stopped that scheme by commencing a bankruptcy case against ACM and ACM GP.  *See In re Acis Cap. Mgmt., L.P.*, Case No. 18-30264-sgj11 (N.D. Tex. Bankr.).

30.    On January 31, 2019, Judge Stacey G.C. Jernigan of the United States Bankruptcy Court for the Northern District of Texas approved a bankruptcy plan that transferred 100% of the equity in ACM and ACM GP to Mr. Terry.  *Id.* ECF 827, attached hereto as **Exhibit A**.

9

31.    Unwilling to accept Judge Jernigan's ruling, Dondero has pursued a vendetta against Mr. Terry and ACM through the entities that he controls.  Dondero functionally controls NexPoint, as its founder and portfolio manager, and also controls its wholly-owned subsidiary, NHF TRS.  Upon information and belief, Dondero also functionally controls DAF,[1] which, through CLO HoldCo, holds a 49% ownership stake in HCLOF.  Highland holds a majority, 51% stake in HCLOF.  HCLOF, in turn, owns 100% of the subordinated notes in ACIS 4 and ACIS 5 and 87% of the subordinated notes in ACIS 6.  Dondero has sought to weaponize his indirect interest in the ACIS CLOs' subordinated notes to harass Plaintiffs through the court system.  U.S. Bank became the target of Dondero's vendetta after, consistent with the ministerial and administrative nature of its duties, U.S. Bank declined to interfere with ACM's management of the ACIS CLOs.

32.    First, on October 24, 2019, Dondero caused DAF to file a complaint in this District against U.S. Bank, alleging mismanagement of the ACIS CLOs by ACM.  *See The Charitable Donor Advised Fund, L.P. v. U.S. Bank Nat'l Ass'n, et al.*, 1:19-cv-9857-NRB, ECF 1 (S.D.N.Y.) (the "2019 Lawsuit").

---

[1]    In a decision holding Dondero, DAF, and CLO HoldCo in contempt, Judge Jernigan made numerous factual findings showing that Dondero exercised functional control over DAF. *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054-sgj11, ECF 2660 (N.D. Tex. Bankr.), attached hereto as Exhibit B.  Judge Jernigan found that (1) Dondero was the founder and primary donor to DAF and serves as the president and director of the foundations that hold participation shares in DAF; (2) he formerly served as DAF's managing member; (3) DAF's subsequent managing members were a longtime friend of Dondero and then a former Highland employee, neither of whom had charitable sector experience; and (4) Dondero served as DAF's informal investment advisor without any agreement.  *Id.* at 2-3, 3 n.10, 20.  Judge Jernigan found that Dondero had induced DAF to commence a lawsuit in violation of the Bankruptcy Court's order and that DAF's current managing member, a former Highland employee, "basically abdicated responsibility to Mr. Dondero."  *Id.* at 21.  Further, on September 23, 2020, Dondero's former counsel told Judge Jernigan that "Mr. Dondero – and … entities with which he is identified" had "brought or threatened suit against Mr. Terry and Acis," a clear reference to the 2019 and 2020 Lawsuits that DAF and CLO HoldCo brought.  *See* September 23, 2021 Ltr. from D. Michael Lynn to Hon. Stacey Jernigan, attached hereto as Exhibit C.

33.     On November 1, 2019, DAF filed an Amended Complaint that added Moody's
Investors Service, Inc. ("Moody's"), as a defendant,[2] *id.* ECF 6, which it refiled on November 4,
2019, *id.* ECF 8.

34.     The Court *sua sponte* wrote to counsel for DAF on January 6, 2020, observing that
there was no indication that the Amended Complaint had been served and directing DAF to effect
service by February 3, 2020, or the Court would dismiss the Amended Complaint.  *Id.* ECF 17.

35.     In response, on January 31, 2020, DAF filed a Second Amended Complaint, adding
ACM and Mr. Terry as defendants.  *Id.* ECF 18, attached hereto as **Exhibit F**.

36.     The Second Amended Complaint alleged that ACM had effected transactions
involving ACIS CLO assets that did not satisfy the Weighted Average Life Test ("WAL test") and
the Minimum Weighted Average Moody's Recovery Rate Test ("WAM test"); had permitted the
Weighted Average Moody's Rating Factor ("WARF") to increase; and had permitted the ACIS
CLOs to incur unjustified and exorbitant fees, as well as that Moody's ratings of the ACIS CLOs
were false.  *Id.* ¶¶ 60-70, 73, 78-83.  It further alleged that U.S. Bank had breached its duties to
exercise due care in the performance of non-discretionary, ministerial tasks and to avoid conflicts
of interest.  *Id.* ¶¶ 84-99.

37.     In the 2019 Lawsuit, DAF sought damages allegedly suffered by the subordinated
notes owned by HCLOF.  *See id.* ¶ 87 (claiming damages for subordinated notes that DAF "owns

---

[2]     On August 6, 2019—less than three months before the 2019 Lawsuit was filed—other
entities controlled by Dondero, including NexPoint, sent demand letters to U.S. Bank and
Moody's advancing the same allegations that DAF later made in the 2019 Lawsuit.  *See* August
6, 2019 Ltr. from Michael K. Hurst to Daniel P. Novakov, attached hereto as Exhibit D; August
6, 2019 Ltr. from Michael K. Hurst to Shana Sethi, attached hereto as Exhibit E.  These demand
letters confirm Dondero's functional control over DAF.

indirectly pursuant to the ACIS Indentures").  As explained above, HCLOF owns the subordinated notes, and DAF only has an indirect minority interest in HCLOF via CLO HoldCo.

38.     But Dondero wanted to hold the sword of litigation above Plaintiffs' heads rather than actually litigate claims he would lose.  So although DAF served the Second Amended Complaint on U.S. Bank, it never served Moody's, ACM, or Mr. Terry.  Instead, DAF filed a letter requesting voluntary dismissal of the lawsuit without prejudice for lack of service on each of the defendants on February 3, 2020, *id.* ECF 20, which the Court entered on February 5, 2020, *id.* ECF 22.

