# 25-0643-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## JOINT APPENDIX
### Volume 39 of 43 (Pages A-9526 to A-9726)

---

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
*Attorneys for Plaintiffs-Counter-*
  *Defendants-Appellees*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant-*
  *Appellant NHF TRS, LLC and*
  *Defendant-Counter-Claimant-*
  *Appellant Nexpoint Diversified*
  *Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

*(For Continuation of Appearances See Inside Cover)*

---

 (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Counter-Defendant-
    Appellee*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Amended Complaint, dated and filed
February 23, 2022 ................................................ A-56

Exhibit A to Amended Complaint -
Bench Ruling and Memorandum of Law In
Support of (A) Final Approval of Disclosure
Statement; and (B) Confirmation of Chapter 11
Trustee's Third Amended Joint Plan, in re: *Acis
Capital Management, L.P., Debtor,* Case No. 18-
30264-SGJ-11, and in re: *Acis Capital
Management GP, L.L.C., Debtor*, Case No. 18-
30265-SGJ-11, dated January 31, 2019 ................. A-80

Exhibit B to Amended Complaint -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021 ................................ A-128

Exhibit C to Amended Complaint -
Letter of Bonds Ellis Eppich Schafer Jones LLP
to Court, dated September 23, 2020 ..................... A-160

Exhibit D to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019 ........................... A-163

Exhibit E to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Shana Sethi,
dated August 6, 2019 .......................................... A-170

ii

**Page**

Exhibit F to Amended Complaint -
Plaintiff's Second Amended Complaint and Jury
Demand in *The Charitable Donor Advised Fund,
L.P., v. U.S. Bank National Association, et al.*,
Case No. 1:19-CV-09857-NRB ............................ A-179

Exhibit G to Amended Complaint -
Plaintiffs' Original Complaint in *The Charitable
Donor Advised Fund, L.P., and CLO HOLDCO,
Ltd. v. U.S. Bank National Association, et al.*,
Case No. 1:20-cv-1036 ........................................... A-212

Exhibit H to Amended Complaint -
Letter of Myers Bigel to Mark Kotwick, dated
May 8, 2020 ............................................................. A-246

Exhibit I to Amended Complaint -
Plaintiff's Second Amended Complaint, *NexPoint
Strategic Opportunities Fund v. Acis Capital
Management, L.P., et al.*, Case No. 1:21-cv-
04384-GHW .......................................................... A-254

Exhibit J to Amended Complaint -
Letter of Quinn Emanuel to The Charitable
Donor Advised Fund, L.P. and Others, dated
December 28, 2021 ................................................ A-296

Exhibit K to Amended Complaint -
Letter of Parsons McEntire McCleary PLLC to
Jonathan E. Pickardt and Mark D. Kotwick, dated
January 10, 2022 .................................................... A-299

Exhibit L to Amended Complaint -
Settlement Agreement, dated April 28, 2021 ......... A-302

iii

**Page**

Exhibit M to Amended Complaint -
Order Approving Debtor's Settlement with (A)
Acis Capital Management, L.P. and Acis Capital
Management GP LLC (Claim No. 23), (B)
Joshua N. Terry and Jennifer G. Terry (Claim No.
156), and (C) Acis Capital Management, L.P.
(Claim No. 159) and Authorizing Action
Consistent Therewith, dated October 7, 2020........ A-329

Exhibit N to Amended Complaint -
Memorandum Opinion and Order Granting in
Part Plaintiff's Motion to Hold James Dondero in
Civil Contempt of Court for Alleged Violation of
TRO in re: *Highland Capital Management, L.P.,
Debtor,* Case No. 19-34054-sgj-11, and *Highland
Capital Management, L.P. v. Dondero*, Case No.
20-03190-sgj11, dated June 7, 2021 ..................... A-354

Exhibit O to Amended Complaint -
Transcript of Proceedings in re: *Highland Capital
Management, L.P., Debtor*, Case No. 19-34054-
sgj-11, dated June 25, 2021 .................................. A-410

Exhibit P to Amended Complaint -
Acis Capital Management, L.P.'s Memorandum
of Law in Support of its Motion to Dismiss
Plaintiff's Second Amended Complaint and for
Attorneys' Fees and Costs, dated January 27,
2022, *NexPoint Strategic Opportunities Fund v.
Acis Capital Management, L.P., et al.*, Case No.
1:21-cv-04384-GHW ........................................... A-533

iv

**Page**

Order on Plaintiffs' Unopposed Motion to Amend
Caption, dated March 26, 2022............................... A-562

Defendants the Charitable Donor Advised Fund,
L.P., and CLO HoldCo, Ltd.'s Amended Answer
and Counterclaim, dated and filed
March 30, 2023 ....................................................... A-563

Amended Answer of Defendant/Counter-Plaintiff
NexPoint Diversified Real Estate Trust to
Amended Complaint, dated March 30, 2023......... A-597

Exhibit 1 to Amended Answer -
Indenture, dated April 16, 2015 ............................ A-656

Exhibit 2 to Amended Answer -
Portfolio Management Agreement, dated
April 16, 2015, labeled Exhibit 2.......................... A-985

Exhibit 3 to Amended Answer -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019, labeled
Exhibit E ................................................................ A-1037

Notice of Defendant/Counter-Plaintiff NexPoint
Diversified Real Estate Trust for Leave to Add
Party, dated and filed April 10, 2023 .................... A-1043

Order of Honorable Gregory H. Woods, dated
May 1, 2023 and filed May 2, 2023...................... A-1043.1

Notice of Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023.............. A-1044

Declaration of Blair A. Adams, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023.............. A-1047

v

**Page**

Exhibit 1 to Adams' Declaration -
Transcript of Hearing, dated February 23, 2023.... A-1051

Exhibit 2 to Adams' Declaration -
Second Amended Complaint (Including Claim
Objections and Objections to Administrative
Expense Claim), *Acis Cap. Mgmt. L.P. and Acis
Cap. Mgmt. GP, LLC v. Highland Cap. Mgmt.,
L.P., et al.*, Adv. Pro. No. 18-03078, dated
June 20, 2019 ........................................................ A-1084

Exhibit 3 to Adams' Declaration -
Agreement, dated February 28, 2023 ................... A-1193

Exhibit 4, Part 1, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015........................................................ A-1257

Exhibit 4, Part 2, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 *continued* ...................................... A-1367

Exhibit 5 to Adams' Declaration -
Transcript of Proceedings, dated May 1, 2023 ...... A-1379

Exhibit 6, Part 1, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017................................................... A-1425

Exhibit 6, Part 2, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1432

vi

**Page**

Exhibit 6, Part 3, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1439

Exhibit 6, Part 4, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1446

Exhibit 7 to Adams' Declaration -
Order Granting Senior Certificate Holders'
Motion for Summary Judgment and Denying
Junior Certificate Holders' Motion for Summary
Judgment, *In the Matter of the Trust Established
Under the Pooling and Service Agreement
relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage Pass-
Through Certificates, Series 2007-C30*, Case No.
62-TR-CV-19-33, dated October 26, 2022 .......... A-1454

Exhibit 8 to Adams' Declaration -
Ruling in *In re Acis Cap. Mgmt., L.P.*, 18-30264-
SGJ-11, dated August 30, 2018 ............................ A-1473

Exhibit 9 to Adams' Declaration -
Portfolio Management Agreement, dated
June 5, 2014............................................................ A-1481

Exhibit 10 to Adams' Declaration -
Indenture, dated June 5, 2014, paginated bottom
center as Exhibit 3, Page 1 of 421 ........................ A-1534

Exhibit 11 to Adams' Declaration -
Portfolio Management Agreement, dated
November 18, 2014 ............................................... A-1956

vii

**Page**

Exhibit 12 to Adams' Declaration -
Indenture, dated November 18, 2014, paginated
bottom center as Exhibit 4, Page 1 of 335 ............. A-2008

Exhibit 13 to Adams' Declaration -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021
(Reproduced herein at pp. XXX – EX B)

Exhibit 14 to Adams' Declaration -
Original Complaint, *NexPoint Diversified Real
Estate Trust v. Acis Capital Management, L.P., et
al.*, dated October 3, 2022 ...................................... A-2344

Exhibit 15 to Adams' Declaration -
Notice of Appeal, *In re Acis Capital
Management, LP.*, Appeal No. 19-10847, dated
July 26, 2019 ......................................................... A-2392

Exhibit 16 to Adams' Declaration -
Opening Brief of Appellant Highland CLO
Funding, LTD, in above appeal, dated
September 20, 2019 ................................................ A-2396

Exhibit 17 to Adams' Declaration -
Memorandum of Law in Support of Defendant
U.S. Bank, National Association's Motion to
Dismiss the Second Amended Complaint,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2473

viii

**Page**

Exhibit 18 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding LTD.'s Motion to Intervene,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated November 24, 2021 .......... A-2499

Exhibit 19 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding Ltd.'s Motion to Dismiss,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022 ............... A-2521

Declaration of Jonathon Milne, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 16, 2023 ............... A-2543

Exhibit 1 to Milne's Declaration -
Sections 12, 25(3), 28(1), 38, 46 and 48 of the
Cayman Islands Companies Act ........................... A-2569

Exhibit 2 to Milne's Declaration -
*In the Matter of Lancelot Investors Fund Limited
(In Official Liquidation)* [2015] (1) CILR 328 ...... A-2576

Exhibit 3 to Milne's Declaration -
*Marex Financial Ltd. v Sevilleja* [2020]
UKSC 31 ................................................................. A-2599

Exhibit 4 to Milne's Declaration -
*Primeo Fund v Bank of Bermuda (Cayman) Ltd*
[2021] UKPC 22 .................................................... A-2682

Exhibit 5 to Milne's Declaration -
*Renova Resources Private Equity Limited v
Gilbertson* [2009] CILR 268 ................................. A-2713

ix

**Page**

Exhibit 6 to Milne's Declaration -
Order 15, rule 12A of the Grand Court Rules........ A-2745

Exhibit 7 to Milne's Declaration -
*Birch v Sullivan* [1957] 1 WLR 1247 ................... A-2749

Exhibit 8, Part 1, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) ........................... A-2754

Exhibit 8, Part 2, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2774

Exhibit 8, Part 3, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2794

Exhibit 8, Part 4, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2813

Exhibit 8, Part 5, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2829

Exhibit 9 to Milne's Declaration -
*Foss v Harbottle* (1843) 2 Hare 461 ...................... A-2847

Exhibit 10 to Milne's Declaration -
*Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204 .................... A-2868

Exhibit 11 to Milne's Declaration -
*Johnson v Gore Wood & Co* [2000] UKHL 65 ...... A-2902

Exhibit 12 to Milne's Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-2948

x

**Page**

Exhibit 13 to Milne's Declaration -
Sections 994 to 996 of the UK Companies Act
2006 ....................................................... A-3131

Exhibit 14 to Milne's Declaration -
*Kuwait Ports Authority et al. v Port Link GP Ltd
et al.* (Court of Appeal 20 January 2023 decision)   A-3135

Exhibit 15 to Milne's Declaration -
*Rolled Steel Products (Holdings) Ltd v British
Steel Corp* [1986] Ch. 246 .................................... A-3204

Exhibit 16 to Milne's Declaration -
*Nurcombe v. Nurcombe* [1985] 1 370 .................... A-3270

Exhibit 17 to Milne's Declaration -
*Portfolios of Distinction v Laird* [2004]
2 BCLC 741 ............................................ A-3284

Exhibit 18 to Milne's Declaration -
*Schultz v Reynolds* [1992-93] CILR 59 ................. A-3308

Exhibit 19 to Milne's Declaration -
*Berland v Earle* [1902] AC 83 .............................. A-3333

Exhibit 20 to Milne's Declaration -
*Harris v Microfusion* [2017] 1 B.C.L.C. 305 ........ A-3355

Exhibit 21 to Milne's Declaration -
*Top Jet Enterprises Limited v Sino Jet* [2018] (1)
CILR 18 ................................................ A-3370

Exhibit 22 to Milne's Declaration -
*Estmanco (Kilner House) Ltd v G.L. C.* [1982] 1
W.L.R. 2 ................................................ A-3405

Exhibit 23 to Milne's Declaration -
*Cook v Deeks* [1916] 1 AC 554 ............................ A-3420

xi

**Page**

Exhibit 24 to Milne's Declaration -
*Pavlides v. Jensen* [1956] 2 All ER 518................. A-3433

Exhibit 25 to Milne's Declaration -
*Menier v Hooper's Telegraph Works* LR 9 Ch
App 350 .................................................. A-3440

Exhibit 26 to Milne's Declaration -
*Heyting v Dupont* [1964] 1 W.L.R. 843 ................. A-3446

Exhibit 27 to Milne's Declaration -
*Burnford et al. v Automobile Association
Developments Limited* [2022] EWCA Civ 1943 ... A-3460

Exhibit 28 to Milne's Declaration -
*De Sena & Anor v Notaro & Ors* [2020] EWHC
1031 (Ch).............................................. A-3482

Exhibit 29 to Milne's Declaration -
*Williams v Natural Life Health Foods Ltd* [1998]
1 WLR 830.............................................. A-3558

Declaration of Todd William McGuffin, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed May 16, 2023......... A-3569

Exhibit 1 to McGuffin Declaration -
*Morton v Paint* [1996] 21 GLJ 61 ....................... A-3582

Exhibit 2 to McGuffin Declaration -
*Flightlease Holdings (Guernsey) Ltd v
Flightlease (Ireland) Ltd* [2009–10] GLR 38 ........ A-3608

Exhibit 3 to McGuffin Declaration -
*Perpetual Media Capital Limited v Enevoldsen,*
[2014] GLR 57........................................... A-3646

xii

**Page**

Exhibit 4 to McGuffin Declaration -
*Prodefin Trading Limited v Midland Resources*
Royal Court, 14 February 2017, Judgement
7/2017, unreported.................................................. A-3675

Exhibit 5 to McGuffin Declaration -
*Fonds v GRCF* [2022] GRC 039 .......................... A-3701

Exhibit 6 to McGuffin Declaration -
*Carlyle Capital Corporation Limited v Conway
& Ors* Royal Court, 4 September 2027, Judgment
38/2017, unreported................................................ A-3726

Exhibit 7 to McGuffin Declaration -
*Jackson v Dear* (2013) GLR 167.......................... A-4197

Exhibit 8 to McGuffin Declaration -
*Pilatus (PTC) Limited v RBC Trustees
(Guernsey) Limited* [2021] GRC 063 ................... A-4222

Exhibit 9 to McGuffin Declaration -
*Apex Global Management Limited v Fi Call
Limited* [2015] EWHC 3269 (Ch) ........................ A-4233

Exhibit 10 to McGuffin Declaration -
*Re Coroin Limited* (No 2) [2012] EWHC 2343
(Ch).......................................................................... A-4288

Exhibit 11 to McGuffin Declaration -
*Grace v Biagioli* [2005] EWCA Civ 1222............. A-4447

Exhibit 12 to McGuffin Declaration -
*Rock (Nominees) Limited v RCO (Holdings) plc*
[2004] EWCA Civ 118............................................ A-4478

Exhibit 13 to McGuffin Declaration -
*Re Saul D Harrison & Sons plc* [1994] BCC 475 . A-4496

xiii

**Page**

Exhibit 14 to McGuffin Declaration -
*Apex v Fi Call Ltd* [2014] BCC 286 ...................... A-4524

Exhibit 15 to McGuffin Declaration -
*Zedra Trust Company (Jersey) Limited v The Hut
Group Limited* [2020] EWHC 5 ........................... A-4565

Exhibit 16 to McGuffin Declaration -
*Peskin v Anderson* [2001] BCC 874 ..................... A-4591

Exhibit 17 to McGuffin Declaration -
*Sharp v Blank* [2015] EWHC 3220 ...................... A-4607

Exhibit 18, Part 1, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22 ..... A-4624

Exhibit 18, Part 2, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22,
*continued*................................................................. A-4643

Exhibit 19 to McGuffin Declaration -
*Foss v Harbottle* [1843] 2 Hare 461 ..................... A-4663

Exhibit 20 to McGuffin Declaration -
*Marex Financial Ltd v Sevilleja* [2020] UKSC 31 A-4684

Exhibit 21 to McGuffin Declaration -
*Prudential Assurance Co. Ltd v Newman
Industries Ltd. and Others* (No. 2) [1982] Ch 204 A-4767

Exhibit 22 to McGuffin Declaration -
*Renova Resources v Gilbertson* [2009] CIFsd 10.. A-4806

Notice of Motion of Counter-Defendant Brigade
Capital Management, LP's ("Brigade") to
Dismiss the Counterclaims of Defendant
NexPoint Diversified Real Estate Trust against
Brigade, dated and filed May 31, 2023.................. A-4869

xiv

                                                                    **Page**

Declaration of Jason C. Hegt, Esq., in Support of
    Brigade's Motion to Dismiss, dated and filed
    May 31, 2023 ........................................................  A-4871

Exhibit 1 to Hegt Declaration -
Indenture, dated April 16, 2015, paginated
bottom center as "Exhibit 5, Page 1 of 329" .........  A-4873

Exhibit 2 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
February 9, 2023 .................................................  A-5203

Exhibit 3 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
January 4, 2022 .....................................................  A-5211

Declaration of Mazin A. Sbaiti, Esq., in Opposition
    to Plaintiffs' Motion to Dismiss Defendants'
    Counterclaims and for Judgment on the
    Pleadings, dated and filed June 14, 2023 ...............  A-5217

Exhibit 1 to Sbaiti Declaration -
Indenture, dated April 16, 2015, labeled as
Exhibit 1 ...............................................................  A-5219

Exhibit 2 to Sbaiti Declaration -
Offering Circular relating to the offering of the
Co-Issued Notes of ACIS CLO 2015-6 Ltd. and
ACIS CLO 2015-6 LLC and the Issuer Notes of
ACIS CLO 2015-6 Ltd. dated April 14, 2015 .......  A-5548

Exhibit 3 to Sbaiti Declaration -
Portfolio Management Agreement, dated
April 16, 2025, labeled Exhibit 3 ..........................  A-5768

xv

**Page**

Exhibit 4 to Sbaiti Declaration -
Red-lined version of Amended Complaint, *U.S.
Bank National Association, et al. v The
Charitable Donor Advised Fund, L.P., et al.*, Case
No. 1:21-cv-11059-GHW, dated and filed
February 23, 2022 ................................................. A-5820

Exhibit 5 to Sbaiti Declaration -
Excerpt from *Tianrui (Int'l) Holding Co. Ltd. v.
China Shanshui Cement Grp. Ltd.*, Grand Court
of the Cayman Is., April 6, 2020 ........................... A-5844

*Declaration of Bhavesh Narendra Patel, Esq., in
Opposition to Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 14, 2023 ......... A-5917

Exhibit 1 to Patel Declaration -
*Islena Airlines v Jefferson* [1998 CILR 148] ......... A-5942

Exhibit 2 to Patel Declaration -
Section 14(1) of the Exempted Limited
Partnerships Act, (2022 Revision) ........................ A-5955

Exhibit 3 to Patel Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) .................................................... A-5959

Exhibit 9 to Patel Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-5970

Exhibit 22 to Patel Declaration -
*Scott v Metropolitan Police Commissioner* [1974]
UKHL 4 ................................................................ A-6096

Exhibit 25 to Patel Declaration -
*Watson v Kea Investments* [2019] EWCA Civ
1759 ...................................................................... A-6106

xvi

**Page**

Exhibit 28 to Patel Declaration -
Cayman Grand Court Rules, Order 15, Rule 12A . A-6130

Reply Declaration of Jonathon Milne, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 28, 2023 ........ A-6133

Exhibit 1 to Milne's Reply Declaration -
*Snell's Equity* ............................................................. A-6161

Exhibit 2 to Milne's Reply Declaration -
Lewis on Trusts ....................................................... A-6166

Exhibit 3 to Milne's Reply Declaration -
*Knight v Knight* ..................................................... A-6172

Exhibit 4 to Milne's Reply Declaration -
*Hunter v Moss* ........................................................ A-6188

Exhibit 5 to Milne's Reply Declaration -
*Grand View Private Trust Co. Ltd. et al. v*
*Wen-Young Wong, et al.* ......................................... A-6200

Exhibit 6 to Milne's Reply Declaration -
*In the Matter of the Ta-Ming Wang Trust* .............. A-6243

Exhibit 7 to Milne's Reply Declaration -
*Helen Gorbunova v The Estate of Boris*
*Berezovsky, et al.* ................................................... A-6256

Exhibit 8 to Milne's Reply Declaration -
*In re Empress Engineering Company* .................... A-6283

Exhibit 9 to Milne's Reply Declaration -
*Neste Oy v Lloyds Bank PLC* ................................ A-6290

Exhibit 10 to Milne's Reply Declaration -
*Steven Anthony Pearson, et al. v Lehman*
*Brothers Finance SA, et al.* ................................... A-6301

xvii

**Page**

Exhibit 11 to Milne's Reply Declaration -
*Chanan Singh Thandi v. Mark Sands and Andrew
Appleyard* ............................................................. A-6399

Exhibit 12 to Milne's Reply Declaration -
*Grupo Torras S.A. and Torras Hostench London
Limited v. Bank of Butterfield International
(Cayman) Limited and Five Others* ....................... A-6421

Exhibit 13 to Milne's Reply Declaration -
*Bailey and another v. Angove's PTY Limited* ......... A-6443

Exhibit 14, Part 1, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al.* .......................................................... A-6463

Exhibit 14, Part 2, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al. continued* .......................................... A-7363

Exhibit 15, Part 1, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL)* ................................................ A-8366

Exhibit 15, Part 2, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL) continued* ................................ A-8397

Exhibit 16, Part 1, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another* ....................... A-8429

Exhibit 16, Part 2, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another continued* ...... A-8460

Exhibit 17 to Milne's Reply Declaration -
*Pearson v. Primeo Fund* ........................................ A-8487

xviii

**Page**

Exhibit 18 to Milne's Reply Declaration - Sections of Cayman Islands Companies Act (2023 Revision) ..................................................... A-8513

Exhibit 19 to Milne's Reply Declaration - *Secretary of State for Trade and Industry and another* ................................................................. A-8517

Exhibit 20 to Milne's Reply Declaration - *China Shanshui Cement Group Limited v. Tianrui (International) Holding Company Limited* ............ A-8542

Exhibit 21 to Milne's Reply Declaration - *GAO v. China Biologic Products Holdings Incorporated* ........................................................... A-8561

Exhibit 22 to Milne's Reply Declaration - *West Mercia Safetywear Ltd (in liq) v Dodd and another* ................................................................. A-8604

Exhibit 23 to Milne's Reply Declaration - *Svanstrom and Nine Others v. Jonasson* ................ A-8611

Exhibit 24 to Milne's Reply Declaration - Directors' Duties, Creditors' Rights and Shareholder Intervention ....................................... A-8629

Exhibit 25, Part 1, to Milne's Reply Declaration - *McKillen v. Misland (Cyprus) Investments Limited, et al.* ...................................................... A-8663

Exhibit 25, Part 2, to Milne's Reply Declaration - *McKillen v. Misland (Cyprus) Investments Limited, et al. continued* ....................................... A-8711

Exhibit 25, Part 3, to Milne's Reply Declaration - *McKillen v. Misland (Cyprus) Investments Limited, et al. continued* ....................................... A-8759

xix

**Page**

Exhibit 25, Part 4, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ........................................ A-8806

Exhibit 26 to Milne's Reply Declaration -
*Monsolor 1Q Ltd. v Woden Park Ltd.* .................... A-8825

Exhibit 27 to Milne's Reply Declaration -
*Chartbook Limited v. Persimmon Homes Limited
and Others and Another* ........................................ A-8842

Exhibit 28, Part 1, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.* ...... A-8885

Exhibit 28, Part 2, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8932

Exhibit 28, Part 3, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8974

Exhibit 28, Part 4, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-9014

Exhibit 29 to Milne's Reply Declaration -
*Yeoman's Row Management Limited and Another
v Cobbe* .................................................................. A-9027

Exhibit 30 to Milne's Reply Declaration -
*Mutter v. Eastern and Midlands Railway
Company* .................................................................. A-9080

Exhibit 31 to Milne's Reply Declaration -
*Peak Hotels and Resorts Limited v. Tarek
Investments Limited, et al.* ..................................... A-9097

xx

**Page**

Second Declaration of Bhavesh Narendra Patel in
    Opposition to the Plaintiffs' Motion to Dismiss
    Defendants' Counterclaims and for Judgment on
    the Pleadings on Plaintiffs' Claims, dated and
    filed July 19, 2023 ................................................ A-9126

    Exhibit 1 to Second Declaration -
    *Arnold* v. *Britton* [2015] UKSC 36 ....................... A-9140

    Exhibit 2 to Second Declaration -
    *Al Sadik v Investcorp Bank BSC & Ors*
    *[2017 (1) CILR 1])*................................................. A-9189

    Exhibit 3 to Second Declaration -
    *Williams v Central Bank of Nigeria* [2014]
    UKSC 10................................................................. A-9342

    Exhibit 4 to Second Declaration -
    *Broadcasting Investment Group Ltd v Smith*
    [2021] EWCA Civ 912, [2022] 1 WLR 1 .............. A-9406

Stipulation and Proposed Order Regarding Addition
    of NHF TRS, LLC as Party, filed
    October 31, 2023 .................................................... A-9427

    Exhibit A to Stipulation-
    Counter-Plaintiffs NexPoint Diversified Real
    Estate Trust and NHF TRS LLC's First Amended
    Counterclaim, dated October 24, 2023 .................. A-9434

    Exhibit B to Stipulation-
    Second Amended Complaint, dated
    October 31, 2022 .................................................... A-9487

Stipulation and Order Regarding Addition of NHF
    TRS, LLC as Party, dated October 31, 2022 and
    filed November 1, 2023 ......................................... A-9512

xxi

                                                                    **Page**

Stipulation of Voluntary Dismissal, dated and filed
    March 10, 2025........................................................ A-9518

Notice of Appeal of NexPoint Diversified Real
    Estate Trust, dated and filed March 18, 2025 ........ A-9522

Amended Notice of Appeal of NexPoint Diversified
    Real Estate Trust and NHF TRS LLC, dated and
    filed March 26, 2025.............................................. A-9524


**<u>*Additional Exhibits to Declaration of
Bhavesh Narendra Patel, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023</u>**

Exhibit 4 to Patel Declaration -
    Re Hydrodam (Corby) Ltd...................................... A-9526

Exhibit 5 to Patel Declaration -
    Omni Securities Limited........................................ A-9531

Exhibit 6 to Patel Declaration -
    Hutchinson Limited v Cititrust & Ors ................... A-9553

Exhibit 7 to Patel Declaration -
    Whar-Hansen v Bridge Trust Company................. A-9575

Exhibit 8 to Patel Declaration -
    Ritter v Butterfield Bank ...................................... A-9592

Exhibit 10 to Patel Declaration -
    AHAB v SAAD Investment Company................... A-9634

Exhibit 11 to Patel Declaration -
    Westdeutsche Landesbank v Islington London ..... A-9910

xxii

**Page**

Exhibit 12 to Patel Declaration -
Ernst & Young v FOI Officer................................. A-9983

Exhibit 13 to Patel Declaration -
Kuwait Ports Authority v Port Link GP Ltd .......... A-10016

Exhibit 14 to Patel Declaration -
Prudential Assur Co v Newman Indus................... A-10084

Exhibit 15 to Patel Declaration -
Marex Financial v Sevilleja .................................... A-10160

Exhibit 16 to Patel Declaration -
Russell v Wakefield Water Works.......................... A-10232

Exhibit 17 to Patel Declaration -
MacDougall v Gardiner .......................................... A-10242

Exhibit 18 to Patel Declaration -
Tempo Group v Fortuna Development .................. A-10246

Exhibit 19 to Patel Declaration -
FamilyMart China v Yin-Hen Wei......................... A-10385

Exhibit 20 to Patel Declaration -
Burland v Earle ....................................................... A-10418

Exhibit 21 to Patel Declaration -
Schultz v Reynolds & Newport ............................. A-10439

Exhibit 23 to Patel Declaration -
Merkanti v Raiffeisen Bank ................................... A-10463

Exhibit 24 to Patel Declaration -
H1 of Tolleys on Administration of Trusts ............ A-10487

Exhibit 26 to Patel Declaration -
Cayman Trusts Act................................................. A-10537

Exhibit 27 to Patel Declaration -
Re China Milk......................................................... A-10539

ChD                                                                            **161**

A      **Re Hydrodan (Corby) Ltd.**
       Chancery Division.
       Millett J.
       Judgment delivered 17 December 1993.

       *Wrongful trading – Shadow director – De facto director – Whether terms de facto*
       *and shadow directors overlapped – Whether directors of parent company were*
B      *shadow directors of subsidiary of which parent was a shadow director – Insolvency*
       *Act 1986, s. 214.*

       1. The liability for wrongful trading imposed by s. 214 of the Insolvency Act 1986
       extended to de facto and shadow directors as well as to de jure and shadow directors.

       2. An allegation that a defendant acted as de facto or shadow director, without
       distinguishing between the two, was embarrassing. It suggested that de facto and shadow
C      directors were very similar, that their roles overlapped, and that it might not be possible to
       determine in any given case whether a particular person was a de facto or a shadow director.
       The terms did not overlap. They were alternatives, and in most and perhaps all cases were
       mutually exclusive.

       3. The directors of a parent company which was alleged to be a shadow director of a
       subsidiary, would not ipso facto themselves be shadow directors of the subsidiary. If (which
D      was not alleged) the directors of the parent as a collective body gave directions to the
       directors of the subsidiary (which were Channel Island companies) and the directors were
       accustomed to act in accordance with such directions, the result would be to constitute the
       parent, but not its directors, a shadow director of the company.

       A G Boyle QC (instructed by Dibb Lupton Bromhead) for the eighth defendant.
       A G Bompas (instructed by Paisner & Co) for the fifth defendant.
E      Gregory Hill (instructed by Emsley Collins, Leeds) for the liquidator.

                                        JUDGMENT

       **Millett J:** These are appeals by the fifth and eighth defendants respectively from an
       order made on 4 August 1993 by District Judge Whitehurst in the Northampton County
       Court dismissing their applications to strike out proceedings which had been brought
       against them.
F      The proceedings arise in the liquidation of Hydrodan (Corby) Ltd ('the company'), a
       wholly-owned indirect subsidiary of Eagle Trust plc ('Eagle Trust'). The company was
       ordered to be compulsorily wound up by the Northampton County Court on 13
       December 1988 on a creditors' petition which had been presented on 17 October 1988.
       On 18 February 1993 the liquidator made an application in the Northampton County
       Court against fourteen defendants alleging that they had been guilty of wrongful trading
G      and seeking orders against them under s. 214 of the *Insolvency Act* 1986. The defendants
       included Eagle Trust itself, one of its subsidiaries and all its directors. The liquidator
       supported his application by an affidavit setting out the evidence upon which he relied.
       On 19 April 1993 the fifth defendant, Mr Thomas, applied to strike out the liquidator's
       application against him. He supported his application by a short affidavit. On 5 May
       1993 the eighth defendant, Dr Hardwick, made a similar application. The two
       defendants' applications were heard by the District Judge on 18 May 1993. He gave
H      judgment on 4 August 1993 and dismissed both applications, but very sensibly ordered
       the liquidator to serve points of claim. Mr Thomas and Dr Hardwick now appeal to this
       court.
       Meanwhile, on 5 October 1993, the liquidator duly served points of claim against all
       the defendants. Mr Hill, who appears before me for the liquidator, concedes that the
       points of claim truly represent the liquidator's case as supported by the evidence filed by

EXHIBIT

4

**162**                      **Re Hydrodan (Corby) Ltd**                      **[1994] BCC**
                                  *(Millett J)*

him, and there is no further evidence available to him which would support any other or further pleadings.

Accordingly, counsel have agreed before me that the issue is exactly the same as that which would have arisen had the points of claim been before the District Judge and the question is whether they should be struck out as disclosing no reasonable cause of action against Mr Thomas and Dr Hardwick. The company or the group structure is not entirely clear, but for the purpose of present appeals I must take the structure to be that alleged by the liquidator. Eagle Trust had a wholly-owned subsidiary, Midland City Partnerships Ltd ('MCP') which in turn had a wholly-owned subsidiary, Landsaver MCP Ltd (which I will call 'Landsaver 19'). The liquidator alleges that the company is a wholly-owned subsidiary of Landsaver 19 and thus a wholly-owned indirect subsidiary of Eagle Trust. Eagle Trust had eight or nine directors, some of whom were executive directors and some of whom were non-executive directors. As one would expect, the executive directors were also directors of MCP and of Landsaver 19, the operating companies; but they were not directors of the company. The titular and only directors of the company were two Channel Island companies: Tuscan Investments Ltd and Ithaca Investments Ltd, which were appointed directors of the company on 18 March 1986.

The liquidator alleges that the company was trading wrongfully from 24 April 1986 until 17 October 1988, the date on which the winding-up petition was presented. As against Mr Thomas and Dr Hardwick, the liquidator alleges that they became responsible for the wrongful trading of the company as from 15 April 1987, the date on which they were appointed to be directors of Eagle Trust.

Liability for wrongful trading is imposed by s. 214 of the *Insolvency Act* 1986. The statutory liability is imposed exclusively upon persons who are or were at the material time directors of the company in liquidation. But s. 214(7) provides that in the section 'director' includes a shadow director. A shadow director is defined in s. 251 of the *Insolvency Act* 1986 in these terms:

‘ "Shadow director", in relation to a company, means a person in accordance with whose directions or instructions the directors of the company are accustomed to act . . .'

I need not recite the proviso to that definition.

Directors may be of three kinds: de jure directors, that is to say, those who have been validly appointed to the office; de facto directors, that is to say, directors who assume to act as directors without having been appointed validly or at all; and shadow directors who are persons falling within the definition which I have read.

The defendants accept, though for the purpose of these appeals only, that the liability imposed by s. 214 extends to de facto directors as well as to de jure and shadow directors. It appears to me that that concession is plainly correct. Liability for wrongful trading is imposed by the Act on those persons who are responsible for it, that is to say, who were in a position to prevent damage to creditors by taking proper steps to protect their interests. Liability cannot sensibly depend upon the validity of the defendant's appointment. Those who assume to act as directors and who thereby exercise the powers and discharge the functions of a director, whether validly appointed or not, must accept the responsibilities which are attached to the office. Nevertheless, the statutory liability is imposed exclusively upon directors of one or other of the three kinds that I have mentioned. Accordingly, the liquidator must plead and prove against each defendant separately that he or it was a director of the company.

Mr Thomas and Dr Hardwick were never appointed directors of the company. It is submitted on their behalf that the liquidator has neither pleaded the necessary facts nor put forward the necessary evidence to establish that either of them was a de facto or

© 1994 CCH Editions Limited

ChD                          Re Hydrodan (Corby) Ltd                          **163**
                                      (Millett J)

A    shadow director of the company. In para. 1.7 of the points of claim under the heading
     'Summary', the liquidator has pleaded the substance of his case as follows:

           'The individual respondents also personally acted as de facto or shadow directors
           of the company as hereinafter pleaded in relation to them respectively.'

     This makes it necessary to examine the later allegations in the pleadings in order to
     discover what the facts are relied upon to support the allegation that Mr Thomas and Dr
B    Hardwick were de facto or shadow directors of the company.

     I would interpose at this point by observing that in my judgment an allegation that a
     defendant acted as de facto or shadow director, without distinguishing between the two,
     is embarrassing. It suggests – and counsel's submissions to me support the inference –
     that the liquidator takes the view that de facto or shadow directors are very similar, that
     their roles overlap, and that it may not be possible to determine in any given case whether
     a particular person was a de facto or a shadow director. I do not accept that at all. The
C    terms do not overlap. They are alternatives, and in most and perhaps all cases are
     mutually exclusive.

     A de facto director is a person who assumes to act as a director. He is held out as a
     director by the company, and claims and purports to be a director, although never
     actually or validly appointed as such. To establish that a person was a de facto director
     of a company it is necessary to plead and prove that he undertook functions in relation
D    to the company which could properly be discharged only by a director. It is not sufficient
     to show that he was concerned in the management of the company's affairs or undertook
     tasks in relation to its business which can properly be performed by a manager below
     board level.

     A de facto director, I repeat, is one who claims to act and purports to act as a director,
     although not validly appointed as such. A shadow director, by contrast, does not claim
E    or purport to act as a director. On the contrary, he claims not to be a director. He lurks
     in the shadows, sheltering behind others who, he claims, are the only directors of the
     company to the exclusion of himself. He is not held out as a director by the company. To
     establish that a defendant is a shadow director of a company it is necessary to allege and
     prove: (1) who are the directors of the company, whether de facto or de jure; (2) that the
     defendant directed those directors how to act in relation to the company or that he was
     one of the persons who did so; (3) that those directors acted in accordance with such
F    directions; and (4) that they were accustomed so to act. What is needed is, first, a board
     of directors claiming and purporting to act as such; and, secondly, a pattern of behaviour
     in which the board did not exercise any discretion or judgment of its own, but acted in
     accordance with the directions of others.

     In the present case, there were titular directors of the company. They were Channel
     Island companies. That fact alone may be sufficient to justify an inference that they were
G    accustomed to act in accordance with the directions of others; in which case there were
     shadow directors of the company. But there is nothing pleaded in the points of claim to
     suggest that there were, in addition to the titular directors, any other persons who claimed
     to be directors of the company at all.

     Counsel have argued the case before me on the footing that sufficient facts are pleaded
     to justify the inference that Eagle Trust, and possibly MCP as well, acted as a shadow
     director of the company. I shall assume that that is so. Against Dr Hardwick – I take
H    him first as the simpler of the two – what is alleged is pleaded under the heading of 'The
     respondents' respective involvement' and is contained in para. 23 of the points of claim,
     as follows:

           'Dr Hardwick, as a director of Eagle Trust, is, with the other directors thereof,
           collectively responsible for the conduct of that company [i.e. Eagle Trust] . . . in
           relation to the company.'

**164**          **Re Hydrodan (Corby) Ltd**          **[1994] BCC**
                      *(Millett J)*

It is therefore the liquidator's case that Eagle Trust was a director of the company   A
(presumably a shadow director); and Dr Hardwick's liability is based exclusively upon
the fact, being the only fact alleged against him, that he was one of the directors of Eagle
Trust. As one of the directors of a shadow director, it is alleged, he was one of those
collectively responsible for Eagle Trust's conduct; and was accordingly a shadow director
of the company. In my judgment the conclusion does not follow from the premise.

The liquidator submitted that where a body corporate is a director of a company,   B
whether it be a de jure, de facto or shadow director, its own directors must ipso facto be
shadow directors of the company. In my judgment that simply does not follow.
Attendance of board meetings and voting, with others, may in certain limited
circumstances expose a director to personal liability to the company of which he is a
director or its creditors. But it does not, without more, constitute him a director of any
company of which his company is a director.

It is not alleged against Dr Hardwick that he did anything at all in relation to the   C
affairs of the company, not even that he voted as a director of Eagle Trust in respect of
any matter in relation to the affairs of the company.

In my judgment the mere fact that Dr Hardwick was a director of Eagle Trust does
not establish that he was either a shadow director or a de facto director of the company.
The expression 'collectively responsible' obscures the relevant legal relationship. By   D
reason of his appointment as a director of Eagle Trust, Dr Hardwick owed fiduciary
duties and a duty of care to Eagle Trust, but it does not follow that he ever gave
instructions to the directors of the company or that the directors of the company were
accustomed to act on his instructions. Nor does it follow that he ever acted as a director
of the company.

It is possible (although it is not so alleged) that the directors of Eagle Trust as a   E
collective body gave directions to the directors of the company and that the directors of
the company were accustomed to act in accordance with such directions. But if they did
give such directions as directors of Eagle Trust, acting as the board of Eagle Trust, they
did so as agents for Eagle Trust (or more accurately as the appropriate organ of Eagle
Trust) and the result is to constitute Eagle Trust, but not themselves, shadow directors of
the company.

In practice, in a case of the present kind, it is much more likely that it will be found   F
that the executive directors of the ultimate parent company (or some of them) have from
time to time individually and personally given directions to the directors of the subsidiary
and thereby rendered themselves personally liable as shadow directors of the subsidiary.
But if all they have done is to act in their capacity as directors of the ultimate holding
company, in passing resolutions at board meetings, then in my judgment the holding
company is the shadow director of the subsidiary, and they are not.          G

Against Mr Thomas, the liquidator has pleaded rather more. He has pleaded as
follows:

'1. [Mr Thomas] participated in the decision to sanction the disposal of Landsaver
19's assets to another company, Company 22, and Company 22 to Central Pacific
Securities and to [two named gentlemen], which disposals had the effect of
impeding the identification of the company's assets and of increasing the costs of   H
the liquidation.'

Then follows the same allegation as that against Dr Hardwick:

'2. Generally as a director of Eagle Trust [he] is, with the other directors thereof,
collectively responsible for the conduct of that company in relation to the
company.'

© 1994 CCH Editions Limited

ChD           Re Hydrodan (Corby) Ltd          **165**
                      *(Millett J)*

A      The first of those pleadings does not allege anything in relation to the affairs of the company. It does not in terms allege that Mr Thomas gave any directions to the directors of the company or that he acted in any way in relation to the company's affairs. On the contrary, all that he appears to have done is to have participated in a decision – I take it a decision of Eagle Trust – to sanction, that is, to approve or authorise, certain disposals not by the company, but by another company, Landsaver 19.

B      I find it difficult to extract from that pleading any relevant relationship between Mr Thomas and the company. But assuming that such a connection can be extracted, the most that is alleged against Mr Thomas is that as one of the directors of Eagle Trust, he was party to a decision by Eagle Trust to authorise or approve of a disposal of its assets by a wholly-owned subsidiary. That allegation in my judgment is not even sufficient to constitute Eagle Trust a shadow director of the company. It is a commonplace that the disposal of a subsidiary or a subsidiary's business by its directors would require the sanction or approval of the parent company, acting in this instance as the shareholder.

C      Provided that the decision is made by the directors of the subsidiary, exercising their own independent discretion and judgment whether or not to dispose of the assets in question, and that the parent company only approves or authorises the decision, then in my judgment there is nothing which exposes the parent company to liability for the decision or which constitutes it a shadow director of the subsidiary.

D      In my judgment therefore the liquidator has neither pleaded nor adduced any evidence to support any allegation that either Mr Thomas or Dr Hardwick is or was at any material time a director of the company. Accordingly the proceedings against those two defendants must fail and ought now to be struck out. I allow the appeals accordingly.

*(Order accordingly)*

———————————

E

F

G

H

A-9531

**[1999 CILR 126]**

**IN THE MATTER OF OMNI SECURITIES LIMITED (No. 4)**

*Grand Court*

(Smellie, C.J.)

**31 March 1999**

*Civil Procedure—pleading—amendment—time-barred claims—new cause of action barred by Limitation Law (1996 Revision), s.41(3) is new allegation of new loss or injury for which new remedy sought—alleged breach of contract or duty of care may be new claim even though coincided in time with breaches already pleaded and in same legal category*

*Civil Procedure—pleading—amendment—time-barred claims—no leave to amend under Grand Court Rules, O.20, r.5(2) and (5) to introduce otherwise time-barred claim if minimal overlap with issues already pleaded and extensive new factual inquiries required to answer allegations*

*Civil Procedure—pleading—amendment—time-barred claims—leave granted to amend under Grand Court Rules, O.20, r.5(2) and (5) to restore abandoned cause of action outside limitation period if original case reasonably pleaded upon legal advice and amendment in interests of justice—potential disruption to proceedings and closeness to trial date to be balanced against benefit to plaintiff in raising all relevant matters*

The plaintiff brought an action to recover damages from the defendants for breach of contract and negligent misstatement in the preparation of audit reports.

The second defendant, DH&S (Cayman), was appointed as the

EXHIBIT

5

accounts and answered various statutory inquiries, and the preparation of the annual audit report was carried out by its associated firm in Switzerland, the eighth defendant, D&T (Zurich). In proceedings against the two firms and their various partners following the plaintiff's liquidation, it alleged in its statement of claim that DH&S (Cayman) had acted in breach of its contract and that both firms had breached their duty of care in tort in failing to alert it to the financial consequences of unsecured loans which it had made to or obtained on behalf of other affiliated companies during 1988 and 1989. The plaintiff claimed for losses in relation to these loans and to payments made after the issue of the 1989 audit report to the owner of the Omni Group, Werner Rey, and private companies owned by him. The general endorsement on the writ included a claim in contract against D&T (Zurich) which was omitted from the statement of claim.

The plaintiff applied to amend its statement of claim (i) to correct or clarify factual matters, (ii) to allege (outside the statutory limitation period) breach of contract by D&T (Zurich) and its principals, (iii) to include claims (also potentially time-barred) for further losses arising from loans or advances to Rey and his private companies during 1988 and 1989, and (iv) to allege that since these transactions were unauthorized by its board and since Rey was a shadow director or agent of the company, they were performed in breach of fiduciary duty and contrary to Cayman law.

The plaintiff submitted that (a) the further claims in respect of the Rey transactions did not represent new causes of action for the purposes of s.41(1) and (3) of the Limitation Law (1996 Revision), since they were merely further examples of, and had occurred simultaneously with, causes of action already pleaded, namely, breach of contract and negligence; (b) even if the claims did constitute new causes of action, which were time-barred, the court should grant them leave to amend their pleading under the Limitation Law (1996 Revision), s.41(4) and (5) and the Grand Court Rules, O.20, r.5(2) and (5), since the losses had arisen from the factual circumstances already pleaded; (c) although the contractual claim against D&T (Zurich) had been omitted from the statement of claim upon erroneous advice, it had not been abandoned and could now be restored, since the defence alleged that a contractual relationship existed between D&T (Zurich) and the plaintiff's parent company, and therefore no great inconvenience or expense would be occasioned in answering the claim; and (d) the remaining amendments would simply correct or further particularize existing claims.

The defendants submitted in reply that (a) the claims arising from the Rey transactions did not fall within the causes of action already pleaded even though they arose at the same time and were founded in contract and tort; (b) therefore these new causes of action, which were time-barred under the Limitation Law, could not now be pleaded and the court should not grant the plaintiff leave to do so under s.41(4) and (5) and O.20, r.5(2) and (5), since the alleged breaches of duty and resulting losses raised

A-9533

1999 CILR                                                                                    GRAND CT.

issues which did not overlap with those pleaded; (c) the plaintiff should not now be permitted in response to D&T (Zurich)'s defence to allege that that firm had a contract with it, having staunchly denied that this was the case in related proceedings and having abandoned the claim as outlined in the writ; and (d) the addition of this claim (also time-barred) would cause unwarranted disruption to the time-tabling of the proceedings.

**Held,** making the following rulings:

(1) The plaintiff would be refused leave to amend its statement of claim to include claims in respect of the Rey transactions outside the limitation period, since they amounted to new causes of action for the purposes of the Limitation Law (1996 Revision), s.41(1) and (3). A new cause of action was defined as a new allegation giving rise to new loss or injury and for which a new remedy was sought, and since no claim had previously been made in respect of the Rey transactions during 1988–89, these were new claims in every respect, notwithstanding that the alleged breaches had coincided in time with those already pleaded and fell within the ambit of breach of contract and tort. Furthermore, the court had no jurisdiction to allow these amendments under O.20, r.5(2) and (5) of the Grand Court Rules as read with s.41(4) and (5) of the Law, since there was insufficient similarity between the factual issues now raised and those already pleaded, and the proposed amendments would require the defendants to answer new allegations relating to, *e.g.* shadow directorship, breach of fiduciary duty and agency, necessitating extensive and onerous new factual inquiries (page 133, lines 36–43; page 135, lines 3–9; page 136, line 14 – page 137, line 6; page 138, lines 15–36; page 139, line 23 – page 140, line 10).

(2) However, the plaintiff would be permitted to restore its claim in contract against D&T (Zurich) even though time-barred, since it arose from facts similar to those already pleaded and it was in the interests of justice that it should be revived. As the plaintiff had acted reasonably and diligently in pleading its case, given the different contractual positions adopted by both parties at different times in the history of the case, the fact that it had decided upon legal advice not to include the claim in the original statement of claim did not mean that it could not be added later. The court, in the exercise of its discretion, had to balance the interests of the plaintiff in raising all arguable issues for the court's consideration at trial, against the burden on the defendant of responding to the restored claim, any consequent disruption to the proceedings and whether any such disruption could be adequately compensated for by an order for costs against the plaintiff. The closer to the proposed trial date, the more disruptive such amendments were likely to be. Since the amendment could be made in this case without injustice to the defendant or other litigants from delay, the court would allow it (page 143, line 6 – page 144, line 4; page 145, lines 16–33; page 146, lines 22–42).

1999 CILR                                                         GRAND CT.

**Cases cited:**

(1) *Cellular Clothing Co. Ltd. v. G. White & Co. Ltd.* (1952), 70 R.P.C. 9, not followed.

(2) *Hydrocarbons Great Britain Ltd. v. Cammell Laird Shipbuilders Ltd. (No. 2)* (1991), 58 BLR 123, considered.

(3) *Hydrodam (Corby) Ltd., Re,* [1994] 2 BCLC 180; *sub nom. Re Hydrodan (Corby) Ltd.*, [1994] BCC 161.

(4) *Johnson v. Deloitte & Touche A.G.*, 1997 CILR 120.

(5) *Leicester Wholesale Fruit Market Ltd. v. Grundy (No. 2)* (1990), 53 BLR 6, *dicta* of Glidewell, L.J. applied.

(6) *Letang v. Cooper*, [1965] 1 Q.B. 237; [1964] 2 All E.R. 929.

(7) *Marshall v. London Passenger Transp. Bd.*, [1936] 3 All E.R. 83, *dicta* of Lord Wright, M.R. applied.

(8) *Steamship Mutual Underwriting Assn. Ltd. v. Trollope & Colls (City) Ltd.* (1986), 33 BLR 77; 6 Con. L.R. 11, followed.

(9) *Sterman v. E.W. & W.J. Moore*, [1970] 1 Q.B. 596; [1970] 1 All E.R. 581, not followed.

(10) *Swiss Bank & Trust Corp. v. Iorgulescu*, 1994–95 CILR 149, applied.

(11) *Welsh Dev. Agency v. Redpath Dorman Long Ltd.*, [1994] 1 W.L.R. 1409; [1994] 4 All E.R. 10.

(12) *Worldwide Corp. Ltd. v. G.P.T. Ltd.*, English Court of Appeal, December 2nd, 1998, unreported, *dicta* of Waller, L.J. applied.

**Legislation construed:**

Grand Court Rules, O.20, r.5: The relevant terms of this rule are set out at page 134, line 31 – page 135, line 2.

Limitation Law (1996 Revision) (Law 12 of 1991), s.41: The relevant terms of this section are set out at page 134, lines 1–29.

Insolvency Act 1986 (c.45), s.214(7): The relevant terms of this sub-section are set out at page 139, lines 17–18.

s.251: The relevant terms of this section are set out at page 139, lines 13–15.

*A. Turner* and *D.T.J. McCahill* for the plaintiff;

*J. Smouha* and *G.F. Ritchie* for the eighth defendant;

*N.R.L. Clifford* for the first to seventh, ninth and tenth defendants.

**SMELLIE, C.J.:** We have now reached the point along the
40  meandering course of this very complex case at which the plaintiff seeks leave to amend its statement of claim.

Notwithstanding that the amendments would affect more than 80 paragraphs and sub-paragraphs of the present pleading, the plaintiff contends that only one provision—that in the proposed new para. 17A
45  which seeks to add a claim in contract against the eighth defendant

A-9535

1999 CILR                                                        GRAND CT.

("D&T (Zurich)")—raises a new cause of action. The rest, Mr. Turner submitted, are simply intended to clarify and particularize the causes of action already pleaded and although they give rise to a claim for loss (for approximately SFr. 14.5m.) not previously pleaded, that that claim arises from the factual circumstances already pleaded and so should be allowed. The loss derives from transactions in 1988 and 1989 which appear in the plaintiff's ledgers for those years and which relate to Mr. Werner Rey and are referred to as "the Rey transactions." The context will be explained below.

Many of the proposed amendments do not attract criticism. There are others which have drawn objection from the defendants but which I accept can readily be regarded as intended only to particularize the existing claims. Examples are in the proposed re-drafted paras. 22A and 22B. I intend to allow these. These do not, it is to be noted, involve the Rey transactions. Thus it is that the proposed amendments relating to the Rey transactions and the proposed para. 17A give rise to the two main issues presented upon the present application:

1. Whether the Rey transactions constitute a new cause of action and if so, as it would now be statute-barred, whether this court has jurisdiction to allow the amendments to the pleadings. If satisfied that there is jurisdiction, I must then exercise my discretion as to whether to allow the amendments, and in that context criticisms of them—delay, illegality, inefficacy, inconsistency and embarrassment (in the technical sense)—would arise for consideration.

2. Notwithstanding that the proposed claim in contract against D&T (Zurich) (the proposed para. 17A) is acknowledged as arising from the same or substantially the same facts as already pleaded, D&T (Zurich) argues that it has been abandoned (having been asserted in the writ but not properly pleaded in the statement of claim) and now is statute-barred and so should not be allowed. In this context also, objections arise for the court to resolve in the exercise of its discretion, namely, delay, costs and prejudice (in the widest sense) to D&T (Zurich) as the defendant affected. None the less, the primary objection raised by D&T (Zurich) is that the claim was abandoned upon the plaintiff's election not to include it in the statement of claim.

It is significant to emphasize that from that broad outline of the two main issues are important threshold points of jurisdiction to be resolved.

*Background*

The plaintiff was a member of the world-wide Omni Group of companies based in Switzerland where the parent company, Omni Holdings A.G. ("OHAG"), had its headquarters.

The scale of the failure of the Omni group has assumed global and notorious proportions. Very much at the helm was Mr. Werner Rey, an

entrepreneur who, by all accounts, was the controlling and dominant force behind the board of directors of OHAG and officially its chairman. Rey is now the subject of criminal proceedings in Switzerland arising from his allegedly fraudulent mismanagement of the Omni Group. Rey

5 had also separately established a private empire of companies and portfolios which now comprise his estate in bankruptcy.

The Rey transactions relate to indebtedness which now stands in the books of the plaintiff, Omni Securities Ltd., as owing by Rey personally or by his private companies. They represent a deficit which at the end of

10 1988 and 1989 stood at the combined total sum of SFr. 14.5m. already mentioned. The pleadings also seek to allege that Rey was a shadow director and/or otherwise an agent of the plaintiff and owed it fiduciary duties which he breached by the abuse of his position for his own ends, and that this was or should have been known to the defendants and that

15 they, as the plaintiff's auditors, failed in their duties in not advising the plaintiff's board of the impropriety of the Rey transactions. Furthermore, as the result of that failure, the opportunity to recover the resultant debts, to obtain adequate security for them, or to take preventive action to avoid them, was lost.

20

*The pleadings*

The action is for breach of contract and negligence. As presently constituted the claims relate to the audit report for the financial year 1989. This report was dated March 16th, 1990.

25 The principal defendants are the second defendant ("DH&S (Cayman)") and D&T (Zurich). The allegations against the other defendants as partners or associates of DH&S (Cayman) (which is the successor firm to the first defendant) are derivative of and dependent upon any liability of DH&S (Cayman). DH&S (Cayman), D&T

30 (Cayman) and their individual partners and associates are also referred to as "the Cayman practice" and D&T (Zurich) and its predecessor firm as "the Swiss practice." As the pleadings presently stand, a contract is alleged to exist between the plaintiff and DH&S (Cayman) and a duty of care in tort is alleged to be owed by DH&S (Cayman) and by D&T

35 (Zurich).

By far the single largest head of loss claimed relates to what is called "the Harpener transaction," by which the plaintiff obtained loans totalling SFr. 563,637,000 on behalf of three German companies (affiliated within the Omni Group) to enable them to refinance the acquisition of 2.1m.

40 shares on behalf of OHAG in a large German conglomerate called Harpener A.G. The loan to the three German affiliates was completely unsecured and yet constituted, on the plaintiff's balance sheets, its single largest asset by way of receivables.

Notwithstanding that the plaintiff had itself given no security for the

45 loans (which were instead in the main secured by pledges of the Harpener

1999 CILR                                                       GRAND CT.

shares to the lending syndicate of banks and by a guarantee from the plaintiff's parent, OHAG), the plaintiff claims that the defendants' failure to advise its board about the true status of the loans resulted in a wholly misleading picture of the plaintiff's financial viability, and in the loss of
5    opportunity for redemptive action by its board to obtain security for or recovery of the loan.

    The statement of claim as presently pleaded also includes claims relating to receivables due from other affiliate Omni companies, *i.e.* loans which the plaintiff claims should not have been advanced given the
10   plaintiff's financial position at the respective points in time. These loans ("the three receivables," representing SFr. 3.8m., SFr. 8.4m. and SFr. 17.7m.) are described in paras. 42–46 of the statement of claim and are significant losses claimed to be attributable to the alleged breaches of duty. More to the point, however, is the fact that the statement of claim
15   also contains claims against the defendants for payments made to Rey or to his companies subsequent to the 1989 audit. These include sums in the amount of SFr. 28m. (the value of Omni entities shares transferred through the plaintiff's balance sheets to Rey) and SFr. 121.320,000 by way of advances or loans to Rey or for his benefit.

20   It is primarily by way of comparison to these pleaded losses more so than the others alleging Rey's dominance over the Omni Group (Harpener and the three receivables) that I must decide whether the Rey transactions which arose in 1988 and 1989 are new causes of action or whether they relate to and arise from matters already pleaded.

25

*The proposed amendments*

    For present purposes I can conveniently adopt the defendants' catego rization of the many proposed amendments by reference to whether or not they are opposed and the grounds for opposition. Thus they fall into four
30   broad categories and are helpfully described in an analytical schedule prepared by Mr. Smouha as follows:

    *Category 1*: The amendments to which the defendants do not object. These involve 59 amendments which in the main are typographical or factual errors or merely clarifying in nature. Two of these—the re-drafted
35   paras. 23.3A and 63A—are averments of reliance upon the audit report by the plaintiff and were in fact allowed earlier during proceedings in March 1998.

    Having considered the proposed amendments being raised in this category, I intend to allow them.

40   *Category 2*: Amendments objected to because they are described as seeking to add new causes of action after the expiry of the relevant limitation period. Those relating to Rey and to the Rey transactions are all objected to as falling within this category. So also are those in the proposed para. 17A which seek to plead the cause of action in contract
45   against D&T (Zurich).

*Category 3*: Amendments described as seeking to add claims which had been encompassed within the general endorsement of the writ but which were abandoned by their omission from the statement of claim. This is the principal ground of objection to the proposed para. 17A. It is
5    also the basis for objection to the proposed para. 46F in so far as it would include Rey transactions during 1988 which were entered on the plaintiff's transactions ledger for that year.

As already noted, in the general endorsement to the writ there were claims both in contract and in tort against all defendants in respect of both
10   audit years 1988 and 1989. The statement of claim omitted claims for 1988 and any claim in contract against D&T (Zurich). In his second affidavit, Mr. Johnson, one of the plaintiff's liquidators, explained that this was because after "extensive investigations" and consultations with his "expert advisers," he had concluded that "there was no basis for a
15   claim based on [D&T (Zurich)'s] audit of the plaintiff's financial statements for the period ending December 31st, 1988."

*Category 4*: Amendments which should not be allowed for being contrary to the rules of pleadings because: (a) they would be bound to fail in law; (b) they have no consequence in terms of relief sought; (c) they
20   are inconsistent with matters already pleaded; (d) they are not sufficiently particularized as to justify their inclusion in the pleading; and/or (e) they are for some other reason pointless, embarrassing (in the technical sense) *etc.* and therefore no purpose is to be served by allowing them.

There was considerable overlap between the categories into which
25   some amendments were argued by Mr. Smouha as falling. I consider that for present purposes it would be tedious in the extreme to attempt an analysis of the impugned amendments by reference to each ground of objection. What I propose to do instead is to consider first those relating to the Rey transactions as a group, then those relating to the claim in
30   contract against D&T (Zurich); first by reference to the threshold points of jurisdiction and then, depending on whether there is jurisdiction, by reference to the other grounds of objection.

*The Rey transactions*

35   *Jurisdiction*

The financial years of the plaintiff in issue here were 1988 and 1989 and it was in respect of the latter that the audit report dated March 16th, 1990 was issued. As a result, any claims in contract or tort arising now some 9–10 years later would be *prima facie* time-barred. The plaintiff
40   accepts this to be so.

However, the Grand Court Rules, O.20, r.5, taken with s.41 of the Limitation Law (1996 Revision), vests jurisdiction in the court to allow a new cause of action if certain pre-conditions are satisfied. I set out the relevant provisions first of the Limitation Law (1996 Revision), then of
45   the Grand Court Rules. Section 41 reads:

1999 CILR                                                    GRAND CT.

"(1) For the purposes of this Law, any new claim made in the course of an action shall be deemed to be a separate action and to have been commenced in the case of—

(a) a new claim made in or by way of third party proceedings…; and

(b) any other claim, on the same date as the original action.

(2) In this section—

'new claim' means a claim by way of set-off or counterclaim, and a claim involving the addition or substitution of…a new cause of action….

(3) Except as provided by section 39 or by rules of court, a court shall not allow a new claim within paragraph (b) of subsection (1), other than an original set-off or original counterclaim, to be made in the course of an action after the expiry of any time limit under this Law which would affect a new action to enforce that claim….

(4) Rules of court may provide for allowing a new claim to which subsection (3) applies to be made as therein mentioned, but only if the conditions specified in subsection (5) are satisfied, and subject to any further restrictions the rules may impose.

(5) The conditions referred to in subsection (4) are in the case of a claim involving—

(a) a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on [sic] any claim previously made in the original action….

….

(9) In this section—

'rules of court' means rules made under section 19(3) of the Grand Court Law (1995 Revision)…."

The Grand Court Rules, O.20, r.5 provides as follows:

"(1)…[T]he Court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct.

(2) Where an application to the Court for leave to make the amendment mentioned in paragraph…(5) is made after any relevant period of limitation current at the date of issue of the writ has expired, the Court may nevertheless grant such leave in the circumstances mentioned in that paragraph if it thinks it just to do so.

….

(5) An amendment may be allowed under paragraph (2) notwithstanding that the effect of the amendment will be to add or substitute a new cause of action if [it] arises out of the same facts or substantially the same facts as a cause of action in respect of which relief

134

1999 CILR                                                      GRAND CT.

has already been claimed in the action by the party applying for
leave to make the amendment."

The effect of those provisions is first, that if the claim gives rise to a new
cause of action but does not arise out of the same or substantially the
same facts as are already in issue, the court has no jurisdiction to grant
leave to amend. Secondly, even if that first test is met, the court's
discretion is to be exercised by reference to what is necessary in the
interests of doing justice in the case and having regard particularly to
other grounds for objection.

*New cause of action*

The first issue then is whether the Rey transactions comprise a new
cause of action. Paragraphs 46A–F introduce for the first time in the
pleadings references to (I quote from proposed para. 46A) "a consid
erable number of transactions with Mr. Rey which are evidenced in the
general ledger accounts" of the plaintiff for 1988 and 1989.

The proposed para. 46B reads: "The debit transactions comprised
moneys advanced and/or lent to Mr. Rey or for his benefit, transfers of
shares to Mr. Rey and to companies and entities for the ultimate benefit of
Mr. Rey and interest on amounts owed by Mr. Rey."

The proposed paras. 46C–E then go on to allege that the indebtedness
was entirely unsecured, that the transactions were entered into without
authority on the part of the plaintiff as they were not approved by the
plaintiff's board and were, in the circumstances, in breach of Cayman
law, as Rey was also a shadow director and/or agent of the plaintiff.

In the proposed para. 46F the averments would go on to allege that the
pattern of movements on the balance sheets (which showed small deficit
balances at the end of 1988 and 1989 despite much larger deficits during
the year) was "probably orchestrated to hide the true extent of Rey's true
and/or typical indebtedness to the plaintiff during the course of the year."
From those alleged factual particulars, the pleadings progress to allege
breaches of duty in the proposed para. 61.11, by the averment that the
audit report failed to warn that the net deficits in Rey's accounts with the
plaintiff (1988—SFr. 4,693,720; 1989—SFr. 11,645,863) were
unsecured, interest-bearing and repayable on demand and failed to warn
of the real maxima which the transactions had attained throughout the
year. The defendants should have expressed their findings and
conclusions—had they conducted the audits in the manner required—that
the loans to Rey were not approved by the plaintiff's board of directors
and were improper, as the plaintiff had no interest in entering into them.
And, as the loans had been advanced to Mr. Rey in breach of Cayman
law, the outstanding balances ought to have been repaid by Mr. Rey or
proper security obtained.

Finally, the proposed pleadings go on to allege the consequences of the
breaches, namely, had the defendants not been in breach of their duties

135

1999 CILR                                            GRAND CT.

they would have brought the attention of the plaintiff's board to the
unlawfulness of the Rey transactions, and the Board would have taken all
appropriate steps to recover the outstanding balances or to obtain security.
Furthermore, as regards 1989 and thereafter, they would have taken steps
5    to prevent any further transfers of shares or advances or loans for Rey's
benefit in breach of Cayman law. A further consequence to be alleged
would be the loss of opportunity to recover the sum of SFr. 14,593,363
plus interest—the balance on the Rey account prior to March 16th, 1990.

So we see for the first time in the pleadings reference to these
10   transactions with Rey in 1988 and 1989 and the allegation that, as he was
a shadow director and/or agent of the plaintiff, they were illegal and gave
rise to duties, breaches of those duties on the part of the auditors, and
consequential losses.

Mr. Turner submitted that these new pleadings do not raise a new cause
15   of action, as they come within the context of those already pleaded in the
writ: breach of contract, breach of duty, negligence, negligent
misstatement and breach of statutory duty, in relation to the plaintiff's
financial affairs. And in these new averments the plaintiff is merely
giving further examples of the defendant's breach of contract and/or
20   negligence.

On the contrary, I concluded that all the elements of the new
pleadings—factual averments, alleged breaches and alleged losses—
amount to a new cause of action not pleaded before. They go beyond the
mere particularization of existing claims. As Diplock, L.J. (as he then
25   was) stated in *Letang* v. *Cooper* (6) ([1965] 1 Q.B. at 242–243): "A cause
of action is simply a factual situation the existence of which entitles one
person to obtain from the court a remedy against another person." Lord
Wright, M.R., in an earlier pre-O.20, r.5 case, *Marshall* v. *London
Passenger Transp. Bd.* (7), said ([1936] 3 All E.R. at 88) that a new cause
30   of action arises where—

"the proposed amendment [would involve] a quite different set of
ideas, quite a different allegation of fact…. [It] would, if allowed…
set up a new cause of action involving quite new considerations,
quite new sets of facts, and quite new causes of damage and injury,
35   and the only point of similarity would be that the plaintiff had
suffered certain injuries."

I note here in passing that in adopting these definitions of a cause of
action, I prefer them to the narrower meaning, adopted in other cases, *e.g.
Sterman* v. *E.W. & W.J. Moore* (10), in reference only to the legal head of
40   claim, *i.e.* a simple statement in an endorsement such as "breach of
contract" or "deceit," and which is the meaning which Mr. Turner submits
should be adopted. Apropos the test in *Marshall* v. *London Passenger
Transp. Bd.*, a sufficiently pleaded allegation of breach of fiduciary duty
is made for the first time in respect of the Rey transactions for 1988 and
45   1989 by the proposed amendments and, if approved, they would seek the

new remedy of damages in the amounts of the deficits from the Rey transactions—damages also not pleaded before.

I think that when the test is stated in this way it clearly illustrates the further error in the approach, which the plaintiff seeks to advance, that the issues fell to be examined by the defendants within the same audit year as those already pleaded and therefore are part of the same cause of action.

The experience of the courts in building disputes has given rise to a substantial body of case law in this area. One practical reason is that defects which give rise to causes of action often appear at different times notwithstanding that the breaches of duty occurred at the time of construction and so questions of further pleadings or new causes of action often arise in that context.

A leading case of the kind is *Steamship Mutual Underwriting Assn. Ltd.* v. *Trollope & Colls (City) Ltd.* (8), where, after the expiry of the period of limitation, the plaintiff sought to amend the statement of claim to add new claims in respect of defects which came to light only after the action based on other defects had begun. The plaintiff's arguments, which failed, included the proposition that as the later defects were after all only different defects to the same building, they should be regarded as constituting the same cause of action.

A similar decision is appropriate here in response to the argument that the breaches complained of in relation to the Rey transactions do not constitute a new cause of action because they occurred ultimately during the course of a single audit (that for the year 1989).

*Same or similar facts*

Upon that conclusion on the first aspect of the test, the amendments must be disallowed unless they arise from the same or similar facts. In the *Steamship Mutual* case the court was required also to consider this issue. I find the approach taken there to be helpful here in this respect also. Similar provisions of the English limitation statute were applied as are under consideration here and the decision of the court dealing with both aspects of the test appears from the following passage from the headnote to the case in the *Building Law Reports* (33 BLR at 78):

"(2) The amendments raised new claims for the purposes of section 35 of the Limitation Act 1980:

(a) whether or not a proposed amendment would introduce a new claim or claims within section 35 of the Limitation Acts 1980 was a mixed question of law and fact and a matter of degree. The original statement of claim narrowed the causes of action to those concerned with air-conditioning….

per May L.J.: 'In the light of the definitions of a cause of action already referred to, [citing *Letang* v. *Cooper*] I do not think one can look only to the duty [of] a party, but one

137

must look also at the nature and extent of the breach relied upon, as well as to the nature and extent of the damage complained of in deciding whether, as a matter of degree, a new cause of action is sought to be relied upon. The mere fact that one is considering what are, as it is said, after all only different defects to the same building, does not necessarily mean that in any way they are constituents of one and the same [cause] of action....'

(b) Further whether or not the cause of action the subject of the proposed amendment arose out of the same or substantially the same set of facts within the meaning of O.20 r.5(5) was also a question of degree; the judge had correctly determined that there was insufficient overlap and that therefore he had no jurisdiction to allow the amendments."

I should go further to explain that while the comparison to be made is "a matter of degree" and of "impression" (*Welsh Dev. Agency* v. *Redpath Dorman Long Ltd.* (11) ([1994] 1 W.L.R. at 1418, *per* Glidewell, L.J.), in this case I find the differences to be stark and obvious. Here I find there to be the clearest of distinctions between the present issues—the Rey transactions—and those already pleaded. And it is to be emphasized that that is indeed the test, *i.e.* whether the similarity is to be found between the present factual issues and those already pleaded and not, as the plaintiff's submissions would suggest, whether the legal heads of claim or types of causes of action which it seeks to plead are similar to those already pleaded, nor, as Mr. Turner argued, whether the alleged duties, breaches of duty and alleged losses are substantially the same.

Another manner of approaching the question is from the point of view of the degree of overlap between the issues, namely whether, and if so to what extent, the proposed amendments would result in prejudice to the eighth defendant or any of them in having to deal with the factual matters raised by them: see *Hydrocarbons Great Britain Ltd.* v. *Cammell Laird Shipbuilders Ltd.* (2).

In this case the wide extent of the factual investigations which the defendants would necessarily undertake to meet the new allegations is a fair indicator and, to my mind, illustrative of their dissimilarity to, or absence of overlap with the existing pleadings. Mr. Smouha described at least three areas of investigation which, I accept, would have to be undertaken in respect of just one of the proposed issues, *i.e.* whether Rey was a shadow director of the plaintiff (assuming for the moment the legality of such an averment). These would be: (a) whether in respect of each transaction the directors of the plaintiff accepted and acted upon an instruction from Rey as opposed to a request; (b) whether the instruction was carried out without the application of the *de jure* director's mind as to whether the instructions should (in the interests of the company) be complied with; and (c) whether the instructions form part of a pattern

1999 CILR                                                    GRAND CT.

within the context of the company's business as a whole. This inevitably involves consideration of the transaction by comparison with the totality of the company's transactions.

These are issues which would arise, as I have noted, assuming the
5   legality of the proposed averment and by reference to the concept of "shadow director" as definitively encompassing those specific elements of the relationship between Rey and the plaintiff's board of directors: see *Re Hydrodam (Corby) Ltd.* (3) ([1994] 2 BCLC at 183, *per* Millett, J.), where those elements and the definitions of the concept of shadow
10   director are discussed.

The concept comes from the English Insolvency Act 1986, s.251, a provision for which there is no equivalent in Cayman statute law. Section 251 provides: "'[S]hadow director' in relation to a company, means a person in accordance with whose directions or instructions the directors
15   of the company are accustomed to act…." Section 214(7) provides that for certain purposes of the Act (including the imposition of responsi bilities and liabilities attached to the office of director) "'director' includes a shadow director."

Although I doubt that the concept separately exists at common law so
20   as to be part of Cayman law for the purposes of ascribing fiduciary responsibilities to persons who appear to be in the factual relationship of shadow directors, I need not and do not make any such finding now.

For present purposes, reference to the proposed pleading that raises this entirely new legal issue suffices to give an example of the extent to
25   which departures from the existing pleadings would occur. Currently there is only a general reference to Mr. Rey's "dominance" over OHAG and hence over the Omni Group, including the plaintiff.

Mr. Turner conceded that for the averment of shadow directorship to succeed, the court would need to rely upon the definition of that concept
30   as developed in English law. That, as we have seen, carries different legal consequences from a general averment of "dominance." And a fiduciary relationship between Rey and the plaintiff would be essential to liability in respect of the Rey transactions, for otherwise there would be no *prima facie* illegality or impropriety in the transaction upon which the auditors
35   were obliged to report or advise. Thus inevitably an inquiry into the entirely new issue of shadow directorship would arise. The same is true of the alternative pleading of a relationship of agency between Rey and the plaintiff.

I consider that those findings serve adequately to illustrate why I am
40   unable to accept the plaintiff's contention that the new claims based on the Rey transactions arise out of the same or similar facts already at issue in the pleadings. In summary, the facts already pleaded relate to the Harpener transaction, the three receivables and advances to Rey made post-March 1990. No reference is made to the Rey transactions in 1988 or
45   1989. On the face of the ledgers taken by themselves, this would call for

1999 CILR                                                                    GRAND CT.

inquiries into whether over 70 separate transactions were somehow conducted in breach of the alleged fiduciary duties of Rey as shadow director or, for that matter, as agent of the plaintiff. The Rey transactions cited in the present schedule to the statement of claim are all post-March
5    16th, 1990—the date of the audit report—and, by contrast, do not rely for proof upon any alleged breach of fiduciary duty on his part.

Upon the conclusion that there is no overlap or similarity between the issues, the result is that I have no jurisdiction to allow the proposed amendments in respect of the Rey transactions and so the application for
10    leave to that extent must be refused.


*The claim in contract against D&T (Zurich) (amended para. 17A)*

The plaintiff's case as it stands is that it entered a contract with the Cayman defendants (through the second defendant) but that to the extent
15    that D&T (Zurich) carried out part of the audit field work, D&T (Zurich) owed a duty *in tort* to the plaintiff in respect of that work. Thus, at present and as already noted, there is no claim *in contract* against D&T (Zurich) and the proposed para. 17A would seek to plead that claim.

In its defence the second defendant denies that it was a party to a
20    contract with the plaintiff. D&T (Zurich), for its part, denies that a contract was made with the plaintiff as opposed to the plaintiff's parent company OHAG, but accepts that if the plaintiff was a party to a contract, it was with D&T (Zurich). Given that state of uncertainty in the present state of the pleadings, it is not surprising that the plaintiff would wish to
25    plead in the alternative that D&T (Zurich) was party to a contract with it.

The issue now—that of whether the plaintiff has abandoned that claim—can only be resolved by further reference to the history of the pleadings. The case, as originally broadly formulated in the general endorsement to the writ, included in para. 1 a claim in damages for breach
30    of contract against D&T (Zurich). However, as was noted above, a deliberate decision was taken not to include that claim in the statement of claim. Mr. Johnson explains in his affidavits that after "extensive investi gations" and after having consulted his "expert advisers" he was satisfied that the alternative claim in contract against D&T (Zurich) should not be
35    pleaded but that the statement of claim should include the claim that the second defendant was in fact the plaintiff's auditor.

Among the factors taken into account then was, importantly, that the second defendant had actually signed and issued the audit reports for 1988 and 1989 in unqualified terms. Mr. Johnson also asserts his own
40    surprise that D&T (Zurich), in its defence, now admits that it had a contract with OHAG to conduct the plaintiff's audit or that it might arguably be regarded as owing such contractual duties to the plaintiff itself. This form of defence would, of course, serve to refute the claim in contract against the Cayman defendants.

45    Much was made of this matter of Mr. Johnson's "surprise" in the

A-9546

1999 CILR                                                            GRAND CT.

arguments for D&T (Zurich). Mr. Smouha in particular sought to lay emphasis on the circumstances which would suggest the contrary. These are described in detail in Mr. Ritchie's second affidavit. This contains a narrative of the plaintiff's assertions in relation to the contractual
5   relationships in this and in two other related causes of action: Cause No. 93 of 1992 and Cause No. 147 of 1996. Cause No. 93 of 1992 was an application by the plaintiff's liquidators against the Cayman defendants, as the former auditors of the plaintiff, for the production of documents relating to the plaintiff's affairs.

10   From my review of the correspondence exchanged between the liquidators and the Cayman defendants in that case, it is clear that issue was taken over the status of the defendants as a result of which it emerged, on the part of the Cayman defendants, that they asserted that D&T (Zurich) was the primary auditor and the Cayman defendants the
15   secondary auditors of the plaintiff. But this assertion did not emerge without some confusion, as I think is shown from the affidavit of Mr. Michael Pilling (a partner in the first defendant) filed in Cause No. 93 of 1992 on September 11th, 1995: "In the Omni situation the Swiss firm is clearly 'primary' *as auditor of the parent company* of Omni Securities
20   whereas Cayman is 'secondary' as auditor of record of the subsidiary…." [Emphasis supplied.]

On that occasion neither the second defendant nor D&T (Zurich) itself responded (although not a party, the latter could have) by way of asserting an unqualified contractual relationship either with OHAG or the plaintiff.
25   I think it is fair to say that confusion reigned over this issue throughout Cause No. 147 of 1996 as well. In that action, *Johnson* v. *Deloitte & Touche A.G.* (4), D&T (Zurich) claimed *locus standi* as the former auditor of the plaintiff to apply to remove the liquidators on the basis of the liquidators' alleged conflict of interests. D&T (Zurich) relied on the
30   evidence of Mr. David Wilson, who stated in his affidavit:

"The audit report was signed by the Cayman practice on March 23rd, 1990. However, as I have already explained, it was in fact the Swiss practice which actually carried out the audit work and the Cayman practice signed the audit report in reliance on that work. A
35   similar arrangement applied for the non-consolidated financial statements as at December 31st, 1989."

To my mind, the fact that this passage distinguished the roles of the Cayman and Swiss practices (the Cayman defendants and D&T (Zurich), respectively) without going so far as to admit in unequivocal terms the
40   respective contractual relationships, is significant to understanding the liquidators' attitude to the pleading of the claim in contract. At no stage prior to the filing of D&T (Zurich)'s defence was there a positive acceptance of an arguable claim in contract as between the plaintiff itself (as distinct from OHAG) and D&T (Zurich).

45   In *Johnson* v. *Deloitte & Touche A.G. (4)* the Court of Appeal was

1999 CILR                                                          GRAND CT.

invited to assume the correctness of the evidence relied upon by D&T (Zurich) and so to regard D&T (Zurich) as the primary auditor of the plaintiff. The conflict application proceeded on that basis. This, however, was against the background also asserted, that the Cayman practice had actually signed off the relevant auditor reports.

5

Now that the plaintiff is asserting in this action the alternative duty in contract against D&T (Zurich), it has had to abandon, at my insistence, the assertion—maintained in *Johnson v. Deloitte & Touche A.G.* even up to the appeal by D&T (Zurich) before the Privy Council—that D&T (Zurich) was not its auditor.

10

The fact that there was not, before the filing of its defence, any positive assertion that D&T (Zurich) was *contractually* responsible for the plaintiff's audit does not necessarily imply deliberate equivocation on the part of the defendants. They have consistently asserted that D&T (Zurich) was the *primary* auditor of the Omni Group and thus of the plaintiff.

15

But that, to my mind, is an insufficient basis for concluding, as I am being asked by the defendants to conclude, that the liquidators were or should always have been aware that the defendants would aver that D&T (Zurich) was, to the exclusion of the Cayman defendants, contractually responsible for the audits. A passage from an affidavit sworn by Mr. Johnson on March 13th, 1995 (in support of his application for leave to serve the writ outside the jurisdiction upon D&T (Zurich)) is illustrative of the fluid mental state which I find existed over this issue from the earliest stages:

20

25        "Deloitte & Touche A.G. [D&T (Zurich)] audited the intended plaintiff's financial statements for the year ended December 31st, 1990…. Although [D&T (Cayman)] signed the audit reports relating to the financial statements for the years ending December 31st, 1988 and December 31st, 1990, *it is likely that* Deloitte &
30        Touche A.G. provided assistance to [D&T (Cayman)] in the preparations of the audit reports relating to the financial statements for the year ended December 31st, 1988 and December 31st, 1989. The company (*i.e.* the plaintiff) is part of the Omni Group of companies based in Switzerland. The primary auditor of the *Omni*
35        *Group* was Deloitte & Touche A.G." [Emphasis supplied.]

The distinction between its relationship with OHAG as the parent company and the plaintiff as subsidiary is still maintained even on the present state of D&T (Zurich)'s defence. Given that background, the issue for me now is whether I should regard the decision of the liquidators
40   not to plead the claim in contract against D&T (Zurich), when settling the statement of claim, as an abandonment of that claim.

It is to my mind not insignificant here that we are considering the decision of professional men acting in an official, not personal, capacity and in so doing, upon the advice of other professionals as to the
45   significance within the accounting profession of the inter-practice

142

1999 CILR                                                              GRAND CT.

relationships of primary and secondary audit functions. These are
relationships giving rise to contractual roles in regard to which—given
the modern and relatively recent phenomenon of transnational audits and
liquidations—there were no determinative judicial pronouncements to
5  guide their decisions.

The real question then is whether Mr. Johnson, having determined
upon advice, primarily because the Cayman practice signed off the audits,
that they and not D&T (Zurich) were contractually responsible, should be
deemed to have abandoned any such claim in contract against D&T
10  (Zurich). A brief overview of the legal principles will, I believe, help to
inform the decision to the contrary at which I have arrived.

The claim in contract against D&T (Zurich), not having been included
in the statement of claim, is now time-barred and the right to plead this in
defence to that claim has accrued to D&T (Zurich). The court none the
15  less has the power to allow the claim at this stage arising as it does—and
as is conceded by D&T (Zurich)—from the same or similar facts already
in issue on the existing claim.

But not to be overlooked are the renewed strain and expense which a
restored claim in contract will visit, ultimately, upon the individual
20  members of D&T (Zurich) against whose professional conduct the
allegations are levelled. Just what should be the proper scope of
contractual duties—assuming such duties were owed—will be a matter of
considerable complexity in the circumstances of this case as will the
issues which D&T (Zurich) will have to address. Allowing the
25  amendment will therefore be a matter of great concern to them. That,
however, is only one side of the balance to be struck in the assessment of
the interests of justice.

As yet, no procedural consequences of the amendment have been
identified by D&T (Zurich) which cannot be addressed by an order for
30  costs. Thus, this is not a case where the amendment will greatly disrupt
the procedural steps remaining until trial or result in the vacating of any
fixture already made. There will be no need, given the similarity of the
issues to those already pleaded, for a fundamental change in approach to
the preparations for trial. While the modern approach to judicial case
35  management requires the court to be more vigilant against abuses of the
system, it is still the law in the Cayman Islands that an amendment which
is necessary to allow a party properly to plead his case without injustice
to the other side will normally be made: see *Swiss Bank & Trust Corp.*
Ltd. v. *Iorgulescu (10)*.

40  I do accept, though, that this statement of principle is to be qualified by
appropriate sanctions in the light of the modern approach to litigation,
including refusal where a party has so disrupted the flow of the
proceedings as to visit hardship and inconvenience upon the other side
which cannot adequately be addressed by an order for costs. Moreover,
45  the modern approach will take into account not just the disruption to the

143

A-9549

1999 CILR                                                          GRAND CT.

affairs of the present parties but also the effect upon other litigants whose access to justice may be delayed. The closer the amendments proposed come to the actual date for trial, the more disruptive all round they are likely to be and so are more likely to be refused.

5    An example of such disruption and of the modern approach of dealing with it by refusal can be found in *Worldwide Corp. Ltd.* v. *G.P.T. Ltd.* (12) in the English Court of Appeal. The following passage, which I find to be compelling, appears in the judgment of Waller, L.J.:

10    "…[I]n previous eras it was more readily assumed that if the amending party paid his opponent the costs of an adjournment that was sufficient compensation to that opponent. In the modern era it is more readily recognized that in truth, payment of the costs of an adjournment may well not adequately compensate someone who is desirous of being rid of a piece of litigation which has been hanging
15    over his head for some time, and may not adequately compensate him for being totally (and we are afraid there is no better word for it) 'mucked around' at the last moment. Furthermore, the courts are now much more conscious that in assessing the justice of a particular case, the disruption caused to other litigants by last-
20    minute adjournments and last-minute applications have also to be brought into the scales.

    Take this very case. By attempting a last-minute amendment a trial has had to be interrupted by argument over some days, the challenge to the judge's order has to be dealt with by the Court of
25    Appeal as a matter of urgency, with serious disruption to its list and other litigants, and if the amendment were allowed there would have to be a further delay in the trial coming on and/or a last-minute lengthening of the trial which may cause serious inconvenience in the Commercial Court and thus to other litigants."

30    There is, to my mind, nothing in the law and rules of procedure of our courts which would preclude the application of those considerations and a similar result in an appropriate case. In the *Iorgulescu* case (10) itself, the court laid emphasis upon the consideration of potential prejudice to the other parties as a result of the amendment allowed.

35    I note also that even in the eight short years since that case was decided, litigation has developed apace in this jurisdiction and the demands upon the system now more than ever justify the consideration of potential disruption and prejudice to other cases and litigants. Those comments are, however, made *de bene esse* and in passing.

40    Here, it is in the plaintiff's favour that the more egregious consequences of amendment such as would have followed in the *Worldwide Corp.* case (12) will not arise. But there are other legal issues to address. *Dicta* from the still developing case law in this area would suggest that once abandoned after a deliberate election, a claim remains
45    abandoned.

144

A-9550

1999 CILR                                                                    GRAND CT.

This was the view expressed by Harman, J. after a review of the earlier cases, in *Cellular Clothing Co. Ltd.* v. *G. White & Co. Ltd.* (1) (70 R.P.C. at 12):

> "Once abandoned, the claim remains abandoned, and it does not lie
5      in the mouth of the Plaintiff to say 'Now I should like to put it back again.' If it be, as I think it probably is, a matter of discretion, I refuse leave, because the Plaintiffs, having deliberately taken the course they did and announced to the world and to the Defendants
10     that the only particulars which they were going to rely upon were such and such, now sought to rely on other particulars altogether, which either were, or ought to have been, within their knowledge before they issued their writ, and, indeed, were the reason, so it is said, why the writ was originally issued. In my judgment, it would be quite wrong to allow an amendment of this sort under those
15     circumstances."

That test would ascribe a strict responsibility to a claimant who has made an informed (or deemed informed) election not to plead a claim and rejects the court's discretion to look objectively at the requisites of justice in the particular case.

20     When it is viewed in that way I do not regard that to be the appropriate test. I do not think that the test is so strict as to preclude the exercise of discretion in an appropriate case, notwithstanding that a deliberate election has been made. This must be so where—as I find to be the case here—the election was one made reasonably, if mistakenly, in the
25     exercise of professional judgment in their official capacity and before the wisdom of pleading the alternative claim in contract against D&T (Zurich) became clear to them. No question of the earlier conflict allegation against the liquidators has arisen here.

The existence of the discretionary power to be exercised in the
30     interests of justice is also recognized in the *Iorgulescu* case (10) It appears also to be recognized in the English Court of Appeal decision in *Leicester Wholesale Fruit Market Ltd.* v. *Grundy (No. 2)* (5), where the *Cellular Clothing* decision was considered. The following appears in the judgment of Glidewell, L.J. (53 BLR at 14–15):

35     > "The argument relating to abandonment requires more detailed consideration.
>
> The judge's approach to the problem [at first instance] is set out [in] the judgment. He said:
>
40     >> 'I think that the true principle, whether a plaintiff abandons or elects not to proceed with a claim made in the statement of claim, is that the court has the discretion to allow the claim to be revived, but will not exercise it in favour of the plaintiff unless a good explanation is given for the dropping of the claim and the desire to revive it'.
>
45     > Applying that principle he considered whether the plaintiff had a

good explanation, decided that it had, and therefore allowed the amendment.

Mr. Knight submits that the judge was in error in adopting this principle. He argues that the question the judge should have asked himself was, had the plaintiff discovered, or might it with reasonable diligence have discovered, before abandoning the claim for breach of contract [the particular facts disclosing the breach]? If so, then the plaintiff should not be allowed to reinstate its claim in this respect.

Mr. Knight relies on a passage in the judgment of Harman, J. in *Cellular Clothing Co. Ltd.* v. *White & Co. Ltd....*" He then referred to the judgment of Harman, J. quoted above and continued (*ibid.*, at 17):

"The only task for this court is to decide whether the judge was right to allow amendments so as to permit the plaintiff to seek to establish that the cause of action against [the defendant] did not arise until the facts alleged to have been concealed were discovered, or could with reasonable diligence have been discovered, i.e. in October 1986 at the earliest.

…[I] think that the learned judge applied the correct test, and came to the correct conclusion on this issue."

Stated in that manner, the discretion to be exercised is certainly not without its limits. The claimant must show that he has acted reasonably and diligently in the case he had chosen to plead. Those strictures are only fair, particularly in a case where the claim to be revived is one which is time-barred and so has given rise to an accrued defence of limitation. But that having been said, the discretion is to be exercised ultimately in the interests of justice—that is the rationale for the power given in the Law and the Rules. The requirement that the same or similar factual premises must exist is in and of itself a protection for defendants against the prejudice of having to respond to new or amended claims which they could not anticipate.

Although in this case it cannot be said that the defendants in any way concealed the full and true nature of the contractual relationships from the plaintiff, given the nature of the intra-relationships of the plaintiff within the Omni Group, uncertainty or indecisiveness on the part of the liquidators about that matter is understandable. And, as the evidence shows, there were and continue to be strategic positions taken on both sides in the pleadings and affidavits on this very issue.

For all the foregoing reasons, I conclude that it would be in the interests of justice in this case to allow the plaintiff to restore its claim in contract against D&T (Zurich).

As regards the various other proposed amendments not yet specifically addressed, I think I need only make specific mention of those in paras. 34A, 60.1, 61.2 and 61.6, which I will allow. I consider those to be

A-9552

1999 CILR                                                    GRAND CT.

nothing more than an elaboration of the existing pleadings re Harpener and the three receivables.

5    Other proposed amendments, many not objected to, I will deal with as shown by reference to the schedule in the analysis prepared by Mr. Smouha.

*Order accordingly.*

*W.S. Walker & Co.* for the plaintiff; *Charles Adams, Ritchie, Duckworth& Co.* for the eighth defendant; *Hunter & Hunter* for the other defendants.

147

A-9553

**[1999 CILR 126]**

**IN THE MATTER OF OMNI SECURITIES LIMITED (No. 4)**

*Grand Court*

(Smellie, C.J.)

**31 March 1999**

*Civil Procedure—pleading—amendment—time-barred claims—new cause of action barred by Limitation Law (1996 Revision), s.41(3) is new allegation of new loss or injury for which new remedy sought—alleged breach of contract or duty of care may be new claim even though coincided in time with breaches already pleaded and in same legal category*

*Civil Procedure—pleading—amendment—time-barred claims—no leave to amend under Grand Court Rules, O.20, r.5(2) and (5) to introduce otherwise time-barred claim if minimal overlap with issues already pleaded and extensive new factual inquiries required to answer allegations*

*Civil Procedure—pleading—amendment—time-barred claims—leave granted to amend under Grand Court Rules, O.20, r.5(2) and (5) to restore abandoned cause of action outside limitation period if original case reasonably pleaded upon legal advice and amendment in interests of justice—potential disruption to proceedings and closeness to trial date to be balanced against benefit to plaintiff in raising all relevant matters*

   The plaintiff brought an action to recover damages from the defendants for breach of contract and negligent misstatement in the preparation of audit reports.

   The second defendant, DH&S (Cayman), was appointed as the

EXHIBIT
5

accounts and answered various statutory inquiries, and the preparation of the annual audit report was carried out by its associated firm in Switzerland, the eighth defendant, D&T (Zurich). In proceedings against the two firms and their various partners following the plaintiff's liquidation, it alleged in its statement of claim that DH&S (Cayman) had acted in breach of its contract and that both firms had breached their duty of care in tort in failing to alert it to the financial consequences of unsecured loans which it had made to or obtained on behalf of other affiliated companies during 1988 and 1989. The plaintiff claimed for losses in relation to these loans and to payments made after the issue of the 1989 audit report to the owner of the Omni Group, Werner Rey, and private companies owned by him. The general endorsement on the writ included a claim in contract against D&T (Zurich) which was omitted from the statement of claim.

The plaintiff applied to amend its statement of claim (i) to correct or clarify factual matters, (ii) to allege (outside the statutory limitation period) breach of contract by D&T (Zurich) and its principals, (iii) to include claims (also potentially time-barred) for further losses arising from loans or advances to Rey and his private companies during 1988 and 1989, and (iv) to allege that since these transactions were unauthorized by its board and since Rey was a shadow director or agent of the company, they were performed in breach of fiduciary duty and contrary to Cayman law.

The plaintiff submitted that (a) the further claims in respect of the Rey transactions did not represent new causes of action for the purposes of s.41(1) and (3) of the Limitation Law (1996 Revision), since they were merely further examples of, and had occurred simultaneously with, causes of action already pleaded, namely, breach of contract and negligence; (b) even if the claims did constitute new causes of action, which were time-barred, the court should grant them leave to amend their pleading under the Limitation Law (1996 Revision), s.41(4) and (5) and the Grand Court Rules, O.20, r.5(2) and (5), since the losses had arisen from the factual circumstances already pleaded; (c) although the contractual claim against D&T (Zurich) had been omitted from the statement of claim upon erroneous advice, it had not been abandoned and could now be restored, since the defence alleged that a contractual relationship existed between D&T (Zurich) and the plaintiff's parent company, and therefore no great inconvenience or expense would be occasioned in answering the claim; and (d) the remaining amendments would simply correct or further particularize existing claims.

The defendants submitted in reply that (a) the claims arising from the Rey transactions did not fall within the causes of action already pleaded even though they arose at the same time and were founded in contract and tort; (b) therefore these new causes of action, which were time-barred under the Limitation Law, could not now be pleaded and the court should not grant the plaintiff leave to do so under s.41(4) and (5) and O.20, r.5(2) and (5), since the alleged breaches of duty and resulting losses raised

A-9555

1999 CILR                                                         GRAND CT.

issues which did not overlap with those pleaded; (c) the plaintiff should not now be permitted in response to D&T (Zurich)'s defence to allege that that firm had a contract with it, having staunchly denied that this was the case in related proceedings and having abandoned the claim as outlined in the writ; and (d) the addition of this claim (also time-barred) would cause unwarranted disruption to the time-tabling of the proceedings.

**Held,** making the following rulings:

(1) The plaintiff would be refused leave to amend its statement of claim to include claims in respect of the Rey transactions outside the limitation period, since they amounted to new causes of action for the purposes of the Limitation Law (1996 Revision), s.41(1) and (3). A new cause of action was defined as a new allegation giving rise to new loss or injury and for which a new remedy was sought, and since no claim had previously been made in respect of the Rey transactions during 1988–89, these were new claims in every respect, notwithstanding that the alleged breaches had coincided in time with those already pleaded and fell within the ambit of breach of contract and tort. Furthermore, the court had no jurisdiction to allow these amendments under O.20, r.5(2) and (5) of the Grand Court Rules as read with s.41(4) and (5) of the Law, since there was insufficient similarity between the factual issues now raised and those already pleaded, and the proposed amendments would require the defendants to answer new allegations relating to, *e.g.* shadow directorship, breach of fiduciary duty and agency, necessitating extensive and onerous new factual inquiries (page 133, lines 36–43; page 135, lines 3–9; page 136, line 14 – page 137, line 6; page 138, lines 15–36; page 139, line 23 – page 140, line 10).

(2) However, the plaintiff would be permitted to restore its claim in contract against D&T (Zurich) even though time-barred, since it arose from facts similar to those already pleaded and it was in the interests of justice that it should be revived. As the plaintiff had acted reasonably and diligently in pleading its case, given the different contractual positions adopted by both parties at different times in the history of the case, the fact that it had decided upon legal advice not to include the claim in the original statement of claim did not mean that it could not be added later. The court, in the exercise of its discretion, had to balance the interests of the plaintiff in raising all arguable issues for the court's consideration at trial, against the burden on the defendant of responding to the restored claim, any consequent disruption to the proceedings and whether any such disruption could be adequately compensated for by an order for costs against the plaintiff. The closer to the proposed trial date, the more disruptive such amendments were likely to be. Since the amendment could be made in this case without injustice to the defendant or other litigants from delay, the court would allow it (page 143, line 6 – page 144, line 4; page 145, lines 16–33; page 146, lines 22–42).

1999 CILR                                                        GRAND CT.

**Cases cited:**

(1) *Cellular Clothing Co. Ltd. v. G. White & Co. Ltd.* (1952), 70 R.P.C. 9, not followed.

(2) *Hydrocarbons Great Britain Ltd. v. Cammell Laird Shipbuilders Ltd. (No. 2)* (1991), 58 BLR 123, considered.

(3) *Hydrodam (Corby) Ltd., Re,* [1994] 2 BCLC 180; *sub nom. Re Hydrodan (Corby) Ltd.*, [1994] BCC 161.

(4) *Johnson v. Deloitte & Touche A.G.*, 1997 CILR 120.

(5) *Leicester Wholesale Fruit Market Ltd. v. Grundy (No. 2)* (1990), 53 BLR 6, *dicta* of Glidewell, L.J. applied.

(6) *Letang v. Cooper*, [1965] 1 Q.B. 237; [1964] 2 All E.R. 929.

(7) *Marshall v. London Passenger Transp. Bd.*, [1936] 3 All E.R. 83, *dicta* of Lord Wright, M.R. applied.

(8) *Steamship Mutual Underwriting Assn. Ltd. v. Trollope & Colls (City) Ltd.* (1986), 33 BLR 77; 6 Con. L.R. 11, followed.

(9) *Sterman v. E.W. & W.J. Moore*, [1970] 1 Q.B. 596; [1970] 1 All E.R. 581, not followed.

(10) *Swiss Bank & Trust Corp. v. Iorgulescu*, 1994–95 CILR 149, applied.

(11) *Welsh Dev. Agency v. Redpath Dorman Long Ltd.*, [1994] 1 W.L.R. 1409; [1994] 4 All E.R. 10.

(12) *Worldwide Corp. Ltd. v. G.P.T. Ltd.*, English Court of Appeal, December 2nd, 1998, unreported, *dicta* of Waller, L.J. applied.

**Legislation construed:**

Grand Court Rules, O.20, r.5: The relevant terms of this rule are set out at page 134, line 31 – page 135, line 2.

Limitation Law (1996 Revision) (Law 12 of 1991), s.41: The relevant terms of this section are set out at page 134, lines 1–29.

Insolvency Act 1986 (c.45), s.214(7): The relevant terms of this sub-section are set out at page 139, lines 17–18.

s.251: The relevant terms of this section are set out at page 139, lines 13–15.

*A. Turner* and *D.T.J. McCahill* for the plaintiff;

*J. Smouha* and *G.F. Ritchie* for the eighth defendant;

*N.R.L. Clifford* for the first to seventh, ninth and tenth defendants.

    **SMELLIE,   C.J.:**   We   have   now   reached   the   point   along   the
40   meandering course of this very complex case at which the plaintiff seeks leave to amend its statement of claim.

    Notwithstanding   that   the   amendments   would   affect   more   than   80 paragraphs   and   sub-paragraphs   of   the   present   pleading,   the   plaintiff contends   that   only   one   provision—that   in   the   proposed   new   para.   17A
45   which   seeks   to   add   a   claim   in   contract   against   the   eighth   defendant

1999 CILR                                                        GRAND CT.

("D&T (Zurich)")—raises a new cause of action. The rest, Mr. Turner submitted, are simply intended to clarify and particularize the causes of action already pleaded and although they give rise to a claim for loss (for approximately SFr. 14.5m.) not previously pleaded, that that claim arises from the factual circumstances already pleaded and so should be allowed. The loss derives from transactions in 1988 and 1989 which appear in the plaintiff's ledgers for those years and which relate to Mr. Werner Rey and are referred to as "the Rey transactions." The context will be explained below.

Many of the proposed amendments do not attract criticism. There are others which have drawn objection from the defendants but which I accept can readily be regarded as intended only to particularize the existing claims. Examples are in the proposed re-drafted paras. 22A and 22B. I intend to allow these. These do not, it is to be noted, involve the Rey transactions. Thus it is that the proposed amendments relating to the Rey transactions and the proposed para. 17A give rise to the two main issues presented upon the present application:

1. Whether the Rey transactions constitute a new cause of action and if so, as it would now be statute-barred, whether this court has jurisdiction to allow the amendments to the pleadings. If satisfied that there is jurisdiction, I must then exercise my discretion as to whether to allow the amendments, and in that context criticisms of them—delay, illegality, inefficacy, inconsistency and embarrassment (in the technical sense)—would arise for consideration.

2. Notwithstanding that the proposed claim in contract against D&T (Zurich) (the proposed para. 17A) is acknowledged as arising from the same or substantially the same facts as already pleaded, D&T (Zurich) argues that it has been abandoned (having been asserted in the writ but not properly pleaded in the statement of claim) and now is statute-barred and so should not be allowed. In this context also, objections arise for the court to resolve in the exercise of its discretion, namely, delay, costs and prejudice (in the widest sense) to D&T (Zurich) as the defendant affected. None the less, the primary objection raised by D&T (Zurich) is that the claim was abandoned upon the plaintiff's election not to include it in the statement of claim.

It is significant to emphasize that from that broad outline of the two main issues are important threshold points of jurisdiction to be resolved.

*Background*

The plaintiff was a member of the world-wide Omni Group of companies based in Switzerland where the parent company, Omni Holdings A.G. ("OHAG"), had its headquarters.

The scale of the failure of the Omni group has assumed global and notorious proportions. Very much at the helm was Mr. Werner Rey, an

1999 CILR                                                        GRAND CT.

entrepreneur who, by all accounts, was the controlling and dominant force behind the board of directors of OHAG and officially its chairman. Rey is now the subject of criminal proceedings in Switzerland arising from his allegedly fraudulent mismanagement of the Omni Group. Rey had also separately established a private empire of companies and portfolios which now comprise his estate in bankruptcy.

The Rey transactions relate to indebtedness which now stands in the books of the plaintiff, Omni Securities Ltd., as owing by Rey personally or by his private companies. They represent a deficit which at the end of 1988 and 1989 stood at the combined total sum of SFr. 14.5m. already mentioned. The pleadings also seek to allege that Rey was a shadow director and/or otherwise an agent of the plaintiff and owed it fiduciary duties which he breached by the abuse of his position for his own ends, and that this was or should have been known to the defendants and that they, as the plaintiff's auditors, failed in their duties in not advising the plaintiff's board of the impropriety of the Rey transactions. Furthermore, as the result of that failure, the opportunity to recover the resultant debts, to obtain adequate security for them, or to take preventive action to avoid them, was lost.

*The pleadings*

The action is for breach of contract and negligence. As presently constituted the claims relate to the audit report for the financial year 1989. This report was dated March 16th, 1990.

The principal defendants are the second defendant ("DH&S (Cayman)") and D&T (Zurich). The allegations against the other defendants as partners or associates of DH&S (Cayman) (which is the successor firm to the first defendant) are derivative of and dependent upon any liability of DH&S (Cayman). DH&S (Cayman), D&T (Cayman) and their individual partners and associates are also referred to as "the Cayman practice" and D&T (Zurich) and its predecessor firm as "the Swiss practice." As the pleadings presently stand, a contract is alleged to exist between the plaintiff and DH&S (Cayman) and a duty of care in tort is alleged to be owed by DH&S (Cayman) and by D&T (Zurich).

By far the single largest head of loss claimed relates to what is called "the Harpener transaction," by which the plaintiff obtained loans totalling SFr. 563,637,000 on behalf of three German companies (affiliated within the Omni Group) to enable them to refinance the acquisition of 2.1m. shares on behalf of OHAG in a large German conglomerate called Harpener A.G. The loan to the three German affiliates was completely unsecured and yet constituted, on the plaintiff's balance sheets, its single largest asset by way of receivables.

Notwithstanding that the plaintiff had itself given no security for the loans (which were instead in the main secured by pledges of the Harpener

shares to the lending syndicate of banks and by a guarantee from the plaintiff's parent, OHAG), the plaintiff claims that the defendants' failure to advise its board about the true status of the loans resulted in a wholly misleading picture of the plaintiff's financial viability, and in the loss of
5   opportunity for redemptive action by its board to obtain security for or recovery of the loan.

The statement of claim as presently pleaded also includes claims relating to receivables due from other affiliate Omni companies, *i.e.* loans which the plaintiff claims should not have been advanced given the
10  plaintiff's financial position at the respective points in time. These loans ("the three receivables," representing SFr. 3.8m., SFr. 8.4m. and SFr. 17.7m.) are described in paras. 42–46 of the statement of claim and are significant losses claimed to be attributable to the alleged breaches of duty. More to the point, however, is the fact that the statement of claim
15  also contains claims against the defendants for payments made to Rey or to his companies subsequent to the 1989 audit. These include sums in the amount of SFr. 28m. (the value of Omni entities shares transferred through the plaintiff's balance sheets to Rey) and SFr. 121.320,000 by way of advances or loans to Rey or for his benefit.

20  It is primarily by way of comparison to these pleaded losses more so than the others alleging Rey's dominance over the Omni Group (Harpener and the three receivables) that I must decide whether the Rey transactions which arose in 1988 and 1989 are new causes of action or whether they relate to and arise from matters already pleaded.

25

*The proposed amendments*

For present purposes I can conveniently adopt the defendants' categorization of the many proposed amendments by reference to whether or not they are opposed and the grounds for opposition. Thus they fall into four
30  broad categories and are helpfully described in an analytical schedule prepared by Mr. Smouha as follows:

*Category 1*: The amendments to which the defendants do not object. These involve 59 amendments which in the main are typographical or factual errors or merely clarifying in nature. Two of these—the re-drafted
35  paras. 23.3A and 63A—are averments of reliance upon the audit report by the plaintiff and were in fact allowed earlier during proceedings in March 1998.

Having considered the proposed amendments being raised in this category, I intend to allow them.

40  *Category 2*: Amendments objected to because they are described as seeking to add new causes of action after the expiry of the relevant limitation period. Those relating to Rey and to the Rey transactions are all objected to as falling within this category. So also are those in the proposed para. 17A which seek to plead the cause of action in contract
45  against D&T (Zurich).

A-9560

1999 CILR                                                            GRAND CT.

*Category 3*: Amendments described as seeking to add claims which had been encompassed within the general endorsement of the writ but which were abandoned by their omission from the statement of claim. This is the principal ground of objection to the proposed para. 17A. It is
5    also the basis for objection to the proposed para. 46F in so far as it would include Rey transactions during 1988 which were entered on the plaintiff's transactions ledger for that year.

As already noted, in the general endorsement to the writ there were claims both in contract and in tort against all defendants in respect of both
10   audit years 1988 and 1989. The statement of claim omitted claims for 1988 and any claim in contract against D&T (Zurich). In his second affidavit, Mr. Johnson, one of the plaintiff's liquidators, explained that this was because after "extensive investigations" and consultations with his "expert advisers," he had concluded that "there was no basis for a
15   claim based on [D&T (Zurich)'s] audit of the plaintiff's financial statements for the period ending December 31st, 1988."

*Category 4*: Amendments which should not be allowed for being contrary to the rules of pleadings because: (a) they would be bound to fail in law; (b) they have no consequence in terms of relief sought; (c) they
20   are inconsistent with matters already pleaded; (d) they are not sufficiently particularized as to justify their inclusion in the pleading; and/or (e) they are for some other reason pointless, embarrassing (in the technical sense) *etc.* and therefore no purpose is to be served by allowing them.

There was considerable overlap between the categories into which
25   some amendments were argued by Mr. Smouha as falling. I consider that for present purposes it would be tedious in the extreme to attempt an analysis of the impugned amendments by reference to each ground of objection. What I propose to do instead is to consider first those relating to the Rey transactions as a group, then those relating to the claim in
30   contract against D&T (Zurich); first by reference to the threshold points of jurisdiction and then, depending on whether there is jurisdiction, by reference to the other grounds of objection.

*The Rey transactions*

35   *Jurisdiction*

The financial years of the plaintiff in issue here were 1988 and 1989 and it was in respect of the latter that the audit report dated March 16th, 1990 was issued. As a result, any claims in contract or tort arising now some 9–10 years later would be *prima facie* time-barred. The plaintiff
40   accepts this to be so.

However, the Grand Court Rules, O.20, r.5, taken with s.41 of the Limitation Law (1996 Revision), vests jurisdiction in the court to allow a new cause of action if certain pre-conditions are satisfied. I set out the relevant provisions first of the Limitation Law (1996 Revision), then of
45   the Grand Court Rules. Section 41 reads:

1999 CILR                                                        GRAND CT.

"(1) For the purposes of this Law, any new claim made in the course of an action shall be deemed to be a separate action and to have been commenced in the case of—

(a) a new claim made in or by way of third party proceedings…; and

(b) any other claim, on the same date as the original action.

(2) In this section—

'new claim' means a claim by way of set-off or counterclaim, and a claim involving the addition or substitution of…a new cause of action….

(3) Except as provided by section 39 or by rules of court, a court shall not allow a new claim within paragraph (b) of subsection (1), other than an original set-off or original counterclaim, to be made in the course of an action after the expiry of any time limit under this Law which would affect a new action to enforce that claim….

(4) Rules of court may provide for allowing a new claim to which subsection (3) applies to be made as therein mentioned, but only if the conditions specified in subsection (5) are satisfied, and subject to any further restrictions the rules may impose.

(5) The conditions referred to in subsection (4) are in the case of a claim involving—

(a) a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on [sic] any claim previously made in the original action….

….

(9) In this section—

'rules of court' means rules made under section 19(3) of the Grand Court Law (1995 Revision)…."

The Grand Court Rules, O.20, r.5 provides as follows:

"(1)…[T]he Court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct.

(2) Where an application to the Court for leave to make the amendment mentioned in paragraph…(5) is made after any relevant period of limitation current at the date of issue of the writ has expired, the Court may nevertheless grant such leave in the circumstances mentioned in that paragraph if it thinks it just to do so.

….

(5) An amendment may be allowed under paragraph (2) notwith standing that the effect of the amendment will be to add or substitute a new cause of action if [it] arises out of the same facts or substan tially the same facts as a cause of action in respect of which relief

has already been claimed in the action by the party applying for leave to make the amendment."

The effect of those provisions is first, that if the claim gives rise to a new cause of action but does not arise out of the same or substantially the same facts as are already in issue, the court has no jurisdiction to grant leave to amend. Secondly, even if that first test is met, the court's discretion is to be exercised by reference to what is necessary in the interests of doing justice in the case and having regard particularly to other grounds for objection.

*New cause of action*

The first issue then is whether the Rey transactions comprise a new cause of action. Paragraphs 46A–F introduce for the first time in the pleadings references to (I quote from proposed para. 46A) "a consid erable number of transactions with Mr. Rey which are evidenced in the general ledger accounts" of the plaintiff for 1988 and 1989.

The proposed para. 46B reads: "The debit transactions comprised moneys advanced and/or lent to Mr. Rey or for his benefit, transfers of shares to Mr. Rey and to companies and entities for the ultimate benefit of Mr. Rey and interest on amounts owed by Mr. Rey."

The proposed paras. 46C–E then go on to allege that the indebtedness was entirely unsecured, that the transactions were entered into without authority on the part of the plaintiff as they were not approved by the plaintiff's board and were, in the circumstances, in breach of Cayman law, as Rey was also a shadow director and/or agent of the plaintiff.

In the proposed para. 46F the averments would go on to allege that the pattern of movements on the balance sheets (which showed small deficit balances at the end of 1988 and 1989 despite much larger deficits during the year) was "probably orchestrated to hide the true extent of Rey's true and/or typical indebtedness to the plaintiff during the course of the year." From those alleged factual particulars, the pleadings progress to allege breaches of duty in the proposed para. 61.11, by the averment that the audit report failed to warn that the net deficits in Rey's accounts with the plaintiff (1988—SFr. 4,693,720; 1989—SFr. 11,645,863) were unsecured, interest-bearing and repayable on demand and failed to warn of the real maxima which the transactions had attained throughout the year. The defendants should have expressed their findings and conclusions—had they conducted the audits in the manner required—that the loans to Rey were not approved by the plaintiff's board of directors and were improper, as the plaintiff had no interest in entering into them. And, as the loans had been advanced to Mr. Rey in breach of Cayman law, the outstanding balances ought to have been repaid by Mr. Rey or proper security obtained.

Finally, the proposed pleadings go on to allege the consequences of the breaches, namely, had the defendants not been in breach of their duties

they would have brought the attention of the plaintiff's board to the
unlawfulness of the Rey transactions, and the Board would have taken all
appropriate steps to recover the outstanding balances or to obtain security.
Furthermore, as regards 1989 and thereafter, they would have taken steps
5   to prevent any further transfers of shares or advances or loans for Rey's
benefit in breach of Cayman law. A further consequence to be alleged
would be the loss of opportunity to recover the sum of SFr. 14,593,363
plus interest—the balance on the Rey account prior to March 16th, 1990.

So we see for the first time in the pleadings reference to these
10  transactions with Rey in 1988 and 1989 and the allegation that, as he was
a shadow director and/or agent of the plaintiff, they were illegal and gave
rise to duties, breaches of those duties on the part of the auditors, and
consequential losses.

Mr. Turner submitted that these new pleadings do not raise a new cause
15  of action, as they come within the context of those already pleaded in the
writ: breach of contract, breach of duty, negligence, negligent
misstatement and breach of statutory duty, in relation to the plaintiff's
financial affairs. And in these new averments the plaintiff is merely
giving further examples of the defendant's breach of contract and/or
20  negligence.

On the contrary, I concluded that all the elements of the new
pleadings—factual averments, alleged breaches and alleged losses—
amount to a new cause of action not pleaded before. They go beyond the
mere particularization of existing claims. As Diplock, L.J. (as he then
25  was) stated in *Letang* v. *Cooper* (6) ([1965] 1 Q.B. at 242–243): "A cause
of action is simply a factual situation the existence of which entitles one
person to obtain from the court a remedy against another person." Lord
Wright, M.R., in an earlier pre-O.20, r.5 case, *Marshall* v. *London
Passenger Transp. Bd.* (7), said ([1936] 3 All E.R. at 88) that a new cause
30  of action arises where—

"the proposed amendment [would involve] a quite different set of
ideas, quite a different allegation of fact…. [It] would, if allowed…
set up a new cause of action involving quite new considerations,
quite new sets of facts, and quite new causes of damage and injury,
35  and the only point of similarity would be that the plaintiff had
suffered certain injuries."

I note here in passing that in adopting these definitions of a cause of
action, I prefer them to the narrower meaning, adopted in other cases, *e.g.
Sterman* v. *E.W. & W.J. Moore* (10), in reference only to the legal head of
40  claim, *i.e.* a simple statement in an endorsement such as "breach of
contract" or "deceit," and which is the meaning which Mr. Turner submits
should be adopted. Apropos the test in *Marshall* v. *London Passenger
Transp. Bd.*, a sufficiently pleaded allegation of breach of fiduciary duty
is made for the first time in respect of the Rey transactions for 1988 and
45  1989 by the proposed amendments and, if approved, they would seek the

A-9564

1999 CILR                                                          GRAND CT.

new remedy of damages in the amounts of the deficits from the Rey transactions—damages also not pleaded before.

I think that when the test is stated in this way it clearly illustrates the further error in the approach, which the plaintiff seeks to advance, that the issues fell to be examined by the defendants within the same audit year as those already pleaded and therefore are part of the same cause of action.

The experience of the courts in building disputes has given rise to a substantial body of case law in this area. One practical reason is that defects which give rise to causes of action often appear at different times notwithstanding that the breaches of duty occurred at the time of construction and so questions of further pleadings or new causes of action often arise in that context.

A leading case of the kind is *Steamship Mutual Underwriting Assn. Ltd.* v. *Trollope & Colls (City) Ltd.* (8), where, after the expiry of the period of limitation, the plaintiff sought to amend the statement of claim to add new claims in respect of defects which came to light only after the action based on other defects had begun. The plaintiff's arguments, which failed, included the proposition that as the later defects were after all only different defects to the same building, they should be regarded as constituting the same cause of action.

A similar decision is appropriate here in response to the argument that the breaches complained of in relation to the Rey transactions do not constitute a new cause of action because they occurred ultimately during the course of a single audit (that for the year 1989).

*Same or similar facts*

Upon that conclusion on the first aspect of the test, the amendments must be disallowed unless they arise from the same or similar facts. In the *Steamship Mutual* case the court was required also to consider this issue. I find the approach taken there to be helpful here in this respect also. Similar provisions of the English limitation statute were applied as are under consideration here and the decision of the court dealing with both aspects of the test appears from the following passage from the headnote to the case in the *Building Law Reports* (33 BLR at 78):

"(2) The amendments raised new claims for the purposes of section 35 of the Limitation Act 1980:

(a) whether or not a proposed amendment would introduce a new claim or claims within section 35 of the Limitation Acts 1980 was a mixed question of law and fact and a matter of degree. The original statement of claim narrowed the causes of action to those concerned with air-conditioning….

per May L.J.: 'In the light of the definitions of a cause of action already referred to, [citing *Letang* v. *Cooper*] I do not think one can look only to the duty [of] a party, but one

137

1999 CILR                                                        GRAND CT.

must look also at the nature and extent of the breach relied upon, as well as to the nature and extent of the damage complained of in deciding whether, as a matter of degree, a new cause of action is sought to be relied upon. The mere
5    fact that one is considering what are, as it is said, after all only different defects to the same building, does not necessarily mean that in any way they are constituents of one and the same [cause] of action….'

10   (b) Further whether or not the cause of action the subject of the proposed amendment arose out of the same or substantially the same set of facts within the meaning of O.20 r.5(5) was also a question of degree; the judge had correctly determined that there was insufficient overlap and that therefore he had no jurisdiction to allow the amendments."

15   I should go further to explain that while the comparison to be made is "a matter of degree" and of "impression" (*Welsh Dev. Agency* v. *Redpath Dorman Long Ltd.* (11) ([1994] 1 W.L.R. at 1418, *per* Glidewell, L.J.), in this case I find the differences to be stark and obvious. Here I find there to be the clearest of distinctions between the present issues—the Rey
20   transactions—and those already pleaded. And it is to be emphasized that that is indeed the test, *i.e.* whether the similarity is to be found between the present factual issues and those already pleaded and not, as the plaintiff's submissions would suggest, whether the legal heads of claim or types of causes of action which it seeks to plead are similar to those
25   already pleaded, nor, as Mr. Turner argued, whether the alleged duties, breaches of duty and alleged losses are substantially the same.

Another manner of approaching the question is from the point of view of the degree of overlap between the issues, namely whether, and if so to what extent, the proposed amendments would result in prejudice to the
30   eighth defendant or any of them in having to deal with the factual matters raised by them: see *Hydrocarbons Great Britain Ltd.* v. *Cammell Laird Shipbuilders Ltd.* (2).

In this case the wide extent of the factual investigations which the defendants would necessarily undertake to meet the new allegations is a
35   fair indicator and, to my mind, illustrative of their dissimilarity to, or absence of overlap with the existing pleadings. Mr. Smouha described at least three areas of investigation which, I accept, would have to be undertaken in respect of just one of the proposed issues, *i.e.* whether Rey was a shadow director of the plaintiff (assuming for the moment the
40   legality of such an averment). These would be: (a) whether in respect of each transaction the directors of the plaintiff accepted and acted upon an instruction from Rey as opposed to a request; (b) whether the instruction was carried out without the application of the *de jure* director's mind as to whether the instructions should (in the interests of the company) be
45   complied with; and (c) whether the instructions form part of a pattern

within the context of the company's business as a whole. This inevitably involves consideration of the transaction by comparison with the totality of the company's transactions.

5 These are issues which would arise, as I have noted, assuming the legality of the proposed averment and by reference to the concept of "shadow director" as definitively encompassing those specific elements of the relationship between Rey and the plaintiff's board of directors: see *Re Hydrodam (Corby) Ltd.* (3) ([1994] 2 BCLC at 183, *per* Millett, J.), where those elements and the definitions of the concept of shadow 10 director are discussed.

The concept comes from the English Insolvency Act 1986, s.251, a provision for which there is no equivalent in Cayman statute law. Section 251 provides: "'[S]hadow director' in relation to a company, means a person in accordance with whose directions or instructions the directors 15 of the company are accustomed to act…." Section 214(7) provides that for certain purposes of the Act (including the imposition of responsi bilities and liabilities attached to the office of director) "'director' includes a shadow director."

Although I doubt that the concept separately exists at common law so 20 as to be part of Cayman law for the purposes of ascribing fiduciary responsibilities to persons who appear to be in the factual relationship of shadow directors, I need not and do not make any such finding now.

For present purposes, reference to the proposed pleading that raises this entirely new legal issue suffices to give an example of the extent to 25 which departures from the existing pleadings would occur. Currently there is only a general reference to Mr. Rey's "dominance" over OHAG and hence over the Omni Group, including the plaintiff.

Mr. Turner conceded that for the averment of shadow directorship to succeed, the court would need to rely upon the definition of that concept 30 as developed in English law. That, as we have seen, carries different legal consequences from a general averment of "dominance." And a fiduciary relationship between Rey and the plaintiff would be essential to liability in respect of the Rey transactions, for otherwise there would be no *prima facie* illegality or impropriety in the transaction upon which the auditors 35 were obliged to report or advise. Thus inevitably an inquiry into the entirely new issue of shadow directorship would arise. The same is true of the alternative pleading of a relationship of agency between Rey and the plaintiff.

I consider that those findings serve adequately to illustrate why I am 40 unable to accept the plaintiff's contention that the new claims based on the Rey transactions arise out of the same or similar facts already at issue in the pleadings. In summary, the facts already pleaded relate to the Harpener transaction, the three receivables and advances to Rey made post-March 1990. No reference is made to the Rey transactions in 1988 or 45 1989. On the face of the ledgers taken by themselves, this would call for

inquiries into whether over 70 separate transactions were somehow conducted in breach of the alleged fiduciary duties of Rey as shadow director or, for that matter, as agent of the plaintiff. The Rey transactions cited in the present schedule to the statement of claim are all post-March
5   16th, 1990—the date of the audit report—and, by contrast, do not rely for proof upon any alleged breach of fiduciary duty on his part.

Upon the conclusion that there is no overlap or similarity between the issues, the result is that I have no jurisdiction to allow the proposed amendments in respect of the Rey transactions and so the application for
10  leave to that extent must be refused.

*The claim in contract against D&T (Zurich) (amended para. 17A)*

The plaintiff's case as it stands is that it entered a contract with the Cayman defendants (through the second defendant) but that to the extent
15  that D&T (Zurich) carried out part of the audit field work, D&T (Zurich) owed a duty *in tort* to the plaintiff in respect of that work. Thus, at present and as already noted, there is no claim *in contract* against D&T (Zurich) and the proposed para. 17A would seek to plead that claim.

In its defence the second defendant denies that it was a party to a
20  contract with the plaintiff. D&T (Zurich), for its part, denies that a contract was made with the plaintiff as opposed to the plaintiff's parent company OHAG, but accepts that if the plaintiff was a party to a contract, it was with D&T (Zurich). Given that state of uncertainty in the present state of the pleadings, it is not surprising that the plaintiff would wish to
25  plead in the alternative that D&T (Zurich) was party to a contract with it.

The issue now—that of whether the plaintiff has abandoned that claim—can only be resolved by further reference to the history of the pleadings. The case, as originally broadly formulated in the general endorsement to the writ, included in para. 1 a claim in damages for breach
30  of contract against D&T (Zurich). However, as was noted above, a deliberate decision was taken not to include that claim in the statement of claim. Mr. Johnson explains in his affidavits that after "extensive investigations" and after having consulted his "expert advisers" he was satisfied that the alternative claim in contract against D&T (Zurich) should not be
35  pleaded but that the statement of claim should include the claim that the second defendant was in fact the plaintiff's auditor.

Among the factors taken into account then was, importantly, that the second defendant had actually signed and issued the audit reports for 1988 and 1989 in unqualified terms. Mr. Johnson also asserts his own
40  surprise that D&T (Zurich), in its defence, now admits that it had a contract with OHAG to conduct the plaintiff's audit or that it might arguably be regarded as owing such contractual duties to the plaintiff itself. This form of defence would, of course, serve to refute the claim in contract against the Cayman defendants.

45  Much was made of this matter of Mr. Johnson's "surprise" in the

1999 CILR                                                        GRAND CT.

arguments for D&T (Zurich). Mr. Smouha in particular sought to lay emphasis on the circumstances which would suggest the contrary. These are described in detail in Mr. Ritchie's second affidavit. This contains a narrative of the plaintiff's assertions in relation to the contractual
5   relationships in this and in two other related causes of action: Cause No. 93 of 1992 and Cause No. 147 of 1996. Cause No. 93 of 1992 was an application by the plaintiff's liquidators against the Cayman defendants, as the former auditors of the plaintiff, for the production of documents relating to the plaintiff's affairs.

10   From my review of the correspondence exchanged between the liquidators and the Cayman defendants in that case, it is clear that issue was taken over the status of the defendants as a result of which it emerged, on the part of the Cayman defendants, that they asserted that D&T (Zurich) was the primary auditor and the Cayman defendants the
15   secondary auditors of the plaintiff. But this assertion did not emerge without some confusion, as I think is shown from the affidavit of Mr. Michael Pilling (a partner in the first defendant) filed in Cause No. 93 of 1992 on September 11th, 1995: "In the Omni situation the Swiss firm is clearly 'primary' *as auditor of the parent company* of Omni Securities
20   whereas Cayman is 'secondary' as auditor of record of the subsidiary…." [Emphasis supplied.]

On that occasion neither the second defendant nor D&T (Zurich) itself responded (although not a party, the latter could have) by way of asserting an unqualified contractual relationship either with OHAG or the plaintiff.
25   I think it is fair to say that confusion reigned over this issue throughout Cause No. 147 of 1996 as well. In that action, *Johnson* v. *Deloitte & Touche A.G.* (4), D&T (Zurich) claimed *locus standi* as the former auditor of the plaintiff to apply to remove the liquidators on the basis of the liquidators' alleged conflict of interests. D&T (Zurich) relied on the
30   evidence of Mr. David Wilson, who stated in his affidavit:

"The audit report was signed by the Cayman practice on March 23rd, 1990. However, as I have already explained, it was in fact the Swiss practice which actually carried out the audit work and the Cayman practice signed the audit report in reliance on that work. A
35   similar arrangement applied for the non-consolidated financial statements as at December 31st, 1989."

To my mind, the fact that this passage distinguished the roles of the Cayman and Swiss practices (the Cayman defendants and D&T (Zurich), respectively) without going so far as to admit in unequivocal terms the
40   respective contractual relationships, is significant to understanding the liquidators' attitude to the pleading of the claim in contract. At no stage prior to the filing of D&T (Zurich)'s defence was there a positive acceptance of an arguable claim in contract as between the plaintiff itself (as distinct from OHAG) and D&T (Zurich).

45   In *Johnson* v. *Deloitte & Touche A.G. (4)* the Court of Appeal was

invited to assume the correctness of the evidence relied upon by D&T (Zurich) and so to regard D&T (Zurich) as the primary auditor of the plaintiff. The conflict application proceeded on that basis. This, however, was against the background also asserted, that the Cayman practice had
5   actually signed off the relevant auditor reports.

Now that the plaintiff is asserting in this action the alternative duty in contract against D&T (Zurich), it has had to abandon, at my insistence, the assertion—maintained in *Johnson v. Deloitte & Touche A.G.* even up to the appeal by D&T (Zurich) before the Privy Council—that D&T
10  (Zurich) was not its auditor.

The fact that there was not, before the filing of its defence, any positive assertion that D&T (Zurich) was *contractually* responsible for the plaintiff's audit does not necessarily imply deliberate equivocation on the part of the defendants. They have consistently asserted that D&T (Zurich)
15  was the *primary* auditor of the Omni Group and thus of the plaintiff.

But that, to my mind, is an insufficient basis for concluding, as I am being asked by the defendants to conclude, that the liquidators were or should always have been aware that the defendants would aver that D&T (Zurich) was, to the exclusion of the Cayman defendants, contractually
20  responsible for the audits. A passage from an affidavit sworn by Mr. Johnson on March 13th, 1995 (in support of his application for leave to serve the writ outside the jurisdiction upon D&T (Zurich)) is illustrative of the fluid mental state which I find existed over this issue from the earliest stages:

25      "Deloitte & Touche A.G. [D&T (Zurich)] audited the intended plaintiff's financial statements for the year ended December 31st, 1990…. Although [D&T (Cayman)] signed the audit reports relating to the financial statements for the years ending December 31st, 1988 and December 31st, 1990, *it is likely that* Deloitte &
30      Touche A.G. provided assistance to [D&T (Cayman)] in the preparations of the audit reports relating to the financial statements for the year ended December 31st, 1988 and December 31st, 1989. The company (*i.e.* the plaintiff) is part of the Omni Group of companies based in Switzerland. The primary auditor of the *Omni*
35      *Group* was Deloitte & Touche A.G." [Emphasis supplied.]

The distinction between its relationship with OHAG as the parent company and the plaintiff as subsidiary is still maintained even on the present state of D&T (Zurich)'s defence. Given that background, the issue for me now is whether I should regard the decision of the liquidators
40  not to plead the claim in contract against D&T (Zurich), when settling the statement of claim, as an abandonment of that claim.

It is to my mind not insignificant here that we are considering the decision of professional men acting in an official, not personal, capacity and in so doing, upon the advice of other professionals as to the
45  significance within the accounting profession of the inter-practice

142

1999 CILR                                                            GRAND CT.

relationships of primary and secondary audit functions. These are
relationships giving rise to contractual roles in regard to which—given
the modern and relatively recent phenomenon of transnational audits and
liquidations—there were no determinative judicial pronouncements to
5    guide their decisions.

The real question then is whether Mr. Johnson, having determined
upon advice, primarily because the Cayman practice signed off the audits,
that they and not D&T (Zurich) were contractually responsible, should be
deemed to have abandoned any such claim in contract against D&T
10   (Zurich). A brief overview of the legal principles will, I believe, help to
inform the decision to the contrary at which I have arrived.

The claim in contract against D&T (Zurich), not having been included
in the statement of claim, is now time-barred and the right to plead this in
defence to that claim has accrued to D&T (Zurich). The court none the
15   less has the power to allow the claim at this stage arising as it does—and
as is conceded by D&T (Zurich)—from the same or similar facts already
in issue on the existing claim.

But not to be overlooked are the renewed strain and expense which a
restored claim in contract will visit, ultimately, upon the individual
20   members of D&T (Zurich) against whose professional conduct the
allegations are levelled. Just what should be the proper scope of
contractual duties—assuming such duties were owed—will be a matter of
considerable complexity in the circumstances of this case as will the
issues which D&T (Zurich) will have to address. Allowing the
25   amendment will therefore be a matter of great concern to them. That,
however, is only one side of the balance to be struck in the assessment of
the interests of justice.

As yet, no procedural consequences of the amendment have been
identified by D&T (Zurich) which cannot be addressed by an order for
30   costs. Thus, this is not a case where the amendment will greatly disrupt
the procedural steps remaining until trial or result in the vacating of any
fixture already made. There will be no need, given the similarity of the
issues to those already pleaded, for a fundamental change in approach to
the preparations for trial. While the modern approach to judicial case
35   management requires the court to be more vigilant against abuses of the
system, it is still the law in the Cayman Islands that an amendment which
is necessary to allow a party properly to plead his case without injustice
to the other side will normally be made: see *Swiss Bank & Trust Corp.*
Ltd. v. *Iorgulescu (10)*.

40   I do accept, though, that this statement of principle is to be qualified by
appropriate sanctions in the light of the modern approach to litigation,
including refusal where a party has so disrupted the flow of the
proceedings as to visit hardship and inconvenience upon the other side
which cannot adequately be addressed by an order for costs. Moreover,
45   the modern approach will take into account not just the disruption to the

143

A-9571

1999 CILR                                                           GRAND CT.

affairs of the present parties but also the effect upon other litigants whose access to justice may be delayed. The closer the amendments proposed come to the actual date for trial, the more disruptive all round they are likely to be and so are more likely to be refused.

5      An example of such disruption and of the modern approach of dealing with it by refusal can be found in *Worldwide Corp. Ltd.* v. *G.P.T. Ltd.* (12) in the English Court of Appeal. The following passage, which I find to be compelling, appears in the judgment of Waller, L.J.:

10         "…[I]n previous eras it was more readily assumed that if the amending party paid his opponent the costs of an adjournment that was sufficient compensation to that opponent. In the modern era it is more readily recognized that in truth, payment of the costs of an adjournment may well not adequately compensate someone who is desirous of being rid of a piece of litigation which has been hanging
15         over his head for some time, and may not adequately compensate him for being totally (and we are afraid there is no better word for it) 'mucked around' at the last moment. Furthermore, the courts are now much more conscious that in assessing the justice of a particular case, the disruption caused to other litigants by last-
20         minute adjournments and last-minute applications have also to be brought into the scales.

            Take this very case. By attempting a last-minute amendment a trial has had to be interrupted by argument over some days, the challenge to the judge's order has to be dealt with by the Court of
25         Appeal as a matter of urgency, with serious disruption to its list and other litigants, and if the amendment were allowed there would have to be a further delay in the trial coming on and/or a last-minute lengthening of the trial which may cause serious inconvenience in the Commercial Court and thus to other litigants."

30     There is, to my mind, nothing in the law and rules of procedure of our courts which would preclude the application of those considerations and a similar result in an appropriate case. In the *Iorgulescu* case (10) itself, the court laid emphasis upon the consideration of potential prejudice to the other parties as a result of the amendment allowed.

35     I note also that even in the eight short years since that case was decided, litigation has developed apace in this jurisdiction and the demands upon the system now more than ever justify the consideration of potential disruption and prejudice to other cases and litigants. Those comments are, however, made *de bene esse* and in passing.

40     Here, it is in the plaintiff's favour that the more egregious consequences of amendment such as would have followed in the *Worldwide Corp.* case (12) will not arise. But there are other legal issues to address. *Dicta* from the still developing case law in this area would suggest that once abandoned after a deliberate election, a claim remains
45     abandoned.

1999 CILR                                                    GRAND CT.

This was the view expressed by Harman, J. after a review of the earlier cases, in *Cellular Clothing Co. Ltd.* v. *G. White & Co. Ltd.* (1) (70 R.P.C. at 12):

"Once abandoned, the claim remains abandoned, and it does not lie
5     in the mouth of the Plaintiff to say 'Now I should like to put it back again.' If it be, as I think it probably is, a matter of discretion, I refuse leave, because the Plaintiffs, having deliberately taken the course they did and announced to the world and to the Defendants that the only particulars which they were going to rely upon were
10     such and such, now sought to rely on other particulars altogether, which either were, or ought to have been, within their knowledge before they issued their writ, and, indeed, were the reason, so it is said, why the writ was originally issued. In my judgment, it would be quite wrong to allow an amendment of this sort under those
15     circumstances."

That test would ascribe a strict responsibility to a claimant who has made an informed (or deemed informed) election not to plead a claim and rejects the court's discretion to look objectively at the requisites of justice in the particular case.

20     When it is viewed in that way I do not regard that to be the appropriate test. I do not think that the test is so strict as to preclude the exercise of discretion in an appropriate case, notwithstanding that a deliberate election has been made. This must be so where—as I find to be the case here—the election was one made reasonably, if mistakenly, in the
25     exercise of professional judgment in their official capacity and before the wisdom of pleading the alternative claim in contract against D&T (Zurich) became clear to them. No question of the earlier conflict allegation against the liquidators has arisen here.

The existence of the discretionary power to be exercised in the
30     interests of justice is also recognized in the *Iorgulescu* case (10) It appears also to be recognized in the English Court of Appeal decision in *Leicester Wholesale Fruit Market Ltd.* v. *Grundy (No. 2)* (5), where the *Cellular Clothing* decision was considered. The following appears in the judgment of Glidewell, L.J. (53 BLR at 14–15):

35     "The argument relating to abandonment requires more detailed consideration.

The judge's approach to the problem [at first instance] is set out [in] the judgment. He said:

'I think that the true principle, whether a plaintiff abandons or
40     elects not to proceed with a claim made in the statement of claim, is that the court has the discretion to allow the claim to be revived, but will not exercise it in favour of the plaintiff unless a good explanation is given for the dropping of the claim and the desire to revive it'.

45     Applying that principle he considered whether the plaintiff had a

145

1999 CILR                                                    GRAND CT.

good explanation, decided that it had, and therefore allowed the amendment.

Mr. Knight submits that the judge was in error in adopting this principle. He argues that the question the judge should have asked himself was, had the plaintiff discovered, or might it with reasonable diligence have discovered, before abandoning the claim for breach of contract [the particular facts disclosing the breach]? If so, then the plaintiff should not be allowed to reinstate its claim in this respect.

Mr. Knight relies on a passage in the judgment of Harman, J. in *Cellular Clothing Co. Ltd.* v. *White & Co. Ltd.…*" He then referred to the judgment of Harman, J. quoted above and continued (*ibid.*, at 17):

"The only task for this court is to decide whether the judge was right to allow amendments so as to permit the plaintiff to seek to establish that the cause of action against [the defendant] did not arise until the facts alleged to have been concealed were discovered, or could with reasonable diligence have been discovered, i.e. in October 1986 at the earliest.

…[I] think that the learned judge applied the correct test, and came to the correct conclusion on this issue."

Stated in that manner, the discretion to be exercised is certainly not without its limits. The claimant must show that he has acted reasonably and diligently in the case he had chosen to plead. Those strictures are only fair, particularly in a case where the claim to be revived is one which is time-barred and so has given rise to an accrued defence of limitation. But that having been said, the discretion is to be exercised ultimately in the interests of justice—that is the rationale for the power given in the Law and the Rules. The requirement that the same or similar factual premises must exist is in and of itself a protection for defendants against the prejudice of having to respond to new or amended claims which they could not anticipate.

Although in this case it cannot be said that the defendants in any way concealed the full and true nature of the contractual relationships from the plaintiff, given the nature of the intra-relationships of the plaintiff within the Omni Group, uncertainty or indecisiveness on the part of the liquidators about that matter is understandable. And, as the evidence shows, there were and continue to be strategic positions taken on both sides in the pleadings and affidavits on this very issue.

For all the foregoing reasons, I conclude that it would be in the interests of justice in this case to allow the plaintiff to restore its claim in contract against D&T (Zurich).

As regards the various other proposed amendments not yet specifically addressed, I think I need only make specific mention of those in paras. 34A, 60.1, 61.2 and 61.6, which I will allow. I consider those to be

A-9574

1999 CILR                                                     GRAND CT.

nothing more than an elaboration of the existing pleadings re Harpener and the three receivables.

Other proposed amendments, many not objected to, I will deal with as shown by reference to the schedule in the analysis prepared by Mr. Smouha.

5

*Order accordingly.*

*W.S. Walker & Co.* for the plaintiff; *Charles Adams, Ritchie, Duckworth& Co.* for the eighth defendant; *Hunter & Hunter* for the other defendants.

A-9575

**[1997 CILR 527]**

**WAHR-HANSEN**

*v.*

**BRIDGE TRUST COMPANY LIMITED and FOUR OTHERS**

*Court of Appeal*

(Zacca, P., Kerr and Collett, JJ.A.)

**28 November 1997**

*Trusts—creation—obligation to distribute income—may infer intention to create trust despite absence of express obligation to distribute income if possible to give favourable construction to uphold charitable objects*

*Charities—charitable purposes—intention of settlor—no construction of general words ejusdem generis with class of other implicitly charitable objects unless trust instrument shows intention to benefit exclusively charitable objects—clause permitting amendments to benefit non-charitable objects may suggest contrary intention*

The parties applied to the Grand Court for a declaration to determine the validity of a trust.

The appellant represented the estate of the alleged owner of assets settled in The Bahamas on the trusts of the Continental Foundation ("CF"), of which the second respondent was the first trustee. By cl. 3 of the trust, the trustees, when not required by law to do so, were given "an absolute discretion to distribute income…to any one or more religious, charitable or educational institution or institutions or any organizations or institutions operating for the public good…the intention being to enable the trustees to endeavour to act for the good or for the benefit of mankind in general or any section of mankind in particular anywhere in the world or throughout the world."

The law governing the trust was changed from that of The Bahamas to that of the Cayman Islands under cl. 39 of the trust instrument.

The ostensible settlor of the CF trust was also the settlor of a second trust, the Aall Foundation, of which the first and second respondents were trustees, and to which the majority of the CF trust assets were transferred after the death of their alleged owner. The appellant brought proceedings in England alleging misappropriation of the trust assets by the first and second respondents, who in turn sought directions from the Grand Court on how best to proceed in the interests of the two trusts.

The Grand Court (Harre, C.J.) ruled, on the preliminary issues relating to the validity of the CF trust, that the governing law had changed from Bahamian to Cayman law, and that under the law relating to charitable trusts in the Cayman Islands (which was the same as that in England) the trust instrument created a trust the objects of which were exclusively charitable and which was not invalidated by its lack of geographical

EXHIBIT

7

527

limits. The last of the four categories of object listed, namely "any organizations or institutions operating for the public good" was to be read *ejusdem generis* with the preceding three heads of charity to achieve this construction. Accordingly, the trust was valid. The proceedings in the Grand Court are reported at *1996 CILR 52*.

On appeal, the appellant submitted that (a) regardless of the settlor's intentions, the trust instrument did not create a valid trust of any kind, since it imposed no obligation on the trustees to distribute income to the objects specified in cl. 3, but instead created a collection of powers without any duty to exercise them; (b) the objects of the trust, in any event, were not exclusively charitable since (i) the recitals expressed the settlor's wish to benefit "worthy *individuals*, organizations and *corporations*," an intention which could only be achieved by an amendment to cl. 3, which at present permitted only "organizations or institutions" to benefit, and (in contast to the Aall Foundation) amendments which might alter the charitable nature of the trust were not prohibited, (ii) although the first three categories of object specified in cl. 3 were charitable, the fourth could not be so construed as the words "or any organizations or institutions operating for the public good" suggested a disjunctive interpretation, allowing non-charitable bodies to benefit unless the context indicated otherwise, and (iii) the principle of *ejusdem generis* did not apply to extend the charitable nature of the first three categories to the fourth, since the terms of the trust as a whole did not imply an exclusively charitable intention; and (c) accordingly, there was no valid charitable trust and the assets of the CF trust were held on a resulting trust for the settlor.

The respondents submitted in reply that (a) since it was clear from the recitals and cl. 3 that the settlor had intended to create a trust and to make provision for the management and distribution of the trust fund, the court should construe the operative provisions favourably so as to uphold the charitable objects of the trust; (b) the trust instrument therefore created an implied trust to apply income for the benefit of the objects listed in cl. 3, together with a power to accumulate the income, which could be exercised indefinitely, so that a distribution might never be made; and (c) the objects of the trust were exclusively charitable since (i) the fourth category of objects in cl. 3, namely organizations and institutions operating for the public good, was to be construed as confined to objects within the spirit of the Preamble to the Charitable Uses Act 1601, as were the first three categories, by the application of the *ejusdem generis* principle, (ii) the court should uphold as charitable a gift in general words for the public benefit, provided there was nothing expressed to prevent such a construction, and (iii) given the draftsman's undoubted knowledge of the four heads of charity at common law, any other construction of the settlor's intention would be perverse.

**Held,** allowing the appeal:

(1) The court was satisfied that the change of the law governing the trust from that of The Bahamas to that of the Cayman Islands was valid

1997 CILR                                                                C.A.

for the purposes of s.4 of the Trusts (Foreign Element) Law, 1987, and would adopt the reasoning of the Grand Court in this respect (page 532, lines 15–31).

(2) It was accepted by the parties, and the court agreed, that the law relating to charitable trusts was the same in the Cayman Islands as in England. Accordingly, no more liberal construction of charitable purposes was to be applied here than elsewhere for socio-economic reasons or otherwise (page 532, lines 32–45).

(3) The CF trust instrument had created a valid trust even though it imposed no express obligation on the trustees to distribute the income, since the recitals stated that the purpose of the instrument was to create a trust and it could be inferred from cl. 3 that that was the settlor's intention. Furthermore, since its objects were ostensibly charitable, the court would construe its provisions favourably so as to uphold those objects if possible (page 535, line 27 – page 536, line 12; page 536, lines 20–24).

(4) However, upon closer analysis, the trust was not charitable, since no intention was shown to benefit exclusively charitable objects. Although the first three categories of object described in cl. 3—namely religious, charitable (relief of poverty) and educational bodies—were accepted as being within the spirit and intendment of the Preamble to the Charitable Uses Act 1601 and were implicitly charitable, the fourth was not. Since not all bodies operating for the public good could be regarded as charitable, the respondents were required to show an intention to benefit only institutions of that kind which were also charitable. The phrase "or any organizations…" was *prima facie* disjunctive and could not be construed *ejusdem generis* with the preceding words as there was nothing in the trust as a whole to imply such an intention. On the contrary, there was no prohibition on amendments which might alter the charitable status of the trust, and the "worthy *individuals*, organizations and *corporations*" described in its recitals could only be benefited under it by precisely such an amendment. Accordingly, the assets of the CF trust were held on a resulting trust for the settlor (page 536, lines 29–43; page 537, lines 15–33; page 538, lines 21–31; page 539, lines 8–26; page 540, lines 27–43; page 541, line 28 – page 543, line 9; page 543, lines 26–31).

**Cases cited:**

(1) *Atkinson's Will Trusts, In re, Atkinson v. Hall*, [1978] 1 W.L.R. 586; [1978] 1 All E.R. 1275, applied.

(2) *Att.-Gen. v. Carlisle (Mayor & Corp.)* (1828), 2 Sim. 437; 57 E.R. 851.

(3) *Att.-Gen. v. Lonsdale (Earl)* (1827), 1 Sim. 105; 57 E.R. 518.

(4) *Att.-Gen. v. National Provncl. & Union Bank of England*, [1924] A.C. 262; [1923] All E.R. Rep. 123, *dicta* of Lord Cave applied.

1997 CILR                                                                    C.A.

(5) *Att.-Gen. (Bahamas) v. Royal Trust Co.* (1983), 36 W.I.R. 1; on appeal, [1986] 1 W.L.R. 1001; [1986] 3 All E.R. 423, *dicta* of Luckhoo, P. applied.

(6) *Att.-Gen. (New Zealand) v. Brown*, [1917] A.C. 393; [1916-17] All E.R. Rep. 245.

(7) *Blair v. Duncan* [1902] A.C. 37; (1901), 71 L.J.P.C. 22.

(8) *Combe, In re, Combe v. Combe*, [1925] Ch. 210; [1925] All E.R. Rep. 159; *sub nom. In re Coombe, Coombe v. Coombe* (1925), 133 L.T. 473, distinguished.

(9) *Houston v. Burns*, [1918] A.C. 337; (1918), 87 L.J.P.C. 99.

(10) *Income Tax Special Purpose Commrs. v. Pemsel*, [1891] A.C. 531; [1891-4] All E.R. Rep. 28, *dicta* of Lord Macnaghten applied.

(11) *Incorporated Council of Law Reporting (England & Wales) v. Att.-Gen.*, [1972] Ch. 73; [1971] 3 All E.R. 1029, *dicta* of Russell, L.J. applied.

(12) *Incorporated Council of Law Reporting (Queensland) v. Commr. of Taxation (Australia)* (1971), 125 C.L.R. 659; 45 ALJR 552.

(13) *Inland Rev. Commrs. v. McMullen*, [1981] A.C. 1; [1980] 1 All E.R. 884.

(14) *Macduff, In re, Macduff v. Macduff*, [1896] 2 Ch. 451; [1895-9] All E.R. Rep. 154.

(15) *Mitford v. Reynolds* (1842), 1 Ph. 185; 41 E.R. 602; [1835-42] All E.R. Rep. 331.

(16) *Nightingale v. Goulburn* (1848), 2 Ph. 594; 41 E.R. 1072; [1843-60] All E.R. Rep. 420.

(17) *Ogden (H.J.), In re, Brydon v. Samuel*, [1933] Ch. 678; [1933] All E.R. Rep. 720, distinguished.

(18) *Pardoe, In re, McLaughlin v. Att.-Gen.*, [1906] 2 Ch. 184; (1906), 75 L.J. Ch. 455, considered.

(19) *Smith, In re, Public Trustee v. Smith*, [1932] 1 Ch. 153; [1931] All E.R. Rep. 617, distinguished.

(20) *Vandervell's Trusts (No. 2), In re, White v. Vandervell Trustees Ltd.*, [1974] Ch. 269; [1974] 3 All E.R. 205, applied.

(21) *Weekes' Settlement, In re*, [1897] 1 Ch. 289; (1897), 76 L.T. 112, distinguished.

(22) *West v. Knight* (1669), 1 Cas. in Ch. 134; 22 E.R. 729.

**Legislation construed:**

Trusts (Foreign Element) Law, 1987 (Law 17 of 1987), s.4(4):

"If the terms of a trust so provide, the governing law of the trust may be changed to or from the laws of the Islands provided that:

(i) in the case of a change to the law of the Islands, such change is recognised by the governing law of the trust previously in effect…."

Charitable Uses Act 1601 (43 Eliz. 1, c.4), Preamble: The relevant terms of this Preamble are set out at page 537, lines 2–6.

A-9579

1997 CILR                                                                                           C.A.

*P.H. Goldsmith, Q.C.*, *D.J. Close* and *G.F. Ritchie* for the appellant;

*T.M.E.B. Etherton, Q.C.*, *C.R.F. Tidmarsh* and *A.J.E. Foster* for the first and second respondents;

*M.C.C. Hart, Q.C.* and *W.J. Helfrecht* for the third respondent;

*A.G. Boyle, Q.C.*, *N.F. Harrison* and *N.R.L. Clifford* for the fourth respondent;

*S. Barrie* for the fifth respondent.

**COLLETT, J.A.**, delivering the judgment of the court: The subject
matter of this appeal is the Continental Foundation and its validity or
otherwise in law as a charitable trust. The foundation was set up by a
memorandum of agreement under seal dated July 20th, 1976, made
between Thorleif Monsen as the ostensible settlor, Robert Slatter of
Nassau, The Bahamas, as the first trustee and three gentlemen described
15  as advisors to the trustees, who are invested with certain supervisory
powers thereunder.

We are concerned in this appeal essentially with the question of the
proper construction of this agreement but a brief resumé of the history of
the matter is necessary to set it in context. The appellant here represents
20  the insolvent estate of one Andrew Jahre who died in 1982 and who is
alleged by the appellant to have been the real and effective settlor, using
Mr. Monsen as a front, and the substantial ultimate contributor of the
funds made available to the Foundation after its establishment.

The first and second respondents are trustees of another allegedly
25  charitable foundation, the Aall Foundation, set up by a separate memo
randum of agreement dated October 7th, 1982 of which the ostensible
settlor was also Thorleif Monsen. The connection between these two
foundations is that, shortly after the death of Mr. Jahre, the vast majority
of the assets then subsisting in the Continental Foundation
30  were transferred to the trustees of the Aall Foundation, where they remain
today.

Litigation having been commenced in the Grand Court in connection
with these transactions, it was ordered that preliminary issues as to the
validity of each of the Continental and Aall Foundation be tried, in
35  which the present first and second respondents were the plaintiffs, and
the defendants were respectively the Attorney General of the Cayman
Islands, the present appellant, Compass Trust Co. Ltd., as legal personal
representative of Thorleif Monsen, deceased, and various individual
partners of a Canadian law firm engaged in the preparation of the trust
40  deeds in question.

At the hearing of the preliminary issues in the Grand Court it appears
to have been conceded by the present appellant that, as a matter of
construction of the deed of October 7th, 1982, the Aall Foundation was a
valid charitable trust in law and the court so found. No issue was
45  therefore raised in this appeal as to the decision of the Grand Court in that

respect, and so we are now solely concerned with the validity or other wise of the Continental Foundation.

It is also not in dispute that if the Continental Foundation is not valid as a charitable trust, it is void and of no effect in law. This is for two reasons, as counsel for the appellant has submitted. The first is that it would offend the relevant rule against perpetuities and the second, that it is a "purpose trust" whose beneficial objects are not identifiable. Only a trust which is exclusively charitable can be valid if it is capable of extending beyond the legal perpetuity period and only such a trust can avail of the services of the Attorney General on behalf of the Crown to enforce its provisions in the absence of identifiable beneficiaries. If, therefore, the Continental Foundation is not a valid charitable trust it must fail, and a resulting trust in favour of the settlor will arise instead (see *In re Vandervell's Trusts (No. 2)* (20)).

Before the Grand Court several issues were raised and decided with which we have not been greatly troubled on appeal. The first of these concerns the governing law. This law was, in accordance with cl. 39 of the memorandum of agreement, originally that of The Bahamas, being the place where the majority of the original trustees resided. That clause empowered the trustees, in the exercise of their discretion, to transfer the *situs* and/or the governing law to another jurisdiction, and this they did by a further memorandum of agreement dated December 22nd, 1976. The validity of that transfer was in issue at the Grand Court hearing and after careful consideration of the Trusts (Foreign Element) Law, 1987 and in particular s.4(4) thereof, the learned Chief Justice concluded that it should be upheld as valid. In consequence the preliminary issue raised with respect to the Continental Foundation fell to be determined by Cayman rather than Bahamian or any other law. While this particular issue was not extensively canvassed before us for reasons which will be apparent, we see no reason to question or to depart from the Chief Justice's ruling in that respect and are content to adopt it and proceed accordingly.

At the Grand Court hearing further argument was advanced by those concerned to uphold the validity of the Foundation as to the extent to which the law relating to charitable trusts in England and Wales also applies in the Cayman Islands. A suggestion was advanced on behalf of the Attorney General that a more liberal construction was proper here than in England for various socio-economic reasons. That suggestion was rejected by the learned Chief Justice and his judgment in this respect has not been further challenged on appeal. Before this court it was generally accepted by all parties that, to paraphrase the judgment of Luckhoo, P. in *Att.-Gen. (Bahamas)* v. *Royal Trust Co.* (5) in the Bahamas Court of Appeal, the law of the Cayman Islands "is the same as that of England in relation to the broad legal principles by which a court exercising equitable jurisdiction should be guided in determining whether particular purposes are charitable in the eye of the law."

1997 CILR                                                                    C.A.

It will shortly be necessary to examine those legal principles but before doing so the pertinent terms of the Continental Foundation should be set out so that the question of its proper construction may be examined in the light of the relevant authorities. These terms are as follows:

5   First Recital: "Whereas the settlor wishes to establish a trust for the benefit of worthy individuals, organizations and corporations all upon the terms and conditions hereinafter set forth, and to be known as the 'Continental Foundation."'

Clause 3: "The trustees may accumulate and add to the capital, 10 the net annual income derived from the trust fund for so long as the law applicable to the trustees permits them to do so. In any year that the law applicable to the trustees requires them to distribute income or in any year that the trustees not being required to distribute income decide in the exercise of an absolute discretion to distribute 15 income then such income or any part thereof shall be paid to any one or more religious, charitable or educational institution or institutions or any organizations or institutions operating for the public good (and the trustees shall be sole and absolute judges of whether any organization or institution so qualifies are [*sic*] as a beneficiary 20 hereunder) the intention being to enable the trustees to endeavour to act for the good or for the benefit of mankind in general or any section of mankind in particular anywhere in the world or throughout the world. In the case of any question as to the propriety of any distribution or selection by the trustees the written approval 25 of the advisors to the trustees, if such exist, shall be an absolute and final determination which shall not be open to question."

Clause 4: "The trustees may at any time or from time to time prior to the date of final distribution provided they first obtain the written approval of the advisors but otherwise in their discretion, pay or 30 transfer any part of the capital of the trust fund (and even if it shall result in a complete distribution of the entire trust fund) to any person, persons, institution or organization who at that time qualify as beneficiaries who are entitled or contingently or prospectively entitled to receive income as herein before provided."

35 Clause 31: "By unanimous agreement at any time between the trustees and upon obtaining the written approval of the advisors to the trustees any term or provision of the trust may be amended or revoked or additional terms may be added thereto provided always that in no event shall any amendment whatsoever be made which 40 results in any part of the capital or income of the trust fund being paid to the settlor or to a person who is or has been a trustee hereunder."

Mention should also be made of cl. 5 of the agreement, which empowers the trustees, with the approval of the advisors, to transfer the whole or 45 part of the trust fund for resettlement upon new trusts in favour of the

beneficiaries or prospective or contingent beneficiaries of the trust. This appears to have constituted the legal basis for the transfer of assets out of the Continental Foundation and into the Aall Foundation in 1982.

5
10
15
The argument for the appellant in this court essentially falls under two separate heads. The first introduces a new point which was not raised at the hearing in the Grand Court. This is of course no reflection upon its validity in law but the late stage at which it has now been raised deprives us of such assistance as we might have otherwise derived from a consideration of it by the trial judge. The point is contained in para. 1(5) of the memorandum of grounds of appeal. The appellant also contends that no exclusively charitable intent can be derived from the wording of the memorandum of July 20th, 1976 but, in this alternative new argument, he submits that, even if such a charitable intent could be found, the Continental Foundation still fails because, on its true construction, no trust is created but only a mere compendium of miscellaneous powers in the so-called trustees without any obligation to exercise them.

20
25
The argument proceeds upon this basis. An essential feature of every trust is that it is imperative—conferring a duty upon the trustee(s). A mere power is quite different in that it may or may not be exercised. For the Continental Foundation to be a valid charitable trust there must be a duty to distribute either capital or income or both to the allegedly charitable objects. No such duty, either express or implied, can be found, it is said, in the wording of the memorandum properly considered in its context. Accordingly, the trustees hold the capital of the trust fund upon a resulting trust in favour of the settlor, irrespective of whether or not the objects are legally charitable.

30
35
40
The operative clauses of the memorandum, including those already quoted, do not disclose the existence of any express obligation upon the trustees to stand possessed of the trust fund upon trust to apply the capital or distribute the income arising therefrom to any of the objects specified in cl. 3. Counsel for the respondents, however, point out that the trustees have by that clause only two options available to them, namely, to distribute income among those beneficiaries or to accumulate it to the extent that the governing law permits. They submit that a trust in favour of those beneficial objects ought to be implied and that the memorandum should be construed as a trust to apply the income to the beneficiaries coupled with a power to accumulate income for an indefinite period in the meantime subject to that limitation. Some analogy could perhaps be drawn with the statutory trust for sale of real property under the current English law of real property, when conveyed or devised to two or more beneficial owners, which is coupled with an indefinite power in the trustees to postpone sale. In such a case the sale may never happen. The same applies to the distribution here.

45
The authorities cited by counsel for the appellant in support of this argument do not greatly assist. *In re Weekes' Settlement* (21) and *In re*

534

1997 CILR                                                                C.A.

*Combe* (8) were both instances of private will trusts in favour of those members of a defined class of objects who might be selected in the exercise of a limited power of appointment, the question being in each case whether the terms of the respective will disclosed an intention on the part of the testator to benefit the class as a whole in the absence of any exercise of that power. That is far from the present case, where the question is rather whether the settlor by deed *inter vivos* intended to impose upon his trustees an obligation to apply income arising from the trust fund in favour of objects which, *ex hypothesi* for the purpose of this ground of appeal, should be regarded as legally charitable and capable of taking benefit.

Nor is much assistance to be derived from *In re H.J. Ogden* (17) where the question was whether an immediate bequest of capital to a class of institutions, not necessarily charitable, was void for uncertainty or valid, where the executors were empowered to select those who should benefit. Indeed Lord Tomlin said ([1933] Ch. at 683): "I can find no trust at all" but nevertheless he upheld the validity of that gift in its context.

This question is ultimately to be answered by our seeking to discover, from the terms of the memorandum itself, whether it must have been the intention of the settlor that the trustees should apply at least the income of the trust fund to the objects specified in cl. 3. The fact that no positive obligation to distribute capital is included, as opposed to the discretionary power to do so contained in cl. 4, is of itself no bar to the validity of a charitable trust (see Tudor, *Charities*, 8th ed., at 140 (1995) and the cases there cited). Nor is the existence of a power of revocation, as for instance here in cl. 31, any bar to the validity of such a trust *pro tem*.

What indications, if any, exist in this memorandum as to the intentions of the settlor in this regard? One of the most powerful must be the opening words of the first recital, "Whereas the settlor wishes to establish a trust for the benefit of…." It must be apparent from these opening words that, if an imperative obligation has not been imposed upon his trustees by the succeeding words of the document, his overriding intention has been frustrated by the inattention of the draftsman. Is the obligation to invest and the carefully detailed provisions for management of the trust fund merely to give rise to a resulting trust in favour of the settlor himself? It is noteworthy that even the provision for amendment or revocation of the memorandum contained in cl. 31 is subject to a provision barring any future benefit for the settlor himself. We are, of course, concerned here with an exercise of interpretation of the deed itself and speculation as to the ultimate motives of Mr. Jahre, who is not even mentioned there, lies wholly outside its scope.

A further indication of the settlor's intentions occurs after the words in parenthesis in cl. 3 of the memorandum: "…[T]he intention being to enable the trustees to endeavour to act for the good of mankind in general or any section of mankind in particular…." "Enable" presumably refers

535

to the provision of the trust funds. If the stated intention is that the trustees should endeavour to use the funds for such a purpose, is it reasonable to suppose that they should have no obligation to do so but should be left to decide entirely in their discretion whether to pursue
5 those endeavours or not? This seems extremely unlikely to have been the intention of the settlor.

Finally, if at the end of the day one is left in any doubt as to whether or not an intention to create a valid trust is imputable to the settlor of the Continental Foundation, it would be legitimate to invoke the benignant
10 rule that the courts will strain to hold dispositions in favour of charitable objects valid rather than allow them to fail by adopting a narrow or conser vative construction: "*Ut res magis valeat quam pereat!*" This rule was considered with approval by the learned Chief Justice in the Grand Court, admittedly in a different context, though he did not have to rely upon it.
15 He cited a passage from the speech of Lord Hailsham, L.C. in *Inland Rev. Commrs.* v. *McMullen* (13) ([1981] A.C. at 14) which explains this doctrine and, since for the purposes of this particular issue the objects must be taken as charitable, it is right that it should be put into the balance here should any doubt remain as to the imperative nature of the deed.

20 As a result we are of the clear view that an intention to create a trust in favour of the objects specified in cl. 3 of the memorandum is to be implied and accordingly the points raised in para. 1(5) of the memo randum of grounds of appeal lack substance and afford no basis for disagreement with the judgment of the court below. We now, therefore,
25 turn to the main complaints made against that judgment in sub-paras. (1) - (4) of ground 1 of that memorandum, namely the question whether exclusively charitable purposes are to be found in the memorandum of July 20th, 1976.

The law relating to charitable trusts in England and Wales, which as we
30 have seen is also that of the Cayman Islands and of The Bahamas, is a creature of Equity and has developed over many centuries. As the learned Chief Justice observed in his judgment, a trust will only qualify as charitable if it falls within one or other of the four heads of charity established by case law and is "within the spirit and intendment of the
35 Preamble to the Charitable Uses Act 1601, often referred to as 'the Statute of Elizabeth I.'" These four heads were comprehensively defined in the well known *dicta* of Lord Macnaghten in *Income Tax Special Purpose Commrs.* v. *Pemsel* (10) as follows ([1891] A.C. at 583):

"'Charity' in its legal sense comprises four principal divisions:
40 trusts for the relief of poverty; trusts for the advancement of education; trusts for the advancement of religion; and trusts for other purposes beneficial to the community, not falling under any of the preceding heads."

The four heads of Lord Macnaghten's classification are indeed a com
45 pendium of miscellaneous purposes. Reference to the Preamble to the

1997 CILR                                                                    C.A.

Statute of Elizabeth I itself shows quite how miscellaneous it is; it
comprises specifically "the repair of bridges, ports, havens, causeways,
churches, seabanks and highways…the relief, stock or maintenance of
houses of correction…the supportation, aid and help of young
5  tradesmen, handicraftsman and persons decayed; the relief or redemption
of prisoners or captives"; apart from those specific purposes which can be
grouped under one or other of the three other stated heads of that classifi
cation. Many further purposes not set out in the Preamble have
subsequently been held by decisions of the courts of equity over the years
10  to be charitable under the fourth head of the classification by a process of
analogy. The promotion of health, the provision of recreational facilities,
social rehabilitation and the protection of animals have, according to
Picarda, *The Law & Practice Relating To Charities*, 2nd ed., at 11 (1995)
been recognized by the courts as charitable purposes within the spirit and
15  intendment of the Preamble. It is evident that the fourth head of
Lord Macnaghten's classification is far from closed and this fact is generally
recognized.

Nevertheless, it is also clear from the authorities that, although new
purposes may be held to be legally charitable under the fourth head of
20  classification, that head is by no means co-extensive with every purpose
which is for the public good or public benefit. As Lord Cave pointed out
in *Att.-Gen.* v. *National Provncl. & Union Bank of England* (4) ([1924]
A.C. at 265):

"My lords, it has been pointed out more than once, and particularly
25  by the members of the Court of Appeal in *Re Macduff*…that Lord
Macnaghten did not mean that all trusts for purposes beneficial to
the community are charitable, but that there were certain charitable
trusts which fell within that category; and accordingly to argue that
because a trust is for a purpose beneficial to the community it is
30  therefore a charitable trust is to turn round his sentence and to give it
a different meaning. So here it is not enough to say that the trust in
question is for public purposes beneficial to the community or for
the public welfare; you must also show it to be a charitable trust."

In perhaps the most recent extension of the fourth head of legal charity,
35  the courts both in England and Australia have held the purpose of the
gratuitous editing and publication of the reports of their legal decisions to
be both for the public benefit and also, by analogy, within the spirit and
intendment of the Preamble: see *Incorporated Council of Law Reporting
(England & Wales)* v. *Att.-Gen.* (11) and *Incorporated Council of Law
40  Reporting (Queensland)* v. *Commr. of Taxation (Australia)* (12). Russell,
L.J. in the former case had this to say ([1972] Ch. at 88):

"The Statute of Elizabeth I was a statute to reform abuses: in such
circumstances and in that age the courts of this country were not
inclined to be restricted in their implementation of Parliament's
45  desire for reform to particular examples given by the Statute and

1997 CILR                                                                              C.A.

they deliberately kept open their ability to intervene when they thought necessary in cases not specifically mentioned, by applying as the test whether any particular case of abuse of funds or property was within the 'mischief' or 'equity' of the Statute.

5    For myself I believe that this rather vague and undefined approach is the correct one, with analogy its handmaid, and that when considering Lord Macnaghten's fourth category in *Pemsel's* case… of 'other purposes beneficial to the community' (or as phrased by Sir Samuel Romilly (then Mr. Romilly) in argument in *Morice* v.
10   *Bishop of Durham*…'objects of general public utility') the courts, in consistently saying that not all such are necessarily charitable in law, are in substance accepting that if a purpose is shown to be so beneficial or of such utility it is prima facie charitable in law, but have left open a line of retreat based on the equity of the Statute in
15   case they are faced with a purpose (*e.g.* a political purpose) which could not have been within the contemplation of the Statute even if the then legislators had been endowed with the gift of foresight into the circumstances of later centuries."

     We are content to adopt that formulation as the right approach to the
20   difficult question of defining the extent of the fourth head of classification of legal charity. However, the problem of construction which arises in the instant case is not to determine whether a particular purpose or object, such as law reporting, can be considered charitable as being of undeniable public utility and within the spirit and intendment
25   of the Preamble by analogy. Rather it is to decide whether the phraseology adopted by the draftsman of the memorandum of July 20th, 1976 in cl. 3 and elsewhere in that document discloses an intention to confine the objects and purposes which the trustees are empowered to benefit to such as are legally charitable not only under the first three but
30   also under the fourth and last of Lord Macnaghten's heads of classification. Such a task requires a close analysis of the text of the document. Before undertaking it, however, a brief review can profitably be made of some of the authorities which were cited and relied upon by counsel in argument.

35   There is a particular line of authority which might perhaps be designated as the "disjunctive purpose" cases, where the mention of legally charitable purposes has been coupled by the draftsman of the relevant instrument, often by use of the word "or" with mention of public purposes of a different kind. Examples are *In re Macduff* (14)—
40   "charitable or philanthropic purposes"; *Att.-Gen. (Bahamas)* v. *Royal Trust Co.* (5)—"education and welfare of Bahamian children"; *Att.-Gen.* v. *National Provncl. & Union Bank of England* (4)—"patriotic purposes …or charitable objects"; *Blair* v. *Duncan* (7)—"such charitable or public purposes as my trustee thinks proper"; and *Houston* v. *Burns* (9)—
45   "public, benevolent, or charitable purposes."

A-9587

1997 CILR                                                          C.A.

The principle underlying the decisions in each of these cases is that, once the different purposes are shown by the process of interpretation to have been used disjunctively, logic then requires the court to conclude that mention of the non-charitable purposes is intended to extend the
5   ambit of the beneficial objects of the trust beyond the grounds of legal charity. Hence, the objects cannot be viewed as exclusively charitable and the instrument is not a valid charitable trust.

The words used in the dispositive part of cl. 3 of the memorandum of July 20th, 1976, before the parenthesis to describe the objects of the trust
10  are "one or more religious, charitable or educational institutions or institutions or any organizations or institutions operating for the public good." It was common ground between the parties that the reference in this passage to "charitable" was to its alternative eleemosynary meaning of "for the relief of poverty," which seems to be the proper explanation
15  for its use in this context. The first three of these objects, corresponding to the first three heads of Lord Macnaghten's classification, albeit in a different order, are therefore *prima facie* charitable in law but the question remains: Is the object comprised in the "organizations or institutions operating for the public good" necessarily limited to such as
20  are legally charitable? Certainly the words "or any" which precede that particular phrase are such as to point to a disjunctive intent. The phrase stands on its own. It follows that unless the context in which it appears can be seen to confine its ambit to legally charitable objects, this phrase must be regarded as comprising both charitable and non-charitable
25  objects, given that not all public purposes beneficial to the community can be accepted as being charitable in law, which we have already seen.

Another line of authority which was considered by the learned Chief Justice in this connection comprises what are known as the "locality cases." An outright gift to or for the benefit of the inhabitants of a
30  particular locality is presumed to be implicitly limited to charitable purposes and is good. This doctrine reached its apogee in *In re Smith* (19), a decision of the English Court of Appeal in which many of the earlier cases were reviewed. Amongst these were *West* v. *Knight* (23), which featured a gift to the parish of the testator's birth; *Att.-Gen.* v. *Earl*
35  *of Lonsdale* (3) in which a gift was made "to the good of the county of Westmorland"; *Att.-Gen.* v. *Mayor & Corp. of Carlisle* (2)—"defence of and preservation of the peace within a city"; *Mitford* v. *Reynolds* (15)—a gift "to the Government of Bengal for the benefit of the native inhabitants"; and *Nightingale* v. *Goulburn* (16)—a bequest to the
40  Chancellor of the Exchequer "to be by him appointed to the benefit and advantage of Great Britain." Each of these gifts were upheld as charitable gifts which were not bad for uncertainty. In *In re Smith* the bequest was simply "unto my country England for own use and benefit absolutely" and this also was upheld as a good gift to be applied to charitable
45  purposes for the benefit of the country as a whole.

1997 CILR                                                                    C.A.

The relevance of this line of authority culminating in *In re Smith* (19) to the question of construction which faces us in this case is not readily apparent, for this is not a locality case. The discretion of the trustees is at large and not confined to the inhabitants of any particular locality. So
5  much is quite apparent from the words in cl. 3 which immediately follow the parenthesis: "to enable the trustees to act for the good or for the benefit of mankind in general or any section of mankind in particular anywhere in the world or throughout the world." Such a dedication is almost the direct antithesis of a gift to a defined locality, be that a parish,
10  city, county or a country.

The learned Chief Justice found in certain observations of Lord Hanworth, M.R. in *In re Smith* (19) support for a general proposition that "very general words of gift may in some instances be interpreted as being confined to charitable purposes" although he did not rely upon it in
15  coming to his conclusion. In view of this passage it is perhaps necessary to point out that such a proposition was not the *ratio* of the decision of the Court of Appeal in *In re Smith*. Lawrence, L.J. stated his conclusion thus ([1932] 1 Ch. at 173):

> "…[T]he present case falls within the principle of the cases in
20      which the gift is for the benefit of a *particular class* and, therefore, for a *specified* public purpose and not within the line of cases in which the gift is for public purposes of a *general* and *wholly unrestricted* nature." [Emphasis supplied.]

Romer, L.J. (*ibid.*, at 176) was content to rest his conclusion by analogy
25  with the cases which establish the principle that a gift of trust for the inhabitants of a particular place is a good charitable gift or trust.

Counsel for the first and second respondents sought to urge upon us an extension of that general proposition by inviting the court to hold that, where there is a gift in very general words for the public benefit and there
30  is nothing which renders it impossible to imply a dedication to exclusively charitable purposes, then such a dedication ought to be presumed. This proposition must be regarded as an attempt substantially to extend the law of charitable trusts by extrapolating from the locality cases a doctrine of general application to cases of a different nature. If accepted, it would also
35  extend the rebuttable presumption which applies to the first three heads of Lord Macnaghten's classification—that they are charitable unless it can be shown that no public benefit will ensue—to the fourth head also. But it is precisely because these first three heads are recognized as specifically charitable in nature and because the fourth contains a miscellany which
40  *may or may not* be charitable that such a presumption cannot rightly be applied to general words of public benefit not referable to any such recognized charitable head. If it were to be so applied, the floodgates would be opened. This proposition must therefore be rejected.

We come then finally to the question of construction and the reasons
45  which led the Grand Court to impute to the Continental Foundation the

1997 CILR                                                    C.A.

status of a valid charitable trust. It is evident from passages in the latter part of the Chief Justice's judgment that he founded it essentially upon an application of the canon of construction known as "*ejusdem generis*" and "*noscitur a sociis*." The passages are as follows (*1996 CILR at 80-81*):

5          "We have four categories set out in cl. 3, each represented by the word 'or.' It is clearly disjunctive in the sense that it enumerates them separately but not in the sense that it treats institutions operating for the public good as different from, and alternatives to, the preceding three categories which are clearly charitable. What it
10        does is define a fourth category which, like the other three, is limited to the spirit and intendment of the Preamble to the statute of Elizabeth I. Lord Macnaghten must have intended that. So must the draftsman of CF, in the sense in which that phrase has been inter preted in the intervening years. The context overwhelmingly imports
15        that meaning. It is a classic case for an *ejusdem generis* construction, the genus being 'charity.'"

Counsel for the first and second respondents in argument put the same point in this way:

20        "The public good object, in the context of an express reference to three of the four heads of charity, is so evocative of Lord Macnaghten's fourth head of charity that it would be perverse not to credit the draftsmen with a knowledge of those four heads and an intention to repeat them in cl. 3."

25        In support of his application of the *ejusdem generis* rule, the learned Chief Justice referred to *In re Pardoe* (18), where a residuary gift "to and amongst such public charities and institutions or for such charitable purposes for the public advantage or benefit" as the trustees should in their discretion select was upheld. Kekewich, J., although not holding all public institutions to be necessarily charitable, found in the context a
30        clear indication that a limitation to such public institutions as are legally charitable should be implied in the will ([1906] 2 Ch. at 191): "[I]t is all coloured," he said, "with the notion of charity."

Attractive as this line of argument is at first sight, there are on close examination formidable difficulties about its adoption in the present case.
35        Clause 3 of the Continental Foundation memorandum is not notably coloured with the notion of legal charity. The only mention of the word in the clause is in its other eleemosynary sense. The charitable context, if it exists, can only be gathered by regarding the whole of that part of the clause as a restatement in a somewhat different order and in different
40        language of Lord Macnaghten's classification of charitable heads.

It is interesting to compare the language of cl. 3 of the Continental Foundation memorandum with the corresponding language of the Aall Foundation memorandum of October 7th, 1982 because there are clear similarities in the scheme of the two deeds, though significant differences
45        in the language employed. In defining the beneficial interests in its cl. 3,

1997 CILR                                                                    C.A.

the Aall Foundation memorandum specifies them thus: "The beneficiaries shall be any charitable, religious or educational organizations, institutions or other such objects anywhere in the world." This admirably brief description leaves no doubt as to the charitable context in which it is
5  employed, by contrast with cl. 3 of the Continental Foundation memorandum, which leaves the question open.

Nevertheless, had cl. 3 of the latter deed stood alone, it might have been possible to resolve the patent ambiguity which it presents in favour of a restriction to purely charitable objects by adopting the rule as to a
10  benignant construction in favour of charity, reference to which has already been made in a different context. But it does not stand alone. When seeking to discern whether the intent is to benefit purely charitable objects, all relevant parts of the document require consideration as part of the context. This requires us to examine also the first recital and cl. 31.

15  In the recitals the settlor has expressed an intention to benefit "worthy individuals, organizations and corporations." In the first place, it is impossible to equate "worthy" with "charitable" (see *In re Atkinson's Will Trusts* (1)). Secondly, as all parties seem to agree, the reference to individuals and perhaps also to corporations can only be given effect to
20  by operation of cl. 31, and this consideration counters the argument that until that clause is actually implemented, it has no bearing upon the real intent of the settlor as to the nature of the beneficial objects.

When one turns to the terms of cl. 31 itself it becomes apparent that its scope is not merely limited to amendment of the machinery for
25  implementing the trust or to its eventual revocation. The clause extends to any alterations which the trustees with the consent of the advisors may wish to make to the beneficial objects of the trust, subject to the sole limitation that the settlor himself and past and present trustees can take no benefit. No restriction to exclusively charitable objects is expressed and
30  none may be implied because it is only by including non-charitable objects in any such alteration that the trustees could give effect to the settlor's earlier expressed desire to benefit worthy individuals and most (*e.g.* trading) corporations considered worthy. Once again comparison with the Aall Foundation memorandum is instructive. Clause 39 of that
35  trust (as amended) empowers the trustees and advisors of that Foundation also to amend or revoke any provision of the deed but subject to the express limitation that "in no event shall any amendment whatsoever be made which alters the charitable nature of the trust."

It is therefore impossible in our judgment to dismiss as irrelevant the
40  terms of the first recital and cl. 31 of the Continental Foundation deed when considering whether or not its objects are intended to be confined to such as are legally charitable only. When the effect of these provisions is taken into account, one is driven to the conclusion that the settlor did not intend so to confine them and that, by giving his trustees a discretion
45  under cl. 3 to select institutions or organizations operating for the public

A-9591

1997 CILR                                                                                    C.A.

good so as to benefit mankind in general or any section of mankind in particular anywhere in the world or throughout the world, he meant them to have and ensured that they did have power to do so on a virtually unrestricted basis. The *ejusdem generis* canon of construction cannot
5   operate in such a context. Just as in *Att.-Gen. (New Zealand)* v. *Brown* (6), references in other parts of the deed have destroyed the context in which it could have otherwise been applied. Philanthropic the intention may well have been, but not necessarily charitable in the legal connotation of that word; and that, of course, is not enough.

10   Various sophisticated arguments have been deployed to persuade the court that a charitable intent is nevertheless implicit in this memorandum. But the answer to all of them becomes apparent when one asks, if its validity as a charitable trust is upheld, how would our courts restrain the trustees from applying income to objects clearly not within Lord
15   Macnaghten's classification? If, for instance, with the blessing of the advisors they were to devote the entire income to the campaign against further oil exploration in the world's oceans, clearly a controversial political and therefore not a charitable object, how could it be said to be a breach of trust? Many would vehemently declare that in the interest of
20   environmental conservation, a ban upon such exploration is for the general public good. Others would equally vehemently disagree. The courts would find themselves ensnared in a political debate which they could not sensibly resolve because the issue which it raises is not a justiciable issue. This is precisely the dilemma which the sometimes
25   difficult and technical rules of charity law are designed to avoid.

With some reluctance, therefore, we feel obliged to differ from the conclusion reached in the Grand Court that, on the true construction of the memorandum of agreement dated July 20th, 1976 (known as the Continental Foundation), the trusts declared therein are valid. The appeal
30   is allowed and that declaration is now revoked. In its place there will be a declaration that the said trusts are not valid charitable trusts.

The appellants must have their costs of this appeal to be paid by the first and second respondents. We shall hear counsel further as to the incidence of the costs of the other respondents to the appeal and also as to
35   the incidence of the costs of the hearing in the Grand Court in substitution for the orders made therein.

*Appeal allowed.*

*Charles Adams, Ritchie & Duckworth* for the appellant; *W.S. Walker & Co.*, *Ian Boxall & Co., Hunter & Hunter* and *C.S. Gill & Co.* for the respondents.

A-9592

[2018 (2) CILR 638]

## RITTER and GENEVA INSURANCE SPC LIMITED (in voluntary liquidation) v. BUTTERFIELD BANK (CAYMAN) LIMITED

GRAND CT. (Williams, J.) December 31st, 2018

*Civil Procedure — costs — indemnity basis — defective pleading and lack of evidence for speculative dishonest assistance claim against bank highly unreasonable conduct justifying costs on indemnity basis — plaintiffs informed by defendant that pleadings defective and warned of negative costs implications*

The plaintiffs sought damages for, inter alia, breach of contract, negligence and breach of fiduciary duty/dishonest assistance.

The first plaintiff was a director, sole shareholder and beneficial owner of the second plaintiff, a captive insurance company incorporated in the Cayman Islands. In 2008, the second plaintiff opened a corporate bank account with the defendant bank. A director of the second plaintiff made fraudulent transactions on the account by forging the first plaintiff's signature. The payments were honoured by the bank. The plaintiffs brought proceedings against the defendant claiming damages for breach of contract, negligence and dishonest assistance. They contended that by allowing the withdrawals based on forged signatures the bank breached its mandate, with a resultant net loss of US$529,191.

The defendant denied liability. It claimed that the first plaintiff became aware of the fraudulent transactions in September 2011 but failed to inform it until August 2012, depriving it of the opportunity to prevent a number of other transactions and to recover the money wrongfully paid. The plaintiffs should therefore be estopped from asserting the forgeries on which the claims were based. The defendant also denied that it or any of its employees had acted dishonestly. It wrote to the plaintiffs inviting them to withdraw the claim of dishonest assistance because it was not properly pleaded and there was a lack of evidence, warning that it would seek costs on the indemnity basis if the plaintiffs persisted with the claim.

The Grand Court (Williams, J.) found in favour of the defendant. It held that the plaintiffs were estopped from bringing the claim and dismissed the dishonest assistance claim, which was not properly pleaded or evidenced (that judgment is reported at 2018 (1) CILR 529). The plaintiffs sought to appeal against the decision on estoppel.

The defendant applied pursuant to GCR O.62 for the plaintiffs to be ordered to pay its costs on the indemnity basis. The plaintiffs conceded

EXHIBIT

8

GRAND CT.                                RITTER v. BUTTERFIELD BANK

that costs should follow the event but sought an order that costs be taxed on the standard basis and an order capping them at a proportionate sum to the value of the claim.

The defendant submitted that (a) the claim of dishonest assistance was baseless and defective, and the plaintiffs' conduct in persisting with the claim was unreasonable to a high degree and justified an order for indemnity costs; and (b) indemnity costs were sought in relation to the whole of the proceedings on the basis of the plaintiff's improper and highly unreasonable conduct.

The plaintiffs submitted that (a) it had not been unreasonable to bring the claim of dishonest assistance; (b) an order for costs on the indemnity basis should only be made in exceptional circumstances; (c) even if a party lost on all points in a claim, that was not in itself sufficient to categorize the case as so exceptional as to justify indemnity costs; (d) if the court did make a costs order on the indemnity basis, it should only be in relation to the dishonest assistance claim; and (e) the costs of the proceedings should be capped at an amount proportionate to the claim in dispute.

**Held,** ordering as follows:

(1) The general rule in litigation was that costs followed the event and that the successful party would be awarded his costs. GCR O.62, r.4(11) provided that costs could be taxed on the indemnity basis if the court were satisfied that the paying party had conducted the proceedings, or that part of the proceedings to which the order related, improperly, unreasonably or negligently. The discretion under the rule was not fettered or circumscribed, and had to be exercised judicially in light of the facts of the case. Something special or unusual had to be demonstrated to justify a departure from the ordinary costs order, which included that the losing party misconducted itself in relation to the proceedings, where the institution of the proceedings was plainly unreasonable, or where the proceedings were issued for a collateral purpose. The court's focus should be primarily on the conduct of the losing party, not the merits of the case. Advancing a claim which was unlikely to succeed or did in fact fail would not in itself be sufficient to justify an award of indemnity costs; there should normally be an element in the losing party's conduct which deserved a mark of disapproval. Such conduct would need to be unreasonable to a high degree, though not necessarily deserving moral condemnation (paras. 36–43).

(2) The defendant's costs of the dishonest assistance element of the plaintiffs' claim should be assessed on the indemnity basis. When dismissing the plaintiffs' dishonest assistance claim the court had noted that due to their serious nature and the resultant tactical litigation pressure exerted on and consequences for the other party whether the allegations were proved or not, the principles of pleading had to be strictly observed from the outset. The plaintiffs' pleadings had been defective, which the defendant had drawn to their attention from an earlier stage of the proceedings,

639

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

and the plaintiffs had failed to provide sufficient evidence. The plaintiffs had been made aware of the potential negative costs implications if they persisted with the claim. A formal warning of an intention to seek indemnity costs could make the award of indemnity costs more likely. When considering whether the plaintiffs' conduct took the case out of the norm (*i.e.* outside the ordinary and reasonable conduct of proceedings), the test was not necessarily conduct attracting moral condemnation but rather unreasonableness. The court had regard to the plaintiffs' conduct throughout the proceedings, prior to and during the hearing, and also to whether it was reasonable for the plaintiffs to raise and pursue the dishonest assistance allegations, as well as the persistent and forceful manner in which they did so. The claim was clearly defectively pleaded, speculative, involving high risk, and evidentially very weak. The plaintiffs should have realized that in choosing to improperly pursue the serious allegations of dishonesty over an extended period of time, especially after the defendant's letter, they were taking a high risk and were aware of the risk of indemnity costs being sought if it failed. The plaintiffs advanced and aggressively pursued the dishonest assistance claim, despite the defective pleading and lack of supporting evidence, and maintained the allegations without apology to the end of the hearing. They recognized the potential damage that such an allegation could inflict on the bank. The nature of the claim and the plaintiffs' highly unreasonable conduct took the pursuit of the dishonest assistance element of the proceedings out of the norm (paras. 44–45; paras. 49–52).

(3) The costs of the balance of the proceedings should be taxed on the standard basis. The determination of the estoppel issue was not straightforward and required a careful application of the law to the relevant facts. It could not be said that the plaintiffs, who were victims of a fraud perpetrated by a third party in relation to funds held at the bank, had been unreasonable in initiating their primary claim and opposing the estoppel defence raised by the defendant. The court had not found that the first plaintiff was dishonest when giving evidence and in his actions, although some of his actions and the approach he took with the bank were questionable. His evidence was at times unconvincing but his reliance upon such evidence in defence of the estoppel argument did not amount to behaviour that was so unreasonable as to justify an order for indemnity costs. The court was not satisfied that the first plaintiff's conduct was highly unreasonable and out of the norm. It would therefore order costs on the standard basis in relation to the estoppel issue. The court suggested that the parties assist the Taxing Officer by providing schedules setting out which costs fell under which part of the claim (paras. 64–72).

(4) A costs capping order would not be made. The court was not satisfied that it had the power to introduce costs capping given the more limited case management and costs provisions in the Cayman Islands as compared with the more comprehensive provisions in England and Wales. There had been no move in the Cayman Islands to introduce provisions or

GRAND CT.                                              RITTER v. BUTTERFIELD BANK

guidance in Practice Directions about costs that were consistent with an intent to widen the court's costs management powers to include the making of costs capping orders. Such a novel concept could only be introduced in this jurisdiction after detailed consideration by the Grand Court Rules Committee and codification by further clarifying costs provisions in the Grand Court Rules and guidance in a Practice Direction (paras. 94–95).

(5) If the court were wrong in considering that it lacked the power to make a costs capping order, it was not satisfied that it would be appropriate to make such an order in the present case. In England and Wales, the purpose of costs capping orders was to case manage costs before they were, or possibly as they were being, incurred. Such orders should be made prospectively rather than retrospectively, and as soon as possible in proceedings in order to enable the capped party to plan the appropriate level of expenditure (paras. 96–104).

**Cases cited:**

(1) *AB* v. *Leeds Teaching Hospitals NHS Trust*, [2003] EWHC 1034 (QB); [2003] 3 Costs L.R. 405; [2003] Lloyd's Rep. Med. 355, considered.

(2) *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.*, 2013 (2) CILR 344, considered.

(3) *Arroyo* v. *Equion Energia Ltd. (formerly known as BP Exploration Co. (Colombia) Ltd.)*, [2016] EWHC 3348 (TCC); [2017] 1 Costs L.O. 31, *dicta* of Stuart-Smith, J. considered.

(4) *BDO Cayman Ltd., In re*, 2018 (1) CILR 187, considered.

(5) *Billson* v. *Residential Apts. Ltd.*, [1992] 1 A.C. 494; [1992] 2 W.L.R. 15; [1992] 1 All E.R. 141; (1992), 63 P. & C.R. 122; [1992] E.G.L.R. 43, referred to.

(6) *Black* v. *Arriva North East Ltd.*, [2014] EWCA Civ 1115, *dicta* of Briggs, L.J. considered.

(7) *Esure Servs. Ltd.* v. *Quarcoo*, [2009] EWCA Civ 595, referred to.

(8) *Euroption Strategic Fund Ltd.* v. *Skandinaviska Enskilda Banken AB*, [2012] EWHC 749 (Comm), followed.

(9) *Henry* v. *British Broadcasting Corp.*, [2005] EWHC 2503 (QB); [2006] 1 All E.R. 154; [2006] 3 Costs L.R. 412, considered.

(10) *Huntsman Chemical Co. Aust. Pty. Ltd.* v. *International Pools Aust. Pty. Ltd.* (1995), 36 NSWLR 242, referred to.

(11) *King* v. *Telegraph Group Ltd.*, [2004] EWCA Civ 613; [2005] 1 W.L.R. 2282; [2004] 3 Costs L.R. 449; [2004] E.M.L.R. 429, followed.

(12) *Leigh* v. *Michelin Tyre plc*, [2003] EWCA Civ 1766; [2004] 1 W.L.R. 846; [2004] 2 All E.R. 175; [2004] 1 Costs L.R. 148; [2004] C.P. Rep. 20, *dictum* of Dyson, L.J. referred to.

(13) *Petursson* v. *Hutchinson 3G UK Ltd.*, [2004] EWHC 2609 (TCC); [2005] BLR 210, followed.

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

(14) *Sagicor Gen. Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.*, 2011 (2) CILR 471, referred to.
(15) *Smart* v. *East Cheshire NHS Trust*, [2003] EWHC 2806 (QB), considered.
(16) *Solutia UK Ltd.* v. *Griffiths*, [2001] EWCA Civ 736; [2001] 2 Costs L.R. 247; [2001] C.P. Rep. 92; [2002] P.I.Q.R. P16, considered.
(17) *Talent Business Invs. Ltd.* v. *China Yinmore Sugar Co. Ltd.*, 2015 (2) CILR 113, followed.
(18) *Various Ledward Claimants* v. *Kent & Medway Health Auth.*, [2003] EWHC 2551 (QB); [2004] 1 Costs L.R. 101, referred to.
(19) *Willis* v. *Nicolson*, [2007] EWCA Civ 199, referred to.

**Legislation construed:**
Grand Court Rules 1995 (Revised), O.62, r.4(2): The relevant terms of this sub-rule are set out at para. 32.
O.62, r.4(11): The relevant terms of this sub-rule are set out at para. 37.
*S. Dobbyn* for the plaintiffs;
*S. Said* for the defendant.

1   **WILLIAMS, J.:**

**The background**

This costs hearing arises in proceedings brought by the plaintiffs' amended writ of summons and statement of claim filed on November 2nd, 2016. The claim therein was that the defendant was liable for breach of contract, negligence and dishonest assistance in facilitating a fraud carried out on the second plaintiff's corporate account ("the Geneva account") which had been opened at the defendant bank in March 2008.

2   The second plaintiff, Geneva Insurance SPC Ltd. ("Geneva"), was incorporated in the Cayman Islands on March 28th, 2000 with the sole purpose to act as a captive insurance company serving the insurance needs of medical professionals practising in the United States. The first plaintiff, William Ritter ("Mr. Ritter"), was a director, sole shareholder and beneficial owner of Geneva.

3   The defendant is a bank which was incorporated in the Cayman Islands on November 22nd, 1967. In its amended defence filed on November 8th, 2016, the defendant denied any liability. It contended that the plaintiffs were estopped from asserting the forgeries upon which its claim was based, as the second plaintiff had failed to comply with its duties as the bank's customer by failing to notify the bank of forgeries that he was aware of. The defendant further denied that it, or any of its employees, had acted dishonestly in the operation of the Geneva account and sought a dismissal of the plaintiffs' dishonest assistance claim on the

GRAND CT.                                        RITTER v. BUTTERFIELD BANK

basis that there is a lack of evidence to justify such serious findings and because the claim was "defectively pleaded."

4   On October 16th, 2015, the plaintiffs made a written offer to settle for US$600,000. On October 22nd, 2015, the defendant replied, setting out the weaknesses it saw in the plaintiffs' case and made an offer to settle the proceedings for a payment of US$150,000. Although the plaintiffs clearly recognized and warned the defendant that there would be damaging publicity for the bank if they issued proceedings,[1] the defendant pointed out in the October 22nd, 2015 letter that the matter had already been reported in the press and online and that litigation risks and the possibility of irrecoverable costs led to the offer to settle being made.

5   On September 8th, 2016, the defendant made an increased written offer to settle for US$200,000. On September 26th, 2016, the defendant wrote[2] to set out the weaknesses it saw in the plaintiffs' dishonest assistance claim and invited them to withdraw that claim.

6   On May 29th, 2018, I delivered my reserved written judgment ("the judgment") following an eight-day hearing spread over a period of seven months. The background of the case is set out at length in the judgment and I do not intend to repeat that detail herein, as the parties should be fully aware of the content. In the judgment I found that the plaintiffs were estopped from bringing the claims based upon the forgeries. I also dismissed the plaintiffs' dishonest assistance claim.

7   By a notice of appeal dated June 12th, 2018, the plaintiffs seek to challenge only the estoppel decision contained in the judgment. To date, the parties have not filed an order setting out the terms of the judgment for the court to perfect.

**The costs issues**

8   At para. 203 in the judgment under the heading "Costs," I expressed a provisional view on costs as follows (2018 (1) CILR 529, at para. 203):

   "As the bank has been the successful party in this matter, as costs ordinarily follow the event, I am presently minded to make an order for the plaintiffs to pay the bank's costs. Having reviewed the manner in which the case has been argued, I am presently minded to make the order on the standard basis. However, if either party wishes to be

─────────────────────

   1   See para. 51 below concerning plaintiffs' counsel's observations in their October 16th, 2016 letter sent to the defendant six days earlier highlighting the adverse publicity for the bank resulting just from any publication of the writ and statement of claim.
   2   See para. 47 below.

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

heard on the issue of costs they should, within 21 days of the circulation of the perfected version of this judgment, file and serve a summons seeking a costs hearing."

On June 14th, 2018, the defendant filed a summons in which it sought at para. 1:

"Pursuant to GCR O.62, the Plaintiffs to pay the Defendant's costs of and incidental to these proceedings, to be taxed on the indemnity basis if not agreed."

9   On June 15th, 2018, the plaintiffs filed their summons in which they sought, at para. 1, orders:

"Pursuant to section 24 of the Judicature Law (2017 Revision) and GCR O.62 that the Defendants' costs of and incidental to these proceedings as may be ordered to be paid by the Plaintiff shall be taxed on the standard basis if not agreed and shall be capped at such sum as the Court shall think fit to be proportionate to the value of the claim determined by the Court in these proceedings, namely US$529,191.72."

10   The parties submitted the listing form dated June 14th, 2018 to the listing officer on June 15th, 2018. The listing form clearly set out that the issues for the court to determine were those found in the two above-mentioned summonses. No other issues in relation to costs were mentioned in the listing form. It is clear that the summonses were issued with the date of August 7th, 2018 being set for the hearing based on the issues contained in the summonses and repeated in the listing form signed by both parties.

11   On July 16th, 2018, the defendant wrote to the plaintiffs. In the letter, a concern was expressed about the level of costs that may be incurred in relation to the appeal and that neither plaintiff had sufficient assets available to enforce any costs order that may be made against them in the appeal. The defendant invited the plaintiffs to provide financial information to meet an inference that they had insufficient assets and indicated that, if they failed to do so by July 20th, 2018, an application would be made for security for costs.

12   On July 16th, 2018, the plaintiffs' attorney responded, stating that it was impossible to substantially respond within four days and that, due to her workload, she requested that an extension be given until July 31st, 2018 for a response.

13   On July 17th, 2018, the defendant replied by email and refused to give an extension until July 31st, 2018. It indicated that, if a security for costs application needed to be heard, it should be heard at the hearing which is now before me. In the email the defendant suggested directions

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

and for the first time set out the orders sought, which are detailed in para. 17 below.

14   On July 18th, 2018, the plaintiffs' attorney responded to the email, reiterating that she could not comply with a deadline of July 20th, 2018 due to her pre-existing work commitments. She rightly highlighted that the notice of appeal had been filed and served on June 12th, 2018 and that the defendant, after a gap of five weeks, was now seeking this disclosure with a very tight deadline. She made clear that she would be opposed to the hearing being used in relation to any orders which were not contained in the two summonses and the listing form. She stated that the legal arguments for a security for costs application and the further orders would be different, requiring separate written submissions and preparation. Counsel indicated that she would complete a new listing form, as it would be sensible to deal with the further orders at the same time as any application for security of appeal costs.

15   On July 19th, 2018, the defendant's counsel responded. He indicated that his client agreed, with an apparent degree of reluctance, that the security for costs for the appeal application may be pursued at a later hearing. He also argued that no further summons was required in relation to the further consequential costs applications and that they logically fell to be determined together with the costs issues raised in the two filed summonses. Counsel was unsympathetic to the claims by the plaintiffs' counsel concerning her workload and he stated that she had ample time in the three weeks prior to this hearing to address the new issues.

16   On July 19th, 2018, the plaintiffs' attorney responded, indicating that Mr. Ritter was away on vacation and that no instructions would be received from him until July 30th, 2018.

17   On July 26th, 2018, an affidavit, sworn by Andrew Bolton on the same day, was filed. At para. 3 of the affidavit Mr. Bolton stated:

"Pursuant to the Summons, and as notified to the Plaintiffs' Attorneys on 17 August 2018, the defendant seeks the following further consequential costs orders:

   (a) an order that the plaintiffs make a payment on account of the recoverable costs incurred by the defendant in these proceedings, within 28 days of the sealing of the Court's Order on the Summons;

   (b) Certification by this Honourable Court, pursuant to paragraph 3 of Practice Direction No. 1 of 2011, that the allowable rates to be applied by the Taxing Officer in any taxation of the Defendant's costs incurred on these proceedings, shall be those applicable in the Financial Services Division of the Grand Court, on the basis that the proceedings can fairly be described as having been both unusually complex, and unusually important (the latter given the allegations of

645

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

dishonesty made against one of the Islands' leading, and highly reputable, Class A Banks); and

   (c) an order that the Plaintiffs do pay interest on the recoverable costs incurred by the Defendant in these proceedings, from the date of the judgment until final payment (at the rate of 2.375% as per the Judgment Debts (Rates of Interest) Rules."

18   On August 1st, 2018, the defendant wrote to the plaintiffs, indicating that he had still not received a substantive response, despite the fact that the requested July 30th, 2018 extended deadline date had passed. As a consequence, a listing form was submitted in relation to a separate security for costs of the appeal application.

19   On August 1st, 2018, the plaintiffs' attorney responded, acknowledging receipt of the affidavit sworn by Mr. Bolton. She reiterated that the summonses before the court did not contain applications for the consequential relief set out in the affidavit, and argued that meant the applications were therefore not before the court. She made it clear that she did not consent to deal with the new applications, especially without service of a summons and the provision of a new listing form. Counsel stated that the applications were premature and that any hearing in relation to consequential orders should follow from the final determination of costs, at which time she agreed the application for the security for the costs of appeal could also be heard.

20   On August 2nd, 2018, the defendant's attorney responded indicating that he could not understand the plaintiffs' opposition to dealing with "these short and simple consequential costs application." He understandably, although without mentioning it by name, advocated the type of approach envisaged by the overriding objective.

21   The impasse between the parties concerning what should be dealt with at the hearing was reiterated by the plaintiffs in writing on August 2nd, 2018. Counsel stated that their written submissions would not address the further consequential costs issues, save to contend that they needed to be made as a separate application. She lamented the defendant's characterization of her approach to the proceedings as being "a lack of co-operation," and she again repeated the unrelated work that she had already been obligated to undertake following the listing of the two summonses which are now before me.

**The costs hearing**

22   On August 7th, 2018, I received lengthy oral submissions from both counsel on the issue of costs. At the hearing the court had before it a 31-page skeleton argument filed for the defendant and the plaintiffs' 11-page written submissions. The plaintiffs' written submissions were

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

considerably briefer, as they did not cover the issues raised by "the further
consequential costs orders" rehearsed at para. 3 in Mr. Bolton's affidavit.

23    Due to the number of issues raised, some of which were not disclosed in the
listing form, the hearing could not be concluded in the one day allotted. Therefore,
following their request, the parties were permitted to submit further written
submissions. Regrettably, the case then followed an unattractive, albeit familiar,
path in this matter with a number of supplemental written submissions being filed,
as well as the court receiving a number of emails, including inter-party
correspondence in which each party sought to address points made in the latest
written submissions filed by the other party. The court's concern about the
procedural course being followed by the parties was pointed out to them in writing
on September 4th, 2018. They were informed that, if there were any issues arising
out of the written submissions received by that date which a party wished the court
to deal with, then that party would need to file and serve the appropriate application
before my return to the jurisdiction at the end of September 2018. The parties were
told that, if no application was received by September 28th, 2018, the court would
then embark upon the judgment writing exercise. Unfortunately, this has caused
delay, especially as the judgment writing time allocated to me for this case in the
court lists was lost due to the issues arising about the post-hearing written
submissions. Following the September 4th, 2018 communication to the parties, no
application or further submissions were received about the subject matter or
concerning exclusion of any of the written submissions already received. This is
the reserved written judgment following my review of all of the oral and written
submissions received to date.[3]

24    At the outset of the hearing, the plaintiffs reiterated their opposition to the
hearing being used to also determine the further costs orders sought. The court was
referred to some of the correspondence which I have outlined in paras. 11–20
above. The plaintiffs' counsel again argued that the issues to be determined at the
hearing should be those set out and agreed in the listing form.

25    I agree with the defendant that, if feasible, the court should deal with as many
applications as it can at one hearing. In certain circumstances such an approach
may well be consistent with the court dealing with every cause in "an expeditious
and economical" way, as the aim of the overriding objective of the Grand Court
Rules is to enable the court to do so. The overriding objective also requires the
court to deal with every

---

3    The parties were informed in writing on October 4th, 2018 that as no
applications had been filed, the court would "take it that the parties
are now content for [the court] to go ahead (when time permits) to
commence the judgment writing based on *all* of the
submissions/material which each party has submitted to date."

A-9602

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

cause or matter in a "just way." It is this latter purpose upon which I see some merit in the plaintiffs' submissions, even though I may liberally construe the Rules "to give effect to the Overriding Objective to secure the just, most expeditious and least expensive determination of every cause or matter on its merits."

26   Ordinarily, one would expect a party to place substantive orders sought in the face of the relevant summons. The purpose of that is to enable the court, when fixing matters for hearing, to review the content of the summons, along with the listing form, to thereby ascertain that the time estimate is appropriate and how urgent the hearing is. The purpose is also to enable the other party to know from the time of service what issues it has to prepare for and, armed with that knowledge, to agree in an informed manner to a specific listing date and time estimate. In the Family Division, this has led to a development whereby a party that is seeking additional orders not set out in the original summons will frequently file an amended summons in a timely fashion. It may be that a similar approach should be followed in the Civil Division.

27   The absence of the specific applications in the summons and/or in a listing form does not in itself prevent a court making "such further order as the Court thinks fit," especially if both parties have had the opportunity to adequately prepare and present their arguments concerning orders that the court may consider making.

28   By June 15th, 2018, the parties were *ad idem* about the orders the other party was asking the court to make. On that basis, both parties agreed on that date about their available dates and ability to properly prepare for the hearing having regard to their wider court commitments. It was not until five weeks later that the defendant informed the plaintiffs that further consequential cost orders would also be sought at this hearing. I do not agree with the defendant's counsel's characterization of the applications, in his email of August 2nd, 2018, as being "short and simple." As soon as counsel for the plaintiffs was made aware of the intended application for consequential costs orders, she made it abundantly clear the basis upon which the agreed listing had been made, especially having regard to her busy workload. She is an experienced attorney, and I do not deem it appropriate for the court to explore what wider and unrelated case work this officer of the court had already been obliged to undertake at the time she was notified of the additional orders being sought.

29   I understand what motivates the defendant's position, as it simply seeks to have all the issues dealt with at the same time, thereby potentially saving court time and reducing costs. Of course some of the issues that it seeks determination of will only become relevant if it is successful in the determination of the issues actually set out in the two summonses.

648

A-9603

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

30   Having considered all of the above, in the absence of agreement in the circumstances of this case for the court to consider making wider orders at this time, I deemed it appropriate for the court to limit its consideration to the contested orders set out in the two summonses.[4] I did not feel it just for me, in the circumstances of this case, to go on to make the further orders belatedly sought using my wide discretion when considering costs and the paragraph in the summonses which invited the court to make further other orders as it may think fit.

**Agreement between the parties concerning the general principle that costs follow the event**

31   The plaintiffs sensibly concede that costs should follow the event in accordance with GCR O.62, r.4(5). The plaintiffs also sensibly concede that the defendant has been the successful party and is therefore entitled to its costs. Accordingly, I am satisfied that the plaintiffs should pay the costs of the proceedings. The issue is what should be the nature of those costs orders.

32   I am conscious that GCR O.62, r.4(2) provides:

"The overriding objective of this Order is that a successful party to any proceeding should recover from the opposing party the reasonable costs incurred by him in conducting that proceeding in an economical, expeditious and proper manner unless otherwise ordered by the Court."

33   Accordingly, the present costs hearing concentrated on the different orders sought by each party. The defendant seeks an order that the costs be taxed on the indemnity basis. The plaintiffs, on the other hand, seek an order that the costs be taxed on the standard basis and be capped at a proportionate sum to the value of the claim, which they put at US$529,191.72.

34   In my judgment dated December 15th, 2016, I made costs orders in relation to the plaintiffs' applications for leave to amend their statement of claim and for an adjournment of the trial. At the costs hearing, the defendant had sought an order for its costs occasioned by the amendments to be made on the standard basis and an order for its costs thrown away in relation to the adjournment to be made on the indemnity basis. For the reasons set out in para. 69 in my judgment, I made no order for the costs thrown away in relation to the adjourned trial. I made an order that the plaintiffs do pay the defendant's costs occasioned by the amendments on the standard basis. I made no order for costs in relation to that costs

---

4   Save for the parties' agreement about the defendant's claim for interest set out at para. 3(c) in the affidavit sworn by Andrew Bolton on July 26th, 2018.

THE CAYMAN ISLANDS LAW REPORTS                              2018 (2) CILR

hearing. The parties agree that those orders, and any others made of a similar nature in the proceedings, remain in place and that they will not be displaced by any orders that I may now make.

35   The parties agree that the court may make an order that the plaintiffs do pay interest on the recoverable costs incurred by the defendant in these proceedings, from the date of the judgment until final payment (at the rate of 2.375% as per the Judgment Debts (Rates of Interest) Rules). Accordingly, I make such an order.

**Indemnity costs—general principles**

36   The general rule in litigation is that costs follow the event and that the successful party will be awarded costs. It is recognized that this can leave the successful party out of pocket. The gap between the amount of costs in fact paid by a successful litigant and the amount of party and party costs which are recoverable can be substantial.

37   As highlighted by Henderson, J. in *Sagicor Gen. Ins. (Cayman) Ltd.* v. *Crawford Adjusters (Cayman) Ltd.* (14), GCR O.62, r.4(11) provides an alternative basis upon which costs may be ordered. The rule provides in respect of costs ordered on an indemnity basis that—

   "the Court may make an inter partes order for costs to be taxed on the indemnity basis only if it is satisfied that the paying party has conducted the proceedings, or that part of the proceedings to which the order relates, improperly, unreasonably or negligently."

38   The discretion under the rule is not fettered or circumscribed, and it must be exercised judicially in the light of the particular facts of each case. There are many cases which have considered the appropriate principles to be applied in exercising the discretion to award costs on the basis other than party and party. It is accepted that something special or unusual must be demonstrated in order to justify a departure from the ordinary costs order.[5] These include where a losing party has misconducted itself in relation to the proceedings, where the institution of the proceedings was plainly unreasonable or where the proceedings were issued for a collateral purpose.

39   The award of costs on the indemnity basis is often seen in cases where the court wishes to indicate its disapproval of the conduct of the paying party. In the words of 10 *Halsbury's Laws*, 4th ed., para. 22, at 22, n.8 (2007):

_____

   5   *Billson* v. *Residential Apts. Ltd.* (5).

GRAND CT.                           RITTER v. BUTTERFIELD BANK

"Indemnity costs may be awarded against the party whose conduct has been unreasonable, even though the conduct could not properly be regarded as lacking moral probity or deserving moral condemnation: *Reid Minty (a firm)* v *Taylor* [2001] EWCA Civ 1723."

40   The defendant helpfully highlights the following parts of Smellie, C.J.'s summary of the principles in *Talent Business Invs. Ltd.* v. *China Yinmore Sugar Co. Ltd.* (17). I make no apology for setting out in detail the Chief Justice's insightful analysis (2015 (2) CILR 113, at paras. 35–41):

"35   . . . I shall set out the general principles that guide the application of the rule, as developed in the case law (and as helpfully presented by counsel in their written submissions).

36   In *Ahmad Hamad Algosaibi & Bros. Co.* v. *Saad Invs. Co. Ltd.* . . . the following guidance was given, as summarized in the headnote (2013 (2) CILR at 346–347):

'In considering awards for indemnity costs, the court's focus should be primarily on the conduct of the losing party, not on the substantive merits of the case. Such an award should be made only in exceptional circumstances, *such as where the losing party had behaved improperly, negligently or unreasonably.* Advancing a claim which was unlikely to succeed, or which did in fact fail, was not by itself sufficient for the award of indemnity costs; to justify such an award, *there should normally be an element in the losing party's conduct which deserved a mark of disapproval. That conduct would need to be unreasonable to a high degree, though may fall short of deserving moral condemnation.*' [Emphasis supplied.]

37   In *Al Sadik* v. *Investcorp Bank BSC* . . . Jones, J., applying the same test, ordered (2012 (2) CILR 33, at para. 14 and paras. 16–17) the plaintiff to pay indemnity costs because he had conducted the proceedings improperly and unreasonably:

'14   In my judgment, a proceeding, or some identifiable part of it, can only be said to have been conducted 'improperly' within the meaning of r.4(11) if the court is satisfied, in all the circumstances of the case, that a party has invoked the court's jurisdiction illegitimately or abused the process in a way which attracts moral condemnation. *A party who asserts a cause of action when he knows that he has no legitimate basis for doing so is acting improperly* . . .

16   . . . The outcome of litigation frequently turns upon the court's findings of fact and it is not unusual for such findings to depend upon the court's assessment of the credibility and

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

truthfulness of the witnesses. By itself, this outcome does not lead to the conclusion that the losing party had no legitimate case and was abusing the court's process in some way. It can only be said that *Mr. Al Sadik is guilty of substantive misconduct to the extent that he advanced a case which he knew to be false.*

17   . . . I have come to the conclusion that the conduct of Mr. Al Sadik's case was "improper and unreasonable" only in one respect. His claim to have the benefit of a guaranteed return was raised after the market crash triggered by the Lehman Brothers bankruptcy and pursued relentlessly to the bitter end, notwithstanding that he knew in his own mind that he had not been given any enforceable guarantee. In this respect, I conclude that Mr. Al Sadik's case was conducted improperly and unreasonably within the meaning of r.4(11).'

38   This decision later received the approval of the Court of Appeal in *Asia Pacific Ltd.* v. *ARC Capital LLC* . . . Chadwick, P. stated (2015 (1) CILR 299, at para. 56):

'In my view, Jones, J. was correct to take the view, in the *Sadik* case, that "a party who asserts a cause of action when he knows that he has no legitimate basis for doing so is acting improperly" within the meaning of O.62, r.4(11). He was correct to draw the distinction between a party who is advancing an honest case—but who fails because the court finds the evidence which he has adduced in support of that case to be incredible or untruthful—and *a party who is advancing a case which he knows to be false.*'

39   That *the deliberate giving of false evidence can be sufficient to justify an award of costs on the indemnity basis* has been clear for some time. In *Nike Real Estate Ltd.* v. *De Bruyne* . . . (a case decided on the basis of the court's inherent jurisdiction prior to the coming into force of O.62, r.4(11)), the court found that two of the defendants had colluded in giving false evidence. In the circumstances, the court was of the view that the case justified the award on the indemnity basis and granted costs to the plaintiff on that basis, observing (2002 CILR 33, at para. 15, *per* Kellock, Ag. J.):

'I do not think that either the High Court in England or this court exists for the purposes of encouraging people to put forward such a case, and if they do I would have thought that the charge of abuse of process was made out, at least to the extent necessary to justify an award of indemnity costs.'

652

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

40   Further, I am satisfied that the court is entitled to consider *whether it was reasonable for a party to proceed with a particular defence, taking into account what should have been evident to the party as rendering it improper when filing that defence*: *Att. Gen.* v. *Bennett* . . . In that case, it was held, as summarized in the headnote (2010 (1) CILR 479).

> 'The plaintiff would not be awarded indemnity costs. Although a party's pursuit of a hopeless claim or maintaining a hopeless defence would justify an order for indemnity costs against it, proceeding with a merely weak claim or defence would not. It would be reasonable for a party with a merely weak claim or defence to seek the court's determination of the issue, and an award of indemnity costs—which were penal in nature—would therefore be inappropriate. Moreover, the court needed to avoid the use of hindsight. The question would be whether it was reasonable to proceed with the claim or defence based on the facts as they should have appeared to the party at the time. Since the respondent would not have understood the defence to be hopeless—indeed, the plaintiffs' attorney had estimated his chance of success at 50%—the plaintiff would only be awarded his costs on the standard basis.'

41   Whilst the jurisdiction to award indemnity costs in England is thought to be somewhat wider than that in the Cayman Islands, some of the leading English authorities nevertheless remain of assistance. In *Three Rivers D.C.* v. *Bank of England* . . . Tomlinson, J. summarized ([2006] 5 Costs L.R. 714, at para. 25) the principles upon which the court should determine any question of indemnity costs, elaborating upon the test of unreasonableness as follows:

> '(1) The court should have regard to all the circumstances of the case and *the discretion to award indemnity costs is extremely wide*.
>
> (2) The critical requirement before an indemnity order can be made in the successful [party's] favour is that *there must be some conduct or some circumstance which takes the case out of the norm*.
>
> (3) Insofar as the conduct of the unsuccessful claimant is relied on as a ground for ordering indemnity costs, *the test is not conduct attracting moral condemnation, which is an a fortiori ground, but rather unreasonableness*.
>
> (4) The court can and should have regard to the conduct of an unsuccessful claimant during the proceedings, both before and during the trial, as well as *whether it was reasonable for*

653

A-9608

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

*the claimant to raise and pursue particular allegations and the manner in which the claimant pursued its case and its allegations.*

(5) Where a claim is *speculative, weak, opportunistic or thin*, a claimant who chooses to pursue it is taking a high risk and can expect to pay indemnity costs if it fails.

(6) *A fortiori*, where the claim includes allegations of dishonesty, let alone allegations of conduct meriting an award to the claimant of exemplary damages, and those allegations are pursued aggressively *inter alia* by hostile cross examination.

(7) *Where the unsuccessful allegations are the subject of extensive publicity*, especially where it has been courted by the unsuccessful claimant, that is a further ground.

(8) The following circumstances take a case out of the norm and justify an order for indemnity costs, particularly when taken in combination with the fact that a defendant has discontinued only at a very late stage in proceedings;

   (a) *Where the claimant advances and aggressively pursues serious and wide ranging allegations of dishonesty or impropriety over an extended period of time*;

   (b) *Where the claimant advances and aggressively pursues such allegations, despite the lack of any foundation in the documentary evidence for those allegations, and maintains the allegations, without apology, to the bitter end*;

   (c) Where the claimant actively seeks to court publicity for its serious allegations both before and during the trial in the international, national and local media;

   (d) Where the claimant, by its conduct, turns a case into an unprecedented factual enquiry by the pursuit of an unjustified case;

   (e) *Where the claimant pursues a claim which is, to put it most charitably, thin and, in some respects, far-fetched*;

   (f) *Where the claimant pursues a claim which is irreconcilable with the contemporaneous documents*;

   (g) *Where a claimant commences and pursues large-scale and expensive litigation in circumstances calculated to exert commercial pressure on a defendant, and during the course of the trial of the action, the claimant resorts to advancing a constantly changing case in order to justify*

654

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

> *the allegations which it has made, only then to suffer a resounding defeat.'"*[6]

41   The defendant points out that at paras. 16–19 in *In re BDO Cayman Ltd.* (4), Parker, J. highlighted such factors as a "root and branch" opposition, a "dogged defence," the pursuit of "every conceivable argument," as well as "thin and unconvincing" arguments and "imaginative arguments" on the law.

42   The plaintiffs helpfully highlight the following parts of Gloster, J.'s summary of the principles in *Euroption Strategic Fund Ltd.* v. *Skandinaviska Enskilda Banken AB* (8) ([2012] EWHC 749 (Comm), at paras. 11–14 and para. 17):

> "11.  . . . The principles are well-known and have been exhaustively rehearsed in the relevant authorities. The following is no more than a headline summary.
>
> 12.   First, on either basis, the receiving party is only entitled to recover costs which it has actually incurred, and, further, is only entitled to receive costs which were reasonably incurred and were reasonable in amount. Second, the standard basis is the normal basis of assessment: see *Reed Minty v Taylor* [2002] 1 WLR 2800 at [28]; *Excelsior Commercial & Industrial Holdings Ltd v Salisbury Hammer Aspden & Johnson* [2002] EWCA (Civ) 879 at [19]. This means that there has to be something in the conduct of the action, or about the circumstances of the case in question, which takes it out of the norm in a way which justifies an order for indemnity costs: see *Excelsior* (*supra*) and *Noorani v Calver* [2009] EWCA 592 (QB) at [9], *per* Coulson J. Third, cases vary very considerably, and the Court of Appeal has declined to lay down guidelines on the subject: see *Excelsior* (*supra*) at [32]. It is obvious from a reading of the authorities that each case is highly fact-dependent.
>
> 13.   Fourth, to demonstrate that a case has gone outside the norm of behaviour, it is not necessary to show that the paying party's conduct lacked moral probity or deserved moral condemnation in order to attract recovery of costs on an indemnity basis: see *Balmoral Group Ltd v Borealis (UK) Ltd* [2006] EWHC 2531 (Comm) at [1], where Christopher Clarke J said:
>
>> '. . . The basic rule is that a successful party is entitled to his costs on the standard basis. The factors to be taken into account when deciding whether to order costs in the latter basis have been helpfully summarised by Tomlinson, J., in *Three Rivers*

_____

6   Emphasis and highlights made by the defendant.

District Council v The Governor and Company of the Bank of England [2006] EWGC 816 (Comm) [*sic*]. The discretion is a wide one to be determined in the light of all the circumstances of the case. To award costs against an unsuccessful party on an indemnity scale is a departure from the norm. There must, therefore, be something—whether it be the conduct of the claimant or the circumstances of the case—which takes the case outside the norm. It is not necessary that the claimant should be guilty of dishonesty or moral blame. Unreasonableness in the conduct of the proceedings and the raising of particular allegations, or in the manner of raising them may suffice. So may the pursuit of a speculative claim involving a high risk of failure or the making of allegations of dishonesty that turn out to be misconceived, or the conduct of an extensive publicity campaign designed to drive the other party to settlement. The making of a grossly exaggerated claim may also be a ground for indemnity costs.'

14.    However, as Mr. Shivji emphasised, by reference to paragraph 8 of the decision in *Noorani* (*supra*), conduct must be unreasonable 'to a high degree' to attract indemnity costs. 'Unreasonable' in this context does not mean merely wrong or misguided in hindsight: see per Simon Brown LJ (as he then was) in *Kiam v MGN Limited (No 2)* [2002] 1 WLR 2810. In each case, it is a fact dependent question as to whether or not the paying party's conduct has been unreasonable to a high degree.

. . .

17.    In my judgment, for the purposes of the exercise of my discretion, it is necessary to stand back and look at the nature of Euroption's claim as a whole, rather than conduct a micro-analysis of particular aspects of particular claims."

43    With these uncontroversial general principles in mind, I move on to analyse the facts and their application to the law in the specific legal arguments advanced by each party concerning the issue of the appropriate basis of taxation.

**Basis of taxation of costs in relation to the dishonest assistance element of the plaintiffs' claim**

44    In the judgment I dismissed the plaintiffs' dishonest assistance claim. The plaintiffs contend that the dishonest assistance claim was interrelated with their estoppel claim. Although the plaintiffs have appealed other parts of the judgment, the court's ruling on the dishonest assistance element has not been appealed. It is submitted by the plaintiffs that the test for indemnity costs is "not predicated on a case being dismissed for want of

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

prosecution" as it "requires unreasonable or negligent conduct in bringing such a claim."

45   I noted in the judgment, due to their serious nature and the resultant tactical litigation pressure exerted on and consequences for the other party whether the allegations were proved or not, the particular importance in dishonesty claims that the principles of pleading must be strictly observed from the outset and be ongoing. I found that the pleadings were defective and that this had been drawn to the plaintiffs' attention by the defendant from an earlier stage of these proceedings. I also found that the plaintiffs failed to provide sufficient evidence to prove the potentially very damaging allegation.

46   The defendant contends that the plaintiffs' conduct in persisting with its "wide-ranging" dishonesty claim against the defendant, which the bank characterizes based upon in its interpretation of my judgment as being "baseless in fact" and "defective in law," amounts to "conduct deserving moral condemnation" and is "litigation conduct which is unreasonable to a high degree, justifying an order for indemnity costs." The defendant, prior to addressing other areas of the plaintiffs' case opined that "the issues surrounding the Plaintiffs' pleading and pursuit of the dishonesty claim are sufficient on their own to justify an order for indemnity costs."

47   In the letter dated September 26th, 2016 to the plaintiffs' attorney, the defendant gave a "formal invitation" to them to withdraw their "hopelessly defective" dishonest assistance claim.[7] The defendant set out eight reasons why the claim should have been withdrawn at that stage including the lack of evidence and defective pleadings. In the letter the following clear warning was then given:

"We hereby put your clients on notice that if they persist in this claim despite the valid points we make above, we reserve the right to bring this correspondence to the attention of the Court on the question of costs, which we will seek (*in respect of this issue*) on the indemnity basis, given that it will have been pursued improperly, unreasonably and negligently (for the purposes of GCR O.65 [*sic*] r.4(11))."

48   In a letter dated October 6th, 2018, the defendant reiterated:

"Our position to your clients' dishonest assistance claim remains as set out in our letter of 26 September 2018. If you are not prepared to withdraw that claim as requested, we will bring the defects pointed out in that letter to the courts' attention and seek appropriate relief."

_____

7   See para. 5 above.

657

A-9612

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

49   If one reviews the content of the defendant's above-mentioned letter of September 26th, 2016, it is clear that the plaintiffs were made aware of the inevitable outcome of this part of their claim and were warned of the potential negative costs implications if they persisted with bringing the same.

50   A formal warning of an intention to claim indemnity costs can make the awarding of indemnity costs more likely. This is illustrated by the non-binding Australian case of *Huntsman Chemical Co. Aust. Pty. Ltd.* v. *International Pools Aust. Pty. Ltd.* (10). As can be seen from the above, the defendant did give a formal costs warning to the plaintiffs relating to the flaws in the dishonest assistance claim, and this warning, which was not heeded, forms a part of my consideration of this application.

51   The court should have regard to all the circumstances of the case and the discretion to award indemnity costs is extremely wide. In relation to the dishonest assistance claim I have considered whether the plaintiffs' conduct took the case out of the norm. "Out of the norm" does not mean that the conduct or circumstance has to be a rare occurrence, but rather "something outside the ordinary and reasonable conduct of proceedings."[8] The test in relation to that conduct is not necessarily conduct attracting moral condemnation but rather unreasonableness. With this in mind I have regard to the plaintiffs' conduct throughout the proceedings, prior to and during the hearing. I also have regard as to whether it was reasonable for the plaintiffs to raise and pursue the dishonest assistance allegations, as well as the persistent and forceful manner in which they did so. The dishonest assistance claim was clearly defectively pleaded, a speculative claim involving high risk and evidentially very weak. Some of these are factors which Gloster, J., highlights at para. 13 of the *Euroption* case (8), a case actually greatly relied on in the plaintiffs' written submissions on costs dated August 3rd, 2018. The plaintiffs should have realized that, when choosing to improperly pursue the serious allegations of dishonesty over an extended period of time, especially after the defendant's letter of September 26th, 2016, they were taking a high risk and were aware of the risk of indemnity costs being sought if it failed. For indemnity costs to be awarded in such a situation there is no requirement for a judge to have drawn concerns about the pleadings or about the evidentiary strength of a claim to a plaintiff's attention during the proceedings or the hearing, although if a judge does that may also be a factor to take into account in a dishonesty claim. The plaintiffs advanced and aggressively pursued the dishonest assistance claim, despite the defective pleading and lack of supporting evidence, and maintained the allegations, without apology, right to the end of the hearing. It is evident that they recognized the

_____

8   *Esure Servs. Ltd.* v. *Quarcoo* (7), Waller, L.J.

A-9613

GRAND CT.                           RITTER v. BUTTERFIELD BANK

potential damage that such an allegation could inflict on the bank and that could be
unattractively used as leverage in settlement negotiations. In the letter dated
October 16th, 2015, in which an offer to settle for payment of $600,000 was made,
the plaintiffs' counsel stated to the defendant's attorney:

> "Your client will no doubt be aware that the finalised writ and statement of
> claim will be published in Offshore Alert approximately 10 days after they are
> filed in the Grand Court. *Accordingly, in deciding whether to settle this matter
> the Bank will need to consider what value it places on such adverse publicity
> and on preserving its institutional reputation.*" [Emphasis supplied.]

**Conclusion on the basis of the taxation of the costs for the dishonest assistance
claim**

52   The nature of the claim and the plaintiffs' highly unreasonable conduct takes
the pursuance of dishonest assistance element of the proceedings out of the norm.
Accordingly, I order an assessment on the indemnity basis of the costs related to
that element of the proceedings. The fact that the plaintiffs now disclose that they
relied upon their view that leading counsel in England, who reviewed their
pleadings, did not consider the plaintiffs' dishonest assistance claim to have no
prospect of success does not excuse their failure to withdraw the claim, especially
following and in light of the correct observations made in correspondence in
September 2016 by the defendant's attorney. That is not the same as the Chief
Justice's consideration in *Ahmad Hamad Algosaibi & Bros. Co. v. Saad Invs. Co.
Ltd.* (2) when not making an order for costs on the indemnity basis, of the effect of
the forensic accountancy report upon which reliance was placed before bringing
the claim in that matter.

**Basis of taxation of costs in relation to the balance of the proceedings**

53   Before I analyse the parties' submissions, I wish to clarify the content of para.
205 in the judgment (2018 (1) CILR 529, at para. 205). It is the final paragraph in
the judgment where both counsel were deservedly commended for their hard work
during the course of the proceedings. In that paragraph I mentioned that there were
a number of complex issues which required counsels' and the court's attention.
This case was heard at Grand Court level and it is not unusual for the Civil Division
of this court and the parties to have to grapple with issues of this nature. The issues
that arose and which were determined were not such as to cause this case to be
regarded as being unusual in complexity or importance or a test case. My
preliminary view is that the nature of the case does not merit a direction for an uplift
of the allowable rates of the fees to the level permitted for

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

cases in the Financial Services Division.[9] However, I am aware that a summons has been issued for that point to be properly argued and I reserve my final decision on the issue when I have had the opportunity to receive more detailed submissions. An order for indemnity costs should not be made solely due to the nature of the subject matter or legal issues involved in this case.

54    The plaintiffs rightly point out that a decision to grant indemnity costs would concentrate on the conduct of the losing party and not the substantive merits, and that this was only in exceptional circumstances. The plaintiffs also rightly point out that even if a party loses on all points in a claim, that in itself does not lead to a categorization of the case as being one out of the norm and being so exceptional as to merit the making of an indemnity costs order. When reading the written submission the parties are in agreement about the above general principles. The plaintiffs seem to wrongly view that the defendant seeks indemnity costs not for unreasonable conduct reasons, but primarily based on a submission that it would be right to do so to penalize the plaintiffs for losing the case.

55    The defendant claims that indemnity costs are not sought simply on the basis of the merits of the case, but, in light of findings in the judgment, due to the first plaintiff's conduct which it is contended was improper and highly unreasonable "by advancing a defence to the estoppel case which he knew to be false, without legitimate basis and irreconcilable with contemporaneous documents." It is claimed that the first plaintiff gave false evidence to the court and that the plaintiffs conducted their case in "a manner which was unreasonable to a high degree."

56    The defendant points out that the first plaintiff, despite asserting from the start and in his evidence-in-chief that he did, must not have genuinely believed the story spun by Mr. Self that the money paid to him had come from family money, especially as stated in his evidence that he recognized that there was a real risk that it had been stolen from other customers. The defendant contends that there are a number of other reasons why the court should lay down a mark of disapproval for the plaintiffs' conduct which was "both unreasonable to a high degree, and deserving moral condemnation," by making an order for indemnity costs for those incurred in meeting all of the plaintiffs' unsuccessful claims. These include a contention that—

   (i) thin, unconvincing and far-fetched arguments on the facts were presented and persisted with by the plaintiffs despite contradictory evidence filed by the defendant that was accepted by the court;

_____

      9    Paragraph 3, Practice Direction No. 1/2011.

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

(ii) the plaintiffs put forward and persisted with a number of imaginative and clearly misconceived arguments on the law;

(iii) the first plaintiff advanced parts of his case, in evidence, knowing that there was no factual basis for doing so;

(iv) the plaintiffs' case was constantly changing, resulting in inconsistency with positions previously taken in the proceedings and that on fundamental issues in the case, on their own case, there were inconsistencies;

(v) the plaintiffs' case was completely irreconcilable with contemporaneous documents which illustrated a disregard for the need to tell the truth; and

(vi) the plaintiffs sought to wrongly blame or criticize innocent third parties in an attempt to make the first plaintiff appear to be the only innocent party.

57   I have carefully reviewed the parts of the evidence and from my judgment highlighted by the defendant at paras. 16–21 of his written submissions and reiterated at para. 3 of his supplemental submissions.

58   In support of a submission that the plaintiffs presented "thin and unconvincing arguments on the facts" which were "far-fetched" and which were persisted with despite highly contradictory evidence from professionals who had previously been employed by the plaintiffs, such as Mr. Arbo of BDO and Mr. Krys of Krys Global,[10] the defendant highlights:

(i) the first plaintiff's evidence that he believed that BDO were going to "notify everyone who needed notifying" including the bank[11]; and

(ii) the first plaintiff's evidence that he concurrently believed that Krys Global were going to "notify everyone who needed notifying" including the bank. Those arguments were persisted in, even after the defendant served evidence from Mr. Arbo and Mr. Krys entirely contradicting these allegations.[12]

59   In support of its contention that the plaintiffs also put forward and persisted with a number of "imaginative" and "entirely and obviously misconceived arguments on the law," the defendant highlights:

_____

10   Paragraph 91 of the judgment.
11   As mentioned at para. 66 in the judgment.
12   Mr. Arbo's and Mr. Krys's evidence was preferred by the court—see para. 80 and 96 of the judgment.

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

(i) the point raised for the first time after the hearing had commenced that the *Greenwood* duty "might possibly be curtailed by a possibly conflicting duty under the proceeds of criminal conduct law"; and

(ii) the argument that the defendant's claim against Mr. Self was a claim in subrogation, rather than in deceit, despite there being no authority for such a position and the cases clearly referring to the claim being in fraud.

60   In support of the defendant's contention that the plaintiffs were constantly changing resulting in inconsistency with positions previously taken in the proceedings and that on fundamental issues in the case, on their own case, there were inconsistencies, the defendant highlighted:

(i) the first plaintiff's contention at the hearing that he had notified the defendant, which was entirely inconsistent with what the court found at para. 42 of the judgment to the other parts of his case, namely that he believed and expected that BDO and Krys Global would be notifying the bank;

(ii) that the first plaintiff knew throughout that he had not notified the defendant and that, as found at para. 71 of the judgment, he deliberately chose not to warn them about the forgery in order to prioritize the unhindered receipt of the funds into his USA account; and

(iii) that the first plaintiff still maintained at various points in pre-action correspondence, pleadings and evidence that there was "only a suspected fraud" on September 1st, 2011, until at trial, as mentioned at para. 48 of the judgment, he referred to his knowledge on September 1st, 2011 that the actions of Mr. Self constituted a fraud and a forgery.

61   In support of the defendant's contention that the plaintiffs' case was irreconcilable with contemporaneous documents and showed a disregard for the truth when seeking to provide an explanation after the event as to why he had failed in his responsibility to immediately inform the defendant about the forgeries, the defendant highlighted:

(i) that the first plaintiff's claim that he had notified the defendant on September 1st, 2011, when his contemporaneous email, as noted at para. 79 of the judgment (*ibid.*, at para. 79), stated that he had "not spoken with [the bank] at all on this matter"; and

(ii) that the first plaintiff's inaccurate evidence that he "never requested a delay in the SAR" in light of the contradictory contemporaneous email record made by Mr. Arbo which was referred to at para. 81 of the judgment.

62   In support of the defendant's contention that, in light of the court's finding at para. 71 of the judgment that the first plaintiff deliberately chose not to warn the bank by disclosing the forgery, the plaintiffs' conduct was improper due to the extent to which they sought to criticize or blame

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

innocent third parties to enable the first plaintiff to contend that he was the "wholly innocent" party, the defendant highlighted:

(i) that the first plaintiff publicly questioned the professional ethics of Mr. Arbo and Mr. Krys;

(ii) that the first plaintiff claimed that Mr. Arbo and Mr. Krys made certain statements which he must have known they had not made[13]; and

(iii) that, as set out at paras. 80, 81 and 104 in the judgment, the first plaintiff must have known that his attempts to criticize each of CIMA, BDO and Krys Global had no legitimate basis as he was aware that he had concealed crucial information from each of them.

63   I have carefully considered all of the above, which are provided by the defendant as examples of what is submitted to be highly unreasonable conduct of the first plaintiff sufficient to merit the making of an indemnity costs order.

**Conclusion on basis of taxation of costs in relation to the estoppel proceedings**

64   It is clear that the court has a wide discretion as to what costs orders may be made following a trial, and as to the basis upon which they are to be made. In relation to the issue as to whether the standard or indemnity basis should form the basis of any assessment, it is clear that the indemnity basis may be justified where either the facts of the case and/or the conduct of the parties is such as to take the situation away from the norm. In this regard, it is not always necessary to show deliberate misconduct, in some cases unreasonable conduct to a high degree will suffice.

65   I remind myself, as did Stuart Smith, J. in *Arroyo* v. *Equion Energia Ltd. (formerly BP Exploration Co. (Colombia) Ltd.)* (3) ([2016] EWHC 3348 (TCC), at para. 72), "not to cherry-pick but to see the litigation as a whole and to have regard to all the circumstances of the case" and that to obtain indemnity costs a "high threshold" has to be passed and because "there are facts that take the case out of the norm does not automatically or even probably lead to an order for indemnity costs."

66   The estoppel issue was one that involved a full review of the relevant case law in relation to each of the elements. The determination of the estoppel argument was not straightforward or clear cut. It also required a careful application of the relevant facts to the law. It cannot be said that the plaintiffs, who are victims of a fraud perpetrated by a third party in

_____

13  Paragraphs 56, 57 and 74 of the judgment.

663

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

relation to funds held in the bank, were unreasonable in initiating their primary claim and opposing the estoppel defence raised by the defendant.

67   However, the defendant contends that it is their conduct, the manner in which they approached and conducted themselves during the proceedings, which should be viewed as being highly unreasonable. The defendant characterizes the first plaintiff as being a dishonest witness who deliberately gave false evidence, advancing a defence to the estoppel case that he knew to be false.

68   The defendant, as outlined above, rightly highlights parts of the judgment where the court:

   (i) rejected parts of the first plaintiff's evidence;

   (ii) preferred the evidence of particularly Mr. Arbo and Mr. Krys to the inconsistent evidence of the first plaintiff;

   (iii) found that the first plaintiff had failed to notify the bank; and

   (iv) stated that parts of the first plaintiff's evidence had the character of someone searching for and creating excuses after the event for his failure to notify the bank.

However, I am conscious that at the time the first plaintiff was under a great deal of pressure and that all of his actions at the time primarily were driven by his desire to restore the funds which had been wrongly removed. I did not express a finding in the judgment that the first plaintiff was dishonest when giving evidence and in his actions, although some of his actions and the approach he took with the bank were questionable. His evidence was at times unconvincing, but the fact that he relied upon such evidence in the defence of the estoppel argument does not amount to behaviour so unreasonable to justify an order for indemnity costs. Unlike in the dishonest assistance claim, the detailed and full legal arguments raised in relation to the technical estoppel claim that understandably required careful consideration of both parties' arguments by the court, albeit one of two of which were raised belatedly, should not be viewed as being unreasonable when considering the complexities of the law to be addressed in such claims.

69   In relation to the estoppel part of the proceedings, I am satisfied that the order should be for the costs to be taxed on the standard basis. Mr. Said has argued most forcefully for indemnity costs and this is a case where one could rightly characterize the first plaintiff's conduct highlighted by him as having been unreasonable, but I am not satisfied that it is so highly unreasonable and out of the norm that the court should impose an order for costs on the indemnity basis for that claim.

70   I remind myself of the oral submissions made by Ms. Dobbyn, where she correctly reminded the court that the estoppel claim occupied the

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

majority of the time at the hearing. She contended that about 20% of the time would have been spent on the dishonest assistance claim. During the hearing I mentioned to the parties that one option for the court might be to make a split costs order with indemnity costs being ordered on the dishonest assistance claim and on the standard basis in relation to the estoppel defence. Ms. Dobbyn contended that, if the court did feel that such an approach to costs was appropriate, it should take a "broad brush approach" with "back of the envelope convenient percentages" and it would be reasonable to split the costs order to be indemnity costs at 20% of the costs for the dishonest assistance claim and that the estoppel claim be taxed on the standard basis in relation to the remaining 80% of the costs.

71   It is clear that the defendant's argument is that the total costs should be taxed on the indemnity basis. I accept that, due to the late hour at the hearing, the defendant did not have time to make oral submissions in reply to those made on behalf of the plaintiffs. With that in mind, the parties were afforded the opportunity to file further written submissions. The defendant took the opportunity to do so on issues of indemnity and any capping of a costs order. On p.5 of his supplemental submissions, the defendant contends that the informal approach to setting a percentage is not appropriate and that, in any event, the percentage would be greater than the suggested 20% for the dishonest assistance claim. The defendant further submits that, if the court decided to make a split costs order, the percentage approach would be unworkable as each line item would need to be considered by the Taxing Officer on the two bases of taxation. I agree with the defendant that such an order would not be feasible unless the parties were able to agree a percentage and a mechanism for the Taxing Officer to operate under.

72   Having made a finding at para. 52 herein that the dishonest assistance claim should be taxed on the indemnity basis and at para. 69 herein that the balance of the proceedings should be taxed on the standard basis, I have considered whether there are any helpful directions that I may give to the Taxing Officer. I respectfully suggest that, prior to the taxation, the parties assist the Taxing Officer by providing schedules in which they set out which costs fall under which part of the claim. This is not one of those cases where I am able to provide a date from which a certain basis of costs will be paid from or up to.

**Costs capping application made by the plaintiffs**

73   In light of the defendant's disclosure that its costs are a little under $1.2m. and the plaintiffs stating that their costs are lower than $600,000, I am invited to cap the defendant's costs to an amount proportionate to the claim in dispute, which the plaintiffs put to be in the region of US$550,000 to US$600,000. This figure is not agreed by the defendant

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

who contends that the claim of US$371,286.07 in consequential losses and the claim for compound interest, although not argued at the hearing, should be included.[14]

74   The defendant rightly states that the costs of and incidental to all civil proceedings in the Grand Court are in the discretion of the court. The defendant adds that, pursuant to s.24(3) of the Judicature Law (2017 Revision), the Grand Court has the power to determine by whom and to what extent the costs are to be paid. The defendant further adds that the powers or discretion of the court are exercised subject to and in accordance with O.62 of the Grand Court Rules. It is submitted that the discretion of the court is wide and unfettered and thereby enables costs capping orders to be made. It is contended that costs should be reasonable and proportionate and that is consistent with the overriding objective of O.62, found at O.62, r.4(2).[15]

75   The introduction of the Civil Proceedings Rules 1998 ("the CPR") in England and Wales introduced fundamental reforms to the case management of cases, including the management of costs. Costs capping orders began to be made in cases where the courts found that the power to do so arose under their case management powers. The costs capping orders were made in high value cases and the cap was almost always imposed before the relevant costs were incurred. I will analyse some of those cases below as they were decided at a time, as is the case now in the Cayman Islands, where the rules did not contain specific costs capping provisions. The intention behind the reformed approach to costs was that the courts would take an active role, from the outset of the proceedings, in "keeping costs within bounds" and proportional. To enable this costs management function to effectively operate there was an integral requirement for the parties, at different stages of the proceedings, to file details or a budget about costs incurred and an estimate of costs of proposed further work.

76   In 2008, a consultation process was carried out by the Civil Procedure Rule Committee ("the Committee"). The Committee sought views on proposals to amend Part 44 of the CPR ("General Rules About Costs") by inserting rules on costs capping orders and to amend the Practice Direction About Costs to provide guidance on costs capping.

77   As a consequence, the courts' costs management function was developed in England and Wales by the Civil Procedure (Amendment No. 3) Rules 2008 applicable from April 6th, 2009 which introduced a new

_____

14   The defendant points out that in December 2015 the plaintiffs pleaded the total value of their claim against the defendant, excluding interest and costs, as US$900,477.79.
15   The rule is set out at para. 32 herein.

A-9621

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

CPR, rr. 44.18–20 provision for a procedural regime for making costs capping orders. Rule 44.18 provided that:

"(1) A costs capping order is *an order limiting the amount of future costs* (including disbursements) which a party may recover pursuant to an order for costs subsequently made.

(2) In this rule, '*future costs*' *means costs incurred in respect of work done after the date of the costs capping order* but excluding the amount of any additional liability.

. . .

(5) The court may at any stage of proceedings make a costs capping order against all or any of the parties, if—

    (a)  it is in the interests of justice to do so;

    (b)  there is a substantial risk that without such an order costs will be disproportionately incurred; and

    (c)  it is not satisfied that the risk in sub-paragraph (b) can be adequately controlled by—

      (i)  case management directions or orders made under Part 3; and

     (ii)  detailed assessment of costs.

(6) In considering whether to exercise its discretion under this rule, the court will consider all the circumstances of the case, including—

    (a)  whether there is a substantial imbalance between the financial position of the parties;

    (b)  whether the costs of determining the amount of the cap are likely to be proportionate to the overall costs of the litigation;

    (c)  the stage which the proceedings have reached; and

    (d)  the costs which have been incurred to date and the future costs." [Emphasis supplied.]

78   The Costs Practice Direction included new provisions at s.23A in relation to costs capping orders. It gave guidance as to the procedure, including the requirements for estimate and schedule of costs, as well as the factors to be taken into account when assessing the quantum of the costs cap. Under the heading "When to make an application" it stated that the courts would make costs capping orders only in exceptional circumstances. It also stated that the application must be made as soon as possible before or at the first case management hearing or shortly afterwards and that the stage which the proceedings have reached at the

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

time of the application will be one of the factors the court will consider when deciding whether to make a costs capping order.

79   The costs management function of the courts was further developed in 2013 by costs capping rules found at CPR rr. 3.19–3.21 which replaced the provisions found at Part 44. In 2016 these were amended by the Civil Procedure (Amendment No. 2 Rules) 2016. The new provisions were almost identical to those set out in para. 78 above.

80   The consultation that led to the above rules which set out a procedural regime for making costs capping orders followed the Court of Appeal's observation in *Willis* v. *Nicolson* (19) ([2007] EWCA Civ 199, at para. 24), that it should be for the Committee and not the court to provide guidance on costs capping. Buxton, L.J. made a number of insightful general comments about costs capping. Buxton, L.J. stated (*ibid.*, at para. 7) that—

". . . after some uncertainty as to the exact basis for such an order in an individual case, such as the present, it is now settled that the various weapons of the Civil Procedure Rules give the court ample powers to make an order at any stage of the proceedings: *King v Telegraph Group Ltd* [2005] 1 WLR 2282 [85]. The effect of a costs capping order is to advance the process of assessment and limitation of costs from the assessment after trial to an earlier point in the process; and to limit the amount of recoverable costs prospectively and not merely by an exercise conducted after the costs have been incurred. Unless a successful application is made to increase the cap, the party against whom an order has been made cannot recover on final assessment more than the amount of the order. That does not prevent the paying party from attempting on final assessment to reduce that amount, but the Senior Costs Judge indicated to us that his colleagues, having assessed the costs once, would look for good reasons, usually founded in a change of circumstances, before they intervened further."

81   Buxton, L.J. spoke about how the courts had approached costs capping when he stated (*ibid.*, at para. 8):

"Such orders are essentially case-management decisions, depending heavily on the judge's perception of the needs of his case, and general statements about when and in what circumstances a costs capping order should be made can only be general statements. We were shown some observations of first-instance judges, some of them of great experience in this field, that orders should only be made in limited circumstances, of which the most conspicuous is the dictum of Gage J (as he then was) in *Smart v East Cheshire NHS Trust* [2003] EWHC 2806 (QB) [22]:

668

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

> the court should only consider making a costs cap order in [single] cases
> where the applicant shows by evidence that there is a real and substantial
> risk that without such an order costs will be disproportionately or
> unreasonably incurred; and that this risk may not be managed by
> conventional case management and a detailed assessment of costs after a
> trial.

By contrast, there have been various indications in this court encouraging the
use of costs capping. Those indications include the observations of Sir
Christopher Staughton in *Solutia UK Ltd v Griffiths* [2002] PIQR P176 [27]–
[30]; Dyson LJ in *Leigh v Michelin Tyre plc* [2004] 1 WLR 846 [34]; and in
particular Brooke LJ in *King v Telegraph Group Ltd* [2005] 1 WLR 2282 [92]:

> it would be very much better for the court to exercise control over costs
> in advance, rather than to wait reactively until after the case is over and
> the costs are being assessed.

This difference of opinion is in need of resolution, but for the reason given in
§24 it is not resolved in this judgment."

82   Buxton, L.J. added (*ibid.*, at paras. 18–19 and paras. 21–23):

"18.   . . . When the Civil Procedure Rules replaced the Rules of the Supreme
Court, and encouraged active intervention by the court and the application of
public values and not merely those values with which the parties were
comfortable, it was hoped that that practice might change; and that hope was
reinforced when this court said, in §2 of its judgment in *Lownds v Home Office
(Practice Note)* [2002] 1 WLR 2450:

> Proportionality played no part in the taxation of costs under the Rules of
> the Supreme Court. The only test was that of reasonableness. The problem
> with that test, standing on its own, was that it institutionalised, as
> reasonable, the level of costs which were generally charged by the
> profession at the time when professional services were rendered. If a rate
> of charges was commonly adopted it was taken to be reasonable and so
> allowed on taxation even though the result was far from reasonable.

19.   However, in the event nothing seems to have changed. That is because,
as explained in §29 of the same judgment, 'proportionality' is achieved by
determining whether it was necessary to incur any particular item of costs. And
then 'When an item of costs is necessarily incurred then a reasonable amount
for the item should normally be allowed': and the reasonable amount per hour
of the professional's time continues to be determined by the market . . .

669

A-9624

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

21.   The focus of costs limitation thus has to be on the way in which the professionals intend to conduct the case because, as we have seen, the amount recoverable on assessment is fixed, as to rates, by the standard amounts allowed . . .

22.   To limit the way in which the professionals intend to conduct the case is a delicate matter. As Lindsay J put it at §28 of his judgment in *Weir v Secretary of State for Transport*

> If there is to be a cap in any case, the party capped is likely to be required to alter its conduct in relation to costs, if that were not part of the intent behind the cap then there would probably be no point in having a cap.

The court will be careful before imposing such a restriction, particularly when those restricted are, as in the present case, acting for a claimant who has suffered catastrophic injuries. To conduct the exercise properly the court will need reliable information about, and understanding of, the nature of the particular case and the general demands of that type of litigation. And both for reasons of fairness and for reasons of practicality *a cap cannot be imposed retrospectively, so the enquiry must take place at a sufficiently early stage to have a real effect on expenditure: the present case demonstrates the hopelessness of leaving an application until close to the date of trial.* As Gray J said in *Henry v BBC* [2006] 1 All ER 154 [39]:

> *the purpose of a capping order is to enable the capped party to plan ahead* the appropriate level of expenditure to bring the case to trial at a cost which is in line with the amount of the cap.

There has, accordingly, to be careful selection of the right moment in the litigation process for the consideration of a costs cap.

23.   And further reasons why the exercise of costs capping should not be entered upon lightly are that amount of the cap has to be determined by a costs judge, a scarce resource; and if the exercise is to be done properly it is likely, as in effect a substitute for final assessment, to be as expensive and time-consuming as a final assessment itself." [Emphasis supplied.]

Although setting out Buxton, L.J.'s view concerning the existence of a power to make costs capping orders, I have also highlighted certain parts of the judgment relating to the timing of the application and whether a cap can be imposed retrospectively. Buxton, L.J.'s view that applications should be made earlier in proceedings and that orders should not be retrospective are consistent with the cases mentioned from para. 97 below where I go on to deal with such issues in more detail.

670

GRAND CT.                                    RITTER v. BUTTERFIELD BANK

83   As I mentioned above, there were, prior to the addition of costs capping provisions in the CPR, a number of post-CPR cases in which costs capping orders were made. In *AB* v. *Leeds Teaching Hospitals NHS Trust* (1) Gage, J. made an order capping costs under the CPR, which at the time was considered to be ground breaking. Gage, J. held that in group litigation there was a clear risk that costs may become disproportionate and excessive and therefore a costs cap order was necessary to manage costs. Gage, J. set a budget in respect of the claimants' publicly funded costs in order to guide them as to the proportionality of their costs expenditure and to provide a cap on costs which they would recover if successful. It is important to note that since the inception of the CPR parties are required to provide estimates at different stages of the proceedings as to the likely costs to be incurred. The courts have regard to the costs estimates as an integral part of their case management functions in relation to costs. This was highlighted by the Court of Appeal in *Leigh* v. *Michelin Tyre plc* (12), in which Dyson, L.J. observed ([2003] EWCA Civ 1766, at para. 1) that "One of the principal objects of the Woolf reforms was the control of costs . . ." and the costs estimates are a fundamental part of the machinery of costs management.

84   Gage, J., before making the order, considered whether the court had the power to make a costs cap order. He acknowledged that the CPR gave the court no specific power to make a costs cap order. That is the same as the GCR. Gage, J. noted the Supreme Court Act 1981 (as amended) gave the court wide powers in relation to costs. Section 24 of the Judicature Law is a very similar provision and also provides that costs in civil proceedings "shall be in the discretion of the relevant court" and that the "court shall have full power to determine by whom and to what extent the costs are to be paid." Gage, J. also highlighted that the CPR also provided the court with extensive and wide-ranging general case management powers to be carried out in accordance with the overriding objective in Part 1 of the CPR. There is a great similarity between CPR Part 1 and paras. 1–3 in the Preamble to the GCR.

85   Gage, J. highlighted that the court's general case management powers were contained in Part 3 of the CPR and that its powers in relation to costs were in Parts 43 and 44. Gage, J. highlighted that s.6 of the Practice Direction About Costs also dealt with estimates of costs and directed parties and their lawyers to take certain steps to keep the parties informed about their potential liabilities to costs and in order to assist the court to decide what, if any, order to make about costs and case management.

86   In light of all of these various provisions, Gage, J. concluded that he had the jurisdiction to make a costs cap order, stating ([2003] EWHC 1034 (QB), at paras. 17–18):

671

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

"17.   Section 6 of the Practice Direction about Costs under the heading 'Estimates of Costs' provides that parties and their legal representatives must take certain steps to keep the parties informed about their potential liability to costs and in order to assist the court to decide what, if any, order to make about costs and case management.

18.   Having referred to section 51 of the 1981 Act, to the various Parts of the CPR which deal with costs, and giving full effect to the overriding objective of the CPR, in my judgment, the court has power to make a costs cap order. In my opinion the general powers of case management and in particular CPR 3.1(2)(m) and 44.3 are sufficiently wide to encompass the making of such an order in both GLOs[16] and other actions. In addition, the provision for Estimates of Costs in the Practice Direction about Costs is, in my view, in keeping with such a power. Further, I am fortified by the encouragement provided by the Court of Appeal in *Solutia UK Limited v Griffiths* to conclude that in appropriate cases, of which GLOs are prime examples (see those parts of the Woolf Report to which I have previously referred), the court should do so."

87   In reaching his conclusion, Gage, J. had regard to Sir Christopher Staughton's following remarks in *Solutia UK Ltd.* v. *Griffiths* (16) ([2001] EWCA Civ 736, at para. 29): "So surely case management powers will allow a judge in the future to exercise the power of limiting costs, either indirectly or even directly, so that they are proportionate to the amount involved."

88   Gage, J. also referred to Mance, L.J.'s comments in *Solutia* (*ibid.*, at para. 33):

"The present litigation was conducted under the old rules preceding the Woolf reforms. It is to be hoped that subsequent to the Woolf reforms judges conducting cases will make full use of their powers under the Practice Direction about costs, section 6, which appears in the Civil Procedure White Book 43/PD–006, to obtain estimates of costs and to exercise their powers in respect of cost and case management to keep costs within the bounds of the proportionate in accordance with the overriding objective."

Section 6 in the Practice Direction sets out the requirements concerning the filing of costs estimates and s.6.6 provides that in an assessment of costs of a party the court may have regard to any estimate filed in the proceedings and that the estimate can be taken into account as a factor

_____

16   Group litigation orders.

GRAND CT.                                          RITTER v. BUTTERFIELD BANK

when assessing the reasonableness of any costs claimed. Mance, L.J.'s *obiter* view about judges making full use of their powers under s.6 when exercising their powers in respect of costs and case management does not apply in the Cayman Islands where no such provision exists.

89    The Preamble in the GCR is similar to Part 1 of the CPR. However, the GCR do not contain provisions that mirror those found at Part 3 CPR, which it is well recognized "provides the court with extensive and wide-ranging general powers of case management to be carried out in accordance with the overriding objective."[17] The GCR do not have a provision that fully mirrors CPR 3.1(2)(m) which provides that the court may "take any other step or make any other order for the purpose of managing the case and furthering the overriding objective," although it is right to recognize that para. 4.3 in the Preamble to the GCR states "whenever a proceeding comes before the Court, whether on a summons for directions or otherwise, the Court will consider making orders on its own motion for the purpose of giving effect to the overriding objective of the rules." The GCR do not include a provision mirroring Part 44.3 CPR, although it is right to say that GCR O.62 is a detailed costs provision. I note that the latter part of GCR O.62, r.4(2)[18] indicates that the way that the successful party has conducted the proceedings may be a relevant factor when recovering costs. The way that the defendant has conducted the proceedings in an expeditious and proper manner and the way in which they conducted themselves in the actual proceedings cannot be said to have increased the expenditure required in the case. However, that is not to say that during taxation any claims they make may not be taxed down by a Taxing Officer—that is what is envisaged by GCR O.13(2) where the Taxing Officer may have regard to the amount of money involved, the importance of the case and the complexity of the issues during a taxation on the standard basis.

90    It is important to note that Gage, J. in *AB* (1) had regard to all of the mentioned provisions and the Practice Direction About Costs when reaching his conclusion that the case management powers were wide enough to enable the court to make costs capping orders. Although the Cayman Islands has some provisions similar to those in England and Wales, especially in the Preamble to the GCR and to some extent in GCR O.62, they cannot be said to be as wide ranging and comprehensive as those found in England and Wales post the introduction of the CPR as well as pre and post the introduction of specific costs capping provisions in the CPR.

_____

17  Gage, J. in *AB* v. *Leeds Teaching Hospitals NHS Trust* (1) ([2003] EWHC 1034 (QB), at para. 12).
18  Rule set out at para. 32 above.

673

A-9628

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

91   I am satisfied that the cases decided pre the 2008 amendments to the CPR made it clear that, under the costs regime contained in the Supreme Court Act, the CPR and the Practice Direction About Costs, the courts in England and Wales had the power to make costs capping orders. As stated by Gage, J. in *Smart* v. *East Cheshire* (15) ([2003] EWHC 2806 (QB), at para. 22) the function of the jurisdiction is to place a prospective limit on recoverable costs when "there is a real and substantial risk that without such an order costs will be disproportionately or unreasonably incurred; and that this risk may not be managed by conventional case management and a detailed assessment of costs after a trial." Therefore, the jurisdiction was exercisable if there was a real risk that the costs incurred by a party may get out of hand. The existence of a risk would come to the fore in proceedings because the provisions required parties to file costs estimates.

92   The purpose of the Preamble in the GCR is to enable the civil litigation process to be fair, fast and inexpensive. It is intended to promote the responsibility of the court to case manage proceedings before it. Therefore, there is some force in the plaintiff's submission that the overriding objective promotes the court case managing costs in a case. The issue is to what degree the court can do that under the existing provisions. In the Cayman Islands there are no specific costs capping provisions or procedures like those that exist now in England and Wales and there appears to be no Cayman Islands case in which a costs capping order has been made. As I have indicated herein, the provisions in the Cayman Islands are not even as comprehensive as they were in England and Wales when the courts there found that they had the power to order caps on costs.

93   Importantly, apart from the Practice Direction No. 1/11 Guidelines Relating to the Taxation of Costs, there are no Practice Directions about costs in the Cayman Islands. As a consequence, for example, there is no supporting mechanism for costs capping in place, such as the requirement for a party to file costs estimates. In the absence of the need to file estimates, a party would likely not be in position to apply at an early stage in any proceedings for a costs capping order as it would not have been informed about the escalating costs earlier. If a party had no knowledge of the detail that would appear in a costs estimate, it may not have a reason to apply and may not be able to support such application.

**Conclusions on the court's power to make costs capping orders**

94   In the absence of the more comprehensive package of provisions and costs procedures set out in relevant Practice Directions found in England and Wales which their courts relied upon when finding that they had the power to make capping orders post-1998, I am not satisfied that, at this time, the Cayman Islands' more limited case management and costs provisions highlighted by the plaintiffs and mentioned by me are sufficient

GRAND CT.                                          RITTER v. BUTTERFIELD BANK

to enable me to now find that a judge has the power to introduce the concept of costs capping for the first time. Accordingly, I decline to make the costs capping order sought.

95   From soon after the CPR coming into force, the English courts recognized that their provisions enabled them to cap costs, and they have made later provisions to develop and give more certainty to this power. Despite the knowledge about the power in England and following the introduction of the overriding objective in the GCR Preamble, there has been no such move in the Cayman Islands to introduce provisions or guidance in Practice Directions about costs that are consistent with an intent to widen the court's cost management powers to include the making of costs capping orders. For such a novel concept, for this jurisdiction at least, to be introduced here, when one considers our cost provisions and the Preamble to the GCR, such an advancement could, I suggest, only occur after detailed consideration by the Grand Court Rules Committee and codification by further clarifying costs provisions in the GCR and guidance in a Practice Direction about costs.

### Costs capping—retrospectivity

96   If I am wrong in my conclusion about the lack of a power to make costs capping orders, I am not satisfied that this would be an appropriate case for an order to be made due to the timing of the application. It is evident that Gage, J. in *AB* (1) approached costs capping in a prospective rather than a retroactive sense. He rightly pointed out that Part 3.1.8 CPR mentioned "Costs Budgeting" and that the Woolf Report made reference to para. 12 entitled "Prospective Budget Setting" in Zuckerman ["Devices for Controlling the Cost of Litigation Through Costs Taxation" (presented to the Woolf Inquiry)] where the author wrote:

"One option to be considered is replacing retrospective taxation with prospective budget setting. Under this regime budgets would be set in advance so that the process would have to conform to budgetary constraints, rather than the cost following the process as at present."

97   In *King* v. *Telegraph Group Ltd.* (11), Brooke, L.J. reviewed the provisions and recognized the merit of the costs capping power when he said ([2005] 1 W.L.R. 2282, at para. 83):

"It is, after all, an important feature of the overriding objective that the court must be enabled to save expense and deal with a case in ways which are proportionate to the amount of money involved, the importance of the case, the complexity of the issues and the financial position of each party (CPR r 1.1), and the parties are required to help the court to further the overriding objective: CPR r 1.3."

675

THE CAYMAN ISLANDS LAW REPORTS                    2018 (2) CILR

98    However, at paras. 79–80, Brooke, L.J. after also referring to the costs in the *Solutia* case (16) made comment about the timing of the application for a capping order when he stated (*ibid.*, at para. 80):

> "The fact that the court was uneasy about the sheer size of this legal bill, judged retrospectively, led two of its members to draw attention to the desirability of a judge being able to control legal expenditure on a piece of litigation prospectively. Sir Christopher drew attention (in para 27) to the statutory power possessed by an arbitral tribunal under section 65 of the Arbitration Act 1996 to limit the amount the parties to an arbitration could incur by way of costs. *This is a power which must be exercised, if at all, at an early stage, so that a party does not find that it has spent more than the limit if a costs cap was directed later on.*" [Emphasis supplied.]

99    Brooke, L.J. then added (*ibid.*, at para. 105):

> "There are three main weapons available to a party who is concerned about extravagant conduct by the other side, or the risk of such extravagance. The first is a *prospective* costs capping order of the type I have discussed in this judgment. The second is a retrospective assessment of costs conducted toughly [*sic*] in accordance with CPR principles. The third is a wasted costs order against the other party's lawyer . . ." [Emphasis supplied.]

In the matter before me, as a costs capping order with retrospective effect is sought, the "weapon" that should be used by the plaintiffs is the second one mentioned by Brooke, L.J., albeit in accordance with the GCR provisions.

100    In *Henry* v. *British Broadcasting Corp.* (9), a costs capping order was sought but was opposed due to the late timing of the application. Although Gray, J. felt that the case was a "prime candidate" for a costs capping order, the court refused to make a costs capping order finding that the application was made too late as it resulted in the exercise being prospective and not retrospective by nature. The court held that the purpose of a capping order was to enable the capped party to plan ahead the appropriate level of expenditure in line with the amount of the cap. Gray, J. stated ([2005] EWHC 2503 (QB), at paras. 39–40):

> "39.    . . . It does not, however, follow that it would be right for me at this stage in the proceedings to impose a costs cap. *Mr Caldecott has, as I have said, accepted that any cap would have to be prospective. He is in my view right to adopt that stance. There is ample authority that cost capping orders should invariably operate prospectively and not retrospectively*: see *King v. Telegraph Group plc* per Brooke LJ at paragraph 80; *Weir v. Secretary of State for Transport* (Ch D 20.4.05) per Lindsay J at paragraph 28. I see

676

GRAND CT.                                          RITTER v. BUTTERFIELD BANK

considerable force in the point made by Mr Rampton that the imposition of a
costs cap so close to trial would in effect penalise the Claimant, or perhaps
more accurately her legal advisers, when, as has often been said, *the purpose
of a capping order is to enable the capped party to plan ahead the appropriate
level of expenditure to bring the case to trial at a cost which is in line with the
amount of the cap.*[19][1] It would in my opinion be wrong to use the cost capping
jurisdiction in a way which would deny the Claimant the benefit of the CFA
to which she is statutorily entitled.

40.   I would therefore with some reluctance decline to make a cost capping
order on the ground that the application is made too late." [Emphasis supplied.]

101   On the issue of whether a costs capping order could be retrospective, helpful
guidance was also given by Judge Kirkham in *Petursson* v. *Hutchinson 3G UK Ltd.*
(13). The learned judge rightly distinguished *Smart* v. *East Cheshire NHS Trust*
(15) and *Various Ledward Claimants* v. *Kent & Medway Health Auth.* (18) where
the costs cap orders had a retrospective and prospective effect. In both of those
cases "the element of retrospectivity was limited" due to the areas of agreement
reached. Judge Kirkham rightly stated that a costs cap should "normally be
prospective and not retrospective." She also rightly highlighted that the case
authorities, a number of which she reviewed ([2004] EWHC 2609 (TCC), at para.
42) "suggest that the court expects an order capping costs to be made at an early
stage. A party should know in advance if its costs are to be capped so that it can
tailor its case accordingly." Judge Kirkham added that (*ibid.*, at para. 43):

"Both sides have the right to a fair hearing. To impose a retrospective limit
on costs in this case would . . . amount to a breach of the defendant's right to a
fair hearing . . . it would be a wholly exceptional case where it would be
appropriate to order a cap retrospectively."

And (*ibid.*, at para. 51):

"The appropriate time to consider a costs cap is at the early stages of an action
where the parties and the court can together plan the steps needed to bring the
matter to trial, the costs implications of those steps and whether a cap is
appropriate. In this case, that stage has long since passed."

——————————

19  See this extract from Gray, J.'s judgment at para. 83 above where
      mentioned by Buxton, L.J. in *Willis* v. *Nicholson* (19).

677

102   As mentioned above at para. 78, in England and Wales the Civil Procedure (Amendment No. 3) Rules 2008 applicable from April 6th, 2009 introduced a new CPR 44.18–20. It made clear that costs capping orders would only apply to "future costs." These were defined as costs incurred in respect of work done after the date of the costs capping order but excluding the amount of any additional liability. This intended to prevent attempts to reduce costs already incurred and to make clear that the order could not be retrospective.

103   In the more recent case of *Black* v. *Arriva North East Ltd.* (6), Briggs, L.J. took into account the timing of the application. Briggs, L.J. stated that ([2014] EWCA Civ 1115, at para. 25):

"The effect of what I have described is that by the time of the application, the major part of the solicitor's costs of the appeal had been incurred. The effect of the order sought would, therefore, be that the Respondents will have already have spent what is, if a costs capping order is made, in substance a budget laid down by the court without knowing that it had to stick to that insofar as it sought to recover its costs. In principle, the person who is the subject of the costs capping order ought, so far as possible, to know the budget to which he must work in advance."

104   In England and Wales, Practice Direction 3F—Costs Capping, dated January 2017 at Section I under the heading "General Rules about Costs Capping" and the sub-heading "When to make an application" the following is again stated:

"**1.1** The court will make a costs capping order only in exceptional circumstances.

**1.2** An application for a costs capping order must be made as soon as possible, preferably before or at the first case management hearing or shortly afterwards. The stage which the proceedings have reached at the time of the application will be one of the factors the court will consider when deciding whether to make a costs capping order."

This is consistent with all of the previous Practice Directions in which guidance has been given about costs capping. It makes clear that in England and Wales the intention was and remains that the purpose of costs capping orders is to case manage costs before they are, or possibly as they are being, incurred.

**General comments**

105   As noted, the standard basis is less generous than the indemnity basis. In both cases, costs which have been unreasonably incurred, or which are unreasonable in amount, will not be allowed at taxation. On an indemnity basis, doubt as to reasonableness is resolved in the favour of the

Grand Ct.                                          RITTER v. BUTTERFIELD BANK

successful party. On the standard basis, doubt as to reasonableness is resolved in
favour of the losing party. Further, on the standard basis, the Taxing Officer will
only order the other party to pay costs which are proportionate. When considering
whether costs are proportionate, the Taxing Officer will assess whether they bear a
reasonable relationship to factors such as the sums in issue, the value of any non-
monetary relief, the complexity of the litigation and conduct. I am satisfied, in line
with the options outlined by Brooke, L.J. at para. 105 in *King* (11), that the Taxing
Officer will be able to carefully consider the merit, if any, of the concerns about
proportionality and reasonableness raised by the plaintiff and that that is the
appropriate "weapon" for the plaintiffs to resolve those issues.

***Order accordingly.***

Attorneys: *Sinclairs* for the plaintiffs; *Appleby* for the defendant.

———————————————

A-9634

IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS
FROM THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CICA CIVIL APPEAL NO: 15 of 2018
(Formerly Cause No: FSD 54 of 2009 (ASCJ))

BETWEEN:

AHMAD HAMAD ALGOSAIBI AND BROTHERS COMPANY

*Plaintiff/Appellant*

-and-

(1) SAAD INVESTMENTS COMPANY LIMITED
(2) MAAN AL SANEA and others

*Defendants/Respondents*

| | |
|---|---|
| **BEFORE:** | **The Rt. Hon Sir Bernard Rix JA**<br>**The Hon John Martin QC JA**<br>**The Hon Sir Michael Birt JA** |
| Appearances: | John Wardell QC instructed by Nicholas Fox and Christopher Levers of Mourant Ozannes for the Appellant ('**AHAB**').<br><br>Stephen Smith QC and Marcus Haywood, instructed by Colette Wilkins and Shelley White of Walkers for the 1st, 8th, 30th to 33rd, 35th to 37th Respondents ('**GT Respondents**').<br><br>Ben Valentin QC, Harriet Fear Davies, James Hart instructed by Ian Lambert of HSM Attorneys for the 13th to 18th Respondents ('**AwalCos**').<br><br>Thomas Lowe QC and Jack Watson, instructed by William Peake, James Elliott and Niall Dodd of Harney, Westwood & Reigels for the 34th Respondent ('**SIFCO 5**'). |
| **Heard:** | **21 May 2019 – 20 June 2019** |
| **Draft Judgment circulated:** | **16 November 2021** |
| **Judgment Delivered:** | **21 December 2021** |

## **JUDGMENT**

EXHIBIT

10

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

1

## TABLE OF CONTENTS

| Subject | Paragraph |
|---|---|
| Introduction | 1 |
| An executive summary of the judgment below | 6 |
| An introduction to the Personae Dramatis | 9 |
| The Respondents' Summary of Findings at trial | 36 |
| The era of Abdulaziz | 37 |
| The Money Exchange accounts and Audit Packs | 65 |
| The era of Suleiman and Saud | 124 |
|     -  2001 | 129 |
|     -  2002 | 137 |
|     -  2003 | 142 |
|     -  2004 | 146 |
|     -  2005 | 153 |
|     -  2006 | 160 |
|     -  2007 | 163 |
|     -  2008 | 165 |
| The collapse and its aftermath | 167 |
| AHAB's "New for Old" case: a phoenix born of the collapse of the London Proceedings | 185 |
| The agreed List of Issues on appeal | 194 |
| Disclosure | 212 |
| The Money Exchange's fraud on the banks: some pivotal questions and answers at the commencement of trial | 224 |
| The nature of the appeal | 231 |
| The witnesses | 250 |
| "Core errors, substantive and procedural irregularities" | 268 |
| AHAB's allegedly new point of fully informed consent | 309 |
| Innocence, complicity and fraud: a road-map | 335 |
|     -  AHAB's submissions: | 340 |
|       (i)   Al Sanea was the fraudster | 343 |
|       (ii)   The Counterclaim | 357 |

|  | (iii) | AHAB's knowledge of the fraud on the banks and of Al Sanea's indebtedness | 365 |
| - | The Respondents' submissions: | | 387 |
|  | (i) | An overview | 393 |
|  | (ii) | The purpose and nature of the Money Exchange | 397 |
|  | (iii) | The Audit Packs | 402 |
|  | (iv) | Suleiman and Yousef | 409 |
|  | (v) | Suleiman's knowledge of Al Sanea's activities | 418 |
|  | (vi) | Yousef's knowledge of Al Sanea's activities | 420 |
|  | (vii) | Saud's knowledge | 426 |
|  | (viii) | Dawood's knowledge | 466 |

New for Old, forgery and manipulation — 470

- New for Old — 484
- Manipulation — 499
- Forgery — 513

Innocence, complicity and fraud: Discussion and analysis — 619

- Foreign exchange transactions — 651
- Letters of credit — 656
- The property transactions — 657
- TIBC and the Financial Businesses — 661

Innocence, complicity and fraud: Conclusion — 665

The Payment of $ 191 million on 3 May 2009 — 673

(i) Factual background — 674
(ii) The Chief Justice's finding — 678
(iii) Discussion — 680

The proper law of the claims — 692

(i) AHAB's claims — 692
(ii) The Chief Justice's decision as to the proper law — 704
(iii) Outline contentions on appeal — 707
(iv) Classification of the claims — 709
(v) The receipt based claims — 715
(vi) The tortious claims — 729
(vii) Conclusion — 737

The substantive law of Saudi Arabia — 739

(i) Introduction — 739
(ii) Proprietary claim — 748
(iii) Joint and several liability — 782

Attribution — 798

(i) Introduction — 798
(ii) The law — 810
(iii) Application to the facts — 847

Tracing                                                                                 858

        (i)      Governing law                                                           859
        (ii)     Factual background                                                      867
        (iii)    Cayman law on tracing                                                   871
                 (1) The Chief Justice's findings                                        871
                 (2) Discussion                                                          880
                     (a) Inferences                                                      881
                     (b) Maelstrom                                                       901
                 (3) Duty to account                                                     930
                 (4) Tracing to particular Respondent companies                         933

The claims other than the proprietary claim                                             954

        (i)      Dishonest assistance under Cayman law                                   959
        (ii)     Conspiracy under Cayman law                                             979
        (iii)    Dishonest assistance and conspiracy under Saudi law                     987
        (iv)     Unjust enrichment under Cayman law                                      1000
        (v)      Unjust enrichment and Saudi law                                         1015
        (vi)     Knowing receipt and Saudi law                                          1023

Illegality                                                                              1024

        (i)      The law on illegality                                                   1026
        (ii)     Relevant factual background                                             1033
        (iii)    The Chief Justice's decision                                            1042
        (iv)     Discussion                                                              1049

Summary of conclusions                                                                  1087

**Judgment of the Court**

*Introduction*

1.      This appeal arises out of the massive collapse of a Saudi Arabian partnership which is under bankruptcy proceedings in the Kingdom of Saudi Arabia. A principal figure within the history of that partnership, albeit not a partner himself, is Maan Al Sanea (**Al Sanea**), a leading Saudi Arabian businessman and reputedly once one of the wealthiest men in the world. He is the son-in-law of Sheikh Abdulaziz, who, from about 1980 until an incapacitating stroke in 2000 (followed by his death in 2003) had been the most influential of three brothers who were partners at the apex of the partnership. Al Sanea's affairs involved numerous Cayman Islands companies, which are themselves in liquidation. It is this fact that grounds this litigation in these Islands. The collapse of the partnership and of Al Sanea's business affairs occurred in May 2009, no doubt in part as a result of the 2008 global financial crisis. This litigation is in effect a struggle between the creditors of the partnership and the creditors of Al Sanea's erstwhile business empire for control of the remaining funds. The claim is brought in the name of the partnership, which has made a deal with its creditors for the purpose of the litigation. The claim is in the order of a net amount of $ 4 billion.[1] The litigation is immense. The trial took place over a period of a year. The judgment below runs to over 1300 pages.

---

[1] AHAB's Re-Amended Memorandum of Appeal, para 89 ("Relief Sought"), **AA/4/41-42**, and its Written Submissions at para 11.80, **AB/1.11/38**. The net amount is stated as a total of "at least" $ 4.029 billion. A figure of $ 4.9 billion has also been mentioned (eg **Day13A/1**). So has a figure of $ 6 billion (see para 4 of the

2.      The principal allegation of the plaintiff partnership is that Al Sanea over all or much of his business life, which stretches back into the early 1980s, defrauded the partnership by using both his position as the favoured son-in-law of Sheikh Abdulaziz and the partnership's ability to borrow in order to enrich himself at the partnership's risk and expense. The principal allegation of the defendant Al Sanea companies and their creditors is that the partnership ran a gigantic Ponzi scheme, in which both the partners and Al Sanea were involved. For numerous reasons, but in essence because the partnership was entirely complicit in the scheme and therefore knew and authorised everything that Al Sanea did, the defendants say that the loss must lie where it falls and the partnership's claim must fail.

3.      The judge, Chief Justice Smellie, agreed with that defence. In dismissing a counterclaim brought (inter alia) on Promissory Notes purportedly granted by AHAB to Al Sanea's companies, he concluded his judgment as follows:

> For the sake of clarity, it should be understood that while I have rejected and dismissed the counterclaim and in doing so accept that Al Sanea as its partial instigator would seek to defraud AHAB, this conclusion does not suggest an acceptance on my part that his running of the Money Exchange prior to its collapse in May 2009 involved a fraud by him upon AHAB. That issue is separately and from my point of view conclusively dealt with above in this Judgment in which is examined the overwhelming evidence of the AHAB Partners' knowledge and authorisation of his activities at the Money Exchange (and to a lesser but no less significant extent, at the other Financial Businesses).[2]

4.      In a very real sense that paragraph sums up the whole of the dispute from the point of view of the judgment below. The partnership appeals. There is no Respondents' notice.

5.      In the course of writing this judgment, AHAB and the so-called GT Defendants (the 1st, 8th, 30th-33rd, and 35th-37th defendants) settled. More recently, AHAB and the so-called AwalCos (the 13th-18th defendants) have also settled. On the other hand, it does not appear that any of the substantive issues which we have had to consider have been affected by those settlements.

### *An executive summary of the judgment below*

6.      It may assist the reader to have at the outset an executive summary of the lengthy judgment below. This summary was agreed by the defendant Respondents on 15 November 2018. It is not confirmed by the agreement of AHAB, but it remains a helpful and sufficiently accurate introduction to our judgment on appeal.[3] It is as follows:

> 1. Ahmad Hamad Algosaibi Brothers partnership, or AHAB, has its origins in a business begun by Hamad Algosaibi in the 1940s. Hamad died in 1969 and was succeeded by his three sons, Ahmad, Abdulaziz, and Suleiman. Together, they incorporated AHAB as a general partnership and successively chaired AHAB until Suleiman's death in February 2009. AHAB has since been chaired by Yousef, Ahmad's son. Yousef, Saud (Abdulaziz's son), and Dawood (Suleiman's son) are amongst the current AHAB Partners.

---

Executive Summary of the Chief Justice's judgment, cited at para 6 hereof below, referring to AHAB's amended pleaded claim at trial).
[2] Judgment at page 1327, para 180, **AA/2.4/1327**.
[3] **AA/2.3/1-7**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

2. From 1980 onwards, AHAB strategically expanded into financial services and other related businesses. In 1981, AHAB's board of directors established the Money Exchange as an unincorporated division of AHAB. Maan Al Sanea ("Al Sanea"), who had married Abdulaziz's daughter in 1980, was appointed its Managing Director. In the 1980s, AHAB incorporated Algosaibi Investment Holdings EC ("AIH") and Algosaibi Trading Services Ltd ("ATS") (originally incorporated as Algosaibi Investment Services Ltd ("AIS")) and in 2003, AHAB incorporated a bank in Bahrain, The International Banking Corporation ("TIBC") (collectively, "the Financial Businesses").

3. From near the time of the establishment of the Money Exchange until its collapse in May 2009, financial statements, disseminated to in excess of one hundred lending banks, understated the extent of the borrowings and true extent of AHAB indebtedness to the banks and its status as a borrower. By presenting them to the banks, the false financial statements became the central instrumentality of a fraud.

4. In 2009, AHAB defaulted on more than 34 billions of Saudi Riyals of debt ($9.2 billion). Shortly after that default AHAB commenced these Proceedings against Al Sanea and the corporate Defendants (established by Al Sanea in this jurisdiction and who are in liquidation). AHAB's claim was initially to recover the $9.2bn of total borrowings that was unpaid at the time of the default, (subsequently by amendment reduced to $6bn) representing the proceeds of the alleged fraud as at the end of May 2009 (plus interest).

5. The claims of AHAB are, in essence, for alleged fraudulent breaches of fiduciary duties by Al Sanea and restitution, damages and compensation from the Defendants; on the basis of their conspiracy with Al Sanea, their knowing assistance of his alleged fraud upon AHAB and ultimately, their knowing receipt of the massive proceeds of that fraud. AHAB also brings proprietary claims against the Defendants on the basis that their assets represent AHAB's property – the proceeds of the fraud – which AHAB could trace into their bank accounts or other assets.

6. AHAB's claims are dismissed.

_Knowledge and authority_

7. The AHAB Partners knew of and authorised the fraudulent borrowing through the Money Exchange and the Financial Businesses:

(a) during Abdulaziz's time, the fraudulent practices of the Money Exchange were institutionalised for the purpose of defrauding the banks. Abdulaziz was knowingly aware of this and was the primary architect of the practices;

(b) Suleiman and Yousef were knowingly aware of the fraudulent practices and they continued these practices after Abdulaziz became incapacitated by a stroke and later died;

(c) Saud was fully aware of the fraudulent practices and of the financial position of the Money Exchange throughout the period 2000 to 2009;

      (d) Dawood had knowledge of the massive borrowing which he transacted, not only on behalf of the Money Exchange but also on behalf of the Financial Businesses, in early 2009.

### *"New for Old", Forgery and Manipulation*

8. As part of its amended case, AHAB alleged the existence of a "New for Old" policy. Stated to be a policy that Suleiman, sometime after Abdulaziz's stroke on 30 September 2000, implemented to restrict borrowing by Al Sanea through the Money Exchange to only such loans as had been taken before the time of its implementation. There is no objective evidence to prove its existence. "New for Old" is not supported by the documents. "New for Old" never existed.

9. AHAB's case also relies on the allegation that Al Sanea, in his fraud upon AHAB, engaged in forgery "*on an industrial scale*". However, AHAB's forgery allegations have been made on a random basis with reference to questioned documents which were selected under circumstances which were themselves questionable and without any reasonable foundation for a finding that the questioned documents and signatures were deployed by Al Sanea without the knowledge and authority of the AHAB Partners.

10. In addition to the forgery case, AHAB also ran a manipulation case. The bank facility documents on which AHAB's manipulation case is based also cannot bear the weight of inference that AHAB wishes to place on them. Whatever the reason for the alteration of these documents might have been at the time, the one thing that the documents show is that AHAB was in fact aware of the ever increasing facilities which they procured – that, in and of itself, is inconsistent with any concept of "New for Old", and with the evidence of AHAB's own witnesses.

### *Relative Benefits and Al Sanea's indebtedness to the Money Exchange*

11. The explanation for AHAB's complicity is the pursuit by the AHAB Partners of the strategy to use borrowing in order to acquire and hold investments. These comprised the immensely valuable strategic equity investments in banks and other institutions, together with land holdings. Because of AHAB's failure to inject capital or to pay down the borrowings of the Money Exchange the strategy also required the constant taking of further borrowing to repay earlier borrowing.

12. The AHAB Partners were willing to allow the massive personal borrowing of Al Sanea from the Money Exchange to go unchecked because it was the *quid pro quo* for his willingness also to use the Money Exchange to procure fraudulent borrowing on behalf of the AHAB Partners themselves. Withdrawals by Al Sanea were not "*misappropriations*" but loans, which AHAB expected to be repaid and which were meticulously accounted for.

### *Proprietary Claims*

13. AHAB's claims are primarily proprietary in nature seeking to recover what AHAB says is its property (or the traceable substitutes) from the Defendants.

14. For every proprietary tracing claim, two premises must be established: (1) the antecedent breach of trust or fiduciary duty; (2) the identification of the traced asset or its traceable proceeds in the possession of the defendant.

15. AHAB seeks to assert as against the Defendants a liability to account on the basis of their dishonest involvement with Al Sanea and knowing receipt of the proceeds of his fraud against AHAB and thereby reverse the burden of proof. The Defendants are also said to have participated with Al Sanea in the creation of a "*maelstrom*" and to have been involved in the "*cross-firing*" of transactions. However,

    (a) there was no "maelstrom" or "cross-firing" of transactions; and

    (b) AHAB must first prove the antecedent breach of trust by Al Sanea before it can rely on the line of cases towards the "*reversal of the burden of proof*" for which it contends and it has failed to do so.

16. Even if AHAB had been able to establish the antecedent breach of trust by Al Sanea, it would still have had to prove the necessary transactional links, invariably required by the case law, between the funds taken from the Money Exchange and the accounts of the Defendants. It has failed to do so. Other than in respect of $165m of transfers from the Money Exchange to the GT Defendants the necessary transactional links have not been proved (and the evidence reveals that the transfers totalling $165m were made for commercial purposes allowed by AHAB as between the Money Exchange and the GT Defendants such that AHAB's claim in relation to them is unsustainable).

*Personal Claims*

17. Each of the dishonest assistance, conspiracy and unjust enrichment claim (sic) rests upon the allegation that the Defendants received money or assets that represent the proceeds of funds misappropriated from the Money Exchange. Accordingly, if the tracing claim fails, so must all of these claims.

*Conflicts of Law*

The proper law governing AHAB's equitable claims is the law of Saudi Arabia. Whether regarded as proprietary or personal, AHAB's claims against the Defendants all depend on AHAB being able to trace its funds into the hands of the Defendants in the Cayman Islands. Both as a matter of Saudi and Cayman Islands law, no such claim is tenable.

*Illegality*

18. The Defendants' illegality defence is entitled to succeed, not only on the basis of AHAB's continuous complicity in the fraud from beginning to end but, even (contrary to the findings) in the event "New for Old" existed, because of AHAB's indisputable involvement through Abdulaziz until October 2000, in what had already become a massive fraud on the banks and one which AHAB must have known would be continued, even if curtailed, in order to give effect to "New for Old" itself. In other words, the putative "New for Old" policy itself involved the continued dissemination to the banks of falsified accounts, in order to induce the banks to continue to lend at least as much as was required to prevent the collapse of the Money Exchange and the other Financial Businesses.

*Counterclaims*

19. The GT Defendants bring counterclaims against AHAB for a total of about $5.9bn, instigated in large part by Promissory Notes presented to the GT Defendants by Al Sanea as representing security for debts owed to two of the GT Defendants (SICL and Singularis) by AHAB. Other of the counterclaims amounting to more than US$ (sic) 1bn were based primarily upon liabilities recorded in the accounts of SICL as due from AHAB.

20. The GT Defendants' counterclaims are dismissed. The evidence relied upon in proof of the counterclaims is unsafe and unreliable against the background and out of the cauldron of fraud that characterised the operation of the Money Exchange and the Financial Businesses.

7. Respondents' counsel have also prepared a Summary of Findings made by the Chief Justice, which formed part of the Core Bundle for this appeal.[4] It too was not agreed by AHAB, but it is a useful exposition of the lengthy judgment and puts further flesh on the Executive Summary above. It is in effect a precis of the Chief Justice's judgment, with references to its corresponding sections and paragraphs. We will set out at para 36 below some extracts from this Summary, concentrating on the Chief Justice's findings relating to knowledge and authority and to the counterclaims. But first it will be helpful to introduce the reader to the principal protagonists.

8. It is also worth saying something at the outset about the structure of the trial. All live witnesses of fact were called by AHAB. The Respondents called no witnesses of fact, contenting themselves with relying on certain hearsay statements. Many of AHAB's witnesses were not cross-examined, although the principal Algosaibi family witnesses were cross-examined at length. Although the Chief Justice had much to say in criticism of AHAB's disclosure, there was practically no disclosure at all from the Respondents, save for what Al Sanea chose to provide the Respondents with, for instance in support of the GT Respondents' counterclaims.

***An introduction to the Personae Dramatis***

9. That Latin expression, still much in use in litigation, the Persons of the Drama, is entirely appropriate to the history that led to this litigation.

10. The partnership is called Ahmad Hamad Algosaibi and Brothers Company, which has been referred to by the acronym AHAB (**AHAB** or the **partnership**). The Algosaibi family business began in 1940. The patriarch Hamad established a bonded warehouse dedicated to ARAMCO, the national oil company. From there the business developed into trading and other entrepreneurial activities. In 1956 it became the licensee and distributor of Pepsi Cola. It operates a multiplicity of different businesses. Its headquarters are in Al Khobar, in the Eastern Province of Saudi Arabia.

11. The business passed in 1969 into the hands of Hamad's three sons, Ahmad, Abdulaziz and Suleiman and became a partnership (*sharikat al-tadamun*) with separate legal personality. Although there have always been many other partners, including sons and daughters, apart from the principal partners, there has never been any dispute that the relevant partners for the purposes of investigating AHAB's knowledge and grant of authority were the principal partners.[5] In the 1980s the brothers took the partnership into the area of financial services. In

---

[4] **AA/2.5/1**

[5] It appears that the three brothers held one-third of the partnership each, and that percentage shares were allotted to children, with any son holding about twice as much as any daughter: see for instance at **G/4500.2/7**

1981, when the partnership's net asset value was some SAR 900 million (the exchange rate at the time of the judgment below was $1 = SAR 3.75, so that SAR 900 million was $240 million, and the current exchange rate remains the same), AHAB established its so-called **Money Exchange** as an unincorporated division of the partnership. The Money Exchange had little existing business on its formation, essentially AHAB's limited travel cheque and foreign exchange business.

12. At that time Ahmad was about 80, Abdulaziz was about 60, and Suleiman was about 54. Ahmad was the chairman of the partnership and of the Money Exchange, until his death in September 1990. Abdulaziz then succeeded him as chairman until his death on 12 May 2003 (albeit he had been incapacitated by a stroke on 30 September 2000). Suleiman who had been acting chairman from that time and became full chairman on his brother's death, remained chairman until his own death on 22 February 2009.

13. The succession then passed to the next generation. Ahmad's eldest son, **Yousef**, became chairman and remains so. **Saud**, Abdulaziz's only son, became a partner and managing director of AHAB and a director of the Money Exchange from May 2003, following his father's death. The evidence shows, however, that, because he was more numerate and entrepreneurial than his uncle Suleiman, who has been described as a genial man and cautious in business, Saud was an influential figure and worked closely with Suleiman in the affairs of both AHAB and its Money Exchange throughout the period following Abdulaziz's stroke.

14. **Dawood**, Suleiman's only son, became a partner only on his father's death in February 2009. He had been a member of AHAB's board from May 2003, where his role was concentrated on managing the Algosaibi Hotel in Al Khobar (of which he had been managing director since 2000). He suffered a serious illness in 2004, and even after his recovery in 2006 spent much of his time in recuperation. His father's death, and his inheritance of his father's partnership share, forced him into greater activity thereafter, in what turned out to be the last few months before the collapse in May 2009.[6]

15. Al Sanea married Abdulaziz's daughter, Sana'a, in 1980. She is also now a partner, together with a number of other female family members. There had been other marriages between the Algosaibi family and Al Sanea's family. Abdulaziz was fond of Al Sanea and treated him as a son. Al Sanea was made a "partner" (with a 25% interest) and managing director of the Money Exchange at the time of its creation in 1981. He was then only 25. He was obviously an able man, a new broom, and trusted by Abdulaziz to take AHAB into the new paths favoured by his own strategic vision.

16. The other "partners" in the Money Exchange were AHAB with 65% and Yousef with 10%.

17. Although the elderly Ahmad was chairman of AHAB (and the Money Exchange) in 1981, his brother Abdulaziz, who had been managing director of AHAB since 1969, appears to have held the reins, even before he officially became chairman in 1990. He was described as "the driving force" behind AHAB, who set its "strategic direction".[7]

---

[6] Dawood witness statement at paras 6, 9 and 10, **C1/1/2-4**

[7] Per Mr Mohamed Hindi, witness statement in the London proceedings, at **C1/20/5-6**, paras 14 and 17. Mr Hindi was a senior vice president and a director of AHAB until 2012, and died in 2015.

18.   The Money Exchange occupied a separate floor of AHAB headquarters, namely its first floor. The central offices of the AHAB Partnership were on the third floor of its building (also described as **AHAB head office** or **HO**). There was evidence that in time Al Sanea kept the first floor strictly as his domain, even under separate lock and key. From about 1990 Al Sanea changed the physical centre of his operations from the Money Exchange (which remained at AHAB headquarters) to separate offices, albeit also at Al Khobar, used by his own group of companies, known as the **Saad Group**.

19.   The Money Exchange changed the full title of its formal name from time to time, but for convenience has been referred to as the Money Exchange throughout these proceedings.

20.   The purposes of the Money Exchange were (i) to purchase and hold AHAB's share and property investments, principally equity holdings in a range of Saudi Arabian banks and (ii) to act as the central treasury of AHAB. There is controversy about that second aim, for the very reason that it rubs up to some extent against AHAB's contention that much of the Money Exchange's borrowings were executed by Al Sanea in fraud of AHAB and taken for his own purposes: but on any view, as will become apparent, that second aim was accepted by the Chief Justice and is plainly a finding to which he was entitled.

21.   One of the Money Exchange's core holdings was shares in Saudi American Bank (**SAMBA**), which in 1980 took over the Citibank enterprise in Saudi Arabia. AHAB's holding in SAMBA was so significant that successive Algosaibis (Abdulaziz and Saud) became directors and chairmen of the bank. In 1999 SAMBA merged with United Saudi Bank.

22.   AHAB's and the Money Exchange's long-term local auditors were **El Ayouty**. Every year El Ayouty would send to the chairman of AHAB and the Money Exchange its so-called Audit Packs. A critical issue debated in this litigation is the extent to which the information contained in these Audit Packs was known to the AHAB Partners.

23.   Al Sanea's right hand man, at the Money Exchange and at the Saad Group, from his appointment in 1993 (up to 1997) as deputy general manager of the Saad Group's Saad Investments Company Limited, followed by his appointment in 1998 (until the collapse in 2009) as general manager of the Money Exchange, was Mark **Hayley**. At trial, he gave evidence for AHAB.

24.   Significant employees of AHAB head office were Badr El Din **Badr** and Omar **Saad** Hamdah (referred to as Mr **Saad**). Mr. Badr joined AHAB in 1983 as deputy finance manager and reported directly to Abdulaziz, Suleiman and Saud. He left AHAB in 2010. He provided a hearsay witness statement late on in the proceedings below, but did not give oral evidence. Saad was still in post at the time of trial. His employment went back to 1956. His title was Chief Accountant, and he reported to Ahmad, Abdulaziz, Suleiman, Yousef and Saud. His duties involved maintaining inter-company accounts, for instance between AHAB head office and the Money Exchange. He would provide trial balances to El Ayouty, which were used by El Ayouty to produce the audited accounts. He gave evidence at trial for AHAB.

25.   The **Financial Businesses** were AHAB businesses operated from, and, with one exception, incorporated in Bahrain. They were Algosaibi Investment Holdings (**AIH**), Algosaibi

Investment Services Limited, renamed Algosaibi Trading Services Bermuda Limited (**AIS** then **ATS**, incorporated in Bermuda), and The International Banking Corporation (**TIBC**). All three businesses operated from the same building in Bahrain. AIH goes back to 1984, and AIS to 1985. TIBC was incorporated in 2003.

26.    There is a dispute as to the extent to which AHAB knew about or were concerned in the operation of these businesses, which were in the hands of Al Sanea. Al Sanea was managing director of AIH, AIS and TIBC from their inception. Ahmad, Abdulaziz, Suleiman and Yousef as well as Al Sanea were on AIH's first board of directors. AIS/ATS was originally owned directly by the partners of AHAB, but in April 2005 its shares were transferred to AIH (which was itself owned by the partners of AHAB). At that time its directors included Suleiman, Yousef and Al Sanea. As for TIBC, this was an offshore banking subsidiary, ostensibly 93% owned by AHAB, licensed in Bahrain. The remaining 7% was owned by Al Sanea, or by his wife, but in August 2006 appears to have been transferred to AIH. There is evidence that Suleiman was its first chairman. The defendants allege that Saud and Yousef were members of its executive committee.

27.    Al Sanea purportedly resigned as managing director of AIH and ATS on 25 October 2005, and on the same day resigned as a director of TIBC having previously resigned as its managing director on 23 December 2004. However, he continued to remain involved in the running of these companies despite such resignations.

28.    AHAB's case was that these Financial Businesses were used by Al Sanea to borrow more money in fraud of AHAB, and that "The establishment and operation of TIBC is one of the most brazen aspects of Mr Al Sanea's fraud".[8] Yousef, Saud and Dawood gave evidence denying any knowledge of the Financial Businesses until the collapse of May 2009. The most they acknowledged was some sort of small, representative office or branch of the Money Exchange in Bahrain, albeit at one point Saud was driven to accept that he knew that the branch "was being converted to a bank".[9] However, the Chief Justice found that the AHAB Partners were aware of and approved of the activities of the Financial Businesses, and indeed participated in them.

29.    Al Sanea and the Saad Group defendants are numerous – there were 37 defendants in all – but can be briefly described. Chief among them and first defendant is Saad Investments Company Limited (**SICL**). Al Sanea was a director from September 1990 and chairman from January 1994. It is common ground that Al Sanea was ultimate beneficial owner, but Al Sanea's position was that he held in common with his family. Singularis Holdings Limited (**Singularis**, the 8th defendant) was a defendant to proceedings in London, of which mention is made below. Saad Cayman Limited and variously numbered Saad Investments Finance Companies Limited make up, together with SICL and Singularis, the so-called **GT Defendants** or **GTDs**. The GT Defendants were represented by Stephen Smith QC as leading counsel. The GT Defendants have now settled this litigation.

30.    Variously numbered Awal Finance Companies Limited (the 13th to 18th defendants) are referred to as the **AwalCos**. They are separately represented, and their leading counsel is Mr Ben Valentin QC. They have also now settled this litigation, albeit quite recently, after the Court had communicated its decision to the parties, but before circulation of a draft of this judgment.

---

[8] Judgment below, section 1, para 783, **AA/2.4/302**
[9] Judgment below, section 1, para 852, **AA/2.4/343**

31. Saad Investments Finance Company (No 5) Limited (the 34th defendant) is referred to as **SIFCO 5**. It is again separately represented from all the other defendants and its leading counsel is Mr Thomas Lowe QC. It remains the only respondent to this appeal with which AHAB has not settled.

32. All the defendant companies are in official liquidation in the Cayman Islands.

33. Saad Trading and Contracting Company (STCC) was an important member of the Saad Group, but is not a defendant to this litigation or a respondent to this appeal. It was a partnership under Saudi law of which Al Sanea was the 90% partner and his wife the remaining 10% partner. The vast majority of the money taken by Al Sanea from the Money Exchange (as indebtedness say the Respondents and as found by the Chief Justice, but as "misappropriations" say AHAB) went through STCC.

34. Following the collapse of AHAB and the Saad Group in 2009, Al Sanea was imprisoned in Saudi Arabia. Having unsuccessfully challenged jurisdiction in this litigation,[10] he has, in the words of the Chief Justice, "steadfastly distanced himself from these proceedings".[11] He has given no disclosure and no evidence. His companies have nevertheless pleaded a counterclaim amounting to some $ 5.9 billion, some $ 4.5 billion of which is based on a Promissory Note purportedly signed by Suleiman in favour of Singularis (the **Counterclaim**). The Chief Justice rejected the Counterclaim as well as AHAB's claim.[12]

35. Following the collapse, AHAB instructed Deloitte to investigate matters. It formed an "Investigation Team" headed by a Deloitte partner, **Simon Charlton**. Mr Charlton led the Investigation Team from shortly after the collapse in 2009 until June 2013, when he became acting CEO and Chief Restructuring Officer of AHAB. He remains in that position. He has given evidence for AHAB.

### *The Respondents' Summary of Findings at trial*

36. We refer to para 7 above. It is convenient at this point of our judgment to set out some of the Chief Justice's principal findings, as drawn up in a document prepared by the GT Respondents' counsel[13]:

<u>Knowledge and Authority</u>

1. The pivotal issue in this case is whether the AHAB Partners knew of and expressly or implicitly authorized the enormous borrowings from banks which were obtained by fraudulent means through the Money Exchange and the Bahraini Financial Businesses. (Section 1, para 1).

2. The resolution of this pivotal issue is heavily influenced by the findings as to the extent of the Partners' knowledge of and involvement with the means by which the Money Exchange perpetrated the fraud against the banks; namely, by the dissemination to the banks of falsified financial statements. The methodology used for the falsification of the financial statements was elaborate and sophisticated and, over the course of several years, became institutionalized within the Money Exchange. (Section 1, para 2).

---

[10] Judgment of the Court of Appeal, 1 December 2010, **B/20/1**
[11] Judgment below, section 8, para 1, **AA/2.4/1229**
[12] Judgment below, section 8, para 180, **AA/2.4/1327**, cited at para 3 above
[13] **AA/2.5**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

3. From near the time of the re-establishment of the Money Exchange in July 1981 until its collapse in May 2009, the financial statements deliberately and grossly understated the extent of the borrowings and so the true extent of the AHAB indebtedness to the banks and its status as a borrower. By presenting them to the banks, the false financial statements became the central instrumentality of the fraud. (Section 1, para 3).

4. AHAB's case on knowledge and authority ultimately became that while there was involvement by the Partners with the falsified financial statements and knowledge to some extent of the borrowings, this developed and operated only until circa 30 September 2000, when Abdulaziz suffered his stroke. Thereafter, the practice of false accounting which Abdulaziz had put in place (without admission by AHAB of fraudulent intent), and allowed Al Sanea to implement, had ceased. That so far as successive Partners were aware, the extent of the borrowing had been curtailed, by means of what came to be described as the "New for Old" policy – the policy said to have been imposed upon Maan Al Sanea by Suleiman. The purported aim of the New for Old policy was to ensure that the borrowings did not increase beyond SAR 7.8bn ($2.3bn). (Section 1, para 7).

5. The Money Exchange (orchestrated in conjunction with the Bahraini Financial Businesses) had been used to perpetrate one of the largest Ponzi schemes in history, with later borrowing used to repay earlier borrowing, while also providing funds for the ever-increasing indebtedness of the Money Exchange. (Section 1, para 11).

6. Over the years following the alleged implementation of the "New for Old" policy until the collapse of the Money Exchange in May 2009, some $126 billion was raised by the Money Exchange (including through the Bahraini Financial Businesses) by way of fraudulent borrowing, from at least 118 different banks around the world. From January 2000 to May 2009, the total flow of cash through the Money Exchange was over $330 billion. The total amount of unpaid borrowings at the time of collapse, as at end May 2009, was SAR 34.6 bn ($9.2 bn). (Section 1, para 9).

7. I am satisfied that the knowledge and authority of the AHAB Partners is overwhelmingly and conclusively proven. (Introduction, para 3). The Court has no doubt that each of Abdulaziz, Suleiman, Yousef and Saud knew of and expressly authorized the issuance of fraudulent financial statements and knew of the fraud on AHAB's lending banks. On the basis of his late involvement at the final stages of the crisis leading to the collapse of the Money Exchange, the evidence of Dawood's involvement is also revealing of his state of knowledge. (Section 1, para 71).

8. During Abdulaziz's time, the fraudulent practices of the Money Exchange were institutionalized for the purposes of defrauding the banks. He was knowingly aware of this and was the primary architect of the practices. Not only was Abdulaziz responsible as Chairman for the adoption of the fraudulent accounting practices, he also was fully aware of their meaning and effect, as is abundantly clear especially from the many exchanges he had with El Ayouty on the subject. (Section 1, Conclusion para 1).

9. During Abdulaziz's life time, Suleiman and Yousef were also knowingly aware of the fraudulent practices and they continued the practices after his

time. There is clear evidence of Suleiman's knowledge of the fraud being perpetrated through the Money Exchange. (Section 1, Conclusion para 2).

10. The documentation clearly reveals that Yousef had knowledge of the fraudulent accounting practices and an intimate understanding of the El Ayouty Audit Packs and their significance. (Section 1, para 359). Yousef was aware of the activities of the Money Exchange and of the extent of the borrowing and of the Al Sanea indebtedness. (Section 1, para 445). Yousef received and understood in 1999, the ramifications of the Audit Pack for 1998 which prompted his complaint to Abdulaziz. In light of his mistrust of Al Sanea, it is inconceivable that he thereafter took no steps to monitor the state of that indebtedness for which, along with that of the Money Exchange itself as a whole, he was personally liable. (Section 1, para 446). Yousef was party to, and so was aware of, the adoption of the fraudulent accounting practices and the issuance of the misleading financial statements to the banks. (Section 1, para 447). Yousef received updates after 2003 from El Ayouty regarding the Al Sanea indebtedness and the Money Exchange borrowing; and from Omar Saad, regarding the value of the shareholdings. He must have been aware therefore, that the Money Exchange had woefully insufficient capital and generated no income with which to redeem the bank loans. Despite knowing these things, apart from his personally motivated agitations with Abdulaziz and Suleiman before December 2000, Yousef took no steps to restrain the activities of the Money Exchange. He must therefore be regarded as knowing and approving of (or at least acquiescing in) those activities. (Section 1, para 449).

11. There is ample evidence of Saud's involvement throughout the years following November 2000, with the procurement of resolutions confirming the continuation of the false accounting practices, such that it is implausible to think that Saud would not have understood their meaning and implications. (Section 1, para 457). It is an inescapable inference that, by April 2001, Saud was fully conversant with the El Ayouty Audit Packs and reports, with the comments or criticisms they contained and that his evidence to the contrary was dishonest. (Section 1, para 500).

12. Saud's Calculations are a clear revelation of his knowledge of the extent of the borrowing and the Al Sanea indebtedness as reported in Attachments 8 and 9 of the 2001 El Ayouty Audit Pack. Saud claims to have undertaken his calculations at Suleiman's request and admitted to having brought them to Suleiman's attention. From no later than that occasion, Saud would have known that the Audit Packs and reports were the reliable source of information as to the state of affairs at the Money Exchange. The evidence reveals that Saud was fully aware of the fraudulent practices and of the financial position of the Money Exchange throughout the period 2000 to 2009. His assertions to the contrary are rejected as deliberately untruthful. (Section 1, Conclusion para 2).

13. Saud lied about his knowledge of the borrowings and the Al Sanea indebtedness: (a) in his statement in the London Proceedings in order to present a false impression of the state of his knowledge of the Money Exchange's indebtedness; and (b) in his witness statements and evidence in this Court in attempting to explain his evidence in the London proceedings and especially, the crucial revelations of Saud's Calculations. (Section 1, para 548).

14. Saud was consistently involved, not just in monitoring the financial position of the Money Exchange, but in the significant decisions taken by the Money Exchange. (Section 1, Conclusion para 3).

15. Saud knew of and authorised Maan Al Sanea's activities. (Section 1, Conclusion para 4, Section 1, para 552). Saud was as fully aware of Maan Al Sanea's activities and the borrowing of the Money Exchange, as he needed to have become, in order to have intervened to put an end to those activities. Saud's and AHAB's failure to intervene lead to the unavoidable conclusion that they connived in Maan Al Sanea's continued use of the Money Exchange to obtain fraudulent lending from the banks. (Section 1, para 552).

16. In the maintenance of its case of lack of knowledge and involvement in the fraud upon the banks, AHAB has sought to distance itself from the Bahraini Financial Businesses, laying the blame for their operations solely and squarely upon Maan Al Sanea. The reality disclosed by the evidence is very different and shows that the AHAB Partners, including more latterly Suleiman and Saud, were very much aware of the establishment of the Financial Businesses and approved of their use for the procurement of billions of dollars of borrowing. (Section 1, paras 757-758).

17. Dawood's evidence strikes the Court as a false and convenient narrative aimed at avoiding the fact that his involvement, as a partner of AHAB, fixes AHAB with his knowledge of the massive borrowing [over SAR 10 billion] which he transacted, not only on behalf of the Money Exchange but also on behalf of the Bahraini Financial Businesses, in early 2009. (Section 1, para 805).
…

AHAB's "New for Old" Case

23. "New for Old" is pleaded by AHAB as a policy that Suleiman – sometime after Abdulaziz's stroke on 30 September 2000 – implemented to restrict borrowing by Maan Al Sanea through the Money Exchange to only such loans as had been taken before the time of its implementation. (Section 3, para 1).

24. Without "new for old", there could be no basis for a finding that there was at any time placed upon Maan Al Sanea's authority to borrow, any restriction such as to have rendered his actions unauthorized and, unless unauthorized, any basis for the claim that he had defrauded AHAB. (Section 3, para 6).

25. "New for Old" is a recent invention, raised in a desperate attempt to salvage AHAB's falsified case. (Section 3, para 11). There is no objective evidence to prove its existence. "New for old" is not supported by the documents. (Section 3, para 188). AHAB's case on "new for old" is so difficult to pin down, and no witness is able to provide a coherent account of it precisely because it never happened. (Section 3, para 189). "New for Old" never existed. (Section 3, para 190).

The Forgery Allegations

26. AHAB's case pivots around the allegation that Maan Al Sanea, in his fraud upon AHAB, engaged in forgery "*on an industrial scale*" and relies on the presence of "matched" signatures and apparently manipulated documents

recovered from among the records of the Money Exchange, AHAB HO and the other Financial Businesses. (Section 4, para 1).

27.  The forgery allegations are shown to have been made on a random illogical basis without any reasonable foundation for a finding that the questioned documents and signatures were deployed by Maan Al Sanea without the knowledge and authority of the AHAB Partners. (Section 4, para 243).

28.  The documents purportedly signed by Abdulaziz after he had his stroke were certainly not signed by him. However, it was the Algosaibi family who saw the need to pretend to the world that Abdulaziz was still able to run AHAB, and it will have been the family, no doubt including Al Sanea, who arranged to put Abdulaziz's signatures onto documents during that period. (Section 4, para 244).

29.  In the case of Suleiman, AHAB has failed to show matched signatures on all (or even a significant majority) of increased facilities. There are matched signatures on numerous renewals. On AHAB's "New for Old" case, there was never any need for Al Sanea to forge a signature on a renewal. (Section 4, para 250).

30.  There are documents in the Forgery Schedule undeniably signed by Yousef, Saud and Dawood. Those documents should not be there as there is no basis for an allegation of forgery. (Section 4, 245).

31.  In the case of Dawood, he signed his signature over 130 times on bank documents for over SAR 10 billion, following an agreement between him and Saud that he should do so during the final months leading to the collapse of the Money Exchange. Little wonder then that even while they appear on the Forgery Schedule, far from alleging that his signatures at this crucial time of reckoning for AHAB were forged, Dawood feigned amnesia and ignorance. (Section 4, para 247).

32.  The fact that AHAB made pleaded allegations of forgery in relation not only to  Suleiman's but also to Dawood's, Saud's and Yousef's signatures, speaks volumes about AHAB's willingness to make such allegations, even where there is no evidence to support them. (Section 4, para 249).

<u>The Manipulation of Documents</u>

33.  AHAB's manipulation case, based on 16 sets of bank facility documents, emerged very late in the day. (Section 5, para 1). AHAB suggested that the significance of these documents was that they showed that "*Mr Al Sanea fabricated or manipulated facility and related documents which were presented to Suleiman for signing, with the aim of deceiving Suleiman and creating the impression of Mr Al Sanea's compliance with the policy imposed on him by Suleiman in 2002 that new lending should only replace old lending so that the Money Exchange's overall borrowing levels did not increase...*" (Section 5, para 2).

34.  AHAB's case became *some* borrowing was authorized under "New for Old"; *some* facility documents were forged; and *some* documents were manipulated by Al Sanea in order to deceive Suleiman into thinking that the existing and new facility agreements (respectively "Old Facility" and "New Facility"

agreements) were for the same amount when they were not. (Section 5, para 4).

35. The 16 sets of documents cannot bear the weight of inference that AHAB wishes to place upon them. It is not possible to infer from the existence of these 16 sets of documents (or 10 transactions) either the existence of the "New for Old" policy, or its evasion. In the case of these documents, there is no clear inference that can be drawn in AHAB's favour. (Section 5, para 69).

36. Whatever the reason for the alteration of the 16 sets of documents might have been at the time, the documents show (from those for higher amounts being found at AHAB's HO) that AHAB was aware of the increasing facilities. That is inconsistent with any concept of "New for Old", and with the evidence of AHAB's own witnesses. (Section 5, para 70).

Al Sanea indebtedness to the Money Exchange

37. The Algosaibis were willing to allow the massive personal borrowing of Al Sanea to go unchecked because it was the *quid pro quo* for his willingness also to use the Money Exchange to procure fraudulent borrowing on behalf of the AHAB Partners themselves. (Section 6, para 1). The Algosaibis allowed Maan Al Sanea to use the Money Exchange to borrow because they also benefitted. (Section 6, para 22). Abdulaziz acting on behalf of AHAB Partners, guaranteed Al Sanea's borrowing (see further below).

38. Withdrawals by Maan Al Sanea were not "misappropriations" but loans which were expected to be repaid. Ledger 03 recorded an ongoing facility for Al Sanea to borrow funds. This was a facility that was granted to Maan Al Sanea by Abdulaziz and was never revoked. (Section 6, para 5).

39. Al Sanea's net indebtedness to the Money Exchange was debt, it was understood by the Algosaibis as debt and it was accounted for as debt. (Section 6, para 6). Mr Al Sanea was entitled to procure funds on behalf of the Money Exchange and to borrow those funds provided they were properly accounted for. (Section 6, para 7).

40. In addition, the amounts guaranteed by Abdulaziz were not exclusively Al Sanea "*indebtedness*" but were also costs of borrowing attributable to SAMBA shares held in Al Sanea's name on behalf of AHAB. (Section 6, para 36).

41. The Algosaibis assumed that Mr Al Sanea would be able to pay back his debt (at least as much of it as was genuinely his). He was thought to be one of the wealthiest men in the world. What they had not reckoned on and what shocked them in May 2009, when the global financial crisis erupted, was that he would be unable to do so. The reality is that they had made a bad credit decision. (Section 6, para 8).
…

The GT Defendants Counterclaims

96. The GT Liquidators' counterclaims against AHAB are for a total of about $ 5.9 billion. (Section 8, para 1).
…

100. While the internal accounts of SICL purport to show entries for the liabilities, there are no matching entries within the accounts of the Money Exchange to reflect them as one would expect and as would be essential to a claim based upon the existence of such accounting entries and counter-entries. (Section 8, para 7).

101. In relation to cash claimed as due to SICL from AHAB based upon alleged profits made by SICL on 20 forward FX trades between SICL and the Money Exchange, the undisputable evidence is that these were "rigged" to guarantee a profit to SICL. Money was not transferred to SICL based upon these sham transactions but the records generated allowed SICL to record the transactions in its accounts to reflect enormous profit, further enabling SICL to falsify its accounts in its campaign of fraud against its lenders. (Section 8, para 8).

102. While Al Sanea used the Money Exchange and other Financial Businesses with the certain knowledge and authority of the AHAB Partners to defraud the banks, as part of the *quid pro quo* of that nefarious arrangement, he was also given free reign (sic) to use the Money Exchange to support his own Saad Group's activities, even where, as it has been shown, that involved his separate campaign of fraud against the outside world. If this meant that using the Money Exchange to "cook the books" of SICL and SHL suited his ends, the Court does not doubt that the AHAB Partners saw no need to inquire into or interfere with such activities. (Section 8, para 11).

103. The counterclaims are based on entries found in SICL's and Singularis's accounts which do not appear in the Money Exchange's ledgers. The Money Exchange's ledgers and DMS contained accurate accounts of its activities. What is in question here is the accuracy of the SICL and Singularis accounts. (Section 8, para 12).

104. The liability of the Money Exchange did not really exist. The generation of such sham activity, like the fictitious use of LC transactions through TIBC, was not meant during the operation of the Money Exchange to defraud AHAB but to enable Al Sanea to continue to defraud AHAB's bankers and to wage his own campaign of fraud against the outside world. (Section 8, para 13).

### *The era of Abdulaziz*

37. The Money Exchange was established in July 1981, when Abdulaziz was already the prime mover within AHAB. His new son-in-law (as of 1980), Al Sanea, was made a 25% partner and managing director from the outset. Yousef was a 10% partner, and the balance of 65% was held by AHAB. Its establishment more or less coincided with a new strategy to invest in banking shares. In 1984, Abdulaziz became chairman of SAMBA, the Money Exchange's primary equity holding.

38. In May 1984, AIH was incorporated in Bahrain, and in September 1985 AIS was incorporated in Bermuda.

39. In time, the Money Exchange began to suffer under the difficulties of its income (mainly in the form of dividends from its share portfolio) being less than its outgoings (in the form of interest on its borrowings). In December 1986, the Money Exchange recorded its resolution (if it had not done so before) to capitalise interest on its holdings as part of their cost, and thus to show such interest not as an ongoing expense but as part of the holdings' asset value, shown in the accounts at cost including the holding cost represented by such interest. The Money Exchange

also recorded its resolution to adjust its accounts, by limiting and understating the amount of borrowings disclosed. Overall, figures were to be adjusted "such that the numbering matches the numbers of 1985 and to display them well, in a way suitable to the next stage".[14] The December 1986 summary of these resolutions was signed by Abdulaziz and Suleiman, but not by Ahmad, Yousef or Al Sanea.[15] The Chief Justice described these accounting devices as "the two most significant fraudulent practices" of the Money Exchange.[16] They were to continue year in, year out.

40.     Thus in November 1988, Money Exchange resolution R/73 spoke of the need "to make necessary adjustments to both sides of the assets and liabilities in order to show the [accounts] in an appropriate manner to others and to adopt these amendments to suit the comparative figures for previous years".[17] Similar resolutions were made in successive years.

41.     In September 1990, on the death of the eldest brother, Ahmad, Abdulaziz became chairman of AHAB and the Money Exchange. At about the same time, Al Sanea moved out of the Money Exchange's premises on the first floor of AHAB headquarters and set up his own operation elsewhere in Al Khobar, from where he operated his Saad Group of companies. Also in 1990, Saud, Abdulaziz's son, became a member of AHAB's board of directors. He had been working in AHAB since 1988, when, at the age of 24, he completed a degree in Business Administration in the USA.

42.     In May 1990, El Ayouty wrote to Al Sanea to complain that 90% of the advertised capital of the Money Exchange remained unpaid by the partners, and also to complain about the adjustments made to its balance sheet. Abdulaziz and Al Sanea replied to say that the Money Exchange was "playing the role of the treasury for the colleague companies" and that "the strategy…is to look forward to the future regarding the value of [the] investments".[18] In other words, the Money Exchange's accounts were to be understood as part of AHAB's overall operation, and that future increases in the value of the Exchange's portfolio would float the ship to safety. El Ayouty were to make many similar complaints to the partners over the years, but always succumbed to the directions contained in yearly resolutions of the Money Exchange. The straightforward statement by Abdulaziz and Al Sanea that the Money Exchange also played the role of treasury for AHAB in general plainly justifies the Chief Justice's finding to that effect. The Chief Justice also referred to an AHAB group lending document for 1994 which recorded overall group lending by the Money Exchange in the amount of SAR 680 million, and to a calculation that at a conservative carrying cost of 8% per annum this would have amounted to nearly SAR 2 billion by end 2008.[19]

43.     On 7 April 1991, Abdulaziz wrote to El Ayouty concerning the Money Exchange's financial statements.[20] He said:

> It is also known that there are conflicts between the balances of the record books received from the local and foreign banks and the logbook balance as of 31 December 1990 for the current and loan debit accounts, as well as other accounts. It is natural for such a conflict to arise, as it is the result of the implementation of the Board of Directors decision number R/73 dated 14 November 1988. In summary, it involves implementing a decrease on the

---

[14] **G/1105/1-2**
[15] **G/1104/2** (Arabic), **G/1105/2** (English)
[16] Judgment below, Section 1, para 141, **AA/2.4/73**
[17] Judgment below, Section 1, para 150, **AA/2.4/77**
[18] Judgment below, Section 1, para 178, **AA/2.4/90**, **G1/1288.1**
[19] Judgment below, Section 2, paras 140-141, **AA/2.4/474**
[20] **G/1388.2/1-2**

assets and liabilities side in order to show the budget in an appropriate manner toward outside parties (in English)…

In light of the confidential nature of your inquiries into the financial data, we reiterate and emphasise to you that you must refrain from making inquiries or remarks about the financial data of the Money Exchange department and the main headquarters to anyone except Mr Maan Al-Sanea, who will take on the task of responding to those remarks and inquiries.

Abdulaziz thereby recognised that there was a need for secrecy around the Money Exchange's financial affairs. The Respondents at trial below and again on this appeal called this AHAB's "dirty secret". Abdulaziz's response also underlines the close relationship between him and Al Sanea.

44.    On 28 March 1992, Suleiman and Yousef wrote to Abdulaziz urging him to liquidate the Money Exchange.[21] In their letter they made reference to an earlier request ("You have promised well, but days and months passed without response"). The letter, written with exquisite courtesy, nevertheless betrayed discomfort with the operations of the Money Exchange. The letter stated inter alia as follows:

It has been a long time since we spoke with you…

Therefore, we come to you today with this request once again to put matters into perspective and face our responsibilities with an open mind, preserving our rights and the rights of our relative Brother Maan [Al Sanea].

This is our authorization, and we ask to kindly terminate the matter in phases and in the best possible way without fuss to protect our obligations before the banks and clients, for our name and that of Brother Maan to remain respected and appreciated by all and to prevent any tendentious or envious person from coming between us, we are one family, you are a father to us all, and Maan is a brother and relative to us all with no shortcomings regarding his work and the success and progress he has realized for us and the exchange…

45.    Despite his misgivings, in December 1992 Suleiman (but not Yousef) joined Abdulaziz in signing the Money Exchange resolution R/5[22] to restate its accounts by reference to three separate divisions, the "Exchange" division, the "Equity Investment" division and the "Finance and Property" division. In the judgment below, the first two divisions were addressed together as the "Exchange and Investment" division. The other division has been called the "Finance" division. The financial statements of the former were to be in English and thus available to creditor banks, and were to be drawn up as "for previous years, on the same principles", ie on the basis of capitalised interest and the understating of borrowings; whereas the financial statements of the Finance division were to be in Arabic and show the true state of borrowing with figures taken from the Money Exchange's own ledger accounts. Consolidated financial statements for the two divisions would also be drawn up in Arabic. Although Yousef did not sign R/5, he did sign a "Summary of the Decisions issued by the Board of Directors through the year 1992" dated 6 December 1992, in which the effect of R/5 is stated, if anything more plainly.[23] For instance, at its para 13:

The decision of the Board of Directors numbered R/5, dated 4/12/1992 relates to a substitute procedure for reducing the "assets and liabilities entry" as of the

---

[21] G/1435
[22] G/1457/1-2
[23] G/1458.2/3

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

end of the financial year. This is to be accomplished by opening a special division which will be called the Finance & Real Estate Investment division which will represent the past "assets and liabilities entry" at end of financial year.

To be sure, statements of Ahmad Hamad Algosaibi & Bros Money Exchange, Commission and Investment will be comprised of three divisions:

  (1)  The Money Exchange Division
  (2)  Investment Shares Division
Note: (The financial statements of Divisions 1 and 2 will be compiled jointly in English language).
  (3)  Finance & Real Estate Investment Division

It is hard to acquit Suleiman and Yousef of any failure to understand the dishonest nature of the Money Exchange's relationship with the lending banks even at this comparatively early time. Their involvement in the central resolutions by which it was effected, and their plain misgivings as to where things were headed, are firm evidence of their complicity. Nevertheless, AHAB relies for instance on El Ayouty's letters dated 28 May 1994 (cited at paras 48-49 below) to submit that Abdulaziz – and Al Sanea – was  keeping cards close to his chest, at any rate concerning Al Sanea's borrowings from the Money Exchange.

46.     On 25 April 1994, Abdulaziz wrote to El Ayouty setting out (but it is hard to believe that it was for the first time) the effect of these manipulations, and explaining that the Finance Division and Consolidated balance sheets "are internal balance sheets for the partners and are not provided for any other party". Abdulaziz also wrote there of a "plan" to liquidate all of the Money Exchange's share portfolio with the exception of the SAMBA shares.[24]

47.     On 19 May 1994, El Ayouty is found writing again, "To the Attention of all Shareholders", to express concern about the Money Exchange's financial problems and its accounts.[25] El Ayouty referred to past criticisms "that were presented to you every year as of the establishment of the branch in August 1981, but they have greatly aggravated this year". The Chief Justice observes:

Indeed, it is fair to say that El Ayouty were fully aware and very critical of the practices adopted by the Partners. This can be seen clearly from so much of the correspondence as has been disclosed in the trial and which reveals that El Ayouty provided regular and explicit advice to AHAB about the activities of the Money Exchange, if only – it might be inferred – to ensure that they could not be sued at a later stage by AHAB for negligence.[26]

48.     On 28 May 1994, El Ayouty followed up the above letter with a further, personal, warning and appeal to Abdulaziz:

I reiterate my deepest concern regarding your passive position to deal with this situation which we fear will turn into a disaster if you don't deal with it with some firmness and resolution. I personally was surprised by your stance, whether in Al Khobar or Riyadh, before Brother Maan Al Sanea when I confronted him. You made me look like I was falsely accusing him and doubting his goodwill. I am not saying that Brother Maan has the intention to sabotage, but at the very least he is acting with money that does not belong to

---

[24] G/1530/1
[25] G/1548/1-7
[26] Judgment below, Section 1, para 164, AA/2.4/82

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

anyone. I will not be careful with your money any more than you are. The shock and the feeling of regret is due to the fact that the good faith with which we handled this situation in previous years is no longer valid.

The conclusion, Abu Saud…if the matter is no longer in your hands, I think it is something that needs to be put in front of all partners so they can all take action.

There will not be a budget before all the points I raised in our letter are responded to. Most important now is to secure a way by which Brother Maan can return the two billion riyals in his possession. What are the guarantees to accomplish that? Who is responsible for delaying and hiding all that appeared in our reports for the past years regarding these actions?

I reiterate my feelings that I am talking to you first as a brother, next as someone who audited the accounts as was appointed by all the partners who are unaware of anything and then as a human being whose conscience does not accept that rights will be lost, especially as we had set forth all the facts before you and they weren't even looked into. We are waiting for your recommendations. You have my best regards. Peace.[27]

49.     On the same day, 28 May 1994, El Ayouty wrote separately to Al Sanea as follows:

…The issue is how we face and prevent disaster from happening, regardless of what my personal opinion is, and how do we give everyone their own rights without any oppression or injustice. You know very well that all those points were presented to you on an annual basis but unfortunately it is clear now that the partners didn't know anything as they claim…

The second step that immediately follows is that you personally set a schedule to repay the loans that you owe, which equals to the amount of the loans borrowed from the bank…

One day you will realise that I am an honest advisor to you and that this, like painful surgery, is needed to save the patient from dying. May God help you to return rights that are owed to others. I am convinced that you did not intend to take it – God forbid – by fraudulent means, but it was just effort on your part.

50.     On 28 June 1994, AHAB may have responded to El Ayouty in a letter headed "The Exchange Balance Sheet 1993", apparently signed or to be signed by all the partners in the Money Exchange (that is by Abdulaziz, Suleiman, Yousef and Al Sanea), although we do not have a signed copy to hand.[28] In that letter, the partners provide El Ayouty with the information which had been requested in an entirely formal manner. There is reference to a "Stage One", viz the accounts for 1993, where certain adjustments "will be made", and to a "Stage Two", viz the accounts for 1994, where "all the remaining adjustments and suggestions" will be completed. Under the heading of "Investments", the partners refer to 355,600 shares in SAMBA registered in Al Sanea's name pursuant to a board resolution of 29 December 1991, adding "and the Board

---

[27] **G/1552.1**
[28] **G/1562/1-5**, see also **G/1563/7**. There were earlier drafts of this letter: **G/1557.2/1** and **G/1558/1**. The judge refers to the letter of 28 June 1994 as a "further unsigned draft": the judgment below, Section 2, para 70.

reserves its reasons".[29] Under the heading "Loans and Advances", the partners state that Al Sanea's "due payments shall be considered as withdrawals to be settled at a later time". The letter ends, however, by stating that the partners "have all authorised" Abdulaziz to respond to all El Ayouty's queries "to finally settle it with you and clear the partners' accounts in the manner he deems appropriate", and as follows:

> To that end, he may compose a comprehensive plain (sc. plan) to fulfil the company's obligations either by liquidating all or part of its assets and work to acquire its due payments from others whether clients or partners…To that end, he may appoint a liquidator to be agreed with Mr. Maan Al Sanei (sic) and determine his fees…

51.    The crisis with El Ayouty may have been managed in this way, either by sending that letter or in a personal meeting between Abdulaziz and El Ayouty, but there was no liquidation and matters continued much as before.

52.    In May 1995, the Money Exchange resolved a further refinement of its accounting practices. There were now to be three so-called "divisions". One would be named the *Stock Investments Division*, and this would produce its financial statements "in English [as in] previous years, on the same principles", succeeding to the erstwhile Exchange and Investment Division, a title with which the judgment below persevered (as it turns out, so did the Money Exchange); a second would be named the *Finance and Property Investments Division*, whose financial statements would be in Arabic and so would reflect what has been called, and the judgment below continued to call, the Finance Division; and the third would be the Money Exchange Division itself, which would issue a "Consolidated Balance Sheet" for all three divisions, "which in total represent the actual records" of the Money Exchange.[30]

53.    On 1 April 1997, El Ayouty wrote again, "*To the Attention of All Partners*", setting out, as the Chief Justice put it, "in detail damning criticisms of the way the Money Exchange was being operated".[31] El Ayouty complained inter alia of how the partners had still failed to pay up the declared capital of the Money Exchange; of the resort to bank borrowing to expand share purchases; of the Money Exchange becoming the "main financer for the withdrawals by the parent company, the partners, and their affiliated companies"; of the failure to "achieve any positive results since the beginning of the branch's activity"; and of "a permanent shortage in liquidity".

54.    As the end of the year approached, and the annual financial statements loomed, Abdulaziz wrote on 24 November 1997 to Al Sanea to revert to the question of liquidating the Money Exchange. Abdulaziz referred back to the letter dated 28 March 1992 (see at para 44 above) which Suleiman and Yousef had written to him requesting liquidation, and reminded Al Sanea that "since that time we have reconsidered the subject with you and that was on the promise that the situation would improve in all aspects…We also spoke with you at the end of last year…". Abdulaziz continued:

> As you know the partners are still repeatedly talking about the subject of the liquidation and for it to be done as quickly as possible as they are continually referring me to the letter delivered to me previously in '92 AD. I have promised this to them often from time to time and their patience and mine has been used up. Now there is no longer any excuse for me and for you to delay the

---

[29] The Chief Justice considered that this transfer (and perhaps other transfers) of shares to Al Sanea was probably connected with the warehousing of SAMBA shares in circumstances where AHAB was up against a 5% percentage limit on its holdings. Al Sanea held as a nominee. The judgment below, Section 2, paras 66-67.
[30] Judgment below, Section 1, para 184, **AA.2.4/92**
[31] Judgment below, Section 1, para 266, **AA/2.4/121**, **G/1698/1-7**

> liquidation. As you also know I have delayed informing some of the partners of the balance and the statements of the main centre because I was hoping for the end of the Exchange [branch] so that I can show them everything at once.[32]

55. Abdulaziz concluded by looking forward to beginning on liquidation measures in the first quarter of 1998. However, that did not happen.

56. In 1998, Yousef suffered a serious stroke and spent six months in the USA undergoing treatment. However, in late 1999, after his recovery, he wrote a curt letter to his brother Abdulaziz, dated 26 December 1999.[33] It is apparent from his letter that Yousef had asked Abdulaziz for the latest "annual report", which must be a reference to what we call the Audit Pack for 1998, and that Abdulaziz had, apparently falsely, replied that he "does not have it", so that Yousef had asked for it directly from El Ayouty. Yousef says that he reviewed it and noted certain things, such as that the net indebtedness of Al Sanea had reached SAR 2.3 billion as of end 1998. He asked: "why no end has been put the increase annually" (sic). He also complained about the high interest rate charged him on his own overdraft account, compared to the rates applicable to Al Sanea's borrowings. (We know, see at para 99 below, that the surviving Attachment 9 to the otherwise lost 1998 Audit Pack, shows Al Sanea's net indebtedness to be at SAR 2.3 billion.) Yousef's letter therefore demonstrates that in Abdulaziz's time, as other letters such as those from El Ayouty also suggest, Abdulaziz played his cards close to his chest, but that there was no difficulty in finding out the audited state of affairs of the Money Exchange, including Al Sanea's borrowing from it, by contacting El Ayouty. It also demonstrates that, although the other partners may not have known, without consulting the Audit Packs, precisely what the state of Al Sanea's borrowings were, they were aware that Al Sanea was an ongoing borrower of funds from the Money Exchange.

57. On 2 March 2000, Abdulaziz signed a "Declaration" to the effect that he was "joint guarantor" of the debts owed by Al Sanea "and his corporations and companies" and that he held ownership deeds for land and real estate covering such debts and that he was willing to transfer them into the name of "the company" (possibly AHAB or the Money Exchange) pursuant to a power of attorney which he held from Al Sanea. He recorded Al Sanea's debts as of end 1999 as SAR 2.234 billion net (ie total liabilities less deposits).[34]

58. On 22 July 2000, Yousef wrote to Abdulaziz to remind him that "twelve years ago" they had decided to liquidate the Money Exchange. "Everybody agreed", but nothing had happened. He therefore asked Abdulaziz to "accept my exemption from continuing to take part in these activities" with effect from the end of that year.[35] It appears that Yousef had decided to surrender his interest in the Money Exchange in the hope of being exempted, at any rate for the future, from its liabilities. However, he remained a partner of AHAB, and does not seem to have insisted on his departure from the Money Exchange either, as will appear below, and he continued to draw dividends from it.

59. In September 2000, Abdulaziz suffered an incapacitating stroke. He spent two years in hospital in Dallas, before being returned to Saudi Arabia in October 2002, and dying in May 2003. His brother Suleiman succeeded him, first as acting chairman (of AHAB and the Money Exchange) from September 2000, and then, on Abdulaziz's death, as full chairman. At the same time Saud, a member of the next generation of Algosaibis, became a partner and managing director of AHAB and a director of the Money Exchange, at the time of his father's death. Suleiman, a more cautious man than his brother Abdulaziz, came to rely on Saud as being more numerate and also more entrepreneurial than he was.

---

[32] G/1761
[33] G/2025
[34] G/2093/1
[35] G/2185/1

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

60.     Thus it was in Abdulaziz's era that the essential conduct of the Money Exchange was established. Through the Money Exchange AHAB acquired a substantial portfolio of (mainly) Saudi banking shares on borrowed money. The borrowing was engineered in reliance on false accounts presented in English, whereas the true accounts were in Arabic and were kept secret. AHAB's and the Money Exchange's auditors, El Ayouty, reported each year in the form of an Audit Pack, in which they made repeated criticisms about the way in which the Money Exchange's accounts were drawn up. There is some evidence that Abdulaziz was wary of taking his family fully into his confidence, at any rate as to the preferable way in which his son-in-law Al Sanea was being treated over the matter of the latter's borrowings. But it is plain nevertheless that, whatever that element of reluctance to share that aspect fully with his family, Suleiman and Yousef were unhappy with the situation to the extent of wanting to close the Money Exchange down and (in Yousef's case) in wanting to depart from it, for the very reason that they knew enough of what was going on, were complicit in the fraud being practised on the lending banks, were aware of Al Sanea's borrowings, and were able to discover for themselves, through El Ayouty and their Audit Packs, the precise amount of Al Sanea's borrowings.

### *The start of Suleiman's era – Saud's Calculations*

61.     Following Abdulaziz's stroke and up to his death, Saud spent much of his time looking after his father. Even so, already in 2002, Saud had investigated, for his uncle Suleiman, the extent of the Money Exchange's and Al Sanea's borrowings. The sheets of manuscript figures have become known as **Saud's Calculations**. They were based on figures attached to El Ayouty's Audit Pack for 2001. They showed that the Money Exchange's total borrowings were SAR 7.8 billion, and that Al Sanea's borrowings (from the Money Exchange, net of his deposits with the Money Exchange) were SAR 3.368 billion. The Respondents rely inter alia on Saud's Calculations (and what flows from them) as significant evidence that the partners of AHAB knew all about and authorised the bank borrowings by the Money Exchange and in turn Al Sanea's borrowings from the Money Exchange, both before and after 2002.

62.     Saud's Calculations remained unknown and undisclosed in this litigation until they emerged in 2011 on the eve of trial in proceedings in London commenced against AHAB by various banks, as to which more is said below (the **London proceedings**).

63.     In May 2003, Abdulaziz died, and Suleiman formally succeeded to the chairmanship of AHAB and the Money Exchange. In the same month, TIBC was incorporated in Bahrain, and Saud became chairman of SAMBA.

64.     With Abdulaziz's passing from control, a question has arisen for the purposes of this litigation as to the extent of the succession's knowledge of the financial status of the Money Exchange. Apart from other evidence, Saud's Calculations demonstrate that in 2002, Saud, and it follows Suleiman, must have known of the full extent of the Money Exchange's borrowings from the banks and of Al Sanea's borrowings from the Money Exchange. The position of Yousef is more problematical, given his then asserted departure from the Money Exchange as of the end of 2000. However, we know that he only did so because at the end of 1999 he had informed himself directly through El Ayouty of the true state of affairs. And even so, Yousef continued to sign Money Exchange board resolutions, such as that of 16 March 2002, which concerned the annual distribution of dividends (including to himself as a partner of the Money Exchange) and the issue of financial statements in English.[36]

---

[36] **N/173/1** and **N/190/1**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

*The Money Exchange accounts and the Audit Packs*

65.     It is necessary and convenient at this stage to break off from this chronological history to say something more in explanation of the Money Exchange accounts and the so-called Audit Packs which El Ayouty sent each year to the Money Exchange.

66.     We have been provided with two volumes of an Accounts Bundle. The first contains what have been described as Audit Packs. The second contains what have been described (as well as in the judgment below) as "financial statements".

67.     The financial statements are in English, typewritten, and contain brief and condensed balance sheets and profit and loss accounts, originally without anything very much in the way of notes, explanation or break-down of major items, but latterly with some greater detail. There is usually, but not always, a brief "Statement" by either the managing director (Al Sanea) or latterly by the various chairmen of AHAB. There are financial statements for each year from 1981 to 2008 (except for 1983). All such financial statements (possibly with one exception) contain an "Auditor's Report" by El Ayouty, whose terms vary over the years, but are to the effect that the audit has been conducted in accordance with generally accepted auditing standards or principles and present the financial position of the Money Exchange fairly.

68.     Both the Audit Packs and the financial statements may be called accounts; but it is useful to have different nomenclature for the two varieties. The financial statements in English are by and large unrevealing in themselves and become increasingly divorced from reality. They are the means by which a fraud was performed on the banks which lent to the Money Exchange. That fraud is common ground, although it is submitted on behalf of AHAB that even Abdulaziz, who it is accepted knew all about what was happening, was not conscious of dishonesty, and that the other partners were ignorant of much of what was happening.

69.     The Audit Packs, as they have survived, are intermittent. Their English versions have been translated from their original Arabic, but only for the purpose of this litigation. The original Audit Packs were written solely in Arabic. We have them for 1981 and 1982, for 1987 (not complete but in significant part), for 1994, for 1996, only attachment 9 for 1998, only attachments 8 and 9 for 2001, only attachment 9 for 2002, and then the full Audit Packs for a run of years from 2004 to 2008. Finally, there is an attachment 9 for the 2009 period up to 30 April 2009. The Audit Pack for 1994 comes from Saud's safe (also referred to as Saud's wife's safe) in Saud's villa; and the attachments from the otherwise absent 1998, 2001 and 2002 Audit Packs come from either Saud's safe or the so-called N files[37]. The documents from the N files and those from Saud's safe are disclosure which have come forward late, the former in disturbing circumstances and the latter because their significance was only appreciated once they were translated into English in about 2015. However, the very fact that the documents in Saud's safe were collected and placed there and found there was considered by the Chief Justice to be significant. The Audit Packs for 1994, 1996 and 2008 were produced in discovery only in 2015. The Audit Packs for 2004-2007 were obtained directly from El Ayouty only.

70.     The first audited accounts of the Money Exchange are those for the period from 27 August 1981 to the end of 1981. The undated covering letter from El Ayouty is addressed to the "managing director", ie Al Sanea. It recorded a net profit of SAR 454,351.43, which appears to derive mainly from the earnings of the Money Exchange's traveller cheque business. There are customers to whom money has been advanced. There is no sign as yet of the purchases of bank shares. Although there are references to assets and liabilities, in some detail, it is difficult to discern a proper balance sheet.[38] In our bundles it is referred to as both an Audit Pack and a financial statement.

---

[37] See para 186 below
[38] **F/2**

71.     The 1982 financial statements were produced on 14 June 1983.[39] We do not know to whom within the Money Exchange the financial statements were sent or by whom they were seen. These statements are typewritten, in English, and contain a balance sheet and profit and loss account in short form without much in the way of detail or notes or explanation.  Assets now total some SAR 665 million, albeit only SAR 82 million are stated to be in the form of investments and the majority appear to be in the form of deposits by the Money Exchange or advances to, and therefore receivables from, customers. Net income has risen to SAR 62 million. Borrowings by the Money Exchange total SAR 184 million, of which borrowings from banks are at SAR 174 million; and deposits owed to creditors are at SAR 197 million.

72.     Also for 1982, however, is a handwritten document in Arabic.[40] This is also addressed to Al Sanea as managing director of the Money Exchange. It has been referred to in our bundles as an Audit Pack. This sets out assets and liabilities in considerable detail, item by item. Borrowings from banks are again totalled at SAR 174 million[41]. Although the Arabic version is in much greater detail than the English version, the two versions do not seem as yet to diverge.

73.     There are no financial statements for 1983 as a whole, only for the half year as at 30 June 1983[42]. However, there is a document dated 17 August 1984 listing dividends earned on shares owned by the Money Exchange totalling just over SAR 101 million.[43] We also learn from the 1984 financial statements (see below) that assets were now SAR 1.2 billion (of which only SAR 0.375 billion were investments) and loans to the Money Exchange were SAR 0.55 billion.[44]

74.     The 1984 financial statements were produced on 3 June 1985.[45] They show assets of SAR 1.354 billion and borrowings by the Money Exchange at SAR 0.6 billion. Net income was some SAR 31 million (SAR 143 million gross, presumably nearly all dividends on shares).

75.     The 1985 financial statements were produced on 17 March 1986.[46] Assets are at SAR 1.6 billion (of which investments are SAR 0.55 billion) and borrowings by the Money Exchange are still at SAR 0.6 billion. Net income remains at SAR 31 million.

76.     It will be recalled that it was at the end of 1985 that we find recorded the resolutions which the Chief Justice considered to be the arch instruments of the Money Exchange's frauds on the banks from which it borrowed. It follows that it ought to be in the 1985 financial statements that we see the signs of some change, unless of course such signs were disguised by the very purpose of the resolutions. At any rate the 1985 financial statements (in their English form) are in line with previous years. Bank borrowings are in excess of investments, but not significantly so. The financial statements are, as before, complicated, however, by large sums of receivables due from customers on the one hand, and on the other hand by inward deposits owed by the Money Exchange to others.

77.     The 1986 financial statements are dated 17 March 1987. Assets are shown at SAR 1.4 billion, of which SAR 0.558 billion are in the form of investments, and bank borrowings are at SAR 0.512 billion. Net income is at SAR 38 million.[47]

[39] **F/6**
[40] **F/4**
[41] **F/4/34**
[42] **F/9**
[43] **H29/60A/1**
[44] **F/12/5**
[45] **F/12**
[46] **F/13**
[47] **F/17**

78.     The 1987 financial statements are dated 4 May 1988[48]. They show assets at SAR 1.47 billion, of which SAR 0.57 billion are in the form of investments, and bank borrowings are at SAR 0.587 billion. Again, it is receivables from customers and deposits owed to customers which make up most of the difference. Net income is at SAR 34 million. In his Statement, Al Sanea said that –

> Investments which are stated at lower of cost or market remained almost unchanged. Their market values, particularly Samba and Arab National Bank, have increased considerably and our investments, which are some 85% in Saudi Banks, should continue to be most rewarding during the coming years.

79.     For 1987 there is also a fairly but not entirely complete version of an Audit Pack.[49] This shows a number of significant matters:

(i)     Borrowings from banks totalled SAR 1.3 billion, not SAR 0.587 billion as stated in the financial statements. El Ayouty observe that to the liability figure in respect of bank borrowings of SAR 1.3 billion should be added (a) deposits made with the Money Exchange by partners with funds derived from the Money Exchange's borrowings (SAR 0.258 billion); and (b) unpaid-up capital of SAR 0.187 billion out of the Money Exchange capital falsely said to have been paid up to the full extent of SAR 0.2 billion and taken as a credit against foreign loans. In El Ayouty's opinion therefore the total liability in respect of bank borrowings amounted to SAR 1.755 billion.[50]

(ii)    Interest ("commission") on such borrowings is said to be running around SAR 150 million per annum.[51]

(iii)   The book cost of local (Saudi) shareholdings was SAR 0.837 billion, of which more than 40% (SAR 0.360 billion) was the capitalised cost of interest on borrowings financing their acquisition. As it happened, the fall in the value of these shares was such that market value was only SAR 0.387 billion, ie even less, by SAR 38 million, than their original cost price (not counting the capitalisation of their finance cost). Since the accounting principle was to value at the lower of cost or market, the shares were significantly overvalued.[52]

(iv)    The effect of capitalising interest on bank borrowings covering the cost of investments was adding (in 1987) SAR 94 million to the Money Exchange's assets and hiding a similar amount as an expense on the profit and loss account. The effect "may in fact give others a false impression of the results of the company's activities which will continue to generate losses", as El Ayouty observed.[53]

(v)     Al Sanea and "his subsidiary companies" had overdrawn their accounts with the Money Exchange by SAR 73.8 million.[54]

(vi)    No interest was paid by Al Sanea on his borrowings.[55]

---

[48] F/22
[49] F/19
[50] F/19/25, F/19/30
[51] F/19/31
[52] F/19/23
[53] F/19/26-27
[54] F/19/12
[55] F/19/17

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

80.     The 1988 financial statements are dated 13 May 1989.[56] They show assets at SAR 1.66 billion, of which investments stand at SAR 0.641 billion. Borrowings by the Money Exchange are stated at SAR 0.652 billion. Net income is at SAR 40 million.

81.     We also have a so-called adjustment schedule which lists "The Amendments Performed on the Book Figures to Show the Financial Data as of 31 December 1988 (in English)".[57] These are the amendments "required to lessen the assets and liabilities, in order to present the budget appropriately to outside parties, and to accredit those amendments so that they match with the comparison figures from the previous years". Thus SAR 1.150 billion is deducted from both sides of the balance sheet, including many cases of bank loans in foreign currency, and a special figure of SAR 0.3 billion, which has no identity in any ledger number.

82.     There is a similar adjustment schedule for 1989.[58] These adjustments are presumably incorporated in the 1989 financial statements which are dated 21 May 1990.[59] These show assets of SAR 1.73 billion, of which investments stand at SAR 0.687 billion, while bank borrowings are at SAR 0.760 billion. Net income is at SAR 41 million.

83.     Similarly, the 1990 financial statements dated 6 April 1991 presumably incorporated the adjustment schedule found for 1990.[60] The 1990 financial statements[61] are the first to contain a Statement by the Chairman, now Abdulaziz. All previous financial statements had contained a Statement by the managing director, Al Sanea. Assets are shown at SAR 1.66 billion, of which SAR 0.67 are in the form of investments, while bank borrowings are at SAR 0.714 billion. As for receivables owed to the Money Exchange, and deposits taken by the Money Exchange and owed to others, Abdulaziz's Statement explains that SAR 0.679 billion out of the total receivables of SAR 0.799 billion are described as customer advances "to the Group", and that the balance of SAR 0.12 billion is "fully secured"; as for customer deposits of SAR 0.369 billion, SAR 0.295 billion are "from the Group". There is no suggestion here of any such advances or deposits being respectively to or from Al Sanea or his businesses, unless by "the Group" a reader was expected to understand that the expression was intended to cover the individual partners of the Money Exchange and thus Al Sanea's and his companies' borrowings as well as AHAB's.

84.     Abdulaziz also referred to the Money Exchange's investments as follows:

>       The large capital appreciation which has occurred as a result of increases in the market values of our investments is not reflected in the Balance sheet as investments are shown at the lower of cost or market value. Nevertheless, the amounts are very substantial and if we were to sell our two major bank shareholdings we would realise profits in excess of SR 1,300 million…

85.     Al Sanea had made similar remarks before.

86.     It will be recalled that it was in the run-up to these financial statements that Abdulaziz wrote on 7 April 1991 to El Ayouty to the effect that discrepancies between the Money Exchange's records and these accounts in the matter of bank borrowings was due to the policy, pursuant to resolution R/73 of 14 November 1988, of adjusting both the asset and liability side of the

---

[56] **F/24**
[57] **H25/32.1/1-3**
[58] **H25/38/1-7**
[59] **F/28, G/1291/1-10**
[60] **H25/2/1-6**
[61] **F/32**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

balance sheet "in order to show the budget in an appropriate manner toward outside parties (in English)".[62]

87.    The 1991 financial statements (which presumably incorporated the figures of the 1991 adjustment schedule[63]) are dated April 1992.[64] They were issued not long after Suleiman's and Yousef's letter dated 28 March 1992 to Abdulaziz requesting him to liquidate the Money Exchange (see para 44 above). It is possible that this request came forward at a time when, as indicated by Abdulaziz's Statement in the 1991 financial statements (and again in those for 1992, see below), the investments were showing a considerable profit on their cost: thus Abdulaziz spoke of a profit over book value on the two major bank shareholdings of SAR 2.8 billion. Assets are shown at SAR 1.712 billion, bank borrowings at SAR 0.727 billion, net income at SAR 47 million. If so, it would be an opportune time for liquidating.

88.    The 1992 financial statements are dated 28 March 1993.[65] Assets are shown at SAR 1.823 billion, of which investments comprised SAR 0.714 billion. Bank borrowings are shown at SAR 0.78 billion. Abdulaziz's Statement now referred to a capital appreciation on the two major holdings in excess of SAR 3.5 billion.

89.    The 1993 financial statements were delayed by the crisis between the Money Exchange and El Ayouty in the spring of 1994 (see at paras 46-51 above). They are dated 25 July 1994.[66] Total assets are stated at SAR 1.7 billion, including investments at SAR 0.671 billion. Borrowings are stated at 0.771 billion, net income at SAR 68 million. Abdulaziz refers in his Statement to advances by the Money Exchange of SAR 0.768 billion, of which SAR 0.676 billion "are to the Group". Again, there is no express suggestion of large advances to or large deposits by Al Sanea or his group of businesses.

90.    The 1994 financial statements are dated 30 July 1995.[67] Total assets are stated as SAR 1.724 billion, including investments of SAR 0.599 billion. Bank borrowings are stated as SAR 0.746 billion. Net income is stated as SAR 84 million.

91.    The Audit Pack for 1994 survives, having been found in Saud's safe.[68] It is the first entirely complete Audit Pack to have survived (since the rather jejune one for 1981). It is addressed "For the attention of all partners" and Sheikh Abdulaziz as Chairman. It is dated 15 May 1995. The following matters appear:

(i)     Attachment 8, headed "(Consolidated) Balance Sheet…Exchange and Investment Division and Finance Division", shows "Loans from Banks" at SAR 2.97 billion, not SAR 0.746 as stated in the financial statements for 1994. It also refers to an increasing deficit on liabilities against assets of SAR 1.8 billion.

(ii)    Subject to that Consolidated Balance Sheet, separate accounts are presented for first the Exchange and Investment Division and then for the Finance Division.

(iii)   The unpaid capital of SAR 180 million is still noted.

(iv)    Attachment 9 is headed "Net Indebtedness of Mr Maan Al Sanea". Its total is SAR 1.06 billion (SAR 1.43 billion gross).

---

[62] **G/1388.2/1**
[63] **H25/41**
[64] **F/36**
[65] **F/39**
[66] **F/51**
[67] **F/61**
[68] **F/56**

(v)     These are the first appearances we have of Attachments 8 and 9.

(vi)    711,200 (previously 355,600 before a 1 for 1 split) shares in SAMBA are in the name of Al Sanea although they belong to AHAB. An assignment dated 20 July 1994 had been signed by Al Sanea but "to date, ownership of these shares has not been transferred".

(vii)   The "capitalization policy (capitalization of financing cost)" is referred to, with the plaintive comment "but until when will this continue?"

(viii)  "Current account receivable[s]" were divided between the two divisions of the Money Exchange. They show that although Al Sanea was the main debtor (with at least 22 separate accounts), Yousef was also a debtor for some SAR 50 million, and there was a great deal of "unpaid capital interest". Meanwhile Al Sanea's indebtedness was on the rise, indeed "one can say that whenever the Division had cash resources, Mr Maan withdrew them and used them to increase his accounts".

92.     The 1995 financial statements are dated 27 June 1996.[69] Total assets are put at SAR 2.13 billion, including investments at SAR 0.679 billion. Bank borrowings are stated at SAR 1.054 billion. Net income is at SAR 94 million. Abdulaziz's Statement acknowledges that market values of the investments have fallen, for he says –

        We have taken advantage of lower stock market prices to increase our investments and were we to sell our major bank shareholdings we would realise profits in excess of SR 1 billion.[70]

93.     The 1996 financial statements are dated 30 May 1997.[71] Total assets are now SAR 2.341 billion, including investments at SAR 0.724 billion and lending ("current accounts") at SAR 1.205 billion. Bank borrowings are put at SAR 1.165 billion, net income at SAR 117 million.

94.     There is also an Audit Pack for 1996 in our bundles, dated 3 May 1997. It is addressed for the "Attention: all the partners" but is also headed as "Delivered" to Abdulaziz. It is a lengthy and detailed document of some 66 pages. It begins (at pages 2-33) with the figures for the Exchange and Investment division of the Money Exchange, which are in line with the figures in the 1996 financial statements given above. There are however additional notes and explanations, such as that the cost of financing the investments had risen to SAR 1.985 billion. Lending by the Money Exchange at SAR 1.205 billion turns out to include SAR 0.938 billion, or over 75%, to have been borrowed by Al Sanea, who operated no less than 22 accounts which "are continually increasing". Abdulaziz's Statement in the 1996 financial statement had said that SAR 0.98 billion of such lending, described there as "Customer Advances", "are to the Group". Therefore Al Sanea was being treated as a "Group" customer. But AHAB's share of such lending of SAR 1.205 billion was, by comparison, a mere SAR 88 million, or less than 10% of Al Sanea's borrowing. As for the Money Exchange's bank borrowings, we learn that the signatures on the loan contracts are sometimes those of Abdulaziz and Suleiman, but mostly Abdulaziz on his own behalf and by power of attorney for the other partners.

95.     At pages 34-67 of the 1996 Audit Pack are found the figures for the Finance division of the Money Exchange. These show very different figures from those found for the Exchange and Investments division. Thus total assets are there stated to be SAR 4.344 billion, made up in the

---

[69] **F/65**
[70] **F/65/11**
[71] **F/75**

main by investments of SAR 1.86 billion and "current accounts" (ie lending) of SAR 2.38 billion. The debit side is made up by bank borrowings of SAR 2.393 billion and inward deposits of SAR 1.7 billion. Al Sanea's borrowings from the Money Exchange turn out to be not SAR 0.98 billion but *an additional* SAR 1.567 billion, and it appears that he paid no interest on 13 of his 22 accounts. The Money Exchange's net loss for the year turns out to be SAR (297) million (as compared to a financial statement net income of SAR 117 million).

96.  The 1996 Audit Pack also annexes detailed attachments which give still further details. For instance, the important Attachments 8 and 9 state that Al Sanea's total borrowings from the Money Exchange are SAR 2.505 billion, and that even net of his deposits with the Money Exchange his borrowings stand at SAR 1.634 billion. Attachment 3 values the investments at SAR 2.263 billion, of which SAR 1.62 billion is ascribed to the investment in SAMBA shares.

97.  The 1997 financial statements are dated 1 July 1998.[72] They show total assets at SAR 2.9 billion, including investments at SAR 0.974 billion, bank borrowings at SAR 1.8 billion and net income at SAR 121 million. Abdulaziz's Statement said that the Money Exchange had taken advantage of favourable market conditions to invest a further SAR 0.250 billion in shares, and that the liquidation of major shareholdings would realise profits of over SAR 1.7 billion over cost "at which we carry these assets in our books".[73]

98.  The 1998 financial statements are dated 10 May 1999.[74] Total assets are given as SAR 3.1 billion, investments at SAR 1.088 billion, bank borrowings at SAR 1.859 billion and net income at SAR 132 million.

99.  There is also for 1998 a surviving Attachment 9 from that year's Audit Pack (which has not otherwise surfaced within disclosure). The separated Attachment 9 comes from disclosure from Saud's safe. It shows that Al Sanea's net indebtedness to the Money Exchange was SAR 2.318 billion (made up of a total indebtedness of SAR 3.122 billion, and deposits of SAR 0.804 billion).[75] Al Sanea's net indebtedness is in line with the figure of SAR 2.3 billion which Yousef referred to in his letter of 26 December 1999 (see at para 56 above, strongly suggesting (although it is disputed) that he was privy to Attachment 9 to the 1998 Audit Pack.

100.  The 1999 financial statements are dated 25 March 2000.[76] Total assets are given as SAR 3.4 billion, investments at SAR 1.468 billion, bank borrowings at SAR 2.175 billion, and net income at SAR 103 million. These are the last statements signed by Abdulaziz as chairman.

101.  These 1999 financial statements of the Money Exchange can be compared to the accounts for AHAB for 1999.[77] These accounts made no reference at all to the business of the Money Exchange and seem to have been restricted to a small number of AHAB's operations and subsidiaries, such as the National Bottling Co (the Pepsi Cola business) and the Algosaibi Hotel. Total assets amounted to SAR 2.2 billion, including net fixed assets of SAR 1.2 billion, and liabilities were shown as comparatively small, with partners' equity, in the form of capital, capital reserve and retained earnings, forming a large part of the balance sheet. Net income was also comparatively small, at SAR 96 billion. This may illustrate that the venture which AHAB had undertaken through the Money Exchange came enormously to outweigh its traditional business. This must have been clear to the Algosaibis as a whole.

---

[72] **F/78**
[73] **F/78/3**
[74] **F/82**
[75] **H30/18.1**
[76] **F/89**
[77] **F/83**

102.   The 2000 financial statements are undated and contain no Statement by either managing director or chairman (Abdulaziz had by now suffered his stroke).[78] They give total assets at SAR 3.862 billion, investments at SAR 1.551 billion, bank borrowings at SAR 2.486 billion, and net income at SAR 151 million.

103.   The 2001 financial statements are dated 25 April 2002 and are again without a managing director's or chairman's Statement.[79] They show total assets at SAR 4.288 billion, investments at SAR 1.639 billion, bank borrowings at 2.865 billion, and net income at SAR 168 million. The financial statements now give somewhat more detail than in earlier years. In particular, there is now a heading called "Loans and Advances" (at SAR 2.248 billion) which is broken down between "Loans to related parties (see note 12)" and "Loans to third party customers". The former is stated at SAR 1.868 billion, the latter at the much smaller figure of SAR 384 million.[80] Note 12 states:

> In the ordinary course of business, the Company enters into transactions with associates, shareholders (i.e. partners), directors, senior management of the Algosaibi Group and their related concerns. The terms and conditions of these transactions are approved by the board of directors, on an arm's length basis, on commercial terms and conditions and at market rates.[81]

It is difficult to think that Suleiman, who was now acting chairman of the Money Exchange, and Saud, who was assisting Suleiman in his new role, were not aware of these statements in their accounts.

104.   The Audit Pack for 2001 is not in our files, but Attachments 8 and 9 from it are, coming forward in disclosure in 2011 as part of the N files. The Attachments were separated from the Audit Packs and were clearly the basis of Saud's Calculations in 2002, which also came forward in the N files[82]. Attachment 8 (headed "Balances of Loans and Bank Overdrafts") records a total figure of SAR 7.8109 billion, made up of (1) loans from local banks, (2) loans from foreign banks, (3) loans through AIS Bahrain, and (4) overdrafts.[83] The figure for (2) loans from foreign banks is not legible because it has been obscured by highlighting, but it can be deduced from the other figures to be SAR 2.2277 billion. Attachment 8 also contains the equivalent figures for 2000, 1999 and 1998. Attachment 9 is headed "Net Liabilities of Mr Maan Al Sanea as of 31 December 2001".[84] It provides figures for 2001 and 2000. The attachment first totals Al Sanea's liabilities to the Money Exchange on his various accounts, then deducts from that total his deposits with the Money Exchange (less the deposits of his Saad Investments Company), in order to arrive at a net liability figure. The 2001 figures are in part obscured by highlighting (in 2000 the gross liability figure was SAR 4 billion (SAR "3,966,852,317") and the net liability figure was SAR 3.3 billion (SAR "3,256,737,116"). The 2001 figures were higher. Saud's Calculations record total bank loans at "7,810,900,000" clearly taken from attachment 8, and Al Sanea's gross liability to the Money Exchange at "4,128,113,411" which is a highlighted and obscured figure in Attachment 9. Saud's Calculations also record Al Sanea's net liability figure at SAR "3,368,205,368". This is also a highlighted and obscured figure in Attachment 9. Despite the obscured figures in Attachment 9 for 2001, Attachment 9 for 2002[85], which also contains the comparative figures for 2001, confirms Al Sanea's gross liability to have been SAR 4,128,113,411 and his net liability to have been SAR 3,368,205,368 as at 31 December

[78] F/97
[79] F/109
[80] F/109/10
[81] F/109/13
[82] N/744/1 (Arabic manuscript), N/745/1 (English transcription)
[83] N/782 (Arabic), N/783 (English): only the English version has been highlighted
[84] F/781.1/1-2 (Arabic and English), G/2682.1/2
[85] H30/46.1/1

2001, exactly the figures in Saud's Calculations. It follows that Saud's Calculations were clearly derived from Attachments 8 and 9 of the 2001 Audit Pack, which, as we have said, were found, together with Saud's Calculations in Saud's office as part of the N Files.

105.   These figures, derived from Attachments 8 and 9 of the 2001 Audit Pack are of course wholly inconsistent with the 2001 financial statements, which record bank borrowings at only SAR 2.865 billion (not SAR 7.8 billion), and loans and advances, whether to related parties or to third party customers, at only SAR 2.248 billion (not, so far as Al Sanea is concerned, at gross SAR 4.128 billion).

106.   The 2002 financial statements are dated 22 April 2003.[86] On this occasion there is a Chairman's Statement by Suleiman. It reports the death of Abdulaziz and that Saud has joined the Money Exchange board. It announces, as of "particular note...the formation of a banking subsidiary in Bahrain", which "will strengthen our business": clearly a reference to TIBC. Assets are stated to stand at SAR 4.565 billion, investments at SAR 1.689 billion, bank borrowings at SAR 3.041 billion, and net income at SAR 157 million. However, Suleiman's Statement also said that the *market* value of investments exceeded SAR 3.8 billion. Loans to related parties are at SAR 1.92 billion.

107.   Attachment 9 to the 2002 Audit Pack has also survived.  It was found in Saud's villa.[87] This shows Al Sanea's indebtedness as of 31 December 2002. The figures show his gross liability according to the Exchange and Investment Division at SAR 2,485,895,003, and his gross liability according to the Finance Division at SAR 2,789,162,324, for a total gross liability to the Money Exchange at SAR 5,637,401,638, some SAR 5.6 billion. The figure net of deposits is given as SAR 4,141,270,317, some SAR 4.1 billion. It is naturally impossible to reconcile these figures with the 2002 financial statements. On the original Arabic version of Attachment 9, someone has written, in English, "2002" and "Saud received full report".[88] In his witness statement, Saud addressed this, merely saying "I do not recall having seen or received the full report. Had I done so and understood the content, I believe that I would have confronted Mr Al Sanea and asked for an explanation".[89] However, it is plain from Saud's Calculations that Saud did understand the content of such an attachment, and had analysed it. It is also plain that he accepted receiving Attachment 9. His evidence on this point does him no credit. At the same time, it reveals that he must have understood the significance of these figures: as he said "I would have confronted Mr Al Sanea and asked for an explanation."

108.   The 2003 financial statements are dated 20 April 2004.[90] The Statement is now headed "Statement of the Board of Directors" and is signed by both Suleiman and Saud. Assets are stated to stand at SAR 4.856 billion, investments at SAR 1.847 billion, bank borrowings at SAR 3.1 billion, and net income at SAR 294 million. Loans to related parties are at SAR 1.754 billion.

109.   The 2004 financial statements are dated 25 April 2005.[91] The Board of Directors' Statement is again signed by Suleiman and Saud. It states that "the management decided to present the financial statements at fair value" in accordance with international financial reporting standards. Accordingly, a fair value surplus of SAR 6.39 billion since inception had been created. Assets were therefore now stated at SAR 12.676 billion, investments at SAR 7.8 billion, bank borrowings at SAR 4.262 billion, and net income (affected by the surplus on investments) at SAR 3.791 billion with the balance going into a restatement of previous years'

---

[86] **F/115**
[87] **H30/46.1/1**
[88] **H30/46**
[89] **C1/2/41** at para 188
[90] **F/127**
[91] **F/148**

income. Loans to related parties are given at SAR 1.588 billion, but loans to third party customers have risen to SAR 1.373 billion.[92] Note 7 concerns TIBC, whose capital is said to have been increased to $ 300 million (by transfer of investments), and which is said to have made a net profit of $ 166 million.[93] The 2004 financial statements are now much lengthier and more detailed documents than they were in earlier years. Partners are listed at page 5: the list reads as though it was a list of the partners of the Money Exchange, but it must have been intended as a list of the partners of AHAB, because Al Sanea is not mentioned, and instead 11 female members of the Algosaibi family are mentioned: in all 15 partners are listed.[94]

110. The 2004 Audit Pack dated 21 April 2005 has survived.[95] This is the first surviving full Audit Pack from the era of Suleiman. As before, it is marked for the attention of "All partners", but also headed as delivered to (the current chairman, by now) Suleiman. As in the case of the 1994 and 1996 Audit Packs, it begins with the accounts of the Exchange and Investment Division, and continues with the accounts of the Finance Division. There are no consolidated accounts of the Money Exchange as a whole, but Attachments 8, 9 and 10 consolidate the aspects there dealt with. Thus, while the Exchange and Investment Division accounts reflected those of the 2004 financial statements, the Finance Division accounts (beginning at page 41 of Audit Pack[96]) showed further figures, including lending to Al Sanea (most of the total lending figure of SAR 3.8 billion) as well as enormous deposits from AIS (SAR 4.5 billion), Al Sanea (SAR 1.5 billion) and TIBC (SAR 1 billion).[97] Such matters were again, as usual, summed up in Attachments 8 and 9. Attachment 8 showed both a "Consolidated Statement of Financial Position as at 31 December 2004" for the whole Money Exchange[98] and (at Attachment 8/2) the Money Exchange's total borrowing figures (the equivalent of the page from Attachment 8 for 2001 found in Saud's safe)[99]. The consolidated accounts showed loans from banks at SAR 6 billion but also deposits with the Money Exchange of SAR 7.2 billion. On the other hand Attachment 8/2 showed "Loans and Overdraft Accounts" at a total figure of SAR 10.5 billion (up from 2003's figure of SAR 9.5 billion, 2002's figure of SAR 9 billion, and 2001's figure of SAR 7.8 billion).[100] The reason why Attachment 8/2's total figure of SAR 10.5 billion exceeds Attachment 8's figure for "Loans from banks" at SAR 6 billion seems to be because the former figure includes SAR 4.5 billion described as "Loans through AIS in Bahrain". It would seem therefore that this figure lies within the first page's figure of SAR 7.2 billion of "Deposits". Attachment 9 showed Al Sanea's indebtedness at SAR 7.3 billion gross and SAR 4.9 billion net (net of deposits of SAR 2.4 billion).[101]

111. The Money Exchange's borrowings on the one hand, and Al Sanea's borrowings and deposits on the other hand were spread between the two divisions of the Money Exchange and consolidated in these attachments. Other attachments showed matters separately for the Money Exchange's two divisions: for instance, attachment 5/2 gave details of Al Sanea's (borrowing) accounts with the Exchange and Investment Division, and attachments 6 and 7 gave details of Al Sanea's deposits and borrowings respectively in the Finance Division. Of course, this division was fictitious and only necessitated by the Money Exchange's long-term decision to show only a partial and false account of their business to the lending banks in the form of the annual financial statements. The complexities of the interchange of borrowing by the Money Exchange, of lending by the Money Exchange to Al Sanea, and of Al Sanea's own deposits

---

[92] **F/148/14**
[93] **F/148/16**
[94] **F/148/9**
[95] **F/138**
[96] **F/138/41**
[97] **F/138/47**
[98] **F/138/73**
[99] **F/138/76**
[100] **F/138/76**
[101] **F/138/77**

with the Money Exchange, presumably almost entirely with monies borrowed by Al Sanea from the Money Exchange but derived from the Money Exchange's or the Financial Businesses' borrowings from banks, are not easy to follow. But the best and easiest summaries of them are at Attachments 8 and 9. It is not surprising therefore to find these attachments in Saud's papers separately from the Audit Packs to which they relate.

112. The 2005 financial statements are undated as they appear to lack either a Board of Directors' Statement or an auditor's report.[102] They show assets at SAR 19.39 billion, investments at SAR 13.1 billion, bank borrowings at SAR 5.4 billion, and net income at SAR 5.543 billion. Loans to related parties are stated at SAR 1.711 billion and to third party customers at SAR 2.282 billion.

113. There is also an Audit Pack for 2005.[103] As before it is marked for the attention of all the partners, but is also addressed to Suleiman. It is in similar form to earlier Audit Packs, and contains detailed criticisms on the way the accounts are shown. With the move to stating investments at fair value, the policy of capitalisation of the cost of interest on the investments is said to have become redundant, so that El Ayouty's advice is that "it is better to write off this capitalisation and end this policy"[104]. The important Attachments 8 and 9 are again there. The first page of Attachment 8, showing the consolidated position of both divisions of the Money Exchange, states investments at SAR 13.1 billion, lending at SAR 10.6 billion, bank borrowings at SAR 7.1 billion, and inward deposits at SAR 10.8 billion.[105] The second page of Attachment 8 (now called Attachment 8/1) details bank borrowings at SAR 12.1 billion.[106] Again, there is a disparity between bank borrowings shown on the first page at SAR 7.1 billion, and the total figure of SAR 12.1 billion shown on the second page: but again we infer that this is because the latter figure includes SAR 4.9 billion described as "Loans through AIS in Bahrain", whereas this figure is included in the figure for deposits (of SAR 10.8 billion) on the first page of Attachment 8.

114. As for Attachment 9, Al Sanea's net indebtedness to the Money Exchange was shown as SAR 4.5 billion (SAR 10.1 billion gross, less credit balances of SAR 5.6 billion).[107] Details of these figures are given in attachments 5, 6 and 7 of the Audit Pack. Among the details in Attachment 9 are "Deposits belonging to him [Al Sanea] in the name of TIBC" stated at SAR 2.7 billion. Earlier in the Audit Pack, where it dealt with liabilities, TIBC's deposits (in the slightly different figure of SAR 2.8 billion) are ascribed as owed to TIBC, not Al Sanea. Seeing that TIBC was 93% owned by AHAB, it is odd to find therefore that in Attachment 9 the TIBC deposit is credited to Al Sanea. It looks therefore as though Al Sanea was using TIBC as a nominee for his own lending to the Money Exchange. This emphasises the extent to which Attachment 9 (year on year) provides an insight into the true account as between Al Sanea and the Money Exchange. We repeat the observation in the penultimate sentence of para 111 above.

115. Among the comments in the Audit Pack are numerous references to Al Sanea's accounts, as well as his failure to pay interest on the majority of them, even though he received interest on his deposits.[108]

---

[102] **F/161**
[103] **F/172**
[104] **F/172/45**
[105] **F/172/75**
[106] **F/172/76**
[107] **F/172/77**
[108] eg at **F/172/46-47** For instance: "This commission [interest due from Al Sanea] is regarded as book revenues because it is calculated and applied but not paid while the amounts due to him on his deposits are paid to him by cheque".

116.    The 2006 financial statements are also undated and lack any Statement for the Board or auditor's report.[109] They show assets at SAR 16.48 billion, investments at SAR 9.348 billion, bank borrowings at SAR 6.006 billion, and a net loss of SAR (205 million).

117.    There is also an Audit Pack for 2006.[110] It is stated to be delivered to Suleiman for the attention of all the partners. It follows the familiar format. Attachment 8 (first page), stating the consolidated financial position of the Money Exchange, shows financial investments at SAR 9.3 billion plus investments at cost at SAR 7.6 billion, loans and advances at SAR 15.2 billion, loans from banks at SAR 8.8 billion, inward deposits at 17.4 billion.[111] Attachment 8/1 shows total borrowings at SAR 22 billion (including SAR 6.7 billion through AIS and SAR 6.5 billion through TIBC).[112] Attachment 9 shows Al Sanea's net indebtedness to the Money Exchange at SAR 10.2 billion (SAR 14.1 billion gross less SAR 3.9 billion deposits in the Finance Division, see attachment 6).[113]

118.    The 2007 financial statements are undated.[114] They contain an auditor's report but not a Statement for the board. Assets are stated at SAR 21.6 billion, investments at SAR 12.7 billion, bank borrowings at SAR 5.2 billion – but there are also "term loans" of SAR 3.275 billion – loans and advances at SAR 5.2 billion, and net income at SAR 2.6 billion. The net income is presumably as a result of a further revaluation of the investments, and the 2006 net loss is restated at SAR (3.6 billion).

119.    The 2007 Audit Pack is dated 23 April 2008.[115] This is on the eve of the global financial crisis. As usual it is marked for the attention of "All Partners" and states that it is "To be delivered" to Suleiman. Attachment 8 (the consolidated accounts) shows investments at SAR 12.7 billion plus their cost at SAR 9.9 billion (although attachment 3 values the share portfolio at only SAR 8.9 billion book value, and SAR 11.3 billion at market value). As for liabilities, reference to bank borrowings has now gone: there is an item of "Bank balances" at SAR 8.5 billion (the 2006 figure for this item is stated at SAR 8.7 billion, close to the SAR 8.8 billion in the 2006 Audit Pack for loans from banks); but the largest item by far is "Deposits" at SAR 28.4 billion.[116] Attachment 8/1 ("Branch Obligations Regarding Loans and Advances") is cut down from its earlier form and simply shows "Bank balances" at SAR 8.5 billion, "Deposits" at SAR 28.4 billion and Loans at SAR 3.3 billion.[117] It shows corresponding figures for 2006 but not for earlier years. As for Attachment 9, this shows Al Sanea's net indebtedness at SAR 13.7 billion (SAR 25 billion gross, less SAR 11.3 billion deposits).

120.    The 2008 financial statements, the last such annual statements, are dated 8 April 2009.[118] That covers the year of the global financial crisis. There is an auditor's report but no board Statement. Assets are given at SAR 14.8 billion, investments at SAR 5.6 billion, loans and advances at SAR 5.9 billion of which only SAR 1.2 billion is to related parties and SAR 4.7 billion is to third party customers (a complete turn-around from the relative figures for 2001, which was the first year in which this breakdown was given), and net loss at SAR (178 million). The TIBC capital is now stated to be $ 1 billion.

---

[109] F/185
[110] F/197
[111] F/197/75
[112] F/197/76
[113] F/197/77
[114] F/214
[115] F/230
[116] F/230/74
[117] F/230/75
[118] F/264

121. The 2008 Audit Pack is dated 6 April 2009.[119] It is as usual marked for the attention of all the partners and "To be delivered to" Yousef, the new chairman of the Money Exchange. Attachment 8 contains the consolidated balance sheet: among the assets are financial investments at SAR 5.6 billion (plus investments at cost of SAR 12.5 billion) and "loans and borrowings" at SAR 31.5 billion; among the liabilities are "loans from banks" at SAR 13.4 billion and "deposits" of SAR 34.6 billion.[120] Attachment 9 shows Al Sanea's net indebtedness at SAR 16 billion (SAR 29 billion gross, less credit balances of SAR 13 billion).[121]

122. Finally, an Attachment 9 to an otherwise missing Audit Pack for 2009 up to 30 April 2009, found in Saud's safe, stated Al Sanea's net indebtedness at SAR 19.7 billion (SAR 33.3 billion gross, less deposits and credits of SAR 13.6 billion).[122] There are the standard cross references to Attachments 5 and 7. It is not clear if, in the immediate run up to the Money Exchange's collapse in May 2009, El Ayouty completed an Audit Pack for the four months up to 30 April 2009. However, El Ayouty had clearly been asked to bring Attachment 9, showing Al Sanea's gross and net borrowings, up to date in the days immediately before or after the collapse.

123. We would summarise this history of the Money Exchange's financial statements and Audit Packs as follows. They demonstrate an Alice in Wonderland world, not untypical of fraudulently run enterprises, of numerous different accounts being kept for different purposes, of which one set must, for those in charge, tell an accurate story of the undertaking's true financial position. That accurate set is found in Attachments 8 and 9 of El Ayouty's Audit Packs. Yousef's and Saud's (and through Saud) Suleiman's interest in such attachments is revealing of their understanding of how such accounting documents really worked. In presenting the figures in such attachments, and in their advice and admonitions generally, El Ayouty appear to have been loyal (indeed over-loyal) to the Algosaibis whom they had served for so many decades. Attachment 9 in particular illustrates how over the years Al Sanea's borrowings were meticulously recorded, but also how they rose, even taking into account the counter-deposits effected by him, year on year. They rose particularly steeply in the bullish years preceding the global financial crisis. The false financial statements in English are signed off by figures such as Suleiman and Saud. Suleiman did not, we are told, understand English, but it is almost inevitable that he must have therefore relied on Saud to explain them to him to the extent that was necessary. It is also inevitable that the Algosaibis who have looked to the Audit Packs to keep them informed of the true position. As for Suleiman, with his lack of English, it would have been vital for him as chairman of the Money Exchange, and of AHAB too, to scrutinise the Audit Packs. If he was less entrepreneurial and financially acute than his brother Abdulaziz, he had Saud to assist him. It is impossible to believe that the Algosaibis, who worked out of the same suite of offices at AHAB HO, were not in constant touch and communication about their enterprise. Moreover, the Audit Packs are full of references about the Financial Businesses in Bahrain, and also of their size and importance. It is impossible to believe the evidence of the Algosaibis at trial that they had no inkling of the substantial business being conducted by and through them.

### *The era of Suleiman and Saud*

124. Against the background of these financial figures, we can revert to the essential story of the fate of the Money Exchange during the era of Suleiman and Saud, following Abdulaziz's stroke on 30 September 2000.

---

[119] **F/260**
[120] **F/260/71-72**
[121] **F/260/73**
[122] **H29/206.1/1**

125.    We have already referred to Saud's 2002 Calculations. It is plain from those Calculations that Saud, as well as Suleiman (and before him Abdulaziz) had access to those Audit Packs, and knew their way about them, in particular concentrating on Attachments 8 and 9, where the Money Exchange's borrowings from banks and Al Sanea's borrowings from the Money Exchange were to be respectively found. Moreover, the first page of Attachment 8, even if not itself separated from the 2001 Audit Pack as part of Saud's Calculations, would have contained the consolidated balance sheet of the Money Exchange, and must have itself been seen by Saud. That said, it was plainly the extent of the Money Exchange's borrowings from the banks and of Al Sanea's borrowings from the Money Exchange that were of principal interest to Saud and Suleiman at this time.

126.    Another aspect of Saud's Calculations which we have not detailed above is his investigation of the interest payable and unpaid on Al Sanea's borrowings and deposits. This was of natural concern to the Algosaibis because, as El Ayouty were warning them, Al Sanea was not paying interest on his loans but was receiving interest on his deposits. The issue of interest was also a theme of Yousef's letter to Abdulaziz dated 26 December 1999 (see at para 56 above).

        *2000*

127.    On 26 November 2000 Saud, Suleiman, Yousef and Al Sanea signed resolution R/66, which resolved to adopt the previous decisions in relation to the Money Exchange's financial reports.[123]

128.    On 19 December 2000, Yousef wrote to Suleiman, prompting him about a previous letter from him dated 22 July 2000 to Abdulaziz (see at para 58 above) "excusing myself from continued participation in Exchange activities" as of the end of that year. He asked what measures had been undertaken in that regard.[124]

        *2001*

129.    In March and April 2001, a Money Exchange employee, Peter Shepherd, wrote anonymously to various financial institutions to inform them of inappropriate conduct at the Money Exchange. He had been employed as assistant treasury manager from November 1989 to July 2000. A sample of this whistleblowing is as follows[125]:

        You might wish to know that…Al Sanea…has used Algosaibi's (sic) as his shell company to extract over $1 billion in bank debt for his Saad group of companies leaving Algosaibi's in a mess…The Algosaibi financials are as transparent as a bowl of mud…

130.    However, he was sued very promptly for defamation by Al Sanea and the Money Exchange in Canada and forced to retract his statements. The Statement of Claim gives other examples of his whistleblowing, eg "The auditors are corrupt. The cash flow is negative. The annual financials are fake…The western management is corrupt and lie to you all the time."[126] The legal proceedings in Canada appear to have been handled personally by Al Sanea through a London based US attorney, Joseph Consolo.[127]

---

[123] **G/2290**
[124] **G/2320**
[125] **G/2392/16**
[126] **G/2414/6**
[127] **G/2392/3**

131.    Even before Saud's Calculations, Saud is to be found writing to Al Sanea on 16 April 2001 raising with him "According to our last meeting" a list of 17 issues "that have been repeated for several years on the balance sheet that should be remedied". Among them (as number 12) is "Determination of the accounts belonging to Mr Maan Al Sanea and his companies". This is the so-called "**Saud's List**", which was among the documents in the N files.[128] Saud's List demonstrates both Saud's perfect familiarity with the issues repeatedly raised by El Ayouty over the years, and thus with the Audit Packs, and the fact that the state of Al Sanea's borrowings, although an issue for action, was just one among a number of concerns that Saud was chasing up. Saud's reference to "our last meeting" shows that Saud and Al Sanea were in the habit of meeting on business matters. Saud's List (among other things) also demonstrates that the whistleblower Mr Shepherd's use of the word "extract" in the citation at para 129 above cannot be read as referring to a misappropriation unknown to the Algosaibis.

132.    On 17 April 2001 Al Sanea replied to Saud, referring to a proposal to write to El Ayouty presumably about such matters (a proposal which must have been discussed at the meeting) and requesting that that be postponed until completion of the 2000 accounts. Saud wrote in manuscript on Al Sanea's letter disputing delay and saying that "the said comments are easy to deal with and easy to amend" and that "The [accounts] for the last 5 years have the same comments".[129] That is consistent with Saud's comment in his letter to Al Sanea described in the previous paragraph about El Ayouty's issues "repeated for several years". It is to be inferred therefore that Saud had at his disposal the Audit Packs not only for 2000 but also for 1995-1999 (at least).

133.    On 14 May 2001 Money Exchange resolution R/77, signed by both Suleiman and Al Sanea, spoke of Al Sanea's accounts being reduced by SAR 400 million by the year end.[130] The means of doing this were quite complex, but our understanding is that he would use SAR 400 million of his credit balances with the Money Exchange to pay off SAR 400 million of the Money Exchange's bank borrowings. This is another N file document.

134.    At about the same time, the Saudi Arabian Monetary Agency (**SAMA**) wrote to AHAB about the proposal by Royal Decree to merge all money exchanges into one joint stock company, again requesting financial data for the years 1997, 1998, 1999 and 2000.[131] The Money Exchange replied by letter dated 4 June 2001 to say that the Money Exchange was a branch of AHAB and had no separate accounts, that it was preparing separate accounts as at 30 June 2001, that delay was regretted but excusing the partners on the ground that they were "standing by" Abdulaziz in his illness.[132] SAMA's proposal and its request for accounts put AHAB and the Money Exchange into a difficult position. AHAB and the Money Exchange did not have accounts which could withstand scrutiny by an authority such as SAMA. Procrastinating attempts were made towards satisfying SAMA's request, but in the end the Money Exchange could not put itself in a position where it could join the single joint stock company proposed.

135.    On 20 June 2001, El Ayouty wrote to Al Sanea to refer to a recent meeting at which Al Sanea had requested accounts for the Money Exchange as at 30 June 2001, but saying that it was not as yet in a position to provide them so as to meet the requirements of SAMA.[133]

136.    On 16 October 2001, Suleiman wrote to Al Sanea asking him to assist by submitting a statement to El Ayouty "identifying and clarifying your accounts".[134]

---

[128] **G/2430.2, N/293**
[129] **N/277**
[130] **G/2458, N/337**
[131] **G/2472/3**
[132] **G/2481**
[133] **G/2497/4**
[134] **G/2592**

*2002*

137.    This is the year in which AHAB plead that the policy of "New for Old" was introduced by Suleiman to restrict borrowings by the Money Exchange from the banks to the level previously reached. AHAB have expressed some uncertainty as to exactly when that policy was introduced, with some suggestion that it went back to Suleiman's accession as acting chairman in 2000. However, its pleaded case is that it was introduced "In or around 2002 or early 2003".[135] We will refer more fully to the issues around the alleged "New for Old" policy below. Suffice it to say at this stage that the allegation was only made by amendment in July 2012, nearly three years after AHAB's original Statement of Claim of November 2009, which had been based on an entirely generalised denial of authority for any borrowing from the banks.[136] The July 2012 amended Statement of Claim was formally introduced as follows:

> The Statement of Claim was amended on 23rd July 2012 (pursuant to AHAB's undertaking and the Court's direction) to reflect the impact of the disclosure of certain documents known as the "N Files" on AHAB's allegation of unauthorised borrowing and to correct certain inaccuracies.[137]

138.    On 16 March 2002, the directors of the Money Exchange resolved by resolution R/90 to declare a distribution of "profit" of SAR 36 million (as in other years too), and to approve "all previous decisions relating to the issuance of an English language budget [ie financial statements]" and to assign to El Ayouty the responsibility of issuing it.[138] That resolution was signed by Suleiman (both for himself and for Abdulaziz) and by Yousef and Al Sanea.[139]

139.    On 27 and 28 March 2002, Saud wrote to El Ayouty to request them to prepare accounts which would succeed in removing most of the adverse comments found in previous years' Audit Packs. Saud was concerned to prepare the ground for satisfying SAMA. In his second letter, Saud said that the draft accounts would be discussed first with Al Sanea (as managing director) and then would be submitted to "us", viz the AHAB Partners.[140]

140.    On 4 April 2002, Saud wrote to Al Sanea concerning the latter's personal accounts and reminding him of their decision for him to repay SAR 400 million before the end of 2001, which had not been done, "but we hope you will fulfil your promise soon".[141]

141.    The Money Exchange's financial statements for 2001 are dated 25 April 2002, and it is likely that the Audit Pack for 2001 (which is missing) was issued at around the same date. Since Saud's Calculations refer to numbers taken from Attachments 8 and 9 to the missing Audit Pack (see above at para 104), Saud's Calculations cannot be earlier than the end of April 2002.

*2003*

142.    On 17 January 2003, Al Sanea wrote to Saud[142] enclosing draft 2002 accounts (in English) consolidating both the Money Exchange and AHAB[143]. The figures reflected the Money Exchange's (fraudulent) English language financial statements, not the Money Exchange's full

---

[135] Amended Statement of Claim, **A1/2.3/40** at para 99K
[136] *Ibid*, **A1/2.3/37** at para 99: "AHAB refers to all such borrowing as **"unauthorised borrowing"**".
[137] *Ibid*, **A1/2.3/1**
[138] **N/173**
[139] **N/190**
[140] **G/2798.3, G/2798.6**
[141] **N/327**
[142] **N/73/1**
[143] **N/73/2**

accounts encompassing the figures for both its divisions. Thus "bank borrowing" was put at SAR 3.1 billion (near enough to the Money Exchange's 2002 financial statements' figure of SAR 3 billion). Saud would have known that this figure could not have been accurate, when compared with Attachment 9 to the Audit Packs of both 2001 and 2002. It would seem that this form of consolidated English language report was needed either to satisfy the banks from which the Money Exchange was borrowing and/or SAMA.

143.    On 12 May 2003, Abdulaziz died, and Suleiman succeeded (on 24 May) formally to the chairmanship of AHAB and the Money Exchange, and Saud became a partner in AHAB and a director of the Money Exchange.

144.    On 22 May 2003 TIBC was incorporated. On 26 August 2003 Al Sanea forwarded to Saud a Group Profile and other documents, which described the Money Exchange as AHAB's central treasury and also described TIBC in some detail, as well as AIH and ATS. Saud noted "M.E.files" in his own handwriting on Al Sanea's cover letter. This was recovered from the N Files.[144]

145.    Late in 2003, Saud joined the board of directors of SAMBA.

*2004*

146.    On 6 March 2004, Al Sanea wrote to Saud concerning a prospective purchase of further shares in SAMBA, which were being sold by Citigroup, for SAR 1 billion, and of financing this purchase at borrowing ratios to value of up to 140%.[145] Saud's reply stated:

> I wish to reiterate what I explained to you before that our group does not wish to increase the banking facilities with banks, specifically local banks, because they reduce the chances for the principal office and the subsidiaries and sister companies to receive additional facilities from banks, in addition to the additional burdens on exchange.

However, Saud floated the "compromise" of a purchase of half the shares (ie to the value of SAR 525 million) between AHAB and Al Sanea without any need for borrowing.[146] We observe that, while expressing a general reluctance to increase borrowing at this time, Saud made no reference to a policy of "New for Old" as in any way standing in the way of Al Sanea's proposal.

147.    On 28 March 2004 Al Sanea sent Mr Hayley a memo concerning Suleiman's signing of Money Exchange documents. It was precipitated by Mr Hayley's memo to Al Sanea of the same date to record that a lending bank "will accept Uncle Suleiman's signature on behalf of all the partners. However, the bank insists that he must sign individually for each partner." Al Sanea replied about a format to reduce the number of signatures Suleiman had to sign, adding "Uncle Suleiman usually gets emotionally upset and uptight whilst signing for all the heirs individually".[147]

148.    On 29 May 2004, Saud wrote to Al Sanea again about the latter's wish to use the occasion of SAMBA's IPO to buy more shares in the bank.[148] Saud said that he had "mentioned to you on several occasions and through previous memoranda that our Group is not interested, in principle, in increasing the banking facilities in the Exchange, especially as the liquidation decision has been pending for years." Saud's letter continued as follows:

---

[144] **N/589**
[145] **G/3939**
[146] **N/627**, from the N Files
[147] **G/3970**
[148] **G/4104**

One of the reasons for making that decision was that we had no desire to increase the personal guarantees extended by the partners among which was the provision of shares guaranteed by new loans, as these shares were already bought using bank loans against guarantees from the partners that are still outstanding.

As you are aware, it was already agreed with my late father to liquidate the Exchange and the last thing my father spoke to me of when he was in hospital in London at the time of his illness was to finalize the issue of the Exchange which has been pending for years. To honour his wishes, we discussed several alternative options with you, the first of which was repayment of your debt and obtaining a banking licence and the last of which was your approval to purchase the branches of the Exchange and affiliates outside the Kingdom…This was done in the presence of Uncle Suleiman and brother Yousef last year, and no practical steps were taken…

In view of immense pressure I am facing from all the family members to finish this matter…I ask that you determine which shares belong to us so that we may meet with you to finalize this issue…

As to the SAMBA shares offered for sale by Citi Bank, each of us may, once this matter is concluded, independently purchase shares if they wish away from the Exchange…

AHAB relies on this letter as being supportive of its "New for Old" policy.

149.    On 30 June 2004, Saud and Al Sanea together signed a letter to HM the King of Bahrain, requesting Bahraini citizenship for large numbers of members of their family. The letter spoke of "investments and commercial activities in Bahrain for 20 years…" speaking specifically of TIBC and Saad Securities Company, going back to 1984, and enclosing TIBC's articles of incorporation.[149]

150.    Awal Bank (a bank within the Al Sanea group) was incorporated in August 2004 in Bahrain. It had already been referred to in the letter above to the King.

151.    On 25 August 2004, Saud wrote to Al Sanea prompting him "to have a dividend distribution resolution as we have done last year". Saud said that he would send the resolution to Suleiman in Lebanon for signature.[150]

152.    On 23 December 2004, Al Sanea wrote to Suleiman, resigning as managing director of TIBC, now that it was "well established…wishing the Bank and all of its management all success under your leadership and guidance".[151] Minutes of a board meeting of TIBC said to have been held in Bahrain on 27 December 2004, at which Suleiman, Yousef and Saud, as well as Al Sanea were said to have been present, recorded Al Sanea's resignation as managing director.[152]

        *2005*

153.    A long-projected AHAB report for 2004, consolidating the Money Exchange's English language financial statements, and accompanied by KPMG Cairo's "Review Report" dated 3

---

[149] **G/4171**
[150] **N/28**
[151] **G/4480**
[152] **G/4490**

May 2005 and KPMG Saudi Arabia's further "Examination Report" dated 11 May 2005, probably reflects the need to satisfy lending banks and SAMA.[153] There are some signs however that, despite the signed and dated KPMG reports, the document as a whole was still in draft, with manuscript amendments to it.[154] As at end 2004, investments are stated at SAR 12.4 billion, loans and advances at SAR 3.6 billion, and bank borrowings at SAR 5.1 billion, but there is no substantial figure under liabilities for deposits received (save for a mere SAR 45 million described as "Deposits from customers").[155] It is not easy to make sense of these figures as compared to the 2004 financial statements for the Money Exchange (or to the 2004 financial statements, dated 25 April 2005, of AHAB by itself[156]). Perhaps the great bulk of the advances and deposits of related persons were cancelled out. Of course, the true figures relating to the Money Exchange are not incorporated, because this was an English language document designed for public consumption.

154.    However, it is interesting to note what the AHAB report states about the Money Exchange. Thus, it is the first of its divisions to be mentioned, highlighting the participation of AHAB in banking and financial services and continuing:

> Currently, the Algosaibi Money Exchange undertakes retail currency exchange and remittances through its seven branches, situated in the Eastern Province and in Riyadh and Jeddah, in support of which it maintains extensive nostro-account relationships worldwide.

> The Algosaibi Money Exchange extends loans to third party clients, who either have business dealings with the Group, or who are individually well known to the Partners. Additionally it has a small portfolio of American Express Gold Cards, for which it is a franchisee in Saudi Arabia.

> Furthermore, the Algosaibi Money Exchange engages in off-balance-sheet documentary credit business through the acceptance of bills of exchange, and its Import Department provides corporate clients with a documentary credit processing service.

> Additionally, the Money Exchange is the central treasury for the Algosaibi Group, providing funding, hedge management, and foreign exchange services.

> As a discrete business within the Group, and with a separately allocated capital of SAR 200 million, the Algosaibi Money Exchange maintains individual books of account and issues its own financial statements.[157]

155.    Interestingly, the Money Exchange's major investments in banking shares are not ascribed to the Money Exchange but to AHAB indeed: ownership of SAMBA shares is ascribed to "the Algosaibi Partnership and members of the Algosaibi family individually".[158] TIBC is mentioned – not in the context of the Money Exchange, but as a subsidiary of AHAB (which

---

[153] **G/4500.2**
[154] See for instance at **G/4500.2/65** and **/83**
[155] **G/4500.2/50**
[156] **F/140/1** These show investments at a mere SAR 0.9 billion, although they are stated to be worth SAR 2.6 billion at market value (**F/140/12**). The Board of Directors' Statement, signed by Suleiman and Saud, points out that, as in previous years, the financial statements of AHAB and of its Money Exchange division are not consolidated (**F/140/2**)
[157] **G/4500.2/8**
[158] **G/4500.2/12**

of course it was as to 93%) – as extending "trade related finance".[159] AIH and ATS are mentioned as "Affiliated Companies", wholly owned by the Algosaibi partners. AIH is said to manage investment portfolios for its shareholders, and ATS is said to specialise in arranging structured Islamic trade transactions for third parties.[160]

156. As for the Money Exchange's ambitions to be recognised by SAMA as part of a newly created bank, the report stated:

> As we have mentioned in the past, it is our intention to obtain for the Money Exchange an Investment Company licence under the new Saudi Securities and Exchange Commission (a division of the Saudi Arabian Monetary Agency). Although we have no material progress to report, our application remains under the consideration of the authorities…[161]

157. As for projections, approved by KPMG in its Examination Report, the stated ambition was to grow "from SR 29,205 million in 2004 to SR 42,053 million by the end of 2009".[162]

158. On 25 October 2005, Al Sanea purported to resign his directorships of TIBC, AIH and ATS.[163] He also began to sign memos as "Executive Committee" rather than as managing director.[164] The Executive Committee appears to have been a committee of one. Similarly, Mr Hayley would address memos to the Executive Committee.

159. On AHAB's case, it is from 2005 onwards that there is a considerable escalation in the number of forged documents, principally facility agreements and related documents: see AHAB's Forgery Schedule.

*2006*

160. The Saudi stock market peaked in February 2006, and by August 2006 had lost 60% of its value.[165]

161. On 13 May 2006, we find an example of the collaboration between Al Sanea and Saud in the matter of bank borrowings, and of Saud's oversight of them. Al Sanea wrote to Saud to press him to finalise with his signature a facility from the Arab National Bank, as local banks were increasing their interest rates and Al Sanea wished to use the Arab National Bank facility to pay off the local banks' overdraft facilities. Saud wrote to Al Sanea on the same day to observe that the "yearly renewal for Algosaibi Group facilities" from Arab National Bank showed an increase, and he asked Al Sanea "to know the rationale behind the increase and uses". Al Sanea replied, explaining that the increase was to reduce borrowings at 12% down to 6%. He also offered to split SAR 200 million as to SAR 100 million for "Head Office utilisation" so that "we will give Head Office SAR 100 and we will keep SAR 100". It appears that by "we", Al Sanea is referring to the Money Exchange, which is distinguished from AHAB HO.[166] Al Sanea also asked Saud to sign the 2005 financial statements.

162. On 20 November 2006, Al Sanea purported to resign as managing director of the Money Exchange and of AHAB. "Please relieve me from all the responsibilities" he wrote to AHAB's

---

[159] **G/4500.2/12**
[160] **G/4500.2/13**
[161] **G/4500.2/17**
[162] **G/4500.2/41**
[163] **G/4983, G/4976, G/4977**
[164] Hayley witness statement, **C1/9/14**, para 53
[165] Hatton witness statement, **I/1/69**
[166] **H22/103/1, H22/114/1, N/545/1**

board.[167] Thus, over the period from December 2004, Al Sanea appears to have sought to disengage himself formally (but not in fact) from the operations of first the Financial Businesses and then the Money Exchange and AHAB themselves. Had he seen the writing on the wall? If so, he still remained bullish for himself (see below).

*2007*

163.    In 2007 Al Sanea was spending money again in building up a holding in HSBC. He considered it opportune to buy into a decline in HSBC shares when it issued a profit warning "in the wake of the meltdown in the US subprime mortgage market".[168] The Financial Times reported that he had spent about £3 billion building up a stake of 3.11 per cent since mid-February 2007, to become the largest shareholder in HSBC after Barclays. Breaching the 3% limit triggered a requirement to notify the market. The FT report described Al Sanea as "one of the most aggressive and dynamic businessmen of his generation" and as "now ranked 97th in the Forbes rich list". It said that his Saad Group had traditionally centred on construction, healthcare and education and was now increasingly expanding into finance and financial services "and even low-cost airlines".

164.    Al Sanea was clearly bullish at a dangerous time. It will be recalled that in the period from 2005-2007 the Money Exchange's Audit Packs showed bank borrowings rising from SAR 12.1 billion in 2005 to SAR 22 billion in 2006 to a total of SAR 40.1 billion in 2007 (described in that year as "obligations regarding loans and advances"). As for Al Sanea's borrowings from the Money Exchange at this period, they had risen from SAR 4.5 billion (net) in 2005, to SAR 10.2 billion (net) in 2006 and to SAR 13.7 billion (net) in 2007. This was an enormous acceleration of indebtedness at a time of first enormous confidence in markets and then a break in that confidence. If Al Sanea's judgment of markets had been justified, all might have been salvageable, for himself, and thus perhaps for the Money Exchange and AHAB. As it was, he was buying into an impending storm. It is difficult to think that his strategy, reflected in his major purchase of HSBC shares, was unknown to the AHAB Partners. The financial world knew about it. It is equally difficult to think that the Algosaibis did not know of the large additional borrowings that Al Sanea was arranging for himself through the Money Exchange in order to pay for this expansion. It would seem therefore that the correspondence between Saud and Al Sanea in 2004 which had expressed a reluctance to increase borrowing to buy more shares in SAMBA had either been part of a temporary cautiousness which had given way to later and greater ambitiousness: or that the Algosaibis were willing to trust Al Sanea's instincts, even if previously unwilling to increase their own investment in SAMBA (of which they may have thought that they had enough).

*2008*

165.    The strain that the darkening times were putting on Al Sanea's strategy can be seen from a private and confidential report that Mr Hayley, Al Sanea's right hand man, made to him on 9 January 2008. After recalling that the "past two years were good to us", he said that 2007 had brought higher interest rates and an annual interest bill of $ 650 million. Borrowing of $ 1.695 billion and $ 1.115 billion in 2006 and 2007 "can not be matched this year". Recently, in November and December 2007, Al Sanea (through his company STCC) was taking about $ 1 million each day in the form of cheques and transfers (*sc* from the Money Exchange).[169]

---

[167] **G/5517, G/5519**
[168] **X2/3/1** Financial Times 16 April 2007. There is also evidence that the HSBC stake was built up over a period up to December 2008, and was acquired by Singularis: Davies statement, **I/6/59**. William Davies was a respondent forensic accounting witness.
[169] **G/6272**

166.    The disaster in markets known as the global financial crisis (**GFC**) initiated by the bankruptcy of Lehman Brothers began on 15 September 2008. There is a reference to market difficulties in a message dated 19 September 2008 from Al Sanea to managers within his Saad enterprises reporting a $ 0.5 billion capital increase[170], but otherwise there is hardly any sign from documentation within AHAB, the Money Exchange or Al Sanea's enterprise of anything of immense importance having occurred. It is impossible, however, to believe that Al Sanea and the Algosaibis as a whole were not aware of this crisis, the greatest financial storm to hit the world since the 1929 crash, or were not greatly concerned with its consequences for their undertakings.

### *2009 – The collapse and its aftermath*

167.    On 22 February 2009 Suleiman died in hospital in Switzerland, after a short illness. Dawood began to work longer hours at AHAB head office, having only worked part time since 2006.[171] Yousef succeeded to the chairmanship of AHAB and the Money Exchange on 26 February.

168.    The 2008 Audit Pack (see at para 121 above) was dated 6 April 2009. It was for delivery to Yousef, the new chairman, and addressed to all the partners. Loans and borrowings (Attachment 8) were shown at SAR 31.5 billion, mainly in the form of "deposits". Al Sanea's borrowings (Attachment 9) had grown within the last year from a net figure of SAR 13.7 billion (in 2007) to a net figure of SAR 16 billion, a rise of some SAR 2.3 billion.

169.    In cross-examination, Yousef accepted that he had received a copy of the 2008 Audit Pack, that he passed the document to Saud, and may have discussed it with him.[172]

170.    Something had caused El Ayouty to supply an emergency Audit Pack for 2009 down to 30 April 2009. That Audit Pack is missing, but its Attachment 9 survived in Saud's safe in his villa (see at para 122 above).

171.    As it became harder and harder for Al Sanea to maintain the Money Exchange's borrowings, the final dénouement arrived in May 2009. Mr Hayley appears to have wished to dissociate himself from Al Sanea at this period.

172.    On 3 May 2009, Mr Hayley met with Saud and Dawood. He had tried to visit Saud at AHAB head office on 2 May, but Saud was away travelling. He did speak to him that day by telephone, however, and told him that there was an $ 8 billion problem at the Money Exchange and that he should speak to Al Sanea. On 3 May, according to Mr Hayley, Saud asked him if $ 1 billion would resolve the problem, and Mr Hayley said that it would help only in the short term.[173]

173.    On the same day, 3 May 2009, Al Sanea diverted some $ 191 million from the Money Exchange's funds with Bank of America to an account in the name of Awal Bank. Al Sanea signed a written instruction to Mr Hayley (who was unwilling to act on Al Sanea's verbal instructions) to do so (leaving just $ 2 million in the account with Bank of America).[174] Awal Bank was a bank within Al Sanea's group of enterprises. Al Sanea was its chairman and a 47% shareholder. The Chief Justice described this last minute transfer as "characteristically greedy and dishonest conduct on the part of Al Sanea", and that "Al Sanea's main focus was to

---

[170] **G/7025.1**
[171] Dawood witness statement, **C1/1/3-4**
[172] Judgment at 401, para 976, **AA/2.4/401**, Yousef **Day 38/61-62**
[173] Hayley witness statement, **C1/9/64**
[174] **G/7850**, Hayley witness statement, **C1/9/60-61**

extract every last bit of cash he could for himself", but did not accept AHAB's submission that it demonstrated AHAB's case of a total fraud by Al Sanea on an ignorant AHAB Partnership.[175]

174.    Also on 3 May 2009, Saud and Dawood visited Al Sanea. Their evidence was that he was calm and reassuring, and spoke of a routine problem with the settlement of a foreign exchange deal.[176] However, it is clear from a letter written by Saud to Al Sanea dated 4 May, and which refers to an earlier letter on the same subject matter written on 3 May, that at that meeting, or directly as a result of it, Saud and Dawood were willing to give Al Sanea the Money Exchange and its Bahrain Financial Businesses for nothing, in release from AHAB's liabilities. The Algosaibis appear therefore to have known already at that time that the Money Exchange and their interests in the Financial Businesses were worthless.

175.    Thus on 4 May 2009, Saud wrote to Al Sanea "concerning your purchase of the Money Exchange free of charge". In his letter, Saud said that Dawood was in agreement, and that Yousef, who would be consulted that same day, would be.[177] The idea was for the transfer of ownership as well of "banks registered in Bahrain", so as "to clear us from all potential liability". The letter referred to another letter "from yesterday" (ie 3 May 2009) on the same subject of a purchase free of charge. The Chief Justice not unreasonably inferred that "by that stage the Algosaibis knew that the financial position of the Money Exchange was so dire (notwithstanding the prestigious portfolio and the large receivable from Al Sanea) that they needed, above all, a swift exit".[178]

176.    On 7 May 2009, Saud's evidence is that he contacted Hassan Zaatar, the deputy general manager of finance at AHAB's National Bottling Company. Mr Zaatar had held that position since 1990, and was a qualified accountant. He joined Saud at his villa. Mr Saad was already there, with two employees of El Ayouty. Saud sent them to the Money Exchange to investigate its financial records and establish what its liabilities were. They had difficulty gaining access to the Money Exchange's offices. Mr Zaatar gave evidence that he found the El Ayouty personnel unhelpful. Two employees from the Money Exchange (Mr Adel Ibrahim, its chief accountant appointed by Al Sanea in January 2008, and Mr Shakur, in charge of its IT systems) were, Mr Zaatar said, equally unhelpful. Even so, Mr Zaatar reported late that night that there were "large debit balances that apparently related to Mr Al Sanea and explained that it seemed to me that the Money Exchange had been used to raise loans to fund Mr Al Sanea's businesses", but that he had no feel for the figures involved save that they appeared very large. He said that his report "clearly shocked [Saud] deeply." He was asked to continue his investigations. El Ayouty withdrew all cooperation. It was Mr Zaatar who established the approach to Deloitte to take over the investigation, but, although this was not immediate, he could not remember exactly when.[179]

177.    On 11 May 2009, Mr Hayley circulated a note about payments due to local banks on foreign exchange deals made over the last few weeks. On 13 May 2009 Al Sanea wrote to Saud blaming such deals on Mr Hayley as having been made in bad faith and saying that this was a ground for "termination of services for Mark and his team as I have reiterated this on many occasions. You should take the action now rather than later."[180]

---

[175] Judgment at 405-406, paras 990-994, **AA/2.4/405-406**
[176] Saud witness statement, **C1/2/70, C1/1/15**
[177] **H/30/61.1**
[178] Judgment at 407, para 995, **AA/2.4/406-407**
[179] Zaatar witness statement, **C1/14/7-10**, Saud witness statement at **C1/2/72**, Charlton witness statement at **C1/5/7**
[180] **G/7879.1**

178.  Also on 11 May 2009, Saud and Dawood met with Tariq Ali of Gulf Banking Consultants and instructed them to provide debt restructuring advice.[181] Mr Ali had been engaged by Al Sanea in the past. In May 2009 he was approached for advice (for the Algosaibi family) by Maan Al Zayer of the Saad Group. Al Zayer pointed Mr Ali in the direction of TIBC in Bahrain, where he met Mr Hayley, and Benjamin Jesudas, who had been employed by the Money Exchange since 1983, had become manager of the back office in 2003, and was acting treasurer in 2009. TIBC was in the firing line, because of foreign exchange deals on which it had defaulted. Saud and Dawood attended a TIBC board meeting in Bahrain with Mr Ali on 14 May.[182] They were to say that it was the only TIBC board meeting that they had attended, whatever board minutes may have said.

179.  Mr Ali gave evidence[183] that, while Dawood remained quiet, Saud led for AHAB and the Algosaibi family; that Saud appeared to be in shock and without an idea of the magnitude of the situation; that Mr Hayley said that Al Sanea controlled the Money Exchange; that Mr Jesudas (who was not a witness himself) said that Al Sanea's deposits at the Money Exchange "were not funded deposits, and did not actually exist"; and that –

> It was plain that, unless they are both consummate actors, all of this was absolutely news to [Saud and Dawood]. They were completely surprised. Saud said that the family understood there was a branch of the Money Exchange in Bahrain, but they didn't know about these companies and their roles in TIBC transactions.[184]

180.  On 26 May 2009, Deloitte, Dubai, wrote an engagement letter to AHAB with its proposal to conduct a forensic examination and potential debt restructuring of "Algosaibi Group entities" including TIBC, AIC, ATS and the Money Exchange.[185] Deloitte became closely involved in the consequences of the Money Exchange's and AHAB's collapse. Their team was led by Simon Charlton, managing director of Deloitte Corporate Finance Limited (incorporated in Dubai). Mr Charlton led Deloitte's forensic and dispute services practice in the Middle East from 2008 to 2013. From 1 June 2013 he became AHAB's acting CEO and Chief Restructuring Officer. He gave evidence on behalf of AHAB.

181.  As Mr Charlton explained, the AHAB matter was first referred to him on 19 May 2009. A colleague was sent to Bahrain on 22 May 2009 and then on to Al Khobar, where he met Mr Hayley and Mr Jesudas, and reported to Mr Charlton that the matter was potentially very serious. Mr Charlton's first meeting (in Bahrain) was on 24 May 2009. A Deloitte team first arrived at AHAB's headquarters in Al Khobar on 27 May 2009.[186]

182.  In June 2009, following an approach made to HRH King Abdullah by the AHAB Partners, asking for a standstill agreement to protect AHAB from its creditors and help in obtaining information from Al Sanea, King Abdullah by royal order froze AHAB's and its partners' assets and appointed a Royal Committee to look into things.[187] Among its early orders was a travel ban imposed (with rare exceptions) on the AHAB Partners.[188]

183.  Also in June 2009, first three and later more creditor banks commenced proceedings in the Commercial Court in London.

---

[181] Ali witness statement, **C1/4/7ff**
[182] **G/7891**, Ali witness statement **C1/4/16**
[183] Ali witness statement, **C1/4/5ff**
[184] Ali witness statement, **C1/4/15** at para 64
[185] **G/7946**
[186] Charlton witness statement, **C1/5/7-8**
[187] Saud witness statement, **C1/2/95-96**
[188] Saud witness statement, **C1/2/97**

184.    These proceedings in the Cayman Islands were commenced on 27 July 2009.

**AHAB's "New for Old" case: a phoenix born of the collapse of the London proceedings**

185.    Trial of the London proceedings began on 9 June 2011. It had been AHAB's and the partners' case as defendants in those proceedings, and in its dealings with the King's Royal Committee, that they had no knowledge of and had not authorised *any* of the loans obtained by the Money Exchange from the creditor banks and that everything had been orchestrated by Al Sanea without their authority.[189] Indeed, it had been on a similar basis that in July 2009 AHAB had obtained in these Cayman Islands proceedings a world-wide freezing order against the defendants here. However, in April 2011, the claimants in the London proceedings pressed for further disclosure, complaining that AHAB had failed in its disclosure obligations. Mr Justice Flaux made orders for further investigation and placed the responsibility on AHAB's legal advisors to ensure that full and frank disclosure was secured. This led to further search of both the AHAB offices and other places where documents might have been kept.[190]

186.    On 10 or 11 May 2011 AHAB's team found a substantial number of important documents in a cupboard in Saud's office at AHAB headquarters. This was despite the fact that Saud's offices had been searched before. These documents came to be called the "**N files**", having been labelled as such in the London proceedings. The Chief Justice referred to Mr Charlton's evidence in cross-examination in these proceedings that the N files had been found "eerily stacked" in Saud's cupboard, in conspicuous isolation from the huge number of other documents ultimately disclosed herein as potentially relevant.[191]

187.    The disclosure of the N files led to the collapse of AHAB's defence in the London proceedings, on the basis that they disclosed knowledge of very substantial borrowing by the Money Exchange, as well as knowledge of the allocation of large amounts of these borrowed funds to accounts in the name of Al Sanea.[192] AHAB admitted the contract claims against them, with claims in deceit and restitution falling away.[193] It is not easy to see how that admission of liability is consistent with AHAB's case of ignorance and forgery in these proceedings; but we say that entirely by the way, because we do not know enough about the precise claims made in those proceedings.

188.    In the light of these events, the defendants here obtained the discharge of the freezing order against them, and applied to strike out AHAB's claim. In response to that application, AHAB for the first time put forward their "New for Old" case, which was to the effect that Abdulaziz's incapacitation afforded Suleiman the opportunity to impose controls on borrowing by the Money Exchange, so that any new borrowing had to be matched by a retiring old borrowing, plus, as the case developed during Saud's cross-examination, "a bit more to cover interest". Having survived the strike-out application, AHAB's case therefore came to rest on the thesis that all borrowings over and above the level which existed at the time of the institution of the

---

[189] See for instance Saud's first affirmation dated 3 April 2010 in the Cayman Island proceedings, which was also used in the London proceedings, at **L1/4**. He here states his belief that continuing investigations support a case that his, Saud's, signature on documents relied on by Al Sanea were forged. For instance, "I consider any signature of mine on such a document [questionably signed by Suleiman] to be highly questionable" (at para 35). "I am also concerned that even if documents do contain my signature, it is certainly possible that I was duped into signing them by Mr Al Sanea or others acting on his behalf" (at para 36).

[190] Judgment at 28, **AA/2.4/28**

[191] Judgment at 29, **AA/2.4/29**

[192] Judgment at 29, **AA/2.4/29**

[193] **L4/1.4/11**

new policy, plus a bit more to cover interest, were unknown and unauthorised. As part of that thesis, it was said that any further borrowing was achieved by forgery or manipulation.[194]

189.   The Chief Justice, called this a "seismic shift", and said that –

> if the AHAB Partners are shown beyond the year 2000 to have been aware of and to have authorized – including by deliberately turning a blind eye – Al Sanea's procurement of the ever-increasing fraudulent borrowings, then AHAB's cases against the Defendants in these proceedings must fail.[195]

190.   When was the New for Old policy initiated? Is there any documentary evidence of it?

191.   The Chief Justice spoke of it as being said to be introduced "in around late 2000".[196] The Chronology agreed for this appeal states that "On AHAB's pleaded case, Suleiman allegedly puts in place the "New for Old" policy in 2002."[197] AHAB's (much-amended) Statement of Claim at para 99K (referenced in the Chronology) states:

> In or around 2002 or early 2003, and prior to Abdulaziz's death, Suleiman instructed Mr Al Sanea that if Mr Al Sanea wished to renew or replace any existing borrowing of the Money Exchange then he had to establish that the proposed new borrowing was not an increase on the expiring facility. Suleiman thereafter indicated that he was adopting the practice of signing new facility agreements or facility renewals only when such facilities were rollovers of existing facilities.

192.   If such a policy existed, it would at least make sense for it to have been introduced after, rather than before, Saud's Calculations, which (see above at para 141) can be dated to late April 2002 at the earliest. There is, however, no document which describes it. Importantly, there is no Money Exchange board resolution (of which there are many examples) which speaks to the introduction of New for Old, or indeed refers in any way to it either before or after its introduction. The only document which is pleaded by AHAB in its New for Old amendment as evidencing it (at para 99L of the amendment) refers to Saud's letter to Al Sanea dated 29 May 2004, concerning Al Sanea's proposal to borrow SAR 1 billion to finance the purchase of more SAMBA shares: in as much as Saud speaks there inter alia of "our group [not being] interested, in principle, in increasing the banking facilities of the Exchange", and of the family's desire to liquidate it (see at para 148 above).

193.   However, Saud spoke about New for Old in his evidence, as did Badr (in a late hearsay notice dated 8 March 2017[198]). And it was AHAB's case that its presence is also proved by the forgery of signatures and the manipulation of documents which are relied on, and which is discussed below. It may be noted, however, that Dawood, in his only witness statement (dated 4 April 2016, just a few months before the July 2016 amendment which introduced New for Old) said nothing about it; and that Yousef in his first witness statement, also dated 4 April 2016, said nothing about it either – save for a passing reference to his being certain that "Uncle Suleiman would not indulge Mr Al Sanea the way Uncle Abdulaziz had and…that no new additional borrowing was to be incurred."[199] Yousef's second witness statement, dated 5 September 2016, did not add to this.[200] Similarly, Mr Hindi, who was a long-standing supporter of Suleiman, and

---

[194] Judgment at 31, **AA/2.4/31**
[195] Judgment at 31, **AA/2.4/31**
[196] Judgment at 30, para 30, **AA/2.4/30**
[197] Chronology at **AA/6/11**, citing AHAB's Statement of Claim para 99K at **A1/2.3/40**.
[198] **C1/40**
[199] Yousef's first witness statement, **C1/3/24** at para 108
[200] Yousef's second witness statement, **C1/3.1**

who did not give live evidence, made a number of witness statements in the London proceedings but did not speak to New for Old.[201] Mr Saad, another long-time retainer of AHAB, who did give evidence, in his first witness statement (dated 4 April 2016), said nothing about New for Old, indeed nothing much of any interest at all[202]; and in his second witness statement (dated 5 May 2016) said nothing about New for Old, and merely spoke to Suleiman's signing habits (viz that he used manuscript and never used a stamp).[203]

***The agreed List of Issues on appeal***

194.    A List of Issues was agreed by the parties during the preparations for the appeal and is dated 3 April 2019. It does not reflect any refinements arising out of the Respondents' later Submissions, or AHAB's reply submissions, or the parties' oral arguments. However, it was not subsequently amended and it more than reflects both the essence and the detail of AHAB's appeal.[204]

195.    The List runs to 21 pages and the Issues number 51, with many sub-issues enumerated. It can be summarised as follows.

196.    Issues 1-9 are headed "Core errors, substantive and procedural irregularities". These raise the overall question whether the Chief Justice properly applied his mind to the parties' respective cases at trial and whether he had abdicated his judicial responsibility by over-reliance on and citation of the defendants' submissions. In effect these issues asked whether AHAB had received a fair trial.

197.    Issues 10-15 ("The Money Exchange") and 16 ("The Saad Empire") asked whether the Chief Justice had made appropriate findings about the history of the Money Exchange and the Saad Group and the nature of the relationship between the Algosaibis and Al Sanea.

198.    Issue 17 ("Inherent Probabilities") asked whether the Chief Justice's treatment of inherent probabilities and improbabilities was wrong.

199.    Issues 18-21 grappled with "The 'New for Old' Policy, Forgery and Manipulation". They asked whether the Chief Justice approached this subject-matter in a compartmentalised fashion and thereby simply came to the wrong conclusions about them.

200.    Issues 22-24 ("Destruction and Suppression of Evidence") asked whether the Chief Justice's conclusions that AHAB had destroyed and suppressed evidence were flawed inter alia by the drawing of impermissible inferences.

201.    Issues 25-30 ("Al Sanea's Breach of Fiduciary Duty") asked whether the Chief Justice had reached a conclusion which no reasonable judge could have reached in failing to find that Al Sanea had breached his fiduciary duties to the AHAB Partners inter alia by diverting funds to his or his companies' benefit, or committing AHAB to borrowing monies which could not be repaid, or by forgery and manipulation; particularly in the light of the Chief Justice's findings on the Counterclaim.

202.    Issues 31-39 asked a series of questions about "AHAB's Knowledge and Fully Informed Consent". For instance, as to who bore the burden of proof on such issues; as to whether there was "fully informed consent" even if the AHAB Partners knew of Al Sanea's borrowings from the Money Exchange; as to whether the Algosaibis had read the documents they had signed; as

---

[201] **C1/19, C1/20, C1/21**
[202] **C1/11**
[203] **C1/22**
[204] List of Issues, **AA/6.3**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

to the Algosaibis' knowledge of the Financial Businesses; as to the significance of Saud's Calculations; as to knowledge of the fraud against the banks after Abdulaziz's departure from affairs; and as to the Chief Justice's *quid pro quo* theory as an explanation of events.

203.   Issue 40 raised the question of "Illegality", viz whether the Chief Justice was right to say that AHAB's claim was barred by its own illegality/lack of clean hands.

204.   Issue 41 ("Attribution of Knowledge from Al Sanea to the Defendant Companies") asked whether Al Sanea's knowledge could be attributed to the Respondent companies.

205.   Issue 42 ("Tracing") asked under many sub-paragraphs whether property could be traced by AHAB through Al Sanea into the hands of the Respondents.

206.   Issues 43-44 ("Conflicts of Law and Choice of Law") asked about the Chief Justice's analysis concerning applicable laws.

207.   Issues 45-47 ("The Law of Saudi Arabia") asked questions about Saudi law, if that was applicable.

208.   Issues 48-50 ("Dishonest Assistance, Conspiracy and Unjust Enrichment") asked, by reference to the headlined doctrines, whether the Chief Justice had erred in concluding that without the ability to trace property into the hands of the Respondents, AHAB's claims under these headings failed.

209.   Issue 51 ("Remedies and Relief") asked about the remedies available to AHAB on this appeal, in particular whether this Court could grant substantive relief to AHAB or at any rate a new trial, or whether the right course was to dismiss the appeal.

210.   Despite the breadth of issue 51 referred to above, Mr John Wardell QC, leading counsel for AHAB, accepted at the outset of the hearing on appeal that the most that AHAB could realistically achieve on appeal was a new trial, that this Court could not properly substitute its findings for those of the judge of trial, and that any new trial would have to begin again, albeit subject to any incidental rulings on law which this court might hand down.

211.   Subject to that overall consideration, the core issues raised by AHAB's appeal might be said to be centred in the following: (1) first, whether AHAB had received due process; and (2) secondly, whether the Algosaibis had known about and authorised the borrowings by Al Sanea or whether, following the institution of a regime of New for Old, Al Sanea had misappropriated funds from the Money Exchange by forgery and manipulation or at least in breach of fiduciary duties and the obligation to ensure fully informed consent. If the answer to the first was No, or the answer to the second was Yes or at any rate that the Chief Justice had not safely adjudicated that issue, then a new trial ought to were ordered. All further issues were subsidiary, albeit the Respondents would submit that (3) the doctrine of illegality, and (4) the absence of any right to trace, meant that in any event there could be no right in AHAB to any real remedy.

### Disclosure

212.   The Chief Justice quite properly directed himself that contemporaneous documentation and the probabilities of the matter, rather than current memory, assisted and/or undermined as the latter so often is by self-belief, self-interest and outright dishonesty, were the better touch-stone of the truth. He cited the famous authorities on the subject, such as *Onassis v. Vergottis* [1968] 2 Lloyd's Rep 403, *Armagas Ltd v. Mundogas SA (The Ocean Frost)* [1985] 1 Lloyd's Rep 1 (CA, *per* Lord Justice Robert Goff at 57), *Grace Shipping v. Sharp & Co* [1987] 1 Lloyd's Rep 207 (PC) at 214-6, and *Villeneuve v. Gaillard* [2011] UKPC 1 at [67], as well as the recent

exposition by Leggatt J (as he then was) in *Gestmin SGPS v. Credit Suisse (UK) Ltd* [2013] EHC 3560 Comm at [15]-[22],  and the extra-judicial writings of Lord Bingham in *The Judge as Juror: the Determination of the Factual Issues* (1985).[205]

213.    As it was, the Chief Justice had to grapple with a rich history of defective disclosure. We have already referred to the late disclosure in May 2011, and the importance, of the N Files found in Saud's office at AHAB headquarters, and of a series of highly significant documents found in Saud's safe in his villa.

214.    The disclosure of the N Files not only came critically late in terms of the London proceedings, but its circumstances raised justifiable suspicions of a deliberate attempt to suppress documentation revelatory about the Algosaibis' knowledge of the Money Exchange. This was because (i) there was, as the Chief Justice said, "no clear or convincing explanation" of the late disclosure of the N Files; (ii) it was common ground that at the time of the collapse of the Money Exchange in May 2009 Saud had instructed "certain younger members of my family" (who came to be known as the **Young Algosaibis**) to go into both the Money Exchange and AHAB headquarters to search for and remove to Saud's villa (at the beach) documents which appeared to have any bearing on the demands for repayment which the banks were then making on AHAB;[206] (iii) the Deloitte investigation team searched Saud's office at AHAB headquarters in September/October 2009 and Saud's villa in September/October 2010, without finding the N Files; (iv) Saud himself therefore surmised that in some way and at some time which he does not recall, albeit it must have been on his instructions, the documents must have made their way from AHAB headquarters to his villa and back to his office between those two dates, to be ultimately discovered in May 2011.[207]

215.    Saud explained his instructions to the Young Algosaibis as an attempt to forestall Al Sanea from destroying incriminating documents.[208] The Chief Justice, however, rejected that explanation, and agreed with the Respondents' description of the work of the Young Algosaibis as a "ransacking" of the records of the Money Exchange and AHAB headquarters, designed to "purge the institutional records of documents which could show the true state of knowledge on the part of the AHAB Partners".[209] He pointed out that none of the Young Algosaibis had been asked by AHAB to give witness evidence as to the their role, even though Mohammed Algosaibi (Yousef's son), whom Saud had named as one of the Young Algosaibis, had been present in court during the early stages of the trial, but had become "conspicuously absent" from the time questions started to arise about this issue.[210]

216.    It seems to us, as no doubt it did to the Chief Justice, that if Saud's intention was the honest one of preserving documents for the discovery of the truth, then these very documents ought to have been the first to have been disclosed. Moreover, the fact that the N Files included documents taken from AHAB's headquarters, undermines the rationale that what was done was simply to preserve documents from Al Sanea's dishonest grasp.

217.    As it was, the issue of the N Files, which included many important documents such as in particular Saud's Calculations of 2002 together with the associated Attachments 8 and 9 from the 2001 Audit Pack, still left on one side the further issue of other similarly important documents which were revealed when Saud's safe (which he also described as his wife's

---

[205] Judgment at 42-45, **AA/2.4/42-45**
[206] Saud witness statement at para 363, **C1/2/75**. Saud explained his instructions to the Young Algosaibis as an attempt to forestall Al Sanea from destroying incriminating documents
[207] Judgment at 32-33, paras 36-40, **AA/2.4/32-33**
[208] Saud witness statement para 363, C1/2/75
[209] Judgment at 415, paras 1005-1006, **AA/2.4/415**
[210] Judgment at 417, para 1008, **AA/2.4/417**

safe[211] in his villa gave up its contents. The safe was opened and its contents catalogued (with other documents from Saud's villa) by the Deloitte Investigation Team when they visited Saud's villa sometime in 2010. However, these documents (mostly in Arabic) were not translated or disclosed in the London proceedings. Their appearance in this litigation therefore even postdates the disclosure of the N Files. The safe had not been opened for Deloitte in 2009 and was only opened to Deloitte in 2010 when they asked for that to happen in the context of the London proceedings. However, their significance was not then appreciated by Deloitte. When asked about this, Mr Charlton was unable to explain why the documents had not then been disclosed.[212] The Arabic documents appear to have been left untranslated, but why that happened with documents of such significance (see at para 218 below), is not clear. Moreover, because Deloitte had at least catalogued the documents from Saud's safe, it was possible to establish, following their disclosure, that some of them, and in particular files of correspondence with El Ayouty, had gone missing.

218.    The documents in Saud's safe included 180 significant documents from before Abdulaziz's stroke (which the Chief Justice concluded had been removed from Abdulaziz's safe after his stroke and taken by Saud), such as the 1994 Audit Pack, as well as documents from after Abdulaziz's stroke such as copies of resolutions R/66 and R/82 (approving the false accounting) and even some documents from 2009 including April 2009's Attachment 9.

219.    The Chief Justice dealt with the subject of AHAB's document disclosure in numerous places of his judgment. For instance: he found that the N Files had been deliberately concealed to prevent their disclosure in the London proceedings;[213] that the records of the Money Exchange and AHAB headquarters had been ransacked in May 2009 and unknown quantities of documents removed to Saud's villa,[214] for the purpose of purging the records which could show the true state of knowledge of the AHAB Partners;[215] that, as Saad testified, Saud had removed the carefully filed and labelled documents from Abdulaziz's safe, including El Ayouty annual reports, ie the Audit Packs;[216] that Saud's instructions to the Young Algosaibis were to remove documents which revealed the knowledge of the AHAB Partners, such as the El Ayouty correspondence and the Audit Packs;[217] that Saud had lied about denying that Mohammed Algosaibi was one of the Young  Algosaibis, even though in answer to a specific request to name them, AHAB by their lawyers had, by letter dated 28 July 2016, identified Mohammed (and Ahmed);[218] and that the failure to call any of the Young Algosaibis to give evidence was a deliberate strategy to withhold evidence from the court on a crucial issue.[219]

220.    AHAB submit[220] that the Chief Justice's findings as to the suppression of documents by AHAB are flawed, and also distracted attention from Al Sanea's own dishonesty in the matter of the destruction, removal and withholding of documents (while at the same time selectively providing the GT Defendants with the Promissory Notes on which the controversial and dishonestly inspired Counterclaim was based). They accept that there was a disorganised and unforensic process in the period before Deloitte could take hold of things. They also accept that the circumstances in which the N files came to be discovered in May 2011 "were (and remain) unclear and confused" and that that was unsatisfactory. Nevertheless, AHAB emphasises that the N Files were disclosed (five years prior to the Cayman Islands trial), and that if AHAB had

---

[211] Trial **Day 60/67** and **/121**
[212] Trial **Day 84/89-92**
[213] Judgment at 29, para 26, **AA/2.4/29**
[214] Judgment at 32, para 37, **AA/2.4/32**
[215] Judgment at 415, para 1006, **AA/2.4/415**
[216] Judgment at 194, para 479, **AA/2.4/194** and at 200, paras 498-499, **AA/2.4/200-201**
[217] Judgment at 424, para 1027, **AA/2.4/424**
[218] Judgment at 616-619, paras 105-111, **AA/2.4/616-619**
[219] Judgment at 619, para 111, **AA/2.4/619**
[220] AHAB's written submissions on appeal, **AB/1.10**, particularly at paras 23-24

been minded to suppress documents, they would have been destroyed. AHAB also submit that hiring Deloitte to investigate the Money Exchange was inconsistent with AHAB's guilty knowledge of their activities, a point made by Mr Charlton himself in his evidence.[221] In that connection Deloitte itself had made a detailed hard copy file list of documents, submitted to be in effect an inventory of the files in AHAB's possession in 2009 and 2010, which had itself been disclosed.

221.    AHAB also criticised the Chief Justice for failing *in this context* to refer to a witness statement made by SIFCO 5's liquidator, Nicolas Matthews, who had accepted the invitation made by AHAB to all the Respondents' liquidators to visit Saudi Arabia to inspect documents in situ there. Mr Matthews' statement was subsequently withdrawn so that AHAB was unable to cross-examine on it. However, it had been referred to in SIFCO 5's written and oral openings, and it was relied on by the Chief Justice *in another context* (that of Al Sanea's alleged campaign of forgery) to dispute AHAB's case. Following his visit in May 2016, Mr Matthews spoke of a concern that there were documents (listed by Deloitte) which had been misplaced, or could not be identified or located, but he did so in circumstances where he had described, with understanding "given the reality on the ground", the difficulties faced by the Deloitte team in 2009 given the volume of documentation, the spread of different locations, the volume of Arabic language documents, and the chaotic nature of the filing system used in Al Khobar.[222]

222.    The Respondents on the other hand submit that the Chief Justice's findings were entirely justified. They stress inter alia the following matters.[223] AHAB's original case and evidence, to the effect that they had disclosed everything to Deloitte's investigation team and that any gap in documentation was due to Al Sanea, could not survive the saga of the Young Algosaibis (which itself only emerged after the discovery of the N files and in an attempt to explain their late discovery), the emergence of the suppression of documents, and the hiding away of documents later emerging from Saud's office (which had already been searched a number of times by Deloitte or AHAB's lawyers) and his villa and safe. Saud even pretended that a filleted version of Abdulaziz's documents (taken from the latter's safe) which had emerged from Saud's own (smaller) safe had appeared there without his knowledge. In his cross-examination, he went so far as falsely to deny the presence of any documents in his safe,[224] asserting that it was in any event his wife's safe.[225] This was to be contrasted with evidence in cross-examination that Saud had taken the documents from Abdulaziz's safe after Abdulaziz's death.[226] Although the documents in Saud's safe were catalogued by Deloitte, they were not translated until shortly before the trial. The only plausible explanation for the presence of the selection of documents in the safe (which included not only documents from Abdulaziz's era but also documents from after 2000 and even documents from April and May 2009), was that Saud had himself obtained them, read them, understood them, and had squirrelled them away as being important and sensitive. As for documents which must have existed but had been successfully suppressed for good, there were the missing Audit Packs and correspondence files with El Ayouty. An El Ayouty correspondence file from Saud's villa had been logged by Deloitte, but when years later it was sought for, it had disappeared. The Chief Justice recorded repeatedly that he had been wholly persuaded by the written submissions concerning the suppression of documents put before him on behalf of the Respondents.[227]

---

[221] Trial **Day 84/118-119**
[222] Matthews second witness statement, **C4/3/6**
[223] Respondents' written submissions on appeal section 5 at paras 387ff, **AC/1/5/159ff**, and section 11, **AC1/11/1**
[224] **Day 56/136**
[225] **Day 60.67, 121**
[226] **Day 88.68-69, Day 90.33-34**
[227] Judgment eg at **AA/2.4/424**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

223.   In our judgment, this is peculiarly an issue on which the Chief Justice's views should be accorded great respect. The long preparations for trial, the many occasions on which matters of disclosure must have been considered, the intricate procedural developments with which such large-scale litigation are concerned, and the witnesses' explanations of the shifting procedural landscape, all this can hardly be reassembled at the appellate stage. The parties have nevertheless done well to set out their submissions on this issue for our consideration: but we are satisfied that the Chief Justice has dealt with this matter properly and that his strictures of AHAB's attitude to the collection, preservation, and disclosure of documents are fully justified. They are of a piece with AHAB's disastrous conduct of the London proceedings and with AHAB's highly significant change of tack, following disclosure of the N Files, from a case of total ignorance of Al Sanea's doings to a shifting case based on New for Old.

***The Money Exchange's fraud on the banks: some pivotal questions and answers at the commencement of trial***

224.   On 22 August 2016 the Chief Justice directed that AHAB answer certain questions which had been left in the air on its pleaded case. On 26 August 2016, AHAB responded as follows:[228]

> *1.  Is it common ground that, from its inception, AHAB's Money Exchange was involved in a fraud on banks from whom it borrowed by:*
> *(1) Dishonestly manipulating its financial statements so as to overstate the Money Exchange's assets and understate its liabilities? and*
> *(2) Dishonestly providing those financial statements to Banks so as to induce them to lend or to renew or extend such lending?*

> *Answer:*  It is common ground that the Money Exchange was involved in a fraud on banks from whom it borrowed by:
> (1) Dishonestly manipulating its financial statements so as to understate the Money Exchange's assets and understate its liabilities (liabilities and assets were understated to the extent that both liabilities and assets were allocated to ledger 3 which was not reported in the financial statements provided to banks); and
> (2) Dishonestly providing those financial statements to banks so as to induce them to lend or to renew or extend such lending.

> AHAB admits that the fraud was operating by 1998 when Mark Hayley joined the Money Exchange and had been operating for some years before then, but AHAB does not know when the accounts were first manipulated for a dishonest purpose, and so makes no admission.

> *2.  Is it common ground that this fraud continued until AHAB's default in May 2009?*

> *Answer:*  It is common ground that until May 2009, the Money Exchange continued to be involved in a fraud on banks from whom it borrowed by:
> (1) Dishonestly manipulating its financial statements so as to understate the Money Exchange's assets and understate its liabilities; and
> (2) Dishonestly providing those financial statements to banks so as to induce them to lend or to renew or of (sic) extend such lending.

> *2A.  If not, was there a time when AHAB says it was discontinued?*

---

[228] Judgment at 46-48, **AA/2.4/46-48**

*Answer:*   As noted above, the fraud continued until May 2009. Until 30 September 2000, both Abdulaziz and Maan Al Sanea were aware of how the financial statements were prepared and of the provision of the English language financial statements to the banks (but that is not an admission that Abdulaziz "participated in the fraud"; see further the answer to 3 below). After Abdulaziz's stroke, only Mr Al Sanea was aware of the fraud on the banks.

**3.   Is it common ground that the following persons participated in that fraud:**
   **(1)   AHAB**
   **(2)   Ahmad**
   **(3)   Abdulaziz**
   **(4)   Suleiman**
   **(5)   Yousef**
   **(6)   Saud; and/or**
   **(7)   Maan?**

*Answer:*    It is common ground that Maan Al Sanea participated in the fraud. It is AHAB's case that Mr Al Sanea was the architect of and was responsible for the execution of the fraud on the banks. Subsequent to Abdulaziz's stroke, Mr Al Sanea was the only person named above with knowledge of the fraud on the banks. He was also responsible for the fraud on AHAB, which is the subject of AHAB's claim.

It is common ground that Abdulaziz knew about and authorised the issue of the financial statements to the banks prior to his stroke. AHAB cannot say whether Abdulaziz knew this was dishonest and, as such, AHAB does not admit that Abdulaziz participated in the fraud on the banks (or any fraud).

It is common ground that until 30 September 2000, AHAB (through Abdulaziz) knew how the statements were prepared and that the English language financial statements were provided to the banks. It is not admitted that AHAB knowingly participated in a fraud prior to Abdulaziz's stroke and AHAB denies that it knowingly participated in a fraud after 30 September 2000.

It is not common ground that Ahmad, Suleiman, Yousef or Saud participated in the fraud on the banks.

225.   In other words, AHAB's case at the beginning of trial was that, although there had admittedly been a fraud on the banks over decades, only Al Sanea was guiltily responsible for it. Abdulaziz had been Al Sanea's supporter, and knew about the financial statements, but his guilty mind, his *mens rea*, was not admitted. All who came after him, were free of any complicity. It may be pointed out at this juncture that the joint statement of the forensic accounting experts, Mr Humphry Hatton for AHAB and Mr Theo Bullmore for SIFCO 5, led to it being common ground at trial that the financial statements were false and misleading.[229]

226.   The Chief Justice could not hear from Abdulaziz or Suleiman (or Ahmad), who had all died. The Chief Justice could not hear from Al Sanea, who had distanced himself from the proceedings. The Chief Justice heard only from Saud, and Yousef and Dawood. He heard them cross-examined over many days and weeks. (Yousef's cross-examination, however, could not be completed, because he fell ill). The Chief Justice summed up his long and detailed examination of this part of the enquiry at trial in these words:

---

[229] Judgment at **AA/2.4/192** at para 471, referring to the experts' joint statement at **I/3/3**

> The inquiry leaves me in no doubt that each of Abdulaziz, Suleiman, Yousef and Saud knew of and expressly authorized the issuance of fraudulent financial statements and knew of the fraud on AHAB's lending banks.[230]

227.   He went on to find that Dawood, who came to be involved with the Money Exchange only at a late stage, knew of the massive borrowing which occurred in 2009 shortly before the collapse.[231] He did not, however, make a finding as to Dawood's complicity in the original fraud on the banks. It may be observed that the Respondents' question 3, directed by the Chief Justice, did not ask a question concerning Dawood's complicity in that fraud.

228.   On this appeal, Mr Wardell, on behalf of AHAB, made a serious and sustained submission that AHAB were not complicit in the admitted fraud on the banks and that the Chief Justice had been wrong to find that they were. In the light of the financial statements and the Audit Packs and the contrasts between them, the repeated resolutions of the Money Exchange as to the method for drawing up the Money Exchange's accounts which made it clear that the Money Exchange's true state could not be found in its English language financial statements but had to be sought elsewhere, and El Ayouty's repeated warnings, this submission presented its difficulties. Be that as it may, Mr Wardell's dominant concern, however, was to persuade us that nevertheless the AHAB Partners were ignorant (or more or less ignorant) of the sheer extent of Al Sanea's use of the Money Exchange (or the Financial Businesses) for continued borrowing from the banks; and in particular were kept more or less ignorant of the use to which Al Sanea put these borrowings, both in their extent and in his purposes, business or personal.

229.   In this connection, Mr Wardell sought to emphasise that Al Sanea owed fiduciary duties to the AHAB Partners, that such duties were, in Saudi law as in English law, onerous and demanding in terms of the need for fully informed consent, and that the Chief Justice had failed to grapple properly or even fairly with the consequences of Al Sanea's deceit and arrogance. In particular, Mr Wardell raised the forensic questions: Why should the AHAB Partners have been willing to put at risk the whole of their business and fortune to assist a man whom, on the evidence of the family at trial, no one liked or trusted? Why, if they had been fully informed, would they have permitted Al Sanea to get away with what amounted to the wholesale spoliation of their business? And why, in all these matters, did the Chief Justice show such little regard for Al Sanea's obvious dishonesty proven in respect of the Respondents' failed Counterclaim, or, correspondingly, for AHAB's complaints of wholesale forgery and manipulation?

230.   One of Mr Wardell's major complaints on the appeal was that the Chief Justice had compartmentalised the issues overmuch. He could not have come to a sound conclusion about the partners' knowledge and the extent of their knowledge without taking into account Al Sanea's fraud in the background to the Respondents' Counterclaim, and without taking into account all of AHAB's allegations of fraud, forgery and manipulation. As it was, the Chief Justice had first satisfied himself of the partners' knowledge, inferred that it was total and complete, and largely on that basis had rejected as unproven their allegations against Al Sanea. Thus at the very beginning of section 2 of his judgment, having dealt at section 1 with AHAB's knowledge of both the fraud on the banks and Al Sanea's indebtedness, the Chief Justice said that he was "satisfied that the knowledge and authority of the AHAB Partners is overwhelmingly and conclusively proven".[232] There was a reprise of that expression at the very end of the judgment, when the Chief Justice said, in a passage already cited (at para 3 above), that his decision on the Counterclaim did not suggest that he accepted that Al Sanea had defrauded AHAB in his running of the Money Exchange, for "That issue is separately and from my point of view conclusively dealt with above" in his judgment's section 1.[233]

---

[230] Judgment at 49, para 71, **AA/2.4/49-50**
[231] Judgment at 49, para 71, **AA/2.4.50**, and 360ff, especially at 370, para 899, **AA/2.4/370**
[232] Judgment at **AA/2.4/427**, para 3
[233] Judgment at **AA/2.4/1327**, para 180

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

*The nature of the appeal*

231. At the commencement of the appeal, AHAB sought nothing short of a complete reversal of the Chief Justice's overwhelming findings against AHAB, so as to score a profound victory over the Respondents. However, in the course of the appeal, Mr Wardell came to appreciate that it would be impossible to ask this Court itself to make wholesale revisions to the Chief Justice's findings of knowledge and honesty. In essence, therefore, Mr Wardell's and AHAB's strategy came to be to make such inroads into the fairness, logic, and safety of the Chief Justice's findings and conclusions, as to earn the right to a new trial. If some questions of law could, meanwhile, be decided in AHAB's favour, so much the better.

232. At the forefront of this appeal, therefore, comes the question as to the circumstances in which this Court, as an appellate court, could properly find that the Chief Justice's findings of fact were sufficiently subject to revision as to justify a new trial; or, on that way, to reverse any particular finding. On that question, and subject to AHAB's overriding submission as to the fairness of the Chief Justice's judgment, the Parties' submissions were substantially as follows.

233. As AHAB's pre-trial written submissions stated in its first paragraph: "By this appeal, AHAB seeks to overturn almost every finding of fact and law made by the Judge."[234] But in essence there was little dispute (or room for dispute) about the powers and role of an appellate court so far as concerns findings of fact. It was not in doubt that "the Court shall…have all the powers, authority and jurisdiction of the Grand Court".[235] But similarly, it was not in dispute that recent decisions of the highest authority confirmed that an appellate court is not to interfere with findings of fact unless they are "plainly wrong" in the sense that they are ones which "no reasonable judge could have reached".

234. Thus, in *Henderson v. Foxworth Investments Ltd* [2014] UKSC 41, [2014] 1 WLR 2600 Lord Reed said (at [62]):

> It does not matter, with whatever degree of certainty, that the appellate court considers that it would have reached a different conclusion. What matters is whether the decision under appeal is one that no reasonable judge could have reached.

235. Lord Reed continued (at [67]):

> It follows that, in the absence of some other identifiable error, such as (without attempting an exhaustive account) a material error of law, or the making of a critical finding of fact which has no basis in the evidence, or a demonstrable misunderstanding of relevant evidence, or a demonstrable failure to consider relevant evidence, an appellate court will interfere with the findings of fact made by a trial judge only if it is satisfied that his decision cannot be reasonably explained or justified.

236. To similar effect, in *Beacon Insurance Co Ltd v. Maharaj Bookstore Ltd* [2014] UKPC 21, [2014] 4 All ER 418, where Lord Hodge devoted an extended passage of his judgment (at [11]-[18]) to the role of an appeal court, he explained the "plainly wrong" requirement as directing the appellate court –

---

[234] **AB/1.1/1**
[235] Court of Appeal Law (2011 revision), section 5

> to consider whether it was permissible for the judge at first instance to make the findings of fact which he did in the face of the evidence as a whole" (at [12]).

237.   Lord Hodge also cited with approval (at [14]) the oft-acknowledged dictum of Lord Sumner in *SS Hontestroom (owners) v. SS Sagaporack (owners)* [1927] AC 37 at 47 that –

> not to have seen the witnesses puts appellate judges in a permanent position of disadvantage as against the trial judge, and, unless it can be shown that he has failed to use or has palpably misused his advantage, the higher court ought not to take the responsibility of reversing conclusions so arrived at, merely on the result of their own comparisons and criticisms of the witnesses and of their own views of the probabilities of the case…If his estimate of the man forms any substantial part of his reasons for his judgment the trial judge's conclusions of fact should…be let alone.

238.   Lord Hodge also referred to the statement of Lord Bridge of Harwich in *Whitehouse v. Jordan* [1981] 1 WLR 246 at 269-270 about –

> the wide spectrum from, at one end, a straight conflict of primary fact between witnesses, where credibility is crucial and the appellate court can hardly ever interfere, to, at the other end, an inference from undisputed primary facts, where the appellate court is in just as good a position as the trial judge to make the decision

as to which Lord Hodge observed (at [17]) that –

> Where the honesty of a witness is a central issue in the case, one is close to the former end of the spectrum as the advantage which the trial judge has had in assessing the credibility and reliability of oral evidence is not available to the appellate court. Where a trial judge is able to make his findings of fact based entirely or almost entirely on undisputed documents, one will be close to the latter end of the spectrum.

239.   Given the nature of the trial below in this case, with its numerous witnesses, its disputed disclosure, and the sheer length of the evidence, it is pertinent to refer to what both Lord Reed in *McGraddie v. McGraddie* [2013] UKSC 58, [2013] 1 WLR 2477 (at [4]) and Lord Hodge in *Beacon* (at 15]) cited from the majority of the Canadian Supreme Court in *Housen v. Nikolaisen* [2002] 2 SCR 235 (at para 14), namely –

> The trial judge has sat through the entire case and his ultimate judgment reflects this total familiarity with the evidence…The insight gained by the trial judge who has lived with the case for several days, weeks or even months may be far deeper than that of the Court of Appeal whose view of the case is much more limited and narrow…

240.   This last thought has been memorably spotlighted by the brilliant observation of Lewison LJ in *Fage UK Ltd v. Chobani Ltd* [2014] EWCA 5, [2014] ETMR 26 at [114(iv)] where he said –

> In making his decisions the trial judge will have regard to the whole of the sea of evidence presented to him, whereas an appellate court will only be island hopping.

241.   As the Chief Justice himself observed, in relation to the critical issue of the knowledge of the AHAB Partners:

> …everything will depend on what the Court makes of the evidence of the knowledge, recollections, truthfulness or untruthfulness of witnesses.[236]

242.  It also needs to be said, as both sides acknowledged, that over-reliance on oral testimony where it runs directly counter to documents and probabilities, which have not been properly assessed, may be suspect. The *locus classicus* for that insight is in the judgment of Lord Justice Robert Goff (as he then was) in *Armagas Ltd v. Mundogas SA (The Ocean Frost)* [1985] 1 Lloyd's Rep 1 at 57. That passage, having been cited at [8], was applied by the Privy Council in *Central Bank of Ecuador v. Conticorp SA* [2015] UKPC 11, [2016] 1 BCLC 26, where Lord Mance, at [164]-[165] said that the Board –

> found itself compelled to undertake its own review of all the material before it in order that, for the first time, the central issues in the case should be directly addressed and analysed…Having undertaken the exercise identified in the previous paragraph, the Board is however fully satisfied that this is one of the very rare cases where it must interfere with the decisions reached below.

243.  That, however, was a case where the Board was called upon to criticise the lower courts for an essential failure to give "any answer to the critical question whether the Respondents could have honestly believed that the transactions were in IAMF's interests" (at [163]). Otherwise, the Board emphasised the difficulty and rarity of an appellate court's interference with a judge's findings: see at [4]-[7].

244.  In *The Ocean Frost* (at 57) Robert Goff LJ also spoke of the difficulty of discerning whether a witness is telling the truth. He said:

> It is frequently very difficult to tell whether a witness is telling the truth or not; and where there is a conflict of evidence such as there was in the present case, reference to the objective facts and documents, to the witnesses' motives and to the overall probabilities can be of very great assistance to a judge in ascertaining the truth.

245.  The difficulty of telling the truth merely from oral testimony has recently but memorably been addressed by Mr Justice Leggatt (as he then was) in *Gestmin SGPS SA v. Credit Suisse (UK) Ltd* [2013] EWHC 3560 (Comm), a case which AHAB cited on this appeal. At [15]ff Leggatt J spoke about the fallibility of human memory. He continued (in a passage cited with approval by Lord Kerr in *R (Bancoult) v. Secretary of State for Foreign and Commonwealth Affairs (No 3)* [2018] 1 WLR 973 at [103]):

> [22] In the light of these considerations, the best approach for a judge to adopt in the trial of a commercial case is, in my view, to place little if any reliance at all on witnesses' recollections of what was said in meetings and conversations, and to base factual findings on inferences drawn from the documentary evidence and known or probable facts. This does not mean that oral testimony serves no useful purpose – though its utility is often disproportionate to its length. But its value lies largely, as I see it, in the opportunity which cross-examination affords to subject the documentary record to critical scrutiny and to gauge the personality, motivations and working practices of a witness, rather than in testimony of what the witness recalls of particular conversations and events. Above all, it is important to

---

[236] Judgment, **1/53, AA/2.4/42**

> avoid the fallacy of supposing that, because a witness has confidence in his or her recollection and is honest, evidence based on that recollection provides any reliable guide to the truth.

246.    In the present case, the factual issues did not, on the whole, depend on conflicts as to what was said in particular meetings and conversations, indeed the absence of evidence from Al Sanea ensured that that was the case. Rather, the Chief Justice had to evaluate the motivations and personalities, credibility and reliability of key witnesses, and especially the AHAB Partners, as to their case that, over a long period of time, they lacked the knowledge of Al Sanea's borrowings which the documents strongly suggested that they had. In such a case, the trial judge's estimation of the honesty and integrity of the witnesses' evidence seems to us, as directed by the authorities, to be of particular significance.

247.    The Chief Justice himself, in a passage at the outset of his judgment headed "General probabilities or improbabilities", directed himself expressly by several of the authorities cited above as to the approach to be taken by a trial judge in a case –

> so heavily burdened with allegations of fraud on all sides and where everything will depend on what the Court makes of the evidence of the knowledge, recollections, truthfulness or untruthfulness of witnesses.[237]

248.    Thus, the very first authority he cited under this heading was the famous passage from Robert Goff LJ's judgment in *The Ocean Frost*, repeated and applied, as the Chief Justice remarked, in *Grace Shipping v. Sharp & Co* [1987] 1 Lloyd's Rep 207 at 215-216 and by the Privy Council in *Villeneuve v. Gaillard* [2011] UKPC 1 at [67]. He also referred in this connection to *Gestmin*, and to other similar expressions concerning the importance of balancing subjective impressions of witnesses and their evidence against the objective factors of documents, admitted or incontrovertible facts, and motive: such as is found in Lord Pearce's dissenting judgment in *Onassis v. Vergottis* [1968] 2 Lloyd's Rep 403 at 431 and extra-judicially in Lord Bingham's 1985 paper, *The Judge as Juror: the Judicial Determination of Factual Issues*.[238]

249.    In sum, whatever criticisms AHAB have to make of the Chief Justice's approach to issues of fact and his handling of witnesses' testimony, there cannot be any disquiet as to the self-direction he gave himself at the outset. And there is no material issue as to the self-directions which this Court should give itself in reviewing the factual findings at trial. Therefore, we should not interfere with the Chief Justice's findings unless they are plainly wrong in the sense that they are ones which no reasonable judge could have reached. We will also refer to this test as asking whether the Chief Justice was justified or entitled to reach the findings and conclusions of fact that he did.

### The witnesses

250.    At this point, it is apposite to summarise the Chief Justice's essential findings about the most important witnesses whom he heard.

251.    On behalf of AHAB, the partners themselves were especially important.

252.    As for Saud, who gave evidence for 26 days (from Days 41 to 67), the Chief Justice found that he had lied about the suppression of documents, had concocted and lied about the New for Old policy as a recent invention designed to distance AHAB from Abdulaziz's complicity with Al Sanea, and concluded that Saud's evidence about his lack of knowledge of the affairs of the

---

[237] Judgment at **AA/2.4/42**, para 53
[238] Judgment at **AA/2.4/233-45**, paras 58-62

Money Exchange and of Al Sanea's borrowings was "deliberately untruthful".[239] Examples cited by the Chief Justice of Saud's unsatisfactory evidence in cross-examination are plentiful. For instance, he found that Saud's persistence in denying knowledge of the Financial Businesses (despite a lengthy examination of that issue) was "a deliberate and transparent lie".[240] After citing a question of his own to Saud, as well as Saud's answer, the Chief Justice commented: "I am compelled to find that this was yet another characteristically evasive and incoherent response from Saud".[241] The Chief Justice also said this:[242]

> The conclusion to which I am driven is that Saud had lied about his knowledge of the borrowings and the Al Sanea indebtedness: (a) in his statement in the London Proceedings in order to present a false impression of the state of his knowledge of the Money Exchange's indebtedness; and (b) in his witness statements and evidence in this Court in attempting to explain his evidence in the London proceedings and especially, the crucial revelations of Saud's Calculations.

253.  As for Yousef, who it will be recalled became the chairman of AHAB on Suleiman's death, the Chief Justice found his evidence to be equally unsatisfactory, as he sought to play down the obvious documentary evidence of his discomfort with the operations of the Money Exchange and his repeated attempts to extricate himself from it. His letter to Abdulaziz dated 26 December 1999 (see at para 56 above) demonstrated that he had obtained a copy of the 1998 Audit Pack from El Ayouty and had studied it and understood it, including the level of Al Sanea's borrowings. In his evidence, however, Yousef sought to say that he had not obtained the 1998 Audit Pack for himself but had been told about Al Sanea's borrowings on a single occasion by El Ayouty. The Chief Justice commented:

> This is a transparently thin attempt to explain away and avoid the implications of Yousef's plain acknowledgment in his letter to Abdulaziz that it was by his own initiative that he had obtained the 1998 Audit Pack and had read and understood its contents.[243]

254.  The Chief Justice went on to find it "simply incredible" that Yousef would not have continued to monitor the state of the bank borrowings and the Al Sanea indebtedness.[244] The Chief Justice concluded that Yousef's evidence was to be rejected as "patently untrue".[245]

255.  As for Dawood, who became a partner on Suleiman's death, his signature appears on facility documentation committing AHAB to liabilities of some SAR 11 billion between February and April 2009, a high proportion of the sums which AHAB seek to recover in their action. His evidence "varied between denial of his signatures to non-recollection of the documents even though none is on the Forgery Schedule".[246] It was accepted by AHAB's counsel (then Mr Quest QC) that these documents were not alleged to be manipulated or forged, but they were "not admitted" and reliance was placed on Dawood's witness statement that "he had no knowledge of this borrowing", implying that, if he had signed them, he had done so unquestioningly and without appreciating their import.[247] But the Chief Justice called this "a convenient untruth", for Dawood was on the evidence a perfectly capable and experienced

---

[239] Judgment at **AA/2.4/425**, para 1031
[240] Judgment at **AA/2.4/398**, para 968
[241] Judgment at **AA/2.4/341-342**, paras 848-849
[242] Judgment at **AA/2.4/217**, para 548
[243] Judgment at **AA/2.4/168** para 404
[244] Judgment at **AA/2.4/177** para 430. See also **AA/2.4/184** para 441
[245] Judgment at **AA/2.4/184** para 442
[246] Judgment at **AA/2.4/363** para 891
[247] Judgment at **AA/2.4/365** para 893

businessman, and Saud had given evidence that it had been specifically agreed with Dawood that he would sign facility documentation, albeit in keeping with New for Old.[248] When Dawood was asked about an agreement for his signing, he "resorted to loss of memory", even though such an agreement was independently evidenced by a contemporaneous document[249]. The Chief Justice concluded:

> Dawood's evidence strikes me as a false and convenient narrative aimed at avoiding the fact that his involvement, as a partner of AHAB, fixes AHAB with his knowledge of the massive borrowing which he transacted, not only on behalf of the Money Exchange but also on behalf of the Financial Businesses, in early 2009.[250]

256.   Mark Hayley was an important witness, because he had been Al Sanea's right hand man at the Money Exchange. He was called by AHAB in support of their case, inter alia on Al Sanea's forgery of the partners' signatures, because he had experienced his own signature being used without his permission on one occasion. Nevertheless, he also said that he was "astonished" when members of Deloitte told him that signatures on banking documents had been forged. His evidence was frank about the misdeeds of the Money Exchange and Al Sanea, but he also accepted that in a private examination in London on 8 December 2015 he had stated that he had never heard of the expression "New for Old", and that the expression had been introduced to him shortly before his cross-examination by the lawyer who had helped him prepare his witness statement. He went on to say that, although the expression "New for Old" was new to him, he did recollect that there was a period when the Algosaibi family did not want to increase their borrowings from the local banks.[251] Mr Hayley also accepted that his witness statement differed from his evidence at his London examination in 2015 in other respects, this time relating to what he had been told by El Ayouty in May 2009 concerning El Ayouty's reporting to Saud: and that it was his London account rather than his witness statement that was accurate, whereas his trial statement was misleading.[252] The Chief Justice also referred to Mr Hayley's "selective recall" in relation to the Algosaibis' involvement.[253]

257.   The Chief Justice concluded:[254]

> 55.   Before relying on it, I would be astute to ensure that Mr Hayley's evidence is supported by contemporaneous documents. Wherever there is a conflict between his evidence and a contemporaneous record, the contemporaneous record should be preferred.
>
> 56.   I accept, however, as the Defendants also point out, that Mr Hayley did not lie about everything. The evidence he gives adverse to the Algosaibis should be accepted. Mr Hayley said that he always assumed that the Algosaibi family knew about the debt at the Money Exchange. The evidence he gives about the fraud on the banks – that all borrowing

---

[248] Judgment at **AA/2.4/366-370** paras 895-899
[249] **G/7648** dated 20 March 2009
[250] Judgment at **AA/2.4/370** para 899
[251] Judgment at **AA/2.4/508-512**, paras 44-46. This evidence ties in with Saud's letters to Al Sanea in March and May 2004 about AHAB's reluctance to increase their borrowings from local banks for the purpose of further investment in SAMBA shares: see at paras 146 and 148 above. It is significant that Mr Hayley does not associate that temporary and isolated reluctance with any ongoing policy stretching across the better part of a decade of New for Old, which it would have been Al Sanea's devoted aim and need to get around (by what is alleged to be forgery and manipulation).
[252] Judgment at **AA/2.4/514-516**, at paras 51-53
[253] Judgment at **AA/2.4/516**, at para 54
[254] Judgment at **AA/2.4/516-517**, at paras 55-56

during his time was procured by fraud – should be accepted. I also accept that Mr Hayley spoke to Saud in order to tell him "*it was over*" and told Saud it was an $8 billion problem, and that he told Saud that $1 billion would resolve the problem but in the short term only. I also accept Mr Hayley's account of his one to one meeting with Saud in 2006 (of which Saud has "*no memory*") when Saud went downstairs to the offices of the Money Exchange and asked Hayley "*Can the Money Exchange repay its debts?*" That meeting took place in the context of a massive crash in the Saudi Arabian stock market in 2006. Saud was obviously extremely concerned about the huge drop in the value of the Money Exchange's securities and the very large amounts of money which he knew that the Money Exchange had borrowed.

258.   Nevertheless, Mr Wardell was critical of the Chief Justice's approach to Mr Hayley's evidence.[255] As a reformed and self-confessing fraudster, he should have been believed *tout court*. The Chief Justice's approach was therefore unbalanced. Mr Wardell itemised certain aspects of Mr Hayley's evidence of which the Chief Justice took insufficient or no notice, such as the forgery of his signature, or the control which Al Sanea kept over the presentation of the Money Exchange's financial statements: and see Mr Wardell's criticisms at paras 280-283 below.

259.   It is not clear to us, however, whether such criticisms, however much validity they may have as a counsel of perfection, are in the ultimate analysis of significant moment. On the most essential matters, Mr Hayley's evidence was not helpful to AHAB. He had never heard of New for Old, which, if it had existed, he must have done, for it would ultimately have been his responsibility, as Al Sanea's right hand man, to evade it. He knew nothing of any forgery of the Algosaibis' signatures on facility documents, on the contrary he was astonished to be told of it after the collapse. He always assumed that the Algosaibis knew of the debt, ie Al Sanea's indebtedness, at the Money Exchange, an assumption which would have been highly unlikely if that debt had all been the result of misappropriations. And his conversation with Saud in 2006, which Saud did not remember, was consistent with Saud's ongoing understanding and concern about the finances of the Money Exchange.

260.   We refer briefly here to some other witnesses, of far less importance than those mentioned above, on whom AHAB relied. Where necessary, their evidence will be dealt with below in its relevant context. Many of such witnesses were not cross-examined, either because they were advanced only by way of hearsay notice, or because they were not required for cross-examination. In the latter case, Mr Wardell stressed what he described as "unchallenged evidence". In either event, the Chief Justice was not called upon to assess their evidence in person. But Mr Wardell complained that the Chief Justice had wholly failed to refer at all to 14 of AHAB's witnesses.[256]

261.   Such lesser witnesses included the following. Thus, Deepak Krishnan had been an employee of the Money Exchange from 1999, and was still employed by AHAB at the time of trial as an executive assistant to Mr Charlton. He was not cross-examined. He said he was not involved in dealing with facility documents; that Al Sanea's control over the Money Exchange and its employees was strict; and that there was little interaction with AHAB HO. Mr Wardell complained that the Chief Justice made no mention of Mr Krishnan's evidence that Money Exchange documents were taken during the 2000s to a Saad warehouse for storage. It is not apparent to us what was lost to the Chief Justice's judgment by his omission to refer to this evidence. It may be noted that Mr Krishnan's witness statement was dated 4 April 2016, ie before AHAB's amendment to plead New for Old.

---

[255] **Day9A/136ff**
[256] **Day9A/127ff**

262. Mohammed Salem Hindi's statements of 2011 in the London proceedings were proffered via a hearsay notice dated 1 April 2016.[257] This evidence went back even before the disclosure of the N Files. Mr Hindi said that he worked closely with Suleiman and that Suleiman never allowed others to sign for him. Mr Wardell said he did not criticise the Chief Justice for omitting mention of this, since it was not highlighted by AHAB in their closing submissions at trial in the context of forgery.

263. Ratib Abu Sharikh **(Sharikh)** was a secretary at AHAB HO, not called for cross-examination. He said Suleiman signed in manuscript and never used or owned a stamp. However, he did not refer to facility documentation but to personal letters such as those congratulating people on their wedding or references for employees.[258]

264. Badr provided a witness statement dated 7 March 2017 which was produced by means of a hearsay notice.[259] He gave evidence about New for Old, and we will refer to it in that context below.

265. Jean-Michel Thomas, a food and beverage manager employed by Al Sanea, gave a witness statement about an occasion when he was with James Dennis, a Saad Group computer designer, who was boasting and demonstrating his ability in creating false documents.[260] He was not called for cross-examination. We will also refer to this evidence below in the context of discussing forgery.

266. Mr Wardell also complained about the Chief Justice's failure to mention a number of statements[261] relating to the **BPP Report**, a report commissioned by the Bahraini Public Prosecutor (hence BPP), but conducted by Howard Cooper, a managing director of Kroll in London, which concluded that Al Sanea had been guilty of forgery in connection with TIBC and Awal Bank in Bahrain. The Chief Justice regarded that Report as inadmissible. We will refer to it in context below. Mr Cooper was not called for cross-examination. His evidence was that he believed that it was common practice in Bahrain for complainants (viz AHAB) who have requested the Public Prosecutor to conduct a criminal investigation to be asked to fund that investigation. Even so, the Report was not provided to AHAB but to the Public Prosecutor.

267. We have carefully considered all such evidence, to which Mr Wardell submits the Chief Justice did not do justice. Where necessary, such evidence is referred to in context below. As will appear, however, we do not conclude that any omission on the part of the Chief Justice in this regard undermines the substance of his findings.

### *"Core errors, substantive and procedural irregularities"*

268. At the forefront of his submissions, Mr Wardell directed a root and branch attack on the Chief Justice's fundamental approach to judgment as a matter of due process. Among his criticisms were that the Chief Justice had abdicated his core judicial responsibility by uncritically adopting and reproducing the Respondents' closing written submissions, without proper regard for the final oral and written counter-submissions rendered on AHAB's behalf, and without giving any or any adequate reasons for his preference. He was assisted in this error by adopting an over-compartmentalised approach to the case. His core error led him to overlook or disregard significant evidence, even unchallenged evidence, and contemporaneous documentation, to fail

---

[257] **C1/19, C1/20, C1/21**
[258] **C1/24**
[259] **C1/40**
[260] **C1/13**
[261] **C1/26, C1/27, C1/28, C1/30, C1/31, C1/6**

to make findings on important issues, and to make wholly unreasonable findings elsewhere. In particular, the Chief Justice made two basic errors which destroyed the logic of his judgment. One was to fail to take into account the proven dishonesty of Al Sanea against the Algosaibis before finding that the Algosaibis were complicit in Al Sanea's global dishonesty. This was an aspect of the Chief Justice's over-compartmentalised approach to the case. It led him to reject compelling arguments in favour of Al Sanea's use of forgery and manipulation, a rejection which in turn led him to be unduly sceptical of the partners' protestations of ignorance of Al Sanea's misdeeds. The other was to proceed uncritically from a conclusion concerning the partners' participation in a fraud against the lending banks to an unwillingness to accept that Al Sanea had in all probability committed gross breaches of fiduciary duty against the partners, to which the only defence could have been a fully informed consent, which was never proven, but too readily assumed.

269.    In sum, Mr Wardell's criticisms amounted to the fundamental submission that the Chief Justice in his judgment had been unfair. He had also been unfair in the conduct of the trial itself, in that he had permitted Saud and Yousef to be cross-examined at inordinate length. His inability to preserve the scales of justice evenly, for as long as was necessary, was demonstrated by an unbalanced approach to the non-attendance of witnesses, all to the detriment of AHAB.

270.    The consequence of this unfairness led the Chief Justice to make repeated errors of fact, to make findings which were either plainly wrong, errors which no reasonable judge should have made, or, where evidence or inference were more nuanced, to fall into conclusions which a more fairly balanced mind would have avoided. Examples of such errors were that there was any *quid pro quo* which could explain AHAB's willingness to allow Al Sanea to feather his own nest at their total risk, that simulated Algosaibi signatures had always been authorised, that the Algosaibis had always had oversight and understanding of Al Sanea's control of the Money Exchange at home, let alone the Financial Businesses in Bahrain, and that Saud, Yousef and Dawood had therefore lied and pursued a dishonest case.

271.    Mr Wardell submitted that the Chief Justice's over-reliance on the Respondents' submissions led him to make inferences against AHAB and its witnesses which were unjustified. Indeed, he submits that the Respondents' whole case was built on inference, and that that made the Chief Justice's approach to his judgment all the more dangerous. Mr Wardell described the appeal as a "demand for justice as yet denied to AHAB and its creditors".[262]

272.    The ultimate end of all this, submitted Mr Wardell, is that, even if no other conclusions positively in favour of AHAB can be arrived at on this appeal, the least that this Court should determine in favour of AHAB's appeal is the order of a new trial.

273.    AHAB sought to demonstrate the extent of the Chief Justice's reliance on the Respondents' closing written submissions by subjecting his judgment to anti-plagiarism software. This exercise is addressed in the thirty-third affidavit of Andrew Ford (**Ford 33**)[263], and the result of the exercise was illustrated by the highlighting in yellow of the repetition in the Chief Justice's judgment of the *ipsissima verba* of the Respondents' writings. Mr Wardell submitted that the Chief Justice had adopted the Respondents' submissions as the template for his judgment and had failed thereby and in consequence to perform his duty of deciding the issues for himself, or of engaging with AHAB's case and giving it due consideration.

274.    Ford 33 and AHAB's submissions explain what is said to be the conservative nature of the comparison exercise. Minor edits would reduce the amount of highlighting in yellow, but the essential copying remains. Moreover, the point is made that –

---

[262] AHAB's Reply Submissions, **AB/10.1/8**, at para 1.40
[263] **AB/2**

One of the consequences of the Judge's cut-and-pasting of the Defendants' written closing submissions (which were drafted without sight of AHAB's closing submissions) is that the Judge often refers to AHAB's opening submissions rather than its closing submissions. This means that the Judge has ignored AHAB's written and oral closing submissions which were, of course, based on the evidence given at trial.[264]

275. It seems that some 51% of the judgment's important section 1 (on "Knowledge of the AHAB Partners of the Fraud on the Banks and of the Extent of the Bank Borrowings, including the Al Sanea Indebtedness") reproduces the Respondents' written submissions. This section, amounting to close on the first third of the judgment, turned out to be decisive of the case. It castigates AHAB for their suppression of disclosure, and makes conclusive findings on the all-embracing knowledge of the AHAB Partners. Mr Wardell submits that on the critical passages relating to the partners' knowledge no less than 281 out of 342 pages are in substance devoted to copying large extracts from the Respondents' closing written submissions. Mr Wardell compares this to "five short paragraphs or sentences from AHAB's written closing submissions" plus a small number of footnoted references, themselves derived from the Respondents' template.[265] Other sections of the judgment are said to reflect percentages of verbatim copying extending to 65% (section 3, "New for Old"), 59% (section 4, forgery) and 83% (section 5, manipulation). This is to be compared with the matching to AHAB's written submissions demonstrated by the software, viz 9% in section 1, 15% in section 3, 17% in section 4, and 3% in section 5. In section 7D (illegality), the Chief Justice reproduced the Respondents' complete submissions (57 pages): this was an important topic because the Chief Justice's conclusion was that AHAB's case would have failed in any event in the light of the illegality defence. The overall average is said to be around two-thirds.

276. Mr Wardell contrasted the Chief Justice's approach to the Respondents' Counterclaim, where AHAB's and the Respondents' submissions were set out in more equal measure; and the Counterclaim dismissed.

277. Mr Wardell submits that the Chief Justice's lack of even-handedness in his approach in the fundamental structure of his judgment was confirmed and exacerbated in other ways. Thus, examples of important issues which Mr Wardell submits were left unaddressed include:

- Why simulated signatures were applied to facility documents
- Why documents found in AHAB's head office had been altered (or as AHAB submits manipulated), although the Chief Justice accepted that they had been altered
- The true nature of the complex transactions between the Saad Group and the Money Exchange
- Al Sanea's use of Money Exchange funds in fraud of AHAB
- Whether the Respondents had in fact received monies taken from the Money Exchange
- The BPP Report about the Financial Businesses and its conclusions that the Algosaibis were ignorant of the fraudulent operations of TIBC and Awal Bank and that 89 documents had been forged.[266]

278. Mr Wardell also provided the Court, at our request, with (19) examples of important contemporaneous documents which he submitted were left unaddressed by the Chief Justice.[267]

---

[264] AHAB's Submissions, **AB/1.5/6**, at para 5.20

[265] AHAB's appeal Submissions at **AB/1.5/10**, para 5.24

[266] **M68/1**. There is an issue between the parties as to whether the BPP Report was inadmissible, or treated as inadmissible at the trial. Even so, the Chief Justice made no reference to such matters.

[267] Items 295 to 313 on the list of documents referred to during oral submissions during the appeal, found at **AX1/1.19-20** and raised by Mr Wardell in oral submissions at **Day9A/121ff**

These include Mr Shepherd's whistleblower emails (referred to above at paras 129-130); Saud's letter to Al Sanea dated 29 May 2004 expressing resistance to the idea of borrowing to buy more SAMBA shares (referred to above at para 148); a letter, not otherwise referred to in Mr Wardell's submissions, dated 26 July 2004 from Al Sanea to Money Exchange staff, expressing concern that a banking letter addressed to Al Sanea's Money Exchange PO Box number had been forwarded to Suleiman and demanding that all correspondence addressed to Suleiman or Saud "should be forwarded to my office for review first";[268] a memorandum dated 9 January 2008 from Mr Hayley to Al Sanea, relating to cash flow and speaking of current withdrawals (by STCC) from the Money Exchange at the rate of $1 million a day;[269] and the BPP Report (referred to at paras 266 and 277 above, and below at paras 283 and 295).

279.   Mr Wardell also complains that the Chief Justice was not even-handed in his approach to evidence. He was dismissive, even critical, of the hearsay evidence provided by AHAB, and even when it went uncontested: for instance that of Badr, who was over 80 years old and unwilling to travel or to subject himself to pressure. On the other hand, the Chief Justice accepted, for instance, the hearsay evidence of Omar Al Mardi, a Bahraini lawyer who was chairman of TIBC and who had expressed unwillingness to attend the trial. Nevertheless, his evidence was relied on both to assert the Algosaibis' involvement with the Financial Businesses and to exonerate Al Sanea after his resignation in December 2004. The Chief Justice was also wrongly impressed by the hearsay evidence of Mr Salah Al Harbi, a junior Saudi Arabian lawyer acting for the Respondents, who gave evidence about telephoning manufacturers of signature stamps (which the Respondents surmised had been used by Suleiman or with his authority in place of his signature). AHAB were severe in their criticisms of Mr Al Harbi's evidence, but the Chief Justice did not refer to these submissions at all.[270]

280.   Mr Wardell also complains of the Chief Justice's treatment of Mark Hayley, a significant witness, because he was Al Sanea's right hand man at the Money Exchange. The Chief Justice was prepared to accept any evidence he gave that was adverse to AHAB, but otherwise to be sceptical. That was, Mr Wardell submits, another bow to the influence of the Respondents' written submissions.[271] In fact, Mr Wardell submits, Mr Hayley's evidence was consistent with contemporaneous documents and should by and large have been accepted. The Chief Justice made no reference to Mr Hayley's evidence that his own signature had been forged. The Chief Justice ignored Mr Hayley's uncontested evidence that Al Sanea was the chief architect of the fraud on the banks, and rather presented that fraud as being supervised and authorised by the AHAB Partners. The Chief Justice rejected Mr Hayley's evidence that the Money Exchange was not used as a central treasury for AHAB. In doing so, the Chief Justice was content to say that

In this massive case, it is impossible to address in this Judgment every detail of every issue. It will therefore suffice that I note here my acceptance of the Defendants' submissions on this issue.[272]

281.   That was enough, nevertheless, Mr Wardell points out, for the Chief Justice to say that this "serves, *ipso facto*, to falsify Mr Hayley's narrative".[273]

---

[268] **G/4234**
[269] **G/6272**
[270] Further reference to the evidence of Mr Al Harbi and the issue of the signature stamps is made below, in the context of AHAB's case on forgery, see at paras 548-552 below
[271] Thus the Chief Justice's criticisms of Mr Hayley at Judgment **AA/2.4/516-517**, paras 55-56 (discussed above at para 257) were essentially copied from the Respondents' submissions.
[272] Judgment at **AA/2.4/383**, para 927
[273] Judgment at **AA/2.4/383**, para 928

282.  The Chief Justice also erred in accepting the Respondents' complaints about alleged differences between Mr Hayley's London examination evidence and his witness statement and evidence at trial. There was nothing improper in a lawyer raising an issue on his client's case with a witness, and Mr Hayley frankly conceded that it was true that, as he had said in London, he had not heard the expression "New for Old". As for the slight difference of language between Mr Hayley's London account of his meeting with El Ayouty in May 2009 and the account of that contained in his witness statement, the Chief Justice had simply got that wrong, as was clear from setting the language side by side. In London Mr Hayley said: "They then told me that up to, I think it was about 2005, they reported on the financial position of the Money Exchange to Maan Al Sanea and to Saud. They told me that after 2005 they ceased reporting to Saud Algosaibi." In para 325 of his trial witness statement he said: "[He] told me that this report was sent to Mr Al Sanea and Sheikh Abdulaziz during his lifetime. He explained that after about 2005, he sent the annual reports to Mr Al Sanea only". It was implicit in the latter that up to 2005, the reports had been sent to an Algosaibi, although it was not expressly said to be Saud; and Mr Hayley had been consistent that after 2005 Saud had not been the recipient of the El Ayouty reports. The Chief Justice had simply made far too much of this.

283.  Mr Wardell complains that the Chief Justice's failures to address such issues adequately were real defects of his judgment: that it was incumbent on him, for instance, to determine why documents were manipulated or signatures simulated; why the transactions between the Money Exchange and the Saad Group and the Respondent companies were as myriad and complex as they were; why the BPP Report's findings, based on the expertise of its accountant authors, as to the fraudulent devices of the Financial Businesses and AHAB's ignorance of them were left out of account, despite and in the light of *Rogers v. Hoyle* [2015] QB 265 which distinguishes between the inadmissible opinion evidence of non-expert decision-makers and reporters and the evidence and opinions of experts; and why a correct appreciation of Mr Hayley's frank, and ultimately largely unchallenged evidence, was of particular importance, given that he had been Al Sanea's man and had "come clean".

284.  Mr Wardell also complained that the Chief Justice had largely ignored Al Sanea's failure to appear to defend the claims made against him and his companies, while at the same time wrongly criticising AHAB for failing to call a witness from El Ayouty. By absenting himself, Al Sanea had avoided having to give proper disclosure or to be cross-examined, for instance as to the allegations of forgery and manipulation and as to the undisputed expert evidence that mechanical or simulated signatures had been employed on original and copy documents from 2000 onwards. As for El Ayouty, the Chief Justice made no reference to AHAB's submissions, set out in an appendix to their written closing submissions, concerning El Ayouty's inconsistent statements and lies to AHAB and the Saudi Arabian authorities, as well as their failure to provide correspondence. If any inference was to be drawn from a failure of evidence from El Ayouty, it should have been drawn against the Respondents for their failure to call a witness from El Ayouty to support their critical case that the Algosaibis had knowledge of the Money Exchange's financial accounts. Indeed, the Respondents called no oral evidence of fact at all.

285.  The Chief Justice had moreover wrongly relied on the witness statements of Mr Matthews, one of the joint liquidators of SIFCO 5, even though his evidence had been withdrawn, in order to support a finding concerning an alleged missing suitcase of (signature) stamps (relevant to the allegations of forgery), since the Respondents suggested that such stamps had been willingly used and authorised by the Algosaibis as a matter of signing convenience. The Chief Justice had himself described this as an issue "of marked importance in the case".[274] The Chief Justice had even found assistance in the hearsay statements of witnesses such as Maan Al Zayer, the CFO of STCC and described as Al Sanea's "fixer". The Chief Justice had also found that Barclays, and not Al Sanea, was the true (bona fide) purchaser of SIFCO 5's funds portfolio (and arguably the directing mind and will of SIFCO 5) for the purpose of assessing SIFCO 5's

---

[274] Judgment at **AA/2.4/684-685** at para 238

*bona fides* in connection with AHAB's tracing claims. The Chief Justice therefore found that AHAB had failed to establish that Al Sanea's knowledge of fraud against AHAB could be imputed to SIFCO 5.[275] The Chief Justice did so even though he had received no evidence at all from any representative of Barclays and without commenting on or taking account of that fact.

286.    On behalf of the Respondents, on the other hand, the following points (down to para 299 below) are made by way of submission in support of the Chief Justice's judgment on these issues. The judgment is lengthy, detailed and obviously carefully prepared. Its detail went beyond what was necessary. AHAB's criticisms are grossly unfair. The judgment's reasons are sufficiently apparent for AHAB to understand why it lost. There is no unfairness and no injustice. Given the judgment's conclusions, there ought to be no surprise that there is a greater reference to the submissions of the Respondents. The simple fact is that the Chief Justice preferred the Respondents' case to that of AHAB.

287.    As for Ford 33, and the percentages relied on as being derived from it, a significant amount of so-called copying is nothing but citation of case law, documentary and other evidence, or even (in one case) citation of AHAB's pleadings[276], embedded in the Respondents' submissions. In any event, the Chief Justice needed to exercise pragmatism when faced with a case of this magnitude. He repeatedly and openly acknowledged his drawing upon the Respondents' submissions. And not all of the highlighted material was properly to be regarded as a case of copying (see Appendices 1-4 of the Respondents' Written Submissions on this appeal). Above all, any copying was not uncritical: the text was repeatedly altered and interspersed by the Chief Justice's own language, thereby demonstrating his independent thought and critical thinking (separately highlighted in blue by the Respondents, see Appendix 5 of those Submissions). Repeatedly, the Chief Justice's ultimate conclusions were expressed in his own words, unhighlighted by AHAB's software. The Respondents' Submissions give many instances of such passages, for instance, and importantly, the Chief Justice's conclusion as to the significance of Saud's Calculations for AHAB's knowledge of Al Sanea's indebtedness,[277] or as to "the ransacking of the records by the Younger Algosaibis of documents which could show the true state of knowledge on the part of the AHAB Partners",[278] or as to it being simply incredible that AHAB would not have addressed their "New for Old" case, if it were true, for the purpose of the London proceedings.[279]

288.    The Chief Justice had openly acknowledged his debt (to both sides of the case) in his statement close to the beginning of his judgment, as follows –

> Indeed, my discussion of this issue follows the pattern of the detailed written submissions of the Defendants, incorporating my findings and referencing AHAB's submissions which I also address simultaneously.[280]

289.    Similarly, on the important subject of Saud's knowledge, the Chief Justice said this:

> So clear is the proof of Saud's knowledge and involvement, that I do not see the need to discuss every aspect of the evidence that reveals it. I will, however, following below, deal with some of the most significant and telling

---

[275] Judgment at **AA/2.4/1114-1116, 1149, 1153**

[276] **AB/3/23-27**

[277] Judgment at **AA/2.4/227** and **236-7** at paras 580 and 608

[278] Judgment at **AA/2.4/415** at para 1005

[279] Judgment at **AA/2.4/507** at para 38

[280] Judgment at **AB/2.4/41-42** , para 52

aspects as have been helpfully identified by the Defendants in their Closing
Submissions and as I find to be proven.[281]

290.    Even Mr Wardell accepted that in the "crucial and pivotal" section 1, concerned with AHAB's
knowledge, which the Chief Justice (rightly) regarded as determinative of AHAB's entire
claim, copying at the alleged 51% was comparatively low.

291.    As for section 6 of the judgment, concerned with Al Sanea's indebtedness to the Money
Exchange, where AHAB's allegation based on Ford 33 was a contrast of 67% copying of the
Respondents' submissions (compared to 6% for AHAB's), it was sufficient to cite the following
summary of AHAB's case expressed in the Chief Justice's own words to show that he had
correctly understood and characterised that case:

> AHAB's case is that there was no commercial purpose or reason for AHAB
> to permit Al Sanea to 'take huge amounts of money' from the Money
> Exchange and they therefore invite the Court to infer that such withdrawals
> were unauthorised or misappropriations.[282]

292.    As for section 7D on the important issue of illegality, the Chief Justice again openly expressed
his debt to the Respondents' submissions, in the following terms:

> I pause here to acknowledge my indebtedness to Mr Lowe and his instructing
> attorneys for their elucidating analysis of the legal principles and their
> application of the principles to the facts and circumstances of this case.
> Having found myself to be in complete agreement, I will gratefully adopt
> and adapt their submissions to express my decision and reasoning on the
> subject.[283]

293.    As for the Respondents' Counterclaim, even though the judgment matched up to 78% of their
submissions, the Counterclaim failed – "perhaps the most graphic illustration that a merely
numerical analysis" was incompetent to assess the performance of the Chief Justice's judicial
function.

294.    As for matters complained of as having been left unaddressed in the judgment, each was
addressed as part of AHAB's overall case on such issues as Al Sanea's alleged forgery of
signatures and manipulation of documents, or his alleged misuse and theft of borrowed monies
in fraud of AHAB, or the role of his group companies in furtherance of such fraud. However,
in a situation where AHAB was seeking inferences of dishonest activity with inadequate
material, the Chief Justice was not to be faulted for his findings that AHAB had ultimately
failed to prove its case. In such circumstances, it is not possible to explain every alleged oddity.
The Chief Justice was not obliged to deal with every sub-issue, or to reach certain findings on
every mystery. Nevertheless, the judgment dealt in great detail with the total range of AHAB's
submissions, and the complaint in this respect, as in others, is no more than a dispute over the
merits of the judgment's conclusions.

295.    The complaints about the Chief Justice's treatment of certain witnesses and aspects of evidence
were similarly unjustified. The BPP Report was paid for by AHAB, was drawn up in different
circumstances and was concerned with different issues, and was in any event inadmissible (see
*Hollington v. Hewthorn* [1943] KB 587 and *Three Rivers District Council v. Governor of the
Bank of England (No 3)* [2003] 2 AC 1 at 238, 244). No complicity in dishonesty was alleged
against Dr Al Mardi, and the Chief Justice in any event concluded "even without reliance on

---

[281] Judgment at **AA/2.4/187** at para 452
[282] Judgment at **AA/2.4/733** at para 4
[283] Judgment at **AA/2.4/1156**, para 5

the evidence of Dr Al Mardi" that the Algosaibis were aware of and approved of the activities of the Financial Businesses.[284]

296.  As for Mr Hayley, the Chief Justice was right to treat his evidence, as that of a self-confessed fraudster, with caution, to seek confirmation of disputed evidence in contemporaneous documentation, but to accept his evidence where adverse to AHAB. If the Chief Justice's caution led him to leave out of account aspects of Mr Hayley's evidence which were favourable to AHAB but of which the judge was uncertain, that was his prerogative and could not be made a matter of complaint.

297.  As for Saud, Yousef and Dawood, in consideration of the travel ban imposed on them in Saudi Arabia, they were permitted to give evidence by video-link, in a shortened day, with an interpreter present with them in case of need, of which they took advantage, and no need for translation into Arabic of documents in English. They had prepared their witness statements in English, without an Arabic translation. No complaint was made about the length of cross-examination in AHAB's written closing submissions at trial, and there had been no application at trial to curtail cross-examination, even if in Saud's case there had been complaint during trial about the length of his cross-examination.

298.  As for Al Sanea's failure to appear, that had little to do with AHAB's failure to prove its case. As for El Ayouty, the Chief Justice's approach had been entirely justified in circumstances where they had been AHAB's auditors over the years. Deloitte had themselves met with El Ayouty in March 2010 (without disclosure of the damaging notes of the meeting, concerning the submission and distribution of the Audit Packs, until very late). El Ayouty were AHAB's auditors, not the Respondents'. As for Badr, he was likely from his trusted position as liaison between AHAB head office and the Money Exchange to have had knowledge of the alleged New for Old policy, indeed it was AHAB's case that he was tasked with overseeing its operation.[285] The Chief Justice had himself remarked in August 2016, when considering an application on the part of AHAB to amend its pleadings, that he was concerned at the absence of evidence from Badr. In March 2017, after live evidence had been concluded, AHAB adduced Badr's hearsay statement. Even if Badr had been difficult to track down, as AHAB alleged, he had still been employed by AHAB in 2009. On a critical issue, and in circumstances where an apparently significant earlier statement in the form of a draft letter from Badr found at Saud's villa and logged on or about 31 August 2010 had gone missing, the Chief Justice was entitled to be sceptical about such a witness in the absence of the opportunity for his cross-examination, and given the limited scope of his statement. AHAB were even equivocal as to whether  Badr was himself deceived by Al Sanea's forgery and manipulation or a dishonest partner to it.[286] In these circumstances, the Chief Justice was entitled to the view he formed that he should ascribe no weight to the statement whatsoever. Even AHAB accepted that "only limited weight" could be put on it.[287] As it is the Chief Justice gave consideration to Badr's statement over many pages of his judgment[288] and he was entitled to his view that, if he had been cross-examined,  Badr's evidence would very probably have been unsupportive of AHAB's case generally and not merely on the New for Old issue.[289]

299.  In sum, the Chief Justice's preference for the Respondents' case was not a matter of unfairness but of judgment, meticulously recorded.

---

[284] Judgment at **AA/2.4/309** at para 805
[285] Judgment at **AA/2.4/544** at para 124
[286] Judgment at **AA/2.4/543-4** at paras 121-123
[287] Judgment at **AA/2.4/554** at para 145
[288] Judgment at **AA/2.4/536-554**
[289] Judgment at **AA/2.4/554** at para 146

*Discussion*

300.     Individual issues, where material to this judgment, are discussed below. For example, this Court differs from the Chief Justice as to such issues as attribution, tracing under Cayman law, and illegality; and it has ordered a retrial of the issue concerning the $191 million transfer which Al Sanea made as the ship was going down. Moreover, the Court sees cogency in AHAB's argument that the Chief Justice may have, as a matter of technique, over-compartmentalised his judgment. But for the most part, on review, and taking full account of the submissions made on behalf of AHAB, this Court is unable to say that the Chief Justice has erred as a matter of substance, let alone conducted an unfair trial. And on the vital issue of AHAB's knowledge of the fraud on the banks and of Al Sanea's borrowings, as will appear below, this Court cannot do otherwise than agree with the Chief Justice's conclusion that the partners had such knowledge.

301.     It is not possible to say that the Chief Justice has failed conscientiously to address the issues. He has grappled with the evidence and the submissions of the parties. And it cannot be said that the parties do not know, or cannot tell, why AHAB have lost and the Respondents have, for the most part and in vital part, succeeded at trial. Nor has the Chief Justice failed to appreciate that Al Sanea was himself dishonest, and in all probability the chief villain of the piece. It is not as though the structure of this case consisted in a straightforward argument between the honesty of the AHAB Partners and the dishonesty of Al Sanea. The essential question, to put it bluntly, was whether they were all in it together, or whether Al Sanea deceived a more or less complicit but somehow blindsided AHAB. On such a question, the Chief Justice was both immersed in the evidence and the arguments, and clearly on top of them.

302.     In such circumstances, what is this Court to make of the submission that there has been very considerable copying and repetition of the Respondents' submissions? The Court accepts that that is so. Individual percentage scores of particular sections of the judgment may be debated, and the Court accepts the Respondents' submission that AHAB's calculated percentages may be overstated, for a number of reasons which have been advanced. However, even after making full allowance for such factors, there is no doubt that the Chief Justice relied, to a substantial extent, and as he himself repeatedly acknowledged, on the Respondents' submissions as a partial template for his judgment.

303.     There is jurisprudence which justifies criticism of such a judicial approach. In *Crinion v. IG Markets Ltd* [2013] EWCA Civ 587, [2013] CP Rep 41 the first instance judgment had been taken almost entirely word for word from the successful party's closing submissions. There was no appeal on the merits, but "on whether [the judge] properly addressed the Appellants' case at all" (at [36]). Some 94% of the words of the judgment represented counsel's drafting, and there was no alteration whatever to the structure (at [11]). It was there submitted, as here, that the judge had "abdicated his core judicial responsibility" to think through the issues which it was his job to decide (at [12]); and that the judge had failed to address the loser's case at all (at [13]). Lord Justice Underhill said that he had never before seen such a judgment (at [16]). However, on analysis he was satisfied that the judge had performed his essential judicial role and that his reasons were sufficiently apparent; and that he had brought an independent judgment to bear (at [37]). Sir Stephen Sedley, while agreeing that the appeal failed, was if anything more critical. He spoke of "something approaching electronic plagiarism" and said that it was "unacceptable". He hoped that a judgment of such a kind would not be encountered again (at [39]-[40]). Lord Justice Longmore, equally critical, said that the failure to refer to the loser's submissions "inevitably leaves a deep sense of grievance" (at [42]). He put the matter in the following way:

43. It also puts this court in a position of considerable difficulty because it has to make a detailed examination of underlying factual material to see whether the judge has truly engaged with the losing party's case when the judge could so easily have shown that he had so engaged, by reciting the main points made by the losing party and stating why he rejects them. Having made that detailed examination, all of us are satisfied that the judge has in fact engaged with the defendants' cases and has rightly seen that they have no substance; it would therefore serve no purpose to order a new trial before a different judge.

44. But we trust that no judge in any future case will lift so much of a claimant's submissions into his own judgment as this judge has done and that, if substantial portions are to be lifted, it will be with proper acknowledgment and with a recitation of the defendant's case together with a. reasoned rejection of it…

304. Longmore LJ's recommendations were indorsed by Lord Wilson JSC in *Ramnarine v. Ramnarine* [2013] UKPC 27 at [13], but, subject to that, Lord Wilson also said:

It is not, of itself, bad practice for a judge who has considered the rival contentions on a discrete issue, such as credibility, to decide that the contentions which he prefers have been expressed by counsel in terms upon which he cannot improve and which he should therefore incorporate into his judgment.

305. A similar issue was debated in the Supreme Court of Canada in *Cojocaru v. British Columbia Women's Hospital* [2013] SCC 30, [2013] 2 RCS 357. That case concerned a claim in tort arising out of the delivery of a baby ultimately by Caesarean section. The dominant issue was whether the trial judge's decision should be set aside because his reasons incorporated large portions of the plaintiffs' submissions (at [1]). That submission was rejected. In her judgment for the Supreme Court, McLachlin CJ conducted a wide review of jurisprudence including that of the US Supreme Court, and emphasised that the critical question was whether the judge had put his mind to the issues to be decided. She concluded:

[73] Despite extensive copying of the plaintiffs' closing arguments, the defendants' arguments do not rebut the presumption of judicial impartiality.

[74] Taking full account of the complexity of the case, and accepting that it would have been preferable for the trial judge to discuss the facts and issues in his own words, I cannot conclude that the trial judge failed to consider the issues and make an independent decision on them. On the contrary, the fact that he rejected some of the plaintiffs' key submissions demonstrates that he considered the issues independently and impartially…

[75] It would have been better if the reasons had not copied extensively from the plaintiffs' submissions. However, to set aside the decision of the trial judge requires more. To rebut the presumption of judicial integrity, the defendants must establish that a reasonable person apprised of all the circumstances would conclude that the trial judge failed to consider and deal with the critical issues before him in an independent and impartial fashion. The defendants have not done so.

306.    The Court accepts that over-reliance on one or other party's submissions in the form of copying of them is not a desirable way of drafting a judgment, if only because it sets up anxieties in the losing party. That said, the Court has sympathy for the Chief Justice in the task which the parties here had set for him. And if, having asked himself whether he could believe the AHAB witnesses, and having determined that he could not, he proceeded, with full acknowledgments, to find assistance in the organisation of his judgment in the Respondents' preferred submissions, it is possible to be understanding of that. Moreover, such jurisprudence as has been cited to this Court does not encourage an appellate court to the conclusion that, on that ground alone, and irrespective of the merits of a case, a judgment will be set aside.

307.    Perhaps it was for some such reasons as this that, on behalf of AHAB, Mr Wardell ultimately acknowledged, in his oral argument, that his reliance on the extent of the Chief Justice's citation of the Respondents' submissions was not, as the contention had been in *Crinion*, an all or nothing point, but was to be seen *in combination with* AHAB's submissions on the merits. In the Court's judgment, this was realistic. The Court has taken account of AHAB's submissions generally, both its headline and introductory submissions under the current issues, and the detailed submissions considered hereafter with respect to separate areas of the appeal before the Court. In doing so, the Court has always kept in mind these headline submissions. However, whether or not the Chief Justice may have erred in separate departments of the argument, or across those departments, eg by reason of the complaint of over-compartmentalisation, or in his overall conclusions, the Court has not been persuaded that he has failed to bring to bear and to exercise an independent and impartial mind, or that in any other respect he has failed in any substantial way to exercise due process. Nor have we been persuaded that the Chief Justice was blind to, or gave insufficient attention to, the submissions made on behalf of AHAB below. Those submissions are reflected in his judgment, even if more tersely, but not for that reason less cogently – and even if ultimately less successfully – than those of the Respondents.

308.    The Court will therefore seek to address, under the heading of individual issues below, those of AHAB's arguments raised above which the Court considers it is necessary to deal with on the merits. However, before continuing with that examination, it is convenient at this point to refer to an important argument between the parties as to whether certain of those issues are new and of such a kind as cannot fairly be raised for the first time at the appellate stage.

### AHAB's allegedly new point of fully informed consent

309.    The most important of such allegedly new points, and a leitmotiv among Mr Wardell's submissions, was the issue of fully informed consent. Indeed, Mr Wardell submitted that the Chief Justice's failure to address this issue was among the most significant of the core errors alleged against the judgment below.

310.    Mr Wardell submitted that it was not sufficient for the Chief Justice to have found merely that AHAB knew about, and authorised, Al Sanea's massive borrowings from the Money Exchange. The AHAB Partners could not be said to have known about or authorised Al Sanea's borrowings unless they also knew the full ins and outs of his activities, such as what he was intending to do with the money, how he was deploying it, how profitably he was using it, how reliable he was as a debtor, and how he was planning to pay it back. In other words, AHAB could not be said to have given its fully informed consent, in a fiduciary situation, unless it knew at least as much about Al Sanea's activities, as a borrower, as an ordinary banking creditor would want to know. Indeed, because the relationship between AHAB and Al Sanea was not the ordinary relationship of creditor and debtor but that of reciprocating fiduciaries, AHAB would want to know still more: and could not be said to have consented to those borrowings without that fully informed consent about which the authorities speak in the fiduciary context. AHAB was not to know that Al Sanea was not the respected hugely wealthy businessman that

he appeared to the world, but a fraudster feathering his own nest and running a gigantic Ponzi scheme.

311.     The presence of such fully informed consent was, moreover, something for Al Sanea to prove: it was not for AHAB to prove its absence. Mr Wardell submitted that this was something which the Chief Justice had overlooked, and on which he had erred. And given Al Sanea's absence from the proceedings, the Respondents were wholly unable to come up to proof.

312.     Thus, AHAB submitted as follows in their written submissions for the appeal[290], (albeit the submission was also repeated in many forms and on many occasions throughout Mr Wardell's oral submissions, and was highlighted at the outset of his address to the Court):

> 11.83 This was a misdirection. It does not follow from the fact that the AHAB Partners knew (assuming for the moment that they did) that Al Sanea was raising money from third-party banks using fraudulent financial statements that they condoned his use of those funds to further his fraudulent activities through the Saad Group. The correctness of this proposition is easy to demonstrate and is supported by authority. Take, by way of example, a group of five partners who decide that they wish to buy a commercial building. They fully intend to go ahead with the transaction and to repay the mortgage instalments as and when they fall due. However, their accounts do not get them to the correct loan to value ratio and so they falsify them. The monies are then advanced but one of the partners runs off with the money and spends it on gambling and high living. The question whether the rogue partner acted in breach of duty is a separate one from the question whether the partners together would have been jointly liable to the lender. The issue of the rogue partner's conduct and whether it amounts to a breach of duty has to be assessed, in the first instance, by reference to what he did. The fact that his co-partners were also involved in the same prior wrongdoing does not automatically mean that the rogue partner did not act in breach of fiduciary duty (although it will be relevant to any illegality defence).

> 11.84 Putting it another way, even a realisation that Al Sanea was borrowing money for his own ends does not in itself mean that such expenditure was authorised by the Algosaibis. Even then, one can and should distinguish between, on the one hand, express and implied authority to invest in a genuine, *bona fide* parallel business venture and, on the other, authority to spend monies on an ever-expanding Ponzi scheme. The trouble here is that the Judge was too readily persuaded that knowledge that the banks were being misled by false financial statements, coupled with the failure to put a stop to it, amounted to acquiescence which precluded the AHAB Partners from complaining that the actual use to which the borrowed and then withdrawn funds were put amounted to a clear breach of duty on Al Sanea's part. The proper starting point for the analysis of whether Al Sanea had acted in breach of duty was to assess what Al Sanea was doing with the funds (that has been addressed in the previous section of these submissions). However, because the Judge started from the end of the analysis, he failed to bring any rigour, let alone an appropriate degree of rigour, to his analysis and effectively equated knowledge of borrowing from third-party banks and knowledge of Al Sanea's withdrawals with acquiescence in expenditure by Al Sanea, whatever that might be.

---

[290] AHAB's Written Submissions, **AB/1.11/39-40**

> 11.85 This error of approach resulted in the Judge's failure to analyse and
> determine precisely what the Algosaibis knew and whether it could be
> said that their consent to Al Sanea's conduct was fully informed. It is
> well established that, once it is shown that a fiduciary was acting in
> breach of duty, the burden is on him to show that consent was fully
> informed. Since it is obvious that Al Sanea's withdrawals were aimed at
> damaging and were highly damaging to the Money Exchange and that
> they were designed only to help him and entities in the Saad Group, the
> burden lay on the Defendants to establish that the AHAB Partners knew
> and gave their fully informed consent to what was going on.

313.   The Court will not need to consider whether this is a matter for Cayman law or Saudi law. Mr
Wardell submitted that by the close of the trial it had become common ground that Al Sanea
was a fiduciary under Saudi law and that there was no material difference between the duties
owed as such under Saudi or Cayman law. The Chief Justice appears to have accepted that Al
Sanea was "AHAB's fiduciary ("amin")" under Saudi law.[291] However, on the premise that it
is a matter for Cayman law, or that Cayman law might supply the absent interstices of Saudi
law, Mr Wardell drew the Court's attention to such well known authorities as those referred to
in *Snell's Equity* (33rd ed, 2015) at para [7-015] (and see now 34th ed, 2020 also at para [7-
015]), citing *Boardman v. Phipps* [1967] 2 AC 46 as among the leading cases. Thus, *Snell* there
states:

> To provide the fiduciary with an effective defence to a claim for breach of
> fiduciary duty, the principal's consent to relaxation of the fiduciary's
> liability must be fully informed. The burden of establishing informed
> consent for conduct which would otherwise constitute a breach of fiduciary
> duty lies on the fiduciary. In order to show that the consent was fully
> informed there must be clear evidence that it was given after the fiduciary
> made "full and frank disclosure of all material facts". "The key is disclosure
> – 'sunlight bleaches'". The principal's consent will be "watched with infinite
> and the most guarded jealousy" by the court.

314.   This leitmotiv was powerfully made and deployed, but the Respondents objected that it was
beside the point, for it was a new point, not raised at trial, and could not be raised for the first
time on appeal. Yes, it had been in issue at trial that the AHAB Partners had not known of the
extent of Al Sanea's borrowings, first from the banks on behalf of the Money Exchange
(AHAB's New for Old case), and secondly from the Money Exchange (and via the Financial
Businesses) for use in the Saad empire. That case had been thoroughly examined at trial, and
the Chief Justice had determined that it had been overwhelmingly and conclusively proved[292]
that the AHAB Partners had known all about and authorised both the Money Exchange's
borrowings from the banks and Al Sanea's borrowings from the Money Exchange. For these
purposes, the strictness of the doctrine of fully informed consent, to the extent that it had been
insisted on below, can be said to have been applied.[293] But there had been no case at trial that
it had to be proved by the Respondents that AHAB had consented in full knowledge to every
particular use of Al Sanea's borrowings. Thus, it could not be said that Al Sanea had either
fraudulently stolen, or in breach of fiduciary duty "misappropriated", AHAB's money. Apart
from and in addition to the investments made directly by AHAB, in particular in the shares of

---

[291] Judgment, **AA/2.4/837-838**

[292] Judgment, **AA/2.4/427**, para 3

[293] Even if the Respondents also had submissions, repeated on appeal, that in critical respects burdens of proof
rested on AHAB against Respondents who were separate legal persons from Al Sanea and against whom AHAB
was seeking remedies, such as tracing, conspiracy, dishonest assistance and knowing receipt, and unjust
enrichment, based on fraud.

Saudi banks, the AHAB Partners had been content that Al Sanea used bank borrowings, which they knew he was generating on their account or against their guarantee from the banks, in his own business interest, as a borrower from and acknowledged debtor to the Money Exchange, in amounts precisely recorded and accounted for.

315.   Thus, the Respondents drew attention to the following aspects of the trial. First, the phrase "fully informed consent" had not appeared anywhere in AHAB's pleadings, or in its oral opening or closing submissions (even if the phrase "informed consent" had). Secondly, although the issue of AHAB's knowledge and consent had been the key issue at trial, that issue had been defined purely in terms of borrowings, for instance in this way, in AHAB's closing written submissions:

> The partner knowledge questions…are therefore these:
>
> (1)  Did the AHAB Partners know that Mr Al Sanea had withdrawn net $ 4 billion from the Money Exchange after October 2000?
>
> (2)  Did the AHAB Partners know that Mr Al Sanea had arranged $ 7 billion of new borrowing on AHAB's credit, most of which had been used to fund those withdrawals?[294]

316.   As to which the answers given, 400 hundred pages of submission later, were as follows:

> For all the reasons explained above, AHAB submits that the Algosaibis (a) did not know the full extent of the borrowing which the Money Exchange incurred under Mr Al Sanea's control from 1 October 2000 to May 2009; (b) did not know that the borrowed monies were still being diverted to Al Sanea or other companies under his control throughout that period; and (c) did not know that the funds he was withdrawing, and misappropriating from the Money Exchange, were not being repaid by him.[295]

317.   Thirdly, and perhaps most significantly of all, the Respondents point to and rely on the following exchange, in the course of closing oral submissions on Day 129 of the trial, between the Chief Justice and Mr David Quest QC, then leading counsel on behalf of AHAB:

> CJ:   What do you say would have been required to be informed consent?
>
> DQ:   Mr Al Sanea would have had to tell the partners that he was continuing to take out money and how much money he was taking out and they would have to agree to that.
> …
> CJ:   Let's cut to the chase on this point. If they had been seeing the Audit Packs throughout the 2000s and they did nothing to stop them, would that be tantamount to informed consent?
> …
> DQ:   My Lord, I think I have said already that if they were seeing and studying and understanding the El Ayouty Audit Packs and seeing year on year and understanding that Mr Al Sanea was taking out increasing amounts of money then I think that is probably right. It would be difficult for them to argue that he was doing it without permission. But it did require them to see and know and understand

---

[294] **D/3/23**
[295] **D/4/422**

> not just that he was taking out money but how much he was taking out.
> …
> I understand your Lordship's point. Of course, if they were being told, if they were being informed every year how much he was borrowing and made no objection to it, it would be difficult, I agree, to say that it was something that was not permitted.
> …
> Our fundamental position is that as managing director of the Money Exchange, Mr Al Sanea could only take the Money Exchange's money, whether borrowed or otherwise, for himself if the other partners in the Money Exchange had consented to it. Ideally that should be some kind of express consent, but even if one was to find some kind of implicit consent, that consent can't be given, can't be contemplated, unless he has told them and he understands that they know what he is actually taking out. The fundamental question really that your Lordship has to decide is what they knew about that.[296]

318.  In the Court's judgment, the Chief Justice accurately reproduced the effect of that submission about the "fundamental question" in the case when he said, close to the outset of his judgment:

> And so, if the AHAB Partners are shown beyond the year 2000 to have been aware of and to have authorized – including by deliberately turning a blind eye – Al Sanea's procurement of the ever-increasing fraudulent borrowings, then AHAB's case against the Defendants in these proceedings must fail. AHAB's primary proprietary and receipt based claims against the Defendants, developed on the basis of Al Sanea's alleged fraud against AHAB, can be no better than AHAB's proprietary claim against Al Sanea himself. AHAB's case would therefore be unsustainable if the AHAB Partners are shown to have been aware of and authorized his fraudulent activities against the lending banks, and were aware of his indebtedness to the Money Exchange incurred by the allocation of much of the borrowings for his own purposes. In short, AHAB's case, which depends fundamentally upon AHAB's lack of knowledge and authorization, will have disintegrated.[297]

319.  In response to the Respondents' submission that his "fully informed consent" line was a new case, Mr Wardell had four strands of argument. The first, advanced at the outset of AHAB's Reply Submissions,[298] was that the Chief Justice had never satisfactorily answered "a pivotal question" asked below, viz -

> why would the Algosaibis have permitted Al Sanea to borrow, in the course of the 2000s particularly, enormous amounts in their name, billions of dollars, amounts that would inevitably, and indeed have, bankrupted the Algosaibis, for the purpose of enriching himself and his companies, when, as we will see, the Algosaibi family and the AHAB Partnership received no, or certainly no comparable, benefit from the Money Exchange?[299]

---

[296] **Day 129/49-52**
[297] Judgment **AA/2.4/31** at para 35 of Section 1
[298] **AB/10.1/7**
[299] **Day 2/15**

320.     That, however, was not so much an answer to the Respondents' submission, as a side-stepping of it, by way of a complaint that the Chief Justice had reached the wrong result on the arguments addressed below.

321.     The second strand, was to submit that "informed consent" had been pleaded and put in issue, and that that issue, because it threw the burden of it on the Respondents, must be understood to require proof by the fiduciary of all matters conceivably material to such consent, whatever they may be: such as, and fundamentally, the fact that Al Sanea's borrowings from the Money Exchange were in execution of his own giant Ponzi scheme, and that therefore it was most unlikely that the Money Exchange would ever have been repaid. AHAB must have been entitled to know that. The AHAB Partners in other words had, like the rest of the world, been deceived by Al Sanea's apparent wealth. In this respect, Mr Wardell pointed to another exchange between the Chief Justice and Mr Quest on Day 129 of the trial, where Mr Quest said that the taking of money without any intention to repay "is not really a loan at all, it is just theft" and that only a genuine loan would be consistent with Al Sanea's fiduciary duty.[300]

322.     The third strand was to argue that Mr Quest's concession, if he must be understood to have made it, was one of law, not fact, and was after the evidence had been called (so that it cannot be said to have influenced the evidence at trial), and could therefore be withdrawn. The fourth strand was the submission that a new point, if it was a new point, could be raised on appeal if either it was a point of law which could not have affected the course of trial, or, although a matter of fact, it had in any event been pleaded, even if not actively advanced at trial.

323.     In this connection, the Court was referred to *The Tasmania* (1890) 15 App Cas 223 (HL) and *Lowe v. W Machell Joinery Ltd* [2011] EWCA Civ 794, [2012] 1 All ER (Comm) 153.

324.     In *The Tasmania*, a case about a collision, one vessel, *The City of Corinth*, was found solely to blame at trial for having improperly turned to starboard; but on appeal, the other vessel, *The Tasmania*, was also found to blame for delaying in taking avoiding action. In the House of Lords reliance was placed on certain matters in evidence at trial, but, as Lord Macnaghten put it (at 231):

> The singular part of the case is that the error attributed to the *Tasmania* does not seem to have been apparent to any one until the parties came before the Court of Appeal. It was not noticed at the trial by the presiding judge; it was overlooked by his nautical assessors; and though a foundation for the charge has been discovered in the pleadings, it escaped, for the time, the attention of the learned counsel for the *City of Corinth*.

325.     Lord Herschell said (at 225):

> My Lords, I think that a point such as this, not taken at the trial, and presented for the first time in the Court of Appeal, ought to be most jealously scrutinised. The conduct of a cause at the trial is governed by, and the questions asked of the witnesses are directed to, the points then suggested. And it is obvious that no care is exercised in the elucidation of facts not material to them.
>
> It appears to me that under these circumstances a Court of Appeal ought only to decide in favour of an appellant on a ground there put forward for the first time, if it be satisfied beyond doubt, first, that it has before it all the facts bearing upon the new contention, as completely as would have been the case if the controversy had arisen at the trial; and next, that no satisfactory

---

[300] **Day 129/53**

> explanation could have been offered by those whose conduct is impugned if
> an opportunity for explanation had been afforded them when in the witness
> box.

326.   Lord Macnaghten found the charge of negligence against the *Tasmania* not proven on the facts,
but he added (at 236):

> …I cannot help adding that I think it would have been a matter of regret, and
> not, perhaps, of the best example, if your Lordships had been compelled to
> determine the case against the captain of the *Tasmania* upon a ground that
> was not urged during the trial, and in reference to which he was asked no
> questions, and given no opportunity of explanation.

327.   Lord Morris also agreed that there was no negligence on the facts, but considered that he was
in any event entitled to differ from the Court of Appeal in the light of the direction the trial had
taken (at 238-9):

> I should, however, have felt great, if not insuperable difficulty, acting on my
> own opinion, in reversing the order of the Court of Appeal in a case of this
> kind, except for this reason; the whole course of the trial before Butt J. was
> on an entirely different contention on the part of the Respondents. There is
> no trace of any contention that the captain of the *Tasmania* delayed
> improperly in changing his course when it became necessary to avoid
> imminent danger; on the contrary, the charge was that he had improperly
> altered his course and thereby led to the collision. The evidence was
> addressed to that contention, and it would be most dangerous and unfair, in
> my opinion, to spell out conclusions on a new issue from answers in the
> evidence which were given to questions on a different and inconsistent issue.

328.   In *Lowe v. Machell*, although the Court of Appeal split in the outcome, as a result of different
views as to what should be regarded as having occurred at trial (see for instance at paras [65-
66], [79], [89] and [100]), there was little overall disagreement about the applicable principles,
even if some of the jurisprudence cited was variously regarded as exemplifying different
aspects of the problem. That jurisprudence indicates that it may not, in certain circumstances,
be irrelevant that an issue which did not get much prominence at trial had been pleaded, or that
a concession of law comes too late to affect the conduct of a trial. Nevertheless, *The Tasmania*,
revisited in more recent years in the Court of Appeal of England and Wales in such cases as
*Crane (t/a Indigital Satellite Services) v. Sky In-home Ltd* [2008] EWCA Civ 978 at paras [18]-
[23] and *Jones v. MBNA International Bank* [2000] 6 WLUK 831, is still the leading case.

329.   We have, at Mr Wardell's request, revisited AHAB's pleadings, for instance at para 176.3/4 of
the Amended Statement of Claim ("Al Sanea assumed and owed fiduciary duties…not without
the informed consent of AHAB to put himself in a position where his own interests were or
might be in conflict with those of the Money Exchange and AHAB" and "not without the
informed consent of AHAB to make any profit derived from his position at the Money
Exchange"). Those are high level invocations of fiduciary duty and the doctrine of informed
consent (for which purpose the Court makes no distinction between "informed consent" and
"fully informed consent"). However, the case made about "Breach of fiduciary duty" follows
at para 177, and that is confined to a case of specific and scheduled "unauthorised borrowing"
(from banks), "misappropriations" (from the Money Exchange), and some other manipulations
(for instance foreign exchange transactions) the purpose of which was to book false profits at
the expense of the Money Exchange. The essence of all those matters was, however,
a combination of unauthorised borrowings at AHAB's expense from banks together with the theft
of those borrowings from AHAB by means of unauthorised transactions mainly in the form of
borrowings by Al Sanea and his Saad Group entities. That essence was emphasised throughout

the trial, culminating in the exchange between the Chief Justice and Mr Quest quoted above, but also highlighted in the pleadings themselves, for instance in these paragraphs at the outset of the Amended Statement of Claim:

> 1. The Second Defendant ("**Mr Al Sanea**") was until May 2009 the person exercising complete managerial control of "**the Money Exchange**"…Over many years he used his position to defraud AHAB by misappropriating very large amounts of money from the Money Exchange. AHAB presently estimates that over $ 5bn was misappropriated, principally in the period 2000 to 2009…
>
> 2. …
>
> 3. Mr Al Sanea funded the fraud by using his control of the Money Exchange, and other financial businesses associated with AHAB, to obtain massive unauthorised borrowing. The majority of this borrowing was obtained by the forgery of the signatures of the chairmen of AHAB by or at the direction of Mr Al Sanea. AHAB estimates that the balance of the borrowing, including accrued interest, commitment fees and related charges was over $ 9.2 bn as at the end of May 2009, of which, as pleaded in section F.1 bis below, the great majority was unknown to AHAB…

330.    Similarly, at the outset of AHAB's (Re-Re-Re-Re-) Amended Reply (**RAR**), AHAB joined issue with the Respondents' defence by putting the Respondents to proof of AHAB's knowledge, consent and acquiescence in Al Sanea's unauthorised borrowing and theft in the face of Al Sanea's forgeries.

331.    The matter must be looked at on the hypothesis that AHAB's appeal against the Chief Justice's findings (that the AHAB Partners did know of, authorise and consent to both the borrowings from the banks and Al Sanea's borrowings from the Money Exchange) failed. Then, applying the jurisprudence cited above to the problem before this Court, we conclude that it is not open to AHAB to raise a new case of lack of fully informed consent, based on additional complaints that the partners did not fully know about the uses to which Al Sanea put the money or his prospects for repaying his borrowings. It may be true that Al Sanea must be regarded as a rogue, and that it would have been extremely difficult for him to prove anything the burden of which lay on him to prove. Nevertheless, if we assume ex hypothesi that the Respondents would be able to sustain the Chief Justice's findings on appeal, it would be unfair to say that the Respondents must lose on any new case which AHAB proposes on appeal, just because they had put in issue on the pleadings a doctrine of fully informed consent the burden of disproving which lay on the Respondents.

332.    Powerfully as Mr Wardell put his case of fully informed consent, for instance in his submissions on behalf of AHAB in AHAB's Written Submissions at paras 11.81-97,[301] which we regard as though fully incorporated herein, we feel obliged to distinguish between the case put at trial and the new case put on appeal.[302]

---

[301] AHAB's Written Submissions, **AB/1.11/38-45**

[302] We refer to AHAB's submissions cited at para 312 above. However, these submissions in their own way demonstrate the flaw in AHAB's fully informed consent argument. On the case developed at trial, and subject to the "New for Old" point, Al Sanea's Ponzi scheme was not his own Ponzi scheme, separate from a touch of creative accounting on the part of the Money Exchange, but was part and parcel of a single, albeit developing, Ponzi scheme stretching back into the 1980s which the Money Exchange and Al Sanea together had created and pursued. Nor had there been, as it would appear, a clear break between a business investment in property and gambling and high living. Huge amounts of Al Sanea's expanding credit in the 2000s was spent (whether in part for the Money Exchange or for himself in the form of more SAMBA shares was in dispute) on investments in

333.    In a case of overwhelming complexity, AHAB chose, in essential accordance with the way they had developed and argued their case, to take their stand on their knowledge or ignorance, since 2000, of fraudulent borrowings from the banks and of unauthorised borrowings from the Money Exchange by Al Sanea. In that connection, AHAB sought to support both the allegations of innocence and ignorance on the part of the AHAB Partners, and the allegations (by way of corollary) of fraudulent borrowings from banks and in turn from the Money Exchange on the part of Al Sanea, by accusations of wholesale forgery against Al Sanea. If that case made at trial failed, and were to fail again on appeal, AHAB cannot find a refuge, a *tabula ex naufragio*[303], in new allegations that the Respondents had failed to prove that the AHAB Partners had been informed about and consented to every aspect of Al Sanea's business purposes and prospects. That would be somewhat analogous to allowing a new case of negligence to be advanced after the failure of a case of fraud; or, a fortiori, of allowing a new case of fraud to be raised after the failure of a first case of fraud.

334.    The court therefore turns to AHAB's case that the partners were ignorant and innocent of a campaign of fraud and forgery waged against them by Al Sanea.

### Innocence, complicity and fraud: a road-map

335.    The Court approaches this central topic in the following way. Unlike the Chief Justice, who understandably approached the issue of AHAB's knowledge of the affairs of the Money Exchange first, we will begin with AHAB's case of forgery and manipulation. We will therefore side-step AHAB's complaint that the Chief Justice over-compartmentalised his judgment, and rejected the case of manipulation and forgery on the very ground that he had already decided, conclusively and overwhelmingly, that AHAB knew about and consented to the borrowings from the banks by the Money Exchange and the borrowings from the Money Exchange by Al Sanea.

336.    In the context of forgery and manipulation, we will consider AHAB's case on New for Old, because it is an essential part of AHAB's case on forgery and manipulation that they were used to evade the limitations of that regime.

337.    We will also look at certain other transactions, for instance letter of credit and foreign exchange transactions, of which AHAB complains.

338.    We will seek to consider the issues of knowledge or complicity, forgery and fraud, in the round. We will begin, however, with a brief restatement of the Chief Justice's essential conclusion on this congery of issues. We will then refer extensively to the Parties' submissions, before turning to our own discussion, analysis and conclusions.

---

banking shares, such as SAMBA, HSBC and Credit Suisse. Call it gambling or investment, it was what the Money Exchange had been set up to do. In any event, if a case was to be developed that there was a break between two separate Ponzi schemes, and a separate fraud committed on the Algosaibis, the issue of fully informed consent as developed for the first time on appeal would have taken a vast amount of still further evidence and enquiry. As it was, that further area of investigation was not conducted, and the AHAB Partners were prepared to take their stand on the issue of their own knowledge of and acquiescence in Al Sanea's borrowings and their extent. As AHAB's submissions went on to put it, at para 11.93: "The Judge did not directly consider the question whether AHAB knew of and consented to Al Sanea using the fraudulent lending which the Money Exchange obtained for his own fraudulent and selfish purposes within the Saad Group which would lead to AHAB's ruin." The Chief Justice did not, because it was not in issue.

[303] Cicero Att 4,18,3

339.    As recorded above, the Chief Justice found that the AHAB Partners were complicit in the long-standing fraud on the banks and were willing to use the money so borrowed both to finance AHAB's policy of large-scale investment in Saudi banking shares and to permit Al Sanea to pursue his own entrepreneurial activities via the Saad Group. In effect, that was the Faustian pact which began in Abdulaziz's lifetime and continued after his death. All the details of the Money Exchange's borrowings from the banks and of Al Sanea's borrowings from the Money Exchange were faithfully recorded and annually summed up in El Ayouty's Audit Packs and their Annexes (together with El Ayouty's strictures on the fraud and their advice to bring it to a halt). The historic fraud on the banks could barely be denied, despite the newly fashioned New for Old defence. That defence was incompatible with the continuously rising tide of bank borrowings recorded in the Audit Packs. Al Sanea's borrowings from the Money Exchange were similarly recorded in its Ledger 3. The Audit Packs were distributed annually to the Partners. There may have been a time when Abdulaziz kept them to himself, but after his death the details of inward and outward borrowings were investigated by Saud and kept under review. The surviving AHAB Partners were extensively cross-examined and found wanting, both in terms of their evidence and in terms of their honesty. The evidence of their complicity in the underlying fraud, and in the financing of Al Sanea, and in the cover-up of their knowledge, and in their concealment of documents, was established beyond doubt. In the circumstances AHAB's case of New for Old was found to be wanting, and with it went their case on forgery and manipulation as well. It was common ground between the experts that documents on AHAB's forgery schedule had been signed for Suleiman and others by mechanical means rather than in manuscript, and that documents on AHAB's manipulation schedule had been altered. But AHAB's case, premised on New for Old, did not make sense and, whatever may have been the explanations in individual cases, AHAB had failed to prove that the documents in issue had not been authorised by the AHAB signatories.

*AHAB's submissions*

340.    In approaching the trial findings, AHAB's overall complaint was that the Chief Justice had, by reason of failing to stand back and so to take in the bigger picture, and by reason of over-compartmentalisation, erred in inferring from merely circumstantial evidence and without a proper basis that the AHAB Partners had known of both the fraud on the banks and of Al Sanea's borrowings. In truth, whatever may have been the position in the previous century with Abdulaziz, since 2000 the AHAB Partners, Suleiman, Yousef, Saud and Dawood, so far from being complicit in a fraud on the banks who were lending money to the Money Exchange, had themselves been deceived by Al Sanea. Even if they had known about his borrowings from the Money Exchange to some degree, they had not known of their extent, or of their purpose, and they were to be regarded as victims and not perpetrators. As for Al Sanea's fraud on AHAB, this had been conducted by manipulation, in order to escape from the strictures of New for Old and, as time went on, by the wholesale use of forgery. That forgery was to be seen most clearly in the Counterclaim, where the Chief Justice did recognise it. But he failed to apply that realisation to the case as a whole. The scales did not fall from his eyes. In any event, the Chief Justice should have taken, but failed to take, into account Al Sanea's distancing of himself from the proceedings, and drawn an adverse inference against him as to the bona fides of his conduct vis-à-vis the Algosaibis.

341.    The trial was fought on so wide a canvas and in such detail that a certain amount of categorisation of subject-matter had to be undertaken, and needs to be undertaken again on this appeal. However, sight should not be lost of the need to bring everything into a single picture. If Al Sanea was a fraudster, and had sought to defraud AHAB in the Counterclaim, the utmost care should have been taken before condemning the Algosaibis as being complicit in Al Sanea's schemes, and that care had been lacking.

342.     Mr Wardell therefore sought to approach his task on this appeal stage by stage, but ultimately with an eye to the bigger picture, the overall narrative. Thus, at one point of his submissions he focussed on Al Sanea's secrecy and dishonesty and the AHAB Partners' ignorance of that, while at another point he focussed on the partners' knowledge or ignorance of the extent of Al Sanea's borrowings, and at another point he focussed on the Partners' knowledge or ignorance of any dishonesty in the Money Exchange's borrowings from the banks. But he sought to bring this all into relation with the various parts of the narrative. He chose to start with Al Sanea's dishonesty. To a large extent this was tied up with his further argument relating to fully informed consent, which we have already dealt with. But to some extent, it was also part of the general submission that the AHAB Partners were to be regarded as ignorant victims, not as parties complicit with fraud.

*Al Sanea was the fraudster*

343.     Thus AHAB submitted that in truth the Chief Justice's findings were based not on fact but on unjustified inference. There was, it was said, a merely circumstantial case, without hard proof of contemporaneous documentary evidence recording consent to Al Sanea's withdrawals from the Money Exchange. The unjustified inference was inherently improbable. The Algosaibis would have known that Al Sanea's publicised wealth was built on fraudulent foundations and was a charade, that there was no prospect whatsoever of his being able to repay his enormous indebtedness, and that they had underwritten his enterprise, from which they stood to benefit not at all, to their ultimate inevitable ruin.

344.     Moreover, if the Algosaibis were complicit in Al Sanea's fraud, there was no need for his forgery of signatures, no need of manipulated documents, and no need for complicated schemes, such as dubious foreign exchange transactions, for the extraction of funds from the Money Exchange.

345.     Similarly, if the Algosaibis were complicit, their reaction to the collapse of the Money Exchange in 2009 made no sense. It would have been a deceit in itself. As it was, and to the contrary, they engaged external advisers (Baker & Mackenzie, and Deloitte) to investigate what had gone wrong, and had approached the King of Saudi Arabia to set up a royal committee to investigate the affairs of the Money Exchange. Al Sanea, on the other hand, reacted to the crash with deceit and lies to the Algosaibis, as well as with his theft of the last available cash in the sum of $ 191 million, which demonstrated that he and they were not complicit with but divided by his fraud. Meanwhile, the accusation of destroying and concealing documents was belied by the apparent incompetence of their efforts. They would have undertaken the enormous cost of these proceedings in the knowledge that it would probably end in failure. Mr Wardell submitted in sum that –

> This narrative was obviously inherently improbable and the Judge should have recognised it as such because it was built on speculation and theorising which defied common sense and did not fit with a fair appraisal of the evidence…[304]

346.     The Chief Justice should rather have found that Al Sanea was, with the possible exception of Abdulaziz, the lone architect of the whole fraud, from its inception to its denouement. The Algosaibis had no involvement at all in the day-to-day running of the Money Exchange, and were physically excluded from it by Al Sanea.[305] It had its own IT system, its own access, staff, postal address and mail room.[306] The fact that the Ponzi scheme kept its own records was

---

[304] AHAB's Written Submissions at para 8.4, **AB/1.8/4**
[305] Hayley witness statement 1/195, **C1/9/40**, Charlton witness statement 1/53, **C1/5/15**, Zaatar witness statement 1/30, **C1/14/8**
[306] Krishnan 1/21, **C1/10/5**, **G/4235/1**, Saud 1/82, **C1/2/17**, Hayley 1/26, **C1/9/7**

irrelevant ("Al Sanea and his employees needed to make a careful record otherwise it would have been impossible to keep the Ponzi scheme going").[307] No banker was called to give evidence that the Algosaibis were involved. The correspondence between the partners showed their desire to extract themselves from an operation over which they had no control, and to close the Exchange. Suleiman was no businessman. Yousef fell out with Al Sanea early on and retired, and was only pitchforked into chairmanship of the Money Exchange at the last moment in February 2009 on Suleiman's death. He had had to struggle to get hold of the 1998 Audit Pack directly from El Ayouty because Abdulaziz had not circulated it. Thereafter he withdrew from the Money Exchange.

347.    Al Sanea's reaction to that and to Abdulaziz's stroke was first to limit the flow of documents to Abdulaziz for signature and then, after his stroke, to place his signature on documents which Abdulaziz could not have signed, the beginning of his practice of wholesale forgery.

348.    Saud only became involved in 2000 following Abdulaziz's stroke. In that period, Al Sanea doubled-down on his illicit control of affairs. He dealt with the whistle-blower incident of 2001 on his own accord, by suing Mr Shepherd in Canada and using Mr Hayley to placate the banks. Saud was cross-examined about the incident and denied any knowledge. No contemporaneous evidence faulted that evidence. The Chief Justice did not mention the incident in his judgment, but it illustrated Al Sanea's control and Saud's exclusion from knowledge. Then in August 2001 Al Sanea directed that all Money Exchange original documents should be held at the Saad Group's head office.[308] They could not be obtained for the proceedings or tested for the purposes of forgery. The Chief Justice was wrong to regard this as merely "at best equivocal" (ie on the basis that Al Sanea had been merely attempting to keep them safe).[309] In November 2001, Al Sanea directed that documents of the Bahraini Financial Businesses were to be dealt with in the same way.[310] In November 2002, Al Sanea insisted that he was to be the sole signatory (apart from Saad Group employees) for AIH, excluding Suleiman.[311] Mr Wardell asks: why this insistence on exclusive control, if the Algosaibis were in the know? Meanwhile, Al Sanea secured the loyalty and silence of his associates and the Money Exchange's employees, chief among them Mr Hayley, by making large cash payments to them, not recorded in the Exchange's books. Mr Hayley's evidence about this was not challenged in cross-examination,[312] but the Chief Justice made no reference to it.

349.    It was in this period that AHAB's borrowings (and with them, Al Sanea's) escalated significantly. AHAB accepted that "it was common ground that the Money Exchange had always had some borrowing from third-party banks and it was common ground that the partners were aware of that. It was also clear that they were aware that Al Sanea was borrowing money from the Money Exchange."[313] However, AHAB drew attention to the figures from the 2000s[314] which showed borrowings escalating from SAR 7 billion (some $ 1.9 billion) in 2000 to SAR 9.5 billion (some $ 2.8 billion) in 2004 and on to SAR 33.5 billion (some $ 8.9 billion) in 2008. AHAB submitted that there was no evidence to show that the Algosaibis benefited from that increase at all. AHAB put Al Sanea's diversion of funds from the Money Exchange at about $ 4 billion, while the balance of the borrowings had gone on interest.[315] The escalation from SAR 10.5 billion in 2004 to SAR 33.5 billion in 2008 is particularly marked, and was aided by the setting up of TIBC and Awal Bank in Bahrain in 2003-4, of Singularis in November 2006 (used

[307] AHAB's Written Submissions at para 6.8, **AB/1.6/3**
[308] **G/2542**
[309] Judgment at para 98, **AA/2.4/613-614**
[310] **G/2628**
[311] **G/3028, 3032**
[312] **G/4082**, Hayley 1/22-24, **C1/9/6-7**
[313] AHAB's Written Submissions, para 6.118, **AB/1.6/48**
[314] In a table set out in AHAB's Written Submissions, para 6.120, **AB/1.6/49**
[315] AHAB's Written Submissions at paras 6.123, **AB/1.6/50** and 11.11, **AB/1.11/4-5**

in 2007 to purchase Al Sanea's holding of 3% in HSBC) and of the AwalCos in August to November 2006. Although the Chief Justice accepted that TIBC was used by Al Sanea to raise funds fraudulently, he failed to refer to an exchange of correspondence from which it was to be inferred (as the BPP Report found, although it was not taken into account as it should have been on the basis of hearsay evidence, as distinct from opinion evidence) that the Algosaibis never attended its meetings, which were in Bahrain and not at AHAB head office.[316] Similar submissions were made as to AHAB's lack of knowledge of the day to day operations of the other Financial Businesses, such as ATS and AIH. The Chief Justice was plainly wrong to have inferred that AHAB knew and approved of their use for the procurement of billions of dollars of borrowings.[317]

350.   In this connection, although there was a large amount of evidence to illustrate the innumerable complex transactions necessary to support Al Sanea's Ponzi scheme, there was nothing to show that the Algosaibis were involved in that process, or had benefited from it. As Al Sanea's edifice neared collapse in May 2009, and the scrabble for cash intensified, the AHAB Partners were not to be seen to be implicated in avoiding the impending disaster – until after it had occurred. When it did, it came as a complete surprise to them. And yet, if the Algosaibis were complicit with Al Sanea, they would have been involved in the attempt to avert collapse of the scheme. The Chief Justice failed to take account of this lack of any evidence of communication. Mr Hayley gave evidence of an occasion, in 2006 (at a time of a massive collapse in the Saudi stock market), when Saud asked him whether the Money Exchange could pay its debts. The submission was that that was the only occasion of such interest, and that no specific figures were discussed.

351.   Such was the scale of Al Sanea's use of the borrowed funds to support his own interests and enterprises, without any benefit to AHAB, the question naturally arises how it could possibly be inferred that the partners knew and approved of such borrowing. The Chief Justice's answer to that question was expressed in argument as follows, and was described by Mr Wardell as the "*quid pro quo* theory":

> In essence, it seems to me the argument is that they really had no choice, unless they were prepared to liquidate the share portfolio of investments, and if they were not prepared to do that then they must have understood the borrowing would have increased. The quid pro quo was that Al Sanea would be allowed to borrow as well. He was running the Ponzi scheme for them.[318]

352.   The Chief Justice expressed this in his judgment as follows:

> …the pursuit by the AHAB Partners, beginning in the 1980s with Abdulaziz and carried on ever since, of the strategy – through the instrumentality of the Money Exchange under the management of Al Sanea – to use borrowing in order to acquire and hold investments…because of AHAB's failure to inject capital or to pay down the borrowings…also required the constant taking of further borrowing to repay earlier borrowing. The quid pro quo was that Al Sanea was allowed to deploy a similar strategy for his own purposes as well – all resulting in the spiralling vortex of indebtedness which inevitably overwhelmed the Money Exchange.[319]

---

[316] **G/7083**, email of 15 October 2008
[317] Judgment, para 784, **AA/2.4/302**
[318] The Chief Justice's observation at **Day127/20-21**
[319] Judgment, para 10, **AA/2.4/429**; see also para 1, **AA/2.4/732**, and para 11, **AA/2.4/1231-1232**, where the Chief Justice said: "If this meant that using the Money Exchange to "cook the books" of SICL and Singularis suited his ends, I do not doubt that the AHAB Partners saw no need to inquire into or interfere with such activities."

353. However, Mr Wardell submitted that there was no direct evidence to support such a theory, and that it was incoherent in as much as without any evidence of the means to repay Al Sanea's borrowings, the process would end in disaster. If, on the other hand, as the Chief Justice also found, the Algosaibis believed in Al Sanea as "one of the wealthiest men in the world" and had therefore "made a bad credit decision",[320] then that went to show their lack of insight and knowledge.

354. Mr Wardell in this connection complained of the Chief Justice's attempt to find some commensurate benefit for the AHAB Partners in the scheme. Such benefits as they enjoyed, for instance as shareholders and directors of Saudi banks, or in the form of dividends paid by the Money Exchange (in any event overestimated by the Chief Justice), were limited compared to the billions that Al Sanea had extracted. Moreover, until the Saudi crash in 2006, AHAB's share portfolio would have enabled the Money Exchange to repay its cost, including interest. Thus the Audit Pack for 2005 valued investments at over SAR 13 billion, and bank borrowings (stripped of borrowings through AIS) at SAR 7 billion.[321] Moreover, the Chief Justice was wrong to have found (trusting too much in the Respondents' closing submissions) that AHAB had spent money in 2004-2005 on acquiring more SAMBA shares, albeit in the name of STCC, through monies raised through the Financial Businesses. The Chief Justice was also wrong to have found that the Money Exchange operated as AHAB's central treasury and thus as "an important source of funding for AHAB and its Partners"[322], at any rate during the 2000s or from Mr Hayley's arrival in 1998 (which was Mr Hayley's unchallenged evidence). Similarly, the Chief Justice erred in finding that the Partners had benefited from the purchase in 2004, through borrowings, of some SAR 1 billion of Etisalat[323] shares and their sale in 2005 for some SAR 1.3 billion; and in finding that the Partners had not made proper disclosure of unknown overseas assets.

355. If AHAB's benefits from its borrowings were small compared with those of Al Sanea, the Chief Justice also failed to take account of the fact that the Algosaibis derived no benefit from Al Sanea's business empire in the Saad Group, which he had built with the assistance of his borrowings from the Money Exchange and in which AHAB had no interest. The Chief Justice accepted that Al Sanea's business was built on fraud: as he put it, Al Sanea had conducted a "campaign of fraud against the outside world"[324]. But he failed to take proper account of the fact that Al Sanea's fraud was aimed as much against the Algosaibis. If the world was deceived, so was AHAB.

356. In all these respects, AHAB submitted that the Chief Justice had reached conclusions which no reasonable judge could have reached.

*The Counterclaim*

357. Moreover, a particularly egregious part of Al Sanea's fraud relied on by Mr Wardell related to Al Sanea's Singularis, its deposits with the Money Exchange, and its counterclaim against AHAB (inter alia) for some $ 4.5 billion.[325] The total Counterclaim was for nearly $ 6 billion, but the largest single item, for $ 4.5 billion, was based on a Promissory Note in favour of Singularis (**the Note**), dated 28 January 2009. The Note was purportedly signed by Suleiman in pen and ink. The handwriting experts said that authenticity was inconclusive, so that, as the

---

[320] Judgment, para 8, **AA/2.4/733**
[321] There was, however, disputed evidence between experts (Mr Hatton for AHAB and Mr Bullimore for the Respondents) as to the carrying costs of the Money Exchange's share portfolio.
[322] Judgment at para 928, **AA/2.4/383**
[323] Etisalat was a successful Saudi telecoms company
[324] Judgment, para 11, see also para 13, **AA/2.4/1232**
[325] See Judgment, paras 171ff, **AA/2.4/1318-1327**

Chief Justice said, there was no expert evidence of forgery.[326] Saud said that he could not recollect being present when the note was signed, but that he recognised the signature. Yousef was not available for cross-examination on this point. The Note provided that AHAB would pay on demand. A demand was served on 18 April 2011. According to Singularis' ledger, Singularis made two deposits with the Money Exchange, one of $ 1 billion on 25 September 2007, and the other $ 3.3 billion on 22 October 2007, with interest accumulating. Nevertheless, the deposits do not appear in the ledgers of the Money Exchange, and the experts (Messrs Andrews and Hatton) agreed that this suggested that the deposits were not made. The Respondents did not invite the Chief Justice to find that they were made. At trial, AHAB therefore submitted that the Note was not genuine, observing that its provenance was dubious, since the Note was first handed to liquidators by a representative of Al Sanea on 7 June 2011. However, no copy of the Note was found in Singularis' files nor was there any reference to the Note in those files. The first mention of the Note was by Al Sanea in his affirmation in these proceedings of 2 December 2009. The liquidators had pressed Al Sanea for production of the Note and for an explanation of the circumstances in which it was made, but if an explanation was given, privilege was asserted over it.

358.  At trial, AHAB therefore submitted both that "the Court cannot be satisfied that the [Singularis] Promissory Note is genuine" and that it had been forged, an example of Al Sanea's previous fraud against AHAB in the years running up to the Money Exchange's collapse, as well as his continuing attempts to defraud AHAB long past that collapse.

359.  It was in these circumstances that the Chief Justice had said, as already cited above, that –

> it should be understood that while I have rejected and dismissed the counterclaim and in doing so accept that Al Sanea as its partial instigator would seek to defraud AHAB, this conclusion does not suggest an acceptance on my part that his running of the Money Exchange prior to its collapse in May 2009 involved a fraud by him upon AHAB. That issue is separately and from my point of view conclusively dealt with above in this Judgment in which is examined the overwhelming evidence of the AHAB Partners' knowledge and authorisation of his activities at the Money Exchange…[327]

360.  Indeed, the Chief Justice had generalised these distinctions in dealing both with other elements of the Counterclaim and, outside the Counterclaim, with other fictitious transactions (such as letter of credit transactions through TIBC). All these came within the same twin rationalisations, namely

> 13  …that the generation of such sham activity, like the fictitious use of LC transactions through TIBC, was not meant during the operation of the Money Exchange to defraud AHAB but to enable Al Sanea to continue to defraud AHAB's bankers and to wage his own campaign of fraud against the outside world.

> 14. A different view must, of course, be taken of Al Sanea's state of mind now in relation to what I also regard as his fraudulent instigation of these counterclaims as they relate to the SICL and Singularis Promissory Notes.

---

[326] Judgment, para 171, **AA/2.4/1318**
[327] Judgment, para 180, **AA/2.4/1327**

15. I do not suppose that this is the first or last time that the forensic world will have seen such dishonourable behaviour following upon the unravelling of a fraudulent compact.[328]

361. On this appeal, Mr Wardell submitted that the Chief Justice had erred in thus making two false distinctions: one, that Al Sanea had been prepared to conduct a campaign of fraud "against the world" without at the same time doing so against AHAB; the other, that Al Sanea had been prepared to defraud AHAB in the context of these proceedings, but had not been dishonest with them before the crash. To the contrary, Mr Wardell submitted that Al Sanea could hardly have been dishonest to the world without at the same time being highly damaging to AHAB's interests and dishonest to the Algosaibis. Moreover, to draw such distinctions in the case of a man clearly accepted by the judge as being hugely dishonest was an artificial, unrealistic and impermissible exercise in judgment. It followed from the Chief Justice's "overcompartmentalised approach to the evidence and to the case as a whole".[329]

362. As it was, Singularis' Note sued upon in the Counterclaim was to be seen in the context of two other Promissory Notes, this time of SICL as distinct from Singularis, dated 1 December 2008, accompanied by related security agreements, covering a total AHAB debt of some $ 2.2 billion. The liquidators had earlier relied on these two notes as part of their Counterclaim, but had abandoned the claim a few months before trial. The structure of these arrangements had been to provide SICL with the right to payment on demand of whatever sums were shown in SICL's books as due to SICL from AHAB. Such entries were to be "considered conclusive evidence as to the correctness of the liabilities owed by [AHAB] to [SICL]". As in the case of the Singularis Note, the SICL notes are signed in pen and ink, purportedly by Suleiman, the experts found evidence of forgery to be inconclusive, and Saud accepted that the signatures looked like Suleiman's.

363. Nevertheless, the Chief Justice accepted AHAB's submissions on the SICL notes at trial to the effect that the SICL notes were forgeries. No copies or references to them had been found in AHAB's or SICL's files. In AHAB's accounts, the amount due to SICL by AHAB as at 31 December 2008 had been only $ 162 million, not some $ 2.2 billion. Al Sanea had also produced, in other proceedings between him and AHAB, another note and security agreement dated 16 November 2008 for the same amount ($ 1.423 billion) as one of the two SICL notes, but in this case in favour of Al Sanea personally.[330]

364. The two SICL notes and the Singularis Note were thus treated alike by the Chief Justice as being the products of Al Sanea's post-collapse fraudulent schemes, involving forgery. But AHAB submitted that this ought to have thrown a lurid but also revealing light over Al Sanea's relationship with the AHAB Partners and the Money Exchange generally.

*AHAB's knowledge of the fraud on the banks and of Al Sanea's indebtedness*

365. AHAB went on to submit that the AHAB Partners "did not know about and were not complicit in any fraud on the banks".[331] To some extent this relied on submissions already recorded above, such as Al Sanea's exclusion of everyone but his own dishonest associates from the Money Exchange; his manipulations to evade the New for Old curtailment of his borrowing; his forgery; his misuse of the Financial Businesses without involvement of the Algosaibis; and the improbability of the so-called *quid pro quo* doctrine. Mr Wardell went on, however, to highlight other aspects of the narrative as well, such as the family's suspicion and dislike of Al Sanea,

---

[328] Judgment, paras 13-17, **AA/2.4/1233-1234**. The "fraudulent compact" referred to there was the Chief Justice's view of the relationship between AHAB and Al Sanea.
[329] AHAB's Written Submissions, para 11.76, **AB/1.11/36-37**
[330] Judgment, para 27, **AA/2.4/1238-1240**
[331] AHAB's Written Submissions, para 13.3, **AB/1.13/1**