# 25-0643-cv

## United States Court of Appeals

*for the*

### Second Circuit

———————◆———————

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 40 of 43 (Pages A-9727 to A-9927)

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
*Attorneys for Plaintiffs-Counter-*
  *Defendants-Appellees*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant-*
  *Appellant NHF TRS, LLC and*
  *Defendant-Counter-Claimant-*
  *Appellant Nexpoint Diversified*
  *Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS  (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Counter-Defendant-
   Appellee*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Amended Complaint, dated and filed
February 23, 2022 ................................. A-56

Exhibit A to Amended Complaint -
Bench Ruling and Memorandum of Law In
Support of (A) Final Approval of Disclosure
Statement; and (B) Confirmation of Chapter 11
Trustee's Third Amended Joint Plan, in re: *Acis
Capital Management, L.P., Debtor,* Case No. 18-
30264-SGJ-11, and in re: *Acis Capital
Management GP, L.L.C., Debtor*, Case No. 18-
30265-SGJ-11, dated January 31, 2019 ................ A-80

Exhibit B to Amended Complaint -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021 ................................. A-128

Exhibit C to Amended Complaint -
Letter of Bonds Ellis Eppich Schafer Jones LLP
to Court, dated September 23, 2020 ..................... A-160

Exhibit D to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019 ............................. A-163

Exhibit E to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Shana Sethi,
dated August 6, 2019 ............................................. A-170

ii

**Page**

Exhibit F to Amended Complaint -
Plaintiff's Second Amended Complaint and Jury
Demand in *The Charitable Donor Advised Fund,
L.P., v. U.S. Bank National Association, et al.*,
Case No. 1:19-CV-09857-NRB ............................ A-179

Exhibit G to Amended Complaint -
Plaintiffs' Original Complaint in *The Charitable
Donor Advised Fund, L.P., and CLO HOLDCO,
Ltd. v. U.S. Bank National Association, et al.*,
Case No. 1:20-cv-1036 ........................................... A-212

Exhibit H to Amended Complaint -
Letter of Myers Bigel to Mark Kotwick, dated
May 8, 2020 ............................................................. A-246

Exhibit I to Amended Complaint -
Plaintiff's Second Amended Complaint, *NexPoint
Strategic Opportunities Fund v. Acis Capital
Management, L.P., et al.*, Case No. 1:21-cv-
04384-GHW ........................................................... A-254

Exhibit J to Amended Complaint -
Letter of Quinn Emanuel to The Charitable
Donor Advised Fund, L.P. and Others, dated
December 28, 2021 ................................................. A-296

Exhibit K to Amended Complaint -
Letter of Parsons McEntire McCleary PLLC to
Jonathan E. Pickardt and Mark D. Kotwick, dated
January 10, 2022 .................................................... A-299

Exhibit L to Amended Complaint -
Settlement Agreement, dated April 28, 2021 ......... A-302

iii

**Page**

Exhibit M to Amended Complaint -
Order Approving Debtor's Settlement with (A)
Acis Capital Management, L.P. and Acis Capital
Management GP LLC (Claim No. 23), (B)
Joshua N. Terry and Jennifer G. Terry (Claim No.
156), and (C) Acis Capital Management, L.P.
(Claim No. 159) and Authorizing Action
Consistent Therewith, dated October 7, 2020........   A-329

Exhibit N to Amended Complaint -
Memorandum Opinion and Order Granting in
Part Plaintiff's Motion to Hold James Dondero in
Civil Contempt of Court for Alleged Violation of
TRO in re: *Highland Capital Management, L.P.,
Debtor,* Case No. 19-34054-sgj-11, and *Highland
Capital Management, L.P. v. Dondero*, Case No.
20-03190-sgj11, dated June 7, 2021 .....................   A-354

Exhibit O to Amended Complaint -
Transcript of Proceedings in re: *Highland Capital
Management, L.P., Debtor*, Case No. 19-34054-
sgj-11, dated June 25, 2021 ..................................   A-410

Exhibit P to Amended Complaint -
Acis Capital Management, L.P.'s Memorandum
of Law in Support of its Motion to Dismiss
Plaintiff's Second Amended Complaint and for
Attorneys' Fees and Costs, dated January 27,
2022, *NexPoint Strategic Opportunities Fund v.
Acis Capital Management, L.P., et al.*, Case No.
1:21-cv-04384-GHW ...........................................   A-533

iv

                                                              **Page**

Order on Plaintiffs' Unopposed Motion to Amend
    Caption, dated March 26, 2022.............................. A-562

Defendants the Charitable Donor Advised Fund,
    L.P., and CLO HoldCo, Ltd.'s Amended Answer
    and Counterclaim, dated and filed
    March 30, 2023 ...................................................... A-563

Amended Answer of Defendant/Counter-Plaintiff
    NexPoint Diversified Real Estate Trust to
    Amended Complaint, dated March 30, 2023 ........ A-597

    Exhibit 1 to Amended Answer -
    Indenture, dated April 16, 2015 ............................ A-656

    Exhibit 2 to Amended Answer -
    Portfolio Management Agreement, dated
    April 16, 2015, labeled Exhibit 2.......................... A-985

    Exhibit 3 to Amended Answer -
    Letter of Lynn Pinker Cox Hurst to Daniel P.
    Novakov, dated August 6, 2019, labeled
    Exhibit E ............................................................... A-1037

Notice of Defendant/Counter-Plaintiff NexPoint
    Diversified Real Estate Trust for Leave to Add
    Party, dated and filed April 10, 2023 .................... A-1043

Order of Honorable Gregory H. Woods, dated
    May 1, 2023 and filed May 2, 2023...................... A-1043.1

Notice of Plaintiffs' Motion to Dismiss Defendants'
    Counterclaims and for Judgment on the
    Pleadings, dated and filed May 15, 2023 .............. A-1044

Declaration of Blair A. Adams, Esq., in Support of
    Plaintiffs' Motion to Dismiss Defendants'
    Counterclaims and for Judgment on the
    Pleadings, dated and filed May 15, 2023 .............. A-1047

v

**Page**

Exhibit 1 to Adams' Declaration -
Transcript of Hearing, dated February 23, 2023 .... A-1051

Exhibit 2 to Adams' Declaration -
Second Amended Complaint (Including Claim
Objections and Objections to Administrative
Expense Claim), *Acis Cap. Mgmt. L.P. and Acis
Cap. Mgmt. GP, LLC v. Highland Cap. Mgmt.,
L.P., et al.*, Adv. Pro. No. 18-03078, dated
June 20, 2019 ......................................................... A-1084

Exhibit 3 to Adams' Declaration -
Agreement, dated February 28, 2023 ................... A-1193

Exhibit 4, Part 1, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 ......................................................... A-1257

Exhibit 4, Part 2, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 *continued* ....................................... A-1367

Exhibit 5 to Adams' Declaration -
Transcript of Proceedings, dated May 1, 2023 ...... A-1379

Exhibit 6, Part 1, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 .................................................... A-1425

Exhibit 6, Part 2, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1432

vi

**Page**

Exhibit 6, Part 3, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* .................................. A-1439

Exhibit 6, Part 4, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* .................................. A-1446

Exhibit 7 to Adams' Declaration -
Order Granting Senior Certificate Holders'
Motion for Summary Judgment and Denying
Junior Certificate Holders' Motion for Summary
Judgment, *In the Matter of the Trust Established
Under the Pooling and Service Agreement
relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage Pass-
Through Certificates, Series 2007-C30*, Case No.
62-TR-CV-19-33, dated October 26, 2022 .......... A-1454

Exhibit 8 to Adams' Declaration -
Ruling in *In re Acis Cap. Mgmt., L.P.*, 18-30264-
SGJ-11, dated August 30, 2018 ............................ A-1473

Exhibit 9 to Adams' Declaration -
Portfolio Management Agreement, dated
June 5, 2014 ........................................................... A-1481

Exhibit 10 to Adams' Declaration -
Indenture, dated June 5, 2014, paginated bottom
center as Exhibit 3, Page 1 of 421 ........................ A-1534

Exhibit 11 to Adams' Declaration -
Portfolio Management Agreement, dated
November 18, 2014 ............................................... A-1956

vii

**Page**

Exhibit 12 to Adams' Declaration -
Indenture, dated November 18, 2014, paginated
bottom center as Exhibit 4, Page 1 of 335 ............. A-2008

Exhibit 13 to Adams' Declaration -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021
(Reproduced herein at pp. XXX – EX B)

Exhibit 14 to Adams' Declaration -
Original Complaint, *NexPoint Diversified Real
Estate Trust v. Acis Capital Management, L.P., et
al.*, dated October 3, 2022...................................... A-2344

Exhibit 15 to Adams' Declaration -
Notice of Appeal, *In re Acis Capital
Management, LP.*, Appeal No. 19-10847, dated
July 26, 2019 ......................................................... A-2392

Exhibit 16 to Adams' Declaration -
Opening Brief of Appellant Highland CLO
Funding, LTD, in above appeal, dated
September 20, 2019 ................................................ A-2396

Exhibit 17 to Adams' Declaration -
Memorandum of Law in Support of Defendant
U.S. Bank, National Association's Motion to
Dismiss the Second Amended Complaint,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2473

viii

**Page**

Exhibit 18 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding LTD.'s Motion to Intervene,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated November 24, 2021 .......... A-2499

Exhibit 19 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding Ltd.'s Motion to Dismiss,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2521

Declaration of Jonathon Milne, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 16, 2023............... A-2543

Exhibit 1 to Milne's Declaration -
Sections 12, 25(3), 28(1), 38, 46 and 48 of the
Cayman Islands Companies Act ........................... A-2569

Exhibit 2 to Milne's Declaration -
*In the Matter of Lancelot Investors Fund Limited
(In Official Liquidation)* [2015] (1) CILR 328 ...... A-2576

Exhibit 3 to Milne's Declaration -
*Marex Financial Ltd. v Sevilleja* [2020]
UKSC 31................................................................. A-2599

Exhibit 4 to Milne's Declaration -
*Primeo Fund v Bank of Bermuda (Cayman) Ltd*
[2021] UKPC 22 .................................................... A-2682

Exhibit 5 to Milne's Declaration -
*Renova Resources Private Equity Limited v
Gilbertson* [2009] CILR 268 ................................. A-2713

ix

**Page**

Exhibit 6 to Milne's Declaration -
Order 15, rule 12A of the Grand Court Rules........    A-2745

Exhibit 7 to Milne's Declaration -
*Birch v Sullivan* [1957] 1 WLR 1247 ....................    A-2749

Exhibit 8, Part 1, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ)............................    A-2754

Exhibit 8, Part 2, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ...........    A-2774

Exhibit 8, Part 3, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ...........    A-2794

Exhibit 8, Part 4, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ...........    A-2813

Exhibit 8, Part 5, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ...........    A-2829

Exhibit 9 to Milne's Declaration -
*Foss v Harbottle* (1843) 2 Hare 461 ......................    A-2847

Exhibit 10 to Milne's Declaration -
*Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204 ....................    A-2868

Exhibit 11 to Milne's Declaration -
*Johnson v Gore Wood & Co* [2000] UKHL 65......    A-2902

Exhibit 12 to Milne's Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 .....    A-2948

x

**Page**

Exhibit 13 to Milne's Declaration -
Sections 994 to 996 of the UK Companies Act
2006 ........................................................................ A-3131

Exhibit 14 to Milne's Declaration -
*Kuwait Ports Authority et al. v Port Link GP Ltd
et al.* (Court of Appeal 20 January 2023 decision)   A-3135

Exhibit 15 to Milne's Declaration -
*Rolled Steel Products (Holdings) Ltd v British
Steel Corp* [1986] Ch. 246 ..................................... A-3204

Exhibit 16 to Milne's Declaration -
*Nurcombe v. Nurcombe* [1985] 1 370 .................... A-3270

Exhibit 17 to Milne's Declaration -
*Portfolios of Distinction v Laird* [2004]
2 BCLC 741 ............................................................ A-3284

Exhibit 18 to Milne's Declaration -
*Schultz v Reynolds* [1992-93] CILR 59 ................. A-3308

Exhibit 19 to Milne's Declaration -
*Berland v Earle* [1902] AC 83 .............................. A-3333

Exhibit 20 to Milne's Declaration -
*Harris v Microfusion* [2017] 1 B.C.L.C. 305 ........ A-3355

Exhibit 21 to Milne's Declaration -
*Top Jet Enterprises Limited v Sino Jet* [2018] (1)
CILR 18 .................................................................. A-3370

Exhibit 22 to Milne's Declaration -
*Estmanco (Kilner House) Ltd v G.L. C.* [1982] 1
W.L.R. 2 ................................................................. A-3405

Exhibit 23 to Milne's Declaration -
*Cook v Deeks* [1916] 1 AC 554 ............................. A-3420

xi

**Page**

Exhibit 24 to Milne's Declaration -
*Pavlides v. Jensen* [1956] 2 All ER 518.................  A-3433

Exhibit 25 to Milne's Declaration -
*Menier v Hooper's Telegraph Works* LR 9 Ch
App 350 ..................................................................  A-3440

Exhibit 26 to Milne's Declaration -
*Heyting v Dupont* [1964] 1 W.L.R. 843 ................  A-3446

Exhibit 27 to Milne's Declaration -
*Burnford et al. v Automobile Association
Developments Limited* [2022] EWCA Civ 1943 ...  A-3460

Exhibit 28 to Milne's Declaration -
*De Sena & Anor v Notaro & Ors* [2020] EWHC
1031 (Ch)................................................................  A-3482

Exhibit 29 to Milne's Declaration -
*Williams v Natural Life Health Foods Ltd* [1998]
1 WLR 830...............................................................  A-3558

Declaration of Todd William McGuffin, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed May 16, 2023.........  A-3569

Exhibit 1 to McGuffin Declaration -
*Morton v Paint* [1996] 21 GLJ 61 ........................  A-3582

Exhibit 2 to McGuffin Declaration -
*Flightlease Holdings (Guernsey) Ltd v
Flightlease (Ireland) Ltd* [2009–10] GLR 38 ........  A-3608

Exhibit 3 to McGuffin Declaration -
*Perpetual Media Capital Limited v Enevoldsen,*
[2014] GLR 57.........................................................  A-3646

xii

**Page**

Exhibit 4 to McGuffin Declaration -
*Prodefin Trading Limited v Midland Resources*
Royal Court, 14 February 2017, Judgement
7/2017, unreported .................................................. A-3675

Exhibit 5 to McGuffin Declaration -
*Fonds v GRCF* [2022] GRC 039 ........................... A-3701

Exhibit 6 to McGuffin Declaration -
*Carlyle Capital Corporation Limited v Conway
& Ors* Royal Court, 4 September 2027, Judgment
38/2017, unreported ................................................. A-3726

Exhibit 7 to McGuffin Declaration -
*Jackson v Dear* (2013) GLR 167 ........................... A-4197

Exhibit 8 to McGuffin Declaration -
*Pilatus (PTC) Limited v RBC Trustees
(Guernsey) Limited* [2021] GRC 063 .................... A-4222

Exhibit 9 to McGuffin Declaration -
*Apex Global Management Limited v Fi Call
Limited* [2015] EWHC 3269 (Ch) ......................... A-4233

Exhibit 10 to McGuffin Declaration -
*Re Coroin Limited* (No 2) [2012] EWHC 2343
(Ch) .......................................................................... A-4288

Exhibit 11 to McGuffin Declaration -
*Grace v Biagioli* [2005] EWCA Civ 1222 ............. A-4447

Exhibit 12 to McGuffin Declaration -
*Rock (Nominees) Limited v RCO (Holdings) plc*
[2004] EWCA Civ 118 ............................................. A-4478

Exhibit 13 to McGuffin Declaration -
*Re Saul D Harrison & Sons plc* [1994] BCC 475 .   A-4496

xiii

**Page**

Exhibit 14 to McGuffin Declaration - *Apex v Fi Call Ltd* [2014] BCC 286 ..................... A-4524

Exhibit 15 to McGuffin Declaration - *Zedra Trust Company (Jersey) Limited v The Hut Group Limited* [2020] EWHC 5 ........................... A-4565

Exhibit 16 to McGuffin Declaration - *Peskin v Anderson* [2001] BCC 874 ..................... A-4591

Exhibit 17 to McGuffin Declaration - *Sharp v Blank* [2015] EWHC 3220 ..................... A-4607

Exhibit 18, Part 1, to McGuffin Declaration - *Saloman v Saloman & Co. Ltd* [1897] A.C. 22 ..... A-4624

Exhibit 18, Part 2, to McGuffin Declaration - *Saloman v Saloman & Co. Ltd* [1897] A.C. 22, *continued*............................................... A-4643

Exhibit 19 to McGuffin Declaration - *Foss v Harbottle* [1843] 2 Hare 461 ..................... A-4663

Exhibit 20 to McGuffin Declaration - *Marex Financial Ltd v Sevilleja* [2020] UKSC 31 A-4684

Exhibit 21 to McGuffin Declaration - *Prudential Assurance Co. Ltd. v Newman Industries Ltd. and Others* (No. 2) [1982] Ch 204 A-4767

Exhibit 22 to McGuffin Declaration - *Renova Resources v Gilbertson* [2009] CIFsd 10.. A-4806

Notice of Motion of Counter-Defendant Brigade Capital Management, LP's ("Brigade") to Dismiss the Counterclaims of Defendant NexPoint Diversified Real Estate Trust against Brigade, dated and filed May 31, 2023.................. A-4869

xiv

**Page**

Declaration of Jason C. Hegt, Esq., in Support of
  Brigade's Motion to Dismiss, dated and filed
  May 31, 2023 ........................................................  A-4871

Exhibit 1 to Hegt Declaration -
Indenture, dated April 16, 2015, paginated
bottom center as "Exhibit 5, Page 1 of 329" .........  A-4873

Exhibit 2 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
February 9, 2023  .................................................  A-5203

Exhibit 3 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
January 4, 2022 ....................................................  A-5211

Declaration of Mazin A. Sbaiti, Esq., in Opposition
  to Plaintiffs' Motion to Dismiss Defendants'
  Counterclaims and for Judgment on the
  Pleadings, dated and filed June 14, 2023 ...............  A-5217

Exhibit 1 to Sbaiti Declaration -
Indenture, dated April 16, 2015, labeled as
Exhibit 1 .................................................................  A-5219

Exhibit 2 to Sbaiti Declaration -
Offering Circular relating to the offering of the
Co-Issued Notes of ACIS CLO 2015-6 Ltd. and
ACIS CLO 2015-6 LLC and the Issuer Notes of
ACIS CLO 2015-6 Ltd. dated April 14, 2015 .......  A-5548

Exhibit 3 to Sbaiti Declaration -
Portfolio Management Agreement, dated
April 16, 2025, labeled Exhibit 3 ..........................  A-5768

xv

**Page**

Exhibit 4 to Sbaiti Declaration -
Red-lined version of Amended Complaint, *U.S.
Bank National Association, et al. v The
Charitable Donor Advised Fund, L.P., et al.*, Case
No. 1:21-cv-11059-GHW, dated and filed
February 23, 2022 .................................................. A-5820

Exhibit 5 to Sbaiti Declaration -
Excerpt from *Tianrui (Int'l) Holding Co. Ltd. v.
China Shanshui Cement Grp. Ltd.*, Grand Court
of the Cayman Is., April 6, 2020 ........................... A-5844

*Declaration of Bhavesh Narendra Patel, Esq., in
Opposition to Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 14, 2023 ......... A-5917

Exhibit 1 to Patel Declaration -
*Islena Airlines v Jefferson* [1998 CILR 148] ......... A-5942

Exhibit 2 to Patel Declaration -
Section 14(1) of the Exempted Limited
Partnerships Act, (2022 Revision) ......................... A-5955

Exhibit 3 to Patel Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ...................................................... A-5959

Exhibit 9 to Patel Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-5970

Exhibit 22 to Patel Declaration -
*Scott v Metropolitan Police Commissioner* [1974]
UKHL 4 .................................................................. A-6096

Exhibit 25 to Patel Declaration -
*Watson v Kea Investments* [2019] EWCA Civ
1759 ........................................................................ A-6106

xvi

**Page**

Exhibit 28 to Patel Declaration -
Cayman Grand Court Rules, Order 15, Rule 12A . A-6130

Reply Declaration of Jonathon Milne, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 28, 2023 ........ A-6133

Exhibit 1 to Milne's Reply Declaration -
*Snell's Equity* ............................................................. A-6161

Exhibit 2 to Milne's Reply Declaration -
Lewis on Trusts ...................................................... A-6166

Exhibit 3 to Milne's Reply Declaration -
*Knight v Knight* ...................................................... A-6172

Exhibit 4 to Milne's Reply Declaration -
*Hunter v Moss* ........................................................ A-6188

Exhibit 5 to Milne's Reply Declaration -
*Grand View Private Trust Co. Ltd. et al. v
Wen-Young Wong, et al.* ......................................... A-6200

Exhibit 6 to Milne's Reply Declaration -
*In the Matter of the Ta-Ming Wang Trust* .............. A-6243

Exhibit 7 to Milne's Reply Declaration -
*Helen Gorbunova v The Estate of Boris
Berezovsky, et al.* .................................................. A-6256

Exhibit 8 to Milne's Reply Declaration -
*In re Empress Engineering Company* ..................... A-6283

Exhibit 9 to Milne's Reply Declaration -
*Neste Oy v Lloyds Bank PLC* ................................ A-6290

Exhibit 10 to Milne's Reply Declaration -
*Steven Anthony Pearson, et al. v Lehman
Brothers Finance SA, et al.* .................................... A-6301

xvii

**Page**

Exhibit 11 to Milne's Reply Declaration -
*Chanan Singh Thandi v. Mark Sands and Andrew
Appleyard*................................................................ A-6399

Exhibit 12 to Milne's Reply Declaration -
*Grupo Torras S.A. and Torras Hostench London
Limited v. Bank of Butterfield International
(Cayman) Limited and Five Others* ....................... A-6421

Exhibit 13 to Milne's Reply Declaration -
*Bailey and another v. Angove's PTY Limited*......... A-6443

Exhibit 14, Part 1, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al.*........................................................... A-6463

Exhibit 14, Part 2, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al. continued* .......................................... A-7363

Exhibit 15, Part 1, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL)* ................................................ A-8366

Exhibit 15, Part 2, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL) continued* ............................... A-8397

Exhibit 16, Part 1, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another* ....................... A-8429

Exhibit 16, Part 2, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another continued* ...... A-8460

Exhibit 17 to Milne's Reply Declaration -
*Pearson v. Primeo Fund* ........................................ A-8487

xviii

                                                                  **Page**

Exhibit 18 to Milne's Reply Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ...................................................... A-8513

Exhibit 19 to Milne's Reply Declaration -
*Secretary of State for Trade and Industry and
another*.................................................................. A-8517

Exhibit 20 to Milne's Reply Declaration -
*China Shanshui Cement Group Limited v. Tianrui
(International) Holding Company Limited*............ A-8542

Exhibit 21 to Milne's Reply Declaration -
*GAO v. China Biologic Products Holdings
Incorporated* .......................................................... A-8561

Exhibit 22 to Milne's Reply Declaration -
*West Mercia Safetywear Ltd (in liq) v Dodd and
another*.................................................................. A-8604

Exhibit 23 to Milne's Reply Declaration -
*Svanstrom and Nine Others v. Jonasson*................ A-8611

Exhibit 24 to Milne's Reply Declaration -
Directors' Duties, Creditors' Rights and
Shareholder Intervention ....................................... A-8629

Exhibit 25, Part 1, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al.* ....................................................... A-8663

Exhibit 25, Part 2, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ....................................... A-8711

Exhibit 25, Part 3, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ....................................... A-8759

xix

Page

Exhibit 25, Part 4, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ........................................ A-8806

Exhibit 26 to Milne's Reply Declaration -
*Monsolor 1Q Ltd. v Woden Park Ltd.* ................... A-8825

Exhibit 27 to Milne's Reply Declaration -
*Chartbook Limited v. Persimmon Homes Limited
and Others and Another* ........................................ A-8842

Exhibit 28, Part 1, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.* ...... A-8885

Exhibit 28, Part 2, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8932

Exhibit 28, Part 3, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8974

Exhibit 28, Part 4, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-9014

Exhibit 29 to Milne's Reply Declaration -
*Yeoman's Row Management Limited and Another
v Cobbe* .................................................................. A-9027

Exhibit 30 to Milne's Reply Declaration -
*Mutter v. Eastern and Midlands Railway
Company* ................................................................. A-9080

Exhibit 31 to Milne's Reply Declaration -
*Peak Hotels and Resorts Limited v. Tarek
Investments Limited, et al.* ..................................... A-9097

xx

**Page**

Second Declaration of Bhavesh Narendra Patel in
  Opposition to the Plaintiffs' Motion to Dismiss
  Defendants' Counterclaims and for Judgment on
  the Pleadings on Plaintiffs' Claims, dated and
  filed July 19, 2023 ................................................. A-9126

Exhibit 1 to Second Declaration -
  *Arnold* v. *Britton* [2015] UKSC 36 ........................ A-9140

Exhibit 2 to Second Declaration -
  *Al Sadik v Investcorp Bank BSC & Ors
  [2017 (1) CILR 1])* .................................................. A-9189

Exhibit 3 to Second Declaration -
  *Williams v Central Bank of Nigeria* [2014]
  UKSC 10 ................................................................... A-9342

Exhibit 4 to Second Declaration -
  *Broadcasting Investment Group Ltd v Smith*
  [2021] EWCA Civ 912, [2022] 1 WLR 1 .............. A-9406

Stipulation and Proposed Order Regarding Addition
  of NHF TRS, LLC as Party, filed
  October 31, 2023 ..................................................... A-9427

Exhibit A to Stipulation-
  Counter-Plaintiffs NexPoint Diversified Real
  Estate Trust and NHF TRS LLC's First Amended
  Counterclaim, dated October 24, 2023 ................... A-9434

Exhibit B to Stipulation-
  Second Amended Complaint, dated
  October 31, 2022 ..................................................... A-9487

Stipulation and Order Regarding Addition of NHF
  TRS, LLC as Party, dated October 31, 2022 and
  filed November 1, 2023 ........................................... A-9512

xxi

                                                            **Page**

Stipulation of Voluntary Dismissal, dated and filed
    March 10, 2025...................................................... A-9518

Notice of Appeal of NexPoint Diversified Real
    Estate Trust, dated and filed March 18, 2025 ........ A-9522

Amended Notice of Appeal of NexPoint Diversified
    Real Estate Trust and NHF TRS LLC, dated and
    filed March 26, 2025............................................. A-9524


**<u>*Additional Exhibits to Declaration of
Bhavesh Narendra Patel, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023</u>**

Exhibit 4 to Patel Declaration -
    Re Hydrodam (Corby) Ltd...................................... A-9526

Exhibit 5 to Patel Declaration -
    Omni Securities Limited........................................ A-9531

Exhibit 6 to Patel Declaration -
    Hutchinson Limited v Cititrust & Ors ................... A-9553

Exhibit 7 to Patel Declaration -
    Whar-Hansen v Bridge Trust Company.................. A-9575

Exhibit 8 to Patel Declaration -
    Ritter v Butterfield Bank ...................................... A-9592

Exhibit 10 to Patel Declaration -
    AHAB v SAAD Investment Company.................. A-9634

Exhibit 11 to Patel Declaration -
    Westdeutsche Landesbank v Islington London ..... A-9910

**xxii**

Page

Exhibit 12 to Patel Declaration -
Ernst & Young v FOI Officer................................ A-9983

Exhibit 13 to Patel Declaration -
Kuwait Ports Authority v Port Link GP Ltd .......... A-10016

Exhibit 14 to Patel Declaration -
Prudential Assur Co v Newman Indus................... A-10084

Exhibit 15 to Patel Declaration -
Marex Financial v Sevilleja ................................... A-10160

Exhibit 16 to Patel Declaration -
Russell v Wakefield Water Works.......................... A-10232

Exhibit 17 to Patel Declaration -
MacDougall v Gardiner ......................................... A-10242

Exhibit 18 to Patel Declaration -
Tempo Group v Fortuna Development .................. A-10246

Exhibit 19 to Patel Declaration -
FamilyMart China v Yin-Hen Wei......................... A-10385

Exhibit 20 to Patel Declaration -
Burland v Earle ...................................................... A-10418

Exhibit 21 to Patel Declaration -
Schultz v Reynolds & Newport ............................. A-10439

Exhibit 23 to Patel Declaration -
Merkanti v Raiffeisen Bank ................................... A-10463

Exhibit 24 to Patel Declaration -
H1 of Tolleys on Administration of Trusts ............ A-10487

Exhibit 26 to Patel Declaration -
Cayman Trusts Act................................................. A-10537

Exhibit 27 to Patel Declaration -
Re China Milk........................................................ A-10539

their willingness to sell the Money Exchange to Al Sanea, and the lack of documentation from Al Sanea and the Respondents. As in all his submissions, Mr Wardell recognised the need to submit that "the Judge's conclusions were of the kind that no reasonable tribunal could have reached."[332]

366.    Mr Wardell stressed that it was no part of his case that, up to September 2000, when Abdulaziz suffered his stroke, the Algosaibis, through Abdulaziz and Al Sanea, were not aware of how the Money Exchange's financial statements were prepared and presented to the banks. It was also accepted that this was a fraud on the banks.[333] But, it was not accepted that the other Algosaibis participated in that fraud; and, after September 2000, only Al Sanea was a party to that fraud.

367.    Thus it was submitted that there was nothing in the board resolutions relied on by the Chief Justice that was immediately suspicious of fraud, referring as they did to "appropriate" adjustments to "both sides of the assets and liabilities". On their face, the resolutions do not explain the fraudulent consequences of the accounting practices. Yousef gave evidence that he did not understand the accounting issues put to him. Suleiman was not a sophisticated businessman, and his signature on even objectively dishonest board resolutions was not to be held against him, and, having died, he could not speak for himself. There was no evidence that correspondence between El Ayouty and Abdulaziz was shared with the other Algosaibis, and the correct inference was that Abdulaziz kept matters to himself, especially given the tension between Al Sanea on the one hand and Suleiman and Yousef on the other.

368.    Meanwhile the manipulations and forgeries committed by Al Sanea would have been unnecessary if there had been complicity.

369.    As for the documents found in Saud's safe or coming from his villa, for instance the 1994 Audit Pack, and the correspondence between Abdulaziz and El Ayouty, there was no evidence that Saud had read and understood them previously to May 2009. There was no evidence as to the note "Saud received full report" written (by whom, when and why?) on Attachment 9 to the 2002 Audit Pack.

370.    As for the Audit Packs in general, although the Chief Justice found that Suleiman, Yousef and Saud had received them on an annual basis, there was no contemporaneous document which proved that, or that they had read and understood them. Hearsay evidence from El Ayouty was not a safe basis for such a finding. Although the Chief Justice criticised AHAB for not calling El Ayouty, that criticism was equally or better aimed at the Respondents, who bore the burden of proof. There was no evidence that Abdulaziz had shared the Audit Packs or El Ayouty's correspondence about them with Suleiman and Yousef. Although a draft of a letter to El Ayouty, dated 28 June 1994, purportedly to be signed by each of Abdulaziz, Suleiman, Yousef, and Al Sanea,[334] was relied on by the Chief Justice as standing for an original signed version having been sent and suppressed, he was wrong to do so.

371.    The finding that Yousef had received the 2008 Audit Pack in April or May 2009 was unsafely based on cross-examination which did not ask a direct question. In any event, this was too close to the final denouement to be significant. His signature on a resolution dating from 1988, albeit objectively dishonest, was not to be held against him as showing his understanding of its dishonest implications: accounting matters were "like Chinese" to him.[335] He was, during at any rate the earlier part of the Abdulaziz period, a member of the younger generation, without

---

[332] AHAB's Written Submissions, para 13.7, **AB/1.13/4**
[333] But AHAB reserved the question whether Abdulaziz was aware that this was dishonest.
[334] **G/1562**, see at para 50 above
[335] Day 34.73

decision-making responsibility, who readily accepted wherever Abdulaziz led.[336] Later, he pressed Abdulaziz to close the Money Exchange and when, in December 1999, he wanted to review the Money Exchange's financial position, he had to go to El Ayouty for a copy of the 1998 Audit Pack, for the very reason that he had not got it and could not get it from Abdulaziz (see at para 56 above). His letter to Abdulaziz of 26 December 1999 complained both of Al Sanea's borrowings but also of a failure to distribute the Money Exchange's profits – which demonstrated that he failed to understand that the Money Exchange was in fact operating at a loss.[337] Thereafter he washed his hands of the Money Exchange. Yousef's evidence at trial was that of an unwell, elderly and confused man[338], whose evidence had to be cut short on doctor's advice. It was not a safe basis of findings of complicity with fraud.

372. There was no evidence that any of the AHAB Partners played a role in producing figures for the Money Exchange: that was the province of Mr Hayley and Al Sanea.

373. Dawood's signing of documents, after his father Suleiman's death, in February 2009 was insubstantial evidence of any relevant knowledge. Dawood had had nothing to do with the Money Exchange for many years. His evidence was that he signed the facility documents put in front of him to sign, without understanding their significance. The authenticity of Dawood's facility documentation, having previously been disputed (relevant documents were on AHAB's forgery schedule) was accepted in the course of the appeal: on that basis AHAB "does not challenge the finding that Dawood had knowledge of this borrowing". However, AHAB submitted that this was of no further consequence, for instance it threw no light on AHAB's general knowledge of the extent of the borrowings, or on New for Old, or on AHAB's forgery case (seeing that Al Sanea presumably did not as yet have the means for reproducing Dawood's signature), and that the Chief Justice was unfair to find that it did, especially seeing that Dawood was new to the business of the Money Exchange.[339]

374. "The overarching point" in AHAB's submissions "which the Judge failed to identify and acknowledge was that whatever level of knowledge Abdulaziz could be held to have had on an objective basis, that did not automatically equate to Suleiman and/or Yousef and/or Saud also having the same knowledge."[340]

375. The Chief Justice inferred from the Money Exchange board resolutions and the Audit Packs that the AHAB Partners intended to keep a close eye on its affairs. But they were prevented from doing so by Al Sanea's secrecy and dishonesty. There was no oversight of the Money Exchange (other than by Abdulaziz in his lifetime). And where Abdulaziz, as he sometimes did, had signed resolutions on behalf of Suleiman and Yousef as well, it was illegitimate to infer that he did so with their knowledge and understanding.

376. In effect, the Chief Justice had adopted a "presumption of fraud", by inferring dishonesty from the partners' signatures on documents and then requiring them to meet the burden of disproving the inference. Such signatures (even of objectively dishonest documents) were not enough to demonstrate "full, guilty knowledge of any fraud on the banks".[341]

377. On the contrary, there was evidence of Abdulaziz choosing how and when to present financial information about the Money Exchange to the other Algosaibis, as well as of tension about such matters between Abdulaziz on the one hand and Suleiman and Yousef on the other.[342] In this,

---

[336] AHAB's Written Submissions, para 13.56(3), **AB/1.13/34**
[337] AHAB's Reply Submissions, para 5.63, **AB/10.5/23**
[338] Yousef was 70 at the time of trial. He had undergone heart surgery in 2016 not long before the trial started.
[339] AHAB's Written Submissions, **AB/1.13/80-84**
[340] AHAB's Written Submissions, para 13.40, **AB/1.13/23**
[341] AHAB's Written Submissions, para 13.50(4), **AB/1.13/29**
[342] **G/1539.4, G/1552, G/1759, G/1761**

as in other respects, Mr Wardell complained that the Chief Justice did not address AHAB's closing submissions at trial, and put himself too much in the hands of the Respondents' submissions.

378.   In sum, Mr Wardell submitted that, down to Abdulaziz's passing from the scene in 2000, "the contemporaneous documents did not provide the evidential support for the Judge's findings and the Judge should have concluded that Yousef and Suleiman (and later Saud) had no knowledge and were not complicit in any fraud."[343]

379.   As for the position post October 2000, the Chief Justice wrongly built upon his erroneous findings as to the earlier period. He was right to say that Saud came to adopt the previously established accounting practices, but wrong to find that he did so knowing them to be fraudulent, or intending to continue with a fraud on the banks. The signatures of Suleiman, Yousef, Saud and Al Sanea on resolution R/66 of November 2000, were not indicative of fraud, even if that resolution (and repetitions of it) continued with the accounting practices of Abdulaziz's era.[344] The Chief Justice was thereby erroneously continuing with his presumption of fraud.

380.   As for Suleiman, the Chief Justice was wrong to infer that he would have wished to inform himself about the affairs of the Money Exchange, which was mere speculation. In any event, the Chief Justice failed to give proper weight to the extent that Al Sanea was able to pull the wool over Suleiman's (and his fellow partners') eyes by manipulation and forgery. The Chief Justice found forgery and manipulation unproven because he was completely (but wrongly) satisfied as to the Algosaibis' knowledge. He should rather have weighed both strands of the argument together and concluded that forgery and manipulation (of which there was good evidence) had been proved as part and parcel of a failure by the Algosaibis to get on top of Al Sanea's fraud against the banks and thus themselves as well.

381.   It was only in 2002, as a result of Saud's Calculations, that Suleiman came to be on notice of Al Sanea's borrowings, whereupon he instituted the New for Old regime in order to curtail and monitor them, albeit unsuccessfully. However, the Chief Justice was wrong to find that Suleiman was thereafter able to monitor and understand the fraud that continued to be perpetrated, given his lack of sophistication, the dishonesty of Al Sanea's reporting, and the absence of good evidence of receipt, reading and understanding of a full series of Audit Packs. Thus even El Ayouty, when they finally provided disclosure in 2015, only produced Audit Packs for 2004 to 2008.  For instance, Yousef in his cross-examination said that he had only once received an Audit Pack from El Ayouty, and that had been back in Abdulaziz's time. As for Saud, although the 1994 Audit Pack was found in his safe in his villa, he denied having read it, and it could not be said that that and other documents found there had been seen and read before the collapse. Saud's List and Calculations might suggest that Saud had read the Audit Pack for 2001, or parts of it, and also perhaps previous years' Audit Packs, but not that he had access to Audit Packs in subsequent years. In the absence of proper production of documents from El Ayouty, or live evidence from them adduced by the Respondents, and in the light of their clear complicity in fraud, the Chief Justice should not have paid any regard to hearsay statements from El Ayouty following the Money Exchange's collapse, to the effect of the AHAB Partners receiving regular annual Audit Packs. Even Al Sanea had not disclosed the Audit Packs to the GT Defendants or said that the Algosaibis had been provided with them year by year.[345]

---

[343] AHAB's Written Submissions, para 13.78, **AB/1.13/45**
[344] AHAB's Written submissions, para 13.83-4, **AB/1.13/47**
[345] AHAB's Reply Submissions, para 5.28, **AB/10.5/11**, where "key submissions" with respect to the Audit Packs are, among other places, collected.

382.    As for Saud's Calculations, the Chief Justice was wrong to have drawn much assistance from them, to the effect that Saud had ongoing oversight of the Money Exchange and the extent of Al Sanea's borrowings, and had lied about his total ignorance about the Money Exchange's affairs prior to the Calculations' discovery among the N Files. The proper inferences that should have been drawn were: that they were consistent with Saud not having access to the full 2001 Audit Pack, and the truthfulness of his evidence about his general ignorance. The Calculations were unnecessary if Saud had full oversight of all that was going on. The natural inference from them was that Suleiman, Yousef and Saud did not receive the Audit Packs. Moreover, they only presented a snapshot at a single point of time, prior to the imposition of New for Old and Al Sanea's promise that his borrowings were reducing. AHAB submitted:

> On a proper analysis of the evidence as a whole and the inherent probabilities, Saud's Calculations show a lack of knowledge and monitoring of Al Sanea's borrowing prior to 2002 on Suleiman's, Yousef's and Saud's part. They support AHAB's case that henceforth the Algosaibis were not willing for Al Sanea to continue racking up as much debt as he liked and siphoning off as much of that as he liked for himself. They provide no evidence of the ongoing monitoring of Al Sanea's activities thereafter and no evidence of the Algosaibis' knowledge of what Al Sanea was doing in 2003 onwards. The Judge should have so found.[346]

383.    The Chief Justice was also wrong to have ignored Mr Hayley's evidence that each year it was Al Sanea, with Mr Hayley's help, who cooked up the figures which were to be presented to the banks, and which El Ayouty would certify. Saud had no hand in that.

384.    As for the Financial Businesses, whatever the Algosaibis may have known about their being established paled into insignificance compared with the use that Al Sanea had gone on to make of them to enhance his ability to borrow via the Money Exchange. References to the Financial Businesses in the Audit Packs and other financial statements are subject to the submissions about the availability of them to the Algosaibis. In essence, the little the Algosaibis knew about the Financial Businesses did not amount to an insight into Al Sanea's fraudulent use of them, either as against third parties or against themselves. Thus, as AHAB put it in their Written Submissions:

> 13.130  The same is true of any initial "*intention behind TIBC…to provide a respite from the liquidity problems of the Money Exchange*" which was held by the Algosaibis themselves.[347] Once it is recognised that the Algosaibis knew, and had accepted even before the trial started, that the Money Exchange share portfolio was funded using third party borrowing, it is consistent with their case that, if the share portfolio was not sold, they would need to have access to borrowing to support the carrying cost of the share portfolio whether via the Money Exchange or, if no banking licence was granted to the Money Exchange and it was forced to close down for regulatory reasons, through another entity.

> 13.131  However, the Judge should have found that that was not evidence from which it was appropriate to draw an inference of the Algosaibis' knowledge of or consent to: (a) how TIBC ultimately operated; or (b) how much money was raised by TIBC; or (c) how money paid into TIBC was siphoned off to STCC.[348]

---

[346] AHAB's Written Submissions, para 13.105, **AB/1.13/69**
[347] Judgment, para 887, **AA/2.4/359**
[348] AHAB's Written Submissions, **AB/1.13/83**

385.    The Chief Justice was also wrong to have placed reliance on Ledger 3 (where Al Sanea's withdrawals from the Money Exchange were meticulously recorded and then summarised each year in Attachment 9 to the Audit Packs). However, the Audit Packs did not record fictitious transactions which operated to the Money Exchange's loss but did not increase Al Sanea's indebtedness, such as the foreign exchange and letter of credit transactions.[349]

386.    Key passages in AHAB's Reply Submissions which seek to summarise their case on ignorance of Al Sanea's borrowings and his separate fraud against them include the following:

> 5.54…The short responses to this are: (a) Al Sanea had been put in charge of the Money Exchange early on; (b) it was regarded as his domain with which the likes of Suleiman and Yousef could not interfere whilst Abdulaziz was still alive; (c) after Abdulaziz's stroke Al Sanea went to great lengths to ensure that his control was absolute; (d) Al Sanea was a family member, and whilst not liked, he was not distrusted to the extent that the family thought he was or might be defrauding them, including by forging their signatures; (e) there was a check on his activities in the form of the "*new for old*" policy and (f) Al Sanea had told Saud that he had repaid some of his indebtedness.
>
> 5.55 One of the key, unsafe findings of the Judge is the inference that a person's signature on a document is evidence that the party signing it has read and understood its content. The Respondents submit that the Judge cannot be criticised for this inference. The evidence which they rely upon to support the Judge's conclusion is insufficient. Properly analysed, there is no corroborating evidence to suggest that Yousef and Suleiman (or Saud) understood the full import and consequences of what they were signing in respect of individual documents. … The mere fact that they may have done so does not mean that they understood the implications particularly when those implications are not clear on the face of the document itself.
> …
> **Conclusion on Partner knowledge**
> 5.89 The Respondents' submissions in several, material, places are factually wrong. Their analysis of the relevant legal principles is also incorrect. Lastly, the impermissible inferences drawn by the Judge that they seek to uphold in respect of partner knowledge are based on loose theories that are unsupported by the evidence and contradicted by contemporaneous evidence.[350]

*The Respondents' submissions*

387.    The Respondents in their turn strike three core themes. The first is that AHAB's root and branch attack on the judgment below is misconceived. The second is that AHAB's claim and now their appeal is wholly undermined by their dishonesty and their dishonest attempts at suppressing disclosure. The third is that the evidence of the AHAB Partners' knowledge, both of Al Sanea's borrowings from the banks and of his use of those borrowings to increase his own indebtedness to the Money Exchange, is overwhelming.

388.    As to the first of these themes, the Respondents underline both the vastness of the universe of the trial and the relative inadequacy of the "island-hopping" being conducted on appeal. In this connection, they also emphasise the enormous understanding that the Chief Justice brought,

---

[349] AHAB's Reply Submissions, paras 5.30-5.34, **AB/10.5/12-14**
[350] AHAB's Reply submissions, paras 5.54-55 and para 5.89, **AB/10.5/19-20, 37**

through his experience of the many interlocutory proceedings in the case over half a decade even before trial, to the material in the case.

389.   As to the second of these themes, the Respondents point to the following matters: the assertion by Saud in his witness statements to the Commercial Court in London, and again in his 2010 affirmation to the Grand Court in the Cayman Islands (challenging jurisdiction), that Al Sanea's suggestion that the Algosaibis knew anything at all about Al Sanea's unauthorised borrowing from the banks or the Money Exchange was absurd; the abandonment of the defence in the London proceedings when belated disclosure of the N Files was produced, a collapse which was inconsistent with such professed ignorance and thus with lack of AHAB's authority; the consequential discharge by consent of the world-wide freezing orders which AHAB had obtained in July 2009 from the Grand Court against the Respondents; the development of the New for Old case put forward in these proceedings, about which the Chief Justice commented in his leave to amend judgment of 2 December 2011 that it was a "seismic shift", a "fundamental change" from a case based on "complete lack of authorisation…to one of qualified authorisation". In the face of lies which had had to be admitted (along with the emergence of Saud's Calculations and the Audit Packs) and which had previously underpinned AHAB's defence to the London proceedings and had succeeded in obtaining a world-wide freezing order against the Respondents, AHAB's submission that the Chief Justice has misjudged the evidence given to him by the AHAB Partners was hard to understand.

390.   The suppression of proper disclosure was part of that dishonesty. Prior to the discovery of the N Files, the existence of the Audit Packs had been unknown: they had not previously been referred to in either the London or Cayman proceedings. Yet AHAB accepted in opening the trial below that they provided a "more or less accurate understanding of what was really happening at the Money Exchange".[351] On disclosure, AHAB produced only three Audit Packs (for 1994, 1996 and 2008), despite evidence that Abdulaziz kept them neatly in his safe, and despite the fact that they were delivered at least to Suleiman during his era. One explanation for this was the ransacking of AHAB's documents by the Young Algosaibis. Another was the absence of proper disclosure from AHAB's auditors, El Ayouty: indeed, a file of correspondence between AHAB and El Ayouty, recovered by Deloitte from AHAB's office and listed for disclosure, went missing.[352] It was only as a result of the Respondents' insistence that AHAB approach El Ayouty not long before trial, leading to a court order, that some further material (including a run of Audit Packs from 2004) were obtained. There was also late disclosure of an attendance note made in March 2010 of a meeting between El Ayouty and Deloitte (including Mr Charlton), leading to hearsay evidence of that meeting, where the El Ayouty representatives spoke of the Audit Packs, of separate meetings with the Algosaibis, and of their principal points of contact over the years as having been with Abdulaziz, Suleiman and Saud. In a letter addressed to the Saudi State Prosecutor dated 29 May 2010, El Ayouty said that the AHAB Partners' claim "that they did not know is unacceptable". The Chief Justice was entitled to find that AHAB had not called El Ayouty to give evidence because they knew that such evidence would have been damaging to them.

391.   In such circumstances, the Chief Justice's findings that Suleiman, Saud and Yousef were aware of the Audit Packs and able to use them to monitor Al Sanea's activities was inevitable; as was his finding that New for Old was another lie. As for the latter, there was no document which formalised that supposedly significant limitation on Al Sanea's authority. In any event, during the evidence, Saud was compelled to admit that it had to allow for "a little bit extra for interest" – since the logic of the Money Exchange's investments was that its income from them was always exceeded, and by no means insignificantly, by the interest on its borrowings.

---

[351] **Day 2/71**
[352] Judgment, **AA/2.4/82**, footnote 134 at para 164 of section 1

392.  On the subject of AHAB's knowledge in general, the third of their core themes, the Respondents developed their submissions as follows.

*(i)  An overview*

393.  At a high level, the Respondents submit that AHAB are unable to present a coherent narrative to explain the history of events; that instead they resort to a multitude of individual criticisms of the Chief Justice's findings; and that in this context they appear oblivious to the limitations imposed on an appeal on the facts of such a kind. They categorise AHAB's main themes as reliant on a new case of "fully informed consent" (see above), on the inherent improbability of AHAB risking so much for little return, and on Al Sanea's dishonesty and alleged forgeries. As to Al Sanea's borrowings, these were authorised as an available facility to him from the Money Exchange: his borrowings were recorded in Ledger 3 and audited each year in the Audit Packs and summarised there in Attachment 9, as his indebtedness. Subject to the allegation of an undocumented regime of New for Old, no limit or revocation was ever recorded or placed on his ability to borrow. Indeed, it was common ground that before 2000 Abdulaziz had permitted him to borrow, and New for Old is in its own way a recognition of that fact. His borrowings were part and parcel of the borrowings from the banks which he arranged. Those bank borrowings financed both AHAB's share portfolio and his own business. The two were intertwined.

394.  As it is, no claim is made in these proceedings with respect to any of Al Sanea's borrowings or activity prior to 2000, by which time his borrowings already stood at $ 1 billion. AHAB's own expert, Mr Hatton, referred to Ledger 3 to support his conclusions.

395.  In the circumstances, it was entirely reasonable for the Chief Justice to conclude that the arrangement whereby Al Sanea was allowed to borrow for his own purposes was part and parcel of his activity of raising bank borrowings to support AHAB's own investments. As the Chief Justice found, this was –

> the only explanation for the AHAB Partners' failure to heed the faithful advice rendered by El Ayouty each year to them about the reckless borrowing policy and the Al Sanea indebtedness, all of which was meticulously detailed in Attachment 9 to their Audit Packs. This meticulous record of the Al Sanea indebtedness crucially reveals the intention as between himself and AHAB, contrary to AHAB's case of lack of knowledge and authority, that his indebtedness was all expected to be repaid.[353]

396.  The Chief Justice did not proceed by ascribing to each of the Algosaibi protagonists the knowledge that Abdulaziz possessed, just because Abdulaziz possessed it. Rather he investigated and concluded that each of Suleiman, Saud, and Yousef knew of and authorised Al Sanea's activities at all relevant times, and Dawood knew of the position in 2009.

*(ii)  The purpose and nature of the Money Exchange*

397.  The Chief Justice observed that the fraud on the banks was the *raison d'être* of the Money Exchange, it was its central premise, it was in its DNA.[354] It was the means of raising and maintaining the capital needed to invest in banking shares, and remained so throughout its life. It was therefore no wonder that Abdulaziz wanted, and Al Sanea was permitted, to conceal its activities from outsiders (which did not include the family auditors, El Ayouty), and why, come the collapse, when outsiders, in the form of Deloitte and others, had to come on the scene, there was an exercise in denial and suppression of documents. That secrecy started from

---

[353] Judgment at **AA/2.4/430**, section 2 at para 13-14
[354] Judgment at **AA/2.4/1188-1189**, section 7D at paras 71-72

the beginning, and was such as to be found recorded in Abdulaziz's memorandum of 27 July 1987, where he said:

> …all Exchange business documents of special importance, which are to be seen by partners from time to time…are to be kept in the main safe, which is under the supervision and responsibility of Mr Omar Saad, head of the Main Centre's accounts.[355]

398.   Abdulaziz's memorandum, addressed to the board directors of AHAB, dictated the rules of the game. It opened by speaking of a "commitment to confidentiality", of "building" and "laying down sound foundations for this financial edifice", and continued:

> …I find it is important that all members are to be aware of all what is happening in the Exchange sector…as the following policy has been laid down for the next phase…

Provision was then made for semi-annual accounts to be managed by Dr Sami, for monthly review balances, for any partner to seek additional data from Al Sanea, but all subject to the need for the important documents to be kept in Abdulaziz's safe. The memorandum concluded by underlining "the power of our financial reputation among foreign and international banks" and looked forward to largescale additional borrowings, such as SAR 100 million from one bank ("while the size of our facilities did not exceed ten million riyals during the last thirty years"), and "doubling our facilities from local banks".

399.   Thereafter, as Saud himself accepted, the Money Exchange was not discussed again at AHAB's board meetings, nor mentioned in any board minute.[356] Mr Fakhri confirmed that this was a matter of policy, "because it was a private family affair".[357] For the most important part of AHAB's business to be treated in this way spoke legions.

400.   The Chief Justice therefore found that AHAB's purpose in establishing the Money Exchange was to "access funds on a scale never before available to it", against the background of the stagnation of its existing business.[358] AHAB's board resolution of 27 July 1981 spoke of "a new activity".[359] As it was, in his comments of 3 May 1990, El Ayouty wrote that the Money Exchange's shortage of equity funds had always existed "ever since it started its activity and right up until the present time", while "funds borrowed from the banks…increases the speculative nature of the ownership [of its investments]".[360] Yousef accepted that the retention of the share portfolio was a long-term strategy, which ensured that the borrowings could not be repaid and would lead to ever-increasing borrowing.[361] Meanwhile, the ownership of those shares gave the Algosaibis a prestige which they sought and enjoyed.

401.   The Money Exchange's fraud on the banks is common ground, and AHAB's reservations about Abdulaziz's self-knowledge of dishonesty, or about any knowledge at all on the part of Suleiman or Yousef, are unrealistic. Abdulaziz, Suleiman and Yousef signed the critical accounting records which led to the misleading of the banks. El Ayouty needed their approval of the process.

[355] **H29/85.1/2**
[356] **Day 59/106**
[357] **Day 87/125-126**
[358] Judgment at **AA/2.4/54**, section 1 para 83
[359] **G/885/1**
[360] **G/1304.3**
[361] **Day 31/45, Day 31/93**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*
101

*(iii) The Audit Packs*

402.   The Audit Packs set out the true position of the Money Exchange. Ledger 3 was the separate ledger within the accounting records of the Money Exchange which, as the Chief Justice recorded, "meticulously, completely and accurately" recorded Al Sanea's indebtedness.[362]

403.   The Chief Justice concluded a lengthy review of the evidence relating to the Audit Packs in these terms (and in essentially his own words):

> While it cannot be found that the Partners collectively or individually would have considered each and every one of the Audit Packs or Financial Statements, the foregoing examination undertaken in this Judgment satisfies me that each of Abdulaziz, Suleiman, Yousef and Saud would have seen and considered significant numbers of these records, so much so that there can be no reason to doubt that they would have been aware of the mounting indebtedness of the Money Exchange (including as acquired through the Financial Businesses) and of the increasing Al Sanea indebtedness.[363]

404.   AHAB argued that there was no contemporaneous record that the partners, other than chairmen Abdulaziz or Suleiman, had actually received the Audit Packs.  However, the Packs were recorded to have been "delivered" to the chairman of AHAB, were intended for the partners generally ("for the attention of all Partners"), and were backed by representation letters signed by the chairman.[364] Prior to 2000, Suleiman and Yousef as well as Abdulaziz, and after 2000, Yousef and Saud as well as Suleiman, are seen to have engaged with the Audit Packs on a number of occasions. Their existence, and reliability, must have been known to the partners. It is not plausible that the partners did not make use of the opportunity to consult them. Nor is it plausible that the partners would have set a course of borrowing ever increasing sums without oversight. El Ayouty's commentary was consistently critical of the situation, and of Al Sanea's privileges.

405.   It is known that the 1994 Audit Pack was found in Saud's safe. It is to be inferred that it came from Abdulaziz's safe, presumably with other Audit Packs of the Abdulaziz era. And at the other end of the story, Yousef accepted that he probably received the 2008 Audit Pack, and gave it to Saad or Saud. [365] Saad said he gave it to Saud. Saad also confirmed that there were annual meetings between El Ayouty and the chairman.[366] While no signed copies of the representation letters have come to light, there is no complaint from El Ayouty of their absence. One of the purposes of the Audit Packs, as revealed by their Attachment 9, was to record the indebtedness of Al Sanea. El Ayouty's narrative report also repeatedly underlined the extent of Al Sanea's withdrawals, and the absence of interest ("commission") charged on many of his accounts. Another of the purposes of the Audit Packs was to record the full extent of the Money Exchange's bank borrowings, as revealed in Attachment 8. These two attachments revealed the full extent, each year, of both the Money Exchange's and Al Sanea's borrowings. This must have been obvious to any reader or recipient of them privy to the basic purpose and workings of the Money Exchange. The Respondents underline that the Audit Packs were "a comprehensive *ex post facto* critique of the financial information supplied by the Money Exchange for any given year."[367] They were specifically designed for the Algosaibi family, not for the presentation of accounts to the world. And they were critical of Al Sanea. Mr Hayley

---

[362] **Judgment AA/2.4/47**, footnote 78
[363] **Judgment AA/2.4/399**, section 1, para 970
[364] Copies of the representation letters for 1999, 2000, 2001, 2003, 2005, 2006 and 2008 survive.
[365] **Day 38/62**
[366] **Day 90/30**
[367] Respondents' Submissions, **AC1/5/53**, para 106

appears to have played no role in them. AHAB's case at trial that (after 2000) they were provided only to Al Sanea is absurd.

406.  It is implausible to think that missing Audit Pack documents have not been suppressed, and that those which have emerged have done so either by accident or under compulsion, as the Chief Justice concluded. Thus some attachments, but in Arabic and untranslated, were disclosed during the London proceedings. But it was not until after discovery of the N Files that a full Audit Report (for 1994) was found in Saud's villa safe. Significantly, Attachment 9 for 1998 was found in Saud's villa, Attachment 9 for 2001 was found, with Attachment 8, in the N Files, Attachment 9 for 2002 was found in Saud's villa (with manuscript notation "Saud received full report"), and Attachment 9 for 2008 was also found there.[368] Saud's manuscript comment by way of his reply to Al Sanea's letter of April 2001 ("The financial statements for the last 5 years have the same comments")[369] confirm that Saud had access to the Audit Packs generally. It was only under the compulsion of the court that AHAB were forced to go to El Ayouty for further disclosure, which produced the Audit Reports for 2004-2008.

407.  Saad's evidence was that Abdulaziz would have an annual meeting with El Ayouty at which the Audit Reports were discussed and signed off. They were filed in Abdulaziz's safe. Saad however was not privy to the meeting or the Packs.[370] This was despite the fact that he was AHAB's chief bookkeeper. After Abdulaziz's stroke, the meetings took place with Saud.[371]

408.  El Ayouty should have been AHAB's witnesses, but were not called by them. But their hearsay evidence, taken in part from their letter dated 29 May 2010 to the chairman of the Saudi Public Prosecutor, was that "the partners' claim that they did not know is unacceptable".[372] On 25 March 2010 El Ayouty had met with Mr Charlton and Mohammed Algosaibi. A note of the meeting was made, which was not disclosed until Mr Charlton gave evidence.[373] Part of it also entered hearsay evidence. They said that their principal points of contact over the years had been with Saad, Abdulaziz, then Suleiman, and Saud. They had discussed the level of borrowings with Suleiman, who was upset to learn they had risen. The Packs were also sent, at any rate in more recent years, to Al Sanea. The 2008 Pack was sent to Saud and Al Sanea in May 2009.[374] AHAB's submission, that El Ayouty were lying, was a matter for the Chief Justice, who was entitled to conclude that it was consistent with the documentary evidence in general.[375] The Chief Justice was also entitled to draw adverse inferences from AHAB's failure to call El Ayouty: see *Wisniewski v. Central Manchester HA* [1998] PIQR 324, 340. El Ayouty were AHAB's long-standing auditors, whom they had served loyally. Their 2008 Audit Pack "as it did every year, contained all the bad news, reporting truthfully on the state of the Money Exchange, its liabilities and Al Sanea's withdrawals".[376] They may have been complicit in AHAB's fraud, but they had not been negligent. AHAB never sued them, although AHAB's position in these proceedings was that they had colluded with Al Sanea against them. AHAB did make formal demands for documentation from El Ayouty, on two occasions (in 2009 and 2011), but not in such a way as to seek their cooperation.[377] Mr Hayley's unsatisfactory hearsay evidence, when it emerged, that El Ayouty had told him that they had stopped having meetings

---

[368] The reference details are accumulated at para 112(5) of the Respondents' Submissions at **AC1/5/56**
[369] **N/277**
[370] **Day 90/30-32,  53-54**
[371] **Day 89/5**
[372] **M/41/2, C4/5/2**
[373] Its existence only emerged in Mr Charlton's cross-examination. Privilege was claimed, but the Chief Justice ruled that it was not privileged.
[374] **C4/8**
[375] **Judgment AA/2.4/147,** para 342 of Section 1
[376] Respondents' Submissions, **AC1/5/67,** para 150(3)
[377] **M/85/4, M/70.2**

with Saud in 2005 was neither here nor there. It confirmed Saud's involvement up to 2005, and it left no explanation for any lack of involvement thereafter.

*(iv) Suleiman and Yousef*

409.   Suleiman and Yousef go back to the beginning of the Money Exchange. Suleiman was chairman (acting or confirmed) from 2000 to 2009. Yousef was chairman until close to the end. They were chairmen for all but the last three months of the period relevant to AHAB's claim.

410.   AHAB rely on their allegations that Suleiman and Yousef disliked Al Sanea and wanted the Money Exchange to close. Be that as it may, they could not extricate themselves. Even the New for Old regime recognised the ongoing need to maintain the fraudulent bank borrowings with additional borrowing to meet interest needs. Apart from the fact that the Algosaibis enjoyed their influence at SAMBA, there were two main impediments to the unwinding of the Money Exchange. One was that the value of their investments only intermittently exceeded their borrowings. And the other was that they needed Al Sanea's agreement, not only because he was a large borrower himself, but also because he was a partner in the Money Exchange with a 20% claim to profit on the shares.

411.   In any event, the premise of their dislike of Al Sanea and of the operation conducted by him merely serves to underline the incoherency of AHAB's case that they did not make it their business to know what was going on. In these circumstances, so far from the Chief Justice's findings being irrational, they were close to inevitable. Yousef himself recognised that AHAB's case would ("probably") justify calling them "incompetent".[378]

412.   As it is, their signatures on numerous Money Exchange documents attest to their knowledge. AHAB submit (a) that some signatures are forged, and (b) that in any event a signature does not prove that the documents had been read or understood. However, the Chief Justice was entitled to reject the latter submission (made in the context of a discussion of Dawood's role) as implausible, indeed "surreal".[379] Subject to the forgery case, there is no allegation equivalent to *non est factum*. They were experienced and successful men of business, even if Suleiman was no Abdulaziz.[380] The dislike and suspicions ascribed to them would make them all the more cautious about taking anything on mere trust. They were not ill or infirm. Their signatures are repeated year after year. Their signatures are consistent, not inconsistent, with the overall evidence of knowledge. AHAB cannot sustain the unreality of treating them as simpletons. If, as was said, Suleiman was not a confident or natural businessman, he had those around him, such as Saud, whom he could consult. Yousef agreed in his evidence that he would read a document before he signed it ("Yes, of course, yes").[381] AHAB's forensic suggestion that the Chief Justice acted on a presumption of fraud must be rejected.

413.   Yousef borrowed funds from the Money Exchange for his private business and for his home, but did not repay his borrowings. He and Suleiman knew that the advertised capital of the Money Exchange had not been paid up, while enjoying its dividends. Yousef acknowledged that the advertised capital was misleading.[382]

---

[378] **Day 38/69**
[379] **Judgment AA/2.4/365,** para 893 of section 1, citing oral submissions of Mr Quest at trial
[380] **Judgment AA/2.4/75,** para 145 of section 1: speaking of the Algosaibis generally, the Chief Justice found: "Each in his own right was or is a knowledgeable and experienced man of business, responsible in turn not only for the Money Exchange but for other very substantial and sophisticated areas of operation of AHAB's widespread business interests."
[381] **Day 30/84**
[382] **Day 31/80-82, 87-88**

414.    Although the signature of the chairman of AHAB would be enough to bind all its partners, on important occasions when changes in fraudulent accounting practices were recorded, all partners signed, as the Chief Justice found.[383] Yousef accepted that he read such documents (annually repeated), and Suleiman, having died, could not rebut the inference to be derived from his signatures. Suleiman and Yousef must therefore have known that the true picture could not be obtained from the financial statements presented in English to the banks, and would have to be derived from elsewhere, viz the separate statements produced in Arabic, and the consolidation of these in the Audit Packs. The Respondents ask rhetorically, for whom were such statements in Arabic provided if not the AHAB Partners?

415.    Although AHAB rely on correspondence with El Ayouty being addressed only to Abdulaziz or only from Abdulaziz, it is wrong to criticise the Chief Justice for inferring that such information was shared with Suleiman and Yousef. On the contrary, the fact that all partners had signed critical resolutions of the Money Exchange demonstrates that the critical information was shared. That is what Abdulaziz expressly stated in his letter to El Ayouty dated 11 May 1994 he would be doing.[384] AHAB have not pleaded any suppression by Abdulaziz, and any such case would be inconsistent with AHAB's non-acceptance of any subjective dishonesty on the part of Abdulaziz. AHAB's reliance on Abdulaziz's remark in his letter to Al Sanea dated 24 November 1997 that "As you also know I have delayed informing some of the partners of the balance and statements of the main centre because I was hoping for the end of the Exchange [branch] so that I can show them everything at once" is equivocal.

416.    Yousef's December 1999 complaint, also relied on by AHAB, showed that Yousef knew about the Audit Packs, knew how to get one when he wanted to, and knew his way around them when he wanted to find out how much Al Sanea owed to the Money Exchange.

417.    In September 2000 Abdulaziz suffered his stroke. On 26 November 2000, Suleiman, Yousef, Saud and Al Sanea all signed resolution R/66, which resolved to adopt the previous decisions in relation to the Money Exchange.[385] It expressly referred to resolution R/2 of 28 February 2000, signed by Abdulaziz on behalf of all the partners, which repeated the ongoing practices of fraud, such as the capitalisation of interest and the necessary adjustments to the English language financial statements.[386] A copy of R/2 was found both in the N Files and in Saud's safe. Resolution R/66 was repeated each year down to the end. A copy was also found in the N Files, next to R/2. It spoke of the enforcement of R/2, of the "approval of all previous decisions" concerning English language accounts, and the tasking of El Ayouty in this respect. The Chief Justice found it was executed to "record the Partners' collective intention and desire to continue with Abdulaziz's practices"; and he recorded Yousef's answer in cross-examination that that was "probably" so.[387] AHAB's pleadings admitted that the partners signed the repeated R/66 resolutions each year, and its oral opening at trial accepted that this was "a formal adoption of

[383] **Judgment AA/2.4/73**, para 137 of Section 1. For instance, the resolutions dated 16 March 1988 at **G/1167** and 14 November 1988 at **G/1203**, and resolutions R/5 and R/6 of 5 December 1992 at **G/1454** and **G/1458**

[384] **G/1539.4** ("I will be providing them with full copies of the consolidated financial statements and the detailed report submitted…I will also be informing them of the comments that have been indicated in them…"). On 19 May 1994, El Ayouty sent a letter "for the attention of all Shareholders", speaking of "our annual reports that were presented to you every year" (ie the Audit Packs), and complaining of the lack of internal oversight by Al Sanea. It is natural to suppose both that El Ayouty's letter came to the attention of the partners, and that they were essentially content or complaisant with the situation of which El Ayouty complains. Indeed, El Ayouty were making it plain that they would not proceed without Algosaibi approval. The letter in response (albeit we have it in draft only) is for signing by Abdulaziz, Suleiman, Yousef and Al Sanea. The Chief Justice concluded that it must have been sent, since El Ayouty had stated that they would not proceed without some such response. The absence of a signed letter from El Ayouty's disclosure, in the circumstances, is of no significance: **Judgment AA/2.4/111**, para 235 of Section 1.

[385] **N/204, G/2290**

[386] **N/206**

[387] **Judgment AA/2.4/130-131**, para 299 of Section 1

the accounting practices, going all the way back to the 1990s".[388] AHAB's argument, nevertheless, was that this was done without knowledge, understanding or endorsement of these practices; but that submission is unacceptable. Saud gave equally implausible evidence that the purpose of these resolutions was merely to enable the payment of annual dividends (which they incidentally did). The Chief Justice could not be criticised for failing to accept such evidence.

*(v)   Suleiman's knowledge of Al Sanea's activities*

418.    Against the background set out above, the Chief Justice was entitled and right to find that Suleiman, when he became chairman of the Money Exchange, would have sought to monitor the activities of the Exchange in general and Al Sanea's borrowings in particular.[389] Indeed, the hypothesis of AHAB's New for Old regime, and its case of forgery and manipulation, was that they were driven on the one hand by AHAB's intent to control borrowing, and on the other by Al Sanea's intent to evade that control.

419.    Along the way, the Chief Justice was aided in that finding by the following factors: (i) Saud's Calculations; (ii) Yousef's evidence that Suleiman regarded Al Sanea as untrustworthy and "out of control",[390] and Saud's evidence that he "didn't feel at ease" with Al Sanea[391]; (iii) Yousef's evidence that Suleiman was cautious in business[392]; (iv) Saud's evidence that everyone, including Al Sanea, reported to Suleiman, and that he, Saud, reported anything of significance to him[393]; and (v) El Ayouty's reports to the chairman (see above). The Chief Justice rightly referred to the inherent tension and implausibility of AHAB's case of ignorance in that setting.[394] AHAB's submission that Suleiman was simply too weak or unintelligent to take any interest in monitoring the business of which he was chairman or in listening to and understanding what he was told, in particular by Saud, simply does not wash.

*(vi)  Yousef's knowledge of Al Sanea's activities*

420.    The Chief Justice's findings and conclusions that Yousef was aware of the activities of the Money Exchange and of the extent of Al Sanea's borrowings and indebtedness, and acquiesced in them, despite his long-standing distrust of Al Sanea and desire for the Exchange to be wound up, cannot be faulted and are supported by the difficulties of Yousef's own testimony and the documentary history of his involvement in the Exchange's affairs.

421.    Yousef's English was poor, and he did not understand passages in his own witness statement, of which only an English version existed which he accepted had been drafted for him. He was unable to recall having made his first affidavit.[395] He accepted that his written evidence that the Money Exchange never conducted substantial volumes of banking business was probably misleading.[396] Ill-health forced his withdrawal before he could be questioned on important parts of his involvement. In the circumstances, the Chief Justice was entitled to place little weight on much of his evidence, while accepting some of his answers where they amounted to concessions. As to that latter aspect, despite AHAB's submission that the Chief Justice failed to make appropriate allowances for Yousef's poor English and frail health, that was wholly a matter for the Chief Justice's judgment. He was best of all placed to assess all such factors.

---

[388] **Day 5/48-49**
[389] **Judgment AA/2.4/149,** para 350 of Section 1. See also paras 315-350
[390] **Day 31/15-16**
[391] **Day 67/14**
[392] Yousef witness statement, **C1/3/6**
[393] **Day 45/45, Day 46/41-42, Day 56/31**
[394] **Judgment AA/2.4/139,** paras 323-324 of Section 1
[395] **Day 29/8-11, Day 29/21-22**
[396] **Day 33/90-91**

422.    As for the documentary evidence of Yousef's involvement and understanding of the Exchange's affairs, the Chief Justice was entitled to conclude that it was compelling (see above under *(iv)*). AHAB's submission that Yousef deferred to Abdulaziz and lacked understanding of financial documents was considered but found wanting.[397] That understanding had led him (together with Suleiman) to want to close the Exchange during the 1990s (there is correspondence in 1992 and again in 1997), and when that did not occur, to seek to withdraw personally from it in 2000. He did so, as he accepted in his evidence, with knowledge of Al Sanea's already large borrowings. The Chief Justice was right to conclude that Yousef had informed himself of Al Sanea's borrowings, whether from the Audit Packs or otherwise, as he had done in 1999 when he obtained the 1998 Audit Pack directly from El Ayouty. Yousef's letter to Abdulaziz dated 26 December 1999[398] shows that, although he had on this occasion to obtain the 1998 Audit Pack from El Ayouty since Abdulaziz had said he did not have it, he knew what to ask for and where to find (undoubtedly from Attachment 9) the precise figure (SAR 2.3 billion) of Al Sanea's indebtedness. AHAB rely instead on Yousef's witness statement for evidence that his letter was prompted by an approach from El Ayouty themselves and that he had no understanding of financial affairs at all: but in the light of the terms of his letter, that is a highly improbable version of events, and the Chief Justice was right to reject it. Moreover, Yousef accepted even in his witness statement that he may have discussed this with Suleiman.[399]

423.    In the end, Yousef was prepared simply to abandon his 10% interest in the Money Exchange (his letter of 22 July 2000 to Abdulaziz).[400] The Chief Justice inferred, as he was entitled to do (despite AHAB's submission that this was mere speculation), that this was because Yousef knew (from the 1999 Audit Pack) of the Money Exchange's worsening situation.[401]

424.    Yousef's witness statement said that he had made it clear to Abdulaziz that he had washed his hands of the Money Exchange and that Abdulaziz had told him that he had the situation under control.[402] However, on 19 December 2000 Yousef wrote to Suleiman (now acting chairman), referring to his 22 July 2000 letter to Abdulaziz and asking what had been done to facilitate his withdrawal from the Money Exchange. No response, if any, from Suleiman is available, but from then on Yousef took no further steps to seek the closure of or to withdraw from the Money Exchange. Moreover, he accepted in cross-examination that he would be informed by El Ayouty about Al Sanea's indebtedness, and that he would sit down once a year with Mr. Badr to discuss the value of the Money Exchange's investments. He said that information would come from El Ayouty in the form of audit materials (ie the Audit Packs) and that this was during Suleiman's chairmanship. He said that he would pass them on to Saud, and not read them himself. As for the Audit Pack for 2008, this was delivered to him as chairman, following Suleiman's death. He said that he did not remember it, but would have passed it to Saud or Saad. He could not remember their reactions to it.[403]

425.    This was, if true, a confession of (albeit partial) wilful neglect, and, if false, a black hole. In the circumstances, the Chief Justice had to make of this what he could, and was entitled and right to conclude, as he did, that –

> it is impossible to accept that Yousef was unaware of the activities of the Money Exchange and of the extent of the borrowing and of the Al Sanea

---

[397] **Judgment AA/2.4/82,** para 162 of Section 1
[398] **G/2025**
[399] **C1/3/21** at para 95
[400] **G/2185**
[401] **Judgment AA/2.4/175,** para 420 of Section 1
[402] **C1/3/23** para 102
[403] **Day 29/72, Day 29/77-79, Day 38/1-3, Day 38/61-64, Day 38/70**

indebtedness, in particular. I reject AHAB's Submissions in closing which
are to that effect...

Despite knowing these things, apart from his personally motivated agitations
with Abdulaziz and Suleiman before December 2000, Yousef took no steps
to restrain the activities of the Money Exchange. He must therefore be
regarded as knowing and approving of (or at least acquiescing in) those
activities.[404]

*(vii) Saud's knowledge*

426.    Saud was AHAB's principal witness. He was Abdulaziz's son. He was intelligent and
numerate and held a degree in Business Administration from the USA. He became a board director of
AHAB in 1990 and its managing director from 2003 to 2013. From May 2003 he was also a
director of the Money Exchange, and from later that year a director of SAMBA and from 2007
its chairman. Yousef in his evidence referred to him as responsible for the Money Exchange's
financial accounts, and as the one who would "brief" the others on them.[405]

427.    At the start of a large survey of this subject, the Respondents headlined a number of points,
which in sum amounted to Saud's involvement in every aspect of the Money Exchange and its
significant decisions over the period from at least 2002, as well as in the (mis)conduct of this
litigation.

428.    As to the latter, the Respondents contrasted his first affirmation's "never had any involvement
in the [Money Exchange's] operations" with his later witness statements, after the discovery of
the N Files, where he admitted "only sporadic involvement" but "no general involvement", and
then similar inconsistencies in his oral evidence, as he was presented with the documents and
went as far as to concede, but only that far, that he was "helping a business that we have through
the guy who runs it" ie Al Sanea.[406]

429.    The Respondents divided their submissions under this heading into the following chapters.

430.    *Documents held in Saud's safe.* We have referred to this above, under the heading "Disclosure"
at paras 212ff above. However, in this context, and in sum, the Respondents stress that it did
Saud no credit that he repeatedly lied about there being documents in his safe, even though they
were found there and catalogued by his own investigation team (without at the time any
appreciation by Deloitte of their significance). Their presence demonstrated that Saud had
collected them there as important and sensitive documents. They were therefore an insight into
his own knowledge and understanding of the situation. They included many documents dating
from the Abdulaziz era, including the 1994 Audit Pack. They also included post-2000
documents such as resolution R/66, a list of SAMBA shares owned by the Money Exchange as
at June 2001 (which included shares in Al Sanea's name) and an updated Attachment 9 for 30
April 2009 and other documents from that period, which demonstrated that Saud was visiting
the safe at or after the time of collapse.

431.    It was also significant that, despite the decanting of Abdulaziz's safe and Saud's personal
collection, much documentation has never been produced: such as the five Audit Packs to which
Saud referred ("The [accounts] for the last 5 years have the same comments") in his manuscript
note on correspondence in April 2001 (see at para 132 above).[407] The Respondents submit:

---

[404] **Judgment, AA/2.4/185-186,** paras 444 and 448 of Section 1
[405] **Day 31/30**
[406] **L1/4/4, L1/8/17, 19, C1/2/55, L1/8/19, C1/2/59, Day 44/30**
[407] Part of the N Files: **N/277**

Accordingly, it follows that the envelopes containing El Ayouty Audit Packs were removed from Abdulaziz's safe by Saud and put somewhere else…Neither Abdulaziz's envelopes, nor El Ayouty's Audit Packs delivered to Suleiman/Saud nor correspondence have ever seen the light of day.[408]

432.  _Saud's inconsistent evidence._ In the London proceedings, the original theme of Saud's witness statements was that he knew little to nothing of either the Money Exchange's borrowings or Al Sanea's indebtedness.[409] Following the discovery of the N Files and thus of Saud's Calculations, his interlocutory affirmations in these proceedings sought to explain that event as an isolated project undertaken at Suleiman's request, which he had forgotten.[410] Similarly, in London he said that, some time before Abdulaziz's death, he had heard from Al Sanea that he had some borrowings ("I never knew the amount") which Al Sanea said he would repay, and later, that he had repaid.[411] In his witness statement for trial in these proceedings, he said that Mr. Badr had shown him a receipt,[412] which had not been mentioned before and was not in evidence, nor reflected in any correspondence. And then in his oral evidence, under pressure, he said that Suleiman told him that Al Sanea had paid his debt.[413] The Chief Justice rejected this evidence as lies, concluding that "These garbled and incoherent responses … are incapable of belief. They are rejected."[414]

433.  AHAB's attempt to dispute these findings of the Chief Justice on the ground that Saud had been essentially consistent in his evidence as to a belief in Al Sanea's repayment flies in the face of the judge's careful consideration of the evidence including Saud's oral testimony.

434.  Saud was also inconsistent about his knowledge of borrowings by the Money Exchange. In his London witness statement he spoke of a figure of about SAR 1 billion as representing the Money Exchange's long-term borrowings, and said that in early 2009 he was told (without being able to name the source) that borrowings were then SAR 4 billion and assets in the form of shares of SAR 9 billion.[415] So he was "utterly shocked" to learn the true position in May 2009. However, after the discovery of the N Files, and faced with his own Calculations, (which as of end 2001 gave Al Sanea's borrowings at some SAR 4.1 billion gross and SAR 3.4 billion net, and the Money Exchange's borrowings at SAR 7.8 billion), Saud's witness statement in these proceedings said both that he had forgotten Al Sanea's debt and misremembered a figure of SAR 1 billion instead of the (more or less) $ equivalent of $ 1 billion.[416] Later in his oral evidence Saud gave an equally incoherent account of his earlier recollection of the Money Exchange's borrowings, dependent on confusing the SAR 7.8 billion for $ 1 billion (a $ figure obtained by netting off an allegation of Al Sanea's repayment of about $ 1 billion).[417] A further refinement was to blame his earlier denial of all knowledge of borrowing on his lawyers.[418] The Chief Justice was entirely justified in saying that –

> The conclusion to which I am driven is that Saud had lied about his knowledge of the borrowings and the Al Sanea indebtedness: (a) in his

---

[408] Respondents' Submissions, **AC1/5/168** at para 402(3)
[409] **L1/6, L1/7**
[410] **L1/8/12-13** at paras 42, 45
[411] **L1/6/15** at para 56
[412] **C1/2/58** at para 278
[413] **Day 65/18-19**
[414] **Judgment AA/2.4/208-213,** concluding at para 539
[415] **L1/6/18-19**
[416] **L1/8/13-14** at para 47: "albeit that I subsequently forgot this (ie that the amount was somewhat in excess of $ 1 billion, not SAR 1 billion)."
[417] **Day 58/58**
[418] **Day 58/69**

statement in the London proceedings in order to present a false impression
of the state of his knowledge of the Money Exchange's indebtedness; and
(b) in his witness statements and evidence in this Court in attempting to
explain his evidence in the London proceedings and especially, the crucial
revelations of Saud's Calculations.[419]

435.    _Saud's role in signing off false accounting minutes._ The significance of resolutions R/2 and
R/66, referred to above (at para 417), in the context of Saud's knowledge, is that he added his
signature to the latter, which incorporated the former, despite not being a partner of the Money
Exchange. When asked why, he said that he had not read them, that he followed Suleiman's
direction, and that he did so simply to obtain release of the dividends.[420] However, the Chief
Justice rejected these explanations in the light of plentiful evidence that Saud came to have a
significant role in the drafting and preparation of Money Exchange minutes and resolutions and
is even to be found chasing Al Sanea for his signature.[421] Despite AHAB's criticisms of these
findings, they are fully justified as showing Saud's understanding of the Money Exchange's
fraudulent borrowing practices. That Saud understood the significance of resolutions R/2 and
R/66 is demonstrated by their presence in his villa.

436.    _Saud and the Audit Packs._ Saud had a copy of the 1994 Audit Pack in his safe, the only full
copy of an Audit Pack produced from AHAB's own documents. The Chief Justice was entitled
to find that it was there because Saud realised its significance, and had wanted to study it.[422]
Saud's List (sent to Al Sanea on 16 April 2001) is further evidence of such study, which must
have come from the Audit Packs (Saud's letter refers to issues "repeated for several years on
the balance sheet"[423]). Saud's denial that his List was the product of such study did him no
credit (as the Chief Justice found, it was "dishonest"[424]). Saud's correspondence with Al Sanea
at that time also showed that he understood about the separation of the divisions of the Money
Exchange and was prepared to exercise authority over him. Similarly, Saud became a point of
contact for dealing with El Ayouty, as Saad explained[425] and as El Ayouty had told Mr
Hayley[426]. Saud had El Ayouty on speed dial.[427] AHAB's submission that such evidence did
not go far enough to prove Saud's involvement in or understanding of the operations of the
Money Exchange were typical of many such submissions calling into question obvious
inferences from established fact.

437.    Saud was also involved at about this time in negotiations involving Suleiman, El Ayouty and
Al Sanea for the latter to repay SAR 400 million of borrowings and for a netting off of his
borrowings and deposits.[428] The negotiations showed that Saud knew that Al Sanea was
promising to repay only part of his borrowings.

438.    Saud's Calculations come at some time in 2002, being clearly based on the 2001 Audit Pack.
When discovered, they caused the collapse of the London proceedings. AHAB's submissions
are an exercise in damage limitation, to the effect that the Calculations do not show that Saud
had the whole Audit Pack (as distinct from its Attachments 8 and 9) or other Audit Packs, but
do suggest that the Algosaibis were generally ignorant of the financial situation of the Money
Exchange, and that the Chief Justice was not justified to infer ongoing monitoring and

---

[419] Judgment at **AA/2.4/217,** para 548 of Section 1
[420] **Day 62/83-87**
[421] **Judgment AA/2.4/188-193**
[422] **Judgment AA/2.4/196,** at para 484 of Section 1
[423] See paras 131-132 above
[424] **Judgment AA/2.4/201,** para 499 of Section 1
[425] **Day 91/20-21**
[426] **Judgment AA/2.4/206,** para 511 of Section 1 at footnote 399
[427] **Judgment AA/2.4/206,** para 510 of Section 1. **Day 61/93**
[428] **Judgment AA/2.4/222-225**

knowledge. However, Saud himself said[429] that he was given the figures by Badr (ie they were not derived from the Audit Packs or their Attachments), but that evidence was suspect given his general affectation of forgetfulness about the whole episode, and was not supported by Mr. Badr in his witness statement. In any event, it was already clear that Saud had had access to a whole run of previous Audit Packs (see above), so why not that for 2001? In any event, where has the 2001 Audit Pack gone, and why have Attachments 8 and 9 been found in the N Files close to the Calculations? Moreover, all the evidence about Saud's access to the Audit Packs does nothing to suggest a falling away of interest or access after 2002. Nor would the 2001 figures come as a surprise given Saud's obvious access to previous years' Packs. And if they had come as a surprise, all the more reason for continuing oversight (as to which the Respondents had more to say, see below).

439.    *Saud's knowledge post 2003.* As to the subsequent period, the Chief Justice investigated that in detail and found that Saud was regularly involved in creating the financial statements for the Money Exchange over the years and in doing so knew that they were misleading, that its borrowings were increasing, and that Al Sanea's indebtedness was increasing as well.[430]

440.    One illustration of this is to be found in Saud's dealings with SAMA. Mr Hayley confirmed that Saud was the Money Exchange's public face vis-à-vis SAMA.[431] On 26 May 2001 SAMA wrote to Saud to request audited balance sheets since 1997.[432] On 4 June 2001 Saud replied to say that it had been agreed with Abdulaziz that the Money Exchange did not have separate balance sheets, so that one was being prepared.[433] It was not. Of course, Saud could not present the true figures, and feared to present the false financial statements. On 31 May 2003, Saud wrote a letter of apology, excusing the failure to produce a balance sheet.[434] As a result the Money Exchange was unable to participate in the merger of Saudi deposit takers which SAMA was planning and which Saud wanted to join. The Chief Justice was entitled to find, as he did, that in all this Saud was shown to be knowledgeable about the financial circumstances of the Money Exchange and deceitful in his dealings with SAMA.[435]

441.    It was possibly in an attempt at satisfying SAMA (or the banks from which the Money Exchange was borrowing) that Saud was involved with Al Sanea (and El Ayouty[436]) in the preparation of financial statements for 2003 consolidating the Money Exchange's and AHAB's accounts, but on a basis which Saud must have known, merely in the light of Attachment 9 for 2001 and 2002, was fraudulent.[437]

442.    On 26 August 2003 Al Sanea forwarded to Saud a number of documents "for your information", including a Group Profile and KPMG prepared projections for AHAB and the Money Exchange over the next three years. Although Saud denied any knowledge or recollection of such documents, he recognised their importance[438], and Saud noted "M.E. files" in his own handwriting on Al Sanea's cover letter, which demonstrated that he had reviewed the material and knew where he wanted to file them.[439] The material contained obviously false information (in English) about the Money Exchange borrowing, but also described the Money Exchange as AHAB's central treasury "providing funding, hedge management, and foreign exchange

---

[429] **Day 63/125**
[430] **Judgment AA/2.4/237-302,** paras 610ff of Section 1
[431] **Day 24/103**
[432] **G/2472.3**
[433] **N/329**
[434] **G/3362**
[435] **Judgment AA/2.4/289-299,** paras 771-775 of Section 1
[436] **N/649**
[437] **Judgment AA/2.4/242,** para 622 of Section 1. See also para 134 above
[438] **Day 46/22, Day 46/26**
[439] **N/589**

services" as well as lending and documentary credit business. TIBC was among the businesses described in some detail[440], as were AIH and ATS. The projections, like the Group Profile, described bank borrowings at some SAR 3 billion (hugely less than the figure of SAR 7.8 billion known to Saud through his Calculations as of end 2001), but even so said to be due to increase by some 10% per year "net of repayments", and reported as having increased over the period from 1998 to 2002.

443.    In 2004 and 2005, Saud was still being involved in the issue of consolidated accounts and in the use of KPMG as reviewers (rather than auditors) of financial statements for 2003 and 2004.[441] The Chief Justice heard, but did not accept, Saud's denials of having any knowledge of such documents. Saud said his signature on them was forged, but they were found among the N Files.[442] Given the background to Saud's knowledge of the use of KPMG (for the purpose of giving respectability to the accounts), and the fact that such documents were found in Saud's possession, the Chief Justice was entitled to reject Saud's denials; and all the more so in the light of AHAB's New for Old argument.

444.    Similarly, Saud's signature was found on successive years of the Money Exchange's financial statements. Despite AHAB's submission that such signatures, although not themselves on AHAB's forgery schedule, should be regarded as suspect, the Chief Justice was entitled to rely on clear evidence of Saud's involvement with Al Sanea in the preparation and procurement of such statements, for instance as to whether or not to present investments at market value (so as to show their increased value).

445.    AHAB relied on Saud's correspondence with Al Sanea in March through May 2004 (see at paras 146 and 148 above) concerning Al Sanea's interest in buying more SAMBA shares, to support a submission that Saud was interested in restricting the Money Exchange's borrowings. However, the Chief Justice was entitled to find that Saud's main concern was in limiting any increase in borrowing from *local* banks as distinct from borrowing in general.[443] The reason was that local banks had access to SAMA's statistics about local borrowing. While it is true that the priority of that concern got progressively watered down in later and final drafts of the first of those letters, the question of further purchases remained in issue for some time, so that it was still being discussed in Saud's letter to Al Sanea dated 4 September 2005, where subscription to further shares in both AHAB's and Al Sanea's name was recommended. In the end, further purchases of Citibank's SAMBA shares (at the top of the market) were presumably responsible for the large increase in the Money Exchange's borrowings in 2005.

446.    In May 2006 there is correspondence between Saud and Al Sanea concerning both the renewal of facilities at Arab Bank and the signing off of the 2005 financial statements (see para 161 above). It shows Saud's interest in the level of bank borrowings, and also his role in signing off the annual financial statements. AHAB submits, based on Saud's evidence, that it was possible that this correspondence was about AHAB HO's, and not the Money Exchange's, borrowings and financial statements, pointing out that El Ayouty's 2005 Audit Pack had been already dated 15 April 2006. However, that takes the matter no further. And the Chief Justice was entitled to be influenced by Saud's "angry and incoherent" evidence about this correspondence, which, even so, included his reaffirmation that Al Sanea had nothing to do with AHAB HO

---

[440] "At the end of 2002 the Algosaibi Group was granted an offshore banking license by the Bahrain Monetary Agency…the new bank began operations in July 2003 under the name…TIBC…TIBC will provide commercial loans and will extend trade related finance…Effectively, the Bank will take over most of the existing investments and activities from [AIH]…TIBC will be funded from the interbank market and, in need, by the Parent Company."
[441] **F/128, N/1**
[442] **Judgment AA/2.4/269-270,** para 703 of Section 1
[443] **Judgment AA/2.4/222,** para 561 of Section 1

financials.[444]  And Saud's signature was found on the 2005 draft Money Exchange financial statements.[445]

447.    Similarly, Saud was involved with the Money Exchange financial statements for 2006. Around 10 April 2007 Al Sanea sent a letter to Mr. Badr asking him to obtain Saud's signature to draft financial statements for 2006. Badr wrote on the letter "necessary action taken". This letter was found at AHAB HO together with the draft financial statements signed by Saud and Al Sanea.[446] AHAB again relies on earlier dates for the 2006 Audit Report and financial statements, which puzzled the Chief Justice,[447] but the latter of these may well have been backdated. The 2007 Money Exchange financial statements were again signed by Saud and Al Sanea in drafts found in Saud's villa.[448]

448.    In 2006 the Saudi stock market had suffered a severe crash. Mr Hayley gave evidence that Saud had come downstairs to the Money Exchange offices to speak to him. He said Saud asked him "Can the Money Exchange repay its debts?" He replied "No". Saud said he had no recollection of this conversation, but the Chief Justice accepted Mr Hayley's account and observed that it demonstrated that Saud knew that the Exchange was very heavily borrowed.[449] Moreover, there was no apparent difficulty in Saud making his way into the Exchange offices, despite AHAB's submissions to the contrary, to the effect that it was a barred fortress.

449.    On 8 February 2008 Saud wrote a manuscript note to Mr. Badr about separating AHAB and the Money Exchange so as to facilitate the Money Exchange becoming a separate real estate company, valued at around $ 40 billion, but also involving financial services. That was a huge increase even on figures involved in the Audit Pack for 2007 (see para 119 above). Saud said he had no recollection of what had prompted this note, other than it was an attempt at trying to find a "forward path",[450] but the Chief Justice was entitled to find that it was "only consistent with Saud's ongoing oversight of the affairs of both the AHAB Partnership and the Money Exchange and being closely involved in directing their future plans."[451]

450.    If the February 2008 note to Mr. Badr was an act of brain-storming at finding a future for the Money Exchange, it was an alternative to Saud's long-standing attempts to resolve the Money Exchange issues by disposing of it to Al Sanea. These went back at least to early 2003, for on 15 April 2003 Saud wrote to Al Sanea to prompt him about "what was agreed upon with me and Uncle Suleiman and my cousin, Yousif a few months ago".[452] Saud's letter "enclosed a draft proposal of this agreement". Neither any earlier correspondence nor the draft agreement have survived. In his witness statement, Saud recognised these discussions ("Under [Suleiman's] chairmanship, it remained AHAB's intention to implement the (by then longstanding) decision to dispose of the Money Exchange"), but said that the issue of SAMBA shares in Al Sanea's name remained a sticking point.[453] Saud said that discussions continued into 2006, with draft terms being tabled; and that the essence of the deal was that Al Sanea would take the Money Exchange and its debt, and AHAB would receive the Money Exchange's

[444] **Judgment AA/2.4/275,** para 714 of Section 1
[445] **F/161**
[446] **H22/57, H22/59**
[447] **Judgment AA/2.4/284,** para 730 of Section 1: "While this, like so many factors in this byzantine case, is strange and begging of explanation, it cannot negate the compelling effect of the presence of Saud's signatures of the draft statements themselves, nor the clear implications of Badr's note on the copy of the letter found at AHAB H.O."
[448] **H30/55**
[449] **Judgment AA/2.4/517,** para 56 of Section 3
[450] **Day 54/120-121, Day 54/135**
[451] **Judgment AA/2.4/284-285,** para 732 of Section 1
[452] **N/303, G/3222**
[453] Saud witness statement, **C1/2/49** at paras 233ff

shares. The Chief Justice was entitled to find that these discussions required the Algosaibis to know all about the Money Exchange, its assets and liabilities. As he found:

> …it is inconceivable that [these discussions] could have been entered into without especially Saud, Suleiman and Yousef having apprised themselves of the true state of the Money Exchange's bank liabilities and of the Al Sanea indebtedness.[454]

451.    _Knowledge of increasing borrowings._ Some of the Money Exchange's borrowings came from SAMBA itself, of which Abdulaziz had been chairman since 1984, Saud a director from 2004 and himself chairman from 2007. The Algosaibis were actively engaged in such borrowings. Saudi law[455] required SAMBA to hold security for facilities provided to a borrower in which a SAMBA director held office. Accordingly, each year Saud had to sign a letter to SAMBA certifying details of the SAMBA facilities, and did so. Such certificates showed that over the period between 2000 and 2009, indebtedness to SAMBA increased from SAR 0.77 billion to SAR 1.8 billion.

452.    Correspondence and facility agreements with SAMBA also covered Suleiman's and Saud's requests for increases in bridging finance and for new facilities, about which forgery allegations were limited to Suleiman's signatures on the 2005 facilities (although other documents included "matched" Saud signatures, ie signatures which because they precisely match other signatures are considered to have been applied mechanically or electronically but not by manuscript). It is inconceivable, however, that borrowings from SAMBA can be considered as being in fraud of AHAB, given the need for Suleiman and Saud to certify those facilities annually to SAMBA. The 2005 facilities in particular are hedged around by many other documents signed by Saud, such as his letter dated 5 January 2005 expressly requesting an additional new facility of $ 100 million (among many other details).[456]

453.    In 2005 and again in 2007 Saud's requests for increases in facilities were expressly in part to support ATS. This is inconsistent with AHAB's case that they did not authorise any borrowing by or through ATS, indeed that they were unaware of or had no involvement in ATS or its activities. The Chief Justice was entitled to find that such correspondence provided "a striking illustration of the understanding of both Suleiman and Saud that ATS existed and of its role in AHAB's borrowing".[457] Meanwhile, Saud dealt with such correspondence on the basis that he was just "helping out".

454.    In December 2008, at Al Sanea's request, Saud wrote to SAMBA, in the aftermath of the credit squeeze caused by the GFC, to request " temporary financing in addition to our $120 million standby L/C facility, for six months or until such time as the global banking system has reverted to normal".[458] On 21 January 2009 SAMBA replied to Saud to decline his request. Saud, in cross-examination, accepted the situation was critical.[459] Accordingly, when Saud replied he enclosed a letter from Suleiman addressed to SAMBA's managing director, repeating the request "due to the continuous growth in the business activities of the company".[460] Saud said in cross-examination that Al Sanea had contacted Suleiman about this.[461] Suleiman followed up with a telephone call to SAMBA, which proved decisive in obtaining the increased facility.

---

[454] **Judgment AA/2.4/292-293,** para 752 of Section 1
[455] Article 9 of the Banking Control Law
[456] **G/4507**
[457] **Judgment AA/2.4/325-326,** paras 831-832 of Section 1
[458] H21/62
[459] **Day 50/27-29**
[460] **H21/56, H21/59**
[461] **Day 50/37**

455. The Chief Justice was entitled to find that this evidence concerning the increases in facilities from SAMBA itself exploded the New for Old thesis. AHAB's submission in response is that such increases would not have alerted Suleiman or Saud to an increase of *overall* borrowing across the lending banks in general. However, AHAB's pleaded New for Old case was that there could be no increase "on the expiring facility" and that only "rollovers of existing facilities" were permitted.[462]

456. In sum, the history of SAMBA borrowing was inconsistent with almost every critical part of AHAB's case, including its New for Old thesis, its forgery case, and its ignorance of ATS. It was inconsistent with AHAB's case that Al Sanea defrauded AHAB by being kept fundamentally in ignorance of the fraud conducted by Al Sanea at the Money Exchange.

457. Nevertheless, Saud's written evidence was that –

> Other than the 2009 Samba facility extension (see above), I have never knowingly signed any loan or other facility documents in respect of borrowing by the Money Exchange.[463]

However, in his oral evidence he was often compelled to change his profession of ignorance to explaining that he was willing to help out, if asked. For instance, in the period of the GFC from September 2008 to May 2009 Saud (and other partners) signed facilities for billions of SAR in an effort to prevent collapse.[464] Saud's evidence of ignorance in this regard was found by the Chief Justice to be untrue.[465]

458. <u>*2009 and the collapse.*</u> As the situation worsened during the GFC, and Dawood signed numerous enormous loans, Saud's reaction (whatever his evidence) was not that of wakening to a fraud, but of reacting to a loss of control. The 2008 Audit Pack was dated 6 April 2009, but it was followed not long thereafter by new accounts drawn up to end April 2009, of which an Attachment 9 survived (and was found in Saud's safe). By then Yousef had succeeded to the chairmanship on the death of Suleiman. The 2008 Audit Pack showed "loans and borrowings" of SAR 31.5 billion and a gross Al Sanea indebtedness of SAR 29 billion.

459. Yousef accepted that he received a copy of the 2008 Pack and may have discussed it with Saud.[466] El Ayouty, in their interview with Deloitte, confirmed that they had provided a copy to Saud.[467] The 2008 Audit Pack at trial contained manuscript notes and underlinings[468] which were accepted by Mr Zaatar to be his.[469] Mr Zaatar had been tasked by Saud on 8 May 2009 to investigate the financial situation of the Money Exchange. Although Mr Zaatar complained in his witness statement about the lack of help he had received both at the Money Exchange offices and from El Ayouty personnel, he accepted in cross-examination that during the course of the evening he had established Al Sanea's gross and net indebtedness and bank indebtedness.[470] The Chief Justice found therefore that "within a matter of hours [Mr Zaatar] was able to establish the financial position of the Money Exchange…because he reviewed the Audit Pack for 2008 and reconciled the trial balance to the general ledger". He also found that "Saud (along

---

[462] AHAB's (amended) Statement of Claim at para 99K: **A1/2.3/40**. Saud gave evidence in support of "New for Old" in similar terms: Saud's witness statement at **C1/2/53-54,** at paras 256-257
[463] Saud's witness statement, **C1/2/84** at para 406
[464] Abu Dhabi Commercial Bank for $ 50 million (**G/7499**) and for $ 1.56 billion (**G/7500**), Ahli United Bank for $ 85 million (**G/7511**)
[465] **Judgment AA/2.4/665,** para 204 of Section 4
[466] **Day 38/61-62**
[467] **C4/7**
[468] **F/261** passim
[469] **Day 88/23, Day 88/29**
[470] **C1/14/8-9, Day 88/26-30**

with Yousef and Dawood) must have received and read the 2008 Audit Pack before 8 May 2009 when Saud tasked Mr Zaatar to investigate…"[471]

460. Mr Hayley gave evidence that a number of days earlier, on 3 May 2009, he had made contact with Saud by telephone (Saud was at Beirut airport) about the growing crisis. His witness statement recorded:[472]

> I told him there was a problem at the Money Exchange and he asked me what was the sum involved. I said US$8 billion and that he needed to speak to Mr Al Sanea when he returned to Saudi Arabia, that evening.
>
> I had a short meeting with Saud and Dawood the following day, and Saud asked me if US$1 billion would resolve the problem. I said it would, in the short term only. Saud reassured me that he would sort out the problem and he instructed me to maintain a position of strength with our bankers.

461. The Chief Justice commented that Saud's immediate calm and collected reaction was very telling.[473] Saud confirmed that he and Dawood went to see Mr Hayley on 4 May 2009. He accepted Mr Hayley's account of their conversation.[474] Saud and Dawood went to see Al Sanea on the same day. The Respondents make the point that Saud's suggestion about $1 billion was because Saud would have noticed that in the period between the records of Attachment 9 to the 2008 Audit Pack and to the April 2009 Audit Pack Al Sanea's net borrowings had increased by $1 billion or SAR 3.7 billion (from SAR 16 billion to SAR 19.7 billion). The Chief Justice noted that 8 May 2009 was the last day on which AHAB had any contact with El Ayouty, so that the Attachment 9 as of 30 April 2009 must have been received by that date. The Respondents infer that it, or information about its bottom line, must have been received in time for Saud's conversation on 4 May 2009. They submit: "Saud plainly needed to have someone [Mr Zaatar] attend the Money Exchange in order to determine that his own understanding (derived from the Audit Packs) was in fact correct."

462. AHAB's account of the collapse of the Money Exchange was one of surprise, shock, despondency and then professional investigation. However, the Respondents paint a different picture. When, on 4 May 2009, Saud was informed of an $8 billion problem, an alarm of fraud should have been sounded then and there, but was not. On 4 May 2009, Saud wrote to Al Sanea offering to sell him the Money Exchange, together with the "banks registered in Bahrain", "free of charge", on the basis that the Algosaibis were to be cleared from all potential liability.[475] His letter referred to the offer having been made by a previous letter the day before, 3 May 2009. This was five days before Mr Zaatar was sent to the Money Exchange. The Chief Justice found that Saud's offer was "consistent only with a real understanding of the true state of affairs"[476], and that "the Algosaibis knew that the financial position of the Money Exchange was so dire (notwithstanding the prestigious portfolio and the large receivable from Al Sanea) that they needed, above all, a swift exit."[477]

463. On 9 May 2009 Mr Hayley wrote a memo to Saud to say that it had been reported to him that the Money Exchange's default would be large enough to impact Arab Bank's viability.[478] On the same day, Mr Hayley and Mr Stewart recommended a standstill agreement with all the

---

[471] **Judgment AA/2.4/401-403,** paras 978-981
[472] **C1/9/64,** paras 317-318
[473] **AA/2.4/404,** para 984
[474] Ibid; Saud witness statement **C1/2/70,** para 340
[475] **H30/61**
[476] **Judgment AA/2.4/409-410,** para 1000 of Section 1
[477] **Judgment AA/2.4/406,** para 995 of Section 1
[478] **G/7872, Judgment AA/2.4/417-418,** para 1011 of Section 1

banks.[479] Still, Saud did not sound the alarm of fraud. Instead, on 11 May 2009, Dawood, and on 12 May Dawood and Saud, in meetings with HSBC, said that the damage had been caused by Mr Hayley's error in failing to cover foreign exchange transactions, and promised repayment. Mr Hayley was said to have been sacked.[480] On 14 May 2009 Saud and Dawood attended a meeting of TIBC. Tariq Ali said that they were shocked by their ignorance of its affairs into silence: however, the minutes do not record that they had no idea of the bank or their shareholding in it, and the Chief Justice rejected Tariq Ali's account. He considered that Saud's and Dawood's "apparent reticence at the meeting is therefore equally consistent with prior knowledge and lack of surprise on their part as it is with his impression of their state of shock and surprise."[481] Although AHAB criticised this conclusion as irrational, the Chief Justice was more than justified in his view that Mr Ali's perception of Saud's (and Dawood's) states of mind was outweighed by the overwhelming evidence of knowledge elsewhere referred to. On 16 May 2009, a report to Saud on TIBC by Gulf Banking Consultants (**GBC**), Mr Ali's firm, which had been formally retained by Saud to provide debt restructuring advice, made no mention of any fraud on AHAB.[482]

464.    In the meantime, from an early time "As the problems at the Money Exchange began to be revealed in early to mid-May 2009" (as Saud put it in his witness statement),[483] Saud had sent in the Young Algosaibis to suppress incriminating documents (or as he put it to save potentially relevant documents for safekeeping as suspicions about Al Sanea grew). As the Chief Justice found[484]:

> It is accepted that by prevaricating and waiting to announce AHAB's fraud claim, Saud provided himself and the other Partners an opportunity for him (and the Younger Algosaibis) to remove and suppress significant documents.

465.    The Chief Justice noted that Saud's evidence about when AHAB say that they became aware of Al Sanea's fraud was very imprecise, but that the time for their epiphany was when Mr Zaatar went into the Money Exchange on 8 May 2009 and reported back to Saud "large debit balances that apparently related to Mr Al Sanea…it seemed to me that the Money Exchange had been used to raise loans to fund Mr Al Sanea's businesses"[485]. The truth, however, was that they had known all along. In sum, the evidence of Saud's involvement and knowledge was both "extensive and damning", and the Chief Justice was fully entitled to reach the conclusions he did. They included the following:[486]

> AHAB's actions at the time were inconsistent with their fraud claim which later emerged: if, as the Defendants ask rhetorically, the Partners genuinely thought they were being defrauded, why did they lie to their lending banks rather than crying from the rooftops that they had been the victims of a massive and sophisticated fraud? Why did AHAB continue to negotiate with Al Sanea until at least 20 May 2009, when they knew on 9 May 2009 (eleven days earlier) that the debts of the Money Exchange were in the order of magnitude of an "$8 billion problem" and that a single obligation was so large that it could bring down one of Saudi Arabia's largest banks?

*(viii) Dawood's knowledge*

---

[479] **G/7873**
[480] **G/7880/5-6**
[481] **Judgment AA/2.4/420-421,** para 1017 of Section 1
[482] **G/7901**
[483] Saud witness statement, **C1/2/75,** para 363
[484] **Judgment AA/2.4/424,** para 1029 of Section 1
[485] Mr Zataar's witness statement, **C1/14/9,** para 35
[486] **Judgment AA/2.4/423,** para 1024 of Section 1

466.  Between February and late April 2009, following his father, Suleiman's, death, Dawood signed facility documentation amounting to SAR 10.7 billion (or $ 2.8 billion), about 42% of the SAR 25.6 billion outstanding at the time of the May 2009 collapse of the Money Exchange. There is no allegation of forgery with respect to this documentation, but the authenticity of the signatures was not admitted by AHAB[487]. Dawood's evidence veered between denial and that he had no recollection of signing these documents, also suggesting that they had been imposed on him while grieving for his father.[488] The Chief Justice described this evidence as "a false and convenient narrative", itself inconsistent with any New for Old regime.[489]

467.  Saud's evidence was that in February or early March 2009 he had agreed with Dawood that the latter would sign facility documentation in place of his father, and would do so pursuant to the New for Old regime.[490] There is also a memorandum (coming from Al Sanea as "Executive Committee") dated 20 March 2009 to the Money Exchange, TIBC and AIH, stating that documents should be amended from requiring the signature of Saud to requiring instead the signature of Dawood, giving the explanation that Saud would be travelling.[491]

468.  Dawood's oral evidence in places accepted that he had signed documents. For instance:

> Because when my father died, they give me – Badr tell me that I sign for the company…it's a new job for me and they bring for me a lot of paper for the company I was signing, but I don't remember what I sign…They brought a lot of documents for me to sign but I don't remember that I have ever signed any papers or documents related to banks…I have signed a lot of documents, a lot of documents…I trust him [an employee] so I sign them. But I don't remember that I signed documents related to banks.[492]

That evidence reflected his written evidence.[493]

469.  Following AHAB's acceptance on appeal of the authenticity of Dawood's facility documentation, they still maintained that this was of little significance to their general case on the state of their knowledge. However, Dawood had had considerable experience of AHAB's businesses even before he became an AHAB director in 2003. Even if he had not been involved in the Money Exchange before Suleiman's death, he was well capable of understanding what he was signing. His evidence that he could not recollect signing this documentation was not a sound basis for rejecting that obvious conclusion as to his understanding. Moreover, his evidence was plainly inconsistent with any application of a "New for Old" regime, or therefore for any need for forgery on the part of Al Sanea.

### New for Old, forgery and manipulation

470.  Into this subject-matter of the general and overall question of AHAB's innocence or complicity and of Al Sanea's fraud on AHAB, come the important topics of New for Old, forgery and manipulation. The topic of AHAB's case of New for Old has been introduced at paras 185-193 above.

---

[487] Although conceded by AHAB during the appeal
[488] See for instance **Judgment AA/2.4/360-362,** para 890 of Section 1
[489] **Judgment AA/2.4/370,** para 899 of Section 1
[490] **Day 67/122-124, Judgment AA/2.4/367-368,** para 896 of Section 1
[491] **G/7648**
[492] **Day 78/29-32, Judgment AA/2.4/362,** para 890 of Section 1
[493] Dawood witness statement, **C1/1/11** at para 40

471.     In support of that case, on appeal from the Chief Justice's rejection of it, Mr Wardell submitted that after Abdulaziz's stroke in 2000 but before his death in 2003, at some time in 2002, AHAB restricted the level of borrowing by a policy of New for Old. Compliance with that policy would have thwarted Al Sanea's ambitions, but he nevertheless had to put on a show of compliance. He therefore adopted two principal means of circumventing the policy and thus concealing his borrowings from the Money Exchange and how they were funded. He manipulated facility documents, typically by increasing the amount to be borrowed after the document had been signed. And he forged, or procured the forgery of, the signatures of AHAB Partners on facility documents, by transposing identical signature images (so-called "matched" signatures) from document to document.

472.     In his oral submissions to us, Mr Wardell said that AHAB's case on forgery went to the very heart of their claim and appeal. It went to the Algosaibis' knowledge of the amount of borrowing obtained by the Money Exchange and the Financial Businesses and their knowledge of the scale of Al Sanea's withdrawals for his own benefit. It was evidence of Al Sanea's concealment of the extent of his borrowings, giving rise to an inference of AHAB's lack of consent to them. It supported AHAB's case that some sort of restriction had been placed on Al Sanea's conduct after Abdulaziz's stroke; and it supported AHAB's case of minimal knowledge of and no involvement in the Financial Businesses.[494]

473.     For the purpose of their forgery case, AHAB presented a forgery schedule, originally annexed to AHAB's Amended Statement of Claim, dated 4 April 2017 at trial and on appeal appended (in amended and extracted form) to their Reply Submissions at Appendix 4.[495] In its original state it set out in tabular form 906[496] documents or classes of documents bearing signatures in the names of Abdulaziz, Suleiman, Saud, Yousef and Dawood. These had been examined by two forensic document experts, Dr Giles (engaged by AHAB) and Mr Handy (engaged by the Respondents). The questioned documents came from a number of sources. The first set, provided to Dr Giles, were selected by the Young Algosaibis from documents found by them in the Money Exchange and AHAB's HO. Further documents were provided by creditors making claims against AHAB. And 10 documents, relating to dealings with Al-Jazira Bank, were provided by lawyers acting for Al Sanea. The originals of those 10 documents were seen only by Dr Giles, although she supplied high-quality copies to Mr Handy. Most of the signatures in question are Suleiman's, and some are Abdulaziz's, Saud's or Yousef's. Dawood's signatures on the schedule are now accepted as authentic.

474.     The 906 documents span a period between 24 July 2000 and 11 April 2009. Excluding those which are described as "various", there are 22 documents from the calendar year 2000; 18 from 2001; 9 from 2002; 36 from 2003; 95 from 2004; 102 from 2005; 123 from 2006; 149 from 2007; 287 from 2008; and 45 from the earlier months of 2009. Of these, on AHAB's analysis[497], there are 80 facility or facility-related documents concerning 26 banks in 2004, 96 such documents concerning 41 banks in 2005, 115 such documents concerning 38 banks in 2006, 120 such documents concerning 41 banks in 2007, and 226 such documents concerning 53 banks in 2008.

475.     Dr Giles and Mr Handy were in substantial agreement as to the results of their investigations. In particular, they were agreed that a large number of the documents on the forgery schedule bore duplicate or "matching" or "matched" signatures, principally in Suleiman's name. As Dr Giles explained in relation to signatures in Suleiman's name, "these are signatures which are

---

[494] Day 4A/170-171
[495] Reply Submissions, **AB/10.24/1**. The purpose of the extraction was to illustrate a point about signatures said to have been witnessed by Saad Group employees in places other than AHAB HO.
[496] The judgment speaks of 872 documents (and 16 manipulated documents).
[497] **D4/343-4**

virtually superimposable with a degree of similarity far exceeding that which would normally be expected in the normal independently written signatures of a single individual".[498] Dr Giles identified 101 such signatures in Suleiman's name, which she termed Source Signatures. Some of these appeared on more than one document: for example, Source Signature 9 is agreed by the experts to appear on over 60 documents, sometimes multiple times and in different sizes; and Source Signatures 14 and 18 are each found on over 40 documents. Dr Giles and Mr Handy agreed that "where an image of the same Source Document appears on a number of documents…not all of these documents can have been signed independently by Suleiman Algosaibi".[499] It was accordingly common ground between the experts that where a document was described in the forgery schedule as bearing a matched signature it could not have been independently signed in manuscript by the signatory.

476.    The forgery schedule makes reference to three categories of documents which are complained about for reasons over and above any question of matched signatures. The first category is included because they could not have been signed on the *dates* they bear by the persons whose signatures appear on them. In the case of Abdulaziz, whose signature appears on the majority of documents in this category, it is common ground that that is because he was incapable of signing documents after his stroke, so that any document apparently signed by him between the date of his stroke and the date of his death cannot bear his authentic manuscript signature. Further reference is made to such signatures below.

477.    The second such category of documents referred to in the forgery schedule are original (as opposed to copy) documents which contain mechanically applied, but not matching, signatures.

478.    The third such category of documents are said by AHAB to be forgeries because they were "witnessed at Saad/Money Exchange/ATS". The basis of this allegation is AHAB's evidence that they never went to any of those offices to sign documents and so their signatures could not have been witnessed there.

479.    The experts said this in relation to the *method of application* of matched Suleiman signatures:

>    With a few exceptions, where signatures appear as coloured signatures on documents, we are in agreement that the signatures have not been applied to the individual documents in a normal manner with pen on paper, but have been applied by various mechanical processes. A number of the duplicated signatures in the name Suleiman Algosaibi have been applied to documents by means of laser printer technology (in her Appendix A, Dr Giles has identified sixty-eight documents that she considers bear such signatures and Mr Handy in his Appendix 2 has identified thirty-six such documents). In other cases the mode of application is not clear. Dr Giles has suggested that a number of the Source Signatures have been applied by means of ink jet printer technology. Mr Handy agrees that there are examples of signatures applied by this means; however, he identified forty-eight documents bearing sixty-eight signatures that he considers were applied by a mechanical process other than by laser printer technology or inkjet technology, and suggested that they may have been produced by a hand-stamp. Dr Giles does not disagree with Mr Handy that a hand-stamp may have been used in some cases[500].

480.    As for Saud, the experts also identified documents bearing matched signatures in his name too, and were agreed that where the matched signatures appear on two or more different documents

---

[498] **J/1/9-10**
[499] **J/1/10**
[500] Joint Statement, **J/9/3** at para 4.1

it was clear that not all of these documents could have been independently signed by Saud. As for Yousef, they identified a small number of matched signatures in his name. As for Dawood, they were unable to carry out any "useful examination" (Dr Giles) or "meaningful comparison" (Mr Handy) in relation to his signatures. In essence, therefore, AHAB's case revolved principally around the case of Suleiman's signatures, who, having died back in 2009, was of course unable to give evidence at the trial.

481.    Of the 906 documents on the forgery schedule, AHAB contended in this Court that some 700, viz those containing matched signatures, were forgeries. Mr Wardell was at pains, however, to emphasise that the absence of a signed document from the forgery schedule did not mean that it was authentic. He said that AHAB made a positive case of forgery in relation to the documents that did appear on the (amended) forgery schedule, but he also asked us to be prepared to draw an inference, as the Chief Justice had been invited to do, from the large number of nominated forgeries on the schedule, "that in all probability many other documents were forged by Al Sanea, for which AHAB had not been able to produce positive forensic evidence of forgery".[501] He submitted that this was the more likely in that Mr Handy had identified further matching signatures which did not correspond to the set of Source Signatures that Dr Giles had used (a factor which the Chief Justice failed to have regard to or discounted). Of the 906 documents examined by the experts, 76 were originals (the Chief Justice was wrong to say that the experts had examined no originals), of which 90% contained mechanically applied signatures, and one third of those had been applied using an ink jet printer or laser printer and could not have been applied using a stamp.

482.    The Chief Justice rejected AHAB's forgery case, which he considered at length in section 4 of his judgment. His conclusion at the end of that section[502] stated that the case was incoherent, inconclusive, and contradicted by the evidence of many matched signatures on documents which were not on AHAB's forgery schedule. The forgery allegations were made on a random scatter-shot basis without any reasonable foundation for a finding that the matched signatures of which complaint was made had been deployed without the knowledge and authority of the AHAB Partners concerned. Documents bearing Abdulaziz's signature during his lifetime but after his stroke had certainly not been signed by him but reflected the Algosaibi family's desire to keep his incapacity from the world. Other documents had undeniably been signed by Yousef, Saud and Dawood. Saud's matched signatures were certainly applied with his knowledge and authority and a similar conclusion was justified in the case of Suleiman. As for Dawood, whose signatures appeared on SAR 10 billion of facilities in the last few months before the Money Exchange collapsed, and even though those signatures appeared on the forgery schedule, he feigned ignorance and amnesia rather than complained of forgery. (On appeal, AHAB dropped allegations of forgery of his signature.) As for Suleiman (by far the majority signatory on the forgery schedule), although there were many matched signatures, there were many others not on the schedule. Finally, the Chief Justice said this:

268. I am unable to determine why any signature was applied. It may have been a matter of convenience. Given the fact that some 54,000 bank facilities were obtained during Suleiman's time, it may have been because Suleiman did not like or was simply incapable of signing so many documents. I am unable to say how each signature was applied. Some may have been applied using a computer and laser printer, some using scissors and paste and some possibly by using hand stamps. In the circumstances it is not possible to conclude that Suleiman's signatures were applied without his authority, let alone to conclude that Al Sanea forged Suleiman's signatures.

---

[501] **Day 4A/164**
[502] **AA/2.4/698-701**

483.   On this appeal AHAB and Mr Wardell approached their task of displacing the Chief Justice's judgment on these issues as follows.

*New for Old*

484.   We start with New for Old, which is the stated harbinger and cause of forgery and manipulation.[503]

485.   <u>AHAB's Submissions</u>. AHAB accepted, as they did at trial, that "there was no one single document which evidenced Suleiman (or Saud) communicating the "*new for old*" policy to Al Sanea".[504] It also accepted that the policy was "flawed. In particular, there was no monitoring of the overall levels of borrowing whilst the "*new for old*" policy was in place".[505] Nevertheless, there were contemporary documents showing that Al Sanea knew that, in order to get approval for Money Exchange borrowing, he had to liaise with Badr with documentation in accordance with that policy, viz both the corresponding old and the new facility agreements for Mr. Badr to check before presenting to Suleiman for signature. These documents were assembled on appeal in a special bundle described as "F Documents relied on in relation to 'New for Old' identified in X1/1" (having been listed in closing at trial in a list X1/1) (**F(X1/1)**).[506]

486.   The Chief Justice considered this material,[507] but was wrong to dismiss it as constituting evidence of the policy. AHAB's submissions stressed the following points. First, the Chief Justice was wrong to reject documents dated 2001 as too early to be relevant, one of which had "OLD DOCS" written in manuscript on a Post-it label.[508] Secondly, the Chief Justice was wrong to treat as merely neutral and thus to ignore as relevant any document which referred to "renewal" of a facility. Thirdly, the Chief Justice was wrong to view increases in SAMBA's facilities as exploding the New for Old case, just because such increases must have been known to Saud and/or Suleiman: any such knowledge would not have alerted them to borrowing overall across all lenders. Fourthly, the record of facilities kept by Mr. Badr up to the end of 2001, but not maintained into the subsequent period, was neither here nor there: AHAB acknowledged that the policy was not monitored. Fifthly, the Chief Justice was unbalanced in failing to find support for the policy in Al Sanea's letter to Saud dated 1 May 2002, with its comment "which will also keep our exposure to the banks at [the] same level as before".[509] Sixthly, the Chief Justice was unjustifiably dismissive of Mr. Badr's evidence, relied on by AHAB in support of its New for Old case. Seventhly, the Chief Justice undervalued Mr Hayley's evidence, even if he did admit in cross-examination that he had never heard of the New for Old expression. In particular, Mr Hayley's comment in his memorandum to Al Sanea dated 23 April 2007 that "I recall that last year Saud Algosaibi did not want any increase in local bank facilities", which he said had been gleaned by him (from Mr Jamjoum), was not given due weight.[510]

487.   Apart from the material discussed above (and the case on forgery and manipulation discussed below), AHAB's direct case on New for Old rested on the evidence of Saud and Mr. Badr (the latter in the form of a late hearsay statement). Saud spoke of Mr. Badr as the gate-keeper of the policy, the essence of which was that any particular renewal had to be shown to be a "like-for-

---

[503] AHAB's Written Submissions, **AB/1.9/19**, para 9.19
[504] *Ibid*, para 9.20
[505] *Ibid*, para 9.22(4) at **AB/1.9/22**
[506] However, bundle F(X1/1) was barely if at all visited on the appeal
[507] The Chief Justice dealt with "New for Old" at Section 3 of his judgment, a section of 188 paragraphs, **Judgment, AA/2.4/494-578**. He dealt with the documentation relied on by AHAB at **AA/2.4/564-577**.
[508] **H2/22/1**
[509] **H9/45, G/2844**
[510] Hayley witness statement **C1/9/51** at para 244, referring to **G/5811**

like replacement of existing borrowing". If it was not, Mr. Badr's role was to reject it and return it to Al Sanea. If it was, Mr. Badr was to present it to Suleiman for signature.[511]

488.   Mr. Badr's hearsay statement was dated 7 March 2017, which was well into the trial. It began with an apology for not wishing to attend trial, due to age (Mr. Badr was over 80) and an unwillingness to face "the pressure of being asked questions about my job".[512] He stated that around 2000, when Abdulaziz suffered his stroke, Suleiman and Saud asked him to take on the role of comparing any "new" loan with its "old" version, both for amount and to see if the old loan had been signed by Abdulaziz or Suleiman, because "Suleiman did not read English and did not understand banking documents". The old and new loans would come in sealed envelopes from Al Sanea. He would take the documents to Suleiman "whether the new loan and old loan amounts were the same or not", but would not present any loan for signature without an old loan being present in the envelope. He would advise Suleiman if there was an increase in the facility. If there was, Suleiman would not sign. Otherwise, he would. Sometimes, he saw Saud before going to see Suleiman, and if the new loan was for an increased amount, he would confirm with Saud that the documents should be returned unsigned, without bothering Suleiman. Documents were returned unsigned "on a number of occasions".

489.   _The Respondents' Submissions_ on New for Old were more extensive than AHAB's and were as follows.[513]

490.   First, the Respondents stressed the unsatisfactory way in which AHAB's case had evolved, which highlighted internal inconsistencies and rendered it the more implausible. "Iteration 1", to be found in AHAB's original Statement of Claim served on 10 November 2009, where it was said that all borrowing was unauthorised, no loan documentation was ever sent to AHAB Partners for their signature, and all signatures on loan documentation were forged. "Iteration 2" was New for Old: this was first canvassed in the London proceedings in May 2011[514], first deployed in these Cayman proceedings in Saud's affirmation of 10 September 2011, and first pleaded by way of amendment in July 2012, where it was now said that signatures were forged in "very many cases". The historical time-line of New for Old also developed, from about 2001 (Saud's affirmation) to, finally, "In or around 2002 or early 2003" (the amended Statement of Claim). "Iteration 3" introduced instances of alleged manipulation in support of the New for Old policy: this was first heralded in AHAB's written opening submissions for trial and led to further amendments, which were debated 25 days into the trial and were allowed on appeal by consent, for pragmatic reasons (since the trial was in progress) and without any hearing. At the same time, a distinction was advanced by AHAB between a New for Old _policy_, which was said to have been established in 2002, and a New for Old _protocol_, which arrived in 2002 or early 2003. The protocol was the means for checking the policy. "Iteration 4" was a switch, in AHAB's opening oral submissions, from a facility-by-facility policy to a total amount of

---

[511] Saud witness statement **C1/2/54**, paras 257-258

[512] Mr. Badr witness statement, **C1/40/10**, para 4

[513] Respondents' Submissions, **AC1/10/1-41**, parts A to D of Section 10

[514] But not under the expression "New for Old". In Saud's third affirmation in the London proceedings, **L1/7**, dated 9 May 2011, Saud described (at paras 26-29) a temporary process, initiated by Suleiman in about 2000/2001 pending a then planned sale to Al Sanea or closure of the Money Exchange, to prevent any increase in the level of borrowings. He stated (para 28 of the affirmation) that "To achieve this, [Suleiman] told Mr Al Sanea that if he wished to renew or replace any existing borrowing of the Money Exchange, he needed to show head office documentation that showed the proposed new borrowing was not an increase on the expiring facility.  Badr was enlisted to be the link between AHAB and Mr Al Sanea…If he considered that the new agreement was effectively a like-for-like replacement of existing borrowing, he was to take it to my uncle Suleiman…" The expression New for Old" was first used by Saud in his second affirmation dated 10 September 2011 in these proceedings, at para 51 of **L1/8**, where he said "I referred to this "new for old" arrangement in a little more detail in paragraphs 26-31 of my third witness statement in the English commercial court proceedings." Saud also said at para 57 of **L1/8** that "I was not directly involved in the management of the Money Exchange and accordingly I do not know how closely this policy was followed."

borrowing policy: thus, Mr Quest said, "... our case about borrowing is not really a case that we make primarily on a facility-by-facility basis .. we say that Al Sanea's authority to borrow money in the name of the Algosaibis was .. limited to renewing and rolling over the existing balance ".[515] "Iteration 5" came in Saud's oral evidence, when "a bit more to cover interest" was conceded.[516] "Iteration 6" was suggested by Saud in his re-examination, when he spoke of exceptions to the policy, if there was a need for further finance in some other area of AHAB's business ("Saudi reinsurance or something I was contemplating at the time").[517]

491.   Secondly, to the extent that the policy was addressed by factual witnesses, that evidence was unsatisfactory and incoherent. As for Saud, the Chief Justice found his evidence "convoluted" and "patently unsatisfactory", inter alia because it had not been mentioned to AHAB's Investigation Team or lawyers and was only developed after the emergence of the N Files.[518] Badr's witness statement was only provided after all relevant cross-examination of live witnesses. The Chief Justice regarded it as bearing many signs of contrivance and in part positively inconsistent with AHAB's case and Saud's evidence on the same subject.[519] Other AHAB employees, such as Saad, Fakhri, and Sharikh, did not address New for Old. Neither did Yousef or Dawood in their witness statements. Mr Charlton and Mr Hayley made no mention of New for Old in either their London or Cayman evidence. Mr Hayley said in his 2015 interview and repeated in cross-examination that he had never heard of the expression "New for Old".

492.   In this connection, the Respondents had more to say on the subject of Badr's and Mr Hayley's evidence. As to Badr, the Respondents highlight AHAB's schizophrenic approach to his reliability. In both its Opening and Closing Submissions at trial, AHAB drew attention to the fact that he had been dismissed by AHAB in 2010, because he was then suspected of dishonesty, and Mr Hayley said that he was regarded as Al Sanea's "eyes and ears" in AHAB HO.[520] On the other hand, at the last moment AHAB put Badr forward as a witness of truth, relied on by the Algosaibis as Suleiman's gate-keeper.

493.   As for Mr Hayley, he had been general manager at the Money Exchange for a decade, but had never heard of New for Old, as became clear from his December 2015 interview, on oath, pursuant to section 236 of the Insolvency Act 1986. He there said, "I don't understand your question", when asked about the expression. He went on to answer "No", when asked if he was ever aware of any "guidelines for the Money Exchange which required there to be new for old borrowings only; in other words, no increase in the borrowings?" There was nothing about New for Old in his witness statement in these proceedings.[521] However, in the course of his oral cross-examination at trial, he volunteered that his answers in the interview were "not true", and given "Because I believed it to be true at the time I gave it". So, he was asked what had happened to change his understanding, and he said that he had been asked, within the last ten days, by AHAB's lawyer (Andrew Ford, who had drafted his witness statements for these proceedings with him) about New for Old. Mr Ford had initiated the conversation. Mr Hayley also said:

---

[515] **Day 2/142**
[516] **Day 59/9**
[517] **Day 67/75,** referenced in **Judgment AA/2.4/534,** para 102 of Section 3
[518] **Judgment AA/2.4/532** (at para 99 of Section 3), **AA/2.4/501-504,** paras 28-30 of section 3, **AA/2.4/507,** para 38 of Section 3
[519] **Judgment AA/2.4/537,** para 110 of Section 3. The Chief Justice dealt at length with  Badr's evidence at **AA/2.4/537-554,** paras 110-146 of Section 3
[520] Hayley witness statement, **C1/9/26,** para 120 ; AHAB's trial Closing Submissions **D/4/222**; AHAB's trial Opening Submissions **Day5/25**
[521] **C1/9**

> I do recollect that there was a period when the Algosaibi family didn't want any increases in the borrowings from local banks… But the actual phrase "new for old" was not one that I recall from my period in Saudi Arabia; and the phrase "new for old" is one that has been introduced recently during my conversations with the lawyers for the Algosaibis.[522]

494.    As for the Hayley memorandum dated 23 April 2007, there was a distinction between local bank borrowing and borrowing generally, because of the danger of SAMA monitoring of local lending; and in any event, the very drawing of that distinction was inconsistent with a policy of New for Old in general.[523]

495.    Thirdly, the Chief Justice's findings in relation to New for Old were entirely justified and in any event ones to which he was entitled. In particular, the following additional points were emphasised. (i) There was no documentary evidence setting out any written record of either a policy or a protocol, or of how it would have been communicated to Al Sanea. (ii) Saud's evidence that he understood Al Sanea to have repaid his indebtedness prior to the death of Abdulaziz was incompatible with any need for a New for Old policy at any rate beyond the date in question ("sometime before my father died in 2003" according to Saud).[524] That remained a telling blow against AHAB's case, even if Saud's belief in Al Sanea's repayment was itself, as the Chief Justice found "simply incredible".

496.    Fourthly, the Chief Justice went carefully through most of the 47 documents (ie those collected together in bundle F(X1/1)) relied on by AHAB as signposting a New for Old policy, and gave detailed reasons why they did no such thing.[525] Few of them at trial, and fewer still on this appeal, were addressed specifically by AHAB. The Chief Justice rightly said that by and large -

> these documents simply demonstrate Saud's close involvement in the approval of increasing and additional facilities. Had Saud thought that they supported the "New for Old" case, one might perhaps have expected him to have explained the Policy by reference to these documents in his witness statements. As it is, when any document was referred to Saud in cross-examination, he generally feigned ignorance of it, and/or its purpose.[526]

497.    Moreover, not one of AHAB's witnesses, not even Badr, referred to or relied on any of the 47 documents, nor were any of those who gave oral evidence taken to any of them in examination in chief. None of them articulated a policy or protocol. 47 documents out of the millions disclosed was a figure revealing in itself. In any event, any such documents had to be set against, and could not withstand the overwhelming volume of documents that were inconsistent with any concept of New for Old and which established increased borrowing and the Algosaibis' knowledge of and participation in that borrowing (see above concerning the Audit Packs and the Algosaibis' knowledge in general).

498.    _AHAB's brief Reply Submissions_ on the subject of New for Old take matters no further, and seem to us, if anything, rather defensive: for instance, "the absence of a piece of paper setting out the New for Old policy is inconsequential"; "Badr was only a gate-keeper and was reliant on documents provided to him by Al Sanea. However, it has to be accepted that his monitoring was not that effective"; "the Judge should have concluded that the lack of Mr. Badr's or Saud's

---

[522] **Judgment AA/2.4/508-512,** paras 44-46 of Section 3; **Day21/145-150**
[523] The Chief Justice had made both these points at **Judgment AA/2.4/221-222,** paras 560-561 of Section 1
[524] **Judgment AA/2.4/561-564,** paras 160-164
[525] **Judgment AA/2.4/564-577,** paras 165-183 of Section 3
[526] **Judgment AA/2.4/577,** para 183 of Section 3

(or Suleiman's) overall monitoring of each and every Money Exchange facility meant that the AHAB Head Office did not keep a check on borrowing levels across the banks."[527]

*Manipulation*

499.    We next turn to the subject of manipulation, since that is tied in closely with AHAB's case on "New for Old" as a subversion of it. That said, matters of manipulation are also said to depend on forgery, and were considered by the forensic document experts, Dr Giles and Mr Handy. Thus, AHAB's manipulation case was that facility and related documents had been altered ("manipulated") so that they represented the level of borrowing that was either to be approved or that had been approved in the past. The only explanation for this was said to be that it enabled Al Sanea to mislead Suleiman into signing for a higher facility than was consistent with New for Old, thereby itself demonstrating the existence of that policy. As pleaded, the contention was that Al Sanea either (1) forged facility documents by manipulating the text and/or content of documents (including by increasing the amount of facilities) *after* they had been signed by Suleiman, or (2) dishonestly induced Suleiman to sign new facility documents by presenting manipulated old facility documents in order to conceal the fact that the facility concerned was being increased.[528] It was said that category (1) documents reflected cases where a lower value facility was found on AHAB HO files and a higher value facility was found at the Money Exchange, the signature page on the former having been transposed to the latter; and that category (2) documents were cases where the higher value was found at AHAB HO in order to mislead the AHAB Partners for the time when the facility would come back to be increased later.

500.    As an example of the first category, we were shown (a) a guarantee[529] dated 30 June 2002 in favour of Gulf Bank by which AHAB guaranteed credit facilities of up to $ 80 million in favour of ATS, and (b) another guarantee[530] also dated 30 June 2002 in favour of Gulf Bank in substantially similar terms save as to amount, by which AHAB guaranteed credit facilities of up to $ 30 million in favour of AHAB and ATS. Both of these guarantees bear the signature of Suleiman, which in themselves are not said to be forged and are accepted as genuine. However, AHAB submits that it is an irresistible inference that the document guaranteeing up to $ 30 million was presented to Suleiman for his signature and that that document was subsequently altered so that his genuine signature apparently authenticated a guarantee for $ 80 million, by the switching of the signature page. Other records record that the Gulf Bank facility was increased in 2002 from an original $ 40 million to $ 80 million.

501.    As an example of the second category we were shown a facility agreement dated 30 August 2006[531], by which Mashreqbank agreed to provide facilities to a limit of $ 272.1 million, and another agreement of the same date in substantially identical terms save that the credit limit was $ 429 million.[532] There is also a third document, this one dated 12 June 2007, ie 9 months later, by which Mashreqbank agreed to provide facilities up to the higher amount of $ 429 million. Both of the earlier documents bear Suleiman's signature: the signature on the agreement for the lower amount is said to be genuine, whereas that on the agreement for the higher amount is said to be matched and forged. Suleiman's signature on the later document is agreed by the experts to be a matched signature, but AHAB does not rely on this as a forgery. What is said to have happened is that the forged earlier document was presented to Suleiman nine months later to induce him to sign the third document of June 2007.

---

[527] AHAB's Reply Submissions, **AB/10.10/1-3**
[528] The amended Statement of Claim at paras 103A-B, **A1/2.3/44**
[529] **G/2895.1**
[530] **H4/39**
[531] **G/5400**
[532] **H2/96**

502.    Another example shown to us by Mr Wardell is a guarantee signed by Suleiman dated 30 September 2002 made in favour of Gulf Investment Corporation. One version is in respect of facilities for $ 60 million, and another version, substantially but not entirely identical, and dated 24 October 2002, is in respect of $ 35 million. The signature page of the $ 35 million version is the same as the signature page of a still earlier guarantee to Gulf Investment Corporation dated 14 January 2002, bearing three genuine Suleiman signatures. AHAB's submission is that it is to be inferred that the signature page of the earliest document was used to support the later guarantee at the higher amount.

503.    A fourth example shown to us by Mr Wardell concerns the Bank of Tokyo-Mitsubishi. Two guarantees are dated 9 August 2003. One refers to a facility agreement for $ 40 million, the other to a facility agreement for $ 30 million. Both have identical signature pages signed three times by Suleiman. Mr Wardell submits that the higher value document was used in 2006 to support an increase in this facility from the original 2003 limit of $ 30 to $ 40 million, under a facility agreement dated 30 July 2006. The 2006 facility agreement appears in two versions: one, found at AHAB HO, for $ 40 million referring to an earlier agreement dated 9 August 2003 also for $ 40 million; and the other, found at the Money Exchange, marking an increase in facility from $ 30 million to $ 40 million and referring to an earlier agreement dated 9 August 2003 for $ 30 million. The signature pages appear identical. This would be a further example within category two. The two versions of the 2006 agreement were needed because the genuine one referred to an increase from $ 30 million to $ 40 million.

504.    A fifth example shown to us by Mr Wardell concerns Al Ahli Bank of Kuwait. Two guarantees are dated 9 August 2004. One is for $ 30 million, the other is for $ 40 million. The signature pages, however, are not identical, and neither is the bank's logo on the first (double-side printed) page. The guarantees go together with two facility agreements of the same date, one for $ 30 million and the other for $ 40 million, but not on identical terms. There are also differences between the bank logo. The signature pages are not identical. Dr Giles says that the signatures on the $ 30 million documents are not matched to any source signatures and are therefore presumed to be genuine. The documents were found at AHAB HO. The signatures on the $ 40 million documents, however, are different from the $ 30 million signatures and are matched signatures and therefore submitted to be applied artificially and therefore forged. This therefore is put forward as another example commensurate with the Gulf Investment Corporation example (para 502 above), but different from it in that the suggestion is that, instead of using an identical but genuine signature page on a new document, Suleiman's signature is forged on the new document.

505.    A sixth example shown to us by Mr Wardell concerns Barclays. There are two versions of an amendment dated 7 June 2007 to a facility agreement dated 23 April 2007, one referring to $ 90 million, found at AHAB HO, and the other referring to $ 40 million, found at the Money Exchange. They are in substantially the same, but not identical, form. The former is signed by Suleiman, but not the latter. A further document dated 4 December 2007 refers to the original agreement being for $ 43.5 million and records an increase to $ 90 million. AHAB's case in this example is not clear, but it appears to be suggested that the $ 90 million document was presented to Suleiman in June 2007, taking the risk that he did not remember the $ 40 million facility of April 2007, in order to obtain his agreement to a $ 90 million loan in December 2007, when the December document itself refers to an increase from an original amount of $ 43.5 million.

506.    AHAB deals with manipulation at paras 9.29 to 9.31 of Section 9 of its Written Submissions and at paras 10.41 to 10.42 of Section 10 of its Reply Submissions. There is also a separate bundle of "Manipulated Documents" within Bundle F, where 14 sets of documents have been collected. The Gulf Bank example referred to above is at tab 1 of that bundle, and the Mashreqbank example is at tab 13. The Gulf Investment Corporation example is at tab 2. The

Bank of Tokyo-Mitsubishi example is at tabs 5 and 11. The Al Ahli Bank example is at tabs 6 and 7. The Barclays example is at tab 14.

507.    The Chief Justice deals with AHAB's manipulation case at section 5 of his judgment. The Chief Justice acknowledged that the Respondents accepted that specific documents identified by AHAB as having had been altered had been altered, while raising questions as to when, by whom, and why.[533] In the end he concluded that the documents relied on by AHAB "simply cannot bear the weight of inference that AHAB wishes to place on them" and that the questions raised went unanswered. He accepted the Respondents' written submissions which had examined each of the sets of documents concerned and which he considered reinforced the conclusion that AHAB's case based on these documents was unsustainable.[534] He was influenced by the fact that the documents derived from AHAB HO, had been in the possession of AHAB for 7 years without being considered of any importance, and only came to prominence when the Respondents sought disclosure, which was originally resisted.[535]

508.    AHAB nevertheless submitted, in essence, that the Chief Justice had never managed to deflect himself from his original view that AHAB's application to amend to plead manipulation should never have been allowed (as it was, by consent, on appeal), and that he had been too willing to accept a host of implausible explanations advanced by the Respondents to account for the alterations relied on. In the absence of Al Sanea, whose dishonesty towards AHAB was accepted by the Chief Justice with regard to his Counterclaim, and in the absence of Suleiman who had died, it was unfair to impose on the victims of deceit the burden of explanation, and on that ground evade any finding as to why the documents had been altered and by whom. It was one thing for the Chief Justice to shrug his shoulders and say: who can explain what fraudsters in it together (the Algosaibis and Al Sanea) get up to, and why? It is another thing to hold the scales of justice in balance to the very end and weigh these examples of manipulation, together with evidence of forgery of signatures, in support of AHAB's case of New for Old.[536] Why else the need to manipulate these documents?

509.    _The Respondents' Submissions._[537] Although it was common ground at trial that certain documents had been altered (to adopt a neutral expression), the Chief Justice's scepticism as to dishonest manipulation was one to which he was entitled. First, AHAB's case rested on a tiny number of documents among thousands of facility agreements and millions of documents disclosed. Secondly, in such circumstances it was irrelevant that the Respondents' expert, Mr Handy, had found an additional example to those originally relied on by AHAB. Thirdly, what AHAB described as far-fetched and unsupported speculations (eg, as to wrong signature pages being attached by the Young Algosaibis to the wrong agreements) were reasonable observations and in any event not critical to the Chief Justice's overall conclusion. The Chief Justice was also entitled to have regard to the facts that AHAB had not clearly pleaded its case on each of the manipulations alleged, and that its general case was unsupported by any specific evidence from Mr. Badr or Saud or anyone. Fourthly, the Chief Justice was not obliged to make findings as to the detail of alterations in such circumstances, where he had concluded that he was unable to do so. His findings and scepticism were well expressed in detail in his judgment on AHAB's late application to amend to plead their manipulation case, the hearing of which had occupied three days on Days 25-27 of the trial.

---

[533] **Judgment AA/2.4/707,** para 15 of Section 5
[534] **Judgment AA/2.4/730,** paras 71-72 of Section 5
[535] **Judgment AA/2.4/705,** para 7 of Section 5
[536] **Day 10A/104-105**
[537] The Respondents' written submissions on manipulation are contained in Section 10, sub-section F of their Written Submissions at **AC1/10/107-114**

510.    In the Respondents' oral submissions[538], Mr Valentin emphasised that nothing of any significance had subsequently emerged at trial, and that the Chief Justice was therefore well entitled to refer extensively to his detailed judgment on the application to amend. He claimed that Mr Quest's oral closing submissions at trial on the subject of manipulations had lasted only four minutes, and that written submissions had merely repackaged the arguments that had been deployed at the application to amend hearing. A fundamental difficulty with the whole theory of manipulation was that it was put forward as Al Sanea's attempt to subvert a New for Old regime which never in fact existed.

511.    Mr Valentin went through Mr Wardell's examples. For instance, with respect to Gulf Bank (para 500 above), there were on the same day, 30 June 2002, to be found not only the impugned $ 80 million personal guarantee, but also *another* $ 80 million guarantee signed by Suleiman jointly and severally with AHAB in favour of Gulf Bank, not on the forgery schedule.[539] Then, with respect to a Gulf Investment Bank example (not cited above), where there are two facility agreements both dated 20 March 2003, one for $ 10 million and one for $ 15 million, where the higher value document was said to be found at the Money Exchange and the lower value document was said to be found at AHAB HO, Mr Valentin pointed out that the higher value document was also to be found at AHAB HO.[540] Then, with respect to the Gulf Investment Corporation example (see para 502 above), Mr Valentin pointed to a third document signed by Suleiman in November 2002 for $ 95 million (again not within AHAB's manipulation bundle), which demonstrated that Suleiman was well aware that borrowing from this bank far exceeded $ 30 million. As for the Mashreqbank example (see para 501 above), Mr Valentin drew attention to what the Chief Justice had said about this at paras 61-62 of Section 5 of his judgment.[541] And so on.

512.    In AHAB's oral submissions in reply,[542] Mr Wardell observed (wrongly, we would observe) that the Court had not been taken by the Respondents to any of the relevant documents, because, he submitted, there was no plausible explanation for them. Instead, the Respondents had relied on the Chief Justice's mistaken views at the time of the amendment application, which had been overtaken by the presentation of relevant evidence in the case, such as the expert reports and Badr's witness statement. He emphasised that the Chief Justice had here, as elsewhere on the subject of forgery wrongly placed on AHAB a criminal burden of proof, such that any possible explanation might default AHAB's case.

*Forgery*

513.    We come next to the wider subject of forgery. As to that, AHAB's initial task was to establish that the documents appearing on the forgery schedule were indeed forgeries, and not merely documents bearing signatures applied by someone other than the apparent signatory but with their authority.

514.    <u>AHAB's Submissions.</u> In their Written Submissions[543] AHAB explained their case that forgery began with Abdulaziz's signature at the time of his stroke[544], and accelerated first in 2003 and

---

[538] **Day14A/74ff**
[539] Judgment at **AA/2.4/576** at para 180 of Section 3, citing **G/3547.3** (not a document within AHAB's manipulation collection)
[540] **H5/29**
[541] Judgment **AA/2.4/725-726**
[542] **Day20A/39ff**
[543] **AB/1.9/29-48**
[544] AHAB's case in this respect was primarily concerned with (30 out of 32) documents dated after Abdulaziz's stroke, as to which the Chief Justice's conclusion, that this was done for convenience to disguise the seriousness of Abdulaziz's condition from the outside world, was at fault, since his illness was well known to the outside world.

again in the 2004 to 2008 period employing the signatures of Suleiman, Saud and Yousef. It was supported by the evidence of Mr Thomas about the Saad Group's database of signatures and the ability of James Dennis, a Saad Group employee, to compose documents electronically. It was corroborated by the Chief Judge's finding of fraud with respect to the Counterclaim; and by the experts' findings of matched signatures on the forgery schedule, which the Chief Justice failed properly to evaluate. It was not gainsaid by any positive evidence from the Respondents as to how documents came to be signed or why matching Algosaibi signatures were applied.

515.    Significantly, it was not put to Saud, or Yousef, that they had authorised the use of the mechanical application of their signatures. Similarly, Al Sanea had never advanced a case that he had been authorised to apply Algosaibi signatures, on the contrary he had stated that he had no reason to think that there had been any use of simulated signatures.[545] The Chief Justice thought that was "simply incredible".[546]

516.    The Chief Justice also erred in giving too much credence and insufficient analysis to a theory that Suleiman had made use of hand-stamps to facilitate the demand for multiple signing of documents. This was a theory put forward by the Respondents on a faulty basis and inconsistent with the weight of expert and non-forensic evidence. Mr Handy's suggestion of use of a hand-stamp had been based on a single document. But 29 different hand-stamps would have been needed to produce the different signatures considered by the experts, and there were multiple other difficulties with the theory. Mr Wardell's submissions on hand-stamps are further developed below.

517.    The Chief Justice also erred in giving weight to the Respondents' theory that mechanical signatures were applied as a matter of convenience, citing as an example the 2007 Westdeutsche Landesbank facility, where Suleiman had signed one document in a series in manuscript while other documents were found with matched signatures. AHAB asked: Why not sign all in manuscript?[547]

518.    AHAB summed up their case on forgery as follows:[548]

> In any event, the Judge needed to determine why and by whom simulated Algosaibi signatures had been applied so as to reject AHAB's allegations of forgery. The Judge failed in his judicial duty by leaving those issues without determination. The Judge should have found that:
>
> (1) It was Al Sanea who had procured the application of simulated Algosaibi signatures to documents in order to continue to obtain borrowing which he knew he had no authority to obtain so that he could then divert funds out of the Money Exchange for his own benefit, all in breach of fiduciary duty.
>
> (2) It was Al Sanea who had procured the application of simulated Algosaibi signatures to documents related to the operation of TIBC and the other Bahraini Financial Businesses in furtherance of his fraud on the Algosaibis and on the lending banks.
>
> (3) There was no evidence that the Algosaibis authorised Al Sanea to apply their signatures by hand-stamp or any other mechanical means, and they did not authorise Al Sanea to so apply their signatures. Indeed, there was uncontested evidence that documents

---

[545] Al Sanea at **L2/9/42 and 45**
[546] **Judgment AA/2.4/698-699,** para 261 of Section 4
[547] AHAB's Written Submissions, **AB/1.9/42** at para 9.41(g)
[548] AHAB's Written Submissions, **AB/1.9/45** at para 9.45

         were executed/signed by the relevant partner with a pen and not in any other way.

(4) The "*new for old*" policy was not a fabrication and it did exist from 2002 onwards.

(5) Al Sanea deliberately sought to circumvent the "*new for old*" policy by forging the Algosaibis' signatures and by manipulating facility documents to give the false impression of his compliance with the "*new for old*" policy.

519.    In their Reply Submissions,[549] AHAB returned to and developed some of these themes. Thus, they reverted to Mr Thomas's evidence about Mr Dennis fabricating a document for Mr Thomas and telling him that his primary role at Saad was the production of documents in a similar fashion. They dismissed as absurd the suggestion that the Algosaibis would have used similar equipment (if any was available within AHAB HO itself, which was denied) to apply mechanically their own signatures to documents. They challenged the Respondents' interpretation of the expert reports and the forgery schedule, which had misled the Chief Justice, who had been overly reliant on the Respondents' submissions. They made the broad submission that mechanical application of signatures was evidence from which it could be inferred that the signatory did not consent to the transaction, particularly where there was no evidence of authority to apply such mechanical signatures. Reverting to the hand-stamp theory, and to the evidence, such as Mr Harbi's, relied on by the Respondents and the Chief Justice, in support of it, they complained that the Chief Justice had ignored documents purportedly signed by Suleiman after he was incapacitated. They added other examples to that of Westdeutsche Landesbank in opposition to the convenience theory, now submitting that the unmatched signatures were themselves probably forged. In that connection, they disputed the Chief Justice's figure of 54,000 finance transactions, pointing out that the Respondents themselves had calculated the figure at 24,000, and that a better estimate for the years 2000-2009 was of only 3,377 signatures (based on a much smaller number of facilities dealt with by the Respondents' bank chronologies)[550]. They highlighted the appearance of Algosaibi signatures on proxies to TIBC board meetings, when Bahraini law forbad proxy attendance and required attendance in person, as something which the Algosaibis would not have countenanced. And they drew attention to employees who had purported to witness the signatures on the forgery schedule, when signatures would be signed by the Algosaibis at AHAB HO and the employees worked elsewhere, either at the Money Exchange or at the Saad offices[551].

520.    In presenting his appeal orally, Mr Wardell developed these submissions as follows. We address the Counterclaim separately, and start with Mr Wardell's submissions about the TIBC documents.

521.    Mr Wardell's essential contention in relation to TIBC was that none of the Algosaibis knew anything about or had any involvement in TIBC's activities – although they knew in general of its existence. Documents which appear to show such knowledge or involvement are said, without exception, to be forgeries: indeed, Mr Wardell asserted that in the whole of the voluminous discovery there was no single instance of a document relating to TIBC's affairs which bore a genuine signature of any of the AHAB Partners. Eight categories of documents were relied on in this respect: (i) documents relating to the initial capitalisation of TIBC, (ii) proxy appointments, (iii) board minutes, (iv) board resolutions, (v) financial statements, (vi) loan customer applications, (vii) payroll, and (viii) bonus schedules.

---

[549] **AB/10.10/3-17**
[550] AHAB's Reply Submissions at Appendix 3, **AB/10.23**
[551] AHAB's Reply Submissions at Appendix 4, **AB/10.24**

A-9765

522.     We will start with (ii), (iii) and (iv), documents arising out of board meetings. So far as the documents disclose, there were board meetings held, or purportedly held, in Bahrain beginning with 14 March 2006 and extending to 4 September 2008. In addition, there were meetings held, or purportedly held, in Saudi Arabia in May 2003, May 2007 and February 2008.

523.     There are minutes of, or resolutions resulting from, these board meetings for May 2003, June 2006, February, July and December 2007, and February and May 2008. With a few exceptions, which include the minutes for May 2003, TIBC's first, all the minutes are signed by Peter Belmont as chairman (although strictly speaking Suleiman was chairman of the board), state that Suleiman, Saud and Yousef were present by proxy and attach a sheet headed "Minutes Reviewed and Endorsed" apparently signed by Suleiman, Saud and Yousef. A few of the documents are signed by Suleiman alone. The experts agreed that all Suleiman's signatures on these documents are matched, with the exception of the attached sheet for the meeting of February 2008, which neither expert says is matched. As for Saud, they agree that his signature is matched on four of the documents signed by him, but his signature on the attached sheet for the meeting of February 2008, as in the case of Suleiman, is not said to be matched. As for Yousef, the experts agree that his signature is matched on three documents, but his signature on two others are stated not to have been examined.

524.     As for the proxies, there are forms for meetings running from June 2006 to May 2008, variously signed by the Algosaibis, almost all of which are agreed by the experts to bear matched signatures. The exceptions are Suleiman's signature on the proxy for the February 2007 meeting, which Mr Handy says is matched but Dr Giles says is not, and Suleiman's signature for the September 2007 meeting, which neither expert says is matched.

525.     There is an email exchange which relates to the contents of the minutes of the board meeting of September 2008. On 15 October 2008, Mr Belmont said, in relevant part, that –

          I do think it proper, however, even though the three EDs were not physically present, to note that their proxies were delivered and who held those proxies.[552]

          The answer, sent by TIBC's Chief Risk Officer, Afzal Abbaali, was in the following terms:

          Can someone tell Mr Belmont that our Executive Directors including the Bank's chairman were PRESENT PHYSICALLY…this point forward there won't be any "Proxy Business" in our board meetings nor will he ever meet the bank's Chairman or we will ever have a meeting in Alkhobar…he must not cry for the moon!!! He must get this message clearly and loudly!!![553]

          The minute recorded the presence of Suleiman, Saud and Yousef, and said nothing about proxies; but the fact that Mr Belmont chaired the meeting suggests that Suleiman was not in fact present. Mr Wardell relied on this exchange as contemporaneous evidence that the Algosaibis did not personally attend, and were not intended personally to attend, board meetings of TIBC. We observe that the logic of Mr Abbali's protest (sarcasm or irony) is not entirely clear, but we think that the background to Mr Wardell's point is that Bahraini law required the physical presence and not mere proxy presence of company directors, but that even so the Algosaibi directors would never appear in person.

526.     There were also meetings of TIBC's executive committee purportedly held in Saudi Arabia every two months or so between December 2007 and December 2008. There are minutes of all

---

[552] **G/7083**
[553] **G/7083**

these meetings except the first, apparently signed by Suleiman as chairman, and showing Saud as also present. The experts agreed that Suleiman's signatures on these minutes are matched.

527.    Then as to capitalisation of TIBC ((i) above), the initial board meeting in May 2003 is represented by a minute signed by Suleiman which is not on the forgery schedule. The minute records resolutions that TIBC's capitalisation be partly constituted by Saudi bank shares acquired from AHAB at defined prices. There are also letters dated May and June 2003 by which AHAB acknowledges receipt of various sums from TIBC for its purchase of the various shares, signed by Suleiman, all of which appear in the forgery schedule as bearing his mechanically applied matched signatures. One letter in this series, however, concerning shares in the Eastern Cement Company does not appear on the forgery schedule.[554]

528.    December 2004 saw an increase in TIBC's capitalisation. There are eight documents relating to it, including a board resolution, all signed by Suleiman, and the experts agree that all are matched signatures.

529.    As for financial statements ((v) above), Suleiman's matched signatures appear, as the experts agree, on the TIBC 2008 financial statements dated 9 February 2009, at which time Suleiman was incapacitated. (However, we observe that Suleiman's signature appears on TIBC's financial statements for 2005, 2006 and 2007, and those documents do not appear on the forgery schedule.)

530.    As for TIBC customer credit applications ((vi) above), payroll schedules ((vii) above), and bonus schedules ((viii) above), there were 13 of the first, 15 of the second, and one of the third, each bearing a Suleiman signature agreed to be matched.

531.    It is to be noted that some documents relating to TIBC's capitalisation were found at AHAB HO, which might suggest that they are genuine. However, Mr Wardell suggests that those of them which appear on the forgery schedule are simply copies of forgeries; and that documents relating to TIBC's capitalisation would tell AHAB nothing about its activities.

532.    Mr Wardell also relied in the TIBC context on the following matters:

(a)    The BPP Report, which made findings of forgery of the Algosaibi signatures on every one of the TIBC documents examined, accepted that there was no evidence to suggest that any of the Algosaibis attended any board meetings throughout the existence of the bank, that false customer accounts had been created, and that financial statements and other documents had been designed to support fake customer loans to allow Al Sanea to channel money from TIBC to the Money Exchange;

(b)    The evidence of Tariq Ali to the effect that, when Saud and Dawood attended the board meeting of May 2009, they were not recognised by anybody, and claimed to have no knowledge of any of the affairs of TIBC, and the evidence of Saud and Dawood to like effect;

(c)    The evidence of Mr Potter to the effect that Al Sanea took care to distance the AHAB Partners from the affairs of TIBC.

533.    Forgery in the time of Abdulaziz was next on Mr Wardell's agenda. The earliest group of forgeries relied on by AHAB were said to have occurred in October 2000, after Abdulaziz's incapacitating stroke on 30 September of that year. It was common ground that he was thereafter incapable of signing documents. On 3 October 2000, Al Sanea sent a memorandum to Mr Potter, asserting that Abdulaziz had had "a minor operation to his right finger" and

---

[554] **G/3387**

instructing that any document requiring his signature would be signed instead by Al Sanea under an existing Money Exchange resolution authorising Al Sanea to do so.[555] Al Sanea thereby hoped to keep Abdulaziz's incapacitation a secret, and to excuse his inability to sign documents by reference to the false story of an operation to his writing hand. However, Mr Hayley, learning of this instruction, countered in a memorandum to Al Sanea in which he pointed out that the resolutions of AHAB and the Money Exchange referred to by Al Sanea covered only the operational consequences of existing facilities, that under articles of association it was necessary for Abdulaziz as chairman to designate someone to undertake his duties, and that banks would be alive to these formalities if documents not bearing Abdulaziz's signature were to be relied on. As it happened, the problem was imminent in terms of a new facility from HSBC Bahrain to AIS: "Please may I have your instructions."[556] Then, on 7 October 2000 there came (i) a board meeting minute of AIS resolving to undertake the HSBC facility, and stating that Abdulaziz had chaired the meeting; (ii) notice of that meeting, signed three times by Abdulaziz, for himself, Suleiman and Yousef; and (iii) a minute of a meeting of AHAB resolving to guarantee the obligations of AIS and purporting to be signed by Abdulaziz.[557] On 18 October 2000 there followed three HSBC facility agreements, each bearing Abdulaziz's signature on behalf of AHAB as guarantor, and a letter from Mr Potter to HSBC enclosing the three agreements and the board resolutions of AIS and AHAB.[558]

534.   It is AHAB's case that since Abdulaziz was incapacitated throughout, he could not have chaired the meeting of AIS on 7 October 2000, could not have signed the minute of AHAB's meeting or the notice of that meeting, and could not have signed the facility agreements of 18 October 2000. Those documents were accordingly forged.

535.   AHAB also submit that Abdulaziz's signatures, in the resolutions referred to in Mr Hayley's memorandum of 4 October 2000 as being relied on by Al Sanea, were themselves forgeries: the experts, having examined the originals, agreed that the signatures had been mechanically applied, and, according to Mr Handy, using fused toner powder. At the date of those resolutions, 24 July 2000, there would have been no reason why Abdulaziz could not have signed them for himself. Mr Wardell therefore submitted that these resolutions must have been backdated. This was a new point raised in oral submissions on appeal (see further below at para 537, where it is observed that the Chief Justice was in effect puzzled by the appearance of these documents on the forgery schedule).

536.   Mr Wardell also questioned the authenticity of these resolutions as being inconsistent with other contemporaneous arrangements for obtaining Abdulaziz's signature. Two memoranda from Al Sanea dated 20 and 23 July 2000 spoke of Al Sanea's wish to reduce or limit the documents being forwarded for signature to Abdulaziz to Promissory Notes, new facilities, and the renewal of old facilities. "I would like to send a minimum paper for Uncle Abdulaziz's signature starting immediately".[559] Mr Wardell submitted that these instructions were inconsistent with the resolutions dated 24 July 2000, which provided for signatures either by Abdulaziz or Al Sanea, and to other documents of August 2000, which indicated according to Mr Wardell that Abdulaziz was expected to continue to sign documents: so that Mr Wardell's submission was that these resolutions had been backdated from a time shortly after Abdulaziz's stroke, in order to avoid the necessity for obtaining the signatures of Suleiman or Yousef on facility and other documents. When Mr Hayley pointed out that these resolutions did not permit Al Sanea to sign new facilities, this necessitated the forging of Abdulaziz's signature on the HSBC facility documents. This episode, submitted Mr Wardell, marked the beginning of a very extensive and increasingly sophisticated programme of forgery by Al Sanea.

---

[555] **G/2231**
[556] **G/2236**
[557] G/2240, G/2243 and **G/2237**
[558] **G/2254/16, G/2258/16, G/2259.1/16, G/2256**
[559] **G/2180, G/2187**

537.   The Chief Justice nevertheless concluded[560] that these resolutions of 24 July 2000 could not be forgeries because (a) even on AHAB's case forgery did not start until the New for Old policy was put in place after Abdulaziz's stroke; and (b) Abdulaziz knew of the bank borrowing incurred during his time. He accepted the Respondents' contention that the only rational explanation for the resolutions bearing mechanically applied signatures was that this was done as a matter of convenience. He considered that this was consistent with Al Sanea's memoranda wishing to limit the number of documents put to Abdulaziz for his signature. Mr Wardell criticised this reasoning on the basis that it assumed without analysis that the resolutions were passed on the date that they bear, but also inter alia on the basis that Abdulaziz could have signed the resolutions if he had been at the meeting and that they were inconsistent with the idea that Abdulaziz would be required to sign less often.

538.   Despite the enthusiasm with which Mr Wardell articulated this argument, we do not think that it adds much if anything to his case. We do not ourselves see that there is an inconsistency between an expectation that Abdulaziz would sign fewer documents and resolutions authorising both him and Al Sanea to sign independently. That is particularly so, because Al Sanea's memorandum dated 20 July 2000 proposing a reduction in the documents requiring Abdulaziz's signature also suggests the drafting of a new board resolution to deal with signing. Nor do we see that there is a necessary inconsistency between the terms of the resolutions of 24 July 2000 and the expectation evinced by the documents that Abdulaziz's signature would continue to be required in some circumstances. The suggestion that the resolutions must be forged because Abdulaziz would have had no reason not to sign them at a meeting which he had chaired depends on copies of the resolutions having already been drawn up for his signature and made available at the meeting. Overall, it seems to us that the Chief Justice was entitled to take the view that the mechanical application of Abdulaziz's signature may well have been for the purpose of convenience.[561]

539.   AHAB's case is at any rate in theory stronger in relation to documents apparently signed by Abdulaziz after his stroke. After all, it was common ground that he was thereafter unable to sign documents. The question, however, is whether this was just a case of those dealing with the Money Exchange in those circumstances, such as not only Al Sanea, but also Suleiman, Yousef and Saud, deciding that Abdulaziz's incapacity needed to be kept from the outside world as long as possible. Clearly Al Sanea thought that was necessary, hence his lie about Abdulaziz's injured writing hand. Nevertheless, it may be noted that "Abdulaziz" also signed on behalf of other Algosaibis. A good example in this context is perhaps the notice of the board meeting of AIS on 7 October 2000[562], in which the "undersigned directors" acknowledged the receipt and sufficiency of the notice: but the only apparent signatory apart from Al Sanea is Abdulaziz, who appears to have signed on his own behalf and on behalf of Suleiman and Yousef. Not only could the signatures not have been appended by Abdulaziz himself, but Suleiman and Yousef could have signed for themselves. There are other examples of Abdulaziz apparently signing for Suleiman and/or Yousef in the period of Abdulaziz's incapacity. An example is a letter dated 9 January 2001 from the National Bank of Bahrain confirming a facility, countersigned by way of acceptance by Al Sanea on behalf of AIH and apparently by Abdulaziz on behalf of himself and Suleiman, as well as generally for AHAB and Hamad's heirs.[563] Another is a guarantee of the same date from the Money Exchange to the Bank of Tokyo-Mitsubishi, apparently signed by Abdulaziz on behalf of himself and Suleiman. Is this support for AHAB's thesis that Al Sanea was disguising from Suleiman and Yousef matters

---

[560] **Judgment AA/2.4/622** at paras 121ff of Section 4
[561] In any event, Mr Wardell's point that these resolutions had been backdated from a period after Abdulaziz's stroke had not been made to the Chief Justice and was new on appeal.
[562] **G/2244**
[563] **G/2350**

that he suspected they would object to? Or was this a continuation of a previous practice whereby Abdulaziz, before his stroke, would sign for the other partners as well?

540.    Another document, a Promissory Note dated 12 March 2001 given in favour of the Arab Investment Company,[564] is relied on by AHAB as the first example of documents containing a further indication of forgery. The Promissory Note is apparently signed by Abdulaziz and is witnessed by Khalil Khalil and Mohammed Hussain, ostensibly in Dammam. Abdulaziz was not in Dammam in March 2001, and was anyway not capable of signing documents. The two witnesses were Saad Group employees, and they and other employees of the Saad Group, the Money Exchange and ATS frequently countersigned as witnesses documents bearing Algosaibi signatures. Khalil Khalil, for example, is said to have witnessed 95 documents, and another employee, Ahmed Fawzi (head of operations at the Saad Group), is said to have witnessed 109, as also individually noted on the forgery schedule.[565] This was over the period covered by the forgery schedule, extending into 2009, and not just during the period of Abdulaziz's incapacity.

541.    According to Mr Wardell, the relevance of the forgery of Abdulaziz's signatures was (i) that it was a good illustration of the Chief Justice's unduly compartmentalised approach, (ii) that it also illustrated his overlooking and/or misunderstanding contemporaneous documents, and (iii) that having got this initial aspect of the forgery case wrong, the Chief Justice was not in a good place to proceed to consider the rest of the forgery allegations. If the Chief Justice had interpreted this evidence as any reasonable judge would have done, he would have concluded that Al Sanea was responsible for the Abdulaziz forgeries, and that conclusion would have fed into his reasoning process when he came to consider the allegations concerning forgery of Suleiman, Saud and Yousef signatures, leading him to realise the truth of Al Sanea's industrial programme of forgery. That would in turn have compelled the Chief Justice to infer that even for documents not on the forgery schedule there was no automatic sound basis for finding that a document was authentic and genuine.

542.    Mr Wardell referred us to the fact that Suleiman did sign some documents during the period of Abdulaziz's incapacity, taking as one example a facility dated 29 November 2000 between SAMBA and the Money Exchange, signed by Suleiman on AHAB's behalf.[566] Mr Wardell's purpose in referring us to this document was to rebut the suggestion, adopted by the Chief Justice, that Suleiman knew and accepted that Al Sanea was applying Abdulaziz's signature as finance documents as a matter of convenience. He suggested that Suleiman's willingness to sign certain documents indicated that he would have been unlikely to have been content to allow Al Sanea to obtain finance by applying Abdulaziz's signature wholesale. It seems to us, however, that this example is equivocal, since the evidence was that SAMBA knew of Abdulaziz's incapacity (he was chairman of SAMBA) and would therefore have been unwilling to accept his signature on a facility document.

543.    Mr Wardell's next point was to refer to what he described as unchallenged evidence supporting AHAB's case of forgery. He started with the evidence of Mr Jean-Michel Thomas, Al Sanea's former food and beverage manager, who stated[567] that he had witnessed forgery of documents at the Saad Group. He referred specifically to an occasion when James Dennis, a computer designer employed by the Saad Group, created false bank documents and a false employment certificate for the purpose of a mortgage application to be made by Mr Thomas. Mr Thomas said that Mr Dennis had what appeared to him to be top-of-the-range equipment and had explained to Mr Thomas that he had databases of signatures, stamps and letterheads and that he could create any document he liked using them. Mr Thomas said:

---

[564] **G/2395**
[565] AHAB's Reply Submissions, Appendix 4, **AB/10.24**
[566] **H9/189**
[567] Thomas witness statement, **C1/13**

> He created the letterhead first, using a template on his system, and then he typed in some text. He then opened a file containing a large number of scanned signatures and dragged one onto the letter. Next, he opened another file containing scanned stamps and dragged one onto the letter. He added some smudged marks and told me this was a good idea, as a perfect stamp does not look genuine. Lastly, he changed the colour of the document so that it was not too white.[568]

544.   This was in early 2008.[569] Mr Thomas said that he had not used the false documents. Mr Thomas also recounted a further meeting with Mr Dennis at dinner in about December 2009:

> …He then went on to explain that most of his time was taken up in producing documents in the way that he had done for me. He explained that many of these documents were in Arabic and that he was told where to place signatures and stamps on the document; James didn't speak or read Arabic. I was shocked at the apparent scale, James said to me, "This is what I do." He was quite matter-of-fact about it.

> James told me that he took his instructions directly from the Chairman, who gave directions as to what documents needed to be produced.[570]

In December 2009, Mr Dennis was still employed by the Saad Group.

545.   Mr Wardell next referred to Mr Hayley's evidence that his own signature had been forged on a letter addressed to a bank while he was on holiday in the early 2000s: he found it on his desk on his return.[571] He said he was incensed, phoned Al Sanea and yelled at him. However, we observe that Mr Hayley also said that "I certainly did not have any idea that any of the signatures on the banking documents were forged…none of the banks ever complained to me about the alleged forgery of a signature…I was astonished when members of Deloitte told me that signatures on banking documents had been forged."[572] He also said that Al Sanea apologised.

546.   Then Mr Wardell referred to what he again referred to as unchallenged evidence provided by Mr Sharikh (Suleiman's secretary)[573], Dawood[574], Saad[575], and Mr Hindi[576] about Suleiman's procedures for signing documents. That evidence was consistent in saying that Suleiman did not permit other people to apply his signature mechanically and did not himself use hand stamps.

547.   Mr Wardell's particular purpose in referring to this evidence was to rebut the suggestion that matched signatures of Suleiman had been routinely applied using hand stamps. The genesis of the stamp theory lay in Mr Handy's first report:[577]

> The disputed document numbered 09-002 consists of a "glossy" paper, the surface of which would be less absorbent than a standard "matt" paper. The mechanically applied signature on this document exhibits a concentration of

---

[568] **C1/13/31** at para 163
[569] **G/6191, G/6278**
[570] **C1/13/32** at paras 169-170
[571] Hayley witness statement, **C1/9/59** para 288
[572] **C1/9/58-59** at paras 286, 292
[573] Sharikh witness statement, **C1/24**
[574] Dawood witness statement, **C1/23**
[575] Saad witness statement, **C1/22**
[576] Hindi witness statement, **C1/20**
[577] Handy first report, **J/2/9** at para 44

ink along the borders of pen lines and this observation of "tram lines" is characteristic of ink applied under pressure, such as occurs with a "rubber stamp". It is therefore possible that all signatures recorded as mechanically applied were made using a "rubber stamp".

548.  Mr Wardell's first point in relation to this theory was that it could relate only to a minority of documents and signatures identified by Mr Handy as being applied by mechanical means *other* than by laser print or ink jet technology – 48 documents containing 68 signatures, and even in relation to those Mr Handy was prepared to say merely that it was possible that they had been applied using a stamp. Moreover, the experts were agreed that if all the signatures described by Mr Handy as mechanically applied had been produced by hand stamps, a total of 29 individual hand stamps would have had to have been used.[578] Still further, one of Suleiman's Source Signatures appeared a number of times twice on the same page but in different sizes, so that two different hand stamps would have had to have been used on the same document.

549.  The evidence of the existence of hand stamps came from Mr Al Harbi, initially in the form of two attendance notes, intended to be admitted as hearsay evidence.[579] The notes recorded telephone enquiries made by Mr Al Harbi of two manufacturers of hand stamps. His note of the response received from the Al Muhaizee Printing Press, a Saudi Arabian company, stated that he asked if the company had produced or still produced stamps for AHAB and its subsidiaries –

> and any signature stamps for their directors/partners. The Company confirmed that they have produced signature stamps for both AHAB companies and AHAB individual directors/partners, and that they have enjoyed a long relationship with AHAB spanning more than 30 years.[580]

550.  The other company which he approached was Ideal Rubber Stamps & Engraving WLL, a Bahraini company, whose representative was unable to provide a definite answer to the question whether the company had ever made signature stamps for individual AHAB directors/partners, but explained that he believed that they had done so in the past. Mr Al Harbi subsequently gave a witness statement verifying the attendance notes, and was cross-examined, primarily on the basis that his enquiries were directed only to the production of company, not individual, stamps. In response, AHAB called Gamal Al-Mutalab, who had worked for Al Muhaizee Printing Press since 1991 and since 2005 had been its executive manager. His evidence was that, although Al Muhaizee had made numerous company stamps for AHAB and its branches and subsidiaries, it had never made a signature stamp for any Algosaibi partner or director, including never having made a stamp with the signature of Suleiman or Abdulaziz. He too was cross-examined. At the end of his oral evidence, in response to questions from the Chief Justice, he said that if anybody wanted a signature stamp produced for himself, he had to go to Al Muhaizee and sign several times, and the company had to keep a copy of his *iqama* (Saudi residency visa).

551.  The Chief Justice's conclusion on this evidence was that both Al Muhaizee and Ideal Rubber Stamps had produced stamps "of some kind" for AHAB over the years. He accepted that both companies had confirmed to Mr Al Harbi that they had produced signature stamps for AHAB. He said:

> The evidence of the witnesses from the stamp companies does not, to my mind, affect Mr Handy's opinion (agreed by Dr Giles) nor the conclusions

---

[578] Joint expert report, **J/9/5** at para 9.2
[579] **C2/47, C2/49**
[580] **C2/47**

to be derived – that it is <u>possible</u> that signature stamps were produced and were used.[581]

552.   Mr Wardell criticised this conclusion, primarily on the basis that it failed to distinguish between company stamps produced for AHAB and signature stamps produced for individual partners or directors, and had no regard to the answer given to the Chief Justice's own questioning of Mr Al Mutalab.

553.   A point arose about a missing suitcase. One of the items listed in AHAB's disclosure as being at AHAB HO was "a suitcase that contains stamps and keys".[582] According to Mr Matthews, AHAB undertook to provide the contents of the suitcase for inspection by Mr Handy; but that did not happen. The Chief Justice dealt with this issue, saying:

> AHAB has not sought to deny having given that undertaking. Nor could AHAB have misunderstood that it was undertaking to locate and provide hand-stamps which may be relevant to the forgery allegations. I am compelled to regard AHAB's belated and unfounded suggestion – that the missing suitcase did not contain hand-stamps but some other kind of stamps – as nothing less than attempt to obfuscate an issue which is of marked importance in the case.[583]

554.   Mr Wardell criticised this part of the judgment as little more than speculation: in effect, the Chief Justice was treating AHAB as having deliberately suppressed evidence when there was no possible basis for that suggestion. Nobody could know the nature of the stamps contained in the suitcase, the undertaking was no more than to provide the stamps that could be found; and the contention that there was no evidence of the existence of signature stamps in the name of the AHAB Partners is a perfectly proper contention on the evidence.

555.   Three of the Al Jazira Bank documents, a series of three documents which occur in 2007 the originals of which were supplied by Al Sanea,[584] contained 10 of the Suleiman Source Signatures, which it was common ground had been applied to 305 documents. The experts agreed that in the case of five of the 10 Al Jazira Source Signatures, transposition by hand stamp or any other process would have been "not ideal" because the signatures on the Al Jazira documents intersected with printing or pencil marks on the documents[585]. The Chief Justice pointed out that this applies to any means of transposition, and therefore was not an argument against the use of hand stamps[586]. He also remarked that, despite Dr Giles's firm view that she had examined original documents, three of the 10 Source Signatures derived from the Al Jazira documents had appeared on documents dated some 10 days before the date borne by the Al Jazira documents[587]. Mr Wardell criticised these conclusions as a basis for upholding the hand stamp theory; and we agree that the first at least, indicating that any form of transposition would have involved some manipulation of the original signatures, provides no support for the theory that hand stamps were more likely than any other method of reproduction of signatures. (On the other hand it was no one's case, neither Mr Handy's nor the Respondents', that hand stamps were more likely than any other means of application, only that it was a possible means in at any rate some cases).

---

[581] **Judgment AA/2.4/688** at para 245 of Section 4
[582] **H6/5/1:** 3rd Floor Archive, line 1264
[583] **Judgment AA/2.4/685** at para 239 of Section 4
[584] The Al Jazira documents are discussed in the Judgment at **AA/2.4/693-697**
[585] **J/9/4**, paragraph 4.3.
[586] **Judgment AA/2.4/696**, para 257 of Section 4
[587] **Judgment AA/2.4/697**, para 259 of Section 4

556.    The Chief Justice cited a summary of AHAB's own submissions at trial[588] and then stated his own conclusion on the hand stamp theory as follows[589]:

> I am not prepared to accept these points made merely *in arguendo* by AHAB so as to reject the possibility of the use of hand stamps in circumstances where AHAB has failed in its duty to produce the missing suitcase of stamps which is the very subject of the enquiry. AHAB has given no explanation in evidence to support Mr Quest's conjecture that the suitcase contained stamps other than signature stamps. It is impermissible for AHAB to argue for a conclusion to that effect without presenting credible evidence as to the actual contents of the suitcase and what became of them.

557.    In essence, Mr Wardell submitted that what the Chief Justice appeared to have done was to take the view that the hypothesis advanced by AHAB was at best no more likely than the stamp theory, and that accordingly AHAB had failed to satisfy the burden of proof, in particular where a listed suitcase of "stamps" had gone missing. Given the Chief Justice's findings in respect of the suppression of documents generally, the Chief Justice's scepticism over the disappearance of that suitcase is perhaps understandable. Nevertheless, taken overall, we agree with Mr Wardell that the Chief Justice may have placed too much reliance on the hand stamp theory. Even if signature stamps existed for and were used by AHAB Partners, in particular Suleiman, the expert evidence is agreed that no more than a minority of the documents appearing on the forgery schedule bear signatures which may possibly have been applied using a hand stamp; and their use as an explanation of what was found would have required many different hand stamps. The stamp theory in particular provides no explanation for the majority of documents bearing signatures applied using fused toner powder or inkjet technology; and the evidence of Mr Al Harbi on which the Respondents and the Chief Justice relied was not impressive one way or the other. However, we also think that Mr Wardell made more of his criticism of the Chief Justice's approach to hand-stamps than it deserved: see at para 647 below.

558.    Mr Wardell next turned his attention to land transactions, in particular those underlying the Counterclaim. The Chief Justice's conclusions as to these were by way of acceptance of AHAB's submissions of forgery, which were recited in his judgment under the words "which I accept".[590] The sums purportedly in question amounted to some $ 780 million. The notarial deeds and declarations of trust by AHAB in favour of SICL, relied on by the Respondents, were forgeries:

> 10.24 The deeds are forgeries: that is what the parties' lawyers were told by officials when they sought to verify the deeds and there is no reason to doubt the official position. There is no evidence of the Money Exchange having paid any money to the purported vendors; and Mr Saad, who according to the deeds purportedly represented AHAB, said that he had no knowledge of the purchases.

> 10.25 The declarations of trust are also forgeries: the copies bear purported Suleiman signatures but the signatures are matched.

> 10.26 SICL alleges that the Properties were purchased with the proceeds of earlier transactions involving Property 0, Property 1 and Property 2. As set out in Section 5, paragraphs 5.59 to 5.83 {*D/5/19-27*}, those transactions were also fictitious or concocted.[591]

---

[588] **Judgment AA/2.4/689-691,** para 247 of Section 4
[589] **Judgment AA/2.4/691-2,** para 248 of Section 4
[590] **Judgment AA/2.4/1316-1317,** para 170 of Section 8
[591] **Judgment AA/2.4/1317**

559.    Mr Wardell's primary focus was on the forgery of notarial documents: an example (relating to
property 1) is a purportedly notarised deed of sale in Arabic dated 16 September 2007.[592] The
allegation of forgery arises not from the signatures on the document but from the reaction of
the notary when approached by the parties jointly in March 2016 with a view to establishing
the authenticity of the document.[593] Further, a document described as a Master Agency, Trust
and Service Agreement dated 17 July 2007 between SICL and AHAB (which recited that SICL
intended from time to time to acquire real and other property in Saudi Arabia and that AHAB
had agreed to act as its non-exclusive agent and hold properties on trust for SICL), although it
purports to have been signed on AHAB's behalf by Suleiman, is agreed by the experts to bear
Suleiman's matched signature.[594] Similarly, Suleiman's signatures on an apparent sale contract
dated 8 September 2008 and in the letter of the same date from the Money Exchange to SICL
confirming the sale of property 1 are agreed to be matched.[595] Mr Wardell submits: if you have
a forgery on this scale, the theory that there is some sort of convenience for the Algosaibis,
because they could not be bothered to sign documents, really just falls away.

560.    Similarly, in relation to property 2, in addition to forged notarial deeds, there are transaction
documents signed by Suleiman which are on the forgery schedule: for example a declaration of
trust dated 15 May 2008[596], a bill of sale of the same date[597], contracts of sale dated 7 October,
8 October, 8 October and 15 October 2008,[598] and a confirmation letter from the Money
Exchange dated 21 October 2008.[599] The Suleiman signatures on all these are agreed by the
experts to be matched. Again, in relation to property 0, a bill of sale dated 17 September 2007[600]
has a Suleiman matched signature.

561.    Similar points were made in relation to Awal Bank land transactions.  Letters dated 28 February
2009[601] and 8 March 2009[602] from AHAB to Awal Bank, both purportedly signed by Saud,
confirming the sale and purchase of land on Awal's behalf, and a declaration by AHAB of trust
in favour of Awal Bank attached to the second letter, all have Saud signatures that the experts
are agreed are matched. Saud gave evidence that he knew nothing about the transactions.

562.    Finally in relation to forgery, Mr Wardell referred to what he submitted were specific errors by
the Chief Justice. On two occasions in his judgment the Chief Justice stated that the entirety of
the documents in the forgery schedule had been selected by the Young Algosaibis from the
documents they had taken from AHAB HO and the Money Exchange.[603] In fact only the first
tranche of documents came from the Young Algosaibis; other documents examined by Dr Giles
came from banks pursuing claims against AHAB, documents relied on by the Respondents in
their pleadings, and documents identified by AHAB's lawyers as needing examination, as well
as documents supplied by lawyers acting for Al Sanea. According to Mr Wardell, the fact that
the Chief Justice made such a key error raised questions or suggested that he had not understood
fundamental aspects of the experts' evidence.

---

[592] **G/6037/5**
[593] See the report of the visit at **Q/659**
[594] **G/5930**
[595] **G/6991, G/6995**
[596] **G/6653**
[597] **G/6651**
[598] **G/7059, G/7061, G/7062, G/7083**
[599] **G/7097**
[600] **G/6038**
[601] **G/7556.1**
[602] **G/7585**
[603] **Judgment AA/2.4/582** at para 13 and **AA/2.4/692** at para 249 of Section 4

563.    Three additional asserted errors of the Chief Justice were relied on: the suggestion that the only original documents examined by the experts were those provided by Al Jazira bank; the statement that the Source Signatures could not be confirmed by the experts to be the very first of their kind and so to be truly without any precursors; and the statement that there was evidence of Photoshop capability not only at the Saad Group but also within AHAB itself.[604] Mr Wardell said that the first of these was plainly wrong, and the error was not reduced by the fact that some pages earlier in his judgment the Chief Justice had inconsistently recognised that the experts had been able to identify mechanically applied signatures on original documents.[605] The second error was criticised on the basis that, whether or not the Source Signatures were the first of their kind, the sheer number of instances of the signatures made the possible existence of precursors of no relevance. In relation to the third error, Mr Wardell submitted that there was no coherent narrative capable of suggesting that the Algosaibis might have wanted to have the capacity to apply their own signatures mechanically. Even so, the Chief Justice said:

> …the most I think I need say here is that I am unable to conclude that Al Sanea must himself have been responsible for the application of "simulated" or matched signatures.[606]

564.    Mr Wardell submitted that these errors reveal three broad points: (i) a material misunderstanding of numerous aspects of the evidence which led the Chief Justice into error in assessing the evidence and drawing inferences and conclusions from it; (ii) a failure by the Chief Justice to apply his own critical thinking to the forgery allegations and to ensure that his reasoning was cogent and internally consistent; and (iii) a failure by the Chief Justice to assess the forgery allegations in the round, in particular in the light of his conclusions about Al Sanea's dishonesty and his forgery of the documents founding the Counterclaim.

565.    In the end Mr Wardell summarised his forgery case as follows: (a) the Chief Justice found that Al Sanea was a fraudster; (b) the Chief Justice found the official notarial deeds to implement the land transactions and thus inflate SICL's balance sheet were forged; (c) the Chief Justice found there were four other forged documents linked with the SICL fake land transactions; (d) the Chief Justice accepted that Abdulaziz's signature was simulated when he was incapacitated; (e) the Chief Justice found that Al Sanea had lied about his knowledge of simulated signatures; (f) the Chief Justice had found that Al Sanea had instigated a dishonest Counterclaim relying on Promissory Notes purportedly bearing Suleiman's signature; (g) there was unchallenged evidence of sophisticated forgery capability at the Saad Group from Mr Thomas; (h) there was unchallenged evidence from Mr Hayley of Al Sanea forging his signature; and (i) there was unchallenged evidence from Mr Hayley that Saud did not sign the Awal Bank land transaction documents. In addition, there were the TIBC documents. In such circumstances, the Chief Justice had erred fundamentally in not accepting that in all probability Al Sanea's wholesale forgery and dishonesty had been practised against and not with the knowledge and complicity of the Algosaibis.

566.    _The Respondents' Submissions on forgery._ The Respondents' submissions on forgery[607] were essentially to the effect that, in the context of the extremely strong evidence that the Algosaibis had continued throughout in complicity with Al Sanea's fraudulent borrowing from the banks, and in the context of the extremely weak evidence in favour of their case on New for Old, the Chief Justice was entitled to conclude that there was no reasonable foundation for a finding in favour of AHAB that the questioned documents and signatures had been deployed by Al Sanea without the knowledge and authority of the Algosaibis.[608]

---

[604] **Judgment AA/2.4/692** at para 249 of Section 4
[605] **Judgment AA/2.4/681** at para 229 of Section 4
[606] **Judgment AA.2.4/692** at para 249 of Section 4
[607] Respondents' Submissions, **AC1/10/41-107**
[608] **Judgment AA/2.4/698,** paras 260-261 of Section 4

567.     In such circumstances, it was unnecessary for the Chief Justice to reach any definitive conclusions about the reason why or method by which signatures were applied to particular documents.

568.     In this connection, it was important to realise that AHAB's case on signatures essentially revolved around Suleiman. In the case of Abdulaziz, his signatures had undoubtedly been used dishonestly, at a time when he was incapacitated, but it was impossible to believe that that had been done without the complicity of the remaining AHAB Partners, who did not wish his incapacity to be generally known. In the case of Saud, there were few signatures on the forgery schedule, and the Chief Justice found his complicity in general to be so complete that he was "compelled to conclude that Saud's matched signatures were not forgeries but were applied with his knowledge and authority".[609] In the case of Yousef, there were again few signatures, and the Chief Justice found that there was no evidence of forgery.[610] In the case of Dawood, his signatures on the forgery schedule related to the huge renewals of over SAR 10 billion in early 2009, but during the hearing Mr Wardell confirmed that his signatures were accepted as genuine. In the case of Suleiman, there were many matched signatures on the forgery schedule; but they included many cases where renewals were at the same level as earlier facilities (so that on the New for Old case there would have been no need for forgery) and there were also many other cases of increased facilities where Suleiman's signature was not on the forgery schedule as being matched. The Chief Justice therefore concluded that the New for Old and forgery cases did not support one another as pleaded.

569.     As for factual witness evidence, although AHAB's grounds of appeal complain that the Chief Justice disregarded Mr Thomas's evidence about Mr Dennis, this was taken into account by the Chief Justice, who recited AHAB's submission that "There is unchallenged evidence of the existence of facilities at the Saad group to reproduce electronically stored signatures". The Chief Justice had then himself added "[Thomas 1W]" as the reference point for that submission.[611] Nor did the Chief Justice overlook the possibility that such facilities had been utilised to create matched signatures. He again recited AHAB's submission that "The handwriting experts agree that these sorts of facilities could have produced the laser printed and ink jet printed signatures which the experts agree appear on 30% of original documents".[612] It was just that, given inter alia the disappearance of the suitcase of stamps, the Chief Justice could not exclude the use of handstamps or regard such expert evidence as conclusive.

570.     Similarly, in the case of Mr Hayley's evidence, AHAB's submission that the Chief Justice overlooked his account of his own signature being misused in a letter found on his desk after his absence is beside the point. The Chief Justice in any event found Al Sanea capable of forgery with respect to the Counterclaim.

571.     Similarly, in the case of Mr Sharikh's evidence (unchallenged because he was not required to attend trial) that Suleiman did not use hand stamps, AHAB's complaint that this was ignored by the Chief Justice is unfair in circumstances where even AHAB made only passing reference to it in a footnote in its written closing submissions at trial. Nor did AHAB then suggest, as they did on this appeal, that Mr Sharikh, who appears to have rendered administrative help to Suleiman in dealing with an entirely different, and more personal, line of correspondence such as answering invitations and congratulating people on their wedding, was precisely the sort of person who would have applied the signature stamp if it existed.

---

[609] **Judgment AA/2.4/699,** para 262 of Section 4
[610] In the case of Yousef and Saud signatures, see also below at paras 578ff
[611] **Judgment AA/2.4/690,** para 247(1) of Section 4
[612] *Ibid* at para 247(2)

572.    As for the Abdulaziz signatures, there were 32 documents in question.[613] Two of these purported to predate Abdulaziz's stroke, but it was AHAB's submission (a new point made only on appeal) that those two (the resolutions dated 24 July 2000) had been backdated.[614] The Chief Justice's conclusion was that the signatures on these (30) documents were applied as a matter of convenience because of AHAB's desire to keep the seriousness of Abdulaziz's condition from the outside world but at the same time to enable the Money Exchange's business to continue.[615]

573.    Thus, the Chief Justice reasoned as follows:

> As to the steps which appear to have been taken to keep the seriousness of Abdulaziz's condition from the outside world: (1) Suleiman requested a medical report that stated "*that brothers Abdulaziz Bin Hamad Algosaibi is in good health, and he is undergoing only physical therapy*". This resulted in letters from Dr. Killen dated 27 February 2001 and 3 October 2001 and a letter from the Baylor University Medical Center dated 3 October 2001, each of which said Abdulaziz showed signs of improvement. (2) Abdulaziz is represented as having made the Chairman's statement in SAMBA's Annual Report for 2002 on which his signature appeared, and (3) in January 2003, Al Sanea signed a letter to Sandy Weill of Citigroup on behalf of Abdulaziz seeking extension of time before the bank terminated its relationship with AHAB. Al Sanea, signing here on behalf of Abdulaziz, would have conveyed to the bank that Abdulaziz, fully two and a half years after his stroke, remained in charge. A copy of this letter was sent to Saud by Al Sanea under cover of another letter of 12 February 2003 and which bears a further note from Al Sanea to Saud "*P.S: I will discuss it when I return from London.*" This letter was marked by Saud "*file working papers M.E.*" and found in the N Files. Saud, it must be inferred, was fully aware of Al Sanea's signing on behalf of Abdulaziz, indicative of an understanding within AHAB that Abdulaziz would be represented to the outside world as remaining in charge.
>
> It was in those circumstances that someone put Abdulaziz's signature on the two HSBC documents on 18 October 2000, then in the early period after his stroke. There is no evidence as to where it was done or by whom. It is known that on 18 October 2000, Saud and Al Sanea were in Dallas, but Yousef and Suleiman appear to have been in the Arabian Peninsula on 18 October 2000. Any of them, the Defendants submit, could have given an instruction to put Abdulaziz's signature on the HSBC facilities.

574.    The Chief Justice went on to say this at his footnote 1671 at para 148 of section 4 of his judgment:

> Saud's evidence at trial to the effect that Abdulaziz's illness was well known to the outside world including to SAMBA {**Day 42/113:23**}-{**Day42/114:20**} could easily if true have been substantiated by independent evidence but AHAB chose not to adduce any such evidence. Given that Saud succeeded Abdulaziz on the SAMBA Board, it is peculiar, to say the least, that he didn't "*have a clue about*" how his father's signature could have come to be applied to two successive SAMBA Annual Reports as Chairman

---

[613] The Abdulaziz signatures in question were not "matched" signatures. We are not sure we know how the signatures were applied.
[614] See also under para 595 below
[615] **Judgment AA/2.4/625-626** and **635,** paras 130 and 148 of Section 4

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

in 2001 and 2002 {**Q/538/8**}, {**Q/539/9**}, Saud xx {**Day 42/118:25**} - {**Day 42/120:9**}.

575.    AHAB's submission on the other hand was that "Al Sanea had procured the simulation of Abdulaziz's signature without authority from the Algosaibis to do so"[616] and it advanced seven reasons why the Chief Justice had got this wrong.[617] The first and second were that Saud gave evidence that Abdulaziz's illness was known to the outside world, including to SAMBA, individuals from which had visited Abdulaziz in hospital, and to Citigroup. The third was that the medical reports referred to by the Chief Justice hardly presented Abdulaziz as a man able to run a business effectively on a day to day basis. The fourth was that although the Chief Justice saw significance in the presence of Yousef and Suleiman in the Middle East and Al Sanea (with Saud) in Dallas on 18 October 2000 (the date of the HSBC facilities signed by Abdulaziz[618]), Al Sanea could have given instructions from anywhere. The fifth was that the Chief Justice misunderstood the significance of the fact that Al Sanea could not sign the facilities himself, as explained in Mr Hayley's memorandum of 4 October 2000.[619] The sixth was that Al Sanea's letter of February 2003 to Citigroup was signed by Al Sanea, not Abdulaziz, so that took the matter nowhere. And the seventh was that there was no evidence that AHAB had knowledge of Abdulaziz's signature on the 2001 and 2002 SAMBA annual reports, and Saud gave evidence that he knew nothing about it and the Chief Justice gave no reason for rejecting that evidence.

576.    In response the Respondents submit as follows. (1) and (2): The Chief Justice's reasons for rejecting Saud's evidence were unimpeachable. In any event, Saud did not give evidence that SAMBA visited Abdulaziz in hospital: he said "I assume SAMBA knew" because Citigroup had visited (Citigroup had an interest in SAMBA) and he also said "I don't know" who at SAMBA knew of Abdulaziz's condition.[620] (3): The medical reports were given on the family's express request for a report that Abdulaziz was in good health, and AHAB conceded in their Written Submissions that the reports "did overstate the improving health of Abdulaziz" and could only comment that they did not conceal that Abdulaziz was in hospital and was not in line for immediate discharge. (4): The Chief Justice was balanced in his evaluation: it was correct that any of those named could have instructed the application of Abdulaziz's signature; the question was whether that was done without AHAB's knowledge and complicity, and not whether Al Sanea was or was not responsible for or privy to the simulation, as to which the Chief Justice found that he must have been at least privy[621]. (5): The Chief Justice plainly understood AHAB's contentions, which he set out at length. The fact was that some solution to Abdulaziz's incapacity had to be found, and the critical issue was whether AHAB were privy to the solution.[622] (6): The critical matter, left untouched by AHAB's submission, was that Saud knew of Al Sanea's letter to Citigroup, since a copy of it was sent to Saud. Saud therefore knew that Al Sanea was signing on behalf of Abdulaziz, and the Chief Justice's inference, that Saud was therefore privy with Al Sanea in representing to the world that Abdulaziz was still in charge, was one he was entitled to draw. Saud's only evidence about this letter was that he did not recall it.[623] (7): The Chief Justice was fully entitled to reject Saud's evidence, and he certainly gave reasons for doing so, both generally, and in the specific context of SAMBA's knowledge of Abdulaziz's incapacity – see the Chief Justice's footnote 1671 itself, cited (at para 574) above.

---

[616] AHAB's Written Submissions **AB/1.9/18**
[617] AHAB's Written Submissions **AB/1.9/16-17** at para 9.12
[618] See para 533 above
[619] See para 533 above
[620] **Day42/114**
[621] **Judgment AA/2.4/632,** para 143(4) of Section 4
[622] **Judgment AA/2.4/628-632**
[623] Saud witness statement **C1/2/65-66** at para 319

577.    We feel that AHAB have a difficult case to make that they were not involved in, and privy to, a manoeuvre to disguise the extent of Abdulaziz's incapacity from the world, including SAMBA. While SAMBA must ultimately have known, from Abdulaziz's absence as chairman, that he was not well, it is difficult to understand how the bank could have published its annual reports in 2001 and 2002 under his signature if it had known the full truth. It is very hard, therefore, to think that Saud, as a director of SAMBA following Abdulaziz's death, had no insight into how SAMBA was kept informed of Abdulaziz's health. The Chief Justice was entitled to disbelieve Saud's vague protestations to the contrary. It is equally difficult to think that, following Abdulaziz's incapacity, the Algosaibi family as a whole, including Al Sanea, who the family knew had worked closely with Abdulaziz, did not come to some decision about how the Money Exchange was to be conducted and presented to the world in the immediate aftermath of his stroke. It is noticeable that the forgery schedule lists Abdulaziz signatures up to 12 March 2001 and that thereafter Suleiman's signature takes over. The first matched Suleiman signature of which complaint is made on the forgery schedule is then dated 22 April 2003. In these circumstances, it is counter-intuitive to think that AHAB's face (and signature) to the world, following Abdulaziz's stroke and the appointment of Suleiman as acting chairman of the Money Exchange, was other than a matter for general family agreement. However, we will keep such observations as merely provisional pending a consideration of the forgery issues in the round.

578.    The Respondents reverted to the few instances of Yousef signatures on the forgery schedule. In all, ten documents are involved. In the case of six of them, his name appears together with other names (Saud, Suleiman or Dawood) on documents where, although the other signatures were examined, his were not.[624] Two of those documents were TIBC minutes. Two others of the six contained Dawood as a co-signature where Dawood's signature is accepted as genuine and it is to be inferred that Yousef's signatures are as well. In the case of four documents (ie in addition to the six just mentioned), they are TIBC documents (two proxies, a board resolution, and minutes), and Yousef's signatures are matched.[625] Yousef's cross-examination had to be curtailed due to ill-health before he could be asked about any of these. In sum, therefore, there are four matched signatures of Yousef (possibly six, if we were to infer that the other two TIBC documents, although unexamined for Yousef's signature, also bore matched signatures). We will deal with the Respondents' submissions about TIBC documents as a whole, below.[626]

579.    In the case of Saud, although there were numerous documents on the forgery schedule where Saud's signature was a matched signature, there were also a number which were examined but not matched.[627] Two of them were English language financial statements for the Money Exchange for 2003 and 2004.[628] Saud signed these together with Suleiman. However, Suleiman's signatures on these documents are matching signatures. A further such document is AHAB's financial statement for 2004, where again Saud's signature appears with Suleiman's, Suleiman's being matched but Saud's not. The Money Exchange accounts were part of the Money Exchange's fraud on the banks and a necessary part of its whole endeavour. The AHAB accounts had nothing to do with Al Sanea. If Saud's signatures on these three accounts are not matched, the inference drawn by the Chief Justice is that the matched signatures of Suleiman cannot be unauthorised and therefore forged, signatures, but was presumably a matter of convenience ("may well have been a matter of convenience").[629]

---

[624] Forgery schedule lines 303, 400, 812, 857, 859, 860
[625] Forgery schedule lines 302, 386, 448, 542
[626] See paras 661-664 below
[627] Forgery schedule lines 55, 56, 56.1, 56.2, 74, 155, 400, 416, 417, 861.
[628] **F127, F153,** lines 74 and 155
[629] **Judgment AA/2.4/663-664,** para 201. The Chief Justice analysed Saud's 51 signatures on the forgery schedule in detail at **AA/2.4/663-674,** paras 200-215. Some related to TIBC documents, some related to bank facilities and related documents, of which not all were for increased facilities, some were co-signed with Suleiman where

580.    The Respondents drew attention to some of the limitations under which the experts had been
required to conduct their examinations: such as the small number of original documents
available, and the question-mark over the integrity of the chain of custody in the collection and
selection of documents. That arose from the fact that many of the documents coming forward
for analysis had come from the Young Algosaibis in their own attempt, in pursuit of a forgery
case, to find the so-called "Source Signatures" which were the origin for other matching
signatures. The Chief Justice was entitled to remark on such matters.[630] The Respondents also
drew attention to the inconsistency, remarked on by the Chief Justice, between AHAB's New
for Old case, which was that documents were signed at AHAB HO (with the assistance of the
gatekeeping of Badr), and their forgery case, which was that everything was manufactured
under the instructions of Al Sanea at his offices.[631]

581.    As for AHAB's complaint that the Respondents had not challenged Saud or Yousef about
permitting Al Sanea to use their signatures, Saud's cross-examination was in any event
complained of as being too long, and Yousef's was interrupted by his ill-health. And as for their
complaint that the Chief Justice had dismissed, as "simply incredible", Al Sanea's statement
that he had no reason to think that there had been any use of simulated signatures, the Chief
Justice's reaction was entirely justified, seeing that Al Sanea had his own reasons for not
wanting to admit to anything which the banks might latch on to. In any event it was odd to find
AHAB relying (selectively) on the truthfulness of Al Sanea.

582.    The concern of AHAB with the possible use of hand stamps was misplaced. Whatever the
method used, and the experts between them identified hand stamps as one possibility in addition
to laser print technology and inkjet printer technology, the critical question was whether the
use of any such methods was authorised. The Respondents only asked for a finding that the use
of hand stamps was possible, and that is as far as the Chief Justice went, as he was entitled to,
seeing the experts were themselves agreed on that.[632] AHAB's contention that the use of hand
stamps should be rejected as a possibility therefore rightly failed. The missing suitcase, logged
by Deloitte as containing "stamps and keys" came from AHAB HO. In the circumstances, the
value of the witness evidence about AHAB's ordering of hand stamps was not critical, but, as
far as it went, the Chief Justice was entitled to think that the evidence supported the supply to
AHAB of stamps of some kind, the precise nature of which could not be determined in the light
of the failure to produce the missing suitcase. Even so, the Chief Justice was also entitled,
having heard the evidence of Mr Al Harbi, a lawyer, about his enquiries of two stamp
manufacturers, supported by his almost contemporaneous attendance note, and then in rebuttal
evidence from one of those manufacturers, to conclude that signature hand stamps were
probably among the stamps ordered.

583.    As for the Al Jazira documents, AHAB's essential point was that, despite the importance of
these documents as the possible source of 10 Source Signatures and thus of signatures on 305
out of 872 documents on the forgery schedule, the experts agreed that in the case of five of
those Source Signatures they were "not ideal" for making hand stamps. However, the experts
continued: "not ideal for making hand stamps, or for any other transposition process", which
the Respondents submit takes the matter no further, as the Chief Justice agreed.[633] Moreover,
the experts were not agreed as to whether the Al Jazira documents were original documents,
and, if they were not, the signatures on them as well as on all 305 documents on the forgery
schedule came from elsewhere. In that connection, three of the 10 Source Signatures appeared

---

Suleiman's signature was considered by Mr Handy to be "possibly matched to stamps", or where Suleiman's
signature was not matched.
[630] **Judgment AA/2.4/612-619**
[631] **Judgment AA/2.4/607** at para 82 of Section 4
[632] **Judgment AA/2.4/688-692** at para 245-248
[633] **Judgment AA/2/696** at para 257

on documents predating the Al Jazira documents, which suggests that Dr Giles was mistaken in thinking that she had original documents to work on. On this basis, AHAB's reliance on the Al Jazira documents as counting against any hand stamp theory is without force.

584.   As for Suleiman's signatures, and the convenience theory in general, the Chief Justice was modest in his conclusions, making no firm findings, save sporadically, but merely underlining the plausibility of that theory. He did not have to go further. That said, the Respondents have themselves drawn up a substantial list of more positive findings[634], such as in relation to Abdulaziz's signatures ("only rational explanation", "probable"), and Saud's signatures ("irresistible inference") and Suleiman's signatures in general ("The whole point of using mechanical means…would have been for the sake of convenience"). In the light of these findings, the Respondents also draw attention to the fundamental way in which the case was argued, by reference to AHAB's counsel Mr Quest's closing submission:

> …Because that really is the dichotomy here between the parties' cases. The existence of large numbers of electronically or mechanically signed documents is only explicable by one of two things: it is only explicable by convenience, as the defendants say or concealment, as we say. Those really are the rival cases.[635]

In such circumstances, the Chief Justice was entitled to find, for multiple reasons, that AHAB's case of concealment had to make way for a conclusion of convenience.

585.   In this connection, a question arose as to how many facilities required signing. On any view, even on the figure of 24,000, a vast number of signatures were needed. Some facilities were signed 15 times, as the Chief Justice correctly noted.[636] The figure of 24,000 transactions (not signatures) derives from AHAB's own evidence in the London proceedings, where Mr Charlton (of Deloitte) gave the figure as 24,304 loans, at Table C para 130 of his witness statement, derived from the Money Exchange's own records.[637] This figure is dealing with the period 1 January 2000 to 2009.

586.   In sum, the Respondents relied on the "many and detailed reasons" given by the Chief Justice in section 4 of his judgment.

587.   We turn to additional points raised by the Respondents, through Mr Valentin, in their oral submissions on forgery on Days 12/14 of the appeal hearing.

588.   First, looking at the matter in the round, the Chief Justice was entitled to be influenced by the fact that he considered that the Respondents had already proved that AHAB had, in the light of their knowledge, given authority to Al Sanea for borrowings, whether from banks or from the Money Exchange itself. In those circumstances, the Chief Justice was entitled to look for something more or less conclusive in support of forgery to make him want to circle back to the

---

[634] Respondents' Submissions, **AC1/10/96-98** at para 157 of Section 10
[635] **Day 108/19**
[636] **Judgment AA/2.4/701** at para 268 of Section 4, footnote 1930
[637] Charlton witness statement, **L1/25/52.** We observe that Mr Charlton's table may need some interpretation. At para 131 of his witness statement, immediately below Table C, Mr Charlton said: "Adding together the last two figures in the table, it can be seen that in a nine year period, the Money Exchange and ATS entered into over 12,500 separate financing transactions (excluding FX deals), having a total value of more than $80 billion. Not all of the deals represented new facilities because the DMS does not distinguish between new facilities and renewals or roll-overs of existing facilities…Moreover, that does not take into account finance raised by TIBC…" The DMS stands for Deal Management Settlement System, which was the Money Exchange's own electronic system (para 56 of Mr Charlton's witness statement). It would seem that the 24,303 figure includes transactions of TIBC and the Saad group. The precise figure given for the Money Exchange by itself is 8,347. Even that figure represents an average of over 800 transactions per year or 16 per week.

general and overall issue of knowledge and authority. As AHAB had put the matter in a document entitled "AHAB's Further Submissions in relation to Authenticity of Signed Documents" produced in closing on Day 124 of the trial:

> The ultimate issue to which the evidence of forgery is relevant is the question of whether Mr Al Sanea concealed from the AHAB Partners how much he was borrowing through the Money Exchange and how much he was taking from the Money Exchange.[638]

589.    As it was, the Chief Justice found the forgery case to be so full of variables that it became impossible to posit with any confidence as to why any particular document had been signed in any particular way or with any particular motive. Mr Wardell had himself conceded[639] that it is common in today's world for signatures to be applied electronically or mechanically, without any evidence of dishonesty and without any untoward intention. The Chief Justice therefore had to be careful on the issue as to whether AHAB had proved forgery on the balance of probabilities. If forgery was a device to avoid New for Old, the Chief Justice had to ask himself why documents showing increases in facilities were found at AHAB HO; or why documents showing the renewal of facilities without any increase were included on the forgery schedule and said to be forged; or why a facility with a bank said to be forged is followed later, even sometimes within the same year, by a facility with the same bank without any allegation of forgery; and so on. And it was because the theory of forgery to avoid the New for Old policy did not work on the facts that the Chief Justice was entitled, and right, to say that it was an incoherent theory.

590.    Mr Valentin next addressed AHAB's argument that, since Al Sanea was shown to be a forger with respect to the Counterclaim, what was so difficult about finding that he was a forger with respect to AHAB's claim to New for Old? The answer, he submitted, was that such evidence as there was, based on the forgery schedule, to the effect that Al Sanea, admittedly a most dishonest man, exercised his dishonesty in that respect against AHAB, was hugely and disproportionately outweighed by the vast number of documents about which no forgery was alleged (or could be alleged). Thus, it was common ground that Dawood had signed, at the end of the period in question, for no less than 42% of the facilities that give rise to AHAB's claim.

591.    Oddly enough, however, Mr Valentin also said that "I can't tell" whether Al Sanea was a forger (ie an unauthorised user of unauthorised signatures).[640] This was possibly because, bearing in mind such things as hand stamps and electronic facilities at AHAB HO itself, the Chief Justice was himself agnostic about whether the mechanically applied and matched signatures undoubtedly found (as agreed by the experts) had been applied by Al Sanea or at his behest. There was, even allowing for the hearsay evidence given by Mr Thomas about Mr Dennis, no direct evidence of Al Sanea applying or procuring a mechanical signature: everything depended on inference, and against the background of the AHAB Partners' knowledge, inter alia through the Audit Packs, of the borrowings both from the banks and by Al Sanea, an inference in favour of forgery was not there to be made.

592.    Mr Valentin next addressed the burden and standard of proof. He submitted that it was for AHAB, as the pleader of unauthorised use of forged signatures, to prove that case, and not for the Respondents to disprove it. And as for AHAB's suggestion that the Chief Justice had deployed a criminal standard of proof, he pointed to the Chief Justice's own self-directions on the matter (which the Chief Justice observed had been adopted from submissions of the Defendants but were uncontroverted by AHAB): such as that "AHAB, as the party making the allegation of forgery, is obliged to prove it"; that "The standard of proof in civil proceedings is

---

[638] **X1/63/7** at para 20
[639] **Day5A/35**
[640] **Day12A/133-136**

the balance of probabilities"; that "once the Court is satisfied that a person has acted fraudulently on one occasion, it ceases to be inherently improbable that such a person would have done so on another occasion", albeit one needed to bear in mind that in this case both sides had behaved dishonestly; that "For fraud to be established it must be the only possible explanation for the facts relied upon" at any rate where inferences rather than direct evidence is relied upon; and that "There is no burden on the Defendants to provide an alternative explanation or prove a negative". In that connection the Chief Justice had no doubts of Al Sanea's dishonesty, saying: "Here it is undoubtedly the case that Al Sanea behaved dishonestly".[641] Nevertheless, the Chief Justice properly concluded that he could not infer forgery, ie the unauthorised use of the AHAB Partners' signatures, in circumstances where he was conscious of his findings about AHAB's knowledge and authority derived from Section 1 of his judgment. Moreover, there was nothing in AHAB's grounds of appeal to question these self-directions.

593.    A further port of call for Mr Valentin was Mr Wardell's submission that the Court could infer that many other documents not on the forgery schedule were also signed with matched signatures and were forged. That was, Mr Valentin submitted, going beyond AHAB's pleading, which was confined to its forgery schedule, as was confirmed when AHAB applied for permission to appeal to introduce it.[642] The highest AHAB could put their reservations was that it should not be taken as accepted by AHAB and therefore proved that all documents not on the forgery schedule were authentically signed. Nevertheless, AHAB could not go from there, as they had sought to do on occasions, and submit that documents not on the forgery schedule were forged. Nor could they submit that, because a document had been found at AHAB HO and was not on the forgery schedule, its signature was necessarily a genuine manuscript. Similarly, it was inconsistent to say, as Mr Wardell had, that "we don't rely on them" in relation to Abdulaziz's signatures on the 2001 and 2002 SAMBA reports, even though they appear on the forgery schedule.[643]

594.    Mr Valentin underlined one of the consequences of AHAB's New for Old case, namely that the Algosaibis *had* authorised all borrowings which were not an increase on previous facilities, with something more to pay the interest on outstanding borrowings. And if that case of New for Old were not accepted, but on the contrary the Algosaibis knew the extent of borrowings by the Money Exchange and by Al Sanea, and year after year permitted them, then it was the natural inference that they had authorised them. There were hundreds of resolutions by which AHAB expressly gave broad powers of attorney authorising AHAB Partners or Al Sanea to enter into transactions.[644] The Chief Justice made a series of findings of this nature, thus –

> 35. A signature is not a forgery if it is applied to a document with authority of the person on whose behalf it is applied. This was made clear in **Gordon Ramsay v Love**…[645]

---

[641]    **Judgment AA/2.4/584-586** at paras 21-27, citing among other authorities *Constantine Line v. Imperial Smelting Corp* [1942] AC 154, 174, *Re B* [2009] 1 AC 11, *Armitage v. Nurse* [1998] Ch 241, 256 ("if the facts pleaded are consistent with innocence, then it is not open to the Court to find fraud"), and *Rhesa Shipping Co SA v. Edmunds* [1985] 1 WLR 948 (HL). Mr Valentin also relied on *Sienkiewicz v. Greif* [2011] UKSC 10, [2011] 2 AC 229 at para [193] where Lord Mance referred back to *Rhesa Shipping* to observe "…there will be continuing good sense in the House of Lords' reminder to fact-finders…that it is not their duty to reach conclusions of fact, one way or the other, in every case. There are cases where, as a matter of justice and policy, a court should say that the evidence adduced (whatever its type) is too weak to prove anything to an appropriate standard, so that the claim should fail." The Chief Justice could not therefore be faulted if he held back from definite findings on AHAB's forgery case.
[642]    **Day25/128-130**
[643]    **Day5A/38**
[644]    **Judgment AA/2.4/591** at para 41 footnote 1554
[645]    *Ramsay v. Love* [2015] EWHC 65

36. That was a case of actual, not ostensible authority. It is important to note that Mr Hutcheson's authority was a "wide general authority" to offer Mr Ramsay's guarantee in relation to a lease "when the business required it". The landlord did not have to demonstrate that Mr Ramsay had authorised the application of his signature to the particular guarantee of the particular premises…

37. In the present case, if the Algosaibis had authorised entering into bank facilities, that is actual authority for those facilities to be signed. How the signature was applied cannot alter that fact. AHAB no longer advances a case that <u>all</u> banking facilities were unauthorised. On AHAB's finally pleaded case, the Algosaibis had authorised the entering into and renewal of facilities up to the amount outstanding in September 2000 when Abdulaziz had his stroke. On AHAB's case the Algosaibis also understood that the interest on outstanding facilities needed to be paid and would be added to the loans. On AHAB's "New for Old" case <u>all borrowing is authorised apart from increased borrowing</u>.

38. Thus, if a banking facility in question was authorised, it matters not that the signature was applied using pen-and-ink, laser printer, ink jet printer, writing machine or hand stamp. The signature is not a forgery. The real difficulty facing AHAB therefore is proving those signatures which it says were unauthorized from among the many which must have been authorized.

39. The Algosaibi family are shown to have given wide general authority to each other and to others including Al Sanea to enter into or to sign agreements as necessary. They habitually delegated the running of their various businesses to others. This included authority to sign bank facility agreements and related documents.

40. On the deaths of Abdulaziz in 2003, Khaled in 2005 and Suleiman in 2009, very broad powers of attorney were respectively granted by each member of the family to other members of the family, in particular to Suleiman and Saud.

41. AHAB passed numerous board resolutions authorising AHAB Partners or Al Sanea to enter into particular facilities.

42. For the reasons already examined AHAB needed to enter into renewed and increased facilities to keep AHAB from collapsing. AHAB needed facility documents to be signed and it needed the lending banks to be satisfied that the signatures on documents were authorised signatures.

43. On AHAB's own case Suleiman, Saud and Dawood expected to sign documents on behalf of AHAB for themselves and for various branches of the family and they had authority to do so.

44. In his testimony Mr Hayley said that he thought that the Algosaibis knew of and had approved the bank facilities. He was justified in taking that view:

> Q. *Mr Hayley, just a final couple of questions. This is merely asking you in each case to confirm what you have already said in witness statements that you have given. The first of these questions is: it is right, isn't it, that you always assumed that the Algosaibi family knew about the debt at the Money Exchange?*

> A. *Yes*

> Q. *It is also right that when you saw signatures of AHAB Partners on copies of loan documentation, you assumed that*

> *they were genuine and that the AHAB Partners had approved the borrowing?*
>
> A. Yes

45. A possible inference of a broad authority to apply Algosaibi signatures as necessary to bank facility and related documents is also supported by the memorandum of 28 March 2004 written at the time when Suleiman matched signatures first seem to have appeared on facility documents as relied upon by AHAB, and by the agreement between Saud and Dawood in 2009 that Dawood should take over signing responsibilities.[646] [citing **G/3970** and Saud witness statement **C1/2/84** at para 406]

595. In connection with Abdulaziz, in the period after his stroke, Mr Valentin submitted that Mr Wardell's point about the resolutions dated 24 July 2000, to the effect that they were backdated from early October 2000, shortly after Abdulaziz's stroke, was a new point not made to the Chief Justice. That was why the Chief Justice had said of them that they –

> …both pre-date Abdulaziz's stroke…The resolutions are both dated 24 July 2000. Abdulaziz's stroke happened on 30 September 2000. These resolutions cannot be found to be forgeries because (a) even on AHAB's case forgery does not start until the *"New for Old"* policy was put in place, which was after Abdulaziz's stroke and (b) Abdulaziz knew of the bank borrowing incurred during his time…the only rational explanation for these resolutions having mechanically applied signatures is that the signatures were applied mechanically as a matter of convenience. That is consistent with a memorandum dated 23 July 2000 in which Al Sanea instructed Mr Hayley and Mr Michael Davis at the Money Exchange (copied to Mr Stewart):
>
> > *"Please note that I would like you to limit the documents for signature to Uncle Abdulaziz, as advised earlier I require you to send only the facility documents (either renewal or new) and Promissory Notes for his signature. Any other paper work should be prepared either for my signature or with my approval you should sign them.*
> >
> > *I would like to send a minimum [of] paper for Uncle Abdulaziz's signature starting immediately.[647]"*

596. Mr Valentin observed that the back-dating point was made for the first time in Mr Wardell's oral submissions, having not been made at trial, nor in the grounds of appeal, nor in AHAB's written opening or reply submissions for the appeal. The genuine date of 23 July 2000 was not only consistent with the Al Sanea memorandum of that date mentioned by the Chief Justice in the passage cited above, but also with another memorandum of Al Sanea dated 20 July 2000 to Mr Hayley ("Please be advised that it is my intention to reduce the documents being forwarded for signature of Uncle Abdulaziz…you could draft a new resolution for this purpose").[648] Mr Hayley was asked about these memoranda and recognised them and thought that he had drafted the resolution he had been asked for.[649]

597. With respect to the idea that AHAB deliberately set out to keep Abdulaziz's incapacity from the world, Mr Valentin emphasised the deception which Suleiman and Saud had commissioned

---

[646] Judgment **AA/2.4/589-592**
[647] **Judgment AA/2.4/622-623** at paras 122-123 of Section 4.
[648] **G/2180**
[649] **Day 23/78**

from Abdulaziz's doctors in Dallas. On 26 February 2001 Suleiman wrote to Saud confirming the request made of Saud that he obtain "a medical report from the hospital in America that states that brothers Abdulaziz…is in good health, and he is undergoing only physical therapy, and have that report certified by the Saudi Embassy and State Department in America".[650] Saud accepted in cross-examination that this was a request to obtain an untrue report.[651] A report was obtained, from Dr Kenneth Killen, in Dallas, stating inter alia that Abdulaziz "continues to have excellent kidney, liver, heart, gastrointestinal and lung functions. He is involved in physical therapy…He has shown signs of improvement…It is anticipated that the patient will be discharged from our hospital in 3-4 months and be able to return to Saudi Arabia".[652] When Saud was asked about it, he said "I have no clue, really" and "I don't remember".[653] Moreover, legal difficulties arising from the absence of Abdulaziz's signature were discussed in a legal opinion from a Saudi law firm to Norton Rose concerning a facility from Credit Agricole Indosuez.[654] His inability to sign therefore had to be concealed. Similarly, on 22 January 2003, Al Sanea caused a letter to be sent to Sandy Weill of Citigroup under Abdulaziz's signature, ie the letter purported to come from Abdulaziz himself.[655] Al Sanea sent a copy of this letter to Saud on 12 February 2003.[656] The Chief Justice had relied on these two letters as indicating that Saud was privy to the use of Abdulaziz's signature during the period of Abdulaziz's incapacity (see para 573 above).[657] All this is consistent with what the whistle blower, Peter Shepherd, had written in March 2001, for instance: "Contrary to what they tell you, Abdulaziz Algosaibi is on a life support machine in an American hospital".[658] As for the HSBC facility documents signed by Abdulaziz of which complaint was made by AHAB, it is perfectly clear from documents found at AHAB HO and the Respondent's "Bank Chronologies" that AHAB knew all about the HSBC lending, and the increase in it.[659]

598.   All such matters contributed to evidence of a family-wide effort to disguise the fact that Abdulaziz was incapacitated and to use his signature as necessary to maintain that disguise. In the circumstances, the Chief Justice was entitled to conclude that, however fraudulent the use of Abdulaziz's signature was vis-à-vis the outside world, it was not shown that its use within AHAB was unauthorised.

599.   Mr Valentin made a point about signatures said to be witnessed by Saad Group employees, namely that many such witnessed documents, found at AHAB HO, are not said to be forged, as the Chief Justice observed[660], including a guarantee signed by Dawood in March 2009. (We would observe that it must often be the case – although strictly speaking it should not – that witnesses will sign as witnesses of the application of a well-known signature even though the signature was not applied in their presence.)

600.   As for the so-called "unchallenged" evidence of Mr Thomas, most of his witness statement is entirely irrelevant. There are a few paragraphs at the end, under the heading of "Forgery", but it merely speaks to a young computer designer and producer of the Saad Group's marketing material (Mr Dennis) producing a false employment certificate for Mr Thomas's wife and then

---

[650] **G/2381.2**
[651] **Day42/120-122**
[652] **G/2393.1**
[653] **Day42/123-124**
[654] **G/2786**
[655] **N/64**
[656] **G/3137, N/63**
[657] **Judgment AA/2.4/625** at para 130 of Section 4. We observe that "Abdulaziz's" letter to Mr Weill of Citigroup is not on AHAB's forgery schedule.
[658] **G/2392/7**
[659] **E3/35**
[660] **Judgment AA/2.4/642** at para 162, footnote 1700

speaking at dinner about "producing documents in the way that he had done for me".[661] However, that helped not one little bit with the critical issue on AHAB's forgery case, which was whether mechanical application of Algosaibi signatures was or was not authorised. In any event, the Chief Justice took this evidence into account, observing that while AHAB's case was that forgery began in October 2000, Mr Dennis was not employed by the Saad Group until 2002; and that the evidence had originally been relied on for AHAB's case of total ignorance and total forgery.[662]

601.     As for Mr Hayley's evidence about discovering a letter on his desk signed under his name during his absence on holiday, it is true that the Chief Justice had not mentioned this: however, the Chief Justice did consider Mr Hayley's evidence in considerable detail, and the difficulty with it was in knowing where he was truthful and where he was not. Be that as it may, it was also relevant that, in the light of the episode with the letter, Mr Hayley went on to say that: "I was astonished when members of Deloitte told me that signatures on banking documents had been forged."[663]

602.     Mr Valentin referred to the BPP Report. Its use at trial was insignificant (whether admissible or not). It had never been translated from the Arabic. It was mentioned once in AHAB's closing written submissions and not at all in its oral closing submissions. It is therefore unsurprising that the Chief Justice did not refer to it, and more surprising that so much was made of it on appeal. As it is, the Report stated that the documents studied were incomplete and that there was very limited original documentation.

603.     Mr Valentin's next port of call was the signatures of Suleiman, Yousef and Saud. The Chief Justice dealt with these at length.[664] As for Suleiman, the Chief Justice found that the occurrence of matched signatures was so much at random as to suggest that they occurred for reasons other than a deliberate campaign of forgery.[665] He went on to illustrate that randomness by examples. For instance, a matched Suleiman signature is found on the financial statements of AHAB's 2002 and 2003 accounts. These were AHAB HO documents which "had nothing whatsoever to do with Al Sanea".[666] Suleiman was chairman of AHAB. Another example was a series of letters to banks dated 24 May 2003, signed by Suleiman with matched signatures but also signed by Saud (without a complaint of forgery) announcing Suleiman's succession and the election of Saud as a director of the Money Exchange. The Chief Justice commented: "It is entirely credible that the Algosaibis would have had their signatures applied to this circular letter to all the banks…It is, as the Defendants submit, probable that this was done as a matter of convenience, and with authority."[667]

604.     The same remark applied to Suleiman's signature on a Gulf International Bank guarantee, with respect to which Al Sanea wrote to Mr Hayley to point out that "Uncle Sulaiman usually gets emotionally upset and uptight whilst signing for all the heirs individually". This was because the bank was requesting a Suleiman signature for each partner.[668]

---

[661] Thomas witness statement, **C1/13/30-32**
[662] Judgment **AA/2.4/593** at paras 50ff, **AA/2.4/681** at para 230, **AA/2.4/690** at para 247(1) of Section 4
[663] Hayley witness statement, **C1/9/59** at para 292
[664] Judgment **AA/2.4/636-674** at paras 153-215 of Section 4
[665] Judgment **AA/2.4/637** at para 158 of Section 4
[666] Judgment **AA/2.4/638** at para 160 of Section 4. As for the 2003 accounts, there is also a Saud signature which the experts agreed was not matched. See lines 54 and 74 of the forgery schedule. That suggests that Saud, as in the case of the documents referred to in the next footnote, knew and appreciated that Suleiman's signature was applied mechanically.
[667] Judgment **AA/2.4/640** at para 161(1) of Section 4
[668] Judgment **AA/2.4/642-643** at paras 163-165 of Section 4, referring to **G/3970** and forgery schedule line 83

605. The Chief Justice next examined, by reference to the Respondents' "Bank Narrative Chronologies" used at trial, the consistency of AHAB's case on New for Old, which required renewals without any increase to be signed in manuscript by Suleiman, but increased facilities to be forged. The purpose of these Chronologies is explained by the Chief Justice as follows:

> 169. There are 91 different banks on the Forgery Schedule. The Defendants Bundle E3 contains very carefully presented Narrative Chronologies for 56 of the lending arrangements between AHAB/the Money Exchange/the Financial Businesses and each of those banks. The Narrative Chronologies have been produced for (a) banks listed in the Forgery Schedule with the largest claims against AHAB; (b) banks whose lending to the AHAB Group appears to have increased over the years but whose facilities do not appear on the Forgery Schedule; and (c) banks that appear to have renewed (but not increased) lending to AHAB whose renewals are subject to forgery allegations.
>
> 170. There is a spread sheet overview of the lending relationship with each bank and which identifies the inconsistencies between the established facts and AHAB's pleaded case. On the spread sheet, facilities are identified under various headings including: (1) increased facilities but which are not alleged to be forged; (2) renewed facilities (without increases) which are alleged to be forged; (3) facilities ( and supporting documents or related correspondence) with both matched and non-matched signatures on them; (4) facilities where there is other evidence of AHAB Partner knowledge of the borrowing or of the matching signatures on them; (5) facilities where the borrower is ATS, AIH or TIBC where there is no allegation of forgery although an AHAB Partner signed the facility contrary to AHAB's pleaded case of lack of knowledge of these entities; and (6) facilities where the borrower is shown as ATS, AIH or TIBC and, contrary to AHAB's pleaded lack of knowledge of these entities, the documents are said to have been manipulated to induce Suleiman to sign.
>
> 171. Because of such inconsistencies, not only does the forensic evidence fail to support AHAB's case but much of it undermines it. In very many instances, **renewed** facilities, which on AHAB's case there would have been no need to forge, have matched signatures, and **increased** facilities, which should have been forged on AHAB's case, do not have matched signatures.[669]

606. AHAB did "not dispute the factual statements made in the conclusions in the bank chronologies", as they made clear to the Chief Justice, at his express request to state AHAB's submission on them.[670]

607. As for Yousef, the Chief Justice referred only briefly to his matched signature appearing on only two pairs of documents, matched to one another, one pair being TIBC proxy forms of May 2006 and February 2007 and the other pair relating to a TIBC board resolution and meeting minutes of July 2007 and February 2008 respectively.[671] The Chief Justice had already dealt with the Algosaibis' knowledge of TIBC in Section 1.

---

[669] **Judgment AA/2.4/644-645**

[670] **Day124** and **X1/63/2**, cited at Respondents' Submissions **AC1/10/91**

[671] **Judgment AA/2.4/662-663.** We think there were in all seven Yousef signatures on the forgery schedule, at lines 302, 303, 386, 400, 448, 542, and 812. Line 302 was a TIBC proxy form of 31 May 2006, signed by Yousef alone with a matched signature. (There were similar proxy forms of the same date signed by Suleiman and Saud with matched signatures.) Line 303 was minutes of a TIBC board meeting dated 8 June 2006, signed by Suleiman

608.    As for Saud, the forgery schedule lists 51 signatures. The Chief Justice carried out a similar exercise in his case by reference to the Bank Chronologies, with similar results, concluding that Saud, contrary to his evidence, had signed facility documents in respect of which no allegation of forgery was contained in the forgery schedule.

609.    In the case of Saud there was also further evidence, cited by the Chief Justice. Thus, as far back as 31 December 2001, Badr sent a handwritten note in spreadsheet format in Arabic to Saud enclosing "statements of the banking facilities from both foreign and local banks which were, upon your approval, signed by [Suleiman]".[672] 21 banks were listed showing facilities then, at end 2001, amounting to SAR 2.7 billion. This is among other documents which show Saud's oversight of facilities and his interest in them; and his direct involvement in agreeing with Suleiman on the signing of banking facilities. And, towards the end, in 2009, in connection with Dawood's acknowledged signings, Saud accepted in his oral evidence that he had arranged for Dawood to take over the job of signing facilities. Did that mean taking over from Suleiman or taking over from Saud himself? The Chief Justice concluded it meant taking over from Saud himself, as a result of the following evidence taken from Saud's re-examination by Mr Quest:

> Q.    …After your Uncle Suleiman died, how on your understanding did the new for old policy work?
> A.    You know, they bring the old documentation and the new documentations…[Badr] matched them – to do the matching, and then he would, er, give them to us, presumably, at the time.
> CJ.    …"Us" meaning whom?
>          It means me or Dawood, but Dawood mainly. This is the – but Dawood, after his father passed away, he took more of, er, some of the activities that er, er, my uncle did.

Mr Quest then referred to a memo dated 20 March 2009 from the "Executive Committee", ie Al Sanea, to Mr Hayley and others concerning the Money Exchange, TIBC and AIH, which read:

> Please be advised that the documents that you will forward for the signature of Saud Algosaibi should be amended for the signature of Dawood Algosaibi as most of the time Saud will be travelling and the documentation will be delayed for erection. Further to the Partners Resolutions it is mentioned that either members of the Board Mr Saud; Mr Yousif or Mr Dawood can sign the documents.
> Please proceed with the above accordingly while forwarding future documentation.[673]

---

and Saud as well as Yousef. Suleiman and Saud's signatures were matched, Yousef's signature was not examined. Line 386 was a TIBC proxy form dated 4 February 2007, signed by Yousef alone with a matched signature (there is a similar proxy form of the same date signed by Saud with a matched signature). Line 400 is minutes of a TIBC board meeting dated 28 February 2007, signed by Suleiman, Saud and Yousef: Yousef's signature was not examined; Suleiman's signature was matched; but Saud's signature was *not* matched. Line 448 is a TIBC board resolution dated 20 July 2007 signed by Suleiman, Saud and Yousef matched signatures. Line 542 is a similar TIBC board minutes dated 27 February 2008. Line 812 is a guarantee dated 16 March 2009 signed by Saud and Yousef: Saud's signature is matched, Yousef's signature was not examined. Subject to a general point concerning TIBC documents, dealt with elsewhere, we do not think that this group of signatures advances AHAB's case. In particular, Saud's signature was not matched on line 400; it is difficult to think that there is anything sinister about line 812 at a time when Dawood was signing for SAR billions on documents which are not challenged; and Yousef's signatures were not examined on lines 303, 400 and 812.

[672] **H9/3/4**
[673] **G/7648**

Mr Quest then asked Saud:

> Q.   What was your understanding as to why documents went to Dawood to sign and not to you?
>
> A.   It was just an agreement I made with Dawood, er, you know, in the office, that er, er, - it's not about travelling or something, just something, er, er, I agreed with Dawood to be done.[674]

610.   The Chief Justice said, "For if Saud had never been involved in signing banking facilities, he would not have agreed with Dawood that Dawood should take over the signing of those facilities, which Dawood did."[675] We think that the Chief Justice was entitled to draw that conclusion, both from the terms of Al Sanea's memo, which clearly supports documentation having been prepared for Saud's signature prior to 20 March 2009, and from Saud's volunteering in re-examination that he had himself made an agreement with Dawood, outside Al Sanea's memo, that he would look to Dawood to do "more of...some of the activities that...my uncle did". We also think that this evidence supports signing (by whatever means) of banking facilities by Suleiman, Saud and Dawood in turn. No doubt Saud would say, within the confines of the "New for Old" policy, but that is another question, but also the fundamental question raised on AHAB's case. It may be noted in this connection that Suleiman died on 22 February 2009, and that the forgery schedule contains documents signed by Saud (with matched signatures) and/or Dawood during the following weeks. Significantly, we think, given AHAB's concession that Dawood's signatures were not forged, Saud was a co-signatory with Dawood in respect of facilities signed on 9 and 16 March 2009 (lines 804, 805, 806, 812 and 814 of the forgery schedule) and a sole signatory at this time on further facilities dated 16 March 2009 (lines 811 and 811.1).

611.   As to hand stamps, Mr Valentin submitted that the issue had been debated at length and with tenacity by AHAB, but that its importance to the Chief Justice's conclusions should not be over-estimated. The Chief Justice had concluded only that it was possible that hand stamps had been used in some cases, reflecting the agreed expert evidence.[676]

612.   As for the convenience theory, much criticised by AHAB, the Chief Justice was entitled to conclude that it made sense. In a situation where, as the Chief Justice otherwise found, the Algosaibis knew and approved of the borrowings from the banks, it made sense that mechanical applications of a signature were to be explained by the convenience of it. In specific situations, such as Abdulaziz's incapacity, or Suleiman's periods of hospitalisation, indisposition or illness, it was a necessity. In other cases, travel may have required it. There was evidence, for instance, from Mr Sharikh, one of the secretaries at AHAB HO, that Suleiman would not sign documents when he was abroad.[677] There was the sheer volume of documentation which needed signing. Each facility was surrounded by multiple documents and manifold signatures. Whatever the precise figure of transactions, and Mr Charlton in his evidence in the London proceedings had been able to be very precise[678], even Mr Quest had had to accept that "I'm not saying that there were not a lot of documents to be signed. There were."[679]

---

[674] **Judgment AA/2.4/666** at para 204 of Section 4, citing from **Day67/122-123**
[675] **Judgment AA/2.4/665** at para 204 of Section 4
[676] As the Chief Justice concluded in his final paragraph on forgery, para 268 of Section 4, **AA/2.4/701**: "and some possibly by using hand stamps". The Chief Justice had also referred to the agreed evidence of the experts about the possibility of hand stamps having been used (in some cases) at para 245 of Section 4, **AA/2.4/688**, where the Chief Justice had underlined the word "possible".
[677] Sharikh witness statement **C1/24/3** at para 12
[678] See Mr Charlton's evidence referred to at para 585 and footnote 637 above
[679] **Day 127/136**

613.    As for the complaint of compartmentalisation, it was a lengthy and complex judgment, and the Chief Justice had had to start somewhere. That was not to say that it had not been the product of a thought process over a considerable period of time. The Chief Justice decided to start where the parties were agreed the fundamental and pivotal issue lay, and that was with the question whether the Algosaibis knew of and expressly or implicitly authorised the enormous bank borrowings which had been fraudulently obtained through the Money Exchange and the Financial Businesses. And it was common ground that the fraud on the banks had occurred. Nor should it be assumed that in deciding the pivotal issue, the Chief Justice had left out of account or of his thinking what lay ahead in terms of the allegations of New for Old and Al Sanea's alleged forgery against AHAB. That is supported by what Lord Simonds said in *Thomas v. Thomas* to the effect that, in the absence of a compelling reason to the contrary, an appellate court is entitled and bound to assume that a trial judge making findings had taken the whole of the evidence into consideration.

614.    There were in any event signposts in the judgment that that was exactly what the Chief Justice had done. For instance, at the outset, he had said:

> At the heart of AHAB's claims lay the allegations that Al Sanea fraudulently without their knowledge and authority evaded Suleiman's "New for Old" policy and that he did so by the implementation of a program of forgery "*on an industrial scale*".
> …Thus, the crucial and pivotal issue in the case became whether the AHAB Partners knew about and authorised Al Sanea's activities at the Money Exchange and other Financial Business. This crucial and pivotal issue is that which is first examined first in this judgment. Other important issues, including the allegations of forgery against Al Sanea will also be examined in turn.[680]

615.    The Chief Justice spoke to similar effect elsewhere in setting out his task. He underlined AHAB's essential case as being "borne in mind throughout my examination of the evidence":

> AHAB, in its Closing Submissions emphasizes that when considering the issue of AHAB's knowledge and what the evidence reveals in that regard, the Court should ask itself these two overarching questions:
> (1) If the AHAB Partners knew of the extent of the borrowing incurred by the Money Exchange, the full extent of the Money Exchange's assets and the full extent of the Al Sanea indebtedness to the Money Exchange, why would the AHAB Partners have allowed him to continue to act as he did for years and not put a stop to it?
> (2) If the AHAB Partners knew and approved of all the borrowing incurred by the Money Exchange, why was it necessary to forge (whether by hand or mechanical application) the signatures of Abdulaziz, Suleiman, Saud and Yousef?
>
> These are indeed questions which will be borne in mind throughout my examination of the evidence…The second will be discussed in Section 4: The Forgery Allegations.[681]

616.    Similarly, the Chief Justice reminded himself early on that it was common ground that Al Sanea was a fraudster on the banks, and that it was AHAB's case that this fraudster "was also

---

[680] **Judgment AA/2.4/5** at paras 13-14 of the introduction.
[681] **Judgment AA/2.4/41** at paras 50-51 of Section 1

responsible for the fraud on AHAB, which is the subject of AHAB's claim"[682], and he also referred early on to the Counterclaim[683] and again to AHAB's case that Al Sanea had used forgery and manipulation to circumvent the New for Old policy.[684] When the Chief Justice reached forgery in Section 5, he began by saying "The most troubling aspect of this case has been the allegation of wide-spread forgery."[685] Moreover, in dealing with forgery in Section 5, he looked forward to the Counterclaim by citing in terms Mr Quest's oral summary of AHAB's forgery claim, which ended with the words "it included the forgery of very large Promissory Notes".[686] There are similar anticipatory looks ahead to the Counterclaim elsewhere, for instance, under the heading "SICL and Singularis Promissory Notes": "I will come to explain in dealing with the counter-claim why I am not satisfied about their authenticity."[687] However, the Chief Justice always had in mind that Al Sanea's fraud against the banks, his complicity with the Algosaibis in the fraud against the banks, and his fraud against AHAB, while separate questions in themselves, were nevertheless all part of the puzzle which he was tasked with solving.

617.   When the Chief Justice came to the Counterclaim itself, he was able to find forgery against Al Sanea, even though the experts' evidence was inconclusive as to the signatures on the Promissory Notes. And the Chief Justice then circled back and finally asked himself whether his conclusions on the Counterclaim should affect his conclusions on Section 5 (and Section 4 and 6) and he answered that question, No. But that question should not be regarded as though it was an afterthought: it was there from the very beginning. The earlier sections were written with the Counterclaim in mind and, it must be inferred, with the Chief Justice's conclusions on the Counterclaim in mind.

618.   Finally, Mr Valentin dealt with a question which had emanated from the Court, which was whether the signing with unmatched signatures of increased facilities could be explained on the basis of "a bit more to cover interest" (per Saud). Mr Valentin pointed out that that question had not been investigated at trial, because the development of the New for Old regime during Saud's evidence in terms of "a bit more to cover interest" had never been pleaded and only arose out of cross-examination. Nevertheless, an examination of the Bank Chronologies overnight, in response to the Court's question, revealed that of 33 bank chronologies showing increases with unmatched signatures all but one were well outside an increase that could plausibly be represented by a provision for interest. These 32 bank chronologies showed increases in a range of over 20% to over 50%. In one case only, that of Saudi Hollandi Bank, the increase was outside that range, being of 2.7% over the year from October 2000 to October 2001 and then 8.8% over the year from October 2001 to November 2002.

***Innocence, complicity and fraud: Discussion and analysis***

619.   After this lengthy recitation of submissions, which AHAB's appeal on these central issues of fact has made necessary, we proceed to give our views on this unwieldy material, which we began setting out at para 335 above.

620.   We remind ourselves that we are not here to conduct a trial. That has already taken place. AHAB have nevertheless conducted their appeal on these central issues of fact as though this

---

[682] **Judgment AA/2.4/48** at para 66 of Section 1
[683] **Judgment AA/2.4/43** at para 57 of Section 1
[684] **Judgment AA/2.4/53** at para 79 of Section 1
[685] **Judgment AA/2.4/580** at para 1 of Section 5
[686] **Judgment AA/2.4/583** at para 20 of Section 5, citing Mr Quest at **Day6/126**
[687] **Judgment AA/2.4/620** at para 117 of Section 5; see also at **AA/2.4/662** at para 196, and at **AA/2.4/693** at para 250

Court were sitting at first instance. Even so, Mr Wardell has recognised that he is not in a position to ask us to reverse the Chief Justice on his central findings, but at best (from his point of view) to say that the Chief Justice has erred so significantly from findings that he was entitled to make that it is necessary to order a new trial. In this connection, Mr Wardell presses on us what he submits was the Chief Justice's unfair concentration on the Respondents' submissions, which he asks us to take into account. We bear that important submission in mind, but for our part also direct ourselves to recall that on appeal we can only "island hop" in an ocean of facts which stretches over decades of business activity and the lifetimes of leading actors in the drama. We also bear in mind that it was the Chief Justice who had the advantage of not only having all the factual material presented to him over the course of a lengthy trial, but also of hearing and seeing the many witnesses and principal actors in person.[688]

621.    In these circumstances, we start our analysis by reminding ourselves of certain facts which are incontrovertible or at least firmly established, either because they are common ground or because they are plainly supported by the best of evidence.

622.    The first is that there was a long-standing fraud on the banks, which started with Abdulaziz and his young son-in-law Al Sanea, and which continued decade after decade throughout the succession of Suleiman and finally (albeit briefly) Yousef as chairmen of the Money Exchange. Although AHAB would seek to acquit Abdulaziz of conscious appreciation of dishonesty, it is impossible to do so. The structure of the Money Exchange's operations whereby the banks were misled as to the extent of the Money Exchange's borrowings and the value of its assets was part of the DNA of the Money Exchange's operations.

623.    Although it is difficult now to be sure how fully Abdulaziz took his partners into his detailed knowledge of the operation, it is impossible to think that they did not understand the essential structure of the fraud. They were members of the same family. They spent their business lives as part of a family business, working together out of the same offices, at AHAB HO. Although individually they may have differed in their business accomplishments and personalities, they all worked in the AHAB family business and came from a mercantile background. Saud was educated in the United States in business affairs. There is good evidence that both Suleiman and Yousef felt sufficiently uncomfortable about the Money Exchange's business operations to want it liquidated already during Abdulaziz's lifetime. Indeed, Yousef sought to absent himself from involvement in the Money Exchange by his apparent unilateral abandonment of his 10% share in 2000. He did so, having investigated for himself, with the help of the Audit Pack for 1998, the details of Al Sanea's indebtedness.[689] Despite that discomfort, however, and despite whatever suspicions any of them harboured as to Al Sanea's business methods or loyalty, not even Yousef disengaged himself altogether, and Suleiman went on to become acting chairman on Abdulaziz's incapacity and then to succeed formally as chairman on Abdulaziz's death. Yousef, however much he had remained in the background, then succeeded to the chairmanship of the Money Exchange on Suleiman's death. In truth, he never seems to have disengaged himself entirely or even formally. He continued to sign board resolutions, such as those distributing dividends to the partners, including himself for his 10% interest.[690]

---

[688] We observe, but only as a passing thought, that even on any retrial, those actors who were *not* present at the original trial, such as Abdulaziz and Suleiman, whose evidence would have been so important, are of course still unavailable to give evidence, because they had already died; that Al Sanea remains very unlikely to be willing to engage in the dispute; and that there may well be other significant witnesses whom the passing of time may render unavailable.

[689] It is common ground that Yousef was "shown the Audit Pack by El Ayouty", giving rise to his curt letter to Abdulaziz dated 26 December 1999: see **AHAB's Written Submissions AB/1.6/23** at para 6.59 and **Reply Submissions AB/10.5/23** at para 5.64

[690] **N/173, N/190**

624.    The conditions in which Suleiman succeeded to Abdulaziz's role were therefore not auspicious. For that very reason, it is simply impossible to believe that he did not take steps to inform himself properly and appropriately, to the extent that that may have been necessary, about the affairs of the Money Exchange: and all the more so because we are told that he did not speak English, and he would therefore have had to rely all the more on El Ayouty's Audit Packs and the more entrepreneurial Saud for a sufficient understanding of the Money Exchange's operations. Saud had become managing director of AHAB on his father Abdulaziz's death.

625.    In this context, we remind ourselves that Saud's Calculations, which are clearly based on the 2001 Audit Pack's figures, are made sometime in 2002, and are drawn up as a result of Suleiman's request. Indeed, it is inherently likely that the English speaking, US educated, soon to be AHAB managing director, Saud would have been heavily relied on by Suleiman. Nor is it easy to believe that Saud was not taken into the confidence of his father, Abdulaziz, during the latter's lifetime, even if that must remain less clear. Moreover, Saud's List (para 131 above) emphasises how completely Saud understood the Audit Packs which he had studied.

626.    Suleiman, having died before the collapse of the Money Exchange and the bringing of these proceedings, could not speak for himself. But there is no good evidence deriving from his time as chairman that he did not appreciate what was going on in terms of borrowings from banks and borrowings by Al Sanea. He was properly advised, and warned, of the ongoing and true state of affairs by El Ayouty, by means of the annual Audit Packs, delivered to him personally, in Arabic, each year. It is impossible to believe that he did not discuss them with at least Saud who had produced his Calculations for him. And Saud had El Ayouty's phone number on speed dial.

627.    In these circumstances, the evidence given by the surviving Algosaibis, by Saud in particular, but also by Yousef and Dawood, has to be seen as critical. It is particularly damning therefore that AHAB's first story, put out in the London proceedings, was one of total or near total ignorance. In his witness statement dated 13 March 2011, nearly two years after the collapse of the Money Exchange, Dawood said "I do not believe that I had ever received or reviewed any financial information relating to the Money Exchange." He said of his father Suleiman's purported activities as chairman that "The suggestion that my father acted in this way is completely incredible and offensive to his memory". Every signature of Suleiman was said to be forged. "Had my father given anyone that authority [to sign for him], I believe that I would have known about it." Everything was blamed on Al Sanea. As for the documents Dawood had himself signed in February to April 2009, they were all routine, and "I do not recall signing any agreements or related documentation during this period extending or renewing any bank borrowing, or entering into any fresh borrowing, and I did not knowingly do so…I am not prepared to accept that any signatures on documents I do not recall signing (and would not have signed had I been aware of their contents) are genuine."[691] And yet, as late as this appeal, AHAB has had to accept that Dawood's signatures on billions of SAR of borrowings are genuine. Saud himself was to give evidence at trial below of how he agreed with Dawood that he, Dawood, would sign the facility documentation at this time.

628.    Similarly, Yousef gave evidence in the London proceedings as chairman of AHAB to the effect that from the mid-1980s right until the collapse of May 2009 he had no involvement in the Money Exchange, from which he had distanced himself as a result of antipathy to Al Sanea. As far as he was aware "the Money Exchange never conducted substantial volumes of banking business". "I had no knowledge of the enormous lending which Mr Al Sanea obtained in the

---

[691] Dawood's witness statement in the London proceedings dated 13 March 2011, **L1/2** at paras 13, 28, 47-48 and passim

name of AHAB…I first learned about the borrowing after the investigations…in May 2009 began to reveal the details of Mr Al Sanea's fraud."[692]

629.    Saud's evidence in the London proceedings was to the same effect, if somewhat more nuanced. In his main (second) witness statement he denied knowing what Yousef had learned in 1999 from the 1998 Audit Pack about the then level of Al Sanea's borrowings, saying he had learned of that only "now". He acknowledged, however, that "I did hear", but he could not remember from whom, that "Mr Al Sanea had borrowed from the Money Exchange." But "I never knew the amount of the borrowing" and in any event Al Sanea told him it had been repaid. "I did not receive regular or formal management or financial information relating to the Money Exchange. Since I was not involved in its management there was no reason for me to do so". He had now, ie at the time of his second statement, been shown El Ayouty's financial statements (the Audit Packs) for 2006 and 2007, but he did not recall reading them before (with their references to TIBC) and much of their information "is unrecognisable to me". He was only aware since the May 2009 collapse of Al Sanea's enormous borrowings, or of even the existence of ATS and TIBC. It was inconceivable that Suleiman had known about or approved the vast borrowing undertaken in the 2000s. He was not aware of any of the facilities and guarantees relied on by the claimant banks.[693]

630.    However, as the Chief Justice remarked, this evidence became impossible in the light of subsequent documentary discovery, and so the New for Old policy was introduced for the first time in subsequent witness statements in these Cayman proceedings. In the circumstances, the new thesis became that what must in any event have been a significant ongoing and ever-recurring level of authorised borrowing was now accepted as genuine and authorised, but that anything in advance of such roll-overs plus sufficient new borrowing to allow for the interest on the "old" borrowing was not. Anyone who knows of the enormous power of interest compounded over the years will recognise the difficulty of Saud's "little bit of interest" suggestion. Be that as it may, the new thesis, being irreconcilable with the old, is one which any court would be reluctant to accept save on the basis of the most powerful evidence, preferably documentary but also personal oral testimony from witnesses with first-hand and direct knowledge of the formulation, application and supervision of such a policy, especially from witnesses untainted by the Algosaibis' previous false protestations of total ignorance.

631.    On the other hand, it is also established that Al Sanea was himself a fraudster, and a forger. He was of course, from the beginning, fully complicit in AHAB's fraud against the banks from which the Money Exchange borrowed. In that respect, he was a partner in fraud with the Algosaibis. But he was also prepared to commit fraud against AHAB and thus against his own family. For these purposes we need look no further than the fraud and forgery he committed against AHAB in terms of the Counterclaim. Although the Chief Justice was of the view that such fraud and forgery were a late development in reaction to the failure of his operations, we are prepared to be sceptical about that in the overall analysis (but see below).

632.    It follows that in coming to a conclusion about the heart of this litigation's dispute concerning AHAB's knowledge and therefore complicity with Al Sanea in the borrowing and disposition of the vast sums he disposed of, or on the other hand its ignorance and innocence of his activities, the Chief Justice had to take account of two macro aspects of AHAB's case. The first was AHAB's profession of a New for Old policy adopted in the period after Abdulaziz's incapacity and death; and the second was its explanation of its documented signing off on the

---

[692] Yousef's witness statement in the London proceedings dated 15 March 2011, **L1/12** at paras 49, 77 and passim

[693] Saud's second witness statement in the London proceedings dated 16 March 2011, **L1/6** at paras 55, 56, 68, 69, 79, 83 and passim

borrowings from the banks, and of its audited (apparent) acquiescence in the borrowings by Al Sanea from the Money Exchange, as having been both procured by Al Sanea's forgery and deceit.

633.    These two aspects of AHAB's case, the burden of proving both of which in the circumstances lies on AHAB, have of course a bearing on each other. If the Algosaibis' knowledge and authority of the borrowings from the banks is shown to be probable, then proof of Al Sanea's forgery of Algosaibi signatures on the facility documentation becomes harder and ultimately improbable. Similarly, if the Algosaibis' knowledge of Al Sanea's borrowings from the Money Exchange is shown to be probable, then proof of Al Sanea's alleged misappropriations from AHAB becomes difficult. If, however, Al Sanea is shown to have forged Algosaibi signatures, that is to say, to have applied them without their authority, or to have committed some other forgery by manipulation or alteration of documents, presumably in an attempt to defraud AHAB, then the posited case of ignorance becomes correspondingly easier to accept.

634.    Both these aspects of AHAB's case need, however, to be seen and evaluated in the context of its posited New for Old policy. That policy allows that there must be many, indeed innumerable, facility documents which are renewals of previous facilities, or renewals with an allowance for additional interest: and that such documents, whether signed with a manuscript signature or a mechanically applied signature, are genuine and authorised. Secondly, a policy of such a kind should, in the natural course of events, be easily traceable in documentary allusion and in some form of audited supervision. Thirdly, it should follow that facility documents signed with manuscript signatures, such as the huge borrowings of 2009 signed by Dawood, lie strictly within the New for Old guidelines, when they so plainly do not. All such considerations, however, count against a finding in favour of the policy of New for Old or wholesale forgery, as indeed the Chief Justice found. And without proof of New for Old, there is little or nothing to stand in the way of the conclusion that the appearance of mechanically applied signatures on several hundred documents (out of a vastly greater number, for it will be recalled that the facilities number in the tens at least of thousands) goes nowhere to prove that non-manuscript signatures were forged without authority. And then one is simply left with the obvious facts that, without the slightest sign of a significant change in regime following the passing of the era of Abdulaziz, matters continued essentially as before: the AHAB resolutions continuing the Abdulaziz regime were re-promulgated; the Audit Packs continued to be delivered to the chairman of the Money Exchange as before; as Yousef saw in 1999 and Saud saw in 2002, those Audit Packs showed an unending rise in borrowings on the part of both AHAB from the banks and Al Sanea from the Money Exchange; and it becomes difficult or impossible to escape the conclusion, which in any event the documents naturally suggest, that the Algosaibis knew everything, and willed it or acquiesced in it, in any event authorised it.

635.    In this connection, two big questions remain, much pressed on us by Mr Wardell. The first concerns AHAB: what was in it for them? Why on earth would they risk the whole of their business in what turned out to be essentially all for Al Sanea's advantage? The second concerns Al Sanea: if he was a fraudster not only against the banks but also against AHAB, as the Counterclaim shows him to be, why is it difficult to understand and accept that mechanically applied signatures and manipulated documents are consistent with the New for Old regime and go very far to prove it and AHAB's general case of innocence and ignorance?

636.    The Chief Justice's suggestion in answer to the first question was much derided by Mr Wardell as the *quid pro quo* theory. We do not think that derision is justified. Whatever the understanding between the Algosaibis and Al Sanea, and irrespective of any equity in their allocation of risks and rewards, and whatever term one may wish to use to describe that understanding, the facts found proved by the Chief Justice, taken at any level, illustrate a situation in which a dishonest and Faustian pact was made between the Algosaibis and Abdulaziz's son-in-law. It may be that at the beginning only Abdulaziz fully understood the nature of that pact. At any rate Abdulaziz plainly believed fully in the abilities of his son-in-

law. However, over the years, and with the assistance of El Ayouty, and aided by the greater scepticism of the other Algosaibis, such as Suleiman and Yousef, there must have come an understanding that the able, perhaps dishonestly brilliant, Al Sanea could do what the Algosaibis could not do for themselves, namely make them much richer and more influential in their world than their more modest, if successful, origins.

637.    Thus the Algosaibis became significant figures in the Saudi banking world, with members of the family holding directorships and the chairmanship of a leading Saudi bank, SAMBA. Their investments in Saudi banking shares proved valuable, and there were times over the years when the market value of those shares exceeded their cost and carrying costs. If, as late as 2006, before the crash that year in the Saudi stock market, followed in 2008 by the GFC, the Algosaibis had sold out of their investments, they would have done pretty well, all achieved on credit. The Chief Justice seems to have considered that what he regarded as a gigantic Ponzi scheme was doomed to inevitable ruin, and perhaps that is the common way of such risky enterprises based on borrowed money. However, that does not mean that the Algosaibis had not been beguiled over the decades by the wealth and influence that the Money Exchange had apparently brought them, on the coat-tails of the still more apparently successful Al Sanea. There came a time when Forbes featured Al Sanea as one of the richest and most successful businessmen in the world. The Financial Times referred to him in April 2007 as "widely regarded as one of the most aggressive and dynamic businessmen of his generation". It also reported that in the early months of 2007 he had invested about £3 billion on a 3.11 per cent stake in HSBC, through Singularis. It is impossible to think that the Algosaibis were not aware of such moves and that the enormous borrowings of Al Sanea from the Money Exchange were not being used for such purposes.

638.    One can debate, but perhaps fruitlessly, to what extent the Algosaibis disliked Al Sanea for his brashness and opportunism and/or admired him for his success. That lies within the minds and hearts of the protagonists, and even they may not have been entirely sure how they felt. In the outcome, they can certainly not be relied on to give honest evidence about such matters. However, whatever it was that bound the Algosaibis and Al Sanea together, probably a mixture of family connection, greed, fear of – and the difficulty of achieving – change, they stuck together, for better or worse, over decades. Despite clearly voiced unhappiness, despite the clear evidence of their knowledge of Al Sanea's borrowings from banks and from the Money Exchange, and despite every opportunity which they had and plainly knew they had, via El Ayouty and the Audit Packs, to know every last detail of those borrowings, opportunities which the Chief Justice was plainly entitled to consider that they had taken or else recklessly disregarded, the Algosaibis persisted in their Faustian pact to the very end, via signing up through Dawood for further billions to support the sinking ship in the early months of 2009. If Al Sanea is to be regarded as an unscrupulous tiger, the Algosaibis had long since climbed on his back and did not want or know how to dismount.

639.    Nor can we believe that, at the nadir of the world's financial fortunes, in the early months of 2009, in which crisis banking shares suffered worst of all, the Algosaibis were surprised, despite their evidence to say that they were, that the Money Exchange was foundering. That evidence of astonishment and revelation is not to be credited. It was effectively admitted to be false, by reason of the changes to AHAB's case following the disclosure of the N Files in the London proceedings, but nevertheless persisted in.

640.    All of that seems to us to be at the very least highly probable and perhaps inevitable on the material which has been debated before us, as well as on the Chief Justice's essential findings. Indeed, so far are we from being persuaded that the Chief Justice was plainly wrong, or made critical findings to which he was not entitled, or was taken from the correct path by an uncritical reliance on the Respondents' submissions, that we consider that his overall conclusions on the relationship between the Algosaibis and Al Sanea were in all probability right.

641.    However, before any final conclusion on the issues before us, it is also necessary to answer the second question posed in para 635 above, namely whether Al Sanea's acknowledged dishonesty to AHAB in connection with the Counterclaim is not sufficient, allied with the experts' evidence about mechanically applied signatures and alleged manipulation, to bring AHAB's case of wholesale forgery, as the weapon used by Al Sanea to overcome the defence of New for Old, to acceptance, whatever the Chief Justice may have found, so as to win for AHAB a new trial.

642.    In this connection, however, it is important to recognise that the experts' evidence is essentially neutral. It demonstrates that many signatures were mechanically applied, but the experts cannot say why they were applied in the way that they were, or that they were forged without authority. The AHAB allegation of wholesale forgery, significantly amended to a partial allegation of forgery and/or manipulation to evade the New for Old policy, has nevertheless to be proved. The prime witnesses to that allegation, Saud, Yousef and Dawood, have been regarded by the Chief Justice as not being witnesses of truth, and it would be impossible for us in this Court to depart from the Chief Justice's assessment of witnesses whom he had heard and seen give evidence before him over substantial periods of time. Nor is there anything which has arisen on this appeal which has required us to reject that assessment of the Chief Justice. (Badr had a very late, walk-on, part on the subject of New for Old, via a hearsay witness statement which he was unable and unwilling to be cross-examined on.) Moreover, the details of AHAB's revised forgery case do not match the theory of it, because manuscript signatures are found on documents which according to the theory should have been forged, and mechanically applied signatures are found on documents which, on the New for Old case, should have had no need for such mechanical applications. Even Mr Hayley, put forward by AHAB as a witness of truth who had suffered repentance and atonement for the frauds that he had carried out on the banks, the man who had for years been at the very centre of Al Sanea's operations, said that he was "astonished" when members of Deloitte told him that signatures on banking documents had been forged.

643.    On top of all that, the very thesis of New for Old, which is the stated reason for the forgeries or manipulations complained of, is both unproven and unlikely. It is unproven because it was not put in the forefront of AHAB's case when it first ought to have been; because it is in itself inconsistent with the case of total fraud and forgery on the part of Al Sanea which was the AHAB case for years, up until the surfacing of documents which ought to have been previously disclosed and whose disclosure made that earlier case impossible; because the evidence of the Algosaibis could not be relied upon and in any event only Saud gave evidence in support of "New for Old" and Yousef and Dawood did not; because there was compelling evidence, contrary to their original case and also to their amended case, that the Algosaibis knew and accepted the ever-increasing level of borrowings from the banks by the Money Exchange (including via the Financial Businesses) and by Al Sanea from the Money Exchange; because there is no documentary evidence of any value or significance in support of New for Old, which is incredible if the policy existed, especially in circumstances where AHAB plead that "Suleiman instructed Mr Al Sanea that if Mr Al Sanea wished to renew or replace any existing borrowing of the Money Exchange then he had to establish that the proposed new borrowing was not an increase on the expiring facility"[694]; because not even Mr Hayley, who ought to have known of the policy and the need to get round it, said nothing in its support in his witness statement, and in his oral evidence was forced to explain how the expression had been raised with him by AHAB's lawyer shortly before his taking the stand and that otherwise he had never heard of the expression; and because Mr Hayley, in speaking of Badr in his witness statement, did not refer to him as the gate-keeper to Suleiman for the purposes of any New for Old policy (under whatever description), but on the contrary described him as performing a role "at a very low level" and also as Al Sanea's "mole" in AHAB HO.

---

[694] Amended Statement of Claim at para 99K, **A1/2.3/40**

644.    New for Old is unlikely, for all of the above reasons, but also because it simply does not fit the proven facts. Those facts included the ever increasing borrowings from the banks, their accurate recording in AHAB's books, the auditing and reporting on those borrowings by El Ayouty in their annual Audit Packs, and all the other multitude of evidence to show that borrowings from the banks were monitored, audited, investigated (for instance by Yousef and Saud), and, at the last, signed for by Dawood in vast amounts. Similarly, it does not fit the facts of Al Sanea's borrowings, which were also meticulously recorded in Ledger 3, highlighted in annual restatements in the form of Attachment 9, audited and reported on by El Ayouty, and plainly kept under review by family members who must at one and the same time have been both wary of and impressed by Al Sanea's success. The two matters went together. The Algosaibis knew about the bank borrowings which they incurred or guaranteed, and they knew that those borrowings both supported their own investments and business and went to support the borrowings in turn by Al Sanea, some of which were at times deposited with the Money Exchange.

645.    In these circumstances, we consider that the detailed arguments we heard about the value of Badr's hearsay evidence, or of the various witnesses who spoke to the presence or absence of hand-stamps at AHAB HO, are of minor significance. Be that as it may, we record our views of such matters as follows.

646.    Badr's hearsay witness statement was dated 7 March 2017, which was late during the trial, and was only produced after all other live evidence had been heard. He is the only witness to speak for AHAB on New for Old apart from Saud; other AHAB employees, such as Messrs Saad, Fakhri and Sharikh, said nothing about it. Badr's name was not mentioned in AHAB's pleading of New for Old. AHAB does not seem to have intended to make use of his evidence, albeit an explanation was advanced to the effect that he had been difficult to track down. Badr, who was admittedly 80, was not willing to face "the pressure of being asked questions about his job", as he himself wrote in his statement. He ascribed the new policy to around the time of Abdulaziz's stroke (2000), whereas AHAB's pleading ascribes it to "In or around 2002 or early 2003". He said that if he presented a new facility for signing to Suleiman which was for an increase on the amount of the old facility, then Suleiman would not sign. He did not remember how many times loan documentation was returned unsigned, "but I do remember it happening on a number of occasions" and that "there were a number of times" when the new loan documentation would be returned with the amount changed to be the same amount as the old loan. However, no documentary support for the setting up or implementation or supervision of such arrangements has been found. On such an important subject, we regard Badr's evidence, unavailable for cross-examination, as being of very little value.

647.    As for the matter of hand-stamps, the Chief Justice was faced with conflicting oral evidence: from the lawyer, Mr Al Harbi, who gave evidence about his enquiries of two companies which produced hand-stamps, supported by his attendance notes of those enquiries, to the effect that they had supplied AHAB with stamps, and the evidence of Mr Al-Mutalab of one of those companies, who said that his firm had never made a hand-stamp for Suleiman or any AHAB director or partner. The Chief Justice also had the expert evidence of Mr Handy that the signatures on 48 documents could have been produced by hand-stamps; and the evidence that a listed suit-case containing keys and stamps had gone missing. All in all, we do not consider that anything very much turns on such matters. It is common ground that some hundreds of documents on the forgery schedule were signed with mechanically applied signatures in some way or other. The Chief Justice did not go further than to say that some signatures may have been applied with a hand-stamp. That remains a possibility, but no more. The essence of the argument over the forgery allegations lies elsewhere.

648.    There remains the matter of the Counterclaim forgeries. The Chief Justice regarded them, or at any rate the most egregious of them, being the Promissory Note for $ 4.5 billion, as being a post-collapse expedient. Thus, the Note in favour of Singularis dated 28 January 2009 for $ 4.5

billion, which was by far the largest element in the Counterclaim, bore a date which, although still prior to the crash, was itself very late in the story and, of more importance, was a date for which there was no evidence of any kind. The Note did not surface until 7 June 2011 when it was first handed to liquidators by a representative of Al Sanea, and that was after first demand had been made on it as late as 18 April 2011. That provenance, coupled with the facts that no copy of it was found in Singularis's files, there was no reference to it in Singularis's files, and the underlying deposits on which it was based did not appear in the ledgers of the Money Exchange, led to AHAB questioning its provenance and authenticity (even though the forgery experts agreed that evidence of forgery was inconclusive). It has every appearance of a late attempt, after the Algosaibis had turned on Al Sanea, of having been created by Al Sanea as his "get out of jail free" card.

649.    In this connection, there is a link with the two SICL Promissory Notes, purportedly dated a bit earlier on 1 December 2008, about which the experts also agreed that evidence of forgery was inconclusive (but which, after initial reliance on them, were not ultimately pursued in the Counterclaim). These were also produced by Al Sanea (the judgment does not say when, but we assume that it was in the course of post-collapse proceedings). One is for $ 1.423 billion, and the other is for $ 810 million: however, as of 1 December 2008, only $ 162 million was due by the Money Exchange to SICL. Another suspicious feature was a yet further Note produced by Al Sanea in other proceedings between him and AHAB, again for $ 1.423 billion, but in that case in favour of Al Sanea personally (not SICL) and dated 16 November 2008.

650.    All these Notes appear to be an attempt by Al Sanea, once the Algosaibis turned against him so as to blame him for everything that had happened as being in fraud of AHAB, to give himself some protection. They are therefore good evidence of Al Sanea's fraud and willingness to forge (and we know that he had for decades been willing, but along with the Algosaibis, to defraud the lending banks), but as a matter of self-defence against AHAB, which, post the collapse, was blaming him for everything, while claiming complete innocence and ignorance for the Algosaibis themselves. This is of course no exoneration of Al Sanea in the slightest, but it is not a situation which compels, or even raises a case of any particular strength, in favour of some seven years of forgery against AHAB.

*Foreign exchange transactions*

651.    Another aspect of the Counterclaim (which also failed) concerned some 20 foreign exchange (**fx**) transactions between SICL and the Money Exchange, which had been entered into between February 2008 and February 2009. SICL's claim was in the balance of an amount of some $ 75 million. The Chief Justice found, on the basis of the evidence of the Parties' experts on the subject, that the Money Exchange had commenced fx trading from at least December 1996, and had conducted some 2000 to 4000 transactions in each year from 1997 to 1998, and in excess of 1,000 transactions in the first few months of 2009. SICL also conducted an fx trading business, both with other Saad Group companies and also with the Money Exchange. 122 fx transactions between SICL and the Money Exchange were recorded between 2007 and 2009. In principle, the Chief Justice regarded these as genuine transactions, the ability to make which was in theory an advantage to the Money Exchange, which needed to draw down foreign exchange for the purpose of its bank borrowings.[695] There is an ISDA Master Agreement dated 18 July 2007, signed by Suleiman, albeit bearing matched signatures.[696] A running account was kept between SICL and the Money Exchange on profits and losses occurring between them on these transactions, but, until the Counterclaim concerning the 20 transactions (which failed),

---

[695] **Judgment AA/2.4/1268ff**
[696] Line 447 of the forgery schedule

there had been no attempt to enforce the obligations arising from them, as was agreed between the experts.[697]

652.   The 20 transactions with which the Counterclaim is concerned had not matured as of 5 August 2009. A question arose as to whether they had been backdated, at non-genuine rates, so as artificially to generate apparent profits to SICL's advantage. There was technical evidence to suggest that they were backdated, having been created around 16 March 2009, but given earlier dates. If so, why? Mr Hayley explained that it was a matter of mutual convenience, merely to give the impression to third parties that SICL was better off than it in fact was (albeit no cash ever passed between the Money Exchange and SICL), and to demonstrate to the banks that the Money Exchange was making use of its foreign exchange facilities, in other words a classic *Snook* "sham".[698] At trial AHAB submitted that they were therefore unenforceable (and only in the alternative, if there had been any intention to enforce the trades, a fraud on AHAB). The Chief Justice simply said that he accepted those submissions.[699] That dispensed with this aspect of the Counterclaim. In this connection, the Chief Justice also referred to the Audit Pack for 2008 which stated that fx transactions had been entered into "for the purpose of stimulating [the Money Exchange's] accounts at the financial institutions so that its accounts appear to be continually active throughout the year and give the impression to the financial institutions that part of the facilities granted are in use".[700]

653.   On appeal, however, Mr Wardell for the first time took the matter of the fx transactions further. He submitted that that there had been wholesale (albeit, as he conceded in oral submissions, quantitively uncertain) misuse of fx transactions to generate false profits for Al Sanea or his companies and false losses for the Money Exchange, even though the transactions themselves were not genuine. AHAB also referred to an exhibit to Mr Hatton's report which recorded a summary of losses incurred as a result of fx transactions as totalling $ 922 million.[701] Although no money ever changed hands, he submitted that the absence of the transactions from Ledger 3 meant that Ledger 3 was not after all an accurate account of the state of play between the Money Exchange and  Al Senea and that Al Sanea's debt was therefore understated.[702]

654.   We have to say, however, that this point is not properly understood, perhaps for the very reason that it had not been explored at trial, and we are in any event unwilling to give any effect to it on this appeal. At trial it was accepted that Ledger 3 (and thus Attachment 9) was an accurate and complete record of the state of accounts between Al Sanea (and his companies) and the Money Exchange.[703] That being the case, it does not seem to us to be open to AHAB, as Mr Smith submitted it was not, for any such point to be raised on appeal. Moreover, Mr Wardell submitted that the effect of such transactions was always to show a loss to the Money Exchange: but there are two difficulties about that submission. One is that, the twenty fx transactions explored for the purpose of the Counterclaim showed losses and gains going in both directions (although overall the losses went against the Money Exchange). The other is that, on the hypothesis that the losses always went against the Money Exchange, then the absence of the recording of the effect of the fx transactions from Ledger 3 is to leave Al Sanea's debt where it was and not to defray it by crediting him with his fx profits. In any event, the experts were agreed that the separate account in which the fx transactions were recorded did not give rise to any transfer of cash – which their entry into Ledger 3 would have done. In sum, this was an

---

[697] Andrews/Hatton Joint Statement, **I/22/16**, Hatton statement, **I/1/104** at para 12.77, **Day 3A/143-144, Day 20A/188**
[698] Hayley witness statement, **C1/9/35-36** at paras 171-176
[699] **Judgment AA/2.4/1276** at para 97 of Section 8
[700] **Judgment AA/2.4/1275** at para 96
[701] AHAB's Reply Submissions, **AB/10.5/15** at para 5.37
[702] AHAB's Reply Submissions, **AB/10.5/15** at para 5.40: "Even where there was no transfer of funds, the rigged transactions had the effect of reducing rather than increasing Al Sanea's indebtedness."
[703] **Day4A/69, Day12A/28-31**

attempt, essentially in oral submission[704], to prove a new case, not explored at trial, which ran counter to an important area of common ground at trial. It is not perhaps surprising that it remained very difficult to understand what AHAB's case was.

655.   Perhaps we could leave this subject with these additional comments. If the fx transactions were left on one side and not reflected in Ledger 3, then any fictitious profits either way did not affect the state of Al Sanea's indebtedness to the Money Exchange. If, however, the effects of these transactions had been reflected in Ledger 3, so as (overall) to reduce Al Sanea's indebtedness artificially, then it would have been for AHAB at trial to make its case on that basis. As it was, it was left to SICL to make a counterclaim on the twenty fx transactions concerned, which failed. In any event, the importance of Ledger 3, whether it was entirely accurate (as was common ground below) or was not, was that it showed that, contrary to their case, the AHAB Partners knew, without objection, that Al Sanea was borrowing huge sums of money from the Money Exchange and accounting for them as loans. In that connection, the precise quantum was not material. In connection with the separate AHAB submission, that the backdated fx transactions were part of a wider campaign of dishonesty against AHAB which ought to have led the Chief Justice to accept AHAB's most important claim, to ignorance of any increase in borrowing beyond the restrictions of New for Old (with a little bit for interest) as well as to corresponding ignorance of Al Sanea's borrowing from and indebtedness to the Money Exchange, AHAB's difficulties, as discussed in this judgment, were manifold, and not assisted by their own evidence, through Mr Hayley, that fx transactions were entered into as a matter of window-dressing, but that "No money was ever delivered pursuant to these transactions".[705]

*Letters of credit*

656.   Another separate head of complaint raised by AHAB on appeal was concerned with letters of credit, said to be bogus and which similarly were submitted to upset the legitimacy of Ledger 3 and Attachment 9 as records of the state of accounts between AHAB and Al Sanea. However, it is again very difficult to discover from AHAB's Re-Amended Memorandum of Grounds of Appeal or from AHAB's Written Submissions or Reply Submissions exactly what the nature of the complaint made of the trial process was. The matter was again essentially dealt with in oral submissions,[706] but, we fear, without clarity. Mr Wardell submitted that the letter of credit mechanism was a dishonest method which Al Sanea used to withdraw funds from the Money Exchange. Thus, Mr Wardell drew attention to Mr Hayley's evidence that the Money Exchange issued letters of credit in favour of Saad Group entities for non-existent goods.[707] It was a means used to generate finance from the issuing banks over a 180 day period. However, all the sums concerned were provided to the auditors, and Al Sanea's account was debited accordingly, as Mr Wardell accepted.[708] It was not as though the sums concerned were represented in the accounts as having been properly earned by Al Sanea (or his companies). So, in the upshot, Al Sanea's withdrawals were recorded in Ledger 3 and Attachment 9. In essence, this was part of Mr Wardell's failed new case about fully informed consent.

*The property transactions*

657.   Reverting to the Counterclaim, AHAB also drew attention to the Chief Justice's findings of Al Sanea's dishonesty with respect to land transactions (see also at paras 558-560 above). As part of its Counterclaim, SICL claimed the transfer to it of certain properties which it said had been bought by AHAB for SICL, with SICL's money, and were held by AHAB in trust for it,

[704] **Day3A/122-128** and **142-143, Day4A/60-72, Day8A/76-86**
[705] Hayley witness statement, **C1/9/36** at para 175
[706] See **Day2A/70ff,**
[707] Hayley witness statement, **C1/9/32-34**
[708] **Day4A/61, 65**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*
169

alternatively some $ 0.75 billion as their value, alternatively restitution of the money paid by SICL to AHAB for their purchase. AHAB countered that this was all fictitious: there were no properties, the deeds to them were forgeries, no money had ever been paid by SICL to the Money Exchange for their purchase, the declarations of trust were forgeries. There had been a transfer at one stage of $ 200 million by AHAB to SICL in September 2007, but this was almost immediately transferred back again by SICL to AHAB. The net cash flow in connection with the Properties was zero. The Chief Justice accepted AHAB's submissions to this effect.[709]

658.     AHAB also submitted and the Chief Justice accepted the following:

> It might be said that, even though there was no net cash flow, AHAB has in some way been enriched by the fact that it acquired Property 0. However, Property 0 has no real value – it is no more than a device used by SICL to manipulate its financial statements – and, moreover, it was never validly transferred to AHAB, the bill of sale being a forgery. At any rate, AHAB has no interest and wants no interest in Property 0: it is fully prepared to transfer whatever rights it may have in Property 0 if that is what the GT Liquidators want.[710]

659.     On this appeal, however, AHAB submit that the fiction in connection with Property 0 went back before the collapse and AHAB's attack on Al Sanea, and that the $ 200 million which had (for a day or so) left the Money Exchange falsified the legitimacy of Ledger 3. It also submits that in accepting AHAB's account of these transactions, the Chief Justice was accepting that Suleiman's (matched) signature on a fictitious bill of sale had been forged.[711] Other property transaction documents bearing Suleiman's matched signatures were also on the forgery schedule.

660.     However, for all that the story of the property transactions was found by the Chief Justice to be one of fiction and forgery, involving Suleiman's mechanically applied signatures, there is nothing in those findings, *which are expressed in terms of AHAB's own submissions*, which amounted to a finding of a *fraud against AHAB*. The attack on AHAB only comes in the proceedings themselves, where Al Sanea promoted material, such as the Promissory Notes, or the fx transactions, or, now under examination, the property transactions, as a means of fighting back against AHAB's attack. The critical aspect of the property transactions for present purposes seems to us to be the fact, which was common ground at trial, that the property transactions were cash neutral so far as the position between AHAB and Al Sanea was concerned: "The net cash flow in connection with the Properties was zero." Indeed, AHAB even went so far as to express a certain sensitivity about whether it might be said that AHAB had benefited from the acquisition of Property 0, a benefit which it was happy to disavow.

*TIBC and the Financial Businesses*

661.     AHAB dispute all, or practically all, knowledge of TIBC and the other Financial Businesses, and rely in this respect on mechanically applied signatures to proxy and other documents relating to TIBC, as well as on the evidence of the AHAB Partners.

662.     However, the Chief Justice rejected that case, in a detailed section of his judgment running to almost 100 pages.[712] He found that Saud, Yousef and Dawood had lied about their ignorance,

---

[709] **Judgment AA/2.4/1316-1318** at para 170 of Section 8, in conclusion of a lengthy passage examining every aspect of the land transactions at **Judgment AA/2.4/1277-1316** paras 98-169 of Section 8.
[710] **Judgment AA/2.4/1318** at para 170 of Section 8, citing para 10.29 of AHAB's written closing submissions at trial
[711] Forgery schedule line 470, a bill of sale dated 17 September 2007
[712] **Judgment AA/2.4/302-399**

which he considered disproved by a wealth of documentary material. He found that any reading of the Audit Packs alone would have immediately revealed that there were multiple such businesses, that they were substantial, and that the purpose of ATS and TIBC was to raise money for the Money Exchange by the use of facilities guaranteed by the partners of AHAB, their parent.[713] He also found that the Bank Chronologies showed that there were many instances of Suleiman signatures on documents relating to facilities for the Financial Businesses which were not matched signatures on the forgery schedule.[714] They included Saud's signatures in February 2009 relating to ADCB facilities which secured borrowing of over $ 1.5 billion for ATS. They also included facilities where the borrower is ATS, AIH or TIBC on documents on AHAB's manipulation schedule, where AHAB allege that Suleiman was duped into signing for increased facilities, but where there could be no disguising that the borrower was one of the Financial Businesses.[715]

663.     The Chief Justice made detailed findings as to Saud's and Suleiman's knowledge of the setting up of TIBC, such as their signatures on BMA (Bahrain Monetary Authority) questionnaires; and as to the logic of setting up TIBC, namely to compensate for the Money Exchange's failure to be licensed by SAMA as (a merged part of) a Saudi bank. It cannot be said that the Chief Justice was not entitled to make those findings.

664.     It is true that there is good evidence that the Algosaibis, who were nominally directors of (for instance) TIBC and ought, as a matter of Bahraini law, to have attended board meetings in person and not by proxy, did not do so; and that there is a series of proxy and other board documents signed in their names with matched signatures. However, it is impossible to believe that they did not know that they were directors of these companies. References to the Financial Businesses are repeatedly to be found in AHAB's own documents and reports, in which their size and importance are noted or even praised. One telling example is the reference to TIBC's capital as having been raised to $ 1 billion, something entirely inconsistent with the Algosaibis' protest at trial that it was known as only a small business. Saud and Al Sanea wrote on behalf of large numbers of their family to the King of Bahrain to ask for Bahraini citizenship on the basis that their Bahraini businesses were substantial (see para 589 above). Despite being directors, however, they were willing to allow Al Sanea to manage and operate these Businesses, and to take a back seat themselves. Just as they had with the Money Exchange. In the meantime, El Ayouty's Audit Packs kept them completely up to date with the relevant borrowings guaranteed by AHAB and with Al Sanea's indebtedness derived from such borrowings. Surprise expressed following the collapse was no more honest in the case of these Businesses than it was in the case of the Money Exchange itself. It is telling that GBC, instructed by Saud after the collapse to report on TIBC, made no mention of any fraud on AHAB (see at para 463 above). In such circumstances, the matched signatures cannot be found to have been unauthorised.

*Innocence, complicity or fraud: Conclusion*

665.     We revert therefore to consider what effect to give to the Counterclaim fictions and forgeries in connection with our review of the Chief Justice's and this Court's overall judgment about whether the Algosaibis knew what was going on in terms of the relationship between Al Sanea and the Money Exchange.

666.     AHAB and Mr Wardell summed up AHAB's case on forgery at two points in their submissions: in writing, as set out at para 518 above, and orally as set out at para 565 above. The written summary amounts to an assertion that the use of mechanically applied signatures was without

---

[713] **Judgment AA/2.4/398-399** at paras 968-971 of Section 1
[714] **Judgment AA/2.4/657** at para 193 of Section 4
[715] **Judgment AA/2.4/657-660** at paras 193-194 of Section 4

authority in furtherance of a fraud on AHAB (as well as on the banks), and to the further assertions that New for Old was not a fabrication and did exist from 2002 onwards, and that forgery and manipulation were Al Sanea's means to circumvent it. As such, that summary does not take the argument analysed above any further.

667.  The oral summary is more pointed, and seeks to accumulate various stratagems of the deeply dishonest Al Sanea into a conclusion that that dishonesty had been practised and deployed all along, at any rate following the death of Abdulaziz, against the Algosaibis themselves, and that the Chief Justice erred in failing to recognise that. Mr Wardell stressed ten points. (i) The Chief Justice found Al Sanea to be a fraudster. But that is and was common ground, and the Chief Justice was undoubtedly fully aware of that. (ii) The Chief Justice found that the property transactions were fictions. But that again is and was common ground, and AHAB themselves accepted below that the Money Exchange was not the loser from that, and Mr Wardell himself accepted that Al Sanea's purpose was to inflate SICL's balance sheet (this being part of the ongoing fraud against the banks). (iii) The Chief Justice found that a number of the property transaction documents were fictions and thus forgeries. But yet again that is and was common ground, and the same answer holds good. There is no evidence that this was done in fraud of the Algosaibis. (iv) The Chief Justice accepted that Abdulaziz's signature was simulated when he was incapacitated. But that was, and had to be, common ground, and can hardly have happened without the knowledge of the Algosaibis. If anything, we consider this to be a point against AHAB. (v) The Chief Justice found that Al Sanea lied about his knowledge of simulated signatures. But, while that is consistent with Al Sanea's general dishonesty and suggests sensitivity on his part about the use of mechanical application of signatures, that is hardly surprising and does not take us very far. (vi) The Chief Justice was satisfied that Al Sanea had instigated a dishonest Counterclaim relying on forged Promissory Notes. But, while that was true, the Chief Justice was well aware of that, and, albeit the Counterclaim comes naturally at the end of his judgment, he was aware of its significance while constructing his judgment as a whole. AHAB's difficulty was that the Singularis Promissory Note in particular was regarded by the Chief Justice, for what seems to us to be good reasons, to have been forged and used against AHAB as a defence to AHAB's post collapse attack on him. (vii) There was evidence of sophisticated forgery capability at the Saad Group through the unchallenged evidence of Mr Thomas. But that goes no further than to say that there was a capability to use mechanically applied signatures, which it was common ground and accepted by the Chief Justice had been applied. (viii) There was unchallenged evidence from Mr Hayley of Al Sanea forging his signature. But that happened on only one occasion, for which Al Sanea apologised, as Mr Hayley went on to say. Mr Hayley also said that he was "astonished" when members of Deloitte told him that signatures on banking documents had been forged and that he had no idea that any of the signatures of banking documents had been forged. That was AHAB's own evidence. (ix) There was evidence from Saud that he did not sign the Awal Bank land transaction documents. But Saud's evidence was of no weight, even if he was not challenged, as Mr Wardell claimed he was not, on every aspect of his denials.[716] (x) There were matched signatures on some TIBC documents. But the Chief Justice was aware of that, and the evidence that the Algosaibis knew about TIBC and the significance of its business and borrowings was overwhelming, even if they were willing to leave its operations to Al Sanea.

668.  In sum, AHAB's case on appeal was not so much that the Chief Justice ignored or mistook the established evidence in the case, but that he did not reach the conclusion that AHAB advocated

---

[716] In any event, the Awal Bank land transactions were another attempt by Al Sanea, similar to the property deals which were made a subject-matter of the Counterclaim, to create fictional assets for his companies. As in the case of other elements of the Counterclaim, the Awal Bank transactions come very late (Mr Wardell put them to May 2009 but backdated to March 2009 (see **Day 3A/119**)). They appear to have been entered into for the purpose of window-dressing the Saad Group's assets, but, as in other cases, without misappropriation by Al Sanea from the Money Exchange or increasing Al Sanea's indebtedness to it.

with respect to forgery and manipulation, namely that they were an evasion of New for Old in fraud of the Algosaibis.

669.   We have carefully considered AHAB's submissions. We agree that there was a degree of over-compartmentalisation, in as much as the Chief Justice was convinced of AHAB's knowledge and complicity, rather than of its ignorance and innocence, before he reached the subject-matter of forgery and manipulation and the Counterclaim. However, we have some sympathy for the Chief Justice in the formulation of his judgment over the vast and crowded terrain put before him. We for our part would accept the Respondents' submission that he did not leave out of sight what he knew to be AHAB's case of forgery and deceit exercised against it. We also agree with Mr Wardell that the Chief Justice may have utilised too stiff a standard of proof in requiring AHAB to prove its case of lack of authority to a degree where any plausible explanation of the facts consistent with AHAB's non-complicity was capable of being destructive of its case. That seems to us to be too similar to a criminal burden of proof. The issue was ultimately whether AHAB had proved its case of unauthorised use of the Algosaibis' signatures on the balance of probability in all the circumstances of the case, which included both the seriousness of the allegation and the fact that Al Sanea was shown to be a thoroughly dishonest man who did not stop at fraud and forgery – as the Chief Justice was only too aware. Nevertheless, when we consider all AHAB have argued, against the background of the Chief Justice's findings and what was common ground, we are not persuaded that the Chief Justice erred in his conclusions and certainly not persuaded that he reached conclusions to which he was not entitled.

670.   We recognise, as did the Chief Justice, that Al Sanea was a thoroughly dishonest man. However, the Algosaibis were also dishonest, decade after decade, and their dishonesty was intimately linked with Al Sanea's. Their protestations of total ignorance and innocence, subject to a muted part acknowledgment and part excuse that Abdulaziz did not comprehend his own dishonesty, rightly fell on stony ground. Their foundational case of New for Old rightly failed and with it the basis for their submission that Al Sanea had to cheat them as well in order to continue with their mutual fraud on the banks. Their dishonesty continued, after the Money Exchange's collapse, into the era of litigation, in London and the Cayman Islands, with suppression of documents and dishonest evidence. There may have been the odd occasion, such as the matter, at the last, of the $ 191 million heist, when Al Sanea cheated his family and life-long collaborators. However, it may be noted that in several areas which were examined in detail at trial, and/or have been raised on appeal, such as the fx transactions, the letters of credit, and the property transactions, it has not been proved, and it is hard to see, that the prestidigitations used were aimed at, or achieved, financial exploitation of the Algosaibis, as distinct from window-dressing to support the shaky financial foundations of Al Sanea's (and the Money Exchange's) empire. In the meantime, AHAB enjoyed the apparent wealth and prestige of the Money Exchange's success and the family's banking influence. And all the time, Al Sanea's indebtedness, and the intimate hand in glove relationship of Al Sanea's and the Money Exchange's fortunes, were recorded in the accounts and audited and reported on by El Ayouty, whom AHAB failed and possibly feared to call as witnesses in support of their case of ignorance and innocence.

671.   We revert to the manner in which Mr Quest at trial, in a critical exchange with the Chief Justice, towards the very end of the trial, on its Day 129, answered the judge (see at paragraph 317 above). The Chief Justice asked Mr Quest what his submission would be if the Algosaibis had been seeing the Audit Packs and did nothing to stop Al Sanea in his borrowings both from the banks on the credit of AHAB and from the Money Exchange on his own credit. Mr Quest then accepted that if that was the position, and the Algosaibis read and understood the Audit Packs, then he had lost. There had been informed consent. We think that concession was rightly made in the context of that trial, and we conclude that the Chief Justice was more than entitled to think that his premise was fulfilled. That, whoever took the lead in these matters, and it was probably both Suleiman, as chairman with the responsibilities of chairman and head of his

family, and Saud, Abdulaziz's son, with his more modern experience of the wider business world, the Audit Packs were read and digested. In particular, Attachments 8 and 9 provided ready and easy access to the information required, and we know that Saud had studied these.

672.   For all these reasons, we consider that this appeal fails, save that Al Sanea's $ 191 million transfer right on the point of collapse raises a special case which we address below. As will there appear, we conclude that an exception needs to be made in this instance and that a new trial will be necessary as between AHAB and SIFCO 5 to deal with it.

### The Payment of $ 191 million on 3 May 2009

673.   For the reasons we have given, we have upheld the Chief Justice's decision in relation to knowledge, authority, informed consent and breach of fiduciary duty as being one with which we agree and to which he was in any event entitled. That conclusion and those findings are however subject to one exception which we shall now consider.  It relates to the payment on 3 May 2009 of $ 191 million made from the Money Exchange's bank account with Bank of America, New York to an account with Awal Bank on the instructions of Al Sanea. The payment was specifically pleaded in the Amended Statement of Claim[717] and was included in the sum of $ 4.029 billion claimed by AHAB by the time of closing speeches before the Chief Justice.

   *(i)  Factual background*

674.   The facts relating to this payment were not disputed by the Respondents and appear from the witness statement of Mr Hayley and the contemporaneous documents.

675.   As the agreed chronology discloses, by the end of April/beginning of May 2009, financial institutions were beginning to serve notices of default. On 2 May 2009, Mr Hayley sent a memo to Al Sanea giving a list of overdue payment obligations of the Money Exchange totalling $ 465m. He said that if these obligations were not met, it would be necessary to advise the banks no later than 4 May that the Money Exchange was suspending all payments, which would amount to an event of default. He asked for advice as to whether the shareholders were able to inject $ 465m in order to keep the Money Exchange in operation or alternatively whether he should be instructed to notify the banks that the Money Exchange was defaulting[718].  This was not news to Al Sanea.  On 30 April 2009, he had instructed Mr Hayley to prepare a memorandum to the "Executive Committee" at the Money Exchange (ie to himself) explaining that the Money Exchange was unable to meet its obligations to repay debt.

676.   On 3 May 2009, Mr Hayley received a telephone call from Mr Stewart, the chief executive of TIBC, during which he could hear Al Sanea giving instructions to Mr Stewart in the background. He heard Al Sanea instructing him to transfer all of the available funds from the Money Exchange's account at Bank of America to an account in the name of AHAB at Awal Bank. Mr Hayley requested written instruction from Al Sanea to that effect and insisted that at least $ 2 million be left in the Bank of America account.

677.   Al Sanea provided written instructions the same day to transfer all the funds then held with Bank of America, less the sum of $ 2m, to the account of "A.H. Algosaibi" with Awal Bank[719]. Mr Hayley complied with those instructions. He said that a few days earlier, on 30 April, he

---

[717] **A1/2.3/33** at paras 86-92
[718] **G/7844**
[719] **G/7848**

had refused to comply with instructions given by Mr Stewart on behalf of Al Sanea to transfer $170m from the Bank of America account to an account at Ifabanque in the name of a company which he believed to be owned by Al Sanea's wife. However, he said that he considered the transfer on 3 May to be from one account held by the Money Exchange to another of its bank accounts, and accordingly he complied with Al Sanea's instruction. This transfer was a matter of days before the collapse of the Money Exchange.

*(ii)  The Chief Justice's finding*

678.    The Chief Justice dealt with this matter[720] in the following terms:

> 990. I accept that Al Sanea's contemporaneous behaviour was nothing short of dishonest.  It seems that even while Mr Hayley was anxious to inform the Algosaibis about the true state of crisis at the Money Exchange, Al Sanea's main focus was to extract every last bit of cash he could for himself.  And so, on 3 May 2009, he wrote to Mr Hayley "you are hereby instructed to transfer funds currently held with our Bank of America nostro account to the account of "A.H. Algosaibi" with Awal Bank.  Please retain $2 million with Bank of America".

> 991. Mr Hayley confirms that he reluctantly complied with these instructions resulting in the transfer of US$ 192m to the Algosaibi account with Awal Bank because "I considered the transfer to be from one bank account held by the Money Exchange to another of its bank accounts".

> 992. Given the then known circumstances, the transfer of such a large sum, virtually wiping out the Money Exchange's only $ account for a transfer to Awal Bank known to be controlled by Al Sanea, Mr Hayley's cannot be regarded as an acceptable explanation.

> 993.  AHAB submits that this conduct of Al Sanea's, albeit facilitated by Mr Hayley, was entirely consistent with Al Sanea's fraud on AHAB, suggesting that AHAB was, at all times, an unwitting and innocent party.

> 994. I do not accept that submission.  This, although characteristically greedy and dishonest conduct on the part of Al Sanea, was merely an opportunistic grab for whatever he could get as he departed the sinking ship.  The fact that the ship was bound to sink was already well-known to the AHAB Partners.

679.    The Chief Justice returned to the topic of this payment[721] where, having reaffirmed his conclusion that there had been no breach of fiduciary duty by Al Sanea, he went on to add the following at footnote 2120:

> There was a possible exception in relation to Al Sanea's activities at the very end, when he directed Mark Hayley to make the final transfers out of the Money Exchange's Bank of America Account and when he must have

---

[720]**AA/2.4/405** at paras 990-994
[721]**AA/2.4/780** at para 15

known that the Money Exchange might never be able to repay the sums then transferred because the banks had stopped lending.  Even in the context of the compact between Al Sanea and AHAB to use the Money Exchange to obtain fraudulent borrowing from the banks, it might have been arguable that at this stage, Al Sanea had determined to defraud AHAB as well, and this despite the fact that the transfer out was ostensibly to AIH's account with AWAL Bank….  Prior to this point in time, the faithful and meticulous recording of the Al Sanea indebtedness did not allow for any such inference of breach of trust.  *A claim based on this limited premise was however, not available to AHAB given its dishonestly pleaded case of ignorance and lack of authority of all new borrowing, post circa October 2000.*  Whether AHAB would have been able to show the transactional links between these last transfers and the accounts of the Defendants necessary for proving a tracing claim or a claim based on knowing receipt, would have been an entirely different matter." [*emphasis added*]

*(iii) Discussion*

680.    It was common ground before the Chief Justice and before this Court that, although the content of the fiduciary duties owed by Al Sanea to AHAB was of course governed by the law of Saudi Arabia, the duties under Saudi law were similar to the duties owed by a director of a Cayman company as set out in paragraph 176 of the Amended Statement of Claim[722]. This included at para 176.1 the duty "to act in good faith and only in the best interests of the Money Exchange and AHAB".

681.    It is well established under English common law (Cayman law being identical in this respect) that a director's duty to act in the best interests of the company of which he is a director will, in certain circumstances relating to insolvency, include a duty to have regard to the interests of creditors. As Lord Toulson and Lord Hodge put it in their judgment in *Bilta (UK) Limited v Nazir (No 2)*[723]:

> 123.  It is well established that the fiduciary duties of a director of a company which is insolvent or bordering on insolvency differ from the duties of a company which is able to meet its liabilities, because in the case of the former the director's duty towards the company requires him to have proper regard for the interest of its creditors and prospective creditors….

> 125.  …A director of an insolvent company is not directly a fiduciary agent of the creditors and cannot be sued by an individual creditor for breach of the fiduciary duty owed by the director to the company….

> 126.  Instead, the protection which the law gives to the creditors of an insolvent company while it remains under the directors' management is through the medium of the directors' fiduciary duty to the company, whose interests are not be treated as synonymous with those of the shareholders but rather as embracing those of the creditors.

To like effect was the observation of Lord Sumption at [104]:

---

[722] **A1/2.3/84**
[723] *Bilta (UK) Limited v Nazir (No 2)* [2016] AC 1 at [123] et seq

> The common law goes further than this, treating the interests of an actually or prospectively insolvent company as synonymous with those of its creditors…. The duty to have regard to the interests of creditors is not one of the general duties of directors identified in the statute, but the common law duty is preserved by s 172(3) of the Act, notwithstanding the directors' obligation to serve the interests of members.

682.    It is of course the case that the duties of a director of an English company are now set out in section 172 of Companies Act 2006. However, the position in relation to creditors is, pursuant to section 172(3), still governed by the common law as Lord Sumption indicates.

683.    Further guidance as to the point at which a director's duty to the company requires him to have regard to the interests of creditors is to be found in the judgment of the English Court of Appeal in *BTI 2014 LLC v Sequana SA*[724], published since the hearing of the appeal.  After an informative and helpful discussion beginning at [105], David Richards LJ, in a judgment agreed by Henderson and Longmore LJJ, rejected the suggestion that the duty to have regard to the interests of creditors arises when there is a real, as opposed to a remote, risk of insolvency. The court concluded that such a test was too vague and uncertain and that the duty only arises when the directors know or should know that the company will probably become insolvent. David Richards LJ summarised the position as follows:

> 216. I have, however, concluded that the duty may be triggered when a company's circumstances fall short of actual, established insolvency. This is certainly the view taken by many judges in the cases to which I have referred.  However, for good reason, not least because it has rarely been necessary, judges have shied away from a single form of words, preferring instead a variety of expressions such as those I have mentioned…

> 219. I consider there to be a problem with formulations in the second category, such as being on the verge of insolvency, because they suggest a temporal test.  If the test is that insolvency is 'imminent', or if similar words are used, it suggests that actual insolvency will be established within a very short time.  That may well describe many situations in which the duty is triggered, but it does not or may not cover the situation where, although the company may be able to pay its debts as they fall due for some time, perhaps a considerable time, to come, insolvency is nonetheless likely to occur and decisions taken now may prejudice creditors when the likely insolvency occurs.

> 220. Judicial statements should never be treated and construed as if they were statutes but, in my judgment, the formulation used by Sir Andrew Morritt C and Patten LJ in *Bilta v Nazir*, and by judges in other cases, that the duty arises when the directors know or should know that the company is or is likely to become insolvent accurately encapsulates the trigger.  In this context, 'likely' means probable, not some lower test such as that adopted by Hoffmann J in construing the statutory test for the making of an administration order…

684.    This summary seems to us equally appropriate as a statement of the position under Cayman law and accordingly, it follows that, from the point at which Al Sanea knew or should have known

---

[724] *BTI 2014 LLC v Sequana SA* [2019] 2 All ER 784

that the Money Exchange would probably become insolvent, his accepted duty to act in good faith in the best interests of AHAB required him to have regard to the interests of the creditors of the Money Exchange.

685. In our judgment, there was overwhelming evidence that by 3 May 2009, Al Sanea knew that the Money Exchange was or (at its lowest) would probably become insolvent. Defaults in payment to the banks had already begun to occur; he had requested Mr Hayley to produce a memo saying that the Money Exchange was unable to meet its obligations; and he had received Mr Hayley's memo of 2 May 2009 stating that there were overdue payment obligations of $465m and that unless that sum was injected by the shareholders, Mr Hayley would have to notify the banks on 4 May that the Money Exchange was defaulting. That indeed was the finding of the Chief Justice.  As he put it[725], this was an opportunistic grab for whatever Al Sanea could get as he departed the sinking ship, which was bound to sink. He described it as "characteristically greedy and dishonest conduct on the part of Al Sanea".

686. This was therefore a clear breach of Al Sanea's duty to act in good faith in the best interests of AHAB because he completely ignored the interests of creditors at a time when he knew the Money Exchange was or was about to become insolvent.

687. In the emphasised passage from footnote 2120 quoted above, the Chief Justice seems to have accepted that Al Sanea's conduct in this respect was arguably a breach of fiduciary duty, but to have found that such a finding was not available to AHAB "given its dishonestly pleaded case of ignorance and lack of authority of all new borrowing post circa October 2000". With great respect to the Chief Justice, we do not follow this argument. The fact that the Chief Justice had rejected AHAB's claim that it was not aware of and had not consented to previous borrowing cannot, in our judgment, operate to prevent a finding that this particular action on the part of Al Sanea on 3 May 2009 as the ship went down *did* amount to a breach of duty, because it was clearly not acting in good faith in the best interests of AHAB given the financial position of the Money Exchange at the time.

688. We should add that no point was taken before us or, so far as we are aware, before the Chief Justice that it made any difference that the payment of the $191m was to an account of the Money Exchange with Awal Bank, rather than to some different entity.  In our judgment, one has to have regard to the reality of the situation, which was that this was a payment on Al Sanea's instructions to the bank which he owned and controlled, and where he could thereafter direct where the money went and do with it as he wished.  Indeed, when pressed in oral submissions during the appeal, Mr Smith very properly said that, whilst he did not concede that it was a breach of fiduciary duty, he could see the force of the argument against him and that it was difficult for him to say it was not a breach of fiduciary duty when the Chief Justice had found that it was dishonest[726]. His main point was that it did not affect any of the Respondents because there was simply no evidence as to what happened to the $191m after it got to Awal Bank. There was therefore no evidence that it had reached any of the Respondents.

689. In summary, whilst, as stated earlier in this judgment, we are not generally in a position to make alternative findings of fact if we consider that the Chief Justice's finding of fact was outside the range of decisions reasonably open to him, we consider that this particular payment constitutes an exception. In our judgment, the only rational finding in relation to this payment is that Al Sanea was acting dishonestly contrary to the best interests of AHAB and was accordingly in breach of the fiduciary duty which he owed to AHAB.

690. The question then arises as to whether this finding results or could result in any liability on the part of any of the Respondents.  We consider that aspect later in this judgment.

[725] **AA/2.4/406** at para 994
[726] **Day19A/16-17**

691.  A combination of our finding that the only breach of fiduciary duty by Al Sanea was in relation to the payment of $ 191m and the fact that the GT Respondents and AwalCos have settled AHAB's claims against them means that the remainder of this judgment is only necessary on the question of whether SIFCO 5 is liable to AHAB in respect of the $ 191m payment. However, we shall consider some of the issues in more general terms where we think this is of assistance.

**The proper law of the claims**

*(i) AHAB's claims*

692.  It is convenient at this stage to set out the five heads of claim brought by AHAB as set out in the Amended Statement of Claim. Although some of the claims were only against particular Respondents, for present purposes we shall not distinguish between the Respondents.

693.  As summarised earlier, the essential allegation which underlies AHAB's claims is that, in breach of his fiduciary duty owed to AHAB, Al Sanea misapplied substantial sums belonging to the Money Exchange, which sums were paid to or applied for the benefit of various companies (largely STCC) in the Saad Group and that these sums (or part thereof) were ultimately received by one or more of the Respondents.

*(a) Proprietary claim*

694.  Where property is misappropriated in breach of fiduciary duty, the person to whom the fiduciary duty is owed (the **plaintiff**) has equitable title to the misappropriated property and is entitled to bring a proprietary claim against the defaulting fiduciary seeking the return of the plaintiff's property. Where the misappropriated property can be followed or traced into the hands of a third party (other than a bona fide purchaser for value), the plaintiff may bring a proprietary claim to recover his property (or its traceable proceeds) from the third party. The advantage of such a claim, if successful, is that the property belongs to the plaintiff and is therefore not available to creditors of the third party.

695.  AHAB rely on the alleged breach of fiduciary duty by Al Sanea and contend that they are entitled to trace the misappropriated property into the hands of the Respondents and are therefore entitled to a proprietary remedy entitling them to recover the traceable proceeds of the misappropriated property from the relevant Respondent in priority to the claims of creditors of that Respondent.

*(b) Knowing receipt*

696.  Where property transferred in breach of fiduciary duty is received by a third party, then, as well as a proprietary claim, the plaintiff has a personal claim against the third party (ie regardless of whether the third party still holds the property or its traceable proceeds) if the third party received the property (or its traceable proceeds) with sufficient knowledge of the facts surrounding the breach of fiduciary duty to make it unconscionable for him to retain the benefit of his receipt.

697.  In this connection, AHAB rely first on the same matters as in the proprietary claim, namely the misappropriation by Al Sanea of property belonging to the Money Exchange in breach of fiduciary duty and the subsequent receipt by the Respondents of the traceable proceeds of such misappropriated property.  AHAB further plead that the knowledge of Al Sanea is to be

attributed to the Respondents, who accordingly received the traceable proceeds of the misappropriated property with knowledge of Al Sanea's breach of fiduciary duty, so as to render it unconscionable for them to retain the benefit of such receipts.

### (c) Unjust enrichment

698.   An action for unjust enrichment will lie when (i) the defendant has benefitted, in the sense of being enriched; (ii) that enrichment has been at the expense of the plaintiff; (iii) the enrichment was unjust; and (iv) there are no available defences.

699.   AHAB plead that the Respondents were unjustly enriched at AHAB's expense as a result of their receipt of money misappropriated by Al Sanea in breach of fiduciary duty from the Money Exchange or as a direct consequence of money misappropriated from the Money Exchange. AHAB's case is that, unlike in the case of the proprietary claim and the knowing receipt claim, it is not necessary to show that the Respondents received the traceable proceeds of the misappropriation.   It is sufficient to show that there has been enrichment and that such enrichment was "at the expense" of AHAB. This involves, AHAB submit, a less stringent approach to the suggested transactional links between the misappropriation and any enrichment of the Respondents than is required for tracing.

### (d) Dishonest assistance

700.   A claim for dishonest assistance lies against a defendant where (i) there is a fiduciary duty; (ii) there is a breach of that fiduciary duty by the person who owes the duty; (iii) the defendant induces or assists that breach of fiduciary duty; and (iv) the defendant does so dishonestly.

701.   AHAB contend in the Amended Statement of Claim that the Respondents dishonestly assisted Al Sanea in his breach of fiduciary duty by acting as repositories for the misappropriated money and/or investing it for him and/or handling it.  They did so dishonestly because the dishonesty of Al Sanea should be attributed to the Respondents.

### (e) Conspiracy

702.   A claim in the tort of conspiracy lies where there is an agreement (which need not be a contractually binding agreement) or a common understanding between two or more people to do an unlawful act (or a lawful act by unlawful means) which causes damage to the plaintiff. As the Chief Justice correctly held[727], a company, as a separate legal person, can enter into a conspiracy with the person who is its directing mind and will.

703.   AHAB plead in the Amended Statement of Claim that the misappropriation by Al Sanea from the Money Exchange and the unauthorised borrowing from the banks were effected pursuant to a conspiracy between Al Sanea and the Respondents (amongst others). The conspiracy involved Al Sanea misappropriating monies from the Money Exchange and using his control to obtain unauthorised borrowings. So far as the AwalCos and SIFCO 5 were concerned, AHAB plead that the conspiracy involved the following elements:

> 184.3 SICL, the SIFCos, Singularis, Awal Bank, the AwalCos, Saad Air and Awal Trust Company, which at all material times acted under the control of Mr Al Sanea and in concert with him, acted as repositories for the proceeds of the fraud, or a large part of them …

---

[727] **AA/2.4/862** at para 84

*(ii) The Chief Justice's decision as to the proper law*

704.    As can be seen from the above summary, AHAB's claims were all pleaded under Cayman law (which is the same as English law in this area). However, the Respondents submitted that the claims were governed by the law of Saudi Arabia.

705.    The Chief Justice dealt with this in section 7 of his judgment.  He held that the law of Saudi Arabia was the proper law governing AHAB's "equitable claims"[728]. He set out his reasons for this conclusion by accepting and incorporating in his judgment the written submissions of Mr Lowe QC on behalf of SIFCO 5 (which were adopted by the other Respondents) in relation to what Mr Lowe called the "receipt based" claims. Those submissions included the claim in dishonest assistance as a receipt based claim as well as the proprietary claim and the claims in knowing receipt and unjust enrichment. It appears therefore that, when using the expression "equitable claims" the Chief Justice was including all of AHAB's claims with the exception only of that of conspiracy. The Chief Justice accepted that the test for ascertaining the proper law of the "equitable claims" was the law which had the closest and most real connection with the critical events and also accepted the submission of the Respondents that this was Saudi Arabia.

706.    As to the claim in conspiracy, there appears to have been no dispute before the Chief Justice that this was a claim in tort and that, where there is a claim in tort involving a foreign element, the "double actionability" rule applies.  This rule requires that, had it been committed in the Cayman Islands, the act in question would be actionable as a tort under Cayman law and also that it be actionable under the law of the foreign country where it was in fact committed (the *lex loci delicti*). The Chief Justice appears to have accepted that the acts relied upon as amounting to the tort of conspiracy were committed in Saudi Arabia and accordingly that they had to be actionable under the laws of both Saudi Arabia and the Cayman Islands[729].

*(iii)  Outline contentions on appeal*

707.    AHAB made a number of criticisms of the Chief Justice's approach when considering the proper law of AHAB's various claims. In particular, Mr Wardell submitted that the Chief Justice's almost complete reliance on the written submissions of SIFCO 5 for his reasons for concluding that the claims were governed by the law of Saudi Arabia had led him into error. For example:

(i)    The Chief Justice did not address (if only to reject) the detailed arguments made by AHAB in their closing written and oral submissions as to why Cayman law was the proper law of the claims.

(ii)   The Respondents wrongly categorised dishonest assistance as a "receipt based claim", which led the Chief Justice wrongly to include the claim of dishonest assistance in what he termed the "equitable claims". He had therefore applied the wrong test when ascertaining the proper law of the claim in dishonest assistance.

(iii)  The Respondents wrongly cited Rule 257 of the 15th edition of *Dicey, Morris and Collins* (*Dicey*)[730] as setting out the approach for determining the proper law of a receipt based claim. However, Rule 257 was based upon Regulation (EC) 864/2007 "the law applicable to non-contractual obligations" (*Rome II Regulation*). That Regulation does not apply to

---

[728] **AA/2.4/846** at para 78
[729] **AA/2.4/862** at para 85
[730] Dicey, Morris and Collins, The Conflict of Laws

the Cayman Islands and the question therefore fell to be determined by the principles of the common law.  The common law approach was summarised in Rule 230 of the 14th edition (2006) of *Dicey*, which was not in identical terms to Rule 257.

(iv)   The Chief Justice accepted[731] that pursuit of AHAB's receipt based or proprietary claims for knowing receipt, dishonest assistance or unjust enrichment / restitution required a Saudi cause of action which satisfied the double actionability principle. That was incorrect as the double actionability rule only applied to tortious claims.

708.   We consider that there is some substance in these submissions. However, the question for this appeal is whether the Chief Justice reached the correct conclusion as to the proper law of the various claims. Accordingly, we turn to consider that issue.

*(iv)   Classification of the claims*

709.   As stated above, the Chief Justice appears to have accepted the Respondents' submission that AHAB's claim in dishonest assistance should be regarded as a "receipt based claim" (to use the Respondents' terminology) or an "equitable claim" (to use the Chief Justice's terminology). Either way, it was not regarded as a tortious claim.

710.   In our judgment, AHAB are correct in their submission that a claim in dishonest assistance should be regarded as a tortious claim for private international law purposes and this was not disputed on appeal by the Respondents[732]. That was the view (albeit obiter) of Christopher Clarke J in *OJSC Oil Company Yugraneft (in liquidation) v Abramovich*[733] where at [223] he said:

> 223.   If it was necessary, I would strongly incline to holding that a claim in dishonest assistance was, for the purposes of the 1995 Act a 'tort'.  In <u>Harding v Wealands</u> [2006] UKHL the House of Lords assumed that Parliament intended that the expression 'questions of procedure' used in part III should be understood in the way that it would be understood in the field of private international law; and that the scheme of part III would not work on any other basis.  The same must apply to the expression 'tort'.  Dishonest assistance, a form of equitable wrong doing, is so closely analogous to a claim in tort (as characterised for purely domestic purposes) that it should, I would have thought, be so characterised for private international law purposes.

711.   This was also the view of Andrew Smith J in *Fiona Trust and Holding Corporation v Privalov*[734] who at [54] specifically agreed with the above observation of Christopher Clarke J.

712.   The position is summarised in the 15th edition of *Dicey* at 36-060 in the following terms:

> Dishonest assistance in a breach of trust is very likely to fall within the choice of law rules for torts in the Rome II Regulation.  It is a claim based on non-contractual wrongdoing for which the paradigm claim is for compensation for loss.  At common law, after some uncertainty, it appeared to have been established that the choice of law rules for torts applied equally

---

[731] **AA/2.4/852** at paras 79-80
[732] See section 18, para 70 of the Respondents' written submissions (**AC1/18/30**)
[733] *OJSC Oil Company Yugraneft (in liquidation) v Abramovich* [2008] EWHC 2613 (Comm) (**R1/39**)
[734] *Fiona Trust and Holding Corporation v Privalov* [2010] EWHC 3199 (Comm) (**R1/39.8**)

to dishonest assistance.  In *Casio Computer Co Limited v Sayo*, the Court of Appeal considered that dishonest assistance fell within the European autonomous meaning of 'matters relating to tort' under Art. 5(3) of the Brussels Convention.

713.    Whilst in this particular case, the dishonest assistance alleged is said to have involved receipt of funds misappropriated in breach of fiduciary duty, receipt is not a necessary element of dishonest assistance and in many cases will not be present.  The equitable wrong of dishonest assistance consists simply of giving dishonest assistance to a breach of trust or fiduciary duty, which assistance may be given in a variety of ways.  We agree therefore with the observations of Christopher Clarke J in *Yugraneft* and Andrew Smith J in *Fiona Trust* that dishonest assistance is closely analogous to a claim in tort and should be treated as such for private international law purposes.

714.    On this basis, AHAB's claims fall into two categories for private international law purposes. The proprietary claim and the claims in knowing receipt and unjust enrichment can be categorised as receipt based or restitutionary claims.  The claims in dishonest assistance and conspiracy are to be regarded as tortious claims.


*(v)    The receipt based claims*

715.    It was common ground before us that the proprietary claim and the claims in knowing receipt and unjust enrichment are to be regarded as receipt based claims for conflict of law purposes. AHAB submit that the proper law of the receipt based claims is the law of the place of enrichment which, they assert, is the Cayman Islands because that is where the Respondents are incorporated.

716.    AHAB refer to Rule 230 of the 14th edition of *Dicey*, which was the last edition to deal with the position prior to the introduction into English law of the *Rome II Regulation*. Rule 230 is in the following terms:


(1)    The obligation to restore the benefit of an enrichment obtained at another person's expense is governed by the proper law of the obligation.

(2)    The proper law of the obligation is (*semble*) determined as follows:-

(a)    if the obligation arises in connection with a contract, its proper law is the law applicable to the contract;

(b)    if it arises in connection with a transaction concerning an immovable (land), its proper law is the law of the country where the immovable is situated (lex situs);

(c)    if it arises in any other circumstances, its proper law is the law of the country where the enrichment occurs.

717.    Although Rule 230 is expressed in fairly unqualified terms, it is clear from the insertion of the word "*semble*" that the position was not regarded as being free from doubt. Since publication

of the 14th edition in 2006, there have been two cases which have clarified the approach to ascertaining the proper law of a receipt based claim such as a proprietary claim and a claim in knowing receipt or unjust enrichment.

718.    The first case is *Yugraneft* (supra).  It was alleged in that case that Yugraneft, the claimant, had been the victim of a fraud directed by Mr Abramovich whereby its interest in a Russian joint venture company had been effectively reduced from 50% to less than 1%, as a result of which it had suffered very substantial loss. The question whether the claims were governed by Russian law or English law was important because they were barred for limitation under Russian law. As in the present case, the receipt based claims comprised a proprietary claim and claims in knowing receipt and unjust enrichment.

719.    Having quoted Rule 230 of *Dicey* as set out above, Christopher Clarke J went on as follows (omitting references):

> 240. The commentary explains that the general principle of English law is:
>
> > "...to subject claims in the law of obligations to the law with which the obligation has its closest and most real connection" i.e. "of identifying the law which has the most significant connection with the claim".
>
> 241. The principle in Rule 230(2) has been so interpreted in *Cheshire & North's Private International Law* (13th Edn 199) at p 685 and by the Outer House of the Court of Session in *Baring Bros & Co v Cunninghame DC*…where Lord Penrose held that a restitutionary obligation is governed by the law of that obligation and noted expressly that this meant the law of the country with which, in light of all the facts and circumstances, "the critical events had their closest and most real connection".
>
> 242. A number of dicta support the view that claims in unjust enrichment (absent a contractual relationship between the parties and other than claims to land) are governed by the law of the place of enrichment….
>
> 243. But as *Dicey* points out at paras 34-030 ff there may be cases in which there is a divergence between the place of enrichment and the law which has the closest connection with the claim.
>
> 244. In *Barros Mattos Jnr v Macdaniels Limited*…Lawrence Collins, J, examined a number of authorities, including some of the above, and concluded that the weight of dicta on the applicable law of receipt based restitutionary claims supported the application of the law of place of receipt.  But he also said that:
>
> > "117. There is, however, no decision of the Court of Appeal in which approval of Rule 200(2)(c) [the corresponding Rule in the 13th edition of Dicey to Rule 230 (2)(c)] or the application of a similar principle, is the ratio.  Rule 200(2)(c) is a tentative formulation of the application of the basic principle in Rule 200(1) where the parties have no prior connection.   There is no decision that Rule 200(2)(c) must be treated as a free-standing rule mechanically applying the law of the place where bank accounts are kept irrespective of the factual circumstances and irrespective of the particular issues.
>
> > 118. Here parties in Nigeria agreed that one was to sell to the other dollars for delivery in Switzerland in exchange for Nigerian currency in Nigeria.  This is just

> *the kind of case where the law of the place of the enrichment will not necessarily give an answer which corresponds to the law which has the closest connection with the claim or with the issue.*"

245. The Court of Appeal of the Eastern Caribbean [in the case of *Sibir Energy PLC v Gregory Trading SA*, Civil Appeal 26 of 2005 (R1/37.3.1) at [23] in the BVI between many of the same parties and arising out of the same matters as in *Yugraneft*] approached the matter thus:-

> "*Lawrence Collins J showed in that review that it is not in all instances the law of the place of enrichment [which] will be the proper law and stated so in his conclusion.  As I understand the cases this is essentially because the law of the place of the enrichment will not invariably be the law that has the closest connection with the claim.  Dicey and Morris makes this very point. Cheshire & North makes the point even more firmly and argues against the tentative Rule 200(2)(c) and in favour of 'a flexible solution'.  However, while there may be debate whether the principle contained in Rule 200(1) is to be applied by reliance upon even a tentatively advanced clause (2)(c), in my respectful view the review by Lawrence Collins J and the discussion of the cases in both of the leading texts put it beyond argument, not just that the obligation to restore the benefit of an enrichment obtained at another's expense is governed by the proper law of the obligation, which the appellant accepts, but (to use again the language of Cheshire and North) that 'The proper law of the obligation refers to the law of the country with which the obligation has the closest and most real connection'.  That was the premise on which all the treatments proceeded*".

246. I agree with this view.  I reject the suggestion that a claim in knowing receipt with a foreign element is to be regarded as determined simply by asking whether or not the receipt is such that, in the eye of English equity, it cannot in conscience be kept or disposed of otherwise than by restoration to the equitable owner.  *Any obligation to restore an unjust enrichment, including a claim in knowing receipt as well as a claim in unjust enrichment itself, must in principle be determined by its proper law, which is, intrinsically, that law which has the closest connection with that obligation.*  Rule 230(2)(a) – (c) indicates what, in the instances to which it refers, is likely to constitute that law.  But the indicators of the likely result of the application of the principle cannot replace the principle itself.  In the case of (c) the place of enrichment may, depending on the facts, be of the greatest importance or very little importance at all.

247. If there is a contractual or similar relationship between the claimant and the defendant, the law of that relationship is likely to govern.  If the parties are complete strangers and the defendant is a recipient from a wrongdoer, the place of receipt is likely to be relevant, although that may well not be so if, for instance, the place of receipt is a transitory home.  If the defendant is the primary wrongdoer or the instigator of, or someone vicariously responsible for, the wrongdoing, it is likely to

be relevant to examine where the wrongdoing and its effects took place. As Dicey puts it at 34-06:

> "'*[2(c)] is not to be applied whenever the centre of gravity of the factors relevant to the obligation indicates that the proper law is different; and this will be more likely when the claim arises in connection with a wrong committed by the defendant against the claimant'*."

[*emphasis added*]

720.   The second case is the *Fiona Trust* case referred to above which also involved claims in knowing receipt. In that case Andrew Smith J agreed with the approach in the Scottish case of *Baring Bros and Co v Cunninghame DC* and that of Christopher Clarke J in *Yugraneft* which, in his view, adopted a more flexible approach than might be thought to appear from Rule 230(2)(c). He went on to say at [162]:

> 162. Citing these authorities, the Standard Maritime defendants against whom the claims of knowing receipt are pursued submitted that the law governing knowing receipt claims is that law of the place with which they have the closest and most real connection. The claimants did not submit that the governing law is determined by applying inflexibly the rule stated by Dicey, Morris and Collins. They submitted that the restitutionary claims for knowing receipt are governed by the law which has the closest connection with the obligation to restore the unjust enrichment, which in cases in which the obligation arises in connection with a contract is likely to be the law applicable to the contract and otherwise, except where the claim is in respect of real property, the law of the place where the enrichment occurs. Thus, the difference between the parties' formulations of the rule to determine the governing law appears to be that, whereas the Standard Maritime defendants referred to the law with the closest (or closest and most real) connection with the *claims*, the claimants refer to the closest connection with the *obligation* to restore the receipt. This distinction does not, as I see it, give rise to a difference of any significance, at least for present purposes, but, if it matter[s], I would adopt the rather broader formulation of the Standard Maritime defendants. The question which considerations have a particular significance for identifying that connection depends upon the facts of the case. [*Emphasis added*]

721.   Andrew Smith J went on to say this in connection with the significance of the place of enrichment:

> 179. There are claims against Standard Maritime defendants for knowing receipt of sums that they received in relation to RCB scheme, the newbuildings scheme, the Sovcomflot commissions claims, the hull no 1231 commission scheme, and the 'Romea Champion' commission scheme. The claimants' case is that, upon Mr Nikitin's directions, various companies, including Standard Maritime defendants, received payments into bank accounts in Switzerland. As I have said, in some circumstances the place where the payment was received is likely to be relevant to determining which law has the closest and most real connection to issues relating to a claim for knowing receipt, and so to determining which law governs them, but when, as is alleged here, payments were made into accounts in a Swiss branch of a Swiss bank in the name of a BVI company owned or said to be owned through

bearer shares by a Russian or by Russians, I do not find it easy to determine where the payment was received in any meaningful or substantial sense, and I am unable to accept that this question plays any significant part in deciding which law is most really and closely connected with the claim.

180. I consider that in this case what is more significant is what led to the payments being made in circumstances that justify a claim against the recipient. This approach requires that the governing law should be determined by reference to similar considerations to those which apply under the 1995 Act. In particular, it means that the important considerations include where any breach of fiduciary duty that caused or allowed the payment to be made took place, and how and where the recipient came to know that the claimants were entitled to the monies paid. In other words, important considerations are that, as the claimants primarily contended, the payments were made because of events in Russia where Mr Skarga, and also Mr Borisenko, acted in breach of their fiduciary duties and Mr Nikitin, through the arrangements that he had made, knew that the payments were made in breach of such duties. I therefore conclude that, insofar as the knowing receipt claims are brought on the basis that the payments were made in circumstances involving dishonesty and breach of duty on the part of Mr Skarga, their closest and most real connection is with Russian law, and that issues relating to the claims are governed by Russian law…

722. We consider that the observations of Christopher Clarke J and Andrew Smith J referred to above reflect the correct approach to the choice of proper law for the reasons which they give. The proper law is therefore the law which has the closest and most real connection. The question then is "connection with what?". The cases refer to two slightly different formulations. At [240] in *Yugraneft*, reference to the law with which the obligation has its closest and most real connection is explained in terms of identifying the law which has the most significant connection with the claim, whereas at [246] Christopher Clarke J speaks in terms of the law which has the closest connection with the obligation to restore an unjust enrichment. As can be seen, to the extent that he thought there was any difference in the two formulations, Andrew Smith J at [162] in *Fiona Trust* inclined towards the former formulation, ie the closest and most real connection with the claim.

723. AHAB submit that there is a difference between the formulations and that the latter is the correct one. The proper law is that most closely connected with the obligation to restore the unjust enrichment. The choice of proper law must therefore focus on the obligation to restore the benefit and the place of that obligation or the place with which that obligation has the closest connection. That is to be distinguished from the facts which give rise to the receipt in the first place.

724. AHAB further submit that, as the Respondents are incorporated in the Cayman Islands and it is to be assumed that this must have been deliberately arranged by Al Sanea so as to be outside Saudi Arabia and so that they could invest with all the benefits associated with offshore status, the obligation to restore the benefit by the Respondents is most closely connected with the Cayman Islands.

725. Even if the latter formulation is correct, we reject the weight which AHAB seek to place upon the place of incorporation. It was not suggested to us that there was any other connection with the Cayman Islands such as the bank accounts into which the monies were paid being situated here. Accordingly, if AHAB are correct, it would mean that whenever there is a receipt based claim such as knowing receipt and a company is the recipient against whom the claim is

brought, the law of the country of that company's incorporation will be the proper law. In our judgment, AHAB's submission is also inconsistent with the decision of the East Caribbean Court of Appeal in the *Sibir Energy* case[735]. That was a claim in knowing receipt against various companies incorporated in the BVI and the sole connection with the BVI was that it was the place of incorporation of those companies. The Court of Appeal rejected the argument that this meant that BVI law had the closest connection with the obligation when all the other connecting factors were with Russia.

726.    Like Andrew Smith J, we do not consider that there is any significant distinction between the closest connection with the claim and the closest connection with the obligation. A person brings a claim in, for example, knowing receipt because property misappropriated in breach of fiduciary duty has been received by the defendant in circumstances where his knowledge of the breach is such as to render it unconscionable for him to retain the benefit of the receipt. The obligation to restore the benefit which the defendant has received arises because of the surrounding circumstances which give rise to the claim. We accordingly agree with Andrew Smith J at [180] of his judgment in *Fiona Trust* when he says that important considerations will include where the breach of fiduciary duty that caused or allowed the payment took place and how and when the recipient came to know about the breach. To the extent that there is any difference between the two formulations, like Andrew Smith J we prefer the former, namely that the proper law is the law which has the closest and most real connection with the claim.

727.    Turning to the facts of this case, the only connection with the Cayman Islands is the fact that the Respondents are incorporated here. Conversely, there are a number of factors connected with Saudi Arabia.  Thus –

(i)      The claim arises out of a breach of the fiduciary duty owed by Al Sanea to AHAB, which was a partnership established under the law of Saudi Arabia and carried on business there. It is common ground that the fiduciary duty owed by Al Sanea to AHAB was governed by the law of Saudi Arabia.

(ii)     The acts relied upon as constituting breaches of that fiduciary duty all took place in Saudi Arabia in relation to the Money Exchange, an unincorporated division of AHAB.

(iii)    The money misappropriated by Al Sanea was for the most part paid to another company in Saudi Arabia, namely STCC which was part of the Saad Group which was ultimately owned by or for the benefit of Al Sanea.

(iv)     The Respondents are all ultimately owned by or for the benefit of Al Sanea.

(v)      Al Sanea was resident in Saudi Arabia at all material times and was ultimately directing operations both in relation to the original misappropriations and the onward movement of misappropriated funds. There is no evidence that he took any of these actions in the Cayman Islands.

728.    In the circumstances, we have no hesitation in concluding that the Chief Justice was correct to find that, whether expressed by reference to the claim (as we prefer) or the obligation, the critical events had their closest connection with Saudi Arabia, which is therefore the proper law in respect of the three receipt based claims.

*(vi) The tortious claims*

729.    We turn to consider the claims in dishonest assistance and conspiracy.

---

[735] **R1/37.3.1** (cited at [247] of *Yugraneft* quoted above)

730.    There is no dispute between the parties as to the correct approach in relation to tortious claims where the act giving rise to the claim occurred outside the Cayman Islands.  There are two requirements:

    (i)    the act must give rise to civil liability in the place where it was committed – the *lex loci delicti*; and

    (ii)    the act must be such that it would be actionable under Cayman law if it had been committed in the Cayman Islands.

This is known as the requirement for double actionability.

731.    AHAB submit that, whether considered under the heading of conspiracy or dishonest assistance, the acts giving rise to the claims took place in the Cayman Islands, which is therefore the *lex loci delicti*; accordingly, no question of double actionability arises. The Chief Justice was clearly of a contrary view because, in relation to the claim for conspiracy (which was the only claim he was considering as a tortious claim) he found that the double actionability requirement applied[736].

732.    AHAB did not develop their case on this aspect in detail in their written or oral submissions before us.  At para 18.17 of their Reply Submissions, they asserted simply that, for the same reasons they had argued that the receipt based claims were more closely connected with Cayman than with Saudi Arabia, when the relevant factors, acts and evidence of the conspiracy and the dishonest assistance were analysed properly, Cayman was the place where the acts took place and accordingly Cayman law was the *lex loci delicti*.

733.    Taking first the claim in dishonest assistance, the pleaded claim in the Amended Statement of Claim was that SICL, the SIFCos, Singularis, Awal Bank, the AwalCos, Saad Air and Awal Trust Company dishonestly assisted Al Sanea in his breach of fiduciary duty by acting as repositories for the misappropriated money and/or investing it for him and/or handling it, and they were dishonest because the knowledge of Al Sanea could be attributed to those companies as he exercised complete and effective control over them.

734.    As with the receipt based claims, there is in our judgment no connection with the Cayman Islands other than the fact that the Respondents are incorporated here. All of the acts giving rise to the breach of fiduciary duty and the misappropriation of monies from the Money Exchange took place under the direction of Al Sanea in Saudi Arabia and there is no suggestion that the monies were received by the Respondents in bank accounts in Cayman. We find therefore that the acts giving rise to the claim in dishonest assistance were committed in Saudi Arabia and accordingly the issue of whether the acts in question give rise to a civil claim have to be considered both under the law of Saudi Arabia and Cayman law.

735.    As to the claim in conspiracy, the Amended Statement of Claim pleads at para 184 that the unauthorised borrowings by, and the misappropriations from, the Money Exchange were effected pursuant to a conspiracy between Al Sanea, SICL, the SIFCos, Singularis, Awal Bank, the AwalCos, Saad Air and Awal Trust Company and that they involved the following four elements:

    (i)    Al Sanea using his control of the Money Exchange and certain other companies in Saudi Arabia or Bahrain to obtain unauthorised bank borrowing in the name of AHAB;

    (ii)    Al Sanea misappropriating money from the Money Exchange in breach of fiduciary duty;

---

[736] **AA/2.4/853** at para 82 and **AA/2.4/862** at para 85 of Section 7

(iii) The companies named above, acting under the control of Al Sanea and in concert with him, acting as repositories for the proceeds of the fraud or large part thereof, and / or receiving property directly from the Money Exchange; and

(iv) SICL, Singularis and Awal Bank using the Money Exchange to manipulate their own accounts and records for their own benefit including by way of false fx transactions, false confirmations of deposits and temporary deposits.

736. In our judgment, there is no evidence that these elements of the conspiracy or the conspiracy itself took place in the Cayman Islands. On the contrary, as pleaded, the conspiracy revolved around Al Sanea and his activities in relation to the Money Exchange, all of which took place in Saudi Arabia. The alleged conspiracy involved only one operative mind, namely Al Sanea in his own capacity and as the directing mind and will of the relevant Respondent. He was at all times resident in Saudi Arabia and the conspiracy must therefore have been agreed upon in Saudi Arabia. As in the case of the claim in dishonest assistance, there is no evidence of any connection with the Cayman Islands other than the fact that the Respondents are incorporated here. Accordingly, we find that the *lex loci delicti* of the claim in conspiracy is the law of Saudi Arabia and that accordingly the double actionability rule applies as found by the Chief Justice.

*(vii) Conclusion*

737. In summary, we uphold the decision of the Chief Justice that all five claims have to be considered by reference to the law of the Saudi Arabia. In the case of the proprietary claim and the claims in knowing receipt and unjust enrichment, this is because the law of Saudi Arabia is the proper law of the claim as being the law of the place with which the claim has its closest and most real connection; in the case of the claims in dishonest assistance and conspiracy, it is because the claims have to be actionable both under Cayman law and under the law of Saudi Arabia (as the *lex loci delicti*) pursuant to the double actionability rule.

738. We have not in this section of the judgment considered the question of whether tracing is a matter of substantive law (and therefore governed by the proper law of the particular claim) or a matter of evidence, which is governed by the *lex fori*. We shall deal with this when considering the topic of tracing.

**The substantive law of Saudi Arabia**

*(i)   Introduction*

739. Having determined that the law of Saudi Arabia is the law governing the three receipt based claims and is applicable to the other two by reason of double actionability, the Chief Justice then had to consider the substance of that law in relation to the claims (which, as stated above, were expressed under Cayman law). The Chief Justice dealt with this in section 7 of his judgment.

740. Two aspects of his decision on the substance of the law of Saudi Arabia have been challenged by AHAB in their appeal. They are:

(1) The Chief Justice's decision that Saudi law does not permit a proprietary claim against the Respondents by way of tracing into substitutional property such as money in a bank account; and

(2) his decision that, in respect of the tortious claims, the liability of the Respondents (if proved) would not be joint and several, but would be several, assessed by reference to the amount of misappropriated funds received by each Respondent.

741.    Given his finding that AHAB had knowledge of and had consented to Al Sanea's withdrawals from the Money Exchange, this aspect of the Chief Justice's decision was not strictly necessary. But, very properly, he dealt with it in case the matter went further and we propose to do likewise, not least because it is relevant to the $191m misappropriation.

742.    Three experts on the law of Saudi Arabia prepared reports and gave oral evidence before the Chief Justice. AHAB instructed Professor Frank Vogel. He prepared a report dated 18 April 2016 (**Vogel 1**), a supplemental report in response to the opinion of Dr Hammad dated 17 June 2016 (**Vogel 2**) and a further supplemental report in response to the opinion of Professor Mallat dated 4 July 2016 (**Vogel 3**).

743.    The GT Defendants instructed Professor Chibli Mallat. He prepared a report dated 18 April 2016 (**Mallat 1**) and a supplemental report dated 30 June 2016 (**Mallat 2**). SIFCO 5 instructed Dr Adli Hammad. He prepared a report dated 18 April 2016 (**Hammad 1**). In addition, there was a Joint Memorandum (the **Joint Memorandum**) of Professor Vogel and Professor Mallat dated 16 June 2016 setting out their points of agreement and disagreement. There was also a Joint Statement (the **Joint Statement**) of Professor Vogel and Dr Hammad dated 5 August 2016 setting out their points of agreement and disagreement.

744.    The judgment of the Chief Justice focusses on the evidence of Professor Vogel and Professor Mallat in relation to the two issues mentioned above and we shall do likewise.

745.    We begin by reminding ourselves of the correct approach of an appellate court to a finding by a trial judge on a disputed point of foreign law. As was common ground between the parties, a finding as to foreign law is treated as a finding of fact and accordingly the approach is that described at paras 231-249 above. It follows that this Court may only intervene if the Chief Justice's decision on either of the two points referred to above is plainly wrong, ie one that no reasonable court could reach.

746.    In the particular context of findings of foreign law, we were referred to the judgment of the Court of Appeal of England and Wales in *Dexia Crediop SpA v Comune di Prato*[737] where, having referred at [41] to the observation in *Dicey* (15th ed) at para 9-010 to the effect that –

> …generally an appellate court, which will not have had the opportunity to put questions to the expert witness of foreign law, will be slow to substitute its opinion for that of the trial judge

the court went on to say at [42]:

> Mr Handyside QC for Dexia submitted that this proposition was not fully supported by the authority cited…. He suggested that the reasoning in that case turned on the extent to which the trial judge had in fact taken advantage of the opportunity to ask questions of the experts in foreign law. We do not so read the judgment. Moore-Bick LJ referred expressly at paragraphs 26-28 of his judgment to the advantage which the judge enjoyed in hearing the witnesses. In our view, subject to the exceptions recognised in the cases [which are not relevant in the present appeal] this court's reluctance to intervene in cases involving findings of foreign law is more general. The trial judge not only has the advantage of asking questions of the experts, but also reads all the expert evidence and sees and hears the experts being cross-examined on it. He will see the extent to which the experts were able to justify their opinions and will be able to evaluate their reasoning. This is not solely,

---

[737] *Dexia Crediop SpA v Comune di Prato* [2017] 1 CLC 969 (**AG1/77**)

or even primarily, a question of assessing their 'demeanour'. This court is in no position to recreate the judge's experience from a reading of the transcript and by 'island hopping' (to use Lewison LJ's vivid metaphor) in the sea of relevant evidence available to the judge.

747.    With that introduction we turn to consider the two matters raised by AHAB.

*(i) Proprietary claim*

748.    In their respective reports, both Professor Vogel and Professor Mallat discussed various causes of action which exist under the law of Saudi Arabia. However, in their Joint Memorandum, they agreed on the existence of what Professor Mallat described as a "unifying theory" of liability. At para 3.7 of the Joint Memorandum[738] they described how this unifying theory has three elements, namely harm, wrongful act and causation. It is a general theory of liability covering both tort and contract. They also agreed at para 3.8 of the Joint Memorandum that Islamic law emphasises in many contexts an owner's right to regain possession of his property from others holding it without lawful basis ie a proprietary claim. It was possible for an owner to regain his property by proof of his ownership against anyone holding it who cannot prove a lawful basis for his holding. They further agreed that tracing the owner's specific property can give rise to particular issues of fact and law when the property has been mixed with other property.

749.    However, they differed thereafter. Thus at paragraph 54 of Vogel 1[739], Professor Vogel stated that, insofar as monies misappropriated from the Money Exchange were transferred to any of the Respondents by Al Sanea, then, so long as they could be traced and identified as funds belonging to AHAB, AHAB could regain them in full.

750.    Professor Mallat on the other hand was more cautious. We think it helpful to set out certain paragraphs from Mallat 1.

751.    In Section C, when considering the tort (to use the Western expression) of "*ghasb*" (referred to as "usurpation"), which is the unlawful and forceful seizure of someone else's property (and it was common ground that it was not applicable in this case because of a lack of any "forceful seizure" of Money Exchange cash by Al Sanea), Professor Mallat said this in relation to the consequences of *ghasb*:

> 189.  If established, the legal consequence of ghasb is restitution, otherwise compensation. Compensation in Islamic law is known as daman…. Daman is compensation for harm irrespective of whether its origins lay in tort or in contract….. In the particular case of ghasb, the principle of reparation is set out in article 1378 and article 1384 of the Hanbali Majalla: return in specie, unless it is impossible to do so. In that case restitution is replaced by equivalent compensation.

> 190.  Restitution in the Hanbali Majalla is literally the return (radd) of the object unlawfully seized… article 1384 uses more precisely radd 'aynan, return as such, in kind. Radd al-'ayn, the 'physical object's return' is also used in article 1387 and article 1391; 'ayn as physical object is distinguished in classical and modern law alike from dayn, debt. Both are the subject of property, but the virtual reality of dayn,

---

[738] **K1/4/7**
[739] **K1/1/20-21**

debt, is acknowledged in contrast with the physical reality of 'ayn as an object. One can restitute an 'ayn, but not a dayn. This is also common in the classical legal texts. Restitution is a clearly identifiable concept, separate from reparation or compensation."[740]

It is clear from the above extracts that Professor Mallat fully understood and indeed emphasised the distinction between restitution (the return of the thing itself) and compensation (an award of damages to compensate for loss).

752. Section G of Mallat 1 is entitled "Alleged proprietary / tracing claim" and Professor Mallat begins by setting out his understanding of the factual position and what he has been asked to advise upon as follows[741]:

Saudi Arabian law questions

264. Is there any Saudi Arabian law equivalent to tracing?

265. If so, what are the principles that govern it?

266. Where such a right has arisen, in what circumstances is it lost?

I understand from my instructions that:

267. AHAB alleges that it was and remains the equitable owner of the money allegedly misappropriated from the ME. AHAB further alleges that it is entitled to 'trace' the money allegedly misappropriated from it into and through the hands of the alleged recipients including SICL and Singularis.

268. AHAB further alleges that the law of Saudi Arabia recognises and allows the pursuit of a proprietary claim to assets which have been usurped and/or embezzled and/or converted by another and to the substitutes of such assets.

269. Under the law of the Cayman Islands, tracing is an exercise in identifying assets which are or may be taken to represent the property of a plaintiff. Tracing is not a cause of action in itself but where it is possible to trace an asset a plaintiff may be able to assert a proprietary claim to that asset.

270. For the purposes of my analysis, I have considered in particular paragraph 187 of the AHAB Statement of Claim and paragraph 59.3A of the AHAB Reply.

Analysis

271. There is no concept of 'tracing' in Saudi legislation. The closest equivalent for tracing of money in Hanbali law is the concept of khalt or ikhtilat, literally translated as mixing of money or property after it is removed from the control of the lawful owner. Again, its treatment

---

[740] **K1/2/46**
[741] **K1/2/63**

is most detailed in Book 12 of the Hanbali Majalla on ghasb or
seizure/usurpation, Arts. 1375-1422, referred to above in sections B,
C and E.

272.  The most relevant articles of the Majalla appear in Chapter 6 – Rules
concerning the person to whom the seized property is transferred:

*"Article 1413: Any person to whom the seized property
has been transferred is in the position of the [unlawful]
seizor, and the [original] owner may have him
compensate the property and lost benefits [of the
property]…"*[Emphasis added].

In cross-examination[742] Professor Mallat accepted that "compensate the property" was perhaps
not a good translation and that what it meant was "restitute the property".

753.  Professor Mallat expressed his conclusion to Section G of Mallat 1[743] in the following terms:

284.  It appears from these texts that the great Hanbali jurists struggled with
where to ascribe liability in circumstances where there is a chain of
money passing from party to party even in the case of unlawful seizure.
As in all legal systems, the restitution of an object that is identifiable is
easier than the restitution of an object which has been mixed.

285.  First, the texts suggest that the jurists were attentive to the difference
between an object that remains the same and an object which gets
transformed in various ways, including where money gets mixed with
other money.  Where an asset continues to be identifiable, it needs to
be restituted in kind….  The Article explicitly states that the owner
cannot be forced to accept an equivalence in value even if the
compensation offered is superior to the value of the object….. and
where the object has been mixed, an effort will be made, to the largest
possible extent, to distinguish the original misappropriation from the
money mixed into it.  [emphasis added]

286.  Secondly, in the case of mixture where the original asset cannot be
identified, article 1386 summarises the principle of a pro-rated
compensation: if the property is mixed…. without remaining distinct
or is mixed with a better property or with a different kind so that it
cannot be distinguished, then the two owners are partners in the
mixture to the extent of the respective value of their property.
[Original emphasis]

287.  Thirdly, there is in all the cases involving a third party a particular
attention paid to whether that third party knew about the
misappropriation before the object or the money passed to him.  When
the object of the seizure is mixed, usually in the case of money,
knowledge makes the seizor and the third party partners in restitution.
When the third party's knowledge of the misappropriation is lacking,
the third party who is in possession of the money does not necessarily
have to return it to the original owner.  If he does, he can claim back
compensation from the seizor." [original emphasis]

---

[742] **Day105/93**
[743] **K1/2/68**

754.    As already mentioned, both Professor Mallat and Professor Vogel gave oral evidence.  It was AHAB's case in closing before the Chief Justice that, when giving his oral evidence, Professor Mallat had departed significantly from the position adopted in his report and in effect agreed that there could be a proprietary claim against money in a bank account held by a Respondent.

755.    The Chief Justice dealt with the matter very briefly. He did not recount the evidence given by either expert and addressed the matter only in the following four paragraphs. He said[744]:

> 61.  Nor does the 'unifying theory' as explained by Prof Mallat assist AHAB to establish the proprietary links between its property and the assets of the Defendants.  Prof Mallat, unlike Prof Vogel, did not go so far as to expressly accept that under Saudi law, a claim comparable to a proprietary tracing claim could be pursued for the recovery of intangible property (dayn), such as a balance in a bank account, as distinct from a claim for usurpation (ghasb) in personam for the recovery of tangible property (ayn), such as gold coins.  Whether speaking of restitution of stolen property or compensation in damages, I understood Prof Mallat to have been speaking of personal remedies, to be imposed in personam against the wrong-doer, not to proprietary remedies which could be imposed in rem against intangible property (dayn).  Such a concept is tantamount to a contradiction in terms, under Saudi law.

> 62.  I found Prof Vogel's argument for the existence of such a proprietary claim "analogous" to usurpation, based upon a certain Saudi case in which compensation appears to have been awarded for embezzlement, to be unpersuasive.  Prof Vogel's position that, by analogy, tracing / following can be applied to third parties other than the usurper was also shown to be inconsistent with his earlier evidence given in 2004 and is unsupported by any Saudi legal authority.  Certainly, whether because the reporting of decided cases is a new phenomenon in Saudi Arabia such that other cases of relief analogous to usurpation exist but cannot be cited or because the general or "unifying" theory is still in its infancy, there is no clear basis for finding that Saudi law has out-grown its civilian roots, to the stage where it now allows for proprietary tracing claims into intangible property.  Prof Mallat was clear in emphasizing in cross-examination, the compensatory as distinct from proprietary nature of remedies available under the unifying theory in relation to the tort of embezzlement.  The difference is between the in personam nature of the latter and the in rem nature of the former type of remedy."

756.    And later[745], he returned to the subject to say:

> 79.  Having accepted this principle [that the proper law for receipt based claims is the law with which the critical events have their closest and most real connection] as being applicable here, the finding that Saudi law does not admit of a proprietary claim against intangibles (dayn), means that AHAB could not satisfy the conflict of laws rules in respect

---

[744] **AA/2.4/838-839** at paras 61-62 of Section 7
[745] **AA/2.4/852** at para 79 of Section 7

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

of its receipt based or proprietary claims for knowing receipt, dishonest assistance or unjust enrichment / restitution.

80. The pursuit of such claims requires a Saudi cause of action which not only satisfies double actionability but which also (i) recognizes proprietary claims against third parties into whose hands the claimed property is said to have come and (ii) can allow the property in their hands to be identified as AHAB's property regardless of the forms of transfer which took place (i.e. which allows substitutional tracing). The fact that AHAB had no such cause of action in Saudi Arabia means that AHAB was unable to establish the "proprietary base" for its claims which, therefore, rendered them untenable.

757.   It is clear from passages later in section 7 that the Chief Justice preferred the evidence of Professor Mallat to Professor Vogel where they differed. Thus[746] he set out a lengthy extract from the written submissions of the GT Defendants which he expressly accepted. At para 28 of those submissions[747] the GT Defendants submitted that on points of material difference between the evidence of Professor Vogel and Professor Mallat, the court should prefer the evidence of Professor Mallat for four reasons, which were then set out in detail. It is clear[748] that the Chief Justice accepted this submission and the validity of the four reasons given for preferring the evidence of Professor Mallat. In our judgment, it cannot possibly be said that the Chief Justice's decision to accept the evidence of Professor Mallat in preference to that of Professor Vogel was outside the band of reasonable decisions open to him.

758.   That, no doubt, is why AHAB have not sought to argue on this appeal that the Chief Justice should have accepted the evidence of Professor Vogel. Instead, they based their ground of appeal on this aspect entirely on a submission that the Chief Justice misunderstood the evidence of Professor Mallat and, in particular, failed to have regard to how his oral evidence departed significantly from what he had said in his report. The Chief Justice had therefore reached a decision which no reasonable judge could reach.

759.   We have taken the opportunity of reading the transcript of the cross-examination of Professor Mallat by Mr Quest QC on behalf of AHAB. This is to be found on **Day105/35-175**. On this particular topic, the relevant pages are 85-127.

760.   We would summarise the key aspects of Professor Mallat's oral evidence in cross-examination as follows (the references in brackets are to the pages of the transcript):

(i)   A modern Saudi commercial court would apply the unifying theory rather than seek to pigeon hole the case into a particular category of action as taken from the classical texts (89, 91,111);

(ii)   Where an asset continues to be identifiable, even where there is a chain of money passing from party to party, it needs to be restituted in kind; in other words, the actual property has to be given back; furthermore it is not impossible to restitute an object that has been mixed (97-98);

(iii)   Where the misappropriated property has been mixed with other property in such a way as to make them indistinguishable, the original owner and the owner of

---

[746] **AA/2.4/867** at para 90 of Section 7
[747] **AA/2.4/878**
[748] **AA/2.4/867** at para 90 of Section 7

the monies that have been mixed become co-owners imposed by law (95-97 and 100);

(iv)   When considering remedies, a Saudi judge would not be constrained by reference to the remedies for the classical causes of action (eg *ghasb*). He would apply whatever remedy he thought was appropriate, including return *in specie* ie restitution (111-113);

(v)   *Ayn* and *dayn* are both types of property but whereas *ayn* can be the subject of restitution, *dayn* cannot (113-114);

(vi)   He agreed that he had not discussed in his report whether money in a bank account (which Mr Quest thereafter referred to as 'bank money') was *ayn* or *dayn*. He further confirmed that, when writing his report, he was aware that what was said to have been misappropriated was bank money rather than physical coins and that there was no suggestion in his report that what he was saying about restitution and mixed funds applied only to physical coins; indeed, he further accepted that the whole discussion would have been irrelevant if it only applied to physical coins, given that this case was concerned with bank money; nor was there any discussion in his report of the relevance of the distinction between *ayn* and *dayn* (116-121);

(vii)   On the key issue therefore of whether restitution could be ordered in respect of bank money, the following exchange took place at 122-124:

Q:  I understand you weren't able to find anything, but what I am just trying to get from you – because you very helpfully have given your evidence about how you think a modern Saudi judge would approach things.

A:  Yes.

Q:  And that's obviously what we are concerned with today, rather than necessarily what would have been done in classical times. And the point I was putting to you, Professor Mallat, is that if one imagines oneself in a modern Saudi court faced with a dispute over money, where the judge, as I think you were saying, will be applying a more holistic approach to the case –

A:  Yes.

Q:  If the judge were otherwise satisfied that it was an appropriate case for a restitutionary remedy, in other words, *if he was satisfied the property was identifiable* and he was satisfied that it had been seized without lawful right, yes? If he was otherwise satisfied of those matters, he would not be dissuaded from granting an order of restitution of the property only because it was bank money rather than money in the form of coins. That's the point I'm putting to you?

A:  Yes.

Q:  You agree with that?

A*:  I agree.  I think identifiable is very important there.*

Q:  Yes.

A:  And the rest of the conditions is also important.  I think he would have a rather discretionary power to try to understand what has happened to that money in what form it ended, and that, to that extent, he would or would not –

Q:  Yes.

A:  Restitute – I prefer "compensate" in this case.

Q:  Don't get me wrong; I'm not suggesting there aren't difficulties, particularly when money is moved from place to place.

A:  Exactly.

Q:  But in principle, I think what you've agreed with is the fact that whether the property over which restitution was sought was in the form of money in a bank account rather than coins in a sack, wouldn't in itself be a reason for the Saudi judge to refuse a remedy?

A:  I agree."

[*emphasis added*]

761.    AHAB repeat the submissions which they made in closing before the Chief Justice about the effect of Professor Mallat's evidence and submit that the Chief Justice's conclusion is inconsistent with that evidence.

762.    The Respondents devoted considerable effort in their written and oral submissions to criticising the evidence of Professor Vogel. However, it is not necessary to consider that criticism.  As stated above, the Chief Justice was entitled to prefer the evidence of Professor Mallat to Professor Vogel and AHAB have not sought to argue that this Court should revisit that preference. The question for consideration therefore is whether the Chief Justice misunderstood the effect of the evidence given by Professor Mallat and that is the sole matter relied upon by AHAB on appeal.

763.    The Respondents submit that he did not. They say that he was entitled to find that money in a bank account is *dayn* rather than *ayn* and that there can be no proprietary claim in respect of *dayn*. They submit that Professor Mallat's unifying theory was about compensation, not restitution and that Professor Mallat made it clear that he had never come across a case of tracing. Furthermore, when analysed closely, Professor Mallat's comments summarised above at para 760 were made in the context of a claim against the original wrongdoer, not a third party. He was never specifically asked with clarity about the position of third parties. In any event, even where there was said to be an ability to obtain restitution from a third party, that was in reality a question of following property rather than tracing it into substituted property.

764.    Before turning to consider this issue, it is right to recall the difference between following and tracing. As Lord Millett explained in *Foskett v McKeown*[749]:

> The process of ascertaining what happened to the Plaintiffs' money involves both tracing and following.  These are both exercises in locating assets which are or may be taken to represent an asset belonging to the Plaintiffs and to which they assert ownership.  The processes of following and tracing are, however, distinct.  Following is the process of following the same asset as it moves from hand to hand.  Tracing is the process of identifying a new asset as the substitute for the old.  Where one asset is exchanged for another, a

---

[749] *Foskett v McKeown* [2001] 1 AC 102 at 127 (**R1/33/26**)

claimant can elect whether to follow the original asset into the hands of the new owner or to trace its value into the new asset in the hands of the same owner…

765.   The difference is also helpfully explained in *Smith, Law of Tracing*, 1997[750]:

> In contrast, the context of tracing is substitution.  Tracing identifies a new thing as the potential subject matter of a claim, on the basis that it is the substitute for an original thing which was itself the subject matter of a claim.  The new thing, as a substitute, stands in the place of the old thing, and therefore can be subject to the same claims.  The distinction between the exercise of following and the exercise of tracing is critical.  Where an asset is used to acquire a substitute asset, the exercise of tracing points towards the substitute asset.  In that situation, though, a plaintiff might wish to ignore the substitute and concentrate on the original thing, as it moves from one holder to another.  For example, where a car is stolen, the victim can generally assert an interest against any subsequent possessor of the car.  Here, the victim is not looking to a substitute asset, but to his original asset: his subsisting ownership of the car.  Whatever might be the source or nature of the plaintiff's original right, if the plaintiff's goal is to assert that right in relation to its original subject matter, then there is no question of tracing, but only of following.

766.   There is no dispute that the proprietary claims by AHAB against the Respondents involve tracing, not following. It is not suggested that the original money misappropriated from the Money Exchange can be followed into the hands of the Respondents; what is said is that the money which ended up in their hands can be treated as a substitute for the original money and therefore treated as representing the original money for the purposes of a proprietary claim.

767.   The key issue for determination therefore is whether Saudi law recognises a proprietary claim against substituted assets. The Chief Justice referred to this as "substitutional tracing"[751].

768.   We have come to the conclusion that the Chief Justice was entitled to find that the law of Saudi Arabia does not recognise a proprietary claim to substituted assets in the hands of third parties such as the Respondents. We have come to that conclusion for the following reasons.

769.   First – and differing from the Chief Justice in this respect – we accept, as AHAB submit, that in his oral evidence Professor Mallat accepted the possibility of a proprietary claim against money in a bank. This is, in our judgment, the natural interpretation of his evidence and in particular the passage set out at para 760(vii) above.

770.   But secondly, Professor Mallat was consistent in emphasising the importance of being able to identify the object sought to be the subject of restitution; see for example para 285 of Mallat 1 and part of the passage quoted above, which we repeat for convenience:

> Q:   If the judge were otherwise satisfied that it was an appropriate case for a restitutionary remedy, in other words, *if he was satisfied the property was identifiable* and he was satisfied that it had been seized without lawful right, yes?  If he was otherwise satisfied of those matters, he would not be dissuaded from granting an order of restitution of the property only because it was bank

---

[750] *Smith, Law of Tracing*, 1997 at page 6 (**R2/6/2**)
[751] **AA/2.4/852** at para 80 of Section 7

money rather than money in the form of coins.  That's the point I'm putting to you?

A:     Yes.

Q:     You agree with that?

A:     *I agree.  I think identifiable is very important there.*

[*emphasis added*]

771.    In our judgment, Professor Mallat was clearly speaking of following rather than tracing.  His concern was that the object owned by the plaintiff should remain identifiable. This is an altogether different concept from tracing, where the proprietary claim lies not against the original property but against property which has been substituted for the original property.

772.    The question then is whether Professor Mallat's reference to "mixing" can be taken as supporting the existence of a proprietary claim against substituted property. His evidence was that he had tried to find the nearest equivalent to tracing and had got no further than mixing. Thus, at **Day 105/120** the following exchange took place:

A:     Was I wrong to address the issue of tracing?

Q:     No, I'm not suggesting you are wrong, Professor Mallat.

A:     No, no I might have mis-answered, but I thought that I was being      asked about    tracing, and I made a huge effort to try to understand what the closest equivalent to tracing is in Saudi law, and it turned out that they – if that's of any interest to my Lord – that it corresponds to the *commixtio* of the Justinian Code.  That was a small discovery that this case has allowed.  So that is the only thing that I could find in the text, and I could not discuss something else that I was not asked about.

773.    As set out above, Professor Mallat accepted[752] that where misappropriated property had been mixed with other property in such a way as to make them indistinguishable, the original owner and the owner of the monies that had been mixed become co-owners imposed by law. However, he seems to have been a little uncertain as to the nature of this co-ownership. Thus, the following exchange took place at **Day105/96**:

Q:     Yes, thank you.  When you say 'partners', that's not partners in a partnership sense but partners in the sense of co-owners?

A:     In the…?

Q:     In the sense of co-owners.

A:     Yes.

Q:      Rather than....

---

[752] **Day105/97** and **Day105/100**

A:      I wish I could be as specific as this.  This is where it stops, and we have to go to the classical texts to try to understand what that ownership is.

Q:      Right, but it is some sort of ownership.  We are not talking about partners in a Money Exchange partnership way, are we, when you use the word 'partners' or are you?

A:      You know, it is a good question.  I must say it is occurring to me now, it is not – it is the same word, so it could be the partnership as partners in a de facto partnership.  But the ownership is probably more prevalent here.

774.    The difficulty is that the nature of this co-ownership and its consequences in the context of money moving from hand to hand was never explored in cross-examination with Professor Mallat. The professor had already stated in his report[753] that there was no concept of "tracing" in Saudi law. He was never asked to spell out whether, assuming certain facts in favour of AHAB were found, there could be a proprietary claim against money in the hands of any of the Respondents.

775.    Transposing what Professor Mallat said to the facts of this case, with Al Sanea as the wrongdoer and STCC as the third party who has received the misappropriated funds with knowledge, Professor Mallat appears to have accepted that misappropriated money in the hands of STCC could be made the subject of restitution if it remained identified (ie it remained segregated and not mixed with other money). He also appears to have accepted that if $100 of misappropriated money was mixed in STCC's hands with $100 belonging to STCC, STCC and AHAB would be co-owners, presumably to the extent of 50% each of the $200. There would therefore presumably be a form of proprietary claim by AHAB against STCC in respect of the 50%. However, there was simply no exploration as to what the position would be – as in fact occurred – if STCC then paid on money to the Respondents where it was quite possibly mixed with other monies in their hands. Given his clear assertion[754] that there is no concept of tracing (which he confirmed in cross-examination at **Day105/92**) we cannot, in the absence of his being asked about it specifically, interpret his evidence as retreating from this assertion and accepting that a proprietary claim lies under Saudi law against substituted property (rather than the original property) in the hands of a third party.

776.    In this context, it is worth recalling the other evidence which was before the Chief Justice on this topic. As stated earlier, Professor Vogel asserted[755] that there could be a proprietary claim against monies misappropriated from the Money Exchange and transferred to any of the Respondents so long as they could be traced and identified as funds belonging to AHAB. However, in cross-examination, he was forced to concede that the cases he had referred to in support of this assertion were all cases of following rather than tracing and that he had not come across any precedent for the proposition that the law of Saudi Arabia would allow a proprietary claim into substituted assets[756].

777.    Dr Hammad was of the clear view that a proprietary claim into substituted assets was not permissible under Saudi law. Thus at para 4.6 of the Joint Statement with Professor Vogel[757] he said:

---

[753] **K1/2/63** at para 271
[754] Mallat 1 at para 271 at **K1/2/63**
[755] Vogel 1 at para 54 at **K1/1/20-21**
[756] **Day104/153-156**
[757] **K1/8/17**

(b) Furthermore, the tracing referred to by Professor Vogel is simple tracing of one party tracing his misappropriated or stolen property from the misappropriating or thieving party or recovery of the original property. It is altogether different to suggest that a party is entitled to 'trace' a replacement or substitute asset into the hands of a third party. Dr Hammad is unaware of any examples of third party tracing being applied in Saudi courts and, in his experience, any claims to trace into the assets of third parties are rejected by the Saudi courts.

(c) As to the cases cited by Professor Vogel, Dr Hammad considers that they do not support the point that Professor Vogel seeks to make for three reasons. First, Dr Hammad does not accept that any significant weight can be attributed to any such cases. Secondly these cases are based on criminal charges and cannot be applied to the case at hand. Thirdly, these cases all address instances where the property was misappropriated and any fungible assets were transferred onto third parties in whole (rather than in part) and was not mixed with other assets. Accordingly, the cases are properly understood as following rather than tracing into a substitute asset and are not comparable to this case.

778.    Against that background, and in the absence of more specific questioning of Professor Mallat, we cannot read his evidence as giving support to the existence under Saudi law of a proprietary claim against substituted assets as opposed to a proprietary claim against the original assets where they can be followed into the hands of the third party or against a proportion where they can be followed into the hands of a third party and then mixed with other similar assets.

779.    In its appeal submissions, AHAB were critical of the Chief Justice for not referring to what was called the *Bugshan* case. This was a Saudi case which was mentioned by Dr Hammad and appeared, on the basis of his description, possibly to give some support to the concept of substitutional tracing in Saudi law. However, it transpired that this was a case in which Dr Hammad had been involved professionally and there was no published written record of it. In his oral closing submissions in reply, Mr Quest accepted that, in those circumstances, he could not really take reliance on the case any further. We agree. In the absence of any available written record of what the case was about and what it actually decided, no weight could be placed on it and it is not surprising that the Chief Justice did not think it necessary to mention the case in his judgment.

780.    We therefore reject AHAB's appeal in relation to whether Saudi law recognises a proprietary claim against substituted property. It follows that, in view of the decision of the Chief Justice (which we have upheld) that the proprietary claim is governed by Saudi law, that claim must fail even in relation to the $191m.

781.    We have also upheld the Chief Justice's decision that the claims (as expressed under Cayman law) in knowing receipt and unjust enrichment are also governed by Saudi law. The evidence of Professor Mallat was that there is no cause of action under Saudi law known as knowing receipt or unjust enrichment. Instead, a modern Saudi judge would apply the unifying theory described at paragraph 748 above. Thus, although under Cayman law, knowing receipt and unjust enrichment are very different claims with different requirements, there is in effect only one claim under Saudi law, namely a claim under the unifying theory and that will cover both of the Cayman law claims of knowing receipt and unjust enrichment. We consider the claim under the unifying theory below.

*(iii)  Joint and several liability*

782.    The second question of Saudi law concerns the topic of joint and several liability in the context of the tortious claims of dishonest assistance and conspiracy. Although attention below was

focussed on the tort of conspiracy, it seemed to be accepted by both experts that there was a general head of claim of participation in a tort under Saudi law and that this would cover what under Cayman law would be dishonest assistance or conspiracy.

783.    The Chief Justice held[758] (by means of approval of the written submissions of the GT Defendants which he set out) that the apportionment of liability between joint tortfeasors is a matter of substantive law, rather than procedure, and is therefore to be determined by the law of Saudi Arabia in this case for the purposes of satisfying the double actionability rule. That position has not been challenged on appeal and in our judgment is correct: see *Harding v Wealands*[759] and *Cox v Ergo Versicherung AG*[760].

784.    Accordingly, the parties adduced evidence of Saudi law on the issue of joint and several liability at trial: by Professor Vogel for AHAB and Professor Mallat for the GT Defendants.

785.    Both experts agreed that what was alleged by AHAB against the Respondents could, if proved, fall within the unifying theory referred to earlier and that they would be participants in that wrongdoing, eg Vogel 1 at para 118; Mallat on **Day105/139-140**. However, the experts differed on the allocation of liability as between the Respondents in the event of one or more of them being found liable.

786.    Professor Vogel asserted that the law of Saudi Arabia distinguished between 'direct' participants and 'indirect' participants.  In the case of the former, liability is joint and several whereas, in the case of the latter, the share of total liability is determined in the discretion of the judge[761].  In relation to the facts of this case, he considered that, assuming knowledge of the misappropriation on the part of the Respondents, they were likely to be treated as direct participants and so would be jointly and severally liable for AHAB's loss.

787.    Professor Mallat, on the other hand, was of the opinion that a Saudi judge has a discretion as regards the apportionment of liability in all cases where there is more than one tortfeasor.  The judge will exercise that discretion and apportion liability according to the extent of a defendant's participation in the wrongdoing. On the facts of this case, this was likely to mean that the recoverable compensation against each Respondent would be the equivalent of the financial benefit received by that Respondent (para 263 of Mallat 1[762] and 5.8 of the Joint Memorandum[763]).

788.    The Chief Justice dealt with this issue[764] in the following terms:

> 88.    The massive claim last described above based on the alleged unlawful means conspiracy between Al Sanea and the Defendants is also shown to be untenable, both as a matter of Cayman and Saudi law.  As already also discussed, at all events AHAB also needed to prove that the Defendants, in each case of participation in the alleged conspiracy, did actually receive proceeds of that crime in order to ground civil (as distinct from criminal) liability for damages.   AHAB sought to overcome this difficulty through the evidence of Prof Vogel who testified to the effect that under Saudi civil law there was strict joint and several liability attaching to each *particeps criminis* in a conspiracy

---

[758] **AA/2.1/877**
[759] *Harding v Wealands* [2007] 2 AC 1 per Lord Hoffmann at [14] (**R1/37.3**)
[760] *Cox v Ergo Versicherung AG* [2014] UKSC 22 per Lord Sumption at [17] and Lord Mance at [41].
[761] Vogel 1 at paras 114 and 118 (**K1/1/48 and 50**) and para 5.9 of the Joint Memorandum (**K1/4/16**)
[762] **K1/2/62**
[763] **K1/4/16**
[764] **AA/2.4/867** at paras 88-89 of Section 7

such as to make each jointly and severally liable for the harm and the payment of damages at large.

89.   While even such a premise if proven could not have elevated AHAB's claim in the liquidation of any Defendant company to a proprietary (as distinct from a personal damages) claim, for the sake of completeness I think I should explain why this head of claim, too, was rejected. I found, in agreement with the Defendants, that in Saudi law, there is no hard and fast strict rule of joint and several liability for harm and damages at large, for conspiracy (which itself, is not recognized as a distinct tort).

789.   The Chief Justice then specifically accepted the written submissions of the GT Defendants which he set out over the next 37 pages. This explained why he preferred the evidence of Professor Mallat to Professor Vogel. The GT Defendants summarised the position at paragraphs 91-93 of their submissions[765] in the following terms, which again were specifically accepted by the Chief Justice:

Conclusion

91.   In all these circumstances, the Court is invited to reject Prof Vogel's advocated theory that there exists under the relevant law of Saudi Arabia any distinction between 'direct' and 'indirect' participants under which 'direct' participants will be jointly and severally liable for the full amount of the victim's losses. No such law exists.

92.   Instead, the Court is invited to accept the views of Prof Mallat…that:

(1) The Saudi Judge has a discretion as regards the apportionment of liability in cases where there is more than one tortfeasor, to be exercised by him depending on the facts.

(2) In a case involving alleged misappropriation, the Saudi Judge will apportion the liability of each party to the extent of his participation in the scheme. This means that the recoverable compensation would be the equivalent of the actual financial benefit received by each party (i.e actual receipts).

93.   On the facts of this case, this means that the Saudi Judge would likely apportion liability on an actual 'receipts' basis. Receipt in this context means monies actually received by a defendant the benefit of which is retained by that defendant (not simply money passing through an account).

790.   The Chief Justice went on to say[766]:

As noted in the introduction of the foregoing submissions of the Defendants, I accept them based upon Prof Mallat's evidence, as being the correct representation of the Saudi law on the subject.

---

[765] **AA/2.4/912-913**
[766] **AA/2.4/914 a**t para 91 of Section 7

In summary therefore the Chief Justice held that the liability of any Respondent company would be limited to any amounts shown to have been received by that company from the misappropriated assets of AHAB.

791.   Again, AHAB do not seek to argue on appeal that the Chief Justice should have preferred the evidence of Professor Vogel to that of Professor Mallat. They submit on appeal that the Chief Justice was wrong in reaching this conclusion on two grounds (we reverse the order in which they were listed by AHAB):

(i)   The Chief Justice did not appreciate the extent to which Professor Mallat had accepted in cross-examination that a Saudi judge would and could award compensation on a joint and several basis. The Chief Justice should have found that, in AHAB's case, a Saudi judge could and would have ordered that all of Al Sanea and the Respondent companies were jointly and severally liable for the total loss to AHAB of some US$ 4.029 billion.

(ii)   The Chief Justice did not consider the factors that a Saudi judge would have considered relevant to the question of whether to award joint and several damages; he only focused on his findings about the receipt of funds by the Respondents from the Money Exchange and did not consider any other aspect of their complicity in the wrongdoing vis-a-vis AHAB, which formed their participation in a joint tort against AHAB.

792.   In relation to the first ground, it is correct that Professor Mallat accepted without difficulty during his cross-examination that it was possible for a Saudi court to award damages jointly and severally against joint tortfeasors.  For example, the following exchange took place on **Day105/144**:

Q:   Which is, as I understand your position, your view is that where there are participants, the court will always apportion damages severally between the defendants according to its view of their contribution?

A:   Yes, and to be exactly precise on this because I think it will help you, it can decide jointly and severally.

Q:   Right.

A:   But it can decide severally.  It's is not constrained with the decision under any circumstance of saying everybody is fully, jointly and totally liable.

Q:   Right, well, that…

A:   It could and there are instances where it does, but when it comes to participation, the factoring in is much more complicated and it's a matter of fact.

   .......

Q:   You don't need to look back at it, but the evidence that Professor Vogel gave yesterday is, trying to put it neutrally, is that in certain circumstances the Saudi court can make participating defendants jointly and severally liable. Now, as I understand it, you are not necessarily disagreeing that it is possible for the Saudi court to make defendants jointly and severally liable.

A:   Absolutely.

793.    However, Professor Mallat maintained that a Saudi judge would usually make a distinction and that the imposition of joint and several liability was rare[767]. He further maintained that how much each tortfeasor received was an important factor in the judge's assessment. For example, the following exchange took place[768]:

    Q:   Do you know of others?

    A:   I have looked at participation in both criminal and civil contexts and it is almost a constant that there is a distinction made because the court is able to find a number of factors that are different.  It goes from the action itself to how much each one received, to how the degree of harm, the degree of intensity, even recidivism is something that appears in some of the criminal cases, so they will generally give different penalties or compensation.

794.    Ultimately, Professor Mallat did not depart from the view expressed in Mallat 1 and the Joint Memorandum as encapsulated orally as follows[769]:

    Q:   It seems to me, where the difference lies really between you and Professor Vogel is how Saudi law would approach the question of awarding damages where there are multiple defendants, yes?  And your view, if I have understood this, is that where you have got multiple defendants or multiple participants, the court would apportion damages according to their respective fault and contribution to the loss.

    A:   Yes, and what they received.

    Q:   Right. That apportionment exercise, you say, would result in apportionment, according to receipt?

    A:   Yes.

795.    In our judgment, it was open to the Chief Justice to accept the evidence of Professor Mallat that, whilst it was open to a Saudi judge to impose joint and several liability on participants in a tort, on the facts of this case, the liability of a particular Respondent would probably be limited to the amount received by that Respondent.  Such a conclusion can certainly not be said to be outside that reasonably open to the Chief Justice.

796.    As to the second point, the argument at first instance seems to have been between AHAB's contention (based on Professor Vogel's evidence) that joint and several liability must follow and the Respondents' contention (based on Professor Mallat's evidence) that it should be according to the level of receipts. We were not referred to any point in the trial where, if there was a discretion in the judge, AHAB articulated the factors which should be taken into account in assessing whether joint and several liability should be imposed, nor have any such factors been rehearsed before us. In the circumstances we find no merit in this second ground of criticism of the Chief Justice.

797.    In summary, for the reasons given we uphold the decision of the Chief Justice that the liability of any individual Respondent (if proved) would be limited to the amount of misappropriated funds which that Respondent had received.

---

[767] eg **Day105/147**
[768] **Day105/149-150**
[769] **Day105/140-141**

*Attribution*

*(i)    Introduction*

798.    If there has been a breach of fiduciary duty and if monies have been received by a Respondent, the state of mind of that particular Respondent will be of importance.  As stated earlier in the section dealing with the substantive law of Saudi Arabia, whether a party receiving misappropriated monies has knowledge of the misappropriation is a relevant aspect in those claims governed by Saudi law. Similarly, in relation to the claim of dishonest assistance under Cayman law, it will be necessary to show that the particular Respondent, when giving assistance by receiving monies, was aware of the misappropriation. In relation to the claim in conspiracy under Cayman law, AHAB must show that the particular Respondent conspired to defraud AHAB.

799.    In all of these cases, the issue arises as to how one determines the state of mind of a company. It is this question which brings in the issue of attribution.  A useful summary of the concept of attribution in the context of a company is to be found in the judgment of Lord Walker of Gestingthorpe in the Hong Kong Final Court of Appeal in *Moulin Global Eye Care Trading Limited (in liquidation) v The Commissioner of Inland Revenue*[770]:

> 61. Attribution means, in this context, the process of legal reasoning by which the conduct or state of mind of one or more natural persons (that is, human beings) is treated as that of a non-natural person (that is, a company) for the purpose of determining the company's legal liability or rights in civil proceedings (in particular, its liability or rights in contract, in tort or for unjust enrichment) or its criminal liability.  In approaching the topic of attribution it is necessary to recognise that there is a problem of terminology in the word 'agent'.  A natural person may choose whether or not to appoint an agent to act in the management of his property or the conduct of his business affairs. …... A company, on the other hand, never has a choice.  As English company law developed during the nineteenth century, eminent judges repeatedly emphasised that a company, as a *persona ficta*, a legal construct with no real personality, can act only by its agents.

800.    Al Sanea was the ultimate beneficial owner as well as the chairman of each of the Respondents. AHAB argued before the Chief Justice that Al Sanea was an agent of the Respondents and indeed was the "directing mind and will" of each of them, with the consequence that his knowledge of the misappropriations from the Money Exchange was to be attributed to each of the Respondents. The Respondents therefore had the necessary knowledge of the misappropriations when receiving misappropriated funds.

801.    The Respondents, on the other hand, submitted that there was no evidence that Al Sanea was the directing mind and will of the various companies.  Each of them had an independent board of directors and had been established for legitimate purposes. They further submitted that, for each transaction entered into by the Respondents upon which reliance was placed, AHAB had to show that Al Sanea was wearing his "hat" to represent that particular Respondent. Furthermore, they relied upon the principle established in *Re Hampshire Land Co*[771] (the

---

[770] *Moulin Global Eye Care Trading Limited (in liquidation) v Commissioners of Inland Revenue* [2014] HKCFA 22 at [61] (**AG1/80**)
[771] *Re Hampshire Land Co* [1896] 2 Ch 743 (**R1/2.5** at bundle R1 tab 8)

*Hampshire Land* **principle**), that where one person is an officer of two companies, the knowledge which he has acquired as an officer of one company will not be imputed to the other company unless he has some duty imposed on him to communicate his knowledge to the second company, and also a duty to the second company to receive that knowledge. It was submitted that there was no evidence before the Court that Al Sanea was under a duty under Saudi law to communicate the source of funds received to the Respondents, nor was there any such principle under Cayman law. There were additional specific submissions by Mr Lowe QC on behalf of SIFCO 5 that in reality the directing mind and will of SIFCO 5 was Barclays Bank, which owned the shares which were entitled to substantially all the economic interest in the company, alternatively a company called SFS, which was the appointed investment manager of SIFCO 5.

802.   The Chief Justice rejected the submission of AHAB that the *Hampshire Land* principle was not applicable where a person acted as the directing mind and will of a company either generally or for the purpose of a particular transaction. He held that it was clear from *Bilta v Nazir (No 2)*[772], that directors were to be regarded as agents of a company and that the law treats a company as thinking through agents just as it acts through them. The concept of a directing mind and will was therefore a principle of agency and the *Hampshire Land* principle applied whether the person whose knowledge was said to be attributable to the company was a director or other employee or agent of the company[773]. He held that there was no evidence that Al Sanea was under a duty under Saudi law to communicate the source of funds to SIFCO 5, nor was there any such principle under Cayman law. There was therefore no basis on which any knowledge of Al Sanea as to his own activities at the Money Exchange could be attributed to SIFCO 5[774]. Although the Chief Justice did not specifically say so, his conclusion in this respect would appear to have been equally applicable to the remaining Respondent companies.

803.   Furthermore, consideration had to be given as to whether Al Sanea's knowledge could be attributed to a Respondent company on a "hat" by "hat" or company by company basis. The Chief Justice held that, in relation to all the Respondents except SIFCO 5, there had not been sufficient enquiry into the relationship between Al Sanea and the particular Respondent to allow him to rule on the question of attribution, had he found Al Sanea to be in breach of fiduciary duty. In relation to SIFCO 5, he ruled that Al Sanea's knowledge could not be attributed to SIFCO 5. Thus, SIFCO 5 had been established for a bona fide commercial purpose and was operated in accordance with that purpose. The management functions were properly exercised by SFS as investment manager and there was no evidence that Al Sanea had exercised any of his powers as a director of SIFCO 5 otherwise than consistently with SIFCO 5 having a properly constituted board of directors, which exercised proper corporate governance[775].

804.   On appeal, AHAB submitted that the Chief Justice erred in his analysis of the legal and factual position. As to the law, AHAB submitted that, in *El Ajou v Dollar Land Holdings Plc*[776], the English Court of Appeal was clear that there were two alternative routes to attribution: one was through the directing mind and will approach and the other was through the concept of agency; and the *Hampshire Land* principle had no application where the directing mind and will approach applied. *Bilta* was concerned with an entirely different situation, namely whether, in the context of a claim by the company against the director, the acts or knowledge of that fraudulent director should be attributed to the company so as to defeat the company's claim on the basis of illegality. *Bilta* was not concerned with a claim *by* a third party against a company, where the issue was whether the knowledge of a director should be attributed to the company so as to clothe the company with the relevant knowledge. *El Ajou* was referred to by most of

---

[772] *Bilta v Nazir (No 2)* [2016] AC 1; [2015] UKSC 23 (**R1/51.1** at bundle R9 tab 112)
[773] see 1148 / 8.56 (AA/2.4/1148)
[774] 1144 / 8.46 (AA/2.4/1144)
[775] 1143 / 8.43 (AA/2.4/1143)
[776] *El Ajou v Dollar Land Holdings plc* [1994] 2 All ER 685 (**R1/21/1** at Bundle R2 tab 39)

the judges in *Bilta* but none of them suggested that it had been wrongly decided. The Chief Justice was wrong therefore to conclude[777] that the concept of the directing mind and will of a company was a principle of agency.

805.  Furthermore, the Chief Justice had erred in his interpretation of the *Hampshire Land* principle. The real principle, commonly known as the "breach of duty exception", to be extracted from that case was that where the director (agent) acted in breach of duty to (or in fraud of) the company (principal) and caused damage to the company (principal) to which he owed that duty, the company (principal) will not be deemed to know of the director's (agent's) breach of duty (or fraud) by the operation of attribution of knowledge from that director (agent) so as to prevent the company (principal) from bringing a claim against the director (agent). As such, it can be seen as an exception to the general rule of attribution.

806.  As to the facts, the Chief Justice erred in finding that Al Sanea was not the directing mind and will of SIFCO 5 and also erred in concluding that there had not been sufficient enquiry before him to allow him to determine the question of attribution in relation to the other Respondent companies.  AHAB submitted that they had made detailed submissions to support their case that Al Sanea should be treated as the directing mind and will of all the Respondent companies and the Chief Justice had failed to address these submissions.

807.  The Respondents submitted that the Chief Justice was entirely correct in his analysis. The leading modern exposition on the topic of attribution in company law was to be found in the judgment of Lord Hoffmann in the Privy Council in *Meridian Global Funds Management Asia Limited v Securities Commission*[778]:

> Any proposition about a company necessarily involves a reference to a set of rules.  A company exists because there is a rule (usually in a statute) which says that a persona ficta shall be deemed to exist and have certain of the powers, rights and duties of a natural person.  But there would be little sense in deeming such a persona ficta to exist unless there were also rules to tell one what acts were to count as acts of the company.  It is therefore a necessary part of the corporate personality that there should be rules by which acts are attributed to the company.  These may be called "the rules of attribution".
>
> The company's primary rules of attribution will generally be found in its constitution, typically the articles of association, and will say things such as "for the purpose of appointing members of the board, a majority vote of the shareholders shall be a decision of the company" or "the decisions of the board in managing the company's business shall be the decisions of the company".  There are also primary rules of attribution which are not expressly stated in the articles but implied by company law….
>
> These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business.  Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders.  The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency.  It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary

---
[777] **AA/2.4/1148** at para 8.55
[778] *Meridian Global Funds Management Asia Limited v Securities Commission* [1995] 2 AC 500 at 506-507 (**R1/26.2.1** at bundle R2 tab 45)

> rules of attribution, count as the acts of the company. And having done so, it will make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract and vicarious liability in tort….
>
> The company's primary rules of attribution together with the general principles of agency, vicarious liability and so forth are usually sufficient to enable one to determine its rights and obligations. In exceptional cases, however, they will not provide an answer. This will be the case when a rule of law, either expressly or by implication, excludes attribution on the basis of the general principles of agency or vicarious liability. For example, a rule may be stated in language primarily applicable to a natural person and require some act or state of mind on the part of that person "himself", as oppose to his servants or agents. This is generally true of rules of the criminal law, which ordinarily impose liability only for the actus reus and mens rea of the defendant himself. How is such a rule to be applied to a company?

808.    Lord Hoffmann then went on to consider that question and referred in particular to *Lennard's Carrying Co Limited v Asiatic Petroleum Co Limited*[779] where Viscount Haldane LC had introduced the concept of the "directing mind and will" of the company. This was in the context of deciding whether the company fell within section 502 of the Merchant Shipping Act 1894, which provided a ship owner with a defence to a claim for the loss of cargo put on board his ship if he could show that the casualty happened "without his actual fault or privity".

809.    The Respondents submitted that *Meridian Global* was clear authority for the proposition that the ordinary rules of agency were applicable to companies and this had been affirmed by the Supreme Court in *Bilta*. The Chief Justice was therefore correct to hold that the concept of the directing mind and will of a company was a principle of agency. He was further correct to find that the question of attribution had to be considered on a company by company basis and by reference to the particular transaction. He had also correctly understood the *Hampshire Land* principle and correctly held that it applied, so that there was no assumption that the knowledge of a director who is a director of different companies will be attributed to all his companies.

*(ii)    The law*

810.    We begin by considering the decision of the English Court of Appeal in *El Ajou*, which AHAB places at the heart of its submissions. In that case, the plaintiff, who had been defrauded, brought a claim in knowing receipt against the defendant (**DLH**) on the ground that DLH had received money from the fraudsters with knowledge that it represented the proceeds of fraud. The plaintiff alleged that DLH possessed that knowledge through a Mr Ferdman, who had acquired the knowledge in his capacity as officer of another company. Mr Ferdman was a non-executive director and the chairman of DLH but was found to play only a minor role in the management of DLH's business, although he had played the major role in connection with the receipt of the proceeds of fraud. DLH also appointed him as agent or broker and he was to receive from DLH an introductory commission of 5% on monies introduced. The judge dismissed the claim on the ground that, by reason of the minor role which he played in the management of DLH, Mr Ferdman could not be considered the directing mind and will of DLH and accordingly his knowledge could not be attributed to the company.

---

[779] *Lennard's Carrying Co Limited v Asiatic Petroleum Co Limited* [1915] AC 705

811.    On appeal, the plaintiff put his case in two alternative ways. First, he submitted that Mr Ferdman *was* the directing mind and will of DLH in connection with the receipt of the funds in question, even if he was not in general terms the directing mind and will of the company; his knowledge was therefore to be taken as that of the company. Secondly, as an appointed agent for DLH in relation to this transaction, his knowledge was to be attributed to the company.

812.    A strong Court of Appeal[780] allowed the appeal on the directing mind and will point but dismissed it on the agency ground. A number of points emerge from their judgments.

813.    First, the court clearly accepted that there were two completely separate ways of putting the plaintiff's case. Nourse LJ said[781]:

> Thus arises the most important question remaining in dispute, which is whether Mr Ferdman's knowledge can be treated as having been the knowledge of DLH. The plaintiff contends that it can and ought to be, first, on the ground that Mr Ferdman was, in relation to DLH's receipt of the assets representing the monies fraudulently misapplied, its directing mind and will; secondly and alternatively, on the ground that he was its agent in the transaction. Because a company's directing mind and will are often the mind and will of one or more of its directors and because a director is for many purposes an agent of the company, there is a danger of confusion between the two grounds on which the plaintiff relies. But they are, as the judge made clear, quite separate. The plaintiff can succeed on either…

And Hoffmann LJ[782]:

> There are two ways in which Mr Ferdman's knowledge can be attributed to DLH. The first is that as agent of DLH his knowledge can be imputed to the company. The second is that for this purpose he *was* DLH and his knowledge was its knowledge. [*original emphasis*]

814.    Secondly, the court emphasised that the directing mind and will of a company has to be considered in relation to the transaction in question. Thus Nourse LJ[783] said:

> *Directing mind and will*
> This doctrine, sometimes known as the alter ego doctrine, has been developed, with no divergence of approach, in both criminal and civil jurisdictions, the authorities in each being cited indifferently in the other. A company having no mind or will of its own, the need for it arises because the criminal law often requires mens rea as a constituent of the crime, the civil law intention or knowledge as an ingredient of the cause of action or defence. In the oft-quoted words of Viscount Haldane LC in *Lennards Carrying Co Ltd v Asiatic Petroleum Co Ltd* [1915] AC 705 at 713, [1914-1915] All ER Rep 280 at 283:
>
> > '*My Lords, a corporation is an abstraction. It has no mind of its own any more than it has a body of its own; its active and directing will must consequently be sought in the person of somebody who for some purposes may be called an agent, but who is really the*

---

[780] Nourse, Rose and Hoffmann LJJ
[781] at 695
[782] at 701
[783] at 695-6

> *directing mind and will of the corporation, the very ego and centre*
> *of the personality of the corporation.'*

> The doctrine attributes to the company the mind and will of the natural
> person or persons who manage and control its actions. At that point, in the
> words of Millett J ([1993] 3 All ER 717 at 740): "Their minds are its minds;
> their intention its intention; their knowledge its knowledge". *It is important*
> *to emphasise that management and control is not something to be considered*
> *generally or in the round. It is necessary to identify the natural person or*
> *persons having management and control in relation to the act or omission*
> *in point….* [*Emphasis added*]

The judgment of Rose LJ was to similar effect[784]:

> There are, it seems to me, two points implicit, if not explicit, in each of these
> passages. First, the directors of a company are, prima facie, likely to be
> regarded as its directing mind and will whereas circumstances may confer
> that status on non-directors. Secondly, a company's directing mind and will
> may be found in different persons for different activities of the company.

And finally Hoffmann LJ[785]:

> The authorities show clearly that different persons may for different
> purposes satisfy the requirements of being the company's directing mind and
> will. Therefore the question in my judgment is whether in relation to the
> Yulara transaction, Mr Ferdman as an individual exercised powers on behalf
> of the company which so identified him.

815. Thirdly, insofar as the plaintiff's claim was based upon Mr Ferdman's position as the
company's agent, the Court of Appeal held that Mr Ferdman's knowledge that the monies
received by DLH were the proceeds of fraud, which he had acquired in his capacity as director
of another company, could not be attributed to DLH. In doing so the court relied upon the
*Hampshire Land* principle as exemplified in the subsequent case of *Re David Payne & Co Ltd,*
*Young v David Payne & Co Ltd*[786].

816. Fourthly, the court clearly considered that the *Hampshire Land* principle had no application
where it was sought to attribute the knowledge of the directing mind and will of a company to
that company. Differing from Millett J at first instance, the court held that Mr Ferdman was the
directing mind and will in relation to the receipt of the monies in question and accordingly his
knowledge that they were the proceeds of fraud was to be attributed to DLH, which therefore
had the requisite knowledge for a claim against it in knowing receipt to succeed. The fact that
he acquired that knowledge in his capacity as a director of another company did not prevent his
knowledge being attributed to DLH. The court did not, in the context of the directing mind and
will of the company, give any consideration to whether Mr Ferdman, as the directing mind and
will, was under any obligation to disclose his knowledge to DLH or whether he owed any duty
to the other company to communicate his knowledge.

817. AHAB rely strongly on this case. They submit that it is clear authority that, once one has
ascertained the directing mind and will of a company in relation to a particular transaction, the
knowledge of that person is without more ado to be treated as the knowledge of the company

---

[784] at 699
[785] at 706
[786] *Re David Payne & Co Ltd, Young v David Payne & Co Ltd* [1904] 2 Ch 608 (**R1/5.5** at bundle R1 tab 11)

regardless of how the person acquired that knowledge. The *Hampshire Land* principle is simply not relevant.

818. The Respondents submit that matters have moved on since *El Ajou* and that attribution is now seen in terms of agency, with the consequence that the *Hampshire Land* principle is relevant. They refer first to the statement of Lord Hoffmann in *Meridian Global* quoted above. They also place reliance upon various statements in the judgments in *Bilta*.

819. *Bilta* was a very different case from the present case and from *El Ajou*. In that case *Bilta*, through its liquidators, claimed damages for conspiracy and equitable compensation for breach of fiduciary duty against the directors. The conspiracy was alleged to have been an unlawful means conspiracy, and the unlawful means were the directors' alleged breach of their fiduciary duties. There were two directors, one of whom owned all the issued shares in Bilta and it seems to have been common ground that together they were the directing mind and will of Bilta. A claim was also brought against two other defendants for conspiracy and/or dishonest assistance in the directors' breach of their fiduciary duties, and the other two defendants applied to strike out the proceedings on the ground that the dishonest conduct of the directors should be attributed to Bilta and that accordingly the claim by Bilta was barred on the basis of illegality.

820. Not surprisingly, the Supreme Court held that the application to strike out failed. The conduct of the directors was not to be attributed to the company so as to prevent the claim. The key finding was perhaps summarised in the judgment of Lord Neuberger of Abbotsbury PSC (with whom Lord Clarke of Stone-Cum-Ebony and Lord Carnwath agreed) in the following terms:

> 7…Where a company has been the victim of wrongdoing by its directors, or of which its directors had notice, then the wrongdoing, or knowledge, of the directors cannot be attributed to the company as a defence to a claim brought against the directors by the company's liquidator, or in the name of the company and/or on behalf of its creditors, for the loss suffered by the company as a result of the wrongdoing, even where the directors were the only directors and shareholders of the company, *and even though the wrongdoing or knowledge of the directors may be attributed to the company in many other types of proceedings*. [*Emphasis added*]

Lord Neuberger went on to say:

> 9…However, I agree with Lord Mance JSC's analysis at paras 37-44 of his judgment, that the question is simply an open one: whether or not it is appropriate to attribute an action by, or a state of mind of, a company director or agent to the company or the agent's principal in relation to a particular claim against the company or the principal must depend on the nature and factual context of the claim in question.

821. However, in passing the judges considered the topic of attribution in fairly general terms and the Respondents referred us particularly to the following passages as supporting the view of the Chief Justice that the concept of the directing mind and will of a company had been subsumed in the law of agency and that the *Hampshire Land* principle therefore applied.

822. The Chief Justice relied on a number of passages from the judgment of Lord Sumption. At [65] Lord Sumption said:

> English law might have taken the position that a company, being an artificial legal construct, was mindless. If it had done that, then legal wrongs which depended on proof of some mental element such as dishonesty or intention

could never be attributed to a company and the present question could not arise…. This question was, however, settled as far as English civil law was concerned by the end of the 19th Century. As Lord Lindley put it in *Citizens Life Assurance Co Limited v Brown* [1904] AC 423, 426, once companies were recognised by the law as legal persons, they were liable to have the mental states of agents and employees such as dishonesty or malice attributed to them for the purpose of establishing civil liability…It cannot be emphasised too strongly that neither in the civil nor in the criminal context does this involve piercing the corporate veil. It is simply a recognition of the fact that the law treats a company as thinking through agents, just as it acts through them.

823.   Lord Sumption continued:

67. The question what persons are to be so far identified with a company that their state of mind will be attributed to it does not admit of a single answer….The primary rule of attribution is that a company must necessarily have attributed to it the state of mind of its directing organ under its constitution, i.e. the board of directors acting as such or for some purposes the general body of shareholders. Lord Hoffmann, delivering the advice of the Privy Council, observed that the primary rule of attribution together with the principles of agency and vicarious liability would ordinarily suffice to determine the company's rights and obligations. *However, they would not suffice where the relevant rule of law required that some state of mind should be that of the company itself*…The directing organ of the company may expressly or implicitly have delegated the entire conduct of its business to the relevant agent, who is actually although not constitutionally its "directing mind and will" for all purposes. This was the situation in the case where the expression "directing mind and will" was first coined…. Such a person in practice stands in the same position as the board. The special insight of Lord Hoffmann…was to perceive that the attribution of the state of mind of an agent to a corporate principal may also be appropriate where the agent is the directing mind and will of the company for the purpose of performing the particular function in question, without necessarily being its directing mind and will for other purposes…[*emphasis added*]

68.  A modern illustration of the attribution of knowledge to a company on the basis that its agent was its directing mind and will for all purposes is *Royal Brunei Airlines Sdn Bhg v Tan* [1995] 2 AC 378, where the Privy Council was concerned with the knowledge required to make a company liable as constructive trustee on the footing of knowing assistance in a dishonest breach of trust. The defendants were a one-man company, BLT, and the one man, Mr Tan. At pp392-393, Lord Nicholls of Birkenhead, delivering the advice of the Board, observed that Mr Tan had known the relevant facts and was therefore liable. "By the same token, and for good measure, BLT also acted dishonestly. [Mr Tan] was the company, and his state of mind is to be imputed to the company". On the other hand, *El Ajou v Dollar Land Holdings plc*… did not concern a one-man company. The issue was whether knowledge of the origin of funds received for investment by Dollar Land Holdings, a public company, could be imputed to it so as to found a liability to account as a constructive trustee on the footing of knowing receipt. Lord Hoffmann, delivering the leading judgment of the Court of Appeal and applying the principles which he would later explain in *Meridian*

*Global*, held that the company was fixed with the knowledge of one Mr Ferdman, its part-time chairman and a non-executive director, because he had acted as its directing mind and will for the particular purpose of arranging its receipt of the tainted funds.

824.     Turning to what he called the "breach of duty exception", Lord Sumption said this:

71.   Bilta's answer to this, which was accepted by both the judge and the Court of Appeal, is that the dishonesty of Mr Chopra and Mr Nazir [the two directors] is not to be attributed to Bilta, because in an action for breach of duty against the directors there cannot be attributed to the company a fraud which is being practised against it by its agent, even if it is being practised by a person whose act and state of mind would be attributable to it in other contexts.   It is common ground that there is such a principle.   It is commonly referred to as the fraud exception, but it is not limited to fraud… I shall call it the "breach of duty exception".

72   The breach of duty exception is commonly referred to as the *Hampshire Land* principle, after the judgment of Vaughan Williams J in *In Re Hampshire Land Co* [1896] 2 Ch 743.   This case did not involve any allegation of fraud.   The facts were that the Hampshire Land Company had borrowed money from a building society.   The borrowing required the authority of the shareholders in general meeting, but their authority, although it was given, was vitiated by defects in the notice by which it was summoned.   The issue was whether the building society was affected by notice of the irregularity so as to be prevented from relying on the internal management rule.   The contention was that the building society was on notice because its secretary happened also to be the secretary of the borrower, and in the latter capacity he knew the facts. In the course of discussing that question, the judge observed, at p 749:

"*if Wills had been guilty of a fraud, the personal knowledge of Wills of the fraud that he had committed on the company would not have been knowledge of the society of the facts constituting that fraud; because common sense at once leads one to the conclusion that it would be impossible to infer that the duty, either of giving or receiving notice, will be fulfilled where the common agent is himself guilty of fraud.*"

73. Vaughan William J's dictum was subsequently adopted by two members of the House of Lords in *JC Houghton and Co v Nothard Lowe and Wills* [1928] AC 1, where the issue was whether a company was bound by an arrangement adverse to the company's interest which had been made by two of its directors for their own benefit and was never approved by the board.   It was contended that the knowledge of the two directors could be attributed to the company so as to found a case of acquiescence. Viscount Dunedin (at p 14) summarily rejected the suggestion that the company could be treated as knowing about a director's breach of duty by virtue only of the knowledge of the defaulting director himself…

825.     Finally, Lord Sumption said this:

87 There are three situations in which the question of attribution may arise. First, a third party may sue a company for a wrong such as fraud, which involves a mental element…

88.  In the first situation, the illegality defence does not arise.  The company has no claim which could be barred, but is responding to a claim by the third party.  It will be vicariously liable for any act within the course of the relevant agent's employment, and in the great majority of cases no question will arise of attributing the wrong, as opposed to the liability, to the company.  Where the law requires as a condition of liability that the company should be personally culpable, as Lord Nicholls appears to have assumed it did in *Royal Brunei Airlines*, the sole function of attribution is to fix the company with the state of mind of certain classes of its agents for the purpose of making it liable.  The same is true in cases like *McNicholas*, involving statutory civil penalties for quasi-criminal acts.  *It is also true of cases like El Ajou where the relevant act (receipt of the money) was unquestionably done by the company but the law required as a condition of liability that it should have been done with the knowledge of some matter.  This will commonly be the case with proprietary claims, where vicarious liability is irrelevant.* [*Emphasis added*]

826.   We were also referred to certain passages in the joint judgment of Lord Toulson and Lord Hodge. Thus they said:

180.  The issue of attribution arises in the context that Mr Nazir and Mr Chopra were the only directors of the company and Mr Chopra was its sole shareholder.  Bilta in its amended particulars of claim (at para 42) referred to them as its "directing mind and will".  While there is a role in our law for the concept of the directing mind and will of a company, it is important to analyse that role and in particular to avoid the dangers of ascribing human attributes to a non-natural person such as a company.

181.  In most circumstances the acts and state of mind of its directors and agents can be attributed to a company by applying the rules of the law of agency.  It has become common to speak of "the *Hampshire Land* principle" or the "fraud exception" as the exception to an otherwise general rule that attribution occurs.  It is our view that "the fraud exception" is not confined to fraud but is simply an instance of a wider principle that whether an act or a state of mind is to be attributed to a company depends on the context in which the question arises.  "The fraud exception" applied to prevent an agent from pleading his own breach of duty in order to bar his principal's claim against him, is the classic example of non-attribution.  But it is not the only one.

827.   The Chief Justice placed (and the Respondents place) particular weight upon the following paragraph from the joint judgment:

205.  In the first case, where a third party makes a claim against the company, the rules of agency will normally suffice to attribute to the company not only the act of the director or employee but also his or her state of mind, where relevant.  In this context, the company is like the absent human owner of a business who leaves it to his managers to run the

> business, while he spends his days on the grouse moors (to borrow
> Staughton LJ's colourful metaphor in *PCW Syndicates v PCW*
> *Reinsurers* [1996] 1 WLR 1136, 1142). Where the rules of agency do
> not achieve that result, but the terms of a statute or contract are
> construed as imposing a direct liability which requires such attribution,
> the court can invoke the concept of the directing mind and will as a
> special rule of attribution…

828.     Finally, we would refer to the judgment of Lord Walker in the Hong Kong Final Court of Appeal in *Moulin Global*.[787] At [104], he quoted with approval the following extract from the judgment of Patten LJ in the Court of Appeal in *Bilta*[788], which we find helpful:

> 34.    The point being made in this passage is that attribution of the conduct
> of an agent so as to create a personal liability on the part of the company
> depends very much on the context in which the issue arises. In what I
> propose to refer to as the liability cases like *El Ajou v Dollar Land*
> *Holdings Plc…, Royal Brunei Airlines Sdn Bhd v Tan…, McNicholas*
> *Construction Co Ltd v Customs and Excise Comm …* and *Morris v*
> *Bank of India…*, reliance on the consequences to the company of
> attributing to it the conduct of its managers or directors is not enough
> to prevent attribution because, as Mummery LJ pointed out, it would
> prevent liability ever being imposed. As between the company and the
> defrauded third party, the former is not to be treated as a victim of the
> wrongdoing on which the third party sues but one of the perpetrators.
> The consequences of liability are therefore insufficient to prevent the
> actions of the agent being treated as those of the company. The
> interests of the third party who is the intended victim of the unlawful
> conduct takes priority over the loss which the company will suffer
> through the actions of its own directors.

> 35.    But, in a different context, the position of the company as victim ought
> to be paramount. Although the loss caused to the company by its
> director's conduct will be no answer to the claim against the company
> by the injured third party, it will and ought to have very different
> consequences when the company seeks to recover from the director the
> loss which it has suffered through his actions. In such cases the
> company would itself be seeking compensation by an award of
> damages or equitable compensation for a breach of the fiduciary duty
> which the director or agent owes to the company. As between it and
> the director, it is the victim of a legal wrong…

This observation of Patten LJ was also approved by Lord Toulson and Lord Hodge in their joint judgment in *Bilta* in the Supreme Court[789].

829.     Lord Walker summarised the position in the following terms:

> **Attribution and the Fraud Exception: Conclusions**

> 106. The decision of the Court of Appeal in *Bilta* has achieved a welcome
> clarification of the law in this area. The general effect of the authorities
> discussed above can in my view be summarised in some short

---

[787] *Moulin Global* (**AG1/80**)
[788] Court of Appeal in *Bilta*, [2014] 1 All ER 168 at [34] and [35]
[789] at [208]

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*

propositions.  (1) Questions of attribution are always sensitive to the factual situation in which they arise, and the language and legislative purpose of any relevant statutory provisions…. (2) The "directing mind and will" concept in *Lennard*, although still often referred to in judgments, has been greatly attenuated by recognition of the importance of the factual and legislative context; *El Ajou* at pp 151, 154, 159; *Meridian* at pp 507-509 and 511; and numerous later cases. It might be better if it were to fade away as a general concept… (4) The underlying rationale of the fraud exception is to avoid the injustice and absurdity of directors or employees relying on their own awareness of their own wrongdoing as a defence to a claim against them by their own corporate employer….(5)  The exception applies even if the wrongdoing consists of a transaction formally approved by the whole board of directors, and completed under the company seal…; in other words the exception can apply even where the primary rules of attribution are in play.  (6) But the exception does not apply to protect a company where the issue is whether the company is liable to a third party for the dishonest conduct of a director or employee; *El Ajou* at p 702…; *Meridian* at p 511…; *Bilta* at para 34.  (7) The supposed distinction between primary and secondary victims, although sometimes a useful analytical tool, is ultimately much less important than the distinction between third party claims against a company for loss to the third party caused by the misconduct of a director or employee, and claims by a company against its director or employee (or an accomplice) for loss to the company caused by the misconduct of that director or employee; *Bilta* at paras 45 and 77…

830.    Lord Walker also commented on the concept of a directing mind and will in the following two paragraphs:

66.    That was the factual context in which Viscount Haldane LC spoke of the need to identify a company's "directing mind and will".  But it would be wrong to suppose that the same person or persons (not being the full board of directors) must perform the function for each and every one of a company's activities…

67.    The rather belated recognition of this important qualification of the 'directing mind and will' concept considerably reduces its apparent force.  Except in the case of very small companies with very simple activities, there will not be a single individual in a company who satisfies the test for all purposes.  After *Meridian* some legal scholars conjectured that the concept might disappear from company law, and it might be better if it had disappeared, as it tends to obscure the underlying importance of the basic principles of agency.  To refer instead to "the relevant responsible director or employee" or some such expression, would be less arresting but a good deal more accurate…

831.    It seems to us from the above discussion that the expression "the *Hampshire Land* principle" is sometimes used to refer to two different aspects of the judgment in that case. The Chief Justice used the expression to refer to the principle which we have summarised at paragraph 801 above, namely that, where one person is an officer of two companies, the knowledge which he has acquired as an officer of one company will not be imputed to the other company unless he has some duty imposed on him to communicate his knowledge to the other company, and also a

duty imposed on him by the company which is alleged to be affected by the knowledge to receive that knowledge. That indeed is what the head note of the report of the *Hampshire Land* case states. However, the case has also been taken as the basis for what Lord Sumption described as the "breach of duty exception" summarised at paragraph 824 above.

832.    We respectfully differ from the Chief Justice's conclusion that the *Hampshire Land* principle (as we have defined it) applies in this case. There appear to us to be two grounds upon which this conclusion may be reached.

833.    The first is that put forward by AHAB by reference to the decision in *El Ajou*.  As summarised above, the Court of Appeal expressly held in that case that the *Hampshire Land* principle operated to defeat the plaintiff's claim insofar as it was based upon Mr Ferdman's position as an appointed agent of DLH.  However, when considering the plaintiff's claim on the basis that the knowledge of Mr Ferdman, as the directing mind and will of DLH in connection with the receipt of the fraudulent proceeds, was to be treated as the knowledge of DLH, the court made no reference to the *Hampshire Land* principle and clearly considered that it had no application to that aspect of the claim.

834.    There is a coherent reason for such a distinction. As Hoffmann LJ made clear at 701 in the passage quoted at paragraph 813 above, whereas an agent's knowledge can be imputed to a company, the knowledge of the directing mind and will of the company *is* the knowledge of the company.  Nourse LJ spoke to similar effect at 695 when, in connection with the persons who are the directing mind and will of a company, he quoted the words of Millett J at first instance:

> "*Their minds are its mind; their intention its intention; their knowledge its knowledge.*"

835.    When (assuming it did) a Respondent company received a payment, it must have had some state of mind in relation to that payment.  It cannot have been a complete blank. That state of mind can only be the state of mind of the person (or persons) who was (or were) the controlling mind and will of the company in relation to that receipt.  If such person knew that the receipt was of misappropriated money, so did the company; if that person did not know, nor did the company. If that person did not know, but had reasonable cause to suspect the fraudulent source of the monies, that was also the state of the mind of the company. The state of mind of the company is no different whether the person who is the controlling mind and will acquired his knowledge as an officer of another company or in some other way.

836.    We accept that, as Nourse LJ said in *El Ajou* at 695, a director is for many purposes an agent of the company. Similarly, the passage from Lord Walker in *Moulin Global* quoted at paragraph 799 above refers to the fact that a company can only act by its agents. We also accept that in *Bilta*, there are many references to directors as agents and indeed the words "director" and "agent" are often used interchangeably. But at no point in *Bilta* or *Moulin Global* is it suggested that *El Ajou* was wrongly decided, despite the fact that it is referred to and considered in some depth in both cases.

837.    Accordingly, it seems to us that *El Ajou* remains good law as a matter of English law and we see no reason to differ from it as a matter of Cayman law.

838.    But, even if we were wrong in relation to the status or effect of *El Ajou*, there is a second ground for concluding that nothing in *Hampshire Land* operates to prevent any attribution which would otherwise be made in this case. It is clear from the judgments in *Bilta* and *Moulin Global* that whether it is appropriate to attribute the state of mind of a director to the company in relation

to a particular claim depends on the nature and factual context of the claim in question[790]. Since the hearing of this appeal, this approach has been confirmed by the United Kingdom Supreme Court in *Singularis Holdings Limited v Daiwa Capital Markets Limited*[791].

839.    The nature and context of the present case is, like *El Ajou*, a claim that a company has received the proceeds of fraud and that the directing mind and will of the company in respect of that receipt knew that the money represented misappropriated funds. That is very different from the circumstances in *Hampshire Land* itself and also in the subsequent case of *Re David Payne & Co Ltd* (supra), which is also referred to in *El Ajou* and some of the other cases.  In *Hampshire Land*, the company had borrowed money from a building society. The directors of the company were empowered to borrow money but only up to a certain limit without the consent of a general meeting. A general meeting had given the required consent, but the notice summoning the meeting did not, as required by the articles of association, specify that borrowing beyond the limit was to be authorised by the meeting. The secretary of the company was aware of this irregularity and he was also the secretary of the building society. The liquidators of the company challenged the ability of the building society to claim as a creditor for its loan on the ground that the knowledge of the secretary was to be attributed to the building society, so that it was aware of the irregularity.

840.    It was in those circumstances that Vaughan Williams J held that the secretary's knowledge should not be attributed to the building society and articulated the principle we have described above.

841.    In *Re David Payne*, K, who was a director of company A and was also interested in company B, having ascertained in his private capacity that company B proposed to borrow a sum of money for a purpose outside the scope of its business, induced company A to advance the money to company B on the security of a debenture. No other director of company A, except K, knew how the money was intended to be applied by company B. The liquidator of company B brought proceedings for a declaration that the debenture was invalid on the ground that the knowledge of K was to be attributed to the lending company, company A. The Court of Appeal followed *Hampshire Land* and held that the director's knowledge was not to be attributed to the lending company because there was no legal duty on him to impart his knowledge nor any duty on the part of the lending company to have acquired that knowledge.

842.    As can be seen, the circumstances of the present case are completely different.  In each of *Hampshire Land* and *Re David Payne*, a company sought to avoid its liability to repay a borrowing by attributing the knowledge of an officer of the lending company to that company. It is not surprising that the court was not willing to attribute knowledge in those circumstances and sought to establish certain limitations on attribution in such circumstances.

843.    We do not consider that those limitations are applicable to the wholly different situation where a defrauded third party seeks to recover the proceeds of that fraud from a company which has received them on the basis that the person who was the directing mind and will of the company in relation to that receipt was aware that the monies received were the proceeds of fraud.

844.    To hold otherwise would lead to very undesirable consequences. It is common for a fraudulent director of a company, who has misappropriated funds of that company, to transfer the monies directly or through a series of companies to a company of which he is the directing mind and will and the beneficial owner. Unlike in this case, the ultimate recipient company may not be insolvent with the result that, if the claim fails, the fraudster will, through his beneficial

---

[790] See for example Lord Neuberger at [9] in *Bilta*, Lord Walker at [104] and [106] in *Moulin Global* and Patten LJ at [34] – [35] in *Bilta*.
[791] United Kingdom Supreme Court in *Singularis Holdings Limited v Daiwa Capital Markets Limited* [2019] 3 WLR 997 (**AG1/83**) per Baroness Hale of Richmond (with whom the other justices agreed) at [34].

ownership of the recipient company, keep the benefit of the misappropriated funds. Is it really to be said that, unless the defrauded company can establish a duty of the director (possibly in relation to any intermediate company as well) to both the defrauded company and the recipient company along the lines of the *Hampshire Land* principle, the claim will fail for lack of attribution of the fraudster's state of mind to the recipient company?

845.   Accordingly, on both grounds, we hold that, *if* AHAB can establish in relation to any Respondent company that Al Sanea was the directing mind and will of that company in relation to any particular activity of the company relied upon, eg receipt of monies, agreement to a conspiracy, or the provision of dishonest assistance, then Al Sanea's knowledge of his misappropriation of funds belonging to the Money Exchange may be attributed to the company in question.

846.   As outlined above, the concept of the directing mind and will – or, as Lord Walker put it, the relevant responsible director – has to be considered in relation to any particular activity relied upon. But it is of course possible, in the case of some companies, to show that a particular person is the controlling mind and will of the company generally, ie in connection with all activities undertaken by that company. If that is established, a court may, depending on the circumstances, infer that the person in question was the directing mind and will of the company in respect of a particular activity even if there is no direct evidence in relation to that activity.

*(iii)   Application to the facts*

847.   As already mentioned, the Chief Justice made no finding as to whether the knowledge of Al Sanea should be attributed to the GT Respondents or the AwalCos. In its written submissions, AHAB invited this Court to find that Al Sanea's knowledge should be so attributed.

848.   As stated at the outset of this judgment, we do not consider that we should in general make findings of fact in substitution for those of the Chief Justice.  As Lewison LJ put it so aptly and so memorably in his oft-quoted metaphor in *Fage UK Limited v Chobani UK Limited*[792]:

> In making his decisions the trial judge will have regard to the whole of the sea of evidence presented to him, whereas an appellate court will only be island hopping.

849.   Accordingly, the question of attribution would fall to be considered afresh in the event of any re-trial of this case or any part of it. We would however say that, during the course of their submissions before the Chief Justice, AHAB raised significant arguments in favour of attribution which would need to be carefully considered in a re-trial. For example, to name but a few:

(i)   In their written closing submissions at paragraphs 5.132-5.134[793], AHAB referred to various occasions when the GT liquidators or witnesses on their behalf had accepted that Al Sanea controlled the Saad Group.

(ii)   In particular, in relation to Singularis, one of the liquidators accepted during the course of proceedings brought by Singularis against Daiwa Capital Markets Limited in the High Court of England and Wales that "[Al Sanea] had day-to-day executive control of decision making".  It can also be noted that, in her judgment in those proceedings (see paragraph 838 above), having referred at [9] to Al Sanea being a "dominant personality", Lady Hale described him in relation to Singularis as the "company's directing mind" at [39].

---

[792] *Fage UK Limited v Chobani UK Limited* [2014] EWCA Civ 5 (**AG1/43**) at [114]
[793] **D/5/45-46**

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*
221

(iii) During the course of this appeal, Mr Wardell spent some time in making powerful submissions as to the level of day-to-day control exercised by Al Sanea in respect of the Money Exchange. If he exercised such control in respect of an entity in which he only had a minority interest, it would certainly be open to a judge to infer that he would exercise no lesser level of control in respect of the Respondent companies, which were all set up to hold assets offshore for him and his family.

(iv) In relation to SICL, one of the directors, Mr Buxton, was interviewed by the GT liquidators and what he had to say was summarised at 1136 – 1137 of the judgment[794]. He said that by the end of 2008, Al Sanea was personally placing deposits on behalf of SICL and that the board of directors had no idea what was happening to such deposits. He said that although there had been a drive for good corporate governance, Al Sanea was a very dominant chairman.

These, together with other arguments on the part of AHAB and the responses of any of the Respondent companies, will fall to be considered in the event of any re-trial. Although many of the points raised by AHAB refer to one of more of the GT Respondents, it would be open to the judge on any re-trial to infer that control of the AwalCos would be of a like nature to any control of the GT Respondents.

850.   The Chief Justice did however make a finding in respect of SIFCO 5. He held that Al Sanea's knowledge could not be attributed to that company. SIFCO 5 was a special purpose vehicle wholly owned by SICL which was set up to facilitate a financing of SICL.

851.   That financing took place pursuant to an Accreting Strike Option ("ASO") entered into in September 2006 between Barclays Capital (**Barclays**) and SICL. Al Sanea signed the ASO on behalf of SICL. The scheme involved the following:

(i)    SICL contributed a portfolio of funds ("the Funds Portfolio"), which it already owned, to SIFCO 5. In return, SIFCO 5 issued Class B shares to Barclays.

(ii)   The Class B shares were non-voting shares but were preferential equity shares. They were the only participating shares in SIFCO 5 with the result that no capital return could be made to any other share class until all the Class B shares were redeemed.

(iii)  The other shares in issue were the Class A shares. These were management shares and were owned by SICL. The power of appointing directors etc therefore rested with SICL.

(iv)   In return for the issue of the Class B shares, Barclays paid $ 70m directly to SICL. In effect, the ASO was a financial product sold by Barclays prior to 2008. It enabled SICL to raise money on the Funds Portfolio without having to show a liability in its balance sheet in the amount advanced by Barclays or record losses in the value of the Funds Portfolio. Contractually, SICL had sold the Funds Portfolio to SIFCO 5 and it had no liability to repay the amount provided to it by Barclays. Barclays' protection lay entirely in its ownership of the Class B shares.

(v)    SICL had a right of redemption in the Funds Portfolio which it could exercise by paying the "Strike Price" to Barclays. The Strike Price was defined by a formula which took account of an interest component and other matters. However, SICL did not have to exercise its right of redemption. If it did not, Barclays' only recourse was to the B shares and to the rights of capital which those shares conferred.

(vi)   SFS was appointed investment manager of SIFCO 5's assets. SFS was of course wholly owned by Al Sanea.

---

[794] AA/2.4/1136-1137

852.    Apart from the legal point concerning the *Hampshire Land* principle, which we have already dealt with, the Chief Justice's reasons for holding that Al Sanea's knowledge of the fraud on the Money Exchange could not be attributed to SIFCO 5 are to be found at page 1143 of Section 8[795] of his judgment. We would summarise his reasons as follows:

   (i)     SIFCO 5 was established for a bona fide commercial purpose and at all times was operated in accordance with that purpose.

   (ii)    Management functions were properly exercised by SFS.

   (iii)   There was no evidence that Al Sanea exercised any of his powers as a director of SIFCO 5 other than consistently with the company having a properly constituted board of directors and with the due delegation of management functions to SFS.

   (iv)    Indeed, it was arguable that in reality, the "directing mind and will" of SIFCO 5, for the purpose of assessing its bona fides was Barclays (alternatively SFS).

853.    We do not consider that these matters are sufficient to justify the Chief Justice's conclusion. As discussed earlier, the key question is as to who was the directing mind and will (or "relevant responsible director" to use Lord Walker's expression) in respect of the transactions relied upon by AHAB. In relation to SIFCO 5, that is the transfer of assets from SICL, as no other transfers are alleged. Those transfers comprise the initial transfer of the Funds Portfolio and any subsequent transfers by SICL to SIFCO 5.

854.    The entering into the ASO and the initial transfer of the Funds Portfolio were undertaken for the benefit of SICL and it was Al Sanea who signed the ASO on behalf of SICL. There is clearly a strong argument for thinking that Al Sanea, as beneficial owner of SICL, would be the decision maker as to whether SIFCO 5 should participate in the ASO and receive the Funds Portfolio from SICL. However, this aspect is not addressed by the Chief Justice.

855.    Furthermore, the fact that SIFCO 5 was established and operated for bona fide commercial reasons cannot of itself be a decisive, or even significant factor. In *El Ajou*, DLH was a company not owned by the fraudsters and carrying on a wholly legitimate property development business. Yet this did not prevent it being liable in knowing receipt because of the guilty knowledge of the director who was the directing mind and will of DLH in respect of the receipt of misappropriated funds.

856.    Furthermore, we do not see that Barclays can possibly be said to be the directing mind and will of SIFCO 5. Barclays owned only the non-voting B shares and did not, so far as we are aware, have any representative on the board of directors. It was merely a passive shareholder; voting control lay with SICL. In relation to SFS, this company appears only to have undertaken management functions after receipt of the Funds Portfolio and would not therefore be the directing mind and will of SIFCO 5 in relation to the decision to receive those funds. In any event, it was wholly owned by Al Sanea and consideration would then have to be given as to whether Al Sanea was the directing mind and will of SFS.

857.    In summary, we do not consider that the judgment addressed the key issue of who was the directing mind and will (or, if preferred, the relevant responsible director) of SIFCO 5 in relation to the decision to receive the Funds Portfolio and subsequent monies from SICL. It cannot therefore stand. Accordingly, this issue would also be a matter for consideration afresh on any re-trial.

*Tracing*

---

[795] **AA/2/1143** at paras 8.43-8.44

858.    We turn next to consider the issue of tracing.

*(i)      Governing law*

859.    If, contrary to our decision, the proper law of the proprietary claim and the claim in knowing receipt is Cayman law, then the Cayman law of tracing is clearly applicable.  Both a proprietary claim and a claim in knowing receipt require AHAB to prove that the relevant Respondent has received the traceable proceeds of the misappropriations from the Money Exchange.  However, as described above, we have upheld the Chief Justice's decision that what are referred to as the receipt based claims are governed by the law of Saudi Arabia.  If we are to consider the subject of tracing, we must determine whether it is also governed by the law of Saudi Arabia (as the *lex causae*) or by Cayman law (as the *lex fori*).

860.    In his judgment, the Chief Justice considered the issue of tracing exclusively by reference to Cayman law (being based in turn on English law) and he does not refer to there having been any dispute before him as to whether this was the correct approach.  However, during oral submissions before this Court, it emerged that this was in issue between the parties.

861.    Mr Wardell submitted that tracing is a matter of evidence and is therefore governed by Cayman law as the *lex fori*.  Accordingly, having established that Saudi law recognises proprietary claims against property which remains "identifiable", it is for the *lex fori* to determine (by means of its rules of tracing) whether property remains identifiable. He referred in support to the case of *Foskett v McKeown*[796].  Although he did not refer us to any specific passages, he no doubt had in mind the following dicta. At 113, Lord Steyn said:

> In arguing the merits of the proprietary claim counsel for the purchasers from time to time invoked 'the rules of tracing'. By that expression he was placing reliance on a corpus of supposed rules of law, divided into common law and equitable rules. In truth tracing is a process of identifying assets: it belongs to the realm of evidence. It tells us nothing about legal or equitable rights to the assets traced.

862.    Lord Millett had this to say on the subject at 128 D-E:

> Tracing is thus neither a claim nor a remedy. It is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who handled or received them, and justifies his claim that the proceeds can properly be regarded as representing his property. Tracing is also distinct from claiming. It identifies the traceable proceeds of the claimant's property. It enables the claimant to substitute the traceable proceeds for the original asset as the subject matter of his claim.  But it does not affect or establish his claim….

863.    On the other hand, Mr Smith, on behalf of the Respondents, relied on the following passage from *Dicey (15ᵗʰ Edition)*[797] where at paras 36-097/098, the following passage appears:

> 36-097 Greater difficulty arises where the question is whether the claimant's property can still be identified in the hands of the defendant.  If the claimant is able to rely on the choice of law rules which deal with transfers of property

---

[796] *Foskett v McKeown* [2001] 1 AC 102 **(R1/33/1** at bundle R4 tab 59)

[797] *Dicey* (15ᵗʰ edition) **(AG2/14/14)**

in order to show that the defendant has his property, he will be able to rely on the same choice of law rule to 'follow' that property if it has not changed its form from one person to another.  Where property has changed its form, the question may arise whether the claimant's original property can be 'traced' through mixture or substitution.  In English domestic law, it has been said of tracing that: 'in truth, tracing is a process of identifying assets; it belongs to the realm of evidence.  It tells us nothing about the legal or equitable rights to the assets traced'.  This is on the basis that a person who can identify asset (sic) through mixture or substitution cannot actually claim them unless he can also show a claim to the original assets, and may yet be defeated by the acquisition of title by a third party purchaser.  But such a description should not lead to tracing being classified as 'procedural' as tracing may be a necessary step to the assertion of substantive rights.

36-098 The better view is that the lex causae should determine whether a party can trace and that tracing should not be subject to an independent choice of law rule.  Frequently, this will lead to the application of property choice of law rules, where a legal or beneficial owner of property asserts that his rights have not been defeated by mixture or substitution.  But it may not inevitably do so.  For instance, a claim for damages for knowing receipt should, for choice of law purposes, be classified as a non-contractual obligation.  If, according to the law governing that obligation, it is necessary to show that the recipient did actually receive the traceable proceeds of the claimant's property through mixture or substitution, it is suggested that that law's rules of tracing should apply, so as not to distort the coherent application of that law and not to lead to recovery where it would not be possible by the lex causae because the assets are, by that law, untraceable.

864.    It has to be said that, because of the time which the parties very understandably spent on other matters during their oral submissions for this appeal, no time was devoted to this particular topic.  Mr Wardell simply submitted by reference to *Foskett* that it was trite law that tracing was a matter of evidence and therefore governed by the *lex fori*, whereas Mr Smith simply relied on the quoted passage from *Dicey*.  In circumstances where we have not had detailed submissions, we express our view somewhat tentatively.  However, it seems to us that the point made in the final sentence of para 36-098 of *Dicey* is compelling.  We have upheld the Chief Justice's finding that the receipt based claims are governed by Saudi law.  We have also upheld his finding that Saudi law does not recognise a proprietary claim against substituted property in the hands of a third party.  If it is held that the Cayman rules of tracing are applicable and if, for the purposes of argument, they were to permit a finding that misappropriated property from the Money Exchange could be traced into the hands of a Respondent, the result would be that a proprietary claim would lie against such Respondent in circumstances where the governing law of the claim did not permit a proprietary claim.  That would not seem to be a satisfactory outcome.

865.    Whilst it is true that tracing is essentially an evidential exercise to decide whether substituted property can properly be regarded as representing the originally misappropriated property, we do not consider that it can alter the substantive law.  Cayman law (following English law) has chosen as a matter of substantive law to say that substituted property can be treated as the original misappropriated property if the rules of tracing so permit.  Tracing is an evidential matter to see if the links between the original property and the substituted property are sufficiently close to allow substitution.  But it is a matter of substantive law as to whether a proprietary claim in respect of the original property can in principle be transposed to substituted property.  Saudi law has not chosen as a matter of substantive law to follow this course.  In our judgment therefore, even if the Cayman rules of tracing would allow a substitution, there is no

proprietary claim under Saudi law against the substituted property. Thus, even if AHAB were able to show under the Cayman rules of tracing that misappropriated property from the Money Exchange could be traced into the hands of one or more of the Respondents, that would not allow it to succeed in the proprietary claim as this is governed by Saudi law. It follows that the appeal in respect of the proprietary claim must be dismissed even in relation to the $191m misappropriation. Separate considerations apply to the other receipt based claims and these are addressed later in this judgment.

866.     However, the Chief Justice dealt with the Cayman law of tracing in considerable depth and the parties in their submissions on appeal have done likewise. In addition, tracing would be relevant if we are wrong in upholding the Chief Justice's decision that the receipt based claims are governed by Saudi law or if we are wrong in the view which we have described in the preceding two paragraphs. Furthermore, as discussed in the next section, the Cayman law of tracing may still be relevant in relation to the claims other than the proprietary claim. Accordingly, we turn to consider the arguments raised on appeal in relation to tracing under Cayman law, which is similar to English law in this respect.

*(ii)     Factual background*

867.     When dealing with tracing, we shall for convenience refer to "misappropriated" funds. In the light of our decision in relation to breach of fiduciary duty, the only sum actually misappropriated was the $191m. However, at times this tracing section proceeds on the assumption that this is not so and that there were other misappropriated funds as well.

868.     STCC was a partnership under Saudi law of which Al Sanea was the 90% partner and his wife the remaining 10% partner. It was therefore an entity which was under his control and he can be regarded as the beneficial owner of it. The vast majority of the funds misappropriated from the Money Exchange was paid to STCC. Thus, in a finding which has not been challenged on appeal and appears to be common ground, the Chief Justice said[798]:

> The significance of the role of STCC should not be understated. STCC, as the Saudi head office of the Saad Group, was the hub of its wheel. The vast majority of transfers out of the Money Exchange alleged to have gone to the Saad Group went to STCC. There was also a very large flow of funds the other way, to the Money Exchange from STCC.

There was also evidence of very substantial numbers of payments from STCC to other members of the Saad Group and vice versa.

869.     The bank statements and internal financial records of STCC were not available at trial. There were some financial statements, but the Chief Justice accepted that the financial statements of any member of the Saad Group had to be treated with some caution. However the Chief Justice found that STCC was not only receiving funds from the Money Exchange; it had a portfolio of assets, trading revenues (although the true extent of these was queried by AHAB), loans from third party banks of some $ 4.3 billion as at 31 December 2008, and net borrowings from Al Sanea of $ 4.9 billion[799].

870.     AHAB submitted that in the light of these circumstances, STCC constituted a "black hole" or "maelstrom" for tracing purposes and that the vast number of payments back and forth between STCC and the Money Exchange and STCC and other members of the Saad Group constituted "cross-firing". We shall explain these terms shortly.

---

[798] **AA/2.4/824** at para 31 of Section 7
[799] **AA/2.4/824** at para 32 of Section 7 and **AA/2.4/1024** at paras 240-241 of Section 7A

(iii)   *Cayman law on tracing*

(1)   *The Chief Justice's findings*

871.   The traditional concept of tracing money in a bank account involves tracking the money (or more strictly the chose in action reflecting its value) from one account to another.  Thus, in a simple example, if £100 in account A belonging to the victim is misappropriated by the fraudster and transferred to account B in the fraudster's name and then the next day £100 is transferred from account B to account C in the name of a third party, the victim is able (subject to any available defences) to trace the £100 into account C and enforce a proprietary claim in respect of that sum if it is still there.  If, whilst the £100 is in account B, a further sum of £100 from another source is paid into account B and £100 is then transferred to account C, the victim will be able to trace a proportionate part into account C, namely £50.  As Buckley LJ said in *Borden (UK) Limited v Scottish Timber Products Limited*[800]: "it is a fundamental feature of the doctrine of tracing that the property to be traced can be identified at every stage of its journey through life….".

872.   In the absence of bank statements and financial records of STCC and given the number and frequency of transactions, the tracing experts on both sides agreed that this exercise was not possible in the present case.  To deal with this difficulty, AHAB raised three main arguments before the Chief Justice.

873.   First, they argued that the court could draw inferences when tracing and should infer the necessary links in the transaction chain from the surrounding circumstances, including in particular the fact that large amounts had been misappropriated from the Money Exchange between 2002 and 2008 and that large amounts had arrived in the various Respondent companies during the same period.  In support of this argument, AHAB referred in particular to the decision of the English Court of Appeal in *Relfo Limited (in liquidation) v Varsani*[801] (*Relfo*) and *Federal Republic of Brazil v Durant International Corporation*[802] both in the Royal Court of Jersey and in the Jersey Court of Appeal (*Durant*)[803].

874.   Secondly, they submitted that the evidence that was available of money flows between the Money Exchange, Al Sanea, STCC and the Respondent companies showed that there was a "cross-firing" of transactions or "maelstrom" which had been deliberately created by Al Sanea, using the Respondents and other companies, to obscure the source and trail of money flows.  He had also caused the lack of financial records.  In those circumstances the burden shifted so as to fall on the Respondent companies to prove the sources of the monies they had received and accordingly to show that such monies had not originated from the Money Exchange.  In relation to this point, AHAB placed particular weight upon the decision of the English Court of Appeal in *Sinclair Investments (UK) Limited v Versailles Trade Finance Limited (in administrative receivership)*[804] (*Sinclair*).

---

[800] *Borden (UK) Limited v Scottish Timber Products Limited* [1981] Ch. 25, at 46 (**R1/12.2**) (quoted with approval by Leggatt LJ in *Bishopsgate Investment Management Limited v Homan* [1995] Ch 211 at 221 (**R1/23.1**)
[801] *Relfo Limited (in liquidation) v Varsani* [2015] 1 BCLC 14; [2014] EWCA Civ 360 (**R1/46/1** at bundle R7 tab 93)
[802] *Federal Republic of Brazil v Durant International Corporation* 2012 (2) JLR 356 (**R1/44.0.C** at bundle R7 tab 85A)
[803] [2013] JCA 71, 2013 (1) JLR 273 (**R1/45.2** at bundle R7 tab 91)
[804] *Sinclair Investments (UK) Limited v Versailles Trade Finance Limited (in administrative receivership)* [2012] Ch 453 (**R1/41** at bundle R6 tab 80)

875.   Thirdly, they submitted that Al Sanea (as a fiduciary) and the Respondent companies (as companies wholly owned and controlled by him) were subject to a duty to account to AHAB for the monies which they had received.  This meant that the burden lay upon them to prove the source of the money which they had received and to show that it was not sourced from the Money Exchange (and therefore not subject to AHAB's equitable interest).  Any evidential gaps in the links in the transaction chain meant that their duty to account had not been discharged.  Such evidential gaps should not be held against AHAB and should not defeat their tracing case.

876.   The Chief Justice rejected all three of these submissions.  In relation to the first, he accepted the principle that inferences could be drawn when appropriate to fill gaps in the transaction links,[805] but concluded that this ability did not extend as widely as submitted by AHAB.  In particular, given the other sources of funds for STCC (bank loans, trading receipts and loans from Al Sanea), he was unable to infer that funds emerging from STCC and passing to the Respondent companies were necessarily to be taken as the money coming into STCC from the Money Exchange[806].

877.   As to the second submission, concerning maelstrom and cross-firing, he concluded (i) that this only operated to reverse the burden of proof on the part of the defaulting trustee himself, not companies owned by the defaulting trustee[807] and (ii) that a maelstrom must have been created by the defaulting fiduciary precisely in order to defeat attempts to trace the relevant funds[808]. He concluded that the reasonable inference in this case was that the maelstrom and cross-firing were not aimed at defrauding AHAB but that they were aimed at enabling the Money Exchange to defraud the banks or for apparent commercial reasons[809].

878.   As to the third submission, he rejected the argument that, simply because a company was owned by a defaulting fiduciary, it had a duty to account and the burden lay on it to prove that the money it had received did not constitute misappropriated funds.

879.   The Chief Justice then went on to consider the detailed facts in relation to the tracing claims against the GT Defendants, the AwalCos and SIFCO 5 at sections 7A, 7B and 7C respectively of the judgment and we shall return to those sections to such extent as is necessary in due course.

   *(2)   Discussion*

880.   In their written submissions, AHAB repeated the same three key arguments as they had made before the Chief Justice.  However, in relation to its third argument, Mr Wardell substantially modified AHAB's position in his oral submission.  We shall consider each of the arguments in turn.

   *(a)   Inferences*

881.   It is well established – and the Chief Justice accepted – that a court may draw inferences in relation to links in the transactional chain where direct evidence (eg bank statements) of one or more links is not available.  We were referred to a number of cases in this connection and it is helpful to summarise three of them briefly.

---

[805] eg **AA/2.4/828** at para 44 of Section 7
[806] See for example the judgment at **AA/24/826** at para 38 of Section 7 and **AA/2.4/1024-1028** at paras 241-248 of Section 7A
[807] **AA/2.4/1088** at para 44(1) of Section 7A
[808] **AA/2.4/834** at paras 57-58 of Section 7
[809] **AA/2.4/827** and **AA/2.4/831** at paras 39 and 54 of Section 7

882.    In *El Ajou v Dollar Holdings plc*[810] a fraud was carried out by some Canadians.  Some of the proceeds of the fraud were transferred to Panama on 30 March and 1 April 1986 including a payment of $ 1.6m to Bank of America.  Subsequently, on 12 and 16 May respectively, two sums of $1,541,432 and $1,143,000 were credited to an account called the Keristal No 2 account in Geneva.  These monies were subsequently paid to the defendant Dollar Holdings plc (DLH) for a property development project in London.  DLH was not owned by the Canadians.  An issue arose as to whether the proceeds of the fraud could be traced into the two payments into the Keristal No 2 account.  As the trial judge Millett J said, the trail was lost once the money was paid to Panama.  At 734, Millett J said this in connection with the issue of tracing through Panama:

> It is, of course, beyond dispute that the money which was received in the Keristal No 2 account was the Canadians' money.  It is, however, true that the plaintiff is unable by direct evidence to identify that money with the money which Mr D'Albis had sent to Panama only a few weeks before.  If the question arose in proceedings between the plaintiff and the Canadians, then, in the absence of evidence to the contrary, the court would draw the necessary inference against the latter, for they would be in a position to dispel it.  But DLH is not; it is as much in the dark as the plaintiff.

> Nevertheless, in my judgment there is sufficient, though only just, to enable the inference to be drawn.  One of the two sums received in the Keristal No 2 account was $1,541,432 received on 12 May 1986 from Bank of America.  That corresponds closely with the sum of $1,600,000 transferred to Bank of America, Panama on 1 April 1986.  In relation to the later transaction, Bank of America may, of course, merely have been acting as a correspondent bank in New York and not as the paying bank; and the closeness of the figures could be a coincidence.  It is not much, but it is something; and there is nothing in the opposite scale.  The source of the other money received in the Keristal No 2 account is not known, but from the way in which the Canadians appear to have dealt with their affairs, if one sum came from Panama, then the other probably did so too.

883.    Millett J went on to note the fact that there was no evidence that the Canadians had any substantial funds available to them which did not represent the proceeds of the fraud and concluded at 736:

> In my judgment, there is some evidence to support an inference that the money which reached the Keristal No 2 account represented part of the moneys which had been transmitted to Panama by the second tier Panamanian companies some six weeks previously, and the suggestion that it was derived from any other source is pure speculation.

884.    Millett J's inference that the monies received in the Keristal No 2 account could be traced through Panama as representing the proceeds of fraud was subsequently upheld by the Court of Appeal[811].

885.    In *Relfo*, a Mr Gorecia and his wife were the shareholders and directors of Relfo Limited.  On 5 May 2004, at a time when Relfo owed substantial sums to HMRC, Mr Gorecia wrongfully

---

[810] *El Ajou v Dollar Holdings plc* [1993] 3 All ER 717 (Millett J) (**R1/20** at bundle R2 tab 35)
[811] *El Ajou v Dollar Land Holdings plc* [1994] 2 All ER 685 (**R1/21** at bundle R2 tab 39)

caused the sum of £500,000 ("the Relfo/Mirren payment") to be paid out of Relfo's bank account in London into the bank account of Mirren Limited in Latvia. This left Relfo insolvent.

886. On the same day, Intertrade Group LLC (**Intertrade**) made a transfer ("the Intertrade payment") in a sum which was the US dollar equivalent of £500,000 (less an amount representing 1.3%) from its account in Lithuania to the account of Mr Bhimji Varsani in Singapore. The bank statements for Intertrade's account showed that the Intertrade payment was funded by two payments made to Intertrade's account the same day. However, Relfo accepted at trial that it could not point to specific transactions between the Mirren and Intertrade accounts to show how the Relfo/Mirren payment was translated into the Intertrade payment made to Mr Varsani. On 13 May 2004, the sum of $100,000 was paid out of Mr Varsani's account to Mr and Mrs Gorecia. After the Relfo/Mirren payment, Mirren's account was dissipated but none of the withdrawals was paid to Intertrade.

887. A source in Ukraine produced documents showing that the Relfo/Mirren payment was originally intended to be a loan from Relfo to Mirren but that this arrangement was replaced by one which provided for the payment to go to Mr Varsani in settlement of some obligation from another entity.

888. The trial judge held that Mr Gorecia caused the Relfo/Mirren payment to be paid intending to produce the result that the funds so paid should, by means to be devised by his Ukrainian contacts, be paid on to Mr Varsani and it was likely that they acted so as to bring about the result which Mr Gorecia asked them to produce. He noted that the Relfo/Mirren payment and the Intertrade payment were closely related in time and amount and the information from Ukraine provided a plausible explanation for the precise 1.3% difference between the two payments. He held therefore that Relfo was entitled to trace the Relfo/Mirren payment into the Intertrade payment in Mr Varsani's hands. Mr Varsani had the requisite knowledge and accordingly was liable in knowing receipt.

889. The Court of Appeal upheld the judge's decision. Arden LJ, in a judgment agreed on this point by Gloster and Floyd LJJ, held that the trial judge was entitled to draw the inference not merely that Relfo's monies had passed into Intertrade's account but that those monies were actually the source of the monies paid to Mr Varsani. She said that, although the payments were greater in number and scale than those that Millett J had referred to in *El Ajou*, the principle was the same. She referred to the similarity in amount and timing of the Relfo/Mirren payment and the Intertrade payment, the fact that the amount paid to Mr Varsani was the same as the amount of the Relfo/Mirren payment less 1.3% (which might well have been commission), and the judge's finding that Mr Gorecia authorised the payment from Relfo's account intending it should lead to a payment to Mr Varsani. In passing she said this at paragraph 64:

> I further agree with Mr Shaw that there is no logical reason why the substituted product of a claimant's money cannot be traced through any number of accounts. There is no limit on the number of substitutions that can in theory take place. However, the number of substitutions and the fact that they do not occur in chronological sequence may make it harder to substitute one asset for another.

890. Finally, we refer to *Durant*. The facts of that case, so far as relevant, are as follows. Members of the Maluf family defrauded the Municipality of Sao Paulo in Brazil in late 1997 and early 1998 of some $ 11.2m (being the dollar equivalent of the sum misappropriated in Brazilian currency). It was alleged that out of this sum, some $10.5m could be traced into 13 specific payments to an account in New York (the **Chanani account**) between 9 January and 6 February 1998. The Chanani account was controlled and beneficially owned by one or more members of the Maluf family. It was alleged that the removal of the proceeds of the fraud from Brazil,

their conversion into US dollars and their payment into the Chanani account had been facilitated by black market currency dealers known as *doleiros*.  Over a period of 10 days from 14 to 23 January 1998, there were 6 payments from the Chanani account to an account held by the defendant Durant International Corporation (**Durant**) in Jersey.  They totalled just over $13m.  The Municipality claimed to trace the amount of $10.5m (ie the amount allegedly paid in through the *doleiros*) through the Chanani account to the account with Durant and thence to a co-defendant company.  Durant and the co-defendant company were found to be beneficially owned by the Maluf family.

891.  The Municipality accepted that it was unable to demonstrate precisely how the misappropriated funds had reached the Chanani account. However, it invited the court to infer that the monies received by the 13 payments into the Chanani account represented the proceeds of the fraud, which were accordingly traceable into the Chanani account. The defendants disputed that this was a proper inference. Their argument on this point was summarised by the Royal Court at paragraph 203 in the following terms:

> Even if the plaintiffs are to be regarded as having originally had a sufficient proprietary interest in any kick-backs to permit tracing in principle, Mr Steenson submitted that their inability to show exactly how the funds credited to the Chanani account were derived from the….fraud made tracing in practice impossible.  On the plaintiffs' own case, he said, the immediate source of the funds had been one or more doleiros; the court knew nothing for certain about who were they were, how exactly they operated, how they were put in funds in Brazil or what bank accounts were used to transfer money abroad in the present case.  The plaintiffs' suggestion that one could treat their involvement as if it entailed nothing more than effecting foreign exchange transactions or acting as correspondent banks was dismissed as unrealistic (with which we agree); the evidence suggested that a doleiro might have one or more bank accounts of his own through which the funds of multiple clients passed (which we accept could be the case); and without knowing the state of those accounts at the material time, the rules governing the tracing of money into or through accounts where it has been mixed with other money could not be applied…. Depending on the nature and state of those accounts and what other debits and credits there had been, any right to trace into or through them might well have been lost…

892.  The Royal Court rejected these concerns.  It reminded itself that tracing was a matter of evidence referring, as we have above, to the observations of Lord Steyn and Lord Millett in *Foskett*. The Royal Court went on to say as follows:

> 206.  With this distinction in mind, it follows that, while the initial burden will usually be on a plaintiff to adduce sufficient evidence to make out a prima facie case, once he has done this the evidential burden will shift to the defendant to displace the conclusion that would otherwise naturally follow.

> 207.  In the present case, the plaintiffs having adduced evidence from which, in the absence of any other explanation, a court would be more than justified in concluding that funds stolen from the Municipality had found their way, within a matter of days, into the Chanani account, the evidential burden shifts to the defendants to displace that conclusion. No countervailing evidence having been adduced by the defendants to demonstrate that the inferred link with the Chanani account is unfounded or that the plaintiffs' original proprietary interest in the

stolen money was lost by reason of the rules relating to tracing through mixed bank accounts, the plaintiffs are entitled to invite the court to conclude that the credits to the Chanani account in question represent funds in which the plaintiffs continue to have an unbroken thread of proprietary interest even though they are unable to show – because they have no means of knowing – the exact route by which the funds reached their destination.

The *prima facie* evidence the court referred to included hearsay evidence that the Malufs had arranged for the kick-back payments to be deposited abroad in US dollars via *doleiros*.

893.    The finding of the Royal Court was upheld by the Jersey Court of Appeal[812] in the following terms:

> 42.    The next question is whether the Respondents' money can be traced into the Chanani account. So far as that is concerned, in our judgment the Royal Court was fully entitled to reach the conclusion that the appellants' pleading "was a thing writ in water" (ibid., at para. 74) and that there was no evidence of any kind to support their assertion as to the allegedly innocent source of the relevant payments into the Chanani account (at para. 79). Nevertheless, the appellants submitted on appeal that the Respondents could not identify their money "at every stage of its journey through life" (Borden (U.K.) Ltd. v. Scottish Timber Prods. Ltd. (8) ([1981] Ch. at 46)) because even if it is accepted that substantial payments were made to the Malufs in relation to the fraud the trail goes cold when the money passes into the hands of the doleiros; and there is no verifiable link between the (assumed) payments made to the Malufs from the fraud and the credits subsequently received into the Chanani account.

> 43.    The Royal Court dealt with this line of argument at 2012 (2) JLR 356, at paras. 203–212 and we would uphold its findings without lengthening this judgment unnecessarily by setting them out verbatim. In summary, the Royal Court's analysis was that tracing is a matter of evidence and, as such, the question whether a plaintiff has discharged the burden on him will depend on an assessment by the trial court of the primary evidential material and the inferences which ought properly to be drawn from it. Where (as in this case) the Respondents had raised a prima facie case on the basis of documentary material and hearsay statements (as to which we would pay tribute to the meticulous analysis at paras. 74–176 of the judgment below), and the appellants had failed to produce any evidence to rebut it, the Royal Court was fully entitled to reach the conclusion that the Respondents' evidence should be accepted - particularly in light of the fact that (i) no satisfactory explanation was given for the Malufs' failure to give evidence; (ii) there was no evidence to suggest that the De Oliveira document was a forgery; (iii) Mr. De Oliveira had himself specifically acknowledged his authorship of document No. 7, which obviously formed part of the same sequence of documents as the De Oliveira document itself; and (iv) the break in the life story of the funds (i.e. when they passed into the hands of doleiros) was in fact caused by the Malufs' own handling of the money.

---

[812] 2013 (1) JLR 273 (**R1/45.2** at bundle R7 tab 91)

44.   We would add only this. It would, in our judgment, be too formalistic to latch onto the words of Buckley, L.J. in Borden (8) as if they required, in every case, direct evidence of every movement of funds before a tracing claim could ever succeed. *In an appropriate case, the necessary links can be inferred from the circumstances, even in the absence of direct evidence*, and that is essentially what happened in this case. [*emphasis added*]

894.   Although there was a further appeal to the Privy Council, to which we shall refer shortly, that was on the issue of whether funds could be traced from the Chanani account to the account of Durant in view of the fact that the payments to the Durant account occurred before some of the 13 receipts into the Chanani account.  This raised the issue of backward tracing.  However, there was no appeal in respect of the finding of the Royal Court, upheld by the Jersey Court of Appeal, that the proceeds of the fraud could be traced from Brazil via the *doleiros* into the Chanani account.

895.   AHAB submit strongly that, if the court in *Durant* was able to infer the necessary transactional links so as to trace the money from Brazil into the Chanani account, the Chief Justice should have been able to reach a similar conclusion in respect of monies passed through STCC and other companies by Al Sanea, so as to conclude that the receipts by the various Respondent companies could be linked with the monies misappropriated from the Money Exchange.

896.   In our judgment, the Chief Justice's decision on this aspect – assuming no reversal in the burden of proof – fell within the range of decisions reasonably open to him and accordingly is not one with which this Court can interfere.  The circumstances in relation to monies passing through STCC were very different from the circumstances in the three cases referred to above.

897.   Thus, in *El Ajou*, the court was concerned with only two payments made within a few weeks of the payment of fraud proceeds to Panama in circumstances where one of the payments was in a very similar sum to one of the transfers to Panama and appeared to come from the same bank (Bank of America).  In addition, the judge found that the Canadians had no alternative sources of funding for the payments to the Keristal No 2 account. Even then, Millett J concluded that it was "only just"[813] sufficient to enable him to draw the inference of identifying the money received into the Keristal No 2 account with the payment of the fraud proceeds to Panama a few weeks earlier.

898.   In *Relfo*, the court was again concerned with only two payments, namely the Relfo/Mirren payment and the Intertrade payment.  These two payments were made on the same day and in the same amount (less 1.3% which was explained as commission). Furthermore, there was surrounding evidence showing a connection between Mr Gorecia (who made the original payment out of Relfo) and Mr Varsani (as the recipient of the Intertrade payment).

899.   Finally, in *Durant*, the court was concerned with 13 payments which were made within "a matter of days" of the fraud in Brazil, where there was evidence that the Malufs used *doleiros* to export the product of their fraud and where the Chanani account was under their control.  Furthermore, after moving from the Chanani account, the monies ended up in the account of one or more companies which the court found to be beneficially owned by the Malufs.

900.   Conversely, in the present case, the Court was concerned with thousands of payments over a period of many years between the Money Exchange and STCC and between STCC and other companies in the Saad Group.  For example, when considering simply a period from 1 July

---

[813] (ibid.) at 734

2007 to 31 March 2008, Mr Hargreaves, a tracing expert called on behalf of AHAB, said at para 217 of his report:[814]

> In summary, the above analysis shows over three billion dollars of transfers from STCC to SICL and Singularis as well as a churning process whereby funds were routed back to Awal Bank, STCC and SICL / Singularis.

If STCC had had no source of funds other than money misappropriated from the Money Exchange, it might well have been appropriate for the Chief Justice to infer that monies paid out of STCC to other companies in the Saad Group represented the proceeds of those misappropriations.  But that was not the position.  As set out at paragraph 869 above, the Chief Justice found that STCC had other sources of funds; in particular loans from third party banks of some $ 4.3 billion as at 31 December 2008 and net borrowings from Al Sanea of $ 4.9 billion as well as a portfolio of assets and trading revenues.  In those circumstances, it cannot be said to have been a decision which no reasonable judge could have reached for him to conclude that he could not make the necessary link with the Money Exchange in relation to particular payments out of STCC.  The monies might have originated from the Money Exchange, but they could equally have originated from the other sources of funding which he found were available to STCC.

### (b) Maelstrom

901.    As already described, in view of the difficulties in tracing in the conventional manner through STCC, AHAB concentrated their efforts on arguing that, in the particular circumstances, the burden of proof was reversed and lay on the Respondent companies to show that their receipts had not originated from the Money Exchange.  They did so on the two grounds described at paragraphs 874 and 875 above, and we turn first to consider their submissions in relation to the topic of maelstrom.

902.    The concept of a maelstrom or cross-firing having the effect of varying the burden of proof is to be found in the decision of the English Court of Appeal in *Sinclair*[815]. The facts of that case were complex but, for our purposes, can be simplified as follows. The defendant company Versailles Trade Finance Limited (**VTFL**) was ultimately owned by two fraudsters.  The business of VTFL was ostensibly a modified form of factoring.  Trading Partners Limited (**TPL**) was another company controlled by the fraudsters. It solicited funds from traders who, having been promised high returns, supplied funds to TPL for investment in the factoring activities of VTFL.  VTFL entered into a management agreement with TPL and as a result the funds advanced by traders to TPL were duly passed to VTFL. However, they were not used by VTFL for the purchase of goods or in genuine factoring transactions. Instead the funds were (i) used to pay purported profits to traders, (ii) stolen by one of the fraudsters or (iii) circulated round a number of other companies also controlled by the fraudsters. The purpose of this circulation of funds, referred to as "cross-firing", was to inflate VTFL's apparent turnover and to mask the absence of any genuine business.  VTFL also obtained loans from three banks and the monies advanced by the banks was also used in the cross-firing.  Eventually the fraud, which the trial judge described as a classic Ponzi scheme, collapsed. Administrative receivers were appointed of VTFL and they paid certain monies to the banks in reduction of the bank loans.

903.    Sinclair Investments (UK) Limited was one of the traders who had paid money to TPL and it took an assignment of all the claims of TPL and of the traders.  However, the court continued to treat the claims as being brought by TPL.

---

[814] (I/2/69)
[815] *Sinclair* at **R1/41 (**bundle R6 at tab 80)

904.    The relevant claim for our purposes was a proprietary claim brought by TPL against VTFL and the banks.  TPL contended that VTFL owed fiduciary duties to TPL in respect of the funds entrusted to VTFL, that it had breached those duties and that TPL could trace those funds into VTFL and thence into the hands of the banks in respect of the monies which the administrative receivers had paid to the banks in reduction of their loans.

905.    There was no dispute before the Court of Appeal that TPL had a proprietary interest in the funds entrusted to VTFL.  However, it was contended on behalf of the defendants that, because of the cross-firing and the maelstrom, it was impossible to maintain a proprietary claim in respect of money in VTFL.  The nature of the cross-firing was described at [13] of the judgment of Lord Neuberger of Abbotsbury MR, in a passage taken from the judgment of the trial judge, Rimer J, as follows:

> VTFL's turnover was inflated in the following manner: (i) the account showed money paid to and received from other companies controlled and managed by [the fraudsters] (the so-called 'cross-firing' companies) as if they were genuine trading payments and receipts, which they were not; and (ii) the nominal ledger contained entries which purported to be sales, purchases and trading receipts and payments which were not justified by any actual trading. The main cross-firing companies were [effectively controlled by] the fraudsters.  In broad terms, it worked as follows.  VTFL had a customer service division, which was a genuine trade generating funds.  VTFL was financed by bank loans. It also received finance…from March 1996 [from] TPL…[which was] financed by the traders. The money so received by VTFL was then revolved around the cross-firing companies…between June 1993 and October 1999 hundreds of millions of pounds were transferred both ways between VTFL and various cross-firing companies. VTFL's receipts were disguised in its cash books to make them appear as genuine sales to genuine customers so falsely inflating its turnover.

906.    In view of the importance attached to this decision by AHAB, we think it helpful to quote from the judgment of Lord Neuberger setting out the passages upon which AHAB rely.  At [135] onwards Lord Neuberger said this:

> *Is the proprietary claim defeated by the inextricable mixing of moneys?*

> 135    Mr Collings's contention in this connection is that the cross-firing led to the monies beneficially owned by TPL and by VTFL being so inextricably mixed together that it was impossible for TPL to mount a proprietary claim in respect of any of the money in VTFL's name.  As the judge put it…"All the witnesses agree that it is not possible to trace any of TPL's money through VTFL.  VTFL was variously described as a 'black hole' or a 'maelstrom'."

> 136    The argument that this means that tracing or following is impermissible is said by Mr Collings to be supported by observations in various well-known cases concerned with tracing…

> 137    However, I accept that Mr Collings gets somewhat more assistance from Lord Ellenborough CJ in *Taylor v Plumer* (1815) 3 M&S 562, 575 where he said that the right to trace ceases when there is no means of ascertaining whether the source of particular funds is money beneficially owned by the claimant, and gave as an example where the money is

"mixed and confounded in a general mass of the same description". Accordingly, contended Mr Collings, in view of the conclusion reached by Lewison J that payments into VTFL's accounts fell into a "maelstrom" or "black hole", it must follow that, even if TPL would otherwise have the ability to trace into such accounts, they cannot claim such a remedy.

138  I reject this argument.  I do not doubt the general principle, reiterated by Lord Millett in *Foskett v McKeown* [2001] 1 AC 102, that if a proprietary claim is to be made good by tracing, there must be a clear link between the claimant's funds and the asset or money into which he seeks to trace. However, I do not see why this should mean that a proprietary claim is lost simply because the defaulting fiduciary, whilst still holding much of the money, has acted particularly dishonestly or cunningly by creating a maelstrom.  Where he has mixed the funds held on trust with his own funds, the onus should be on the fiduciary to establish that part, and what part, of the mixed fund is his property.  Unless constrained by authority, I should therefore be very reluctant to accede to the defendants' case on this point.  In fact it seems to me that authority actually supports my view.

139  In *Cook v Addison* (1869) LR 7 Eq 466, 470, Stuart V-C said:
> "It is a well-established doctrine in this court, that if a trustee or agent mixes and confuses the property which he holds in a fiduciary character with his own property, so as that they cannot be separated with perfect accuracy, he is liable for the whole."

Ungoed-Thomas J considered and applied this principle in *In Re Tilley's Will Trusts* [1967] Ch 1179, 1183 saying:

> "*The words in that passage 'so as that they cannot be separated with perfect accuracy' are an essential part of the Vice-Chancellor's proposition, and indeed of the principle of Lupton v White, 15 Ves Jun 432. If a trustee mixes trust assets with his own, the onus is on the trustee to distinguish the separate assets and to the extent that he fails to do so they belong to the trust.*"

140  *Lupton v White* (1808) 15 Ves Jun 432 was referred to with approval by Lord Millett in the section of his opinion dealing with the rules of tracing in *Foskett v McKeown*. Mr Collings's submission seems to me to be contrary to the whole thrust of that section of Lord Millett's opinion. But it goes further than that. Lord Millett specifically quoted with approval the observation of Page Wood VC in *Frith v Cartland* (1865) 2 Hem & M 417, 420 to this effect: "If a man mixes trust funds with his own, the whole will be treated as the trust property, except so far as he may be able to distinguish what is his own."

141  It seems to me to follow from this that both principle and authority establish that, as Lewison J concluded, once it is shown that money held on trust for TPL was paid into a 'maelstrom' account, the administrative receivers, representing VTFL for this purpose, bear the burden of showing that money in that account is not that of TPL.  Both legal principle and fairness to other creditors of the defaulting fiduciary

suggest that the extent of that burden should not be other than the normal civil standard of proof, namely the balance of probabilities.  So if, after considering the evidence, the court concludes that it is more probable than not that a particular sum of money held in the name of VTFL is not attributable to any of the funds held by VTFL on trust for TPL or its identifiable substitute, then the court should refuse any tracing remedy in respect of such money.

907.   The Court of Appeal accordingly upheld the decision of Lewison J at first instance to allow TPL's proprietary claim against the funds in the hands of VTFL and to trace those funds into the hands of the banks as from the date upon which the banks had notice of TPL's proprietary interest in the mixed fund, at which point they ceased to be bona fide purchasers for value without notice.

908.   The above observation by Lord Neuberger was quoted with approval by the Royal Court in *Durant*.  Thus at [208] onwards the court said as follows:

> 208.   That this conclusion [that the credits to the Chanani account represented funds in which the plaintiffs continued to have an unbroken thread of proprietary interest even though they were unable to show – because they had no means of knowing – the exact route by which the funds reached their destination] accords with elementary notions of justice is, moreover, underlined by the fact that the plaintiffs' inability to trace the movement of funds step by step is the consequence of the Malufs' (and thus the defendants') deliberate creation of what Mr Baker referred to as a 'black hole' or 'maelstrom' of coded bank accounts and doleiros designed to obscure transactions in which they had an interest.  The terminology originates in the judgment of Lewison J in <u>Sinclair</u>.

Having referred to some of the passages from the judgment of Lord Neuberger quoted above, the Royal Court went on:

> 210.   The context in <u>Sinclair</u> was, it is true, simply that of funds mixed in a single account; but the principle appears to us to be equally applicable to the wider circumstances of the present case.  It is important to recall that Marcus Staff's file note of his conversation with Flavio Maluf on May 9 2000 and Schellenberg Wittmer's letter of June 9 2000 make it clear that the use by the Malufs of coded bank accounts and doleiros was deliberate, common and, in part at least, avowedly designed to screen the family's personal accounts from third parties.  And, while it might fairly be said that if the Malufs were in fact innocent they would be in no better position than the plaintiffs to explain where funds of which the Municipality had been defrauded had gone, the same cannot be said when it comes to explaining exactly *where the funds credited to the Chanani account had come from and why*.  As it was, the only explanation offered varied from moment to moment, was unsupported by any evidence and was, as we have already held, wholly unconvincing [*original emphasis*].

> 211.   Somewhat surprisingly, there seem to be no other reported decisions in which courts have had occasion expressly to address the matter of tracing into or through 'black hole' type situations deliberately created by a defendant: certainly no others were cited to us.  But the view expressed by Lord Neuberger appears to us, with respect, to accord with

both justice and good sense and to be one which the courts of Jersey should be very ready to follow.

909.    We note however that this part of the Royal Court's judgment is obiter.  The court had already decided, applying the ordinary burden of proof, that the plaintiffs had succeeded in tracing the monies from Brazil to the Chanani account[816].  The court had so found on the basis that the plaintiffs had produced prima facie evidence from which a court could conclude that the funds could be traced into the Chanani account and that, no evidence having been produced to displace that conclusion, the court could find accordingly.  This did not involve a reversal of the burden of proof.  It was a straightforward application of the well-established principle summarised by Lord Sumption in *Prest v Petrodel Resources*[817], in which he adopted at [44] the view expressed by Lord Lowry with the support of the rest of the Judicial Committee of the Privy Council in *R v Inland Revenue Commissioners Ex p TC Coombs and Co*[818] that:

> In our legal system generally, the silence of one party in face of the other party's evidence may convert that evidence into proof in relation to matters which are, or are likely to be, within the knowledge of the silent party and about which that party could be expected to give evidence.  Thus, depending on the circumstances, a prima facie case may become a strong or even an overwhelming case.  But, if the silent party's failure to give evidence (or to give the necessary evidence) can be credibly explained, even if not entirely justified, the effect of his silence in favour of the other party may be either reduced or nullified.

910.    The Chief Justice gave two reasons for rejecting AHAB's submission that the principle in *Sinclair* operated to reverse the burden of proof in this case.

911.    <u>*Intention behind the maelstrom and/or cross-firing.*</u> First, he concluded that the cross-firing and the creation of a maelstrom must be done for the purpose of defeating attempts to trace the relevant funds.  Passages where he dealt with this are listed at paragraph 877 above but, for convenience, we set out two paragraphs of the judgment[819] as follows:

> 57.    It is clear that what is envisaged is the kind of 'coordinated scheme' referred to in **Relfo** and **Durant**.  It would be insufficient, in order to reverse the burden of proof, simply that the tracing exercise is difficult.  Lord Neuberger's statement that "*I do not see why this should mean that a proprietary claim is lost simply because **the defaulting trustee, while holding much of the money** [original emphasis] has acted particularly dishonestly or cunningly by creating a maelstrom*" envisages that the maelstrom has been created by the defaulting fiduciary precisely in order to defeat attempts to trace relevant funds.

> 58.    The applicability of the foregoing principles will of course depend on the circumstances of the case but in every case there will be the minimal requirement of proof [of] a deliberate attempt to create a "*coordinated scheme calculated to hinder any attempt to trace*" relevant funds before the burden of proof will be reversed…

The Chief Justice went on to hold that it had not been shown that the cross-firing and maelstrom were created by Al Sanea in order to defeat attempts to trace relevant funds.

---

[816] See [206] and [207] quoted at para 892 above
[817] *Prest v Petrodel Resources* [2013] 2 AC 415 (**R1/44.5** at bundle R7 tab 87)
[818] *R v Inland Revenue Commissioners Ex p TC Coombs and Co* [1991] 2 AC 283, 300 (**R1/18.2**)
[819] **AA/2.4/834** at paras 57-58

912.    In our judgment, the Chief Justice construed this aspect of the judgment of Lord Neuberger in an unduly restrictive manner. It will often be the case that the creation of cross-firing or a maelstrom will at the same time serve to facilitate the fraud and, in the event the fraud is discovered, make it impossible to trace through the maelstrom. Thus, in *Sinclair* itself, it is relevant to note that the cross-firing was effected for the purpose of inflating the apparent trading of VTFL thereby assisting the fraud on the traders and the banks. Of course, it had the incidental effect of making it impossible for TPL subsequently to trace through VTFL but this was not stated to be the purpose behind it[820]. Yet, there is no suggestion in the judgment that the fact that the purpose was to assist the fraud rather than obstruct tracing meant that the burden of proof should not be reversed.

913.    We remind ourselves of the observation of Lord Toulson when *Durant* reached the Judicial Committee of the Privy Council[821]. Lord Toulson said:

> 38.    The development of increasingly sophisticated and elaborate methods of money laundering, often involving a web of credits and debits between intermediaries, makes it particularly important that a court should not allow a camouflage of interconnected transactions to obscure its vision of their true overall purpose and effect…

This observation was made in the context of whether to allow backward tracing, but it seems to us that it is equally applicable when considering the effect of cross-firing or a maelstrom which the defaulting fiduciary has caused to be created.

914.    In the present case, it was not disputed that there was a maelstrom or black hole in the form of STCC and that there was cross-firing in the form of thousands of transfers back and forth between the Money Exchange and STCC and between STCC and other companies in the Saad Group. As the Chief Justice held[822], the cross-firing and maelstrom may well have been intended primarily to assist the Money Exchange's fraud on the banks – and, we would add, the similar fraud effected on the banks by the Saad Group – by the provision of false accounts. But the maelstrom and cross-firing have had the effect of making it impossible to trace monies through STCC. In our judgment, the intention to assist in the commission of the frauds on the banks and the effect of making tracing impossible are two sides of the same coin. It would be wrong to disallow tracing of the proceeds of fraud simply because the fraudster has created a maelstrom and effected cross-firing to assist in his fraud which has the inevitable effect of subsequently defeating attempts to trace. It will, in any event, be impossible in many cases to determine the exact intention behind the fraudster's creation of a maelstrom and cross-firing.

915.    Accordingly, we would hold that the Chief Justice erred in law in concluding that he was prohibited from reversing the burden of proof as per Lord Neuberger's statement simply because he was unable to find that the intention of Al Sanea in creating the maelstrom was to prevent tracing rather than to aid the fraud on the banks.

916.    *Does the principle apply only to the defaulting trustee himself?* The second reason given by the Chief Justice for holding that *Sinclair* did not lead to a reversal of the burden of proof in the present case was that it only applied where a defaulting trustee had mixed trust property with his own property and the plaintiff beneficiary was seeking to trace property into the hands of the defaulting trustee. It was in those circumstances that the burden of proof lay on the

---

[820] See paras 13 and 20 of Lord Neuberger's judgment
[821] [2016] AC 297 (**R1/51** at bundle R9 tab 110)
[822] **AA/2.4/827** at para 39 of Section 7

defaulting trustee to the extent that, where he failed to prove that particular assets in his hands were his own, the plaintiff's claim would succeed[823].

917.    AHAB submitted on appeal that this was wrong.  There could be no principled reason for distinguishing between a situation where the defaulting trustee mixes misappropriated funds and creates a maelstrom in his own hands and where he does so in a company which he owns and controls.  In *Durant*, the Royal Court was not dealing with a maelstrom in the hands of the defaulting trustees (the Malufs) but rather in the unknown hands of the *doleiros*. Furthermore, although obiter, the Royal Court was willing to apply the *Sinclair* principle so as to trace monies ultimately into the hands of the companies which were owned by the defaulting trustees, not just into the hands of the defaulting trustees themselves.

918.    The Respondents, on the other hand, submitted that the Chief Justice was correct.  *Sinclair* was in reality simply a reaffirmation of a well-established principle, drawn from the cases to which Lord Neuberger referred, whereby, when a defaulting trustee has mixed the trust property with his own funds, the burden is on him to establish what part of the mixed fund is his property and, in the absence of such proof, it will be presumed to be trust property.  That was not the situation here. The defaulting trustee was Al Sanea whereas the maelstrom was in STCC, which had obtained funds from other sources such as banks.  The situation therefore differed from that in *Durant*.

919.    We accept that in *Sinclair*, the Court of Appeal was concerned with a situation where trust property was in the hands of the defaulting trustee itself ie VTFL.  Whilst the Royal Court in *Durant* stated that it would be content to apply *Sinclair* to the situation which it was faced with, where the maelstrom was in the accounts of the *doleiros* rather than the Malufs as defaulting trustees, that observation was not necessary for its decision.  Although, therefore, the observation of the Royal Court is of some assistance, we must consider the issue afresh.

920.    We bear in mind the observation of Lord Toulson in *Durant* (referred to at para 913 above) and the need to take account of the development of increasingly sophisticated and elaborate methods of money laundering, often involving a web of credits and debits between intermediaries.  However, we also note his cautionary words at [33] in the same case where he said:

> The courts should be very cautious before expanding equitable proprietary remedies in a way which may have an adverse effect on other innocent parties. If a trustee on the verge of bankruptcy uses trust funds to pay off an unsecured creditor to whom he is personally indebted, in the absence of special circumstances it is hard to see why the beneficiaries' claim should take precedence over those of the general body of unsecured creditors.

921.    Nevertheless, whilst we accept that this would be an extension of what was actually decided in *Sinclair*, we can see no good reason not to apply the approach in *Sinclair* where a defaulting trustee pays the misappropriated trust funds to the account of a company which he owns and controls rather than to an account in his own name.  On the basis of *Sinclair*, if trust funds misappropriated by defaulting trustee A are paid into an account in his own name and mixed with his own funds, the burden will lie upon A to prove that particular funds belong to him rather than being trust monies.  Why should the situation be any different if, instead of paying the trust monies into an account in his own name, he pays them into the account of company B which he owns and controls?  To allow this to make a difference would be to ignore the realities of the way in which modern money laundering is likely to take place.

---

[823] **AA/2.4/833** at para 56(3) of Section 7 and **AA/2.4/1088** at para 44(1) of Section 7C

922.    Furthermore, it is clear from *Sinclair* that it should not make any difference that the company's own funds constitute monies borrowed from third party banks. In *Sinclair* itself, VTFL had borrowed money from banks. The Court of Appeal held that TPL could trace its property through VTFL into the hands of the banks to whom repayments had been made (with knowledge of the fraud). This meant that the banks had to pay to TPL the sums which VTFL had repaid to them, leaving them simply to claim as unsecured creditors against VTFL. But suppose that the banks had not been repaid and that the proceeds of their loans remained in the hands of VTFL, thereby constituting the property of VTFL mixed with the trust property belonging to TPL. It is clear from the judgment of the Court of Appeal that TPL's proprietary claim would take priority over the claims of the banks to the extent that VTFL was unable to prove that particular assets were its own property rather than being the traceable proceeds of trust property; and that accordingly the banks would only obtain repayment after satisfaction of the TPL's proprietary claim. That situation should, in our judgment, apply in exactly the same way where the recipient of the trust property is a company owned and controlled by the defaulting trustee rather than the defaulting trustee himself.

923.    Transposing this to the present case, it is common ground that a substantial proportion of the money misappropriated from the Money Exchange was paid to STCC, which was owned and controlled by Al Sanea, the defaulting trustee. Thus STCC is in the position of company B in the above example. Accordingly, if AHAB were claiming against STCC, the burden would lie upon STCC to prove that any assets in its possession were not the proceeds of the misappropriations from the Money Exchange; and it would make no difference that monies which it claimed were its own property were derived from borrowings from banks. As in *Sinclair*, the proprietary claim of AHAB would trump any claim by the banks save to the extent that STCC could prove on the balance of probabilities that particular assets did not represent the traceable proceeds of the misappropriated funds.

924.    But what of monies paid out of STCC? On whom does the burden rest to show that such monies are not the traceable proceeds of trust property? Again, it would seem from *Sinclair* that the burden lies on the recipient, at least if the recipient has notice of the breach of trust. Thus, in that case, VTFL having failed to satisfy the burden of showing that the monies repaid to the banks were not the traceable proceeds of trust property, the banks had to pay that money to TPL. In effect therefore, unless the banks could show that the monies they received from VTFL were not the traceable proceeds of trust property, the proprietary claim succeeded against them. It must follow that, if TPL's claim had been against one or more of the cross-firing companies controlled by the fraudsters to which funds had been paid by VTFL, they would have been in the same position as the banks and would have faced the burden of showing that the monies they had received from VTFL were not the traceable proceeds of TPL's property.

925.    It seems to us that this accords with the need to combat modern methods of fraud and money laundering. It will not be at all rare for a fraudster to pay the proceeds of his fraud into a company which he owns and controls and for that money then to be passed into a number of other piggy bank companies which he owns and controls, perhaps with many payments back and forth by way of cross-firing. If, because of the level of cross-firing and the absence of financial records, a maelstrom is created by the fraudster such that it is impossible to trace payments into those companies in the conventional manner, it does not seem unreasonable for the burden to rest upon the fraudster's companies to prove that particular payments to them were not the traceable proceeds of the fraud. In this connection, it is relevant to note that[824] the Chief Justice spoke of the "cauldron of fraud" which characterised the existence and operation, not only of the Money Exchange and other Financial Businesses, but also the existence and operation of SICL and Singularis in the manner of their use by Al Sanea to foster the growth of his wealth by defrauding others. In the same paragraph, he spoke of the complex and massive Ponzi scheme of borrowing through the Financial Businesses and the Saad entities.

---

[824] **AA/2.4/1230** at para 5 of Section 8

926.    It seems to us that it is at this point that attribution becomes of fundamental importance, namely, can the knowledge of the fraudster be attributed to successor companies?  Reverting to the example given earlier, if company B, after receipt of the traceable proceeds from A, pays money to company C, which is owned and controlled by A and can have his knowledge attributed to it, it seems to us that, just as with the banks in *Sinclair*, company C can be in no better position than company B and accordingly the burden should lie upon company C to prove that the monies it received from company B were not the traceable proceeds of A's misappropriations.  Similarly, if company C then pays money to company D, which is also owned and controlled by A and to which his knowledge can be attributed, the same should apply.  That is because none of these companies will be a bona fide purchaser for value (so as to interrupt any tracing) and none of them can be in any better position than company B.  Not only is this consistent with the principle in *Sinclair* but to hold otherwise would enable a defaulting trustee to escape the shackles of tracing simply by interposing enough piggy bank companies which he owns and controls.  All the more should this be the case where the absence of financial records to enable conventional tracing and the cross-firing have been caused by the fraudster (as in this case).

927.    Reverting to the present case, if AHAB can prove a payment from STCC (or any other of Al Sanea's companies into which they can prove misappropriated funds from the Money Exchange were paid) to, for example, SICL and if there were to be a finding that Al Sanea's knowledge of the misappropriated funds should be attributed to SICL, it seems to us that the burden should lie upon SICL to prove that the payment made to it by STCC was not the traceable proceeds of monies misappropriated from the Money Exchange.  In those circumstances, SICL can be in no better position than STCC.  Payments on from SICL (which appears to be another maelstrom by reason of the degree of cross-firing and the fact that Al Sanea removed many of SICL's financial records from Geneva) to another company owned and controlled by Al Sanea to which his knowledge could be attributed, would fall to be dealt with in the same manner.  Thus, the receiving company would bear the burden of proving that the money it received from SICL was not the traceable proceeds of the monies misappropriated from the Money Exchange.

928.    We respectfully differ therefore from the Chief Justice and hold that STCC (and any other company where Al Sanea has caused such cross-firing and removal of financial records to the extent that a conventional tracing exercise cannot be undertaken) constituted a maelstrom and that the principle described in *Sinclair* can properly be extended to cover the present situation such that, in respect of any company beneficially owned and controlled by Al Sanea in respect of which Al Sanea's knowledge can be attributed to the company, such company bears the burden of showing that any particular transfer to it was not the traceable proceeds of the misappropriations from the Money Exchange.  As stated in the section on attribution at paragraph 847-848 above, although there are powerful arguments in favour, we are not in a position to make any findings of fact as to whether Al Sanea's knowledge should be attributed to any of the Respondent companies and, if so, which ones. It would therefore be for the judge hearing any re-trial to determine whether the above conditions are met in respect of any particular company such that the burden of proof is reversed.  Given our finding that the only misappropriation was of $191m on 3 May 2009, the judge would only need to consider the issue of maelstrom, cross-firing and any reversal of the burden of proof in relation to Awal Bank and any company which AHAB alleged had received funds directly or indirectly from Awal Bank.

929.    We would add that Mr Smith submitted that, whatever the position whilst Al Sanea was in charge of the Respondent companies, the position changed once liquidators were appointed.  They had no knowledge of the ultimate source of payments made to the relevant company.  We do not accept that submission.  A company's position in this respect cannot improve simply because it is placed in liquidation.  In *Sinclair* itself, VTFL was in the hands of administrative

receivers and it was they who paid the money to the banks; but this did not prevent the maelstrom principle applying so as to place the burden of proof on VTFL.

*(3)    Duty to account*

930.    Turning to the third key submission, as mentioned already, before the Chief Justice and in their written contentions on appeal, AHAB submitted that as the Respondent companies were owned by Al Sanea, who was a fiduciary and owed a duty to account, they too owed such a duty and the burden therefore lay upon them to prove their funds were not derived from the Money Exchange.  Their duty to account was not contingent on receipt of misappropriated funds or on an antecedent breach of fiduciary duty.

931.    In his oral submissions, Mr Wardell abandoned this contention.  He dealt with the issue on day 10 and his submissions are contained at pages 115-120 of the transcript of that day's hearing[825].  In order to record his new position as accurately as possible, we would quote the following extracts from that transcript beginning at page 115 where Mr Wardell said:

> The fact that a duty to account is imposed upon a fiduciary without a beneficiary having to establish a breach of duty is well established in the English authorities.  However, I accept that to extend that duty to account to a company owned and controlled by a fiduciary, it is necessary for the beneficiary to adduce evidence to give rise to an inference that the company had received trust assets.  I also accept that the likelihood is that in those circumstances, the company will not be an innocent recipient of the trust assets because the knowledge of the fiduciary will be attributed to the company.
>
> It follows from this that I don't rely on *Miller v Bain* and *Burnden Holdings* line of authority to try to extend a duty to account to the respondent companies absent showing at least an inference of their receipt of misappropriated funds.  As a result, I am not pressing the arguments made in paragraph 16.9 through to 16.34 of AHAB's appeal submissions…. about the Respondents' duty to account not being contingent on receipt or on an antecedent breach of fiduciary duty.

He continued at 117:

> It follows from this that we accept that AHAB has – to succeed on its tracing claim – AHAB has to adduce evidence from which an inference can be drawn that the Respondent companies received money or its substitute which originated from the Money Exchange.  We say that we discharged that burden at trial, and that being so, the duty to account and the burden of proof fell on the Respondent companies, irrespective of the fact that prior to their receipt of the Money Exchange's funds, they were not in a fiduciary relationship with the Money Exchange or AHAB.
>
> In other words, it ceased being for AHAB to show that the Money Exchange's funds were in fact received by the Respondent companies, and it was for the Respondent companies to show that their funds did not originate from the Money Exchange.

Then at pages 118-119:

> MARTIN JA:          I am just trying to work out where the burden of proof shifts.

---

[825] **Day10A/115-120**

| | |
|---|---|
| MR WARDELL: | It shifts when – when there's – when we can show receipt and we can show prior breach of fiduciary duty by Al Sanea, and we can show a maelstrom, a cross-firing or a black hole.  In those circumstances, it then becomes their duty to show that they did not receive them.  But at that stage I'm not really dealing with attribution. |
| MARTIN JA: | No. Okay.  I hadn't realised we were on to the maelstrom point. |
| MR WARDELL: | Yes. |
| BIRT JA: |  But you are still having to show receipt. |
| MR WARDELL: | Yes. |
| BIRT JA: | What do you mean by "receipt"?  Do you mean receipt in the terms of traceable proceeds applying normal tracing principles? |
| MR WARDELL: | Inference that they received monies emanating from the Money Exchange, not actual proof that this particular sum of money did come from it; and because of the maelstrom/black hole point, the evidential burden then shifts on them to demonstrate that the monies did not come from the Money Exchange rather than the other way round. |

Finally, at 119-120:

| | |
|---|---|
| RIX JA: | Never mind about the judge.  I'm speaking of your proposition.  You have to show breach of fiduciary duty, receipt and maelstrom and then the burden shifts, you say? |
| MR WARDELL: | Yes. |
| RIX JA: | If you have shown receipt… |
| MR WARDELL: | It is an inference that monies that they got would have emanated, because everything went through STCC, which is the black hole and the hub of the operation.  If I get over the hurdle of showing an inference is to be drawn that some of the monies that they received originated from the Money Exchange, then the burden shifts. |
| RIX JA: | I see, receipt of some. |
| MR WARDELL: | Yes, not the particular pot of money. |
| RIX JA: | Got it. |
| BIRT JA: | So just a general inference that they must have received some money which came originally from the Money Exchange; is that what you are saying? |
| MR WARDELL: | Exactly. |

932.    This was the extent of AHAB's submissions on this point.  No authorities were referred to in support of the new formulation and there were of course no written submissions given the change of stance.  In view of the limited nature of the submissions, we do not think it would be right to rule on it and it is not necessary to do so in the light of our other conclusions.  In any event, it is not clear that it adds materially to the maelstrom point.  The formulation seems to require the existence of maelstrom as well as a breach of fiduciary duty and receipt, albeit that it is not entirely clear as to what would be sufficient to constitute a receipt.

        *(iv)  Tracing to particular Respondent companies*

933.    Having considered the legal principles of tracing, the Chief Justice then considered the tracing claim against the three groups of Respondents in separate sections of the judgment, namely

section 7A in respect of the GT Defendants, section 7B in respect of the AwalCos and section 7C in respect of SIFCO 5.

934.   As the GT Respondents have settled with AHAB since the hearing of this appeal, we do not need to consider the tracing claim against them any further. AHAB have also settled with the AwalCos, but this was after the Court had notified the parties of its decision to dismiss AHAB's appeal with respect to the AwalCos. In the circumstances, we consider that we should retain those parts of the judgment (which had been drafted before news of this settlement) which explain why we had reached the view that AHAB's appeal with respect to the AwalCos should be dismissed even in relation to the $ 191m misappropriation.

935.   In relation to the AwalCos and SIFCO 5, insofar as we have upheld the Chief Justice's decision that there was no breach of fiduciary duty by Al Sanea, it is not necessary for us to determine whether the Chief Justice's finding that misappropriated funds from the Money Exchange could not be traced into their hands was one which was reasonably open to him. However, we do need to consider the position in relation to the payment of $191m in May 2009, which we have found to constitute a breach of fiduciary duty. In order to address that, we need to consider very briefly the general nature of the tracing claims against the AwalCos and SIFCO 5.

936.   _The AwalCos._ The AwalCos were all wholly owned by Awal Bank, which was in turn owned as to 48% by SICL, 47% by Al Sanea and 5% by STCC. The AwalCos were investment companies and they were funded essentially from one of two sources. They borrowed directly from third party lenders and they also received money from their parent, Awal Bank. It was common ground that virtually all of the third party lending had been repaid.

937.   AHAB's tracing case was based upon the evidence of their expert Mr Hargreaves. He identified seven capital contributions to Awal Bank between August 2004 and June 2008 totalling $2bn. He considered in particular capital contribution 3 dated 21 June 2005 in the sum of $200m and capital contribution 4 dated 18 December 2006 in the sum of $250m. He sourced these two capital contributions from STCC and Al Sanea. He then purported to trace funds from these two capital contributions into the AwalCos in the total sum of $242m, made up as to payments totalling $142m from capital contribution 3 and $100m from capital contribution 4.

938.   The Chief Justice rejected the tracing claims against the AwalCos essentially on two grounds:

(i)   In accordance with his earlier decision (which we have referred to at para 876 above) that he was not able to infer that money emerging from STCC or from Al Sanea was the traceable property of the Money Exchange, he could not infer that capital contributions 3 and 4 came from the Money Exchange.

(ii)   In any event, he did not accept that these two capital contributions could be traced from Awal Bank to the AwalCos as suggested by Mr Hargreaves.

939.   As already mentioned, we do not think it necessary to consider the Chief Justice's decision in detail. However, we are of the opinion that his conclusion at (ii) is open to question.

940.   In the first place, the AwalCos' own expert conceded that certain sums could be traced back to the capital contributions to Awal Bank, albeit he used a different tracing method from Mr Hargreaves.

941.   Secondly, capital contribution 3 in the sum of $200m was received by Awal Bank for value on 21 June 2005. At that point in time, the account had an overdrawn balance of $199,925,222.99. That overdrawn balance had apparently arisen due to the placement of a deposit of $200m made earlier the same day. The Chief Justice held that, because capital contribution 3 was paid into an overdrawn account, it could not be traced thereafter. However, we would have thought it

strongly arguable that, the capital contribution being made the same day as the creation of the overdraft by reason of a new deposit, this would be an example of where backward tracing would be permissible in accordance with the decision of the Privy Council in *Durant*. However, neither of these matters would have affected his ultimate decision given his conclusion concerning the inability to trace through STCC and Al Sanea as set out in para 938(i) above.

942. We turn therefore to consider whether, given our decision that the $191m transfer to Awal Bank on 3 May 2009 was a breach of fiduciary duty, it is arguable that any part of that sum can be traced into the AwalCos.

943. In our judgment, even if one reverses the burden of proof on the ground of maelstrom, it is not. That is for the following reasons:

(i) The payment of $191m was made to an account at Awal Bank on 3 May 2009. We were not referred by any party during the appeal to any evidence as to what happened to that money thereafter.

(ii) AHAB's tracing expert Mr Hargreaves was instructed, amongst other matters, to identify transfers from the Money Exchange via other Saad Group companies, including Awal Bank, to any of the Defendants, including the AwalCos.

(iii) As part of his first witness statement, he listed at schedule D.1-1 the transfers between Awal Bank and any of the AwalCos. The last such transfer is dated 23 December 2008 There is accordingly no evidence of any transfer from Awal Bank to any of the AwalCos after 23 December 2008, let alone after the transfer of $191m on 3 May 2009.

(iv) We were not referred to any evidence of any transfer after 3 May 2009 to any of the AwalCos by any other company in the Saad Group (on the basis that the $191m might have been paid to another Saad Group from Awal Bank before being transferred on to any of the AwalCos).

(v) In this connection, we note however that schedule 7(b) of the Amended Statement of Claim lists those payments by any member of the Saad Group to the AwalCos relied upon by AHAB. There are four payments on that schedule which occurred after 3 May 2009, namely in June and July 2009 totalling $2,414,769. However, they are all described as book transfers from SIFCO 4 to AFCL 4. SIFCO 4 was of course the same legal entity as AFCL 4, having been purchased from SICL by Awal Bank in September 2007 and having then changed its name. This schedule does not therefore suggest any payment of money from another Saad company to any of the AwalCos after 3 May 2009 from any company in the Saad Group.

(vi) Furthermore, it is clear that the decision of Al Sanea to remove the $191m from the Money Exchange account on 3 May 2009 was a last minute decision taken in view of the impending collapse of the Money Exchange. As the Chief Justice said it was "merely an opportunistic grab for whatever he could get as he departed the sinking ship"[826]. In those circumstances it is not possible that the payments from Awal Bank to the AwalCos in late 2008 were made in anticipation of the funding to be received of $191m in May 2009, so as to form a coordinated scheme and permit backward tracing as envisaged by the Privy Council in *Durant*.

944. In those circumstances, even if there were to be a reversal of the burden of proof, we consider that there is simply no prospect of AHAB being able to show that any part of the $191m ended up in the hands of the AwalCos, there being no evidence that any of the AwalCos received any

---

[826] **AA/2.4/406** at para 994

sum from any source after 3 May 2009.  It follows that, even if Cayman law on tracing is applicable, AHAB's appeal in respect of its tracing claim against the AwalCos must be dismissed.

945.    *SIFCO 5.* Section 7C of the judgment dealt with AHAB's tracing claim against SIFCO 5. As explained earlier under the heading of "Attribution", SIFCO 5 was a special purpose vehicle incorporated in 2006 as part of a borrowing/financing arrangement between Barclays Bank and SICL, being the parent company of SIFCO 5. The arrangement was called an Accreting Strike Option (ASO) and it involved SICL contributing a portfolio of funds (the Funds Portfolio) to SIFCO 5 as an *in specie* contribution, in return for which the class B shares in SIFCO 5 were allotted to Barclays. The class B shares were preferential shares which conferred the economic interest in SIFCO 5 upon those shares. In return for the allocation of the B shares, Barclays paid monies to SICL.

946.    AHAB claimed to be able to trace $166m and €1m into SIFCO 5.  This was said to represent the initial value of the Funds Portfolio in the sum of $100m together with further sums of $66m and €1m paid by SICL to SIFCO 5 after the contribution of the Funds Portfolio. Such sums were either used to pay calls on the investments of SIFCO 5 or to make further investments.

947.    AHAB's primary case before the Chief Justice was that the burden of proof lay upon SIFCO 5 to prove that the sums contributed by SICL did not originate from misappropriations from the Money Exchange.  However, as outlined above, the Chief Justice rejected this submission.  The Chief Justice further held that, applying the ordinary burden of proof upon a plaintiff and traditional tracing principles, AHAB had not proved that the funds contributed by SICL to SIFCO 5 could be traced to funds misappropriated from the Money Exchange.  Amongst other matters, he relied upon the evidence of AHAB's tracing expert, Mr Hargreaves, to the effect that, without the SICL or SIFCO 5 accounting systems, he (Mr Hargreaves) had insufficient information to link the balance on the SICL/SIFCO 5 intercompany account to STCC or other Al Sanea controlled entities.   Mr Hargreaves considered that the funding of one of the investment funds in the Funds Portfolio held by SIFCO 5 could be linked to monies provided by Al Sanea but the Chief Justice did not accept this.  Assuming no reversal of the burden of proof, the Chief Justice's finding was one which was reasonably open to him.

948.    The question then arises as to whether, given our finding that $191m was misappropriated from the Money Exchange on 3 May 2009 by transfer to Awal Bank and that it would be open to a judge to consider finding a reversal of the burden of proof on the ground of maelstrom/cross-firing, it is arguable that any part of the $191m can be traced into SIFCO 5.

949.    On the one hand, we were not referred in the written or oral submissions of the parties to any evidence on this issue, ie as to what may have happened to the $191m after it was paid into Awal Bank on 3 May 2009.  Furthermore, there is nothing in the evidence of Mr Hargreaves which suggests that any part of the $191m could be traced into SIFCO 5.

950.    As against that, it would appear to be common ground that there was one payment into SIFCO 5 after 3 May 2009, namely a payment of $500,000 from SICL on 3 June 2009 – see schedule 12 of the Amended Statement of Claim, which is admitted on this point in schedule 2 of the Amended Defence of SIFCO 5.  The question then is whether, if there were to be reversal of the burden of proof, it would be arguable that this payment could be traced back to the misappropriation of $191m on 3 May in the absence of proof by SIFCO 5 that it came from other sources.

951.    As we have said, we were not referred to any evidence on the point.  Mr Smith said that it was not known what had happened to the $191m and Mr Wardell did not address the point.  However, we note that schedule 13 of the Amended Statement of Claim pleads that the sum of $61,999,955 was transferred from Awal Bank to SICL on 20 May 2009, ie just over two weeks

after the transfer of the \$191m and before the payment of \$500,000 from SICL to SIFCO 5 on 3 June 2009.

952.   Paragraph 159A of the Amended Statement of Claim (which incorporates schedule 13) was not admitted by the GT Defendants in their Amended Defence and Counterclaim[827] and was denied by SIFCO 5 in its Amended Defence[828].  In the absence of any submissions on the point, it is not clear to us whether the payment of \$61,999,955 from Awal Bank to SICL on 20 May 2009 was in fact proved.

953.   On balance, to the extent that tracing is relevant (which we discuss in the next section of this judgment below), we would be minded to order a retrial on the limited issue of whether any part of the \$191m can be traced into the hands of SIFCO 5. On the evidence before us, that would appear to be a maximum of \$500,000, although it would of course be open to AHAB on any retrial to show (if it be the case) that there were other sums received by SIFCO 5 after 3 May 2009 and to argue that these sums should also be traced to the \$191m misappropriation.

### *The claims other than the proprietary claim*

954.   AHAB accept that their claims against the Respondents all turn on the same core factual allegations of Al Sanea's fraud against AHAB, ie his breach of fiduciary duty by misappropriating funds of the Money Exchange.  Save in respect of the payment of \$191m in May 2009, we have upheld the Chief Justice's decision that there was no breach of fiduciary duty by Al Sanea (because of the knowledge and consent of AHAB). It follows that the only misappropriation of assets was the payment of \$191m and it is only in respect of that misappropriation that we need to consider the remaining claims.

955.   Furthermore, the GT Respondents having settled their claims, we need only consider the claims in respect of that sum against the AwalCos and SIFCO 5.

956.   The Chief Justice considered the claims of dishonest assistance, conspiracy and unjust enrichment separately from the proprietary claim and the claim for knowing receipt.  The parties have followed the same course in their written and oral submissions before us.  For ease of reference, we shall therefore do likewise and will only deal with the topic of knowing receipt at the end of this section.

957.   The Chief Justice held[829] that each of the dishonest assistance claim, the conspiracy claim and the unjust enrichment claim against SIFCO 5 rested upon the allegation that SIFCO 5 received money or assets that represented the proceeds of funds misappropriated from the Money Exchange.  He held that accordingly, if the tracing claim failed (which he had already concluded it did), so must each of these other three claims.  Although he only specifically addressed these claims in respect of SIFCO 5, it seems clear that he must have reached the same conclusion in respect of the GT Respondents and the AwalCos.

958.   These three claims are all personal claims.  A remedy in the event of success would be an award of damages or equitable compensation.  AHAB would rank *pari passu* with other unsecured creditors of the relevant Respondent in respect of any such damages or compensation.  The parties' submissions addressed the issues in relation to these claims almost exclusively by reference to Cayman law.  However, Saudi law is relevant to all three claims.  It is relevant to the claims in dishonest assistance and conspiracy because they are tortious claims which must satisfy the double actionability principle if they are to succeed; and it is relevant to the claim in

---

[827] **A1/9/107** at para 233J
[828] **A1/14/176** at para 35O
[829] **AA/2.4/1150** at para 8.67 of Section 7C

unjust enrichment because we have upheld the Chief Justice's decision that that claim is governed by Saudi law. We shall consider Saudi law in relation to the claims in dishonest assistance and conspiracy after we have considered both of those claims under Cayman law, and we shall consider Saudi law in relation to unjust enrichment after consideration of the way in which that claim is said to arise under Cayman law.

*(i)    Dishonest Assistance under Cayman law*

959.    Having held that the claim in dishonest assistance failed because the tracing claim failed, the Chief Justice went on to hold[830] that, even if AHAB were able to trace their misappropriated funds into SIFCO 5, the facts pleaded by AHAB did not amount to dishonest assistance. That was for the following reasons:

(i)   Mere receipt of funds, absent more, was insufficient to constitute "assistance" for the purposes of a claim of dishonest assistance (otherwise every knowing recipient would automatically also be liable as a dishonest assistant).

(ii)  Many of the misappropriations occurred before SIFCO 5 was incorporated; it could not therefore have assisted those breaches of duty.

(iii) It received funds merely to fulfil its commercial purposes pursuant to the ASO rather than as a repository of misappropriated funds.

(iv) Its acts in receiving funds did not provide any assistance to Al Sanea's breaches of fiduciary duty. Such breaches would have occurred in any event and were not dependent on the "assistance" of SIFCO 5 in receiving or holding assets.

(v)  Any assistance was not dishonest. Any receipts were for the purpose of fulfilling SIFCO 5's obligations under the ASO.

960.    As mentioned already, the Chief Justice did not specifically address the position of the AwalCos or the GT Respondents but we proceed on the assumption that the above reasons were applied by the Chief Justice to those companies, save in so far as the reasons related specifically to SIFCO 5 and the ASO.

961.    AHAB's principal submission is that the Chief Justice erred in concluding that the dishonest assistance claim must fail if AHAB could not successfully trace the proceeds of the misappropriated funds into the hands of a particular Respondent. They argue that dishonest assistance does not require receipt of misappropriated assets as does, for example, a claim in knowing receipt.

962.    It is, correctly, common ground between the parties that dishonest assistance can occur without the assistant ever having received any of the funds which have been misappropriated in breach of trust or fiduciary duty. Lord Nicholls of Birkenhead, delivering the advice of the Privy Council in the leading case of *Royal Brunei Airlines Sdn Bhd v Tan*[831] explained the difference between knowing receipt and dishonest assistance (referred to by its then usual name of "knowing assistance") very clearly at 382D:

> In the conventional shorthand, the first of these two circumstances in which third parties (non-trustees) may become liable to account in equity is 'knowing receipt', as distinct from the second, where liability arises from 'knowing assistance'. Stated even more shortly, the first limb of Lord

[830] **AA/2.4/1151-1152** at paras 8.69-8.70 of Section 7C
[831] *Royal Brunei Airlines Sdn Bhd v Tan* [1995] 2 AC 378 (**R1/23** at bundle R2 tab 42)

*CICA (Civil) 15 of 2018 – AHAB v SAAD Investments Company Limited et al – Judgment*
249

Selborne L.C.'s formulation is concerned with the liability of a person as a *recipient* of trust property or its traceable proceeds. The second limb is concerned with what, for want of a better compendious description, can be called the liability of an *accessory* to a trustee's breach of trust. Liability as an accessory is not dependent upon receipt of trust property. It arises even though no trust property has reached the hands of the accessory. It is a form of secondary liability in the sense that it only arises where there has been a breach of trust…[*original emphasis*]

To like effect is the statement of Lord Millett in *Twinsectra Limited v Yardley*[832], when discussing the difference between knowing receipt and dishonest assistance:

> 107. The accessory's liability for having assisted in a breach of trust is quite different. It is fault-based, not receipt based. The defendant is not charged with having received trust money for his own benefit, but with having acted as an accessory to a breach of trust. The action is not restitutionary; the claimant seeks compensation for wrongdoing. The cause of action is concerned with attributing liability for misdirected funds. Liability is not restricted to the person whose breach of trust or fiduciary duty caused their original diversion. His liability is strict. Nor is it limited to those who assist him in the original breach. It extends to everyone who consciously assists in the continuing diversion of the money. Most of the cases have been concerned, not with assisting in the original breach, but in covering it up afterwards by helping to launder the money…

963. As mentioned by Lord Millett, dishonest assistance may be given after the event, eg by laundering misappropriated money, which may involve receipt. The position in relation to giving assistance after the initial breach of duty is, in our judgment, helpfully summarised in *Lewin on Trusts*[833] in the following terms:

> *Time of assistance*
> 43-033 The assistance will normally precede the breach or be contemporaneous with it. Where the assistance takes the form of inducement, it must necessarily precede the breach. The assistance may even take place before the trustee committing the breach of trust has taken office, as for example where a third party facilitates the appointment to office of a fraudulent trustee so as to enable him to misappropriate the trust fund. Once the breach of trust has been fully implemented, the subsequent acts or omissions of the defendant will not assist its commission because it has already been committed.

> *Assistance in money laundering cases*
> 43-034 But that does not mean to say that the defendant cannot be liable by reason of assistance given after the time when the breach of trust first occurs. In those cases where the breach of trust consists of misappropriation of assets, the breach will not end when the assets have initially been removed from the trust fund, but when they have been hidden away, beyond the reach of the beneficiaries who might seek their recovery. Accordingly those who assist in money laundering after the breach of trust has first occurred may be made liable for dishonest assistance.

> …

---

[832] *Twinsectra Limited v Yardley* [2002] 2 AC 164 (**R1/34.4** at bundle R4 tab 61)
[833] *Lewin on Trusts* (20th edition) at 43-033/4

> In money laundering cases, the assistance will normally take the form of receiving and then parting with money representing the trust property while it is in the course of being laundered. For the purpose of establishing assistance in this kind of case, it will be necessary to trace the money representing the trust property into the hands of the defendant, using the equitable tracing rules for the purpose…

964.  To determine whether there has been dishonest assistance in the present case, one must have regard to the nature of the assistance which it is alleged was given. For that, one must turn to the pleadings. The relevant paragraphs of the Amended Statement of Claim are in the following terms:

> 158.  The money misappropriated by Mr Al Sanea was often paid in the first instance to various Saad Group companies, including STCC. However, as part of his fraud, Mr Al Sanea extensively used SICL and Singularis… AWAL Bank, AwalCos and SIFCOs as the ultimate repositories of the proceeds of his fraud, or a large part of them.
>
> …
>
> 180.  As pleaded in section (I), SICL, the SIFCOs, Singularis, AWAL Bank and the AwalCos received the proceeds of the misappropriations, or a large part of them, as cash or capital contributions
>
> …
>
> 183.  Further, SICL, the SIFCOs, Singularis, AWAL Bank, the AwalCos…. dishonestly assisted Mr Al Sanea in his breach of fiduciary duty by acting as repositories for the misappropriated money and / or investing it for him and / or handling it.

965.  Paragraph 183 is the key pleading in relation to dishonest assistance. Applying it for our present purposes in relation to the $191m breach of duty, it alleges that the AwalCos and/or SIFCO 5 dishonestly assisted Al Sanea in his breach of duty in misappropriating the $191m by acting as repositories of the misappropriated money and/or investing that money for him and/or handling that money.

966.  Whilst accepting that, in the light of the pleading in the Amended Statement of Claim, some form of receipt was necessary, AHAB's position remains – as it was before the Chief Justice – that the nature and extent of the receipt necessary to establish dishonest assistance (and conspiracy) in this case is less than the closer transactional links required for a proprietary tracing claim. Its position was summarised by Mr Quest QC, who represented it before the Chief Justice, in the following terms when discussing the claims in dishonest assistance and conspiracy[834]:

> Mr Quest:    No, not necessarily net receipts. And not necessarily receipt in the strict tracing sense.
>
> Chief Justice:   Right, that's what I meant.
>
> Mr Quest:    On the assistance-based claims, you are not trying to make a proprietary claim, one is just saying the companies had some involvement. That involvement might well be receiving a benefit which is the result of or which is caused by the money taken from the Money Exchange.
> So it is a slightly looser test. One does not need to be necessarily concerned with an exact trace in that situation. But your Lordship is

---

[834] **Day110/24-25**

right to say that the premise for that part of the conspiracy assistance case is that the companies did receive something caused by the fraud which they then invested.  So there needs to be – if I can put it this way – a causative link between the monies that were received by the defendants and the fraud in order that it can be said that they participated in the fraud.  So I accept that.

That position is the case in relation to the AwalCos and SIFCO 5, where our assistance-based claims against those claims (sic) are based on their receipt and investment of monies.

967.    We cannot accept the above submission.  A repository is a place where something is stored or kept safely.  In order to be a repository for something, that thing must be received by the repository so that it can be stored or kept safely. What is alleged in the Amended Statement of Claim is that the AwalCos and/or SIFCO 5 assisted Al Sanea's breach by storing or keeping safely "the misappropriated money".  In our judgment that must mean they have received the misappropriated money.  In context that must mean the misappropriated money or its traceable proceeds.  If the ability to trace is lost, one cannot say that what has been received by the company as a repository is "the misappropriated money".  Nor does it assist by expanding the alleged act of assistance to include 'investing' or "handling".  In each case the investing or the handling is alleged to be of the misappropriated money.

968.    Furthermore, we have some difficulty in ascertaining the exact nature of the lesser test put forward by Mr Quest in the passage referred to above.  What is "something caused by the fraud" or "a causative link between the monies that were received by the defendants and the fraud"?

969.    What is pleaded is that the AwalCos and SIFCO 5 acted as repositories for the misappropriated money.  To act as a repository they had to receive the misappropriated money and, in legal terms, the expression "misappropriated money" must relate to the traceable proceeds of the misappropriated money; otherwise it is in law no longer the misappropriated money.  This approach would appear to be consistent with the last sentence of the passage from *Lewin* quoted above.

970.    For these reasons, we conclude that, on the basis of the pleaded claim in this particular case, in order to prove dishonest assistance, AHAB had to show that the AwalCos and/or SIFCO 5 had received the traceable proceeds of the monies misappropriated from the Money Exchange.  It follows that we agree with the Chief Justice's conclusion on this point.

971.    It further follows that, given our decision at paragraph 944 above that AHAB cannot succeed in their tracing claim against any of the AwalCos in respect of the $191m, it similarly cannot succeed as a matter of Cayman law in their claim for dishonest assistance against those companies.

972.    In relation to SIFCO 5, we have held that on a re-trial, it would be open to the judge to conclude that there was a reversal of the burden of proof in relation to tracing and that it may therefore be that AHAB can trace the $191m into the hands of SIFCO 5, although on the face of it only to the extent of $500,000.  It follows that a claim for dishonest assistance against SIFCO 5 may be available as a matter of Cayman law, subject to consideration of the other reasons given by the Chief Justice for rejecting such a claim as summarised at paragraph 959 above.

973.    With respect to the Chief Justice, we do not consider that those reasons would prevent such a claim against SIFCO 5.  As to (i) and (iv), whilst we accept that mere receipt (without more) of trust property may, in some circumstances, not constitute "assistance"[835], it will all depend on the facts of the particular case.  As Lord Millett made clear in the passage from *Twinsectra*

---

[835] Eg *Brown v Bennett* [1999] 1 BCLC 649 (**R1/30.2** at bundle R2 tab 50)

quoted above, dishonest assistance is often given after the event by assisting the fraudulent fiduciary to disguise or legitimise the misappropriated proceeds; see also the observation of Barling J in *Twentieth Century Fox Film Corporation v Harris*[836] where, albeit in the context of considering the issue of conspiracy in connection with various corporate defendants (having found earlier at [148] that they were controlled by the fiduciary and that the main concern of the fiduciary (and by extension the corporate defendants) was to ensure that the misappropriated property was put beyond the reach of and, so far as possible, concealed from the claimants), he said this in relation to dishonest assistance at [159]:

> I agree with the Claimants' submission that there is a strong analogy between the acts carried out by the corporate Defendants, and those which are capable of founding liability for dishonest assistance in relation to a breach of trust or fiduciary duty carried out by another.  Such assistance can post-date the breach of trust or duty eg as part of a cover up, can take a wide variety of forms eg helping to provide an appearance of legitimacy, and need not be extensive so long as it is not de minimis…

974.   What is alleged by AHAB is that SIFCO 5 was owned and controlled by Al Sanea who was the directing mind and will of the company in relation to the receipts in question and, when discussing attribution, we have held that it would be open to a judge on a re-trial to find that this was so.  In those circumstances, it seems to us arguable that SIFCO 5 assisted Al Sanea by receiving and looking after misappropriated funds on his behalf.

975.   SIFCO 5 submits that the Chief Justice was correct to find at (iv) of paragraph 959 above that Al Sanea's breaches would have occurred in any event and were not dependent on the assistance of SIFCO 5, so that SIFCO 5 cannot be found liable for dishonest assistance.  We reject that submission.  It will often be the case, particularly where an accessory assists the fiduciary after the breach has occurred, that the breach would have occurred even without the assistance.  However, that does not, in our judgment, prevent liability for dishonest assistance arising.  As Laddie J said in *Balfron Trustees Limited v Petersen*[837]:

> There is only one other point which seems to be inherent in the cause of action for knowing assistance.  The accessory is liable, not because he carried out all, or even the majority, of the acts which constitute the primary breach of trust.  His liability arises from the fact of assistance to the primary wrongdoers.  If he has assisted, then equity imposes liability on him.  It is no answer, either to say that he only participated in a part of a chain of events all of which led to the breach of trust, or to assert that the breach of trust would probably have occurred without his assistance.

976.   As to (ii), this does not arise in relation to the $191m as the misappropriation of that sum occurred after SIFCO 5 was incorporated.

977.   As to (iii) and (v), we have already held that it would be open to the judge on a re-trial to find that Al Sanea's dishonest knowledge should be attributed to SIFCO 5.  In that event, any assistance offered by SIFCO 5, for which Al Sanea was responsible, would be dishonest.

978.   In summary, AHAB cannot succeed under Cayman law in their claim for dishonest assistance against any of the AwalCos.  In relation to SIFCO 5, it is open to AHAB to argue on any re-trial that SIFCO 5 is liable in dishonest assistance under Cayman law.  We shall consider the extent of any such liability when discussing the law of Saudi Arabia below.

---

[836] *Twentieth Century Fox Film Corporation v Harris* [2014] EWHC 1568 (Ch) (**R1/46.5.3** at R8 tab 98)
[837] *Balfron Trustees Limited v Petersen* [2002] Lloyd's Rep PN 1 at [21] (**R1/35.0.2**)

*(ii)    Conspiracy under Cayman law*

979.    As set out at paragraph 957 above, the Chief Justice held that AHAB's claim in conspiracy (as well as dishonest assistance and unjust enrichment) could not succeed in the absence of AHAB establishing that the relevant Respondent had received the traceable proceeds of funds misappropriated from the Money Exchange. That conclusion is challenged by AHAB on appeal.

980.    The Chief Justice accepted the submissions of AHAB in relation to conspiracy[838], which he had set out on the preceding pages, as an accurate summary of the law of conspiracy under Cayman law.  That summary included the following passage[839]:

> 723.    Under Cayman (and English) law, it is well-established that the tort of conspiracy turns on an agreement (which need not be a contractually binding agreement), a combination, a common intention, a common understanding, or a concert of two or more people to do an unlawful act (or a lawful act by unlawful means) which causes damage to the claimant.  AHAB alleges that Mr Al Sanea and the Defendants were engaged in an unlawful means conspiracy with the result that it is not necessary for AHAB to establish a predominant purpose held by the Defendants to injure its interests.

981.    It was not submitted on appeal by any party that this was an inaccurate statement of the position. It follows of course that, speaking generally, there is no requirement for a conspirator to have received misappropriated property in order to be liable for the tort of conspiracy.  Damage can be caused to a claimant in all sorts of ways which do not involve misappropriating the claimant's property.  Even where it does, a co-conspirator may join the conspiracy and play a role which does not involve receipt of misappropriated funds.

982.    However, in order to determine whether the claim in conspiracy is made out against any of the Respondent companies, one must turn to the pleadings to see what is alleged against them.  The relevant paragraph of the Amended Statement of Claim is paragraph 184 which is in the following terms:

> 184.    The misappropriations and unauthorised borrowing were effected pursuant to a conspiracy between Mr Al Sanea, SICL, the SIFCos, Singularis, Awal Bank, the AwalCos, Saad Air and Awal Trust Company.  The conspiracy was orchestrated by Mr Al Sanea and involved the following elements:
>
> 184.1   Mr Al Sanea used his control of the Financial Businesses, and of the Senior Executives, to obtain unauthorised borrowing in the name of AHAB, as pleaded in section F;
>
> 184.2   Mr Al Sanea misappropriated monies from the Money Exchange as pleaded in section E;
>
> 184.3   SICL, the SIFCos, Singularis, Awal Bank, the AwalCos, Saad Air and Awal Trust Company, which at all material times acted under the control of Mr Al Sanea and in concert with him, acted as repositories for the proceeds of the fraud, or a large part of them, as pleaded in

---

[838] **AA/2.4/862** at para 84 of Section 7
[839] **AA/2.4/854** at para 82 (citation of para 723) of Section 7

section I, and/or received payments directly from the Money Exchange;

184.4  SICL, Singularis and Awal Bank used the Money Exchange to manipulate their own accounts and records for their own benefit as pleaded in section G, including by way of false FX transactions, false confirmations of deposits and temporary deposits.

983.    As outlined earlier, we are no longer concerned with allegations against any of the Respondent companies other than the AwalCos and SIFCO 5, and we are concerned only with the misappropriation of $191m on 3 May 2009.

984.    For the reasons we have given above in relation to dishonest assistance, we hold that, in order to establish that a Respondent company has acted as a repository for the proceeds of the fraud, AHAB have to establish that the relevant company received the traceable proceeds of the fraud. In the present context that means that AHAB must show that the AwalCos and SIFCO 5 received traceable proceeds of the misappropriated sum of $191m.

985.    For the reasons we have given, that cannot be established in the case of the AwalCos.  There is no evidence that they received any funds after 3 May 2009.  In respect of SIFCO 5, it is arguable that, if the burden of proof is reversed, AHAB may be able to establish that SIFCO 5 received traceable proceeds of the $191m to the extent of $500,000.  It was not disputed that a company can conspire with one of its directors or indeed with its directing mind and will.  Whilst there is no specific evidence of an agreement, it would in our judgment be open to a judge on a re-trial to infer that there was such an agreement between Al Sanea and SIFCO 5 if satisfied that Al Sanea was the directing mind and will of SIFCO 5.  Whether the judge would do so would be a matter for determination at any such retrial.

986.    The Chief Justice held[840] that there could not have been such an agreement between SIFCO 5 and Al Sanea because of the legitimate purpose for which SIFCO 5 was established.  As we have set out earlier, we do not consider that the mere fact that the ASO was a legitimate commercial agreement necessarily negates this claim.  If the dishonest state of mind of Al Sanea can be attributed to SIFCO 5, it would be open to a court to conclude as a matter of Cayman law, depending on the evidence, that Al Sanea had conspired with himself as the directing will and mind of SIFCO 5 that proceeds from the $191m fraud should be channelled via SICL to SIFCO 5.

(iii)    *Dishonest assistance and conspiracy under Saudi law*

987.    As discussed in the section on the choice of proper law, the claims in dishonest assistance and conspiracy have to satisfy the principle of double actionability; in other words, liability has to be established against a particular Respondent as a matter of both Cayman law and Saudi law.  In view of our conclusion that there is no claim in dishonest assistance or conspiracy against the AwalCos under Cayman law, we do not need to consider those claims under Saudi law.

988.    Given our decision that there is an arguable claim under Cayman law in dishonest assistance and conspiracy against SIFCO 5 in relation to the $191m, we must consider whether such liability also exists under the law of Saudi Arabia.

989.    It was common ground between Professor Mallat and Professor Vogel that there were no specific heads of claim in Saudi law known as dishonest assistance or conspiracy.  But there is the unifying theory of liability referred to at para 748 above and there is also the concept of

---

[840] **AA/2.4/1152** at para 8.72 of Section 7

"participation" by more than one party in a tort. Professor Mallat accepted in Mallat 2[841], that, depending on the facts found, the GT Defendants could be found liable under the theory of participation. Although Professor Mallat referred in Mallat 2 only to the GT Defendants, his comments must be taken as being equally applicable to the AwalCos and SIFCO 5. It was also clear from his oral evidence that a Saudi judge would consider the question of liability under the unifying theory[842]. Paragraph 246 of Mallat 1[843] is to like effect.

990.   There are two aspects where Saudi law needs to be considered.

991.   The first relates to the issue of joint and several liability. As discussed in the section dealing with the substantive law of Saudi Arabia, AHAB contended before the Chief Justice that any Respondent found liable for dishonest assistance or conspiracy would be jointly and severally liable with Al Sanea for any loss suffered by AHAB as a result of Al Sanea's breach of duty. Transposing that to the matter currently before us, if found liable for dishonest assistance or conspiracy, SIFCO 5 would be jointly and severally liable with Al Sanea in respect of Al Sanea's breach, ie for $191m.

992.   However, what a joint tortfeasor is liable for is a matter of substantive law[844]. Under the double actionability principle, SIFCO 5 cannot be liable in these proceedings for something for which it would not be liable under Saudi law. We have upheld the Chief Justice's finding that, under Saudi law, and on the facts of this case, any liability of a Respondent company would be limited to the amount received by that particular Respondent[845].

993.   On that basis, even if found liable for dishonest assistance or conspiracy, SIFCO 5 would not be liable jointly and severally for $191m; its liability would be restricted to what it had received. On the information presently before us, that would suggest a maximum liability of some $500,000, although this would be a matter for any re-trial.

994.   This then raises the second aspect for consideration, namely what is necessary under Saudi law to establish receipt for these purposes. Is it the case that, because, as the Chief Justice found, Saudi law does not recognise a proprietary claim to substituted property (even if traceable under Cayman law), there can be no receipt of property for the purposes of a claim to compensation under the unifying theory?

995.   In Mallat 1 at para 263 and in the Joint Memorandum at para 5.8, Professor Mallat said that it was likely that:

> The recoverable compensation would be the equivalent of the financial benefit received by each party.

Unfortunately, there was no exploration with Professor Mallat as to whether this expression had any form of technical meaning under Saudi law. In particular, he was not asked whether and did not give any evidence to the effect that compensation could not be ordered under the unifying theory unless a proprietary claim was also made out against the particular Respondent. If that had been the case, we would certainly have expected Professor Mallat to say so, because he was clearly very aware of the distinction between compensation and restitution, the latter being a proprietary matter but the former being simply damages for a loss suffered.

---

[841] **K1/6/8** at para 37
[842] See para 760(i) above
[843] **K1/2/57**
[844] See the authorities referred to at para 783 above
[845] See para 797 above

996.    In the absence of any evidence to such effect, it seems to us that the question of whether a wrongdoer (such as SIFCO 5 on this hypothesis) had received a financial benefit would be a question of fact for the Saudi judge to decide. On the face of it, it would be surprising if the question of whether a participant had received a financial benefit as a result of a tort turned on whether a proprietary claim could be brought in respect of assets in the participant's hands. Let us suppose a simple example of a wrongdoer, in agreement with a third party, misappropriating a painting belonging to the plaintiff. Let us further suppose that the stolen painting is then passed by the wrongdoer to the third party who has knowledge of the wrongdoing, and that the third party then sells the painting on the open market to a bona fide purchaser for value. On the Chief Justice's finding (which we have upheld), the plaintiff would have no proprietary claim against the sale proceeds in the hands of the third party because the sale proceeds would be a completely different asset which had been substituted for the misappropriated painting. It would be a case of substitutional tracing rather than following. However, it would be surprising if a Saudi judge came to the conclusion that the third party had not received any financial benefit as a result of his participation in the wrongdoing. He would have received the sale proceeds which would remain in his hands. It seems inevitable that a Saudi judge would in those circumstances hold that the third party had indeed received a financial benefit and would order compensation against him accordingly pursuant to the unifying theory.

997.    If it is found that, applying the Cayman law of tracing, SIFCO 5 can be regarded as having received some of the traceable proceeds of the $191m misappropriation, we see nothing in the expert evidence before the Chief Justice to prevent a finding that SIFCO 5 has received a financial benefit (for the purposes of the unifying theory) as a result of the misappropriation to the extent of the amount which can be traced into its hands. Whether a person has received a financial benefit as a result of wrongdoing is a very different question from whether the victim has a proprietary claim against assets in the hands of that person. The fact that Saudi law only recognises a proprietary claim in very limited circumstances does not, in our judgment, suggest that damages cannot be awarded pursuant to the unifying theory where the evidence shows that a financial benefit has been received as a result of participation in wrongdoing.

998.    If we are wrong in the above analysis and it is regarded not as a matter of fact but as a matter of Saudi Arabian law as to whether a participant has received a financial benefit as a result of misappropriation, we consider that Rule 25 of *Dicey*[846] comes into play in that, where evidence of foreign law on a point is not adduced, the Court will apply the *lex fori*. No evidence of Saudi law on this particular point has been adduced and accordingly Cayman law can be applied to ascertain whether a financial benefit has been received by SIFCO 5. Under Cayman law, receipt of traceable proceeds with knowledge of the misappropriation would undoubtedly be regarded as financial benefit.

999.    Putting these matters together, we consider that, if on a re-trial it was held that SIFCO 5 was liable under Cayman law for dishonest assistance and/or conspiracy in respect of any traceable sum received from the $191m misappropriation, it would also be liable under Saudi law, with the consequence that the double actionability principle would be satisfied.

*(iv)    Unjust enrichment under Cayman law*

1000.   This is a claim which the Chief Justice held was governed by the law of Saudi Arabia[847] and we have upheld that decision. Despite this, all the submissions before us focused on the English (and therefore Cayman) law of unjust enrichment. In case we are wrong in having upheld the Chief Justice's decision that the claim in unjust enrichment is governed by Saudi law and

---
[846] Rule 25 of *Dicey* at 9R001
[847] See paragraph 705 above

because the submissions assist in identifying the nature of AHAB's claim under this heading, we shall do likewise before turning to the position under Saudi law.

1001.   It was common ground before us that a claim in unjust enrichment is a personal, not a proprietary claim.   Thus, even if a claimant is successful, he will only rank *pari passu* with other unsecured creditors of the defendant.

1002.   It was also common ground that, when addressing a claim in unjust enrichment, four questions need to be considered:

> (i)   Has the defendant been benefitted, in the sense of being enriched?
> (ii)   Was the enrichment at the expense of the claimant?
> (iii)   Was the enrichment unjust?
> (iv)   Are there any defences?

1003.   The Chief Justice only specifically dealt with the unjust enrichment claim in relation to SIFCO 5, but again we understand his reasoning to be equally applicable to the other Respondents. As stated at paragraph 957 above, he held that, like the claims for dishonest assistance and conspiracy, AHAB's claim for unjust enrichment could only succeed on the facts of this case if there was a successful tracing claim, ie that a particular Respondent company could be shown to have received the traceable proceeds of Al Sanea's breach of duty. AHAB submit that the Chief Justice erred in this respect. Their claim based on unjust enrichment did not require them to establish as direct a link between the misappropriation from the Money Exchange and the receipt of the funds in the hands of a Respondent company as would be necessary for a proprietary claim.

1004.   The most recent guidance on the law of unjust enrichment is to be found in the judgment of Lord Reed (agreed by the other justices) in the United Kingdom Supreme Court in the case of *Investment Trust Companies v Revenue and Customs Commissioners*[848]. In his judgment, Lord Reed considered in some depth the circumstances in which the enrichment of a defendant can be said to be "at the expense" of the claimant.   We think it helpful to quote the following extracts from his judgment:

*Direct and Indirect Provision of a Benefit*

> 46.   Situations in which the defendant has received a benefit from the claimant, and the claimant has incurred a loss through the provision of that benefit, usually arise where the parties have dealt directly with one another, or with another's property.   Common examples are the gratuitous payment of money, or provision of goods or services, by the claimant to the defendant, where there was no intention of donation.   In such a situation, if the enrichment of the defendant is unjust – if, in other words, the transfer of value is defective in a sense recognised by the law of unjust enrichment – then the claimant is prima facie entitled to have the enrichment reversed.

> 47.   There are, however, situations in which the parties have not dealt directly with one another, or with one another's property, but in which the defendant has nevertheless received a benefit from the claimant, and the claimant has incurred a loss through the provision of that benefit.   These are generally situations in which the difference from the direct provision of a benefit by the claimant to the defendant is more apparent than real.

---

[848] *Investment Trust Companies v Revenue and Customs Commissioners* [2017] 2 WLR 1200 (**R1/62** at bundle R10 tab 121)

1005.   Lord Reed then went on at [48] and [49] to give examples of where an indirect benefit can be regarded as equivalent to a direct transfer and therefore "at the expense" of the claimant. For ease of reference, we have sub-divided his [48] and numbered the sub-paragraphs we have introduced:

48.   (i)   One such situation is where the agent of one of the parties is interposed between them.  In that situation, the agent is the proxy of his principal, by virtue of the law of agency.   The series of transactions between the claimant and the agent, and between the agent and the defendant, is therefore legally equivalent to a transaction directly between the claimant and the defendant.

(ii)   Similarly where the right to restitution is assigned…the claimant stands in the shoes of the assignor, and is therefore treated as if he had been a party to the relevant transaction, and the defendant's enrichment had been directly at his expense.

(iii)   Another situation is where, as in [Relfo], an intervening transaction is found to be a sham (para 121).  Since the sham is created precisely in order to conceal the connection between the claimant and the defendant, it is disregarded when deciding whether the latter was enriched at the former's expense.  So in [Relfo] Gloster and Floyd LJJ describe the arrangements in question as being 'equivalent to a direct payment' (paras 103 and 115).

(iv)   There have also been cases, discussed below, in which a set of co-ordinated transactions has been treated as forming a single scheme or transaction for the purpose of the 'at the expense of' inquiry, on the basis that to consider each individual transaction separately would be unrealistic.

(v)   There are also situations where the defendant receives property from a third party into which the claimant can trace an interest.  Since the property is, in law, the equivalent of the claimant's property, the defendant is therefore treated as if he had received the claimant's property.

49.   A different type of situation is typified by the case where the claimant discharges a debt owed by the defendant to a third party…

50.   It has often been suggested that there is a general rule, possibly subject to exceptions, that the claimant must have directly provided a benefit to the defendant.  The situation as discussed in the two preceding paragraphs can be reconciled with such a rule, if it is understood as encompassing a number of situations which, for the purposes of the rule, the law treats as equivalent to a direct transfer, in the sense that there is no substantive or real difference.  So understood, the suggested rule is helpful.  It may nevertheless require refinement to accommodate other apparent exceptions, and it would be unwise at this stage of the law's development to exclude the possibility of genuine exceptions, or to rule out other possible approaches.

51.      *Where, on the other hand, the defendant has not received a benefit directly from the claimant, no question of agency arises, and the benefit does not consist of property in which the claimant has or can trace an interest, it is generally difficult to maintain that the defendant has been enriched at the claimant's expense…* [*emphasis added*]

1006.   It is of course the case that a claim in unjust enrichment does not normally require an ability to trace the property of the claimant into the hands of the defendant. The most common situation giving rise to such a claim is a payment made by the claimant to the defendant under a mistake of fact or law. Because the payment is made intentionally and voluntarily, legal and equitable title in the payment passes to the defendant. The claimant no longer has any proprietary interest in the sum paid. He therefore brings a personal claim in unjust enrichment submitting that the defendant has been unjustly enriched at his expense.

1007.   However, as Lord Reed makes clear[849] it *may* be necessary to show a proprietary interest (through the ability to trace) in the case of an indirect benefit.

1008.   It is common ground in the present case that, if there is any enrichment of the AwalCos or SIFCO 5, it is an indirect enrichment because there is no suggestion of any direct payment of the $191m from the Money Exchange to the AwalCos or SIFCO 5; on the contrary, the whole sum was paid to Awal Bank.  What is pleaded by AHAB at para 186 of the Amended Statement of Claim is the following:

> Mr Al Sanea, SICL, the SIFCOs, Singularis, AWAL Bank, the AwalCos, SAAD Air and Awal Trust Company have been unjustly enriched at the expense of AHAB by their receipt of the money paid out by the Money Exchange and/or their enrichment as a direct consequence of money misappropriated from the Money Exchange…

1009.   Although the Amended Statement of Claim refers to enrichment "by their receipt of the money" or "as a direct consequence of money misappropriated", it seems to us that the only form of enrichment which is realistically alleged against the AwalCos or SIFCO 5 is the receipt of money.  It is said that they were enriched because they received payments.

1010.   In our judgment, there can be no question of any sustainable claim in unjust enrichment against any of the AwalCos arising out of the misappropriation of the $191m. That is because, as set out at paragraph 943 above under the heading of "Tracing'", there is no evidence of any payment to any of the AwalCos after 3 May 2009. Thus there is no evidence of any enrichment at all, let alone enrichment "at the expense" of AHAB by reference to the $191m payment.

1011.   Turning to SIFCO 5, as set out at paragraphs 950 to 951 above, there is a pleaded payment of some $62m from Awal Bank to SICL on 20 May 2009, and an admitted payment of $500,000 from SICL to SIFCO 5 on 3 June 2009. We were not referred to evidence of any other payment to SIFCO 5 after 3 May 2009.

1012.   Having regard to the limited circumstances described by Lord Reed where an indirect benefit is treated as equivalent to a direct transfer, we consider that, if Cayman law had applied to the claim in unjust enrichment, the Chief Justice was correct to find that, on the particular facts of this case, enrichment of SIFCO 5 could only be "at the expense" of AHAB if it is shown that SIFCO 5 has received the traceable proceeds of the funds misappropriated from the Money Exchange.  We do not see that any question of agency can be properly said to arise on the facts of this case so that any receipt of money by SIFCO 5 from some other company in the Saad

---

[849] At [48(v)] of his judgment (using our numbering)

Group can be treated as a direct transfer from the Money Exchange. Furthermore, we find nothing in Lord Reed's judgment to support AHAB's argument that, in the case of indirect benefit, some lesser form of transactional link than is required for tracing will suffice for the purposes of unjust enrichment.

1013. For the reasons given earlier, it would be open to a judge on a re-trial to agree to a reversal of the burden of proof in relation to the tracing exercise and, if this were to occur, there is a realistic possibility of it being found that SIFCO 5 has received the traceable proceeds of the misappropriated $191m to the extent of any funds received by it after 3 May 2009, which, on the evidence before us, would appear to be $500,000.

1014. It follows that, if Cayman law were relevant, AHAB would have an arguable claim in unjust enrichment against SIFCO 5.

*(iii) Unjust enrichment and Saudi law*

1015. However, as discussed earlier, we have upheld the Chief Justice's decision that the claim in unjust enrichment is governed by Saudi law. It follows that, strictly speaking, the above discussion is irrelevant as Cayman law does not apply to the claim. We need therefore to consider the claim under Saudi law.

1016. At para 3.6 of the Joint Memorandum, Professor Vogel and Professor Mallat agreed that there was no specific cause of action known as unjust enrichment in Saudi law. However, they also agreed that a claim which would be treated as unjust enrichment under Cayman law was nevertheless provided for under Saudi law. This appears to have been a reference to the unifying theory of liability which has three elements, namely harm, wrongful act and causation. Professor Mallat emphasised in his oral evidence that a Saudi judge would not be concerned to put a label on a particular claim, but to consider whether the elements of the unifying theory were satisfied[850].

1017. We have already discussed the unifying theory in the context of the claims in dishonest assistance and conspiracy. On the basis that Al Sanea committed a breach of fiduciary duty in misappropriating $191m and that this caused loss to AHAB, the question then is whether a particular Respondent company would be liable under the unifying theory. As Professor Mallat said, the liability of a Respondent would be established according to the financial benefit received by that particular Respondent. If it received a financial benefit as a result of Al Sanea's breach of duty, liability under the unifying theory would be established to the extent of that financial benefit.

1018. For the reasons set out above, there can be no suggestion of any of the AwalCos having received any financial benefit in connection with Al Sanea's breach of duty as there is no evidence of any receipt by any of them after 3 May 2009. Accordingly, a claim under the unifying theory against them must fail.

1019. As to SIFCO 5, in our discussion relating to dishonest assistance and conspiracy, we have already held that receipt of the traceable proceeds (under Cayman law) of the $191m was *sufficient* to show receipt of financial benefit for the purposes of the unifying theory. But is receipt of traceable proceeds *necessary* to establish such benefit or can some form of less close linkage between the misappropriated monies and the monies received by a Respondent be sufficient for the purposes of Saudi law to establish receipt of financial benefit for the purposes of the unifying theory?

---

[850] **Day105/85-86**

1020.    This question would only arise in the event of AHAB failing on a retrial in their tracing claim (under Cayman law) despite relying on inference and a reversal of the burden of proof because of maelstrom and cross-firing. On the basis that whether a person has received a financial benefit for the purposes of the unifying theory is a question of fact, we regard it as inconceivable that a Saudi judge would find that SIFCO 5 had received a financial benefit as a result of Al Sanea's misappropriation of the $191m in circumstances where AHAB had failed to establish receipt of any traceable proceeds (under Cayman law) of that misappropriation and nothing in the expert evidence suggested otherwise. As mentioned above, there was simply no exploration of this issue with Professor Mallat.

1021.    Alternatively, as discussed at paragraph 998 above, if the question of whether a wrongdoer has received a financial benefit for the purposes of the unifying theory is a question of law, Rule 25 of *Dicey* comes into play as there is no evidence of Saudi law on this point.  Cayman law would therefore be applied in default.  For the reasons given at paragraph 1012 above, under Cayman law SIFCO 5 will not have received a financial benefit (ie been enriched) as a result of the misappropriations unless it has received the traceable proceeds of such misappropriations.

1022.    It follows that we uphold the Chief Justice's conclusion that AHAB can only succeed in a claim against SIFCO 5 to the extent that they establish receipt by SIFCO 5 of the traceable proceeds of the $191m misappropriation.

*(iv)    Knowing receipt and Saudi law*

1023.    As discussed earlier, given the decision that they are both governed by Saudi law, the claims in knowing receipt and unjust enrichment (using Cayman terminology) fall to be determined pursuant to the unifying theory under Saudi law. Thus there are no longer claims in knowing receipt and unjust enrichment, simply a single claim under the unifying theory. It follows that what we have said at paragraphs 1015-1022 above is equally applicable to the claim (as expressed under Cayman law) in knowing receipt, even though, under Cayman law, the requirements of knowing receipt and unjust enrichment are very different.

**Illegality**

1024.    Given the settlement of AHAB's claim against the GT Respondents and our decision that AHAB has no valid claim against the AwalCos, the issue of illegality only arises in respect of AHAB's possible claim against SIFCO 5 arising out of the $191m misappropriation.

1025.    However, the Chief Justice dealt with the issue generally at section 7D of his judgment and the parties have filed detailed written submissions (supported by brief oral submissions) on the topic in this court.  In the circumstances, we think we should express our views on the subject.

*(i)    The law on illegality*

1026.    It was accepted by all the parties that the issue of illegality is to be considered under Cayman law as the *lex fori*.  It was further accepted that Cayman law in this respect does not differ from English law.

1027.    The classic statement of the illegality principle is that of Lord Mansfield CJ in *Holman v Johnson*[851] at 343 where he said:

---

[851] *Holman v Johnson* (1775) 1 Cowp 341 (**R1/0.2** at bundle R1 tab 2)

> The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may say so. The principle of public policy is this; ex dolo malo non oritur actio. No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise ex turpi causa, or the transgression of a positive law of this country, there the Court says he has no right to be assisted. It is upon that ground that the Court goes; not for the sake of the defendant; but because they will not lend their aid to such a plaintiff.

1028.   The test which has traditionally been applied to determine whether a claim should be barred on the ground of illegality is often referred to as the reliance test. Does the person making the claim have to rely, in support of it, on an illegal act on his part? The reliance test was specifically approved by the House of Lords in the leading case of *Tinsley v Milligan*[852].

1029.   However, in *Patel v Mirza*[853] the Supreme Court, by a majority, adopted a new and more flexible approach in place of the former test. That approach is summarised in the leading judgment of Lord Toulson (with whom Lady Hale, Lord Kerr, Lord Wilson and Lord Hodge agreed). The key consideration, set out at [100], is "whether allowing recovery for something which was illegal would produce inconsistency and disharmony in the law, and so cause damage to the integrity of the legal system". Lord Toulson summarised the new approach at [120] in the following terms:

> 120.   The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary (a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, (b) to consider any other relevant public policy on which the denial of a claim may have an impact and (c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate.

1030.   At [107] of his judgment Lord Toulson elaborated on the question of proportionality in the following terms:

> 107.   In considering whether it would be disproportionate to refuse relief to which the claimant would otherwise be entitled, as a matter of public policy, various factors may be relevant. Professor Burrows' list is helpful but I would not attempt to lay down a prescriptive or definitive

---

[852] *Tinsley v Milligan* [1994] 1 AC 340 (R1/20.2)
[853] *Patel v Mirza* [2017] AC 467 (**R1/55**)

list because of the infinite variety of cases. Potentially relevant factors include the seriousness of the conduct, its centrality to the contract, whether it was intentional and whether there was marked disparity in the parties' respective culpability.

1031.  The reference to Professor Burrows' list is to a range of factors suggested by Professor Burrows which were set out by Lord Toulson at [93] as follows:

> 93.  If a "range of factors" approach were preferred, Professor Burrows suggested... that a possible formulation would read as follows:
>
> > "*If the formation, purpose or performance of a contract involves conduct that is illegal (such as a crime) or contrary to public policy (such as a restraint of trade), the contract is unenforceable by one or either party if to deny enforcement would be an appropriate response to that conduct, taking into account where relevant – (a) how seriously illegal or contrary to public policy the conduct was; (b) whether the party seeking enforcement knew of, or intended, the conduct; (c) how central to the contract or its performance the conduct was; (d) how serious a sanction the denial of enforcement is for the party seeking enforcement; (e) whether denying enforcement will further the purpose of the rule which the conduct has infringed; (f) whether denying enforcement will act as a deterrent to conduct that is illegal or contrary to public policy; (g) whether denying enforcement will ensure that the party seeking enforcement does not profit from the conduct; (h) whether denying enforcement will avoid inconsistency in the law thereby maintaining the integrity of the legal system*."
>
> Professor Burrows noted that the final factor is capable of a wider or narrower approach, depending on what one understands by inconsistency.

1032.  Although the claim in *Patel* was one of unjust enrichment, this arose after a failure of consideration in a contract and some of the passages in the judgments referred to illegality in the context of the law of contract. However, as Lord Toulson pointed out at [2], illegality has the potential to provide a defence to civil claims of all sorts, whether in relation to contract, property, tort or unjust enrichment. In our judgment, it is clear that the Supreme Court intended the new approach to be of general application in civil cases. That has since been confirmed by the Supreme Court since the hearing of this appeal in the case of *Henderson v Dorset Healthcare University NHS Trust*[854].

*(ii)  Relevant factual background*

1033.  As stated earlier in this judgment, the Respondents are all in liquidation. The Chief Justice was informed that all the Respondents were insolvent and that accordingly all of their assets would be used to pay off creditors rather than being paid to Al Sanea or his family. The creditors are largely banks who lent money to entities within the Saad Group. It is common ground that Al Sanea, through various companies within the Saad Group, carried out a similar fraud on banks

---

[854] *Henderson v Dorset Healthcare University NHS Trust* [2020] 3 WLR 1124 at [76]

as was carried out through the Money Exchange, ie the banks were presented with falsified accounts of companies within the Saad Group as a result of which they lent money.

1034.   AHAB are not in liquidation.  At the date of the trial, the Joint Directorate of Enforcement at the General Court in Al Khobar (the **JDEK**), which had been appointed by an order of the Supreme Judicial Council of Saudi Arabia in 2016, was responsible for issuing enforcement orders against AHAB and effectively overseeing the process of distributing AHAB's assets to satisfy those orders, either through a settlement agreement or a liquidation process.  The Chief Justice was informed[855] that AHAB had negotiated a proposed settlement with a steering committee of creditor banks.  That involved the pledging of substantial real estate as collateral.  All recoveries up to SAR 6 billion would be for the creditors' benefit.  If AHAB recovered SAR 5 billion from the proceeds of the current litigation, it would recover 50% of the real estate portfolio so pledged.  Any recoveries over SAR 6 billion would have to be used by AHAB to "buy back" the remaining 50% of their real estate portfolio.  Once they had bought back their entire real estate portfolio, recoveries above that would be shared between the creditors and AHAB.

1035.   The proposed agreement between AHAB and the creditors was subject to the approval of the JDEK.  The agreement was said by AHAB to be intended to incentivise AHAB to achieve maximum recoveries through their litigation efforts.

1036.   There has however been a change in AHAB's circumstances since the trial.  In September 2018, a new bankruptcy law came into effect in Saudi Arabia.  In April 2019, two of AHAB's creditors petitioned the Commercial Court in Dammam, Eastern Province, Saudi Arabia to commence a "Liquidation Procedure" against AHAB, which would effectively be a winding up.  AHAB objected and renewed an application (which they had initially made unsuccessfully in March 2019) for a "Financial Restructuring Procedure" (**FRP**) instead.  The Dammam Commercial Court acceded to AHAB's application and rejected the application for a Liquidation Procedure.  The consequence is that AHAB are now subject to an FRP.

1037.   The new bankruptcy law defines an FRP as a procedure under the supervision of the Financial Restructuring Officeholder (**Bankruptcy Trustee**) to facilitate reaching an agreement between the debtor and its creditors for the financial restructuring of the debtor's activities.  It is said by Mr Charlton in the affidavit referred to below to be similar to an English Creditor's Voluntary Arrangement or to the chapter 11 procedure in the United States.

1038.   The Dammam Commercial Court has appointed an independent Bankruptcy Trustee who is a member of the firm of accountants Baker Tilly.  His duties are set out in the law and regulations but they include the preparation of an inventory of assets, supervision of the operations of AHAB, the review of creditors' claims and the preparation of a proposal to be voted on by creditors.  A creditors' committee will also be formed.  The Bankruptcy Trustee works with the debtor and the creditors to prepare a financial restructuring and settlement proposal.  It is then presented to creditors for final approval.

1039.   The consequence of the order for an FRP is that the jurisdiction of the JDEK has now come to an end and any settlement agreement proposed under the auspices of the JDEK has lapsed.  All matters will now be dealt with under the supervision of the Dammam Commercial Court.

1040.   We should add that the above summary of the current position is derived from the 25th affidavit of Mr Charlton of AHAB.  Mr Wardell applied for leave to adduce this affidavit in evidence during the course of the hearing before us.  With the agreement of the parties, the court received the affidavit *de bene esse* in order to give counsel for the Respondents an opportunity of

---

[855] **AA/2.4/1200** at para 101 of Section 7D

considering whether they wished to oppose admission of the affidavit. No objection was made during the course of the Respondents' oral submissions and the court therefore admits the affidavit as evidence of events since the trial.

1041. The upshot is that, as Mr Wardell accepted, there is likely to be some form of agreement between the creditors and AHAB (subject to approval by the Bankruptcy Trustee) under which creditors will make recovery from the proceeds (if any) of this litigation but AHAB may also benefit.

*(iii) The Chief Justice's decision*

1042. In outlining the law on illegality, the chief justice referred to the well-known case of *Everet v Williams*[856] (commonly known as the *Highwayman's case*). Everet and Williams were two highwaymen who had agreed to split the proceeds of their robberies but Everet alleged that Williams had taken more than his fair share out of the proceeds of selling items stolen in the robberies. Everet consequently brought a claim seeking an account to recover his share of the "profits" from the "partnership". Although his pleadings were suitably vague as to the exact nature of the activities carried on by the partnership, the court saw the claim for what it was and dismissed it as "both scandalous and impertinent".

1043. The Chief Justice concluded[857] that the *Highwayman's case* laid down the principle that, where the court is faced with an unlawful partnership (or a partnership formed to carry out an unlawful purpose), the court will not condescend to re-distribute the proceeds of ill-gotten gains among wrongdoers. He further accepted[858] the submission of the Respondents that this was a freestanding head of illegality, distinct from and an exception to the reliance test.

1044. He then turned to consider the changes brought about by *Patel* before concluding at [60]:

> 60. In this regard, I also accept that it is important to remember that, crucially, the highwayman's case (*Everet –v- Williams*) remains good law, save that Lord Toulson has updated the example for modern times to include a drug trafficking operation or enterprise. At paragraphs [110] and [116], Lord Toulson ought therefore to be read as articulating the well-known proposition (repeatedly affirmed following the highwayman's case) that parties to a fraudulent partnership or enterprise will not be entitled to invoke the powers of the court to recover the proceeds of their fraudulent partnership from their fellow criminal so as to profit from it.

1045. The Chief Justice then considered the first three of the eight factors listed by Lord Toulson at [93] of his judgment by reference to the facts of the present case before expressing his conclusion in the following terms:

> 76. In its claim to recover the amounts allegedly misappropriated from the Money Exchange, AHAB is seeking to recover both as a proprietary claim and as damages, US$6bn withdrawn by Mr Al Sanea. Yet every dollar he withdrew was derived from the funds dishonestly obtained from the lending banks.
>
> 77. Accordingly, it is the case as I find and as SIFCO 5 has submitted, that the Money Exchange is indistinguishable from the case of the

---

[856] *Everet v Williams* (1729), unreported but noted at (1893) 9 LQR 157 (**R1/2.4** at bundle R1 tab 7)
[857] **AA/2.4/1173** at para 43 of Section 7D
[858] **AA/2.4/1174** at para 43 of Section 7D

highwayman or the modern-day example of the drug dealer given by Lord Toulson.  AHAB seeks to recover the ill-gotten gains of dishonestly obtained borrowing of the venture of which it was a partner in the same way as Everet did:-

(1) The argument over the proceeds of that illegality (i.e. the fraudulently acquired borrowing) is indistinguishable from the highwayman's case; it is akin to the argument over the proceeds of a theft and is not a matter over which the courts should adjudicate.   This is particularly the case given that the highwayman is seeking an account from third parties rather than his fellow wrongdoer.

(2) The foundation of the clean hands/illegality doctrine is that the court ought not to adjudicate upon illegal arrangements and it is inconsistent with the foundations of that doctrine for the court to make available the equitable remedy of tracing in circumstances where the funds came from an illegal source.

(3) In this case, when I ask myself the guiding question from Patel – v- Mirza, whether it would be contrary to the public interest to enforce AHAB's claim if to do so would be harmful to the integrity of the legal system (or possibly, certain aspects of public morality, the boundaries of which have never been entirely clear but which [such as potential unfairness to innocent third party creditors] could arise in this case), the resounding answer is "yes".

(4) Accordingly, I hold that AHAB's claim ought to have been barred in any event through the application of the Court's policy that it will not enforce an illegal arrangement and/or because AHAB lacks clean hands and so is not entitled to invoke the equitable remedies.

78.  What follows to the end of this section of the Judgment is a consideration of the further factors identified by Lord Toulson in Patel v Mirza and other potentially relevant issues.  I include them out of appreciation for the thoroughness of the research and treatment of the issues by Mr Lowe and his team of SIFCO 5 lawyers and, of course, as well because of the potential significance of those issues in this case and in other cases coming within our jurisdiction.

1046.  The Chief Justice went on to consider the remaining five factors listed by Lord Toulson at [93] of Patel with reference to the facts of the case but it is clear from paragraph 78 of his judgment that these were not essential to his decision and were included out of appreciation for the efforts of defence counsel and because his observations might be of assistance in other cases.

1047.  Finally, having considered these factors, the Chief Justice turned[859] to the question of whether the insolvency of AHAB and the fact that they were subject to the JDEK process meant that their claim should not be barred for illegality.  He noted that AHAB were arguing that the fact that any recoveries from the claims would not be primarily for their benefit but rather for the benefit of their creditor banks meant that it would be disproportionate to bar the claim.  The Chief Justice considered[860] that this implied some general exemption from the illegality

---

[859] **AA/2.4/1199** at paras 90ff of Section 7D
[860] **AA/2.4/1203** at paras 103-104 of Section 7D

principle where there was a form of supervised liquidation or insolvency process but rejected the proposition that there was any such general exception.

1048.   He went on to distinguish AHAB's position from where a company was in liquidation with an independent liquidator and noted that AHAB would, if the proposed agreement proceeded, benefit from any recoveries pursuant to the litigation. Accordingly, the fact that AHAB were insolvent and subject to the JDEK process did not affect his conclusion that the claim was barred for illegality.

*(iv) Discussion*

1049.   Because, save in respect of the $191m payment, the issue of illegality does not in fact arise in view of this Court's decision to uphold the Chief Justice's findings that (i) AHAB (through their partners) were knowing participants together with Al Sanea in the fraud on the banks effected by the Money Exchange; and (ii) AHAB consented to Al Sanea's withdrawal of monies from the Money Exchange with the consequence that Al Sanea was not in breach of fiduciary duty, it is necessary first to consider what counter-factual scenario should be assumed for the purpose of considering whether illegality would bar an otherwise successful claim.

1050.   Mr Wardell submitted that illegality should be considered on the assumption that AHAB failed in their appeal against the finding that AHAB had knowingly participated in the fraud on the banks but succeeded in their appeal in relation to Al Sanea's breach of fiduciary duty. In other words, for the purposes of the counter-factual scenario, the Court should assume that AHAB were knowing participants in the fraud on the banks together with Al Sanea but that Al Sanea then committed a breach of fiduciary duty by wrongly removing from the Money Exchange monies borrowed from the banks and using this money for the benefit of the Saad Group. The Court should further assume that such monies were received by the Respondents in circumstances that enabled AHAB to succeed in one or more of their claims against the Respondents.

1051.   Mr Wardell raised three main arguments in support of his contention that the Chief Justice was wrong to find that, on this counter-factual scenario, an otherwise successful claim against the Respondents should be barred for illegality. Those three arguments were:

(i)   The Chief Justice erred in law in concluding that the *Highwayman's case* amounted to a free-standing head of illegality which applied as between partners in illegal conduct and which determined the outcome in this case. Although the Chief Justice purported to apply the *Patel* approach, that application was flawed as a result of this error of law.

(ii)   In his application of *Patel*, the Chief Justice did not consider the first two limbs of the tripartite test described by Lord Toulson at [101] (repeated at [120]) of his judgment.

(iii)   In any event, the Chief Justice erred in his consideration of proportionality and should have found that it would be disproportionate to bar AHAB's claim on the ground of illegality in the particular circumstances of this case.

We propose to concentrate on the first and third arguments.

1052.   As to the first argument, Mr Wardell submitted that it was clear from paragraphs 43 and 60 of (Section 7D of) his judgment[861] that the Chief Justice had accepted the Respondents'

---

[861] referred to at paragraphs 1043 and 1044 above

submission to the effect that the *Highwayman's case* was a special rule which applied to partnerships for illegal purposes and that it had survived the decision of the Supreme Court in *Patel*.

1053.   Conversely, the Respondents submitted that the Chief Justice did not purport to apply a free-standing rule drawn from the Highwayman's case; on the contrary, he applied the *Patel* principles.  It was simply that, in a case analogous to the *Highwayman's case* (as this was), application of the *Patel* approach would inevitably lead to a claim by one partner in a criminal enterprise seeking recovery of the ill-gotten gains of the partnership being barred on the ground of illegality.  That is all the Chief Justice did in this case.

1054.   We begin by considering whether the *Highwayman's case* does indeed constitute a free-standing head of illegality which remains good law after *Patel*.  In our judgment it does not.

1055.   The *Highwayman's case* is only mentioned in one of the judgments in *Patel*, namely that of Lord Sumption at [228] and then only in passing.  It is clear from all the judgments that the Supreme Court was considering the topic of illegality in general, no matter what the nature of the cause of action, and was laying down a test of general application.  In the circumstances, we regard it as inconceivable that the Supreme Court was accepting that there was some free-standing rule of illegality which fell outside the principles being articulated in that case.

1056.   The Chief Justice said that "at paragraphs [110] and [116], Lord Toulson ought therefore to be read as articulating the well-known proposition (repeatedly affirmed following the highwayman's case) that parties to a fraudulent partnership or enterprise will not be entitled to invoke the powers of the court to recover the proceeds of their fraudulent partnership from their fellow criminal so as to profit from it".[862]  We have carefully considered those two paragraphs in Lord Toulson's judgment, but we cannot read them as confirming the continuation of some free-standing head of illegality which has not been mentioned at any point in his judgment.

1057.   In summary, we consider that *Patel* is of general application and any consideration of illegality as a possible defence must be considered by reference to the principles established by the majority in that case as articulated in the judgment of Lord Toulson.

1058.   In our judgment, given the terms of what he said[863], the Chief Justice must be taken to have held that the *Highwayman's case* did constitute a free-standing head of illegality and he therefore erred in law.  However, he went on to consider the matter by reference to some of the factors set out in *Patel,* and the question which therefore arises is whether this error is material.

1059.   The Chief Justice stated his conclusion on illegality at para 77 of his section 7D.[864]  Whilst the third sub-paragraph undoubtedly refers to the test in *Patel*, it does seem to us that the Chief Justice is viewing the essential question raised by *Patel* very much through the prism of a free-standing rule in the *Highwayman's case*.  Furthermore, as the next paragraph, para 78, makes clear, the Chief Justice reached his decision on illegality without regard to the matters which then follow. These include the issue of insolvency and five of the factors mentioned by Lord Toulson as being potentially relevant when considering the question of proportionality.

1060.   In the circumstances we have concluded that it is necessary to reconsider the application of the *Patel* principles and, in particular, the question of proportionality.

1061.   Given our decision that the Chief Justice erred in this respect, it is not necessary for us to consider the submission of the Respondents to the effect that this Court may only interfere with

---

[862] **AA/2.4/1181** at para 60 of Section 7D
[863] **AA/2.4/1173** at para 43 and **AA/2.4/1181** at para 60
[864] **AA/2.4/1190** at para 77 of Section 7D, quoted at para 1045 above

the decision of a trial judge on the issue of proportionality in the context of illegality if the decision of the trial judge is *Wednesbury* unreasonable.  This submission was based on the observation of Sir Geoffrey Vos C in *Singularis Holdings Limited v Daiwa Capital Markets Europe Limited*[865] at [65] where he said:

> It seems to me quite clear that an appellate court should not interfere merely because it would have taken a different view had it been undertaking the evaluation.  The test involves balancing multiple policy considerations and applying a proportionality approach.  Accordingly, an appellate court should only interfere if the first instance judge has proceeding on an erroneous legal basis, taken into account matters that were legally irrelevant, or failed to take into account matters that were legally relevant.  That would be the approach in any other situation where proportionality was in issue on an appeal and should, therefore, be the case here.

1062.   However, we should not be taken as necessarily agreeing that that is the correct approach.  In this connection we note the cautionary observation of Lady Hale giving the unanimous judgment of the Supreme Court on appeal in *Singularis Holdings v Daiwa Capital Markets Ltd*[866], where she said at [21]:

> …I should, however, record my reservations about the view expressed by the Court of Appeal as to the role of an appellate court in relation to the illegality defence: that "an appellate court should only interfere if the first instance judge has proceeded on an erroneous legal basis, taken into account matters that were legally irrelevant or failed to take into account matters that were legally relevant"…. Daiwa point out that applying the defence is "not akin to the exercise of discretion" (citing Lord Neuberger of Abbotsbury PSC in *Patel v Mirza*) …. and an appellate court is as well placed to evaluate the arguments as is the trial judge.  It is not necessary to resolve this in order to resolve this appeal and there are cases concerning the illegality defence pending in the Supreme Court where it should not be assumed that this court will endorse the approach of the Court of Appeal.

Lady Hale's reference to pending cases appears to be a reference to *Henderson* (*supra*) and *Grondona v Stoffel & Co*[867], but in neither of these cases did the Supreme Court in fact consider this issue.

1063.   We return therefore to Lord Toulson's tripartite test set out at [101] (and summarised again at [120]) of his judgment.

1064.   In considering whether allowing a claim which is tainted by illegality would be harmful to the integrity of the legal system, the court must consider first the underlying purpose of the prohibition which has been transgressed and whether that purpose would be enhanced by denial of the claim.  The underlying illegality here is the fraud carried out on the banks.  The money which AHAB seek to recover is the proceeds of that fraud which, as the Chief Justice pointed out, involved vast sums of money fraudulently obtained from a large number of banks.  Denial of the claim would therefore, on the face of it, be supportive of the fight against fraud and of the approach taken in the *Highwayman's case*.

1065.   The second limb of the test requires the court to consider, conversely, any other relevant public policies which may be rendered ineffective or less effective by denial of the claim.  On the

---

[865] *Singularis Holdings Limited v Daiwa Capital Markets Europe Limited* [2018] 1WLR 2777 (**AG1/83**)
[866] *Singularis Holdings v Daiwa Capital Markets Ltd* [2019] 3 WLR 997
[867] *Grondona v Stoffel & Co* [2020] 3 WLR 1156

counter-factual scenario, Al Sanea has in turn carried out a massive fraud on AHAB and the proceeds have ended up in the hands of the Respondents.  If AHAB's claim were barred, the Respondents would remain enriched by the proceeds of Al Sanea's fraud on AHAB.

1066.  In our judgment, the key factor is the third limb of the test, namely whether denial of the claim would be a proportionate response to the illegality, always keeping in mind the possibility of overkill as Lord Toulson said at [101] in *Patel*.  In considering whether barring a claim would be harmful to the integrity of the legal system, it is helpful to remind oneself of the observation of McLachlin J in *Hall v Hebert*[868] at 165:

> … to allow recovery in these cases would be to allow recovery for what is illegal.  It would put the courts in the position of saying that the same conduct is both legal, in the sense of being capable of rectification by the court, and illegal.  It would, in short, introduce an inconsistency in the law.  It is particularly important in this context that we bear in mind that the law must aspire to be a unified institution, the parts of which – contract, tort, the criminal law – must be in essential harmony.  For the courts to punish conduct with the one hand while rewarding it with the other, would be to "create an intolerable fissure in the law's conceptually seamless web".  …. We thus see that the concern, put at its most fundamental, is with the integrity of the legal system.

1067.  In the hope of offering assistance in future cases, we propose to consider the application of the proportionality test first, on the hypothesis that AHAB do not have creditors and are claiming for their own benefit and secondly, upon the factual basis as presented to us, namely that AHAB are subject to an FRP in Saudi Arabia.

1068.  If AHAB were claiming entirely for their own benefit, we would be of the clear view that it would not be disproportionate to deny relief on the ground of illegality.

1069.  Suppose A is a drug trafficker and B a trusted accomplice in his drug trafficking enterprise.  Suppose further that B defrauds A of a share of the drug trafficking proceeds.  In our judgment, for the reasons articulated by McLachlin J and as envisaged by Lord Toulson at [110] in *Patel*, it would indeed be harmful to the integrity of the legal system for the court to assist A in recovering his share of the proceeds of drug trafficking from B or from any companies to which B had transferred such proceeds.  It would amount to the court enabling its process to be used in order for a criminal to recover the proceeds of his criminal enterprise from a fellow criminal in circumstances where the criminal courts would wish to punish him and quite possibly confiscate the proceeds of his crime.  It would involve the court system generally sending out extremely mixed and inconsistent messages.

1070.  As Lord Sumption pointed out at [13] of his judgment in *Les Laboratoires Servier v Apotex Inc*[869], the doctrine of illegality operates harshly in some cases because it bars claims which would otherwise have succeeded and for that reason it will often confer capricious benefits on defendants who may have little to be said for them in the way of merits, legal or otherwise.  This was acknowledged by Lord Mansfield CJ in the passage from *Holman v Johnson* quoted at para 1027 above.  The fact that an unmeritorious defendant may benefit from application of the illegality doctrine is outweighed by the importance of avoiding inconsistency in the law and thereby maintaining the integrity of the legal system.

1071.  We agree with the Chief Justice that the facts of the present case are akin to those of the highwayman and the drug dealer.  On the counter-factual scenario, AHAB and Al Sanea were

---

[868] *Hall v Hebert* [1993] 101 DLR(4th) 129 (**R1/20.3** at bundle R2 tab 37)
[869] *Les Laboratoires Servier v Apotex* Inc [2015] AC 430 (**R1/46.7** at bundle R8 tab 101)

both parties to the fraud committed against the banks. Al Sanea subsequently defrauded AHAB/the Money Exchange by misappropriating a substantial proportion of the proceeds of the fraud on the banks for his own benefit. AHAB now seek to claim back the share of the proceeds of which they have been defrauded. It is therefore a case of one criminal participant seeking to recover the proceeds of crime from another criminal participant (or the companies to which the latter criminal has paid the proceeds).

1072.   In our judgment, if AHAB were claiming for their own benefit, we would uphold the Chief Justice's decision that the claim should be barred on the ground of illegality for the reasons discussed above. We would reach that conclusion not because the Highwayman's case remains a free-standing head of illegality but because application of the principle established in *Patel* leads to the same result. We have taken into account the further factors listed by Professor Burrows, as suggested by Lord Toulson at [107] of his judgment, together with the additional potentially relevant factors listed in that paragraph. In particular, we are content to accept for these purposes that Al Sanea was more culpable than AHAB in that not only was he the most prominent player in the fraud on the banks but he also committed the further fraud against AHAB.

1073.   But to allow AHAB, as one of the participants in the fraud on the banks, to claim back their share of the proceeds of that fraud from the Respondents as companies to which Al Sanea (as AHAB's co-conspirator) had transferred the proceeds, would be a clear case of acting in an inconsistent manner as envisaged by McLachlin J and would be failing to maintain the integrity of the legal system.

1074.   Does the fact that AHAB are subject to an FRP (or was previously subject to the jurisdiction of the JDEK) alter the position? In our judgment it does.

1075.   Suppose AHAB were an insolvent company subject to a conventional liquidation with an independent liquidator whose duty was to gather in AHAB's assets and distribute the proceeds amongst the creditors. The creditors in this case are the banks who are the victims of the fraud. It is their money which was fraudulently obtained by the Money Exchange and, on this hypothesis, is now in the possession of the Respondents. If relief were to be denied to such a liquidator on the ground of illegality, the consequence would be that the victims of the crime would not recover the proceeds of that crime but the creditors of the companies to which the traceable proceeds of fraud had been paid would obtain a windfall. They would be paid out with monies derived from the fraud in circumstances where the doctrine of illegality would be preventing the victims of that crime from regaining the proceeds via the liquidator's claim. Indeed, the situation could be worse. Suppose that the Respondent companies were not in insolvent liquidation. In those circumstances, to deny the claim on the ground of illegality would benefit Al Sanea as beneficial owner at the expense of the defrauded creditors.

1076.   In either of the above scenarios, this seems to us to be an undesirable and inappropriate outcome. We cannot see that any public interest would be served by preventing the victims of the fraud from regaining the proceeds of that fraud via a claim by AHAB's liquidator. We cannot see that enforcement of AHAB's claim in such circumstances would adversely impact on the integrity of the legal system. On the contrary, for the court to assist the victims of the fraud to recover the proceeds of that fraud would be entirely consistent with the objective of the criminal law. Furthermore, allowing such recovery by the creditors would not unfairly prejudice the interests of the creditors of the Respondents; it would merely prevent them from gaining a windfall by being paid out with monies which were originally fraudulently obtained from the victims of the fraud perpetrated by AHAB and Al Sanea through the Money Exchange. In such circumstances it would be the denial of relief to AHAB which would be harmful to the integrity of the legal system rather than the allowing of such a claim.

1077.    Of course, AHAB are not in liquidation with an independent liquidator.  At the time of the trial they were subject to the JDEK process and they are now under an FRP as described above.  The key differences from liquidation for our purposes are first, that the litigation is in the hands of the partners of AHAB rather than an independent liquidator and secondly, that any recoveries are likely to be allocated as between AHAB and the creditors so that AHAB will derive a benefit rather than, as in an insolvent liquidation, all the recoveries being used to pay the creditors.  Does this mean that, unlike the situation where there was a liquidation, denial of the claim would be a proportionate response to the fact that the monies in question derived from a fraud on the banks?

1078.    This is more finely balanced but, in the particular circumstances of this case, we do not think so.  Any agreement between AHAB and the creditors will be subject to approval by the Bankruptcy Trustee and the whole FRP is subject to the supervision of the Dammam Commercial Court.  The proposed agreement under the JDEK envisaged the first SAR 6 billion going entirely to the creditors with AHAB only possibly sharing in any recoveries thereafter.  Mr Wardell accepted that it was likely that any agreement under the FRP would also allow for some participation by AHAB but it is clear that the Bankruptcy Trustee will be looking at matters independently and is unlikely to approve any agreement reached between the creditors and AHAB unless he considers it to be in the interests of the creditors.

1079.    In our judgment, the mere fact that AHAB may well benefit partially from any recoveries from the Respondents pursuant to this litigation is not sufficient to make it proportionate to bar the claim.  If the claim were to be barred, it would mean that the victims of the fraud would be prevented from making any recovery of the proceeds of that fraud whilst at the same time a windfall would be provided to the creditors of the Respondents.

1080.    As Lord Toulson stated, the court must guard against overkill if the law on illegality is not applied with a due sense of proportionality.  In our judgment, the fact that AHAB may benefit from the claim by being allowed to keep some of the recovered proceeds of the fraud for themselves does not make it proportionate to bar the claim altogether, with the consequence that the victims of the fraud would be prevented from gaining any access to the monies of which they have been defrauded.  We consider that the overall justice of the case would be better served by allowing AHAB to share in the recovery of any proceeds with the creditors to such extent as may be permitted by the Bankruptcy Trustee under the supervision of the Dammam Commercial Court rather than by preventing the creditors, as victims of the fraud, from being able to recover at all.

1081.    For these reasons, we do not consider that AHAB's claims would be barred on the ground of illegality.

1082.    Before leaving the topic of illegality, we should add that, although it was not referred to by counsel, we have noted the observation of Lord Walker of Gestingthorpe in *Stone & Rolls Limited (in liquidation) v Moore Stephens*[870] at [184].  That case concerned a claim by a company in liquidation against its auditor. The sole directing mind and will and beneficial owner of the company had caused the company to defraud banks by means of false documents. The company became insolvent when the fraud was discovered and the liquidators sought to recover damages from the auditors of the company for negligence in carrying out the audit and failing to detect the fraud. The auditors pleaded that the case was barred because of the company's illegal conduct. The House of Lords held by a majority of three to two that the claim was barred. In passing, Lord Walker said at [184]:

> It was argued for the appellants that the public policy defence should not bar claims brought by a company in insolvent liquidation, where the creditors

---

[870] *Stone & Rolls Limited (in liquidation) v Moore Stephens* [2009] 1 AC 1391 (**R1/38.8** at bundle R5 tab 71)

were innocent parties who had been defrauded by Mr Stojevic.  If that were right, it would create a very large gap in the public policy defence, since most fraudsters (individual and corporate) become insolvent sooner or later and have liabilities to those whom they have defrauded.  Mr Brindle conceded that if Mr Stojevic had carried out his frauds directly (and not through a one-man company) neither he nor his trustee in bankruptcy could have resisted the public policy defence.  That conclusion was reached by Langley J… and is clearly correct…There is no good reason to apply a different rule to a company in liquidation.  Apart from special statutory claims in respect of misfeasance, wrong trading and so on, it cannot assert any cause of action which it could not have asserted before the commencement of its liquidation, as Mr Brindle concedes. That is especially true in the context of the duties of an auditor, which are not owed to a company's creditors.

1083.    Despite the eminence of its source, we do not consider that this observation prevents us from reaching the conclusion that the claim in the present case is not barred.  That is for two main reasons.

1084.    First, although not by reference to this particular observation, the decision in *Stone & Rolls* has been subject to widespread and sustained criticism. In his judgment in *Bilta (UK) Limited (in liquidation) v Nazir (No 2)*[871] (where the Supreme Court held that a claim by a company in liquidation against its directors for breach of fiduciary duty in causing it to commit fraud was not barred on the grounds of the company's illegality) Lord Neuberger went so far as to say at [30]:

> 30.    Subject to these points, the time has come in my view for us to hold that the decision in *Stone & Rolls* should, as Lord Denning MR graphically put it in relation to another case in *In Re King*…be put "on one side in a pile and marked 'not to be looked at again'''.  Without disrespect to the thinking and research that went into the reasoning of the five Law Lords in that case, and although persuasive points and observations may be found from each of the individual opinions, it is not in the interests of the future clarity of the law for it to be treated as authoritative or of assistance save as already indicated.

1085.    Secondly, and more significantly, *Stone & Rolls* was decided before the significant change in approach brought about by *Patel*.  Unlike previously, it is clear that the court must now consider whether it be contrary to the public interest to allow a claim to be enforced because it would be harmful to the interests of the legal system.  In particular, the court must ask itself whether barring a claim is a proportionate response to the illegality in question.  The landscape is therefore very different from that which was being considered by Lord Walker in *Stone & Rolls*. For the reasons we have given, we consider that barring the claim in the present action would be a disproportionate response because it would prevent the victims of the fraud from recovering (via AHAB's claim) the proceeds of that fraud.

1086.    As already stated, the only claims of AHAB which survive following our decision are the claims against SIFCO 5 arising from the misappropriation of the $191m. It follows from what we have said that those claims are not barred for illegality.


***Summary of conclusions***

---

[871] *Bilta (UK) Limited (in liquidation) v Nazir (No 2)* [2016] AC 1 (**R1/51.1** at bundle R9 tab 112)

1087.   We would summarise our key conclusions as follows, bearing in mind that AHAB have settled with the GT Respondents and that the outstanding claims therefore only relate to the AwalCos and SIFCO 5.

(i)     Subject to (ii), we uphold the Chief Justice's decision that, by reason of AHAB's knowledge and consent, Al Sanea was not in breach of his fiduciary duty owed to AHAB/the Money Exchange.

(ii)    We find that he was, however, in breach of fiduciary duty in relation to the transfer of $191m from the Money Exchange to Awal Bank on 3 May 2009.

(iii)   The Chief Justice was correct to hold that the governing law of the proprietary claim and the claims in knowing receipt and unjust enrichment was Saudi law.

(iv)    The claims in dishonest assistance and conspiracy are tortious claims which are subject to the double actionability principle.

(v)     As to the substance of Saudi law, we uphold the Chief Justice's decision that Saudi law does not recognise a proprietary claim against substituted property representing misappropriated monies.  We also uphold his decision that, in this case, liability of the Respondent companies would not be on a joint and several basis but would instead be limited to the amount which each company received.

(vi)    As to attribution, we hold that the *Hampshire Land* principle does not apply in this case.  On any re-trial, it would be a matter for the judge as to whether the knowledge of Al Sanea should be attributed to SIFCO 5 as being the "directing mind and will" or "relevant responsible director" in connection with receipt by SIFCO 5.  We do not accept that the reasons given by the Chief Justice for holding that Al Sanea's knowledge could not be attributed to SIFCO 5 are sufficient and this too would be open afresh to the judge on any re-trial.

(vii)   As to tracing under Cayman law:-

        (a) In accordance with the decision in *Sinclair*, the burden of proof may be reversed even where the defaulting fiduciary (Al Sanea) did not create a maelstrom or cross-firing for the specific intention of rendering it more difficult to trace misappropriated assets and even if the property is in the hands of companies owned by the defaulting fiduciary rather than the defaulting fiduciary himself.  Accordingly, depending on any finding as to attribution and the level of control exercised by Al Sanea over SIFCO 5, it would be open on a re-trial to hold that the burden of proof was reversed because of Al Sanea's creation of a maelstrom and cross-firing.

        (b) Even assuming a reversal of the burden of proof, it is not possible to trace any part of the $191m into the hands of any of the AwalCos.

        (c) It would be for a judge on any re-trial to determine whether any part of the $191m can be traced into the hands of SIFCO 5.  On the evidence before us, such claim would appear to be limited to the sum of $500,000, but that would be a matter for evidence on a retrial.

(viii)  The claims of dishonest assistance, conspiracy and under the unifying theory (reflecting the Cayman law claims of knowing receipt and unjust enrichment) against the AwalCos all fail.

(ix)    The claims of dishonest assistance, conspiracy and under the unifying theory against SIFCO 5 are arguable in relation to such part of the $191m as can be shown by application of Cayman law tracing principles (including reversal of the burden of proof if appropriate) to have been received by SIFCO 5 and can be re-tried.

(x)     AHAB's claims are not barred on the ground of illegality.

A-9909

1088.   Although, as mentioned at paragraph 934 above, we have been informed that AHAB have settled with the AwalCos, the terms of any order for the withdrawal or dismissal of AHAB's appeal against the AwalCos have not yet been agreed, with the consequence that AHAB's appeal against the AwalCos is still in existence and needs to be disposed of.  Accordingly, for the reasons set out above, we dismiss AHAB's appeal entirely in respect of the AwalCos.  As to SIFCO 5, we dismiss AHAB's appeal in respect of the proprietary claim, but otherwise allow it to the extent of ordering a re-trial as to whether any of AHAB's claims of dishonest assistance, conspiracy or under the unifying theory against SIFCO 5 succeed in relation to the sum of $191m misappropriated from the Money Exchange in breach of fiduciary duty by Al Sanea on 3 May 2009.

1089.   On any re-trial, it is not open to SIFCO 5 to re-open the decisions upheld by this Court as to breach of fiduciary duty, the proper law of the claims, the substantive law of Saudi Arabia or illegality.  The only aspects which are to be re-visited are those of attribution and tracing, which are to be determined in accordance with the law as we have held it to be.

1090.   We would not want to leave this judgment without recording our grateful thanks both to counsel together with their instructing attorneys, and to the Chief Justice. In this complex and arduous case, counsel and those who have instructed them have been of the greatest assistance in the preparation and presentation of the material. As for the Chief Justice's  judgment with which we have been concerned, although we have differed from it in certain respects, the longer we have grappled with the difficult issues of fact and law which have been put before us, the greater we have admired the thoroughness and care which the Chief Justice brought to his immense task.

A-9910

669

A.C.                              The Makkutai (P.C.)

A    purposes stated therein. It was common ground between the parties before
     their Lordships that, in the event of the shipowners' appeal being
     dismissed, the cross-appeal would not arise and the cargo owners should
     continue to be entitled to retain the letter of guarantee pursuant to the
     consent order. It follows that no order should be made on the cross-
     appeal, and their Lordships will humbly advise Her Majesty accordingly.

B    *Solicitors: Sinclair Roche & Temperley; Crump & Co.*

                                                              S. S.

C                              ————

                          [HOUSE OF LORDS]

D    **WESTDEUTSCHE LANDESBANK GIROZENTRALE**      RESPONDENT

                              AND

     **ISLINGTON LONDON BOROUGH COUNCIL**    .    .    APPELLANT

     1995  July 10, 11, 12, 13;      Lord Goff of Chieveley, Lord Browne-Wilkinson,
     1996  May 22                         Lord Slynn of Hadley, Lord Woolf
E                                             and Lord Lloyd of Berwick

     *Restitution—Quasi-contract—Moneys had and received—Lump sum
        paid by bank to local authority under interest rate swap agreement—
        Local authority making payments pursuant to agreement—
        Agreement ultra vires local authority—Balance of lump sum
        recovered by bank—Whether compound interest recoverable from
F       date sum paid—Whether local authority holding moneys on resulting
        trust—Whether equity to supplement bank's right to simple interest
        on common law claim*

         The parties entered into a 10-year interest rate swap agreement
     starting on 18 June 1987 based on a notional principal sum of
     £25m. Additionally, the plaintiff bank as the fixed rate payer paid
     the defendant council as the floating rate payer a lump sum of
     £2·5m. Pursuant to the agreement, the council made "interest"
G    payments in December 1987, June and December 1988 and June
     1989 to the bank totalling £1,354,474·07. On 1 November 1989
     the Divisional Court of the Queen's Bench Division held in an
     unrelated case that interest rate swap transactions by local
     authorities were ultra vires. Following that decision, the council
     made no more payments. The bank brought an action against the
     council claiming repayment of the balance of the £2·5m. amounting to
H    £1,145,525·93 plus interest from 18 June 1987. The judge gave
     judgment for the bank for the principal sum plus compound interest
     from 1 April 1990. The Court of Appeal dismissed an appeal by the
     council and allowed a cross-appeal by the bank against the judge's
     rejection of 18 June 1987 as the date from which interest should run.

EXHIBIT

11

670

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

On appeal by the council against the award of compound    **A**
interest:—
   *Held*, (1) that on a claim at common law for recovery of
moneys paid in pursuance of an ineffective contract the claimant
was entitled under section 35A of the Supreme Court Act 1981 to
simple interest only; that in the absence of fraud equity had never
awarded compound interest except against a trustee or other
person in a fiduciary position in respect of profits improperly
made; that the recipient of moneys under a contract subsequently  **B**
held void for mistake or as being ultra vires did not hold those
moneys on a resulting trust and it would be undesirable so to
develop the law of resulting trusts since to do so would give the
claimant a proprietary interest in the moneys and produce
injustice to third parties and commercial uncertainty; and that the
council was not otherwise in a fiduciary position vis-à-vis the
bank (post, pp. 690C–F, 698C–D, 700H–701A, C, 702D–E, 703E–F,
705A–B, 708E, 709F, 716E–F, 720G–H, 738B–C).                       **C**
   (2) Allowing the appeal (Lord Goff of Chieveley and Lord
Woolf dissenting), that it would be undesirable for equity to
award compound interest in aid of the bank's common law claim
for restitution having regard, inter alia, to the fact that Parliament
had twice since 1934 considered what interest should be awarded
on claims at common law and had expressly not authorised the
award of compound interest; and that, accordingly, the bank       **D**
should recover simple interest only as from 18 June 1987, the date
of accrual of its cause of action (post, pp. 713H–714B, 717B,
D–718B, D–E, 719A–C, 723D–B, 738A–B, 741F).
   *President of India v. La Pintada Compania Navigacion S.A.*
[1985] A.C. 104, H.L.(E.) applied.
   *Chase Manhattan Bank N.A. v. Israel-British Bank (London)
Ltd.* [1981] Ch. 105 considered.
   *Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.) departed from.  **E**
   Decision of the Court of Appeal [1994] 1 W.L.R. 938; [1994]
4 All E.R. 890 reversed.

The following cases are referred to in their Lordships' opinions:

*Afovos Shipping Co. S.A. v. R. Pagnan and Flli.* [1980] 2 Lloyd's Rep. 469
*Ames' Settlement, In re; Dinwiddy v. Ames* [1946] 1 Ch. 217; [1946] 1 All E.R. 689   **F**
*Arnott v. Redfern* (1826) 3 Bing. 353
*Attorney-General v. Alford* (1855) 4 De G.M. & G. 843
*B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783;
   [1982] 1 All E.R. 925
*Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353,
   C.A.
*Barnes v. Addy* (1874) L.R. 9 Ch.App. 244                        **G**
*Birch v. Blagrave* (1755) 1 Amb. 264
*Burdick v. Garrick* (1870) L.R. 5 Ch.App. 233
*Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981]
   Ch. 105; [1980] 2 W.L.R. 202; [1979] 3 All E.R. 1025
*Childers v. Childers* (1857) 1 De G. & J. 482
*Commissioner of Stamp Duties (Queensland) v. Livingston* [1965] A.C. 694;
   [1964] 3 W.L.R. 963; [1964] 3 All E.R. 692, P.C.                **H**
*Cook, In re; Beck v. Grant* [1948] Ch. 212; [1948] 1 All E.R. 231
*De Havilland v. Bowerbank* (1807) 1 Camp. 50
*Diplock, In re; Diplock v. Wintle* [1948] Ch. 465; [1948] 2 All E.R. 318, C.A.
*Eddowes v. Hopkins* (1780) 1 Doug. 376

671

A.C.                     Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

**A**
*Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32; [1942] 2 All E.R. 122, H.L.(E.)
*Gittins v. Steele* (1818) 1 Swan. 24; (1818) 1 Swan. 199
*Goldcorp Exchange Ltd., In re* [1995] 1 A.C. 74; [1994] 3 W.L.R. 199; [1994] 2 All E.R. 806, P.C.
*Hadley v. Baxendale* (1854) 9 Exch. 341
*Hallett's Estate, In re; Knatchbull v. Hallett* (1880) 13 Ch.D. 696, C.A.

**B**
*Hazell v. Hammersmith and Fulham London Borough Council* [1990] 2 Q.B. 697; [1990] 2 W.L.R. 1038; [1990] 3 All E.R. 33, C.A.; [1992] 2 A.C. 1; [1991] 2 W.L.R. 372; [1991] 1 All E.R. 545, H.L.(E.)
*Hungerfords v. Walker* (1989) 171 C.L.R. 125
*Johnson v. The King* [1904] A.C. 817, P.C.
*Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972

**C**
*Leslie (R.) Ltd. v. Sheill* [1914] 3 K.B. 607, C.A.
*Lipkin Gorman v. Karpnale Ltd.* [1987] 1 W.L.R. 987; [1992] 4 All E.R. 331; [1991] 2 A.C. 548; [1991] 3 W.L.R. 10; [1992] 4 All E.R. 512, H.L.(E.)
*London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429, H.L.(E.)
*McCormick v. Grogan* (1869) L.R. 4 H.L. 82, H.L.(I.)
*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391; [1989] 3 W.L.R. 563; [1989] 3 All E.R. 14, C.A.

**D**
*Montagu's Settlement Trusts, In re* [1987] Ch. 264; [1987] 2 W.L.R. 1192
*Moses v. Macferlan* (1760) 2 Burr. 1005
*Muller, In re; Cassin v. Mutual Cash Order Co. Ltd.* [1953] N.Z.L.R. 879
*Napier and Ettrick (Lord) v. Hunter* [1993] A.C. 713; [1993] 2 W.L.R. 42; [1993] 1 All E.R. 385, H.L.(E.)
*National Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637; [1989] 3 W.L.R. 1330; [1990] 1 All E.R. 78, H.L.(E.)

**E**
*O'Sullivan v. Management Agency and Music Ltd.* [1985] Q.B. 428; [1984] 3 W.L.R. 448; [1985] 3 All E.R. 351, C.A.
*Page v. Newman* (1829) 9 B. & C. 378
*Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R. 221
*Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234; [1966] 3 All E.R. 77, H.L.(E.)
*President of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104; [1984] 3 W.L.R. 10; [1984] 2 All E.R. 773, H.L.(E.)

**F**
*Quistclose Investments Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567; [1968] 3 W.L.R. 1097; [1968] 3 All E.R. 651, H.L.(E.)
*Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera Ecuatoriana* [1983] 2 A.C. 694; [1983] 3 W.L.R. 203; [1983] 2 All E.R. 763, H.L.(E.)
*Sinclair v. Brougham* [1914] A.C. 398, H.L.(E.)
*Stocks v. Wilson* [1913] 2 K.B. 235

**G**
*Vandervell v. Inland Revenue Commissioners* [1967] 2 A.C. 291; [1967] 2 W.L.R. 87; [1967] 1 All E.R. 1, H.L.(E.)
*Vandervell's Trusts (No. 2), In re* [1974] Ch. 269; [1974] 3 W.L.R. 256; [1974] 3 All E.R. 205, C.A.
*Vinogradoff, In re; Allen v. Jackson* [1935] W.N. 68
*Wadsworth v. Lydall* [1981] 1 W.L.R. 598; [1981] 2 All E.R. 401, C.A.
*Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975] 1 All E.R. 849, C.A.

**H**
*West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund Trusts, In re* [1971] Ch. 1; [1970] 2 W.L.R. 848; [1970] 1 All E.R. 544
*Woolwich Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C. 70; [1992] 3 W.L.R. 366; [1992] 3 All E.R. 737, H.L.(E.)

A-9913

672

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

The following additional cases were cited in argument:                          A

*Alati v. Kruger* (1955) 94 C.L.R. 216
*Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd.* [1980] Q.B.
   677; [1980] 2 W.L.R. 218; [1979] 3 All E.R. 522
*Bishopsgate Investment Management Ltd. v. Homan* [1995] Ch. 211; [1994]
   3 W.L.R. 1270; [1995] 1 All E.R. 347, C.A.
*Craven-Ellis v. Canons Ltd.* [1936] 2 K.B. 403; [1936] 2 All E.R. 1066, C.A.
*Cundy v. Lindsay* (1878) 3 App.Cas. 459, H.L.(E.)                                  B
*El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717; [1994] 2 All E.R.
   685, C.A.
*General Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd.* [1975]
   1 W.L.R. 819; [1975] 2 All E.R. 173, H.L.(E.)
*Guardian Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3)* [1992] 2 Lloyd's
   Rep. 193
*International Railway Co. v. Niagara Parks Commission* [1941] A.C. 328; [1941]   C
   2 All E.R. 456, P.C.
*Mathew v. T. M. Sutton Ltd.* [1994] 1 W.L.R. 1455; [1994] 4 All E.R. 793
*Norwich Union Fire Insurance Society Ltd. v. Wm. H. Price Ltd.* [1934] A.C.
   455, P.C.
*Reg. v. Shadrokh-Cigari* [1988] Crim.L.R. 465, C.A.
*Vyse v. Foster* (1872) L.R. 8 Ch.App. 309; (1874) L.R. 7 H.L. 318, H.L.(E.)

                                                                                   D
APPEAL from the Court of Appeal.
   This was an appeal by the defendant, Islington London Borough
Council, by leave of the House of Lords from the decision of the Court
of Appeal (Dillon, Leggatt and Kennedy L.JJ.) on 17 December 1993
dismissing an appeal by the council and allowing a cross-appeal by the
plaintiff bank, Westdeutsche Landesbank Girozentrale, from the order of
Hobhouse J. on 12 February 1993 giving judgment for the bank in the    E
sum of £1,145,525.93 with compound interest from 1 April 1990 totalling
£446,368.81. The bank's cross-appeal related to the date from which
compound interest should run; the Court of Appeal ordered that it should
run from 18 June 1987, thus totalling £1,358,098.57 as at the date of the
judge's judgment.
   The Court of Appeal refused the council leave to appeal from its    F
decision, but on 23 May 1994 the Appeal Committee of the House of
Lords (Lord Goff of Chieveley, Lord Browne-Wilkinson and Lord
Mustill) allowed a petition by it for leave.
   The facts are stated in their Lordships' opinions.


   *Trevor Philipson Q.C.* and *Brian Doctor* for the council. Both parties
accept that compound, as opposed to simple, interest is payable only if    G
the council received the money under the void interest rate swaps
agreement as fiduciary: see *President of India v. La Pintada Compania
Navigacion S.A.* [1985] A.C. 104, 116.
   The bank contends that where the sole legal basis on which the
property in money purportedly passed is non-existent (as where money is
paid under an ultra vires contract or by mistake) there is a separation of
the legal title in the money, which passes to the recipient, and the equitable    H
title, which remains in the original owner. That contention would apply
to the position of the revenue in *Woolwich Equitable Building Society v.
Inland Revenue Commissioners* [1993] A.C. 70, the charities in *In re*

673

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A   *Diplock; Diplock v. Wintle* [1948] Ch. 465, the building society in *Sinclair v. Brougham* [1914] A.C. 398 and the bank in *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105. But if the recipients were all fiduciaries simply because the legal basis for their receipt of money was non-existent there would never have been any doubt that they had to account for the money.

B       According to the analysis in *Sinclair v. Brougham* the council received the money as an innocent volunteer. If the analysis in *Sinclair v. Brougham* is not followed and/or applied to this case, the council received the money in circumstances where the bank did not retain equitable title in the money; alternatively, even if it did, the council was not constituted a "fiduciary" for the purposes of the question whether it is liable to pay compound interest. However, even if the council was in the position of a

C   fiduciary, the fact that it was justifiably ignorant of that status should preclude it from having to account for profits or pay compound interest for any period before it could reasonably have been expected to have become aware of such status. Even if that is incorrect, there is a distinction to be made between accounting for profits and paying compound interest on the one hand and the saving of expenses that the council might otherwise have incurred if it had had to borrow the money elsewhere. No

D   authority was cited in support of that extension of the obligation of a fiduciary to account by either Hobhouse J. or the Court of Appeal. The Court of Appeal relied on *Sinclair v. Brougham* for the proposition that the payment of money pursuant to an ultra vires contract made the recipient a fiduciary in respect of the money. However, in that case the building society was held to be not a fiduciary but an innocent volunteer:

E   see pp. 422–423, 445–456, 452–453 and *In re Diplock; Diplock v. Wintle,* at pp. 529–532, 544 and 547E. Like the council the building society was unaware at the time when the contracts were concluded that they were ultra vires. If, however, in *Sinclair v. Brougham* it was possible to construe the handing over of the money to the directors as being for a purpose (to invest in a lawful banking business) that failed, in the present case the bank can have had no purpose at all in handing over the money to the

F   council other than to give it completely and irrevocably to the council to do with it what it wished. A finding that the council was a fiduciary might mean that the council would have to account for any profits made with the money, despite the fact that the money was given to it out-and-out and that before it issued its writ the bank did not seek the return of the money but instead sought the further performance of the contract. The

G   bank would have been a preferred creditor in respect of the money if the council or a person in its position had become insolvent: *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105. A payer able to frame his claim in equity might be able to avoid a change of position defence and/or a defence of limitation. *Sinclair v. Brougham* is not authority for such startling propositions. Viscount Haldane L.C. does not say that the building society was in the position of a trustee. Nor does

H   the case support the bank's proposition that the separation of the legal from the equitable interest necessarily imports a trust.

       [LORD GOFF OF CHIEVELEY.   Their Lordships wish to hear argument as to whether *Sinclair v. Brougham* was correctly decided.]

674

If *Sinclair v. Brougham* is authority for the proposition that a person    A
who receives money under an ultra vires transaction without knowledge
of that fact does so as a fiduciary liable to pay compound interest, then it
ought to be departed from.

Complex issues arise in relation to the position of a "fiduciary" on
bankruptcy: however desirable it may be to fashion remedies in such a
situation, the complexities cannot be avoided, nor can the problems be
solved, by labelling the payee of money in a situation such as the present    B
as a "fiduciary". This was a commercial contract that envisaged that on
payment the money would become the property of the council, which
could do with it as it pleased: see *In re Goldcorp Exchange Ltd.* [1995]
1 A.C. 74, 98A–F, 100D–101E, 102G–103E and *Goff & Jones, The Law of
Restitution,* 4th ed. (1993), pp. 94–96 and 541, n. 24b. If the council was a
fiduciary, it was not in breach of its fiduciary duty by retaining and    C
spending the money. It is irrelevant whether the bank can trace the
property into the council's hands on the basis of ownership. The unwitting
use of someone else's property does not give rise to a breach of trust.

The equitable jurisdiction to award compound interest is exercisable if
money has been withheld or misapplied by a trustee or anyone else in a
fiduciary position. If the council was not in a fiduciary position on receipt    D
of the money, that removes the basis of the order for payment of
compound interest. (No one suggested that it became a fiduciary when it
failed to pay. If that were so, every overdue debtor would be a fiduciary
liable to compound interest.) However, even if the council was a fiduciary
the Court of Appeal applied the wrong test in determining whether the
circumstances were such that compound interest was appropriate. The
cases cited by Dillon L.J. [1994] 1 W.L.R. 938, 949–950 and Leggatt L.J.,    E
at pp. 953–954, show that the courts have consistently justified an award
of compound (as opposed to simple) interest not by way of punishing the
fiduciary for making use of the plaintiff's money but on the basis that it
represents the profit that the fiduciary has made or is presumed to have
made from use of the principal sum. Compound interest is given not to
compensate for loss of profit but to ensure as far as possible that the    F
defendant retains no profit for which he ought to account: see *Burdick v.
Garrick* (1870) L.R. 5 Ch.App. 233, 241 and *Wallersteiner v. Moir
(No. 2)* [1975] Q.B. 373, 406. It depends on the evidence as to what the
accounting party has done or can be presumed to have done with the
money (see *Wallersteiner v. Moir (No. 2),* at p. 406 and *Burdick v.
Garrick,* at pp. 241 and 243–244), but if it is established that he has used    G
the money in ordinary trade the court will presume that the accounting
party has made that amount of profit that persons ordinarily do make in
trade: see *Burdick v. Garrick,* at p. 242, *Wallersteiner v. Moir (No. 2),* at
pp. 397E–F, 398F, 406F; *O'Sullivan v. Management Agency and Music
Ltd.* [1985] Q.B. 428, 461F–G and *Guardian Ocean Cargoes Ltd. v. Banco
do Brasil S.A. (No. 3)* [1992] 2 Lloyd's Rep. 193, 198. Whether his object    H
is personal or proprietary is irrelevant. There is no evidence that the
council earned compound interest on the money or used it in a trade. The
basis of the Court of Appeal's decision was that it had had a benefit from
the money by being relieved of the obligation to pay compound interest

675

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A    on the money that it would otherwise have had to borrow. That in
     accordance with the test as laid down in the authorities.
         As to the date from which interest should run, the prima facie rule in
     *B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783,
     846 was plainly applied by the Court of Appeal in the context of
     compound interest. The court took the view that, because the obligation
B    to repay ran from the date of payment, the interest too ran from that
     date. That is unattractive. If simple interest is awarded the dictum of Lord
     Wilberforce in *General Tire & Rubber Co. v. Firestone Tyre & Rubber Co.
     Ltd.* [1975] 1 W.L.R. 819, 836H is of some force. Until the decision in
     *Hazell v. Hammersmith and Fulham London Borough Council* [1990] 2 Q.B.
     697; [1992] 2 A.C. 1, both parties considered the agreement as binding
     and the bank neither demanded nor expected that it would be repaid its
C    capital sum. There is no evidence that the bank would have agreed to the
     termination of the contract before the Divisional Court's decision in
     *Hazell's* case, and there is evidence that it went on demanding performance
     pursuant to the contract even after the House of Lords gave judgment in
     that case until it issued its writ in April 1991. The time at which persons
     acting honestly and reasonably would have paid is no earlier than the date
D    of the Divisional Court's judgment, alternatively 1 April 1990 (the date
     chosen by Hobhouse J.), alternatively, a date just after the House of
     Lords had settled the law. No other recent case has sought to expand the
     old principles; they have simply been applied. [Reference was made to
     *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council*
     [1994] 4 All E.R. 972.]
         *Jonathan Sumption Q.C.* and *George Leggatt* for the bank. Any civilised
E    system of law is bound to provide remedies for "unjust enrichment or
     unjust benefit:" see *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe
     Barbour Ltd.* [1943] A.C. 32, 61 and *Woolwich Equitable Building Society
     v. Inland Revenue Commissioners* [1993] A.C. 70, 197, 202. The benefit that
     the council gained from the upfront payment is not limited to the net
     principal sum that it failed to repay to the bank. It includes the enrichment
F    caused by having had the use of the money from the time of its receipt
     until it was paid back: see *per* Hobhouse J. [1994] 4 All E.R. 890, 954C–D.
     If the council had borrowed the money, it would in the commercial world
     have done so at compound and not merely simple interest: see *National
     Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637. It
     follows that to award no more than simple interest on the money received
G    by the council or to award interest for only part of the period for which
     the council had the use of that money, would be to award less than full
     restitution. Such a result would be inconsistent with legal principle.
         Where money is paid either pursuant to a contract which is void, or
     under a fundamental mistake of fact or law, the money is impressed in the
     hands of the payee with a trust in favour of the payer. The payee is then
     accountable to the payer not only for the principal but for the entire
H    benefit which he has obtained from his possession of the principal in the
     intervening period. Compound interest may not be the measure of that
     benefit in all cases, but in the present case an award of compound interest
     was appropriate.

676

Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

Where a payment is made under a contract which is void, no title to          A
the money will pass: see *Cundy v. Lindsay* (1878) 3 App.Cas. 459. The
position is the same where the contract is voidable and has been avoided
ab initio: The property revests in the transferor as if it had never passed;
if it cannot revest at law it will revest in equity: *Alati v. Kruger* (1955)
94 C.L.R. 216. Where, as here, the money is paid into a bank account in
which it is mixed with the recipient's own money, the legal ownership of
the money is lost by the payer: see *Lipkin Gorman v. Karpnale Ltd.* [1991]          B
2 A.C. 548, 572D and *In re Hallett's Estate: Knatchbull v. Hallett* (1880)
13 Ch.D. 696, 717–718. In equity, however, it remains the property of the
payer: see *Sinclair v. Brougham* [1914] A.C. 398, 418, 420, 423, 424, 441,
444 and *In re Diplock; Diplock v. Wintle* [1948] Ch. 465, 536–537.

An analogy can be drawn with the case of a payment made for a
limited purpose that becomes incapable of fulfilment. The money is then          C
held on a resulting trust for the payer: *In re Diplock*, pp. 540–541; *In re
Ames' Settlement; Dinwiddy v. Ames* [1946] 1 Ch. 217 and *Quistclose
Investments Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567.

The separation of the legal from the equitable interest necessarily
imports a trust: see *Sinclair v. Brougham*, at pp. 421, 441; *In re Diplock*,
at pp. 530–531 and *Birks, An Introduction to the Law of Restitution* (1985),
pp. 381–382. In the case of money paid under an ultra vires contract, this          D
is so whether or not the money is still traceable to specific assets in
accordance with the rule in *In re Hallett's Estate*. The application of this
principle to a solvent defendant such as the council results in the bank
recovering its property in full from the local authority's general assets.
The rules of tracing were devised to work rough justice between the
various victims of an insolvent fiduciary, not to enable the fiduciary
himself to extinguish a claim against him in reliance on his own          E
rearrangement of his assets: see *El Ajou v. Dollar Land Holdings Plc.*
[1993] 3 All E.R. 717, 735J–736A and Hobhouse J. [1994] 4 All E.R. 890,
938F–J.

Quite apart from the proprietary claim, the bank also has a personal
claim in equity to require the council to account for its property: *Snell's
Equity*, 29th ed. (1990), pp. 284–287.          F

In *Sinclair v. Brougham* it was held that there was no personal claim
in equity or at law, because to allow such a claim would be indirectly to
enforce an invalid borrowing contract: see pp. 414, 418. This part of the
decision has been subjected to powerful and justified criticism by Lord
Wright "*Sinclair v. Brougham*" (1938) 6 C.L.J. 305. But even if correct it
has no application to a restitutionary claim, whether at law or in equity,          G
arising out of a void swap contract since such restitution would not be
legally or financially equivalent to enforcement of the contract itself.

Hobhouse J. gave it as an alternative ground of his decision that, even
if the invalidity of the swap contract had not given rise to an obligation
to repay the money in equity, the mistake under which the premium was
paid to the council by the bank was capable of doing so. This is correct.
Where money (or other property) is transferred under a mistake as to a          H
matter fundamental to the transferor's intention to pass ownership, the
intention to transfer ownership is vitiated and title to the money does not
pass to the recipient: *Norwich Union Fire Insurance Society Ltd. v.*

677

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

A  *Wm. H. Price Ltd.* [1934] A.C. 455, 462–463. As Hobhouse J. observed, at
p. 432i, it would be hard to think of a more fundamental mistake than the
belief of a person paying money that he was doing so pursuant to a
binding agreement when there was in reality no such agreement. The
result in equity is the same as it is in the case of payments under a void
contract. The payer retains the equitable interest in the money: *Chase
Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105;
B  *Reg. v. Shadrokh-Cigari* [1988] Crim.L.R. 465 and *In re Goldcorp Exchange
Ltd.* [1995] 1 A.C. 74, 103. It follows that he has the same proprietary and
personal claims arising out of that state of affairs. As the law is presently
understood, it would be an answer to a claim at common law founded on
mistake that the mistake was one of law. However, there is no authority
that could require the House of Lords to hold that the distinction between
C  mistakes of fact and law is relevant to a claim for equitable relief, and
there is no justification in the generality of cases for the continued
recognition of the distinction, even at common law.

   The jurisdiction to award compound interest arises from the inherent
powers of a court of equity. The award of compound interest can depend
only on what measure of restitution the conscience of equity requires. The
award of interest, whether simple or compound, is not punitive and does
D  not depend on proof of misfeasance. The fundamental principle on which
equity exercises its inherent jurisdiction to award interest is that the
defendant should not profit personally from having had the use of assets
to which he had no right. He is therefore accountable for the benefit that
he has derived from them or may be presumed to have derived from them:
see *Attorney-General v. Alford* (1855) 4 De G.M & G. 843, 851; *Burdick v.
E  Garrick,* L.R. 5 Ch.App. 233, 241–242; *Vyse v. Foster* (1872) L.R. 8 Ch.
App. 309; (1874) L.R. 7 H.L. 318; *In re Diplock; Diplock v. Wintle* [1948]
Ch. 465; *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373, 388, 397; *Guardian
Ocean Cargoes Ltd. v. Banco do Brasil S.A. (No. 3)* [1992] 2 Lloyd's Rep.
193 and *Mathew v. T. M. Sutton Ltd.* [1994] 1 W.L.R. 1455, 1461.

   The relationship of the parties is relevant to whether interest should be
awarded in equity, but not to the measure of that interest. The relationship
F  is very much wider than that of trust or analogous relationships: see
*International Railway Co. v. Niagara Parks Commission* [1941] A.C. 328,
344–345 and *Halsbury's Laws of England,* 4th ed., vol. 32 (1980), p. 55,
para. 109.

   Reference was also made to the Report of the Law Commission, "Law
of Contract: Report on Interest" (Law Com. No. 88) (1978) (Cmnd.
G  7229), paras. 8, 10, 21 and *President of India v. La Pintada Compania
Navigacion S.A.* [1985] A.C. 104.

   Every statutory intervention in the common law regarding interest has
been not on general principle but to remedy some perceived defect. The
exclusion of compound interest in section 35A of the Supreme Court Act
1981 is not relevant here even by analogy.

   *Sinclair v. Brougham* reflected the received view in 1914 about money
H  had and received. The basis of the law of restitution has changed
significantly since then. The House of Lords would not imply a contract
to repay; also, repayment would have been tantamount to performance. It
is desirable that that part of the decision in *Sinclair v. Brougham* should

A-9919

678

be brought into line with modern thinking. *Sinclair v. Brougham* would    A
today be regarded as based on obsolete reasoning.

[Reference was made to *Goff & Jones, The Law of Restitution*, p. 5;
Lord Wright, "*Sinclair v. Brougham*," 6 C.L.J. 305, 313 et seq.; *R. Leslie
Ltd. v. Sheill* [1914] 3 K.B. 607; *Craven-Ellis v. Canons Ltd.* [1936] 2 K.B.
403; *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.*
[1943] A.C. 32; *Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R.    B
221; *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548 and *Woolwich
Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C.
70.]

In considering whether to overrule *Sinclair v. Brougham* on the equity
point, the House of Lords should take into consideration that there are
more common law remedies today. However, it cannot be an objection to
recognising an equitable remedy that there is a common law remedy for    C
the same problem. One may assimilate the remedy. A wide range of
equitable remedies serve the interests of justice: see Lord Wright, "*Sinclair
v. Brougham*," 6 C.L.J. 305; *Cundy v. Lindsay*, 3 App.Cas. 459; *Norwich
Union Fire Insurance Society Ltd. v. Wm. H. Price Ltd* [1934] A.C. 455
and *Alati v. Kruger*, 94 C.L.R. 216.

Professor Birks's analysis in *An Introduction to the Law of Restitution*,    D
pp. 396 et seq., is correct. The analogy with resulting trusts is helpful.
There is no reason to distinguish between cases where the purpose fails
afterwards and those where it was always non-existent. [Reference was
made to *In re Ames' Settlement, Dinwiddy v. Ames* [1946] 1 Ch. 217; *Reg.
v. Shadrokh-Cigari* [1988] Crim.L.R. 465 and *Mathew v. T. M. Sutton Ltd.*
[1994] 1 W.L.R. 1455.]

As to notice, the council says that a person cannot be a trustee where    E
he does not know that he is one, but the only thing the council was
ignorant of here was the true construction of the Local Government Act
1972; it was not ignorant of any facts. [Reference was made to Birks, "No
Consideration: Restitution after Void Contracts" (1993) 23 W.A.L.R. 195
and *El Ajou v. Dollar Land Holdings Plc.* [1993] 3 All E.R. 717.]

The case for awarding interest from the date when the sum of £2·5m.    F
was received by the council, as the Court of Appeal held, was
overwhelming. Since the principle on which equity awards interest is to
prevent the defendant from profiting from the use of money to which it
had no right, effect can be given to the principle only by awarding interest
in respect of the whole period during which the defendant had the use of
the money: *Woolwich Equitable Building Society v. Inland Revenue
Commissioners* [1993] A.C. 70, 197D. This period ran from 18 June 1987,    G
when the council received the premium. Hobhouse J. did not award
interest from that date, on two grounds: (i) that both parties were
conducting themselves at that time on the basis that their contract was
valid; and (ii) that the bank was not in fact out of pocket at that time
because it had received an equivalent sum under its swap with Morgan
Grenfell & Co. Ltd. As to the first, it cannot be material that neither    H
party was initially aware that the contract between them was void. As to
the second ground, the bank's receipt of an equivalent sum of £2·5m.
under a separate contract with Morgan Grenfell was irrelevant. The swap

679

A.C.                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))

**A** with Morgan Grenfell was res inter alios acta: see *per* Hobhouse J., at
p. 948J and *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough
Council* [1994] 4 All E.R. 972, 985D.

The relevant period for the running of interest would be the same if it
were to be awarded under section 35A of the Act of 1981: see *General
Tire & Rubber Co. v. Firestone Tyre & Rubber Co. Ltd.* [1975] 1 W.L.R.
**B** 819, 841; *B.P. Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979]
1 W.L.R. 783, 845. No such reason for departing from the fundamental
principle exists in this case.

*Philipson Q.C.* in reply. Having heard the bank's argument on the
question of the correctness of *Sinclair v. Brougham* [1914] A.C. 398, and
in view of the fact that only 26 minutes remain of the time allotted for the
hearing of the appeal, the council does not wish to incur the cost of a
**C** further day's hearing on this question and is content to allow its
submissions already made to stand as its argument. It will use the time
remaining to address the bank's submissions on the jurisdiction of the
court to award compound interest.

As Lord Brandon of Oakbrook said in *President of India v. La Pintada
Compania Navigacion S.A.* [1985] A.C. 104, 116, there is no general
**D** discretion to award compound interest in equity. There is no broad
principle that the defendant should not benefit from assets to which he
has no right. The principle underlying the equitable jurisdiction of the
court is that equity will ensure that the defendant will not make a profit
from having the benefit of the money: see *Wallersteiner v. Moir (No. 2)*
[1975] Q.B. 373. The bank failed to show that there was some such
relationship as forbade the use of the money to the council's own purpose.
**E** If the council was a volunteer, no claim can be made against it. There
is no personal claim in equity in a case like this against a volunteer. That
requires knowledge on the part of the volunteer that he has received trust
property: see *Lipkin Gorman v. Karpnale Ltd.* [1987] 1 W.L.R. 987. There
is no proprietary claim, because the money was paid into a bank account
that became exhausted. [Reference was also made to *Bishopsgate
**F** Investment Management Ltd. v. Homan* [1995] Ch. 211.]

Alternatively, if there is some proprietary claim derived from *Sinclair
v. Brougham* (a right to trace), that is no basis for an award of compound
interest. (If the asset is traced and has increased in value, it may be that
the increase is recoverable: see *In re Diplock; Diplock v. Wintle* [1948] Ch.
465 and *Goff & Jones, The Law of Restitution*, p. 95.) The bank has to
**G** show that the council is a trustee or fiduciary in respect of these funds. It
says that *Sinclair v. Brougham* shows that when money is paid under a
void contract the equitable title is retained in the payer. That is wrong:
see *Barclays Bank Ltd. v. W. J. Simms Son & Cooke (Southern) Ltd.*
[1980] Q.B. 677. It is wrong to suggest that there was no intention to pass
the property. That may perhaps be so in the case of an asset, but it is not
so in the case of money: see Birks, "No Consideration: Restitution after
**H** Void Contracts," 23 W.A.L.R. 195 and W. J. Swadling, "Restitution for
No Consideration" [1994] R.L.R. 73. There was no fundamental mistake
here. The part of Lord Haldane's opinion in *Sinclair v. Brougham* that
refers to tracing cannot be explained as if he thought that the building

680

**Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**                    [1996]

society was a trustee. If it had been, it would have had to repay the      A
money. In Lord Haldane's eyes it was an innocent volunteer.

Their Lordships took time for consideration.

22 May. LORD GOFF OF CHIEVELEY. My Lords, this appeal is      B
concerned with a transaction known as an interest rate swap. Under such
a transaction, one party (the fixed rate payer) agrees to pay the other over
a certain period interest at a fixed rate on a notional capital sum; and the
other party (the floating rate payer) agrees to pay to the former over the
same period interest on the same notional sum at a market rate determined
in accordance with a certain formula. Interest rate swaps can fulfil many
purposes, ranging from pure speculation to more useful purposes such as
the hedging of liabilities. They are in law wagers, but they are not void as      C
such because they are excluded from the regime of the Gaming Acts by
section 63 of the Financial Services Act 1986.

One form of interest rate swap involves what is called an upfront
payment, i.e. a capital sum paid by one party to the other, which will be
balanced by an adjustment of the parties' respective liabilities. Thus, as in
the present case, the fixed rate payer may make an upfront payment to the      D
floating rate payer, and in consequence the rate of interest payable by
the fixed rate payer is reduced to a rate lower than the rate which would
otherwise have been payable by him. The practical effect is to achieve a
form of borrowing by, in this example, the floating rate payer through the
medium of the interest rate swap transaction. It appears that it was this
feature which, in particular, attracted local authorities to enter into
transactions of this kind, since they enabled local authorities subject to      E
rate-capping to obtain upfront payments uninhibited by the relevant
statutory controls.

At all events, local authorities began to enter into transactions of this
kind soon after they came into use in the early 1980s. At that time, there
was thought to be no risk involved in entering into such transactions with
local authorities. Financially, they were regarded as secure; and it was      F
assumed that such transactions were within their powers. However, as is
well known, in *Hazell v. Hammersmith and Fulham London Borough
Council* [1992] 2 A.C. 1 your Lordships' House, restoring the decision of
the Divisional Court [1990] 2 Q.B. 697, held that such transactions were
ultra vires the local authorities who had entered into them. It is
unnecessary for present purposes to examine the basis of that decision;
though I wish to record that it caused grave concern among financial      G
institutions, and especially foreign banks, which had entered into such
transactions with local authorities in good faith, with no idea that a rule
as technical as the ultra vires doctrine might undermine what they saw as
a perfectly legitimate commercial transaction. There then followed
litigation in which banks and other financial institutions concerned sought
to recover from the local authorities with which they had dealt the balance
of the money paid by them, together with interest. Out of the many      H
actions so commenced, two were selected as test cases. These were the
present case, *Westdeutsche Landesbank Girozentrale v. Islington Borough
Council*, and *Kleinwort Benson Ltd. v. Sandwell Borough Council*. Both

A-9922

681

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
                                                                                 of Chieveley

A   cases came on for hearing before Hobhouse J. [1994] 4 All E.R. 890. Your
Lordships are concerned only with the former case. In a powerful
judgment Hobhouse J. held that the plaintiffs ("the bank") were entitled
to recover from the defendants ("the council") the net balance outstanding
on the transaction between the parties, viz. the difference between the
upfront payment of £2·5m. paid by the bank to the council on 18 June
1987, and the total of four semi-annual interest payments totalling
B   £1,354,474·07 paid by the council to the bank between December 1987
and June 1989, leaving a net balance of £1,145,525·93 which the judge
ordered the council to pay to the bank. He held the money to be
recoverable by the bank either as money had and received by the council
to the use of the bank, or as money which in equity the bank was entitled
to trace into the hands of the council and have repaid out of the council's
C   assets. He decided that the bank's right to restitution at common law
arose from the fact that the payment made by the bank to the council was
made under a purported contract which, unknown to both parties, was
ultra vires the council and so void, no consideration having been given for
the making of the payment. The decision by the judge, which was affirmed
by the Court of Appeal [1994] 1 W.L.R. 938, raised important questions
in the law of restitution, which are of great interest to lawyers specialising
D   in this field. Yet it is an extraordinary feature of the present appeal to
your Lordships' House that the judge's decision on the substantive right
of recovery at common law does not fall for consideration by your
Lordships' House. The appeal of the council is confined to one point
only—the question of interest.
     The judge ordered that the council should pay compound interest on
the sum awarded against them, calculated at six-monthly rests from
E   1 April 1990 to the date of judgment. The Court of Appeal affirmed the
judge's decision to award compound interest but, allowing a cross-appeal
by the bank, ordered that interest should run from the date of receipt of
the upfront payment. Both the judge and the Court of Appeal held that
they were entitled to invoke against the council the equitable jurisdiction
to award compound interest, on the basis that the bank was entitled to
F   succeed against the council in an equitable proprietary claim. The
foundation for the bank's equitable proprietary claim lay in the decision
of this House in *Sinclair v. Brougham* [1914] A.C. 398. Since that decision
has for long been controversial, the Appellate Committee invited argument
on the question whether the House should depart from the decision
despite the fact that it has stood for many years.

G

*The shape of the case*

     Once the character of an interest swap transaction has been identified
and understood, and it is appreciated that, because the transaction was
beyond the powers of the council, it was void ab initio, the basic question
is whether the law can restore the parties to the position they were in
before they entered into the transaction. That is, of course, the function
H   of the law of restitution. I feel bound to say that, in the present case, there
ought to be no difficulty about that at all. This is because the case is
concerned solely with money. All that has to be done is to order that each
party should pay back the money it has received—or, more sensibly, to

682

Lord Goff
of Chieveley          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

strike a balance, and order that the party who has received most should      A
repay the balance; and then to make an appropriate order for interest in
respect of that balance. It should be as simple as that. And yet we find
ourselves faced with a mass of difficult problems, and struggling to
reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these
cases, I too have found myself struggling in this way. But in the end      B
I have come to realise the importance of keeping my eyes on the simple
outline of the case which I have just described; and I have discovered that,
if one does that—if one keeps one's eyes open above the thicket of case
law in which we can so easily become enclosed—the solution of the
problem in the present case becomes much more simple. In saying this,
I do not wish in any way to criticise the judges who have been grappling
with the case at first instance and in the Court of Appeal, within the      C
confines of the doctrine of precedent by which they are bound. On the
contrary, they are entitled to our gratitude and respect. The masterly
judgment of Hobhouse J., in particular, has excited widespread admiration.
But it is the great advantage of a supreme court that, not only does it
have the great benefit of assistance from the judgments of the courts
below, but also it has a greater freedom to mould, and remould, the
authorities to ensure that practical justice is done within a framework of      D
principle. The present case provides an excellent example of a case in
which this House should take full advantage of that freedom.

*The three problems*

There are three reasons why the present case has become so
complicated. The first is that, in our law of restitution, there has developed      E
an understanding that money can only be recovered on the ground of
failure of consideration if that failure is total. The second is that because,
in particular, of the well known but controversial decision of this House
in *Sinclair v. Brougham*, it has come to be understood that a trust may be
imposed in cases such as the present where the incapacity of one of the
parties has the effect that the transaction is void. The third is that our law      F
of interest has developed in a fragmentary and unsatisfactory manner, and
in consequence insufficient attention has been given to the jurisdiction to
award compound interest.

I propose at the outset to devote a little attention to each of these
matters.

*(1) Total failure of consideration*      G

There has long been a desire among restitution lawyers to escape from
the unfortunate effects of the so-called rule that money is only recoverable
at common law on the ground of failure of consideration where the failure
is total, by reformulating the rule upon a more principled basis; and signs
that this will in due course be done are appearing in judgments throughout
the common law world, as appropriate cases arise for decision. It is      H
fortunate however that, in the present case, thanks (I have no doubt) to
the admirable researches of counsel, a line of authority was discovered
which had escaped the attention of the scholars who work in this field,

683

A.C.                   Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                Lord Goff
                                                                                    of Chieveley

A    This line of authority was concerned with contracts for annuities which were void if certain statutory formalities were not complied with. They were not therefore concerned with contracts void by reason of the incapacity of one of the parties. Even so, they were concerned with cases in which payments had been made, so to speak, both ways; and the courts had to decide whether they could, in such circumstances, do justice by restoring the parties to their previous positions. They did not hesitate to

B do so, by ascertaining the balance of the account between the parties, and ordering the repayment of the balance. Moreover the form of action by which this was achieved was the old action for money had and received—what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J. felt free to make a similar order in the present case; and in this he was self-evidently right.

C    The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of *failure* of consideration. Hobhouse J. thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not troubled by the question whether there had

D been a total failure of consideration.
      The approach so adopted may have found its origin in the idea, to be derived from a well known passage in the speech of Viscount Simon L.C. in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a

E contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J. is contrary to principle and could, if accepted, lead to undesirable consequences: see Professor Birks, "No Consideration: Restitution after Void Contracts"

F (1993) 23 W.A.L.R. 195; Mr. W. J. Swadling, "Restitution for No Consideration" [1994] R.L.R. 73 and Professor Burrows, "Swaps and the Friction between Common Law and Equity" [1995] R.L.R. 15. However since there is before your Lordships no appeal from the decision that the bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee.

G It would therefore be inappropriate to express any concluded view upon it. Even so, I think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

H

    (2) *A proprietary claim in restitution*

      I have already stated that restitution in these cases can be achieved by means of a personal claim in restitution. The question has however arisen

A-9925

684

Lord Goff
of Chieveley                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

whether the bank should also have the benefit of an equitable proprietary      A
claim in the form of a resulting trust. The immediate reaction must be—
why should it? Take the present case. The parties have entered into a
commercial transaction. The transaction has, for technical reasons, been
held to be void from the beginning. Each party is entitled ·to recover its
money, with the result that the balance must be repaid. But why should
the plaintiff bank be given the additional benefits which flow from a
proprietary claim, for example the benefit of achieving priority in the      B
event of the defendant's insolvency? After all, it has entered into a
commercial transaction, and so taken the risk of the defendant's
insolvency, just like the defendant's other creditors who have contracted
with it, not to mention other creditors to whom the defendant may be
liable to pay damages in tort.

    I feel bound to say that I would not at first sight have thought that an      C
equitable proprietary claim in the form of a trust should be made available
to the bank in the present case, but for two things. The first is the decision
of this House in *Sinclair v. Brougham* [1914] A.C. 398, which appears to
provide authority that a resulting trust may indeed arise in a case such as
the present. The second is that on the authorities there is an equitable
jurisdiction to award the plaintiff compound interest in cases where the
defendant is a trustee. It is the combination of these two factors which      D
has provided the foundation for the principal arguments advanced on
behalf of the bank in support of its submission that it was entitled to an
award of compound interest. I shall have to consider the question of
availability of an equitable proprietary claim, and the effect of *Sinclair v.
Brougham*, in some depth in a moment. But first I wish to say a few words
on the subject of interest.                                                     E

(3) *Interest*

    One would expect to find, in any developed system of law, a
comprehensive and reasonably simple set of principles by virtue of which
the courts have power to award interest. Since there are circumstances in
which the interest awarded should take the form of compound interest,
those principles should specify the circumstances in which compound      F
interest, as well as simple interest, may be awarded; and the power to
award compound interest should be available both at law and in equity.
Nowadays, especially since it has been established (see *National Bank of
Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C. 637) that banks
may, by the custom of bankers, charge compound interest upon advances
made by them to their customers, one would expect to find that the      G
principal cases in which compound interest may be awarded would be
commercial cases.

    Sadly, however, that is not the position in English law. Unfortunately,
the power to award compound interest is not available at common law.
The power is available in equity; but at present that power is, for historical
reasons, exercised only in relation to certain specific classes of claim, in
particular proceedings against trustees for an account. An important—      H
I believe the most important—question in the present case is whether that
jurisdiction should be developed to apply in a commercial context, as in
the present case.

685

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))            Lord Goff
                                                                                    of Chieveley

A    *Equitable proprietary claims*

        I now turn to consider the question whether an equitable proprietary
     claim was available to the bank in the present case.
        Ever since the law of restitution began, about the middle of this
     century, to be studied in depth, the role of equitable proprietary claims in
     the law of restitution has been found to be a matter of great difficulty.
B    The legitimate ambition of restitution lawyers has been to establish a
     coherent law of restitution, founded upon the principle of unjust
     enrichment; and since certain equitable institutions, notably the
     constructive trust and the resulting trust, have been perceived to have the
     function of reversing unjust enrichment, they have sought to embrace
     those institutions within the law of restitution, if necessary moulding them
     to make them fit for that purpose. Equity lawyers, on the other hand,
C    have displayed anxiety that in this process the equitable principles
     underlying these institutions may become illegitimately distorted; and
     though equity lawyers in this country are nowadays much more
     sympathetic than they have been in the past towards the need to develop
     a coherent law of restitution, and to identify the proper role of the trust
     within that rubric of the law, they remain concerned that the trust concept
D    should not be distorted, and also that the practical consequences of its
     imposition should be fully appreciated. There is therefore some tension
     between the aims and perceptions of these two groups of lawyers, which
     has manifested itself in relation to the matters under consideration in the
     present case.
        In the present case, however, it is not the function of your Lordships'
     House to rewrite the agenda for the law of restitution, nor even to identify
E    the role of equitable proprietary claims in that part of the law. The judicial
     process is neither designed for, nor properly directed towards, such
     objectives. The function of your Lordships' House is simply to decide the
     questions at issue before it in the present case; and the particular question
     now under consideration is whether, where money has been paid by a
     party to a contract which is ultra vires the other party and so void ab
F    initio, he has the benefit of an equitable proprietary claim in respect of
     the money so paid. Moreover the manner in which this question has arisen
     before this House renders it by no means easy to address. First of all, the
     point was not debated in any depth in the courts below, because they
     understood that they were bound by *Sinclair v. Brougham* [1914] A.C. 398
     to hold that such a claim was here available. But second, the point has
G    arisen only indirectly in this case, since it is relevant only to the question
     whether the court here has power to make an award of compound interest.
     It is a truism that, in deciding a question of law in any particular case, the
     courts are much influenced by considerations of practical justice, and
     especially by the results which would flow from the recognition of a
     particular claim on the facts of the case before the court. Here, however,
     an award of compound interest provides no such guidance, because it is
H    no more than a consequence which is said to flow, for no more than
     historical reasons, from the availability of an equitable proprietary claim.
     It therefore provides no guidance on the question whether such a claim
     should here be available.

686
Lord Goff
of Chieveley        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        [1996]

In these circumstances I regard it as particularly desirable that your    A
Lordships should, so far as possible, restrict the inquiry to the actual
questions at issue in this appeal, and not be tempted into formulating
general principles of a broader nature. If restitution lawyers are hoping to
find in your Lordships' speeches broad statements of principle which may
definitively establish the future shape of this part of the law, I fear that
they may be disappointed. I also regard it as important that your    B
Lordships should, in the traditional manner, pay particular regard to the
practical consequences which may flow from the decision of the House.

With these observations by way of preamble, I turn to the question of
the availability of an equitable proprietary claim in a case such as the
present. The argument advanced on behalf of the bank was that the
money paid by it under the void contract was received by the council
subject to a resulting trust. This approach was consistent with that of    C
Dillon L.J. in the Court of Appeal: see [1994] 1 W.L.R. 938, 947. It is also
consistent with the approach of Viscount Haldane L.C. (with whom Lord
Atkinson agreed) in Sinclair v. Brougham [1914] A.C. 398, 420–421.

I have already expressed the opinion that, at first sight, it is surprising
that an equitable proprietary claim should be available in a case such as
the present. However, before I examine the question as a matter of
principle, I propose first to consider whether Sinclair v. Brougham supports    D
the argument now advanced on behalf of the bank.

Sinclair v. Brougham

The decision of this House in Sinclair v. Brougham has loomed very
large in both the judgments in the courts below and in the admirable
arguments addressed to the Appellate Committee of this House. It has    E
long been regarded as a controversial decision, and has been the subject
of much consideration by scholars, especially those working in the field of
restitution. I have however reached the conclusion that it is basically
irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck
Permanent Benefit Building Society decided to set up a banking business,
known as the Birkbeck Bank. The banking business was however held to    F
be ultra vires the objects of the building society; and there followed a
spate of litigation concerned with solving the problems consequent upon
that decision. Sinclair v. Brougham was one of those cases.

The case has been analysed in lucid detail in the speech of my noble
and learned friend, Lord Browne-Wilkinson, which I have read (in draft)
with great respect. In its bare outline, it was concerned with the    G
distribution of the assets of the society, which was insolvent. There were
four classes of claimants. First, there were two classes of shareholders—
the A shareholders (entitled to repayment of their investment on maturity)
and the B shareholders (whose shares were permanent). Next, there was a
numerous class of people who had deposited money at the bank, under
contracts which were ultra vires and so void. Finally, there were the
ordinary trade creditors of the society. By agreement, the A shareholders    H
and the trade creditors were paid off first, leaving only the claims of the
depositors and the B shareholders. There were sufficient assets to pay off
the B shareholders, but not the depositors and certainly not both. The