# 25-0643-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————◆———————

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 41 of 43 (Pages A-9928 to A-10128)

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
  &amp; SULLIVAN, LLP
*Attorneys for Plaintiffs-Counter-
  Defendants-Appellees*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant-
  Appellant NHF TRS, LLC and
  Defendant-Counter-Claimant-
  Appellant Nexpoint Diversified
  Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS    (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Counter-Defendant-
Appellee*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... A-1

Amended Complaint, dated and filed
February 23, 2022 ................................................. A-56

Exhibit A to Amended Complaint -
Bench Ruling and Memorandum of Law In
Support of (A) Final Approval of Disclosure
Statement; and (B) Confirmation of Chapter 11
Trustee's Third Amended Joint Plan, in re: *Acis
Capital Management, L.P., Debtor,* Case No. 18-
30264-SGJ-11, and in re: *Acis Capital
Management GP, L.L.C., Debtor*, Case No. 18-
30265-SGJ-11, dated January 31, 2019 ................. A-80

Exhibit B to Amended Complaint -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021 ................................ A-128

Exhibit C to Amended Complaint -
Letter of Bonds Ellis Eppich Schafer Jones LLP
to Court, dated September 23, 2020 ...................... A-160

Exhibit D to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019 ........................... A-163

Exhibit E to Amended Complaint -
Letter of Lynn Pinker Cox Hurst to Shana Sethi,
dated August 6, 2019 ........................................... A-170

ii

**Page**

Exhibit F to Amended Complaint -
Plaintiff's Second Amended Complaint and Jury
Demand in *The Charitable Donor Advised Fund,
L.P., v. U.S. Bank National Association, et al.*,
Case No. 1:19-CV-09857-NRB ............................ A-179

Exhibit G to Amended Complaint -
Plaintiffs' Original Complaint in *The Charitable
Donor Advised Fund, L.P., and CLO HOLDCO,
Ltd. v. U.S. Bank National Association, et al.*,
Case No. 1:20-cv-1036 ......................................... A-212

Exhibit H to Amended Complaint -
Letter of Myers Bigel to Mark Kotwick, dated
May 8, 2020 ........................................................... A-246

Exhibit I to Amended Complaint -
Plaintiff's Second Amended Complaint, *NexPoint
Strategic Opportunities Fund v. Acis Capital
Management, L.P., et al.*, Case No. 1:21-cv-
04384-GHW ........................................................... A-254

Exhibit J to Amended Complaint -
Letter of Quinn Emanuel to The Charitable
Donor Advised Fund, L.P. and Others, dated
December 28, 2021 ................................................ A-296

Exhibit K to Amended Complaint -
Letter of Parsons McEntire McCleary PLLC to
Jonathan E. Pickardt and Mark D. Kotwick, dated
January 10, 2022 ................................................... A-299

Exhibit L to Amended Complaint -
Settlement Agreement, dated April 28, 2021 ......... A-302

iii

**Page**

Exhibit M to Amended Complaint -
Order Approving Debtor's Settlement with (A)
Acis Capital Management, L.P. and Acis Capital
Management GP LLC (Claim No. 23), (B)
Joshua N. Terry and Jennifer G. Terry (Claim No.
156), and (C) Acis Capital Management, L.P.
(Claim No. 159) and Authorizing Action
Consistent Therewith, dated October 7, 2020........  A-329

Exhibit N to Amended Complaint -
Memorandum Opinion and Order Granting in
Part Plaintiff's Motion to Hold James Dondero in
Civil Contempt of Court for Alleged Violation of
TRO in re: *Highland Capital Management, L.P.,
Debtor,* Case No. 19-34054-sgj-11, and *Highland
Capital Management, L.P. v. Dondero*, Case No.
20-03190-sgj11, dated June 7, 2021 .....................  A-354

Exhibit O to Amended Complaint -
Transcript of Proceedings in re: *Highland Capital
Management, L.P., Debtor*, Case No. 19-34054-
sgj-11, dated June 25, 2021 ..................................  A-410

Exhibit P to Amended Complaint -
Acis Capital Management, L.P.'s Memorandum
of Law in Support of its Motion to Dismiss
Plaintiff's Second Amended Complaint and for
Attorneys' Fees and Costs, dated January 27,
2022, *NexPoint Strategic Opportunities Fund v.
Acis Capital Management, L.P., et al.*, Case No.
1:21-cv-04384-GHW ............................................  A-533

iv

**Page**

Order on Plaintiffs' Unopposed Motion to Amend
    Caption, dated March 26, 2022.............................. A-562

Defendants the Charitable Donor Advised Fund,
    L.P., and CLO HoldCo, Ltd.'s Amended Answer
    and Counterclaim, dated and filed
    March 30, 2023 ...................................................... A-563

Amended Answer of Defendant/Counter-Plaintiff
    NexPoint Diversified Real Estate Trust to
    Amended Complaint, dated March 30, 2023 ......... A-597

Exhibit 1 to Amended Answer -
    Indenture, dated April 16, 2015 ............................ A-656

Exhibit 2 to Amended Answer -
    Portfolio Management Agreement, dated
    April 16, 2015, labeled Exhibit 2.......................... A-985

Exhibit 3 to Amended Answer -
    Letter of Lynn Pinker Cox Hurst to Daniel P.
    Novakov, dated August 6, 2019, labeled
    Exhibit E ............................................................... A-1037

Notice of Defendant/Counter-Plaintiff NexPoint
    Diversified Real Estate Trust for Leave to Add
    Party, dated and filed April 10, 2023 .................... A-1043

Order of Honorable Gregory H. Woods, dated
    May 1, 2023 and filed May 2, 2023...................... A-1043.1

Notice of Plaintiffs' Motion to Dismiss Defendants'
    Counterclaims and for Judgment on the
    Pleadings, dated and filed May 15, 2023............... A-1044

Declaration of Blair A. Adams, Esq., in Support of
    Plaintiffs' Motion to Dismiss Defendants'
    Counterclaims and for Judgment on the
    Pleadings, dated and filed May 15, 2023............... A-1047

v

**Page**

Exhibit 1 to Adams' Declaration -
Transcript of Hearing, dated February 23, 2023.... A-1051

Exhibit 2 to Adams' Declaration -
Second Amended Complaint (Including Claim
Objections and Objections to Administrative
Expense Claim), *Acis Cap. Mgmt. L.P. and Acis
Cap. Mgmt. GP, LLC v. Highland Cap. Mgmt.,
L.P., et al.*, Adv. Pro. No. 18-03078, dated
June 20, 2019 ........................................................ A-1084

Exhibit 3 to Adams' Declaration -
Agreement, dated February 28, 2023 ................... A-1193

Exhibit 4, Part 1, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015........................................................ A-1257

Exhibit 4, Part 2, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 *continued* ...................................... A-1367

Exhibit 5 to Adams' Declaration -
Transcript of Proceedings, dated May 1, 2023 ...... A-1379

Exhibit 6, Part 1, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017.................................................. A-1425

Exhibit 6, Part 2, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1432

vi

**Page**

Exhibit 6, Part 3, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1439

Exhibit 6, Part 4, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1446

Exhibit 7 to Adams' Declaration -
Order Granting Senior Certificate Holders'
Motion for Summary Judgment and Denying
Junior Certificate Holders' Motion for Summary
Judgment, *In the Matter of the Trust Established
Under the Pooling and Service Agreement
relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage Pass-
Through Certificates, Series 2007-C30*, Case No.
62-TR-CV-19-33, dated October 26, 2022 .......... A-1454

Exhibit 8 to Adams' Declaration -
Ruling in *In re Acis Cap. Mgmt., L.P.*, 18-30264-
SGJ-11, dated August 30, 2018 ............................ A-1473

Exhibit 9 to Adams' Declaration -
Portfolio Management Agreement, dated
June 5, 2014 ........................................................... A-1481

Exhibit 10 to Adams' Declaration -
Indenture, dated June 5, 2014, paginated bottom
center as Exhibit 3, Page 1 of 421 ........................ A-1534

Exhibit 11 to Adams' Declaration -
Portfolio Management Agreement, dated
November 18, 2014 ............................................... A-1956

vii

**Page**

Exhibit 12 to Adams' Declaration -
Indenture, dated November 18, 2014, paginated
bottom center as Exhibit 4, Page 1 of 335 ............. A-2008

Exhibit 13 to Adams' Declaration -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021
(Reproduced herein at pp. XXX – EX B)

Exhibit 14 to Adams' Declaration -
Original Complaint, *NexPoint Diversified Real
Estate Trust v. Acis Capital Management, L.P., et
al.*, dated October 3, 2022...................................... A-2344

Exhibit 15 to Adams' Declaration -
Notice of Appeal, *In re Acis Capital
Management, LP.*, Appeal No. 19-10847, dated
July 26, 2019 ......................................................... A-2392

Exhibit 16 to Adams' Declaration -
Opening Brief of Appellant Highland CLO
Funding, LTD, in above appeal, dated
September 20, 2019 ................................................ A-2396

Exhibit 17 to Adams' Declaration -
Memorandum of Law in Support of Defendant
U.S. Bank, National Association's Motion to
Dismiss the Second Amended Complaint,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2473

viii

**Page**

Exhibit 18 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding LTD.'s Motion to Intervene,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated November 24, 2021 .......... A-2499

Exhibit 19 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding Ltd.'s Motion to Dismiss,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2521

Declaration of Jonathon Milne, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 16, 2023............... A-2543

Exhibit 1 to Milne's Declaration -
Sections 12, 25(3), 28(1), 38, 46 and 48 of the
Cayman Islands Companies Act ........................... A-2569

Exhibit 2 to Milne's Declaration -
*In the Matter of Lancelot Investors Fund Limited
(In Official Liquidation)* [2015] (1) CILR 328 ...... A-2576

Exhibit 3 to Milne's Declaration -
*Marex Financial Ltd. v Sevilleja* [2020]
UKSC 31................................................................ A-2599

Exhibit 4 to Milne's Declaration -
*Primeo Fund v Bank of Bermuda (Cayman) Ltd*
[2021] UKPC 22 .................................................... A-2682

Exhibit 5 to Milne's Declaration -
*Renova Resources Private Equity Limited v
Gilbertson* [2009] CILR 268 ................................ A-2713

ix

**Page**

Exhibit 6 to Milne's Declaration -
Order 15, rule 12A of the Grand Court Rules........ A-2745

Exhibit 7 to Milne's Declaration -
*Birch v Sullivan* [1957] 1 WLR 1247 ................... A-2749

Exhibit 8, Part 1, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ)........................... A-2754

Exhibit 8, Part 2, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2774

Exhibit 8, Part 3, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2794

Exhibit 8, Part 4, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2813

Exhibit 8, Part 5, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2829

Exhibit 9 to Milne's Declaration -
*Foss v Harbottle* (1843) 2 Hare 461 ...................... A-2847

Exhibit 10 to Milne's Declaration -
*Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204 .................... A-2868

Exhibit 11 to Milne's Declaration -
*Johnson v Gore Wood & Co* [2000] UKHL 65 ...... A-2902

Exhibit 12 to Milne's Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-2948

x

**Page**

Exhibit 13 to Milne's Declaration -
Sections 994 to 996 of the UK Companies Act
2006 ........................................................... A-3131

Exhibit 14 to Milne's Declaration -
*Kuwait Ports Authority et al. v Port Link GP Ltd
et al.* (Court of Appeal 20 January 2023 decision) A-3135

Exhibit 15 to Milne's Declaration -
*Rolled Steel Products (Holdings) Ltd v British
Steel Corp* [1986] Ch. 246 .................................... A-3204

Exhibit 16 to Milne's Declaration -
*Nurcombe v. Nurcombe* [1985] 1 370 .................... A-3270

Exhibit 17 to Milne's Declaration -
*Portfolios of Distinction v Laird* [2004]
2 BCLC 741 ............................................................ A-3284

Exhibit 18 to Milne's Declaration -
*Schultz v Reynolds* [1992-93] CILR 59 ................. A-3308

Exhibit 19 to Milne's Declaration -
*Berland v Earle* [1902] AC 83 ............................... A-3333

Exhibit 20 to Milne's Declaration -
*Harris v Microfusion* [2017] 1 B.C.L.C. 305 ........ A-3355

Exhibit 21 to Milne's Declaration -
*Top Jet Enterprises Limited v Sino Jet* [2018] (1)
CILR 18 ................................................................. A-3370

Exhibit 22 to Milne's Declaration -
*Estmanco (Kilner House) Ltd v G.L. C.* [1982] 1
W.L.R. 2 ................................................................ A-3405

Exhibit 23 to Milne's Declaration -
*Cook v Deeks* [1916] 1 AC 554 ............................. A-3420

xi

**Page**

Exhibit 24 to Milne's Declaration -
*Pavlides v. Jensen* [1956] 2 All ER 518 ................. A-3433

Exhibit 25 to Milne's Declaration -
*Menier v Hooper's Telegraph Works* LR 9 Ch
App 350 ................................................................ A-3440

Exhibit 26 to Milne's Declaration -
*Heyting v Dupont* [1964] 1 W.L.R. 843 ................. A-3446

Exhibit 27 to Milne's Declaration -
*Burnford et al. v Automobile Association
Developments Limited* [2022] EWCA Civ 1943 ... A-3460

Exhibit 28 to Milne's Declaration -
*De Sena & Anor v Notaro & Ors* [2020] EWHC
1031 (Ch) ............................................................. A-3482

Exhibit 29 to Milne's Declaration -
*Williams v Natural Life Health Foods Ltd* [1998]
1 WLR 830 ............................................................ A-3558

Declaration of Todd William McGuffin, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed May 16, 2023 ......... A-3569

Exhibit 1 to McGuffin Declaration -
*Morton v Paint* [1996] 21 GLJ 61 ........................ A-3582

Exhibit 2 to McGuffin Declaration -
*Flightlease Holdings (Guernsey) Ltd v
Flightlease (Ireland) Ltd* [2009–10] GLR 38 ........ A-3608

Exhibit 3 to McGuffin Declaration -
*Perpetual Media Capital Limited v Enevoldsen,*
[2014] GLR 57 ...................................................... A-3646

xii

**Page**

Exhibit 4 to McGuffin Declaration -
*Prodefin Trading Limited v Midland Resources*
Royal Court, 14 February 2017, Judgement
7/2017, unreported.................................................. A-3675

Exhibit 5 to McGuffin Declaration -
*Fonds v GRCF* [2022] GRC 039 ........................... A-3701

Exhibit 6 to McGuffin Declaration -
*Carlyle Capital Corporation Limited v Conway
& Ors* Royal Court, 4 September 2027, Judgment
38/2017, unreported................................................ A-3726

Exhibit 7 to McGuffin Declaration -
*Jackson v Dear* (2013) GLR 167........................... A-4197

Exhibit 8 to McGuffin Declaration -
*Pilatus (PTC) Limited v RBC Trustees
(Guernsey) Limited* [2021] GRC 063 .................... A-4222

Exhibit 9 to McGuffin Declaration -
*Apex Global Management Limited v Fi Call
Limited* [2015] EWHC 3269 (Ch) ......................... A-4233

Exhibit 10 to McGuffin Declaration -
*Re Coroin Limited* (No 2) [2012] EWHC 2343
(Ch)........................................................................ A-4288

Exhibit 11 to McGuffin Declaration -
*Grace v Biagioli* [2005] EWCA Civ 1222.............. A-4447

Exhibit 12 to McGuffin Declaration -
*Rock (Nominees) Limited v RCO (Holdings) plc*
[2004] EWCA Civ 118............................................ A-4478

Exhibit 13 to McGuffin Declaration -
*Re Saul D Harrison & Sons plc* [1994] BCC 475 . A-4496

xiii

**Page**

Exhibit 14 to McGuffin Declaration -
*Apex v Fi Call Ltd* [2014] BCC 286 ..................... A-4524

Exhibit 15 to McGuffin Declaration -
*Zedra Trust Company (Jersey) Limited v The Hut
Group Limited* [2020] EWHC 5 ........................... A-4565

Exhibit 16 to McGuffin Declaration -
*Peskin v Anderson* [2001] BCC 874 ..................... A-4591

Exhibit 17 to McGuffin Declaration -
*Sharp v Blank* [2015] EWHC 3220 ..................... A-4607

Exhibit 18, Part 1, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22 ..... A-4624

Exhibit 18, Part 2, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22,
*continued*.................................................................. A-4643

Exhibit 19 to McGuffin Declaration -
*Foss v Harbottle* [1843] 2 Hare 461 ..................... A-4663

Exhibit 20 to McGuffin Declaration -
*Marex Financial Ltd v Sevilleja* [2020] UKSC 31 A-4684

Exhibit 21 to McGuffin Declaration -
*Prudential Assurance Co. Ltd. v Newman
Industries Ltd. and Others* (No. 2) [1982] Ch 204 A-4767

Exhibit 22 to McGuffin Declaration -
*Renova Resources v Gilbertson* [2009] CIFsd 10.. A-4806

Notice of Motion of Counter-Defendant Brigade
Capital Management, LP's ("Brigade") to
Dismiss the Counterclaims of Defendant
NexPoint Diversified Real Estate Trust against
Brigade, dated and filed May 31, 2023.................. A-4869

xiv

| | Page |
|---|---|
| Declaration of Jason C. Hegt, Esq., in Support of Brigade's Motion to Dismiss, dated and filed May 31, 2023 ........................................................ | A-4871 |
| Exhibit 1 to Hegt Declaration - Indenture, dated April 16, 2015, paginated bottom center as "Exhibit 5, Page 1 of 329" ......... | A-4873 |
| Exhibit 2 to Hegt Declaration - Excerpt of Transcript of Proceedings, dated February 9, 2023 ................................................... | A-5203 |
| Exhibit 3 to Hegt Declaration - Excerpt of Transcript of Proceedings, dated January 4, 2022 ...................................................... | A-5211 |
| Declaration of Mazin A. Sbaiti, Esq., in Opposition to Plaintiffs' Motion to Dismiss Defendants' Counterclaims and for Judgment on the Pleadings, dated and filed June 14, 2023 ............... | A-5217 |
| Exhibit 1 to Sbaiti Declaration - Indenture, dated April 16, 2015, labeled as Exhibit 1 ................................................................. | A-5219 |
| Exhibit 2 to Sbaiti Declaration - Offering Circular relating to the offering of the Co-Issued Notes of ACIS CLO 2015-6 Ltd. and ACIS CLO 2015-6 LLC and the Issuer Notes of ACIS CLO 2015-6 Ltd. dated April 14, 2015 ....... | A-5548 |
| Exhibit 3 to Sbaiti Declaration - Portfolio Management Agreement, dated April 16, 2025, labeled Exhibit 3 .......................... | A-5768 |

xv

**Page**

Exhibit 4 to Sbaiti Declaration -
Red-lined version of Amended Complaint, *U.S.
Bank National Association, et al. v The
Charitable Donor Advised Fund, L.P., et al.*, Case
No. 1:21-cv-11059-GHW, dated and filed
February 23, 2022 ................................................. A-5820

Exhibit 5 to Sbaiti Declaration -
Excerpt from *Tianrui (Int'l) Holding Co. Ltd. v.
China Shanshui Cement Grp. Ltd.*, Grand Court
of the Cayman Is., April 6, 2020 ........................... A-5844

*Declaration of Bhavesh Narendra Patel, Esq., in
Opposition to Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 14, 2023 ......... A-5917

Exhibit 1 to Patel Declaration -
*Islena Airlines v Jefferson* [1998 CILR 148] ......... A-5942

Exhibit 2 to Patel Declaration -
Section 14(1) of the Exempted Limited
Partnerships Act, (2022 Revision) ........................ A-5955

Exhibit 3 to Patel Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ..................................................... A-5959

Exhibit 9 to Patel Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-5970

Exhibit 22 to Patel Declaration -
*Scott v Metropolitan Police Commissioner* [1974]
UKHL 4 ................................................................. A-6096

Exhibit 25 to Patel Declaration -
*Watson v Kea Investments* [2019] EWCA Civ
1759 ....................................................................... A-6106

xvi

**Page**

Exhibit 28 to Patel Declaration -
Cayman Grand Court Rules, Order 15, Rule 12A . A-6130

Reply Declaration of Jonathon Milne, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 28, 2023 ........ A-6133

Exhibit 1 to Milne's Reply Declaration -
*Snell's Equity* ............................................................. A-6161

Exhibit 2 to Milne's Reply Declaration -
Lewis on Trusts ...................................................... A-6166

Exhibit 3 to Milne's Reply Declaration -
*Knight v Knight* ...................................................... A-6172

Exhibit 4 to Milne's Reply Declaration -
*Hunter v Moss* ........................................................ A-6188

Exhibit 5 to Milne's Reply Declaration -
*Grand View Private Trust Co. Ltd. et al. v
Wen-Young Wong, et al.* .......................................... A-6200

Exhibit 6 to Milne's Reply Declaration -
*In the Matter of the Ta-Ming Wang Trust* .............. A-6243

Exhibit 7 to Milne's Reply Declaration -
*Helen Gorbunova v The Estate of Boris
Berezovsky, et al.* .................................................... A-6256

Exhibit 8 to Milne's Reply Declaration -
*In re Empress Engineering Company* .................... A-6283

Exhibit 9 to Milne's Reply Declaration -
*Neste Oy v Lloyds Bank PLC* ................................ A-6290

Exhibit 10 to Milne's Reply Declaration -
*Steven Anthony Pearson, et al. v Lehman
Brothers Finance SA, et al.* .................................... A-6301

xvii

**Page**

Exhibit 11 to Milne's Reply Declaration -
*Chanan Singh Thandi v. Mark Sands and Andrew
Appleyard*............................................................. A-6399

Exhibit 12 to Milne's Reply Declaration -
*Grupo Torras S.A. and Torras Hostench London
Limited v. Bank of Butterfield International
(Cayman) Limited and Five Others* ...................... A-6421

Exhibit 13 to Milne's Reply Declaration -
*Bailey and another v. Angove's PTY Limited*......... A-6443

Exhibit 14, Part 1, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al.*......................................................... A-6463

Exhibit 14, Part 2, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al. continued* .......................................... A-7363

Exhibit 15, Part 1, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL)* ................................................. A-8366

Exhibit 15, Part 2, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL) continued* ............................... A-8397

Exhibit 16, Part 1, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another* ...................... A-8429

Exhibit 16, Part 2, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another continued* ...... A-8460

Exhibit 17 to Milne's Reply Declaration -
*Pearson v. Primeo Fund* ........................................ A-8487

xviii

**Page**

Exhibit 18 to Milne's Reply Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ..................................................... A-8513

Exhibit 19 to Milne's Reply Declaration -
*Secretary of State for Trade and Industry and
another*................................................................. A-8517

Exhibit 20 to Milne's Reply Declaration -
*China Shanshui Cement Group Limited v. Tianrui
(International) Holding Company Limited*............ A-8542

Exhibit 21 to Milne's Reply Declaration -
*GAO v. China Biologic Products Holdings
Incorporated* ......................................................... A-8561

Exhibit 22 to Milne's Reply Declaration -
*West Mercia Safetywear Ltd (in liq) v Dodd and
another*................................................................. A-8604

Exhibit 23 to Milne's Reply Declaration -
*Svanstrom and Nine Others v. Jonasson*............... A-8611

Exhibit 24 to Milne's Reply Declaration -
Directors' Duties, Creditors' Rights and
Shareholder Intervention ....................................... A-8629

Exhibit 25, Part 1, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al.* ....................................................... A-8663

Exhibit 25, Part 2, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ....................................... A-8711

Exhibit 25, Part 3, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ....................................... A-8759

xix

Page

Exhibit 25, Part 4, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ........................................ A-8806

Exhibit 26 to Milne's Reply Declaration -
*Monsolor 1Q Ltd. v Woden Park Ltd.* ..................... A-8825

Exhibit 27 to Milne's Reply Declaration -
*Chartbook Limited v. Persimmon Homes Limited
and Others and Another* ........................................ A-8842

Exhibit 28, Part 1, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.* ...... A-8885

Exhibit 28, Part 2, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8932

Exhibit 28, Part 3, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8974

Exhibit 28, Part 4, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-9014

Exhibit 29 to Milne's Reply Declaration -
*Yeoman's Row Management Limited and Another
v Cobbe* .................................................................. A-9027

Exhibit 30 to Milne's Reply Declaration -
*Mutter v. Eastern and Midlands Railway
Company* .................................................................. A-9080

Exhibit 31 to Milne's Reply Declaration -
*Peak Hotels and Resorts Limited v. Tarek
Investments Limited, et al.* ...................................... A-9097

xx

Page

Second Declaration of Bhavesh Narendra Patel in
    Opposition to the Plaintiffs' Motion to Dismiss
    Defendants' Counterclaims and for Judgment on
    the Pleadings on Plaintiffs' Claims, dated and
    filed July 19, 2023 ................................................. A-9126

Exhibit 1 to Second Declaration -
    *Arnold* v. *Britton* [2015] UKSC 36 ........................ A-9140

Exhibit 2 to Second Declaration -
    *Al Sadik v Investcorp Bank BSC & Ors*
    *[2017 (1) CILR 1])* ................................................. A-9189

Exhibit 3 to Second Declaration -
    *Williams v Central Bank of Nigeria* [2014]
    UKSC 10 ................................................................ A-9342

Exhibit 4 to Second Declaration -
    *Broadcasting Investment Group Ltd v Smith*
    [2021] EWCA Civ 912, [2022] 1 WLR 1 .............. A-9406

Stipulation and Proposed Order Regarding Addition
    of NHF TRS, LLC as Party, filed
    October 31, 2023 ................................................... A-9427

Exhibit A to Stipulation-
    Counter-Plaintiffs NexPoint Diversified Real
    Estate Trust and NHF TRS LLC's First Amended
    Counterclaim, dated October 24, 2023 .................. A-9434

Exhibit B to Stipulation-
    Second Amended Complaint, dated
    October 31, 2022 ................................................... A-9487

Stipulation and Order Regarding Addition of NHF
    TRS, LLC as Party, dated October 31, 2022 and
    filed November 1, 2023 ......................................... A-9512

xxi

                                                                **Page**

Stipulation of Voluntary Dismissal, dated and filed
    March 10, 2025......................................................  A-9518

Notice of Appeal of NexPoint Diversified Real
    Estate Trust, dated and filed March 18, 2025 ........  A-9522

Amended Notice of Appeal of NexPoint Diversified
    Real Estate Trust and NHF TRS LLC, dated and
    filed March 26, 2025..............................................  A-9524


**<u>*Additional Exhibits to Declaration of
Bhavesh Narendra Patel, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023</u>**

Exhibit 4 to Patel Declaration -
    Re Hydrodam (Corby) Ltd......................................  A-9526

Exhibit 5 to Patel Declaration -
    Omni Securities Limited........................................  A-9531

Exhibit 6 to Patel Declaration -
    Hutchinson Limited v Cititrust & Ors ...................  A-9553

Exhibit 7 to Patel Declaration -
    Whar-Hansen v Bridge Trust Company.................  A-9575

Exhibit 8 to Patel Declaration -
    Ritter v Butterfield Bank ......................................  A-9592

Exhibit 10 to Patel Declaration -
    AHAB v SAAD Investment Company..................  A-9634

Exhibit 11 to Patel Declaration -
    Westdeutsche Landesbank v Islington London .....  A-9910

xxii

**Page**

Exhibit 12 to Patel Declaration -
Ernst & Young v FOI Officer................................. A-9983

Exhibit 13 to Patel Declaration -
Kuwait Ports Authority v Port Link GP Ltd .......... A-10016

Exhibit 14 to Patel Declaration -
Prudential Assur Co v Newman Indus................... A-10084

Exhibit 15 to Patel Declaration -
Marex Financial v Sevilleja ................................... A-10160

Exhibit 16 to Patel Declaration -
Russell v Wakefield Water Works.......................... A-10232

Exhibit 17 to Patel Declaration -
MacDougall v Gardiner ......................................... A-10242

Exhibit 18 to Patel Declaration -
Tempo Group v Fortuna Development .................. A-10246

Exhibit 19 to Patel Declaration -
FamilyMart China v Yin-Hen Wei......................... A-10385

Exhibit 20 to Patel Declaration -
Burland v Earle ...................................................... A-10418

Exhibit 21 to Patel Declaration -
Schultz v Reynolds & Newport .............................. A-10439

Exhibit 23 to Patel Declaration -
Merkanti v Raiffeisen Bank ................................... A-10463

Exhibit 24 to Patel Declaration -
H1 of Tolleys on Administration of Trusts ............ A-10487

Exhibit 26 to Patel Declaration -
Cayman Trusts Act................................................. A-10537

Exhibit 27 to Patel Declaration -
Re China Milk........................................................ A-10539

687

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
of Chieveley

A   question of how to reconcile their competing claims arose for consideration
on a summons by the liquidator for directions.

The problem arose from the fact that the contracts under which the
depositors deposited their money at the bank were ultra vires and so void.
That prevented them from establishing a simple contractual right to be
repaid, in which event they would have ranked with the ordinary trade
creditors of the society in the liquidation. As it was, they claimed to be
B   entitled to repayment in an action for money had and received—in the
same way as the bank claimed repayment in the case now before your
Lordships. But the House of Lords held that they were not entitled to
claim on this ground. This was in substance because to allow such a claim
would permit an indirect enforcement of the contract which the policy of
the law had decreed should be void. In those days, of course, judges still
C   spoke about the common law right to restitution in the language of
implied contract, and so we find Lord Sumner saying in a much quoted
passage, at p. 452:

"To hold otherwise would be indirectly to sanction an ultra vires
borrowing. All these causes of action are common species of the
genus assumpsit. All now rest, and long have rested, upon a notional
D   or imputed promise to repay. The law cannot de jure impute promises
to repay, whether for money had and received or otherwise, which, if
made de facto, it would inexorably avoid."

This conclusion however created a serious problem because, if the
depositors had no claim, then, in the words of Lord Dunedin, at p. 436:

"The appalling result in this very case would be that the society's
E   shareholders, having got proceeds of the depositors' money in the
form of investments, so that each individual depositor is utterly
unable to trace his money, are enriched to the extent of some 500 per
cent."

As a matter of practical justice, such a result was obviously unacceptable;
and it was to achieve justice that the House had recourse to equity to
F   provide the answer. It is, I think, apparent from the reasoning of the
members of the Appellate Committee that they regarded themselves, not
as laying down some broad general principle, but as solving a particular
practical problem. In this connection it is, in my opinion, significant that
there was a considerable variation in the way in which they approached
the problem. Viscount Haldane L.C., with whom Lord Atkinson agreed,
G   did so, at p. 421, on the basis that there arose in the circumstances "a
resulting trust, not of an active character." Lord Dunedin based his
decision upon a broad equity of restitution, drawn from Roman and
French law. He asked himself the question, at p. 435: "Is English equity
to retire defeated from the task which other systems of equity have
conquered?"—a question which he answered in the negative. Lord Parker
of Waddington, at pp. 441–442, attempted to reconcile his decision with
H   the established principles of equity by holding that the depositors' money
had been received by the directors of the society as fiduciaries, with the
effect that the depositors could thereafter follow their money in equity
into the assets of the society. Lord Sumner, at p. 458, considered that the

688

Lord Goff
of Chieveley                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                 [1996]

case should be decided on equitable principles on which there was no                          A
direct authority. He regarded the question as one of administration, in
which "the most just distribution of the whole must be directed, so only
that no recognised rule of law or equity be disregarded." Setting on one
side the opinion of Lord Parker, whose approach I find very difficult to
reconcile with the facts of the case, I do not discern in the speeches of the
members of the Appellate Committee any intention to impose a trust
carrying with it the personal duties of a trustee.                                           B

For present purposes, I approach this case in the following way. First,
it is clear that the problem which arose in *Sinclair v. Brougham,* viz. that
a personal remedy in restitution was excluded on grounds of public policy,
does not arise in the present case, which is not of course concerned with a
borrowing contract. Second, I regard the decision in *Sinclair v. Brougham*
as being a response to that problem in the case of ultra vires borrowing                      C
contracts, and as not intended to create a principle of general application.
From this it follows, in my opinion, that *Sinclair v. Brougham* is not
relevant to the decision in the present case. In particular it cannot be
relied upon as a precedent that a trust arises on the facts of the present
case, justifying on that basis an award of compound interest against the
council.

But I wish to add this. I do not in any event think that it would be                         D
right for your Lordships' House to exercise its power under the *Practice
Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234 to depart from
*Sinclair v. Brougham.* I say this first because, in my opinion, any decision
to do so would not be material to the disposal of the present appeal, and
would therefore be obiter. But there is a second reason of substance why,
in my opinion, that course should not be taken. I recognise that nowadays                     E
cases of incapacity are relatively rare, though the swaps litigation shows
that they can still occur. Even so, the question could still arise whether, in
the case of a borrowing contract rendered void because it was ultra vires
the borrower, it would be contrary to public policy to allow a personal
claim in restitution. Such a question has arisen in the past not only in
relation to associations such as the Birkbeck Permanent Benefit Building
Society, but also in relation to infants' contracts. Moreover there is a                      F
respectable body of opinion that, if such a case arose today, it should still
be held that public policy would preclude a personal claim in restitution,
though not of course by reference to an implied contract. That was the
opinion expressed by Leggatt L.J. in the Court of Appeal in the present
case [1994] 1 W.L.R. 938, 952E–F, as it had been by Hobhouse J.; and the
same view has been expressed by Professor Birks (see *An Introduction to                      G
the Law of Restitution* (1985), p. 374). I myself incline to the opinion that
a personal claim in restitution would not indirectly enforce the ultra vires
contract, for such an action would be unaffected by any of the contractual
terms governing the borrowing, and moreover would be subject (where
appropriate) to any available restitutionary defences. If my present opinion
were to prove to be correct then *Sinclair v. Brougham* will fade into
history. If not, then recourse can at least be had to *Sinclair v. Brougham*                  H
as authority for the proposition that, in such circumstances, the lender
should not be without a remedy. Indeed, I cannot think that English law,
or equity, is so impoverished as to be incapable of providing relief in such

689

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
                                                                                  of Chieveley

A    circumstances. Lord Wright, who wrote in strong terms ("*Sinclair v. Brougham*" (1938) 6 C.L.J. 305) endorsing the just result in *Sinclair v. Brougham*, would turn in his grave at any such suggestion. Of course, it may be necessary to reinterpret the decision in that case to provide a more satisfactory basis for it; indeed one possible suggestion has been proposed by Professor Birks (see *An Introduction to the Law of Restitution*, pp. 396 et seq.). But for the present the case should in my opinion stand, though

B    confined in the manner I have indicated, as an assertion that those who are caught in the trap of advancing money under ultra vires borrowing contracts will not be denied appropriate relief.

### *The availability of an equitable proprietary claim in the present case*

C    Having put *Sinclair v. Brougham* on one side as providing no authority that a resulting trust should be imposed in the facts of the present case, I turn to the question whether, as a matter of principle, such a trust should be imposed, the bank's submission being that such a trust arose at the time when the sum of £2·5m. was received by the council from the bank.

   As my noble and learned friend, Lord Browne-Wilkinson, observes, it

D    is plain that the present case falls within neither of the situations which are traditionally regarded as giving rise to a resulting trust, viz. (1) voluntary payments by A to B, or for the purchase of property in the name of B or in his and A's joint names, where there is no presumption of advancement or evidence of intention to make an out-and-out gift; or (2) property transferred to B on an express trust which does not exhaust the whole beneficial interest. The question therefore arises whether

E    resulting trusts should be extended beyond such cases to apply in the present case, which I shall treat as a case where money has been paid for a consideration which fails.

   In a most interesting and challenging paper, "Restitution and Resulting Trusts," published in *Equity: Contemporary Legal Developments* (1992) (ed. Goldstein), p. 335, Professor Birks has argued for a wider role for the resulting trust in the field of restitution, and specifically for its availability

F    in cases of mistake and failure of consideration. His thesis is avowedly experimental, written to test the temperature of the water. I feel bound to respond that the temperature of the water must be regarded as decidedly cold: see, e.g., Professor Burrows, "Swaps and the Friction between Common Law and Equity" [1995] R.L.R. 15, and Mr. W. J. Swadling, "A new role for resulting trusts?" (1996) 16 Legal Studies 133.

G    In the first place, as Lord Browne-Wilkinson points out, to impose a resulting trust in such cases is inconsistent with the traditional principles of trust law. For on receipt of the money by the payee it is to be presumed that (as in the present case) the identity of the money is immediately lost by mixing with other assets of the payee, and at that time the payee has no knowledge of the facts giving rise to the failure of consideration. By the time that those facts come to light, and the conscience of the payee

H    may thereby be affected, there will therefore be no identifiable fund to which a trust can attach. But there are other difficulties. First, there is no general rule that the property in money paid under a void contract does not pass to the payee; and it is difficult to escape the conclusion that, as a

690

Lord Goff
of Chieveley                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                 [1996]

general rule, the beneficial interest in the money likewise passes to the payee.     A
This must certainly be the case where the consideration for the payment
fails after the payment is made, as in cases of frustration or breach of
contract; and there appears to be no good reason why the same should
not apply in cases where, as in the present case, the contract under which
the payment is made is void ab initio and the consideration for the
payment therefore fails at the time of payment. It is true that the doctrine     B
of mistake might be invoked where the mistake is fundamental in the
orthodox sense of that word. But that is not the position in the present
case; moreover the mistake in the present case must be classified as a
mistake of law which, as the law at present stands, creates its own special
problems. No doubt that much criticised doctrine will fall to be
reconsidered when an appropriate case occurs; but I cannot think that the
present is such a case, since not only has the point not been argued but     C
(as will appear) it is my opinion that there is any event jurisdiction to
award compound interest in the present case. For all of these reasons
I conclude, in agreement with my noble and learned friend, that there is
no basis for holding that a resulting trust arises in cases where money has
been paid under a contract which is ultra vires and therefore void ab
initio. This conclusion has the effect that all the practical problems which
would flow from the imposition of a resulting trust in a case such as the     D
present, in particular the imposition upon the recipient of the normal
duties of trustee, do not arise. The dramatic consequences which would
occur are detailed by Professor Burrows in his article on "Swaps and the
Friction between Common Law and Equity" [1995] R.L.R. 15, 27: the
duty to account for profits accruing from the trust property; the inability
of the payee to rely upon the defence of change of position; the absence     E
of any limitation period; and so on. Professor Burrows even goes so far
as to conclude that the action for money had and received would be
rendered otiose in such cases, and indeed in all cases where the payer
seeks restitution of mistaken payments. However, if no resulting trust
arises, it also follows that the payer in a case such as the present cannot
achieve priority over the payee's general creditors in the event of his
insolvency—a conclusion which appears to me to be just.                           F

For all these reasons I conclude that there is no basis for imposing a
resulting trust in the present case, and I therefore reject the bank's
submission that it was here entitled to proceed by way of an equitable
proprietary claim. I need only add that, in reaching that conclusion, I do
not find it necessary to review the decision of Goulding J. in *Chase
Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105.     G

*Interest*

It is against that background that I turn to consider the question of
compound interest. Here there are three points which fall to be considered.
These are (1) whether the court had jurisdiction to award compound
interest; (2) if so, whether it should have exercised its jurisdiction to make     H
such an award in the present case; and (3) from what date should such an
award of compound interest run, if made.

It is common ground that in a case such as the present there is no
jurisdiction to award compound interest at common law or by statute.

691

A.C.                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
                                                                              of Chieveley

A  The central question in the present case is therefore whether there is
   jurisdiction in equity to do so. It was held below, on the basis that the
   bank was entitled to succeed not only in a personal claim at common law
   but also in a proprietary claim in equity, that there was jurisdiction in
   equity to make an order that the council should pay compound interest
   on the sum adjudged due. It was that jurisdiction which was exercised by
   Hobhouse J., whose decision on the point was not challenged before the
B  Court of Appeal, on the basis that *Sinclair v. Brougham* [1914] A.C. 398
   provided binding authority that a proprietary claim was available to the
   bank in this case. However since, in my opinion, *Sinclair v. Brougham*
   provides no such authority, and no proprietary claim is available to the
   bank, the question now arises whether the equitable jurisdiction to award
   compound interest may nevertheless be exercised on the facts of the
C  present case.
       I wish however to record that Hobhouse J. was in no doubt that, if he
   had jurisdiction to do so, he should award compound interest in this case.
   He said [1994] 4 All E.R. 890, 955:

       "Anyone who lends or borrows money on a commercial basis receives
       or pays interest periodically and if that interest is not paid it is
D      compounded. . . . I see no reason why I should deny the plaintiff a
       complete remedy or allow the defendant arbitrarily to retain part of
       the enrichment which it has unjustly enjoyed."

   With that reasoning I find myself to be in entire agreement. The council
   has had the use of the bank's money over a period of years. It is plain on
   the evidence that, if it had not had the use of the bank's money, it would
E  (if free to do so) have borrowed the money elsewhere at compound
   interest. It has to that extent profited from the use of the bank's money.
   Moreover, if the bank had not advanced the money to the council, it
   would itself have employed the money on similar terms in its business.
   Full restitution requires that, on the facts of the present case, compound
   interest should be awarded, having regard to the commercial realities of
F  the case. As the judge said, there is no reason why the bank should be
   denied a complete remedy.
       It follows therefore that everything depends on the scope of the
   equitable jurisdiction. It also follows, in my opinion, that if that
   jurisdiction does not extend to apply in a case such as the present, English
   law will be revealed as incapable of doing full justice.
G      It is right that I should record that the scope of the equitable
   jurisdiction was not explored in depth in the course of argument before
   the Appellate Committee, in which attention was concentrated on the
   question whether a proprietary claim was available to the bank in the
   circumstances of the present case. In other circumstances, it might well
   have been appropriate to invite further argument on the point. However,
   since it was indicated to the Committee that the council was not prepared
H  to spend further money on the appeal, whereupon it took no further part
   in the proceedings, and since the relevant authorities had been cited to the
   Committee, I am satisfied that it is appropriate that the point should now
   be decided by your Lordships' House.

692

Lord Goff
of Chieveley                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                [1996]

I wish also to record that I have had the opportunity of reading in    A
draft the speech of my noble and learned friend, Lord Woolf, and that
I find myself to be in agreement with his reasoning and conclusion on the
point. Even so, I propose to set out in my own words my reasons for
reaching the same conclusion.

I shall begin by expressing two preliminary thoughts. The first is that,
where the jurisdiction of the court derives from common law or equity,
and is designed to do justice in cases which come before the courts, it is    B
startling to be faced by an argument that the jurisdiction is so restricted
as to prevent the courts from doing justice. Jurisdiction of that kind
should as a matter of principle be as broad as possible, to enable justice
to be done wherever necessary; and the relevant limits should be found
not in the scope of the jurisdiction but in the manner of its exercise as the
principles are worked out from case to case. Second, I find it equally    C
startling to find that the jurisdiction is said to be limited to certain specific
categories of case. Where jurisdiction is founded on a principle of justice,
I would expect that the categories of case where it is exercised should be
regarded not as occupying the whole field but rather as emanations of the
principle, so that the possibility of the jurisdiction being extended to other
categories of case is not foreclosed.

It is with these thoughts in mind that I turn to the equitable jurisdiction    D
to award interest. In *President of India v. La Pintada Compania Navigacion
S.A.* [1985] A.C. 104 Lord Brandon of Oakbrook, delivering a speech with
which the other members of the Appellate Committee agreed, described
the equitable jurisdiction in the following words, at p. 116:

"Chancery courts had further regularly awarded interest, including
not only simple interest but also compound interest, when they    E
thought that justice so demanded, that is to say in cases where money
had been obtained and retained by fraud, or where it had been
withheld or misapplied by a trustee or anyone else in a fiduciary
position."

Later however he said that Courts of Chancery only awarded compound,    F
as distinct from simple, interest in two special classes of case.

With great respect I myself consider that, if the jurisdiction to award
compound interest is available where justice so demands, it cannot be so
confined as to exclude any class of case simply because that class of case
has not previously been recognised as falling within it. I prefer therefore
to read the passage quoted from Lord Brandon's speech as Mason C.J.
and Wilson J. read it in *Hungerfords v. Walker* (1989) 171 C.L.R. 125,    G
148, as providing examples (i.e., not exclusive examples) of the application
of the underlying principle of justice.

Now it is true that the reported cases on the exercise of the equitable
jurisdiction, which are by no means numerous, are concerned with cases
of breach of duty by trustees and other fiduciaries. In *Attorney-General v.
Alford* (1855) 4 De G.M. & G. 843, for example, which came before Lord
Cranworth L.C., the question arose whether an executor and trustee, who    H
had for several years retained in his hands trust funds which he ought to
have invested, should be chargeable with interest in excess of the ordinary
rate of simple interest. It was held that he should not be chargeable at a

693

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Goff
                                                                        of Chieveley

A  higher rate. Lord Cranworth L.C. recognised that the court might in such
a case impose interest at a higher rate, or even compound interest. But he
observed that if so the court does not impose a penalty on the trustee. He
said, at p. 851:

> "What the court ought to do, I think, is to charge him only with the
> interest which he has received, or which it is justly entitled to say he
B  > ought to have received, or which it is so fairly to be presumed that he
> did receive that he is estopped from saying that he did not receive it."

In cases of misconduct which benefits the executor, however, the court
may fairly infer that he used the money in speculation; and may, on the
principle "In odium spoliatoris omnia praesumuntur," assume that he
made a higher rate, if that was a reasonable conclusion.
C          Likewise in *Burdick v. Garrick* (1870) L.R. 5 Ch. App. 233, where a
fiduciary agent held money of his principal and simply paid it into his
bank account, it was held that he should be charged with simple interest
only. Lord Hatherley L.C., at pp. 241–242, applied the principle laid down
in *Attorney-General v. Alford*, namely that:

> "the court does not proceed against an accounting party by way of
D  > punishing him for making use of the plaintiff's money by directing
> rests, or payment of compound interest, but proceeds upon this
> principle, either that he has made, or has put himself in such a
> position that he is to be presumed to have made, 5 per cent., or
> compound interest, as the case may be. If the court finds . . . that the
> money received has been invested in an ordinary trade, the whole
> course of decision has tended to this, that the court presumes that the
E  > party against whom relief is sought has made that amount of profit
> which persons ordinarily do make in trade, and in those cases the
> court directs rests to be made."

For a more recent case in which the equitable jurisdiction was invoked,
see *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373.
F          From these cases it can be seen that compound interest may be
awarded in cases where the defendant has wrongfully profited, or may be
presumed to have so profited, from having the use of another person's
money. The power to award compound interest is therefore available to
achieve justice in a limited area of what is now seen as the law of
restitution, viz. where the defendant has acquired a benefit through his
wrongful act (see *Goff & Jones, The Law of Restitution*, 4th ed. (1993),
G  pp. 632 et seq.; *Birks, An Introduction to the Law of Restitution*, pp. 313 et
seq.; *Burrows, The Law of Restitution* (1993), pp. 403 et seq.). The general
question arises whether the jurisdiction must be kept constrained in this
way, or whether it may be permitted to expand so that it can be exercised
to ensure that full justice can be done elsewhere in that rubric of the law.
The particular question is whether the jurisdiction can be exercised in a
case such as the present in which the council has been ordered to repay
H  the balance of the bank's money on the ground of unjust enrichment, in a
personal claim at common law.
          At this stage of the argument I wish to stress two things. The first is
that it is plain that the jurisdiction may, in an appropriate case, be

694

Lord Goff
of Chieveley            Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))            [1996]

exercised in the case of a personal claim in equity. In both *Alford's* case       A
and *Burdick v. Garrick*, the cases were concerned with the taking of an
account, and an order for payment of the sum found due. In each case
the accounting party was a fiduciary, who held the relevant funds on trust.
But the jurisdiction is not limited to cases in which a proprietary claim is
being made and an award of interest is sought as representing the fruits
of the property so claimed. On the contrary, the jurisdiction is in
personam, and moreover an award of interest may be made not only       B
where the trustee or fiduciary has made a profit, but also where it is held
that he ought to have made a profit and has not done so. Furthermore in
my opinion the decision of the Court of Appeal in *In re Diplock; Diplock
v. Wintle* [1948] Ch. 465 provides no authority for the proposition that
there is no *jurisdiction* to award compound interest where the claim is a
personal claim. It is true that in that case the Court of Appeal decided       C
not to award interest against a number of charities which had been held
liable, in a personal claim in equity, to repay legacies which had been paid
to them in error. But in so doing the court simply followed an old decision
of Lord Eldon L.C. in *Gittins v. Steele* (1818) 1 Swan. 199, in which his
judgment was as follows, at p. 200:

> "Where the fund out of which the legacy ought to have been paid       D
> is in the hands of the court making interest, unquestionably interest
> is due. If a legacy has been erroneously paid to a legatee who has no
> farther property in the estate, in recalling that payment I apprehend
> that the rule of the court is not to charge interest; but if the legatee is
> entitled to another fund making interest in the hands of the court,
> justice must be done out of his share."

E

The Court of Appeal in *In re Diplock* can have had no desire to make an
award of interest against the charities in the personal claim against them
in that case, and they must have been very content to follow uncritically
this old "rule of court." But it does not follow that the rule of court went
to the jurisdiction of the court. It is more likely that it represented an
established practice which, as Lord Eldon L.C.'s brief judgment indicates,
was subject to exceptions. In any event the Court of Appeal was there       F
concerned only with simple interest; and in cases of the kind there under
consideration, it seems unlikely that any question of an award of
compound interest would ever have arisen.

I must confess that I find the reasoning which would restrict the
equitable jurisdiction to award compound interest to cases where the claim
is proprietary in nature to be both technical and unrealistic. This is shown
by the reasoning and conclusion of Hobhouse J. in *Kleinwort Benson Ltd.       G
v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972,
another swap transaction case, in which the plaintiff bank had no
proprietary claim. The judge upheld the submission of the defendant
council that, although they were under a personal liability to make
restitution both at law and in equity, nevertheless the court had no
jurisdiction to award compound interest on the sum adjudged due. He       H
said, at p. 994:

> "If . . . the plaintiff is only entitled to a personal remedy which will
> be the case where, although there was initially a fiduciary relationship

695

A.C.  Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))  Lord Goff
of Chieveley

A  and the payer was entitled in equity to treat the sum received by the payee as his, the payer's, money and to trace it, but because of subsequent developments he is no longer able to trace the sum in the hands of the payee, then there is no subject matter to which the rationale on which compound interest is awarded can be applied. The payee cannot be shown to have a fund belonging to the payer or to have used it to make profits for himself."

B

This reasoning is logical, assuming the restricted nature of the equitable jurisdiction to award compound interest. But if, as Lord Brandon in *President of India v. La Pintada Compania Navigacion, S.A.* [1985] A.C. 104, 116 stated, the jurisdiction is founded upon the demands of justice, it is difficult to see the sense of the distinction which Hobhouse J. felt compelled to draw. It seems strange indeed that, just because the power to trace property has ceased, the court's jurisdiction to award compound interest should also come to an end. For where the claim is based upon the unjust enrichment of the defendant, it may be necessary to have power to award compound interest to achieve full restitution, i.e. to do full justice, as much where the plaintiff's claim is personal as where his claim is proprietary in nature. Furthermore, I know of no authority which compelled Hobhouse J. to hold that he had no jurisdiction to award compound interest in respect of the personal claim in equity in the case before him.

C

D

For these reasons I am satisfied that there is jurisdiction in equity to award compound interest in the case of personal claims as well as proprietary claims.

I turn next to the question whether the equitable jurisdiction can be exercised in aid of common law remedies such as, for example, a personal remedy in restitution, to repair the deficiencies of the common law. Here I turn at once to *Snell's Equity*, 29th ed. (1990), p. 28, where the first maxim of equity is stated to be that "Equity will not suffer a wrong to be without a remedy." The commentary on this maxim in the text reads:

E

F  "The idea expressed in this maxim is that no wrong should be allowed to go unredressed if it is capable of being remedied by courts of justice, and this really underlies the whole jurisdiction of equity. As already explained, the common law courts failed to remedy many undoubted wrongs, and this failure led to the establishment of the Court of Chancery. But is must not be supposed that every *moral* wrong was redressed by the Court of Chancery. The maxim must be taken as referring to rights which are suitable for judicial enforcement, but were not enforced at common law owing to some technical defect."

G

To this maxim is attributed the auxiliary jurisdiction of equity. The commentary reads:

H  "Again, to this maxim may be traced the origin of the auxiliary jurisdiction of the Court of Chancery, by virtue of which suitors at law were aided in the enforcement of their legal rights. Without such aid these rights would often have been 'wrongs without remedies.' For instance, it was often necessary for a plaintiff in a common law

A-9937

696

Lord Goff
of Chieveley            **Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**            [1996]

action to obtain discovery of facts resting in the knowledge of the    A
defendant, or of deeds, writings or other things in his possession or
power. The common law courts, however, had no power to order
such discovery, and recourse was therefore had to the Court of
Chancery, which assumed jurisdiction to order the defendant to make
discovery on his oath."

The question which arises in the present case is whether, in the exercise of    B
equity's auxiliary jurisdiction, the equitable jurisdiction to award
compound interest may be exercised to enable a plaintiff to obtain full
justice in a personal action of restitution at common law.
    I start with the position that the common law remedy is, in a case such
as the present, plainly inadequate, in that there is no power to award
compound interest at common law and that without that power the
common law remedy is incomplete. The situation is therefore no different    C
from that in which, in the absence of jurisdiction at common law to order
discovery, equity stepped in to enable justice to be done in common law
actions by ordering the defendant to make discovery on oath. The only
difference between the two cases is that, whereas the equitable jurisdiction
to order discovery in aid of common law actions was recognised many
years ago, the possibility of the equitable jurisdiction to award compound    D
interest being exercised in aid of common law actions was not addressed
until the present case. Fortunately, however, judges of equity have always
been ready to address new problems, and to create new doctrines, where
justice so requires. As Sir George Jessel M.R. said, in a famous passage
in his judgment in *In re Hallett's Estate; Knatchbull v. Hallett* (1880)
13 Ch.D. 696, 710:

    "I intentionally say modern rules, because it must not be forgotten    E
    that the rules of courts of equity are not, like the rules of the common
    law, supposed to have been established from time immemorial. It is
    perfectly well known that they have been established from time to
    time—altered, improved, and refined from time to time. In many
    cases we know the names of the Chancellors who invented them. No
    doubt they were invented for the purpose of securing the better    F
    administration of justice, but still they were invented."

    I therefore ask myself whether there is any reason why the equitable
jurisdiction to award compound interest should not be exercised in a case
such as the present. I can see none. Take, for example, the case of fraud.
It is well established that the equitable jurisdiction may be exercised in
cases of fraud. Indeed it is plain that, on the same facts, there may be a    G
remedy both at law and in equity to recover money obtained by fraud: see
*Johnson v. The King* [1904] A.C. 817, 822, *per* Lord Macnaghten. Is it to
be said that, if the plaintiff decides to proceed in equity, compound
interest may be awarded; but that if he chooses to proceed in an action at
law, no such auxiliary relief will be available to him? I find it difficult to
believe that, at the end of the 20th century, our law should be so
hidebound by forms of action as to be compelled to reach such a    H
conclusion.
    For these reasons I conclude that the equitable jurisdiction to award
compound interest may be exercised in the case of personal claims at

Case: 25-643, 06/06/2025, DktEntry: 65.1, Page 35 of 225

A-9938

697

A.C.            Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))            Lord Goff
                                                                          of Chieveley

A   common law, as it is in equity. Furthermore I am satisfied that, in
    particular, the equitable jurisdiction may, where appropriate, be exercised
    in the case of a personal claim in restitution. In reaching that conclusion,
    I am of the opinion that the decision of Hobhouse J. in *Kleinwort Benson
    Ltd. v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972
    that the court had no such jurisdiction should not be allowed to stand.

        I recognise that, in so holding, the courts would be breaking new
B   ground, and would be extending the equitable jurisdiction to a field where
    it has not hitherto been exercised. But that cannot of itself be enough to
    prevent what I see to be a thoroughly desirable extension of the
    jurisdiction, consistent with its underlying basis that it exists to meet the
    demands of justice. An action of restitution appears to me to provide an
    almost classic case in which the jurisdiction should be available to enable
C   the courts to do full justice. Claims in restitution are founded upon a
    principle of justice, being designed to prevent the unjust enrichment of the
    defendant: see *Lipkin Gorman v. Karpnale Ltd.* [1991] 2 A.C. 548. Long ago,
    in *Moses v. Macferlan* (1760) 2 Burr. 1005, 1012, Lord Mansfield C.J.
    said that the gist of the action for money had and received is that "the
    defendant, upon the circumstances of the case, is obliged by the ties of
    natural justice and equity to refund the money." It would be strange
D   indeed if the courts lacked jurisdiction in such a case to ensure that justice
    could be fully achieved by means of an award of compound interest,
    where it is appropriate to make such an award, despite the fact that the
    jurisdiction to award such interest is itself said to rest upon the demands
    of justice. I am glad not to be forced to hold that English law is so
    inadequate as to be incapable of achieving such a result. In my opinion
E   the jurisdiction should now be made available, as justice requires, in cases
    of restitution, to ensure that full justice can be done. The seed is there,
    but the growth has hitherto been confined within a small area. That
    growth should now be permitted to spread naturally elsewhere within this
    newly recognised branch of the law. No genetic engineering is required,
    only that the warm sun of judicial creativity should exercise its benign
    influence rather than remain hidden behind the dark clouds of legal
F   history.

        I wish to add that I for my part do not consider that the statutory
    power to award interest, either under section 3 of the Law Reform
    (Miscellaneous Provisions) Act 1934 or under section 35A of the Supreme
    Court Act 1981 (which, pursuant to section 15 of the Administration of
    Justice Act 1982, superseded section 3 of the Act of 1934), inhibits the
G   course of action which I now propose. It is true that section 3(1) of the
    Act of 1934, when empowering courts of record to award interest in
    proceedings for the recovery of any debt or damages, did not authorise
    the giving of interest upon interest. But I cannot see that it would be
    inconsistent with the intention then expressed by Parliament later to
    extend the existing equitable jurisdiction to award compound interest to
    enable courts to ensure that full restitution is achieved in personal actions
H   of restitution at common law. It is of course common knowledge that,
    until the latter part of this century, the existence of a systematic law of
    restitution, founded upon the principle of unjust enrichment, had not been
    recognised in English law. The question whether there should be a power

698

to award compound interest in such cases, in order to achieve full    A
restitution, simply did not arise in 1934 and cannot therefore have been
considered by Parliament in that year. To hold that, because Parliament
did not then authorise an award of compound interest in proceedings the
nature of which was not then recognised, the courts should now be
precluded from exercising the ordinary judicial power to develop the law
by extending an existing jurisdiction to meet a newly recognised need
appears to me to constitute an unnecessary and undesirable fetter upon    B
the judicial development of the law. It is not to be forgotten that there is
jurisdiction in equity, as well as at common law, to order restitution on
the ground of unjust enrichment; and I cannot see that section 3(1) of the
1934 Act would have precluded any extension of the existing equitable
jurisdiction to award compound interest to enable full restitution to be
achieved in such a case. Accordingly neither would section 3(1), which    C
applied to all courts of record, have precluded a similar extension of the
jurisdiction to enable full restitution to be achieved in actions at common
law. Section 35A of the Act of 1981 no doubt perpetuated the position as
established by section 3(1) of the Act of 1934, in that it, too, did not
confer a power on the courts to award compound interest; but I cannot
see that this affects the position. In so far as it is relevant to refer to the    D
Report of the Law Commission "Law of Contract: Report on Interest"
(Law Com. No. 88) (Cmnd. 7229) of 7 April 1978 which preceded that
enactment, it appears from the Report that it was generally opposed to
the introduction of any general power to award compound interest; but
there was no intention of interfering with the equitable jurisdiction, and
the problem which has arisen in the present case was not addressed. I wish
to add that such an extension of the equitable jurisdiction as I propose    E
would, in my opinion, be a case of equity acting in aid of the common
law. There is in my opinion no need, and indeed no basis, for outlawing
such a development as a case of equity acting in aid of the legislature
simply because the legislature, in conferring upon courts the power to
award simple interest, did not authorise the giving of compound interest.

It remains for me to say that I am satisfied, for the reasons given by
Hobhouse J., that this is a case in which it was appropriate that compound    F
interest should be awarded. In particular, since the council had the free
use of the bank's money in circumstances in which, if it had borrowed the
money from some other financial institution, it would have had to pay
compound interest for it, the council can properly be said to have profited
from the bank's money so as to make an award of compound interest
appropriate. However, for the reasons given by Dillon L.J. [1994]    G
1 W.L.R. 938, 947–949, I agree with the Court of Appeal that the interest
should run from the date of receipt of the money.

### Conclusion

For these reasons I would dismiss the appeal.

LORD BROWNE-WILKINSON. My Lords, in the last decade many local    H
authorities entered into interest rate swap agreements with banks and
other finance houses. In *Hazell v. Hammersmith and Fulham London
Borough Council* [1992] 2 A.C. 1 your Lordships held that such contracts

699

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-
                                                                        Wilkinson

A  were ultra vires local authorities and therefore void. Your Lordships left
   open the question whether payments made pursuant to such swap
   agreements were recoverable or not. The action which is the subject matter
   of this appeal is one of a number in which the court has had to consider
   the extent to which moneys paid under such an agreement are recoverable.

       An interest rate swap agreement is an agreement between two parties
   by which each agrees to pay the other on a specified date or dates an
B  amount calculated by reference to the interest which would have accrued
   over a given period on a notional principal sum. The rate of interest
   payable by each party (on the same notional sum) is different. One rate
   of interest is usually fixed and does not change (and the payer is called
   "the fixed rate payer"); the other rate is a variable or floating rate based
   on a fluctuating interest rate such as the six-month London Inter-bank
C  Offered Rate ("LIBOR") and the payer is known as "the floating rate
   payer." Normally the parties do not make the actual payments they have
   contracted for but the party owing the higher amount pays to the other
   party the difference between the two amounts.

       In the present case the swap contract was concluded between the
   respondent bank, Westdeutsche Landesbank Girozentrale ("the bank"),
   and the appellant, the council of the London Borough of Islington ("the
D  local authority"), on 16 June 1987. The arrangement was to run for 10
   years starting on 18 June 1987. The interest sums were to be calculated on
   a notional principal sum of £25m. and were to be payable half-yearly. The
   bank was to be the fixed rate payer at a rate of 7·5 per cent. per annum
   and the local authority was to be the floating rate payer at the domestic
   sterling LIBOR rate. In addition, the bank was to pay to the local
E  authority on 18 June 1987 a sum of £2·5m. ("the upfront payment") which
   payment was made. As a result of the provision of the upfront payment
   the rate of interest payable by the bank as the fixed rate payer was agreed
   to be lower than what would have been appropriate (9·43 per cent.) if the
   upfront payment had not been made.

       Pursuant to the terms of the agreement, the following payments were
   made:

F

| Date | Payment by bank to council | Payment by council to bank |
|------|---------------------------|----------------------------|
| 18.06.87 | £2,500,000 | |
| 18.12.87 | | £   172,345·89 |
| 20.06.88 | | £   229,666·09 |
| 19.12.88 | | £   259,054·56 |
| 19.06.89 | | £   693,407·53 |
| Total | £2,500,000 | £1,354,474·07 |

H  Therefore the payments made by the bank to the local authority exceed
   those made by the local authority to the bank to the extent of
   £1,145,525·93.

       On 1 November 1989 the Divisional Court gave judgment in *Hazell's*
   case declaring void swap transactions entered into by local authorities.

700

Lord Browne-Wilkinson                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

The decision applied to the contract between the parties in the present      A
case.

As will appear it is of central importance to note the way in which the
local authority dealt with the upfront payment of £2·5m. made to it on
18 June 1987. The money was credited to a bank account of the local
authority in which there were other moneys of the local authority, i.e.
a mixed account. That account itself became overdrawn overnight on
several dates in June and July 1987. There was an overall debit balance      B
on the account on 16 November 1987. The moneys in the mixed account
were used by the local authority for its general expenditure. If the upfront
payment had not been received, the local authority would have had to
borrow more money if it could. The local authority had been, and was
likely to be in the future, rate-capped and one of the attractions to the
local authority in the swap agreement was that it obtained the upfront     C
payment in a form which did not attract statutory controls.

The bank in this action sought recovery of the amounts paid by it
under the void agreement together with interest. On 12 February 1993
Hobhouse J. [1994] 4 All E.R. 890 gave judgment in the Commercial
Court for the bank ordering payment by the local authority to the bank
of the balance together with compound interest on the balance as from       D
1 April 1990 with six-monthly rests.

The council appealed to the Court of Appeal against that order and
the bank cross-appealed contending that compound interest should have
been ordered as from the date of receipt of the principal sum, i.e. 18 June
1987.

On 17 December 1993 the Court of Appeal (Dillon, Leggatt and
Kennedy L.JJ.) [1994] 1 W.L.R. 938 dismissed the local authority's appeal    E
and allowed the cross-appeal by the bank. It held that the bank was
entitled to recover the balance at law as money had and received
(Dillon L.J., at p. 946; Leggatt L.J., at p. 953E–F). It also held that the bank
was entitled to recover the balance in equity on the ground that the
local authority held the upfront payment on a resulting trust and was there-
fore personally liable, as trustee, to repay the bank (Dillon L.J., at        F
p. 947A–E; Leggatt L.J., at p. 953G–H). The Court of Appeal further held
the local authority liable to pay compound interest on the balance from
time to time outstanding as from the date of receipt of the upfront
payment. The ability of the court to award compound, as opposed to
simple, interest was founded on the equitable jurisdiction to award
compound interest as against a trustee or other person owing fiduciary
duties who is personally accountable and who has made use of the             G
plaintiff's money: Dillon L.J., at pp. 949–951; Leggatt L.J., at pp. 953–
955.

The local authority now accepts that it is personally liable to repay the
balance to the bank. The local authority appeals to your Lordships only
against the award of compound interest. But, as will appear,
notwithstanding the narrow scope of the appeal it raises profound
questions for decision by your Lordships.                                     H

*Compound Interest in equity*

It is common ground that in the absence of agreement or custom the
court has no jurisdiction to award compound interest either at law or

A-9942

701

A.C.    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))    Lord Browne-Wilkinson

A   under section 35A of the Supreme Court Act 1981. It is also common
ground that in certain limited circumstances courts of equity can award
compound interest. Mr. Philipson, for the local authority, contends that
compound interest can only be ordered on a claim against a trustee or
other person owing fiduciary duties who in breach of such duty has used
trust moneys in his own trade. He contends that compound interest cannot
be awarded in this case since (a) the local authority never held the upfront
B   payment as a trustee or in a fiduciary capacity and (b) in any event the
local authority did not use the upfront payment in its trade. Mr. Sumption,
for the bank, contends that compound interest can be awarded in equity
whenever the defendant is liable to disgorge a benefit received whether or
not he is a trustee or a fiduciary. Alternatively, Mr. Sumption contends
that the local authority did receive the upfront payment as a trustee and
C   as such is in equity accountable for the benefits it has received, including
the benefit of not having to borrow £2·5m. on the market at compound
interest.

In the absence of fraud courts of equity have never awarded compound
interest except against a trustee or other person owing fiduciary duties
who is accountable for profits made from his position. Equity awarded
simple interest at a time when courts of law had no right under common
D   law or statute to award any interest. The award of compound interest was
restricted to cases where the award was in lieu of an account of profits
improperly made by the trustee. We were not referred to any case where
compound interest had been awarded in the absence of fiduciary
accountability for a profit. The principle is clearly stated by Lord
Hatherley L.C. in *Burdick v. Garrick*, L.R. 5 Ch.App. 233, 241:

E       "the court does not proceed against an accounting party by way of
punishing him for making use of the plaintiff's money by directing
rests, or payment of compound interest, but proceeds upon this
principle, either that he has made, or has put himself into such a
position as that he is to be presumed to have made, 5 per cent., or
compound interest, as the case may be."

F       The principle was more fully stated by Buckley L.J. in *Wallersteiner v.
Moir (No. 2)* [1975] Q.B. 373, 397:

        "Where a trustee has retained trust money in his own hands, he will
be accountable for the profit which he has made or which he is
assumed to have made from the use of the money. In *Attorney-
General v. Alford*, 4 De G.M. & G. 843, 851 Lord Cranworth L.C.
G       said: 'What the court ought to do, I think, is to charge him only with
the interest which he has received, or which it is justly entitled to say
he ought to have received, or which it is so fairly to be presumed that
he did receive that he is estopped from saying that he did not receive
it.' This is an application of the doctrine that the court will not allow
a trustee to make any profit from his trust. The defaulting trustee is
normally charged with simple interest only, but if it is established that
H       he has used the money in trade he may be charged compound interest.
... The justification for charging compound interest normally lies in
the fact that profits earned in trade would be likely to be used as
working capital for earning further profits. Precisely similar equitable

A-9943

702

Lord Browne-
Wilkinson      **Wesideutsche Bank v. Islington L.B.C. (H.L.(E.))**      **[1996]**

principles apply to an agent who has retained moneys of his principal    A
in his hands and used them for his own purposes: *Burdick v. Garrick*."

In *President of India v. La Pintada Compania Navigacion S.A.* [1985]
A.C. 104, 116 Lord Brandon of Oakbrook (with whose speech the rest of
their Lordships agreed) considered the law as to the award of interest as
at that date in four separate areas. His third area was equity, as to which
he said:                                                              B

"Thirdly, the area of equity. The Chancery courts, again differing
from the common law courts, had regularly awarded simple interest
as ancillary relief in respect of equitable remedies, such as specific
performance, rescission and the taking of an account. Chancery
courts had further regularly awarded interest, including not only
simple interest but also compound interest, when they thought that    C
justice so demanded, that is to say in cases where money had been
obtained and retained by fraud, or where it had been withheld or
misapplied by a trustee or anyone else in a fiduciary position. . . .
Courts of Chancery only in two special classes of case, awarded
compound, as distinct from simple, interest."

These authorities establish that in the absence of fraud equity only awards    D
compound (as opposed to simple) interest against a defendant who is a
trustee or otherwise in a fiduciary position by way of recouping from such
a defendant an improper profit made by him. It is unnecessary to decide
whether in such a case compound interest can only be paid where the
defendant has used trust moneys in his own trade or (as I tend to think)
extends to all cases where a fiduciary has improperly profited from his    E
trust. Unless the local authority owed fiduciary duties to the bank in
relation to the upfront payment, compound interest cannot be awarded.

### *Was there a trust? The argument for the bank in outline*

The bank submitted that, since the contract was void, title did not pass
at the date of payment either at law or in equity. The legal title of the    F
bank was extinguished as soon as the money was paid into the mixed
account, whereupon the legal title became vested in the local authority.
But, it was argued, this did not affect the equitable interest, which
remained vested in the bank ("the retention of title point"). It was
submitted that whenever the legal interest in property is vested in one
person and the equitable interest in another, the owner of the legal interest
holds it on trust for the owner of the equitable title: "the separation of the    G
legal from the equitable interest necessarily imports a trust." For this
latter proposition ("the separation of title point") the bank, of course,
relies on *Sinclair v. Brougham* [1914] A.C. 398 and *Chase Manhattan Bank
N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105.

The generality of these submissions was narrowed by submitting that
the trust which arose in this case was a resulting trust "not of an active
character:" see *per* Viscount Haldane L.C. in *Sinclair v. Brougham* [1914]    H
A.C. 398, 421. This submission was reinforced, after completion of the
oral argument, by sending to your Lordships Professor Peter Birks's paper
"Restitution and Resulting Trusts:" see *Equity: Contemporary Legal*

703

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-
                                                                                  Wilkinson

A  *Developments*, p. 335. Unfortunately your Lordships have not had the
   advantage of any submissions from the local authority on this paper, but
   an article by William Swadling "A new role for resulting trusts?" 16 Legal
   Studies 133 puts forward counter-arguments which I have found
   persuasive.

       It is to be noted that the bank did not found any argument on the
   basis that the local authority was liable to repay either as a constructive
B  trustee or under the in personam liability of the wrongful recipient of the
   estate of a deceased person established by *In re Diplock; Diplock v. Wintle*
   [1948] Ch. 465. I therefore do not further consider those points.


   *The breadth of the submission*

       Although the actual question in issue on the appeal is a narrow one,
C  on the arguments presented it is necessary to consider fundamental
   principles of trust law. Does the recipient of money under a contract
   subsequently found to be void for mistake or as being ultra vires hold the
   moneys received on trust even where he had no knowledge at any relevant
   time that the contract was void? If he does hold on trust, such trust must
   arise at the date of receipt or, at the latest, at the date the legal title of the
D  payer is extinguished by mixing moneys in a bank account: in the present
   case it does not matter at which of those dates the legal title was
   extinguished. If there is a trust two consequences follow: (a) the recipient
   will be personally liable, regardless of fault, for any subsequent payment
   away of the moneys to third parties even though, at the date of such
   payment, the "trustee" was still ignorant of the existence of any trust: see
   Burrows, "Swaps and the Friction between Common Law and Equity"
E  [1995] R.L.R. 15; (b) as from the date of the establishment of the trust
   (i.e. receipt or mixing of the moneys by the "trustee") the original payer
   will have an equitable proprietary interest in the moneys so long as they
   are traceable into whomsoever's hands they come other than a purchaser
   for value of the legal interest without notice. Therefore, although in the
   present case the only question directly in issue is the personal liability of
F  the local authority as a trustee, it is not possible to hold the local authority
   liable without imposing a trust which, in other cases, will create property
   rights affecting third parties because moneys received under a void
   contract are "trust property."


   *The practical consequences of the bank's argument*

G      Before considering the legal merits of the submission, it is important
   to appreciate the practical consequences which ensue if the bank's
   arguments are correct. Those who suggest that a resulting trust should
   arise in these circumstances accept that the creation of an equitable
   proprietary interest under the trust can have unfortunate, and adverse,
   effects if the original recipient of the moneys becomes insolvent: the
   moneys, if traceable in the hands of the recipient, are trust moneys and
H  not available for the creditors of the recipient. However, the creation of
   an equitable proprietary interest in moneys received under a void contract
   is capable of having adverse effects quite apart from insolvency. The
   proprietary interest under the unknown trust will, quite apart from

A-9945

704

Lord Browne-Wilkinson       Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))       [1996]

insolvency, be enforceable against any recipient of the property other than    A
the purchaser for value of a legal interest without notice.

Take the following example. T (the transferor) has entered into a
commercial contract with R1 (the first recipient). Both parties believe the
contract to be valid but it is in fact void. Pursuant to that contract: (i) T
pays £1m. to R1 who pays it into a mixed bank account; (ii) T transfers
100 shares in X company to R1, who is registered as a shareholder.
Thereafter R1 deals with the money and shares as follows: (iii) R1 pays    B
£50,000 out of the mixed account to R2 otherwise than for value; R2 then
becomes insolvent, having trade creditors who have paid for goods not
delivered at the time of the insolvency; (iv) R1 charges the shares in X
company to R3 by way of equitable security for a loan from R3.

If the bank's arguments are correct, R1 holds the £1m. on trust for T
once the money has become mixed in R1's bank account. Similarly R1    C
becomes the legal owner of the shares in X company as from the date of
his registration as a shareholder but holds such shares on a resulting trust
for T. T therefore has an equitable proprietary interest in the moneys in
the mixed account and in the shares.

T's equitable interest will enjoy absolute priority as against the
creditors in the insolvency of R2 (who was not a purchaser for value)
provided that the £50,000 can be traced in the assets of R2 at the date of    D
its insolvency. Moreover, if the separation of title argument is correct,
since the equitable interest is in T and the legal interest is vested in R2,
R2 also holds as trustee for T. In tracing the £50,000 in the bank account
of R2, R2 as trustee will be treated as having drawn out "his own"
moneys first, thereby benefiting T at the expense of the secured and
unsecured creditors of R2. Therefore in practice one may well reach    E
the position where the moneys in the bank account of R2 in reality reflect the
price paid by creditors for goods not delivered by R2: yet, under the
tracing rules, those moneys are to be treated as belonging in equity to T.

So far as the shares in the X company are concerned, T can trace his
equitable interest into the shares and will take in priority to R3, whose
equitable charge to secure his loan even though granted for value will pro
tanto be defeated.    F

All this will have occurred when no one was aware, or could have
been aware, of the supposed trust because no one knew that the contract
was void.

I can see no moral or legal justification for giving such priority to the
right of T to obtain restitution over third parties who have themselves not
been enriched, in any real sense, at T's expense and indeed have had no    G
dealings with T. T paid over his money and transferred the shares under
a supposed valid contract. If the contract had been valid, he would have
had purely personal rights against R1. Why should he be better off
because the contract is void?

My Lords, wise judges have often warned against the wholesale
importation into commercial law of equitable principles inconsistent with
the certainty and speed which are essential requirements for the orderly    H
conduct of business affairs: see *Barnes v. Addy* (1874) L.R. 9 Ch.App. 244,
251 and 255; *Scandinavian Trading Tanker Co. A.B. v. Flota Petrolera
Ecuatoriana* [1983] 2 A.C. 694, 703–704. If the bank's arguments are

705
A.C.                     Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-Wilkinson

A   correct, a businessman who has entered into transactions relating to or dependent upon property rights could find that assets which apparently belong to one person in fact belong to another; that there are "off balance sheet" liabilities of which he cannot be aware; that these property rights and liabilities arise from circumstances unknown not only to himself but also to anyone else who has been involved in the transactions. A new area of unmanageable risk will be introduced into commercial dealings. If the

B   due application of equitable principles forced a conclusion leading to these results, your Lordships would be presented with a formidable task in reconciling legal principle with commercial common sense. But in my judgment no such conflict occurs. The resulting trust for which the bank contends is inconsistent not only with the law as it stands but with any principled development of it.

C

### The relevant principles of trust law

(i) Equity operates on the conscience of the owner of the legal interest. In the case of a trust, the conscience of the legal owner requires him to carry out the purposes for which the property was vested in him (express or implied trust) or which the law imposes on him by reason of his

D   unconscionable conduct (constructive trust).

(ii) Since the equitable jurisdiction to enforce trusts depends upon the conscience of the holder of the legal interest being affected, he cannot be a trustee of the property if and so long as he is ignorant of the facts alleged to affect his conscience, i.e. until he is aware that he is intended to hold the property for the benefit of others in the case of an express or implied trust, or, in the case of a constructive trust, of the factors which

E   are alleged to affect his conscience.

(iii) In order to establish a trust there must be identifiable trust property. The only apparent exception to this rule is a constructive trust imposed on a person who dishonestly assists in a breach of trust who may come under fiduciary duties even if he does not receive identifiable trust property.

F   (iv) Once a trust is established, as from the date of its establishment the beneficiary has, in equity, a proprietary interest in the trust property, which proprietary interest will be enforceable in equity against any subsequent holder of the property (whether the original property or substituted property into which it can be traced) other than a purchaser for value of the legal interest without notice.

These propositions are fundamental to the law of trusts and I would

G   have thought uncontroversial. However, proposition (ii) may call for some expansion. There are cases where property has been put into the name of X without X's knowledge but in circumstances where no gift to X was intended. It has been held that such property is recoverable under a resulting trust: *Birch v. Blagrave* (1755) 1 Amb. 264; *Childers v. Childers* (1857) 1 De G. & J. 482; *In re Vinogradoff; Allen v. Jackson* [1935] W.N. 68; *In re Muller; Cassin v. Mutual Cash Order Co. Ltd* [1953] N.Z.L.R.

H   879. These cases are explicable on the ground that, by the time action was brought, X or his successors in title have become aware of the facts which gave rise to a resulting trust; his conscience was affected as from the time of such discovery and thereafter he held on a resulting trust under which

706
Lord Browne-Wilkinson        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        [1996]

the property was recovered from him. There is, so far as I am aware, no          A
authority which decides that X was a trustee, and therefore accountable
for his deeds, at any time before he was aware of the circumstances which
gave rise to a resulting trust.

Those basic principles are inconsistent with the case being advanced
by the bank. The latest time at which there was any possibility of
identifying the "trust property" was the date on which the moneys in the
mixed bank account of the local authority ceased to be traceable when the      B
local authority's account went into overdraft in June 1987. At that date,
the local authority had no knowledge of the invalidity of the contract but
regarded the moneys as its own to spend as it thought fit. There was
therefore never a time at which both (a) there was defined trust property
and (b) the conscience of the local authority in relation to such defined
trust property was affected. The basic requirements of a trust were never      C
satisfied.

I turn then to consider the bank's arguments in detail. They were
based primarily on principle rather than on authority. I will deal first with
the bank's argument from principle and then turn to the main authorities
relied upon by the bank, *Sinclair v. Brougham* [1914] A.C. 398 and *Chase
Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105.
                                                                                D

*The retention of title point*

It is said that, since the bank only intended to part with its beneficial
ownership of the moneys in performance of a valid contract, neither the
legal nor the equitable title passed to the local authority at the date of
payment. The legal title vested in the local authority by operation of law
when the moneys became mixed in the bank account but, it is said, the           E
bank "retained" its equitable title.

I think this argument is fallacious. A person solely entitled to the full
beneficial ownership of money or property, both at law and in equity,
does not enjoy an equitable interest in that property. The legal title carries
with it all rights. Unless and until there is a separation of the legal and
equitable estates, there is no separate equitable title. Therefore to talk      F
about the bank "retaining" its equitable interest is meaningless. The only
question is whether the circumstances under which the money was paid
were such as, in equity, to impose a trust on the local authority. If so, an
equitable interest arose for the first time under that trust.

This proposition is supported by *In re Cook; Beck v. Grant* [1948] Ch.
212; *Vandervell v. Inland Revenue Commissioners* [1967] 2 A.C. 291, 311G,
per Lord Upjohn, and 317F, per Lord Donovan; *Commissioner of Stamp             G
Duties (Queensland) v. Livingston* [1965] A.C. 694, 712B–E; *Underhill and
Hayton, Law of Trusts and Trustees,* 15th ed. (1995), p. 866.

*The separation of title point*

The bank's submission, at its widest, is that if the legal title is in A but
the equitable interest in B, A holds as trustee for B.                          H

Again I think this argument is fallacious. There are many cases where
B enjoys rights which, in equity, are enforceable against the legal owner,
A, without A being a trustee, e.g. an equitable right to redeem a mortgage,

707

A.C.                Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        Lord Browne-Wilkinson

A  equitable easements, restrictive covenants, the right to rectification, an
   insurer's right by subrogation to receive damages subsequently recovered
   by the assured: *Lord Napier and Ettrick v. Hunter* [1993] A.C. 713. Even
   in cases where the whole beneficial interest is vested in B and the bare
   legal interest is in A, A is not necessarily a trustee, e.g. where title to land
   is acquired by estoppel as against the legal owner; a mortgagee who has
   fully discharged his indebtedness enforces his right to recover the
B  mortgaged property in a redemption action, not an action for breach of
   trust.

         The bank contended that where, *under a pre-existing trust,* B is entitled
   to an equitable interest in trust property, if the trust property comes into
   the hands of a third party, X (not being a purchaser for value of the legal
   interest without notice), B is entitled to enforce his equitable interest
C  against the property in the hands of X because X is a trustee for B. In my
   view the third party, X, is not necessarily a trustee for B: B's equitable
   right is enforceable against the property in just the same way as any other
   specifically enforceable equitable right can be enforced against a third
   party. Even if the third party, X, is not aware that what he has received is
   trust property B is entitled to assert his title in that property. If X has the
   necessary degree of knowledge, X may himself become a constructive
D  trustee for B on the basis of knowing receipt. But unless he has the
   requisite degree of knowledge he is not personally liable to account as
   trustee: *In re Diplock; Diplock v. Wintle* [1948] Ch. 465, 478; *In re
   Montagu's Settlement Trusts* [1987] Ch. 264. Therefore, innocent receipt of
   property by X subject to an existing equitable interest does not by itself
   make X a trustee despite the severance of the legal and equitable titles.
E  *Underhill and Hayton, Law of Trusts and Trustees,* pp. 369–370, whilst
   accepting that X is under no personal liability to account unless and until
   he becomes aware of B's rights, does describe X as being a constructive
   trustee. This may only be a question of semantics: on either footing, in
   the present case the local authority could not have become accountable
   for profits until it knew that the contract was void.

F
   *Resulting trust*

         This is not a case where the bank had any equitable interest which pre-
   dated receipt by the local authority of the upfront payment. Therefore, in
   order to show that the local authority became a trustee, the bank must
   demonstrate circumstances which raised a trust for the first time either at
G  the date on which the local authority received the money or at the date
   on which payment into the mixed account was made. Counsel for the
   bank specifically disavowed any claim based on a constructive trust. This
   was plainly right because the local authority had no relevant knowledge
   sufficient to raise a constructive trust at any time before the moneys, upon
   the bank account going into overdraft, became untraceable. Once there
   ceased to be an identifiable trust fund, the local authority could not
H  become a trustee: *In re Goldcorp Exchange Ltd.* [1995] 1 A.C. 74.
   Therefore, as the argument for the bank recognised, the only possible
   trust which could be established was a resulting trust arising from the
   circumstances in which the local authority received the upfront payment.

708

Lord Browne-
Wilkinson     Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))     [1996]

Under existing law a resulting trust arises in two sets of circumstances:    **A**
(A) where A makes a voluntary payment to B or pays (wholly or in part)
for the purchase of property which is vested either in B alone or in the
joint names of A and B, there is a presumption that A did not intend to
make a gift to B: the money or property is held on trust for A (if he is the
sole provider of the money) or in the case of a joint purchase by A and B
in shares proportionate to their contributions. It is important to stress
that this is only a *presumption*, which presumption is easily rebutted either    **B**
by the counter-presumption of advancement or by direct evidence of A's
intention to make an outright transfer: see *Underhill and Hayton, Law of
Trusts and Trustees*, pp. 317 et seq.; *Vandervell v. Inland Revenue
Commissioners* [1967] 2 A.C. 291, 312 et seq.; *In re Vandervell's Trusts
(No. 2)* [1974] Ch. 269, 288 et seq. (B) Where A transfers property to B
*on express trusts*, but the trusts declared do not exhaust the whole    **C**
beneficial interest: ibid. and *Quistclose Investments Ltd. v. Rolls Razor Ltd
(In Liquidation)* [1970] A.C. 567. Both types of resulting trust are
traditionally regarded as examples of trusts giving effect to the common
intention of the parties. A resulting trust is not imposed by law against
the intentions of the trustee (as is a constructive trust) but gives effect to
his presumed intention. Megarry J. in *In re Vandervell's Trusts (No. 2)*
suggests that a resulting trust of type (B) does not depend on intention    **D**
but operates automatically. I am not convinced that this is right. If the
settlor has expressly, or by necessary implication, abandoned any beneficial
interest in the trust property, there is in my view no resulting trust: the
undisposed-of equitable interest vests in the Crown as bona vacantia: see
*In re West Sussex Constabulary's Widows, Children and Benevolent (1930)
Fund Trusts* [1971] Ch. 1.    **E**

Applying these conventional principles of resulting trust to the present
case, the bank's claim must fail. There was no transfer of money to the
local authority on express trusts: therefore a resulting trust of type
(B) above could not arise. As to type (A) above, any presumption of
resulting trust is rebutted since it is demonstrated that the bank paid, and
the local authority received, the upfront payment with the intention that
the moneys so paid should become the absolute property of the local    **F**
authority. It is true that the parties were under a misapprehension that the
payment was made in pursuance of a valid contract. But that does not
alter the actual intentions of the parties at the date the payment was made
or the moneys were mixed in the bank account. As the article by William
Swadling, "A new role for resulting trusts?" 16 Legal Studies 133
demonstrates the presumption of resulting trust is rebutted by evidence of    **G**
any intention inconsistent with such a trust, not only by evidence of an
intention to make a gift.

Professor Birks, "Restitution and Resulting Trusts" (see *Equity:
Contemporary Legal Developments*, p. 335, at p. 360), whilst accepting that
the principles I have stated represent "a very conservative form" of
definition of a resulting trust, argues from restitutionary principles that
the definition should be extended so as to cover a perceived gap in the law    **H**
of "subtractive unjust enrichment" (at p. 368) so as to give a plaintiff a
proprietary remedy when he has transferred value under a mistake or
under a contract the consideration for which wholly fails. He suggests that

709

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-
                                                                                 Wilkinson

A    a resulting trust should arise wherever the money is paid under a mistake
     (because such mistake vitiates the actual intention) or when money is paid
     on a condition which is not subsequently satisfied.
         As one would expect, the argument is tightly reasoned but 1 am not
     persuaded. The search for a perceived need to strengthen the remedies of
     a plaintiff claiming in restitution involves, to my mind, a distortion of
     trust principles. First, the argument elides rights in property (which is the
B    only proper subject matter of a trust) into rights in "the value transferred:"
     see p. 361. A trust can only arise where there is defined trust property: it
     is therefore not consistent with trust principles to say that a person is a
     trustee of property which cannot be defined. Second, Professor Birks's
     approach appears to assume (for example in the case of a transfer of value
     made under a contract the consideration for which subsequently fails) that
C    the recipient will be deemed to have been a trustee from the date of his
     original receipt of money, i.e. the trust arises at a time when the "trustee"
     does not, and cannot, know that there is going to be a total failure of
     consideration. This result is incompatible with the basic premise on which
     all trust law is built, viz. that the conscience of the trustee is affected.
     Unless and until the trustee is aware of the factors which give rise to the
     supposed trust, there is nothing which can affect his conscience. Thus
D    neither in the case of a subsequent failure of consideration nor in the case
     of a payment under a contract subsequently found to be void for mistake
     or failure of condition will there be circumstances, at the date of receipt,
     which can impinge on the conscience of the recipient, thereby making him
     a trustee. Thirdly, Professor Birks has to impose on his wider view an
     arbitrary and admittedly unprincipled modification so as to ensure that a
E    resulting trust does not arise when there has only been a failure to perform
     a contract, as opposed to total failure of consideration: see pp. 356–359
     and 362. Such arbitrary exclusion is designed to preserve the rights of
     creditors in the insolvency of the recipient. The fact that it is necessary to
     exclude artificially one type of case which would logically fall within the
     wider concept casts doubt on the validity of the concept.
         If adopted, Professor Birks's wider concepts would give rise to all the
F    practical consequences and injustices to which 1 have referred. 1 do not
     think it right to make an unprincipled alteration to the law of property
     (i.e. the law of trusts) so as to produce in the law of unjust enrichment
     the injustices to third parties which I have mentioned and the consequential
     commercial uncertainty which any extension of proprietary interests in
     personal property is bound to produce.

G
     *The authorities*

         Three cases were principally relied upon in direct support of the
     proposition that a resulting trust arises where a payment is made under a
     void contract.

H    (A) *Sinclair v. Brougham [1914] A.C. 398*

         The case concerned the distribution of the assets of the Birkbeck
     Permanent Benefit Building Society, an unincorporated body which was
     insolvent. The society had for many years been carrying on business as a

A-9951

710

bank which, it was held, was ultra vires its objects. The bank had accepted    A
deposits in the course of its ultra vires banking business and it was held
that the debts owed to such depositors were themselves void as being ultra
vires. In addition to the banking depositors, there were ordinary trade
creditors. The society had two classes of members, the A shareholders
who were entitled to repayment of their investment on maturity and the B
shareholders whose shares were permanent. By agreement, the claims of    B
the ordinary trade creditors and of the A shareholders had been settled.
Therefore the only claimants to the assets of the society before the court
were the ultra vires depositors and the B shareholders, the latter of which
could take no greater interest than the society itself.

The issues for decision arose on a summons taken out by the liquidator
for directions as to how he should distribute the assets in the liquidation.
In the judgments, it is not always clear whether this House was laying    C
down general propositions of law or merely giving directions as to the
proper mode in which the assets in that liquidation should be distributed.
The depositors claimed, first, in quasi-contract for money had and
received. They claimed secondly, as the result of an argument suggested
for the first time in the course of argument in the House of Lords (at
p. 404), to trace their deposits into the assets of the society.

D

*Money had and received*

The House of Lords was unanimous in rejecting the claim by the ultra
vires depositors to recover in quasi-contract on the basis of moneys had
and received. In their view, the claim in quasi-contract was based on an
implied contract. To imply a contract to repay would be to imply a
contract to exactly the same effect as the express ultra vires contract of    E
loan. Any such implied contract would itself be void as being ultra vires.

Subsequent developments in the law of restitution demonstrate that
this reasoning is no longer sound. The common law restitutionary claim is
based not on implied contract but on unjust enrichment: in the
circumstances the law imposes an obligation to repay rather than implying
an entirely fictitious agreement to repay: *Fibrosa Spolka Akcyjna v.*    F
*Fairbairn Lawson Combe Barbour Ltd.* [1943] A.C. 32, 63–64, *per* Lord
Wright; *Pavey & Matthews Pty. Ltd. v. Paul* (1987) 162 C.L.R. 221, 227,
255; *Lipkin Gorman v. Karpnale Ltd* [1991] 2 A.C. 548, 578c; *Woolwich
Equitable Building Society v. Inland Revenue Commissioners* [1993] A.C.
70. In my judgment, your Lordships should now unequivocally and finally
reject the concept that the claim for moneys had and received is based
on an implied contract. I would overrule *Sinclair v. Brougham* on this    G
point.

It follows that in *Sinclair v. Brougham* the depositors should have had
a personal claim to recover the moneys at law based on a total failure of
consideration. The failure of consideration was *not* partial: the depositors
had paid over their money in consideration of a promise to repay. That
promise was ultra vires and void; therefore the consideration for the
payment of the money wholly failed. So in the present swaps case (though    H
the point is not one under appeal) I think the Court of Appeal were right
to hold that the swap moneys were paid on a consideration that wholly
failed. The essence of the swap agreement is that, over the whole term of

711

A.C.    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))    Lord Browne-Wilkinson

A  the agreement, each party thinks he will come out best: the consideration for one party making a payment is an obligation on the other party to make counter-payments over the whole term of the agreement.

If in *Sinclair v. Brougham* the depositors had been held entitled to recover at law, their personal claim would have ranked pari passu with other ordinary unsecured creditors, in priority to the members of the society who could take nothing in the liquidation until all creditors had
B  been paid.

### The claim in rem

The House of Lords held that, the ordinary trade creditors having been paid in full by agreement, the assets remaining were to be divided between the ultra vires depositors and the members of the society pro rata
C  according to their respective payments to the society. The difficulty is to identify any single ratio decidendi for that decision. Viscount Haldane L.C. (with whom Lord Atkinson agreed) and Lord Parker of Waddington gave fully reasoned judgments (considered below). Lord Dunedin apparently based himself on some "super-eminent" equity (not a technical equity) in accordance with which the court could distribute the remaining assets of the society: see pp. 434 and 436. The members (by which presumably he
D  means the society) were not in a fiduciary relationship with the depositors: it was the directors not the society which had mixed the moneys: p. 438. This indicates that he was adopting the approach of Lord Parker: yet he concurred in the judgment of Lord Haldane L.C.: p. 438. I can only understand his judgment as being based on some super-eminent jurisdiction in the court to do justice as between the remaining claimants in the course
E  of a liquidation.

Lord Sumner plainly regarded the case as a matter of doing justice in administering the remaining assets in the liquidation, all other claims having been eliminated: p. 459. He said, at p. 458:

"The question is one of administration. The liquidator, an officer of the court, who has to discharge himself of the assets that have come to his hands, asks for directions, and, after hearing all parties
F  concerned, the court has the right and the duty to direct him how to distribute all the assets. . . . In my opinion, if precedent fails, the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded."

Lord Haldane L.C. treated the case as a tracing claim: could the depositors follow and recover property with which, in equity, they had
G  "never really parted:" p. 418. After holding that the parties could not trace at law (pp. 418–420) he said that the moneys could be traced in equity "based upon trust:" p. 420. The only passage in which he identifies the trust is at p. 421:

"The property was never converted into a debt, in equity at all events, and there has been throughout a resulting trust, not of an active
H  character, but sufficient, in my opinion, to bring the transaction within the general principle."

He treats the society itself (as opposed to its directors) as having mixed the depositors' money with its own money, but says, at pp. 422–423, that

712

Lord Browne-Wilkinson                 Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                [1996]

such mixing was not a breach of fiduciary duty by the society but    A
authorised by the depositors: it was intended that "the society should be
entitled to deal with [the depositors' money] freely as its own." On that
ground he distinguished *In re Hallett's Estate,* 13 Ch.D. 696 (a trustee is
taken to have drawn his own money first) and held that the mixed moneys
therefore belonged to the depositors and members pro rata.

Like others before me, I find Lord Haldane L.C.'s reasoning difficult,    B
if not impossible, to follow. The only equitable right which he identifies
arises under "a resulting trust, not of an active character" which, as
I understand it, existed from the moment when the society received the
money. Applying the conventional approach, the resulting trust could only
have arisen because either the depositors were treated as contributors to a
fund (a resulting trust of type (A) above) or because the "trust" on which
the moneys were paid to the society had failed (a resulting trust of type    C
(B)). Yet the finding that the society was not in breach of fiduciary duty
because it was the intention of the parties that the society should be free
to deal with the money as its own (p. 423) is inconsistent with either type
of resulting trust. Such an intention would rebut the *presumption* of
resulting trust of type (A) and is inconsistent with a payment on express
trusts which fail, i.e. with a type (B) resulting trust. Therefore the inactive
resulting trust which Lord Haldane L.C. was referring to was, as Professor    D
Birks points out ("Restitution and Resulting Trusts," *Equity: Contemporary
Legal Developments,* at pp. 359–362), not a conventional one: indeed there
is no trace of any such trust in earlier or later authority. The question is
whether the recognition of such a trust accords with principle and the
demands of certainty in commercial dealings.

As to the latter, Lord Haldane L.C.'s theory, if correct, gives rise to    E
all the difficulties which I have noted above. Nor does the theory accord
with principle. First, it postulates that the society became a trustee at a
time when it was wholly ignorant of the circumstances giving rise to the
trust. Second, since the depositors' money was *intended* to be mixed with
that of the society, there was never any intention that there should be a
separate identifiable trust fund, an essential feature of any trust. Third,
and most important, if Lord Haldane L.C.'s approach were to be    F
applicable in an ordinary liquidation it is quite incapable of accommodating
the rights of ordinary creditors. Lord Haldane L.C.'s inactive resulting
trust, if generally applicable, would give the depositors (and possibly the
members) rights having priority not only to those of ordinary trade
creditors but also to those of some secured creditors, e.g. the common
form security for bank lending, a floating charge on the company's assets.    G
The moneys of both depositors and members are, apparently, trust moneys
and therefore form no part of the company's assets available to pay
creditors, whether secured or unsecured. This seems to be an impossible
conclusion. Lord Haldane L.C. appreciated the difficulty, but did not
express any view as to what the position would be if there had been trade
creditors in competition; see pp. 421–422 and 425–426.

Lord Parker analysed the matter differently. He held that the depositors    H
had paid their money not to the society itself but to the directors, who
apparently held the moneys on some form of *Quistclose* trust (*Quistclose
Investments Ltd. v. Rolls Razor Ltd. (In Liquidation)* [1970] A.C. 567): the

713

A.C.                     Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-Wilkinson

A  money had been paid by the depositors to the directors to be applied by
   them in making valid deposits with the society and, since such deposit was
   impossible, the directors held the moneys on a trust for the depositors: see
   pp. 441–442, 444. It is to be noted that Lord Parker does not at any time
   spell out the nature of the trust. However, he held that the directors owed
   fiduciary duties both to the depositors and to the members of the society.
   Therefore it was not a case in which a trustee had mixed trust moneys
B  with his own moneys (to which *In re Hallett's Estate* would apply) but of
   trustees (the directors) mixing the moneys of two innocent parties to both
   of whom they owed fiduciary duties: the depositors and members therefore
   ranked pari passu: p. 442.
      I find the approach of Lord Parker much more intelligible than that of
   Lord Haldane L.C.: it avoids finding that the society held the money on a
C  resulting trust at the same time as being authorised to mix the depositors'
   money with its own. In *In re Diplock; Diplock v. Wintle* [1948] Ch. 465
   the Court of Appeal found the ratio of *Sinclair v. Brougham* to lie in Lord
   Parker's analysis. But, quite apart from the fact that no other member of
   the House founded himself on Lord Parker's analysis, it is in some
   respects very unsatisfactory. First, the finding that the depositors' moneys
   were received by the directors, as opposed to the society itself, is artificial.
D  Although it was ultra vires the society to enter into a contract to repay
   the moneys, it was not ultra vires the society to receive moneys. Second,
   Lord Parker's approach gives depositors and members alike the same
   priority over trade creditors as does that of Lord Haldane L.C. The fact
   is that any analysis which confers an equitable proprietary interest as a
   result of a payment under a void contract necessarily gives priority in an
E  insolvency to the recovery of the ultra vires payment. Lord Parker too
   was aware of this problem: but he left the problem to be solved in a case
   where the claims of trade creditors were still outstanding. Indeed he went
   further than Lord Haldane L.C. He appears to have thought that the
   court had power in some cases to postpone trade creditors to ultra vires
   depositors and in other cases to give the trade creditors priority; which
   course was appropriate he held depended on the facts of each individual
F  case: pp. 444 and 445. There is much to be said for the view that Lord
   Parker, like Lord Haldane L.C. and Lord Sumner, was dealing only with
   the question of the due administration of assets of a company in
   liquidation. Thus he says, at p. 449:

         "nor, indeed, am I satisfied that the equity to which effect is being
      given in this case is necessarily confined to a liquidation. It is,
G     however, unnecessary for your Lordships to decide these points."

   This makes it clear that he was not purporting to do more than decide
   how the assets of that society in that liquidation were to be dealt with.
      As has been pointed out frequently over the 80 years since it was
   decided, *Sinclair v. Brougham* is a bewildering authority: no single ratio
   decidendi can be detected; all the reasoning is open to serious objection; it
H  was only intended to deal with cases where there were no trade creditors
   in competition and the reasoning is incapable of application where there
   are such creditors. In my view the decision as to rights in rem in *Sinclair
   v. Brougham* should also be overruled. Although the case is one where

Case: 25-643, 06/06/2025, DktEntry: 65.1, Page 52 of 225

714

Lord Browne-Wilkinson          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

property rights are involved, such overruling should not in practice disturb    A
long-settled titles. However, your Lordships should not be taken to be
casting any doubt on the principles of tracing as established in *In re
Diplock*.

If *Sinclair v. Brougham*, in both its aspects, is overruled the law can be
established in accordance with principle and commercial common sense: a
claimant for restitution of moneys paid under an ultra vires, and therefore
void, contract has a personal action at law to recover the moneys paid as    B
on a total failure of consideration; he will not have an equitable
proprietary claim which gives him either rights against third parties or
priority in an insolvency; nor will he have a personal claim in equity, since
the recipient is not a trustee.

(B) *Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.*    C
    *[1981] Ch. 105*

In that case Chase Manhattan, a New York bank, had by mistake
paid the same sum twice to the credit of the defendant, a London bank.
Shortly thereafter, the defendant bank went into insolvent liquidation. The
question was whether Chase Manhattan had a claim in rem against the
assets of the defendant bank to recover the second payment.    D

Goulding J. was asked to assume that the moneys paid under a mistake
were capable of being traced in the assets of the recipient bank: he was
only concerned with the question whether there was a proprietary base on
which the tracing remedy could be founded: p. 116a. He held that, where
money was paid under a mistake, the receipt of such money without more
constituted the recipient a trustee: he said that the payer "retains an
equitable property in it and the conscience of [the recipient] is subjected    E
to a fiduciary duty to respect his proprietary right:" p. 119.

It will be apparent from what I have already said that I cannot agree
with this reasoning. First, it is based on a concept of retaining an equitable
property in money where, prior to the payment to the recipient bank,
there was no existing equitable interest. Further, I cannot understand how
the recipient's "conscience" can be affected at a time when he is not aware
of any mistake. Finally, the judge found that the law of England and that    F
of New York were in substance the same. I find this a surprising
conclusion since the New York law of constructive trusts has for a long
time been influenced by the concept of a *remedial* constructive trust,
whereas hitherto English law has for the most part only recognised an
institutional constructive trust: see *Metall und Rohstoff A.G. v. Donaldson
Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391, 478–480. In the present context,    G
that distinction is of fundamental importance. Under an institutional
constructive trust, the trust arises by operation of law as from the date of
the circumstances which give rise to it: the function of the court is merely
to declare that such trust has arisen in the past. The consequences that
flow from such trust having arisen (including the possibly unfair
consequences to third parties who in the interim have received the trust
property) are also determined by rules of law, not under a discretion.    H
A remedial constructive trust, as I understand it, is different. It is a judicial
remedy giving rise to an enforceable equitable obligation: the extent to
which it operates retrospectively to the prejudice of third parties lies in the

715

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-Wilkinson

A    discretion of the court. Thus for the law of New York to hold that there
     is a remedial constructive trust where a payment has been made under a
     void contract gives rise to different consequences from holding that an
     institutional constructive trust arises in English law.

          However, although I do not accept the reasoning of Goulding J.,
     *Chase Manhattan* may well have been rightly decided. The defendant bank
     knew of the mistake made by the paying bank within two days of the
B    receipt of the moneys: see at p. 115A. The judge treated this fact as
     irrelevant (p. 114F) but in my judgment it may well provide a proper
     foundation for the decision. Although the mere receipt of the moneys, in
     ignorance of the mistake, gives rise to no trust, the retention of the
     moneys after the recipient bank learned of the mistake may well have
     given rise to a constructive trust: see *Snell's Equity*, p. 193; *Pettit, Equity
     and the Law of Trusts*, 7th ed. (1993) p. 168; *Metall und Rohstoff A.G. v.
C    Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391, 473–474.


          (C) *In re Ames' Settlement; Dinwiddy v. Ames* [1946] Ch. 217

          In this case the father of the intended husband, in consideration of the
     son's intended marriage with Miss H., made a marriage settlement under
D    which the income was payable to the husband for life and after his death
     to the wife for life or until her remarriage, with remainder to the issue of
     the intended marriage. There was an ultimate trust, introduced by the
     words "If there should not be any child of the said intended marriage who
     attains a vested interest ..." for an artificial class of the husband's next
     of kin. The marriage took place. Many years later a decree of nullity on
     the grounds of non-consummation had the effect of rendering the marriage
E    void ab initio. The income was paid to the husband until his death which
     occurred 19 years after the decree of nullity. The question was whether
     the trust capital was held under the ultimate trust for the husband's next-
     of-kin or was payable to the settlor's estate. It was held that the settlor's
     estate was entitled.

          The judgment is very confused. It is not clear whether the judge was
F    holding (as I think correctly) that in any event the ultimate trust failed
     because it was only expressed to take effect in the event of the failure of
     the issue of a non-existent marriage (an impossible condition precedent)
     or whether he held that all the trusts of the settlement failed because the
     beneficial interests were conferred in consideration of the intended
     marriage and that there had been a total failure of consideration. In either
     event, the decision has no bearing on the present case. On either view, the
G    fund was vested in trustees on trusts which had failed. Therefore the
     moneys were held on a resulting trust of type (B) above. The decision
     casts no light on the question whether, there being no express trust,
     moneys paid on a consideration which wholly fails are held on a resulting
     trust.


H    *The stolen bag of coins*

          The argument for a resulting trust was said to be supported by the
     case of a thief who steals a bag of coins. At law those coins remain
     traceable only so long as they are kept separate: as soon as they are mixed

A-9957

716

Lord Browne-
Wilkinson    **Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))**    [1996]

with other coins or paid into a mixed bank account they cease to be    A
traceable at law. Can it really be the case, it is asked, that in such
circumstances the thief cannot be required to disgorge the property which,
in equity, represents the stolen coins? Moneys can only be traced in equity
if there has been at some stage a breach of fiduciary duty, i.e. if either
before the theft there was an equitable proprietary interest (e.g. the coins
were stolen trust moneys) or such interest arises under a resulting trust at    B
the time of the theft or the mixing of the moneys. Therefore, it is said, a
resulting trust must arise either at the time of the theft or when the
moneys are subsequently mixed. Unless this is the law, there will be no
right to recover the assets representing the stolen moneys once the moneys
have become mixed.

   I agree that the stolen moneys are traceable in equity. But the
proprietary interest which equity is enforcing in such circumstances arises    C
under a constructive, not a resulting, trust. Although it is difficult to find
clear authority for the proposition, when property is obtained by fraud
equity imposes a constructive trust on the fraudulent recipient: the
property is recoverable and traceable in equity. Thus, an infant who has
obtained property by fraud is bound in equity to restore it: *Stocks v.
Wilson* [1913] 2 K.B. 235, 244; *R. Leslie Ltd. v. Sheill* [1914] 3 K.B. 607.
Moneys stolen from a bank account can be traced in equity: *Bankers    D
Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, 1282c–e: see also *McCormick
v. Grogan* (1869) L.R. 4 H.L. 82, 97.


*Restitution and equitable rights*

   Those concerned with developing the law of restitution are anxious to    E
ensure that, in certain circumstances, the plaintiff should have the right to
recover property which he has unjustly lost. For that purpose they have
sought to develop the law of resulting trusts so as to give the plaintiff a
proprietary interest. For the reasons that I have given in my view such
development is not based on sound principle and in the name of unjust
enrichment is capable of producing most unjust results. The law of
resulting trusts would confer on the plaintiff a right to recover property    F
from, or at the expense of, those who have not been unjustly enriched at
his expense at all, e.g. the lender whose debt is secured by a floating
charge and all other third parties who have purchased an equitable interest
only, albeit in all innocence and for value.

   Although the resulting trust is an unsuitable basis for developing
proprietary restitutionary remedies, the remedial constructive trust, if    G
introduced into English law, may provide a more satisfactory road
forward. The court by way of remedy might impose a constructive trust
on a defendant who knowingly retains property of which the plaintiff has
been unjustly deprived. Since the remedy can be tailored to the
circumstances of the particular case, innocent third parties would not be
prejudiced and restitutionary defences, such as change of position, are
capable of being given effect. However, whether English law should follow    H
the United States and Canada by adopting the remedial constructive trust
will have to be decided in some future case when the point is directly in
issue.

717

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Browne-
                                                                        Wilkinson

A    *The date from which interest is payable*

        The Court of Appeal held that compound interest was payable by the
     local authority on the balance for the time being outstanding, such interest
     to start from the date of the receipt by the local authority of the upfront
     payment of £2·5m. on 18 June 1987. Although, for the reasons I have
     given, I do not think the court should award compound interest in this
B    case, I can see no reason why interest should not start to run as from the
     date of payment of the upfront payment. I agree with the judgment of
     Leggatt L.J. in the Court of Appeal [1994] 1 W.L.R. 938, 955 that there is
     no good ground for departing from the general rule that interest is payable
     as from the date of the accrual of the cause of action.

     *Equity acting in aid of the common law*

C       Since drafting this speech I have seen, in draft, the speeches of my
     noble and learned friends, Lord Goff of Chieveley and Lord Woolf. Both
     consider that compound interest should be awarded in this case on the
     grounds that equity can act in aid of the common law and should exercise
     its jurisdiction to order compound interest in aid of the common law right
     to recover moneys paid under an ultra vires contract.
D       I fully appreciate the strength of the moral claim of the bank in this
     case to receive full restitution, including compound interest. But I am
     unable to accept that it would be right in the circumstances of this case
     for your Lordships to develop the law in the manner proposed. I take this
     view for two reasons.
        First, Parliament has twice since 1934 considered what interest should
     be awarded on claims at common law. Both the Act of 1934, section 3(1),
E    and its successor, section 35A of the Act of 1981, make it clear that the
     Act does not authorise the award of compound interest. However both
     Acts equally make it clear that they do not impinge on the award of
     interest in equity. At the time those Acts were passed, and indeed at all
     times down to the present day, equity has only awarded compound interest
     in the limited circumstances which I have mentioned. In my judgment,
F    your Lordships would be usurping the function of Parliament if, by
     expanding the equitable rules for the award of compound interest, this
     House were now to hold that the court exercising its equitable jurisdiction
     in aid of the common law can award compound interest which the statutes
     have expressly not authorised the court to award in exercise of its common
     law jurisdiction.
        Secondly, the arguments relied upon by my noble and learned friends
G    were not advanced by the bank at the hearing. The local authority would
     have a legitimate ground to feel aggrieved if the case were decided against
     them on a point which they had had no opportunity to address. Moreover,
     in my view it would be imprudent to introduce such an important change
     in the law without this House first having heard full argument upon it.
     Although I express no concluded view on the points raised, the proposed
     development of the law bristles with unresolved questions. For example,
H    given that the right to interest is not a right which existed at common law
     but is solely the creation of statute, would equity in fact be acting in aid
     of the common law or would it be acting in aid of the legislature? Does
     the principle that equity acts in aid of the common law apply where there

718

Lord Browne-
Wilkinson          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

is no concurrent right of action in equity? If not, in the absence of any   **A**
trust or fiduciary relationship what is the equitable cause of action in this
case? What were the policy reasons which led Parliament to provide
expressly that only the award of simple interest was authorised? In what
circumstances should compound interest be awarded under the proposed
expansion of the equitable rules? In the absence of argument on these
points it would in my view be imprudent to change the law. Rather, the
whole question of the award of compound interest should be looked at   **B**
again by Parliament so that it can make such changes, if any, as are
appropriate.

For these reasons, which are in substance the same as those advanced
by my noble and learned friend, Lord Lloyd of Berwick, I am unable to
agree with the views of Lord Goff of Chieveley and Lord Woolf.

  **C**

*Conclusion*

I would allow the appeal and vary the judgment of the Court of
Appeal so as to order the payment of simple interest only as from 18 June
1987 on the balance from time to time between the sums paid by the bank
to the local authority and the sums paid by the local authority to the
bank.   **D**

LORD SLYNN OF HADLEY. My Lords, for the reasons given by my
noble and learned friend, Lord Browne-Wilkinson, I agree that *Sinclair v.
Brougham* [1914] A.C. 398 should be departed from and that it should be
held that in this case the local authority was neither a trustee of, nor in a
fiduciary position in relation to, the moneys which it had received from   **E**
the bank, nor had it improperly profited from the use of those moneys.
For the reasons which he gives no resulting trust could arise on the
present facts.

It follows that if, as I think, Lord Brandon of Oakbrook in *President
of India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104, 116,
was right to say that in the Court of Chancery the award of compound
interest was limited to situations "where money had been obtained and   **F**
retained by fraud, or where it had been withheld or misapplied by a
trustee or anyone else in a fiduciary position," Courts of Chancery would
not have awarded compound interest in a case like the present.

It is common ground that compound interest could not have been
awarded at common law as presently formulated nor under the statutory
provisions in section 3 of the Law Reform (Miscellaneous Provisions) Act   **G**
1934 nor under section 35A of the Supreme Court Act 1981 as inserted by
the Administration of Justice Act 1982.

But for the legislation I would have accepted that it was open to your
lordships to hold that, in the light of the development of the law of
restitution, the courts could award compound interest, either by modifying
the common law rule or by resorting to equity to act in aid of the common
law right to recover moneys paid under a void transaction. As to whether   **H**
it would have been right to do so in general terms, or whether it would
have been right to limit the cases in which compound interest should be
awarded, or whether compound interest should be awarded at all I am

A-9960

719

A.C.              Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))         Lord Slynn
                                                                          of Hadley

A    not, on the restricted arguments advanced in this case, prepared to
comment.

    I do not, however, consider that it would be right on this appeal to
enlarge the cases in which compound interest can be awarded when
Parliament has twice in relatively recent times limited statutory interest to
simple interest. This is a matter which should be considered by Parliament
when the merits or disadvantages of giving the courts power to award

B    compound interest could be examined in a context wider than the present
case.

    Accordingly in agreement with my noble and learned friends, Lord
Browne-Wilkinson and Lord Lloyd of Berwick, and despite the forceful
reasoning of my noble and learned friends, Lord Goff of Chieveley and
Lord Woolf, I would allow the appeal and vary the judgment of the Court

C    of Appeal so as to award simple interest from 18 June 1987.

    LORD WOOLF.  My Lords, this appeal raises directly only one issue of
law. It is whether the courts have jurisdiction to make an order for the
payment of compound interest ancillary to an order for restitution when
a contract is ultra vires. All the judges in the courts below concluded that
there was jurisdiction to do so.

D     In this case an order was made in favour of the respondent bank as
against the appellant local authority which was the recipient of the ultra
vires payment. There is no dispute that there was jurisdiction to make an
order for the payment of *simple* interest. The dispute is limited to the
order for compound interest.

    It is accepted that if there is jurisdiction to make the order this is a

E    case in which this achieves a just result. There is only one other issue
raised by the appeal and that is as to the date from which the interest
should be paid.

    The transaction was a commercial transaction. The local authority in
calculating the balance which it had to repay the bank was given credit
for the sums which it had paid by way of notional interest under the
contract prior to it being appreciated that the contract might be ultra

F    vires. If the transaction had not taken place the local authority would
have had to borrow (if it could find a way of lawfully doing so) the sum
paid to it by the bank on terms which would be likely to involve
compound interest being recoverable in proceedings for default. (Here see
*National Bank of Greece S.A. v. Pinios Shipping Co. No. 1* [1990] 1 A.C.
637 as to commercial transactions with banks.) The bank could have lent

G    that sum on the same basis.

    Hobhouse J., the judge at first instance, reflected the commercial
justice of the situation in the passage in his judgment in which he set out
succinctly why he considered compound interest was payable [1994] 4 All
E.R. 890, 955:

    "[The local authority] has kept that sum and has not made any
restitution. In this situation I see no reason why I should not exercise

H    my equitable jurisdiction to award compound interest. Simple interest
does not reflect the actual value of money. Anyone who lends or
borrows money on a commercial basis receives or pays interest
periodically and if that interest is not paid it is compounded

720
**Lord Woolf**          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

(e.g. *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373 and *National Bank*    A
*of Greece S.A. v. Pinios Shipping Co. No. 1, The Maira* [1990] 1 A.C.
637). I see no reason why I should deny the plaintiff a complete
remedy or allow the defendant arbitrarily to retain part of the
enrichment which it has unjustly enjoyed. There are no special factors
which have to be taken into account. No question of insolvency is
involved nor is there any basis for any persuasive argument to the
contrary."                                                                    B

This being the situation I am relieved that I am of the opinion that the
judges in the courts below were correct in concluding that in the
circumstances of this case they were entitled to award compound interest.
Any other decision would be inconsistent with the court's ability to grant
full restitution. It would be a further unhappy aspect, from a commercial    C
standpoint, of the history of this case in particular and the swaps litigation
as a whole. This commenced with the decision, to which I was a party at
first instance, of *Hazell v. Hammersmith and Fulham London Borough
Council* [1992] 2 A.C. 1. It is no secret that the decision at first instance in
that case, which was approved by this House, caused dismay among some
of those concerned with the standing abroad of the commercial law of this
country. That concern is likely to be increased if the outcome of this       D
litigation is that this appeal has to be allowed by this House because the
courts have no jurisdiction to grant compound interest.

The position is not improved by the fact that such is the confused state
of English law as to the extent of its jurisdiction to award interest that the
hearing before their Lordships involved four days of argument. Argument
that could have lasted even longer but for counsel for the local authority    E
courteously informing their Lordships that because of the costs which the
local authority was incurring on the appeal he was required by his clients
to curtail his argument.

The argument had been extended by their Lordships themselves raising
the issue as to the correctness of a decision of this House of some 80 years
standing (*Sinclair v. Brougham* [1914] A.C. 398). That case does not
directly involve the courts' equitable jurisdiction to award interest. Yet the   F
issue as to whether the case was correctly decided still needed to be raised
because the reasoning in that case was inconsistent with the submissions
of the local authority. The fact that counsel was required to take the
course of seeking to limit his argument does put in question whether the
way appeals are managed before the House and the resources available to
their Lordships are ideal for meeting both the contemporary needs of       G
litigants and their Lordships' responsibilities for the proper development
of the law.

I have had the considerable advantage of being able to read in draft
the admirably reasoned speeches of Lord Goff of Chieveley and Lord
Browne-Wilkinson. That reasoning convinces me that the bank is not
entitled to proceed by way of an equitable proprietary claim and that the    H
recipient of a sum of money paid under an ultra vires contract should not
be regarded as owing the duty of a trustee or a fiduciary to the payer of
that sum. Further than that it is not necessary for me to go. This avoids
the dangers which Lord Browne-Wilkinson suggests could result from the

721

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A   wholesale importation into commercial law of equitable principles. I am
also in agreement with Lord Goff's reasoning as to compound interest
being able to be awarded where one party is under a duty to make
restitution to another, as a consequence of the development of the law of
restitution.

B   *The significance of the difference between equitable principles and remedies*

Such a wholesale importation is not necessarily the consequence of a
finding that the courts have the equitable jurisdiction to make an order
for the payment of compound interest in conjunction with the grant of a
remedy of restitution. We are concerned here primarily not with equitable
principles of substantive law but with the possible existence of an equitable
remedy. Compound interest, if it is recoverable, will be recoverable in the

C   circumstances of this case in equity because of the absence of any statutory
or common law remedy which will prevent the local authority being
unjustly enriched at the expense of the bank if compound interest is not
payable.

The situation is one in which compound interest would be awarded
because it would be unconscionable to allow the local authority to make

D   a profit out of a contract which was void because it had exceeded its own
powers. This is very much an analogous situation to those where equity
has traditionally provided remedies. Perhaps the best example is provided
by specific performance. It is unnecessary to inquire whether the right
which is being enforced by an order of specific performance is one
recognised by the common law or equity. What does matter is whether it
is equitable to grant the remedy and whether an award of damages in lieu

E   would be an adequate remedy.

In addition, if the contract had not been void and the local authority
had failed to make the payments required the bank might well, as I will
seek to show, have been fully protected by its remedy in damages at
common law. Because there is no contract damages are not available.
Here the situation is very much in accord with those where equity

F   traditionally mitigates the inadequacy of a common law remedy without
having to invoke substantive equitable law principles. This situation is
described in *Snell's Equity,* p. 26:

"Between them, equitable interests, mere equities, floating equities
and the great doctrines of equity cover most of the field of equity;
and they are all concerned to a greater or lesser degree with the rights
of property. Yet although the existence of such rights has long been

G   an important factor in deciding whether equity will intervene, it is not
essential. Equitable remedies, though often used in aid of property
rights, are also often used in other cases. The underlying principle is
the inadequacy of the common law remedy of damages. Thus the
equitable remedies of rescission and injunction may be employed in
relation to contracts for personal services; and injunctions are

H   sometimes granted in cases of tort which involve no rights of property.
In this sense there may be equities unrelated to property."

In the same way there may be equities unrelated to a breach of trust
or fiduciary duty. I would add that equity does not only come to the aid

722
Lord Woolf          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

of a claimant where damages are an inadequate remedy. It can also do so    A
when one of the other common law remedies is inadequate. I would take
as an example the remedy of an account. The advantages of the equitable
remedy over the common law remedy have resulted in the latter remedy
being supplanted by the former. It may well be that the editors of *Snell's
Equity* did not have in mind the power to award interest when writing the
paragraph I have set out. The paragraph is nonetheless of general
application and there is no reason why it should not apply to the equitable    B
remedy of awarding interest in the same way as it applies to
other equitable remedies. The award of interest is only distinct from other
remedies in that it is usually awarded as an ancillary to some other
remedy.

I therefore accept Mr. Sumption's submission on behalf of the bank
that where there is a duty to make restitution equity can achieve full    C
restitution by granting, when it is appropriate to do so, simple or
compound interest in addition to requiring repayment of the principal
sum. For this to be the position the defendant must have made an actual
or presumed profit, a profit which he is presumed to have derived from
his having been the recipient of a principal sum which he has not repaid.
The compound interest will not be payable as of right. The remedy of
awarding interest, like other equitable remedies, will be discretionary.    D
Interest will only be awarded when it accords with equitable principles to
make the award.

I appreciate that Mr. Sumption did not advance the argument in
favour of the grant of compound interest on the basis that I have put
forward. However, he came before your Lordships' House not expecting
*Sinclair v. Brougham* [1914] A.C. 398 to be challenged. He had no reason    E
in his printed case to do other than base his argument on the fact that the
local authority was a fiduciary. Before your Lordships he made clear that
while he was arguing that the local authority was a fiduciary he was also
contending that, if there was power to order restitution, equity could, as
I have already indicated, achieve full restitution. This is also clear from
the statements in the bank's case to which I will refer shortly.

                                                                           F
*The absence of previous authority*

There may be no clear previous authority to support this conclusion
but this is not surprising where the relatively new jurisdiction of ordering
restitution is involved. What is more important than the absence of clear
support in the authorities for the grant of compound interest is the
absence from the existing authorities of any statement of principle    G
preventing the natural development of a salutary equitable jurisdiction
enabling compound interest to be awarded. The jurisdiction is clearly
desirable if full restitution in some cases is to be achieved. It is relevant
here to repeat what is stated at the outset in the bank's case under the
heading "The Position in Principle:"

     "1. '. . . any civilised system of law is bound to provide remedies    H
     for cases of what has been called unjust enrichment or unjust benefit,
     that is to prevent a man from retaining the money of or some benefit
     derived from another which it is against conscience that he should
     keep:' *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour*

723

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A      *Ltd.* [1943] A.C. 32, 61 (Lord Wright), approved in *Woolwich
       Equitable Building Society v. Inland Revenue Commissioners* [1993]
       A.C. 70, 197, 202."

       Restitution is an area of the law which is still in the process of being
       evolved by the courts. In relation to restitution there are still questions
       remaining to be authoritatively decided. One question, which was still
B      undecided until the decision on this appeal, is whether its legitimacy is
       derived from the common law or equity or both. In order to decide
       whether compound interest is payable in this case I do not consider it is
       necessary to decide which is the correct answer to that question, but I am
       content to assume that the cause of action is one at common law. If the
       principal sum is repayable as money had and received rather than under
C      some trust or because of the existence of a fiduciary duty it is still
       unconscionable for the local authority to retain the benefit it made from
       having received payment under a contract it purported to make which was
       outside its powers. The fact that, until the law was clarified by the decision
       in this case, the local authority may reasonably not have appreciated that
       it should make restitution is not critical. What is critical is that the
       payment of compound interest is required to achieve restitution.
D      A defendant may perfectly reasonably not regard himself as having been
       a trustee until the court so decides but this does not effect the remedies
       which the court has jurisdiction to grant. The jurisdiction of the court to
       grant remedies has to be judged in the light of what the court decides.

       As to the date from which the interest should run I am in agreement
       with Lord Browne-Wilkinson that the decision of the Court of Appeal
E      should not be disturbed.


       *Unjust enrichment creates the required relationship*

       There are a great many situations where interest as an equitable
       remedy has been awarded. Examples are conveniently set out in *Halsbury's
F      Laws of England*, 4th ed., vol. 32 (1980), p. 55, para. 109. The principle
       which connects those examples is stated in the first sentence of the
       paragraph. It is the existence of a "particular relationship . . . between the
       creditor and debtor." The "particular relationship" in this case arises out
       of the right of the bank to restitution and the fact that the local authority
       would be unjustly enriched if it retained what it had received. That made
       the local authority an accounting party. The bank had to give credit for
G      the sums it had received and the local authority had to pay the balance
       which was still due of what it had received. What it had received included
       the use of the money. The approach is precisely that indicated in the
       passage in the judgment of Lord Hatherley L.C. in *Burdick v. Garrick*,
       L.R. 5 Ch.App. 233, 241 already cited by Lord Browne-Wilkinson. It is
       the making of the award not as a punishment but to disgorge a profit
H      made or presumed to have been made out of the payment of a sum of
       money which should not have been made. Here this was because the
       contract was void as being ultra vires. There would be no difference of
       principle if the contract was void for mistake.

724

Lord Woolf          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

*No distinction in principle between simple and compound interest*          A

If the case is one where there is jurisdiction to award equitable interest then whether compound or simple interest is recoverable depends on the facts of the particular case. If it is not a situation where the defendant would have earned compound interest then as in *Burdick v. Garrick* there would be no profit of compound interest so it will not be awarded. Simple interest will awarded instead.                                               B

*The Law Commission's approach*

In Law of Contract: Report on Interest (Law Com. No. 88) (1978) (Cmnd. 7229), the Law Commission decided not to make any recommendations for change as to the equitable jurisdiction. It is, however, interesting to note the following paragraphs of the report:          C

"10. Thirdly, there is the equitable jurisdiction. Interest may be awarded as ancillary relief in respect of equitable remedies such as specific performance, rescission or the taking of an account. Furthermore, the payment of interest may be ordered where money has been obtained and retained by fraud, or where it has been withheld or misapplied by an executor or a trustee or anyone else in a fiduciary position. . . ."          D

"(a) The equitable jurisdiction

"21. The equitable jurisdiction to award interest and to fix the rate at which it should be paid is extensive. It includes, for example, the power to order the payment of interest where money has been obtained or withheld by fraud or where it has been misapplied by someone in a fiduciary position. In such cases the court has an          E inherent power to order the payment of interest at whatever rate is equitable in the circumstances and may direct that such interest be compounded at appropriate intervals. Our view is that it would not be appropriate to impose statutory controls upon the exercise of the equitable jurisdiction to award interest, beyond those controls that are already in existence. We invited criticisms of this view in our          F working paper but no one disagreed with us. Accordingly, we make no recommendations for change in relation to the equitable jurisdiction."

From what I have said already it is clear that I agree with the statements in those paragraphs in so far as the equitable jurisdiction to award interest is regarded as "ancillary relief" but not in so far as they          G suggest that it is only equitable remedies in relation to which there can be the ancillary jurisdiction to award interest. The paragraphs are perfectly satisfactory as long as they are not regarded as exhaustive. It has to be remembered that the Law Commission were not intending to make any recommendations as to equitable interest.

The fact that the paragraphs accept that compound interest is payable          H in the case of fraud perhaps suggests that it is not intended to limit the relief to situations which only give an entitlement to an equitable remedy. In many cases of fraud the appropriate remedy will be common law damages. It is true in the first of the only two cases referred to by the Law

A-9966

725

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A   Commission, *Johnson v. The King* [1904] A.C. 817, 821, the Privy Council appeared to think that interest was not payable in the case of an overpayment by mistake. However the authority relied on for this conclusion was *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429. Lord Macnaghten, at p. 821, regarded "the law as settled by the judgment" of this House in that case. It is a case to which I will refer later but it was not concerned with the equitable

B   jurisdiction to grant interest, only the common law jurisdiction. What is of interest is what Lord Macnaghten said as to the power to award interest if there had been fraud. He said, at p. 822:

"In order to guard against any possible misapprehension of their Lordships' views, they desire to say that, in their opinion, there is no doubt whatever that money obtained by fraud and retained by fraud

C   can be recovered with interest, whether *the proceedings be taken in a court of equity or in a court of law*, or in a court which has a jurisdiction both equitable and legal, as the Supreme Court of Sierra Leone possesses under the Ordinance of November 10, 1881." (Emphasis added.)

D   Lord Macnaghten did not consider that it mattered whether the proceedings were based on a common law or equitable cause of action.

The other case referred to in the Report is *Wallersteiner v. Moir (No. 2)* [1975] Q.B. 373. That case is a clear authority for the existence of an equitable jurisdiction and that it can be exercised where there is breach of a fiduciary duty but the court was not concerned with extent of that jurisdiction. It was accepted by all the members of the Court of Appeal

E   that the jurisdiction was frequently exercised in the case of breach of trust and of a fiduciary duty but there is nothing in the judgments to suggest that the jurisdiction is limited to those situations. Indeed Lord Denning M.R. clearly did not regard it as being so limited. He said, at p. 388:

"The reason is because a person in a fiduciary position is not allowed

F   to make a profit out of his trust: and, if he does, he is liable to account for that profit or interest in lieu thereof. In addition, in equity interest is awarded whenever a wrongdoer deprives a company of money which it needs for use in its business. It is plain that the company should be compensated for the loss thereby occasioned to it. Mere replacement of the money—years later—is by no means adequate compensation, especially in days of inflation. The company

G   should be compensated by the award of interest. That was done by Sir William Page Wood V.-C. (afterwards Lord Hatherley) in one of the leading cases on the subject, *Atwool v. Merryweather* (1867) L.R. 5 Eq. 464n., 468–469. But the question arises: should it be simple interest or compound interest? On general principles I think it should be presumed that the company (had it not been deprived of the money) would have made the most beneficial use open to it: cf.

H   *Armory v. Delamirie* (1723) 1 Stra. 505. It may be that the company would have used it in its own trading operations; or that it would have used it to help its subsidiaries. Alternatively, it should be presumed that the wrongdoer made the most beneficial use of it. But,

726

Lord Woolf          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

   whichever it is, in order to give adequate compensation, the money  A
   should be replaced at interest with yearly rests, i.e. compound
   interest."

This was a broader approach than that adopted by Buckley L.J. or
Scarman L.J.

  There remains a further case to which I should make reference before
leaving the authorities as to the equitable jurisdiction. It is *President of*  B
*India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104. This is the
leading case as to the common law and statutory jurisdictions to which
I will return later. I refer to it for the leading speech of Lord Brandon of
Oakbrook with which the other members of the House agreed. Lord
Brandon reviewed the different jurisdictions to award interest. While doing
so he made the following dicta about the equitable jurisdiction, at p. 116  C
(Lord Brandon also referred to the equitable jurisdiction, at pp. 118–121,
but he was then dealing with the position as to interest in the Admiralty
Court and I do not consider those references are of any help here):

   "Thirdly, the area of equity. The Chancery courts, again differing
   from the common law courts, had regularly awarded simple interest
   as ancillary relief in respect of equitable remedies, such as specific
   performance, rescission and the taking of an account. Chancery  D
   courts had further regularly awarded interest, including not only
   simple interest but also compound interest, when they thought that
   justice so demanded, that is to say in cases where money had been
   obtained and retained by fraud, or where it had been withheld or
   misapplied by a trustee or anyone else in a fiduciary position. . . .
   The first point is that neither the Admiralty Court, nor Courts of  E
   Chancery, awarded interest, except in respect of moneys for which
   they were giving judgment. The second point is that the Admiralty
   Court never, and Courts of Chancery only in two special classes of
   case, awarded compound, as distinct from simple, interest."

The House had been referred in the course of argument to the report of
the Law Commission and I suspect that Lord Brandon restricted the  F
jurisdiction of the courts to award interest to equitable remedies following
what was stated in that report. Likewise as to the distinction which he
drew between the jurisdictions to award simple and compound interest.
According to the report of argument, counsel did not address the House
on the limits of the equitable jurisdiction. Therefore although any
statement of Lord Brandon is entitled to the greatest respect I do not
regard these two dicta as indicating that Lord Brandon held a considered  G
opinion inconsistent with my views, which I have set out above. It may
well be that he was doing no more than describing the situations where in
the past the equitable jurisdiction had been exercised.

*The position where the claim is based on a personal equity*

  Lord Browne-Wilkinson, in his speech, points out that two arguments  H
were not advanced on behalf of the bank. The first is that the local
authority should be liable to make the repayments as a constructive
trustee. There is no need for me to make any comment about this

A    argument. The second argument which was not advanced is that the bank was entitled to repayment because of the existence of a personal equity based on the decision in *In re Diplock; Diplock v. Wintle* [1948] Ch. 465. This is a point which it is necessary for me to consider because of the decision of Hobhouse J. in *Kleinwort Benson Ltd. v. South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972, although the decision in *In re Diplock* dealt with very different circumstances from those which

B    exist here. The court in *In re Diplock* was concerned with the personal equitable liability of a legatee to repay the executors of an estate of a deceased person a sum which was wrongly paid to them out of the estate. In the *Kleinwort Benson* case, Hobhouse J. decided that the existence of a personal equitable cause of action did not create a power to award compound interest. This conclusion is inconsistent with the view which

C    I have expressed that there is a power to award compound interest in the circumstances of this case.

    Personal equitable rights are not confined to the situation considered in *In re Diplock*. For example, a personal equitable right to contribution can exist between co-sureties. This is regarded as being an application of an equitable approach to restitution to a situation where the remedy at law is not normally satisfactory. It exists without there having to be any

D    proprietary right which could give rise to the difficulties to which Lord Browne-Wilkinson has referred.

    The *Kleinwort Benson* case also involved a local authority which had entered into a swap transaction which was void. Hobhouse J. distinguished the *Kleinwort Benson* case from the present case because in that case there was no reliance on an equitable proprietary claim for repayment of the sum which had been paid under the void swap contract. In the *Kleinwort*

E    *Benson* case, the local authority accepted that prima facie they were under a personal liability to make restitution in law and in equity to the bank but argued it was not open to a court to award compound interest where only remedies in personam were established.

    Hobhouse J. decided that the local authority's submissions were correct. He said, at pp. 994–995:

F
    "The position is therefore that if a plaintiff is entitled to a proprietary remedy against a defendant who has been unjustly enriched, the court may but is not bound to order the repayment of the sum with compound interest. If on the other hand the plaintiff is only entitled to a personal remedy which will be the case where, although there was initially a fiduciary relationship and the payer was

G    entitled in equity to treat the sum received by the payee as his, the payer's, money and to trace it, but because of subsequent developments he is no longer able to trace the sum in the hands of the payee, then there is no subject matter to which the rationale on which compound interest is awarded can be applied. The payee cannot be shown to have a fund belonging to the payer or to have used it to make profits for himself. The legal analysis which is the

H    basis of the award of compound interest is not applicable. (It is possible that in some cases there might be an intermediate position where it could be demonstrated that the fiduciary had, over part of the period, profited from holding a fund as a fiduciary even though

728

**Lord Woolf**          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

he no longer held the fund at the date of trial and that in such a case      A
the court might make some order equivalent to requiring him to
account for those profits; but that is not the situation which I am
asked to consider in the present case.) Although the original equitable
right in both situations is the same at the outset, that is to say at the
time when the payment was made and received, the two situations do
not continue to be the same and are not the same at the time of trial      B
when the remedy comes to be given. The payee no longer has property
of the payer. The payer is confined to personal rights and remedies
analogous to those recognised by the common law in the action for
money had and received. In such a situation only simple interest can
be awarded even though the plaintiff is relying upon a restitutionary
remedy. Simple interest was awarded in *Woolwich Equitable Building
Society v. Inland Revenue Commissioners* [1993] A.C. 70 and in *B.P.*      C
*Exploration Co. (Libya) Ltd. v. Hunt (No. 2)* [1979] 1 W.L.R. 783
and both those cases involved an application of restitutionary
principles which carried with them remedies in personam (see also
*O'Sullivan v. Management Agency and Music Ltd.* [1985] Q.B. 428.)."

    The three cases cited by the judge to support his proposition that      D
simple interest only could be awarded do not in fact assist to determine
the question of principle which is at stake here. In both the *Woolwich* and
the *B.P. Exploration* cases, the claim which was advanced was limited to
statutory interest. The position as to compound interest was not
considered. In the *O'Sullivan* case, it was conceded that in relation to part
of the claim compound interest was payable and, in fact, it was awarded.
Only simple interest was paid in relation to the balance of the claim, but      E
this was not because of any lack of jurisdiction; it was because it was only
appropriate to award simple interest in the circumstances of that case.
    If Hobhouse J.'s reasoning is correct, then even if there had been an
equitable claim in rem which would justify the award of compound
interest, that would cease to be the situation if the right to trace were lost.
That this would create an unsatisfactory state of affairs is demonstrated      F
by the contrasting decisions to which the judge came in this case and in
the *Kleinwort Benson* case. The power of the court to award compound
interest would depend upon circumstances over which the claimant would
have no control. This is inconsistent with the commercial realities to which
the judge referred in the passage which I have cited from his judgment in
this case.
                                                                              G
    Contrary to the view expressed by Hobhouse J., the rationale on which
compound interest is awarded is independent of whether or not there is
any property capable of being traced still in the payee's hands. The critical
issue is whether, as has happened in this case, the authority was able to
make a profit (which would include making a saving in the interest which
it had to pay) from the fact it had received a sum of money to which it
was not entitled. Even in the case of a claim in rem, the profit is distinct      H
from the traceable property. If this were not the position the payee by
returning the property to the payer prior to the proceedings could defeat
the right which a claimant would otherwise have to compound interest.

729

A.C.                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    Lord Woolf

A    Hobhouse J. refers, at p. 994, to *In re Diplock; Diplock v. Wintle* [1948]
     Ch. 465 in order to identify the distinction between personal and
     proprietary equitable remedies. He cites a passage from the very long
     judgment of the Court of Appeal in that case, at p. 521. However,
     although this is not clear, I would regard that passage as dealing only
     with equitable *proprietary* remedies. He also refers to a further passage in
     the judgment in *In re Diplock*, at p. 517, which he does not cite. He
B    presumably refers to the sentence in the judgment which indicates the view
     of the Court of Appeal that:

          "upon their personal claims the appellants [plaintiffs] are not entitled
          to any interest. The same may not however be true as regards the
          claims in rem, at least where the appellants are able to 'trace' their
          proprietary interest into some specific investment."

C
     It is therefore probable that Hobhouse J. was influenced in coming to his
     decision by the judgment of the Court of Appeal in *In re Diplock*.
     However, that judgment provides a shaky foundation for Hobhouse J.'s
     decision. The passage to which he refers can, and should, in my judgment,
     be regarded as doing no more than indicating the decision on the merits
     of the situation which the Court of Appeal was considering in *In re*
D    *Diplock*, a situation which is very different from that which exists here.
     There was no commercial relationship between the parties. The overpaid
     legatees' liability was secondary and they were charities. In those
     circumstances if they had actually made a profit from the overpayment
     which could be traced it would have been reasonable to award interest but
     if they had not it would not have been reasonable to do so. I would draw
E    attention here to the following passage of the judgment of the Court of
     Appeal in *In re Diplock*, at p. 503, which indicates the Court of Appeal's
     general approach:

          "Since the original wrong payment was attributable to the blunder of
          the personal representatives, the right of the unpaid beneficiary is in
          the first instance against the wrongdoing executor or administrator:
          and the beneficiary's direct claim in equity against those overpaid or
F         wrongly paid should be limited to the amount which he cannot
          recover from the party responsible. In some cases the amount will be
          the whole amount of the payment wrongly made . . ."

     I would also draw attention to the only passage in the Court of
     Appeal's judgment which gives any reason for their conclusion as to
G    interest which is in these terms, at pp. 506–507:

          "We should add that . . . in our judgment the respondents are
          liable under this head of their claim for the principal claimed only
          and not for any interest. This last result appears to follow from the
          case of *Gittins v. Steele* (1818) 1 Swan. 199, cited in *Roper on
          Legacies*, 4th ed. (1847), p. 461, where the language of Lord Eldon
H         L.C. in the case, at p. 200, is cited: 'If a legacy has been erroneously
          paid to a legatee who has no farther property in the estate, in recalling
          that payment, I apprehend that the rule of the court is not to charge
          interest; but if the legatee is entitled to another fund making interest
          in the hands of the court, justice must be done out of his share.' "

730
Lord Woolf        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        [1996]

The judgment of Lord Eldon L.C., at p. 200, in this case is extremely    A
short. The Court of Appeal has cited the whole of the judgment except
the opening sentence which reads: "Where the fund out of which the
legacy ought to have been paid is in the hands of the court making
interest, unquestionably interest is due."

In fact, interest was therefore ordered to be paid in that case at 4 per
cent. The short judgment of Lord Eldon L.C. was in proceedings which
followed an earlier judgment (1818) 1 Swan. 24. Having examined the    B
case in both reports, I find they provide no support for a general
proposition that equity could not in an appropriate case award interest in
support of a personal equitable claim. The case supports the contrary
view. In the circumstances which Lord Eldon L.C. is considering, the
legatee had as far as one can tell benefited financially from the early
payment and, that being so, the decision is merely an example of the fact    C
that if a payee has benefited financially from his being unjustly enriched,
an order for interest will be made. It is relevant that as interest had been
earned (in the hands of the court), interest was payable.

Before leaving *In re Diplock* it is important to note that *In re Diplock*
was not concerned with whether compound interest was payable; it was
concerned with whether any interest, simple or compound, was payable.
The view that no interest, not even simple, was payable was understandable    D
on the facts but not otherwise.

While, therefore, it is not necessary on my approach to decide whether
the sums paid by the bank are recoverable from the local authority in
equity or in common law, it is necessary for me to indicate that
Hobhouse J. was wrong in his judgment in *Kleinwort Benson Ltd. v. South
Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972 in deciding    E
that he would have no power to award compound interest if, as he
thought was the case, the bank was entitled to a personal equitable remedy
which would enable it to obtain judgment for the sums which had been
paid.

There is one more aspect of Hobhouse J.'s judgment to which I should
refer. In his review of the authorities, Hobhouse J. drew attention to two
lines of authority, one where simple interest is being awarded, and the    F
second where compound interest being awarded. In the former situation,
the court, according to Hobhouse J., is concerned to compensate the party
for what he has lost in consequence of not receiving the money to which
he was entitled. In the latter situation the court is concerned with the
benefit which the payee has derived as a result of the payment having
been made. The distinction is a valid one if what is being considered is the
right to interest on the one hand under the statute or common law and on    G
the other in equity. The distinction is not valid if a different position is
being considered, namely, whether simple or compound interest should be
awarded in equity. Equity, in the case of both simple and compound
interest, will look at the benefit which the payee has derived. If it is
equitable so to do, the payee will be ordered to pay simple or compound
interest depending upon the benefit which has resulted from the payment.    H

### The position at common law and by statute

I should now deal shortly with the situation as to interest at common
law and by statute. At common law the power to award interest was

731
A.C.        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        Lord Woolf

A   linked to the power to award damages. While the equitable jurisdiction was concerned to prevent profit by the recipient of funds to which he was not entitled, the common law was concerned with the loss suffered by the payer of the funds. The statutory jurisdiction differed from the common law because initially there had to be a judgment for the payment of a debt or damages before interest could be awarded and the legislator was dealing with the generality of those situations.

B       As to the common law position a convenient starting-point is provided by the decision of this House in *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429 which I have already cited. In that case the Lord Chancellor, Lord Herschell, and the other members of this House, came to the conclusion with considerable reluctance that at common law where there was no agreement or statutory provision which permitted the payment of interest a court had no power to award interest, whether simple or compound, by way of damages for the late payment of a debt. The view of the House was rather surprising because the members reluctantly followed a decision of Lord Tenterden C.J. in *Page v. Newman* (1829) 9 B. & C. 378 which was based on convenience in preference to an earlier and more "liberal" line of authorities including a decision of Lord Mansfield C.J. in *Eddowes v. Hopkins* (1780) 1 Doug. 376 and Lord Ellenborough C.J. in *De Havilland v. Bowerbank* (1807) 1 Camp. 50. Lord Mansfield C.J. stated the position in these terms:

C

D

> "that though by the common law, book debts do not of course carry interest, it may be payable in consequence of the usage of particular branches of trade; or of a special agreement; . . ."

E   (which of course is beyond question) or, in cases of long delay under vexatious and oppressive circumstances, if a jury in their discretion shall think fit to allow it. Lord Ellenborough C.J. included among four categories of situations where interest was payable that where the money had been actually used and interest made on it.

        After the decision in the *London, Chatham and Dover Railway Co.* case it was generally accepted that at common law, apart from statute and some limited exceptions, there was no power to award simple or compound interest for the late payment of a sum of money.

F

        This situation which was regarded as unsatisfactory by this House in 1893 was ameliorated in 1934 by the intervention of the legislature. Section 3(1) of the Law Reform (Miscellaneous Provisions) Act 1934 considerably extended the power which was contained in Lord Tenterden's Act, the Civil Procedure Act 1833 (3 & 4 Will. 4, c. 42). The Act of 1934 so far as relevant provided:

G

> "3(1) In any proceedings tried in any court of record for the recovery of any debt or damages, the court may, if it thinks fit, order that there shall be included in the sum for which judgment is given interest at such rate as it thinks fit on the whole or any part of the debt or damages for the whole or any part of the period between the date when the cause of action arose and the date of the judgment: Provided that nothing in this section—(a) shall authorise the giving of interest upon interest; or (b) shall apply in relation to any debt

H

732

Lord Woolf Westdeutsche Bank v. Islington L.B.C. (H.L.(E.)) [1996]

upon which interest is payable as of right whether by virtue of any A
agreement or otherwise; . . ."

It is to be noted that section 3 of the Act of 1934 makes it abundantly
clear that it does not authorise the giving of compound interest and that
it confines the power to award interest to situations where there is a "sum
for which judgment is given." The latter point was a cause of considerable
injustice. It enabled a debtor to prevent a court exercising the power under B
section 3 of the Act of 1934 by making a late payment but a payment
prior to any judgment being given. To remedy that situation, the Supreme
Court Act 1981 was amended by the Administration of Justice Act 1982
by adding a new section, section 35A. Section 35A is still the current
relevant statutory provision. It makes clear: (a) that it is still only simple
interest which is payable, that it only applies to the recovery of a debt or
damages and that interest is to be paid at "such rate as the court thinks C
fit or as rules of court may provide" (subsection (1)); (b) that the section
does not apply when for whatever reason interest on a debt already runs
(subsection (4)); (c) that the section applies to payments made up to the
date of the judgment (subsection (1)(a)).

The Act of 1982 followed the Report on Interest by the Law
Commission (Law Com. No. 88) (Cmnd. 7229) of 7 April 1978 to which D
I have already referred. Parliament did not implement by the Act of 1982
all the recommendations of the Law Commission as to changes which
should be made. In particular, it did not accede to the suggestion of the
Law Commission that there should be a statutory standard rate of interest
for reasons of administrative convenience. Instead, it retained the court's
existing wide statutory discretion. E

There are two more cases to which I need to refer. The first is
*Wadsworth v. Lydall* [1981] 1 W.L.R. 598 and the second is *President of
India v. La Pintada Compania Navigacion S.A.* [1985] A.C. 104, to which
I have already referred. The decision in *Wadsworth v. Lydall* received
express approval in *La Pintada*. I refer to *Wadsworth v. Lydall* for three
reasons. The first is that it brings out clearly that despite the decision of
this House in *London, Chatham and Dover Railway Co. v. South Eastern* F
*Railway Co.* [1893] A.C. 429, there is no inherent common law bias against
the award of compound interest at common law. What is required for
compound interest to be payable is that the contract either expressly or
impliedly provides for the payment of compound interest or there is a
breach of the contract and the breach is such that compound interest will
be regarded as flowing from the breach in accordance with the second G
limb of the principle laid down in *Hadley v. Baxendale* (1854) 9 Exch.
341. The second reason is that while prior to the decision in *Wadsworth v.
Lydall* it could legitimately be thought that the situations where compound
interest would be awarded at common law were necessarily of a
commercial nature, this is not an essential requirement. The situations
where it was clearly established that compound interest was recoverable
(as, for example, in the case of bills of exchange or banking transactions) H
should be regarded not so much as independent exceptions to a general
rule but as examples of the application of a general rule where in
accordance with ordinary contractual principles compound interest should

733

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A   be recoverable. The third reason why I refer to *Wadsworth v. Lydall* is
    that it clearly demonstrates that notwithstanding the period which has
    elapsed since the decision in the *London, Chatham and Dover Railway Co.*
    case, in 1893, the courts will be prepared to limit the application of that
    decision where this can be done in accordance with principle and it is
    appropriate to do so.

B       *Wadsworth v. Lydall* was a decision of the Court of Appeal. The facts
    were straightforward. The defendant and the plaintiff had an informal
    partnership agreement under which the partnership held an agricultural
    tenancy of a farm and the plaintiff lived in the farmhouse. When the
    partnership was dissolved the plaintiff and the defendant agreed that the
    plaintiff would give up possession of the farm by a specified date when he
    would receive £10,000 from the defendant. On the strength of that
C   agreement the plaintiff entered into a further agreement with a third
    party to purchase another property on terms which required him to pay
    the £10,000, which by then he should have received from the defendant,
    to the third party. Only part of the £10,000 was paid by the defendant to
    the plaintiff prior to his completing his transaction with the third party.
    The plaintiff therefore had to take out a mortgage from the third party
    for the balance. In an action which he brought against the defendant the
D   plaintiff claimed as special damages the interest and costs he incurred due
    to his having to obtain the mortgage.

        The trial judge disallowed those two items of special damage but the
    plaintiff succeeded in recovering them as a result of the decision of the
    Court of Appeal. In relation to the argument that the Court of Appeal
    were bound to conclude that the appeal failed because of the combined
E   effect of the decision in the *London, Chatham and Dover Railway Co.* case
    and because of the provisions of the Law Reform (Miscellaneous)
    Provisions Act 1934, Brightman L.J. said, at p. 603:

            "In my view the court is not so constrained by the decision of the
        House of Lords. In *London, Chatham and Dover Railway Co. v. South
        Eastern Railway Co.* [1893] A.C. 429 the House of Lords was not
        concerned with a claim for special damages. The action was an action
F       for an account. The House was concerned only with a claim for
        interest by way of general damages. If a plaintiff pleads and can
        prove that he has suffered special damage as a result of the
        defendant's failure to perform his obligation under a contract, and
        such damage is not too remote on the principle of *Hadley v. Baxendale*
        (1854) 9 Exch. 341, I can see no logical reason why such special
G       damage should be irrecoverable merely because an obligation on
        which the defendant defaulted was an obligation to pay money and
        not some other type of obligation."

        The facts of *President of India v. La Pintada Compania Navigacion S.A.*
    [1985] A.C. 104 are not important. Its significance is that the approach of
    this House was that Parliament had chosen to remedy some of the
H   injustices caused by the common law rule as laid down in the decision in
    the *London, Chatham and Dover Railway Co.* case, and the restrictive
    language of section 3(1) of the Act of 1934. Due deference to the intention
    of Parliament therefore prevented any further departure from the House's

734

**Lord Woolf**        Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))        [1996]

A  earlier decision in relation to interest. So the earlier decision would still apply to general damages.

In his speech, Lord Brandon of Oakbrook identified, at p. 122, "three cases in which the absence of any common law remedy for damage or loss caused by the late payment of a debt may arise . . ." For convenience he described these cases as case 1, case 2 and case 3. Case 1 is where a debt is paid late, before any proceedings for its recovery have been begun.
B  Case 2 is where a debt is paid late, after proceedings for its recovery have begun, but before they have been concluded. Case 3 is where a debt remains unpaid until, as a result of proceedings for its recovery being brought and prosecuted to a conclusion, a money judgment is given in which the original debt becomes merged.

Having examined the history and origins of the common law rule and the interventions by the legislature, Lord Brandon described qualification
C  of the common law rule made in *Wadsworth v. Lydall* as being important, and set out his conclusions as follows, at p. 129:

"First, an ideal system of justice would ensure that a creditor should be able to recover interest both on unpaid debts in case 1, and also in respect of debts paid late or remaining unpaid in cases 2 and 3.
D  Secondly, if the legislature had not intervened twice in this field since the *London, Chatham and Dover Railway Co.* case, first by the Act of 1934 and more recently by the Act of 1982, and if the Court of Appeal had not limited the scope of that case by its decision in *Wadsworth v. Lydall* [1981] 1 W.L.R. 598, I should have thought that a strong, if not an overwhelming, case would have been made out for your Lordships' House, in order to do justice to creditors in all three
E  cases 1, 2 and 3, to depart from the decision in the *London, Chatham and Dover Railway* case [1893] A.C. 429. But, thirdly, since the legislature has made the two interventions in this field to which I have referred, and since the scope of the *London, Chatham and Dover Railway* case has been qualified to a significant extent by *Wadsworth v. Lydall* [1981] 1 W.L.R. 598, I am of the opinion, for three main
F  reasons, that the departure sought by the respondents would not now be justified."

The first of the reasons Lord Brandon gave for his conclusion was that the greater part of the injustice had already been remedied by the intervention of the legislature and judicial qualification of the scope of the
G  decision in *London, Chatham and Dover Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429. The second was that Parliament had given effect in legislation to some of the recommendations of the Law Commission (Law of Contract: Report on Interest (Law Com. No. 88) (1978) (Cmnd. 7229)) but had not given effect to further recommendations which meant that for the House to intervene would be to intervene in a manner which would conflict with the policy indicated by Parliament. The
H  third reason was that the intervention would create for creditors a remedy as of right rather than a discretionary remedy which would be again contrary to the policy of Parliament as indicated in the Acts of 1934 and 1982.

735

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A   *The reasoning in President of India v. La Pintada Compania Navigacion*
    *S.A. does not apply to equitable interest*

        In relation to that reasoning [1985] A.C. 104 it is important to note
    that none of the three reasons directly apply to the issue at present before
    their Lordships. The first reason does not directly apply to the present
    case because neither the legislation nor the decision in *Wadsworth v.*
B   *Lydall* [1981] 1 W.L.R. 598 addresses the injustice demonstrated by the
    facts of this case. The injustice arises because, contrary to the intention of
    the parties, there is no contract. The inroads which have been made on
    the decision in the *London, Chatham and Dover Railway Co.* case by
    *Wadsworth v. Lydall* can only apply where there is a contract under which
    either interest is expressly payable or the situation is one where the second
    limb of the rule in *Hadley v. Baxendale*, 9 Exch. 341 applies to a breach
C   of contract. The second reason given by Lord Brandon, at p. 129, does
    not apply because the Law Commission made no recommendation as to
    the equitable remedy of interest. The third reason does not apply because
    if the court has jurisdiction to award interest in equity, like other equitable
    remedies, the remedy will be discretionary.
        I therefore do not find anything in Lord Brandon's reasoning which
    makes it inappropriate to extend the right in equity so that it extends to
D   the recovery of compound interest ancillary to a restitutionary remedy. In
    this case this is particularly true because if there had been a contract and
    non-payment of the sums due under the contract by the local authority
    the bank may well, if proceedings resulted, have received compound
    interest as special damages.

E   *The desirability of the equitable jurisdiction being extended*

        A decision in favour of the bank in this case will mark a further
    improvement in the powers of the English courts, an improvement the
    need for which has so frequently been recognised. While the improvement
    is consistent with the decision of this House in *La Pintada*, it should be
    noted that that decision has not been free from criticism. In a typically
F   closely reasoned article, "On Interest, Compound Interest and Damages"
    (1985) 101 L.Q.R. 30 the late Dr. F. A. Mann was not impressed by the
    reasoning of the House. Dr. Mann, at p. 34, found it difficult to
    understand, if interest, including compound interest, was recoverable
    under the second limb under the rule in *Hadley v. Baxendale*:

G       "why it should not also be recoverable under the first limb, where
        damages are such 'as may fairly and reasonably be considered arising
        naturally, i.e. according to the usual course of things' from the
        breach?"

    As Dr. Mann pointed out, at pp. 34–35, to say that interest considered as
    damages is too remote is an argument which at the present time is no
    longer realistic or persuasive and which can only be described as an
H   "empty phrase." The modern test should be whether the debtor could
    reasonably foresee that in the ordinary course of things the loss was likely
    to occur or was on the cards. Who would refuse to impute such knowledge
    to a debtor? Who would venture to suggest that a defaulting debtor could

A-9977

736

**Lord Woolf**          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          [1996]

not reasonably foresee interest as the creditor's loss flowing from the
failure to pay?                                                             A

    Dr. Mann did not distinguish between simple and compound interest.
However, if what he said with regard to simple interest is true then
adopting the same approach it must equally apply to compound interest.
Dr. Mann's final comment was, at p. 47:

    "The history of interest, particularly in the field of Admiralty, displays    B
    a lack of legal analysis and a degree of positivism and inflexibility
    which show the common law of England at its worst."

In my judgment, their Lordships should avoid leaving the equitable
jurisdiction of the English courts open to the same criticism.

    Lord Browne-Wilkinson and Lord Lloyd of Berwick (whose speech I
have also had the advantage of reading in draft) do not regard this as a     C
case in which it would be appropriate to extend the law in the way
I would wish. Their arguments, which are based on the legislative history
as to interest and, in the case of Lord Lloyd, also based on *La Pintada*,
I have dealt with already. However, as to the suggestion of usurpation of
the role of Parliament I do remind myself of the approach of Lord
Brandon of Oakbrook in the passage in his speech in *La Pintada*, at
p. 129, which I have previously cited. Both Lord Browne-Wilkinson and     D
Lord Lloyd also make the additional point that the local authority could
feel aggrieved if this appeal were to be decided on the approach which
Lord Goff and I would adopt. Here I take a different view. If their
Lordships had not raised the issue of the correctness and scope of the
decision in *Sinclair v. Brougham* [1914] A.C. 398, the bank would have
succeeded. The local authority were only prepared to argue this point with    E
reluctance. As I have indicated, the local authority also wanted the
argument curtailed. In these circumstances they can hardly complain if
they lacked the opportunity of dealing with the detail of your Lordships'
reasoning.

    In my recollection of his argument Mr. Sumption made it clear that
his argument was not totally dependent on establishing that the local
authority was a fiduciary. I have already set out how his case described    F
the position in principle. I would also refer to paragraph 13 of his case
and the footnote thereto, where he said:

    "Quite apart from the proprietary claim, the bank also has a
    *personal* claim in equity to require the council to account for its
    property: *Snell's Equity*, 29th ed., pp. 284–287.[1]" (Emphasis added.)

    "[1] In *Sinclair v. Brougham* it was held that there was no personal    G
    claim in equity or at law, because to allow such a claim would be
    indirectly to enforce an invalid borrowing contract: see, in particular,
    pp. 414, 418 (Viscount Haldane L.C.). This part of the decision has
    been subjected to powerful and justified criticism by Lord Wright
    (1938) 6 C.L.J. 805. But even if correct *it has no application to a*
    *restitutionary claim, whether at law or in equity*, arising out of a void
    swap contract since such restitution would not be legally or financially    H
    equivalent to enforcement of the contract itself." (Emphasis added.)

    The passage in *Snell's Equity* refers to a personal claim in equity where
their is a breach of trust. However, the footnote makes reasonably clear

737
A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Woolf

A          that Mr. Sumption was applying the same approach as I would to a
restitutionary claim "whether at law or in equity."
          For these reasons I would dismiss the appeal.

          LORD LLOYD OF BERWICK.   My Lords, it was common ground before
your Lordships that the bank is entitled to recover the principal sum of
£1,145,526 in a common law action for money had and received. Judgment
B          for that sum would carry simple interest at the appropriate rate under
section 35A of the Supreme Court Act 1981. Hobhouse J. [1994] 4 All
E.R. 890 and the Court of Appeal [1994] 1 W.L.R. 938 have held (albeit
for different reasons) that the bank has an alternative claim to recover the
principal sum in equity, and that the equitable cause of action entitles the
bank to claim a discretionary award of compound interest, depending on
C          the facts of the particular case. The issue in the appeal as it came before
your Lordships was whether the courts below were right in this respect.
Thus the bank's argument is stated succinctly in paragraph 11 of its
printed case as follows:

          "The bank's submission in summary is that where money is paid
          either (i) pursuant to a contract which is void, or (ii) under a
D          fundamental mistake of fact or law, the money is impressed in the
          hands of the payee with a trust in favour of the payer. The payee is
          then accountable to the payer not only for the principal but for the
          entire benefit which he has obtained from his possession of the
          principal in the intervening period."

          A little later it is said, in paragraph 12(5): "The separation of the legal
E          from the equitable interest necessarily imports a trust." In support of his
argument Mr. Sumption relied, as he had in the courts below, on Sinclair
v. Brougham [1914] A.C. 398. He also relied on the speech of Lord
Brandon of Oakbrook in President of India v. La Pintada Compania
Navigacion S.A. [1985] A.C. 104, 116. It was not suggested in the bank's
printed case that Lord Brandon's formulation of the equitable jurisdiction
F          to award compound interest was incomplete, or insufficient for the bank's
purposes. Nor was it suggested that the decision of Hobhouse J. in the
parallel decision of Kleinwort Benson Ltd. v. South Tyneside Metropolitan
Borough Council [1994] 4 All E.R. 972 (in which he declined to make an
award of compound interest in favour of the bank, on the ground that the
bank was in that case confined to its common law action for money had
and received) was wrongly decided.

G          The local authority, in paragraph 5.1 of its case, stated the issue for
decision in similar terms:

          "Both parties accept that compound, as opposed to simple, interest
          is payable only if the council received the money under the void
          interest rate swaps agreement as fiduciary: President of India v. La
          Pintada Compania Navigacion S.A. [1985] A.C. 104, 116."

H          The whole thrust of the local authority's case was directed to showing
that it was not a fiduciary when it received the money and did not become
a fiduciary thereafter. Sinclair v. Brougham could be distinguished. It had
never been suggested that the mere failure to pay back the principal sum

738

Lord Lloyd
of Berwick                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

rendered the local authority a fiduciary, otherwise "every overdue debtor    A
would be a fiduciary liable to compound interest" (paragraph 6.12).

Both parties, therefore, came before your Lordships on the basis that
*Sinclair v. Brougham* was correctly decided, for whatever it did decide. But
in the course of the argument your Lordships indicated that the House
would be willing to reconsider the correctness of that decision. For the
reasons given by my noble and learned friend, Lord Browne-Wilkinson,    B
I agree that *Sinclair v. Brougham* was wrongly decided on both the points
discussed in his speech, and should be overruled. I understand that all
your Lordships are agreed that the bank has failed to make good its claim
that it has an equitable cause of action against the local authority for
breach of duty as trustee or fiduciary. It follows that the ground on which
the courts below awarded compound interest cannot be supported. The
local authority has succeeded on the only issue on which the parties came    C
before your Lordships. Accordingly, I would be content to allow the
appeal, and leave it at that.

But my noble and learned friend, Lord Woolf, is of the view that, even
though the bank has failed to prove any breach of trust or fiduciary duty,
it may nevertheless be entitled to claim compound interest by way of a
general equitable remedy ancillary to its common law claim for money    D
had and received; and his views receive the powerful support of my noble
and learned friend, Lord Goff of Chieveley.

I have naturally considered these views with the greatest care; for there
is much force in the argument that the local authority ought, in justice, to
pay compound interest, if it would have had to pay compound interest (as
no doubt it would) on sums borrowed by way of more orthodox bank
lending. But I regret that in my opinion the House cannot, or at any rate    E
should not, hold that there is any such power in equity to make good the
supposed defects of the common law remedy. I have come to that
conclusion for three main reasons.

In the first place the point in question, which is one of great general
importance, was scarcely argued. This was not the fault of counsel. The
point only emerged from the background once it became apparent that    F
*Sinclair v. Brougham* might fall to be reconsidered. By then there was no
time to develop the argument. Thus the decision of Hobhouse J. in the
*Kleinwort Benson* case, which would have to be overruled if the point is
good, was only mentioned by Mr. Philipson at the very end of his
argument, and then only in connection with the date from which interest
should run. The decision was never mentioned by Mr. Sumption in oral    G
argument at all.

Nor did Mr. Sumption seek to question the reasoning or conclusion of
the House in *President of India v. La Pintada Compania Navigacion S.A.*
[1985] A.C. 104. On the contrary, he relied on Lord Brandon's speech as
an accurate summary of the equitable jurisdiction to award compound
interest in the two special classes of case to which Lord Brandon referred.
I may be wrong, but I do not recall any reference to the comments    H
expressed by Mason C.J. and Wilson J. in *Hungerfords v. Walker*, 171
C.L.R. 125. It is accepted that to decide the compound interest point in
favour of the bank would mean breaking new ground, and would be

739

A.C.          Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))          Lord Lloyd
                                                                        of Berwick

A  extending the equitable jurisdiction to a field where it has never before
   been exercised. I do not think it right to take so momentous a course
   involving such widespread ramifications, on the back of such inadequate
   argument. Above all I cannot regard it as fair to decide the case against
   the local authority on the alternative argument when through no fault of
   their own they have not had a proper opportunity to deal with the
   argument.

B       Secondly, I have difficulty in reconciling an award of compound
   interest as an equitable remedy available in support of the common law
   claim for money had and received with the ratio decidendi of the House
   in *La Pintada*. The facts of that case were that the charterers were between
   two and six years late in paying sums due to the owners by way of freight
   and demurrage. The owners claimed interest in respect of the late payment.

C  The question was referred to arbitration, and the umpire awarded
   compound interest in favour of the owners for the whole period of the
   delay. One of the questions of law for the court was whether the umpire
   had jurisdiction to award interest in respect of the late payment.
   Mr. Saville Q.C. launched a frontal attack on *London, Chatham and Dover
   Railway Co. v. South Eastern Railway Co.* [1893] A.C. 429, in which it was
   held that a claim for interest by way of general damages will not lie at

D  common law for late payment of a debt, in the absence of some custom
   binding on the parties, or some express or implied agreement. In giving
   the leading speech, Lord Brandon said, at p. 129, that other things being
   equal there was "a strong, if not an overwhelming, case" for departing
   from the decision in the *London, Chatham and Dover Railway Co.* case in
   order to do justice to creditors. But with regret he felt unable to take that

E  course. I return to his reasons later. All the other noble Lords shared
   Lord Brandon's regret. Lord Roskill said, at p. 111:

        "It has long been recognised that *London, Chatham and Dover Railway
        Co. v. South Eastern Railway Co.* left creditors with a legitimate sense
        of grievance and an obvious injustice without remedy. I think the
        House in 1893 recognised those consequences of the decision, but

F       then felt compelled for historical reasons to leave that injustice
        uncorrected."

   Like Lord Brandon, he felt unable to depart from the *London, Chatham
   and Dover Railway* case, and called for the injustice to be remedied by
   further legislation.
        I quote these passages in order to make the point that if Mr. Saville,

G  for the owners, could have detected some way of supporting the umpire's
   award of compound interest, he would have found a ready ear. He pointed
   out in the course of his argument that the equitable jurisdiction to award
   compound interest had survived the passing of the Act of 1934, as had the
   Admiralty jurisdiction, and he argued that these "exceptional" jurisdictions
   should be regarded as the rule, and not vice versa. But this argument did
   not prevail. When Lord Brandon said, at p. 116, that "the Admiralty

H  Court never, and Courts of Chancery *only in two special classes of case*"
   awarded compound, as distinct from simple, interest (my emphasis), he
   meant, I think, exactly what he said. Moreover, he regarded it as a point
   of importance. I cannot, therefore, agree that he was only giving examples

740

Lord Lloyd
of Berwick                    Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))                    [1996]

of the application of a more general equitable jurisdiction to grant      A
ancillary relief by way of compound interest. To my mind the immediate
context, and the shape of the case as a whole, make quite clear that that
was not his meaning.

It may be said that in *President of India v. La Pintada Compania
Navigacion S.A.* [1985] A.C. 104 the claim was for payment of a debt due
under a contract, whereas in the present case the claim is for money had      B
and received. But why should that make any difference? It is true that the
common law action for money had and received can be given a
restitutionary label; and that "restitution" may be said to be incomplete
unless compound interest is included in the award. But the label cannot
change the underlying reality. The cause of action remains a common law
action for the return of money paid in pursuance of an ineffective contract.
If compound interest cannot be recovered in a claim for debt due under a      C
contract (in the absence of custom, or some express or implied agreement
to that effect) I cannot see any reason in principle, or logic, why it should
be recoverable in the case of money paid under a contract which turns out
to be ineffective.

It is said, nevertheless, that the reasoning which led Lord Brandon to
reject the owners' claim for compound interest does not apply to the
different facts of the present case. Lord Brandon identified three main      D
reasons for his conclusion. It is to the second reason, at p. 130, that
I would draw attention. I will quote the reason in full:

"My second main reason is that, when Parliament has given effect by
legislation to some recommendations of the Law Commission in a
particular field, but has taken what appears to be a policy decision
not to give effect to a further such recommendation, any decision of      E
your Lordships' House which would have the result of giving effect,
by another route, to the very recommendation which Parliament
appears to have taken that policy decision to reject, could well be
regarded as an unjustifiable usurpation by your Lordships' House of
the functions which belong properly to Parliament, rather than as a
judicial exercise in departing from an earlier decision on the ground
that it has become obsolete and could still, in a limited class of cases,      F
continue to cause some degree of injustice."

It is true that the Law Commission (Law of Contract: Report on Interest
(Law Com. No. 88) (1978) (Cmnd. 7229)) made no recommendation for
changing the equitable jurisdiction to award interest, and so Parliament
cannot be said to have taken a policy decision to reject any such      G
recommendation. But the underlying objection remains. Parliament has
on two occasions, first in 1934, and then in 1981, remedied injustices
which had long been apparent in the power to award interest at common
law. On the latter occasion it did so in the light of the view expressed by
the Law Commission that the equitable jurisdiction to award interest was
working satisfactorily, and called for no change. To extend the equitable
jurisdiction for the first time to cover a residual injustice at common law,      H
which Parliament chose not to remedy, would, I think, be as great a
usurpation of the role of the legislature, and as clear an example of
judicial law-making, as it would have been in *La Pintada.* If it is thought

A-9982

741

A.C.                     Westdeutsche Bank v. Islington L.B.C. (H.L.(E.))              Lord Lloyd
                                                                                      of Berwick

A  desirable that the courts should have a power to award compound interest
   in common law claims for money had and received, then such a result can
   now only be brought about by Parliament.

       My third reason for rejecting the bank's claim for compound interest
   is that I am by no means certain that the policy considerations all point
   in favour of change. It is presumably in commercial transactions that the
   discretionary power to award compound interest would most frequently
B  be used, on the ground that the money received by the payee would
   otherwise have had to be borrowed at compound interest. But it is in just
   such transactions that the need for certainty is paramount. Disputes which
   would otherwise be settled on the basis of simple interest would be fought
   in the hope of persuading the court that an award of compound interest
   was appropriate. It is interesting to note that it was on this very ground
C  that Lord Tenterden C.J. rejected the solution proposed by Best C.J. in
   *Arnott v. Redfern* (1826) 3 Bing. 353. In *Page v. Newman* (1829) 9 B. & C.
   378, Lord Tenterden said, at pp. 380–381:

       "If we were to adopt as a general rule that which some of the
       expressions attributed to the Lord Chief Justice of the Common Pleas
       in *Arnott v. Redfern* which it seemed to warrant, viz. that interest is
D      due wherever the debt has been wrongfully withheld after the plaintiff
       has endeavoured to obtain payment of it, it might frequently be made
       a question at nisi prius whether the proper means had been used to
       obtain payment of the debt, and such as the party ought to have
       used. That would be productive of great inconvenience."

       As one who has in the past attempted to keep open the availability of
E  equitable remedies in commercial disputes, I am now conscious of the
   strength of the arguments the other way: see *Scandinavian Trading Tanker
   Co. A.B. v. Flota Petrolera Ecuatoriana* [1983] 2 A.C. 694, disapproving
   dicta of Lloyd J. in *Afovos Shipping Co. S.A. v. R. Pagnan and Flli.* [1980]
   2 Lloyd's Rep. 469. It is, of course, true that even an award of simple
   interest lies in the discretion of the court, as does the rate of interest. But
   in the great majority of cases it is not difficult to predict the amount of
F  simple interest which is likely to be awarded. Compound interest, on the
   other hand, is not so predictable. It presents wider room for disagreement.
   Disputes would be likely to end up in court, and this would, in the words
   of Lord Tenterden, "be productive of great inconvenience." Despite the
   weight which must attach to the views of my noble and learned friends,
   Lord Goff of Chieveley and Lord Woolf, I would allow the appeal.

G
                                                    *Appeal allowed with costs.*

                   *Solicitors: Nabarro Nathanson; Travers Smith Braithwaite.*

                                                                      M. G.

H

A-9983

IN THE GRAND COURT OF THE CAYMAN ISLANDS

CAUSE NO:  G15 OF 2015

BETWEEN:



      (1) ERNST & YOUNG LTD
      (2) MAPLESFS LIMITED
      (3) KPMG
      (4) BUTTERFIELD BANK (CAYMAN) LIMITED

PLAINTIFFS

AND

      THE INFORMATION MANAGER OF THE DEPARTMENT
      OF IMMIGRATION OF THE CAYMAN ISLANDS GOVERNMENT
      ('the FOI Officer')

DEFENDANT'

CAUSE NO:  G20 OF 2015

BETWEEN:

      (1) ERNST & YOUNG LTD
      (2) MAPLESFS LIMITED
      (3) KPMG
      (4) BUTTERFIELD BANK (CAYMAN) LIMITED

PLAINTIFFS

AND

      (1) KERRY TIBBETTS
      (2) PERSONS UNKNOWN

DEFENDANTS

IN CHAMBERS
BEFORE THE HON. ANTHONY SMELLIE

THE 30TH JANUARY 2015; THE 6TH FEBRUARY, 2015;
WRITTEN REASONS DELIVERED ON 12TH FEBRUARY 2015.

APPEARANCES:    ON 30TH JANUARY 2015:
                Mr. Mac Imrie, Ms. Lara Kuehl and Ms. Krista-Lynn Wight of Maples
                and Calder for the Plaintiffs

EXHIBIT

12

Page 1 of 33

A-9984

ON THE 6TH FEBRUARY 2015:

Mr. Mac Imrie, Ms. Lara Kuehl and Ms. Krista-Lynn Wight of Maples and Calder for the Applicants

(Also present on 6th February 2015:  Mr. Andrew Bolton of Appleby and Mr. David Legge of Pinnacle Publishing and – deponent of an affidavit considered on 30th January 2015) – as observers with the consent of the Plaintiffs.)

***General disclosure of personal and commercially sensitive information by FOI Officer- whether leave should be given for judicial review of the decision to disclose- whether injunction against further disclosure by the FOI Officer should be granted – whether injunction should be extended against persons unknown who may have come into possession of the information and further, contra mundum, to restrain anyone in the world at large who may come into possession of the information from further disclosure of it – whether rules of court allow writ to be issued against unnamed defendants.***

## <u>REASONS FOR DECISIONS</u>

## <u>CAUSE NO. G15 OF 2015</u>

1.   On 30th January 2015, upon an ex parte application by the Plaintiffs in the first of these two causes, I granted  them  leave to bring an application for judicial review of the decision of the defendant in that Cause (the "FOI Officer").  By that decision, the FOI Officer had disclosed to the *Cayman Compass*, a local newspaper, a Microsoft spread-sheet containing personal and commercially sensitive information about all work permit holders in the Cayman Islands ("the Spread-sheet").

2.   The Spread-sheet comprised the following kind of information about those 21,000 persons:

(1)   The names of the employers



    (2)     Personal information about the employees, not including their individual names but including:

        (i)     their individual salaries;

        (ii)    their nationalities;

        (iii)   their job titles;

        (iv)   their start dates.

3.    Injunctive orders were also granted to restrain the FOI Officer from publishing and/or disclosing to any person or entity external to the Department of Immigration the information in the Spread-sheet until further order and requiring the FOI Officer to disclose to the Plaintiffs and to the Court, the identities of any and all persons to whom the Spread-sheet had been disclosed, or any part of the information therein contained.

4.    The fact of the disclosure to the Cayman Compass had been brought to the attention of the Plaintiffs by none other than the publisher of the newspaper himself, Mr. David Legge.

5.    In his affidavit filed in support of the Plaintiffs' application, Mr. Legge explains that on 19th January 2015, a reporter employed by the Cayman Compass requested information about Cayman Islands work permit holders from the FOI Officer under the Freedom of Information Law 2007 Revision (the "FOI Law").

6.    In response, on 22nd January 2015, the FOI Officer provided the Cayman Compass with the Spread-sheet.

7.    Mr. Legge explains that the Cayman Compass has not published and does not intend to publish any information from the Spread-sheet that would identify or aid anyone in



identifying companies, individuals or employees.  On the basis of that assurance, the Cayman Compass has itself not been joined by the Plaintiffs as a party to these proceedings and no order has been sought as against it.

8. The Plaintiff's application was also supported by a number of affidavits sworn by Chief Executive Officers and Senior Partners of a number of the employer entities whose information is contained in and disclosed in the Spread-sheet.

9. These officers spoke in unison in their affidavits, to the prejudice that disclosure of the information would cause to the commercial interests of their respective businesses.  The affidavit of Mr. Layman Daniel Scott, the Senior Partner of Ernst & Young is in terms, the same in these regards as the affidavits sworn to on behalf of all the Plaintiffs:

> "6.1 *In common with the position in most companies, employees of Ernst & Young do not generally know what salaries other employees of Ernst & Young are paid.  If employees knew what every work permit holding employee was paid, this could lead to workplace disputes, bad morale and complaints.  It is also likely to put Ernst & Young at a disadvantage when hiring any future employees (whether or not they would be work permit holders) as prospective employees would be likely to insist upon receiving the highest level of salary available for employees holding the same job description, without regard to commercial factors and individual merits.*
>
> 6.2 *If competitors and clients knew the number of work permit holders with a particular job description or knew how much the salaries of*



> *work permit holders was costing Ernst & Young, they would be able to*
> *ascertain the likely scale of Ernst & Young's operations in the Cayman*
> *Islands and the cost of such operations. Such detailed knowledge of*
> *Ernst & Young's operations is likely to damage its competitive*
> *advantage, given that such information would not normally be publicly*
> *available."*

10.   Mr. Scott, again in unison with the other officers, also explained the sensitivity of the
information as to the personal information of employees:

> 7.   *In addition to its own commercial interests, Ernst & Young is concerned*
> *about the rights of its employees to have their personal information kept*
> *private. As a responsible employer, Ernst & Young considers that it is under*
> *a duty to take steps to ensure that the personal information of its employees is*
> *protected from unauthorised disclosure. Ernst & Young wishes to safeguard*
> *its employees, some of whom are likely to be identifiable from the information*
> *in the Spread-sheet, from facing a situation in which the exact level of their*
> *salaries is publicly available information (known by their acquaintances,*
> *family, professional rivals, future prospective employers etc.).*



> 8.   *Neither Ernst & Young nor its employees were notified by the Defendant*
> *either before or after the Spread-sheet was disclosed to the Cayman Compass*
> *and no consent was sought to the same."*

11.   The sensitivity of the information was underscored by its obvious currency: start
dates for employees included in the Spread-sheet are as recent as 22 January 2015.

**Leave to apply for judicial review**

12.    In presenting their applications for judicial review, the Plaintiffs emphasised the apparent breach of the FOI Law itself which is involved in the disclosure of the information contained in the Spread-sheet.

13.    As Mr. Imrie submitted, a fundamental point is that the information is not disclosable under the FOI Law, if it is clearly personal information.

14.    The same is true if the information is clearly commercially sensitive information. Sections 21 and 23 of the FOI Law apply in clear terms:

> *"21(1) Subject to subsection (2), a record is exempt from disclosure if –*
>
> > *(a)   Its disclosure would reveal –*
> >
> > > *(i)   Trade secrets;*
> > >
> > > *(ii)   Any other information of a commercial value, which value would be, or could reasonably be expected to be destroyed or diminished if the information were disclosed.*
> >
> > *(b)   It contains information (other than that referred to in paragraph (a)) concerning the commercial interests of any person or organisation (including a public authority) and the disclosure of that information would prejudice those interests.*
>
> *(2)  Subsection (1) shall not apply where the applicant for access is the person or organisation referred to in that subsection or a person acting on behalf of that person or organisation.*
>
> *....*
>
> *23(1)  Subject to the provisions of this section, a public authority shall not grant access to a record if it would involve the unreasonable disclosure of personal information of any person, whether living or dead.*
>
> *....*
>
> *(3)  Records relating to personal information shall be exempt without limitation as to time."*



15.    The definition of "personal information" means information or an opinion (including information forming part of a data base) whether true or not, and whether recorded in a material form or not, <u>about an individual whose identity is apparent</u>, or <u>can reasonably be ascertained</u>, <u>from the information</u> or opinion, including but not limited to:

(a) …

(b) The <u>individual's</u> race, <u>national</u> or ethnic origin, …

….

(g) information about the individual's …<u>financial</u>, <u>employment</u> or criminal <u>history</u>…. (emphases applied)."

16.    I was satisfied, having regard especially to the words in emphasis above, that for the purposes of deciding whether or not to grant leave to apply for judicial review of the FOI officer's decision to disclose the Spread-sheet, that it very arguably contains personal information within the meaning of the FOI Law and Regulations and as such, its disclosure is in *prima facie* breach of the FOI law.

17.    However, the prohibition against disclosure of personal information is not absolute, as section 23(4) provides that the extent to which third party rights are to be protected shall be set out in the Regulations made under the Law.  Regulation 11 provides that where an information manager intends to give access to a record which he believes contains personal information, he shall, within fourteen calendar days of receipt of the application, send the third party written notice of the application for access.  Although the expression "third party" is not defined, it can only mean the person whose information is to be affected by the disclosure.



18.  The subsequent sub-paragraphs of Regulation 11 set out an elaborate process by which the third party might object, including by way of appeal beyond the department which holds the information, to the Information Commissioner.  The notice periods of at least 60 days prescribed by the Regulations would allow the third party enough time also to seek relief before the courts, by way of judicial review of the decision to disclose.

19.  Nothing of that elaborate process was observed by the FOI officer here, in relation to the personal information of the approximately 21,000 "third parties" affected, the Spread-sheet having been disclosed within only three days of the request being presented to the FOI officer.

20.  In contrast to how the prohibition on disclosure of personal information is qualified by the Regulations, no such qualification appears in relation to the prohibition on the disclosure of commercially sensitive information.

21.  For instance, there is no provision in section 21, the equivalent of section 23(4), allowing for "third party" contact before disclosure of commercially sensitive information, as one would expect if disclosure of such proprietary information were allowed. This factor may therefore be regarded as reflecting the statutory intention to prohibit disclosure.

22.  In the light of the affidavits filed in support of the applications of the Plaintiffs, it is clear that they all believe that the Spread-sheet contains personal and as well as commercially sensitive information and are adamant as to the harm likely to result from its disclosure.

23.   I am satisfied, having regard to all the foregoing, that the Plaintiffs have the prerequisite standing to bring these applications, both as a matter of their own commercial interests and as a matter of their seeking to protect the personal information that relates to their employees.

24.   Accepting that the Plaintiffs have thus established a sufficient interest to protect, have shown a high prospect of success on both grounds on which they seek judicial review – illegality and Wednesbury unreasonableness tainting the FOI officer's decision to disclose the Spread-sheet – and have not delayed in bringing their application (all as required by Grand Court Rules Order 53); I acceded to their application for leave to apply for judicial review.

**Prohibitory and mandatory injunctive relief**

25.   Notwithstanding that the Cayman Compass has undertaken not to publish or otherwise disclose the information in the Spread-sheet, Mr. Imrie explained the Plaintiffs' concern to prevent disclosure by the FOI Officer to anyone else and to prohibit onward disclosure by anyone to whom the Spread-sheet might have been disclosed.

26.   There was, I accept, the obvious risk of the Spread-sheet or information it contains being posted on the Internet and of its "viral" dissemination from then on.

27.   The Court's jurisdiction to grant this kind of injunctive relief against an officer of the Crown in support of judicial review proceedings, is well established   In M v Home Office [1994] 1 AC 377, the House of Lords rejected the argument on behalf of the Home Secretary that mandatory interim injunctive relief could not be made against him to restrain him from removing M (an asylum seeker), from the jurisdiction.  The



House of Lords held that although the Crown's immunity from injunctions had been preserved by the Crown Proceedings Act 1947, the Courts continued to have jurisdiction to grant mandatory interim injunctions in judicial review proceedings against officers of the Crown. And, in consequence of the breach of such an injunction, while the Crown cannot be held in contempt of court, a minister exercising his power on behalf of the Crown can be.

28. Here, while no formal service of the Plaintiff's application was served upon the Crown, contact was made with the Solicitor General to inform her of the application. She made no application to intervene on behalf of the FOI Officer; instead she quite properly expressed a willingness to investigate the circumstances of the disclosure and to advise against any further disclosure, pending the outcome of this, the Plaintiffs' application.

29. In view of the need for swift action to contain dissemination and check abuse, interim injunctions are of special importance in cases of disclosure of confidential information. The general principles – that there should be a serious issue to be tried and that the balance of convenience should be satisfied – apply. Applications for interim injunctions for breach of confidence must be considered also in the context of balancing the often conflicting rights guaranteed by the Human Rights Act 1998 of the United Kingdom (in this jurisdiction by the Constitutional Bill of Rights); especially the right to privacy on the one hand and the right to freedom of expression on the other: *Halsbury's Laws of England.* (5th Edition, Vol. 19, para. 84), citing inter alia: *American Cyanamid v Ethicon Ltd.* [1995] A.C. 396 and *A v B plc* [2002] EWCA 337.

30.   This being the interlocutory stage of this action, I needed to be satisfied that the balance of convenience weighed in favour of the right to privacy and so in favour of the injunction being imposed, pending the trial of the action.

31.   In keeping with the principles laid down in *American Cyanamid Co. v Ethicon Ltd.*, I accepted Mr. Imrie's submissions to the following effect:

　　(i)   *There is a serious issue to be tried, i.e., whether it is permissible for a government body to disclose confidential and commercially sensitive and/or personal information in response to FOI Law requests. This question is also of considerable public importance, given that it will impact on the approach taken by government bodies to protecting sensitive commercial or personal information in the government's care and given that it will affect public confidence in the government's approach.*

　　(ii)  *Damages cannot adequately compensate the Plaintiffs (or other affected employers or the employees concerned) for the loss of their confidentiality which is in the information. If the information became public, the confidentiality would be lost permanently. Damages for the adverse effect on the Plaintiffs' commercial interests would be very difficult to quantify and monetary damages self-evidently could not compensate individuals for the violation of their right to have their personal information kept private.*



> (iii)   *The balance of convenience clearly favours the Plaintiffs: the only entity which could be affected commercially by the injunctions being granted now is the Cayman Compass, but it has already voluntarily undertaken not to publish the Information.   The FOI officer as the Defendant has no commercial or other interest in dissemination of the Information and therefore there is no risk of harm to the Defendant.  By contrast, the harm to the Plaintiffs (and other employers and their employees) would be serious.*
>
> (iv)   *The Plaintiffs' prospects of success are very high: the Defendant's decision to disclose the Information is plainly unlawful and/or unreasonable and (the Plaintiffs submit) is extremely likely to be quashed by the Court upon judicial review."*

32.    In granting the prohibitory and mandatory injunctive relief, I also accepted that there was no need to require an undertaking in damages from the Plaintiffs as a condition of obtaining the injunctions – there appeared to be no individual to be affected by the injunctions, except the Defendant FOI Officer herself - but she has no personal interest in the information itself or in its dissemination.  Nor was there discernible an immediate public interest in securing that the Spread-sheet is disclosed.  Any arguments to the contrary may, of course, be deployed at an *inter partes* hearing if the FOI Officer or anyone else, would seek to so argue.  Until then, I had to be guided by the manifest policy of the FOI Law itself, where it recognises that the general right of



every person to have access to information governed by the FOI Law, is subject to the provisions of the FOI Law itself.  In this regard, any argument that the personal and commercially sensitive information contained in the Spread-sheet should be disclosed "in the public interest" as that test is defined by section 26 of the FOI Law and regulation 2 of the Regulations, can be entertained by the Court at the *inter partes* stage.  Until the merits of such an argument are established, it was manifestly more appropriate that the injunctions should be granted to protect the information from further disclosure and to require the FOI Officer to identify anyone to whom the Spread-sheet has been disclosed.

33.     The prohibitory and mandatory injunctions were granted accordingly.

**CAUSE 20 OF 2015**

34.     The foregoing orders having been made on 30th January, the Plaintiffs returned to Court on 6th February for further injunctive relief in this new Cause, in the context of the following new circumstances.

35.     On 2nd February 2015, the Solicitor General, on behalf of the FOI Officer, told the Plaintiffs that the Spread-sheet had not been disclosed to anyone other than the Cayman Compass.

36.     However, on 5 February 2015, the Plaintiffs became aware that what appeared to be information from the Spread-sheet was being published on the Internet through "Facebook": www.facebook.com - by an Internet "community" describing itself as "I am Caymanian! Where are my rights?"

37.     Affidavits filed by Martin La Roda Thomas and Rachel Baxendale both of Maples and Calder (the Plaintiffs' attorneys), describe and exhibit "screen-shots" from this

Facebook Page, including a number of what appear to be excerpts from the Spread-sheet relating to a number of different Cayman Islands companies and their employees.

38.   One of the excerpts published on the Facebook Page included information about the salary of one of the Plaintiffs' (KPMG's), director of internal audit.

39.   The Plaintiffs subsequently received an affidavit from the FOI Officer in which she admits that the Spread-sheet was sent to another person and that her Department – upon later receiving notice of the injunctions granted on 30th January – had informed that other person that the publication or disclosure of the information was prohibited by the injunctions.

40.   It was learnt that that "other person", had submitted a request under the FOI Law to the Immigration Department on 27 January 2015 by email, identifying herself only as "Rosey Posey[1]" and although framing her request as seeking information in relation only to "Construction Companies" or "Real Estate Development Companies" and their employees; was provided with the Spread-sheet notwithstanding that it relates to all work permit holders and their employers.

41.   It appears from the search of the Facebook Page carried out by Rachel Baxendale, that the first defendant in this Cause, Kerry Tibbetts, may be the person or one of the persons responsible for the Facebook Page.  I quote from paragraphs 4 and 5 of the Baxendale affidavit:

---

[1] Schedule 1 to Regulation 3 stipulates the form for making a request and provides that "unless the request is for personal information you do not need to give your real name" but requires also that "If you are making a request for personal information (you must give): Identity Verification".  Thus, it appears, a further error was made in disclosing the Spread-sheet to someone providing only a pseudonym.

"4.     Within the comments section of the Facebook Page, the author invites viewers to "email me [at] *propertiesky@yahoo.com* for further information. A printed screenshot of that comment is exhibited (as "RCB – 1"). I have seen (another) page on *www.facebook.com* titled "The Cayman Islands Government" where an individual named Kerry Tibbetts posted a comment on 22 July 2013 providing both her mobile phone number and the same email address as active as her contact information. A printed screenshot of that comment (is also exhibited). This has led me to conclude that the email address mentioned above belongs to Kerry Tibbetts and consequently that she is the author of the Facebook Page.

5.      Save for the Facebook Page, email address and mobile phone number mentioned in paragraph 4 above, I have been unable to locate any further contact details for Kerry Tibbetts from publically available sources, including the Cayman Islands telephone directory and internet searches on databases such as Google and Bing."

42.   A further implication of Ms. Baxendale's affidavit is that if not one and the same person, there must be a link between "Rosey Posey" and Kerry Tibbetts; that is: if the FOI Officer is correct that Rosey Posey is the only other person to whom the Spread-sheet has been disclosed. And this is an inference that Mr. Imrie invited me to draw in presenting the application in this new Cause, for further injunctive orders,

including as against Kerry Tibbetts.  Further discussion on this will be engaged below.

43.   Having examined the screenshots from the Facebook Page myself, it is clear that the confidential information being published on it is of the kind contained in the Spread-sheet and presents the potential for the very kind of abuse that the Plaintiffs sought to prevent by the injunctive relief which they obtained on 30th January 2015.

44.   Several of those pages apparently excerpted from  the Spread-sheet, appear to have been photographed and posted on the Facebook Page.  They have generated comments ranging from alarm to hostility at what the readers regard as the "Anti-Caymanian" developments perceived to be disclosed by the information.  Some "bloggers" propose the commercial boycott of some of the businesses whose information is disclosed, out of the perception that they hire and pay foreign employees lucrative salaries while denying such employment opportunities and salaries to Caymanians.

45.   Such sentiments, whatever the public interest may be in the proper and lawful disclosure of the information, certainly reveal its sensitivity and foreshadow the potential commercial harm that could arise from further disclosure.

46.   The FOI Officer having now confirmed that the Spread-sheet was sent to "Rosey Posey" and that that person was informed – by way of her given email address at Rosey2010Posey2010@gmail.com – that publication or disclosure of the information was prohibited by the Injunction Orders of 30th January 2015 and that the disclosure was made in error; the Plaintiffs now apply for further injunctive orders in support of this their new writ action.  The action is against  (1) Kerry Tibbetts and (2) persons



currently unknown, seeking damages for breach of confidence and a permanent prohibitory injunction against further publication or disclosure of the information contained in the Spread-sheet.

47.    The basis for both  remedies of damages and injunctions says Mr. Imrie, is that a duty of confidence is owed by the Defendants to the Plaintiffs; and indeed, to all persons whose personal or commercially sensitive information is contained in the Spread-sheet.

48.    At this ex parte stage, the Plaintiffs seek interlocutory injunctions as they did in Cause G0015 of 20915, to preserve the confidentiality of the information until the Court determines whether a permanent injunction should be granted.

**Breach of duty of confidence**

49.    Mr. Imrie argued that at common law a duty of confidence arises when confidential information comes to the knowledge of a person  in circumstances where it would be unfair if that person disclosed the information to others.  And that this is a duty that the Courts can and will enforce.

50.    I accept that there is certainly a well-developed jurisdiction in the courts to protect confidence,: see: *A-G v Guardian Newspaper Ltd., A-G v Times Newspaper Ltd.* [1990] 1 AC 109. (*The" Spycatcher case"*)

51.    The obligation of confidence may be imposed not only by an express or implied term in a contract but it may also exist on the basis of an independent equitable principle of confidence,: see: *Saltman Engineering Co. Ltd. v Campbell Engineering Co. Ltd.* (1948) [1963] 3All.E.R.413n, 65 RPC 203 CA.

52.    The equitable jurisdiction may be invoked, among other circumstances, where information is received such that the recipient knows or ought to know that it is being imparted in breach of confidence. The test of the reasonable recipient can be invoked: *Coco v AN Clark (Engineers) Ltd* [1969] RPC 41 at 48, cited in Halsbury's Laws of England, op cit, Para 16.

53.    In some cases – such as where highly personal or commercially sensitive information is involved – the detriment to the person to whom the duty of confidence is owed is clear. Such is the situation contended for by the Plaintiffs here in their capacities as employers (on behalf of their employees); and as business owners. Mr. Scott and the other principals of the Plaintiffs have explained their concerns as set out above from his affidavit in terms identical to the others.

54.    In some cases, there may be no financial detriment to the person to whom the duty is owed but the breach of confidence results in an invasion of personal privacy. Such, as I understand it, is the detriment perceived to the employees who, although not identified by name, are identifiable by reference, in particular, to the positions they hold in the respective firms for which they work and their nationalities.

55.    So identified, their respective salaries then become discernible from the Spread-sheet and are obviously matters of potential personal embarrassment, including in the ways described in Mr. Scott's affidavit.

56.    The case law is well-established in declaring that "*the right to personal privacy is clearly one which the law should in this field seek to protect*": per Lord Keith in *A-G v Guardian Newspaper* (above) at 255 F-H; approving of *Duchess of Argyll v Duke of*



*Argyll* [1967] Ch. 302, the latter being a case in which the equitable jurisdiction was invoked to grant an injunction against the revelation of marital confidences.

57.     However, depending on the circumstances, the right to equitable injunctive relief may not be absolute:  there may be competing public interests in the information being made public and there may be an argument in favour of the freedom of expression of the recipient of the information, to discuss or disseminate the information; the press being an important example. The court, as a public body, must act in accordance with the rights guaranteed  under the Human Rights Act 1998 (here the Constitutional Bill of Rights) even when adjudicating on common law  (or equitable) causes of action: *Venables  v News Group Newspapers* [2001] 1 All. E. R.  908.

58.     The Court must also make a preliminary judgment as to whether "*the information in question is so generally accessible that, in all the circumstances, it cannot be regarded as confidential*" (in the words of Lord Goff's "first limiting principle" in *A-G v Guardian Newspaper, (*above), at 282.  "Limiting" in the sense that the right to an injunction may be limited having regard to the extent to which the information is already disclosed and in the public domain.

59.     In my view there is however simply no basis for thinking that the information contained in the Spread-sheet was already in the public domain. The available evidence as to the extent of disclosure comes only from the FOI Officer's affidavit in which she affirms to disclosure having been made only to the Cayman Compass and to 'Rosey Posey".

60.     Accepting as I do, that a final injunction may be granted but subject to the ordinary principles of equitable relief that apply in respect of both threatened and actual

breaches of confidence and arising from any of the sources of jurisdiction in which an obligation of confidence may be founded (*Halsbury's* op.cit, para 85); it follows that it may well be appropriate in circumstances such as these to grant interim injunctive relief. The final decision whether to invoke the jurisdiction being left to be taken at the inter partes stage, when any question as to the extent of the obligation and the need for its enforcement will be resolved.

61.   And so the question became whether, at this the interlocutory stage, the balance of convenience weighed in favour of restraining disclosure until after the competing arguments (if any) are heard and decided upon. As in Cause G0015 of 2015, in this new Cause also I accepted that this test is satisfied, having regard to the following further factors advanced by Mr. Imrie:

> "(i)   *There is a serious question to be tried in this new Cause; i.e.:, whether a duty of confidence is owed by the Defendants in respect of the information in the Spread-sheet, due to the inherent confidentiality of such information and/or the circumstances in which the Spread- sheet was disclosed to the Defendants.*
>
> (ii)   *Here too, damages cannot adequately compensate the Plaintiffs (or other affected employers or the employees concerned) for the loss of confidentiality in the Information. If the information became public, the confidentiality would be lost permanently. Damages for the adverse effect on the Plaintiffs' commercial interests would be very difficult to*



*quantify and monetary damages self-evidently could not compensate individuals for the violation of their right to have their personal information kept private.*

(iii) *The balance of convenience favours the Plaintiffs: if the Court subsequently decides that there is no duty of confidence owed by these Defendant or that public interest favours publication of the Information, it is difficult to see what prejudice would be caused to the Defendants in having had to wait a few weeks or months to publish the Information. The Plaintiffs are not aware that any person has an interest in immediate publication/disclosure (as opposed to waiting a short period until this matter is properly determined).*

(iv) *The Plaintiffs' prospects of success are high: it is likely that the Defendants received the Spread-sheet in dubious circumstances in which the confidentiality of the Information would have been obvious to the Defendants and therefore a duty of confidence attaches to the Information."*

62.   I am cognisant that in *Cream Holdings v Banergee* [2005] 1 AC 253, the House of Lords declared that the threshold usually to be passed, where the competing human rights interests in the disclosure of information are engaged, is not that an "arguable case" or even a "strong *prima facie* case", must be shown by the applicant for an injunction, but rather whether the applicant is "likely to succeed" ultimately in



restraining publication if there is a contest at trial. Applying that test here, I would nonetheless have been satisfied that the injunctions should issue.

## Injunctions against Persons Unknown and Against the World.

63.     Further questions arose whether the Court has jurisdiction to grant an injunction in the particular terms sought that is: (a) against persons unknown where the Plaintiffs do not currently know the identities of all defendants who have possession of the relevant information and (b) in the context of varying the injunction granted on the 30 January in Cause G0015 of 2015, to restrain the world at large; that is: to restrain anyone who may come into possession of the information having received notice of this injunction, from further publication or dissemination of it. Such an order has come in the case law to be called an injunction *contra mundum* and I will come below to elaborate upon my reasons for granting it.

64.     First I note that I accepted, on the authority of the case law, that the Court has jurisdiction to award an injunction against "persons unknown", where plaintiffs do not currently know the identity of all defendants who have possession of the information, the confidentiality of which is properly sought to be protected.

65.     This is a jurisdiction which Eady J., in an expansive and instructive judgment, described as a "recently developing area of law and practice" in which the interpretation of provisions of the Human Rights Act 1998 is being implemented in a rather experimental environment: *X and another v Persons Unknown* [2006] EWHC 2783 (QB) at [55]. The guiding thesis of his judgment – which follows and expands upon the seminal reasoning of Sir Andrew Morritt V-C in *Bloomsbury Publishing Group Ltd. v. News Group Newspaper Ltd.* [2003] EWHC 1205 (Ch.) – is that in the

exercise of the broad and developing jurisdiction to restrain publication of information, the Court must be ever mindful of the competing interests and the necessary scope and duration of any injunction that it might make. Specifically also at [62], Eady J. advised that it is now recognised that generally speaking, an order restricting the communication of ideas and information should include a "public domain proviso": citing: *Attorney General v Times Newspaper Ltd.* [2001] EWCA Civ. 97; *Harris v Harris; Attorney General v Harris* [2001] 2 FLR at 208 and 353 (Munby J.) and *A v B, C, and D* [2005] EMLR 36 at 16-17. In practice, this would mean excluding from the reach of the injunction, aspects of the information which are already in the public domain.

66.   No such public domain proviso was included in the orders made by me on either the 30th January or 6th February 2015 because, as already explained; there was no basis for thinking that the personal and commercially sensitive information involved here was, otherwise than by those to be restrained from doing so, already placed in the public domain.

67.   Consideration was however given by me to the appropriate scope, particularization and duration of the order – recognising that no injunction may be granted when there is inadequate particularity as to what material is confidential. The application must provide full and proper particulars of the confidential information sought to be protected, so that an injunction is enforceable and of a certain scope discernible to those who are to be restrained.

68.   For that reason, there are Schedules to the Orders which describe the nature of the specific information to be protected and the interim nature of the order, which

implicitly allows access to the Court to anyone who would wish to apply for the discharge of the injunctions.

69.     Having regard – not only to the potentially competing interests of the press in getting it and of the freedom of expression of those who may come to see this information – but also to the rights and needs of those to whom the information relates for the protection of their privacy, the Orders, framed in terms of the Schedules, are regarded as providing a proportional and fair response.  They restrain further publication, for the time being, not only by the named Defendant Kerry Tibbetts, but also by persons unknown who may come into possession of the information.

70.     I must note a further matter of pleading which required to be addressed before these orders could have been made. It is the identification of defendants other than by name, as "persons unknown". This was the specific issue addressed by Vice-Chancellor Morritt in *Bloomsbury Publishing* (above), where, in granting injunctions to prevent breach of copyright by the unauthorised publication or dissemination of copies of the fifth in the well-known Harry Potter series of books,  he accepted (at [17]) that joining "persons unknown" among the defendants was a permissible form of pleading and that the issuance of an injunction in such terms cannot cause confusion because "*anyone to whom it is shown will know immediately whether or not it is descriptive of and therefore directed to him or her.*"

71.     In *Bloomsbury Publishing*, it was also a part of the learned Vice-Chancellor's reasoning that the Civil Procedure Rules in England and Wales no longer require in the prescribed claim form, that defendants must be named, only that they "should". In light of the mandate of the over-riding objectives of the rules for "*enabling the*



*court to deal with cases justly*", he concluded (at [19]) that "*The over-riding objectives and the obligations cast on the court are inconsistent with an undue reliance on form over substance. The proper application of Rule 3.10 is incompatible with a conclusion that the joinder of a defendant by description rather than by name is for that reason alone impermissible.*"

72.   This is reasoning that I readily adopt here, notwithstanding that our GCRs (like the old Rules of the Supreme Court upon which they are based) prescribe a form of writ that requires to be addressed to a named defendant or defendants.

73.   I am fortified in this approach by the fact that the Rules Committee has, in its wisdom, sought to adopt and superimpose in the Preamble to the GCRs, similar over-riding objectives as those which guide the application of the Civil Procedure Rules.

74.   This court must therefore always be mindful that, as the Vice-Chancellor also recognised (at [14]) (citing with approval the dictum of Anderson J. from *Tony Blain Pty Ltd v Splain* [1994] FSR 497, 499):

> "*It is an ancient maxim of the law that where there is a right there is a remedy: Ubi jus ibi remedium. In circumstances where it is plain that persons are infringing proprietary interests which the law recognises, or deceiving the public by way of trade in a manner which indirectly affects the commercial interests of others, the law should, if it reasonably can, provide a remedy.*"



**Variation of the orders of 30th January 2014 issued in
Cause G0015 of 2015: Injunction *contra mundum***

75.     Similar considerations informed my decision to accede to the Plaintiffs' application to
        vary the injunction Order of 30th January so as to allow it to operate *contra mundum.*

76.     The Plaintiffs, not being aware of the identity of all persons who may have come into
        possession of the Spread-sheet (and being reasonably concerned from its
        dissemination on the Facebook Page that such wider dissemination may have
        occurred); applied to vary the Order such that the injunction applies, in terms perhaps
        to regarded as wider than to "persons unknown", but also to all persons receiving
        notice of the injunction, wherever they may be.

77.     Although an injunction operates on the party to whom the injunction is addressed,
        third parties may be liable for contempt if they act in a manner which is contrary to
        the terms of an injunction of which they have notice so as to frustrate the purpose of
        the judge in making the order. This is the so-called "Spycatcher principle":
        *Halsbury's* op cit. para 84.

78.     While still an emerging area of jurisprudence, it now appears settled that occasionally
        and where the circumstances justify – such as where the importance of the material
        warrants it – an injunction (including ultimately a final injunction) may be made
        *contra mundum*: *Attorney General v Barker* [1990] 3 All. E.R. 257; and see, for a
        general discussion of the principles: *Carter-Ruck on Libel and Privacy* (6th Edition)
        London: LexisNexis.

79.     The textbook states (at [21.61] - [21.63]) that the possibility of making such an
        injunction first arose in the context of the wardship jurisdiction of the English courts

in *X (a minor), Re, X County Council v A* [1985] 1 All E.R. 53 and that injunctions *contra mundum* are now regularly used in that context where necessary for the protection of the identity and family life of minors and those responsible for their care and personal safety.

80. This jurisdiction is said by the authors to have been opened with respect to adult claimants by the decision of the Family Division of the High Court (now Senior Court) of England and Wales in *Venables v News Group Newspaper Ltd.* (above). To quote from the text at [21.60]:

> "In that case Dame Elizabeth Butler-Sloss P. was faced with apparently settled law to the effect that injunctions could be made only against a party to a suit. She explained, however, that the position had shifted on account of the coming into force of the Human Rights Act 1998. Having recognised the incipience of a positive duty on the court as a public authority to take steps to protect individuals from the criminal acts of others (following Osman v United Kingdom (1998) 29 EHRR 245), and having been persuaded that on the facts there was a real possibility that the claimants would be in danger of revenge attacks if their identities (that is: personal private information) were disclosed such as to make the instant case an exceptional one, she was satisfied that injunctive relief could "be granted openly against the world.""



81. In *X (a woman formerly known as Mary Bell and Y v O'Brien* [2003] EWHC 1101 (QB) a similar injunction securing lifetime anonymity was granted. This was

notwithstanding the fact that there was no proven threat to the Article 2 right to life of either the mother or daughter to whom the injunction would relate. But press intrusion had previously forced X, her husband B and her daughter Y, to relocate five times and to change their identities twice. Moreover, it was adduced that absent an injunction the family would be at considerable risk of press intrusion and harassment, public stigma and ostracism. This was all on account of the fact that X, many years before when 11 years old and suffering from dementia had killed two small children, three and four years old. Having been convicted of manslaughter by reason of diminished responsibility, she was sentenced to detention for life under the provisions of section 53(1) of the Children and Young Persons Act 1933. Having been released from prison as an adult, considerable public interest was generated by the press in revealing her identity within any community in which she sought to re-establish her life.

82.     From the medical evidence, the prospect of identification had caused an adverse effect upon X's mental and physical health which could be expected to be further exacerbated in the absence of injunctive relief. In light of these factors the Court (again per Madam Justice Butler-Sloss P.) deemed the serious breach of Article 8 rights to privacy to be enough for treating the case as exceptional.

83.     The development of the law reflected in these two judgments of Madam Justice Butler-Sloss P. has been noted by Lord Phillips MR. as *"exemplifying ...the manner in which the courts have extended both the scope of confidential information and the use of the injunction to protect this, thereby giving effect to the right to respect for*



*private life conferred by Article 8 of the Human Rights Convention: Re S (a child)*
*(identification: restriction on publication), [2003] EWCA Civ. 963 at [99]."*

84.  This was notwithstanding the importance of the balancing exercise required by the
conflicting fundamental rights.  Having approved at [30], of Lord Donaldson's earlier
distinction drawn – in *Re M and N (minors) (Wardship: Publication of Information*)
[1990] FAM 211 – between "the public interest and the public's curiosity" Lord
Phillips came later to express his concluded views on how the balance should be
struck in the case then before the Court of Appeal, dealing also with the publication
of information that could affect the welfare of a child but in which the press and the
public would be interested.  At [53 and [54] he declared as follows:

In *A v B plc* [2003] 3 WLR 542 [(cited above at para 28 of this judgment)] Lord
Woolf CJ observed at para 6:

> *"There is a tension between the two articles (of the Convention*
> *and Fundamental Rights) which requires the court to hold the*
> *balance between the conflicting interests they are designed to*
> *protect. This is not an easy task but it can be achieved by the*
> *courts if, when holding the balance, they attach proper weight*
> *to the important rights which both articles are designed to*
> *protect. Each article is qualified expressly in a way which*
> *allows the interests under the other article to be taken into*
> *account."*



This is the approach which should have been followed in this case.  The
concept of proportionality means that the proposed interference or restriction

[of publication] must be supported by 'relevant and sufficient grounds'; it must respond to a 'pressing social need'; and it must be no greater than necessary to meet the legitimate aim pursued".

85. It must be acknowledged  that the jurisdiction to grant an injunction *contra mundum* is a developing one and the defining principles are not yet expositively settled by the highest courts.

86. It nonetheless appears from the existing case authorities, some as discussed above, that an injunction *contra mundum* can granted in exceptional circumstances (such as risk to life, risk of harassment from  press intrusion, etc.).  The case law suggests that it is necessary for this Court to consider any countervailing public interest in disclosure or the general right of persons to freedom of expression and freedom of information, against the right of the Plaintiffs (and their employees) in the protection of their confidential personal and commercially sensitive information.

87. Given the number of persons who could be adversely affected here (some 21,000 work permit holders) and the large number of businesses (all  employers who employ work permit holders); the Plaintiffs submit, and I accept, that there is sufficient private and public interest in preventing publication and potential abuse of the information to constitute exceptional circumstances justifying the grant of an injunction *contra mundum*, "against the world at large".

88. To the extent that there are to be genuine concerns about the granting of such an injunction on a permanent basis and/or any concerns about how the competing public interests and issues such as freedom of expression should be weighed (Article 11 of

the Constitutional Bill of Rights), those may be considered more fully at any later *inter partes* stage of these proceedings.

89.    I accepted that at this stage, the balance of convenience, as applied in keeping with *American Cyanamid* (and as still further discussed in this last context below) is struck in favour of granting the injunction, given that (again as I observed when making the 30th January Orders - as far as the Plaintiffs say they are aware)  no persons would be adversely affected by being required to wait until the matter is finally determined before publishing this information; and assuming that a permanent injunction is not to be granted at that stage.


**The test for varying the grant of interlocutory injunctions is met**

90.    There is no specific test for <u>varying</u> interlocutory injunctions.  I considered that, in effect, I am granting a new injunction on the same terms as the previous injunction.  The new (varied) injunction must therefore meet the original test for the grant of an interlocutory injunction.

91.    The test for the grant of (a varied)  interlocutory injunction, is therefore the same as that applied above in the earlier contexts: there must be a serious issue to be tried; it must appear that damages may not be an adequate remedy to compensate the Plaintiffs and that the balance of convenience is in favour of granting the injunctions to "hold the ring", until the issues may be resolved (see *American Cyanamid Co.* above).  This was the test recognised in granting the injunctions on 30th January.  I accept and find now that the test continues to be met; even more so in light now of the publication of some of the information on the Facebook Page.

92.    Specifically as to the balance of convenience, I find that it favours the Plaintiffs: the only entity which could be affected commercially by the injunctions is the Cayman Compass but it has already voluntarily undertaken not to publish the Information.  The Defendant, Ms Tibbetts has no commercial or other interest in dissemination of the Information and therefore there is no risk of harm to her.  In respect of an injunction against the world, no person who may assert an interest will be prejudiced by waiting until this matter is finally determined before knowing whether it is lawful to publish the Information.  By contrast, the harm to the Plaintiffs (and other employers and their employees) to arise from disclosure would be serious.

93.    I also recognized that the Plaintiffs' prospects of success are very high:  the FOI Officer's decision to disclose the Information is very arguably unlawful and/or unreasonable and is arguably very likely to be quashed by the Court upon judicial review.  The FOI Officer has admitted in her affidavit that "appropriate redactions should have been made to the Spread-sheet to ensure that personal information and legitimate commercial interests were adequately protected."

94.    These are factors which could be important also in the event the grant of what are intended now to be injunctions by way of interim relief, prove to be finally determinative. This could  happen here in the event no one seeks to challenge the injunctions. It is for this reason that the law regards the *American Cyanamid* principles as stated above, as being of qualified applicability in cases which involve the freedom of expression. In such cases, and where it appears to the court that no one may actually seek to challenge the injunctions, the test goes beyond *American Cyanamid*, to require that the court is satisfied that the applicant for interim injunctive relief – relief which



may turn out to be final and determinative -- has a strong case: Halsbury's; op cit para 84, citing *Cream Holdings Ltd v Banerjee* (above) and *Dunford & Elliott Ltd v Johnson & Firth Brown Ltd* [1977] 1 Lloyds Rep 505.

95.    With all the foregoing considerations in mind, it remained clear that the different forms of injunctive relief sought by the Plaintiffs would be necessary and proportionate responses to the difficulties presented in this case by the unwarranted disclosure of the Spread-sheet and so they were accordingly granted in the terms expressed in the Orders.

96.    No order for costs was sought or made in Cause 15 of 2015. The costs in Cause 20 of 2015 were reserved.

Hon. Anthony Smellie
Chief Justice

February 12, 2015

A-10016

**IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS**

**ON APPEAL FROM THE GRAND COURT, FINANCIAL SERVICES DIVISION**

**CICA (Civil) Appeal Nos. 002 & 003 of 2022**
**(Grand Court Cause No. FSD 236 of 2020 (RPJ))**

**BETWEEN:**

**(1) KUWAIT PORTS AUTHORITY**
**(2) THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**
**(3) THE PORT FUND L.P.**

Plaintiffs/Respondents

**-and-**

**(1) PORT LINK GP LTD.**
**(2) MARK ERIC WILLIAMS**
**(3) WELLSPRING CAPITAL GROUP, INC**
**(4) KGL INVESTMENT COMPANY ASIA**

Defendants/Appellants

**BEFORE:**

**The Hon. Sir Richard Field JA**
**The Hon Sir Michael Birt JA**
**The Rt Hon Sir Jack Beatson JA**

**Appearances:**

**Ms Clare Stanley KC and Mr Peter Tyers-Smith and Mr Thomas**
**Wright of Kobre & Kim on behalf of the First Appellant**

**Mr Graham Chapman KC, Mr Andrew Pullinger and Mr Harry Shaw**
**of Campbells LLP on behalf the Second-Fourth**
**Appellants**

**Mr David Allison KC, Ms Jennifer Fox,  Mr Oliver Green and Mr**
**Harry Clark of Ogier for the Respondents**

**Date of hearing:**  **25 and 26 May 2022**

**Date draft judgment circulated:**  **13 December 2022**

**Judgment Delivered:**  **20 January 2023**

**JUDGMENT**

**Sir Richard Field JA**

**Introduction**

1.      This is the judgment of the Court to which each member has contributed.

**EXHIBIT**

**13**

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

2.      There are two appeals before the Court. The first is brought by all the appellants from the order made by Justice Parker ("the judge") dismissing their summonses to strike out certain claims in the Amended Statement of Claim[1] (the "ASOC") (the "Strike Out Appeal"). The second appeal is brought by the first appellant against the dismissal of its summons for security for costs ("the SFC Appeal"). Hereinafter, we refer to the appellants as "the defendants" or "D1", "D2", "D3" and "D4" and to the respondents as "the plaintiffs".

The Strike Out Appeal

3.      This appeal raises important issues concerned with: (a) the nature of a Cayman Islands Exempted Limited Partnership ("ELP") established under the Exempted Limited Partnership Act (2021 Revision) ("the ELPA"); (b) whether a limited partner of an ELP can sue, independently of any of the other limited partners ,alleged wrongdoers, including the ELP's general partner, who are alleged to have been parties to the wrongful misappropriation of the ELP's assets held on trust by the general partner and, if so, what is the appropriate remedy to be granted by the court;  and (c) the circumstances in which a limited partner can bring a derivative action under section 33(3) of the ELPA in the name of the ELP against the general partner for  breaches of contractual, statutory and fiduciary duty.

4.      The ELP in question is The Port Fund L. P. ("TPF") which was registered on 21 March 2007. It was established as a vehicle for investments in port-related assets around the world.  It has one general partner and eleven limited partners including the two plaintiffs, the Kuwait Ports Authority ("KPA"), which it is alleged has invested USD 85 million giving it at least a 41% interest in TPF and The Public Institution for Social Security ("PIFSS"), which it is alleged invested USD 40 million (giving it a 23.77% interest in TPF). The total invested in TPF by the limited partners was USD 188,152,000.

5.      The first defendant, Port Link GP Limited ("the GP" or "D1"), is a Cayman Islands Exempted Limited Company incorporated on 8 March 2007. It was appointed the general partner of TPF pursuant to a limited partnership agreement ("the LPA") made on 21 March 2007 between it and the original limited partners of TPF. The whole of the GP's share capital is held by Port Link Holdings USA Inc ("PLH"), a Delaware company; and the whole of PLH's share capital is held by the Second Defendant ("Mr Williams"). Mr Williams is also CEO, CFO, President, Vice President, Treasurer and Secretary of the Third Defendant, Wellspring Capital Group Inc ("Wellspring"), a company incorporated in the US State of Georgia. Wellspring is owned by

---

[1] The Defendants' application to strike out those paragraphs of the ASOC that pleaded the criminal convictions in Kuwait of a Ms Lazareva and a Mr Dashti was not opposed and the judge so ordered.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

the Mark E Williams Living Trust, the trustees of which are Mr Williams, his wife Laura Williams, and his brother, Dylan Williams.

6.      TPF's sponsor and placement agent was KGL Investment Company KSCC, a Kuwaiti company ("KGLI Kuwait"). From September 2007 until 2008, Mr Williams was KGLI Kuwait's Vice President and he was its Investment Director from 2009 to 2011. He was also a member of TPF's Investment Committee in the years 2009 – 2013.

7.      Pursuant to an agreement with the GP dated 28 June 2007 ("the IMA"), KGL Investment Cayman Limited was appointed TPF's investment manager. In July 2018, KGL Investment Cayman Limited changed its name to Emerging Markets PE Management Limited ("EMPEML"). The ultimate beneficial owner of EMPEML as at the date of the IMA and until around January 2018 was KGLI Kuwait, which is the 100% shareholder of the Fourth Defendant ("KGLI Asia").   KGLI Asia is said by the defendants to have provided administrative support to TPF between December 2017 and August 2020 pursuant to an agreement for the provision of such services dated 1 December 2017 ("the ASA").

8.      Briefly put, the plaintiffs plead in the ASOC that assets of TPF worth hundreds of millions of US Dollars held on trust by the GP have been misappropriated as part of an unlawful means conspiracy and/or dishonest breaches of trust and fiduciary duty and that each of the defendants has wrongfully participated in some or all of these defalcations, in some cases having knowingly received some or all of the proceeds thereof. Amongst the allegations made against the defendants is a claim that the GP made substantial improper payments using TPF monies that were not for the benefit of TPF.

9.      Two of the other limited partners in TPF, Gulf Investment Corporation ("GIC") and General Retirement and Social Insurance Authority of Qatar ("GRSIA"), who between them it is alleged invested 15.14 % of the total alleged investment in TPF, have brought claims against the Second and Third Defendants in the US State of Georgia alleging that those parties are guilty of dishonesty, deliberate breaches of fiduciary and unlawful means conspiracy.  GIC and GRSIA have consented to a stay of their claims in the courts of Georgia pending determination of the instant proceedings which they support.

10.     The two current directors of the GP ("the FFP Directors") are individuals recruited from FFP (Directors) Limited. Mr Andrew Childe ("Mr Childe") was appointed on 29 January 2020 and Mr Richard Lewis ("Mr Lewis") on 28 October 2020, replacing Mr Christopher Rowland ("Mr Rowland") who had been appointed at the same time as was Mr Childe.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

11.     The FFP Directors have no connection to any of the wrongdoing alleged in the ASOC and describe themselves as "independent directors". In his third affidavit, Mr Lewis states that, fully cognisant of their fiduciary duties, they have conducted an intensive, forensic investigation into the actions of the GP and the former management team of TPF for the benefit of all the limited partners and not just the plaintiffs. The stated results of the FFP Directors' forensic investigation are set out in a series of memoranda issued to the limited partners in an update to the limited partners dated 29 May 2021, save for their investigations into the DIFC Proceedings Claim and the Lazareva Lobbying Campaign which are respectively dealt with in [300] –[345] and [346] – [399] of Mr Lewis's third affidavit. In their view, there is currently no cause to bring the derivative claims and even if TPF had meritorious claims, it would be necessary to consider whether the claims were worth pursuing on a cost/benefit analysis and, if so, whether TPF was in a position to pursue them or could raise funding to do so, and whether it would be in the best interests of TPF to do so.

12.     The plaintiffs plead individual direct claims against the defendants for losses each has suffered as a limited partner in TPF by reason of the defendants' actionable involvement in the wrongful misappropriation of assets held on trust by the GP. Relying on section 33(3) ELPA, they also plead derivative claims against the GP and the other defendants on behalf of TPF in respect of the aforesaid alleged misappropriation of assets.

**The direct claims and the applications to strike them out**

13.     We first consider the direct claims brought against the GP, (D1), Mr Williams (D2), and Wellspring (D3). It is not necessary to consider the plaintiffs' claims against KGLI Asia (D4) for their losses from payments made to that entity under the ASA because the plaintiffs' counsel, Mr Allison KC, accepted that there is no direct claim against D4; see respondents' skeleton [48].

14.     The plaintiffs plead that in breach of the statutory, contractual, common-law and fiduciary duties owed by the GP to TPF and the limited partners and pursuant to a conspiracy to injure TPF and the limited partners by unlawful means, the GP made very substantial payments using TPF monies that were not for the benefit of TPF and the limited partners. These payments were allegedly made to the following five recipients and/or for the following purposes: (i) Apache Asia Limited and its related Macau entity, Apache Asia Limitada ("Apache") which received USD 58,528,399 from the GP, of which USD 45,850,000 was purportedly for services under an advisory agreement and USD 14,550,000 was directed to be paid to KGLI Kuwait; (ii) Wilfredo Placino who received USD 2,920,900 purportedly by way of "advisor fees"; (iii)

lawyers and lobbyists acting for Ms Marsha Lazareva (a director of the GP from 8 March 2007 to 24 May 2018) and Mr Saeed Dashti (a director of the GP from 16 April 2007 to 24 May 2018); (iv) a group of Kuwaiti Service Providers, allegedly for services rendered, of which USD 14,070,000 was paid to Golden Shahin General & Trading Contracting Company ("Golden Shahin"), which is part of a group of companies associated with KGLI Kuwait and Mr Dashti; and (v) Wellspring, which received USD 59,990,461.30 ("the Wellspring Payment") by way of a payment alleged to be due under a judgment given in proceedings brought by EMPEML against the GP and TPF in the Dubai International Finance Centre Court ('the DIFCC').

15.    The alleged background to (v) is that on 15 November 2017, USD 496,429,767 (representing part of the net proceeds resulting from the sale by the GP of a TPF asset in the Philippines called "Clark City") were transferred to the GP's account with Noor Bank PJSC ("Noor Bank"). The same day, Noor Bank made a suspicious transaction report to the Financial Intelligence Function of the UAE which issued a report to the Dubai Public Prosecutor who successfully moved to freeze the transferred money, an order that remained in place until February 2019. On 9 July 2018, EMPEML commenced proceedings ("the DIFC Proceedings") against the GP and TPF in the DIFCC of First Instance claiming unpaid Carry in the sum of USD 45,462,000, compound interest on the unpaid Carry sum, and unpaid Management Fees of USD 8,106,386 with compound interest thereon at 8% pa. The GP acknowledged service of the claim, submitted to the jurisdiction of the DIFCC and admitted the claim in the sum of USD 56,808,005. The DIFCC then entered judgment ordering the GP and TPF to pay USD 56,999,978 and, at the request of EMPEML, the GP transferred USD 59,990,461.30 to Wellspring in satisfaction of the judgment. The plaintiffs claim, inter alia, that this payment was made by the GP in wilful and negligent breach of trust in that EMPEML had no entitlement to the claimed Management Fees having assigned its rights therein to KGLI Kuwait; there was no contractual right to interest; it was wrong to submit to the jurisdiction of the DIFCC when the law of the Cayman Islands governed the relationship between the GP and EMPEML; and the IMA contained an exclusive jurisdiction clause in favour of the courts of the Cayman Islands. The plaintiffs also allege that the payment made in satisfaction of the DIFCC judgment was made on the advice of the same legal counsel who, to the GP's knowledge, was also advising EMPEML with respect to its entitlement.

16.    The plaintiffs' direct claims against D1 and D3 are for relief under the Fraudulent Dispositions Act, 1996 Revision: (see ASOC [179] and [189]). They claim that these defendants culpably participated in the aforementioned imp roper payments made by the GP that are related in [14] and [15] above and/or dishonestly received such payments or the

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

traceable proceeds thereof. They maintain that Wellspring was party to an unlawful means conspiracy, dishonestly assisted in a breach of trust/duty by the GP, knowingly procured a breach of the contractual obligations the GP owes the limited partners, and is liable in knowing receipt for "the Wellspring Payment" holding "the Wellspring Payment" or its traceable proceeds on constructive trust for TPF. The plaintiffs also claim that Mr Williams conspired and dishonestly assisted in the GP's breaches of duty and was in breach of his fiduciary duties to TPF and the GP by orchestrating the DIFC Proceedings and the Wellspring Payment.

17.    The GP applied to strike out the direct and the derivative claims against it but not on the ground that they lacked merit.  Instead, it accepted that the pleaded allegations were arguable, but contended in relation to the direct claims that it is impermissible for two members of a class of eleven limited partners to claim damages from the GP to be paid directly to themselves except by seeking partnership accounts that would require the joinder of the other limited partners.

18.    D2-D4 applied to strike out the derivative claims against them but D2 and D3 did not apply to strike out the direct claims against them. They have not appealed the judge's decision, but do not admit that the plaintiffs have standing to bring the direct claims that they face. Like D1, they maintain that these claims "*ought to be pursued by way of a partnership account as against the GP*".

**The general rule as to who may bring proceedings by or against an ELP**

19.    Section 16 ELPA provides that all rights or property of an ELP shall be held on trust by the GP as an asset of the ELP and section 33 contains the general rule as to who can bring proceedings by or against an ELP. Section 16(1) reads:

> "*Any rights or property of every description of the exempted limited partnership, including all choses in action ... shall be held or deemed to be held by the general partner and if more than one by the general partners jointly,* **upon trust as an asset of the exempted limited partnership** *in accordance with the terms of the partnership agreement*" (emphasis added).

20.    The material provisions of section 33 are:

> "*(1)  Subject to subsection (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings.*
>
> *(2)  If the court considers it just and equitable any person or a general partner shall have the right to join in or otherwise institute proceedings against*

> *any one or more of the limited partners who may be liable under section 20(1) or to enforce the return of the contribution, if any, required by section 34(1).*
>
> (3) *A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings."*

21.   It is important to note that, as recognized in [2] and [6] of D2 – D4's skeleton argument for the appeal, the effect of ELPA section 33 is that *"ordinarily, actions **for and on behalf of an ELP** must by statute be brought by the general partner of that ELP"* and ***"a claim belonging to a limited partnership must be brought by the GP acting for and on behalf of the ELP"*** (emphasis added). Sections 33 (1) and (3) thus apply only to claims brought by or on behalf of an ELP, that is to derivative claims. They therefore do not apply to direct claims brought by a limited partner in respect of its own right of action against the GP and others.

**The judge's decision on the direct claims**

22.   The judge dealt with direct claims by a limited partner at [60]-[65]. Before doing so, at [46]-[59] he helpfully considered and analysed the characteristics of an ELP, how it differs from an ordinary partnership and a company, and the statutory regime established by the ELPA.

23.   He stated at [46]-[47] that the rights and obligations of the limited partners and the general partner (or partners) *inter se* are regulated by the ELPA, the express provisions of which are to prevail where they are inconsistent with the rules of equity and of common law applicable to partnerships as modified by the Partnership Act (2013 Revision). He also referred at [46] to the provision in section 3 of the ELPA that absent such inconsistency those rules *"shall apply to an exempted limited partnership"*.

*(a) Characteristics of an ELP that differ from those of an ordinary partnership:*

24.   At [46]-[53] the judge identified the following characteristics of ELPs which he considered to be important points of distinction from an ordinary partnership, and which create different rights and obligations between the partners to those in an ordinary partnership:

(1)   By section 4(2) and 20 of the ELPA, the limited partners in an ELP have limited liability whereas the general partner is liable for all debts and obligations of the ELP: [48].

(2)     By section 14 of the ELPA limited partners have no active involvement in the business in their capacity as limited partners. The business is carried out by the general partner who enters into all contracts by or on behalf of the ELP: [49] and [52].

(3)     Section 19(1) of the ELPA imposes an express duty of good faith on the general partner of an ELP requiring the general partner to act in the interests of the ELP: [50].[2]

(4)     Whereas in an ordinary partnership, mutual and reciprocal rights and obligations are owed to each other by partners, section 19(2) of the ELPA provides that, unless the partnership agreement provides to the contrary, a limited partner owes no fiduciary duty either to the ELP or to other partners: [51].

*(b)     Characteristics of an ELP that differ from those of a company:*

25.     At [54]-[55] the judge stated that the fundamental legal distinction is that an ELP has no separate legal personality and exists only as its constituent partners and cannot own property in its own right. He stated that the consequence of the ELP not having a separate legal personality is that its general partner holds its rights and property, including choses in action, on trust for each of the partners. Because a limited partnership has no legal personality, the partnership as a whole is not able to enforce the general partner's obligations as trustee.

26.     The judge then identified other characteristics of ELPs which he considered to be important points of distinction from those of companies:

(1)     the general partner of an ELP owes its duties to all of the individual limited partners whereas the board of directors of a company only owe duties to the company (as the legal entity) and not to its shareholders: [56]-[57.

(2)     because in the case of a company directors' duties are owed to the company, any breach by them is generally only actionable by or on behalf of the company and not by shareholders, although there are important exceptions where the wrongdoer directors are in control of the company: [57]-[59].

(3)     by section 33(1) of the ELPA, the general partner in an ELP is the only entity who can institute proceedings on behalf of the partnership, whereas in the case of a company there are exceptions to the rule in *Foss v Harbottle* (1843) 2 Hare 461 where the wrongful directors are in control of the company. The judge stated that "*if the limited*

---

[2] The judge did not mention, but must have been aware, that this statutory duty is subject to any express provisions to the contrary in the partnership agreement.

> *partners have claims against the GP it is in practice unworkable for it to bring proceedings against itself for breach of duty. If the GP is the arbiter of whether to bring claims against itself that clearly gives rise to a conflict of interest*": [60].[3]

(c)    *Direct claims by a limited partner:*

27.    The judge accepted the submissions of counsel for the plaintiffs, Mr Allison KC, based on the characteristics of an ELP which differ from those of an ordinary partnership and a company, in particular that an ELP has no separate legal personality and that a limited partner does not owe fiduciary duties to the ELP or to the other limited partners. He stated that:

> "*[T]he logical consequence of the aforesaid analysis of the nature and characteristics of an ELP is that the GP's obligations must be capable of enforcement by each of the partners to whom it owes duties individually. That is to be contrasted to the situation where directors of a company hold the company's assets and are treated as trustees because they owe fiduciary duties to the company. In that situation they hold the assets for the company, rather than the shareholders*": [61].

> "*The GP of an ELP owes fiduciary duties to each of the Limited Partners and any breaches are therefore enforceable by the Limited Partners themselves*": [62].

28.    The judge then stated:

> "*It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners. There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist at law. The Limited Partners in enforcing their individual claims do not owe duties to each other*": [63].[4]

29.    He concluded at [64] that:

> "*[T]he direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners ... who wish to obtain redress for TPF are in effect put in the place of the GP, and bring claims on behalf of TPF*".

30.    The judge rejected the submission on behalf of the GP and the other defendants that sections 16(1) of the ELPA and clauses 3.1 and 3.3 of the LPA prevented such direct claims because the limited partners cannot usurp the function of the GP, who is the only authorized agent of the

---

[3] In [60] the judge does not mention section 33(3) of the ELPA which, as we have seen, permits a limited partner to bring a derivative action: "an action on behalf of an [ELP] if any one or more of the GPs with authority to do so have, without cause, failed or refused to do so".

[4] The last sentence, stating that, in enforcing their individual claims, limited partners do not owe duties to each other, contains a footnote referring to section 19(2) of the ELPA on which see para [24] (4) above.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

partnership, here TPF, able to sue. He stated that: "*the practical difficulty with that submission is that in practice the GP could obviously not sue itself and suffers from the conflict of interest*" that arises if the GP is the arbiter of whether to bring claims against itself which clearly gives rise to a conflict of interest: see [76] and (on the conflict of interest) [60].

*(a)     The Henderson case*

31.     At [66]-[78] the judge considered the decision of Cooke J in the English Commercial Court in *Certain Limited Partners in Henderson PFI Secondary Fund II LLP (A Firm) v Henderson PFI Secondary Fund II LLP (A Firm) & others* [2012] EWHC 3259 (Comm) (hereafter "*Henderson*"). That case concerned the similar but by no means identical UK statutory regime in the Limited Partnerships Act 1907 under which such partnerships also have no legal existence independent of their constituent partners. The focus of *Henderson* was whether limited partners were entitled to pursue derivative claims on behalf of the partnership, and, if so, the consequence of doing so.[5]   We therefore primarily consider it when giving our conclusion and reasons about the derivative claim against D1 at [147] – [148] below. But in considering entitlement to pursue a derivative claim, Cooke J also considered whether a limited partner could sue the general partner for "*its own loss under its own claim*" under the limited partnership agreement. He stated that it could because "*it has its own contractual or fiduciary claim for its own loss*": [2012] EWHC 3259 (Comm) at [28] and [31].

32.     In the present case, the judge stated that Cooke J held that:

> (i)    "*each limited partner could in its own individual capacity sue … the general partner for its own losses in respect of liabilities under the limited partnership agreement*": [69];
>
> (ii)   "*any claim brought by each limited partner as an individual contractual or fiduciary claim would not involve management of the partnership business*", [72]; and
>
> (iii)  "*the partnership which consisted of the limited partners and the general partner together, had no form of joint right or claim against the general partner*": [72].

*(c)     Must direct claims by a Limited Partner be by seeking an order for partnership accounts?*

---

[5] i.e. whether the pursuit of derivative claims constituted taking part in the management of the business of the partnership so that, under section 6(1) of the 1907 Act, claimants doing so would forfeit their limited liability.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

33.    The judge considered the GP's submission that direct claims by a limited partner can *only* be vindicated by the taking of partnership accounts at [79] ff. At [86]-[87], he rejected it and accepted the plaintiffs' submission that the claims advanced were principally direct claims vested in the individual limited partners rather than in TPF (the ELP itself) and that the taking of partnership accounts was not the only procedural route available to the plaintiffs.[6]

34.    The judge took into account the distinct characteristics of an ELP and the provisions of the ELPA: [80]-[81]. He considered that the English authorities on ordinary partnerships which Ms Stanley submitted were "*pellucidly clear*" in requiring rights and obligations between partners only to be procedurally adjudicated by the taking of partnership accounts had no direct application to Cayman Islands' ELPs. His reasons were that, unlike ordinary partnerships, under a Cayman Islands' ELP:

(ii)    there are no reciprocal fiduciary obligations or reciprocal duties between the limited partners unless the LPA provides otherwise: [84];

(iii)    the absence of reciprocal fiduciary obligations between the limited partners means that the joinder of all partners to any proceedings so that the necessary accounting for any monetary claims required by *Public Trustee v Elder* [1926] 1 Ch. 776 at 789 does not apply to a Cayman Islands' ELP: [82];

(iv)    the general partner owes fiduciary and contractual duties directly to the limited partners and those duties are enforceable directly by the limited partners: [ 83];

(v)    each limited partner is not, as is the case in an ordinary partnership, jointly and several liable for the partnership's liabilities; referring to sections 3[7], 4(3), 16(1) and 19(2) of the ELPA, the judge stated that "*the rules of equity and common law applicable to ordinary partnerships are in this respect inconsistent with express provisions of the ELP*": [85];

(vi)    claims against the general partner for a breach of the statutory, equitable, common law or contractual duties owed to the limited partners are vested in the limited partners themselves and may be brought directly: [87].

---

[6] His summary of the GP's submissions is at [2(i)&(ii)].
[7] "The rules of equity and of common law applicable to partnerships as modified by the Partnership Act (2013 Revision) but excluding sections 31, 45 to 54 and 56 to 57 shall apply to an exempted limited partnership, except where they are inconsistent with the express provisions of this Act".

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

**The questions before us and the submissions**

35.    We have stated that D2 and D3 did not apply to strike out the direct claims against them but do not accept that the plaintiffs have standing to bring such claims against them and, although D2 and D3 were not partners, maintain that their direct claims "*ought to be pursued by way of a partnership account as against the GP*". The result was that the focus of the submissions before us was on the judge's rejection of the application to strike out the direct claims against the GP. Little was said specifically about the direct claims against D2 and D3. Ms Stanley for D1, accepted in substance, that there are direct claims against the GP. But, supported by Mr Chapman, she submitted that the judge erred in two respects. The first was his finding that the rule/principle that claims by partners *inter se* can only be brought by the taking of partnership accounts does not apply to a limited partnership. She maintained that the judge erred in holding at [85] that the application of the rule/principle is inconsistent with the express provisions of the ELPA and that it has therefore been disapplied by section 3 of the ELPA. She submitted that his second error was in holding at [55] that the GP holds the property of the ELP "*on trust for each of the partners*". That, she submitted, was a clear misreading of ELPA section 16(1). However, she accepted that before the dissolution of a partnership, although there is jurisdiction to obtain a partnership account, "*it is an exceptional jurisdiction to allow an account pre-dissolution*": Transcript day 2 4/2-14.

36.    On behalf of the plaintiffs, Mr Allison submitted that the partnership accounts rule/principle does not apply to ELPs in this jurisdiction, in the same way that it does not apply to limited partnerships in England and Wales.[8] This, he maintained, is because the element of reciprocity of fiduciary duties in an ordinary partnership is absent in an ELP. Moreover, in an ordinary partnership, but not an ELP, all the partners have unlimited liability for the partnership's liabilities, and (subject to contrary agreement) are entitled to take part in the management of the partnership business. Mr Allison further argued that to apply the rule/principle would be inconsistent with ELPA section 32 (12) (c)[9] which makes it clear that partners in an ELP have a right to an account. Here the pleaded claims against the GP and D2 and D3 include claims for accounts and equitable compensation for the plaintiffs' individual losses. Mr Allison submitted that they are entitled to bring these against the GP because of the GP's position as a fiduciary and statutory trustee and its overarching duty to account. Although less clearly stated, it appears that the basis for the plaintiffs' entitlement to bring direct claims against D2 and D3 is their

---

[8] In fact the Limited Partnership Act 2007 applies throughout the U.K

[9] "A partnership agreement may provide that, as against any other partner, any assignment or other disposition by a partner of any right, debt or other chose in action arising under a partnership agreement shall confer economic rights only and for the purposes of this section "economic rights" are… The right to an account for the purpose of ascertaining the amount of share of any of the foregoing …"

knowing receipt of TPF's property or monies which the GP transferred to them in breach of its statutory, equitable and other obligations, and their participation in a conspiracy to cause loss to the plaintiffs by unlawful means. During Ms Stanley's oral submissions there was some debate as to whether, in a claim by a limited partner against the GP or against a third party, the court could order that the remedy against an unsuccessful defendant should be the restoration of the trust fund by analogy with the position where a claim is brought by the beneficiary of a trust: *Target Holdings Limited v Redferns* [1996] AC 421 (hereafter "*Target v Redferns*"). Ms Stanley accepted that this was possible in a claim against the GP (Transcript day 1 155/2-12) but did not accept that it was possible in a claim against a third party such as D2 and D3. She stated that the obvious way for a limited partner to make a claim against a third party would not be by a direct claim but, using the trust analogy, by a claim on behalf of the trust: see Transcript day 1 155/18-156/11. That appears to be a submission that the claim must be a derivative claim and thus subject to the requirements of ELPA section 33(3). Mr Chapman's written submissions on behalf of D2 and D3, to which we have referred, are to the same effect.

37.    In principle, two main questions arise in respect of the direct claims although, in the light of the way the appeal has proceeded, the second does not in fact arise. The first question is whether a direct claim by a limited partner against the general partner must be made by claiming partnership accounts in proceedings to which all the partners are parties as it must in an ordinary partnership. Can a limited partner claim an account against a general partner for breach of fiduciary or other duty without at the outset joining the other partners and, if the breach is established, may a limited partner obtain an order that the general partner restore the fund?

38.    The second question is whether the ELP itself, although not a legal entity, also has a claim against the GP or a third party such as D2 and D3 for breach of their fiduciary and other obligations. The judge stated at [63] (set out at [29] above) that there is no distinct or separate loss in respect of "the partnership" which does not exist in law as an entity. When dealing with the derivative claims later in this judgment, we state that, for the reasons we give at [145] below, we are not to be taken as agreeing that the judge was correct in concluding that the partnership has no claim against the GP. However, absent a Respondents' Notice in respect of the judge's finding or any submission by the plaintiffs that the judge was wrong, the question is not properly before us. But since it is accepted that a limited partner may have a direct claim against the GP for breach of its fiduciary and other duties, albeit only in the context of partnership accounts, uncertainty as to whether TPF itself also has a claim *qua* ELP does not affect our resolution of the dispute about the plaintiffs' direct claims.

39.     There were three limbs to Ms Stanley's submissions. The first was that the application of the partnership accounts rule/principle to limited partnerships is not inconsistent with the provisions of the ELPA and therefore is not disapplied by section 3. She accepted (skeleton [28]-[36]) that there are obvious examples of inconsistency between the rules of equity and common law that apply to ordinary partnerships and the provisions of the ELPA governing limited partnerships. She gave three examples. The first is the disapplication by ELPA sections 4(2) and 16(2) of the rule that in ordinary partnerships each partner is liable jointly and severally with the other partners for all partnership liabilities. The second is section 32(11)'s provision that in limited partnerships the rule that a partner cannot assign its partnership interest to a third party without the consent of the other partners does not apply. The third is that, in the case of limited partnerships, the rule in ordinary partnerships that certain events cause a dissolution of the partnership does not apply to the events specified in ELPA section 35(a)(i)-(vi). But she submitted (skeleton [35]) that none of these "*shed light on the fundamental question at issue on Grounds 2 and 3, namely whether limited partners are entitled to bring direct claims against the GP*". It would appear this may require some reformulation in the light of her acceptance during her oral submissions in response to questions by Birt JA (Transcript day 2 3/21-4/2-14) that in a claim by a limited partner against the GP the court could order that the defendant restore the fund and that it is exceptional to obtain partnership accounts whilst the partnership is continuing.

40.     As to the meaning of "inconsistent", Ms Stanley relied on *Re Knight and Tabernacle BS* [1891] 2 QB 63 at 69. That case concerned a statutory provision that its provisions were to apply except where those provisions were inconsistent with those of another statute. She submitted that this approach applied where, as in the case of section 3 of the ELPA, the question is whether non-statutory rules and principles are inconsistent with the express provisions of a statute and that the partnership accounts rule/principle is not inconsistent with these provisions in the sense used in *Re Knight and Tabernacle BS*. That case stated that to be "inconsistent", the rule/principle must be so at variance with the machinery and procedure indicated by the statute that, if it is applied, the statute would not work. Ms Stanley argued (skeleton [43]) that this shows that "inconsistent" means "irreconcilable" rather than "different to", and that there is no such irreconcilability between the partnership accounts rule/principle and the provisions of the ELPA.

41.     Ms Stanley also referred to the judge's statement (at [86]) that there is "*no good reason why the taking of partnership accounts should be the only procedural route available to the Plaintiffs to obtain redress under the ELPA*". She submitted that the judge thus "*accepted that*

*partnership accounts **were** a means of redress available*" which showed that there is no irreconcilability or inconsistency between the partnership accounts rule/principle and the provisions of the ELPA.

42. Mr Allison's response to these submissions was that the reasons given by the judge at [82]-[85] (summarised at [34] above) for concluding that the partnership rule/ principle was disapplied by ELPA section 3 and is inconsistent with the scheme of the ELPA were correct. As to the scheme of the ELPA, he also submitted that the inconsistency is shown *inter alia* by section 16(1) which makes the GP trustee of an ELP's assets and by section 32(11) which permits the assignment of a limited partner's interest without the consent of the other partners, and section 32(12)(c) which gives a limited partner the right to claim an account.

43. The second limb of Ms Stanley's submissions were the authorities which hold that claims by partners *inter se* can **only** be brought in the context of the taking of partnership accounts. She referred to the statements in *Meyer v Faber (No 2)* [1923] 2 Ch 421 at 439 and *Hurst v Bryk* [2002] 1 AC 185 at 194 respectively that in an action against a co-partner "*the only relief which the plaintiff could obtain would be an account*" and that "*the amount owing to a partner by his fellow partners is recoverable only by the taking of an account in equity after the partnership has been dissolved*". Mr Allison's response was that the cases relied on by Ms Stanley emphasise the reciprocity of personal obligation and trust and the mutuality of personal liability in an ordinary partnership, and Cooke J at [28] of *Henderson's* case emphasised the absence of this in a limited partnership.

44. The third limb of Ms Stanley's submissions were considerations of "*practicality and policy*". She maintained (skeleton [49]) that there were sound practical reasons for the application of the partnership account rule/principle to Cayman Islands ELPs. The rule/principle ensures that the creditors of the partnership are paid first before the partners (as they should be) and that all the limited partners will be bound by the outcome. It, she argued, prevents a multiplicity of proceedings with resulting chaos by providing a mechanism for the orderly winding up of the affairs of the ELP.

45. Ms Stanley submitted that if the partnership accounts rule/principle does not apply "*the limited partners would have to bear the additional burden of the costs of the GP dealing with a multiplicity of proceedings, rather than one*": skeleton [49(4)]. There was, she argued, no prejudice to the partners of an ELP by the application of the rule/principle because "*claims can all be dealt with in the managed process of the taking of partnership accounts*": skeleton [49(4)]. She relied on the statements in *Public Trustee v Elder* [1926] Ch 776 at 784 that all

partners needed to be joined "*to avoid multiplicity of actions*", in *Stevenson v Akt. Fur Carton-Nagen-Industrie* [1918] AC 329 at 247 that partners "*cannot sue each other excepting for the balance of the account taken in accordance with the principles which the courts of equity apply in working out the results of dissolution*", and on 29(1) *Atkins Court Forms on 'Partnerships, Limited Partnerships and LLPs* at [15].

46.     In his oral submissions, Mr Allison relied on *Golstein v Bishop* [2013] EWHC 881 (Ch.), [2014] Ch. 131 to show that in a partnership dispute it is not always necessary to have a claim for a partnership account at the outset. Mr Christopher Nugee QC, sitting as a Deputy High Court judge, stated at [2] and [24] that factual matters and the merits of the claim in that case, which included a claim for damages for breach of the partnership agreement,[10] would be determined but that dissolution accounts would be taken at a later stage. In the Court of Appeal, Briggs LJ, with whom Kay and Sullivan LJJ agreed, recognized that there are remedies other than the taking of a partnership account that might be available for breaches of duty in an ordinary partnership: see [2014] EWCA Civ 10 at [11]. Ms Stanley submitted that *Golstein v Bishop* was distinguishable for two reasons. The first was that the point before us did not arise in that case because the parties had agreed to this being dealt with by way of preliminary issue. Secondly, the substance of the partnership rule/principle was satisfied in that case because there were only two partners, and they were both before the court. Notwithstanding the force of those points, the case shows that, even in the case of an ordinary partnership, there is room for flexibility.

47.     As to misreading ELPA section 16(1), its material provisions are set out at [19] above. It expressly provides that the rights and property of an ELP, including all choses in action are held "*by the general partner upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement*" (emphasis added). Ms Stanley compared its wording with the judge's holding at [55] that the property of an ELP is held "*on trust for each of the limited partners*".

48.     She submitted that the judge's holding was clearly a misreading of section 16(1). The legislature has directed that the assets are those of "the partnership". Thus, giving full recognition to the fact that whilst an ELP has no independent legal personality, it provided for there to be a first call on the assets by the creditors of limited partnerships and that the limited partners stand behind those creditors. She argued that section 16(1) is consistent with the preservation of the operation of the partnership accounts rule/principle which enables the court to identify the

---

[10]  The Chancery Report omits [178] – [214] of the judgment which deal with the claim for damages for breach of the partnership agreement but those paragraphs are included in the neutral citation version available on the BAILLI website.

assets of the ELP which are "*actually available*" for distribution to limited partners after the creditors had been paid.

49.     Drawing on the analogy of the position under a non-partnership trust, she also relied on the statements in the decisions of the High Court of Australia in *Chief Commissioners of Stamp Duties v Buckle* [1998] HCA 4, 192 CLR 226 and *Commissioner of State Revenue v Rojoda* [2020] HCA 7, 268 CLR 281. In *Buckle's* case the High Court stated at [48] that "*the entitlement of the beneficiaries is confined to so much of those assets as is available after the liabilities in question had been discharged or provision has been made for them*". In *Rojoda's* case, the High Court stated at [33] that "*unlike the beneficiary of a fixed trust, it was well established that a partner's interest was not an interest in, or in relation to, any specific asset other than an entitlement to the partner's share of the net proceeds from the sale of each asset at the completion of winding up. In other words, the only right that the partners have, both before and after dissolution, in relation to each asset is a right to the account and distribution after sale of the proceeds of that asset – 'not to an individual proportion of a specific article, but to an account: the property to be made the most of, and divided'.*"

50.     In *Buckle's* case, the High Court also stated at [47] that in aid of the right of a trustee to reimbursement or exoneration for liabilities properly incurred by the trustee in the administration of the trust, "*the trustee cannot be compelled to surrender the trust property to the beneficiaries until the claim has been satisfied*". At the beginning of [48] it stated that, until such reimbursement or exoneration, "*it is impossible to say what the trust fund is*".

51.     Mr Allison submitted that because an ELP has no separate legal personality the only sensible construction of the words in ELPA section 16(1) is that the general partner of an ELP holds its assets on trust for all the limited partners. The judge was correct so to hold. Because the general partner owes fiduciary duties to all the limited partners, any breaches of those duties must be enforceable by the limited partners themselves. Where there is a claim against the general partner itself it cannot be only the general partner who can institute proceedings. The absence of separate legal personality means that, legally, it is the ELP's constituent limited partners who suffer loss directly and the general partner's fiduciary obligations "*must be capable of enforcement by the other partners (just as the obligations of any other trustee are enforceable at the suit of the beneficiaries)*": skeleton [83(3) – (5)].

**Conclusions on the direct claims**

52.     We first consider the direct claims brought by the plaintiffs against the GP and then consider the direct claims brought against D2 and D3.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

(a)      *Direct claims by a limited partner against the GP*

53.      There is considerable force in the considerations of "*practicality and policy*" relied on by Ms Stanley and the need to protect the positions of the creditors of an ELP and of the other limited partners. But we have concluded that the differences between ordinary partnerships and ELPs mean that it is not appropriate to require that a direct claim by a limited partner against the GP must always be initially brought by way of a claim for partnership accounts and that it is not necessary to protect the positions of the creditors and of the other limited partners by requiring this. We have so concluded for the following reasons.

54.      First, we have borne in mind two related factors based on the wording of the ELPA. One is the inconsistency of the proposition that such a claim must be by way of partnership accounts with the right given to a limited partner under ELPA section 32(12)(c) to claim "an account". The legislature addressed the question and used the word "account" but not the term "partnership account". We agree with Mr Allison's submission (skeleton [92]) that it is difficult to see a principled justification for refusing a limited partner a claim to "an account" but permitting such a partner to claim "a partnership account" although there are no mutual and reciprocal rights and obligations between limited partners or fiduciary duties. The other is that ELPA section 16(1) provides that the general partner holds or is deemed to hold "[a]*ny rights or property of every description of the exempted limited partnership, including all choses in action … upon trust as an asset of the exempted limited partnership* in accordance with the terms of the partnership agreement*" (emphasis added). That in substance (see [56] below), provides that the assets of an ELP are held by the general partner on a statutory trust for the limited partners.

55.      Secondly, an ELP does not have the mutuality and reciprocity of obligations that is the hallmark of an ordinary partnership. This is because ELPA section 19(2) provides that, absent express provision in the partnership agreement, the limited partners owe no fiduciary duties. The statements in the cases relied on by Ms Stanley requiring the claim to be brought by way of a partnership account emphasise the reciprocity and mutuality that exists between conventional partners.

56.      We turn to Ms Stanley's submissions based on section 3 of the ELPA that, absent inconsistency with the rules of equity and of common law applicable to partnerships, those rules "*shall apply to an exempted limited partnership*" and *Re Knight and Tabernacle BS*. We bear in mind the modern purposive approach to statutory interpretation. We consider that, as well as provisions such as sections 16 (1) 19 (2) and 32 (12 (c), the scheme of the ELPA with the absence of

reciprocity and mutuality of rights and obligations is inconsistent with requiring claims by a limited partner to be brought by taking partnership accounts in proceedings to which all the limited partners are party. We accept Mr Allison's submission that because an ELP has no separate legal personality the only sensible construction of the words in ELPA section 16(1) is that the GP of an ELP holds its assets on trust for all the limited partners. On its own, the judge's use of the phrase "*on trust for each of the partners*" at [55] may leave some uncertainty as to whether he meant to treat the entitlement of each of the partners as totally individuated, but at [61] what he said was "*capable of enforcement by each of the partners to whom [the GP] owes duties individually*".

57.     Because a trust also has no separate legal personality, thus making the position similar to the statutory trust created by ELPA section 16(1), we also regard the position of a claim by a beneficiary of a trust against the trustee as important. The beneficiary of a subsisting trust including a discretionary trust is entitled to bring a claim against the trustee to recover loss suffered by the trustee's breach of trust, but the remedy is for an order to restore to the trust what ought to have been there: see *Target v Redferns*; *Lewin on Trusts*, 20th ed., [21-046] and *Snell's Equity*, 34th ed., [2-003] – [2-004] and 21-46.

58.     In *Target v Redferns* at 436D-E, Lord Browne-Wilkinson stated that the rule developed by equity reflected the fact that while each beneficiary had the right to claim, "*no one beneficiary was entitled to the trust property*" and there was a "*need to compensate all beneficiaries for the breach*". He had earlier stated at 434C-D that an order to restore was "*the only way in which all beneficiaries' rights [could] be protected*" (emphasis added). The remedy thus ensured that all the beneficiaries' rights were protected and that the beneficiary who issued the proceedings did not steal a march on the others and scoop the pool. There is no inconsistency between such an order and what was stated in *Chief Commissioners of Stamp Duties v Buckle* [1998] HCA 4, 192 CLR 226 and *Rejoda's* case because all that is ordered at that stage is restoration of the fund. Should there be a claim against the ELP, it can then be determined. There is also no inconsistency between such an order and what was said by the High Court of Australia in *Rejoda's* case about the nature of the partnership trust in an ordinary partnership and the difference between that and that of the beneficiary of a fixed trust because ordering restoration of the fund does not give an individual limited partner an interest in any specific asset.

59.     We consider that this approach and remedy is equally applicable in the case of the statutory trust created by section 16 (1) ELPA. We have had regard to the two factors based on the wording of the ELPA referred to at [54] and [55] above; the inconsistency of the proposition that such a claim must be by way of a partnership account with the right expressly given to a

limited partner under ELPA section 32(12)(c) to claim "an account" and the absence in an ELP of the mutuality and reciprocity of obligations that is the hallmark of an ordinary partnership. Whilst, as Ms Stanley submitted at [20] - [25] of her reply skeleton by reference to *Rajoda's* case, assets held by a partner of an ordinary partnership are also held on trust for the partnership, these factors lead to the conclusion that the partnership accounts rule/principle is inconsistent with the ELPA and the judge was correct in his conclusion. Mr Allison accepted that it was likely that the plaintiffs could not have as a remedy equitable compensation payable directly to them because that took no account of the other limited partners and of the ELP's creditors: Transcript day 2 75/12-23. We have concluded that in proceedings against the GP, a limited partner can recover for loss suffered by the breach of the statutory trust but that the remedy would be the restoration of the ELP's fund thus compensating the direct losses suffered by all the constituent limited partners. We discuss further aspects of ordering the restoration of the fund and its doctrinal underpinning when considering the plaintiffs' direct claims against D2 and D3. The important point is that while the individual partners, like the beneficiaries of a discretionary trust, have a direct claim, if established, the remedy for that claim reflects the fact that no one partner is entitled to all of the fund.

60.    This remedy prevents a limited partner claimant from benefitting alone from any recovery either at the expense of the other limited partners or of the ELP's creditors. It thus directly meets the "stealing a march" and "scooping the pool" elements of the practical and policy reasons relied on by Ms Stanley, the substantive elements of her case for requiring a claim by a limited partner against the GP to be by way of partnership accounts from the outset. As we have stated, *Golstein v Bishop* shows that even in the case of an ordinary partnership there is room for flexibility and that a trial of the merits of the claim may be held before taking a partnership account. It suggests that where there is no prejudice either to the creditors of the partnership or to other third parties it is possible to have a trial of the merits of a claim brought by a partner before a partnership account is taken.

61.    We consider that the problem of multiplicity of actions and what Mr Chapman referred to as an "ungated litigation superhighway" can be dealt with by robust case management. Later claims brought in a single jurisdiction can be stayed or consolidated and ordered to be heard together. Where claims are brought in more than one jurisdiction, stays or anti-suit injunctions can also be used to avoid the problems identified by Ms Stanley and Mr Chapman.

62.    Mr Allison's description (see skeleton [89]) of the insistence on the joinder of all the limited partners from the outset as "*unedifyingly formalistic*" may put it too highly. We, however, consider that insistence that a claim for partnership accounts always be made at the outset

reflects an entirely technical procedural approach. In her responses to questions by the Court, Ms Stanley at one stage suggested that the plaintiffs in effect should start again and now seek the taking of partnership accounts and that this either be by the Court now directing further pleadings or an inquiry to identify what is being alleged by the limited partners: Transcript day 1 136/9 -137/20. She argued that the taking of partnership accounts occurs "*in a much more court managed process than a fraud trial where anything goes ...*": Transcript day 1 137/21 – 138/10.

63.     Our rejection of the submission that the direct claims are defective in not at the outset joining all partners and seeking partnership accounts does not mean that the court cannot direct that there be such a procedure at a later stage as part of its case management powers if that proves necessary. If, after the merits of the plaintiffs' claims against the GP have been determined, it appears that an order to restore the fund should be made but that, given the GP's wrongdoing, steps such as placing the assets in escrow, appointing a Receiver, or taking partnership accounts are necessary, the court can make appropriate directions. Alternatively, if the plaintiffs so apply, we would allow them now to add a prayer for the taking of partnership accounts to their pleading, but that such accounting should take place only after the resolution of the issues in their current claims and only if, at that time, it appears necessary.

64.     In summary, for the reasons we have given, we dismiss the GP's appeal against the judge's refusal to strike out the plaintiffs' direct claims against the GP. The consequence is that the plaintiffs may bring their direct claim against the GP. We wish to make it clear that, in the event of success, the likely remedy would be an order to restore the trust fund rather than equitable compensation payable directly to the relevant limited partner.

*(b)*     *Direct claims by a limited partner against third parties such as D2 and D3*

65.     We have stated that there was no application by D2 and D3 to strike out the direct claims against them on the merits but they submit that the plaintiffs do not have standing to bring the direct claims against them and ought to have brought the claims against the GP seeking the taking of partnership accounts.

66.     The question is whether, if D2 and D3 are held liable to the plaintiffs for breach of their statutory, equitable and other obligations, it is open to the court to order that those defendants restore the fund rather than pay the plaintiffs. If the court is not able to order this, there will be a risk of prejudice to the creditors of the ELP and/or to the other limited partners in the ways we have discussed in the context of claims against the GP but concluded it did not exist in that context. Indeed, since different limited partners may bring claims against different third parties,

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

there may be a multiplicity of both plaintiffs and defendants and the risk of chaos referred to by Ms Stanley and Mr Chapman might well be greater. That risk would be avoided by a derivative action where the requirements of section 33(3), discussed at [94] – [98] below, are satisfied.

67.     Ms Stanley submitted that it is not possible to order D2 and D3 to restore the fund and that the only way that TPF would be entitled to anything is if the plaintiffs' claims are made on its behalf and are thus derivative claims: Transcript day 1 155/25 – 156/10. During an exchange primarily about the claims against the GP, it was put to Mr Allison that against the other defendants he might not be able to get an order restoring the trust. His response (see Transcript day 2 91/3-6) was "*arguably not*" but it is not altogether clear whether the exchanges related to the direct or the derivative claims against D2 and D3.

68.     Since D2 and D3 did not apply to strike out the direct claims against them, strictly the question of whether it is possible for the court to order D2 and D3 to restore the fund is one which falls for determination after the merits of the claims against them have been determined. Although we did not hear full argument on this question, in the light of the points that were made, we consider it appropriate to give our preliminary view on the question. We consider that the plaintiffs have a good arguable case that, where third parties are liable for breaches such as those claimed against D2 and D3, the court may order those defendants to restore the fund rather than pay the plaintiffs and thus avoid the risk of prejudice to other limited partners or creditors.

69.     As in the case of a claim against the general partner, the starting point is the position of a claim by a beneficiary of a trust. It is clear that the interest of the beneficiary of a discretionary trust is enforceable against a third party who received trust property which the trustee did not have authority to transfer and the third party knew enough to make it unconscionable to retain the asset for his own benefit: see *Lewin on Trusts*, 20th ed., [21-046] and *Snell's Equity*, 34th ed., [2-003] –[2-004] and 21-46.

70.     *Snell* also states that "*the beneficiary's only right would be to have the asset or its proceeds reinstated to the trustee …*": see [21-045] and to the same effect [22-005] and [30-015]. The reason given is that the beneficiary "*could not compel the third party to transfer the asset directly to himself since this would give him a greater equitable right against the third party than he had against the trustee … ". At [2-004] of *Snell* it is stated that "*the third party's duty is to restore the trust asset to the properly appointed trustee*" and that this would happen "*if the original trust involved continuing duties to manage a fund and if the beneficiary did not have*

*the entire beneficial interest in the trust asset*". Nolan, "Equitable Property" (2006) 122 LQR 232 at 242-243 states that the cases on the rights of a beneficiary against the recipients of misapplied trust assets all acknowledge that a recipient is bound to restore the assets and their proceeds to the relevant trustees, or else transfer them at the direction of a beneficiary or beneficiaries who, being absolutely entitled to the assets in equity, may terminate the trust and direct such a transfer. At p. 255 he states that the cases provide a doctrinal basis for actions to restore the integrity of a pool of assets held in trust, should it be depleted without authority.

71.   That doctrinal basis explains why, given the analogy between a non-partnership trust, an ELP with no separate legal personality, and the statutory trust imposed by section 16(1) of the ELPA, it is possible to order third parties such as D2 and D3 to restore the fund where the claim against them succeeds. The analogy rests on the fact that, in cases of knowingly assisting a trustee in a fraudulent and dishonest disposition of the trust property, although the third party is not in fact a trustee, he is made liable in equity "**as if he were**" a trustee: *Selangor United Rubber Estates Ltd. v Craddock and others (No. 3)* [1968] 1 WLR 1555 at 1580 and 1582 citing Lord Esher MR in *Soar* v. *Ashwell* [1893] 2 Q.B. 390, 394-395 and Lord Selborne LC in *Barnes* v. *Addy* (1874) 9 Ch. App. 244 at 251. This reflects the fact that it is the fund which has suffered the loss and, in the words of Lord Browne-Wilkinson in *Target v Redferns,* an order to restore is "*the only way in which **all** beneficiaries' rights"* could be protected.

72.   For these reasons, had D2 and D3 applied to strike out the plaintiffs' direct claims against them, our preliminary view is that the objections raised to the plaintiffs' standing to bring the claims are unfounded. The consequence is that the plaintiffs may bring these claims against D2 and D3. It will be for the court hearing the claims to decide whether they are in fact made out on the merits and, if they are, whether, in the circumstances of this case, an order to restore the fund should be made and, given that the GP would be implicated in the wrongdoing, steps such as placing the assets in escrow, the appointment of a Receiver, or the taking of partnership accounts are necessary.

**The derivative claims**

73.   We turn to consider the derivative claims brought against D1 and D2-4.  This is the first occasion on which one or more limited partners of a Cayman Islands ELP have sought to bring a derivative claim pursuant to section 33(3) ELPA and accordingly we shall proceed to review the approach adopted by the judge and consider if we can provide any guidance for the future.

74.   We begin with a brief discussion of derivative claims generally before turning to consider the interpretation of section 33(3). We shall then consider a number of specific matters of principle raised by the parties before turning to apply our conclusions on the law to the facts of this case.

*(a)    Derivative claims in general*

75.   The general rule is that the only person who can bring an action against another who has caused injury or damage is the person who has suffered that injury or damage. As the Court of Appeal put it in the leading case of *Prudential Assurance Co Limited v Newman Industries Limited* [1982] 1 Ch 204 at 210:

> *"A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule in Foss v Harbottle (1843) 2 Hare 461 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence."*

76.   The court went on to outline an exception to the rule in *Foss v Harbottle* in the following terms at p. 211:

> *"There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue."*

77.   A further helpful general description of a derivative claim in the context of companies is to be found in the judgment of Lewison J in *Iesini v Westrip Holdings Limited* [2009] EWHC 2526 (Ch) at [73]:

> *"I should begin by saying a little about derivative claims generally. In the first place the new code has replaced the common law derivative action. A derivative claim may 'only' be brought under the [Companies Act 2006]. As section 260(1) makes clear a derivative claim is one in which the cause of action is vested in the company, but where the claim is brought by a member of the company. This reflects the old law in which a derivative action was an exception to the general principle (known as the rule in Foss v Harbottle....) that where an injury is done to a company only the company may bring proceedings to redress the wrong. Allied to this principle was the principle that whether a company should bring proceedings to redress a wrong was a matter that was to be decided by the company internally; that is to say by its board of directors, or by a majority of its shareholders if dissatisfied by the board's decision. The Court would not second guess a decision made by the company in accordance with its own*

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> *constitution. The exception to these principles was necessitated where the company's own constitution could not be properly operated. If the wrongdoers were in control of the company (because they were a majority of the shareholders) they would not in practice vote in favour of taking proceedings against themselves, even though the taking of proceedings would be in the company's best interest...."*

78.    Derivative claims are not restricted to companies. They can also be brought, for example, in connection with trusts and limited partnerships.

79.    In relation to trusts, it is well-established that, although in general terms the only person who may bring an action against a third party on behalf of a trust is the trustee, a beneficiary can, in special circumstances, bring a derivative action so as to stand in the place of the trustee. In *Roberts v Gill and Co* [2011] 1 AC 240, Lord Collins of Mapesbury summarised the position as follows at [46]:

> *"The cases go back to the 18th century, and many of them were reviewed in Hayim v Citibank NA [1987] AC 730. The special circumstances which were identified in the earliest authorities as justifying a beneficiary's action were fraud on the part of the trustee, or collusion between the trustee and the third party, or the insolvency of the trustee, but it has always been clear that these are merely examples of special circumstances, and that the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy...."*

80.    To like effect is the observation of Lord Walker of Gestingthorpe at [110] (omitting references):

> *"There is ample authority, comprehensively reviewed in the judgment of Lord Collins JSC, as to the need for special circumstances before the court will countenance a derivative action. Such actions are now relatively common in cases concerned with mismanaged companies, and in many jurisdictions actions by or on behalf of minority shareholders are now regulated by a statutory code... Derivative actions by beneficiaries under inter vivos trusts or wills are less common.... But in all these cases the unifying factor – what has to be special about the circumstances – is that the derivative action is needed to avoid injustice...."*

81.    A helpful summary of the position in relation to trusts under the law of England and Wales is to be found in *Lewin on Trusts (20th Edition)* at [47-006] and [47-008]:

> *"47-006. However, as an alternative to proceedings brought in the name of trustees, a beneficiary may, sometimes, bring an action in his name on behalf of the trust against a third party. The fact that the action is brought in the name of the beneficiary rather than the name of the trustee does not alter its character. The action is a derivative action in which the beneficiary stands in the place of the trustees and sues in right of the trust, and does not enforce duties owed to him rather than the trustees; a beneficiary can be in no better position than trustees carrying out their duties in a proper manner....*

> 47-008. *A beneficiary can bring a derivative action only in special circumstances, <u>for example circumstances which tend to disable the trustees from suing (as where their acts and conduct with reference to the trust fund are impeached), or in circumstances rendering it difficult or inconvenient for the trustees to sue, as where there is a conflict between their interest and duty</u>. Special circumstances are not confined to circumstances of these kinds. The guiding principle is that there must be exceptional circumstances, which embrace a failure, excusable or inexcusable, by the trustees in the performance of a duty to the beneficiaries to protect the trust estate, or to protect the interests of the beneficiaries in the trust estate. The special circumstances relied on must have something to do with the willingness or ability of the trustee or alleged trustees to bring the action."* [Emphasis added]

As can be seen from the emphasised passage, circumstances where the trustees are inhibited from suing because their own conduct in relation to the trust is impeached or they are under a conflict of interest are leading examples of *'special circumstances'*.

82.    Turning to English limited partnerships, the question of whether and, if so, in what circumstances, a limited partner can bring a derivative claim on behalf of the limited partnership arose in *Henderson* referred to above in [31]. As we have already stated, although by no means identical, there are similarities between an English limited partnership and an ELP. In particular, neither is a separate legal entity and, as in an ELP, the limited partners in an English limited partnership may not take part in the management of the partnership business, which is to be left in the exclusive hands of the general partner. Thus, in the ordinary way, a limited partner cannot sue a third party in the name of the limited partnership; such action can only be taken by the general partner.

83.    In *Henderson*, a majority of limited partners instituted derivative proceedings on behalf of the partnership against the general partner and the manager of the partnership (who had been appointed as manager by the general partner on behalf of the partnership). The manager was a sister company of the general partner. The claims sought compensation in respect of various alleged breaches of duty by both the general partner and the manager. It was directed that a preliminary issue should be tried as to whether the claimants could bring derivative claims on behalf of the partnership against the general partner and the manager, and it was this issue which came before Cooke J.

84.    For reasons discussed below, Cooke J held that the limited partners could not bring a derivative claim against the general partner. However, having referred to *Roberts v Gill* and to the equivalent passage in the 18th edition of *Lewin* to that referred to at [81] above, he held that special circumstances existed which enabled the derivative claim to be brought against the manager. The special circumstances were that the general partner had an irremediable conflict

of interest because it was a sister company of the manager and was therefore not in a position to be seen fairly to determine whether to sue the manager. Cooke J therefore allowed the derivative claim against the manager to proceed, but went on to hold that, under the relevant provision of the English statute, the limited partners would lose their limited liability as a consequence.

85.     In summary, Cooke J applied the '*special circumstances*' test concerning trusts (as summarised in *Lewin*) to limited partnerships.

86.     Although the ability to bring a derivative action in respect of a company is now governed by statute in England and by the Grand Court Rules in this jurisdiction, the principles governing such claims were developed as a matter of common law. Similarly, the requirement of special circumstances in connection with trusts and limited partnerships has been developed entirely by the courts.

87.     The position is different in relation to ELPs because of the terms of section 33(3) of the Act and accordingly we turn next to consider the correct interpretation of that provision.

**Interpretation of Section 33(3) of the ELPA**

88.     Unlike in the case of trusts or English limited partnerships, the legislature has prescribed in section 33 ELPA when a derivative action may be brought in respect of an ELP. For convenience we repeat the relevant provisions of section 33 at this stage:

> (1)     *Subject to sub-section (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings….*
>
> (2)     ….
>
> (3)     *A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings…."*

As can be seen, the key requirement is that the general partner must have "*without cause, failed or refused to institute proceedings*".

89.     Before the Grand Court, the defendants argued that, when considering section 33(3), the court had to apply principles derived from cases dealing with derivative claims in other contexts. The judge rejected this submission. His conclusion is expressed at [98]-[101] of his judgment:

> "98.  The terms of section 33(3) ELPA which allows a limited partner in an ELP
> to bring proceedings on behalf of the ELP if the general partner has <u>without
> cause failed or refused</u> to do so has no language requiring permission or
> special circumstances.  In my view the principles taken from the common
> law or equity for bringing derivative claims whether as regards companies,
> trusts, limited partnerships or associations are not applicable. [original
> emphasis]
>
> 99.  In my judgment section 33(3) is sui generis and is not subject to the rules
> relating to permission or for special circumstances for derivative actions in
> other contexts.  I accept Mr Allison QC's submission that to this extent it can
> be said to 'occupy the field' in the Cayman Islands with respect to ELPs and
> there is no room for a case by case judge led formulation of a common law
> or equitable test.
>
> 100.  I have in coming to this view had regard to the principles Ms Stanley QC
> and Mr Chapman QC referred me to relating to cases which dealt with
> failures or refusals to bring claims in other contexts, for example where the
> board of the company or the trustee had the relevant inhibition which
> prevented a decision to bring claims.  Whilst these principles provide helpful
> guidance, the company and trusts law cases to which I was referred do not
> directly apply to the position in this case which involves the application of a
> specific statutory test for Cayman Islands ELPs.
>
> 101.  I note however that the common thread running through those cases is that
> where the authorised decision maker is inhibited, the Court may permit, in
> the interests of justice, derivative claims."

90.    On appeal, the defendants have argued that the judge fell into error in stating at [98] and [99]
that the principles applicable in other contexts, such as trusts and companies, are not applicable
in relation to the statutory test.  At [68] of her skeleton argument, Ms Stanley submitted that
*'without cause'* should be interpreted by reference to the well-established tests applied in all
other derivative actions.  Similarly, at [8] of his skeleton argument, Mr Chapman submitted that
the statutory gateway prescribed by section 33 did not oust the ordinary rules of common law
and equity.  On the contrary, it provided a <u>further</u> statutory hurdle or threshold that had to be
met, together with those imposed by the common law and equity, before a derivative claim
would be permitted.  He submitted that this was a fundamental error in the judge's approach.

91.    Conversely, in his skeleton argument, Mr Allison submitted at [124] and [125] that the judge
was correct to hold that section 33(3) *'occupies the field'* and that there was no scope or reason
to import any *'special circumstances'* test or other common law or equitable principles that
apply to derivative claims in respect of other entities or structures.  There was no reason to
imply any requirements for derivative claims beyond those explicitly mentioned in section
33(3).

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

92.     It seems to us that, during the course of the hearing, both sides rather modified their submissions and were eventually not very far apart in relation to the proper construction of section 33(3). Thus Mr Chapman (who by agreement with Ms Stanley presented the main argument on the derivative claims on behalf of all the defendants) conceded that, to the extent that his written submissions had suggested that one imported wholesale the common law and equitable principles on derivative claims, this might go too far.  He accepted that one had to apply the statutory test set out in section 33(3), but submitted that this test was consistent with the established principles and that one derived assistance from those principles when construing and applying the statutory test.[11]

93.     Similarly, Mr Allison accepted that, when applying the statutory test and determining whether the failure by the general partner to institute proceedings was *'without cause'*, one could have regard to the principles established in other contexts, such as whether special circumstances existed.[12]

94.     In our judgment, in circumstances where the legislature has established a statutory criterion for bringing a derivative action in respect of an ELP, the courts are duty bound to apply that statutory test.  The test cannot be replaced by common law and equitable principles developed in other contexts even if, in the absence of a statutory test, the courts would no doubt have applied those principles to an ELP.  Nor can those principles form an additional threshold beyond the statutory test, as submitted by Mr Chapman in his skeleton argument referred to at [90] above.

95.     The statutory test is in general and imprecise terms and leaves open how the test should be applied in practice. However, we think that the expression "without cause" must carry the implication of "good" cause. The legislature cannot have intended that a decision for any cause, no matter how inhibited or conflicted the decision-maker, would be sufficient to prevent a derivative action.  This is so notwithstanding the fact that, as originally enacted, the legislation referred to 'good cause' whereas, in its current form, the word 'good' is omitted.  No guidance as to the reason for this change is to be found in the legislative materials produced in relation to the revision of the statute and we cannot attribute any significance to the change.

96.     In these circumstances, we are of the view that the court is entitled to have regard to and may derive assistance from the developed principles in other contexts.  In particular, given the existence of the statutory trust imposed by section 16(1) of the ELPA (namely that the general

---

[11] Transcript, day 1 pp 48-50
[12] Transcript, day 2 pp 45-46 and 49

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

partner holds the property of the ELP *'upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement'*), the court is likely to derive assistance from considering whether special circumstances (as established in the contexts of trusts and English limited partnerships) exist.

97.    If special circumstances exist, this is likely to assist the Court in deciding whether a general partner's decision not to institute proceedings is *'without cause'*. Indeed, in opening his oral submissions on appeal, Mr Allison (rightly in our view) accepted that, if a general partner were under a relevant inhibition or conflict of interest – concepts which emerge strongly from consideration of special circumstances as stated in the emphasised passage from [47-008] of *Lewin* quoted at [81] above – his decision would necessarily and unavoidably be *'without cause'*.[13]

98.    We emphasise, however, that the court's duty is to apply the statutory test of *'without cause'*; it is not sufficient simply to consider whether there are special circumstances and, if so, then to allow a claim under section 33(3). Consideration of whether there are special circumstances, if it assists at all, is simply a step on the road to determining the statutory test. If the court decides that the facts would satisfy the special circumstances test, it must nevertheless go on and consider whether they therefore satisfy the *'without cause'* test in section 33(3). Conversely, we do not rule out the possibility of a case in which the facts enable the court to find that the general partner's decision is *'without cause'* without consideration of whether there are special circumstances. The two tests are not to be equated, although we envisage that consideration of whether there are special circumstances is likely in most cases to be of considerable assistance in determining whether the decision is *'without cause'*. Indeed, it was common ground before us that a decision by a decision-maker which is made under a relevant inhibition will be a decision *'without cause'*.

99.    Although there is some ambiguity and possible inconsistency between [98] and [99] of the judge's judgment on the one hand and [100] on the other, we do not see the judge's decision on this aspect as being essentially any different from our own. [98] and [99], when read in context, simply state that the court's duty is to apply the statutory test, not the common law and equitable principles, but [100] goes on to explain that, although they are not directly applicable, these principles provide helpful guidance. The fact that such helpful guidance may be obtained is emphasised by the fact that, when he goes on to consider the application of the statutory test to the facts of this case, the judge concentrates exclusively on the fact that, in his view, the GP

---

[13] Transcript day 2, p8

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

was subject to an inhibition because of its conflict of interest.  Inhibition is not a word which appears in section 33 but, as the judge correctly states at [101] of his judgment, it is a concept which is a common thread in the cases which allows the court to permit derivative claims in other contexts in the interests of justice.

100.   Having expressed our view as to the correct interpretation of section 33(3), we turn next to consider a number of supplementary points which were argued before us in relation to the statutory test.

**Procedure for determining the statutory test**

101.   Unlike in the case of companies, there is no requirement under section 33 for a limited partner to seek leave from the court to bring derivative proceedings under section 33(3).  It follows that a limited partner is free to commence derivative proceedings without leave.

102.   In this respect, the position is the same as derivative claims in respect of companies prior to the introduction by statute and/or rules of court of a requirement for leave and is the same as it remains in respect of trusts and English limited partnerships.  But, despite the historical lack of a requirement for leave in respect of companies, it was established as long ago as 1982 in *Prudential* that the question of whether a plaintiff should be permitted to bring a derivative action on behalf of a company should be determined at an early stage rather than left until trial.  In *Prudential*, the defendant applied by summons to have heard as a preliminary issue whether the plaintiff was entitled to maintain the derivative action.  The judge dismissed the summons on the ground that it was more convenient to decide the issue after the action had been heard.  The Court of Appeal was very critical of this decision saying at 221:

> "First, as we have already said, we have no doubt whatever that Vinelott J erred in dismissing the summons of May 10, 1979.  He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action.  It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30-day action.  Such an approach defeats the whole purpose of the rule in Foss v Harbottle and sanctions the very mischief that the rule is designed to prevent."

103.   Following *Prudential*, it has been the practice that a plaintiff's standing to bring a derivative action is determined at an early stage in the proceedings rather than the issue being left to trial, with all the disadvantages which that course would bring as described in *Prudential*.  Where there is a leave requirement (e.g. for companies) the issue is dealt with on the application for leave.  Where there is no requirement to obtain leave, the matter is traditionally dealt with on

an application by the defendant to strike out the proceedings on the ground of a lack of standing on the part of the plaintiff or by the court ordering, at the request of the defendant, the trial of a preliminary issue as to whether the plaintiff has the necessary standing to bring a derivative action.

104.   The practice was conveniently summarised by Chadwick P in this court in the case of *Autumn Holdings Asset Inc v Renova Resources Private Equity Limited and Others* [2017] (2) CILR 136 at [26], where he quoted with approval from the judgment of Ribeiro PJ in the Hong Kong Final Court of Appeal in the case of *Waddington Limited v Chan Chun Hoo Thomas* [2008] HKCFA 63; [2009] 2 BCLC 82, where that learned judge said:

> *"[13]    ... Procedurally, there is no requirement at common law for a person seeking to sue derivatively first to obtain the leave of the court....*
>
> *[14]    The time honoured practice at common law is for the plaintiff to issue proceedings 'on behalf of himself and the other shareholders other than the defendants', naming the company on whose behalf the proceedings are brought as one of the defendants.  A challenge to the plaintiff's locus generally takes the form of an application by the relevant defendants to strike out the claim or to have the court determine as a preliminary issue that the plaintiff has no locus to sue on the company's behalf."*

105.   In our judgment, this is also the appropriate procedure to be followed in relation to proceedings brought under section 33(3).  The subsection is clear that a limited partner may only bring a derivative claim if the general partner has refused or failed to do so without cause.  It is therefore necessary for the court to decide at an early stage of the proceedings whether the limited partner can indeed bring himself within section 33(3) and therefore 'bring' the claim.  For the reasons set out so graphically in *Prudential*, this is not a matter which should normally be left until trial. We agree therefore that a defendant wishing to challenge the right of a limited partner to have instituted proceedings on behalf of an ELP pursuant to section 33(3), should do so either by applying to strike out the proceedings on the ground of a lack of standing (as was done in this case) or by applying for the court to direct the trial of a preliminary issue as to the limited partner's ability to bring himself within subsection (3).

106.   The question then arises as to the approach which the court should adopt on such an application. In the first place, it is clear that the outcome cannot depend on which of the two courses a defendant chooses to follow.  The court's approach must therefore be the same whether there is a strike out application or the trial of a preliminary issue.

107.   The judge held that, as this was a strike out application, the normal approach on such an application should be adopted, with the result that the defendants had to show that it was certain

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

that, at trial, the plaintiffs would fail to bring themselves within the terms of section 33(3); see *Hughes v Colin Richards & Co* [2004] EWCA Civ 266, cited with approval in *Re Sphinx Group* [2010] 1 CILR 234, at para 37. The burden lay upon the defendants to show this and there was no burden on the plaintiffs to show that they came within section 33(3). If there was an arguable case that at trial the plaintiffs would be able to satisfy the requirements of that subsection, that was sufficient to enable the case to proceed.[14] It would only be at trial that it would be finally resolved whether the plaintiffs had brought themselves within section 33(3)[15]. Although at times the judge used slightly inconsistent language about his approach[16], we are satisfied that he essentially applied the test we have just described and which he spelt out at [33] of his judgment. Mr Allison submitted that the judge had followed the right approach.

108.   Mr Chapman, on the other hand, submitted that this was the wrong approach. In his submission, the onus lay upon the plaintiffs to satisfy the court that they came within section 33(3) i.e. that the GP had refused or failed to institute proceedings without cause.

109.   In other contexts, the onus lies upon a plaintiff to satisfy the court that he should be permitted to bring a derivative action. Thus in *Prudential*, after the passage cited above, the Court of Appeal went on to say at 221-222:

> "...we do not think that the right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of 'fraud' and 'control' are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed and, (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v Harbottle."

This approach has been followed in this jurisdiction in relation to companies; see *Top Jet Enterprises Limited v Sino Jet Holding Limited* [2018] (1) CILR 18 at [29] per Segal J.

110.   It is not entirely clear what standard the Court of Appeal in *Prudential* was intending to set by referring to a plaintiff *'at least'* being required to establish a *'prima facie'* case that he falls within the exception to the rule in *Foss v Harbottle*. Some assistance can be derived from the subsequent judgment of Knox J in *Smith v Croft (No 2)* [1988] Ch 114 at 138-139 (approved in *Top Jet* at [30]) as follows:

---

[14] Judgment [33], [119], [123]
[15] Judgment [33(ii)], [138]
[16] Thus at [102] the judge refers to *'good arguable case'* and [106] and [136] might be said to suggest that he was in fact making a clear finding that D1 had failed without cause to bring proceedings rather than that it was simply arguable.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> *"My conclusion is that it is the question stated by the Court of Appeal that has to be decided as a preliminary matter, that it is a special form of procedure concerned with giving sensible operation to the rule in Foss v Harbottle, and which is concerned with avoiding the Scylla and Charybdis, on the one hand, of having a preliminary issue which effectively requires one to try the whole action where the rule serves no useful purpose and, on the other side of the strait, of assuming that everything the plaintiffs allege is necessarily correct as a matter of fact, which is of course the technique the court adopts when it has what was called a strict demurrer. The Court of Appeal, it seems to me, has laid down a halfway house for this very special type of case, one in which the legal issues in this particular case are sufficiently well defined for the parties to be able to argue them."*

In other words, the approach should be a halfway house between a strike out application and a full trial.

111.   When pressed during the hearing as to what he thought the Court of Appeal meant by a prima facie case, Mr Allison suggested that it meant a good arguable case and that was in fact an expression the judge used at [102] of his judgment, despite his references (see [107] above) to mere arguability being the test. This court recently had occasion to consider what was meant by the expression *'good arguable case'* in *Scully Royalty Limited v Raiffeisen Bank International AG* (30 December 2021) at [47]-[52]. In particular, the court approved the observation of Mustill J in *The Niedersachsen [1983]* 2 Lloyds Rep 600 at 605 where he said:

> *"I consider that the right course is to adopt the test of a good arguable case, in the sense of a case which is more than barely capable of serious argument, and yet not necessarily one which the judge believes to have a better than fifty percent chance of success."*

112.   During the hearing, the court invited counsel to ascertain whether recent English decisions in relation to derivative actions offered any assistance as to the standard to be applied when considering whether the grounds for permitting a derivative action had been made out. However, counsel's researches were unable to come up with anything of significant assistance.

113.   Mr Chapman referred us to the decision of the English Court of Appeal in *Barrett v Duckett* [1995] (1) BCLC 243, which was decided before the requirement for leave in relation to companies was introduced by statute. This was a case where B & D each held a 50% shareholding in a company. B instituted a derivative action against D and others on behalf of the company alleging wrongdoing by D and others, D being the sole director of the company. The defendants applied to strike out the claim on the basis that it was not a proper case for a derivative action. In the course of his judgment Peter Gibson LJ sought at p.249 to summarise the principles in relation to derivative actions concerning companies in the following terms (omitting passages not relevant for our purposes):

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> *"The general principles governing actions in respect of wrongs done to a company or irregularities in the conduct of its affairs are not in dispute:*
>
> > *1. The proper plaintiff is prima facie the company.*
> >
> > *2. ...*
> >
> > *3. There are however recognised exceptions, one of which is where the wrongdoer has control which is or would be exercised to prevent a proper action being brought against the wrongdoer: in such a case the shareholder may bring a derivative action (his rights being derived from the company) on behalf of the company.*
> >
> > *4. When a challenge is made to the right claimed by a shareholder to bring a derivative action on behalf of the company, it is the duty of the court to decide as a preliminary issue the question whether or not the plaintiff should be allowed to sue in that capacity.*
> >
> > *5. In taking that decision it is not enough for the court to say that there is no plain and obvious case for striking out; it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.*
> >
> > *6. ..."*

114.   Mr Chapman relied in particular on the second part of 5 above, namely that it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.  He submitted not simply that this places the onus on the shareholder, which we accept, but that it means that the shareholder must establish his ability to sue on the balance of probabilities.  He says that *Barrett* changed the test set out in *Prudential*, with its reference to a prima facie case.

115.   We are unable to place such weight on the decision in *Barrett*.  Peter Gibson LJ was simply recording general principles, which were not in dispute.  We do not think that it assists on how a shareholder satisfies the court that he should be allowed to sue on behalf the company.  What is made clear, however, in the first part of 5 above is that the court should not apply the normal strike out test.  It is therefore inconsistent with the approach which the judge adopted in the present case.

116.   It is perhaps of note that the relevant provisions of the English Companies Act set out a number of factors which the court should consider when deciding whether it should allow a derivative action, but the matter is ultimately left to the court as a matter of evaluation.  In our judgment, that approach is consistent with the observation of Lord Collins (*'the underlying question is whether the circumstances are sufficiently special to make it just for the beneficiary to have the remedy....'*) and Lord Walker (*'the unifying factor – what has to be special about the*

*circumstances – is that the derivative action is needed to avoid injustice....')* in *Roberts v Gill* quoted above in relation to special circumstances.

117.   It is clear that, whether the matter is being considered on a strike out application or on the trial of a preliminary issue, the court should not hold a mini trial in order to decide whether the criterion in section 33(3) is met.  However, it should, as in the present case, permit the parties to adduce affidavit evidence on the topic.  Ultimately, the court must then reach a view on the material provided to it.

118.   Whilst reference to a *'good arguable case'* may in some cases be a helpful criterion, in our judgment the task is ultimately an evaluative one.  The court must decide, on the basis of the material before it, whether the likelihood of the general partner having failed or refused to institute proceedings without cause is sufficient to lead the court to conclude that a derivative action should be permitted in the interests of justice.  In reaching this evaluative conclusion, the court will no doubt have regard, inter alia, to the strength of the evidence that the general partner has failed or refused to institute proceedings without cause, the strength of the underlying claim which is sought to be brought and the likelihood and nature of any injustice if the derivative claim is not permitted.

119.   For these reasons, we respectfully disagree with the judge that, because this was a strike out application, the burden was on the defendants and he only had to consider whether it was merely arguable that the plaintiffs met the statutory criterion in section 33(3).  That was to set the bar too low.  It follows that, as Mr. Chapman submitted, he erred in this respect.

120.   However, we have before us the same affidavit evidence that was before the judge and accordingly we propose to reach our own decision, applying the approach we have just described.

**Timing**

121.   As occurred in this case, and as will invariably be the position, given that there is no requirement for leave before commencing an action in reliance on section 33(3), the hearing of a strike-out application or a preliminary issue as to whether the claim falls within section 33(3) will take place at some point after the action is begun.  The question then arises as to whether the court should assess compliance with section 33(3) by reference to the facts at the time of commencement of the action or as at the date of the hearing of the strike out or preliminary issue.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

122.    The judge held at [127] and [128] that the question of whether the general partner had failed or refused to bring a claim without cause was to be judged on the relevant facts as they were at the time the proceedings were commenced.

123.    The plaintiffs support the judge's decision. They point out that the words '*failed or refused*' in section 33(3) are in the past tense, which suggests that the relevant failure or refusal must have taken place before the date of institution of the derivative claim.

124.    We do not agree with the judge's decision on this point, essentially for the reasons advanced by Mr Chapman. The plaintiffs' approach would require the court to ignore anything that has happened between the institution of the proceedings and the hearing of the relevant strike out application/preliminary issue. This could lead to highly unsatisfactory results. Thus, suppose that, after the institution of the proceedings, a new general partner was appointed with completely separate ownership, so there was no longer any question of an inhibition or conflict of interest. Suppose further that the new general partner has reviewed the alleged claim and decided in good faith on commercial grounds to maintain the decision of the former general partner not to institute proceedings against the alleged wrongdoer.

125.    In our judgment, the legislature cannot have intended that the court should allow a derivative claim to proceed in circumstances where, as at the date of the hearing of the strike out or preliminary issue, the requirements of section 33(3) are not met because, for example, any inhibition of the general partner has disappeared. In our judgment, the natural meaning of section 33(3) is that the court should consider the issue of whether the requirements of the subsection are met by reference to the facts as they are at the time of the hearing of the strike out or preliminary issue. Mr Allison submitted that the court could surmount any difficulty which his construction of section 33(3) might cause by taking any change of circumstances into account when considering whether to exercise its discretion to allow the derivative claim to proceed. However, we do not see that as a satisfactory solution, nor is it in our view consistent with the natural meaning of section 33(3).

126.    Whilst by no means determinative – because the legislation is not the same – we note that in England and Wales, in the context of derivative actions for companies, the court does take into account events which have occurred between the institution of the proceedings and the hearing before the court as to whether the derivative action should be allowed to proceed; see for example the decision of Newey J in *Kleanthous v Phaphitis [2011] EWHC 2287 (Ch)* where the judge placed great weight on the fact that, since the institution of the proceedings, the company had appointed a special committee of independent directors, who had decided that the

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

company should not bring or continue the claim which the plaintiff was seeking to bring derivatively.

127.     In our judgment therefore, a judge hearing a strike out application or preliminary issue in relation to an ELP should consider whether the test in section 33(3) is met by reference to the facts as they appear at the time of the relevant hearing.

**Pleading**

128.     In relation to the derivative claim against D1, [25] of the ASOC pleads:

> *"In the alternative, if and to the extent that the claims set out in this Statement of Claim (or any of them) are properly regarded as and/or must be brought as derivative claims on behalf of TPF, the Plaintiffs will contend that Port Link has without cause failed to initiate proceedings on behalf of TPF against itself (and there is no real prospect of it doing so) such that the requirements of section 33(3) of the Exempted Limited Partnership Act (2020 Revision) (the "ELP Act") are satisfied, such that the Plaintiffs should be permitted to prosecute the relevant claims on behalf of and in the name of TPF."*

129.     In relation to the derivative claims against D2, D3 and D4, para 25B of the ASOC pleads:

> *"The balance of the claims against Mr Williams and Wellspring and the claim against KGLI Asia are brought by the Plaintiffs as derivative claims on behalf of TPF in circumstances where Port Link has without cause failed to initiate proceedings on behalf of TPF against those parties and there is no real prospect of it doing so.  Not only did Port Link fail to commence such claims; as described in paragraph 4 above, it deliberately withheld from the Limited Partners the information upon which the claims are based.  In the premises, the requirements of section 33(3) of the ELP Act are satisfied such that the Plaintiffs should be permitted to prosecute these claims on behalf of and in the name of TPF."*

130.     The judge held at [127] that [25B] of the ASOC was sufficient to enable the defendants to understand the gist of the case, which had also been factually set out in the detailed evidence filed in the strike out applications.

131.     That conclusion was criticised by Mr Chapman.  He submitted that it was necessary for a limited partner to plead the facts and matters relied upon as allowing the limited partner to bring a derivative claim pursuant to section 33(3) and that the particulars in this case were wholly inadequate to serve that purpose.  Thus, there was no pleading of the facts and matters relied upon to show that D1 as general partner was under an inhibition or suffered from a conflict of interest.

132.    Mr Allison, on the other hand, submitted that the facts and matters relied upon emerged with sufficient clarity from the detailed allegations of wrongdoing against D1 and the other defendants set out in the ASOC.

133.    In our judgment, the ASOC was inadequately pleaded in this respect.  In *Roberts v Gill* Lord Walker at [103] in relation to a derivative claim on the grounds of special circumstances concerning an estate or trust, said this:

> *"So while he need not obtain prior leave from the court, he must plead the special circumstances entitling him to the court's indulgence.  Those special circumstances are part of his cause of action."*

134.    In our judgment, the position is analogous in cases brought pursuant to section 33(3).  There is no requirement for leave but a limited partner may only bring a claim where the general partner has failed or refused to bring proceedings without cause.  The failure or refusal without cause is part of the cause of action brought by the limited partner and must therefore be pleaded.  In our judgment, it is not sufficient simply to plead the wording of section 33(3) as was done by the plaintiffs in this case.  A limited partner must plead the facts and matters relied upon as showing that he comes within the provisions of section 33(3).

135.    What is relied upon by the plaintiffs in this case is that D1 as general partner is under a clear inhibition arising from its conflict of interest.  The facts and matters relied upon as showing that this was so should therefore have been pleaded.  Accordingly, we differ from the judge's assessment that the pleading was adequate.  However, we are satisfied that no prejudice has been caused to the defendants by this failure.  As the judge correctly stated, the points of issue emerge very clearly from the evidence filed during the strike out applications and it is clear that the defendants knew the case which they had to meet.  We therefore decline to decide this case on a technical pleading point, although we emphasise, for the future, that simply pleading that a claim is brought pursuant to section 33(3) is not sufficient and that a plaintiff must plead the facts and matters relied upon as showing that he falls within the subsection.

**Need for a request to sue**

136.    It is common ground that the plaintiffs in this case did not request or demand that D1 as general partner bring proceedings against D2-D4.  Mr Chapman submits that there must be such a request before a general partner can be said to have failed or refused to bring such proceedings.  We agree that the word '*refused*' implies the existence of a request.  However, this is not so in relation to the word '*failed*'.  A general partner can be said to have '*failed*' to bring proceedings if he simply has not brought such proceedings.

137.    Whilst it will often be the case that, before instituting derivative proceedings under section 33(3), a limited partner will have requested the general partner to institute the relevant proceedings, it is not a necessary pre-condition he has done so.  In this case, it is perfectly apparent from the evidence that D1 has not brought the relevant proceedings and has no intention of doing so. As outlined earlier, it has reached a decision not to institute proceedings even following the change in the board of directors by the appointment of the FFP Directors. The requirement of section 33(3) that the general partner has failed to bring proceedings on behalf TPF has obviously been satisfied.

**Discretion**

138.    It is well established in other contexts that the court has a discretion whether or not to allow a derivative claim even where the relevant ground for the bringing of such an action (e.g. an exception to the rule in *Foss v Harbottle* in the case of companies and *'special circumstances'* in the case of trusts or limited partnerships) is met.  Although there is no reference to the existence of a discretion in section 33(3) itself, the judge considered that he had such a discretion and it was common ground before us that there is such a discretion[17].

139.    Thus, even if it be satisfied that a plaintiff can bring himself within section 33(3), the court may in its discretion decide that he should not be permitted to continue the derivative claim. One relevant factor in the exercise of this discretion is likely to be whether the plaintiff has an alternative remedy, so that a derivative action is not required in order to avoid injustice.

**Summary**

140.    Pulling the threads of the above discussion together, we would attempt to summarise our conclusions in relation to section 33(3) as follows:

(i)    There is no requirement for leave to bring derivative proceedings under section 33(3). A limited partner may simply institute such proceedings.

(ii)    A limited partner must however plead the facts and matters relied upon as showing that he can bring himself within the requirements of the subsection because this forms an essential part of his cause of action.

---

[17] D2 – D4, skeleton argument,  [80(i)]; the plaintiffs, transcript, day 2 pp12,61.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

(iii)    If a defendant wishes to raise an issue as to the standing of a limited partner to bring such derivative proceedings, he should do so by means of a strike out application or seek the trial of a preliminary issue.

(iv)    Whichever of these routes is chosen does not affect the test which has to be applied in deciding whether section 33(3) is complied with and whether a limited partner should be permitted to continue with the derivative claim.

(v)    The decision of the court on such an application or preliminary issue is determinative (subject to appeal). If the court holds that the derivative claim may be continued, the limited partner thereafter has the necessary standing to pursue the claim. It is not an issue which is deferred until or revisited at trial (save possibly in the context of costs at the end of the trial).

(vi)    The court should not conduct a mini trial as to whether the requirements of section 33(3) are satisfied. The court has to reach its decision on the basis of the material before it, which will be more limited than it will be following discovery and trial.

(vii)    At the hearing, the onus is on the limited partner to satisfy the court that the requirements of section 33(3) are met. Reference to '*onus*' is not to be mistaken as a reference to a '*burden*' in the sense of having to show something on the balance of probabilities.

(viii)    The essential task for the court at such a hearing is to determine whether the limited partner has brought himself within the terms of section 33(3), namely that the general partner has failed or refused to bring the relevant proceedings without cause.

(ix)    In determining this issue, the court is likely to be assisted by consideration of whether special circumstances (as developed in cases concerning trusts, limited partnerships and other entities) exist, but the court's task remains one of applying the statutory test set out in section 33(3).

(x)    Whilst reference to a '*good arguable case*' may be a helpful indicator of the level of comfort which the court should have when deciding whether the requirements of section 33(3) are met, the court's task is essentially an evaluative one having regard to the facts as they appear to the court at that stage of the proceedings from the material before the court and the need to avoid injustice balanced with the need to respect the fact that a derivative action is an exception to the general principle in the ELPA that

management (including decisions as to litigation) of an ELP is for the general partner, not the limited partners.  As stated at [118] above, the court should consider, inter alia, the strength of the evidence that the general partner has failed or refused to institute proceedings without cause, the strength of the underlying claim which is sought to be brought and the likelihood and nature of any injustice if the derivative claim is not permitted.

(xi)  The court should reach its decision as to standing by reference to the facts as they appear at the date of the hearing of the strike out or preliminary issue.

(xii)  Even where the requirements of section 33(3) are met, the court has a discretion as to whether to permit a derivative claim to continue. One of the factors which is likely to be relevant in exercising that discretion is whether the plaintiff has an alternative remedy.

**Application to the facts**

(a)  <u>The claim against D1</u>

141.  It is to be recalled that, as described at [75] above, a derivative action allows a party to bring a claim in the name of and on behalf of a second party against a third party for loss and damage caused to the second party.  It follows that the second party must have a claim against the third party before the first party can be permitted to bring such a claim derivatively.

142.  Ms Stanley submits that, regardless of whether the test in section 33(3) is otherwise met, (i.e. that D1 is subject to an inhibition which makes its decision in relation to potential proceedings one which is without cause), there is a more fundamental reason why the derivative claim against D1 should be struck out, namely that, on the judge's finding, the ELP has suffered no loss or damage and therefore has no claim of its own to bring.

143.  At [63] the judge said:

> "It follows that where an ELP is alleged to have suffered loss, as in this case, that is the loss of each of the Limited Partners.  There is no distinct or separate loss in respect of 'the partnership' (TPF), which as an entity does not exist in law."

144.  To similar effect is the decision of Cooke J in *Henderson* in relation to limited partnerships at [28] – [32].  Thus at [28] he said:

> "The Partnership, unlike a limited company, does not possess a corporate legal personality.  Like an ordinary partnership under the Partnership Act, 'the

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

-42-

Partnership', is simply a convenient way of referring to the body of partners as a whole. In my judgment therefore, no difficulty arises for a Limited Partner's claim against the General Partner, regardless of whether or not removal and substitution of the General Partner is possible. The claim to be made against the General Partner is that of the individual Limited Partners and is not a Partnership Asset. Each Limited Partner has its own contractual or fiduciary claim for its own loss, where the inter-relationship with the General Partner is governed by the [Partnership Agreement]. _The Partnership, which consists of the Limited Partners and the General Partner together has no form of joint right or claim against the General Partner, as the claimants suggest._" [Emphasis added]

145.   We are not to be taken as agreeing that this is correct. As already stated, section 16(1) of the Act provides that the general partner will hold the assets of the ELP upon trust. In the case of a trust, whilst a beneficiary undoubtedly has a direct claim against the trustee for breach of trust, the appropriate remedy (as discussed above by reference to _Target v Redferns_) is for an order that the trustee restore the trust fund to what it would have been had the breach not been committed. Such a claim may be brought by one or more beneficiaries, but a successor trustee will often bring such a claim against a former trustee for breach of trust on behalf of the trust as a whole and will hold any sums recovered from the former trustee upon the terms of the trust. Thus, even though like an ELP, a trust is not a separate legal entity, it can properly be said that the trust as well as a beneficiary has a claim against a trustee for breach of trust and that such a claim can be considered as an asset of the trust. It seems to us strongly arguable that the position is the same in relation to an ELP, particularly given that the general partner is also a trustee.

146.   However, there has been no Respondents' Notice in respect of the above finding of the judge and indeed the plaintiffs have not sought to argue that the judge was wrong in this respect. What they say is that the judge was correct in what he said at [64] where, immediately following the passage quoted above in [143] above from [63] he said:

"64.   _I therefore find that the direct claims in respect of the individual partners' losses are vested in the Limited Partners alone, and are not claims that can be brought on behalf of TPF derivatively, except in the circumstances permitted by section 33(3) of the ELPA where the Limited Partners who wish to obtain redress for TPF are in effect put in the place of the GP and bring claims on behalf of TPF_".

147.   With respect to the learned judge we cannot accept that section 33(3) permits a claim in such circumstances. The subsection pre-supposes that there is a claim to be brought by the general partner on behalf of the partnership. If, as the judge held, the partnership has no claim against the general partner, there can be no failure by the general partner to bring such a claim without cause.

148.   Even if we are wrong on this point, there is a second reason for not permitting the derivative claim against D1 as a matter of discretion; that is because the plaintiffs as limited partners have an adequate alternative remedy.

149.   As we have held earlier in this judgment, a limited partner has the right to claim against a general partner for breach of duty on the part of the general partner. In the event of such a claim succeeding, the appropriate remedy will almost certainly not be an award of equitable compensation to the particular limited partners who have sued (thereby potentially causing difficulties in relation to those who have not also joined in the action and in respect of creditors of the ELP), but instead an order that the general partner restore the trust fund as outlined in *Target v Redferns*.

150.   In these circumstances, exactly the same will be achieved by a direct claim as would be the case in a derivative action. In the event of the plaintiffs succeeding in their direct claim, the estate of the ELP will be made whole by payment from the general partner pursuant to an order for restoration of the trust fund. Success in a derivative action would have the same result. Accordingly, there is simply no need for a derivative action; it would add nothing to the direct claims brought by the limited partners coupled with an order for restoration of the trust fund in the event of such claims succeeding. Indeed, during oral argument, Mr Allison accepted that, if the plaintiffs have a valid direct claim against D1 for which restoration of the trust fund can be awarded, there would be no need for the derivative action[18]. In those circumstances, we conclude that, as a matter of discretion, the derivative claim against D1 should not be permitted.

151.   Accordingly, for both of the above reasons, we strike out the derivative claim of the plaintiffs against D1.

(b)   The claims against D2 – D4

152.   We have described the claims brought against the various defendants at [13] to [16] above. The relevant features for present purposes can be summarised as follows:

(i)      The plaintiffs invested some 65% of the total amount invested in TPF.

(ii)     Other limited partners, who invested 15.14%, have instituted broadly similar claims against D2 and D3 in the State of Georgia, USA. Thus a total of 80.3% by value of

---

[18] Transcript day 2 pp 90(22) - 92(11)

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

limited partners are litigating on the basis of alleged serious wrongdoing on the part of the GP.

(iii)     Of the remaining 19.7% (by value), 14% are associated with the GP.

(iv)     The plaintiffs allege that D1 as the general partner has been guilty of wrongdoing which has caused TPF loss said to be well in excess of US \$100m.

(v)     The claims against D1 essentially allege that, in breach of its fiduciary, contractual and other duties, it acted contrary to the interests of TPF and the limited partners by making substantial payments, using TPF's monies, that were not for the benefit of TPF and/or the limited partners. Amongst these is the alleged sham settlement of the DIFC Proceedings brought against it in the DIFCC as a result of which the Wellspring Payment of US \$59,990,461.30 was paid to D3. The ASOC alleges that D1 conspired with, amongst others, D2 (Mr Williams) and D3 (Wellspring) to cause loss to TPF and/or the limited partners by unlawful means in relation to the DIFC Proceedings and the Wellspring Payment.

(vi)     The claims against D2 are that he orchestrated the DIFC Proceedings and the Wellspring Payment and was accordingly party to the above conspiracy. It is further alleged that he dishonestly assisted in D1's breach of trust/fiduciary duty, knowingly procured D1 to breach its contractual duties and was in breach of fiduciary duties he owed to TPF and/or D1.

(vii)     The claims against D3 are for knowing receipt of the Wellspring Payment, conspiracy in relation to the Wellspring Payment and the DIFC Proceedings and for repayment of the Wellspring Payment pursuant to Section 4 of the Fraudulent Dispositions Act (1996 Revision).

(viii)     The claim against D4 is for knowing receipt in respect of a number of payments said to have been made to it in breach of trust and/or fiduciary duty by D1 as general partner.

153.     The judge held at [106] that section 33(3) required a finding as to whether the GP (i.e. the relevant corporate entity) has failed or refused to institute the proceedings without cause, not the directors at the relevant time. He concluded at [102] that there was a good arguable case that D1 had and still has a relevant inhibition because it is conflicted in relation to the plaintiffs' claims. Its decision not to bring the claims against D2 – D4 was infected and made unsafe by the facts giving rise to its conflict of interest.

154.    The underlying facts in relation to the inhibition were not disputed before us and would appear
to be as follows:

(i)     Mr Williams, D2, is the sole shareholder of PLH, a Delaware company, which in turn
is the sole shareholder of D1.  Thus Mr Williams is the sole ultimate beneficial owner
of the general partner of TPF.  He was the investment director of TPF's sponsor and
placement agent from 2009 – 2011 and a member of the Investment Committee of TPF
from 2009 – 2013.

(ii)    On 23 January 2020, he was appointed as the authorised representative of D1 in relation
to proceedings against D1 by certain limited partners (including the first plaintiff)
pursuant to section 22 of the ELPA seeking disclosure of full information regarding the
state of the business and financial condition of TPF. The resolution conferred full
authority on Mr. Williams to take all necessary actions in relation to the section 22
proceedings.  The application of the limited partners under section 22 was opposed by
D1 at a time when the FFP Directors were in post and eventually Parker J ruled against
D1 and ordered it to make disclosure.  Thereafter, D1 sought to appeal that decision
but the appeal was eventually compromised and D1 agreed to provide the necessary
information.

(iii)   Mr Williams is the CEO, CFO, President, Vice-President, Treasurer and Secretary of
D3, Wellspring.  The company is owned by the Mark E Williams Living Trust, of
which Mr Williams, his wife and brother are the trustees.  The ASOC pleads that it is
to be inferred that the beneficiaries are also Mr Williams' family.

(iv)    D4, KGLI Asia is a company incorporated in the Cayman Islands and Mr Williams was
its CEO from 1 January 2012.

155.    As can be seen therefore, Mr Williams is the ultimate beneficial owner of the GP and has very
close connections with Wellspring and KGLI Asia.

156.    In considering whether D1 as the general partner would be under an inhibition in relation to the
taking of proceedings against D2 – D4, it is useful to refer to the case of *Henderson*.  The facts
of that case are summarised at [83] to [84] above.  Certain limited partners of an English limited
partnership sought to bring a derivative action against, inter alia, the manager, who had been
appointed by the general partner and was a sister company of the general partner.

157.    Cooke J held at [59] that as a result the general partner had an irreconcilable conflict of interest in relation to whether to institute proceedings against the manager and this constituted *'special circumstances'* which therefore justified the limited partners being able to bring a derivative claim.  In coming to that conclusion, he held that (i) the ability (which was not straightforward) under the limited partnership agreement for the limited partners to remove and replace the general partner and (ii) the ability of the limited partners to sue the general partner for wrongly failing to institute proceedings against the manager, were not satisfactory alternative remedies so as to refuse the limited partners the ability to bring a derivative claim.

158.    We respectfully agree with the decision of Cooke J in *Henderson*.  In our judgment there is a similar conflict of interest in the present case.  On the plaintiffs' case, D1 as the general partner was deeply involved in all the alleged wrongdoing as was Mr Williams.  D1 has to decide whether to institute proceedings against D2 – D4 in circumstances where:

(i)     The essential wrongdoing giving rise to the claims against D2 – D4 was that of D1 itself in making the various payments and where it is said to be part of the unlawful means conspiracy to injure TPF involving Mr Williams and Wellspring.

(ii)    The contemplated proceedings would have to be brought against the beneficial owner of the GP and against two companies in which Mr Williams is deeply and closely involved, namely Wellspring and KGLI Asia.

(iii)   D1 would also have to consider whether (as general partner) it should sue itself (in its own right) as a co-conspirator in the alleged unlawful means conspiracy.

159.    On the face of it, by reason of the obvious and serious conflict of interest, D1 is under an inhibition which would amount to special circumstances in the context of a trust or limited partnership and this inhibition also means that the failure by D1 to bring proceedings against D2 – D4 is without cause for the purposes of section 33(3).

160.    However, the defendants say that this is not the position for two associated reasons.  First, they point out that the present directors of D1, namely the FFP Directors, are wholly independent and were not in office at the time of the alleged wrongdoing on the part of D1.  They do not therefore suffer from any conflict of interest.  They are in a position to bring an independent and impartial view to bear on whether claims should be brought against D2 – D4 and in this respect are in the same position as a liquidator of a company, who has to decide whether to bring a claim against former directors or other parties for injury caused to a company.  The defendants point out that, as summarised in the third affidavit of Mr Lewis, the FFP Directors

have reviewed the position thoroughly with the benefit of legal advice and have concluded that the interests of TPF are best served by not instituting any claims against D2 – D4 for the reasons there set out.

161.   It is clear, submit the defendants, that the court must give great weight to the commercial judgment of those who have responsibility for the management of the relevant entity under the constitutive documents; see for example the observation of the Lewison J in *Iesini* quoted at [77] above.

162.   Secondly, they submit that the independence of the FFP Directors is fortified by the fact that Mr Williams has given an undertaking that the shareholder of the GP will not exercise any powers so as to remove the FFP Directors or interfere in any way in the exercise of their functions.  Thus, submit the defendants, the FFP Directors are, and are seen to be, free to act independently.

163.   In our judgment, these submissions do not overcome the inhibition referred to earlier.  In relation to the first point, the judge was in our view correct to focus on the entity which is the general partner rather than the directors for the time being of that entity.  Section 33(3) refers to the 'general partner' having failed or refused to bring proceedings without cause.  The general partner is the legal entity D1.  D1 is subject to the conflicts of interest we have summarised above and thus cannot be seen to be in a position to take a fair and independent decision about the potential litigation.  New directors are not in the same position as a liquidator, who is appointed by and subject to the supervision of the court and therefore clearly is and is seen to be independent of the company, its directors and shareholders.  The FFP Directors owe a fiduciary duty to act in the best interests of D1.  The defendants submitted that because D1 owes fiduciary duties to act in the best interests of the partnership, the FFP Directors therefore have a duty to act in the best interests of TPF.  However, there is certainly the potential for conflict between acting in the best interests of TPF (which might include taking action against D1 as a co-conspirator) and acting in the best interests of D1 (which might be said to include the avoidance of being sued).

164.   In connection with the undertaking, we were referred to the case of *St. John's Trust Company (PVT) Limited v Medlands (PTC) Limited and Others* [2021] CA (Bda) 20 Civ, ("the B Trust"), a decision of the Court of Appeal of Bermuda.  That was a case which involved a number of issues but, for present purposes, it is sufficient to say that one of the issues before that court was whether it would be appropriate to reappoint St. John's Trust Company (PVT) Limited ("SJTC") as trustee of the B Trust.  SJTC was wholly owned by a company, Cabarita, which

was in turn wholly owned by a Mr T.  Mr T was said to have misappropriated funds from the B Trust and there were ongoing proceedings against him in this respect.

165.  Mr T had appointed two independent directors of SJTC and, before the Bermuda Court of Appeal, he proffered an undertaking not to interfere with the appointment of these two individuals.  Despite this, the Bermuda Court of Appeal held at [62] that it was clearly not appropriate for SJTC to be trustee.  It would be contrary to the interests of the beneficiaries for Mr T to have any control or influence over the B Trust.  This would be possible, despite his undertaking, by reason of his ownership of Cabarita which owned SJTC. The undertaking did not meet the fundamental issue of Mr T's potential influence.

166.  Mr Chapman sought to distinguish re B Trust on three grounds.  First, he pointed out that Mr Williams is only an <u>indirect</u> beneficial owner of the D1; but that was also the case in the B Trust as Mr T owned Cabarita which owned SJTC.  Secondly, he referred to the undertaking by Mr Williams not to interfere.  However, an undertaking was also given by Mr T in the B Trust and this did not persuade the Bermuda Court of Appeal that his potential influence was thereby negated.  Thirdly, he submitted that the B Trust was concerned with whether there might be interference in the future by Mr T whereas the present case was concerned with a decision (namely not to issue proceedings) which had already been taken.  However, we do not see that this is a significant point of difference.  The fact is that the decision as to whether to institute proceedings on behalf of TPF involved consideration by the GP of whether to sue itself as an alleged co-conspirator and whether to sue its beneficial owner and two closely linked companies in circumstances where the claims were said to arise on the basis of the wrongdoing of the GP and its beneficial owner.

167.  We find the reasoning of the Court of Appeal of Bermuda to be persuasive.  In our judgment, the undertaking given by Mr Williams is insufficient to overcome the inhibition from which D1 as general partner suffers.  If one stands back and considers how it would appear to the plaintiffs (who allege that there has been serious wrongdoing by D1 – D4 which has cost TPF over US $100m) for the decision as to whether to seek recompense from any one or more of D1 – D4 to be left in the hands of D1, they would have no confidence that a fair and independent decision had been taken, even following the appointment of the FFP Directors.  In our judgment, they would be justified in this lack of confidence.  There is no doubt in our view that D1 was and is suffering from an inhibition which leads to the conclusion that, subject to the exercise of any discretion, it is appropriate for the plaintiffs to bring derivative claims on behalf of TPF pursuant to section 33(3) against D2 – D4.

168.    Given our decision to uphold the judge's conclusion that it is the position of D1 as the general
        partner which must be considered in relation to any inhibition rather than the position of the
        directors from time to time, it is not necessary for us to address his finding about the position
        of the FFP Directors.  Suffice it to say that, if we had found it necessary to do so, we would
        have considered that the judge was entitled to reach the conclusions which he did in this respect.

169.    As to discretion, the defendants submit that, because the plaintiffs are bringing direct claims
        against D2 and D3, they have an alternative remedy in respect of those two defendants and
        there is no need for them to bring a derivative action.  They point out that they have not sought
        to strike out the direct claims against D2 and D3.  That is so, but it is of note that footnote 10
        to [15] of the skeleton argument of D2 – D4 states:

>       *"For the avoidance of doubt, [D2 – D4] do not admit that the Respondents, in
>       particular KPA, have standing to bring the direct claims, and expressly reserve
>       the right to challenge the Respondents' standing to bring such claims, including
>       on the basis of a lack of authority in the case of KPA."*

170.    As stated at [67] above, Ms Stanley asserted in oral argument that the only way to get the
        proceeds of any successful claim against D2 and D3 into TPF is by way of a derivative claim.
        Furthermore, despite the defendants' explanation, submitted in response to the draft of this
        judgment, that footnote 10 was only intended to cover the KPA lack of authority point and the
        partnership accounting point, the fact remains that the footnote expressly reserves the right to
        challenge the plaintiffs' standing to bring the direct claims in general terms and the KPA point
        is merely mentioned by way of inclusion as a ground of challenge. We bear in mind the
        overriding objective and, in our view, it would be inconsistent with that objective and highly
        undesirable to run the risk of the court eventually finding against D2 and D3 on the underlying
        merits of the claims but finding that the plaintiffs did not have standing for the direct claims or
        that it could not make an order for restoration of the trust fund in the absence of a derivative
        claim on behalf of TPF. The existence of an alternative remedy is a matter to be taken into
        account when determining whether to allow a derivative claim to proceed although its existence
        is not conclusive of the matter; see *Henderson* at [39]. In our judgment, whilst we have
        expressed certain preliminary views at [65]-[72] above, in the light of the above matters there
        is sufficient uncertainty about whether the plaintiffs have direct claims against D2 and D3 or
        whether the court could order restoration of the trust fund on the success of such claims that, as
        a matter of discretion, it is just and fair to allow the derivative claims to proceed alongside the
        direct claims so that they are all heard at the same time. If, following a trial, the direct claims
        are upheld and the court also holds that it can order restoration of the trust fund as a remedy for
        such claims, then there will be no need to make any award on the derivative claims; if on the

other hand the direct claims are found not to be maintainable or restoration of the trust fund cannot be ordered, the derivative claims will be necessary to provide a remedy, assuming that the underlying allegations against the defendants are upheld.

171.    We add by way of postscript, that both sides sought to raise arguments based on the position of the Cayman Islands as a leading centre for the establishment of investment funds.  Thus the defendants argued that, by setting the bar for derivative actions too low, the judge had rendered it less likely that promotors of investment funds in the form of ELPs would choose the Cayman Islands as the location of their funds because of the comparatively easy exposure to derivative claims.

172.    Conversely, the plaintiffs argued that it was important for the reputation of the Cayman Islands as a centre for investment funds that persons who have invested in ELPs should have a remedy when the general partner is alleged to have been guilty of wrongdoing and that a derivative action is the only remedy in such circumstances.  It should not therefore be too difficult to bring such an action.

173.    Whilst noting these arguments, we have not decided this case by reference to the arguments' respective merits, which are more matters for the legislature.  We have confined ourselves to construing section 33(3) in the light of the words used against the background of the law on derivative claims generally.

**Summary of conclusions reached on the derivative claims**

174.    In respect of D1, for the reasons which we have given above, we allow the appeal to the extent of striking out the plaintiffs' derivative claims against it.

175.    In relation to the derivative claims against D2 – D4, we dismiss the appeals brought by these defendants, with the consequence that the plaintiffs may bring those claims under section 33(3).

**The SFC Appeal**

176.    At the hearing below, the GP (D1) applied for security of costs ("SFC") in the sum of USD 5,536,025.50 and the sum sought by D2 – D4 was USD 2,720,000. It is and was common ground that the plaintiffs are both Kuwait state-owned enterprises ordinarily resident out of the jurisdiction and accordingly the judge had jurisdiction to exercise the discretion conferred on the court by GCR O.23 r.1(1), which reads in relevant part:

> "*Where on the application of a defendant to an action or other proceedings it appears to the Court – (a) that the plaintiff is ordinarily resident out of the*

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> *jurisdiction; ... then, if having regard to all the circumstances of the case, the Court thinks that it just to do so, it may order the plaintiff to give such security for the defendant's costs of the action or other proceedings as it thinks just."*

177.    Briefly summarised the defendants' case was that there were substantial obstacles to the enforcement in Kuwait of an adverse costs order since there was no treaty between Kuwait and the Cayman Islands for the mutual enforcement of judgments and as a matter of Kuwaiti law even a judgment of the Kuwaiti courts was incapable of enforcement against the plaintiffs because they were state entities.

178.    In dismissing the SFC applications, the judge began by setting out the legal principles he found to be applicable. He then analysed the principles and applied them to the case before him and then proceeded to give the reasons for his decision. The key elements of this part of his judgment can be summarised as follows:

<u>The applicable principles</u>

179.    (i)    There is no presumption that the court will ordinarily require a foreign plaintiff to give SFC; rather the discretion "is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case"; (see *Re Cybervest Fund* [2006 CILR 80], per Smellie CJ at [23]). [149]

(ii)    The court should follow the guidance on the interpretation of O. 23 r.1(1) provided by the following passage in the judgment of Smellie CJ in *Tasarruf Mevduati Sigorta Fonu v Wisteria Bay Limited [2006 CILR 351 at [14]]:* [150].

> *"There is no hard and fast rule that every foreign plaintiff must be required to put up security. The matter is one, as already stated, of discretion to be exercised in every case. All the circumstances will be considered including the means and ability of the plaintiff to pay and even, in an appropriate case the relative strength or weakness of the case for each side provided those factors are clearly discernible from the evidence. See, for these propositions, the leading case of Sir Lindsay Parkinson & Co Ltd v Triplan.."*

(iii)    The court's discretion must be exercised impartially and must not be exercised discriminately; see eg *Ahab v Saad* [2017 (2) CILR 602 at [21]. [151]

(iv)    The merits of the case will only be relevant if: (i) either party can clearly demonstrate a strong probability of success or (ii) the Court is considering a summary judgment application at the same time. [152].

Analysis and application of the principles to this case

(v)  In this case, the merits could not be properly determined at this stage. [153]

(vi)  The issue to be decided was whether the defendants had shown there are objectively justified grounds for concluding that there are obstacles or burdens to the enforcement of a costs order against the plaintiffs, such that there is a real risk of non-enforcement and whether, if there are such real risks, it is just in the circumstances to order security and if so, on what terms. [154]. (This proposition, like principle (iii) above, is based on *Ahab v Saad* [2017(2) CILR 602] where Smellie CJ stated at [15]-[16]

> "*the focal concern of the modern case law [on security for costs] is not to ensure that a plaintiff is seldom required to provide security or that orders for security are only exceptionally made but to ensure that such orders are not imposed in an arbitrary or discriminatory manner. Accordingly, the making of such orders against a non-resident plaintiff would be appropriate, and may now be justified, not simply on the discriminatory basis of the plaintiff's foreign status but because real risks of unenforceability are shown "on objectively justified grounds" to exist: per Gloster, L.J. in her dictum cited above from Bestfort (1), applying the dictum of Mance, L.J. from Nasser (7). This approach dictated by the modern cases is aimed at addressing not only basic tenets of fairness but more particularly, the requirements of the Constitutional Bill of Rights where, in s.16, it is mandated that "government shall not treat any person in a discriminatory manner in respect of the rights under this Part of the Constitution"—the most directly operative here being that right to a fair and public trial guaranteed by s.7 which states that "Everyone has the right to a fair and public hearing in the determination of his or her legal rights and obligations by an independent and impartial court within a reasonable time.")*

(vii)  Where the plaintiff is a foreign government or state agency, there is a presumption that SFC should not be awarded, although each case will turn on its own facts. The presumption arises from comity and common sense and may be displaced by the evidence; see *Tasarruf* at [22].[156].

(viii)  As Smellie CJ observed in *Tasarruf,* the only modern reported case in  which SFC had been ordered against a foreign government was *Sierra Leone Govt. v Davenport* [2003] EWHC 1913 (Ch) where the circumstances were exceptional in that Sierra Leone had recently emerged from a civil war. [157].

(ix)  PIFSS (the second plaintiff) was the subject of the SFC application determined in *Cybervest* where PIFSS was petitioning as a shareholder for the winding up of a Cayman incorporated investment fund. In giving judgment in this case, Smellie CJ noted that PIFSS

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

had "immensely valuable assets to be regarded as being within the jurisdiction" and so if
PIFSS failed to pay an order for costs it would be open to the applicant to seek recourse.
The SFC application was dismissed on the grounds that: (a) PIFSS's very valuable
shareholding in the fund was to be treated as assets within the jurisdiction; and (b) PIFSS
was *"a state agency of a foreign government of undoubted resources and enjoying a high
reputation in the global financial and commercial community'' [that was] relevant insofar
as it would tend to negate any concern the plaintiff would be likely to obey an order for
costs made in favour of the respondent."*

(x)   Security will not be required of a foreign plaintiff who has substantial assets within the
jurisdiction; see *Cybervest* at [25]. [160].

(xi)   Where any liability for costs on the plaintiffs' part will inevitably be joint and several,
security will not be required if at least one plaintiff has substantial assets within the
jurisdiction. [160].

(xii)   A foreign plaintiff does not have the burden of establishing that it has fixed and permanent
property within the jurisdiction. [161]. See the following extract from the judgment of
Lightman J in *Oded Moshe Leyvand v Amnon Barasch & Ors* [2000] WL 191256 at [6]:

> *"The commonsense principle applies that the existence of assets within the
> jurisdiction, their fixity and performance, are among a number of
> potentially relevant factors, their importance depending on the particular
> facts of the case. The Court will not infer the existence of a real risk that
> assets within this country will be dissipated or shipped abroad to avoid
> their being available to satisfy a judgement for costs unless there is a
> reason to question the probity of the claimant: there is no such reason in
> this case. If there is a reason to question the claimant's probity, the
> character of his property within the jurisdiction is relevant in assessing the
> risk: the risk may be greater if the property is cash or immediately
> realisable or transportable, and less if fixed and permanent".*

(xiii)   Undertakings given by a plaintiff that it will not raise any of the potential defences in their
home jurisdiction should an award of costs be made against it would be very persuasive
evidence in any court in the plaintiff's home jurisdiction [162]. See Sanderson Ag. J in
*Elliott v Cayman Islands Health Service* Authority [2007 CILR 163] at [18].

<u>The judge's reasons why, on the application of the foregoing principles, the SFC application
would be refused.</u>

(xiv)   The plaintiffs are both wholly owned by, and are the agents of, the State of Kuwait. There
is therefore on the decided cases a rebuttable presumption that security for costs should

not be ordered (see *Tasarruf* at [23]). This presumption has not been rebutted on the evidence adduced. The plaintiffs appeared to have ready access to funds and would be able to satisfy any adverse costs order in a timely manner. [164] – [166].

(xv)  KPA is an internationally recognised commercial organisation and relies on its international reputation to do business. Its profit for the financial year 2020 – 2021 was KWD 56,450,000 (about USD 187,522,553 based on the exchange rate on 9 August 2021).The Director General of KPA has confirmed that it has sufficient resources to meet any costs order made against it in these proceedings, and will comply with any such costs orders in a timely fashion, a position that has been reconfirmed by the Kuwaiti Department for Legal Advice and Legislation ("DLAL"). In addition, KPA has provided a written undertaking to this effect to the Court on 27 May 2021. [167] – [169].

(xvi)  PIFSS is a public institution which administers Kuwait's pension fund for all Kuwaiti citizens in the workforce, both in public and private sectors. It operates independently from the State of Kuwait and has its own budget and board of directors. It has a global investment asset portfolio worth approximately USD 133.7 billion (as at 31 March 2021). Its profit for the period March 2020 to December was USD 18.9 billion. An officer in PIFSS's Compliance and Government Department had confirmed that PIFSS had sufficient resources to meet any costs order made in these proceedings and will comply with any such orders in a timely fashion. PIFSS has provided a written undertaking to this effect to the Court. In addition, PIFSS has been party to several sets of proceedings before the Cayman Islands Courts and has never failed to comply with any costs order. [170] - [172].

(xvii)  It would be clearly detrimental to PIFSS's ongoing commercial reputation and business to be in breach of an order of the Cayman Islands Courts.[173].

(xviii)  Accordingly, after a careful consideration of the evidence, the presumption against ordering security against agents of a foreign state has not been rebutted. Accordingly, it would not be just to grant the SFC applications against the plaintiffs. [174].

(xix)  It is well established that security will not be ordered against a foreign plaintiff who has substantial assets within the jurisdiction (see *Cybervest*) and PIFSS is such a plaintiff by reason of its interest valued at EUR 35,074,942 as a 31 March 2021 in the Jermyn Street Commercial Real Estate Fund ("the Jermyn Street Fund"), of which PIFSS is a limited partner. [175] – [176].

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

(xx)    There is no reason to doubt the probity of PIFSS, which is an agent of the State of Kuwait and familiar with conducting international litigation (including in the Cayman Islands). [177].

(xxi)   There is no reason to conclude that PIFSS's interest in the Jermyn Street Fund is encumbered, or not amenable to enforcement if necessary, and no reason to conclude that PIFSS would dispose of or otherwise encumber its interest to attempt to defeat an order as to costs. [177].

(xxii)  Accordingly, since PIFSS has sufficient assets within the jurisdiction to cover any costs order that is made against the plaintiffs (in respect of which they would be jointly and severally liable), and in circumstances where both plaintiffs have given written undertakings to the court, it would not be just to require the plaintiffs to pay security for costs (even if they were not agents of the State of Kuwait). [178].

(xxiii) In light of the correspondence between Campbells (for D2-D4) and Ogier (for the plaintiffs) there was no basis to form the view that PIFSS would seek to frustrate the enforcement of a cost order against it by disposing of its interest in the Jermyn Street Fund, even if it were able to do so. [179].

(xxiv)  The enforceability of Cayman Islands judgments in Kuwait does not therefore arise for determination. [189].

<u>The case advanced by the GP (D1)</u>

180.    (i)     By reason of the errors made by the judge in reaching his decision to refuse to order SFC, his decision should be set aside and the SFC summons remitted to another judge of the Grand Court or alternatively the judge himself.

        (ii)    Although the discretion under GCR O.23, r.1(a) is at large, it can only be properly exercised when **all** of the circumstances are taken into account, and this the judge failed to do because he did not consider the obstacles of enforcement in Kuwait. Instead, he appears to have been satisfied that the plaintiffs could and would pay adverse costs order without question and the defendants had not proved otherwise.

        (iii)   The judge erred in principle in proceeding on the basis that there was a presumption that a foreign government or state agency will not be ordered to provide security for costs unless the applicant "rebuts" the presumption. The authorities the judge relied for the presumption -- *Cyberfest* and *Tasarruf* -- laid down no such principle. Instead, Smellie

CJ in the former case decided it on the basis that the Court had a wide discretion which fell to be exercised on a case-by-case basis and in the latter case, Smellie CJ highlighted that it was all a matter of discretion taking into account all the circumstances. The true ratio was that the Court does not apply the rules for SFC differently depending on whether the plaintiff is a state or an individual but on the basis that all plaintiffs who seek to engage the Court's jurisdiction must play by the same rules. This, after all, is the position in England (see *Sierra Leone (Govt) v Davenport* [2003] EWHC 1913 (Ch) ) and in Australia (see eg *Papua New Guinea v Sandline* [1998] QDC 298 (per Andrews J) and *Ministry of Foreign Affairs of the Republic of Italy v Simeone* [2016] QDC 160.

(iv) Where there is joint and several liability between plaintiffs for costs and one of them is in the jurisdiction, it is the practice not to make a SFC order against the plaintiff who is resident outside the jurisdiction if it is inevitably to be inferred by the Court that there will be joint liability for costs between the plaintiffs. Assuming that this practice can apply to a situation where both plaintiffs are outside the jurisdiction but one has substantial assets within the jurisdiction, D1 submits that there were no sufficient grounds for the judge to have concluded that the plaintiffs would be jointly and severally liable for the costs. Indeed, D1 pleads a defence against KPA that it commenced and carried on its claims against them without due authority, and ratification of these acts is not possible under Kuwaiti law.

(v) The judge erred in taking into account the confirmation from the Director General of KPA, Mr Al-Sabah, which was related to Mr Florent, who in turn related it in paragraph 18 of his Third Affidavit, that KPA had sufficient resources to meet a costs order made against it in these proceedings, and would comply with any such costs order in a timely fashion. Mr Florent's Third Affidavit was sworn on 27 August 2021 but Mr Al Sabah had been suspended from the position of Director General of KPA by the Minister of Commerce and Industry on 24 October 2021 pending investigations of "violations" attributed to him. The expert evidence before the judge was that during his suspension, Mr Al-Sabah was not authorised to represent KPA in any capacity or exercise any powers on behalf of KPA.

(vi) The judge erred in treating the letters he called "undertakings" to pay an adverse costs order as if they were indeed "undertakings" when they were merely "comfort letters" since they contained the words, ***"Without prejudice to the exercise of KPA's legal rights"*** and stated ***"we confirm** that KPA will comply with any final and binding costs orders …"** Even if the letters had contained express undertakings on behalf of the plaintiffs to pay an adverse costs order the judge should have considered whether there remained a significant

risk that such a costs order would not be paid and  gone on to find that there was such a risk because the undertaking could only be enforced by committal or sequestration proceedings in the jurisdiction and such an order would not be enforceable in any other court. Nor was it clear that the comfort letters would be enforced by the Courts of Kuwait.

(vii)  The judge erred in placing reliance on the evidence given in Mr Florent's third affidavit to the effect that PIFSS had never failed to comply with any costs order made in proceedings before the courts of the Cayman Islands when there was no evidence that any adverse costs order had ever been made against PIFSS in any Cayman Island proceedings. What the judge should have done was to require production of examples of Cayman Islands costs orders that had been honoured by PIFSS.

(viii)  The judge made the following errors in giving the weight he did to PIFSS's assets within the jurisdiction:

(a)  He stated that the plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction when that burden in fact lay upon the plaintiffs and he should have taken note of the fact that PIFSS's interest in the Jermyn Street Fund was not of a fixed or permanent nature but was in the nature of a receivable in the event that a distribution were to be made and/or the Fund were wound up.

(b)  He was wrong to consider whether there was any reason to doubt the probity of PIFSS when the question to be considered was whether there was a real risk that the assets in the jurisdiction may not be available if and when a case of enforcement arises; see Butcher J in PJSC *Tatneft v Bogolybov* [Costs LR 977 at [49]] and Henshaw J in *Pisante v Logothetis* [2020] EWHC 3332 (Comm) at [65]-[66].

*Discussion and decision*

181.  We deal first with D1's submission that the judge erred in proceeding on the basis there was a presumption that a foreign government or state agency will not be ordered to provide security for costs unless the applicant "rebuts" the presumption.

182.  The principal authority relied on by the judge for the aforesaid presumption was *Tasarruf*. Here, as related in [2] and [3] of Smellie CJ's judgment in that case, the plaintiff was a Turkish state entity authorised by statute to recover deficiencies in the accounts of insolvent banks by, among

other things, the seizure and sale of the assets of their managers, shareholders or auditors. This authorisation was given as part of a regulatory scheme to protect depositors against bank failure. In March 2004, the plaintiff seized in Turkish waters two motor yachts registered in the Cayman Islands Shipping Registry in the names of the corporate defendants. These yachts were said to belong to the controlling shareholders of a leading Turkish bank now in the administration of the plaintiff. In December 2004, the plaintiff brought an action in the Grand Court to prevent the completion of registration of mortgages for amounts in excess of their total value, granted against each vessel in favour of the third defendant in person.

183.    On the question whether the plaintiff should be ordered to provide SFC, in *Tasarruf* the Chief Justice said that the fundamental question was whether an agency of a friendly foreign state, enjoying good standing in the international community and which has invoked the jurisdiction of this court, should be required to put up security for a defendant's costs of the action [14]. In earlier times there had been a practice that a foreign plaintiff should be ordered to provide SFC[19] but given the changes to the Rules since then and the discretionary nature of the exercise requiring the court to consider all the circumstances, a modern and different approach where the plaintiff is a foreign state, was discernible from the judgments in *Banco Economico S.A. v Allied Leasing & Fin. Corp* [1998 CILR 102] and *Ministère de la Culture &c. de France* v. *Lieb* [1981] 1 WLUK 253 at [16] – [18]. This modern principle was *"that where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government) it should be assumed as a matter of comity and common sense, in the absence of anything to the contrary, that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances".* [22]

184.    In *Banco Economico S.A. v Allied Leasing & Fin. Corp.* the plaintiff, a Brazilian bank, itself in liquidation and under the control of a liquidator appointed by the Brazilian Government, petitioned for the winding up of the respondent. Mr Justice Smellie (as he then was) was of the prima facie view that there was merit in the petition [p. 112] and he concluded:

> *"that the proper balance is struck when account is taken of the consideration that the petitioner is now under the control of a liquidator who is appointed by the Brazilian Government. Even in the ordinary case, the fact of insolvency will not by itself dictate an order for security. When the entity is a large bank, as the petitioner is, any such presumption becomes even less appropriate as grounds*

---

[19] See e.g. *Costa Rica (Republic) v Erlanger* (1876) 3 Ch D 62

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> *for ordering security for costs: see Dartmouth Harbour Commrs. v. Mayor of Dartmouth Hardness (3) and the notes in 1 The Supreme Court Practice 1997, para. 23/1–3/13, at 412. Although Ms. Collins (who argued the aspect of the matter for the petitioner) had no instructions to give an undertaking as to costs, I have nothing at all before me to support any suggestion that the Brazilian Government would not ensure that its obligations for costs (to be incurred if its appointed officer proves unsuccessful before this court) would not be honoured. In the interest of comity, I would consider that any presumptions would arise in favour of such obligations being met and not the other way around. The rule in the Dartmouth Harbour Commrs. case applies, a fortiori, to the present circumstances".*

185. As related in [179 (ix)] above, *Cybervest* concerned a petition to wind up a fund incorporated in the Cayman Islands presented by PIFSS which faced a SFC application. In [22]-[23] of his judgment Smellie CJ said:

> *"The wording of [O.23, r.1 (1)] plainly reveals the wide discretion to be exercised in the making of an order. The wording does not admit any judicial policy that would mandate the making of an order simply because the plaintiff is a foreign plaintiff; the requirement that the plaintiff is ordinarily resident outside the jurisdiction is simply a pre-condition to the making of an order under the particular O.23, r. 1(1) (a). It is a precondition just like those stipulated in (b) – (a), the other sub-rules, which are aimed at plaintiffs who may not ordinarily reside out of the jurisdiction. ... I would simply add that discretion is to be exercised on a case-by-case basis, as the rule states, having regard to all the circumstances of the case."*

186. After noting the significant fact that PIFSS had immensely valuable assets (its shares in the fund PIFSS was seeking to have wound up) that were to be regarded as being within the jurisdiction, Smellie CJ went on to say,

> *"Another circumstance, of some weight, is the fact that the petitioner is a state agency of a foreign government of undoubted resources and enjoying a high reputation in the global financial and commercial community. This is relevant insofar as it would tend to negate any concern that the plaintiff would be unlikely to obey an order for costs made in favour of the respondent. To my mind, it also addresses the concern raised by Mr. Farrow, that efforts to enforce an order in Kuwait, if it ever came to that, could be met with a plea of state immunity".*

187. The judge supported his statement in [165] of his judgment that there was a rebuttable presumption that SFC should not be ordered by reason of the plaintiffs being the agent of, and wholly owned by, the State of Kuwait by footnote 87 which reads "*Tasarruf at §23*". However, it is clear that the paragraph of the judgment in *Tasarruf* to which the judge intended to refer was [22] which reads:

> *"Taken together, there is a common practical principle to be discerned from these last cited three cases which is that where the plaintiff is the government (or a state agency) of a foreign state enjoying good standing in the international*

> *community (in particular from this court's point of view, enjoying diplomatic relations with H.M. Government)* **it should be assumed** *as a matter of comity and common sense,* **in the absence of anything to the contrary,** *that it will honour its obligations for costs made against it. Nonetheless, as the question remains one to be decided on a case by case basis in the discretion of the court, an order for security for costs could undoubtedly be made against a foreign state in appropriate circumstances."* [ Emphasis supplied]

188.    It was no doubt in light of the emphasised words in this passage that the judge expressed himself as he did in [165] of his judgment. In our view, with respect to the judge, the Chief Justice is not to be taken here as laying down a principle based on a presumption that was to prevail unless it was rebutted. We say this having regard to the words used in the following sentence in the quoted passage that stress that the court is exercising a broad discretion on a case-by-case basis. It follows, in our opinion, that the judge erred in law in proceeding as he did on the basis that there was a presumption arising from comity and common sense that security for costs should not be awarded against the plaintiffs, although each case will be decided on its own facts.

189.    In our opinion, the approach of the court when dealing with an SFC application against a foreign state or foreign state agency that enjoys good standing in the international community should be that it can treat this as a factor in favour of such of a plaintiff to go into the scales but on the basis that it is just one amongst all the other factors that must be weighed by the court when exercising the discretion conferred upon it.

190.    We also accept Ms Stanley's submission that the judge erred in stating that a foreign plaintiff does not have the burden of establishing that it has fixed and permanent property within the jurisdiction. The judge supported this statement by citing Lightman J's dictum in *Oded Moshe Leyvand v Amnon Barasch et al* [2000] WL 191256 that the court will not infer a real risk that assets within the jurisdiction will be dissipated or moved abroad in the absence of a question over the plaintiff's probity.  Whilst the judge clearly intended this statement to apply to a situation where the evidence showed that a foreign plaintiff had property within the jurisdiction but there was nothing or very little about the property's permanency or freedom from encumbrances, we find it to have been too broadly expressed. Evidence that a foreign plaintiff has valuable property within the jurisdiction will obviously be of relevance but the significance of this evidence will depend on all the facts of the case, including any evidence as to the permanency of the property and its freedom from encumbrances (or the lack of such evidence) and other evidence tending to show that the plaintiff can be trusted to honour an adverse costs order. We also respectfully disagree with Lightman J's dictum in *Oded Moshe Leyland v Amnon Barasch*. In our view, the approach adopted by Butcher J in  PJSC *Tatneft v Bogolyubov* [2019]

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

Costs LR 977 at [49] and Henshaw J in *Pisante v Logothetis* [2020] 3332 (Comm) at [65]- [66]: "the question is not whether a lack of probity has been shown, but whether there is a real risk that the assets in a Contracting State may no longer be available if and when an asset enforcement arises," is to be preferred.

191.   We turn to Ms Stanley's submission challenging the finding by the judge in [178] that, if the plaintiffs' claims against the defendants all fail, there will be a costs order in respect of which KPA and PIFSS will be jointly and severally liable, the latter having substantial assets within the jurisdiction. Ms Stanley's submission is based on the contention now pleaded in [12] of D1's Defence that KPA'S claim is a nullity because it was not authorised by the Chairman of KPA, who, as a matter of Kuwaiti law (having regard to KPA's constitution) is the only officer of KPA who can authorise the bringing of claims by the company and who has no authority to delegate this power or to ratify an earlier unauthorised issue of proceedings.

192.   D1's Defence and Counterclaim to KPA's Claim was served and filed on 31 January 2022, over three months after the hearing below. In her skeleton argument for this appeal, Ms Stanley submits that, "As recorded in the evidence [the fourth affidavit of Mr Lewis] and then set out in the GP's Defence at [12], there is a major factual dispute in this case as between KPA and the Appellants as to whether these proceedings have been commenced and continued on behalf of KPA with its authority (there being no power under Kuwaiti law to ratify proceedings if brought without authority.)"

193.   Attention was first drawn to the significance of the plaintiffs being joint and several debtors under an adverse costs order in paragraph 20 of Mr Florent's third affidavit dated 27 August 2021, where he deposed that he had alerted PIFSS to the possibility that, owing to the joint and several nature of costs orders in the Cayman Islands, it was possible that PIFSS would be required to satisfy any costs order that may be made in these proceedings in full from its own resources.

194.   In [42] – [47] of his fourth affidavit dated 17 September 2021, Mr Lewis deposed that the FFP Directors had been sent an opinion of Mr Omar Al Qahtani of the Turkey office of Al Tamimi & Co ("the Al Tamimi Opinion") stating that only the Chairman of KPA had authority to approve the issuance of proceedings by KPA and this authority was not capable of being delegated; nor could an unauthorised issuance of proceedings be ratified by the KPA's Chairman. Reference was also made to the suspension of Mr Al Sabah on 24 August 2021 from his position as Director General KPA.

195.    Curious as to how this lack of authority contention was deployed below, the Court has perused the skeleton arguments relied on before the judge and the transcript of the oral submissions advanced below by Ms Stanley for D1, Mr Chapman for D2 – D3 and Mr Allison for the plaintiffs.

196.    In [245] of his skeleton argument for the hearing below, Mr Allison contended that PIFSS had sufficient assets within the jurisdiction to cover any costs order that might be made against the plaintiffs in respect of which they would be jointly and severally liable.

197.    Mr Chapman did not contend in either his skeleton argument or his oral opening submissions that one of the consequences of the Tamimi Opinion was that it was not inevitable that if the plaintiffs' claims were dismissed they would both be jointly and severally liable for the costs of the proceedings.

198.    Ms Stanley also did not contend in her skeleton argument or in her opening or closing submissions that, in light of the Tamimi Opinion, KPA's claim was a nullity so that it could not be said that it was inevitable that if KPA's and PIFSS's respective claims were dismissed, the plaintiffs would be jointly and severally liable for the costs of the proceedings. Instead, she contended that the effect of the Tamimi Opinion was that it undermined the plaintiffs' contention that an adverse costs order would be enforceable in Kuwait and undermined KPA's reliance on assurances given by KPA's Director General, Mr Al Sabah, both before and after he was suspended from that office, that KPA would honour any costs order made against it.

199.    In his oral submissions in reply, Mr Allison observed that the defendants had not taken the point that it was only one of the plaintiffs, PIFSS, that had assets within the jurisdiction and contended that, even if it had been taken, as Mr Florent explained in paragraph 30 of his third affidavit, PIFSS was well aware of the joint and several nature of costs orders so that it may have to pay the whole sum from its own resources. Mr Allison also submitted that the "lack of authority issue" was not a live issue in the proceedings before the Court because there had been no application to strike out KPA's claim on that basis or to seek the determination of a preliminary issue.

200.    In the course of his reply submissions made ahead of Ms Stanley's reply submissions, Mr Chapman accepted that, if the plaintiffs' claims were dismissed, the likely costs order would be a joint and several one, subject to the possibility that PIFSS might well argue that joint and several liability should not apply if KPA's claim was found to have been brought without authority.

201.    Whilst Ms Stanley had expressly adopted Mr Chapman's opening oral submissions when she
made her own opening oral submissions, she did not adopt the same course when she delivered
her oral closing submissions, in the course of which she said she was going to deal just with the
Al Tamimi/authority/suspension point and the point she wished to make was not the lack of
authority to commence KPA's proceedings but the suspension of Mr Al Sabah as Director
General of KPA and the resulting loss of his authority to provide information to Mr Florent
upon which Mr Florent had purported to rely in advancing KPA's case.[20]

202.    In our judgment, since the point now taken by D1[21] as to the impact of the lack of authority
contention on what the judge said in [178] of his judgment was not taken on behalf of D1 below,
when it plainly could have been, it is not open to D1 to take the point in this appeal in support
of D1's case that the judge's decision refusing the Defendants' SFC applications should be set
aside.

203.    In our judgment, the errors of the judge identified in [188] and [190] above played such a
significant role in the exercise of his discretion (see eg [155], [165], [166] and [176]) that his
decision must be set aside.

204.    In these circumstances, it is open to us to exercise the discretion conferred by GCR O. 23, r. 1
(1) and since we have before us all the evidence and the parties' skeleton arguments that were
before the judge and the transcript of the oral submissions the judge heard on the SFC issue,
we propose to decide whether SFC should or should not be ordered against each of the plaintiffs.

205.    We proceed on the assumption that the defendants are correct in their submission that there
would be very real difficulties indeed in enforcing in Kuwait costs orders made against the
plaintiffs if their claims against the defendants are dismissed.

206.    Although it is a necessary condition for the ordering of SFC that there is a real risk that an
adverse costs order would not be enforced against the postulated foreign plaintiff in his/its home
jurisdiction, this is not a sufficient condition for ordering SFC whatever the other circumstances
of the case. Instead, it is open to the court, if there is sufficient evidence to support such a
conclusion, to find that there is no real risk that the plaintiff will not honour an adverse costs
order and for this reason to decline to order SFC. In our judgment, this is such a case having
regard to the following matters.

---

[20] Day 5, p.139
[21] See paragraph 180 (iv) above

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

207.    As is common ground, the plaintiffs are agencies of a foreign state, Kuwait, which is of good standing in the international community and enjoys diplomatic relations with HM Government. Further, as related above, an instrumentality of the State of Kuwait, the DLAL, acting by the Head of its International Arbitration and Litigation Sector, sent a formal letter to the judge on behalf not only of KPA and PIFSS but also the State of Kuwait that reads in relevant part:

> *"Dear Sirs.*
>
> *Cause No. FSD 236 of 2020 ( RPJ ) - ( 1 ) Kuwait Ports Authority and (2 ) The Public institution for Social Security v ( 1 ) Port Link GP Ltd ., (2) Mark Eric Williams, ( 3 ) Wellspring Capital Group, Inc and (4) KGL Investment Company Asia (the "Proceedings')*
>
> *I am the Head of the International Arbitration and Litigation Sector for the Department of Legal Advice and Legislation (the "Department') of the State of Kuwait.*
>
> *One of the responsibilities of the Department is to act as legal adviser to the State of Kuwait as well as to certain State entities and/or incarnations of the State. In particular, the Department currently advises and represents each of the Kuwait Ports Authority ("KPA') and The Public Institution for Social Security ("PIFSS') in connection with the Proceedings.*
>
> *I hereby confirm, on behalf of the Department, that KPA and PIFSS are wholly owned by the State of Kuwait and bring to your attention the attached letters, duly signed by authorised representatives of KPA and PIFSS confirming that they will comply with any final and binding costs orders made against them in the Proceedings ("Costs Orders').*
>
> *We respectfully request, on behalf of KPA and PIFSS [and the State of Kuwait]²² that the Grand Court take these letters into consideration in determining whether or not KPA and/or PIFSS should be required to provide security for costs in the Proceedings".*
>
> [Emphasis supplied]

208.    The letters (also addressed to the judge) that were sent with the DLAL letter on behalf of PIFSS and KPA were in common form. In relevant part, they read:

> *"Dear Sirs*
>
> *We refer to the abovementioned Proceedings before the Grand Court of the Cayman Islands, in which Kuwait Ports Authority ("KPA') [PIFSS] is a Plaintiff.*
>
> *Without prejudice to the exercise of KPA's [PIFSS's] legal rights, including without limitation its right to appeal, or to seek leave to appeal, any decision of the Grand Court, we confirm that KPA will comply with any final and binding*

---

²² The brackets do not signify that the words they contain were not part of the original letter, they were.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

> *costs order(s) made against KPA in the course of the Proceedings ("Costs Orders").*
>
> *Yours faithfully"*

209.   The KPA letter is signed by Mr Al Sabah in his capacity as KPA's Director General. The letter is dated 27 May 2021, which was at least two months before Mr Al Sabah was suspended from this office on 24 August 2021.

210.   Ms Stanley criticises the judge for placing the reliance he did on these letters. Focusing on the words, "Without prejudice to the exercise of KPA's [PIFSS's] legal rights, including without limitation to its right to appeal, or to seek leave to appeal, any decision of the Grand Court", she submits that the letters were merely "comfort letters" and further contends that the judge should have found there remained a significant risk that an adverse costs order would not be paid because the confirmation expressed in the letters could only be enforced by committal or sequestration proceedings in the jurisdiction and such an order would not be enforceable in any other court; nor was it clear that the comfort letters would be enforced by the Courts of Kuwait.

211.   We do not accept these criticisms. In our judgment the three letters amount to a representation intended to be relied on by the Grand Court that the plaintiffs would honour any final and binding costs order made against them and we regard the letters as providing strong support for the conclusion that there is no real risk that such costs orders would not be paid. We say this because we have no doubt that the State of Kuwait and its agencies, KPA and PIFSS, would suffer very significant reputational damage if the plaintiffs were to depart from the confirmations given in the letters. Also, further support for this "no real risk" conclusion comes from the evidence as to the financial resources of the plaintiffs that shows that each could be expected to have the ready funds to honour an adverse costs award.

212.   As related by the judge, the unchallenged evidence is that PIFSS, which administers independently Kuwait's pension fund for all Kuwaiti citizens in the workforce, had a global investment asset portfolio worth approximately USD 133.7 billion as at 31 March 2021 and earned a profit for the period March 2020 to December 2020 of USD 18.9 billion. Included in these assets is its investment in the Jermyn Street Fund, a Cayman Islands ELP, which was valued at EUR 35,074,942 as at 31 March 2021. It is true that PIFSS is likely to be entitled to redeem this investment under the partnership agreement and to do so without publicity but there are no reasons to think that PIFSS would set about redeeming its investment and transferring the proceeds out of the jurisdiction to avoid having to satisfy a costs order: accordingly its existence provides reassurance that PIFSS is going to have amply sufficient resources over at

least the next five to six years to meet an adverse costs order should its claims against the Defendants be dismissed.

213.    When setting out KPA's financial details that are recorded in [179 (xv)] above when relating the his reasons why the SFC applications should be dismissed, the judge was relying on the evidence given in Mr Florent's Third Affidavit which was based in part on information that had come from Mr Al Sabah. Ms Stanley submits that this evidence was and is inadmissible because it is hearsay and Mr Florent's Third Affidavit was sworn on 27 August 2021 after Mr Al Sabah was suspended on 24 August 2021. We are not impressed by this submission. Even assuming that the information from Mr Al Sabah was provided to Mr Florent after Mr Al Sabah had been suspended (which we think unlikely), Mr Al Sabah would have been in a position to provide reliable figures showing that KPA's profit for the financial year 2020 – 2021 was KWD 56,450,000, the equivalent to c.USD 187,522,553 (based on a foreign exchange currency conversion of KWD 1: USD 3.32 as at 9 August 2021). Further, Mr Florent exhibits at pp. 171 -172 of MEF-4 a public announcement made by KPA on 4 April 2021 that KPA's profit for the financial year 2020 – 2021 was KWD 56,450,000.

214.    Apart from its interest in the assets held on trust for it and TPF by the GP, KPA has no assets within the jurisdiction but it is clear to us from the level of profit earned by KPA for the year 2020 – 2021 that it is extremely likely to have ample resources to honour an adverse costs order over the next five to six years.

215.    It was argued below by the defendants that the plaintiffs could not be trusted to honour an adverse costs order on two particular grounds: the attempts by the Attorney General of Kuwait to obtain the monies that had been paid into the account held at the Noor Bank that were part of the proceeds from the sale of Clark City, TPF's asset in the Philippines; and the manner in which the defendants had conducted the proceedings, including the bringing of proceedings against Walkers, the defendants' previous attorneys, the bringing of derivative claims for proceeds that would be paid to the plaintiffs and the plaintiffs' alleged refusal to compromise the SFC issue. These contentions are not advanced by Ms Stanley. Had they been, they would have found no favour with the Court.

216.    For the reasons given in [205] – [215] above, we find that there is no real risk that the plaintiffs will not honour their confirmations that they will pay any final and binding costs order made against them and accordingly we order that the plaintiffs should not be ordered to provide security for costs.

217.    It follows that D1's appeal against the judge's refusal to order SFC must be and is dismissed.

**Summary of conclusions**

218.    We would summarise our conclusions as follows:

(i)     D1's appeal against the refusal of the judge to strike out the plaintiffs' direct claims against D1 is dismissed.

(ii)    D1's appeal against the refusal of the judge to strike out the plaintiffs' derivative claims against D1 is allowed and the claims are struck out.

(iii)   The appeals of D2, D3 and D4 against the refusal of the judge to strike out the plaintiffs' derivative claims against them are dismissed.

(iv)    The appeal of D1 against the refusal of the judge to order the plaintiffs to provide security for costs is dismissed.

219.    Our preliminary view as to costs is:

(i)     There should be no order as to costs in respect of D1's strike out appeal. Although D1 succeeded in having the derivative claim against it struck out, it did not succeed on its argument that the plaintiffs' claims were misconceived because they were not in the form of an application for partnership accounts.

(ii)    D2, D3 and D4 should pay the costs of their strike out appeals.

(iii)   D1 should pay the costs of its SFC appeal.

(iv)    The parties are at liberty to contend for different costs orders than those set out in (i) – (iii) but they must serve (concise) written submissions in support thereof within 10 days of the issuance of this judgment.

**Sir Michael Birt JA**

220.    I agree.

**Sir Jack Beatson JA**

221.    I also agree.

*CICA (Civil) Appeal Nos 2 and 3 of 2022 Kuwait Ports Authority et al -v- Port Link GP Ltd et al - Judgment*

257

**1 Ch.**        **Prudential Assurance v. Newman Industries**        **Vinelott J.**

**A** members of the class who share a common interest in obtaining the declarations I have outlined are shareholders other than the second and fourth defendants as at July 29. A person coming within that class will be entitled to rely on the declarations as res judicata, but will still have to establish damage in a separate action.

I therefore propose to allow the amendments in principle, but to invite Mr. Caplan to consider their form in the light of the judgment I have just **B** given.

> *Leave to amend the writ and statement of claim in form appearing in judgment.*
> *Leave to appeal with extension of time sine die.*

**C** Solicitors: *C. F. Whitehorn; Simmons & Simmons; Clifford-Turner.*

T. C. C. B.

————

**D**

PRUDENTIAL ASSURANCE CO. LTD. *v.*

NEWMAN INDUSTRIES LTD. AND OTHERS (No. 2) †

[1976 P. No. 112]

**E** 1979   June 14, 15, 18–22, 25–29;                 Vinelott J.
         July 2, 3, 5, 6, 9–13, 16–18, 23, 25–27;
         Oct. 2–5, 8–12, 15–17, 22–26, 29–31;
         Nov. 1, 2, 5, 6, 9, 21–23, 26–30;
         Dec. 3–7, 10–12;
     1980   Feb. 18, 19

**F** *Company—Shareholder—Rights against company or directors—Minority shareholder's action—Directors deceiving majority of shareholders into voting to acquire assets of another company—Directors having no control over voting rights—Whether minority shareholder entitled to bring action on behalf of itself, the company and other shareholders suffering damage*

**G** B was a director of N Ltd. and T.P.G. and he became the chairman of N Ltd. in 1973. L was a director of T.P.G. and he became a director of N Ltd. in 1974. They also had a wholly owned company, S Ltd., which owned 35 per cent. of T.P.G. shares. Between 1972 and 1974, T.P.G. acquired the share capital or substantial holdings in a number of companies, including a 25 per cent. holding of the issued ordinary shares of N Ltd. Where possible those acquisitions were financed by the issue of shares in T.P.G. but nearly £1,000,000 had been raised by borrowings. By the end of 1974, due partly to the **H** decline of stock market prices, an overall deficiency of collateral to cover such borrowings had arisen and the financial


EXHIBIT
14

† At the time of going to press argument was proceeding in the Court of Appeal.

Prudential Assurance v. Newman Industries (No. 2)          [1981]

A  position of T.P.G. had become desperate. As S Ltd. was not in a position to lend moneys to T.P.G., B and L conspired to use £215,950 belonging to N Ltd. to aid T.P.G. without the knowledge or authority of the board of directors of N Ltd. However the use of that money did not alleviate T.P.G.'s underlying problems.

B  B and L then embarked upon a plan by which B prepared a memorandum ("the strategy document") for consideration by the board of directors of N Ltd. which recommended, inter alia, a transaction whereby N Ltd. would acquire all the T.P.G. assets, with the exception of its shareholding in N Ltd. and an interest in a loan of £100,000 made by T.P.G. to S Ltd. The consideration for the proposed transaction was to be the assumption by N Ltd. of the liabilities of T.P.G. and a cash payment of £325,000. The strategy document contained statements known by B and L to be false and misleading. The

C  strategy document was supported by a pro forma balance sheet of T.P.G. which represented the net assets to be acquired at a value of not less than £350,000. The balance sheet was known by B and L to be false and misleading in important respects. By those means the board of directors of N Ltd., with one dissentient member, were induced by B and L to approve the transaction in principle on March 17, 1975. Shortly afterwards

D  the Stock Exchange Quotations Department was falsely informed that the board of directors had agreed to the transaction subject to obtaining an independent valuation. The valuation was prepared by a member of the firm of auditors of N Ltd. relying largely on information provided by L, but certain facts were either misrepresented or concealed from him. The initial valuation of £235,000 was increased to £325,000 following persuasion by L. B and L then procured the execution of an agreement to acquire the appropriate assets of

E  T.P.G. knowing that the board of directors of N Ltd. had not agreed to the proposed terms. A tricky and misleading circular was prepared and circulated to N Ltd.'s shareholders and at an adjourned extraordinary general meeting held on July 29, 1975, a resolution approving the transaction was agreed, after a poll, by a small majority, the T.P.G. shareholding not voting. The opposition had been led by the plaintiff, a company holding 3·2 per cent. of the ordinary shares in N Ltd.

F  The plaintiff brought an action, which after amendment to the pleadings, claimed declaratory relief and as against B, L and T.P.G. damages on behalf of the plaintiff itself, N Ltd. and all shareholders of N Ltd. on July 29, 1975, who like the plaintiff had suffered damage and were entitled to relief. The plaintiff was thus claiming in a direct capacity, in a derivative action on behalf of N Ltd., and in a representative capacity on behalf of the shareholders.

G  On the questions whether the plaintiff could bring such an action and whether they were entitled to the relief claimed: —

*Held*, (1) that B and L had conspired knowingly and wrongfully to injure N Ltd. and indirectly its shareholders, and had as a result of the conspiracy caused N Ltd. to acquire T.P.G.'s assets for £445,000 more than N Ltd. need have paid; that in consequence the shareholders had suffered damage since

H  increased indebtedness arising from the transaction must necessarily have reduced net earnings and thereby have affected the prices paid for the shares of N Ltd. (post, pp. 294E—295C, 297H—298A, 302C–D, E—303D).

**1 Ch.**            Prudential Assurance v. Newman Industries (No. 2)

A

*McConnel* v. *Wright* [1903] 1 Ch. 546, C.A. applied.

(2) That since the direct, derivative and representative claims were all founded on the allegation that B and L had conspired to injure N Ltd. and its shareholders by procuring that the shareholders voted in favour of a resolution by which the agreement to acquire T.P.G.'s assets became unconditional, there was no objection to those claims being joined in one action (post, p. 304c–e).

B

(3) That, although B and L did not have control of N Ltd., their actions had deceived all but one director to believe that they had adequate independent advice on the feasibility of acquiring the assets of T.P.G. and firmly to support and approve of the transaction; that, in those circumstances, there was no real prospect that the question whether proceedings should be brought by the company would ever be put to the shareholders in a way that would enable them to exercise a proper judgment and, therefore, justice required that the court should entertain a claim by a minority shareholder and make an order for recovery of damage in the derivative action on behalf of N Ltd. against B, L and T.P.G. (post, pp. 326G–327c).

C

*Atwool* v. *Merryweather* (1867) L.R. 5 Eq. 464 and *Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100 applied.

D

*Foss* v. *Harbottle* (1843) 2 Hare 461; *Burland* v. *Earle* [1902] A.C. 83, P.C.; *Alexander* v. *Automatic Telegraph Co.* [1900] 2 Ch. 56, C.A.; *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064, C.A. and *Daniels* v. *Daniels* [1978] Ch. 406 considered.

*Pavlides* v. *Jenson* [1956] Ch. 565 and *Heyting* v. *Dupont* [1964] 1 W.L.R. 843 distinguished.

E

The following cases are referred to in the judgment:

*Alexander* v. *Automatic Telephone Co.* [1900] 2 Ch. 56, C.A.
*Atwool* v. *Merryweather* (1867) L.R. 5 Eq. 464.
*Birch* v. *Sullivan* [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56.
*Burland* v. *Earle* [1902] A.C. 83, P.C.
*Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100.
*Clinch* v. *Financial Corporation* (1868) L.R. 5 Eq. 450.

F

*Cook* v. *Deeks* [1916] 1 A.C. 554, P.C.
*Daniels* v. *Daniels* [1978] Ch. 406; [1978] 2 W.L.R. 73; [1978] 2 All E.R. 89.
*East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather* (1864) 2 Hem. & M. 254.
*Edwards* v. *Halliwell* [1950] 2 All E.R. 1064, C.A.
*Foss* v. *Harbottle* (1843) 2 Hare 461.

G

*Gething* v. *Kilner* [1972] 1 W.L.R. 337; [1972] 1 All E.R. 1166.
*Gray* v. *Lewis* (1873) 8 Ch.App. 1035.
*Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A.
*Kerry* v. *Maori Dream Gold Mines Ltd.* (1898) 14 T.L.R. 402, C.A.
*McConnel* v. *Wright* [1903] 1 Ch. 546, C.A.
*North-West Transportation Co.* v. *Beatty* (1887) 12 App.Cas. 589, P.C.

H

*Pavlides* v. *Jensen* [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R. 518.
*Regal (Hastings) Ltd.* v. *Gulliver* [1942] 1 All E.R. 378; (Note) [1967] 2 A.C. 134, H.L.(E.).

Prudential Assurance v. Newman Industries (No. 2)          [1981]

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474.                    **A**
Shaw (John) & Sons (Salford) Ltd. v. Shaw [1935] 2 K.B. 113, C.A.
Sproule, In re (1886) 12 S.C.R. 140.
Stroud v. Lawson [1898] 2 Q.B. 44, C.A.
Turquand v. Marshall (1869) L.R. 4 Ch.App. 376.
Wallersteiner v. Moir (No. 2) [1975] Q.B. 373; [1975] 2 W.L.R. 389;
    [1975] 1 All E.R. 849, C.A.

                                                                              **B**
The following additional cases were cited in argument:

Allen v. Flood [1898] A.C. 1 H.L.(E.).
Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, C.A.
Bamford v. Bamford [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All
    E.R. 969, C.A.
Bank voor Handel en Scheepvaart N.V. v. Slatford [1953] 1 Q.B. 248;      **C**
    [1952] 2 All E.R. 956, C.A.
Barnes v. Addy (1874) 9 Ch.App. 244.
Beddoe, In re [1893] 1 Ch. 547, C.A.
Bedford (Duke of) v. Ellis [1901] A.C. 1, H.L.(E.).
Beeching v. Lloyd (1855) 3 Drew. 227.
Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. [1979] Ch.
    250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
Burrows v. Becker (1968) 70 D.L.R. (2d) 433.                                   **D**
Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2) [1969] 2 Ch. 276; [1969]
    2 W.L.R. 427; [1969] 2 All E.R. 367, C.A.
Cavendish Bentinck v. Fenn (1887) 12 App.Cas. 652, H.L.(E.).
Chillingworth v. Chambers [1896] 1 Ch. 685, C.A.
Clemens v. Clemens Bros. Ltd. [1976] 2 All E.R. 268.
Competitive Insurance Co. v. Davies Investments Ltd. [1975] 1 W.L.R.
    1240; [1975] 3 All E.R. 254.
                                                                              **E**
Cotter v. National Union of Seamen [1929] 2 Ch. 58, C.A.
Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546, P.C.
Farrar v. Farrars Ltd. (1888) 40 Ch.D. 395, C.A.
Foley v. Burnell (1783) 1 Bro.C.C. 274; (1785) 4 Bro.Parl.Cas. 319,
    H.L.(E.).
Goldex Mines Ltd. v. Revill (1974) 54 D.L.R. (3d) 672.
Harmer v. Armstrong [1934] Ch. 65, C.A.
Hirsche v. Sims [1894] A.C. 654, P.C.                                          **F**
Hobbs v. Tinling [1929] 2 K.B. 1, C.A.
Hogg v. Cramphorn Ltd. [1967] Ch. 254; [1966] 3 W.L.R. 995; [1966]
    3 All E.R. 420.
Karak Rubber Co. Ltd. v. Burden (No. 2) [1972] 1 W.L.R. 602; [1972]
    1 All E.R. 1210.
Kaye v. Croydon Tramways Co. [1898] 1 Ch. 358, C.A.                            **G**
Macaura v. Northern Assurance Co. Ltd. [1925] A.C. 619, H.L.(I.).
MacDougall v. Gardiner (1875) 1 Ch.D. 13, C.A.
Markt & Co. Ltd. v. Knight Steamship Co. Ltd. [1910] 2 K.B. 1021, C.A.
Mason v. Harris (1879) 11 Ch.D. 97, C.A.
Menier v. Hooper's Telegraph Works (1874) 9 Ch.App. 350.
Mosely v. Koffyfontein Mines Ltd. [1911] 1 Ch. 73, C.A.
Moxham v. Grant [1900] 1 Q.B. 88, C.A.                                         **H**
New Sombrero Phosphate Co. v. Erlanger (1877) 5 Ch.D. 73, C.A.; (1878)
    3 App.Cas. 1218, H.L.(E.).
Nocton v. Lord Ashburton [1914] A.C. 932, H.L.(E.).

1 Ch.                Prudential Assurance v. Newman Industries (No. 2)

A
Normandy v. Ind Coope & Co. Ltd. [1908] 1 Ch. 84.
Parke v. Daily News Ltd. [1962] Ch. 927; [1962] 3 W.L.R. 566; [1962] 2
    All E.R. 929.
Parker v. Lewis (1873) 8 Ch.App. 1035.
Pratt v. British Medical Association [1919] 1 K.B. 244.
Pritchard v. Briggs [1980] Ch. 338; [1978] 2 W.L.R. 317; [1978] 1 All
    E.R. 886; [1979] 3 W.L.R. 868, C.A.
Quinn v. Leathem [1901] A.C. 495, H.L.(I.).

B
Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock
    Urban District Council [1968] Ch. 605; [1968] 2 W.L.R. 1214; [1968]
    2 All E.R. 59, C.A.
Rex v. Lord Kylsant [1932] 1 K.B. 442, C.C.A.
Selangor United Rubber Estates Ltd. v. Cradock (No. 3) [1968] 1 W.L.R.
    1555; [1968] 2 All E.R. 1073.
Spokes v. Grosvenor and West End Railway Terminus Hotel Co. Ltd.
    [1897] 2 Q.B. 124, C.A.

C
Tiessen v. Henderson [1899] 1 Ch. 861.
Travis v. Milne (1851) 9 Hare 141.
Vandepitte v. Preferred Accident Insurance Corporation of New York
    [1933] A.C. 70, P.C.
Ving v. Robertson & Woodstock Ltd. (1912) 56 S.J. 412.
West Jewell Tin Mining Co., In re (1879) 10 Ch.D. 579, C.A.

D
Woking Urban District Council (Basingstoke Canal) Act 1911, In re [1914]
    1 Ch. 300, C.A.
Yeatman v. Yeatman (1877) 7 Ch.D. 210.


ACTION

By a writ and re-amended statement of claim, the plaintiff, Prudential
E Assurance Co. Ltd. (" Prudential "), sued (i) on behalf of itself and all the
other shareholders of the first defendant, Newman Industries Ltd.
(" Newman "), other than the second defendant, Alan Frank Bartlett, and
the fourth defendant, Thomas Poole & Gladstone China Ltd. (" T.P.G."),
(ii) in the plaintiff's personal capacity, and (iii) on behalf of all the share-
holders of Newman on July 29, 1975, who like the plaintiff had suffered
F damage and were entitled to damages. Prudential claimed, inter alia, a
declaration that the circular sent by Newman to its shareholders and signed
by the defendant Bartlett, as chairman and chief executive of Newman
was and had at all times been misleading and/or tricky; damages against
Bartlett and the third defendant, John Knox Laughton, for conspiracy and
breach of duty; and further or in the alternative as against the fourth
defendant T.P.G., a declaration that in entering into the agreement of
G June 3, 1975, or in the alternative in receiving the money under the terms
of the agreement when it knew or ought reasonably to have known that
for Newman to enter into the agreement upon the terms on which it did
so involved a conspiracy and breach of duty on the part of the defendants
Bartlett and Laughton, T.P.G. (a) acquired the benefit of the agreement
as constructive trustee for Newman and, accordingly, held the benefit of the
H agreement on trust for Newman and (b) was liable to account to Newman
for the full amount of the loss suffered by Newman as a result of the
acquisition of the benefit.

By their defences, the defendants denied the allegations made by

A-10089

262

Prudential Assurance v. Newman Industries (No. 2)                    [1981]

Prudential and claimed that Prudential was not entitled to any of the
relief claimed. They sought to have heard as a preliminary issue whether
Prudential, as a minority shareholder in Newman, was entitled under the
rule in *Foss* v. *Harbottle* (1843) 2 Hare 461 to maintain the claim against
them. On June 28, 1979, Vinelott J. refused the defendants' application and
gave Prudential leave to amend the writ and statement of claim: see
ante, p. 229.

The facts are stated in the judgment.

*Richard Scott Q.C., Alan Sebestyen* and *Judith Jackson* for the
second and third defendants, Bartlett and Laughton. There should be
a preliminary issue. The plaintiff has no locus standi, as a minority
shareholder in Newman Industries Ltd., to bring an action in a deriva-
tive form claiming unliquidated damages against Newman's directors,
Bartlett and Laughton, or against the fourth defendants, T.P.G. The
proper plaintiff in a claim for injury to a company is the company itself.
The only exception is where the wrongdoers have control of the votes
and are preventing the launching of an action against themselves on
the company's behalf. An exception was created to the rule in *Foss*
v. *Harbottle* (1843) 2 Hare 461, to cover that sort of case. *Birch* v.
*Sullivan* [1957] 1 W.L.R. 1247 shows that where a misfeasance action
is brought by a minority shareholder on behalf of himself and other
shareholders in which the company and the remaining shareholders are
defendants, the statement of claim must, if it is not to be demurrable,
contain the necessary allegations showing that the action could not
have been brought in the name of the company and the facts support-
ing such a claim must be proved at the trial. In *Heyting* v. *Dupont*
[1964] 1 W.L.R. 843, the Court of Appeal upheld the decision of
Plowman J. to the effect that since there was no allegation in that case
of ultra vires or of fraud, or of the appropriation of assets in fraud of the
minority, the court lacked jurisdiction to entertain the plaintiff's claim.
In the present case there is no allegation that Bartlett and Laughton were
in control of Newman either at board level or in general meeting. Con-
siderations of justice and convenience require that the plaintiff's right to
bring the action should be decided at an early stage, as a preliminary
issue. The only circumstances in which an action for damages can be
brought in a company's name by a minority shareholder is where the
wrongdoers are in a position to stifle, or are in fact stifling, the bringing
of an action. It can be done in some cases where the company's property
is being withheld or is being wrongfully conveyed away, and something
which is ultra vires can also be prevented.

The existing statement of claim is demurrable and no amendment can
cure it, but even if an amendment were possible that is no reason why
the matter should not be dealt with by way of preliminary point, because
the defendants are entitled to have the case against them properly pleaded
before the case starts. The court should therefore direct the trial of a
preliminary issue.

Generally preliminary points are decided on agreed facts: the pleadings
can of course be referred to, but the plaintiff would not be entitled to go

**1 Ch.**                    **Prudential Assurance v. Newman Industries (No. 2)**

A  outside his pleading unless referring to something which was common
   ground.

   *Ian Edwards-Jones Q.C.* * and *Robert Reid* for the first defendant,
   Newman.  The company, Newman, is in an ambivalent position.  The
   proceedings are brought by Prudential on Newman's behalf, but the board
   of Newman is concerned lest the company should be killed by kindness.
   The present board's view is that it is quite contrary to the company's
B  interests that the transaction, of acquiring T.P.G.'s assets, should be
   rescinded or criticised.  The board therefore wishes to support the request
   for the trial of a preliminary issue, so that the action may be disposed of
   as speedily as possible.

   *Leonard Caplan Q.C., Peter Curry Q.C., Philip Heslop* and *John
   Brisby* for the plaintiff.  Prudential has nothing to gain personally; the
C  action is brought on behalf of shareholders less financially equipped to
   fight an expensive action than Prudential, and because there are matters
   which Prudential considers should be exposed in the public interest.  If
   a preliminary point *is* to be decided it should always be a point
   capable of decision without evidence, and such that whatever the
   evidence the point of law should be conclusive against the plaintiff.  It
D  is inappropriate where the nature of the evidence indicated by the plead-
   ing may have a bearing on the legal question to be decided.  If perchance
   the existing statement of claim were held to be defective, Prudential
   would seek an amendment, and if that were allowed it would be seen
   that the trial of a preliminary issue in this case would be inappropriate.

   In *Radstock Co-operative and Industrial Society Ltd.* [1968] Ch. 605,
E  624, Harman L.J. protested against the use of preliminary point pro-
   cedure, in place of a motion to strike out, because it was unsatisfactory
   for the court to have to deal with a matter without evidence, and at
   p. 632 Sachs L.J. stated that the facts on which a preliminary issue was
   to be decided should be clearly ascertainable.  If there had been a motion
   to strike out in the present case, and the pleadings were found to be
   amiss, an amendment would have been permitted.

F     The action is both derivative, on behalf of Newman, for injury done
   to the company, and personal for injury done to Prudential as a share-
   holder, and for other shareholders possibly, in a representative capacity.
   The reason for the rule in *Foss* v. *Harbottle*, 2 Hare 461, is the court's
   disinclination to become involved in the internal disputes and administra-
   tion of companies, unless there is a good reason for so doing in exceptional
G  cases.  A personal action against directors, permitted to a shareholder
   for injury to himself and/or other shareholders, though commonly spoken
   of as an exception to the rule in *Foss* v. *Harbottle*, is strictly not an
   exception at all, because the rule relates, strictly, only to the derivative
   action.  Apart from special exceptions, namely for declarations that
   directors have acted ultra vires or that purported resolutions are invalid,
   there is only one other exception to the rule, that the rule does not
H  operate where justice otherwise requires, an instance being where there

   * Reporter's note. Mr. Edwards-Jones ceased to appear on behalf of Newman
   after July 31, 1979, on his appointment as a Commissioner for National Insurance.

A-10091

264
**Prudential Assurance v. Newman Industries (No. 2)**                    **[1981]**

has been a fraud on a minority. This point emerges in the judgment of    A
Wigram V.-C. in *Foss* v. *Harbottle* itself. *Russell* v. *Wakefield Waterworks
Co.* (1875) L.R. 20 Eq. 474, 480, emphasises that the rule is not universal,
and must give way to the necessity for the court to do justice. *Baillie* v.
*Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503, shows that
an individual shareholder can maintain an action where there had not
been full and frank disclosure to shareholders of the facts on which they
had been asked to vote. *Daniels* v. *Daniels* [1978] Ch. 406 shows that the    B
needs of justice may require that a shareholder should be allowed to sue
a director in the company's name, even though there was no fraud on the
minority. Justice requires that a minority shareholder should be allowed
to sue wherever there is reason to think that a decision on whether the
company should bring proceedings against the directors for a wrong done
to the company is one which cannot justly be left to the shareholders in    C
general meeting.

If the court had grounds for thinking that either honesty or full
information as to the facts were lacking to the shareholders in reaching
their decision, the court would not drive a minority shareholder from the
seat of judgment. Until the court hears the evidence, it cannot say that
the requirements of justice are not paramount, over the technical rule in
*Foss* v. *Harbottle*, 2 Hare 461. The question at issue here is neither one    D
of ultra vires, nor of the invalidity of any resolution, but whether pursuit
of delinquent directors should be left to the company in general meeting,
where the shareholders, because of a lack of full information, conduced
to by the directors, might decide not to sue. The plaintiff's pleaded case
alleges that two directors conspired to procure the issue by the company
of a tricky and misleading circular in order to deceive the shareholders.    E
The evidence might have a bearing on whether the rule in *Foss* v.
*Harbottle* applied, and therefore manifestly that question should not be
tried as a preliminary issue in advance of the evidence. The onus of
showing that the evidence could not conceivably have a bearing on the
preliminary issue rests on the defendants. The evidence may lead the
court to conclude that the technique of deception involved in producing
the circular was so sophisticated and devious that its exposure would have    F
been impossible without extended discovery. The circular achieved its
purpose so that the resolution benefiting the conspirators was duly passed.
The question therefore is whether there was any real prospect of the
shareholders deciding that the conspirators should be sued for their
delinquency. Without the aid of discovery in an action there was no way
in which the shareholders' minds could be disabused of the misconceptions    G
so sedulously and cunningly practised upon them.

As an example of the deceptions employed, the suggested price of
£325,000 for the assets was on the basis that it included £100,000 in respect
of promissory notes issued by Smithamcote Ltd. to T.P.G. In fact instead
of having a present value of that amount, there were ten separate notes,
each of £10,000 maturing yearly over ten years, and documentary evidence    H
discloses that Smithamcote's financial position was such that, as must have
been well known to both Bartlett and Laughton, it could not have
honoured the notes. The first note in fact fell due on June 28, 1975, a

Case: 25-643, 06/06/2025, DktEntry: 65.1, Page 189 of 225

A-10092

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 9 of 76
265
1 Ch.          Prudential Assurance v. Newman Industries (No. 2)

A  month before the meeting, and was not met, yet this fact was deliberately concealed. If it was shown that the shareholders' consent, obtained at the meeting, was vitiated by fraud the court would not insist that the decision whether to sue the directors should be left to the shareholders. It would be wrong to direct a preliminary issue and refuse to hear the evidence. Whether the question is one of procedure or of jurisdiction the same is true.

B    The directors also owed a duty to the shareholders, or had an obligation towards them, to give advice in good faith and not by means of a tricky and misleading circular. The directors are liable at the suit of shareholders for breach of that obligation, and the damages recoverable by the shareholders are not necessarily the same as those recoverable by the company: see *Baillie* v. *Oriental Telephone and Electric Co. Ltd.*

C  [1915] 1 Ch. 503 and *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358. What is recoverable is damages for conspiracy, with the special feature that they are not limited to the financial loss suffered by the plaintiff: see *Pratt* v. *British Medical Association* [1919] 1 K.B. 244. Here the plaintiff's personal action will have to traverse the whole of the evidence and it would therefore be wrong to segregate the derivative action, when the court will have to deal later with the personal action.

D    *Scott Q.C.* in reply. On a true analysis this action is purely derivative, and not personal. The pleadings contain no allegations of breach by the directors of any duty to the shareholders, but only of breach of duty to the company. The damages alleged to have been suffered by the shareholders are all consequential on the alleged breach of duty to the company. If more was intended, the pleading is misleading. A share-

E  holder claiming in that capacity must relate the damages claimed to the value of his shares. No particulars of such damages are given. In fact, the value of the shares has risen three-fold since the acquisition of T.P.G.'s assets.

    If there is a personal action which Prudential can bring for itself, it would have to be in respect of some duty which a director owed not qua

F  director to the company, but imposed on the director arising out of the circular and the particular circumstances relating to the particular shareholders. Each shareholder's claim would be different, depending on whether his loss arose from reduced dividends. or from sale at a loss. Such damages, if relied on, would have to be alleged, but here there is no such allegation, either of duty owed or damage suffered. A representative action for shareholders claiming damages could not be brought since the

G  claims to damage would differ inter se, if, as in conspiracy, damage is an ingredient in the cause of action.

    [Reference was made to R.S.C., Ord. 15, r. 12, and to *Markt & Co. Ltd.* v. *Knight Steamship Co. Ltd.* [1910] 2 K.B. 1021.] It is possible to claim a declaration in a representative action, but it is difficult to see that in tort one could ever establish a sufficient common interest to

H  establish a representative action. If a declaration were sought that the circular was tricky and misleading, a number of the shareholders on whose behalf it was sought might have no cause of action at all. What the plaintiff has been seeking is payment of damages to the company; it may

A-10093

266

**Prudential Assurance v. Newman Industries (No. 2)**          **[1981]**

be that Prudential has a personal cause of action, but that is not why the
action is brought.  If the claim on the company's behalf is wholly ill-
founded, the plaintiff should not be permitted to sue in that form.          A

[Reference was made to *Duke of Bedford* v. *Ellis* [1901] A.C. 1.]
*Beeching* v. *Lloyd* (1855) 3 Drew. 227 is difficult to support, but is dis-
tinguishable.

*Caplan Q.C.*  It is conceded that the plaintiff cannot pursue any claim
for damages in the representative personal action as opposed to the          B
derivative action.  What is pursued in the personal action is a declaration
that there is a liability to damages to Prudential, and a declaration that
there is a liability to damages to all other shareholders, who like
Prudential have suffered damage.  The point of such a declaration would
be to enable others who have suffered damage to come in and prove no
more than that they have suffered such damage.                               C

*Scott Q.C.*  It is a totally wrong approach to assume that it is permiss-
ible to investigate all the company's affairs, managing decisions and be-
haviour for the purpose of saying that the interests of justice require that a
minority shareholder should be allowed to sue, except possibly where the
alleged wrongdoers are in control.  If that is right it is a monstrous
injustice that the defendants should be subjected to such an inquisitorial
procedure.  The derivative action ought not to be allowed, and the          D
personal action, if the plaintiff is entitled to bring one, should be limited
to a claim against the second and third defendants, the first and fourth
defendants being struck out.  That is why, even if the pleadings could be
amended, it is no reason why the preliminary issue should not be tried,
to decide whether or not the derivative action can stand.

The philosophy behind the rule in *Foss* v. *Harbottle*, 2 Hare 461, was          E
that where a company was controlled by someone it was not just that he
should be able to prevent himself being sued, merely because he was in
control of the company.  But the exceptions allowed must be confined
to cases where fraud is alleged.  Other exceptions are where something
ultra vires or illegal is alleged, or where the company's property is being
given away.  It is for the board to decide whether to sue a prospective          F
defendant for fraud or in respect of defalcations by an employee, and in
the last resort it is a matter for the company in general meeting.  In an
action by the company itself, the same investigation could be undertaken
as in an action by a minority shareholder, so that it is wrong to suggest
that as being a reason for allowing a minority shareholder to sue.  [Ref-
erence was made to *Parke* v. *Daily News Ltd.* [1962] Ch. 927.]

The rule in *Foss* v. *Harbottle*, 2 Hare 461, establishes as a matter of          G
general principle that the court will not interfere in the internal affairs
of the company, and accordingly if some internal irregularity occurs in
administration which can be put right by a simple majority it is no use
for the minority or an individual shareholder to complain to court.  In
such cases the rule is one of practice and procedure rather than of juris-
diction: see *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358; *Tiessen*          H
v. *Henderson* [1899] 1 Ch. 861 and *Baillie* v. *Oriental Telephone and
Electric Co. Ltd.* [1915] 1 Ch. 503.  Where the irregularity relates to a
special resolution the court will interfere, because that cannot be cured

267

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)

A    by a simple majority.  The philosophy behind the rule is set out by
Mellish L.J. in *MacDougall* v. *Gardiner* (1875) 1 Ch.D. 13.

Cases where irregularities in administration of that sort have occurred
are easily distinguishable from cases where some wrong has been done to
the company, giving the company a cause of action against its directors or
others.  In such a case the rule is one of jurisdiction, since the court will
not in general listen to someone asserting a cause of action not vested in

B    himself: see *Normandy* v. *Ind Coope & Co. Ltd.* [1908] 1 Ch. 84.  In the
case of a wrong done to the company there is no question as to whether
the matter can be put right in general meeting, and if so by whom.  All
that is necessary is to know whether there is any reason why the company
itself cannot sue.  Since the abandonment of the claim to rescission it is
not relevant to ask whether an irregularity can be cured in general

C    meeting.  The relief claimed is confined to damages.  It is for the
company to decide whether to sue unless the wrongdoers are in control.
Unless there is control there is no majority oppressing a minority.
[Reference was made to *Atwool* v. *Merryweather* (1867) L.R. 5 Eq.
464; *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247; *Burland* v. *Earle* [1902]
A.C. 83; *Menier* v. *Hooper's Telegraph Works* (1874) 9 Ch.App. 350;
*Russell* v. *Wakefield Waterworks Co.,* L.R. 20 Eq. 474; *Spokes* v.

D    *Grosvenor and West End Railway Terminus Hotel Co. Ltd.* [1897] 2 Q.B.
124; *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064; *Daniels* v. *Daniels*
[1978] Ch. 406; *Heyting* v. *Dupont* [1964] 1 W.L.R. 843 and *Waller-
steiner* v. *Moir (No.* 2) [1975] Q.B. 373.]

If different causes of action are being pursued, one on behalf of the
company and another personally, it would not be a proper argument for

E    getting rid of the action against the company if it were shown to be not
maintainable, to say " Oh well, the other cause of action is good and can
be pursued, so let both be tried."  In *Stroud* v. *Lawson* [1898] 2 Q.B. 44,
the Court of Appeal ruled that where the plaintiff was suing in a personal
capacity in respect of a fraud inducing him to become a shareholder, and
in a representative capacity for himself and other shareholders in respect of

F    ultra vires acts by the directors in paying a dividend out of capital, it was
not permissible to join the two causes of action in the same proceedings,
because they did not arise out of the same transaction within the then
existing rule, R.S.C., Ord. 16, r. 1.  [Reference was made to *Mosely* v.
*Koffyfontein Mines Ltd.* [1911] 1 Ch. 73.]

Not only is there no particular ground of convenience for joining the
two causes of action in the present case, it is inconvenient to do so, since

G    completely separate causes of action are involved and the types of relief
sought are different.  The defendants have to deal on two fronts with un-
named plaintiffs, who may or may not have a cause of action against them
so far as the representative action is concerned.  If the derivative action is
not properly based it should be disposed of on a preliminary issue, leaving
a fairer and short action for the defendants to deal with.  The question of

H    Prudential's locus standi to bring the derivative action is one of jurisdiction.
If it were disposed of there would be no need for a new derivative action.

[VINELOTT J. gave judgment on the application for the trial of a pre-
liminary issue, holding that it was unnecessary to decide the issue, since

268

**Prudential Assurance v. Newman Industries (No. 2)**                    [1981]

whatever the outcome Prudential intended to pursue its personal claim
against Bartlett and Laughton for damages for conspiracy and would **A**
also seek on behalf of all shareholders, as at the date of the passing of
the resolution, a declaration that the circular was tricky and misleading.
Thereafter argument continued and Caplan Q.C. sought leave to amend his
pleadings in regard to Prudential's claim to sue in a representative capacity
for other shareholders, as at July 29, 1975. Argument on this question
followed and judgment was delivered on June 28, 1979. This part of the **B**
case is separately reported, ante, p. 229.]

*Leonard Caplan Q.C., Peter Curry Q.C., Phillip Heslop* and *John Brisby*
for the plaintiff in relation to the plaintiff's derivative action against
Bartlett and Laughton. A director holds his powers as a fiduciary or
trustee, and must therefore exercise those powers bona fide in the interests
of the company. He would be in breach of that duty if otherwise than **C**
in good faith he supported, and a fortiori if he engineered, a transaction
which was not in the company's interests and under which he benefits
directly or indirectly. The word "support" in the above proposition
includes the exercise by a director of such influence as he may possess
with his fellow directors and with the general body of shareholders. If
two directors, by agreement, breach their duty in this way they are guilty
of a conspiracy to do a wrongful act. A transaction is not in the **D**
interests of a company if it is a purchase at a price more than it was
necessary and proper in the company's interest to pay. A transaction
which is detrimental to the company and beneficial to the director is
not "supported" by him in "good faith," if his support includes, inter
alia, participation in the preparation and distribution of a circular which
he knows or ought to know is tricky and misleading, and which is **E**
intended to persuade shareholders to sanction the transaction. A circular
may be misleading even though one cannot point to a single statement
in it which is untrue: see *Rex* v. *Lord Kylsant* [1932] 1 K.B. 442.

In a transaction by a company in which a director has a conflict of
interest, and from which he stands to benefit directly or indirectly, and
which he has supported or engineered, the onus of proving that he did so **F**
in good faith rests upon the director concerned. He can only discharge that
onus by showing that he acted fairly, or by showing that he had sufficient
reasons for bona fide believing that he had so acted. [Reference was made
to *Kerr on Fraud and Mistake*, 7th ed. (1952), p. 5 and *Gower, Modern
Company Law*, 3rd ed. (1969), p. 564, as to the meaning of "fraud" in
equity.] Possibly "fraud" is used in equity in cases where fraud has not
been proved affirmatively but where the defendant has not discharged the **G**
onus placed upon him of disproving fraud. If there has been a breach of a
fiduciary obligation there is no need to show that the motive was an impure
motive. [Reference was made to *New Sombrero Phosphate Co.* v.
*Erlanger* (1877) 5 Ch.D. 73; (1878) 3 App.Cas. 1218; *In re West Jewell
Tin Mining Co.* (1879) 10 Ch.D. 579 and *Hirsche* v. *Sims* [1894] A.C.
654.] Bad faith cannot be rebutted by showing that somebody really did **H**
believe something: it has to be shown that he reasonably believed it.

The derivative action against T.P.G. is in the realm of constructive
trusteeship. A person is liable, quite apart from any question of knowl-

269

**1 Ch.**            **Prudential Assurance v. Newman Industries (No. 2)**

A   edge on his part of a fraudulent transaction, if he knows that a trust fund is being applied otherwise than where there is any authority for it to be so applied. Thus T.P.G. would be a constructive trustee of the £325,000 paid for the assets if at the time of payment T.P.G. had knowledge of the fraud, and that the money was being paid away pursuant to a void resolution, i.e. knew that the circular was tricky and misleading, and therefore did not give proper notice to the shareholders in accordance with the

B   Newman articles, of the nature of the business to be transacted: see *Barnes* v. *Addy* (1874) 9 Ch.App. 244; *Russell* v. *Wakefield Waterworks Co.,* L.R. 20 Eq. 474 and *Moxham* v.*Grant* [1900] 1 Q.B. 88.

Although Prudential would be entitled to claim rescission, it does not do so. It is entitled instead to treat T.P.G. as being a constructive trustee of the money received. As plaintiff, Prudential can choose the remedy

C   sought on behalf of the company. Where a company's money is paid away without proper authority to persons who know that there is no proper authority, those persons are constructive trustees. That proposition is quite independent of any participation in a fraudulent design such as is required by the second leg *of Barnes* v. *Addy,* 9 Ch.App. 244. [Reference was made to *Selangor United Rubber Estates Ltd.* v. *Cradock (No.* 3) [1968] 1 W.L.R. 1555; *Chillingworth* v. *Chambers* [1896] 1 Ch. 685;

D   *Karak Rubber Co. Ltd.* v. *Burden (No.* 2) [1972] 1 W.L.R. 602 and *Belmont Finance Corporation Ltd.* v. *Williams Furniture Ltd.* [1979] Ch. 250.]

The knowledge of a person other than a director does not make a company itself possessed of that knowledge. Even if Bartlett and Laughton had not been directors of T.P.G., T.P.G. would have known

E   that the transaction could not go through without the approval of Newman shareholders, and that a circular was needed, the terms of which were bound to be known to T.P.G. Having looked at that circular, T.P.G. would have known that things were said in it which were untrue. T.P.G. would at least have received a copy of the circular as a shareholder of Newman. As a constructive trustee T.P.G. is liable to give equitable

F   compensation over and beyond the £325,000 received which must include compensation for having taken over T.P.G.'s liabilities. It cannot be for a company's benefit to pay more than is necessary for assets. If the true effect of a transaction is to give away a company's assets, the transaction would be ultra vires and cannot be ratified.

Three types of conspiracy are alleged. The first, in the personal action, is conspiracy to do an unlawful act, being either a breach of a

G   director's duty to the company, or his duty to the shareholders. A breach by a single director of his duty to the company would be actionable only by the company, but if two or more directors conspired then any person injured by the conspiracy could sue, the gist of such person's action being (a) the unlawful act of conspiracy and (b) the damage suffered. The second type is a conspiracy to " injure," where both conspiracy and

H   damage are essential. The third type is a conspiracy to procure a breach of contract. Procuring a breach of contract without lawful excuse, even if committed by a single person, is actionable as a tort, in which case conspiracy really adds nothing to the cause of action. Where there is a

A-10097

270          Prudential Assurance v. Newman Industries (No. 2)          [1981]

proved or, as here, admitted duty to the shareholders, as distinct from the     A
duty to the company, the breach gives rise only to a personal and not to
a derivative action.  The question arises whether it would not be ultra
vires for the shareholders in general meeting to resolve that the company
should not claim from the directors money which the court has declared,
in a derivative action by a minority shareholder, that the directors are
liable to repay to the company for the losses sustained as a result of the
breach of duty owed to the company, since any resolution not to claim     B
the money would be equivalent to a giving away of the company's money.
Such a resolution might constitute a fraud on the minority, and be capable
of being upset on those grounds.

Even in regard to matters which are capable of ratification in general
meeting it is questionable whether it would be desirable to proceed on the
lines of the procedure in *Hogg* v. *Cramphorn* [1967] Ch. 254, bearing in     C
mind that if the decision in general meeting went one way that decision
might be invalid.  If the court were to hold that the transaction was
*designedly* a concealed way of giving away the company's property, then
the company in general meeting could not ratify it, without an article
which permitted that to be done, and such an article does not exist here.
If Prudential obtains judgment on behalf of the company in the derivative
action, it would not pursue its relief in the personal action, but Prudential     D
would wish to pursue its entitlement in the personal action if for some
reason the company did not wish to accept money which the court held
it was entitled to.  [Reference was made to *McConnel* v. *Wright* [1903]
1 Ch. 546.]

*Edwards-Jones Q.C.*  Newman was a necessary party to the action
but is neither prosecuting it, nor defending it.  The case is unique in     E
that although the action is framed in part as a minority shareholders
action, no control over the shareholders or over the board was vested
in the personal defendants.  Laughton ceased to be a director since
before the action commenced, and Bartlett, though still a director, is
only one of a number on the present board.  The board, which was
independent, took the view that while it was powerless to prevent
Prudential from pursuing the action, the action was not one which the     F
board of Newman wished to adopt.  Any advantage which might accrue
to the company is likely to be far outweighed by the harm being inflicted
on the company by the continuance of the action, with its adverse
publicity and other side effects.  The board has accepted counsel's advice
that counsel's attendance is an avoidable expense, unless the court other-
wise indicates, though instructing solicitors would continue to attend.     G
But one observation should be made: there must be a logical limit for
practical reasons to the concept that a company cannot give away its
property.

*Caplan Q.C.*  Clearly a company can give away its property for the
purpose of preserving its good image, and where if it did not do so its
image would suffer.     H

*Richard Scott Q.C., Alan Sebestyen* and *Judith Jackson* for the second
defendant Bartlett and, until July 18, for the third defendant, Laughton.
Prudential's case against Bartlett has been based upon mere inference

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)

A from documents. The main thrust of their case is alleged fraudulent conspiracy. Until March 1976, Prudential's case had been based solely on " honest disagreement of judgment " and there was no allegation that the circular was tricky and misleading or fraudulent, but such an allegation was raised for the first time in the statement of claim in the present proceedings. No further material was, however, available than before, and the claim is entirely speculative. Investigative procedure, such as is

B involved in litigation of this sort, imposes a burden on defendants which even if they succeed and obtain party and party costs, is likely to bring financial ruin upon them, and, if they lose, ruin of reputation following upon financial ruin. The pressure brought to bear upon them by a minority shareholder with a bottomless purse, such as Prudential, is apt to produce a totally unfair situation, which is contrary to public policy.

C In some sorts of litigation defendants can protect themselves against the uncertainties of litigation by appropriate offers or by payment into court, but where directors in public life are charged with fraudulent conspiracy and with having knowingly issued a tricky and misleading circular, payment into court is not a practical proposition. Directors can only resist such charges or accept being hounded from public life. Prudential owes no duty to its fellow shareholders. It has power without responsibility.

D The arguments here advanced do not depend on the innocence or otherwise of the directors concerned. It is not an argument in favour of such litigation to say " We think we can satisfy the judge on the balance of probabilities," if you thereby bring down innocent people. Prudential claims to bring this complex and expensive litigation on behalf of other shareholders, but no single shareholder had been produced to support that contention. Prudential does not purport to bring the action for its own

E benefit; its main purpose is the derivative action. If it succeeds in that, it will not, so it is said, pursue its personal claim. It will not claim on behalf of other shareholders as at July 25, 1975, even though they may be different people from the current shareholders. The shareholders as at July 25, 1975, would be bound by the result, because the action is in a representative form. Prudential is only pursuing the action in the personal

F and representative capacities in case the action in the derivative capacity should fail on account of the rule in Foss v. Harbottle, 2 Hare 461.

It ought not to be the law that a powerful individual shareholder can arrogate to himself the power of acting on behalf of a company and forcing the company to litigate. Prudential's action, whether personal or representative, is brought simply for the purpose of investigation. It is

G cynical because it is not truly brought for Prudential's own sake. Prudential has not produced any evidence to connect the company's alleged loss with loss in capital value of the shares or of the dividends. The need for investigation in the personal action was used as a powerful argument for inducing the court to refuse the trial of a preliminary point in the derivative action alone. Since March 1975 Prudential has sought to force

H the investigation regardless of the damage to the company resulting from the litigation, or of the quantum of damages that might be recovered. The litigation is an exercise of power without responsibility.

The case must in the end turn on the honesty or otherwise of Bartlett

272

Prudential Assurance v. Newman Industries (No. 2)                    [1981]

A
and Laughton. Once Cooper, the auditor, had concluded that £325,000 was a fair value for the package transaction, they cannot be blamed for relying on that figure. The position might be different had they deliberately misinformed Cooper or concealed matters from him affecting the valuation. The second issue is whether, if the circular was tricky and misleading, it was intended to be so. There was always a close working connection between Newman and T.P.G., who shared offices and secretarial staff. There never was an arms-length bargain, between totally

B
unconnected parties. Directors would not expect shareholders to try to value the assets themselves, and plainly it cannot be general Stock Exchange practice that circulars should contain sufficient information for the shareholders to attempt to do so, since otherwise Stock Exchange requirements would be much stricter, and balance sheets of associated companies would always have to be included. [Reference was made to

C
*Farrar* v. *Farrars Ltd.* (1888) 40 Ch.D. 395; *Nocton* v. *Lord Ashburton* [1914] A.C. 932; *Carl Zeiss Stiftung* v. *Herbert Smith & Co. (No. 2)* [1969] 2 Ch. 276; *Competitive Insurance Co.* v. *Davies Investments Ltd.* [1975] 1 W.L.R. 1240; *Quinn* v. *Leathem* [1901] A.C. 495 and *Allen* v. *Flood* [1898] A.C. 1.]

D
Prudential's case against T.P.G. is one of constructive knowledge. T.P.G. is alleged to have had knowledge of some dishonest and fraudulent design on the part of the individual defendants. T.P.G. must either have had such knowledge or have participated in the particular breach of fiduciary duty which is relied on. If what was done by Bartlett and Laughton was not dishonest and fraudulent then no claim could be raised against T.P.G., based on the second limb of *Barnes* v. *Addy,* 9 Ch.App. 244, i.e. actual participation in a dishonest and fraudulent design. The

E
claim would have to be confined to the first limb, namely receiving the money knowing it to be trust money. To show that the money received was trust money it would be necessary to show that the resolution approving the transaction was void, and that would open the door to complete rescission, which would, it is believed, damage Newman's interests because, since the date of the transaction, the value of Newman's assets

F
has greatly increased. If the transaction was void, account must be taken, in assessing any damage that Newman might have suffered, of the benefits derived from possessing T.P.G.'s assets.

Before there could be any equitable compensation it must be shown that damage had been caused by the breach of duty. If a lower price had been suggested for T.P.G.'s assets, T.P.G. might not have agreed to

G
sell, in which case damage would not have resulted at all even if the assets were worth less than the £325,000 that was paid for them. *Cavendish Bentinck* v. *Fenn* (1887) 12 App.Cas. 652 shows that the onus of proving misfeasance rests on the plaintiff, so that even if the misfeasance alleged is non-disclosure of material facts, the plaintiffs must prove non-disclosure so that in a case for rescission of a sale by a director of his own property to the company it is not for the company to prove non-disclosure but for

H
the director to prove disclosure affirmatively, but if the proceedings are for misfeasance then it is for the company to prove non-disclosure. There is no evidence justifying the inference that the approval by the share-

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**

A  holders of the transaction was in fact procured by the nature of the circular, which is alleged to have been tricky and misleading.  No share-holder has been called to show that he was misled into voting for the resolution by the circular.

It is not justifiable for the court, without expert evidence, to infer that a loss to the company must necessarily result in a loss to the share-holders in the market value of the shares.  To succeed in the derivative

B  action, Prudential must establish (i) that the defendants conspired to make the shareholders of Newman adopt a transaction which was adverse to Newman's interests, (ii) that they did so with knowledge that the trans-action was adverse to Newman's interests, and (iii) that the intention was thereby to relieve T.P.G.'s financial problems.  The test is whether there was an honest belief that the transaction would benefit Newman, and

C  benefit it at that price, not whether the price was in fact a fair and proper one.  Nothing short of common law fraud would suffice to bring the case within the exception to *Foss* v. *Harbottle*, 2 Hare 461.  In no reported case has a minority shareholder succeeded in complaining of a wrong done to the company, where the director concerned was simply guilty of a breach of fiduciary duty without there being any evidence of dishonesty.

D  If the first two issues in the derivative action are decided against the defendants, it is conceded that it would be necessary to see whether any damage had been caused to Newman.  In the personal and representative actions Prudential would have to prove damage, because the cause of action in those cases is dependent on proof of damage.  Plainly the company's assets do not belong to the shareholders.  A capital loss to the company must not necessarily be taken to be a loss to the shareholders:

E  see *Bank Voor Handel En Scheepvaart N.V.* v. *Slatford* [1953] 1 Q.B. 248 and *Macaura* v. *Northern Assurance Co. Ltd.* [1925] A.C. 619. Prudential has not attempted to show that the value of the Newman shares has suffered.  That should be the end of the personal and repre-sentative actions.  It may be that if the minority cannot persuade the majority to bring an action there would be no remedy.  The minority

F  cannot insist on a remedy.  The majority should not be forced to accept an investigation into the company's affairs against the majority's wishes.

No evidence was given to show that Prudential's shares had suffered in market value in consequence of the take-over transaction.  It is not justifiable for the court to infer, without expert evidence, that a loss to the company must necessarily result in a loss to the shareholders in respect of the market value of the shares.  It is not a valid criticism that the

G  valuation of T.P.G.'s assets was carried out by Deloittes, who were Newman's auditors, rather than by an independent merchant bank. Bartlett had no knowledge of how Cooper of Deloittes arrived at his valuation.  If the court were to disbelieve Bartlett's denial of knowledge, *Hobbs* v. *Tinling* [1929] 2 K.B. 1 shows that non-acceptance of a denial does not amount to establishing the affirmative contrary to the denial.

H  Failing to consider possible alternatives to the take-over transaction or failing to consider each asset in the package individually does not amount to a lack of caution on the part of Bartlett or Laughton.  They were justified in leaving the valuation to experts.  There is no evidence of

274          Prudential Assurance v. Newman Industries (No. 2)          [1981]

conspiracy between Bartlett and Laughton to fix the price of the package.  A
[Reference was made to *Pritchard* v. *Briggs* [1980] Ch. 338.]  where
it is sought to show that a resolution is invalid, and to unscramble the
resulting transaction the words "tricky and misleading" are used in a
different sense from that in which they are used in pleadings for the
purpose of claiming damages in a personal action.  The test as to whether
a circular is tricky and misleading so as to render the notice convening a
meeting void and the meeting and resolutions passed thereat defective,  B
cannot depend on the state of mind of those directors who sent out the
circular; it must depend objectively on the contents of the circular itself.
Even if a circular were intended to mislead, it would not necessarily be a
bad notice for the purpose of complying with the company's articles, or
render the resolutions passed at the meeting null and void.

Even if the court were to hold that Bartlett was dishonest, and lacked  C
bona fides in carrying out his duties towards Newman, he is nevertheless
entitled to judgment in his favour, both on the personal, and on the
derivative actions.  As to the personal action, any damage was suffered
by the company and not by the shareholders.  In partnerships, from which
joint stock companies evolved, it was always possible for decisions to be
taken by the majority of the partners, so as to bind the minority.  Without  D
such a contract, any one of those joining in a joint venture, could always
sue in his own name as plaintiff, joining the others who might not wish to
sue, as defendants.  If the majority were fraudulently or dishonestly
appropriating to themselves the partnership assets, or were preventing the
ventilation of a wrong the courts would permit the minority to sue.  When
joint ventures were superseded by companies, the contract was embodied
in the company's articles, but the cause of action became vested in the  E
company as a separate legal persona, and was no longer vested in the
members.  Cases still arise where the majority, by means of the company's
constitution, seek to prevent pursuit of themselves for their misdeeds, and
then the courts will permit the minority to sue by analogy with the pre-
incorporation position.  Shareholders in general meeting can decide to
overlook the defalcations of an agent of the company, and that being so  F
it is impossible for the minority to start an action against the fraudulent
agent, on the ground that although the majority entitled to ratify the
agent's actions, and let the wrong to the company go unredressed, such
majority has not in fact done so.  A distinction must be drawn between
cases where it is proper for the company to decide not to sue, and those
where it cannot properly so decide.  In the latter case, for instance, where
the wrongdoers are in control, there is an exception to the rule in *Foss* v.  G
*Harbottle*, 2 Hare 461.  But if the company has expressed disinterest in
suing, or has merely not decided, an action would be maintainable by a
minority *only* if it was a case where the company could not properly
decide not to sue; otherwise there would be nothing left of the rule in
*Foss* v. *Harbottle*.  The only case where a person with no cause of action
vested in himself has locus standi to sue is where it can be shown that it  H
would be fraudulent for those in control to prevent an action being
brought against themselves.  It is necessary to show that it would be futile
to ask the company in general meeting to decide, because one knows in

275

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)

A  advance what the answer would be. It is for the company to decide
whether it wishes to incur the cost and risks of litigation. [Reference
was made to *Parker* v. *Lewis* (1873) 8 Ch.App. 1035.]

In *Burland* v. *Earle* [1902] A.C. 83, 93, Lord Davey stated the prin-
ciples underlying the rule in *Foss* v. *Harbottle* as being that it is an
elementary principle of the law relating to joint stock companies that the
court will not interfere with the internal management of companies acting
B  within their powers, and in fact it has no jurisdiction to do so. Also that
the company is the proper plaintiff in an action to redress a wrong done to
the company. The exceptions to the rule are cases where there is fraud
or ultra vires, or where the votes of the shareholders are controlled by the
wrongdoers. [Reference was made to *Regal (Hastings) Ltd.* v. *Gulliver*
[1942] 1 All E.R. 378.] The reason why Prudential's action is barred by
C  the rule, is not because the resolution approving the transaction was
passed by the majority of the shareholders, but because the company
could have sued on the cause of action regardless of the resolution. The
vital question is not whether the resolution is impeachable, but whether
there is any reason why the company itself should not bring the action.
The very complexity of the action is a valid reason why the company
might not wish to sue. *Clemens* v. *Clemens Bros. Ltd.* [1976] 2 All E.R.
D  268 shows that votes can be validly cast by a majority shareholder with a
view to improving her own proprietary interests, and not those of the
company.

An action which pleads fraud and looks upon discovery as a necessary
process to ascertain whether the allegation is made out would plainly be
improper. To start an action based on inference on the footing that it
E  would be dropped if discovery did not produce sufficient supporting
evidence would be an abuse of process. Prudential should have put the
question to the company in general meeting as to whether or not an
action should be brought. [Reference was made to *Parker* v. *Lewis,* 8
Ch.App. 1035.] When Jessel M.R. said in *Russell* v. *Wakefield Water-
works Co.,* L.R. 20 Eq. 474, 480, that the rule in *Foss* v. *Harbottle* was not
F  universal, and was subject to exceptions which " depend very much on
the necessity of the case," it did not correspond with the law at that time.
[Reference was made to *Mason* v. *Harris* (1879) 11 Ch.D. 97; *Atwool* v.
*Merryweather,* L.R. 5 Eq. 464; *MacDougall* v. *Gardiner,* 1 Ch.D. 13;
*Menier* v. *Hooper's Telegraph Works* (1874) 9 Ch.App. 350 and *Cook* v.
*Deeks* [1916] 1 A.C. 554.]

The common feature running through exceptions to the rule in *Foss*
G  v. *Harbottle* is that the exception exists where the control which the
wrongdoers exercise over the company is preventing them from being sued
by their company.

*Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546 shows that
on a true analysis the only true exception to the rule in *Foss* v. *Harbottle,*
2 Hare 461, is where there is unfair, fraudulent or improper abuse by the
H  majority of their position. [Reference was made to *Alexander* v. *Auto-
matic Telephone Co.* [1900] 2 Ch. 56.] The authorities show that the
true exception is not where there is merely an ingredient of fraud in the
cause of action, but where there is wrongful oppression of the minority by

276
Prudential Assurance v. Newman Industries (No. 2)          [1981]

the wrongdoers. In *Daniels* v. *Daniels* [1978] Ch. 406 a sale of the
company's asset at an undervalue by two directors to one of their number        A
in breach of duty could not be ratified since that would be fraudulent
oppression by the majority of the minority. In *Pavlides* v. *Jenson* [1956]
Ch. 565 it was held that since there was no allegation of fraud or mis-
appropriation of assets by the directors, the action did not fall within the
exception to the rule in *Foss* v. *Harbottle*, and minority shareholders were
not entitled to sue the directors and the company for damages for gross        B
negligence. [Reference was made to *Spokes* v. *Grosvenor and West End
Railway Terminus Hotel Co. Ltd* [1897] 2 Q.B. 124; *Edwards* v. *Halli-
well* [1950] 2 All E.R. 1064 and *Turquand* v. *Marshall* (1869) L.R. 4
Ch.App. 376.]

In *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247 it was held that in a mis-
feasance action by a minority shareholder on behalf of himself and other        C
shareholders it must be proved not only at the trial but also be stated in the
statement of claim why the action cannot be brought in the name of the
company and the allegations on which it is founded. If that is correct it
means that it must be shown that the wrongdoer is in control, otherwise
there would be no way of showing why the company could not bring the
action. The case shows that it must be shown to be futile to call a general
meeting *because* of the control enjoyed by the wrongdoers, not merely        D
futile for some other reason, such as that the shareholders do not know
enough about the proposed action to form a view as to whether or not it
should be brought. Any application to stay the proceedings would be a
matter of discretion. In *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192;
[1964] 1 W.L.R. 843, in the discussion of the rule in *Foss* v. *Harbottle*,
again there is no suggestion that the exceptions require anything less than        E
control by the wrongdoer to be shown. [Reference was made to *Goldex
Mines Ltd.* v. *Revill* (1974) 54 D.L.R. (3d) 672.]

In some cases minorities are allowed to stop the company from doing
something, or to protest against the effective ratification by the company
of something already done, as for instance in *Kaye* v. *Croydon Tramways
Co.* [1898] 1 Ch. 358. The provision in that case of an additional sum        F
for the directors of the vendor company, over and above the sum payable
by the purchasing company to the vendor company, reference to which
was omitted from the notice of meeting, did not render the notice ultra
vires, or the resolution voidable. [Reference was made to *Baillie* v.
*Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503 and to *Goldex
Mines Ltd.* v. *Revill*, 54 D.L.R. (3d) 672.]

The Canadian cases also show that the exceptions to the rule in *Foss*        G
v. *Harbottle* are where the wrongdoers are in control: see *Burrows* v.
*Becker* (1968) 70 D.L.R. (2d) 433. See also *Ving* v. *Robertson & Wood-
stock Ltd.* (1912) 56 S.J. 412 and *In re Woking Urban District Council
(Basingstoke Canal) Act* 1911 [1914] 1 Ch. 300.

To wait until the end of the trial and then to ask whether the needs of
justice require a payment to be made to the company is to transpose the        H
purpose for which the court needs to look at the needs of justice; they
should be looked at in the beginning, in order to see whether the plaintiff
is entitled to sue at all. The court cannot logically decide that question by

**1 .Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**

A the result of the case, or there could be no rule in *Foss* v. *Harbottle* at all. At the end, the court would be considering convenience, not the interests of justice. The question whether a minority shareholder is debarred from suing is of its nature a preliminary point, to be dealt with before a full trial. The rule in *Foss* v. *Harbottle*, 2 Hare 461, is more than a rule of procedure: see *Burland* v. *Earle* [1902] A.C. 83; *Cook* v. *Deeks* [1916] 1 A.C. 554 and *Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546.

B It is a rule of law, not of procedure. That view is supported by *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247 and *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1964] 1 W.L.R. 843. It cannot be right to treat the rule as a flexible rule of procedure, such that a minority shareholder pleading a cause of action in an unexceptionable way can have the case tried, as a matter of convenience, together with a derivative action, which would not otherwise be justifiable, and then for the court to allow the derivative action to

C proceed while the personal action fails. If one could escape the impact of the rule in *Foss* v. *Harbottle* simply by alleging fraud and oppression in a personal action which demanded full investigation of the facts in a lengthy trial, it would mean completely rejecting the rule itself. It would be a strange result if, the personal action having failed, the court concluded that the company had suffered an injury so that " in the interests of justice " the

D plaintiff ought to be granted a remedy in the derivative action. If on the other hand the personal action were to succeed, but the derivative action failed on the ground that the minority shareholder had failed to show that he was entitled to sue on the company's behalf, there would be no bar on the company bringing an action since there would be no res judicata on the cause of action point. The interests of justice do not necessarily require

E that wrongs be righted, since the majority shareholders may decide that the wrong done to the company need not be remedied. [Reference was made to *Bamford* v. *Bamford* [1970] Ch. 212.]

The defendant Bartlett is entitled to succeed on the derivative action for the reasons stated above. Prudential's contentions are contrary to a well established and long accepted line of authority, and there is no basis on which the court ought to make new law for a particular case. See

F *Gething* v. *Kilner* [1972] 1 W.L.R. 337.

*Caplan Q.C.* in reply. The powers of the Department of Trade and of the Stock Exchange take-over panel are much more limited than the Securities and Exchange Commission in the United States of America. Without the court's assistance there would be no reasonable prospect that, in some instances, wrongdoers in relation to the affairs of joint stock

G companies could be unmasked. An obvious defect of the self-regulating and self-policing system adopted in this country is that unless there is someone sufficiently public spirited and with a sufficiently deep purse to shoulder the burden of court proceedings there may be circumstances in which the policing system would prove abortive, and only an institutional investor could shoulder the burden, as Prudential has done here.

H The importance of the case goes beyond its importance merely to the parties.

The unlawful conspiracy entered into by Bartlett and Laughton was to induce Newman's board and ultimately Newman's shareholders to accept

278
Prudential Assurance v. Newman Industries (No. 2)          [1981]

the package of T.P.G.'s assets and liabilities at any price, whether beneficial A
to Newman or not. It would have been unlawful even if no unlawful means
had been adopted, such as by misleading the valuer as to value of the
assets. Laughton was appointed to the committee chosen to supply informa-
tion to the valuer of the assets of T.P.G. and played a principal part in their
task. It is hard to imagine a more inappropriate appointment of someone
to deal with the valuer chosen on Newman's behalf than someone who had
conflicting loyalties and whose personal interests would be benefited the B
higher the valuation turned out to be. Conspiracy can properly be inferred
where two persons are found doing separate wrongs which conduce to a
personal benefit of the same kind to both. The crucial question is not
whether Bartlett honestly believed that the price to be paid by Newman was
a fair one, and that Newman stood to benefit from the transaction, but
whether he believed that the price had been fairly arrived at and had been
given proper consideration by the board, based on the information which C
the board should have had. The advantages of acquiring T.P.G.'s assets
may have been put to the board but not the disadvantages of taking over
T.P.G.'s liabilities. The outrageous conduct of Laughton as a director of
Newman inducing the valuer to T.P.G.'s assets in a telephone conversa-
tion to increase the proposed valuation by nearly £100,000, can hardly
be described in moderate language. D

The overall impression conveyed by the circular submitted to Newman
shareholders was that £325,000 was a fair price to pay for the package of
T.P.G.'s assets and liabilities, which anyone else could have been expected
to pay, and that the transaction was recommended by the directors after
having had a proper opportunity to consider the valuation and based on
information provided by Deloittes which had been fairly arrived at without
improper influence having been exerted by Newman's directors adversely E
to Newman's interests. That was the impression which Bartlett and
Laughton knew and intended that it should convey, though they knew it
to be false in every respect. Bartlett's words at the meeting on July 8, 1975,
further fostered the impression, and he failed at that meeting to disclose
that a promissory note forming part of T.P.G.'s assets had already been
dishonoured. F

With regard to the personal and representative actions, a conspiracy to
injure without a legitimate interest to protect is itself a tort where damage
has been suffered as a result. The defendants' contention that no damage
to the shareholders has been proved is negatived by three propositions:
(1) that in the absence of special circumstances such as a take-over bid,
the market price of shares is based on the expectation of profits; (2) that the
expectation of profits is based upon past history and the company's assets G
being skilfully used, the larger the assets the larger the profit expected;
(3) that if the fair price for the assets had been less than in fact it was,
Newman would have had a larger asset base remaining available, which
would have produced a higher expectation of profits than if a larger sum
was paid, as in fact was the case. The profits would have been greater
and the share quotation therefore higher. These three propositions are self
evident to the extent that they have not been proved. Possibly—though H
this may be academic—if the derivative action succeeds the plaintiff in his
personal capacity will have obtained redress, and will therefore have

Case: 25-643, 06/06/2025, DktEntry: 65.1, Page 203 of 225

A-10106

Case 1:21-cv-11059-GHW   Document 141-14   Filed 06/14/23   Page 23 of 76
279
1 Ch.          Prudential Assurance v. Newman Industries (No. 2)

A   suffered no damage, thus obviating the risk of double damages being awarded for the same injury; whereas if the derivative action were dismissed, leaving it still open to the company to sue, but the shareholders have, in their representative action, got their damages, it might be doubtful what defences the defendants would then have, if sued by the company. That, however, is a problem which does not arise here in view of Prudential's stated intention that if the derivative action succeeds they will not

B   seek an order for damages. Shareholders who had sold their shares, since the transaction, would still have a right of action. If a purely personal action had been brought and had succeeded, and it was manifest from that that the company could sue if it desired, the problem arises in its most acute form, because there is probably no authority, entitling the court to say that a person injured by a conspiracy had no right of action because someone else, i.e., the company, might have a right of action against the

C   same defendants. But again Prudential's attitude obviates the need to consider this interesting but academic situation.

    The rule in *Foss* v. *Harbottle*, 2 Hare 461, applies to the derivative action against the individual defendants and that against T.P.G. in the same way. The tendency has been to regard the rule as a kind of incantation which automatically closes the door against an approaching litigant, but

D   that " fraud on a minority " and " ultra vires " are other incantations which open the door. The rule does not in origin relate to non-interference with internal management of companies. Provided the articles are complied with, the majority is free to regulate the company's affairs in whatever way they think fit, but the rule is not the same as saying that the question whether to enforce a right of action should be left to the decision of the majority, though it is analogous to that. Where any persona, whether legal

E   or natural, is possessed of a remedy, prima facie, it is at the instance of that persona that the law should be set in motion to obtain that remedy. [Reference was made to *Cotter* v. *National Union of Seamen* [1929] 2 Ch. 58.] The *Foss* v. *Harbottle* principle relates to jurisdiction only in the sense that it states a prima facie rule as to the circumstances in which the courts will decline to exercise jurisdiction. A substantive right relates to the right

F   which a person has to a remedy; procedure deals with the way in which that person's right is to be enforced. If it can only be enforced by proceedings at his own instance, that is a matter of procedure, and if it can only be enforced by proceedings at someone else's instance on his behalf, that is still a matter of procedure. The rule is essentially one of demurrer.

    Cases on the rule in *Foss* v. *Harbottle* can be classified into two cate-

G   gories, those where the court sees no reason to depart from the rule, and those where the court finds a reason to depart from it. In the first category is *Foss* v. *Harbottle*, 2 Hare 461 itself. In considering the possible circumstances which might induce the court not to decline jurisdiction, Wigram V.-C. nowhere referred to " fraud on a minority " or to " ultra vires," and the case did not purport to lay down a complete and comprehensive state-

H   ment of the relevant circumstances which would justify the court in not applying the prima facie rule.

    A transaction which is ultra vires the company is void, not merely voidable; it cannot be ratified by the shareholders in general meeting, and

280

so in not declining jurisdiction and allowing a minority shareholder to sue in **A** such a case the court is not usurping the right of the majority of the share- holders.  If the transaction has not been completely implemented the court would not refuse a declaration of voidness and an injunction to restrain its implementation.  The court allows a derivative action because it sees a good reason for doing so, whether or not that reason comes within the category of "the needs of justice."  If the transaction has been fully implemented, the company may have a remedy in damages against some **B** of the directors, and while the shareholders in general meeting would have no power to sanction it retrospectively, they could decide not to pursue the directors for damages.  The most obvious reason for not applying the prima facie rule would be the interests of justice, which are not bounded by fraud on a minority or ultra vires.  A general meeting may always condone a director's conduct whether in connection with implementing a void trans- action or for some other breach of duty.  *Burland* v. *Earle* [1902] A.C. 83 **C** falls into both categories, because part of the claim was on the basis that it was ultra vires to establish a reserve fund out of profits rather than to distribute them and part dealt with matters for which Burland was called to account as a trustee, in respect of improper investment of the company's money.  It is helpful in all these cases to look at the actual decision, and not to look at the dicta too closely, which it is often hard to reconcile one **D** with another.  It is a fraud on a minority for a majority shareholder who happens to be a trustee of the company's money to refuse to account, even if there is no other fraud involved.  *MacDougall* v. *Gardiner,* 1 Ch.D. 13 falls squarely within the first category, so that anything said as to what would be good reasons for not declining judgment would be purely obiter. In *Menier* v. *Hooper's Telegraph Works,* 9 Ch.App. 350, the good reason found by the court could be construed as a fraud on a minority or as a **E** threatened exercise of ultra vires powers, namely, giving the company's property to the majority to the exclusion of the minority pursuant to a resolution of the company in general meeting.  This case falls into the second category.

*Atwool* v. *Merryweather,* L.R. 5 Eq. 464, is a case of much interest and importance.  Page Wood V.-C. decided the case, it appears, on two separate **F** grounds, one being that where it was alleged that a defendant had obtained shares by fraud that was a good ground for exercising jurisdiction in a derivative action since otherwise if the shares fraudulently issued consti- tuted a majority there would be no way of putting matters right—the ratio decidendi therefore appears to be that where the shares allegedly issued in fraud were not a majority the casting of those shares at a general meeting with other shares though not amounting to control could preclude the **G** possibility of a fairly arrived at decision.  The second ground may perhaps be based on ultra vires, or on the fact that it might be said that the fraud was practised both against the company with respect to the acquisition of assets and against the shareholders for inducing them to purchase shares. On that basis on both grounds the case is within the second category.  The court's insistence on the right of a majority to be deceived, would be a very **H** popular one amongst those who are bent on deceit.

*Gray* v. *Lewis* (1873) 8 Ch.App. 1035 was a case where the bill was demurrable on almost every ground possible.  In *Russell* v. *Wakefield*

**1 Ch.**      **Prudential Assurance v. Newman Industries (No. 2)**

A   *Waterworks Co.*, L.R. 20 Eq. 474, there is an obiter dictum that the exceptions to the rule depend very much on the need to do justice. There is also a reference at p. 482 to *Atwool* v. *Merryweather*, L.R. 5 Eq. 464. The use of the word " control " is important and demonstrates that the control which the court will not find tolerable is not limited to control by voting power of the wrongdoer; it can be control by deceit or the control which the wrongdoer is likely to be able to exercise. Where there has been a

B   meeting at which the shareholders have once been deceived by the wrong-doers, the court cannot conclude that at another meeting they will not be similarly deceived. *Mason* v. *Harris*, 11 Ch.D. 97, and *Cook* v. *Deeks* [1916] 1 A.C. 554 were both cases in which the sufficient ground for departing from the prima facie rule was fraud on a minority, and relevant remarks will all be obiter dicta.

C   In *Dominion Cotton Mills Co. Ltd.* v. *Amyot* [1912] A.C. 546 only two questions were decided, namely whether a certain lease was ultra vires and whether it was vitiated by fraud. Any observations on *Foss* v. *Harbottle* are entirely outside the actual grounds of decision. *Alexander* v. *Automatic Telephone Co.* [1902] 2 Ch. 56 was a case where the Court of Appeal found that the defendants had been guilty of a breach of fiduciary duty and they were in control. There was no attempt at demurrer and *Foss*

D   v. *Harbottle* was not referred to in argument at all.

     *Daniels* v. *Daniels* [1978] Ch. 406; *Pavlides* v. *Jenson* [1956] Ch. 565; *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192; [1964] 1 W.L.R. 843 and *Birch* v. *Sullivan* [1957] 1 W.L.R. 1247, dealing with the question whether breaches of duty falling short of actual fraud but amounting to equitable fraud or negligence on the part of a majority of shareholders, or whether

E   the withholding of assets of a company without fraud or ultra vires may be the subject of a derivative action, do not assist the court. If there has been actual or equitable fraud on a minority a derivative action will lie. The question whether a breach of duty by mere negligence would found an action is irrelevant.

     In *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358 there was no

F   reference to *Foss* v. *Harbottle* either in argument or in the judgment, and the case does not help. *Baillie* v. *Oriental Telephone and Electric Co. Ltd.* [1915] 1 Ch. 503 was not a case in which, on the facts, either the rule in *Foss* v. *Harbottle* or the exceptions to the rule were dealt with. The case shows that where a notice convening a meeting is required specifying the general nature of the business to be transacted, it fails to do so where it is accompanied by a tricky and misleading circular. A notice accompanied

G   by a tricky and misleading circular fails to specify the general nature of the business properly, and a resolution passed at such a meeting would be void and would remain void although the transaction which it purported to approve may have been implemented, but equally it is a resolution the passing of which would form the basis for an action for damages against the wrongdoing directors.

H   In *Burrows* v. *Becker*, 63 D.L.R. (2d) 100 the wrongdoing directors did not own the majority of the votes, and the question arose whether they could be said to have " control " or " command " of a majority because they had convincingly shown their ability to control the majority

Prudential Assurance v. Newman Industries (No. 2)                    [1981]

of the votes in the past, so that it would be futile or a waste of time to call a shareholders' meeting to decide whether an action should be instituted. The case shows that if one can show that if a meeting were held it would be futile because there was a degree of "control" or influence by the wrongdoing directors which the court did not find acceptable, then the court would allow a derivative action by a minority shareholder. The means of control which the court will not accept as tolerable for this purpose are various; they may take the simple form of the delinquents owning the majority of the votes. They may take the form, as in *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, of the delinquents having such number of votes as together with the votes of the others will "overwhelm" the opposition. They may take the form of a near bribe having been given to the shareholders in the hope of inducing them to vote in favour of the delinquents. But these examples cannot and do not exhaust the class of unacceptable means. What is alleged in the pleadings is that at the time of the commencement of this action there was no real prospect that the shareholders would have voted for action. There is no prospect that full information would have been available. The probability is that once again the shareholders would have been duped. The fact that no meeting was held in December 1975 does not result in the court applying the rule in *Foss* v. *Harbottle*, 2 Hare 461.

Another reason for allowing the derivative action in the interests of justice is that if the personal and representative action succeed alone, the derivative action being rejected, the company might then sue the directors with the risk that they would be liable for double damages, whereas if the derivative action were allowed this risk would be obviated.

In regard to the action against T.P.G., Laughton's knowledge of the conspiracy can be imputed to T.P.G.; it cannot be said that knowledge which he gained as a director of Newman of the conspiracy was confidential to Newman.

*Charles Turnbull* for the fourth defendant, T.P.G. The action to recover damages from T.P.G., as constructive trustee, on the basis of the second limb of *Barnes* v. *Addy*, 9 Ch.App. 244, is misconceived for the following reasons. If, as is alleged, the circular was tricky and misleading, then the notice convening the meeting was invalid, and the resolution approving the transaction was void and was not properly authorised on Newman's behalf. The effect of that is that neither Newman nor T.P.G. acquired a good title to what they received under the transaction and therefore Newman cannot claim, on the basis of constructive trusteeship, the difference in value between the consideration given and the consideration received, measured as at the date of the transaction. The submissions based on *Baillie* v. *Oriental Telegraph and Electric Co. Ltd.* [1915] 1 Ch. 503 and *Kaye* v. *Croydon Tramways Co.* [1898] 1 Ch. 358 to the effect that if the notice was accompanied by a tricky and misleading circular which grossly misrepresented the merits of the transaction then the notice was invalid and the resolution void are adopted. If the resolution was void there was simply no authority to carry through the transaction. In these circumstances T.P.G. could have sought a declaration that the resolution was ineffective. In the light of knowledge or alleged

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**

A  knowledge or participation in the fraud, it would have been difficult for
T.P.G. to have asked for the transaction to be unscrambled in any
action brought by T.P.G., but this could have been done by way of
counterclaim.  As to the transfer of the £325,000 from Newman to
T.P.G. if Newman's agent had no actual or ostensible authority, then
T.P.G. acquired no title to the money, and Newman could demand it
back.  T.P.G.'s liabilities would simply not be dischargeable by Newman.
B  As to T.P.G.'s assets, Newman would have acquired no title thereto, and
T.P.G. could by way of counterclaim demand their return, or their
proceeds of sale if they have since been sold.  If the assets have been sold
and the proceeds have become untraceable, then T.P.G. could claim
damages for conversion or compensation for money had and received.
A party cannot claim damages in respect of the difference in value
C  between the consideration given and the consideration received where
no title passed because the transaction was void.

If the above propositions are wrong, and if Prudential is entitled
to sue T.P.G. for loss, then the submissions for the second and third
defendants as to the method of calculating the loss and as to *Foss* v.
*Harbottle* are adopted.

*Robert Reid* for the first defendant, Newman.  Without abandoning
D  Newman's position of neutrality, the point which does alarm the company
is that if too wide an extension of the doctrine of *Foss* v. *Harbottle*, 2
Hare 461, is allowed it may lead to a multiplicity of actions by other
minority shareholders, which would be of dubious utility to the company
and which would prove extremely costly.  There is no realistic likelihood
that if Bartlett and Laughton lose the case they will be able to pay Pru-
E  dential's costs, or to have anything left over to pay damages to Newman.
The danger of such actions as this is that the company will be " killed by
kindness."  The exceptions to the rule in *Foss* v. *Harbottle* are set forth
in an unexceptionable way in *Daniels* v. *Daniels* [1978] Ch. 406, and they
should not be extended.  The proper course for Prudential to have
pursued if they indeed had evidence of fraud was to seek to get a meeting
F  of the company called and to have placed the evidence before the meeting.
It is not right to assume that the meeting would have been deceived or
misled again, if in truth they were misled in the first place.  If the
Newman directors had refused to call a meeting and if Prudential failed
to get sufficient support from other shareholders to force the calling of a
meeting, Prudential could as a last resort have asked the Department of
Trade to take action under section 37 of the Companies Act 1967.  If
G  a new exception is allowed on these lines the number of shareholders
affected who are continuing shareholders must be shown and the matter
must be dealt with in the pleadings.

*Scott Q.C.* in further argument.  *Lewin, Trusts*, 16th ed. (1964), pp.
637, 638 states the principle for which *Foley* v. *Burnell* (1783) 1 Bro.C.C.
274; (1785) 4 Bro.Parl.Cas. 319 is cited in support.  In *Travis* v. *Milne*
H  (1851) 9 Hare 141 it is said that the surviving partners of a testator dealing
with the property of the testator with the knowledge that it belongs to the
estate are bound to inquire into the trusts on which it is held and are
liable as if they had actual knowledge of those trusts, but nevertheless a

284

**Prudential Assurance v. Newman Industries (No. 2)**        **[1981]**

suit by parties beneficially interested in the estate of a deceased partner        A
cannot be maintained against both his executors and surviving partners
in the absence of special circumstances, but collusion is not the only
ground for such a suit and it may be maintained where the relation
between the executors and surviving partners is such as to present a
substantial impediment to the prosecution by the executors of the rights
and parties' interests in the estate against such partners. That is a very
different approach from that in the *Foss* v. *Harbottle* cases, where the        B
court is concerned to see that the wrongdoers should not be able to prevent
action being brought against themselves, by a manipulation of their
position in the company. See also *Yeatman* v. *Yeatman* (1877) 7 Ch.D.
210 and *Harmer* v. *Armstrong* [1934] Ch. 65. *Vandepitte* v. *Preferred
Accident Insurance Corporation of New York* [1933] A.C. 70 underlines
that there is no reason why the principle that where a person is entitled to        C
use the name of another the practice of allowing him to sue in that name
should not apply where the contract is one made under seal.

The interesting point in these cases is that there is a flexibility wielded
by the court to avoid forcing potential plaintiffs through two different
sets of proceedings in order to produce the same obvious result. Where
the court can see on the material before it what the result will be in the
preliminary proceedings of the *In re Beddoe's* type [1893] 1 Ch. 547, then        D
sensibly the court does not insist on such preliminary proceedings. If that
is the right analysis of the principle, there is no analogy with the *Foss* v.
*Harbottle* line of cases, because there is no preliminary action that the
minority shareholder can bring, the necessity for which can be avoided by
the court, since what the court is concerned with is what the majority of
the shareholders may or may not decide for themselves.        E

Whilst the position of the beneficiary in an unadministered estate is
somewhat similar to that of a shareholder in that he has no legal or equit-
able interest in the assets of the company, there is nevertheless this
fundamental distinguishing feature, namely that in the beneficiary's case
the court has jurisdiction in equity to give directions for the administra-
tion of the estate, and, to give effect to such directions, may allow the
beneficiary to sue in his own name, joining the trustee as a defendant.        F
But there is no counterpart with regard to a company. The cases do not
demonstrate any broad flexibility in procedure entitling the court to allow
a minority shareholder's action simply because it might be convenient
to do so.

An infant's action is brought by a next friend, and similarly with a
mental patient but in neither case is there an exception to the rule that        G
the person having the cause of action must be the plaintiff. There is no
provision for making an infant or a mental patient a defendant. The
true plaintiff always brings the action.

The exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461, applies
and applies only where the wrongdoers are, by means of a manipulation of
their position in the company, in a position to prevent the action being        H
brought against themselves. That principle covers the ordinary case
where they hold a majority of 51 per cent. or more, or sufficient control
to prevent what would otherwise be a majority from authorising the

285

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)

A    action, or where they control the board and are thereby in control by means of proxies.

    The effect of allowing a minority shareholder to bring an action would be an injustice to the majority. A director owes two entirely separate duties, a fiduciary one to the company and a separate duty in certain circumstances to the shareholders, this latter duty being a " tortious " one. It is a coincidence if one finds that a particular act happens to be a breach
B    of both duties. In no way can the majority deprive an individual shareholder of a right *vested in himself*. If there was a breach of duty, but no damage to the shareholder, he has no right of action. If there has been damage, the shareholder can sue irrespective of any derivative action. While success by a shareholder in a personal action might show the likelihood of success by the company in the company's action, it would not
C    necessarily be so, since the duties are different. If dishonest advice is given by a director to the shareholders there is plainly a breach of duty.

    Newman's expectation of profit, after the acquisition of T.P.G.'s assets for £325,000, was based on the fact that the market believed that Newman had received assets of that value. The fallacy of the Prudential's submissions is in saying that there would necessarily have been a greater
D    *expectation* of profit if the assets had been bought for say only £125,000. There is no evidence as to what in fact the market's expectations were.

    *Caplan Q.C.* replied.

*Cur. adv. vult.*

    February 18 and 19, 1980. VINELOTT J. read the following judgment.

E
*Introduction*

    The plaintiff, Prudential Assurance Co. Ltd. (" Prudential ") is and has at all material times been the holder of 3·2 per cent. of the issued ordinary shares of the first defendant, Newman Industries Ltd. (" Newman "). At the material time the second defendant, Alan Frank Bartlett, was the
F    chairman and chief executive of Newman and the third defendant, John Knox Laughton, a non-executive director and vice-chairman of Newman. Mr. Bartlett and Mr. Laughton were also the non-executive chairman and the vice-chairman and chief executive respectively of the fourth defendant, Thomas Poole & Gladstone China Ltd. (" T.P.G."). T.P.G. held 25·6 per cent. of the issued ordinary shares of Newman. Another company, Strongpoint Ltd., all the shares of which were beneficially owned by Mr. Bartlett
G    and Mr. Laughton and of which they were directors, held over 35 per cent. of the issued ordinary shares of T.P.G.

    By an agreement dated June 3, 1975, T.P.G. agreed to sell and Newman agreed to purchase a bundle of assets (" the package ") which comprised all the assets then owned by T.P.G. except its holding of shares of Newman and a debt of £100,000 owed to it by Strongpoint. The consideration for
H    the sale was the assumption by Newman of all the liabilities of T.P.G. consisting of bank overdrafts and loans amounting to £1,117,000. and the payment by Newman to T.P.G. of a balance of £325,000 cash. The agreement was conditional upon its approval in general meeting both by the

286
Vinelott J.          Prudential Assurance v. Newman Industries (No. 2)          [1981]

members of T.P.G. and by the members of Newman. Having regard to     A
the common directorships of Mr. Bartlett and Mr. Laughton (and others)
and to their beneficial ownership of Strongpoint, the Stock Exchange
regulations governing "Admission of Securities to Listing," embodied in
what is commonly known as the "Yellow Book," required that the
agreement should be subject to this condition. By a circular letter dated
June 21, 1975, Mr. Bartlett informed the shareholders of Newman that the
directors of Newman recommended them to vote in favour of a resolution     B
approving the agreement of June 3, 1975. The letter also informed the
shareholders that the directors recommended them to vote in favour of a
further resolution approving the exercise by Newman of an option to
acquire from Strongpoint 3,500,000 ordinary shares of 5p each of T.P.G.
amounting to 19·8 per cent. of the issued ordinary share capital of T.P.G.
at a price of 10p per share, making an aggregate consideration of £350,000,     C
of which £280,000 had been paid to Strongpoint on July 2, 1974, the date
of an agreement by which the option (which I shall refer to as "the
Strongpoint option") was said to have been created. I shall for convenience
refer to that circular letter and its accompanying appendices as "the
Newman circular." The Newman circular was accompanied by a notice
convening an extraordinary general meeting of Newman on July 8, 1975,
for the purpose of considering and if thought fit passing the two resolutions     D
which I have mentioned. On or shortly before July 8, 1975, Prudential
persuaded the directors of Newman to adjourn the extraordinary general
meeting until July 29, 1975. The adjournment was agreed in the expectation,
disappointed in the event, that a report would be obtained before July 29,
1975, from an independent firm of merchant bankers on the merits of the
resolutions. On July 29, no report having been obtained from the merchant     E
bankers appointed, namely Schroder Wagg & Co. Ltd., Prudential again
proposed an adjournment. That proposal was defeated on a poll and the
resolution approving the agreement of June 3, 1975, was approved. The
resolution approving the exercise of the Strongpoint option was not put to
the extraordinary general meeting.

I shall return later in this judgment to the precise sequence of events     F
in June and July 1975 and to the subsequent history of the investigation
and report by Schroder Wagg & Co. Ltd. It is sufficient for the purpose of
these introductory remarks to say that Prudential claim that the Newman
circular was, and was known and intended by Mr. Bartlett and Mr.
Laughton to be, tricky and misleading, and that Mr. Bartlett and Mr.
Laughton conspired to procure this tricky and misleading circular to be
sent to the shareholders of Newman in order to induce them to approve     G
an agreement designed to benefit T.P.G. at the expense of Newman. The
claim is brought by Prudential on behalf of itself and all other share-
holders of Newman, except Mr. Bartlett and T.P.G., to recover damages
or compensation in favour of Newman; to that extent the claim is what is
now, following the practice in the United States of America, frequently
called a "derivative claim." But Prudential also makes a claim against     H
Mr. Bartlett and Mr. Laughton for damages for conspiracy. I shall refer to
this as the direct claim and in so far as Prudential seeks damages on its
own behalf, the direct personal claim. On June 18, 1979, I heard and

287

**1 Ch.**     Prudential Assurance v. Newman Industries (No. 2)     Vinelott J.

A   dismissed an application by Mr. Bartlett and Mr. Laughton that it be
determined as a preliminary issue whether as a matter of law Prudential,
as a minority shareholder, is entitled to maintain a derivative claim against
defendants who do not control the majority of the votes capable of being
cast in general meeting of the company on whose behalf the derivative
claim is brought. On June 28 ([1980] 2 W.L.R. 339), I heard and allowed
an application by Prudential to amend the title to the action and the relief
B   sought so as to join with the direct personal claim against Mr. Bartlett and
Mr. Laughton a claim by Prudential as representing all shareholders of
Newman, other than Mr. Bartlett and T.P.G., as at July 29, 1975, for
declarations that the Newman circular was misleading and tricky, that Mr.
Bartlett and Mr. Laughton conspired to procure the distribution of the
Newman circular in order to induce the shareholders of Newman to vote
C   in favour of the resolution approving the agreement, and that that
conspiracy was an unlawful conspiracy founding a claim for damages by
any member of the class represented who was injured thereby. Common
to the derivative claim and to the direct claims both personal and
representative are the allegations that the Newman circular was deliberately
tricky and misleading and that Mr. Bartlett and Mr. Laughton conspired
to procure its circulation in order to secure the approval of an agreement
D   designed to benefit T.P.G. at the expense of Newman.

The evaluation of these claims requires a detailed examination not only
of the terms of the Newman circular but also of the financial position of
T.P.G. at the time that the agreement of June 3, 1975, was negotiated,
of the history and method of valuation of the individual items comprised
in the bundle of assets acquired by Newman and of the relationship
E   between, on the one hand, T.P.G. and Strongpoint and, on the other hand,
T.P.G. and Newman. But there are two matters which are recurring themes
in this history and of which some preliminary explanation is needed.
These are, first, the requirement of the Yellow Book and, secondly, the
proper treatment in the balance sheet of a company which holds what has
been described as a " strategic stake " in another company—that is a hold-
F   ing of not less than 20 per cent. nor more than 50 per cent. of the shares
of that company carrying voting rights coupled with representation on its
board of directors—of the assets and undistributed profits of the company
in which the strategic stake is held.

*The Yellow Book*

G   Chapter 4 of the Stock Exchange regulations, governing the " Admission
of Securities to Listing," contains the requirements of the Stock Exchange
concerning acquisitions and realisations of assets by companies which have
the privilege of listing and quotation on the Stock Exchange and which
have accordingly entered into a listing agreement. Chapter 4 deals with four
categories of transactions of which only two are relevant. A class 1 transac-
H   tion includes one where the value of assets acquired or disposed of by a
listed company amounts to 50 per cent. or more of the value of the other
assets of the acquiring or disposing company. Such a transaction must
(save in exceptional circumstances and with the approval of the Council

288

Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

of the Stock Exchange) be explained to the members of the company con-
cerned by a circular approved by the Quotations Department of the Stock
Exchange. The approval of shareholders is not required. A class 4 transac-
tion includes one under which there is an acquisition or disposal of assets
by a company or the subsidiary of a company from or to a director or
substantial shareholder or from or to an associate of a director or
substantial shareholder—including any company which is a subsidiary or
holding company of such a substantial shareholder. Save in exceptional
circumstances and with the approval of the Council of the Stock Exchange
such a transaction must be explained in a circular sent to the shareholders
and must be made conditional on their approval in general meeting. The
Council of the Stock Exchange reserve the right to require that any
director or substantial shareholder or associate interested in the transaction
abstain from voting. Although not specifically so provided in the Yellow
Book current in June 1975 in practice the Quotations Department of the
Stock Exchange almost invariably require that a report by independent
financial advisers on the merits of the acquisition or disposal be obtained
and that the substance of that report be set out in the circular.

These provisions form a very important part of the voluntary system of
regulation of the City administered by, amongst others, the Stock Exchange.
The sanction for failure to comply with these regulations is, of course, a
suspension of the offending company from listing on the Stock Exchange.

*The accounting standards*

The Institute of Chartered Accountants from time to time issues
statements of standard accounting practice which prescribe methods of
accounting approved by the Council of the Institute. The standards
prescribed are not intended to be a comprehensive code of inflexible rules
but they are intended as more than a guide or indicator of practice. Where,
for some exceptional reason, they are impractical or inappropriate a
departure from the standards must be disclosed and explained. They must,
of course, be read subject to the overriding requirement that accounts must
be so presented as to give a true and fair view of a company's affairs.

In January 1971 a statement of standard accounting practice was issued
dealing with the method of accounting for the results of associated
companies. The Companies Act 1948 requires a company which has a
subsidiary to produce group accounts, normally consolidated accounts,
showing the combined assets and liabilities and the combined profits or
losses of the parent and subsidiary companies. The 1971 statement noted:

"In recent years there have been two important developments. One
has been the growing practice of companies to conduct parts of their
business through other companies (frequently consortium or joint
venture companies) in which they have a substantial but not a con-
trolling interest. The other is the importance which investors have
come to attach to earnings (as distinct from dividends), the price/
earnings ratio (P/E ratio) and, increasingly, earnings per share. Thus,
in order that the investing companies' accounts as a whole may give
information, and provide a total of earnings from which the most

289

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A    meaningful ratios can be calculated, it is considered necessary that the coverage of consolidated accounts be extended so that they should include (within the framework of the existing law), the share of earnings or losses of companies which are described in this statement as associated companies . . ."

The description or definition of an " associated company " provides that a company is to be treated as an " associated company " of a group or
B   company acquiring shares in it (referred to as the " investing group or company ") if (not being a subsidiary of the investing group or company) either

    " (a) the investing group or company's interest in the associated company is effectively that of a partner in a joint venture or consortium; or (b) the investing group or company's interest in the associated company
C   is for the long term and is substantial (i.e. not less than 20 per cent. of the equity voting rights), and, having regard to the disposition of the other shareholdings, the investing group of company is in a position to exercise a significant influence over the associated company."

D   The standard requires that where the investing group or company produces consolidated accounts the investing group or company must show in its consolidated profit and loss account the aggregate of its share of pre-tax profits less losses of associated companies, the tax attributable thereto and the net profits retained by the associated companies.  The requirements concerning the consolidated balance sheet are as follows:

    " Unless shown at a valuation, the amount at which the investing
E   group's interests in associated companies should be shown in the consolidated balance sheet is: (a) The cost of the investments less any amounts written off and (b) the investing company or group's share of the post-acquisition retained profits and reserves of the associated companies . . . Information regarding associated companies' tangible and intangible assets and liabilities should be given, if materially
F   relevant for the appreciation by the members of the investing company of the nature of their investment."

    Two points should be noted. First the standard applies to quoted as well as to unquoted companies; as regards holdings in the equity share capital of unquoted companies the provisions of the standards overlap, and must not be read as derogating from, the provisions introduced
G   by paragraph 5A of Schedule 2 to the Companies Act 1967. Secondly, there is nothing in the statement which requires or justifies the inclusion in the consolidated accounts of the investing group or company of a share of the net assets or liabilities of an associated company. Information regarding tangible and intangible assets and liabilities must be given " if materially relevant for the appreciation by the members of the investing
H   company of the nature of their investment." Such information will ordinarily be given by a note in the accounts and not by consolidation of the assets and liabilities of the associated company in the consolidated accounts of the investing group or company.

290
Vinelott J.        **Prudential Assurance v. Newman Industries (No. 2)**        [1981]

One of the witnesses who gave evidence on behalf of Prudential was
Sir Charles Ball, a well known merchant banker who was for many years   A
vice-chairman of Kleinwort Benson & Co. Ltd. Sir Charles Ball was trained
as a chartered accountant becoming a member of the Institute in 1950
and a fellow in 1960. He said that he had never known a case where a
share of the underlying assets of an associated company had been brought
into the balance sheet of the investing group or company. It was suggested
to him in cross-examination that it was in fact common practice to do so   B
and Sir Charles Ball was referred to the published accounts of a number
of large public companies—such as General Electric Co., Beecham Group,
Taylor-Woodrow Group and Royal Dutch/Shell Group—in which shares
of the underlying assets of associated companies were so treated. However,
as Sir Charles pointed out, it is dangerous to draw conclusions from
published accounts alone without making investigation into the reasons for   C
a particular accounting treatment. There may be exceptional circumstances
which justify bringing a share of the underlying assets of associated com-
panies into consolidated accounts.  For instance, in the case of General
Electric Co. none of the associated companies was quoted on the London
Stock Exchange; most were unquoted though some were quoted on
overseas stock exchanges; it was apparent from the description that many,   D
if not all, the associated companies were in the nature of joint ventures,
many in foreign companies where the local laws required that a majority
of the voting shares be held by local residents. There may be good reasons
for including a share of underlying assets in the case of an associated
company formed as a joint venture with a foreign investor if the contribu-
tion made by each investor is made on terms that the aggregate will be
applied in the acquisition of assets which in turn will appear at cost in   E
the balance sheet of the associated company. Although Sir Charles Ball's
view may initially have been expressed in terms which were too categorical,
I accept his evidence that, in the absence of exceptional circumstances
such as those I have described, it is contrary to good accounting practice
to include in consolidated accounts a share of the underlying assets of an
associated company and that in the case, at least, of a trading or manu-
facturing company, the inclusion of a share of underlying assets in the   F
consolidated accounts of the investing group or company is likely to
produce a misleading, even a very misleading, impression of the true value
of the assets of the investing group or company. A share of the underlying
assets of an associated company is unlikely to provide any guide to the
market value of the shares of that company held by the investing group
or company—at least in those cases where the associated company is a   G
trading or manufacturing company: it may be different if the associated
company is a property holding or investment company, whose assets have
been recently revalued. As will be seen, in the present case the device of
including as assets of T.P.G. a share of the underlying assets of certain
of its associated companies played an important part in the original
formulation of the proposals for the acquisition by Newman of T.P.G.'s   H
assets and in the way in which the transaction was presented in the
Newman circular.

A-10118

291

1 Ch.        Prudential Assurance v. Newman Industries (No. 2)        Vinelott J.

*Background history*

A

[The following is a summary of the facts stated by his Lordship. Mr. Bartlett, a management consultant and a director of several public companies, became a director of Newman in 1969 and its non-executive chairman in 1973. Newman's main business was the manufacture of electric motors but under Mr. Bartlett's direction it pursued a policy of expansion. That resulted in a liquidity problem and by the end of 1974

B Newman's current assets were valued at £14,789,619 and its liabilities, which included a bank overdraft exceeding £5 million, at £12,109,740. At the beginning of 1975 Newman, like other companies, faced a possible recession and a period of tight credit.

Mr. Laughton, a qualified chartered accountant and a management consultant, was on the board of a company of which Mr. Bartlett was

C deputy chairman. In 1971 Mr. Laughton became a director of T.P.G. which was then a small public company carrying on business manufacturing pottery and china. Subsequently he became chief executive of T.P.G. In October 1971 Mr. Bartlett became a director of T.P.G. In 1974 Mr. Laughton became a director of Newman.

Between 1972 and the end of 1974 T.P.G. acquired interests in various

D companies. In January 1973 it acquired the assets of Strongpoint Ltd. which had a substantial shareholding in T.P.G. and a shareholding in Newman. Subsequently Mr. Bartlett and Mr. Laughton transferred their shares in T.P.G. to Strongpoint which by December 31, 1974, held 35 per cent. of T.P.G.'s issued ordinary shares. T.P.G. acquired further shares in Newman giving it a 25 per cent. shareholding in Newman. It also acquired shareholdings in Alfred Clough Ltd. (" Clough "), in a private company,

E S. Newman Ltd., in various commercial radio companies (" the media interests "), in Dover Engineering Ltd. (" Dover "), in Metropole Industries Ltd. (" Metropole ") and in Agar Cross Ltd. (" Agar Cross "). T.P.G. also formed a new company, Smithamcote Ltd., to acquire shares in two other companies in exchange for shares in Smithamcote. T.P.G. took 49 per cent. of voting shares of Smithamcote and sold to Smithamcote for

F £100,000 (which remained outstanding as a debt due from Smithamcote) shares of an investment company into which had been put T.P.G.'s minority holding of shares of S. Newman Ltd. T.P.G.'s acquisitions were financed partly by the issue of shares in T.P.G. and partly by cash borrowings from banks. By the end of 1974 the cash borrowings amounted to about £1 million and included a loan from the Ulster Investment Bank Ltd. (" Ulster ") which was repayable by January 31, 1975. The bank

G borrowings were made on terms that T.P.G. deposited with the banks quoted investments having a market value exceeding the amount of the borrowing by a certain percentage. Due to the decline of the stock market at the end of 1974 T.P.G., by January 1975, was in serious financial difficulties; the overall collateral security provided by it for bank borrowings had become inadequate, its investment income was insufficient to meet

H its running expenses and interest on the borrowing and there was no other source of money to which it could resort; moreover the Ulster loan was due for repayment on January 31. In those circumstances agreements (" the January agreements ") were entered into by exchange of letters dated

Vinelott J.        **Prudential Assurance v. Newman Industries (No. 2)**        [1981]

January 7 which were not disclosed to the Newman board, whereby New-    A
man agreed to buy T.P.G.'s shareholdings in Metropole and Dover for
£85,000 and £146,000 respectively, payable by instalments; the value of
those shareholdings on the Stock Exchange was £37,450 and £104,000
respectively. Under the January agreements Newman paid £215,950 to
T.P.G., without the knowledge of the Newman board, which T.P.G. used
to keep afloat; but its underlying difficulties were not alleviated, although it
was granted an extension of time, to March 31, 1975, to repay the Ulster    B
loan. Mr. Bartlett therefore conceived another, bolder, plan, namely, to
sell T.P.G.'s entire portfolio to Newman whilst concealing the January
agreements and the payments made thereunder.

To implement the plan Mr. Bartlett prepared a memorandum (" the
strategy document ") for the Newman board which was supplied to board
members at or shortly before a Newman board meeting held on March 4,    C
1975. The strategy document made two recommendations (" the package ");
first that Newman should purchase from T.P.G. all T.P.G.'s assets, except
for its shareholding in Newman and a loan to Strongpoint of £100,000, in
consideration for Newman assuming T.P.G.'s liabilities and making a
cash payment to T.P.G. of £350,000; and secondly, that Newman should
purchase three and a half million ordinary shares of T.P.G. from Strong-
point (i.e. approximately 20 per cent. of T.P.G.'s issued ordinary shares)    D
on payment by Newman to Strongpoint of £70,000, in addition to a sum
of £280,000 already paid by Newman to Strongpoint for the Strongpoint
option, to purchase from Strongpoint shares in T.P.G. The strategy docu-
ment stated that it was within T.P.G.'s resources to mount a takeover bid
for Newman. That was a dishonest statement since T.P.G. was not in a
position to mount a takeover, and was made to induce the Newman board    E
to accept the proposed transaction. Further, the document attributed a
value to T.P.G.'s assets which Mr. Bartlett and Mr. Laughton knew was
false and misleading.

At the board meeting held on March 4 at which Mr. Bartlett was
appointed chief executive of Newman and Mr. Laughton was appointed
vice-chairman " responsible to the board for negotiations," it was resolved,    F
after some preliminary discussion of the package, to consider the strategy
document at a later board meeting on March 17 to enable the board
to give further thought to the document. At the meeting on March 17
Mr. Bartlett and Mr. Laughton persuaded all the members of the board
except for Mr. Angus Murray (a professional company director of wide
experience who regarded himself as watchdog for Newman shareholders)
to accept the package in principle, but no final agreement was reached    G
to implement it and in particular there was no agreement as to the
detailed composition of the package. To protect Newman's interests
Mr. Murray ensured, at the meeting, that a report would be obtained
on the package from Newman's auditors, Deloitte & Co., and the board
agreed to appoint a sub-committee, which included Mr. Laughton, to
brief Deloitte on the matter. Mr. Murray thought that a final decision    H
on the transaction would not be made until the board had considered
Deloitte's report but Mr. Bartlett and Mr. Laughton were determined
to press ahead with the transaction without giving the board further

293

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A opportunity to consider it. With this end in mind they instructed Mr. Cooper of Deloitte's to make a valuation of the net assets to be acquired by Newman under the package, and instructed solicitors to commence work on the necessary circular to Newman shareholders explaining the transaction. On March 24 Mr. Bartlett wrote to the Stock Exchange stating that the Newman board had unanimously approved the recommendations in the strategy document. Because Mr. Bartlett and Mr.

B Laughton misled Mr. Cooper regarding the package and the assets to be acquired under it and led him to believe that it would be sufficient for him to produce a valuation of the transaction as a whole without attributing a value to each asset to be acquired, Mr. Cooper applied an improper process of valuation which resulted in a provisional valuation of the net value of the assets to be acquired at £235,000. At Mr. Laughton's persua-

C sion Mr. Cooper increased valuation to £325,000. The latter figure exceeded by approximately £445,000 the market value of the package as a whole even on the footing that Newman as a willing purchaser would pay a premium of 10 per cent. over the mid-market price of the assets. Mr. Cooper's valuation of £325,000 was put to a Newman board meeting on May 6. Mr. Bartlett and Mr. Laughton by trickery and deceit induced the board to accept the valuation as a basis for negotiating the package and

D having done that, determined to press ahead to procure the board to enter into a binding agreement with T.P.G. without giving the board any opportunity to examine the basis of Mr. Cooper's valuation. On June 3 Mr. Laughton, purporting to act on behalf of Newman, but without authorisation from the Newman board, signed an agreement implementing the package for a net consideration from Newman of £325,000. The

E agreement was conditional on approval of it by Newman and T.P.G. in general meeting.

Newman's solicitors prepared the circular required to be sent to Newman shareholders explaining the transaction (" the Newman circular "), in conjunction with Deloitte and with the assistance of, inter alia, Mr. Bartlett and Mr. Laughton. On June 18 a committee of the Newman

F board consisting of Mr. Bartlett, Mr. Laughton and two others approved the draft circular and also approved a notice convening on July 8 an extraordinary general meeting of Newman to consider two resolutions, one approving the agreement of June 3, and the other approving exercise by Newman of the Strongpoint option. The chairman's letter, forming the body of the circular, stated that the directors of Newman considered that the resolutions were in Newman's best interests and recommended share-

G holders to vote in favour of them. Mr. Murray objected to the circular because it implied, contrary to the true position, that all the Newman directors had fully considered the transactions and unanimously approved them. He put pressure on Mr. Bartlett to postpone the meeting of July 8 to allow further investigation of the transactions by merchant bankers. An extraordinary general meeting was held on July 8 but Mr. Bartlett

H decided to adjourn the meeting to July 29 having been threatened by institutional investors that unless the meeting was adjourned they would blacklist Newman shares. However Mr. Bartlett made a speech to the shareholders at the meeting on July 8 in which he made dishonest and misleading

294
Vinelott J.          Prudential Assurance v. Newman Industries (No. 2)          [1981]

statements. The Newman board resolved to appoint Schroder Wagg & Co. **A**
(" Schroder ") to investigate and report on the transactions covered by the
resolutions. Schroder were unable to complete their report in time for the
meeting on July 29. Prudential pressed Mr. Bartlett to adjourn the meeting
until Schroder's report was ready but by July 24 Mr. Bartlett had made
it clear that he would not agree to a further adjournment. Prudential there-
fore issued a writ, on July 28, claiming, inter alia, an injunction restraining
the Newman directors, except Mr. Murray, from considering proposing **B**
or voting on the resolutions in the circular and applied for an interlocutory
injunction in those terms. On July 28 Walton J. dismissed that application.
An extraordinary general meeting of Newman was duly held on July 29
(a resolution by Prudential to adjourn it until Schroder had reported being
narrowly defeated on a poll) and at that meeting the resolution that the
agreement of June 3 be approved was passed on a poll by a small majority. **C**
The resolution approving the exercise of the Strongpoint option was not
put to the meeting.   On January 9, 1976, Prudential gave notice dis-
continuing the action commenced on July 28, 1975, and on the same date
(January 9) issued the writ in the present action (which claimed that the
Newman circular was, and was known and intended by Mr. Bartlett and
Mr. Laughton to be, tricky and misleading and that they conspired to **D**
procure the circular to be sent to Newman shareholders to induce them
to approve the agreement of June 3). In his Lordship's judgment the
Newman circular was tricky and misleading in several respects and was
known to Mr. Bartlett and Mr. Laughton to be so.   His Lordship
continued: ]

*The conspiracy*                                                              **E**
     The case pleaded in the statement of claim is that (1) in addition to
the fiduciary duty which Mr. Bartlett and Mr. Laughton owed to Newman
as two of its directors : (a) Newman owed a contractual duty under article
55 of its articles of association which is in substantially the same terms as
article 50 of Table A to specify in the case of special business to be
transacted at a general meeting the general nature of that business; and **F**
(b) inasmuch as the Newman circular contained advice from Mr. Bartlett
and Mr. Laughton to the shareholders to vote in favour of the proposed
resolution approving the agreement of June 3 each of them owed an
obligation to every shareholder to give that advice in good faith and not
to advise in a tricky or misleading fashion.
     (2) Mr. Bartlett and Mr. Laughton conspired to benefit T.P.G. at the **G**
expense of Newman and the shareholders of Newman by procuring the
approval of the shareholders of Newman in general meeting to the agree-
ment of June 3 by means of the distribution of a circular which they knew
and intended to be misleading and tricky.
     (3) The conspiracy was (a) a conspiracy to commit an unlawful act;
(b) a conspiracy to injure Newman and the shareholders of Newman; and
(c) a conspiracy to induce or procure a breach of Newman's contractual **H**
obligations to its shareholders.
     (4) By means of such conspiracy Mr. Bartlett and Mr. Laughton
procured the approval of the shareholders of Newman to the agreement

295

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A of June 3 and by reason of that approval Newman and its shareholders have suffered damage for which Mr. Bartlett and Mr. Laughton are liable to Newman and its shareholders.

Mr. Scott accepts, and in my judgment rightly, that Mr. Bartlett and Mr. Laughton as directors of Newman, in advising the shareholders of Newman to support the resolution for the approval of the agreement of June 3, owed them a duty to give such advice in good faith and not to do

B so in a tricky and misleading way: see *Gething* v. *Kilner* [1972] 1 W.L.R. 337. But Mr. Scott submitted that there is no evidence to support the only conspiracy pleaded in the statement of claim, that is, a conspiracy to procure the approval by the shareholders of Newman of the agreement of June 3 by means of the distribution of a circular which they knew and intended to be misleading and tricky. In my judgment Prudential has

C established the facts relied upon in the parts of the statement of claim which I have summarised. In my judgment the inception of the conspiracy and the steps taken in furtherance of it were as follows:

(1) In January 1975 in order to meet T.P.G.'s pressing obligations Mr. Bartlett and Mr. Laughton procured the execution of the January agreements and procured the payment by instalments between January 8 and April 18, 1975, of sums amounting to £215,950. The January agree-

D ments were executed and the instalments were paid without the authority of the board of Newman. In procuring the execution of the agreements and the payment of the instalments Mr. Bartlett and Mr. Laughton conspired to do an unlawful act, namely, to procure the improper use of Newman's money for the benefit of T.P.G.

(2) In February 1975 Mr. Bartlett and Mr. Laughton conceived a more

E extensive plan which was to (a) persuade the board of Newman to take over all the assets owned by T.P.G., except its holding of shares of Newman, the debt owed to T.P.G. by Strongpoint and any other assets of T.P.G. which they might succeed in selling at a favourable price to another purchaser; (b) use whatever means might transpire to be available to ensure that the highest possible value was attributed to the assets of

F T.P.G. acquired by Newman in the report by an independent valuer which they knew would be necessary before the approval of the transaction by the shareholders of Newman could be obtained; (c) take whatever steps might transpire to be available to secure the approval of a sale of the assets of T.P.G. to Newman at that price by the directors and in due course the shareholders of Newman.

Mr. Bartlett and Mr. Laughton had been accustomed to work together

G as a team. They had done so in relation to the January agreements and the payments made thereunder. Each knew that he could rely upon the other to use any means, proper or improper, which might become available to him to further this plan.

(3) The first step taken in furtherance of this plan was Mr. Bartlett's "strategy document." The strategy document contained statements known

H by Mr. Bartlett and Mr. Laughton to be false and misleading. First it was represented that T.P.G. was in a position to mount a takeover and might mount a takeover of Newman. Secondly, it was represented that the value of the package net of liabilities was at least £350,000.  That representation

296
Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

was supported by a pro forma balance sheet of T.P.G. which attributed **A**
a value to assets owned by T.P.G. which Mr. Bartlett and Mr. Laughton
knew to be false and misleading in important respects. The strategy docu-
ment was to prove of crucial importance in furthering Mr. Bartlett and
Mr. Laughton's plan. In my judgment Mr. Cooper of Deloitte & Co. was
influenced in making his valuation by the belief that a sum of £350,000
net of liabilities was believed by the chairman and chief executive of
Newman to represent a fair price for Newman to pay and for T.P.G. to **B**
accept and that the other directors of Newman had agreed, subject to
confirmation by independent valuation that the price was fair, that the
price was worth paying in order to secure the commercial advantages
advanced in the strategy document.

(4) At the meeting of the board of Newman on March 17 Mr. Bartlett
and Mr. Laughton used their influence on the board to ensure that the **C**
necessary valuation would be carried out by the auditors of Newman and
not by a merchant bank in the belief (justified in the event) that they
would find it easier to persuade the auditors of Newman to accept a
valuation favourable to T.P.G. They also used their influence to procure
the appointment of a committee, including Mr. Laughton, which could be
used to supply the auditors with arguments and information supporting a **D**
valuation favourable to T.P.G. The appointment of Mr. Laughton to the
committee was secured in the following way. The appointment of a
committee—with, as Mr. Murray was led to believe, terms of reference
limited to preparing a brief for Deloittes—having been agreed, Mr. Bartlett
asked for volunteers to serve on the committee well knowing Mr. Laughton
would be the first to volunteer. **E**

(5) Shortly after the meeting of March 17 the Quotations Department
of the Stock Exchange was falsely informed that the board of Newman
had agreed the package deal subject only to obtaining the necessary
independent valuation.

(6) As was intended, Mr. Laughton played the leading role in supplying
information to Mr. Cooper. In so doing he put forward every fact and **F**
argument that would favour a higher, and failed to put forward any fact
or argument that would favour a lower, valuation of the package. In the
strategy document and in the information supplied by Mr. Laughton
material facts were either deliberately misrepresented or concealed. In
particular, Mr. Cooper was led to believe that the current level of profits
earned by Metropole was £250,000, although at the time when he com-
pleted his valuation it was known to both Mr. Bartlett and Mr. Laughton **G**
that the current level of profits of Metropole was far less. He was led to
believe that the shares of S. Newman Ltd. formed an adequate security for
the debt owed to T.P.G. by Smithamcote and to attribute a value of
£100,000 to that debt although both Mr. Bartlett and Mr. Laughton knew
that the shares of S. Newman Ltd. were worth substantially less than
the £100,000 and that the market value of the debt on whatever basis it was **H**
valued was not more than £35,000. Mr. Laughton concealed the fact,
known to him, that many unsuccessful attempts had been made to find a
buyer for the shares of S. Newman Ltd. and that the family which

297

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A    controlled S. Newman Ltd. were unwilling either to join in a flotation or sale of the entire shareholding.

(7) In a telephone conversation on May 4 Mr. Laughton was informed by Mr. Cooper that he had provisionally valued the package net of liabilities at £235,000. Mr. Laughton induced him to increase that figure to £325,000 to the benefit of T.P.G. and the detriment of Newman. In doing so Mr. Cooper was induced to add £50,000 to the value of the

B    package as representing the alleged enhancement due to the inclusion of T.P.G.'s holding of shares of Smithamcote—which taken by themselves had no market value. Mr. Laughton knew that the inclusion of T.P.G.'s holding of shares of Smithamcote added nothing to the value of the package and that in agreeing the addition of this sum Mr. Cooper had made a serious error of judgment and had made an addition to the value of the package

C    which could not be justified on any basis of valuation which he was competent to make.

(8) At the meeting of the board of Newman on May 6 Mr. Laughton concealed from the board the fact that the valuation by Mr. Cooper had attributed a value to items in the package which he knew to be far in excess of the true value of those items and that Mr. Cooper had been led to add a sum of £50,000 as representing the enhancement of the package

D    due to the inclusion of T.P.G.'s holding of shares of Smithamcote. Mr. Laughton knew that the question whether the inclusion of T.P.G.'s shares of Smithamcote in the package enhanced the package and if so to what extent was a matter of commercial judgment which ought to be considered by the board and which it was beyond the competence of Mr. Cooper to assess. In my judgment Mr. Bartlett also knew the value attributed to the

E    items in the package by Mr. Cooper in his provisional valuation and the additions he had been induced to make by Mr. Laughton. But if he did not he knew that Mr. Cooper had been led either to put a value on T.P.G.'s shares of Smithamcote which was greatly in excess of their true market value or that he had been led to put a value on other items in the package which was in excess of their true market value.

F    (9) Having secured a favourable valuation from Mr. Cooper by these means Mr. Bartlett and Mr. Laughton agreed that they would take all means available to them to ensure that the transaction between T.P.G. and Newman was not further considered by the board and to procure the passing of a resolution by the shareholders approving the transaction. They procured the execution of the agreement of June 3 and the preparation and circulation of the Newman circular knowing that the board had

G    not finally agreed the acquisition of the package from T.P.G.

(10) The Newman circular was known by Mr. Bartlett and Mr. Laughton to be misleading and tricky in the respects which I have already summarised.

(11) At the extraordinary general meeting on July 8 Mr. Bartlett, in order to assuage the anxieties of shareholders to which press criticisms had given

H    rise, made the dishonest statements which I have already summarised.

In my judgment the plan, formulated and carried into effect in the way I have described, was a conspiracy knowingly and wrongfully to injure Newman and the shareholders of Newman. Each part of the plan, agreed

298
Vinelott J.          **Prudential Assurance v. Newman Industries (No. 2)**          [1981]

expressly or tacitly in the course of and to secure the accomplishment of
the overall plan, including the contributions to and the preparation and the
approval and circulation of the Newman circular, was in itself such a
conspiracy.

*The legal issues*
   *Introductory*
      In the statement of claim as originally formulated the relief primarily
sought by Prudential comprised declarations that the Newman circular was
misleading and tricky, that the notice in the Newman circular convening
the extraordinary general meeting was invalid, that the adjourned extra-
ordinary general meeting on July 29 was not duly convened, that the
resolution approving the agreement of June 3 was invalid and that
agreement should accordingly be, in a broad sense, rescinded—that is that
the parties should be restored to their original positions. It was agreed by
Prudential before the action came on for trial that restitutio in integrum
was no longer practicable. Thereafter the action proceeded as an action
for equitable compensation, as between Newman on the one hand and Mr.
Bartlett, Mr. Laughton and T.P.G. on the other hand, and for common
law damages as between Prudential and Mr. Bartlett and Mr. Laughton.
The central issue is whether Prudential, having abandoned its claim that
the agreement of June 3 never became unconditional and that there was
no valid transfer of property pursuant to it, is entitled to bring a derivative
action—that is an action on behalf of Newman—to recover equitable com-
pensation or damages. But before turning to that question there is a
preliminary question whether on the facts I have found it can be said that
Newman has suffered any loss.

*The loss suffered by Newman*
      Mr. Caplan's submission was that Newman is entitled to recover from
Mr. Bartlett, Mr. Laughton and T.P.G. a sum equal to the difference
between the price paid for the package under the agreement of June 3
and the true market value of the assets acquired under that agreement
ascertained at the date when the resolution approving the agreement was
passed. He founded this submission upon the decision of the Court of
Appeal in *McConnel* v. *Wright* [1903] 1 Ch. 546. In that case the plaintiff
was induced by a fraudulent misrepresentation in a prospectus to subscribe
for shares in a company. The misrepresentation relied on was a statement
that the company had acquired shares in certain other companies. In fact,
those shares had not been acquired, at the date of the prospectus or at
the date of the allotment, but the shares were subsequently acquired by the
company. The argument for the defendant—the chairman of the company
—was that, as the representation upon which the plaintiff acted had been
made good shortly after the issuing of the prospectus, the company at the
time of the action contained all that the plaintiff had reason to suppose
it would contain and that the plaintiff could not, therefore, claim that he
had suffered damage as a result of any misrepresentation in the prospectus.
The company had been wound up and was hopelessly insolvent but it was
said that this was due to circumstances not existing at the date of the

299

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**          Vinelott J.

A allotment. In his judgment Sir Richard Henn Collins M.R. said, at pp. 554–555:

> B "That obliges me to say something as to the principle upon which damages are assessed in these cases. There is no doubt about it now. It has been laid down by several judges, and particularly by Cotton L.J. in *Peek* v. *Derry* (1887) 37 Ch.D. 541; but the common sense and principle of the thing is this. It is not an action for breach of contract, and, therefore, no damages in respect of prospective gains which the person contracting was entitled by his contract to expect come in, but it is an action of tort—it is an action for a wrong done whereby the plaintiff was tricked out of certain money in his pocket; and therefore, prima facie, the highest limit of his damages is the whole extent of his loss, and that loss is measured by the money which was in his pocket
> C and which is now in the pocket of the company. That is the ultimate, final, highest standard of his loss. But in so far as he has got an equivalent for that money, that loss is diminished; and I think, in assessing the damages, prima facie the assets as represented are taken to be an equivalent and no more for the money which was paid. So far as the assets are an equivalent, he is not damaged; so far as they fall
> D short of being an equivalent, in that proportion he is damaged."

The inquiry directed was therefore an inquiry into the true value of the shares at the date of the allotment, that is, before the misrepresentation was made good. The action was brought under section 3 of the Directors Liability Act 1890 but it is well settled that the measure of damage in an action under that section is the same as in an action for deceit. The measure
E of compensation in equity cannot be less.

Mr. Scott's answer to this submission was that Mr. Caplan's approach obscures the all-important question—what was the cause of the loss? If the true inference from the facts proved is that, but for the misconduct on the part of Mr. Bartlett and Mr. Laughton, Newman could have acquired the package at a lower price—which can be ascertained by reference to market values of the assets comprised in the package at that time—then, said Mr.
F Scott, Newman would be entitled to recover a sum equal to the difference between the price paid under the agreement of June 3 and that aggregate value. But, the argument continues, if the true inference from the facts proved is that T.P.G. would never have been willing to sell the package at a price less than £325,000 net of liabilities, then, while the measure of damage is still the difference between the price paid under the agreement
G of June 3 and the value of the assets acquired under it, the court, in ascertaining that value, must have regard to all facts known at the date when the value is assessed so far as those facts throw light upon the value of the assets at the date of the transaction. This may be illustrated by the following example. Suppose that a purchaser is induced to purchase a horse for £40,000 on the faith of a fraudulent misrepresentation as to its
H true pedigree. If he can show that the market value of that horse ascertained in the light of all the facts known to the vendor at that time was £10,000, that but for the misrepresentation he would only have been willing to pay £10,000, and that the vendor would have been willing to sell the

300

Vinelott J.     Prudential Assurance v. Newman Industries (No. 2)      [1981]

horse for that price, then he can recover the difference of £30,000 as the
loss flowing from the fraudulent misrepresentation. If he cannot show that
the vendor would have been willing to sell the horse for £10,000 he can
recover the difference between £40,000 and the true value of the horse at
the date of the sale but in ascertaining that value subsequent events can be
looked at so far as they throw light upon the true value of the horse. If,
despite its humble pedigree, the horse, at the date of the action, has won
a classic race, the vendor is entitled to adduce evidence to show that the
true value of the horse, ascertained still at the date of the sale but in the
light of subsequent events, was in excess of £40,000 and that accordingly
the plaintiff has not suffered any damage.

The application of that principle, if well founded, to the facts of the
present case gives rise to some difficult problems. The problems can be
illustrated by the subsequent history of Clough. The price attributed to
T.P.G.'s holding of shares of Clough by Mr. Cooper was £550,000, that is
£1·10 per share. The affairs of Clough did not prosper. In 1975 its profit
was less than in the preceding year and in 1976 it made a substantial loss.
In the course of 1976 Newman acquired Major Marley's 61 per cent. hold-
ing of shares in Clough at the price of 53p per share and made a public
offer for the outstanding shares at the same price which was accepted by
all shareholders except a small minority holding 1·6 per cent. In 1977 under
Newman's management Clough made a very large profit. The current level
of profitability of Clough and the value of Newman's present holding of
shares of Clough were relied on by Mr. Bartlett in his oral evidence as
showing the commercial advantages of the deal. I am not satisfied that,
even if it had been shown that T.P.G. would not in any circumstances
have been willing to sell the package at a sum less than £325,000 net of
liabilities, it would have been right, in ascertaining the damage to Newman,
to compare the price paid for T.P.G.'s minority holding of shares of Clough
with a proportionate part of the value of Newman's present holding of
shares of Clough or to take into account the subsequent history of Clough.
There are two reasons. First, it is by no means obvious that it is fair to
compare the present value of an appropriate proportion of Newman's 99
per cent. holding of the shares of Clough with the price it paid for the
34 per cent. it acquired from T.P.G. Even assuming, in favour of the
defendants, that the acquisition of the shares of Clough has proved a
successful investment—and Sir Charles Ball did not accept that it had—
it may be said that the benefit derives from Newman's own efforts and
that it was in effect compelled to acquire the outstanding shares of Clough
and put in its own management in order to salvage an investment for
which it had initially paid too much. Secondly, it is by no means obvious
that, if Newman had not acquired T.P.G.'s 34 per cent. holding in 1975
at £1·10 per share, it would none the less not have been able to acquire
Major Marley's 61 per cent. in Clough in 1976 at 53p per share and to
make a bid for the remaining 39 per cent. at the same price, which, in
practice, T.P.G. (or its successor) would have been bound to accept.

However, I do not need to enter into this doubtful and difficult field
and I express no opinion on it. The true position, in my judgment, is that if
the package deal with Newman had been rejected by Newman at any time

301

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A  between the date of the strategy document and July 29, 1975, T.P.G. would have been bound to sell substantially the whole of its portfolio of quoted investments. From January 1975 its position was steadily becoming worse as interest on its bank borrowings piled up. Its investment income was wholly insufficient to meet its administrative expenses, interest and other costs. The shares of S. Newman Ltd., the debt due from Smithamcote and the debts due from Mr. Abbott (chairman of Dover Engineering Group

B  Ltd.) and Queen Square Securities were virtually unsaleable or, if saleable, could have been sold only at a substantial discount. Unsuccessful negotiations had taken place in and before March 1975 for the sale of T.P.G.'s "media interests." The price asked was less than the figure of cost which Sir Charles Ball was prepared to accept as a price that could have been obtained in an arm's length sale between T.P.G. and Newman. In a forced

C  sale of T.P.G.'s portfolio of quoted investments under pressure from its bankers T.P.G. would have been fortunate if it could have placed its large minority holdings at prices equal to mid-market prices quoted on the Stock Exchange. Sir Charles Ball's evidence was that a vendor seeking a purchaser for a strategic stake will normally have to accept a discount from quoted prices. It is true that a sale to Newman suffered from the disadvantage that the transaction would be a class 4 transaction so that

D  there would be delay in completion. But, in my judgment, a sale to Newman at a premium of 10 per cent. above mid-market prices quoted on the Stock Exchange would still have been favourable to T.P.G. In my judgment, if the agreement of June 3 had not been entered into and subsequently approved, T.P.G. would have been compelled to realise substantially the whole of its assets—including the larger part of its holding of shares of

E  Newman, though T.P.G. would, I think, probably have retained as many of the shares of Newman as it could in order that T.P.G. might continue to exercise some influence in general meetings of Newman. In the course of that realisation, Newman would have been able to acquire T.P.G.'s portfolio of quoted investments, other than its holding of shares in Newman, at prices not exceeding 10 per cent. above mid-market prices quoted on

F  the Stock Exchange. In addition it would have been able to acquire the media interests at a price not exceeding £120,000, the debt from Smithamcote at a price not exceeding £35,000 and the debts due from Mr. Abbott and Queen Square Securities at properly discounted values, assuming of course that it wanted them. Mr. Bartlett, in his oral evidence, insisted that apart from the package deal T.P.G. would have been able to negotiate

G  sales of strategic stakes at prices substantially in excess of quoted prices and in particular might have been able to sell its holdings of shares in Newman at substantially more than quoted prices and might thereby have solved its financial problems without selling its other strategic stakes, except to the extent of completing the January agreements. He relied upon the letter of July 18, 1975, to a director of Lonrho, which was written after

H  the extraordinary general meeting to approve the agreement of June 3 had been adjourned and in which he indicated that T.P.G. might be willing to sell its holding of shares of Newman at 75p per share—more than twice the quoted price—and to sell its holding of shares of Newman