# 25-0643-cv

## United States Court of Appeals

*for the*

## Second Circuit

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## Volume 42 of 43 (Pages A-10129 to A-10329)

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
*Attorneys for Plaintiffs-Counter-
  Defendants-Appellees*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant-
  Appellant NHF TRS, LLC and
  Defendant-Counter-Claimant-
  Appellant Nexpoint Diversified
  Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

*(For Continuation of Appearances See Inside Cover)*

 (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Counter-Defendant-
    Appellee*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

i

## TABLE OF CONTENTS

                                                                    **Page**

District Court Docket Entries ....................................   A-1

Amended Complaint, dated and filed
    February 23, 2022 ................................................   A-56

Exhibit A to Amended Complaint -
    Bench Ruling and Memorandum of Law In
    Support of (A) Final Approval of Disclosure
    Statement; and (B) Confirmation of Chapter 11
    Trustee's Third Amended Joint Plan, in re: *Acis
    Capital Management, L.P., Debtor,* Case No. 18-
    30264-SGJ-11, and in re: *Acis Capital
    Management GP, L.L.C., Debtor*, Case No. 18-
    30265-SGJ-11, dated January 31, 2019 ................   A-80

Exhibit B to Amended Complaint -
    Memorandum Opinion and Order Holding
    Certain Parties and Their Attorneys in Civil
    Contempt of Court for Violation of Bankruptcy
    Court Orders, in re: *Highland Capital
    Management, L.P., Debtor,* Case No. 19-34054-
    sgj-11, dated August 3, 2021 ................................   A-128

Exhibit C to Amended Complaint -
    Letter of Bonds Ellis Eppich Schafer Jones LLP
    to Court, dated September 23, 2020 .....................   A-160

Exhibit D to Amended Complaint -
    Letter of Lynn Pinker Cox Hurst to Daniel P.
    Novakov, dated August 6, 2019 ...........................   A-163

Exhibit E to Amended Complaint -
    Letter of Lynn Pinker Cox Hurst to Shana Sethi,
    dated August 6, 2019 ............................................   A-170

ii

**Page**

Exhibit F to Amended Complaint -
Plaintiff's Second Amended Complaint and Jury
Demand in *The Charitable Donor Advised Fund,
L.P., v. U.S. Bank National Association, et al.*,
Case No. 1:19-CV-09857-NRB ............................ A-179

Exhibit G to Amended Complaint -
Plaintiffs' Original Complaint in *The Charitable
Donor Advised Fund, L.P., and CLO HOLDCO,
Ltd. v. U.S. Bank National Association, et al.*,
Case No. 1:20-cv-1036 .......................................... A-212

Exhibit H to Amended Complaint -
Letter of Myers Bigel to Mark Kotwick, dated
May 8, 2020 ............................................................ A-246

Exhibit I to Amended Complaint -
Plaintiff's Second Amended Complaint, *NexPoint
Strategic Opportunities Fund v. Acis Capital
Management, L.P., et al.*, Case No. 1:21-cv-
04384-GHW .......................................................... A-254

Exhibit J to Amended Complaint -
Letter of Quinn Emanuel to The Charitable
Donor Advised Fund, L.P. and Others, dated
December 28, 2021 ................................................ A-296

Exhibit K to Amended Complaint -
Letter of Parsons McEntire McCleary PLLC to
Jonathan E. Pickardt and Mark D. Kotwick, dated
January 10, 2022 .................................................... A-299

Exhibit L to Amended Complaint -
Settlement Agreement, dated April 28, 2021 ......... A-302

iii

**Page**

Exhibit M to Amended Complaint -
Order Approving Debtor's Settlement with (A)
Acis Capital Management, L.P. and Acis Capital
Management GP LLC (Claim No. 23), (B)
Joshua N. Terry and Jennifer G. Terry (Claim No.
156), and (C) Acis Capital Management, L.P.
(Claim No. 159) and Authorizing Action
Consistent Therewith, dated October 7, 2020........   A-329

Exhibit N to Amended Complaint -
Memorandum Opinion and Order Granting in
Part Plaintiff's Motion to Hold James Dondero in
Civil Contempt of Court for Alleged Violation of
TRO in re: *Highland Capital Management, L.P.,
Debtor,* Case No. 19-34054-sgj-11, and *Highland
Capital Management, L.P. v. Dondero*, Case No.
20-03190-sgj11, dated June 7, 2021 ......................   A-354

Exhibit O to Amended Complaint -
Transcript of Proceedings in re: *Highland Capital
Management, L.P., Debtor*, Case No. 19-34054-
sgj-11, dated June 25, 2021 ..................................   A-410

Exhibit P to Amended Complaint -
Acis Capital Management, L.P.'s Memorandum
of Law in Support of its Motion to Dismiss
Plaintiff's Second Amended Complaint and for
Attorneys' Fees and Costs, dated January 27,
2022, *NexPoint Strategic Opportunities Fund v.
Acis Capital Management, L.P., et al.*, Case No.
1:21-cv-04384-GHW ...........................................   A-533

iv

**Page**

Order on Plaintiffs' Unopposed Motion to Amend
Caption, dated March 26, 2022.............................. A-562

Defendants the Charitable Donor Advised Fund,
L.P., and CLO HoldCo, Ltd.'s Amended Answer
and Counterclaim, dated and filed
March 30, 2023 ...................................................... A-563

Amended Answer of Defendant/Counter-Plaintiff
NexPoint Diversified Real Estate Trust to
Amended Complaint, dated March 30, 2023......... A-597

Exhibit 1 to Amended Answer -
Indenture, dated April 16, 2015 ............................ A-656

Exhibit 2 to Amended Answer -
Portfolio Management Agreement, dated
April 16, 2015, labeled Exhibit 2.......................... A-985

Exhibit 3 to Amended Answer -
Letter of Lynn Pinker Cox Hurst to Daniel P.
Novakov, dated August 6, 2019, labeled
Exhibit E ............................................................... A-1037

Notice of Defendant/Counter-Plaintiff NexPoint
Diversified Real Estate Trust for Leave to Add
Party, dated and filed April 10, 2023 .................... A-1043

Order of Honorable Gregory H. Woods, dated
May 1, 2023 and filed May 2, 2023...................... A-1043.1

Notice of Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023.............. A-1044

Declaration of Blair A. Adams, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 15, 2023.............. A-1047

v

**Page**

Exhibit 1 to Adams' Declaration -
Transcript of Hearing, dated February 23, 2023 .... A-1051

Exhibit 2 to Adams' Declaration -
Second Amended Complaint (Including Claim
Objections and Objections to Administrative
Expense Claim), *Acis Cap. Mgmt. L.P. and Acis
Cap. Mgmt. GP, LLC v. Highland Cap. Mgmt.,
L.P., et al.*, Adv. Pro. No. 18-03078, dated
June 20, 2019 ......................................................... A-1084

Exhibit 3 to Adams' Declaration -
Agreement, dated February 28, 2023 ................... A-1193

Exhibit 4, Part 1, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 ........................................................ A-1257

Exhibit 4, Part 2, to Adams' Declaration -
Acis CLO 2015-6 Offering Circular, dated
April 14, 2015 *continued* ....................................... A-1367

Exhibit 5 to Adams' Declaration -
Transcript of Proceedings, dated May 1, 2023 ...... A-1379

Exhibit 6, Part 1, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 ................................................... A-1425

Exhibit 6, Part 2, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................ A-1432

vi

**Page**

Exhibit 6, Part 3, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1439

Exhibit 6, Part 4, to Adams' Declaration -
Order, *Pimco Absolute Return Strategy v. Wells
Fargo Bank*, Index No. 654743/17, dated
December 5, 2017 *continued* ................................. A-1446

Exhibit 7 to Adams' Declaration -
Order Granting Senior Certificate Holders'
Motion for Summary Judgment and Denying
Junior Certificate Holders' Motion for Summary
Judgment, *In the Matter of the Trust Established
Under the Pooling and Service Agreement
relating to the Wachovia Bank Commercial
Mortgage Trust Commercial Mortgage Pass-
Through Certificates, Series 2007-C30*, Case No.
62-TR-CV-19-33, dated October 26, 2022 .......... A-1454

Exhibit 8 to Adams' Declaration -
Ruling in *In re Acis Cap. Mgmt., L.P.*, 18-30264-
SGJ-11, dated August 30, 2018 ............................ A-1473

Exhibit 9 to Adams' Declaration -
Portfolio Management Agreement, dated
June 5, 2014 ............................................................. A-1481

Exhibit 10 to Adams' Declaration -
Indenture, dated June 5, 2014, paginated bottom
center as Exhibit 3, Page 1 of 421 ........................ A-1534

Exhibit 11 to Adams' Declaration -
Portfolio Management Agreement, dated
November 18, 2014 ................................................ A-1956

vii

**Page**

Exhibit 12 to Adams' Declaration -
Indenture, dated November 18, 2014, paginated
bottom center as Exhibit 4, Page 1 of 335 ............. A-2008

Exhibit 13 to Adams' Declaration -
Memorandum Opinion and Order Holding
Certain Parties and Their Attorneys in Civil
Contempt of Court for Violation of Bankruptcy
Court Orders, in re: *Highland Capital
Management, L.P., Debtor,* Case No. 19-34054-
sgj-11, dated August 3, 2021
(Reproduced herein at pp. XXX – EX B)

Exhibit 14 to Adams' Declaration -
Original Complaint, *NexPoint Diversified Real
Estate Trust v. Acis Capital Management, L.P., et
al.*, dated October 3, 2022...................................... A-2344

Exhibit 15 to Adams' Declaration -
Notice of Appeal, *In re Acis Capital
Management, LP.*, Appeal No. 19-10847, dated
July 26, 2019 ......................................................... A-2392

Exhibit 16 to Adams' Declaration -
Opening Brief of Appellant Highland CLO
Funding, LTD, in above appeal, dated
September 20, 2019 ................................................ A-2396

Exhibit 17 to Adams' Declaration -
Memorandum of Law in Support of Defendant
U.S. Bank, National Association's Motion to
Dismiss the Second Amended Complaint,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022............... A-2473

viii

**Page**

Exhibit 18 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding LTD.'s Motion to Intervene,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated November 24, 2021 .......... A-2499

Exhibit 19 to Adams' Declaration -
Memorandum of Law in Support of Highland
CLO Funding Ltd.'s Motion to Dismiss,
*NexPoint Strategic Opportunities Fund v. Acis
Capital Management, L.P., et al.*, Case No. 1:21-
cv-04384-GHW, dated January 27, 2022 ............... A-2521

Declaration of Jonathon Milne, Esq., in Support of
Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed May 16, 2023 ............... A-2543

Exhibit 1 to Milne's Declaration -
Sections 12, 25(3), 28(1), 38, 46 and 48 of the
Cayman Islands Companies Act ........................... A-2569

Exhibit 2 to Milne's Declaration -
*In the Matter of Lancelot Investors Fund Limited
(In Official Liquidation)* [2015] (1) CILR 328 ...... A-2576

Exhibit 3 to Milne's Declaration -
*Marex Financial Ltd. v Sevilleja* [2020]
UKSC 31 ................................................................. A-2599

Exhibit 4 to Milne's Declaration -
*Primeo Fund v Bank of Bermuda (Cayman) Ltd*
[2021] UKPC 22 .................................................... A-2682

Exhibit 5 to Milne's Declaration -
*Renova Resources Private Equity Limited v
Gilbertson* [2009] CILR 268 ................................. A-2713

ix

**Page**

Exhibit 6 to Milne's Declaration -
Order 15, rule 12A of the Grand Court Rules........ A-2745

Exhibit 7 to Milne's Declaration -
*Birch v Sullivan* [1957] 1 WLR 1247 .................... A-2749

Exhibit 8, Part 1, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ)............................ A-2754

Exhibit 8, Part 2, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2774

Exhibit 8, Part 3, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2794

Exhibit 8, Part 4, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2813

Exhibit 8, Part 5, to Milne's Declaration -
*Shinsun Holdings (Group) Co., Ltd,* 21 April
2023 FSD 0192 OF 2022 (DDJ) *continued* ........... A-2829

Exhibit 9 to Milne's Declaration -
*Foss v Harbottle* (1843) 2 Hare 461 ...................... A-2847

Exhibit 10 to Milne's Declaration -
*Prudential Assurance Co Ltd v Newman
Industries Ltd (No 2)* [1982] Ch 204 .................... A-2868

Exhibit 11 to Milne's Declaration -
*Johnson v Gore Wood & Co* [2000] UKHL 65...... A-2902

Exhibit 12 to Milne's Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-2948

x

**Page**

Exhibit 13 to Milne's Declaration -
Sections 994 to 996 of the UK Companies Act
2006 ....................................................................... A-3131

Exhibit 14 to Milne's Declaration -
*Kuwait Ports Authority et al. v Port Link GP Ltd*
*et al.* (Court of Appeal 20 January 2023 decision)   A-3135

Exhibit 15 to Milne's Declaration -
*Rolled Steel Products (Holdings) Ltd v British*
*Steel Corp* [1986] Ch. 246 ..................................... A-3204

Exhibit 16 to Milne's Declaration -
*Nurcombe v. Nurcombe* [1985] 1 370 .................... A-3270

Exhibit 17 to Milne's Declaration -
*Portfolios of Distinction v Laird* [2004]
2 BCLC 741 ............................................................ A-3284

Exhibit 18 to Milne's Declaration -
*Schultz v Reynolds* [1992-93] CILR 59 ................. A-3308

Exhibit 19 to Milne's Declaration -
*Berland v Earle* [1902] AC 83 ............................... A-3333

Exhibit 20 to Milne's Declaration -
*Harris v Microfusion* [2017] 1 B.C.L.C. 305 ........ A-3355

Exhibit 21 to Milne's Declaration -
*Top Jet Enterprises Limited v Sino Jet* [2018] (1)
CILR 18 .................................................................. A-3370

Exhibit 22 to Milne's Declaration -
*Estmanco (Kilner House) Ltd v G.L. C.* [1982] 1
W.L.R. 2 ................................................................. A-3405

Exhibit 23 to Milne's Declaration -
*Cook v Deeks* [1916] 1 AC 554 ............................. A-3420

xi

**Page**

Exhibit 24 to Milne's Declaration -
*Pavlides v. Jensen* [1956] 2 All ER 518................. A-3433

Exhibit 25 to Milne's Declaration -
*Menier v Hooper's Telegraph Works* LR 9 Ch
App 350 .................................................. A-3440

Exhibit 26 to Milne's Declaration -
*Heyting v Dupont* [1964] 1 W.L.R. 843 ................. A-3446

Exhibit 27 to Milne's Declaration -
*Burnford et al. v Automobile Association
Developments Limited* [2022] EWCA Civ 1943 ... A-3460

Exhibit 28 to Milne's Declaration -
*De Sena & Anor v Notaro & Ors* [2020] EWHC
1031 (Ch).................................................. A-3482

Exhibit 29 to Milne's Declaration -
*Williams v Natural Life Health Foods Ltd* [1998]
1 WLR 830................................................ A-3558

Declaration of Todd William McGuffin, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed May 16, 2023 ......... A-3569

Exhibit 1 to McGuffin Declaration -
*Morton v Paint* [1996] 21 GLJ 61 ........................ A-3582

Exhibit 2 to McGuffin Declaration -
*Flightlease Holdings (Guernsey) Ltd v
Flightlease (Ireland) Ltd* [2009–10] GLR 38 ........ A-3608

Exhibit 3 to McGuffin Declaration -
*Perpetual Media Capital Limited v Enevoldsen,*
[2014] GLR 57.............................................. A-3646

xii

**Page**

Exhibit 4 to McGuffin Declaration -
*Prodefin Trading Limited v Midland Resources*
Royal Court, 14 February 2017, Judgement
7/2017, unreported ................................................ A-3675

Exhibit 5 to McGuffin Declaration -
*Fonds v GRCF* [2022] GRC 039 .......................... A-3701

Exhibit 6 to McGuffin Declaration -
*Carlyle Capital Corporation Limited v Conway
& Ors* Royal Court, 4 September 2027, Judgment
38/2017, unreported ................................................ A-3726

Exhibit 7 to McGuffin Declaration -
*Jackson v Dear* (2013) GLR 167 .......................... A-4197

Exhibit 8 to McGuffin Declaration -
*Pilatus (PTC) Limited v RBC Trustees
(Guernsey) Limited* [2021] GRC 063 ................... A-4222

Exhibit 9 to McGuffin Declaration -
*Apex Global Management Limited v Fi Call
Limited* [2015] EWHC 3269 (Ch) ......................... A-4233

Exhibit 10 to McGuffin Declaration -
*Re Coroin Limited* (No 2) [2012] EWHC 2343
(Ch) .......................................................................... A-4288

Exhibit 11 to McGuffin Declaration -
*Grace v Biagioli* [2005] EWCA Civ 1222 ............. A-4447

Exhibit 12 to McGuffin Declaration -
*Rock (Nominees) Limited v RCO (Holdings) plc*
[2004] EWCA Civ 118 ............................................ A-4478

Exhibit 13 to McGuffin Declaration -
*Re Saul D Harrison & Sons plc* [1994] BCC 475 . A-4496

xiii

**Page**

Exhibit 14 to McGuffin Declaration -
*Apex v Fi Call Ltd* [2014] BCC 286 .................... A-4524

Exhibit 15 to McGuffin Declaration -
*Zedra Trust Company (Jersey) Limited v The Hut
Group Limited* [2020] EWHC 5 ........................... A-4565

Exhibit 16 to McGuffin Declaration -
*Peskin v Anderson* [2001] BCC 874 .................... A-4591

Exhibit 17 to McGuffin Declaration -
*Sharp v Blank* [2015] EWHC 3220 .................... A-4607

Exhibit 18, Part 1, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22 ..... A-4624

Exhibit 18, Part 2, to McGuffin Declaration -
*Saloman v Saloman & Co. Ltd* [1897] A.C. 22,
*continued*............................................................... A-4643

Exhibit 19 to McGuffin Declaration -
*Foss v Harbottle* [1843] 2 Hare 461 .................... A-4663

Exhibit 20 to McGuffin Declaration -
*Marex Financial Ltd v Sevilleja* [2020] UKSC 31 A-4684

Exhibit 21 to McGuffin Declaration -
*Prudential Assurance Co. Ltd. v Newman
Industries Ltd. and Others* (No. 2) [1982] Ch 204 A-4767

Exhibit 22 to McGuffin Declaration -
*Renova Resources v Gilbertson* [2009] CIFsd 10.. A-4806

Notice of Motion of Counter-Defendant Brigade
    Capital Management, LP's ("Brigade") to
    Dismiss the Counterclaims of Defendant
    NexPoint Diversified Real Estate Trust against
    Brigade, dated and filed May 31, 2023.................. A-4869

xiv

**Page**

Declaration of Jason C. Hegt, Esq., in Support of
Brigade's Motion to Dismiss, dated and filed
May 31, 2023 ........................................................ A-4871

Exhibit 1 to Hegt Declaration -
Indenture, dated April 16, 2015, paginated
bottom center as "Exhibit 5, Page 1 of 329" ......... A-4873

Exhibit 2 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
February 9, 2023 .................................................. A-5203

Exhibit 3 to Hegt Declaration -
Excerpt of Transcript of Proceedings, dated
January 4, 2022 ..................................................... A-5211

Declaration of Mazin A. Sbaiti, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023 ............... A-5217

Exhibit 1 to Sbaiti Declaration -
Indenture, dated April 16, 2015, labeled as
Exhibit 1 .............................................................. A-5219

Exhibit 2 to Sbaiti Declaration -
Offering Circular relating to the offering of the
Co-Issued Notes of ACIS CLO 2015-6 Ltd. and
ACIS CLO 2015-6 LLC and the Issuer Notes of
ACIS CLO 2015-6 Ltd. dated April 14, 2015 ....... A-5548

Exhibit 3 to Sbaiti Declaration -
Portfolio Management Agreement, dated
April 16, 2025, labeled Exhibit 3 .......................... A-5768

xv

**Page**

Exhibit 4 to Sbaiti Declaration -
Red-lined version of Amended Complaint, *U.S.
Bank National Association, et al. v The
Charitable Donor Advised Fund, L.P., et al.*, Case
No. 1:21-cv-11059-GHW, dated and filed
February 23, 2022 ................................................... A-5820

Exhibit 5 to Sbaiti Declaration -
Excerpt from *Tianrui (Int'l) Holding Co. Ltd. v.
China Shanshui Cement Grp. Ltd.*, Grand Court
of the Cayman Is., April 6, 2020 ........................... A-5844

*Declaration of Bhavesh Narendra Patel, Esq., in
Opposition to Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 14, 2023 ......... A-5917

Exhibit 1 to Patel Declaration -
*Islena Airlines v Jefferson* [1998 CILR 148]......... A-5942

Exhibit 2 to Patel Declaration -
Section 14(1) of the Exempted Limited
Partnerships Act, (2022 Revision) ......................... A-5955

Exhibit 3 to Patel Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ..................................................... A-5959

Exhibit 9 to Patel Declaration -
*BTI 2014 LLC v Sequana SA* [2022] UKSC 25 ..... A-5970

Exhibit 22 to Patel Declaration -
*Scott v Metropolitan Police Commissioner* [1974]
UKHL 4 ................................................................. A-6096

Exhibit 25 to Patel Declaration -
*Watson v Kea Investments* [2019] EWCA Civ
1759 ...................................................................... A-6106

xvi

**Page**

Exhibit 28 to Patel Declaration -
Cayman Grand Court Rules, Order 15, Rule 12A . A-6130

Reply Declaration of Jonathon Milne, Esq., in
Support of Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings, dated and filed June 28, 2023 ........ A-6133

Exhibit 1 to Milne's Reply Declaration -
*Snell's Equity* ............................................................ A-6161

Exhibit 2 to Milne's Reply Declaration -
Lewis on Trusts ..................................................... A-6166

Exhibit 3 to Milne's Reply Declaration -
*Knight v Knight* ..................................................... A-6172

Exhibit 4 to Milne's Reply Declaration -
*Hunter v Moss* ........................................................ A-6188

Exhibit 5 to Milne's Reply Declaration -
*Grand View Private Trust Co. Ltd. et al. v*
*Wen-Young Wong, et al.* .......................................... A-6200

Exhibit 6 to Milne's Reply Declaration -
*In the Matter of the Ta-Ming Wang Trust* .............. A-6243

Exhibit 7 to Milne's Reply Declaration -
*Helen Gorbunova v The Estate of Boris*
*Berezovsky, et al.* .................................................... A-6256

Exhibit 8 to Milne's Reply Declaration -
*In re Empress Engineering Company* .................... A-6283

Exhibit 9 to Milne's Reply Declaration -
*Neste Oy v Lloyds Bank PLC* ................................ A-6290

Exhibit 10 to Milne's Reply Declaration -
*Steven Anthony Pearson, et al. v Lehman*
*Brothers Finance SA, et al.* .................................... A-6301

xvii

**Page**

Exhibit 11 to Milne's Reply Declaration -
*Chanan Singh Thandi v. Mark Sands and Andrew
Appleyard* ............................................................... A-6399

Exhibit 12 to Milne's Reply Declaration -
*Grupo Torras S.A. and Torras Hostench London
Limited v. Bank of Butterfield International
(Cayman) Limited and Five Others* ....................... A-6421

Exhibit 13 to Milne's Reply Declaration -
*Bailey and another v. Angove's PTY Limited* ......... A-6443

Exhibit 14, Part 1, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al.* .......................................................... A-6463

Exhibit 14, Part 2, to Milne's Reply Declaration -
*ACL Netherlands B.V., et al., v Michael Richard
Lynch, et al. continued* .......................................... A-7363

Exhibit 15, Part 1, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL)* ................................................ A-8366

Exhibit 15, Part 2, to Milne's Reply Declaration -
*Conway and Walker v. Skandinaviska Enskilda
Banken AB (PUBL) continued* ............................... A-8397

Exhibit 16, Part 1, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another* ....................... A-8429

Exhibit 16, Part 2, to Milne's Reply Declaration -
*Holland v. The Commissioners for Her Majesty's
Revenue and Customs and Another continued* ...... A-8460

Exhibit 17 to Milne's Reply Declaration -
*Pearson v. Primeo Fund* ........................................ A-8487

xviii

**Page**

Exhibit 18 to Milne's Reply Declaration -
Sections of Cayman Islands Companies Act
(2023 Revision) ..................................................... A-8513

Exhibit 19 to Milne's Reply Declaration -
*Secretary of State for Trade and Industry and
another*................................................................. A-8517

Exhibit 20 to Milne's Reply Declaration -
*China Shanshui Cement Group Limited v. Tianrui
(International) Holding Company Limited* ............ A-8542

Exhibit 21 to Milne's Reply Declaration -
*GAO v. China Biologic Products Holdings
Incorporated* ......................................................... A-8561

Exhibit 22 to Milne's Reply Declaration -
*West Mercia Safetywear Ltd (in liq) v Dodd and
another*................................................................. A-8604

Exhibit 23 to Milne's Reply Declaration -
*Svanstrom and Nine Others v. Jonasson*................ A-8611

Exhibit 24 to Milne's Reply Declaration -
Directors' Duties, Creditors' Rights and
Shareholder Intervention ....................................... A-8629

Exhibit 25, Part 1, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al.* ....................................................... A-8663

Exhibit 25, Part 2, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ....................................... A-8711

Exhibit 25, Part 3, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ....................................... A-8759

xix

Page

Exhibit 25, Part 4, to Milne's Reply Declaration -
*McKillen v. Misland (Cyprus) Investments
Limited, et al. continued* ........................................ A-8806

Exhibit 26 to Milne's Reply Declaration -
*Monsolor 1Q Ltd. v Woden Park Ltd.* .................... A-8825

Exhibit 27 to Milne's Reply Declaration -
*Chartbook Limited v. Persimmon Homes Limited
and Others and Another* ........................................ A-8842

Exhibit 28, Part 1, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.* ...... A-8885

Exhibit 28, Part 2, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8932

Exhibit 28, Part 3, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-8974

Exhibit 28, Part 4, to Milne's Reply Declaration -
*UTB LLC v. Sheffield United Unlimited, et al.
continued* ................................................................ A-9014

Exhibit 29 to Milne's Reply Declaration -
*Yeoman's Row Management Limited and Another
v Cobbe* .................................................................. A-9027

Exhibit 30 to Milne's Reply Declaration -
*Mutter v. Eastern and Midlands Railway
Company* ................................................................ A-9080

Exhibit 31 to Milne's Reply Declaration -
*Peak Hotels and Resorts Limited v. Tarek
Investments Limited, et al.* ...................................... A-9097

xx

**Page**

Second Declaration of Bhavesh Narendra Patel in
Opposition to the Plaintiffs' Motion to Dismiss
Defendants' Counterclaims and for Judgment on
the Pleadings on Plaintiffs' Claims, dated and
filed July 19, 2023 ................................................ A-9126

Exhibit 1 to Second Declaration -
*Arnold* v. *Britton* [2015] UKSC 36 ........................ A-9140

Exhibit 2 to Second Declaration -
*Al Sadik v Investcorp Bank BSC & Ors
[2017 (1) CILR 1])*................................................ A-9189

Exhibit 3 to Second Declaration -
*Williams v Central Bank of Nigeria* [2014]
UKSC 10.................................................................. A-9342

Exhibit 4 to Second Declaration -
*Broadcasting Investment Group Ltd v Smith*
[2021] EWCA Civ 912, [2022] 1 WLR 1 .............. A-9406

Stipulation and Proposed Order Regarding Addition
of NHF TRS, LLC as Party, filed
October 31, 2023 .................................................... A-9427

Exhibit A to Stipulation-
Counter-Plaintiffs NexPoint Diversified Real
Estate Trust and NHF TRS LLC's First Amended
Counterclaim, dated October 24, 2023 .................. A-9434

Exhibit B to Stipulation-
Second Amended Complaint, dated
October 31, 2022 .................................................... A-9487

Stipulation and Order Regarding Addition of NHF
TRS, LLC as Party, dated October 31, 2022 and
filed November 1, 2023 .......................................... A-9512

xxi

                                                                    **Page**

Stipulation of Voluntary Dismissal, dated and filed
    March 10, 2025 ........................................................ A-9518

Notice of Appeal of NexPoint Diversified Real
    Estate Trust, dated and filed March 18, 2025 ........ A-9522

Amended Notice of Appeal of NexPoint Diversified
    Real Estate Trust and NHF TRS LLC, dated and
    filed March 26, 2025 ............................................. A-9524


**<u>*Additional Exhibits to Declaration of
Bhavesh Narendra Patel, Esq., in Opposition
to Plaintiffs' Motion to Dismiss Defendants'
Counterclaims and for Judgment on the
Pleadings, dated and filed June 14, 2023</u>**

Exhibit 4 to Patel Declaration -
    Re Hydrodam (Corby) Ltd. .................................... A-9526

Exhibit 5 to Patel Declaration -
    Omni Securities Limited ........................................ A-9531

Exhibit 6 to Patel Declaration -
    Hutchinson Limited v Cititrust & Ors ................... A-9553

Exhibit 7 to Patel Declaration -
    Whar-Hansen v Bridge Trust Company ................. A-9575

Exhibit 8 to Patel Declaration -
    Ritter v Butterfield Bank ....................................... A-9592

Exhibit 10 to Patel Declaration -
    AHAB v SAAD Investment Company .................. A-9634

Exhibit 11 to Patel Declaration -
    Westdeutsche Landesbank v Islington London ..... A-9910

xxii

**Page**

Exhibit 12 to Patel Declaration -
    Ernst & Young v FOI Officer................................. A-9983

Exhibit 13 to Patel Declaration -
    Kuwait Ports Authority v Port Link GP Ltd .......... A-10016

Exhibit 14 to Patel Declaration -
    Prudential Assur Co v Newman Indus................... A-10084

Exhibit 15 to Patel Declaration -
    Marex Financial v Sevilleja .................................. A-10160

Exhibit 16 to Patel Declaration -
    Russell v Wakefield Water Works.......................... A-10232

Exhibit 17 to Patel Declaration -
    MacDougall v Gardiner ......................................... A-10242

Exhibit 18 to Patel Declaration -
    Tempo Group v Fortuna Development .................. A-10246

Exhibit 19 to Patel Declaration -
    FamilyMart China v Yin-Hen Wei........................ A-10385

Exhibit 20 to Patel Declaration -
    Burland v Earle ..................................................... A-10418

Exhibit 21 to Patel Declaration -
    Schultz v Reynolds & Newport ............................. A-10439

Exhibit 23 to Patel Declaration -
    Merkanti v Raiffeisen Bank ................................... A-10463

Exhibit 24 to Patel Declaration -
    H1 of Tolleys on Administration of Trusts ............ A-10487

Exhibit 26 to Patel Declaration -
    Cayman Trusts Act................................................. A-10537

Exhibit 27 to Patel Declaration -
    Re China Milk....................................................... A-10539

A-10129

302

Vinelott J.          Prudential Assurance v. Newman Industries (No. 2)          [1981]

together with its holding of shares of Agar Cross for £1,500,000 " with an  **A**
additional £100,000 for Metropole." (It is noteworthy that, in this letter,
the current profits of Metropole are said to be £300,000 per annum.)
However, there is no evidence as to what happened as a result of this offer
and I disregard it. At a much later stage T.P.G. did sell its holding of
shares in Newman to Lonrho at a price substantially above quoted price
but, again, there is no evidence as to the circumstances in which this sale
was negotiated. Turning to the other associated companies, there were  **B**
negotiations for the sale of T.P.G.'s holding of shares in Clough, in con-
junction with Major Marley's holding, which started in December 1974.
The price asked was £1 per share. It is true that this was 20 per cent. above
mid-market prices quoted on April 4, 1975, but the combined holding was
95 per cent. of the issued ordinary shares and a holding of that size would
command a substantial premium. Even then no firm offer was made and  **C**
Major Marley's shares were not sold until August 1976. There is no
evidence at all that any of T.P.G.'s other strategic stakes could have been
sold at figures higher than mid-market quoted prices. If there had been
any purchaser willing to purchase at a premium I have no doubt that
negotiations would have been vigorously pursued.

In my judgment, therefore, Prudential have established that if the  **D**
agreement of June 3 had not been entered into Newman would have been
able to acquire the package at a price at least £445,000 less than it in fact
paid under that agreement—that is, in effect, a nil price but with the
assumption of fewer of T.P.G.'s liabilities.

*The direct representative claim*

As I have said, Mr. Scott accepts, in my judgment rightly, that Mr.  **E**
Bartlett and Mr. Laughton, in advising the shareholders of Newman to
support the resolution for the approval of the agreement of June 3, owed
them a duty to give such advice in good faith and not to do so in a tricky
and misleading way. But, said Mr. Scott, that duty is a duty of general
obligation. It is no more than a particular application, to directors who
*assume responsibility for giving advice to shareholders*, of the general  **F**
duty to act honestly and with due care. An action for breach of that duty
sounds in tort and proof of damage is a necessary ingredient of the cause
of action. But, the argument continues, although Prudential has adduced
evidence to show that Newman was injured by having foisted upon it,
by means of an unlawful conspiracy, a bundle of assets which, apart from
the conspiracy, it could have acquired, if it had wanted them, for some
£445,000 less than it paid, no evidence has been adduced to show that the  **G**
shareholders of Newman have suffered any loss. As the shares of Newman
are quoted on the Stock Exchange such loss, it is said, could only have
been the difference between the prices actually quoted (that is, at which
shares were actually bought and sold) and the prices that would have
been quoted if the resolution had not been passed; and to establish such a
loss, expert evidence should have been adduced. In my judgment this  **H**
argument presses the division between a company and its shareholders too
far. Given that the shareholders of Newman were induced by deceit to

303
**1 Ch.**      **Prudential Assurance v. Newman Industries (No. 2)**      **Vinelott J.**

A  approve an agreement under which Newman paid some £445,000 more than the value of the assets it acquired under that agreement and £445,000 more than it needed to pay to acquire those same assets, then it follows that Newman's indebtedness immediately after the transaction was at least £445,000 more than it would have been apart from the deceit. At all material times Newman owed its bankers sums in excess of £5,000,000. Newman therefore lost the interest on £445,000 and to the extent of that

B  interest its profits were less than they would otherwise have been. That reduction in profit or net earnings must, in turn, have affected the prices at which shares of Newman changed hands and, therefore, the quoted price. One point on which Sir Charles Ball and Mr. Cooper are agreed is that an important factor, if not the most important factor, affecting the price at which shares, quoted or unquoted, change hands is the historic

C  and expected level of earnings, the price being frequently calculated and expressed in terms of a price/earnings ratio. Of course, the amount of damage suffered by Prudential (and other shareholders) is a matter which can only be determined in the light of expert evidence. But the evidence adduced by Prudential is in my judgment sufficient to show that it (and other shareholders) have suffered some damage in consequence of the conspiracy and that is sufficient to complete their cause of action, the

D  amount of the damage being, if necessary, referred to an inquiry.

Before leaving the direct personal representative claims there is one other matter which I should mention. It is often said that a derivative action cannot be combined with an action for a wrong done to a shareholder personally: see e.g. *Gore-Browne on Companies*, 43rd ed. (1977), para. 28.6. But the case cited, *Stroud* v. *Lawson* [1898] 2 Q.B. 44, does not

E  support this broad formulation. In that case the plaintiffs claimed damages from the directors of a company for inducing him to purchase shares in the company by fraud. In the particulars of fraud, one allegation made was that the defendant directors had declared and paid a dividend when there were no profits. He sought on behalf of himself and the other shareholders a declaration that the dividend was ultra vires and illegal and for repayment of the dividend by the defendants. It was held in the Court of Appeal

F  that the personal and representative claims could not be combined in one action. A. L. Smith L.J. said, at p. 49:

"Thus he is joining with the well-known common law action of deceit another kind of action altogether, well known in the Chancery Division. In my opinion these are wholly separate and distinct causes of action which do not arise out of the same transaction, or series of

G  transactions. With regard to one of them, in respect of which the plaintiff sues in his personal capacity, he has to prove fraud. With regard to the other, in respect of which he sues in a representative capacity, he has not to prove fraud but merely that the act of the directors was ultra vires."

Then, after referring, at p. 50, to R.S.C., Ord. 16, r. 1, which provided:

H  "All persons may be joined in one action as plaintiffs, in whom any right to relief in respect of or arising out of the same transaction or series of transactions is alleged to exist, whether jointly, severally or

304
Vinelott J.      Prudential Assurance v. Newman Industries (No. 2)          [1981]

in the alternative, where if such persons brought separate actions, any common question of law or fact would arise," <sub>A</sub>

he said:

> " . . . the plaintiff in this case cannot join the two causes of action which he is putting forward in different capacities, unless he can shew that they both arise out of the same transaction. It is not enough for him to shew that, if separate actions were brought, 'a common question of law or fact would arise,' for those words do not apply, unless the right to relief in each case arises out of the same transaction. I do not think that is so in the present case. The right to relief which the plaintiff claims on his own behalf in the first part of the statement of claim depends wholly on the existence of fraud. The right to relief which he claims in a representative capacity in the second part of the statement of claim is quite independent of any fraud on the part of the defendants."

Mr. Scott has not sought to argue that in the present case the derivative claim and the direct personal (that is, non-representative) claims do not " arise out of the same transaction." In my view he was right not to pursue that point. Both the derivative and the direct claims are founded upon the same allegation, namely, that Mr. Bartlett and Mr. Laughton conspired to injure Newman and its shareholders by procuring the shareholders to vote in favour of a resolution by virtue of which, and by virtue of which alone, the agreement of June 3 became unconditional. Equally, in my judgment, there is no objection to joining the derivative claim and the direct claim so far as brought by Prudential as representative of shareholders as at July 29, 1975. It is true that a derivative action is, in form, an action brought on behalf of the members of the defendant company except the persons against whom relief is sought and it may seem odd at first sight that a plaintiff should seek to represent two different sets of shareholders—those as at July 29, 1975, and those as at the date of the action—which may not coincide. Shares may have changed hands between July 29, 1975, and the issue of the second writ. But although a derivative action is in form a representative action it differs from other representative actions in that if the action succeeds property or damages are recovered not by the plaintiff or the class whom he claims to represent but by the company—and only indirectly by the shareholders through the accretion to the company's assets: see *Wallersteiner* v. *Moir (No. 2)* [1975] Q.B. 373 *per* Lord Denning M.R. at p. 391. In substance there is only one truly representative action—the direct action—which is joined with a derivative action brought on behalf of the company. The relationship between the direct action and the derivative action and the question whether they are cumulative or strictly alternative is one to which I shall return later in this judgment.

*The derivative claim*                                                       H

The real issue in this action is whether the derivative claim is barred by the rule commonly known as the rule in *Foss* v. *Harbottle* (1843) 2 Hare

305

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A
461. This rule was stated by Jenkins L.J. in *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064, 1066-1067, in the following terms:

" The rule in *Foss* v. *Harbottle*, 2 Hare 461, as I understand it, comes to no more than this. First, the proper plaintiff in an action in respect of a wrong alleged to be done to a company or association of persons is prima facie the company or the association of persons itself.

B
Secondly, where the alleged wrong is a transaction which might be made binding on the company or association and on all its members by a simple majority of the members, no individual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or association is in favour of what has been done, then cadit quaestio. No wrong has been done to the company or association

C
and there is nothing in respect of which anyone can sue. If, on the other hand, a simple majority of members of the company or association is against what has been done, then there is no valid reason why the company or association itself should not sue. In my judgment, it is implicit in the rule that the matter relied on as constituting the cause of action shall be a cause of action properly belonging to the general body of corporators or members of the company or association

D
as opposed to a cause of action which some individual member can assert in his own right."

Jenkins L.J. went on to point out that the rule so formulated can have no application unless the members of the company can by ordinary resolution, passed in general meeting, validly resolve that no proceedings should

E
be instituted to remedy the wrong to the company. Thus, the rule cannot apply (a) to cases where the minority seek to restrain the commission of an act which is ultra vires or illegal or to recover on behalf of the company property disposed of under an ultra vires or illegal transaction; (b) to cases where the minority seeks to have a resolution of the company in general meeting declared void upon the ground that the resolution was one which could only be passed by a special resolution; or (c) to cases where the

F
wrong done to the company is also an infringement of the minority's own individual rights, whether as members or otherwise.

These three categories of cases are sometimes referred to as exceptions from the rule in *Foss* v. *Harbottle*, 2 Hare 461. They are exceptions only in the sense that cases within these categories fall outside the ambit of the rule as formulated by Jenkins L.J. There is another exception which is an

G
exception in a different sense, namely, that it operates to exclude from the rule cases which would otherwise fall within its apparent scope. This exception, which I shall call simply " the exception," is stated by Jenkins L.J. in these terms, at p. 1067:

" It has been further pointed out that where what has been done amounts to what is generally called in these cases a fraud on the

H
minority and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they

A-10133

306

Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

were denied that right, their grievance could never reach the court   A
because the wrongdoers themselves, being in control, would not allow
the company to sue."

The exception is commonly stated in terms which require the plaintiff
in a minority shareholders' action to establish two things. First, that the
wrong to the company which it is sought to remedy was a wrong of a
fraudulent character and, secondly, that the wrongdoers are in control of   B
the company. I shall examine each of these two requirements in turn.

*Fraud*

   A convenient starting point is a passage, frequently cited, in the speech
of Lord Davey giving the advice of the Judicial Committee in *Burland* v.
*Earle* [1902] A.C. 83, where he said, at pp. 93–94:   C

   " It is an elementary principle of the law relating to joint stock
   companies that the court will not interfere with the internal manage-
   ment of companies acting within their powers, and in fact has no
   jurisdiction to do so. Again, it is clear law that in order to redress a
   wrong done to the company or to recover moneys or damages alleged
   to be due to the company, the action should prima facie be brought   D
   by the company itself. These cardinal principles are laid down in the
   well-known cases of *Foss* v. *Harbottle*, 2 Hare 461 and *Mozley* v.
   *Alston* (1847) 1 Ph. 790, and in numerous later cases which it is un-
   necessary to cite. But an exception is made to the second rule, where
   the persons against whom the relief is sought themselves hold and
   control the majority of the shares in the company, and will not permit
   an action to be brought in the name of the company. In that case   E
   the courts allow the shareholders complaining to bring an action in
   their own names.   This, however, is mere matter of procedure in order
   to give a remedy to a wrong which would otherwise escape redress,
   and it is obvious that in such an action the plaintiffs cannot have a
   larger right to relief than the company itself would have if it were
   plaintiff, and cannot complain of acts which are valid if done with the   F
   approval of the majority of the shareholders, or are capable of being
   confirmed by the majority. The cases in which the minority can
   maintain such an action are, therefore, confined to those in which
   the acts complained of are of a fraudulent character or beyond the
   powers of the company.   A familiar example is where the majority are
   endeavouring directly or indirectly to appropriate to themselves money,
   property, or advantages which belong to the company, or in which   G
   the other shareholders are entitled to participate, as was alleged in the
   case of *Menier* v. *Hooper's Telegraph Works* (1874) L.R. 9 Ch. 350.
   It should be added that no mere informality or irregularity which can
   be remedied by the majority will entitle the minority to sue, if the
   act when done regularly would be within the powers of the company
   and the intention of the majority of the shareholders is clear. This may   H
   be illustrated by the judgment of Mellish L.J. in *MacDougall* v.
   *Gardiner* (1875) 1 Ch.D. 13, 25. There is yet a third principle which
   is important for the decision of this case. Unless otherwise provided

307

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A   by the regulations of the company, a shareholder is not debarred from voting or using his voting power to carry a resolution by the circumstance of his having a particular interest in the subject-matter of the vote. This is shewn by the case before this Board of the *North-West Transportation Co.* v. *Beatty* (1887) 12 App.Cas. 589.  In that case the resolution of a general meeting to purchase a vessel at the vendor's price was held to be valid, notwithstanding that the vendor himself held

B   the majority of the shares in the company, and the resolution was carried by his votes against the minority who complained."

It is not easy to see why the statement of the rule in *Foss* v. *Harbottle*, 2 Hare 461, the "second rule," of the exception to it, and of the principle that the minority

C   "cannot complain of acts which are valid if done with the approval of the majority of shareholders, or are capable of being confirmed by the majority"

alone or in conjunction with Lord Davey's "third principle," compel the conclusion that the cases where the minority can maintain an action are confined to those where the act complained of, not being ultra vires or

D   unlawful, is of a fraudulent character. On the one hand, the company's cause of action is a form of property and there is, on the face of it, something unconscionable in the conduct of the majority if they use their voting power in general meeting to prevent an action being brought against them. The "fraud" lies in their use of their voting power, not in the character of the act or transaction giving rise to the cause of action. On

E   the other hand, if the persons against whom an action might be brought do not control the company there is no obvious limit to the power of the majority to resolve in general meeting to condone the injury to the company, or not to pursue the action whatever may have been the act or transaction giving rise to the cause of action and whether fraudulent or not there may be good practical reasons why the claim should not be pursued,

F   for instance, because of the potential injury to the reputation of the company or because the prospect of recovery would not justify the expense of litigation. The difficulty cannot be resolved by defining the limit of the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461, by reference to any category of acts or transactions which are incapable of being authorised or ratified by the majority in general meeting. For, again, there is no obvious limit to the power of the majority to authorise or ratify any act or

G   transaction whatever its character provided that it is not ultra vires or unlawful and provided that the majority does not have an interest which conflicts with that of the company. In *Regal (Hastings) Ltd.* v. *Gulliver (Note)* [1967] 2 A.C. 134, the appellant company sought to recover a profit, made on the sale of shares of another company, which the directors had obtained only by reason of the fact that they were directors of the

H   appellant company. Lord Russell of Killowen said, at p. 150, that the directors "could, had they wished, have protected themselves by a resolution (either antecedent or subsequent) of the Regal shareholders in general meeting."

308

Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

It is suggested in the editor's note in the report at [1942] 1 All E.R. 378, 379, that the resolution " would have been a mere matter of form, since [the defendant directors] doubtless controlled the voting." I can see nothing in the report which indicates that the defendant directors controlled the voting and, as I understand this passage in the speech of Lord Russell of Killowen, he contemplated that the defendant directors might have protected themselves by a resolution in general meeting precisely because they had not control of the majority of the votes. This passage would otherwise conflict with the decision of the Privy Council in *Cook* v. *Deeks* [1916] 1 A.C. 554, where directors who controlled a majority of shares of a company were not permitted by a resolution in general meeting to deprive the company of the benefit of a contract which in equity belonged to the company. It may be that in drawing the conclusion that the cases where the majority can sue are limited to those where the act complained of is of a fraudulent character or ultra vires Lord Davey had in mind the decision of the Privy Council in *North-West Transportation Co.* v. *Beatty* (1887) 12 App.Cas. 589, which he cites in support of the " third principle." I shall return to this case later in this judgment.

It is important to bear in mind in reading this passage in Lord Davey's speech that Lord Davey was not expressing the opinion of the Board on the issues raised on the appeal and was not attempting to set out an exhaustive statement of the rule in *Foss* v. *Harbottle*, 2 Hare 461 and the exception to it. This passage forms a brief preface to the detailed discussion of the issues in the appeal which follows. Detailed analysis of the facts and of the actual decision shows that Lord Davey did not intend to confine the exception within any narrow limits. In *Burland* v. *Earle* [1902] A.C. 83, one George Burland, referred to in the report as " Burland," controlled the defendant company; at the date of the action he held 1,077 ordinary shares of 100 dollars each out of an issued share capital of 1,700 shares of 100 dollars each. There were two main complaints made in the action, which was brought by minority shareholders. The first was that the defendant company had no power to establish a reserve fund and that a balance on profit and loss account ought to be distributed amongst the shareholders. That claim, though ill founded, would, if well founded, have fallen within the ultra vires exception. The second main claim was that Burland, who had bid for the assets of another company at an auction and afterwards sold them to the defendant company at a profit, had bought the assets on behalf of the company or had otherwise constituted himself a trustee of them for the company. Lord Davey said, at p. 98:

" ... the relief prayed by the amended statement of claim, ... is altogether misconceived. There is no evidence whatever of any commission or mandate to Burland to purchase on behalf of the company, or that he was in any sense a trustee for the company of the purchased property."

Two points should be noted. First, it is clear that Lord Davey took the view that the plaintiffs would have been entitled to succeed if they could have shown that Burland had purchased the assets on behalf of the company or had otherwise constituted himself a trustee of them for the

309
**1 Ch.**        **Prudential Assurance v. Newman Industries (No. 2)**        **Vinelott J.**

A  company. On that footing there would have been no material distinction between the assets purchased by Burland and the benefit of the contract obtained by the directors and held as trustees for the company which fell to be reconsidered in the subsequent decision in *Cook* v. *Deeks* [1916] 1 A.C. 554. Secondly, the claim for an account of the profits allegedly made by Burland by selling to the company assets which he held as trustee for the company was the only claim made in respect of that transaction. It

B  was not alleged, and on the facts stated could not have been alleged, that the company had a claim for damages. The company had not suffered any loss—the assets had been resold with other property at an advantageous price—and there was no evidence that Burland had sold at an excessive price; indeed, Lord Davey refers to evidence called by Burland to establish the fairness of the sale to the company. It was, of course, too late to claim

C  rescission. But Lord Davey did not dismiss the possibility that, if the company had not sold the assets, the minority shareholders might have been entitled to claim rescission. He said, at p. 99:

"Let it be assumed that the company or the dissentient shareholders might by appropriate proceedings have at one time obtained a decree for rescission of the contract. But that is not the relief which they ask or could in the circumstances obtain in this suit."

D

In making that observation Lord Davey may have had in mind an observation by Sir Richard Baggallay in *North-West Transportation Co.* v. *Beatty*, 12 App.Cas. 589. There the defendant director sold a steamship to a company which he controlled. The purchase which was made by the board was afterwards confirmed and adopted by a resolution of the

E  company in general meeting. It was held by the trial judge in an action by a minority shareholder to set aside the sale that there was no evidence of any fraud or unfair dealing. In the Privy Council it was held that the controlling shareholder was entitled to vote on the resolution adopting and confirming the purchase and that the resolution destroyed the right of rescission which would otherwise have arisen from the circumstance that the defendant was one of the directors. But at the end of his judgment

F  Sir Richard Baggallay said, at pp. 600–601:

"It may be quite right that, in such a case, the opposing minority should be able, in a suit like this, to challenge the transaction, and to shew that it is an improper one, and to be freed from the objection that a suit with such an object can only be maintained by the company itself."

G

It seems, therefore, that Sir Richard Baggallay did not consider that the resolution of the company in general meeting would be a bar to an action to set aside the transaction on the ground that it was an " improper " one. Prima facie, the transaction would have been an improper one if no steps had been taken to ensure that the price was within the range of what

H  could be reasonably considered a fair price, and that the transaction was in other respects within the range of what could be considered a commercial transaction. As I see it all that *Beatty's* case shows is that a contract between a company and a majority shareholder which is authorised

310
Vineiott J.      Prudential Assurance v. Newman Industries (No. 2)      [1981]

or ratified in general meeting, the resolution being passed by the use of the
controlling shareholder's votes, will not be set aside unless it is shown to
have been an improper one. That proposition follows from the principle
that a majority shareholder in exercising his votes in general meeting in
relation to a transaction in which he is involved does not owe any fiduciary
duty to the company or to the other shareholders. It was an irrelevant
circumstance that the original sale was one by a director and entered into
on behalf of the company by a board of which he was a member and one
which, apart from its adoption or ratification by the company in general
meeting, might, under the ordinary rules of equity, have been set aside
without proof of any unfairness. *Beatty's* case is not, as I see it, authority
for the more general proposition that a controlling shareholder who is also
a director can, by using his votes in general meeting, confirm or ratify an
act or transaction, not being of a fraudulent character or ultra vires, which
was a breach of his duty as a director and thereby prevent the minority
from bringing a derivative action. The resolution in general meeting super-
seded the resolution of the directors and there was, therefore, no question
of the majority using their votes to prevent an action being brought to set
aside a transaction between the board of directors and one of their number.

That Lord Davey did not intend to confine cases where a minority
shareholder can bring an action on behalf of the company within any
narrow limits is confirmed by analysis of the minor claims made in the
action. One of the orders made in the Court of Appeal was that Burland,
who had invested the company's reserve funds in his own name, was liable
to account to the company for his dealings and transactions: see paragraph
(3) of the summary of this order made in the Court of Appeal [1902] A.C.
83, 85. Another was that he was liable to account for all moneys and
interest on a bad debt which it was alleged he had foisted upon the
company: see paragraph (6) of the summary. There was no appeal against
these orders, but Lord Davey referred to them without criticism. The claim
in paragraph (6) was, of course a claim for an account on the footing of a
wilful default. But the claim in paragraph (3) was for the ordinary account
to which a beneficiary is entitled against a trustee without any allegation
of misconduct. The Court of Appeal had granted an injunction against
Burland restraining him from " personally controlling " the moneys of the
company. As to that Lord Davey said, at p. 97:

" And it is equally clear that the injunction against Burland cannot be
maintained. It is not ultra vires for the company, if it thinks fit to do
so, to invest in the name of a sole trustee, however imprudent and
undesirable such a course may be.  Nor can Burland as shareholder,
manager, and president of the company be restrained from exercising
any personal control over any portion of the company's earnings, in
which, indeed, he has the largest interest. If it appeared that under
the guise of investing undivided profits or the reserve fund the directors
were, in fact, embarking the moneys of the company in speculative
transactions, or otherwise abusing the powers vested in them for the
management of the company's business, different considerations would
of course arise.  But it does not appear to their Lordships that the
investment of the surplus profits in bank shares or bonds of trading

311

**1 Ch.**          Prudential Assurance v. Newman Industries (No. 2)          **Vinelott J.**

A      companies really bears that character, or was intended to be or was otherwise than a bona fide exercise of the powers of the company and the directors."

It seems clear from this passage that Lord Davey thought that the action would have come within the exception if it had been shown that Burland had been embarking the moneys of the company in " speculative transac-

B    tions." He clearly did not have in mind only the possibility that the minority might have been entitled to maintain the action if it had been alleged and proved that Burland had speculated with the company's money for his own benefit. That would have been obvious misconduct. Lord Davey must, I think, also have had in mind the possibility that the minority would have been entitled to maintain the action if it could have been shown that Burland had speculated with the company's money in breach of his

C    fiduciary duty to invest the company's moneys prudently. Such a breach of duty would not necessarily import bad faith.

     Further, two years before *Burland* v. *Earle* [1902] A.C. 83 was decided *Alexander* v. *Automatic Telephone Co.* [1900] 2 Ch. 56 was decided by a Court of Appeal consisting of Lindley M.R., Rigby and Williams L.JJ. In that case the directors who subscribed to the memorandum of

D    association of a company subscribed for a large number of shares which gave them together a controlling interest. They then issued shares to other persons on terms that 6d. per share should be paid on application and 2s. 6d. on allotment. The directors paid nothing on their own shares. Lindley M.R. summarised the position in his judgment in these words, at pp. 64–65 :

E    " The directors, in fact, so managed matters as to place themselves in a better position as regards payment than the other shareholders, and they did so without informing the other shareholders of the fact. This, the plaintiffs contend, was a breach of duty on the part of the directors to those who applied for and took shares upon the faith that the directors were not obtaining advantages at their expense. It is no

F    answer to the plaintiffs' case so put to appeal to the contracts alone, for the charge is that the directors were guilty of a breach of duty in procuring those contracts and in taking advantage of them so as to benefit themselves at the expense of the other shareholders. In the statement of claim and in the court below the defendants were charged with deliberate fraud; but this charge was ultimately abandoned in the court below, and, having been abandoned, it cannot be brought forward

G    again, or be listened to on the appeal. But, apart from all fraud, and although the directors acted in the belief that they were doing nothing wrong, there may, nevertheless, have been a breach of duty such as is relied upon, and it is necessary to consider whether there was or was not such a breach of duty."

     Lindley M.R. having later found there was a breach of duty expressed his

H    conclusion, at p. 69 :

     " It is necessary, however, to consider the form of the action, and the relief which can be given. The breach of duty to the company consists

312
Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

in depriving it of the use of the money which the directors ought to have A
paid up sooner than they did. I cannot regard the case as one of mere
internal management which, according to *Foss* v. *Harbottle*, 2 Hare 461
and numerous other cases, the court leaves the shareholders to settle
amongst themselves. It was ascertained and admitted at the trial that,
when this action was commenced, the defendants held such a pre-
ponderance of shares that they could not be controlled by the other
shareholders. Under these circumstances an action by some share- B
holders on behalf of themselves and the others against the defendants
is in accordance with the authorities, and is unobjectionable in form:
see *Menier* v. *Hooper's Telegraph Works*, L.R. 9 Ch. 350. An action
in this form is far preferable to an action in the name of the company,
and then a fight as to the right to use its name. But this last mode
of procedure is the only other open to a minority of shareholders C
in cases like the present."

The decision in *Alexander* v. *Automatic Telegraph Co.* [1900] 2 Ch. 56,
shows that a minority shareholders' action may fall within the exception
if controlling directors though " acting in the belief that they were doing
nothing wrong," acted in breach of their fiduciary duty and in a way
which benefited themselves and deprived the company of the use of moneys D
which it would have had if an equal call had been made on all the shares.
*Alexander* v. *Automatic Telegraph Co.* was not cited in *Burland* v.
*Earle* [1902] A.C. 83 but Lord Davey can hardly have been unaware of it.
As I see it, it is consistent with the actual decision of the Privy Council
in respect of the minor claims which I have mentioned and shows that the
exception is not limited to cases where there is any conscious and deliberate E
wrongdoing on the part of the directors who are alleged to be liable to the
company for breach of their fiduciary duty or improper retention or
appropriation of property or advantages belonging to the company.

There are many dicta in early cases, which indicate that a minority
shareholders' action will not be permitted, if all that is alleged is negligence
on the part of controlling directors: see for instance *Turquand* v. *Marshall* F
(1869) L.R. 4 Ch.App. 376, 386. These cases ante-date the modern develop-
ments of the law of negligence. However, in two comparatively modern
cases actions by minority shareholders have been held to be barred by the
rule in *Foss* v. *Harbottle*, 2 Hare 461 upon the ground that the acts
complained of were not of a fraudulent character. The first is the decision
of Danckwerts J. in *Pavlides* v. *Jensen* [1956] Ch. 565. In that case the G
minority shareholder sought to bring a derivative action against directors
for damages for what was described as " gross " negligence consisting in
the sale of an asbestos mine by the defendant company, Tunnel Asbestos
Ltd., to another company, Cyprus Asbestos Mines Ltd. (" the Cyprus com-
pany "), at a price greatly below its true value. Tunnel Asbestos was a
subsidiary, though not wholly owned, of another company, Tunnel Portland
Ltd. The directors of Tunnel Asbestos were also directors of Tunnel H
Portland. Tunnel Asbestos held 25 per cent. of the issued capital of the
Cyprus company but it does not appear from the report that Tunnel Portland
or its directors were shareholders or directors of the Cyprus company.

1 Ch.          Prudential Assurance v. Newman Industries (No. 2)          Vinelott J.

A   One question raised was whether the control of Tunnel Asbestos in general meeting—which was, in effect, exercised by the directors on behalf of Tunnel Portland as shareholder—was of a kind which came within the exception. The second question was whether the action was maintainable in the absence of any allegation of fraud. Danckwerts J. held that in the absence of an allegation of fraud in the statement of claim the action was not maintainable and the action was accordingly struck out. He said, at

B  p. 576:

> "On the facts of the present case, the sale of the company's mine was not beyond the powers of the company, and it is not alleged to be ultra vires. There is no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority share-
C    holders in fraud of the minority. It was open to the company, on the resolution of a majority of the shareholders, to sell the mine at a price decided by the company in that manner, and it was open to the company by vote of the majority to decide that, if the directors by their negligence or error of judgment had sold the company's mine at an undervalue, proceedings should not be taken by the company against the directors. Applying, therefore, the principles as stated by
D    Lord Davey, it is impossible to see how the present action can be maintained."

  It should be noted that, although it was alleged in the statement of claim that the sale was a breach of duty by the directors, it was not a breach of duty which, on the facts pleaded, benefited the directors or the company, Tunnel Portland, which controlled Tunnel Asbestos in general meeting
E  and which, accordingly, had power to appoint directors of Tunnel Asbestos.

  The other case is *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192. The facts of that case are very complex. It is sufficient to say that the action was brought by a minority shareholder and was, in part, a derivative action brought on behalf of the defendant company against the individual defendant who was the majority shareholder. There was a counterclaim by the indi-
F  vidual defendant which was also brought on behalf of the company. In both the claim and counterclaim the claims on behalf of the company were combined with personal or direct claims. Plowman J. treated the action as one which made no allegation of ultra vires or fraud on the part of the individual defendant or of appropriation of assets by the individual defendant in fraud of the minority. Although the action had come on for trial and although no objection was taken on the part of the individual defendant to
G  the form of the proceedings, Plowman J. himself raised the objection that the case was not within the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461 and that accordingly the court had no jurisdiction. He also held that the court had no jurisdiction to entertain the counterclaim upon the additional ground that the individual defendant did not and could not allege that the plaintiff controlled the defendant company. It is not easy
H  to see why the rule in *Foss* v. *Harbottle* should be applied to bar a claim by a minority shareholder if the majority shareholder and the company are both defendants to the proceedings. If the objection was that the counter-claim ought to have been made by the company and not by the minority

314

Vinelott J.          Prudential Assurance v. Newman Industries (No. 2)          [1981]

shareholder on its behalf the objection could have been met by amending
the counterclaim so as to make it a claim by the company.          A

There was an appeal from the decision of Plowman J.  In the Court of
Appeal [1964] 1 W.L.R. 843 it was argued that two of the allegations made
in the statement of claim were allegations that the individual defendant had
wrongfully withheld property of the company. As to one of these allegations,
the Court of Appeal held that the allegation as pleaded did not set out a case
of damage caused to the company. As to the other allegation Russell L.J.          B
said, at pp. 849–850:

> "The allegation of damage to the company of the character alleged
> is at least in theory sufficiently plausible for the pleading of mis-
> feasance to hold water."

Russell L.J. went on to refer to a number of cases which I shall examine
later in this judgment in which the rule in *Foss v. Harbottle* has been des-          C
cribed as a flexible rule, which "will be relaxed where necessary in the
interests of justice."  He said at p. 851:

> "I am prepared to assume for the purposes of this case (though
> I must not be understood as accepting it as a proposition of law)
> that there may be occasions in which justice requires departure from
> the rule when all that is asserted is damage to the company arising          D
> from misfeasance in withholding an asset of the company without
> fraud or ultra vires. But to my mind it is quite plain that justice does
> not require it in the present case."

He held that looking at all the circumstances of the case, that allegation
was "wholly visionary" and at p. 852:          E

> "... it cannot by any stretch of imagination be said that the interests
> of justice require that the ordinary rule should be departed from so
> as to permit such barren litigation."

Davies L.J. concurred in the judgment of Russell L.J.  Harman L.J.,
having summarised the grounds of the decision of Plowman J., said, at
p. 854:          F

> "For myself, I incline to the view that this was right. At any rate,
> to decide the other way would be to extend still further the exceptions
> to the rule that a company alone can complain of a wrong done to it.
> As Russell L.J.'s judgment shows, there are cases which suggest that
> the rule is not a rigid one and that exception will be made where the
> justice of the case demands it. I am content, as my brethren are, to          G
> assume that there may be misfeasance in respect of which the excep-
> tion should be allowed, but I also agree with them that this is
> emphatically not a case where the rule should be further stretched."

The Court of Appeal thus left open the question whether the exception
applies in a case where the allegation is of damage to the company by the
withholding of property of the company but there is no other allegation of          H
fraud on the part of the person against whom the claim is made. However,
the decision of the Court of Appeal shows that a derivative claim may be
struck out at an early stage if, notwithstanding that an allegation is made

A-10142

315

**1 Ch.**        Prudential Assurance v. Newman Industries (No. 2)        Vinelott J.

A   which would bring the case within the exception, the court takes the view that the allegation is plainly ill founded.

More recently in *Daniels* v. *Daniels* [1978] Ch. 406 a minority shareholder sought to bring a derivative action on behalf of a defendant company against two directors who were husband and wife and who together controlled the company. It was alleged that on their instructions land belonging to the company had been sold to one of the directors in 1970

B   for £4,250, that the sale was made at probate value which the defendant directors knew or ought to have known was below market value, and that the land was resold by the purchasing director in 1974 for £120,000. It was conceded by Mr. Blackburne for the plaintiff that the statement of claim did not allege fraud. Templeman J., after a very full review of the authorities including *Pavlides* v. *Jensen* [1956] Ch. 565 and *Heyting* v.

C   *Dupont* [1964] 1 W.L.R. 843, said, at pp. 413–414:

" The authorities which deal with simple fraud on the one hand and gross negligence on the other do not cover the situation which arises where, without fraud, the directors and majority shareholders are guilty of a breach of duty which they owe to the company, and that breach of duty not only harms the company but benefits the directors.

D   In that case it seems to me that different considerations apply. If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves. It would seem to me quite monstrous —particularly as fraud is so hard to plead and difficult to prove—if the confines of the exception to *Foss* v. *Harbottle*, 2 Hare 461,

E   were drawn so narrowly that directors could make a profit out of their negligence. Lord Hatherley L.C., in *Turquand* v. *Marshall*, L.R. 4 Ch.App. 376, 386, opined that shareholders must put up with foolish or unwise directors. Danckwerts J. in *Pavlides* v. *Jensen* [1956] Ch. 565, accepted that the forbearance of shareholders extends to directors who are ' an amiable set of lunatics.' Examples, ancient and modern,

F   abound. To put up with foolish directors is one thing; to put up with directors who are so foolish that they make a profit of £115,000 odd at the expense of the company is something entirely different. The principle which may be gleaned from *Alexander* v. *Automatic Telephone Co.* [1900] 2 Ch. 56 (directors benefiting themselves), from *Cook* v. *Deeks* [1916] 1 A.C. 554 (directors diverting business in their own favour) and from dicta in *Pavlides* v. *Jensen* [1956] Ch. 565

G   (directors appropriating assets of the company) is that a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company. This principle is not contrary to *Turquand* v. *Marshall*, L.R. 4 Ch.App. 376, because in that case the powers of the directors

H   were effectively wielded not by the director who benefited but by the majority of independent directors who were acting bona fide and did not benefit. I need not consider the wider proposition for which Mr. Blackburne against some formidable opposition from the authorities

316
Vinelott J.        **Prudential Assurance v. Newman Industries (No. 2)**        [1981]

contends that any breach of duty may be made the subject of a   A
minority shareholder's action."

It is clear, as Templeman J. points out, that an action against directors
who sell the company's property to one of their number without taking
steps to ensure that the transaction is fair by obtaining a proper valuation
is not to be equated with a common law action for negligence. The decision,
as I see it, is clearly in accord with the principles to be extracted from *Burland*   B
*v. Earle* [1902] A.C. 83 on a proper analysis of that case and indeed the
transaction would appear to be the kind of improper transaction which
Sir Richard Baggallay in *North-West Transportation Co.* v. *Beatty*, 12
App.Cas. 589 thought might be attacked by a minority shareholder.

Thus the authorities show that the exception applies not only where
the allegation is that directors who control a company have improperly   C
appropriated to themselves money, property or advantages which belong to
the company or, in breach of their duty to the company, have diverted
business to themselves which ought to have been given to the company,
but more generally where it is alleged that directors though acting " in the
belief that they were doing nothing wrong " (*per* Lindley M.R. in *Alexander*
*v. Automatic Telephone Co.* [1900] 2 Ch. 56, 65) are guilty of a breach   D
of duty to the company, including their duty to exercise proper care, and
as a result of that breach obtain some benefit. In the latter case it must be
unnecessary to allege and prove that the directors in breaking their duty to
the company acted with a view to benefiting themselves at the expense of
the company; for such an allegation would be an allegation of misappropria-
tion of the company's property. On the other hand, the exception does not
apply if all that is alleged is that directors who control a company are   E
liable to the company for damages for negligence it not being shown that
the transaction was one in which they were interested or that they have in
fact obtained any benefit from it. It is not easy to see precisely where the
line between these cases is to be drawn. For instance, is an action to be
allowed to proceed if the allegation is that the controlling director is liable
to the company for damages for negligence and that as a result of his   F
negligence a benefit has been obtained by his wife or a friend or by a
company in which he has a substantial shareholding? In *Pavlides v. Jensen*
[1956] Ch. 565 would it have been enough if, in addition to the allegation
of negligence, it had been alleged that Portland Tunnel had a substantial
shareholding in the Cyprus company and therefore benefited indirectly?
It is also not easy to see what principle underlies the distinction. Whether
the claim is for property improperly withheld or for damages for negligence   G
or breach of fiduciary duty and, in the latter case, whether those controlling
the company have or have not obtained some benefit the reason for the
exception is the same, namely that the claim is brought against persons
whose interests conflict with the interest of the company. It may be said,
in a perfectly intelligible sense, to be a fraud on the minority that those
against whom the claim would be brought are in a position to procure,   H
and, if the derivative claim is not brought, will procure, that the com-
pany's claim, however strong it may appear to be, will not be enforced.
Mr. Scott, very frankly, admitted that he could not put forward any valid

A-10144

317

**1 Ch.**      Prudential Assurance v. Newman Industries (No. 2)      Vinelott J.

A  ground of distinction between a case where the claim by the company is of
a proprietary nature and one where it is for damages only, nor between
a claim for damages for negligence where the loss to the company is
matched by a benefit to those in control and a claim for damages for
negligence where the loss to the company is either not matched by any
benefit to anybody or is not matched by a benefit to those in control.
However, Mr. Scott also conceded that the claim by Prudential is a claim
B  founded on acts of a "fraudulent character," whatever meaning is
attributed to those words. I have endeavoured to state the principle which
underlies the first limb of the exception, because the second limb cannot
be construed in isolation from it, but it is unnecessary for me to decide
precisely where the boundary limiting the category of cases which permit
of a minority shareholders' action is to be drawn and it would be wrong
C  for me to attempt to do so.

*Control*

The central issue in this case is whether a derivative action can be
brought against defendants who do not have voting control of the company
on whose behalf the derivative claim is brought and, if it can, in precisely
what circumstances such a claim will be allowed to proceed.
D
At an early stage in these proceedings, in the course of his argument in
support of the application by Mr. Bartlett and Mr. Laughton that the
question whether a minority shareholder can bring a derivative action
against defendants who are not alleged to control a majority of the votes
capable of being cast in general meeting should be determined as a pre-
liminary issue, Mr. Scott, who then appeared for both Mr. Bartlett and
E  Mr. Laughton, indicated that it would be his submission that the court has
no jurisdiction to entertain a derivative action at the suit of a minority
shareholder unless the persons against whom relief is sought on behalf of
the company are able to control a majority of votes capable of being cast
in general meeting.

The rule and the exception have sometimes been expressed in terms
F  of jurisdiction. In *Heyting* v. *Dupont* [1963] 1 W.L.R. 1192 Plowman J.,
of his own motion, raised and decided the question whether the court could
entertain the action. In the Canadian case of *Burrows* v. *Becker* (1967) 63
D.L.R. (2d), 100, Norris J.A. said, at p. 121 : " . . . once the rule is applied,
any judgment or order that the learned trial judge may purport to give
must be void and of no effect," and he cited with approval an observation
of Taschereau J. in *In re Sproule* (1886) 12 S.C.R. 140, 242, that proceedings
G  brought in breach of the rule, were " a complete nullity, a nullity of non
esse." However, it became clear as Mr. Scott's argument later developed
that his initial simple and rigid formulation of the rule and of the exception
to it is inconsistent with early authorities, in particular *Atwool* v. *Merry-
weather* (1868) L.R. 5 Eq. 464 which was decided in 1864 but is reported
only as a note to *Clinch* v. *Financial Corporation* (1868) L.R. 5 Eq. 450.

H  The decision of Sir William Page Wood V.-C. in *Atwool* v. *Merry-
weather* is of crucial importance and the facts and history of the litigation
require careful examination. The facts as found by Page Wood V.-C. at
the trial (which took place after some preliminary skirmishing) were

318
Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

shortly as follows. The defendant Merryweather had a leasehold interest in
the East Pant Du Mine which he knew had little, if any, value. He arranged
in conjunction with the defendant Whitworth to form a company, the East
Pant Du United Lead Mining Co. Ltd., for the purpose of purchasing and
working the mine which was to be sold to the company for £7,000. The
£7,000 was then to be divided and paid as to £4,000 to Merryweather and
as to £3,000 to Whitworth. The company was formed and 2,000 shares of
£5 each were subscribed for but of that sum only £3,940 was paid to the
company. The plaintiff Atwool was one of the subscribers. The £3,940 was
paid to Merryweather and in addition 600 shares were registered in his
name and credited as fully paid in satisfaction of £3,000 of the balance of
the £7,000. The agreement between Merryweather and Whitworth under
which Merryweather was to get £4,000 and Whitworth was to get £3,000
for his assistance in the scheme was concealed from the other directors of
the company who were thus led to believe that £7,000 was bona fide paid
as the purchase price of the mine. Very shortly afterwards the mine was
found to be worthless. A committee of the shareholders reported that the
undertaking should be abandoned and steps taken to recover back moneys
paid by the shareholders. On June 16, 1864, at an extraordinary general
meeting a resolution was passed that the report be received and entered
in the minutes but no resolution was passed formally adopting it. On
June 30, 1864, a bill was filed in the name of the company alleging that the
contract for the purchase of the mine by the company from Merryweather
had been fraudulently obtained and was void. On August 1 Merryweather
applied to the court for an order that the bill be taken off the file on the
ground that there had been no resolution of a majority of the shareholders
authorising the use of the company's name. That motion was stood over
until the next term so that the shareholders might have an opportunity of
expressing their opinion whether they would adopt the bill or not. An
extraordinary general meeting was held on October 12, 1864. A resolution
was proposed adopting the proceedings, whereupon Whitworth proposed
an amendment referring all matters in dispute to arbitration and staying
the proceedings. The amendment was lost and the original resolution was
carried on a show of hands but, on a poll, proxies were produced and the
resolution was defeated and the amendment carried. However, excluding
the votes of Merryweather and Whitworth, there was a majority of 86
votes and excluding the votes of Merryweather alone a majority of 58 votes
against the amendment and in favour of the original resolution. At that
stage Page Wood V.-C. ordered that the bill be taken off the file on the
ground that Merryweather was entitled to vote as shareholder despite his
contrary interest, and that the company had accordingly not given authority
for the proceedings to be continued. That earlier decision is reported:
see *East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather* (1864)
2 Hem. & M., 254.

Atwool then commenced proceedings joining the company, Merry-
weather and Whitworth as defendants. That action succeeded and Page
Wood V.-C. ordered that the agreement for the purchase of the mine be
set aside, the purchase price repaid and the share certificate issued to

319

1 Ch.         Prudential Assurance v. Newman Industries (No. 2)         Vinelott J.

A    Merryweather cancelled. He also directed that the company be wound up.
     He based his decision upon two grounds. The first was:

> " . . . that it would not be competent for a majority of the shareholders
> against a minority to say that they insist upon a matter of that kind
> where the whole inception of the company is simply a motion by a
> fraudulent agent, qua director, to confirm a purchase as made for
> £7,000, which was made for £4,000. The whole thing was obtained by
B> fraud, and the persons who may possibly form a majority of the
> shareholders, could not in any way sanction a transaction of that
> kind."

     But the second and independent ground was:

> " . . . . it is hardly necessary to rely upon that, because, having it
> plainly before me that I have a majority of the shareholders, indepen-
C> dent of those implicated in the fraud, supporting the bill, it would be
> idle to go through the circuitous course of saying that leave must be
> obtained to file a bill for the company, and pro forma have a totally
> different litigation." (See L.R. 5 Eq. 464, 468.)

D    The contrast between Page Wood V.-C.'s two decisions is important. The
     first shows that a minority shareholder cannot bring an action in the
     company's name if the wrongdoers are in control, and can by the use of
     their own votes procure the passing of a resolution that no proceedings be
     brought by the company. The second shows that the use of a wrongdoer's
     votes to prevent proceedings being taken by a company to remedy a wrong
     done to it may justify a minority shareholder bringing a derivative action.
E        *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, has been frequently cited
     without any doubts being expressed as to its correctness. Both decisions
     were cited in argument in *Beatty's* case, 12 App.Cas. 589. *Atwool* v.
     *Merryweather* was cited in argument in *Burland* v. *Earle* [1902] A.C. 83.
     It is referred to in the judgment in *Gray* v. *Lewis* (1873) 8 Ch.App. 1035,
     in the Court of Appeal in Chancery, where, however, a careful reading of
F    the facts will show that the individual defendants had voting control of the
     defendant company. It is also referred to in the judgment of Sir George
     Jessell M.R. in *Russell* v. *Wakefield Waterworks Co.* (1875) L.R. 20 Eq.
     474, to which I shall later refer. The second ground of the decision in
     *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, is inconsistent with the proposi-
     tion that the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461 is
     limited to cases where the persons against whom relief is sought control a
G    majority of the votes in general meeting. It is also inconsistent, as I see it,
     with the proposition that the rule, and the exception to it, are founded upon
     any limitation in the court's jurisdiction, if by that is meant jurisdiction in
     the strict sense of the power of the court to enter upon and determine a
     dispute. It might be possible to argue that the rule and the exception are
     founded upon jurisdiction in the strict sense if the exception only extended
H    to cases where the persons against whom relief is sought control a majority
     of the votes in general meeting of the company; it might then be possible
     to argue that the jurisdiction of the court to entertain a case within the
     exception is to be found in the fact that those who control the company

320

Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

are defendants to the action. But *Atwool* v. *Merryweather*, L.R. 5 Eq. 464      A
shows that the court has jurisdiction to entertain a claim by a minority
shareholder and to make an order in favour of the defendant company
even where the other defendants, alone or together with the plaintiff, do
not have a majority of votes in general meeting and where the other
shareholders are not parties. If that is so, then as I see it, the exception
can only be founded on a general jurisdiction of the court to make an order
for recovery of property or damages in favour of a defendant company      B
against co-defendants where the jurisdiction is invoked by a minority
shareholder. The question is then whether, in any given case, the jurisdic-
tion is properly invoked. But that is a question not of jurisdiction but of
the circumstances in which the court will allow the action to proceed and
will make an order for the recovery of property or damages by the
company.      C

  In *Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100 the Canadian courts
have taken a further step. That case was heard shortly before Canadian
legislation was passed giving the court power in certain circumstances to
permit a minority shareholder to sue in the name of the company. At the
time when *Burrows* v. *Becker* was heard there was no material distinction
between English and Canadian law. The facts in *Burrows* v. *Becker* were
very complex. Briefly summarised, the position was that the plaintiffs      D
were shareholders in a company, Ocean Towers Ltd., which owned what
was described at p. 101 as a "self-owned apartment building." A person
who wished to take an apartment in the block was required to take an
allotment of shares equal in nominal value to the price of the apartment;
at the same time, he was granted a lease of the apartment for 50 years at a
nominal rent plus a share of the expenses of maintaining the block. At the      E
relevant time a large block of shares was retained under the control of
the original promoters. In the action, which was derivative in form, the
plaintiffs as minority shareholders claimed on behalf of the company
against the promoters relief in regard to alleged fraudulent concealment
of breaches of duty and also claimed, against a group of former directors,
damages for breach of fiduciary duty. Apart from promoters or repre-
sentatives of corporate promoters who were directors there was a majority      F
of independent directors who, however, were also shareholders. The trial
judge, Munroe J., found that none of those independent directors had been
guilty of any fraud or breach of fiduciary duty. A careful analysis of the
distribution of the shareholding at the date when the action was brought is
made in the judgment of Tysoe J.A. at p. 151 and shows that the promoters,
even in conjunction with the directors, did not have voting control of the      G
company. The directors had resolved that the company should not com-
mence litigation against the promoters and the former directors. The trial
judge held that it would have been "futile and a waste of time" (see
p. 115) for the minority shareholders to have convened a general meeting
with a view to reversing that decision upon the ground that on earlier
occasions the directors and promoters had (see p. 152) "demonstrated their
ability to command a majority of poll votes . . ." and at pp. 147–148:      H

    "the directors and promoters have demonstrated to my satisfaction . . .
    (at the date of the action) . . . and at all times since that they would

**1 Ch.**        **Prudential Assurance v. Newman Industries (No. 2)**        **Vinelott J.**

321

A    act in unison and that they held and controlled the majority of the
shares in Ocean upon a poll vote, and that they would have used such
voting power at any meeting of shareholders to defeat any motion
designed to authorise or direct Ocean to sue the promoters or the
directors."

     It is clear from the analysis of the distribution of the shareholdings by
B    Tysoe J.A. that the trial judge, when he said that the promoters and
directors " controlled the majority of the shares on a poll vote," did not
mean that they were holders or beneficial owners of shares carrying voting
rights or otherwise able to direct how a majority of the votes were cast.
Tysoe J.A. after a very long review of all the facts held there was no
justification for the inference that the directors and promoters were other-
wise able to " command a majority of poll votes " or that the promoters
C    and independent directors would always " act in unison." He and the other
members of the Court of Appeal held that in those circumstances there was
no ground for excluding the rule in *Foss* v. *Harbottle*, 2 Hare 461. What
is significant is that it was not suggested in the judgment of Tysoe J.A. nor
in either of the other judgments that the case would have fallen outside
the exception to the rule in *Foss* v. *Harbottle* if the trial judge had been
D    right in his finding that it would have been futile to have held a general
meeting upon the ground that the promoters, the former directors and the
independent directors would have acted in unison in order to prevent
action being brought against the promoters and would have succeeded in
preventing action being brought against the promoters by the use of their
own votes or by the use of those votes with proxies given to directors.
*Burrows* v. *Becker* (1967) 63 D.L.R. (2d) 100 thus shows that the exception
E    applies—at least in Canada—where the persons alleged to have wronged
the company do not control the company in general meeting, and are not
a majority of the board of directors, and where it is not shown, as in
*Atwool* v. *Merryweather*, L.R. 5 Eq. 464, that a resolution has been passed
by the use of the votes of the wrongdoers that no proceedings should be
brought by the company but where it is otherwise shown that it would be
F    " futile " to call a general meeting because of the influence exercised by
the wrongdoers over the board of directors, and directly or indirectly,
through the use of proxy votes, over the votes capable of being cast in
general meeting.

     These two cases are consistent with observations in another strand of
authority where the rule in *Foss* v. *Harbottle*, 2 Hare 461, has been
G    described as a flexible rule. In *Foss* v. *Harbottle* itself Sir James Wigram
V.-C. said, at p. 492:

          " If a case should arise of injury to a corporation by some of its
     members, for which no adequate remedy remained, except that of a
     suit by individual corporators in their private characters, and asking
     in such character the protection of those rights to which in their
H    corporate character they were entitled, I cannot but think that the
     principle so forcibly laid down by Lord Cottenham [L.C.] in *Wall-
     worth* v. *Holt* (1840) 4 Myl. & Cr. 619, 635 and other cases, would
     apply, and the claims of justice would be found superior to any

322

Vinelott J.          **Prudential Assurance v. Newman Industries (No. 2)**          [1981]

difficulties arising out of technical rules respecting the mode in which corporations are required to sue."  **A**

In *Edwards* v. *Halliwell* [1950] 2 All E.R. 1064 Jenkins L.J. said, at p. 1067, of the exception that it showed " that the rule is not an inflexible rule and that it will be relaxed where necessary in the interests of justice." In *Burland* v. *Earle* [1902] A.C. 83, 93, Lord Davey, in stating the " elementary " rule, that the court would not interfere with the management of companies acting within their powers, added: " and in fact has no jurisdiction to do so "; but he stated the narrower rule, that in an action to redress a wrong to a company the company must be the plaintiff, as a prima facie rule only.  **B**

In *Russell* v. *Wakefield Waterworks Co.*, L.R. 20 Eq. 474, a minority shareholder sought on behalf of a company to recover against its directors and against the promoters of a bill in Parliament of a rival concern a payment said to have been made by the directors to the promoters to buy off opposition by the promoters of the new undertaking to an application by the defendant company in Parliament for enlarged powers which would compete with the proposed new undertaking. Such a payment might have been illegal if made fraudulently, and if so would have been ultra vires; but, unless illegal, it was clearly not a matter of which any complaint could be made since the directors of the defendant company might reasonably think it in the interests of the company to buy off opposition in that way. Sir George Jessel M.R. summarised two objections to the action which he said were well founded. The first was that:  **C**

**D**

" ... there is no case made by the bill shewing that the act complained of was beyond the powers of the old company, there being no direct allegation of fraud, although the word ' corrupt ' is used ": see p. 478.  **E**

As I read that passage in relation to the facts of that case, Jessel M.R. was not intending to lay it down as a general rule that a case does not fall within the exception to the rule in *Foss* v. *Harbottle*, 2 Hare 461, unless there is an allegation of fraud but only to say that on the facts of that case the payment would be unobjectionable unless made fraudulently, but if made fraudulently might be ultra vires. He gave leave to amend on this point. He then continued to make some general observations upon the rule in *Foss* v. *Harbottle* and the exceptions to it. Having stated the general rule he said in a passage often cited, at p. 480:  **F**

" But that is not a universal rule; that is, it is a rule subject to exceptions, and the exceptions depend very much on the necessity of the case; that is, the necessity for the court doing justice."  **G**

Mr. Scott suggested that in that passage read in its context Jessel M.R. is not suggesting that the relevant exception is flexible or depends " on the necessity of the case," but only that the range of possible exceptions is not fixed. But that explanation will not, I think, stand with a later passage in the judgment on p. 482 where Jessel M.R., having referred to *Atwool* v. *Merryweather*, L.R. 5 Eq. 464, which is referred to as a case " ... in which the corporation was controlled by the evildoer, and would not allow its name to be used as plaintiff in the suit " said:  **H**

323

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**          **Vinelott J.**

A   " It is not necessary that the corporation should absolutely refuse by
vote at the general meeting, if it can be shewn either that the wrong-
doer had command of the majority of the votes, so that it would be
absurd to call the meeting; or if it can be shewn that there has been
a general meeting substantially approving of what has been done; or
if it can be shewn from the acts of the corporation as a corporation,
distinguished from the mere acts of the directors of it, that they have
B   approved of what has been done, and have allowed a long time to
elapse without interfering, so that they do not intend and are not
willing to sue.  In all those cases the same doctrine applies, and the
individual corporator may maintain the suit.  As I have said before,
the rule is a general one, but it does not apply to a case where the
interests of justice require the rule to be dispensed with."

C   In that passage, as it seems to me, Jessel M.R. clearly contemplates that
the relevant or " true " exception may apply not only where the wrong-
doers are a majority but where some other reason can be shown for saying
that unless the minority are allowed to sue on behalf of the company the
interests of justice will be defeated in that an action which ought to be
pursued on behalf of the company will not be pursued.

D        If the rule and the exception cannot be confined within the rigid
formulation expressed in terms of voting control by the persons against
whom relief is sought on behalf of the company, then the question whether
a given case falls within the exception can only be answered by reference
to the principle which underlies the rule and the exception to it. Mr. Scott
submitted, I think rightly, that the principle which underlies the rule is that
E   it would be wrong to allow a minority shareholder to bring proceedings
joining the company as defendant and claiming against other defendants
relief on behalf of the company for a wrong alleged to have been done
to it if the majority of the members of the company take the view that it is
not in the interests of the company that the proceedings should be pursued.
Indeed, it would be so plainly wrong that it might be said that, in a broad
F   sense, the court would have no jurisdiction to allow the wishes of the
minority to override the wishes of the majority in that way. The principle
which underlies the exception to the rule is that in ascertaining the view
of the majority whether it is in the interests of the company that the claim
be pursued, the court will disregard votes cast or capable of being cast by
shareholders who have an interest which directly conflicts with the interest of
the company. Those are general principles of substantive law and are not
G   mere rules of procedure. But in any derivative action the plaintiff must allege
in his statement of claim some ground which, if established at the trial,
would bring the case within the exception and justify an order that the
company recover damages or property from the other defendants: see
*Birch* v. *Sullivan* [1957] 1 W.L.R. 1247. Thus the question whether an
action falls within the exception will normally be tested at an early stage.
H   So, if the defendants against whom relief is sought on behalf of the com-
pany control the majority of votes, the action will be allowed to proceed
whether a resolution that no action should be brought by the company has
been passed or not; so also, if the persons against whom relief is sought

324
Vinelott J.          Prudential Assurance v. Newman Industries (No. 2)          [1981]

do not control a majority of the votes but it is shown that a resolution has          A
been passed and passed only by the use of their votes. By contrast if a
resolution has been passed that no proceedings should be started by the
company or if the matter has not been put to the shareholders in general
meeting and if no good reason is advanced in the statement of claim why
the wishes of the majority should not be given effect the action will be
struck out or, possibly, in the latter case, stood over while a general meeting
is called, as in *East Pant Du United Lead Mining Co. Ltd.* v. *Merryweather*          B
2 Hem. & M. 254.

But there are an infinite variety of possible circumstances which fall
within these two extremes. If shareholders having a majority of votes in
general meeting are nominees, the court will look behind the register to the
beneficial owners to see whether they are the persons against whom relief
is sought: see *Pavlides* v. *Jensen* [1956] Ch. 565, 577. There seems no good          C
reason why the court should not have regard to any other circumstances
which show that the majority cannot be relied upon to determine in a
disinterested way whether it is truly in the interests of the company that
proceedings should be brought. For instance, some shareholders able to
exercise decisive votes may have been offered an inducement to vote in
favour of the wrongdoers. In *Atwool* v. *Merryweather*, L.R. 5 Eq. 464,          D
it was suggested that some shareholders who voted against the resolution
authorising proceedings had been offered an indemnity by Merryweather.
In *Kerry* v. *Maori Dream Gold Mines Ltd.* (1898) 14 T.L.R. 402, a
derivative action was allowed upon the ground that the majority had been
given a benefit denied to the minority. Moreover, today it would be un-
common for any large number of shareholders to attend and vote in person
at a general meeting of a large public company, and—an instance suggested          E
by Mr. Scott—directors alleged to be liable to the company might be able
to determine the outcome of a resolution in general meeting in their own
favour by the use of proxy votes. Similarly, most modern articles confide
to the directors, the management of the business of the company (see e.g.,
article 80 of Table A) and it is possible that an article in these terms vests
in the directors a discretion whether proceedings should be commenced by the
company which cannot be overridden by resolution in general meeting: see          F
*Buckley on the Companies Acts*, 13th ed. (1957), p. 860 and *John Shaw and
Sons (Salford) Ltd.* v. *Shaw* [1935] 2 K.B. 113, 134, where an earlier passage in
*Buckley* in the same terms was approved in the Court of Appeal. If directors
who have an interest direct or indirect in the question whether proceedings
should be commenced refuse to submit that question to the shareholders
in general meeting, the majority could in theory remove the directors, but          G
might only be able to ensure that the question whether proceedings should
be commenced is properly considered by a disinterested board by taking
that extreme step, which, in turn, they might consider would involve
damage to the company greater than any benefits to be derived from the
action against the directors. Mr. Scott at the end of his very clear and
helpful argument summarised the principle that underlies the exception          H
to the rule in these terms: it applies wherever the persons against whom
the action is sought to be brought on behalf of the company are shown to

325

**1 Ch.**        **Prudential Assurance v. Newman Industries (No. 2)**        **Vinelott J.**

A  be able " by any means of manipulation of their position in the company " to ensure that the action is not brought by the company. That broad formulation I accept, provided that the means of manipulation of the defendant's position in the company are not too narrowly defined. The question is how this test applies to the grounds advanced in the statement of claim for bringing the present action within the exception.

B    It is alleged in paragraph 24 of the amended statement of claim that the deceptions which resulted from the tricky and misleading character of the circular:

"... were such that at the time of the commencement of his action there was no real prospect that, without recourse to legal proceedings, they could have been exposed so as to give the majority of the share-holders the full information with regard to the facts upon which a decision could be made in general meeting as to the company bringing legal proceedings against the said defendants. Without exposure of the said deceptions a decision of the majority of the shareholders not to sanction such proceedings would have been thereby vitiated, and such decision would thereby have been under the control of the said defendants through the operation of their said deceptions."

C

D    Mr. Scott submitted that in this paragraph two distinct questions are elided and confused. The first and relevant question is whether on the facts known to Prudential it was truly in the interests of the company that the action should be commenced by the company. That, it is said, is the question which the majority of the shareholders are entitled to decide in general meeting, and in deciding that question the members are entitled to weigh the potential injury to the company of having its affairs publicly investigated, the uncertainty of the litigation, the disruption to its business by the litigation in which far-reaching discovery may have to be made, the time during which its officers may be occupied in preparing for the hearing and attending to give evidence, and the potential liability of the company for costs which might prove irrecoverable—though that last consideration clearly does not weigh in the present case. The question whether, at the end of the litigation, it is established that the passing of the resolution was procured by the fraud of the individual defendants is, it is said, a different question. A minority should not be allowed, by the device of bringing a direct (personal and representative) claim against the individual defendants, to remove from the decision of the members in general meeting the question which should be asked at an early stage, namely, whether the company should or should not join in the litigation as plaintiffs. It would, said Mr. Scott, be unjust that an action which could have been stayed in limine upon the ground that the members of the company had not been consulted, had it not been joined with direct personal and representative claims, thereby necessitating a full inquiry into the allegations made in the statement of claim, should, when those allegations have been fully investigated and proved, result in a judgment in favour of the company. I see considerable force in these submissions. But on the facts of the present case they bear a somewhat unreal air. At all times after Mr. Murray

E

F

G

H

326

Vinelott J.        **Prudential Assurance v. Newman Industries (No. 2)**        [1981]

released his letter to the financial press in July 1975 the other members of   A
the board of Newman have sided with Mr. Bartlett. Mr. Murray's criticism
of the transaction was regarded by them as tardy and motivated by improper
considerations. In fact Mr. Murray's criticisms were wholly justified even
on the facts known to Mr. Murray at that time. The evidence adduced in
these proceedings shows that there were even more severe criticisms that
could have been made. Mr. Murray saw himself as the watchdog for the
shareholders and throughout acted with integrity and courage in his        B
endeavours to see that their interests were protected. The other members
of the board in my judgment were tricked into believing that a valuation
had been obtained by Deloittes supporting the values attributed to the
assets in the package in Mr. Bartlett's original strategy document and,
having once taken sides, were not in any position to exercise a dispassionate
judgment. That this was so may be illustrated by the history of the        C
Schroders/Harman report. On February 6, 1976, there was a meeting of
the board of Newman. Mr. Bartlett reported that there had been a meeting
on January 21, 1976, between representatives of Schroders and Mr.
Harman on the one hand and of himself, Mr. Bush and Mr. Baldwin on
behalf of Newman, with their legal adviser, on the other hand and that
Schroders and Mr. Harman were in a position to present their conclusions.
The effect but not the full report was then stated, namely:        D

> " that on the balance of the evidence we have examined, it was not
> unreasonable for the board of Newman to have recommended the
> transaction to shareholders."

Mr. Murray asked for more documentary evidence and said that he was
" not prepared to accept the opinion and wished to check the facts." Mr.   E
Murray was then, in effect, removed as a director. It seems that after he
had left the meeting the full report was distributed to the other members
of the board. No evidence has been called to show the course of the
investigations made by Schroders and Mr. Harman and the process which
led to the conclusions which I have cited earlier in this judgment. This
must be, to some extent, a matter of speculation. However, it is to my mind   F
clear beyond doubt that Schroders and Mr. Harman did not know of the
January agreements or of the misstatements of fact made to Mr. Cooper,
and could not have known of the detailed attributions of value made by
Mr. Cooper or the way in which he had been induced to increase his
original value in the course of the telephone conversation on May 5. For
in paragraph 9.12 of the report Schroders and Mr. Harman explain that   G
the independent directors of Newman: " were entitled to accept, on the
basis of independent professional advice, that the price proposed was a
proper one " and that " the board of Newman were entitled to consider
that they had received adequate independent advice on this aspect." Given
that the board were deceived and, at least in part, as a result of that
deception viewed Mr. Murray's conduct in this hostile way, there was in my   H
view no real possibility that the question whether proceedings should be
commenced by the company would ever be put to the shareholders in a way
which would enable them to exercise a proper judgment as to whether

A-10154

327

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**          **Vinelott J.**

A  it was in the interests of the company that the litigation should be commenced. The shareholders would inevitably look to the directors for guidance. No doubt Prudential could, in theory, have proposed the appointment of additional directors with a view to entrusting to them alone the task of investigating and advising shareholders whether an action should be brought by Newman. Bearing in mind the size of T.P.G.'s shareholding and what happened to Mr. Murray when he suggested further inquiry, the

B  prospect of their succeeding in this course is so remote as to be merely fanciful. I am satisfied on the evidence as a whole that there was no way in which Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction including in particular Mr. Cooper's valuation.

C  In those circumstances, in my judgment Prudential have shown that the interests of justice do require that a minority action should be permitted.

In his reply Mr. Caplan submitted that the derivative action should be allowed upon another ground. If the derivative claim is dismissed Prudential will be entitled to judgment, in the direct claim, for damages to be assessed in an inquiry, and entitled, so far as they sue as representatives, to declarations entitling any other shareholders at July 29, 1975, who can

D  establish that they have suffered damage, to recover damage. But there is no reason why Newman should not itself commence proceedings and, indeed, if the shareholders look solely to the financial interests of Newman and if there is any real prospect of recovery, they could be expected to do so. The result would be that Prudential will in substance be compensated twice in respect of the same wrong, first, by recovering damages in the

E  direct claim and, secondly, by the restoration of the loss suffered by the company, unless, possibly, the possibility of recovery in an action by Newman is taken into account in assessing the damage to a shareholder who, like Prudential, remains a shareholder. It would clearly be wrong that Prudential should recover damages for the loss it has indirectly suffered as a shareholder if the loss suffered directly by Newman is subsequently

F  made good, and it would be unjust to Prudential to bring the damages capable of being recovered by the company into account in evaluating the loss indirectly suffered by the shareholders when it cannot be certain that an action will be brought by Newman. Of course, there must inevitably be a danger that the individual defendants will suffer a double claim for damages in that, if Newman recovers damages, they may still be liable to a

G  shareholder as at July 29 who has since disposed of his shares and could show that he sold his shares at a price lower than that which he could have obtained had not the package been foisted on Newman at an excessive price. But that element of duplication is inavoidable.

Mr. Scott stressed that Mr. Bartlett and Mr. Laughton owed a fiduciary duty to the company but owed to its shareholders only the common obligation to act honestly and with due care. It was, he said, in a

H  sense a coincidence that the shareholders' cause of action in tort coincided with the company's cause of action based on equitable fraud. The two do not necessarily run together. Directors might conclude in good faith that a

328

Vinelott J.     Prudential Assurance v. Newman Industries (No. 2)     [1981]

particular transaction was to the benefit of their company and yet
deliberately mislead shareholders into approving it by a dishonest circular. A
This nice discrimination seems to be over-refined on the facts of the
present case. The charge made by Prudential is that Mr. Bartlett and Mr.
Laughton conspired to injure Newman, and indirectly its shareholders,
by procuring Newman to enter into a transaction designed to benefit T.P.G.
at its expense which—because of the requirements of the Stock Exchange—
could only be made binding on Newman by a resolution of the shareholders B
of Newman. By putting out a deliberately misleading circular they injured
Newman and its shareholders. As at present advised I think there is much
to be said for the view that in circumstances such as these the company
should be made a defendant unless the company has by resolution in
general meeting effectively released its cause of action—which it might do
for instance by approving a compromise. But a decision on this point may C
have far-reaching consequences and, as I have reached the conclusion that
the derivative claim should be allowed on other grounds, I do not propose
to express any final conclusion on it. Mr. Caplan made it clear at a very
early stage that if Prudential succeeded in the derivative claim it would
not wish to persist in the direct claim whether personal or representative.
As I see it, it would be wrong to dismiss the direct claim altogether. There
is a theoretical possibility, however remote, that the majority of the D
members of Newman, after full consideration of the facts disclosed in this
litigation, may resolve not to take advantage of the judgment in favour
of the company. The right course, as I see it, is to direct that no further
proceedings be taken in the direct personal or representative claims without
the leave of the court. But this is a matter upon which counsel may wish
to address me further.                                                       E

*The claim against T.P.G.*

    It is conceded by Mr. Turnbull, who appeared for the T.P.G., that
T.P.G. must be taken as having actual knowledge of the fraud practised
upon Newman, which knowledge is to be imputed to T.P.G. because T.P.G.'s
managing director and deputy chairman, Mr. Laughton, and its chairman, F
Mr. Bartlett, were concerned in a fraud designed to benefit T.P.G. at the
expense of Newman. Mr. Turnbull concedes, therefore, that T.P.G. is
prima facie liable to make good any loss suffered by Newman as a result
of the breach of fiduciary duty on the part of Mr. Bartlett and Mr.
Laughton. But he argued that T.P.G. are entitled by way of defence to
say that the facts relied upon by Prudential as establishing their claim
against Mr. Bartlett and Mr. Laughton show of necessity that the resolution G
approving the agreement of June 3 was void, that the agreement of June 3
never became unconditional, and that all transfers of property purportedly
made pursuant to it, were made without authority. The argument, as I
understand it, is that in these circumstances T.P.G. is entitled to assert
by way of defence that Newman's only remedy is to seek declarations that
the transfers of property made purportedly in pursuance of the agreement H
of June 3 were void and that the transaction be unscrambled. Mr. Turnbull
accepts, as I understand his argument, that if the transaction had been
voidable Newman could have elected not to avoid it but to claim com-

329

**1 Ch.**     **Prudential Assurance v. Newman Industries (No. 2)**     Vinelott J.

A  pensation from Mr. Bartlett and Mr. Laughton and that T.P.G., having knowledge of and through Mr. Bartlett, and Mr. Laughton having participated in the fraud, would be equally liable with Mr. Bartlett and Mr. Laughton to make good any loss suffered by Newman. But, he says, a void transaction is not capable of being confirmed and the alternative claim is not available. I hope I have correctly summarised this argument. I confess that I have felt some difficulty in following it. I can see no reason

B  why, given that the resolution was void, that the agreement of June 3 did not become unconditional, and that all transfers of property made in purported pursuance of it were made without proper authority, Newman should not say that the transaction though void cannot now be unscrambled and that Newman has suffered damage in consequence of a breach of fiduciary duty by Mr. Bartlett and Mr. Laughton in procuring the resolution

C  to be passed, and therefore, in turn, in procuring the transfers of property to be made. If Newman can claim compensation from Mr. Bartlett and Mr. Laughton upon this ground then as I see it T.P.G. is equally liable to make compensation.

*Concluding observations*

D  I have felt compelled to the conclusion that Mr. Bartlett and Mr. Laughton together pursued a plan designed to benefit T.P.G. at the expense of Newman and did so by means which included the deception of the board and the shareholders of Newman as to their true motives in propounding the transaction between the two companies and as to the market value of the assets acquired by Newman. I reach this conclusion with regret. The motives which inspire human conduct are rarely unmixed

E  and Mr. Bartlett may well have persuaded himself that the end at which he aimed justified the means to which he resorted. As I see it Mr. Bartlett, during his years as a management consultant, persuaded himself that a combination of large minority holdings or strategic stakes in public companies with the resources of a management consultancy business could be used to the advantage of the companies concerned. His plan was to acquire strategic stakes in a number of companies with overlapping interests

F  which, with the assistance of a team of management consultants, would enter into new trading relationships for the benefit of the group as a whole, and whose financial resources would be combined—a process which could be facilitated in some cases by transferring subsidiary companies of one company short of cash to another with surplus cash. At the centre of the spider's web controlling the axial threads would sit T.P.G., and, controlling

G  T.P.G., Strongpoint. I doubt whether Mr. Bartlett ever fully understood the difficulties and dangers inherent in the conflicts which were bound to arise between the interests of associated companies. But the scheme suffered from a defect of another kind. The acquisition of this group of associated companies was to be financed, except where shares of T.P.G. could be offered in exchange for strategic stakes, by bank borrowing, which would

H  be replaced in time by the sale of strategic stakes in successful companies which were no longer needed as part of the group, or by raising loan capital, or by a rights issue. Financing the acquisition of strategic stakes,

330

Vinelott, J.      **Prudential Assurance v. Newman Industries (No. 2)**      [1981]

for which a premium above quoted price would be required, by bank
borrowing was inevitably a risky course. To finance such acquisitions
against a falling market at a time when credit was tight and expensive
proved a highway to disaster. When disaster loomed unmistakably ahead
Mr. Bartlett saw the destruction of what he genuinely believed to be a
potentially valuable scheme and a potentially valuable network of associated
companies. I think he may well have believed that it would be for the
ultimate benefit of Newman that it should be placed in relation to the
network of associated companies in the central position which was
originally to have been occupied by T.P.G. He and Mr. Laughton would
still have the ultimate control and would not see the destruction or dis-
integration of the interlocking group. But to say that Mr. Bartlett was
motivated at least in part by his desire to keep the package together as an
entity and that he believed that benefits would ultimately flow from it,
is not to excuse his conduct. He knew that if the true facts as to the financial
position of T.P.G. and the market value of its assets became known to the
board and shareholders of Newman there would be no prospect that they
could be persuaded to accept them at a price sufficient to enable him to
salvage T.P.G. and so avoid embarrassing disclosures as to the use made
of T.P.G.'s and Newman's moneys for the benefit of Strongpoint. Having
embarked upon the scheme for transferring the package to Newman it was
carried through with the co-operation of Mr. Laughton by means which
involved the deliberate deception of the board and shareholders of
Newman.

It is, I think, probable that but for two circumstances the scheme would
not have succeeded. First, Mr. Cooper did not in my judgment approach
his task of valuation in a sufficiently critical way. He should not have
accepted insider information from Mr. Laughton, without making some
effort to confirm it, and he should not have made the additions he made
in the course of the telephone conversation on May 5 without ensuring that
those additions and the reasons for them were known to the board. But
Mr. Cooper was placed in a difficult position. He was confronted with a
transaction apparently approved in principle by the board and based upon
a valuation put forward by the chairman and the vice-chairman of a
public company of which his firm were auditors. His main channel of
communication was through one of the two persons who were effectively
vendors of the package. The history of this case raises the question whether
the Stock Exchange should accept that the auditor of a company is a
sufficiently independent adviser to evaluate and, in effect, advise share-
holders as to the financial merits of a class 4 transaction.

The second and related point is this. Article 93 of Newman's articles
of association—which is in substantially the same terms as article 84 of
Table A—modifies the strict rule that the board of directors of a company
cannot enter into a transaction with one of their members in which he has
an interest by providing, in general terms, that a director who is interested
in any contract with the company shall declare his interest and shall not
vote in respect of the contract. But there is an exception from the require-
ment that the director shall not vote where, amongst other things, the
contract is

A-10158

331

**1 Ch.**          **Prudential Assurance v. Newman Industries (No. 2)**          **Vinelott J.**

A  " with any other corporation or firm and the sole interest of the
director is that he is a director, member, partner, employer or creditor
or otherwise interested in any such corporation or firm."

Given that many transactions in which a director is interested will be
transactions with companies in which he has a substantial shareholding—
or is even the sole shareholder—this exception seems to me far too wide.

B  If article 93 had not been qualified by this exception Mr. Bartlett and Mr.
Laughton would not have been entitled to vote at any of the board meetings
at which the package deal or the Strongpoint option were considered, and
it must be at least doubtful whether Mr. Laughton would have been
appointed to the committee which dealt with Mr. Cooper. I suggest that
the Stock Exchange should consider whether the requirements of the
Yellow Book concerning class 4 transactions should not be modified so as

C  to give the Council of the Stock Exchange power to require that class 4
transactions be considered solely by directors who do not have an interest
which conflicts with the company on whose behalf a circular seeking
shareholders' approval is sought and do not take any part in the prepara-
tion of such a circular. The Council, of course, already have power to
insist that such a director or a company in which he is interested shall not

D  vote on a resolution to approve the transaction.

*Proceedings adjourned.*

March 17 and 18. Counsel addressed the court as to the appropriate
orders to be made. The order as drawn up provided :

E  (1) Declaration that the circular dated June 21, 1975, sent by Newman
to its shareholders and signed by Mr. Bartlett was tricky and misleading.

(2) Declaration (*a*) that as against the second and third defendants, Mr.
Bartlett and Mr. Laughton, the plaintiff in its personal capacity was
entitled to damages for conspiracy, and (*b*) that all other shareholders in
Newman, who, like the plaintiff, had suffered damage and were entitled
to damages, were entitled to damages against the defendants Mr. Bartlett

F  and Mr. Laughton for conspiracy, and (*c*) that the first defendant, Newman,
was entitled to damages for conspiracy and breach of fiduciary duty.

(3) Declaration that the fourth defendant, T.P.G., was liable to pay
compensation to Newman in consequence of the breach of fiduciary duty
by the defendants Mr. Bartlett and Mr. Laughton.

(4) Inquiry as to the amount of compensation to Newman payable

G  jointly and severally by Mr. Bartlett, Mr. Laughton and T.P.G. respectively,
in respect of fiduciary duty by the defendants, Mr. Bartlett and Mr.
Laughton.

(5) Order for payment of the amounts so found due, respectively, in
the appropriate proportions.

(6) Stay of all proceedings pursuant to paragraphs 2 (*a*) and (*b*) above,

H  without leave of the court.

(7) Order that the defendants, other than Newman, do pay to the
plaintiff and Newman respectively their costs of the action except as other-
wise specifically provided, save (i) that as against T.P.G. such costs should

A-10159

332

Vinelott J.        Prudential Assurance v. Newman Industries (No. 2)        [1981]

not include those attributable to the plaintiff's personal claim at 5 per cent. **A** of such costs (other than those referred to in paragraph 8 below) and 5 per cent. of Newman's costs, and (ii) as against the defendants other than Newman such costs should not include those attributable to the plaintiff's amendment of the statement of claim and in taxing the costs of the plaintiff the taxing master should allow the attendance of three counsel for the plaintiff, provided always that any sums recovered should be applied between the plaintiff and Newman in proportion that their respective costs **B** bear to their combined costs.

(8) Order that the costs of the preliminary issue and of the application to amend the statement of claim be the plaintiff's costs in cause.

(9) Order that the defendants other than Newman do pay to the plaintiff and Newman respectively their costs of taking a shorthand note of the evidence and of supplying expedited transcripts and copies thereof. **C**

(10) Order that the taxing master tax the costs of Newman as between party and party, and the plaintiff's costs as between party and party and on the common fund basis, and to certify the difference.

(11) Order that Newman do indemnify the plaintiff as to the difference between (a) 95 per cent. of the costs incurred by the plaintiff (other than those in paragraph 8 above) together with the whole of the costs referred **D** to in paragraph 8 both taxed on a common fund basis and (b) the costs recovered from the other defendants, provided always that the amount so recovered by way of indemnity shall not exceed the amount recovered on behalf of Newman by way of damages and equitable compensation from the second, third and fourth defendants.

(12) Costs of the inquiry reserved.

(13) Stay of proceedings to enforce the order until after time for appeal **E** expired.

(14) In the event of an appeal a further stay until the appeal be disposed of.

(15) Liberty to apply.

Solicitors: *C. F. Whitehorn; Simmons & Simmons*, until judgment **F** on February 18 and 19, thereafter *Macfarlanes; Simmons & Simmons; Clifford-Turner.*

T. C. C. B.

**G**

———

**H**

A-10160



255

[2020] 3 WLR                                         Marex Financial Ltd v Sevilleja (SC(E))

A

Supreme Court

## Marex Financial Ltd *v* Sevilleja (All Party Parliamentary Group on Fair Business Banking intervening)

[2020] UKSC 31

B
2019  May 8;                                    Lord Reed PSC, Lord Hodge DPSC,
2020  July 15                              Lady Black, Lord Lloyd-Jones, Lord Kitchin,
                                               Lord Sales JJSC, Baroness Hale of Richmond

*Company — Creditor's claim against beneficial owner — Rule against reflective loss*
*— Claimant obtaining judgment against companies — Companies allegedly*
*stripped of assets by defendant beneficial owner so that unable to pay judgment*
C
*debt — Claimant's action in tort against defendant for damages to recover sums*
*removed from companies equal to judgment debt — Defendant claiming action*
*relating to same loss as that incurred by companies contrary to rule precluding*
*recovery of reflective loss — Extent to which rule remaining good law —*
*Whether extending to claims by unsecured creditors or limited to claims by*
*shareholders for diminution in value of shares caused by actionable loss to*
*company — Whether claimant entitled to pursue claim*

D
   The claimant obtained judgment against two companies incorporated in the
British Virgin Islands for sums due under a contract, but the companies' assets were
found to be of an amount significantly below the judgment debt and the companies
subsequently went into liquidation.  The claimant alleged that, after the draft
judgment had been released, the defendant, a resident of Dubai who was the ultimate
beneficial owner and controller of the companies, had dishonestly stripped the
E
companies of their wealth and moved it overseas out of the claimant's reach in order
to prevent the judgment from being enforced.  It also alleged that the companies'
liquidator, funded by the defendant, had taken no steps to recover the companies'
losses.  The claimant issued proceedings against the defendant seeking damages in
tort for inducing or procuring the violation of its rights under the judgment and
intentionally causing it loss by unlawful means, and was given permission to serve the
claim form on the defendant out of the jurisdiction.  The defendant applied to set
F
aside service of the claim form on the ground, inter alia, that since it remained open
to the companies' liquidator to pursue any claim against the defendant for any sums
unlawfully removed, the rule against reflective loss barred the claimant from making
the same claim.  The judge, having rejected that argument and the other grounds of
objection, dismissed the application.  The Court of Appeal allowed the defendant's
appeal, holding that the rule against reflective loss was not limited to precluding a
shareholder from claiming for a diminution in the value of its shareholding that was
G
merely a reflection of a loss suffered by the company in consequence of a wrong done
to it by the defendant, but also precluded a claim by an unsecured creditor of a
company where each of the creditor and the company had its own cause of action
against a third party defendant in respect of the same wrongful conduct by him.
   On the claimant's appeal—
   *Held*, allowing the appeal, that there was no justification for a reflective loss
principle in the law of damages and to the extent that case law had purported to lay
down such a principle it was not to be followed; that there were grounds, however,
H
(Lord Kitchin, Lord Sales JJSC and Baroness Hale of Richmond dissenting) for
upholding a more limited principle of company law, namely that shareholders in a
company could not bring an action to make good a diminution in the value of their
shareholding, or in the dividends they received, which flowed from loss suffered by
the company for the recovery of which it had a cause of action, even if the company
were to decline or fail to make good that loss; that the rationale for the rule was that,

© 2020 The Incorporated Council of Law Reporting for England and Wales

256
**Marex Financial Ltd v Sevilleja (SC(E))**                    [2020] 3 WLR

where it applied, the shareholder did not suffer a loss which was recognised in law as    A
having an existence which was separate and distinct from the company's loss given
the long-established principle of company law that the only person who could seek
relief for an injury done to a company, where the company had a cause of action, was
the company itself; that where a claim was brought in respect of a loss which did not
fall within that description, whether by a shareholder or a creditor of the company,
that claim fell to be adjudicated on by the courts in the ordinary way notwithstanding    B
that the company had a right of action in respect of substantially the same loss; and
that, accordingly, the claimant had been entitled to pursue its claim against the
defendant and to do so irrespective of whether or not the companies' liquidator chose
to pursue their own action against him (post, paras 10, 28, 39, 67, 79–84, 89, 92, 95,
98–100, 102, 109, 116, 211).

    *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204,
CA and dicta of Lord Bingham of Cornhill in *Johnson v Gore Wood & Co* [2002]
2 AC 1, 35–36, HL(E) approved.                                                            C

    Dicta of Lord Millett in *Johnson v Gore Wood & Co* [2002] 2 AC 1, 62–67,
HL(E) disapproved.

    *Giles v Rhind* [2003] Ch 618, CA, *Gardner v Parker* [2004] 2 BCLC 554, CA and
*Perry v Day* [2005] 2 BCLC 405 overruled.

    *Per* Lord Reed PSC, Lord Hodge DPSC, Lady Black and Lord Lloyd-Jones JJSC.
The court has not been addressed on the issue of double recovery, in so far as it might
arise in relation to the claimant's claim.  But it should be borne in mind that the        D
avoidance of double recovery does not entail that the company's claim must be given
priority.  Nor does the pari passu principle entail that the company's claim must be
given priority (paras 87, 93, 95).

    Decision of the Court of Appeal [2018] EWCA Civ 1468; [2019] QB 173; [2018]
3 WLR 1412; [2019] 1 All ER (Comm) 522; [2018] 2 BCLC 601 reversed.

The following cases are referred to in the judgments:

*Alico Life International Ltd v Thema International Fund plc* [2016] IEHC 363           E
*Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656, CA
*Banque Financière de la Cité v Parc (Battersea) Ltd* [1999] 1 AC 221; [1998] 2 WLR
    475; [1998] 1 All ER 737, HL(E)
*Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427, CA
*Birch v Cropper* (1889) 14 App Cas 525, HL(E)
*Chen v Karandonis* [2002] NSWCA 412
*Christensen v Scott* [1996] 1 NZLR 273                                                 F
*Company (No 00709 of 1992), In re A* [1999] 1 WLR 1092; [1999] 2 All ER 961;
    [1999] 2 BCLC 1, HL(E)
*Cooper (Gerald) Chemicals Ltd, In re* [1978] Ch 262; [1978] 2 WLR 866; [1978]
    2 All ER 49
*Creative Finance Ltd, In re* (2016) 543 BR 498, US Bankruptcy Court for the
    Southern District of New York
*Duncan, Fox, & Co v North and South Wales Bank* (1880) 6 App Cas 1, HL(E)             G
*Edwards v Halliwell* [1950] 2 All ER 1064, CA
*Fischer (George) (Great Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260,
    CA
*Foss v Harbottle* (1843) 2 Hare 461
*Freeman v Ansbacher Trustees (Jersey) Ltd* [2009] JRC 003; [2009] JLR 1
*Gardner v Parker* [2004] EWCA Civ 781; [2004] 2 BCLC 554, CA
*Gerber Garment Technology Inc v Lectra Systems Ltd* [1997] RPC 443, CA               H
*Giles v Rhind* [2002] EWCA Civ 1428; [2003] Ch 618; [2003] 2 WLR 237; [2002]
    4 All ER 977; [2003] 1 BCLC 1, CA
*Golden Strait Corpn v Nippon Yusen Kubishika Kaisha (The Golden Victory)* [2007]
    UKHL 12; [2007] 2 AC 353; [2007] 2 WLR 691; [2007] Bus LR 997; [2007] 3 All
    ER 1; [2007] 2 All ER (Comm) 97; [2007] 2 Lloyd's Rep 164, HL(E)

© 2020 The Incorporated Council of Law Reporting for England and Wales

257
[2020] 3 WLR                                Marex Financial Ltd v Sevilleja (SC(E))

A   *Gould v Vaggelas* [1984] HCA 68; 157 CLR 215
    *Greenhalgh v Arderne Cinemas Ltd* [1951] Ch 286; [1950] 2 All ER 1120, CA
    *Halcyon Skies, The* [1977] QB 14; [1976] 2 WLR 514; [1976] 1 All ER 856; [1976]
        1 Lloyd's Rep 461
    *Heron International Ltd v Lord Grade* [1983] BCLC 244, CA
    *Hodges v Waters (No 7)* [2015] FCA 264; 232 FCR 97; 325 ALR 682
    *International Leisure Ltd v First National Trustee Co UK Ltd* [2012] EWHC 1971
B       (Ch); [2013] Ch 346; [2013] 2 WLR 466; [2014] 1 BCLC 128
    *Johnson v Gore Wood & Co* [1999] BCC 474; [1999] Lloyd's Rep PN 91; [1999]
        PNLR 426, CA; [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481,
        HL(E)
    *Latin American Investments Ltd v Maroil Trading Inc* [2017] EWHC 1254 (Comm);
        [2017] 2 CLC 45
    *Lee v Sheard* [1956] 1 QB 192: [1955] 3 WLR 951; [1955] 3 All ER 777, CA
C   *Liverpool, The (No 2)* [1963] P 64; [1960] 3 WLR 597; [1960] 3 All ER 307, CA
    *Lumley v Gye* (1853) 2 E & B 216
    *McAlpine (Alfred) Construction Ltd v Panatown Ltd* [2001] 1 AC 518; [2000]
        3 WLR 946; [2000] 4 All ER 97, HL(E)
    *Macaura v Northern Assurance Co Ltd* [1925] AC 619, HL(NI)
    *Moule v Garrett* (1872) LR 7 Ex 101
    *OBG Ltd v Allan* [2007] UKHL 21; [2008] AC 1; [2007] 2 WLR 920; [2007] Bus LR
D       1600; [2007] 4 All ER 545; [2008] 1 All ER Comm 1, HL(E)
    *O'Sullivan v Williams* [1992] 3 All ER 385; [1992] RTR 402, CA
    *Peak Hotels and Resorts Ltd v Tarek Investments Ltd* [2015] EWHC 3048 (Ch)
    *Perry v Day* [2004] EWHC 3372 (Ch); [2005] 2 BCLC 405
    *Primeo Fund v Bank of Bermuda (Cayman) Ltd* (unreported) 13 June 2019, Cayman
        Islands Ct of Appeal
    *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1981] Ch 257;
E       [1980] 3 WLR 543; [1980] 2 All ER 841, Ch D; [1982] Ch 204; [1982] 2 WLR
        31; [1982] 1 All ER 354, CA
    *Salomon v A Salomon & Co Ltd* [1897] AC 22, HL(E)
    *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452; [2003] Ch 350; [2003] 2 WLR 922;
        [2002] 4 All ER 835; [2003] 1 BCLC 157, CA
    *Short v Treasury Comrs* [1948] 1 KB 116; [1947] 2 All ER 298, CA; [1948] AC 534;
        [1948] 2 All ER 509, HL(E)
F   *Stein v Blake* [1998] 1 All ER 724; [1998] 1 BCLC 574, CA
    *Stratford (JT) & Son Ltd v Lindley* [1965] AC 269; [1964] 3 WLR 541; [1964] 3 All
        ER 102; [1964] 2 Lloyd's Rep 133, HL(E)
    *Swynson Ltd v Lowick Rose llp (formerly Hurst Morrison Thomson llp)* [2017]
        UKSC 32; [2018] AC 313; [2017] 2 WLR 1161; [2017] 3 All ER 785, HL(E)
    *Townsing v Jenton Overseas Investment Pte Ltd* [2007] SGCA 13; [2008] 1 LRC
        231, Singapore Ct of Appeal
G   *Waddington Ltd v Thomas* [2008] HKCU 1381; [2009] 2 BCLC 82
    *Xie Zhikun v Xio GP Ltd* (unreported) 14 November 2018, Cayman Islands Ct of
        Appeal

    The following additional cases were cited in argument:

    *BAT Industries plc v Sequana SA (BTI 2014 llc v Sequana SA)* [2019] EWCA Civ
H       112; [2019] Bus LR 2178; [2019] 2 All ER 784; [2019] 2 All ER (Comm) 13;
        [2019] 1 BCLC 347, CA
    *Cherry v Boultbee* (1839) 4 My & Cr 442
    *Coote v Rubin* [2011] EWCA Civ 106; [2011] BCC 596, CA
    *Day v Cook* [2001] EWCA Civ 592; [2002] 1 BCLC 1, CA
    *Edennote Ltd, In re* [1996] 2 BCLC 389, CA

© 2020 The Incorporated Council of Law Reporting for England and Wales

258
**Marex Financial Ltd v Sevilleja (SC(E))**                                        **[2020] 3 WLR**

*4 Eng Ltd v Harper (No 2)* [2009] EWHC 2633 (Ch); [2010] Bus LR D58; [2010]                    A
    1 BCLC 176
*Hengwell Development Pte Ltd v Thing Chiang Ching* [2002] 4 SLR 902, Singapore
    High Ct
*Hockin v Royal Bank of Scotland* [2016] EWHC 925 (Ch)
*Jefcoate v Spread Trustee Co Ltd* (unreported) 31 October 2014, Royal Ct of
    Guernsey (Ordinary Division)
*Kaupthing Singer & Friedlander Ltd (No 2), In re* [2011] UKSC 48; [2012] 1 AC 804;                B
    [2011] 3 WLR 939; [2011] Bus LR 1644; [2012] 1 All ER 883; [2012] 1 BCLC
    227, SC(E)
*Kazakhstan Kazagy plc v Arip* [2014] EWCA Civ 381; [2014] 1 CLC 451, CA
*Kazakhstan Kazagy plc v Zhunus* [2016] EWHC 2363 (Comm); [2017] 1 WLR 467
*LF2 Ltd v Supperstone* [2018] EWHC 1776 (Ch); [2018] Bus LR 2303; [2019]
    1 BCLC 38, Ch D
*Lister v Hesley Hall Ltd* [2001] UKHL 22; [2002] 1 AC 215; [2001] 2 WLR 1311;                   C
    [2001] ICR 665; [2001] 2 All ER 769; [2001] 2 FLR 307, HL(E)
*Longmeade, In re* [2016] EWHC 356 (Ch); [2016] Bus LR 506; [2017] 2 All ER 244;
    [2017] 2 All ER (Comm) 161; [2017] 1 BCLC 605
*McLeod v Rooney* [2009] CSOH 158; 2010 SLT 499
*St Vincent European General Partner Ltd v Robinson* [2018] EWHC 1230 (Comm);
    [2019] 1 BCLC 706
*Stichting Shell Pensioenfonds v Krys* [2014] UKPC 41; [2015] AC 616; [2015] 2 WLR               D
    289; [2015] 2 All ER (Comm) 97; [2015] 1 BCLC 597, PC
*Ultraframe (UK) Ltd v Rigby (Kenneth Brian)* [2005] EWCA Civ 276, CA
*Veron International Ltd v RCG Holdings Ltd* [2015] HKCFI 1246
*Watson, Laidlaw & Co Ltd v Pott, Cassels & Williamson* (1914) 31 RPC 104, HL(Sc)

**APPEAL** from the Court of Appeal                                                              E
    By a claim form dated 9 August 2016 the claimant, Marex Financial Ltd,
claimed against the defendant, Carlos Sevilleja Garcia, damages for (1) the
tort of inducing and/or procuring the violation by two British Virgin Islands
companies, Creative Finance Ltd and Cosmorex Ltd, of the claimant's rights
pursuant to a judgment obtained in its favour following a claim brought by
the claimant against the companies; and/or (2) the tort of intentionally
causing loss to the claimant by unlawful means, on the basis that the                           F
defendant had deliberately procured the dissipation of millions of dollars
out of the accounts of those two companies, of which he was—according to
the claimant—beneficial owner and director, and into his personal control,
leaving the companies with minimal assets, unable to satisfy the judgment
obtained by the claimant, and in liquidation.  On 11 August 2016 the
claimant obtained the permission of the court under CPR r 6.36 to serve the
claim form out of the jurisdiction on the defendant, a resident of Dubai, as                    G
being a claim "made in tort" within paragraph 3.1(9) of CPR Practice
Direction 6B.  By a judgment dated 25 April 2017 Knowles J [2017] EWHC
918 (Comm); [2017] 4 WLR 105 refused an application made by the
defendant under CPR Pt 11 challenging the jurisdiction of the court on a
number of grounds including a claim that the rule against reflective loss
barred the claimant's ability to show a completed cause of action in tort.

    By an appellant's notice dated 16 May 2017 and with permission of the               H
Court of Appeal (Asplin LJ) granted on 16 October 2017 the defendant
appealed on the sole ground that the judge had erred in holding that the
defendant had not shown that the rule against reflective loss barred the
claimant's ability to show a completed cause of action in tort.  By a

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10164

259

[2020] 3 WLR                              Marex Financial Ltd v Sevilleja (SC(E))
                                                                  Lord Reed PSC

A   respondent's notice dated 31 October 2017 the claimant sought to uphold
the judge's reasoning on the further or additional bases that, even if the rule
against reflective loss were to apply, it did not apply to the entirety of the
claimant's claims; but that, in any event, the exception to the rule against
reflective loss in *Giles v Rhind* [2003] Ch 618 applied.

B   By a judgment dated 26 June 2018 the Court of Appeal (Lewison,
Lindblom and Flaux LJJ) [2018] EWCA Civ 1468; [2019] QB 173; [2018]
3 WLR 1412 allowed the appeal, save in respect of the enforcement costs,
and on 16 July 2018 gave the claimant permission to appeal to the Supreme
Court whilst refusing the defendant permission to cross-appeal.

On 11 February 2019 the Supreme Court (Lord Reed DPSC, Lady Black
and Lord Kitchin JJSC) refused an application by the defendant for
permission to cross-appeal on the enforcement costs. On 2 May 2019 the
C   Supreme Court (Baroness Hale of Richmond PSC, Lord Reed DPSC and
Lord Hodge JSC) gave the All Party Parliamentary Group on Fair Business
Banking permission to intervene. The issues for the court are set out in the
judgment of Lord Reed PSC, post, para 22.

The facts are stated in the judgment of Lord Reed PSC, post, paras 15–21.

*George Bompas QC* and *Sophie Weber* (instructed by *Memery Crystal*
D   *llp*) for the claimant.
*David Lewis QC* and *Richard Greenberg* (instructed by *Mackrell Turner
Garrett, Woking*) for the defendant.
*Peter Knox QC*, *Simon Reevell*, *Richard Samuel*, *Amit Karia* and *Chloe
Shuffrey* (instructed by *Trowers & Hamlins llp*) for the intervener.

E   The court took time for consideration.

15 July 2020. The following judgments were handed down.

**LORD REED PSC** (with whom **LADY BLACK** and **LORD LLOYD-
JONES JJSC** agreed)

F   1   This appeal concerns the supposed principle that "reflective loss"
cannot be recovered. Before describing the factual background, or entering
into the details of the legal issues, it may be helpful to begin by considering
some basic principles of our law.

*Introduction*

2   It is not uncommon for two persons, A and B, to suffer loss as a result
G   of the conduct of a third person, C. If that conduct was in breach of an
obligation owed by C to A, then A will in principle have a cause of action
against C. If the conduct was also in breach of an obligation owed by C to B,
then B will also have a cause of action against C. A and B are both at liberty
to sue C whenever they please, subject to rules as to limitation and
prescription, and C is normally liable to compensate them both for the loss
which they have suffered. If A obtains and enforces a pecuniary award
against C, and some time later B also seeks a similar award but C is unable to
H   pay it, then in principle that is B's misfortune. However, where C is
insolvent at the time when the first claim is made against him, the law of
insolvency protects the position of both A and B by imposing a regime for
the distribution of C's assets among his creditors which ensures that they are

© 2020 The Incorporated Council of Law Reporting for England and Wales

260
Marex Financial Ltd v Sevilleja (SC(E))                        [2020] 3 WLR
Lord Reed PSC

treated equally, after the claims of secured or preferred creditors have been met.                                                                           A

3   The position can become more complicated where A and B have concurrent claims in respect of losses which are interrelated in such a way that a payment by C to one of them will have the practical effect of remedying the loss suffered by the other.  The general position in situations of that kind was described by Brandon J in *The Halcyon Skies* [1977] QB 14, 32:                                                                          B

"There is no reason, as a matter of law, why two different persons should not have concurrent rights of recovery, based on different causes of action, in respect of what is in substance the same debt.  The court will not allow double recovery or, in a case of insolvency, double proof against the insolvent estate: *The Liverpool (No 2)* [1963] P 64.  Subject to this, however, either of the two persons is entitled to enforce his right independently of the other."                                                                  C

4   The principle that double recovery should be avoided does not prevent a claimant from bringing proceedings for the recovery of his loss. But the court will have to consider how to avoid double recovery in situations where the issue is properly before it.  Procedurally, that may occur in a number of ways.  For example, both claimants may bring proceedings concurrently, or the wrongdoer may raise the issue by way of defence to proceedings brought by one claimant, and join the other potential claimant as a defendant, or the court may itself direct the claimant to notify the other potential claimant so that he has an opportunity to intervene (as explained in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262, 268–269).                                                              D

5   The principle that double recovery should be avoided does not deflect the law from compensating both claimants, but affects the remedial route by which the law achieves that objective.  There are a number of ways in which the law can avoid double recovery, or double proof in insolvency, where concurrent rights of recovery might otherwise have that result.  In some circumstances, priority is given to the cause of action held by one person, and the claim of the other person is excluded so far as may be necessary to avoid double recovery.  The rationale in such cases is that, by directly achieving its remedial objective in respect of the person who is permitted to bring the prior claim, the law indirectly achieves that objective in respect of the person whose claim is excluded.                                                      E, F

6   That was the approach adopted, for example, in the decision cited by Brandon J, *The Liverpool (No 2)* [1963] P 64.  In that case, a port authority sought to prove against an insolvent fund, established to meet the liabilities of the owners of one vessel, the *Liverpool*, for the cost of clearing the wreck of another, the *Ousel*, which had been damaged in a collision for which the *Liverpool* was responsible.  The authority also made a statutory claim for the same cost against the owners of the *Ousel*, and they in turn sought to prove for that amount against the fund.  The Court of Appeal held that the claim of the authority against the fund should be given priority over that of the owners of the *Ousel*, since the authority was actually out of pocket, while the claim of the owners of the *Ousel* against the fund should be disallowed.  It also observed that it would be consonant with justice and good sense that, in the event that the authority sought to recover also from the owners of the *Ousel* (for any balance remaining after it had received a                                           G, H

© 2020 The Incorporated Council of Law Reporting for England and Wales

261
[2020] 3 WLR                                   Marex Financial Ltd v Sevilleja (SC(E))
                                                                      Lord Reed PSC

A   dividend out of the fund), it would have to give credit for the amount that it
    had already recovered. In that way, the owners of the *Ousel* benefited from
    the authority's recovery from the fund to the same extent as they would have
    done if their claim against the fund had been allowed. A similar approach, in
    the context of concurrent claims arising out of the breach of a construction
    contract, can be seen in *Alfred McAlpine Construction Ltd v Panatown Ltd*
    [2001] 1 AC 518, 595.

B   7   There are also circumstances in which the law finds other means of
    avoiding double recovery, such as subrogation (as discussed, for example, in
    *Gould v Vaggelas* (1984) 157 CLR 215), or the imposition on one claimant
    of an obligation to account to the other out of the damages which the former
    has received (as, for example, in *O'Sullivan v Williams* [1992] 3 All ER 385).
    The most suitable approach to adopt in a particular case will depend upon
    its circumstances.

C   8   This appeal is concerned with a particular type of situation in which
    two persons, A and B, suffer loss as a result of the conduct of a third person,
    C. The situation in question is one in which A is a company, B is a creditor of
    that company, and B's loss is consequential upon the loss suffered by A,
    because C's conduct has rendered A insolvent and unable to pay its debt to
    B.

D   9   The fact that a claim lies at the instance of a company rather than a
    natural person, or some other kind of legal entity, does not in itself affect the
    claimant's entitlement to be compensated for wrongs done to it. Nor does it
    usually affect the rights of other persons, legal or natural, with concurrent
    claims. There is, however, one highly specific exception to that general rule.
    It was decided in the case of *Prudential Assurance Co Ltd v Newman
E   Industries Ltd (No 2)* [1982] Ch 204 that a shareholder cannot bring a claim
    in respect of a diminution in the value of his shareholding, or a reduction in
    the distributions which he receives by virtue of his shareholding, which is
    merely the result of a loss suffered by the company in consequence of a
    wrong done to it by the defendant, even if the defendant's conduct also
    involved the commission of a wrong against the shareholder, and even if no
    proceedings have been brought by the company. As appears from that
F   summary, the decision in *Prudential* established a rule of company law,
    applying specifically to companies and their shareholders in the particular
    circumstances described, and having no wider ambit.

    10   The rule in *Prudential*, as I shall refer to it, is distinct from the
    general principle of the law of damages that double recovery should be
    avoided. In particular, one consequence of the rule is that, where it applies,
G   the shareholder's claim against the wrongdoer is excluded even if the
    company does not pursue its own right of action, and there is accordingly no
    risk of double recovery. That aspect of the rule is understandable on the
    basis of the reasoning in *Prudential*, since its rationale is that, where it
    applies, the shareholder does not suffer a loss which is recognised in law as
    having an existence distinct from the company's loss. On that basis, a claim
    by the shareholder is barred by the principle of company law known as the
H   rule in *Foss v Harbottle* (1843) 2 Hare 461: a rule which (put shortly) states
    that the only person who can seek relief for an injury done to a company,
    where the company has a cause of action, is the company itself.

    11   Putting matters broadly at this stage, in *Johnson v Gore Wood & Co*
    [2002] 2 AC 1 the House of Lords purported to follow *Prudential*, but the

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10167

262
**Marex Financial Ltd v Sevilleja (SC(E))**                              [2020] 3 WLR
*Lord Reed PSC*

reasoning of some members of the Appellate Committee was not clearly      A
confined to circumstances of the kind with which *Prudential* was concerned.
In particular, the reasoning of Lord Millett, which proved particularly
influential in subsequent cases, advanced a number of other justifications for
the exclusion of the shareholder's claim whenever the company had a
concurrent claim available to it, of wider scope than the approach adopted
in *Prudential*.                                                           B

12   The decision in *Johnson* has been interpreted in later cases as
establishing a principle, generally referred to as the "reflective loss"
principle, whose legal basis and scope are controversial.  This supposed principle has
been applied to claims brought by a claimant in the capacity of a creditor of a
company, where he also held shares in it, and the company had a concurrent
claim.  In the present case, the Court of Appeal held that the principle applied
to a claim brought by an ordinary creditor of a company (who was not a         C
shareholder), where the company had a concurrent claim.

13   In the present appeal, the court is invited to clarify, and if necessary
depart from, the approach adopted in *Johnson*, and to overrule some later
authorities.  It is also necessary for the court to examine the rationale and
effect of the decision in *Prudential*, in order to consider the reasoning in
*Johnson* and the later cases.                                             D

*The present appeal*

14   The appeal is brought against an order of the Court of Appeal
(Lewison, Lindblom and Flaux LJJ), allowing an appeal against an order
made by Knowles J in the Commercial Court.  In summary, an application
was made to Knowles J to set aside an order giving permission for service of
proceedings on the respondent, Mr Sevilleja, out of the jurisdiction.  One of     E
the arguments advanced by Mr Sevilleja in support of his application was
that the appellant, Marex, did not have a good arguable case against him
because the losses which Marex was seeking to recover were reflective of loss
suffered by two companies which had concurrent claims against him, and
were therefore not open to Marex to claim.  The judge held that Marex had a
good arguable case that its claim was not precluded by the "reflective loss"    F
principle, and therefore dismissed Mr Sevilleja's application [2017] 4 WLR
105.  On appeal, the Court of Appeal accepted that the "reflective loss"
principle applied to about 90% of Marex's claim [2019] QB 173.  The effect
of the Court of Appeal's decision is that although Marex's permission to
serve out was not set aside, it can pursue its claim only as regards the 10% of
its alleged losses which were conceded not to be "reflective".             G

*The facts*

15   It is common ground that, for the purposes of the present
proceedings, the facts must be taken to be as alleged by Marex in its
particulars of claim and supporting documents.  On that basis, the material
facts—which, it should be made clear, are disputed by Mr Sevilleja—can be
summarised as follows.                                                     H

16   Mr Sevilleja was the owner and controller of two companies
incorporated in the British Virgin Islands ("the BVI"), Creative Finance Ltd
and Cosmorex Ltd ("the Companies"), which he used as vehicles for trading
in foreign exchange.  Marex brought proceedings against the Companies in

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                          Marex Financial Ltd v Sevilleja (SC(E))
                                                 Lord Reed PSC

A     the Commercial Court for amounts due to it under contracts which it had entered into with them. Following a trial before Field J in April 2013, Marex obtained judgment against the Companies for more than US$5·5m. It was also awarded costs which were later agreed at £1·65m.

17   Field J provided the parties with a confidential draft of his judgment on 19 July 2013, the judgment being handed down and orders for payment made on 25 July 2013. Over a few days starting on or shortly after 19 July 2013, Mr Sevilleja procured that more than US$9·5m was transferred offshore from the Companies' London accounts and placed under his personal control. By the end of August 2013, the Companies disclosed assets of US$4,329·48. The object of the transfers was to ensure that Marex did not receive payment of the amounts owed by the Companies. In procuring the transfers, Mr Sevilleja acted in breach of duties owed to the Companies.

18   The Companies were placed into insolvent voluntary liquidation in the BVI by Mr Sevilleja in December 2013, with alleged debts exceeding US$30m owed to Mr Sevilleja and persons and entities associated with him or controlled by him. Marex was the only non-insider creditor.

19   According to Marex, the liquidator has been paid a retainer, and has been indemnified against his fees and expenses, by an entity controlled by Mr Sevilleja or associated with him. The liquidation process has effectively been on hold. The liquidator has not taken any steps to investigate the Companies' missing funds or to investigate the claims submitted to him, including claims submitted by Marex. Nor has he issued any proceedings against Mr Sevilleja.

20   Marex refers in its pleadings to proceedings in the United States, where the court, after hearing evidence, refused to recognise the BVI liquidation as a main proceeding under Chapter 15 of the US Bankruptcy Code. It described the liquidation as "a device to thwart enforcement of a $5m judgment against the [Companies] that Marex won in the courts of England—and the most blatant effort to hinder, delay and defraud a creditor this court has ever seen": *In re Creative Finance Ltd* (2016) 543 BR 498, 502 (United States Bankruptcy Court for the Southern District of New York). It also found that "From beginning to end, Sevilleja's tactics were a paradigmatic example of bad faith, and the liquidator's actions—and inaction—facilitated them" (p 503). Mr Sevilleja was found to be guilty of "attempting (unfortunately, successfully) to control a BVI liquidator, who was supposed to act as an independent fiduciary, by the purse strings . . . [and] depriving the liquidator of the resources he needed to properly do his job" (p 513).

21   In the present claim against Mr Sevilleja, Marex seeks damages in tort for (1) inducing or procuring the violation of its rights under the judgment and order of Field J dated 25 July 2013, and (2) intentionally causing it to suffer loss by unlawful means. The amounts claimed are (1) the amount of the judgment debt, interest and costs awarded by Field J, less an amount recovered in US proceedings concerning the bankruptcy of a company which was indebted to the Companies, and (2) costs incurred by Marex in the US proceedings and in other attempts to obtain payment of the judgment debt. Mr Sevilleja concedes that those costs fall outside the scope of the "reflective loss" principle.

© 2020 The Incorporated Council of Law Reporting for England and Wales

264
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Reed PSC

22    The issues in the appeal are agreed by the parties to be the following:                    A

    "1. Whether the no reflective loss rule applies in the case of claims by
    company creditors, where their claims are in respect of loss suffered as
    unsecured creditors, and not solely to claims by shareholders.
        "2. Whether there is any and if so what scope for the court to permit
    proceedings claiming for losses which are prima facie within the no
    reflective loss rule, where there would otherwise be injustice to the                    B
    claimant through inability to recover, or practical difficulty in recovering,
    genuine losses intentionally inflicted on the claimant by the defendant in
    breach of duty both to the claimant and to a company with which the
    claimant has a connection, and where the losses are felt by the claimant
    through the claimant's connection with the company."

*Prudential Assurance v Newman Industries (No 2)*                    C

23    Although incorporated companies have long existed, it was only
towards the end of the 19th century that the independent legal personality of
the company was conclusively established by the decision of the House of
Lords in *Salomon v A Salomon & Co Ltd* [1897] AC 22.  During the 20th
century, the implications of corporate personality for rights of property, and                    D
for the nature of a shareholder's interest, were addressed by the courts in a
series of cases, including *Macaura v Northern Assurance Co Ltd* [1925] AC
619 and *Short v Treasury Comrs* [1948] 1 KB 116, affirmed [1948] AC 534.
In more recent times, the courts have had to consider the position where a
shareholder seeks to recover damages in respect of a diminution in the value
of his shareholding or in the distributions received from the company,
resulting from a loss suffered by the company in respect of which the                    E
company has its own cause of action.

24    The issue appears to have arisen for the first time in *Prudential
Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204.  The case
concerned a situation where the directors of a company were alleged to have
made a fraudulent misrepresentation in a circular distributed to its
shareholders, so as to induce them to approve the purchase of assets at an
overvalue from another company in which the directors were interested.                    F
Prudential, which was a minority shareholder in the company, brought a
personal and a derivative action against the directors, claiming that they had
committed the tort of conspiracy against the company and its members.
In relation to the personal claim, the Court of Appeal (Cumming-Bruce,
Templeman and Brightman LJJ) concluded that, where a company and its
shareholders had suffered wrongs which resulted in a loss to the company                    G
and a fall in the value of its shares, a shareholder could not bring a personal
action against the wrongdoer.

25    The court devoted most of its judgment to the derivative action, and
dealt with the personal action relatively briefly.  It approached the issue on
the basis that the directors had acted in breach of their obligations to the
shareholders (p 222), and that the loss suffered by the company had brought
about a fall in the value of its shares.  It recorded at p 222 that no facts were                    H
relied upon in support of the personal claim which were not relied upon
in support of the derivative claim.  It also expressed the opinion, at
pp 223–224, that the plaintiffs were never concerned to recover in the
personal action, and were only interested in it as a means of circumventing

© 2020 The Incorporated Council of Law Reporting for England and Wales

265
[2020] 3 WLR                     Marex Financial Ltd v Sevilleja (SC(E))
                                                        Lord Reed PSC

A   the rule in *Foss v Harbottle*, which stood directly in the way of a derivative action.  Nevertheless, it dealt with the personal action on the basis of general principles rather than on its particular facts; and the court's decision was treated by the House of Lords in *Johnson* [2002] 2 AC 1 as establishing principles of general application, which Lord Bingham of Cornhill set out at pp 35–36 (see para 41 below).

B   **26**   The court disallowed Prudential's claim on the ground that it had not suffered any personal loss.  It stated [1982] Ch 204, 222–223:

> "But what he [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage.  He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company."

C   As that passage makes clear, the decision was concerned only with a diminution in the value of shares or in distributions, suffered by a shareholder merely because the company had itself suffered actionable damage.  It was not concerned with other losses suffered by a shareholder, or with situations where the company had not suffered any actionable loss.

D   **27**   The court explained its reasoning as follows, at p 223:

> "The shareholder does not suffer any personal loss.  His only 'loss' is through the company, in the diminution in the value of the net assets of the company . . . The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association.  The shares themselves, his right of participation, are not directly affected by the wrongdoing.  The plaintiff still holds all the shares as his own absolutely unencumbered property."

E

F   **28**   That reasoning requires elaboration.  It is unrealistic to assert as a matter of fact that the shareholder does not suffer any personal loss: ex hypothesi, there has been a fall in the value of his shares.  It is not immediately obvious what it means to say that his only loss is through the company.  It is, however, possible to explain the court's decision, particularly in the light of later passages in the judgment.  As I understand its reasoning, what the court meant, put shortly, was that where a company suffers actionable loss, and that loss results in a fall in the value of its shares (or in its distributions), the fall in share value (or in distributions) is not a loss which the law recognises as being separate and distinct from the loss sustained by the company.  It is for that reason that it does not give rise to an independent claim to damages on the part of the shareholders.

G   **29**   The court provided at p 223 an illustration of its approach:

> "Suppose that the sole asset of a company is a cash box containing £100,000.  The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff.  The plaintiff holds the key of the cash box.  The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key.  The defendant then robs the company of all its money.  The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil.  There are two wrongs,

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

266
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Reed PSC

the deceit practised on the plaintiff and the robbery of the company.  But *the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company . . .* The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company." (Emphasis added.)

The court also made it clear that the company's failure to recover its loss would not open the door to recovery by the shareholder, asking rhetorically how the failure of the company to pursue its claim could entitle the shareholder to recover the loss for himself.

30   The cash box example has been criticised for its artificiality. Certainly, by envisaging a company whose only asset was cash, the court greatly simplified a situation which, in real life, is likely to be more complex. But the point being made has a rationale in real life as well as in the simplified example.

31   The starting point is the nature of a share, and the attributes which render it valuable.  A share is not a proportionate part of a company's assets: *Short v Treasury Comrs*.  Nor does it confer on the shareholder any legal or equitable interest in the company's assets: *Macaura v Northern Assurance Co Ltd*.  As the court stated in *Prudential*, a share is a right of participation in the company on the terms of the articles of association.  The articles normally confer on a shareholder a number of rights, including a right to vote on resolutions at general meetings, a right to participate in the distributions which the company makes out of its profits, and a right to share in its surplus assets in the event of its winding up.

32   Where a company suffers a loss, that loss may affect its current distributions or the amount retained and invested in order to pay for future distributions (or, if the company is wound up, the surplus, if any, available for distribution among the shareholders).  Since the value of a company's shares is commonly calculated on the basis of anticipated future distributions, it is possible that a loss may result in a fall in the value of the shares.  That is, however, far from being an inevitable consequence: companies vary greatly, and the value of their shares can fluctuate upwards or downwards in response to a wide variety of factors.  In the case of a small private company, there is likely to be a close correlation between losses suffered by the company and the value of its shares.  In the case of a large public company whose shares are traded on a stock market, on the other hand, a loss may have little or no impact on its share value.  If there is an impact on share value, it will reflect what Lord Millett described in *Johnson* [2002] 2 AC 1, 62 as "market sentiment", and will not necessarily be equivalent to the company's loss.  If the company's loss does not affect the value of its shares, then there is no claim (or at least no sustainable claim) available to a shareholder, and in principle the problem addressed in *Prudential* does not arise.  A problem only arises where, as in *Prudential*, a shareholder claims that the company's loss has had a knock-on effect on the value of his shares.

33   Considering, then, the situation where a company suffers actionable loss as the result of wrongdoing, the company then acquires a right of action. If the company's loss results (or is claimed to result) in a fall in the value of its shares, then, but for the rule in *Prudential*, the shareholder would simultaneously acquire a concurrent right of action.  The purpose of an

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                          Marex Financial Ltd v Sevilleja (SC(E))
                                                              Lord Reed PSC

A   award of damages to the company is to restore it to the position in which it
    would have been if the wrongdoing had not occurred.  In circumstances
    where an award which restores the company's position to what it would
    have been if the wrongdoing had not occurred would also restore the value
    of the shares, the only remedy which the law would require to provide, in
    order to achieve its remedial objectives of compensating both the company
    and its shareholders, would be an award of damages to the company.  For
B   the shareholders to have a personal right of action, in addition to the
    company's right of action, would in those circumstances exceed what was
    necessary for the law to achieve those objectives, and would give rise to a
    problem of double recovery.  Most of the cases in which the rule in
    *Prudential* has been applied (but not *Prudential* itself) have concerned small
    private companies, where those circumstances are likely to have existed.  As
C   I have explained, however, there are also circumstances where there may not
    be a close correlation between the company's loss and any fall in share value.
    The avoidance of double recovery cannot, therefore, be sufficient in itself to
    justify the rule in *Prudential*.
        34   That conclusion is also supported by another point.  What if the
    company fails to pursue a right of action which, in the opinion of a
    shareholder, ought to be pursued, or compromises its claim for an amount
D   which, in the opinion of a shareholder, is less than its full value?  If that
    opinion is shared by a majority of the shareholders, then the company's
    articles will normally enable them to direct the company's course of action
    by passing a suitable resolution at a general meeting.  Even if the shareholder
    finds himself in a minority, he has a variety of remedies available to him,
    including the bringing of a derivative action on the company's behalf,
E   equitable relief from unfairly prejudicial conduct, or a winding up on the
    "just and equitable" ground, if (put shortly) those in control of the company
    are abusing their powers.  But what if the company's powers of management
    are not being abused, and a majority of shareholders approve of the
    company's decision not to pursue the claim, or its decision to enter into a
    settlement?  Should the minority shareholder not then be able to pursue a
    personal action?
F       35   In *Prudential* [1982] Ch 204, the court answered that question in the
    negative, stating at p 224 that the rule in *Foss v Harbottle* would be subverted
    if the shareholder could pursue a personal action.  The rule, as stated in
    *Edwards v Halliwell* [1950] 2 All ER 1064 and restated in *Prudential* at
    pp 210–211, has two aspects.  The first is that "the proper plaintiff in an
    action in respect of a wrong alleged to be done to a corporation is, prima
G   facie, the corporation".  As was explained in *Prudential* at p 210, one of the
    consequences of that aspect of the rule is that a shareholder cannot, as a
    general rule, bring an action against a wrongdoer to recover damages or
    secure other relief for an injury done to the company.  The second aspect of
    the rule is that "Where the alleged wrong is a transaction which might be
    made binding on the corporation and on all its members by a simple majority
    of the members, no individual member of the corporation is allowed to
H   maintain an action in respect of that matter because, if the majority confirms
    the transaction, cadit quaestio [the question falls]; or, if the majority
    challenges the transaction, there is no valid reason why the company should
    not sue."  This second aspect of the rule reflects the fact that the management
    of a company's affairs is entrusted to the decision-making organs established

© 2020 The Incorporated Council of Law Reporting for England and Wales

268
**Marex Financial Ltd v Sevilleja (SC(E))**                     [2020] 3 WLR
**Lord Reed PSC**

by its articles of association, subject to the exceptional remedies mentioned in
para 34 above.  When a shareholder invests in a company, he therefore
entrusts the company—ultimately, a majority of the members voting in a
general meeting—with the right to decide how his investment is to be
protected.  As the court stated in *Prudential* at p 224:

> "When the shareholder acquires a share he accepts the fact that the
> value of his investment follows the fortunes of the company and that he
> can only exercise his influence over the fortunes of the company by the
> exercise of his voting rights in general meeting."

36    Accordingly, in a situation where a shareholder claims that his shares
have fallen in value as a result of a loss suffered by the company, and the
company has a right of action in respect of that loss, the shareholder can
exercise such rights of control over its decision-making as have been granted
to him by the articles of association.  These normally provide for the
ultimate control of the company's affairs by a majority of the shareholders
voting at a general meeting.  A minority shareholder has other remedies
available to him if the company's management is acting improperly,
including a derivative action and an application for relief against unfairly
prejudicial conduct.

37    As the court observed in *Prudential*, to allow the shareholder in
addition to pursue a personal action would subvert the rule in *Foss v
Harbottle*.  This is not merely a theoretical concern.  Examples of the use of
personal actions, post-*Johnson*, to circumvent the rule in *Foss v Harbottle*
are discussed in paras 52–53 below.  The existence of concurrent claims
could also result in the shareholder's preventing the company's management
from dealing with its claim in the way they considered appropriate in the best
interests of the company, thereby undermining the rule in *Foss v Harbottle*.
That could occur, for example, where the company's management wanted to
compromise the company's claim but were prevented from doing so by the
shareholder's refusal to enter into a settlement with the wrongdoer.  One can
envisage other situations where the existence of concurrent claims could
result in the shareholder's acting contrary to the company's interests, for
example where the wrongdoer's assets were inadequate to satisfy both
claims.  But the effect of the rule in *Foss v Harbottle*, as the court said in
*Prudential* at p 224, is that "[the shareholder] accepts the fact that the value
of his investment follows the fortunes of the company".  It is for that reason
that the rule in *Prudential* has been said to recognise "the unity of economic
interests which bind a shareholder and his company": *Townsing v Jenton
Overseas Investment Pte Ltd* [2008] 1 LRC 231, para 77.

38    In addition to arguments based on *Foss v Harbottle*, there are also
pragmatic advantages in a clear rule that only the company can pursue a
right of action in circumstances falling within the ambit of the decision in
*Prudential*.  As Lord Hutton commented in *Johnson* [2002] 2 AC 1, 55, the
rule in *Prudential* has the advantage of establishing a clear principle, rather
than leaving the protection of creditors and other shareholders of the
company to be given by a judge in the complexities of a trial.  Those
complexities should not be underestimated.  Even without the complications
arising from the existence of concurrent claims, it would not be
straightforward to establish the extent, if any, to which a fall in the value of
a company's shares was attributable to a loss that it had suffered as a

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10174

269
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                          Lord Reed PSC

A consequence of the defendant's wrongdoing. But the existence of a concurrent claim by the company would add another dimension to the difficulties. It would be necessary, for example, to take account of the fact that the wrongdoing had resulted in the company's acquiring an asset, namely its right of action against the defendant, which might have offset any detrimental effect of the wrongdoing on the value of his shares. It would also B be necessary to consider the question of double recovery, and how it should be addressed both procedurally and substantively. Those issues might have to be addressed in the context of a proliferation of claims, possibly in different proceedings, at different times, and in different jurisdictions. They would also arise in a context where there might well be conflicts of interest between the shareholder and the company's directors, its liquidator, other shareholders, and creditors.

C 39 In summary, therefore, *Prudential* decided that a diminution in the value of a shareholding or in distributions to shareholders, which is merely the result of a loss suffered by the company in consequence of a wrong done to it by the defendant, is not in the eyes of the law damage which is separate and distinct from the damage suffered by the company, and is therefore not recoverable. Where there is no recoverable loss, it follows that the shareholder cannot bring a claim, whether or not the company's cause of D action is pursued. The decision had no application to losses suffered by a shareholder which were distinct from the company's loss or to situations where the company had no cause of action.

*Johnson v Gore Wood & Co*

E 40 The decision in *Prudential* was considered by the House of Lords in *Johnson v Gore Wood & Co* [2002] 2 AC 1. The case concerned alleged negligence on the part of solicitors acting for a private company, which caused it to suffer losses. The company brought proceedings against the solicitors, which were settled during the sixth week of the trial for a very substantial proportion of the sum claimed, as Lord Bingham explained at p 18. Mr Johnson, who owned virtually all the shares in the company and F was its managing director, then brought proceedings against the solicitors in which he alleged that they had also acted in breach of a duty owed to him personally, and that he had suffered personal losses. The claim was struck out as an abuse of process. Mr Johnson appealed against the striking out of his claim, and the defendants cross-appealed to have certain heads of loss struck out on the ground that Mr Johnson was seeking to recover for damage which had been suffered by the company. It is only the latter aspect G of the case which needs to be considered.

41 Lord Bingham stated at pp 35–36 that the authorities supported the following statement of principle:

"(1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that H merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its

© 2020 The Incorporated Council of Law Reporting for England and Wales

270
Marex Financial Ltd v Sevilleja (SC(E))                        [2020] 3 WLR
Lord Reed PSC

constitutional organs, has declined or failed to make good that loss. So    A
much is clear from *Prudential Assurance Co Ltd v Newman Industries
Ltd (No 2)* [1982] Ch 204, particularly at pp 222–223, *Heron
International* [*Heron International Ltd v Lord Grade* [1983] BCLC 244],
particularly at pp 261–262, *George Fischer* [*George Fischer (Great
Britain) Ltd v Multi Construction Ltd* [1995] 1 BCLC 260], particularly    B
at pp 266 and 270–271, *Gerber* [*Gerber Garment Technology Inc v
Lectra Systems Ltd* [1997] RPC 443] and *Stein v Blake* [[1998] 1 All ER
724], particularly at pp 726–729.

"(2) Where a company suffers loss but has no cause of action to sue to
recover that loss, the shareholder in the company may sue in respect of it
(if the shareholder has a cause of action to do so), even though the loss is a
diminution in the value of the shareholding.  This is supported by *Lee v
Sheard* [1956] 1 QB 192, 195–196, *George Fischer* and *Gerber*.    C

"(3) Where a company suffers loss caused by a breach of duty to it, and
a shareholder suffers a loss separate and distinct from that suffered by
the company caused by breach of a duty independently owed to the
shareholder, each may sue to recover the loss caused to it by breach of the
duty owed to it but neither may recover loss caused to the other by breach
of the duty owed to that other.  I take this to be the effect of *Lee v Sheard*,    D
at pp 195–196, *Heron International*, particularly at p 262, *R P Howard*
[*R P Howard Ltd v Woodman Matthews & Co* [1983] BCLC 117],
particularly at p 123, *Gerber* and *Stein v Blake*, particularly at p 726.  I do
not think the observations of Leggatt LJ in *Barings* [*Barings plc v Coopers
& Lybrand* [1997] 1 BCLC 427] at p 435B and of the Court of Appeal of
New Zealand in *Christensen v Scott* [1996] 1 NZLR 273, 280, lines    E
25–35, can be reconciled with this statement of principle."

42   In Lord Bingham's proposition (1), the first sentence is a statement of
the rule in *Foss v Harbottle*.  The second sentence encapsulates the reasoning
in *Prudential*, and explains why, in the circumstances described, a
shareholder who is "suing in that capacity and no other" cannot bring a
claim consistently with the rule in *Foss v Harbottle*.  The third sentence    F
should not be understood as limiting the rule in *Prudential* to cases where
there is an exact correlation between the company's loss and the fall in share
value.  As was explained at paras 32–38 above, it is possible to envisage
cases where there is not a precise correlation, and where recovery by the
company might not therefore fully replenish the value of its shares, but
where the rule in *Prudential* would nevertheless apply.

43   Lord Bingham's proposition (2), stating that a shareholder can sue    G
for "reflective loss" where the company has no cause of action, on the
authority of *Lee v Sheard* [1956] 1 QB 192, *George Fischer (Great Britain)
Ltd v Multi Construction Ltd* [1995] 1 BCLC 260 and *Gerber Garment
Technology Inc v Lectra Systems Ltd* [1997] RPC 443, merits closer
consideration.

44   In *Lee v Sheard* the plaintiff was a company director and shareholder    H
who earned his living by working for the company and being remunerated
by distributions out of its profits.  He suffered injuries in a road accident for
which the defendant was responsible.  He was unable to work while he
recovered from his injuries, and as a result there was a fall in the company's
profits, which led to a reduction in the distributions paid to him.  He

© 2020 The Incorporated Council of Law Reporting for England and Wales

271
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                      Lord Reed PSC

A    recovered damages for his loss of earnings.  The company had no cause of
     action against the negligent driver.  This was not, therefore, a case concerned
     with concurrent claims.  The plaintiff's loss of earnings took the form of a
     reduction in distributions, but it was not "merely a reflection of the loss
     suffered by the company", in the phrase used in *Prudential* (para 26 above).
     He, not the company, had been injured in the road accident.  He, not the
     company, was entitled to recover damages for his loss.
B        45   In *George Fischer (Great Britain) Ltd v Multi Construction Ltd*,
     the defendant entered into a contract with the plaintiff company ("the
     shareholder") to install equipment at the premises of one of its subsidiaries
     ("the company").  When the equipment proved defective, causing the
     company to suffer a loss of profits, the shareholder was held to be entitled to
     damages for breach of contract in respect of the loss which it had suffered as
C    a result of the company's reduced profits.  That was another case where the
     wrong was committed against the shareholder, not the company.  Since the
     company had no cause of action, there was no reason why the shareholder
     should not recover its loss by means of an award of damages, in accordance
     with ordinary principles.
         46   Similar observations apply to *Gerber Garment Technology Inc v
D    Lectra Systems Ltd*.  The plaintiff company was the owner of a patent which
     was infringed, causing it to suffer a loss of income.  As the commercial
     exploitation of the patent was carried on by its subsidiary, the plaintiff's loss
     of income took the form of a reduction in the distributions it received from
     its subsidiary.  But it was the plaintiff, not its subsidiary, whose patent was
     infringed, and which suffered a loss of income to which its ownership of the
     patent entitled it.
E        47   Lord Bingham's proposition (3), stating (put shortly) that a
     shareholder can sue to recover a loss which is separate and distinct from that
     suffered by the company, reflects the fact that the shareholder's loss, where it
     does not consist merely of a fall in the value of his shareholding, or in the
     distributions which he receives by virtue of his shareholding, does not fall
     within the ambit of the rule in *Prudential*.  This proposition also makes it
F    clear that the rule renders certain heads of loss irrecoverable, rather than
     barring a cause of action as such.
         48   Lord Bingham went on to explain how courts should apply the
     relevant principles [2002] 2 AC 1, 36:

         "On the one hand the court must respect the principle of company
     autonomy, ensure that the company's creditors are not prejudiced by the
     action of individual shareholders and ensure that a party does not recover
G    compensation for a loss which another party has suffered.  On the other,
     the court must be astute to ensure that the party who has in fact suffered
     loss is not arbitrarily denied fair compensation."

     The aims identified in the first sentence—respecting the principle of company
     autonomy, ensuring that the company's creditors are not prejudiced by the
     action of individual shareholders, and ensuring that a party does not recover
H    compensation for a loss which another party has suffered—are all objectives
     or consequences of the rule in *Foss v Harbottle*, and are consistent with the
     decision in *Prudential*.  The second sentence reflects the fact that deciding
     whether a loss falls within the scope of the rule may call for the exercise of
     judgement.

© 2020 The Incorporated Council of Law Reporting for England and Wales

272
**Marex Financial Ltd v Sevilleja (SC(E))**                                    [2020] 3 WLR
Lord Reed PSC

**49**   Before turning to Lord Bingham's treatment of the losses claimed, it
is necessary to consider Lord Millett's speech, which lies at the origin of the
expansion of the supposed "reflective loss" principle in the subsequent
case law.  Lord Millett began by discussing the relationship between the
company's assets and the value of its shares.  A share, he said at p 62,
"represents a proportionate part of the company's net assets, and if these are
depleted the diminution in its assets will be reflected in the diminution in the
value of the shares".  But a share is not a proportionate part of the
company's net assets: see *Macaura*.  The idea that a diminution in the value
of a company's net assets will be reflected in the value of the shares is
therefore not an axiomatic truth, as was noted in para 32 above.  The rule in
*Prudential* is not premised on any necessary relationship between a
company's assets and the value of its shares (or its distributions).

**50**   Approaching the matter on the basis which he had described, Lord
Millett observed at p 62 that the problem which arose, where the company
suffered loss caused by the breach of a duty owed to it, and a shareholder
claimed to have suffered a consequent diminution in the value of his
shareholding or in distributions, caused by the breach of a duty owed to it by
the same wrongdoer, was the risk of double recovery, on the one hand, or a
risk to the company's creditors through the depletion of its assets, on the
other:

> "If the shareholder is allowed to recover in respect of such loss, then
> either there will be double recovery at the expense of the defendant or the
> shareholder will recover at the expense of the company and its creditors
> and other shareholders.  Neither course can be permitted . . . Justice to
> the defendant requires the exclusion of one claim or the other; protection
> of the interests of the company's creditors requires that it is the company
> which is allowed to recover to the exclusion of the shareholder."

**51**   As explained at para 33 above, the principle that double recovery
should be avoided is not in itself a satisfactory explanation of the rule in
*Prudential*.  As was explained at paras 34–37 above, the unique position in
which a shareholder stands in relation to his company, reflected in the rule in
*Foss v Harbottle*, is a critical part of the explanation.  In addition, as was
explained at para 38 above, there are pragmatic advantages in adopting a
clear rule.  However, by treating the avoidance of double recovery—a
principle of wider application—as sufficient to justify the decision in
*Prudential*, Lord Millett paved the way for the expansion of the supposed
"reflective loss" principle beyond the narrow ambit of the rule in *Prudential*.

**52**   One problem with reasoning based on the avoidance of double
recovery is that the principle is one of the law of damages.  It does not deny
the existence of the shareholder's loss, as the rule in *Prudential* does, where
the loss falls within its ambit, but on the contrary is premised on the
recognition of that loss.  Applying an approach based on the avoidance of
double recovery, it is therefore possible for a shareholder to bring a personal
action based on a loss which would fall within the ambit of the decision in
*Prudential*, and to obtain a remedy which that decision would have barred
to him, provided the relief that he seeks is not an award of damages in his
own favour.  This device has been exploited in a number of cases subsequent
to *Johnson*, in ways which circumvent the rule in *Foss v Harbottle*: a rule

A

B

C

D

E

F

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

273
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                           Lord Reed PSC

A   which is not confined to actions for damages but also applies to other
    remedies, as explained at para 35 above.

    53   For example, in *Peak Hotels and Resorts Ltd v Tarek Investments
    Ltd* [2015] EWHC 3048 (Ch), the judge considered it arguable that the
    "reflective loss" principle, as explained by Lord Millett in *Johnson*, did not
    bar proceedings by a shareholder, who complained of a fall in the value of
B   his shares resulting from loss suffered by the company in respect of which the
    company had its own cause of action, where the relief that he sought was not
    damages but a mandatory injunction requiring the defendant to restore
    property to the company.  A similar view was taken in *Latin American
    Investments Ltd v Maroil Trading Inc* [2017] 2 CLC 45, where the
    shareholder complained of a fall in the value of its shares resulting from a
    breach of obligations owed to the company, which also involved a breach of
C   contractual obligations owed to itself.  It responded to the argument that its
    claim was for "reflective loss" by seeking an order for the payment of the
    contractual damages not to itself but to the company.  A further example is
    *Xie Zhikun v Xio GP Ltd* (unreported) 14 November 2018, Cayman Islands
    Court of Appeal.  Summarising complex facts, in that case the shareholder
    applied for a quia timet injunction to prevent the breach of fiduciary duties
    owed both to the company and to himself, which would cause the company
D   to suffer loss, and would consequently affect the value of his interest in it.  Sir
    Bernard Rix JA observed at para 66 that he did not see "how, other than
    perhaps in terms of pure formalism . . . the present case differs from . . . a
    derivative action".

    54   Those cases demonstrate how right the Court of Appeal was in
    *Prudential* in considering that the rule established in that case, based on the
E   absence of separate and distinct loss, was necessary in order to avoid the
    circumvention of the rule in *Foss v Harbottle*.  The exception to that rule is
    the derivative action.  Whether a shareholder can bring such an action
    depends on whether the relevant conditions are satisfied.

    55   The most obvious difficulty with the avoidance of double recovery,
    as an explanation of the judgment in *Prudential*, is perhaps its unrealistic
    assumption that there is a universal and necessary relationship between
F   changes in a company's net assets and changes in its share value.  Another
    serious problem is its inability to explain why the shareholder cannot be
    permitted to pursue a claim against a wrongdoer where the company has
    declined to pursue its claim or has settled it at an undervalue, and the risk of
    double recovery is therefore eliminated in whole or in part.

    56   In addressing this point, Lord Millett relied on a number of
G   arguments, none of which, with respect, appears to me to be persuasive.  The
    first was based on causation.  Lord Millett stated [2002] 2 AC 1, 66 that, "if
    the company chooses not to exercise its remedy, the loss to the shareholder is
    caused by the company's decision not to pursue its remedy and not by the
    defendant's wrongdoing".  The same reasoning, he added, applies if the
    company settles for less than it might have done.  The logic of the argument
    is that it is impossible for the shareholder to suffer a loss caused by the
H   wrongdoer, since his actions result in the company's loss being balanced by a
    right of action of equivalent value, so that its net assets are unaffected.  It is
    only if the company fails to enforce its right of action that the shareholder
    can suffer a loss, and his loss will in that event be caused by the company.
    That reasoning might be contrasted with the logic of the argument based on

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10179

274
**Marex Financial Ltd v Sevilleja (SC(E))**                                     [2020] 3 WLR
Lord Reed PSC

A

the avoidance of double recovery, namely that the company's loss results in the shareholders suffering an equivalent loss, because their shares "represent" the company's net assets.

B

57   As Lord Hutton observed in *Johnson* at p 54, causation does not provide a satisfactory explanation.  One difficulty is that the failure of the company to sue the wrongdoer, or its decision to settle with him for less than the full value of its claim, may be the result of its impecuniosity, caused by the defendant's wrongdoing.  In those circumstances, the company's failure to recover its loss can hardly be regarded as interposing a novus actus interveniens between the defendant's wrongdoing and the shareholder's loss. Furthermore, in an economic tort case, where the shareholder's claim is based on an allegation that the wrongdoer committed the wrongdoing with the intention of causing the shareholder to suffer loss, it is bizarre to say that the loss which the defendant intended to cause, and which ensued from his wrongdoing, was nevertheless not caused by what he did.

C

58   In addition to the causation argument, Lord Millett put forward at p 66 two other reasons, which he described as policy considerations, for excluding the shareholder's claim where the company had settled its claim. The first was that the personal interests of the directors might otherwise conflict with their fiduciary duty to the company.  Presumably Lord Millett was envisaging a situation where the directors were also shareholders, and might be tempted to settle the company's claim at an undervalue, or fail to pursue it altogether, in order to recover the balance of the loss for their personal benefit. This reasoning does not, however, explain why shareholders are generally prevented from pursuing a claim for a fall in share value which is consequential on the company's loss, when the company has its own cause of action: the principle is not confined to shareholders who are also directors.  Nor is it apparent why, having prohibited directors from acting in breach of their fiduciary duties, the law should also impose a disability on shareholders (who normally owe the company no such duties) as an additional, indirect, and indiscriminate safeguard.

D

E

59   The second policy consideration was that it would be difficult for a liquidator to settle claims against wrongdoers for the benefit of the company's creditors, if the wrongdoers remained exposed to further claims brought by the shareholders: the conduct of the company's claims would effectively be taken out of the liquidator's hands.  This point is addressed by the rule in *Prudential*, consistently with the underlying rule in *Foss v Harbottle*, as was explained in para 37 above.

F

60   The most serious difficulty with the approach favoured by Lord Millett is that the possibility of double recovery can arise where concurrent claims exist at the instance of companies and of persons who have suffered loss otherwise than as shareholders.  As will be explained, Lord Millett's approach has been interpreted in subsequent cases as extending to such persons the same categorical exclusion of claims as he applied to shareholders.  That is not the position on the approach adopted in *Prudential*: the loss suffered by a creditor, for example, when he cannot recover a debt owed to him by a company because of losses which it has incurred, stands in a different relationship to the company's loss from the loss sustained by a shareholder whose shares have fallen in value, and raises different issues. This is discussed at paras 62–63 and 84–85 below.

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

275
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
Lord Reed PSC

A   61   Lord Millett went on to express the opinion that the concept of reflective loss extended beyond the diminution of the value of shares and the loss of dividends, stating at p 66 (omitting the citation):

"it extends to . . . all other payments which the shareholder might have obtained from the company if it had not been deprived of its funds. All transactions or putative transactions between the company and its
B   shareholders must be disregarded.  Payment to the one diminishes the assets of the other.  In economic terms, *the shareholder has two pockets*, and cannot hold the defendant liable for his inability to transfer money from one pocket to the other." (Emphasis added.)

It appears from the passage cited in para 62 below that those observations may have been intended to apply only to payments receivable by
C   shareholders in that capacity, in which case they correctly recognise that distributions can take other forms besides the payment of dividends. However, the words that I have italicised repeat a point made earlier on p 66, when Lord Millett said:

"The test is not whether the company could have made a claim in respect of the loss in question; the question is whether, *treating the*
D   *company and the shareholder as one* for this purpose, the shareholder's loss is franked by that of the company." (Emphasis added.)

These passages appear to suggest that the separate legal personalities of the company and its shareholder are to be disregarded in this context. That would provide a simple explanation of why the company and its
E   shareholders cannot have concurrent claims, but would also introduce an important exception to the fundamental principle in *Salomon v A Salomon & Co Ltd* [1897] AC 22, with potentially significant ramifications.  That issue was not discussed.

62   In words which have had a particular influence on later developments, Lord Millett continued [2002] 2 AC 1, 67:

"The same applies to other payments which the company would have
F   made if it had had the necessary funds even if the plaintiff would have received them qua employee and not qua shareholder and even if he would have had a legal claim to be paid.  His loss is still an indirect and reflective loss which is included in the company's claim."

This is not altogether easy to follow.  Lord Millett's reasoning in the preceding passage, cited (first) in para 61 above, is not transferable to
G   persons whose claims are not brought as shareholders, but, for example, as employees or creditors of the company.  As Lord Millett had indicated, a company may be regarded in economic terms as the alter ego of its shareholders.  It cannot be regarded as the alter ego of its creditors or employees, or of shareholders whose claims are brought in the capacity of creditors or employees.

63   If Lord Millett meant that all claims against a wrongdoer in respect
H   of amounts which the company would have paid to the claimant if it had had the necessary funds must be excluded where the company also has a cause of action, then I would respectfully regard the dictum as going further than was necessary for the decision of the appeal, and as being mistaken.  For example, one might envisage a situation in which a creditor of a company

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10181

276
**Marex Financial Ltd v Sevilleja (SC(E))**                    [2020] 3 WLR
Lord Reed PSC

has entered into a contract with the wrongdoer, the performance of which          A
would have preserved the company's solvency, and the wrongdoer then
breaches the contract and also his duties to the company, rendering it
insolvent and unable to pay the debt it owes to the creditor. If the creditor
sues the wrongdoer for breach of contract, he is entitled to damages. The
fact that the company also has a cause of action is no reason why the creditor
should be deprived of the benefit of his contract. In the event that any issue           B
of double recovery arises, it will need to be addressed; but that possibility is
no reason for barring the creditor's claim, regardless of whether any such
issue arises in the particular case. Where the creditor's claim against the
wrongdoer is based on tort, it is equally important that he should not be
deprived of the protection afforded by the law of tort, merely because the
debt in question is owed to him by a company rather than a natural person.

64   Turning to the remaining speeches in *Johnson*, Lord Goff of           C
Chieveley agreed with Lord Millett's analysis. Lord Cooke of Thorndon
accepted the correctness of the decision in *Prudential*, and agreed that the
English authorities cited by Lord Bingham supported the three propositions
which he had stated. He also concurred in the order proposed by Lord
Bingham. On the other hand, some of his observations (at pp 45 and 47)
suggest that he regarded the avoidance of double recovery and of prejudice           D
to creditors as the critical considerations. Lord Hutton also emphasised
those considerations (at p 54). He considered that the *Prudential* principle
should be upheld, although he was critical of the reasoning in that case in so
far as it denied that the shareholder had suffered a personal loss.

65   The decision on the facts of *Johnson* is also important. The House of
Lords concluded that two of the heads of loss should be struck out. The first
of these was a claim for the fall in the value of Mr Johnson's shareholding in           E
the company. Its being struck out followed from Lord Bingham's
proposition (1). The second was a claim for loss in respect of the value of a
pension policy set up by the company for Mr Johnson's benefit. Since the
striking out of this head of loss has featured prominently in the subsequent
case law, it is necessary to consider the matter in some detail. Mr Johnson
claimed that he had suffered loss as a result of the company's failure to make           F
payments into the policy which it would have made out of its profits if it had
not suffered the losses caused by the defendants. It was not suggested in any
of the speeches, or in the judgment of the court below [1999] BCC 474, that
the company was under any obligation to Mr Johnson to pay the pension
contributions. That aspect of his claim was not, therefore, brought as a
creditor of the company. It appears, instead, that the pension contributions
were a form of distribution of the company's profits to its 99% shareholder:           G
an alternative to the payment of dividends or bonuses.

66   Lord Bingham dealt with this aspect of the case extremely briefly: an
indication that he did not regard it as raising any issue which he had not
already addressed in his discussion of shareholders' claims. He stated [2002]
2 AC 1, 36: "this claim relates to payments which the company would have
made into a pension fund for Mr Johnson: I think it plain that this claim is
merely a reflection of the company's loss and I would strike it out." The           H
other members of the House agreed. There is no indication in the speeches,
other than possibly in the passage in Lord Millett's speech cited at para 62
above, that the Appellate Committee intended, in its treatment of this
element of Mr Johnson's claim, to suggest that the principle which excluded

© 2020 The Incorporated Council of Law Reporting for England and Wales

277
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                            Lord Reed PSC

A   a shareholder's claim for a diminution in the value of his shares or in the distributions which he received should also apply to claims brought otherwise than in the capacity of a shareholder. Lord Bingham clearly intended that the principle which he had explained should be confined to claims brought in that capacity: see the second sentence of his proposition (1), cited in para 41 above. His conclusion that this head of loss should be struck out was consistent with the application of that proposition.

B   67   In summary, *Johnson* gives authoritative support to the decision in *Prudential* that a shareholder is normally unable to sue for the recovery of a diminution in the value of his shareholding or in the distributions he receives as a shareholder, which flows from loss suffered by the company, for the recovery of which it has a cause of action, even if it has declined or failed to make good that loss. Lord Bingham's speech is consistent with the reasoning in *Prudential*. On the other hand, the reasoning in the other speeches,

C   especially that of Lord Millett, departs from the reasoning in *Prudential* and should not be followed.

*Later cases*

68   *Johnson* has been followed by a multitude of cases in which litigants,
D   usually relying on the speech of Lord Millett, have sought either to establish exceptions to the general principles laid down by Lord Bingham, or to establish that the rule against the recovery of reflective loss extends more widely than *Johnson* had determined. One of the issues which remained controversial was whether, notwithstanding Lord Bingham's analysis, there were circumstances in which a shareholder could recover for loss which flowed from the company's loss where the company had a cause of action

E   but failed to pursue it.

69   In *Giles v Rhind* [2003] Ch 618 the Court of Appeal decided that such circumstances existed. The claimant was a former company director who was also a shareholder in the company. He brought proceedings against a defendant who had conducted a business in competition with that of the company, in breach of contractual obligations owed to both the

F   claimant and the company. The company's action for damages had been discontinued due to its inability to find security for costs, as a result of impecuniosity caused by the defendant's wrongdoing. The terms on which the action was discontinued precluded the company from bringing any further proceedings in relation to its claim. The claimant sought to recover for a variety of losses, including the loss of the value of his shares. The Court

G   of Appeal allowed the claim to proceed to trial. It considered that it would be unjust to allow a wrongdoer to defeat a claim by shareholders on the basis that the claim was trumped by a right of action held by the company which his own wrongful conduct had prevented the company from pursuing. It concluded that the "reflective loss" principle, in so far as it was relevant, did not apply in those circumstances.

H   70   One can sympathise with the Court of Appeal's sense of the unattractiveness of the defendant's position, but the fact that a wrongdoer has unmeritoriously avoided his liability in damages to A is not a reason for requiring him to pay damages to B. The basis of the decisions in *Prudential* and *Johnson* is that a shareholder, whose shares have fallen in value as the consequence of loss suffered by the company for the recovery of which it has

© 2020 The Incorporated Council of Law Reporting for England and Wales

278
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Reed PSC

a cause of action, has not suffered a recoverable loss. That conclusion does
not depend on whether the company is financially able to bring proceedings
or not. If the shareholder has not suffered a recoverable loss, he has no claim
for damages, regardless of whether, or why, the company may have failed to
pursue its own cause of action.

71   The same criticism applies to the later decision in *Perry v Day* [2005]
2 BCLC 405, where the court followed *Giles v Rhind* in a situation where
the wrongdoer had abused his powers as a director of the company so as to
prevent it from bringing a claim under which it could have recovered its loss.
The solution which company law provides, in a situation of that kind, is the
derivative action.

*Gardner v Parker*

72   A question left in doubt by Lord Millett's speech in *Johnson* was
how widely the bar on the recovery of reflective loss applied. That issue
came before the Court of Appeal in *Gardner v Parker* [2004] 2 BCLC 554.
The claim was brought by the assignee of rights of action held by a company
("the shareholder") which was both a shareholder and a creditor of a second
company ("the company"), against a defendant who was a director of both
the shareholder and the company. He was alleged to have sold the
company's principal assets at an undervalue to another entity in which he
had an interest, rendering the company insolvent, and preventing the
shareholder from recovering the debt which the company owed it. In so
acting, the defendant had acted in breach of fiduciary duties owed separately
to the shareholder and to the company as a director of both of them. The
shareholder then sought to recover in respect of the fall in the value of its
shareholding, and also in respect of the loss arising from its inability to
obtain repayment of the debt. Proceedings brought by another of the
company's creditors against the purchaser of the company's assets had been
resolved by a settlement, to which the company, acting by receivers
appointed by that creditor over its property, and the defendant, were both
party. Under the settlement, a payment was made to that creditor, and the
defendant was released from all claims which the company might have
against him (other than claims vested solely in its liquidators; but the
company was not in liquidation).

73   The Court of Appeal considered three questions. The first was
whether the "reflective loss" principle applied where the wrongdoing took
the form of a breach of fiduciary duty rather than the breach of a duty arising
under the common law. The court held that it did, following its earlier
decision in *Shaker v Al-Bedrawi* [2003] Ch 350. That aspect of the decision
is not challenged in the present appeal.

74   The second question was whether the exception established in *Giles
v Rhind* ought to be extended to a situation in which the company had
disabled itself, under a settlement with the wrongdoer, from bringing
proceedings against him for the recovery of its loss. The court held that it
should not. As I have explained, I would hold that no such exception exists.

75   The third question was whether the "reflective loss" principle
applied to a claim arising from a creditor's inability to recover a debt owed
to it by a company in which the creditor was a shareholder. The court held

A

B

C

D

E

F

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

279
[2020] 3 WLR                                    Marex Financial Ltd v Sevilleja (SC(E))
                                                                      Lord Reed PSC

A    that it did, relying on the treatment of the claim for loss of pension in
     *Johnson's* case, and applying Lord Millett's dictum, cited at para 62 above.
     Neuberger LJ stated [2004] 2 BCLC 554, para 70:

          "It is clear from those observations, and indeed from that aspect of the
          decision, in *Johnson's* case that the rule against reflective loss is not
          limited to claims brought by a shareholder in his capacity as such; it
B         would also apply to him in his capacity as an employee of the company
          with a right (or even an expectation) of receiving contributions to his
          pension fund.  On that basis, there is no logical reason why it should not
          apply to a shareholder in his capacity as a creditor of the company
          expecting repayment of his debt."

C    The claim brought as a creditor was therefore dismissed.  Taking this
     reasoning to its logical conclusion, Neuberger LJ added (ibid) that the same
     reasoning should apply even where the employee or creditor was not also a
     shareholder.

     76    As was explained in paras 65–66 above, on the facts of *Johnson* the
     claim in respect of lost pension contributions was a claim for a loss of
     distributions, brought by Mr Johnson in the capacity of a shareholder.  It
D    therefore fell within the scope of the reasoning in *Prudential*, and Lord
     Bingham's proposition (1).  The claim brought by the creditor-shareholder
     in *Gardner v Parker* did not fall within the scope of that reasoning, or Lord
     Bingham's proposition.  It should not have been barred as reflective loss.
     The court might have had to consider the avoidance of double recovery,
     applying the general principles discussed in paras 2–7 above, if that issue had
E    been raised; but it was not.

     77    The cases since *Gardner v Parker* have followed the approach
     adopted in that case.  The supposed "reflective loss" principle has been
     treated as being based primarily on the avoidance of double recovery and the
     protection of a company's unsecured creditors, and as being applicable in all
     situations where there are concurrent claims and one of the claimants is a
F    company.  So understood, the "reflective loss" principle, as Sir Bernard Rix
     JA observed in *Xie Zhikun* at para 95, "seems to be extending its scope
     wider and wider".  Sir Bernard added at para 96 that "a number of
     distinguished judges have commented on the uncertainties and difficulties of
     the reflective loss doctrine".  Professor Andrew Tettenborn has rightly
     warned that "Today it promises to distort large areas of the ordinary law of
     obligations": "Creditors and Reflective Loss: A Bar Too Far?" (2019) 135
G    LQR 182.  The decision of the Court of Appeal in the present case, applying
     the approach laid down by Lord Millett in *Johnson* and by the Court of
     Appeal in *Gardner v Parker*, confirms that threat.  It is the first case in this
     jurisdiction in which the "reflective loss" principle has been applied to a
     claimant which is purely a creditor of a company.  The extension of the
     principle to such cases has the potential to have a significant impact on the
H    law and on commercial life.  The possibility of the further extension of the
     principle to creditors of natural persons, which the Court of Appeal
     considered, indicates the extent to which it has become difficult to confine.
     As the scope of the principle has expanded, so have the volume of litigation
     and the level of uncertainty.

© 2020 The Incorporated Council of Law Reporting for England and Wales

280
**Marex Financial Ltd v Sevilleja (SC(E))**                    [2020] 3 WLR
Lord Reed PSC

*Other jurisdictions*                                                          A

78  Almost 40 years have passed since *Prudential* was decided.  The
decisions in that case and in *Johnson* have been followed throughout much
of the common law world, albeit sometimes on the basis of different
reasoning.  Without attempting an exhaustive survey, they have, for
example, been followed in Australia (see, for example, *Chen v Karandonis*      B
[2002] NSWCA 412 and *Hodges v Waters (No 7)* (2015) 232 FCR 97); in
the Cayman Islands (see *Xie Zhikun v Xio GP Ltd*, (unreported)
14 November 2018 and *Primeo Fund v Bank of Bermuda (Cayman) Ltd*
(unreported) 13 June 2019, both Cayman Islands Court of Appeal); in Hong
Kong (see, for example, *Waddington Ltd v Thomas* [2009] 2 BCLC 82,
where Lord Millett's approach in *Johnson* was followed, in a judgment
delivered by Lord Millett NPJ, and *Giles v Rhind* [2003] Ch 618 was
doubted and not followed); in Ireland (see, for example, *Alico Life*           C
*International Ltd v Thema International Fund plc* [2016] IEHC 363, where
the court followed the reasoning in *Prudential*, and of Lord Bingham in
*Johnson*, and rejected the reasoning in *Christensen v Scott* [1996] 1 NZLR
273); in Jersey (*Freeman v Ansbacher Trustees (Jersey) Ltd* [2009] JLR 1,
where the principle was treated, consistently with the reasoning in
*Prudential*, as an aspect of the rule in *Foss v Harbottle*); and in Singapore   D
(see, for example, *Townsing v Jenton Overseas Investment Pte Ltd* [2008]
1 LRC 231, where the principle was explained as an aspect of the rule in *Foss*
*v Harbottle*, and the reasoning in *Christensen* was rejected).

*Summary*

79  Summarising the discussion to this point, it is necessary to             E
distinguish between (1) cases where claims are brought by a shareholder in
respect of loss which he has suffered in that capacity, in the form of a
diminution in share value or in distributions, which is the consequence of
loss sustained by the company, in respect of which the company has a cause
of action against the same wrongdoer, and (2) cases where claims are
brought, whether by a shareholder or by anyone else, in respect of loss which
does not fall within that description, but where the company has a right of      F
action in respect of substantially the same loss.

80  In cases of the first kind, the shareholder cannot bring proceedings in
respect of the company's loss, since he has no legal or equitable interest in
the company's assets: *Macaura* and *Short v Treasury Comrs*.  It is only the
company which has a cause of action in respect of its loss: *Foss v Harbottle*.
However, depending on the circumstances, it is possible that the company's
loss may result (or, at least, may be claimed to result) in a fall in the value of  G
its shares.  Its shareholders may therefore claim to have suffered a loss as a
consequence of the company's loss.  Depending on the circumstances, the
company's recovery of its loss may have the effect of restoring the value of
the shares.  In such circumstances, the only remedy which the law requires to
provide, in order to achieve its remedial objectives of compensating both the
company and its shareholders, is an award of damages to the company.           H

81  There may, however, be circumstances where the company's right of
action is not sufficient to ensure that the value of the shares is fully
replenished.  One example is where the market's valuation of the shares is
not a simple reflection of the company's net assets, as discussed at para 32

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                              Marex Financial Ltd v Sevilleja (SC(E))
                                                              Lord Reed PSC

A   above.  Another is where the company fails to pursue a right of action which,
    in the opinion of a shareholder, ought to have been pursued, or compromises
    its claim for an amount which, in the opinion of a shareholder, is less than
    its full value.  But the effect of the rule in *Foss v Harbottle* is that the
    shareholder has entrusted the management of the company's right of action
    to its decision-making organs, including, ultimately, the majority of
    members voting in general meeting.  If such a decision is taken otherwise
B   than in the proper exercise of the relevant powers, then the law provides the
    shareholder with a number of remedies, including a derivative action, and
    equitable relief from unfairly prejudicial conduct.

        82   As explained at paras 34–37 above, the company's control over its
    own cause of action would be compromised, and the rule in *Foss v Harbottle*
    could be circumvented, if the shareholder could bring a personal action for a
C   fall in share value consequent on the company's loss, where the company
    had a concurrent right of action in respect of its loss.  The same arguments
    apply to distributions which a shareholder might have received from the
    company if it had not sustained the loss (such as the pension contributions in
    *Johnson*).

        83   The critical point is that the shareholder has not suffered a loss which
    is regarded by the law as being separate and distinct from the company's
D   loss, and therefore has no claim to recover it.  As a shareholder (and unlike a
    creditor or an employee), he does, however, have a variety of other rights
    which may be relevant in a context of this kind, including the right to bring a
    derivative claim to enforce the company's rights if the relevant conditions
    are met, and the right to seek relief in respect of unfairly prejudicial conduct
    of the company's affairs.

        84   The position is different in cases of the second kind.  One can take as
E   an example cases where claims are brought in respect of loss suffered in the
    capacity of a creditor of the company.  The arguments which arise in the case
    of a shareholder have no application.  There is no analogous relationship
    between a creditor and the company.  There is no correlation between the
    value of the company's assets or profits and the "value" of the creditor's
    debt, analogous to the relationship on which a shareholder bases his claim
F   for a fall in share value.  The inverted commas around the word "value",
    when applied to a debt, reflect the fact that it is a different kind of entity from
    a share.

        85   Where a company suffers a loss, it is possible that its shareholders
    may also suffer a consequential loss in respect of the value of their shares, but
    its creditors will not suffer any loss so long as the company remains solvent.
G   Even where a loss causes the company to become insolvent, or occurs while it
    is insolvent, its shareholders and its creditors are not affected in the same way,
    either temporally or causally.  In an insolvency, the shareholders will recover
    only a pro rata share of the company's surplus assets, if any.  The value of
    their shares will reflect the value of that interest.  The extent to which the
    company's loss may affect a creditor's recovery of his debt, on the other hand,
    will depend not only on the company's assets but also on the value of any
H   security possessed by the creditor, on the rules governing the priority of debts,
    and on the manner in which the liquidation is conducted (for example,
    whether proceedings are brought by the liquidator against persons from
    whom funds might be ingathered, and whether such proceedings are
    successful).  Most importantly, even where the company's loss results in the

© 2020 The Incorporated Council of Law Reporting for England and Wales

282
**Marex Financial Ltd v Sevilleja (SC(E))**                          [2020] 3 WLR
Lord Reed PSC

creditor also suffering a loss, he does not suffer the loss in the capacity of a
shareholder, and his pursuit of a claim in respect of that loss cannot therefore
give rise to any conflict with the rule in *Foss v Harbottle*.

86   The potential concern that arises in relation to claims brought by
creditors is not, therefore, the rule in *Foss v Harbottle*. On the other hand,
the principle that double recovery should be avoided may be relevant,
although it is not necessarily engaged merely because the company and
the creditor have concurrent claims against the same defendant. In
*International Leisure Ltd v First National Trustee Co UK Ltd* [2013] Ch
346, for example, the principle was not engaged where the company and a
secured creditor had concurrent claims against an administrative receiver
whom the creditor had appointed, since the company could only claim in
respect of any loss remaining after the secured creditor had been paid in
full.

87   Where the risk of double recovery arises, how it should be avoided
will depend on the circumstances. It should be borne in mind that the
avoidance of double recovery does not entail that the company's claim must
be given priority. Nor, contrary to the view expressed in a number of
authorities, including the decision of the Court of Appeal in the present case,
does the pari passu principle entail that the company's claim must be given
priority. That principle requires that, in a winding-up, a company's assets
must be distributed rateably among its ordinary creditors. The proceeds of
its recovery from a wrongdoer will form part of its assets available for
distribution (subject to the claims of secured and preferred creditors). But
the pari passu principle does not give the company, or its liquidator, a
preferential claim on the assets of the wrongdoer, over the claim of any other
person with rights against the wrongdoer, even if that claimant is also a
creditor of the company. In other words, the pari passu principle may
restrict a creditor of an insolvent company to the receipt of a dividend on the
amount which the company owes him, but it does not prevent him from
enforcing his own right to recover damages from a third party, or confer on
the company's right against the third party an automatic priority. In the
event that the third party cannot satisfy all the claims made against him, the
position will be regulated by the law of (his) insolvency.

88   It is also necessary to consider whether double recovery may
properly be avoided by other means than the prioritising of one claim over
the other, such as those mentioned in paras 5–7 above. The judgments of
Gibbs CJ and Brennan J in *Gould v Vaggelas* 157 CLR 215, at pp 229 and
258–259 respectively, raise the possibility that subrogation, in particular,
may provide a solution to issues of double recovery arising in connection
with creditors' claims. That question has not, however, been discussed in
the present proceedings, and I express no view upon it.

89   I would therefore reaffirm the approach adopted in *Prudential*
[1982] Ch 204 and by Lord Bingham in *Johnson* [2002] 2 AC 1, and depart
from the reasoning in the other speeches in that case, and in later authorities,
so far as it is inconsistent with the foregoing. It follows that *Giles v Rhind*
[2003] Ch 618, *Perry v Day* [2005] 2 BCLC 405 and *Gardner v Parker*
[2004] 2 BCLC 554 were wrongly decided. The rule in *Prudential* is limited
to claims by shareholders that, as a result of actionable loss suffered by their
company, the value of their shares, or of the distributions they receive as

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10188

283
[2020] 3 WLR                                     Marex Financial Ltd v Sevilleja (SC(E))
                                                                          Lord Reed PSC

A   shareholders, has been diminished.  Other claims, whether by shareholders
    or anyone else, should be dealt with in the ordinary way.

    *The present case*

        90   In the light of the foregoing discussion, the present case can be
    addressed relatively briefly.  As explained earlier, Marex obtained judgment
B   against the Companies for US$5·5m.  Following the circulation of the
    judgment in draft, Mr Sevilleja is alleged to have stripped the Companies
    of their assets, rendering them insolvent.  That action is alleged to have
    involved the commission of economic torts against Marex, as well as a
    breach of fiduciary duties owed by Mr Sevilleja to the Companies.
        91   Three issues arose before the Court of Appeal.  The first was whether
C   the "reflective loss" principle applied to creditors as well as shareholders.
    Knowles J had held that it did not.  No authority, he said, compelled him to
    apply the principle to cases of knowingly procuring a third party to act in
    violation of a creditor's rights, or intentionally causing loss to a creditor by
    unlawful means directed against a debtor company.  The Court of Appeal
    disagreed.  In a careful judgment, Flaux LJ accepted that the rationale of the
    decision in *Prudential* was that a personal action by a shareholder would
D   subvert the rule in *Foss v Harbottle*, and that if the rule against "reflective
    loss" had rested there, it would only apply to claims by shareholders.
    However, he correctly noted that the scope of the rule had been expanded in
    *Gardner v Parker*, following the approach of Lord Millett in *Johnson*.  The
    second issue was whether the *Giles v Rhind* exception applied.  The Court of
    Appeal held that it did not: it was a narrow exception which applied only
E   where the company's claim was barred by law as a result of the defendant's
    wrongdoing, rather than merely prevented on the facts.  The third issue was
    whether the "reflective loss" doctrine applied to intentional torts.  The court
    held that it did.  It also granted Marex permission to appeal, in order, as
    Lewison LJ explained at para 71, to enable this court to consider the
    coherence of the law in the current state of the authorities.  The appeal
F   concerns only the first and second issues.
        92   For the reasons I have explained, the rule in *Prudential* has no
    application to the present case, since it does not concern a shareholder.  That
    disposes of the first issue.  It also disposes of the second, since no question
    arises of a possible exception.  In any event, as I have explained, there is no
    *Giles v Rhind* exception.  It follows that Marex should be permitted to
    pursue the entirety of its claim.
G       93   The court has not been addressed on the issue of double recovery, in
    so far as it might arise in relation to Marex's claim.  That issue may or may
    not arise on the facts of the case, bearing in mind that no claim has yet been
    brought against Mr Sevilleja on behalf of the Companies, and that Marex
    maintains that the other debts supposedly owed by the Companies are not
    genuine, and that the liquidation is merely part of Mr Sevilleja's scheme to
H   defeat its claim.  If the issue of double recovery does arise, the court will need
    to consider it in the light of the discussion at paras 2–7 and 86–88 above.

    *Conclusion*

        94   For the foregoing reasons, I would allow the appeal.

© 2020 The Incorporated Council of Law Reporting for England and Wales

284
**Marex Financial Ltd v Sevilleja (SC(E))**                                    [2020] 3 WLR
Lord Hodge DPSC

**LORD HODGE DPSC** (agreeing with **LORD REED PSC**)                                A

95   I agree for the reasons given by Lord Reed PSC that this appeal
should be allowed.  There is no disagreement within the court that the
expansion of the so-called "principle" that reflective loss cannot be
recovered has had unwelcome and unjustifiable effects on the law and that, if
the facts alleged by Marex are established in this case, the exclusion of the
bulk of its claim would result in a great injustice.  But because there is a          B
division of view as to whether a shareholder can recover damages for the
diminution in value of its shareholding in a company or for the loss of
distributions which the company would have paid to it in circumstances
where a wrong has been done both to the company and to the shareholder,
I wish to add a few comments about the central role of company law in the
Court of Appeal's judgment in *Prudential Assurance Co Ltd v Newman*            C
*Industries Ltd (No 2)* [1982] Ch 204 which is the fons et origo of the
principle.  In my view the problems and uncertainties which have emerged in
the law have arisen because the "principle" of reflective loss has broken from
its moorings in company law.

96   In the *Prudential* case the Court of Appeal's discussion of
Prudential's personal claim comprised merely three pages of a long                    D
judgment, which was principally concerned with its derivative claim, and
that discussion should be read in the context of the judgment as a whole.
The discussion of the personal claim followed a longer discussion of
Prudential's derivative action which Newman opposed as being contrary to
the interests of the company (p 211).  In its discussion of the rule in *Foss v
Harbottle* (1843) 2 Hare 461 the Court of Appeal (p 210F–G) referred to the
classic definition of the rule in the judgment of Jenkins LJ in *Edwards v*           E
*Halliwell* [1950] 2 All ER 1064, 1066 which I quote in part:

"First, he proper plaintiff in an action in respect of a wrong alleged to
be done to a corporation is, prima facie, the corporation.  Secondly,
where the alleged wrong is a transaction which might be made binding
on the corporation and on all its members by a simple majority of
the members, no individual member of the corporation is allowed to          F
maintain an action in respect of that matter because, if the majority
confirms the transaction, cadit quaestio; or, if the majority challenges the
transaction, there is no valid reason why the company should not
sue . . ."

The court went on to state that the rule did not operate where the alleged
wrong was ultra vires the company or if the transaction could be sanctioned         G
only by a special majority of the members of the company and that there was
an exception to the rule if those in control of the company committed a fraud
on a minority of shareholders.

97   When the Court of Appeal turned to consider Prudential's personal
action it held that the directors in advising the shareholders to support the
resolution approving the impugned transaction owed the shareholders a                H
duty to give advice in good faith and not fraudulently.  It continued:

"It is also correct that if directors convene a meeting on the basis of a
fraudulent circular, a shareholder will have a right of action to recover
any loss which he has been personally caused in consequence of the

© 2020 The Incorporated Council of Law Reporting for England and Wales

285
[2020] 3 WLR                                    Marex Financial Ltd v Sevilleja (SC(E))
                                                              Lord Hodge DPSC

A   fraudulent circular; this might include the expense of attending the
    meeting": [1982] Ch 204, 222G–H.

    The Court of Appeal in so stating clearly recognised that the allegedly
    fraudulent circular, on which Prudential founded its personal claim, could
    give rise to a right of action in damages by the shareholder.  That was the
    context in which the court made the centrally important statement, which
B   Lord Reed PSC quotes at para 26 above but which bears repeating:

        "But what he [the shareholder] cannot do is to recover damages merely
        because the company in which he is interested has suffered damage.  He
        cannot recover a sum equal to the diminution in the market value of his
        shares, or equal to the likely diminution in dividend, because such a 'loss'
        is merely a reflection of the loss suffered by the company": pp 222–223.
C
    98   This exclusion, as Lord Reed PSC has stated, relates only to the
    diminution in value of shares or in distributions which the shareholder
    suffers in his capacity as a shareholder as a result of the company having
    itself suffered actionable damage.  When a shareholder pursues a personal
    claim against a wrongdoer in another capacity, such as guarantor or creditor
    of the company, the exclusion has no application.
D   99   The court's reasoning on p 223, which Lord Reed PSC has quoted at
    paras 27 and 29 above, has been criticised because the stark assertion, that
    the shareholder "does not suffer any personal loss" by the diminution in the
    value of its shares or of the distributions which it received, cannot be taken
    at face value—clearly the shareholder suffers economic loss—and because
    the example of a non-trading company whose only asset was a cash box
E   containing £100,000 is an oversimplification.  But the reasoning is none the
    less clear where the court asserts (a) that the deceit on the shareholder causes
    the shareholder "no loss which is separate and distinct from the loss to
    the company" (p 223), (b) that "when the shareholder acquires a share he
    accepts the fact that the value of his investment follows the fortunes of the
    company and that he can only exercise his influence over the fortunes of the
    company by the exercise of his voting rights in general meeting" (p 224), and
F   (c) that "[a] personal action would subvert the rule in *Foss v Harbottle*", a
    rule which "operates fairly by preserving the rights of the majority" (p 224).
    I agree with Lord Reed PSC (para 28 above) that what the court was saying
    is that where a company suffers a loss as a result of wrongdoing and that loss
    is reflected to some extent in a fall in the value of its shares or in its
    distributions, the fall in the share value or in the distributions is not a loss
G   which the law recognises as being separate and distinct from the loss
    sustained by the company.
    100   That is the full extent of the "principle" of reflective loss which the
    *Prudential* case established.  It was not articulated as a general principle to
    be applied in other contexts; it is a rule of company law arising from the
    nature of the shareholder's investment and participation in a limited
    company and excludes a shareholder's claim made in its capacity as
H   shareholder.
    101   As this court has been invited to review the "principle" of reflective
    loss it is appropriate to ask whether this rule as formulated by Lord
    Reed PSC in para 28 above from his analysis of the *Prudential* case is
    supported by principle.

© 2020 The Incorporated Council of Law Reporting for England and Wales

286
**Marex Financial Ltd v Sevilleja (SC(E))**                    [2020] 3 WLR
Lord Hodge DPSC

102    In my view, the Court of Appeal's articulation of the rule in the   A
*Prudential* case was a principled development of company law which should
be maintained.  Investment in or conducting a business through the medium
of a limited company brings advantages to the shareholder, principally in the
form of limited liability, which is a consequence of the separate personality
of the company: *Salomon v A Salomon & Co Ltd* [1897] AC 22.  As the
Court of Appeal stated in *Prudential* [1982] Ch 204, 224, "The company is   B
liable for its contracts and torts; the shareholder has no such liability".  The
company owns its assets and the shareholders have no legal or equitable
interest in and are not part owners of those assets: *Macaura v Northern
Assurance Co Ltd* [1925] AC 619, 626, 630, 633, per Lord Buckmaster,
Lord Sumner and Lord Wrenbury; *Short v Treasury Comrs* [1948] 1 KB 116,
122, per Evershed MR.

103    A shareholding in a company confers a right of participation in the   C
affairs of the company in accordance with the terms of the company's
articles of association, often in the form of voting on resolutions at general
meetings, and it entitles the shareholder to ensure that other shareholders
comply with the rules imposed on them by the articles of association:
section 33(1) of the Companies Act 2006 ("the 2006 Act").  A shareholder in
an unfair prejudice application under section 994 of the 2006 Act can   D
also invoke equity to protect it from unfairness by restraining the exercise
by another shareholder of its legal rights which are contrary to the
understandings reached or promises made: *In re A Company (No 00709 of
1992)* [1999] 1 WLR 1092.  It is a significant principle of company law that,
in the absence of agreement to the contrary such as that expressed in the
terms of a share issue, shares confer the same rights and impose the same
liabilities: see for example section 284 of the 2006 Act and *Birch v Cropper*   E
(1889) 14 App Cas 525, 543, per Lord MacNaghten.

104    A shareholding will usually entitle its holder to participate in the
success of the company's enterprise by receiving distributions from the
company out of its profits and to receive a return of its capital and a
proportionate share of any surplus assets of the company on its winding up:
*Macaura* [1925] AC 619, 626–627, per Lord Buckmaster; *Birch v Cropper*   F
14 App Cas 525, 543.

105    A share confers rights in a company as well as rights against a
company.  The shareholders as a body have certain characteristics of
proprietorship of the company to the extent that they exercise ultimate
control over the direction of a company through their votes in general
meetings and have a claim to its surplus assets on a winding up.  But as the
*Short v Treasury Comrs* case has shown, they are not part owners of the   G
undertaking.

106    Investment in a limited liability company through a shareholding
often involves the separation of management of the company from the
ownership of its shares.  This facilitates the transfer of the members' interests
as, absent contractual restrictions, shares in a public company can be bought
and sold without requiring the consent of others.

107    Investment in a company by means of a shareholding can also bring   H
disadvantages.  A minority shareholder is liable to be outvoted by other
shareholders, who form a majority in a vote at a general meeting of the
company, in decisions concerning the company.  The shareholder in a large
company normally leaves it to the Board to make decisions about the

© 2020 The Incorporated Council of Law Reporting for England and Wales

287
[2020] 3 WLR                     Marex Financial Ltd v Sevilleja (SC(E))
                                                         Lord Hodge DPSC

A  business of the company, including whether to sue a wrongdoer for a wrong
   done to the company.  A minority shareholder would have to obtain the
   support of the holders of sufficient numbers of shares to create a majority in
   order to force the directors to adopt a policy towards the company's business
   which the Board did not support.  Further, unless the shareholder can sell its
   shareholding to a third party, there are restrictions on the ways in which it
B  can realise its investment in the company in order to protect the interests of
   the company's creditors.  In particular, the shareholder's entitlement to
   receive money from the company on its winding up is postponed to the
   claims of the creditors of the company: Insolvency Act 1986, sections 107
   and 143(1).
       108    The characteristics of a shareholding as a means of participation in a
   company's enterprise which are most directly relevant in the context of this
C  appeal are the default rule of equality among shareholders and the
   postponement of the shareholders' entitlements on a winding up to the claims
   of the company's creditors.  Against this background, the law's refusal to
   recognise the diminution in value of a shareholding or the reduction or loss of
   a distribution, which is the consequence of the company suffering loss as a
   result of wrongdoing against it, as being separate and distinct from the
D  company's loss is a principled development of company law.  It excludes the
   possibility of double recovery.  It avoids a scramble between shareholders to
   establish their private claims against a wrongdoer in case the wrongdoer does
   not have sufficient accessible assets to meet those claims.  It thereby upholds
   the default position of equality among shareholders in their participation in
   the company's enterprise: each shareholder's investment "follows the
E  fortunes of the company".  It maintains the rights of the majority of the
   shareholders, as the Court of Appeal stated in *Prudential* [1982] Ch 204, 224.
   And it preserves the interests of the company's creditors by maintaining the
   priority of their claims over those of the shareholders in the event of a
   winding up.
       109    It may well be, as Lord Sales JSC reasons, that the law can achieve
   some protection of those interests by other means such as case management
F  and equitable subrogation.  But the creation of a bright line legal rule, as the
   Court of Appeal did in the *Prudential* case, is principled.  That judgment has
   stood for almost 39 years; it was upheld by the House of Lords in *Johnson v
   Gore Wood & Co* [2002] 2 AC 1; and it has been adopted in other common
   law countries.  We should not depart from it now.

G  **LORD SALES JSC** (with whom **LORD KITCHIN JSC** and **BARONESS
   HALE OF RICHMOND** agreed)

   *Introduction*

       110    The facts in this case are relatively simple.  The legal issues are more
   complex.
H      111    By its claim form in these proceedings Marex claims damages
   against Mr Sevilleja for inducing or procuring violation of Marex's rights
   under the judgment of 25 July 2013 (based on the principle first recognised
   in *Lumley v Gye* (1853) 2 E & B 216: I will refer to this as the *Lumley v Gye*
   claim) and for intentionally causing loss to Marex by unlawful means (based
   on the principle recognised in *OBG Ltd v Allan* [2008] AC 1 ("*OBG*"): I will

© 2020 The Incorporated Council of Law Reporting for England and Wales

288
Marex Financial Ltd v Sevilleja (SC(E))                          [2020] 3 WLR
Lord Sales JSC

A

refer to this as the *OBG* claim), by dissipating the assets of the Companies. The judge found that, subject to the issue of reflected loss, these claims are arguable and suitable for service out of the jurisdiction. There has been no appeal to challenge this aspect of the judge's conclusions.

B

112    This appeal is concerned with a distinct argument for Mr Sevilleja, that the loss suffered by Marex reflected the loss suffered by the Companies a s a result of his alleged unlawful actions and that reflective loss of this kind is irrecoverable.  The result, says Mr Sevilleja, is that Marex is unable to contend that it has any completed cause of action in tort (save in respect of certain costs incurred by Marex in trying to obtain payment of the judgment debt).  He contends that there is a principle established by the decision of the Court of Appeal in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] Ch 204 ("*Prudential*") and the decision of the House of Lords

C

in *Johnson v Gore Wood & Co* [2002] 2 AC 1 ("*Johnson*") which precludes recovery of reflective loss of this kind ("the reflective loss principle").  The judge did not accept this argument.

113    Mr Sevilleja appealed to the Court of Appeal to challenge this part of the judge's reasoning.  Marex filed a respondent's notice by which it submitted that if, contrary to its primary case, the reflective loss principle is applicable, its claims against Mr Sevilleja fell within the exception to that principle established by the decision in *Giles v Rhind* [2003] Ch 618.  In that

D

case the Court of Appeal held that there is an exception to the reflective loss principle in certain circumstances where the action of the defendant who has unlawfully abstracted funds from a company makes it impossible for a claim to be pursued by the company itself.  The Court of Appeal allowed Mr Sevilleja's appeal and rejected Marex's submission based on *Giles v Rhind*.

E

114    Marex now appeals to this court with permission granted by the Court of Appeal with the object of providing this court with the opportunity to review the scope of the reflective loss principle and the exception to it identified in *Giles v Rhind*.  In view of the significance of the case, this court granted permission to the All Party Parliamentary Group on Fair Business Banking ("the APP Group") to intervene by oral and written submissions in

F

support of Marex's appeal.  The first part of the appeal is concerned with the question whether the reflective loss principle applies to preclude recovery where the claimant is an unsecured creditor of the relevant company, but is not a shareholder in that company, where each of the creditor and the company has its own cause of action against a third party defendant in respect of the same wrongful conduct by him.  However, in order to answer

G

that question it is necessary to examine what justification there is for the reflective loss principle in a shareholder case as well.

115    It is therefore necessary to examine whether the reasoning in *Prudential*, a shareholder case, can be sustained as a matter of principle.  It is only if one subjects to critical examination the rationale for the reflective loss principle as stated in *Prudential* that one can see whether that rationale extends to cover a creditor case.  This court has been convened as an

H

enlarged panel with the object of examining the rationale for the reflective loss principle and the coherence of the law in this area.  The APP Group placed material before us which argued that the law had made a wrong turn in the *Prudential* case.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A     116   I have come to the same conclusion as Lord Reed PSC and the majority that Marex's appeal should be allowed. But my reasoning differs from theirs. It may be helpful if I give a brief outline of where the differences lie.

117   Lord Reed PSC says that the reflective loss principle is justified in a shareholder case but that the rationale for it does not extend to cover a creditor case. On his account, the reflective loss principle laid down in B  *Prudential* is a rule of law: the court deems that the loss suffered by a shareholder in relation to diminution in the value of shares or loss of dividends simply is to be regarded as irrecoverable in a case where the company has a parallel claim against the third party defendant (paras 9, 28–39 and 52). Lord Hodge DPSC likewise says that the Court of Appeal in C  *Prudential* laid down a rule of law (paras 99, 100 and 108) that loss suffered by a shareholder is regarded as irrecoverable. Since it is a rule of law that the shareholder is deemed not to have suffered a loss different from that suffered by the company, it is not a matter of evidence whether he has or has not in fact suffered such a loss. It follows that, apart from this deeming effect, the reflective loss principle is not concerned with the issue of double recoverability against the third party defendant.

D    118   By contrast, in my opinion the Court of Appeal in *Prudential* did not lay down a rule of law that a shareholder with a claim against a third party defendant in parallel with, and reflective of, a claim by the company against the same defendant simply had to be deemed to suffer no different loss of his own which he could recover, whatever the true position on the facts. It did not purport to do so. Rather, the court set out reasoning why it thought the shareholder in such a case in fact suffered no loss. But as E  I explain below, that reasoning cannot be supported. There clearly are some cases where the shareholder does suffer a loss which is different from the loss suffered by the company. In the face of this difficulty with the reasoning in *Prudential*, I do not think it is appropriate to re-characterise the court's decision as one laying down a new rule which simply deems that loss suffered by the shareholder to be irrecoverable as a matter of law. If a F  shareholder has a valid cause of action against the third party defendant in respect of different loss which he has in fact suffered, it is not open to a court to rule it out as a matter of judicial fiat.

119   This means that, in common with many other courts and judges, I consider that the issue of double recovery is of importance in relation to shareholder claims as well as in relation to creditor claims. That was clearly G  the view of four of the Law Lords in *Johnson* [2002] 2 AC 1, who said so in terms: see Lord Reed PSC's discussion above of the speech of Lord Millett (with whom Lord Goff of Chieveley agreed) and pp 45D–E and 47E per Lord Cooke of Thorndon and 54H–55D per Lord Hutton. I do not read Lord Bingham of Cornhill's speech as discounting the relevance of this factor in a shareholder case.

120   The idea of reflective loss was employed by the Court of Appeal in H  *Prudential* as a way of addressing a number of points which the court grouped together. Some aspects of the idea are valid, but some are not. It is necessary to analyse with care what exactly is in issue when any specific proposition of law is advanced and is said to be justified on the basis of a principle relating to reflective loss.

© 2020 The Incorporated Council of Law Reporting for England and Wales

290
Marex Financial Ltd v Sevilleja (SC(E))                              [2020] 3 WLR
Lord Sales JSC

*The reflective loss principle and other principles*                                A

121   In the case note cited by Lord Reed PSC at para 77, Professor
Tettenborn has likened the reflective loss principle to "some ghastly legal
Japanese knotweed" whose tentacles have spread alarmingly and which
threatens to distort large areas of the ordinary law of obligations: "Creditors
and Reflective Loss: A Bar Too Far?" (2019) 135 LQR 182, 183.  The Court
of Appeal in this case loyally sought to identify and follow through the       B
rationale of the reflective loss principle first identified and relied upon in the
*Prudential* case, but in my opinion its decision shows how the reasoning in
that case leads to an unprincipled and unattractive terminus.  In granting
permission to appeal to this court, the Court of Appeal has invited us to
consider the conceptual basis and extent of the reflective loss principle.  That
requires consideration of principles of law which long predate 1981, when     C
the judgment in *Prudential* was handed down.  In another article placed
before the court, Alan Steinfeld QC contends that "The law took a seriously
wrong turn when in *Prudential* the court elevated what was a relatively
simple everyday problem concerned with an assessment of damages into a
principle of causation"; he urges that this court should "now think it over
and wonder why it was ever thought to be necessary or just to have this rule   D
at all": "In the Looking Glass: Holding Companies and Reflective Loss"
(2016) 22(3) Trusts & Trustees 277, 285.

122   Before turning to examine the authorities, it is relevant to have in
mind some very basic points.  A company is a legal person distinct from its
shareholders, which has its own assets which are distinct from theirs.
A share in a company is an item of property owned by the shareholder,
which is distinct from the assets owned by the company.  Typically, or at     E
least very often, a share in a company has a market value which reflects the
market's estimation of the future business prospects of the company, not
what its net asset position happens to be at any given point in time.  There is
no simple correspondence between the value of a 1% shareholding and 1% of
the net assets of the company.  This is true both in respect of a company
whose shares are publicly traded and in respect of a small private company.
In that regard, I respectfully disagree with the observation by Lord Millett in   F
*Johnson* [2002] 2 AC 1, 62A–B, where he said that a share "represents a
proportionate part of the company's net assets, and if these are depleted the
diminution in its assets will be reflected in the diminution in the value of the
shares" and stated that in the case of a small private company whose net
assets are diminished the correspondence with the diminution in the value of
the shares "is exact".  The shares in both public and private companies are     G
marketable and their value reflects the view of the relevant market about the
future prospects of the company; it is just that in the former case it might be
easier to identify the market value.  I expand on this below.

123   A company which is wronged acquires its own cause of action in
respect of that wrong.  That cause of action is a chose in action which is the
property of the company.  What the company does with it is a matter for
decision by the relevant organs of the company; a shareholder has no right to   H
seek to vindicate the company's cause of action: *Foss v Harbottle* (1843)
2 Hare 461 and *Prudential* [1982] Ch 204, 224.  That is subject to an
exception if the wrongdoer has control of the relevant decision-making
organs of the company, in which case a court may authorise a shareholder to

© 2020 The Incorporated Council of Law Reporting for England and Wales

A     bring a derivative action on behalf of the company. Litigation is an expensive enterprise, especially if lost, and can have negative consequences on trading relationships and business reputation. It is not to be embarked upon lightly and, subject to the exception to the rule, whether a company should take on the risks of litigation is a matter to be decided by the relevant decision-making organs of the company.

B     124   A person may act in ways such that several people acquire causes of action against him. Sometimes, the same actions by that person may give rise to causes of action vested in different people, such as when he owes different people duties of care in respect of the same activity—a type of case discussed in *Barings plc v Coopers & Lybrand* [1997] 1 BCLC 427 ("*Barings*") and in *Johnson*—or where he breaches a duty owed to one person with the intention of harming another, in circumstances where the other person acquires his own right of action pursuant to the principle in the

C     *OBG* case. The law lays down no general principle to govern the order in which people who have causes of action against the wrongdoer should sue to vindicate their rights against him. Each may seek to sue and execute any judgment he obtains without regard to the impact that may have on the rights of others.

D     125   That is, of course, subject to any obligation a claimant may have assumed in relation to those others. But a shareholder in a company does not, by becoming a shareholder, assume any obligation to anyone else (whether the company itself, other shareholders in the company or creditors of the company) to the effect that he will stay his hand as regards vindication of his personal rights of action against a defendant in order to safeguard theirs. For example, if a shareholder in a company is run over by a driver

E     employed by the company acting in the course of his employment, the shareholder is entitled to sue to obtain damages from the company even though by doing so he might diminish the ability of the company to pay a dividend to shareholders or to meet its obligations to its creditors. Similarly, if a shareholder and a company each have their own cause of action against a third party defendant, the shareholder is entitled to seek to sue and obtain

F     recovery from that defendant in the usual way, even though by doing so he may reduce the capacity of the defendant to satisfy the company's claim and hence might diminish the ability of the company to pay a dividend or pay its creditors.

     126   The shareholder does not violate the pari passu principle by proceeding in this way, because the vindication of his own cause of action is not subject to that principle at the stage at which he brings his claim. If the

G     third party defendant is insolvent, then during the insolvency process the shareholder's claim and those of everyone else against the defendant will be subject to that principle and any other insolvency rules which are applicable. The insolvency rules constitute a regime for securing fair outcomes as between competing claimants, if there is a risk that the defendant will not be able to meet the claims of all. There is, therefore, no obvious need to create

H     an a priori solution such as that which the reflective loss principle attempts to provide by means of a crude bright line rule to exclude a shareholder's claim. As explained below, if the company and a shareholder have overlapping claims against a third party defendant, there is scope at trial (if an action is brought) or in the insolvency process for the relationship

© 2020 The Incorporated Council of Law Reporting for England and Wales

292
Marex Financial Ltd v Sevilleja (SC(E))                                    [2020] 3 WLR
Lord Sales JSC

between those claims to be worked out in a practical way which secures     A
overall justice for all those parties.

127   Arising from the concept of the company as a society or societas of
its members and from the history of company law in the law of partnership,
it is recognised that shareholders may be subject to certain obligations owed
to their fellow shareholders other than those expressly stated in the articles
of association: see *In re A Company (No 00709 of 1992)* [1999] 1 WLR
1092, 1098–1099 (Lord Hoffmann).  These obligations are concerned with     B
the way in which the company's affairs are managed when the shareholders
act together, requiring that they use their powers as set out in the articles of
association for proper purposes and in good faith for the benefit of the
company as a whole: see e g *Allen v Gold Reefs of West Africa Ltd* [1900]
1 Ch 656, 671, per Lindley MR; *Greenhalgh v Arderne Cinemas Ltd* [1951]
Ch 286, CA.  Such obligations do not extend to limiting the ability of a     C
shareholder to take action to vindicate any cause of action he may himself
have sounding in damages against a third party defendant.  A general
obligation of good faith of this kind does not require that the shareholder
should regard himself as deprived of his property in the form of such a cause
of action.

128   A defendant may owe obligations in contract or tort to the           D
shareholder owner of a company where breach of those obligations results in
loss to the shareholder which is suffered in the form of a reduction in the
value of its shares in the company or a diminution of dividends which it
receives.  There is no inherent conceptual difficulty about recovery of
damages in respect of loss suffered in that way: see *Lee v Sheard* [1956] 1 QB
192, *George Fischer (Great Britain) Ltd v Multi Construction Ltd* [1995]
1 BCLC 260 and *Gerber Garment Technology Inc v Lectra Systems Ltd*         E
[1997] RPC 443 ("*Gerber*").  In such cases, the usual rules of contract or tort
apply: the claimant shareholder is to be put in the same position as if the
contract had been complied with or the tort had not been committed.

129   A defendant may owe obligations to the shareholder owner of a
company which are similar to those owed to the company itself.  This was
the situation addressed in *Barings*, in which it was alleged that auditors had  F
undertaken a duty owed to the parent shareholder company to audit its
subsidiary with reasonable care and also a duty owed to the subsidiary to
similar effect. I discuss this case below.  The Court of Appeal declined to rule
out the parent's claim on the basis of the reflective loss principle.  If the
auditors failed to exercise reasonable care, that would constitute a breach of
the duty owed to the parent and at the same time a breach of the duty
owed to the subsidiary.  Each of them would have a cause of action.  The     G
subsidiary could sue for losses which it suffered as a result (these might
include, for example, loss of its property flowing from a failure by the
auditors to detect defalcations or unauthorised loss-making trading).  The
parent could sue for the different losses which it suffered as a result (these
might include a reduction in the value of the shares it owned or a loss of
dividends from the subsidiary).  It is difficult to see why the fact that the
subsidiary has its own claim for a different loss should preclude the parent    H
from being able to vindicate its own right of action in respect of the loss
which it has suffered.

130   In this latter type of case there is no difference from the position
described in para 128 above, save that in assessing the loss actually suffered

© 2020 The Incorporated Council of Law Reporting for England and Wales

293
[2020] 3 WLR                               Marex Financial Ltd v Sevilleja (SC(E))
                                                              Lord Sales JSC

A   by the parent one would have to bring into account the fact that by reason of
    the auditors' lack of care the subsidiary would also have acquired its own
    cause of action against them. That would be an asset of the subsidiary to be
    set against its losses. Depending on the facts, it might be that the existence or
    vindication of that cause of action would prevent the parent from suffering
    any loss itself; but that would turn on the evidence in the case and could not
B   simply be assumed.
        131    Suppose that the subsidiary in this scenario waived its claim, or
    settled it for only a fraction of its value, or came to lose it by limitation
    arising through the lapse of time. That would in no way remove the parent's
    cause of action, assuming the parent had sued within the limitation period.
    The auditors undertook a separate duty of care owed to the parent to
    safeguard the parent against losses which it would suffer if the duty was not
C   satisfied and it might indeed have suffered loss. Subject to any argument
    about novus actus interveniens, the abandonment by the subsidiary of its
    claim, or its compromise or loss of that claim, would just affect the extent of
    the loss which the parent might be able to show it had suffered.
        132    In discussing the authorities, it is relevant to call attention to what
    I regard as unhelpfully slippery and imprecise language which has been used
    in them. Judges have talked about loss suffered by a shareholder in his
D   personal capacity which "reflects" the loss suffered by a company. This is a
    rather deceptive word. Where the company suffers loss and this affects the
    value of shares in it, there is obviously some relationship between the loss
    suffered by the company and the loss suffered by a shareholder, so that in a
    loose sense it might be said that the latter loss reflects the former. But the loss
    suffered by the shareholder is not *the same as* the loss suffered by the
E   company. There is no necessary, direct correlation between the two. The loss
    suffered by the shareholder does not reflect the loss suffered by the company,
    in the stricter sense of there being a one-to-one correspondence between
    them. These different senses of the word "reflects" have been conflated.
    A similar point may be made about references in the cases to whether the loss
    suffered by the shareholder is "separate and distinct" from the loss suffered by
    the company. In a loose sense of that phrase, it is not; but in a strict sense, it
F   may be.
        133    The reflective loss principle was first identified and relied upon in
    the judgment of the Court of Appeal in *Prudential* in 1981. It is striking that
    this occurred so late in the development of the law, despite the existence of
    joint stock companies for a very long time and the passage of more than 80
    years after the decision of the House of Lords clarifying the position of
G   companies in *Salomon v A Salomon & Co Ltd* [1897] AC 22.
        134    The relevant facts in *Prudential* can be summarised as follows. The
    claimant, Prudential, held 3·2% of the issued ordinary shares in Newman
    Industries ("Newman"), a company whose shares were quoted on the stock
    exchange. Mr Bartlett was the chairman and chief executive of Newman
    and Mr Laughton was a non-executive director and its vice-chairman. They
    were also associated with another company, TPG. Prudential's case was
H   that Mr Bartlett and Mr Laughton conspired to make fraudulent statements
    to the board and shareholders of Newman by means of which they induced
    Newman, acting by its board and by its shareholders voting in general
    meeting (which was required to approve the transaction), to purchase assets
    of TPG at a price higher than their true value; and that by reason of that

© 2020 The Incorporated Council of Law Reporting for England and Wales

294
Marex Financial Ltd v Sevilleja (SC(E))                                    [2020] 3 WLR
Lord Sales JSC

overpayment the value of Newman's shares was reduced.  In fact, however,   A
the market value of shares in Newman had increased after the transaction
(as pointed out by Mr Richard Scott QC, counsel for Mr Bartlett and
Mr Laughton at first instance [1981] Ch 257, 265E) and Prudential had not
pleaded particulars of its loss and did not adduce any evidence to show that
the market value of shares in Newman had been in any way detrimentally
affected by the alleged overpayment (as Mr Scott QC energetically           B
emphasised in his submissions at first instance [1981] Ch 257, 265E–F, 271G,
273A, 273D–F and 285D).  Prudential adduced no expert evidence in relation
to the impact, if any, of the overpayment on the market value of shares in
Newman and no evidence in relation to market expectations regarding the
performance of Newman and whether such expectations were in any way
affected by the overpayment.  Prudential brought a claim against Mr Bartlett
and Mr Laughton in its own capacity as shareholder for damages for the      C
diminution in value of its shares (and also claiming to represent other
shareholders with similar claims), and also sought to bring a derivative
action against them in the name of Newman in respect of the loss which it
suffered in the form of the overpayment for the assets of TPG.  Since proof of
loss was a necessary element of Prudential's cause of action based on
conspiracy, Mr Scott's submission was that Prudential had failed to establish   D
that it had any cause of action of its own against Mr Bartlett and
Mr Laughton.  Mr Caplan QC, counsel for Prudential, made it clear that
Prudential's main objective was to pursue a derivative claim on behalf of
Newman and indicated that if that claim succeeded Prudential would not
be seeking any damages in respect of its own alleged cause of action in
conspiracy [1981] Ch 257, 278H–279C; noted by Vinelott J at p 328C.
Prudential's position on this serves to underline that in respect of its own   E
cause of action it entirely relied on the loss suffered by the company, rather
than seeking to prove any different loss suffered by itself.

135   Vinelott J found at trial that Prudential's case was made out on the
facts and held that Prudential was entitled to sue in its own right for loss
which it maintained it had suffered in respect of the diminution in value of
its shares in Newman and was also entitled to bring a derivative action on   F
behalf of Newman, under the exception to the rule in *Foss v Harbottle*.  As
regards Prudential's own cause of action (and the representative claim it
made on behalf of other shareholders), the judge was prepared to assume
that the overpayment to TPG to acquire the relevant assets had caused a
reduction in the value of shares in Newman, despite the absence of evidence
about whether the overpayment had had any effect on their value [1981]
Ch 257, 302E–303D.  He directed an inquiry as to the amount of the           G
damages.

136   Mr Bartlett and Mr Laughton appealed.  By the time of the hearing
in the Court of Appeal, Mr Scott had ceased to act for them and they
appeared as litigants in person.  The Court of Appeal upheld certain of the
judge's findings of fact to the effect that Mr Bartlett and Mr Laughton had
made fraudulent statements which induced Newman to buy the assets of
TPG at an overvalue (though this was only in the sum of £45,000 rather than   H
£445,000 as had been found by the judge).  However, the court held that
Prudential had no cause of action in its own right, because it was seeking to
recover damages in respect of the loss in value of its shares in Newman on
the basis that Newman had suffered damage, which claim fell foul of the

© 2020 The Incorporated Council of Law Reporting for England and Wales

295
Marex Financial Ltd v Sevilleja (SC(E))
Lord Sales JSC

[2020] 3 WLR

A  reflective loss principle. The court also held that the judge ought to have held a trial of a preliminary issue of whether this was an appropriate case for a derivative action in the name of Newman; however, as the full trial of that claim had taken place and Newman had indicated that it would take the benefit of an order in its favour, in the particular circumstances of the case it was not necessary to determine whether Prudential had been entitled to bring a derivative action.

B  137  Both aspects of the court's judgment are significant for the present discussion. Again, Prudential's main objective was to succeed on the derivative claim, rather than on its own cause of action (referred to as its personal claim). The court was scathing about Prudential's pleadings, which it described as "vague and obscure" and confused [1982] Ch 204, 225–226, and the whole presentation of its case. As a prelude to the relevant part of the court's reasoning on reflective loss, it noted [1982] Ch 204, 222D:
C  "Counsel for the plaintiffs [Mr Caplan QC] agreed before us that no facts are relied upon in support of the personal claim which are not relied upon in support of the derivative claim." Thus, at this stage, Mr Caplan was not seeking to argue in relation to Prudential's personal claim that any finding could be made that Prudential had suffered any loss in the value of its shares in Newman different from the part of Newman's own loss which was proportionate to Prudential's shareholding in Newman. This position no doubt reflected the points made by Mr Scott at first instance, that Newman had not given particulars of any different or distinct loss of its own and had not adduced any evidence about such loss at trial. The Court of Appeal was not prepared to make the assumption which Vinelott J had made regarding different loss suffered by Prudential, in the absence of a properly pleaded case and evidence in support. By reason of Mr Caplan's position at the hearing in the Court of Appeal, there was no need for the court to deal with the point which had been debated at first instance.

138  In view of the importance of the judgment in *Prudential* as the foundation for the reflective loss principle and the adoption of the reasoning in it in *Johnson*, it is necessary to set out the court's reasoning at some length [1982] Ch 204, 222E–224D:

F  "Vinelott J upheld the plaintiffs' personal claim . . . He began with the proposition, which accorded with his findings, that Newman had been induced by fraud to approve an agreement under which Newman paid more (he thought about £445,000 more) than the value of the assets acquired and thus £445,000 more than it needed to pay; therefore Newman's indebtedness to its bankers immediately after the transaction (about £5m) was £445,000 more than it would have been but for the fraud; therefore the fraud caused a reduction in net profits, which must have affected the quoted price of Newman shares; therefore, the plaintiffs suffered some damage in consequence of the conspiracy and that was sufficient to complete the cause of action, the quantum of damages being left to an inquiry.

H  "In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr Bartlett did not dispute, that he and Mr Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if

© 2020 The Incorporated Council of Law Reporting for England and Wales

296
Marex Financial Ltd v Sevilleja (SC(E))                                    [2020] 3 WLR
Lord Sales JSC

A  directors convene a meeting on the basis of a fraudulent circular, a
shareholder will have a right of action to recover any loss which he has
been personally caused in consequence of the fraudulent circular; this
might include the expense of attending the meeting.  But what he cannot
do is to recover damages merely because the company in which he is
interested has suffered damage.  He cannot recover a sum equal to the
diminution in the market value of his shares, or equal to the likely
B  diminution in dividend, because such a 'loss' is merely a reflection of the
loss suffered by the company.  The shareholder does not suffer any
personal loss.  His only 'loss' is through the company, in the diminution in
the value of the net assets of the company, in which he has (say) a 3%
shareholding.  The plaintiff's shares are merely a right of participation in
the company on the terms of the articles of association.  The shares
themselves, his right of participation, are not directly affected by the
C  wrongdoing.  The plaintiff still holds all the shares as his own absolutely
unencumbered property.  The deceit practised upon the plaintiff does not
affect the shares; it merely enables the defendant to rob the company.
A simple illustration will prove the logic of this approach.  Suppose that
the sole asset of a company is a cash box containing £100,000.  The
company has an issued share capital of 100 shares, of which 99 are held
D  by the plaintiff.  The plaintiff holds the key of the cash box.  The
defendant by a fraudulent misrepresentation persuades the plaintiff to
part with the key.  The defendant then robs the company of all its money.
The effect of the fraud and the subsequent robbery, assuming that the
defendant successfully flees with his plunder, is (i) to denude the company
of all its assets; and (ii) to reduce the sale value of the plaintiff's shares
E  from a figure approaching £100,000 to nil.  There are two wrongs, the
deceit practised on the plaintiff and the robbery of the company.  But the
deceit on the plaintiff causes the plaintiff no loss which is separate and
distinct from the loss to the company.  The deceit was merely a step in
the robbery.  The plaintiff obviously cannot recover personally some
£100,000 damages in addition to the £100,000 damages recoverable by
the company.
F    "Counsel for the plaintiffs sought to answer this objection by agreeing
that there cannot be double recovery from the defendants, but suggesting
that the personal action will lie if the company's remedy is for some
reason not pursued.  But how can the failure of the company to pursue its
remedy against the robber entitle the shareholder to recover for himself?
What happens if the robbery takes place in year 1, the shareholder sues in
year 2, and the company makes up its mind in year 3 to pursue its
G  remedy?  Is the shareholder's action stayed, if still on foot?  Supposing
judgment has already been recovered by the shareholder and satisfied,
what then?
     "A personal action could have the most unexpected consequences.  If a
company with assets of £500m and an issued share capital of £50m were
defrauded of £500,000 the effect on dividends and share prices would not
be discernible.  If a company with assets of £10m were defrauded, there
H  would be no effect on share prices until the fraud was discovered; if it
were first reported that the company had been defrauded of £500,000 and
subsequently reported that the company had discovered oil in property
acquired by the company as part of the fraud and later still reported that

© 2020 The Incorporated Council of Law Reporting for England and Wales

297
[2020] 3 WLR                                    Marex Financial Ltd v Sevilleja (SC(E))
                                                                    Lord Sales JSC

A    the initial loss to the company could not have exceeded £50,000, the
effect on share prices would be bewildering and the effect on dividends
would either be negligible or beneficial.
    "The plaintiffs in this action were never concerned to recover in the
personal action. The plaintiffs were only interested in the personal action
as a means of circumventing the rule in *Foss v Harbottle*. The plaintiffs
succeeded. A personal action would subvert the rule in *Foss v Harbottle*

B    and that rule is not merely a tiresome procedural obstacle placed in the
path of a shareholder by a legalistic judiciary. The rule is the consequence
of the fact that a corporation is a separate legal entity. Other consequences
are limited liability and limited rights. The company is liable for its
contracts and torts; the shareholder has no such liability. The company
acquires causes of action for breaches of contract and for torts which
damage the company. No cause of action vests in the shareholder. When

C    the shareholder acquires a share he accepts the fact that the value of his
investment follows the fortunes of the company and that he can only
exercise his influence over the fortunes of the company by the exercise of
his voting rights in general meeting. The law confers on him the right to
ensure that the company observes the limitations of its memorandum of
association and the right to ensure that other shareholders observe the

D    rule, imposed upon them by the articles of association. If it is right that the
law has conferred or should in certain restricted circumstances confer
further rights on a shareholder the scope and consequences of such further
rights require careful consideration. In this case it is neither necessary nor
desirable to draw any general conclusions."

E    **139**  This reasoning of the Court of Appeal was a new departure in
the case. At first instance it appears to have been common ground that
(a) the loss suffered by a shareholder could not simply be equated with a
proportionate part of the loss suffered by the company and (b) in order for
the shareholder to have his own cause of action in tort (where damage was
the gist of the action), it was necessary to show that there had been a
diminution in the value of his shares by reason of the wrongdoing: for

F    Mr Scott's argument on behalf of the defendants, see the references above;
for Mr Caplan's argument for Prudential, see [1981] Ch 257, 265B and
278F–H; and for the judge's ruling that Prudential had made out its claim
that there had been a diminution in the value of its shareholding, which was
not equivalent to a proportionate part of the loss suffered by the company,
see [1981] Ch 257, 302E–303D. Further, by setting out reasoning which

G    seemed to cover every case involving loss by a shareholder and loss by a
company which are related, including those where they are not the same, the
court went further than it needed to do and further than was justified on the
case as presented to it: see para 137 above.

    **140**  As noted above, the rule in *Foss v Harbottle* is to the effect that
where a company has a cause of action, it is for the relevant organs of the
company to decide whether to sue upon it. In the present case, on the facts as
alleged by Marex, the Companies have their own causes of action against

H    Mr Sevilleja in respect of misappropriation of their money by him. Marex
has no right to sue in relation to those causes of action; nor would recovery
by Marex in relation to its cause of action affect the ability of the Companies
to recover the full extent of their losses in relation to their causes of action.

© 2020 The Incorporated Council of Law Reporting for England and Wales

298
**Marex Financial Ltd v Sevilleja (SC(E))**                    [2020] 3 WLR
Lord Sales JSC

There is no great difficulty in answering the questions posed by the Court of    A
Appeal in *Prudential* when this distinction is borne in mind. Since the
Companies are now in liquidation the relevant organ of the Companies is the
liquidator, who is an officer subject to the control of the courts in the BVI. It
is for him to decide whether to prosecute such claims as the Companies may
have against Mr Sevilleja, taking into account the resources available for
that. I see no reason to question the good faith of the present liquidator, who    B
is an insolvency practitioner from a reputable firm. This is not a case in
which the relevant organ of a company is under the control of the wrongdoer
against whom the company has a cause of action, so there is no question of
the exception to the rule in *Foss v Harbottle* being applicable. In the Court
of Appeal, Flaux LJ said, "there is no evidence that there is anything
preventing a claim against Mr Sevilleja by the present or another liquidator
or preventing Marex from taking an assignment of the Companies' claim"    C
[2019] QB 173, para 60.

141    However, Marex does not seek to sue Mr Sevilleja to vindicate the
Companies' causes of action against Mr Sevilleja, but to vindicate what it
maintains are its own causes of action against him comprising the *Lumley v
Gye* claim and the *OBG* claim.

142    The Court of Appeal in *Prudential* regarded the personal claim by    D
Prudential in respect of the diminution in the value of its shares in Newman
as misconceived and an illegitimate attempt to circumvent the rule in *Foss v
Harbottle*. The cause of action relied upon was conspiracy, and no facts were
relied on in support of the personal claim that were not relied on in support
of the derivative claim. Further, as appears from the passage above, the
court's view was that Prudential was never concerned to recover in the
personal action, but was only interested in it as a means of circumventing    E
the rule in *Foss v Harbottle* ([1982] Ch 204, 223H–224A). There was,
therefore, no real focus on the independent nature of the causes of action
which Prudential might have had in its personal capacity. In the final part of
the passage quoted above, I respectfully consider that the court conflated the
rationale for the rule in *Foss v Harbottle* with the rationale for the reflective
loss principle, and assumed as correct what was actually in question
(namely, whether a personal action would in fact subvert the rule in *Foss v    F
Harbottle*); while at the same time the court left open the possibility that the
law might confer further rights on a shareholder. Thus, the court did not
address the possibility that a shareholder might have a personal cause of
action based on intentional infliction of harm by unlawful means as
illustrated by the *OBG* case, which would depend upon the shareholder
establishing additional facts which would not be relevant to the company's
own cause of action (i e that there was deliberate action by the wrongdoer,    G
unlawful as against an intermediate party—the company—but aimed at
inflicting harm on the shareholder).

143    Be that as it may, earlier in the passage quoted the court offered
reasons of a general nature to justify the introduction of the reflective loss
principle. I have already noted that the court went further in its reasoning
than it needed to do, on the case as presented to it by Prudential. There is    H
no report of any argument which led it to do this. Since Mr Caplan for
Prudential had made the concession referred to above and Mr Bartlett and
Mr Laughton were representing themselves, it must be doubted that the
court had the benefit of rigorous argument on this issue. With respect, I do

© 2020 The Incorporated Council of Law Reporting for England and Wales

299
[2020] 3 WLR                                    Marex Financial Ltd v Sevilleja (SC(E))
Lord Sales JSC

A not consider that the court's reasoning is sustainable.  Again, it conflates something which is undoubtedly correct (a shareholder cannot recover damages "merely because the company in which he is interested has suffered damage": of course not, because the mere fact that the company suffers damage does not create a cause of action for the shareholder), with something which is highly questionable (a shareholder "cannot recover a

B sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company.  The shareholder does not suffer any personal loss").

144   In fact, however, the third party defendant's actions may include elements which, in combination with his unlawful action vis-à-vis the company, give rise to a cause of action vested in the shareholder.  That may

C be so if the defendant has acted with the intention of using his unlawful actions vis-à-vis the company to harm the shareholder, so as to give rise to a cause of action vested personally in the shareholder for the tort of intentional infliction of harm by unlawful means as discussed in the *OBG* case [2008] AC 1 (see also *JT Stratford & Son v Lindley* [1965] AC 269, noted by Lord Hoffmann at para 48 in the *OBG* case, regarding the ability

D of a claimant to rely on breaches or threatened breaches by a defendant of contractual duties owed by the defendant to a third party as the relevant unlawful means for the purposes of this tort, if the defendant acted with the requisite intention of harming the claimant).  Furthermore, the shareholder may well have suffered loss as a result of the commission of that tort (particularly in the form of a reduction in the market value of his shares or a

E reduction in dividend payments) which is different from, and does not have a simple one-to-one correspondence with, the loss suffered by the company itself.

145   The reasoning in relation to the cash box example is in my view flawed.  Companies come in many varieties and there are several methodologies for valuing their shares, which may be more or less appropriate in a particular case depending on the context.  The cash box

F example assumes a company which is not trading and has no liabilities, where the market value of the shares is equivalent to the value of the assets in the cash box.  I will return to this example below, but for the purposes of analysis it should be emphasised that this is an unusual scenario.  In the case of a trading company, especially one whose shares are quoted and freely traded on a public exchange, common valuation methodologies for

G shares include application of price/earnings ratios and discounted cashflow models.  What is important for the calculation of value under these methodologies is the future income or profits of the company, not its current net asset position (see Charles Mitchell, "Shareholders' Claims for Reflective Loss" (2004) 120 LQR 457, 475–478).  A company may be predicted to have strong prospects of future income or future profits which may support a high valuation of its shares; and that may be so even though

H its net asset value is relatively low.  Often, the predicted future income or profits of a trading company will reflect a judgment about its capacity to enter into new contracts in the future, which are not yet reflected in its balance sheet.  When a person buys a share in a trading company in the market, he pays both for a capital asset (the share itself, which he can sell

© 2020 The Incorporated Council of Law Reporting for England and Wales

300
Marex Financial Ltd v Sevilleja (SC(E))                                      [2020] 3 WLR
Lord Sales JSC

the next day if he chooses) and for the right to participate in the future    A
commercial performance of the company.

146   In this sense, the Court of Appeal in *Prudential* was right to say
that "When the shareholder acquires a share he accepts the fact that the
value of his investment follows the fortunes of the company", p 224; but in
my view it was wrong to conflate this with the erroneous idea implicit in
the cash box example that the shareholder's interest and the value of his    B
shares is confined to a right to participate in the assets of the company as
they happen to stand at any given point of time.  It is only on this basis that
the court could say in relation to that example that two wrongs were
committed (one against the shareholder and one against the company), yet
the wrong against the shareholder plaintiff "causes the plaintiff no loss
which is separate and distinct from the loss to the company", p 223.  The
court states this proposition as if it is a logical conclusion applicable in all    C
cases, whereas the question whether the shareholder suffers a different loss
of his own is a matter of fact.  In the more typical case, the position may
well be that the shareholder suffers a different loss with reference to the
value of his shares in the company whose assets have been stolen.  (Even if
the company has a claim against the defendant wrongdoer for loss of profits
as well as loss of assets, the recoverable profits which might be awarded as    D
compensation by a court are not necessarily the same as the market's
estimation of future profits which supports the market value of a share in
that company: see in that regard the comments by Waller LJ in *Giles v
Rhind* [2003] Ch 618, para 28).

147   This point has been made in the scholarly literature and later
cases—in particular *Christensen v Scott* [1996] 1 NZLR 273, 280 (NZCA),
per Thomas J, delivering the judgment of the court, and *Gerber* [1997] RPC    E
443, 475 and 479 (per Hobhouse LJ) and 482–483 (per Hutchinson LJ)—as
reviewed in Mitchell 120 LQR 457.  Mitchell rightly criticises the
explanation in *Prudential* as (p 459):

> "an indefensibly narrow view of the value inherent in shares.  No one
> would dispute that shares are valuable because they are contractual rights
> of participation in a company, but it does not follow from this they    F
> have no other value—and if one accepts that shares are also valuable
> as property which generates income and can be sold to others, then one must
> conclude that a shareholder suffers a personal loss when the value of his
> shares or the amount of dividends he receives goes down."

(Joyce Lee Suet Lin, "Barring Recovery for Diminution in Value of Shares on
the Reflective Loss Principle" [2007] CLJ 537, 539–552, also points out that    G
the value of the shares in a company may well be different from the net assets
of the company.)

148   In my view, the Court of Appeal in *Prudential* was right to say that
Prudential had no good cause of action in respect of the diminution in value
of its shares in Newman; but this was for a different, and narrower, reason
than the one it gave.  As explained above, at the hearing in the Court of
Appeal Prudential's only argument was that it was entitled to say that it    H
sustained damage in relation to the value of its shares equivalent to that part
of the loss suffered by Newman which was proportionate to its shareholding
in Newman.  It did not attempt to establish that there had in fact been a fall
in the market value of its shareholding and had adduced no evidence to that

© 2020 The Incorporated Council of Law Reporting for England and Wales

301
[2020] 3 WLR                                    Marex Financial Ltd v Sevilleja (SC(E))
Lord Sales JSC

A   effect. On the case as presented by Prudential, the Court of Appeal was right
to hold that Prudential had failed to show that it had suffered any loss which
was different from the loss suffered by Newman. The distinction drawn by
the court between Prudential's personal claim and the claim a shareholder
might have to recover loss he has personally been caused when acting on his
own behalf in consequence of a fraudulent circular, such as the expense of
B   attending the meeting, is a valid one. By contrast, by reason of the way in
which it presented its personal claim, Prudential had failed to show that it
had suffered any loss in respect of the value of its shareholding and so could
not establish that it had any cause of action. Its attempt to say that it had
suffered loss equivalent to a proportionate share of Newman's loss was
rightly dismissed by the Court of Appeal. That loss, on which Prudential
sought to rely for the purposes of its personal claim, was not loss in respect
C   of which it had any cause of action. The only person with a cause of action
in relation to that loss was the company, Newman.

149   What, then, is to happen in a case where the actions of a third party
defendant constitute two wrongs (one as against the company and one as
against the shareholder) with different loss in each case, so that the company
and the shareholder each have their own distinct fully established cause of
D   action against him?

150   In principle, as mentioned above, if a person has a cause of action
against another he is entitled to bring proceedings to vindicate his rights. He
may proceed as quickly as he chooses and with a view to maximising his
prospects of securing recovery from the defendant. If he is a shareholder
with a personal cause of action, nothing in the articles of association
constitutes a promise by him that he will not act to vindicate his own
E   personal rights against a defendant against whom the company also has its
own cause of action; and there is no other obligation to that effect arising out
of his membership of the company.

151   It is sometimes said that in a case where a wrong is done to the
company which has an impact on the value of its shares, in circumstances
capable of giving rise to independent causes of action for the company and for
F   a shareholder, the shareholder's claim fails for reasons of causation. It is
suggested that the cause of the loss suffered by the shareholder in the form of
diminution in the value of his shares or loss of dividend payments which
would otherwise have been made to him is not the wrong committed by the
defendant wrongdoer, but the decision of the company not to sue to recover
in respect of the loss it has suffered: *Gerber* [1997] RPC 443, 471, per
Hobhouse LJ; *Johnson* [2002] 2 AC 1, 66, per Lord Millett; *Giles v Rhind*
G   [2003] Ch 618, para 78, per Chadwick LJ. In my view, this reasoning cannot
be sustained. As explained above, the loss suffered by the shareholder is not
the same as the loss suffered by the company, and it does not follow that
eventual recovery by the company will have the effect of eliminating the loss
suffered by the shareholder.

152   As Charles Mitchell points out in his article 120 LQR 457, 469–470,
H   the causation argument begs the important question. It presupposes that the
shareholder will suffer a reflective loss when the company decides not to
pursue its remedy, because the shareholder cannot recover this loss for
himself. The argument does not show why the shareholder should be disabled
from claiming in the first place.

© 2020 The Incorporated Council of Law Reporting for England and Wales

302
**Marex Financial Ltd v Sevilleja (SC(E))**                                    [2020] 3 WLR
Lord Sales JSC

A

153   The absence of any necessary correspondence between the loss to a
shareholder and the loss to the company which follows from a wrong done
to the company which also forms part of a parallel wrong done to the
shareholder can be demonstrated in various ways.  Knowledge in the market
that the company had been made a victim of the wrong might have the effect
of undermining market confidence in its management, thereby reducing the
market value of shares in it even if the company made a full recovery of what

B

it had lost.  Further, in other cases, the timing of recovery by the company
may be important.  If a wrong done to the company were instantaneously
and automatically corrected, a shareholder might suffer no diminution in the
value of his shares as a result of that wrong.  But that is not the real world.
The law has to address the real world, not an imaginary one (see e g *Gould v
Vaggelas* (1984) 157 CLR 215, 225, per Gibbs CJ; p 232, per Murphy J;
pp 242 and 244–246, per Wilson J).  In reality, a shareholder may be able to

C

prove that, but for the defendant's wrongful actions which gave rise to
independent causes of action vested in the company and in the shareholder
respectively, he would have been paid a dividend or his shares would have
had a higher value which he could have realised in the market.  It does not
follow that if the company sues to vindicate its rights and is successful years
later in obtaining a judgment against the third party defendant and in
obtaining execution of that judgment that it would, in the changed

D

circumstances then prevailing, choose then to make the same dividend
payment it would have made previously but for the defendant's wrongdoing.
Nor does it follow that the value of the shares held will automatically be
restored to what it would have been previously but for the defendant's
wrongdoing.  The company's prospects, as judged by the market, may be
radically different at the later point in time.  Or the shareholder may already

E

have sold the shares at a price discounted for uncertainty regarding possible
recovery by the company.  In many cases the company's recovery of its loss
will not have the effect of restoring the value of the shares.  Since the
company's recovery may not put the shareholder back in the position he
would have been in but for the defendant's wrongdoing, it cannot be said
that it is the decision of the company whether to sue or not which has a
determinative causative effect in relation to whether the shareholder suffers

F

loss as a result of such wrongdoing.
154   Further and in any event, whether the company decides to sue,
compromise or waive its rights in respect of the cause of action with which it
is vested as a result of the defendant's wrongdoing is res inter alios acta so far
as concerns the entitlement of the shareholder to sue in relation to the
separate cause of action vested in him as a result of that wrongdoing.  The

G

company does not control what the shareholder may do in relation to
vindicating his own cause of action.  He is entitled to sue in relation to his
own cause of action if he thinks he can prove he has suffered a loss.  If the
company makes recovery in respect of its loss, that may have an effect on the
extent of the loss suffered by the shareholder, but may well not eliminate it.
If the company decides to settle its claim for less than its whole value or
decides not to sue, that does not affect the entitlement of the shareholder to

H

sue on his own cause of action in respect of the loss suffered by him as a
result of the defendant's wrongdoing.  As Peter Watts observes in his case
note on *Johnson* in "The Shareholder as Co-promisee" (2001) 117 LQR 388,
391:

© 2020 The Incorporated Council of Law Reporting for England and Wales

A    "It is difficult to see that the firm [Gore Wood, the defendant firm of solicitors which had advised both the company and the shareholder] could be relieved from its obligation to the shareholder by laying the blame for the shareholder's not being indemnified on the company's having settled its claim, an outcome achieved only with the firm's concurrence."

B    In particular, in relation to a claim based on *OBG*, where the defendant has acted with the intention of harming the shareholder claimant and has succeeded, it would be contrary to justice to hold that the claimant cannot sue the defendant in relation to his cause of action just because the company has decided not to pursue its own cause of action. In fact, if the company foregoes recovery in respect of the wrong done to it, the effect may be to make it easier for the shareholder to establish the extent of his loss and to meet another objection to his claim, to which I now turn.

C    155   As a matter of basic justice, the defendant ought not to be liable twice for the same loss, once to a shareholder with a personal claim and again to the company. But in the situation under review the wrongs and also the losses suffered by the claimant shareholder and the company respectively are different. The claimant and the company each have distinct causes of action of their own. The company can recover for its losses, e g depletion of its assets stolen by the defendant and consequential loss of profits. The claimant can recover for diminution in the value of his shares, which is a function of how the market values them, and for loss of dividends he might have received but for the wrong in relation to himself. These losses may have some relationship to the losses suffered by the company, but are not the same as those losses. The loss suffered by the company as a result of theft of its assets may represent a substantial loss of the working capital it needs to generate future profits; and if so, that may have an effect on the value which the market places on shares in the company (but, contrary to what is said to be demonstrated by the cash box example, the loss will be different from that suffered by the shareholder and there is unlikely to be direct correspondence between what the company has lost and the reduction in the value of the shareholder's shares). On the other hand, the loss suffered by the company might be insignificant in terms of any effect on its ability to generate profits in future, in which case the impact on share value might be practically nothing.

G    156   If, after the wrongdoing of the defendant, the company is still trading and the claimant shareholder has not sold his shares, he retains shares of some worth in the market which reflects, among other things, the value of the company's own claims against the defendant. In my view, the claimant would then be entitled to claim damages in respect of the reduced market value of his shares due to the wrong against him committed by the defendant (by the means of or in parallel with his commission of a wrong against the company), i e their market value absent the wrong done to the company (and to the shareholder) less their actual current market value, reflecting among other things the company's claims against the defendant. Accordingly, it can be said that in such a case due allowance in respect of the company's claims against the defendant is reflected in what is recoverable by the claimant. It does not, then, seem to me to be unjust to allow both the

© 2020 The Incorporated Council of Law Reporting for England and Wales

claimant and the company to pursue their separate claims for their different losses against the defendant.

157   In the cash box example given in *Prudential*, in the case of an inert, non-trading company, the market would presumably value each share as equivalent to a proportionate part of the assets of the company, namely the cash in the cash box.  The result would be that the loss suffered by the claimant personally would be directly reduced pound for pound by the company's own claim against the defendant, so there would be no question of the defendant being liable twice over for the same loss (if for some reason the company does not sue, the claimant's loss will not have been reduced and he would be able to pursue his own cause of action: see paras 131 and 154 above).  In more typical situations, the relationship between the company's loss and the claimant's loss will not be direct like this, but due allowance for the company's potential to make recovery for its losses (albeit possibly discounted to a degree to allow for the hazards of litigation) will still be reflected in the calculation of the claimant's loss.

158   One could also envisage a situation in which, after the defendant's wrongdoing, a claimant shareholder decided to sell his shares in the company, and in consequence of that wrongdoing received a lesser price than he otherwise would have done.  In that case the claimant could recover for the crystallised loss he has suffered by way of the diminution in the shares' value due to the wrong committed by the defendant.  Lord Millett appears to have contemplated that this might be so, since in explaining *Stein v Blake* [1998] 1 All ER 724 in *Johnson* [2002] 2 AC 1, 64B he emphasised that the shareholder had not disposed of his shares in the company.  In *Heron International Ltd v Lord Grade* [1983] BCLC 244 the Court of Appeal would have been prepared to distinguish *Prudential* and allow shareholders to sue for damages in a situation where breaches of fiduciary duty by a company's directors caused a diminution in the value of its assets resulting in a reduction in the value of its shares as sold by the shareholders in the market, albeit on the facts this had not occurred and would not occur: see p 262A–H; and see Joyce Lee Suet Lin [2007] CLJ 537, 554.  In this situation, what the claimant has received for his shares by selling them in the market will have reflected the market's view of the value of the company's claims against the defendant (alongside its other assets and its general trading prospects).  The company's claims against the defendant will have been brought into account for the credit of the defendant in this way, to the extent that they are material to valuing the claimant's loss, and it would not be unjust to allow the claimant to recover the full amount of his crystallised loss.  It should not make any difference to the position whether the claimant has sold his shares or has decided to retain them.  (In *Johnson* the House of Lords held that the claimant shareholder was entitled to claim in respect of his loss of a 12·5% shareholding in the company, transferred to a lender as security for a loan which, by reason of his lack of funds attributable to the defendant's wrongdoing, he was unable to redeem: [2002] 2 AC 1, 37A: presumably the value of what the claimant had lost would reflect the value which the relevant market would place upon the company as a company having amongst its assets its own cause of action against the defendant.)

159   Moreover, if there remains a concern about the risk of the defendant being liable twice over by virtue of the relationship between the company's loss and the loss suffered by the claimant shareholder, that has to

*A*

*B*

*C*

*D*

*E*

*F*

*G*

*H*

© 2020 The Incorporated Council of Law Reporting for England and Wales

305
[2020] 3 WLR                        Marex Financial Ltd v Sevilleja (SC(E))
                                              Lord Sales JSC

A    be balanced against a concern that if one excludes the liability of the
defendant to the claimant, then the claimant may well be undercompensated
in respect of a real and different loss which he has suffered as a result of the
defendant's wrong against him. The claimant would have to prove on the
balance of probabilities that he has indeed suffered a loss which is different
from the loss suffered by the company. If he can do so, then given the choice
B    between ensuring that the claimant is fully compensated for the wrong done
to him and eliminating any risk that the defendant might have to pay
excessive compensation, I consider that the choice should be in favour of
giving priority to protecting the interests of the innocent claimant rather
than to giving priority to protecting the interests of the wrongdoing
defendant. Compare Watts's case note on *Johnson* 117 LQR 388, 390:
C    referring to a case where a defendant has given the same promise of
performance to the company and the shareholder, he says "If, as a fact, a
promisor has undertaken obligations which might contemplate its having a
double liability upon default, it is not plain that the law should be unduly
concerned"; and Joyce Lee Suet Lin [2007] CLJ 537, 556 makes the same
point. In the context of a claim based on *OBG* (and also, in the context of a
claim by a creditor of the company, as discussed below, based on *Lumley v
Gye*) the wrongdoer has likewise engaged in deliberate conduct which
D    engages the right of the claimant shareholder to sue him alongside any right
of action the company might have.
     160   In some cases, the relationship between the loss suffered by the
company and the loss suffered by the claimant shareholder may be more
direct. Perhaps the cash stolen in the cash box example was being
earmarked by the company for payment of a dividend to shareholders, and
E    in stealing it the defendant had the requisite intention to harm the claimant
shareholder (as required for an *OBG*-type claim by him) by depriving him of
his share of the dividend. Two points may be made about this. First, it
would still be the case that the claimant has a distinct cause of action against
the defendant in respect of losses suffered personally by him, assessed by
reference to what would have happened if the defendant had committed no
wrong. The claimant's case would be that if the cash had remained in the
F    cash box, the company would in fact have chosen to distribute it by way of
payment of a dividend. The fact that the company, when actually faced with
the loss of the cash, might decide not to pursue its own cause of action
against the defendant does not undermine that case; and if the company so
decides, any concern regarding double liability of the defendant is thereby
removed. Even if the company decided to pursue its own claim as well, that
G    would not necessarily undermine the claimant's case either. If and when the
company makes recovery for its loss, circumstances will be different and it
may be that the company will not at that stage decide to use the money so
recovered to make any dividend payment. So the claimant will again have
suffered a real loss which would not be eliminated by the award of a remedy
to the company.
     161   Secondly, the court can take steps to manage the coincidence of
H    claims by the claimant and by the company by procedural means. For
instance, it could, if it were thought necessary, direct the claimant to give the
company notice of the claim he is bringing against the defendant so that the
company can choose to join in the proceedings and bring its own claim if it
wants to. The court could then work through the interaction of the two

© 2020 The Incorporated Council of Law Reporting for England and Wales

306
Marex Financial Ltd v Sevilleja (SC(E))                                      [2020] 3 WLR
Lord Sales JSC

A   claims, in so far as there is found to be any concrete and relevant relationship
between them, in a pragmatic way with full information as the proceedings
progress. For example, if it became clear that the company would recover in
the proceedings the money stolen from the cash box and would use it to
make a belated dividend payment, as it had intended to do previously, the
claimant's own loss might be reduced to the value to be ascribed to being
deprived of the money for a period of time, rather than altogether.
B   Alternatively, if the money recovered by the company was going to be
retained by it, the claimant would have to give credit for any increase in the
market value of his shares attributable to the fact that the company's assets
will have been swelled to that extent. This is an aspect of working out the
application of the principle of compensation in the light of what is known by
the time of the judicial decision: cf *Golden Strait Corpn v Nippon Yusen
Kubishika Kaisha (The Golden Victory)* [2007] 2 AC 353; *Gould v Vaggelas*
C   157 CLR 215, in particular at pp 254–255, per Brennan J.
   **162**   Courts considering the issue prior to the decision in *Johnson*
considered that procedural ways of managing the coincidence of claims
would generally be possible (even if not available in every case) and
appropriate: *Christensen v Scott* [1996] 1 NZLR 273, 281; *Barings* [1997]
1 BCLC 427, 435; see also Mitchell 120 LQR 457, 465; and Joyce Lee Suet
D   Lin [2007] CLJ 537, 554–555. Similarly, at first instance in *Prudential*,
Vinelott J (who, unlike the Court of Appeal, was confronted with the
argument that there would be situations in which a shareholder had a cause
of action and suffered a loss different from that suffered by the company)
proposed as a procedural solution that the company might be joined as a
defendant in such cases: [1981] Ch 257, 328B–E. If the company is joined as
E   a party and does not advance its own claim at trial, it may be estopped from
doing so in later proceedings. On the other hand, if the company does wish
to pursue its claim, it may be beneficial in case management terms to allow
the company's claim to be tried first or at the same time as the shareholder's
claim, since then the extent of the company's recovery can be brought into
account when valuing the loss suffered by the shareholder claimant.
F   A procedural approach allows for nuanced adjustment of the vindication of
parallel claims in the light of all relevant evidence about the circumstances
regarding the interests of the company and the shareholder. The court can
ensure that there is no double recovery and that the shareholder by his action
does not deprive the company of sums properly due to it. The decision of the
High Court of Australia in *Gould v Vaggelas*, discussed below, provides an
example of how a court can work through the practical implications where a
G   company and its shareholders both have claims against the same defendant
and where the liquidator of the company fails to take steps to vindicate its
claim against the defendant.
   **163**   Similarly, in *In re Gerald Cooper Chemicals Ltd* [1978] Ch 262,
Templeman J envisaged that a procedural solution would be appropriate for
managing the coincidence of claims in respect of carrying on the business of
a company with intent to defraud creditors, in contravention of section 332
of the Companies Act 1948 (see now sections 213 and 214 of the Insolvency
H   Act 1986), available both to the liquidator of the company and to a
supplier/creditor dealing with it, as against persons involved in carrying on
its business: pp 268–269. To avoid the defendants being placed in double
jeopardy for the loss, the liquidator was to be informed of a claim brought

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10212

307
[2020] 3 WLR                           Marex Financial Ltd v Sevilleja (SC(E))
                                                        Lord Sales JSC

A   by the supplier/creditor to allow the liquidator the option of bringing a
    claim himself. In reviewing the statutory insolvency regime and making
    recommendations, the Cork Committee emphasised the desirability of
    flexibility for courts with regard to beneficiaries in relation to awards in
    respect of what are now sections 213 and 214 of the 1986 Act, in view of the
    diversity of situations which can arise: *Insolvency Law and Practice*, Report
    of the Review Committee (1982) (Cmnd 8558), para 1797.

B       164   A focus on procedural solutions also emerges in the decision of the
    Court of Appeal of Singapore in *Townsing v Jenton Overseas Investment Pte
    Ltd* [2008] 1 LRC 231. This concerned a misapplication of funds of a
    company by its director in breach of his fiduciary duty owed to the company
    and also in breach of duty which he owed directly to the shareholder owner
    of that company. The shareholder sued the director for loss which it had
C   suffered as a result of the wrong done to it, claiming that the loss was
    equivalent to the amount of the funds of the company which had been
    misapplied. Thus in its action, much as happened in the *Prudential* case in
    the Court of Appeal, the shareholder simply equated the loss it suffered with
    the loss suffered by the company and made no attempt to identify a different
    loss: para 29. The court's judgment has to be read with this in mind. In
D   these circumstances the court decided that the reflective loss principle
    accepted in *Johnson* should apply in Singapore, in preference to the position
    set out in *Christensen v Scott*: paras 77–79. This was on the basis that (in
    light of the way in which the shareholder presented its claim and following
    Lord Millett in *Johnson* [2002] AC 1, 66–67) there was a unity of the
    economic interests of a shareholder and his company; that the "no reflective
E   loss" rule is a variant of the proper plaintiff rule in *Foss v Harbottle*; and that
    it protects against the risk of double recovery and prejudice to the creditors
    and shareholders of the company. In my opinion, for reasons set out above,
    the unity of interests point and the "proper plaintiff" point do not support
    the reflective loss principle, in so far as it is sought to be applied in relation to
    a different loss suffered by a shareholder in relation to which he has his own
    cause of action. As to protection against the risk of double recovery and
F   prejudice to shareholders and creditors, the court recognised that these
    points could be met by procedural means, such as by the shareholder
    obtaining an undertaking from the liquidator of the company that it would
    not sue on the wrong done to it: paras 85–86. At para 85 the court also
    noted with approval that in *Christensen* "the court was prepared to deal
    with the problem of double recovery in several ways, such as staying one
    proceeding or staying execution against one or other of the parties". Since
G   the appellant director had not pleaded the reflective loss principle as a
    defence to a claim by the shareholder, he had deprived the shareholder of
    procedural opportunities of this kind by which it might have met such a
    defence and he was not permitted to introduce the plea for the first time on
    the appeal. The reflective loss principle was not treated as a rule of law
    which had the effect of stipulating that the shareholder could not be
    regarded as suffering any loss at all.
H       165   Are there any reasons of public policy why the shareholder's cause
    of action should be eliminated altogether in order to ensure priority for the
    company's claim? Lord Reed PSC says (para 38), with reference to the
    speech of Lord Hutton in *Johnson*, that there are pragmatic advantages
    which justify having a rule of law that a shareholder cannot sue to recover

308
**Marex Financial Ltd v Sevilleja (SC(E))**                           [2020] 3 WLR
Lord Sales JSC

his own loss.  However, as I set out below, none of the other law lords in
*Johnson* agreed with Lord Hutton.  In my view, there are no sound reasons
why the shareholder's personal cause of action should be eliminated in this
way.  The cause of action is personal, so there is no reason why it should be
subjected to the collective decision-making procedures which apply when
the company decides what to do in relation to any cause of action it may
have.  The shareholder's cause of action falls outside the rule in *Foss v
Harbottle*.  To say he is to be denied being able to vindicate his own cause of
action by reason of his position as shareholder in the company seems to me
to erode the principle of the separate legal personality of the company
established in the *Salomon* case without good justification.

166    There is no question of the shareholder being entitled to recover
damages due to the company in respect of the company's own cause of
action and in that way reducing the assets of the company which are
available for paying its creditors or distributing to its shareholders.  It is,
however, possible that if the claimant shareholder sues to vindicate his
personal cause of action and succeeds in making recovery from the
defendant wrongdoer, that may so diminish the defendant's fund of assets
that when the company sues to vindicate its cause of action against him, it is
unable to make full recovery in respect of its claim.  That may mean that the
company's shareholders and creditors lose out.  But in my view, this is not a
reason to prevent the claimant shareholder from recovering in respect of his
cause of action.  As observed above, he owes no duty to the company, its
creditors or the other shareholders to hold off from seeking to vindicate his
own rights.  The risk that those other persons might suffer if he acts to
vindicate his rights is simply a risk inherent in the general situation where
a defendant has liabilities owed to different persons.  The shareholder is
exposed to the same risk in reverse, if the company obtains judgment and
execution before the shareholder vindicates his rights.  Moreover, these
types of risk can be managed by procedural means and also fall to be
addressed by the law of insolvency, so there is no sound basis for recognition
of a principle of reflective loss on these grounds.  There is also no good
reason of public policy why a shareholder's personal right of action should
be deprived of effect in order to protect the wrongdoing defendant: see
para 159 above.

167    It is true that adoption of the rule of law identified by Lord
Reed PSC and Lord Hodge DPSC would eliminate the need for debate about
the interaction of the company's cause of action and the shareholder's cause
of action, and in that way would reduce complexity.  Bright line rules have
that effect.  But the rule only achieves this by deeming that the shareholder
has suffered no loss, when in fact he has, and deeming that the shareholder
does not have a cause of action, when according to ordinary common law
principles he should have.  In my respectful opinion, the rule would therefore
produce simplicity at the cost of working serious injustice in relation to a
shareholder who (apart from the rule) has a good cause of action and has
suffered loss which is real and is different from any loss suffered by the
company.  Common law courts are used to working through complex
situations in nuanced and pragmatic ways, to achieve practical justice.  In
my opinion, the fact that the interaction between the company's cause of
action in respect of its loss and the shareholder's cause of action in respect of
his own loss gives rise to complexity is more a reason for *not* adopting a

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10214

309
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                         Lord Sales JSC

A    crude bright line rule which will inevitably produce injustice, and requiring
     instead that the position be fully explored case by case in the light of all the
     facts, with the benefit of expert evidence in relation to valuation of shares
     and with due sensitivity to the procedural options which are available.

     **168**   In *Christensen v Scott* [1996] 1 NZLR 273 the New Zealand Court
     of Appeal, sitting as a five-judge court, declined to apply the reflective loss
B    principle.  The defendants were chartered accountants and solicitors who
     acted for the claimants personally in advising them on channelling their
     assets into a company taking a lease of farmland.  The defendants came to
     act for the company as well.  The claimants alleged that negligence on the
     part of the defendants meant that the consent of the landlord's mortgagees
     was not obtained, nor was a caveat registered against the title.  Consequently
     the land was lost and the company failed.  The company's claim against the
C    defendants was settled by the liquidator for a sum alleged by the plaintiffs to
     be totally inadequate.  The Court of Appeal held that the personal claims of
     the claimants should not be struck out before trial.  Thomas J, giving the
     judgment of the court, said at pp 280–281:

          "We do not need to enter upon a close examination of the [*Prudential*]
D         decision.  It has attracted not insignificant and, at times, critical comment.
          See eg *Gower's Principles of Modern Company Law*, 5th ed (1992),
          pp 647–653; LS Sealy, 'Problems of Standing, Pleading and Proof in
          Corporate Litigation' [in *Company Law in Change*, ed BG Pettit], p 1, esp
          pp 6–10; and MJ Sterling, 'The Theory and Policy of Shareholder Actions
          in Tort' (1987) 50 MLR 468, esp pp 470–474.  It may be accepted that the
          Court of Appeal was correct, however, in concluding that a member has
E         no right to sue directly in respect of a breach of duty owed to the company
          or in respect of a tort committed against the company.  Such claims can
          only be brought by the company itself or by a member in a derivative
          action under an exception to the rule in *Foss v Harbottle* (1843) 2 Hare
          461.  But this is not necessarily to exclude a claim brought by a party, who
          may also be a member, to whom a separate duty is owed and who suffers
          a personal loss as a result of a breach of that duty.  Where such a party,
F         irrespective that he or she is a member, has personal rights and these
          rights are invaded, the rule in *Foss v Harbottle* is irrelevant.  Nor would
          the claim necessarily have the calamitous consequences predicted by
          counsel in respect of the concept of corporate personality and limited
          liability.  The loss arises not from a breach of the duty owed to the
          company but from a breach of duty owed to the individuals.  The
          individual is simply suing to vindicate his own right or redress a wrong
G         done to him or her giving rise to a personal loss.

          "We consider, therefore, that it is certainly arguable that, where there
          is an independent duty owed to the plaintiff and a breach of that duty
          occurs, the resulting loss may be recovered by the plaintiff.  The fact that
          the loss may also be suffered by the company does not mean that it is not
          also a personal loss to the individual.  Indeed, the diminution in the
          value of Mr and Mrs Christensen's shares in the company is by definition
H         a personal loss and not a corporate loss.  The loss suffered by the
          company is the loss of the lease and the profit which would have been
          obtained from harvesting the potato crop.  That loss is reflected in the
          diminution in the value of Mr and Mrs Christensen's shares.  They can

© 2020 The Incorporated Council of Law Reporting for England and Wales

310
Marex Financial Ltd v Sevilleja (SC(E))                                    [2020] 3 WLR
Lord Sales JSC

no longer realise their shares at the value they enjoyed prior to the
alleged default of their accountants and solicitors.  (For a discussion of
the policy issues which arise in considering these questions, see Sterling,
at pp 474–491.)

"In circumstances of this kind the possibility that the company and the
member may seek to hold the same party liable for the same loss may pose
a difficulty.  Double recovery, of course, cannot be permitted.  The
problem does not arise in this case, however, as the company has
chosen to settle its claim.  Peat Marwick and McCaw Lewis accepted a
compromise in the knowledge that Mr and Mrs Christensen's claim was
outstanding.  It may well be, as was acknowledged by Mr Pidgeon in
the course of argument, that an allowance will need to be made for the
amount already paid to the liquidator in settlement of the company's
claim.

"It is to be acknowledged, however, that the problem of double
recovery may well arise in other cases.  No doubt, such a possibility is
most likely with smaller private companies where the interrelationship
between the company, the directors and the shareholders may give rise to
independent duties on the part of the professional advisers involved.  But
the situation where one defendant owes a duty to two persons who suffer
a common loss is not unknown in the law, and it will need to be examined
in this context.  It may be found that there is no necessary reason why the
company's loss should take precedence over the loss of the individuals
who are owed a separate duty of care.  To meet the problem of double
recovery in such circumstances it will be necessary to evolve principles to
determine which party or parties will be able to seek or obtain recovery.
A stay of one proceeding may be required.  Judgment, with a stay of
execution against one or other of the parties, may be in order.  An
obligation to account in whole or in part may be appropriate.  The
interest of creditors who may benefit if one party recovers and not the
other may require consideration.  As the problem of double recovery does
not arise in this case, however, it is preferable to leave an examination of
these issues to a case where that problem is squarely in point.

"Essentially, Mr and Mrs Christensen are alleging that as a result
of Peat Marwick and McCaw Lewis's breach of duty owed to them
personally they suffered a personal loss, that is, a reduction in the value of
their assets.  Their assets in this case had been channelled into their
company.  Thus, it is arguable that the diminution in the value of their
shareholding is the measure of that loss.  It may well be that when the
evidence is heard it will be apparent that Mr and Mrs Christensen's claim
is inflated, but that is a matter for the trial.

"We are not prepared to hold at this stage that they do not have an
arguable case to recover damages for the breach of an acknowledged
duty."

169   It will be clear from what I have said about *Prudential* [1982] Ch
204 that I consider that there is considerable force in this reasoning.  The
law as stated in *Christensen v Scott* [1996] 1 NZLR 273 was in substance
affirmed by Leggatt LJ in *Barings* [1997] 1 BCLC 427, 435.  That case was
concerned with negligence of auditors in relation to the audit of a subsidiary
company, in relation to which they were alleged to owe a similar duty of care

© 2020 The Incorporated Council of Law Reporting for England and Wales

311
[2020] 3 WLR                                Marex Financial Ltd v Sevilleja (SC(E))
                                                              Lord Sales JSC

A   to both that company and its ultimate parent company.  The Court of Appeal
    held that the parent company's claim against the auditors was an arguable
    claim fit for service out of the jurisdiction and that the *Prudential* case
    provided no answer to it.

        170   I find the decision of the High Court of Australia in *Gould v
    Vaggelas* 157 CLR 215 helpful in relation to the issues which arise on this
    appeal.  That case concerned the purchase by a company of a holiday resort
B   business as a result of fraudulent representations by the vendors regarding its
    trading history and prospects made to the claimant shareholders/controllers
    of the company.  Induced by those fraudulent representations, the claimant
    shareholders entered into transactions which had the practical effect that
    they lent the company $733,212·12 to enable it to pay part of the purchase
    price to the vendors; they also mortgaged certain properties of theirs to the
C   vendors and provided the vendors with personal guarantees in respect of
    outstanding parts of the purchase price which were to be paid by the
    company over a period of time after completion.  Later, as the business
    faltered, the claimant shareholders lent the company further sums to enable
    it to continue trading.  It was found by the trial judge and by a majority in the
    High Court that the claimant shareholders acted reasonably and without
D   knowledge of the fraud when providing this further lending to support the
    business.  The business eventually failed, the mortgaged properties were lost
    and the claimant shareholders incurred a substantial liability under their
    personal guarantees.  The company did not repay them the sums they had
    lent it.  The claimant shareholders came to realise that they had been
    deceived.  In their own right they sued the vendors in deceit, claiming as
    damages the original sum lent to the company for the purchase, the further
E   sums lent by them to support its continued trading, the value of the securities
    lost by reason of the failure of the company to repay the bank lending and
    the amount they had to pay under the guarantees they had given.  The
    liquidator of the company, which had its own right of action against the
    defendants in deceit for being induced to purchase the business, for want of
    resources originally chose not to commence proceedings against the
    defendants and only issued a claim against them after the decision at first
F   instance on the claimant shareholders' claim.

        171   The trial judge awarded the claimant shareholders the damages
    claimed by them.  His decision was overturned by the full court on appeal as
    regards the damages claimed, but on further appeal to the High Court his
    decision was upheld by a majority.  The losses suffered by the claimant
    shareholders in providing the company with funds to acquire the business
G   and to keep it trading were recoverable even though the company had its
    own claim against the vendors in respect of the price it paid (using the funds
    provided by the shareholders) and the sums it spent (using funds provided by
    the shareholders) to keep the business going.  The approach of the majority
    in the full court to identify the claimant shareholders with the company was
    disapproved: see pp 240–241, 256–257 and 264.  The shareholders had
    suffered personal losses in respect of which they were entitled to damages
H   from the vendors notwithstanding that the company had its own parallel
    claim against the vendors.

        172   Although the *Prudential* case was referred to, only Dawson J in a
    minority opinion and without any critical examination of the reasoning in
    the case thought that the claimant shareholders' claim should be excluded by

© 2020 The Incorporated Council of Law Reporting for England and Wales

312
Marex Financial Ltd v Sevilleja (SC(E))                     [2020] 3 WLR
Lord Sales JSC

reason of the reflective loss principle: pp 269–270.  On the other hand,      A
Gibbs CJ (p 220), Murphy J (pp 231–232), Wilson J (pp 245–246) and
Brennan J (p 253) all treated *Prudential* as distinguishable, because the
claimant shareholders sued in their personal capacity for losses suffered
by them by spending their own resources in reliance on the fraudulent
representations made to them, and not on behalf of the company in respect
of its loss.  This is in line with my own view regarding the *Prudential*      B
decision: para 148 above.  Although on the facts the company was funded by
debt rather than equity (other than to a negligible extent), according to the
reasoning by the majority I do not think that it would have made any
difference to the right of recovery of the claimant shareholders if they had
been induced to fund the company's purchase and continued trading by
subscribing for shares in it rather than lending it money.  That is the view
taken in *Spencer Bower & Handley, Actionable Misrepresentation*, 5th ed     C
(2014), para 12.26: it is pointed out that issues of double recovery can be
addressed by treating the defendant as subrogated to the shareholders' rights
to the extent that the defendant satisfies a judgment which they obtain
against him, in a manner similar to the solution proposed in the case of a
creditor in *Gould v Vaggelas* itself (see below).

173   The majority recognised that in principle the claimant             D
shareholders had to bring into account as a credit the value of their rights
against the company as shareholders and creditors, but on the facts the
company's only value and only means of repaying them depended on its
vindicating its own claim against the vendors, which in view of the conduct
of the liquidator and as events had transpired had to be treated as nil.
See pp 226–229 per Gibbs CJ (focusing on the rights of the claimant           E
shareholders as creditors of the company); p 232 per Murphy J (referring
both to the value of the shareholders' shares and of their rights as creditors
of the company); p 246 per Wilson J (focusing on their rights as creditors,
but to be assessed at an earlier point in time when he considered they
became aware of the fraud); pp 254–258 per Brennan J (focusing on their
rights as creditors).

*Johnson v Gore Wood*                                                          F

174   However, the leading English authority is now the decision of the
House of Lords in *Johnson* [2002] 2 AC 1.  The case is primarily concerned
with other issues, of abuse of process and estoppel by convention.  It appears
that there was only comparatively limited argument about the reflective loss
principle and it seems that it was not suggested that *Prudential* was wrongly   G
decided by reference to that principle, only that it was distinguishable.
A difficulty with the case is that the law lords produced separate speeches in
which the reasoning on the subject of reflective loss is materially different.
Although on various other issues which arose in the case (including on the
question of abuse of process, on which the case is the leading authority)
agreement was expressed with the reasoning of Lord Bingham, no member
of the appellate committee expressed agreement with his reasoning in         H
relation to the issue of reflective loss.  Lord Bingham and Lord Millett, in
their separate speeches, accepted the approach and reasoning in *Prudential*
without question.  However, there was in fact no agreement between them
on the reasoning applicable in relation to the reflective loss issue, nor any

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10218

313

[2020] 3 WLR            Marex Financial Ltd v Sevilleja (SC(E))
                                          Lord Sales JSC

A    majority for any particular analysis. Therefore, I do not think that the case can be regarded as authority for the special rule of law identified by Lord Reed PSC and Lord Hodge DPSC. It is necessary to examine the relevant reasoning in the separate speeches on its merits in each case to determine what weight it should be given. The one point on which at least four of the law lords were agreed (and Lord Bingham as well, as I read his speech) was that the issues of double recoverability and prejudice to creditors were
B    relevant factors driving the application of the reflective loss principle: see para 119 above. For present purposes the facts can be summarised as follows.

     175   The claimant, Mr Johnson, was a businessman who conducted certain of his business affairs through a company, W Ltd, in which he held all but two of the shares. On behalf of W Ltd he instructed the defendant firm
C    of solicitors, GW, in connection with the purchase of land for development. W Ltd had an option to purchase the land, and GW were instructed to serve a notice exercising the option. Service of the notice was followed by a dispute as to its validity and consequent legal proceedings which resulted in an order for specific performance against the vendor. The need for legal proceedings meant there was a long delay before completion of the
D    conveyance and the property market collapsed in the interim, with the result that W Ltd suffered a loss of profit on its development project; W Ltd also suffered the loss of legal expenses from having to litigate in a lengthy trial against the vendor, who was legally aided. W Ltd claimed against GW that they had breached a duty of care owed to W Ltd to ensure that the notice to exercise the option was served in such a way as to avoid argument regarding its validity. Mr Johnson also alleged in correspondence that GW owed him
E    personally a duty of care to like effect and intimated that he would in due course claim to recover damages. W Ltd commenced proceedings, but for particular reasons Mr Johnson held off bringing his own claim at the same time. GW settled W Ltd's claim. After that, Mr Johnson commenced his personal claim against them. GW applied to strike out his claim on grounds of abuse of process and in reliance on the reflective loss principle. The House
F    of Lords held that Mr Johnson had committed no abuse of process. By application of the reflective loss principle it struck out certain heads of damages claimed by Mr Johnson, but allowed his claim to proceed in relation to other heads of claim.

     176   Lord Bingham addressed the reflective loss principle at [2002] 2 AC 1, 35–37. After the passage quoted by Lord Reed PSC at para 41 above, Lord Bingham continued:
G
     "These principles do not resolve the crucial decision which a court must make on a strike-out application, whether on the facts pleaded a shareholder's claim is sustainable in principle, nor the decision which the trial court must make, whether on the facts proved the shareholder's claim should be upheld. On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are
H    not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the

© 2020 The Incorporated Council of Law Reporting for England and Wales

314
Marex Financial Ltd v Sevilleja (SC(E))                              [2020] 3 WLR
Lord Sales JSC

strike-out stage and all the proven facts at the trial stage: the object is to    A
ascertain whether the loss claimed appears to be or is one which would be
made good if the company had enforced its full rights against the party
responsible, and whether (to use the language of [*Prudential*] [1982] Ch
204, 223) the loss claimed is 'merely a reflection of the loss suffered by
the company'.  In some cases the answer will be clear, as where the          B
shareholder claims the loss of dividend or a diminution in the value of a
shareholding attributable solely to depletion of the company's assets, or a
loss unrelated to the business of the company.  In other cases, inevitably,
a finer judgment will be called for.  At the strike-out stage any reasonable
doubt must be resolved in favour of the claimant.
    "I turn to consider the heads of claim now pleaded by Mr Johnson.
(1) Collector Piece Video Ltd and Adfocus Ltd.  The claim is for sums         C
which Mr Johnson, acting on GW's advice, invested in these companies
and lost.  This claim is unobjectionable in principle, as Mr Steinfeld came
close to accepting.  (2) Cost of personal borrowings: loan capital and
interest.  The claim is for sums which Mr Johnson claims he was obliged
to borrow at punitive rates of interest to fund his personal outgoings and
those of his businesses.  Both the ingredients and the quantum of this       D
claim will call for close examination, among other things to be sure that it
is not a disguised claim for loss of dividend, but it cannot at this stage be
struck out as bad on its face.  The same is true of Mr Johnson's claims for
bank interest and charges and mortgage charges and interest (which will
raise obvious questions of remoteness).  (3) Diminution in value of
Mr Johnson's pension and majority shareholding in WWH.  In part this          E
claim relates to payments which the company would have made into a
pension fund for Mr Johnson: I think it plain that this claim is merely a
reflection of the company's loss and I would strike it out.  In part the
claim relates to enhancement of the value of Mr Johnson's pension if the
payments had been duly made.  I do not regard this part of the claim as
objectionable in principle.  An alternative claim, based on the supposition
that the company would not have made the pension payments, that its          F
assets would thereby have been increased and that the value of
Mr Johnson's shareholding would thereby have been enhanced, is also a
reflection of the company's loss and I would strike it out.  (4) Loss of
12·5% of Mr Johnson's shareholding in WWH.  Mr Johnson claims that
he transferred these shares to a lender as security for a loan and that
because of his lack of funds, caused by GW's breach of duty, he was
unable to buy them back.  This claim is not in my view objectionable in      G
principle.  (5) Additional tax liability.  If proved, this is a personal loss and
I would not strike it out."

    **177**  With respect to Lord Bingham, he takes the reasoning of the
Court of Appeal in *Prudential* to be correct without subjecting it to
critical examination.  The authorities the effect of which he summarises
essentially did the same, save for *Christensen v Scott* and *Barings*.  In my    H
view, following as they do the reasoning in *Prudential*, Lord Bingham's
propositions inaccurately equate the loss suffered by a company and the loss
in the value of its shares (or from non-payment of a dividend) suffered by a
shareholder.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A   **178**   Lord Goff agreed with the analysis of Lord Millett on this part of the case.  In my view, the reasoning of Lord Millett again assumes, without questioning it, that the reasoning in *Prudential* is correct and he inaccurately equates the loss suffered by a company and the loss suffered by the shareholder.  Lord Millett's discussion of the reflective loss principle begins by noting that a company's cause of action is its property for it to decide what to do with, that shares in a company are the property of the shareholder, "and if he suffers loss as a result of an actionable wrong done to
B   him, then prima facie he alone can sue and the company cannot" [2002] 2 AC 1, 61–62.  He goes on at p 62:

C   "On the other hand, although a share is an identifiable piece of property which belongs to the shareholder and has an ascertainable value, it also represents a proportionate part of the company's net assets, and if these are depleted the diminution in its assets will be reflected in the diminution in the value of the shares.  The correspondence may not be exact, especially in the case of a company whose shares are publicly traded, since their value depends on market sentiment.  But in the case of a small private company like this company, the correspondence is exact."

D   **179**   Lord Millett's comment regarding a company whose shares are publicly traded recognises that, contrary to the suggestion in *Prudential*, there is no necessary correspondence between the value of shares in the hands of a shareholder and the value of the company's assets.  However, he did not subject the reasoning in *Prudential* to critical examination in the light of this.  His comment regarding the correspondence between the value of shares in a small private company and its net assets reflects the reasoning
E   in the *Prudential* case.  This is made clear a little further on, when Lord Millett sets out the passage in that judgment dealing with the cash box example [2002] 2 AC 1, 62–63.  This is fundamental to Lord Millett's whole approach in his speech.  As stated above, however, I do not consider that this reasoning can be supported.  When it is appreciated that a shareholder has his own cause of action in respect of a loss which is not identical with the loss
F   suffered by the company, as a matter of principle it is not possible to treat the shareholder's cause of action as something eliminated by virtue of the fact that the company has its own cause of action in respect of loss which it suffers.

    **180**   Lord Millett points out that the problem of corresponding loss which he postulated causes no difficulty if the company has a cause of action in respect of that loss, but the shareholder does not; or if the shareholder has
G   a cause of action in respect of it, but the company does not [2002] 2 AC 1, 62B–D.  He continues, at p 62D–F:

    "The position is, however, different where the company suffers loss caused by the breach of a duty owed both to the company and to the shareholder.  In such a case the shareholder's loss, in so far as this is measured by the diminution in value of his shareholding or the loss of dividends, merely reflects the loss suffered by the company in respect of
H   which the company has its own cause of action.  If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders.

© 2020 The Incorporated Council of Law Reporting for England and Wales

316
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Sales JSC

> Neither course can be permitted.  This is a matter of principle; there is no                    A
> discretion involved.  Justice to the defendant requires the exclusion of one
> claim or the other; protection of the interests of the company's creditors
> requires that it is the company which is allowed to recover to the
> exclusion of the shareholder."

This reasoning is predicated on the loss suffered by the company and the loss
suffered by the shareholder being identical, as is also made clear by his                          B
citation of the cash box example in *Prudential* as the principal authority in
support of his statement of principle [2002] 2 AC 1, 62G–63D.  In my
respectful opinion, that is a false premise.

181    The same false premise is evident again in Lord Millett's treatment
of his own previous judgment in *Stein v Blake* [1998] 1 All ER 724.  The case
concerned the misappropriation of assets belonging to certain companies                            C
("the old companies") by a director, where the claimant shareholder alleged
that the director also owed a duty to him personally and that he had suffered
loss.  The Court of Appeal affirmed the decision that the claim should be
struck out.  Lord Millett explained [2002] 2 AC 1, 64A–D:

> "The problem [for the plaintiff] was that the only conduct relied upon                           D
> as constituting a breach of that duty was the misappropriation of assets
> belonging to the old companies, so that the only loss suffered by the
> plaintiff consisted of the diminution in the value of his shareholding
> which reflected the depletion of the assets of the old companies.  The old
> companies had their own cause of action to recover their loss, and the
> plaintiff's own loss would be fully remedied by the restitution to the
> companies of the value of the misappropriated assets.  It was not alleged
> that the plaintiff had been induced or compelled to dispose of his shares in                     E
> the companies; he still had them.  If he were allowed to recover for the
> diminution in their value, and the companies for the depletion of their
> assets, there would be double recovery.  Moreover, if the action were
> allowed to proceed and the plaintiff were to recover for the lost value of
> his shares, the defendant's ability to meet any judgment which the old
> companies or their liquidators might obtain against him would be                                 F
> impaired to the prejudice of their creditors.  The plaintiff would have
> obtained by a judgment of the court the very same extraction of value
> from the old companies at the expense of their creditors as the defendant
> was alleged to have obtained by fraud."

182    The court assumed that if the old companies recovered in respect of
their loss, the claimant's loss would be "fully remedied".  But that would                         G
only be so if the loss was identical.  Since the losses were not identical,
double recovery would not necessarily follow from allowing the claimant to
bring his personal claim.  Also, as I have sought to explain, he would have to
give credit for the effect on the value of his shares due to the old companies
having their own causes of action against the defendant.  There was no
principled reason why the claimant should not be entitled to seek to
vindicate his own cause of action against the defendant.  That would not                           H
prevent the old companies from obtaining recovery in respect of their cause
of action and their loss.

183    In my opinion, the same false premise underlies Lord Millett's
criticism of the decisions in *Barings* [1997] 1 BCLC 427 and in *Christensen v*

© 2020 The Incorporated Council of Law Reporting for England and Wales

317
[2020] 3 WLR                          Marex Financial Ltd v Sevilleja (SC(E))
                                                              Lord Sales JSC

A   *Scott* [1996] 1 NZLR 273.  In respect of the latter, he said that he could not
    accept the reasoning of Thomas J [2002] 2 AC 1, 66B–C:

        "It is of course correct that the diminution in the value of the plaintiffs'
    shares was by definition a personal loss and not the company's loss, but
    that is not the point.  The point is that it merely reflected the diminution
    of the company's assets.  The test is not whether the company could have
B   made a claim in respect of the loss in question; the question is whether,
    treating the company and the shareholder as one for this purpose, the
    shareholder's loss is franked by that of the company.  If so, such reflected
    loss is recoverable by the company and not by the shareholders."

    184   However, with respect, I consider that the error is Lord Millett's.
    The claimants' personal loss did not "merely reflect" the company's loss; it
C   was not identical with that loss, and the company could not make a claim in
    respect of the loss which the claimants had suffered.  There is no good reason
    to treat the company and the shareholder "as one" for the purpose of
    working out who could sue for the losses in question, since there is not a
    single loss.  Similarly, for the reasons given above, I do not think that Lord
    Millett's further reliance on the causation point [2002] 2 AC 1, 66D–E can be
    supported.
D   185   Lord Millett continued at p 66F–G:

        "But there is more to it than causation.  The disallowance of the
    shareholder's claim in respect of reflective loss is driven by policy
    considerations.  In my opinion, these preclude the shareholder from going
    behind the settlement of the company's claim.  If he were allowed to do so
E   then, if the company's action were brought by its directors, they would be
    placed in a position where their interest conflicted with their duty; while if
    it were brought by the liquidator, it would make it difficult for him to
    settle the action and would effectively take the conduct of the litigation
    out of his hands . . ."

    186   I do not consider that these policy considerations can justify the
    reflective loss principle.  Again, the underlying point is that the company and
F   the shareholder each have their own cause of action and that the loss suffered
    by the company and the loss suffered by the shareholder are not one and the
    same.  If the company settles its claim, the shareholder will have to give
    appropriate credit for that to the extent that it has reduced his loss (which
    might or might not be significant, depending on the facts of the case).  In
    bringing his claim he would not go behind nor undo the settlement of the
G   company's claim.  If the shareholder is also a director of the company, that
    could give rise to a conflict of interest and duty in deciding how the company
    should prosecute its claim; but as pointed out by Mitchell 120 LQR 457,
    470, there will be cases which do not involve shareholders who are directors.
    In any event, company law has procedures for coping with similar conflicts
    of interest and duty on the part of directors and this point does not amount
    to a good reason to eliminate the shareholder's properly constituted cause of
H   action.  If a director has been run over by an employee of the company or has
    a contract claim against it, one would not say that he was prevented from
    suing the company because he would thereby be placed in a position where
    his interests and those of the company would conflict.  If exposed to the
    possibility of claims by a shareholder and a company, a defendant would still

© 2020 The Incorporated Council of Law Reporting for England and Wales

318
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Sales JSC

have an interest to settle with the liquidator of the company in order to cap        A
his liability to the company and there is no good reason why the liquidator,
by his conduct of the company's claim, should be able to defeat a viable
cause of action vested in the shareholder.

187   In my view, the same flawed premise underlies the following two
paragraphs in Lord Millett's speech, which have particular relevance in the
context of the present appeal concerning the application of the reflective loss        B
principle to claims brought by a creditor of a company [2002] 2 AC 1,
66G–67C:

"Reflective loss extends beyond the diminution of the value of the
shares; it extends to the loss of dividends (specifically mentioned in
[*Prudential*]) and all other payments which the shareholder might have        C
obtained from the company if it had not been deprived of its funds. All
transactions or putative transactions between the company and its
shareholders must be disregarded. Payment to the one diminishes the
assets of the other. In economic terms, the shareholder has two pockets,
and cannot hold the defendant liable for his inability to transfer money
from one pocket to the other. In principle, the company and the
shareholder cannot together recover more than the shareholder would
have recovered if he had carried on business in his own name instead of        D
through the medium of a company. On the other hand, he is entitled
(subject to the rules on remoteness of damage) to recover in respect of a
loss which he has sustained by reason of his inability to have recourse to
the company's funds and which the company would not have sustained
itself. The same applies to other payments which the company would
have made if it had had the necessary funds even if the plaintiff would        E
have received them qua employee and not qua shareholder and even if
he would have had a legal claim to be paid. His loss is still an indirect
and reflective loss which is included in the company's claim. The
plaintiff's primary claim lies against the company, and the existence of
the liability does not increase the total recoverable by the company, for
this already includes the amount necessary to enable the company to
meet it."                                                                       F

188   The analogy with a shareholder with two pockets does not give
appropriate recognition to the separate legal personality of a company, as
emphasised in the *Salomon* case. The analogy assumes, incorrectly, that
the loss suffered by the company is identical with the loss suffered by the
shareholder. Starting from that assumption, Lord Millett would extend
the reflective loss principle to prevent recovery from a wrongdoing         G
defendant by a creditor of the company who suffers the loss of being
unable to recover what he is owed by the company as a result of the wrong
done at the same time by the defendant to him and the company. His
speech therefore provides support for Mr Sevilleja's case on this appeal.
I will discuss the position of creditors after finishing this discussion of
*Johnson*.

189   Lord Cooke stated that he had difficulty with the part of        H
Lord Bingham's speech dealing with the recoverability of damages by
Mr Johnson on his personal claim against GW. Although he was at pains
not to criticise the decision in *Prudential* [2002] 2 AC 1, 43A and 45F, he
observed that the cash box illustration was not helpful in the *Johnson* case

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR    Marex Financial Ltd v Sevilleja (SC(E))
Lord Sales JSC

A "because it does not envisage any loss except of the company's £100,000": pp 42G–43B. In other words, the illustration proceeds on the basis that the company's loss and the shareholder's loss are identical, as was also true of the analysis in *Stein v Blake*. Lord Cooke agreed that the English authorities cited by Lord Bingham supported the three propositions stated by him. None the less, Lord Cooke was not willing to dismiss the statement of the law by Thomas J in *Christensen v Scott* and pointed out that

B Leggatt LJ in *Barings* and Hobhouse LJ in *Gerber* (at [1997] RPC 443, 475) had regarded it as in line with English legal principles. Lord Cooke observed that the court in *Christensen v Scott* had been guarded in its approach and he stated that if a client is suing his own solicitor, "it would appear that only the problems of double recovery or prejudice to the company's creditors would justify denying or limiting the right to recover

C personal damages which, on ordinary principles of foreseeability, would otherwise arise" [2002] 2 AC 1, 45D–E; also pp 47E and 48B. Despite his reservations about Lord Bingham's reasoning, however, Lord Cooke was prepared to agree the order proposed by him, as were the other members of the appellate committee: p 48B–E.

190    Lord Hutton also agreed with the order proposed by Lord Bingham, but his analysis was different from the others. Lord Hutton noted

D that the basis on which *Prudential* had been distinguished by Hobhouse LJ in *Gerber* (on the footing that the shareholder claimants in *Prudential* did not have an individual cause of action) was invalid, since the Court of Appeal considered that they did have such a cause of action (however, see para 148 above); contrary to the view of Hobhouse LJ in *Gerber*, Lord Hutton stated (correctly, in my view) that the ruling against the shareholder

E claimants in *Prudential* could not be explained on the ground of causation; and he agreed (again correctly, in my view) with the court in *Christensen v Scott* that the shareholders could be regarded as suffering a personal loss caused by breach of duty of the defendant, different from the loss of the company, and considered that the reasoning in *Prudential* on this point was open to criticism [2002] 2 AC 1, 54. However, he stated that there is a need to ensure that there is no double recovery and that creditors and the other

F shareholders of the company are protected: pp 54H–55D. On that basis, faced with the conflict between *Prudential* and *Christensen v Scott*, Lord Hutton preferred to endorse the approach in *Prudential* despite the flaws in its reasoning, since it provided a bright line rule to debar a shareholder from bringing a claim without the need for "the complexities of a trial" to examine the extent of overlap between the loss of the claimant shareholder

G and the loss of the company. A bright line rule of this character would ensure that there would be no double recovery and that the creditors and other shareholders would be protected; it would also avoid the possibility of conflicts of interest between directors and some shareholders or between liquidator and some shareholders: p 55C–G.

191    I disagree with this last step in the reasoning of Lord Hutton. None of the other law lords endorsed this. The problem, as I see it, is that the

H factors mentioned by Lord Hutton do not justify depriving a claimant shareholder who has suffered a loss different from the loss suffered by the company of what Lord Hutton accepted would otherwise be a perfectly valid cause of action in his own right. I also agree with Mitchell's criticism of Lord Hutton's bright line approach, that it proves too much, in that it

© 2020 The Incorporated Council of Law Reporting for England and Wales

320
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Sales JSC

would prevent recovery by a shareholder even if there is no policy reason to       A
support this, e g in a case where the company itself never had a cause of
action against the defendant 120 LQR 457, 460.

192   It is a very strong thing for a bright line rule to be introduced in the
common law as a matter of policy to preclude what are otherwise, according
to ordinary common law principles, valid causes of action; especially on the
basis of the very summary explanation given by Lord Hutton.  Whilst, as          B
noted above, it would allow for simple and speedy resolution of disputes, the
price to be paid for that is too high.  The effect of Lord Hutton's bright line
rule would be disproportionate and arbitrary.  So long as there is any degree
of overlap between the company's loss and the shareholder's loss, however
small the degree of overlap and however large the shareholder's loss might
be, it seems that the shareholder's claim must fail in limine.  And this is so
even though, as explained above, the claimant shareholder's loss would be        C
calculated after due allowance for the effect of rights of action which the
company would have against the wrongdoing defendant and even though
the law has other techniques available to deal with issues of conflict of
interest which might arise.

193   It is also a rule which, in my view, gives undue priority to the
interests of other shareholders and creditors of the company in circumstances    D
where the claimant shareholder is not subject to any obligation to
subordinate his interest in vindicating his personal rights to their interests.
Insolvency law is a regime which already makes appropriate provision to
cater for the possibility that the defendant does not have sufficient assets to
meet all claims against him, and there is no good policy basis for recognition
of the reflective loss principle at common law to supplement that regime.
Further, there will be cases where there is in fact no difficulty in the defendant  E
being able to meet all claims.

194   In summary, in my respectful opinion the reasoning in *Johnson*, in
so far as it endorses the reflective loss principle as a principle debarring
shareholders from recovery of personal loss which is different from the loss
suffered by the company, ought not to be followed.  The reasoning of
Lords Bingham, Goff and Millett purports to be based on the logic in
the *Prudential* case, which on critical examination is not sustainable.  The     F
reasoning of Lord Hutton relies on a policy-based bright line exclusionary
rule which is not justified.  The reasoning of Lord Cooke is suspended
uneasily between the majority and Lord Hutton.  Lord Cooke endorsed the
decision in *Prudential* (and in my opinion was right to do so as to the result:
para 148 above), albeit he was unwilling to disclaim the judgment in
*Christensen v Scott* (even though the reasoning in the two cases cannot be
reconciled, a fact which he was not prepared to acknowledge); and to the         G
extent that, like Lord Hutton, he emphasised that there should not be double
recovery and that the company's other shareholders and creditors should be
protected, in my view he gave insufficient attention to the ways in which the
law already allows for the risk of double recovery to be taken into account
and did not explain why the interests of the company's other shareholders
and creditors should take priority over the interests of the claimant          H
shareholder suing to vindicate a personal cause of action.

195   Lord Reed PSC points out (para 78) that the decisions in *Prudential*
and *Johnson* have been followed in other common law jurisdictions.
However, whilst there is some variation in the reasoning which is deployed,

© 2020 The Incorporated Council of Law Reporting for England and Wales

[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                        Lord Sales JSC

A   the courts in those jurisdictions have not given *Prudential* and *Johnson* the
    same interpretation as Lord Reed PSC gives them. To a substantial degree
    they have regarded them as being concerned with the issues of double
    recovery and protection of the interests of creditors and other shareholders
    of the company, which I have addressed above: see e g the discussion at
    para 164 above of the judgment of the Court of Appeal of Singapore in
B   *Townsing v Jenton Overseas Investment Pte Ltd* [2008] 1 LRC 231. This is
    not surprising, given that in *Johnson* Lords Millett, Goff, Cooke and Hutton
    all identified these as the important issues by reference to which the reflective
    loss principle fell to be justified, and Lord Bingham (as I read his speech) did
    not dispute this.

    196   Flaux LJ in his judgment in the Court of Appeal in the present case
    [2019] QB 173, para 32 distilled a four-fold justification for the reflective
C   loss principle, principally derived from the speech of Lord Millett in
    *Johnson*: (i) the need to avoid double recovery by the claimant shareholder
    and the company from the defendant; (ii) causation, in the sense that if the
    company chooses not to claim against the wrongdoer, the loss to the
    claimant is caused by the company's decision not by the defendant's
    wrongdoing ([2002] 2 AC 1, 66; also per Chadwick LJ in *Giles v Rhind*
D   [2003] Ch 618, para 78); (iii) the public policy of avoiding conflicts of
    interest, particularly that if the claimant had a separate right to claim it
    would discourage the company from making settlements; and (iv) the need to
    preserve company autonomy and avoid prejudice to minority shareholders
    and other creditors.

    197   In my opinion, none of these considerations in fact provides a
    viable justification for the reflective loss principle. Points (i) and (ii) reflect
E   Lord Millett's incorrect view that the loss suffered by the company is
    the same as the loss suffered by the shareholder (to the extent of his
    shareholding), and ignore the ways in which the law takes account of the
    need to avoid double recovery by other means. Point (iii) also reflects Lord
    Millett's view regarding the identity of the loss suffered by the company and
    the loss suffered by the shareholder, and ignores the availability of other
F   mechanisms to deal with conflicts of interest on the part of directors and the
    interest that a defendant would have in settling with a company which
    makes a claim in parallel with a personal claim made by a shareholder.
    Point (iv) again reflects Lord Millett's view regarding identity of loss; it
    ignores the fact that company autonomy (safeguarded by the rule in *Foss v
    Harbottle*) remains in place as regards any cause of action vested in the
    company; and it gives undue weight to protection of other shareholders and
G   other creditors.

    *The reflective loss principle and claims by creditors of the company*

    198   The discussion above indicates that the reflective loss principle as
    stated in *Prudential* is a flimsy foundation on which to build outwards into
    other areas of the law, and particularly when it is sought to be deployed in
H   answer to Marex's claim in the present case. Marex was not a shareholder
    in the Companies, but their creditor. In my view this means that there is
    even less reason for saying that its interest in obtaining recovery directly
    from Mr Sevilleja should be eliminated by virtue of the fact that the
    Companies also have claims against him. A creditor of a company has not

322
Marex Financial Ltd v Sevilleja (SC(E))                    [2020] 3 WLR
Lord Sales JSC

chosen to be in a position where he is required to follow the fortunes of the   A
company in the same way as a shareholder. Subject to the company having
sufficient assets, whether the creditor gets paid or not does not depend on
the decision of the directors, as payment of a dividend to a shareholder
does: when armed with a court judgment the creditor can execute it against
the assets of the company. Moreover, there is a clear mechanism available
to meet the problem of possible double recovery against the defendant       B
in respect of the loss suffered by Marex and the loss suffered by the
Companies. To the extent that Marex sues Mr Sevilleja and obtains
recovery from him for the judgment sum, Mr Sevilleja can be subrogated to
Marex's rights against the Companies or allowed a right of reimbursement
in respect of them.

199  If Marex's debtor had been an individual and Mr Sevilleja had
stolen all his assets with a view to preventing him paying the debt due to   C
Marex, it would be possible for Marex to bring an *OBG* claim against him,
in line with the part of the judgment of Knowles J which is not under appeal.
Also, in line with that part of the judge's judgment, Marex would arguably
have been able to bring a *Lumley v Gye* claim against him. By his tortious
actions, Mr Sevilleja would have made himself, in a practical sense, jointly
and severally liable with the individual debtor in respect of the amount of    D
the unpaid debt and Marex could sue either or both of them. Marex would not
be required to sue the individual debtor to make him bankrupt and then seek
to procure his trustee in bankruptcy to pursue Mr Sevilleja in the hope that a
recovery would eventually lead to it receiving a dividend in the bankruptcy
(after deduction of the trustee's fees). Mr Sevilleja's torts in respect of
Marex would create a direct nexus between them of such force that Marex's
rights against him would not have to be postponed behind any proof in    E
the individual debtor's bankruptcy in this way.

200  To the extent that the individual debtor or Mr Sevilleja paid the
money due, Marex would have to give credit in pursuing the other. To the
extent that Mr Sevilleja paid Marex a sum representing money owed
by the individual debtor (which he would have had to pay Marex had
Mr Sevilleja not stolen all his assets), the justice of the case would require    F
that the individual debtor should give credit for that when suing Mr Sevilleja
in relation to the theft. In my view, this outcome could readily be achieved in
a case involving an individual debtor.

201  The question which arises, therefore, is whether the fact that
Marex's debtor is a company rather than an individual should make any
difference. In my view, there is no good reason why it should.

202  Mr Sevilleja's position would be protected if Marex assigned its   G
rights against the Companies to him, to the extent any payment he made
to Marex was in respect of the debts owed. Alternatively, if by making
payment in respect of the Companies' debts to Marex Mr Sevilleja was able
to discharge them, he would have a right of reimbursement against the
Companies, as they are the primary obligee in respect of the debt obligations:
*Moule v Garrett* (1872) LR 7 Ex 101; *Duncan, Fox & Co v North and South
Wales Bank* (1880) 6 App Cas 1, 10 per Lord Selborne LC; *Goff & Jones*,     H
*The Law of Unjust Enrichment*, 9th ed (2016), paras 19-19–19-21. If
Mr Sevilleja seeks to compromise Marex's claim, he could make it a term of
their agreement that he takes an assignment of Marex's rights as creditor.
Absent such agreement, a court ruling on Marex's claim against him could

© 2020 The Incorporated Council of Law Reporting for England and Wales

323
[2020] 3 WLR                                      Marex Financial Ltd v Sevilleja (SC(E))
                                                                           Lord Sales JSC

A    impose as a condition for the grant of relief that Marex should assign its
rights to him to an appropriate extent or that it should acknowledge his
payment as discharging the debt to that extent, thereby bringing into effect a
right of reimbursement in favour of Mr Sevilleja pursuant to *Moule v
Garrett*.

    203   Even if these mechanisms were not pursued and payment by
B    Mr Sevilleja did not discharge the debts of the Companies, in my view
Mr Sevilleja would have a right to be subrogated to an appropriate extent to
the rights of Marex as against the Companies. In my opinion, this would in
fact be the simplest and most appropriate solution. Subrogation is a flexible
equitable remedy which would be available in this case for basic reasons of
equity and natural justice similar to those which underlie the rule in *Moule v
Garrett*, in order to ensure that neither the Companies (if Marex did not sue
C    them on the debts) nor Marex (if it did sue them on the debts) would receive
a windfall enrichment by virtue of the payment by Mr Sevilleja of the
judgment sum or part thereof: see *Banque Financière de la Cité v Parc
(Battersea) Ltd* [1999] 1 AC 221 and *Swynson Ltd v Lowick Rose llp
(formerly Hurst Morrison Thomson llp)* [2018] AC 313, paras 18–19, per
Lord Sumption JSC; and *Mitchell & Watterson*, *Subrogation Law and
D    Practice* (2007), paras 1.01–1.03, 1.07 and 1.08.

    204   Again, the decision of the High Court in *Gould v Vaggelas* 157
CLR 215 provides a helpful illustration. The case was concerned with a
situation in which a company owed money to creditors (who happened to be
shareholders, but who sued the defendants relying on their capacity as
creditors of the company), which the company had been prevented from
repaying by reason of losses suffered as a result of a deceit practised on it by
E    the defendants. As Brennan J put it at p 253: "The [claimants'] loss is the
loss suffered by a creditor of the company which, apart from its cause of
action in deceit, is worthless". The position was in my view analogous to
that in the present case. The High Court held that the claimants were
entitled to sue the defendants to vindicate their personal rights in respect of
the loss suffered by them as a result of the failure of the company to repay the
F    loans. The justices who directly considered the question of what would
happen if the defendants paid the claimants the equivalent of the money
owed to them by the company while claims against the defendants by the
company remained on foot were clear that the justice of the case would
require that the claimants could not take the benefit of sums which the
company might later be able to repay: see p 246 per Wilson J and
G    pp 258–259 per Brennan J. Gibbs CJ at p 229 referred to the possibility of
there being a right of subrogation for the defendants should the company
later be able to pay back the loans.

    205   The most considered discussion was that by Brennan J, who
observed that since satisfaction of the claimants' judgment against the
defendant would not discharge the company from liability for the
company's debt, a right of reimbursement under the principle in *Moule v
H    Garrett* would not arise; but said that the defendant would be subrogated to
the claimants' rights against the company in respect of the loans (p 259).
Save that, as indicated above, I think there would be ways in which the
principle in *Moule v Garrett* might be brought into operation, I agree with
Brennan J's analysis.

© 2020 The Incorporated Council of Law Reporting for England and Wales

324
Marex Financial Ltd v Sevilleja (SC(E))                              [2020] 3 WLR
Lord Sales JSC

206    Turning to address the four considerations identified by Flaux LJ at *A*
para 32 of his judgment, this time in the context of liability in respect of a
claim by a creditor of a company, I do not consider that they justify
excluding Marex's claim against Mr Sevilleja, even if (contrary to my view
above) they might have force in respect of a claimant shareholder's claim.
Point (i) (the need to avoid double recovery) is satisfied by recognising that
Mr Sevilleja will have a right to be subrogated to Marex's right of action *B*
against the Companies, to the extent that he makes a payment referable to
the debts they owe Marex. Point (ii) (absence of causation, because the
claimant's rights depend on the company's decision) has no force, because
Marex's right to seek payment from the Companies had already accrued and
was not dependent on a choice to be made by the Companies. Mr Sevilleja's
wrongdoing clearly caused loss to Marex because it prevented Marex from
being able to execute a judgment in respect of the judgment sum against *C*
the Companies' assets. Point (iii) (avoidance of conflicts of interest and
discouraging settlements by the company) similarly has no force. The
Companies were obliged to pay Marex to satisfy its accrued rights against
them, so it was out of the hands of their directors and not a matter of
discretion whether they should do so or not. If the liquidator of the
Companies seeks a compromise of their claims against Mr Sevilleja, it is
open to Mr Sevilleja to bargain for protection against double liability *D*
if Marex is also successful in obtaining payment from him. Point (iv)
(preservation of company autonomy and avoidance of prejudice to minority
shareholders and other creditors) also cannot justify dismissing Marex's
claim. The Companies have no autonomy to exercise as regards the debt
claim against them, and have no right or power of control in respect of
Marex's own property in the form of its rights of action against Mr Sevilleja.
If the Companies had been insolvent at the time of Mr Sevilleja's *E*
wrongdoing so that, but for his actions, Marex would only have received,
say, 50% of the value of what was due to it, its claim for damages against
Mr Sevilleja would be limited to that amount. It is not apparent that
minority shareholders or other creditors of the Companies would suffer
unacceptable detriment from allowing Marex to proceed directly against
Mr Sevilleja. In any event, as explained above, there is no rule which *F*
governs the order in which people can seek to vindicate their rights against
others; and even less than in the case of a shareholder can it be said that an
ordinary creditor of a company has undertaken not to seek to enforce his
rights against the wrongdoing defendant in order to safeguard the interests
of the shareholders and other creditors of that company.

207    There is an additional consideration in respect of point (iv) which *G*
arises on the facts of this case which I should mention, albeit I prefer to state
the reasons why Marex's appeal should succeed in more general terms. It
appears that Mr Sevilleja is very wealthy and both for that reason and
because there is no indication that the liquidator proposes to pursue the
Companies' claims against him, it does not seem that there is any real risk
that the creditors of the Companies will in fact find themselves less well off if *H*
Marex's claim against him is allowed to proceed than they would otherwise
have been.

208    There is support from Lord Millett's speech in *Johnson* (at [2002]
2 AC 1, 66G–67C, quoted above) for Mr Sevilleja's submission that the
reflective loss principle precludes a claim against him by Marex, as a creditor

© 2020 The Incorporated Council of Law Reporting for England and Wales

325
[2020] 3 WLR                    Marex Financial Ltd v Sevilleja (SC(E))
                                                          Lord Sales JSC

A   of the Companies, in respect of loss suffered by Marex as a result of the
    non-payment by the Companies of the judgment sum. Lord Bingham also
    arguably provides implicit support for Mr Sevilleja's submission, in that he
    struck out Mr Johnson's claim under head (3) for payments which the
    company would have made into a pension fund for his benefit. It seems that
    these would have been discretionary, non-contractual payments for
    Mr Johnson's benefit as part of his remuneration, not payments by way of
B   dividend. Lord Bingham did not suggest that it would make a difference
    if these payments constituted remuneration to which Mr Johnson was
    contractually entitled.

    209   There is also support for Mr Sevilleja's submission in the judgment
    of Neuberger LJ in *Gardner v Parker* [2004] 2 BCLC 554, with which
    Mance LJ and Bodey J agreed. The case concerned the claim of a company
C   (BDC), as assigned to the claimant in the proceedings, against its sole
    director, Mr Parker. BDC's principal assets were a 9% shareholding in
    another company, S Ltd (of which Mr Parker was also the sole director and
    in which he held 91% of the shares), and a debt of £799,000 owed to BDC by
    S Ltd. The claimant alleged that, in breach of the fiduciary duties he owed to
    BDC and S Ltd, Mr Parker procured the sale by S Ltd of its principal asset at
    an undervalue to another company in which Mr Parker had an interest; that
D   his purpose in doing so was to extract from S Ltd its most valuable asset to
    the detriment of BDC or to damage BDC; and that as a consequence of the
    sale S Ltd became insolvent. It was pleaded that, as a consequence, the value
    of BDC's 9% shareholding in S Ltd was reduced to nil and the value of the
    loan due from S Ltd was also reduced to nil. Neuberger LJ held that the
    losses claimed by BDC in its capacity as creditor of S Ltd were caught by
E   the reflective loss principle, as were BDC's claims in its capacity as
    shareholder in S Ltd, with the result that it could not claim in respect of
    them: paras 35 and 67–75. Neuberger LJ relied on the speeches of Lord
    Bingham and, in particular, Lord Millett in *Johnson*. Proceeding on the
    basis of the reasoning in those speeches, Neuberger LJ observed that there
    was no logical reason why the reflective loss principle should not apply to
F   a shareholder in his capacity as a creditor of the company and added that
    "it is hard to see why the [reflective loss principle] should not apply to a
    claim brought by a creditor (or indeed, an employee) of the company
    concerned, even if he is not a shareholder" (para 70). According to
    Neuberger LJ, the creditor would not be without remedies; he "can put the
    company into liquidation (if that has not already happened) and can either
    fund a claim by the liquidator against the defendant or, as Mr Gardner did
G   in relation to BDC, he can take an assignment of the company's claim"
    (para 74). Neuberger LJ observed that the arguments for the claimant
    were more consistent with the approach in *Christensen v Scott*, but that
    decision had been disapproved in *Johnson*. Accordingly, in his view,
    although the claimants' arguments were "not without force, although not
    without difficulties either", they could only be accepted at the highest level
    if it was thought appropriate to reconsider the reflective loss principle
H   (para 75).
    210   The Court of Appeal in the present case followed these authorities
    in respect of Marex's claims, based as they are on its being a creditor of the
    Companies. In this court, it is open to us to re-examine them from the point
    of view of principle, rather than to treat them as binding authority.

© 2020 The Incorporated Council of Law Reporting for England and Wales

A-10231

326
**Marex Financial Ltd v Sevilleja (SC(E))**                               [2020] 3 WLR
**Lord Sales JSC**

A

**211**   In my judgment, the foundation in the reasoning of Lord Bingham and Lord Millett regarding the reflective loss principle in respect of shareholder claimants is not sustainable.  I would not follow *Johnson* in so far as it endorsed the reflective loss principle identified in *Prudential* in relation to claims by shareholder claimants.  But even if the principle is to be preserved in relation to such claimants, the questionable nature of the justification for it means that it is appropriate for this court to stand back and ask afresh whether it can be justified as a principle to exclude otherwise valid claims made by a person who is a creditor of the company.  We are not trapped by *Prudential* and the speeches of Lord Bingham and Lord Millett in *Johnson* in the way in which the Court of Appeal in *Gardner v Parker* felt that it was bound by their reasoning.  For the reasons given above, I would hold that the reflective loss principle, if it exists, does not apply in the present case.

B

C

*The exception in Giles v Rhind*

**212**   In view of my conclusion that the reflective loss principle does not apply in this case, the question regarding the ambit of the exception to that principle which was identified in *Giles v Rhind* [2003] Ch 618 does not arise. However, it is worth pointing out that the exception was identified in an effort to achieve practical justice against the backdrop of an assumption that the reflective loss principle stated in *Prudential* was valid.  If *Prudential* is held to lay down a bright line rule of law deeming reflective loss not to be a loss, whatever the true position on the facts, and that bright line rule is endorsed, cases such as *Giles v Rhind*, exemplifying the dissonance between the rule and practical justice on the facts, will continue to arise.  This will put pressure on the acceptability of the rule itself.

D

E

*Conclusion*

**213**   For the reasons set out above, I would allow Marex's appeal and permit it to proceed with its *OBG* claim and *Lumley v Gye* claim directly against Mr Sevilleja.

F

*Appeal allowed.*

Colin Beresford, *Barrister*

G

H

© 2020 The Incorporated Council of Law Reporting for England and Wales

474 EQUITY CASES. [L. R.

M. R.
1875
May 28.

RUSSELL *v.* WAKEFIELD WATERWORKS COMPANY.

[1875 R. 43.]

*Company—Suit by Shareholder on behalf of Himself and other Shareholders—*
*Illegal Payment by Directors—Ultrà Vires—Form of Suit.*

Where a shareholder in an incorporated company filed his bill on behalf of himself and all other shareholders against the directors and the promoters of a bill in Parliament for a rival purpose, alleging an illegal payment of the company's money to such promoters to buy off their opposition, and praying that it might be replaced :—

*Held,* on demurrer, that it was not sufficiently alleged in the bill that the payment was *ultrà vires*:

*Held,* also, there being no allegation that the company would not sue, that it was not a case in which the suit could be maintained in its present form ; and that the demurrer must be allowed, with leave to amend.

Observations on the exceptions to the general rule, that the company and not an individual corporator must sue when the trust funds of the company have been misapplied.

## DEMURRER.

The bill was filed by the Plaintiff *Henry Edward Russell,* on behalf of himself and all other the shareholders in the *Wakefield Waterworks Company,* except such of the Defendants as were shareholders therein.

The Defendants were the said *Wakefield Waterworks Company,* the six directors of the same company, and the six promoters of an undertaking called the *Wakefield and District New Water Bill.*

The bill alleged that in the year 1874 the Plaintiff became, by purchase, the duly registered owner of two fully paid-up shares in the Defendant company ; that he afterwards heard of the payment of £5500 to the promoters of the *Wakefield and District New Water Bill* to buy up their opposition ; that in the balance-sheet for the half-year ending the 30th of June, 1874, there was the following entry in the capital account : "Parliamentary expenses, £8517 14*s.* 9*d.*"; and that the balance-sheet for the half-year ending the 31st of December, 1874, contained the following entry : "Parliamentary expenses, £9083 10*s.* 11*d.*"; but that neither the balance-sheets nor the reports contained any explanation of these entries:

EXHIBIT

16

exhibitsticker.com

A-10233

VOL. XX.]                    EQUITY CASES.                              475

That the Plaintiff's solicitor was informed by the secretary to    M. R.
the company that the sum of money paid to the promoters of the      1875
New Water Bill was included in the said sum of £8517 14s. 9d.,     RUSSELL
and charged to the capital account of June, 1874, and was paid        v.
by the directors in accordance with a resolution of the share-   WAKEFIELD
                                                                 WATERWORKS
holders, authorizing them to do all necessary acts, and in exercise  COMPANY.
of the lawful powers of the directors, and that the accounts con-
taining the payments had since been passed and confirmed by the
shareholders:

That the Plaintiff had ascertained the following facts with
reference to the transaction in question:—During the session of
Parliament in the year 1874 the Defendants, the directors of the
waterworks company, introduced a bill into Parliament autho-
rizing them to make new reservoirs and works, and to raise more
money, and to extend their limits of supply.   During the same
session a bill was introduced by the Defendants, the promoters
thereof, intituled the *Wakefield and District New Water Bill*,
whereby it was proposed to erect waterworks of a similar character
to those proposed by the Defendant company for the supply of
*Wakefield* and its neighbourhood, and the promoters lodged a
petition against the bill introduced by the said directors.   On
the 9th of April the promoters of the *Wakefield and District New
Water Bill* withdrew their bill, such withdrawal being, as the
Plaintiff alleged, the result of a corrupt agreement made between
the promoters of that bill and the directors of the Defendant com-
pany, and which was in the following terms:—

"Terms of arrangement between the *Wakefield Waterworks
Company* and the *Wakefield New Waterworks Company* made this
7th of April, 1874.   The directors of the *Wakefield Old Water-
works Company* pledge their words as men of honour to proceed
with their present application to Parliament for a supply of water
from *Langsett*, and to use their utmost endeavours to secure the
passing of their new bill in both Houses of Parliament during the
present session, and will also pay to the directors of the *Wakefield
New Waterworks Company* the sum of £5500 for the costs and
expenses incurred by them in connection with their present
scheme, on condition that the *Wakefield New Waterworks Com-
pany* do forthwith withdraw their bill now before Parliament, and

476                          EQUITY CASES.                    [L. R.

M. R.
1875
RUSSELL
*v.*
WAKEFIELD
WATERWORKS
COMPANY.
also withdraw at once the petition filed by the *Wakefield New Waterworks Company* and the inhabitants and consumers of water in *Wakefield* and its neighbourhood, recently lodged or filed, and do use their influence, and do render all the assistance in their power to the directors of the *Wakefield Old Waterworks Company* (if and when required by them) at the expense of the said last-named company, to secure the passing of the present bill of the *Wakefield Old Waterworks Company,* now before Parliament, into law during the present session of Parliament. As witness the hands of the directors of the said two companies." This agreement was signed by the several Defendants the directors of the Defendant company, and by the several Defendants the promoters of the said bill, on the 7th of April, 1874, and on or about that date the directors of the Defendant company paid to the promoters of the said bill out of the moneys of the Defendant company the sum of £5500.

The bill alleged that the promoters had express notice that the sum of £5500 was paid out of the moneys of the Defendant company, and that the directors had no authority so to pay the same; that no general meeting of the shareholders of the Defendant company was held, and no resolution passed for the purpose of authorizing the said agreement, or the payment of the said £5500.

The Plaintiff insisted that the transaction was illegal, and that its illegality was known to the directors and promoters; and he charged that the said sum of £5500 was illegally paid out of the capital and funds of the Defendant company to the said promoters, and that they received such moneys with full notice and knowledge that the same was being so paid to them illegally, and by a breach of trust; that the promoters concurred in such breach of trust; and that the directors and promoters were liable to repay the same.

The bill prayed that it might be declared that the agreement of the 7th of April, 1874, and the said payment of the sum of £5500 were not within the powers of the Defendant company; that an account might be taken of the moneys so paid, and that the Defendants, the directors and promoters, might be ordered to repay the same.

The Defendants demurred generally for want of equity.

VOL. XX.]                    EQUITY CASES.                           477

*Mr. Bagshawe*, Q.C., and Mr. *Bunting*, for the Defendants, in support of the demurrer :—

This bill seeks to recover back a sum of money paid by the Defendants, the directors of the waterworks company, to the other Defendants, the promoters of the bill which was withdrawn, on the ground that such payment was *ultrà vires ;* but there are, we submit, no sufficient allegations in the bill to shew that the act complained of was beyond the powers of the directors.

Further, the suit is wrongly framed.  A bill like this, to recover moneys belonging to a corporate body alleged to be improperly paid to a stranger, cannot be filed by an individual shareholder, unless it is distinctly alleged that the corporation or company have refused to sue, or that there is some reason which prevents the company from suing: *Gray* v. *Lewis* (1) ; *Mozley* v. *Alston* (2) ; *Foss* v. *Harbottle* (3).

It is not alleged in this bill either that the Defendant company has refused to sue, or that it is incapable of suing : on these grounds, therefore, as well as on the first, we contend that the demurrer should be allowed.

*Mr. Chitty*, Q.C., and Mr. *W. W. Cooper*, for the Plaintiff, in support of the bill :—

The conduct of the directors of the waterworks company in entering into the agreement with the promoters of a rival company, and paying them the sum of £5500 to buy off their opposition, was, on the facts alleged in the bill, both illegal and *ultrà vires*.  The directors were in the position of trustees for the company, and, as such, they are liable in this Court to account for the company's money which they have misapplied.  The bill alleges that the promoters received the money with notice that it was the property of the company.  That would be sufficient to render them in this Court liable to account for it: *Ferguson* v. *Wilson* (4) ; *Hodgkinson* v. *National Live Stock Insurance Company* (5) ; *Maunsell* v. *Midland Great Western (Ireland) Railway Company* (6) ; *Atwool* v. *Merryweather* (7).

M. R.

1875

RUSSELL
*v.*
WAKEFIELD
WATERWORKS
COMPANY.

(1) Law Rep. 8 Ch. 1035.         (4) Law Rep. 2 Ch. 77.
(2) 1 Ph. 790.                   (5) 4 De G. & J. 422.
(3) 2 Hare, 461.                 (6) 1 H. & M. 130.
(7) Law Rep. 5 Eq. 464, n.

A-10236

478                  EQUITY CASES.              [L. R.

M. R.
1875
RUSSELL
*v.*
WAKEFIELD
WATERWORKS
COMPANY.

In *Salomons* v. *Laing* (1), where money belonging to one railway company had been improperly paid over by the directors to the directors of another company who had notice of the breach of trust, and a bill was filed by a shareholder of the first company on behalf of himself and the other shareholders against the directors of both companies to recover back the fund, it was held on demurrer that the directors of the second company were properly made parties to the suit, and also that such a suit might be instituted by an individual shareholder, although it was not alleged that the company had refused to sue. That case is a direct authority in favour of the bill being framed in its present form.

Mr. *Bagshawe*, in reply, on the question whether the Plaintiff should have leave to amend.

SIR G. JESSEL, M.R. :—

I am of opinion that this bill is open to general demurrer on two grounds. The nature of the case which I suppose was intended to be made by the bill is that the waterworks company were not authorized to pay a sum of £5500 to the promoters of an opposition company, who were opposing a bill for extending the powers of what I will call the old company, in order to buy off the opposition. The bill seeks to make liable both the directors of the old company who had paid the money and the promoters of the new company who received the money.

The two objections, which I think are well founded, are these: first, it is said there is no case made by the bill shewing that the act complained of was beyond the powers of the old company, there being no direct allegation of fraud, although the word "corrupt" is used; and secondly, it is said that, even if the act complained of was shewn to be *ultrà vires*, it was a case in which the old company, which was an incorporated company, ought to sue. [His Honour then reviewed the allegations in the bill, and considered that the bill did not sufficiently allege that the payment complained of was beyond the powers of the old company.]

A great deal of the argument in this case turned upon what

(1) 12 Beav. 377.

may be described perhaps, in one sense, as a technical objection, but which is a very formidable and important objection. It was said that this is a bill to make a stranger pay back money belonging to a company which the stranger has illegally or improperly possessed himself of, or appropriated to his own use, and that any person who takes possession of a trust fund is liable to be sued in equity by the owner of the trust fund if he had notice at the time that it was a trust fund; and although he gave value, still in that way the bill can be maintained against him.

M. R.
1875
RUSSELL
v.
WAKEFIELD
WATERWORKS
COMPANY.

The answer was, that where the owner of the trust fund is an incorporated company, the corporation is the only party to sue; the stranger has nothing whatever to do with the individual corporators; and although in a sense it is their property, because individual corporators make up the corporation, yet in law it is not their property, but the property of the corporation, and therefore the right person to sue is the corporation, who is the *cestui que trust* or equitable owner of the fund. That I take to be the general rule of this Court. In this Court the money of the company is a trust fund, because it is applicable only to the special purposes of the company in the hands of the agents of the company, and it is in that sense a trust fund applicable by them to those special purposes; and a person taking it from them with notice that it is being applied to other purposes cannot in this Court say that he is not a constructive trustee.

But the general rule being that the *cestui que trust* must sue, and not the individual corporator who has only an ultimate beneficial interest, the only point remaining to be considered is, whether there are any exceptions to the general rule. I entirely agree that the general rule, if I may say so respectfully, is correctly stated by Lord Justice *James* in the case of *Gray* v. *Lewis* (1): " Where there is a corporate body capable of filing a bill for itself to recover property, either from its directors or officers, or from any other person, that corporate body is the proper plaintiff, and the only proper plaintiff." I do not understand the Lord Justice to intend to state more than the general rule, because he began by saying: " It is very important, in order to avoid oppressive litigation, to adhere to the rule laid down in *Mozley* v. *Alston* (2), and *Foss* v.

(1) Law Rep. 8 Ch. 1035, 1050.          (2) 1 Ph. 790.

A-10238

480                             EQUITY CASES.                      [L. R.

M. R.
1875

Russell
*v.*
Wakefield
Waterworks
Company.

*Harbottle* (1), which cases have always been considered as settling the law of this Court." So that in laying down the general rule he did not intend to impeach or interfere with those cases, but only to express the result of them. In reality *Mozley* v. *Alston* (2) simply affirmed *Foss* v. *Harbottle,* and therefore when you want to find the rule you must look to *Foss* v. *Harbottle,* where you will find the general rule is that which I have stated. But that is not a universal rule; that is, it is a rule subject to exceptions, and the exceptions depend very much on the necessity of the case; that is, the necessity for the Court doing justice.

In *Foss* v. *Harbottle* (3) Vice-Chancellor Sir *J. Wigram* says this: "The first objection taken in the argument for the Defendants was that the individual members of the corporation cannot in any case sue in the form in which this bill is framed. During the argument I intimated an opinion to which, upon further consideration, I fully adhere, that the rule was much too broadly stated on the part of the Defendants. I think there are cases in which a suit might properly be so framed. Corporations like this of a private nature are in truth little more than private partnerships, and in cases which may easily be suggested it would be too much to hold that a society of private persons associated together in undertakings which, though certainly beneficial to the public are nevertheless matters of private property, are to be deprived of their civil rights *inter se* because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate character. If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord *Cottenham,* in *Wallworth* v. *Holt* (4) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue." That I take to be the correct law on the subject.

(1) 2 Hare, 461.                    (3) 2 Hare, 491.
(2) 1 Ph. 790.                      (4) 4 My. & C. 619, 635.

VOL. XX.]                     EQUITY CASES.                            481

It remains to consider what are those exceptional cases in which,    M. R.
for the due attainment of justice, such a suit should be allowed.   1875
We are all familiar with one large class of cases which are cer-   RUSSELL
tainly the first exception to the rule.  They are cases in which an   v.
individual corporator sues the corporation to prevent the corpora-  WAKEFIELD
tion either commencing or continuing the doing of something  WATERWORKS
which is beyond the powers of the corporation.  Such a bill, indeed,  COMPANY.
may be maintained by a single corporator, not suing on behalf of
himself and of others, as was settled in the House of Lords in a
case of *Simpson* v. *Westminster Palace Hotel Company* (1).  If the
subject matter of the suit is an agreement between the corporation
acting by its directors or managers and some other corporation or
some other person strangers to the corporation, it is quite proper
and quite usual to make that other corporation or person a Defen-
dant to the suit, because that other corporation or person has an
interest, and a great interest, in arguing the question and having
it decided, once for all, whether the agreement in question is really
within the powers or without the powers of the corporation of
which the corporator is a member.  So that in these cases you
must always bring before the Court the other corporation.

The cases are so numerous on this subject, that one ought not
perhaps to refer to them.  But I may mention a few of them.
There is, first, the well-known case of *Hare* v. *London and North-
Western Railway Company* (2); there is the case of *Simpson* v.
*Denison* (3); there is a case of *Beman* v. *Rufford* (4); and a vast
number of cases as regards agreements between railway companies
which have been held to be *ultrà vires*.  When you have got the
second corporation or person a party to the suit, it may happen
that, in addition to the relief that you are entitled to as regards the
first, you are entitled to have relief against the second for something
that has been done under the *ultrà vires* agreement.  You may be
entitled to have money paid back which has been paid under the
*ultrà vires* agreement, as in the case of *Salomons* v. *Laing* (5), and
you may be entitled to have property returned or other acts done.
If the detainer or holder of the money or property, that is, the

(1) 8 H. L. C. 712.                    (3) 10 Hare, 51.
(2) 2 J. & H. 80.                      (4) 1 Sim. (N.S.) 550.
                  (5) 12 Beav. 377.

482                        EQUITY CASES.                    [L. R.

M. R.
1875
RUSSELL
v.
WAKEFIELD
WATERWORKS
COMPANY.

second corporation or other person, is already a party, and a neces-
sary party, to the suit, it would be indeed a lame and halting conclu-
sion if the Court were to say it could do justice in a suit so framed
by ordering the money to be returned or the property restored. It
is a necessary incident to the first part of the relief which can be
obtained by individual corporators, and will do complete justice on
each side, and that has always been the practice of the Court.
Therefore, in a case so framed there is no objection to a suit by
an individual corporator to recover from another corporator, or
from any other persons being strangers to this corporation, the
money or property so improperly obtained. But that is not the
only case. Any other case in which the claims of justice require
it is within the exception.

Another instance occurred in the case of *Atwool* v. *Merry-
weather* (1), in which the corporation was controlled by the evil-
doer, and would not allow its name to be used as Plaintiff in the suit.
It was said that justice required that the majority of the corporators
should not appropriate to themselves the property of the minority,
and then use their own votes at the general meeting of the corpora-
tion to prevent their being sued by the corporation, and consequently
in a case of that kind the corporators who form part of the minority
might file a bill on their own behalf to get back the property or
money so illegally appropriated. It is not necessary that the corpo-
ration should absolutely refuse by vote at the general meeting, if
it can be shewn either that the wrong-doer had command of the
majority of the votes, so that it would be absurd to call the meeting;
or if it can be shewn that there has been a general meeting substan-
tially approving of what has been done; or if it can be shewn from
the acts of the corporation as a corporation, distinguished from the
mere acts of the directors of it, that they have approved of what
has been done, and have allowed a long time to elapse without
interfering, so that they do not intend and are not willing to sue.
In all those cases the same doctrine applies, and the individual
corporator may maintain the suit. As I have said before, the rule
is a general one, but it does not apply to a case where the in-
terests of justice require the rule to be dispensed with. I do not
intend by the observations I have made in any way to restrain

(1) Law Rep. 5 Eq. 464, n.

VOL. XX.]                    EQUITY CASES.                         483

the generality of the terms made use of by the learned Judge     M. R.
who decided the case of *Foss* v. *Harbottle* (1).  Therefore I cannot     1875
help seeing it is quite possible so to amend this bill as to get rid     RUSSELL
of the difficulty which now exists, and I think that on this part     *v.*
of the case I should give leave to amend.  Of course, in allowing     WAKEFIELD
                                                                  WATERWORKS
the demurrer, I allow it in the usual form.                       COMPANY.

    Solicitor for the Plaintiff: Mr. *Horace Philbrick.*
    Solicitors for the Defendants: Messrs. *Singleton & Tattershall ;*
Messrs. *Torr & Co.*

------

## ATTORNEY-GENERAL *v.* WEBSTER.

[1871 A. 65.]

*Parish Property—Charitable Trust.*

    A trust of property in favour of a parish or the parishioners of a parish
for ever can only be upheld on the ground of its being a charitable trust.

    In 1585 property was conveyed to two persons upon a secret trust for a
*London* parish.  The income of the property was afterwards received by the
churchwardens and applied to charitable purposes:—

    *Held*, that the property was subject to a charitable trust.

M. R.
1875
June 4.

T HIS was an *ex officio* information by the Attorney-General for the
purpose, 1, of having it declared that certain properties known as
the *Parish Estates of St. Stephen's, Coleman Street*, in the city of
*London*, were held upon charitable trusts, and not (according to a
claim set up as to part thereof) simply the private property of the
parishioners; 2, of having the specific trusts affecting the several
properties distinguished ; and, 3, of establishing a scheme for the
regulation of the charities.

    The Defendants were the churchwardens of *St. Stephen's, Cole-
man Street*, and the feoffees in trust of the said estates appointed
by an indenture dated the 3rd of April, 1856.

    The instruments by which the several properties were originally
devoted to the purposes of the parish had all been lost ; and in
later times the practice had prevailed of conveying the whole
of the estates from time to time from one set of feoffees or trustees

(1) 2 Hare, 461.

A-10242

606                     CHANCERY APPEALS.                    [L. R.

L. JJ.                 MACDOUGALL *v.* GARDINER.

1875                        [1874 M. 200.]

July 28.          *Company—Directors calling a Meeting—Jurisdiction.*

Where, by the articles of association of a company, the directors, and in
the alternative a certain portion of the shareholders, can summon a meeting
of the company, the Court will not order the directors to summon a meeting
for the general purposes of the company.

Order of *Malins*, V.C., reversed.

THE bill in this suit was filed by *A. W. MacDougall*, on behalf of
himself and all other shareholders in the *Emma Mining Company*
(except the Defendants), against the four directors of the company
and Mr. *Hutton*, whose position as director was denied by the
Plaintiff, and against the company.   The bill stated and the
Plaintiff deposed to the formation of the company, and that the
Plaintiff held 350 shares, and that the Plaintiff wished to become
a director, but was opposed by the other directors.   That at a
meeting of the company on the 15th of May, 1874, the Defendant
Mr. *Hutton* was declared by the chairman to be elected a director.
That the Plaintiff then filed a bill to have it declared that he was
a director, but by filing demurrers the Defendants had prevented
the Plaintiff from obtaining the proper information.   That on the
requisition of the Plaintiff and others a general meeting of the
company was held on the 14th of October, 1874; and the bill
stated that there were many irregularities in the conduct of that
meeting.   And the bill prayed a declaration to that effect, and
a declaration that certain resolutions were duly passed at that
meeting, and were binding on the directors, and in the alternative
that a meeting of shareholders might be forthwith summoned for
the purpose of having those resolutions submitted to the meeting.

By the articles of association of the company the directors had
power at their discretion to summon a meeting; and were, upon a
requisition by members of the company holding in the aggregate
shares to the nominal amount of one-fifth of the capital of the
company, to convene a special general meeting; and if the

EXHIBIT

17

A-10243

VOL. X.]                 CHANCERY APPEALS.                      607

directors did not proceed to convene the meeting within thirty days, then the requisitionists, or any other members holding the required amount of shares or stock, might themselves convene a meeting.

The Plaintiff, on the 29th of June, moved in this suit that a certain injunction already granted might be continued, and for production of documents, and for leave to amend by striking out the name of the company as Defendant and adding the company as co-Plaintiff. On this motion, the Defendants undertaking not to make any arrangement with the vendors of the mine until such arrangement should have been submitted to the shareholders, an order was made by Vice-Chancellor *Malins* for production, and "that the Defendants do forthwith summon a general meeting of the company to take steps for electing a governing body of the Defendant company, and for general purposes."

A motion was now made on behalf of the company by way of appeal, that so much of the order as directed a meeting to be summoned might be discharged.

Mr. *J. Pearson,* Q.C., and Mr. *Colt,* for the company :—

The Court has no authority to direct a company to call a meeting for general purposes: *Mozley* v. *Alston* (1). The shareholders can themselves convene a meeting. No doubt a case might be made for the interference of the Court, but no such case has been made here.

Mr. *Higgins,* Q.C., and Mr. *Wintle,* for the directors.

Mr. *Glasse,* Q.C., and Mr. *Robinson.* Q.C., for the Plaintiff :—

The Plaintiff says that the directors were improperly elected, and this is a bill to rectify the impropriety. We want to amend and make the company co-Plaintiff, and in order to do that we ought to know what is the wish of the company, and that can only be done by a meeting. The meeting was suggested by the Vice-Chancellor, and no proceeding can be more proper. *Atwool* v. *Merryweather* (2), *Featherstone* v. *Cooke* (3), are clear authorities

L. JJ.
1875
MACDOUGALL
*v.*
GARDINER.

(1) 1 Ph. 790.                    (2) Law Rep. 5 Eq. 464, n. ]
            (3) Law Rep. 16 Eq. 298.

608 CHANCERY APPEALS. [L. R.

L. JJ.
1875

MACDOUGALL
*v.*
GARDINER.

as to the power of the Court to direct a meeting to be summoned.

SIR W. M. JAMES, L.J. :—

I am of opinion that this order cannot be sustained. Perhaps it is to be regretted that the Court has no jurisdiction in these matters to do what is right or what is beneficial for the parties, but Lord *Cottenham* seems to have indicated clearly in *Mozley* v. *Alston* (1) that the Court has no jurisdiction whatever to do that which it is for the company itself to do according to the provisions of the articles. If a general meeting is wanted for any purpose, then the directors, if they think it for the interests of the company, have power to call a general meeting; but I do not think that the Court has any jurisdiction to compel the directors to call the meeting, when they may honestly think it not for the interests of the company to do so. Then if the directors do not call the meeting, it is left to the shareholders to call it, with these restrictions, that before the company can be called together, and before they can be put to any such inconvenience, one-fifth of the shareholders must give in a requisition to the directors, and if one-fifth do not join in it, then there is no power to call the meeting.

Now, what power have we to say that a general meeting is to be called, if the directors do not think it right, and if one-fifth of the shareholders will not sign a requisition for the purpose? We have no authority, and there is, as it appears to me, no reason why we could interfere to do that which the shareholders have a right to do for themselves. The great principle laid down in the two cases of *Mozley* v. *Alston* and *Foss* v. *Harbottle* (2) was, that whatever should be done by the company itself through its own internal organization, ought to be left to the company, and ought not to be interfered with by this Court. In the cases which have been cited, and upon the statement of which the Vice-Chancellor seems to have altered his original opinion, there was a doubt whether the legal proceedings had been authorized by the company; and the Court said that a meeting ought to be summoned in order to ascertain whether the company desired its name to be continued

(1) 1 Ph. 790. (2) 2 Hare, 461.

A-10245

VOL. X.]                    CHANCERY APPEALS.                         609

as Plaintiff or Defendant. Of course that was a very obvious     L. JJ.
and very necessary proceeding, but that is not a direction to call a    1875
meeting for any purpose connected with the management of the   MACDOUGALL
company, or to do anything which the company could do for itself       *v.*
according to its own organization.                                 GARDINER.

    I am of opinion that the order so far as appealed from ought
to be discharged, on the ground which the Vice-Chancellor ori-
ginally took, viz., that there is no jurisdiction.

SIR G. MELLISH, L.J.:—

    I am of the same opinion. I cannot see how the Court has
power to take the management of the company out of the hands of
the directors, at any rate whilst the question is still in litigation,
whether they are properly directors or not. If a case happened in
which there were no directors, or in which there was a majority,
and they had neglected to appoint directors, or directors had died,
so that there was not a quorum, then I do not say whether the
Court might not have yielded to the proposal to summon a
meeting in order to prevent the company from altogether coming
to an end. In this case it is not necessary to consider that
question, as there is a board of directors who are *de facto* acting,
and it has not been determined that they were not properly
appointed. Under these circumstances, I cannot see how the Court
can deprive them of the discretion which is given them by the
articles. By the articles it is in their discretion whether to summon
a meeting or not, and the Court cannot take the management of
the company in that respect out of their hands.

    Solicitors for the Plaintiff: Messrs. *Valpy & Chaplin.*

    Solicitors for the Defendants: Messrs. *Sole, Turners, & Knight*;
Messrs. *Bischoff, Bompas, & Bischoff.*

A-10246

## IN THE GRAND COURT OF THE CAYMAN ISLANDS

FSD CAUSE NO. 125 of 2012

BETWEEN



**TEMPO GROUP LIMITED**

**and others**

plaintiffs

And

**FORTUNA DEVELOPMENT CORPORATION**

**and others**

defendants

Mr. M. Green, QC instructed by
Mr. M. Imrie & Ms. L. Kuehl
of Maples & Calder for the Plaintiffs

Mr. R. Hacker, QC & Mr. R. Fisher instructed by
Mr. P. McMaster, QC & Ms. A. Gilbert
of Appleby for the Defendants

Henderson, J.

Trial: September 1 – 5, 8 – 12, 15 – 19, 22 – 23, 30; October 1 – 3; November 26 – 28;

December 1 – 2, 2014

Judgment: March 31, 2015

*150331 Tempo v Fortuna Judgment*

**EXHIBIT**

**18**

Page 1 of 139



**JUDGMENT**

| Contents | Page |
|---|---|

1.    Pleadings...........................................................................................................................3

2.    Evidence of Dr. Chen Ching Chih...........................................................................6

3.    Evidence of Chen Chao Hon...................................................................................37

4.    Evidence of Randy Chen...........................................................................................40

5.    Evidence of Philip Niu...............................................................................................41

6.    Evidence of Lawrence Ting......................................................................................54

7.    Evidence of Ferdinand Tsien...................................................................................55

8.    Evidence of Gayle Tsien............................................................................................67

9.    Evidence of Pearl Niu................................................................................................74

10.   Evidence of Josephine Tsien...................................................................................78

11.   Evidence of Albert Hsu............................................................................................81

12.   Evidence of Arthur Ting...........................................................................................83

13.   Evidence of Other Witnesses.................................................................................85

14.   Maxima Samoa...........................................................................................................88

15.   Expert Evidence for the Plaintiffs.........................................................................91

16.   Expert Evidence for the Defendants....................................................................98

17.   The Duomatic Principle..........................................................................................104

18.   The Contract Claim...................................................................................................105

19.   The Company Claim.................................................................................................118

20.   Conclusion..................................................................................................................139

*150331 Tempo v Fortuna Judgment*

1.     After an amicable relationship lasting many years, the three principal owners of Fortuna Development Corporation became embroiled in an acrimonious and bitter dispute which is now in its second decade of litigation. In this judgment I am to determine whether the three men agreed that Dr. Chen Ching Chih was to be guaranteed a seat on the board of directors and whether his subsequent removal from the board is valid.

## Pleadings

2.     The first Defendant Fortuna Development Corporation ("Fortuna") is a Cayman Islands entity incorporated as a holding company in 1994 to hold various substantial Vietnamese investments including a power plant, a large land development and other infrastructure near Ho Chi Minh City. Its three major shareholders are holding companies owned by Dr. Chen Ching Chih ("Dr. Chen", the second Plaintiff), Mr. Lawrence Ting ("Mr. Ting") and Mr. Ferdinand Tsien ("Mr. Tsien").

3.     The amended statement of claim alleges a "mutual understanding and agreement" between the three men that the Vietnamese investments "would be owned and operated as a joint venture and quasi-partnership between the three of them, and that each of them would be entitled to participate equally in the management of the venture, and that no party would be excluded from management without his consent." It is alleged that this agreement was reflected in a joint venture agreement dated September 20, 1989 between the three men and the Central Investment Corporation of

*150331 Tempo v Fortuna Judgment*

the Kuomintang ("the KMT") political party in Taiwan.  The three men had agreed that each would be entitled to designate a director of a predecessor company known as CT & D Taiwan.  It is alleged that when Fortuna was incorporated in February 1994 the three men, acting on behalf of their respective nominee companies Tempo Group Limited ("Tempo"), Wynner Group Limited ("Wynner") and New Frontier Development Corporation ("New Frontier"), agreed that these companies would be the registered shareholders of Fortuna.  The plaintiffs say it was an express or implied term of this agreement that the personal rights and obligations of each of the three men would be accepted and assumed by the nominee companies.  The result was that there came into existence an agreement between the three companies that they should "be entitled to participate equally in the management of Fortuna, and in particular to have equal representation on its board of directors, and that none of them would be excluded from the management of Fortuna without its consent".

4.     Mr. Green said in his opening that the plaintiffs do not allege a novation but assert an entirely new agreement involving Fortuna.  Fortuna was operated as a "quasi-partnership in a corporate form".  Dr. Chen says that he has an entitlement under this agreement to participate as Tempo's nominee on Fortuna's board of directors.  He seeks an order, whether by specific performance or otherwise, requiring Wynner and New Frontier to procure his reinstatement to the board and an injunction restraining them from removing him from the board thereafter.  There is also a claim in damages. When

*150331 Tempo v Fortuna Judgment*

asked at trial what role he wanted in management, Dr. Chen said "I just want to be on the board".

5.  The defendants say that the relationship between the three men was never the subject of any mutual understanding or agreement, express or implied, and never took the form of a quasi-partnership. In any event, say the defendants, if there was an agreement, Dr. Chen had repudiated that by his conduct late in 2003 and early in 2004. As for the claim in damages, the defendants say that any alleged loss is too remote, not of a kind which may be recovered, and that there has been a failure to mitigate.

6.  On June 22, 2004 an extraordinary general meeting of the shareholders of Fortuna ("the EGM") was held in Beijing. Over the objections of Dr. Chen, Mssrs. Ting and Tsien were successful in passing a series of special and ordinary resolutions which removed Dr. Chen from the board and greatly restricted his right to deal with his shares.

7.  The special resolutions could not have succeeded without the support of Maxima Resources Corporation (variously, "Maxima" and "Maxima Samoa") which owned 5% of the outstanding shares. Mr. Philip Niu ("Mr. Niu") claimed to be the sole director and owner of Maxima and sought admission to the EGM but was refused entry; he intended to support Dr. Chen and thus ensure the defeat of the special resolutions. Instead, Mr. Tsien voted pursuant to a proxy from Maxima in favour of all resolutions. The defendants say that the true beneficial owner of Maxima was Pearl Niu, Mr. Niu's

*150331 Tempo v Fortuna Judgment*

mother; that she had utilized bearer shares to give legal ownership of Maxima to Mr.
Tsien and his wife; and that they had arranged for Maxima to give its proxy for the EGM
to Mr. Tsien. The result, say the defendants, is that all of the special and ordinary
resolutions are valid as Mr. Niu had no right to represent Maxima at the EGM. In any
event, a 2011 shareholders meeting of Fortuna has ratified the impugned resolutions.

8.     The plaintiffs say that Mr. Niu, not his mother, was the beneficial owner of Maxima and
its sole director. The bearer shares were not validly issued so the legal ownership of
Maxima remained with Mr. Niu, its sole registered shareholder. The "issuance" of the
bearer shares and the proxy to Mr. Tsien were not done in good faith. The deliberate
and dishonest exclusion of Mr. Niu from the EGM rendered the meeting, and all
business transacted at it, a nullity which is incapable of ratification.

**Evidence of Dr. Chen Ching Chih**

9.     Dr. Chen is a citizen of Taiwan and of the United States with degrees from the
Massachusetts Institute of Technology.  Now 76, he has been involved in businesses in
Taiwan and internationally for over 44 years.  He has also acted as an advisor to the
Ministry of Finance in Taiwan.

10.    The first Plaintiff, Tempo, is a company owned and controlled by Dr. Chen; it was
incorporated to hold his 30% shareholding in Fortuna. The second defendant, Fortuna

*150331 Tempo v Fortuna Judgment*

East Asia Holding Corporation, was formerly known as New Frontier; it was, during the time material to this action, owned and controlled by Mr. Ting and was established to hold his 30% shareholding in Fortuna. The third defendant, Wynner, was owned and controlled by Mr. Tsien and holds his 25% shareholding in Fortuna. A fourth shareholder in Fortuna, Bates Group Limited ("Bates") (the fourth defendant) owned a 10% shareholding on behalf of Dr. Chen, Mr. Ting and Mr. Tsien equally. Finally, and crucially to the issues in this trial, Maxima, the third plaintiff, incorporated as a holding company in Samoa, owned the remaining 5% shareholding. The ownership of Maxima and the right to control it and vote its shareholding is a major issue in this case.

11.     Both Mr. Ting and Mr. Tsien have passed away and have never given evidence expressly for use in this trial.

12.     Fortuna has a number of subsidiaries, the most important of which are: Metropolitan Development Corporation ("MDC"), which owns indirectly the Hiep Phuoc Power Company Limited ("HPPC") in Ho Chi Minh City, Vietnam; the Tan Thuan Corporation ("TTC"), the developer of a large tract of land in the same area; and the Phu My Hung Corporation ("PMHC"), the developer of a parkway and other infrastructure in the Saigon South area near Ho Chi Minh City. The value of Fortuna and its various direct and indirect subsidiaries (collectively, "the Fortuna Group") is in excess of US $1 billion.



13.     Dr. Chen's involvement with Mssrs. Tsien and Ting commenced in relation to a predecessor company to Fortuna – CT & D Taiwan ("CT & D"). In the summer of 1989 Mr. Tsien arranged to meet with Dr. Chen in Taipei. The men had known each other since the mid-1970s. Mr. Tsien was the son-in law of Mrs. Pearl Niu; she had introduced Dr. Chen to the woman who would become his wife. Dr. Chen describes himself as a close friend of Phillip Niu, the son of Robert and Pearl Niu. Dr. Chen's father had had a long standing personal and business relationship with Mr. Robert Niu.   Dr. Chen describes Mr. Tsien and the latter's wife, Josephine Tsien (formerly Niu), as "friends".

14.     Mr. Tsien explained to Dr. Chen that he and Mr. Ting were considering investing in a joint venture with the Kuomintang political party (the "KMT") for the purpose of investing in a Taiwanese investment company.  That entity was already under the control of the KMT.  Since Dr. Chen was not acquainted with Mr. Ting, Mr. Tsien explained that he was the son-in-law of a former Minister of Finance in Taiwan, had attended university in the U.S.A., and had returned to Taiwan to go into business. Mr. Ting had been approached by Mr. Albert Hsu, Chairman of the Central Investment Committee of the KMT and a former Deputy Premier of Taiwan, to take over the management of the investment company.  The KMT would continue as the majority shareholder and would have a majority of directors on the board; it was proposed that Mssrs. Ting and Tsien and Dr. Chen would be minority shareholders and would each have a representative on the board.  Mr. Tsien proposed that the three men meet with Albert Hsu, someone with whom Dr. Chen was already friendly.

*150331 Tempo v Fortuna Judgment*

15.     Not long after this first meeting Albert Hsu met with the three prospective investors in

        Taipei.  Mr. Hsu proposed that the KMT would own a 75% shareholding, with Mssrs.

        Tsien and Ting each having 10% and Dr. Chen 5%.  It was suggested that Mr. Ting "with

        the assistance of Mr. Tsien" would have control of the day-to-day business operations.

        Dr. Chen was to have no day-to-day role but was to be a board member of the joint

        venture company, which was to be known as CT & D Taiwan.  Mr. Hsu closed the

        meeting by providing the three men with a draft joint venture contract for review.

16.     On September 20, 1989 the parties executed the joint venture agreement.  It provides

        that each of the three men would be entitled to designate a director on the board of CT

        & D Taiwan. Dr. Chen says that the quasi-partnership which was created in January,

        1994 following the joint purchase by the three men of the majority shareholding in   CT

        & D Taiwan carried forward the "spirit" of the understandings and agreement

        manifested by the joint venture agreement. The defendants deny the existence of a

        quasi-partnership.

17.     In December, 1993 Mssrs. Tsien and Ting and Dr. Chen met at the American Club in

        Taipei to discuss the possibility of purchasing the KMT shareholding in CT & D Taiwan.

        Mr. Tsien told Dr. Chen that Albert Hsu had told him that the former president of

        Taiwan, Mr. Lee Teng-Hui, had requested that Dr. Chen be a shareholder and director.

        Mr. Lee and Dr. Chen were acquainted. Mr. Tsien explained that President Lee desired

*150331 Tempo v Fortuna Judgment*

the participation of Dr. Chen because of his independence from the KMT, his contacts in the Taiwanese business community and his personal financial resources. At the time, Dr. Chen's personal net worth was in the range of hundreds of millions of U.S. dollars. Mssrs. Ting and Tsien were both of "mainland Chinese descent" while        Dr. Chen was of Taiwanese descent; he felt this distinction was a motivating factor.

18.    Dr. Chen denies he was a passive investor in CT & D Taiwan. Although Mr. Ting and Mr. Tsien were responsible for management, Dr. Chen says he participated in decision making of a strategic nature. He held the title of Vice-Chairman. Between 1989 and 1991 he consulted with Mssrs. Ting and Tsien to determine the best location for investment. With the concurrence of Dr. Chen, they eventually settled upon Vietnam. Dr. Chen met "frequently" with Mssrs. Tsien and Ting to discuss possible investment opportunities, although the initial identification of such opportunities was "primarily" their responsibility. In his written evidence Dr. Chen said these discussions took place in the CT & D offices in Taipei but he agreed in cross-examination that this was incorrect. What Dr. Chen described as a "close working relationship" continued until early 2004. Once the three men had agreed upon a certain course of action, Mr. Ting (as board chairman) would communicate the proposal to Albert Hsu who would bring it to the entire CT & D board.

19.    Dr. Chen says that he travelled to the head offices of Fortuna's important subsidiaries once or twice per year until 2001. Beginning in 2002, he visited "more regularly". In

*150331 Tempo v Fortuna Judgment*

Page 10 of 139

particular, he visited Vietnam on behalf of the Fortuna Group from time to time. On one occasion, he went there with the Chairman of the KMT (Professor Liu) and the two men jointly selected an architectural firm to design a set of plans. On another occasion Dr. Chen took the lead in acquiring a third party's 25% interest in a Fortuna subsidiary, Power JV.

20.    Around mid-November, 1993 Dr. Chen learned that Professor Liu was recommending that the Vietnamese investments (with one exception) be abandoned in favour of investment in Indonesia and in the Philippines. Dr. Chen met with Mssrs. Ting and Tsien; all three felt that Vietnam continued to offer good opportunities for investment. The men agreed that Dr. Chen would meet with President Lee to ask whether the KMT would be prepared to change its view. It was also agreed that if the KMT maintained its intention to divest CT & D Taiwan of its Vietnamese investments, Dr. Chen would explore a sale by the KMT of its interest to the three men. Dr. Chen says that he was chosen to meet with President Lee because of their "close relationship". The meeting with President Lee took place at his home shortly afterwards.

21.    A few weeks later, President Lee telephoned Dr. Chen to say that the KMT would sell its shares to Dr. Chen and to Mssrs. Ting and Tsien. Dr. Chen left the other two men to work out the details of the transaction.

A-10257

22.    Around January 29, 1994 Dr. Chen met with Mssrs. Ting and Tsien at the American Club

       in Taipei to consider a draft purchase agreement. The KMT was to sell all but 10% of its

       75% interest in CT & D Taiwan to the three men. It was important that the KMT

       continue to be involved in order to maintain orderly relations with a lender. Mr. Ting

       advised Dr. Chen that the KMT would only enter into the purchase and sale agreement if

       Dr. Chen assumed personal liability for certain KMT bank loans and guarantees; he was

       also asked to issue promissory notes to cover the entire purchase price of the

       shareholding. In effect, Dr. Chen was to become the guarantor for all three of the

       partners.

23.    Dr. Chen told Mr. Tsien and Mr. Ting that he was prepared to enter into the agreement

       to purchase the KMT's interest "if we did so as equal partners". His witness statement

       continues:

               *Mr. Tsien and Mr. Ting both agreed and they confirmed that, if the
               purchase was to proceed, then our investments in CT & D Taiwan would
               be owned and operated as a joint venture and quasi-partnership between
               the three of us and that each of us would be entitled to have equal
               representation on the boards of directors of those companies and would
               not be excluded from management.*

24.    This alleged agreement between the three men in their personal capacities has been

       referred to in evidence as the "CT & D Taiwan Agreement". It was never reduced to

       writing by any of the three parties. It was agreed that Mr. Ting and Mr. Tsien would

       each acquire 20% of the KMT's shareholding and Dr. Chen would acquire the remaining

*150331 Tempo v Fortuna Judgment*

25%; the result was to be that each man would own an equal 30% interest in CT & D Taiwan.

25.    The share purchase agreement was signed on February 1, 1994. As agreed, Dr. Chen issued promissory notes to the KMT for the full purchase price of the shareholding. Mr. Tsien and Dr. Chen were appointed co-vice-chairmen of the company. Dr. Chen was also appointed to the boards of several subsidiaries. As time passed, he says he became responsible for "resolving issues" between the KMT and the three partners.

26.    While the three men were discussing the buyout of the KMT's shareholding, they also considered establishing a new "tax efficient" company in which to hold the Vietnamese business interests. Dr. Chen describes their meetings as having been held "on an ad hoc basis, usually over lunch"; no written record was kept of what was said. Mr. Tsien advised that he had received advice from Offshore Incorporations Limited ("OIL") to the effect that an offshore holding company should be created to hold the assets owned by CT & D Taiwan. That holding company is Fortuna, the first defendant. The proposal was that CT & D Taiwan continue to manage the Group companies under a management agreement.

27.    In the first or second week of February, 1994 Dr. Chen, Mr. Tsien and Mr. Ting met at the CT & D offices in Taipei to discuss how the new holding company would be managed and controlled. Dr. Chen's witness statement says:

150331 Tempo v Fortuna Judgment

A-10259

> *Mr. Tsien told us that, because the company would simply be replacing CT & D Taiwan as the holding company for the group, he considered that the partnership arrangements that we had in place for CT & D Taiwan, governed by the CT & D Taiwan Agreement, could simply be carried over to the new entity.*

28.  In effect, because each man was entitled to participate equally in the "management" of CT & D and to have equal representation on its board of directors, it was proposed that none of the three could be excluded from the management of Fortuna or from its board without that individual's consent. Thus, each of the three families would own 30% of Fortuna and 10% would be reserved for the KMT if it decided to participate.  Dr. Chen's witness statement says:

> *Mr. Tsien's proposal seemed entirely logical and both Mr. Ting and I agreed to the proposal without much discussion.*

29.  The discussion then turned to how the men would hold their investments in the new holding company. Mr. Tsien explained that he had had advice from OIL to the effect that they should establish offshore holding companies through which to own their interests. The motive was to minimize tax liability.  There was some discussion about how these offshore vehicles would be established and then both Mr. Ting and Dr. Chen told Mr. Tsien that he should proceed to instruct OIL to put the plan into effect.

30.  Thus, on the evidence of Dr. Chen, there were three main elements to what has been referred to in evidence as the "Fortuna Agreement":

*150331 Tempo v Fortuna Judgment*

- Each of the three men would be entitled to equal representation on the Fortuna board of directors; and

- none of the three men would be excluded from "management" without that man's consent; and

- each of the three men would hold their shares in Fortuna in an offshore company rather than in their personal names.

31.   As was the case with the CT & D Taiwan Agreement, the Fortuna Agreement was never reduced to writing. Dr. Chen describes Mr. Ting and Mr. Tsien as being "very enthusiastic" about Dr. Chen joining the board.

32.   Fortuna was incorporated in the Cayman Islands as an exempted limited company on February 25, 1994. The articles of association, prepared by OIL, contain nothing which reflects the terms of the Fortuna Agreement. All three men were appointed to the board. The shareholdings in Fortuna were transferred to Tempo, Dr. Chen's company; to New Frontier, Mr. Ting's company; and to Wynner, the property of Mr. Tsien. As at June, 2004 Tempo owned 30% of Fortuna, New Frontier owned 30% and Wynner owned 25%. The remaining minority shareholders were Bates and Maxima. Tempo was owned by Dr. Chen, by his brother Mr. C.H. Chen and by Dr. Chen's son Randy Chen.



33.   Around January, 2002 Mr. Albert Hsu was invited to become a director and shareholder of Fortuna. This was to procure the continued involvement of the KMT in Fortuna by giving it a representative at board level.

34.   Bates was established by the three principals with the intention of inducing the KMT to take up (through Bates) a shareholding of up to 10% in Fortuna. The original shareholders of Bates were Tempo, New Frontier, and Wynner in equal proportions. In fact, the KMT did not take up this opportunity.

35.   The remaining Fortuna shareholder was Maxima Samoa, which held 5%. In the summer of 1994 Mr. Tsien had told Mr. Ting and Dr. Chen that he proposed to transfer 5% of his own shareholding in Fortuna to a company owned by Phillip Niu; Dr. Chen later learned that the company was named Maxima. Because of his close connections with Phillip Niu and with the Niu family Dr. Chen was happy to agree. Mr. Ting also agreed. Dr. Chen says that Mr. Tsien "confirmed that he would make the necessary arrangements regarding the transfer".

36.   Dr. Chen says he played a crucial role in the financing of Fortuna and its investments. He was instrumental in arranging for the KMT to agree to extend the period during which it would provide collateral for CT & D. In 1996 each of the shareholders of Fortuna was required to make a pro rata contribution of additional capital. Mr. Ting found himself unable to do so. Dr. Chen arranged for a company under his control to loan the sum of

*150331 Tempo v Fortuna Judgment*

U.S. $5 million to Mr. Ting; the loan was eventually repaid. In 1995 Fortuna borrowed U.S. $40 million from a syndicate organized by First Commercial Bank Limited. Dr. Chen was one of several guarantors of Fortuna's obligation. He pledged a large and valuable shareholding. Dr. Chen says that, had Fortuna defaulted on the loan, the lender would have exercised its security rights over his shares in preference to pursuing the other guarantors. Fortuna borrowed an additional U.S. $180 million from the same syndicate. Again, Dr. Chen was a personal guarantor and pledged a substantial shareholding as security. Again, he says that the lender viewed the shares he pledged as its primary security for the loan. In the event, the loans were repaid and the pledged shares were released. On a number of occasions, from June 1999 to April, 2002 Dr. Chen and his brother (Mr. C.H. Chen) loaned money to the Fortuna Group. These loans ranged from U.S. $535,000 to U.S. $10,500,000. They were to provide short term financing to Fortuna at a time when it was growing slowly and still required capital.

37.    In 2003, Dr. Chen, Mr. Ting and Mr. Tsien began to discuss bringing the next generation of members of their respective families into the business. Dr. Chen's son, Randy Chen; Mr. Tsien's daughter, Gayle Tsien; and Mr. Ting's son, Arthur Ting; were appointed to the board of directors. The gist of the discussion between the three principals was that each of them would introduce one successor onto the board. The three members of the next generation, together with Albert Hsu, attended their first board meeting as directors on January 16, 2004.

*150331 Tempo v Fortuna Judgment*

38.     Loans obtained from the First Commercial Bank Limited syndicate (referred to in
        evidence as the "MDC facility") required the pledging of shares by Dr. Chen and his
        brother, Mr. C.H. Chen.  By 2001, Mr. C.H. Chen had become increasingly concerned
        about his conditional liability.  He said to Dr. Chen that he wanted Mr. Ting and Mr.
        Tsien to agree in writing to a list of key corporate actions which they would not take
        without the approval of Dr. Chen and his brother.  Messrs. Tsien and Ting agreed.  On July
        4, 2001 a written agreement was executed by the three partners in their personal
        capacity and by Tempo, New Frontier and Wynner. This has been referred to in evidence
        as the "Shareholders Agreement".  A recital in the agreement sets out its purpose:  "to
        procure that C.H. Chen will cause the guarantees to be extended or renewed..."  Dr.
        Chen's position is that the terms of the Shareholders Agreement were not intended to
        affect in any way the much earlier Fortuna Agreement upon which his claim is based.

39.     By mid-2002 Fortuna was beginning to make a profit. In particular, the real estate
        market in and around Ho Chi Minh City was very buoyant.  Fortuna had not been paying
        dividends but Messrs. Ting and Tsien now wanted to change that.  Mr. Ting suggested to
        Dr. Chen that U.S. $20 million should be paid out to the shareholders.  Dr. Chen agreed
        although he had no immediate need for the money.  Mr. Ting told Dr. Chen that it was
        "extremely important" to himself and to Mr. Tsien that a dividend be paid.  Fortuna's
        lenders agreed to the dividend.



40.     Shortly after, Dr. Chen met with Jessie Hsu, the Chief Financial Officer of CT & D Taiwan and of Fortuna. Jessie Hsu presented a memorandum and supporting documents to, as he said, help explain the accounting aspects of the dividend payment. Dr. Chen found the material puzzling and troubling. The memorandum said that the sum of U.S. $5 million "will be used to cancel out the amount receivable" without presenting any explanation of how or in what circumstances this receivable had come into existence. It went on to say that the remaining U.S. $15 million "will be distributed to the three shareholders in equal shares." However, there were five shareholders not three. A line item in a table referred to U.S. $15 million as "other expenses". A note beside it said "deduct U.S $5 million each time from dividends distributed - 3 deductions in total." There were some cryptic notations beside the U.S. $15 million line item which in total amounted to U.S. $13.7 million but the circumstances in which these purported liabilities had been occurred were not revealed.

41.     Dr. Chen says that he raised many "questions" with Jessie Hsu but the latter said only that he was not in a position to answer them. He directed Dr. Chen to speak with Mssrs. Ting and Tsien. Shortly afterwards, Dr. Chen did meet with Mr. Ting but the latter said he would need to arrange another meeting at a later stage to discuss these questions. In the meantime, the formal board resolution authorizing the U.S. $20 million dividend was passed; the resolution makes no reference to the U.S. $5 million deduction. In the result, Tempo received significantly less than Dr. Chen believed was its entitlement.

*150331 Tempo v Fortuna Judgment*

A-10265

42.   Dr. Chen says that he tried to speak with Mr. Ting and with Mr. Tsien about the confusing information presented to him by Jessie Hsu and about the U.S. $5 million deduction but they always "claimed" that they were unable to meet or unable to answer the questions.  As a result, Dr. Chen's confidence in his partners began to evaporate.

43.   Gayle Tsien, who has acted as Fortuna's Vice-President of Finance, has examined the company records. She says that the amounts owed to Fortuna by its shareholders are recorded properly and that Dr. Chen has always been at liberty to examine these accounts. The accounts have been audited by KPMG without adverse comment.

44.   In December 2002 Mr. Ting and Dr. Chen travelled to Hanoi to meet with the Deputy Minister of Finance for Vietnam.  A subsidiary in the Fortuna Group, PMHC, considered that it had an agreement to be taxed at an overall rate of 10%. When certain building permits were issued to it they stipulated that the tax rate on profit would be 25%.  At the time, PMHC did not protest but the purpose of the meeting was to ask the government to reinstate the lower rate.  During the meeting, the Deputy Minister of Finance suggested a compromise – the applicable rate should be 18%.  Dr. Chen was about to accept this offer on behalf of Fortuna when Mr. Ting stopped him and told the government official that he and Dr. Chen would have to discuss the offer.



*150331 Tempo v Fortuna Judgment*

A-10266

45.     After they had left the meeting and returned to their hotel, Mr. Ting, according to Dr.

Chen, explained that they did not have to accept the 18% offer because an arrangement

had already been made with other officials to reduce the tax rate back to the original

10%. Dr. Chen says that Mr. Ting said that he had arranged for a payment of U.S. $10

million to people connected with the Vietnamese government – in essence, a bribe of

mammoth proportions. Dr. Chen says he was stunned. He asked Mr. Ting where the

U.S. $10 million was coming from because he had seen no reference to it in the monthly

financial reports. Mr. Ting did not answer this question but said he would discuss it

when they arrived back in Taiwan.

46.     After hearing from counsel at a case management hearing, I have ruled that the

question of whether bribes were paid or money was misappropriated from Fortuna will

not be resolved in this trial. The evidence of bribery or misappropriation is of limited

relevance; it serves only to explain what Dr. Chen believed in 2003 and 2004 and thus

provide an explanation for his actions at that time. It also serves to explain why Mssrs.

Ting and Tsien wished to remove Dr. Chen from Fortuna's board; they would have been

motivated to remove him whether his allegations were true or false. A determination of

whether bribes were actually paid or money was truly misappropriated is simply

unnecessary.

47.     From this point on, Dr. Chen began to take a much more active interest in the affairs of

Fortuna and its subsidiaries. He travelled to Vietnam in December, 2002 in search of

*150331 Tempo v Fortuna Judgment*

A-10267

information about some of the "other expenses" to which Jessie Hsu had referred. He

visited the offices of SPCC, a major component of the Fortuna Group, requested access

to certain business records and accounts, and formed the conclusion he was being put

off.

48. Upon Dr. Chen's arrival back in Taiwan, Mr. Tsien raised with him the possibility of

another dividend payment. Dr. Chen was reluctant. The proposed dividend payment

was U.S. $25 million, a figure which seemed inordinately high. At a meeting between

the three partners Mr. Ting said that he thought that U.S. $10 million of the proposed

dividend should be withheld to pay for certain "extraordinary expenses" of Fortuna. Dr.

Chen had no knowledge of these extraordinary expenses and suspected that the

deduction was linked to the alleged bribes to which Mr. Ting had referred a short time

previously. Dr. Chen asked Mr. Ting to elaborate but found the explanation unclear.

When Mr. Ting promised to provide full details of the extraordinary expenses Dr. Chen

acquiesced in the declaration of the U.S. $25 million dividend. The sum of U.S. $10

million was withheld from the shareholders as Mr. Ting had suggested.

49. Towards the end of December, 2002 Dr. Chen questioned Mr. Ting about the alleged

bribes to Vietnamese officials. Dr. Chen has said in evidence that, by this point, he was

"convinced" that no bribes had actually been paid; he considered the suggestions of

bribery to be a way to explain what were actually misappropriations by Mssrs. Ting and

Tsien. He quotes Mr. Ting as saying that U.S. $5 million had been paid directly to several

*150331 Tempo v Fortuna Judgment*

Vietnamese officials and the remaining U.S. $5 million had been deposited into a Swiss bank account. When Dr. Chen asked for the information regarding the "extraordinary expenses", Mr. Ting said that staff members were compiling the information and it would be provided to Dr. Chen in due course.

50.   In January, 2003 Dr. Chen met with Mr. Tsien to pose to him the same questions he had asked earlier of Mr. Ting. Mr. Tsien responded that the matters under discussion were "very confidential" and that Dr. Chen should trust his partners to make the right decisions but "should not have been involved in any details".

51.   Around January, 2003 Mr. Jessie Hsu gave to Dr. Chen a table entitled "Northern Office Expenses". This table suggests that substantial cash payments were being withdrawn from CT & D Taiwan and from Warson, another group company, and then booked as "receivables" against the interests of the three main shareholders. Fortuna's financial statements make no reference to these receivables. The table suggests that payments totaling U.S. $14.475 million were made between May 2000 and November 2002. Neither the purpose of the payments nor the recipients are stated. The reference to the "Northern Office" is not explained. Dr. Chen speculated that it was a reference to the Fortuna group office in Hanoi. After receiving this document Dr. Chen says that he pressed Mr. Tsien for information about it on several occasions. Eventually, according to Dr. Chen, Mr. Tsien said in effect that the payments listed in the table were illegal;

they were "public relation expenses" and Dr. Chen should not enquire into the detail. Dr. Chen was dissatisfied and determined to investigate further.

52.     On April 28, 2003 a further dividend of U.S. $20 million was declared by Fortuna. Only U.S. $15 million was paid out to the shareholders. On August 14, 2003 Fortuna declared a dividend in the amount of U.S. $15 million. No deduction was taken from the dividend on this occasion. Again, on December 5, 2003, a dividend was declared – this time in the amount of U.S. $10 million. The board chairman (Mr. Ting) was authorized to set a time for distribution of the dividend; it was never distributed. Dr. Chen alleges that this latter "dividend" was, according to Mr. Ting, to be used to fund the payment of bribes to Vietnamese officials in order to resolve the tax issue. Dr. Chen says that Mr. Ting told him the money had already been paid out.

53.     In 2003 Dr. Chen made nine trips to Vietnam to try, as he said, to gain a better understanding of the operations of the main Vietnamese subsidiaries and to "try to investigate from where the source of funds for Mr. Ting's claims about bribery could be". Mr. Ting "assigned" a friend of his, General Zhang, to accompany Dr. Chen in Vietnam. Dr. Chen formed the view that both Mr. Ting and General Zhang were obstructing and frustrating his enquiries.



54. Randy Chen was working at the offices of a Fortuna subsidiary in Vietnam in 2003. He has described in evidence the delivery of a large sum of cash to a Vietnamese official. Dr. Chen said that his son told him of this incident when it happened.

55. In October 2003 at a Fortuna directors meeting Dr. Chen says that Mr. Ting told those present that he hoped the tax rate dispute would be resolved soon because of the payment of U.S. $10 million in bribes. Again, Dr. Chen asked for information about the source of funding and why the payment was necessary and, again, was told that the issue was sensitive and that he did not need to know anything more. Arthur Ting and Gayle Tsien, who were present, deny that any such conversation occurred.

56. Towards the end of 2003 Mr. Ting provided a copy of a letter to Dr. Chen which was written in code. Dr. Chen says that Mr. Ting said that the document confirmed that bribes of U.S. $5 million and U.S. $2 million to certain named officials. Dr. Chen was skeptical about this explanation. He did not think the payment of such sizable bribes was consistent with his knowledge of business practices in Vietnam. He said in his witness statement:

> What seemed more likely to me was that Mr. Ting and Mr. Tsien were using the excuse of paying bribes to cover up the fact that they were extracting more money from the group than they were entitled to. By referring to bribery and corruption of such senior officials, I believe they were hoping to deter me from investigating the accounting irregularities.

Arthur Ting has examined the letter and says that it is not in his late father's handwriting and, in any event, the translation of it in evidence is inaccurate. Gayle Tsien points out

that the "letter" is labeled a "draft", which seems an odd status to confer upon a document purporting to record payments already made.

57.    Shortly after receiving the coded letter from Mr. Ting, Dr. Chen showed it to Mr. Tsien. Dr. Chen says that Mr. Tsien confirmed that the letter reflected his own understanding of the situation.

Dr. Chen's evidence makes reference to a number of other entries in the books and records of Fortuna group which appeared irregular. By the end of 2003 Dr. Chen began to share his concerns with other trusted colleagues. He discussed the situation with his brother, with Mr. Albert Hsu and with Mr. Philip Niu. Mr. C.H. Chen wrote to Mr. Ting in January seeking details of the extraordinary expenses.

59.    A board meeting of Fortuna was scheduled for February 23, 2004. Before the meeting, a preliminary meeting took place between Dr. Chen, Mr. C.H. Chen, Mr. Ting, Mr. Tsien and Mr. Albert Hsu. Dr. Chen says that Mr. Ting told those present that the extraordinary expenses were illegal payments in the form of bribes to Vietnamese officials. He said they had been recorded in Warson's accounts and those of other subsidiaries as "receivables". Dr. Chen says that Mr. Ting then presented a list of 80 payments allegedly made to various government officers and authorities between 2000 and 2003. He allegedly said that all of the payments had been approved by Mr. Tsien

*150331 Tempo v Fortuna Judgment*

and by himself. Mr. Tsien was silent throughout. Dr. Chen alleges that Mr. Ting then wrote on a blackboard the names of four Vietnamese government agencies and explained to whom each of the various sums had been paid. Dr. Chen took notes, which are in evidence. Again, all allegations of bribery and misappropriation are denied by the defendants and by their witnesses. Dr. Chen himself did not believe the allegations.

60.     At the ensuing board meeting Dr. Chen, at his own initiative, was appointed to "oversee finance matters". The actual resolution reads:

> within the function of the board of directors, Dr. C.C. Chen shall oversee finance matters.

Arthur Ting and Gayle Tsien, who were present, assert that the resolution was not intended to give Dr. Chen any rights in relation to subsidiaries; his entitlement was confined to Fortuna itself.

61.     Subsequently, there was a dispute about whether the intention of this resolution was to permit Dr. Chen access to books and records of the Fortuna Group subsidiaries. Mr. Tsien advised Dr. Chen that Gayle Tsien, the Chief Financial Officer of CT & D Taiwan, would supply the information requested. Subsequently, Mr. C.H. Chen reported to his brother that he had been told by Gayle Tsien that most of the requested documentation had been destroyed (and some was stored in Kuala Lumpur and required review before Dr. Chen would be permitted access). This bit of news triggered a written demand by Dr. Chen for all of the records and for recognition of his right to approve all transactions

*150331 Tempo v Fortuna Judgment*

A-10273

over U.S. $100,000 including expenses exceeding that amount, among other things. Gayle Tsien denies that any of this came about for the purpose of preventing Dr. Chen from seeing the records.

62.     In April, 2004 Dr. Chen met with Mr. Ting and Mr. Tsien and again demanded access to the records concerning the receivables and the extraordinary expenses. Mr. Tsien replied that the books and records had been sent to Malaysia for "safekeeping". Dr. Chen says there was no good reason for that.

63.     Dr. Chen now instructed his attorneys in Hong Kong (Holman, Fenwick and Willan) to send a formal letter of demand to Fortuna for payment of Tempo's outstanding dividends and an accounting. The letter was not answered. On April 29, 2004 Holman's advised Fortuna and CT & D Taiwan that Fortuna had instructed attorneys in the Cayman Islands and Taiwan to commence legal proceedings.

64.     As of May, 2002 the MDC Facility was secured by, among other things, personal guarantees from Dr. Chen and Mr. C.H. Chen. Dr. Chen was experiencing doubts that the value of the underlying assets held as security for the facility could satisfy the indebtedness. He believed that the lenders would prefer to exercise their rights under the personal guarantees rather than try to realize assets in Vietnam. Moreover, since Mr. C.H. Chen was not a shareholder, he was receiving no benefit from the substantial dividends which had been declared. Those considerations led to discussions between

150331 Tempo v Fortuna Judgment

the three principals and Mr. C.H. Chen, who wished to be removed as a guarantor. The First Commercial Bank (the lead bank in the syndicate) said towards the end of 2003 that Mr. C.H. Chen's guarantee could be extinguished if all of the other lenders agreed. All but one did so.

65.   By early 2004, Dr. Chen had formed the view that he and his brother needed to be released from their guarantees. In light of his good relationship with the lenders, he felt he could induce them to encourage Mssrs. Ting and Tsien to co-operate with Dr. Chen and resolve their differences.  Dr. Chen did not believe that any of the lenders would declare an act of default simply by his approaching them to discuss his current difficulties.  He says that in none of his conversations with the lenders did he allude to fraudulent conduct or bribery.

66.   There is an attendance note of a meeting between Dr. Chen and his attorney on March 27, 2004 over which privilege has been waived.  The note reads in part:

> (1)   The objective ultimately is to force out Dr. Chen's two co-investors, Mr. Tsien and Mr. Ting.
> (2)   Then insert professional management.
> (3)   Alternatively, if they can raise the finance, they can buy him out.
> (4)   He believes that Mr. Tsien and Mr. Ting – who are the executives in the Company – are stealing from him.

67.   In his oral evidence, Dr. Chen said that he wanted to force Mssrs. Ting and Tsien out of "management" but not force them off the board of directors.

68.     On April 19, 2004 Dr. Chen's Taiwanese attorneys wrote to First Commercial Bank stating that it had "violated the loan agreement" by applying certain monies to pay down the principal. The letter also alleged that Fortuna was "suspected of falsely using loan borrowing to pay out cash dividends." The loan agreement contained terms constraining the ability of certain Fortuna subsidiaries from increasing their indebtedness. The letter also alleged that Fortuna "is suspected to have cause [sic] [a subsidiary] to increase new borrowings". Dr. Chen's attorneys said that since Dr. Chen had not acquiesced in these violations he intended to terminate his guarantee effective June 1, 2004.

69.     Dr. Chen says that he did not intend to prejudice Fortuna's rights under the loan agreement. He conceded that at least one of his approaches to the lenders amounted to an act of default but said he "knew" that the loan would not be called as the lenders considered it secure.

70.     In a letter dated April 29, 2004 the First Commercial Bank denied breaching the agreement and refused to accept a release of the personal guarantees. Dr. Chen's Taiwanese attorneys replied to the bank by letter dated May 12, 2004. This latest letter repeats the earlier allegations in somewhat more detail and then notes pointedly that when a guarantor requests a release of his guarantee "this would constitute an event of default and all the lenders may immediately take legal or other action". The letter then repeats a request for release of the guarantees. Somewhat ingenuously, Dr. Chen says

*150331 Tempo v Fortuna Judgment*



in his evidence "of course, we did not want this to happen, and nor did we think it would happen". His goal was to induce the syndicate banks to pressure Mssrs. Ting and Tsien to resolve their differences with Dr. Chen.  In the event, the lenders neither treated the request as an act of default nor sought to pressure Dr. Chen's two partners. The guarantees were not released.  Nonetheless, Dr. Chen said in evidence that "I felt that progress was being made …" The syndicate did impose some additional terms upon Fortuna in relation to the distribution of dividends and timing of loan repayments.

71.    Before June, 2004 both board meetings and shareholders meetings of Fortuna had been arranged informally and by a consensus of the three men.  They were usually held in Taipei at a mutually convenient time.  In May Mr. Ting and Mr. Tsien decided to convene a board meeting to be held in Beijing on June 2, 2004.  Taiwanese citizens require special visas for travel to Beijing, which can take over a week to obtain. A formal written notice of the meeting dated May 21, 2004 was mailed from a Fortuna subsidiary in Vietnam to Dr. Chen's address in Taipei.  It came to his notice around May 28th while he was in the United States. Both the date and the location were inconvenient, as was the short notice. Contrary to the earlier practice, the notice did not identify the resolutions which would be proposed at the meeting. Dr. Chen requested that the meeting be put off to another time but this was refused.  Despite requesting them, Dr. Chen did not receive a copy of the minutes of this meeting until the discovery phase of this action. Those present at the board meeting resolved to convene an extraordinary general meeting of Fortuna shareholders "within the next three months on such a date as is

*150331 Tempo v Fortuna Judgment*

determined appropriate by the chairman of the board [Mr. Tsien] or the chairman of this meeting [Mr. Ting] each acting individually." Because of the short notice, neither Randy Chen nor Albert Hsu attended the meeting.

Several days after the board meeting, Dr. Chen asked Mssrs. Ting and Tsien for a renewal of the 2001 Shareholders Agreement for an indefinite period of time. They refused. On June 17, 2004 Tempo issued proceedings in this Court (Cause No. 291 of 2004) against Fortuna seeking recovery of Tempo's unpaid share of the declared dividends.

73.    On June 18, 2004 Dr. Chen sent an email to Gayle Tsien and Phillip Niu suggesting that a Fortuna shareholders meeting be held on June 30, 2004. He received a reply from Gayle Tsien on June 20th, when he learned for the first time that an extraordinary general meeting of shareholders was planned for June 22nd in Beijing. She advised Dr. Chen of the place and time of the EGM. She did not advise him of the agenda or of the proposed resolutions. Formal notice of the EGM had been sent to Tempo's registered address in the British Virgin Islands (as is required by the Fortuna articles of association) but, in the past, such notices have been sent to Dr. Chen's address in Taipei. When Dr. Chen asked Gayle Tsien why the notice had not been sent to him by email, she did not answer.

74.    Despite the short notice, both Phillip Niu and Dr. Chen arrived in Beijing by June 22nd. The EGM was due to start at 9:00 a.m. Dr. Chen and Mr. Niu arrived at the meeting in

*150331 Tempo v Fortuna Judgment*

A-10278

the company of Mr. Paul Hatzer, an attorney representing them both, and his assistant. Dr. Chen says that there were security guards at the door to the meeting room. Dr. Chen and Mr. Hatzer were admitted to the meeting but entry was barred to Mr. Niu. Gayle Tsien explained that Maxima was already represented at the meeting because it had granted its proxy for that purpose to Mr. Tsien. When Dr. Chen and Mr. Niu asked for a copy of the proxy, Gayle Tsien said she did not have one. Inside the meeting room, Mr. Tsien produced a minute of a board of directors meeting of Maxima dated June 14, 2004 which contained a resolution appointing Mr. Tsien as Maxima's proxy.

75.     This dispute over the right to represent Maxima was crucial because its votes were needed to pass the special resolutions to be proposed at the EGM. The articles of association of Fortuna required a two-thirds majority for a special resolution. New Frontier and Wynner (the Ting and Tsien holding companies) held a total of 55% of the shares. Bates, which at this time was controlled by Mssrs. Tsien and Ting, owned a further 10%. Thus, Maxima's 5% shareholding was vital to the success of any special resolution to which Dr. Chen might be opposed.

76.     Present at the EGM were: Mr. Tsien (acting as chairman), Gayle Tsien (acting as secretary), Mr. Ting, Arthur Ting, Dr. Chen, and Mr. Hatzer. Mr. Tsien began by announcing that 100% of the shares of the company were represented at the meeting. Mr. Hatzer protested on behalf of Tempo that Maxima had been wrongly excluded from

he meeting, that inadequate notice of the meeting had been given, and that no agenda had been received. A copy of the agenda was then provided.

77.    The first special resolution imposed upon shareholders a requirement to seek approval at a general meeting of shareholders for any transfer of share ownership. If the members were to withhold approval, the directors were empowered to require the member in question to transfer all of his shares to a party designated by the directors. Until he complied with such a direction, the member would be deprived of any rights and privileges attaching to his shareholding. This was passed.

78.    The second special resolution made changes to the articles of association. One change dealing with "confidentiality" prohibited a member from disclosing confidential information to any third party. Another change required a member to acquire the written consent of the chairman before speaking to any government authority, to the media or to the public about anything relating to the business of the company. A third change gave a power to the directors to determine if a member had breached these obligations; if so, the directors were empowered to require the member to sell his shareholding to a party designated by the directors. Despite Mr. Hatzer's protest, the resolution was passed.

79.    Other special resolutions, also opposed by Dr. Chen and Mr. Hatzer, were passed to increase the number of authorized shares, to decrease the required notice period for a

*150331 Tempo v Fortuna Judgment*

A-10280

shareholders meeting, to amend the voting procedures for shareholders and directors meetings, and to change the quorum requirement for a general meeting from "two members entitled to vote" to "two members holding 50% of the issued shares and entitled to vote." The last-mentioned amendment gave Mr. Ting and    Mr. Tsien the ability to hold a meeting without Tempo's participation.  In every case, Dr. Chen and his legal advisor learned of the fundamental changes to be made for the first time in the meeting room.

80.    After the special resolutions had been passed, an ordinary resolution was proposed to reduce the number of directors to two. When Mr. Hatzer asked the reason for this, Mr. Tsien gave him a one word answer: "simplicity". A second ordinary resolution nominated Mr. Ting and Mr. Tsien as the sole directors of the company. Mr. Hatzer's protest that this was unfair to Dr. Chen, who still owned 30% of the company, was ignored. The resolution was passed.

81.    In its effect, the June 22nd EGM extinguished any ability of Dr. Chen and his company, Tempo, to influence the affairs of Fortuna. By removing Dr. Chen from the board, Mssrs. Ting and Tsien ensured that Dr. Chen's ability to obtain detailed information from the books and records was eliminated. By shareholders' resolutions dated June 28th and 30th, 2004 Dr. Chen was removed from the boards of various subsidiary companies.



*150331 Tempo v Fortuna Judgment*

A-10281

82.   In July, 2004, Fortuna commenced proceedings against Dr. Chen in this Court alleging that he had breached his fiduciary duties as a director.  Dr. Chen filed a petition in this Court seeking a winding up of Fortuna.

83.   In August 2004, after he had been removed from the board of Fortuna, Dr. Chen made a complaint to the Taiwanese prosecuting authorities "about the conduct" of Mssrs. Ting and Tsien in relation to CT & D Taiwan. His witness statement contains no further detail of the terms of his complaint.  The office of CT & D Taiwan and the home of Mr. Ting were searched and books and records were seized.  Mr. Ting then committed suicide. Mr. Tsien passed away in April, 2006.

84.   The fifth defendant, Mr. Stephen Driscoll, was first appointed a director of Fortuna in September, 2004.  The sixth defendant, Mr. Lii San-Rong, became a director of Fortuna in April, 2007.  The two men are named as defendants simply to ensure that they are bound to implement any orders this Court might make in relation to Fortuna. The same is true of Bates.

85.   On April 13, 2011, after this action had been extant for some considerable time, Fortuna held an EGM.  Each of the ordinary resolutions passed at the EGM on June 22, 2004 was ratified with effect from the date of that earlier meeting.  In each case, Tempo and Maxima were opposed.  There was also an attempt to ratify each of the special resolutions passed at the June 22, 2004 meeting and now under attack in this action.  In

*150331 Tempo v Fortuna Judgment*

A-10282

the case of each special resolution, the opposition of Tempo and Maxima ensured that ratification did not occur; these resolutions were rejected. Tempo's position is that the resolutions passed in 2004 (both ordinary and special) are incapable of ratification.

## Evidence of Chen Chao Hon

86.   Mr. Chen Chao Hon, the brother of Dr. Chen, is a former banker and has considerable experience in dealing with Taiwanese banks. He has a number of useful relationships with Taiwanese banking officials.

87.   In 1994, Mr. Chen assisted the board of CT & D Taiwan to obtain financing. Although not a board member, he attended some board meetings to discuss it. A syndicated loan agreement was obtained from First Commercial Bank Ltd in April, 1995 in the amount of US $40 million. A further loan in the amount of US $180 million (later increased to US $190 million) was obtained in 1998. Each of these lending agreements required that Mr. Chen and his brother pledge shares as security. Some 39 million shares of Wan Hai Lines (a Chen family company) were pledged. Dr. Chen and his brother provided personal guarantees. Some 8.65 million shares in a company called SLPC were also pledged. In general, Mr. Chen asserts that his relationships and the Chen family wealth were of "considerably more importance" to the lenders than the personal guarantees provided by Mssrs. Ting and Tsien.

A-10283

88.  By 2001 Mr. Chen became somewhat uneasy about his financial exposure in relation to Fortuna's borrowing.  After consulting his brother (who concurred), he asked for a written agreement to which he would be a party.  This has been referred to above as the "Shareholders Agreement"; the parties are Mssrs. Ting and Tsien, Mr. Chen and Dr. Chen, Tempo, New Frontier and Wynner.  In consideration for Dr. Chen and his brother continuing to provide their personal guarantees, the agreement sets out a number of major decisions and actions of Fortuna which could only be taken with the express consent of the Chen brothers.

89.  Despite the Shareholders Agreement, by late 2003 Mr. Chen wished to approach the lending banks to ask for the release of his personal guarantee.  The preliminary approach to the First Commercial Bank elicited the response that the personal guarantees could be released only if alternative security was provided.  A second approach to the lending syndicate resulted in a concession that Mr. Chen's guarantee could be released once the indebtedness had been reduced to US. $140 million. However, the syndicate was not unanimous; one lender, Cosmos Bank, did not wish to release Mr. Chen at all.  Mr. Chen spoke to the chairman of Cosmos Bank but was unsuccessful at extracting any concession. The Chen family has a small shareholding in this Bank.

90.  Mr. Chen also says that early in 2003 Dr. Chen began to "raise concerns with me" about his suspicions concerning improper payments and possible bribery. He recalls being told

*150331 Tempo v Fortuna Judgment*

about some U.S. $25 million being paid for "extraordinary expenses" which may have been linked to bribery payments to Vietnamese officials. On January 15, 2004 Mr. Chen wrote to Mr. Ting and asked for an explanation of the extraordinary expenses and of the memorandum produced by Mr. Jesse Hsu. Later, he met with Mr. Tsien who attempted to persuade him to withdraw his request.

91.   Mr. Chen attended the meeting on February 23rd, 2004 immediately prior to the board meeting and corroborates his brother's evidence of what was said at that meeting. Subsequently, Mr. Chen met with the various financial controllers in the Fortuna Group and explained that Dr. Chen's accounting team now required access to various original records.  Gayle Tsien told him that most of the requested documentation had been "destroyed" and the remaining records were stored in Kuala Lumpur.  She also said she needed to review the requested information (regarding shareholder transactions, dividends, expenses and paid up capital) before it could be shown to   Dr. Chen and his accounting staff.  This unsatisfactory response resulted in a written request from Dr. Chen to Mssrs. Ting and Tsien for various accounting records of Fortuna and its subsidiaries.

92.   By April, 2004 Mr. Chen had decided that he needed to protect his financial position "by trying to put pressure on the banks for both of us to withdraw the guarantees or get assistance from the banks to pressure Mr. Ting and Mr. Tsien to start behaving properly". After discussing the situation with his brother, Mr. Chen formed the opinion

*150331 Tempo v Fortuna Judgment*

that if certain "minor breaches of the terms of the MDC Facility" were brought to the attention of the lenders, that would induce them to release the personal guarantees. He also believed that knowledge of these breaches would lead the banks to put the desired pressure upon Mr. Ting and Mr. Tsien to address the concerns of the Chen brothers.

### Evidence of Randy Chen

93.  Mr. Randy Chen has degrees from Duke University and M.I.T. in the United States. In 2002 he returned to Taipei to become involved in the family businesses. He worked in Vietnam and in Taiwan for entities within the Fortuna Group. He also served a brief term as a board member of Fortuna from January 16, 2004 until June 22, 2004.

94.  Around the beginning of 2003 Dr. Chen explained to his son that there were some accounting issues contained in documentation received from Jessie Hsu which he did not understand. Around the end of February, 2004 Randy Chen received a memorandum terminating his employment with PMHC, a Fortuna entity for which he had been working. The memo was signed by Mr. Ting. He remained in Vietnam and worked primarily on the affairs of HPPC, another Fortuna subsidiary. He gave evidence about certain activity he had witnessed in Vietnam which is suggestive of bribery.

95.     Randy Chen never received a notice of the board meeting held on June 2, 2004 in Beijing. He learned about it shortly before the meeting at a time when he was unable to obtain the necessary visa.

## Evidence of Philip Niu

96.     Philip Niu is the son of Mrs. Pearl Niu. His sister Josephine Niu Ping Tsien ("Mrs. Tsien") is the widow of Mr. Tsien; they were married in 1964. Mr. Niu's father, Robert Niu, died in 1974. Gayle Tsien is the daughter of Mr. Tsien and Mrs. Tsien. Philip Niu was educated in England and in the United States. He has lived and worked extensively in the United States but has also lived for periods of time in Guam and in Taipei. Since 2002 he has resided in California.

97.     Mr. Niu made it clear in his evidence that he has retained few business records in relation to his ownership of assets and due to the passage of time his memory of events and transactions is poor. He has refreshed his memory by reviewing two earlier affidavits sworn by him in 2004 and in 2011.

98.     Robert Niu founded and operated various "family" businesses in Taipei. When Robert Niu passed away in 1974, the ownership of the family businesses fell under the control of his widow Mrs. Pearl Niu. Mr. Niu said in his witness statement that ownership of the

family businesses "passed to my mother, my two sisters and me." Jane Niu, the late

sister of Philip Niu, passed away in 1986.

99.   After the death of Robert Niu, Mr. Tsien was entrusted with the management of many

of the family businesses.  Over time, says Philip Niu, Mr. Tsien became "an influential

advisor" to the Niu family.  It is clear that at least until 2003 Mr. Niu relied implicitly

upon the advice of Mr. Tsien.

100.  In early 1994, upon the advice of Mr. Tsien, the two main businesses inherited from

Robert Niu were sold for approximately US. $28 million.  Shortly thereafter a third

business was sold for US $10 million. According to Philip Niu, Mr. Tsien "retained all of

the relevant documentation".  Mr. Niu never received any "detailed records" of these

transactions.

101.  Pearl Niu "arranged" for the cash proceeds of sale to be deposited at an account

name at Deutsche Bank in Singapore. Philip Niu says the account was "managed" by Mr.

Tsien on his mother's behalf.  Bank statements were sent to Mr. Tsien's address and he

provided instructions to the bank.

102.  According to Mr. Niu, there were frequent discussions between Pearl Niu, Mr. Tsien,

and himself about how the sale proceeds (to which I shall refer as the "Family Funds")

should be allocated and distributed.  Mr. Niu says that a broad agreement was reached

*150331 Tempo v Fortuna Judgment*

that Pearl Niu, his sisters and himself would share the Family Funds equally. Because none of the family members had a need for the money at the time, no distribution actually took place. Mr. Niu says that "we were content for the Family Funds to remain on deposit in the bank account". Josephine Tsien denies that any such discussion took place in her presence and says she was "almost always" present when her husband discussed family business with Pearl and Philip Niu. She denies there was an agreement to share the Family Funds equally. Gayle Tsien's evidence is to the same effect.

103.   Mr. Niu has a recollection of discussing on several occasions in 1993 or 1994 with   Mr. Tsien the possibility of Mr. Niu providing funding to a business venture – CT & D Taiwan. He recalls being told that the KMT had agreed to sell its shares in CT & D Taiwan to Mr. Tsien, to  Mr. Ting and to Dr. Chen. In early 1994 Mr. Tsien asked Mr. Niu for a loan of about U.S. $20 million from the Family Funds for the purpose of paying his portion of the buyout price. Mr. Niu said he had no objection provided Pearl Niu agreed. She did. There does not appear to have been any formal loan agreement. Mrs. Tsien's evidence is that the loan was from Pearl Niu to Mr. Tsien and did not require Philip Niu's consent.

104.   At some time in the first half of 1994, another discussion took place. Mr. Tsien, his wife, Pearl Niu and Philip Niu discussed the possibility that the latter would purchase an interest in CT & D Taiwan. Mrs. Tsien suggested it and Mr. Tsien agreed. Philip Niu was hesitant at first but became convinced that the investment was "potentially lucrative". The proposal was that Mr. Niu would buy a 5% shareholding in CT & D Taiwan. The size

*150331 Tempo v Fortuna Judgment*

A-10289

of the investment was eventually settled at US $5 million but Mr. Niu does not say when that amount was agreed upon. This evidence is contradicted flatly by Mrs. Tsien; she says the investment opportunity was offered to Pearl Niu but not to her son Philip.

105. Mr. Niu says that Mr. Tsien explained that he would arrange for an offshore company to be established to hold Philip Niu's investment. Mr. Tsien said that Philip Niu would be the sole director and shareholder of this company and that Mr. Niu's wife (Rosemarie Porschitz) could act as company secretary. OIL would arrange the incorporation. The purpose, said Mr. Tsien, was to minimize Mr. Niu's Taiwanese tax liabilities. On several occasions Mr. Tsien came to Philip Niu and had him sign documents in relation to the new offshore company. He rarely provided copies and Mr. Niu did not request them.

106. Eventually, Mr. Niu came to understand that two offshore companies had been incorporated by OIL: Maxima Samoa and Maxima Samoa Resources Corporation (Liberia) ("Maxima Liberia"). It appears that Maxima Liberia purchased the 5% shareholding in Fortuna and another 5% shareholding in CT & D Taiwan. The Fortuna shareholding was then transferred to Maxima Samoa in 1994. It is not a matter of dispute that Mr. Niu remains the sole shareholder and director of Maxima Liberia to this day. There is also evidence (to be discussed below) that a single ordinary registered share in Maxima Samoa was registered in the name of Mr. Niu. This registered share was then cancelled immediately after issuance. Mr. Niu says he does not know why this was done.

*150331 Tempo v Fortuna Judgment*

107. Mr. Niu does have some recollection of attending the first directors meeting of Maxima Samoa in the company of Mr. Tsien. He recalls being appointed as the sole director of Maxima Samoa and consenting to act. The minutes of the first directors meeting record that Mr. Niu approved the allotment of a single bearer share in Maxima Samoa (a source of controversy which will be referred to in greater detail below). He said in evidence that he does not recall why he requested that a bearer share be allotted to him. Moreover, he does not recall taking any further steps to issue the bearer share and says he has never received a bearer share certificate.

108. Mr. Niu gave Mr. Tsien verbal authority to represent Maxima Samoa at shareholders meetings of Fortuna. His witness statement says: "the authority was limited to representing Maxima Samoa at Fortuna shareholders meetings only; he had no authority to take any other steps in relation to Maxima Samoa without my consent".

109. Mr. Niu rarely received minutes of Fortuna shareholders meetings but did receive telephone calls updating him on company affairs. He says that in the following years he visited the various Vietnam investments owned by the subsidiaries of Fortuna including the Saigon South development, the power station, the economic processing zone, and the forestry project. From time to time Mr. Tsien sent invoices for the cost of the administration of Maxima Samoa and Maxima Liberia to Mr. Niu, who says he paid them personally. One such invoice is in evidence.

*150331 Tempo v Fortuna Judgment*

110. Over time, Mr. Niu (and, according to his evidence, Pearl Niu) became disenchanted with Mr. Tsien's manner of controlling the Family Funds. Increasingly, their requests for up to date information were not being complied with. Mr. Niu expressed the belief that, with the benefit of hindsight, Mr. Tsien had come to believe that he was entitled to "control" the Family Funds absolutely because he had made a major contribution to the success of the family businesses.

111. By early 2004, Philip Niu was pressing Mr. Tsien for information concerning the Family Funds. He asked for a written statement setting out the balance in the bank account and the sources of the money. Mr. Niu says that Mr. Tsien acquiesced.

112. Around March 20, 2004, Gayle Tsien provided a statement ("the Family Funds Statement") to Mr. Niu. The statement (in the form of a spreadsheet) sets out that U.S. $21,964,102 was received from the sale of the "Cannon shares" owned by Robert Niu. There are four columns on the spreadsheet headed "Philip", "Josephine", "Jane", and "Pearl". (Josephine is the Americanized name of Mrs. Tsien.) These are the four family members entitled to claim an interest in Robert Niu's estate. The sale proceeds are divided equally between Philip, Josephine and Pearl. The second section of the Family Funds Statement shows the sum of U.S. $10 million derived from other shareholdings. This sum was divided equally between the four family members with Jane's estate receiving a one-quarter share. Immediately underneath the sum allocated to Philip Niu

150331 Tempo v Fortuna Judgment

is a debit of U.S. $5 million; the line item description for this is "less: CT & D share purchase (P. Niu only)". Mr. Niu says that he had not asked Mr. Tsien to provide an allocation of the funds between family members "because the precise split had still not been determined". The line described as "total owed to shareholders" shows that the share to which Philip Niu would otherwise be entitled has been reduced by U.S. $5 million.

113.  Mrs. Josephine Tsien has said that she never received a copy of this document and that it is "entirely inconsistent" with how the Family Funds were regarded by the family – as the sole property of Pearl Niu. Gayle Tsien's position is that the so-called Family Funds Statement was actually created for the use of Pearl Niu and was for estate planning purposes. She also asserts that the copy of this document produced during the litigation by Philip Niu differs materially from the spreadsheet she created originally; the original was given to Pearl Niu and has since been lost.

114.  In 2002 and 2003 Fortuna declared a series of four dividends.  The minutes of these meetings each list as being present "Maxima Resources Corporation (Western Samoa) as represented by: Mr. Niu Fei". (Niu Fei is Philip Niu's Chinese name.) Mr. Tsien has signed for Mr. Niu in each case indicating his authority to represent him. Maxima Samoa's share of each dividend was: US $752,515.33, US $750,000.00, US $750,000.00 and US $814,731.60.  Three of the four dividends were paid into a bank account in Guam in the name of Mr. Niu and his wife; the third dividend was paid into a bank

*150331 Tempo v Fortuna Judgment*

A-10293

account the couple kept at the Bank of America. Each of the four dividends is significantly less than what Maxima was entitled to receive for its 5% shareholding. Mr. Niu did not notice this at the time and no one alerted him to the fact. He trusted Mr. Tsien. In late 2003 and early 2004 Mr. Niu had a series of discussions with Dr. Chen during which he learned that Maxima had not received its full entitlement from the dividend payments. The total deficiency is U.S. $1 million.

115.   Prior to receiving the third and fourth dividend payments Mr. Niu became concerned about his tax liability and induced his mother to provide him with an admittedly fraudulent letter asserting that these payments were a "gift" from her in the sum of U.S. $1.5 million (sic). There is an email message from Gayle Tsien to Philip Niu dated March 9, 2004 in which she states clearly that the dividend payments are being made "to you". This is significant because the position of the defendants is that Pearl Niu is the true owner of Maxima, the dividends were therefore owed to her, and she was transferring them to her son as gifts. In other words, the defendants do not accept that the gift letter mentioned above was fraudulent; they say it represented the true state of affairs.

116.   As time passed and Dr. Chen's suspicions and concerns deepened he kept Mr. Niu informed of them. Mr. Niu assured Dr. Chen that he would "support his investigation". At the end of 2003, prompted by discussions he had had with Dr. Chen, Mr. Niu told Mr. Tsien verbally that "I wanted to attend Fortuna meetings on behalf of Maxima Samoa and I no longer wanted Mr. Tsien to hold himself out as representing Maxima Samoa or

*150331 Tempo v Fortuna Judgment*

A-10294

my interest." Mr. Tsien tried to explain that any such change was unnecessary. Mr. Niu replied that "my decision had been made and that I expected him to act in accordance with the decision". Eventually, Mr. Tsien said he would inform Mr. Niu of the next Fortuna shareholders meeting. Mr. Niu told Dr. Chen of the change.

117.  On June 1st 2004 Mr. Niu sent an email to Gayle Tsien asking when the next Fortuna shareholders meeting would be held and requesting a copy of the agenda. He told her that he would attend in person. The following day, she responded by email saying that there would be a shareholders meeting sometime in the next few weeks on an undecided date. She asked that Mr. Niu grant a proxy in favour of Pearl Niu (sic) to vote the Maxima Samoa shares. She warned her uncle that the meeting would be acrimonious and said: "the next meeting might put you in a difficult position re voting of your shares". Mr. Niu remained resolved to attend.

118.  On June 9, 2004 Mr. Niu received a telephone call from Gayle Tsien during which she reiterated what she had said in her earlier email and asked Mr. Niu to absent himself from the meeting. He said he would attend. The following day in another email Gayle Tsien told Mr. Niu that the shareholders meeting would take place between the 20th and 25th of June "in China". She said she wished to visit Mr. Niu in San Francisco before the meeting. He welcomed her proposed visit.

*150331 Tempo v Fortuna Judgment*

119.  On June 18, 2004 Mr. Niu met with Gayle Tsien and with his sister, Mrs. Josephine Tsien, in San Francisco. He was sufficiently concerned about what was to be discussed that he brought his son, an American attorney, with him. Mr. Niu says that Gayle Tsien and Mrs. Tsien asked that Mr. Niu's son leave the meeting. Mr. Niu refused. They deny this.

120.  Gayle Tsien then explained that the shareholders would be asked to remove Dr. Chen from the board of directors of Fortuna and to amend the articles of association because Dr. Chen was causing problems by interfering with Fortuna's lending arrangements and by conducting an unwarranted investigation into various accounting matters. Mr. Niu said he would not vote to remove Dr. Chen. Mrs. Tsien sat silently throughout the meeting. She never mentioned the purported directors meeting of Maxima Samoa of four days earlier at which Mr. Tsien was authorized to represent it at the Fortuna EGM.

121.  There was a further discussion between the four people the next day. Mr. Niu says that Gayle Tsien said she had decided that there was no need for him to grant a proxy in favour of Pearl Niu (which, in any event, he had refused to do). There was more discussion between Gayle Tsien and Philip Niu about the forthcoming shareholders meeting. She urged him not to attend. He said he wished to do so. He asked for the date and location of the meeting. She said that "she would in due course confirm the details of the meeting". Eventually, Dr. Chen advised Philip Niu that the meeting was scheduled for June 22, 2004 in Beijing. In his witness statement Mr. Niu says that Gayle Tsien never told him the date but an earlier affidavit of his contradicts that.

*150331 Tempo v Fortuna Judgment*

A-10296

122.  Mr. Niu arrived in Beijing the day before the EGM. After some discussion with Dr. Chen and Paul Hatzer (Dr. Chen's lawyer) he met with Mssrs. Ting and Tsien. He told them he would attend the meeting the following day and that he would not support the removal of Dr. Chen as a director. Mr. Niu says that the other two men remained silent.

123.  On the morning of the EGM, Gayle Tsien told Mr. Niu that he could not attend the meeting because he "was not a shareholder of Fortuna". When he arrived at the meeting room he was prevented by security guards from entering the room. Gayle Tsien emerged from the meeting to tell Mr. Niu, again, that he could not attend. During the meeting Gayle Tsien produced a document dated June 14, 2004 purportedly signed by Mrs. Tsien as a director of Maxima Samoa granting authority to represent that company to Mr. Tsien. Mr. Niu has sworn that he never authorized such a document.

124.  Mr. Niu retained an attorney. After an exchange of correspondence, Fortuna's attorneys asserted that Mr. Niu was not the sole director of Maxima Samoa and had never been the legal and beneficial owner of its shares.

125.  The defendants rely in this action upon certain corporate records of Maxima Samoa including: the register of members, the bearer share certificates numbered B001 and B002, an unsigned and undated "directors resolution" approving the conversion of Mr. Niu's registered share into a bearer share, an unsigned letter to Maxima requesting the conversion of the registered share into a bearer share, minutes of the Maxima Samoa

*150331 Tempo v Fortuna Judgment*

A-10297

shareholders meeting dated January 15, 2004, and minutes of the Maxima Samoa directors meeting dated June 14, 2004.  Mr. Niu has sworn that he has "never seen" these documents until their disclosure in some related litigation in October 2004. He says that he never consented to the cancellation of his registered share, did not sign the two bearer share certificates, and believes that the signature on those certificates is that of his mother, Pearl Niu.  He says he did not consent to the issuance of bearer shares. He was not notified of the meeting of Maxima's shareholders on January 15, 2004.  He was also not notified of the directors meeting of June 14, 2004. He would have opposed the resolution to authorize Mr. Tsien to represent Maxima at Fortuna's EGM.

126. Mr. Niu commenced an action in the Supreme Court of Samoa seeking a declaration that he was the sole beneficial and legal shareholder of Maxima Samoa and its sole director and that the two bearer shares were unauthorized and invalid.  Eventually the action was settled on terms which prohibit Mr. Niu from referring to the settlement agreement.

127. As a component of the settlement, Philip Niu sent a letter to Mr. and Mrs. Tsien and to Pearl Niu in which he (in his personal capacity, not on behalf of the company) conceded that the three addressees of the letter had held "an honest belief" that Pearl Niu was the beneficial owner of Maxima and, as a consequence, that all three had an honest belief in the validity of the appointment of Mr. and Mrs. Tsien as directors.  He says it is acknowledged by the defendants that he is the current legal and beneficial owner of the

150331 Tempo v Fortuna Judgment

A-10298

Maxima Samoa shares. He remains the sole shareholder and director of Maxima Liberia. I do not consider that I am bound, when deciding the claims of Tempo and Dr. Chen, to reach the conclusion conceded by Mr. Niu in the settlement. No rule of evidence or procedure would compel that result.

128.  Philip Niu was 78 years of age when he gave evidence. He was clearly confused about many points of detail. The impression left by his witness statement that he recalls a reasonable amount of detail was displaced by his oral evidence. Mr. Niu readily admitted that he had discussed his evidence prior to trial with Dr. Chen; however, there was no indication whatsoever that Mr. Niu was shading his evidence to favour Dr. Chen or, for that matter, any of the plaintiffs including Maxima.

129.  Mr. Niu said that except for Maxima he had never been involved with the incorporation of a company. He has no experience of corporate record keeping and matters of that kind. He has never until recently understood what a bearer share is and did not know at any material time that he was the owner or holder of bearer shares. He says he has no familiarity with how companies work and that he is not "a detail person". He agreed readily that some things in his memory are "reconstructed". Mr. Niu's desire to support Dr. Chen at the EGM was "emotional" because he thought Dr. Chen had been treated unfairly. Mr. Niu did not purport to understand the reasons for the dispute between the three men.

130.    Mr. Niu said he was certain that the assets of his father had passed not only to his mother but to himself and his two sisters. He said his father had no will and it is "normal" in Taiwanese families for the surviving spouse and children to take the property. He did say at one point in cross-examination that the "starting point" was that the money belonged entirely to his mother. At another point in cross-examination he was asked if it was all his mother's money and he replied that he did not know. Mr. Niu says there was never a decision reached on how the assets should be allocated to the various family members and that he did not know how much his share of the Family Funds was to be. With respect to documents, he said that he simply signed everything that he was asked to sign.

**Evidence of Lawrence Ting**

131.    Because of Mr. Ting's untimely death, the only evidence from him which the defendants have been able to enter is a redacted transcript of an examination under oath by Fortuna's Inspectors. In 2004, Mssrs. Russell Smith and David Walker, who had been appointed Joint Inspectors under the *Companies Law* by this Court, conducted an examination of Mr. Ting.

132.    Mr. Ting took issue with Dr. Chen's claim that he was instrumental in the founding of CT & D Taiwan and Fortuna. Mr. Ting said that Dr. Chen had little involvement in the affairs of the group until 2002. The relationship between the three men was good until early in

*150331 Tempo v Fortuna Judgment*

2003, at which point it began to "sour irreparably".  Mr. Ting said that Dr. Chen was trying to withdraw his personal guarantee which had been given to secure the syndicated loan agreement and that the "banks actually were really troubled" by this. He observed that pursuant to a request from Dr. Chen the "originally more informal and verbal agreements in the business operations" had to be put in writing starting from February 2004.  He said that the removal of Dr. Chen from the board of directors was necessary to avoid additional damage to the Fortuna Group.  Mr. Ting confirmed that he held a proxy from Bates and voted it at the June EGM.

133.    In various oral statements made by Mr. Ting to others prior to his death, he hotly denied the allegations of bribery and misappropriation made by Dr. Chen then and now.

## Evidence of Ferdinand Tsien

134.    Mr. Tsien has given no evidence in the present proceeding but he has sworn a lengthy affidavit on October 19, 2014 in a Petition action brought by Tempo to wind up Fortuna. Ultimately, the Petition was dismissed.

135.    Mr. Tsien was the chairman of Fortuna and a director of all of the Group's companies. Although his affidavit was directed at opposing Tempo's attempt to wind up Fortuna, it also addresses matters of relevance in the case at bar.  In general, Mr. Tsien contradicts



many of the serious allegations made by Dr. Chen in his own affidavit on the winding up
proceeding.

136.   Mr. Tsien refers in his affidavit to several sources of contention with Dr. Chen.  He says
that Dr. Chen became aggrieved by the reluctance of Mssrs. Tsien and Ting to grant him
a leading role in the management of the Fortuna Group.  He denies that the three men
ever agreed that either CT & D Taiwan or Fortuna would be operated as a quasi-
partnership.  However, in a hand written letter dated September 27, 1993 Mr. Tsien
described the relationship as a "three-party partnership".  He says that after Dr. Chen
left his position with Wan Hai Lines Limited in 1999 he began to take a more active
interest in the management of Fortuna.  Dr. Chen was annoyed by the refusal of Mssrs.
Tsien and Ting to give Randy Chen "an extremely significant management role".  One
company in the Fortuna Group, HPPC, commenced litigation arising from a US $35
million insurance claim against an insurer of which Dr. Chen was a director and
significant shareholder.

137.   Mr. Tsien's position is that Dr. Chen has "vastly exaggerated" his role in the formation of
CT & D Taiwan.  The idea to set up CT & D Taiwan came initially from Mr. Albert Hsu,
who was then the chairman of the Finance Committee of the KMT.  Mr. Ting was
appointed to the board of CT & D Taiwan "to represent the interests of the KMT".
Albert Hsu then decided to offer a shareholding to a "passive investor".  Mssrs. Ting and

A-10302

Tsien proposed that Dr. Chen be offered a 5% shareholding and this was done. The KMT owned a 75% shareholding and Mssrs. Ting and Tsien owned 10% each.

138. Mr. Tsien describes Dr. Chen's involvement in the process of buying out the KMT shareholding as "merely peripheral". Neither of the two men asked Dr. Chen to meet with President Lee. Dr. Chen was, however, asked to assist Fortuna in obtaining financing which he did. In recognition of this, Mssrs. Ting and Tsien agreed that each of the three men should have a 30% shareholding in CT & D Taiwan after the departure of the KMT. During this period Dr. Chen's only active role was to facilitate the obtaining of financing. Mr. Tsien says that after the initial contacts with the lenders had been made, Chen played a "very limited role" in Fortuna's dealing with the banks.

139. In Dr. Chen's petition affidavit he said that he issued certain promissory notes at the time of the formation of Fortuna and thus bore "primary liability" for CT & D Taiwan's debt. Mr. Tsien points out that Dr. Chen failed to mention that Mssrs. Ting and Tsien counter-signed the back of the notes and thus became jointly and severably liable under them.

140. Mr. Tsien says that he "effectively ran CT & D Taiwan" together with Mr. Ting. Mr. Tsien says that Dr. Chen "played absolutely no part" in the research which led to the decision to invest heavily in Vietnam. Dr. Chen was at this time a "passive shareholder with no executive responsibility". In any event, his presidency of Wan Hai Lines kept him

150331 Tempo v Fortuna Judgment

occupied. He agrees that Dr. Chen was provided with periodic updates on the progress of the development in Vietnam. His agreement was sought on significant strategic issues of the sort which would typically be discussed at board level. Most of the board meetings were held at the American Club in Taipei. In general, the strategic decisions would be taken by Mssrs. Ting and Tsien and then brought to the board for approval.

141. Mr. Tsien has denied categorically both the allegations of bribery and the allegations of misappropriation of funds. He says that by 2000 Fortuna had started to generate a positive cash flow. Around March 2000 the three men agreed that each of them would be granted an interest-free line of credit which could be drawn upon by way of shareholder advances. This collective decision was "not documented". He described it as a "gentleman's agreement". Mr. Tsien continued like this:



> *There are many other examples of such 'gentlemen's agreements' between Mr. Chen, Mr. Ting and me prior to and up to this period since our relationship at that time was amicable. Business was therefore conducted informally. For instance, it was extremely rare for there to be any formal agreements between us and the company for the provision of security. The loans I made to the company were not always formally documented. Nor were sales of shares generally documented. ... at the time, that was the nature of the relationship.*

142. Mr. Tsien says it was understood that members of the family of the three principals could draw upon the line of credit. It was intended that each family would draw approximately the same amount. The indebtedness was to be repaid from dividends when they were declared. The limit on each family's line of credit was US $5 million. Once a dividend was agreed upon, Mr. Ting would tell Jesse Hsu of the decision and the

latter would then give instructions to Mr. Jeff Wang, Vice-Manager of Fortuna's finance department, to prepare documentation. The draft shareholders resolution would be signed by the three men. Mr. Tsien says that although there were five shareholders not three, Maxima and Bates were ignored for the purpose of the shareholder advance agreement because "in purely practical and economic terms ... it is appropriate to regard the company as having three shareholders belonging to each of Mr. Ting, Mr. Chen and me and our respective families." Mr. Tsien points out that Dr. Chen signed each of the resolutions approving the dividends and he accepted that deductions would be made to repay shareholder advances. In fact, Dr. Chen proposed that the dividend of January, 2003 be increased to US $25 million to allow for a larger repayment.

143.    At the end of 2003 Mr. C.H. Chen asked Mr. Ting and Mr. Tsien if he could be released from his personal guarantee of the MDC Facility. He says that he was happy to accommodate this request but the banks would obviously have to agree. Fortuna wrote to First Commercial Bank asking for the release of C.H. Chen. Seven of the eight syndicate banks agreed to that. The lone holdout was Cosmos Bank, in which the Chen family itself had a 2% investment.

144.    Mr. Tsien characterized Dr. Chen's subsequent actions as a campaign to "destabilize" Fortuna. Mr. Tsien denies that any of the matters raised by Dr. Chen with the lending banks amount to breaches of the lending facility. In any event, he says that all of the matters which were complained of were approved by the banks in advance. Dr. Chen

150331 Tempo v Fortuna Judgment

had known about and approved all of them. Mr. Tsien exhibits some documentation to that effect. It is Mr. Tsien's case that Dr. Chen abused his position as a director of Fortuna by seeking to have the lenders call their loans. Mr. Tsien says that the attempts by Dr. Chen and his brother to demonstrate to the lenders that there had been an act of default "were taken seriously" by the banks. However, Fortuna explained to the lenders that it had fully complied with its obligations, that the incidents complained of by Dr. Chen did not amount to breaches of the lending agreement, and that Dr. Chen had in fact approved the impugned transactions. By the time of the petition action, Mr. Tsien was able to say that Dr. Chen's efforts "appeared to have failed for the moment".

145. Mr. Tsien explained Fortuna's document retention policy. He said that all original records were retained until after the relevant audit had been finished and any queries arising from it had been dealt with. At that point, any documents which the company "no longer needed" were destroyed. This occurred in the normal course of the company's business. He also said that the new Taiwanese government which came to power in 2000 was beginning to show an unhealthy interest in the business affairs of companies affiliated with the KMT. Because of the danger of a "politically motivated investigation", the three men (including Dr. Chen) decided to keep any books and records which were not needed in Taipei in storage in Kuala Lumpur.

146. Mr. Tsien has sworn that the allegations concerning the bribery of Vietnamese officials are completely untrue. Mr. Ting had never suggested any such thing. The table

*150331 Tempo v Fortuna Judgment*

prepared by Jesse Hsu records only the details of shareholder advances and repayments. The so called "northern office expenses" have nothing to do with Hanoi. The last three letters of "Taipei" formed the Chinese word for "north". Mr. Tsien says the term is a form of shorthand used by Fortuna staff (including Mr. Hsu) to refer to the shareholder advances. The table itself is nothing more than a summary of the advances which have been made. Mr. Tsien has denied expressly that he told Dr. Chen not to query these payments because some of them were illegal and has denied causing any illegal or improper payments to be made to Vietnamese or any other government officials.

147. Mr. Tsien says that Dr. Chen's difficulty in obtaining information from Group companies in 2003 is attributable to his aggressive approach to Group employees combined with inappropriate verbal abuse. He says that General Zhang was an old friend of Dr. Chen's and the suggestion that General Zhang was his "minder" in Vietnam was ludicrous.

148. Mr. Tsien mentioned the board meeting of January 16, 2004. He said the "next generation" of family members – Gayle Tsien, Arthur Ting and Randy Chen – were appointed to the board. When Mssrs. Ting and Tsien refused to promote Randy Chen to a position suggested by Dr. Chen, the latter showed that he was unhappy.

149. Mr. Tsien contradicted Dr. Chen's version of events concerning the preliminary meeting on February 23, 2004 immediately before the board meeting that day. He denies that

*150331 Tempo v Fortuna Judgment*

the meeting was convened for the purpose of discussing the list of payments referred to by Dr. Chen. The real purpose of the meeting was to discuss the deteriorating relationship between the three shareholders. In the course of the discussion Mr. Ting (not Dr. Chen) produced the list of shareholder advances. Mr. Tsien says that Mr. Ting did not suggest that the "other expenses" were referable to bribes to Vietnamese government officials. Mr. Tsien confronted Dr. Chen about a conversation Mr. Driscoll had had with Dr. Chen that month in which the latter made serious allegations about Messrs. Ting and Tsien. The confrontation made Dr. Chen angry: he shouted, banged on the table and called Mr. Driscoll a liar.

150.   At the board meeting, a resolution was passed that "Dr. C.C. Chen shall oversee finance matters". Mr. Tsien says that this appointment was intended to be a "very limited one", confined to financial matters at board level. It was agreed expressly that Dr. Chen was not to be involved in the day to day management of the Group. There was no agreement that his accounting staff would be entitled to audit financial records. Mr. Tsien says the appointment was "essentially a gesture".

151.   During the spring of 2004 Mr. Tsien became increasingly concerned about Dr. Chen's approaches to the lending banks and the "rumours he was spreading in Vietnam". He mentions in particular a letter from Dr. Chen's lawyers to the company's auditors requesting that they investigate certain transactions. He says there was nothing needing investigation and the request was inappropriate.

*150331 Tempo v Fortuno Judgment*

A-10308

152. By June 2004 Mssrs. Tsien and Ting had decided that it was necessary to remove Dr. Chen from the board of directors. The board meeting of June 2, 2004 was called strictly in accordance with the articles of association of Fortuna. At the meeting it was decided that an EGM would be held at such time as the two men would decide. Subsequently, Mssrs. Tsien and Ting agreed that the meeting would be held on June 22, 2004. Mr. Tsien says that: "the primary purpose of the EGM was therefore to remove Mr. Chen from the board of directors in an attempt to limit his ability to continue trying to damage the group". He also says that the shares in Fortuna owned by Maxima Samoa were "always seen as part of my own family's holding."

153. Mr. Tsien represented Maxima Samoa at the EGM. He has provided a detailed explanation of how that came about.

154. From 1971 until the death of Robert Niu in 1974, Mr. Tsien assisted him in "restructuring" one of the Niu family investments. After Mr. Robert Niu's death, Mr. Tsien continued to help Mrs. Pearl Niu in "managing the family's business affairs". When it came time to buy out the shareholding of the KMT in CT & D Taiwan, part of Mr. Tsien's funding for that included a "contribution" from Mrs. Pearl Niu. At the same time, she expressed an interest in investing on her own behalf. Mr. Tsien agreed to let her have a 5% shareholding in the company to be taken from his own 30% shareholding. He goes on to say:

*150331 Tempo v Fortuna Judgment*



*It was always anticipated by Mrs. Niu and me that these two shareholdings would effectively be treated as a single family block. Similarly, it was understood by Mrs. Niu and myself that I would be fulfilling a management role in the company and that I would protect her interests as well as my own.*

155.   By this time Mrs. Niu was in her late 70s and was considering how the family assets "would eventually be divided". Mr. Tsien said that it was Mrs. Niu's stated intention that Philip Niu would receive the 5% shareholding in CT & D Taiwan "along with the rest of her assets" after her death.

156.   Mr. Tsien arranged the mechanics of Pearl Niu's investment.  He already had a Liberian shelf company known as Maxima Resources Corporation (Liberia).  He paid the costs of incorporation and the annual fees.   Mr. Tsien advanced the funding of the share purchase initially and was later reimbursed by Pearl Niu.

157.   Shortly afterwards, Mr. Tsien decided to incorporate Maxima Samoa.  He again paid the costs of incorporation and has made the annual fee payments.  The "company kit" for Maxima Samoa "has been kept at all times by me and my wife on behalf of Mrs. Niu".  On August 10, 1994 the Fortuna shares were transferred from Maxima Liberia to Maxima Samoa.

158.   Mr. Tsien says that Mrs. Niu informed him that she wanted Philip Niu to be the "sole director" of Maxima Samoa.  Philip Niu agreed.  Mr. Tsien goes on to say:

*150331 Tempo v Fortuna Judgment*



*Although Philip Niu was appointed as a director and was, as a matter of formality, the transferee of the single ordinary (registered) share subscribed for on incorporation of Maxima, I understand that Mrs. Niu made it clear to Philip Niu that she would retain the family assets, including Maxima, under her control. I believe that it was for this reason that Mrs. Niu gave instructions for the initial (registered) ordinary share to be cancelled and for two bearer shares to be issued. The register of members confirms this. In part the creation of bearer shares was done since they would allow Mrs. Niu to retain control over Maxima and her interest in the company during her lifetime but would be easy to transfer to her son when the time came. Before that time Mrs. Niu retained her ownership of Maxima, while being represented by Philip Niu on its board of directors. ... Mrs. Niu took steps to ensure that the bearer shares remained in her control. Accordingly she asked me and my wife to keep them in our physical custody on her behalf, together with the common seal, company chop (an engraved seal used for authenticating documents) and corporate documents. Mrs. Niu has told me and my wife that these arrangements were expressly agreed to by Philip Niu. ... Philip Niu has never been the person who controls Maxima.*

159.   Mr. Tsien asserts that Philip Niu was not in a position between 1994 and 1998 to finance a purchase of shares in Fortuna. His business ventures had been unsuccessful. He says:

*I normally represented Maxima and signed the relevant minutes on behalf of Maxima. When I did so I noted Philip Niu's name next to my signature as the director of Maxima to signify that I was acting in this capacity, and in recognition of Philip's position as the future shareholder, and who (unless Mrs. Niu decided otherwise) would ultimately inherit the Maxima shareholding. ... On each occasion on which a dividend was to be paid, I (or, on one occasion, Gayle Tsien) consulted Mrs. Niu and obtained her instructions as to where she wanted the dividend to be paid. In some instances, Mrs. Niu instructed me to leave the dividend funds with the company as a debt to Maxima (as a shareholder).*

160.   Mr. Tsien says that money received by Philip Niu in the form of dividends from Fortuna were actually "gifts from his mother". He asserts that Pearl Niu gave the instructions to

*150331 Tempo v Fortuna Judgment*

A-10311

remit each of the dividend payments to her son. One dividend remittance instruction carries the notation "re Mrs. Pearl Niu".

161. Mr. Tsien says that by September 2003 both he and Mrs. Niu had a concern regarding the tax implications arising from any eventual distribution of her assets. Pearl Niu said that she wanted to make a gift of U.S. $1.5 million to her son Philip. She directed    Mr. Tsien to have the company remit this amount in two payments. There is an email dated September 26, 2003 in evidence in which Philip Niu says it was a gift.

162. Mr. Tsien says that by the end of 2003 Pearl Niu had reached a reluctant decision that leaving her son as the sole director of Maxima Samoa might be a source of difficulty. He says that she asked Mr. Tsien and his wife to become additional directors of Maxima. She also "made it clear to me and my wife that the shares would remain under her control and that our votes would be subject to her directions". Mr. and Mrs. Tsien accepted the appointment. The shareholders resolution was "passed by Mrs. Niu". Mr. Tsien says that he understands from discussions with Pearl Niu that she "chose not to advise Philip Niu of the additional appointments as she was hopeful that it would not prove necessary to rely upon them". She was hoping that Philip Niu would decide not to support Dr. Chen and considered the appointment of Mr. and Mrs. Tsien as a sort of fallback position.

*150331 Tempo v Fortuna Judgment*

Page 66 of 139

163.   Gayle Tsien and Mrs. Josephine Tsien travelled to the United States in an unsuccessful attempt to dissuade Philip Niu from supporting Dr. Chen.  When the result of this effort was reported to Pearl Niu, she instructed Gayle Tsien to advise her father to use the proxy "that had been prepared on 24 [sic] June, 2004". Mr. Tsien also says:

> At Mrs. Niu's direction, I was authorized by my wife (in her capacity as a director of Maxima) to attend and vote at the meeting.

In any event, Pearl Niu never authorized Philip Niu to attend the EGM.

164.   Mr. Tsien notes that Dr. Chen made a false criminal complaint against Mssrs. Ting and Tsien to the Taiwanese prosecuting authority alleging a misuse of Fortuna's funds.

## Evidence of Gayle Tsien

165.   Gayle Tsien, the daughter of Mr. Tsien and Mrs. Josephine Tsien has been a Certified Public Accountant since 1993.  She has a Master of Science in Accounting degree from New York University. In 1993 she began to work in the planning department of CT & D Taiwan as a project manager.  Between 2000 and 2004 she worked for PMHC, a Fortuna subsidiary, in Vietnam.  On January 16, 2004 she became a director of Fortuna.

166.   Understandably, Gayle Tsien has no personal knowledge of whether the three men entered into an agreement that each would be entitled to participate equally in the management of CT & D (and later Fortuna), that no one of them would be excluded

*150331 Tempo v Fortuna Judgment*

from management, and that each would have equal representation on the board of directors. In general terms, she has sworn that nothing she has been told by her father or by Mr. Ting has ever suggested to her that such an agreement was in existence. She says that she once clearly asked both Mr. Ting and her father whether there were any shareholder agreements with Tempo in place and each answered in the negative.

167. Gayle Tsien made reference to an executed joint venture agreement dated September 20, 1989 found in the records of Fortuna. The parties to this agreement are Mssrs. Ting and Tsien, Dr. Chen, and a company owned and controlled by the KMT. The parties agreed to establish CT & D Taiwan as a joint venture company with the KMT owning 75% of the shares. Dr. Chen was allotted a 5% shareholding (although the text of English translation of the agreement in evidence specifies it as "10%"). The parties agreed that there would be a board of nine directors, six to be designated by the KMT and one each by the other three men. Mr. Ting was appointed as the first chairman of the company. The management of the company was to be placed in the hands of a general manager and a financial accounting manager; the agreement does not allocate any management rights (beyond the right to nominate one director) to Dr. Chen.

168. In general terms, Gayle Tsien says that Dr. Chen took no role in the management of the Fortuna Group until he began to involve himself about 2002. After the incorporation of Fortuna, CT & D Taiwan had two residual purposes. It retained some of the "non-core" assets and it provided management services to Fortuna and to its subsidiaries.

*150331 Tempo v Fortuna Judgment*

169. Gayle Tsien says she was involved in discussions with her grandmother (at which her parents were present) about the possibility of Pearl Niu investing in Fortuna. Eventually she "became aware" that her grandmother had purchased a 5% shareholding.

170. She says that all important operational decisions were taken by Mr. Ting and all the senior management reported to him. She swears that she cannot recall any occasion upon which Mr. Ting said that he needed to obtain consent from Dr. Chen.

171. Gayle Tsien referred to a letter from Dr. Chen's Vietnamese lawyers to a government authority dated July 18, 2004 which says in part:

> *The Chen family entrusted Lawrence S. Ting and Ferdinand Tsien to be responsible for the management of CT & D Taiwan, Fortuna Cayman and the activities of the subsidiaries. Such subsidiaries include Tan Thuan Export Processing Zone, Hu Mei Hang Corporation and Hiep Phuoc Power Plant. The reason for such entrustment was that the Chen family already owned huge assets in Taiwan, which required direct management.*

172. In a statement to the media dated September 24, 2004 Dr. Chen said that Mssrs. Ting and Tsien were responsible for the "operation and management of" Fortuna and its subsidiaries. He added that he had never participated in "any activity related to the operation and management of" Fortuna. Elsewhere he has said that he was not able to participate because he was "preoccupied" with the business of Wan Hai Lines.

173.   Gayle Tsien attended the board meeting of February 23, 2004. She says that the resolution giving to Dr. Chen the power to oversee "finance matters" was expressly limited to matters at board level.  There was no discussion of any entitlement of Dr. Chen to audit the financial records of Fortuna.

174.   Throughout the spring of 2004 Dr. Chen's conduct was "extremely damaging and disruptive" and, in addition to troubling the relationship with the company's lenders, resulted in Vietnamese government officials "becoming reluctant to meet" with Mssrs. Ting and Tsien.  When Dr. Chen's allegations against Mssrs. Ting and Tsien came to their attention, both men were shocked and angry. Bribery had never been discussed in her presence but, as a director, she would have been aware of it if it had been contemplated. On May 5, 2004 (and again on May 28, 2004) notices were published in the Taiwanese and Vietnamese press by the Fortuna Group stating that because of certain disagreements between management and shareholders the Group would "not be responsible for any acts, any means of communications or any kind of promises" made by Dr. Chen or Randy Chen.

175.   The June 2, 2004 board meeting was held in Beijing because Mr. Ting, Arthur Ting and Gayle Tsien had meetings scheduled there with a Chinese power company.  On the evening of June 2, 2004 (within hours of the board meeting of that day) Gayle Tsien sent the notice and agenda for the June 22nd EGM by air mail to the shareholders.  These

were mailed from a Beijing post office.  The letters were sent to the address of each

shareholder recorded in the register of members as is required by the Fortuna articles.

176.    On June 18, 2004 Gayle Tsien received an email message from Dr. Chen suggesting a

shareholders meeting on June 30th.  She then realized that Dr. Chen was unaware of the

EGM scheduled for June 22nd.  On June 20th she sent Dr. Chen by email a copy of the

notice of the EGM but did not include the agenda.  She says: "I confirm that this was an

oversight on my part".  Eventually, but prior to the EGM itself, she sent the agenda to

Dr. Chen by fax.

177.    As secretary to the meeting on June 22nd, it was Gayle Tsien's responsibility to ensure

that the attending shareholders "had the correct authorizations".   Wynner was

represented by Mr. Tsien and by Gayle Tsien.  New Frontier was represented by     Mr.

Ting and by Arthur Ting.  Tempo was represented by Dr. Chen's attorney, Paul Hatzer

(although Dr. Chen was also present).  Bates was represented by Mr. Ting pursuant to a

resolution of the directors of Bates dated June 10, 2004.

178.    Gayle Tsien says that her father represented Maxima pursuant to an authorization of

June 14, 2004.  He acted as chairman of the meeting.  She recalls informing Philip Niu

that he was not entitled to attend the meeting because Maxima had authorized her

father to represent it.  She has no recollection of meeting him in the lobby of the hotel

on the morning of the meeting. She said that she prepared the minutes right after the
meeting in order to do so while the events were fresh in her recollection.

179.   Gayle Tsien says that her understanding "for as long as I can remember" is that the
family businesses were owned by Pearl Niu. The contention by Philip Niu that there had
been a division of the sale proceeds resulting in an allocation of a share to him is
contrary to Gayle Tsien's understanding. She agrees that she had not been involved in
the legal formalities in respect of Robert Niu's estate and resulting assets.

180.   Gayle Tsien does say that she understood from conversations with her mother that
Pearl Niu intended Philip Niu to inherit the shares in Maxima after her death. She says
this was "generally known" within the family. The prospective inheritance was the
reason for the appointment of Philip Niu as sole director. In general, Gayle Tsien says
she was aware from discussions within the family that Pearl Niu had asked Mr. and Mrs.
Tsien to become additional directors of Maxima although Pearl Niu did not inform her
son of this. She was also aware that her parents had physical possession of the bearer
shares.

181.   Gayle Tsien says that around September, 2003 Pearl Niu instructed her to pay the sum
of U.S. $1.5 million (in the form of two Fortuna dividends) to Philip Niu. She says this
was a gift. This was the only occasion upon which she spoke with Pearl Niu about

*150331 Tempo v Fortuna Judgment*

dividends owed to Maxima. She mentioned her email message of February 24, 2004 to Philip Niu regarding the family funds which says in part:

*Provided Grandma is in agreement, your portion is 5 mm plus one year of interest.*

182.   She says this illustrates the need for the agreement of Pearl Niu before any payment from the family funds could be made to Philip Niu. She also said that she had an understanding that Pearl Niu had instructed that all dividend payments owing to Maxima should be paid to Philip Niu. In an email to Philip Niu shortly before the June 22nd EGM, Gayle Tsien referred to the "voting of your shares". She explains this by pointing out that Philip Niu would inherit the shares eventually and was the sole director of Maxima; she accepted that the emails "were not worded well". She says these were "colloquial references".

183.   She wanted to obtain a proxy from Philip Niu so that Mr. Tsien would not have to use his authority from Maxima granted to him by Pearl Niu and thus reveal to Philip Niu that his mother did not fully trust him in the matter. Gayle Tsien says that during their conversations in San Francisco Philip Niu at first promised that he would not attend the June 22nd EGM but later changed his mind. She denies saying to Philip Niu on the evening of June 19th that she would inform Dr. Chen of the details of the forthcoming meeting if Philip Niu agreed not to attend.

A-10319

184.   On the evening of June 21, 2004 Gayle Tsien spoke with Pearl Niu who then instructed her to authorize Mr. Tsien to represent Maxima at the meeting.   She relayed this instruction to Mr. Tsien and to Mr. Ting.

## Evidence of Pearl Niu

185.   Pearl Niu is now 101 years of age.   Although her evidence and an assessment of her credibility are crucial to the second major issue in this case, I have accepted the advice of counsel that her health now prevents her from giving evidence either in person or by video link. One of her doctors has given his opinion to that effect.

186.   Mrs. Pearl Niu has a degree in economics from the University of Shanghai.   Her three children with Robert Niu are Philip, Josephine (who married Mr. Tsien) and Jane, who passed away in 1986.

187.   Mrs. Niu has provided one brief witness statement in this proceeding which incorporates by reference a series of six affidavits sworn by her in 2004 and 2005 in proceedings in Samoa. The Samoa proceeding was an attempt by Philip Niu to obtain a declaration confirming his beneficial ownership of Maxima Samoa.   He obtained a preliminary ruling to that effect, after which Pearl Niu intervened and requested a re-hearing.  Before the issue could be reconsidered, the proceeding was settled on terms which remain confidential.

*150331 Tempo v Fortuno Judgment*

188.  Mrs. Niu says that after her husband Robert passed away she decided to allow Mr. Tsien

to manage her financial affairs for her.  She found him trustworthy and believes he gave

very useful investment advice.  Upon his recommendation, she instructed Mr. Tsien to

use some of the Family Funds to purchase a 5% shareholding in Fortuna for her.  Philip

Niu was not involved in this decision and did not contribute to the purchase price.

189.  Mrs. Niu decided that after her passing Philip "may" receive the 5% investment in

Fortuna.  She says she did not and has not made any irrevocable decision on that

question. Mrs. Niu says she speaks fluent English.  Mrs. Niu's daughter Josephine looks

after her daily needs.  She says "I rely heavily" upon her.  Josephine Tsien accompanies

Mrs. Niu whenever she leaves her residence and ensures that she receives her daily

meals.  Mrs. Niu describes her as "my full time carer".

190.  After deciding to invest in Fortuna, Mrs. Niu instructed Mr. Tsien to arrange the

transaction for her.  She said that she instructed him to set up a company in Samoa,

Maxima Samoa. She describes the decisions she made concerning Maxima as follows:

> Consistent with my intention that Maxima's stake in Fortuna may
> ultimately be passed on to Philip, I informed Mr. Tsien that I intended to
> nominate Philip as the sole director of Maxima.   There was no
> arrangement that the company fees for Maxima be taken from my son's
> prospective inheritance for I had made no decision at that time as to
> what his inheritance would be.  Accordingly, Philip was appointed as
> a director.  As a matter of formality, he was the holder of the single share
> subscribed for on the incorporation of Maxima.  However, I made it clear
> to him that I would retain the family assets, including Maxima, under my
> control.  Further, the company documents from Maxima have been kept
> at all times by Mr. Tsien on my behalf.  At the same time, I instructed Mr.

*Tsien to cancel the original share in Maxima and to issue two bearer shares to give me greater flexibility over any future distribution of Maxima that may be necessary. I thought that the creation of bearer shares would allow me to retain control over Maxima and my interest in Fortuna during my lifetime but would be easy to transfer to my son, if appropriate, when the time came. I took steps to ensure that the bearer shares remained in my control by asking Mr. Tsien and my daughter to keep them in their custody on my behalf, together with the common seal and corporate documents. At the time I informed Philip of these arrangements. I confirm that the signatures on the bearer shares are mine.*

[paragraphs 20 to 24 in Pearl Niu's affidavit of December 10, 2004]

191.   Mrs. Pearl Niu says that she instructed Mr. Tsien about the disposition of dividends owed to Maxima Samoa.  Some were left with Fortuna (as a debt owed to Maxima Samoa) and some were paid to Philip Niu as a "gift". Philip Niu denies that he has ever discussed the question of bearer shares with his mother and says that she would not have had any knowledge of such matters. He first became aware of her claim to be the beneficial owner of Maxima Samoa from evidence filed in the winding up proceeding in October, 2004.

192.   By 2003 Mrs. Niu had begun to "resent deeply" various aspects of Dr. Chen's conduct. One of her objections was that she understood Dr. Chen had been seeking to buy Maxima Samoa's shares from her son. This annoyed her because they were not his shares and he had no authority to sell them. This allegation is denied by Dr. Chen.

193.    By the end of 2003 Mrs. Niu decided to add Mr. Tsien and Mrs. Josephine Tsien to the

        board of directors of Maxima Samoa. She instructed them that the bearer shares would

        remain under her control and that she would give directions as to how Maxima Samoa

        would vote at Fortuna shareholder meetings. She did not advise her son Philip of the

        additional appointments because she hoped to avoid additional family strife.

194.    Mrs. Niu gave her instructions on June 14, 2004 that a proxy should be granted to Mr.

        Tsien to represent Maxima Samoa at the Fortuna EGM. This occurred after Mrs. Niu had

        learned that Gayle Tsien and Josephine Tsien had been unsuccessful in convincing Philip

        Niu to abandon Dr. Chen. Mrs. Niu says that she told Philip Niu that Mr. Tsien would be

        representing Maxima Samoa at the meeting.

195.    In her affidavit of December 17, 2004 Mrs. Niu said that she had "physical possession"

        of the two bearer shares of Maxima Samoa. In her affidavit of January 13, 2005 Mrs.

        Niu said that she paid US $1.5 million for the Fortuna shares. She did this by using

        Maxima Liberia for the purpose. It was upon her instruction to Mr. Tsien that Maxima

        Liberia acquired the Fortuna shares and subsequently transferred them to Maxima

        Samoa. In this subsequent affidavit Mrs. Niu said:

> *Philip was nominally named as the shareholder simply for the purposes of
> effecting the transfer of Maxima to me from OIL Samoa and held the
> position, as nominee, for less than a day. ... At the time of the
> incorporation of Maxima Samoa, Philip well knew that he was not the
> true owner of the Fortuna shares but that his name would be used to
> effect the transfer of Maxima Samoa to me from OIL Samoa and that his
> name would be removed as a shareholder almost immediately.*

196. Mrs. Niu says that the subscriber share which had been transferred to Philip Niu was cancelled and the two bearer shares were created upon her instructions. Her evidence does not suggest any cogent reason for the issuance of bearer shares.

197. In March 2004 Mrs. Niu instructed Gayle Tsien to assist her in preparing a spreadsheet setting out the source of the Family Funds. She says in her affidavit of July 1st 2005 that this was prepared "in accordance with my intention at the time for my own estate planning purposes..." When she swore the last-mentioned affidavit, she said she was unable to locate the spreadsheet. She took issue with the version of the spreadsheet produced by Philip Niu in the Samoan proceedings which suggested that U.S. $5 million had been deducted from his share of the family funds to purchase Maxima, Samoa's shareholding in Fortuna.

## Evidence of Josephine Tsien

198. Mrs. Josephine Tsien (born Niu Ping) attended university in Taipei and then pursued postgraduate studies in education in the United States. During her marriage to Mr. Tsien she often discussed his business affairs with him but did not seek to influence him or to participate herself. Thus her evidence was necessarily general and impressionistic, based largely upon things which had been said to her by others.

199.   She said in her evidence that Mr. Tsien came from a wealthy family in Shanghai but left

China in 1949. The couple met and married in the United States and returned to Taiwan

in 1971. At this time the family businesses of Robert Niu were "heavily debt- ridden"

but Mr. Tsien gradually changed that. After the death of Mr. Niu, debts were repaid by

Mrs. Pearl Niu from the Family Funds.

200.   Josephine Tsien said:

> The nature of our family businesses are such that my father was, and now
> my mother is, the actual beneficial shareholder at all times of any
> company or investments owned by the family.  While Philip and I (or
> others) may appear on the face of the corporate records as a shareholder
> or as directors, our names do not represent any beneficial interest or
> entitlement. In fact, I would say that my mother borrowed our names as
> she deemed convenient for whatever particular purposes she had in mind.

201.   Mrs. Tsien said that Mrs. Pearl Niu sometimes gave gifts to her children and

grandchildren using income from the family businesses, at her discretion.

202.   Mrs. Tsien's evidence makes it clear that she has always regarded Maxima Samoa as

being the property of her mother. She was aware, however, that Mrs. Pearl Niu's

intention was to leave the Maxima Samoa investment eventually to Philip Niu as a

bequest. Pearl Niu asked Mr. and Mrs. Tsien to look after the Maxima Samoa bearer

shares, seal, and incorporation documents. These were kept in a safe in Mr. Tsien's

office to which both Mr. and Mrs. Tsien had access. Around the end of 2003       Mrs.

Tsien agreed to become an additional director of Maxima Samoa at her mother's request. She said that:

> When Ferdinand [Tsien] asked me to attend meetings and sign documents I would make myself available to do so.  Consistent with my typical practice on such occasions I ensured that I signed the minutes based on Ferdinand's instruction.

203.   There is in evidence a letter dated July 5, 2004 signed by Mrs. Tsien and addressed to Pearl Niu.  In it, Mrs. Tsien says that she is the custodian of the two bearer shares numbered B001 and B002; she acknowledges that Pearl Niu is the beneficial owner and the shares are being held in trust for her.  The letter goes on to assert that Mrs. Tsien will be responsible for exercising Maxima Samoa's voting rights in the future.  There is no mention at all in this letter of Mr. Tsien.  Mrs. Tsien says that she signed this letter at her husband's suggestion.  More generally, she says:

> I wish to emphasize that the meetings I attended and the documents I signed were as a result of requests made of me by Ferdinand [Tsien] and my mother.

204.   Mrs. Tsien confirms that on June 14, 2004 she acted upon an instruction from her mother and signed an authorization to Mr. Tsien to represent Maxima at the Fortuna EGM. She says her husband prepared the document.

205.   Josephine Tsien displayed almost no recollection or understanding of relevant events. Nonetheless, she provided a number of answers which she must have known would assist the defendant's cause. She said that Pearl Niu instructed Mr. Tsien to make   Mr.

and Mrs. Tsien directors of Maxima Samoa. She said that although Pearl Niu is 101 years of age she is fully aware of what is happening in the dispute between the two families. Mrs. Tsien was asked if she had ever told Philip Niu that she had become a director of Maxima Samoa and that Mr. Tsien had been appointed to represent it at the Fortuna EGM. She answered both questions in the negative.

206. Mrs. Tsien was cross-examined about the affairs of Wynner, of which she is the sole director. She displayed no knowledge of those matters. She said she did not know what Wynner's function was and did not know where Wynner's bearer share is kept. She did display an awareness that Wynner owns shares in Fortuna. She summed up her role by saying "my husband put my name down — I am just a housewife".

## Evidence of Albert Hsu

207. Mr. Albert Hsu has provided two witness statements which I have considered but he did not submit to cross-examination in court although the plaintiffs requested that.   Mr. Hsu is resident in Taipei. He has provided two reasons for his reluctance to attend the trial:  he did not believe that he could devote the necessary time to preparing to give evidence; and did not wish to appear to take sides in what he has characterized as a "private matter between the shareholders".  In my ruling of September 10, 2014 I held that his witness statements are admissible.  The absence of cross-examination must be taken into account in deciding how much weight to give to his evidence.

A-10327

208.   Mr. Hsu has university degrees in public administration and political science. He has held a number of very senior government positions in Taiwan, including the chairmanship of the finance committee of the KMT and the office of Vice- Premier. He has also acted as a director of a number of corporations.

209.   As chairman of the KMT finance committee between 1988 and 1993, Mr. Hsu was instrumental in the creation of CT & D Taiwan. A company owned and controlled by the KMT – China Trading Corporation – was not performing to Mr. Hsu's expectations so he recruited Mr. Ting to become its chairman. Mr. Hsu then accepted the suggestion of Mr. Ting that the KMT's overseas investments be placed in a new entity, CT & D Taiwan. Mr. Hsu executed the joint venture agreement dated September 20, 1989 on behalf of the KMT.

210.   Mr. Hsu asserts that he was not made aware at any time of the existence of an understanding or agreement between Mssrs. Ting, Tsien and Chen that

> each would be entitled to participate equally in the management of the investments (and that no party would be excluded from so managing, without his consent).

211.   In any event, the KMT owned 75% of CT & D Taiwan in 1989 so any such agreement would have been inconsistent with that in Mr. Hsu's view. The KMT retained the power to appoint six of the nine directors. It also retained control over the identity of CT & D Taiwan's minority shareholders. During this period, Mr. Ting reported to the KMT; Mr.

*150331 Tempo v Fortuna Judgment*

A-10328

Hsu was not aware of any involvement of Dr. Chen in the management of the company. When Mr. Hsu became Vice-Premier of Taiwan in 1993 his involvement with CT & D Taiwan ceased. Mr. Hsu denied that the KMT had any particular interest in Dr. Chen's involvement in CT & D Taiwan. He said that he cannot recall any contribution made "directly or indirectly" by Dr. Chen.

212.   In January 2004 Mr. Hsu was appointed a director of Fortuna but says that he did not play any active role. He has no recollection of the events leading up to the board meeting of June 2, 2004 or the EGM of June 22, 2004. He was unavailable to attend those meetings. He also denied that his appointment to the board of Fortuna was for the purpose of investigating the veracity of Dr. Chen's allegations. He did say that he had attempted to act as mediator between Dr. Chen and Mssrs. Ting and Tsien from time to time.

## Evidence of Arthur Ting

213.   Arthur Ting is now the Chairman of CT & D Taiwan. He has a degree in management and finance from Boston College in the United States. Mr. Ting was appointed to the Fortuna board of directors on January 16, 2004 together with the other members of the "second generation".

A-10329

214.    As with the evidence of Gayle Tsien, most of Mr. Ting's evidence describes things he has been told by others and impressions he has gained.  In general, he understood Dr. Chen to have no executive role in Fortuna; he was a passive investor. Arthur Ting says that he has never heard, until the present litigation, of any suggestion that the agreement alleged by Dr. Chen was made.

215.    Mr. Ting described several examples of what he termed aggressive and inappropriate behavior by Dr. Chen.  At the board meeting of January 16, 2004 he recalls Dr. Chen proposing that Randy Chen be appointed the General Manager of PMHC, to replace Frances Ba; this allegation is denied by Dr. Chen.  The proposal was rejected. Mr. Ting said that Dr. Chen was bypassing the chain of command within the Fortuna group by requesting documents directly from employees of subsidiary companies; Dr. Chen says that, as a director of Fortuna and many of its subsidiaries, he was entitled to do that.  In addition, by the end of 2003 Dr. Chen was spreading rumours intended to discredit Mr. Ting (Senior) and Mr. Tsien.

216.    Arthur Ting confirms that the board meeting of June 2nd 2004 was held in Beijing because a number of other meetings had already been scheduled there.  He recalls mailing notice of this board meeting to the registered addresses of the directors from Vietnam on May 22nd 2004.  After the board meeting, he recalls accompanying Gayle Tsien to the post office while she mailed notices of the June 22 EGM to the shareholders at their registered addresses in accordance with the Fortuna articles.

*150331 Tempo v Fortuna Judgment*