# 25-0643-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF AND SPECIAL APPENDIX FOR COUNTER-CLAIMANT-APPELLANT NHF TRS, LLC AND DEFENDANT-COUNTER-CLAIMANT-APPELLANT NEXPOINT DIVERSIFIED REAL ESTATE TRUST

MAZIN A. SBAITI
GRIFFIN S. RUBIN
SBAITI & COMPANY PLLC
*Attorneys for Counter-Claimant -
Appellant NHF TRS, LLC and
Defendant-Counter-Claimant-
Appellant Nexpoint Diversified
Real Estate Trust*
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
(214) 432-2899

CP COUNSEL PRESS    (800) 4-APPEAL • (514525)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for NexPoint Diversified Real Estate Trust hereby certifies that it is a publicly held real estate trust (NYSE:NXDT). NHF TRS, LLC is a wholly owned subsidiary of NexPoint Diversified Real Estate Trust. The following is a list of its corporate parents, affiliate, and/or publicly held companies that own 10% or more of its stock:

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .............................................. i

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION .................................................................................. 1

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES .............................................................. 2

STATEMENT OF THE CASE ................................................................. 2

SUMMARY OF THE ARGUMENT ...................................................... 10

STANDARD OF REVIEW ..................................................................... 13

ARGUMENT ...................................................................................... 14

I.    The Counterclaims State a Claim for Tortious Interference ........................................................................ 14

II.    NexPoint Has Standing to Bring a Direct Claim for Breach of Fiduciary Duty Under New York Law ................ 22

    A.    Trust or Quasi Trust .................................................... 24

    B.    Common Law Fiduciary Relationship ......................... 29

    C.    IAA-Based Fiduciary Duty Actionable Under New York Law ............................................................ 35

III.    In the Alternative, This Court Should Certify the Question of NexPoint's Standing to Bring a Direct Claim for Breach of Fiduciary Duty Under New York Law to the New York Court of Appeals ............................... 41

IV.    In the Alternative, NexPoint Has Standing to Bring a Claim for Breach of Fiduciary Duty Under Cayman Islands Law ................................................................... 45

    A.    Derivative Claim ........................................................ 45

    B.    Direct Claim .............................................................. 51

V.    The Other Claims NexPoint Pleaded Withstand 12(b)(6) Scrutiny .................................................... 53

       Aiding and Abetting ................................................... 53

       Conversion ................................................................. 53

       Negligence ................................................................. 55

CONCLUSION ....................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ajdler v. Province of Mendoza,*
  890 F.3d 95 (2d Cir. 2018) ................................................................ 44

*Anonymous v. CVS Corp.,*
  728 N.Y.S.2d 333 (N.Y. Sup. Ct. 2001) .......................................... 29

*Apple Recs., Inc. v. Capitol Recs., Inc.,*
  529 N.Y.S.2d 279 (N.Y. App. Div. 1988) ........................................ 36

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................... 14

*Barrett v. Freifeld,*
  883 N.Y.S.2d 305 (N.Y. App. Div. 2009) ........................................ 22

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................... 14

*Belmont v. MB Inv. Partners, Inc.,*
  708 F.3d 470 (3d Cir. 2013) .............................................................. 38

*Benesowitz v. Metro. Life Ins. Co.,*
  471 F.3d 348 (2d Cir. 2006) .............................................................. 43

*Brass v. Am. Film Techs. Inc.,*
  987 F.2d 142 (2d Cir. 1993) .............................................................. 36

*Catskill Dev., L.L.C. v. Park Place Ent. Corp.,*
  547 F.3d 115 (2d Cir. 2008) .............................................................. 14

*CFTC v. Walsh,*
  618 F.3d 218 (2d Cir. 2010) .............................................................. 42

*Chiapparelli v. Baker, Kellogg & Co.,*
  169 N.E. 274 (N.Y. 1929) ................................................................. 21

*Ciccone v. Hersh,*
  530 F. Supp. 2d 574 (S.D.N.Y. 2008) .............................................. 36

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.,*
  516 N.E.2d 190 (N.Y. 1987) ............................................................. 56

iv

*Commerzbank AG v. United States Bank Nat'l Ass'n*,
  277 F. Supp. 3d 483 (S.D.N.Y. 2017) ....................................................55

*Curley v. AMR Corp.*,
  153 F.3d 5 (2d Cir. 1998) ...................................................................46

*Dorking Genetics v. United States*,
  76 F.3d 1261 (2d Cir. 1996) ..............................................................56

*Douglass v. Beakley*,
  900 F. Supp. 2d 736 (N.D. Tex. 2012)................................................38

*Eccles v. Shamrock Capital Advisors, LLC*,
  245 N.E.3d 1110 (N.Y. 2024) ............................................................23

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)...........................................................................23

*Feldman v. CSX Transp., Inc.*,
  821 N.Y.S.2d 85 (N.Y. App. Div. 2006)..............................................37

*Fielding v. Kupferman*,
  65 A.D.3d 437 (N.Y. App. Div. 2009)............................................15-16

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
  No. 12-cv-7372, 2020 U.S. Dist. LEXIS 155918
  (S.D.N.Y. Aug. 27, 2020)..........................................................46-47, 48

*Gilbert v. Commissioner*,
  262 F.2d 512 (2d Cir. 1957) ..............................................................34

*Giordano v. Mkt. Am., Inc.*,
  599 F.3d 87 (2d Cir. 2010) ...........................................................42, 43

*Goldenson v. Steffens*,
  No. 2:10-CV-440, 2014 U.S. Dist. LEXIS 201258
  (D. Me. Mar. 7, 2014) ........................................................................38

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ......................................................39, 40

*Green v. Dep't of Educ. of N.Y.*,
  16 F.4th 1070 (2d Cir. 2021)..............................................................13

*Hodge v. Engleman*,
  90 F.4th 840 (5th Cir. 2024) ..............................................................13

*Howe v. Bank of N.Y. Mellon*,
  783 F. Supp. 2d 466 (S.D.N.Y. 2011) ................................................... 48

*Hydro Invs., Inc. v. Trafalgar Power Inc.*,
  227 F.3d 8 (2d Cir. 2000) ..................................................................... 55

*In re Application of Bd. of Comm'rs*,
  52 N.Y. 131 (1873) ............................................................................... 18

*In re China Cast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ............................................................... 35

*In re Est. of Rubin*,
  540 N.Y.S.2d 944 (N.Y. Sur. Ct. 1989),
  *aff'd*, 570 N.Y.S.2d 996 (N.Y. App. Div. 1991) .............................. 27, 28

*In re Thelen LLP*,
  736 F.3d 213 (2d Cir. 2013) ................................................................ 42

*In re Tyco Int'l, Ltd.*,
  340 F. Supp. 2d 94 (D.N.H. 2004) ................................................... 50, 51

*Jackson v. Wells Fargo Home Mortg.*,
  No. 15-CV-5062, 2018 U.S. Dist. LEXIS 136643
  (E.D.N.Y. Aug. 10, 2018), *report and recommendation adopted*,
  2019 U.S. Dist. LEXIS 51986 (E.D.N.Y. Mar. 27, 2019).................... 21

*Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*,
  96 F.4th 539 (2d Cir. 2024)................................................................. 44

*King County v. IKB Deutsche Industriebank AG*,
  863 F. Supp. 2d 288 (S.D.N.Y. 2012)................................................. 55

*Lamb v. Emhart Corp.*,
  47 F.3d 551 (2d Cir. 1995) ................................................................. 18

*Lappin v. Greenberg*,
  34 A.D.3d 277 (N.Y. App. Div. 2006)................................................. 16

*Lelchook v. Societe Generale de Banque Au Liban Sal*,
  67 F.4th 69 (2d Cir. 2023)................................................................. 43

*Lovatio v. Petróleos De Venez., S.A.*,
  No. 1:19-cv-4799, 2020 U.S.Dist. LEXIS 181114
  (S.D.N.Y. Sept. 30, 2020) ................................................................. 15

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
No. 03-CV-5539, 2004 U.S. Dist. LEXIS 11761
(S.D.N.Y. June 24, 2004) ...................................................... 30

*Mitsubishi UFJ Inv'r Servs. &
Banking (Luxembourg) S.A. v. Byblos Bank S.A.L.*,
No. 653915/2022, 2024 N.Y. Misc. LEXIS 25411
(N.Y. Sup. Ct. Dec. 16, 2024) ............................................. 20

*NBT Bancorp v. Fleet/Norstar Fin. Grp.*,
664 N.E.2d 492 (N.Y. 1996) ................................................ 14

*Ne. Gen. Corp. v. Wellington Advert.*,
624 N.E.2d 129 (N.Y. 1993) ................................................ 43

*Nisselson v. Waltzer (In re MarketXT Holdings Corp.)*,
No. 04-12078, 2008 Bankr. LEXIS 1562
(Bankr. S.D.N.Y. May 22, 2008) ......................................... 46

*Northrop Grumman Info. Tech., Inc. v. United States*,
535 F.3d 1339 (Fed. Cir. 2008) ........................................... 17

*Oddo Asset Management v. Barclays Bank PLC*,
973 N.E.2d 735 (N.Y. 2012) ............................... 33, 42, 47, 48

*Orentreich v. Prudential Ins. Co. of Am.*,
713 N.Y.S.2d 330 (N.Y. App. Div. 2000) ........................... 24

*Penato v. George*,
383 N.Y.S.2d 900 (N.Y. App. Div. 1976) ........................... 30

*PepsiCo P.R., Inc. v. Commissioner*,
Nos. 13676-09, 13677-09, 2012 Tax Ct. Memo LEXIS 270
(T.C. 2012) ............................................................................ 34

*Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.*,
51 F.4th 456 (2d Cir. 2022) ........................................... 43, 45

*Republic of Haiti v. Duvalier*,
626 N.Y.S.2d 472 (N.Y. App. Div. 1995) ........................... 54

*Rose v. Different Twist Pretzel, Inc.*,
999 N.Y.S.2d 438 (N.Y. App. Div. 2014) ........................... 14

*Sampaio v. Atl.-Heydt, LLC*,
294 F. Supp. 2d 466 (S.D.N.Y. 2003) ................................. 37

*Schneider v. Lazard Freres & Co.*,
552 N.Y.S.2d 571 (N.Y. App. Div. 1990) ...................................... 31, 32

*SEC v. ABS Manager, LLC*,
No. 13-cv-319, 2014 U.S. Dist. LEXIS 80542
(S.D. Cal. June 11, 2014) ................................................................. 54

*SEC v. Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (1963) ........................................................................ 34, 39

*SEC v. Markusen*,
143 F. Supp. 3d 877 (D. Minn. 2015) .............................................. 38

*SEC v. Roberts*,
No. 8:21-cv-01615, 2022 U.S. Dist. LEXIS 25502
(C.D. Cal. Jan. 25, 2022) ............................................................. 35-36

*Starr Indem. & Liab. Co. v. Brightstar Corp.*,
388 F. Supp. 3d 304 (S.D.N.Y. 2019) ........................................... 18, 19

*State ex rel. Udall v. Colonial Penn Ins. Co.*,
812 P.2d 777 (N.M. 1991) ................................................................ 38

*Strougo ex rel. Braz. Fund v. Scudder, Stevens & Clark, Inc.*,
964 F. Supp. 783 (S.D.N.Y. 1997) ................................................... 39

*Tire Eng'g & Distribution, LLC v. Bank of China*,
740 F.3d 108 (2d Cir. 2014) ............................................................. 42

*Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*,
556 F.3d 100 (2d Cir. 2009) ............................................................. 44

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
444 U.S. 11 (1979) ............................................................................ 39

*Travelers Ins. Co. v. 633 Third Assocs.*,
14 F.3d 114 (2d Cir. 1994) ............................................................... 36

*U.S. Bank N.A. v. Xxx*,
No. 650630/2021, 2021 N.Y. Misc. LEXIS 3747
(N.Y. Sup. Ct. June 28, 2021) .......................................................... 27

*Winn v. Schafer*,
499 F. Supp. 2d 390 (S.D.N.Y. 2007) .............................................. 49

*Wolfson v. Glass*,
   754 N.Y.S.2d 82 (N.Y. App. Div. 2003) ................................................. 37

**Statutes & Other Authorities:**

15 U.S.C.§ 80b-6(4) ........................................................................... 37, 40

28 U.S.C. § 1291 ....................................................................................... 2

28 U.S.C. § 1331 ....................................................................................... 1

28 U.S.C. § 1367 ....................................................................................... 1

17 C.F.R. § 275 ...................................................................................... 40

17 C.F.R. § 275.206(4) .......................................................... 34, 37, 39, 40, 54

17 C.F.R. § 275.206(4)-8 ........................................... 34, 35, 37, 38, 40, 54

22 N.Y.C.R.R. § 500.27(a) .................................................................... 42

106 N.Y. Jur.2d Trusts § 348 ............................................................... 28

BLACK'S LAW DICTIONARY (10th ed. 2014) ....................................... 47

FED. R. APP. P. 32(a)(6) ......................................................................... 58

FED. R. APP. P. 32(a)(7) ......................................................................... 58

FED. R. APP. P. 32(a)(7)(B)(iii) ............................................................. 58

FED. R. CIV. P. 12(b)(6) ............................................................. 3, 13, 53

FED. R. CIV. P. 44.1 .............................................................................. 46

J. R. Kemper, *Construction and Operation of Will or Trust Provision
   Appointing Advisors to Trustee of Executor*,
   56 A.L.R.3d 1249, § 10 ...................................................................... 28

*Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*,
   72 Fed. Reg. 44,756 (Aug. 9, 2007) ................................................. 40

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302 ........................ 23

RESTATEMENT (SECOND) OF TRUSTS § 185 (AM. L. INST. 1959) ............ 28

# INTRODUCTION

The ubiquity of collateralized loan obligations (CLOs) and other similarly structured financial products makes the question raised by this appeal a critical one: What rights does an investor in the junior-most tranche have? The district court answered the question bluntly: None. Yet, those investors provide the seed capital for every single CLO, CDO, CMO, CMBS, and the like. Without them, the sponsors could not borrow the necessary liquidity to purchase the subject investments, and these cornerstones of modern finance could not exist.

So, it cannot be that the seed investors have no enforceable rights, and trustees and advisors are allowed to self-deal with impunity. If the securities at issue came with no standing to enforce the holders' rights, they would be illusory. Yet that is exactly what the district court held here. This appeal seeks to correct that error.

# JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The district court granted Appellees' motion to dismiss on March 1, 2024. ECF No. 261 [SPA-1-45]. Appellants timely noticed their appeal on March 18, 2025, and March 26,

2025. ECF Nos. 323-24 [A-9522-9523, A-9524-9525]. This Court has jurisdiction over this appeal from a final judgment under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

NexPoint is a subordinated Noteholder of the Acis 6 CLO trust, the rights of which are set forth in an indenture. The Indenture vests title to the assets in a trustee and vests total control and authority over those assets in Appellee Acis Capital Management. ***Does NexPoint have standing to pursue claims against ACM and its associated parties for interfering with NexPoint's rights under the Notes and the Indenture, and/or for breach of fiduciary duty or related claims***?

## STATEMENT OF THE CASE

Appellants appeal from a judgment entered by the United States District Court for the Southern District of New York (Woods, J.) finding a failure to state a claim upon which relief could be granted because Appellants lacked standing to bring all claims other than the claim for tortious interference, and the tortious-interference claim was dismissed on the merits. The district court's memorandum opinion and order granting Appellees' motion to dismiss is unreported at 2024 WL 898907, 2024 U.S. Dist. LEXIS 36334 (S.D.N.Y. Mar. 1, 2024).

* * *

Appellant NexPoint Diversified Real Estate Trust ("NexPoint")[1] appeals from the district court's dismissal of its counterclaims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The counterclaims assert seven causes of action against Appellees Acis Capital Management, L.P. ("ACM"), Joshua N. Terry ("Terry"), Brigade Capital Management, LP ("Brigade"), each stemming from obligations under transactional documents deemed to be part of NexPoint's pleadings, including the Notes, Indenture,[2] Offering Circular,[3] and Portfolio Management Agreement ("PMA") which governed the transactions (together, the "Transaction Documents").

The district court dismissed the counterclaims with prejudice—not because NexPoint had not set forth plausible claims of self-dealing and malfeasance—but because NexPoint ostensibly lacks standing to assert

---

[1] NHF TRS, LLC is an additional appellant, as it is "NexPoint's subsidiary" and "the registered holder of the Subordinated Note issued by Acis CLO 6." Dkt. 220 at 1 [SPA-9512]. For simplicity and consistency with the record, NexPoint and NHF TRS, LLC are considered together and referred to as a singular entity.

[2] Sbaiti Declaration, Ex. 1 (New York choice of law) [A-5219-5547]; Dkt. No. 78, ¶ 46 ("Counterclaim") [A-9444-9445].

[3] Sbaiti Declaration, Ex. 2 (the "Offering Circular") [A-5548-5767]. The key terms of the Indenture are summarized in the Offering Circular, and the Offering Circular's statements about them are incorporated into the Indenture.

claims relating to breaches of fiduciary duty and breaches of the PMA (nevermind that NexPoint did not even base its tortious-interference claim on a breach of the PMA).

The parties agreed below that the Notes, Indenture, Offering Circular, and PMA,[4] along with the allegations of the Counterclaims themselves, establish the following:

- o that NexPoint is an investor and Note holder in a pooled investment vehicle, the Acis-6 Collateralized Loan Obligation Fund (the "<u>Acis-6</u>" CLO or trust)

- o that NexPoint holds Notes 12.5 percent of the Notes in that vehicle, and is therefore entitled to 12.5% of all residual and net proceeds after senior debt obligations, fees, and expenses[5]

- o that all senior debt obligations have been paid [6]

- o that the Acis-6 CLO is managed and advised by ACM

---

[4] While some familiarity with CLOs is assumed for the purposes of this brief, the description of how they work and function is set forth in the First Amended Counterclaim ¶¶ 18-44 [A- 9438 – 9444].

[5] Counterclaim, ¶ 46 [A-9444-9445] (stating that Appellant owns $7,500,000 in notional equity, which in the Indenture is the subordinated class); Indenture at p. 66 (total notional amount of subordinated class was $59,850,000) [A-5292]. $7,500,000 ÷ $59,850,000 = 12.5% (approximate).

[6] Counterclaim, ¶¶ 69–72 [A-9450-9451].

- o that Terry controls ACM[7]

- o that ACM retained Brigade as sub-advisor to the Acis-6 CLO[8]

- o that each of ACM, Terry, and Brigade (the "Advisors") are registered investment advisors ("RIAs") subject to the Investment Advisers Act of 1940 ("IAA")[9]

- o that the Acis-6 CLO consists of monies, securities, and assets (together, the "Assets") that are in the *possession* of U.S. Bank (the "Trustee"), but under the *control* of ACM (the "Portfolio Manager")

- o that the two entities serving the roles of "Issuer" and "Co-Issuer"—the assignors of those Assets—are inconsequential here except for having (i) retained a nominal amount of cash and (ii) effectively disclaimed any and all liabilities[10]

---

[7] A-9449-9450; *see also* Ex. 2, Offering Circular, pp. 13, 15-16 [A-5239, 5241-5242].

[8] Counterclaim, ¶¶ 59–69 [A-9448-9450].

[9] Counterclaim, ¶¶ 11, 59-69 [A-9438, A-9448-9450].

[10] Acis CLO 2015-6 Ltd., a Cayman Islands company, is the Issuer and Acis CLO 2015-6 LLC, a Delaware limited liability company, the Co-Issuer. They are required to assign all assets to trustees except for $250, and retain no liabilities. See, e.g., Offering Circular at 107 [A-5666] ("The Issuer has, and will have, no assets other than the sum of US$250. . . ."); Indenture, § 2.8(i) [(A-5309-5310; "subordinated

None of this is in dispute. Nor is it disputed that, under the Indenture, the Offering Circular, and the PMA, the Advisors charge fees calculated as a percentage of assets under management ("AUM").[11]

Given how the fees are calculated, the Transaction Documents contain several safeguards designed to prevent the Advisors from self-dealing or managing the Assets in a way that would be financially detrimental to the investor-beneficiaries. These include collateral-quality tests and coverage tests.[12] Failure to abide by these tests violates the Indenture.[13]

NexPoint points out that the Notes are part of the Indenture and incorporate the Indenture by reference, including these and other investor protections, such that disregarding the collateral-quality and

---

noteholder's obligations are "payable solely from the Assets") [A-83-84].

[11] A-9443 *see also* Ex. 1, Indenture, p. 1 [A-5227] ("The Co-Issuers are entering into this Indenture and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged."); *id.* at pp. 1–2 [A-5227-5228] (bearing the Granting Clauses, which state, in relevant part, "The Trustee acknowledges such Grants, accepts the trusts hereunder in accordance with the provisions hereof").

[12] *See* Counterclaim, ¶¶ 101-108 [A-9456-9457].

[13] *See* Ex. 2, Offering Circular, p. 17 [A-5576] ("Collateral Quality Test" and "Concentration Limitations"); Ex. 1, Indenture, pp. 35–36 [A-5261-5262] (definition of "Market Value"); p. 14 [(A-5240] definition of "Collateral Quality Test"); pp. 61–64, 140–41, 189–95 [A-5287-5290, A-5366-5367, A-5415-5421] (Indenture §§ 1.2, 7.18, 12, rules governing purchase and sales of securities).

coverage-test requirements constitute breaches of the Notes.[14] NexPoint
also alleges that the Advisors engaged in acts that, taken individually or
collectively, amounted to a self-dealing, deceptive, and manipulative
scheme which injured NexPoint. [A-9452-9461]. That scheme is as
follows:

   ***First***, the Advisors engaged in a scheme to maximize their fees by
inflating the value of the AUM. AUM is calculated by simply adding up
the face value, *i.e.*, par value, of the securities owned by the fund—and
doing so without regard to their actual worth on the market or how much
was paid for them.[15] The Advisors' fees are a percentage of *notional* assets

---

[14] *See* Ex. 1, Indenture, Form of Subordinated Note (Indenture Ex. A-2, pp. A2-1
through A2-10 [A-5475-5484]; *id.* at A2-7 [A-5481-5482] ("Reference is hereby made to
the Indenture and all indentures supplemental thereto for a statement of the
respective rights, limitations of rights, duties and immunities thereunder of the
Issuer, the Trustee and the Holders of the Notes[.]"). The standards that impact the
right to payment under the Notes include things such as the fact that the Indenture
cannot be wound up until all payments due to note holders in accordance with the
terms and conditions in the Indenture, have been made. *See also* Indenture § 7.1 [A-
5350] ("The Issuer will, … pursuant to the Priority of Payments, duly and punctually
pay all required distributions on the Subordinated Notes, in accordance with the
Subordinated Notes and this Indenture."); Indenture § 11.1 [A-5407-5415] (outlining
priority of payments to subordinated noteholders); Indenture § 12.2(a)(iii), (iv) [A-
5417-5418] (setting forth investment criteria that needs to be followed when
purchasing new Assets including compliance with Coverage Tests and Collateral
Quality Tests); § 12.2(b) [A-5418-5419] and § 12.3 [A-5420] (stating that purchases
and sales of Assets will satisfy or, if not satisfied, maintain or improve collateral
quality under—Collateral Quality Tests). *See also* § 12.3(a) [A-5420] (incorporating
PMA standards).

