# 25-0643-cv

## United States Court of Appeals
### *for the*
## Second Circuit

———◆———

JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT,

*Plaintiffs-Counter-Defendants-Appellees,*

BRIGADE CAPITAL MANAGEMENT, LP,

*Counter-Defendant-Appellee,*

U.S. BANK NATIONAL ASSOCIATION, in its capacity as Trustee,

*Plaintiff,*

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF OF APPELLEES JOSHUA N. TERRY, ACIS CAPITAL MANAGEMENT AND BRIGADE CAPITAL MANAGEMENT, LP

JASON C. HEGT
LATHAM & WATKINS LLP
*Attorneys for Appellee*
  *Brigade Capital Management, LP*
1271 Avenue of the Americas
New York, New York 10020
(212) 906-1200

JONATHAN E. PICKHARDT
WILLIAM B. ADAMS
BLAIR A. ADAMS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
*Attorneys for Appellees*
  *Joshua N. Terry and Acis*
  *Capital Management*
295 Fifth Avenue
New York, New York 10016
(212) 849-7000

CP COUNSEL PRESS    (800) 4-APPEAL • (383526)

– v. –

NEXPOINT DIVERSIFIED REAL ESTATE TRUST,

*Defendant-Counter-Claimant-Appellant,*

NHF TRS, LLC,

*Counter-Claimant-Appellant,*

THE CHARITABLE DONOR ADVISED FUND, L.P., CLO HOLDCO, LTD.,

*Defendants-Counter-Claimants,*

HIGHLAND CLO FUNDING LTD.,

*Counter-Defendant.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Counter-Defendant-Appellee Acis Capital Management, L.P. states that it is a nongovernmental corporate entity that is owned 99.9% by Shorewood Holdings, LLC ("Shorewood Holdings") and 0.1% by Shorewood GP, LLC ("Shorewood GP"). Shorewood Holdings owns 100% of Shorewood GP.  No publicly held corporation holds a direct or indirect ownership interest of 10% or more in Shorewood Holdings.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Counter-Defendant-Appellee Brigade Capital Management, LP ("Brigade") states that it is a nongovernmental entity with no parent corporation.  No other publicly held corporation holds a direct or indirect ownership interest of 10% or more in Brigade.

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................ I

TABLE OF AUTHORITIES ................................................ IV

PRELIMINARY STATEMENT .............................................. 1

COUNTERSTATEMENT OF ISSUES PRESENTED ........................ 3

COUNTERSTATEMENT OF THE CASE .................................... 4

    A.    ACM's Role As Acis 6 CLO's Portfolio Manager ................ 4

    B.    Prior Proceedings ............................................. 7

    C.    The Proceedings Below ........................................ 7

        1.    The Relevant Pleadings ................................... 7

        2.    The District Court's Decision ............................ 9

SUMMARY OF ARGUMENT .............................................. 12

ARGUMENT ............................................................ 15

I.    THE DISTRICT COURT CORRECTLY DISMISSED NEXPOINT'S CLAIM FOR TORTIOUS INTERFERENCE WITH THE NOTE ............. 15

II.    THE DISTRICT COURT CORRECTLY DISMISSED NEXPOINT'S OTHER CLAIMS .................................................. 21

    A.    NexPoint's Remaining Claims Are Derivative And Fail Under Cayman Law ................................................... 22

        1.    The Claims Belong To Acis 6 ............................. 22

        2.    NexPoint Cannot Bring A Derivative Claim As A Matter Of Law ................................................... 27

        3.    NexPoint Failed To Satisfy The Threshold Contemporaneous Ownership Requirement For Bringing A Derivative Claim .................................... 32

    B.    NexPoint Has No Direct Breach of Fiduciary Duty Claim Under Either Cayman Or New York Law .............................. 34

        1.    ACM Is Not A Co- Or Shadow Trustee Of Any Trust ....... 35

2. The "Nature Of The Relationship" Between ACM And NexPoint Does Not Create Any Fiduciary Duties ...................41

3. The Investment Advisers Act Does Not Create A Fiduciary Relationship Between ACM And NexPoint............46

4. Brigade Did Not Owe, Much Less Breach, Any Fiduciary Duty to NexPoint .......................................................51

C. Certification Is Not Appropriate ........................................52

III. NEXPOINT'S CLAIMS FAIL AS A MATTER OF LAW FOR ADDITIONAL REASONS ..........................................................54

CONCLUSION....................................................................................56

CERTIFICATE OF COMPLIANCE....................................................58

CERTIFICATE OF SERVICE .............................................................59

iii

# TABLE OF AUTHORITIES

## Cases

*10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*,
21 F.4th 216 (2d Cir. 2021) ...................................................................54

*In re 305 E. 61st St. Grp. LLC*,
130 F.4th 272 (2d Cir. 2025) ................................................................22

*99 Wall Dev., Inc. v. Consigli & Assocs., LLC*,
238 A.D.3d 502 (1st Dep't 2025) .........................................................55

*Abdulaziz v. McKinsey & Co., Inc.*,
2022 WL 2444925 (2d Cir. July 5, 2022) .............................................56

*ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*,
957 F. Supp. 1308 (S.D.N.Y. 1997) .....................................................25

*Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*,
147 A.D.3d 122 (3d Dep't 2017) ..........................................................22

*In re Acis Cap. Mgmt. L.P.*,
2019 WL 417149 (Bankr. N.D. Tex. Jan. 31, 2019) ), *aff'd*, 604
B.R. 484 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap.
Mgmt., L.P.*, 850 Fed. App'x 302 (5th Cir. 2021) .................................5

*AG Cap. Funding Partners, L.P. v. State Street Bank & Trust Co.*,
11 N.Y.3d 146 (2008) ....................................................................35, 53

*Agudas Chasidei Chabad of U.S. v. Gourary*,
833 F.2d 431 (2d Cir. 1987) .................................................................37

*Alexander & Alexander of New York, Inc. v. Fritzen*,
114 A.D.2d 814 (1st Dep't 1985), *aff'd*, 68 N.Y.2d 968 (1986) ..........33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................34

*Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*,
888 F. Supp. 2d 508 (S.D.N.Y. 2012) ..................................................52

iv

*Bank of N.Y. Mellon, London Branch v. Cart 1, Ltd.*,
    2021 WL 2358695 (S.D.N.Y. Jun. 9, 2021) ........................................20

*BanxCorp v. Costco Wholesale Corp.*,
    723 F. Supp. 2d 596 (S.D.N.Y. 2010) ...............................................44

*In re Bd. of Comm'rs of Washington Park*,
    52 N.Y. 131 (1873) ...........................................................................16

*Beaver v. Beaver*,
    117 N.Y. 421 (1889) .........................................................................37

*Beijing Neu Cloud Oriental Sys. Tech. Co. v. IBM Corp*,
    110 F.4th 106 (2d Cir. 2024) .......................................................20, 32

*Belmont v. MB Inv. Partners*,
    708 F.3d 470 (3d Cir. 2013) ..............................................................49

*Boardman v. Phipps*,
    [1967] 2 A[1]C 46, 47F (U.K.) ........................................................35

*Bogle-Assegai v. Connecticut*,
    470 F.3d 498 (2d Cir. 2006) ..............................................................31

*In re Chappell*,
    25 Misc. 3d 704 (Sur. Ct. 2009) .......................................................35

*City of Harper Woods Emps.' Ret. Sys. v. OlverRet. Sys.*,
    589 F.3d 1292 (D.C. Cir. 2009) ........................................................28

*CooperVision, Inc. v. Intek Integration Techs., Inc.*,
    7 Misc. 3d 592 (N.Y. Sup. Ct. 2005) ................................................18

*CPF Acquisition Co. v. CPF Acquisition Co.*,
    255 A.D.2d 200 (1st Dep't 1998) ......................................................23

*Credit All. Corp. v. Arthur Andersen & Co.*,
    65 N.Y.2d 536 (1985) .......................................................................56

*Dance v. Town of Southampton*,
    95 A.D.2d 442 (2d Dep't 1983) ........................................................48

*Davis v. Scottish Re Grp. Ltd.*,
   160 A.D.3d 114, 116 (1st Dep't 2018) ....................................28, 29, 30

*DiBella v. Hopkins*,
   403 F.3d 102 (2d Cir. 2005) ................................................................53

*Douglass v. Beakley*,
   900 F. Supp. 2d 736 (N.D. Tex. 2012) ..............................................50

*Druck Corp. v. Macro Fund Ltd.*,
   290 Fed. App'x 441 (2d Cir. 2008) ......................................24, 33, 40

*Eccles v. Shamrock Capital Advisors, LLC*,
   42 N.Y.3d 321 (2024) ...................................................................25, 26

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d 162 (S.D.N.Y. 2011) (Sullivan, J.)..........................36

*Ezrasons, Inc. v. Rudd*,
   ___ N.Y.3d ___, 2025 WL 1436000 (May 20, 2025) ......................25

*In re Facebook, Inc., Initial Pub. Offering Deriv. Litig.*,
   797 F.3d 148 (2d Cir. 2015) .........................................................32, 33

*Fazi v. United States*,
   935 F.2d 535 (2d Cir. 1991) ...............................................................48

*Feldman v. CSX Transp., Inc.*,
   31 A.D.3d 698 (2d Dep't 2006) ..........................................................49

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   2020 WL 5057466 (S.D.N.Y. Aug. 27, 2020)....................................27

*Foster v. Churchill*,
   87 N.Y.2d 744 (1996) .........................................................................20

*Funicular Funds, LP v. Pioneer Merger Corp.*,
   700 F. Supp. 3d 49 (S.D.N.Y. 2023) ..................................................34

*Galef v. Alexander*,
   615 F.2d 51 (2d Cir. 1980) .................................................................23

*Goldenson v. Steffens*,
2014 WL 12788001 (D. Me. Mar. 7, 2014) ........................................50

*Goldstein v. S.E.C.*,
451 F.3d 873 (D.C. Cir. 2006)..........................................................47

*Halebian v. Berv*,
590 F.3d 195 (2d Cir. 2009), *abrogated on other grounds by
Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229
(2d Cir. 2015)....................................................................................32

*Hamilton v. Beretta U.S.A. Corp.*,
96 N.Y.2d 222 (2001) .......................................................................56

*HF Mgmt. Servs. LLC v. Pistone*,
34 A.D.3d 82 (1st Dep't 2006) .........................................................49

*Horowitz v. Nat'l Gas & Elec., LLC*,
2018 WL 4572244 (S.D.N.Y. Sept. 24, 2018) ..................................20

*Houbigant, Inc. v. Deloitte & Touche LLP*,
303 A.D.2d 92 (1st Dep't 2003) .......................................................56

*Howe v. Bank of New York Mellon*,
783 F. Supp. 2d 466 (S.D.N.Y. 2011) ........................................27, 44

*IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*,
40 N.Y.3d 277 (2023).......................................................................55

*Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*,
2013 WL 4856199 (S.D.N.Y. Sept. 10, 2013) ..................................16

*Johnson v. Cestone*,
162 A.D.3d 526 (1st Dep't 2018) ......................................................55

*Kobin v. Goodman*,
222 N.Y.S.2d 744 (N.Y. Sup. Ct. 1961).............................................34

*Konikoff v. Prudential Ins. Co. of Am.*,
234 F.3d 92 (2d Cir. 2000) ...............................................................52

*Krys v. Pigott*,
749 F.3d 117 (2d Cir. 2014) ..............................................................52

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) ........................................................................ 15

*Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*,
  28 N.Y.3d 675 (2017) ........................................................................ 19

*Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers,
  AFL-CIO v. United Aircraft Corp.*,
  534 F.2d 422 (2d Cir. 1975) .............................................................. 18

*Lopes v. Rostad*,
  45 N.Y.2d 617 (1978) ..................................................................48, 53

*Madison Sullivan Partners LLC v. PMG Sullivan St., LLC*,
  173 A.D.3d 437 (1st Dep't 2019) ...................................................... 51

*Meckel v. Cont'l Res. Co.*,
  758 F.2d 811 (2d Cir. 1985) .............................................................. 35

*Metro. West Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
  2004 WL 1444868 (S.D.N.Y. June 25, 2004) ...............................42, 43

*Miller v. Brightstar Asia, Ltd.*,
  43 F.4th 112 (2d Cir. 2022) ............................................................... 22

*Mujo v. Jani-King Int'l, Inc.*,
  13 F.4th 204 (2d Cir. 2021) ............................................................... 52

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
  772 F.3d 740 (2d Cir. 2014) .........................................................23, 26