39.     Dondero then tried the same trick a second time.  On February 6, 2020—the day after the voluntary dismissal of the 2019 Lawsuit was entered, DAF filed a new lawsuit in this District making substantively identical allegations.  *See The Charitable Donor Advised Fund, L.P. v. U.S. Bank Nat'l Ass'n*, 1:20-cv-1036-LGS, ECF 1 (S.D.N.Y) (the "2020 Lawsuit"), attached hereto as **Exhibit G**.  This time, Dondero added CLO HoldCo as an additional plaintiff, while alleging claims against Plaintiffs, Moody's, and Brigade.  *Id.*

40.     Like the 2019 Lawsuit, the 2020 Lawsuit alleged that ACM had effected transactions involving ACIS CLO assets that did not satisfy the WAL test and the WAM test, permitted the WARF to increase, and permitted the ACIS CLOs to incur unjustified and exorbitant fees, as well as that Moody's ratings of the ACIS CLOs were false.  *Id.* ¶¶ 61-71, 74, 79-84.  Like the 2019 Lawsuit, the 2020 Lawsuit alleged that U.S. Bank had breached its duties to exercise due care in the performance of non-discretionary, ministerial tasks and to avoid conflicts of interest.  *Id.* ¶¶ 85-100.  Like the 2019 Lawsuit, the 2020 Lawsuit claimed for damages to the subordinated notes that DAF "owns indirectly pursuant to the ACIS Indentures"—in short, for damages to the subordinated notes that HCLOF owns.  *Id.* ¶ 88.

41.     Rather than test the allegations in the 2020 Complaint in court, DAF and CLO HoldCo, after serving U.S. Bank but before serving the other defendants, filed a notice of voluntary dismissal without prejudice on February 25, 2020. *Id.* ECF 14.  The court so ordered that dismissal the following day. *Id.* ECF 15.

42.     On May 8, 2020—scarcely two months after the voluntary dismissal of the 2020 Lawsuit—DAF and CLO HoldCo confirmed in writing that they intended to continue to hold the sword of litigation over Plaintiffs' heads.  On that date, DAF and CLO HoldCo sent a demand letter (the "May 8 Letter") to U.S. Bank's counsel, copying ACM's counsel, attached hereto as **Exhibit H**.[3]

43.     DAF and CLO HoldCo's letter repeated the allegations from the 2019 and 2020 Lawsuits, namely that ACM had effected transactions involving ACIS CLO assets that did not satisfy the WAL test and the WAM test, permitted the WARF to increase, and permitted the ACIS CLOs to incur unjustified and exorbitant fees and that Moody's ratings of the ACIS CLOs were false.  *Id.* at 2-7.  The 2020 Lawsuit, DAF and CLO HoldCo explained, was intended to "put US Bank and the other defendants on notice" of DAF and CLO HoldCo claims to induce ACM to change its management of the ACIS CLOs.  *Id.* at 2.  DAF and CLO HoldCo told the Trustee that it "appear[ed] unwilling or unable to fulfill its duties," and "expressly reserve[d] [all rights] should this matter proceed to litigation."  *Id.* at 7. The May 8 Letter made crystal clear what was already apparent from the 2019 and 2020 Lawsuits—DAF and CLO HoldCo have no intention of

---

[3] Grant Scott signed the letter on behalf of DAF and CLO HoldCo.  Judge Jernigan found that Scott, DAF's then-managing member, "was Mr. Dondero's long-time friend, college housemate, and best man at his wedding."  Ex. B at 2.  In deposition testimony, Scott described Dondero as "my closest friend."  *Id.* at 2 n.7.  Scott's authorship of the letter confirms that Dondero is behind the threatened litigation campaign against Plaintiffs.

withdrawing their baseless claims of misconduct or conceding their lack of standing to pursue those claims.

44.     Although Dondero and his controlled entities went silent with respect to the ACIS CLOs for a period of time after the exchange of correspondence related to the May 8 Letter, on May 14, 2021, scarcely two weeks after the HCLOF Settlement Agreement was executed and before ACM had commenced the ACIS CLOs redemption process, NexPoint, another Dondero-controlled entity, commenced the NexPoint Lawsuit against Plaintiffs and Brigade in this District. *See NexPoint Strategic Opportunities Fund*, Case No. 1:21-cv-04384-GHW.   A copy of the operative complaint in that lawsuit, *id.* ECF 42, is attached hereto as **Exhibit I**.   In that lawsuit, NexPoint brought, among other causes of action, claims under the Advisers Act against ACM and Mr. Terry, *id.* ¶¶ 132-81, as well as claims under the TIA against U.S. Bank, *id.* ¶¶ 193-201. NexPoint is an investor in only one of the ACIS CLOs, ACIS 6, and its claims concern ACM's management of ACIS 6 and another ACM-managed CLO,[4] but not ACIS 4 or ACIS 5.   NHF TRS did not participate in the NexPoint Lawsuit even though, at the time it was filed, NHF TRS and not NexPoint owned the Acis 6 Note.

45.     The NexPoint Lawsuit regurgitated the same vexatious claims that DAF and CLO HoldCo made in the 2019 and 2020 Lawsuits: that ACM had effected transactions involving ACIS CLO assets that did not satisfy the WAL test and the WAM test, permitted the WARF to increase, and permitted the ACIS CLOs to incur unjustified and exorbitant fees, as well as that U.S. Bank had breached its duties of due care and to avoid conflicts of interest by not interfering with ACM's management of the ACIS CLOs.  *Id.* ¶¶ 33-36, 65-108, 119, 202-11.  The claims against ACM,

---

[4]  NexPoint was also an investor in now-redeemed secured notes of ACIS CLO 2014-3, Ltd., which is not one of the defined "ACIS CLOs" in this Complaint.