[15] Ex. 2, Offering Circular, pp. 9–11 [A-5568-5570] (*Application of Principal*

under management—that is, cumulative par value irrespective of asset quality.[16] NexPoint alleges that the Advisors entered into agreements for trades through which they purchased lesser quality assets (which would have been less expensive) that failed the various collateral-quality tests under the Indenture and the PMA—all to inflate the AUM.[17] NexPoint alleges that the Advisors also held on to certain securities when they should have been sold.[18] Put differently, the same amount of money could purchase lower-quality securities in greater volume, thus inflating the aggregate par value and, by extension, the AUM—which concomitantly (and not coincidentally) increased fees.

**_Second_**, the Advisors also created a mix of assets whose maturities were further out than the Indenture would have allowed, thus extending the life of Acis-6 in violation of the Indenture's provisions that required

---

*Proceeds*).

[16] Counterclaim, ¶ 35 [A-9443]; Ex. 2, Offering Circular, pp. 13, 100-101 [A-5572, 5660] (defining management fee as percentage of Fee Basis Amount).

[17] Counterclaim, ¶¶ 78–85 [A-9452-9453], ¶¶ 35-44 [A-9443-9444], and ¶¶ 173-176 [A-9467-9474]; Ex. 2, Offering Circular, pp. 17-19 [A-5576-5578] ("Collateral Quality Tests" and "Concentration Limitations"); Ex. 1, Indenture, pp. 35-36 [A-5261-5262] ("Market Value"); p. 14 [A-5240] (definition of "Collateral Quality Test"); *id.,* pp. 61–64, 140–41, 189-195 [A-5287-5290, A-5366-5367, A-5415-5421 (Indenture §§ 1.2, 7.18, 12.1 (Portfolio Manager's authority over purchase and sales of securities)).

[18] Counterclaim, ¶¶ 124–35 [A-9459-9460], 14–87 [A-9438-9454].

8

improvement or maintenance of the weighted average life of the assets.[19] Thus, not only could the Advisors collect higher fees in violation of the IAA, but they could also do so for a longer period, tying up investors' money instead of returning it to them so that they could deploy it in more productive investments.

**_Third_**, NexPoint alleges that the Advisors repeatedly violated the best-execution rule in the way they purchased and sold securities. Among other things, they (i) ignored relevant market dynamics; (ii) traded in ways that exacerbated losses; (iii) purchased when they should have remained in cash; and (iv) bundled same-day purchases, bulk bought securities, and did not seek best pricing.[20]

**_Fourth_**, NexPoint alleges that the Advisors inflated expenses and charged expenses outside of what was authorized and more than what had historically been charged with no explanation for the increase. NexPoint specifically alleges how, upon taking over Acis-6 CLO, the Advisors caused it to incur expenses that were orders of magnitude

---

[19] Counterclaim, ¶¶ 78–124 [A-9452-9459].

[20] Counterclaim, ¶¶ 76–77 [A-9452], 78–83 [A-9452-9453], 130–398 [A-9460-9461], 143–87 [A-9462-9475]; Ex. 2, Offering Circular, p. 17 [A-5576] (describing standard for meeting Collateral Quality Tests).

higher than what had been incurred in the past, and what would appear to have been authorized by the Indenture or the PMA.[21]

Thus, the fees and expenses generated by these tactics—and the underlying transactions too—harmed NexPoint and were unlawful. And NexPoint seeks damages, disgorgement, a constructive trust, and other remedies.[22]

NexPoint maintains that each of these constituted tortious interference with its rights in the Notes, otherwise violated fiduciary duties and other obligations, and were the components of a scheme to convert or misappropriate moneys that the Advisors were not entitled to keep under the law and under the various agreements.

NexPoint brought its claims both directly, under New York law, and alternatively under Cayman Island law, both directly and derivatively.[23]

## SUMMARY OF THE ARGUMENT

NexPoint's claim for tortious interference rests on three premises: (a) the Notes are a contract to which NexPoint is a party, (b) the Advisors are not parties to the Notes, and (c) the Advisors' alleged malfeasance

---

[21] Counterclaim, ¶¶ 78–123 [A-9452-9459]; 143–87 [A-9462-9475].

[22] Counterclaim, ¶ 251 [A-9485].

[23] Counterclaim, ¶¶ 240–41 [A-9483].

(which is not denied) interfered with NexPoint's rights and benefits under the Notes, causing NexPoint damages. The district court ignored this direct line, holding that the Notes were divorced from the Indenture. Not so. The Notes are incorporated into, and incorporate, the Indenture.

Regarding its fiduciary-duty claim, NexPoint has standing to bring a direct claim under New York against the Advisors—ACM for principal breach, and Brigade and Terry for aiding and abetting. New York recognizes the CLO at issue here as a trust—there is a settlor (the issuer), a grant (the Indenture), a res, and vested trusteeship. The district court problematized the last element while conceding the others. The fact that ACM is not the named or nominal "trustee" is of no moment given that New York has long recognized that one in ACM's shoes is a co-trustee and exercises all the traditional roles of *res* management that a common-law trustee would exercise. Separately, New York has long recognized direct fiduciary relationships between advisors and their investors in structures like this one. The New York Court of Appeals has expressly recognized that a manager can owe fiduciary duties to holders of a security nominally called a "note" where, as here, they "absorbed the initial losses" and "share in the profits," but otherwise have no

11

guaranteed return.

These features are all true of NexPoint's subordinated notes in the Acis 6 CLO.

And finally, Section 206(4) of the IAA codified the common-law fiduciary duty between registered investment advisors (like ACM) and investors—even if not in direct privity—which should be actionable under New York law. Because the New York Court of Appeals has not squarely addressed these questions, NexPoint respectfully submits that certification to the Court of Appeals would be proper under this Court's local rules and precedents.

If this Court is inclined to view the case as one of derivative standing under Cayman Islands law, NexPoint submits that derivative standing exists. The district court held that standing was lacking because the subordinated notes were debt and not equity. But the Cayman Islands recognizes the right to bring a derivative suit where the plaintiff is the residuary beneficiary—which (as described above) is true of the Notes. The elevation of form over substance should not carry the day on this issue, nor is it required by Cayman Islands law.

Finally, save for one, NexPoint's other claims were dismissed

predicated on the incorrect application of New York law, or as an extension of the prevailing errors described above. NexPoint would concede that while there is no cause of action for unjust enrichment—it is merely a remedy—it properly pleaded the bases for the remedy both for its fiduciary claims or in the event that the Court finds the Notes illusory, and therefore quasi-contract ought to apply.

In sum, this Court should reject the district court's ruling that Appellees' corrupt acts are committed with impunity and that NexPoint, as the holder of subordinated notes, has no standing to bring even a single claim to enforce its rights.

## STANDARD OF REVIEW

"Rule 12(b)(6) motions are 'viewed with disfavor and rarely granted.'" *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) (citation omitted). This Court "review[s] de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Green v. Dep't of Educ. of N.Y.*, 16 F.4th 1070, 1076 (2d Cir. 2021) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

**I.    The Counterclaims State a Claim for Tortious Interference**

By lining their own pockets in disregard of duties defined in the Indenture and incorporated into the Notes, the Advisors tortiously interfered with NexPoint's contractual rights under the Notes.

The elements of this claim in New York are (i) the existence of a valid contract with a third party, (ii) defendant's knowledge of that contract, (iii) defendant's intentional and unjustified act caused a breach of that contract, and (iv) damages caused by the breach. *Rose v. Different Twist Pretzel, Inc.*, 999 N.Y.S.2d 438, 440 (N.Y. App. Div. 2014). Utilizing "dishonest, unfair, or improper means" is sufficient to meet the third element. *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008). Thus, even otherwise "lawful behavior" suffices when it meets the standard. *NBT Bancorp v. Fleet/Norstar Fin. Grp.*, 664 N.E.2d 492, 496 (N.Y. 1996).

Here, each element of tortious interference is met by the Counterclaims' allegations. The Notes are a contract between the holders

14

and the Issuer or the trust. *Lovatio v. Petróleos De Venez., S.A.*, No. 1:19-cv-4799, 2020 U.S. Dist. LEXIS 181114, at \*10–12 (S.D.N.Y. Sept. 30, 2020) (recognizing that notes issued pursuant to an indenture are both securities and contracts). The Advisors are third parties to the Notes. Element one is met.

Certainly, the Advisors knew of this contract. The Notes are attached as an exhibit to the Indenture and referenced extensively therein as well as in the PMA.[24] The PMA, in creating obligations for ACM, explicitly references and adopts the obligations of the Issuer to the Note holders as provided by the Indenture.[25] Element two is met.

Skipping element three momentarily, element four, damages, can be pleaded generally. A-9481-9482, A-9484-9485. Indeed, allegations from which damages may be reasonably inferred are sufficient. *Fielding*

---

[24] *See, e.g.,* Ex. 1, Indenture p. 57 [A-5283], § 2.2 [A-5290], § 7.1 [A-5350] and § 11.1 [A-5407-5415] (payment duties to note holders); Form of Notes Ex. A2-7 [A-5481], *et seq.*; PMA p. 10 [A-5779], and § 3(a)[A-5774] ("Subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager agrees to supervise and direct the investment and reinvestment of the Assets, and shall perform on behalf of the Issuer the duties that have been specifically delegated to the Portfolio Manager in this Agreement and in the Indenture . . . ").

[25] *See* Sbaiti Declaration, Ex. 3 ("Portfolio Management Agreement" or "PMA") at pp. 5–9 [A-5774-5778] (§ 3, Duties of Portfolio Manager to comply with investment criteria and Collateral Quality Tests and other terms of Indenture); § 8 [A-5784-5785] (prohibiting ACM, Terry or Brigade from "taking any action that would intentionally, or with reckless disregard . . . adversely affect the interest of the Holders [of notes] in the Assets in any material respect").

*v. Kupferman*, 65 A.D.3d 437, 442 (N.Y. App. Div. 2009); *Lappin v. Greenberg*, 34 A.D.3d 277, 279 (N.Y. App. Div. 2006). Here, NexPoint extensively detailed how it lost money due to ACM's and Brigade's self-dealing and breaches and tortious interference.[26] Element four is met.

The district court identified no shortcomings concerning the first, second, or fourth elements. Only the third—an intentional and unjustified act that caused a breach of contract—was held to be problematic.

The district court concluded that the Counterclaims failed to allege this element because, it reasoned, (i) looking strictly at the Notes, they confer no enforceable rights on Noteholders, and (ii) looking strictly at the Indenture, Noteholders are not signatories or parties to that agreement.[27]

The district court based this conclusion on its interpretation of the Notes, chiefly its reasoning that the Indenture is *not* incorporated by reference into the Notes, as NexPoint alleged it is.[28] According to the district court, the Notes' many references to the Indenture serve "merely

---

[26] *E.g.*, Counterclaim ¶¶ 168-190 [A-9467-9476].

[27] Order at SPA-23-25.

[28] *Compare* SPA-23-24, *with* A-9480-9481.

to acknowledge that the referenced material is relevant to the contract," as was the case in *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008). This is an incorrect interpretation of the Notes and of *Northrup Grumman*.

The plaintiff in *Northrop Grumman* asked that court to treat a letter as incorporated into a delivery order even though the letter was never mentioned in the order or its accompanying terms and conditions. *Id.* at 1346. Further, what the terms and conditions *did* say about the allegedly incorporated "information" in the letter amounted to nothing more than a "recital" of what had previously happened with that information. *Id.* at 1347. None of the contract language could be read as borrowing rights or obligations from the letter.

The opposite is true here. The ten pages of subordinated Notes appended to the Indenture reference the Indenture by name a total of *twenty-eight* times.[29] One reference to the Indenture even states that the "rights" of "the Holders of the Notes" (among others) are to be found in the Indenture:

> Reference is hereby made to the Indenture and all indentures supplemental thereto for a statement of the

---

[29] A-5130-5139.

> respective rights, limitations of rights, duties and
> immunities thereunder of the Issuer, the Trustee and the
> Holders of the Notes and the terms upon which the Notes
> are, and are to be, authenticated and delivered.[30]

So, clearly, the Notes themselves incorporated the Indenture's "statement" of the "rights of the … Holders of the Notes."

At common law, incorporation by reference requires only that "the parties to the agreement had knowledge of and assented to the incorporated terms." *Lamb v. Emhart Corp.*, 47, F.3d 551, 558 (2d Cir. 1995) (contract language directing parties to look to another agreement for their rights expressly incorporates that agreement as to those rights); *see also Starr Indem. & Liab. Co. v. Brightstar Corp.*, 388 F. Supp. 3d 304, 341 (S.D.N.Y. 2019) (citing *Lamb* for the proposition that New York follows the common law rule, and *In re Application of Bd. of Comm'rs*, 52 N.Y. 131, 131 (1873), for the proposition that "[n]o particular mode of reference is necessary for [incorporation]; any language which indicates the intent that the two shall make one instrument, or a *physical annexing* of the one to the other, in a manner or under circumstances showing clearly such intent, is sufficient" (emphasis added)).

---

[30] A-5136-5137 (emphasis added); *see also* A-4976-4978 (section 4.1 of the Indenture, describing and preserving some holder rights).

Here, the Notes are appended to the Indenture,[31] a "physical annexing," which is sufficient by itself. *Starr Indem.*, 388 F. Supp. 3d at 341. There is language in the Notes directing holders to look to the Indenture for a statement of their rights: "Reference is hereby made to the Indenture . . . for a statement of the respective rights . . . of . . . the Holders of the Notes."[32] There is also the sheer volume of references. And the very nature of the securities speaks to this issue as well. The Indenture (which creates the Notes) and the Notes themselves are prepared *and packaged* together for a reason.

The district court suggests that the parties had to explicitly use the term "incorporate," as they did elsewhere, to bring Noteholders' rights into the contract.[33] But this logic is contradicted by the plain text of the Notes, which references and employs the Indenture's defined terms without using any form of the word "incorporate."[34]

Even the central promise of the Notes, to make payment to their holders, is made subject to the exceptions provided in the Indenture—

---

[31] A-5130-5139.
[32] A-5136-5137.
[33] SPA.24 n.13.
[34] A-5137 ("Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Indenture.").

plainly incorporating those exceptions, but doing so without *expressly* using any form of that word.[35] Also, the district court held that New York law governs the Notes merely because the *Indenture* says so.[36] This performative concession confirms that using the term "incorporate" in the *Notes* is not essential to incorporating any terms in the Indenture.

The district court's premise that the lack of any remedy for breach of the Notes nullifies a tortious interference claim raises the spectre of illusoriness. Because the Notes forbid looking to the Issuer—the nominal counterparty to the Notes—for *any* remedy, the district court's interpretation that there is no standing for a remedy against anyone else would render even the promise to pay NexPoint illusory, causing the contract to fail for want of consideration. *See, e.g.*, *Mitsubishi UFJ Inv'r Servs. & Banking (Luxembourg) S.A. v. Byblos Bank S.A.L.*, No. 653915/2022, 2024 N.Y. Misc. LEXIS 25411, at *7 (N.Y. Sup. Ct. Dec. 16, 2024) ("Such an interpretation, which obligates plaintiff entirely, but does nothing to ensure reciprocal performance obligations of repayment on defendant's part, renders the contract completely illusory and without

---

[35] A-5136.
[36] SPA.25.

consideration."). True, the Notes' *promise* to distribute proceeds would remain. But the entirety of the activities upon which such proceeds are dependent becomes optional if the Notes confer no other "duties enforceable by the noteholders against Acis-6, the Note's trustee, or anyone else," as the district court concluded. Clearly that is a bridge too far. *See Chiapparelli v. Baker, Kellogg & Co.*, 169 N.E. 274, 277 (N.Y. 1929) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement. The unlimited choice in effect destroys the promise and makes it merely illusory."); *Jackson v. Wells Fargo Home Mortg.*, No. 15-CV-5062, 2018 U.S. Dist. LEXIS 136643, at *29–30 (E.D.N.Y. Aug. 10, 2018) (applying New York law) ("[L]anguage that 'relieves a party of its obligation to perform the contract for any reason which it chose to advance' renders such a contract unenforceable." (original alterations and citation omitted)), *report and recommendation adopted*, 2019 U.S. Dist. LEXIS 51986 (E.D.N.Y. Mar. 27, 2019).

It was therefore error for the district court to conclude that the Noteholders do not have enforceable rights, that the Indenture is not incorporated into the Notes, and that the Counterclaims fail to state a

21

claim for tortious interference against the Advisors. Thus, the district court's dismissal of NexPoint's tortious interference claim should be reversed.

## II. NexPoint Has Standing to Bring a Direct Claim for Breach of Fiduciary Duty Under New York Law

Based on the same facts, NexPoint asserts that the Advisors are directly liable for breaching the common-law fiduciary duties of loyalty, transparency, and care, or for aiding and abetting such breaches.[37] The district court's opinion is surprisingly hostile to this claim.[38]

To be sure, the Transaction Documents contain multiple examples of attempts to *limit* exposure. But they also acknowledge liability in varied circumstances, while in others they are careful to respect legal limits that prevent the elimination of liability altogether. Moreover, the nature of the Notes here—where NexPoint and other unsecured noteholders, not shareholders, are entitled to all residual benefits (read: profits)—cries out for the recognition of substance over form.

---

[37] A-9462; *see generally* A-9462-9477.

[38] The elements of a claim for breach of fiduciary duty are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom. *Barrett v. Freifeld*, 883 N.Y.S.2d 305, 308 (N.Y. App. Div. 2009). Nothing in the district court's opinion faults NexPoint's allegations with regard to the latter two elements. Its focus, instead, is entirely on the first.

The district court's hostility to the fiduciary claim seems partially due to its conviction that there is no direct fiduciary duty owed by ACM to NexPoint, and that the fiduciary-duty claim should be subject to the internal affairs doctrine. But it conducted no analysis to support its conclusion that the internal affairs of the Cayman Islands *Issuer* are relevant to claims brought by NexPoint (a residuary beneficiary) against *ACM*, who is not a director or officer, or even a shareholder, of the Issuer, and whose claims are inextricably intertwined with contracts that select New York law and a New York forum for any disputes.[39]

The Indenture also forms the basis for ACM having brought suit

---

[39] A.865-66. Similarly, NexPoint is neither a director, officer, or shareholder of ACM, nor even *technically* a beneficial owner of the Issuer. Instead, it is a beneficial owner of the "Assets" that the Issuers of the Acis-6 CLO assigned to U.S. Bank and ACM. *See, e.g.*, Counterclaim, ¶ 54 [A-9448]. The relationship between NexPoint and ACM is not the kind of relationship deemed "internal" in nature by the New York Court of Appeals in its recent decision in *Eccles v. Shamrock Capital Advisors, LLC*, 245 N.E.3d 1110, 1121 (N.Y. 2024); *see also id.* at 1121 n.11 (citing Restatement (Second) of Conflict of Laws § 302, cmt. e for the proposition that "[i]nternal affairs also generally 'involve a corporation's organic structure or internal administration,' including 'steps taken in the course of the original incorporation, . . . mergers, consolidations, and reorganizations'"). Also, the entire purpose of the internal affairs doctrine would be set on its head if it were applied here to subject the Noteholders and the Advisors to Cayman Islands law when they had agreed to be subject to New York law instead. *See Eccles*, 42 N.Y.3d at 336–37 (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982), and collecting other authorities for the proposition that "the policy underlying the internal affairs doctrine [is to ensure] that 'only one [jurisdiction] should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands").

against NexPoint in New York and under New York law in the first place,[40] and it should be estopped from denying that contract's selection of New York for the law and forum for disputes related to it.

NexPoint respectfully submits that New York law governs the Notes and any claims pertaining to them, as the Indenture provides. And it submits that three independent bases exist for recognizing a direct fiduciary claim here under New York law.

## A.    Trust or Quasi Trust

A direct fiduciary relationship arises here as a result of an express or quasi-trust. This is the first independent basis for a direct fiduciary-duty claim.

"An express trust may be created orally or in writing; no particular form of words is necessary, and it may arise by implication from the settlor's conduct" if "[a]ll of the essential elements of a trust" are present: (i) a designated beneficiary, (ii) a designated trustee, (iii) a clearly identifiable res, and (iv) delivery of the res by the settlor to the trustee with the intent of vesting legal title in the trustee. *Orentreich v. Prudential Ins. Co. of Am.*, 713 N.Y.S.2d 330, 331–32 (N.Y. App. Div. 2000).

---

[40] A-9495.

The Indenture provides each of these essentials. The Noteholders are the beneficiaries, the Assets the *res*, and delivery is required and occurred. Only the trustee issue is tricky.

And the reason it gets tricky is that the functions of the trustee are divided between two parties: the designated nominal trustee, U.S. Bank, has conscientiously avoided all but a small portion of the traditional functions and duties of a trustee. The remainder lies with ACM.

The reasoning behind this conclusion is what the district court (pejoratively) dubbed "creative." But it is actually the opposite kind of thinking: deduction. The logic proceeds in three steps:

1. The Indenture's grant, which the Trustee explicitly accepts,[41] states that all rights, title, or interest in the PMA is assigned away.[42] As a result, ACM's duties are no longer owed to the Issuer but to the Trustee.[43]

2. But because of the strict limitations on the Trustee's role,

---

[41] A-5228.

[42] A-9498-9499, A-5137.

[43] This divorce between the Issuer and the Acis-6 CLO is further evidenced by the fact that Note holders have no recourse against the Issuer and must look solely to the trust *res* for satisfaction of any and all obligations under the Notes. A-5309 ("Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Assets").

someone must step into the empty shoes of the Issuer for the roles that U.S. Bank will not play.