*Nam Tai Elecs., Inc. v. UBS PaineWebber Inc.*,
  46 A.D.3d 486 (1st Dep't 2007) ........................................................ 38

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) ......................................................... 46

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
  620 F. Supp. 3d 36 (S.D.N.Y. 2022) ..........................................7, 36, 40

*NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*,
  80 F.4th 413 (2d Cir. 2023) ........................................................7, 49, 50

*Nisselson v. Waltzer*,
Bankr. LEXIS 1562 (Bankr. S.D.N.Y. May 22, 2008) .......................................27

*Northrop Grumman Info. Tech., Inc. v. United States*,
535 F.3d 1339 (Fed. Cir. 2008) ...................................................................16, 17

*O'Connor v. Soc'y Pass Inc.*,
233 A.D.3d 139 (1st Dep't 2024) ........................................................................18

*Oddo Asset Management v. Barclays Bank PLC*,
19 N.Y.3d 584 (2012) ...............................................................................*passim*

*Oddo Asset Mgmt. v. Barclays Bank PLC*,
36 Misc. 3d 1205(A), 954 N.Y.S.2d 760 (N.Y. Sup. Ct. 2010),
*aff'd*, 84 A.D.3d 692 (1st Dep't 2011), *aff'd*, 19 N.Y.3d 584 (2012) ...............43

*Oneida Indian Nation v. Phillips*,
981 F.3d 157 (2d Cir. 2020) ...............................................................................14

*PepsiCo Puerto Rico, Inc. v. Comm'r*,
104 T.C.M. (CCH) 322 (T.C. 2012) ....................................................................45

*Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*,
2015 WL 2359358 (S.D.N.Y. May 18, 2015) ....................................................33

*R.R. Donnelley & Sons Co. v. Marino*,
505 F. Supp. 3d 194 (W.D.N.Y. 2020).................................................................33

*In re Refco Inc. Sec. Litig.*,
826 F. Supp. 2d 478 (S.D.N.Y. 2011) .................................................................35

*In re Renren, Inc.*,
127 N.Y.S.3d 702 (N.Y. Sup. 2020), *aff'd*, 192 A.D.3d 539 (1st
Dep't 2021) ..........................................................................................................23

*Rowe v. Great Atl. & Pac. Tea Co.*,
46 N.Y.2d 62 (1978) ...........................................................................................17

*Saratoga Advantage Tr. Tech. & Commc'ns Portfolio v. Marvell Tech.
Grp., Ltd.*,
2016 WL 4364593 (N.D. Cal. Aug. 16, 2016) ...................................................31

ix

*Schneider v. Lazard Freres & Co.*,
   159 A.D.2d 291 (1st Dep't 1990) ................................................................42, 43

*SEC v. Capital Gains Research Bureau, Inc.*,
   375 U.S. 180 (1963) ..................................................................................45, 46, 47

*SEC v. Markusen*,
   143 F. Supp. 3d 877 (D. Minn. 2015) ..............................................................50

*Shenwick v. HM Ruby Fund, L.P.*,
   2012 WL 8700419 (N.Y. Sup. Jun. 7, 2012) ...............................................28, 30

*Siemens Energy, Inc. v. Petroleos de Venezuela, S.A.*,
   82 F.4th 144 (2d Cir. 2023) ...............................................................................19

*St. Clair-Hibbard v. Am. Fin. Tr., Inc.*,
   812 Fed. App'x 36 (2d Cir. 2020) .....................................................................26

*Starr Indem. & Liab. Co. v Brightstar Corp.*,
   388 F. Supp. 3d 304 (S.D.N.Y. 2019), *aff'd*, 828 F. App'x 84 (2d
   Cir. 2020) ...........................................................................................................19

*Steadman v. SEC*,
   603 F.2d 1126 (5th Cir. 1979) ..........................................................................49

*Stinner v. Epstein*,
   162 A.D.3d 819 (2d Dep't 2018) .......................................................................35

*Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark,
   Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997) ...........................................................50

*Tolbert v. Queens Coll.*,
   242 F.3d 58 (2d Cir. 2001) ................................................................................38

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
   444 U.S. 11 (1979) ..................................................................................46, 49, 50

*In re Tyco Int'l*,
   340 F. Supp. 2d 94 (D.N.H. 2004) ....................................................................31

*State ex rel. Udall v. Colonial Penn Ins. Co.*,
   812 P.2d 777 (N.M. 1991) .................................................................................50

*Varga v. McGraw Hill Fin. Inc.*,
  2015 WL 4627748 (N.Y. Sup. Ct., 2015) ........................................... 24

*Velez v. Feinstein*,
  87 A.D.2d 309 (1st Dep't 1982) .......................................................... 41

*Wadd v. Hazelton*,
  137 N.Y. 215 (1893) ............................................................................ 37

*White Plains Coat & Apron Co. v. Cintas Corp.*,
  8 N.Y.3d 422 (2007) ............................................................................ 21

*Matter of Will of Rubin*,
  540 N.Y.S.2d 944 (N.Y. Sur. Ct. 1989) ............................................. 36

*William Kaufman Org. v Graham & James LLP*,
  269 A.D.2d 171 (1st Dep't 2000) ....................................................... 56

*Winn v. Schafer*,
  499 F. Supp. 2d 390 (S.D.N.Y. 2007) ................................................ 30

*Wolfson v. Glass*,
  301 A.D.2d 843 (3d Dep't 2003) ......................................................... 50

*In re Wonderwork, Inc.*,
  611 B.R. 169 (Bankr. S.D.N.Y. 2020) ................................................ 51

*XY Plan. Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) ............................................................... 47

*Yoon v. Fordham Univ. Fac. & Admin. Ret. Plan*,
  263 F.3d 196 (2d Cir. 2001) ......................................................... 53, 54

*In re Zohar III, Corp.*,
  2021 WL 3124298 (Bankr. D. Del. July 23, 2021) ............................ 37

*Zohar CDO 2003-1 Ltd. v. Ltd. v. Patriarch Partners, LLC*, 2021 WL
  4460547 (S.D.N.Y. Sept. 29, 2021) .............................................. 24, 29

## **Statutes**

15 U.S.C. § 80b-6 ................................................................... *passim*

15 U.S.C. § 80b-15(b) ................................................................................7

## **Other Authorities**

*Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee or Executor*, 56 A.L.R.3d 1249 § 10 (1974) .....................36

72 Fed. Reg. 44,756, 44,757 (Aug. 9, 2007) ..........................................45

Fed. R. Civ. 12(b)(6)..........................................................................2, 8, 14

Fed. R. Civ. 23.1 .......................................................................8, 13, 32, 33

106 N.Y. Jur. 2d Trusts § 352 ...................................................................36

Restatement (Second) of Trusts § 185(c), (e) (1959) ...............................36

Restatement (Third) of Trusts § 80, cmt...................................................40

Rule 206(4)-(8) ............................................................................45, 46, 48

## PRELIMINARY STATEMENT

This appeal from a final judgment of the U.S. District Court for the Southern District of New York (Woods, *J.*) involves the latest in a series of meritless lawsuits brought by Appellant NexPoint Diversified Real Estate Trust ("NexPoint") and related entities against Appellees Acis Capital Management, L.P. ("ACM"), ACM's sub-advisor Brigade Capital Management, L.P. ("Brigade"), and ACM's co-founder Joshua N. Terry.

NexPoint's allegations concern ACM's purported mismanagement of assets held in a non-party investment fund ACIS CLO 2015-6 Ltd. ("Acis 6"), of which NexPoint holds a portion of the subordinated notes (the "Note"). But rather than further the interests of the fund or other subordinated noteholders, NexPoint's litigious interference has done the opposite: its meritless lawsuits and threats of additional claims have delayed distributions to the Acis 6 subordinated noteholders by forcing the holdback of funds from Acis 6's final distributions in order to be able to cover potential indemnity obligations to ACM, Terry, and Brigade.

This litigation initially began when ACM and others, seeking to avoid any further delay in distributing the funds, sought a declaratory judgment that NexPoint was barred from bringing the claims it has repeatedly brought here and in other lawsuits. In response, NexPoint doubled down on its allegations by asserting the counterclaims against ACM and Terry, and third-party claims against Brigade, that

1

form the basis of this appeal. The district court correctly dismissed each of those claims pursuant to Federal Rule of Civil Procedure 12(b)(6). As to NexPoint's claim that ACM and the others tortiously interfered with one of Acis 6 governing documents—the Note—because it incorporated by reference the indenture between Acis 6 and U.S. Bank National Association ("U.S. Bank" or "Trustee"), as trustee, the district court rightly concluded that the parties nowhere indicated their intent for the indenture to be incorporated.

The district court also correctly concluded that NexPoint's remaining claims for breach of fiduciary duty and aiding and abetting the same, unjust enrichment, negligence, conversion, and declaratory judgment failed as a matter of law because they all relied on a harm to Acis 6. The claims are therefore barred by governing Cayman Islands law, which generally prohibits derivative actions by investors in Cayman companies, subject to narrow exceptions that do not apply here.

The district court also correctly rejected NexPoint's three "theories" of direct fiduciary liability, each of which would broaden NexPoint's rights well beyond those established in the subordinated note's governing documents. *First*, well-established principles of indenture law prevent NexPoint from claiming that the parties implicitly created a trust and vested ACM with "co-trustee" duties alongside the fund's actual trustee, U.S. Bank. *Second*, NexPoint's admitted status as a noteholder precluded it from asserting claims against company fiduciaries. *Third*, Section 206

2

of the Investment Adviser's Act of 1940 (the "IAA")—which NexPoint acknowledges does not create a private right of action—is not somehow actionable under New York law.  And because New York decisions provide clear authority and guidance in the event the Court reaches any issues of New York law, there is no basis to grant NexPoint's alternative request for certification to the New York Court of Appeals.

For these reasons and as more fully explained below, the district court's judgment should be affirmed.

## COUNTERSTATEMENT OF ISSUES PRESENTED

1.    Whether NexPoint failed to state a claim for tortious interference with contract based on conduct allegedly breaching a contract that is mentioned only in passing in the purportedly interfered-with contract.

2.    Whether NexPoint, a subordinated noteholder of a Cayman fund, failed to state claims for common law torts against the fund's investment adviser that are premised on the adviser's mismanagement that allegedly deflated the value of the fund's assets.

3.    Whether NexPoint otherwise failed to state a claim for relief on its non-tortious interference claims.

## COUNTERSTATEMENT OF THE CASE[1]

### A.     ACM's Role As Acis 6 CLO's Portfolio Manager

Collateralized loan obligations ("CLOs") are structured financial transactions in which a special purpose vehicle issues notes to raise capital to purchase debt instruments; the instruments are then pooled and conveyed to an indenture trustee. *See* A9439-42 (¶¶19-28).  The pool both serves as collateral and generates cash flows for the noteholders.  A9439-42.

Acis 6 is an investment fund organized in the Cayman Islands and administered by independent Cayman Island-based directors.  A790-91.  Acis 6 issued notes in a private offering to investors pursuant to an indenture between Acis 6, a co-issuer ACIS CLO 2015-6 LLC, and U.S. Bank, as trustee.  A656-984 (the "Indenture").  Acis 6 repays its noteholders using the interest, principal, and other recoveries it receives from the collateral assets.  A823-24 (§10.2), A844-45 (§11.1).  In addition to the notes, Acis 6 issued common shares to a charitable trust.  *See* A1377.

ACM acts as portfolio manager for Acis 6,  managing Acis 6's assets pursuant to a portfolio management agreement.  *See generally* A985-1036 (the "PMA").  ACM is responsible for "supervis[ing] and direct[ing] the investment and

---

[1]   NexPoint wrongly suggests (Br. 10-11, 30-31, 35-36) that ACM has conceded various allegations against it.  ACM has disputed and continues to dispute that it engaged in any wrongdoing.

reinvestment" of Acis 6's assets.  A991-95 (§3).  ACM has "no obligation" to perform any duties other than those "expressly specified" in the PMA and in certain portions of the Indenture applicable to the portfolio manager.  A992 (§3(c)).  NexPoint is not a party to, nor a third-party beneficiary of, the PMA.  A1023 (§31).

The Indenture governs the rights and obligations of Acis 6, through U.S. Bank as trustee, and noteholders.  Other than during the continuance of an "Event of Default," A761-62 (§5.1), U.S. Bank only owes contractual duties specifically identified in the Indenture; it owes "no implied covenants or obligations."  A775 (§6.1(a)).  Similarly, the Trustee lacks authority to take "any legal action" upon ACM's breach of the PMA "until the occurrence of an Event of Default."  A868 (§15.1(a)).  NexPoint concedes that there has been no Event of Default for Acis 6. A9484 (¶246).