Mr. Terry, and U.S. Bank in the NexPoint Lawsuit are based on those same factual allegations from the 2019 and 2020 Lawsuits.  *See id.* ¶¶ 132-218.  Indeed, portions of the complaint in the NexPoint Lawsuit appear to be lifted verbatim from the complaints in the 2019 and 2020 Lawsuits. Plaintiffs repeatedly warned NexPoint that its claims were fatally flawed, *see NexPoint Strategic Opportunities Fund*, Case No. 1:21-cv-04384-GHW, ECF 35-36, 50-51, 71, but NexPoint refused to withdraw them despite twice amending its complaint.

46.     The NexPoint Lawsuit confirmed that Dondero's threat to use DAF and CLO HoldCo to bring further litigation related to the ACIS CLOs remained.  There is little doubt that DAF and CLO HoldCo  will eventually bring for a fourth time the claims they asserted in the 2019 and 2020 Lawsuits and that Dondero, through NexPoint, brought again in the 2021 NexPoint Lawsuit.  In addition, because the NexPoint Lawsuit brought claims under the Advisers Act and the TIA based on the same factual allegations as in the 2019 and 2020 Lawsuits and the May 8 Letter, there is equally little doubt that DAF and CLO HoldCo will also eventually bring Advisers Act claims against ACM and Mr. Terry, as well as TIA claims against U.S. Bank.

47.     On December 28, 2021, in a letter attached hereto as **Exhibit J**, Plaintiffs wrote to DAF and CLO HoldCo and requested that they "release … the [t]hreatened [c]laims" "[t]o avoid further unnecessary litigation expense."  On January 10, 2022, in a letter attached hereto as **Exhibit K**, DAF and CLO HoldCo refused, stating that they "do not agree to execute a release of … [the] '[t]hreatened [c]laims.'"  DAF and CLO HoldCo's latest refusal on January 10, 2022 to release their threatened, albeit meritless, claims removes any remaining doubt that they continue to threaten to bring further litigation related to the ACIS CLOs.

**C.     ACM And HCLOF Settle HCLOF's Claims**

48.     In January 2021, Highland acquired a 51%, controlling stake in HCLOF.  Upon acquiring this position, Highland's CEO, Mr. Seery, directed Highland and HCLOF to investigate

the claims that DAF and CLO HoldCo brought in the 2019 and 2020 Lawsuits.  Rather than perpetuate the adversarial relationship that Dondero had fostered with ACM, on information and belief, Highland and HCLOF chose to work collaboratively with ACM to liquidate the ACIS CLOs' collateral and return cash to their investors, including HCLOF.

49.     On April 28, 2021, HCLOF, ACM, ACM GP, and Mr. Terry executed the HCLOF Settlement Agreement, attached hereto as **Exhibit L**.  Pursuant to the HCLOF Settlement Agreement, HCLOF released "any and all claims … against [ACM GP], [ACM], and [Mr.] Terry, in any capacity, Brigade Capital Management, LP, U.S. Bank National Association, Moody's Investor Services, Inc., [and] the Acis CLOs."  Ex. J § 10.  The release of claims covered "any claims for breach of any duties or obligations owed by [ACM and ACM GP] to the Acis CLOs under the [ACIS Portfolio Management Agreements] arising prior to the Effective Date, including but not limited to any fees and expenses paid by the Acis CLOs to [ACM or ACM GP]."  *Id.*  The releases were intended to facilitate "the optional redemption of certain Acis CLOs on terms directed by HCLOF."  *Id.* at 2.  To that end, ACM and ACM GP agreed to "execute in good faith the redemptions of the Acis CLOs."  *Id.* § 5.

50.     The HCLOF Settlement Agreement released the claims that DAF and CLO HoldCo attempted to advance derivatively on behalf of HCLOF in the 2019 and 2020 Lawsuits.  *See* Ex. F ¶ 87; Ex. G ¶ 88.  DAF and CLO HoldCo can stand in no better position than HCLOF and are bound by the HCLOF Settlement Agreement that HCLOF reached with ACM, ACM GP, and Mr. Terry.  DAF and CLO HoldCo are collaterally estopped from asserting the Advisers Act, TIA, and other claims that HCLOF released pursuant to that agreement.  And in a separate settlement agreement, Highland similarly granted Mr. Terry, ACM, and the Acis CLOs a "general" release, and also released U.S. Bank and Brigade from "any and all claims … which were or could have

16

been asserted in, in connection with, or with respect to the DAF Lawsuits."   General Release

Agreement §§ 1(b), (c), attached hereto as **Exhibit M**; see also *id.*, § 4 (defining "DAF Lawsuits"

as the 2019 and 2020 Lawsuits).

> **D.    Redemption Of The ACIS CLOs And The Inequitable Impact Of Defendants' Ongoing And Threatened Litigation**

51.    In June 2021, the ACIS CLOs liquidated their assets and redeemed their secured

notes, leaving only the subordinated notes outstanding.   The liquidation of the ACIS CLOs

generated sufficient proceeds to make significant payments to the holders of subordinated notes—

which in the case of ACIS 4 and ACIS 5, are owned entirely by HCLOF, and in the case of ACIS

6, owned primarily by HCLOF.   NexPoint's ongoing lawsuit and DAF and CLO HoldCo's

ongoing litigation threat, however, have frustrated the ACIS CLOs' ability to make the full

distributions to the subordinated notes that they otherwise would.   Faced with ongoing and

threatened litigation against Plaintiffs and the ACIS CLOs' obligation to indemnify Plaintiffs in

connection with that ongoing and threatened litigation, liquidation proceeds were retained to cover

the ACIS CLOs' potential future indemnification obligations.   As a result, significant payments

that HCLOF and other subordinated noteholders would otherwise receive from the liquidation of

the ACIS CLOs have been delayed.[5]

---

[5]   Upon information and belief, the delay in payments to HCLOF and its majority owner, Highland, may be partially motivating Defendants' refusal to abandon their vexatious campaign against ACM and the ACIS CLOs.   Dondero at one time owned and controlled Highland, which he placed into bankruptcy in October 2019.   During the course of the bankruptcy, control was transferred to an independent manager, Mr. Seery.   Ever since, Dondero has directed vexatious litigation towards Highland and Mr. Seery, and has twice been held in contempt for his actions. *See In Re Highland Cap. Mgmt., L.P. v. Dondero*, Case No. 20-3190-sgj, ECF 190 (N.D. Tex. Bankr.), attached hereto as Exhibit N; Ex. B at 26-27, 30.   In the second contempt order, DAF was held in contempt alongside Dondero.