3. Enter ACM, the Portfolio Manager, who controls everything having to do with the fund.[44] Although the Indenture assigns the Issuer's rights under the PMA to U.S. Bank, and a trustee traditionally would hold legal title *and* exercise control over the trust *res*, not so here. Instead, under the Indenture, the trustee role is divided between U.S. Bank (who holds legal title to the Assets but otherwise has no non-ministerial role other than when ACM declares itself in default),[45] and

---

[44] A-5227-5431 (terms of assignment of PMA). *See* A-5429 ("Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf."); *see also* Ex. 2, Offering Circular, p. 100 [A-5659] "Pursuant to the terms of the Portfolio Management Agreement, and in accordance with the requirements set forth in the Indenture, the Portfolio Manager will select the portfolio of Collateral Obligations and will instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation, Eligible Investment or other Asset.").

[45] *See, e.g.,* Ex. 1, Indenture, § 5.6 [A-5333] and Article 6 [A-5338-5350]; *see also* § 6.1(a) [A-5338] ("the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee") and § 6.3(f) [A-5341] ("the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document[.]") and § 6.3(i) [A-5341] ("nothing herein shall be construed to impose an obligation on the part of the Trustee to recalculate, evaluate or verify any report, certificate or information received from the Issuer or Portfolio Manager (unless and except to the extent otherwise expressly set forth herein)"), § 6.3(o) [A-5342] ("the Trustee shall have no liability for the acts or omissions of the Portfolio Manager, the Collateral Administrator, the Issuer or the Co-Issuer, any Paying Agent (other than the Trustee)

ACM (who manages and controls the trust *res* in accordance with the Indenture and PMA).[46]

To speak plainly, exercising control over the *res* in a trust the way ACM does is the traditional core function of a trustee.[47] And so, the Indenture creates an express trust,[48] and ACM serves in the role of co- or quasi-trustee.

New York courts have repeatedly found such roles create direct fiduciary duties to beneficiaries of a trust as a result of an investment advisor exercising the sort of control the Indenture vests in ACM. *See, e.g.*, *In re Est. of Rubin*, 540 N.Y.S.2d 944, 947 (N.Y. Sur. Ct. 1989) ("Insofar as the status of an advisor is concerned, the courts have generally considered him a fiduciary, somewhat in the nature of a co-trustee. Another term employed is that of a quasi-trustee or special

---

or any Authenticating Agent (other than the Trustee) appointed under or pursuant to this Indenture").

[46] *See* Ex. 1, Indenture, p. 44 [A-5270] ("Portfolio Manager" and "Portfolio Management Agreement"). *See also* Indenture, §§ 1.2(b) [A-5287] (duty of Portfolio Manager as to the Assets) and § 3.3(b) [A-5321] (duty of Portfolio Manager regarding purchasing collateral).

[47] *See, e.g.*, N.Y. EST. POWERS & TRUSTS LAW § 11-2 *et seq.*

[48] U.S. Bank must agree, since it sought to declare its rights and obligations under a similar indenture under Article 77 of New York's Civil Practice Law and Rules, a provision strictly reserved for construing rights in trust instruments. *See U.S. Bank N.A. v. Xxx*, No. 650630/2021, 2021 N.Y. Misc. LEXIS 3747, at *17 (N.Y. Sup. Ct. June 28, 2021).

trustee.") (citations omitted) (citing RESTATEMENT (SECOND) OF TRUSTS § 185 (AM. L. INST. 1959)), *aff'd*, 570 N.Y.S.2d 996 (N.Y. App. Div. 1991); *see also* RESTATEMENT (SECOND) OF TRUSTS § 185 cmts. c, e ("A power given to some third person, who is expert in the making of investments, to control the trustee in disposing of or acquiring trust investments, would ordinarily be a power for the benefit of the beneficiaries of the trust generally" and because such power "is for the benefit of someone other than the holder of the power, the holder of the power is subject to a fiduciary duty in the exercise of the power."); *see also* J. R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee of Executor*, 56 A.L.R.3d 1249, § 10 ("Consonant with the status of a nonbeneficiary advisor as a quasi-trustee, or assistant to a trustee, it has generally been held or recognized that such an advisor stands in a fiduciary relationship to the beneficiaries of a[] . . . trust."); 106 N.Y. Jur.2d Trusts § 348 ("the relationship between a trustee and advisor is that of a co-trustee, with the advisor having the controlling power").

Indeed, the Indenture offers further support for the idea that ACM is a trustee too, prohibiting wind up until satisfaction of the "the rights

of Holders of *Notes as beneficiaries hereof with respect to the property deposited with the Trustee* and payable to all of them" in accordance with the Indenture.[49]

In sum, the elements of a trust are met here, and ACM is a co- or quasi-trustee. In that role, it has a direct fiduciary relationship with the beneficiaries of the trust, the Noteholders. As a result, NexPoint has standing to bring a direct claim against ACM for breach of fiduciary duty and the other Advisors for aiding and abetting the breach.

## B.    Common Law Fiduciary Relationship

A relationship of trust and confidence between ACM and the Note holders provides the second independent basis for finding a direct fiduciary-duty claim.

"[I]t is well settled in New York that a fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied." *Anonymous v. CVS Corp.*, 728 N.Y.S.2d 333, 337 (N.Y. Sup. Ct. 2001). The duty "embraces both technical fiduciary relations and those informal

---

[49] A-5321-5322 (emphasis added).

relations which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 383 N.Y.S.2d 900, 904–05 (N.Y. App. Div. 1976).

New York courts have repeatedly found a direct fiduciary relationship between investment advisors and investors. For instance, in *Metropolitan West*, the plaintiff, a junior noteholder, sued an indenture trustee and investment manager for breach of fiduciary duty. *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03-CV-5539, 2004 U.S. Dist. LEXIS 11761, at *2 (S.D.N.Y. June 24, 2004). The investment manager moved to dismiss the fiduciary-duty claim on the premise that "it was in privity with the Issuers, not the noteholders, and thus owed no duty to any individual noteholder." *Id*. at *30. The court disagreed and found that "even in the absence of a contract with plaintiff, it did owe a duty to the noteholders by virtue of its relationship with the Issuers." *Id.* at *30–31. Specifically, the court found that the investment manager was an agent of the issuer and had expressly recognized in its offering documents that it could be liable to the bondholders for their losses in some cases. *See id.*

Similarly here, ACM has acknowledged that it does have liability

to Noteholders for bad-faith omissions, willful misconduct, gross negligence, and the like.[50] The district court's conclusions, however, would eliminate even such limited liability.

In another case resting on similar rationale, shareholders in a fund brought fiduciary-duty claims against an investment advisor who had been hired by a special committee of the board of directors. *See Schneider v. Lazard Freres & Co.*, 552 N.Y.S.2d 571, 572 (N.Y. App. Div. 1990). There, the First Department explained:

> No claim is made by the shareholders that any of them actually relied on any advice the bankers gave the special committee concerning either the conduct of the auction or the relative values of the competing bids. Nor is there any allegation that any such advice was passed on, or intended to be passed on, to any of the shareholders for the purpose of influencing them to take any particular action in connection with the auction. On the contrary, underlying the complaint is the notion that it was the expectation of all concerned that the shareholders were not to do anything other than passively follow the recommendation of the special committee, which was set up specifically to protect their interests in the auction . . . . Viewing the relationship between the shareholders and the special committee thus, that is, as one of principal and agent, we do not see how it can be said that a duty of care

---

[50] *See* A-5788-5789 (disclaiming liability for most actions but acknowledging legal responsibility to Note holders and others for any decrease in the value of ACIS-6's portfolio as a result of bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations); A-5661 (same).

> owed by the bankers to the special committee was not
> intended for the benefit of the shareholders.

*Id.* at 574. Here too, the purpose of the Acis-6 CLO fund and ACM's entire existence in the transaction is to manage the Assets for the benefit of passive investors, including NexPoint.

The district court stressed that, in its view, the Notes are debt, not equity. On that basis the district court declined to consider any argument that the Notes functioned like equity. But the equivalence is there nonetheless. The residual/profit interest that would normally be equity's belongs to the subordinated Noteholders—like NexPoint—here. And percipiently, there are no shareholders with similar or competing interests. NexPoint and the unsecured Noteholders are undisputedly the residuary interest holders.

In other words, the Assets exist, and the Trustee is merely the legal, not the beneficial, owner. So, who should be treated as beneficial owner (*e.g.*, the equity) in the subordinated Note holders' stead? And by what other name should one be called if they control property beneficially owned by another, if not fiduciary? The district court's conclusions do not take these questions into account, but this is precisely the kind of situation in which courts decline to elevate form over substance.

It is not a new idea that noteholders can be viewed as "holders of equity" to whom direct fiduciary duties are owed. The New York Court of Appeals called certain noteholders exactly that in *Oddo Asset Management v. Barclays Bank PLC*, 973 N.E.2d 735, 741 (N.Y. 2012). There, the Court of Appeals treated a tranche of notes called "capital noteholders" as equity and recognized that the noteholders had a direct fiduciary relationship with the investment advisors specifically because they "absorbed the first losses" and their rate of return was not fixed but instead consisted of "a share in the profits." *Id.*

Here too, NexPoint's Notes are not guaranteed any repayment. They have no fixed rate of return. They are first in line for defaults, last to be paid, and their return is limited to "profits."[51] How this interest is *labeled* is not controlling here. For example, the Indenture provides that, for U.S. tax purposes, these interests are classified as equity.[52] This concession is significant given the substance over form doctrine in U.S.

---

[51] *See, e.g.,* Ex. 2, Offering Circular, 31 [A-5590] ("Distributions to holders of the Subordinated Notes will be made solely from distributions on the Assets after all other payments have been made pursuant to the Priority of Payments described herein."); *see also* Ex. 1, Indenture, § 7.1 [A-5350] and § 11.1 [A-5407-5415].

[52] Ex. 1, Indenture, § 7.17(h) [A-5364] ("Each holder of the Subordinated Notes (and any interest therein) will be deemed to have represented and agreed to treat the Subordinated Notes as equity for U.S. federal, state and local income and franchise tax purposes.").

tax jurisprudence—demonstrating that the subordinated notes are, *in substance,* equity. *See PepsiCo P.R., Inc. v. Commissioner*, Nos. 13676-09, 13677-09, 2012 Tax Ct. Memo LEXIS 270, at *55 (T.C. 2012) ("It is axiomatic that the substance of a transaction governs for tax purposes. This principle is equally applicable in debt-versus-equity inquiries." *citing Gilbert v. Commissioner*, 262 F.2d 512, 514 (2d Cir. 1957) (other citations omitted)). Therefore, because NexPoint's Notes were essentially the residuary interest—the equity—NexPoint was owed a direct fiduciary duty.

The Supreme Court's decision in *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), is also informative. There, the Court explained that § 206 of the IAA *codified* the common law fiduciary duties owed by investment advisors to their investors. *See id.* at 194. It did not create the duties. And it did not supplant the common law. This is on point because subsection (4) of § 206—unlike subsections (1) or (2)—is not limited to direct "clients." Neither are the SEC rules promulgated thereunder. *See* Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8. The district court's conclusion that fiduciary relationships exist only between investment advisors and their direct clients is therefore contradicted by

34

statute and by the common-law duties codified there. Under the common law, investment advisors have always been fiduciaries when they act for others and manage property that is not their own. *Id.*

No New York decision has disavowed the common law's recognition of a fiduciary duty between an investment advisor and investors.

In sum, because a direct fiduciary duty arises here as a result of the relationship between investment advisor and investor, NexPoint had standing to bring a claim for breach of fiduciary duty under New York law.

## C. IAA-Based Fiduciary Duty Actionable Under New York Law

The IAA itself provides the third independent basis for finding a direct fiduciary-duty claim.

The Counterclaims set forth with particularity the deceptive acts it contests, included among them a dozen specific transactions.[53] The sufficiency of those allegations has not been challenged.[54] Neither has the

---

[53] *See, e.g.*, Counterclaim, ¶¶ 70–138 [A-9451-9461], 143–87 [A-9462-9475-; *id.*, ¶ 173(a)-(l) [A-9467-9474] (setting forth transactions).

[54] While Terry is liable as principal and under the doctrine of imputation, *In re China Cast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475–76 (9th Cir. 2015) (holding that principals are generally responsible for violations of federal securities laws where agents committed within the scope of their authority), if Terry contends that he cannot be directly liable, NexPoint respectfully submits that Terry would be liable for aiding and abetting at the very least. *See also SEC v. Roberts*, No. 8:21-cv-01615,

allegation that they violated § 206 of the IAA. Instead, the Advisors argued, and the district court agreed, that no private action can be brought for violation of the fiduciary duties itemized in § 206.

While true that the IAA's private enforcement mechanism is unavailable for present purposes and no court has expressly held that violations of § 206 are actionable under New York law, no court has rejected the notion either. That means this Court must make an "*Erie* guess." *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994).

Under New York law, fiduciary relationships exist "where it can be readily seen that one party reasonably trusted another." *Brass v. Am. Film Techs. Inc.*, 987 F.2d 142, 151 (2d Cir. 1993). Therefore, "the existence of fiduciary relationships under New York law cannot be determined by recourse to rigid formulas." *Ciccone v. Hersh*, 530 F. Supp. 2d 574, 577 (S.D.N.Y. 2008); *Apple Recs., Inc. v. Capitol Recs., Inc.*, 529 N.Y.S.2d 279, 283 (N.Y. App. Div. 1988).

Similarly, under New York law, "a statute or regulation may

_____

2022 U.S. Dist. LEXIS 25502, at *16 (C.D. Cal. Jan. 25, 2022) (holding that a defendant could be held civilly liable for aiding and abetting where they were in control of agents' conduct and therefore would have knowledge of same).

provide the Court with the relevant standard of care." *Sampaio v. Atl.-Heydt, LLC*, 294 F. Supp. 2d 466, 469–70 (S.D.N.Y. 2003); *Feldman v. CSX Transp., Inc.*, 821 N.Y.S.2d 85, 89–90 (N.Y. App. Div. 2006) (holding that violation of Federal Railroad Administration regulations could give rise to state tort claims). "[T]he determination as to whether a statute imposes a statutory standard of care turns on 'whether the underlying policy of the legislation is the protection of a certain class of individuals and whether judicial recognition of a statutory standard will further that policy of protection." *Wolfson v. Glass*, 754 N.Y.S.2d 82, 83 (N.Y. App. Div. 2003) (finding that federal Americans with Disabilities Act established a standard of care under New York law despite providing no statutory private cause of action).

Here, it is readily apparent that NexPoint is within the class of persons that § 206(4) of the IAA (15 U.S.C.§ 80b-6(4)) was designed to protect. Indeed, the SEC has determined so by promulgating Rule 206(4)-8 (17 C.F.R. § 275.206(4)-8) ("It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the Act (15 U.S.C. 80b-6(4)) for any investment adviser to a pooled investment vehicle to . . . engage in any act, practice,

or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.").

Courts in other jurisdictions agree and have recognized that state fiduciary-duty actions are vehicles for vindicating breaches of § 206's fiduciary duties. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, 751–52 & n.16 (N.D. Tex. 2012) (holding that the IAA provided the bases for a formal fiduciary relationship actionable under Texas law); *SEC v. Markusen*, 143 F. Supp. 3d 877, 891 (D. Minn. 2015); *Goldenson v. Steffens*, No. 2:10-CV-440, 2014 U.S. Dist. LEXIS 201258, at *137 (D. Me. Mar. 7, 2014) (citing Rule 206(4)-8 and holding that "[e]ven assuming the IAA provides no private right of action, this does not mean that it does not create a standard of care from which a duty arises . . . ."); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 785 (N.M. 1991) (applying the standard in *Capital Gains* and ruling that a state-law claim for breach of fiduciary duty against an investment advisor could proceed); *see also Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 502–06 (3d Cir. 2013) (holding that state fiduciary-duty claims are a recognized vehicle for enforcing violations of the IAA and citing cases). The Southern

District of New York similarly concluded that federally imposed fiduciary duties under the Investment Company Act of 1940 are actionable in state-law actions for breach of fiduciary duty. *See Strougo ex rel. Braz. Fund v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 799 (S.D.N.Y. 1997).

The Advisors conceded below that § 206 imposes fiduciary duties on them. The Supreme Court made clear that § 206—including § 206(4)—codified the common-law fiduciary duties between advisors and investors (*e.g.*, the IAA did not invent them). *See Cap. Gains*, 375 U.S. at 194; *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) (citing *Capital Gains*). The district court's opinion dramatically narrows the scope of those duties. Relying on *Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006), it concludes that § 206 applies only when the advisor is in privity with the plaintiff—*e.g.*, as a direct "client."

But the district court ignored what the D.C. Circuit wrote in full. *Goldstein* actually supports the opposite proposition. Before that court was an SEC rule based on subsection (2) of § 206. And as previously explained, subsection (2)—like § 206(1) and (3)—is explicitly limited to "clients." Thus, it is entirely unsurprising that the circuit court

invalidated a rule promulgated pursuant to § 206(2) which, by its terms, would have been applicable to all investors in advised funds, non-clients too. *Id.* at 881. But the *Goldstein* court also noted that § 206(4) did *not* use the word "clients" and thus was not subject to the same limitation. *See id.* at 881 n.6 ("[Section 206] also applies, however, to persons other than clients. *See* 15 U.S.C. § 80b-6(4).").

The district court declined to credit the above-proffered reasoning, relying instead on the superficial client/non-client distinction that appropriately determined the outcome in *Goldstein*. But that distinction does not apply here. Accordingly, the district court's reliance on *Goldstein* to suggest that there is no direct fiduciary duty under § 206(4) simply because there was no privity is a non-starter.[55]

In sum, § 206(4) reflects the codification of pre-existing common law duties that are between advisor and investor—whether direct or indirect.

---

[55] Separately, the SEC promulgated Rule 206(4)-8 (17 C.F.R. § 275.206(4)-8) pursuant to its authority under § 206(4), and ostensibly at *Goldstein's* suggestion. *See Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles*, 72 Fed. Reg. 44,756, 44,757 (Aug. 9, 2007) (codified at 17 C.F.R. pt. 275) (noting that proposed rule is in reaction to *Goldstein* and that *Goldstein* only addressed § 206(2), not § 206(4)). Section 206(4) gave the SEC the authority to "prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative." Rule 206(4)-8 specifically does so by prohibiting fraudulent means aimed at investors or prospective investors in "pooled investment funds" like the Acis-6 CLO. Therefore, while Rule 206(4)-8 did *not* create a new fiduciary duty, it confirms that § 206(4) applies here and how it was breached.

And their breach should have been held actionable here in a state-law breach-of-fiduciary-duty claim, as similar actions have been in other jurisdictions.

NexPoint's direct action for breach of fiduciary duty under New York law should not have been dismissed.

## III. In the Alternative, This Court Should Certify the Question of NexPoint's Standing to Bring a Direct Claim for Breach of Fiduciary Duty Under New York Law to the New York Court of Appeals

This case presents important questions of New York law that the courts of New York have not yet considered. Certification to the New York Court of Appeals in the first instance may therefore be warranted for three questions: (i) whether, under an arrangement like the Indenture, an advisor to whom a trustee has been delegated the duty to exercise control of the funds in the arrangement is either a trustee or co-trustee of an express trust under New York law; (ii) whether the junior-most investor in a pooled investment fund has standing to sue the fund's advisor under New York law; and/or (iii) whether New York law would recognize a breach of a duty under the IAA as actionable via a New York fiduciary duty cause of action.

"The local rules of the Second Circuit provide that 'if state law

41

permits, the [C]ourt may certify a question of state law to that state's highest court.'" *Giordano v. Mkt. Am., Inc.*, 599 F.3d 87, 100 (2d Cir. 2010) (brackets omitted) (quoting 2d Cir. R. 27.2). "New York law permits [this Court] to certify to New York's highest court 'determinative questions of New York law that are involved in a case pending before us for which no controlling precedent of the Court of Appeals exists.'" *CFTC v. Walsh*, 618 F.3d 218, 230 (2d Cir. 2010) (brackets omitted) (quoting 22 N.Y.C.R.R. § 500.27(a)). "In deciding whether to certify a question, [the Court] consider[s]: '(1) whether the New York Court of Appeals has addressed the issue and, if not, whether the decisions of other New York courts permit us to predict how the Court of Appeals would resolve it; (2) whether the question is of importance to the state and may require value judgments and public policy choices; and (3) whether the certified question is determinative of a claim before us.'" *Tire Eng'g & Distribution, LLC v. Bank of China*, 740 F.3d 108, 114 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 224 (2d Cir. 2013)).

The first factor weighs in favor of certification. While *Oddo Asset Mgmt.*, 973 N.E.2d at 741, came close, the Court of Appeals has not squarely addressed question one, and has never addressed questions two

42

or three. There are simply "no conclusive precedents" on point. *Giordano*, 599 F.3d at 101; *see Lelchook v. Societe Generale de Banque Au Liban Sal*, 67 F.4th 69, 87 (2d Cir. 2023) ("While some Appellate Division and federal court decisions provide some guidance, they do not address the precise issue presented here."). As such, the first factor counsels in favor of certification.

Second, there can be little doubt regarding the importance of these questions and the public policy choices that they involve. The ascertainment and understanding of when fiduciary relationships arise is of critical importance—especially in the realm of investment management. *See, e.g.*, *Ne. Gen. Corp. v. Wellington Advert.*, 624 N.E.2d 129, 131 (N.Y. 1993). This sort of matter is of paramount importance to New York "given its standing as the world's preeminent commercial and financial center. The Court of Appeals has noted New York's interest in promoting and preserving this status, and in maintaining predictability for parties." *Petróleos de Venez. S.A. v. MUFG Union Bank, N.A.*, 51 F.4th 456, 475 (2d Cir. 2022); *see also Benesowitz v. Metro. Life Ins. Co.*, 471 F.3d 348, 352 (2d Cir. 2006) ("[S]tates have a strong interest in supervising highly regulated industries.").

The importance of the proposed questions is enhanced by the involvement of collateralized loans and structured financial products—which overwhelmingly select New York law. *See Ajdler v. Province of Mendoza*, 890 F.3d 95, 105 (2d Cir. 2018) (finding this factor to favor certification because of the matter's relevance "to the many parties that choose New York law to govern their debt offerings and to the many more parties who acquire such instruments"). As such, the second factor weighs in favor of certification. *See, e.g., Tr. for Certificate Holders of Merrill Lynch Mortg. Inv'rs, Inc. v. Love Funding Corp.*, 556 F.3d 100, 109 (2d Cir. 2009) ("Mindful that these questions arise in the context of 'sophisticated business transactions,' and of the importance of New York law to the State's preeminent role in world financial affairs, we conclude that certification of these questions to the New York Court of Appeals is warranted." (citation omitted)).