The Indenture provides noteholders with a limited right to institute proceedings regarding the Indenture.  A noteholder may institute proceedings only if, *inter alia*, it has given the Trustee written notice of an Event of Default, garners support of 25% of the controlling class, then requests in writing that the Trustee institute proceedings "in respect of such Event of Default" in its own name, and the Trustee refuses to do so.  A770-71 (§5.8).

ACM was originally majority owned by James Dondero, who functionally controls NexPoint.  *See In re Acis Cap. Mgmt. L.P.*, 2019 WL 417149, *47 n.30

5

(Bankr. N.D. Tex. Jan. 31, 2019), ), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021); A9488-89. A series of disputes between Dondero and Terry (ACM's co-founder), culminated in a bankruptcy court transferring control of ACM to Terry. *Id.* at *4, *7. ACM, with the bankruptcy court's approval, appointed Brigade to act as a sub-advisor to ACM in managing the Acis 6 assets, *id.* at *8, retaining it to assist with certain administrative and "back-and middle-office functions," A9449 (¶¶62, 67). ACM paid Brigade for those services. A9449 (¶¶62, 67). Brigade is not a party to the Indenture, the PMA, or the Note. *See* A656, A985, A918; *see also* A9441-42 (¶28). NexPoint does not allege that it had any relationship or interaction with Brigade.

NexPoint acquired a portion (approximately $7.5 million) of subordinated notes (the "Note") issued by Acis 6 in 2016, A9444-45 (¶46), and then transferred them to its wholly owned subsidiary, NHF TRS LLC ("NHF"), in March 2021, A9445 (¶46.1).[2] The unsecured subordinated notes are the only notes remaining after Acis 6 redeemed the other notes, including the secured notes. A9447 (¶52). NexPoint concedes that it is not a signatory to the Indenture. A9447 (¶51).

---

[2]  Unless necessary for clarity, this brief does not refer to NHF separately from its parent, NexPoint.

### B. Prior Proceedings

NexPoint has engaged in extensive vexatious litigation against ACM since the bankruptcy court transferred ownership of ACM to Terry in 2019. As relevant here, in 2021 NexPoint sued ACM, Terry, Brigade, and U.S. Bank (the "Original Lawsuit"), alleging substantially similar claims to two prior lawsuits brought by an affiliated entity, including various state law claims and a claim under Section 215(b) of the IAA. *See* 15 U.S.C. § 80b-15(b). The district court dismissed the IAA claim, ruling that NexPoint failed to allege that any contract was illegally made or required illegal performance, as the IAA required. *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 620 F. Supp. 3d 36, 46 (S.D.N.Y. 2022). The court declined to exercise supplemental jurisdiction over NexPoint's remaining state law claims and thus dismissed the complaint in its entirety. *Id.* at 49-50. This Court affirmed. *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 422 (2d Cir. 2023).

### C. The Proceedings Below

#### 1. The Relevant Pleadings

To stop NexPoint's repeated attempts to relitigate frivolous issues and to free up funds for payment to subordinated noteholders, ACM and Terry brought this action against NexPoint, DAF, and CLO HoldCo, Ltd. in 2021. *See* A56-79. Terry and ACM sought a declaration, as relevant here, that NexPoint lacked standing to bring claims as alleged in the Original Lawsuit. ACM and Terry explained that the

7

liquidation of the Acis 6 proceeds generated enough funds to make significant payments to the subordinated noteholders. But NexPoint's litigious conduct has prevented any payout, as the fund needed to retain enough liquidity to cover any potential indemnification obligations. A71-72.

After the court denied NexPoint's motion to dismiss, A1051-83, NexPoint filed an answer and asserted counterclaims against ACM and Terry, and third-party claims against Brigade—again, alleging that they mismanaged Acis 6's assets. A597-655. ACM, Terry, and Brigade moved to dismiss them in full pursuant to Rule 12(b)(6); ACM and Terry also moved for judgement on the pleadings as to their claims. *See* Dkt. 107. After briefing was complete but before the court issued its decision, NexPoint admitted that it transferred its Note to its wholly owned subsidiary, NHF, before it brought the Original Lawsuit. A9445 (¶46.1).

As relevant here, the parties stipulated that NexPoint would file an amended pleading adding NHF as a defendant and counter-plaintiff. A9512-17. They also agreed to treat the pending motions as operative and applicable to NHF. A9512-17. Each also submitted supplemental briefing related solely to the issue of contemporaneous ownership under Federal Rule of Civil Procedure 23.1. A9514-15. The district court, in accepting the parties' stipulation, explained that NexPoint and NHF agreed that NexPoint's admissions from its initial (and only) answer were equally binding on NHF. SPA3 n.4.

8

As reiterated in its amended pleading, NexPoint, now together with NHF, asserts claims for (1) breach of "fiduciary and other duties with respect to the management of" Acis 6, (2) negligence and/or gross negligence; (3) conversion; (4) unjust enrichment, assumpsit, or money had and received; (5) tortious interference with the Note; and (6) a declaratory judgment regarding its rights under the Note. A9435, A9477-82.   They also allege that Terry and Brigade aided and abetted ACM's breaches.  A9481-82.

### 2.    The District Court's Decision

The district court denied the motion for judgment on the pleadings but granted the motions to dismiss.  SPA45.  In a carefully reasoned and exhaustively detailed opinion, the court rejected each of NexPoint's claims.

*First*, the court ruled that NexPoint's tortious interference claim failed as a matter of law.  The Note merely required Acis 6 to pay out proceeds pursuant to the priority outlined in the Indenture, something NexPoint never alleged Acis 6 failed to do.  SPA23-24.[3]  Further, "the Note's mere reference to the Indenture [was] not sufficient to confer upon noteholders the right to enforce duties prescribed by the

---

[3]  The court also stated that NexPoint's other purported tortious interference theories failed because, *inter alia*, NexPoint did not dispute ACM's assertion that the Note itself was not breached because it merely requires Acis 6 to distribute available proceeds pursuant to the priority; NexPoint was not a party to the PMA; and NexPoint could not amend its pleadings by alleging a breach of the Indenture directly in their briefing.  SPA22 n.12; SPA23-25.

Indenture," such that NexPoint's allegation that the Indenture was breached does not suffice to adequately allege that the Note was breached. SPA23. The court explained that when the drafters of Acis 6's governing documents wanted to incorporate documents by reference, they did so explicitly. SPA24 n.13.

*Second*, the court dismissed NexPoint's remaining claims for lack of standing. SPA25-38. Under New York's choice-of-law principles, Cayman law applied to determine whether NexPoint's common law claims were direct or derivative because Acis 6 was incorporated in and conducted business through directors located in the Cayman Islands. SPA25-26.

Applying Cayman law, the court concluded that NexPoint's remaining claims were derivative. SPA27. NexPoint's allegations centered on alleged mismanagement of the Acis 6 funds; the "harm" it purportedly suffered was reduced net proceeds flowing from the monetization of Acis 6's assets. SPA27. Acis 6 suffered those purported harms; NexPoint was harmed, if at all, only indirectly. SPA27.

The court next determined that Cayman law barred NexPoint from bringing these derivative claims. SPA27. Cayman law only allows derivative suits by shareholders; it does not permit NexPoint, as a creditor, to bring claims derivatively on behalf of Acis 6. SPA27. The court also rejected NexPoint's argument that its notes were "essentially equity" (therefore possibly allowing a derivative suit),

because NexPoint could not simply change its investment instrument from a debt security by labeling the Note as equity in its pleadings, in contradiction of the terms of the Indenture.  SPA27-28 n.17.

The court further ruled that, even if the Note was equity, NexPoint's claims still failed as a matter of law because NexPoint had not adequately alleged that it fell within any of the narrow exceptions to the general bar on derivative shareholder suits under Cayman law.  SPA28-29.  The only two exceptions NexPoint asserted— personal rights and fraud on the minority—were inapplicable.  SPA29-30.

The court next ruled that even if NexPoint had derivative standing, any claims would still be barred under the PMA and Indenture because U.S. Bank, as trustee, was the only party granted Acis 6's rights to sue under the PMA and could do so only in the Event of Default.  SPA30.

The court also rejected NexPoint's arguments that that it had a direct fiduciary relationship with ACM under New York law.  For one, nothing in the Indenture indicates that the parties intended to make ACM a co-trustee along with U.S. Bank; on the contrary, the PMA expressly disavows any such relationship.  SPA31-35.  Relying on *Oddo Asset Management v. Barclays Bank PLC*, 19 N.Y.3d 584 (2012), the court next concluded that NexPoint was a noteholder, not a shareholder, and that New York law does not recognize a fiduciary duty running from ACM as manager to NexPoint as noteholder.  SPA35-36.  The court lastly rejected NexPoint's

11

argument that the IAA was actionable under New York law, explaining that the IAA does not confer a private right of action, and any duties ACM owed under the IAA were owed to Acis 6 as the client, not NexPoint. SPA36-38.

*Finally*, the district court ruled that NexPoint's unjust enrichment claim was additionally barred by the existence of a valid contract governing the scope of NexPoint's dispute; its conversion claim was additionally barred because it was predicated on a breach of contract; and its negligence claim was additionally barred by the economic loss doctrine. SPA39-43.

The court subsequently granted the parties' stipulated dismissals of the remaining claims, Dkt. 299; A9518-21, allowing for this appeal of the earlier dismissal of NexPoint's claims against ACM, Brigade and Terry.

## SUMMARY OF ARGUMENT

The district court correctly ruled that NexPoint failed to state any claim against ACM, Brigade, or Terry. As the court rightly concluded, NexPoint's tortious interference claim fails as a matter of law because NexPoint does not allege that Acis 6 breached the Note, and the Note does not incorporate by reference the Indenture. Although the Note acknowledges the Indenture, that acknowledgement is just background information on the transaction and thus is insufficient to show the parties' intent to incorporate. This is particularly so given that Acis 6's governing

12

documents use explicit language to incorporate documents by reference in other places.

The district court also correctly dismissed NexPoint's remaining claims because they properly belong to Acis 6. NexPoint pled its non-tortious interference claims as premised on harm to Acis 6, a Cayman entity, alleging that ACM's "mismanagement" depreciated Acis 6's value. Under governing Cayman law, these claims can only be asserted derivatively. Cayman law would not recognize subordinated debt like the Note as shares and, in any event, NexPoint has failed to plead any of the narrow exceptions to the general prohibition on derivative lawsuits under Cayman law. In addition, NexPoint's derivative claims were properly dismissed because NexPoint failed to allege contemporaneous ownership as required under Federal Rule of Civil Procedure 23.1 and because NHF could not bring a claim when, as here, the alleged wrongdoing predated its acquisition of the Note.

NexPoint's various attempts to manufacture direct fiduciary duty claims under Cayman and New York law also fail. *First*, the district court correctly ruled that the parties did not intend to create any common law trust, nor did they intend to vest ACM with any trustee-status or fiduciary duties. On the contrary, Acis 6's governing documents reflect that the parties clearly did *not* intend to impose any such duties or status. This plain language, plus the absence of any allegation that NexPoint had a contractual relationship or direct dealings with ACM, precludes

13

NexPoint's common law trust theory. *Second*, the nature of the relationship between ACM and NexPoint does not support a claim for breach of fiduciary duty. New York law is clear that managers like ACM do not owe fiduciary duties to noteholders like NexPoint, particularly where, as here, the parties did not intend to create a relationship of heightened trust, a conclusion unchanged by NexPoint's assertion that its Note is "essentially" equity. *Third*, the court correctly rejected NexPoint's attempt to incorporate violations of the IAA—a federal statute not enforceable by private right of action—into New York common law, or vice versa. Because the IAA's fiduciary-duty protections run only from investment advisers to their clients (and not to investors in an investment-fund client), there is no basis to graft the IAA into common law. Guided by existing New York precedent, there is also no need to further prolong this litigation and certify NexPoint's suggested questions to the New York Court of Appeals.

Finally, NexPoint's non-tortious interference claims were properly dismissed for additional reasons, supported by both the district court's decision and the record.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision to grant a motion to dismiss a claim under Federal Rule of Civil Procedure 12(b)(6). *See Oneida Indian Nation v. Phillips*, 981 F.3d 157, 165 (2d Cir. 2020).