52.     With this action, Plaintiffs seek to finally resolve Defendants' standing to pursue claims, including under the Advisers Act and TIA, with respect to the ACIS CLOs, and confirm that all of DAF and CLO HoldCo's threatened claims have been released by HCLOF under the HCLOF Settlement Agreement.   Plaintiffs hope to obtain judicial determinations that the threatened claims and other causes of action that DAF and CLO HoldCo have hung over Plaintiffs' heads without actually filing are meritless.   Moreover, by asserting declaratory judgment claims against NexPoint and NHF TRS, Plaintiffs ACM and Mr. Terry hope to obtain judicial determinations that NexPoint's nearly identical claims are equally meritless, to the extent NexPoint attempts to maneuver to avoid their dismissal with prejudice in the NexPoint Lawsuit.   In doing so, Plaintiffs seek to free up funds that are being held in reserve from distributions to the subordinated noteholders of the ACIS CLOs to cover the ACIS CLOs' indemnity obligations to Plaintiffs and stop the unnecessary delay to the subordinated noteholders who are forced to wait for payments they would otherwise receive today.

## STATEMENT OF RELATEDNESS TO THE NEXPOINT LAWSUIT

53.     This Action and the NexPoint Lawsuit are related cases under Local Civil Rule 13(a)(1) because (a) this Action and the NexPoint Lawsuit concern the same or substantially similar parties, property, transactions or events; (b) there is substantial factual overlap between this Action and the NexPoint Lawsuit; and (c) there would be a substantial duplication of effort and expense for the Court and the parties if this Action and the NexPoint Lawsuit were not treated as related.

54.     As explained above, there is substantial factual overlap between this Action and the NexPoint Lawsuit because they concern the same transactions, events, and property; identical disputed contractual provisions; and related parties.   Also as explained above, this Action seeks declaratory judgment that Defendants lack standing to bring the same claims alleging

18

mismanagement of ACIS 6 by ACM, Mr. Terry, and Brigade and failure to prevent mismanagement by U.S. Bank that NexPoint brought in the NexPoint Lawsuit—namely, that ACM had effected transactions involving ACIS CLO assets that did not satisfy the WAL test and the WAM test, permitted the WARF to increase, and permitted the ACIS CLOs to incur unjustified and exorbitant fees, as well as that the Trustee had breached its duties of due care and to avoid conflicts of interest by declining to intervene.  *Compare* Ex. F ¶¶ 60-70, 73, 78-99 *and* Ex. G ¶¶ 61-71, 74, 79-100, *with* Ex. I ¶¶ 33-36, 65-108, 119, 203-11.  Further, although NexPoint did not invest in the subordinated notes of ACIS 4 and 5, the purchases that the NexPoint Lawsuit and the 2019 and 2020 Lawsuits all challenge were allocated among the ACIS CLOs.  Both the NexPoint Lawsuit and this Action concern the same purchases of collateral securities, alleged to violate the same contractual eligibility tests.  The parties to the lawsuits are also similar.  Plaintiffs and NexPoint are parties to both this Action and the NexPoint Lawsuit; and NexPoint, DAF, and CLO HoldCo are effectively affiliated parties because they are all entities that Dondero functionally controls.

55.     Because this Action and the NexPoint Lawsuit concern the same facts, transactions, events, and property, and similar parties, there would be a substantial duplication of effort and expense if this Action and the NexPoint Lawsuit were not treated as related.  Treating the cases as related would streamline litigation of identical and/or similar issues and avoid duplication of effort and expense by the parties and the Court.  Given Dondero's history of vexatious litigation, there is a significant risk that Dondero will respond to dismissal of the claims in the NexPoint Lawsuit by re-filing identical claims on behalf of DAF and CLO HoldCo in the hopes of finding a more sympathetic court.  *See* Tr. Ruling, *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj11, Dkt. 2500, attached hereto as **Exhibit O**, at 109:17-22 (THE COURT: "I have commented before

19

that we seem to have vexatious litigation behavior with regard to Mr. Dondero and his many controlled entities."); Ex. B at 26 (Judge Jernigan's finding Dondero and others in civil contempt of a bankruptcy injunction and observing that the offending lawsuit "*is, from this court's estimation, wholly frivolous*" (emphasis in original)).  The administration of these two cases together will prevent such gamesmanship and dispose of all standing issues related to claims brought by Dondero's various related entities in a single proceeding.

## CAUSES OF ACTION

**COUNT I: DECLARATORY JUDGMENT THAT THE ADVISERS ACT, TIA, AND OTHER CLAIMS ARE BARRED FOR LACK OF STANDING
(Against All Defendants)**

56.     Plaintiffs incorporate paragraphs 1-55 as if fully set forth herein.

57.     DAF and CLO HoldCo brought claims in the 2019 and 2020 Lawsuits premised on HCLOF's subordinated notes in the ACIS CLOs.  While DAF and CLO HoldCo voluntarily dismissed the 2019 and 2020 Lawsuits, they purportedly did so without prejudice.  They have continued to threaten Plaintiffs with the claims alleged in those lawsuits and other claims based on the same factual allegations ever since, including via the NexPoint Lawsuit, and have refused to release those claims.

58.     Further, because the NexPoint Lawsuit brought claims under the Advisers Act and the TIA based on the same factual allegations as in the 2019 and 2020 Lawsuits and the May 8 Letter, there is little doubt that DAF and CLO HoldCo will eventually attempt to bring Advisers Act claims against ACM and Mr. Terry and TIA claims against U.S. Bank.