Third, the questions proposed for certification, if answered, "will resolve this appeal." *Jones v. Cattaraugus-Little Valley Cent. Sch. Dist.*, 96 F.4th 539, 544 (2d Cir. 2024). The claim at issue—breach of fiduciary duty—was decided solely on standing grounds. If the Court of Appeals answers the certified questions in a manner favorable to Appellees, the

district court's order will be affirmed as to this issue. Otherwise, the order will be reversed given that standing was the only basis on which to dismiss the fiduciary-duty claim. This factor therefore also counsels in favor of certification.

The certification factors all weigh in favor of sending the proposed questions to the Court of Appeals. And because (1) any "expense added by certification is modest relative to the amount in controversy," and (2) any "added litigation time is warranted in light of the considerable stakes," *Petróleos de Venez.*, 51 F.4th at 475 (citation omitted), this Court should certify the proposed questions to the New York Court of Appeals .

## IV. In the Alternative, NexPoint Has Standing to Bring a Claim for Breach of Fiduciary Duty Under Cayman Islands Law

New York law applies, as argued above. But if Cayman law applies, NexPoint has both direct and derivative standing against the Advisors.

### A. <u>Derivative Claim</u>

The district court held that derivative standing is necessary, and even if Cayman law applies to determine derivative standing, NexPoint does not have derivative standing to bring claims on behalf of the Acis CLO. It drew this conclusion because (1) NexPoint is a creditor, not a shareholder, of Acis CLO and creditors cannot have derivative standing,

and (2) even if it were considered a shareholder, NexPoint does not fall within any of the exceptions under *Foss v. Harbottle* that would permit derivative standing. Both parts of this conclusion are wrong.

"[P]ursuant to FED. R. CIV. P. 44.1, a court's determination of foreign law is treated as a question of law, which is subject to *de novo* review." *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir. 1998).

Within the Acis CLO waterfall, NexPoint, as a "junior-most noteholder[]," is entitled to the "cash remaining at the end of each quarter" after expenses, which makes NexPoint "tantamount" to an equity holder.[56] *See Nisselson v. Waltzer (In re MarketXT Holdings Corp.)*, No. 04-12078, 2008 Bankr. LEXIS 1562, at *7 (Bankr. S.D.N.Y. May 22, 2008) ("[E]quity investors also have the most to lose[] because their equity interests are paid last.").

This allegation is nothing more than base-level logic undergirding indenture structure—"due to the fact that there is nobody else with any economic interest in the [Acis CLO], for all practical purposes[,] NexPoint occupies the position of a shareholder."[57] *See Fin. Guar. Ins. Co. v.*

---

[56] Counterclaim, ¶ 25 [A-9441]; *see* First Patel Decl. at ¶¶ 29, 31 [A-5925].
[57] First Patel Decl. at ¶ 36 [A-5927].

*Putnam Advisory Co., LLC*, No. 12-cv-7372, 2020 U.S. Dist. LEXIS 155918, at *29 (S.D.N.Y. Aug. 27, 2020) ("The cash flow is distributed to the investors in a waterfall with the most senior generally paid first and the most junior (or those holding equity) paid last.").

Despite this, the district court concluded that NexPoint could not be considered equity because it possessed only subordinated "Notes," which the district court considered "debt," making NexPoint a creditor.[58] But this hyper-formalistic determination appears to rest on reflex rather than law.[59] Notably, the New York Court of Appeals had no problem considering a tranche of investors to be functionally equivalent to equity even though their securities were specifically called notes. *See Oddo,* 973 N.E.2d at 741 (recognizing that equity holders' securities were termed "capital notes"). No Cayman Island case suggests they would have arrived at a different conclusion. Indeed, Cayman Islands likewise does not elevate form over substance.[60]

---

[58] SPA-27-28.

[59] Notably, the obligation to pay money is a feature common to debt and equity. Here, the subordinated notes lack the key feature of "debt"—a contractual obligation to pay back any specific determinable sum. *Debt*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("a specific sum of money due by agreement or otherwise.").

[60] *See* First Patel Decl. at ¶¶ 28-36 [A-5924-5927] and cases cited therein [A-95959-5969, A-5970-6095; A-9634-9909, A-9910-9982, A-9983-10015, A-10539-10550].

Contrary to the district court's understanding, those actually holding equity *or* the junior-most investors are treated as equity and may, therefore, have derivative standing under Cayman law. *Fin. Guar.*, 2020 U.S. Dist. LEXIS 155918, at *29.[61] The district court's conclusion rests on no Cayman legal authority,[62] and the single domestic case cited in support (*Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 476 (S.D.N.Y. 2011)) is inapposite.[63]

Cayman Islands law is clear—"because of the manner in which the economic interest in the [Acis CLO] flows, and in particular because it is only the Subordinated Noteholders (such as NexPoint) who have the residual economic interest [therein], NexPoint occupies precisely the same position in relation to the [Acis CLO] as a shareholder[.]"[64] And for that reason, NexPoint may operate as equity under these facts and sue derivatively "because there is simply no other class of individual who would have such a right."[65]

---

[61] *See id.*

[62] SPA-27-28.

[63] To the extent it purports to discuss New York law, it conflicts with the New York Court of Appeals in *Oddo,* 973 N.E.2d at 741 (holding that junior most nominal noteholders were "[t]he holders of equity" because they "absorbed the first losses … and would share in the potential profits").

[64] Second Patel Decl. at ¶ 24 [A-9134].

[65] *Id.* at ¶ 25 [A-9135].

Given its creditor-versus-shareholder conclusion, the district court gave short shrift to NexPoint's arguments regarding the applicability of *Foss v. Harbottle*'s derivative-standing exceptions, which delineate why even though Acis CLO should, in ordinary circumstances, sue on its own behalf, it is appropriate here for NexPoint to do so.[66]

The rule in *Foss v. Harbottle* "provides that derivative claims are owned and controlled by the company, not its shareholders, and that a shareholder is not permitted to bring a derivative action on behalf of that company." *Winn v. Schafer*, 499 F. Supp. 2d 390, 396 (S.D.N.Y. 2007). But "[t]here are four recognized exceptions to the rule in *Foss* that would permit a shareholder to bring a derivative action," *id.*, two of which NexPoint invokes here: the personal-rights exception[67] and the fraud-on-the-minority exception.[68] The district court erred in holding that the pleadings on these two exceptions were not even *plausible*.

---

[66] *See generally* First Patel Decl. at ¶¶ 38-42 [A-5928-5929] (discussing *Foss v. Harbottle*).

[67] While a recognized "exception" to *Foss v. Harbottle*, the personal-rights exception is "not actually an exception *per se* . . . but rather an acknowledgement that the rule does not apply because the damage has been caused to the member in his individual capacity in respect of an infringement of a right owed directly to him." First Patel Decl. at ¶ 40 [A-5929]. As such, the relevant analysis for this exception can be found *infra*, where NexPoint explains why it has direct standing under Cayman law to bring its claims.

[68] *See* First Patel Decl. at ¶ 46 [A-5930].

The fraud-on-the-minority exception "applies where (a) the action in question amounts to a fraud on the minority shareholders, and (b) the alleged 'wrongdoers' are themselves in control of the company.'"[69] Both elements are satisfied here. First, NexPoint alleged that Appellees caused the assets under management to be "artificially inflated," which turned into "inflated fees" for Appellees, which is "what the courts generally mean by equitable fraud on the minority."[70] Second, NexPoint pleaded that Appellees—the alleged wrongdoers—are in charge of the Acis CLO: control rests with "ACM (as day to day manager) via the [PMA]."[71] As such, the fraud-on-the-minority exception applies, which enables NexPoint to sue derivatively under the facts as pleaded.

The district court disagreed in a single-sentence determination, finding the exception inapplicable because NexPoint did not allege that Appellees "control a majority of the [Acis CLO] voting securities.[72] But this conclusion is flawed—the fraud-on-the-minority exception turns on control. "English courts have struggled to develop a workable concept of control in this context." *In re Tyco Int'l, Ltd.*, 340 F. Supp. 2d 94, 99

---

[69] *See* First Patel Decl. at ¶ 41 [A-5929].

[70] *Id.* at ¶ 43 [A-5929].

[71] *Id.* at ¶ 45 [A-5930].

[72] SPA-29.

(D.N.H. 2004). It ultimately boils down, however, to "*de facto* control." *Id.* And contrary to the district court's conclusion, NexPoint undoubtedly pleaded and argued below that those committing fraud on the minority possessed control of the Acis-6 CLO.[73]

As such, the district court erred in its conclusion, meaning that the fraud-on-the-minority and individual rights exceptions apply here, and NexPoint may sue in a derivative capacity.

### B. <u>Direct Claim</u>

NexPoint also has standing under Cayman law to bring a direct claim against the Advisors in at least two ways.

*First*, and similarly to the trustee/co-trustee theory *supra*, NexPoint may bring a fiduciary-duty claim as a beneficiary of Acis-6 CLO, which is a Cayman trust. There are four elements to trust formation under Cayman law: (i) the addition of assets; (ii) "certainty of intention to create a trust"; (iii) "certainty of the subject matter forming the assets of the trust"; and (iv) "certainty regarding the objects of beneficiaries of the trust."[74]

---

[73] *See* First Patel Decl. at ¶¶ 44-45 [A-5930].
[74] *See* First Patel Decl. at ¶ 11 [A-5920-5921].

51

These elements are satisfied here. The funds in the CLO are the *res*, those funds (and other assets for which they are later exchanged) are certain, and the Note holders are the beneficiaries. And while a bit less straightforward, the Notes and the Indenture readily demonstrate the parties' intention for a trust to form.[75] As such, "Cayman Islands law[] and its [c]ourts would likely determine that the arrangement would be classified as a trust."[76] And NexPoint, as a Noteholder, *i.e.*, beneficiary, would therefore have direct standing to sue the Advisors.[77]

*Second*, NexPoint may also bring a fiduciary-duty claim against the Advisors given their capacities as shadow directors of the Acis-6 CLO. Whenever an individual or entity, "regardless of their formal title," exercises a role "substantially that of a director [or] general partner," they will often be classified as "a shadow or de facto director/partner," under which they have fiduciary duties.[78] Under the Cayman Island Companies Act, *de jure* and *de facto* directors (shadow directors) bear the

---

[75] *See* First Patel Decl. at ¶ 12 [A-5921].

[76] *See* First Patel Decl. at ¶ 15 [A-5921].

[77] *See* First Patel Decl. at ¶ 16 [A-5921-5922]. And even if an express trust did not form under Cayman law, the Advisors would be implied or constructive trustees of the implied or constructive trust here. *See id.* at ¶¶ 23-27 [A-5923-5924].

[78] *See* First Patel Decl. at ¶ 18 [A-5922].

same obligations and duties.[79] Here, given the way ACM (and thereby Terry and Brigade) have operated in "largely control[ing] the Acis-6 structure," they would likely qualify "as a *de facto* or shadow director of the Issuer," which comes with "corresponding fiduciary duties owed directly to NexPoint."[80] This would also give NexPoint direct standing under Cayman law to sue the Advisors.

## V. The Other Claims NexPoint Pleaded Withstand 12(b)(6) Scrutiny

### *Aiding and Abetting*

The district court dismissed NexPoint's aiding-and-abetting counterclaim solely because it was dismissing the fiduciary duty claim. [SPA-39]. That decision should be reversed for the reasons described above for reversing on the fiduciary duty claim.

### *Conversion*

The district court also concluded that NexPoint failed to state a claim for conversion because the allegations were "predicated on an alleged breach of contract." [SPA-41]. But this understanding misconstrues the pleadings.

---

[79] *See* First Patel Decl. at ¶¶ 19-22 [A-5922-5923].
[80] *See* First Patel Decl. at ¶¶ 26-27 [A-5924].

It is true that the facts giving rise to the conversion claim involve a contract—the Notes. *See* Counterclaim at ¶¶ 207-09 [A-9478]. The district court interpreted this baseline fact to mean that NexPoint's conversion claim was predicated on a breach of contract. Construed favorably to NexPoint, however, the pleadings state that Appellees "interfered with [NexPoint]'s right of possession" by violating duties owed to NexPoint in the management of the assets under the IAA and New York law. *See, e.g.*, *SEC v. ABS Manager, LLC*, No. 13-cv-319, 2014 U.S. Dist. LEXIS 80542, at *45 (S.D. Cal. June 11, 2014) (adopting SEC's position and granting summary judgment as to violations of Rule 206(4)-8 because "section 206(4) and Rule 275.206(4)- 8 . . . prohibit the same conduct as sections 206(1) and 206(2) but in connection with 'pooled investment vehicles'"). The duty not to convert another's property does not depend on a contractual promise. Appellees had no right to act in— and profit from—the manner in which they absconded with NexPoint's money. Because NexPoint's money is "specifically identifiable" and "subject to an obligation to be returned or to be otherwise treated in a particular manner," *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (N.Y. App. Div. 1995), NexPoint has properly pleaded a conversion claim.

*Negligence*

The district court also found NexPoint's negligence claim to fail because the alleged damages are the same as though suffered under a breach of contract.[81] The district court erred for at least two reasons.

First, the district court drew this conclusion by applying the economic loss rule. It did so while even acknowledging, however, that "the New York Court of Appeals [has] cautioned that the 'economic loss rule' has no application outside of the product-liability context." *King County v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012). Moreover, the "economic loss rule . . . does not apply in 'cases involving liability for the violation of a professional duty.'" *Commerzbank AG v. United States Bank Nat'l Ass'n*, 277 F. Supp. 3d 483, 496 (S.D.N.Y. 2017) (quoting *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000)). So where, as here, Appellees are alleged to have violated professional duties under the IAA and New York law, the economic loss rule has no application.

Second, and as with the conversion claim, the district court erred by determining that the negligence claim only seeks damages caused by

---

[81] *See* SPA-41-43.

breaching a contract. As with the conversion claim, Appellees are alleged to have gone further than that—they violated duties owed to NexPoint in the management of NexPoint's assets under the IAA and New York law. The damages caused by Appellees' malfeasance do not *solely* arise out of violation of contractual language. And even if the damages did solely arise out of a breach of contract (the PMA), NexPoint is not a party to the PMA, and NexPoint can still maintain its negligence claim since an independent duty exists for Appellees. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987); *see also Dorking Genetics v. United States*, 76 F.3d 1261, 1269 (2d Cir. 1996) ("Negligent performance of a contract may give rise to a claim sounding in tort as well as one for breach of contract. The two claims may be submitted as alternatives to the jury . . . ." (applying New York law) (citations omitted)). As such, NexPoint has pleaded a viable negligence claim.

## CONCLUSION

For these reasons, NexPoint respectfully requests that the Court reverse the judgment of the district court and remand for further proceedings.

Dated: June 6, 2025                    Respectfully submitted,

                                       */s/ Mazin A. Sbaiti*
                                       Mazin A. Sbaiti
                                       Griffin S. Rubin
                                       SBAITI & COMPANY PLLC
                                       2200 Ross Avenue, Suite 4900W
                                       Dallas, Texas 75201
                                       (214) 432-2899
                                       mas@sbaitilaw.com
                                       gsr@sbaitilaw.com

                                       ***COUNSEL FOR
                                       APPELLANTS NEXPOINT
                                       DIVERSIFIED REAL ESTATE
                                       TRUST AND NHF TRS, LLC***

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.      This brief complies with the type-column limitation of FED. R. APP. P. 32(a)(7) because it contains 12,682 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Version 2209 in 14-point Century Schoolbook font.


Dated:  June 6, 2025                            */s/ Mazin A. Sbaiti*
                                                Mazin A. Sbaiti

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2025, an electronic copy of the foregoing Brief for Appellants was filed with the Clerk of Court using the ECF system and thereby served upon all counsel appearing in this case.

/s/ *Mazin A. Sbaiti*
Mazin A. Sbaiti

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Memorandum Opinion & Order of Honorable
   Gregory H. Woods, dated and filed
      March 1, 2024, Appealed From ............................. SPA-1

15 USCS § 80b-6 ...................................................... SPA-46

15 USCS § 80b-15 .................................................... SPA-47

17 CFR § 275.206(4)-8 ............................................ SPA-48

SPA-1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/1/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
JOSHUA N. TERRY, U.S. BANK, *National*                     :
*Association*, *in its capacity as Trustee*, ACIS          :
CAPITAL MANAGEMENT, L.P.,                                  :
                                                           :          1:21-cv-11059-GHW
                                        Plaintiffs,        :
                                                           :          MEMORANDUM OPINION &
                        -against-                          :          ORDER
                                                           :
THE CHARITABLE DONOR ADVISED                               :
FUND, L.P., CLO HOLDCO, LTD., *and*                        :
NEXPOINT DIVERSIFIED REAL ESTATE                           :
TRUST,                                                     :
                                                           :
                                        Defendants.  :
-----------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

In this one of a series of protracted lawsuits between a set of entities allegedly controlled by

James Dondero, and another set affiliated with Joshua Terry,[1] one allegedly Dondero-affiliated entity

brings counterclaims against Mr. Terry and his affiliates.  Defendant/Counter-Claimant NexPoint

Diversified Real Estate Trust ("NexPoint") brought counterclaims against Plaintiffs/Counter-

Defendants Acis Capital Management, L.P. ("ACM") and Joshua N. Terry (together, the "ACM

Parties") and Counter-Defendant Brigade Capital Management, LP ("Brigade").  NexPoint and its

subsidiary, NHF TRS, LLC ("NHF") (together, the "NexPoint Parties"), have been subordinated

_____

[1] While the defendants in this case assert that they are not in fact controlled by Mr. Dondero, the DAF Party defendants agree that the plaintiffs in this case—affiliated with Mr. Terry—"hold[] substantial animus, malice and ill-will towards James Dondero," and this supposed "animus" constitutes an apparently animating sentiment for the litigation against Defendants.  *See, e.g.*, Defendants' Second Amended Answer and First Amended, Dkt. No. 155 ¶ 55; the NexPoint Parties' Amended Answer and Counterclaim (the "Answer" or "Counterclaim"), Dkt. No. 78, ¶ 54 (the NexPoint Parties denying that NexPoint, DAF, and CLOH "are related parties.").  The series of lawsuits that this dispute has generated are detailed in the Court's February 1, 2024 memorandum opinion and order at Dkt. No. 253.

noteholders in ACIS 6, a fund that acquired interests in collateralized loan obligations ("CLOs").[2]
ACM is the Portfolio Manager of ACIS 6, and Mr. Terry—who owns and serves as President of
ACM—is the primary adviser of ACIS 6.  ACM retained Brigade as its sub-adviser to manage the
portfolio.  As investors in ACIS 6, the NexPoint Parties allege that the ACM Parties and Brigade
mismanaged ACIS 6 and caused the noteholders to incur substantial losses in turn.

Through their creative, but meritless arguments, the NexPoint Parties seek to reconfigure
the fundamental elements of their investment:  although they hold notes, they claim that they have
the derivative rights of shareholders, and that they are directly owed fiduciary duties that are
contractually limited to the issuer of the notes alone.  But their arguments cannot change the basic
capital structure of their deal:  the NexPoint Parties are noteholders, not equity holders, and their
rights are limited to those set forth in the governing transaction documents, as discussed below.  As
a result, the NexPoint Parties lack standing to bring the majority of their claims.  The ACM Parties'
and Brigade's respective motions to dismiss are therefore GRANTED, and the ACM Parties'
motion for judgment on the pleadings is DENIED.

---

[2] On October 31, 2023, the parties filed a stipulation and proposed order regarding the addition of NHF as a party.  Dkt.
No. 220.  In that stipulation, the parties stated that on the date the amended complaint and Counterclaim were filed by
NexPoint, "and as of today, NexPoint's subsidiary NHF . . . has been the registered holder of the Subordinated Note
issued by Acis CLO 6 that is the subject of this litigation."  *Id.* at 1.  The parties agreed to add NHF as an additional
defendant and counter-plaintiff, with all plaintiffs and Brigade consenting to NexPoint filing a second amended answer
and counterclaim that added NHF as a party.  *Id.* at 2; *see also* Dkt. No. 220-1 (supplying the amended counterclaim).
The parties also agreed to allow plaintiffs to file the second amended complaint.  *See* Dkt. No. 220 at 2; *see also* Dkt. No.
220-2 (supplying the second amended complaint).  The parties agreed that they would not be "required to serve any
further answer to the Second Amended Complaint under FRCP 12(a)(1)(A)."  Dkt. No. 220 at 2.  And they agreed to
treat the already-briefed motions to dismiss NexPoint's counterclaims and Plaintiffs' motion for judgment on the
pleadings as governing, notwithstanding the addition of NHF as the real party in interest.  *See id.*  They also agreed that
the already-briefed motions will not be deemed premature, and that "the arguments for dismissal and judgment on the
pleadings raised therein, will apply equally to NHF TRS once it is added as a defendant and any ruling on the Original
Motions to Dismiss and/or the Original MJOP will bind NHF TRS."  *Id.* at 3.  They agreed that all references to the
amended complaint in the original motions to dismiss and motion for judgment on the pleadings will refer to the
Complaint at Dkt. No. 15, "except for the supplemental briefing" on the contemporaneous ownership rule; and that all
references to the Counterclaim refer to that at Dkt. No. 78.  *Id.*  The Court so-ordered the stipulation and proposed
order on November 1, 2023.  Dkt. No. 223.  The Court's citations herein follow the same convention as that described
in the stipulation, and the Court references the "NexPoint Parties" throughout to encompass NHF, notwithstanding the
fact that the underlying documents at Dkt. Nos. 15, 78 reference only NexPoint and not NHF.  Additionally, the Court
accepts the parties' stipulation that its findings here as to NexPoint and the NexPoint Parties are binding on NHF.

SPA-3

### I.   BACKGROUND

On February 1, 2024, the Court issued a memorandum opinion and order granting the motions to dismiss the counterclaims brought by Defendants Charitable Donor Advised Fund ("DAF") and CLO HoldCo ("CLOH") (collectively, the "DAF Parties").  Dkt. No. 253 (the "DAF Counterclaim Ruling").  The Court assumes the reader's familiarity with the general background of this case as set forth in that opinion.