14

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DISMISSED NEXPOINT'S CLAIM FOR TORTIOUS INTERFERENCE WITH THE NOTE

Under New York law, a party asserting a claim for tortious interference with contract must plead "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).[4]  The district court correctly dismissed NexPoint's tortious interference claim because it failed to allege an underlying breach of contract.  SPA22-25.

NexPoint maintains that ACM tortiously interfered with the Note but fails to allege ACM breached it.  The Note only obligates Acis 6 to pay out proceeds according to the Indenture's priority structure (A918); NexPoint never alleges any payments were made out of order (A9434-86).

NexPoint tries to circumvent Acis 6's limited obligations under the Note by arguing (Br. 16-19), as it did below, that the Note incorporates the entirety (or some unspecified subset of alleged noteholder rights and duties) of the Indenture, and it

---

[4]    NexPoint incorrectly states (Br. 16) that the district court "identified no shortcomings" in its pleading of the remaining elements of a tortious interference claim.  The court only acknowledged that NexPoint had argued those points. SPA22-25.

may therefore sue for breach of the Indenture's investment criteria provisions. That the Note may reference the Indenture, however, is inadequate under New York law.

In addition to identifying the document to be incorporated, a contract must also reference the would-be incorporated document "in a manner and by words indicating an intent to make it a part of the instrument, that affects the incorporation of it for all purposes." *In re Bd. of Comm'rs of Washington Park*, 52 N.Y. 131, 134 (1873). Nothing in the Note's passing acknowledgement of some of the parties' rights and duties under the Indenture vis-à-vis Acis 6 indicates a clear intention to incorporate them into the Note. *See, e.g.*, *Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, 2013 WL 4856199, *3 (S.D.N.Y. Sept. 10, 2013) (requiring under New York law language that "clearly communicate[s] that the purpose of the reference is to incorporate the referenced material into the contract[,] rather than merely to acknowledge that the referenced material is relevant to the contract, *e.g.*, as background law." (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1345 (Fed. Cir. 2008))).

Indeed, where the drafters of Acis 6's governing documents wanted to explicitly incorporate by reference certain documents, they did so expressly. *See* A1268 ("This Offering Circular … *incorporate[s] by reference*[] the provisions of the actual [governing] documents …" including the Indenture.) (emphasis added); A1366 (ACM's "Form ADV … is *incorporated by reference* hereto.") (emphasis

16

added); *see also* A920 ("*As provided in the Indenture*, … the Notes *shall be construed* in accordance with … the laws of the State of New York.") (emphasis added). Absent a clear indication that the parties intended to incorporate the Indenture where so mentioned, the district court rightly declined to "interpret [the Indenture] as impliedly stating something which the parties have neglected to specifically include." *See Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72 (1978). NexPoint offers no reason that a passing reference to making payments in accordance with the Indenture was intended to confer on every noteholder the right to bring claims on the many topics covered in the Indenture.

None of NexPoint's arguments urging reversal is availing. For one, NexPoint misconstrues (Br. 17) *Northrop Grumman*'s holding. Although the court there observed that the terms and conditions of the parties' contract did not explicitly refer to the document the plaintiff alleged it incorporated by reference, the court also held that the plaintiff's claim would fail even with an explicit reference because passing observations about the existence of some relevant information would not suffice to "clearly *incorporate* the referenced material." 535 F.3d at 1347. The court reasoned that, had the parties intended to incorporate this language, "they would have explicitly so provided." *Id.* (internal quotation marks omitted). Such is the case here. *See supra*, at 16-17. For the same reason, contrary to NexPoint's contention (Br. 17), the Note's mention of the Indenture more than once is not a clear expression

17

that the parties intended those references to also incorporate the Indenture's terms into the Note.

Nor is NexPoint correct to contend (Br. 18) that a "physical annexing" of one document to another is sufficient to demonstrate an intent to incorporate by reference. Under New York law, "[t]he mere fact that [one document] is appended to [another] is insufficient, standing alone, to demonstrate incorporation," *O'Connor v. Soc'y Pass Inc.*, 233 A.D.3d 139, 146 (1st Dep't 2024); there must also be "contractual language indicating a clear and unequivocal intent to incorporate and integrate" the appended document, *id.*

For the same reasons, NexPoint's argument (Br. 19-20) that the Note need not use the exact phrase "incorporate by reference" to achieve this purpose is misplaced. Although there are no magic words under New York law, there must still be adequate indication in the contract's language to evidence the parties' intent to be bound by the incorporated document. *See, e.g.*, *CooperVision, Inc. v. Intek Integration Techs., Inc.*, 7 Misc. 3d 592, 601 (N.Y. Sup. Ct. 2005) ("Strike Settlement Agreements (cannot) be read as incorporating by reference all relevant provisions of the collective bargaining contracts negotiated concurrently with them [because h]ad that been the desire of the contracting parties, they could have done so expressly.") (quoting *Lodges 743 & 1746, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Aircraft Corp.*, 534 F.2d 422, 441 (2d Cir. 1975)); *O'Connor*, 233

18

A.D.3d at 146 ("No particular mode of reference is necessary for that purpose; any language which indicates the intent that the two shall make one instrument … is sufficient.") (quoting *Starr Indem. & Liab. Co. v Brightstar Corp.*, 388 F. Supp. 3d 304, 341 (S.D.N.Y. 2019), *aff'd*, 828 F. App'x 84 (2d Cir. 2020) (alteration omitted)). Here, there are multiple instances where the parties used phrasing like "incorporate by reference" or "shall have the meaning set forth in the Indenture." A920, A5548, A5656. The parties' intent to incorporate in those circumstances is clear. But that or similar language is absent where the Note mentions the Indenture, confirming the parties did not intend to incorporate it by reference.

Finally, NexPoint argues (Br. 20-21) for the first time on appeal that declining to treat the Note as incorporating the Indenture's rights and obligations would render the Note illusory. NexPoint forfeited that argument by not raising it below. *See, e.g.*, *Siemens Energy, Inc. v. Petroleos de Venezuela, S.A.*, 82 F.4th 144, 160 (2d Cir. 2023). Regardless, the Note is not illusory. "[A]n illusory contract—that is, an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation—is unenforceable." *Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (2017) (cleaned up). The Note *does* impose an obligation—Acis 6 is required to distribute proceeds in accordance with the Indenture's priority of payments. *See* A918. That NexPoint

19

may be frustrated with the scope of the Note's rights and obligations does not negate the Note's terms—the same terms NexPoint knowingly and voluntarily entered into.

In all events, this Court may affirm for two additional reasons supported by the record. *See, e.g.*, *Beijing Neu Cloud Oriental Sys. Tech. Co. v. IBM Corp*, 110 F.4th 106, 113 (2d Cir. 2024). *First*, the conduct NexPoint alleges as forming the basis for the breach of the Indenture—identifying assets to be bought and sold, executing trades, and purportedly inflating the amount of expenses and fees ACM is owed, A9481 (¶229)—is not proscribed by the Indenture. It is conduct governed by the PMA itself to which NexPoint is neither a party nor a third-party beneficiary, A987; A1023, and therefore cannot support a breach of the Note via the Indenture.

*Second*, NexPoint's tortious interference claim is barred by the economic interest doctrine. Under that doctrine, a tortious interference claim is unavailable against a party seeking "to protect an economic interest in the breaching party's business" absent "a showing that defendant acted maliciously, fraudulently, or illegally." *Horowitz v. Nat'l Gas & Elec., LLC*, 2018 WL 4572244, *6 (S.D.N.Y. Sept. 24, 2018) (applying New York law); *see Foster v. Churchill*, 87 N.Y.2d 744, 750 (1996) ("[E]conomic interest is a defense to an action for tortious interference with a contract unless there is a showing of malice or illegality."). The doctrine applies here because, as Acis 6's portfolio manager, ACM has both a legal and financial interest in Acis 6's business. *See Bank of N.Y. Mellon, London Branch v.*

20

*Cart 1, Ltd.*, 2021 WL 2358695, *4 (S.D.N.Y. Jun. 9, 2021) (dismissing tortious interference claim against defendant that acted to protect its "legal and financial interest in [indenture trustee's] proper management of [special purpose vehicle's] funds"); *White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007) (observing that economic interest defense has been applied where, *inter alia*, "the defendant had a managerial contract with the breaching party at the time defendant induced the breach of contract with plaintiff"). Because NexPoint has failed to present any non-conclusory allegations of fraud, malice, or illegality, the Court may affirm on this basis too.

## II.  THE DISTRICT COURT CORRECTLY DISMISSED NEXPOINT'S OTHER CLAIMS

NexPoint also seeks to pursue claims for breach of fiduciary duty, negligence, conversion, and aiding and abetting based on ACM's purported mismanagement of the Acis 6 assets and the assets' resulting decrease in value. If these claims exist at all, they belong to Acis 6, and NexPoint could only pursue them derivatively. But governing Cayman law generally prohibits derivative actions by investors in Cayman companies, subject to narrow exceptions not applicable here. Thus, as the district court correctly ruled, those claims fail as a matter of law. SPA25-26.[5]

---

[5]  Although whether a claim is direct or derivative is often referred to as an issue of "standing," this Court has made clear that "the inquiry into whether a claim is direct, and a plaintiff therefore has 'standing' to bring it, is not an Article III standing

Seeking to avoid that prohibition, NexPoint labels its claims as direct, asserting that ACM's mismanagement injured it directly, because ACM breached a purported fiduciary relationship that ran from ACM to NexPoint itself. The district court was also correct to conclude that none of NexPoint's three theories supports the existence of a fiduciary relationship between NexPoint and ACM and that its other claims likewise could not be brought directly. SPA30-38.[6]

## A. NexPoint's Remaining Claims Are Derivative And Fail Under Cayman Law

### 1. The Claims Belong To Acis 6

NexPoint cannot bring its non-tortious interference claims because those claims properly belong to Acis 6. NexPoint's own pleadings demonstrate the derivative nature of its claims. Its allegations revolve around injuries allegedly suffered by Acis 6: that ACM "breach[ed] fiduciary and other duties with respect to

inquiry"—it is a merits issue. *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 125-26 (2d Cir. 2022).

[6] NexPoint does not meaningfully address the district court's conclusion that it lacked standing under Cayman law to bring its negligence, conversion, or unjust enrichment claims. SPA39-43. Further, even if NexPoint were correct that New York law applied, those claims could still be pursued only derivatively. *See, e.g.*, *Accredited Aides Plus, Inc. v. Program Risk Mgmt., Inc.*, 147 A.D.3d 122, 133 (3d Dep't 2017) ("[C]onversion, unjust enrichment, … [and] negligence [claims] … are derivative" because they "are limited to allegations of harm caused to the trust by alleged mismanagement") (New York law); *In re 305 E. 61st St. Grp. LLC*, 130 F.4th 272, 280 (2d Cir. 2025) (fiduciary duty claim was derivative under New York law). NexPoint does not argue that it is entitled to bring any derivative claims under New York law. This Court may affirm dismissal of those claims on these grounds alone.

the management of" Acis 6, A9435; "[k]nowingly charged [Acis 6] exorbitant amounts of 'expenses' without accountability or justification," A9346 (¶3); "[k]nowingly caused [Acis 6]to purchase loans" that failed to satisfy certain quality control tests, causing Acis 6 to "suffer substantial losses," A9436, A9458 (¶¶3, 111); and "[k]nowingly caused [Acis 6] to sell valuable assets cheaply," A9436 (¶3). ACM thereby allegedly "wiped out millions in value from" Acis 6 and "severely and adversely impacted" Acis 6. A9437, A9450 (¶¶4, 66).

Cayman law—which governs the classification of claims as direct or derivative here given that Acis 6 is a Cayman Island investment fund[7]—confirms the derivative nature of NexPoint's non-tortious interference claims. "In assessing whether a claim is derivative, Cayman Islands law looks to whether the shareholder's loss is merely a reflection of the loss suffered by the company and would be made good if the company enforced its full rights against the party

---

[7] *See, e.g.*, *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, 772 F.3d 740, 743 n.2 (2d Cir. 2014) (holding that corporation's place of incorporation provides governing law regarding its internal affairs, including "whether a claim is direct or derivative") (citing *Galef v. Alexander,* 615 F.2d 51, 58 (2d Cir. 1980)); *CPF Acquisition Co. v. CPF Acquisition Co*., 255 A.D.2d 200, 200 (1st Dep't 1998) ("Plaintiff's standing to sue [derivatively] is governed by … [the] State of the subject corporation's incorporation."); *In re Renren, Inc.*, 127 N.Y.S.3d 702, *24 (N.Y. Sup. 2020), *aff'd*, 192 A.D.3d 539 (1st Dep't 2021) ("Pursuant to the internal affairs doctrine, New York courts look to the substantive law of the place of incorporation to determine whether a plaintiff has standing to bring a derivative suit on behalf of a corporation.").

responsible." *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, 2021 WL 4460547, *11 (S.D.N.Y. Sept. 29, 2021) (internal citations and quotations omitted); *see, e.g.*, V*arga v. McGraw Hill Fin. Inc.*, 2015 WL 4627748, *14 (N.Y. Sup. Ct., 2015) ("Under Cayman law, shareholders may not recover 'reflective losses,' which are losses that the company itself could recover if it chose to initiate legal action."); *accord* A2550-57; A6159.