59.     NexPoint has in fact brought claims under the Advisers Act and the TIA, as well as other claims, against Plaintiffs in the NexPoint Lawsuit.  Plaintiffs have repeatedly warned NexPoint that its claims suffer from fatal flaws, but NexPoint declined to withdraw those claims.

60.     DAF and CLO HoldCo lack direct standing to bring Advisers Act and TIA claims and other claims from the 2019 and 2020 Lawsuits against Plaintiffs because neither Defendant owns any subordinated notes in the ACIS CLOs.

61.     NexPoint and NHF TRS also lack direct standing to pursue the claims asserted against Mr. Terry and ACM in the NexPoint Lawsuit.  For the reasons explained in ACM's motion to dismiss in the NexPoint Lawsuit, NexPoint and NHF TRS's claims are derivative under Cayman Islands law because they are all predicated on direct harm allegedly done to Acis CLO 6 that impact NexPoint and NHF TRS only by virtue of NHF TRS's investment in Acis CLO 6.  *See* **Exhibit P**, *NexPoint Strategic Opportunities Fund*, Case No. 1:21-cv-04384-GHW, ECF 84 at 17-18.  NexPoint and NHF TRS additionally lack standing under the continuous ownership rule, which bars NexPoint's claims because it no longer owns the Acis 6 Note, and which also bars NHF TRS's claims because it did not own that Acis 6 Note at the time of the mismanagement alleged by NexPoint.

62.     Under Guernsey law, DAF and CLO HoldCo cannot assert derivative standing on behalf of HCLOF.

63.     Further, under Cayman Islands law, Defendants cannot assert derivative standing on behalf of the ACIS CLOs, including for the reasons explained in ACM's motion to dismiss in the NexPoint Lawsuit.  *See* Ex. P at 19-23.

64.     An actual controversy has arisen between Plaintiffs and Defendants in that, as described above, (1) NexPoint has brought Advisers Act and other claims against Plaintiffs Mr. Terry and ACM, for which it lacks standing; and (2) DAF and CLO HoldCo have threatened to bring those same claims against Plaintiffs Mr. Terry and ACM, and claims under the TIA and other

claims against Plaintiff U.S. Bank, for which they also lack standing, and have refused to release those claims.

65.    Plaintiffs request a judicial declaration that Defendants DAF and CLO HoldCo lack standing to bring the Advisers Act and TIA claims and other claims set out in the 2019 and 2020 Lawsuits, and the May 8 Letter, and that Defendants NexPoint and NHF TRS lack standing to bring the Advisers Act and other claims against Mr. Terry and ACM in the NexPoint Lawsuit.

66.    A judicial determination is necessary and appropriate at this time and under these circumstances for the Parties to ascertain their rights and obligations to one another and to avoid the hardship caused on the Parties, Highland, and the investors in the ACIS CLOs by a protracted dispute and the further delay that will tie up substantial funds that could otherwise be distributed to investors.

**COUNT II: DECLARATORY JUDGMENT THAT ANY CLAIMS BY DEFENDANTS RELATED TO THE ACIS CLOS ARE BARRED BY THE HCLOF SETTLEMENT AGREEMENT**
**(Against Defendants DAF And CLO HoldCo)**

67.    Plaintiffs incorporate paragraphs 1-66 as if fully set forth herein.

68.    Plaintiff ACM and HCLOF are parties to the HCLOF Settlement Agreement and are releasees under that agreement.

69.    Plaintiffs Mr. Terry and U.S. Bank and non-party Brigade are third-party releasees under the terms of the HCLOF Settlement Agreement.

70.    Under the HCLOF Settlement Agreement, HCLOF released "any and all claims … against [ACM GP], [ACM], and [Mr.] Terry, in any capacity, Brigade Capital Management, LP, U.S. Bank National Association, Moody's Investors Services, Inc., [and] the Acis CLOs (with respect to any claims for breach of any duties or obligations owed by [ACM and ACM GP] to the Acis CLOs under the [portfolio management agreements] arising prior to the Effective Date,

including but not limited to any fees and expenses paid by the Acis CLOs to [ACM or ACM GP])."
Ex. J § 10.

71.     DAF and CLO HoldCo brought claims in the 2019 and 2020 Lawsuits concerning
HCLOF's subordinated notes in the ACIS CLOs.   While DAF and CLO HoldCo voluntarily
dismissed the 2019 and 2020 Lawsuits, they purportedly did so without prejudice, and they have
continued to threaten Plaintiffs with the claims alleged in those lawsuits and other claims based on
the same factual allegations ever since.

72.     An actual controversy has arisen between Plaintiffs, and DAF and CLO HoldCo,
in that, as described above, DAF and CLO HoldCo have threatened to bring claims derivatively
on behalf of HCLOF that HCLOF released in the HCLOF Settlement Agreement, and have refused
to release those claims.

73.     Plaintiffs request a judicial declaration that DAF and CLO HoldCo's Advisers Act,
TIA, and other claims against Plaintiffs as set out in the 2019 and 2020 Lawsuits, and the May 8
Letter are barred by the HCLOF Settlement Agreement.

74.     A judicial determination is necessary and appropriate at this time and under these
circumstances for the Parties to ascertain their rights and obligations to one another and to avoid
the hardship caused on the Parties, Highland, and the subordinated noteholders in the ACIS CLOs,
including HCLOF, by a protracted dispute and the further delay that will tie up substantial funds
that could otherwise be distributed to investors.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully prays for judgment as follows:

a.      A declaration that Defendants DAF and CLO HoldCo do not have standing
to assert claims against Plaintiffs and Brigade with respect to the ACIS CLOs and that Defendants

A-9511

NexPoint and NHF TRS lacks standing to assert claims against Mr. Terry, ACM, and Brigade with respect to the ACIS CLOs;

      b.    A declaration that DAF and CLO HoldCo's threatened claims against Plaintiffs and Brigade with respect to the ACIS CLOs are barred by the HCLOF Settlement Agreement; and

      c.    Such other and further relief as this Court deems just and proper.