#### A.   Parties and Relevant Non-Parties

Plaintiff U.S. Bank is the Trustee of the ACIS CLOs under the ACIS Indentures.  Plaintiffs' Amended Complaint, Dkt. No. 15 ("Compl.") ¶¶ 9, 27;[3] *accord* the NexPoint Parties' Amended Answer and Counterclaim (the "Answer" or "Counterclaim"), Dkt. No. 78 ¶¶ 9, 27, as amended (counterclaims only) at Dkt. No. 220-1.[4]  Plaintiff Joshua N. Terry is a resident of Texas and the President of Shorewood GP, LLC, the general partner of ACM.  Compl. ¶ 10.  According to the Complaint, Mr. Terry owns 100% of the limited partnership interests in ACM, and ACM is the Portfolio Manager to the ACIS CLOs, responsible for managing the ACIS CLOs' assets.  *Id.* ¶ 11.[5]  According to the NexPoint Parties, "Terry exercises complete dominion over [ACM] and its

---

[3] All facts taken from the Complaint cited herein are admitted by the NexPoint Parties in the Answer and Counterclaim, unless noted otherwise.  For reference, the NexPoint Parties' affirmative admissions are noted at paragraph numbers in the Answer that directly correspond to the Complaint paragraph numbers cited herein.

[4] Note that "Answer" citations and "Counterclaim" citations both originate from Dkt. No. 78; the citations prefaced by "Answer" or "Counterclaim," respectively, appear in the corresponding section.  As noted above, the Court recognizes the parties' stipulation adding NHF as a party, as well as the NexPoint Parties' amended counterclaim filed as an exhibit at Dkt. No. 220-1 (which largely duplicates the counterclaim filed at Dkt. No. 78).  As the NexPoint Parties declined to file an amended *answer* at Dkt. No. 220, the Court treats the admissions from the Dkt. No. 78 Answer as binding on both NexPoint and NHF in accordance with its understanding of the parties' stipulation.  The Court treats any conflicting facts provided in the amended counterclaims filed at Dkt. No. 220-1 as superseding those of the original counterclaim filed at Dkt. No. 78 and notes any divergences accordingly, citing to Dkt. No. 220-1 as appropriate.

[5] The NexPoint Parties are "without sufficient knowledge to admit or deny" this.  Answer ¶ 11. The NexPoint Parties agree that generally, "the portfolio manager is responsible for managing the assets of the CLO."  Counterclaim ¶ 30. The portfolio manager's role is to "(1) identify and purchase the assets within a CLO, doing so in a manner that creates the cash flow necessary to satisfy a CLO's debt-service requirements (e.g., the payout, diversification, credit-quality, and average-life requirements) while not exposing the CLO to non-market risks; and (2) to monitor the assets within a CLO to ensure that, over time, those assets individually continue to meet various collateral-quality tests, which are designed to ensure a CLO can meet its debt-service requirements—all the while producing income for equity holders."  *Id.* ¶ 31.

activities;" "Terry and [ACM] have no executive-level employees aside from Terry . . . ." Counterclaim ¶ 65.  Further, ACIS 6 "is managed by [ACM] as the portfolio manager and Terry as the primary advisor.  Brigade is a sub-advisor.  All three are registered investment advisors and agreed to abide by the Portfolio Management Agreement (the 'PMA')."  *Id.* ¶ 2.

Specifically, the NexPoint Parties allege that Mr. Terry "took over [ACM] in August 2018" and became the adviser to the ACIS 6 portfolio then.  *Id.* ¶ 57.  ACM retained Brigade as sub-adviser, according to the NexPoint Parties, "[a]s a result of [ACM] having neither the labor force nor the wherewithal to manage the [CLO] Assets on its own."  *Id.* ¶ 58.  Brigade, as the sub-adviser, "is the agent of [ACM] and, therefore, of ACIS[ ]6."  *Id.* ¶ 62.  Brigade was allegedly retained by Mr. Terry "to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with [ACM's] obligations under the PMA."  *Id.*  Brigade additionally "assist[ed] in the negotiation and execution of all documents necessary to acquire or dispose of assets under the PMA," "identif[ied] potential assets (and their buyers and sellers)[,] and model[ed] ratings, default, and price scenarios as needed."  *Id.* ¶ 63.  Thus, "Brigade worked directly with and for Terry," and Mr. Terry "intended for this arrangement to manifest."  *Id.* ¶ 64.  ACM paid Brigade for its services.  *Id.* ¶ 67.

Defendant DAF, a limited partnership organized in the Cayman Islands, owns 100% of CLOH.  Compl. ¶ 12.  CLOH is a Cayman Islands company that owns 49% of HCLOF.  *Id.* ¶ 13.  Defendant NexPoint is a publicly traded Delaware statutory trust managed by NexPoint Advisors, L.P., with its principal place of business in Texas.  *Id.* ¶ 14; Counterclaim, Dkt. No. 220-1 ¶ 9.  Though NexPoint today operates as a qualified real estate investment trust, "[a]t the time of the events herein, it was operating as 'NexPoint Strategic Opportunities Fund,' a publicly traded (NYSE: NHF) Delaware closed-end trust."  Counterclaim, Dkt. No. 220-1 ¶ 9.  NHF is a Delaware limited

liability company, a "qualified 'taxable real estate subsidiary,' and is a wholly owned subsidiary of NexPoint (and has been at all relevant times)," with its principal place of business in Texas. *Id.* ¶ 9.1. NexPoint became an investor in ACIS 6 in 2016, when it "became a holder of certain subordinated notes" of ACIS 6 through a secondary market transaction. *Id.* ¶ 46. "At that time, the face value of the equity was approximately $7.5 million." *Id.* NexPoint transferred its ACIS 6 notes to NHF on March 31, 2021 for no consideration, and NHF became the noteholder. *Id.* ¶ 46.1–46.2.[6] According to Plaintiffs, HCLOF owns 87% of the subordinated notes issued by ACIS 6. Compl. ¶ 17.[7] "NexPoint denies that NexPoint, DAF, and CLO[H] are related parties." Answer ¶ 54.

Non-parties "ACIS 4, ACIS 5, and ACIS 6 are exempted limited liability companies incorporated in the Cayman Islands." Compl. ¶ 15. They conduct business through directors located in the Cayman Islands. *Id.* ACM manages—though, according to the NexPoint Parties, not exclusively—the offshore ACIS CLO investment funds, which "issued, among other things, certain subordinated notes to investors pursuant to the ACIS Indentures in private offerings." *Id.*; *see also id.* ¶ 25; Answer ¶¶ 15, 25.[8] According to the NexPoint Parties, Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC (collectively, the ACIS 6 "Issuers") "acquired a series of assets, namely interests in collateralized loan obligations [CLOs]. Via a trust indenture agreement, the Issuers granted all rights, title, and interest in the assets to a trustee, U.S. Bank, N.A., and vested all management power over the securities in [ACM], thus creating a trust for the purpose of paying off the secured noteholders and paying all residual cash flows to the equity holders . . . ." Counterclaim ¶ 1. "[T]his arrangement is referred to as 'ACIS[ ]6.'" *Id.* The NexPoint Parties assert that "in executing the

---

[6] Accordingly, where the NexPoint Parties describe their alleged injuries in the counterclaims, they refer to those of NexPoint itself from February 15, 2019 to March 31, 2021 and to those of NHF thereafter. *Id.* ¶ 46.3.

[7] The NexPoint Parties are "without sufficient knowledge to admit or deny" this. Answer ¶ 17.

[8] "NexPoint denies that Acis manages the ACIS CLOs to the extent that the allegation implies that Acis is the exclusive manager." Answer ¶¶ 15, 25.

SPA-6

Indenture, the Issuers, as trust settlors, formed ACIS[ ]6, a trust created under New York law." *Id.* ¶ 160. "Other than the investors themselves, the key parties to the success or failure of a CLO in this arrangement are (1) the portfolio manager, (2) the advisor, and (3) the indenture trustee," who are "bound by contracts known as indentures and portfolio management agreements." *Id.* ¶¶ 28, 29. The NexPoint Parties further allege that ACIS 6 "is a valid trust under New York law," Counterclaim Dkt. No. 220-1 ¶ 154; that "[t]he Indenture designates the equity holders as the beneficiaries of ACIS[ ]6;" and that "[i]n doing so, the Issuers granted all *equitable* title in the Assets to the noteholders, among them, NexPoint and NHF TRS LLC," *id.* ¶ 155 (emphasis in original).

According to Plaintiffs, HCLOF owns 87% of the subordinated notes issued by ACIS 6, Compl. ¶ 17, although the NexPoint Parties lack sufficient knowledge to confirm or deny this, Answer ¶ 17. Approximately 51% of HCLOF is owned by Highland Capital Management, L.P. ("Highland"). Compl. ¶ 18; Counterclaim ¶ 48. Again, CLOH owns the remaining 49% of HCLOF. Compl. ¶ 13. Non-party Mr. Dondero resides in Texas and, according to Plaintiffs, "functionally controls NexPoint," *id.* ¶ 19, although the NexPoint Parties deny this, Answer ¶ 19. Plaintiffs allege that "[u]pon information and belief, Dondero also functionally controls DAF and, through it, CLO[H]," Compl. ¶ 19, although the NexPoint Parties dispute this too, *see* Answer ¶ 19.[9] Plaintiffs further allege that Mr. Dondero formerly owned ACM and formerly served as Highland's CEO, although the NexPoint Parties deny this. *See* Compl. ¶ 19; Answer ¶ 19.

---

[9] As noted in the Complaint, a bankruptcy judge made a series of findings of fact suggesting that Mr. Dondero might in fact exercise such functional control. *See* Compl. ¶ 31 n.1 (citing *In re: Highland Capital Management, L.P.*, Case No. 19-34054-SGJ-11 (N.D. Tex. Bankr.), ECF 2660, which appears in this case's docket at Dkt. No. 15-2). These include findings that "DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr. Dondero's family trusts, or other donor trusts. Mr. Dondero has historically been DAF's informal investment advisor (without an agreement), and he was DAF's managing member until 2012." Dkt. No. 15-2 at 3 (ECF pagination).

### B.  Facts

#### a.  The Structure of the Transaction

The ACIS CLOs raise funds by selling secured notes and subordinated notes, purchasing corporations' senior-secured debt instruments with the proceeds; and any income that the investments generate is used, in turn, to pay the CLOs' expenses, as well as principal and interest owed to the CLOs' noteholders.  Compl. ¶ 25; Answer ¶ 25.  ACM, as the portfolio manager, "is responsible for identifying and purchasing the assets that are held in the ACIS CLOs, monitoring those assets, and monetizing those assets in specified circumstances."  Compl. ¶ 26; *accord* Answer ¶ 26 (admitting the same while caveating that ACM is not "the exclusive manager").

Generally speaking, portfolio managers like ACM are compensated by "receiv[ing] a percentage of the assets under management . . . , which is determined by the face value, or par value, of the assets in a CLO."  Counterclaim ¶ 35.  When "unchecked, portfolio managers can maximize their own pay by purchasing debt instruments with the highest par value, irrespective of the quality of these assets," in effect "manipulat[ing] a CLO's fee structure for their own benefit."  *Id.* ¶¶ 36–37.  The NexPoint Parties allege that the Indenture trustee (here, U.S. Bank) "monitors changes in the assets within a CLO, as well as in the portfolio's credit quality and maturity" to "safeguard the beneficiaries" and protect against this risk.  *Id.* ¶ 40.  "[T]hose managing an indenture trust," like the portfolio manager, "have several benchmarks [that are] designed to protect a CLO's noteholders and equity holders."  *Id.* ¶ 44.  This includes ensuring that the CLOs meet certain collateral-quality tests.  *Id.* ¶¶ 41–44.  These tests include the weighted average rating factor ("WARF") and the weighted average life ("WAL"), which examine, respectively, the credit quality of a CLO's portfolio, and the average maturity of its debt instruments.  *Id.*

The Issuers, Acis CLO 2015-6 Ltd. and Acis CLO 2015-6 LLC, purchased a series of CLOs around 2014, at which point "the face value of the equity was approximately $7.5 million," according

to the NexPoint Parties. *Id.* ¶¶ 45–46. "[T]he Issuers granted all ownership, title, and interest not

only in the [CLOs'] Assets, but also in the Indenture (attached as Exhibit 1), the PMA (attached as

Exhibit 2), and other instruments, to the trustee" on April 16, 2015 through a trust indenture. *Id.* ¶

47 (citing Dkt. Nos. 78-1 (the "Indenture"), 78-2 (the "Portfolio Management Agreement" or

"PMA")). Since closing on the Indenture, the Issuers lack any "title or interests in the assets, [nor

do they have any] independent obligation to pay NexPoint or any other Subordinated Noteholder;"

rather, the trustee (U.S. Bank) is obligated to pay the noteholders out of the CLO assets' income

"and, when liquidated, NexPoint is entitled to a pro-rata share of the liquidation amount, after

deducting the prescribed fees and expenses." *Id.* ¶¶ 49–50. In 2016, NexPoint acquired

subordinated notes issued by ACIS. Counterclaim, Dkt. No. 220-1 ¶ 46. NexPoint transferred its

note to NHF on March 31, 2021. *Id.* ¶ 46.1. The NexPoint Parties invested in ACIS 6 "because the

portfolio was supposed to contain relatively safe, diversified investments and, if managed properly,

secure returns." *Id.* ¶ 7. The NexPoint Parties are a signatory to neither the Indenture, *id.* ¶ 51, nor

the PMA, which is between Counter-Defendants and the trustee, *id.* ¶ 55.

### b. The Governing Documents

"According to the Notes, NexPoint may not seek recourse from the Issuers, the officers or

directors of the Issuers, or the Trustee. Once all senior debt is paid off, the subordinated notes

become entitled to all net residual proceeds (after expenses and fees)." *Id.* ¶ 52. All senior debt has

been paid off. *Id.* The NexPoint Parties allege that "[t]he subordinated notes expressly incorporate

by reference certain duties that are explained in the Indenture and provide that there is no recourse

against the Issuers." *Id.* ¶ 53 (quoting Indenture at A2-7 ("The obligations of the Issuer under this

Note and the Indenture are limited recourse obligations of the Issuer payable solely from the Assets

in accordance with the Indenture . . . ."); *id.* at A2-8 ("Reference is hereby made to the Indenture

and all indentures supplemental thereto for a statement of the respective rights, limitations of rights,

duties and immunities thereunder of the Issuer, the Trustee and the Holders of the Notes and the

terms upon which the Notes are, and are to be, authenticated and delivered.")).  The NexPoint

Parties allege that "[t]he subordinated notes are essentially equity."  *Id.* ¶ 54 (quoting Indenture at

A2-3 (stating that each noteholder "will be deemed to have . . . agreed to treat the subordinated

notes as equity for . . . tax purposes")).

     In the Indenture, the Issuers "assigned away the Issuers' rights and obligations as to the

original securities."  *Id.* ¶ 55.  Therefore, the NexPoint Parties allege that the PMA is "[n]ow" a

contract between the ACM Parties and Brigade and the trustee (U.S. Bank), rather than the Issuers.

*Id.*  The ACM Parties and Brigade, all registered investment advisers, agreed to abide by the PMA.

*Id.* ¶ 2.  The PMA requires ACM as the portfolio manager to "'supervise and direct the investment

and reinvestment of the Assets' and to 'monitor the Assets.'"  *Id.* ¶ 56.  Section 8 of the PMA sets

forth the obligations of the portfolio manager, including that it "shall use commercially reasonable

efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard

take any action, which would (a) materially and adversely affect the status of the Issuer . . . (b) not be

permitted by the Issuer's Governing Instruments, (c) violate any law, rule or regulation of any

governmental body or agency having jurisdiction over the Issuer, . . . or (f) knowingly and willfully

adversely affect the interests of the Holders in the Assets in any material respect (other than (i) as

expressly permitted hereunder or under the Indenture or (ii) in connection with any action taken in

the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its

clients)."  *See* PMA at 15.

     Section 11(a)(i) of the PMA provides the limits of responsibility for the portfolio manager,

ACM.  It dictates that, although the portfolio manager and its agents may not be liable to

noteholders "for any act, omission, error of judgment, mistake of law, or for any claim, loss, liability,

damage, judgments, assessments, settlement, cost, or other expense . . . arising out of any

investment, or for any other act taken by or recommended by or omission arising out of or in connection with the performance by the Portfolio Manager [or its] agents . . . , the Portfolio Manager shall be liable (i) by reason of acts or omissions constituting bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations hereunder or the terms of the Indenture applicable to the Portfolio Manager . . . ." *Id.* at 18–19. The PMA does not expressly state to whom the portfolio manager would be liable in the latter circumstance. *See id.*

### c. ACM's Management and Bankruptcy

According to Plaintiffs, Mr. Dondero, as former owner of ACM, "lost control" of the company through an "involuntary" bankruptcy proceeding. Compl. ¶ 28. The NexPoint Parties deny this. Answer ¶ 28. The bankruptcy was allegedly precipitated by Mr. Dondero's termination of Mr. Terry, who was ACM's portfolio manager; an arbitration proceeding followed. Compl. ¶ 28; Answer ¶ 28 (denying this). The parties do not dispute that the arbitrator found ACM and its general partner, Acis Capital Management GP, LLC ("ACM GP") liable and awarded Mr. Terry $8 million in damages. Compl. ¶ 28; Answer ¶ 28. In addition, the NexPoint Parties allege that "[e]ffective February 15, 2019, the Bankruptcy Court issued an order (the 'BK Order') that (1) released any claims against [ACM] or Terry that accrued prior to the effective date, and (2) enjoined any lawsuit from being filed against [ACM] or Terry to recover on any claims that accrued prior to the effective date." Counterclaims, Dkt. No. 220-1 ¶ 75, n.6. Accordingly, the NexPoint Parties' counterclaims accrue after February 15, 2019. *Id.* at 2 n.1, ¶ 250.

Plaintiffs allege that, instead of directing ACM and ACM GP to pay the arbitration award, Mr. Dondero instead "attempted to frustrate Mr. Terry's ability to enforce it by stripping ACM and ACM GP of their assets"—a "scheme" that Mr. Terry "stopped . . . by commencing a bankruptcy case against ACM and ACM GP." Compl. ¶ 29. The NexPoint Parties lack sufficient information to admit or deny this. Answer ¶ 29. There is no dispute that the bankruptcy court ultimately

approved a transfer of 100% of ACM and ACM GP's equity to Mr. Terry. Compl. ¶ 30; Answer

¶ 30 (asserting that the Texas bankruptcy court's ruling, Dkt. No. 15-1, "speaks for itself"); *see also*

Dkt. No. 15-1 at 18–19 (ECF pagination). The bankruptcy court additionally "formally approved

[ACM]'s appointment of Brigade as sub-advisor and shared-services provider to [ACM] in

connection with [ACM]'s management of the Assets." Counterclaim ¶ 60.

Plaintiffs allege that Mr. Dondero then launched a series of lawsuits against Mr. Terry and

ACM because he was "[u]nwilling to accept [the bankruptcy judge's] ruling" and aims "to harass

Plaintiffs through the court system," Compl. ¶ 31, which the NexPoint Parties deny, Answer ¶ 31.

Among these lawsuits was one initiated by NexPoint against the ACM Parties, Brigade, and U.S.

Bank, filed on May 14, 2021. *See* Answer ¶ 44 (citing *NexPoint Strategic Opportunities Fund v. Acis

Capital Management, L.P., et al.*, Case No. 1:21-cv-04384-GHW (S.D.N.Y.) (the "First NexPoint

Lawsuit")). The First NexPoint Lawsuit involved, *inter alia*, Investment Advisers Act of 1940

("IAA") claims against the ACM Parties and claims brought under the Trust Indenture Act against

U.S. Bank. *Id.*; *see also* First NexPoint Lawsuit. These claims concerned ACM's alleged management

of ACIS 6 and another ACIS-managed CLO. *See* Answer ¶ 44; *see also* First NexPoint Lawsuit.

### d. Alleged Mismanagement of ACIS 6

In this case, the NexPoint Parties allege that the ACM Parties and Brigade: (1) "[k]nowingly

charged ACIS[ ]6 exorbitant amounts of 'expenses' without accountability or justification;

[k]nowingly caused ACIS[ ]6 to purchase loans that failed to meet credit-quality tests and average-life

tests, causing the entire portfolio to fail the applicable collateral-quality tests; [k]nowingly caused

ACIS[ ]6 to sell valuable assets cheaply; and [k]nowingly breached industry standards (e.g., best

execution) when buying and selling assets of managed funds." Counterclaim ¶ 3. Again, the

NexPoint Parties' counterclaims are "solely predicated on claims that accrued after February 15,

2019, which is the effective date of the Bankruptcy Court order exculpating Counter-Defendants

from liability as of that date and enjoining any lawsuit or action seeking to recover for liability

accruing on or prior to that date."  Counterclaim, Dkt. No. 220-1 at 2.

As a result of this alleged "malfeasance," "since February 16, 2019, Counter-Defendants

have wiped out millions in value from ACIS[ ]6 . . . and deprived NexPoint of the full benefit of its

investment bargain."  *Id.* ¶ 4.  Both ACM's "conduct through Terry's direction and control" and

Brigade's conduct allegedly "severely and adversely impacted ACIS[ ]6, in which NexPoint is a

noteholder and equity holder."  *Id.* ¶ 66.  The NexPoint Parties allege that "Counter-Defendants are

legally obligated fiduciaries who must look out for the best interests of the advised funds, i.e.,

ACIS[ ]6 and its beneficiaries."  *Id.* ¶ 8.

In the Counterclaim, the NexPoint Parties contrast the performance of the ACIS CLOs

under the ACM Parties and Brigade's management to that of Highland, which managed the ACIS

indenture trusts and served as ACM's sub-adviser prior to the ACM bankruptcy.  *See id.* ¶ 68.

Following Mr. Terry's takeover of ACM, Highland continued to manage another investment vehicle,

ACIS 7, which continued to produce heightened returns, while the net proceeds of ACIS 6 allegedly

plummeted under Mr. Terry's leadership.  *See id.* ¶¶ 68–69; *see also id.* ¶¶ 78–79 (alleging that the

ACIS CLOs "had produced consistent distributions to equity holders over time" when under

Highland's management, though this ceased after Mr. Terry took control); *id.* ¶¶ 80–86 (detailing

ACM's alleged mismanagement under Mr. Terry's control, including that ACM replaced shorter-

term debt with longer-term loans, increased risk, and decimated the assets' value); *id.* ¶ 87 (noting

the comparatively superior performance of ACIS 7, which has remained under Highland's control).