Such is the case here. As described above, NexPoint's non-tortious interference claims are all predicated on an alleged injury to Acis 6 caused by ACM's alleged mismanagement. The direct harm is therefore done to Acis 6; any harm NexPoint suffers exists only through a diminution in the value of its investment. NexPoint is thus damaged only by virtue of its investment in Acis 6; its claims are quintessentially derivative. *See, e.g.*, *Zohar CDO*, 2021 WL 4460547, at *12 (fiduciary claims brought by CLO noteholder and preference shareholder are derivative because "any loss caused … would be suffered by the [CLO] Funds and the [investors] would only suffer a loss as a result of the [CLO] Funds' loss"). As this Court has emphasized, "[u]nder the law of the Cayman Islands … claims based on breach of fiduciary duty, corporate mismanagement or third party action that result in the diminution of share value belong to the corporation and can only be brought by it or a shareholder suing derivatively." *Druck Corp. v. Macro Fund Ltd*.,

24

290 Fed. App'x 441, 444 (2d Cir. 2008) (summary order) (quoting *ABF Cap. Mgmt. v. Askin Cap. Mgmt., L.P.*, 957 F. Supp. 1308, 1332 (S.D.N.Y. 1997)).

NexPoint wrongly argues (Br. 23 n.39) that Cayman law is inapplicable because NexPoint is not a "shareholder" or "even *technically* a beneficial owner of the Issuer." Contrary to NexPoint's assertion, the New York Court of Appeals' recent decision in *Eccles v. Shamrock Capital Advisors, LLC*, 42 N.Y.3d 321 (2024), does not support its view that the internal affairs doctrine (and therefore Cayman law) is inapplicable here. *Eccles* includes a non-exhaustive list of issues implicating the internal affairs doctrine, including "the relationship between shareholders and directors." *Id.* at 338-39 (internal quotation marks omitted). *Eccles* nowhere suggests, let alone holds, that the internal affairs doctrine no longer extends to the classification of direct versus derivative claims—a determination that turns in substantial part on the nature of the injury for which a party is seeking relief. Indeed, as the Court of Appeals recently reaffirmed, "[w]hether a particular stakeholder is authorized to represent the company … is a question that plainly implicates corporate rights and internal relationships." *Ezrasons, Inc. v. Rudd*, ___ N.Y.3d ___, 2025 WL 1436000 (May 20, 2025). NexPoint's non-shareholder status simply does not negate that its claims rest on supposed injuries to Acis 6, and thus are properly governed by the Cayman law under which Acis 6 is organized. *See supra*, at 23 n. 7.

25

Further, NexPoint does not even attempt to explain how it could bring claims on behalf of ACM against Terry and Brigade. NexPoint does not allege that Terry and Brigade have any direct relationship with Acis 6. To the contrary, NexPoint alleges that they are both affiliated with ACM, A9448 (¶¶57-58), but does not allege how Acis 6 could pursue claims directly against them or how NexPoint can have "double derivative" standing to pursue claims that ACM might have against Terry and Brigade.

Finally, contrary to NexPoint's footnoted argument (Br. 23 n.39), the district court properly ruled that NexPoint cannot avoid Cayman law because the parties supposedly "agreed" to be subject to New York law instead. SPA26 n.14. The governing documents' choice-of-law provisions do not apply to the "threshold issue" of NexPoint's ability to sue. *St. Clair-Hibbard v. Am. Fin. Tr., Inc.*, 812 Fed. App'x 36, 40 n.1 (2d Cir. 2020) (summary order) (citing *NAF*, 772 F.3d at 743 n.2). NexPoint also fails to identify (Br. 23-24 n.39) any connection to New York other than the Indenture's choice-of-law provision. *Cf. Eccles*, 42 N.Y.3d at 339 (requiring party to demonstrate that "New York has a dominant interest in applying its own substantive law" to override presumption that internal affairs doctrine applies).

26

### 2. NexPoint Cannot Bring A Derivative Claim As A Matter Of Law

NexPoint's claims are barred under Cayman law, which permits only shareholders to bring derivative claims—and then in only certain limited circumstances. A2551 (¶38) ("[A] creditor does not have the right to bring a derivative claim to enforce the company's rights."); *see* A2250-64 (¶¶32-78)(similar).[8] As the district court correctly concluded, NexPoint's characterization (Br. 46) of its position in Acis 6 as "tantamount to an equity holder" (a point undercut by NexPoint's concession that it is *not* a shareholder) is irrelevant because Cayman law does not recognize subordinated debt as shares. *See* A2550, A2552-54; *see also Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 475-76 (S.D.N.Y. 2011) (rejecting argument that noteholders in Cayman fund "morph[ed] into an equity interest for the purposes of derivative standing"). Because Cayman law places a heavy emphasis on privity of contract and on official records of a company's relationship with creditors, Cayman courts would not permit creditors to

---

[8]     Because Cayman law governs, NexPoint's reliance (Br. 46-47) on cases describing actual (not effective) equity holders under New York law is misplaced. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 5057466, *8 (S.D.N.Y. Aug. 27, 2020) ("In broadest form, [a CDO] issues notes *and shares* to investors … The cash flow is distributed to the investors in a waterfall with the most senior generally paid first and the most junior (*or* those holding equity) paid last.") (emphasis added); *id.* at *10-11 (distinguishing between equity investors and tranched debt investors); *Nisselson v. Waltzer*, Bankr. LEXIS 1562, *7 (Bankr. S.D.N.Y. May 22, 2008) (same).

27

recharacterize themselves as shareholders in order to take advantage of the unique derivative rights available to shareholders. A2552-54.

NexPoint's expert's opinion that Cayman courts would permit NexPoint to pursue derivative claims is contrary to Cayman law. *Contra* Br. 46-47. Cayman courts have adopted the U.K. Supreme Court's holding that creditors cannot sue derivatively, A2599-2681; A2685; *see* A2550-52; A6151-52. And to the extent NexPoint seeks (Br. 47 n.60) to maintain a derivative claim by analogizing Acis 6 to an insolvent company, that theory also fails; an insolvent company's creditors likewise cannot sue derivatively. A2948; A6149-52.

Even if NexPoint's interest could be considered equity such that it is the *type* of party that could bring a derivative claim under Cayman law, NexPoint still has failed to meet its burden of showing it is entitled to do so under the circumstances here. *See City of Harper Woods Emps.' Ret. Sys. v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009) (noting that, under English law, the shareholder asserting derivative claims must show that he is entitled to do so); *Shenwick v. HM Ruby Fund, L.P.*, 2012 WL 8700419 (N.Y. Sup. Jun. 7, 2012) (concluding that Cayman law follows English law with respect to derivative standing). Under Cayman law, "a shareholder is not permitted to bring a derivative action," subject to "narrow exceptions," only two of which NexPoint relies on: where conduct (1) "infringed on the shareholder's personal rights" or (2) "qualifies as a fraud on the minority." *Davis v. Scottish Re*

28

*Grp. Ltd.*, 160 A.D.3d 114, 116 (1st Dep't 2018) (applying Cayman law and *Foss v. Harbottle*, 67 Eng. Rep. 189, 2 Hare 461 (1843)). As the district court correctly ruled (SPA28-31), NexPoint failed to adequately allege either exception.

In order to plead the fraud-on-the-minority exception, NexPoint needed to have alleged that ACM "controlled a majority of the stock with voting rights" and "committed fraud." *Davis*, 160 A.D. at 116. NexPoint seemingly faults (Br. 50-51) the district court for failing to consider whether ACM acquired "de facto" control of Acis 6's voting shares. But the court rejected that ACM had *de facto* control of Acis 6's voting shares when it concluded NexPoint failed to plead that ACM "control[s] the majority of the Acis 6 voting securities." SPA29 (citing *Davis*, 160 A.D.3d at 116); *see Davis*, 160 A.D.3d at 116 ("[P]laintiff must plead and prove that the alleged wrongdoers controlled a majority of the stock with voting rights …. Control may be sufficiently pleaded by showing that the wrongdoers own a majority of the corporation's voting shares *or have acquired de facto control of those voting shares*.") (emphasis added; internal citations omitted).

In any event, NexPoint's conclusory assertion that it adequately alleged *de facto* control is insufficient. *See* Br. 50 (stating only that control rests with "ACM (as day to day manager) via the [PMA]") (quoting A5930 (¶45)); *see also Zohar CDO*, 2021 WL 4460547, at *13 (ruling fraud-on-the minority exception "meritless" where CDO investor failed to allege that collateral manager controlled majority of

29

CDO voting shares.) NexPoint's barebones references to *de facto* control generally, unsupported by "a single factual allegation," do not plausibly allege that ACM exercised the specific control over voting shares as required by the exception. *Davis*, 160 A.D.3d at 117.

NexPoint also failed to plead fraud. To plead fraud, NexPoint must allege that ACM "obtained a personal benefit at the company's expense" "as a result of [its] wrongful conduct." *Shenwick*, 106 A.D.3d at 639 (applying Cayman law). NexPoint admits (Br. 50) that the only basis on which it claims fraud is that ACM allegedly caused the Acis 6 assets to be "artificially inflated," which then allegedly created artificially high fees for ACM. But this runs directly counter to Cayman law. *Shenwick*, 106 A.D.3d at 639. An allegation that the fund manager "artificially inflat[ed] the fund's net asset value so they would receive higher compensation" cannot satisfy the fraud requirement because there is no allegation that this inflation "resulted in compensation beyond the normal emoluments of office, or came, in some special way, at the expense of shareholders." *Id.*; *see Winn v. Schafer*, 499 F. Supp. 2d 390, 398 (S.D.N.Y. 2007) (allegations of entrenchment by directors, without allegations of "additional benefits … beyond the normal emoluments of office" are "precisely the type of allegations that were found to be insufficient in *Tyco* [applying English law] and which are consistently found to be insufficient to prove director self-interest in the analogous context of derivative actions applying

30

American law") (applying Cayman law); *In re Tyco Int'l*, 340 F. Supp. 2d 94, 100 (D.N.H. 2004) (same).

NexPoint also maintains for the first time (Br. 49 n.67) that the personal rights exception is more appropriately characterized as a preservation of direct claims that are unavailable to the corporation. *See* Dkt. 107 at 34 (ACM describing personal rights exception as exclusion that preserves direct claims); Dkt. 139 at 29 (NexPoint relying only "specific right granted under statute"); SPA27 ("NexPoint does not assert direct standing for its claims under Cayman Islands law."). Having argued otherwise below, NexPoint has waived this argument. *See, e.g., Bogle-Assegai v. Connecticut,* 470 F.3d 498, 505 (2d Cir. 2006). But even if it is not waived, it fails on the merits because NexPoint's claims are predicated on wrongs to Acis 6; it has no claim of its own to bring. *Saratoga Advantage Tr. Tech. & Commc'ns Portfolio v. Marvell Tech. Grp., Ltd.*, 2016 WL 4364593, *4 (N.D. Cal. Aug. 16, 2016) (applying Bermuda law and *Foss* to conclude personal rights exception is unavailable to investor claim based on lost equity value). And, to the extent NexPoint maintains that this exception is applicable for the same reasons it purportedly may bring a direct claim under Cayman law, this argument fails for the reasons stated below. *See infra*, at II.B.

Finally, as the district court observed and NexPoint does not challenge on appeal, NexPoint's derivative claims are barred under the terms of the Indenture and

PMA. SPA30. The trustee, as assignee and the exclusive holder of Acis 6's right to pursue claims against ACM for breach of its obligations under the PMA, may do so only during an "event of default." A868 (§15.1(a)). It is undisputed that no Event of Default has occurred. Thus, there is no claim that NexPoint could pursue even if it somehow had the right to bring claims that belong to the trustee on Acis 6's behalf. Dismissal of the non-tortious interference claims may be affirmed on this basis alone.