Respectfully submitted this 31st day of October, 2022.

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Blair Adams*
Jonathan E. Pickhardt
Blair A. Adams
Brendan Carroll
Misha Boutilier
Jeffrey Arnier
51 Madison Avenue, 22nd Floor,
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiffs Joshua N. Terry,
and Acis Capital Management, L.P.*

SEWARD & KISSEL LLP

By:   */s/ Mark D. Kotwick*
Mark D. Kotwick
Thomas Ross Hooper
Julie J. Hong
One Battery Park Plaza
New York, New York 10004
(202) 574-1200

*Attorneys for Plaintiff U.S. Bank National
Association, in its capacity as Trustee*

A-9512

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/1/2023

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

U.S. BANK, NATIONAL ASSOCIATION, in its
capacity as Trustee, JOSHUA N. TERRY, AND ACIS
CAPITAL MANAGEMENT, L.P.,

                                    *Plaintiffs*,

            v.

THE CHARITABLE DONOR ADVISED FUND, L.P.,
CLO HOLDCO LTD., AND NEXPOINT DIVERSIFIED
REAL ESTATE TRUST,

                                    *Defendants*.

---

No. 1:21-cv-11059 (GHW)

### STIPULATION AND ~~PROPOSED~~ ORDER
### REGARDING ADDITION OF NHF TRS, LLC AS A PARTY

WHEREAS, on the February 23, 2022, filing date of the Amended Complaint (Dkt. 15),

on the March 30, 2023 filing date of the counterclaims (Dkt. 78) filed by Defendant NexPoint

Diversified Real Estate Trust ("NexPoint") and as of today, NexPoint's subsidiary NHF TRS, LLC

("NHF TRS") has been the registered holder of the Subordinated Note issued by Acis CLO 6 that

is the subject of this litigation;

WHEREAS, the parties, Plaintiffs U.S. Bank, National Association, in its capacity as

Trustee, Acis Capital Management, L.P., and Joshua N. Terry (collectively, "Plaintiffs"), Counter-

Defendant Brigade Capital Management, LP ("Brigade"), and Defendants The Charitable Donor

Advised Fund, L.P. and CLO HoldCo Ltd. (the "DAF Parties") and NexPoint (altogether, the

"Parties") have agreed to add NHF TRS as an additional defendant and an additional counter-

plaintiff subject to the conditions of this Stipulation;

NOW THEREFORE, the Parties stipulate and agree as follows:

1.      Plaintiffs and Brigade provide written consent pursuant to FRCP 15(a)(2) to NexPoint filing its proposed Second Amended Answer and Counterclaim attached hereto as Exhibit A.  The Second Amended Answer and Counterclaim add NHF TRS as an additional counter-plaintiff and adjusting certain of its counterclaims to reflect the same.

2.      NexPoint and the DAF Parties provide written consent pursuant to FRCP 15(a)(2) to Plaintiffs filing the Second Amended Complaint attached hereto as Exhibit B.  The Second Amended Complaint adds NHF TRS as an additional defendant on substantially all allegations and all claims against NexPoint.

3.      NexPoint and NHF TRS's Second Amended Answer and Counterclaim referenced in paragraph 1 of this Stipulation and the DAF Parties' Second Amended Answer and First Amended Counterclaim (Dkt. 155) shall each constitute an answer to the Second Amended Complaint referenced in paragraph 2 of this Stipulation, and neither NexPoint and NHF TRS, nor the DAF Parties, shall be required to serve any further answer to the Second Amended Complaint under FRCP 12(a)(1)(A).  NexPoint, NHF TRS, and the DAF Parties further stipulate and agree that they will not assert that the Stipulation and Proposed Order renders the relief sought in Plaintiffs' already-briefed motion for judgment on the pleadings (the "Original MJOP," Dkts. Dkts. 106-107, 139, 151, 162) premature or impact whether the pleadings addressed in the Original MJOP are "closed" for purposes of Federal Rule of Civil Procedure 12(c).  NexPoint, NHF TRS, and the DAF Parties further stipulate and agree that they will not seek to reopen briefing on the Original MJOP based on this Stipulation and Proposed Order and the amended pleadings submitted pursuant thereto.

4.      Plaintiffs' and Brigade's already-briefed motions to dismiss NexPoint's counterclaims (the "Original Motions to Dismiss," Dkts. 106-107, 119-120, 139, 147, 151, 157,

162) and the Original MJOP, and the arguments for dismissal and judgment on the pleadings raised therein, will apply equally to NHF TRS once it is added as a defendant and any ruling on the Original Motions to Dismiss and/or the Original MJOP will bind NHF TRS.  Thus, for example, if the Court enters an order ruling that NexPoint lacks direct and derivative standing to assert its claims based on the arguments in the Original Motions to Dismiss and/or the Original MJOP, that ruling will apply equally to NHF TRS and the Court shall, either *sua sponte* or upon the request of a party, enter an identical order against NHF TRS without further briefing.

5.     All references to the "Amended Complaint" or "AC" in the briefing on the Original Motions to Dismiss and the Original MJOP will refer to the paragraph numbering in Plaintiffs' Amended Complaint (Dkt. 15), except for the supplemental briefing described below.  Further, all references to the answer or counterclaims in the briefing on the Original Motions to Dismiss and the Original MJOP will refer to the paragraph numbering in NexPoint's Amended Answer & Counterclaims (Dkt. 78) filed in response to Plaintiffs' Amended Complaint, except for the supplemental briefing described below.

6.     All references to the "Amended Complaint" or "AC" in the briefing on Plaintiffs' Motion to Dismiss the DAF Parties' Amended Counterclaims and for Judgment on the Pleadings on Plaintiffs' Claims (Dkts. 183, 199) will refer to the paragraph numbering in Plaintiffs' Amended Complaint (Dkt. 15), and all references to the DAF Parties' answer to the Amended Complaint in that same briefing will refer to the DAF Parties' answer (Dkt. 155).