NexPoint alleges that the ACM Parties and Brigade "caused ACIS[ ]6 to incur astronomic,

unprecedented expenses, which were well outside the historical expense patterns—and . . . clearly

outside market and industry norms."  *Id.* ¶ 75; *see also id.* ¶¶ 89–101 (detailing the "mis-accru[ed] and

mis-allocat[ed] expenses"); *id.* ¶¶ 102–24 (alleging the failure to purchase loans that satisfy collateral-

12

quality requirements); *id.* ¶¶ 125–30 (alleging Counter-Defendants' purchase of "bad investments"); *id.* ¶¶ 131–39 (alleging Counter-Defendants' "failure to provide best execution").  In addition, the NexPoint Parties allege that ACM "failed to uphold its duty to ensure that every purchase and sale made thereunder maintained or improved any failing collateral-quality test," *id.* ¶ 76; and that "Counter-Defendants attempted to offset transactions that the Indenture prohibited by making same-day, bulk purchases of loans with non-failing WALs, [which] were overpriced or bad investments . . . ," *id.* ¶ 77.

### C.  Procedural History

On March 30, 2023, the NexPoint Parties filed the Answer and Counterclaim (as amended on October 31, 2023, Dkt. No. 220-1), raising a series of affirmative defenses and counterclaims. The NexPoint Parties allege (1) breach of fiduciary duty by both the ACM Parties and Brigade, "with respect to the management of an investment trust in which NexPoint invested," ACIS 6; (2) negligence and/or gross negligence, (3) conversion, (4) unjust enrichment, assumpsit, or money had and received, (5) "tortious interference with NexPoint's rights under its Notes," and (6) aiding and abetting against Mr. Terry and Brigade, for aiding and abetting ACM's alleged breach.  *See* Counterclaim, Dkt. No. 220-1 at 1–2.  The counterclaims allege, in sum, that the Counter-Defendants' conduct "transgress[es] fiduciary duties which have caused NexPoint damages."  *Id.*  In addition, the NexPoint Parties seek a declaratory judgment.

### a.  The NexPoint Parties' Counterclaim Against the ACM Parties and Brigade

The NexPoint Parties' Counterclaim raises seven causes of action.  First, the NexPoint Parties allege breach of fiduciary duty by both the ACM Parties and Brigade.  *See id.* ¶¶ 139–97.[10]

---

[10] Specifically, the NexPoint Parties "plead that Counter-Defendants (or any of them) owed fiduciary duties directly to NexPoint during the period prior to March 31, 2021, and to NHF TRS LLC from that day on.  [And] to the extent that the fiduciary duties were owed to Acis-6 CLO fund, and that any claims would have to be brought derivatively, NHF

13

They allege that both the ACM Parties and Brigade "owe fiduciary duties under the IAA that are actionable under New York law," *id.* at 28; that "[ACM] owes fiduciary duties as co-trustee of ACIS[ ]6," *id.* at 30; that "under New York law, [ACM] owes fiduciary duties to ACIS[ ]6 even if not a trust," *id.* at 32; and that the ACM Parties "violated their fiduciary duties by breaching the terms of the Indenture, by self-dealing, and by converting property of the investors for themselves," *id.* ¶ 168. The NexPoint Parties allege that this conduct has caused "substantial losses" to "the ACIS[ ]6 portfolio." *Id.* ¶ 173.

Second, the NexPoint Parties allege negligence and/or gross negligence against all Counter-Defendants "[t]o the extent Counter-Defendants would be liable for any of the foregoing causes of action prior to their lack of sufficient intent or willful actions . . . ." *Id.* ¶ 199.  The NexPoint Parties allege that they are owed a duty of care by the ACM Parties "in managing ACIS[ ]6 and in discharging their duties under the IAA, the Indenture, and the PMA," *id.* ¶ 200, that the ACM Parties' conduct has "resulted in substantial losses to NexPoint," *id.* ¶ 201, and "was knowing and willful and done in disregard of known and established safeguards implemented and created in the industry to avoid well-known, foreseeable risks," *id.* ¶ 202.

Third, the NexPoint Parties allege conversion against the ACM Parties and Brigade insofar as "[u]nder the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted." *Id.* ¶ 209.  The NexPoint Parties allege that Mr. Terry "[i]n allowing the payment of inexplicably high expenses . . . wrongfully and improperly reimbursed [ACM], and potentially himself and Brigade, using NexPoint's and NHF TRS LLC's property designated for the payment of ACIS[ ]6's administrative expenses and costs."

---

TRS LLC has standing to bring such claim as the holder of the subordinated note."  Counterclaim, Dkt. No. 220-1 ¶ 139.1.

SPA-15

*Id.* ¶ 211.  And "Terry, [ACM,] and Brigade each exercised a wrongful and unauthorized dominion over NexPoint's and NHF TRS LLC's property designated for the payment of fees and ACIS[ ]6's administrative expenses and costs to the alteration of its condition or to the exclusion of NexPoint's and NHF TRS LLC's rights." *Id.* ¶ 213.

Fourth, the NexPoint Parties allege that "in the alternative[, . . . ] the foregoing actions and omissions are wrongful, and [the NexPoint Parties] are entitled to disgorge the ill-gotten gains from Counter-Defendants under the theory of unjust enrichment, assumpsit or money had and received." *Id.* ¶ 218.

Fifth, the NexPoint Parties allege tortious interference with contract—specifically, the subordinated note—against the ACM Parties and Brigade.  *See id.* ¶¶ 219–31.

Sixth, "[t]o the extent that Terry and Brigade are found to not owe a duty to NexPoint and/or NHF TRS LLC under Counts 1, 2, 3, 4 and 5, [the NexPoint Parties] alternatively plead that Terry and Brigade actively aided and abetted [ACM]'s breaches of the duties [ACM] owed to NexPoint." *Id.* ¶ 233.

Seventh, the NexPoint Parties "seek a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of [the NexPoint Parties] viz-a-viz Counter-Defendants under the Indenture, the PMA, and New York law." *Id.* ¶ 237.  Specifically, the NexPoint Parties seek declaratory relief under 28 U.S.C. §§ 2201–02 that "Counter-Defendants manipulated the assets in derogation of the rights of subordinated noteholders under the Notes in one or more ways as described herein; [t]he [ACIS 6] fund and/or [NexPoint or NHF] were damaged by Counter-Defendants' actions; [NexPoint and NHF] were or are owed fiduciary duties under New York or Federal law as an investor in [ACIS 6; and as] Noteholder[s] suing for [their] rights under the Notes, [NexPoint or NHF] are not bound by the Indenture's No-Action clause for each of its claims." *Id.* ¶ 239.

### b.  The ACM Parties' Motion to Dismiss the NexPoint Parties' Counterclaim

The ACM Parties moved to dismiss the NexPoint Parties' Counterclaim against them, and requested judgment on the pleadings, on May 15, 2023.  Dkt. No. 106.  This motion was supported by a memorandum of law, Dkt. No. 107 (the "ACM Mem."), and four declarations, Dkt. Nos. 108–11.  The NexPoint Parties filed a response on June 14, 2023, Dkt. No. 139 (the "ACM Opp'n"), with supporting declarations, Dkt. Nos. 140, 141.  The ACM Parties' reply was filed on June 28, 2023, Dkt. No. 151 (the "ACM Reply"), with a supporting declaration, Dkt. No. 150.  The NexPoint Parties filed a sur-reply on July 19, 2023.  Dkt. No. 162.

In short, the ACM Parties argue that the NexPoint Parties' Counterclaim should be dismissed because the NexPoint Parties (1) fail to state a claim for tortious interference, (2) lack standing to bring their remaining claims, and (3) even if the NexPoint Parties had standing, they nonetheless fail to adequately plead their remaining counterclaims.[11]  *See* Dkt. No. 107 at 24–40.  The ACM Parties additionally moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  Further, in their supplemental briefing, the ACM Parties argue that Rule 23.1 bars both NexPoint's and NHF's derivative claims.  *See* Dkt. No. 224.

### c.  Brigade's Motion to Dismiss the NexPoint Parties' Counterclaim

On May 31, 2023, Brigade moved to dismiss the NexPoint Parties' Counterclaim against it under Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 119; *see also* Dkt. Nos. 120 (the "Brigade Mem."), 121 (supporting declaration).  On June. 26, 2023, the NexPoint Parties filed a response.

---

[11] Specifically, the ACM Parties argued that the tort claims should be dismissed as duplicative, that the unjust enrichment claim should be dismissed as barred by the underlying contracts, and that the negligence and conversion claims should be dismissed as barred by the economic loss doctrine.

Dkt. No. 147 (the "Brigade Opp'n"). On July 10, 2023, Brigade filed its reply. Dkt. No. 157 (the "Brigade Reply").

In its motion to dismiss, Brigade argues that (1) it has no fiduciary relationship with the NexPoint Parties, nor have the NexPoint Parties alleged that Brigade breached any fiduciary duty; (2) the NexPoint Parties lack standing to pursue their claims; and, in any event, (3) the NexPoint Parties fail to state their claims. *See* Dkt. No. 120.

### d. The Addition of NHF TRS, LLC

On October 31, 2023, the parties agreed to add NHF as an additional defendant and counter-plaintiff in this case, given that NHF—a subsidiary of NexPoint—"has been the registered holder of the Subordinated Note issued by Acis CLO 6 that is the subject of this litigation" since the FAC and Counterclaim were filed. *See* Dkt. No. 220 at 1. The Court "so-ordered" the stipulation and proposed order on November 1, 2023. Dkt. No. 223. In their stipulation, the parties also agreed that the ACM Parties' and Brigade's respective motions to dismiss NexPoint's counterclaims, Dkt. Nos. 106 and 119, "and the arguments for dismissal and judgment on the pleadings raised therein, will apply equally to NHF TRS . . . and any ruling on the Original Motions to Dismiss and/or the Original MJOP will bind NHF TRS." Dkt. No. 223 at 2–3. "Thus, for example, if the Court enters an order ruling that NexPoint lacks direct and derivative standing to assert its claims based on the arguments in the Original Motions to Dismiss and/or the Original MJOP, that ruling will apply equally to NHF TRS and the Court shall, either *sua sponte* or upon the request of a party, enter an identical order against NHF TRS without further briefing." *Id.*

The parties agreed that while the original briefing remains applicable notwithstanding the addition of NHF as a party, they would file supplemental briefing on the issue of whether NexPoint has derivative standing to assert its counterclaims given that it is not at present a subordinated noteholder, and whether NHF TRS has derivative standing given that it was not a subordinated

noteholder at the time of the alleged wrongdoing.  *See id.* at 3–4.  In November 2023, the parties

filed this supplemental briefing on whether the NexPoint Parties satisfy the contemporaneous and

continuous requirement of Federal Rule of Civil Procedure 23.1.  *See* Dkt. No. 224 (the ACM Parties

and Brigade's mem.); Dkt. No. 225 (the NexPoint Parties' response); Dkt. No. 228 (the ACM Parties

and Brigade's reply).

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6):  Failure to State a Claim

"In considering a motion to dismiss a counterclaim, the court applies the same standards as a

motion to dismiss a complaint."  *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y.

2021) (citations omitted); *see also Garvey v. Face of Beauty LLC*, 634 F. Supp. 3d 84, 89 (S.D.N.Y. 2022)

(similar).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at

556).

It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint

or counterclaim must "nudge[ ]" claims "across the line from conceivable to plausible."  *Twombly*,

550 U.S. at 570.  "To survive dismissal, the [non-movant] must provide the grounds upon which his

claim rests through factual allegations sufficient 'to raise a right to relief above the speculative

level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550

U.S. at 555).  Determining whether a complaint or counterclaim states a plausible claim is a

"context-specific task that requires the reviewing court to draw on its judicial experience and

common sense."  *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint or

counterclaim as true and draw all reasonable inferences in the non-movant's favor.  *See Burch v.*

*Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (*per curiam*).  However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  A complaint [or counterclaim] must therefore contain more than "naked assertion[s] devoid of further factual enhancement."  Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting

*Iqbal*, 556 U.S. at 678–79).  Although Rule 8 "does not require 'detailed factual allegations,' . . . it

demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556

U.S. at 678.  Thus, a complaint or counterclaim that offers "labels and conclusions" or "naked

assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Iqbal*, 556

U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557) (alteration in original).

"A court's task" on a motion to dismiss "is to assess the legal feasibility of the complaint [or

counterclaim]; it is not to assess the weight of the evidence that might be offered on either side."

*Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020).  "The purpose of Rule 12(b)(6) is to test, in

a streamlined fashion, the formal sufficiency of the [non-movant's] statement of a claim for relief

*without* resolving a contest regarding its substantive merits.  The Rule thus assesses the legal

feasibility of the complaint [or counterclaim], but does not weigh the evidence that might be offered

to support it."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)

(emphasis in original); *see also In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 437

(S.D.N.Y. 2015) (noting that the Court "may not weigh the evidence in the guise of a plausibility

analysis").

Finally, on a motion to dismiss, a court must generally "limit itself to the facts stated in the

complaint" or, here, counterclaim.  *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir.

2006).  When deciding a motion to dismiss, a court may also consider "any written instrument

attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *see also Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir. 1985). Here, as the Indenture, Portfolio Management Agreements, and Note are attached to the Counterclaim as exhibits—*see* Dkt. Nos. 78-1 (the "Indenture"), *id.* Ex. A (the "Note"), 78-2 (the "Portfolio Management Agreement" or "PMA")—the Court considers those documents in its decision.

### B. Rule 12(c): Judgment on the Pleadings

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12. "'Pleadings' include both the 'complaint' and the 'answer to [the] complaint.'" *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (citing Fed. R. Civ. P. 7(a)). "The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that [for granting] a Rule 12(b)(6) motion for failure to state a claim." *Lynch*, 952 F.3d at 75 (quoting *Patel v. Contemporary Classics*, 259 F.3d 123, 126 (2d Cir. 2001)). In evaluating a motion for judgment on the pleadings pursuant to Rule 12(c), a court must accept all facts set forth in the non-movant's pleading as true and draw all reasonable inferences in favor of the non-movant. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015).

"To survive a Rule 12(c) motion, '[the non-movant's pleadings] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 328 (2d Cir. 2013) (quoting *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "The assessment of whether a

complaint's factual allegations plausibly give rise to an entitlement to relief . . . calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Lynch*, 952 F.3d at 75 (internal quotation marks omitted). "In making this assessment, we 'draw all reasonable inferences in [the non-movant's] favor.'" *Lively*, 6 F.4th at 301 (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). Further, "[w]hen a plaintiff is the moving party, 'the plaintiff may not secure a judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery.'" *Flextech Rts. Ltd. v. RHI Ent., LLC*, No. 09 CIV. 3462 (DC), 2010 WL 245570, at *2 (S.D.N.Y. Jan. 22, 2010) (quoting 5C CHARLES ALAN WRIGHT & ARTHUR MILLER, FED. PRAC. & PROC. CIV. § 1368 & n. 20 (3d ed. 2009)).

Rule 12(c) motions "may be filed before discovery is complete;" and "[u]ntil both parties have an opportunity to test their evidence at summary judgment or trial, [courts] must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party." *Id.* (citation omitted). That said,

> "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." Thus, where a "question [of fact] is in dispute, it [is] improper for the district court to answer it on a motion for dismissal on the pleadings." Thus, a court may consider undisputed allegations of fact on a Rule 12(c) motion under the same standard as Rule 12(b)(6), but it may not use a motion for judgment on the pleadings to weigh disputed factual allegations.

*Id.* (citations omitted); *see also* 5C CHARLES ALAN WRIGHT & ARTHUR MILLER, FED. PRACTICE & PROCEDURE CIV. § 1367 (3d ed. 2021) ("[A] Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties . . . . The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.").

III.   **DISCUSSION**

Because the NexPoint Parties' counterclaims against the ACM Parties and Brigade proceed in tandem, the Court considers them together and proceeds claim by claim.

A.   **Tortious Interference**

The NexPoint Parties have failed to adequately state a claim for tortious interference.  They fail to adequately allege an underlying breach of the Note, which is the only contract that the NexPoint Parties have with the ACM Parties; and to the extent that the NexPoint Parties' brief suggests an allegation of tortious interference with the Indenture, the claim fails because the NexPoint Parties are not parties to the Indenture.[12]  "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996)).  The counterclaim alleges "tortious interference with NexPoint's rights under its Notes," Counterclaim, Dkt. No. 220-1 at 2–3, insofar as "NexPoint was a holder of" the ACIS 6 Note, *id.* ¶ 221, and the Note "incorporates certain duties and obligations of the Indenture and is a contract with ACIS-6," *id.* ¶ 222; *see also* the Note.

The NexPoint Parties claim that "[u]nder the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted." *Id.* ¶ 209 (emphasis in original).  The NexPoint Parties allege that the ACM Parties

---

[12] Nor can the NexPoint Parties amend their pleadings through the briefing.  *See, e.g.*, *Budhani v. Monster Energy Co.*, No. 20-CV-1409 (LJL), 2021 WL 5761902, at *3 (S.D.N.Y. Dec. 3, 2021) (collecting cases).

"were well aware of the note's terms since they were appended to the Indenture, which is incorporated into the PMA . . . ." *Id.* ¶ 224.  And, according to the NexPoint Parties, the ACM Parties' "actions caused ACIS[ ]6 to breach the terms of the subordinated note . . . by causing the portfolio to pay substantially less than what subordinated noteholders were entitled to under the subordinated note." *Id.* ¶ 229.  Specifically, they allege that the ACM Parties' "direct involvement in identifying the securities to be bought and sold in violation of the note's requirements, . . . in executing the trades, and . . . in inflating the amount of expenses and fees directly caused ACIS[ ]6 CLO fund to pay less to [NexPoint and NHF] than what it is obligated to pay under the note." *Id.*

The NexPoint Parties fail to adequately allege breach of the terms of the Note.  Because the Note is attached as an exhibit to the Counterclaim, the Court considers it in evaluating this motion to dismiss.  *See In re Thelen LLP*, 736 F.3d at 219.  The Note obligates ACIS 6 to distribute available proceeds to noteholders in accordance with the payment priority laid out in the Indenture.  *See* Note at Ex. A2-7.  By its terms, the Note does not separately confer any duties enforceable by the noteholders against ACIS 6, the Note's trustee, or anyone else; and the Note's mere reference to the Indenture is not sufficient to confer upon noteholders the right to enforce duties prescribed by the Indenture.  *See, e.g.*, Note, A2-7-8 ("Reference is hereby made to the Indenture . . . for a statement of the respective rights, limitations of rights, duties and immunities *thereunder* of the Issuer, the Trustee and the Holders of the Notes and the terms upon which the Notes are, and are to be, authenticated and delivered.") (emphasis added); *see also Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, No. 12 CIV. 2683 RWS, 2013 WL 4856199, at *3 (S.D.N.Y. Sept. 10, 2013) ("[W]hile express identification of a document is a *necessary* condition for incorporation of that document, it is not a *sufficient* one.  In addition to language explicitly identifying the referenced document, there must also be language that 'clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract[,] rather than merely to acknowledge that the referenced

material is relevant to the contract, e.g., as background law . . . .") (quoting *Northrop Grumman Info.
Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008)) (emphasis in original).[13]  An

allegation that the Indenture was breached does not suffice to adequately allege that the Note was

breached.  Nor do the NexPoint Parties adequately allege—or for that matter, argue in their

response—that the Note *itself* was breached in any way beyond their incorporation argument.  *See,
e.g.*, ACM Mem. at 24 ("The Subordinated Note merely requires Acis 6 to distribute available

proceeds in accordance with the priority of payments in the Indenture.  NexPoint does not allege

any failure by Acis 6 to do so." (citing Note at Ex. A2-7)); ACM Opp'n at 14 (not disputing this

assertion, and instead simply stating that the NexPoint Parties "plead[ed] violations of the

Indenture's material investment terms," and arguing that the ACM Parties failed to comply with the

Indenture and the PMA—both contracts to which the NexPoint Parties are not parties).  Again, the

Note, which requires ACIS 6 to distribute any remaining proceeds to the noteholders in accordance

with the Indenture's priority of payments, does not confer upon the noteholders any rights to hold

the portfolio manager liable for any conduct leading up to the distribution of payments.

Accordingly, the NexPoint Parties have failed to adequately allege actual breach of the Note.

        Nor have they adequately pleaded alleged interference with the Indenture.  While the

Counterclaim itself alleges tortious interference involving actual breach of the Note, *see, e.g.*, *id.* ¶ 229

(alleging that the ACM Parties' "actions caused ACIS[ ]6 to breach the terms of the subordinated

note"), the NexPoint Parties' briefing instead argues that Plaintiffs' conduct induced a breach of the

---

[13] And as the ACM Parties rightly point out in their Reply, "[w]hen the drafters of Acis 6's governing documents wanted
to incorporate by reference, they said so."  ACM Reply at 11 (citing Dkt. No. 140-2 at viii; Dkt. No. 78-1 at Ex.A2-9).
*See, e.g.*, *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) ("Under New York law, a written contract is to be
interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have
employed."); *cf. Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech.*, No. 11 CIV. 2589 JPO HBP, 2012 WL 4473288, at *10
(S.D.N.Y. Aug. 16, 2012), *report and recommendation adopted*, No. 11 CIV. 2589 JPO HBP, 2012 WL 4474587 (S.D.N.Y.
Sept. 28, 2012) ("[T]he parties knew how to draft and include language requiring pro ration when that is what they
intended.  The absence of similar pro ration language [elsewhere in the contract] compels the conclusion that the parties
did not intend monthly pro ration with respect to [that item in the contract].").

SPA-25

Indenture, *see* ACM Opp'n at 25 ("NexPoint pleads that [the ACM Parties'] . . . acts . . . caused [ACIS 6] . . . to breach the terms of the Indenture, which in turn caused NexPoint to lose money in the form of both the misappropriated fees and expenses and the lost appreciation in the investments themselves."); *id.* at 26 n.34 (discussing breach of the Indenture); Brigade Opp'n at 4 (asserting that Brigade participated in "violat[ing] the investment standards in the Indenture").  The NexPoint Parties may not amend their pleadings through their briefing.  And in any case, as the NexPoint Parties admit, they are not parties to the Indenture.  Counterclaim ¶ 51 ("NexPoint was *not* a signatory to the Indenture.") (emphasis in original).  That the Note may merely reference "certain duties that are explained in the Indenture and provide that there is no recourse against the Issuers," *id.* ¶ 53 (citing Note, A2-7), does not suffice to transform the Indenture into a contract existing between the NexPoint Parties and ACIS 6.  Tortious interference requires "the existence of a valid contract between the plaintiff and a third party."  *See Kirch*, 449 F.3d at 401–02 (internal quotation marks and citations omitted).  Thus, to the extent that the NexPoint Parties' tortious interference claim concerns alleged interference with the Indenture—to which NexPoint and NHF are not parties—the claim is dismissed.

Thus, the NexPoint Parties have failed to adequately plead breach of the Note, or any other contract to which the NexPoint Parties are signatories.  The tortious interference claim is therefore dismissed.