### 3. NexPoint Failed To Satisfy The Threshold Contemporaneous Ownership Requirement For Bringing A Derivative Claim

In all events, this Court may affirm the dismissal of the non-tortious interference claims because NexPoint failed to allege contemporaneous ownership as required by Federal Rule of Civil Procedure 23.1. Because Rule 23.1 is a "procedural" pleading standard, it applies to all derivative claims in federal court. *In re Facebook, Inc., Initial Pub. Offering Deriv. Litig.*, 797 F.3d 148, 158 (2d Cir. 2015); *accord Halebian v. Berv*, 590 F.3d 195, 204 (2d Cir. 2009), *abrogated on other grounds by Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229 (2d Cir. 2015). Although the district court did not address this argument, this Court may affirm for any reason supported by the record. *See, e.g.*, *Beijing Neu Cloud*, 110 F.4th at 113.

Rule 23.1 "requires that the plaintiff in a derivative action demonstrate possession of an ownership interest in the company it seeks to represent that is

contemporaneous with the conduct for which it seeks recovery." *Facebook*, 797 F.3d at 157; *see* Fed. R. Civ. 23.1 (requiring that complaint be verified and allege, among other things, that the plaintiff was "a shareholder or member at the time of the transaction complained of"); *Druck*, 290 Fed. App'x at 444 ("[A]s under Cayman law …, a plaintiff may not assert a derivative claim under New York law where it sold its shares before initiating suit.") (internal citation omitted). NexPoint, however, concedes just that. *See* A9512.

Further, NexPoint cannot assert derivative claims on behalf of its subsidiary and the current holder of the Note, NHF. Parent companies may not "proactively pierce the corporate veil" by "assert[ing] the legal rights belonging to [their] subsidiary," *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 204-05 (W.D.N.Y. 2020), because "the mere fact that a company owns … another does not give it an independent basis to bring suit on the other's behalf," *Phoenix Light SF Ltd. v. U.S. Bank Nat. Ass'n*, 2015 WL 2359358, *3 (S.D.N.Y. May 18, 2015); *see also Alexander & Alexander of New York, Inc. v. Fritzen*, 114 A.D.2d 814, 815 (1st Dep't 1985) ("[O]ne corporation will generally not have legal standing to exercise the rights of other associated corporations."), *aff'd*, 68 N.Y.2d 968 (1986). NHF's claims are also barred because the allegations of wrongdoing predate its acquisition of the Note. *See Facebook*, 797 F.3d at 157.

### B. NexPoint Has No Direct Breach of Fiduciary Duty Claim Under Either Cayman Or New York Law

Notwithstanding that it chose to premise its claims on purported harm to Acis 6, NexPoint maintains (Br. 22-41) that it was directly injured because ACM and Brigade supposedly owed fiduciary duties directly to NexPoint and breached them. As explained above, NexPoint's claims are derivative claims belonging to Acis 6 under Cayman law, regardless of the "direct claim" label NexPoint attaches to them. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[L]egal conclusions" need not be "accept[ed] as true."); *Kobin v. Goodman*, 222 N.Y.S.2d 744, 746 (N.Y. Sup. Ct. 1961) ("[T]he mere labeling of a complaint as either a personal or individual one does not convert one category of action into the other. … [A] complaint dressed in derivative language does not conceal its personal nature."). But even if NexPoint's claims were properly considered direct, not derivative, they still fail as a matter of law because NexPoint has not alleged that ACM or Brigade owed it any relevant fiduciary duties, much less that either breached those duties. *Funicular Funds, LP v. Pioneer Merger Corp.*, 700 F. Supp. 3d 49, 59 n.7 (S.D.N.Y. 2023) ("[A]n argument that a defendant did not owe a duty to the plaintiff is merely an argument that one of the elements of the cause of action, breach of fiduciary duty, is not satisfied.").

Both Cayman and New York law require that a party seeking to assert a claim for breach of fiduciary duty adequately plead the existence of a fiduciary duty. *See*

34

*Stinner v. Epstein*, 162 A.D.3d 819, 820 (2d Dep't 2018) (New York law); *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 500 (S.D.N.Y. 2011) (citing *Boardman v. Phipps,* [1967] 2 A[1]C 46, 47F (U.K.)) (same under Cayman law). None of NexPoint's various fiduciary-duty theories has any merit.

### 1.    ACM Is Not A Co- Or Shadow Trustee Of Any Trust

NexPoint's trust-based argument (Br. 24-29, 52-53) fails both because the Indenture executed between U.S. Bank and Acis 6 did not form a trust and, even if it had, ACM would not owe fiduciary duties to noteholders like NexPoint as either a "co-trustee" under New York law or a "shadow trustee" or "shadow director" under Cayman law.

*First*, the Indenture did not create a common law trust. The New York choice-of-law clause governs whether it created a trust. *See, e.g.*, *In re Chappell*, 25 Misc. 3d 704, 706-07 (Sur. Ct. 2009) (applying instrument's choice-of-law provision to determine trust-related issues). As the district court correctly recognized (SPA31-35), under New York law, the common law of trusts and accompanying fiduciary duties are largely inapplicable to commercial indenture trusts. Thus, unlike a common law trustee whose duties are "imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Meckel v. Cont'l Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985); *see AG Cap. Funding Partners, L.P. v. State*

*Street Bank & Trust Co.*, 11 N.Y.3d 146, 156 (2008) ("The trustee under a corporate indenture … has his rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement.") (internal quotation marks omitted); *accord Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011) (Sullivan, J.).  The substance of the Indenture creates a commercial security and debtor-creditor relationship, not a fiduciary relationship; common law trust principles do not apply.  This is particularly true where, as here, the governing documents are clear that the parties did *not* intend to create a pre-Event of Default fiduciary relationship between the trustee and the noteholders.  *See NexPoint*, 620 F. Supp. 3d at 47-48; A1297 ("[T]the Portfolio Manager … will not have a fiduciary relationship with any investor … in the Notes.").  NexPoint's reliance (Br. 27-28) on *common law* rather than *indenture trust* cases is therefore misplaced.  *See Matter of Will of Rubin*, 540 N.Y.S.2d 944, 947 (N.Y. Sur. Ct. 1989) (examining common-law fiduciary trustees when interpreting a will); 106 N.Y. Jur. 2d Trusts § 352 (citing *Rubin*); Restatement (Second) of Trusts § 185(c), (e) (1959) (describing duties of advisors to common-law fiduciary trustees); J.R. Kemper, *Construction and Operation of Will or Trust Provision Appointing Advisors to Trustee or Executor*, 56 A.L.R.3d 1249 § 10 (1974) (same).

The Indenture is also clear that the parties did *not* intend to create a fiduciary duty running from ACM to NexPoint, whether by virtue of ACM's supposed status

as a "co-trustee" or otherwise. NexPoint does not contend that the Indenture expressly names ACM as a co-trustee; rather, it asserts (Br. 27) that through ACM's actions, it is effectively operating as one based on its actions in controlling and managing the fund. These conclusory allegations do not establish the "higher level of trust," *Oddo*, 19 N.Y.3d at 593, that New York law requires to create a fiduciary relationship in the CLO context, *In re Zohar III, Corp.,* 2021 WL 3124298, *14-15 (Bankr. D. Del. July 23, 2021) (applying New York law).

Further, a "trust may emerge by implication 'from the acts or words of the person creating it,'" only "so long as the intent to create such an implied trust arises as a necessary inference from unequivocal evidence." *Agudas Chasidei Chabad of U.S. v. Gourary*, 833 F.2d 431, 434 (2d Cir. 1987) (quoting *Wadd v. Hazelton,* 137 N.Y. 215, 219 (1893)). "Stated another way, to constitute a trust there must be either an 'explicit declaration of trust, or circumstances which show beyond reasonable doubt that a trust was intended to be created.'" *Id.* (quoting *Beaver v. Beaver*, 117 N.Y. 421, 428 (1889)). Both the Indenture and the PMA, however, *disclaim* any implied fiduciary obligations to NexPoint, precluding the existence of a trust, as either expressly stated or implicitly intended, as a matter of law. *See* A775 (§6.1(a)) (the Trustee owes "no implied covenants"); A992 (§3(c)) (ACM owes no "duties [not] expressly specified" in the Indenture or PMA, and owes "no implicit obligations of any kind"); A1023 (§31) (noteholders are not third-party beneficiaries

37

of the PMA). NexPoint has not even alleged that it had either a "contractual relationship" or "direct dealings" with ACM, as required under New York law. *Oddo*, 19 N.Y.3d at 594; *see Nam Tai Elecs., Inc. v. UBS PaineWebber Inc.*, 46 A.D.3d 486, 487 (1st Dep't 2007) (noting that third party's contract with debtor does not create "a fiduciary relationship" between third party and creditor).

For the same reason, NexPoint's argument (Br. 51-52) that the Indenture created a trust and corresponding fiduciary duty under Cayman law also fails. *See* A6140-41; *accord* A5920-21 (¶11) (Cayman law requires satisfying "certainty of intention to create a trust"). The district court correctly ruled that the governing documents do not reflect an intent to form a trustee-beneficiary relationship between ACM and NexPoint. SPA34-35. NexPoint fails to engage with the district court's conclusion at all, instead acknowledging (Br. 52) that its intention analysis is "a bit less straightforward" and then stating (Br. 52), without further explanation, that the Indenture "readily demonstrate[s] the parties' intention" to form a trust. Such generalities are inadequate to preserve the argument for review. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues

38

adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).[9]

Nor is NexPoint correct (Br. 52-53) that ACM owes it a fiduciary duty by virtue of ACM's purported status as a "shadow" or "*de facto*" director of Acis 6. NexPoint failed to adequately plead facts supporting that Cayman law would recognize ACM as a *de facto* or shadow director. *See* A6145 (¶41) (party alleging shadow or *de facto* director status ordinarily has the burden of proof, which typically requires "very detailed evidence of control over" and "an established pattern of instructions to the named directors"); A6145 (¶44) (noting NexPoint's expert agreed that, under Cayman law, it is insufficient to show that the purported shadow director was involved in management that could be performed by someone below board level); A6147 (¶50) (under Cayman law, professional advisers who perform role pursuant to services agreement would not, without more, assume fiduciary obligations). And even if Cayman law would recognize ACM as a shadow or *de facto* director, any duties would likewise run to Acis 6, not NexPoint. A6148-49 (¶¶53-55).

---

[9] The same is true of NexPoint's argument, raised for the first time on appeal in a footnote (Br. 52 n.77), that ACM would be an implied or constructive trustee of an implied or constructive Cayman trust.

*Second*, even if a trust had been created, NexPoint's claims would still fail. For ACM to be vested with "co-trustee" authority, there must be an existing trustee that delegated some of its own fiduciary duties to ACM. *See* Restatement (Third) of Trusts § 80, cmt. g (2007) ("[A]n agent [of the trustee] assumes a fiduciary role" if it "accept[s] the delegation of a trust function from a trustee"). U.S. Bank—the existing trustee (A664)—could not have delegated the requisite fiduciary duty because U.S. Bank itself does *not* have such duties. As the district court ruled in the Original Lawsuit and reiterated in this case, U.S. Bank owes no duties to noteholders like NexPoint absent the continuation of an "Event of Default," as specified in the Indenture. *NexPoint*, 620 F. Supp. 3d at 47-48; *see* A761-62 (§5.1) (defining Event of Default); SPA33 n.21 (noting that NexPoint was asserting its "creative 'common law co-trustee' argument only after the Court's previous holding … that the NexPoint Parties cannot sue the *actual* trustee for breach of fiduciary duty under the terms of the Indenture")) (emphasis in original). Because NexPoint admits there has been no Event of Default (A9484 (¶246)), there are no actionable fiduciary duties that U.S. Bank could have delegated to ACM as a "co-trustee."

*Finally*, even if the Indenture did create a common law trust as NexPoint alleges, its claims still would be derivative because they assert harm to a New York trust. *See Druck*, 290 Fed. App'x at 444 ("Druck alleges only that defendants' breach of fiduciary duty injured the Macro Fund, thus causing a decline in share

40

value, its claim is derivative, and one Druck lacks standing to assert under either Cayman or New York law."); *Velez v. Feinstein,* 87 A.D.2d 309, 314 (1st Dep't 1982) (noting that trust claims are, "properly speaking, [claims] of the trustees"). Because NexPoint does not argue (Br. 22-42) that it can satisfy any of the procedural or substantive requirements for a derivative suit under New York law, and because, as explained (*see supra*, at 40), the Trustee is barred from bringing suit absent an event of default, NexPoint's New York derivative claims fail.