7.     Plaintiffs and Brigade shall file a single supplemental brief of no more than five (5) pages (the "Supplemental Opening Brief") solely to present the argument that under the contemporaneous ownership rule NexPoint lacks derivative standing to assert the claims in the amended counterclaims because it does not currently hold the Subordinated Note and NHF TRS

lacks derivative standing to assert the claims in the amended counterclaims because it did not own the Subordinated Notes at the time of the alleged wrongdoing.  The Opening Supplemental Brief shall be filed by no later than November 3, 2023.

8.    NexPoint shall file a supplemental brief of no more than five (5) pages (the "Supplemental Response Brief") solely to respond to the Supplemental Opening Brief by no later than November 13, 2023.

9.    Plaintiffs and Brigade shall file a single supplemental reply brief (together with the Supplemental Opening Brief and the Supplemental Response Brief, the "Supplemental Briefs"), if any, of no more than two (2) pages solely to respond to the Supplemental Response Brief by no later than November 20, 2023.

10.    All references to NexPoint and NHF TRS's counterclaims in the Supplemental Briefs will refer to the paragraph numbering in NexPoint and NHF TRS's Second Amended Answer and Counterclaim referenced in paragraph 1 of this Stipulation.

Dated:  New York, NY
      October 31, 2022

/s/ *Blair A. Adams*
Jonathan E. Pickhardt
Blair A. Adams
Brendan Carroll
Misha Boutilier
Jeffrey Arnier
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
**Counsel for Plaintiffs ACIS Capital**
**Management, L.P., and Joshua N. Terry**

/s/ *Mark D. Kotwick*
Mark D. Kotwick
Thomas Ross Hooper
Julie J. Hong
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
(202) 574-1200
**Counsel for Plaintiff U.S. Bank National**
**Association, as Trustee**

/s/     *Mazin A. Sbaiti*
Mazin A. Sbaiti
SBAITI & COMPANY PLLC
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
(214) 432-2899
**Counsel for Defendant NexPoint Diversified**
**Real Estate Trust**

By:    */s/ Jason C. Hegt*
Jason C. Hegt
Alexis Kellert Godfrey
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
**Counsel for Counter-Defendant Brigade**
**Capital Management, L.P.**

/s/ *Sawnie A. McEntire*
Sawnie A. McEntire
*Admitted Pro Hac Vice*
Texas Bar No.: 13590100
Fed ID #3476
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Fax: (214) 237-4340
E-mail: smcentire@pmmlaw.com

Roger L. McCleary
*Admitted Pro Hac Vice*
Texas Bar No.: 133937000
Fed. ID #205
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Fax: (713) 960-7347
E-mail: rmccleary@pmmlaw.com

5

A-9517

Lindsey R. Skibell
E-mail: rskibell@glennagre.com
Jewel K. Tewiah
E-mail: jtewiah@glennagre.com
GLENN AGRE BERGMAN & FUENTES LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: 212.358.5600
***Counsel for CLO Holdco, Ltd. and The
Charitable Donor Advised Fund, L.P.***

SO ORDERED.

Dated: November 1, 2023
New York, New York

_____
GREGORY H. WOODS
United States District Judge

6

A-9518

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/10/2025

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**MEMORANDUM ENDORSED**

U.S. BANK NATIONAL ASSOCIATION, in
its capacity as Trustee, JOSHUA N. TERRY,
and ACIS CAPITAL MANAGEMENT, L.P.,

     *Plaintiffs,*

   v.

THE CHARITABLE DONOR ADVISED
FUND, L.P., CLO HOLDCO LTD.,
NEXPOINT DIVERSIFIED REAL ESTATE
TRUST, and NHF TRS LLC,

     *Defendants.*

Case No. 1:21-cv-11059-GHW
The parties have stipulated to the dismissal of this action
under F.R.C.P. 41(a)(1)(A)(ii).  The Clerk of Court is directed
to terminate all pending motions and to close this case.

SO ORDERED.

Dated: March 10, 2025
New York, New York   _____
        GREGORY H. WOODS
       United States District Judge

**STIPULATION OF VOLUNTARY DISMISSAL**

IT IS HEREBY STIPULATED AND AGREED by and between Plaintiffs U.S. Bank

National Association, in its capacity as Trustee, Joshua N. Terry, and Acis Capital Management,

L.P. (collectively, "Plaintiffs") and Defendants The Charitable Donor Advised Fund, L.P. and

CLO HoldCo, Ltd. (collectively "Defendants") and Counter Defendants Highland CLO Funding

Ltd and Brigade Capital Management (together with Plaintiffs and Defendants, the "Parties"),

pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, that the above-

captioned action is voluntarily dismissed with prejudice, with the Parties each bearing their own

fees and costs.

Dated: March 10, 2025

Mark D. Kotwick
Thomas Ross Hooper
Julie J. Hong
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
(212) 574-1200
Kotwick@sewkis.com
Hooper@sewkis.com
Hong@sewkis.com
**Counsel for Plaintiff U.S. Bank National
Association, as Trustee**

Sawnie A. McEntire (*Admitted Pro Hac Vice*)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
(214) 237-4300
smcentire@pmmlaw.com

Roger L. McCleary (*Admitted Pro Hac Vice*)
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315
rmccleary@pmmlaw.com

Lindsey R. Skibell
Jewel K. Tewiah
GLENN AGRE BERGMAN & FUENTES LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 358-5600
rskibell@glennagre.com
jtewiah@glennagre.com
**Counsel for Defendants CLO HoldCo, Ltd.
and The Charitable Donor Advised Fund, L.P.**

Jonathan E. Pickhardt
Blair A. Adams
Jeffrey Arnier
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
jonpickhardt@quinnemanuel.com
blairadams@quinnemanuel.com
jefferyarnier@quinnemanuel.com
**Counsel for Plaintiffs ACIS Capital
Management, L.P. and Joshua N. Terry**