### B.  Standing on the Remaining Claims

The NexPoint Parties lack standing to assert their remaining counterclaims.  New York law—which governs the Indenture and each Note, *see* Indenture § 14.9—requires that "courts 'look to the law of the state of incorporation in adjudicating a corporation's internal affairs,' *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980), including questions as to whether a claim is direct or derivative," *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 (2d Cir. 2014), *certified*

SPA-26

*question answered*, 118 A.3d 175 (Del. 2015) (citing *Seidl v. Am. Century Cos.*, 713 F. Supp. 2d 249, 255 (S.D.N.Y. 2010), *aff'd*, 427 Fed. Appx. 35 (2d Cir. 2011)).[14]   ACIS 6 is a limited liability company incorporated in the Cayman Islands, and it conducts business through directors located in the Cayman Islands.   Compl. ¶ 15; *accord* Answer ¶ 15; Counterclaim ¶ 20 ("admit[ting] that the ACIS CLOs are Cayman Islands-exempted limited liability companies").   Therefore, Cayman law applies to the question of whether the NexPoint Parties' counterclaims are direct or derivative.   *See also Winn v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) (finding that "under New York choice of law rules, Cayman law applies" to claims of breach of fiduciary duty where the state of incorporation was the Cayman Islands); *Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 476 (S.D.N.Y. 2011) (same).

The NexPoint Parties assert that they have both direct and derivative standing under New York and Cayman law.   *See* ACM Opp'n at 16–29.   The NexPoint Parties' argument for direct standing is largely rooted in their errant argument that the ACM Parties are "co-trustees" of ACIS 6, and their argument for derivative standing in turn is grounded in their inappropriate mischaracterization of the ACIS 6 notes as "equity."[15]   *See id.*   For the reasons that follow, the Court finds that the NexPoint Parties lack both direct and derivative standing to bring their counterclaims.

---

[14] The NexPoint Parties' assertion that the PMA's choice of law clause—which selects New York law "without giving effect to [its] conflicts of laws provisions," PMA § 24—governs is incorrect.   *See* ACM Opp'n at 28.   As a non-party to the PMA, NexPoint may not enforce it.   *See* PMA § 31 ("Other than as provided below"—none of which applies here— "no party, including any Holder of Notes, is a third party beneficiary of this Agreement."); *see also St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 F. App'x 36, 40 (2d Cir. 2020) (summary order) (noting that although the contract's choice of law clause selecting New York specifically did so "'without regard to the principles of [New York's] conflicts of law,' . . . the law of [the party's] state of incorporation, Maryland, applies to the threshold issue of Plaintiff's standing to sue") (citing *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014); *Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 476 (S.D.N.Y. 2011) ("Plaintiff cites no law to support his contention that a choice of law provision can govern standing, which is a constitutional issue and governed by the laws of the state of incorporation.")).
[15] The NexPoint Parties argue, in the alternative, that they have derivative standing as trust beneficiaries.   *See* Dkt. No. 139 at 27–28.

1.    **Derivative Standing**

Under Cayman law, the NexPoint Parties' claims involving alleged mismanagement of the CLO funds suffered by ACIS 6 must be brought derivatively.  To the extent that the NexPoint Parties claim that they have been "harmed" by a reduction in their net proceeds flowing from the ACM Parties' monetization of the ACIS 6 CLOs' assets, these alleged harms are suffered directly by ACIS 6, and only indirectly—if at all—by the noteholders.[16]  But the NexPoint Parties lack derivative standing to sue under Cayman law because in the Cayman Islands, creditors like the NexPoint Parties cannot sue derivatively in these circumstances.  *See* Milne Decl. ¶ 63 ("[A] creditor does not have the right to bring a derivative claim to enforce the company's rights.") (citing *Marex Financial Ltd. v. Sevilleja*, [2020] UKSC 31 ¶ 83, Dkt. No. 109-3 (noting that although shareholders' losses are not "separate and distinct from [those of] the company[], and therefore [the shareholder] has no claim to recover it," shareholders, "*unlike a creditor*," may have "the right to bring a derivative claim to enforce the company's rights if the relevant conditions are met" (emphasis added)); Cayman Islands Grand Court Rules, Order 15, Rule 12A, Dkt. No. 109-6) (describing the rules for derivative actions as "appl[ying] to every action begun by writ by one or more *shareholders* of a company where the cause of action is vested in the company and relief is accordingly sought on its behalf" (emphasis added))).

The NexPoint Parties argue that the general prohibition against creditor derivative suits does not apply because "NexPoint has alleged [its Note] is equity," such that the NexPoint Parties can bring a derivative action as "shareholder[s]."  ACM Opp'n at 29 (citing Counterclaim ¶¶ 56–67; Patel Decl. ¶¶ 27–35).  But subordinated notes are debt securities, not shares.  *See* Indenture at 57

---

[16] The Counterclaim itself appears to acknowledge as much.  *See, e.g.*, Counterclaim ¶¶ 4 ("Counter-Defendants have wiped out millions in value *from ACIS[ ]6* . . . and deprived NexPoint of the full benefit of its investment bargain.") (emphasis added), 5 (alleging that the NexPoint Parties suffered losses only as a result of ACIS 6's losses), 66 (alleging that the ACM Parties and Brigade's conduct "severely and adversely impacted ACIS[ ]6"), 75 (alleging harm to ACIS 6), 88 (same), 94 (same), 112 ("The purchase of these loans caused ACIS[ ]6 to suffer substantial losses.").

(defining "Subordinated Notes"), *id.* §§ 2.2–2.3 (describing the Secured Notes and Subordinated

Notes).[17] The noteholders' interest in their subordinated debt does not morph into an equity

interest for purposes of derivative standing. *See, e.g.*, *Howe*, 783 F. Supp. 2d at 476 (rejecting the

argument that "the Noteholders' interest [in Cayman Islands CDO] morphs into an equity interest

for the purposes of derivative standing"). Put very simply, notes are a different part of a company's

capital structure than equity. Defendants presumably were aware of the rights of noteholders when

they invested and where they fit in the capital structure; Cayman law does not allow them to obtain

the rights of equity holders simply by mischaracterizing their notes as "equity."

    And even if the NexPoint Parties' notes were equity, under Cayman law shareholders may

bring derivative actions in only "four narrow" circumstances—none of which apply here. *See Zohar*

*CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, No. 17-CV-307(PKC), 2021 WL 4460547, at *11

(S.D.N.Y. Sept. 29, 2021), *amended*, No. 17-CV-307 (PKC), 2021 WL 4710787 (S.D.N.Y. Oct. 7,

2021) ("Under Cayman law, 'derivative claims are owned and controlled by the company, not its

shareholders' and, thus, 'a shareholder is not permitted to bring a derivative action on behalf of that

company.'" (quoting *Davis v. Scottish Re Grp. Ltd.*, 73 N.Y.S.3d 533, 534–35 (1st Dep't 2018)); *Davis*,

73 N.Y.S.3d at 535 ("Cayman Islands law recognizes only four narrow exceptions to the [rule

---

[17] The NexPoint Parties argue that they pleaded that the notes are essentially equity. ACM Opp'n at 29. It is true that the Counterclaim alleges that the "junior-most noteholders . . . . are *tantamount* to the equity holders, who take on the most risk of any investor in a CLO." Counterclaim ¶ 25 (emphasis added). This legal conclusion, however, need not be accepted as true. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). The Court is not required to credit as true the NexPoint Parties' characterization of the notes as equity because it is contradicted by the documentation incorporated into the complaint. *See In re Thelen LLP*, 736 F.3d at 219; *see also May v. Sony Music Ent.*, 399 F. Supp. 3d 169, 179 (S.D.N.Y. 2019) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." (internal quotation marks and citations omitted)). And even the Counterclaim acknowledges the difference between notes and actual equity—as it must, given the structure of these transactions. *See, e.g.*, Counterclaim ¶¶ 1 (stating that the secured noteholders are paid off, and then the "equity holders" later receive "all residual cash flows"), 20 (describing the process of CLO fundraising in which "the special purpose vehicle brings in the necessary funds by (1) raising equity funds from equity investors, and (2) obtaining additional financing in the form of debt, . . . by issuing notes to third-party investors"), 39 (distinguishing "noteholders *and* equity holders") (emphasis added), 44 (same). It does not escape the Court's notice that the NexPoint Parties, subject to the constraints of Rule 11, plead no more than that "[t]he subordinated notes are *essentially* equity." *See id.* ¶ 54 (emphasis added).

generally barring shareholder actions]: "(1) if the conduct infringed on the shareholder's personal rights; (2) if the conduct would require a special majority to ratify; (3) if the conduct qualifies as a fraud on the minority; or (4) if the conduct consists of ultra vires acts."). The NexPoint Parties' apparent argument that the personal rights exception may be satisfied by virtue of "an injury inur[ing] to [the NexPoint Parties] under a specific right granted under statute," which the Court assumes to be the IAA,[18] *see* ACM Opp'n at 29, fails as the IAA does not confer upon NexPoint a private right of action. *See, e.g.*, *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 418 (2d Cir. 2023) ("[T]he IAA provides 'a limited private remedy [in § 215] . . . to void an investment advisers contract,' but it 'confers no other private causes of action, legal or equitable.'" (citation omitted)); *id.* at 418–21 (concluding, in upholding this Court's ruling on the motion to dismiss in the First NexPoint Lawsuit, that NexPoint is not entitled to rescission under § 215(b), and that "NexPoint does not seek rescission of any contract requiring a party to engage in conduct prohibited by the IAA"); *see also NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36, 43–47 (S.D.N.Y. 2022), *aff'd*, 80 F.4th 413 (2d Cir. 2023) (explaining the same and collecting cases).

Nor would the Counter-Defendants' conduct qualify to confer standing on the NexPoint Parties under the fraud-on-the-minority exception, as the NexPoint Parties fail to allege that the ACM Parties or Brigade control a majority of the ACIS 6 voting securities. *See Davis v. Scot. Re Grp. Ltd.*, 73 N.Y.S.3d 533 (1st Dep't 2018) ("In order to invoke [the fraud-on-the-minority] exception, plaintiff must plead and prove that the alleged wrongdoers controlled a majority of the stock with voting rights and that those wrongdoers committed fraud.").[19]

---

[18] The NexPoint Parties do not specify to what statute they are referring here, nor do they mention another statute that this could conceivably be. *See* ACM Opp'n at 29.

[19] Though not addressed in the briefing, the NexPoint Parties' suggestion in the Counterclaim that Highland, the "controlling holder of HCLOF," is "the majority in interest" and entered into a "collusive settlement" between HCLOF and the ACM Parties does not suffice to argue fraud on the minority. *See* Counterclaim ¶ 247. The Court has already

Nor is a duty triggered to creditors based on an insolvency argument given that no Event of Default has occurred. *See* Milne Decl. ¶ 61 (noting that in Cayman law, "directors may owe a duty to act in the best interests of all creditors if it becomes clear that insolvency is probable or imminent" (citing *West Mercia Safetywear Ltd (in liq) v Dodd*, [1988] BCLC 250, Dkt. No. 150-22)); Counterclaim ¶ 247 (acknowledging that no Event of Default has occurred).

And even if the NexPoint Parties had derivative standing to bring these claims, they would not be able to bring them at this time as a practical matter because the underlying documents do not permit it. The counterclaims concern alleged breaches of the PMA, as well as failure to abide by the terms of the Indenture and the IAA, *see, e.g.*, Counterclaim at 1–3; *id.* ¶¶ 194–96, 200. The NexPoint Parties seek to bring these claims derivatively on behalf of ACIS 6. The Indenture's granting clause vests all of ACIS 6's "rights under the Portfolio Management Agreement" to U.S. Bank, the trustee. *See* Indenture at 1. The Indenture further provides that the trustee lacks the authority "to take any legal action upon the breach of an obligation of the Portfolio Manager" (ACM) under the PMA until an Event of Default occurs. Indenture § 15.1(a) ("[T]he Trustee shall not have the authority to exercise [this] right[] . . . until the occurrence of an Event of Default."). As the NexPoint Parties acknowledge, no Event of Default has occurred. Counterclaim ¶ 247. Thus, even the trustee—who was granted ACIS 6's rights to sue ACM under the PMA in accordance with the Indenture's granting clause—would be unable to bring the claims the NexPoint Parties allege at this time.

### 2. Direct Standing

In addition, the NexPoint Parties lack direct standing to bring their counterclaims. The NexPoint Parties first argue that they have standing to bring a direct claim for breach of fiduciary

---

dismissed the counterclaims brought by the DAF Parties seeking to invalidate the settlement agreement on similar grounds of alleged collusion. *See generally* DAF Counterclaim Ruling. Moreover, because the NexPoint Parties have declined to brief this argument any further, they have, in any case, forfeited it. *See Ramirez v. Temin & Co., Inc.*, No. 20 CIV. 6258 (ER), 2021 WL 4392303, at *9 n.2 (S.D.N.Y. Sept. 24, 2021) ("[A] plaintiff's failure to address an issue in its opposition raised by its adversary amounts to a concession or waiver of the argument.") (citations omitted).

duty because the ACM Parties and Brigade owe them "direct fiduciary duties" either (i) under "the trust theory," (ii) due to the "nature of the relationship," or (iii) "under the IAA" as "actionable under New York law." *See* ACM Opp'n at 16–26. Similarly, in the Counterclaim, the NexPoint Parties allege that both the ACM Parties and Brigade "owe fiduciary duties under the IAA that are actionable under New York law," Counterclaim, Dkt. No. 220-1 at 28; that ACM "owes fiduciary duties as co-trustee of ACIS[ ]6," *id.* at 30, which NexPoint argues is a "a trust created under New York law," *id.* ¶ 159; that "under New York law, [ACM] owes fiduciary duties to ACIS[ ]6 even if not a trust," *id.* at 32; and that the ACM Parties and Brigade "violated their fiduciary duties by breaching the terms of the Indenture, by self-dealing, and by converting property of the investors for themselves," *id.* ¶ 168, causing "substantial losses" to the ACIS 6 portfolio, *id.* ¶ 173. The Court addresses each theory in turn—none of which suffice to confer direct standing on the NexPoint Parties.

### a. The "Co-Trustee" Theory

The NexPoint Parties argue that ACIS 6 assigned its assets "to two trustees: U.S. Bank to hold legal title, and ACM as Portfolio Manager to control the fund and manage the Assets 'for the benefit of' the noteholders." ACM Opp'n at 3. The NexPoint Parties' trust theory posits that the Indenture created a trust under either Cayman or New York law, and that ACM thereby owes to the ACIS 6 noteholders direct fiduciary duties as either a "co-trustee" (under New York law) or "shadow trustee" (Cayman law). *See id.* at 19–20. This theory fails.

Because there is no indication in the Indenture that the ACM Parties are a "co-trustee," it would be inappropriate to ascribe that role to them. In New York, "much of the common law of trusts, and its corresponding fiduciary obligations, are not applicable to commercial trusts." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011). Rather, "[i]t is . . . well-established under state common law that the duties of an indenture trustee are strictly

defined and limited to the terms of the indenture." *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988); *see also AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146, 156 (2008) ("The trustee under a corporate indenture . . . has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement." (internal quotation marks and citations omitted)); *accord Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.").

Neither the Indenture nor the PMA identify the ACM Parties as "co-trustees" with fiduciary duties running from the ACM Parties (or Brigade) to the noteholders, as the NexPoint Parties' creative (but wrong) theory posits.  Indeed, the parties affirmatively disavowed any intention for the fiduciary duties of the ACM Parties and Brigade, pursuant to the PMA, to run from ACIS 6 to the noteholders.  *See* PMA § 11(a)(i) (stating that generally, the ACM Parties may not be held liable by noteholders); *id.* § 2 (noting that the *Issuer* retains the portfolio manager for its services); *id.* § 10 (ACM consenting to enforcement of the PMA "by the Issuer and by the Trustee on behalf of the Holders"); *id.* §§ 31–32 (expressly excluding noteholders from being third-party beneficiaries to the PMA absent specified circumstances not present here); *see also* Dkt. No. 140-2 (the "Offering Circular") at 28 ("None of the Co-Issuers, the Initial Purchaser, the Portfolio Manager, the Collateral Administrator, the Trustee nor any of their respective affiliates is providing investment, accounting, tax or legal advice in respect of the Notes *and will not have a fiduciary relationship with any investor or prospective investor in the Notes*." (emphasis added)); *id.* at 29 (noting that ACM is not "providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes"); *id.* at 57 (noting ACM's "fiduciary duties owed to the Issuer and such other clients, funds or other investment

accounts," while not listing the noteholders); *id.* at 102 (describing ACM's limitation of liability). The Indenture did establish a trustee: U.S. Bank.  Indenture at 1.  There is no indication in the instruments that the parties intended for any "trustee-like" fiduciary duties to run from the ACM Parties (or Brigade for that matter) to the noteholders.  To the contrary, the documents expressly disclaim the creation of such a relationship.  The Court is not aware of a "trustee by implication" doctrine pertaining to indenture trustees, "whose duties and obligations are exclusively defined by the terms of the indenture agreement."  *Meckel*, 758 F.2d at 816.[20]  Thus, the "co-trustee" theory fails to confer direct standing on the NexPoint Parties to sue the ACM Parties over the alleged mismanagement of the ACIS 6 funds.[21]

Given the Indenture's and PMA's choice-of-law clauses, New York law applies to the question of whether the ACM Parties are "co-trustees" of the fund.  But even if Cayman law applied to this issue, the NexPoint Parties' argument still fails.  In the Cayman Islands, parties must satisfy the "three certainties" in order to form a trust:  "(1) certainty of intention to create a trust; (2) certainty of the subject matter forming the assets of the trust; and (3) certainty regarding the objects or beneficiaries of the trust."  *See* Declaration of Bhavesh Patel, Dkt. No. 141 (the "Patel Decl.") ¶ 11 (citing *Islena Airlines v. Jefferson* [1998 CILR 1481], Dkt. No. 141-1 at 159 ("[I]n order to constitute a trust, an arrangement must have three characteristics, known as the three certainties:  certainty of intent, of subject-matter and of object.")); Declaration of Jonathan Milne, Dkt. No. 150 (the "Milne Decl.") ¶¶ 10–11 (agreeing with this statement of Cayman law and collecting additional Cayman

---

[20] As the ACM Parties note in their reply, the NexPoint Parties' authorities on this theory "are inapposite."  *See* ACM Reply at 8; *see also* ACM Opp'n at 19 (citing *Matter of Will of Rubin*, 540 N.Y.S.2d 944, 947 (N.Y. Sur. Ct. 1989) (a Surrogate's Court case examining common-law fiduciary trustees in the context of interpreting an individual's will, not a lengthy Indenture that clearly defines the trustees and prescribes specified duties); 106 N.Y. Jur. 2d Trusts § 348 (citing *Rubin*); Restatement (Second) of Trusts § 185(c), (e) (1959) (discussing the duties of advisors to common-law fiduciary trustees); J.R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee or Executor*, 56 A.L.R.3d 1249 § 10 (1974) (same)).

[21] It is not lost on the Court that the NexPoint Parties assert this creative "common law co-trustee" argument only after the Court's previous holding, in the First NexPoint Lawsuit, that the NexPoint Parties cannot sue the *actual* trustee for breach of fiduciary duty under the terms of the Indenture. *See NexPoint*, 620 F. Supp. 3d at 47–49.

cases in support).  To satisfy the first certainty—that of intent to create a trust—"the settlor must

have intended to impose fiduciary duties on the trustee to whom legal ownership of the property is

transferred . . . .  because, under English and Cayman Islands law, a trust is a fiduciary relationship."

Milne Decl. ¶ 12 (citing *Grand View Private Trust Co Ltd v Wen-Young Wong* [2022] UK.PC 47 ¶ 27,

Dkt. No. 150-5 (noting that trustees have fiduciary duties); *In re Ta-Ming Wang Trust* [2010] (1) CILR

541, 550 ¶ 19, Dkt. No. 150-6 (acknowledging that trustees owe fiduciary duties to their

beneficiaries)); *see also id.* ¶¶ 13–15 (citing SNELL'S EQUITY § 22-013, Dkt. No. 150-1 (stating that to

form a trust, "[i]t is unnecessary . . . to use the word 'trust;'" rather, "[t]he settlor's intention must be

clear on two main questions:  (1) that they intended the trustee to owe legally enforceable duties . . . ;

(2) that if they intended to create a legal relationship, it was to involve trust duties as distinct from

some kind of legal relationship, such as a simple relationship of debtor and creditor"); *id.* § 22-015

("[A] simple advance payment of money for a particular purpose is generally not enough to indicate

that the recipient was intended to hold on trust for the payer," and "[t]he imposition of a trust,

without strong evidence of an intention to declare one, would upset the usual proportionate

distribution of assets in insolvency.")).

   Under Cayman law, it is the intention of the parties to form a trust that controls whether a

"trust relationship" has been formed.  *See* Milne Decl. ¶ 25 ("Under English and Cayman Islands

law, such trust labels do not create a trust if the substance of the instrument shows that it was not

intended to create a trust relationship.") (citing SNELL'S EQUITY § 22-013, Dkt. No. 150-1); *Re

Lehman Brothers International (Europe)* [2010] EWHC 2914 (Ch) 11225(v), 225(vi), 249, Dkt. No. 150-

10 (stating that "[t]he words used by the parties such as 'trust' . . . are not conclusive in favour of the

recognition of [one of the parties'] proprietary interest in the property, if the terms of the agreement

or relationship . . . compel a different conclusion")).  Again, the governing documents here do not

suggest that the ACM Parties and the NexPoint Parties intended to form a trustee/beneficiary

(respectively) relationship.  To the contrary, the documents affirmatively disavow any such intention.
*See* PMA §§ 11(a)(i), 2, 10, 31–32; *see also* Offering Circular at 28, 29, 57, 102.  Thus, the NexPoint
Parties' argument that the ACM Parties constituted "trustees" under Cayman law also fails.