### 2. The "Nature Of The Relationship" Between ACM And NexPoint Does Not Create Any Fiduciary Duties

NexPoint also wrongly asserts (Br. 29-35) the existence of a fiduciary duty based on the nature of the relationship between NexPoint and ACM. Contrary to NexPoint's suggestion, but as the district court rightly concluded (SPA35-36), New York law does *not* recognize a direct fiduciary relationship between investment advisers like ACM and investors like NexPoint. Indeed, the New York Court of Appeals has held that "collateral managers appointed to oversee the assets of" a fund "d[o] not owe a fiduciary duty" to noteholders. *Oddo*, 19 N.Y.3d at 587; *id.* at 593 (because a "debtor and creditor have no special relationship of confidence and trust" and because their relationship is largely controlled by contract, "there is generally no fiduciary obligation in a contractual arm's length relationship between a debtor

41

and a note-holding creditor" (internal quotation marks omitted)). Where, as here,[10] a party admits that its notes were a "form of debt," it is not owed fiduciary duties by managers, whose duties are limited to the funds. *Id.* at 592-94. This result follows the general principle of New York law that where the parties "do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *Id.* at 593 (cleaned up). This is particularly true here, where the parties carefully detailed in the PMA the duties ACM owed Acis 6, but specifically barred noteholders like NexPoint from pursuing claims against ACM. A990 (§2); A1004-05 (§§10, 11); A1023 (§31). The district court thus correctly declined to "fashion the stricter [fiduciary] duty for them" where they did "not create their own relationship of higher trust." *Oddo*, 19 N.Y.3d at 593.

In arguing otherwise, NexPoint relies heavily (Br. 30-32) on two pre-*Oddo* cases as establishing a fiduciary relationship between investment advisers and investors. *See Schneider v. Lazard Freres & Co.*, 159 A.D.2d 291, 296-97 (1st Dep't 1990); *Metro. West Asset Mgmt., LLC v. Magnus Funding, Ltd.*, 2004 WL 1444868, *10 (S.D.N.Y. June 25, 2004). *Metro. West*, which itself relied on *Schneider*,

---

[10] *See* A9448 (¶54) ("The subordinated notes are essentially equity" (citing a tax provision in the Indenture)); SPA28 n.17 (noting that did not plead more than the Note was "essentially equity").

42

concluded that a principal's advisor could owe duties directly to investors, provided that, *first*, the principal also owed the investors fiduciary duties and, *second*, the advisor assisted the principal in advising those investors. *See id*. at *10 (the manager "owed a [fiduciary] duty to plaintiff" because it "was hired by the Issuers, who had a fiduciary relationship with plaintiff"); *accord Schneider*, 159 A.D.2d at 296-97. Neither prerequisite is alleged to exist here. NexPoint does not allege that Acis 6 owed a fiduciary duty to or advised NexPoint at all, let alone with ACM's assistance. *See* A2555 (¶51); A6148 (¶¶53-55) (explaining that, under Cayman law, Acis 6 owes no fiduciary duties to shareholders or creditors); A1297 ("None of the Co-Issuers is providing investment …advice …and will not have a fiduciary relationship with any investor"). In any event, the *Oddo* trial court rejected a similar argument raised by the noteholders. *See Oddo Asset Mgmt. v. Barclays Bank PLC*, 36 Misc. 3d 1205(A), 954 N.Y.S.2d 760, 760 (N.Y. Sup. Ct. 2010), *aff'd*, 84 A.D.3d 692 (1st Dep't 2011), *aff'd*, 19 N.Y.3d 584 (2012) (distinguishing *Metro. West* and *Schneider*).

Nor is NexPoint correct to argue (Br. 30-31 & n.50) that the PMA and the Offering Circular create a fiduciary duty because they provide that ACM might have "liability" for bad-faith omissions, gross negligence, and willful misconduct. Neither document provides that ACM is liable *to noteholders* for any willful misconduct. *See* A1005 (§11(a)(i)) ("[T]he Portfolio Manager shall be liable (i) by

reason of acts or omissions constituting bad faith, willful misconduct, gross negligence, or reckless disregard"); A1347 (similar). Rather, any duties ACM owes under the PMA run to the *Issuer*, not noteholders, who are neither parties to nor third-party beneficiaries of the PMA. *See* A990, A1004, A1023 (§§2, 10, 31). Similarly, the Offering Circular expressly provides that ACM owes duties only to *Acis 6*, A1326, not noteholders, A1297-98. But even if either document created a duty not to act in bad faith towards noteholders, that still would not establish a fiduciary relationship under New York law. *See, e.g.*, *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 618 (S.D.N.Y. 2010) (allegations that a party breached a duty not to "act[] in bad faith" were "insufficient to plead a fiduciary relationship").

NexPoint also contends (Br. 32-34) that its notes have characteristics of equity, thus vesting them with shareholder-type rights, including a fiduciary relationship with ACM. But *Oddo* confirmed the opposite: debtors and their portfolio managers generally do *not* owe fiduciary duties to note-holding creditors. 19 N.Y.3d at 593. This is true even if, as NexPoint asserts, the notes in question have "some equity-like features." *Id.*; *see, e.g.*, *Howe*, 783 F. Supp. 2d at 476 (rejecting argument that CDO fund noteholders with the "residual interest in the

income generated by" the fund "are the [fund's] 'true equity owners'").[11]  And, even if the Note could still somehow be characterized as equity, ACM would still not owe it fiduciary duties because ACM has neither a contractual relationship nor direct dealings with NexPoint.  *Oddo*, 19 N.Y.3d at 594 (treating absence of both as "additional reasons" negating fiduciary duty); *id.* at 594 n.11 (noting the "notes and corresponding offering documents explicitly stated that 'in connection with the purchase of the mezzanine notes,' the collateral manager was not 'acting as a fiduciary or financial or investment adviser for the holder'").

Finally, NexPoint wrongly argues (Br. 34-35) that the IAA somehow demonstrates the existence of a New York common law duty running from investment advisers to non-client investors.  The New York Court of Appeals found no such duty in *Oddo*; nor did the Supreme Court in *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963).  NexPoint's suggestion that IAA § 206(4)'s antifraud restrictions, 15 U.S.C. § 80b-6(4), which do cover non-clients, *see* 72 Fed. Reg. 44,756, 44,757 (Aug. 9, 2007); *infra*, Part II.B.3, recognizes a pre-existing common law fiduciary duty between investment advisers and non-client investors, is wrong.  Rule 206(4)-(8) itself rebuts NexPoint's argument by specifying that

---

[11]   NexPoint's reliance (Br. 33-34) on tax court cases, which applied a multi-step analysis to determine whether funds were debt or equity for federal income tax purposes, is thus misplaced.  *See PepsiCo Puerto Rico, Inc. v. Comm'r*, 104 T.C.M. (CCH) 322 (T.C. 2012).

fiduciary duty claims under that provision must be grounded in "other law." *Id.* at 44,760; *see id.* at 44,757 ("Rule 206(4)-8 does not create … a fiduciary duty to investors … in a pooled investment vehicle not otherwise imposed by law"). Because New York common law does not recognize the duty NexPoint claims exists, *see supra*, at II.B.2, there is nothing for Rule 206(4)-(8) to codify.

### 3. The Investment Advisers Act Does Not Create A Fiduciary Relationship Between ACM And NexPoint

NexPoint fares no better in arguing (Br. 36) that violations of the IAA, while not enforceable via a federal private right of action, are nevertheless "actionable under New York law." The Supreme Court has interpreted section 206 of the IAA as imposing both antifraud provisions and federal fiduciary duties on investment advisers. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 16, 17 (1979).[12] Those fiduciary duties, however, run only to the advisor's *clients* and do not run to non-clients, including investors in an investment-fund client. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1103 (5th Cir. 2024) ("The Advisers Act recognizes a fiduciary duty between an investment adviser and his

---

[12] NexPoint mischaracterizes (Br. 39) the Supreme Court's decisions in *Capital Gains* and *TAMA* as holding that the antifraud provision of section 206(4) extends the advisers' fiduciary duties to investors. They did no such thing; both cases only held that sections 206(1)-(3), which do not run to non-clients, create fiduciary duties. *See Cap. Gains*, 375 U.S. at 191-92 (section 206(2)'s language "recogni[zes] … fiduciary" duties); *TAMA*, 444 U.S. at 16-17 (quoting sections 206(1)-(3) and holding that these provisions "establish federal fiduciary standards" applicable to "any client or prospective client").

*client*.  In the private fund context, that *client is the fund itself*—not the fund's

investors.") (emphasis added); *Goldstein v. S.E.C.*, 451 F.3d 873, 881 (D.C. Cir.

2006) ("The adviser owes fiduciary duties [under section 206] only *to the fund*, not

to the fund's investors.") (emphasis added); *see also Cap. Gains*, 375 U.S. at 194

(describing section 206's "affirmative dut[ies]" and "affirmative obligation[s]" to

"*clients*") (emphasis added; internal quotation marks omitted); *XY Plan. Network,*

*LLC v. SEC*, 963 F.3d 244, 248 (2d Cir. 2020) ("Investment advisers are regulated

under the [IAA] and owe a fiduciary duty to their *clients*.") (emphasis added).  As

the D.C. Circuit observed in *Goldstein*, any other rule would "inevitably" cause

"conflicts of interest" between advisers' duties to the fund and its investors because

the best interests of investors often will not align with those of the fund as a whole.

451 F.3d at 881.[13]

 Some New York courts have recognized that, when a "statute [is] designed to

protect a particular class of persons against a particular type of harm," courts may

---

[13] NexPoint wrongly asserts (Br. 39) that the district court relied on *Goldstein* to
conclude that section 206 applies only when the plaintiff is a direct client.  The
district court relied on, among other cases, the Supreme Court's decision in *Capital
Gains*, not *Goldstein*, in so ruling.  SPA36-37.  In any event, NexPoint's discussion
of *Goldstein* ignores that the D.C. Circuit rejected NexPoint's exact argument there.
The court held that section 206(4) only permitted "investors … [to] sustain an action
for *fraud* against the fund's adviser" and rejected the SEC's contrary argument that
it "created" fiduciary duties that "extend to the relationship between an adviser and
the [investors] of a hedge fund."  451 F.3d at 881 n.6 (emphasis added).

interpret the statute as "creating an additional standard of care." *Dance v. Town of Southampton*, 95 A.D.2d 442, 445 (2d Dep't 1983) (analyzing negligence per se). But NexPoint is wrong to assert (Br. 36-38) that federal fiduciary duties owed under section 206 of the IAA can be used to expand common law fiduciary duties under state law here because, as explained above, any fiduciary duties owed by ACM as the investment adviser under the IAA run to ACM's client, which here is Acis 6, *not* its noteholders like NexPoint. *See, e.g.*, A990 (§2) ("[T]he Issuer hereby engages and retains the Portfolio Manager to provide … investment advisory and related services …."); A1004 (§10) (ACM consenting to enforcement of the PMA "by the Issuer and by the Trustee on behalf of the Holders"); A1023-24 (§§31-32) (expressly excluding noteholders from being third-party beneficiaries to the PMA absent specified circumstances not present here); *see also* A1297 (Offering Circular) ("[Neither t]he Portfolio Manager, … nor any of [its] affiliates is providing investment, accounting, tax or legal advice in respect of the Notes and will not have a fiduciary relationship with any investor or prospective investor in the Notes.").

Since neither Section 206 nor Rule 206(4)-8, *see supra* at 45-48, expands the reach of the federal fiduciary duty standard to encompass NexPoint, there is no basis for either to expand New York common law. *See, e.g.*, *Fazi v. United States*, 935 F.2d 535, 540 (2d Cir. 1991) (federal regulations not intended to protect plaintiff were not "a basis for liability under New York law"); *Lopes v. Rostad*, 45 N.Y.2d

617, 623 (1978) (breach of statutory duty only protects those who come "within the protective orbit of the statute").[14]

Other courts agree that the IAA, which lacks a private right of action, *see, e.g.*, *NexPoint*, 80 F.4th at 418 (citing *TAMA*, 444 U.S. at 24), may not simply be grafted into common law. *See Belmont v. MB Inv. Partners*, 708 F.3d 470, 502 (3d Cir. 2013) (noting that Section 206 "confers no … private cause[] of action," which "ought to call into serious question whether a limitation in federal law can be circumvented simply by hanging a label 'state law' on an otherwise forbidden federal claim."); *see also Steadman v. SEC*, 603 F.2d 1126, 1142 (5th Cir. 1979) ("We do not think this overall purpose [of the Advisers Act] is a warrant to read ... the [antifraud] sections ... as the vehicle to reach all breaches of fiduciary trust.").[15] That some New York courts have recognized the incorporation of *other* tort standards into state law does not support the recognition of such a claim here. *See Feldman v. CSX Transp., Inc.*, 31 A.D.3d 698, 703-04 (2d Dep't 2006) (addressing

---

[14]    The conflicts of interest that *Goldstein* identified also preclude recognizing a common law fiduciary duty to non-client investors, at least under New York law. *See HF Mgmt. Servs. LLC v. Pistone*, 34 A.D.3d 82, 86 (1st Dep't 2006) (declining to recognize a "fiduciary obligation that would … create a conflict [of interest]").