Uri A. Itkin
Michael Chen
AKIN GUMP STRAUSS HAUER & FELD
LLP
Bank of America Tower
1 Bryant Park
New York, New York 10036
(212) 872-1027
**Counsel for Counter-Defendant Highland
CLO Funding, Ltd.**

2

Dated: March 10, 2025

_____
Mark D. Kotwick
Thomas Ross Hooper
Julie J. Hong
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, New York 10004
(212) 574-1200
Kotwick@sewkis.com
Hooper@sewkis.com
Hong@sewkis.com
**Counsel for Plaintiff U.S. Bank National
Association, as Trustee**

_____
Sawnie A. McEntire (*Admitted Pro Hac Vice*)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
(214) 237-4300
smcentire@pmmlaw.com

Roger L. McCleary (*Admitted Pro Hac Vice*)
PARSONS MCENTIRE MCCLEARY PLLC
One Riverway, Suite 1800
Houston, Texas 77056
(713) 960-7315
rmccleary@pmmlaw.com

Lindsey R. Skibell
Jewel K. Tewiah
GLENN AGRE BERGMAN & FUENTES LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
(212) 358-5600
rskibell@glennagre.com
jtewiah@glennagre.com
**Counsel for Defendants CLO HoldCo, Ltd. and
The Charitable Donor Advised Fund, L.P.**

_____
Jonathan E. Pickhardt
Blair A. Adams
Jeffrey Arnier
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
jonpickhardt@quinnemanuel.com
blairadams@quinnemanual.com
jefferyarnier@quinnemanual.com
**Counsel for Plaintiffs ACIS Capital
Management, L.P. and Joshua N. Terry**

_____
Uri A. Itkin
Michael Chen
AKIN GUMP STRAUSS HAUER & FELD
LLP
Bank of America Tower
1 Bryant Park
New York, New York 10036
(212) 872-1027
**Counsel for Counter-Defendant Highland
CLO Funding, Ltd.**

2

Jason C. Hegt
Alexis Kellert Godfrey
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
Jason.Hegt@lw.com
Alexis.Godfrey@lw.com
**Counsel for Counter-Defendant Brigade
Capital Management, LP**

A-9522

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK, NATIONAL ASSOCIATION, in its capacity as Trustee, JOSHUA N. TERRY, AND ACIS CAPITAL MANAGEMENT, L.P.,<br><br>                              Plaintiffs,<br><br>   -against-<br><br>THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO LTD., AND NEXPOINT DIVERSIFIED REAL ESTATE TRUST,<br><br>                              Defendants. | Case No. 1:21-cv-11059 (GHW) |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendant Nexpoint Diversified Real Estate Trust ("NexPoint") in the above-named case appeals to the United States Court of Appeals for the Second Circuit from the Memorandum Opinion & Order [Dkt. 261] entered on March 1, 2024, dismissing NexPoint's counterclaims against  Plaintiffs/Counter-Defendants Acis Capital Management, L.P. and Joshua N. Terry and Counter-Defendant Brigade Capital Management, LP.

The above-referenced Order became final on March 10, 2025, when the remaining claims herein were dismissed with prejudice [Dkt. 322, Stipulation of Voluntary Dismissal].

Dated:  March 18, 2025

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*Mazin A. Sbaiti*
**Mazin A. Sbaiti**
New York Bar No. 4339057
mas@sbaitilaw.com
**Griffin S. Rubin** (Admitted *Pro Hac Vice*)
Texas Bar No. 24121809
gsr@sbaitilaw.com

**PAGE 1**

**Kevin N. Colquitt** (Admitted *Pro Hac Vice)*
Texas Bar No. 24072047
knc@sbaitilaw.com
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: 214.432.2899
F: 214.853.4367

**COUNSEL FOR DEFENDANT NEXPOINT
DIVERSIFIED REAL ESTATE TRUST**

A-9524

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. BANK, NATIONAL ASSOCIATION, in its
capacity as Trustee, JOSHUA N. TERRY, AND
ACIS CAPITAL MANAGEMENT, L.P.,

                   Plaintiffs,

   -against-

THE CHARITABLE DONOR ADVISED FUND,
L.P., CLO HOLDCO LTD., AND NEXPOINT
DIVERSIFIED REAL ESTATE TRUST,

                   Defendants.

**Case No. 1:21-cv-11059 (GHW)**

## AMENDED NOTICE OF APPEAL

Notice is hereby given that Defendants Nexpoint Diversified Real Estate Trust and NHF TRS, LLC ("NexPoint" and "NHF," and collectively, "Defendants") in the above-named case appeal to the United States Court of Appeals for the Second Circuit from the Memorandum Opinion & Order [Dkt. 261] entered on March 1, 2024, dismissing NexPoint's and NHF's counterclaims against Plaintiffs/Counter-Defendants Acis Capital Management, L.P. and Joshua N. Terry and Counter-Defendant Brigade Capital Management, LP.

The above-referenced Order became final on March 10, 2025, when the remaining claims herein were dismissed with prejudice [Dkt. 322, Stipulation of Voluntary Dismissal].

Dated: March 26, 2025           Respectfully submitted,

                             SBAITI & COMPANY PLLC

                             _Mazin A. Sbaiti_____
                             Mazin A. Sbaiti
                             New York Bar No. 4339057
                             mas@sbaitilaw.com

**PAGE 1**

A-9525

Griffin S. Rubin (Admitted Pro Hac Vice)
Texas Bar No. 24121809
gsr@sbaitilaw.com
Kevin N. Colquitt (Admitted Pro Hac Vice)
Texas Bar No. 24072047
knc@sbaitilaw.com
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201
T: 214.432.2899
F: 214.853.4367

**COUNSEL FOR DEFENDANT NEXPOINT
DIVERSIFIED REAL ESTATE TRUST**