### b.  The "Nature of the Relationship"

Nor do the ACM Parties or Brigade owe the NexPoint Parties any direct fiduciary duties due
to the "nature of the relationship."  In New York, courts have "held that a 'fiduciary relationship
arises between two persons when one of them is under a duty to act for or to give advice for the
benefit of another upon matters within the scope of the relation.'"  *Oddo Asset Mgmt. v. Barclays Bank
PLC*, 19 N.Y.3d 584, 592–93 (2012) (quoting *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011)).  "A
fiduciary relationship is 'necessarily fact-specific' and is also 'grounded in a higher level of trust than
normally present in the marketplace between those involved in arm's length business transactions.'"
*Id.* at 593 (citations omitted).  Where the parties "do not create their own relationship of higher
trust" as through, for example, a contract, "courts should not ordinarily transport them to the higher
realm of relationship and fashion the stricter duty for them."  *Id.* (internal quotation marks and
citations omitted).  As the New York Court of Appeals has observed, "there is generally 'no
fiduciary obligation in a contractual arm's length relationship between a debtor and a note-holding
creditor.'"  *Id.* (citations omitted).  This is because "[a] debtor and creditor have no special
relationship of confidence and trust, and the relationship is generally controlled by contract."  *Id.*
(citations omitted).

Here, as in *Oddo*, the NexPoint Parties are noteholders, not shareholders; and "there is no
factual basis to create fiduciary duties running from the managers to the mezzanine noteholders."
*See id.*  Nor did the NexPoint Parties and the ACM Parties, or Brigade for that matter, have any
direct contractual relationship.  *See id.* at 594; *cf. Williams Trading LLC v. Wells Fargo Sec., LLC*, 553 F.
App'x 33, 35–36 (2d Cir. 2014) (summary order) (finding that no fiduciary duty was owed to a

plaintiff that received funds indirectly from the defendants' profit, where the profits themselves "belonged solely to" the defendant); *In re Zohar III, Corp.*, 2021 WL 3124298, at *15 (Bankr. D. Del. July 23, 2021) (applying New York law and finding that CLO investors' allegations that "Managers were required to manage the [CLO] Funds' assets for the Noteholders" are "insufficient to support a conclusion that a higher trust arose between the sophisticated and commercial parties involved in this proceeding") (citing *Oddo*, 19 N.Y.3d at 593 ("A debtor and creditor have no special relationship of confidence and trust, and the relationship is generally controlled by contract.")).  And as already discussed, the underlying documents at issue disclaim any intent to confer fiduciary duties onto the ACM Parties that run to the NexPoint Parties.  Accordingly, neither the ACM Parties nor Brigade owe any fiduciary duties to NexPoint under New York common law.[22]

### c.  Fiduciary Duties Under the IAA

Nor does NexPoint have direct standing to bring its counterclaims under the IAA as "actionable under New York law."[23]  *See* ACM Opp'n at 23.  First, as the Court explained in its ruling in the First NexPoint Lawsuit, "there is no private right of action to bring a claim pursuant to [Section 206 of the IAA]."  620 F. Supp. 3d at 43 (citing *Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19–25 (1979); *Omega Overseas Partners, Ltd. v. Griffith*, No. 13-CV-4202 RJS, 2014 WL 3907082, at *3 (S.D.N.Y. Aug. 7, 2014)).  Second, any fiduciary duties owed by the investment advisers (the ACM Parties and Brigade) under the IAA run to the fund—here, ACIS 6—and not to its investors.  *See, e.g.*, *XY Plan. Network, LLC v. United States Sec. & Exch. Comm'n*, 963 F.3d 244, 248 (2d Cir. 2020) ("Investment advisers are regulated under the Investment Advisers Act of 1940

---

[22] Although the header in the NexPoint Parties' opposition asserts that the "nature of the relationship" confers direct standing on the NexPoint Parties under both New York common law and Cayman Islands law, *see* ACM Opp'n at 20, the NexPoint Parties do not brief any argument regarding Cayman law.  *See id.* at 20–23 (discussing only New York law for the "nature of the relationship" argument); *see also generally* Brigade Opp'n (making no such argument under Cayman law).  Accordingly, the Court understands the NexPoint Parties to have asserted this argument upon the basis of New York common law only.

[23] It is unclear what this phrase is intended to mean, given that the IAA is a federal statute.

('IAA') and owe a fiduciary duty to their *clients*." (citing 15 U.S.C. § 80b-2(a)(11)(C) (defining investment adviser)) (emphasis added)); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963) (describing "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading . . . *clients*" (emphasis added)); *see also S.E.C. v. DiBella*, 587 F.3d 553, 568 & n.11 (2d Cir. 2009) (acknowledging that while "[t]he 'legislative history [of the IAA] leaves no doubt that Congress intended to impose enforceable fiduciary obligations' on investment advisors," the IAA "does not provide a definition of 'client'" (quoting *TAMA*, 444 U.S. at 17)). While Section "206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers," this section was "intended to benefit the *clients* of investment advisers . . . ." *TAMA*, 444 U.S. at 17 (citation omitted and emphasis added).

Here, the ACM Parties and Brigade's client was ACIS 6, not ACIS 6's subordinated noteholders. *See* PMA § 2 ("[T]he Issuer hereby engages and retains the Portfolio Manager to provide . . . investment advisory and related services . . . ."); *id.* § 10 (ACM consenting to enforcement of the PMA "by the Issuer and by the Trustee on behalf of the Holders"); *id.* §§ 31–32 (expressly excluding noteholders from being third-party beneficiaries to the PMA absent specified circumstances not present here); *see also* Offering Circular at 28 ("[Neither t]he Portfolio Manager, . . . nor any of [its] affiliates is providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes."); *id.* at 29 (noting that ACM is not "providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes"); *id.* at 57 (noting ACM's "fiduciary duties owed to the Issuer and such other clients, funds or other investment accounts," while not listing the noteholders); *id.* at 102 (describing ACM's limitation of liability). The ACM Parties and Brigade do not owe the NexPoint Parties any

SPA-38

fiduciary duties pursuant to the IAA since the NexPoint Parties are not the investment advisers' clients.  Nor do the NexPoint Parties provide any within-Circuit support for their assertion that section 206(4) of the IAA "views NexPoint as within the class of persons that the statute was designed to protect" as "[o]ther jurisdictions have recognized that state fiduciary-duty actions are vehicles for vindicated breaches of § 206's fiduciary duties."  ACM Opp'n at 24–25 (citing exclusively out-of-Circuit decisions that are not binding on this Court); *see also id.* at 24 (the NexPoint Parties acknowledging that "no court has expressly held that violations of § 206 are actionable under New York law").  Particularly given the underlying documents at issue here, moreover, the Court declines to find that the NexPoint Parties have direct standing to sue under the IAA as "actionable under New York law," in the NexPoint Parties' words.  *See* ACM Opp'n at 23.

Accepting all facts alleged in the Counterclaim as true, and drawing all reasonable inferences in the NexPoint Parties' favor, *see Burch*, 551 F.3d at 124, the Court concludes that the NexPoint Parties lack standing to bring their counterclaims pertaining to any alleged mismanagement of the ACIS 6 funds.  The NexPoint Parties' application for a declaratory judgment is denied in turn.[24]  Even if they had standing, the NexPoint Parties have failed to adequately allege any fiduciary duties owed to them by the ACM Parties or Brigade as discussed above, so their breach of fiduciary duty claims must be dismissed.[25]

---

[24] The NexPoint Parties requested declaratory relief that "Counter-Defendants manipulated the assets in derogation of the rights of subordinated noteholders under the Notes in one or more ways as described herein; [t]he Acis-6 fund and/or [the NexPoint Parties] were damaged by Counter-Defendants' actions; [the NexPoint Parties] were or are owed fiduciary duties under New York or Federal law as an investor in Acis-6; [and as] Noteholder[s] suing for [their] rights under the Notes, [the NexPoint Parties] are not bound by the Indenture's No-Action clause for each of [their] claims." Counterclaim, Dkt. No. 220-1 ¶ 239.

[25] "The elements of a claim for breach of a fiduciary obligation are: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citation omitted).

SPA-39

### C.  Aiding and Abetting Against Brigade

Because the NexPoint Parties' counterclaim against the ACM Parties for breach of fiduciary duty is dismissed, the counterclaim against Brigade for aiding and abetting the ACM Parties' alleged breach of fiduciary duty, Counterclaim ¶¶ 233–36, fails in turn.  *See ML-SMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 19 (2d Cir. 2011) (summary order) ("To state a claim for aiding and abetting breach of fiduciary duty under New York law, a plaintiff must show 'breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages.'") (quoting *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004)).  Accordingly, the aiding and abetting counterclaim is dismissed.

### D.  Unjust Enrichment

This claim, too, fails for lack of standing.  And even if the NexPoint Parties had standing to bring their counterclaims, the Indenture and PMA would nonetheless bar the NexPoint Parties' quasi-contractual claim for unjust enrichment.[26]  "Unjust enrichment is a quasi-contractual claim that 'ordinarily can be maintained only in the absence of a valid, enforceable contract.'"  *Ellington Credit Fund*, 837 F. Supp. 2d at 202 (quoting *Ohio Players, Inc. v. Polygram Records, Inc.*, No. 99 Civ. 33, 2000 WL 1616999, at *4 (S.D.N.Y. Oct. 27, 2000)) (citing *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987) ("It is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.")).  The Indenture and the PMA bar this quasi-contractual claim notwithstanding the fact that the NexPoint Parties are not signatories to those contracts.  *See, e.g.*, *Ellington Credit Fund*, 837 F. Supp. 2d at 202

---

[26] "Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff."  *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001) (citations omitted).

("Although New York law on this issue is not entirely settled, in the last two decades, 'decisions both in New York state courts and in this district have consistently held that claims for unjust enrichment may be precluded by the existence of a contract governing the subject matter of the dispute even if one of the parties to the lawsuit is not a party to the contract.'" (quoting *Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2007 WL 683974, at *10 (S.D.N.Y. Mar. 5, 2007) (collecting cases))); *see also Mueller v. Michael Janssen Gallery Pte. Ltd.*, 225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016) ("Numerous decisions applying New York law have held that an unjust enrichment claim is barred 'if there is a valid contract governing the subject matter of the dispute, even if one of the parties to the claim is not a party to that contract.'" (citations omitted)).

Here, the Indenture and the PMA clearly cover the subject matter at issue—namely, whether the ACM Parties and Brigade breached their obligations to ACIS 6 as investment advisers. The Indenture and the PMA set forth the ACM Parties and Brigade's obligations to ACIS 6, as well as potential liabilities for any alleged mismanagement. Indeed, the NexPoint Parties pleaded their unjust enrichment claim based on the same allegations as their claims alleging breaches of the Indenture and the PMA. *See* Counterclaim ¶¶ 218–19. Accordingly, the NexPoint Parties' claims for "unjust enrichment, assumpsit or money had and received," *id.* ¶ 219, are dismissed.

### E. Conversion

Even if the NexPoint Parties had standing to bring their conversion claim, *see* Counterclaim ¶¶ 207–17, this claim fails for similar reasons. The NexPoint Parties allege conversion against the ACM Parties and Brigade insofar as "[u]nder the note, the holder is entitled to an amount from the Assets, that is residual after compliance with the investment criteria has been met and specific and identifiable administrative expenses in addition to other costs and expenses have been deducted." Counterclaim, Dkt. No. 220-1 ¶ 209. The NexPoint Parties allege that Mr. Terry, "[i]n allowing the payment of inexplicably high expenses[,] . . . wrongfully and improperly reimbursed [ACM], and

potentially himself and Brigade, using NexPoint's and NHF TRS LLC's property designated for the payment of ACIS[ ]6's administrative expenses and costs." *Id.* ¶ 211.  According to the NexPoint Parties, "Terry, [ACM,] and Brigade each exercised a wrongful and unauthorized dominion over NexPoint's and NHF TRS LLC's property designated for the payment of fees and ACIS[ ]6's administrative expenses and costs to the alteration of its condition or to the exclusion of NexPoint's and NHF TRS LLC's rights." *Id.* ¶ 213.

But "New York law is clear that 'a cause of action for conversion cannot be predicated on a mere breach of contract.'" *Zohar CDO 2003-1*, 2021 WL 4460547, at *15 (quoting *Fesseha v. TD Waterhouse Investor Services, Inc.*, 761 N.Y.S.2d 22, 24 (1st Dep't 2003)) (citing *Johnson v. Cestone*, 80 N.Y.S.3d 15, 17 (1st Dep't 2018)).  The NexPoint Parties' conversion claims here are based on the ACM Parties' alleged breach of the Indenture's expense provisions, which the NexPoint Parties allege were incorporated into the Note.  Counterclaim ¶¶ 53, 104, 209–10, 212; *see also Zohar*, 2021 WL 4460547, at *15 (finding that the conversion claims of a CLO "noteholder[] or preference shareholder" were "based on contract" and dismissing them accordingly).  Besides the fact that the NexPoint Parties lack standing to assert it, the conversion counterclaim would additionally be subject to dismissal insofar as it is predicated on an alleged breach of contract.

### F.  Negligence

To the extent that the negligence counterclaim fundamentally concerns mismanagement of the ACIS 6 funds, the NexPoint Parties lack standing to bring it, as discussed above.  Even if they had standing, the NexPoint Parties fail to state a claim for negligence inasmuch as they fail to establish that a special relationship exists between them and the ACM Parties or Brigade.  The NexPoint Parties allege that they are owed a duty of care by the ACM Parties "in managing ACIS[ ]6 and in discharging their duties under the IAA, the Indenture, and the PMA," *id.* ¶ 201, that the ACM Parties' conduct has "resulted in substantial losses to NexPoint," *id.* ¶ 202, and "was knowing and

willful and done in disregard of known and established safeguards implemented and created in the industry to avoid well-known, foreseeable risks," *id.* ¶ 203.

"New York applies the economic loss doctrine to negligence claims.  This doctrine prevents a plaintiff from recovering purely economic losses in a negligence action." *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012), *aff'd and remanded*, 742 F.3d 520 (2d Cir. 2013).  "A defendant is not liable to a plaintiff for economic loss unless there exists 'a special relationship that requires the defendant to protect against the risk of harm to plaintiff.'" *Id.* (quoting *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001)).  "[C]ourts have applied the economic loss rule to prevent the recovery of damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000); *see also Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 711 (2018) ("[W]e have made clear that 'where plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory.'" (citation omitted)).  While "the applicability of the economic loss rule outside the product-liability context from which it originated is doubtful," *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018); *accord 532 Madison Avenue*, 96 N.Y.2d at 289, "in practice the principle has been applied broadly," *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012), *rev'd in part on other grounds*, No. 09 CIV. 8387 SAS, 2012 WL 11896326 (S.D.N.Y. Sept. 28, 2012) (collecting cases).

Moreover, the economic loss rule "allows . . . recovery in the limited class of cases involving liability for the violation of a professional duty." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 18 (2d Cir. 2000).  Courts look to "whether [the] plaintiff allege[s] damages that flow from the violation of a professional duty, or merely from the violation of the governing agreements . . . ." *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017), *objections overruled sub nom.*, No. 14CIV10067KPFSN, 2017 WL 3610511 (S.D.N.Y.

Aug. 21, 2017); *see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 439 F. Supp. 3d 275,

283 (S.D.N.Y. 2020) (same); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700,

719 (S.D.N.Y. 2016) ("The dispositive issue is whether [the defendant] owed duties to the plaintiffs

that were separate from the duties set forth in the PSAs and the Indenture Agreements."); *Nat'l*

*Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, No. 14-CV-9928 (KBF), 2016 WL 796850, at *11

(S.D.N.Y. Feb. 25, 2016), *aff'd*, 898 F.3d 243 (2d Cir. 2018) ("Plaintiff's allegations for damages

arising from conflict of interest sound in defendants' failure to take contractual actions . . . . Thus,

while the cause of action for breach of fiduciary duty may arise from common law duties and not

from the PSA, 'the injury' and 'the manner in which the injury occurred and the damages sought

persuade us that plaintiff's remedy lies in the enforcement of contract obligations,' and are barred by

the economic loss doctrine.").

      Here, as in *National Credit Union*, the NexPoint Parties' alleged tort injury is that the ACM

Parties and Brigade caused losses in the value of the NexPoint Parties' subordinated notes. *See* 439

F. Supp. 3d 275, 283 (S.D.N.Y. 2020) (similar). These damages, as in *National Credit Union*, "are the

same and occurred in the same manner as the contract claim's damages: [the defendant] failed to

take certain actions required under the [pooling and servicing agreements], which resulted in losses

to plaintiffs' . . . investments." *Id.* (citations omitted). In addition, the PMA circumscribed the

duties owed by the ACM Parties and Brigade to ACIS 6. "[T]he presence of a contract or a financial

transaction that is 'in the nature of contract' can be a strong indicator that a plaintiff was not owed a

legal duty separate and apart from obligations bargained for and subsumed within the transaction."

*King Cnty.*, 863 F. Supp. 2d at 303 (citations omitted). The NexPoint Parties have failed to allege that

a special relationship exists between them and the ACM Parties or Brigade given the terms of the

underlying contracts, as discussed above. Accordingly, the negligence counterclaim is dismissed.

### G.  Judgment on the Pleadings

The ACM Parties' Rule 12(c) motion for judgment on pleadings, however, is denied for the same reasons that the Court articulated in evaluating the motions to dismiss the DAF Parties' counterclaims.  *See* DAF Counterclaim Ruling at 21–23.  To reiterate, in deciding this motion, the Court accepts all facts in the NexPoint Parties' Answer as true and draws all reasonable inferences in the NexPoint Parties' favor.  *See Vega*, 801 F.3d at 78.  Even if the Court may be unconvinced that the NexPoint Parties are likely to prevail at trial, "judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery . . . ."  *Id.*  Here, questions of fact are in dispute, *see id.*, and the NexPoint Parties have raised a series of affirmative defenses and denials in their Answer—notwithstanding the dismissal of their Counterclaim.  For example, the NexPoint Parties assert that the ACM Parties fail to state a claim, that their claims are barred by res judicata and waiver, and that the ACM Parties lack standing to bring their claims.  *See* Answer at 8–9.  As a result, the ACM Parties' Rule 12(c) motion for judgment on the pleadings is denied.

As a result, the ACM Parties' and Brigade's respective motions to dismiss the NexPoint Parties' Counterclaim are granted in part and denied in part as described above.

## IV.   LEAVE TO AMEND

"It is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Leave to amend may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (internal citation omitted).

The ACM Parties' and Brigade's motions to dismiss the NexPoint Parties' Counterclaim are granted without leave to amend, as any amendment here would be futile.  "The court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, leave may be

denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *Id.* Because the NexPoint Parties lack standing to bring their counterclaims alleging purported injuries to a third party as a matter of both Cayman and New York law, any attempt to replead those counterclaims would be futile.

**V.  CONCLUSION**

The ACM Parties' and Brigade's respective motions to dismiss the NexPoint Parties' Counterclaims are granted in part, with prejudice, and denied to the extent that they seek judgment on the pleadings.[27] The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 106 and 119.

SO ORDERED.

Dated: March 1, 2024
New York, New York

GREGORY H. WOODS
United States District Judge

---

[27] In accordance with the parties' stipulation and the Court's subsequent order, *see* Dkt. Nos. 220, 223, this ruling is binding upon both NexPoint and NHF TRS, LLC.

45

SPA-45

SPA-46

*15 USCS § 80b-6*

Current through Public Law 117-200, approved October 11, 2022.

*United States Code Service* > *TITLE 15. COMMERCE AND TRADE (Chs. 1 — 120)* > *CHAPTER 2D. INVESTMENT COMPANIES AND ADVISERS (§§ 80a-1 — 80b-21)* > *INVESTMENT ADVISERS (§§ 80b-1 — 80b-21)*

## § 80b-6. Prohibited transactions by investment advisers

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

**(1)** to employ any device, scheme, or artifice to defraud any client or prospective client;

**(2)** to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

**(3)** acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph (3) shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; or

**(4)** to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

## History

**HISTORY:**

Aug. 22, 1940, ch 686, Title II, § 206, *54 Stat. 852*; Sept. 13, 1960, *P. L. 86-750*, §§ 8, 9, *74 Stat. 887*; July 21, 2010, *P. L. 111-203*, Title IX, Subtitle I, § 985(e)(2), 124 Stat. 1935.

Annotations

## Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Effective date of section:**

**Amendment Notes**

**1960.**

SPA-47

## 15 USCS § 80b-15

Current through Public Law 117-200, approved October 11, 2022.

*United States Code Service  >  TITLE 15. COMMERCE AND TRADE (Chs. 1 — 120)  >  CHAPTER 2D. INVESTMENT COMPANIES AND ADVISERS (§§ 80a-1 — 80b-21)  >  INVESTMENT ADVISERS (§§ 80b-1 — 80b-21)*

## § 80b-15. Validity of contracts

**(a) Waiver of compliance as void.**   Any condition, stipulation, or provision binding any person to waive compliance with any provision of this title [*15 USCS §§ 80b-1* et seq.] or with any rule, regulation, or order thereunder shall be void.

**(b) Rights affected by invalidity.**   Every contract made in violation of any provision of this title [*15 USCS §§ 80b-1* et seq.] and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title [*15 USCS §§ 80b-1* et seq.], or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

## History

HISTORY:

Aug. 22, 1940, ch 686, Title II, § 215, *54 Stat. 856*.

Annotations

## Notes

HISTORY; ANCILLARY LAWS AND DIRECTIVES

Effective date of section:

Transfer of functions:

Effective date of section:

This section became effective on November 1, 1940, as provided by § 221 of Act *Aug. 22, 1940, ch 686*, which appears as *15 USCS § 80b-21*.

Transfer of functions:

SPA-48

## 17 CFR 275.206(4)-8

This document is current through the Oct. 11, 2022 issue of the Federal Register, with the exception of the amendments appearing at 87 FR 61152.

*Code of Federal Regulations > Title 17 Commodity and Securities Exchanges > Chapter II — Securities and Exchange Commission > Part 275 — Rules and Regulations, Investment Advisers Act of 1940*

## § 275.206(4)-8 Pooled investment vehicles.

(a) Prohibition. It shall constitute a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of section 206(4) of the Act (*15 U.S.C. 80b-6(4)*) for any investment adviser to a pooled investment vehicle to:

(1) Make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; or

(2) Otherwise engage in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

(b) Definition. For purposes of this section "pooled investment vehicle" means any investment company as defined in section 3(a) of the Investment Company Act of 1940 (*15 U.S.C. 80a-3(a)*) or any company that would be an investment company under section 3(a) of that Act but for the exclusion provided from that definition by either section 3(c)(1) or section 3(c)(7) of that Act (*15 U.S.C. 80a-3(c)(1)* or (7)).

## Statutory Authority

*Authority Note Applicable to 17 CFR Ch. II, Pt. 275*

## History

[*72 FR 44756*, 44761, Aug. 9, 2007]

Annotations

## Notes

[EFFECTIVE DATE NOTE:

*72 FR 44756*, 44761, Aug. 9, 2007, added this section, effective Sept. 10, 2007.]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2022 All rights reserved.