[15]    Contrary to NexPoint's assertion (Br. 38), *Belmont* did not "hold" that state fiduciary duty claims are a recognized vehicle for enforcing violations of the IAA. Rather, the Third Circuit acknowledged there that while some courts engaged in the "questionable" practice of looking to federal law, that practice circumvents the clear prohibition on no private rights of action. *Belmont*, 708 F.3d at 502.

49

federal railroad regulations); *Wolfson v. Glass*, 301 A.D.2d 843, 844-45 (3d Dep't 2003) (analyzing Massachusetts skiing act) (both cited in Br. 37).[16]

NexPoint's out-of-state cases (Br. 38-39) have no relevance to whether IAA violations can be bootstrapped into New York law. Further, none of the cited cases extended IAA fiduciary duties to *non-clients*. *See Douglass v. Beakley*, 900 F. Supp. 2d 736, 745, 751-52 & n.16 (N.D. Tex. 2012) (IAA standard of care applied to breach of fiduciary duty claim because plaintiff pled that defendants "rendered investment advice to the [plaintiffs]"); *SEC v. Markusen*, 143 F. Supp. 3d 877, 890-91 (D. Minn. 2015) (defendant "was a fiduciary to the Funds"); *Goldenson v. Steffens*, 2014 WL 12788001, *86-88 (D. Me. Mar. 7, 2014) (IAA standard of care could trigger common law fiduciary duty because defendants were "investment advisers for the [plaintiffs]"); *State ex rel. Udall v. Colonial Penn Ins. Co.*, 812 P.2d 777, 779, 784-85 (N.M. 1991) ("professional services contract … whereby [defendant] would advise [plaintiff]" triggered IAA fiduciary duties).[17]

---

[16] NexPoint incorrectly asserts (Br. 37) that *Wolfson* held that the federal American with Disabilities Act establishes a standard of care under New York law. It did not. As noted above, the case addressed a Massachusetts ski statute.

[17] NexPoint's reliance on *Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783 (S.D.N.Y. 1997), is also misplaced because that case concerned an Investment Companies Act "private right of action," *id.* at 797. There is no private right of action under section 206 of the IAA. *See, e.g.*, *NexPoint*, 80 F.4th at 417 (citing *TAMA*, 444 U.S. at 14).

50

### 4. Brigade Did Not Owe, Much Less Breach, Any Fiduciary Duty to NexPoint

All of the above arguments are equally applicable to Brigade, but NexPoint's fiduciary duty claim is even weaker with respect to Brigade, which was one step farther removed from Acis 6's relationship with ACM. NexPoint's few passing references (Br. 15-16, 53) to Brigade all come in the form of group pleading and do not come close to establishing any direct relationship—or even any direct communication—between NexPoint and Brigade. This is insufficient to establish a fiduciary relationship as a matter of law. *See Oddo*, 19 N.Y.3d at 594 (no fiduciary relationship between investor and collateral manager where there was "no contractual relationship" and no "direct communication[]" between them). NexPoint's fiduciary duty claim additionally fails as to Brigade because NexPoint's group pleading lacks "particularized facts" establishing what actions Brigade individually took that breached its purported fiduciary duties. *Madison Sullivan Partners LLC v. PMG Sullivan St., LLC*, 173 A.D.3d 437, 438 (1st Dep't 2019); *In re Wonderwork, Inc.*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. 2020) ("[A] plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim." (internal quotation marks omitted)).[18]

---

[18] To the extent NexPoint's claim against Brigade is for aiding and abetting an alleged breach of fiduciary duty by ACM, that claim fails because (1) there was no breach (*see supra*, Part II.A-B) and (2) NexPoint has barely alleged anything about Brigade, much less the requisite "knowledge and substantial assistance prongs" to

### C. Certification Is Not Appropriate

Faced with clear New York precedent showing its claims fail as a matter of law, NexPoint seeks to prolong this already protracted litigation by asking (Br. 41-45) this Court to certify three questions to the New York Court of Appeals. Because NexPoint's claims are properly considered derivative under Cayman law, the Court need not reach NexPoint's arguments regarding New York law, and by extension, its certification request. *See supra*, at II.A-B; *see also Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 100 (2d Cir. 2000) (declining to certify question when the court could "affirm the judgment of the district court" on alternative grounds). In any event, none of NexPoint's three proposed questions—regarding NexPoint's co-trustee theory, creditor-as-shareholder theory, and IAA-common-law theory—warrants certification.

In considering whether to ask a state court to resolve supposedly unsettled legal questions, this Court considers: "(1) the absence of authoritative state court decisions; (2) the importance of the issue to the state, and (3) the capacity of certification to resolve the litigation." *Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 214-15 (2d Cir. 2021) (internal quotation marks omitted). Certification, however, is

---

support an aiding and abetting claim. *See, e.g.*, *Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 514, 516 (S.D.N.Y. 2012) ("[U]se[ of] the defendant's regular business operation does not rise to the level of substantial assistance."); *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014) (noting that constructive knowledge of a breach is insufficient under New York law).

inappropriate where "sufficient precedents exist for [this Court] to" predict how the New York Court of Appeals would rule, *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005), or where any purportedly "unsettled issue of New York law is intertwined with federal questions," *Yoon v. Fordham Univ. Fac. & Admin. Ret. Plan*, 263 F.3d 196, 203 (2d Cir. 2001).

*First*, as discussed above, NexPoint's proposed questions have already been answered by various New York courts or may confidently be answered by existing precedent. *See, e.g.*, *AG Cap.*, 11 N.Y.3d at 156 (issue of co-trustee of common law trust); *Oddo*, 19 N.Y.3d at 592-93 (issue of whether noteholder status creates fiduciary relationship); *Lopes*, 45 N.Y.2d 617, 623 (1978) (issue of incorporating federal regulation); *see also supra*, at II.B. These cases establish that NexPoint's position as a junior noteholder and the clear language in the Indenture, Note, and PMA properly circumscribe its relationship with an arms-length manager and NexPoint's ability to sue on behalf of Acis 6 regarding an investment arrangement into which NexPoint knowingly entered. Even if there were not any Court of Appeals cases directly on point (there are), contrary to NexPoint's assertion (Br. 43), the absence of any controlling case law would not favor certification given that the substantial existing New York case law on these issues provide sufficient guidance to permit this Court to confidently predict how the Court of Appeals would rule. *See, e.g.*, *DiBella*, 403 F.3d at 111; *see also supra*, at II.B.

53

*Second*, NexPoint's questions do not involve important issues of New York law and public policy. At its core, this is a dispute between non-New York residents over a Cayman entity and governed by Cayman law. The New York implications are especially diminished regarding NexPoint's IAA-incorporation theory, which directly involves federal fiduciary duty standards. *See Yoon*, 263 F.3d at 203. This Court is the best court to resolve the questions presented in this appeal.

*Third*, as explained further throughout, *see supra*, at II.A-B; *infra*, at III certifying NexPoint's proposed questions will not fully resolve this appeal.

*Finally*, certifying NexPoint's proposed questions will add undue expense and delay. NexPoint has made clear its tactic of stalling litigation to prevent distribution of the notes' proceeds, bringing (via affiliates) numerous meritless cases across the country; it has already lost one appeal. Certification, already unwarranted for the reasons stated above, is further inappropriate here because of the "the impact that costs and delays associated with certification will have on the litigants." *See 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 224 (2d Cir. 2021). NexPoint should not be permitted to abuse the certification process to prolong this litigation.

## III. NEXPOINT'S CLAIMS FAIL AS A MATTER OF LAW FOR ADDITIONAL REASONS

In addition to ruling that NexPoint lacked standing to bring its non-tortious interference claims (*see supra*, II.A-B), the district court ruled that its aiding and abetting, unjust enrichment, conversion and negligence claims failed as a matter of

54

law for other reasons. SPA39-43. NexPoint concedes (Br. 13) that the district court properly dismissed its unjust enrichment claim. It also concedes (Br. 53) that its aiding and abetting claim rises and falls with its principal liability claims. And it does not address its declaratory judgment claim. But it wrongly resists (Br. 53-56) dismissal of the conversion and negligence claims.

The conversion and negligence claims (as well as the fiduciary duty claim) fail as duplicative of NexPoint's now-abandoned breach of contract claim. *See IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 290 (2023) ("[W]here plaintiff is essentially seeking enforcement of the bargain, the action should proceed under a contract theory." (internal quotation marks omitted)). All the harm NexPoint alleges flows from conduct that NexPoint contends violates the PMA and Indenture. *See supra*, at II.A. NexPoint wrongly maintains (Br. 54-56) that its claims are not duplicative because of the independent duty rule. *See, e.g.*, *IKB*, 40 N.Y.3d at 304 ("A simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.") (cleaned up). For the reasons stated above, NexPoint failed to allege any independent duty. *See supra*, at II.B. Because the "sole basis" of these tort claims "is [ACM's] alleged breach of its contractual obligations," the district court properly dismissed them as duplicative. *99 Wall Dev., Inc. v. Consigli & Assocs., LLC*, 238 A.D.3d 502, 503 (1st Dep't 2025) (affirming dismissal of negligence claim as duplicative of contract claim); *Johnson*

*v. Cestone*, 162 A.D.3d 526, 527 (1st Dep't 2018) (conversion); *William Kaufman Org. v Graham & James LLP*, 269 A.D.2d 171, 173 (1st Dep't 2000) (fiduciary duty).

With respect to Brigade, the negligence claim additionally fails for the independent reason that NexPoint does not (and cannot) plead that Brigade owed NexPoint any duties at all. To survive dismissal, a plaintiff must show more than a general duty owed to a potentially limitless class of people, but rather a "cognizable duty" owed to the plaintiff. *Abdulaziz v. McKinsey & Co., Inc.*, 2022 WL 2444925, *2 (2d Cir. July 5, 2022) (summary order) (citing *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001)). Brigade is not a party to either the Indenture or the PMA so these agreements could not create obligations as between Brigade and NexPoint. Nor does any duty exist under the common law where, as here, NexPoint fails to allege a single interaction between Brigade and NexPoint. *See Houbigant, Inc. v. Deloitte & Touche LLP*, 303 A.D.2d 92, 94 (1st Dep't 2003) (dismissing negligence claim absent "'any word or action on the part of [the defendant] directed to plaintiffs,' so as to 'link' the [defendant] to the nonclient.") (quoting *Credit All. Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 554 (1985)).

## **CONCLUSION**

The judgment should be affirmed.

56

Dated:  July 18, 2025

 */s/Jason C. Hegt*_____

Jason C. Hegt

**LATHAM & WATKINS LLP**

1271 Avenue of the Americas

New York, New York 10020

(212) 906-1200

jason.hegt@lw.com


*Attorneys for Appellee*

*Brigade Capital Management, LP*

___*/s/ William B. Adams*___

Jonathan E. Pickhardt

William B. Adams

Blair A. Adams

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

295 Fifth Avenue

New York, New York 10016

(212) 849-7000

jonpickhardt@quinnemanuel.com

williamadams@quinnemanuel.com

blairadams@quinnemanuel.com


*Attorneys for Appellees Joshua N. Terry and Acis Capital Management*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,679 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch and Times New Roman.

Dated:  July 18, 2025                     */s/ William B. Adams*
                                        William B. Adams

## **CERTIFICATE OF SERVICE**

I, William B. Adams, hereby certify that on this 18th day of July, 2025, I electronically filed the above document with the Clerk of the Court of the United States Court of Appeals for the Second Circuit by using ACMS .  I certify that all participants in the case are registered ACMS users and that service will be accomplished by ACMS.

Dated:  July 18, 2025                          */s/ William B. Adams*
                                                        William B. Adams